Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS, INC.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                United States Bankruptcy Court

13                One Bowling Green

14                New York, NY   10004

15

16                December 5, 2017

17                9:02 AM

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   JONATHAN

1    HEARING re RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    HOLWELL SHUSTER & GOLDBERG LLP

4         RMBS Trustees

5         750 Seventh Avenue, 26th Floor

6         New York, NY 10019

7

8    BY:  NEIL R. LIEBERMAN

9         DWIGHT A. HEALY

10        DANIEL P. GOLDBERG

11        MICHAEL S. SHUSTER

12

13   ROLLIN BRASWELL FISHER LLC

14        Attorneys for the Debtor

15        8350 E. Crescent Parkway, Suite 100

16        Greenwood Village, CO 80111

17

18   BY:  MARITZA DOMINGUEZ-BRASWELL

19        MICHAEL ROLLIN

20

21

22

23

24

25

1    WILLKIE FARR & GALLAGHER LLP

2        Attorneys for the Debtor

3        787 Seventh Avenue

4        New York, NY 10019

5

6    BY:  TODD G. COSENZA

7        BENJAMIN P. MCCALLEN

8        JOSEPH DAVIS

9

10    CHARLES H. GRICE, Witness

11

12    ALSO PRESENT TELEPHONICALLY:

13

14    THOMAS ALTON

15    AMANDA DARWIN

16    DENNIS J. DREBSKY

17    GRANT STEIN

18

19

20

21

22

23

24

25

Page 5

```
 1                    P R O C E E D I N G S
 2              THE COURT:  I'm ready when you are.
 3              MR. COSENZA:  So Mr. Davis is going to conduct the
 4    examination of --
 5              THE COURT:  Okay.
 6              MR. COSENZA:  -- Mr. Gars.
 7              THE COURT:  Okay.  Hello, Mr. Davis.
 8              MR. DAVIS:  Good morning.  How are you, Your
 9    Honor?  So we'd like to call Mr. Charles Grice --
10              THE COURT:  Very good.
11              MR. DAVIS:  -- to the stand.  And, Your Honor, I
12    have some binders and a PowerPoint.
13              THE COURT:  Okay.
14              MR. DAVIS:  I might as well hand them up.
15              THE COURT:  Sure.  So was it your intention to go
16    through to 2:00 without a lunch break and just breaks or was
17    it your intention to have a lunch break as well just so we
18    can plan?
19              MR. COSENZA:  Your Honor, we could do a short
20    lunch break.  And I think the goal would be, and we'll see
21    where we are, because these things always take longer than
22    we expect.  If possible, to get his direct finished today so
23    --
24              THE COURT:  Okay.
25              MR. COSENZA:  -- plus or minus if we can get done
```

Page 6

1    today.

2            THE COURT:  Okay.

3            MR. COSENZA:  We'd maybe take a shorter lunch

4    break, like 20 or 25 minutes or something.

5            THE COURT:  We have no plans in the afternoon, so

6    we can stay.

7            MR. COSENZA:  So maybe at like 12:00 we can

8    regroup and figure out how much --

9            THE COURT:  Sure.

10           MR. COSENZA:  -- time is left and --

11           THE COURT:  That sounds good.

12           MR. COSENZA:  -- whether we can get this done

13   today.

14           THE COURT:  Okay.

15           MR. COSENZA:  Thank you.

16           THE COURT:  Well, Mr. Grice, would you raise your

17   right hand, please?

18      (WITNESS SWORN)

19           THE COURT:  Very good.  It is warm in here.

20   Everyone is welcome to take off their jackets including you.

21           MR. GRICE:  Thank you.

22           THE COURT:  I encourage you to take off your

23   jacket if it will make you more comfortable.

24           MR. DAVIS:  Do you really?

25           MR. COSENZA:  And no one will.

Page 7

1              THE COURT:  I do, and no one will.  Mr. Davis,

2     take your jacket off.  There you go.

3              We have no control over the heat in this room,

4     okay.  This is your government at work.  Thank you for doing

5     that, Mr. Davis.

6              DIRECT EXAMINATION OF CHARLES H. GRICE

7     BY MR. DAVIS:

8     Q    Mr. Grice, would you introduce yourself to the Court,

9     please?

10    A    Yes.  My name is Charles Hamilton Grice.  I reside at

11    19 Rockledge Road, Canaan, New York up in Columbia County.

12    Q    And where do you work, Mr. Grice?

13    A    For a firm called CRI Compliance, LLC.

14    Q    What is CRI?

15    A    It's a bank consulting firm that I established in 1988

16    that helps banks with internal controls issues.

17    Q    And what is your title at CRI?

18    A    I'm the managing director but, more importantly, I'm

19    the principal and the owner of the firm.

20    Q    What's the focus of your work at CRI?

21    A    Assisting of banks, bank holding companies, thrifts

22    with what I call internal controls issues, which is a bank

23    slang term for operational efficiency and ensuring that the

24    processes inside the company are producing loans that comply

25    with the wishes of the board and senior management.

Page 8

1    Q     And how long has CRI been in operation?

2    A     Since 1988.

3    Q     About how big is CRI?  How many people work there?

4    A     This year we're 62 people.

5    Q     If I can ask you to turn to Tab 1 in the binder that I

6    think you have in front of you.  This is PA-685.

7    A     Yes, sir.

8    Q     What is this document?

9    A     This is my CV.

10   Q     Would you turn to page 3 for a moment?

11   A     Yes, sir.

12   Q     Would you walk us through your educational background?

13   A     So I received a bachelor's degree in international

14   studies from Johns Hopkins University in Baltimore.  I did a

15   year at the graduate school of Hopkins in Washington D.C.

16   called the School of Advanced International Studies looking

17   at Brazil.  I then went to the graduate program in economics

18   at the George Washington University in Washington D.C.  I

19   was a full-time employee of the Federal Reserve but was also

20   a full-time graduate student in economics.

21          From '82 to '83, I went to Brazil as a Fulbright

22   Scholar to teach and do research on the housing market in

23   Brazil and then returned to the United States and did two

24   years at the Kennedy School of Government where I received a

25   master's degree in public policy and then later received a

Page 9

1    three-year part-time fellowship from the Kellogg Foundation

2    in Battle Creek, Michigan to look at mortgage investment

3    programs around the world.

4    Q    Would you tell us a little bit more about your work as

5    a Fulbright scholar?

6    A    I went to Brazil, you know, full of vim and vigor to

7    try to study how Americans could teach the Brazilians to

8    rearrange their housing market.  They didn't have a Fannie

9    Mae or a Freddie Mac.  There was no secondary market at that

10   time.  And so I was hoping to introduce to them the benefits

11   of having a secondary market and learn that the Brazilians

12   had developed other alternatives that also worked very well.

13          And so I came back from my year in Brazil having

14   learned at least as much as I taught to the Brazilians.

15   They were living in a high inflation economy.  I was trying

16   to, in particular, understand the role that mortgages play

17   in building a middle class.  Like here in the United States.

18   that the principle form of savings for most people.  And in

19   Brazil, that mortgage market had not yet developed to a

20   place where middle class people could save, primarily

21   because of inflation.

22   Q    Has any of the coursework you've undertaken bear on the

23   opinions you're going to offer in this matter?

24   A    Oh, absolutely.  So as an undergraduate, I was studying

25   economic development and then came to increasingly focus

Page 10

1  just on mortgage activity as a kind of savings vehicle in

2  economics.  At George Washington and later the Kennedy

3  School, I started looking more at processes generally, how

4  organizations are structured, the role that policies and

5  procedures play, and then, in particular, how would you

6  evaluate a process and identify ways to improve that

7  process.

8          So the Kennedy School, in particular, I think was

9  founded primarily to assist people studying organizations

10  about how to streamline, make them more effective, more

11  efficient.

12  Q    Your resume references Johns Hopkins Credit Union.  Can

13  you tell us about your experience there?

14  A    Yeah.  That was a part-time job during the school year,

15  but it was my first encounter with a bank lobby.  My job was

16  to help customers, prospective customers complete loan

17  applications and just to understand what was being solicited

18  on the loan applications so that the underwriters inside the

19  credit union could make determinations whether to fund the

20  loan or not.

21  Q    And you mentioned on the resume that you worked at

22  Bankers Trust in 1984.  Can you tell us about that?

23  A    Yeah.  That was a summer job looking at -- my

24  particular assignment was to identify, to study and identify

25  characteristics of 600 mortgage loans that the bank wanted

Page 11

1   to sell to another bank.  And this is before securitization,

2   before we had trusts.  So at that point you would so whole

3   loan sales.  The entire pool of loans would be analyzed, and

4   I build what became the loan page, kind of a high-level

5   summary of what was inside those loan files, and got to see,

6   again, pre-securitization mortgage trading, again, three or

7   four years before the RMBS market took off.

8   Q    And what did you do at the California Bankers

9   Association?

10  A    So I got married and moved to California working for

11  the California Bankers Association, which is the trade

12  association for the 450 banks on the West Coast.  And my

13  particular job was to train the bank CEOs on how to make

14  mortgage loans that are consistent with the latest adopted

15  laws and regulations.  This is after the savings and loan

16  crisis in the Southwest, and FIRREA, the Financial

17  Institutions Reform, Recovery, and Enforcement Act had just

18  been adopted, like Dodd-Frank, and it completely changed the

19  landscape for how mortgages should be originated.

20       So my job was to train bank CEOs and work with them and

21  their teams on how to make mortgage loans that were safe and

22  sound.

23  Q    Okay.  Let's talk about CRI a little more.  Can you

24  turn to page 1 of your resume?  At the top there, it says

25  "Internal control and risk management".  Can you explain

1    what that means?

2    A    Again, "internal control" is a phrase that originally

3    comes from COSO, the Committee of Sponsoring Organizations.

4    It's this idea that a board of directors and executive

5    management need to be able to ensure that their intentions

6    are realized with respect to how loans are produced or how

7    accounts are open or whatever the process is.

8         And so the bulk of my career had been spent

9    helping financial clients improve their processes either

10   because they just want to be better or because they've been

11   specifically criticized, usually by a federal banking

12   agency, like the Federal Reserve or the FDIC.

13   Q    And a little bit farther down it says, "Advised on

14   mortgage lending, credit risk management, compliance,

15   processes".  Would you go into that in a little bit more

16   detail?

17   A    Sure.  Most of my clients from the inception have been

18   mortgage lenders.  They're principally engaged in the

19   business of mortgage lending.  You see in the first

20   paragraph, the clients include 31 of the top 50 mortgage

21   companies in the United States.

22        So my clients are people who either want to be

23   better in the way they originate mortgage loans or they're

24   specifically reacting to a government criticism or an audit

25   that found them defective or deficient in the way they did

Page 13

1    mortgage loans, either the way they advertised them, the way

2    they did the underwriting, actually made the credit

3    decision, the way they documented the credit decision,

4    perhaps, the level of assistance they provided to minority

5    applicants versus non-minority applicants or males versus

6    females.

7            So it's also involving the mortgage lending

8    process and how that process can function more effectively

9    in compliance with laws, regulations, and policy.

10   Q    And how many times have you acted as a consultant for

11   banks and mortgage companies?

12   A    So just in terms of pure consulting, about a hundred

13   engagements over the course of the thirty years where I'm

14   usually retained by legal counsel for the company because

15   they either had a criticism from the government or they want

16   me to look at things where I'm going to be criticizing what

17   may be -- I'm doing a stress test in many of these

18   exercises.  I'm trying to find deficiencies, and the mere

19   exercise of looking for those deficiencies is ideally done,

20   I think in my client's view, through attorney-client

21   privilege or attorney-client work product at least.  So it's

22   through the outside counsel that I come into the bank.

23   Q    You say in the fourth paragraph here, you mention

24   "review underwriting processes".  What does that entail?

25   A    Looking at policies and procedures, guidelines, the way

Page 14

1    people are trained, usually comparing the theory of how the

2    loan is going to be made versus the practice, the actual

3    contents of loan files.

4           So we commonly pull loan files either off of the

5    assembly line to ensure that they comply with policies and

6    procedures or guidelines or we'll do a retrospective

7    analysis, but it's a theory versus practice, comparing and

8    contrasting what the company wants to do versus what the

9    company is actually doing.

10   Q    And have you ever personally underwritten a loan?

11   A    I have.  So I'm always an outsider at these banks.

12   I've been a consultant continuously since 1988, so I can't

13   deal with applications from consumers walking in off the

14   street.  Because I'm an outsider though, I have been in five

15   different instances granted authority to make loans under

16   Regulation O, which is the law that governs -- or the

17   regulation that governs loans to officers and directors.

18          So I have no conflict of interest since I'm not

19   the -- I'm not the senior executive at the company, so I can

20   be the person -- so in about 350 instances, I'm the person

21   who has the underwriting authority to deal with the head of

22   HR or the CEO or a board member who wants to take out a 15-

23   year loan or a 30-year loan.  So I'm the in those special

24   cases, I'm the designated underwriter.

25   Q    So other than underwriting, in what other phases of a

Page 15

1    loan's life cycle do you have experience?

2    A    So there are three special emphases in my consulting

3    work.  One is the origination of that mortgage, the creation

4    of the mortgage asset, you know, dealing -- that

5    relationship between the customer who is then an applicant

6    and the loan officer and the underwriter.

7              The second instance which is functionally similar

8    but at a different stage of the life cycle is helping

9    companies purchase loans for inclusion in a securitization.

10   So the sponsor of a securitization will go out and bid on

11   pools, and a due diligence analysis is done, a re-

12   underwriting analysis is done on those loans as they're

13   considered for purchase.

14             And then the third stage is repurchase of the

15   asset.  So, tied to economic cycles and economic decline,

16   when the market falls, the volume of repurchase demands

17   increases.  And so I help companies deal with the incoming

18   repurchase demands or the breach demands.

19   Q    So do you have experience in designing repurchase

20   processes?

21   A    I do.  So in about 15 instances, my assignment has

22   included the repurchase process.  In three of them, there

23   really was no process.  It was, I guess I would say,

24   extremely informal.  And the other dozen, there already was

25   a process, but the question is was it functioning as

Page 16

1    designed.  Was it creating consistent high-quality breach

2    analyses?

3    Q    So turning back to the hundred or so consulting

4    engagements you mentioned, about how many involved business

5    process audits?

6    A    Really at some level almost all of them.  So in half of

7    my clients, the client wants to be better at a process.  The

8    process might be the way we -- we order appraisals and

9    perform appraisals on real estate mortgage loans.  Or it

10   might be how do we originate, say, second-lien mortgages so

11   it's a specific product.  And in order to do that analysis,

12   I have to understand how that process now works and then try

13   to identify ways to improve it.

14        The other half of my work is with clients who have been

15   told by the government that the process is not working.  And

16   so there I have a head start.  I've already got the

17   government saying you failed.  My presence in the company is

18   because of that failure.

19             But even in those instances where I've got an

20   indication of what the nature of the failure was, I have to

21   kind of do a ground-up analysis of my own to understand

22   exactly what I think the procedural defect is and then

23   recommend the mitigating response.

24   Q    And, specifically, what types of processes did those

25   engagements involve?

Page 17

1    A    Again, these three areas of -- of how mortgage loans

2    are made.  The most common issue in the 1990s, for example,

3    was pure discrimination on the basis of gender or race.  And

4    there was something at that point called the thin file

5    syndrome.

6            And so the government would walk into a bank and

7    notice that women and minority mortgage files were very thin

8    compared to white men like myself.  And if you looked inside

9    those files and compared the quality of assistance, you

10   found that the bank officers commonly were giving special

11   preference or benefit or special access to people they felt

12   comfortable with and not to people they did not feel

13   comfortable with.  So it was that aspect of mortgage

14   origination initially.

15           The second area generally is that due diligence

16   process.  So we're trying to help companies perform that

17   diligence in a way that gets at the true credit nature of

18   those loans and whether or not that company wants to

19   purchase them and bring them on to their books, and then

20   these repurchase analyses.

21   Q    And who typically hired you for the repurchase

22   analyses?

23   A    Typically for the repurchase stuff, these are sponsors

24   and sponsors of securitizations, so they tend to be

25   investment banks.  So they're hybrids that, you know,

Page 18

1    they're a financial holding company that has a bank inside

2    or a financial holding company that has a mortgage company

3    and a bank.

4           They tend to be less free-standing banks.  In

5    order to be a sponsor, you tend to be of some size and have

6    access to the securitization process.

7    Q    And for your other business process audits, for what

8    types of clients have you conducted those?

9    A    Well, exclusively financial institutions, but from very

10   small companies, very small mortgage companies and mortgage

11   banks to, again, the 31 of the top 50, so a very large

12   national, you know, active in all the major markets, lending

13   in 50 states.

14   Q    Have you ever opined that --

15          MR. DAVIS:  Bless you.

16          MR. GRICE:  Bless you.

17          THE COURT:  Go ahead.

18   Q    -- that an entity did not have a good process?

19   A    Oh, certainly.  So, again, just in terms of my

20   consulting engagements, about half of these are where the

21   government has told them they have a deficient process.  So

22   it's not a secret.  It's been discovered by the government

23   and now they're trying to have it fixed.

24          Among my -- my sort of healthy, if we want to talk

25   about healthy consulting clients, I've often walked in and

1    found no matter how healthy you think your process is, there

2    are areas that need drastic improvement.  So I'm a process

3    consultant, so I tend to find process deficiencies.

4            In litigation, absolutely, I've taken on

5    assignments for banks and in four instances I've withdrawn

6    from the assignment because I did not feel comfortable with

7    what I saw inside the client.  So those are examples of

8    where I've obviously found issues.

9    Q    Have you ever been retained as an expert to opine on a

10   process that you designed?

11   A    No.  I've never testified or written, act, served as an

12   expert in any capacity or try to do an evaluation of a

13   process that I had my fingerprints on.  I think that would

14   constitute a kind of conflict.

15   Q    You mentioned you've done work at the behest of the

16   government.  Has that work been subject to confidentiality

17   arrangements?

18   A    That's the most confidential of the work that I've

19   engaged in where the nature of the assignment is deemed by

20   the government to be covered by what they call bank examiner

21   privilege.  So all of the documents that I'm reviewing in

22   those assignments do not belong to the bank even.

23           They don't -- they certainly don't belong to me,

24   the consultant.  I'm not allowed to take them out of the

25   building.  I'm not allowed to possess a copy.  I'm allowed

Page 20

```
 1    to review them, but this is, you know, very confidential

 2    findings by bank examination agencies who I don't know all

 3    the reasons but they do not want this information out.  I've

 4    been told by the examination agencies that it's -- some of

 5    it could be perceived as market-moving.

 6              So the presence of a consultant who's fixing some

 7    major issue in a company, especially in the '05, '06, '07,

 8    '08 period, the mere fact that somebody's getting that kind

 9    of assistance, I think, would have some reputation damage or

10    reputation cost for the client.

11  Q    And to your understanding, what information are you

12    barred from communicating by those arrangements?

13  A    Well, the engagement letters prohibit me from ever

14    trading or -- not trading in a financial sense but ever

15    taking advantage of the knowledge gained through that work,

16    discussing it anywhere, like with another client.  I

17    couldn't -- I couldn't discuss the case that I just

18    finished.

19              But the engagement letter itself prevents me from

20    disclosing the existence of the engagement letter, so the

21    name of the client, the nature of the assignment.  So I've

22    described them in my deposition, for example, at a high-

23    level to disclose for the nature of the work, but not in a

24    way that could disclose the identity.

25  Q    So then without disclosing any of the details, can you
```

Page 21

1   describe in as much detail as you can an example of one of

2   your underwriting engagements?

3   A    Sure.  There are two that are effectively identical

4   that occurred at the end of the -- maybe the end of the

5   beginning of the financial crisis, 2006, '07, and '08.  Very

6   large mortgage companies that both originated loans but also

7   purchased loans from others, brokered loans.  And both of

8   these companies thought they were doing a very good job of

9   originating second-lien mortgages.  And so they were proud

10  of the fact they had perfect second-lien mortgages.

11          And the failure that had been identified by the

12  government was to consider the quality of the first lien

13  that the customer already had.  And so obviously if you

14  build the perfect house but it's next door to a house of

15  cardboard, when the market starts to move and asset values

16  collapse, that first lien becomes worthless and your second

17  lien is worth -- certainly less strong and market resistant

18  than you thought it was.  But that's an example.

19          We began by looking at that process and the work

20  expanded to several other areas of the company.

21  Q    So, again, under the same sort of arrangements, can you

22  describe with as much detail as you can a repurchase-related

23  engagement?

24  A    Yeah.  The very first was -- again, these are always

25  tied to the economic -- at least for me, they're always tied

1    to the economic cycle and I'm now on my third economic --

2    hopefully the end of oy third economic decline that we've

3    seen.

4            But in the late 1980s, I was hired by a mortgage

5    company that was having repurchase demands, putbacks from

6    Fannie Mae and Freddie Mac.  And they had put the repurchase

7    process in the hands of kind of a semi-retired executive who

8    did not apply any formality or rigor to the process.  And so

9    whether that loan was repurchased or not really depended on

10   the mood of the loan officer that day.  So it was just

11   informalled in the extreme.

12           And so my job was to sort of build processes

13   around that, an escalation process, you know, at various

14   dollar amounts, put limits on the decision making and the

15   discretion of that loan officer, again, just to formalize

16   and make it robust.

17   Q    And what stage of the repurchase process does your work

18   focus?

19   A    On the -- well, I'm not a lawyer, so /I'm -- I'm

20   focusing on the -- really the contents of the loan, how that

21   loan was made, and the contents of the claim package.  So

22   it's -- it's the underwriting facts.  I call it the

23   threshold facts.  It's the factors that are part of that

24   breach that give rise to the breach, but it's not what we're

25   going to talk about as AMA.  I'm not involved in that piece

Page 23

1   at all, and I don't interpret contract language.  I'm always

2   working next to bank counsel who I rely on for those -- they

3   rely on me to give them an understanding of maybe a piece of

4   evidence, but I rely on them for the full understanding and

5   interpretation of the contract language.

6   Q    When did you begin offering expert opinions in

7   litigation?

8   A    The first was here in New York in I think 2001.

9   Q    And about how many times have you been retained as an

10  expert in litigation?

11  A    It's a little shy of a hundred.  I think it's 95 maybe

12  at this stage.

13  Q    For what types of cases?

14  A    Primarily RMBS, primarily in the -- in the underwriting

15  and re-underwriting space or the forensic loan analysis

16  space, if we want to call it that, and due diligence, and in

17  repurchase, repurchase-related assignments.

18  Q    And about how many litigation assignments have involved

19  repurchase issues?

20  A    I'm going to estimate 20.

21  Q    And who are some of the clients you represented in

22  those litigation numbers?

