Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS INC.,   Case No. 08-13555-scc

7              Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                        United States Bankruptcy Court

11                        One Bowling Green

12                        New York, New York 10004-1408

13

14                        December 11, 2017

15                        9:39 AM

16

17

18

19

20

21

22

23   B E F O R E:

24   HON. SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

1    IN RE:   RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Dawn South and Sherri L. Breach

```
 1    A P P E A R A N C E S :

 2    WILKIE FARR & GALLAGHER LLP

 3         Attorneys for the Plan Administrator

 4         787 Seventh Avenue

 5         New York, NY 10019-6099

 6

 7    BY:  TODD G. COSENZA, ESQ.

 8         BENJAMIN P. MCCALLEN, ESQ.

 9         JOSEPH G. DAVIS, ESQ.

10

11    HOLWELL SHUSTER & GOLDBERG LLP

12         Attorneys for the Trustees

13         750 Seventh Avenue, 26th Floor

14         New York, NY 10019

15

16    BY:  MICHAEL S. SHUSTER, ESQ.

17         DWIGHT A. HEALY, ESQ.

18         NEIL R. LIEBERMAN, ESQ.

19         DANIEL P. GOLDBERG, ESQ.

20         BENJAMIN F. HEIDLAGE, ESQ.

21

22

23

24

25
```

1

2   ROLLIN BRASWELL FISHER LLC/PARTNER

3        8350 E. Crescent Parkway

4        Suite 100

5        Greenwood Village, CO 80111

6

7   BY:  MICHAEL ROLLIN, ESQ.

8        MARTIZA DOMINGUEZ BRASWELL, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Everyone get caught up in the mishap

 3    this morning?

 4              MR. GOLDBERG:  No, fortunately not.

 5              THE COURT:  No?  Good.

 6              MR. GOLDBERG:  Good morning, Your Honor.

 7              THE COURT:  Have a seat.

 8              MR. GOLDBERG:  How are you?  Good morning, Your

 9    Honor.

10              THE COURT:  Welcome back.

11              MR. GOLDBERG:  Thank you.  The trustees are going

12    to open their case with Mr. Edmond Esses.

13              THE COURT:  Very good.

14              MR. GOLDBERG:  We're going to call to the stand --

15              THE COURT:  Sure.

16              MR. GOLDBERG:  -- and my colleague, Benjamin

17    Heidlage, is going to conduct direct examination.

18              THE COURT:  Okay.

19              THE COURT:  Good morning, Mr. Esses, how are you?

20              Would you raise your right hand, please.

21               EDMOND DAVID ESSES, WITNESS, SWORN

22              THE COURT:  Very good.  Have a seat.  I see you

23    have been given some water.  If you need to take a break

24    just let us know, you don't have to wait for the attorneys

25    to ask for one.  All right?
```

Page 6

1          THE WITNESS:  Thank you.

2          THE COURT:  Okay.

3          MR. HEIDLAGE:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. HEIDLAGE:  May I proceed?

6          THE COURT:  Yes.  Do you have any binders?

7          MR. HEIDLAGE:  We do.

8          THE COURT:  Oh, you're going to have to high-

9     priced help giving out the binders.

10      (Laughter)

11          THE COURT:  This is all for me?

12          MR. HEIDLAGE:  Yes.

13          THE COURT:  So the red flags are intentional.

14          MR. HEIDLAGE:  They are intentional.

15          THE COURT:  Okay.  I think we're ready now.

16                    DIRECT EXAMINATION

17     BY MR. HEIDLAGE:

18     Q    Good morning, Mr. Esses.  What's your full name and

19     current position?

20     A    Edmond David Esses, I'm a director in the disputes and

21     investigations practice at Duff & Phelps.

22     Q    And could you walk us through your educational

23     background?

24     A     Sure.  I studied finance at Baru (sic) College,

25     graduated in 2008 with a bachelor's in business

Page 7

1    administration.

2    Q    Okay.

3             MR. HEIDLAGE:  And if we could put up TRDX-100.

4    BY MR. HEIDLAGE:

5    Q    And what was your first job?

6    A    I worked full-time through college as a residential

7    mortgage loan broker at a company called Universal Mortgage,

8    Inc.

9    Q    Okay.  And what were you responsibilities at Universal

10   Mortgage?

11   A    I was generally responsible in working with homeowner

12   home purchaser through the application process placing them

13   with a lending institution, a lending bank, working with the

14   borrower to get the loan approved and closed.

15   Q    Okay.  And what kind of information did you obtain from

16   the borrower?

17   A    Sure.  So as part of that I'd work with the borrower to

18   intake the loan application, which basically entails

19   interviewing the borrower, collecting the loan documents,

20   pulling together the application, and submitting that to the

21   lending institution for approval.

22   Q    Okay.  And when did you leave Universal?

23   A    2007.

24   Q    Okay.  And the what did you do after you left

25   Universal?

Page 8

```
 1    A     Oh, well I finished college.  Once I graduated college

 2    I started as a financial analyst at a CDO manager and hedge

 3    fund, Dynamic Credit Partners.

 4    Q     Okay.  And what kind of business was Dynamic Credit

 5    Partners engaged in?

 6    A     Dynamic Credit structured and managed CDO investment

 7    vehicles, collateralized debt obligations, and primarily

 8    focused on structured finance products, which included RMBS,

 9    residential mortgage-backed securities.

10    Q     And what were your responsibilities at Dynamic Credit?

11    A     I was primarily responsible for monitoring the

12    investments in the funds, which included collecting and

13    analyzing monthly reports on the underlying investments.

14    Q     Okay.  And other than monitoring the reports or the

15    investments did you do anything -- were you responsible for

16    anything else at Dynamic Credit?

17    A     Sure.  So as part of the monitoring that involved

18    certain reporting to investors as well as certain valuation

19    assignments assisting the team with valuing certain of the

20    assets and my marking the assets.

21    Q     Okay.  And as part of your work did you become familiar

22    with the reporting information available for RMBS?

23    A     I did.  Quite familiar.  As I mentioned as part of the

24    monitoring activities I'd review the monthly reports on the

25    underlying investments, which mainly included RMBS, so I'd
```

Page 9

1   review and pull certain information from the monthly remands

2   reports on the residential mortgage-back securities.

3   Q    And just to be clear, when we refer to RMBS you're

4   referring to residential mortgage-back securities; is that

5   correct?

6   A    Correct.

7   Q    Okay.  And how long were you at Dynamic Credit?

8   A    Approximately two and a half years until the group I

9   was part of at Dynamic Credit was purchased by Duff &

10  Phelps.  So they didn't purchase the entire company but they

11  purchased the part of the company I was a part of.

12  Q    Okay.  And at that time what happened -- what did you

13  do?

14  A    So we were doing similarly reporting of valuation

15  consulting, as well as I started to get involved in certain

16  structured finance litigation matters that were continued to

17  Duff & Phelps.

18       We initially joined the valuation group specializing in

19  structured finance, again, litigation relating to

20  residential mortgage-back securities and structured finance

21  products in general, and the valuation and litigation and

22  valuation of the context of litigation continued through to

23  Duff & Phelps.

24  Q    And so just to be clear, when your group was purchased

25  did you move over from Dynamic Credit to Duff & Phelps with

Page 10

1    the team?

2    A    I did, yes.

3    Q    Okay.  And you've referenced certain litigation

4    consulting.  Could you please elaborate as to what you mean

5    by that?

6    A    Sure.  So we were mainly involved in matters relating

7    to breaches of representations and warranties involving

8    either managing or assessing a review of mortgage loans

9    against the representations and warranties.

10   Q    Okay.  And as part of that work did you gain experience

11   working with loan review firms?

12   A    I did.  In addition to receiving and reviewing their

13   work analyzing their work we often worked side by side with

14   them to understand their process, the tools used, and the

15   general procedures that would be applicable to an industry

16   -- a standard industry practice review.

17   Q    Okay.  Now, at what point in time did you become

18   involved in the Lehman matter, this matter that we're here

19   for today?

20   A    So I first got involved when Duff & Phelps was retained

21   by the RMBS trustees, this was in May 2013.

22   Q    Okay.  And what was Duff & Phelps's involvement at that

23   time?

24   A    We were retained to oversee and manage a review of the

25   sample loans, a sample review that had already been under

Page 11

```
 1    way and to -- and certain personnel at Duff to testify to

 2    the results, to oversee -- to specifically oversee a manager

 3    review, and to eventually opine and testify to the results

 4    of that sample review.

 5    Q    Okay.  And who was the -- who were the personnel at

 6    Duff & Phelps that were expected to testify as to the

 7    results?

 8    A    Mr. Jim Aronoff.

 9    Q    Okay.  And what was your role at that time?

10    A    I assisted Mr. Aronoff in the project management

11    responsibilities with regard to the managing the loan review

12    that was under way at that time.

13    Q    Okay.  Are you familiar with the protocol order that

14    was entered in December of 2014?

15    A    I am quite familiar with the protocol order, yes.

16    Q    Okay.  And did Duff & Phelps have responsibilities with

17    respect to the protocol?

18    A    We did.  Duff was retained to assist the RMBS trustees

19    in implementing each of the steps of the protocol.

20    Q    Okay.  Could you please elaborate as to Duff & Phelps's

21    responsibilities?

22    A    Sure.  So part of that implementing the steps of the

23    protocol included several -- many responsibilities.  Mainly

24    to -- including to collect the loan files from the

25    servicers, design a loan review to review the loans under
```

1    the protocol process, manage and oversee the review firms,

2    including a quality control function at Duff & Phelps.

3    Eventually to submit the loans in accordance with the

4    protocol as part of the protocol process to review and

5    respond to the responses from the plan administrator.  Work

6    with the plan administrator on the logistics, the day-to-day

7    communications issues, and to -- the firm was to support

8    Mr. Aronoff in eventually testifying to the results.

9    Q    Okay.  And what were your responsibilities in

10   particular with respect to the protocol?

11   A    Sure.  So I was the project manager responsible for

12   putting in place the processes and procedures to implement

13   each of the steps of the protocol and make sure we had the

14   correct assistance, personnel, and steps to take to

15   successfully implement each of the steps of the protocols.

16   Q    And could you elaborate on what exactly those steps

17   entailed?

18   A    Sure.  So within Duff & Phelps general responsibilities

19   I was specifically responsible and intimately involved in

20   the working with counsel to collect the loan files from the

21   servicers, assist Mr. Aronoff in the design of the review

22   process, implement the review process, work with the counsel

23   and the team at Duff to identify and select the loan review

24   firms, specifically involved in ensuring that the submission

25   of the claim submissions to the plan administrator was in

Page 13

1    accordance with the protocol.

2        I was responsible for implementing the systems and the

3    databases to collect the data, and ensure that we had the

4    appropriate databases to track -- to collect the data and

5    track the specific loans.

6        I worked to -- I worked -- I specifically, along with

7    Mr. Pfeiffer, a managing director at the firm, worked to

8    establish communication with the plan administrator.  Those

9    are my main responsibilities.

10   Q    Okay.  And on this project who did you report to?

11   A    I reported to Mr. Aronoff with regard to the loan

12   review process, and I reported to Mr. Pfeiffer with regard

13   to the project -- my project management responsibilities.

14   Q    Okay.  And is -- when you refer to Mr. Pfeiffer, is

15   that Allen Pfeiffer?

16   A    Mr. Allen Pfeiffer, correct.

17   Q    Okay.  And what was your understanding of Mr. Aronoff's

18   role in this project?

19   A    Mr. Aronoff, in line with his responsibilities with

20   regard to the sample review, was to design and oversee the

21   loan review process, to -- he was the expert who was to make

22   the determinations as to breach findings and adverse and

23   material effect of those findings, whether or not to submit

24   them to the plan administrator, and eventually to testify to

25   the review and to the results of the review.

1    Q    Okay.  Now -- excuse me -- you mentioned that one of

2    your responsibilities was the collection of loan files.

3    Could you please elaborate as to what you meant by that?

4    A    Sure.  So I was primarily responsibility for working

5    with counsel to receive the -- to collect -- to request and

6    receive and collect the loan files from the servicers.

7    Q    Okay.  And why were you working with counsel to collect

8    loan files?

9    A    So we had -- number 1, it was required under the

10   protocol.  But number 2, is we had some experience with

11   collecting the loan files from a sample review, had -- you

12   know, it took a little while, but we wanted to ensure that

13   we were following the protocol and directly communicating

14   with the servicers to ensure that they sent us complete

15   copies of the origination and servicing files that they had

16   available.

17   Q    Okay.  You mentioned the protocol, I won't -- could you

18   please turn to TRX-831.

19          MR. HEIDLAGE:  And for the Court the TRX-831 and

20   the number of exhibits that we're going to be using this

21   first day they're all in Volume 1 --

22          THE COURT:  Okay.

23          MR. HEIDLAGE:  -- of the binders that you just

24   received.

25          THE COURT:  Thank you.

Page 15

1            THE WITNESS:  I have it open.

2    BY MR. HEIDLAGE:

3    Q    Okay.  And you stated that the trustees were required

4    to collect loan files under the protocol.  Could you point

5    me to the provision that you were referring to?

6    A    Right.  So that's zero of the protocol.  It's on page 7

7    of the exhibit under receipt of claim files from servicers.

8    Q    And what was your understanding as to what the trustees

9    were required to do?

10   A    We were initially required to send a mass direction

11   letter to the master servicers, here Nationstar, for the

12   vast majority of the trusts at issue, and Wells Fargo for a

13   few trusts at issue, and talk either -- under the protocol

14   we were required and did do so follow up with the --

15   promptly direct the master servicers to provide the files

16   and work -- and ensure that the primary servicers compiled

17   with that -- with number 1, the court order, but also the

18   direction letters from the master servicer to provide

19   complete copies of the files that they had available.

20   Q    Okay.  Can you just --

21            THE COURT:  Can I interrupt you and ask you

22   question?

23            MR. HEIDLAGE:  Sure.

24            THE WITNESS:  Sure.

25            THE COURT:  So when the files came in did you have

Page 16

1    any way of knowing if in fact the servicers had sent you

2    everything that they had?

3            THE WITNESS:  So yeah, we didn't, but there are a

4    couple of steps that we took to ensure that we satisfied

5    ourselves.

6            THE COURT:  But you didn't -- but you first said

7    you did not, you did not know.

8            THE WITNESS:  Well initially at first.

9            THE COURT:  Okay.

10            THE WITNESS:  I'm sorry, when they first sent us

11    everything they had.  But we had in place --

12            THE COURT:  When they sent you what they sent you.

13            THE WITNESS:  That's correct.

14            THE COURT:  Okay.  So there's a difference between

15    sending you what they sent you and sending you everything

16    that they had.  That's -- if I give you a pile of documents,

17    right, and I say, here's everything I had, I mean unless you

18    come over to my desk or my files you don't know that, right?

19            THE WITNESS:  Right.  And --

20            THE COURT:  I'm just trying to --

21            THE WITNESS:  Yeah, Your Honor, that's exactly why

22    we took the steps that we took --

23            THE COURT:  Okay.

24            THE WITNESS:  -- to ensure that the servicers were

25    in fact sending us the complete --

Page 17

1              THE COURT:  Okay.

2              THE WITNESS:  -- origination and servicing files.

3              THE COURT:  Okay.  Thank you.

4    BY MR. HEIDLAGE:

5    Q    And just to take a step back for a moment, can you

6    please walk us through what a master servicer and a primary

7    servicer are and what they do?

8    A    Right.  So at a high level a master servicer is usually

9    in the context of a trust, a securitization trust where

10   there may be several thousands loans of multiple servicers,

11   whereas a servicer is responsible for working with a

12   borrower on the day-to-day basis collecting the payments.

13   They would -- the master servicer would serve to collect all

14   the information from the -- each of the individual servicers

15   and report that over to the -- report that up to the trusts.

16   Q    Okay.  Now, did you collect loan files from sources

17   other than the master servicers and primary servicers?

18   A    We did not.

19   Q    Okay.  And how did you go about collecting the loan

20   files from the servicers?

21   A    So once we sent the direction letter to the master

22   servicers, which was then forwarded to the primary

23   servicers, including counsel and myself, we then established

24   communication with each of the servicers, and that initial

25   set of communication to work closely with each of the

Page 18

1    servicers over the next following months to collect the loan

2    files.

3    Q    Okay.  And could you please turn to TRX-1064, which is

4    also in Volume 1.  And in particular I want to direct your

5    attention to pages 2 and 3 of the exhibit.

6    A    Okay.

7    Q    Do you recognize this document?

8    A    I do.  So this is -- it's two direction letters, on

9    page 3 of the exhibit and on page 11 of the exhibit, and

10   these were attached to an email which was attached to my

11   declaration submitted in September 2016 in response to the

12   plan administrator's motion to expunge.

13        This is essentially -- these are the direction letters

14   and the communication that was sent to Nationstar and Wells

15   Fargo.

16   Q    Okay.  And did you have any role with respect to the

17   direction letters?

18   A    I did.  I reviewed them as they were being drafted

19   between the plan administrator and the RMBS trustees.

20   Q    Okay.  And the what did the direction letters say to

21   the master servicers?

22   A    Generally directing them as per the governing

23   agreements to produce the servicing files (indiscernible -

24   19:08) which we understood to be the complete origination

25   and servicing files, and to send them to the trustees.

Page 19

1    Q    And you may have mentioned, who drafted the direction

2    letter?

3    A    This was -- I believe it was jointly drafted between

4    the plan administrator and the RMBS trustees, so each had

5    comments that were -- that both comments were -- comments

6    from both sides were accepted with regard to the final

7    letter.

8    Q    And I'd like to direct your attention to page 9 of the

9    exhibit.

10   A    I see that.

11   Q    Do you recognize this exhibit?

12   A    I do.  This is the Exhibit A, the definition of

13   servicing file and includes a list of approximately, you

14   know, 30 to 40 documents listed here.

15        This was, as I mentioned in my declaration at the time,

16   this was suggested by the plan administrator to the RMBS

17   trustees and adopted by the RMBS trustees as an exhibit to

18   the direction letter.

19   Q    Now, did the master servicers request the production of

20   loan files from the primary servicers?

21   A    They did.  They forwarded these letters.

22   Q    Okay.  And after the master servicers made that request

23   what did you do?

24   A    We then, as described earlier, established

25   communication, followed up with each of the servicers, which

Page 20

1    was the first of many communications with each of the

2    servicers.

3    Q    Okay.  And could I direct your attention to TRX-1069,

4    which is I believe the next tab in Volume 1.  And again,

5    directing your attention to pages 2 and 3 of that exhibit.

6    And this again it's in Volume 1.  And do you recognize

7    TRX-1069?

8    A    I do.  This is an email that I was -- it was sent to

9    the servicer and I was cc'd on.

10   Q    Okay.  And what was -- did -- what did this communicate

11   to the servicers?

12   A    So as a follow up to the direction letter that the

13   master servicer sent to each of the servicers we then,

14   trustees' counsel, including myself, sent a follow-up email

15   to each of the servicers to establish a communication.

16       We highlighted -- a few things we highlighted here.

17   Number 1, importantly that time was -- is of the essence,

18   was of the essence.  We were facing court deadlines to

19   retrieve the loan files.  The -- we cited the Court's orders

20   -- the judge's orders with regard to the collecting the

21   documents, and that the Court had ordered that the servicers

22   produce the documents, and that the Court would assist if

23   anybody was not cooperating.

24   Q    Okay.  And did you send similar communications to the

25   other primary servicers?

Page 21

1   A    We did.  So this is an example of one of the emails

2   sent to Citi we actually sent to each of the servicers as

3   attached to my declaration in September 2016.

4   Q    And after you sent these emails did the trustees speak

5   directly to the primary servicers?

6   A    We did.  There were scores of communications, if not

7   hundreds with some of the servicers.  We -- this was the

8   first of many either email or phone conversations with each

9   of the servicers.

10  Q    Okay.

11          MR. HEIDLAGE:  And if we could show TRDX-103.

12  BY MR. HEIDLAGE:

13  Q    Which servicers did you contact?

14  A    So there are initially a set of 12 servicers that

15  covered the population of covered loans.  It expanded later

16  in the protocol when we had identified additional covered

17  loans to approximately 17 total servicers.  The vast

18  majority of the loans were captured by the largest four

19  servicers, Nationstar, Aurora, Accurint, and CitiMortgage.

20  Q    And how did the servicers respond to the communications

21  that you had with them?

22  A    Sure.  So they for the most part that they intended to

23  cooperate, that they were going to work with us.  So we were

24  talking to them about understanding the form in -- number 1,

25  confirming that they understood the request.  That it was

Page 22

1  absolutely for the complete origination and servicing files

2  that hay had available on each of the loans.

3      So -- I mean it's hard to -- it's actually impossible

4  to have a list of documents, loan documents in a file vary

5  from loan to loan, program to program, servicer to servicer,

6  but we wanted to confirm that they understood that they were

7  to send us their complete copies of the origination

8  servicing files that they had available.

9      We wanted to understand the form that they were going

10 to send it in.  We wanted to be ready to receive those.  We

11 wanted to understand the timeline, get a timeline for each

12 of them, make sure they were clear about our timeline for

13 review, and ensure that they would send within the confines

14 of the protocol, and generally if they anticipated any

15 problems.

16     But they -- we established these in discussions, the

17 timeline that they intended to cooperate and that they

18 understood the request.

19 Q    Okay.  And were there any servicers that did not

20 cooperate?

21 A    So I said in most instances.  There were actually a few

22 that we had a little push back initially.  Examples, they

23 were Midwest, at first they only had 33 loan files, at first

24 they gave us a hard time, we eventually discussed that with

25 them and got the loan files.  Colonial, we eventually served

Page 23

```
 1   them with a subpoena before they served the loan files.  And

 2   there was an additional subpoena served late, late, late in

 3   the protocol, this was with regard to the additional covered

 4   loans, one of the servicers had actually gone defunct and

 5   the company that bought them we just -- it was almost the --

 6   coming on the deadlines of the protocol and we wanted to

 7   ensure that they produced those files.  And we served

 8   Bridgefield, ResMAE Citadel, that was the original servicer

 9   with a subpoena.

10   Q    And so just to be clear, the last entity that you

11   served a subpoena with, which was one that?

12   A    Bridgefield.

13   Q    Okay.

14            MR. HEIDLAGE:  And if we could show TRDX-14.

15   BY MR. HEIDLAGE:

16   Q    So were you able to draw any conclusions that you --

17   from the communications that you had with the servicers?

18   A    We did.  We satisfied ourselves with each of the

19   servicers that they were sending us the complete origination

20   -- copies of the origination servicing files that they had

21   available.

22   Q    Okay.  And how did you satisfy yourself?

23   A    It was a series of communications, a series of back and

24   forth with each of the servicers, hundreds of communications

25   altogether, and eventually we got from each of the servicers
```

Page 24

```
 1    we confirmed with them that you are sending us everything

 2    you have.

 3    Q    And in light of the responses that you received did you

 4    feel the need to request a court order?

 5    A    No.  No.  As I mentioned, the -- almost all the

 6    servicers intended to cooperate, were working closely with

 7    us, taking our calls, answering our emails, giving us time

 8    lines, producing documents, engaging in back and forth after

 9    our initial completeness review of the documents, engaging

10    in back and forth after the plan administrator's

11    completeness response, so we did not believe that getting an

12    additional order, in addition to the one that was already

13    entered with regard to the servicers producing the loan

14    files, would have been effective or helpful at that point.

