Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS, INC.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  December 12, 2017

17                  10:06 AM

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JONATHAN

1    HEARING re RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   HOLWELL SHUSTER & GOLDBERG LLP

4        RMBS Trustees

5        750 Seventh Avenue, 26th Floor

6        New York, NY 10019

7

8   BY:  NEIL R. LIEBERMAN

9        DWIGHT A. HEALY

10       DANIEL P. GOLDBERG

11       MICHAEL S. SHUSTER

12       BENJAMIN F. HEIDLAGE

13

14  ROLLIN BRASWELL FISHER LLC

15       Attorneys for the Debtor

16       8350 E. Crescent Parkway, Suite 100

17       Greenwood Village, CO 80111

18

19  BY:  MARITZA DOMINGUEZ-BRASWELL

20       MICHAEL ROLLIN

21

22

23

24

25

Page 4

1    WILLKIE FARR & GALLAGHER LLP

2          Attorneys for the Debtor

3          787 Seventh Avenue

4          New York, NY 10019

5

6    BY:  TODD G. COSENZA

7          BENJAMIN P. MCCALLEN

8

9    HUGHES HUBBARD & REED LLP

10          Attorneys for the Trustee

11          One Battery Park Plaza

12          New York, NY 10004

13

14    BY:  JEFFREY S. MARGOLIN

15

16    SECURITIES INVESTOR PROTECTION CORPORATION

17          1667 K Street N.W., Suite 1000

18          Washington, D.C. 20006

19

20    BY:  KENNETH J. CAPUTO

21

22    EDMOND ESSES, Witness

23

24    JAMES H. ARONOFF, Witness

25

1     ALSO PRESENT TELEPHONICALLY:

2

3     THOMAS ALSTON

4     KYLE BURNS

5     AMANDA DARWIN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2              THE COURT:  Good morning, Mr. Esses.  How are you?

3              MR. ESSES:  Good morning.

4              MR. ROLLIN:  Good morning, Your Honor.

5              THE COURT:  Everyone ready?

6              MR. ROLLIN:  Yeah.

7              MR. GOLDBERG:  We are, Your Honor.

8              MR. ROLLIN:  Your Honor, just by way of update

9    concerning timing, and I advised Mr. Goldberg as well, I

10   think we'll go probably about two hours or so.  We've done a

11   lot to try to streamline and cut this.

12             THE COURT:  Okay.

13             MR. ROLLIN:  We know it's important, particularly

14   in light of the truncated schedule of Mr. Aronoff tomorrow,

15   to try to get him on today.

16             THE COURT:  Okay.

17             MR. ROLLIN:  So, we're doing our part and --

18             THE COURT:  Okay.

19             MR. ROLLIN:  -- we're going to move forward.

20             THE COURT:  Wonderful.

21             MR. ROLLIN:  May I proceed?

22             THE COURT:  Yes.

23             MR. ROLLIN:  Jason, will you put Plan

24   Administrator 783 on, please?  And Page 2.

25                  CROSS-EXAMINATION OF EDMOND ESSES

Page 7

1    BY MR. ROLLIN:

2    Q    Mr. Aranoff, plan administrator exhibit --

3    A    Mr. Esses.

4    Q    -- I'm sorry, Mr. Esses.  We'd been talking about

5    (Indiscernible) this morning.  Mr. Esses, Plan Administrator

6    783 is an excerpt from one of the claims tracking

7    spreadsheets, right?

8    A    Right.  So, this is the Excel version.  It's the --

9    what we were shown yesterday was a PDF version.  This is the

10   Excel version of that.

11   Q    That's right.  In the PDF version you see one claim per

12   PDF but in the Excel version there are multiple rows and

13   each row represents a claim, right?

14   A    Not one claim per PDF.  One claim per series of pages.

15   Q    Understood.  And with respect to the version that was

16   in Excel, an excerpt of which is before you, that shows

17   multiple loans, one per line, and multiple claims, if there

18   are multiple claims, on each line, right?

19   A    That's correct.

20   Q    And will you take a look at column W, please?

21   A    I see that, yes.

22   Q    In column W is the total purchase price, right?

23   A    Yes.

24   Q    That is the amount of money that the Trustees assert

25   should be paid by the Lehman estate for each allegedly

Page 8

1    breaching loan, right?

2    A    Yes, under the terms of the governing agreements.

3    Q    And the purchase price numbers that you included in the

4    claim tracking spreadsheet here in column W, those came from

5    the master servicer, right?

6    A    The -- yes.

7    Q    And that information actually rolls up from the

8    servicer who actually handles the loan and the borrower to

9    the master servicer, and then you got it from the master

10   servicer; am I right?

11   A    Yes.

12   Q    And you took those numbers from the master servicer and

13   you put them on the claims tracking spreadsheet and you

14   passed them on to the plan administrator as the amount of

15   damages requested, right?

16   A    Purchase price.

17   Q    That is the amount of money per loan that the Trustee

18   believes it's entitled to?

19   A    Yes, in exchange for the loan.

20   Q    In the case of a liquidated loan, there is no loan,

21   right?

22   A    I'm not sure of the accurate description of that, but

23   there's no -- the loan has liquidated so they're not selling

24   back a liquid -- I mean, to the extent, you know -- there's

25   not -- right.  The loan has been liquidated.

Page 9

1   Q    Meaning there is no loan, right?

2   A    I'm not sure that's technically accurate depending on,

3   you know, whether you get a liquidated deed or any potential

4   recoveries on that, but generally -- I understand what

5   you're saying.

6   Q    There's nothing to exchange, right?  The plan

7   administrator's not getting a loan back in exchange for the

8   purchase price that you put in column W of the claims

9   tracking spreadsheet, all right?

10  A    I'm not exactly sure, so again, to the extent there's a

11  liquidated deed or whatever may be left of the loan would be

12  the plan administrator's, but I'm not sure of the technical

13  term for that.

14  Q    And with respect to a non-liquidated loan, you're still

15  asserting the same purchase price, correct?

16  A    Correct.

17  Q    We'll talk about in a little while the positions with

18  respect to non-liquidated loans, but the point for the

19  moment is column W represents the amount of money that you

20  would like the Court to award on a per-loan basis, right?

21  A    The purchase price in exchange for the loan as per the

22  governing agreements, yes.

23        MR. ROLLIN:  Your Honor, can I have the witness

24  just say or now?

25        THE COURT:  Yeah.  Okay.  Mr. Esses, this is

Page 10

1    cross-examination.  I'm sure counsel for the Trustees has

2    advised you as to how this goes.  Mr. Rollin is entitled to

3    ask you questions calling for a yes or no answer to the best

4    of your ability.  Would you please answer them with yes or

5    no?  If there are matters that need to be clarified, counsel

6    for the Trustees will take them up on direct, but we're not

7    going to make it through the day if you continue to give

8    long narrative answers to yes and no questions, all right?

9    Thank you.

10   Q    So, column W represents the amount of money that you

11   would like the Court to award on a per-loan basis, right?

12   A    I -- just -- it's the purchase price.

13           THE COURT:  Okay, Mr. Esses.

14           MR. ESSES:  I'm sorry.

15           THE COURT:  Okay.  I understand what you're trying

16   to say, okay?  Let's all agree that the Trustee's position

17   is that it's the purchase price and the plan administrator's

18   position is that it is damages and not technically speaking

19   a purchase price.  So, let's kind of move on from that

20   discussion between you and Mr. Rollin, okay?  Go ahead, Mr.

21   Rollin.

22           MR. ROLLIN:  Thank you, Your Honor.

23   Q    And it was Duff & Phelps' responsibility to identify

24   the purchase price from the materials provided by the

25   servicer and the master servicer and to put it on the claims

Page 11

```
 1    tracking spreadsheet, right?

 2    A    Yes.

 3    Q    And other than in a handful of instances, nobody made

 4    sure that the calculations included in the claims tracking

 5    spreadsheet were correct, right?

 6    A    We did ensure that we were reporting the correct

 7    values.

 8    Q    Who at Duff & Phelps -- strike that.  Nobody at Duff &

 9    Phelps calculated or verified the accuracy of the realized

10    losses.  Am I right?

11    A    We didn't audit the -- we didn't audit that number.

12    Q    Right.  And you also didn't audit the calculation of

13    accrued interest, correct?

14    A    Correct.

15    Q    And you also didn't audit the calculation of fees and

16    expenses, correct?

17    A    Correct.

18    Q    And those are the three components of the purchase

19    price, correct?

20    A    Correct.

21    Q    So, we have three components of a purchase price that

22    you put in column W of the claims tracking spreadsheet that

23    Duff & Phelps didn't audit?

24    A    We took great care to make sure it was -- the numbers

25    were accurate, but we didn't audit it in the sense of an
```

Page 12

1   audit.

2   Q     In the sense of making sure they were right?

3   A     I take issue with that characterization, but I think

4   where -- I understand what you're saying.

5   Q     Well, can you answer my question, though, not whether

6   you understand it?  It is accurate, isn't it, that you

7   didn't make sure the numbers were right?  You yourself did

8   not -- you, the Trustees, did not make sure the numbers that

9   were included in the purchase price were right?

10  A     I did.

11  Q     Did you?

12  A     I did.

13  Q     You took them from the master servicer and you put them

14  on a spreadsheet, correct?

15  A     And I made sure that was right.

16  Q     Oh, the transfer of a figure from the master servicer

17  to the claims tracking spreadsheet.  That's what you made

18  sure was right?

19  A     Yes.

20  Q     But the underlying calculation, nobody made sure that

21  was right?

22  A     There are various ways to check that that we did on a

23  global basis to ensure that it was correct.

24  Q     Nobody made sure that those numbers that you

25  transferred from the master servicer over to the claims

Page 13

1     tracking spreadsheet were right, correct?

2     A     Correct.

3     Q     And you testified yesterday that you understood the

4     plan administrator wanted the loss calculations or the loss

5     certifications and the corporate expense logs because they

6     wanted to audit the damages calculations, right?

7     A     I did, yes.

8     Q     And you understand that the loss certification or a

9     similar worksheet is where the servicers show their math

10    concerning the calculation of loss with respect to any

11    particular loan, right?

12    A     To the extent that document is required, yes.

13    Q     My question was not whether that document was required

14    under the protocol or otherwise.  My question was you

15    understand that the loss certification or a similar

16    worksheet is where the servicers show their math concerning

17    the calculation of loss with respect to any given loan,

18    right?

19    A     I understand that may be a place where they show their

20    math.

21    Q     Will you take a look at your deposition please?  166 --

22    Page 166?  I'll be looking at lines -- line 19 through 167.

23    Tell me when you're there.  All right.  Are you ready for me

24    to ask you a question, Mr. Esses?

25    A     Yes.

Page 14

1  Q    My question 166, line 19:  "To the extent that you

2  understand the term loss certification, what do you

3  understand that document to be?"  Your answer:  "Sure.  As I

4  explained and demonstrated by the plan administrator during

5  the protocol, it's the document that is prepared by the

6  servicer upon foreclosure or liquidation" --

7  A    I'm sorry to interrupt you.  I lost the place.

8  Q    Okay.  I'll be happy to start again.  Are you --

9  A    What page are we on?

10  Q    166.

11  A    Okay.

12  Q    Line 19.

13  A    Thank you.

14  Q    My question.  "To the extent that you understand the

15  term loss certification, what do you understand that

16  document to be?"  Your answer:  "Sure.  As explained and

17  demonstrated by the plan administrator during the protocol,

18  it's the document that is prepared by the servicer upon

19  foreclosure or liquidation of a property that basically

20  calculates the various expenses associated with the

21  liquidation, the recoveries, and the ultimate loss at that

22  point in time."  Question:  "It's the servicer showing their

23  math on how they get to the loss number, right?"  Your

24  answer:  "In effect, yes."  I asked you those questions and

25  you gave me those answers, right?

Page 15

1    A     Yes.

2             MR. HEIDLAGE:  Objection.

3             MR. ESSES:  That's exactly --

4             THE COURT:  Yes?

5             MR. HEIDLAGE:  I think that additional lines need

6    to be read for context in this case.

7             THE COURT:  Okay.  Go ahead.

8             MR. HEIDLAGE:  Sure.  On -- starting on 166, lines

9    11 through 18, which was right -- immediate before the

10   quote.  Question:  "Mr. Esses, you told me you weren't

11   familiar with the term or I believe you told me you weren't

12   familiar with the term or the document in general called a

13   loss certification."  Answer:  "I believe my testimony was

14   that it's not a term that's recognized throughout the

15   industry by all services."

16             And then continuing after where Mr. Rollin left

17   off -- in effect, yes -- line 11 on Page 167.  Question:

18   "And although you may not be familiar with it outside of the

19   protocol as a loss certification, you've seen these types of

20   documents in the course of your work in the (indiscernible)

21   industry, haven't you?"  Answer:  "Yes.  This is something

22   that servicers do.  They calculate losses, right?  Sure.

23   Yes?"  Question:  "And they have documents in which they

24   show their math?"  Answer:  "Maybe."  Question:  "Not maybe

25   but yes.  You know that happens?"  Answer:  "Not necessarily

Page 16

1    a document."

2             MR. ROLLIN:  May I continue reading just briefly?

3    (Indiscernible).

4             THE COURT:  I mean, we could go all day, but I

5    think that in light of what's just been read, Mr. Rollin,

6    you can continue reading.

7             MR. ROLLIN:  Sure.  Page 168 beginning line 2.

8    Question:  "They have some mechanism by which they show the

9    math that leads to the loss number, right?"  Answer:  "Would

10   you repeat that?"  Question:  "Sure.  They have some

11   mechanism by which they can show their math on what leads to

12   the loss number."  Answer:  "Okay."  Question:  "Do you

13   agree with that?"  Answer:  "I agree it's somewhere in their

14   system."

15            THE COURT:  All done here?

16            MR. ROLLIN:  Yes.

17            THE COURT:  Okay.  Keep going.

18   Q    I asked you all those questions and you gave all those

19   answers?

20   A    Yes.

21   Q    And you understand that a corporate expense log -- now

22   we're talking about the other document -- corporate expense

23   log is where the servicers maintain a record of cumulative

24   expenses, correct?

25   A    Correct.

Page 17

1    Q    And you would expect prudent servicers to maintain some

2    record of the status of cumulative expenses, wouldn't you?

3    A    Yes.

4    Q    Now, in a number of instances, as you know, there are

5    still loans on hold because that information has not been

6    provided to the satisfaction of the plan administrator for

7    the purposes of its audit of the purchase price

8    calculations, right?

9    A    I understand that to be the case, yes.

10   Q    Now, we talked about the status conferences that we had

11   many times during the course of the protocol.  You remember

12   that?

13   A    I do, yes.

14   Q    And do you remember that on quite a number of occasions

15   Her Honor mentioned that she's available to assist the

16   parties in the collection of documents if that was

17   necessary?  Do you remember that?

18   A    I do, yes.

19   Q    You did not take the Court up on Her Honor's offer to

20   assist to ensure that all records were collected.  Isn't

21   that right?

22   A    We did not issue -- we did not.  That's correct.

23   Q    In fact, what you believe is that if in receiving the

24   status updates that we looked at yesterday the Court

25   believed that you needed help collecting documents, the

Page 18

1   Court, to use your words, could have spoken up, right?

2   A    I mentally have given a status to the Court, yes.

3   Q    And that if the Court thought on her own that you

4   needed help based on those status updates, Her Honor could

5   have spoken up; isn't that true?

6   A    I might have phrased it that way, yes.

7   Q    You did phrase it that way in your deposition, didn't

8   you?

9   A    Yes.  In the context, yes.

10  Q    And you -- in the context?

11          MR. ROLLIN:  Can we show the clip?

12          MAN 1:  What's the number?

13          MR. ROLLIN:  It is E-2.

14          THE COURT:  Can you give a page and line, please?

15          MR. ROLLIN:  Yes, Your Honor.  I apologize.  It's

16  Page 203, 13 to 204, 20.

17      [PLAYS RECORDING]

18          MR. ROLLIN:  And tell me, please, how many times

19  did you go back to the Court and ask the Court's assistance

20  in obtaining documents by the servicers?

21          MR. ESSES:  I don't recall the specific number of

22  the status conferences.  I believe it was three or four.

23  But I believe we provided an update to the Court on the

24  receipt of loan files in each of those status conferences.

25          MR. ROLLIN:  I didn't ask you about updates.  I

1    asked you how many times did you go back to the Court and

2    ask the Court's assistance in obtaining documents from the

3    servicers?  What's the number -- the answer to that

4    question?

5             MR. ESSES:  In my mind, those are updating the

6    Court to our (indiscernible).  We didn't feel it was

7    necessary to ask the Court's help in those instances.

8             MR. ROLLIN:  So, updating the Court in your mind

9    is the same as asking the Court's assistance to get

10   documents from the servicers, right?

11            MAN 1:  (Indiscernible)

12            MR. ESSES:  To the extent the Court felt it was

13   necessary to get involved, I think the (indiscernible)

14   assumption was that that's -- that we were proving an update

15   with that.  And, you know, if anybody felt otherwise they

16   were open to speak up, including the Court.

17        [RECORDING ENDS]

18   Q    I asked you those questions and you gave those answers?

19   A    Yes.

20   Q    And you didn't send the subpoenas to get the documents

21   the plan administrator was asking for, did you?

22   A    We did not.

23   Q    You didn't ask for the Court's help?

24   A    We did not.

25   Q    Now, you did mention on direct that there were a couple

Page 20

```
1    of instances in which you sent subpoenas to services for the

2    origination documents, right?

3    A    Correct.

4    Q    Those were effective, weren't they?

5    A    Yes.

6    Q    Subpoenas sharpened those guys -- the servicers' focus,

7    didn't they?

8    A    In those instances, yes.

9    Q    I'd like to talk about another aspect of the damages

10   portion of the case, and that is this.  No one on behalf of

11   the Trustees did anything to determine whether the actions

12   of any party other than Lehman caused losses on the loans

13   that were submitted as claims to the Lehman estate, right?

14   A    That is correct, yes.

15   Q    Trustees didn't think that was necessary?

16   A    Correct.

17   Q    And so, you cannot disaggregate that portion of loss

18   which may have been caused by the Lehman estate from that

19   portion of loss which may be caused by something completely

20   unrelated?

21   A    I'm sorry.  Would you repeat the question?

22   Q    You cannot disaggregate that portion of loss that may

23   have been caused by the Lehman estate from that portion of

24   loss which could be caused by something else?

25   A    I can only speak to what we had done and we had not
```

Page 21

```
 1    done that.
 2    Q    So -- and therefore you cannot do that.  You cannot
 3    disaggregate it.
 4    A    I don't know that that's the case.
 5    Q    But it hasn't been done, right?
 6    A    Yes.  That was my testimony.
 7    Q    And losses to the trusts on account of any of these
 8    loans could be caused by something completely unrelated to
 9    any conduct of a Debtor, right?
10    A    It's possible, yes.
11    Q    We don't know that?
12    A    I don't know that.
13    Q    It wasn't part of the Trustee's process to find that
14    out?
15    A    That is correct.
16    Q    And yet you asked the Lehman estate to compensate the
17    trust for all the losses, right?
18    A    Yes.
19    Q    The other thing you didn't do is that nobody on behalf
20    of the Trustees did any analysis at all to determine whether
21    the trusts or any of their representatives had properly
22    mitigated the losses, right?
23    A    That's correct.
24    Q    Mr. Esses, I'd like to move away from the question of
25    damages and move onto the substantive review of
```

Page 22

1    (indiscernible), okay?

2    A    Okay.

3    Q    One of the roles that you filled in the protocol was to

4    allocate and oversee the review of loans by the five re-

5    underwriting vendors, right?

6    A    That is correct.

7    Q    And the vendors are Digital Risk?

8    A    Yes.

9    Q    And Digital Risk is based in Florida, right?

10   A    Yes.

11   Q    And Opus.  And Opus is based in the upper Midwest in

12   Illinois?

13   A    It's outside of Chicago.

14   Q    CrossCheck is in Illinois?  That's the third.

15   A    Yes.

16   Q    Oak Leaf is the fourth and they're in D.C.?

17   A    Correct.

18   Q    And EdgeMAC is the fifth and they're in California?

19   A    Correct.

20   Q    And all five of these firms were reviewing loan files

21   for the (indiscernible) Trustees?

22   A    Yes.

23   Q    And as we talked about yesterday, what the -- and you

24   gave quite a bit of detail about what the loan file review

25   (indiscernible) did was they took the loan file and they

Page 23

1    consulted whatever sources they thought were appropriate to

2    determine whether they thought there were breaches of

3    representations and warrantees, right?

4    A    Yes.

5    Q    And as we talked about yesterday, the foundation of

6    that work is the loan (indiscernible), right?

7    A    Correct.

8    Q    Now, the file that the Trustees' vendors used was a

9    scanned copy, right?

10   A    Yes.

11   Q    Obtained from the servicers, right?

12   A    Yes.

13   Q    Now, that file was born 7 to 13 years before it was

14   reviewed, correct?

15   A    Yes.

16   Q    It was born at a closing table somewhere in America?

17   A    Yes.

18   Q    In hard copy?

19   A    I have no specific knowledge to these loans, but I'd

20   imagine so.

21   Q    Well, you were a loan officer?

22   A    Yes.

23   Q    You've attended many closings?

24   A    I have, yes.

25   Q    And you're familiar that when you sit at the closing

1   table there are a number of people around the table,

2   correct?

3   A    Correct.

4   Q    There's a closing agent who has you sign all of the

5   pieces of paper?

6   A    That's right.

7   Q    And they stack up in a pile, right?  Is that yes?

8   A    Yes.

9   Q    Sorry.  You have to answer audibly.

10  A    Okay.

11  Q    And then they get put into each person's file, correct?

12  A    Yes.

13  Q    And that's all in hard copy, right?

14  A    Yes.

15  Q    You ever seen a closing done with a digital copy?

16  A    I have not.

17  Q    You don't know anything about the specific origination

18  practices of many -- of any of the thousands of originators

19  that created the loan files, correct?

20  A    Can you be a bit more specific?

21  Q    Sure.  You don't know what their -- what each

22  individual originator's practice was with respect to

23  creating the loan file, correct?

