Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS INC.,   Case No. 08-13555-scc

7               Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                        United States Bankruptcy Court

11                        One Bowling Green

12                        New York, New York 10004-1408

13

14                        December 13, 2017

15                        11:35 AM

16

17

18

19

20

21

22

23    B E F O R E:

24    HON. SHELLEY C. CHAPMAN

25    U.S. BANKRUPTCY JUDGE

1     IN RE:   RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:   Dawn South and Sherri L. Breach

Page 3

```
 1   A P P E A R A N C E S :

 2   WILKIE FARR & GALLAGHER LLP

 3        Attorneys for the Plan Administrator

 4        787 Seventh Avenue

 5        New York, NY 10019-6099

 6

 7   BY:  TODD G. COSENZA, ESQ.

 8        BENJAMIN P. MCCALLEN, ESQ.

 9        JOSEPH G. DAVIS, ESQ.

10

11   HOLWELL SHUSTER & GOLDBERG LLP

12        Attorneys for the Trustees

13        750 Seventh Avenue, 26th Floor

14        New York, NY 10019

15

16   BY:  MICHAEL S. SHUSTER, ESQ.

17        DWIGHT A. HEALY, ESQ.

18        NEIL R. LIEBERMAN, ESQ.

19        DANIEL P. GOLDBERG, ESQ.

20        BENJAMIN F. HEIDLAGE, ESQ.

21

22

23

24

25
```

1    ROLLIN BRASWELL FISHER LLC/PARTNER

2         8350 E. Crescent Parkway

3         Suite 100

4         Greenwood Village, CO 80111

5

6    BY:   MICHAEL ROLLIN, ESQ.

7          MARTIZA DOMINGUEZ BRASWELL, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                    P R O C E E D I N G S

 2         (A chorus of good morning)

 3              THE COURT:  Good morning.  I apologize if it's

 4     cold in here today.

 5              MR. SHUSTER:  Prefer it.

 6              THE COURT:  You're good?  Ready when you are.

 7     Mr. Aronoff, please come up.

 8         (Pause)

 9              MR. COSENZA:  Your Honor?

10              THE COURT:  Yes, Mr. Cosenza.

11              MR. COSENZA:  Before the witness restarts, you

12     know, we had an objection to the last question.

13              THE COURT:  Yes.

14              MR. COSENZA:  Mr. Shuster informed me during break

15     that he's going to ask a new question, so --

16              THE COURT:  Okay.

17              MR. COSENZA:  -- I don't know the substance of it,

18     but hopefully we'll -- you know, we'll move on from the

19     objection.

20              THE COURT:  Okay.

21              MR. COSENZA:  Thank you.

22              MR. SHUSTER:  Thank you, Your Honor.

23              THE COURT:  Are you ready, Mr. Aronoff?

24              THE WITNESS:  I am, thank you.

25              THE COURT:  Okay.
```

Page 6

1                 JAMES H. ARONOFF, WITNESS, PREVIOUSLY SWORN

2                     DIRECT EXAMINATION, CONTD.

3    BY MR. SHUSTER:

4    Q    Mr. Aronoff, do you opine in your expert reports as to

5    the purpose of the repurchase provision?

6    A    I believe I do.

7    Q    Let me direct you to your rebuttal report, paragraph

8    148.

9         (Pause)

10   A    Paragraph 148?

11   Q    Yes, please.

12   A    I'm there.

13   Q    So in setting forth your opinion concerning the purpose

14   of the repurchase provision were you responding in part to

15   the opinion put forward by the plan administrator's expert,

16   Daniel Castro?

17   A    Yes.

18   Q    So would you describe the opinion that you provide

19   concerning the purpose of the repurchase provision, please.

20   A    Yes, I'm just taking a couple of seconds to read the

21   paragraph, please.

22        (Pause)

23   A    Okay.  I recall this discussion.

24   Q    And take it in, you know, bytes and we'll -- okay?

25   A    I'll try and keep it clear and organized.

Page 7

1        In my experience and based on my understanding, the

2    repurchase provision is really an administrative provision

3    to be operated among the parties in the normal course of

4    business.  Almost like the return desk at a department store

5    where if a loan is found to have a defect, subject to the

6    satisfaction of certain conditions precedent, the party who

7    received the reps and warranties who's making the claim,

8    delivers it, shows -- gives notice to the maker of the reps,

9    and then the maker of the reps evaluates the quality of the

10   claim and has one of three options if they find that the

11   claim is valid.

12       And it was supposed to be in the normal circumstances

13   prior to the financial crisis as I said a devise that would

14   enable a sponsor to take non-conforming loans out of a pool,

15   to the extent that they were found to be so, without a whole

16   lot of expense or adversarial discussion.

17       And I found in reading some of Mr. Castro's complicated

18   and elaborate requirements to determine a material adverse

19   effect, in my view and experience, were never contemplated

20   by that provision because it would require in almost every

21   instance an expenditure of resources and time that in almost

22   every case it wouldn't justify putting back a loan with a

23   balance of a couple hundred thousands dollars.

24   Q    Very good.  So let me -- you mentioned that there were

25   three options for a sponsor presented with a repurchase

Page 8

1   claim.  What are those options?

2   A     The three options that are typically found in

3   provisions of this type are first to cure, and that is when

4   presented with a deficiency or defect in the loan that

5   causes a breach of the rep and warranty.  To the extent that

6   deficiency or defect is curable the sponsor can do so and in

7   essence take what appears to be a non-conforming loan and

8   turn it into a conforming loan.

9         Secondly within the first two years of a transaction,

10   to the extent the sponsor has what's defined in most of the

11   documents as a qualified substitute loan, they can take the

12   non-conforming loan and replace it with a qualified

13   substitute loan, and in essence put the investors back in

14   the same position they were if the loan had been conforming.

15        And finally to the extent neither of those remedies are

16   available the sponsor is required to deposit the purchase

17   price into the trust in exchange for the non-conforming

18   loan.

19   Q     Do you know why the third option was there?

20   A     Yes, it's to -- as I eluded to earlier, it's to give

21   the investor in essence a money back guarantee for a loan

22   that isn't as they bargained for.  It's a non-conforming

23   loan, investors bought loans that complied with the reps and

24   warranties, and it's a way of providing a payment in lieu of

25   that loan, it puts the investor in the same position as they

Page 9

1    would have been in if that loan had prepaid in full.

2    Q    Should a breaching loan have been in the trust in the

3    first place?

4    A    No, and that's the reason this mechanism exists.

5    Q    You were asked at your deposition by counsel for the

6    plan administrator whether the new purchase provision

7    provides -- leads to a windfall.  Do you recall that?

8    A    Not specifically.

9    Q    Do you have an opinion as to whether it does?

10   A    I don't think if one of those three provisions -- one

11   of those three remedies is exercised by a sponsor in

12   response to a request for repurchase it can ever provide a

13   windfall to investors, it just is the bargain that both

14   sides made.

15        Windfall in my mind requires that the investor be

16   getting something more than they're entitled to, and to

17   receive a repurchase for a defective loan as required by the

18   governing documents in my view would not result in anything

19   more than the parties bargained for.

20   Q    Okay.  Thank you.  Let's talk about material and

21   adverse effect, Mr. Aronoff.

22        I think you testified earlier that you had the occasion

23   to address the AMA standard in the ordinary course of your

24   career.

25   A    That's correct.

Page 10

1   Q    How is that standard understood and applied in the

2   industry?

3   A    Based on my experience and understanding a material

4   adverse effect in connection with an RMBS security is

5   demonstrated if the deficiency or defect that is the basis

6   for the breach finding increases the risk of loss to an

7   investor.

8   Q    Just as a point of clarification.  When you use the

9   term MAE, a material and adverse effect, and I used the term

10  AMA, we're talking about the same thing, right?

11  A    I understand.

12  Q    Yes.  Okay.  You -- so how does the increase in risk of

13  loss translate into an AMA or MAE?

14  A    Okay.  The underlying theory of expected losses on any

15  given mortgage pool, even breaking down the most complicated

16  predictive loss models, is really just a function of the

17  likelihood of default, sometimes called the foreclosure

18  frequency with respect to mortgages, times the loss

19  severity.  That is how much will a loan lose in the event of

20  a default.  And the product --

21  Q    Well let me just stop you --

22  A    Go ahead.

23  Q    -- because I think you've got a chart on this in your

24  book.

25  A    Yes.

Page 11

1   Q     So to the extent you want to refer to that --

2   A     Yeah.  So --

3   Q     -- please feel free, you don't have to.

4   A     So the kind of foundation theoretical formulation of

5   how investors, rating agencies, bond insurers, lenders think

6   about how to calculate or estimate the expected loss in any

7   given pool on any given loan and on any given pool is to

8   look at the likelihood of default times the loss severity,

9   and that will produce -- that product will produce an

10  expected loss.

11  Q     What do you mean by loss severity?

12  A     Loss severity is the amount that would be lost in the

13  event of a default.

14  Q     So does --

15  A     The percentage that would be lost.

16  Q     Thank you, sir.  Does increase risk bear directly on

17  the value of the loan?

18  A     It does.

19  Q     Would you explain how, please.

20  A     Yes.  Because I think of another slide after that, when

21  we talk about expected loss, which is the same as credit

22  risk, that's really the flip side, if you look at this very

23  simple chart, all other things being equal, if you start at

24  zero expected loss, a loan that will -- has absolutely no

25  chance theoretically of defaulting, the value of that loan

Page 12

1   is at its peak.  And as you go down the curve and the

2   likelihood of loss on that loan, that is you will not be

3   repaid the amount that you expect when you pay good value

4   for that loan initially, the value of that loan to an

5   investor will diminish all the way down to there's very

6   little, all other things being equal, that an investor will

7   pay for a loan with a hundred percent likelihood of loss.

8   Q    Does it matter --

9            THE COURT:  Mr. Shuster, can I interrupt for a

10   moment, please.

11            MR. SHUSTER:  Please.

12            THE COURT:  I'm looking at TRDX-175.  You're not

13   presenting this as a scientific representation of anything,

14   right?

15            THE WITNESS:  No, ma'am, this is just a

16   theoretical -- it's a --

17            THE COURT:  Okay.  I mean --

18            THE WITNESS:  -- drawing of the theoretical

19   explanation I'm giving.

20            THE COURT:  But I'm asking a more specific

21   question.  It's a drawing of the theoretical explanation

22   that qualitatively describes the relationship between value

23   and loss.  But I could draw this curve in any number of

24   different ways.

25            In other words I could -- like suppose this were a

1   new car, right, they say that the car depreciates the minute

2   you drive it off the lot, so the value would decline in a

3   different shape, right?  This drawing is not a reflection of

4   some mathematical or statistical model of the relationship

5   between value and expected loss, right?  A function is --

6   describes an arithmetic relationship, one variable as a

7   function of another.  That's not what -- you're just trying

8   to say qualitatively you think there's this relationship.

9           If you -- I'll try it again if you don't

10  understand my question.  All right?  This is not a plot of

11  any actual data points.  This is not derived from any data

12  set, right?

13          THE WITNESS:  That's absolutely correct.

14          THE COURT:  Okay.

15          THE WITNESS:  It's not derived from a data set,

16  it's derived from --

17          THE COURT:  In other words I'm going to take my

18  little red pen here and maybe I can simplify it this way.

19  The curve might look like that, right?

20          THE WITNESS:  The slope of the curve might be

21  different --

22          THE COURT:  Okay.

23          THE WITNESS:  -- for any given transaction.

24          THE COURT:  Very good.

25          THE WITNESS:  The relationship I was trying to

Page 14

1    demonstrate, and the one thing that confused me a little bit

2    is there's no time element in here.  It's at the time the

3    investment decision --

4                 THE COURT:  Yes.

5                 THE WITNESS:  -- is made given any expected loss

6    the value, all other things being equal, would be lower.

7                 THE COURT:  Okay.

8                 THE WITNESS:  But there's no slope that's

9    supported by data.

10                THE COURT:  There's no slope that's supported by

11   data.  That's all I wanted to know.  Thank you.

12                THE WITNESS:  One could construct one, but that's

13   not the purpose of this curve.

14                THE COURT:  And then we'd be here for several more

15   months.

16                THE WITNESS:  I understand.

17   BY MR. SHUSTER:

18   Q    For purposes of the analysis that you just provided,

19   Mr. Aronoff, on the relationship between risk and value,

20   does it matter if a loan is inside or outside of a

21   securitization?

22   A    No, the analysis to estimate how a particular loan will

23   perform is still a function of the characteristics of that

24   loan that are correlated to the likelihood of default or the

25   loss severity or both.

Page 15

1   Q    If a loan had an unknown misrepresentation at the

2   closing of the securitization, what, if anything, does that

3   say about the price paid by investors for that loan?

4   A    To the extent there was an unknown breach, a material

5   adverse breach then that would imply that the investors

6   overpaid for that loan.

7   Q    Does the materiality of a breach in your opinion change

8   over time on a mortgage loan that's been put into a

9   securitization?

10  A    No.

11  Q    Why not?

12  A    Because the loan has actual characteristics that exist

13  with respect to that loan at the time an investor makes the

14  investment decision and pays consideration for that loan.

15  The performance of that loan over time subsequent to that

16  investment decision and the understanding and bargain that's

17  made with respect to that loan is the same.  The only thing

18  that might change over time is that once that defect is

19  discovered at that time the investor understands they've not

20  received the benefit of their bargain and potentially

21  overpaid for a defective loan.

22  Q    Let me ask you this.  Thank you, Mr. Aronoff.

23       If the loan is modified over the course of its life

24  what is the usual consequence to -- securitized loan is

25  modified to provide the borrower some form of relief what is

Page 16

1    the consequence to investors?

2    A    It depends on the type of modification, the specific

3    type of modification.  I mean at a minimum by definition it

4    changes the payment terms of the loan that they expected to

5    have one set of payment terms and has another one.  It could

6    extend the duration, it could lower the coupon, it could

7    provide relief for some part of the principal balance that

8    the borrower expected.  But you know, the most I can say in

9    that broad hypothetical is it changes the payment terms of a

10   loan that were initially expected by the borrower when they

11   paid for this -- the security that's supported by the cash

12   flows of those loans.

13   Q    Is it the --

14          MR. COSENZA:  Your Honor, just --

15          THE COURT:  Yes, Mr. Cosenza?

16          MR. COSENZA:  -- for the record, I don't want to

17   interrupt, I believe that that is not -- that's -- the Q and

18   A was a new opinion, that was not in any of his reports.

19          THE COURT:  Okay.  Let's give Mr. Shuster a

20   moment.  Why don't you look at the question and the answer

21   and help us connect it up.

22          MR. SHUSTER:  Well I think it's within the scope

23   of Mr. Aronoff's opinion concerning material and adverse

24   effect on the value of the loan.

25          THE COURT:  Could you give me the --

1              MR. SHUSTER:  Oh, I'm sorry.

2              THE COURT:  -- question back again, please.

3              MR. SHUSTER:  Oh, of course.  I'm sorry.

4         If a loan is modified over the course of its life

5    what is the usual -- if a securitized loan is modified over

6    the course of its life what is the consequence to investors?

7              MR. COSENZA:  Yeah, I mean if there's a -- again,

8    if there's a cite to one of his reports.  Your Honor, just

9    doing this with the three voluminous reports, I don't recall

10   that opinion in any of his reports.  If there is I'll move

11   on.  We can -- I just want to put that on the record.

12             MR. SHUSTER:  It comes within the scope of

13   Mr. Aronoff's opinion concerning the affect of a breach on

14   value, and in responding to Mr. Castro's opinion that it's

15   necessary to show that a loan defaulted in order to have a

16   -- to have a material adverse effect.

17             THE COURT:  Are we talking -- you have to help me

18   on this.  Are we talking about a loan that's modified --

19   when you say a securitized loan you mean a loan in one of

20   the pools.  Is that what we're talking about?

21             THE WITNESS:  I understood the question to pertain

22   to the covered loans in the trust that we're discussing,

23   yes.

24             THE COURT:  But in the instance of a modification

25   we're talking about a modification to a particular loan?

Page 18

1          MR. SHUSTER:  We're talking about a modification

2     to a securitized loan in general.

3          THE COURT:  Okay.  That's where I'm getting

4     confused by the term securitized loan.

5          MR. SHUSTER:  I mean a loan that --

6          THE COURT:  In a loan that is in a securitization

7     --

8          MR. SHUSTER:  Yes.

9          THE COURT:  -- pool and it is modified --

10         MR. SHUSTER:  Yes.

11         THE COURT:  -- at some course during its life.

12         MR. SHUSTER:  Yes.

13         THE COURT:  And then the question is?

14         MR. SHUSTER:  What is the affect on investors of a

15    loan modification?

16         THE COURT:  And the answer was?

17         THE WITNESS:  It will change the payment terms.

18         THE COURT:  Of the loan.

19         THE WITNESS:  Of the loan that had been expected

20    by the investor from the payment terms --

21         THE COURT:  Okay.

22         THE WITNESS:  -- that had been expected by the

23    investor --

24         THE COURT:  Okay.  So --

25         THE WITNESS:  -- when they initially bought the

Page 19

1    pool.

2            THE COURT:  Okay.  So my common sense response to

3    this is we could stipulate to that fact.  I mean there might

4    be additional questions that actually get us to something

5    that we'd have to look at the expert reports, but on that

6    basic proposition I think that's --

7            MR. COSENZA:  Okay, Your Honor, if we go further

8    into this we'll raise --

9            THE COURT:  Okay.

10           MR. COSENZA:  -- but that's -- I understand.

11           THE COURT:  Okay?

12           MR. COSENZA:  Thank you.

13           THE COURT:  All right.  Thank you.

14   BY MR. SHUSTER:

15   Q    The only further question I have on this is whether the

16   change in the terms of the loan that you just described has

17   adverse consequences to investors?

18   A    It very well may.

19   Q    Mr. Aronoff, is it the industry understanding that a

20   breach of a representation --

21           THE COURT:  Can I just -- now that you've peaked

22   my interest on this point though.

23           When -- there are all kinds of different loan

24   modifications that can occur, right?

25           THE WITNESS:  Yes.

1           THE COURT:  Right.  So a loan could be modified

2    I'll say voluntarily.  The borrower contacts the bank and

3    says I'm hitting a rough patch, can you give me a loan

4    modification?  And the bank will say, sure, right?

5           THE WITNESS:  Yes.

6           THE COURT:  Okay.  So in that instance if -- so

7    that occurred, that transaction.  Then moving forward in

8    time it is discovered that at the inception of the

9    origination of the loan there was a material breach.  I'm

10   making up a hypothetical.

11          THE WITNESS:  I understand.

12          THE COURT:  Okay?  And that that material breach

13   remained undiscovered at the time of the modification.

14   Okay?

15          THE WITNESS:  Yes.

16          THE COURT:  So does the reduction in the amount of

17   the payment stream that goes to the lender, does that count

18   in your view in the what could be asserted against the

19   sponsor?

20          Borrower and lender agree to a reduction, running

21   in the background is a breach that no one discovers, we're

22   now here in 2017, is it for the account of Lehman in this

23   case, the delta in the reduction?  In other words the

24   reduction in the payment stream that the lender voluntarily

25   agreed to give the borrower?  Does that question make sense?

Page 21