23  A    Morgan Stanley, Goldman Sachs, Bank of New York,

24  Countrywide, HSBC I believe, RBS I believe, Deutsche Bank

25  certainly, Greenpoint.  I may be leaving somebody out, but

Page 24

1    that's --

2    Q    Mr. Grice, can I ask you to turn to Tab 2 in your

3    binder, which is PA Exhibit 684?

4    A    Yes, sir.

5    Q    Can you tell us what this is?

6    A    This is the list of testimony and depositions I've

7    provided in the last four years.  So not engagements but the

8    ones where there actually was a report issued or a

9    deposition offered.

10   Q    And just, generally speaking, what types of cases are

11   listed in this exhibit?

12   A    The vast -- you know, 90 percent maybe, 85 percent are

13   RMBS.  A few of them are fraud-related engagements, but the

14   vast majority is RMBS.

15   Q    About how many times have you been deposed?

16   A    I'd say 55 or 60.

17   Q    And in how many trials have you offered an expert

18   opinion?

19   A    This is my fourth trial.  I was also -- I played a role

20   in a federal hearing in Atlanta for Wells Fargo who was not

21   a party to a litigation, but I was there to answer questions

22   for the judge on how large banks process different types of

23   documents.  But this is the fourth actual trial.

24   Q    And are these the matters listed on page 7 of 7 in Tab

25   2, PA-684?

Page 25

1    A     Yes, sir.

2    Q     Can you just go down the list and describe for us the

3    matters and the expertise you were offering?

4    A     Yeah.  The first, the Banco Espirito Santo versus BDO

5    Seidman, I was retained by counsel for the accounting firm

6    BDO and adverse to the bank, obviously.  I was looking at

7    the internal controls processes of the bank.  It's a

8    relatively small community bank in Florida.  It's part of a

9    global -- it's now -- it's now a failed bank, but at the

10   time it was a relatively small community bank in Florida.

11   So the topic was internal controls.

12          The second case, Allen Schein versus Ernst &

13   Young, I was retained by counsel for the accounting firm

14   again, this time looking at a bank called Superior Bank,

15   which failed in 2001 or 2002.  And my -- my assignment was

16   to evaluate the mortgage origination processes and how

17   products were designed at that -- at that company.

18          The third is Western and Southern versus Bank of

19   New York Mellon.  This is the bank from just February of

20   this year where I was retained by counsel for the trustee,

21   Bank of New York Mellon and was doing an evaluation of --

22   it's either 1,400 or 1,500 mortgage loans originated by

23   Countrywide that were included in a securitization.  And so

24   it was sort of the classic re-underwriting repurchase

25   analysis in that context.

Page 26

1           The fourth is this federal hearing I was

2   referencing, the SEC versus (indiscernible) Advisors where

3   the assignment was to help the court understand a very kind

4   of exotic temporary restraining order that was faxed in to

5   Wells Fargo about criminal behavior by fraudsters inside

6   (indiscernible) Advisors, a hedge fund.

7   Q    So just with reference to the Bank of New York matter,

8   did the court make any findings in that case about your

9   testimony?

10  A    They did.  I recall from the order, they found my

11  testimony credible and that's what I understand from the

12  order.

13  Q    And to your knowledge, were you qualified by the courts

14  in each of these matters to testify?

15  A    Yes.  I actually heard -- I heard those -- that, you

16  know, the request that I be qualified and the judge granting

17  it.

18  Q    Have you ever been hired by a plaintiff?

19  A    I have.

20  Q    About what percentage of your engagements, litigation

21  engagements have been on behalf of plaintiffs?

22  A    I'd say 10 to 15 percent over the course of -- of my

23  career.

24  Q    And who were some of the defendants in that matter, in

25  those matters?

Page 27

1    A    Banks.  So I've -- I've -- I've been retained and

2    testified against some banks.  So I've been adverse to banks

3    certainly.  In these 10 to 15 percent of the cases, these

4    are adverse to banks.  I've done two assignments for Maine

5    Justice or at least one -- one for Maine Justice and one for

6    the Southern District, fraud cases, criminal fraud cases

7    against individuals and financial companies but against

8    individuals, not the financial enterprise.

9    Q    So turning back to your CV for a moment, the first tab,

10   the second page of your CV mentions teaching experience.

11   What kind of teaching engagements have you had?

12   A    So at various times in my career, one of the primary

13   activities that I engaged in in the, for example, the early

14   1990s was to teach bankers and underwriters and loan

15   officers and loan processers.  This was as the G.H.W. Bush

16   administration was ending and the beginning of the Clinton

17   administration.

18          The enforcement of anti-discrimination laws spiked

19   quite suddenly.  And so I, you know, almost lived out of my

20   car for two or three years until my daughter was born in

21   1995 sort of training bankers all across the United States

22   on how to comply with the latest expectations of law

23   enforcement on this consistency of customer service.

24          So that was -- that was the largest single topic I

25   have ever taught.  And I've also taught fraud prevention,

Page 28

1    general internal controls.  I've trained boards of directors

2    on how to organize themselves to comply with law and

3    regulation and to ensure kind of orderly -- a good orderly -

4    - proper internal controls inside their companies.

5    Q    Can you provide some examples of the boards of

6    directors you've trained?

7    A    Sure.  If I start on them, I have to think

8    geographically.  Five of those six major banks are in Puerto

9    Rico.  So the first was Banco Popular, First Bank, Banco

10   Santander, Scotiabank.  And as we move onshore, going up

11   Brickell Avenue in Miami in the 1990s, all of the major

12   institutions that were there that are now Bank of America,

13   Wells Fargo, going up the coast, NatWest Bank which is now

14   RBS.  Up into the Bank of Boston, which is now part of Bank

15   of America.

16          If we flip to the West Coast, almost any bank with

17   the name "Federal" so Fidelity Federal, Topa Federal,

18   California Federal, Los Angeles Federal, the large Savings

19   and Loans then in California, companies that are now part of

20   Wells Fargo, Bank of America, Security Pacific Corporation,

21   Seafirst Bank in Seattle, First National Bank of Alaska,

22   Bank of Hawaii, Bank of Honolulu, Bank of Maui, Flagstaff

23   National Bank, Security Pacific -- Security National Bank in

24   Fresno, Community First Bank in Bakersfield.  I can go on,

25   but the limitations of my memory.

Page 29

1    Q    Thank you.

2         MR. DAVIS:  Your Honor, I'd like to tender Mr.

3    Grice as an expert in mortgage loan underwriting and breach

4    review processes.

5         THE COURT:  Mr. Shuster?

6         MR. SHUSTER:  No objections.

7         THE COURT:  Okay, very good.

8    Q    Mr. Grice, let's talk for a moment about your

9    assignment in this case.  What were your assignments?

10   A    My assignment was to evaluate the reliability of the

11   determinations made by the plan administrator, the Lehman

12   plan administrator and their review of the incoming breach

13   claims from the Trustees.  So the focus was the reliability

14   of those decisions.  That analysis was done in a couple of

15   ways.  You know, first, to try to understand the

16   architecture and the policy, but to test that by looking

17   empirically at the actual results of a significant number of

18   breach claims.

19        And so, after understanding the architecture and

20   the policy and the philosophy, I then looked at 1879 breach

21   claims from 1879 loan files.  So that was the first -- my

22   first pass, and that contributed to the report that I filed

23   on June 1st.

24        THE COURT:  Can I ask a clarifying question,

25   please?  You used the word reliability.  Is that a synonym

Page 30

1    in this context for accuracy?  So in other words,

2    reliability implies a consistent process.  Was it your

3    assignment to determine whether the plan administrator was

4    correct or not correct?

5            MR. GRICE:  Yes, ma'am.  I think that's -- the

6    accuracy versus reliability thing, I think is a bigger

7    question.  But I'm certainly looking at whether the

8    decisions made by the PA were accurate.  Were they --

9            THE COURT:  In each individual case.

10           MR. GRICE:  Yes.

11           THE COURT:  And each individual loan, not that

12   they had a similar process.  They reliability came to the

13   same conclusion by the same process in every case.

14           MR. GRICE:  I was trying to understand; did they

15   follow their process consistently.  Given the -- obviously,

16   in my view, I hope it's clear that each of these files is

17   distinctive, so you never see exactly the same combination

18   of facts and circumstances.  But when presented with a kind

19   of evidence and a kind of circumstance, was there a

20   consistency to the way that evidence was evaluated.  Was it

21   -- was the outcome was something that you could have

22   confidence in that it was reasonable and would be stable.

23   It would generate stable results.

24           THE COURT:  So you do mean reliability.  You do

25   not mean accuracy.

1            MR. GRICE:  Reliability is the word I go to first

2    here as I'm trying to understand.  I was trying to look at

3    the PA's process, and was it slipshod, informal.  Would the

4    outcome vary based on the weather and who happened to be

5    doing the review; or was there a, again, a kind of

6    consistency or stability that given, if you could have two

7    identical circumstances, would they be treated in the same

8    way?  That's what I was trying to understand.

9            THE COURT:  Thank you.

10   Q    So just very broadly speaking, how did you undertake to

11   review the plan administrator's process in this case?

12   A    So I did this business process audit or business

13   process review, treating this process like any other process

14   I've seen in my career.  You know, coming in from the

15   outside, looking at the characteristics of the business.

16   This had some unique aspects to it since it's not part of an

17   ongoing enterprise.  Also, it was large; it was a large

18   review being performed.  You know, the exchange of

19   information between the Trustees and the PA is big, so that

20   was an element.

21            And there was also the passage of time.  A lot of

22   these loan files were very old; some were just old.  So, you

23   know, these are files that were originated, for the most

24   part, between 2002 and 2008, so it required an analysis that

25   took that into consideration.

Page 32

1   Q     So in addition to the plan administrator's process,

2   what were you examining with respect to the Trustees' breach

3   claims?

4   A     Well, obviously, in looking at the, you know, the prism

5   for my review was with everybody, it's the lens, was looking

6   at the plan administrator's response to the Trustees' claim

7   packages.  So as these claims came in, I was looking at how

8   the plan administrator reacted to that.  So, in essence, I'm

9   getting an insight into the process employed by the Trustees

10  in preparing their claims packages and finding the

11  supporting evidence.

12          THE COURT:  Could you pause for a minute?  Could I

13  ask you and Mr. Shuster to come up for a moment, please?

14      (PAUSE)

15          THE COURT:  I'll say what I say to every witness.

16  From time to time, I may want to discuss something with the

17  lawyers, or they're undoubtedly during the course of your

18  testimony will be an objection and some sort of disagreement

19  between the lawyers.  It has nothing to do with anything

20  that you say, that you don't say, the way that you say it.

21  It's just lawyer stuff.

22          MR. GRICE:  Thank you.  Thank you, Your Honor.

23          THE COURT:  All right?  And also, I should add

24  that I have a non-systematic system of taking notes.

25  Sometimes, I write; sometimes, I type.  Whether I do one or

Page 33

```
1    the other is absolutely not related to anything that you

2    say.  I'm sure somebody is trying to model when I write and

3    when I type.  I defy them to find any sort of a system in

4    it.  All right?  So I just wanted you to know that as well.

5             MR. GRICE:  Thank you very much.

6             THE COURT:  Okay.  Go ahead, Mr. Davis.

7    Q    Mr. Grice, after you provided your initial opinions,

8    what else were you asked to do in response to the Trustees'

9    positions?

10   A    Well, just in terms of just the exchange of expert

11   reports, I reacted to the Trustees' expert reports, both Mr.

12   Aronoff and Mr. Morrow and others, but those were the two

13   principal pieces of the summer.  We're reacting to these

14   additional reports.  So I did a review in response to Mr.

15   Morrow's 600 loans, not 600 breach claims, but actual loans

16   that included multiple claims drawn from a different

17   population and including, my understanding is, some of the

18   on-hold loans.  So it was, again, a different population,

19   but same kind of assignment.

20   Q    And what other work were you asked to do in response to

21   Mr. Aronoff's opinions?

22   A    I don't follow.  I mean, I obviously react to the

23   assertions he makes in his expert report.  And I looked at,

24   again, many, many, many individual claim files, including

25   his quite pointed responses to points I had made.  So we've
```

Page 34

1    had an exchange over the last several months.

2    Q    Did you learn anything about the Trustees' processes

3    through the testimony and expert reports you reviewed in

4    this case?

5    A    Yes.  So if you think about what I did for the plan

6    administrator, I began with interviews and trying to

7    understand the architecture and philosophy, and then I did

8    the empirical piece.  With the Trustees, it's reversed.

9    Where I first met the Trustees' process through their claims

10   files, and then I got to read Mr. Aronoff's deposition

11   testimony, so I hope to hear him when he testifies.

12          So I've learned some of the architecture and

13   philosophy through what has been revealed in depositions so

14   far.  So it's -- I'm not saying their identical, but they're

15   similar processes where the focus is on the claims packages.

16   But from that, you can learn a lot about the way evidence

17   was evaluated.

18   Q    And what materials did you prepare in connection with

19   your work in this case?

20   A    I prepared three different expert reports that included

21   a total of about 2700 breach claims' analyses.  So we're

22   taking an individual breach claim and evaluating it, the

23   evidence inside the claim file and reconciling that, or

24   trying to assess that, against the loan file.

25   Q    Okay.  I'd like to put up on the screen our first

Page 35

1   slide.  Mr. Grice, could you tell us what this is?

2   A     This is a summary of my key opinions in this case.

3   Q     Would you walk us through them?

4   A     Well, the first I always hope is obvious.  With every

5   loan filed, but more importantly, every borrower, is quite

6   unique.  People have -- they come in all shapes and sizes

7   and they have different facts and circumstances.  And so

8   it's that -- the unique nature of people that makes loan

9   files also unique.

10          And in order, in my view, in order to prepare a

11   breach claim or evaluate a breach claim, you have to

12   consider all of those factors, all the complexity of really

13   the borrower and the contents of the loan file.  So I'm

14   trying to draw a distinction between the information the

15   loan officer obtains from the customer at the application

16   stage.  When I meet you for the first time and I ask you

17   questions about your business or your employment or your

18   income or your occupancy, I'm learning about you.  What

19   makes it to the file is a subset of what I've learned about

20   you through direct contact.

21          The second point is related to this, which is loan

22   files really are an incomplete depiction of all of the

23   knowledge that the loan officer/underwriter has about the

24   customer.  But these loan files also degrade over time.

25   They change over time.  So when I initiate a loan

1    application as an applicant to a company, and I fill out the

2    loan application and I sign it and I go to the closing and

3    now we have an asset, the loan file then goes in multiple

4    directions, right.

5              One set might stay with the originator; that's the

6    origination file.  One set goes to the servicer, who's now

7    their primary job is making sure they collect the monthly

8    payment for that mortgage loan.  Another set may ultimately

9    go to the Trustee or the collateral custodian and the

10   Trustee to make sure that the required elements for that

11   loan file that would enable somebody to foreclose, either

12   the mortgage, the note, or the writers are safe and sound

13   and we've got those tied down.

14             So you end up with multiple types of loan files,

15   each one serving a special business purpose of the

16   originator or the servicer or the Trustee.  But importantly,

17   these things, because of the multiple interventions that

18   occurred in the normal course of business, information

19   degrades.  So, you know, it's common on my business to open

20   a loan file originated 10 years ago and find a document

21   that's a perfect copy of pages 1, 3, 5, and 7 of something.

22   So somebody ran a double-sided document through a copier,

23   and now we have really great copies of some of that

24   document.  Or a scan, you know, scanners back in the day

25   back in the '90s and the 2000s weren't two-sided scanners.

Page 37

1    So you would feed a large document into a scanner and end up

2    with multiple bits of files.  Those have to be stacked back

3    into a deck and turned into a document.

4              So the point I'm making on the second item on the

5    list of key opinions -- time is a challenge in these reviews

6    and loan files do change.  I shouldn't say they don't --

7    they don't -- the files don't just get thinner, they also

8    get fatter because the servicer is going to put monthly

9    servicing records in there each month to show that Charles

10   paid his loan.  So the files just change -- that's the point

11   I was trying to make.

12             And obviously with liquidated loans, it's really

13   in no one's interest to be a curator for this loan file

14   anymore.  The asset is dead.  It stopped performing.  And my

15   understanding is that's a large percentage of the loans at

16   issue here.

17             Third, this is my overall conclusion based on my

18   audit, including the review of the 1879 breach claims.  I

19   viewed the plan administrator's process as both well

20   designed or well constructed and well implemented, carefully

21   implemented.  So, again, that the outcomes, were they

22   reliable quality or a consistent quality?

23             THE COURT:  Can I ask a follow-up question about

24   that?  Was it -- is it 1879 breach claims on 1879 loan

25   files?

Page 38

1           MR. GRICE:  Yes, ma'am.

2           THE COURT:  And were those loan files as to which

3      there was only one breach claim each?

4           MR. GRICE:  No.  Many of the -- and I don't have a

5      complete quantitative answer to this -- many of them had

6      multiple breach claims.  So I was doing just one claim per

7      loan file to understand if that part was done correctly.

8           THE COURT:  Thank you.

9      Q    Next slide.

10     A    So shall I continue?

11     Q    Please.

12     A    So the next aspect of my opinion relates to the

13     Trustees' breach analysis, which, again, I said was a kind

14     of refracted view, right.  So I meet the Trustees' process

15     initially through the review of their claims packages, so

16     four kind of takeaways.  One that, in my view, the loan

17     application which is this, you know, the result of a kind of

18     due diligence exercise between the loan officer, the

19     underwriter, maybe the loan processor, and the applicant,

20     was given short shrift.  It wasn't given sufficient weight.

21           And in many cases, there's evidence where any

22     piece of information gathered by the Trustees would trump,

23     or take precedence, over what was stated on the loan

24     application.  So if I do an interview with my customer and

25     do, I think, a very careful underwriting in 2002, in the

1   Trustees' review, it appears that an inconsistent or

2   inconsonant fact with that loan application is sufficient

3   for them to say, you know, phooey on the loan application,

4   this is the better evidence as to somebody's income or

5   occupancy or employment.

6          So, in my view, disrespect was shown to the loan

7   application.  There wasn't proper weight given to the

8   information gathered through that face-to-face or that real

9   exchange that occurred at origination.  Is that clear?

10          THE COURT:  Yes.  I'm trying to not interrupt.

11   A    Second, the claims files themselves -- I'm calling

12   claims files claims packages, but these are the things that

13   PA received from the Trustees.  Rarely, or actually, I can't

14   think of an example, where it showed evidence of an attempt

15   to grapple with inconsistent information.  So a fact in the

16   loan file that might support information on the loan

17   application, for example, was disregarded; and instead, the

18   focus on the claim package was on that inconsistent piece of

19   data.  So there's no -- I didn't see evidence of trying to

20   grapple with the inconsistent or contradictory information

21   from the loan file.

22          The third, the breach claims submitted by the

23   Trustees, I believe, showed over-reliance on poor quality

24   information.  So this gets to the question of accuracy

25   versus reliability versus sufficiency.  So they would take -

Page 40

1      - the Trustees would take a piece of information and deem it

2      credible and sufficient as a basis for a claim, when I don't

3      think the evidence, in concert with other facts and

4      information inside the loan file, support that.  So it may

5      be accurate information, but it's not probative. It's not --

6      it's certainly not sufficient as a way to frame a

7      repurchased claim.

8              And then fourth, in my view, the facts and

9      circumstances have to be evaluated when thinking about a

10     breach.  I'm looking at what we're calling the threshold

11     facts of that breach claim.  And when we see evidence that

12     that threshold fact may, in fact, exist -- there may, in

13     fact, be evidence in support of a breach -- in my view, in

14     my experience, we have to also look then at the materiality

15     of that information and does it -- would it have made a

16     difference at origination if that threshold fact were

17     different.

18             So if I represent my income to be X and we find a

19     piece of evidence that says it's Y and we think that's

20     important evidence and it should be given some weight, would

21     that evidence have made a difference in the underwriting of

22     that loan, the creation of that original asset?  And I saw

23     no evidence that that assessment of materiality with respect

24     to the breach was performed.

25     Q    Can we have the next slide?

Page 41

1   A    And then finally, I guess, during the course of the

2   summer when I reviewed Mr. Morrow's 600 loan sample, my

3   results were, from my review of Mr. Morrow's results, were

4   consistent with what I found at my initial review of the

5   1879.  So that reinforced my view, my understanding of the

6   Trustees' process.

7           And then finally, I guess I don't agree with Mr.

8   Aronoff's views or opinions about the robust nature of the

9   Trustees' breach claims process.  I think he's incorrect.  I

10  also don't understand -- or better put, I guess, I don't

11  have an understanding as to why 40 percent of the claims

12  were withdrawn, and I don't understand his comfort with that

13  withdrawal.  That's a significant number of the claims that

14  were taken off the table, and I'll be listening carefully as

15  we discuss that.

16          And then finally, this conflict issue.  I don't

17  think Mr. Aronoff is in a position to opine on the robust

18  nature of a process that he supervised, so he's not

19  independent with respect to the claims review process

20  performed by the Trustees.

21  Q    Mr. Grice, what was the first step in your process

22  audit?

23  A    It began with a series of interviews and meetings to,

24  again, understand the architecture of how the process was

25  assembled, and also the philosophy of how the PA would

Page 42

1    perform their review of the evidence.

2    Q    Going into the assignment, what were you trying to

3    understand about the breach claim population?

4    A    I need to understand its diversity.  And also the

5    numericity -- I don't like that word -- but how large was

6    this population of claims; how old were the claims -- not

7    the claims, but the loan files themselves; what could I

8    understand about the population of loan files that I was

9    about to review.

10   Q    You mentioned in response to the Court's question that

11   you conducted a breach claim level review.  What is the

12   breach claim level review?

13   A    I was focusing first, well really only, on the analysis

14   of that claim package with respect to a breach, a single

15   breach.  So I was not performing a loan level repurchase

16   assessment.  I didn't get into AMA at all.  I didn't look at

17   sort of the loan holistic globally, I guess.  I wasn't

18   trying to make it -- offer an opinion at all on repurchase,

19   whether it should be repurchased or not.

20           I was dealing with the most basic currency and the

21   most basic unit in this context, which is the claim.  So my

22   approach was, if we clearly understand the reliability of

23   that process, then everything downstream can stand on that

24   process.  We have to get this foundation right.  So the

25   breach claim is the most foundational element of a

Page 43

1    repurchase context, in my view.

2             THE COURT:  Can I ask a follow up.  So drilling

3    down even more narrowly; were you looking at the threshold,

4    the existence or not of the threshold fact?

5             MR. GRICE:  Yes, Your Honor, that was my focus.

6             THE COURT:  And secondly, how was the -- if on a

7    particular file, hypothetically, if it bad three breach

8    claims, how did you select which breach claim to look at?

9    Or I'll the question a different way.  Did you look at one

10   type of breach claim across all -- one specific type of

11   breach claim across all the files?