15    Q    Now, what did you do when you received the loan files

16    from the servicers?

17    A    So at first Duff & Phelps we did -- at Duff & Phelps we

18    did -- we indexed and would organize the loan files in

19    accord with the protocol.  We'll submit a notice of receipt

20    to the plan administrator.  We'd then prepare and send those

21    files to the -- allocate and assign those files to the

22    review firms and send them over to the review firms for a

23    completeness review, also as required by the protocol.

24    Q    And what did the review firms do with the loan files

25    once they received them?
```

1    A     The first step was a completeness review as required by

2    the protocol.

3    Q     Okay.  And can you explain to me what a completeness

4    review entailed?

5    A     Completeness, the RMBS trustees' completeness review

6    included a flag for looking for what we considered to be six

7    key documents, which included a -- which we would expect to

8    be included in the loan file that were important for our

9    review, and the trustees used as an indicia of completeness

10   for the review files.

11   Q     Okay.  Now, did the protocol require any specific

12   documents to be included in the loan file?

13   A     No.

14   Q     Okay.  Now, if you can turn back to TRX-831, which is

15   the protocol that we looked at earlier.

16         Was there any specific language that the trustees

17   looked to to determine what documents should be in the loan

18   file?

19   A     We did.  So there's not a definition of a -- a specific

20   definition of what the mortgage loan file were to include,

21   but looking at -- under step one of the protocol on page 10

22   of the exhibit, page 10 of 24, so this is 3(e)(6), an RMBS

23   claim file shall include, we read this, the mortgage loan

24   file, including at a minimum all of the loan documents the

25   RMBS trustees received from the applicable master servicer,

Page 26

1   primary servicer, and/or any other party or otherwise relied

2   upon in making their claim, which may include the

3   documentation identified in Exhibit B.  And there's a list

4   of documents in Exhibit B, but we understood that, you know,

5   many of those documents are not available or applicable to

6   every single loan file, so highlighting the language here

7   which may include the documentation identified in Exhibit B.

8   Q    Okay.  And was there any reference in the protocol to

9   what would constitute a complete loan file?

10  A    There was.  There was a reference with regard to the

11  Aurora files.  So the completeness confirmation for Aurora

12  files on page 8 of 24, that they shall serve as a template.

13  I'm quite familiar with the language, but I'm just --

14  Q    Are you referring to the language on page 7?

15  A    Sorry, that's correct.  Right.  So the language on

16  page 7 under 2(a), that the 51,109 substantially complete

17  origination files in Aurora's possession, together with the

18  Aurora servicing files related to such loans file, which

19  encompass loan files pursuant to Section 2(b) below shall

20  serve as a template for what the plan administrator

21  considers a complete file, defined term, a complete file.

22  That's not otherwise used.

23  Q    Okay.  Now, did the Aurora files contain each of the

24  documents that were listed in Exhibit B?

25  A    No.  No.  The RMBS trustees did at a minimum a review

Page 27

1  of the six key documents and we found many of those

2  documents to be missing.

3  Q    Okay.  Now, you mentioned the six key documents.  Can

4  you list those documents for us?

5  A    Sure.  So the documents that we considered to be key,

6  again, expected to be in a loan file and important for our

7  review were the loan application, the origination credit

8  report, the appraisal, a complete appraisal, the mortgage,

9  the note, and the HUD.

10 Q    Okay.  And why were those documents used by the

11 trustees?

12 A    As I mentioned, expected to be in the loan file,

13 important for our review, so you really want an application

14 when you're doing the review for confirming the income,

15 debt, assets, the important pieces of the application.  But

16 the other documents, again, expected to be in the file.  And

17 we wanted to have a method for sort of a completeness

18 indicia where we weren't confirming a list of, you know, 40

19 or 50 documents that may not be applicable, but gave us the

20 ability to flag certain loan files and go back to a

21 servicers and say, hey, you know, some of these documents

22 we'd expect to be in the loan file were not in the loan

23 file, can you please send us these or otherwise confirm that

24 you sent us everything you have available.

25 Q    Okay.  And if a document was -- one of those 60

Page 28

1   documents were missing did you in fact go back to the

2   servicers?

3   A    Absolutely, we did, yes.

4   Q    Okay.  And how did the --

5            THE COURT:  I might have missed it, but who

6   defined -- defined is too strong a word -- who identified or

7   formulated which -- the concept of the six key documents?

8            THE WITNESS:  We -- Duff & Phelps, along with

9   trustee and trustees' counsel, as well as input from the

10  review -- from the one review firm at the time.

11           THE COURT:  Thank you.

12  BY MR. HEIDLAGE:

13  Q    And how did the servicers respond to the follow up

14  based on this review?

15  A    So in almost all of the instances they -- you know, we

16  asked them either send us a document or confirm you've sent

17  us everything you have available.  They did the latter.

18  They confirmed that they had sent us everything that they

19  had available.

20  Q    Okay.  And were there any instances where the servicers

21  in fact came back with more documents?

22  A    There were a few instances early on where we understood

23  that the servicer wasn't pulling the documents from each of

24  their -- from all of the locations, so these two instances

25  were identified and corrected early on.

Page 29

1          Just to give a little detail on that.  So at first we

2     had sent a completeness on the Aurora loans and we had

3     identified that certain of the key documents were missing.

4     They alerted us, that oh, there actually may be some

5     additional hard copy documents in storage, we'll go and scan

6     them and send you and that'll be everything we have.  So

7     what we've already sent you plus oh, yeah, some of these

8     loan files have hard copies and so we'll go get those.

9          A similar story with Citi.  Within their first deliver

10    at first they didn't give us all of the origination files.

11    We identified this, we discussed it with them, and ensured

12    -- and they corrected that on a go forward basis.

13    Q    Now, at the end of the day did you receive all six key

14    documents for each of the loans?

15    A    No.

16    Q    And what was the -- did you have -- understand any

17    significance to that?

18    A    Well again, the significance to that is that these

19    documents are not always available in each of these loans.

20    Q    And I'd like to shift gears a little bit.  We've

21    mentioned a couple of times the review firms.  Can you

22    explain how the trustees identified and selected the loan

23    review firms?

24    A    Sure.  So a key part of this process was identifying

25    and selecting review firms that would be able to review

Page 30

1    loans in accordance with what we understood to be industry

2    practice and the timelines under the protocol.

3        We had been working with the Digital Risk for quite a

4    while at that point.  With regard to the sample review we

5    had gotten very comfortable with their process, the results

6    of the review, so they were at the top of our list, but we

7    understood that we needed more than one firm to meet the

8    deadlines of the protocol without stretching any one firm

9    and sacrificing quality of the review.

10       So we interviewed, we pulled together -- the first step

11   was identifying review firms, we did that by looking to the

12   experience of Duff & Phelps, trustees, trustee counsel,

13   firms that had a strong reputation in the industry, firms

14   that we had previously worked with in these similar types of

15   forensic reviews, and we identified a list of review firms

16   that we would interview and select for the protocol.

17   Q    Okay.  And can you describe for me what the process was

18   for actually selecting the review firm that you eventually

19   would use?

20   A    Right.  So it was an interview process, a series of

21   interviews between the group, Duff & Phelps, trustees, and

22   trustees' counsel and these firms.  We spent, you know, over

23   the course of a series of interviews with each of the firms

24   understanding and ensuring that their processes were in

25   accordance with standard industry practice.  Again, some of

1    these we had experience with and had first-hand knowledge of

2    their processes.  Talking to their key personnel, ensuring

3    that they had a seasoned underwriting staff who was -- who

4    knew how to do these -- who had done and knew how to do

5    these types of reviews.  And ensuring -- very importantly,

6    ensuring that they had the systems and tools necessary to

7    comply with our timelines, and certain data -- you know,

8    certain data of management and loan tracking systems to

9    ensure compliance with the protocol.

10   Q    Okay.  And if we can -- well which were the review

11   firms that were eventually selected?

12   A    So in addition to Digital Risk --

13              MR. HEIDLAGE:  So, if we could TRDX-105.

14              THE WITNESS:  In addition to Digital Risk, which

15   we had gotten quite comfortable with and selected to be one

16   of the review firms, we hired the Oakleaf Group, CrossCheck

17   Compliance, EdgeMAC, and Opus, all firms with a strong

18   reputation with the industry.

19   BY MR. HEIDLAGE:

20   Q    Okay.  If we can just take a step back for a moment.

21   Can you walk me through how the loan process -- loan review

22   process worked generally and how a loan came eventually to

23   be submitted as a claim to the plan administrator?

24   A    Sure.  So we covered the completeness review.  From the

25   completeness review the loans went through a reunderwriting

Page 32

```
 1    or review at the loan review firms, including quality

 2    control to review firms.  They were then sent up to Duff &

 3    Phelps who had a multi-layer quality control process and

 4    were to make the final determination of -- for each breach

 5    finding and the material and adverse effect of those breach

 6    findings, and then submission to the plan administrator.

 7              MR. HEIDLAGE:  And if we can show slide TRDX-106.

 8    BY MR. HEIDLAGE:

 9    Q    Okay.  And turning first to the initial review by the

10    loan review firms, can you walk us through the loan review

11    firms processes?

12    A    Sure.  So once a loan came out of completeness review

13    it was assigned by Duff & Phelps for review and that was

14    until -- the first one was the initial loan review, so

15    that's a two-step process.  So that is an initial processor

16    collecting the -- setting up the loan file in their systems

17    for review, capturing certain data points with regard to the

18    borrower's application and other data points within the loan

19    file, running third-party sources.