24  A    Yes.

25  Q    Or you don't know what their -- the originator's

Page 25

1    practices are with respect to the movement of that file from

2    the closing table to the originator's office, within the

3    originator's office to the servicer, and within the

4    servicing (indiscernible), do you?

5    A    I do not.

6    Q    You don't know how they were handled by any of those

7    people?

8    A    I do not.

9    Q    And you don't know when they were scanned?

10   A    I do not.  I have an idea of when the Aurora files were

11   scanned but otherwise I don't have personal knowledge of the

12   other servicers.

13   Q    You don't have personal knowledge at all, even with

14   respect to Aurora?

15   A    Well, I was told something but that's the knowledge I

16   have.

17   Q    But you do know that they were scanned at some point?

18   A    That's my understanding, yes.

19   Q    Because that's how you got them?

20   A    Exactly, yes.

21   Q    But you don't know when, you don't know by whom?

22   A    I don't know when.  I don't know by whom.

23   Q    And you don't know whether any documents went missing

24   in the course of the loan files' travels between the

25   origination table and the time that it got to you?

Page 26

1    A    I would have -- I would not have personal knowledge of

2    that.

3    Q    And it wasn't part of the Trustees' process to know

4    that, was it?

5    A    There may have been a general understanding that I

6    didn't personally have but it wasn't part of my process to

7    specifically confirm that chain of documents.

8    Q    It was not part of the Trustees' process in

9    implementing the protocol to make sure that they knew that

10   the loan file they were looking at was identical to the loan

11   file that was created at the closing table, right?

12   A    That was not part of my responsibilities, yes.

13   Q    And was it -- and I'm not focusing just on you, Mr.

14   Esses.  I'm focusing on the Trustees' protocol process.

15   There was -- it was not part of that process to make sure

16   that the file that you reviewed was identical to the file

17   that was born at the closing table, right?

18   A    I'm testifying that there may have been a general

19   understanding, but it wasn't specifically part of the

20   process that I oversaw.

21   Q    Well, was the general understanding that the file was

22   identical?

23   A    I can't speak to that.

24   Q    Did you assume for purposes of your review that the

25   file was identical?

Page 27

1    A    Yes.

2    Q    But you understand that all along the way there was

3    opportunity for changes to the file, right?

4    A    I don't have personal knowledge, but I understand they

5    were scanned at some point over time.

6    Q    But you understand that all along the way there was

7    opportunity for changes to the file, right?

8    A    I understand, yes.

9    Q    And as I said before, there were multiple people at the

10   closing table, correct?

11   A    Yes.

12   Q    And there are multiple files that are created, right?

13   A    Yes.

14   Q    One goes to the borrower, for example, right?

15   A    Yes.

16   Q    One may go to the seller, right?

17   A    Yes.

18   Q    There might be attorneys involved?

19   A    Yes.

20   Q    One goes to the originator?

21   A    Yes.  I don't have specific knowledge of that, but I'd

22   presume so.

23   Q    You believe that's the case?

24   A    I believe that's the case.

25   Q    And everybody takes their copy of the file with them,

Page 28

```
 1   right?

 2   A    Generally, yes, they take their copy.

 3   Q    But the only copy you got was the servicer's copy?

 4   A    That is correct.

 5   Q    Do you know that the Trustees or their custodians get

 6   copies of what are called mortgage files, but which are a

 7   subset that contain the key legal documents?

 8   A    I have a general understanding of that, not a specific

 9   knowledge of that.

10   Q    And your general understanding is yes, that's true, the

11   Trustees do get such a file?

12   A    I know what is required under the trust agreement, but

13   again, I don't have specific knowledge of what they do or

14   don't receive.

15   Q    And what you understand under the trust agreement is

16   that they do get such a file, right?

17   A    Yes.  The custodian.

18   Q    Right.  The Trustee or the custodian on behalf of the

19   Trustee, right?

20   A    Agreed, yes.

21   Q    And you did not get those files from the Trustees in

22   this process, did you?

23   A    We did not, no.

24   Q    You didn't ask for them?

25   A    No.
```

Page 29

1    Q    And they weren't offered?

2    A    That's correct.

3    Q    And you know that you filed thousands -- tens of

4    thousands of claims alleging missing documents, right?

5    A    Yes.

6    Q    Now, some of those are disclosure documents where the

7    disclosure has to go to the borrower, correct?

8    A    Correct.

9    Q    Those are the truth-in-lending documents, right?

10   A    Yes.

11   Q    And the -- and like a HUD-1?

12   A    Yes.

13   Q    And there are other claims that aren't necessarily

14   based on documents that go to the borrower but other missing

15   documents in the file, correct?

16   A    Yes.

17   Q    And yet, the Trustees asserted all of these missing

18   document claims without confirming that the documents were

19   actually missing from all of the potential loan file

20   sources, right?

21   A    Yes.

22   Q    Now, another of the jobs that you did, and you talked

23   about this quite a bit, was you reviewed the breach claims

24   and the claim packages -- claim files, the smaller ones,

25   that came from the loan review firms up to Duff & Phelps,

Page 30

1   right?

2   A    I did review them, yes.  Not all of them.  A number of

3   them.

4   Q    Right.  Understood.  And you did that because you

5   wanted to make sure that the re-underwriter's work met Duff

6   & Phelps standards, right?

7   A    As my -- as part of my project management

8   responsibilities, yes.

9   Q    And you wanted to make sure you knew what was going on

10  at a detailed level?

11  A    Yes.

12  Q    And you're specifically referring to understanding at a

13  detailed level what is going on with respect to the breach

14  findings, yes?

15  A    Yes.

16  Q    That's the narrative, right?

17  A    Yes.

18  Q    And the claim packages.  That's the small file, right?

19  A    Yes.

20  Q    I think you testified yesterday you oversaw the whole

21  process?

22  A    Not everything but the process part of it, yes.

23  Q    Certainly everything we just talked about, right?

24  A    Yes.

25  Q    I'd like to talk about that process a little bit more.

Page 31

1    Can we show plan administrator 69?  Plan administrator 69 is

2    a copy of Mr. Aronoff's reply report.  I'll show you

3    something there and then (indiscernible).

4    A     What binder?

5    Q     That is a fair question.

6    A     (Indiscernible).

7    Q     Number one.

8            THE COURT:  Can you come up for a second, Mr.

9    Rollin?

10           MR. ROLLIN:  Sure.

11           THE COURT:  You folks?

12       (Recess)

13           MR. ROLLIN:  You can take that down.

14   Q    Mr. Esses, you -- we talked about -- you described in

15   some detail yesterday that Trustees' process -- and I just

16   want to get a few points.  It begins with the underwriting

17   firms, right?  Actually, can you show the Trustee opening

18   slide number 41?  This is from the -- do you recognize this

19   being from the Trustees' opening slide deck?

20   A     Generally recognize it.  I'll take your word --

21   Q     Yeah.

22   A     -- it's from the --

23   Q     There is a copy of it in the -- for Your Honor as well

24   -- there's a copy of it in the binders.  It's the last

25   binder, number three, and I think it's the last document.

1            THE COURT:  Thank you.

2    Q    You there?

3    A    I am, yes.

4    Q    Good.  Thank you.

5            THE COURT:  I am not.

6            MR. ROLLIN:  Okay.

7            THE COURT:  It's in three?

8            MR. ROLLIN:  It should be number three and I

9    believe it's the very last document.

10            THE COURT:  Yeah, I'm not with you.  I've got --

11    the last thing that I have in that binder is Mr. Aronoff's

12    report at TRX-625.

13            MR. ROLLIN:  Maybe we added something.  It's just

14    called TT Open.  It's probably (indiscernible).

15            THE COURT:  Okay.  I'll just look at it on the

16    screen and then just if you would just make sure we get a

17    copy, that would be great.

18            MR. ROLLIN:  I will, Your Honor.

19            THE COURT:  Okay?  So, it's TT Opening.  You can

20    keep going, Mr. Rollin.

21            MR. ROLLIN:  Thank you, Your Honor.  I apologize

22    for that.

23            THE COURT:  No problem.

24    Q    And this fairly represents the Trustees' process,

25    right?

Page 33

1   A    It actually does not.

2   Q    The Trustees' opening slide does not fairly represent

3   the Trustees' process?

4   A    I think there's an -- you know, it depicts me as being

5   on the QC-1 team.  I mean, I was part of the process.  I

6   wasn't -- if this is to depict me as an overseer of the --

7   part of the QC process, I'd say it's not, you know, exactly

8   accurate.

9   Q    Okay.  Other than that, are there any other

10  inaccuracies?

11  A    I mean, you know, the materiality refers to AMA, I

12  believe, in this over here, not specifically but the process

13  is as I've described, the QC-1 team of underwriters and Mr.

14  Aronoff's team at QC-2.

15  Q    So, what you're doing is you're clarifying that in

16  connection with QC-2, which is point number three, the term

17  materiality refers to AMA, correct?

18  A    Yes.

19  Q    Other than that, this accurately depicts the process?

20  A    And what I described earlier to the extent it does, you

21  know, indicate that I, you know, was part of that QC

22  determination.

23  Q    I understand.  And this is the misrepresentation of

24  income slide.  But this fairly depicts the process subject

25  to the two points that you've made with respect to all of

Page 34

1    the claim types, right?

2    A    Yes.  A clarification on that?

3    Q    Sure.

4    A    There were certain -- I believe as I described, there

5    were certain -- when you say all breach types, there were

6    certain breach types that didn't necessarily go through QC-

7    1, so that's -- so, if you show me each of the -- not all

8    breach types but to the extent we look at individual breach

9    types, I can confirm with regard to that breach type.

10   Q    This is the process that applied to misrepresentation

11   of income, correct?

12   A    Correct.

13   Q    And this was the process that applied to

14   misrepresentations of debt, right?

15   A    Yes.

16   Q    And this is the process that applied to

17   misrepresentations of employment, right?

18   A    Yes.

19   Q    In fact, this applied to all misrepresentation claims?

20   A    Yes.

21   Q    The only way in which it's different is in certain

22   instances when QC-1 did not review a file that had comp up

23   from the review firms, correct?

24   A    Correct.

25   Q    And that was in connection with certain missing

Page 35

1    document claims?

2    A    That's correct, yes.

3    Q    I think you testified in deposition there were certain

4    other claims that it just wasn't cost-effective to do that,

5    right?

6    A    As part of -- they would have overlapped -- they

7    overlapped to the missing document claims.  So, it was

8    really essentially one category.

9    Q    Just missing document claims skipped QC-1?

10   A    There was nothing for the QC-1 team to -- supporting

11   documentation for them to confirm, so, yes, it skipped QC-1.

12           MR. ROLLIN:  Can you pull up TRDX-108?

13   Q    You have before you TRDX-108, yes?

14   A    Yes.

15   Q    This is yesterday from your direct?

16   A    Yes.

17   Q    And I apologize for the quality.  We had to photo copy

18   it.  And these TRDX-108 speaks to the second level of

19   review.  Do we have 107?  This is the initial loan review

20   that happens at the loan review (indiscernible), correct?

21   A    Yes.

22   Q    And the bullet points on the right are the things that

23   they did, right?

24   A    Yes.

25   Q    So, they take the loan file and they take the third-

Page 36

1   party sources, correct?

2   A     Yes.

3   Q     And they produce two things.  They produce the breach

4   narrative and the claim package like we talked about.

5   A     I identified some additional templates and data points

6   yesterday, but yes.

7   Q     And can we go back to PA-783?  And just to give a --

8   and I want to take a look at the breach narrative.  And that

9   would be AD -- column AD, right?  Just as an example so we

10  have it.  Is that right?

11  A     Yes.

12  Q     So, a breach -- sample breach narrative is the loan

13  file did not contain a copy of the appraisal, correct?

14  A     Yes.

15  Q     Or down below for the other loan it says the loan file

16  was missing a final HUD-1 statement for the subject loan,

17  right?

18  A     Yes.

19  Q     Just so we have an example.  Now, one of the things

20  that you testified on direct was that the re-underwriters at

21  the loan review firms were tasked with determining the

22  borrowers for income claims for their actual income,

23  correct?

24  A     Correct.

25  Q     That's what we called the -- or you called the verified

Page 37

1    income, right?

2    A    I believe I called it the actual but either -- I

3    believe I called it the actual.

4    Q    Can we go back to that -- Page 41 from the Trustees'

5    slide?  The opening slide there.  So, the loan review firm

6    would verify the borrower's income?

7    A    Verify works as well, yes.

8    Q    Okay.  And that would be -- and so they -- that would

9    be true for misrepresentation of debts.  They would verify

10   the actual debts, right?

11   A    Correct.

12   Q    And occupancy.  They would verify the actual occupancy?

13   A    Yes.

14   Q    And they would verify the actual employment, correct?

15   A    Yes.

16   Q    And they would verify the actual DTI, right?

17   A    Yes.

18   Q    And to verify the actual DTI, you need the actual debt

19   and you need the actual income, right?

20   A    Yes.

21   Q    At least that's what they were tasked with doing, with

22   verifying the actual facts about the borrower, right?

23   A    Yes.

24   Q    And in order to do that, the review firms used whatever

25   evidence types were appropriate to them?

Page 38

1    A    Industry accepted, yes.

2    Q    They could use whatever evidence types they thought

3    were appropriate, right?

4    A    I'd like to clarify that.  We -- as part of the process

5    we had not given them a specific list but we discussed as

6    part of the guidance and instructions.  So, it's not -- you

7    know, not anything there is but we confirmed that they use

8    industry-accepted, third-party tools.

9    Q    So, you guided them to the evidence types that they

10   relied on?

11   A    There was a common understanding.

12   Q    Both Duff & Phelps and the review firms understood that

13   the evidence types they relied on were acceptable for this

14   purpose?

15   A    Yes.

16   Q    But they were in fact at liberty to decide which

17   evidence sources to use to prove up the claims, right?

18   A    Yes.

19   Q    And the evidence types, just so we get our head around

20   it -- slide 36 from the Trustees' opening, please.  These --

21   for misrepresentation of income, these are the evidence

22   types that the loan review firms used, right?

23   A    Yes.

24   Q    And slide 44, please.  For misrepresentation of debts,

25   these are the evidence types that the loan review firms

Page 39

1    relied on, right?

2    A    Yes.

3    Q    And slide 56, please.  For misrepresentation of

4    occupancy, these are the evidence types that the loan review

5    firms relied on, right?

6    A    Yes.

7    Q    And all of these evidence types, this is what was used

8    for all of the misrepresentation claims, right?

9    A    Specific to each one, yes.

10   Q    One of the evidence types is credit reports, agreed?

11   A    Yes.

12   Q    Plan Administrator 136, please.

13   A    Binder?

14   Q    I'm sorry.  I'll tell you -- (indiscernible).  Will you

15   please turn to Plan Administrator Exhibit 136?

16   A    I have it open.

17   Q    And Plan Administrator 136, Mr. Esses, is a notice from

18   the Consumer Financial Protection Bureau, isn't it?

19   A    Yes.

20   Q    And it talks about credit reports, doesn't it?

21   A    I see that here, yes.

22   Q    And it talks about common errors in credit reports,

23   correct?

24   A    I see that here, yes.

25   Q    It talks about some common errors in credit reports

Page 40

1    being errors with respect to the identity of the person

2    being reviewed?

3    A    I see that?

4    Q    And errors in connection with the reporting of account

5    status?

6    A    I see that.

7    Q    So, for example, the first bullet under that section is

8    "Closed accounts may be reported as open," and that would be

9    an error because they're closed, right?

10   A    I see that.  Yes.

11   Q    And another is -- if you look at the fourth bullet

12   under incorrect reporting of account status, "Incorrect date

13   of last payment, date opened, or date of first delinquency,"

14   right?

15   A    I see that.  Yes.

16   Q    It's another thing that the CFPB lists as a common

17   error with credit reports, right?

18   A    I see that.  Yes.

19   Q    You also have balance errors down at the bottom where

20   it talks about accounts with an incorrect current balance,

21   right?

22   A    I see that.  Yes.

23   Q    These are all errors that CFBP reports in connection

24   with the (indiscernible) on credit reports, right?

25   A    I see that.  Yes.

Page 41

1    Q    Yeah.  And in fact, you know also that the credit

2    rating -- the credit bureaus themselves disclaim the

3    reliability and accuracy of credit reports, don't they?

4    A    I have a general understanding of that, yes.

5    Q    Let's get a specific understanding.

6    A    Okay.

7    Q    PA-682, please.  And that's in the second

8    (indiscernible).

9    A    Sorry.

10   Q    And once you're there I'll direct your attention to

11   Page 9, please.  This, by the way, is the Equifax terms of

12   use.  Do you see that?

13   A    I do, yes.

14   Q    And if you've gone to Page 9 of 11 in the exhibit

15   numbering, at the very top is paragraph 34.

16   A    Okay.

17   Q    At the beginning of paragraph 34, it says, "No

18   warranty" -- I'm sorry.  No warranty, period.  "Much of the

19   data contained in the products is provided to us by others

20   and therefore we do not control the accuracy or completeness

21   of the information contained in the product."  You see that?

22   A    I do.

23   Q    That's the specific disclaimer provided by Equifax,

24   right?

25   A    I see that.

Page 42

1    Q    683, please.  Plan Administrator 683.  Are you there?

2    A    I -- one clarification?  That there are three credit

3    bureaus.  Equifax is one of them.

4    Q    Yeah.

5    A    Yeah.

6    Q    Yeah, thanks.  Are you at Plan Administrator 683?

7    A    I have that, yes.

8    Q    And that is the legal terms for Experian, right?

9    A    Yes.  Well -- do I see Experian on this page somewhere?

10   I do.  Yeah, I found that now.

11   Q    And down there at the very bottom where it begins, "In

12   no event" -- do you see that?

13   A    I do.

14   Q    And here Experian says, "In no event will Experian

15   warrant or guarantee the correctness, comprehensiveness,

16   completeness, accuracy, timeliness, merchantability, or

17   fitness for any particular use or purpose of any

18   information, products, or services on this website."  You

19   see that?

20   A    I see that.  Yes.

21   Q    That's what Experian says about their liability and

22   accuracy of the information in its credit reports, right?

23   A    Yes.

24   Q    PA-688, please.

25   A    I'm there.

Page 43

1    Q    688 are the terms of use for Transunion, right?

2    A    Yes.

3    Q    And if you look at the very bottom where it says,

4    "Disclaimer of warrantees and liability," -- right?

5    A    I see that.

6    Q    Same type of disclaimer, right?

7    A    Yes.

8    Q    Let's talk about MERS.  Plan Administrator Exhibit 138.

9    A    I have that open.

10   Q    The very first page?

11   A    Yes.

12   Q    About three-quarters of the way there's a -- at the

13   bottom (indiscernible) paragraph begins with, "Subscriber

14   understands" -- are you there?

15   A    I see that, yes.

16   Q    And that says, "The subscriber" -- by the way, this is

17   the MERS Terms and Conditions, right?

18   A    Yes, as of November 9, 2017.

19   Q    So, this is the MERS that we all talk about as the MERS

20   in connection with the loan file review, right?

21   A    Yes, that the Trustees used as one of the pieces of

22   evidence in their review, yes.

23   Q    And so, that paragraph that I direct you to says, "The

24   subscriber understands and accepts that any information

25   retrieved from MERS Link should be independently verified.

Page 44

1    The companies do not in any way warrant or guarantee that

2    MERS Link or (indiscernible) services will be uninterrupted.

3    The companies do not verify the accuracy of information on

4    MERS Link or the MERS system, nor the companies warrant the

5    reliability of any information retrieved from MERS Link

6    since the accuracy of all information is the responsibility

7    of MERS system members who enter and update the information

8    in the MERS system.  The companies make no warranties of any

9    kind, either expressed or implied, including without

10   limitation implied warranties of merchantability or fitness

11   for a particular purpose regarding MERS Link or any

12   information provided there," right?

13   A    I see all of that.  Yes.

14   Q    And that's what MERS says about the reliably and

15   accuracy of the information retrieved from its system,

16   right?

17   A    I see that, yes.

18   Q    Plan Administrator Exhibit 681, please.  That should be

19   in the second binder.  Are you there?

20   A    I have that open, yes.

21   Q    And Plan Administrator 681 is the DataVerify services

22   (indiscernible), right?

23   A    Yes.

24   Q    Can you please turn to Page 4 of 9?  Page 4 of the

25   exhibit?

Page 45

1    A    I have that open.

2    Q    You see paragraph B at the top?

3    A    I see that.

4    Q    Four lines down there's a sentence that begins towards

5    the end of the sentence that says, "DataVerify does not."

6    A    I have that.

7    Q    "DataVerify does not guarantee or warrant the

8    correctness, completeness, merchantability, or fitness for a

9    particular purpose of the services or information provided

10   therein, right?

11   A    I see that, yes.

12   Q    And C says, "DataVerify makes no representations or

13   warrantees as to the services will be available or error

14   free."  You see that?

15   A    Yes.

16   Q    And that's what DataVerify says about the accuracy and

17   reliability of its information?

18   A    I see that.  Yes.

19   Q    Can you go to the preceding page, Page 3 of 9?

20   A    Okay.

21   Q    On Page 3 of 9 you see paragraph G?

22   A    I see that.

23   Q    It's all caps, right?

24   A    I see that.  Yes.

25   Q    And it says, "Under no circumstances will subscriber

Page 46

1    use the services provided pursuant to this agreement as the

2    basis for testimony as a witness in litigation nor offer the

3    services in whole or in part in evidence unless compelled by

4    court order," right?

5    A    I see that first sentence, yes.

6    Q    And the Trustees are in fact using DataVerify as the

7    basis for testimony and as evidence, right?

8    A    Yes.

9    Q    Plan Administrator 697, please.  That also should be in

10   Binder 2.

11   A    Sorry, what was the --

12   Q    697.

13   A    Oh, yeah.  I have that open.

14   Q    Thanks.  Now, 597 is a printout from an actual file in

15   this case of a LexisNexis report, right?