```
 1              THE WITNESS:  I understand.  Hopefully my answer
 2    will make sense.
 3              THE COURT:  Okay.
 4              THE WITNESS:  Whether or not there was a
 5    modification was extraneous and irrelevant to our
 6    determination, my determination of whether there was a
 7    material adverse effect caused by the breach.
 8              Where a diminution of payments that otherwise
 9    would have been received by the investor may come into play
10    is simply in the calculation of the purchase price, because
11    when you're calculating what should have the investor
12    received up to this point in time had there not been a
13    modification maybe their repurchase price would have been a
14    little lower because the -- but in any event usually the
15    repurchase price is defined as the original principal
16    balance plus accrued balance.
17              So the only way a modification changes -- may
18    change the repurchase provision is to the extent the payment
19    streams up to that point would change the purchase price to
20    an amount that was different than it would have been absent
21    a modification.  But it doesn't impact the determination of
22    whether or not there was a material adverse effect of the
23    breach in question.
24              THE COURT:  Okay.  Thank you.
25    BY MR. SHUSTER:
```

1   Q    In your experience, Mr. Aronoff, is it the industry

2   understanding that a breach of a representation and warranty

3   must have caused a loss or a default for AMA purposes?

4   A    No, for the same reason that a modification would not

5   impact the finding of discovery of a material adverse

6   breach.  Whether or not the loan defaulted or was performing

7   would not affect that decision either.  And certainly the

8   requirement that a particular breach caused the default is

9   nowhere to be found in the documentation.

10  Q    How did the trustees assess an adverse and material

11  effect during the protocol process?

12  A    There were four basic types of ways in which broadly,

13  generally a determination of whether or not a material

14  adverse effect existed based on the specific facts of each

15  individual loan and breach finding, and these are the four

16  that in one variation or another based on the specific

17  breach finding were cited for each and every breach finding

18  that was presented under the protocol.

19       The first is that the defect causes a increase in the

20  likelihood of default, and therefore since expected loss,

21  the risk of loss is simply the product of the likelihood of

22  default and loss severity if the likelihood of default goes

23  up, all other things being equal, the expected loss has to

24  go up.

25       Similarly if the deficiency or defect of a breach

Page 23

1    finding caused an increase in the loss severity same effect.

2         And of course if the identified breach finding

3    increased both sides of that equation then the product --

4    the expected loss has to go up also.

5         The only additional variance was to the extent a breach

6    in any one of the trust was deemed material -- a breach was

7    deemed material that would also be cited as the materiality

8    statement and the reason for a particular breach finding on

9    a particular loan being found to be -- meet the material and

10   adverse standard.

11   Q    Did the trustees make an AMA determination on a loan by

12   loan basis?

13   A    No, they made it on a breach finding by breach finding

14   basis.

15   Q    Which is to say?

16   A    Which is to say that on some loans that determination

17   was made with respect to each of the --

18   Q    Oh, I'm sorry.

19   A    -- multiple breach findings.

20              THE COURT:  Can I -- is it possible in your view

21   for any of these pools or trusts for there to be a finding

22   of a material breach that then is found to not have an

23   adverse material effect?

24              THE WITNESS:  Yes, there are only a handful, and I

25   think we touched on them yesterday, of representations and

Page 24

1    warranties where there's a materiality standard in the rep

2    that requires you to say to determine on the rep level is

3    there a breach only if there's a material defect, and then

4    once you identify a breach you do the secondary analysis and

5    say is there MAE.  But for most reps without an implicit

6    materiality standard we didn't cite the breach.  There might

7    have been a technical violation or a deviation from the rep

8    factually, but in my parlance that wouldn't ever rise to the

9    level of a breach because the effect of that was not

10   material and adverse to the interest of the investors, never

11   met the MAE.

12        THE COURT:  Well let me ask it a slightly

13   different way, I'm going to hijack Mr. Shuster's

14   examination, he's doing such a nice job.

15        Let's take a hypothetical missing qualified

16   appraisal.  In your architecture of this that would be a

17   material breach, right?

18        THE WITNESS:  Yes.

19        THE COURT:  Okay.  And that would -- that has an

20   adverse material effect in your view, right?

21        THE WITNESS:  On the value to investors, yes.

22        THE COURT:  Yes.  Okay.  So just hypothetical what

23   I'm asking is could there ever be an instance in which you

24   find that a qualified appraisal is missing but you do not

25   find an adverse material effect as a result of the existence

Page 25

1    of that material breach?  That's the structure of my

2    question.

3              THE WITNESS:  Not in that example, Your Honor.

4              THE COURT:  Okay.

5              THE WITNESS:  No.

6              THE COURT:  Okay.  Thank you.

7              MR. SHUSTER:  Thank you, Your Honor.

8    BY MR. SHUSTER:

9    Q    Mr. Aronoff, you've heard that Mr. Grice and at times

10   the plan administrator has said that every mortgage loan is

11   a snowflake.  Do you have a response to that?

12   A    Yes, I do, and I -- it is of course irrefutable that in

13   most cases every single loan is different, even loans to the

14   same borrowers are different to some extent.  The balance is

15   different, an address might be different, certain underlying

16   statistics about the loan might be different.  But I think

17   that is an oversimplification which masks some fairly

18   fundamental basic tenants of securitization.

19        The whole concept of securitization is based on the

20   notion of homogeneity and that there are certain attributes

21   of these loans, which of course are different, can be

22   grouped together sufficiently for an investor to look at a

23   pool of loans and assess the investment risk that is

24   implicit in that pool.  And what the reps and warranties do

25   ironically is that they are the primary source of providing

Page 26

1    the promises to investors that provide the similarities and

2    the homogeneous aspects of those loans.

3        So yeah, they're all different, but they are the same

4    to the extent the reps and warranties circumscribe a type of

5    loan with a type of performance expectation or credit risk

6    that the investor makes a decision to invest in.

7    Q    Is it possible to reach breach conclusions across

8    groups of loans using similar types of evidence?

9    A    There's a lot in that question.

10       The breach determination in this case was made on a

11   loan by loan basis, but the discussion in all my reports

12   about those breaches tries to group similar types of

13   breaches with similar types of effects on a loan for

14   purposes of discussion.

15       So yes, you can, as I tried to do in my report,

16   illustrate why in every case a misrepresentation of income

17   that may be supported by nine different types of supporting

18   documentation but is characterized and described as a

19   misrepresentation of income, based on certain reps that are

20   similar across the pools, will always have the same affect

21   with respect to an investor and therefore will always,

22   absent specific circumstances, will always have the same MAE

23   with respect to that type of breach finding.

24   Q    Now, in addition to discussing loans and types of

25   evidence and groups, and we'll come to this in greater

Page 27

1   detail, you also in your report presented the basis -- the

2   breach finding supporting a breach and supporting the AMA

3   determination for each breach; is that correct?

4   A    Both in the report we did and that information came

5   from the same information that was provided to the plan

6   administrator under the protocol.

7   Q    Thank you.  We'll come back to that.  Mr. --

8         MR. COSENZA:  Your Honor, when we get back to that

9   we're going to have an objection because I don't think we

10  were provided with that information.

11        THE COURT:  Okay.  Well and when we get back to it

12  you can raise it then.

13        MR. COSENZA:  Thank you.

14  BY MR. SHUSTER:

15  Q    Mr. Aronoff, you were at Duff when it was engaged by

16  the trustees for purposes of this matter and in connection

17  with the protocol?

18  A    That's correct.

19  Q    Was it your understanding at the time -- and we're

20  going to get into this in greater detail -- but was it your

21  understanding at the time of the protocol that if the

22  trustees ever needed a testifying expert to testify about

23  the design of the trustees' protocol related forensic loan

24  review and breach findings, to the extent there were any,

25  that that testifying expert would be you?

1   A    Yes.  My ultimate role in the team that worked on this

2   engagement was to provide ultimately an opinion to the Court

3   as to the breach findings, the sufficiency of the breach

4   findings, and the materiality of the breach findings.

5   Q    Mr. Grice has opined that you lack independence because

6   you designed and supervised the review and therefore you

7   can't testify to its efficacy and reliability.  Do you have

8   a response to that?

9   A    To the extent I understand it I disagree with it.

10  Q    Why is that?

11  A    You know, having read his reports I think there was an

12  attempt to equate the engagement that I was involved with

13  with what it appears he was asked to do on behalf of the

14  plan administrators.  He talks about this audit of business

15  processes he was engaged to conduct, which I understand.

16  That was not my purpose.  My purpose was not merely to

17  evaluate a process by looking at the conclusions.

18       My engagement, as we discussed yesterday, was to

19  provide an opinion as to whether there were breaches of a

20  set of reps and warranties pertaining to a set of trusts

21  based on the review of a defined universe of mortgage loans

22  and make a determination and provide the Court with guidance

23  as to whether there were material adverse breaches as

24  defined in the agreements.

25       In order to render those opinions I needed information

Page 29

1    and material on which to base my opinions.  And so it was

2    always my intent to make sure that I managed the process

3    that would assess the loans to enable me to make those

4    opinions.

5        The independence point I think is conflated with his

6    notion of an audit.  The independence, which is very

7    important to me of the type of review I did, was to make

8    sure that none of the parties to the transaction, that is

9    the trustees or their counsel, had input into my conclusions

10   and interpretation of the information that was coming out of

11   the report.  And so in that represent, you know, all the

12   decisions about what evidence should be used, what does a

13   rep and warranty mean with respect to a particular

14   deficiency or defect, and ultimately is there a breach and

15   is it material was my decision.  It was not influenced in

16   any way by any of the parties to the transaction.

17   Q    Thank you, Mr. Aronoff.

18        Incidentally, the structure of your engagement here

19   where you were engaged at the inception to design a review,

20   supervise -- forensic loan review, supervise its execution,

21   and then opine on its results, is that an engagement

22   structure that -- leaving aside scope and magnitude -- but

23   is that an engagement structure that is familiar to you?

24   A    Yes, and you hit on the points.  I mean this type of

25   arrangement when asked to render these types of opinions is

Page 30

```
1    entirely consistent with the type of analysis and loan

2    reviews that I would conduct in any put-back case, and is

3    consistent with my understanding of how other experts render

4    these reports.

5         You might find it hard to believe but this review was

6    particularly unremarkable but for the enormous scope and the

7    time pressure, and then the -- you know, the hard work that

8    other people at Duff had to do to make sure that the

9    information that came out of my review, on which I base my

10   opinions, was properly communicated pursuant to the terms of

11   the protocol.

12   Q    Just to be clear, does your compensation depend in any

13   way on your testimony?

14   A    No.

15   Q    How are you being compensated?

16   A    Hourly.

17   Q    Did you ever commit to finding any particular breach

18   rate or dollar value of claims?

19   A    No.

20   Q    Were you ever asked for?

21   A    I was not.

22   Q    To the best of your knowledge did any of the loan

23   review firms commit to finding any particular breach rate or

24   dollar value of claims?