12            MR. GRICE:  Yes, Your Honor, I did.  I pursued

13   that latter path, which was, I received help from the PA in

14   getting a census of the breach claim types, and also the

15   types of evidence that was combined with those claims, and I

16   wanted to get coverage across all of the major categories of

17   breach claims.

18            THE COURT:  Okay.  So you did not, for example, in

19   the 879 loans, look at misrepresentation of income in each

20   of those; you looked at some of each of these categories of

21   defects.

22            MR. GRICE:  Yes, ma'am.

23            THE COURT:  Okay.  And on a particular file, how

24   did you decide which breach claim you were going to analyze

25   for that file?

1          MR. GRICE:  So I got access to, again, the census,

2     this population, and then we -- so we did what's called a

3     stratified random sample.  I wanted to make sure I drew from

4     each of the major breach claim types and evidence types.

5     And so once we had, like, 62 different buckets and sub-

6     buckets of types, we then used randomness to pull in from --

7          THE COURT:  So it was random.  The selection of a

8     particular breach from a particular loan file to analyze was

9     a random selection by you.

10         MR. GRICE:  Yes, ma'am, within this bucket and

11    sub-bucket.

12         THE COURT:  Thank you.

13    Q    So were you trying to establish what the Trustees had

14    referred to as a breach rate in your analysis?

15    A    No, I wasn't looking at rates at all.  I was trying to

16    get, again, insight into the way the PA was dealing with

17    different types of claim.  So my interest, my objective was

18    coverage across all of those buckets and sub-buckets.  And

19    then I used randomness, but I pulled in -- the number of

20    breaches that I pulled in was in order to feed my -- or to

21    give me sufficient insight into how the PA was dealing with

22    that particular bucket.

23         So as an extreme example.  Understanding how the

24    PA dealt with missing documents was rather easy.  I could

25    look for how they dealt with missing notes; you know, the

1   mortgage note is not in the file.  I didn't need to look at

2   1879 examples of that to understand that they were looking -

3   - if the note was in the file, they would stop their review.

4   That would be a failed claim.

5          So if you look at where I spent most of my time,

6   it was on the more complex misrepresentation of income

7   claims, for example, where there are multiple types of

8   evidence.  And I was interested in seeing the interplay of

9   those claims types and that evidence information.

10  Q    So we've used the threshold fact.  Just so we're all on

11  the same page, what is a threshold fact?

12  A    So a threshold fact is the defect that is the

13  foundation of the claim.  So, for example, misrepresentation

14  of income, the borrower misrepresented their income.  So if

15  that can be reasonably established, then that becomes the

16  root of the claim.

17  Q    And in your audit, what happened if you found that the

18  asserted threshold facts could not be established?

19  A    That I would agree -- so let me back up.  All of the

20  claims I reviewed, the 1879, were claims that had been

21  rejected by the PAs.  These are failed claims that I'm

22  drawing from.  So in that case, I would -- if the threshold

23  fact was not supported, I would agree with the PA's

24  rejection of the claim.

25  Q    And what do you do next if you found some evidence of

1    the threshold fact?

2    A    Then I would a materiality analysis.  I had to consider

3    would it have mattered.  Would this, you know, $5.00

4    difference in represented income, for example, matter.  So

5    it matters, you know, the degree of that threshold fact

6    being inconsistent with the original facts.  So I had to do

7    a materiality review; again, not AMA review, but against the

8    guidelines.  So if that originator, in my view, had access

9    to the new threshold fact, would the approval decision have

10    been the same.  Can we reasonably assume it would be the

11    same credit determination?

12    Q    Were materiality and NLCs required for all kinds of

13    threshold facts?

14    A    No, but for the big one, for misrepresentations of

15    income, employment -- those mattered a lot.  I needed to

16    understand, again, all the facts and circumstances and how

17    they interacted with guidelines.

18            THE COURT:  I'm sorry.  So on that, on your

19    materiality assessment, for example, on a misrepresentation

20    of income, you gave an example of $5.00.  Was your

21    determination of the materiality of that threshold fact

22    based on analysis of how that particular underwriter

23    approached things, or was it more impressionistic on your

24    part that no reasonable underwriter would have deemed a

25    $5.00 difference off a $100,000 income material?  In other

Page 47

1    words, how did you -- what was your methodology for coming

2    to the conclusion as to materiality, you know, on a spectrum

3    between there was 100 percent misrepresentation of income

4    versus a, you know, a $5.00 misrepresentation?

5             MR. GRICE:  It was not impressionistic.  But in

6    the same vein, I have to say underwriting is subjective.

7    There is a subjective judgmental element because it's a

8    human judging facts about another human.  And so, and it's

9    also 10 or 15 years after origination, so we have to -- it's

10   a little bit like archeology, right?  We're trying to

11   recreate a decision process based on imperfect information.

12            But the reference point I was using was the

13   guidelines.  So the guidelines at origination and the

14   processes -- not pr -- but the guidelines reflect kind of

15   the tolerance limits.

16            THE COURT:  Reflects.

17            MR. GRICE:  Reflects.

18            THE COURT:  Okay.

19            MR. GRICE:  Exactly.  So it's with reference to

20   the guidelines, but I acknowledge this is a subjective

21   judgmental exercise done the best we can.

22            THE COURT:  Thank you.

23   Q    And what is the standard by which you would determine

24   that materiality?

25   A    The standard, with reference to what it have made a

Page 48

1  difference.  Would it, at the end of the day, made a -- have

2  made a difference?  So if the under -- for example, an

3  undisclosed debt.  Let's say there's an -- there are many of

4  these, but the undisclosed debt is a car loan for 10 or

5  $15,000.  If you look in the context of that application,

6  that 10 or $15,000 would not create -- it would not

7  contribute to a much higher debt-to-income ratio.  And so

8  that would be an example where that doesn't disqualify that

9  customer at all.  So we're back to would it have mattered.

10 Would that -- even if true, would that undisclosed debt have

11 made a difference, or would the borrower still have

12 qualified?

13 Q    And when you say made a difference, are you referring

14 to a difference with respect to the original credit decision

15 that was made?

16 A    Yes, with respect to it.  And a piece of this analysis

17 -- again, I'm looking back at a loan file and credit

18 decision.  I'm looking at the guidelines, but I'm also

19 looking at the facts and circumstances of the applicant.

20 And so, it matters if somebody has $10,000 in savings or if

21 they have a very low DTI or if they have unusually long work

22 history or they've been living in the house for 38 years.

23 So we call these compensating factors, these sort of surplus

24 strengths that underwriters routinely rely upon in

25 evaluating a borrower.

1    Q     So what did you conclude if you found that applying the

2    threshold factor would not have impacted the original credit

3    decision?

4    A     That I would also agree with the PA in that instance,

5    and I would fail the claim.

6    Q     And what did you conclude if you found that applying

7    the threshold fact would have impacted the original credit

8    decision?

9    A     Then we put those in a bucket which we called, for this

10   lack of a better title, refer to PA for further review.

11   Again, I don't know about the AMA analysis that's being done

12   downstream, but I wanted the PA to reconsider this, at least

13   based on the threshold fact issue and whether it matters.

14   So if I found that it would have mattered, I wanted the PA

15   reconsider -- or consider, I guess, is a more appropriate

16   word.

17   Q     Okay.  Let's talk a little bit about the loans at issue

18   here.  When were these loans originated?

19   A     Some in the late 1980s/early 1990s, but the vast

20   majority between 2002 and 2008.

21   Q     And was this timing relevant to your analysis in some

22   way?

23   A     Yeah.  It creates a challenge because I'm not dealing

24   with an information gap, in a way, created by the passage of

25   time.  I don't have access to the applicant or the loan

Page 50

1    officer or the underwriter.  And as I said earlier, when the

2    information degrades, I have kind of an evaporating set of

3    documents in some instances.

4    Q    Can we have the next slide?  Mr. Grice, what does this

5    slide reflect?

6    A    Well, this is really to address Your Honor's question.

7    This shows the major categories from which I drew my sample,

8    the population I reviewed as part of my audit.  So these are

9    the major buckets of defects, misrepresentation of income,

10   et cetera.  The number by count in the original submission

11   by the Trustees.  And then the third column is the number

12   that I ultimately used in my, again, stratified random

13   assessment, judgmentally adjusted for each of these major

14   claims types.

15          So at the bottom of the slide, for example,

16   failure to provide subject note.  I didn't need to do 1800

17   reviews of how the PA dealt with a missing document.  In the

18   middle of the slide, failure to provide final till.  I

19   looked at 19, until I got sufficient insight into how the PA

20   was -- really, what the PA was seeing in the claim package

21   and how the PA's process dealt with those facts, as an

22   example.

23   Q    And just to be clear, so how did you come to understand

24   when you had selected enough claims from within a given

25   bucket?

Page 51

1    A    It was when I felt comfortable that we had -- we, my

2    team and I -- had sufficient insight and understanding as to

3    the reliability of the PA's review.

4              THE COURT:  Mr. Davis, Mr. Grice, can you -- I do

5    not understand what's on the slide.  What's the difference

6    between -- what is the original submission, what are the

7    totals bolded in black versus the totals in red?  I don't

8    know if you were going to get there, Mr. Davis, but I just

9    need to understand what I'm looking at.

10   Q    Okay.  Mr. Grice, could you walk the Court through?

11   A    If I may.  So these major categories that total to

12   166,000, that's the population in those buckets that I

13   understand were part of the original population of claims

14   submitted by the Trustees to the plan administrator.  The

15   difference between the 166 and the 198 are all of the other

16   buckets that are not listed here.  So these are the major

17   buckets, but it's not a complete list.

18             THE COURT:  Thank you.

19   Q    Mr. Grice, at the end of the day, were you comfortable

20   with your initial audit system?

21   A    Yes.  I thought we had sufficient insight into each of

22   the buckets, and also we had sufficient coverage across the

23   landscape of different types of claims types.

24   Q    Now in the course of your audit, did you come to have

25   an understanding of the structure of the review process that

Page 52

1    the plan administrator put in place to respond to the

2    Trustees' claims?

3    A    I did, and I think we that we have a diagram that I

4    prepared which looks at that major process.  But I was

5    trying to understand the structure and, again, the

6    philosophy, and then empirically how that review was

7    actually performed.

8    Q    We can put up the next slide, but let me ask you.  How

9    did you come by your understanding of the plan

10   administrator's process?

11   A    It was through interviews with members of the plan

12   administrator, the plan administrator's team, so Zach Trumpp

13   was my first window.  And then speaking both with Recovco

14   and RBF to get an understanding for how this flow chart --

15   and this is my flow chart.  But it's how, you know, what

16   this represented, how the flow actually was conducted.

17   Q    Okay, so let's walk through this, the roles and

18   responsibilities of each of the parties that are listed up

19   here.  What experience did Recovco bring to the process?

20   A    Recovco is a nationally recognized, you know, re-

21   unwriting forensic loan file company.  This is their

22   business.  My firm competes with Recovco.  You know, we're

23   in sort of the same space, so they do large-scale file

24   reviews, and they're known, based in Dallas.  I did a phone

25   interview with Craig Pino and a couple of his colleagues

Page 53

1    early in the process to just confirm my understanding of

2    what role he and Recovco were playing.

3            But as I reflected here, obviously, they --

4    Recovco was receiving the loan files, making an inventory.

5    This is where the incomplete loan files were placed on holds

6    pursuant to the instructions of the PA.

7            And then in that second column, reviewing the

8    breach claims.  They had authority to fail the claim at that

9    level.  If, for whatever reason, the claim was improperly

10   constructed, just, you know, it ties to the wrong rep, or

11   the rep that they're asserting doesn't apply to that loan,

12   so they could fail it for a variety of reasons.

13           They focused on looking for evidence of the

14   threshold fact, but then escalated the cases where there may

15   be evidence in support of the threshold fact to RBF, who did

16   the ultimate weighing and evaluation of the evidence.

17           So Recovco plays a kind of triage role, but it's

18   RBF who has the broader role of looking across the entire

19   loan file, looking at all the evidence identified by

20   Recovco; in some cases, going back to Recovco for

21   clarification.  And then eventually doing the evaluation of

22   the evidence, whether it's sufficient or not.  And then an

23   important part that I did not look at, which was the AMA

24   piece, so that AMA determination.

25   Q    What kind of quality control process did Recovco have

1    in place?

2    A    The Recovco process was 100 -- I'm sorry -- 100 percent

3    QC'd, so by the senior person inside Recovco would double

4    check all of the review.

5    Q    So what materials did the Recovco QC team have access?

6    A    Everything, so the entire claim package.  The entire

7    loan file, the guidelines, the reps and warranties, but it's

8    the entire loan file is the key.

9    Q    So what experience did RBF bring to the process?

10   A    RBF brought a lot of years, both in repurchase

11   litigation with Lehman and in other matters and -- so I

12   guess legal for contract expertise as lawyers, but then deep

13   familiarity with mortgage underwriting.  So I was impressed

14   in my conversations with RBF that, again, they had a long

15   history; again, a deep knowledge of how this process worked;

16   and, again, the familiarity, you know, with all of the

17   evidence types that we're talking about in a repurchase

18   context.

19   Q    Did RBF have a QC process in place?

20   A    They did.  My understanding is that almost all of the

21   files were QC'd twice by RBF.

22   Q    So what materials did the RBF QC team have access?

23   A    Well, importantly, the entire loan file.  So this -- I

24   think this is important because, especially if you think

25   about a missing document claim, for example.  If the QC

Page 55

1    process or if the higher order reviewer doesn't have access

2    to the entire loan file, you're going to miss that missing

3    document that's not missing.  So if all you do is check my

4    work -- you know, Charles looked in this part of the folder

5    and it's not there.

6            If you don't look in the entire contents of the

7    loan file, you're going to miss that missing document.  Or

8    what I'll call a footprint -- a document that points to the

9    missing document, but the missing document is not there.

10   And we had many of these, you know.  The credit report is

11   not in the file, but we have the fruit of the credit report;

12   we have the credit score in the file, or we have an

13   incomplete document.  We don't have the contents of the

14   entire appraisal; we have most of the appraisal.

15           So a challenge in these repurchase analyses.  What

16   do you do with that kind of partially missing document, or

17   with that firsthand evidence that a document was there, but

18   it's not there today.  I think you can't cover your eye.

19   You have to try to weigh all of the document, all the facts

20   and circumstances, including this footprint evidence or the

21   incomplete document evidence.

22   Q    Now the Trustees have criticized the plan

23   administrator's decision to rely on RBF doing the protocol.

24   Do you agree?

25   A    I don't.  Again, you're talking to a guy who's spent

1   his life working in financial companies next to attorneys.

2   So I think in the repurchase context, I, as a lone expert,

3   can't make determinations about violations of contract

4   language without the aid and interpretation of legal

5   counsel.  So I think you need legal counsel, I think it's

6   obvious, in order to do a repurchase analysis or a breach

7   analysis that goes beyond the pure forensic piece.  The

8   meaning of that evidence, ultimately, I think becomes a, in

9   part, a legal determination.

10           And so, I'm not equipped to do that.  I need legal

11  counsel.  In all of my work with banks, I've got legal

12  counsel at my elbow.  So building legal counsel into the

13  process from the get-go, I think gets to this question that

14  the Court was asking about reliability.  It gets you more

15  consistent outcomes because you have the same sort of legal

16  criteria and judgment being applied to those loan files over

17  time.

18  Q    So who managed the breach review process for the plan

19  administrator?

20  A    Mr. Trumpp.

21  Q    Did Mr. Trumpp have a team?

22  A    He did.

23  Q    What experience did Mr. Trumpp and his team bring to

24  the process?

25  A    So I spoke to Mr. Trumpp extensively and to a couple of

Page 57

```
1    his colleagues who had, you know, very specialized -- his

2    colleagues had, for example, Charles Halliburton had very

3    special compliance expertise from his years at Aurora.  But

4    Mr. Trumpp brought organizational management, you know,

5    making the trains run on time was his -- the special skill

6    he brought to the table.  So bringing together these expert

7    units, and then ensuring that this large complex enterprise

8    was conducted as close to a schedule as possible was the

9    special role that he played.

10   Q    And what were the plan administrator's team's

11   responsibilities overall?

12   A    Again, to oversee -- well, initially, to select the

13   parties, Recovco and RBF.  But, again, to oversee and ensure

14   that this process was timely and consistent.  So

15   operational, I would call it operational excellence, but to

16   make sure that this thing is going to do what we wanted it

17   to do.  So it's the consistency of the process that

18   ultimately is the goal.

19             THE COURT:  Can I ask a question.  It's come up a

20   number of times, and I still don't know what the facts are.

21   In the first step when Recovco receives the loan files, does

22   it receive a physical file, physical file, as opposed to an

23   electronic file?

24             MR. GRICE:  You know, I don't know the answer to

25   that, Your Honor.  I just don't know.  Everything we
```

Page 58

1    received was electronics; these were pdfs that had been

2    assembled in response to subpoenas, so I just don't know.

3            THE COURT:  Okay, thank you.

4    Q    Now, so having had the opportunity to understand the

5    plan administrator's breach review process, the architecture

6    of that process, do you have an opinion on whether it was --

7    on how it was constructed?

8    A    I think it was well constructed, again, well designed.

9    I think the idea of having two expert firms, each with, you

10   know, their own special knowledge, working under the

11   oversight and supervision of the plan administrator is a

12   good reliable process.

13   Q    Now let's talk about how you pulled together a team to

14   review the breaches of loans that you did.  So did you have

15   a team that assisted you with your breach review?

16   A    I did.  In order to review 1879, ultimately 2700

17   claims, I needed a large team.

18   Q    And was CRI part of your team?

19   A    Yes, I'm sorry.  So I relied on really two

20   organizations to staff my review.  The first was CRI

21   Compliance people.  So I had 29 mortgage underwriters, three

22   QC people who were also underwriters, so it's 32

23   underwriters; and then about 10 -- I think it is exactly 10

24   other people who had backgrounds as loan processors, so

25   these are people who worked in the industry and knew their

Page 59

1    way around loan files, but they weren't decision makers

2    inside financial institutions.  So it was a total of 42

3    people who worked on this.

4              And then a second organization was a consulting

5    firm called Cornerstone Research.  And we used the office in

6    Chicago, Cornerstone Research's Chicago office, a group

7    headed up by Abe Chernin, who I'd worked with on several

8    assignments going back to 2010.

9    Q    So who led the team here at CRI; who was your --

10   A    I relied on a woman named Lisa Murphy, who's been with

11   me since 1999.  Originally, she was a bank examiner for the

12   Treasury Department; then she was a consulting client.  I

13   trained her company and did work for her company, and then

14   1999, I hired her, so she's been with me ever since 1999.

15   Q    And generally speaking, how did the CRI team support

16   your work on the project?

17   A    The bulk of their work, the 6000 or so hours, was

18   reviewing claims -- the actual claims packages submitted by

19   the Trustees, and doing a review of that against the loan

20   file.  Obviously, at some point, looking also at the plan

21   administrator's determination; and then making the

22   determination whether we agreed or not with the plan

23   administrator's failure of that claim.

24             And I, every morning, would receive a download of

25   all the reviews performed the prior day.  And so, throughout

Page 60

1    April and May and early June, I was reviewing each one of

2    these determinations.  And so, as I filed the report on June

3    1st, I personally looked at each of the claim determinations

4    and whether or not I agreed with the plan administrator's

5    decision.

6    Q    Do you have an idea of the collective years of

7    experience of your team?

8    A    It's in the 500s.  I think the average, each

9    underwriter had 18 years on average.  So if you got 18 times

10   32, I think you get to something like 500 and something,

11   544.  It's a lot of years.

12   Q    Can you put up the next slide?  Mr. Grice, what is this

13   demonstrative?

14   A    I prepared this to explain how I interacted with both

15   the plan administrator and my team at CRI.  And so, I had

16   direct interaction with the PA, my team also had direct

17   interaction with the PA, and I had extremely regular

18   interactions with my team, so it was an iterative process.

19   Again, in the course of our work, we began the 1879 in, I

20   think, April.  April and May, I was doing that initial 1879.

21   During the course of the summer, we did the additional 800

22   and change.  So this process continued up until we filed the

23   third report in -- I forget the date -- late August or early

24   September.

25   Q    And who was the dedicated QC team?

Page 61

1    A     Three reviewers, and I don't want to embarrass them by

2    their cumulated years and experience, but it's over 100.

3    These are people who had been with me for a long time who've

4    done mortgage underwriting inside banks that I've worked

5    with since 2010.

6    Q     Did you personally review loan files during your

7    initial audit?

8    A     I did.  My estimate at the time I was deposed was I

9    went into 150 loan files.  I've since gone into many more.

10   But I was going into loan files to try to get an

11   understanding of what my review team was going to see and,

12   again, to establish a work flow in an escalation process.

13   So people would know when to bring me, you know, the first

14   unique combination of a claim and a piece of evidence, for

15   example, or a really unusually -- an unusual piece of

16   evidence.  So the team and I worked together continuously

17   since 2010, but I wanted to make sure that anything that

18   needed to be escalated was brought ultimately to my

19   attention.

20   Q     So during your review, did your team communicate with

21   the plan administrator's loan review team?

22   A     Yes.  They had extensive interaction.  We would pass

23   claims back to the PA with questions, and the PA would pass

24   answers back to us.  I know, for example, we had some slight

25   differences of approach in evaluating certain kinds of

Page 62

1   evidence, which I think is normal in any professional

2   exercise.  So the reconciliation of those differences or the

3   recognition of those differences was an important part of

4   it.

5            And I know that as a consequence of these

6   interactions, the PA passed some claims.  I don't know the

7   ultimate outcomes of any of this, but I do know that the PA

8   did reconsider in many cases.

9   Q    Can you recall some examples of issues you discussed

10  with the PA for your team?

11  A    Yeah.  Some of the differences really have to do with -

12  - some of them are extremely minor and technical questions;

13  some also had to with types of evidence.  There's a type of

14  evidence called the work number, which is a verification

15  where your HR department actually tells a vendor what you

16  were compensated during a calendar year.  And in my

17  experience, that has been a pretty credible kind of evidence

18  with respect to that specific employment by that borrower.

19  So now it doesn't address the question if he's got another

20  income, but it addresses the question of what were you

21  actually paid because it's a firsthand account by the

22  employer and it's rather reliable.  So the PA and I had a

23  different, I think, appreciation of that, and so we shared

24  our view that we thought the work number was relatively more

25  credible than it appeared they were addressing.

Page 63

1           Also, on these undisclosed debt claims, the PA had

2      an approach to how to evaluate that, which we had never

3      used.  Which was, okay, let's assume that undisclosed debt

4      is real.  Let's assume that that was -- in the case of a

5      real estate investor who already has three or four

6      properties on their application, now we have an additional

7      property.  People tend to buy additional properties to rent

8      them out.