20         Once they do that, once they get the loan file all set

21    up for review they then send it over to an underwriter, a

22    seasoned, experienced underwriter who then does a complete

23    review of the loan file, including all the documents, as

24    well as the third-party sources run by the -- set up by the

25    processor, and to the extend they need to confirm any of
```

Page 33

1    that they do a confirmation of those third-party sources.

2    So that's the initial loan review.

3              MR. HEIDLAGE:  If we could show TRDX-107.

4    BY MR. HEIDLAGE:

5    Q    And once the -- that initial loan review is completed

6    what happens next?

7    A    It's then sent up to a second level quality control

8    review at the review firm, which --

9              MR. HEIDLAGE:  And if we can show TRDX-108.

10             THE WITNESS:  Sure.  So the quality control at the

11   review firm is an even more seasoned underwriter who for one

12   confirms that the facts cited support the finding that was

13   flagged by the initial underwriter review.  They review the

14   supporting documentation that the supporting documentation

15   supports the facts cited.  And they do a complete review of

16   the loan file in either all loans or a substantial random

17   sample of loans and they'll specifically look for at that

18   level of review, at the quality control level of review of

19   the entire loan file they'll look for -- confirm that

20   missing documents were in fact missing, that there was no

21   contradictory evidence in the loan file that calls into

22   question the finding of the initial underwriter, and then

23   does a complete review of those loan files in those

24   instances.

25   BY MR. HEIDLAGE:

Page 34

1    Q    So after that review is completed do the loan review

2    firms do anything else?

3    A    Yeah.  There was a what's called a deliverable quality

4    control, a deliverable QC.  And a deliverable QC does a

5    further review of the -- basically the narrative and certain

6    data fields with regard to the loan, that -- again, that the

7    -- it's clear, it's concise that the facts cited support the

8    finding, they're related.  So they do that, that deliverable

9    quality control before signing off on a deliverable and

10   sending that up to Duff & Phelps.

11

12

13        (SLB PART BEGINS AT POSITION MARKER 43:13)

14   Q    Okay.  And before we turn to the -- whatever

15   responsibilities Duff & Phelps has, could you explain, did

16   Duff & Phelps provide any guidance to the review firms with

17   respect to the forensic reviews?

18   A    We did.  We certainly did.

19   Q    Okay.  And can you describe what guidance you provided?

20   A    It composed of a couple of sets of -- a couple of

21   series of guidance.  So at first we had -- started we're in

22   guidance that we provided to each of the firms to ensure

23   there was a consistent playing field across the five review

24   firms.  We had kick off calls with each of the review firms

25   to go through that guidance, answer any questions they had.

Page 35

1    And we instituted weekly calls with the QC, the Duff &

2    Phelps quality control team, and each of the review firms,

3    separate calls with each of the review firms to give them a

4    real time feedback.  We were -- we were quality controlling

5    the loans on a real time, on adjusting time basis and we

6    provide -- that would provide for quick feedback and

7    discussions between the review firms and Duff & Phelps.

8    Q    Did it -- you mentioned a written guidance.  Can you

9    describe what the written guidance was that you provided?

10   A    The written guidance consisted of a list of the breach

11   categories that our naming conventions generally for the

12   breach categories, a mapping for each of the breach

13   categories to the representations and warranties for each of

14   the trusts at issue.  We had around 250 trusts at issue, so

15   each one required its own applicable reps and warranties and

16   mapping, as well as templates.  So a series of templates in

17   which the review firms would deliver the findings back to

18   Duff & Phelps, a form for how they should describe the

19   various breaches, make sure they were hitting certain --

20   giving us clear and accurate information, and enough

21   information for us to make our assessment, as well as a

22   series of data points with regard to the loan as well as

23   with regard to the breach.

24       So they were completing those as part of their review

25   and submitting those -- filling in those templates and

Page 36

1   submitting those to Duff & Phelps along with their

2   deliverable -- along with their deliverables.

3   Q   Okay.  What -- you mentioned breach categories and

4   mapping.  Just to make it a little more concrete, can you

5   provide an example --

6         THE COURT:  Well, the -- can we pause for a

7   minute?  Could you come up, please?

8         MR. HEIDLAGE:  Sure.

9     (At sidebar off the record)

10        THE COURT:  Okay.  So the morning is flying by.

11  Mr. Esses, you are so good at this you're talking too fast.

12    (Laughter)

13        THE COURT:  And the gentleman here needs to keep

14  up with you so that everyone can keep up with your testimony

15  in real time.  So this is a very hard thing to ask a witness

16  to do because it's asking you to do something other than

17  what feels natural.

18        But when we come back -- we're going to take a

19  short break --

20        THE WITNESS:  Sure.

21        THE COURT:  -- and when we come back after the

22  break I'm going to ask you to try to just slow it down a

23  little --

24        THE WITNESS:  I --

25        THE COURT:  -- bit.

Page 37

1                    THE WITNESS:  I apologize.  I've been living --

2                    THE COURT:  You don't --

3                    THE WITNESS:  -- this for almost four years now.

4                    THE COURT:  I -- I understand.  There's absolutely

5       no need to apologize.  You're coming from a good place by

6       talking quickly.  But we're going to have to try to slow it

7       down --

8                    THE WITNESS:  Absolutely.

9                    THE COURT:  -- just a little bit.

10                   THE WITNESS:  No problem.

11                   THE COURT:  All right.  So let's take our first

12      break of the morning.  We'll come back at 11:00.  Someone's

13      phone is ringing.

14          (Pause)

15                   THE COURT:  Is someone going to fess up to that?

16          (Laughter)

17                   THE COURT:  I'm sorry, Your Honor?

18                   UNIDENTIFIED SPEAKER:  Yes.  I'm very sorry.

19                   THE COURT:  Very good.

20                   UNIDENTIFIED SPEAKER:  It's turned off now.

21                   THE COURT:  All right.  We're going to come back

22      at 11:00.

23                   Mr. Esses, the rules are that during any breaks

24      that we have during your testimony, please do not discuss

25      the case or your testimony with anyone or be in anyone's

Page 38

1    presence while they do the same.

2              THE WITNESS:  Understood.

3              THE COURT:  All right.  Thank you.

4              MR. HEIDLAGE:  Thank you, Your Honor.

5         (Recessed at 10:53 a.m.; reconvened at 11:18 a.m.)

6              THE COURT:  I apologize for the delay.

7              MR. HEIDLAGE:  Thank you, Your Honor.  We needed

8    it.

9              Can we approach?

10             THE COURT:  Sure.

11        (At sidebar off the record)

12             THE COURT:  Go ahead.

13             MR. HEIDLAGE:  Thank you.

14   BY MR. HEIDLAGE:

15   Q    Welcome back, Mr. Esses.

16        Did you provide any instructions on the mechanics of

17   how to conduct a forensic review?

18   A    Not specifically, no.

19   Q    Okay.  And why not?

20   A    These firms, the firms that we, you know, as part of

21   our selection process were firms that had a lot of

22   experience in this regard on how to do a forensic review and

23   how to review and re-underwrite a loan.  We simply didn't

24   think it would have been necessary to provide them with that

25   level of detail and instruction.  There's an accepted

Page 39

1    industry practice on how to -- how these reviews are done.

2    It's quite similar across the review firms, especially the

3    review firms we chose and hire.  So we did not feel it was

4    necessary to provide them with instructions on how to flip

5    through a line file, identify documents, use certain party

6    tools.

7    Q    Now you also mentioned certain oral guidance that you

8    provided.  Do you recall that?

9    A    I do.

10    Q    Okay.  And can you describe for me what that oral

11    guidance entailed?

12    A    Sure.  So there were certain instructions with regard

13    to parameters to use, how to use certain types of evidence,

14    variances to use.  That was gone over on the kickoff call as

15    well as ongoing instructions on the weekly calls with the

16    review firms.

17    Q    Okay.  And you referred to certain parameters.  Could

18    you describe the parameters that you provided to the review

19    firms orally?

20    A    Sure.  So the parameters were specifically with regard

21    to certain categories of breaches.  So when citing to a

22    misrepresentation of income there are different levels that

23    you can use with within BLS.  We -- you know, they knew how

24    to use BLS, but we instructed them only use the ninetieth

25    percentile.  Right.  So that was one sort of parameter we

Page 40

1    gave them.

2         With regard to citing to near year documentation with -

3    - on misrepresentations of income, our instructions were to

4    only go out two years.  And when you're doing that, make

5    sure to confirm that, for example, for a salary borrower

6    that they're at the same employer, same or better job title,

7    and that's a parameter to use at near year income with

8    regard to self-employed borrowers that they -- that they are

9    receiving their income from the same source.

10        There are other examples -- well, included within

11   misrepresentation of income.  With regard to the variance we

12   instructed them, we only want to see findings that have a

13   variance between the actual and stated income of more -- of

14   five percent or greater.  In other words, they may find the

15   finding or flag the finding.  We didn't -- you know, we

16   simply didn't want to see those.

17        That's within misrepresentation of income.

18   Q    Sure.  With respect to -- just so that we're all on the

19   same page.  When you talk about a variance, can you explain

20   how you calculate the variance?

21   A    Sure.  So that was -- we instructed them to calculate

22   that as -- and these are some of the data points that we

23   retrieved this by the process, is the actual -- the stated

24   income that you pull from the application against -- as

25   compared to the actual income that we found through -- that

Page 41

1    we found through our review.
2          So when calculating actual overstated minus one as a
3    percentage basis, that the variance was more than -- was
4    more than five percent.
5    Q    Okay.  So, for example, for -- if there was a borrower
6    with -- the stated was 50,000 and the actual was 100,000,
7    what would the variance be?
8    A    Right.  So the math there is a hundred, the actual of a
9    hundred minus the stated of fifty, so a difference of fifty.
10   And fifty divided by the stated, so fifty, so fifty divided
11   by fifty is one or a hundred percent variance with that --
12   would be the math for that example.
13   Q    Okay.  And just for clarity, when you refer to mirror
14   evidence, can you give an example of what you mean by mirror
15   evidence?
16   A    Yeah.  Tax returns that are not -- you know, the two
17   years following, the year or two years following the
18   origination date of the closing, because it was not, you
19   know, same year evidence we had the other parameters with
20   regards to those types of evidence.
21   Q    Okay.  Now were there parameters for any of the other
22   breach categories?
23   A    Yes, within just misrepresentation of debt.  So we
24   didn't have a variance of amount of debt, but we did
25   instruct the review firms with regard to installment debt,

Page 42

1    not to cite to de minimis amounts of installment debt.

2    There was also -- we had a category of post-close debt.  And

3    with regard to post-close we had a similar cutoff, only --

4    one -- the month following the close.  And specifically with

5    regard to installment debt to ensure that there was a credit

6    inquiry on the origination credit report that would have

7    been a red flag for the -- at origination.

8    Q    Okay.  Now were there any other sorts of general

9    instructions that you provided to the review firms on the

10   weekly call?

11   A    We did.  We gave them general guidance with regard to

12   the review.  So as described earlier there was a list of

13   categories, a list of categories that we were looking for.

14   I think, you know, these review firms probably have seen a

15   number of categories and this was to focus -- focus their

16   review on the categories that we wanted to see.

17       And general guidance, so with regard to -- that would

18   be -- I think that would be industry practice to not to cite

19   to technical or non-trivial breaches, but that would have

20   been especially important in the context of this case is

21   that we simply didn't want to see those non-trivial

22   breaches.  We wanted for the review firms to put a filter

23   even though Duff & Phelps, Mr. Aronoff's team was going to

24   make that determination of both material breach and that it

25   had a material and adverse effect on the finding, but sort

Page 43

1    of a filter to avoid a wave of false positives from the

2    review firms of those trivial breaches.

3              THE COURT:  Just to follow up on your statement.

4    So Mr. Aronoff made a determination as to whether or not a

5    breach had an adverse material effect on the loan?

6              THE WITNESS:  Yes.

7              THE COURT:  Thank you.

8              THE WITNESS:  And Mr. Aronoff's team.

9              THE COURT:  Yes.  Thank you.

10   BY MR. HEIDLAGE:

11   Q    Now were there ever any instances where the guidance

12   changed during the protocol?

13   A    Not -- no, not generally.  I mean, there were instances

14   where we may have pulled back a category of breaches.  There

15   was an instance where we pulled back a category of breaches,

16   but the overall guidance and instructions that we provided

17   remained consistent throughout the review under the

18   protocol.

19   Q    Okay.  When you refer to the pulling back a category,

20   can you explain what you mean by that?

21   A    Sure.  There was one category that we -- it was being

22   submitted early on in the process, but when we took a closer

23   look, you know, a few months down the road we determined

24   that it should not have been submitted again as a category.

25   It simply just didn't fit squarely within the representation

Page 44

1    and warranty.

2        At that point we instructed the review firms, stop

3    submitting these.  We don't want to see any more of these.

4    We alerted the PA that we weren't going to pursue those and

5    rescinded them as appropriate in the next steps of the -- in

6    step two of the protocol process.

7    Q    Okay.  Now what happened if a loan review firm reviewed

8    a loan but did not find a breach?

9    A    As part of the template there was one of the

10   spreadsheets the template would provide to tell us that

11   there's no breach.  They told us there was no breach.  That

12   was eventually submitted under the protocols of no breach

13   finding.  There was no further review done on those loans.

14   Q    Okay.  Did Duff & Phelps perform any quality control

15   with respect to instances where no breach was found?

16   A    We did not.

17   Q    Okay.  Now with respect to instances where a loan

18   review firm did find a breach, what was the next step in the

19   process?

20   A    What -- after it went through their review and quality

21   control process it was then sent up to Duff & Phelps to do a

22   quality control review and make a determination of whether

23   that should be submitted to the plan administrator under the

24   protocol.

25   Q    Okay.  And -- excuse me.

Page 45

1      (Pause)

2  Q     Could you please walk us through what the Duff & Phelps

3  review process entailed?

4  A     The Duff & Phelps, we had a two-level quality control

5  process.  The first level of quality control by a team of

6  experienced underwriters to confirm the facts that were

7  cited in the findings and do a review of the supporting

8  documentation.

9      And the second level was Mr. Aronoff's team who, among

10 others, among other functions ensured the consistency and

11 accuracy and clarity of the findings as well as made a

12 determination of material and adverse effect and whether or

13 not to submit that breach finding, that claim to the plan

14 administrator.

15 Q     Okay.  And could you please elaborate a little bit

16 further on what that first level of QC entailed?  And if we

17 could put up Slide TRDX-109?

18 A     That first level of QC was a team of underwriters who

19 reviewed both the breach narratives detail about the loans,

20 the loan data, as well as the supporting documentation, the

21 claim package.  So they ensured that the facts cited in the

22 narrative supported the findings; that the -- again, that

23 the supporting documentation confirmed the facts that were -

24 - that were cited as part of the breach narrative, and

25 consistency cleanup, clarity cleanup, grammatical cleanup,

Page 46

1    that type of review.

2    Q    Okay.  Now who was involved in the first level of

3    quality control?

4    A    Duff & Phelps retained a team of underwriters who had

5    experience to oversee -- to review these -- to review the

6    loans.

7    Q    Okay.  And who -- and who chose the individuals to be

8    on that team?

9    A    I understand it was Mr. Aronoff and his team.

10   Q    And how many of the professionals were engaged in that

11   process?

12   A    It varied over time.  It was around 15, 15 people.

13   Q    Okay.  And were any of those individuals involved in

14   the initial loan review?

15   A    No.

16   Q    Okay.  Now if they had -- if those individuals had any

17   questions about a breach that they were reviewing, what

18   happened then?

19   A    They -- at that stage they flagged those issues or

20   questions or their opinions on the breaches for a look at at

21   the QC, at the second level quality control level.

22   Q    Okay.  Now did all breach claims go through this

23   quality control one process?

24   A    No.

25   Q    Which loans or which claims did not go through this

Page 47

1   process?

2   A    So the function of the review was to review the

3   narratives and review the supporting documentation.  There

4   were loans that only had missing document breaches.  There

5   simply was no supporting documentation to review so that

6   would have -- that may have bypassed the quality control one

7   at Duff & Phelps.

8   Q    Okay.  And when the initial loan review firm was

9   looking at the breaches, could you explain the process by

10  which a loan reviewer would identify a missing document

11  breach?

12  A    So in addition to what we described earlier with regard

13  to -- what I described earlier with regard to their review

14  there was a claim package created including the supporting

15  documentation pulling out of the loan file and any third

16  party sources that was relevant to the finding.

17       With regard to the missing documents, any missing

18  document claims, because you're showing a negative there,

19  there was no supporting documentation or claim package,

20  claim package for those if -- for that finding or if the

21  loan only had missing documents for that loan.

22  Q    And does this differ in any way from identifying

23  breaches, other types of breaches?

24  A    Well, in the sense that there is supporting

25  documentation for other types of breaches where there -- the

Page 48

1   supporting documentation for the missing document claims are

2   the -- is the loan file.

3   Q    Okay.  And how would a QC-1 reviewer go about QCing a

4   breach where there's supporting documentation?

5   A    They had access to the description and data points on

6   the loan and on the breach.  And they had access to the

7   claim package, the claim file with the supporting

8   documentation.  And they would review, number one, the

9   narrative to ensure that the description is clear and

10  supports the finding as well as opening up the claim package

11  to look to ensure that the documents in the claim package

12  support the finding.

13  Q    Okay.  And can you now describe this, the second level

14  -- or I guess I should say what would happen after the QC-1?

15  A    When they were finished with their review they would

16  send it up to Mr. Aronoff's team for the second level of

17  quality control.  Mr. Aronoff's team would then do a final

18  review, mainly for clarity and consistency and to make a

19  determination as to material and adverse effect of the

20  breach finding, and whether or not to submit -- and whether

21  or not to submit that claim to the plan administrator.

22  Q    Okay.  And if we can show TRDX-110?

23       Now who was involved in the -- when you refer to Mr.

24  Aronoff's team, who are you referring to?

25  A    Mr. Charlie Campbell and Mr. Rich Saraloin (ph).

1    Q    Okay.

2    A    Including Mr. Aronoff himself.

3    Q    Okay.  And what would happen if there was a question

4    raised by the QC-2 team?

5    A    It was addressed by the second level of quality control

6    which included either confirming or clarifying with the

7    review form or dropping the breach if it either was not

8    support -- well supported or it -- they determined it to not

9    be -- have a material and adverse effect.

10   Q    Now did the individuals as part of the QC-2 team change

11   at any point in time?

12   A    Yes, in the sense that Mr. Aronoff left Duff & Phelps

13   at December -- in December of 2015 while the protocol was

14   still ongoing.  So Mr. Campbell and Mr. Saraloin assumed the

15   responsibilities for the remainder of the protocol.

16   Q    Okay.  And did that cause any issues as part of the

17   review?

18   A    I don't believe so.  I understood that Mr. Aronoff was

19   available to Mr. Campbell and Mr. Saraloin to the extent

20   they had any questions or concerns.  And I believe that Mr.

21   Campbell and Mr. Saraloin were well positioned to complete

22   the review given their experience as well as their working

23   intimately with Mr. Aronoff for the first almost year of the

24   protocol and having a very strong understanding for that --

25   of the process.

1   Q     Now did you personally have any involvement in

2   reviewing the loans or the claims?

3   A     Just under my -- just as part of my project management

4   responsibilities, not as part of the quality control

5   process.

6   Q     Okay.  And so can you describe for what purposes you

7   would review loans?

8   A     I would review them to -- mainly to stay in the loop,

9   understand the breaches that were being submitted,

10  understand the form that they were being submitted in, and I

11  was going -- I was responsible for taking the next step of

12  submitting them to the plan administrator.  So getting

13  familiar with the breach findings.

14  Q     Now were breaches ever removed as a result of the QC-1

15  of QC-2 process?

16  A     As a result of the QC-2 process as I described the QC-1

17  would flag any issues or concerns for QC -- for quality --

18  for the second level of quality control and second level of

19  quality control would make that determination and, if

20  necessary, drop findings that would otherwise have been

21  submitted to the plan administrator.

22  Q     Okay.  And if the -- Mr. Aronoff's team made a final

23  determination that a claim should be as submitted what was

24  the -- what was the next step?

25  A     The next step as required by the protocol was to make a

Page 51

1    claim submission as described as an RMBS claim file under

2    the protocol, essentially pull together the necessary data

3    fields, the necessary supporting data, supporting

4    documentation in the form and send that over to the plan

5    administrator.

6    Q     Okay.  Now approximately how many loans were reviewed

7    in total by the trustees during the protocol?

8    A     Approximately 171,000 loans were reviewed under the

9    protocol.

10   Q     And approximately how many loans did the trustees

11   identify breaches going through?

12   A     Approximately 94,000 were identified at first under the

13   protocol.

14   Q     And approximately on how many loans did the trustees

15   decide not to submit breaches claims?

16   A     Approximately 77,000 loan files.

17   Q     Okay.  So I want to shift to the materials that you

18   were just describing.  Could you describe the -- again, the

19   materials that were submitted to the plan administrator for

20   the claims that were submitted?

21   A     Sure.  So it consisted of a, what we -- a claim

22   tracking spreadsheet.  That's the form that include the

23   necessary required data fields for the findings.  So it

24   generally included a description of the finding, borrower

25   information.  It included the mapping to the representation

Page 52

1    and warranty that would have been -- that was breached.  The

2    material -- the determination of material -- adverse and

3    material effect as well as the purchase price information

4    among other data points.  That's the -- that was the claim

5    tracking spreadsheet.

6        We also pulled together to deliver to the plan

7    administrator the complete loan file that we had reviewed as

8    well as the claim package which included the supporting

9    documentation as I described earlier, and any supporting

10   documents, any supporting data which mainly included the

11   master servicer, the nation star mainly as well as third

12   party sources loan data tape information.

13   Q    Okay.  If we could display TRDX-111.  And I would like

14   to turn to some of the exhibits in Volume 2.

15              MR. HEIDLAGE:  Just for reference to the Court

16   what we're going to do is we're just walking through a

17   couple of documents very --

18              THE COURT:  Okay.

19              MR. HEIDLAGE:  -- briefly, I think.

20              THE COURT:  Okay.

21              MR. HEIDLAGE:  We're not going to put them on the

22   screen in order to avoid any accidental --

23              THE COURT:  Okay.

24              MR. HEIDLAGE:  -- you know --

25              THE COURT:  All right.

Page 53

1    BY MR. HEIDLAGE:

2    Q    So if you could turn to the first tab under -- behind

3    the Tab Loan with the loan ending in 3301.  And this is TRX-

4    1458.

5    A    In Volume 2?

6    Q    In Volume 2.  Yes.

7         (Pause)

8    Q    Do you recognize --

9    A    Okay.

10   Q    Do you recognize this document?

11   A    I do.

12   Q    What do you recognize this document to be?

13   A    This is an extract from the claim tracking spreadsheet.

14   We had submitted this in accordance with the protocol as a -

15   - as a PDF, but because as you see it's -- this one

16   submission is 17,767 pages.  We submitted this in Excel

17   format as well. But this is the PDF, an extract from the PDF

18   version that was the claim tracking spreadsheet.

19   Q    Okay.  If you could turn to the second physical page of

20   the document that's listed as page of the exhibit 5,382.

21   A    Okay.

22   Q    Okay.  Could you just walk us through what's included

23   in this document?

24   A    Sure.  So there's a large amount of data fields, but

25   mainly information with regard to the loan, the borrower,

Page 54

1    the default status, whether it was a liquidated or a non-

2    liquidated loan.  Turning to the next page the purchase

3    price information as well as the agreement, date of that

4    agreement which -- in which the representation and warranty

5    was included, defect discovery, notice state the description

6    of the defect here a misrepresentation of income.

7         Turning to the next page a description, the factual

8    basis for the defect.  This is a one-breach loan so one

9    breach finding on this one loan, the contractual provisions

10   breached, the two representations and warranties for this

11   loan, as well as a -- the determination for the adverse and

12   material effect.  And then, you know, some relevant

13   footnotes.

14   Q    Okay.  Now can you tell from this document what

15   evidence the trustees or the review firms were relying on to

16   identify the breach?

17   A    I do.  It's described in the factual basis as a post-

18   closing verification of employment from the company that the

19   -- where the borrower was employed at origination.

20   Q    Okay.  And could you please turn to the second or next

21   tab which is TRX-2 for the loan number ending in 3301?  And

22   do you recognize this document?

23   A    I do.  This is the claim package that we submitted.  So

24   the supporting documentation that we sent along with the --

25   in addition to the complete origination and servicing file

Page 55

1    that was reviewed by the trustees.  This was just

2    highlighting the supporting documentation for this -- for

3    the findings for this loan.

4    Q    And before we actually turn -- I meant to ask you, did

5    you send the plan administrator a claim tracking spreadsheet

6    that covered each breach submitted during the protocol?

7    A    We did.  Yes.

8    Q    Okay.  And with respect to the supporting documentation

9    package, the claim package, can you point to the document

10   that was reference -- is the evidence that was relied on in

11   the breach finding included here?

12   A    Yes.  So just to walk through that quickly, the factual

13   basis is that the borrower stated their income as a

14   respiratory therapist making $8,900 a month.  That's found

15   on page 1 of the claim package where the borrower states his

16   employment as well as page 2 where the borrower states they

17   made $8,900 monthly.

18        And then the evidence that the loan file contained a

19   post-closing verification of employment is found within that

20   claim package on page 12 and 13 of this -- of this claim

21   package.

22   Q    Okay.  Now was a claim package submitted with respect

23   to each of the loans where -- I'm sorry -- where -- with

24   respect to each of the breach claims submitted to the plan

25   administrator in the --

Page 56

1    A    As described earlier with regard to the borrower

2    breaches essentially, not with regard to the missing

3    document claims.

4    Q    Okay.  Now did you also provide the plan administrator

5    with the complete loan file for each of the breach -- of the

6    loans for which a claim was submitted?

7    A    Absolutely.  We prepared -- we provided the loan file

8    that we had received and reviewed.

9    Q    Okay.  Now I'm not sure if you have it at your desk,

10   but we have the loan file for this loan at issue.  If you

11   wouldn't mind looking at it and I think this is TRX --

12              MR. HEIDLAGE:  Do you -- does the Court have --

13              THE COURT:  I have two -- I have the two binders.

14   Yes.

15              MR. HEIDLAGE:  Okay.

16              THE COURT:  So --

17              MR. HEIDLAGE:  You're welcome to take it out.  I'm

18   not sure it's necessary.

19              THE COURT:  Okay.  I'll see what happens.  Thank

20   you.

21   BY MR. HEIDLAGE:

22   Q    Do you recognize this document and these two binders?

23   A    I do.  It starts with a claim package, but then is the

24   -- well, it's an awful lot of pages to confirm and flip

25   through, but it seems to me to be the complete loan file

Page 57

1    that was reviewed as part of our review and submitted to the

2    plan administrator.

3              MR. HEIDLAGE:  And for the record this is TRX-1

4    for the loan ending in 330.

5    BY MR. HEIDLAGE:

6    Q    Now did you provide the plan administrator with the

7    complete loan file for each of the loans that were submitted

8    during the protocol, that -- where there was a claim

9    alleged?

10   A    Yes, for any of the complete origination and servicing

11   files that we had received from the servicers we had -- as

12   part of our review we had provided to the plan

13   administrator.

14   Q    Okay.  And what types of documents -- what documents

15   would typically be provided to the plan administrator as

16   part of a loan?

17   A    Any origination documents, any servicing documents that

18   we had received from the servicer.

19   Q    Okay.  Earlier we took a look at the -- okay.  Well --

20   and in addition to the claim tracking spreadsheet, the claim

21   package and the loan file, what other materials did you

22   provide to the plan administrator, if any, with respect to a

23   claim that was submitted?

24   A    The data tape information in support of the purchase

25   price, in support of the submitted purchase price.

Page 58

1  Q    Okay.  And why did you provide these materials to the

2  plan administrator?

3  A    It was required under the protocol.

4  Q    And with respect to the documents in the claim package

5  did the plan administrator ever advise you that they had not

6  received the cited documentation during the protocol?

7  A    No.

8  Q    Okay.  And did the plan administrator ever say to you

9  that the documentation in the claim submission package was

10 incomplete, for example it was missing pages or something

11 like that during the protocol?

12 A    No.

13            THE COURT:  Could you come up for a second?

14       (At sidebar off the record)

15 BY MR. HEIDLAGE:

16 Q    Could you describe your role with respect to --

17            THE COURT:  You can go ahead.  I'm just trying to

18 --

19            MR. HEIDLAGE:  Oh, I'm sorry.

20            THE COURT:  -- make -- remember something from

21 back --

22            MR. HEIDLAGE:  Sure.

23       (Pause)

24            THE COURT:  Go ahead.

25 BY MR. HEIDLAGE:

1    Q    Did the plan administrator provide responses with

2    respect to the claims submitted that the trustee submitted?

3    A    They did.  Yes.

4    Q    Okay.  And what was your role with respect to those

5    responses, if any?

6    A    I -- with regard to the step two responses I reviewed

7    them.  I designed a process in which we would respond to

8    those and managed with my team a team of underwriters who

9    would review the plan administrator's responses.  And I

10   provided the responses to the plan administrator.

11   Q    Okay.  In what form did you receive responses from the

12   plan administrator?

13   A    There was a series of spreadsheets and documents:  A

14   spreadsheet that summarized their accepted loans, a

15   spreadsheet that summarized their rejected loans including a

16   response on a breach by breach basis, a spreadsheet that had

17   citations for certain of those loans that was their

18   preferences as part of their step two responses, a

19   spreadsheet that was a manifest for the hard drive that they

20   had submitted back to us including the loan files, and a

21   summary spreadsheet which summarized the status of the loans

22   that were part of that and what their response was for those

23   -- for that submission, for that trustee's submission.

24   Q    Okay.  And just for references is it okay if I refer to

25   that generally as formal responses?  Would you understand

Page 60

1    what I'm referring to?

2    A    I would prefer to limit the formal response to the

3    rejected spreadsheet which I understood the plan

4    administrator described to me was their -- was their formal

5    response.

6    Q    I see.  Prior to step three did you have any

7    communications personally with the plan administrator?

8    A    I did.  Yes.

9    Q    Okay.  Who at the plan administrator did you

10   communicate with?

11   A    I had a weekly standing call with Mr. Zach Trumpp and

12   Mr. Scott Drausick (ph) as well as members of their team,

13   mainly Ms. Carrie Reid, Ms. Brenda Darnell, as well as

14   participated in meet and confer with the plan administrator,

15   counsel for the plan administrator and representatives of

16   the plan administrator.

17   Q    Okay.  And as part of those conversations with the plan

18   administrator prior to step three did you ever discuss the

19   plan administrator's responses to the -- or their --

20   A    I'm sorry.  Would you repeat the question?

21   Q    Sure.  As part of the communications prior to step

22   three did you ever discuss the plan administrator -- did you

23   ever discuss the claims submitted by the trustees?

24   A    We did.  We received feedback in those weekly calls

25   from Mr. Trumpp and Mr. Drausick with regard to our

Page 61

1    submitted -- our submissions, both in advance of their step

2    two responses and post the receipt of their step two

3    responses as well.

4    Q    Okay.  So I want to -- I just turn back to the

5    questions I asked a little bit earlier.

6         As part of the formal responses that the PA provided

7    did they ever -- did the -- did the PA ever indicate that

8    the documentation had not been received as part of the claim

9    package?

10   A    No.

11   Q    And as part of the formal responses did the plan

12   administrator ever indicate that the documents provided in

13   the supporting documentation package were incomplete?

14   A    They use that term generally, but not in the context of

15   -- that we hadn't provided them everything that we were

16   required to provide.

17             THE COURT:  Mr. Cosenza.

18             MR. COSENZA:  Yeah, Your Honor, may I approach for

19   -- I have an objection to this.

20             THE COURT:  Sure.

21        (At sidebar off the record)

22   BY MR. HEIDLAGE:

23   Q    Let me retry my question and hopefully I can be a

24   little bit more clear.

25        In the formal responses did the plan administrator ever

Page 62

1    identify that documents provided in the claim package were

2    incomplete because they were, for example, missing pages or

3    otherwise deficient?

4    A    Not to my knowledge.

5    Q    Okay.  Now as part of your --

6              THE COURT:  So let's just put a fine point on it.

7    So in other words, the question as an example would be that

8    the plan administrator would say that say the claim -- the

9    trustees alleged a claim and supported it with a near-year

10   tax document.  Right.  I think the question is did the plan

11   administrator or anyone acting on their behalf ever come

12   back to you and say, hey, that tax return only had the even

13   number pages and not the odd number pages.  That's -- right?

14   That's the --

15             MR. HEIDLAGE:  Yes.

16             THE COURT:  -- kind of --

17             MR. HEIDLAGE:  Thank you.

18             THE COURT:  -- deficiency that you're being asked

19   to focus on.  We just want to make -- just trying to be

20   super sure that everybody's --

21             MR. HEIDLAGE:  Yes.

22             THE COURT:  -- talking about the same thing.  So

23   does your answer stand based on that kind of an example?

24             THE WITNESS:  There may have been instances, a few

25   instances of that, but not many.

Page 63

1          THE COURT:  Okay.

2          MR. HEIDLAGE:  Okay.

3          THE COURT:  Okay.  Thank you.

4    BY MR. HEIDLAGE:

5    Q    Now if -- to the extent that the plan administrator in

6    any communication alerted you that documents that had been

7    relied on had not been provided in their complete form, what

8    would the trustees have done?

9    A    To the extent it was a document that was part of the

10   loan file the response would have been that we've given you

11   everything we received and have and satisfied ourselves that

12   that was everything the servicer had available.  To the

13   extent it was a third party document, so, you know, a page

14   of a BLS or a date of verify report, we would have provided

15   the remainder of the report.

16   Q    Thank you.

17        Now did Duff & Phelps do anything to track the loans

18   that it reviewed and the claims that it submitted?

19   A    We did.  As I mentioned earlier I was responsible for

20   setting up and working with a team to set up a data base as

21   well as a system that would track the loan files.  So we

22   did.  Yes.

23   Q    Okay.  And what kind of information did -- was included

24   in that data base?

25   A    There are a few categories that we included in that

Page 64

1    data base.  Number one was tracking of the loan file, so

2    have access to know where each loan was in each stage or

3    process of the protocol.  But with regard to data capture

4    there were a few main categories of data that we captured.

5    With -- we captured loan data, so data from the data tape,

6    data that we received from the master servicer, for example,

7    borrower information name, address, origination date of the

8    loan, anything that would be -- not everything, but many of

9    the fields that would be -- can be captured from the loan

10   tape and master servicer data.

11        We also included data we received from the loan review

12   firm, so data with regard to -- that they pulled from the

13   loan, from the loan files, data with regard to the breaches

14   that they pulled from the review as well as responses from

15   the plan administrator and data that we captured from that

16   -- from the plan administrator's responses.

17             THE COURT:  Mr. Cosenza.

18             MR. COSENZA:  I have an objection.

19             THE COURT:  Okay.

20             MR. COSENZA:  I -- this data -- I can go through

21   it from here.

22             THE COURT:  No.  Go ahead.  You can state it.

23             MR. COSENZA:  This data base that's being

24   discussed, I don't think this data base has ever been

25   exchanged during discovery.  There are all sorts of data

Page 65

1    fields here we've never had access to.

2           THE COURT:  Okay.  Well, we ought to talk about

3    that, I guess.  Come on up.

4           MR. HEIDLAGE:  Certainly.

5        (At sidebar off the record)

6           THE COURT:  We're going to -- I'm going to meet

7    with counsel for a few minutes in the conference room just

8    to make it a little easier.  So we'll take another break for

9    15 minutes and then we'll do one more segment before the

10   lunch break.

11          Should I bring anything with me to have --

12       (Recessed at 12:05 p.m.; reconvened at 1:35 p.m.)

13   THE COURT:  Thank you for your patience.  I very much

14   appreciate it.

15          So we're going to resume with Mr. Esses, and I

16   think everybody is in place.

17          THE WITNESS:  Sure.

18          THE COURT:  All right?

19          MR. HEIDLAGE:  Thank you.  May I begin?

20          THE COURT:  Yes.

21   BY MR. HEIDLAGE:

22   Q    Welcome back, Mr. Esses.

23        Earlier we were discussing the claim tracking

24   spreadsheets.  Do you recall that?

25   A    I do.

1    Q    Okay.  Could you walk us through how those claim

2    tracking spreadsheets were put together?

3    A    Sure.  The claim tracking spreadsheets included data

4    from a variety of sources.  The data tapes, certain data

5    information on the sources, data received from the master

6    servicers, as well as data from the loan and claim

7    supporting documentations.

8        So any data that was from the data tapes or we

9    collected into one place, the governing agreements we

10   collected the language from the governing agreements, we

11   collected all that data, and you know, data from the loan

12   review firm, the narratives, mapping to the representations

13   and warranties, the material in that statement.

14       So basically compiled that into a database and worked

15   with a database management team to produce those claim

16   tracking spreadsheets as -- on a bimonthly basis.

17       I had also mentioned earlier that there was a status

18   for each loan, so as each loan got into its appropriate

19   status, the finalized claim, I don't recall what the exact

20   term was, that a report was printed essentially into -- from

21   that database into a claim tracking spreadsheet in both PDF

22   and Excel form.

23   Q    Okay.  And -- excuse me -- who put the claim tracking

24   spreadsheet together?

25   A    It was printed by our back-end database guys team, but

Page 67

1   I oversaw that, and subject to me and my team's quality

2   control.

3   Q    Okay.  And can you describe a little bit as to how you

4   performed that quality control on the claims tracking

5   spreadsheets?

6   A    Sure.  So we'd get --

7   Q    And just to be clear, I'm sorry, I just want to make

8   sure that this is crystal clear.  When we're talking about

9   the claim tracking spreadsheets is that -- is an example of

10  that what we saw earlier today in TRX-1458?

11            THE COURT:  Which volume was that in?

12            MR. HEIDLAGE:  We're at Volume 2.

13            THE COURT:  Thank you.

14            MR. HEIDLAGE:  And this is the first exhibit in

15  Volume 2.

16            THE COURT:  Yes, thank you.

17            THE WITNESS:  Yes.  So looking at TRX-1458 this is

18  an extract, again, from a 17,767-page document, this is the

19  PDF version.  This is also produced in Excel.  And so the

20  quality control was mainly done on the Excel version, but

21  also spot checking the PDF version.

22            When you have that data in Excel you perform -- we

23  did perform a QC of -- that certain data was properly

24  captured and printed from the system.

25  BY MR. HEIDLAGE:

Page 68

1   Q    Okay.  Now -- and when you say from the system, where

2   was the original source of that data?

3   A    The original source of that data, as I described

4   earlier, was a combination of sources.

5        The loan -- so the data from the loan file, data from

6   the claim tracking -- from the claim package, data from the

7   Nationstar -- from the master servicer, data tapes, the loan

8   tapes, the governing agreements, and from the review firms,

9   to the extent I haven't already covered that, and from Duff

10  & Phelps as well where we, for example, made a determination

11  of material and adverse effect.

12            THE COURT:  Mr. Esses, I'm still having difficulty

13  understanding your creation of the claims tracking

14  spreadsheet.

15            So if you look at the document that we've been

16  pointed to, which is loan number ending 3301.

17            THE WITNESS:  Correct.

18            THE COURT:  So if we just go down all the lines,

19  who would have populated -- so there's a template for this,

20  right?

21            THE WITNESS:  Yes.

22            THE COURT:  Okay.  And who would have populated

23  the fields?  Like literally just at the level of servicer

24  name, loan purchase date, who would have done that?

25            THE WITNESS:  I would have -- me or my team,

Page 69

1    someone on the team would have provided an input template

2    into the database system, to our database team, like so a

3    spreadsheet form --

4              THE COURT:  Right.

5              THE WITNESS:  -- that had data points with regard

6    to a loan number --

7              THE COURT:  But who --

8              THE WITNESS:  -- that I --

9              THE COURT:  -- just very -- I'm being very --

10             THE WITNESS:  Yeah.

11             THE COURT:  -- simplistic.  Who literally would

12   type in loan purchase date?

13             THE WITNESS:  It wasn't literally typed in.

14             THE COURT:  Okay.

15             THE WITNESS:  I had a set of series of

16   spreadsheets with regard to -- so at first I -- just looking

17   at the took, proof of claim number.

18             THE COURT:  Right.

19             THE WITNESS:  So there's one proof of claim number

20   associated with each trust.  So I had a spreadsheet that had

21   the trusts and the proof of claim number --

22             THE COURT:  Uh-huh.

23             THE WITNESS:  -- and the system guys put that in

24   the system so that any time a loan is associated with that

25   trust the proof of claim number is associated with that

Page 70

1    loan, with that trust.

2              THE COURT:  I'm just at a very -- I'm still, I'm

3    sorry, I'm just -- at some point there's a human being.  Is

4    there ever a human being?

5              THE WITNESS:  At the very beginning collecting the

6    initial set of data, but certain things you only have to do

7    once, and it's then prepopulated for that -- for all the

8    loans in that trust.  Something that's trust specific like

9    the claimant, the proof of claim number, the trustee, the

10   debtor, that's going to be repeated, that's going to be

11   trust specific.

12             So I manually created that in the beginning --

13             THE COURT:  So someone created -- someone, you,

14   created a document that for proof of claim number 22606 ties

15   to certain trusts?

16             THE WITNESS:  Correct.

17             THE COURT:  And then there's another document that

18   then pulls in all of the loans in that trust?

19             THE WITNESS:  Correct.

20             THE COURT:  Okay.  And then somewhere in that --

21   I'm asking -- somebody had to input a default status, right?

22   So where did that come into the picture?

23             THE WITNESS:  So that I retrieved from -- you

24   know, retrieved that from the Nationstar or other servicer

25   data tape in --

Page 71

1                THE COURT:  So that would be a one by one by one

2    by one throughout all the loans?

3                THE WITNESS:  I -- in an Excel I'd look them up --

4                THE COURT:  Yes.

5                THE WITNESS:  -- from the data tapes one by one --

6                THE COURT:  Right.

7                THE WITNESS:  -- but I'm not manually entering

8    them.  You know, Excel can look up values from --

9                THE COURT:  Yes.

10               THE WITNESS:  -- one table to another table, so I

11   have this master table of each loan's default status, and I

12   can --

13               THE COURT:  But how did that get created?

14               THE WITNESS:  So I have a list -- two tables.  A

15   list of the loan numbers at issue and a list -- and the data

16   tapes, and I look up -- from the list of the loan numbers, I

17   look up the default status from the data tapes and then I

18   have it in my --

19               THE COURT:  But how can you -- how is it that that

20   is not a loan by loan thing?

21               THE WITNESS:  It is a loan by loan thing.

22               THE COURT:  Okay.

23               THE WITNESS:  That's correct, it is a loan by loan

24   thing.  My point is that it's not manually entered.  It's --

25   Excel has a function that can look up based on a unique

Page 72

1    identifier a loan number --

2              THE COURT:  Right.

3              THE WITNESS:  -- and pull in -- I tell it, hey,

4    look up from -- this table has the default status for all

5    the loans, and now these are my loans, look up from that

6    table and associate each loan and -- and, you know, create a

7    new table that has the default status for each individual

8    loan.

9              THE COURT:  So in the first Excel spreadsheet

10   where you have the loans listed by number --

11             THE WITNESS:  Correct.

12             THE COURT:  -- what you're saying is you put a

13   check -- you tell Excel for the loans that I'm going check

14   look up the default status?  It's not -- it -- I keep going

15   back to loan by loan.

16             THE WITNESS:  You write a formula that tells

17   Excel, Excel, go look up -- go find this number in the

18   second table and give me an associated value --

19             THE COURT:  Okay.  Right, but I'm going try it one

20   more time.  It's not find all loans between 1 and 1,000,

21   right, is it?

22             THE WITNESS:  I started with -- at the beginning

23   of this process I had a defined list of population of loans,

24   approximately 210,000.

25             THE COURT:  Okay.  But they're not numbered 1

Page 73

1    through 210,000, right?

2           THE WITNESS:  No.

3           THE COURT:  They have all kinds of different

4    numbers, right?

5           THE WITNESS:  Yes.

6           THE COURT:  But how can you -- other than

7    literally doing one by one, how can you tell the Excel sheet

8    that has all the loans listed by loan number, how do you

9    search for the default status on each of those loans other

10   than one by one?

11          THE WITNESS:  I'd love to demonstrate it, if

12   possible, but Excel is -- knows how to find -- search and

13   find a unique loan number in a different table and return

14   the value associated --

15          THE COURT:  Yes, I understand that.  But if I'm in

16   the first Excel --

17          THE WITNESS:  Yeah.

18          THE COURT:  -- sheet and I've got 210,000 loans,

19   right, and I only want the -- so on all of them it's going

20   to go look for the default status and populate them back?

21          THE WITNESS:  You write a formula that -- you

22   know, we wrote a formula that -- and it's a formula that you

23   copy, so it's -- the formula is unique to each loan, each

24   row, but with one click of the mouse you can copy that

25   formula to all 210,000 loans, and Excel knows to then for

Page 74