16   A    I see it.  I -- okay.  I see that (indiscernible) -- so

17   --

18   Q    And LexisNexis says -- I've show you this exhibit

19   because it's 105 pages, but I do have Page 105

20   (indiscernible) look at that, please?

21   A    I have that open.

22   Q    And you see paragraph titled "important?"

23   A    I see that.

24   Q    And it says at the beginning, the first two sentences,

25   the public records and commercially available data sources

Page 47

1    used on reports have errors.  Data is sometimes entered

2    poorly, processed incorrectly, and is generally not

3    (indiscernible)."  You see that?

4    A    I do.

5    Q    And you see a couple sentences down it begins, "This

6    system"?  "This system should not be relied upon as

7    definitively accurate.  Before relying on any data this

8    system supplies, it should be independently verified,"

9    correct?

10   A    I see that.

11   Q    And that's what LexisNexis says about the reliability

12   and accuracy of its reports, right?

13   A    Yes.

14   Q    Accurint, PA-694.  Are you there?

15   A    I have that open.  Yeah.

16   Q    At the very top -- this also is the Accurint report

17   that comes from one of the (indiscernible)?

18   A    It looks -- seems to be.

19   Q    And the very, very first paragraph is also titled,

20   "important."  You see that?

21   A    I do.

22   Q    And it says -- I'll begin reading from the second

23   sentence.  "Data is sometimes entered poorly, processed

24   incorrectly, and is generally not free from defects.  This

25   system should not be relied upon as definitively accurate.

Page 48

1   Before relying on any data the system supplies, it should be

2   independently verified," right?

3   A    I see that.  Yes.

4   Q    That's what Accurint says about its own product, right?

5   A    Yes.

6   Q    Now, let's talk about salary.com, Plan Administrator

7   800 also in the second binder.  And directing your attention

8   to 5 of 7 in the lower right-hand.  Do you see that?

9   A    Yeah.  I'm there now.

10  Q    And do you see the paragraph 8 called, "disclaimers"?

11  A    I do.

12  Q    And looking at the very last sentence there, it says,

13  "Without limitation, Salary, its affiliates, partners, and

14  subcontractors make no warranty or guarantee that the sites

15  will be uninterrupted, timely, secure or error-free or that

16  the information and data displayed or shared on this site is

17  accurate or (indiscernible)."  Correct?

18  A    I see that.  Yes.

19  Q    That's what salary.com says about the reliability and

20  accuracy of its own information, right?

21  A    Yes.

22  Q    BLS.  Let's talk about it for a second.  You know the

23  BLS does not give the income for any particular borrower,

24  right?

25  A    I -- yes.

1    Q    It's a survey, correct?

2    A    Yes.

3    Q    And it's done every three years, right?

4    A    I have a general understanding.

5    Q    That that's the case?

6    A    Yes.

7    Q    It -- not everybody responds to the survey?

8    A    I assume so.  I have no personal knowledge.

9    Q    Have you studied the question?

10   A    I have not, no.

11   Q    Have you reviewed any BLS-produced materials?

12   A    Yes.

13   Q    And they describe the limitations of using BLS, right?

14   A    Yes.

15   Q    BLS does not, as I said, give you the income for

16   anybody who's involved in this case, right?

17   A    Correct.

18   Q    And it doesn't -- even for those occupations where it

19   reports, it doesn't give their total income, right?

20   A    I'm not exactly sure.

21   Q    Okay.  Can we have Plan Administrator 108, please?  I'm

22   sorry, 801.  You see, Mr. Esses, that this is

23   (indiscernible) testimony?

24   A    I see that.  Yes.

25   Q    And I'll direct your attention to Page 11 of the

1    exhibit, just to the bolded point there toward the bottom.

2    It says, "This is the statement of the Honorable Erica

3    Groshen, Commissioner of the Bureau of Labor Statistics,"

4    right?  You see that?

5    A    Yes.

6    Q    And --

7            THE COURT:  Can we point out to Mr. Esses that the

8    hearing in which his testimony was given was held on June

9    18, 2013, and that's reflected on Page 3 of the document

10   that Mr. Rollin has given him.

11           MR. ESSES:  Thank you, Your Honor.

12           THE COURT:  All right?

13           MR. ROLLIN:  Thank you very much, Your Honor.

14           THE COURT:  Okay.

15   Q    And if you'll turn the page, let's start with Page 12

16   of 61, (indiscernible) paragraph that begins,

17   "Establishments."  You see that?

18   A    I do.

19   Q    It says, "Establishments are surveyed once every three

20   years with a response rate of about 75 percent."  That's

21   what we were talking about a moment ago, right?

22   A    Yes.

23   Q    And here the Commissioner also says in the very next

24   paragraph that like all statistical products there are --

25   I'm not quoting now, I'm paraphrasing.

Page 51

```
 1    A    No, I wasn't following that.

 2    Q    There are certain limitations with respect to the use

 3    of BLS data, correct?

 4    A    I'm sorry, are you still on that paragraph?

 5    Q    I'm in the -- I'm sorry, Mr. Esses, I was very

 6    confused.  I'm looking at the last paragraph.  It begins

 7    with the word --

 8    A    Oh, okay.

 9    Q    And was the -- take a moment to read it.

10    A    Sure.  Just that paragraph?

11    Q    Yes, for now.

12    A    Okay.

13    Q    And what this is describing is some limitations on the

14    use of BLS, correct?

15    A    I see that, yes.

16    Q    And at the very top of the next page, you see it

17    doesn't measure total compensation, right?

18    A    I see that, yes.

19    Q    It doesn't measure overtime pay or any benefits, for

20    example?

21    A    I see that, yes.

22    Q    I'd also like to show you Plan Administrator 132.  Have

23    you ever reviewed a document --

24    A    I'm sorry, just give me a moment.

25    Q    I'm sorry.  You're right.
```

Page 52

1    A    I'm there now.

2    Q    Have you ever reviewed Plan Administrator 132, or any

3    other document produced by BLS concerning its survey methods

4    and reliability?

5    A    I have not, no.

6    Q    Why?  Was it not part of the Trustees' process to

7    figure out whether BLS was an appropriate evidence source

8    for the task?

9    A    I actually can't speak to that.  I had not seen this.

10   I had not reviewed this document.

11   Q    Have you reviewed any of the disclaimers and caveats

12   that I just showed you in connection with these evidence

13   sources?

14   A    I had come across some of them through the review, but

15   just to that extent.

16   Q    So, in the course of the review, you came across some

17   of these disclaimers and caveats concerning the evidence

18   (indiscernible), right?

19   A    Yes.

20   Q    But not before the review?

21   A    In my experience, I had come across, but not

22   specifically.  Nothing stands out to me.

23   Q    But you were familiar with the lack of accuracy and

24   reliability expressed by the very companies that produce

25   these information sources, right?

Page 53

1    A    Yes.

2    Q    Before you started the review?

3    A    Yes.

4    Q    And during the review?

5    A    Yes.

6    Q    Now, in the course of the review, the Trustees took no

7    depositions, right?

8    A    That's accurate, yes.

9    Q    And obtained no affidavits?

10   A    Yes.

11   Q    And obtained no certified public records?

12   A    I'm not 100% certain about that, but...

13   Q    Did you send anybody to any of the courthouses to find

14   the allegedly undisclosed mortgages?

15   A    I don't believe so.

16   Q    Or any clerk and recorder's offices?

17   A    I don't believe so.

18   Q    Or accessed those official records online?

19   A    That's Pacer account?

20   Q    Not for purposes of this question.

21   A    Okay.  So, then no.  I don't believe so, actually

22   Q    You didn't get any records custodian affidavits, did

23   you?

24   A    I don't believe so.

25   Q    You didn't issue any subpoenas to any primary sources?

Page 54

1   A     We did not.

2   Q     You didn't conduct any field reviews of the properties?

3   A     We did not.

4   Q     You didn't interview anybody who was involved in the

5   original mortgage transaction with respect to any one of

6   these loans?

7   A     I don't believe so.

8   Q     And the Trustees haven't identified even a witness who

9   performed the investigation?

10   A     I'm sorry.

11   Q     The Trustees haven't identified anybody who even

12   performed these loan-level analyses as a witness in this

13   case?

14   A     Like at the review firms?

15   Q     Yeah.  Like nobody here is coming to testify about the

16   review they performed?

17   A     Besides Mr. Aronoff, nobody from the review firms.

18   Q     And it's at the review firms where this factual

19   investigation was done?

20   A     That is correct.

21   Q     Let's put a little more meat on the bones of what they

22   were doing.  Let's take a VOE, for example, Verification of

23   Employment.

24             THE COURT:  Mr. Rollin, I'm going to ask you to

25   pause.  It's been about an hour and 15 minutes.  I think it

Page 55

1    might be a good time --

2              MR. ROLLIN:  Thank you (indiscernible) --

3              THE COURT:  -- to take a break.  Time does fly.

4    Are you on track with your estimated schedule?

5              MR. ROLLIN:  Very much so.

6              THE COURT:  Okay.  So, let's take a break for 10

7    minutes.  We'll come back and then I think we'll go through

8    either to redirect or to the lunch break, depending upon

9    when you finish up.

10             MR. ROLLIN:  Thank you very much.

11             THE COURT:  We'll come back at about between 11:20

12   and 11:25.  Okay?  Thank you.

13             MR. ROLLIN:  Thank you, Your Honor.

14        (Recess)

15             MR. ROLLIN:  Just before we get started --

16             THE COURT:  Sure.

17             MR. ROLLIN:  -- so I don't fumble in the middle of

18   the exam, I was going to refer (indiscernible) if you have

19   it, but if not, this is the binder from the one we've been

20   talking about, 3301, the full ring binder.

21             THE COURT:  Okay.

22             MR. ROLLIN:  And I'm going to be making a

23   reference to a document in Volume 1.  Do you have that?

24             MR. ESSES:  I no longer have that.

25             THE COURT:  I think he no longer has that.  Would

Page 56

1    you be so kind?

2            MR. COZENZA:  Judge do you have a copy up here?

3            MR. ROLLIN:  No, I have one.  Thank you, Mr.

4    Cosenza, but...

5            MR. ROLLIN:  Do you have it now?

6            MR. ESSES:  I do not have it.

7            MR. ROLLIN:  We'll --

8            THE COURT:  Oh, we're going to get -- there we go.

9            MR. ESSES:  Thank you.

10           THE COURT:  Thanks.

11           MR. ROLLIN:  I'm not going to refer to it right

12   away, but I just wanted you to have it, so we don't have to

13   do that.

14           THE COURT:  I think we're all set.

15           MR. ROLLIN:  Okay.  Thank you.

16   Q    Now, we were talking about different evidence types

17   relied upon by the Trustees, Mr. Esses, and I'd like to talk

18   about verifications of employment now, okay?

19   A    Okay.

20   Q    A verification of employment is gathered by the re-

21   underwriting firm, as we've talked about?

22   A    Yes.

23   Q    So, let's say for example you have a re-underwriter who

24   works for Digital Risk and is in Florida somewhere, okay?

25   A    Yes.

Page 57

1   Q    And that re-underwriter is sitting in her office or her

2   cubicle, correct?

3   A    Yes.

4   Q    And as part of this process, she looks at the

5   borrower's loan application, correct?

6   A    Yes.

7   Q    She identifies an employer, right?

8   A    Yes.

9   Q    And she calls the employer and says to the employer, I

10  am calling to re-verify the borrower's employment and

11  income.  Is that what happens on a verbal VOE?

12  A    On a verbal VOE, yes.

13  Q    And there's a person at that phone number who answers

14  the phone, correct?

15  A    Yes.

16  Q    And that person goes to a record that the re-

17  underwriter never sees, right?

18  A    I'm sorry.  Would you mind repeating that?

19  Q    The person at the employer, or at least at the other

20  end of the phone, goes to a record that your re-underwriter

21  in Florida never sees?

22  A    Yes.

23  Q    And that we never see?

24  A    Yes.

25  Q    And which we may or may not --

Page 58

1    A    We?

2    Q    We, meaning the people in the court.

3    A    Yes.

4    Q    And which may or may not actually exist?

5    A    It's possible.

6    Q    We don't know.

7    A    We -- okay.

8    Q    Is that right, we don't know?

9    A    I think we have an idea, but we haven't seen it

10   ourselves.

11   Q    It is not part of the Trustees' process to make sure

12   you see that underlying employment record, right?

13   A    Correct.

14   Q    And if it exists, it may or may not be accurate, right?

15   A    Okay.

16   Q    Is that right?

17   A    Yeah -- anything's possible.

18   Q    Meaning it may or may not be accurate?

19   A    Yes.

20   Q    May or may not be complete?

21   A    Yes.

22   Q    It was prepared originally by a person whose identity

23   we don't know?

24   A    I think the underwriter inquires about what their

25   identity is.

Page 59

```
 1    Q    Not the identity of the person who's speaking to the

 2    re-underwriter, the person who created whatever record that

 3    person is purportedly looking at.  We don't know who did

 4    that?

 5    A    Correct.

 6    Q    We don't know what that person was relying on when they

 7    did that?

 8    A    Okay.  Yes.

 9            THE COURT:  Can I ask an additional question?  So,

10    when this hypothetical re-underwriter is making the VOE

11    phone call, are they reading a standard script?

12            MR. ESSES:  There would be a standard script.  I'm

13    not sure that they always follow it exactly, but there would

14    be generally a script.

15            THE COURT:  Would this script -- well, let me not

16    -- do you know, for each of the five firms, did each of them

17    have a standard script?

18            MR. ESSES:  I don't specifically know.

19            THE COURT:  Thank you.

20    Q    And the re-underwriter writes down whatever is told to

21    them on the phone?

22    A    Yes.

23    Q    And that's a piece of information that forms the basis

24    for a claim against the Lehman estate?

25    A    Yes.
```

Page 60

1    Q    And that doesn't only apply to -- we talked about

2    verbal VOEs, but a written VOE is the same thing, except

3    that it happens by fax or by email, right?

4    A    Yes.

5    Q    So, we've been talking about the loan ending in 3301,

6    right?

7    A    Yes.

8    Q    Do you have that binder?  Volume 1?

9         THE COURT:  Yes.

10   A    I have that.

11   Q    And just to be clear, it's TRX-1, Loan 31783301, right?

12   A    Yes, I see that.

13   Q    And the binder starts with the claim package, right?

14   A    I believe so, yes.

15   Q    And the claim package is, as we talked about, just a

16   subset of the larger loan file, plus whatever third-party

17   documentation.  The loan review was put in there, right?

18   A    Yes.

19   Q    And if you turn to Page 13 of this exhibit, that's the

20   VOE?

21   A    I'm familiar with this firm, yes -- with the form, yes.

22   Q    And what we just described is exactly what happened

23   here.  The re-underwriter apparently sent this form to

24   whoever they thought was the employer, and they got whatever

25   this response is, right?

Page 61

1     A     Yes.

2     Q     And apparently, the --

3              THE COURT:  I'm sorry.  Can I ask if that is in

4     fact the case?  Does this reflect that somebody sent this

5     form, or is this information that was taken over the phone?

6              MR. ESSES:  A form was provided in this instance.

7              THE COURT:  Okay.  Thank you.

8     Q     Now, I see that there's the cover letter, just

9     following up the Court's question, but I don't see --

10    A     Yeah, I should have been more careful with my answer.

11    I should've been more careful with my answer.  I'm actually

12    -- I actually don't have personal knowledge.

13    Q     You don't have personal knowledge of whether this was a

14    written VOE, or this is just a recording of the verbal VOE,

15    right?

16    A     Yes.

17    Q     And there's no way of knowing because there's no fax

18    line or anything like that, right?

19    A     Correct.

20    Q     Who is Heather V.?

21    A     I personally do not know.

22    Q     I guess Heather V. could be somebody who works at

23    CrossCheck Compliance, or maybe somebody who works at

24    Hacienda HealthCare, right?

25    A     I'm not sure.

Page 62

1   Q    And we don't have a last name for Heather V.?

2   A    Correct.

3   Q    We don't know what's meant by the question mark in 2005

4   or...  Is that right?

5   A    I can personally interpret that, but...

6   Q    You'd have to give an opinion.  You don't have facts,

7   right?

8   A    Correct.

9   Q    And the Trustees based their claim on this, their

10  misrep income based on this VOE, right?

11  A    Yes.

12  Q    Believing it was sufficient evidence to establish the

13  borrower's actual income?

14  A    Yes.

15  Q    Verified income.

16  A    Yes.

17  Q    Do you know if this loan performed for 71 months at

18  least?

19  A    I don't know.

20  Q    Doesn't matter to you?

21  A    Not specifically, no.

22          MR. ROLLIN:  Can I have the Trustees' opening

23  slide at Page 41, please?

24  Q    We're back to this slide that we talked about earlier.

25  A    I recognize it.

Page 63

1   Q    So, in QC1, that's marked with the number 2, right?

2   A    Yes.

3   Q    And what was reviewed was the claim package and the

4   breach description.  And breach description is the

5   narrative, right?

6   A    Yes.

7   Q    And in QC2, it says review for clarity and consistency.

8   Do you see that?

9   A    Yes.

10  Q    Meaning the breach narrative, correct?

11  A    Yes.

12  Q    Loan file and third-party documents at the loan review

13  firm, claim package and breach narrative at QC1, breach

14  narrative at QC2, right?

15  A    Yes.

16  Q    We've been talking about the third-party sources that

17  are used to check against information in the loan file.  Now

18  I'd like to spend some time talking about the loan file.

19  Are you oriented?

20  A    I am, yes.

21  Q    The loan files we've seen contains a variety of

22  documents, correct?

23  A    Yes.

24  Q    From various sources, correct?

25  A    Yes.

Page 64

1    Q    Could be a borrower?

2    A    Yes.

3    Q    Could be a loan officer?

4    A    Yes.

5    Q    Could be a tax preparer?

6    A    Yes.

7    Q    Could be a CPA?

8    A    Yes.

9    Q    Employer?  Example W-2s, et cetera?

10   A    Yes.

11   Q    Bankruptcy filing preparers?

12   A    Yes.

13   Q    But during the course of the protocol, none of those

14   people were identified as someone who said I am the person

15   who prepared this document, right?

16   A    Yes.

17   Q    Or I am the person who signed this document, correct?

18   A    Correct.

19   Q    Or I am the person who submitted this document,

20   correct?

21   A    Correct.

22   Q    Or I am the person who made the statement?

23   A    Correct.

24   Q    Not one of the primary sources was ever brought forward

25   in the protocol -- for that matter, in this court, correct?

Page 65

1    A    I'm not sure if primary source is a technical term, but

2    yes.

3    Q    When I say primary source, I mean the borrower.

4    A    What you previously described?

5    Q    Yep.

6    A    Yes.

7    Q    And just so the record is clear, that whole list of

8    people I just went through, that's what I refer to as

9    primary sources.  And none of those people were brought

10   forward either in the protocol or in court to say they're

11   the person who signed or prepared a document and made a

12   statement, right?

13   A    Correct.

14   Q    You'll recall that at its height, there were over 250

15   trusts in the protocol, right?

16   A    Yes.

17   Q    But only three of those trusts had representation that

18   the loans were underwritten to the underwriting guidelines,

19   correct?

20   A    Yes.

21   Q    And so, except for those three trusts, the Trustees and

22   any of their representatives did not consult the

23   underwriting guidelines, correct?

24   A    Not -- for the basis of the claim?

25   Q    They did not consult the underwriting guidelines in

Page 66

1    determining whether there was a claim, correct?

2    A    I'm not sure if they consulted it, and if they did, for

3    what purpose they may have done so.

4    Q    The Trustees and their representatives only consulted

5    underwriting guidelines with respect to claims in those

6    three trusts, right?

7    A    Yes.

8    Q    And likewise, except for those three trusts, the

9    Trustees and their representatives did not consult the

10   product profiles, right?

11   A    Correct.

12   Q    Do you have yesterday's exhibit binders from your

13   direct examination?

14   A    I do not.

15            MR. ROLLIN:  May I have, or may the witness

16   have...?  Your Honor, do you have those?

17            THE COURT:  I do.  Thank you.

18   Q    Can we look at Volume 2 please?

19   A    As soon as I get it.

20   Q    Sure.

21   A    Okay.

22   Q    Can you turn to TRX-5008, please?

23            THE COURT:  5003?

24            MR. ROLLIN:  5008, Your Honor, Volume 2.

25            MR. ESSES:  It's out of order, Your Honor.  My

Page 67

1   confusion as well.

2          THE COURT:  Oh, thank you, 5008.

3          MR. ROLLIN:  Yeah, thanks.

4          THE COURT:  Okay, it comes before 5003.

5          MR. ROLLIN:  It's their binder.

6          MR. ESSES:  That is correct, Mr. Rollin.

7   Q    Do you have 5008, Mr. Esses?

8   A    I do.

9   Q    And 5008 is an example of the Aurora Loan Services'

10  underwriting guidelines, correct?

11  A    Yes.

12  Q    It has all of this detail in here about different loans

13  and considerations in compensating factors, right?

14  A    I have a general understanding of that, yes.

15  Q    And if you look at TRX-2007 -- sorry, 5007, this is an

16  example of a product profile, right?

17  A    Yes.

18  Q    And it also contains all types of information about the

19  underwriting and requirements and conditions of this

20  particular loan product, right?

21  A    Yes.

22  Q    And it is the underwriting guidelines and the product

23  profile that guide the credit decision at origination,

24  right?

25  A    Yes.

Page 68

1    Q    And so, they were consulted only with respect to three

2    trusts, correct?

3    A    Yes.

4    Q    And only for underwriting claims in those three trusts,

5    right?

6    A    Yes.

7    Q    Not for misrepresentation claims, even in those three

8    trusts, right?

9    A    Yes.

10   Q    And you understand that even with respect to the

11   underwriting claims in those three trusts, the Trustees

12   actually used the wrong guidelines, didn't they?

13   A    In certain instances, yes.

14   Q    In other words, guidelines that didn't apply to those

15   loans?

16   A    Yes.

17   Q    And Mr. Esses, you understand these are legal claims,

18   yes?

19   A    Yes.

20   Q    And the Trustees didn't have any licensed attorneys

21   reviewing the claims, right?