25   A    No, they did not.
```

Page 31

1    Q    What happened if the loan review firm -- and we're

2    going to -- we're about to get into the process flow in the

3    review -- but what happened if one of the five forensic loan

4    reviews -- loan review firms that have already been

5    identified reviewed a loan file and found that there was no

6    breach, what happened next?

7    A    They moved on to the next loan.

8    Q    There was no review by trustee counsel or anyone like

9    that?

10   A    No.  In a very rare instance to the extent a loan had

11   multiple breaches and was being reviewed in what I call QC-1

12   or QC-2, which was the Duff review after the initial review,

13   if it was obvious in QC that there was another breach

14   finding that was missed that question might be asked, and if

15   it was meaningful might be referred back to the firm.

16        But in the general course if a loan was found to have

17   no breach that loan was put aside and the review continued

18   on the loans that were left.  There were always loans to

19   review.

20   Q    Do you remember, Mr. Aronoff, in rough numbers how many

21   mortgage loan went through the trustees for forensic review

22   process -- the number of loans that went through originally?

23   A    About 170,000.

24   Q    And how many were found to have breaches?

25   A    About 94,500, but by the time the protocol ended I

Page 32

1   think that number was done to 92,000.

2   Q    Okay.  So let's talk about the trustees' loan review

3   process starting with this work chart.  Can you just

4   describe in general terms what this is meant to convey,

5   TRDX-176?

6   A    Yeah.  I think it just shows -- and we'll look at it a

7   little differently later -- but I think it just shows that

8   in terms of the distribution of responsibilities at Duff my

9   primary responsibility was the oversight and to serve as the

10   subject matter expert with respect to the forensic loan

11   review portion of the claim process that was under the

12   protocol.

13       And under my supervision and ultimate responsibility,

14   and I think in my deposition I was asked, you know, what do

15   you mean by senior leader, and I said, I'm the boss and I

16   think people thought that was, you know, I own that, I was.

17   I was responsible for this aspect of the loan reviews.  And

18   under me I had two gentlemen, who I've worked with for a

19   number of years at other stops as well, whose names are

20   listed here.

21   Q    That Messieurs Campbell and --

22   A    Yes, who were responsible for the day-to-day

23   implementation and -- of the policies that the three of us

24   discussed and decided, and they were primarily responsible

25   for the ongoing conversations with the rest of the team and

Page 33

1    the loan review firms, you know, as the process progressed.

2         And then you can see underneath the kind of Duff unit

3    responsible for the forensic loan review were the five loan

4    review firms that were used to conduct the initial phrase of

5    the reviews.

6    Q    I believe there's been some testimony on this already,

7    but would you just briefly describe how the loan review

8    firms were selected and what role, if any, you played in

9    that process?

10   A    Sure.  In the first instance it was of course important

11   to me that all of these firms were well known in terms of

12   the quality of work that they could perform, and all of

13   these were -- all these firms were not only known but had

14   worked with either members of our team, had worked with Duff

15   in other engagements, or had worked with one or more of the

16   trustees in terms of having some experience and track

17   record.

18        And then quite frankly the major part of the decision

19   came down to the ability of these firms to commit to the

20   resources necessary to engage in a task of this size and the

21   time we had.

22        But you know, those kind of discussions and the

23   discussions about the firms ability to comply with some of

24   the guidelines we were going to impose over them to drive

25   consistency across a process like this were conducted either

Page 34

1    through phone conversations with the firms to make sure that

2    our opinions of the firm and our views of the firm were

3    still the way they were, and in some cases were buttressed

4    by on-sight visits to the firms just to make sure that they

5    had the operational capabilities to perform the tasks they

6    were asked to perform.

7    Q    You may have answered this, but --

8            THE COURT:  Yes, Mr. Cosenza?

9            MR. COSENZA:  Just I can do this for the last

10   series of questions, but I just want to put something on the

11   record.

12           I really believe the last series of questions

13   we've delved into facts, not expert testimony, and the lines

14   are blurred with Mr. Aronoff.  I don't want to make this

15   objection every time, I just want to make a standing

16   objection.  I think he's -- this is not only expert work,

17   this is, you know, fact testimony from this time overseeing

18   the process.

19           THE COURT:  Mr. Aronoff, why don't we take the

20   opportunity to allow you to have a short break.  All right?

21   And if you would leave the courtroom for a few minutes while

22   we discuss this.  Someone with come and find you.

23           THE WITNESS:  Sure.  Thank you.

24           THE COURT:  All right?  Thank you.

25           There is a restroom through that back door, if

Page 35

1     that would be more convenient.

2              THE WITNESS:  Thank you.

3              THE COURT:  And there's a conference room back

4     there you can sit in as well.

5              THE WITNESS:  Oh, thank you.

6              THE COURT:  Okay?

7         (Witness leaves room)

8              MR. COSENZA:  So, Your Honor, just -- you know

9     there have been -- sorry.

10             THE COURT:  So, Mr. Cosenza, to be blunt, so what?

11    I mean that's -- I mean he is wearing -- he's being

12    presented as an expert but he exists as a knower of facts as

13    well.  I mean -- excuse me -- we've talked about this before

14    that he is what he is.  He has done what he has done.  So I

15    don't really understand what I would -- what I am to do

16    about that.

17             MR. COSENZA:  I guess just to be clear on the

18    record he's, you know, testifying about, you know, being a

19    percipient witness to what happened --

20             THE COURT:  Right.

21             MR. COSENZA:  -- during the protocol process.

22             THE COURT:  But that's a predicate of his ability

23    to give an expert opinion on how good the process was.

24             MR. COSENZA:  Your Honor, I think, you know, just

25    to give you an example of why the lines are being blurred,

Page 36

1    we have in his expert report that he was only opining on the

2    loans that remain at issue in the case.  That's expressly in

3    his initial report.  And previously we now have him -- now

4    we have him testifying a few minutes ago that there were

5    94,000 loans that came out of the process.  So we're having

6    like a blurring of what he did as a fact witness and what's

7    in his expert report, and now we're getting into other

8    additional factual things that he did as a -- you know, the

9    overseer of the protocol process.

10              So that's sort of the issue I'm trying to

11   highlight for the Court and why there's, you know, some

12   confusion on our side based on the opinion he put forward in

13   his initial report.

14              THE COURT:  Okay.  Mr. Shuster?

15              MR. SHUSTER:  I must confess that I -- in every

16   case that I've worked on or seen where there's an expert

17   witness testifying to breaches of reps and warranties they

18   have always set up the review the way he has, they hire a --

19   they rely on a forensic review firm or more, they testify to

20   their qualifications and how they were selected.

21              You know, to the extent that the plan

22   administrator thinks there's daylight between what he

23   originally did and what he's opining on now I'm sure they'll

24   bring that out.  Mr. Grice did in his reply report.

25              THE COURT:  All right.

1           MR. SHUSTER:  So, you know, I don't find there to

2     be a blurring of the lines for me and Mr. Aronoff.

3           THE COURT:  Well but I -- maybe blurring of the

4     lines is the wrong word.  He exists as a person --

5           MR. SHUSTER:  Yes.

6           THE COURT:  -- who has done what he has done.

7           MR. SHUSTER:  Agreed.

8           THE COURT:  And what he did as a factual matter is

9     part of the predicate for his opinions as an expert.

10           MR. SHUSTER:  Agreed.

11           THE COURT:  And whether or not I -- but there's

12     several levels here, right?  If he were being presented as a

13     witness solely to present the findings of the protocol

14     process he designed versus the additional level, which is

15     him looking back on the process that he designed and

16     offering an opinion that it was good, right, that second

17     level has nothing to do with the fact that he knows facts

18     from the original process.

19           So I think my answer, Mr. Cosenza, is you're going

20     to cross-examination him to 'til your hearts content --

21           MR. COSENZA:  Sure.

22           THE COURT:  -- but to be clear, on all the facts,

23     right?  In other words if the plan administrator wants to

24     delve into this, you know, provide descriptions of breach

25     categories and specific instructions for certain breach

Page 38

1    categories they get to do that, right?

2                MR. SUSTER:  Yes.

3                THE COURT:  Right?

4                MR. COSENZA:  Okay, Your Honor.

5                MR. SHUSTER:  I mean I'd like to say yes.

6                THE COURT:  Yeah.  No, I mean --

7                MR. SHUSTER:  It's Your Honor's decision, I

8    don't --

9                THE COURT:  -- I'm just clarifying.

10               MR. SHUSTER:  -- I'm not anticipating --

11               THE COURT:  You don't disagree with that.

12               MR. SHUSTER:  I don't plan to object to that.

13               THE COURT:  You don't plan to object to that.

14               MR. COSENZA:  Okay.  As long as we understand the

15   full ground rules, because there was -- I mean there's a gap

16   between the fact and the expert.

17               THE COURT:  But then the elephant in the room is,

18   you know, the 92,000 to the 74,000.

19               MR. COSENZA:  Yes.

20               THE COURT:  I don't know what's going to happen on

21   that, so I'm just going to wait and see what happens.

22               MR. COSENZA:  Sure.  Thank you, Your Honor.

23               THE COURT:  All right?  So why don't you folks

24   take a couple of minutes break and then we can get to a

25   stopping point for the lunch break after the next segment.

1    All right?  How about coming back in a quick ten minutes?

2    All right?

3              MR. SHUSTER:  Thank you, Your Honor.

4              THE COURT:  Okay.  Thank you.

5         (Recessed at 12:27 p.m.; reconvened at 1:36 p.m.)

6              THE COURT:  Ready, Mr. Shuster?

7              MR. SHUSTER:  Yes.

8              THE COURT:  Thank you for letting me make my

9    meeting.

10             MR. SHUSTER:  Not at all, Your Honor.  Thank you.

11   BY MR. SHUSTER:

12   Q    Mr. Aronoff, good afternoon.

13   A    Good afternoon.

14   Q    Mr. Aronoff, what guidance was provided to the forensic

15   loan review firms that performed the trustees' loan review

16   for purposes of the protocol?

17   A    There were a number of areas where although we were

18   using experienced firms with qualified individuals reviewing

19   the files, there was a strong effort to make sure that,

20   particularly because we had five different firms, that we

21   would do everything we could to assure there was consistency

22   with respect to the results coming up from the firms.

23        So one of the things we did is we provided the loan

24   review firms with what we called the breach map, and that

25   really defined for each loan review firm for each trust what

Page 40

1    the applicable reps and warranties were and what the

2    potential types of breach findings could be discovered for

3    that trust given the set of reps and warranties.

4         The second thing was to describe --

5              THE COURT:  Mr. Cosenza?

6              MR. COSENZA:  I'm sorry, Your Honor.  This breach

7    map is a document I don't believe was ever produced to us.

8    I don't think it was ever produced in the litigation.

9              THE COURT:  Is there a document that exists?

10             MR. SHUSTER:  I know that we attached a breach

11   mapping to Mr. Aronoff's report, so --

12             THE COURT:  Well, Mr. Aronoff, why don't we ask

13   you.  This first bullet, if you will, provided a mapping of

14   breach findings, does that reflect a written document?  Is

15   that a reference to a written document?

16             THE WITNESS:  I don't know, I refer to it as a

17   term of art that there's an understanding or an -- and to

18   the extent I explained -- I discuss this in my report and

19   explained it -- there is an exhibit which shows the

20   information.

21             THE COURT:  Can you direct us to it, please.

22             THE WITNESS:  Sure.

23             THE COURT:  Is it in your --

24             THE WITNESS:  It's in my --

25             THE COURT:  -- affirmative report?

Page 41

1                THE WITNESS:  I believe so, Your Honor.

2                THE COURT:  Okay.

3                THE WITNESS:  Just let me refer my recollection.

4       Okay.  Table of contents, should be there.  Yeah, if you

5       look at Exhibit 14.

6                THE COURT:  Okay.  Is that in -- that's in binder

7       two?

8                THE WITNESS:  It's in binder two, yes, Your Honor.

9                MR. SHUSTER:  It's TRX-618.

10               THE WITNESS:  And I simply refer to it as a

11      mapping.

12               THE COURT:  I'm sorry, I'm not with you yet.

13      TRX-618.  Okay.  Is that -- that's what --

14               THE WITNESS:  This is a compendium, for lack of a

15      better term, of the mapping of -- for each trust.

16               THE COURT:  Okay.  So my question is then what --

17      this is that, it says it's a mapping.  When was it created

18      though?

19               THE WITNESS:  This was created for purposes of the

20      report.

21               THE COURT:  Okay.  So --

22               MR. COSENZA:  And that's my objection, Your Honor.

23               THE COURT:  Okay.

24               THE WITNESS:  There --

25               THE COURT:  Okay, hold on, please.

Page 42

1              So just to go back to where this started.  In the

2     demonstrative it says that you provided a mapping of breach

3     findings to representations and warranties to each trust,

4     but you didn't provide this document to the review firms.

5              THE WITNESS:  This is not the document that was

6     provided to the review firms.

7              THE COURT:  Where is the document that was

8     provided to the review firms?

9              THE WITNESS:  I don't know.

10             THE COURT:  Okay.  Thank you.

11             MR. COSENZA:  Thank you, Your Honor.

12             THE COURT:  Keep going I guess, Mr. Shuster.

13    BY MR. SHUSTER:

14    Q    So -- okay, you provided a mapping.  Next?

15    A    Get this out of my way.

16         We also provided descriptions of the various breach

17    categories so that there'd be consistencies among the firms

18    as to calling a particular defect the same thing, because

19    there might be slight variances among the firms.

20             THE COURT:  Mr. Cosenza.

21             MR. COSENZA:  Same objection, Your Honor.  I don't

22    know where this is -- this document, the breaches

23    descriptions that were given to the loan review firm.

24             THE COURT:  Why don't you guys come up for a

25    second.

Page 43

1        (At sidebar off the record)

2   BY MR. SHUSTER:

3   Q     Next?

4   A     Yeah.  There were -- the third thing -- third major

5   thing that was important was to communicate frequently with

6   the loan review firms as results of their reviews started to

7   percolate up to Duff and to our team, and to that extent,

8   you know, recognize that as with all loan reviews this is an

9   iterative process that although you have professionals who

10  understand the reps and the potential deficiencies and

11  defects, particularly when you have the amount of data and

12  information that was being communicated here, you want to

13  make sure that everyone is on the same page, and one of the

14  ways to do that is to provide feedback for the loan review

15  firms based on the reviews of -- that they've already

16  submitted for review.

17       And along with that one of the ways that we attempted

18  to drive consistency and clarity was through consistent

19  formatting of the information that was communicated back up

20  to the firm.

21       So just in terms of the data exchange all of the firms

22  for the most part were asked to communicate the critical

23  information in the same format so that it could be easily

24  incorporated into the data management system, which was the

25  repository of all this information.

Page 44

1          And then the final --

2                 THE COURT:  Can I just ask you a -- at that point,

3     so you're talking about consistency in terms of what comes

4     back to you, right?

5                 THE WITNESS:  Yes.

6                 THE COURT:  Okay.  What about consistency in terms

7     of what each of the review firms did as they were facing the

8     file?

9                 THE WITNESS:  Yes.

10                THE COURT:  Did you do anything to ensure

11    consistency among the firms in that regard?

12                THE WITNESS:  That was the discussion with them,

13    the presentation to them of these are the types of breach

14    findings we would expect the potential universe of potential

15    breach findings that would be evident given this set of reps

16    and warranties.  So, for example, if there's no --

17                THE COURT:  I'm asking a different question,

18    Mr. Aronoff.  I'm asking the question of review firm A is

19    about to get started.  The servicers have sent them 10,000

20    files and they have assembled the review of people who are

21    going to do this.  Right?  Actual people --

22                THE WITNESS:  Yes.

23                THE COURT:  -- who are going to look through the

24    files.  At that moment what was there that told each of

25    those actual people what to do?

1          THE WITNESS:  They -- each of the firms that was

2     retained was engaged in this as their primary business, so I

3     don't think there was much discussion or concern about

4     telling the senior loan reviewers at each of the loan review

5     firms that was used how to conduct the review, and quite

6     frankly some of them might gone about reaching their

7     conclusions in the documents they referred to in a slightly

8     different fashion since there is some art as well as

9     science.

10          But we gave them guidance as to not only the types

11     of deficiencies they might expect to find given the trust

12     they were assigned, but also as we saw the results more of

13     those kinds of substantive discussions about do this and

14     don't do that and think about this and we don't want to see

15     that as a breach anymore, those kinds of discussions were

16     more often held as soon as we had the ability to see some

17     results from their review as opposed to initially giving

18     them guidance.

19          THE COURT:  Okay.  Thank you.

20          MR. SHUSTER:  Thank you.

21     BY MR. SHUSTER:

22     Q    Did you -- for example, did you in any particular area

23     say in income breaches did you identify tolerance levels or

24     anything like that?  Do you know what I mean by that?

25     A    I do.  For certain kind of rules of the road to drive

Page 46

1    consistency, because there might have been some slight

2    differences on the margin, you know, based on other reviews

3    or internal policy.

4         So, for example, with income they may have identified a

5    deficiency but the rule was if it's not a greater than five

6    percent difference in the stated income and the evidence of

7    another income then we didn't want to see it at all.

8         To the extent there was contradictory evidence in the

9    file, you know, don't cherry pick, don't just show us

10   documents that you think support a breach, view any piece of

11   evidence or any document that you think supports a breach in

12   the totality of the file.  And certain other things.

13        We -- without putting a tolerance on it had

14   conversation with them about we didn't want to see trivial

15   debt amounts.  So if there was a difference of a dollar or

16   two in the debt amount so be it, that -- you know, we had a

17   lot of loans to look through and we wanted to identify the

18   most clear cut, well supported breaches.

19   Q    Okay.  So please continue on TRDX-178.  Thank you, sir.

20   A    Yes.  And then the last kind of check to drive

21   consistency and make sure that the firms were doing -- were

22   performing as we expected them to given their pedigree and

23   our track record with them was once a loan percolated up

24   from the loan review firm it was subjected to two different

25   levels of review at Duff.

Page 47

1    Q    And is it your review that the process and guidance you

2    described were applied consistently?

3    A    It's my opinion, I don't know if it's my review.  I

4    think you asked if it was my review.

5    Q    If it's your view?

6    A    It's my view.  Yes, it is.

7    Q    Now, let's just talk about the -- we're going to get

8    into the process flow in just a moment.  But evidentiary

9    types and sources that were used in the review, you identify

10   those here on TRDX-179, or at least many of them, correct?

11   A    Yes.

12   Q    Do you discuss these in your reports?

13   A    I specifically -- I think this -- well this list was

14   generated from certain -- quite a few documentary support

15   types that I discussed in detail in my rebuttal report.

16   Q    So let's just turn to that, which is TRX-625.

17   A    I think the discussion starts around page 16.

18   Q    So what I'd like you to focus on, Mr. Aronoff, is to

19   address the evidence types that you cover there and just

20   focus, if you would, on explaining what it is and why in