9           So the PA had an approach of going to a HUD

10     website and pulling in the fair market rent in that

11     community for that kind of house, whether it's a studio or a

12     three bedroom or whatever.  And you could come up with a

13     fair market value -- again, an average number -- that speaks

14     to a kind of likely rent that you could expect.  And then

15     you adjust it for vacancy, because if I own a piece of real

16     estate and I'm going to rent it out, I'm going to have

17     vacant periods.  But I thought it was a way to provide some

18     structure around, what do you do with this potentially undis

19     -- let's say the undisclosed debt is real, but what if there

20     was income from it.  I need to know if, on net, it's

21     actually contributing to my income or whether it's a net

22     loss.

23           And so this provided a framework for doing that

24     assessment, what the impact it was on DTI ultimately.  And

25     so, I thought that was a good process, and I told the PA

Page 64

1    we're going to use this in all of our future assignments.

2    It's a nice way to add some structures.  It's not

3    dispositive, but it's a nice way to add some structure to

4    this evaluation.

5              THE COURT:  Can I ask a question a question here?

6    I think we're getting to the point where we may want to take

7    a break.  So in other words, if there was a failure to

8    disclose a debt -- flat out, no question about it, right --

9    as you said, for investment property.  You would not -- so

10   that's a threshold fact, right?

11             MR. GRICE:  Correct.  Yes, ma'am.

12             THE COURT:  Okay.  So before calling a DTI breach

13   based on that threshold fact, you would engage in this

14   process of trying to figure out, hypothetically, whether or

15   not there might be an offsetting I to the D, right?

16             MR. GRICE:  Precisely.

17             THE COURT:  In other words, that wouldn't cause

18   the DTI to be unacceptable.

19             MR. GRICE:  Correct.  And in some cases, this

20   analysis shows that the D is bigger than the I.  The net D

21   outweighs it.

22             THE COURT:  Sure.

23             MR. GRICE:  And so it's a net cost and our

24   borrower is worse off.  Again, I can't go back and redo

25   history.  But in that analysis, I can say that undisclosed

Page 65

1    debt actually made that borrower worse off from a DTI

2    perspective, and that may contribute to a DTI breach.

3             THE COURT:  So you do that analysis.  You find the

4    D and you hypothesize the I, and the DTI doesn't change.

5    Before you call that, as that continues to go through the

6    process, does that go to RBF for them?  Who makes the call

7    ultimately whether that becomes a repurchase claim?

8             MR. GRICE:  In my understanding of the process

9    used by the PA, RBF did that assessment and that weighing,

10   with the assistance of underwriting people from Recovco is

11   they needed it.  So Recovco routinely would calculate what

12   they thought the more accurate DTI was.  But in the end, my

13   understanding is that RFB is the one that's weighing that

14   and making that determination.  And, importantly, they're

15   doing the AMA.  So if there are other aspects of that loan

16   that are relevant, whether the AMA has been triggered, all

17   of that is in their bailiwick.

18            THE COURT:  So that could amount to -- this

19   hypothetical that we're talking about in layman's terms,

20   might end up being a no harm, no foul situation.

21            MR. GRICE:  Yes, Your Honor.  That, it could go in

22   any of three directions, right?  The borrower is worse off

23   and, therefore, the DTI is actually going to be worsened,

24   where it's neutral, or where actually the DTI improves

25   because of the net income derived from the property.

Page 66

1          THE COURT:  So you stated it slightly differently.

2     So notwithstanding concluding, a conclusion that, in fact,

3     that borrower misrepresented, failed to disclose a debt,

4     when you go through all the steps, you could nonetheless

5     come to the conclusion that it would not have affected the

6     underwriting decision at origination.

7          MR. GRICE:  Yes, ma'am.  I think it depends

8     obviously on the full contents of the loan file.  But you

9     could imagine those exact facts we've just discussed, but

10    where there is a hardship letter where you see evidence of

11    an intent to withhold or fool the original lender -- you

12    know, I bought this property for my child, and that didn't

13    work out, the child can't pay the mortgage or something --

14    where it reveals something more sinister than kind of the

15    forgetting to disclose.

16          I want to acknowledge there are examples where we

17    failed the loan, we proposed failing the loan because

18    there's some other thing that gets to that intent question.

19          THE COURT:  Thank you.

20    Q    Mr. Grice, let's talk about the loan approval process

21    for a moment.  Would you outline the major steps in the

22    mortgage loan approval process for us?

23    A    Well, at a very high level, you know, the customer

24    walks in or makes a phone contact; now, it's done

25    principally through the internet.  But back in this 2002 to

Page 67

1    2008 period, I would walk into a branch and express

2    interest, and the loan officer is going to help me.  They're

3    going to be my tour guide as I -- as the lender tries to fit

4    me to a mortgage that satisfies my ability and my capacity

5    and my business interests.

6            So it's a tailored -- this is a, it's sort of a

7    dance between the loan officer and the lender to make sure

8    that the -- I'm sorry, between the lender and the borrower,

9    to make sure that this loan ultimately is in the interest of

10   both parties, that it's a safe and sound loan, but it's also

11   one that borrower can live with.  I mean, I place a lot of

12   importance on this.  I called it a dance, which is maybe

13   flip.  But it, you know, for most people, we buy one house

14   in a lifetime or maybe two, and so this is not a language

15   that most applicants speak, and sometimes quite literally.

16           You know, a lot of people I've interviewed are

17   very unfamiliar and uncomfortable sitting in bankers'

18   offices.  So that, it's that interview where unfamiliar

19   terms are being translated, sometimes literally, but where

20   you're helping the applicant understand what it is that

21   we're embarking on.  What information is salient to the

22   decision-making process.  So that can be a quite extensive

23   process that results in multiple versions of the applicable.

24           Because in the first blush, you're going to ask me

25   my income, what are my gross monthly earnings.  I don't know

1   what's in the applicant's mind when they answer that

2   question.  It's a complicated question, right?  It requires

3   maybe an estimation.  As a small business owner, it's what

4   do I think my year is going to look like, I think is one

5   fair interpretation.

6         But then as we go through all the other

7   information, what are your current obligations, what are

8   your monthly bills.  Most people, I think, have an awareness

9   of many of those things, but I don't know people, even

10  banker friends, who have a detailed awareness, including

11  account numbers.

12        So as that application is being completed,

13  information is being pulled in from the credit report to

14  populate the application.  So at the end of this application

15  process, which, again, may last four weeks or eight weeks,

16  I'm going to sign the application at closing.  So we've now

17  consummated this relationship, so now the loan exists.  The

18  loan officer, the underwriter, the loan processer have

19  sufficiently pulled out enough information to qualify the

20  borrower for that loan program.  And now, we have an asset;

21  now we have a mortgage.

22  Q   What are the key attributes of the perspective borrower

23  that the loan officer is trying to assess through the

24  application process?

25  A    Well, earlier I talked about, you know, repayment

Page 69

1    ability, which bankers call that capacity.  Do you have the

2    capacity to make the monthly payments?  I think even more

3    fundamentally is the character of the borrower, sort of, you

4    know, the grit.  Is this borrower going to be able to make

5    the monthly payments?  But, you know, in rough weather, are

6    they going to be resourceful and try hard and so forth?

7            So there are many ways to get insight into

8    somebody's character.  You know, credit score is, I think, a

9    rather valuable tool.  My firm did a series of national

10   conferences in the late 1990s on credit scores and credit

11   discrimination.  And it was interesting to get the creditor

12   bureaus in a room and describing how they come up with these

13   three-digit scores, you know, zero to 800, and how do they

14   come up with these scores?

15           And each of the bureaus acknowledged that, first

16   of all, it's a black box.  We're not going to tell you how

17   we come up with these models.  But also, they each

18   acknowledged that assume a married man and woman, same age,

19   same income, paying their bills out of the same checking

20   account.  The man, for some reason, is 12 to 20 points

21   better off.  So there is, just like there's bias in an SAT,

22   there is potential --

23           THE COURT:  Astonishing.  I just want to know

24   astonishing that there would be that kind of bias.

25           MR. GRICE:  It's hard to believe.

Page 70

1    A    So the score is, it's a necessary part of the credit

2    evaluation now, but it's not sufficient.  Most lenders in

3    the 2000s had alternative methods to also think about

4    creditworthiness: looking at things like how well you pay

5    your utility bills; can you prove that you pay your rent on

6    time?  That that gives us insight into your character also.

7    So it's really capacity, character, how much you've saved

8    over your life.

9           But at the end of the day, you know, I've got to

10   get comfortable with the character of this borrower, at

11   least as much as their capacity to make the monthly

12   payments.

13   Q    And what is the --

14          THE COURT:  Mr. Davis, you're clearly on a roll.

15   But Mr. Grice has been up there for an hour and a half, so I

16   think we ought to take a little break.  Is that okay?  Are

17   you at a stopping point?  All right, Mr. Grice, we're going

18   to take a 10-minute break.  During the breaks, until your

19   testimony is completed, please do not discuss the case or

20   your testimony with anyone or be in anyone's presence while

21   they're doing the same.

22          MR. DAVIS:  Thank you, Your Honor.

23          THE COURT:  All right?  We'll come back in 10

24   minutes.  Thank you.

25       (BREAK)

Page 71

```
 1              THE COURT:  Okay, Mr. Davis.

 2    Q    Mr. Grice, what is the underwriter's role in the loan

 3    origination process?

 4    A    It's to do an assessment of the applicant's capacity

 5    and character, capital, et cetera, and to fit that applicant

 6    to a set of program characteristics.  Again, tailor that

 7    mortgage to fit that borrower.

 8    Q    So does the under --

 9    A    I'm sorry -- and, ultimately to make the credit

10    decision.

11    Q    Does the underwriter see the loan application?

12    A    Yes, and relies upon that heavily.  Again, that's the

13    result of this interactive process with the applicant, the

14    loan officer, the loan processer.

15    Q    And under what standards is the underwrite operating;

16    what are those standards called?

17    A    The underwriter is, again, trying to evaluate that

18    borrower and whether there's an appropriate fit given the

19    products that they offer.  So it's a holistic assessment of

20    that borrower against the underwriting guidelines.

21    Q    Is it possible for a loan to be approved without

22    meeting all the technical standards of the applicable

23    underwriting guidelines?

24    A    Yes.  So earlier, I talked about compensating factors.

25    So if I have a program -- if I'm a bank or a lender and I
```

Page 72

```
 1    have a loan program that requires some characteristic, an

 2    income of X or a credit score of Y, a compensating factor

 3    might be available to sort of adjust for that shortfall.  So

 4    it's a, we call it a surplus strength that's available.  It

 5    doesn't cure all ills, but it just -- it gets back to the

 6    facts and circumstances of the fact that we all come in

 7    different shapes and sizes.

 8    Q    What happens to the loan files after a loan is

 9    approved?

10    A    So at the approval stage, we're now -- our goal as a

11    lender is to get to closing.  And so, a lot of documents

12    have to be prepared for that closing interaction.  If you've

13    been to a closing, you have to spend a lot of time signing

14    and initiating a lot of documents.  All those consumer

15    disclosures and the contract aspects of the loan have to

16    come to the closing table and they have to be properly

17    formulated.  So the loan file, the trajectory then from

18    approval, is getting ready for the actual funding of the

19    loan.  And once the loan is funded, then a whole variety of

20    other series of processes occur.

21    Q    What role does the loan application play at the

22    closing?

23    A    So the somber act at the closing, one of the somber

24    acts, is I sign the final loan application.  This is kind of

25    my last chance to get things right as a borrower, as an
```

Page 73

1      applicant.  And I have to fill out an attestation, which is

2      where I declare that I'm -- if I'm misrepresenting facts, it

3      would constitute bank fraud.  So it's this final

4      certification of the facts and circumstances.

5      Q    What documentation is required to be present at

6      closing?

7      A    Everything about the actual loan contract, in addition

8      to a variety of consumer disclosures, so some of those

9      require signatures, some don't.  But the law requires that

10     I, as the applicant or borrower, be apprised of the total

11     finance charges, the total fees charged.  There's full

12     transparency so that I have a full understanding of what

13     this business interaction is.  Most people don't do this

14     very often, so it's really to provide the borrower with a

15     chance to fully understand as best they can what's about to

16     occur.

17     Q    How does a lender insure that all the required

18     documents are present at closing?

19     A    How do they insure that all the documents are present

20     at closing?  Well, so there's low-end regulation that has

21     certain specific requirements.  And then, also, a lot of

22     banks prepare their own -- they have their own procedures

23     for insuring the documents are there at closing.  One result

24     of that is, there are a lot of documents that need to be

25     present at closing, but there's no requirement they be

1    signed by the customers.

2           A lot of banks will elect to have the customer

3    sign something and acknowledge it, just as a CYA exercise to

4    make sure if the bank examiners come and ask, you can prove

5    that this document was received, because I have an

6    acknowledgement by the customer.  So there are a variety of

7    disclosures that are handed to the customer, provided to the

8    customer at the closing table that don't require a

9    signature, but a lot of companies that I work with have

10   added a signature line.

11   Q    Do lenders prepare checklists or other documents,

12   evidence than what was present at closing?

13   A    Again, this is pretty complex.  So the checklist

14   typically has 20 or 30 items on it.  These are all the

15   things that have to be there.  And that's an example of a

16   footprint that we see with missing documents, where we don't

17   have the document, but we have the checklist.  That's a kind

18   of evidence that the document was present.  And so, there's

19   several of those in the 1,879 that we've reviewed.

20   Q    Is there a single definition of the term a loan file?

21   A    Importantly, no.  So a loan file is -- the term is

22   thrown around a lot.  But there's no proper definition of

23   what isn't a loan file.  So functionally, it's going to vary

24   based on who in the process or the life of that loan is

25   handling it.  So in origination, the loan file, if we want

1    to call it that, is everything that my application included,

2    all the written material, plus maybe notes that the

3    underwriter prepared.

4         Once the loan exists, that information is like a

5    booster rocket, is no longer relevant, and now we need to

6    know where the borrower is, what their work number is, how

7    can I find them, if I have questions about servicing.  So

8    the business purpose changes.

9         And so, the contents of the loan file for a

10   servicer -- and this is what most of the files I reviewed

11   contain, have multiple versions of some things, like credit

12   reports, and monthly, you know, evidence of payment, but not

13   much about the origination of the borrower.  Because we

14   don't -- that's no longer relevant, right?

15        How that loan was approved is now an historic

16   fact.  So now, we care about the servicing of it.  So each

17   of the purposes of that file dictates what you would expect

18   to find in it.

19   Q    What did you observe about the overall quality of the

20   loan files at issue in this case?

21   A    Again, these were old, and the quality was rather poor.

22   We found a lot of broken or incomplete files.  We also found

23   several that were kind of Frankenstein files, where the file

24   might contain parts of two different borrowers that somehow

25   fell together.

Page 76

1        So we found claim packages, where the claim

2   package itself is 300 or 400 pages long, and it's --

3   somebody made a mistake and kind of folded Bob and Mary, who

4   have no relation to each other, into the same claim package,

5   or the same loan file containing kind of the totally

6   unrelated Bob and Mary.  So again, these were not pristine

7   files, and they were old.  They're older than average.

8   Q    How did your understanding of the age and condition of

9   these loan files inform your breach curve analysis?

10  A    Well, it told me that -- and I knew this from my

11  experience -- that there is a challenge created by the

12  passage of time.  So I'm going to see multiple versions of

13  some things, and I'm going to not see important evidence

14  that I would see in a loan that originated toward the end of

15  the period, as opposed to the beginning.

16        So I know from my direct experience, stuff goes

17  missing in files.  The more auditors, the more examiners,

18  the more that loans are subjected to inspection,

19  investigation, photocopying, shipping, things come out of

20  files.  Also, things are added to the files.  So that

21  Frankenstein characters, I don't know how that came to

22  exist, the two unrelated borrowers living together in a

23  file.  But these things are a consequence of documents,

24  especially these liquidated loans being passed around.

25  Q    Next slide.  Mr. Grice, in this case, Mr. Morrow has

Page 77

1    said, "If it's not in the loan file, it didn't happen."  Do

2    you agree with that?

3    A    Not at all.  I think this is -- this flies in the face

4    of common sense, and my experience.

5    Q    Mr. Grice, let's talk a little bit more about the loan

6    application.  May I ask you to turn to Tab 6 in your binder,

7    which is Exhibit 2929B?  Do you recognize this document?

8    A    I do.  It's a -- it's one of the loans at issue, one of

9    the claims at issue.

10   Q    Okay.  Let's start on Page 2 of this tab.  And let me

11   direct your attention to Section 5, (indiscernible) 5.  What

12   does this section request of the borrower?

13   A    Well, this is interesting.  It's obviously requesting

14   gross monthly income.  And then, there are a variety of

15   subcategories underneath there.  In this case, the applicant

16   has said their base employment income is $7,966.  I believe

17   this is a stated income loan, if memory serves, so that the

18   applicant is representing their income.  I don't know if

19   that applicant -- I don't know how they're coming to that

20   formulation of their gross monthly income, but this is what

21   they've represented on the application.

22   Q    Is there a mortgage standard, a mortgage industry

23   standard definition of the term gross monthly income?

24   A    Importantly, there's not.  I should add, there are also

25   scant instructions for this form.  I just completed my tax

1    return for last year, and I -- you know, on a tax return,

2    there are all sorts of definitions and schedules and ways to

3    tabulate and I think the IRS, even though I'm grumpy about

4    the IRS, they do a rather good job of helping you figure out

5    how to fill out the form.

6         This is an area where there are very few instructions,

7    and importantly, no definition of gross monthly income or

8    base employment income.  Well, we have an asterisk here that

9    tells us about self-employed borrowers, maybe required to

10   provide additional documentation.  But this generation of

11   the form didn't really help the applicant or frankly, the

12   loan officer know how to complete this.  So this is where I

13   think more, how the industry interprets this, and most

14   importantly, how the customer understands this, become

15   really important.

16   Q    And in your experience, do borrowers always know how to

17   calculate their gross monthly income?

18   A    No, I think this is -- again, the term is not defined.

19   I don't know if this is -- again, I don't know, this

20   borrower, Richard, I don't know what his basis is for making

21   this.  I don't know if he is making an estimation.  If I

22   recall, he works as an HVAC, you know, a heating and air

23   conditioning worker.

24        The application is completed in the end of August,

25   2006 in Virginia, where it's hot.  I don't know if he's had

1   a good summer and he's kind of doing an estimation of how

2   his year's going to go, or if he's doing a retrospective

3   analysis or if he's basing it on additional information.  We

4   just don't know.  So it's one of those common examples.  I

5   just don't know what the customer is thinking.

6   Q    Are there certain borrowers that might have more

7   difficulty than others, calculating adverse monthly income?

8   A    Yes, and certainly in my experience, complicated income

9   streams, self-employment or combinations of salary plus

10  self-employment.  So I work as a -- you know, I've got a

11  salaried job working at a university as a teacher, but I

12  also do consulting, and I also do some sort of summer

13  employment.  That's going to appear as wage income, plus

14  maybe commissions, plus other self-employment income.

15        I don't know how that person is going to think

16  about this form and how to complete it.  So each of us is

17  different, and I think it's obvious over time, people are

18  becoming more complex in their income streams, to be more

19  resourceful.  So I think it's a very complicated and

20  important question.  I don't have the complete answer to it.

21  Q    Can we have the next (indiscernible) slide?  Would you

22  look at the testimony on this slide, for Mr. Morrow, Mr.

23  Grice?  And tell me, what is Mr. Morrow saying about how you

24  calculate gross monthly income?

25  A    I have to confess, I've read this a few times.  I don't

Page 80

1   completely understand what is being said here.  He's

2   offering a certain formulation, and I think it's

3   retrospective, that at any point in time, you know what the

4   previous 12 months of income was.  And so, you know what

5   your rate of pay was.  And so, that's the answer.  So, and

6   you just know it.  So, but it's retrospective.  And you

7   divide by 12.  So I think that's how I interpret what he

8   said, but I may be wrong.

9   Q    So what is Mr. Aronoff saying about how you calculate

10  gross monthly income?

11  A    Again, I think I speak his language, and I think he's

12  saying it's prospective.  So what they expect to be for the

13  calendar year.  So back to that Richard we were just looking

14  at, at the end of August 2006, I don't know if he's looking

15  back and saying historically this is what I earned, so I'm

16  going to report that?  Or this is prospectively what I think

17  I'm going to be earning.  And so, let me tell you about my

18  good year.

19        But in the context of self-employment in

20  particular, or these blended income streams, it gets really

21  complicated because, I mean, again, as a self-employed

22  person, I don't know what my income is going to be, often

23  until well into the next year.  And I certainly don't know a

24  lot of the kind of arcane accounting terminologies that are

25  relevant to that analysis.

Page 81

1   Q    So what does this testimony tell you about what a

2   borrower should understand the term gross monthly income to

3   mean?

4   A    It tells me that here, two experts don't have a common

5   understanding, and I, you know, I certainly understand and

6   have an understanding the applicants are going to have a

7   hard time figuring this out.  This is -- this does not

8   describe that there's no worksheet.  And again, unlike my

9   tax return, where there's a schedule and a worksheet, here,

10  you're kind of left on your own to interpret what that is.

11        We know there are conversations with loan officers

12  about the meaning of that term.  But we don't have any

13  evidence of what that -- how that was translated.  So we're

14  -- this is guess work.  We don't know.

15  Q    So let's turn back to the loan application we have up,

16  and look at Section 6, Roman VI of the application, and just

17  focusing on assets for a moment.  What information about the

18  borrower's assets typically gets reported in Section VI?

19  A    So again, your -- at first blush, the loan officer is

20  interviewing the customer and saying, "Tell me about your

21  assets.  What are your bank accounts, saving accounts, CDs?"

22  some of us know that, and are -- can recollect that

23  information.  For the most part, we don't know our account

24  numbers.  I've been in banking a long time.  I can't tell

25  you any of my account numbers.

Page 82

1          So on the asset side, you begin with a

2     recollection.  And then, eventually, that information is

3     pulled in from the credit report or through verifications of

4     actual deposit or bank activity.  So it begins as a first

5     blush approximation.  And by the time I go to closing, this

6     section of the application becomes rather complete, and you

7     see a line for account number.  Usually, that's populateds.

8     We actually get either a verification of what's in the

9     account, that includes that detail, or the loan processor

10    obtains it.  But eventually, this gets populated.

11    Q    Is the borrower typically asked to list all of their

12    assets?

13    A    In my experience, typically underwriters and loan

14    officers want sufficient assets to quality for the loan.  So

15    if I'm interviewing a customer, I need to get you across the

16    finish line.  So usually, I have to establish that you have

17    three or six months of expenses in the bank, so that if your

18    job stopped immediately, you'd be able to survive for a

19    while.

20          So I want sufficiency of assets to qualify.  I'm

21    not going to do -- I need to distinguish, at this period of

22    time, 2002 to 2008, there was not a requirement to do a sort

23    of extensive due diligence on all of your financial

24    holdings.  Today, because of Dodd-Frank it's the opposite.