```
 1    each loan do its own look up based on the --
 2              THE COURT:  Okay.
 3              THE WITNESS:  -- unique loan identifier.
 4              THE COURT:  All right.  So let's move off from
 5    default status.
 6              And then the same is true on -- say let's skip
 7    down to date of defect discovery.
 8              THE WITNESS:  Date of defect discovery is actually
 9    -- is the date in which we -- the second level quality
10    control team determined that the loan has a material and
11    adverse effect and should be submitted to the plan
12    administrator.  So that was done on a loan by loan basis,
13    but it's -- in our working system when the reviewer reviews,
14    signs off and checks that, so that's done on a loan by loan
15    basis, then that date is associated with a date that we
16    confirmed that there's a breach finding on this loan.
17              THE COURT:  Okay.  So I'm almost done.
18              THE WITNESS:  Oh, sure no problem.
19              THE COURT:  So then if you turn to the last page
20    of this particular portion of the claims tracking
21    spreadsheet you have factual basis for defect number 1.  So
22    now we're into something that Excel can't do for you, right?
23              THE WITNESS:  No, but this was provided to us by
24    the review firms in a form that we had requested in an Excel
25    spreadsheet so that when they sent us that data I can have
```

Page 75

1    somebody adjust that.

2              THE COURT:  Okay.  Okay.  But some human being

3    wrote this text.

4              THE WITNESS:  Absolutely, yes.  And edited as

5    appropriate.

6              THE COURT:  Okay.  Thank you.  Thank you very

7    much.  That was very helpful.

8    BY MR. HEIDLAGE:

9    Q    And maybe it would be helpful to when we talk about the

10   data tape, could you explain what a data tape is, because

11   I'm not sure that we've actually discussed that yet.

12   A    Yes.  A data tape is the -- is a specific -- generally

13   specific to a trust and for all those -- for all the loans

14   within the trust it has a series of data points, whether

15   static data points or updated on a monthly basis.

16         So the master servicer publishes a data tape on a

17   monthly basis and they'll update let's say the zip code,

18   that's going to stay static, so that's just going to stay

19   from month to month, but the balance is going to be updated

20   on a monthly basis.

21         So every month there'd be a published data tape and any

22   activity with that loan is published so the investors can

23   get a sense -- can analyze the trust and have the underlying

24   loan level information for that trust.

25   Q    Okay.  So the data tape that you're referring to is

Page 76

1    produced by the master servicer?

2    A    The data tape I'm referring to is produced by the

3    master servicer, yes.

4    Q    Okay.  And was that data associated with the specific

5    loans in the -- that are included in the claims tracking

6    spreadsheet or certain points of that data?

7    A    It was for the trusts as a whole, so it reported on all

8    the loans in each trust, but we went and pulled through

9    Excel and other functions, we went and pulled the relevant

10   data to each of our claims.

11   Q    Okay.

12            THE COURT:  Can I ask another question?

13            So at any -- at the various levels of QC that

14   you've described, sticking with our favorite loan ending in

15   3301 here, can you describe -- did the quality control

16   process consist of anything more than going back into the

17   loan file and searching for in this instance the VOE that

18   reflected 2005 year income of $50,000?

19            THE WITNESS:  The review firm QC -- just to be

20   clear.  The review firm QC would have went through the loan

21   file at the Duff & Phelps first level QC they did not look

22   at the loan file, they -- for the most part what they had

23   was this factual basis for a defect and the claim package,

24   which is -- and their instructions were to number 1, make

25   sure this makes sense, make sure that a VOE supporting the

Page 77

1    income misstates -- shows a misstatement of income and then

2    to look at the claim package, which is the next TRX --

3    sorry --

4             THE COURT:  Okay.

5             THE WITNESS:  -- and then confirm that the

6    documentation is actually there supporting the facts cited.

7             THE COURT:  Okay.  Thank you.

8    BY MR. HEIDLAGE:

9    Q    So with -- just with respect to 3301, which referenced

10   the VOE, would the QC-1 would have looked and could see

11   whether or not the claim support package in fact had a VOE

12   that included the information referenced in the breach

13   defect?

14   A    Yes.

15   Q    Okay.  Now, how was the claim tracking -- how were the

16   claim tracking spreadsheets used during the course of the

17   protocol?

18   A    They were submitted to the plan administrator on a

19   bimonthly, as often as we were submitting claims, which was

20   on a --

21   Q    And if I may, sorry, just to make sure.  How do you

22   know that they were submitted to the plan administrator?

23   A    I oversaw and ensured that -- I generally oversaw and

24   was part of the submission process.

25   Q    Okay.  Sorry, I didn't mean to cut you off.

1       So how generally were the claims tracking spreadsheets

2   used by the trustees during -- or your team during the

3   protocol?

4   A    We used them to submit claims to the plan

5   administrator.

6   Q    Okay.  I'd like to talk about what happened after the

7   claims tracking spreadsheets were submitted to the plan

8   administrator.  What happened next?

9   A    The plan administrator was required to do a

10  completeness review of the loan files and to eventually

11  respond under step two of the protocol process.

12  Q    Okay.  And how long was it between when during the

13  trustees' first submissions and the plan administrator's

14  response?

15  A    Our initial submission was in mid-March 2015, the plan

16  administrator's first response was August 31st, 2015.  So a

17  little bit less than six months.

18  Q    Okay.  And did you have discussions with the plan

19  administrator about the claims submitted before you received

20  the plan administrator's responses?

21  A    We did.  We had received feedback on our submitted

22  claims as we were -- in response to our claim submissions,

23  so between that time frame -- within that time frame of

24  March to their first submission, as well as further feedback

25  post the plan administrator's step two responses.

1    Q     Okay.  And can you describe the feedback that you

2    received from the plan administrator?

3    A     Sure.  So there was two types of feedback.  General

4    issues with our submissions, as well as bright line issues

5    with regard to our claims.  And the bright line issues, for

6    example, consisted of certain breach findings that the plan

7    administrator told us they simply were not going to

8    consider.  For example, loans submitted using ELS, that just

9    wasn't something -- they didn't believe it was valid

10   evidence and weren't going to submit it post-close debt.

11   Missing document claims.  Near year evidence.

12         So those are some of the bright line issues that we

13   received feedback that the plan administrator asserted that

14   we should not have been submitting in the first place.

15         With regard to general issues the types of feedback we

16   were getting were at a high level that we hadn't shown

17   certain -- that we weren't supporting our submissions in the

18   sense that, a few examples, we weren't showing seller's

19   knowledge as we -- as the plan administrator asserted we

20   were required to.  We hadn't shown that the loan would not

21   have been approved any ways within the guidelines.  That we

22   hadn't shown that the breach caused the loss -- loss

23   causation argument.  And generally that our proof had to be

24   conclusive and it wasn't conclusive.  So we weren't

25   supporting our claims.

Page 80

1    Q    Okay.  And did the trustees agree with the plan

2    administrator's positions?

3    A    No.

4    Q    I'm sorry, just to be clear.  Were you involved

5    personally in these conversations?

6    A    I was, yes.

7    Q    Okay.  And did the trustees agree with the plan

8    administrator's positions?

9    A    Absolutely not, and we made our position clear with

10   each -- with regard to each of those issues.

11       The fact is that some of them were overarching legal

12   issues that I don't believe were going to be resolved in

13   communication between the plan administrator and the

14   trustees.

15   Q    And in what form did you receive the -- when you talked

16   about the -- when you received the responses in 2015, in

17   what form did you receive the plan administrator's

18   responses?

19   A    As I described a bit earlier it was the -- a series of

20   spreadsheets, mainly a spreadsheet for the accepted loans, a

21   spreadsheet for the rejected claims with their, what I refer

22   to as a formal response, so a description of their

23   rejection, a spreadsheet with additional citations on a loan

24   by loan basis that came to supplement their formal responses

25   as was explained to us, and an additional spreadsheet that

Page 81

1    was an index of a hard drive that they had additionally

2    provided with the loan files.

3    Q    And what did you do when you received the plan

4    administrator's responses?

5    A    We began our review of the rejected claims on the

6    formal responses reading and understanding the formal

7    responses as well as the Bates reference documents.

8    Q    And can you describe what types of responses you saw?

9    A    Sure.  So it really -- it came to confirm our

10   understanding of the plan administrator's assertions with

11   regard to our evidence, our -- these general legal

12   arguments, we found them to be general, consisting of those

13   four general arguments that I described repeated over and

14   over and over and with regard to the loss causation that the

15   material -- that the -- we hadn't shown that the breach had

16   a material and adverse effect in virtually all -- as their

17   response to virtually all of our claims.

18   Q    Now, were all of the responses that you saw of that

19   type?

20   A    No.  We did find that there were what we considered and

21   categorized as particularized responses.  So certain

22   sentences I'd say or responses in addition to the

23   boilerplate general arguments that came to specifically --

24   or asserted to specifically contradict or refute the

25   evidence that the trustees had put forth.

Page 82

1    Q      Okay.

2                MR. HEIDLAGE:  And if we could show slide TRDX-18.

3    BY MR. HEIDLAGE:

4    Q      And can you -- do you recognize this slide?

5    A      I do.  So this -- looking at this is examples of

6    generalized responses that were included in the plan

7    administrator's step two responses.  These would have been

8    sentences that were part of their formal responses.

9           As I described, these are -- we understood them to be

10   the general legal arguments that the plan administrator had

11   in defense of our submitted claims.

12          Looking at the first one the no fraud representation

13   requires seller's knowledge, of which there is no evidence

14   and that we hadn't shown seller's knowledge.  That our

15   evidence had to be conclusive and was not conclusive.

16          So the second one, the evidence is unreliable and

17   insufficient because the income stated in origination year

18   tax documents does not provide perverse a nation income.

19          What I mean by generalized is that just basically

20   coming to say the only way to understand that is our

21   evidence was never going to be good enough, and general in

22   the sense that it did not come to refute or contradict the

23   evidence that we submitted.  Not that we got something in

24   the origination year tax documents incorrect, it's just that

25   that evidence is unreliable and insufficient.

Page 83

```
1          Further the evidence is unreliable and insufficient

2     because -- uncorroborated information obtained outside of

3     origination.  So our use of third-party documents we just

4     considered these to be generalized third-party --

5     Q    And just -- sorry.  And just to take a step back.

6     Where did these statements come from?

7     A    These came -- these were pulled out of the plan

8     administrator's step two responses.

9     Q    Okay.  And are these --

10               THE COURT:  So can I just ask you though, like

11    just take the first one.  The fraud representation requires

12    seller's knowledge of which there is no evidence.  Okay.  So

13    what is -- what was your response to that generalized

14    response?  That just no more discussion on that?

15               THE WITNESS:  No, we had a generalized response to

16    generalized arguments such as that.  So we said something

17    along the lines that I don't -- it would have been something

18    along the lines of well we're not required to show -- that

19    the representation warranty doesn't require us to show

20    seller's knowledge.

21               THE COURT:  Okay.  Go ahead.

22    BY MR. HEIDLAGE:

23    Q    Okay.  Now, you've stated that there were also certain

24    particularized responses?