22   A    Correct.

23   Q    There were no licensed attorneys determining whether

24   the facts alleged with respect to any particular loan

25   constituted a breach of any contract, right?

1   A    I'm sorry, would you repeat that?

2   Q    Sure.

3   A    I missed the beginning.

4   Q    There were no licensed attorneys determining whether

5   the facts alleged with respect to any loan constituted a

6   breach of any particular contract, right?

7   A    Correct.

8   Q    Or whether the facts gave rise to a legal remedy,

9   right?

10   A    Uh --

11   Q    No licensed attorneys involved in that process?

12   A    Thank you.  Yes.

13   Q    Mr. Aronoff used to be a licensed attorney, right?

14   A    That's my understanding, yes.

15   Q    He has practiced law for 30 years, right?

16   A    I think so.  I'm not exactly sure, but it has been some

17   time.

18   Q    And he certainly in this case was not acting in a

19   lawyerly capacity, right?

20   A    No.

21   Q    Now, when you say no, do you mean I am right?

22   A    I forgot the question, but I meant to say...  Yes, you

23   were right.  I didn't forget the question, I just...

24   Q    And you don't even know if anybody at Duff & Phelps

25   reviewed the governing agreements, do you?

Page 70

1    A    We absolutely did.  I do know that.

2    Q    Did Mr. Campbell review the governing agreements in

3    connection with the work that he did on the individual

4    claims?

5    A    I'm sorry, are you reading something?

6    Q    I am reading from your deposition.

7    A    And would you mind pointing me to that?

8    Q    Sure, I'd be happy to.  Let's put it this way.  The QC2

9    team consisted of three people, Mr. Aronoff, Mr. Campbell

10   and Mr. Sauerwein, right?

11   A    Yes.

12   Q    Do you know whether any of them reviewed the governing

13   agreements in connection with the individual claims?

14   A    Yes.

15   Q    So, I'm looking at your deposition, Page 83, Line 8.

16   I'll start with Line 13.  Tell me when you're there.

17   A    Sorry, what page?  83?

18   Q    Yep.

19   A    I have that.

20   Q    Line 13.

21   A    Yes.

22   Q    "Question:  What about Mr. Campbell?  Did Mr. Campbell

23   review the governing agreements in connection with the work

24   that he did on the individual claims?"  Your answer, "I'm

25   not sure."  Next question, "What about Mr. Sauerwein?

Page 71

1    Answer:  I'm not sure."  Next question, "Mr. Aronoff?

2    Answer:  I couldn't be sure."

3    A    What I was explaining to you, Mr. Rollin, was that

4    there was an initial setup where they reviewed the

5    guidelines, and I understood the question to mean that in

6    the course of each claim, did they consult with the

7    governing agreements.

8    Q    Thank you for that.  At the very beginning, before the

9    loans had actually been reviewed, this group consulted the

10   governing agreements, correct?

11   A    Yes.

12   Q    But after the facts and circumstances had been adduced

13   with respect to each individual loan, you don't know whether

14   they did or not?

15   A    That's what I'm not sure about.

16   Q    The Trustees' position, Mr. Esses, is that a breach of

17   representation and warranty adversely and materially affects

18   the value of the loan or the interests of the certificate

19   holders if it significantly increases the risk of loss,

20   right?

21   A    I have a general understanding of that, yes.

22   Q    Whether there was an actual loss is irrelevant to the

23   Trustees, right?

24   A    It's relevant in one sense, but not with regard to the

25   determination of a breach of a representation and a

Page 72

1    warranty.

2    Q    It's not relevant to the determination of whether there

3    was an AMA, right?

4    A    I have a general understanding of that, yes.

5    Q    But even then, there was a point in the protocol where

6    the Trustees ran the loans through some sort of a model that

7    measured or quantified a risk of loss for purposes of

8    determining AMA?

9    A    That is correct.

10   Q    There is no measurement of baseline risk of loss and an

11   increased risk of loss anywhere in the Trustees' process,

12   right?

13   A    I'm not sure about that last question.

14   Q    You don't know the answer to that last question?

15   A    It sounds like a question for the expert.

16   Q    Well, I'm asking you --

17   A    I --

18   Q    As the person who ran the protocol, I'm asking you

19   whether or not there was a baseline risk of loss set and

20   then a measured increase of loss in connection with any of

21   the claims?

22            THE COURT:  Mr. Goldberg.

23            MR. GOLDBERG:  Objection.  He's a fact witness.

24   He's not an expert, and as has come out, it's Mr. Aronoff

25   who made the AMA determination, not this witness.  And he

Page 73

1    just testified about that question.  He's just badgering the

2    witness to answer a question that he doesn't know the answer

3    to.

4             MR. ROLLIN:  Your Honor, I'm not badgering the

5    witness.  I'm asking whether that was done.  That is a fact

6    question, not an opinion question.

7             THE COURT:  All right.  One --

8             MR. ROLLIN:  (indiscernible)

9             THE COURT:  One more round, because I'm hearing

10   that he has answered your question largely.  So, let this be

11   the last one on that subject.

12            MR. ROLLIN:  It will be.

13            THE COURT:  All right?  Do you recall the

14   question, Mr. Esses?

15            MR. ESSES:  I'd appreciate having it repeated.

16            THE COURT:  Sure.

17   Q    There was no point in the protocol where the Trustees

18   measured increased risk of loss, setting a baseline, then

19   quantifying an increase in connection with any loan,

20   correct?

21   A    I testified that there wasn't a model.  I know there

22   wasn't a model, but I'm not exactly sure what the expert,

23   Mr. Aronoff, did or did not do with regard to measuring the

24   risk.  I know he didn't run a model that I'm aware of.  I

25   don't know --

Page 74

1    Q     Thank you.

2    A     -- what he did.

3    Q     Thank you for that clarification.

4          MR. ROLLIN:   Thank you, Your Honor.

5    Q     The Trustees did not perform any analysis related to

6    whether -- related to what the loan prices would be in light

7    of the breach allegations, correct?

8    A     I don't believe so.

9    Q     Meaning you agree with my -- meaning yes?

10   A     Yes.

11   Q     Thank you.  And no one on behalf of the Trustees

12   performed any kind of a calculation to determine what

13   interest rates would have applied to the loans now based on

14   the allegations of breach, correct?

15   A     Correct.

16   Q     In deciding which loans to put through the protocol,

17   the Trustees did not put through any claims on loans that

18   had paid in full, right?

19   A     It may have happened that a loan paid in full after we

20   had submitted it, but we did our best not to submit loans

21   that had paid in full.

22   Q     I understand.  And let's take that into first, if you

23   had a loan -- you started the protocol, you had a loan, it

24   had paid in full, you did not submit it for a claim,

25   correct?

Page 75

1    A    Correct.

2    Q    Even if there might've been a breach in that loan,

3    right?

4    A    Correct.  So, just to give a sense of magnitude here,

5    the population originally was about 450,000 mortgage loans,

6    and we started the protocol with approximately 210,

7    excluding the ones that had previously paid off.  So, there

8    may have been breaches and, you know, out of the 450, to

9    answer your question, yes.

10   Q    Exactly.  There may be loans with breaches of

11   representations and warranties, but which had paid in full,

12   and therefore, were not submitted as claims to the Lehman

13   estate, correct?

14   A    That is correct.

15   Q    Because there's no loss, right?

16   A    Correct.

17   Q    And likewise, when you made claims on loans and then

18   they paid in full during the course of the protocol, you

19   rescinded those claims, correct?

20   A    Correct.

21   Q    For the same reason?

22   A    For the same reason.

23   Q    And there are still -- and loans during the -- the

24   proofs of claim were filed in 2009, correct?

25   A    I have a general understanding of that, yes.

Page 76

1   Q   And all the way until the protocol, those loans, for

2   those that were performing, continued to pay, correct?

3   A   Yes.

4   Q   Certificate owners continued to get the benefit of

5   that?

6   A   Yes.

7   Q   For those that were performing, many of them still were

8   continuing to accrue interest that you put into the claim

9   amount, correct?

10   A   Borrower interest, yes.

11   Q   And interest advances by the servicer, correct?

12   A   Correct.

13   Q   And that's -- between the time you filed the POCs until

14   we got into the protocol was six years, correct?

15   A   Yes.  Yes, 2009 to 2014.

16   Q   Six years, seven years.  And it's true, isn't it, that

17   when the Trustees put claims back on loans that had not yet

18   liquidated, they asked -- they put in the purchase price

19   column the full purchase price, correct?

20   A   Yes.

21   Q   So, in that circumstance the ask is for the full

22   purchase price, but you still have the loan, correct?

23   A   No.

24   Q   The loan still exists in the trust, correct?

25   A   No, the loan would be returned to the estates.

Page 77

1    Q    At the time that you made your claim, you got the loan?

2    A    Yes.

3    Q    And you're making a claim for the full purchase price,

4    correct?

5    A    Yes.

6    Q    And you said yesterday that there was a -- you offered

7    some sort of a model to calculate the remaining value of the

8    loan as an offset, correct?

9    A    To the extent the loan was not repurchased by the

10   estate.

11   Q    Well, you wouldn't sell the loan back to the estate for

12   an allowed claim, would you?

13   A    Not for bankruptcy dollars, no.

14   Q    In fact, you have a reservation of rights in your claim

15   tracking spreadsheet that even if the Court orders you to

16   sell the loan back in exchange for an allowed claim at the

17   purchase price, you reserve the right to rescind that loan,

18   correct?

19   A    Yes, that is correct.

20   Q    That's not an acceptable remedy to you?

21   A    I'm sorry, what --

22   Q    That's not an acceptable remedy to the Trustees, is it,

23   actually giving the loan back in exchange for an allowed

24   claim at the purchase price, correct?

25             THE COURT:  Mr. Goldberg.

Page 78

1           MR. GOLDBERG:  Objection.  Mr. Esses is here as a

2    fact witness.  He's not, in fact, the Trustees.  And asking

3    the witness what the Trustees would accept --

4           THE COURT:  Sustained.

5           MR. ROLLIN:  I'll move on.

6    Q    There are still non-liquidated loans, as you called

7    them, or we call them active loans, in the claim population,

8    correct?

9    A    Yes.

10   Q    And any of them could liquidate without a loss, right?

11   A    Yes.  Or payoff without a loss.

12   Q    Sure.  What's the approximate volume that we're talking

13   about in nonliquidated loans?

14   A    Subject to the hearing?

15   Q    Yes.

16   A    You know, I should know this, but I don't have a

17   specific number --

18   Q    Is it in the 10s of thousands?

19   A    I would -- yes.

20   Q    And which could liquidate without a loss?

21   A    Yes.

22   Q    Now, you also have a number of trusts that have been

23   collapsed during the pendency of the protocol, correct?

24   A    Yes.

25   Q    And in those instances, the Trustees have been paid for

Page 79

1   its claims by the master servicer, correct?

2   A   I have a very -- only what I've heard in the court here

3   about that issue.

4   Q   But you do understand that claims with respect to loans

5   in collapsed trusts have been rescinded?

6   A   Yes.

7   Q   And there's still lots of trusts that could collapse,

8   right?

9   A   Yes.

10  Q   Have you done -- have the Trustees done any work to

11  estimate or quantify the amount of trusts that might still

12  collapse?

13  A   Not to my knowledge.  We may have looked at cash flows

14  early on in the process, but not specific to this issue.

15  Q   Right.  So, specific to this case, the Trustees haven't

16  done anything to analyze how many of these trusts are going

17  to collapse in the future, such that no loss with respect to

18  those loans is going to be occurring, right?

19  A   I'm not sure I follow that last question.

20  Q   Sure.  No analysis has been done by the Trustees in

21  connection with this proceeding to determine, investigate,

22  estimate the number of trusts that may collapse in the

23  future?

24  A   Correct.  I can't speak to the Trustees.  I know what I

25  know.  I should have listened to how you set up that

Page 80

1    question more carefully.

2    Q    As far as you know?

3    A    Correct, yes.

4    Q    In consideration of your oversight role in the

5    protocol?

6    A    Yes.

7    Q    And in connection with this case?

8    A    Yes.

9    Q    The Trustees -- overall, the Trustees submitted a

10   little over 90,000 claims on a little over 90,000 loans in

11   the protocol, right?

12   A    Yes.

13   Q    And you believe those are all valid claims?

14   A    Yes.

15            MR. ROLLIN:  Can I have just a minute with my

16   team, Your Honor?

17            THE COURT:  Sure.

18            MR. ROLLIN:  Can I just clarify my last question,

19   Your Honor?

20            THE COURT:  Yes.

21   Q    I think I misspoke.  I want to make sure I'm clear.

22   The Trustees submitted claims on a little over 90,000 loans

23   in the protocol, correct?

24   A    I thought I heard that question.

25            THE COURT:  No, it was actually a different

Page 81

1   question.

2            MR. ROLLIN:  Yeah, I messed it up.

3            THE COURT:  So, why don't you ask the question you

4   want Mr. Esses to answer, okay?

5            MR. ROLLIN:  Sure.

6   Q    In the course of the protocol, the Trustees submitted

7   claims on a little over 90,000 loans, correct?

8   A    Yes.

9   Q    And you believe all of the claims on all of those loans

10  are valid?

11  A    Yes.  There may be some errors that we made, and we'd

12  rescind those.  But generally, yes.

13           MR. ROLLIN:  (indiscernible).  Thank you, Your

14  Honor.

15           THE COURT:  Thank you.

16           MR. GOLDBERG:  Can we take our lunch break,

17  actually?  That might make more sense?

18           THE COURT:  Is that what you --

19           MR. GOLDBERG:  That's what we'd like.

20           THE COURT:  How much time do you think you need on

21  your redirect?

22           MR. HEIDLAGE:  Probably 30 to 45 minutes, but part

23  of the lunch break, we'll be estimating that, I guess.

24           THE COURT:  Okay.  All right, so I'm just a little

25  stressed about fitting everything in, particularly in light

1  of the fact that we have an early conclusion today for

2  Hanukkah and a late start tomorrow to accommodate Mr.

3  Aronoff.  So, can I negotiate with you for a shorter lunch

4  break today?

5          MR. GOLDBERG:  (indiscernible) from us.

6          THE COURT:  Or do you need the time -- of course,

7  it's okay for you.  Do you need the time for your redirect?

8  If you do, it's fine, we'll take the full hour.

9          MR. GOLDBERG:  We certainly need some time.  I

10  think it's safe to say if we could come back at 1:00, which

11  is 50 minutes --

12          THE COURT:  Can you do 1:00?

13          MR. GOLDBERG:  We can do that.

14          THE COURT:  Okay.  Let's come back at 1:00.

15  That'll be great.  Thank you.

16          ALL:  Thank you.

17          THE COURT:  Home stretch, Mr. Esses.

18          MR. ESSES:  I very much enjoyed myself at lunch

19  yesterday, so I don't notice at all.

20          THE COURT:  Very good.  See you at 1:00.

21          MAN 1:  Okay.

22      (Recess)

23          THE COURT:  I just got word that we're having an

24  evacuation drill on Friday.  I think it's because they have

25  concern that I could ever make it out of here.  Please have

1    a seat.  Ready when you are, yes.

2                    REDIRECT EXAMINATION OF EDMOND ESSES

3    BY MR. HEIDLAGE:

4    Q    Welcome back, Mr. Esses.  Yesterday Mr. Rollin asked

5    you a number of questions about the (indiscernible) loans.

6    Do you generally recall that?

7    A    Generally.

8    Q    Okay.  Do you recall that -- well, just to the record

9    is clear.  Did the Trustees ever agree that the documents

10   requested by the plan administrator were, in fact, necessary

11   for the plan administrator's review?

12   A    No.

13   Q    The -- Mr. Rollin referenced an agreement that was

14   reached on the (indiscernible) loans.  Do you recall that?

15   A    I do.

16   Q    Can you describe your understanding or what do you

17   understand that agreement to mean?

18   A    I recall we agreed to hold the loans in abeyance to be

19   resolved at a later point in time in addition to doing our

20   best to work collaboratively to try to resolve the issue.

21   Q    Did the Trustees ever agree that the claims would be

22   expunged or invalid?

23   A    Absolutely not.

24   Q    Okay.  And did the Trustees ever agree that if the

25   servicers were unable to produce documents to the plan

Page 84

1   administrator's satisfaction, then the Trustees would be

2   unable to make out a claim?

3   A     No.

4   Q     Okay.  Now, Mr. Rollin also asked maybe yesterday and

5   today about some of the efforts of the plan -- of the

6   Trustees, excuse me, to collect the four documents that they

7   requested.  Do you recall that?

8   A     I do.

9   Q     Okay.  Could you describe what the Trustees did in

10  order to collect the documents?

11  A     Which, the original files or the additional --

12  Q     Sorry, excuse me.  I'm focusing on the four documents

13  that the plan administrator identified.

14  A     Sure.  So we -- I think we referenced the letter that

15  we sent to each of the servicers.  We followed up with each

16  of the servicers in that regard, had calls with them, asked

17  them to either produce documents or describe to us if they

18  said they were already in the file, where they were already

19  in the file so that we can take that information back to the

20  plan administrator.

21  Q     Okay.  And Mr. Rollin asked a number of questions today

22  about seeking assistant from the Court.  Do you recall those

23  questions?

24  A     I do, yes.

25  Q     Do you know why the Trustees did not seek assistance

Page 85

1    from the Court on these four documents?

2    A    The servicers were cooperating, working with us,

3    talking to us providing us information.  We did not feel it

4    was necessary.

5              THE COURT:  Mr. Esses, I don't understand that

6    answer.  If you, as I think is undisputed, putting aside the

7    issue of whether or not the Trustees felt that the documents

8    were necessary, required, or anything else, the state of

9    play was still that the plan administrator was saying, "We

10   need these four other documents or some of them," right?

11             MR. ESSES:  Yes.

12             THE COURT:  And the Trustees were saying, "We've

13   tried.  We can't get them from the servicers," right?

14             MR. ESSES:  The answer was a little bit different

15   from the servicers.  It was, "We've already provided to you

16   these documents, specifically," in most instances.

17             THE COURT:  In all cases?

18             MR. ESSES:  In most.

19             THE COURT:  Okay.  In some -- so in some cases

20   they said, "You already have it, you just aren't -- you just

21   don't understand that you already have it," right?  And in

22   some cases --

23             MR. ESSES:  They worked to give us additional

24   documents.

25             THE COURT:  And in some -- but it is a fact that

Page 86

1   you never satisfied the plan administrator's requests with

2   respect to these four categories of documents.  You, meaning

3   the Trustees, correct?

4          MR. ESSES:  Yes.

5          THE COURT:  Okay.  And at that point, the Trustees

6   elected to not have subpoenas issued to the servicers,

7   right?

8          MR. ESSES:  Yes.

9          THE COURT:  Thank you.

10  Q    Mr. Rollin also asked you about some of the status

11  reports.  Do you recall that?

12  A    I do, yes.

13  Q    Okay.  I'd like to direct your attention to TRX-858

14  which was one of the -- it's a status report from December

15  of 2015.  Do you have that in --

16  A    I have a lot of binders in front of me.

17  Q    Sorry.  It's -- let's see if I can identify which one

18  it is.  It's the third volume of the plan administrator

19  binders.

20  A    Okay.

21  Q    Okay.  And so, do you see -- do you recall Mr. Rollin

22  pointing you to Subsection C?

23  A    What page is that?

24  Q    I'm sorry.  I apologize.  It's on Page 7 of the

25  exhibit, 7 of 9.

1    A    Yes.

2    Q    And do you see the reference to protocol, Section 4?

3    A    I do, yes.

4    Q    Okay.  If we could turn to TRX-831 and --

5         THE COURT:  Could you folks come up for a second,

6    please?

7         (Sidebar)

8    Q    You can actually put that binder aside.  You have the

9    Volume 2 of the plan administrator's binder in front of you?

10   A    I do.

11   Q    Okay.  And I'd like to direct your attention to plan

12   administrator Exhibit 73.  I believe it's the exhibit that

13   we looked at earlier with respect to questions about the

14   purchase price.  Do you recall that?

15   A    I do.

16   Q    Okay.  Now, this was an extract on the claim tracking

17   spreadsheet, correct?

18   A    Yes.

19   Q    Okay.  And Mr. Rollins directed your attention to

20   Column W?

21   A    Yes.

22   Q    Okay.  Where did the information used in that column

23   come from?

24   A    The master servicer data.

25   Q    Okay.  And for a good portion of the time and for a

Page 88

```
 1    majority of the loans, who was the master servicer for the

 2    trust at issue here?

 3    A     Aurora.

 4    Q     Okay.  And this data is the same data that was used for

 5    remittance reports; is that correct?

 6    A     Yes.

 7    Q     Okay.  And to calculate the payments to certificate

 8    holders?

 9    A     Yes.

10    Q     Okay.  Are you aware of whether or not the plan

11    administrator could speak with the master servicer if it had

12    any questions regarding the data?

13    A     I guess they could have.

14    Q     Okay.  Do you -- are you aware if they ever did?

15    A     No.  They used us as a conduit.

16    Q     Okay.  Did the plan administrator have access to the

17    data that was published to investors?

18    A     I'm actually not sure.  It's on a website.  We received

19    a login, but I think that you can readily get that login.

20    Q     Okay.  Did the plan administrator ever say that the

21    master servicing data was wrong?

22    A     Not to my knowledge.

23    Q     Did the plan administrator ever come and say that the

24    remittance reports published to the investors were

25    incorrect?
```

1    A    Not to my knowledge.

2    Q    Do you recall the questions regarding whether or not

3    the Trustees were seeking compensation for losses or --

4    excuse me, not cause by the debtor?  Do you recall those --

5    that line of questioning?

6    A    In my testimony?

7    Q    Yes.

8    A    Yes.

9    Q    Okay.  When the Trustees calculated the purchase price,

10   how did they determine how to calculate the purchase price?

11   A    As per the governing agreements.

12   Q    Okay.  So, they relied on the agreements between the

13   parties and worked to decide what number to use?

14   A    Yes.

15            THE COURT:  Mr. Cosenza?

16            MR. COSENZA:  I object.  I don't think there's any

17   foundation for the question as to whether the trustees

18   calculated the purchase price.  There was evidence early

19   today in testimony that there was no calculation done, it

20   was just accepted from (indiscernible) information they got

21   from the master servicer.