21   your view and experience it's a reliable evidentiary source.

22   We may or may not get to Mr. Grice's criticisms, but focus

23   on those two aspects if you would.

24   A    Okay.  I'll try.

25        Okay.  The first type of documents that I address in

Page 48

1    the report are MIRS, Accurint, and LexisNexis, these are

2    third-party data sources, as I say, that are widely used in

3    the industry for both origination and forensic reviews, many

4    of which were used in many cases by the seller or the

5    servicer or both, and I point out where Aurora has used

6    Accurint, MIRS, Clear, which is a LexisNexis product, in a

7    number of the loan files that were reviewed here.

8         In addition some of the rebuttal comments that we

9    received were based on reference to those very same

10   documents as well.

11   Q    So let's take them one by one.  Why do you consider

12   MIRS a reliable source?  What was it used for and why do you

13   consider it a reliable source for that?

14   A    MIRS would be a report, as are Accurint and other

15   LexisNexis products, that provide a snapshot in time around

16   the origination date is what the circumstances were that

17   existed when the loan was originated.

18        So, for example, if there was a number of mortgage

19   loans that the borrower had open and had failed to disclose

20   in connection with the origination of the loan we could see

21   on the historical section of the MIRS report which -- those

22   specific mortgage loans associated with the borrower and

23   conclude that they in fact existed at the time the loan was

24   made and the borrower failed to disclose them.  So --

25   Q    Please continue, sorry.  I was going to ask you how

Page 49

1   reliable is MIRS in your experience?

2   A    Very reliable.  That's not to say that from time to

3   time there aren't mistakes on any of these, and sometimes

4   you see a single mistake compounded on all of them because

5   they pick it up.  But in terms of a customary source that's

6   used in the industry and deemed to be reliable, again, MIRS

7   and these other sources, the point of this section with each

8   particular type of evidentiary support was to put it in

9   context and explain that it is used in the industry,

10  evidence that it's used in the industry is that it was used

11  by the sellers and the servicers in this case, in many cases

12  Lehman entities, and to also cite other put-back cases of

13  the handful that we have available to us where discussions

14  of the reliability or customary use of these particular

15  sources has been addressed by a court, and that discussion

16  is embodied in an opinion.  I cited those discussions and

17  those areas for reference.

18      Similarly to the extent there were -- there was

19  available to me information about Lehman and the conduct of

20  its general business as a participant in the residential

21  mortgage market I cited some examples from their own guides

22  and policies where they have addressed the use of these and

23  has in essence said that these are the sources that we will

24  use.

25      So all those go to the reliability.  And in addition

Page 50

1   they're the types of sources that I've used throughout my

2   career, again, recognizing that on the margin there may with

3   mistakes, as Mr. Grice kept saying, nothing the perfect,

4   humans are involved, but you know, again, these are useful

5   tools and when properly used in the hands of an experienced

6   loan reviewer who can take the information on it and

7   evaluate it in the context of the whole file we don't have

8   anything else to use.

9   Q    So there's MIRS -- did what you just say cover MIRS as

10  well as Accurint and LexisNexis?

11  A    Yes, and it -- I mean the general comments cover all of

12  the sources, which we can walk through in -- specifically.

13  Q    All right.  Let's go to BLS.

14  A    Okay.  BLS is more specific.  The Accurint, MIRS, and

15  LexisNexis type tools can be used for verifying or observing

16  a variety of data points concerning the borrower.

17  Q    Such as?

18  A    Credit, real estate, holdings, occupancy.  They verify

19  socials if they match and just make sure you're dealing with

20  the same borrower.  So there's a lot of different

21  information on those kinds of reports, which depending upon

22  the issues evident in the file may be used, and you know, in

23  the manner that's described in the narrative and in the

24  claim package that accompanies that loan.

25      BLS is very specific.  BLS was used only in connection

Page 51

1   with the process around verifying a borrower's income.  So,

2   you know, that's a very specific tool.  It's a database that

3   shows borrowers incomes in a particular geographic area at a

4   particular time based on a particular job description.  And

5   so BLS is illustrative in terms of trying to look at those

6   features of any particular borrower and comparing the

7   borrower's income to this statistical database of

8   information.

9   Q    Was -- were any guidelines applied in terms of the use

10  of BLS?

11  A    Yes.  Generally again for any particular geographic

12  location, job description, and time frame BLS will give you

13  the median salary, the salary, the 75th percentile of the

14  data points, and the 90th percentile, and in order to

15  maintain some level of conservatism in our reviews we ask

16  the loan review firms, which is fairly standard in the

17  industry, to only refer to the 90th percentile and give the

18  benefit to the borrower of having been in the highest wage

19  earners in that category.

20  Q    What about type of borrower that BLS was applied to?

21  A    It was -- the guidance was to use it in those instances

22  -- well BLS only gathers data regarding wage earners, and it

23  only gathers data with some small exceptions about a

24  borrower's base salary.  To the extent it's a type of job

25  where tips or bonuses are -- like a waitress, it may include

Page 52

1   some component of tips if that's included in the information

2   that the employer reports.

3        So one of the reasons this is reliable data is it comes

4   to the government from the employer about how much their

5   employees are paid.  And so --

6            THE COURT:  But let's accomplish something,

7   Mr. Aronoff.  We're not just talking about waitresses.

8            THE WITNESS:  I'm sorry?

9            THE COURT:  Bankers get a salary and a bonus, and

10  BLS does not -- but only reports the salary, right?  BLS

11  only reflects survey results that asks the question what

12  does a person who indicates that they work as this job

13  description earn, right?

14           THE WITNESS:  That's absolutely right.

15           THE COURT:  Okay.

16           THE WITNESS:  It only captures base salary.

17           THE COURT:  So it's not just about waitresses,

18  it's about all kinds of wage earners throughout the

19  socioeconomic spectrum, right?

20           THE WITNESS:  Yes, Your Honor.

21           THE COURT:  Okay.

22           THE WITNESS:  The distinction I was drawing is

23  from -- is that BLS generally does not capture income

24  information about self-employed borrowers.

25           THE COURT:  Well it also doesn't capture

Page 53

1    information about tips, bonuses, tuition reimbursement,

2    miscellaneous income that might be reportable on a 1099,

3    side businesses, selling stuff on eBay, or anything else

4    like that, right?

5            THE WITNESS:  That's absolutely right.

6            THE COURT:  Thank you.

7    BY MR. SHUSTER:

8    Q    Is BLS used in the industry to verify income or used in

9    repurchase reviews in your experience?

10   A    It is, and its primary value is in forensic reviews.

11   There are other services like Asalary.com for instance that

12   may be used at origination to access the reasonableness of

13   income in a stated income program by a loan originator, but

14   BLS is particularly valuable in the context of a forensic

15   review because it gives you historical.  You can go back to

16   a particular year and see what the data was there, whereas

17   some of the other data sources regarding income ranges are

18   typically only good for 12 or 18 months.  They don't have

19   the historical data points that BLS contains.

20   Q    Let's go onto verifications of employment or VOEs,

21   please.

22   A    Okay.  A VOE is something that simply evidences whether

23   or not the borrower was employed at the -- in the first

24   instance was employed at the job stated.  And in some

25   instances the VOE may contain additional information

Page 54

1    regarding start dates, termination dates, and some level of

2    income information as well, and they -- in these files there

3    were either VOEs that were obtained at the time of

4    origination that may or may not comport with the information

5    that was otherwise exchanged in the application process, and

6    then there are audit VOEs, and any time you put an audit in

7    front of it audit VOE we run a credit report it indicates it

8    was an informational source, a credit report or a VOE that

9    was acquired at the time of the forensic review with

10   reference to information that existed at the time the loan

11   was originated.

12        So in addition to the origination VOEs a very valuable

13   tool if there is the ability to contact employers an audit

14   VOE in some cases would have been obtained and served as the

15   primary evidence as to what -- as the basis for a breach

16   finding.

17   Q    Just so we're clear on terminology.  By an audit VOE

18   you mean a VOE, a verification of employment or income that

19   was performed by the loan review firms during the trustees'

20   loan review process for purposes of the protocol?

21   A    That's correct.

22   Q    Okay.  Let's -- and you consider that verifications of

23   employment and income generally reliable?

24   A    Yes.

25   Q    And you've seen them used in the ordinary course of

Page 55

1   business?

2   A     Yes.  And again in the context of this section of the

3   rebuttal report I try and support my rationale for that

4   view.  And not only that I've used them before and in my

5   experience they're relatively well understood and well used,

6   but again, cite to other evidence of the same use in the

7   same context in the marketplace in other contexts.

8   Q    Let's turn -- thank you, sir.  Let's turn to tax

9   documents.

10  A     Yep, that's the fourth category.  Similar explanation.

11  In tax documents were primarily used to income, but can also

12  be used to employment purposes and occupancy purposes.  As

13  you, you know, may find information about all of those

14  things in the borrower's tax return that conflict or call

15  into question information that was provided in the

16  origination process.

17       Again, commonly used, it was one of the most frequently

18  used sources of income, particularly with misrepresentation

19  of income.

20       And again, all of these documents, when properly used

21  in the hands of an experienced underwriter, provide some

22  information that can be reasonably relied upon to help the

23  loan reviewer determine whether it's more likely than not

24  that such a breach existed -- such a breach finding existed.

25  Q    And what do you mean, just to be precise if not unduly

Page 56

1   pedantic about it, what do you mean by tax documents?

2   A    Primarily tax returns, but it could also be 1099s, it

3   could be W-2s.  I guess tangentially pay stubs.  But

4   primarily W-2s, 1099s, and the various tax return documents.

5   Q    And are these sorts of documents like others you've

6   described in common and ordinary use in the mortgage

7   industry for purposes of loan underwriting or otherwise?

8   A    Yes, and not surprisingly there was a concerted effort

9   here to conduct this review in a way that reviews of this

10  type have been conducted customarily.  There was no attempt

11  to find new and different sources of basing breach findings

12  on in this case given that the reps and warranties were

13  fairly standard and fairly well understood in the industry.

14  Q    Okay.  Thank you.  Let's go to the work number, please.

15  A    Yeah.  The work number is an alternative way for a loan

16  review firm or a credit originator to obtain information

17  from -- about the borrower from their employer.  The work

18  number is simply a service that companies retain so that

19  they're not bothered with these kinds of inquiries from

20  potential lenders to their employees, and so they're kind of

21  a clearinghouse for information.

22       The companies supply various bits of information,

23  again, employment, start, termination dates, some income

24  information, verification that employee is in fact employed

25  there, and rather than calling a company directly a number

Page 57

1   of companies simply refer their employees when they need to

2   to tell any potential lender who's going to perform a credit

3   underwriting, it's called a work number for all that

4   applicable information.

5   Q    And that is -- is that a source of information that's

6   commonly used and considered reliable in the industry?

7   A    Yes, it is.

8   Q    Please go on if you would to data verify.

9   A    Again, with all these they all provide different

10  aspects of information.  As I say in the report, data verify

11  is used in due diligence, QC, repurchase reviews.  It's well

12  understood and well used in the industry.

13       The plan administrator accepted claims where data

14  verify was used as the basis for the claim.  I cite, you

15  know, a number of instances, both in credit review type

16  policy documentation, depositions of loan review experts and

17  other cases where those were available.  And in my view it's

18  a well understood and well used supporting document for

19  forensic reviews of this type.

20  Q    Would you move onto credit reports, please.

21  A    Yes.  And I think there's been some discussion already

22  about credit reports.  Like all of these documents they are

23  not entirely free from error, we know that, and the loan

24  professionals that look at them are well aware of that.  And

25  again, all of these documents are taken for what they're

Page 58

1    worth, which is they are in the terms of credit reports

2    really all we have.  Multi-trillion dollar consumer lending

3    industry is driven by credit reports.  Even with --

4              THE COURT:  You say that as if it's a good thing.

5              THE WITNESS:  It is what it is.  I don't

6    necessarily think it's the perfect way to do it, but it's

7    all we have.  And when someone goes into a department store

8    and applies for credit electronically there's a reference to

9    their credit report and a decision is made.  When every --

10   almost every consumer walks into a mortgage company and

11   wants a loan the lending institution has to refer to their

12   credit report.

13             And so one of the sources, and I think we'd be

14   deficient if we excluded it, one of the sources that we

15   looked at and gave credence to, to the extent it helped

16   support a breach finding, was the credit report.

17   BY MR. SHUSTER:

18   Q    Mr. -- all that said and just again not to be unduly

19   pedantic about it -- but are credit reports, you know, in

20   wide use in the mortgage industry and generally considered

21   reliable in your opinions for the purposes for which they're

22   -- in your experience for the purposes for which they're

23   used?

24   A    They are, and they're the source data for the

25   calculation of a FICO score as well, which seems, you know,

Page 59

1    to come into increasingly more prevalent use, and you know,

2    because it's -- so FICO, credit scores despite all of the

3    understanding or lack of understanding about their

4    limitations are well understood to be used in evaluating

5    credit, decisions initially, and evaluating the quality of

6    credit decisions that were made in the context of a forensic

7    loan review.

8    Q    So am I correct that there were both origination and

9    what you refer to as audit credit reports that were used in

10   the process?

11   A    That's correct.

12   Q    And so -- just to get through this quickly.   An

13   origination report would have been an origination credit

14   report run at the time that the loan was being underwritten?

15   A    That's correct.

16   Q    And an audit credit report would have been one that

17   would have been pulled by one of the loan review firms

18   during the course of the review for purposes of the

19   protocol?

20   A    In most cases.   From time to time there were audit

21   credit reports that had been pulled by the servicer in

22   connection with a modification request or some other request

23   for relief.

24   Q    Thank you.

25   A    So it wasn't the origination date --

Page 60

1    Q     Thank you.

2    A     -- but some time subsequent to that.

3    Q     So let's take the rest of them as a group.  CPA letter,

4    Cydex (ph), business records, and licenses, compliances,

5    quitclaim deeds, and identity theft affidavits.

6          Generally have you seen these be used for purposes of

7    forensic loan reviews or otherwise in the mortgage loan

8    industry and are they considered reliable for the purposes

9    for which they're used?

10   A     Some of those much less frequently than others.  Some

11   of these just given the enormous sample size of files being

12   reviewed here, you know, we looked at and considered, for

13   example, identity theft affidavits is not something that

14   normally pops up in a 4- or 500 loan review, but to the

15   extent in the context of the file there was an affidavit

16   that oh, by the way when the servicer checked to see if this

17   borrower actually existed they found the owner of that

18   social security number and there was evidence that the

19   original borrower was not who they stated they were, and we

20   thought that was pretty compelling documentary evidence that

21   something was awry at the time of origination.

22   Q     Now you -- thank you, Mr. Aronoff.  Now, you've used

23   the -- you mentioned that these are all useful tools in the

24   hands of an experienced loan reviewer and we've heard the

25   term holistic loan review used a lot.  Without necessarily

Page 61

1     adopting that terminology would you -- was -- were holistic

2     loan reviews performed here for purposes of the trustees'

3     forensic loan reviews?

4     A      To the extent that holistic loan review is to consider

5     the quality and usefulness of a particular piece of

6     supporting evidence to support the conclusion that's being

7     drawn, if that means to consider that not just because it's

8     on a tax return, but to consider that data point in the

9     context or totality of the entire file, then yes, and that's

10    what the firms were expected to do.

11          And to the extent that it was believed or discovered in

12    QC that there was any kind of failure to evaluate the

13    sufficiency or meaning of any of these sources of evidence

14    properly in the context of the entire file that was

15    something that was communicated back to the firms.

16    Q      Very good.  Thank you.

17          Okay.  Let's talk about the loan review process and

18    move our way to the quality control.  But let's start at the

19    beginning.  Why don't you take us through it, if you would,

20    please.

21    A      Okay.  This just breaks into five broad stages, the

22    forensic loan review process that determine whether or not

23    there was actually a material adverse breach that would be

24    submitted as a claim pursuant to the protocol.

25          The first one, completeness review, was something that

Page 62

1    I didn't manage, that was a determination as loan files came

2    in by the loan review firms initially as to whether or not

3    there was sufficient documents in the file to even commence

4    a loan review.  Was there a meaningful amount of

5    documentation to even commence a loan review?  And to the

6    extent a file was determined to be complete enough for a

7    review the review commenced.

8        And the first level, we'll call the initial loan

9    review, was the loan review professional at the loan review

10   firm doing their thing, and their thing consisted of, as

11   I've said here, basically reviewing the entire file,

12   verifying key information, identifying a breach, if there

13   was one, a breach finding if there was one, and then

14   describing the breach finding in sufficient detail to allow

15   whoever the next level reviewer was or the PA sufficient

16   information to see here's the finding we're talking about,

17   here's the factual threshold we're talking about, and here's

18   the supporting documentation that we're talking about.

19       At a minimum what's described here is sufficient to

20   show the finding, and in addition to that of course the

21   critical documents that were the basis for that initial

22   narrative were contained in the claim file, which was

23   assembled by the loan review firms.

24       And so that was really the -- and as I eluded to of

25   course at that stage they could also review a file and say

Page 63

1    there's no breach here and the process with respect to that

2    loan.

3    Q    Okay.  Next stage.

4    A    Next stage, each of the five due diligence loan review

5    firms had their own internal QC.  And that was important to

6    us and it was clearly important to them.  They're in the

7    business of identifying meaningful breaches and they wanted

8    to make sure that when work product went out of their firms

9    that it was done properly in accordance with their policies,

10   in accordance with our rules.

11        And for the most part they didn't -- as it says, it

12   ensured compliance with the industry standards and guidance.

13   It confirmed the existence of a breach finding and that the

14   work product was in proper format in terms of the data.

15   There was some data integrity QC that was done to varying

16   degrees of the different firms.

17            THE COURT:  What does that mean, Mr. Aronoff, data

18   integrity?

19            THE WITNESS:  To make sure that the information, so

20   meta checks to make sure that the information that was being

21   communicated is just correct on its face.  The property

22   address is correct.  The borrower's name is correct, and

23   those types of things.

24            THE COURT:  What specific knowledge do you have of

25   any under -- any QC function that was performed in any of

1    the five review firms?

2           THE WITNESS:  Well, there were initial