25          I do a complete inventory of everything you've got

Page 83

1    everywhere, and I will not process the application

2    (indiscernible) all of the pages of all bank statements.

3    But at this period of time, it was -- I needed sufficient

4    assets to qualify for the loan.

5                 THE COURT:  Can I ask a question?  When you're

6    engaging in this process, are you looking at borrower worst

7    case scenario?  In other words, are you looking at coverage

8    for principal on interest on a fully amortized basis?  Or

9    are you only looking for coverage on whatever the proposed

10   product that you're showing to the borrower will require?

11                MR. GRICE:  At this --

12                THE COURT:  Do you understand my question?

13                MR. GRICE:  I do.  At this period of time, it was

14   looking at the product requirements.  By the end of the

15   period, there was a sensitivity to the fact that a lot of

16   these loans had interest only.

17                THE COURT:  Right.

18                MR. GRICE:  And so, a lot of banks got ahead of

19   the game.  The regulators, through the examination process,

20   started giving instructions.  We want you to underwrite

21   against the fully amortized value.  But that -- we were --

22   we, as an entry were slow to catch up to this.  And so, some

23   banks got ahead of that curve faster than others.

24                THE COURT:  So for the most part, you're looking

25   at if it's an interest only product, it's not going to reset

Page 84

1    for five years, you're just looking at coverage for that

2    payment, which is going to be interest only in that period

3    of time?

4              MR. GRICE:  I think in general, that was the

5    practice.

6              THE COURT:  Okay.

7              MR. GRICE:  Certainly, in the beginning of the

8    2002 to 2008.

9              THE COURT:  Thank you.

10   Q    Mr. Grice, what about the liabilities section?  How is

11   that portion of the application -- how is the information in

12   that portion of the application typically obtained?

13   A    So again, initially, through recollection.  So the

14   customer is giving you their best memory or best

15   recollection.  As a bank, though, as a lender, I'm going to

16   get this eventually from the credit report.  So I'm going to

17   pull that in from a more reliable source than your

18   recollection.  And you know, the credit report's come in a

19   couple of different varieties.  Some are single bureau,

20   where one credit scoring company will pull that information

21   together.

22             We also have these tri-bureau -- it sounds like

23   tri-borough, but tri-bureau agencies, where they're

24   reporting everybody's understanding of your credit.  And

25   that's -- either of those give you a set of answers, the

Page 85

```
 1    tri-bureau version gives you a more comprehensive set of

 2    data.

 3    Q    Let's turn the page to Page 405 and look at Section

 4    Roman IX.  What is the purpose of this section?

 5    A    Roman IX is very hard to read, but it's a series of

 6    what, 11 attestations or acknowledgments by the borrower.

 7    Q    If we look at Subpart I, what does this say about the

 8    consequences to the borrower submitting false information?

 9    A    I think it's first for a reason.  It tells you that,

10    you know, under criminal penalties, including fine or

11    imprisonment, I need to get this accurate.  So or

12    accurately.  So it's acknowledging that I understand, I'm

13    engaging in an important process and there are real

14    consequences to misrepresenting.

15    Q    Is this important to your opinions in the case?

16    A    It is.  I mean, I think it's relevant.  It's not -- you

17    know, this is not the homerun, but this tells you that the

18    borrower is at least signing an acknowledgment.  And

19    hopefully, they understand it.  Again, these are rather --

20    and on the one hand, they're very basic concepts of telling

21    the truth.  They're also rather complexly worded.  And

22    again, the print is small and there are a lot of words here.

23    But I think it's listed first for a reason.

24    Q    Mr. Grice, you mentioned the credit report a number of

25    times.  How does an underwriter use a credit report at
```

Page 86

1    origination?

2    A    So the credit report is really a kind of verification

3    of a lot of the facts that you've provided me in the

4    interview.  It's also the basis for additional inquiry.  So

5    if you tell me that you've got three debts, and I find four,

6    it's a way for me to inquire and ask additional questions.

7    So it's a way to -- it's a tool for additional inquiry.

8    It's confirmatory of some things, but you know, it's the

9    difference between what you've been told, that what's on the

10   credit report is part of that conversation that occurs up

11   until the closing.

12   Q    And on these tri-bureau reports that you mentioned, how

13   many scores are typically collected?

14   A    So you get three.  You get the three major credit

15   bureaus -- Experian, TransUnion and FICO, the Fair, Isaac's,

16   and these are the three black boxes that score you from zero

17   to 800.  And this is where there's -- you'll notice, and

18   some of them, they're all quite closely clustered.  And

19   others, they're -- there's a very big disparity, so you

20   wonder -- somebody's placing a lot of reliance on one thing

21   that is going to push somebody potentially out of range for

22   qualifying for that loan.

23   Q    And which of the three scores does the underwriter use

24   in the (indiscernible) decision?

25   A    Yeah, generally, the guidelines tell the underwriter to

Page 87

```
1    pick the middle of the three scores, so not the high, not

2    the low, but the one that's just in the middle.

3    Q    So in your view, and in this time period, how accurate

4    were the credit reports?

5    A    The credit reports then, and I think now, suffer from a

6    lot of accuracy problems.  I read my credit report

7    frequently, and I find I've had a Sears credit card that I

8    don't think I've ever opened.  So the credit reports

9    inherently carry stuff that is being reported about you that

10   you can't directly control.

11           And you know, there's a wide body of regulation,

12   the Fair Credit Reporting Act, that allows consumers the

13   opportunity to get a remedy to fix inaccurate information.

14   I think it's openly acknowledged that there are errors on

15   these things, and that customers need to read the credit

16   reports, and then make corrected statements.  So I would

17   encourage all of us to read our credit reports carefully.

18   Funny things show up there, and it's often a sign of fraud.

19   You'll see account activity that you're not aware of, and

20   that's often the first place that's identified.

21   Q    Does a lender verify from time to time information

22   provided by a borrower at origination?

23   A    It's an important thing.  You see a lot of evidence in

24   these files that I reviewed, where there will be inquiries

25   from creditors, you know, a car lender, a mortgage lender.
```

Page 88

1    And you'll see a letter in the file, where the banker has

2    asked the borrower to write a letter to the file, certifying

3    that they did not open a credit as a result of that inquiry.

4           So during this 2002 to 2008 period, this practice

5    of how we lenders should respond to inquiries became more

6    formalized.  It's really after the financial crisis in 2010

7    that Fannie Mae and Freddie Mac kind of laid down the law

8    for how banks should respond to credit inquiries.  So it --

9    this is -- this financial crisis, the -- one of the lessons

10   the industry learned was, people may try to submit multiple

11   applications simultaneously into lenders to fool the

12   lenders.  And so, we, unfortunately didn't know that until

13   2010.

14   Q    What are some of the common verifications a lender --

15          THE COURT:  Can I go back to that, to make sure I

16   understand it?  So that the -- you get a credit report and

17   you see in the credit report multiple inquiries around the

18   same period of time or not.  So are you saying that that

19   kind of functions as a red flag for you to do for the work,

20   to figure out whether any of those inquiries led to debt or

21   led to another borrowing, rather, proposed applicant?

22          MR. GRICE:  It's hard to answer that question

23   easily.  And the reason is, there's no law or regulation.

24   What there is, is a practice in 2010.  Fannie Mae and

25   Freddie Mac tell people, be sensitive to inquiries, and we

```
 1   want you to pull credit reports frequently, as you approach
 2   closing.
 3            But back during this period, it -- there was a
 4   wide variance.  I think generally, inquiries were seen as
 5   potentially threatening.  And most lenders wanted to get a
 6   letter to put them -- to reassure themselves there was new -
 7   - no new debt out there.
 8            THE COURT:  I see.
 9            MR. GRICE:  But there was no universal approach.
10   So most lenders that I worked with had a procedure that
11   said, if you have more than 15 inquiries, we want a letter.
12   But I mean, 15 is maybe misleading.  If I go shop for a
13   mortgage and talk to a broker --
14            THE COURT:  Right.
15            MR. GRICE:  -- that may cause multiple.  Or if I--
16            THE COURT:  But that's where my question was
17   going, that you could be actually, just being a smart
18   consumer, and shopping for the best mortgage rate that you
19   can get at a given moment.
20            MR. GRICE:  That's right.  And yes.  And also,
21   usually when I buy a house, I'm doing a lot of other things,
22   too, right?  I'm about to buy a couch.  I'm about to maybe
23   buy a car.  So from a financial point of view, it's kind of
24   an explosion of financial activity, and trying to separate
25   what's the normal course of events from unusual is what
```

1    you're trying to get at.

2            THE COURT:   Thank you.

3    Q    And so, in this time period, what would the presence of

4    (indiscernible) explanation tell us about the underwriting

5    process?

6    A    It tells me that this was careful underwriting.   This

7    was a lender trying to establish that there was no new debt

8    created.   And so, we saw many, many, many of these in the

9    1,879, and then the later population we reviewed.

10   Q    Are there circumstances under which a lender might

11   attempt to verify the employment or the income of the

12   borrower?

13   A    Yes.   So many of the guidelines for the program for the

14   products at issue required a verification of employment or a

15   verification of specific bank activity to ensure that the

16   deposit in your account was real.   So again, each program

17   has different requirements.   We see many of these

18   verifications of employment, either by letter or by fax or

19   by phone call.   So it'll be evidence that a phone call was

20   made a few days before closing, to certify that Charles does

21   in fact have a job.

22   Q    Mr. Grice, let's talk about tax documents for a moment.

23   Are you aware that the Trustees have referred to tax returns

24   as a form of evidence that supports the misrepresentation of

25   claims?

Page 91

1   A    Yes, Sir, it's commonly seen in the claims packages.

2   Q    What characteristics of a particular tax return are

3   relevant to its reliability in the context of a breach

4   analysis?

5   A    Well, certainly, you know, timing.  I know from Mr.

6   Shuster's opening that near year tax return is seen as more

7   probative than an out year, distant year.  So you know, we

8   just looked at an application from 2006.  So the -- a 2007

9   tax return has more value than a 2010 tax return.  But I

10  think all things being equal, I agree with that.  But tax

11  return, though, again, has limited value in answering this

12  more fundamental question of when that -- when Richard is

13  applying for a loan in August of 2006, when he says his

14  gross monthly income is $7,900, what is he -- what question

15  is he answering?

16          Is he answering historically, prospectively?  Is

17  it an estimate?  So it does -- the tax return doesn't tell

18  anything about what the rate of pay was on August 31st,

19  2006, when he completed the application.  So that -- I mean,

20  one way to frame this would be, what in fact was his rate of

21  pay that day, if you can establish that?

22          So it doesn't tell us about the rate.  During the

23  course of the year, if things change, the tax return on a

24  calendar basis doesn't tell us anything at all.  And

25  secondly, the completeness of the tax return are the

Page 92

1    schedules that Richard used in the file.

2              So if I'm going to rely on a tax return,

3    especially for anybody who's partially or wholly self-

4    employed, I need Schedule C at the get -- at the outset,

5    because that's where the profit and loss from the business

6    is.  So I need to get, you know, as complete a picture of

7    this borrower as I can.

8              But again, for complex people, it may be Schedule

9    C, Schedule E, you know, partnership income, all sorts of

10   other things come into play, foreign income.  So each of

11   these income streams has a schedule.  I would want

12   completeness.  And then, finally, there's the question of

13   signed and unsigned.

14             And this came up in my deposition.  I obviously,

15   I'm an old guy.  I like signed tax returns.  The guidelines

16   for the loans at issue required lenders to use signed tax

17   returns.  A lot of the tax returns we see are unsigned.

18   That could be because of a practice of signing it

19   electronically, potentially.  It could also be because it's

20   a draft.

21             I mean, any number of things may have caused this

22   tax return not to be the definitive tax return.  So I think

23   that's a factor in the analysis of the evidence.

24   Q    So, and in the context of misrepresentation of income

25   claims, how do the Trustees use a borrower's tax return,

Page 93

1   typically, to calculate a number to compare what the

2   (indiscernible) monthly income was on the loan application?

3   A    So for example, that Richard case we were just looking

4   at, where he says he earns $7,900 -- I'm sorry, $7,966,

5   that's what he represents.  And my understanding, from Mr.

6   Aronoff's deposition is, that fact is now going to be

7   tested.  So the tax return is seen as the proof, and we will

8   use that, assume that to be true, and now see if we can

9   triangulate, tie back to that $7,966.  So you see many

10  examples.

11          The most common practice by the Trustees on this

12  topic is to take a tax return for the same year or a

13  subsequent year, divide some income number by 12 to get a

14  monthly income number, and now say that this trumps whatever

15  was reported on the tax return, and whether there's

16  additional corroborating information or not.  And that, to

17  me, is that lack of respect, I called it, for the tax -- for

18  what's actually on the application.

19          Now Richard filled out this thing, and it's the

20  result of a conversation with the loan officer.  Now, we're

21  going to wipe that away and substitute it with this kind of

22  synthetic representation of income, which is not coming from

23  the customer.

24  Q    Are there any particular challenges associated with

25  analyzing a self-employed borrower's tax return?

Page 94

1    A    It's much more complex.  I mean, again, any self-

2    employed person's tax return is longer.  It has more

3    judgments on it.  It has judgments not only by the borrower,

4    by the accountant.  Again, I've been filing tax returns for

5    42 or three years.  I have no idea what my depreciation rate

6    is in my business.  I can not give you an estimate today or

7    I don't recall last year, and I certainly don't know the end

8    of this year.  So it's a -- it's another language, from I

9    think really most self-employed people.  It's just not a

10   metric I would recognize.

11   Q    Okay.  Let's look at a specific example.  Would you

12   turn to Tab 5 in your binder, which is PA Exhibit 631?

13   A    Yes sir.

14   Q    Do you know what this document is?

15   A    Yeah, this is the claim package for the loan ending in

16   2979.

17   Q    And if you could turn to Page 12 of 30?  Do you

18   recognize this document?

19   A    Oh so this is -- so this is our Richard person again,

20   who lives in Winchester, Virginia, or was living in

21   Winchester, Virginia.

22   Q    And have you reviewed this loan?

23   A    I have, carefully.

24   Q    And were you asked about this loan at your deposition?

25   A    At least once, maybe twice.  I don't recall.

Page 95

1    Q    And do you recall the claim the Trustees made, with

2    respect to this loan?

3    A    It's a misrepresentation of income, at least.  There

4    may be other claims, but that's the one I recall.

5    Q    Do you recall whether the Trustees relied on this tax

6    return?

7    A    Yes.  This was the foundation of their allegation.

8    Q    Would you turn to Page 15 of 30?  What is this form?

9    A    So this is the Schedule C.  This is the -- I've heard

10   this described as a moral quagmire for small businesses.

11   What am I going to deduct?  You know, is the trip to

12   Disneyland a business trip or a vacation?  So this is where

13   the business owner reports income, expenses, broken out with

14   some detail.

15   Q    And what were the gross sales of the business, as

16   reflected here?

17   A    So again, I told you, Richard was an HVAC worker --

18   heating, air conditioning, ventilation.  And his business

19   drew -- brought in $146,588 for 2006.

20   Q    Now would you look at the drawn in box in the bottom

21   right-hand corner?  What is that?

22   A    So this is where the interesting stuff occurs.  So this

23   -- Line 31 on the Schedule C is net profit or loss from the

24   business, and it's derived from a series of calculations

25   above.  And so, from a tax point of view, again, I'm not an

Page 96

1    accountant or a CPA, but so Richard is reporting $26,595

2    from a tax perspective.  So that's his taxable income

3    derived from his self-employed business.  But that's net of

4    several things that I don't think Richard would know about,

5    unless he's lucky and he's both a CPA and an HVAC worker.

6              What's happened is, so the Trustees drew this box

7    around Item 31.  And you see there's an addition.  They add

8    the depreciation back in to his net income, to come up with

9    a $3,996 per month of kind of a derived or synthetic

10   calculated small business income, plus depreciation.

11   Q    Is this a calculation a borrower would likely use to

12   determine his gross income when he was filling out the loan

13   application?

14   A    Well, it'll be a couple of things.  He completes the

15   application on August 31st.  This is an end of year picture,

16   right, or a snapshot.  So he would have -- in order to know

17   this number, he'd have to know what's going to happen in the

18   next three months, September, four months.  And he'd have to

19   know his depreciation, all his other expenses.  So I think I

20   would be surprised if Richard knew this.

21   Q    In your view, was this an appropriate way to calculate

22   this borrower's gross monthly income for purposes of a

23   misrepresentation of income breach claim?

24   A    No.  I think as an underwriter, or I think even in the

25   business of re-underwriting loans historically, you have to

Page 97

```
 1    consider other facts, other factors.  These loans were
 2    originated, these stated income loans were originated in
 3    different companies.  Each company had their own approach to
 4    stated income loans.  But in general, the common thread was
 5    that the underwriter had to make an assessment of the
 6    reasonableness of somebody's stated income.
 7              Sometimes, that results in a document.  Sometimes,
 8    it just results in a determination that I think Richard is
 9    giving me an accurate number or an accurate enough number
10    for me to approve the loan.  So the approval in my
11    understanding is a determination by the underwriter of the
12    reasonableness of that stated income.
13              This calculation is interesting, but it's not
14    anything that could be in the mind of its customer easily.
15    And I think is -- it's convenient.  It's easy to perform.
16    But it's not relevant for the purpose of trying to frame a
17    misrepresentation.
18    Q    Okay, Mr. Grice, we've used the term claim package in
19    this case.  What is a claim package?
20    A    So the claim package is the collection of evidence that
21    is assembled by the Trustees, and then sent to the PA as
22    part of their claim submission.
23    Q    From what document sources will the Trustees select
24    documents for the claim package?
25    A    A wide variety, but that's where the evidence is
```

Page 98

1    supposed to be in support of the claim.  So they'll pull

2    things from the loan file.  They'll also pull things from

3    outside the loan file.  So commonly, you see guidelines, the

4    loan application of third party information pulled in by the

5    forensic review team working with Mr. Aronoff.  So you see a

6    variety of different kinds of information inside the claim

7    package.

8    Q    And how would you characterize the completeness of

9    information in the Trustees' breach claim packages?

10   A    Rather incomplete, rather one-sided.  I mean, I --

11   obviously, this is a claim submission, but you see evidence

12   where they've failed to identify documents in the loan file

13   that even support their claim.  So they find a -- the first

14   piece or the biggest piece of evidence and submit that, but

15   not the other pieces that also support the claim.

16          And I think it's reasonable to expect that they're

17   going to be -- I would include, if I were formulating claims

18   packages, information that presented a challenge or

19   contradicted or presented kind of both sides, to be a more

20   credible balanced submission of a claim.

21   Q    And just in general, what kinds of third party

22   information were in these claim packages?

23   A    This could be tax returns, third company bankruptcy

24   filings pulled off of Pacer, very commonly results of the

25   Bureau of Labor Statistics, which I think has been discussed

Page 99

1    already here in court, a wide variety of data aggregator

2    reports, firms like DataVerify, Lexus Nexus, Accurate, which

3    pull in data from public sources and try to -- they're

4    attempting to either make a correlation or a representation

5    that this borrower has aspects that you might want to

6    consider.  But there are a whole variety of these third

7    party sources that are, again, are reliance material for the

8    Trustees.

9    Q    Mr. Grice, I want to show you some testimony from Mr.

10   Aronoff.  Is Mr. Aronoff's testimony about what third party

11   information was and was not included in the claim file

12   consistent with your observations of the Trustees' claim

13   files?

14   A    It is.  This supports that one-sided nature.  So the --

15   you know, let's take a hypothetical borrower who has a

16   misrepresentation of income.  And the basis for the

17   Trustees' claim is an out-year tax return.  What this quote

18   is telling me, and I hope I'm correct, is that if BLS, if

19   the Bureau of Labor Statistics had been run for that

20   borrower, and the results showed that the borrower perhaps

21   was not misrepresenting, that evidence is not going to be

22   passed forward in the claim package.  So it supports the

23   one-sided nature, and the limited nature of evidence that's

24   submitted by the Trustees.

25   Q    Let's talk about BLS.  What does BLS --

Page 100

1            THE COURT:  Before you go onto that.  Could you --

2     if you have an understanding, could you explain to me,

3     what's the difference between these two blocks of questions

4     and answers?  The first one says what?

5            MR. GRICE:  My understanding is, when Duff and

6     Phelps did their review, there was no procedure for the

7     retention of documents, including unattractive documents,

8     you know, documents that did not support the claim.

9            THE COURT:  Okay.  And what about the second Q&A?

10           MR. GRICE:  And then, again, whether or not it's

11    attractive data from the purpose of the claim, was the

12    practice to forward all of that additional information to

13    the Trustees.  And I think he's saying, it wasn't, and

14    that's also by design.

15           THE COURT:  Well, this one says plan

16    administrator.

17           MR. GRICE:  Yes, so transmitted to the plan -- so

18    the information -- in the first quote, the information being

19    collected is not being retained.  And the second one, to the

20    extent there is this third party material collected, it is

21    not going to be by design, transmitted to the PA.  So the

22    claim package will not include information that's

23    inconsistent or inconsonant somehow with the claim.

24           THE COURT:  But the answer, again, this is, I

25    don't know if this is a worthwhile exercise, but the answer

Page 101

1      that Mr. Aronoff gives here is, he can't tell.  But then he

2      says, it shouldn't happen that way.  Why don't we move on

3      and just leave it there?

4      Q    Mr. Grice, let's talk about BLS for the moment.  What

5      does BLS stand for?

6      A    It's the Bureau of Labor Statistics.  It's an office of

7      the Labor Department, the US Labor Department.

8      Q    And what does BLS data?

9      A    So BLS is a huge creator, collector, maintainer of many

10     different types of statistics.  So it's one of the largest

11     sources of statistics in the country.  You know, the

12     unemployment rate, for example.  So it collects and reports

13     a lot of data.  It also operates a thing called the OES, the

14     Occupational Employment Survey, which they've been doing for

15     many, many years.  And it's a -- an annual survey through

16     the mail of a large variety of employers looking for income

17     and compensation results for about 800 occupations around

18     the United States.

19     Q    And how did the Trustees use BLS to support their

20     breach claims?

21     A    Well, it's important, the BLS is the only data base

22     that is archived, historic data.  So actually, it allows you

23     to do a retrospective test or analysis of whether a 2005

24     represented income for a law professor over something

25     relates at all to the results of the survey.  So it's --

Page 102

1   they used it as the basis for many of their

2   misrepresentation of income claims, by saying that the

3   borrower was inconsistent with the results of this survey,

4   and therefore, making a misrepresentation.

5   Q    And what is your view of the reliability of BLS, as the

6   Trustees use it to serve as representation claims?

7   A    I think it's extremely unreliable for most people,

8   depending on their occupation.  It can lead to extremely

9   misleading results.  It was never intended for this purpose.