25    A    There were, yes.
```

Page 84

1     Q     Okay.

2              MR. HEIDLAGE:  Can we show TRDX-119?

3     BY MR. HEIDLAGE:

4     Q     Okay.  And can you explain what this demonstrative

5     shows?

6     A     Sure.  So again we categorize what we consider to be

7     particularized responses, which are responses that came to

8     contradict or refute, we understood them that the plan

9     administrator had asserted that we had made a mistake or

10    missed something or got something wrong, and when they said

11    something along those lines we considered that a

12    particularized response and made sure to do a thorough

13    review of the evidence submitted.

14         So, for example, when it says the first one, the

15    allegation that the origination appraisal is not currently

16    in the loan file, correct, that was provided in the loan

17    file, so we were saying that an appraisal was missing, plan

18    administrator was responding, no, no, no, it wasn't missing,

19    it was in the loan file.  So that's something that we took

20    great care to confirm.

21         Similarly the second example here, the evidence is

22    unreliable and insufficient because it is inconsistent.  So

23    again, we looked at that and say well, hey, if there's

24    something inconsistent in the loan -- in the claim package

25    or the loan file we want to be sure to take a closer look at

1   that and ensure that we do stand by our submitted evidence.

2        Just to give the third example and not to go through

3   all these on the page, that the alleged breach is invalid,

4   that the alleged debts were either disclosed in current post

5   closing or paid off before closing.  So again the plan

6   administrator is asserting that we made a mistake, we missed

7   something.

8        These were particularized responses that we then made

9   sure to take a careful look to ensure that evidence was --

10  had supported our original claim, or if we made a mistake

11  rescind the claim during the step two process.

12  Q    Okay.  And again, where did these statements come from?

13  A    These were pulled out of the plan administrator's step

14  two responses.

15  Q    Okay.  Now, you also mentioned that the plan

16  administrator provided Bates numbers as well?

17  A    Correct.  So they provided for certain loans an Excel

18  spreadsheet that had either zero or one or two, you know, a

19  number of references pointing us to a document that that was

20  part of their response.

21  Q    Okay.  And did you find that the Bates references

22  clarified the plan administrator's objections to the breach

23  claims?

24  A    So we found that when there was -- sometimes when there

25  was a particularized response they did in fact point us to

Page 86

1    the missing document or a document that showed in the

2    example we used that the debt was in fact paid off prior to

3    closing, and that was helpful.  We looked at that, we

4    reviewed that, and we rescinded the loan if we in fact made

5    a mistake.

6         But for the vast majority we found that they were

7    simply citing to a set of documents which included

8    underwriting guidelines for that loan back to our submitted

9    evidence, our claim package, the application, or our

10   supporting evidence, and a third category of documents,

11   which was a third-party research done by the plan

12   administrator, and we found those to generally consist or in

13   many instances consist of a -- like a fair market rent

14   printout from zero or other database sources showing that in

15   the -- we understood it to mean that if misrepresentation of

16   debt or occupancy that there should have been credit given

17   to the borrower for potentially renting out that loan.

18   Q    Okay.  I'd like to walk through --

19   A    Home.

20   Q    I'm sorry.  I'd like to walk through one example to

21   continue with exemplar loan 3301.  If you turn to the

22   exhibit behind the claim tracking -- I'm sorry -- the claim

23   package, it's TRX-1638.  Do you recognize this document?

24   A    Is that 1683.  Oh, I'm sorry, 16 --

25            THE COURT:  It's about the fourth tab back in your

Page 87

1    binder.

2           THE WITNESS:  1683.  The tab says 1638.

3    BY MR. HEIDLAGE:

4    Q    Oh, I apologize.

5           THE COURT:  Good catch.

6           THE WITNESS:  Okay.  Sorry, what's the question?

7    BY MR. HEIDLAGE:

8    Q    Do you recognize this document?

9    A    I do.  So this is an extract from the -- one of the

10   spreadsheet which came in spreadsheet in PDF form, the

11   rejected loans, and as I mentioned earlier, there was a

12   listing of the loans that they rejected, the claims, and a

13   claim by claim debtor finding, which was the rejection for

14   that loan.

15   Q    Okay.  And which loan does this relate to?

16          MR. HEIDLAGE:  And I'm pointing by the way for the

17   record to the second physical page, which is page 2795 of

18   TRX-1683.

19          THE WITNESS:  Right.  So this is the loan we were

20   looking at earlier, last four digits 3301.

21   BY MR. HEIDLAGE:

22   Q    Okay.  And would this response -- would you have

23   considered this response a generalized or a particularized

24   response?

25   A    Looking at each of the sentences there are only

Page 88

1    generalized responses.  So we would have considered this

2    generalized.  There's nothing in here that specifically

3    comes to contradict or refute the evidence submitted by the

4    trustees.

5    Q    Okay.  And if you can --

6            MR. HEIDLAGE:  If we can put on TRDX-120.

7    BY MR. HEIDLAGE:

8    Q    Okay.  Do you -- and this is -- we have a slide also we

9    produced in the binder.  But do you recognize this

10   demonstrative, TRDX-120?

11   A    I do.  This would have been -- this is the spreadsheet

12   -- one of the spreadsheets that they included in their

13   response that was the Bates references for this loan 3301.

14   So there's three references here in addition to the formal

15   response provided in the document -- the TRX-1683 we were

16   just looking at.

17   Q    Okay.  And if you could turn to the next exhibit.

18           THE COURT:  Can I just ask you a question,

19   Mr. Esses?

20           So if I open up the loan file randomly, right, and

21   I find a document that is contradictory or contradicts on

22   its face the VOE that the trustees relied on, what about

23   that?  I mean was there any part of your process that

24   attempted to reconcile either in the first instance or at

25   any QC level evidence in the file that was not consistent

Page 89

1    with the piece of evidence on which the trustees were

2    relying on a particular breach claim?

3              THE WITNESS:  There was, Your Honor.  We

4    instructed the review firms as part of their initial review

5    and their quality control review --

6              THE COURT:  Right.

7              THE WITNESS:  -- to ensure, to look at both the

8    pros and the cons supporting the evidence and make a

9    determination whether -- if there was a breach.

10             So in an instance that they cited a finding there

11   should not be that contradictory evidence that you

12   described.  If we open up a loan file and we see that I

13   would be extremely surprised and that would be a mistake

14   because of the thorough review these review firms did and

15   the quality control process that they hold.

16             THE COURT:  Okay.  Thank you.

17   BY MR. HEIDLAGE:

18   Q    And to follow up I think on the judge's question.  When

19   you receive a particularized response where for example

20   where it said that the documents were inconsistent, what

21   would be the practice of the trustees?

22   A    At a minimum we'd take a careful look at the response

23   and the reference documents by the plan administrator as

24   part of the step two review and response.  We may have

25   looked back at the loan file, but not in all instances.  We

Page 90

1    would have at that point expected that the plan

2    administrator would have flagged that document.

3    Q    When you say flagged that document do you mean in the

4    Bates references?

5    A    Yeah.  So they gave us a description in the formal

6    response, which happened to be very generalized, or at least

7    -- at the very least flagged the document in their

8    references.

9    Q    Okay.  I'd like to go through and look at the documents

10   that were referenced with respect to this loan in

11   particular.  If you can look at TRX-5007.  Do you recognize

12   this document?

13   A    I do.  This is a product profile for the Aurora

14   mortgage loan program.  I haven't specifically confirmed

15   this, but presumably for the loan at issue.  They were --

16   the plan administrator was pointing us to the underwriting

17   guidelines, the product profile in place at the time of the

18   loan's origination.

19   Q    Okay.  And could you turn to page 4 of the exhibit,

20   TRX-5007?

21   A    Okay.

22   Q    Okay.  Is -- do you recognize this page?

23   A    I do.  This is the specific citation in row -- in the

24   second row on the screen LIBIT (ph) 17069.

25   Q    Okay.  And does this tell you anything about the plan

Page 91

1    administrator's response to the alleged breach?

2    A    It seems to be related to a general argument with

3    regard to underwriting guidelines, but nothing that either

4    comes to contradict or refute the evidence the trustees

5    submitted or we believe supported our claim.

6    Q    Okay.  And if you could turn to TRX-5008.

7    A    Okay.

8    Q    Do you recognize this document?

9    A    I do.  This is more detail of the underwriting

10   guidelines, again, presumably in place at the time the

11   specific loan was issued.

12   Q    Okay.  And if you could turn to page 18 of the exhibit.

13   A    Okay.

14   Q    I believe it's page 14 of the underlying document.  And

15   do you recognize this page?

16   A    I do.  This is the Bates reference that is cited in the

17   spreadsheet, the first row.  So the plan administrator was

18   pointing us to LIBIT 143525 beginning and ending, so a one-

19   page reference.  And what stands out to me is that it's

20   pointing to the documentation which is what was described in

21   the product profile in the prior document we looked at, but

22   again, doesn't -- not coming to contradict or refute the

23   evidence submitted and not sure exactly what to make of it

24   besides for some general legal argument with regard to our

25   submission of claims.

Page 92

1    Q    Okay.  And if you could turn to TRX-5009.

2    A    Okay.

3    Q    Okay.  And you recognize this document?

4    A    I do.  This is the claim package that we submitted for

5    the plan administrator along with the loan file and the

6    claim tracking spreadsheet for the submission of this loan.

7    Q    Okay.  And if you could turn to page 13 of the exhibit.

8    Do you recognize that page?

9    A    I do.  This is the Bates reference that the plan

10   administrator was citing us to, LIBIT 43488464.  So sending

11   us quite literally back to the verification of employment

12   that we sent them as our supporting evidence.

13   Q    Okay.

14             THE COURT:  All right.  So they're sending you

15   back to the verification employment that has a question mark

16   on it, right?  It says 2005?  So what -- so at that point it

17   was just a stalemate?  In other words from the trustees'

18   perspective that VOE was sufficient?

19             THE WITNESS:  Essentially yes.  If there was a

20   particularized response that said something is wrong with

21   your evidence then we'd take a careful look at this and

22   redetermine that and remake -- and reconsider oh, is this

23   enough, do we believe this supports our original finding?

24             THE COURT:  So did that or did that not happen --

25   well I don't know if you can remember -- but in this

Page 93

1   particular instance we're focusing on, the VOE, which was

2   done in 2015, reflects an answer to the question relating to

3   income, question mark, 2005, and gives a $50,000 odd figure,

4   right?

5           THE WITNESS:  Right.

6           THE COURT:  So are you saying that you considered

7   the plan administrator's response generalized or specific --

8           THE WITNESS:  So --

9           THE COURT:  -- where they sent you back to that

10  VOE?

11          THE WITNESS:  So it started at the formal --

12  within the formal response.  I don't remember this one

13  specifically --

14          THE COURT:  Sure.

15          THE WITNESS:  -- but I can tell you that looking

16  at the formal response there's nothing in that response that

17  is what I would consider particularized.  So I probably

18  would not have had the team look at and rereview this VOE.

19  So to answer your question, this one specifically we would

20  not have gone back to look at.

21          THE COURT:  So it's the trustees' position that

22  for that loan a VOE with a question mark on it unclear even

23  what the question mark is related to, the year or the number

24  or whatever, that that was sufficient for the plan

25  administrator to have accepted that as a breach?

Page 94

1          THE WITNESS:  Yes, and this went through initially

2     through step one several layers of quality control that said

3     exactly what you just described.

4          THE COURT:  But you're -- but the trustee is

5     relying on the VOE, in other words, in this instance they're

6     not relying on tax returns, right?

7          THE WITNESS:  That is correct.

8          THE COURT:  Okay.  Thank you.

9     BY MR. HEIDLAGE:

10    Q    If it came out -- there was a question as to whether or

11    not a specific piece of evidence was sufficient or something

12    like that what would happen in that case?  If you received a

13    response and you were not sure if, you know, there was a

14    question about a specific document, do you -- was there a

15    process for what would happen?

16    A    I'm sorry, can you ask the question again?

17    Q    Sure.  Well let me -- let's move on to the next one.

18         So I want you to turn to the next loan which ends in

19    3816.

20    A    Okay.

21    Q    And do you recognize -- so I want you to turn to TRX-

22    1488.

23    A    Okay.  An extract from a claim tracking spreadsheet for

24    a specific loan that ends 3816.

25    Q    Okay.  And so I see that you've already turned to the

Page 95

1   page as 6756; is that correct?

2   A    Yes.

3   Q    Okay.  And can you -- if you turn -- based on the claim

4   tracking spreadsheet can you identify what the allegation

5   was with respect to this loan?

6   A    I can.  There were three breach findings turning to the

7   6758 -- at page 6758, misrepresentation of income, an

8   excessive DTI, and on the next page a failure to provide

9   final HUD-1.

10  Q    Okay.  And what was the evidentiary basis for the

11  misrepresentation of income breach?

12  A    Here on this example as the factual basis sets out a

13  2006 W-2 for a loan that was originated in July 2006.

14  Q    Okay.  And can you turn to the TRX-2 with this loan

15  ending at 3816, which is the next tab?

16  A    Okay.

17  Q    Do you recognize this document?

18  A    I do.  This is the claim package that we submitted in

19  support of our findings.

20  Q    Okay.  And if you can turn to page 19.  Do you

21  recognize that page?

22  A    I do.  This is the 2006 W-2, there's actually one for

23  the borrower, one for the co-borrower, but we are mainly

24  using the bulk of the borrower as supporting evidence for

25  the finding on this loan.

Page 96

1    Q    Okay.  And if you can turn to the next exhibit, TRX-

2    1715, and again to the second page.

3    A    Okay.

4    Q    Do you recognize that document?

5    A    I do.  This is the extract from the rejection

6    spreadsheet from the plan administrator.

7    Q    Okay.  And with respect to the misrepresentation of

8    income breach would you have considered this a generalized

9    or a particularized response?

10   A    Generalized.

11   Q    Okay.  And why is that?

12   A    There's simply nothing in here that comes to contradict

13   or refute the evidence submitted by the trustees, it just

14   seems to be a series of generalized legal arguments.

15   Q    Okay.  If we can turn to --

16            MR. HEIDLAGE:  Or put up on the screen slide TRDX-

17   121.

18   BY MR. HEIDLAGE:

19   Q    And do you recognize this?

20   A    I do.  This is an extract from the spreadsheet where

21   the plan administrator provided their Bates citations.  Over

22   here there was only one citation for this loan.

23   Q    Okay.  And if you'd turn to page 3 of this document --

24   of this exhibit -- excuse me.

25   A    Are we on the next exhibit?

1   Q    I'm sorry, I jumped ahead.  If you could turn to the

2   TRX-5003.

3   A    Okay.

4   Q    And do you recognize this document?

5   A    I do.  This would have been a guidelines or the product

6   profile in place presumably at the -- for this specific

7   loan.

8   Q    Okay.  And can you turn to page 3 of this exhibit?

9   A    I'm there.

10  Q    Okay.  Do you recognize this document?

11  A    I do.  This is a page cited by the plan administrator

12  in their Bates references, LIBIT 00043833.  The page with

13  regard to documentation and the various types of

14  documentation as well as desktop underwriter loan prospector

15  at the bottom of the page.

16  Q    Okay.  And does this document and this citation provide

17  you with any additional information as to the basis for the

18  plan administrator's response?

19  A    It does not, no.

20  Q    Okay.  Did you ever ask the plan administrator -- well

21  you were personally involved in the step two responses,

22  correct?

23  A    I was, yes.

24  Q    Okay.  Did you ever ask the -- can you describe the

25  nature of your involvement?

Page 98

1    A    I reviewed in the first instance these loans, the

2    responses to understand how to design the review and

3    response step two -- how to conduct our step two review, and

4    I designed that review and I oversaw and managed that step

5    two response and review.

6    Q    Okay.  When you say designed that review what do you

7    mean by that?

8    A    Well I mean we had to figure out a way to efficiently

9    respond to the plan administrator's step two responses and

10   decide whether to resubmit the loans.  So it generally was a

11   20-day around.  In the first batch we received responses on

12   18,000 loans, I'm not sure how many findings, but more than

13   that, and within 60 days.  So what I mean by we had to

14   figure out a -- the process I've been described to review

15   and respond to these findings.

16   Q    Okay.  Now, did you ever ask the plan administrator to

17   provide any additional information related to the Bates

18   references they provided?

19   A    We did.  We wanted to make sure we weren't missing

20   anything.  We asked the plan administrator to provide, to

21   the extent they were able to, some descriptions, some color,

22   some mapping between the Bates references and the claims

23   cited.  We asked them to provide more information on that.

24   Q    And how did the plan administrator -- and who at the

25   plan administrator did you ask this?

1    A    This was -- I discussed with Mr. Trumpp.

2    Q    Okay.  And did Mr. Trumpp provide any response to your

3    request?

4    A    This has come up a few times.  At first we were told

5    that there was additional color but they weren't -- would

6    not be able to provide that subject to discussions with

7    counsel, that they were limited in their response.  With

8    regard to the step two responses that additional information

9    would come in step three.  And that -- we suggested actually

10   that we go through a handful of loans and to sort of talk

11   about the ideas -- what we submitted, what the plan

12   administrator responded, and confirm what the issues were to

13   make step two a meaningful step in the process.

14   Q    Okay.  And did you have those conversations?

15   A    We did.  We went through a series of loans.

16   Q    Okay.  And were there any -- can you describe the

17   nature of those -- well were there any conditions on --

18            THE COURT:  Yes, Mr. Cosenza?

19            MR. COSENZA:  May we see you at sidebar just for

20   one second on this?

21            THE COURT:  Sure.

22       (At sidebar off the record)

23   BY MR. HEIDLAGE:

24   Q    And just to be clear, I don't want to get into any

25   substance of communications that you had.  But did any -- at

1    any point did your understanding as to the nature of the

2    objections that the plan administrator was raising change?

3    A     No.

4    Q     Okay.

5    A     Confirmed our understanding that our evidence was

6    largely unrebutted.

7    Q     Okay.  If the plan administrator came back with

8    evidence that did contradict the allegations that were made

9    by the trustees what would the next step be?

10   A     We'd take a careful look at it.  If we found that in

11   fact it contradicted the evidence submitted by the trustees

12   we'd rescind the claims.

13   Q     How many loans were rescinded in step two?

14   A     Approximately 1100.

15   Q     Okay.  Does the fact that approximately 1100 loans were

16   withdrawn or rescinded during step two give you pause as to

17   the reliability of the trustees' loan review process?

18   A     No, absolutely not.  That was a small number of certain

19   -- you know, a small number of errors, potential errors in a

20   much larger review.

21   Q     Okay.  Okay.  I'd like to turn back to TRX-1458.

22   A     What binder?

23   Q     It's the Volume 2, it's actually the first loan -- the

24   first exhibit in the first tab in that binder.

25   A     Okay.

Page 101

1   Q    Okay.  And if you can -- I want to direct your

2   attention to the page 5383.

3   A    Okay.

4   Q    Okay.  And can you explain to me what the information

5   included, do you see the -- there's an indication of a

6   purchase price?

7   A    I do, yes.

8   Q    Okay.  Could you explain to me what information is

9   included in that portion of the claims tracking spreadsheet?

10  A    Sure.  So a purchase price for a liquidated loan, this

11  is a liquidated loan, is the calculated value of the

12  realized losses provided and reported by the master

13  servicer.

14  Q    Okay.  And why did the trustees include a purchase

15  price item on the claims tracking spreadsheet?

16  A    It was required under the protocol.

17  Q    Okay.  And what did the protocol require with respect

18  to the purchase price?

19  A    To submit a purchase price -- a calculation of the

20  purchase price, including all supporting documentation.

21  Q    Okay.  And how did the trustees go about calculations

22  the purchase price?

23  A    As per the governing -- as defined in the governing

24  agreements, so each of the trusts would have the purchase

25  price defined in generally the trust agreement.  We went and

Page 102

1   reviewed the trust agreements, figured out -- well retrieved

2   the calculation for the purchase price and submitted those

3   numbers for our purchase price.

4   Q    Okay.  And was -- and why in particular here -- I

5   notice that there's a line that says realized losses, could

6   you explain that for me?

7   A    Sure.  So the components of the purchase price, this is

8   the calculated value once the loan is liquidated and the

9   liquidation proceeds are netted against the unpaid principal

10  balance of the loan.  So this is essentially the remaining

11  unpaid principal balance of the loan.

12  Q    Okay.  And where did the trustees -- well what was your

13  involvement with respect to putting together the purchase

14  price?

15  A    I was responsible for retrieving and submitting the

16  data, with the assistance of my team.

17  Q    Okay.  And where did the trustees get the information

18  in order to calculate the purchase price?

19  A    For the vast majority of the trusts we got this data

20  from Nationstar, from the loan tapes provided by Nationstar.

21  They report the realized loss numbers as well as the other

22  fields relating to a loan relevant for the purchase price

23  calculation.  And in a few trusts from a third-party source,

24  the intex (ph) data system.

25  Q    Okay.  Why did the trustees use the Nationstar data

Page 103

1    tape to calculate the purchase price?

2    A    As the master servicer we believe that that is the

3    official books and records of the trust and the number that

4    would reflect all -- any and all adjustments through the

5    date of submission.  So we felt that that was the correct

6    place to get the purchase price as required by the governing

7    agreements.

8    Q    Okay.  And how did you -- this was a liquidated loan;

9    is that correct?

10   A    That is correct.

11   Q    Okay.  And why did you use the realized loss number for

12   the liquidated loan?

13   A    As described, that would have been the calculation done

14   by the master servicer to account for the components of the

15   purchase price to apply to account for the liquidation --

16   the net liquidation proceeds as applied to the unpaid

17   principal balance and other factors.  And that is

18   essentially the remaining unpaid principal balance.

19   Q    Okay.  If we could turn to the last tab in this binder,

20   which is Volume 2, which is TRX-1468.  And do you recognize

21   this document?

22   A    Yes.  An extract from the claim tracking spreadsheet

23   for loan number last four digits 1955.

24   Q    Okay.  And does this -- and is this a liquidated or

25   non-liquidated loan?

Page 104

1    A    Non-liquidated loan.

2    Q    Okay.  And can you explain how the purchase price was

3    calculated for this loan?

4    A    Sure.  With regard to the purchase price as defined by

5    the governing agreements it breaks down into very generally

6    the unpaid principal balance and accrued and unpaid

7    principal and interest advances, borrower interest, other

8    expenses.  So that's broken out here starting with the

9    unpaid principal balance and the relevant values as pulled

10   from the reported data tapes.

11   Q    Okay.  And this document would have been provided to

12   the plan administrator?

13   A    The claim tracking spreadsheet was provided to the plan

14   administrator as well as the data tapes and supporting

15   documentation on a monthly basis.

16   Q    Okay.  During the protocol did the plan administrator

17   ever object on a specific basis that for non-liquidated

18   loans there was an interest component -- a borrower interest

19   component?

20   A    Not to my knowledge.

21   Q    Okay.  Now, earlier we also had --

22        THE COURT:  Can I ask a question?  On the data

23   tracking spreadsheet, for example, for the one we're looking

24   at now, loan ending 5983, you have default status non-

25   liquidated, right?  So that means that as of the date that

Page 105

1    the spreadsheet was created the property had not been sold,

2    right, or liquidated -- the loan had not been liquidated,

3    right?

4            THE WITNESS:  Not correct.  Can I make a point,

5    Your Honor?

6            THE COURT:  Yes, please.

7            THE WITNESS:  This is the first page of the claim

8    tracking.

9            THE COURT:  Yeah.

10           THE WITNESS:  The next three pages are one

11   complete loan.  The first page is actually a different loan,

12   so the loan I was looking at is --

13           THE COURT:  Oh, I'm sorry.

14           THE WITNESS:  -- on the top -- the header 1955.

15           THE COURT:  Thank you.  Thank you.

16           THE WITNESS:  Just so that he with have the

17   complete --

18           THE COURT:  Thank you very much.  Okay.  So --

19   very well.  So we're looking at loan ending 1955, a great

20   year, I was born in that year.

21       (Laughter)

22           THE COURT:  I know I don't look that old.

23           And it's non-liquidated, right?  So that means

24   that as of the date of the preparation of this spreadsheet

25   it was not liquidated.

Page 106

```
 1              THE WITNESS:  Correct.

 2              THE COURT:  Meaning the loan was still open.

 3              THE WITNESS:  Correct.

 4              THE COURT:  Okay.  Is there anything on the claims

 5     tracking spreadsheet that indicates the date of the default

 6     on the loan?  The date of non-payment?

 7              THE WITNESS:  No.  So non-liquidated can mean

 8     anything.

 9              THE COURT:  Okay.

10              THE WITNESS:  It can be -- the loan can be a

11     current performing with either a modification or early

12     payment history or 30 days late, 60 days late, so we just

13     said over here liquidated or non-liquidated --

14              THE COURT:  Okay.

15              THE WITNESS:  -- for the purpose of the -- how we

16     set out the purchase price.

17              THE COURT:  Okay.  So I think you said it very

18     well, that it could be the full range of current and

19     performing to there was a default two years ago.