22            THE COURT:  Why don't you lay the foundation?

23            MR. HEIDLAGE:  Sure.

24   Q    Mr. Esses, how was the purchase price number in Column

25   W calculated?

Page 90

1   A    It was retrieved from the data tape information, and

2   for nonliquidated loans summed the various pieces of the

3   purchase price, summed.  And for the liquidated loans,

4   relied on the realized loss.

5   Q    Okay.

6           THE COURT:  So in this -- in the claims tracking

7   spreadsheet that we're looking at right now, the Column W is

8   just a sum of Q, R, S, T, U, and V; right?

9           MR. ESSES:  Yes.

10          THE COURT:  So on this loan, what this means, is

11  that as of 2015 -- as of what date?  11/17/2015?

12          MR. ESSES:  Yes.

13          THE COURT:  Okay.  As of that date, there's an

14  unpaid principal balance of 392,192; right?

15          MR. ESSES:  Yes.

16          THE COURT:  Okay.  And then there's a corporate

17  advance balance.  What does that mean?

18          MR. ESSES:  Corporate advance balance is fees and

19  expenses advanced by the servicer.

20          THE COURT:  Okay.  So that would include

21  attorneys' fees?

22          MR. ESSES:  Maintaining the property, attorneys'

23  fees, anything along those lines.  A condominium fee,

24  potentially.

25          THE COURT:  So on those -- these kinds of loans,

Page 91

1    would the servicer actually we paying condominium fees,

2    property taxes, insurance in all cases?

3                MR. ESSES:  To the extent they were required to

4    advance on the loan, it would be.

5                THE COURT:  What does that mean?

6                MR. ESSES:  It means at -- if the servicer

7    determines that amount is recoverable --

8                THE COURT:  I'm sorry, I don't know what that

9    means either.

10                MR. ESSES:  I'm sorry.  Okay.  So, they're

11    servicing the loan.  The borrower just totally stops paying.

12                THE COURT:  The borrower stops paying.

13                MR. ESSES:  Borrower stops paying.  Now, the

14    condominium association is still sending bills.

15                THE COURT:  Right.

16                MR. ESSES:  Until the point that the servicer

17    determines he's not going to be able to recover any fees

18    they lay out, he's -- the servicer is required to pay those

19    expenses and fees at -- if the servicer --

20                THE COURT:  Pursuant to what?

21                MR. ESSES:  Pursuant to the servicing agreement.

22                THE COURT:  Okay.

23                MR. ESSES:  And if they determine that for -- that

24    that money is not going to be recoverable from the -- to

25    themselves, the servicer, then at that point --

Page 92

1          THE COURT:  What enables them to make the

2   determination that that money is not going to be

3   recoverable?

4          MR. ESSES:  It's a subjective determination that

5   the servicer is allowed to make.  So, looking at the --

6   they'll take into consideration the --

7          THE COURT:  How often do they revisit that

8   determination?

9          MR. ESSES:  They -- I'm not an expert in servicing

10  --

11         THE COURT:  Okay, that's fine.

12         MR. ESSES:  I have a pretty good understanding of

13  how this works.

14         THE COURT:  Okay.  So, this was a 2004 loan and

15  we're now at 2015, and nothing in the spreadsheet indicates

16  at what point the loan went into default, right?

17         MR. ESSES:  That's correct.

18         THE COURT:  Okay.  So, let me keep going just so I

19  understand this.  What's an escrow advance balance?

20         MR. ESSES:  Escrow advance is the escrow payments.

21  That would be for a mortgage that would be escrowed, so the

22  taxes and insurance.

23         THE COURT:  Okay.  So, you're saying that in --

24  for this particular loan as of 2015, the escrow advance

25  balance is $54,000 and does that actually reflect that that

Page 93

1   -- those monies were, in fact, paid such that if I did a

2   search on this property I would find no unpaid property

3   taxes?

4            MR. ESSES:  So what -- I think at some point the

5   servicer flipped a switch and said, "I'm going to stop

6   advancing," and the 54,000, I believe, is at a point in time

7   up until that point the servicer stopped advancing those

8   escrows.

9            THE COURT:  Okay.  So, the escrow advance balance

10  reflects actual cash money paid by the servicer to fund any

11  escrow associated with the loans?

12           MR. ESSES:  Yes.

13           THE COURT:  On account of property taxes and/or

14  insurance?

15           MR. ESSES:  Yes.

16           THE COURT:  Okay.  And then what does principal

17  balance mean?

18           MR. ESSES:  The next column, principle advance?

19           THE COURT:  Principal advance, I'm sorry.  Yes.

20  Principal advance.

21           MR. ESSES:  So similarly the servicer up until a

22  certain point would -- not to interrupt cashflow to the

23  trust -- actually make the principal and interest payments

24  on the -- for that loan, again up until a point they deemed

25  it to be nonrecoverable.  So, the borrower stops paying,

Page 94

1    this was --

2              THE COURT:  So, in this case what that means is

3    that in order to figure out what the principal balance was

4    at the moment that the borrower stopped paying, you would

5    have to add Column Q and Column T?

6              MR. ESSES:  Yes.  And there's a next due date a

7    couple of columns over which tell you that the borrower

8    stopped paying in July 2011.  He made the last -- it doesn't

9    tell me what status he was in, but the last payment he made

10   was in July -- was the month prior to July 2011.

11             THE COURT:  Okay.  So as of July 2011, this

12   borrower would've had a principal -- unpaid principal

13   balance of the sum of Q and T?

14             MR. ESSES:  Not necessarily, because there's a

15   figure in accrued interest which leads me to believe that

16   the servicer stopped paying -- stopped paying payments on

17   this loan at some point in time.  And the number is quite

18   large, so probably for a while.

19             THE COURT:  Okay.  I don't understand that.  I

20   don't understand -- what I'm trying to understand is that if

21   I were to agree with the Trustees on this loan, right, then

22   there would be an allowed claim of $764,542, right?

23             MR. ESSES:  I don't believe that's the case.

24             THE COURT:  Well, it would be greater because

25   interest is continuing to accrue.

Page 95

1          MR. ESSES:  Well, I think we'd provide -- if there

2     was -- if this was an allowed claim, we'd provide a credit

3     for whatever remaining value --

4               THE COURT:  Okay.

5          MR. ESSES:  -- there is of the loan against the --

6               THE COURT:  Fair enough.  Thank you.  Okay.  And

7     what do you -- I'm sorry, I just do not understand.  What

8     are you saying that interest advance means?

9          MR. ESSES:  So I have two -- there are two columns

10    here, interest advance and accrued interest.  So, interest

11    advance is the payments that the servicer made on interest

12    up until a certain point.

13              THE COURT:  Okay.

14         MR. ESSES:  And then the servicer stopped making -

15    -

16              THE COURT:  Okay.  Okay.

17         MR. ESSES:  -- interest payments, and that loan

18    started accruing interest due to the trust.

19              THE COURT:  Okay.

20         MR. HEIDLAGE:  Your Honor, may I ask a few

21    questions that may --

22              THE COURT:  Yeah, I'm just trying to understand

23    this --

24         MR. HEIDLAGE:  Sure.

25              THE COURT:  -- because no one's walked me through

Page 96

1    this and I think it would be good for me to understand it.

2              MR. HEIDLAGE:  I totally understand.  So --

3              THE COURT:  Thank you, Mr. Esses.  That was very

4    helpful.

5    Q    A borrower during a course of the loan is making

6    payments, is that correct?  There's a -- and principal

7    balance goes down?

8    A    To the extent they make principal payments, yes.

9    Q    Okay.  And when the borrower makes payments, that --

10   those payments, whatever they may be, flow up to the trust,

11   correct?

12   A    Minus the servicer fee on a monthly basis.

13   Q    Okay.  And then those payments get distributed to the

14   certificate holders?

15   A    Yes, subject to the waterfall of the trust.

16   Q    Okay.  Now, if -- at some point for some loans,

17   borrowers may stop making payments for whatever reason they

18   may, correct?

19   A    Yes.

20   Q    Okay.  Now, the servicers are required to meet certain

21   obligations under a servicing agreement; is that correct?

22   A    Yes.

23   Q    Okay.  And is one of the obligations generally to

24   continue to advance payments for that loan so that money

25   continues to flow through the trust even though the borrower

Page 97

1   has stopped paying?

2   A    Yes, up until the point where the servicer deems that -

3   - those payments to be unrecoverable.

4   Q    Okay.  And whether or not the servicer can deem the

5   payments unrecoverable and in what circumstances that all

6   is, is that something that's governed by the servicing

7   agreement?

8   A    I -- not exactly familiar with those terms, but I --

9   Q    I apologize.  I understand you're not an expert in

10  servicing.  So just to walk through what each of these

11  elements are here.  Where do the various items that are

12  included here -- where do they come from?  Why are they --

13  why did the Trustees list them on the claim tracking

14  spreadsheet?

15  A    We understood that these were part of the purchase

16  price definition under the governing agreements.

17  Q    I see.  So, the purchase price definition -- and I

18  don't believe we have one right in front of us -- includes -

19  - one of the elements is unpaid principal balance; is that

20  correct?

21  A    Yes.

22  Q    And one of those is servicing advances; is that

23  correct?

24  A    Generally, yes.

25  Q    Okay.  And that's what some of these items here when it

1    refers to an advance, those are the servicing advances that

2    the servicer made when the borrower stopped paying?

3    A    Yes.

4    Q    Okay.  Now, there were some questions about mitigation.

5    Do you recall that?

6    A    I do, yes.

7    Q    Okay.  Now, when a borrower stops paying on a loan, is

8    one of ways that a lender will mitigate the damage -- the

9    losses on that loan is to either foreclose or modify the

10   loan?

11   A    Yes.

12   Q    Okay.  And who is the entity that makes that decision?

13   A    The servicer.

14   Q    Okay.  And to your knowledge, were there foreclosures

15   and modifications on the loans at issue here?

16   A    Yes.

17   Q    There were some questions about how originators handle

18   loan (indiscernible).  Do you remember those questions?

19   A    I -- I do, yes.  Excuse me.

20   Q    Okay.  Of the parties here, which is the party that

21   represented the that the loan files would be complete?

22   A    Aurora.

23   Q    And who made the representations under the governing

24   agreements?

25   A    I'm sorry, I'm not sure I understand the question.

Page 99

```
 1    Q    Okay.  Never mind.  Now, there were some questions
 2    about credit reports.  Do you recall those?
 3    A    I do.
 4    Q    And other third-party sources?  Did the plan
 5    administrator ever use credit reports during the protocol?
 6    A    Sitting here today, I'm not specifically sure.
 7    Q    Okay.  Were there ever references to origination credit
 8    reports or anything like that?
 9    A    I'm not specifically sure.  In the context of our -- I
10    can think of -- I'm thinking of what we put on the screen
11    yesterday, and, you know, that was -- I'm not specifically
12    sure.
13    Q    Okay.  Now, you were a loan officer, correct?
14    A    Yes.
15    Q    And do banks use and rely on credit reports when they
16    underwrite loans to borrowers?
17    A    Yes.
18    Q    Pretty common?
19    A    Yes.
20    Q    And are the loans in the securitizations here -- were
21    any of them based on mortgages where the lenders used credit
22    reports?
23    A    Yes.
24    Q    Now, there were also some questions about some of the
25    various third-party sources, and you were shown a number of
```

Page 100

1    disclaimers.  Do you recall that?

2    A    I do, yes.

3    Q    Okay.  Are you aware that Judge Cote ruled that it was

4    --

5              THE COURT:  Stop.  Come on up.

6        (Sidebar)

7    Q    And Mr. Rollin asked about a number of third party

8    sources to -- do you recall those?

9    A    I recall, yes.

10   Q    Okay.  Do you have an understanding as to how the loan

11   review firms decided which sources to rely on?

12   A    These were sources generally relied on in the industry.

13   Q    Okay.  And you had worked with some of these review

14   firms before previously, correct?

15   A    I had, yes.

16   Q    Okay.  And had they relied on similar sources when your

17   -- past experience?

18   A    Yes.

19   Q    You were also asked some questions about loans that

20   were paid in full.  Do you recall that?

21   A    Yes.

22   Q    Okay.  For loans that had been paid in full, what would

23   the purchase be in accordance with the way that you had

24   calculated it in the -- during the protocol?

25   A    The realized loss.

Page 101

1  Q    Okay.

2          MR. HEIDLAGE:  Give me the --

3          THE COURT:  Sure.

4  Q    When you were requesting loan files in the critical

5  documents, did the servicers ever tell you that they had

6  given you everything that they had?

7  A    Yes.

8  Q    Okay.  And did you accept that representation?

9  A    Yes.

10         MR. HEIDLAGE:  I think we -- I have no further

11  questions.

12         THE COURT:  Thank you.

13         MR. ROLLIN:  (Indiscernible).

14         THE COURT:  It does end, Mr. Esses.

15         MR. ESSES:  Are they going to take long enough to

16  let me run to the restroom, or should I just wait?

17         THE COURT:  Absolutely.  Go ahead, sir.  There's

18  one right in the back.  If you go through that back door

19  where it says, "Exit," it's a shorter walk.

20     (Recess)

21         THE COURT:  Okay.  Very good.  Mr. Esses, thank

22  you very much.  Thank you for your patience and your good

23  humor.  Appreciate it.

24         MR. ESSES:  Thank you.

25         THE COURT:  Have a good afternoon.

Page 102

1          MR. GOLDBERG:  Your Honor, can we take a 10-minute

2    break while we shuffle the deck and get --

3          THE COURT:  You can shuffle the deck.  Should I

4    put aside all these binders, do you think?

5          MR. GOLDBERG:  Yes, I think so.

6          THE COURT:  Okay.  Thank you.

7      (Recess)

8          THE COURT:  Mr. Shuster, welcome back.

9          MR. SHUSTER:  Your Honor, it's good to be back.

10   Thank you.

11         THE COURT:  Now, you have to tell the truth here,

12   you know.

13         MR. SHUSTER:  Yes.

14         THE COURT:  Ready?

15         MR. SHUSTER: Yes.

16         THE COURT:  Okay.

17         MR. SHUSTER:  Your Honor, the Trustees call James

18   Aronoff.

19         THE COURT:  Very good.  Mr. Aronoff, please come

20   up.  Good afternoon.  How are you?

21         MR. ARONOFF:  How are you?

22         THE COURT:  Mr. Aronoff, would you raise your

23   right hand, please, sir?  Do you solemnly swear or affirm

24   that all the testimony you're about to give before the Court

25   shall be the truth, the whole truth, and nothing but the

Page 103

1    truth?

2            MR. ARONOFF:  Yes, I do.

3            THE COURT:  Very good.  Have a seat.  Make

4    yourself comfortable, as comfortable as you can up there.

5    You have water.  If you need a break, let us know.  You do

6    not have to wait for Mr. Shuster to ask you if you would

7    like one.

8            MR. ARONOFF:  Thank you very much.

9            THE COURT:  All right?  Binders, Mr. Shuster?

10           MR. SHUSTER:  Well, I didn't want to be

11   presumptuous because I'm going to try and qualify the

12   witness, but I do have binders.  I have a deck, so why don't

13   we hand out the deck and then we have got Mr. Aronoff's

14   expert reports which are in four binders.

15           THE COURT:  Thank you.

16           MR. SHUSTER:  And we have a loan binder which I'm

17   not -- two loan binders which I don't think we'll get to

18   until tomorrow.

19           THE COURT:  Okay.  Do we want to set up that

20   alternative arrangement, the annex, for Mr. Aronoff's

21   binders?

22           MR. SHUSTER:  You mean over here?

23           THE COURT:  No, over here.

24           MR. SHUSTER:  Yes, I think ---

25           THE COURT:  Oh, it looks like we still have the

Page 104

1   annex.

2            MR. SHUSTER:  Yes, we do.  I think that's a good

3   idea.

4            THE COURT:  Okay.

5                DIRECT EXAMINATION OF JAMES ARONOFF

6   BY MR. SHUSTER:

7   Q    Good afternoon, Mr. Aronoff.

8   A    Good afternoon.

9   Q    Where are you currently employed?

10  A    At Baker Tilly.

11  Q    And what is your position there, sir?

12  A    I'm a principal in the forensic litigation valuation

13  services group.

14  Q    How long have you been there?

15  A    Almost two years.  Since January of 2016.

16  Q    Would you please describe your practice?

17  A    Yes.  My practice is primarily to provide consulting

18  expert and expert witness testimony in connection with

19  complex litigation that resulted from the financial crisis.

20  Q    Is your professional experience and background

21  accurately summarized in the curriculum vitae that's attach

22  as Appendix A to your affirmative expert report?

23  A    Yes, it is.

24  Q    Okay.  And we created -- we're going to work off a

25  chart?

Page 105

1    A    Sure, but I --

2    Q    Yes.

3    A    -- figured I'd look at it.

4    Q    Go ahead.

5    A    It is.  Great pains were taken to make sure that it

6    was, yes.

7    Q    Okay.  So, we pulled up TRX-601 which is a summary of

8    your professional experience.

9    A    I have 161.

10   Q    Sorry, 161, the source is 601.  Would you please start

11   with your educational background, college, and thereafter

12   and walk us through your professional -- your educational

13   experience and then your professional background and

14   qualifications?

15   A    Yes.  I have a bachelor of arts in economics and

16   political science from Yale College and a JD with a

17   specialization in international law from Cornell Law

18   Schools.  That's my educational background.

19   Q    Okay.  Professional?

20   A    Given that background, my first professional engagement

21   as a young employee was at Thacher, Proffitt, and Wood and I

22   joined Thacher in 1983 as one of the first associates hired

23   into the fledgling new mortgage-backed securities group.

24   And in that role, the young attorneys in that group were

25   responsible for assisting our clients who were primarily

Page 106

1    investment banks and those subsidiaries of investment banks

2    that invested, purchased, sold, and securitized residential

3    mortgage loans.

4         So, we were responsible for assisting in the

5    negotiation and drafting of the (indiscernible)

6    documentations of -- related to both the purchase and sale

7    of residential mortgage loans as well as the ultimate

8    securitization of those loans.

9         In addition, back in those days, prior to the

10   existence of forensic loan firms or due diligence firms, it

11   was very, very common for the young attorneys to accompany

12   the bankers on the road to actually sit in conference rooms

13   and crack loan files, much to the chagrin of the partner I

14   worked for who kept saying that our liability insurance

15   didn't cover him for me calculating LTVs and DTIs.

16        From Thacher -- so, a lot, extensive experience

17   helping to draft and create some of the foundation documents

18   that are used -- were used in the market right up until the

19   financial crisis, and in fact I cite in my report and area

20   where they are still called to this day the Thacher form of

21   document.

22        I left Thacher after four and a half years to go

23   to an investment bank, Kidder Peabody, and my role there was

24   primarily as a transaction manager.  And in that role, I was

25   primarily responsible for facilitating the same types of

Page 107

1    transactions for which I was -- that I worked on at Thacher,

2    and that is the purchase and sale whole loans to our conduit

3    which aggregated whole loans for purposes of securitization

4    as well as working on and bringing together all the aspects

5    of the transaction that would ultimately result in a

6    securitization.  Some of that -- go ahead, I'm sorry.

7    Q    I just -- I don't mean to interrupt you.  You mentioned

8    a conduit?

9    A    Yes.

10   Q    What were you referring to?

11   A    We -- there was a facility, a business unit at Kidder

12   that acquired residential whole loans from correspondent

13   sellers as well as bidding on pools of loans that may have

14   come up for the bid, and those were purchases with the

15   specific purpose of securitizing those loans.

16   Q    Okay, please continue your --

17   A    The role of a transaction manager was really to bring

18   together the transaction and coordinate the various

19   constituencies that were involved in either purchase and

20   sale or securitization, so it would be contact with the law

21   firms that were involved; contact with the trading desk; to

22   the extent necessary for a securitization, coordination with

23   the rating agencies; any credit enhancers that were involved

24   in the deal; as well as bring together whatever loan

25   diligence that was conducted in conduction with either the

Page 108

1    acquisition or the securitization.

2         So really, kind of the traffic coordinator and

3    then making sure that ultimately all the appropriate pieces

4    and conditions precedent to closing the transaction were

5    satisfied before we funded either a purchase or the closing

6    of securitization.

7    Q    Please continue.

8    A    After that, I moved to Financial Security Assurance,

9    which I'll probably refer to during the course of my time

10   here as FSA.  FSA was a financial guarantee insurance

11   company sometimes called bond insurers or mono-lines, and

12   the role that FSA played in the RMBS market was to insure

13   RMBS securities for the benefit of investors.

14        So, in terms of the value added to investors, FSA

15   would step into their shoes and guarantee unconditionally

16   and irrevocably that the payments promised to investors

17   would be made regardless of whether those payments were

18   actually available.

19        In that role, I worked in the residential mortgage

20   group with primary responsibilities of sourcing and

21   underwriting transactions; that is, to find those

22   opportunities in the marketplace where bond insurance made

23   sense and was an efficient execution for the parties that

24   were buying it, where there was investor demand, and then

25   once those opportunities were identified to do everything

Page 109

1    that was necessary to bring those transactions in front of

2    our credit committee to get the deal approved and typically

3    that involved a careful analysis of the applicable loan

4    pool.

5           It required an estimation of the expected loss

6    with respect to that pool and all that entailed.  It

7    required the negotiation of the governing documents

8    including reps and warranties which were very similar to the

9    reps and warranties at issue here, as well as facilitating

10   the actual closing of the transaction.  And FSA really

11   rounded out my credit analysis skills.

12          Whereas I had acquired kind of structural and

13   legal skills at Thacher, Kidder more of a banker, got

14   involved in the pricing and the other aspects of providing

15   investment banking services to the market, FSA really put me

16   more in the shoes of the investor and allowed me to

17   understand in a deeper way the credit analysis and the

18   analysis of pool performance and risk of loss with respect

19   to residential mortgage pools.