3    conversations with them.  There was --

4           THE COURT:  Between whom and whom?

5           THE WITNESS:  Duff & Phelps.

6           THE COURT:  Who?  That's not a person.

7           THE WITNESS:  In some cases it was me.  In not all

8    cases it was -- I didn't have that discussion.  And then --

9           THE COURT:  And who was the conversation with at

10   the review firm?

11          THE WITNESS:  It would have been a senior

12   representative of the company who was in the appropriate

13   position to talk about these kinds of issues with us.

14          THE COURT:  These kinds of issues being a quality

15   control that that firm --

16          THE WITNESS:  That --

17          THE COURT:  -- conducted?

18          THE WITNESS:  Among other things.  There were

19   discussions about the process, the resources, and one of the

20   --

21          THE COURT:  Well, I'm asking a very specific

22   question.  I'm asking for you to tell me specifically about

23   what was said between Duff & Phelps, as you said, and any

24   review firm to the question of what comprised their quality

25   control process?

Page 65

1              THE WITNESS:  What -- when I was involved in the

2      conversations?

3              THE COURT:  Yes.

4              THE WITNESS:  I asked them do you have a QC

5      process.

6              THE COURT:  Okay.  And --

7              THE WITNESS:  And then if they said yes, I said,

8      explain it to me.

9              THE COURT:  Okay.  So --

10             THE WITNESS:  Talk to me about it.

11             THE COURT:  So tell me about -- so tell me about

12     one.

13             THE WITNESS:  In most -- in my experience with the

14     firms here the answer I wanted to see if they were qualified

15     was that they have experienced professionals reviewing the

16     work of the initial loan reviewer.

17             THE COURT:  So that was --

18             THE WITNESS:  -- number one.

19             THE COURT:  That was the conversation?

20             THE WITNESS:  Number one.

21             THE COURT:  Yes.

22             THE WITNESS:  And number two, that there was some

23     data integrity component to confirming that the information

24     that was input by someone at their firm that was ultimately

25     going into their deliverable to us was audited and confirmed

Page 66

1    to the extent possible before it was sent up to us.

2           THE COURT:  Thank you.

3    BY MR. SHUSTER:

4    Q    So --

5           THE WITNESS:  Can I add one other thing because it

6    bears on this, I think.

7           THE COURT:  Yes.

8           THE WITNESS:  Prior to the issuance of my report I

9    did go back and talk to each due diligence firm to re-

10   familiarize myself and confirm that some of the

11   conversations and discussions that had taken place back a

12   number of years previously were, in fact, as I remembered

13   them or as were communicated to me by Duff & Phelps when I

14   did my due diligence at Duff to reacquaint myself with the

15   process, particularly those aspects of the process that I

16   might not have been personally involved with.

17          So prior to the issuance of the report I talked to

18   every one of the five due diligence firms and I -- and I

19   asked the very same questions about QC.

20          THE COURT:  Okay.  Thank you.

21   BY MR. SHUSTER:

22   Q    Are you done with step two?  Have you covered it to

23   your satisfaction?

24   A    Yes.

25   Q    Okay.  Let's move on to the next phase.

Page 67

1    A    Yeah.  Step three was what we call QC-1 and that was

2    after the information regarding a particular loan and the

3    breach findings that may have been associated with that loan

4    were communicated to my team at Duff & Phelps, we went

5    through the QC review as described here to make sure the

6    breach finding was accurately described, review the claim

7    package, verify the claim package documents actually

8    supported the breach and were referenced properly, ensure

9    the breach finding was described which seems a lot like the

10   first one, and refer -- and then to the extent they had

11   finished their review they referred the package to QC-2

12   either for a final review or for resolution of any questions

13   that arose during the QC-1 process.

14   Q    By the "they" in the sentence you just used you mean

15   the QC-1 reviewers?

16   A    That's right.

17   Q    Okay.  Would you take us to the next step, please?

18   A    The next step is QC-2 and this is where any questions

19   that may have arisen by the QC-1 reviewer were addressed;

20   that is, the QC-2 they either could have been answered or

21   referred back to the loan review firm if it rose to that

22   level, taken into account or not.  A question may have

23   resulted in a QC-2, the breach finding getting removed and

24   getting kick.

25        QC-2 also verified accepted or rejected findings

Page 68

1    ultimately or as I said referred a particular finding with

2    significant or meaningful open questions back to the loan

3    review firm to see, you know, why -- why they reached the

4    conclusion they reached if it wasn't clear in the file.

5          There was also a check to make sure that for that loan

6    in that trust that breach finding was actually connected to

7    a representation and warranty that existed in that trust.

8          There was also a review of the narratives for clarity

9    and consistency in addition to what was done at QC-1.  And

10   then the final materiality determination on an individual

11   breach finding basis based on the guidance that was provided

12   with respect to various types of breach findings and reps

13   and warranties was made for that breach finding.

14   Q    So having described all that, Mr. Aronoff, and just for

15   the perfect clarity what is your opinion concerning the

16   reliability of the trustees' loan review process and the

17   extent to which it conformed with a stub -- established

18   custom and practices?

19   A    Yeah.  It's -- I -- it's the same as we discussed

20   yesterday; that the conclusions drawn or the breach findings

21   that were the result of a loan review process were

22   reasonable and thoughtful because they were conducted by

23   experienced loan review professionals consistent with the

24   way in which such loan reviews are conducted in the

25   industry, including using the types of sources and analysis

Page 69

1   that are customarily used in reviews of this type.

2   Q    And you may have just answered this, but, again, just

3   for perfect clarity what is your opinion concerning the

4   validity of the breach findings that you present in your

5   report and that you're opining on here in this hearing?

6   A    They are valid and they are material and adverse to the

7   interest of certificate owners.

8   Q    Now various -- we've talked a little bit about various

9   criticisms that Mr. Grice has made about some of your

10  process or conclusions, and I certainly don't want to get

11  into all of those.  But he did -- he did say that the

12  withdrawing of claims from the time of the protocol to the

13  time of issuance of your report reflects that the trustees'

14  processes was unreliable.  Do you agree with that, and if

15  you do not, why, why not?

16            THE COURT:  Yes, Mr. Cosenza.

17            MR. COSENZA:  Your Honor, I --

18            THE COURT:  Come on up.

19            MR. COSENZA:  -- would object to this line of

20  questioning.

21       (Sidebar off the record)

22            THE COURT:  Okay.

23            MR. COSENZA:  I want to --

24            THE COURT:  Mr. Cosenza is conferring with his --

25            MR. COSENZA:  Sure, Your Honor.

Page 70

1              THE COURT:  -- esteemed colleagues.

2              MR. COSENZA:  I'm trying to give them a --

3              MR. SHUSTER:  No.  Given -- what I was going to say

4      is given the sidebar we just had, I just want to reflect a

5      little bit on how I want to come at this, so I'll go onto

6      another topic --

7              THE COURT:  Okay.  So we'll hold that question.

8              MR. SHUSTER:  -- and come back to it.

9              THE COURT:  Okay.  Very good.  I see that the sun

10     is in -- it looks like it's shining right in Mr. Cosenza's

11     face over here.

12             MR. COSENZA:  I can take as much -- I'm constantly

13     indoors, Your Honor.  Getting some sun is good for me.

14             THE COURT:  Okay.  If it's -- if it bothers you

15     then we can close the curtain a little bit.

16             MR. COSENZA:  Thank you

17             THE COURT:  Okay.  And the same goes for somebody

18     back there is right in the sun.

19         (Laughter)

20             THE COURT:  It must feel good today.

21             Okay.

22             MR. SHUSTER:  That is Mr. Zewetsig (phonetic) from

23     U.S. Bank.

24             THE COURT:  Hello, sir.

25     BY MR. SHUSTER:

Page 71

1    Q    Okay.  You're aware, Mr. Aronoff, that the plan

2    administrator put about a third of the loans that were put

3    through the protocol process on hold?

4    A    Yes, I am.

5    Q    Had you ever seen that before incidentally where

6    someone who was the recipient of put back claims refused to

7    review breach findings because certain documents were

8    missing?

9    A    Yes, but not those documents.  I've dealt with -- I've

10   been involved in situations where the response was we're not

11   going to review a file because the supporting documentation

12   for that claim is not here missing, but I've never faced a

13   situation where, as a result documents that had no bearing

14   on the breach finding and the materiality determination,

15   that the party to whom the claim was made didn't react to

16   the breach finding.

17   Q    So you know the four categories are servicing notes,

18   payment histories, loss certifications and corporate expense

19   logs, correct?

20   A    Yes.

21   Q    Can a breach determination be made without those

22   documents?

23   A    It was in almost 30,000 incidents.  So, yes, I believe

24   it can.

25   Q    And can an AMA determination be made without those

Page 72

1   documents?

2   A    Based on my understanding of AMA analysis it can.

3   Q    And have you ever calculated purchase price on a loan?

4   A    I have.

5   Q    And did you use the documents, any of those four

6   categories of documents or did you use other documents?

7   A    Simply to calculate purchase price those documents were

8   not -- I have not used those documents to calculate purchase

9   price.  No.

10  Q    When have you used?

11  A    Primarily the remittance reports or servicer

12  information regarding the status of the loan.

13  Q    Mr. -- thank you.

14      Mr. Grice states that there were some errors in the

15  trustees' breach presentation.  So does Mr. Trumpp.  Do you

16  have a response to that?

17  A    That's one area in which we agree.  There were mistakes

18  made.  The mistakes were -- there was an attempt to keep the

19  mistakes at a minimum and in some instances, in the context

20  of the step two rebuttal process as well as the exchanges

21  among the experts after the reports were filed some specific

22  mistakes in -- with respect to a handful of breach findings

23  were identified.

24      And to the extent we reviewed the file and agreed that

25  a mistake had been made, those handful of claims, and I

1    think post-submission of affirmative reports which included

2    77,000 loans I think at the end of the day I agreed on about

3    33, 34 loans where there -- where a mistake had been

4    identified by the plan administrator or Mr. Grice, and in

5    those instances those loans were withdrawn.

6        But, you know, the -- every attempt -- great pains were

7    taken to make sure that the results of the review were

8    thoughtful and as accurate as possible.  And that was

9    important to me because those are the basis of the opinions

10   that I'm being asked to offer in court today.

11   Q    So where there were errors, though, the plan

12   administrator in the ordinary course of the protocol would

13   point them out?

14   A    Occasionally.  Most of the rebuttals that were received

15   in connection with step two were not sufficiently specific

16   or particularized to require the file be opened.  For the

17   most part they contained statements of a fundamental

18   difference and approach.  This document is not sufficient to

19   support the claim because of its evidentiary weight, not

20   because there wasn't a tax return in the file that showed an

21   income number that was half of the stated income.  There

22   were also statements about MAE that reflected a fundamental

23   difference in point of view about what MAE was, and so on.

24       So in those instances in step two where there was a

25   rebuttal that was directly -- that directly discussed a

Page 74

1    particular fact that was used to support the claim and the

2    statement was that it was wrong or the document didn't say

3    that or there was -- you said there's no appraisal in the

4    file and we found one, to the extent the rebuttals allowed

5    us at Duff, my team at Duff to respond by reopening the file

6    and finding specifically what the criticism was, we did so.

7          In most cases we continued to believe the claim was

8    supported and we disagreed with the comment.  But in those

9    instances where those particularized rebuttals were made and

10   a mistake was discovered, those claims were withdrawn.

11   Q    In your opinion are -- is the presence of some degree

12   of errors entirely avoidable in a forensic loan review of

13   this magnitude?

14   A    We try, but, no, it's not avoid -- entirely avoidable.

15   Q    Okay.

16          MR. SHUSTER:  Your Honor, I think this would be a

17   good time for a break because I intend to get into some

18   loans.

19          THE COURT:  Okay.  That would be great.  And I'm

20   going to have to take another break at 3:30 to take a call

21   for about five minutes.

22          So come back in ten and we'll go until 3:30.  All

23   right.

24          MR. SHUSTER:  Thank you, Your Honor.

25          THE COURT:  Thank you.

Page 75

1             How late did you want to go today, Mr. Shuster?

2             MR. SHUSTER:  Five.  Is five good with the Court?

3             THE COURT:  Yes.

4        (Recessed at 2:40 p.m.; reconvened at 3:02 p.m.)

5             THE COURT:  Please have a seat.

6             Okay.  Are we -- we're moving onto a loan?

7             MR. SHUSTER:  Yes, Your Honor.

8             THE COURT:  All right.

9             MR. SHUSTER:  And we have some loan binders to hand

10   up if --

11            THE COURT:  Right.

12            MR. SHUSTER:  -- we may approach?

13            THE COURT:  Yes.

14       (Pause)

15            MR. SHUSTER:  So we're going to proceed in the

16   order that the loans appear in the deck.  And we'll start

17   with loan 1955.

18   BY MR. SHUSTER:

19   Q    And what I would like you to do, if you would, Mr.

20   Aronoff, is to identify the type of breach and the basis for

21   the breach and the support for the breach.

22            MR. SHUSTER:  And what is this, Mr. Lieberman?

23       (Laughter)

24            MR. LIEBERMAN:  This is a cover sheet, isn't it?

25       (Pause)

1          THE COURT:  So we're on loan 1955 which is about

2     halfway through the binder.

3          MR. SHUSTER:  Yes, Your Honor.

4          THE COURT:  First page says, loss mitigation input

5     data?  The first page other than the one we were just

6     handed, right?  No?

7          MR. SHUSTER:  Let's see.  No.  You would have to go

8     back to the previous tab, Your Honor, which is --

9          THE COURT:  Oh, the claim --

10          MR. SHUSTER:  -- the claim --

11          THE COURT:  -- the claim.  Okay.  Thank you.

12     BY MR. SHUSTER:

13     Q    You've got in your book an exhibit that -- TRDX-186 --

14     A    Yes.  I just want to make sure this is a larger, more

15     readable version of that.  Is that what this is?

16     Q    That is a larger, more readable version of TRDX-184.

17     A    Perfect.  Okay.

18     Q    But TRDX-186 which is a couple of pages forward is the

19     story the loan tells chart.

20     A    I see that.

21     Q    Okay.  So describe if you would the breach and the

22     evidence supporting the breach.

23     A    Sure.  The borrower very simply --

24     Q    And let me -- I don't mean to interrupt, but I just

25     want to caution you about something you already know, which

Page 77

1    is to do everything we can to protect borrower privacy.   So

2    no last names, no full loan number, that kind of thing.   I

3    know you know that.

4    A    No.   Thank you for the --

5    Q    I'm just erring on the --

6    A    -- reminder.

7    Q    -- side of caution.

8    A    Yeah.   The borrower's stated income at their job as a

9    government employee that they earned $10,750 per month.   As

10   I discuss this, do you want me to go into the files or just

11   --

12   Q    Yes.

13   A    -- give the overview?

14   Q    Yes.   The -- yes.   You can turn to page --

15   A    Okay.

16   Q    -- 16 of 37 in the claims app.

17        (Pause)

18   A    Yeah.   And you can see page 16 starts the application.

19   The actual income information is on page 17.   And I just

20   know that if you flip to page 19 and 18 and the top of page

21   16 there's an application that was signed by the borrower on

22   the end of July 2006.

23        And if you go to page 17 of 37 at the top is the income

24   block where the borrower is supposed to list his or her

25   income.   And we see in the base employment income box the

Page 78

1    monthly figure of 10,750 per month which equates to about

2    $129,000 a year as I recall.

3        So the evidence for this -- the primary evidence for

4    this claim that was identified in the factual basis for the

5    claim was tax returns for 2006, the same year the loan was

6    originated, and we can flip to that, the claim package at

7    page 21, a few pages later.

8    Q    And what does that show?

9    A    If you look at wages on line 7 you can see a tax number

10   for that taxable year of 48,602, which equates to a monthly

11   income of 4,050, much lower than 10,750 a month.

12       Now I spoke about this evidence being reviewed in the

13   totality of a file.  And I don't know if you want me to get

14   into the rebuttal replies regarding this particular loan,

15   but let's just walk through the storyline and see what we

16   have.

17       In addition to the '06 return, if you go into the loan

18   file at page 344 -- and these are excerpts from a loan file

19   that was about a thousand pages long --

20           THE COURT:  What was the page again, Mr. Aronoff?

21           THE WITNESS:  344, I believe.

22           THE COURT:  Thank you.  In the next tab, right, in

23   the --

24           THE WITNESS:  In the next tab that --

25           THE COURT:  Yeah.  Okay.

Page 79

1            THE WITNESS:  -- that says, loan excerpts.  It's

2     right after the tab we were looking at.

3            THE COURT:  Okay.

4            THE WITNESS:  And they're just excerpts so they

5     don't --

6        (Pause)

7            THE COURT:  Oh, I see.  Okay.  I'm there.  Thank

8     you.

9            THE WITNESS:  You can see that that is -- I'm not

10    there yet.  I thought I was.

11    BY MR. SHUSTER:

12    Q    Page 344 --

13    A    Yeah.  I'm there.

14    Q    Okay.

15    A    That document is a W-2 for the same year from the

16    employer that shows an income number pretty close to what

17    was reported -- rounded up on the tax return.  The tax

18    return says 48,602.  This says 48,601.63.  So this is

19    confirmation that the number on the tax return, although

20    unsigned and undated, reflects the same number that was

21    reported by the employer on the W-2.

22    Q    When you say unsigned and undated are you referring to

23    the tax return?

24    A    The '06 tax return.  That's correct.

25    Q    Does the tax return indicate that it was prepared by a

Page 80

1   paid preparer?

2   A     It does.

3   Q     Does that tell you anything?

4   A     It -- again, it tells part of the story that -- and the

5   -- we see that that preparer's name appears on subsequent

6   tax returns.  So it's -- it would be more difficult to be

7   something that could have been dreamed up by the borrower

8   for purposes of getting the modification they were

9   ultimately trying to achieve.

10       Then the next data point that's important in the

11  analysis here is -- so we have an '06 return and a W-2 for

12  '06.  But if we look at -- in the loan file at page 338, I

13  think it's on the other side of the W-2 for '06 we see the

14  '07 tax return, the year subsequent to the year of

15  origination and we see wages of 54,596 and that's important

16  for two purposes.

17       First, it's consistent, although higher, with the

18  income we saw in '06, but you can also note here that it's

19  the same borrower and shows another consistent data point.

20       Similarly for '08 at loan file 447 we have annual

21  income of 58,000 which equates to a monthly income of about

22  4,800 a month.

23  Q     Yeah.

24  A     And I think most particularly telling in '09 is we have

25  another tax return that's consistent with the $4,800 a month

Page 81

1    number that we've been seeing with, you know, some increases

2    in compensation from '06 over '08.  But particularly telling

3    in '09, and I refer you to the loan file at page 242, is

4    another -- is that the right cite?  I don't know if that

5    cite is right.  242, I'm sorry, where we have a W-2 from

6    2009 which indicates that the borrower is working at the

7    same employer.

8        So any discussion that they may have worked a partial

9    year, been laid off, is somewhat mitigated.  One could argue

10   they stopped working in -- after the loan in July of '06 and

11   didn't work again till here.  But, again, you look at the

12   totality of the file.

13       And if I might, just on the information relating to

14   '06, even if you assume that on 7/31 when they signed the

15   application they never worked another day in that year, the

16   $48,000 annual income for that year doesn't jive with

17   someone who earned $10,750 a month for seven months of the

18   year.  That would be well in excess of $70,000.

19       So, again, a loan --

20   Q    Mr. Aronoff --

21   A    -- detective would look at all these data points and

22   determine, excuse me, is it more reasonable or not that the

23   750 was a misstatement by the borrower.

24   Q    Incidentally, you mentioned that it's the same

25   borrower.  Did you happen to check, and we don't have it up

Page 82