10  It's intended to be an economic database, to allow people to

11  understand what the cost of building that office in Omaha

12  might be, but it's not intended to be an income verification

13  tool, which is how it's applied here.

14  Q    Let me see the next slide.  Mr. Grice, do you recognize

15  this?

16  A    I do.  This is one of the FAQ's, frequently asked

17  questions from the BLS website, about the data they collect,

18  and also, the data they don't collect.

19  Q    And what does this tell you about the use of BLS status

20  to prove misrepresentation claims?

21  A    Well, it's an open acknowledgment of, by design, we,

22  the BLS, do not collect back pay, jury duty pay, overtime

23  pay, severance pay, ship differentials of bonuses and

24  tuition reimbursements.  For some occupations, like a nurse,

25  a cop, a firefighter, this is huge, or factory workers

Page 103

1    working a third shift.

2              You know, for others, you know, I'm a salaried

3    loan officer at a bank, you know, there's -- overtime pay is

4    usually not an issue.  Ship differentials don't count.  So

5    it's an example of where a type of evidence may be more

6    relevant for some borrowers than for others.

7    Q    Does the accuracy of the BLS output depend in part on

8    how the tool is used?

9    A    Yes.  So if I do an inadequate job of understanding

10   your occupation, I'm going to understand where you are, and

11   I'm going to understand what you -- what I take to be your

12   occupation.  So if I'm doing one of these forensic reviews,

13   and I judge what you are and I call you X, but in fact,

14   you're Y, we are now embarking on a path that's -- may lead

15   to a misrepresentation claim, and it's because I put you in

16   the wrong bucket.

17             So instead of seeing you as this thing, you're

18   actually this other thing.  So the most common confusion is

19   between kind of, if you think about subject matter, kind of

20   you know, I work in a -- I work in the grocery store

21   business.  Well, I could either be a grocery worker, or I

22   could be a functional manager in a grocery company.

23             So if you put me in the grocery bucket, where I'm

24   handling avocados, you're going to come to one kind of

25   result.  If you put me in a management structure, where I'm

Page 104

1    a president of sales, a totally different outcome.  So this

2    is where, again, for some people, this is not a challenge.

3    Again, for some individual borrowers.

4           For some of us, it's quite hard.  And I've tried

5    to train even my own team how to use BLS.  And we've come to

6    very different outcomes for a mortgage reviewer, you know?

7    We think we know who we are, but depending on the nature of

8    the work, you could come to very different outcomes.  So I

9    think great care is required using BLS.

10   Q    Mr. Grice, let me -- let's look at an example.  Let me

11   take you to Tab 14 of your binder, which is PA Exhibit 702,

12   which is an excerpt of Morrow Rebuttal Exhibit D for

13   (indiscernible) and in an 8407.  So this is the first time I

14   think we're seeing one of these kinds of spreadsheets.  Do

15   you recognize this?

16   A    Yeah, this is the format for how we've been exchanging

17   views on these claims for the last several months.  It's an

18   Excel spreadsheet.  On the far left side is the loan number,

19   the trust, the breach finding, which is the threshold fact,

20   the rep or warranty that allegedly is being violated.  And

21   the factual basis is lifted from the Trustees' claim

22   submission.

23   Q    Okay.  According to Column D for this particular loan,

24   what has the breach alleged?

25   A    It's a misrep of income.  So it's one of the most

Page 105

1    common misreps by type.

2    Q    And according to Column F, what did the Trustee cite as

3    the factual basis for this claim?

4    A    So if you look at this, at the heart, the primary

5    evidence is that this borrower didn't match up well to the

6    Bureau of Labor Statistics results for what the forensic

7    analyst took his occupation to be.  So he represented his

8    stated income as $28,000 per month.  The loan closed on

9    12/05/2006.

10             And now, again, the forensic analyst is going to

11    run an analysis using BLS.  Here, they called him a sales

12    representative, wholesale and manufacturing, except

13    technical.  I guess that ought to be in quotes.  So the

14    actual slug of his -- the label for this gentleman's

15    occupation is sales representative, wholesale and

16    manufacturing, except technical.

17             And so, if you go in 2006, for his geographic

18    area, and look him up, and I think he's in Florida

19    someplace.  The 90th percentile for people in that bucket is

20    $7,875 per month.  So that's the test for whether or not he

21    has misrepresented his income.

22    Q    Okay.  Let's take a look at that.  If you turn to the

23    next tab, 15, which is PA Exhibit 634.  Do you recognize

24    what this document is?

25    A    This is the associated claim package for that borrower.

Page 106

1    Q    Okay.  And if you turn to Page 15 of 30, do you

2    recognize what this document is?

3    A    Yeah, this is now the window into the BLS.  So this is

4    the -- this shows you how the analyst is about to analyze

5    whether or not this borrower has allegedly misrepresented

6    his income.

7    Q    And what profession does it show?

8    A    So it is -- you notice on the next page, if you go to,

9    I guess it's 16 of 30, so here we have -- we've taken our

10   borrower, and he's in Tampa, St. Pete Clearwater Florida,

11   metropolitan area.  Occupation Code 401-4012, sales

12   representative, wholesale and manufacturing, except

13   technical.  The median income is $47,000.  The 75 percentile

14   is $65,000.  And the threshold test used by the Trustees and

15   used commonly in these re-underwriting analyses is $94,500.

16            You divide the $94,500 by 12, and that's the typed

17   data.  This is prepared by the Trustees.  You get the $7,875

18   per month.  So the view is, that if you're earning more than

19   this, you must be lying about your income.

20   Q    Now if you turn to the next tab, Tab 16, which is PA

21   Exhibit 84 --

22            THE COURT:  You meant if you say you're earning

23   more than this --

24            MR. GRICE:  Yes.

25            THE COURT:  -- you're lying about your income?

Page 107

1          MR. GRICE:  I'm sorry, you're right, Your Honor.

2          THE COURT:  Thank you.

3    Q    Tab 16 is PA Exhibit 8407B.  Do you recognize this

4    document?

5    A    I do.  This is in a loan file.  This is the verbal

6    verification of employment.  So prior to the loan being

7    funded on November 30, 2006 at the bottom of the slide,

8    somebody, I guess Ryan Beardsley at the bottom -- Ryan, the

9    processor/underwriter at the bottom of the slide, called the

10   employer for James at the top of the slide who works for the

11   employer named something-something Restoration and obtained

12   a confirmation that he is working there for -- I think that

13   says seven -- seven plus years.  Position held, president.

14   Q    Okay.  Now, first of all, was this document in the

15   claim package for this loan?

16   A    No.  It's in the loan file but not the claim package.

17   Q    Okay.  And do you know anything about the business

18   here, which we won't name?

19   A    Yeah, I'm not going to name it, but it's interesting.

20   So, you know, this business is in the kind of high-end

21   restoration of people's homes.  It's also a franchise

22   structure, so my understanding is that James is the head of

23   the franchise for that business in the -- that geography we

24   talked about earlier and he's the president.

25   Q    So, in your opinion, was it appropriate for the

Page 108

1    Trustees to use BLS status of the category of sales

2    representatives, wholesale manufacturing (indiscernible)

3    technical, as support for their misrepresentation of income

4    claim for this borrower?

5    A    No.  I think the more accurate analysis, if you're

6    going to use BLS at all -- again, I have serious misgivings

7    about using BLS -- this is why you'd want to pay attention

8    to the functional title, the function performed by James

9    which is not necessarily being a construction sales person,

10   except technical, of -- but he's the president of a

11   construction firm where -- the income now looks very

12   different than it did when compared to a sales worker in the

13   construction trade except technical.

14   Q    So what does your analysis of this claim tell you about

15   the Trustees' (indiscernible) claim process?

16   A    I think this gets -- there are many of these.  I don't

17   want to pretend this is an isolated case.  This gets to the

18   design -- again, the architecture and design, the philosophy

19   of the Trustees' claim process to rely on this kind of

20   evidence as a base for this kind of claim repeatedly.

21   Q    Mr. Grice, what is an audit credit report?

22   A    So, earlier we looked at origination credit reports

23   that are run at origination by the lender.  The audit credit

24   report is the one that's run many years after the fact as

25   part of a repurchase contest, for example, or a re-

Page 109

1    underwriting exercise.

2    Q    And do audit credit reports share some of the same

3    accuracy issues you mentioned earlier today?

4    A    I would argue they have even more, because again, under

5    the Fair Credit Reporting Act and the practice of the credit

6    agencies, they tend not to carry historic information

7    outside the document retention or record retention

8    requirements of each individual firm.  There's also a lot of

9    state law here, but, you know, on average credit bureaus

10   carry bankruptcy information forward for seven to 10 years.

11          If we're looking back 10 or 12 years, we're going

12   to lose a lot of the color and maybe the facts about what

13   was known 10 or 12 years ago.  So, we may have some of the

14   negative information come forward; we're not going to have -

15   - you know, the number of open revolving accounts or other

16   mortgage history may not survive, so it's hard to generalize

17   but I think the farther we get in time away from

18   origination, the more difficult it is to get a sense -- an

19   accurate sense of these credit reports are helpful.

20   Q    So, what is your view of using -- the liability of

21   audit credit reports used to support misrepresentation of

22   debt claims?

23   A    I think it's a challenge, all right?  It's problematic.

24   It is not dispositive.  I would not want to place my

25   reliance -- excessive reliance on these audit credit reports

Page 110

1    for much information.  Again, there's a role to play and

2    they can confirm.  Perhaps they can give us some color, but

3    again, I would be skeptical.

4    Q    How clear are they typically on the timing of debt?

5    A    At best, you get the month.  So, we learn that, you

6    know, October 2006 is when a credit is reported or born or a

7    loan is paid off.  We're not going to get days.  And

8    sometimes, those days matter.  So if the allegation is the

9    loan was originated after the subject loan, the credit

10   report -- if it's occurring in the same month, we're not

11   going to know which came first, the subject loan or the

12   other -- the other reported debt.

13   Q    Is it always possible in these credit reports to

14   distinguish between lines of credit and debts or obligations

15   that have actually been incurred?

16   A    No.  So the easy one a lot of people are familiar with

17   is home equity lines of credit.  So, if I have a $100,000

18   line of credit against my house, it'll appear as $100,000

19   debt, even though I haven't used it.  So, that's an example

20   where at first blush it looks like I'm indebted.  I have

21   potential indebtedness, but what you would want to know is

22   the actual draw on the line which sometimes but not commonly

23   is on the credit report.

24   Q    Are audit credit reports -- what's your view of the

25   reliability of audit credit reports when used to support

Page 111

1    misrepresentation of occupancy claims?

2    A    Especially unreliable.  So, you know, credit reports

3    are a kind of gossip sheet that accumulate information that

4    -- so when I go to apply for a -- let's say a cell phone and

5    I fill out an application, that information gets rolled up

6    and reported to the credit bureau.

7              So, if I say my employer and I give an address

8    where I live, that now is an occupancy data point that's

9    going to be rolled onto a credit report and may survive for

10   years.  So, I mean, God forbid I should make a mistake.  But

11   this is not an occupation -- or, it is not a declaration of

12   occupancy of where I actually reside.  This may be my

13   billing address or where my firm wants the bills to go.

14             But -- or in my case, I've got a daughter in

15   college in Massachusetts.  My credit report reflects

16   occupancy for me in Williamstown, Massachusetts.  I love

17   Williamstown, but I don't live there.  She does, and I pay

18   her bills, so that's an example where occupancy can be

19   misconstrued based on this -- it's a voluntary report by the

20   creditor to the bureau and then it's voluntarily shared by

21   the bureau.

22             You're kind of a hostage to what happens to get

23   reported.  It may be true, and again, that's why I don't

24   want to say this is information that is always invalid or

25   useless, but it's not reliable.

Page 112

1  Q    Did the Trustees use any third-party aggregators as

2  support in their breach claims?

3  A    They used a variety.  A firm called DataVerify, a firm

4  called Accurint, a firm called LexisNexis which now owns

5  Accurint.  So, a variety of these firms that go out and they

6  suck in public data like cell phone relationship data and --

7  or DMV data, or where I voted data, and they roll all that

8  public data into their proprietary database and then start

9  to make correlations and they sell, sort of the primary

10 data, but now it's organized in a way to help the purchaser

11 of that data reach conclusions.

12 Q    And how would you characterize the reliability of

13 third-party data aggregators to prove breach claims?

14 A    Unevenly accurate, right?  Unevenly reliable.  And so

15 it all depends on the facts and circumstances of how it's

16 used.

17 Q    What do these data aggregators say themselves about

18 their own reliability?

19 A    They warn the user that we don't take responsibility

20 for the accuracy of anything.  They also warn the user, in

21 some cases, not to use this data for purposes other than

22 originally intended which, again, in my kind of historic

23 view these data aggregators were primarily in the business

24 of helping people repossess car loans -- repossess cars that

25 -- so if you look at -- I read my own LexisNexis report

Page 113

1   pretty carefully, and it's interesting just to see what is

2   reported.

3           It tells with uncanny accuracy information about

4   my automobiles -- some of them.  It has no information on

5   others, but it tells you that there's a cassette player in

6   my automobile and what color it is.  It tells me that my

7   current wife's ex-husband, that car also had a cassette

8   player and what the model of registration -- so this is the

9   current registration for this individual who's not in my

10  family.  So that kind of data gets rolled into the

11  LexisNexis format.

12          Again, I think the primary purpose was originally

13  to assist repo men in finding vehicles.  It was not to

14  establish with any kind of certainty or reliable certainty

15  occupancy, occupation, et cetera.  So of my -- of the 29

16  addresses on my LexisNexis report, five are completely

17  unknown to me.  I have no -- I can't recognize the address.

18  But for the others, it's accurate to the point of knowing,

19  obviously, which apartment I was in 25 or 30 years ago.  So,

20  it -- that's why I say it's unevenly accurate.

21  Q    Would you turn to Tab 18 of your binder which is, I

22  think, in the second binder now?  PA Exhibit 681.

23  A    Yes, sir.

24  Q    Do you recognize this form of this document?

25  A    I do.  This is the services agreement for the end user

Page 114

1    of this data aggregator known as DataVerify.

2    Q     Would you take a look at Paragraph G?

3    A     Oh, this is the blown up section.  Yes.  This is the --

4    the instruction or the warning.  "Under no circumstances

5    will subscriber use the services provided as the basis for

6    testimony as a witness in litigation," et cetera.

7    Q     Is this disclaimer consistent with your view of the use

8    of third-party data aggregators such as DataVerify?

9    A     I think it's appropriate.

10   Q     Let me ask you to turn to the next tab in your binder,

11   Tab 19, which is PA Exhibit 703, an excerpt again from

12   Morrow Rebuttal Exhibit D --

13   A     Yes, sir.

14   Q     -- for the loan ending in 0848.  Have you reviewed this

15   loan?

16   A     I have.  Yes, sir.

17   Q     And what breach did the Trustees allege in connection

18   with this loan?

19   A     It's a misrepresentation of occupancy claim.

20   Q     And can I ask you to turn to Column F.  And looking at

21   the first sentence, what did the Trustees allege about the

22   borrower?

23   A     They allege an intent to occupy the subject property,

24   you know, on or after 2/16/2007, so February 16, 2007.

25   Q     So, now in order to prove misrepresentation of intent

Page 115

1    to occupy, what were the Trustees required to prove?

2    A    Specifically that, that the intent was not there which

3    is obviously a difficult thing to demonstrate, right?  You

4    have to get inside the mind of the customer.

5    Q    And what third-party data aggregator did the trust --

6    Trustees rely on to support this particular occupancy claim?

7    A    So, you see in the second paragraph they go to Accurint

8    and the public records pulled in my Accurint.

9    Q    Okay.  And just to orient us, on what date did they

10   allege this particular loan closed?

11   A    On February 16 of '07.

12   Q    Okay.  May I ask you to turn to Tab 20?

13           MR. DAVIS:  Your Honor, with your permission for

14   this sequence, we'd like to just hand up an unredacted

15   version of the --

16           THE COURT:  Okay.

17           MR. DAVIS:  -- document.

18           THE COURT:  And just not put it up on the screen?

19           MR. DAVIS:  Correct.

20           THE COURT:  Okay.  Thank you.

21   A    Thank you.

22           THE COURT:  Mr. Davis, could you just -- before

23   you go on to this unredacted exhibit, could we go back to PA

24   Exhibit 703 behind Tab 19, and could you just -- Mr. Grice,

25   could you just walk me through the column headings here so I

Page 116

1    understand what each of them is?

2          MR. GRICE:  Yes, ma'am.  So, this was a tool --

3    I'm not sure who created the first version of this, but it's

4    an Excel document to enable us to follow the exchange of

5    information and opinions between the Trustees' claim

6    package, the PA's formal response, and then later you'll see

7    the experts each weigh in.

8          So they're -- some of these are quite long.  But

9    the loan number -- each breach was given a unique number.

10   The trust, that third column, is self-explanatory.  The

11   breach finding which is the threshold fact, the specific --

12   this is the no event of default rep for that trust, the

13   factual basis which comes from the Trustee, and I understand

14   this is verbatim --

15         THE COURT:  Okay, so that -- this column, the

16   factual basis for the breach finding, that's the Trustees'

17   statement of the breach -- of the alleged breach?

18         MR. GRICE:  Yes, ma'am.

19         THE COURT:  Okay.

20         MR. GRICE:  Then a description of the materiality

21   basis, really the rationale for why this would constitute a

22   material breach.

23         THE COURT:  Okay.

24         MR. GRICE:  Again, from the Trustees.  The

25   Debtor's position, which I understand here is going to be

Page 117

1    the plan administrator's formal response.

2                THE COURT:  Okay.

3                MR. GRICE:  Agree, disagree.  I think we're now

4    looking at Mr. Morrow's version of this, so he's agreeing --

5    and this is where I get lost in the exchange.

6                THE COURT:  He's agreeing with what?  Do you know?

7                MR. GRICE:  I think that's -- I don't know here,

8    because I think -- this is Mr. Morrow's word.  I'm not sure

9    what he's agreeing with.  I believe he's agreeing with the

10   Trustees; characterization and their decision that this, in

11   fact --

12               THE COURT:  He's not agreeing with the Debtor.

13   That column is not agreeing with the Debtor's position?

14               MR. GRICE:  My understanding is he's agreeing with

15   the Trustees.

16               THE COURT:  Okay.

17               MR. GRICE:  So, he's the expert brought in --

18               THE COURT:  Okay.

19               MR. GRICE:  -- after June 1st.

20               THE COURT:  All right.

21               MR. GRICE:  Then the notes.

22               THE COURT:  So that -- the notes are Mr. Morrow's

23   notes that further support the agreement with the finding?

24               MR. GRICE:  I believe these are my firm's notes.

25   It's a little bit confusing.  These are CRI's notes.  So

Page 118

1    this is an answer to -- I confess, I don't recall --

2              THE COURT:  Okay.  If you don't know, that's fine.

3    And I guess we'll get to it when we hear from Mr. Morrow.

4              MR. GRICE:  Right.  I do recognize the column of

5    notes.  Those are my firm's notes and the source documents,

6    I believe, but -- I apologize.  I just -- I can recognize

7    the notes.

8              THE COURT:  Okay.  And actually, so then this goes

9    onto the back in terms of -- it's the world's longest

10   spreadsheet, right?  So then -- okay.  All right, I think I

11   understand.  We can move on, Mr. Davis.

12   Q    Okay.  Mr. Grice, would you turn to Tab 20, the next

13   tab?  And, I guess, you have now in front of you an

14   unredacted version of this.  First of all, do you recognize

15   what this is?

16   A    I do.  This is the claim package -- I'm looking at the

17   unredacted version, but they're both the claim package as

18   submitted by the Trustees for loan ending in 0848.

19   Q    And would you turn to Page 6 of the claim package?

20   A    Yes, sir.  This is the application submitted by the

21   applicant.

22   Q    And without revealing the full street name, what is

23   just the number of the street address?

24   A    It's 7903 which is the subject property that she's

25   purchasing.

Page 119

1    Q    Okay.  So, this is the address the Trustees allege the

2    borrower did not intend to occupy?

3    A    That's correct.

4    Q    Okay.  Let's take a look at Page 14 of this same claim

5    package.

6    A    Yes, sir.

7    Q    Actually, I think it begins on 13.  What is this?

8    A    So, this is the Accurint report that the Trustees ran,

9    or their consultants ran, and it shows you -- my version

10   shows slightly more detail, but I'm on 13 of 42.  I don't

11   know if you can catch up with me.

12           At the top of 13, you see the borrower's first

13   name and then her last name is blacked out.  So, they then

14   put her name and her Social Security number, and then the

15   rest of the report is populated and it breaks down -- it

16   performs different tests on this customer's information, and

17   it also provides you information on the source of that data.

18           So, if you look under -- there's an alias.

19   Actually the -- that page, as we read down the column of

20   source, we see Accurint is pulling information in from

21   credit bureaus.  So that's the source for its analysis.  So

22   that section on aliases, here we have our borrower with I

23   think a rather unusual name, and there are various

24   combinations.  She's a Latina, and so the placement of names

25   -- whether it's first, second, or third -- sometimes varies.

Page 120

1   So we have various aliases that they've identified.

2          And then on the far right-hand side, it tells you

3   the ranges of years when those names are associated with --

4   when they're finding hits for those names at this stage of

5   the analysis.

6   Q    Okay.  So towards the bottom of the first page, there's

7   a section called, "Reverse Address Lookup."  Do you see

8   that?

9   A    I do.

10  Q    And what information is reflected in that section of

11  the report?

12  A    So here the analysis for the Trustee has typed in the

13  street address of the subject property.  And they are now

14  doing a reverse search to see who else is associated with

15  that address -- not necessarily living there, but who else

16  is associated with it.

17  Q    And so staying -- still on the first page, there are

18  two names that are boxed in there.  What's your

19  understanding of how that box got there?

20  A    That box was placed by the Trustees and the word,

21  "sellers," was written by the Trustees.  So that was

22  appended.  So, they're being flagged as the sellers.

23  Q    So what are the Trustees asserting about the

24  information in this box?

25  A    They're setting up the misrepresentation of occupancy

Page 121

1    by saying our borrower is not -- if you notice the dates,

2    the dates show that the sellers are associated with this

3    address from April of '96 to March of 2016, which I believe

4    is when the report is being run.  So these sellers are

5    continuously associated with this property for quite a long

6    time, and that's the basis for the claim is that how can she

7    live there if these other people are living there.

8              THE COURT:  Can I ask a question?  So down at the

9    bottom of this page where we have the reverse address

10   lookup, if you look at the two individuals above the names

11   in the box -- so the dates are -- also run through March of

12   2016.

13             MR. GRICE:  Yeah, Jeff and Elizabeth appear to be

14   living -- or they appear to be associated with that address

15   exactly the same time.