20              THE WITNESS:  That is correct.

21              THE COURT:  Thank you.

22     BY MR. HEIDLAGE:

23     Q    Okay.  Staying on this page, this is page 7382 of TRX-

24     1468, and I wanted to point -- direct you to the date of

25     defect discovery.  Do you see that at the bottom?
```

Page 107

1   A    I do.

2   Q    Okay.  How was that calculated?

3   A    That is the date that Duff & Phelps confirmed a valid

4   finding by breach of representations and warranties.

5   Q    Okay.  And can you -- I want to direct your attention

6   to the date below that, the notice date, do you see that?

7   A    I do.

8   Q    How was that calculated?

9   A    That would have been the date the claim tracking

10  spreadsheet was submitted to the plan administrator.

11  Q    Okay.  And as far as you know when did the trustees

12  first conduct a loan by loan review of the loans for which a

13  claim was submitted during the protocol?

14  A    To my knowledge it was the loan review done under the

15  protocol, in addition to the sample review that was done in

16  the years prior to the protocol.

17  Q    And during the protocol did the plan administrator ever

18  object to a specific claim that was submitted by the

19  trustees because it was too late?

20  A    Not to my knowledge.

21  Q    Okay.  And do you have an understanding as to whether

22  or not the master servicer has an obligation to provide

23  notice as to any breaches of discoveries?

24  A    I'm generally familiar with the governing agreements

25  and generally have an understanding of that.

Page 108

```
 1   Q    Okay.  Who is the master servicer for a majority of the
 2   loans up to the date of the bankruptcy filing?
 3   A    If not all the loans it was -- it would have been
 4   Aurora -- it was Aurora.
 5   Q    Okay.  Now, did the plan administrator respond to every
 6   breach finding submitted by the trustees?
 7   A    They did not.  They did not respond to the loans that
 8   they had determined to be on hold in the step two process.
 9   Q    Okay.  And approximately how many of the on hold loans
10   are at issue still?
11   A    It's approximately a third of the population.  I
12   believe it's about 24- or 25,000 of the remaining loans at
13   issue.
14            MR. HEIDLAGE:  Okay.  If we could put up slide
15   TRX-122.
16   BY MR. HEIDLAGE:
17   Q    Now, did you gain an understanding as to the basis for
18   the plan administrator not reviewing certain loans?
19   A    I did, yes.
20   Q    Okay.  And what's your understanding of the basis that
21   they provided -- or how did you gain that understanding?
22   A    This was number 1 in discussions between myself and
23   representatives of the plan administrator, as well as
24   letters that I received from the plan administrator setting
25   out the reason the loans that they would respond to put in
```

Page 109

1    progress and the loans that they would put on hold and not

2    respond to in step two.

3    Q    Okay.  And what was the basis that you understood the

4    plan administrator provided?

5    A    Well as explained and set out in the letters the basis

6    was that there were one or up to four documents that they

7    considered critical that were missing from the file and they

8    would not be able to review those loan files until they

9    received those specific -- all four of those specific

10   document.

11   Q    And what were the four specific documents?

12   A    It was a servicer notes, a corporate expense log, a

13   payment history for the loan, as well as what they refer to

14   as a final loss certificate.

15   Q    Okay.  And did the plan administrator explain to you

16   why it believed it needed each of those four documents?

17   A    They did, yes.

18   Q    Okay.  And what was their explanation?

19   A    So that the servicer notes and the payment history

20   would be relevant to the plan administrator's review with

21   regard to a loss causation argument to either disprove or

22   disprove that the -- there was in fact a breach of

23   representation warranty or something else that caused the

24   loss.

25        And with regard to the corporate expense log and the

Page 110

1    document -- the final loss certificate it would have been to

2    audit the submitted purchase price by the trustees.

3    Q    Okay.  And how did the -- did you respond to their

4    arguments about why they needed these documents?

5    A    We did in conversation.  We did provide our side, our

6    response to the plan administrator's rationale for

7    considering these critical documents for their review.

8    Q    And generally what was the trustees' response?

9    A    At a very high level that the -- that for the servicing

10   notes and the payment history that we didn't believe loss

11   causation was part of our submitted -- was part of our

12   claim, our submission.  And with regard to the loss

13   certificate and the corporate expense log number 1, that

14   they didn't need to audit, we had submitted the official

15   books and records, the final number, which would have been

16   more accurate than the loss certificate.  Also that the

17   purchase price didn't allow for an adjustment to the

18   purchase price based on servicer performance.  And generally

19   that we had submitted the purchase price in accordance with

20   the governing agreements.

21              MR. HEIDLAGE:  Does it make sense to take a break

22   for a minute?

23              THE COURT:  Sure, that'll be fine.  Ten minutes,

24   15 minutes?

25              MR. HEIDLAGE:  Ten minutes is fine.

Page 111

1              THE COURT:  Ten minutes?  Okay.  Let's take a ten-

2     minute break.  We'll cock back at approximately 3:20.

3              How much longer do you think?

4              MR. HEIDLAGE:  Just so we can be ready to go.

5              THE COURT:  Yes, of course.

6              MR. HEIDLAGE:  My guess is 30 minutes, but --

7              THE COURT:  Okay.  Sounds good.

8              MR. HEIDLAGE:  Okay.

9              THE COURT:  All right.  We'll see you at 3:20.

10             MR. HEIDLAGE:  Thank you.

11        (Recessed at 3:09 p.m.; reconvened at 3:34 p.m.)

12             THE COURT:  Just to confirm what you had mentioned

13    -- please have a seat -- we're just beset with scheduling

14    requests, we're not going to start on Wednesday until 11:00

15    or 11:30 you had said?

16             UNIDENTIFIED SPEAKER:  Can I confirm?

17             THE COURT:  Sure, please.

18             UNIDENTIFIED SPEAKER:  Confirmed.

19             THE COURT:  Okay.  Okay.  Thanks.

20             Okay.  Ready when you are.

21             MR. HEIDLAGE:  Great.

22    BY MR. HEIDLAGE:

23    Q    Welcome back, Mr. Esses.

24         Before we broke we had talked about the documents that

25    the plan administrator considered to be critical documents.

Page 112

1   Do you recall those?

2   A     I do.

3   Q     Okay.  Did you have an understanding as to whether or

4   not those documents were required under the protocol?

5   A     I had an understanding that not any one document was

6   specifically required under the protocol.

7   Q     Okay.  And what was the basis for that understanding?

8   A     To -- well I understood what we looked at earlier, the

9   Exhibit B and the reference to Exhibit B, that it may

10  include the documents that were available, but also the

11  reference -- a reference to the complete or substantially

12  complete Aurora files, which will serve as a template for

13  the loan files at issue.

14  Q     Okay.  And can you explain what you mean with reference

15  to the Aurora files?

16  A     There are approximately 51,100 loan files that the plan

17  administrator represented were complete at the beginning of

18  the protocol and referred to those as -- that would serve as

19  a template for a complete file.

20  Q     And how did those files bear on your understanding of

21  the allegedly critical documents?

22  A     Well we found that a review of an assemble of those

23  loans that they were actually in -- they were missing

24  several of the, if not all, on the review of loans they were

25  missing those critical documents, as well as other key

Page 113

1    documents as part of the loan file.

2    Q    Okay.  And so just to be clear, were there Aurora files

3    that were missing servicing notes?

4    A    Yes, there were.

5    Q    And were there Aurora files that were missing payment

6    histories?

7    A    Yes.

8    Q    And were there Aurora files missing corporate expense

9    logs?

10   A    Yes.

11   Q    And were there Aurora files missing final loss

12   certifications?

13   A    Yes.

14   Q    Okay.  Earlier we looked at Exhibit B, which you just

15   referenced, that's in TRX-831.

16           MR. HEIDLAGE:  If we could put that up.

17           THE WITNESS:  Specifically to Exhibit B?

18   BY MR. HEIDLAGE:

19   Q    Yes, please.  And that's on page 17.

20   A    Okay.

21   Q    And did this list include -- well first thing, what did

22   you understand Exhibit B to be?

23   A    A list of documents that a file may include.

24   Q    Okay.  And did this list include each of the critical

25   documents?

Page 114

1    A    No, it is actually missing a loss certificate.

2    Q    Okay.  And we also earlier looked at Exhibit 1064.  Do

3    you recall that, the -- I want to direct your attention back

4    to that document.

5    A    I do, the direction letters that were attached to an

6    email to the master servicers.

7    Q    Okay.  And did that also include a -- that also

8    included an exhibit that we looked at earlier, correct?

9    A    It does, yes.

10   Q    Page 9?

11   A    Yes.

12   Q    And who prepared this -- the Exhibit A to the direction

13   letter?

14   A    This was prepared and provided by the plan

15   administrator and adopted as part of the direction letter by

16   the RMBS trustees.

17   Q    Okay.  And did this Exhibit A include all of the

18   critical documents?

19   A    It does not.  It's actually missing corporate expense

20   logs, and again, also missing loss certificate.

21   Q    Okay.  Could you -- did the trustees attempt to resolve

22   the on hold loan issue in any way?

23   A    We did, yes.

24   Q    Okay.  And how did the trustees attempt to resolve

25   those?

Page 115

1   A     A few ways.  In discussions with the plan

2   administrator, number 1, we explained the rationale of why

3   we didn't think these were critical, but we also agreed to

4   work collaboratively with the plan administrator to -- that

5   we would rerequest the documents from the servicers, make a

6   specific request for this document or in other forms of

7   these documents specifically an Excel spreadsheet and the

8   servicers provide this in a form that was acceptable to the

9   plan administrator.

10       We also tried to look to third-party sources that may

11  have this data and satisfy the plan administrator's request

12  for these critical documents.

13  Q     Okay.  And did you in fact reach out to the servicers?

14  A     Yes, we did.

15  Q     Okay.  If you could turn to TRX-1089.  And again

16  starting with page 2.  Do you recognize this document?

17  A     This is an example of our follow up to the servicers.

18  It was attached to my declaration.  And this is a letter

19  attached to an email specifically following up with

20  Nationstar as the primary servicer.  The letter has the

21  eight or so servicers we followed up with that had on hold

22  loans at the time, including Nationstar, as well as the

23  seven other, and this letter basically lays out the

24  trustees' request for specific -- what the plan

25  administrator had determined was critical for their review.

Page 116

1           And on the second paragraph of page 4 of the exhibit

2      sets out that Lehman's counsel advised that the additional

3      servicing files still did not include the payment history

4      log, corporate expense log, servicing notes, and final loss

5      certification, and we requested that data.

6      Q    Okay.  And did any of the servicers that this was

7      directed to respond to this letter?

8      A    They did.  To the best of my recollection they all

9      responded.

10     Q    Okay.  And how did they respond?

11     A    So for the most part they either responded that these

12     documents were already in the file and that they had given

13     us everything they had, but that they'd attempt to either

14     reproduce certain documents or to show us and we'd work with

15     the plan administrator to point out that these documents

16     were already in fact in the loan files in most of the cases.

17     Q    Okay.  I want to direct your attention to exhibit --

18           THE COURT:  So what you're saying as the bottom

19     line is that for -- in most of the cases which are being

20     characterized here as the on hold loans at least one of the

21     four critical documents was actually in the file?

22           THE WITNESS:  To my belief, yes.  I worked to flag

23     the documents that the servicers explained were the

24     documents that they were looking for, they weren't always in

25     the same form, but they said this is how we maintain or

Page 117

1    information.

2              THE COURT:  Thank you.

3    BY MR. HEIDLAGE:

4    Q    And if you could turn to Exhibit 1099.  And again, to

5    pages 2 and 3 of the exhibit.

6    A    I do.

7    Q    Okay.  And do you recognize this document?

8    A    I do.  This is an email from Chase as an example.

9              MR. HEIDLAGE:  Oh, can you put this -- take this

10   off the screen, please.

11             THE WITNESS:  This is an email that I was cc'd on

12   from Sullivan & Cromwell on behalf of Chase basically saying

13   that hey, this stuff is already, you know, in the loan file,

14   this is the most efficient way we can give it to you, we've

15   already given it to you, and it looks like this, and this is

16   our data dictionary that we internally use to understand

17   these servicing notes.

18   BY MR. HEIDLAGE:

19   Q    Okay.  And was this an example of the type of response

20   that you received from the servicers?

21   A    Yes.

22   Q    And did you do anything else to address the plan

23   administrator's requests for additional documents?

24   A    As I mentioned we also gave them in discussions our

25   rationale for why they should be able to review these

Page 118

1    documents, as well as looked to third-party sources to

2    satisfy their request.

3    Q    Could you explain what you mean by third-party sources?

4    A    So, for example, with regard to payment history we

5    discussed with the plan administrator that there are data

6    providers that provide the payment history for the universe

7    of loans outside of the loan file, they collect it as part

8    of their service, they collect the data and sell it.  So we

9    in the instance of payment histories the plan administrator

10   agreed that would satisfy their request.  We went out,

11   purchased the data for them, and provided the data to them.

12   And in many instances it did in fact satisfy the plan

13   administrator's request for payment histories.

14   Unfortunately it didn't have, you know, the level of detail

15   to satisfy some of the other requests.

16            THE COURT:  Can you go back to the document that's

17   behind TRX-1099?

18            THE WITNESS:  Okay.

19            THE COURT:  That's the one that you said was from

20   Sullivan & Cromwell, Mr. McCauley?

21            THE WITNESS:  Yes.

22            THE COURT:  And I think you said that this was in

23   this case JPM's way of saying here's where all the

24   information is that you requested.  It's in one of these

25   categories.

Page 119

1           THE WITNESS:  It's -- it looks like this is a -- it

2    looks like -- this is what it looks like and the screenshots

3    that we already provided.  So it's -- you know, they were

4    having trouble understanding it.  This is sort of like a

5    data dictionary, the codes that they use in their internal

6    systems.

7           THE COURT:  So they might not call something

8    servicing notes, but somewhere on this page are something

9    that's the equivalent of servicing notes?

10           THE WITNESS:  Yes.  There's a corresponding

11    screenshot or page or series of pages.

12           THE COURT:  So if I'm looking -- where -- if I want

13    to -- if -- when I think of what the servicing notes are and

14    a blow by blow description of the history of the loan from

15    the servicer's perspective, would -- what would I look at on

16    this?

17           THE WITNESS:  I would have to retrieve the document

18    that's in this loan file.  It's -- they call it the MSP

19    screens so it -- we would have to retrieve that from a Chase

20    file that has that has that document.

21           THE COURT:  I'm sorry.  What's an MSP screen?

22           THE WITNESS:  Sorry.  That's what they refer to it,

23    their servicing system --

24           THE COURT:  Oh, I'm sorry.  The MSP system.  Okay.

25    And what -- there's a -- after the list of screenshots it

Page 120

```
1    says, "All available information from these screens is

2    provided which goes back the last 37 months."   So what does

3    that mean?  What's your understanding of what that means?

4              THE WITNESS:  My understanding of that and I

5    believe at the time was that that is that they only maintain

6    this for 37 months of prior history.

7              THE COURT:  So if I'm looking at loans that were

8    originated in 2006 I don't have the screens, this data for

9    2006 through 2011?

10             THE WITNESS:  To the extent it was liquidated they

11   may not maintain that data.

12             THE COURT:  Whether it was liquidated or not, this

13   person is communicating to you that in response to your

14   inquiry they're telling you here's the -- here's the best

15   that we have for the last 37 months.

16             THE WITNESS:  That's right.

17             THE COURT:  Thank you.

18             MR. HEIDLAGE:  Okay.

19   BY MR. HEIDLAGE:

20   Q    Now did you receive information that satisfied the plan

21   administrator's request in every instance?

22   A    No, not in every instance.

23   Q    Okay.  And did the servicer's explain why they were

24   unable to provide information that satisfied Lehman -- the

25   plan administrator's request?
```

Page 121

1    A    They explained that that was all that they had, and to

2    the extent it was already in the loan file they had

3    provided, they had provided that information.

4    Q    Okay.  Now you also stated earlier, I believe, that you

5    believed that you provided data that was more accurate than

6    the loss certifications; is that correct?

7    A    Yes.  That was one of the reasons why we believed the

8    plan administrator should not look to the loss certificate

9    to audit the purchase price, but rely on the data that we

10   had submitted including the data tapes.

11   Q    Okay.  And can you -- did you have any discussions with

12   the plan administrator about that position?

13   A    We did.  Very early on in the process the plan

14   administrator asked us to reconcile a few loss certificates

15   for the purchase price that we had been submitting and we

16   went through that exercise -- and we went through that

17   exercise in a series of e-mails and phone calls with the

18   plan administrator and explained to them why our submitted

19   purchase price was, in fact, the official loss amount as

20   opposed to whatever may have been captured on the loss

21   certificate in the file.

22   Q    Can we go to TRX-912 which is in, again, the same

23   volume, volume one?  Do you recognize this document?  I

24   apologize.

25   A    I do.  This is the series of e-mail on this issue

Page 122

1   reconciling the purchase price that we had submitted to the

2   loss certification worksheets.  This is the e-mail that I

3   described.

4   Q    Okay.  And can you explain what the plan administrator

5   had communicated to you in this e-mail?

6   A    So at the --

7   Q    Well, let me step -- take a step back.

8        In looking at page 2 of 3 do you see an e-mail from Ms.

9   Carrie Reid?

10  A    I do.  Yes.

11  Q    Okay.  Who is Ms. Carrie Reid?

12  A    An associate of Mr. Trumpp.  Ms. Reid was on --

13  generally on the weekly calls with Mr. Trumpp, myself, Mr.

14  Pfeiffer for Duff & Phelps, Mr. Drausick, Ms. Reid and Ms.

15  Darnell.

16  Q    Okay.

17  A    For the plan administrator.

18  Q    And can you explain what she has communicated to you

19  and Mr. Pfeiffer in this e-mail?

20  A    Yes.  So there were three -- four actually examples

21  where the loss certificate that they were reviewing in the

22  file did not match to the loss amount that we had submitted

23  as our purchase price for these loans.  So there's a table

24  here.  It's easier to follow on the screen because it wraps

25  around the page.

Page 123

1         But the loan number is the four loans.  The asserted

2    purchase price so that's the submitted purchase price by the

3    RMBS trustees on the claim tracking spreadsheets.  The

4    number that was reported in the loss certificate in the loan

5    file, whether there was -- the next column, whether there

6    was an additional loss certificate in the file.  So for one

7    of these there were two loss certificates in the file.  And

8    the difference between the total of the loss certificates

9    against the asserted -- the submitted purchase price by the

10   RMBS trustees.

11   Q    Okay.  Now did you respond to Ms. Reid's questions?

12   A    I did.  We worked with them through e-mails and calls

13   to reconcile the numbers, and explained why we believed our

14   numbers -- and, in fact, they were accurate whereas the loss

15   certificates in the file were unreliable, not final and not

16   a good document to audit the purchase price.

17   Q    And how did you explain that to Ms. Reid and the plan

18   administrator?

19   A    Sure.  So what we did was to the extent these final

20   loss certificates were not, in fact, final, they were just

21   in the -- in the document and as -- at a point in time.  We

22   showed that there were subsequent adjustments accounted for

23   in the loan tape data that if you take into account post the

24   realized loss or the data of the loss certificate you can

25   see how the subsequent losses or gains affect the final loss

Page 124

1    amount which is what we had submitted as our purchase price.

2            MR. HEIDLAGE:   Okay.   Could we show TRDX-123?

3    BY MR. HEIDLAGE:

4    Q    Okay.   Do you recognize this document?

5    A    So I believe this is screenshots from an Excel

6    spreadsheet we shared with the plan administrator in advance

7    of our call with regard to this issue and used to

8    demonstrate the reconciliation between the submitted

9    purchase price and whatever the loss certificates reported.

10   Q    And can you walk us through the information that you

11   provided?

12   A    Okay.   So it looks like there are three tables here.

13   The first table is simply a summary table of the --

14   Q    And if you wouldn't mind just taking your time when we

15   walk through this.   Sometimes it's a little hard to keep --

16   to follow.

17   A    I will do my best.

18           So on this first -- this first table at the top it has

19   the four loans that the plan administrator had inquired

20   about.   Each row is a loan so just taking the first loan as

21   an example the plan administrator had showed that the loss

22   certificate reported a loss of $341,000.   We had submitted a

23   purchase price of 100 -- approximately $120,000 less than

24   that, $218,000.   And, again, the exercise for this

25   reconciliation was to explain why the loss certificate was

Page 125

1   so far off from the submitted purchase price.

2        And what we're basically showing in the next two

3   columns is when I say Nationstar extract, that's the data,

4   custom data spreadsheet I received from Nationstar reports a

5   number that matches my submitted purchase price.  And the

6   Nationstar data tape is the monthly data tapes that I

7   retrieved from the investor website for -- from Nationstar

8   which also has the

9   $218,000.

10       So just to summarize is we submitted a purchase price

11  of $218,000.  We believed that was the correct amount.  And

12  the plan administrator asked us, well, if that's the right

13  amount why does the loss certificate say $341,000.

14  Q    And did you explain to the plan administrator why that

15  is the case?

16  A    Yes.  That was the purpose of this exercise and the

17  conversation.  And the next table, the middle table on this

18  page is an excerpt from the -- a screenshot from the

19  spreadsheet that we shared with them and worked through on a

20  call.

21       And what it basically shows is that there were -- that

22  there was an initial reported loss in June 2011 for this

23  trust.  But then there were subsequently four adjustments,

24  one additional loss of $2,000 in September 2011, and three

25  gains, so three recoveries, so subsequent recoveries over

Page 126

1   the span of a total of three years.  That's not usual that

2   there's a recovery three years later, but it's possible for

3   a number of reasons.  The servicer made a -- was successful

4   on a judgment or some other reason.

5        THE COURT:  I'm sorry.  What were those words that

6   you just said, a successful?

7        THE WITNESS:  Judgment or something with regard to

8   recovering on the liquidated loan. So they recovered -- so -

9   - sorry.  So the math hear is that in Column D are the

10  specific adjustments and the month they happened in, and

11  Column E is a cumulative realized loss.  So, yes, it was an

12  initial loss of 342,000 which was closely, but not exactly

13  reflected on the loss certificate,.  But the actual, the

14  final realized loss was consistent with the submitted

15  purchase price of 218,000.  And, again, the point of this

16  exercise was to show that we weren't show, you know, that

17  loss certificates were very reliable.  They weren't even a

18  recognized document across the servicer's at issue.  So to

19  consider this a critical document and put the loan on hold

20  just didn't really --

21  Q    So --

22  A    Sorry.

23        THE COURT:  Can I just interrupt because I'm -- I'm

24  looking at the screen.  I'm looking at the middle block,

25  right, that's for Loan 0138, that's what you were just

Page 127

1    describing as there being gains and losses?

2              THE WITNESS:  Yes.

3              THE COURT:  So on June 11th there's a reported loss

4    of 342,311, right?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  And then the loss gets larger in

7    September.

8              THE WITNESS:  That's right.

9              THE COURT:  Right.  And would that just be

10   additional accrued, but unpaid interest owing on the loan?

11             THE WITNESS:  It could be anything.  It could be

12   expenses that came in from the foreclosure lawyer.  I'm not

13   exactly sure what it is, but it could be --

14             THE COURT:  Okay.

15             THE WITNESS:  -- a number of things.

16             THE COURT:  Okay.  And then we skip ahead to

17   December of 2011 and then there's a gain, right?

18             THE WITNESS:  Yes.

19             THE COURT:  So what -- what might I -- what might

20   that be?  Where would $94,000 have come from?

21             THE WITNESS:  They may have recovered from the

22   borrower, had a judgment against the borrower, or some other

23   potential recovery with regard to liquidating the home.

24        (Pause)

25             THE COURT:  And the same would be true in April of

Page 128

1    2013 and 2014?

2         THE WITNESS:  Yes, as reported by the -- this data

3    is being pulled from the monthly data tapes and remittance

4    reports as reported by the master servicer.

5         THE COURT:  Okay.  Thank you.

6    BY MR. HEIDLAGE:

7    Q    So -- and I just want to walk through these columns to

8    make sure that we're -- that it's clear as to what each

9    represents.  When it says period date what does the period

10   date refer to?

11   A    The month through -- that it was reported under -- at

12   the trust.

13   Q    Okay.  And when you say reported at the trust, can you

14   explain what that means?

15   A    The trust will report a realized loss in the month that

16   it occurs or any subsequent adjustments to make -- for the

17   purpose of reporting that to investors as well as making the

18   calculations that effect the investors or certificate

19   holders, and they use the numbers reported to them by the

20   master servicer for those purposes.

21   Q    Okay.  So when it says the reported -- well, then what

22   is the report date?

23   A    The report date is simply the date of the remittance

24   report that -- in which that is reported.

25   Q    Okay.  And is that -- then when you say the remittance

Page 129

1    report is the remittance report the report that is provided

2    to investors by the trustee or the securities administrator?

3    A    Yes, by -- the master servicer provides the data to the

4    trustee and the trustee does the calculations in the form of

5    a remittance report on a monthly basis.

6    Q    Okay.  And when it says the reported realized loss,

7    does this number, the -- for the June 11th number, does that

8    ever get reported to investors?

9    A    It does.  These are the numbers that were reported to

10   investors.

11   Q    Okay.  So just to be clear does that mean that in June

12   -- on June 11th or June 24th, excuse me, 2011 there was a

13   loss reported to investors of $342,311.81?

14   A    That is correct.

15   Q    And then it was revised in four subsequent reports to

16   investors?

17   A    Yes.

18   Q    Okay.  And so the last report that the investors

19   received was one that indicated that the loss for the loan

20   was $218,000 approximately?

21   A    Yes, consistent with the submitted purchase price by

22   the RMBS trustees.

23   Q    Okay.  And were the payments to certificate holders

24   affected by the changes between June -- the June 2011 and

25   2014?

Page 130

1    A    Absolutely.  The cash flow is calculated at a monthly

2    basis.

3    Q    Okay.  And can you explain then, just walk through the

4    last, the bottom screen as well?

5    A    Sure.  Not to spend too much time on it, but quickly

6    there was an initial reported loss of 39,385, two subsequent

7    adjustments within the span of approximately seven months

8    for a total realized loss, a cumulative realized loss of

9    41,733 which looking at the first table matches -- does not

10   match the loss certificate, but matches the Nationstar, both

11   the Nationstar extract and the Nationstar data tape which we

12   used as our supporting documentation for the submitted

13   purchase price.

14   Q    Okay.  And so just to be clear, the numbers that you

15   provided as the basis for the purchase price were the same

16   numbers that were ultimately provided to investors as part

17   of reporting on what they received as further certificates?

18   A    That is correct.  Yes.

19   Q    Okay.  Did the plan administrator dispute any of the

20   calculations that you provided?

21   A    No.  They accepted this explanation.

22   Q    Okay.  And did they raise any other concerns with the

23   purchase price calculation on these three loans?

24   A    No.

25   Q    Okay.  And how many liquidated loans did the plan

Page 131

1    administrator agree to review, i.e. that they did not put on

2    hold?

3    A    To the best of my knowledge that's approximately 30,000

4    including the Aurora deemed complete loans.

5    Q    Okay.  And with respect to the 30,000 loans, did the --

6    and other these -- that these three, did the plan

7    administrator ever say that it can't reconcile the loss

8    certifications with the Nationstar data that you were using

9    to calculate the purchase price?

10   A    Not to my knowledge.

11   Q    Okay.  Now are you aware that the plan administrator

12   submitted expert reports in this case?

13   A    I am.  Yes.

14   Q    Okay, including on the purchase price?

15   A    I believe that was -- would have been covered by Dr.

16   Cornell.  Yes.

17   Q    Okay.  Are you aware of whether or not Dr. Cornell

18   cited any instance where the purchase price did not

19   reconcile the loss certifications and the servicer data that

20   you used?

21   A    Not to my knowledge.

22   Q    Okay.  Now the plan administrator accepted a certain

23   number of loans, correct?

24   A    That is correct.

25   Q    Okay.  For any of the accepted loans did the plan

Page 132

1    administrator ever identify a disparity between the loss

2    certifications or corporate expense logs and the trustees'

3    purchase price?

4    A      Not to my knowledge.  There were adjustments in certain

5    instances to the purchase price, but I don't believe there

6    was with regard to the loss certification not tying to the

7    submitted purchase price.

8    Q    Okay.  If we could put up Slide TRDX-124.  Okay.  And

9    can you explain what this -- do you understand what this

10   demonstrative shows?

11   A      I do.  Yes, 1,263 accepted loans to date that are

12   subject to the hearing, so that accounts for even though an

13   accepted loan might have been in an opt-out trust or a

14   terminated trust, and the breakout here is the -- where the

15   number of loans -- where the plan administrator accepted the

16   trustees' purchase price, 1,188 of those where they did not

17   find any issue with the loss certificate not matching the

18   submitted purchase price, 12 loans where they originally

19   during the protocol accepted the loan, but alleged that

20   because of a servicer error the purchase price should be

21   adjusted downwards.

22        Again, I don't -- I don't believe that's with regard to

23   a loss certification being inaccurate.  And as we discussed

24   earlier we're not -- we were -- we advised that the purchase

25   price does not allow for adjustments due to servicer errors.

Page 133

1    And 63 loans, non-liquidated loans where the plan

2    administrator accepted the loan, so 63 non -- accepted non-

3    liquidated loans where the plan administrator accepted the

4    loan, but said the purchase price should be zero.

5        I understand there was a footnote.  I don't have that

6    in front of me, but a footnote explaining why that should be

7    zero as opposed to the trustees' submitted purchase price on

8    the accepted non-liquidated loans.

9    Q    So I just want to take -- just take a step back and

10   look at the loans with accepted with alleged servicer

11   errors.  Do you -- can you explain what your understanding

12   of the objection was there?

13   A    Yes.  We actually only got the detail on one of those

14   accepted loans, but the fact that -- we understood that the

15   fact that the servicer either had a long foreclosure

16   timeline or made mistakes with the -- not mistakes, but took

17   too long to foreclose on the property or some other reason,

18   that the plan administrator asserted that they -- we should

19   adjust the purchase price down for that alleged servicer

20   error.

21   Q    What's your understanding of the status of that

22   objection?

23   A    I understand it had been -- they retracted that

24   assertion with -- at Dr. Cornell's report.

25   Q    Okay.  And I want to ask just very briefly about the

Page 134

1    non-liquidated loans issue there.  Was there a disagreement

2    in the protocol as to how to deal with non-liquidated loans?

3    A    Not -- I mean, there -- the protocol was pretty clear

4    about how to deal with purchase price, either non-liquidated

5    or liquidated loans.  But there was some discussion around

6    this issue.

7    Q    Okay.  And can you just generally describe what the

8    discussion around the issue is?

9    A    Sure.  So the trustee submitted the purchase price as

10   per the governing agreements as the breakout we saw earlier

11   generally the unpaid principal balance plus any accrued and

12   unpaid advances and borrower interest.  And the plan

13   administrator set that at zero, but before we received their

14   response we had anticipated that the estate would be

15   unwilling or unable to repurchase the loans as per the

16   governing agreements.  So we suggested a way to replicate

17   the economics of that repurchase transaction that we

18   understood to be outside of what the protocol required.

19        So we submitted the purchase price as required of the

20   protocol and we discussed with the plan administrator the --

21   to the extent that there would be a -- we would agree on a

22   way to replicate the economics of that transaction.

23   Q    Okay.  And did the trustees, in fact, propose a way to

24   replicate the economics of the transaction?

25   A    We did.  I proposed to the plan administrator that we

Page 135