20          After FSA, I had the opportunity to go to bring

21   that package together at (indiscernible) Securities where I

22   ultimately ended up running what was called the fixed income

23   structured finance group.  And in that role, one of the

24   desks I was responsible for was our whole loan trading desk

25   where we purchased and sold residential mortgage loans.

Page 110

1           And another business unit I was responsible for

2     was the (indiscernible) conduits.  We had two shelf

3     registrations and again, not unlike my description with

4     Kidder, we purchased and sold mortgage loans through the

5     conduit mechanism to aggregate loans from various

6     correspondence and other sources with an eye toward

7     securitization.

8     Q    In the course of your responsibility for the whole

9     trading desk that purchased and sold residential mortgage

10    loans, what expertise did you bring to bear or acquire?

11    A    The experience that was brought to bear on a daily

12    basis was the pricing of residential mortgage loans as the

13    trading desk reported to me.

14           The ultimate signoff on credit policy with respect

15    to our trading desks as to what parameters relating to the

16    loans -- what the parameters were relating to the types of

17    loans we would purchase, would fit into our programs.

18           I was also the new issue supervisor which gets to

19    the securitization side, but I had responsibility as the

20    licensed representative to make sure that the disclosure

21    relating to the loans that went in the transactions was

22    appropriate and true, and to assure myself that that was the

23    case, we had a fairly extensive operations group that not

24    only was responsible for conducting all related quality

25    control which occurred twice in the process, but also was

Page 111

1    responsible for administering any put-backs that we would

2    engage in during the course of the operation of the

3    business.

4    Q    What do you mean by "put-backs"?

5    A    That to the extent there were loans that we purchased

6    that were found to not conform with the applicable

7    representations and warranties, we administered our rights

8    under the agreements and put those loans back to the

9    appropriate seller.

10    Q    And did those agreements have provisions similar to the

11    ones here?

12    A    Very similar, which is very understandable given that

13    there are standard representations and warranties and

14    standard repurchase provisions that are common to all

15    private label residential mortgage-backed securities.  I say

16    private label to distinguish them from agency securities.

17           I mentioned two times when a loan may be

18    identified for put-back and more a -- and this is consistent

19    with other entities I've worked at and managed with respect

20    to a whole loan acquisition or securitization program.  It

21    is typically, at the time you acquire whole loans, you do

22    some basic due diligence to make sure you can trust the

23    quality of the loans.

24           But it's also a good practice that subsequent to

25    purchase, that there be an ongoing quality control process

Page 112

 1  that allows you to review the loans in your portfolio and

 2  make sure that they conform with the applicable reps and

 3  warranties.

 4          Similarly, prior to securitization, once you've

 5  identified a pool of loans to be securitized, I would engage

 6  in a similar review to make sure that none of the loans

 7  going into the pool didn't satisfy the promises that I was

 8  about to make, excuse me, to the marked about the quality of

 9  those notes.

10  Q    (Indiscernible).

11  A    Yeah, I'm going to take a sip.  Thanks.  So, bear with

12  me.  We're up to 1997.  I'll speed it up.

13  Q    Take your time, please.

14  A    I left NOMURA to start my own mortgage company.  A

15  partner and I raised capital and we purchased loans from the

16  marketplace with an eye toward securitization.  We secured

17  (indiscernible) from investment banks, and over the course

18  of three years we acquired close to 600 million of loans --

19  primarily acquired.

20          Two years into the operation, we acquired a retail

21  originator and in addition to buying closed loans from

22  mortgage bankers, we also started lending directly to

23  customers in 17 states.  I just bring that up because there

24  were multiple channels of types of loans that had to be

25  evaluated and assessed prior to our putting them into

Page 113

1  securitizations to make sure that the promises we made to

2  the market were true and correct.

3  Q    Just to be clear, when you say you began lending to

4  customers in 17 states, do you mean that you -- your entity,

5  your company originated and underwrote mortgage loans?

6  A    Correct.  Our subsidiary did, directly.

7  Q    Did you have a role in that?

8  A    Yes, in terms of -- well, we funded the acquisition.

9  Just like with that acquisition, loans were funded with, in

10 essence, my own money as I was an owner of the mortgage

11 company.  So, yes, not only did we thoroughly evaluate the

12 operation, but of course similarly to running the main

13 company, we -- I said create a policy.

14             I looked at loans frequently in terms of deciding

15 whether or not there were loans we wanted to make.  I was

16 involved in evaluating the QC reports and I was intimately

17 involved in the discussions with the rating agencies and our

18 investment bankers in terms of selling our loans through

19 securitization vehicles.

20 Q    Any role in policies and procedures?

21 A    I --

22 Q    Any role in --

23             THE COURT:  Mr. Shuster, can you keep your voice

24 up?

25             MR. SHUSTER:  Yes, not --

Page 114

1           THE COURT:  I don't think the folks in the back

2    can year you.

3           MR. SHUSTER:  Yes.  Not usually my issue, but I

4    will.

5    Q    Any role in policies and procedures?

6    A    Yes.  Yes.  A very critical and important role.  At

7    first, we -- there was no one else to set the policy.  My

8    partner and I did it all.  As we grew, I delegated authority

9    based on certain parameters.  But yes, the credit culture

10   and the types of loans that we wanted to buy at the prices

11   we wanted to pay were all areas that I had significant input

12   into.

13   Q    Did you -- did FC Capital Corp. actually close any

14   mortgage loan securitization transactions?

15   A    Yes.  We funded two RMBS underwritten by Nomura and

16   Lehman Brothers, and they were insured by FSA.  I might add

17   that at FC Capital as well we were -- we aggressively

18   enforced our rights under the reps and warranties.

19           You tend to do that when you've funded loans with

20   your own money and you're making promises in the marketplace

21   about the quality of those loans, so the extent, again, in

22   either QC or any time we discovered there was a breach of a

23   rep and warranty be means of the functional equivalent of a

24   forensic review, we would put those loans back to the

25   parties that promised that quality to us.

Page 115

1    Q    When you talk about reps and warranties, are you

2    talking about loan level representations and warranties of

3    the type that are present in the securitization documents

4    here?

5    A    That's correct.

6    Q    Did those documents also have material in adverse

7    effect or equivalent standard or what we call here the AMA

8    standard?

9    A    Yes.  Yes, they had the same standard, and generally

10   had the same three types of ways in which the party making

11   the reps could satisfy the, you know, their obligation under

12   the repurchase provision, cure, substitute, or repurchase.

13   Q    Please continue.

14   A    Sold FC Capital, the mortgage company, in 2000 and set

15   up a consulting firm called MTGX, Mortgage X was just the

16   beginning of the internet and we that would be a catchy

17   internet presence name.  Sold the company before we ever

18   brought it to fruition, but it continues today as a reminder

19   of what might have been.

20            Through MTGX, we -- well, it was a sole

21   practitioner LLC, it was mine, and through that entity I was

22   able to, through my familiarity with the market and my

23   contacts, was able to during the early parts of the 2000s

24   provide advisory and consulting work in connection with

25   really building specialty finance companies including

Page 116

1    residential mortgage companies.

2            We would facilitate due diligence for clients, we

3    would set credit policy, we would write policies and

4    procedures manuals, we would help set up and implement

5    mortgage origination platforms -- wherever the market took

6    us at that point in time.  Some of the engagements --

7    Q    And I don't mean to interrupt, but just -- I -- by

8    "us," you mean you and your colleagues?

9    A    Me and my clients and then to the extent we had to

10   secure additional services from consultants, we would.  But

11   yeah, so it was my company and I'll get back to why that's

12   important later.  It also served as an investment vehicle

13   where I was able to actually take investment -- make

14   investments or get sweat equity in some of the entities that

15   I helped set up.

16           There were two along the way that I think are

17   relevant to my involvement here.  One was in 2002-ish.  I

18   was engaged in a full-time consultancy with French Bank to

19   set up a bond insurer and again in that regard I set up the

20   capital market's investment policy and policies and

21   procedures for the financial guarantee insurer called CIFG.

22   They were a subsidiary of (indiscernible).  Helped them get

23   their ratings, and also set the policy, the credit policy

24   and administrative policy, for insuring residential

25   mortgage-backed securities through CIFG.

Page 117

1           When I left, they had offices in three countries,

2    ratings from three rating agencies, triple A, and were on

3    their way.  The other important investment out of MTGX that

4    occurred was in 2003, where I set up a company called

5    Portfolio Reconnaissance Services which we called Recon and

6    what Recon did was it provided information to investors to

7    better track and monitor and understand the pools of loans

8    underlying the securities they bought.

9    Q    Pools of mortgage loans?

10   A    Pools of residential mortgage loans.  The company was

11   geared towards all asset-backed securities.  Truth be told

12   90 percent of our business related only to RMBS.  And that

13   was important at that time because two years later the SEC

14   through the adoption of Reg AB, required that issuers

15   provide the very same type of information to investors to

16   assess the quality of their investments that in 2004 we were

17   able to provide to investors through our technology.

18           I was fortunate to be able to sell Recon in 2004,

19   at the end of 2004, to TA Associates, private equity firm,

20   and was back to work in MTGX advising and consulting

21   participants in the residential mortgage market in various

22   aspects of the market.  At some point, towards the latter

23   part of the 2000s, the work started to shift from building

24   and creating to workout, remediation, and problem

25   resolution, and that tracked the market turning.

Page 118

1   Q    Let's just make sure we cover the building and creating

2   part.

3   A    Yes.

4   Q    So in that time period, now we're '04 to, I guess '09

5   roughly, describe --

6   A    '04 to '07-ish.

7   Q    Okay.  Describe your professional activities

8   (indiscernible).

9   A    Yeah, it was primarily helping capital providers who

10  wanted to participate in the market, in many cases, figure

11  out how to do that.  Do they set up a mortgage company and

12  originate?  Do they buy RMBS?  And regardless of how they

13  wanted to deploy their capital, help them design framework

14  to embark on that exercise that took into account the

15  relative risks involved in that type of activity.

16          And apart from credit policy, a lot of it was just

17  logistical administrative.  So, you have a credit policy,

18  how do you actually execute and administer it?  What kinds

19  of people?  What kinds of systems?  What kinds of controls

20  do you put in place?  You know, how does the accounting

21  work, as opposed to how you've done it before?

22          So, I was nimble and opportunistic and wherever

23  opportunities came up or I thought I could add value, I

24  seriously considered them.

25          Along that time, although it increased as the

Page 119

1    market started to deteriorate, there were from time to time

2    engagements where we were asked to evaluate existing

3    portfolios of mortgage loans and in terms of evaluating

4    them, one of the common audits or reviews that I was asked

5    to do was to help my client determine whether or not a pool

6    of loans conformed with the related reps and warranties.

7            And then to the extent the analysis was done and

8    the determinations were made, very often I was asked to help

9    them administer either a put-back of those or in some

10   instances I had clients that retained us to defend against

11   put-back claims that they may have received from parties to

12   whom they sold loans.

13           In 2007, I was engaged for my first expert witness

14   engagement, and that was -- I was engaged by the debtor

15   estate in the American Home Mortgage bankruptcy to provide

16   consulting expertise to the lawyers at Young Conaway and at

17   that point in time in bankruptcy court in Delaware, that was

18   where Judge Sontchi qualified me as an expert in the RMBS

19   industry.

20           Not surprisingly, sometime thereafter I started

21   getting more calls as the need for experts who had been

22   practitioners started to increase and I started to get more

23   calls in connection with more troubled or distress

24   situations, in particular situations where there were pools

25   of loans in RMBS that some stakeholder to the securitization

Page 120

1   was exploring its rights and remedies under the governing

2   documents.

3           And that, in part, facilitated or -- my desire to

4   grow the sole practitioner consultancy at MTGX, and I merged

5   with a small existing consulting firm called FCS Advisors in

6   2009, and in essence took my existing practice into the FCS

7   shell and took over the management of FCS.  And it was in

8   FCS that I was retained initially for a series of MBIA cases

9   where I served as a consulting expert and expert witness on

10  those cases.

11  Q    Did you have a partner in FCS Advisors, or was is your

12  own entity?

13  A    I had partners, thankfully, who were able to take over

14  any transactional business that I had at the time, because

15  at some point when MBIA asked me if I could work on more

16  than the one case that I had been working on and suggested

17  that I find bandwidth if I want to keep working with them, I

18  made the determination to become an expert witness in this

19  arena full time and started looking for a larger firm that

20  could provide me with the bandwidth needed to work on some

21  of the larger, more complicated cases.

22          And that's what brought me to Duff and Phelps in

23  2012.  By now my practice included other types of cases in

24  addition to the bond insurance cases, probably two other

25  categories, one I'll call securities or blue sky cases, and

Page 121

1    the others are put-back cases which are on all fours with

2    the types of issues we saw here.

3           However, in all three types of cases, the analysis

4    of the residential mortgage loans, the rights and remedies

5    available to the parties to those, governing documents were

6    all, if not the entire focus, a significant important focus

7    of my work.

8           And finally, that brings us to Baker Tilly where

9    Duff and Phelps is not a professional partnership and I was

10   offered the opportunity to become a partner at Baker Tilly

11   and, as I said, in January of 2016 I accepted it and

12   continued to work essentially, for the most part, with the

13   same types of client, the same law firms, on the same types

14   of transactions up through today.

15   Q    During the course of your professional career as you've

16   described it, did you have occasion to develop expertise in

17   mortgage loan origination and underwriting?

18   A    Yes, at NOMURA, FC Capital, and I did it, in essence,

19   for my own account or the firm's account and then on

20   numerous occasions on behalf of clients at MTGX and FCS

21   Advisors.

22   Q    How about residential mortgage -- RMBS due diligence?

23   Same question.

24   A    Again, I think at every stop there was some due

25   diligence that I conducted personally and/or was responsible

Page 122

1   for designing and implementing and administering.  Again,

2   back to the first time at Thacher they put me on a plane and

3   explained to me what an LTV and a DTI was, but yes, at

4   probably every stop along the way cracking loan files and

5   trying to figure out who did what to whom and why.  That's

6   been a kind of defining feature of the work I've embarked

7   on.

8   Q    During your professional career, did you have occasion

9   to develop expertise in the buying and selling of mortgage

10  loans and factors affecting mortgage loan value?

11  A    Yes, at Kidder, NOMURA, and FC Capital, those were

12  essential to the role I played.

13  Q    Did you have occasion to develop expertise in

14  evaluating risk on mortgage loans?

15  A    Yes.  That -- it's hard to separate the evaluation of

16  risk from pricing and due diligence or evaluation of the

17  quality of loans, and in my mind when you talk about the

18  quality and characteristics of loans, other than some

19  economic features of the loan, you're always talking about

20  the credit risk of the loan.  That is, the performance of

21  the loan or the risk of loss with respect to that loan.

22  Q    Did you have -- did you develop expertise in the

23  (indiscernible) the borrower misrepresentations or other

24  defects including their materiality and/or applicable

25  representations and warranties or the AMA standard?

Page 123

1    A    Yes.  From various sides of the existence of those reps

2    and remedies existing in RMBS transactions.  As I said, at

3    Kidder we acquired loans where we were the beneficiary of

4    reps and warranties and we made reps and warranties to the

5    market in our securitizations.

6            Similarly, at NOMURA and FC Capital, same thing.

7    We acquired loans and as part of what we were acquiring we

8    bought the loans and the cashflow off those loans, but part

9    of the bargain was also that the promises that were made to

10   us by the seller, that the loans were of a certain quality

11   and characteristic.

12           At Financial Security Assurance also and CIFG, as

13   the party insuring the credit risk on the loans, the

14   demarcation of what loans were we taking the risk of loss

15   on, i.e., those loans that were conforming with the reps and

16   warranties was very important to know because to the extent

17   we found that loans that were not -- did not conform with

18   the reps and warranties -- were outside that box for lack of

19   a better term -- those were not loans that I had not

20   bargained to take the credit risk on, and for that reason,

21   those loans were to be put back to the seller.

22           And then on behalf of clients, I engaged in

23   similar activities at Recon, FCS Advisors, MTGX.  And then

24   as an expert and consultant, again at FCS, Duff and Phelps,

25   and Baker Tilly.

Page 124

1    Q    You may have covered this.  Did you also have occasion

2    to develop and apply expertise in connection with repurchase

3    claims and the standards and evidence customarily used in

4    the industry for such claims?

5    A    Yeah, I have to answer that in two parts.  Prior to the

6    financial crisis, I was engaged in what I'll call the

7    administration of put-back claims pursuant to repurchase

8    provisions very similar to the ones at issue here.

9         Those didn't involve lawyers, typically.  They

10   typically didn't involve expert witnesses.  They didn't

11   involve judges.  They didn't involve economists.  There was

12   an understanding that certain key features of the loans were

13   material and if that important feature was bad, it was

14   adverse and the discussions would ensue.

15        That's not to say that simply because a repurchase

16   request was made, the other side would agree.  But there was

17   a common understanding of what those things meant in the

18   documents and there was a common understanding as to how the

19   existence of a breach would be demonstrated by the party

20   putting a loan back.

21        And the second part is, when you talk about the

22   standards of evidence, I've come to understand that over the

23   last eight or nine years specifically in connection with my

24   work as an expert witness and consulting expert who's asked

25   to conduct forensic loan reviews for the purposes of

Page 125

1    determining whether or not there are breaches of the

2    applicable rep and warranties and then using that

3    information to -- as the basis for the expert opinions I

4    provide to the Court.

5    Q    And finally, have you had occasion to develop and apply

6    expertise in forensic loan reviews including for purposes of

7    repurchase claims?

8    A    Yes.

9    Q    Is that the expertise you've already described?

10   A    Extensive -- yeah, I think that answer was part of the

11   last answer.

12           MR. SHUSTER:  Your Honor, the Trustees tender Mr.

13   Aronoff as an expert on loan origination, underwriting, and

14   securitization; factors affecting the value of mortgage

15   loans; the industry understanding of reps and warranties and

16   AMA language; and methods and evidence customarily used in

17   repurchase reviews.

18           THE COURT:  Mr. Davis or Mr. Cosenza?

19           MR. COSENZA:  Yeah, Your Honor, just one objection

20   to the record.  We don't have an issue with Mr. Aronoff's

21   expertise.  We do think in this case and we'll do this

22   during cross examination.  I think it's not contested with

23   the Trustees he's in a weird hybrid role here as a both a

24   fact and expert witness and we are going to treat him as

25   such during our examination.  Secondly, to the extent --

Page 126

1          THE COURT:  Let me just ask you to pause.  That --

2     I think that has nothing to do with -- that's not an

3     objection to his qualifications as an expert, correct?

4          MR. COSENZA:  That's correct, Your Honor.

5          THE COURT:  Okay.  Second?

6          MR. COSENZA:  And the second issue, Your Honor, to

7     the extent his understanding of, you know, terms and

8     industry custom and the contracts, to the extent that

9     borders onto legal opinions which we think his reports were

10    close on those, we're going to take that question by

11    question and issue by issue, but I just wanted to alert the

12    Court that that may become an issue during our -- during Mr.

13    Shuster's examination.

14         THE COURT:  Mr. Shuster, did you want to say

15    anything in response to that?

16         MR. SHUSTER:  We don't intend to seek legal

17    opinions from Mr. Aronoff.

18         THE COURT:  Okay.  All right, very good.  You're

19    qualified as an expert, Mr. Aronoff.

20         MR. ARONOFF:  Thank you, Your Honor.

21         MR. SHUSTER:  Thank you.  Means my time here will

22    be much longer.  Mr. Aronoff --

23         THE COURT:  You and me both.  Do you need some

24    water, Mr. Shuster?

25         MR. SHUSTER:  I sound like I do.  I guess I do.

Page 127

1          THE COURT:  No, you don't have to drink water.

2          MR. SHUSTER:  Thank you.

3          THE COURT:  I have these up here as well.

4          MR. SHUSTER:  Always a good idea.  No, I'm good.

5          THE COURT:  Okay.

6          MR. SHUSTER:  Thank you so much.  I'll keep this

7    near to hand.

8    Q    Mr. Aronoff, what was the scope of your engagement here

9    as an expert witness, and --

10   A    I think we have a demonstrable.

11   Q    Yes.

12   A    And this tracks with my affirmative report.

13   Q    This is TRDX-162.  Please, proceed.

14   A    The ask was to summarize the breach findings and the

15   reps and warranties that accompany those breach findings to

16   support the claims submitted by the trustees pursuant to the

17   protocol.  The second was to offer an opinion as to the

18   validity of those breach findings, and the third was to

19   opine as to whether those breaches materially and adversely

20   affect the value of the relevant loans.

21   Q    Can you give us a summary of your opinions, please?

22   A    Not surprisingly, they attempt to answer those very

23   questions.  The first opinion is that each of the loans that

24   are the subject of my affirmative report -- for each of the

25   loans, there are one or more breaches of the reps and

Page 128

1    warranties made by Lehman with respect to those loans.

2          The second opinion is that each breach, materially

3    and adversely affects the value of the loan or in some cases

4    the standard was the interest of the certificate holders in

5    those loans.

6          We've -- and then finally because it's important

7    that the process by which I -- and the information on which

8    I relied is reliable and reasonable, that produced the

9    information on which I used to make those opinions, I've

10   also implicitly opined that these breaches are the result of

11   a forensic review conducted by experienced loan review

12   professionals employing methods customarily used for such

13   reviews including the reliance upon evidentiary sources that

14   are commonly used in such reviews.

15         THE COURT:  Can I ask you a question, Mr. Aronoff?

16   You don't really mean that.  You don't mean that the

17   breaches are the result of the forensic review, you mean

18   that the breach findings --

19         MR. ARONOFF:  The breach findings.

20         THE COURT:  Okay, there's kind of a big

21   difference, right?

22         MR. ARONOFF:  There is a big difference.

23         THE COURT:  Okay.

24         MR. ARONOFF:  And --

25         THE COURT:  Let's let Mr. Shuster catch up with

Page 129

1    us.

2              MR. SHUSTER:  No, I -- I'm trying.

3              MR. ARONOFF:  Your Honor, there -- just from time

4    to time I will use little b breach as a breach finding and

5    big B breach as the stuff you guys have to decide, the legal

6    breach.