```
 1    -- I don't want to have it up here.  But did you check

 2    whether the social security numbers match on the tax return

 3    and the loan application?

 4    A    Yes, to the extent that data is available on the

 5    supporting document there's -- you know, there -- quite

 6    frankly, from time to time in these files there were

 7    documents from one borrower in another borrower's file.  And

 8    every attempt is made to make sure, you know, whether or not

 9    a borrower's name may be Joe Smith or Mary Jones, that the

10    information relates to the specific borrower that is the

11    subject of the forensic loan review.

12    Q    And here the social security number does match?

13    A    They do.

14    Q    So you were going to go through, I think, a couple of

15    other documents?

16    A    Yeah.  If you go to 2010, just to finish the story out.

17    And I might add that much of this documentation was provided

18    by the borrower to Aurora apparently in connection with a

19    number of requests for modification.  But, again, in 2010 we

20    have paystubs confirming a fairly consistent number of

21    $4,600 a month and those paystubs were picked up also, the

22    same source, in what was -- what's called the Aurora wager

23    and are calculated where they made an attempt to calculate

24    the monthly income of the borrower as well based on those

25    paystubs.
```

Page 83

1          So this is a fairly straightforward --

2     Q    So let's turn --

3     A    -- misrep of income refinancing.

4     Q    Thank you, sir.

5          So let's turn to TRDX-150 which is the fold out sheet.

6          (Pause)

7     Q    So let me direct your attention to the claimant's

8     factual basis.  There, it indicates that the -- it -- the

9     2006 tax return was principally relied upon, correct?

10    A    Yes.

11    Q    Was the other information that you just described and

12    took us through, was that in the materials that was -- were

13    provided to the plan administrator?

14    A    Yes.

15    Q    And can we look at the plan administrator's response,

16    Mr. Aronoff?

17    A    Yeah.  Just to get some grounding the top page here

18    that starts with loan number on the far left, that's --

19    Q    Yeah.

20    A    -- the page I'm looking at, this came from -- all this

21    data on the front and the back, these fields, came from

22    Appendix D to Mr. Grice's reply report.  Just to put this in

23    -- there are a lot of these things that look like this

24    flying around.

25         So -- and it simply shows various identifying

Page 84

1   information about the loan and the breaches, PA's breach ID,

2   trustees' breach number, the trust, the type of defect, the

3   contractual bases for that defect.  And as we discussed

4   yesterday you can see it's a misrep.  This trust had both

5   the no event of default and a no entry statement rep.  So

6   this breach finding

7   resulted in a breach of both of those reps for the same

8   reason.

9        And there is a description we talked about where the

10  borrower stated income as a service worker in a particular

11  type of government program.  It states what income they

12  provided in connection with the loan application.  And then

13  it states one of the bases which was sufficient by itself in

14  the context of the file to support this breach finding; that

15  there was a tax return, same year, that -- where the

16  borrower was employed by the same employer, the same title

17  as when the loan closed and reflected annual income of a

18  much lower monthly amount.

19       And then we see next to it -- and this was all -- that

20  was submitted under the protocol as --

21  Q    Yeah.  Yeah.  And I don't mean to cut you off.  I --

22  A    Go ahead.

23  Q    -- want you to go on.

24  A    Yeah.

25  Q    But when you describe the information you said it came

1   from Appendix D to Mr. Grice's reply.  But the information

2   that's set forth on page 1 of this exhibit, TRDX-150, was

3   exchanged -- was that exchanged between the parties during

4   the protocol, the page --

5   A    Yes.

6   Q    -- the page you're looking at?

7   A    Yes.  All of the columns including the next two, plan

8   administrator formal response and claimant's rebuttal, the

9   trustees' rebuttal, all of that was information exchanged up

10  through step two of the protocol.

11  Q    Okay.

12  A    This is not information that was generated or written

13  during the -- subsequent to the exchange of expert reports -

14  -

15  Q    Okay.

16  A    -- which is on the back --

17  Q    So let's --

18  A    -- of this page.

19  Q    -- let's look at the plan administrator's formal

20  response which you would have us to do.

21  A    Yeah.  The plan administrator's formal response was as

22  follows.  The evidence does not support a breach of the no

23  fraud or no event of default representations.  The evidence

24  is unreliable and insufficient because income stated in

25  origin year -- origination of the tax return does not prove

1   origination income.  And generic statistical salary

2   information, which I don't remember talking about, does not

3   prove origination income.

4        Further, the no fraud representation does not require

5   seller knowledge of which there is no evidence.

6        Further, the evidence does not support a finding that

7   the alleged breach had a material and adverse effect.

8   Q    So let's focus initially on the statement about the tax

9   return, "evidence is unreliable and insufficient because

10  income stated in origination year tax return does not prove

11  origination income."

12       What do you understand that to be conveying?

13  A    I understood it, when I read this form of response,

14  this is an example of the non-particularized response I

15  referred to earlier.  And the understanding -- my

16  understanding of that sentence is that you can't use

17  origination year tax returns to prove origination income

18  which is irrelevant to what was done.  We weren't trying to

19  prove origination income in any event.

20       Not to get too technical, but the exercise was to

21  determine whether there was a misrepresentation of income

22  and whether or not it's more likely or not based on the

23  information contained in the file that the income number

24  used, supplied by the borrower in connection with the

25  origination of the loan was mistaken, you know, and met the

Page 87

1    -- unreliable -- well, this is the -- and met the specific

2    language of the reps -- representations and warranties both

3    in terms of the borrower's covenant under the no default rep

4    and in terms of the sponsor's promise to investors and

5    contained in the no interest statement.

6    Q    So --

7              THE COURT:  Can I just interrupt because I didn't

8    understand that first distinction that you made, Mr.

9    Aronoff?  What's the difference between proving origination

10   income and proving a misrepresentation of origination income

11   embedded in a rep or warranty?  Could you explain that?

12             THE WITNESS:  Yes.  Very simply, the way I look at

13   it is I may not know what their income actually was, but I

14   know their income wasn't 10,750 a month.  I know it was

15   nowhere near 10,750 a month.  And so it's more likely than

16   not that the 10,750 a month is wrong.  Whether they made

17   4,000 a month, 5,000 a month or 2,000 a month, I do know.  I

18   don't know that they specifically made 4,827.8 a month, but

19   I know it's more likely than not given the evidence in the

20   file that --

21             THE COURT:  Okay.  But --

22             THE WITNESS:  -- the 10,750 is a misrepresentation.

23             THE COURT:  Okay.  I take your point.  But the

24   underlying -- all of this is about determining what the

25   borrower's income was or was not.  It's -- if it was one

Page 88

1    thing it was not another thing.  I -- you seem to be placing

2    emphasis on this point and I -- I understand exactly what

3    you're saying; that the exercise was, from your perspective,

4    to demonstrate that the income was not $10,000 a month,

5    right?  But implicit in that is two halves of a whole.  If

6    it's not one thing -- if it is one thing then it's not the

7    other thing.

8            THE WITNESS:  I have to agree with you.

9            THE COURT:  Okay.

10           THE WITNESS:  But --

11           THE COURT:  No.  You don't have to.

12           THE WITNESS:  But -- no.  But -- well, what you

13   said was logically correct.

14           THE COURT:  Is logically correct, right?

15           THE WITNESS:  But the -- that was a part of the

16   exercise.  And the ultimate goal is to see if the rep has

17   been breached; that is, is there a misrepresentation --

18           THE COURT:  Yes.

19           THE WITNESS:  -- of income.

20           THE COURT:  Right.  But --

21           THE WITNESS:  And, again, in order to achieve that

22   in many cases given the state of the files you can't with

23   certainty say, here's what they made so 10,750 is wrong.

24   What you can do is say, given this information it's more

25   likely than not that this number couldn't have been true.

Page 89

1    But you don't know with perfect certainty.

2            Again, just the math you do to say, well, if they

3    made 10,750 a month and lost their job in July, they would

4    have made --

5            THE COURT:  I get --

6            THE WITNESS:  -- so --

7            THE COURT:  I get --

8            THE WITNESS:  -- so --

9            THE COURT:  I get all of that.  I'm just really --

10           THE WITNESS:  -- that's the analysis.

11           THE COURT:  -- I'm just parsing the English words

12   and I -- I don't think -- I agree with your formulation.

13   Might the plan administrator have used better, more accurate

14   words in their response, I mean, they can ask a question to

15   indicate to me whether they meant something other than what

16   you and I are talking about right now, whether it simply

17   means does not prove -- well --

18           THE WITNESS:  I --

19           THE COURT:  I think we're understanding each other.

20   At least I think I'm understanding what you're saying.

21           MR. SHUSTER:  Let me ask you -- thank you, Your

22   Honor.

23           THE COURT:  Okay.

24   BY MR. SHUSTER:

25   Q    Let me ask you this, Mr. Aronoff.  Did you understand

1    the plan administrator by its response to be rejecting the

2    use of same year tax returns to establish a income

3    misrepresentation breach, period?

4    A    I did and that initial understanding was supported by

5    the types of criticisms that were put forth in the Grice

6    reports.

7    Q    So let me -- let's just talk about there's a reference

8    in the plan administrator's response to statistical salary

9    information.  That wasn't identified as a factual basis in

10   the claimant's factual basis.  But let me direct your

11   attention to the claim tab and more specifically to page 32

12   of 37 there.

13       (Pause)

14   A    Yes.

15   Q    And what is that, Mr. Aronoff?

16   A    This is the form of printout that's typically provided

17   in connection with a BLS, use of BLS.

18   Q    Okay.  Now -- but this wasn't put forward here, at

19   least in the claimant's -- you didn't cite to it in the

20   claimant's factual basis, right?

21   A    We didn't cite to it, but it was included in the claim

22   package because, again, it wasn't the primary source, but

23   yet another data point was to look at this information at

24   the ninetieth percentile and show that this number is still

25   out of line with $130,000 a year for this location, for this

Page 91

1    time.

2        Now the reason it wasn't cited is this is a very

3    particular type of job, a government social worker in

4    essence when you do the research for a governmental agency,

5    and, you know, I think in QC-2 this was interesting, but

6    this wasn't put forth due to the potential difficulty in

7    understanding whether this particular description was

8    directly applicable to or meaningfully applicable to our

9    specific borrower.

10   Q    Okay.  So let's go back to -- thank you -- to TRDX-150.

11   A    Yeah.

12   Q    So in the plan administrator's formal response there's

13   no reference to the other documents that you identified that

14   are corroborative in your view and that were contained in

15   the materials provided to the plan administrator, correct?

16   A    That's correct.

17   Q    And then did the plan administrator here assert that

18   there wasn't a 2006 tax return or that -- and that it didn't

19   say what the claimants -- the trustees say it said.

20   A    No.  They don't assert that.

21   Q    When it came to the breach types that were predicated

22   on borrower misstatements or omissions, income, debt,

23   occupancy, do you recall in any general way how frequently

24   the plan administrator did assert that the evidence that the

25   trustees were relying upon wasn't, in fact, in the file or

Page 92

1    didn't say what it said?

2    A    It was the -- again, the number of incidents of what I

3    considered particularized responses was very, very small.

4    Q    Okay.

5         (Pause)

6    Q    So -- just so we complete this loan, there's a

7    claimant's rebuttal --

8    A    Yes.

9    Q    -- and in the claimant's rebuttal -- well, why don't

10   you take us --

11   A    Yeah.

12   Q    -- through what --

13   A    And I'll read it.  But --

14   Q    -- what's going on there.

15   A    But this was viewed as, to the extent a response was

16   offered, to explain why the claim was to be continued with

17   under the protocol.  There was an attempt to respond however

18   general to the formal response of the PA.

19   Q    So --

20   A    And there were a number of pieces to it, so we tried to

21   respond to each --

22   Q    Okay.

23   A    -- of those pieces.

24   Q    So just so we can move through it quickly --

25   A    Yes.

Page 93

1  Q    -- the -- there was a response to the statement that

2  they -- that the evidence doesn't support a breach, right?

3  A    Yes.

4  Q    There was a response to the statement that seller

5  knowledge is required under the no untrue statement rep --

6  A    That's correct.

7  Q    -- right?

8  A    Yes.

9  Q    There was a statement that the trustees believed they

10  provided sufficient documentation to support the breach, and

11  that the breach materially and adversely effected the value

12  of the loan, correct?

13  A    Yes.

14  Q    And then there was a statement where the trustees

15  disagree with the position that the plan administrator takes

16  on what is required to establish a material and adverse

17  effect?

18  A    Yes.  That's correct.

19  Q    So let's just go to the other side, and I just wanted

20  to go through that quickly in the interest of time.

21         MR. SHUSTER:  Your Honor, I note it's past 3:30.

22         THE COURT:  Yeah.  Someone's going to open that

23  door to get me when my call comes through.  So you can keep

24  going.

25         MR. SHUSTER:  Okay.

Page 94

1          THE COURT:  Thank you --

2          MR. SHUSTER:  Thank you.

3          THE COURT:  -- for noticing the time, though.

4   BY MR. SHUSTER:

5   Q    Okay.  So then we have the Aronoff rebuttal reference

6   to source documents, additional breach, the Grice review

7   narrative.  So what came in which order here to the extent

8   you can recall?

9   A    Okay.  That's a more difficult question than --

10  Q    Well, I can ask you a simpler --

11  A    No.  No.  No.  What -- I think the sequence of events,

12  this was in his reply brief, reply report which was the --

13  Q    You mean --

14  A    -- last --

15  Q    You mean Mr. Grice?

16  A     -- of the three.  Mr. Grice's.  In my rebuttal report

17  I responded to those loans, exemplars in Mr. Grice's

18  affirmative report as to which he agreed with the plan

19  administrator which was all the information we got, that I

20  saw in connection with Mr. Grice's affirmative report.  He

21  cited the information on the first page we looked at and

22  agreed with the plan administrator or referred it for

23  additional information.  I don't recall one incidence where

24  he actually agreed with the trustees, which was interesting

25  in and of itself to me.

Page 95

1          And so in my rebuttal report, to the extent Mr. Grice

2     agreed with the plan administrator, I provided a rebuttal.

3     And that's what's listed here in my rebuttal report in an

4     exhibit.

5          The second column, source documents Bates numbers, that

6     came from Mr. Grice about -- my understanding is about five

7     weeks after the affirmative report when the request was

8     made, I would assume by counsel, I don't know, to provide

9     the information on which Mr. Grice relied to reach his

10    conclusion that he agreed with the plan administrator.

11         And so some weeks later this source document

12    information came, and what we endeavored to do was open the

13    file, look at that source documentation, guess what he meant

14    the best we could, that -- why he used those documents as

15    the basis for his agreement with the statements we had

16    earlier, and create a rebuttal around the -- those

17    documents.

18              THE COURT:  I -- there's a -- so I'm -- I was with

19    -- so the order was -- just looking on the second page of

20    TRDX-150, the Grice review narrative came first, just on the

21    side of the document, right?  The Grice review narrative

22    came first, right?

23              THE WITNESS:  No.

24              THE COURT:  No?  Just on this side of the document.

25              MR. SHUSTER:  Yes.  So --

Page 96

1           THE COURT:  And -- no?

2           MR. SHUSTER:  No.  I -- well, let -- we'll go

3    through -- let me go through it and I think we can get it

4    out.

5    BY MR. SHUSTER:

6    Q    Mr. Aronoff, on this page --

7           THE COURT:  On this page.

8    Q    -- the Grice -- was the first thing that came the Grice

9    --

10          THE COURT:  Right.

11   Q    -- review conclusion?

12   A    The last Column O was the only thing we had.  That came

13   first in Mr. Grice's affirmative report.

14   Q    The June 1 report?

15   A    Correct.

16   Q    So there was the information on page one of TRDX-150

17   plus that?

18   A    With respect to --

19          THE COURT:  Okay.

20          THE WITNESS:  -- specific loans --

21          THE COURT:  Okay.

22          THE WITNESS:  -- that he talked about.

23          THE COURT:  And along with the Grice review

24   conclusion was the next -- was Column N, the Grice review

25   documents relied upon, yes or no?  No?

Page 97

1          THE WITNESS:  Column K.  Sorry.

2          THE COURT:   Column K?

3          MR. SHUSTER:  No.

4          THE COURT:  No.

5    BY MR. SHUSTER:

6    Q    Do you recall that sub -- that subsequent to the

7    submission of Mr. Grice's report -- you mentioned

8    approximately five weeks subsequent to the submission of the

9    affirmative report Mr. Grice provided Bates numbers that he

10   -- to identifying documents he relied upon?

11   A    Right.  And my understanding --

12   Q    Is that Column --

13   A    -- his --

14   Q    -- N?

15   A    I thought it was K.  It could be N.  One of these is

16   his source documents for his narrative which accompanied the

17   reply report, and one of these is the dump of just Bates

18   numbers that we received five weeks after the -- it could be

19   K or N.  I'm sorry.  This is his -- his appendix.  I know --

20   I know that my rebuttal was constructed based simply on the

21   provision of Bates numbers with respect to this loan.

22   Q    So that -- that's -- so let's get to that step in the

23   sequence.  There was the initial June 1 affirmative report

24   from Mr. Grice, right?

25   A    Correct.

Page 98

1    Q    There was the submission of Bates numbers identifying

2    documents he relied upon pursuant to the request of counsel

3    roughly five weeks later --

4    A    Correct.

5    Q    -- right?  You provided in your rebuttal report a

6    rebuttal narrative based on Mr. Grice's review conclusion

7    and Bates numbers, correct?

8    A    Correct.

9    Q    Mr. Grice's review narrative, the Grice review

10   narrative in Column M didn't actually come until after the

11   reply reports were exchanged, correct?

12   A    Yeah.  I think it was September 1st.

13   Q    And the reply reports were exchanged on or about August

14   27?

15   A    That's my recollection.

16   Q    All right.

17        THE COURT:  So to put a fine point on it and then I

18   think I'm going to have to stop for a moment.  You, Mr.

19   Aronoff, you have not had an occasion to respond to what's

20   in Column M here, the Grice review narrative?

21        THE WITNESS:  That's correct.

22        THE COURT:  All right.  Okay.

23        Could we take a brief --

24        MR. SHUSTER:  Of course.

25        THE COURT:  -- pause and let me try to jump on this

Page 99

1    call and then I'll get back.  Ten minutes.

2          MR. SHUSTER:  Thank you, Your Honor.

3          THE COURT:  Okay.  Thank you.

4          MR. COSENZA:  Thank you, Your Honor.

5      (Recessed at 3:40 p.m.; reconvened at 4:02 p.m.)

6          THE COURT:  I apologize.  Just a little emergency

7    that had to be dealt with.  So we can -- let's resume.  But

8    thank you.  I really apologize for keeping you waiting.

9          MR. SHUSTER:  Thank you, Your Honor.

10          THE COURT:  Okay.

11    BY MR. SHUSTER:

12    Q    Mr. Aronoff, let's continue if we could with TRDX-150.

13    So we went through the sequence of events as it were.  So

14    let's -- why don't you look at the Grice review narrative

15    column and provide your response, whether it's -- whether

16    you're relying upon the Aronoff rebuttal or otherwise.

17    A    Okay.  Now the Aronoff rebuttal preceded the Grice

18    narrative, so --

19    Q    Understood.

20    A    -- there's -- there -- let me just read his narrative

21    for a second.

22          (Pause)

23    A    Okay.  I -- I think the quickest way to do it is just

24    point by point to go through the five or six statements in

25    the narrative related to this loan which the first is that

Page 100

1    the loan approval in file, and I don't necessarily know that

2    we have these documents in the binder.  But there is a

3    reference to a satisfied condition that requested a

4    narrative from the borrower describing her employment

5    responsibilities.  I don't know how that's relevant to the

6    analysis that was completed.

7        I do know that at some point between receipt of this

8    and my sitting here today I looked at this information to

9    see if it changed my opinion with respect to this loan at

10   all, and that document did not change my opinion.

11           THE COURT:  Can you tell me, Mr. Aronoff, if you

12   recall what that document said just out of curiosity?

13           THE WITNESS:  I don't recall, but I think given the

14   unique title in the unredacted version I think there was

15   probably in connection with the origination of the loan, the

16   loan underwriter requested, well, what is that, what is --

17           THE COURT:  I see.

18           THE WITNESS:  -- that job, what do you do, what are

19   your responsibilities so they could put it in the context of

20   their understanding --

21           THE COURT:  I see.

22           THE WITNESS:  -- of what someone in that position

23   did.

24           THE COURT:  Okay.  Thank you.

25           THE WITNESS:  And the -- and he says, the borrower

Page 101

1    provided that letter of explanation regarding her many

2    responsibilities for the unnamed employer --

3              THE COURT:   Thank you.

4              THE WITNESS:  -- is what it is.

5              He goes on to say that the 2006 tax returns were

6    incomplete and unsigned.  Well, we talked about that and we

7    talked about why that, though considered, was not

8    dispositive with respect to the '06 returns in our view.

9    BY MR. SHUSTER:

10   Q    So the '06 return as we looked at indicated that it was

11   prepared by a paid preparer, if you recall?

12   A    Yes.

13   Q    And what does that tell you about the return?

14   A    Well, it was the same preparer that prepared all the

15   other ones.  So in my experience it's not uncommon for the

16   file copy of a tax return retained by a borrower to not be

17   signed.  But, you know, that -- that's still -- whether or

18   not that's true and whether or not that's my experience, I

19   think the more telling information here was we had a W-2 for

20   the same year corroborating the income number on that tax

21   return.  We had other tax returns prepared by that preparer.

22   We had subsequent tax returns showing that the borrower is

23   in the same job for the same year.  And those facts cast in

24   that light demonstrated that the '06 return was reliable.

25   Q    Were people e-filing?  Was e-filing of tax returns

Page 102

1   available at that time?

2   A    I'm -- I have no -- that's way outside my depth.

3   Q    Okay.

4   A    I don't know.

5   Q    All right.  Okay.

6   A    Just to continue because there was a broad statement

7   about the tax return.  Then apparently there's a concern

8   that they didn't represent the final tax return.  They

9   reported an annual number, didn't -- you know, we couldn't

10  tell if it was full-time or unpaid.  We talked about those

11  issues, too, as part of the analysis.

12       So the speculation, although perhaps on point in the

13  context of this file, just are shown to be not a concern.

14  And --

15  Q    Well, and I just want to focus for a second on the fact

16  that the statement by Mr. Grice that the tax returns do not

17  indicate if the borrower was full-time for the year or had

18  periods of unpaid leave.

19       First, is there any -- did you see any evidence in the

20  file that suggested that those were the circumstances, that

21  the borrower didn't work a full year or had periods of

22  unpaid leave?

23  A    There was no indication to that at all in the file.

24  Q    And --

25  A    And there was actually indication, as I pointed out in

Page 103

1    subsequent tax return years and in other information in the

2    file that that was not the case.  The borrower had what

3    appeared to be continued employment in the same position

4    with the same employer.

5    Q    Okay.  So is there anything else you want to add about

6    Mr. Grice's narrative before we move on?

7    A    I don't think so.

8    Q    So I just want to direct your attention, Mr. Aronoff,

9    if I may to the Column N, Grice review documents relied

10   upon.

11   A    Yes.

12   Q    So were these the Bates citations that were provided

13   five weeks after the original submission of his expert

14   report?

15   A    I don't think so.  You guys can correct me.  But if you

16   look at the Grice review narrative --

17   Q    Yeah.

18   A    -- the first document is a letter of explanation which

19   is the first sentence of his narrative.  The second is the

20   '06 tax returns.  I believe that the Column N was provided

21   five weeks later, but I could be wrong.

22   Q    No.  That's the one I was asking you about.

23   A    Oh, K.

24   Q    Column N.

25   A    No.

1   Q    Column N.

2   A    Okay.

3   Q    Look, let me just -- look, it says Grice review

4   documents relied upon.

5   A    Right.

6   Q    And then it points to the loan approval, right --

7   A    Yes.

8   Q    -- which is referenced in his narrative?

9   A    Right.

10  Q    Then it references the letter of explanation which is

11  referenced in his narrative, right?

12  A    Right.

13  Q    And then it references the 2006 tax returns which is

14  referenced in his narrative, right?

15  A    Yes.

16  Q    And then the Bureau of Labor statistics which is

17  referenced in his narrative?

18  A    Right.  And his narrative came on 9/1 --

19  Q    Yeah.

20  A    -- and I believe the documents in N accompanied that.

21  Q    Okay.  The -- okay.  You don't recall --

22  A    And I think --

23  Q    -- that the documents -- the document citations in

24  Column N were the ones that came five weeks after the

25  submission of his report?

Page 105

1   A    I don't recall.  I thought in looking at this again

2   that the documents he provided without any explanation five

3   weeks later to support his conclusion were the documents

4   listed in Column K.

5   Q    Mr. Aronoff, in the Column N Grice review documents

6   relied upon did he cite to any evidence that contradicted or

7   refuted the evidence that the trustees put forward?

8   A    Not in my view.

9   Q    Okay.  Let's move on to loan 2979.  It should come

10  right after this loan in the binder.

11       (Pause)

12  Q    You've also got a story the loan tells chart which is

13  TRDX-187 should you wish to consult it.

14  A    Okay.  Yeah.  In terms of referring to the documents

15  that were the supporting --

16  Q    Right.

17  A    -- evidence for the story I think it's important.

18  Q    Do you recall that this, before we get in to heavily

19  into this loan that this was a exemplar loan put forward by

20  Mr. Grice?

21  A    Yes.

22  Q    Okay.  So take us through it, please, when you're

23  ready.

24  A    All right.  This is a variation on the theme of the

25  prior loan.  It is a misrepresentation of income.  A little

Page 106

1     more complicated analysis here because this borrower was

2     self-employed as opposed to a salaried worker; that is, we

3     don't have the benefit of W-2s, but we do have three years

4     of tax returns where, as I said, again, although the

5     calculation of income is a little more complicated, in each

6     case we gave the borrower credit for wage income as the

7     owner of the company, gave the benefit for the business

8     income as the owner of the company, and then added back in

9     depreciation because that could have represented available

10    cash that they had for that year, but for an -- for

11    accounting purposes was deducted from their taxable income.

12         So it was more conservative and consistent with

13    industry custom and practice when you have a borrower of

14    this employment type to give them credit for any

15    depreciation.

16    Q    You recall that Mr. Grice, and we'll get into each of

17    these columns, but that Mr. Grice testified about this loan

18    on his direct examination and opined that he thought it was

19    odd to add depreciation back into income?  Do you recall

20    that?

21    A    Not specifically.

22    Q    Okay.  Well, regardless of that, did you think it was

23    appropriate to add depreciation back in, and if so, why?

24    A    As I said it -- it is the standard way in which

25    analysis for this type of borrower is done, and I think it

Page 107

1    is also cast -- doesn't attempt to simply take a net income

2    number, a taxable income number, divide it by 12 and try and

3    find a breach.  It tries to represent the actual in

4    composition of the borrower giving them credit back for

5    merely an accounting deduction from that income.

6    Q    Okay.  So I want to -- we see in the claimant's factual

7    basis column the description of the claim, correct, on page

8    -- I guess it's page 18 of TRDX-160.

9    A    Yes.

10   Q    I'm not sure why it's not page 1, but it's not.  I

11   think -- so in any event there is a description of the claim

12   and it -- it states that the claim is predicated or the

13   misrepresentation of income breach assertion is predicated

14   on a same year tax return, right?

15   A    Correct.

16   Q    And then I just want to focus you on the plan

17   administrator's formal response, the -- this -- the third

18   sentence beginning, additionally:  "Additionally, the

19   evidence is unreliable and insufficient because income

20   stated in the origination year tax return was not proved

21   origination income."

22        Do you see that?

23   A    I do.

24   Q    So what did you understand that to be conveying?

25   A    The same thing as in the prior one which since this was

Page 108

1    not a statement that I'm unfamiliar with, given it was

2    repeated thousands of times in the rebuttals and then at the

3    time I thought it meant that tax return wasn't a basis for

4    this claim.  It was unreliable and insufficient for reasons

5    that were not stated in this response.

6          And, again --

7    Q    And --

8    A    -- and that understanding was supported by the

9    discussion as to the unreliability of tax returns in

10   addition to other forms of support that were used in the

11   review and Mr. Grice's reports.

12   Q    Did you believe during the protocol and do you believe

13   now that it's incorrect to assert that tax return documents

14   cannot be used to establish a breach, same year tax returns

15   can't be used to establish an income representation breach?

16   A    I disagree with that.

17   Q    So let's look to -- initially why don't we look to the

18   tax return.

19   A    Okay.  If we go to the claim package.

20   Q    This -- you know what?  We should just start with the

21   loan application so we orient ourselves as to the borrower

22   and the number.  So that's at page 7 as your exhibit

23   indicates, TRDX-187.

24   A    I'm not even in the right tab.  Just give me a second.

25         (Pause)

Page 109