16             THE COURT:  Or a subset of that time.

17             MR. GRICE:  They put the last two years.

18   Precisely.

19   Q    And in fact, Mr. Grice, if you also turn the page, what

20   does the report suggest about names associated with the

21   subject property in 2007 when the loan was originated?

22   A    I'm sorry, I don't follow your question.

23   Q    How many names are associated with the property,

24   roughly --

25   A    I --

Page 122

1   Q    -- in the year 2007?

2   A    -- don't have an accurate count, but we're in the 20s

3   or 30s.  There's a large number of people who appear to be

4   associated with this property during this window of 2006,

5   2007.

6   Q    Now if you look --

7            THE COURT:  Can I interrupt?  Is there anything on

8   this report that tells you what type of property is being

9   looked at, whether it's a single family home, a multi-family

10  home, apartment building?

11           MR. GRICE:  No, ma'am.  That was my first

12  question.  Can we -- you know, does it help us understand --

13  is this an apartment building with 50 units?

14           THE COURT:  Right.

15           MR. GRICE:  And my understanding is it's not.

16  It's a single family home, is my understanding.

17           THE COURT:  Thank you.

18  Q    Now if you look at the third page of this which is --

19  has the dates ending in 2180 in the third line from the top,

20  whose name appears there?

21  A    Our borrower.

22  Q    Does it have our borrower associated with the property

23  in the year of origination?

24  A    Yes.  So that is the span from October -- I'm sorry,

25  November of 2003 to August of 2010.  There's no box around

Page 123

1    it, no highlighting, but that's -- that is our borrower and

2    this seems to demonstrate that she's associated with that

3    property during the relevant timeframe.

4    Q    So does this Accurint report provide any evidence that

5    the borrower misrepresented her intent to occupy the subject

6    property?

7    A    I don't see it.  I mean, I don't I see it raises a lot

8    of questions about a lot of other people and kind of what

9    the nature of the property is.  I wouldn't understand that.

10   But it doesn't establish -- I don't think it's any kind of

11   reliable evidence of a misrepresentation of occupancy.

12   Q    What does the Trustees' use of this Accurint report to

13   prove the breach claim here tell you about their claim

14   process?

15   A    I think it speaks to the poor design and poor

16   implementation that this could be a basis for a misrep.  It

17   just has too many open questions and too few certain

18   answers.

19   Q    Okay.  Now let's return to the -- Page 11 of 42 of the

20   claim file for this.

21   A    Yes, sir.

22   Q    Do you recognize this document?

23   A    I do.  This is a tax document for calendar 2010 which I

24   think you can see at the top of the page just underneath the

25   circle.  It's on the first line of text.

Page 124

1   THE COURT:  It's not 2010.

2   A    Oh, I'm sorry, 2007.  So it's a 2007 calendar year tax

3   return.  What I meant to represent is it is complete -- the

4   bottom of the page it is signed -- or it's completed by the

5   tax preparer -- there we go, on January 12, 2010.

6   Q    Right.

7   A    So it's a Form 1040X, so it's a revised tax form for

8   the calendar year being completed three years in the future.

9   Q    So, I know it's redacted, but are the Trustees saying

10  that the address used on this form by the borrower was not

11  the address of subject property?

12  A    That's right.  This is, I believe, the departing

13  address not the subject property address.

14  Q    And again, this form was filled out in what year?

15  A    2010.

16  Q    Does this tax return demonstrate that the borrower

17  never intended to live at the subject property in 2007?

18  A    Again, I think it has some value.  I mean, again,

19  whether -- we don't know where she's living in 2007 or in

20  2010.  This could show that she has returned to the

21  departing property on January 12, 2010.  It could also show

22  her tax preparer hasn't updated their database.  It could

23  show any number of things, but it -- I mean, I think it's --

24  as a proof of occupancy, it's insufficient.

25  Q    Mr. Grice, what is an audit verification?

Page 125

1    A    This is -- like an audit credit report, this is a

2    verification of employment or verification of a deposit

3    being performed many years after the fact as part of one of

4    these re-underwriting analyses or repurchase analyses.

5    Q    And how did the Trustees procure audit verifications?

6    A    They perform them, so their analysts would contact

7    employers and see if they would find someone who would

8    respond to the questionnaire and establish that somebody did

9    or did not work for that employer in 2002, '03, '04, '05,

10   '06, et cetera.

11   Q    Now based on your review of the Trustees' claims, did

12   the Trustees obtain audit verifications even if there were

13   origination verifications on the same subject in the file?

14   A    They did.  And this is a case where the information

15   gathered contemporaneously at application, or that phase

16   time, does not seem to be given what I would consider the

17   proper weight compared to what they gather in 2015 or 2016.

18   Q    Now in the claim packages you reviewed, did the

19   Trustees ever include an audit verification that was

20   inconsistent with their claims?

21   A    No.  I can't think of an example.

22   Q    Let's turn to Tab 21, if you would.  It's another

23   spreadsheet.  This is PA Exhibit 704, and this is an excerpt

24   of Grice Reply, Appendix D for the loan ending in 899.  Do

25   you recognize this, Mr. Grice?

Page 126

1    A    I do.  This is the package -- this is the summary of

2    the results of our analysis of the claim.  This is my

3    spreadsheet, so I recognize all the columns.  But for loan

4    number 8999.

5    Q    Please take a look at Column E.  What is the claim that

6    is addressed here?

7    A    It's a misrep of employment.

8    Q    So, we haven't really spoken much about

9    misrepresentations of employment.  Can you tell us what a

10   misrepresentation of employment claim is?

11   A    I tell you I have a job X at company Y during some

12   timeframe, and any part of that is incorrect.

13   Q    Okay.  So it could be the wrong job title, for example?

14   A    Could be an incorrect job title, an incorrect employer,

15   or the termination of employment in contradiction to what I

16   stated on the loan application.

17   Q    Okay.  Please direct your attention to Column G in this

18   document, the claimant's factual basis.

19   A    Yes, sir.

20   Q    What was the borrower's occupation?

21   A    He stated that he was a pastor at a church in Auburn,

22   which I believe is suburban Tacoma, Washington.

23   Q    And what are the Trustees alleging and on what basis?

24   A    That they performed a -- what they call -- well, the

25   forensic analyst, which is the Trustees' consultant,

Page 127

1    contacted the borrower's employer on March 9, 2015, and

2    verified that his employment ended on March 15, 2007, one

3    month before the subject loan closed.

4    Q    Okay.  Let's look at the documents.  Would you turn to

5    Tab 7, which is PA Exhibit 636?  Sorry, it's in the first

6    binder.

7    A    Seven, you said?

8    Q    Tab 7, correct.

9    A    Yes, sir.

10   Q    And do you recognize this document?

11   A    I do.  This is the claim package for loan ending in --

12   I think it's 8999.

13   Q    Okay.  Would you turn to Page 12 of 13?

14   A    Yes, sir.

15   Q    What is this document here?

16   A    So this is the origination -- we'll call it the

17   origination verification of employment, the one performed

18   contemporaneously March 12, 2007, about our borrower named

19   Jimmy who works as a pastor.  The form says that -- again,

20   it's verified by Pastor unknown -- pastor redacted -- who

21   has the title of pastor who is verifying that Jimmy redacted

22   with Social Security redacted, was hired more than four

23   years, was actively employed as a pastor at the church.

24   Q    What does this origination VOE tell us about this

25   borrower's employment status as of the origination?

Page 128

1    A    I interpret active to mean he's employed as of the

2    April 12, 2007, and he's been there for four years.

3    Q    Now let's turn back a few pages to Page 9 of 13.  What

4    document is this?

5    A    This is the audit verification of employment, so it was

6    performed on March 9, 2015, so eight years later, by

7    Kimberly who's also redacted.  And we don't know the name of

8    the person completing it, but they are -- I think it's two

9    individuals, an office manager and a bookkeeper, who are

10   verifying, quote unquote, that Jimmy -- his original hire

11   date is now question mark September 2004.  The title is

12   pastor.  His gross income is represented for 2006 and 2007.

13   He's identified as a contract worker and his employment is

14   represented as ending on March 15, 2007, approximately.

15   Q    And what does "approximately" mean in this context?

16   A    Well, a month before the subject loan closes.

17   Q    What's your opinion of the reliability of this

18   particular audit VOE?

19   A    Well, I think, you know, obviously it's a document from

20   the future, right.  If you're Jimmy at origination or if

21   you're the other pastor who fills out the -- who contributes

22   to the original verification, this is something from eight

23   years in the future saying that that employment ended a

24   month ago.

25         And so it contradicts the origination verification

Page 129

1    of employment.  The question is which more reliable as a

2    kind of verification document, the contemporaneous document

3    or this audit exercise from the future?  And obviously, I

4    have my doubt about the reliability of this as the basis for

5    a misrepresentation claim.

6    Q    Does the term "a-p-p-r-o-x" inform those doubts at all?

7    A    I think that tells me that whoever's completing this is

8    not terribly certain.  I think -- more or less, and that

9    matters a lot if you're Jimmy and we're alleging a

10   misrepresentation of occupancy.  I mean, misrepresentation

11   of employment.

12   Q    So does this audit VOE, in your view, sufficient

13   outweigh the loan application and the origination VOE to

14   support the Trustees' misrepresentation of employment claim?

15   A    This is the weighing of facts that I think is really

16   complex and important and subtle and requires an evaluation

17   of all the facts and circumstances.  The burden is on this

18   audit document to replace that origination verification, not

19   -- I don't want to just summarily swap it out.

20          I think the burden should be on this audit

21   document to prove that it is somehow more accurate.  So the

22   approximately and the question mark don't help me have

23   greater confidence in this.

24   Q    And what does the Trustees' reliance on this particular

25   audit really tell you about their breach claim process?

Page 130

1    A    This is another version of that weighing of evidence

2    and placing a premium on documents that are collected by the

3    Trustee at the expense of documents collected at origination

4    such as the application or, in this case, the verification

5    of employment.

6    Q    Mr. Grice, do the Trustees use bankruptcy documents to

7    support their breach claims?

8    A    Extensively.

9              THE COURT:  Mr. Davis, before you launch into

10   bankruptcy documents, my -- one of my favorite subjects

11   obviously -- would this be a good time to take a lunch

12   break?

13             MR. DAVIS:  This would be perfect.  Thank you,

14   Your Honor.

15             THE COURT:  Okay.  And so how long would you like,

16   and also what's your concept as to how late we would go

17   today?

18             MR. DAVIS:  I think maybe just a short break --

19             THE COURT:  Okay.

20             MR. DAVIS:  -- would be good.  Something on order

21   -- I don't know, 45 minutes.  Would that do?

22             THE COURT:  Yeah.  Why don't we call it a half an

23   hour.

24             MR. DAVIS:  Half an hour?

25             THE COURT:  So that if anyone wants to have lunch

Page 131

1    they can do so without undue speed and pressure, and then

2    when we come back, maybe you could let everybody know what

3    your plan is for the rest of the afternoon.

4            MR. DAVIS:  Sure.  We'll do that.

5            THE COURT:  All right?  So, we'll come back at --

6    in a half an hour or 20 minutes before 1, all right?

7            MR. DAVIS:  Thank you.

8            THE COURT:  Thank you.  Same rules apply to the

9    lunch.

10       (Recess)

11           THE COURT:  Okay.  Ready when you are.  Mr. Davis?

12           MR. DAVIS: Thanks --

13           THE COURT:  Any prognostication about the end of

14   the day?

15           MR. DAVIS:  Yes.  Looked at the outline over the

16   break, tried to slim it down.  And so I'm going to try to

17   finish as close to 2 as possible.

18           THE COURT:  With the direct?

19           MR. DAVIS:  Correct.

20           THE COURT:  Okay.  Well, if it goes over it's fine

21   as far as we're concerned.

22           MR. DAVIS:  Okay.  Thank you.

23           THE COURT:  Okay.

24       CONTINUED DIRECT EXAMINATION OF CHARLES H. GRICE

25   BY MR. DAVIS:

Page 132

1   Q    Mr. Grice, we were talking about bankruptcy documents,

2   I think, when we left off.  What are some of the

3   considerations relevant to determine -- to determining the

4   reliability of bankruptcy documents as support for breach

5   claims?

6   A    I think, again, like tax returns the timeliness or the

7   near year characteristics of bankruptcy documents are

8   relevant.  Also, I think it's important to understand the

9   context for which bankruptcy documents are designed, or

10  they're attached to bankruptcy filings, bankruptcy

11  petitions.  So that's different than a tax exercise or a

12  loan application.  But certainly, timing I think, is

13  important, completeness, and understanding the context for

14  which they're created.

15  Q    Just briefly, Mr. Grice, what does a misrepresentation

16  of debts claim?

17  A    The most common form is that there is an undisclosed

18  debt that was not disclosed or represented by the applicant

19  at the time of origination.

20  Q    And how can you tell which debts a borrower has

21  disclosed?

22          THE COURT:  Mr. Davis, could you keep your voice

23  up a little?

24          MR. DAVIS:  Sure.

25          THE COURT:  I'm concerned that the folks in the

Page 133

1    back can't hear you.

2            MR. DAVIS:  Okay.

3            THE COURT:  Okay?

4            MR. DAVIS:  I will try.

5    Q    Mr. Grice, how can you tell which debts a borrower has

6    disclosed?

7    A    The information on the application, I think, is the

8    most common source.  Again, much of that is pulled in from

9    the credit report, so -- but I think the onus would be on

10   the application to represent it.

11   Q    Mr. Grice, would you turn to Page 22 -- Tab 22, I'm

12   sorry, which is PA Exhibit 710 which is an excerpt to the

13   Row of Brice Rebuttal Appendix D?

14   A    Yes, sir.

15   Q    Do you recognize this?

16   A    I do.  This is a -- one of these misrepresentation of

17   debt obligations for the loan ending in 1249.

18   Q    Please take a look at Column F which is Claimant's

19   Factual Basis.  Do you see that?

20   A    I do.

21   Q    What debt does this say was undisclosed?

22   A    So it's a $17,340 loan that originated the same month

23   as the subject mortgage.

24   Q    Okay.  Do you recall this loan, Mr. Grice?

25   A    I do.  Yes, sir.

1    Q     Let's take a look at Tab 23 which is PA Exhibit 629.

2    Do you recognize this?

3    A     Yes.  Once again, it's our claim package for the loan

4    ending in 1249.

5    Q     And if you turn to Page 18 of 103.

6    A     Yes, sir.

7    Q     Would you tell us what this is?

8    A     It's a -- let me take a moment.  It's an application

9    for the purchase of a property in Riverside County outside

10   Los Angeles.

11   Q     Okay.  And what is the date on this application?

12   A     5/24/06.

13   Q     Okay.  Would you turn to Page 20 of this application?

14   A     Yes, sir.

15   Q     What is this portion of the application?

16   A     This is the listing of assets on the left and

17   liabilities on the right.

18   Q     And about how many debts are reflected on this form?

19   A     I count 11, continuing onto Page 21 of 103.

20   Q     Now remind us, how were debts typically -- how did they

21   find their way, typically, to these forms in this timeframe?

22   A     With this level of detail, we have multiple account

23   numbers, multiple liabilities.  My best understanding is

24   this would be coming in off the credit report.  It's called

25   auto-populates.  The credit report provides the data, since

Page 135

1   most people don't recall the specifics.

2   Q    And does this form indicate that there were some auto

3   loans?

4   A    Several, yes.  I count Ford, Toyota, Nissan.

5   Q    And what was the amount of the Ford loan?

6   A    $23,015.

7   Q    And the Toyota loan?

8   A    13,159.

9   Q    The Nissan loan?

10  A    12,708.

11  Q    Can we -- let's turn now to Page 24 of 103.  24, 25.

12  A    Yes, sir.

13  Q    What document is this, then?

14  A    Now this is an audit credit report.  This is -- you see

15  on the upper righthand corner date received completed is

16  April 8, 2015.

17  Q    And is this the credit report that the Trustees are

18  using as a basis for this claim?

19  A    Yes, sir.  So it's nine years after origination.  It's

20  a -- it's trying to capture historic credit information.

21  Q    Okay.  And if you turn to Page 26, please look at the

22  top row.

23  A    This is the alleged undisclosed debt.

24  Q    And what does this information reflected here indicate

25  about when this auto loan opened?

Page 136

1   A    We talked earlier about the specificity or lack of

2   specificity on credit reports.  This says this undisclosed

3   debt was opened on -- during May of '06.  That's a specific

4   as it can be.

5   Q    So we can't tell when in May this debt was incurred?

6   A    That's right.  Sometime during the month.

7   Q    Now please look one row from the bottom.  Do you see

8   that?

9   A    Yeah, the Toyota Motor debt.

10  Q    And did the borrower disclose that debt on his

11  application?

12  A    Yes.  And so the stamp here is from the Trustee.  This

13  is not from the credit bureau.

14  Q    And what does this report tell us happened in May of

15  2006 with respect to that particular loan?

16  A    That another auto loan -- this was originated, we see -

17  - it's originated in 05/05, and it's closed in 05/06, and

18  it's for $15,916.  And just out -- I mean, if you go over a

19  couple of rows, you'll see it's a 60 month loan, so this was

20  a five-year car loan, born in '05, extinguished in '06.

21  It's labeled as closed, and all of the indications on the

22  far right side are that it was paid.  It was paid as agreed.

23  So my understanding is this was paid off.

24  Q    So does this suggest to you anything about this

25  borrower's cars?

Page 137

1    A    I looks like a simple substitution.  One car is

2    returned or sold, and the other car loan is taken out.

3    Q    Does this speak to you at all about the materiality of

4    the alleged undisclosed debt?

5    A    Well, by my analysis, the materiality of this would be

6    the difference between the two high credit values, 17,000

7    for the first one and 15,900 in the second one.  So it's a

8    net difference of $1,400, as this borrower swaps one car for

9    the other.

10   Q    What does this tell you -- what does this, the review

11   of this loan, tell you about the Trustees' breach claim

12   process?

13   A    I think this is poor support for a undisclosed debt

14   misrepresentation.

15   Q    Let's talk for a moment about DTI claims.  What is an

16   excessive DTI claim?

17   A    DTI that is outside guidelines and many of these

18   trusts, there's a DTI rep.  The DTI shall not exceed 60

19   percent in most of the trusts.

20   Q    Are DTI claims related to misrepresentation of debt or

21   income claims?

22   A    Yes.  We call these derivative claims because they're

23   built on either a D or an I, right?  So if -- there's

24   usually a misrepresentation of debt or income or both, and

25   then a -- sort of a traveling companion which is the DTI

Page 138

1   rep, misrepresentation, so they travel together commonly.

2   Q    So what does it mean from the perspective of analyzing

3   DTI claims that they're derivative of misrepresentation of

4   debt and income claims?

5   A    Well, it means if the debt or the income claim is

6   unsupported, then the DTI claim would also -- it would also

7   fail.

8   Q    Mr. Grice, did the Trustees assert claims based on

9   missing documents?

10  A    Many.  Thousands.  I think it's tens of thousands.

11  Q    So before we get into any specifics, what's your view

12  of the propriety of missing document claims in the context

13  of the files at issue here?

14  A    About the propriety -- well, you would expect in older

15  files you're going to have missing documents.  I guess with

16  respect to the propriety, I am not used to seeing missing

17  documents as a basis for breaches with such frequency.  This

18  is a case where there are a very large number of claims tied

19  to -- the underlying issue, the fundamental issue is a

20  missing document.

21  Q    And in what forms do missing document claims come?

22  A    That the document is missing or that the document is

23  incomplete, that it's somehow broken -- it's insufficient in

24  its surviving form.

25  Q    And what types of documents are the subject of this

Page 139

1    missing document claims in this case?

2    A    A wide variety.  There were at one point a very large

3    number of missing credit reports and those, I think, were

4    substantially withdrawn because, again, we had the fruit of

5    the credit report, we had the credit score, so -- as an

6    example.  But they support a wide variety of allegations in

7    this case.

8    Q    And what were the most common reasons why you disagreed

9    with the Trustees' missing document claims?

10   A    I think the two most common would be -- or maybe three

11   most common would be, A, the document's in fact there, so we

12   find the document.  It's just in the loan file.  You have to

13   read it carefully.  Or B, the document is missing but we

14   find a footprint of that document, you know, a checklist or

15   a reference to it, or we find part of the document.  We may

16   not have the entire document, but we have part of it.

17          And the last piece is the doesn't matter area.  Is

18   this a document that would be relevant to an underwriting

19   determination at all or not?  So there are a large number of

20   claims based on missing documents that are just baseless

21   claims.

22   Q    And just to be clear since you used the term a couple

23   times, what do you mean by footprints?

24   A    So a footprint could be a checklist saying that, you

25   know, Mary or Bob completed a document or that I handed the

Page 140

1    required disclosure to the consumer, but we don't have the

2    document.  So that's the kinds of evidence that suggests

3    it's not in all cases probative, but it suggests that the

4    document existed and that it was present at origination.

5    Q    And based on your review of the Trustees' breach

6    claims, did the Trustees take into account document

7    footprints when they were asserting missing document claims?

8    A    I saw no evidence of the Trustees evaluating that.

9    Q    Now, in the circumstance where you had a missing

10   document claim, you could not find the document, and you

11   could not find the footprint of the document, what would be

12   your next step?

13   A    Well, fundamentally, it doesn't matter.  Is this a

14   document that's necessary to the completing of the

15   transaction – or was it a document that, in fact, is

16   required?  Again, many of these I said were baseless.  The

17   document was never required in the first place.

18   Q    Is it your opinion that no claim based on missing

19   documents would be valid in the facts of this case?

20   A    No, I think obviously there could be claims based on

21   missing documents.  You know, if the entire appraisal is

22   missing and there's no reference to the appraisal, there's

23   no value from the appraisal evident in the file, or if you

24   have an affidavit from the appraiser saying, "I didn't do an

25   appraisal"—I mean, you can imagine a variety of facts and

Page 141

1    circumstances that would support a claim based on a missing

2    appraisal.  But it would, in fact, have to be missing and

3    you'd need some credible evidence explaining the missingness

4    or the absence.

5    Q    Let's take a look at Tab 27.

6              THE COURT:  Can I ask you about that one?  So,

7    some hours ago you indicated that ultimately the conclusion

8    as to whether a breach claim is a valid breach claim or not

9    requires something in the nature of an analysis of whether

10   or not it would've made a difference at the point of

11   origination.

12             MR. DAVIS:  Yes, Your Honor.

13             THE COURT:  So, if there -- hypothetically,

14   there's no appraisal in the file and there's no, as you say,

15   footprint, there's no indication other -- another place in

16   the loan file that the appraisal was conducted -- how does

17   that relate to the concept of it could've affected the

18   outcome?

19             In other words, you could retroactively, I

20   suppose, figure out what an appraised value might've been

21   for the property at the time based on public transaction

22   documents.  So, the reason I'm asking is because you're

23   citing that as an example of a missing documents claim that

24   you would say might be valid.  So, could you explain a

25   little more about how that figures into the ultimate

Page 142

1    analysis of something that would've been a game changer in

2    terms of actually going forward with the loan?