```
1    agree or come to an agreement on a third party tool that

2    would value the loans, and we would use that value to net

3    against the purchase price and provide for a net claim

4    amount, which would be a claim in bankruptcy dollars as

5    opposed to going through the -- again, you know, we

6    understood that the plan administrator -- the estate may be

7    unwilling or unable to repurchase the loans at real dollars.

8    Q    So just to be clear, when you say that you proposed to

9    the plan administrator, who exactly did you make that

10   proposal to?

11   A    I proposed that to Mr. Trumpp on our weekly calls early

12   on in the process in April 2015 and I brought it up and

13   proposed it in a meet and confer with a larger group in July

14   2015.

15   Q    Okay.  And did you ever offer to the plan administrator

16   either to Mr. Trumpp or to anyone else the results of the

17   valuation that your team had come up with?

18   A    We absolutely did.  We made it clear that the results,

19   the documentation on the model would be available, we would

20   make available to them and provide them the results if they

21   wanted to review the results to make a determination, or

22   they could suggest an alternative method for valuing the

23   loans to the extent we were going to agree on replacing,

24   replicating the economics of the repurchase transaction.

25   Q    Okay.  And what model --
```

Page 136

1           THE COURT:  Mr. --

2           MR. COSENZA:  Your Honor --

3           THE COURT:  -- hold on.  Mr. Cosenza.

4           MR. COSENZA:  -- can we just have a sidebar for --

5           THE COURT:  Sure.

6           MR. COSENZA:  -- for one minute.

7      (Sidebar off the record)

8  BY MR. HEIDLAGE:

9  Q    Mr. Esses, I would like to just -- to switch topics and

10 sort of just go back to the process that we had or that you

11 described earlier.  And I want to sort of show you the loan

12 file for 3301, and can you just describe for us step by step

13 how this loan would have moved from the original -- from

14 receiving the loan file from the servicers to being

15 submitted as a claim to the plan administrator?  And you

16 don't need to look through the actual file.  I just want to

17 use this as an example.

18 A    I will do my best.  So I -- the process entailed

19 receiving this loan file at Duff & Phelps from the servicer

20 who would index and organize that loan file, send it -- a

21 notice of receipt to the plan administrator, send the loan

22 file to a review firm who would do a completeness review on

23 this loan.  We would then, depending on the results of that

24 completeness review, either follow up with the servicer if

25 certain documents were missing or assign that loan for

Page 137

1    review by the review firm.

2         The review firm would then --

3    Q    So just -- I just want to take a step back and just

4    sort of break that down for a little bit.

5         So the first step would be that somebody at the review

6    firm would go through this 1,000 pages to see whether or not

7    one of the six documents that you referred to earlier were

8    missing; is that correct?

9    A    That is correct.

10   Q    Okay.  And I want to assume for the moment that all six

11   documents are included in that.  Now one of the six

12   documents I think was the HUD-1, do you recall, is that

13   correct?

14   A    That is correct.  Yes.

15   Q    Can you explain to me, for example, why the HUD-1 would

16   be included in those six?

17   A    We would expect that to be in the loan file.  It was

18   important for our review to the extent it was available in

19   the loan file.  And, again, just as a general note on the

20   six key documents they served as a completeness indicia to

21   give us the opportunity to follow up with the servicer to

22   ensure that we had received everything that they had

23   available to them.

24   Q    Okay.  So let's assume that all six documents are in

25   this loan file.  Okay.  What's the next step?

Page 138

1    A    Duff & Phelps would then assign that loan for review.

2    I was responsible for that, give the review firm the go

3    ahead.    They would then send that to a processor to set the

4    loan up for review in their system to the extent they hadn't

5    already completed some of those set up steps for the

6    completeness review, collect certain data from the loan

7    file, run third party searches, again, to the extent

8    applicable and necessary.    They would then send that over to

9    an underwriter --

10    Q    Sir, just -- again, just to take a step back for a

11    second.    When you talk about the processor, so there's an

12    individual at the loan review firm who is examining the loan

13    file first; is that correct?

14    A    That -- not examining, but setting the file up for

15    review, collecting documents.

16    Q    Can you explain what types of documents --

17    A    I mean to say collecting data points.

18    Q    Okay.

19    A    Not necessarily collecting documents.

20    Q    Okay.    And then I think you mentioned something about

21    third party sources.

22    A    Right.    So they would start the process of re-

23    verifications, run an audit credit report, generally look to

24    see if the borrower had a bankruptcy, run Pacer, run the

25    various third party sources that would be applicable to any

1    given -- a specific loan.

2    Q    Okay.  So at that point in time you have the original

3    loan file and then various third party sources as well as

4    data points that are contained in the review firm's system;

5    is that fair?

6    A    That's exactly right.

7    Q    Okay.  And then the loan file is then provided to an

8    initial reviewer?

9    A    An underwriter, yes.

10   Q    An underwriter.  Okay.  And can you explain to me what

11   does the underwriter at the review firm do with this loan

12   file?

13   A    A complete review of the loan file through all the

14   pages included to confirm certain data points that were part

15   of their review as well as a review of the third party

16   sources.

17   Q    Okay.  So does that mean that in the initial -- that

18   initial review somebody has looked at every single one of

19   these approximately 1,200 pages?

20   A    So far at least twice, yes.

21   Q    Okay.  Now in this particular case if we go back to the

22   supporting documentation package, if you -- if this -- this

23   is TRX-2 ending in loan -- for the loan ending in 3301.

24   A    I have that.

25   Q    Okay.  Now there is a -- at the -- at page 12 to 13

Page 140

1      there is a compliance validation form, do you see that, and

2      the --

3      A     I do.

4      Q     This is what we looked at earlier.

5      A     All right.  I'm now familiar with this document.  Yes.

6      Q     Okay.  And how would this be generated?

7      A     This would be generated by the review firm's processing

8      and underwriting team where they would send -- they would

9      pull the information from the loan file and then send their

10     form to the HR department for the original employer of the

11     borrower to be completed.

12     Q     Okay.  So how does a review firm get from this document

13     here to what is eventually alleged as the breach in TRX-1458

14     at 5384?

15     A     Well, they're taking their knowledge of what they --

16     what's on this review form and comparing it to all the pros

17     and cons that either support or contradict this information

18     within the loan file, but especially comparing it to the

19     application, what the borrower originally stated as an

20     applicant.

21     Q     Okay.  So if the review firm comes across this piece of

22     information, okay, and you said they compare it to the loan

23     application?

24     A     Yes.

25     Q     Okay.  Would they stop there if they found this piece

Page 141

1   of information?

2   A    No.  They're doing a complete re-underwriting of the

3   loan file.

4   Q    Okay.  So they would take this document and compare it

5   also with every piece of document in here?

6   A    They would have -- they would keep that in mind when

7   looking through the document -- when looking through the

8   loan file.  Yes.

9   Q    Okay.  And then what would happen after that initial

10  review stage?

11  A    The quality control that I described earlier, so a

12  complete review of the loan file would be done and either

13  all loans, reviewed loans breached -- breach finding loans

14  or a substantial random sample of loans with a -- again,

15  doing a complete review of the loan file to look for in the

16  instance of missing documents confirm the documents were, in

17  fact, missing as well as to the extent there was a finding

18  cited look for potential contradictory evidence.

19  Q    Okay.  So that second level review firm would, for most

20  pieces, in fact, and also look through this entire document?

21  A    A second level at the review firm?

22  Q    Yes.

23  A    I heard something else.  Yes.  Either in all -- for all

24  loans or a substantial random sample.

25  Q    Okay.  After -- if this loan would have -- now at that

Page 142

1    point what are the -- what is provided by the loan review

2    firms to Duff & Phelps?

3    A    So the description of the finding and a narrative along

4    with data points in Excel format as well as a claim package.

5    They did not send us back the loan file.  We already had it.

6    So we just received the templates we had asked for, the form

7    and the form we had asked for them including the data points

8    with regard to the loan and the breach that they found in

9    their review and the claim package.

10        So for this loan the set of 13 documents pages you see

11   -- you see here.

12   Q    Okay.  And so then the QC-1 reviewer, what exactly

13   would they do with the information that they had received

14   from the  --

15             THE COURT:  Are you talking about QC-1 at Duff &

16   Phelps?

17             MR. HEIDLAGE:  Yes.  I'm sorry.  Excuse me.

18             THE COURT:  Okay.

19             THE WITNESS:  I was going to make that

20   clarification as well, Your Honor.

21             THE COURT:  Yeah.

22             THE WITNESS:  QC-1 at Duff & Phelps then were

23   provided the description of the narrative, certain data

24   points with regard to the loan as well as the 13 page claim,

25   claim supporting package.

Page 143

1              MR. HEIDLAGE:  Okay.

2     BY MR. HEIDLAGE:

3     Q    And so they would -- would the QC-1 reviewer compare --

4     at Duff & Phelps compare the factual basis for defect that

5     we saw in the claim tracking spreadsheet with the documents

6     in the claim package?

7     A    Yes.  They would confirm that the facts cited supported

8     the finding in the narrative as well as the supporting

9     documentation supported the finding --

10    Q    Okay.

11    A    -- and facts.

12    Q    And after that was completed what happened with the

13    loan and the breach claim?

14    A    When it went through the second level of QC and it was

15    determined to be submitted to the plan administrator we

16    would prepare that -- a claim submission in accordance with

17    the protocol and send those -- the complete loan file,

18    supporting claim package, the claim tracking spreadsheet and

19    the Nationstar data tapes generally on a hard drive and by

20    e-mail to the plan administrator.

21              THE COURT:  Can I -- it's just -- did you -- I

22    don't know if you said this and I missed it.  What was the

23    difference between QC-1 and QC -- Duff & Phelps QC-1 and

24    Duff & Phelps QC-2?

25              THE WITNESS:  Duff & Phelps QC-1 was a team of

Page 144

1    underwriters confirming the facts, generally confirming the

2    facts cited in support in of the finding.

3              THE COURT:  Based on the loan file?

4              THE WITNESS:  No, based on the description and the

5    supporting package.

6              THE COURT:  Right.

7              THE WITNESS:  We were not going to go into the --

8              THE COURT:  I meant the claim file.  I'm sorry.  I

9    misspoke.

10              THE WITNESS:  Yeah.  Yeah.  Yeah.  Yeah.

11              THE COURT:  The claim file.

12              THE WITNESS:  Yeah.

13              THE COURT:  And what about QC-2?

14              THE WITNESS:  QC-2 was Mr. Aronoff's team mainly

15    reviewing the narrative and making the determination of

16    material and adverse effect, but dealing with issues that

17    were raised by QC-1, dropping findings to the extent

18    necessary, going back to the claim file and loan file, if

19    necessary.

20              THE COURT:   Thank you.

21    BY MR. HEIDLAGE:

22    Q    So just for example, when we -- we looked at the --

23    this -- when we look at this loan of the TRX-2 for loan 3301

24    at page 13 with this, the VOE, do you see that?

25    A    I do.

Page 145

1   Q    Okay.  If QC-1 had seen the what was the employee's

2   gross annual income in 2005 and there was a question mark,

3   if they had a question about that what would happen?

4   A    They would flag that for final determination by Mr.

5   Aronoff's team.  To the extent they had -- they in their

6   experience thought that it made sense to them they wouldn't

7   flag that and they would approve that for a final

8   determination to be made by Mr. Aronoff's team.

9   Q    Okay.  And if Mr. Aronoff's team had a question about

10  how to read the audit VOE what would happen with the file?

11  A    If they had a question they would have went back to the

12  review firm to the extent necessary.

13  Q    Okay.

14       (Pause)

15  Q    Now did the trustees --

16            THE COURT:  Can I ask what -- a follow up question?

17  That VOE that we're all so -- that we have inscribed in our

18  minds at this point, that was by -- what was it, compliance

19  cross-check?

20            THE WITNESS:  Cross-check compliance.

21            THE COURT:  Cross-check compliance.  Is that the

22  same VOE form that all five reviewing firms used?  In other

23  words, was the VOE function -- was cross-check compliance

24  one of the four firms -- one of the five firms?

25            THE WITNESS:  It was.  Yes.

Page 146

1           THE COURT:  Okay.  So a different firm had a

2      different VOE form?

3           THE WITNESS:  Yes.  Substantially the same

4      information, but --

5           THE COURT:  Okay.

6           THE WITNESS:  -- they're own form.

7           THE COURT:  Okay.  Thank you.

8      BY MR. HEIDLAGE:

9      Q    Now did the trustees expect to resolve every single

10     loan submitted under the protocol on a loan by loan basis?

11     A    We expected to go through steps one and steps two and

12     step three to the extent necessary on a loan by loan basis,

13     but we had an understanding that at some point we were going

14     to be able to and have to categorize and deal with loans on

15     a group basis and deal with issues that spanned the loans.

16     Q    Okay.  And what was the basis for the trustees'

17     understanding of that?

18     A    My understanding?

19     Q    Please.  Even better.

20     A    My -- the basis for my understanding was I was involved

21     at the time the protocol was entered given -- well,

22     (indiscernible 4:28:13) thought to how this would work, sort

23     of was common sense to me.  But it was also confirmed by

24     submissions to the Court made by the plan administrator at

25     that time in support of the protocol order.

Page 147

1   Q    Okay.  And was there anything in the protocol that

2   supported that belief?

3   A    There is.

4   Q    Okay.

5   A    Well, I can open -- can open that up.  That's TRX-831

6   is a copy of the protocol order.  So I understood that at

7   the very least when we got to step four certain issues, a

8   mediator would be able to resolve or at least deal with

9   categories of issues or disputes, and it says as much in the

10  protocol.  I'm on page 13 of the 24 of the exhibit.  And,

11  again, you know, it says so:

12       "On the fifth business day of each month the plan

13       administrator may submit disputed rejected claims and

14       disputed approved claims or categories of issues or

15       disputes to a claim facilitator for non-binding

16       individual claim resolution, or for binding -- non-

17       binding resolution of a category of issues or

18  disputes."

19  Q    And earlier we talked about the generalized versus

20  particularized responses that you identified.  What

21  percentage did your team -- did -- you were able to assess

22  the volume of generalized versus particularized?

23  A    We did and it was produced to the plan administrator as

24  part of --

25  Q    Okay.  Go ahead.

Page 148

```
1    A    It was produced as part of Exhibit 15 to Mr. Aronoff's

2    report and from -- I understand that on the borrower

3    breaches we found less than five percent had to have a

4    particularized response.

5    Q    Okay.  And --

6              MR. HEIDLAGE:  Do you mind if we take a break?

7              THE COURT:  I do not mind.  How long a break would

8    you like?

9              MR. HEIDLAGE:  Ten minutes tops, I think.

10             THE COURT:  Okay.  And then -- are you in your last

11   segment, do you think?

12             MR. HEIDLAGE:  Potentially, yes.  I think so.

13             THE COURT:  Okay.  That's not very definitive, so -

14   -

15        (Laughter)

16             THE COURT:  -- potentially we'll see what happens

17   when we come back.  Ten minutes.

18             THE WITNESS:  Thank you, Your Honor.

19        (Recessed at 4:30 p.m.; reconvened at 4:44 p.m.)

20             THE COURT:  Please be seated.

21             MR. HEIDLAGE:  Yeah.  You literally --

22             THE COURT:  You lost your witness.

23        (Laughter)

24             MR. HEIDLAGE:  That's how well we're doing.  He

25   just ran to the restroom.  While we're waiting --
```

Page 149

```
 1              THE COURT:  Sure.

 2              MR. HEIDLAGE:  -- you had asked me to clarify the

 3   time --

 4              THE COURT:  On Wednesday.

 5              MR. HEIDLAGE:  -- in reference to Aronoff.  11:30.

 6              THE COURT:  11:30.  Okay.  So we're going to change

 7   that in our system so that folks who might show up early

 8   won't have --

 9              MR. HEIDLAGE:  Great.

10              THE COURT:  -- be disappointed.  And I had

11   mentioned to you folks at a break that I had a 9:00 tomorrow

12   morning.  That has since been moved out.

13              MR. HEIDLAGE:  Great.

14              THE COURT:  So we'll be on time tomorrow, 10:00.

15   And how much more do you think you have?

16              MR. HEIDLAGE:  I'm going to pass the witness when

17   he comes back.

18              THE COURT:  Okay.  So do you want to start now --

19              MR. ROLLIN:  I would love to --

20              THE COURT:  -- Mr. Rollin?

21              MR. ROLLIN:  -- Your Honor.

22              THE COURT:  You would like to?

23              MR. ROLLIN:  Yes, I would.

24              THE COURT:  Okay.

25         (Pause)
```

Page 150

1          MR. HEIDLAGE:  Just as long as you don't mind for

2     the record.

3          THE COURT:  I don't mind.  Why don't you just make

4     the statement for the record?

5          MR. HEIDLAGE:  Sure.  I pass the witness.

6          THE COURT:  Okay.

7       (Laughter)

8          THE COURT:  Well done.  Thank you.

9          Are we switching binders now, Mr. Rollin?

10          MR. ROLLIN:  We are.  We'll switch them, Your

11     Honor.

12          THE COURT:  Okay.

13       (Pause)

14          THE COURT:  Do you by any chance have another set?

15          MR. ROLLIN:  Sure.

16          THE COURT:  That would be great.  Thank you.

17          So, Mr. Esses, your direct examination has been

18     concluded.  All right.  And we're switching to cross-

19     examination and we're not going to go later than 5:30.

20     Okay.

21          THE WITNESS:  Okay.

22          THE COURT:  Okay.

23       (Pause)

24          MR. ROLLIN:  With your permission, Your Honor?

25          THE COURT:  Sure.

Page 151

```
 1              MR. ROLLIN:  Good.  Thank you.

 2                          CROSS-EXAMINATION

 3    BY MR. ROLLIN:

 4    Q    Good afternoon, Mr. Esses.

 5    A    Good afternoon, Mr. Rollin.

 6    Q    Esses or Esses?

 7    A    They both work.

 8    Q    Okay.

 9    A    I say it Esses.

10    Q    I may vary.

11              THE COURT:  We're going to call you by what you

12    want to be called.