7              THE COURT:  Okay, but just as a matter of the --

8    of English, the breaches are not the -- the breaches are not

9    the result.  I'm --

10             MR. ARONOFF:  No, they're not the result.  They've

11   been identified or discovered in the course of the forensic

12   review.

13             THE COURT:  Yes, thank you.

14             MR. ARONOFF:  I stand corrected

15             THE COURT:  Okay.

16             MR. SHUSTER:  By breaches there, you mean the

17   breach findings, correct?

18             MR. ARONOFF:  The breach finding, yes.

19             MR. SHUSTER:  Which The Court just clarified.

20             THE COURT:  Okay.

21             MR. ARONOFF:  Yes, was identified or discovered by

22   means of the review.  The review didn't make the breaches,

23   yes.

24             THE COURT:  We're on the same page.

25             MR. ARONOFF:  Thank you.  I stand corrected.

Page 130

1    Q    So, Mr. Aronoff, would you just, in general terms, tell

2    us what you presented in your expert reports, please?

3    A    Yes.  The affirmative report provided my

4    qualifications.  It discussed the process.  It explained and

5    summarized the various breach finding categories.  It tied

6    those, or mapped those, to the applicable reps and

7    warranties, since that's the source of any particular breach

8    finding with respect to any particular trust.  The

9    materiality standard is introduced and described, and the --

10   and it -- and then there was some discussion of the major

11   categories of breach findings, and I highlighted various

12   statistics and incidence around those major breach

13   categories.

14   Q    Incidence -- you mean incidents as in?

15   A    Frequency.

16   Q    Incidence ending in CE rather than TS?

17   A    Yes, I do.

18   Q    Please continue.

19   A    I was also asked to provide a rebuttal report and a

20   reply report, and in the rebuttal, to the extent there was

21   information that was provided in any of the Plan

22   Administrator's affirmative -- expert's affirmative reports

23   that needed clarification or reiteration, we attempted to do

24   that.  In particular, we -- I went into some depth about the

25   reliability of the data sources that were used to support

Page 131

1   various types of breach findings, since that seemed to be an

2   area of considerable discussion.  And then, we provided some

3   responses to exemplars that had been discussed in the Plan

4   Administrator's expert's affirmative report.

5        Similarly, in the reply report, there were other

6   continuing discussions and disagreements and areas of

7   concern that we felt needed to be addressed.  In particular,

8   there were some comments about different interpretations of

9   various reps and warranties.  That was addressed in the

10  reply report, in addition to further clarification and

11  discussions about various exemplar loans that had been

12  commented on.  And so, those are the major areas of

13  discussion in the various reports.

14  Q   Okay, we'll get into much of that in greater detail.

15  You mentioned breach finding categories and so forth, so

16  let's start with income breaches.  Can you explain what a

17  breach -- an income breach is and the representations and

18  warranties under which the Trustees found such breaches, or

19  you opine that such breaches exist?  Explain what you mean

20  by income -- what you mean in your reports by income

21  breaches.

22  A   Yeah, we talk primarily, and it's the major breach-

23  finding category, of a misrepresentation of income.  And the

24  rep and warranty source of that type of deficiency or defect

25  is based in one of two -- or both -- representations and

Page 132

1   warranties, based on their appearance in the governing trust

2   agreement where the loan in question resides.  Do you want

3   me to talk about the specific reps and warranties?

4   Q    If you would, please.

5   A    Yeah, the first specific rep and warranty that would be

6   breached if the forensic loan reviewers identified a

7   misrepresentation of income would be what I call the no-

8   default rep.  And very simply, the no-default rep is

9   designed to assure investors that they're not buying a loan

10  that's already in default or contains facts and

11  circumstances that would put it into default right after

12  they bought it.  So, it's a promise that you're buying a

13  loan that isn't in default, and it's pretty straightforward.

14  It says there's no default.  Sometimes, there's a

15  qualification about a monetary default, so the kinds of

16  defaults that we identified that were -- that the loan

17  review firms were asked to identify under this

18  representation warranty had nothing to do with monetary

19  defaults, but only other types of defaults under the

20  mortgage or the mortgage note.  And the primary source of,

21  or the primary way in which a default could exist or

22  circumstances could exist that would trigger a default, are

23  based in the covenants that  the borrower makes to the

24  lender in either the mortgage or the mortgage note.  And

25  I've highlighted here in the demonstrable --

Page 133

1    Q    You mentioned the mortgage or the mortgage note.  You

2    identified the deed of trust here.  Did you mean the

3    mortgage or the deed of trust?

4    A    No, the mortgage is equivalent with the deed of trust.

5    But if you look at the rep and warranty, it says mortgage or

6    mortgage note, and the mortgage and deed of trust are

7    equivalent documents, depending upon what jurisdiction.

8    Q    Thank you.

9    A    It's the security agreement.  The primary covenant that

10   appears in the standard form of mortgage that was used in

11   almost every instance in this -- in these trusts with

12   respect to these loans is written the way in which this

13   Number 8 -- it's the eighth line of the standard agency

14   mortgage or deed of trust, and it says very simply that the

15   borrower shall be in default if the borrower gives

16   materially false, misleading, or inaccurate information or

17   statements to the lender, or fails to provide the lender

18   with material information.  It goes on to talk about

19   occupancy as something that is material, in case there's any

20   doubt about that, to the borrower when making this promise

21   to the lender.  But for purposes of the misrep of income

22   discussion you asked me to engage in, this was the basis for

23   a breach finding, if in fact, upon review of the file, a

24   loan reviewer identified or discovered a file in which they

25   thought the borrower misrepresented their income.

Page 134

1    Q     While we're on this, were other forms of breaches,

2    other than income breaches, also asserted under these

3    provisions?

4    A     Yes, as you might notice, the word income doesn't

5    appear in here, but there are certain types of information

6    or statements that affect the credit risk of the  loan,

7    affect the performance of the loan, that are material.  And

8    that takes into account the fact that it's not any statement

9    made by the borrower, but a material statement made by the

10   borrower for purposes of this representation warranty, and

11   those were limited to -- in the review, those were limited

12   to those facts that go to those critical areas of assessing

13   the borrower's ability to pay, and other aspects of the

14   borrower, that go to the credit risk of the loan.  And so,

15   you'll only find a misrepresentation breach if it relates to

16   one of those critical factors, and there were five of them.

17   It was income, debt, occupancy, assets, and employment.  So,

18   if a mistake or inaccurate information in the application

19   process didn't relate to one of those five important

20   features, there was not a breach cited.

21   Q     You mentioned --

22   A     Despite the breadth of the rep, the covenant.

23   Q     You pointed out the language in the -- first of all, I

24   note for the record that the no-default language is taken

25   from LXS 2006-15, from the MLSAA in that transaction, and

Page 135

1    the mortgage and deed of trust comes from loan ending in

2    1955, which we'll come to.  That's TRX-231 and TRX-1

3    respectively.  You pointed out language relating -- the

4    language that material representations include but are not

5    limited to representations concerning borrowers' occupancy.

6    Is there -- are there any other covenants in the mortgage

7    that go to borrower occupancy?

8    A    Typically, there are, yes, and I think I show that in

9    the next demonstrative, that there's generally a covenant to

10   the extent the borrower has indicated that they will occupy

11   this property as their primary residence.  They're also

12   generally required to promise to the lender that they will

13   occupy -- they shall occupy and establish and use the

14   property as their principal residence within 60 days of the

15   closing, and that they'll stay there for at least a year.

16   So, there's another independent covenant made by the

17   borrower regarding occupancy that, if breached, would

18   trigger -- if not -- if broken, if not a valid promise based

19   on the facts that were discovered, identified in the

20   forensic review, that would cause a default under the

21   mortgage, that would cause a breach of the no-default rep.

22   Q    Now, I notice there's language towards the end of the

23   occupancy covenant referring to extenuating circumstances

24   beyond borrower's control.  You see that?

25   A    I do.

Page 136

1   Q    We'll come to this in greater detail, but was that

2   language taken into account in the course of the Trustees'

3   forensic loan reviews here?

4   A    Yes, it had to be.  It's part of the analysis, so the

5   instruction -- and again, this is a fairly common covenant

6   for primary -- for a borrower who says it's their primary

7   residence.  It's in the standard-form mortgage and deed of

8   trust, so it's fairly well understood that to the extent a

9   review of a loan is being performed to discern whether or

10  not this has been breached, to the extent there our -- there

11  are evident in the file extenuating circumstances of the

12  type mentioned here, those are taken and should be taken

13  into consideration by the reviewer.  They were instructed to

14  do so in this case.  And to the -- and whether or not the

15  borrower moved in within 60 days and stayed there for a

16  year, if extenuating circumstances appeared in the file,

17  then that would not rise to the level of a misrepresentation

18  of occupancy.

19       One exception, one big exception in many -- and this

20  may get to the later, so I might as well bring it up now.

21  In many of these files, in addition to this covenant in the

22  mortgage, there's something called an occupancy affidavit,

23  where in addition to signing the mortgage with this

24  language, the borrower signs something that says they will

25  occupy the property, no extenuating circumstances exception.

Page 137

1    And that affidavit also says if the borrower breaches the

2    covenant in that affidavit, it is a default under the

3    mortgage.  And so, to the extent we had in the file that was

4    a subject of the review a borrower affidavit regarding

5    occupancy, there was -- extenuating circumstances could not

6    provide an exception to the fact that the borrower never

7    occupied that property as promised.

8              THE COURT:  Just as a technical matter, so

9    ordinarily, when you have two documents that on their face

10   conflict, there's something that tells you which one wins.

11   What is there on this point?

12             MR. ARONOFF:  The commercial understanding as a

13   practitioner.

14             THE COURT:  I'm ask -- no, I'm asking you the

15   question --

16             MR. ARONOFF:  The affidavit.

17             THE COURT:  Please, may I ask my question first?

18             MR. ARONOFF:  Yes, yes; I'm sorry.

19             THE COURT:  Thank you.  I'm Joe Borrower.  I'm

20   sitting at the closing table.  Quite remarkably, I've

21   actually read these documents and I'm presented with an

22   affidavit that contradicts what I've just read.  What I just

23   read says unless there are extenuating circumstances.  What

24   is it that tells Joe Borrower which one is the actual thing?

25   He's signing something that conflicts with something else.

Page 138

1    Where --

2            MR. ARONOFF:  Yeah, I don't have the affidavit in

3    front of me.  I can look at one.

4            THE COURT:  Oh, I'm --

5            MR. ARONOFF:  Genuinely, there would be --

6            THE COURT:  Mr. Aronoff, it's going to be a very

7    long day if I -- if I don't get to --

8            MR. ARONOFF:  I'm sorry; I was trying to answer

9    your question.

10           THE COURT:  Let's assume that the affidavit says

11   exactly what you said it says.  What is there that clarifies

12   or sets forth which document prevails over which document

13   when you have a conflict between the affidavit, which as

14   you've just said has no extenuating circumstances, and the

15   mortgage deed of trust said that -- says that there is.  I

16   just don't -- I'm just asking as a factual matter.  If you

17   don't know, that's fine.

18           MR. ARONOFF:  I don't know off the top of my head.

19           THE COURT:  Okay, thank you.

20   Q    Mr. Aronoff, you said there were two principal

21   representations and warranties that were relied upon for

22   purposes of identifying income and other types of breaches.

23   What's the other?  We've covered the no-default

24   representation and warranty.  What's the other one?

25   A    The second one is called the no -- I call the no untrue

Page 139

1   statement representation and warranty.  And this

2   representation and warranty, in addition to assuring the

3   investors that the mortgage and the mortgage note are

4   genuine, that they're enforceable, that the borrower had

5   capacity to execute, there's also very important language

6   that says -- now this is the borrower talking to the

7   investor -- I'm sorry, the sponsor talking to the investor,

8   not the borrower talking to the lender -- that the

9   documents, instruments, and agreements submitted for the --

10  for loan underwriting were not falsified and contain no

11  untrue statement of material fact, or omit to state a

12  material fact required to be stated therein necessary to

13  make the information and statements that are not misleading.

14  So again, these are the same limited -- the

15  misrepresentations were limited to the same five types of

16  important facts that bear on the credit risk of the loan,

17  but to the extent this appears and misrepresentation of

18  income is identified in the file, it would directly breach

19  this rep and warranty as well.

20  Q    Is the same true -- is the same true for the other

21  categories of misrepresentation you identified earlier,

22  debt, employment, occupancy, and assets?

23  A    Yes, for occupancy, debt, assets, and employment, as

24  well as income, as you see, none of those appear in here,

25  but there's a -- for purposes of this review, to the extent

Page 140

1  you don't only have to prove a misstatement, but prove it's

2  a material fact and material omission, the identification of

3  a breach related to this rep and warranty was limited to

4  those material facts.

5  Q    Do you have an understanding of what the expression

6  documents, instruments, and agreements submitted for loan

7  underwriting refers to?

8  A    Yes.  Loan underwriting, in this context, when you're

9  talking about the origin -- would refer to the origination

10  of the loan.

11  Q    Does that language encompass the loan application, in

12  your understanding?

13  A    The loan application would be part of the information

14  that would be submitted for loan underwriting, but it's not

15  the -- the information that may be misrepresented or omitted

16  is not limited to information that does or does not appear

17  on the application, in my view.

18  Q    Let's look at a typical DTI rep, Mr. Aronoff.  Have you

19  selected one?

20  A    Yes.  The DTI rep is relatively straightforward.  DTI

21  is simply the debt-to-income ratio, which I'm sure has been

22  explained previously, and this is simply setting a

23  threshold.  DTI is the promise to investors by the sponsor

24  in this case is that each of the mortgage loans will have a

25  DTI of less than 60 percent.  Or the opposite of that is

Page 141

1   that none of them will have a DTI greater than 60 percent.

2   So, to the extent that debt-to-income ratio was identified

3   that was in excess of 60 percent, that would be a breach

4   finding that would trigger the breach of this particular rep

5   and warranty.

6   Q    Do all of the deals in -- at issue here, all of the

7   trusts -- trust documents have DTI reps in them?

8   A    No, I think it's less than 30 -- 25 or so.  One has a

9   DTI rep like this, but the threshold is 66 percent.  And

10  then there is one other way an excessive DTI breach finding

11  could have resulted in a breach of a rep and warranty, and

12  that would be in the case of three trusts that contained

13  conformity with underwriting guidelines reps.  And if it was

14  identified that a loan in one of those trusts had a DTI that

15  exceeded a program guideline DTA -- DTI, then that would

16  also show up as a -- as an excessive DTI breach finding, but

17  it would map into the underwriting guideline rep and not

18  into one of these types of threshold reps.

19          THE COURT:  Mr. Aronoff, I'm sorry, could you -- I

20  heard the words, but I didn't understand it.  Could you give

21  that answer again?

22          MR. ARONOFF:  Yes.

23          THE COURT:  This is not a trick question.

24          MR. ARONOFF:  No, I --

25          THE COURT:  I'm just trying to follow what you're

Page 142

1    saying because it's different -- there's a number of

2    different levels.

3                MR. ARONOFF:  It's a different priority, and there

4    was no overlap here.  So, three of the trusts --

5                THE COURT:  Yes.

6                MR. ARONOFF:  -- didn't contain these types of

7    reps.

8                THE COURT:  Three of the trusts at issue here did

9    not contain a DTI rep.

10               MR. ARONOFF:  But they did -- well, many trusts

11   didn't contain this, but three didn't contain this, and they

12   did contain what's called the conformity with underwriting

13   guidelines rep, okay?

14               THE COURT:  Okay.

15               MR. ARONOFF:  Within the underwriting guidelines

16   for the loans in those trusts, there may have been language

17   that said for a purchase money mortgage to, you know, this

18   type of investor, the debt-to-income ratio for that loan

19   will not exceed 45 percent.  So, it's an internal DTI

20   threshold based on the loan program, as opposed to a --

21               THE COURT:  So it's like an incorporation by

22   reference kind of a concept?

23               MR. ARONOFF:  Yes.

24               THE COURT:  Okay.

25               MR. ARONOFF:  But -- yes, and so --

Page 143

1        THE COURT:  So functionally, it the same thing, or

2   synthetically, it's the same thing as there being a DTI rep

3   in the documents?

4        MR. ARONOFF:  Yes.  Another way to think about it,

5   in addition to incorporation by reference, is there is a

6   promise that the loan conformed with the underwriting

7   guidelines.

8        THE COURT:  Okay.

9        MR. ARONOFF:  And one of the terms of the

10  guidelines was that the loan -- loans in that trust would --

11  in that program would not exceed a certain DTI.

12       THE COURT:  Okay.

13       MR. ARONOFF:  So, to the extent the loan reviewers

14  discovered that a loan had a DTI that didn't exceed 60, but

15  it exceeded the threshold defined in the underwriting

16  guidelines, that was identified as a breach of that rep, and

17  the breach finding would have been excessive DTI.

18       THE COURT:  Okay, very good.  Mr. Cosenza?

19       MR. COSENZA:  Can I have a sidebar for a second,

20  Your Honor?

21       THE COURT:  Sure.

22    (Pause)

23       THE COURT:  This will be our last break of the

24  day, because we're going to conclude at 4:00 today.  Mr.

25  Aronoff, you're not the usual witness who comes here in

Page 144

1    terms of your expertise, which is somewhat greater than

2    other witnesses, but I'm going to tell you the same thing

3    that I tell all other witnesses.  Any objections or

4    conversations that we have during the course of your

5    testimony should not be interpreted by you in any way as a

6    reflection on anything you have or have not said.

7            MR. ARONOFF:  Understood, Your Honor.

8            THE COURT:  All right?  So, we're going to take a

9    10-minute break, and you do understand that during breaks in

10   the -- in your testimony, you remain under oath and you're

11   not to discuss your testimony or the case with anyone, or be

12   in anyone's presence while they're doing the same.

13           MR. ARONOFF:  I understand, Your Honor.

14           THE COURT:  All right, so we're going to talk to a

15   few folks in the back, and we're going to come back in 10

16   minutes.

17           RECORDED VOICE:  Unmuted.  Press one, mute.

18           THE COURT:  All right, we're going to go back on

19   the record in 10 minutes for the benefit of the folks on the

20   phone.

21      (Recess)

22           THE COURT:  Okay, while everyone gets settled,

23   just for the benefit of everyone, we're going to continue

24   until 4:00 today and stop at an appropriate stopping point

25   at that point.  I'm just asking everyone sitting at Counsel

Page 145

1   table to tidy up a bit, since I have a large group coming in

2   before you folks arrive at 11:30.  We're going to start

3   tomorrow, Mr. Aronoff, at 11:30.

4            MR. ARONOFF:  Thank you very much.

5            THE COURT:  You're very welcome, and our plan is

6   to go for about an hour and a half, and we'll take a lunch

7   break at 1:00, and we'll go from there.  And it is, I think,

8   Mr. Shuster's wish to go as long as we can tomorrow, subject

9   to everyone holding up, and we'll probably go until about

10  5:00 or 5:30 tomorrow, just so everyone can plan, okay?

11           MR. ARONOFF:  Yes, thank you.

12           THE COURT:  All right, Mr. Shuster, back to you.

13           MR. SHUSTER:  Thank you so much, Your Honor.

14           CONTINUED DIRECT EXAMINATION OF JAMES H. ARONOFF

15  BY MR. SHUSTER.

16  Q    Mr. Aronoff, you have referred to certain

17  representations and warranties that have been the basis for

18  the Trustees' assertion of income, debt, employment, asset,

19  and occupancy breaches.  Do you discuss in your reports

20  other representations and warranties that give rise to other

21  types of breaches?

22  A    I do.

23  Q    Can you just tell us what those are with respect to

24  missing documents and compliance breaches, in particular?

25  A    Well, there -- there are a number of reps that various

Page 146

1    deficiencies would map into, but for example, with respect

2    to those breach findings that were identified or determined

3    based on the missing document, those -- you referred to

4    three that would be reps and warranties that, based on the

5    type of document that was missing, the presence or not of a

6    particular rep in a trust may be the basis for the breach

7    claim.  For example, for the most part, a missing HUD, one,

8    or a missing TIL document would map into a compliance with

9    law breach.  In some instances, those few trusts where there

10   were underwriting guideline conformity reps, to the extent a

11   document is required pursuant to the underwriting guidelines

12   or to facilitate the underwriting guidelines, omit -- one of

13   those types of documents missing would trigger a breach of

14   the underwriting guidelines rep.  Similarly, there were some

15   reps which specifically referenced a particular document and

16   promised that it would be there, and I'm thinking of the

17   qualified appraisal rep, where the -- simply, if -- a

18   missing appraisal would be the breach finding that would

19   trigger a breach of that rep.

20   Q    Now, I think you addressed this a little bit, but you

21   mentioned that both the no untrue statement and the rep and

22   the borrower covenants used the word material.  How did the

23   Trustees take that word into account in the course of

24   identifying the breaches?  I think you covered this some,

25   but I want to go further down that path.

Page 147

1    A    Yeah, with respect to the meaning of materiality or

2    material in the language of those reps, and again, not as an

3    attorney but as someone who has spent the better part of my

4    career having to operate my business based on an

5    understanding of what the language in the governing

6    documents means from a commercial standpoint, I tried to

7    ensure that that commercial understanding was utilized by

8    the loan review firms.  And in that case, material means

9    material to the credit risk of the loan as it related to the

10   origination process.

11   Q    So, how do you define credit risk, Mr. Aronoff?

12   A    Credit risk is another way of talking about the risk of

13   loss in a loan.  What is the likelihood that a loan will

14   have -- will perform?  And in making that analysis,

15   investors in mortgage loans and mortgage-backed securities

16   are faced with the calculation, or calculus, of if I'm

17   putting down a certain amount of money today, what's the

18   likelihood that that will be paid back over the time the

19   mortgage loans make pay -- makes payments?  And so, risk of

20   loss, or credit risk, are an important consideration of an

21   investor, and to the extent an investor is unable to

22   appropriately determine the performance of the loan or the

23   pool of loans that's being acquired because certain

24   characteristics of that loan or pool of loans has been

25   masked and doesn't comply with the promises that were made

Page 148

1    about that pool of loans, then by definition, they've

2    overpaid for that loan.