```
 1    A    Yes.  If we go to the claim package and we go to page 7

 2    that's the beginning of the application which runs some five

 3    pages, signed September, end of September '06.  And we see

 4    on page 8 of 30 in the claim package -- well, first, let me

 5    point out on the application on page 7 where -- I don't see

 6    it.

 7         (Pause)

 8    A    If you look at the last box on the left-hand side where

 9    the company is listed he checked the self-employed box.

10    That would indicate to a loan reviewer he's not a wage

11    earner, probably a more complex analysis of income and go

12    down that path with respect to this borrower.

13         So we see in the monthly income box all that this

14    borrower stated was base employment.  So, you know, that is

15    another indicator to the loan reviewer in the first instance

16    as to what types of income they should be looking for and

17    looking at.

18         And if we go to the claim package a few documents

19    later, pages later at page 12, we see the '06 return.  We

20    see business income on line 12 of 26,595.

21    Q    I notice there's a type-written note in the sort of

22    several lines below that number.

23    A    Oh, yeah.  Okay.  This was an annotation by the loan

24    review firm to help anyone looking at the file to understand

25    how the income was calculated and it mirrors what's on the
```

Page 110

1    story where the loan reviewer noted that I have this 26,595

2    of business income for this taxable year, but please refer

3    to Schedule C on page 15 of 30, the bottom, and they boxed

4    that number to check and see if it was the same.

5         And then they also showed that they added back in the

6    depreciation number in order to attain the monthly income

7    calculation of almost $4,000 based on the sum of the

8    business income, the depreciation resulting in about 48,000

9    annually that resulted in the monthly income of 4,000.

10        Again, simply comparing that to the almost 8,000 that

11   was stated in the same year started to tell a story about

12   whether or not that income was misstated or not.

13   Q    Now I just want to stop for a second on that

14   depreciation, Mr. Aronoff, okay?  So can we just stay there?

15   A    We can.

16   Q    So there's a gross income number and then the borrower

17   indicates a deduction for depreciation, correct?

18   A    Yes.

19   Q    You with me?

20   A    Yes.

21   Q    Okay.  So that deduction is 21,361.  So is this

22   depreciation a cash expense?

23   A    No.  It's an accounting entry.

24   Q    And then that results in a net taxable income number,

25   correct?

Page 111

1    A    A reduced taxable -- net taxable income number.

2    Correct.

3    Q    And so then why did the trustees in their loan review,

4    why did they add back in that number in order to provide --

5    why did they take care to add back in that number in order

6    to arrive at a income number for the year to compare to the

7    income number stated on the loan application?

8    A    To attempt to create as best as possible a gross annual

9    income number which would result in a gross monthly income

10   number before the deduction of, you know, accounting entries

11   like depreciation.

12   Q    So had the depreciation not -- had the trustees not

13   taken care to add the depreciation number back in would the

14   income number that they used to compare it to the income

15   number on the loan application been inappropriately low?

16   A    Yeah, by almost half.

17   Q    So that's why they added it back in, the loan reviewer?

18   A    They did it and the industry does it in this manner for

19   the reasons I just discussed.

20   Q    Okay.

21   A    It would have been inappropriate to try and come up

22   with the lowest possible number one could based on the tax

23   returns and use that as the basis for a breach claim.

24   Q    Okay.  So let's --

25           THE COURT:  Could we pause on this?

Page 112

```
 1              MR. SHUSTER:  Please.

 2              THE COURT:  What could be more interesting than

 3    looking through tax returns?

 4              MR. SHUSTER:  Indeed.

 5         (Laughter)

 6              THE COURT:  So these are questions.  Now let me

 7    find where it is.

 8              So, Mr. Aronoff, I know you're not a tax lawyer or

 9    tax accountant, but --

10              THE WITNESS:  Thank you for --

11              THE COURT:  -- you've obviously read --

12              THE WITNESS:  -- prefacing it.

13              THE COURT:  -- you've obviously read a lot of tax

14    returns.  So if we look at page 12 of 30 which is the first

15    page of the '06 1040, in the income block so to speak

16    there's a box around the 26,595 number as the business

17    income or loss, right?

18              THE WITNESS:  Yes.

19              THE COURT:  Okay.  And then below that box there's

20    a negative 13,999, right?

21              THE WITNESS:  Yes.

22              THE COURT:  Okay.  And that's Form 4797 so we can

23    look at that.  And then on 16-A there's -- that appears to

24    be taxable pensions and annuities, right?

25              THE WITNESS:  Yes.
```

Page 113

1          THE COURT:  Okay.  So we don't know what that is or

2    what the borrower was thinking about with respect to that

3    number, right?  I mean, let me state it differently.  The

4    analysis that you -- that Mr. Shuster is taking with you now

5    is keyed off of the 26,595 number with the depreciation put

6    back in and then multiplied, right?  That --

7          THE WITNESS:  That --

8          THE COURT:  That's the formula, right?

9          THE WITNESS:  Yes, Your Honor.  That's --

10          THE COURT:  Okay.

11          THE WITNESS:  -- correct.

12          THE COURT:  So now if you turn to not mysterious

13    Form 4797, but Schedule C, property or loss from business

14    which is at page 15 of 30 there's a box that says, income,

15    and in line 1 is reported the number 146,588, right?

16          THE WITNESS:  Yes.

17          THE COURT:  And then we have cost of goods sold and

18    we get gross profit.  And then our friend the depreciation

19    seems to come in.  And then you get down to the 26,595,

20    right?

21          THE WITNESS:  Correct.

22          THE COURT:  Okay.  So we don't know, as you've

23    emphasized we don't know actually what happened at

24    origination, whether this person misrepresented,

25    misunderstood, we don't know, right?  I mean, I follow your

Page 114

1    math.  I have no question about your math.  But in terms of

2    what the entirety of the tax return shows we just -- we

3    don't know if this was a bad, intentionally misrepresenting

4    borrower or a borrower who misunderstood or a borrower who

5    just thought that when the form said income it was related

6    to the income number on this Schedule C.  I'm just asking.

7    I have --

8              THE WITNESS:  No.  You're absolutely correct.

9              THE COURT:  I mean, we just --

10             THE WITNESS:  But what we can assume that led to

11   our conclusion is that $8,000 a month or thereabouts was

12   represented as being indicative of the borrower's capacity

13   to pay the loan back.  It was used as the basis for the

14   underwriting decision.  There's no other information in the

15   file.

16             THE COURT:  Right.

17             THE WITNESS:  And upon a review of the '06, '07 and

18   '08 tax returns, reading those in the light of an owner of a

19   company as a gross income amount, but pays tax on the amount

20   that's available to pay back the loan after adding back in

21   depreciation -- because all the other deductions from the

22   numbers you talk about are really expenses related to the

23   business that would result in this bottom line number.

24             And so the analysis is really what is the number

25   that it appears accurately represented that borrower's

Page 115

1    capacity to pay.  But we don't know, you're absolutely

2    right, with any certainty.  These are assessments based on

3    the files.

4          THE COURT:  Snowflake?

5          THE WITNESS:  They're not -- oh, the analysis is

6    based on that snowflake.  But to the extent an identify -- a

7    misrepresentation of income is discovered, those breach

8    findings can be treated in this way.

9          THE COURT:  Thank you.

10   BY MR. SHUSTER:

11   Q    Well, why don't you take us through, Mr. Aronoff, the

12   other evidence that you've identified that in your view

13   corroborates the breach finding?

14   A    Again, we have the benefit of '07 and '08 returns that

15   when -- in the loan file that was provided in connection

16   with the breach claim that corroborate the calculations and

17   the monthly income that result from those calculations in

18   subsequent years.

19   Q    Okay.  So let me direct your attention to a couple of

20   things here.  Let's go back to the loan application.  What -

21   - what is the date that the loan application was signed?

22   A    September 29th, 2006.

23   Q    Okay.  So if the borrower had been earning $8,000 a

24   month through that date that would be nine months.  That

25   would be what number?

Page 116

1    A    $72,000.

2    Q    Okay.  And how does that compare to the information

3    that we have for the tax return that is complete through to

4    the end of the year?

5    A    Well, we have a tax return that shows their income for

6    the year.  There's nowhere on the tax return that

7    necessarily shows how many months they worked that year.

8    Q    No.  No.  But I'm saying the income for the year

9    reflected on the tax return with the analysis that you did -

10   -

11   A    Oh, not even close to 72,000, must lower.

12   Q    47,956.

13   A    After doing the calculation we talked about.  Yes.

14   Q    Okay.  And if you took the 7,996 number which is, call

15   that $8,000 and you project that out for 12 months, so what

16   does that come to?

17   A    It comes to $96,000.

18   Q    Right.  Can you look at the tax return and figure out a

19   way to get to $96,000 from the information that is set forth

20   on the tax return?

21   A    No.  Again, and as we discussed with the first loan,

22   those are the kinds of, you know, boxing in the analysis

23   that a loan reviewer would do to see if it's more likely

24   than not that the income, although not known as Your Honor

25   pointed out, is more likely -- has more likely than not been

Page 117

1    misstated.

2    Q    Now let's now look at the Grice -- Mr. Grice's

3    rebuttal.

4         (Pause)

5    Q    And I want to direct your attention to the third

6    paragraph, and specifically the second sentence.  Are you

7    with me?

8    A    Yes.

9    Q    So first of all, Mr. Grice isn't disputing that the tax

10   return or any of the other information is in the file or

11   that it says what it says, is he?

12   A    Let me just read the paragraphs you didn't point my

13   attention to.  No, he does not.

14   Q    And he points to the gross income number on the tax

15   return.  Do you see that, 68,141?

16   A    Yes.

17   Q    And that also, if you divide that by 12 you don't get

18   $8,000, do you?

19   A    No, you don't.

20   Q    You get something like five and a half thousand or

21   something?

22   A    Somewhere between eight and four.

23   Q    Right.

24   A    Closer to four.

25   Q    And then he mentions that the borrower was the owner of

Page 118

1   a heating and air conditioning company that was subject to

2   seasonal fluctuations based on weather temperatures,

3   construction startups, remodeling and needed repairs by

4   clients.  Do you see that?

5   A    I do.

6   Q    Does he point to any specific information in the file

7   that supports those assertions?

8   A    No, he does not.

9   Q    He -- HVAC by the way as he points out is heating and

10  air conditioning, right?

11  A    Heating, ventilation and air conditioning.

12  Q    So cold weather, hot weather?

13  A    HVAC, yes.

14  Q    Right.  And then he says that the subject transaction

15  was closed on or before the onset of the mortgage crisis and

16  borrowers' employed in many occupations, including retail

17  and real estate construction related professions experienced

18  dramatic losses in income.  Do you see that?

19  A    I do.

20  Q    He doesn't -- so apart from making that macroeconomic

21  observation does he point to any information that's specific

22  to this borrower?

23  A    No.

24  Q    Now he says that -- so he's suggesting -- do you

25  understand him to be suggesting that the borrower may have

Page 119

1   experienced a dramatic loss in income in '06?

2   A    He doesn't specifically say that, but I think he was

3   offering some reasons why he may have made $8,000 in

4   September and made a much lower income than 12 times 8,000

5   for the whole year --

6   Q    So --

7   A    -- without any basis in any facts in the file.

8   Q    Let me direct your attention -- give me one moment, if

9   you would.

10          MR. SHUSTER:  May I have a moment?

11       (Pause)

12   BY MR. SHUSTER:

13   Q    There is a -- let me direct your attention to -- and,

14   you know, what we're talking about, again, the loan closed

15   end of September of '06.  So we would be talking about three

16   months, right, if --

17   A    Three months left in the year?  Yes.

18   Q    Yeah.  There -- is there any -- there's a hardship

19   description in the file and I want to point you to page 378.

20       (Pause)

21   A    Uh-huh.

22   Q    So what does that indicate?

23   A    Well, this can give some context.  Again, like most of

24   the information in these files this is not dispositive, but

25   it gives another important indication.  This was the

Page 120

1    borrower's financial statement apparently provided to Aurora

2    some time in 2009 where the borrower is discussing that they

3    had lost time and income to the business due to some medical

4    issues this borrower had within the past year, and also

5    mentions also slowed down due to economy, which, again, more

6    likely than not pertains to the '08-'09 time period and

7    there's no reference to any effect on his business prior to

8    the last year when he's also commenting on this medical

9    condition.

10        So that was read to mean that, yes, this borrower had

11   slow down in the business, but it was unlikely that that

12   slow down related to '06 or '07 and probably related to

13   subsequent years when he apparently ran into some

14   difficulties in paying the loan.

15            MR. SHUSTER:  So I've -- I'm at the point where I

16   would start another loan and my question is whether it's --

17            THE COURT:  I'm good if you're good.  It's up to

18   you folks.

19            THE WITNESS:  This is what I do.

20        (Laughter)

21            THE COURT:  Me, too.

22            MR. SHUSTER:  As of now at least.  Okay.  So let us

23   try another then.

24   BY MR. SHUSTER:

25   Q    Mr. Aronoff --

Page 121