3              MR. DAVIS:  Yes, Your Honor.  I'm certainly open

4    to failed -- I'm sorry, passing a claim based on the absence

5    of, you know, an important document like an appraisal.

6              THE COURT:  Right.

7              MR. DAVIS:  Appraisals tend to leave very clear

8    footprints, right?  Even when it's absent.  On the HUD-1

9    Form, which is the ultimate reconciliation, there's a charge

10   for it.  So you see $454 paid to Appraiser X.

11             THE COURT:  Right.

12             MR. DAVIS:  The Trustees alternatively could have

13   gone to Appraiser X and said, "Give us a copy -- your copy

14   of the appraisal." So, there are a variety of ways to get at

15   whether that appraisal existed.

16             THE COURT:  But I guess -- I'm asking a different

17   question.  I'm asking you to assume that the appraisal

18   doesn't exist.  Let me make the hypothetical.  It never

19   existed.  That the loan officer said, "I know that

20   neighborhood.  That property's worth way more than what

21   you're asking to borrow.  I'll save you the money, we're not

22   going to get an appraisal." That's my hypothetical, right?

23             MR. DAVIS:  Mm hmm.

24             THE COURT:  So, there was no appraisal.  And yet,

25   had an appraisal been done, the loan would've been approved

Page 143

1     anyway.  I'm just trying to understand the relationship

2     between no appraisal, clearly no appraisal but yet, had an

3     appraisal been done, the loan would've still been

4     underwritten.

5          MR. DAVIS:  I think I understand your

6     hypothetical.  I didn't see anything like that here, but I'm

7     certainly open to passing a claim -- if we had some

8     certitude that it didn't exist.  What I don't have --

9     there's no tool that I'm aware of that says --

10          THE COURT:  But I'm saying to you something

11     different.  You're saying that if there were -- if it were

12     clear to you definitively because this loan file came with a

13     crystal ball that said there was no appraisal, and yet if

14     you could tell that an appraisal would've come out just fine

15     -- so the loan would've been approved anyway, why is it that

16     the no appraisal leads to a valid breach claim?  Or maybe

17     I'm asking a legal question.  We can move on.

18     Q    Mr. Grice, when you were responding to the Court's

19     question, when you were speaking of breach, were you

20     speaking of the breach level, the AMA level?

21     A    I tried to address the threshold fact question and the

22     AMA questions -- I don't have a tool for that.

23          THE COURT:  Okay, thank you.  That's the -- I get

24     it now.  Thank you.

25          MR. GRICE:  I hope that helps.

Page 144

1   Q    So, Mr. Grice, let's turn to Tab 27, which is PA

2   Exhibit 706.  And this is an excerpt of Grice Appendix E,

3   the Row 4, loan ending 4698.  Do you see that?

4   A    I do.  Yes, sir.

5   Q    Okay.  How did the Trustees frame their claim for this

6   particular lien?

7   A    Well, you see the quote in Column F?  "The file was

8   missing the appraisal photos for the subject property and

9   comparable sales."

10  Q    And what was the alleged defect?

11  A    This is a failure to obtain qualified appraisal.

12  Q    Okay.  And what specifically was missing, according to

13  the claim?

14  A    The photographs of the subject and the comparable

15  sales.

16  Q    Okay, so the actual claim here was that a piece of the

17  appraisal file was missing, is that right?

18  A    That's correct.

19  Q    And how did the plan administrator respond, if you look

20  at Column G?

21  A    The evidence does not support a breach, the alleged

22  breach is invalid because the alleged missing photographs

23  are in the loan file.  So it's quite a clear -- I would call

24  this a simple claim where the document is either there or

25  it's not there; it's either complete or it's not complete.

Page 145

1    Q    Okay, let's take a look at Tab 30, which is PAA Exhibit

2    4698A.  Do you recognize this document?

3    A    Yes, sir.  This is the appraisal for the subject loan.

4    Q    And would you direct your attention to Page 17 of 19?

5    What do these pages show?

6    A    These are the alleged missing photographs of...  On

7    Page 17, the subject property from the exterior; Page 18 is

8    the subject property's interior; and Page 19 is the

9    comparable properties that are cited in the document.

10   Q    Is there anything incomplete about this appraisal

11   report?

12   A    No.  It seems to exist in its entirety.

13   Q    So what does this claim tell you about the Trustees'

14   process?

15   A    This is at least attention to detail in the loan file.

16   Q    Let's speak for a moment about regulatory claims.  Mr.

17   Grice, what is a TIL, T-I-L, disclosure?

18   A    So the Truth in Lending Act of 1968 requires that

19   lenders provide borrowers a factual statement of both the

20   interest rates as reflected in the APR, the Annual

21   Percentage Rate, for a loan as well as the finance charges

22   over the life of the loan.  And this is very carefully

23   prescribed.  This is a very old, by my account -- it's an

24   old law regulation.  It's quite settled.  There are many

25   pages of guidance.  It's been around for a long time.

Page 146

1    Q    And how did the Trustees typically frame TIL claims?

2    A    The final TIL was missing or unsigned or both.

3    Q    Now, is there a requirement of law regulation that the

4    TIL disclosure be maintained in the loan file?

5    A    So, during this period, no, neither that it be retained

6    or signed.  So, it had to -- I, the bank, had to be able to

7    demonstrate to my banking supervisor that I provided it but

8    there was no requirement to retain it or that the customers

9    sign it.

10   Q    So, what form could information about the provision of

11   this disclosure be held by?

12   A    Commonly, it was an electronic record that showed

13   Charles applied for this loan, this dollar value, this

14   interest rate, and was provided it on Day X.  And so as long

15   as the lender could recreate it to the satisfaction of the

16   bank examiner, it was in compliance with the law.

17   Q    And was there a requirement that the TIL disclosures be

18   retained in paper format during this period?

19   A    No.  None.

20   Q    And how long were lenders required to retain evidence

21   of Truth in Lending disclosures during their open period?

22   A    Whoever had custody of the file -- whoever had custody

23   of the loan, either the originator or the servicer, for a

24   two-year window.  So, at the end of two years, there was

25   even less of a requirement that anything be retained.

Page 147

1   Q    During the relevant period, was there a requirement

2   that the TIL disclosure be signed?

3   A    No.  It's interesting.  Not at all.  There's a model --

4   again, during this period, there was a guidance document

5   created by the Federal Reserve that actually had a model

6   Truth in Lending form, and there was no signature line but

7   there was an instruction that if you want to, you can add

8   one.  And then after the financial crisis, fast-forward to

9   last year, the Consumer Financial Protection Bureau created

10  a requirement for a signature line that takes effect next

11  year in 2018.

12  Q    So, during the relevant period, were Truth in Lending

13  disclosures required for investment properties?

14  A    Not at all.  Because the assumption was you're an

15  investor, you're sophisticated, you can figure out your own

16  finance charges.

17  Q    Did the Trustees assert failure to provide final TIL

18  claims based on unsigned TIL disclosures?

19  A    They did.

20  Q    Did the Trustees assert failure to provide final TIL

21  claims based on missing TIL disclosures?

22  A    Yes.

23  Q    Did the Trustees assert final -- failure to provide

24  final TIL claims based on -- or for investment properties?

25  A    Yes.  Collectively, on the order of 9,000 and change of

Page 148

1    these claims.

2    Q    And what is your view of the Trustees' TIL claims in

3    this case?

4    A    Oh, they're all without merit.

5    Q    Let's take a look at the next slide, the beginning of

6    the next slide.  Mr. Grice, would you walk us through the

7    beginning of this slide?

8    A    So this is intended to convey...  First of all, there

9    were 9,632 of these such claims.  1,977 were withdrawn and

10   the red box is the relevant operative requirement during the

11   timeframe, which is there was no requirement to maintain a

12   TIL in the loan file.  I reviewed 19 of these in my business

13   process audit.  Of those 19, I divided the results into two

14   categories:  the withdrawn claims and the claims that remain

15   in dispute.

16           If we go under the claims in dispute -- if

17   somebody can click on the next thing -- so, this next level

18   of the tree shows that three of these claims were part of a

19   loan pool that did not have a rep that was relevant and

20   required TILs.  So, it was really a manufacturing error in

21   the claim that the loans in particular did not have a rep,

22   that it tested to the presence of a Truth in Lending.  It's

23   a valid claim but it's based on a misunderstanding of the

24   relevant reps.

25           Two of the claims were based on the fact that

1   there was no signature or date on the TIL.  Those are also

2   not required.  One was there's evidence of the TIL's

3   president origination, it just happens not to be in the

4   file.  So, again, footprint evidence.  And then six were

5   claims where -- again, TILs not required -- these were

6   mostly incomplete or degraded loan files.  I think five of

7   those six were files that suffered some structural flaw.

8   You could tell the file was incomplete.  It had a lot of

9   some things and not a lot of others.  So, again, in none of

10  these cases should the claim have existed.

11  Q    Can we see the next slide?

12  A    Now, on this last part of the presentation, the far

13  left corner, these are the three examples where the

14  allegation is the missing TIL.  These are for investment

15  properties where no TIL was required.  In one instance the

16  TIL is actually in the file; and then two of them are,

17  again, based on this misunderstanding of the requirements

18  that there's some signature or date requirement.  Those are

19  also invalid claims.

20  Q    What does this analysis tell you anything about the

21  difference between the claims, the TIL claims that were left

22  in the case and those that were withdrawn?

23  A    Well, this is a simple story, that the entire category,

24  the entire bucket was meritless based on my review.  None of

25  these should've existed as claims.

Page 150

1    Q    And do you see any difference between the claims that

2    were made in the case and those that were withdrawn?

3    A    Looking at left side, right side, they each suffer kind

4    of similar issues, right?  Different qualities of problems.

5    But none of them should've existed.

6              THE COURT:  Can I ask a follow-up question,

7    though?  So, we're looking at two branches, right?  Six are

8    withdrawn.  In other words, no longer still in this dispute,

9    right?

10             MR. GRICE:  Yes, ma'am.

11             THE COURT:  Okay.  And 12 were not?

12             MR. GRICE:  Yes, ma'am.

13             THE COURT:  But I think what Mr. Davis was trying

14   to ask you was that is there a principled distinction that

15   you can make between the types of TIL claims that were

16   withdrawn and the types that have lived to fight another

17   day, right?

18             MR. GRICE:  I can't discern it.

19             THE COURT:  But am I reading this correctly, that

20   two claims based on signature or date, which you say is not

21   required, were withdrawn?

22             MR. GRICE:  Yes, ma'am.

23             THE COURT:  And two claims are still in?  Right?

24   Now, the other three -- the other categories don't match up

25   like that, right?

Page 151

1          MR. GRICE:  That's correct.

2          THE COURT:  Okay, thank you.

3    Q    Mr. Grice, what is a HUD-1?

4    A    A HUD-1 is a disclosure, again, prepared and then

5    delivered to the applicant, which discloses all of the

6    charges associated, all the fees associated with a closing.

7    So, how much I pay for my appraisal, how much I pay for my

8    credit report.  It's intended to give the consumer

9    sufficient information to know if they want to proceed.  .

10          And so, a HUD-1 is -- the final HUD-1 is required

11   to be provided to the consumer at closing.  And what counts

12   is, is the data accurate?  Is the data the final data that

13   actually does reflect the true charges associated with the

14   transactions?

15   Q    Did the Trustees bring claims related to HUD-1?

16   A    Again, many thousands.  Yes, sir.

17   Q    And how did the Trustees typically frame HUD-1 claims?

18   A    Again, like with the TIL, it was either missing or not

19   signed.

20   Q    For how long are lenders required to maintain HUD-1

21   statements in the loan file?

22   A    HUD-1s are required to be maintained for five years,

23   and then after that they're not required to exist.

24   Q    And do you have an understanding of when the Trustees

25   gathered the loan files that are in issue in this case?

Page 152

1    A    My understanding is late '14, early 2015 is when the

2    collection of these files began.

3    Q    So, would that be more than five years after

4    origination?

5    A    In all circumstances from what I understand.

6    Q    Is a signed HUD-1 required to be in the loan file?

7    A    No.  I should say many -- it's not required by law or

8    regulation.  Many banks tell their employees "We want the

9    consumer to sign it as an acknowledgment that I provided it"

10   but that's a bank procedure.  Earlier I said the CYI

11   procedure; this is designed to give me a kind of proof but

12   it's not required by the law or regulation, which is the

13   basis of the rep.

14   Q    Is there any requirement that a stamped HUD-1 be

15   maintained in the loan file?

16   A    Also, not required.

17   Q    Did the Trustees bring claims based on missing HUD-1s?

18   A    Yes.  Many, many.

19   Q    Did the Trustees bring claims based on unsigned HUD-1s?

20   A    Yes.

21   Q    Did the Trustees base claims on unstamped HUD-1s?

22   A    Yes, sir.

23   Q    Let's take a look at the next slide.  Mr. Grice, what

24   is this?

25   A    This is a simple graphic I prepared to show the

Page 153

1    breakdown between where I agreed and where I referred files

2    to the plan administrator for further review.  And those

3    totaled to 1,879.  So this is the results of my process

4    review of the plan administrator's 1,879.  And then the two

5    additional columns relate to the breakdown with just a focus

6    on the withdrawn claims and then the remaining at-issue

7    claims.  And so, I did this to try to help see if I could

8    glean any understanding of what is driving the withdrawal

9    determination by the Trustees.  Is there any meaningful

10   difference between where I'm agreeing with the plan

11   administrator or disagreeing with the plan administrator for

12   the total sample, the withdrawn claims, or the at-issue

13   claims.  And I don't find any discernible difference.

14   Q    Now, just to be clear, when you did your initial audit

15   of 1,800-some odd claims, did you know the Trustees had

16   withdrawn the claims?

17   A    No, I was unaware that they had withdrawn or which ones

18   they had withdrawn.

19   Q    What do these results overall tell you about the plan

20   administrator's breach review process?

21   A    Well, obviously it shows that in the vast majority of

22   the occasions I'm agreeing with the plan administrator's

23   determination to fail the claims.  In a relatively small

24   number I'm referring back for additional review.

25   Q    So, were you always in perfect agreement with the plan

Page 154

1    administrator's team?

2    A    No, no, no.  Obviously, there are 62 in various

3    permutations -- 62 examples in this analysis where I'm

4    disagreeing with the plan administrator.

5    Q    And what's your overall assessment of the results that

6    the plan administrators' review process generated?

7    A    I think they're reliable.  Again, this is the result of

8    a well-conceived, well-implemented process.  I think the

9    results are reliable.  And that's all I could say is they're

10   reliable.

11   Q    Can we see the next slide?  Mr. Glice, what is this

12   slide?

13   A    So, this is focusing just on the 600 loans that were

14   reviewed by Mr. Morrow in his analysis.  So, I submitted my

15   report on June 1st.  Mr. Morrow then apparently began a

16   review of 600 loans drawn from a very different population,

17   including on-hold loans, and in a way -- well, based on a

18   sample identified by Dr. Schwerk, I believe.  And so the 572

19   at the bottom of the slide, that is the number of loans that

20   had not dropped out or been withdrawn based on Mr. Morrow's

21   -- of his 600.  So, I reviewed all 600 but this is the

22   breakdown where I agree and don't agree of those 572.  And

23   then -- so that's by loan number, and on the right side is

24   by breach count.  So, again, many of these loans had

25   multiple breaches.

Page 155

1   Q    And after reviewing Mr. Morrow's sample, what were your

2   conclusions?

3   A    Even though he went through a different process to

4   identify loans and breaches for his review, the results were

5   effectively the same as for the 1,879.

6   Q    Can we see the next slide, please?  Mr. Glice, what

7   does this slide reflect?

8   A    This is intended to convey the count of loans of the

9   original submission by major bucket.  This is a version of

10  what we saw earlier today.  The number of breach claims

11  within those buckets, the major buckets.  And on the far

12  right side the percent of breach claims that have now been

13  withdrawn.  And so, again, these are just the major buckets,

14  not all buckets.  My understanding is that the -- across

15  these major buckets, 37.4 percent of the breaches were

16  withdrawn.  The total number across all the buckets is

17  actually, I think, approaching 40 percent.  So it's just a

18  way of tabulating the frequency of withdrawn breaches across

19  the population.

20  Q    What does the Trustees' withdrawal of 40 percent of

21  their original breach claims suggest to you about the

22  Trustees' breach claim process?

23  A    Obviously, that it's unreliable in the sense that it's

24  changing.  I don't understand what's driving the change but

25  entire categories are being taken out.  I don't know what

Page 156

1   that speaks to.  On things like the failure to provide the

2   final TIL, I don't understand why 20 percent are withdrawn

3   and not 100 percent.  So, I don't have an understanding of

4   what is causing the withdrawal determination.  It just tells

5   me that whatever the results were initially, these results

6   are very different.  I just don't know why.

7   Q   If you had been asked to opine on the breach review

8   process, what we're told that you cannot review 40 percent

9   of the results of that process because they have been

10  withdrawn, would you be willing to audit the process and

11  issue an opinion on it?

12  A   It's hard to imagine how.  You'd have to explain to me

13  with a great degree of transparency what motivated the

14  withdrawal, because that's fundamental to my analysis of the

15  process.  So, if 40 percent are disappearing, it can't be

16  mysterious.  And here -- I think as of now at least, I'm

17  mystified as to why the claims were withdrawn.

18  Q   Let's take a look at the next slide.  Mr. Grice, do you

19  recall this slide from the Trustees' opening statement?

20  A   I do.

21  Q   What point do you think the Trustees are trying to make

22  with this?

23  A   I recall Mr. Shuster used this in his presentation at

24  the opening.  It's a list of the major evidence categories

25  that he's -- that the Trustees are using in their breach

1    claims.  And then it's attempting to, I think, draw some

2    conclusion or point to some reliability -- because these

3    evidence types used by the Trustees are also in some context

4    used in industry or accepted by some court, or used in some

5    context by Lehman, they should therefore be viewed as either

6    sufficient or reliable.  And I don't share that view.  I

7    don't -- the point being made was that the plan

8    administrator was agreeing with the accuracy of these

9    documents.  And I guess I would add the accuracy of these

10   documents in specific contexts; not the accuracy of these

11   documents in all contexts, and certainly not the sufficiency

12   or reliability of these documents in this context.

13   Q    And, Mr. Grice, did you see issues with the accuracy of

14   the Trustees' breach submissions?

15   A    Yes.  Extensive.

16   Q    And what factors does -- what factors, in general, do

17   you look to to determine the question of reliability?

18   A    It's really in this context, right, tied to this

19   context.  So, a tax return may be completely accurate for

20   its intended purpose, which is to summarize the borrower,

21   Richard's annual income.  That may be the proper way for an

22   accountant to report his taxable earnings for that calendar

23   year.  I don't think it's meaningful in trying to

24   triangulate what Richard was thinking on August 31st of that

25   year when he made his represented income on his application.

Page 158

1   It has some role to play but I think the limitations of a

2   tax document, even if accurate, are limited. Right? There

3   are limitations on its utility.

4   Q    Does the fact that a particular piece of evidence is

5   reliable in one circumstance tell you that it's going to be

6   reliable in every circumstance?

7   A    No. I mean, there are endless examples where the

8   document is perfectly good for one purpose but I wouldn't

9   want to use it for others. So, I could go real estate

10  shopping, I could go to Zillow and see how much apartments

11  cost in a neighborhood, but if I'm going to bid on a

12  property I'm not -- I may rely on the actual appraisal. I

13  would want more than just a free internet database. So, I

14  think reliability matters in a specific context.

15  Q    And does the fact that a piece of evidence may be

16  sufficient to show breach in one circumstance mean that the

17  same kind of evidence is always going to be sufficient to

18  show that type of breach?

19  A    No, I think context matters.

20       MR. DAVIS: May I have a moment, Your Honor?

21       THE COURT: Sure.

22       MR. DAVIS: No further questions, Your Honor.

23       THE COURT: Okay, thank you. Okay, Mr. Shuster,

24  it wasn't your intent to start cross-examination today, was

25  it?

Page 159

1           MR. SHUSTER:  No.

2           THE COURT:  Okay.

3           MR. SHUSTER:  He agreed he could start tomorrow,

4   Your Honor, subject to your --

5           THE COURT:  So, we're going to conclude for today

6   and we'll start at 9 o'clock again tomorrow.  And do you

7   think that you will go more than tomorrow with the cross-

8   examination?

9           MR. SHUSTER:  It's possible.  It's possible.

10          THE COURT:  Okay.  All right, so we'll see you at

11  2 o'clock tomorrow, same rules apply overnight, Mr. Grice.

12          MR. GRICE:  Of course, Your Honor.

13          THE COURT:  Okay.  9 o'clock.  Did I say 2

14  o'clock?  9 o'clock.  Wishful thinking.  No one's coming --

15  yes, Mr. Cosenza?

16          MR. COSENZA:  Sorry, can we raise one --

17          THE COURT:  No one's coming in between now and

18  then so you can leave all your things out.

19          MR. DAVIS:  Thank you.

20          MR. COSENZA:  Yes.  Can I just raise one issue?

21          THE COURT:  Sure.

22          MR. DAVIS:  There's one other issue just purely

23  logistical which is Mr. Grice doesn't have a hotel room for

24  the night after, so we would like to try to assist him in

25  getting a hotel room and I hope that we can coordinate that

Page 160

```
 1   with him --
 2           THE COURT:  Okay, I think there are probably a few
 3   rooms in New York.
 4           MR. DAVIS:  Because when you go to different ones
 5   --
 6           THE COURT:  Oh, can you talk to him?
 7           MR. DAVIS:  Yes, yes.  Apparently, there are many
 8   rooms but they're all occupied.  So...
 9           THE COURT:  Well, this will be a problem.  Yes, of
10   course, you can talk to him.
11           MR. COSENZA:  Your Honor, just because of these
12   spreadsheets and how difficult they are to follow, and how
13   big they are, and how they mean different things depending
14   on which expert submitted the appendices, we're going to
15   work jointly with Mr. Shuster, maybe just get a legend so
16   you know for which spreadsheet what the column heading
17   means.
18           THE COURT:  Sure, okay.  That's a great idea.
19           MR. COSENZA:  So that there's less confusion going
20   forward.
21           THE COURT:  Okay.  And also promises were made
22   yesterday by Mr. Goldberg, who conveniently is not here, to
23   give us screengrabs of when he put up the live Excels on the
24   screen.  So --
25           MR. SHUSTER:  I will grab Mr. Goldberg and scream
```

Page 161

1    at him.

2              THE COURT:  Not that funny but...thank you.  See

3    you tomorrow.

4              MR. DAVIS:  Thank you, Your Honor.

5         (Whereupon these proceedings were concluded at 1:25 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 162

1              C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya

7    Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2017.12.06 17:13:53 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 6, 2017