13         (Laughter)

14              THE COURT:  Okay.  It's not -- it's like the

15    difference between Weinstein or Weinstein.  There is an

16    actual way that a person wants to be called.  So --

17              THE WITNESS:  As long as you spell my first name

18    with an O you can pronounce it any way you like.

19              THE COURT:  O.  Well, I sympathize because even my

20    mother-in-law after 40 years spells my name incorrectly.

21         (Laughter)

22              THE COURT:  True story.

23              THE WITNESS:  We only have until 5:30, Your Honor.

24         (Laughter)

25              THE COURT:  I'm glad you're still in a good humor.
```

Page 152

1     It's been a long day.

2     BY MR. ROLLIN:

3     Q    Mr. Esses, the first thing the trustees were required

4     to do under the protocol was to collect loan files, right?

5     A    Steps of the protocol.  Yes.

6     Q    And it is the loan file that the trustees' re-

7     underwriters consider when deciding whether there's a claim

8     for a breach in the representation and warranty, right?

9     A    Loan file plus the third party research.  Yes.

10    Q    Okay.  Without the loan file the trustees' re-

11    underwriters could not do their job, right?

12    A    To the extent we received everything that was available

13    to the servicers on the population of the loans we would

14    have been able to do our job.

15    Q    I may have misstated the question.  I apologize if I

16    have.  Without the loan files the trustees' re-underwriters

17    can't do their job, right?

18    A    I didn't agree with that.

19    Q    You don't agree with that?  You don't agree that

20    without a loan file a re-underwriter cannot perform a re-

21    underwriting (indiscernible 4:50:51); is that your

22    testimony?

23    A    I mean, there's more to the representations and

24    warranties than the re-underwriting review.

25    Q    Yeah.  But in an essential element of a re-underwriting

Page 153

1    review is to look at the loan file, agreed?

2    A    To review whatever is available of the loan file.  Yes.

3    Q    And so collecting the loan files was the very first

4    thing the trustees did in protocol?

5    A    It did -- it was.  Yes.

6    Q    In fact, you led the team that was responsible for

7    collecting the loan files, right?

8    A    I primarily led the team for Duff & Phelps to work with

9    counsel to collect the loan files.  Yes.

10   Q    And the first thing you did in connection with

11   collecting the loan files was that you sent direction

12   letters to the master servicers, right?

13   A    Correct.

14           MR. ROLLIN:  Can you put up plan administrator 782,

15   please?

16   BY MR. ROLLIN:

17   Q    Do you have the plan administrator's binders, the three

18   sets?

19   A    I do not.

20   Q    That is an essential element of the cross-examination.

21        (Pause)

22   A    Thanks very much, Mr. Rollin.

23   Q    There are three volumes.  And I have reason to believe

24   that 782 is in the second volume.

25   A    I have that.

Page 154

1    Q    And we saw some of these earlier on your direct

2    examination, the direction letters to the master servicers,

3    right?

4    A    I believe so.  Yes.

5    Q    And the reason, Mr. Esses, that they're called

6    direction letters is because the trustees have the right to

7    direct the master servicers to produce the loan related

8    documents and information which the servicers have -- master

9    servicers or the servicers have, right?

10   A    I have a general understanding that that's the case.

11   Yes.

12   Q    And it's not just the documents, but it's all of the

13   documents and information that the master servicers or the

14   servicers have with respect to any given loan, correct?

15   A    I understand that to be the case.  Yes.

16   Q    Now there were certain key documents the trustees

17   required for their re-underwriting, right?

18   A    No.

19   Q    There were certain -- you did not have six key

20   documents that the trustees required?

21   A    No.

22        (Pause)

23   Q    You are familiar, however, with the six documents that

24   the trustees characterized as the documents that were the

25   key documents for their re-underwriting review, right?

Page 155

1    A    Yes.  I testified to that earlier today.

2    Q    And those are the final HUD-1, yes?

3    A    Yes.

4    Q    The mortgage?

5    A    Yes.

6    Q    The note?

7    A    Yes.

8    Q    The signed loan application?

9    A    Final loan application.

10          MR. ROLLIN:  Can we show plan administrator 67,

11   please?

12   BY MR. ROLLIN:

13   Q    You can turn to 67.  That's also on the screen.  You

14   see that plan administrator 67 is the expert report of Mr.

15   Aronoff, the affirmative report, right?

16   A    Yes.

17   Q    It's the amended affirmative report that he produced in

18   July, right?

19   A    Yes.  I'm -- yes.

20   Q    Page 19 of that document, please, using the label at

21   the bottom it says PA Exhibit 067, page 19 of 96.  Are you

22   with me?

23   A    I am.

24   Q    Could you please turn to the first formal paragraph?

25   It begins with the words, upon receipt.

Page 156

1    A    I see that.

2    Q    And you see Number 4 in the list of documents of signed

3    loan application?

4    A    I see that.  I was mistaken in my testimony that it was

5    not a signed application.

6    Q    Right.  So the fourth key document was the signed loan

7    application, right?

8    A    I'm with you now.

9    Q    Okay.  The credit report was number five?

10   A    Correct.

11   Q    And the appraisal is number six, right?

12   A    Correct.

13   Q    Now these are all origination documents, agreed?

14   A    Agreed.  Yes.

15   Q    They are not servicing documents --

16   A    No.

17   Q    -- correct?

18   A    Correct.

19   Q    And when you received the loan files from the

20   servicers, as you testified earlier you inventoried them,

21   right?

22   A    Index and organized.

23   Q    Did you index and organize them?

24   A    I did.  Yes.

25   Q    Did you also inventory them?

Page 157

```
 1   A    Not specifically.  I'm not sure how you're using the

 2   term.

 3   Q    Check and see if they were all there?

 4   A    No.

 5   Q    No?

 6   A    Well, we -- no.  We index and organized and then sent

 7   them to the review firms.  Sorry, check and see if the loan

 8   -- it was -- the purpose of it was so that to confirm that

 9   the servicer had said the population runs that they were

10   sending us, that they had, in fact, sent us that population

11   of loans.

12   Q   I want to make sure I understand this.  When you got a

13   given loan file did you go through the loan file to

14   determine whether the six documents or any subset of them

15   were there?

16   A   Yes.  We instructed the review firms to do that.  Yes.

17   Q   Okay.  And if they were there the loan file was deemed

18   complete for purposes of the trustees' review, right?

19   A   Correct.  Yes.

20   Q   And if the servicers did not send one of those six key

21   documents you contacted the servicers to try to get them,

22   right?

23   A   Yes.  We asked them to retrieve that document or

24   otherwise confirm that they had sent us everything they had.

25   Q   In fact, you contacted the servicers specifically for
```

Page 158

1    those documents?

2    A    We did.  They -- but a more -- plus a more general

3    approach to confirm that they had sent us everything they

4    had.

5    Q    And because of the importance to the trustees' re-

6    underwriting exercise when one of these six key documents

7    was missing from the servicers' initial production, you

8    asked them to again confirm that they double, triple,

9    quadruple check their records beyond what they had already

10   done to produce those specific documents, right?

11   A    Generally, yes.

12   Q    Now you know that certain documents were also critical

13   to the plan administrator's claim of new process, correct?

14   A    I was made aware of that.  That's why the administrator

15   considered certain documents critical to their review.

16   Q    And you talked about those a little while ago.  Those

17   are the servicing notes, yes?

18   A    Correct.

19   Q    The payment histories, yes?

20   A    Yes.

21   Q    The corporate expense logs, yes?

22   A    Yes.

23   Q    And the loss certifications, right?

24   A    Yes.  That wasn't a term recognized by all of the

25   servicers, but the components of a loss certificate --

Page 159

```
 1    Q    Right.

 2    A    -- understood.

 3    Q    Now these are all servicing documents, not origination

 4    documents, right?

 5    A    Yes.

 6    Q    They are created in the process of servicing a mortgage

 7    loan, yes?

 8    A    Yes.

 9    Q    And in the process of liquidating a mortgage loan, yes?

10    A    Well, not all of them, but generally some of them.

11    Yes.

12    Q    And you knew that if one or more of those documents

13    were missing the plan administrator did not consider the

14    file complete for purposes of its review, right?

15    A    I -- yes.

16    Q    And that there was placing the file on hold, right?

17    A    Yes.

18    Q    And you received correspondence, for example, from Mr.

19    Trumpp to that effect, right?

20    A    Mr. Trumpp, yes, and I believe Mr. -- from counsel as

21    well.

22         MR. ROLLIN:  Plan administrator 544, please.

23    BY MR. ROLLIN:

24    Q    So if you turn to plan exhibit -- plan administrator

25    Exhibit 544, if I find the right e-mail it was in that is on
```

Page 160

1    the screen, this is an example of the type of correspondence

2    that you received from the plan administrator concerning on

3    hold loans, right?

4    A    It was based on --

5    Q    It's in binder two.

6    A    I'm sorry.  What?

7    Q    It's in binder number two.  Sorry.

8    A    Well, this was based on phone conversations and

9    actually initiated by us and confirmed by Mr. Trumpp.  Yes.

10   Q    Well, sure, you initiated -- so if you take a look at

11   Mr. Pfeiffer's e-mail at the bottom of the page what you

12   initiated was an e-mail in response to a letter that you

13   received from Mr. Cosenza, right?

14   A    I believe so.  I do believe so, and conversations with

15   Mr. Trumpp.

16   Q    So in Mr. Cosenza's letter of April 14th, 2015 as

17   reflected there the plan administrator puts you on notice

18   that certain files were to be placed on hold for incomplete

19   documentation, right?

20   A    Yes.

21   Q    Okay.  Then Mr. Pfeiffer wrote and in the middle of the

22   page Mr. Trumpp writes back to Mr. Pfeiffer, right?

23   A    Yes.

24   Q    Now one of the things that Mr. Trumpp told you in this

25   correspondence and throughout is that although Exhibit B to

Page 161

1   the protocol order contains 40 or so documents, the plan

2   administrator would review the files even in their absence

3   except in circumstances where one of the four critical

4   documents had not been produced, right?

5   A    Yes.  That was extremely important to us that the plan

6   administrator not hold up their review on checking 40 plus

7   documents that was part of their completeness review.

8   Q    And you expressed to the plan administrator that it was

9   important to you, correct?

10  A    We confirmed our understanding of that.

11  Q    And the plan administrator, in fact, did continue to

12  review files notwithstanding the fact that documents within

13  the larger group may be missing, right?

14  A    Right.  Documents not applicable to certain loans may

15  be missing.

16  Q    Now this correspondence that we're referring to, plan

17  administrator 544, is very early in the protocol process,

18  right?

19  A    It is.  Yes.

20  Q    You knew from the very beginning of the protocol that

21  loans missing one or more of the four documents that were

22  critical to the plan administrator's review would be placed

23  on hold, right?

24  A    I believe the first letter was April 14th or around

25  that time and we had discussions with Mr. Trumpp prior to

Page 162

1    that letter.  So fairly early on in the protocol, not from

2    the begin -- not from the very beginning.

3    Q    When did you first start submitting claims, February,

4    March?

5    A    March, mid-March.

6    Q    So the very next month you were on notice of the on

7    hold, right?

8    A    We understood this was an issue, yes.

9    Q    Now when you provided the plan administrator

10   information the plan administrator had been looking for in

11   alternate forms, the plan administrator took those loans off

12   hold and reviewed them, right?

13   A    Not in all instances.

14   Q    Certainly in connection with the purchase price

15   information that plan administrator had been asking for,

16   right?

17   A    Not in all instances.

18   Q    That's because you have a disagreement with the plan

19   administrator about whether the information that you offered

20   in certain circumstances is sufficient to allow the plan

21   administrator to audit the purchase price calculations,

22   right?

23   A    My answer was not with regard to that.

24   Q    We'll come back to it.

25        Now throughout the course of the protocol, and I'm

Page 163

1    staying on this topic of missing -- the four missing

2    documents.  Throughout the course of the protocol the

3    trustees advised both the Court and the plan administrator

4    that you were working on collecting the documents that were

5    necessary for the review, isn't that right?

6    A    We tried very hard to work collaboratively on this

7    issue while the issue was still ripe.

8    Q    Maybe I didn't ask my question well, and I apologize.

9    The question was, throughout the course of the protocol the

10   trustees advised both the Court and the plan administrator

11   that they were working on collecting the documents that were

12   necessary for the review?

13   A    That we would work collaboratively to try to resolve

14   the issue is my understanding.

15          MR. ROLLIN:  Can I have TRX-861, please?

16   BY MR. ROLLIN:

17   Q    Would you please turn to TRX-861?  And that is in the

18   third binder.

19   A    I'm there.

20   Q    And TRX-861 is a status report sent by the trustees,

21   the final by the trustees in court, right?

22   A    That is correct.

23   Q    Can you turn to page 5, please, and to the last full

24   paragraph?

25   A    I'm there.

Page 164

1   Q    What the trustees wrote to the Court according to the

2   plan administrator in that filing is:

3        "Finally, a handful of loan files remain outstanding

4   from     other servicers.  The RMBS trustees continue to

5   work with     the servicers to obtain loan files still that

6   remain  outstanding as well as work with each servicer to

7   obtain   missing documents necessary to complete both the

8   RMBS     trustees' loan file review and the review of the

9   plan     administrator."

10       Did I read that correctly?

11  A    I believe you did.  Yes.

12  Q    And is that what the trustees told both the Court and

13  the plan administrator in their status report?

14  A    Yes.  That's absolutely what we told the Court and what

15  we did as we demonstrated earlier today.

16  Q    And that was -- that was the July 2015 status report,

17  right?

18  A    I see July 17th here.  But the -- so it was entered

19  July 17th.  It seems like the hearing date was July 22nd.

20  Q    Can you please turn to TRX-860?

21  A    I see that here.

22  Q    And TRX-860 is the September 2015 status report of the

23  RMBS trustees, right?

24  A    Correct.

25  Q    Page 3, please.

Page 165

1    A    I'm there.

2    Q    Last sentence, please.

3    A    Would you like me to read it?

4    Q    No.  I'll read it.  "The RMBS trustees have made

5    progress with respect to obtaining outstanding documents

6    that the plan administrator has advised are missing from the

7    6,179 RMBS claims."  Is that right?

8    A    That is correct.

9    Q    And that's --

10   A    I'm just trying to orient myself --

11   Q    Sure.  Sure.

12   A    -- in what we're exactly talking about here.

13        (Pause)

14   Q    What we're talking about here, Mr. Esses, is the

15   documents that the plan administrator identified as the four

16   critical documents that it required for its loan review,

17   right?

18   A    Sure, that we agreed to work collaboratively to -- in

19   order to resolve.

20   Q    Can you turn to TRX-858 in the same volume?

21   A    I'm here.

22   Q    That, sir, is the December 2015 status report of the

23   RMBS trustees, right?

24   A    Correct.

25   Q    Page 7, please.   Are you there?

Page 166

1   A    I'm there.

2   Q    And you see Subsection C, capital C?

3   A    Why am I not finding it?  Page -- oh, I'm on the wrong

4   page.  I see that here.  Yes.

5   Q    And there it says, "As noted the RMBS trustees are

6   pursuing certain servicing information and documents

7   requested by a plan administrator as provided in protocol,"

8   right?

9   A    Yeah.  We absolutely worked extremely hard to try to

10  get these documents to the extent they were available.

11  Q    I'm asking you.  This is what you advised the Court and

12  the plan administrator in your status report, right?

13  A    Yes.

14  Q    Okay.  And it says, "as provided in the protocol

15  order," right?

16  A    Where are you reading?

17  Q    The very end of what I just read to you under

18  Subsection C.  It's highlighted on your screen.

19  A    I see that.

20  Q    And that's what the trustees wrote?

21  A    Okay.

22  Q    Yes?

23  A    Yes.

24  Q    TRX-1111.  The other status report filed by the

25  trustees in this Court?

Page 167

1    A    Okay.

2    Q    March 2016, right?

3    A    Yes.

4    Q    Protocol's almost over?

5    A    Protocol's almost over.

6    Q    Page 8, please.

7    A    Eight of the document or eight of the exhibit?

8    Q    Eight of the exhibit.  Thank you.

9    A    I see that.

10   Q    Sorry.  I'm completely wrong.  It's eight of the

11   document.  It is page 12 of 14 of the exhibit.  Are you with

12   me?

13   A    I'm there now.

14   Q    Paragraph 19 at the top.

15   A    I'm there.

16   Q    As noted the RMBS trustees are pursuing certain

17   servicing information and documents requested by the plan

18   administrator as provided in the protocol order, right?

19   A    With a reference to protocol section four which I'm not

20   -- sitting here I'm not sure what that reference is.

21   Q    That is the status on that issue given by the trustees?

22   A    Yeah.  Understood.

23   Q    Can I ask you to look, please, at TRX-854?

24   A    I have that open.

25   Q    Thank you.

Page 168

1        And can I ask you to turn to page 6 of the exhibit,

2   please?  It's page 5 of the document.

3   A    I'm there.

4   Q    And at the very end there's a sentence that begins,

5   "plan administrator," and then it carries on to the next

6   page.  Are you with me?

7   A    I see that.

8   Q    And that sentence reads:

9        "The plan administrator submitted certain completeness

10       reviews identifying loans that are purported to be

11       missing documents that the plan administrator indicates

12       are necessary for its review which loans are currently

13       being put aside under the protocol by agreement of the

14       parties."

15          Right?

16  A    Yes.  I recall the agreement and the letter.

17  Q    That is what happened.  They were put aside by

18  agreement, right?

19  A    I believe held in abeyance while we worked through an

20  unbelievable amount of other loan files and progress.

21  Q    By agreement, right?

22  A    Yes.  By agreement.

23  Q    And this status report is from June 2016, right?

24  A    That is correct.

25  Q    And at that time the protocol with respect to the

Page 169

1    submission of claims is over?

2    A    I believe -- yes.  That is correct.

3    Q    Now let's talk about the trustees' efforts to obtain

4    the four critical documents required by the plan

5    administrator.  As you testified earlier when requested by

6    the plan administrator you made another request to the

7    servicers for the documents, right?

8    A    Yes.

9    Q    Which if successful and to the satisfaction of the plan

10   administrator would have resulted in the loans being

11   reviewed, right?

12   A    Correct.  Yes.

13   Q    Taken off hold, right?

14   A    Yes.

15   Q    And put through the protocol?

16   A    Yes.

17   Q    And in response to these additional requests if the

18   servicers said they did not have the documents the plan

19   administrator required you took their word for it, didn't

20   you?

21   A    Sorry.  I -- say that again.

22   Q    If the servicers said that they did not have the

23   documents the plan administrator was requesting you took

24   their word for it?

25   A    We did a lot more than that, actually.

Page 170

1    Q    You did take their word for it, didn't you?

2    A    No.  With these we -- they actually pointed us to the

3    documents in the file which we independently reviewed and

4    provided to the plan administrator.

5    Q    You remember our deposition, don't you?

6    A    I do.  Yes.

7    Q    Just a couple of months ago?

8    A    Yes.

9    Q    Let me show you a piece.  D-1, please.

10        (Pause)

11   A    There's no volume.

12   Q    Yeah.  I'm aware of that.

13        (Laughter)

14   A    Do you want to read the questions and I'll read the

15   answers?

16   Q    Let's see if we can get it.

17             MR. HEIDLAGE:  Can I have a page and line?

18             MR. ROLLIN:  You certainly can.  179, 24 to 180,

19   25.

20             MR. HEIDLAGE:  Thanks.

21             THE COURT:  What was the page and line?

22             MR. ROLLIN:  Your Honor, it was 179, line 24 to

23   180, line 25.

24             THE WITNESS:  Do I have a copy of that?

25             MR. ROLLIN:  Can I give the witness a copy of the

Page 171

1    deposition --

2              THE COURT:  Please.

3              MR. ROLLIN:  -- testimony?

4         (Pause)

5              MR. ROLLIN:  Okay.  I am going to do it the old

6    fashion way.

7              THE COURT:  Okay.  That works.

8              MR. ROLLIN:  Tell me when you're --

9              THE COURT:  If there is a technical difficulty and

10   you need our help from our people just let us know for

11   tomorrow.

12             MR. ROLLIN:  Thanks very much.

13   BY MR. ROLLIN:

14   Q    Are you on page 179, line 24?

15   A    Yes.

16   Q    "Question:  How did you confirm that the servicers sent

17        you everything with respect to every loan?

18        "Answer:  Through extensive communication and follow up

19        and confirmation with each of the servicers.

20        "Question:  That is another way of saying when the

21        servicers told you that they gave you everything you,

22   by   that mechanism, confirmed that they gave you

23   everything?

24        "Answer:  Generally, correct, except that there were

25        instances where we went back, you know, a second or

1    third    time or more to confirm on specific loans.

2         "Question:  But in every instance the confirmation that

3         you received was what the servicer was telling you they

4         had available?

5         "Answer:  In addition -- well, yes.  I'm not sure

6    there's  -- there was much more to do than that.  Yes.

7         "Question:  So you asked the servicers.  They told you

8         they didn't have anything else and that's the

9         confirmation that you are referring to?

10        "Answer:  It is.  Yes."

11        I asked you those questions and you gave me those

12   answers, right?

13   A    Yes.  Well, I'm reading this just to get the context.

14        (Pause)

15   A    I think --

16             THE COURT:  Well, I think we're going to leave it

17   there.  The question was simply whether you were asked those

18   questions and gave those answers, so your answer was yes.

19             THE WITNESS:  Well, this is -- sorry.

20             THE COURT:  If your counsel wants to make an

21   objection with respect to context or completeness, they will

22   do that.  Okay.  By your counsel I mean the trustees'

23   counsel.

24             MR. ROLLIN:   Your Honor, I think we can stop there

25   for the afternoon --

Page 173

1           THE COURT:  Okay.

2           MR. ROLLIN:  -- if that's alright.

3           THE COURT:  I think that's a good idea.  It's been

4    a pretty long day.

5           Okay.  So we'll call it a day, then, and we're

6    going to start tomorrow at 10:00 in the morning.

7           Same rules apply, Mr. Esses, overnight.  All right.

8           So have a good evening.  Everybody get home safely.

9           MR. HEIDLAGE:  Thank you, Your Honor.

10          THE WITNESS:  Thank you, Your Honor.  Have a good

11   evening.

12       (Whereupon, these proceedings concluded at 5:18 p.m.)

13                         * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2                    T E S T I M O N Y

3     DEBTOR'S

4     WITNESS                 EXAM BY                    PAGE

5     EDMOND DAVID ESSES      MR. HEIDLAGE                  6

6                             MR. ROLLIN                  151

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 175

1                          C E R T I F I C A T I O N

2

3        We, Dawn South and Sherri L. Breach, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o, ou,
                   email=digital1@veritext.com, c=US
7    _____    Date: 2017.12.13 12:16:51 -05'00'

8    Dawn South

9    Certified Electronic Transcriber

10   Sherri L      Digitally signed by Sherri L Breach
                   DN: cn=Sherri L Breach, o, ou,
     Breach        email=digital1@veritext.com,
                   c=US
11   _____    Date: 2017.12.13 12:19:36 -05'00'

12   Sherri L. Breach

13   AAERT Certified Electronic Reporter & Transcriber CERT*D-397

14

15

16

17   Date:  December 12, 2017

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501