3    Q    Thank you sir.  Let --

4              THE COURT:  Can I --

5              MR. SHUSTER:  Please.

6              THE COURT:  I'm confused again.  Mr. Shuster, can

7    you read the question back that you asked?

8              MR. SHUSTER:  I asked Mr. Aronoff how he defines

9    credit risk.

10             THE COURT:  Before that; the question you asked

11   using the word material.

12             MR. SHUSTER:  Yes.  How did the Trustees take that

13   word into account in the course of identifying breaches?

14             THE COURT:  Okay, so can you answer that question

15   again?  In other words, there's two places in some of these

16   documents that the word material comes into play.  One is a

17   material breach, and one is in AMA, right?  You need a --

18   you find a material breach, and then, in at least some

19   instances, you have to determine that the existence of that

20   material breach has an adverse material effect on the value

21   of the loan or the interest of the certificate holders,

22   right?

23             MR. ARONOFF:  I'm not sure I understand your

24   question.  I think -- I understood Mr. Shuster's question to

25   be simply focusing on the use of the word material in those

Page 149

1    two reps and warranties and how we could --

2              THE COURT:  Okay, let's clarify this, Mr. Shuster,

3    because I thought you were asking one question, and I hear

4    Mr. Aronoff answer a different question.  What I thought you

5    were asking was how he made the determination of what

6    constituted a material breach.  Was that you -- was that --

7              MR. SHUSTER:  I was asking how he -- how the

8    Trustees took into account use of the word material in the

9    no untrue statement representation and in the borrower

10   covenant that relates to the no-default representation.  So,

11   I was asking sort of, at the breach --

12             THE COURT:  At the breach level.

13             MR. SHUSTER:  -- at the breach level --

14             THE COURT:  Not at the AMA level.

15             MR. SHUSTER:  -- not at the AMA level.

16             THE COURT:  Okay, and I heard your answer to be

17   talking about the AMA level, because you're talking about

18   credit risk.  So, is it the same answer?

19             MR. ARONOFF:  Both the AMA analysis and

20   specifically the understanding of the word material to

21   identify a breach with respect to those reps and where that

22   word appears.  Both -- the confusion, I think, lies in the

23   fact that in both cases, the analysis of whether a fact or a

24   material adverse breach in that standard, in both cases,

25   they relate to credit risk.  One is the credit risk of the

Page 150

1   loan to the lender, because it discusses the information

2   exchanged at the time of origination.  And what, you know, I

3   was talking about with respect to, broadly, credit risk --

4           THE COURT:  Okay, so --

5           MR. ARONOFF:  -- because I think it pertains to

6   both, is the credit risk vis-à-vis --

7           THE COURT:  Okay --

8           MR. ARONOFF:  -- the investor.

9           THE COURT:  All right, so you -- you've clarified,

10  at least in my mind.  You in fact answered Mr. Shuster's

11  question.  You are -- your answer applies to the

12  determination of what causes something to be considered a

13  material breach.

14          MR. ARONOFF:  Yes, Your Honor.

15          THE COURT:  Okay, thank you.

16  Q    I think earlier, you testified that you identified five

17  categories, five areas that -- of information that you

18  assessed the accuracy of, or had the loan review firms

19  assess the accuracy of.  Do you remember that?

20  A    I do.

21  Q    And those areas were?

22  A    Employment, debt, occupancy, assets, and income.

23  Q    And why did you pick those categories?

24  A    Those are categories for which there is a significant

25  common understanding in the residential lending industry,

Page 151

1    and for the same reasons, in the residential mortgage loan

2    investment industry, that are highly correlated to the

3    credit risk of the loan.

4    Q    So let's focus on assessing the credit risk at the loan

5    underwriting end of things.

6    A    Yes.

7    Q    So what is entailed in assessing a credit risk for

8    purposes of loan underwriting?

9    A    Right, well, to go to residential mortgage lending 101,

10   some people have three Cs, some people have five Cs.  I

11   discuss in my report what I call the four Cs, and very

12   simply, those are capacity, character, collateral, and

13   compliance.  Capacity is simply, does a borrower have the

14   ability to pay?  Do they have sufficient wherewithal and

15   income, or assets, to pay the monthly obligation on the debt

16   is a baseline inquiry by a lender.  And because the

17   borrower's capacity is highly correlated, all other things

18   being equal, to whether or not a loan will perform, it is

19   also of import to anyone purchasing a mortgage loan

20   subsequent to origination, or someone purchasing a security

21   whose cash flow is dependent upon the performance of

22   mortgage loans.

23   Q    So please tell us, if you would, how the four Cs relate

24   to the types of borrower breaches asserted here, or better

25   yet, how the borrower breach -- types of borrower breaches

Page 152

1    asserted here relate to the four Cs.

2    A    Sure, we'll take them.   Income is straight-up capacity.

3    Character generally refers to a borrower's willingness to

4    pay whether or not they have the capacity, and that's

5    typically the information that can be found regarding a

6    borrower's historical desire to honor their credit

7    obligations.   Are they a payer; are they someone that takes

8    out loans and doesn't pay them back -- the kinds of things

9    that are typically represented in a FICO score or on a

10   credit report.   And that's important, because a borrower

11   might have an income, but may have demonstrated in the past

12   that they don't honor their obligations.

13        Similarly in character would be the whole notion of an

14   intentional misrepresentation, where it's generally not

15   viewed favorably in the lending industry to lend to people

16   that may be less than forthright with you.   If they're not

17   going to give you sufficient information when they're asking

18   you for money, the chances of them paying you back in

19   accordance with the terms of the agreement is generally

20   assumed to be quite low.   So in terms of does the buyer have

21   the wherewithal to pay me back as a lender, it's very

22   important to consider capacity and character.

23        The collateral piece comes in because, as we know, a

24   residential mortgage loan is a secured loan, and a -- and

25   the most important secondary source of repayment, if the

Page 153

1    borrower doesn't pay you, is the collateral in a foreclosure

2    proceeding.  And that, to the extent for one reason or

3    another the borrower is unable to pay, residential lenders

4    take comfort in the fact, and investors in residential loans

5    take comfort in the fact that at least I have collateral

6    that's more than sufficient to pay me back in the event of a

7    default.  So, issues around collateral, the certainty of the

8    value of the collateral, the enforcement of the security

9    agreements that allow you to seize the collateral in the

10   event of default, are all critical features of evaluating

11   the performance of a loan.

12        And then, finally, compliance, which is a relatively,

13   you know, important feature the last decade or two, as

14   consumer protection regulations and statutes regulate all

15   aspects of consumer credit, not -- and as well as mortgage

16   loans being part of that.  And so, it is important for a

17   lender to make sure that they comply with those laws.  It's

18   important for an investor to make sure that they are buying

19   loans in which those laws have complied, primarily for two

20   reasons.  One is that, to the extent a loan was originated

21   and was not in compliance with the applicable regulations,

22   that factor -- that feature could be used to delay a

23   foreclosure proceeding, or in the extreme case, deny the

24   owner of the loan the ability to realize on the collateral

25   in the event of a default.

Page 154

1      Secondly, based on certain failures to comply with

2  regulatory schemes around residential lending, for lack of a

3  better term, a holder in due course, someone stuck holding

4  the bag when the deficiency is discovered may have

5  liability, monetary liability, for simply being the owner of

6  a loan that's not in compliance.

7      So all of these four categories are features that will

8  ex -- will affect the credit risk of a loan, and therefore,

9  affect the performance of the loan with respect to an

10  investor who has purchased securities that are paid off

11  through the payment of those loans.

12  Q   So again, focusing on the four Cs in loan underwriting,

13  you mentioned where income fits in.  How about debt and

14  occupancy?

15  A   Yeah, debt, as I said, goes to probably capacity and

16  character, capacity in that the ratio of the debt to the

17  income, which gives you your DTI, really talks about the

18  free cash available to a borrower.  Two borrowers might make

19  $100,000 a year, but one borrower might have $300,000 worth

20  of debt.  Another borrower with $100,000 may have no debt,

21  so clearly, the capacity of the debt-free borrower with the

22  same income is much greater [COUGHS] -- excuse me -- and

23  they would be viewed as having a lower likelihood of default

24  than a borrower who made the same income but was

25  overburdened with debt.  And the debt side of that, as I had

Page 155

1    mentioned before, goes to character, because that's the --

2    credit and debt is the primary indicator of a willingness to

3    pay.

4         Employment, again, goes to capacity.  If someone has a

5    very stable, certain type of employment they've been in for

6    a long time, that is viewed as a greater capacity than

7    someone who has a job or a career that is more volatile in

8    terms of the certainty of income that can be generated from

9    that job.

10        And assets, as well, I think -- and then I'll get to

11   occupancy. Very quickly, with assets, all other things being

12   equal -- and that's the important point -- capacity can be

13   augmented by significant assets that a borrower may have.

14   And so, you know, that is a consideration for the likelihood

15   that a loan will perform.

16        Finally, with respect to occupancy, occupancy really

17   plays into capacity and character, but primarily character,

18   because it's been demonstrated.  And the reason that lenders

19   and investors differentiate between these three categories

20   of occupancy -- that is, primary, secondary, and investor --

21   is because it's been demonstrated historically that

22   borrowers will default less frequently in the home they live

23   in.  They need a roof over their head.  They need somewhere

24   to live, and they're more likely to let a vacation home go,

25   or second home go, faced with some financial difficulties.

Page 156

1    Similarly, an investment property is typically just a

2    straight economic consideration by the borrower as to as

3    soon as the property is not earning a sufficient amount to

4    cover the mortgage, I'm going to let it go.  I don't have to

5    worry about where I'm going to live; it's just a bad

6    investment and I'll, in essence, trade out of it by giving

7    the property to the bank.  And that theory, that common-

8    sense analysis, is well borne out by all of the data

9    regarding what is the actual foreclosure frequency or

10   likelihood of default of these three types of loans, all

11   other things being equal.  That is, investor properties, all

12   other things being equal, default much more frequently than

13   second homes, and second homes default more frequently than

14   primary residences.

15   Q    So you've identified these areas as areas the Trustees

16   looked at -- income, debt, occupancy, assets, and employment

17   -- because you said they're material to the assessment of

18   the credit risk.  Can you identify some types of information

19   that might be inaccurately presented in the loan

20   underwriting process that are not material, for purposes of

21   identifying a breach?

22   A    I mean, you know, as has been pointed out, through the

23   process, there's a lot of information that's provided to a

24   lender in the course of a lending decision.  You know, we

25   see files all the time where there may be a transcription in

Page 157

1    the address or there may be, you know, some other feature

2    that is clearly wrong when you look at -- you know, they may

3    have misstated the house color or something, or the

4    appraisal might refer to a feature that isn't -- that isn't

5    correlated to the likelihood of the borrower's default.  So,

6    I think it's easier to look at it in terms of an experienced

7    forensic reviewer is not just looking for mistakes and say

8    ah-ha, a mistake.  There's a breach of that fairly broad

9    rep, except for the word material, and that's the

10   controlling feature.  So in guiding and designing this

11   review, we wanted to stick to those types of facts for which

12   there's a common understanding in the [COUGHS] -- excuse me

13   -- in the industry that there's a high correlation between a

14   misstatement of a fact of that type and the performance of a

15   loan.

16   Q    So you heard and you know that Mr. Grice has referred

17   to exceptions and compensating factors, and there were

18   references to those in the responses that were provided

19   during the protocol.  What do you understand by those terms,

20   exceptions or compensating factors?

21   A    The -- in my experience, and I think it comports with

22   the common industry understanding, is that lenders make

23   exceptions to loans, to underwriting guidelines.  But there

24   is procedure around how those exceptions are flagged and

25   identified to distinguish them from mistakes that are made.

Page 158

1    And the way in which best practices require a lender to

2    identify an exception that they they're made -- look, let me

3    start by saying if lenders are portfolio lenders, they're

4    lending for their own account and not securitizing loans,

5    they can make whatever exceptions they want, any way they

6    want to, because they know they did it and they're the ones

7    that are making the bet on the borrower paying them back.

8    That changes dramatically when a lender is selling loans to

9    the secondary market, particularly when they are selling

10   loans into securitization, where investors do not have the

11   opportunity to crack loan files and look at what's being

12   done.  And in that respect, the industry practice is there's

13   still an understanding that although a lender has

14   represented to the market in general that they make loans of

15   this type in accordance with these guidelines that are

16   typically described in the disclosure materials, there's

17   also an understanding that exceptions are made from time to

18   time.  But there's also an understanding that those

19   exceptions will be documented, in writing, at the time the

20   loan is made, and that the compensating factors that were

21   utilized by the loan underwriter to satisfy themselves that

22   the risks created by deviating from the guidelines have been

23   mitigated in some way, they've been mitigated by what are

24   called compensating factors.

25        So, for example, if I want to lend to someone and I

Page 159

1   decide that this is a loan I want to make, even though it

2   doesn't comport in every respect with the guidelines, at the

3   time I make that decision, if I am a seller to the secondary

4   market, as I said, the industry custom and practice would be

5   to identify those features of the loan that you, as an

6   experienced loan underwriter, believe mitigate the risks

7   that are created by your deviation from the guidelines.

8   What isn't done is a scavenger hunt in the file sometime to

9   origination of a loan that was found to deviate from

10  guidelines and say oh, the underwriter could have thought

11  this or should have thought that.  You don't search for

12  compensating factors subsequent to the origination of the

13  loan and try and justify that the loan would have been made

14  anyway.  If there is an exception, and I did this -- I made

15  exceptions to loans all the time that I sold to the market,

16  and we were very clear that the first thing that anyone saw

17  in the loan file was a written explanation of the exception

18  and what the specific aspects of that loan were to allow me

19  to make that exception.

20      So, yeah, the terms exceptions and compensating factors

21  are prevalent in the market.  They're well understood, but

22  they're used, typically -- and understood to be used -- in

23  the way that I just described, and not as a way of

24  justifying what is a deviation from the guidelines.

25      I just want to also say that the incidence of using a

Page 160

1   compensating factor, or the analysis of would this loan have

2   been made anyway, in the context of this forensic loan

3   review only makes sense with respect to the three trusts

4   that have underwriting guidelines, reps, and warranties.

5   The existence or nonexistence of an exception or

6   compensating factors has absolutely no bearing at all on the

7   determination of whether there's been a misrepresentation

8   breach.

9   Q    Thank you.

10          THE COURT:  Mr. Shuster and Mr. Cosenza, could you

11  come up for a moment, please?

12     (Pause)

13  Q    Mr. Aronoff, who typically makes the loan-level

14  representations and warranties in a mortgage-backed

15  securitization?

16  A    The parties that are in the best position to do that,

17  and that's typically the loan originators or the sponsor.

18  Q    Thank you, sir.  And what is the purpose of the loan-

19  level representations and warranties in the mortgage loan

20  securitization market?

21  A    There are many, but I tried to identify three primary

22  purposes for the reps and warranties.  The first, as I

23  alluded to before, is to describe the quality and

24  characteristics of the loans in the securitization, to

25  enable investors to come up with an opinion as to how that

1    loan will perform.  The second is to enable a sponsor to

2    sell a pool of loans at the desired execution.  That is,

3    absent standard reps and warranties on a typical pool would

4    radically diminish that sponsor's ability to get a full-

5    market price for that, for many reasons, the least of which

6    is they probably couldn't get ratings on the transaction.

7    Q    And the third?

8    A    The third is to allocate the risk of a loss between the

9    investors and the sponsor.

10   Q    So let's pick up on that.  How do the loan-level

11   representations and warranties bear on the allocation of

12   risk in residential mortgage-backed securitization

13   transactions?

14   A    Very simply, the reps and warranties circumscribe the

15   loans that the investor understands to be in the pool, and

16   those are the loans for which the investor has agreed to

17   bear the economic risk of loss on those loans.  To the

18   extent a loan is discovered or identified as being

19   nonconforming -- that is, breaches those reps and warranties

20   -- and is outside of the identified pool, through the

21   repurchase provisions, those are loans for which the

22   investor has not bargained to incur the risk of loss, and

23   that risk of loss remains with the sponsor.

24   Q    So let's talk about the repurchase provision that you

25   referred to a moment ago.  What is the remedy in these

Page 162

1    transactions for breach of loan-level representations and

2    warranties?

3    A    Well, assuming and putting aside for the moment that a

4    breach is material and adverse --

5              THE COURT:  Well, time out.  Mr. Cosenza is

6    standing.

7              MR. COSENZA:  Thank you, Your Honor.  I think he -

8    - this is beyond the scope of his opinion.  Both in his

9    reports and during his deposition, he testified extensively

10   he's giving no opinion on any remedy, what the appropriate

11   remedy was in these circumstances.  This is the remedy

12   provision in the contracts.

13             MR. SHUSTER:  Your Honor, I think that Mr. Aronoff

14   testified at his deposition, when he was asked what the

15   remedy would be in bankruptcy, he said that he was not

16   opining on what the remedy would be in bankruptcy.  But he

17   spoke in his reports and in his deposition about his

18   understanding of the industry understanding of this -- these

19   provisions, and specifically, how they operated, what effect

20   they --

21             THE COURT:  Okay, hold, hold, hold, hold.  Time

22   out.  Time out.  Mr. Aronoff, I think we're going to call it

23   a day for today as far as you're concerned, so why don't you

24   have -- take a few minutes' early leave, and then we're

25   going to resolve this, all right?

Page 163

1          MR. ARONOFF:  Thank you, Your Honor.  See you

2     tomorrow.

3          THE COURT:  Okay, thank you.  Have a pleasant

4     evening.  Just leave everything there.

5          MR. ARONOFF:  Yeah, (indiscernible).

6          THE COURT:  They'll clean up for you -- for us.

7     Okay, so, remind me what the question was that you asked

8     which prompted Mr. Cosenza to object.  We were looking at

9     the screen with the two little dots about the allocation of

10    risk.

11         MR. COSENZA:  I have the question.  What is the

12    remedy on these transactions for breach of loan-level

13    representations and warranties?

14         THE COURT:  Okay, and --

15         MR. COSENZA:  Your Honor, that's -- he asked him

16    extensively about remedies.  He keeps opining on remedies,

17    and I played this in my opening.  He said I have no -- I

18    know I botched a quote -- I ain't speaking nothing about no

19    remedies, is basically his response, and that's his opinion.

20    And we are in a bankruptcy context, so that's, you know,

21    what he's -- he's saying he's not opining on what the

22    appropriate remedy is in this circumstance.  So now they

23    have put up this provision and asked for a legal opinion as

24    to what the remedy would be --

25         THE COURT:  Okay.

Page 164

1          MR. COSENZA:  -- on these contracts, I think is

2     inappropriate.

3          THE COURT:  So what's the response to that?

4          MR. SHUSTER:  I'm not asking him what the remedy

5     would be here.  I'm just asking him -- he's talking about

6     how the reps and warrants bear on the allocation of risk in

7     these deals --

8          THE COURT:  Right.

9          MR. SHUSTER:  -- and I'm asking him about the

10    repurchase remedy, to the extent it bears on that issue, not

11    --

12         THE COURT:  I don't -- I don't understand.  I

13    mean, the -- I understand the allocation of risk.  That's

14    the way you -- he has formulated the allocation of risk.

15    But what -- why is the next question about a remedy?  If

16    there -- if under your view, his view is that when there is

17    a material breach, the  risk of that is allocated to Lehman,

18    what is -- why is there a follow-up question about the

19    remedy?

20         MR. SHUSTER:  Well, because -- well at least I

21    think -- I think he will testify, and certainly we believe

22    that the remedy reflects that because it either says cure,

23    substitute, or buy back the loan, and then it  has a

24    repurchase formula  rather than --

25         THE COURT:  Okay, but my question is why are we

Page 165

1   asking him about that?  That's a legal position.

2           MR. SHUSTER:  It's to -- in further support of his

3   opinion that the reps and warrants allocate risk in a

4   securitization transaction.  That's why I'm asking.  And the

5   nature of the remedy in the deals reflects that, because it

6   requires that if a loan is in breach, it either be cured,

7   replaced, or purchased --

8           THE COURT:  Okay, but -- but, so --

9           MR. SHUSTER:  -- rather than, you know, anything

10  else.

11          THE COURT:  So if he says that --

12          MR. SHUSTER:  It's not life and death, but I think

13  it bears on his opinion and, you know, it's part of his

14  opinion concerning the allocation of risk.  That's why we're

15  offering that testimony.

16          THE COURT:   Okay.

17          MR. COSENZA:  Your Honor, on the remedy point,

18  this is a clear legal point and legal opinion.  We briefed

19  this as to what the appropriate remedy is in this court.

20  He's testified at deposition I'm not talking about the

21  appropriate remedies here, and now --

22          THE COURT:  But should we look at the deposition?

23  I mean, if he testified that he's not talking about

24  remedies, then he shouldn't be talking about remedies.  You

25  know, I -- I'm just not good enough to answer two people on

Page 166

1    the same point, so --

2              MR. SHUSTER:  Well, I would have to have a look at

3    the transcript and then -- and then address this.  So I can

4    do that --

5              THE COURT:  Okay, so why don't we -- why don't,

6    like, you do that as your homework assignment for the

7    evening.

8              MR. SHUSTER:  Sure.

9              THE COURT:  See if you can resolve it.

10             MR. SHUSTER:  Yes.

11             THE COURT:  If not, we can take it up first thing

12   in the morning.

13             MR. SHUSTER:  One way or another, I'm sure we can

14   get through it quickly.

15             THE COURT:  Okay.

16             MR. SHUSTER:  Either we'll resolve it, or we'll

17   move on.

18             THE COURT:  Sounds good.  Okay.

19             MR. SHUSTER:  Thank you.

20             THE COURT:  Thanks, folks.  Have a good evening.

21             MR. SHUSTER:  Thank you.

22             MR. COSENZA:  Thank you.

23

24             (Whereupon these proceedings were concluded at

25   3:58 PM)

Page 167

1           C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   Sonya Ledanski Hyde

Digitally signed by Sonya
Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o,
ou, email=digital1@veritext.com,
C=US
Date: 2017.12.13 17:00:11 -05'00'

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  December 13, 2017