```
 1              THE COURT:  Mr. Shuster is having a hard time
 2     containing himself he's having such a good time.
 3              MR. SHUSTER:  Yes. I'm so excited.
 4          (Laughter)
 5     BY MR. SHUSTER:
 6     Q    So loan number 9621 if we could, please.
 7          (Pause)
 8     Q    And again you've got your -- in your deck you've got
 9     your extracts from the Grice report.  You've got a highlight
10     of the information submitted --
11     A    Yes.
12     Q    -- and you've got a story the loan tells chart.
13          (Pause)
14              MR. SHUSTER:  Did you hear that?
15              THE COURT:  No.  What was that?  I missed it.
16              MR. SHUSTER:  I said I don't know if I -- I was
17     asking them what I just said about which loan we're
18     covering.
19              Okay.  Here we are.
20     BY MR. SHUSTER:
21     Q    When you're ready I'll ask you to walk us through the
22     basics, please.
23     A    Sure.  I guess the best place to start is with the
24     claimant's factual basis.  This is a borrower that stated
25     $12,000 a month on the loan application, and we find that on
```

Page 122

1   page 17 of the claim package.  Now we see this happens to be

2   an application that's dated and signed at the end of

3   December in it looks like '04.  I think that's correct.

4   Q    Yeah.  You -- if you look on page 18 and then 19 --

5   A    Yeah.

6   Q    -- it's a little clearer on 19.

7   A    Yes.  Yes.  And we see on the first page of the

8   application on page 16 that this borrower is a self-employed

9   realtor with three years on the job which would have been a

10  somewhat red flag at the beginning as to how someone that

11  inexperienced could earn this much money.  But that's just

12  me looking at the file.

13  Q    So three years on the job, five years in this field.

14  A    Similarly, that's -- that's a lot of money as a real

15  estate broker.  But, in any event, there were '05 and '06

16  tax returns in the file which were considered in the context

17  of the whole file to see if this borrower had misrepresented

18  the income that was shown at the end of '04.  And we see in

19  a review of the '05 tax returns which were viewed as

20  reliable because although this was a self-employed borrower

21  they were in the same profession working for the same real

22  estate company as an agent.

23       So here we have a self-employed borrower that may not

24  have exactly the same features as say an owner of a company,

25  but for lack of a better term, more of a 1099 employee

Page 123

1   acting in a position where to the extent they're in the same

2   location with the same company as an agent that should

3   provide some level of confidence that you're looking at a

4   similar situation.

5        Now that's not to say that a real estate broker's

6   income can't vary from year to year, much more -- in a much

7   greater fashion, be much more volatile than some other

8   professions.  So you have to look at the level and the

9   amount of difference here which is not insignificant.

10  Q    So when you make reference and I -- I don't mean to be

11  cutting you off.

12  A    No.

13  Q    When you make reference to the '05 tax return can I

14  direct your attention to page 20 of --

15  A    Yes.  That's where I was going.  Yeah.

16  Q    Thank you.  So forgive me for interjecting.  Please

17  continue.

18  A    No.  You see business income of 23,000 which reflects a

19  -- as it says on the thing a monthly income a monthly income

20  of less than $2,000 a month.

21       We also see, and I note and we don't know for certain,

22  but we also see in line 21 a net operating loss carryover to

23  2005 of about $15,000 which indicates at some point in time

24  this borrower had no income and had negative income and was

25  trying to get the benefits of that in this subsequent tax

Page 124

1    year.

2         Similarly, when we look at '06 we see a monthly income

3    consistent with the '05 income and this required a little

4    math and this was brought to light, I believe, by Mr. Grice

5    who I think if we look we can find it in the Grice response.

6    As I recall Mr. Grice looks at the '06 income and says, this

7    borrower made $108,000 in '06.  That's pretty close to 144

8    in '04, so it just --

9    Q    Well, let's stop there for a second.

10   A    Okay.

11   Q    How close is 106 (sic) to 144?

12   A    108 to 144, well, it's different, but he uses this to

13   point out, I think, in addition to the fact that '05 was an

14   anomaly and we had 23,000 in '05, but we had 108 and change

15   in '06 and 144 in '07 -- in '04, I'm sorry, I think he tries

16   to call into question the use of '05 as a tax year and point

17   to maybe why did we say that the borrower only made $13,000

18   in '06 when it's clear they made $108,000.

19   Q    Right.  So the -- let's look at the '06 return --

20   A    Yes.

21   Q    -- which is in the Lehman documents tab for this loan,

22   for loan 9621 at page 775 of 1351.  You were taking us

23   through --

24   A    Yeah.

25   Q    -- the analysis.

Page 125

1    A    So if you look at page 776 you see the '06 return.  And

2    if you look at 14 it's fairly clear that this is one time

3    income.  And if you go deeper into the return you can see

4    it's from the sale of a business asset.  So this $95,000

5    which is the lion's share of the 108 that Mr. Grice would

6    ask us to consider was a one-time non-recurring type of

7    income that should fairly not be considered in trying to

8    ascertain what the year over year income as a real estate

9    broker is of this borrower.

10        And, in fact, after controlling for that fact you come

11   up with a number that's although lower than '05, again, more

12   consistent with the number we see in '05 and, again, about

13   one-tenth the amount of income that was reported or stated

14   in order to enable the borrower to secure the loan.

15   Q    And then is there anything -- thank you for that.

16        Is there anything else in the file then that bears on

17   the analysis?

18   A    Yes.  Again, one thing to consider particularly with

19   real estate brokers in California is what's the time period

20   because things changed very quickly.  And as the borrower

21   states in their hardship letter, which is an interesting

22   hardship letter to read, they --

23   Q    Just -- I just want to -- are you looking -- there are

24   two in the file.  Are you looking --

25   A    I'm looking at the one --

Page 126

1   Q    -- at the one, page 758 at the bottom or 798 at the

2   bottom?

3   A    I'm looking at 798.

4   Q    Okay.  So let's start there.  Let's start with 798.

5   A    Yeah.  The more interesting one is the other one.

6   You're right.  But they offer as an explanation for a

7   request for relief is that the real estate market tanked and

8   effected my income significantly and that they had to take

9   another job.

10       But, again --

11  Q    The loan was taken out in '04?

12  A    Five years prior, yes --

13  Q    Okay.

14  A    -- in '04.

15  Q    And when did the market tank?

16  A    In most people's consideration '07ish, '08.  In fact,

17  '04 and '05 arguably could be years in which, and '06 are

18  years in which if you're going to make money as a real

19  estate broker you probably should have made money as a real

20  estate broker.

21  Q    And then let's look --

22       MR. COSENZA:  Objection.

23       THE COURT:  Hold on, Mr. Shuster.  Mr. Cosenza is

24  on his feet.

25       MR. COSENZA:  Your Honor, this is just -- there's

Page 127

1    no foundation for any of this.  It's wild speculation as to

2    when the market tanked, when things happened.

3          THE COURT:  Well, this is -- the borrower said that

4    the market tanked in the hardship letter --

5          MR. COSENZA:  But the --

6          THE COURT:  -- right?

7          MR. COSENZA:  But then we have an answer from Mr. -

8    -

9          THE COURT:  In response to --

10         MR. COSENZA:  Yeah --

11         THE COURT:  -- Mr. Shuster's question.

12         MR. COSENZA:  -- because things change very quickly

13   as they state in the hardship letter.  One more interesting

14   thing, they offered an explanation for request for relief is

15   that the real estate market tanked and effected my income

16   significantly.

17         THE COURT:  Right.

18         MR. COSENZA:  And then he says, most people's

19   consideration '07, '08, '04 '05 are years in which, '06 are

20   years in which -- I'm just reading this -- if you're going

21   to make money as a real estate broker you probably should

22   have made money as a real estate broker.  I -- you know, the

23   foundation of --

24         THE COURT:  Okay.  Let's --

25         MR. COSENZA:  -- when --

Page 128

```
 1              THE COURT:  Let's dial it back.

 2              MR. COSENZA:  Sure.

 3              THE COURT:  Okay.  In terms of Mr. Aronoff is not

 4     being presented as an expert on the real estate industry.

 5     So to the extent that you are making an observation as a

 6     person in the world who reads the newspaper like everybody

 7     else, that's fine.

 8              MR. COSENZA:  Sure.

 9              THE COURT:  But I'm not going to take it as an

10     expert opinion on when in a particular market --

11              MR. COSENZA:  Sure.  Okay.

12              THE COURT:  -- the real estate market tanked as the

13     borrower here said.

14              MR. COSENZA:  Thank you, Your Honor.

15     BY MR. SHUSTER:

16     Q    So let's turn our attention to page 758.

17              THE COURT:  Can -- just continuing along the line

18     of my trying to gather information, I hesitate, but it's

19     just interesting.  I won't go there.  I'll save it for

20     another day.

21              MR. SHUSTER:  Okay.

22              THE COURT:  Okay.

23              THE WITNESS:  You've peaked my interest now.

24          (Laughter)

25              THE WITNESS:  But --
```

Page 129

1              MR. SHUSTER:  I'll -- let me see --

2              THE COURT:  I'll see --

3              THE WITNESS:  -- it's your prerogative to do so.

4              THE COURT:  It's --

5              MR. SHUSTER:  -- let me try to re-peak it.

6              THE COURT:  I try to not interrupt.  It might seem

7    like I'm not doing a good job of that.  I try not to

8    interrupt so I'm going to let Mr. Shuster continue and we'll

9    see if my question gets answered in due course.

10   BY MR. SHUSTER:

11   Q    Mr. Aronoff, let me direct your attention if I may to

12   the hardship letter at page 758.

13   A    I'm there.

14   Q    And let me in the interest of speed point you to the

15   fifth paragraph.

16   A    I see it.

17   Q    What does the borrower say there?

18   A    He says, "My '07 income was affected significantly by

19   the bank-owned homes coming on the market."

20   Q    Okay.  We can stop there.  So the reference is to an

21   effect on '07 income, correct?

22   A    Specifically in this first letter.  Yes.

23   Q    Okay.  So let's go back to TRDX-153 and let's go to

24   page -- the first page which in this is page 5.  I'm getting

25   now how these are numbered, but they're sequential and

Page 130

1   they're probably based on this document.  But in any event

2   it doesn't matter.

3        Let's go to page 5.  Did the plan administrator contest

4   that the information that the trustees were relying on in

5   support of the breach was in the file and that it said what

6   it said?

7   A    No.

8   Q    And then let's just turn to Mr. Grice's rebuttal.  Does

9   he say that?

10       (Pause)

11  A    I think in fairness the second sentence of the last

12  paragraph attempts to do that.  He says that the '05 tax

13  return does not include any information pertaining to how

14  much the borrower was earning, but that's all we have in

15  terms of a specific -- and, again, that could be read

16  generically, too, as to the inadequacy of the tax return.

17  So --

18  Q    Does he refer to the hardship letters we just looked

19  at?

20  A    He does not.

21           MR. SHUSTER:  I'm inclined to leave it there.  I

22  don't know if the witness is able to continue, but I'm not

23  sure I am.

24           THE COURT:  Okay.  I think --

25       (Laughter)

Page 131

1              THE COURT:  I think it's been a long enough day.

2    So why don't we leave it there.

3              Mr. Aronoff, thank you very much.  Have a good

4    evening.

5              Let's talk about tomorrow.  So tomorrow --

6              MR. SHUSTER:  You're -- he's under a continued

7    instruction, just --

8              THE COURT:  Yes, you are under a --

9              MR. SHUSTER:  -- just so he's clear.

10             THE WITNESS:  I understand.

11             THE COURT:  You're under a continued instruction.

12             So we're starting at 10:00 tomorrow.  I have a

13   small crowd coming in at 9:30 for something else.

14             Hold on one second.

15        (Pause)

16             THE COURT:  Okay.  I think you can leave everything

17   out.  I'll just do it in the conference room.  And then what

18   does tomorrow look like in terms of how much more there is

19   to Mr. Aronoff's direct examination?

20             MR. SHUSTER:  I -- my goal is to finish by noon.  I

21   would very much like to do that for obvious reasons --

22             THE COURT:  Yes.

23             MR. SHUSTER:  -- for time constraint reasons.  So

24   I'm not promising --

25             THE COURT:  Okay.

Page 132

```
 1              MR. SHUSTER:  -- but --

 2              THE COURT:  Best efforts.

 3              MR. SHUSTER:  And we're going to --

 4              THE COURT:  Okay.

 5              MR. SHUSTER:  -- you know, I'm know we're going to

 6     get to the exhibits to his report.  We've already had a

 7     forecast that there's going to be some challenges.  That may

 8     slow things down.

 9              THE COURT:  Okay.

10              MR. SHUSTER:  But I'm going to try to get through

11     the loans --

12              THE COURT:  Okay.

13              MR. SHUSTER:  -- quickly.

14              THE COURT:  Okay.  Mr. Cosenza.

15              MR. COSENZA:  Can I raise one issue on --

16              THE COURT:  Yeah.

17              MR. COSENZA:  -- on that, on the exhibits?

18              THE COURT:  Sure.

19              MR. COSENZA:  We still --

20              THE COURT:  Maybe we should --

21              MR. COSENZA:  Yeah.

22              THE COURT:  Mr. Aronoff, why don't we let you go

23     home for the evening?

24              THE WITNESS:  Thank you.

25              THE COURT:  Thank you.
```

Page 133

1          (Pause)

2               THE COURT:  Goodnight.  Thank you.

3               THE WITNESS:  Thank you.

4               MR. COSENZA:  Okay.  Your Honor, so Monday

5     afternoon we raised this issue --

6               THE COURT:  We're talking -- these are the buckets

7     that we're talking about?

8               MR. COSENZA:  The exhibits that have like the

9     summaries that roll up.

10              THE COURT:  The --

11              MR. COSENZA:  Where you --

12              THE COURT:  The demonstrative --

13              MR. COSENZA:  Yeah.

14              THE COURT:  Yeah.

15              MR. COSENZA:  Where we requested sort of a tie in

16    to --

17              THE COURT:  Yes.

18              MR. COSENZA:  -- the documents.

19              THE COURT:  Right.

20              MR. COSENZA:  They said it would be an easy tie in

21    to the numbers.  We requested them Monday night.  We still

22    have not received how they're doing this.  It's -- you know,

23    they're still not in these -- in the slides for Mr. Aronoff.

24              THE COURT:  Okay.  So --

25              MR. COSENZA:  I mean, I'm just sort of in a

Page 134

1    position, I'm not sure -- I don't think it's easy to do.  I

2    don't even know how to respond because I don't think it's in

3    the data we've been provided as I pointed out on Monday.

4    And we're sort of in this position.

5              THE COURT:  All right.  So --

6              MR. COSENZA:  We're just going to be handed

7    something --

8              THE COURT:  So --

9              MR. COSENZA:  -- and we don't know how to --

10             THE COURT:  Forgive me, but my --

11             MR. COSENZA:  -- deal with it.

12             THE COURT:  -- my memory is a little foggy on this.

13             MR. COSENZA:  Yes.

14             THE COURT:  I remember that Mr. Goldberg provided

15   an explanation on this, right?

16             MR. COSENZA:  Yeah.  I don't think -- I don't think

17   that explanation is -- if that was the explanation I don't

18   think that works.  I think that's why there's been a lack of

19   response and less --

20             THE COURT:  Well --

21             MR. COSENZA:  -- of production.

22             THE COURT:  -- why don't we collect who we need for

23   this discussion and go into the conference room, okay, and

24   then everyone else can call it a night.  Okay.

25             Thank you.

Page 135

1          (Whereupon, these proceedings concluded at 5:01 p.m.)

2                              *  *  *  *  *

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 136

1                            I N D E X

2                        T E S T I M O N Y

3    DEBTOR'S

4    WITNESS                    EXAM BY                    PAGE

5    JAMES H. ARONOFF        MR. SHUSTER                    6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 137

1                  C E R T I F I C A T I O N

2

3       We, Dawn South and Sherri L. Breach, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Dawn South
     Digitally signed by Dawn South
     DN: cn=Dawn South, o, ou,
     email=digital1@veritext.com,
     c=US
7    _____
     Date: 2017.12.14 15:31:59 -05'00'

8    Dawn South

9    Certified Electronic Transcriber

10   Sherri L
     Breach
     Digitally signed by Sherri L Breach
     DN: cn=Sherri L Breach, o, ou,
     email=digital1@veritext.com, c=US
     Date: 2017.12.14 15:33:24 -05'00'
11   _____

12   Sherri L. Breach

13   AAERT Certified Electronic Reporter & Transcriber CERT*D-397

14

15

16

17   Date:  December 14, 2017

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501