Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS, INC.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY   10004

15

16                    December 14, 2017

17                    10:45 AM

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   JONATHAN

1    HEARING re RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    HOLWELL SHUSTER & GOLDBERG LLP

4         RMBS Trustees

5         750 Seventh Avenue, 26th Floor

6         New York, NY 10019

7

8    BY:   NEIL R. LIEBERMAN

9          DWIGHT A. HEALY

10         DANIEL P. GOLDBERG

11         MICHAEL S. SHUSTER

12         BENJAMIN F. HEIDLAGE

13

14   ROLLIN BRASWELL FISHER LLC

15         Attorneys for the Debtor

16         8350 E. Crescent Parkway, Suite 100

17         Greenwood Village, CO 80111

18

19   BY:   MARITZA DOMINGUEZ-BRASWELL

20         MICHAEL ROLLIN

21

22

23

24

25

Page 4

1  WILLKIE FARR & GALLAGHER LLP

2       Attorneys for the Debtor

3       787 Seventh Avenue

4       New York, NY 10019

5

6  BY:  TODD G. COSENZA

7       BENJAMIN P. MCCALLEN

8

9  JAMES H. ARONOFF, Witness

10

11  ALSO PRESENT TELEPHONICALLY:

12

13  THOMAS ALSTON

14  SCOTT LEWIS

15  PAUL SHALHOUB

16  PATRICK MOHAN

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Apologize for the delay.  It's the

 3      plan administrator's fault.

 4              MR. SHUSTER:  Good morning, Your Honor.

 5              THE COURT:  Are you ready to go?  Okay, Mr.

 6      Aronoff, please come back up.

 7              MR. ARONOFF:  Good morning.

 8              THE COURT:  How are you?  I totally messed up your

 9      aspiration to be done by noon.  I apologize.

10              MR. SHUSTER:   So did my team.  We've added some

11      additional material, so --

12              THE COURT:  Okay.

13              MR. SHUSTER:  -- I don't think noon was realistic.

14              THE COURT:  So we're going to just -- we're just

15      going to do what we're going to do and if Mr. Aronoff needs

16      to come back next week, is that a possibility?

17              MR. SHUSTER:  Yes, Monday, I think.

18              MR. ARONOFF:  The only caveat is --

19              THE COURT:  Yes?

20              MR. ARONOFF:  -- I have the same recurring

21      obligation on Monday morning --

22              THE COURT:  Obligation?

23              MR. ARONOFF:  -- that I had yesterday.

24              THE COURT:  Okay.  Okay.

25              MR. ARONOFF:  So probably not before 11:30.
```

Page 6

1          THE COURT:  That works for us because we have

2    other matters on in the morning, so --

3          MR. SHUSTER:  Excellent.

4          THE COURT:  -- that'll work.

5          MR. SHUSTER:  Wonderful.

6          THE COURT:  Okay.  All right.

7          MR. SHUSTER:  Thank you, Your Honor.

8             DIRECT EXAMINATION OF JAMES ARONOFF

9    BY MR. SHUSTER:

10   Q    Mr. Aronoff, good morning.

11   A    Good morning.

12   Q    I wanted to return briefly to a loan we discussed

13   yesterday which was 2979. Going to ask Mr. Lieberman to hand

14   you a document and -- if he may approach the Court --

15          THE COURT:  Sure.

16   Q    -- and hand up this document.

17          THE COURT:  Thank you.

18   Q    So this is a letter -- it's another extract from the

19   loan file, so just for administrative purposes here, it's

20   got the same -- this is not of concern to you particularly,

21   but it's got the same exhibit number, it's TRX-1 Loan and

22   then it's got the loan number ending in 2979, and it should

23   be inserted in one's binder for those who are disposed to do

24   so.

25   A    Mr. Shuster, does the binder version have the name

1   redacted?  Mine doesn't.

2   Q    Yes, the -- well, the binder version doesn't but the

3   version we --

4   A    Okay.

5   Q    -- would put up on the screen does.  So thank you for

6   pointing that out.  I just wanted to -- perhaps you recall

7   that on this loan -- and you're free to refer back to it,

8   but Mr. Grice referred to -- in the course of his narrative

9   noted that the borrower's business was subject to seasonal

10  fluctuations and that the subject transaction was closed on

11  or before the onset of the mortgage crisis, and borrowers

12  employed in many occupations experience dramatic losses in

13  income.  So this was, if you recall, an '04 loan -- year end

14  '04?

15  A    Yes.

16  Q    Sorry, '06.  My apologies.  I misspoke, '06.  What is

17  this -- what if anything does this hardship letter tell you

18  about whether and when the borrower would've experienced a

19  drop-off in income?

20  A    The opening statement says that business was excellent

21  until 2007, and then the borrower goes on to explain why

22  after that time period he experienced some financial

23  difficulties.

24  Q    Now, was it -- is it your view that there was an

25  adverse and material effect on this loan?

Page 8

1    A    Yes.

2    Q    So, does the hardship letter change your view on that?

3    A    It does not.

4    Q    Generally, do hardship letters explaining why borrowers

5    may have experienced an inability to pay or to pay on the

6    same terms change your original conclusion as to AMA on any

7    particular loan?

8    A    Hardship letters are generally the opportunity of the

9    borrower to explain to the servicer or the current owner of

10   the loan why they need relief and to the extent there is

11   information in the hardship letters in the file that bears

12   on both the breach finding and the AMA determination that's

13   taken into consideration --

14   Q    I see.

15   A    -- in the course of the forensic review.  My point is

16   the hardship letter isn't dispositive one way or the other

17   on AMA, but it often when looking at a loan after it's

18   closed it gives you some further information about the

19   circumstances that existed at the time the loan was

20   originated.

21          THE COURT:  Can I interrupt, please, Mr. Shuster?

22   So, I have two questions.  One is, in every loan file in

23   which there is or was a hardship letter, did one -- did the

24   applicable servicing firm review the hardship letter?

25          MR. ARONOFF:  I don't know if the servicing firm

Page 9

1   did.  The loan review firms that were working for us --

2            THE COURT:  I'm sorry, I misspoke.  I meant the

3   loan review firms.

4            MR. ARONOFF:  They know that that is an important

5   source of potential information to support a breach finding

6   and to the extent there's contradictory information from the

7   story that they're trying to develop, yes, they need to look

8   at that if it contains facts that bear on the finding.

9            THE COURT:  Okay.  That -- I hear you, but that

10  doesn't quite answer my question.  Do you know as a fact

11  whether the loan review firms as part of their standard

12  operating procedure, if there was a hardship letter in the

13  file, did they review it before rending their conclusion on

14  whether or not there was a breach?

15           MR. ARONOFF:  I don't know personally whether they

16  looked at each and every one.  They would be a very critical

17  aspect of a customary forensic loan review of this type.

18           THE COURT:  Okay.  Thank you.

19           MR. ARONOFF:  They should have known to.

20           THE COURT:  Thank you.

21  Q    Your view, however, remains that even where there are

22  hardship letters that the adverse and material effect

23  determination is based on the increased risk and loss on the

24  loan?

25  A    I believe so.  The hardship letter would bear on the

Page 10

1    likelihood that the threshold fact that was the basis of the

2    breach finding was present in the file or not, and if the

3    threshold fact and the breach finding were, in fact,

4    identified then the analysis would be, is this the type of

5    breach finding given the context of this file that would

6    result in a material adverse effect to the investor.

7    Q    Let us turn to Loan 1643.

8    A    Thank you.

9         MR. SHUSTER:   May Mr. Lieberman approach to hand

10   up --

11        THE COURT:   Sure.   Thank you.

12   Q    Just one further question on hardship letters.   Where

13   there isn't a hardship letter in the file, I take it it's

14   still possible to make both a breach finding -- a breach

15   determination and an AMA determination?

16   A    Absolutely.   Yes.

17   Q    Okay.   So, I think we can get through this loan

18   quickly, Mr. Aronoff.   You can turn to, I think

19   (indiscernible) that you have, TRDX-154 before you.   So why

20   don't you describe, if you would, the claim that's being

21   presented here.

22   A    Sure.   This is another example of a misrepresentation

23   of income breach finding, and in this case the primary

24   supporting evidence is BLS, so this is a loan that closed on

25   or about July 18th -- I see that's when the application was,

1    I don't have the note in front of me -- where the borrower

2    stated monthly income of $13,800 a month or so, which is

3    about 165,000 annually.

4            They're a registered nurse, and the BLS search for

5    registered nurses in the location where the borrower was for

6    the time period in question at the 90th percentile was about

7    93,300 annually, which translates into a monthly income

8    about $8,000 a year.  So -- I'm sorry.

9    Q    Would you turn to page 13 in the claim package?

10   A    Yes.

11   Q    So, can you identify that, please?

12   A    Yeah, on there we can see the -- similar to the one we

13   looked yesterday, the printout from the BLS search and you

14   can see the state, the area which is an (indiscernible).

15   It's defined as that area in California.  The title is

16   registered nurses.  And then it gives the median, the 75th

17   percentile, and the 90th percentile, and you can see under

18   90th which is the reference income that would be used, you

19   see 95,300 there.

20   Q    Okay.  Turn to now, if you would, to TRDX-191 in your

21   deck.

22   A    Lot of stuff in a little space.

23   Q    Yes.

24   A    Yes.

25   Q    So, could you tell us what you are intending to convey

Page 12

1    here?

2    A    Yeah.  This -- the first bullet is just a summary of

3    what I just stated with respect to the facts.  So is the

4    second.  But I wanted to point out that even though the BLS

5    may be the primary supporting data for a breach finding

6    where BLS is used, it's in almost every case accompanied by

7    red flags, as we call them, that would indicate to the

8    forensic loan reviewed that the stated income doesn't make

9    sense for other reasons and that would, you know, be used,

10   again, in reference to the totality of the file to support,

11   based on a BLS number -- income, that's it's more likely

12   than not that the income was misstated.

13            And in this case, some of the red flags that were

14   identified is that at a monthly income of almost $14,000, if

15   you compare that income to -- let's look at the application

16   again if we can on Claim Package Page 6.  There's a box

17   that's circumscribed there which is the income, but if you

18   move to the right you can see the housing expense and this

19   borrower is a renter prior to the -- obtaining the loan and

20   has a monthly rental obligation of $1,300.

21            If you now go to the next page, Page 7, and look

22   at the borrower's monthly debt obligations in terms of other

23   debt -- and they continue on the next page, on Page 8.  So

24   the numbers at the bottom of the liabilities column on Page

25   7 are not going to add up, but if you add them all up on

Page 13

1    Page 7 and Page 8, they come to total debt of about $41,000.

2    The monthly debt obligation of $1,000.

3          And then one other date point I'd like to refer

4    you to is, you can see the borrower's assets, total assets.

5    Liquid assets are about $25,000.  So the analysis that would

6    be done in terms of red flags looking at a borrower with the

7    income that was stated, is they appear to have north of 11 -

8    - more than $11,000 in free cash due every month.  They have

9    $25,000 in the bank and $41,000 in credit card debt.

10         Why would that be?  If they only have 2,400 of

11   obligations every month and they've incurred all this credit

12   card debt that they can easily pay off.  Okay, maybe that's

13   their choice.  Maybe they like debt.  But where is it?  It's

14   not in the bank.  So, it just calls into question.

15         Now, we don't know for certainty any of this.

16   That's why they're red flags.  But an experienced loan

17   reviewer would look at the amount of income, look at the

18   assets, look at the credit, and say, "Does this credit and

19   this asset position make sense for someone who's earning

20   this type of income?"  And that would lead to the inquiry --

21         THE COURT:  I'm sorry, I'm just not following you,

22   Mr. Aronoff.  I don't understand.  I don't understand.

23         MR. ARONOFF:  I'll try again, may I?

24   Q    Well, are you -- let me just to help it along, are you

25   -- you're pointing to -- you're saying that in addition to

Page 14

1    the BLS that was relied upon, essentially there were other

2    red flag in the file that suggested that it was more likely

3    than not that the borrower's income was not what it was

4    represented to be on the loan application?

5    A    Correct.

6            THE COURT:  Okay.  Well, that's what I don't

7    understand.  Why is it that having $41,000 in credit card

8    debt which we can agree seems not like a great thing, but

9    why would having $41,000 in credit card debt be a red flag

10   that the stated income is not what it says?

11           MR. ARONOFF:  Because if that borrower actually

12   made $165,000 a year --

13           THE COURT:  Yes.

14           MR. ARONOFF:  -- they would either have less

15   credit card debt, it would be paid off, or they would have

16   more money in the bank.

17           THE COURT:  That's your hypothesis.  That's just a

18   hypothesis.

19           MR. ARONOFF:  It is.  It is.  But it's how the

20   story of these files when you're looking at a loan file and

21   you see an income number, the first thing a loan underwriter

22   would look at is these kinds of things.  And as I said, this

23   is not the basis for the claim but it's just an inquiry of

24   the underwriter to say, "If this borrower has in excess of

25   $11,000 of free cash available every month, why are they

Page 15

1   incurring so much debt and why don't they have more liquid

2   assets in the bank?"

3           That's -- and that's the only thing.  They're not

4   drawing any conclusions, it's just an inquiry.  And then

5   taken with the statistical database with BLS that shows that

6   in the 90th percentile of registered nurses the income one

7   would expect is about $70,000 less per annum than this

8   borrower claims.  That is the basis for the conclusion by

9   the reviewer that there's a misstatement of income here.

10          THE COURT:  But hypothetically, this borrower

11  could be paying private school or college tuition, right?

12          MR. ARONOFF:  Absolutely.

13          THE COURT:  Hypothetically, this borrower could be

14  paying any number of things that are not reflected in this

15  file that would account for the delta between the amount of

16  income that he or she makes and would further explain why

17  they have a lot of credit card debt because hypothetically

18  they're sending two children to private school, or

19  hypothetically they're caring for an elderly parent, or

20  hypothetically in order to work as a registered nurse this

21  person has to pay daycare expenses.

22          I mean, I don't know if any of those are true, and

23  I just -- I'm struggling to -- I see what you're saying

24  about the story of the loan, but when I can come up with

25  other hypotheses that explain it, I don't understand why.

Page 16

1   What you're saying to me is, in essence I believe, that

2   you've seen this enough to know that when you have these red

3   flags against -- compared with that kind of a BLS profile,

4   something's amiss.  I mean that -- it's kind of an

5   impressionistic conclusion, right?

6           MR. ARONOFF:  Absolutely.

7           THE COURT:  Okay.

8           MR. ARONOFF:  It's the art of the review, not the

9   science.

10          THE COURT:  Very good.  Thank you.

11  Q    Mr. Aronoff, let me just -- you're drawing inferences

12  from the information you see in the loan file, right?

13  A    These are standard areas of inquiry that an experienced

14  loan reviewer would look at and they may impose their own

15  subjective experience on the meaning of that or not.  But in

16  this particular example where BLS is the basis, and I stand

17  by that as a basis for the claim, upon review just in the

18  way I would look at a file, I notice that the credit and the

19  assets of the borrower don't contradict the story.

20  Q    Yeah.  Let me direct your attention to Page 7 of the

21  loan application.  Sorry, Page 7 of 48 in the claim package.

22  So I see there there's a indication that the borrower should

23  indicate assets and liabilities.  So what sorts of

24  liabilities are identified here?

25  A    That's the credit card debt I was referring to.

1   There's some installment --

2   Q    Does that call for the borrower to disclose all

3   recurring liabilities?

4   A    Those should be listed there, yes.

5   Q    So if the borrower was paying private school tuition,

6   for example, wouldn't that be disclosed there?

7   A    Not necessarily, unless they took out a loan to pay --

8   Q    What about other liabilities?

9   A    Those types of expenses would not necessarily appear on

10  the application, but if a loan underwriter in the course of

11  making an underwriting decision saw this type of

12  discrepancy, the red flags I've talked about, it would

13  certainly cause the loan underwriter to inquire and say,

14  "Hey, what's happening to all the money that you're making

15  and we don't see in your assets?"  So, it may come out in

16  that kind of conversation.  But that -- private school

17  tuition probably would not be listed on the application in

18  the normal course.

19  Q    The one thing the application does all for is a listing

20  of child care expense, correct?  Towards the bottom in

21  liabilities, job related expense, child care, et cetera.

22  A    Yes.

23  Q    See anything there for child care, any indication of

24  children on the application?

25  A    No.

Page 18

1    Q    Mr. Aronoff, let me just direct your attention to the

2    monthly income and combined housing expense information

3    section of the loan application on Page 6.

4    A    Okay.  I'm there.

5    Q    So let's just go through those.  The application calls

6    for base employment income and then what else does it call

7    for on a line by line basis?

8    A    Well, to the extent it's applicable and the borrower

9    wants more than the borrower's base salary considered as a

10   source of repayment for the loan, the borrower would list

11   overtime, bonuses, commission; and then special types of

12   income:  dividends and interest and net rental income.  And

13   then there's kind of a miscellaneous box for any other type

14   of income that isn't captured in those prior boxes.  And

15   those are blank in this case.

16   Q    And are those -- do all of the loan applications

17   essentially call for the same sort of breakout of income and

18   identification of sources of income other than base

19   employment income?

20   A    Yes.  You can see at the little bottom corner it says,

21   "Fannie Mae Form 1003," and the standard 1003 which was used

22   in almost every case here, the application, all include

23   that.

24   Q    Thank you.

25   A    In the same format.

Page 19

1    Q    Thank you.  Let us go to Loan 8742.

2              THE COURT:  Thank you.  We have mortgages in Coon

3    Rapids, Minnesota in this one.

4              MR. SHUSTER:  So it would appear.  It sounds like

5    a nice place to be.

6              THE COURT:  You've undoubtedly been there, Mr.

7    Shuster.

8              MR. SHUSTER:  Yes.  I wish I had.

9              THE COURT:  You wish you were there right now.

10             MR. SHUSTER:  Might -- sounds relaxing.  Sounds

11   relaxing.

12   Q    Would you be good enough, once you've had the necessary

13   materials before you to tell us what claim is being

14   presented here?

15   A    Yes.  This is a misrepresentation of debt claim as

16   opposed to misrepresentation of incomes we've looked at, and

17   in this case the forensic loan review based on DataVerify

18   documentation and, I believe, an audit credit report

19   identified two undisclosed mortgages that the borrower had

20   obtained prior to the closing of the subject loan with total

21   debt of about $206,000 that was not disclosed on the

22   application.

23   Q    Okay.  So why don't we look at the loan application?

24   A    Okay, and that can be found in the claim file at Pages

25   6 and -- starting on Page 6, I believe.  No, starting on

Page 20

1    Page 4 running through Page 7.

2    Q    Okay, take us through it, if you would.

3    A    Yeah, if you look at Page 6 on the right, their listing

4    of the assets and liabilities and there is no mention

5    anywhere on this application -- which is dated 8/25/06, by

6    the way -- that the borrower has mortgages at all, let alone

7    in the amounts that I just described.  They just show a

8    couple of what appear to be credit cards and then an

9    obligation to a gym.

10   Q    Okay.  So why don't we look at the evidence of

11   preclosing mortgages presented to the plan administrator by

12   the Trustee?

13   A    Sure.  The first piece of information that supports the

14   existence of debt that was undisclosed can be found at the

15   claim file, Page 11.

16   Q    And what is that document?

17   A    This is what I've referred to previously as a post --

18   as an audit credit report.

19   Q    Which is to say, a credit report pulled by one of the

20   forensic loan review firms in the post-loan process?

21   A    In this case, it appears to be so and as I mentioned

22   yesterday, sometimes there are audit reports that were

23   pulled by the servicers that give us information that post-

24   dates the loan that provides some information.  But this one

25   given the date on the top right of December 15 appears to be

1   something was pulled by the related mortgage review firm.

2   And we see the boxes that are highlighted.  They -- and I

3   may refer you to the very top where it has the borrower's

4   name and Social Security number just to confirm that this is

5   information pertaining to the same borrower.

6           THE COURT:  Mr. Aronoff, this just a purely --

7   question.  How much is this loan?  How much is this loan

8   for?

9           MR. ARONOFF:  The loan amount.

10           THE COURT:  The loan amount.  It's $84,000?

11           MR. ARONOFF:  Let's -- is that what it says on the

12   app?

13           THE COURT:  Yeah.

14           MR. ARONOFF:  That's the amount requested and

15   there's the final application.  That sounds right to me.

16           THE COURT:  And is there a way to tell the

17   purchase price of the subject property?

18           MR. ARONOFF:  If we go -- there's probably

19   something in the file we can look to see what the LTD was.

20   Let me look at the application, because I don't know if it

21   was a -- let's look this --

22           THE COURT:  That's what I don't understand.

23           MR. ARONOFF:  This was a purchase, so --

24           THE COURT:  I'm just -- this is not a trick

25   question.  Here's the part I don't understand.  Mr. Shuster,

Page 22

1    if you'll indulge me.  If you look at Page 7 of the loan

2    application under Roman 7a, purchase price it says $420,000.

3                   MR. ARONOFF:  Yes.  This may be a second.

4                   THE COURT:  This may be --

5                   MR. ARONOFF:  A second lien.

6                   THE COURT:  Mortgage.

7                   MR. ARONOFF:  So they may have taken out a first

8    and this is a subordinate loan.  Let me look.

9                   THE COURT:  See, then if you look under Roman 5 on

10   Page 5 under monthly income and combined housing expense,

11   you see it says, "First mortgage."

12                  MR. ARONOFF:  Yes, it was not unusual.  I don't

13   have the loan file here.

14                  THE COURT:  Yeah.

15                  MR. ARONOFF:  But it was not unusual for a

16   borrower to take out a first and then piggyback second at

17   the same time --

18                  THE COURT:  Right.

19                  MR. ARONOFF:  -- because they couldn't afford the

20   down payment.

21                  THE COURT:  Yeah.

22                  MR. ARONOFF:  And so many lending institutions

23   would provide them with a first and then a second --

24                  THE COURT:  Okay.

25                  MR. ARONOFF:  -- at the same time, and the second

Page 23

1    would have a higher interest rate.

2            THE COURT:  Okay.  But that's where my confusion

3    is coming in, is that this is one the loan application,

4    first mortgage is disclosed.  Just trying to --

5            MR. ARONOFF:  Well again, if there was a first

6    that was taken out as part of the purchase -- same purchase

7    obligation, the obligation on the first as well as the

8    second which is probably this 828 number for other

9    financing.  That's probably the P and I on the subject loan.

10   You'd have to -- you would want to include the first as part

11   of the borrower's new bundle of total obligations.

12           THE COURT:  Okay, but that's my question.  If this

13   is a -- and I'm sorry if maybe I'm just tired.  If this is a

14   misrepresentation of debt case, right, and on this

15   application this borrower is disclosing a first mortgage,

16   are we talking about -- is that the debt that's been

17   misrepresented or is there on top of that, other debt that's

18   been misrepresented?

19           MR. ARONOFF:  We're talking about additional debt,

20   Your Honor.

21           THE COURT:  Additional debt --

22           MR. ARONOFF:  Yes.

23           THE COURT:  -- that's been -- okay.  Okay.  So in

24   addition to disclosing that he's got a first mortgage where

25   the P and I is $2,500-odd a month, what you're saying is

Page 24

1    that there is, in addition to that, other undisclosed debt?

2            MR. ARONOFF:  Yes, and if we look at the credit

3    report --

4            THE COURT:  Yes.  What page would that be?

5            MR. ARONOFF:  Well, I may not be on the credit

6    report, but if we look at the next document we're going to

7    look at --

8            THE COURT:  Yep.

9            MR. ARONOFF:  -- which is the -- on Page 15, we

10   see that in fact it's -- let me confirm before I say it.

11   It's a different property address.  You see, if you look on

12   the first page of the app, the -- I don't want to read it

13   out because it's specific, but you can see the Spring Street

14   property there is the subject property on the first page of

15   the application.

16           THE COURT:  Yep, yep, yep.

17           MR. ARONOFF:  And then if we look at this Accurint

18   report -- DataVerify report, I'm sorry -- DataVerify report

19   on Page 15, can see the circled boxes and the property

20   address for these undisclosed liens is a different property.

21   Under property address, there's registration date then

22   property address, and here we have a 115th Avenue property

23   that is the subject property for these undisclosed liens.

24           THE COURT:  Could you just give me a second to

25   look at this, if you would?

Page 25

1          MR. ARONOFF:  Sure.

2          THE COURT:  Okay.  I really -- I hate to be so

3     disruptive.

4          MR. SHUSTER:  Not at all.

5          MR. ARONOFF:  This is important.

6          THE COURT:  I'm just trying to follow this report

7     because on the second block on the subject property, 4100

8     Spring Street, right, it shows that status as inactive,

9     right?

10         MR. ARONOFF:  Yes.  That would've been as of the

11    12/2015 date.  Remember, this is audit.  It's looking back.

12         THE COURT:  Yeah, yeah, yeah.  Okay.  I guess what

13    I'm trying to figure out is that -- I'll leave it there.  I

14    mean, I --

15    Q    The first document you showed us, Mr. Aronoff, was a

16    credit report, correct?

17    A    Yes.

18    Q    And that identifies the two undisclosed mortgages on

19    the open date as August of '06?

20    A    That's correct.

21    Q    And then next one that you directed us to, which is

22    Page 15, what is that document?

23    A    This is a DataVerify.  We discussed that yesterday.

24    It's a electronic service that provides information about

25    properties and real estate debts among other things that may

Page 26

```
 1    have existed with respect to our borrower at the time the

 2    loan was originated.

 3    Q    And where does DataVerify pull that information?

 4    A    I believe in this case, it was MIRS.

 5    Q    And so here there's a registration date for the

 6    undisclosed mortgages?

 7    A    Yes.  And the registration date would be the date on

 8    which this debt was reported to MIRS which has to be

 9    subsequent to the time the debt was obtained or opened.

10    Q    And is the registration date that's identified prior to

11    the date of the signed loan application on the subject loan?

12    A    Yes, it is.

13    Q    So let's just talk about inactive for a moment --

14    active and inactive.  You mentioned that the designation

15    inactive is a designation as of the time that the credit

16    report is pulled, correct?

17    A    Or in this case, the MIRS report through DataVerify.

18    Q    Okay.  And that report was pulled when?

19    A    If you look at the bottom right-hand corner, it appears

20    to have been printed, anyway, on December 7th, 2015.

21    Q    So does it -- the status of inactive, does that -- for

22    the undisclosed debts, does that tell you anything about the

23    status of those -- does inactive designation mean that a

24    loan was inactive on the registration date?

25    A    It doesn't tell you anything about that.  The purpose -
```

Page 27

1   - the use of this information is to get a snapshot on the

2   date the loan was -- the subject loan was originated to see

3   if there was debt of the borrower that was undisclosed.

4   Q   And so we don't know when the loan became inactive, all

5   we know is that these undisclosed mortgages were registered

6   with MIRS on August 14, 2006?

7   A   And we know the amounts and that it's our borrower,

8   yes.

9   Q   Let me direct your attention to Mr. Grice's commentary

10  on this.

11  A   Just trying to clean up back here.

12  Q   We're still on -- yes.  We're still on 8742.

13  A   I'm with you.  You're referring to the Grice review

14  response?

15  Q   Yes.

16  A   I see it.

17  Q   So, Mr. Grice points out that the credit -- audit

18  credit report identifies the month in which the undisclosed

19  mortgages were opened.  Do you see that?

20  A   Yes.

21  Q   Does he address the DataVerify report that you just

22  testified to showing the registration date of the

23  undisclosed mortgages on MIRS?

24  A   He does in the -- his recitation of the facts regarding

25  the loan right above that.  He says that the DataVerify

Page 28

```
 1    report reflected two mortgages with a registration date of

 2    8/14/06.

 3    Q    Okay.  So does he contest that the audit credit report

 4    and the DataVerify report contain the information that was

 5    put forward by the Trustees?

 6    A    He does not.

 7    Q    Or that, in fact, that debt existed?

 8    A    No.

 9    Q    Let's look at a post-closing undisclosed mortgage.  So

10    let me direct your attention to --

11            MR. COSENZA:  Your Honor, just a clarification.

12            THE COURT:  Yep.

13            MR. COSENZA:  I think there's some ambiguity in

14    the answer debt -- the fact that debt existed, I think the

15    question is when.  I think it's unclear from any of this

16    what that means.  And I'm not sure what his answer is.  I

17    mean, it's unclear.

18            THE COURT:  Okay.  Could you --

19            MR. COSENZA:  He can cross him on it, but I just

20    think the record is, you know, that the debt existed.  I --

21            THE COURT:  Okay.  I think you can cross.

22            MR. COSENZA:  Okay.

23            THE COURT:  Take it up on cross.

24            MR. COSENZA:  Thank you.

25    Q    Mr. Aronoff, do you have any reasonable doubt that the
```

Page 29

1    debt we were just talking about based on the evidence you

2    looked at existed as of 8/14/2006?

3    A     No, not based on the DataVerify report.

4    Q     Thank you.  Okay, let's turn to Loan 7836.

5    A     Thank you.

6          MR. SHUSTER:  Your Honor --

7          THE COURT:  Yes.

8          MR. SHUSTER:  Thank you.

9          THE COURT:  Thank you.

10   Q     When you're ready, please tell us, if you would, what

11   claim is being presented with respect to this loan?

12   A     So this is another misrep of debt breach finding and

13   it's based on audit credit report under the public record

14   searches that indicated that the borrower had four

15   undisclosed mortgages that closed within the same months of

16   the subject.

17         Two of them were opened in May 17 of '07 in the

18   amounts of 368,000 and 92,000.  One was opened on May 4th,

19   2007 in the amount of 475,000 and the final undisclosed

20   mortgage was opened on June 29th in the amount of 335,000.

21   The subject loan closed -- or the date of the application

22   was May 3rd, 2007.

23   Q     Where are you getting that from?

24   A     If we look at the loan application, I'm going by the

25   date the loan application was signed.  We can probably go

Page 30

1   into the loan file and look at the note if it's in the

2   excerpt, but if you look at the claim file, Pages 8 and 9.

3   Page 9, you can see the signature of the borrower dated May

4   3rd, 2007, and the application runs from Page 6 of 43

5   through Page 10 of 43.

6   Q    Okay.  So then would you take us to, if you can, the

7   evidence that the Trustees rely upon to established the

8   addition of undisclosed debt?  I think you have some charts

9   that might help you get there if you need help.  They're at

10  TRDX-200.

11  A    Right.  Well, if we can go back to the application, you

12  can see schedule of real estate loaned -- owned, if

13  additional properties are owned, there's, you know, a spot

14  on the application for a borrower to disclose additional

15  property acquisitions and the debt accompanying that

16  acquisition.

17          It's also well understood and common in the

18  industry that whether or not a subject property has actually

19  closed on the mortgage date, that if a borrower knows that

20  they are acquiring properties and debt accompanying those

21  properties, that that should be disclosed to the originator

22  as well.

23          And that's to avoid, for example, investors from

24  what's called stacking closings so that they appear to have

25  no debt and then stack their closings so they get

Page 31

1   increasingly more debt that closes a day later and you close

2   a loan to a borrower who appears to have no debt and within

3   10 days they are way over leveraged couldn't have possibly

4   afforded the loan you just underwrote to a borrower with no

5   debt.

6              As a result of that kind of -- to observe that

7   kind of occurrence in the forensic loan review industry with

8   respect to mortgage debt, the assumption is that if a

9   mortgage on a real estate acquisition or refinance closes

10  within 60 days of the subject loan date, it is generally

11  picked up as an undisclosed mortgage.

12             In this review, we're more conservative and pulled

13  that analysis back to if a loan closed in -- after the

14  subject loan closing date but -- and within the month

15  following the month of that closing then that was picked up

16  as an undisclosed mortgage on the theory that given the time

17  it takes 45, 60 days, to identify a property, negotiate a

18  sale of a -- a purchase of a property and obtain financing

19  for that property, that any mortgage that closed within 45

20  days of our subject should have been known by the borrower

21  to have -- if not existed on the loan closing date, they

22  should've known that very shortly after the loan they were

23  going to have significantly more debt that should have been

24  disclosed to the lender.

25  Q    And you understand that the borrower would have an

1    obligation to disclose such debt?

2    A    As a lender, yes.  I always wanted to know if a

3    borrower who I'd just underwrote where a key element of it

4    was debt to the extent the borrower in a very few days was

5    going to obtain significantly more debt that would be

6    critical to my understanding of the capacity of that

7    borrower to pay and enable me to adequately assess the

8    credit risk of that loan.

9    Q    Does the borrower covenant that we looked at yesterday,

10   I think, in Section 8 to the standard mortgage or deed of

11   trust call for -- apply both to affirmative misstatements as

12   well as omissions?

13   A    It does refer to omissions and it refers to omissions

14   in the loan application process or in the origination of the

15   loan, and it doesn't limit omissions to information

16   requested on the loan application.

17   Q    Thank you.  So --

18           THE COURT:  Just -- so the proposed closing debt,

19   what's the language that the borrower has -- that reflects

20   what the borrower's misrepresentation is?

21           MR. SHUSTER:  And I'll just note for you -- yes,

22   that Section 8 --

23           THE COURT:  Is that what applies?

24           MR. ARONOFF:  Yeah.  This is the covenant in the

25   mortgage that would trigger a default of the no default rep.

Page 33

1    We see here it says that, "The borrower shall be in default

2    if during the loan application process, the borrower gave

3    materially false, misleading, or inaccurate information or

4    statements to lender or failed to provide lender with

5    material information."  That is, "Oh, I don't have it now

6    but tomorrow I'm going have a million dollars of mortgage

7    debt."

8           They know that given the time it takes to

9    negotiate the purchase and sale of a piece of residential

10   real estate and the time it takes to secure a mortgage.  So

11   we said if mortgage debt closed within the month following

12   the month of the subject closing, we cited that as

13   undisclosed debt which was assumed to be in the knowledge of

14   the borrower, and cited that as a breach of this type of

15   material information debt which would trigger a breach of

16   the no default representation warranty.

17           THE COURT:  Thank you.

18   Q    Thank you.

19   A    I don't think we have an example around installment, so

20   I can talk about that for a minute.

21   Q    We'll come to that.

22   A    Okay.

23   Q    I'll ask you about that, but I just want to close the

24   circle on this one.  Can you just direct us to the reports

25   that you rely upon here, that the Trustees rely upon, for

Page 34

1   establishing the undisclosed debts in question, and --

2   A    Yes.

3   Q    Yes, please.

4   A    If we look at Page 15 of the claim package --

5   Q    Yes.

6   A    -- which is highlighted in TRDX-200, we see the top --

7   and again, this is our borrower, probably much lower chance

8   of confusion based on the name in this case than some other

9   cases.  The note amount of the debt that closed given the

10  note date of 5/17/07.  Right below that we have a note date

11  of 5/4/07 in the amount of 475,000.

12          Below that, another note on a -- looks like

13  possibly a second on the first property of 92,000 that

14  closed on the same date as the first one.  And then finally

15  on yet a third property closed in -- this looks like it had

16  note date the day before our loan closed on 485,000.  So,

17  you know, looking at this, it appears we have an investor

18  who knew how to play the game here.

19  Q    Okay.  Would you turn to TRDX-201 and then take us

20  quickly through?  And I don't mean to rush you, but take us

21  through that evidence, if you would.

22  A    Sure.  This is more corroborating information similar

23  to what we just ran through, and you can see, I guess,

24  they're the gray boxes on that page, but they refer to the -

25  - I don't know if this reference is right.  Okay, we can see

Page 35

1    in some of the highlighted ones, you see the same properties

2    and the same amounts on this audit credit report as well.

3    Q    In any event, the audit credit report only indicated

4    the month.  It's the MIRS credit report that indicates the

5    month and date of the loans.

6    A    It gives the month, that's correct.  But in this case,

7    since our guidance was, as I said, in conforming with

8    industry custom and practice, that if there was debt that

9    closed in the month or the month following -- mortgage debt

10   that closed in the month or the month following our subject

11   that was not disclosed by some means in the file, then it

12   was cited as undisclosed debt, particularly if it was in

13   these large amounts.

14   Q    Okay.  Let's talk about installment debt.  How was

15   installment debt, as distinct from mortgage obligations,

16   addressed in the Trustees' forensic loan review?

17   A    Right.  Recognizing that unlike mortgage debt,

18   installment debt can be closed relatively quickly and one

19   can walk into a car dealer and obtain a loan that day, the

20   only time undisclosed mortgage debt -- I'm sorry,

21   installment debt was cited where the debt was opened

22   following the subject loan date was if there was an inquiry

23   for that same debt on the borrower's credit report prior to

24   the subject loan closing, which means the borrower should

25   have known about it if there was an inquiry on the credit

 1    report.  So that was the guidance with respect to post-

 2    closing installment debt.

 3    Q    Thank you, sir.  Let's turn to Loan 7452.

 4    A    Thanks.

 5            THE COURT:  Yep.  Thank you.

 6    Q    When you're --

 7    A    Oh, we're waiting for each other.

 8    Q    No, thank you for your patience.  When you -- if you're

 9    ready, would you please take us through the breach claim

10    that's presented with respect (indiscernible)?

11    A    Yes.  So as you can see the claimant's factual basis,

12    this is a misrepresentation of occupancy exemplar and in

13    this case the borrower represented that they intended to

14    occupy the subject property and based on review of

15    bankruptcy documentation in the file, it was determined that

16    the borrower never occupied the subject and, in fact, used

17    it as a rental property.

18    Q    Okay, so why don't we start with the loan application

19    which is -- I think you'd be looking at Page 8 of 119 in the

20    claim package.

21    A    That's correct.  So, again, the application runs three

22    pages in this case, and we see on the first page about a

23    third of the way down the first page the purpose of the loan

24    to the right, "Property will be," and the box checked is

25    primary residence.

Page 37

1              MR. COSENZA:  Your Honor --

2              THE COURT:  Yeah.

3              MR. COSENZA:  I'm just having trouble finding this

4      one.

5              THE COURT:  Yeah, I'm having trouble, too.  I have

6      the loan, but I'm --

7              MR. SHUSTER:  Oh, you know, it's my -- I think I

8      mis-referred everyone.

9              THE COURT:  We're in --

10             MR. SHUSTER:  Yes.

11             THE COURT:  -- 7452, which is --

12             MR. SHUSTER: I think we should --

13             MR. ARONOFF:  I'm on Page 8 of the claim file.

14             MR. SHUSTER:  8 of 119 in the claim file.

15             MR. ARONOFF:   Correct.

16             MR. COSENZA:  I have 105 in mine.

17             THE COURT:  Okay, hold on.  Page -- we're on Page

18     8 of 119.  Okay, that's the loan application.

19             MR. SHUSTER:  I think you -- I am in the Lehman

20     Documents Tab, it's the prior tab.

21             MR. COSENZA:  Okay.

22             THE COURT:  It's the penultimate tab in the

23     binder.

24             MR. COSENZA:  Sure.  Yes.  Got it.

25             THE COURT:  Okay.  And now hold on, I saw

Page 38

1    (indiscernible).   TRDX-204.

2              MR. COSENZA:  Got it.  Thank you.

3              THE COURT:  Okay.

4              MR. ARONOFF:  And the blowup of that page is TRDX-

5    204.  That's correct.

6              THE COURT:  All right.  Thank you.

7    Q    So you noted that the property -- the box indicating

8    that the property will be a primary residence is checked,

9    and then what state is the subject property in -- which is

10   to say, the property that's the subject of the loan?

11   A    Yeah.  That's where I was going to refer next.  You can

12   see the subject property, you can see the street address,

13   you can see that it's located in Las Vegas, Nevada.  And you

14   can see a little lower down on that page that the borrower's

15   present address is in New Jersey.

16   Q    Okay.  So then what evidence do the Trustees rely upon

17   to establish a misrepresentation as to occupancy?

18   A    Yeah, the primary document is, if you go to flip

19   through the page, the claim package, you'll see starting on

20   Page 11 is a pacer -- a printout from Pacer and the

21   voluntary petition for bankruptcy filed in October of '07

22   and you see on the first page of the petition which is Page

23   12 of the claim package that -- see our borrower there and

24   you see the borrower lists their address as what was

25   believed to be the departure property as her present street

Page 39

1    address which is the first indication that something may be

2    awry here.

3    Q    And are there other pages in the bankruptcy filing that

4    bear on the analysis?

5    A    There are.  And as noted in TRDX-205 if you turn to

6    Page 45 of the claim package which is further along in the

7    petition you'll see a highlighted box that talks about the

8    prior address of debtor, and they indicate that they have

9    not moved within the past three years.

10            And just to refresh our collective recollection we

11   can see that the loan was taken out in May of '06.  This

12   petition appears to have been filed in October of '07 and so

13   the borrower never occupied the property based on their --

14   the subject property based on number 15, where they have not

15   moved in the prior three years.  So they didn't move between

16   the time they took out the loan and the filing of this

17   petition.

18   Q    Let me direct your attention to Page 28.  Maybe you

19   were getting there, but let me direct your attention to Page

20   28 of 119.

21   A    Yes.

22   Q    What is that?

23   A    This indicates that the borrower, in fact, did own this

24   property with the subject debt.  But it also indicates right

25   below that that their residence is in fact still the

1   departure property.

2   Q    And the Las Vegas -- sorry, the Nevada property is

3   identified as a second property?

4   A    Yes, it is.

5   Q    And then finally let me direct your attention to Page

6   40 and what does that tell you?

7   A    The kind of information that would be meaningful for

8   the purpose of trying to determine whether it was more

9   likely than not that this borrower did not occupy the

10  subject property as a primary residence is the employment

11  box there where it shows that as of the date of this filing,

12  the borrower worked in New Jersey.  Kind of a difficult

13  commute if they lived in Nevada.

14  Q    Thank you.

15          MR. SHUSTER:  So, Your Honor, I'm about to move

16  off of loans onto another subject --

17          THE COURT:  Okay.

18          MR. SHUSTER:  -- so this might be a propitious

19  moment for a break.

20          THE COURT:  Okay.  That sounds good, for a break

21  but not for the lunch break, right?

22          MR. SHUSTER:  Yes.

23          THE COURT:  Okay.  So let's take 10 minutes and

24  we'll come back roughly noon.

25          MR. SHUSTER:  Thank you.

Page 41

1              THE COURT:  Thank you.

2        (Recess)

3              THE COURT:  Please have a seat.

4              MR. ARONOFF:  Thank you, Your Honor.

5              THE COURT:  Okay, so Mr. Shuster, what can I do to

6     improve my real estate --

7              MR. SHUSTER:  We're going to be focusing

8     principally on Mr. Aronoff's affirmative report --

9              THE COURT:  Okay.  So we're going to put up --

10             MR. SHUSTER:  -- which is two binders.  We should

11    be more or less done with the loan files, and we have

12    another smaller deck to hand up as well, if we may.

13             THE COURT:  Mostly on the affirmative report, you

14    said?

15             MR. SHUSTER:  Yes.

16             THE COURT:  Okay.

17             MR. SHUSTER:  May we --

18             THE COURT:  Yes.  So we're -- put away the loan

19    exemplar deck?

20             MR. SHUSTER:  I'm going to have -- I'm starting

21    there.

22             THE COURT:  Okay.

23             MR. SHUSTER:  But only a couple pages in that.

24             THE COURT:  Okay.

25    Q    So, Mr. Aronoff, I want to direct your attention to

Page 42

1    TRDX-151.  It's in the first deck book.

2    A    Yes.

3    Q    It's very much towards the back, second to last.  Can

4    you tell us what that is, please?

5           THE COURT:  I'm there, if you are.

6    A    Yes.

7    Q    Can you tell us what that is, please?

8    A    This appears to be an excerpt with regard to a specific

9    loan from exhibit 15 to my affirmative report.

10   Q    Okay.  And Exhibit 15 which is TRX-619S was produced

11   natively.  It's a Excel spreadsheet, correct?

12   A    Yes.

13   Q    Okay.  So why don't you -- and what does -- what is

14   identified on Exhibit 15?

15   A    It was provided because I was talking about loans that

16   were the subject of my report and Exhibit 15 is the entire

17   compendium of the breach findings and the loans that are the

18   subject of my report.

19   Q    Okay.

20   A    With some other identifying information.

21   Q    So it lists each of the breaches that you present as

22   having -- as claims on the part of the Trustees?

23   A    It lists each individual breach finding that's the

24   subject of my report.

25   Q    Okay.  Could we just pull up Exhibit 15, which again

Page 43

1    was produced in native format, without showing the loan

2    number column if you could, but for this loan?  Is that it?

3    So the excerpt that we have that's TRDX-151 is taken

4    directly from this line of your Exhibit 15?

5    A    Okay.

6    Q    Is it?  Was it?  I'm asking you.

7    A    I don't remember line 43,156, but they appear to line

8    up.

9    Q    Right.  No, we're just not showing the loan number.

10   A    Understood.

11   Q    Okay.  So let's go back to TRDX-151.  How was -- well,

12   how was Exhibit 15 created, Mr. Aronoff?

13   A    I requested certain information that would -- from Duff

14   and Phelps that would populate the fields that you see here.

15   Q    Okay.  And how did you communicate what you wanted?

16   A    Probably through one of my team members at Baker Tilly

17   who was primarily responsible for communication and date

18   management issues with respect to our firm and Duff and

19   Phelps.

20   Q    You're saying "probably."  Is that, in fact, how you

21   did it?

22   A    We did it through someone on my team.  I'm just -- in

23   terms of the specific individual, it was probably the --

24   someone I had in mind.  But yes, I did it through my team.

25   Q    Was is Ms. George?

Page 44

1   A    It was more likely than not Shante George, yes.

2   Q    Did she work with Duff under your supervision to

3   develop Exhibit 15?

4   A    Yes.

5   Q    What's the source of the information in Exhibit 15:

6   A    I asked for the information that had been communicated

7   to the plan administrator pursuant to the protocol.

8   Q    Okay.  So the columns that are identified here on TRDX-

9   151, would those have come from -- where would those have

10  come from?  And if you need to, you can refer to TRDX-152.

11  A    Yeah, I think -- you know, it may be a different source

12  based on the column, but up to, say, Column G that is

13  information that would have been presented -- oh, here we

14  have one -- in connection with a claim.

15       We can see an example of the form that was used to

16  transmit individual loan and individual breach basis to the

17  plan administrator pursuant to the protocol.  So for every

18  loan for which there was a claim under the protocol, there

19  was a transmittal sheet in the form of the one we see on

20  TRDX-115 that contained the information that was required to

21  be submitted under the protocol to the plan administrator.

22  Q    You just referred to TRDX-1 --

23  A    52, I'm sorry.

24  Q    Did you mean --

25  A    I meant 52.

1   Q     -- TRDX-152?

2   A     I did.  And so this came out -- so this information is

3   the same information that populated the breach finding, the

4   contractual provision, the factual basis, and the

5   materiality basis.  Column H and Column J were the

6   information that resided in Duff and Phelps' database that

7   was collected, I believe, in Step 2 of the protocol where

8   Column H is the plan administrator's response to the claim,

9   and then following in Column J was the Trustees' response to

10  the debtor's position.

11  Q    So there is a row like that in your Exhibit 15 for each

12  and every one of the breach claims that are the subject of

13  your report?

14  A    That's correct.

15            MR. SHUSTER:  May I have a moment, Your Honor?

16            THE COURT:  Yes.

17  Q    And do you know how many rows there are in Exhibit 15

18  for individual breach claims?  I assume you don't, but --

19  A     There were 116,000 or so breach claims that were the

20  subject of my report.  I don't know if that's the number of

21  rows there were, but there should've been at least one row

22  for each breach finding.

23  Q    Can we just pull the Excel spreadsheet.  I think the

24  exhibit number, and correct me -- I think it's TRX-619.

25  Again, without the loan column, please?  And if you could

Page 46

1    just scroll to the bottom so we can see how many lines we're

2    talking about --

3    A    Pretty close.

4    Q    Very close.  116,299 individual breach claims, yes?

5    A    Yes.

6    Q    Okay.  So I want to go through some of the other tables

7    and exhibits in your report.  Let's start with Exhibit 1 to

8    your report which is TRX-605.

9              THE COURT:  It's in the first volume of your --

10             MR. ARONOFF:  Yes.

11             THE COURT:  -- affirmative report.

12             MR. SHUSTER:  Thank you, Your Honor.

13             MR. ARONOFF:  I'm caught up with everyone else.

14   Thank you.

15   Q    Thank you, Mr. Aronoff.  What is TRX-605, Exhibit 1 to

16   your report?

17   A    This was simply -- this, too, was a list of all the

18   breach findings that were the subject of my report.  But

19   simply to identify the loan number, the trust, and the

20   status, and I think are only three statuses of loans, maybe

21   in this case two, rejected or accepted.  There might be on

22   hold, which was status that could be found on 15.

23   Q    Yeah, this is an -- as you can see, TRX-605 --

24   A    Is an excerpt.

25   Q    1,463 pages --

Page 47

1    A    Right.

2    Q    -- this is an excerpt.

3            THE COURT:  I need to catch up with where you are.

4    Before we went to this document, we were looking at a native

5    spreadsheet.

6            MR. SHUSTER:  Yes.

7            THE COURT:  And you demonstrated that Mr. Aronoff

8    had remembered correctly that there were 116,000 --

9            MR. SHUSTER:  Right.

10           THE COURT:  -- claims.

11           MR. SHUSTER:  Yes.

12           THE COURT:  This document is now 1,463 pages

13   presented here in truncated form.

14           MR. SHUSTER:  Yes.

15           THE COURT:  But if you look at Page 1,463 of

16   1,463, the count is 76,000.

17           MR. ARONOFF:  If I may, that's a loan count.

18           THE COURT:  Okay.

19           MR. ARONOFF:  These are loan count and the other

20   one was breach findings.

21           THE COURT:  Okay.  I'm just trying to understand

22   what I'm doing.

23           MR. SHUSTER:  Yes.  Yep.

24           THE COURT:  Because this says, "Breach Findings."

25   At the top it says, "Breach Findings."  I suppose it also

```
 1   help, Mr. Shuster, to note -- date each of these as to when

 2   they were -- why don't you and Mr. Cosenza come up, okay?

 3        (Sidebar)

 4   Q    So, I just want to clarify a couple of things, Mr.

 5   Aronoff.  The first -- the Exhibit TRX-602 perhaps could be

 6   more aptly titled, "All Loans With Breach Findings"?

 7   A    Yes, and if you look at Page 4 of the report itself

 8   under the exhibit on the table of contents, it's correctly

 9   identified as listing of all loans with breach findings --

10   Q    Very good.

11   A    -- and if you turn the page to Page 1 of the report

12   which is Page 6 of 96, in context you can see that the

13   heading that we looked at is incorrect and a typo.  It's

14   wrong.

15             And if you look at where Exhibit 1 is described --

16   and I just had it and I just lost it.  Oh, right in the very

17   first paragraph, one, two, three, four, five lines down we

18   talk about retain me to provide expert opinions regarding

19   claims asserted by the Trustees in connection with the loans

20   listed on Exhibit 1.

21   Q    Very good.

22   A    And it's to represent the claims for those loans.

23   Q    And so we looked at Exhibit 15 which listed 116,229

24   individual breach claims?

25   A    Breach findings.
```

Page 49

1    Q    Breach findings, I should say.  And those breach --

2    those are breach findings on the roughly 76,000 loans that

3    are identified in Exhibit 1, correct?

4    A    That's correct.

5    Q    Some of the loans have multiple breaches findings,

6    correct?

7    A    That's correct.

8    Q    And without getting into all of the substance, you're

9    familiar with the term withdrawn claims?

10   A    Yes.

11   Q    So the number of loans that you present and the claims

12   that you present in your report and in your exhibits are net

13   of the withdrawn claims, correct?  The withdrawn claims are

14   out by this point in time?

15   A    Most of them were.  There were some claims that were

16   withdrawn after reports were exchanged.

17   Q    Okay.  We'll come back to that.  But the lion's share?

18   A    That's correct.

19   Q    Okay.  And the -- your report just so we're clear was

20   issued on June 1 of this calendar year?  Not a memory test,

21   please.

22   A    Yes.

23   Q    So, were these exhibits intended to be accurate as of

24   that date?

25   A    Yes.

Page 50

1   Q     Thank you.  Does the information -- coming back to

2   Exhibit 1, does the information in columns -- is the

3   information in Columns 2 and 3 also in the claims tracking

4   spreadsheets -- spreadsheets that were provided by the

5   Trustees in the protocol process?

6   A     I'm going to have to refer to it because I --

7   Q     Oh, please, go ahead.  We're back at Exhibit 1.

8   A     Right.

9   Q     Which is TRX0605.

10  A     No, but I want to see -- I'm not necessarily an expert

11  on what was in the claims tracking spreadsheets.  I want to

12  look at it.

13  Q     You want to look at the claims tracking spreadsheet?

14  A     Yes.

15  Q     That's on --

16  A     152.

17  Q     Yes.

18  A     Yes, there appears to be -- I mean other than count,

19  there appears to be a loan number, the trust, and of course

20  loan status was as of the report date.

21  Q     And is the information in Column 4 of Exhibit 1

22  rejected, accepted, or -- is that information in the

23  rejected claims reports or the plan administrator's formal

24  respones?

25  A     Yes, that would've been based on their response to the

1   initial claims submission.

2   Q    Okay.  Let's look to Exhibit 3 to your report which is

3   TRX-607.  What is this document?

4   A    This is simply to indicate, since I discuss it in the

5   body of the report, for each type of breach finding the

6   frequency with which that breach finding occurs within the

7   population of loans that were the subject of my report.

8   Q    And does the information -- all of the information on

9   this exhibit come from Exhibit 15?

10  A    Yes.

11  Q    Let's look at Table 1 which is in the body of your

12  affirmative report, but it's extracted for simplicity in the

13  first deck which -- TRDX-207.  Again, towards the back.

14  Let's see, fourth chart from the back.

15  A    Got it.

16  Q    And this is following up on what you just said.  So

17  this -- what does this present?

18  A    This is in tabular form, the 12 most prevalent breach

19  findings and it should -- I should check before I say -- it

20  should line up with the first 12 rows of Exhibit 3.

21  Q    And then there are purchase price numbers.  You're not

22  opining on that purchase price numbers, correct?

23  A    Absolutely not.

24  Q    There's -- in fact, there's a footnote.  It's in the

25  body of your report.  There's a footnote in your report,

Page 52

1     Footnote 6, states at Page 3, "All purchase price

2     information included in this report was supplied to me by

3     the Trustees' purchase price expert, Dr. Karl N. Snow."  Is

4     that accurate?

5     A     Yes.

6     Q     Very good.  Let's look, Mr. Aronoff, at Exhibit 4 to

7     your report which is TRX-608.  So now we're going back to

8     the first -- going to binder --

9            MR. SHUSTER:  Can someone help the witness lift

10    these?  Give him a little room?

11    Q     Going back to --

12    A     I don't need this anymore, I don't think.  Do I need

13    the first deck?

14    Q     Not for the moment.

15    A     Okay.

16    Q     We're going back to the exhibits to the report.  You're

17    in the first binder of your affirmative report.

18    A     608?

19    Q     Correct.

20    A     (Indiscernible).

21            THE COURT:  Can -- I hate to do this.  Can you go

22    back to TRDX-107?

23            MR. SHUSTER: 207?

24            THE COURT:  207, yes.

25            MR. SHUSTER:  Yes.  TRDX-207 --

Page 53

```
 1              THE COURT:  So --

 2              MR. SHUSTER:  -- is in the deck that we just --

 3              THE COURT:  Yeah.

 4              MR. SHUSTER:  -- took from the witness?

 5              THE COURT:  It's this --

 6              MR. SHUSTER:  could you give it back to him,

 7    please?

 8              THE COURT:  It's the Table 1 summary of breach

 9    findings.

10              MR. SHUSTER:  Yes.  Yes.

11              MR. ARONOFF:  Thank you.

12              THE COURT:  What caught my eye was the footnote

13    which says, "Many of the mortgage loans have multiple breach

14    findings and therefore the sum of the number of affected

15    loans and the related purchase price columns will be greater

16    than the number of mortgage loans and the total purchase

17    price for the claims."  So does that mean that if I sum the

18    number of affected loans and I can see doing this just at a

19    glance it's going to be larger than 76,000 loans, right?

20              MR. ARONOFF:  That's correct, Your Honor.  The

21    footnote was a direction.  Don't add these columns as you'd

22    normally do.

23    Q    And the purchase price number, Mr. Aronoff?  The

24    aggregate purchase price number will also --

25    A    Will be overstated as well.
```

1             THE COURT:  And how would I be able to tell how

2    the overlap works?

3             MR. SHUSTER:  So actually in the deck --

4             THE COURT:  Is this coming attractions?

5             MR. SHUSTER:  No, well -- now's a good time to do

6    it, so let's do it.  It'd TRDX-208, it's the next chart.

7             MR. ARONOFF:  I think the answer you're looking

8    for, Your Honor, is by reference to Exhibit 15.

9    Q    So just to elicit the testimony, you can sort on

10   exhibit -- using Exhibit 15 by loan.  Loans that are

11   presented with breaches and so you would -- you could just

12   sort individual loans and then you'd get to the total number

13   of loans in any -- that have breaches, correct?

14   A    Yes, and --

15   Q    And also any loan in any -- go ahead.

16   A    Yes.  We provided the number of loans in Exhibit 1 that

17   were the subject of the report.  We provided all of those

18   loans and all of the individual breach findings in Exhibit

19   15 in an Excel spreadsheet.

20             So by sorting the data in Exhibit 15, you can

21   create the frequency of breach finding for each and every

22   loan and can create a chart of how many loans have one, how

23   many loans have two, how many loans have three, and like.

24   But because there are so many different types of breach

25   finding, it gets complicated.  It gets difficult to do

1   intuitively, and so I prepared what I call the dot chart to

2   explain by controlling for four different misrepresentations

3   how you could do the analysis.

4   Q    Okay, so TRDX-208 may be self-explanatory to the Court,

5   is wasn't to me.  So please walk us through it if you would.

6           THE COURT:  I think I get it, but I think --

7           MR. SHUSTER:  Okay.

8           THE COURT:  -- we need to make a record.

9           MR. SHUSTER:  Yes.  Thank you, Your Honor.

10  A    Okay.  So, to the extent we wanted to see what the

11  actual number of loans -- if we wanted to isolate loans with

12  multiple breaches and just control for misrep of income, we

13  can see that by looking at the dot under misrep of income in

14  the one breach per loan category, there are 21,311 loans

15  with one breach and the sole breach is a misrep of income.

16          If we want to see how many of misrepresentation of

17  income loans have two breaches of these four, we can see

18  that 3,397 loans have a misrep of income breach and a misrep

19  of debt breach.  We can see that 1,411 loans have a misrep

20  of income breach with a second breach that is misrep of

21  occupancy and we can see that the last set of

22  misrepresentation of income breached loans with two breaches

23  it is 5,564 and those loans contain a misrep of income

24  breach and an excessive DTI breach, and so on.

25          We can do it with a three and we have a number of

Page 56

```
 1   misrep of income breach with two other breaches.  There are

 2   534 where the two other breaches are debt and occupancy.

 3   For misrep of income breach that has debt and excessive DTI,

 4   there are 1,206 and for a misrep of income breached loan

 5   with two other breaches that are occupancy and DTI, there

 6   are 170.  And then of the misrep of income breaches that

 7   have all four of these there are 246.

 8            And hopefully if you go to the right and add up

 9   all the values in the columns where there's a dot under

10   misrep of income, that better be 34,323.  But I think it

11   does.  So that would be a way of showing that of the four

12   breach findings here, the frequency of that type of breach

13   for each loan.

14   Q    Thank you.  And it works the same way for the other

15   breach categories?

16   A    Correct.

17            THE COURT:  Can I ask a followup question?

18            MR. SHUSTER:  Of course.

19            THE COURT:  So, that was perfect.  Thank you.  My

20   question is, there are 34,323 loans that this chart and you

21   say have misrepresentation breaches.  They can be sorted

22   into these other buckets based on different colored dots as

23   to whether or not that's a one breach -- it's the only

24   breach on a loan or whether it's accompanied by other

25   breaches, right?
```

Page 57

1            MR. ARONOFF:  Yes.

2            THE COURT:  Okay.  And that's the first column.

3     That's reflected in the first column, right?

4            MR. ARONOFF:  That's correct.

5            THE COURT:  Now, so there are 34,000-odd loans

6     that have misrepresentation of income breaches but there

7     only 11,000-odd loans that have excessive DTI and there are

8     23,000 loans that have misrepresentation of debt breaches

9     but there are only 11,000-odd loans that have excessive DTI.

10    So intuitively it seems that there are some

11    misrepresentation of income breaches and/or some

12    misrepresentation of debt breaches either together or

13    separately that don't trip the DTI (indiscernible)?

14           MR. ARONOFF:  That's correct, Your Honor.

15           THE COURT:  Okay.  Thank you.  So that means --

16    one followup only -- is that notwithstanding that a borrower

17    may have misrepresented his or her income, it could

18    arithmetically not have tripped the DTI but nonetheless led

19    to a finding that it was -- that it caused an adverse

20    material effect on the loan?  You could have a income breach

21    without a DTI breach that nonetheless leads you to the

22    conclusion of AMA?

23           MR. ARONOFF:  That's correct.  And many cases the

24    absence of a DTI breach would be because of the absence of

25    an excessive DTI rep and warranty.

```
 1              THE COURT:  Very good.  Thank you.

 2    Q    Okay, Mr. Aronoff.  Let's turn to Exhibit 4 to your

 3    report which is TRX-608.  What is this intended to convey?

 4    A    This is the -- all the data and information regarding

 5    the misrep of income breach findings that I discuss in my

 6    report.  And I discuss in various parts of the affirmative

 7    report the type of evidence.  I discuss the variances.  And

 8    so this is an exhibit which contains, for each

 9    misrepresentation of income breach finding, all of the

10    information that's the subject of a column heading.

11    Q    And was this exhibit, like Exhibit 15, created at your

12    request by someone on your team working under your direction

13    and supervision with Duff and Phelps?

14    A    That's correct.

15    Q    Is that true for all the exhibits to your report?

16    A    It is.

17    Q    Thank you.  As well as the tables and figures in your

18    report?

19    A    Yes, that's correct.

20    Q    So is all of the information, but for the median -- you

21    see the median row at the top between the blue shaded row

22    and then the numbered rows?

23    A    I do.

24    Q    Is all of the information in this but for that and but

25    for the fifth and sixth columns taken from Exhibit 15?
```

Page 59

1   A    The fifth and -- I don't know if the -- I don't know --

2   not taken from Exhibit 15.

3   Q    Taken from the claim package?

4   A    The same data that I referred to before that was the

5   basis for Exhibit 15.  Information that had been provided to

6   the plan administrator pursuant to the protocol deliveries -

7   - the claim package.

8   Q    And then those columns -- the monthly nominal

9   difference and monthly percentage difference -- are those

10  merely computations based on the other information that's

11  set forth in the chart?

12  A    That's correct.

13  Q    And this was -- was this provided in Excel format

14  together with your report?

15  A    It was.

16  Q    And is that true -- well, that's true for all of the

17  exhibits, is it?

18  A    Slightly different information, but the same source of

19  data and the same provision in Excel that would allow any

20  recipient to check the math and re-sort the data in the same

21  way.

22  Q    Okay.

23          MR. SHUSTER:  Your Honor, may I have a moment?

24          THE COURT:  Sure.

25          MR. SHUSTER:  Thank you.

Page 60

1   Q    Now, to the extent that the information on TRX-608 is

2   drawn from a source other than Exhibit 15, and you mentioned

3   the claims packages, what did you do to satisfy yourself

4   concerning the accuracy of that information?

5   A    Well, we were provided with information in the form

6   we've seen it on those large spreadsheets with data and

7   narratives and responses as well is the claim files and the

8   loan files.

9          So -- and we were given an initial, for lack of a

10  better term, data dump of all the loans that were the

11  subject of the report and so in preparing the exhibits we

12  did, taking into account the enormous size of data that was

13  here, we did spot checks and audits -- not in a formal audit

14  but necessary to satisfy me that the data was accurate.

15         So we didn't look at every line, we didn't look at

16  every cell.  I work at an accounting firm, so we're very

17  cautious when I use the word audit because I'm not an

18  accountant and I use the (indiscernible), but understanding

19  that this was the exposition of the information and data on

20  which I relied to provide my expert opinions, I took as much

21  care as we possibly could to assure that the data was

22  accurate and matched what we had been provided originally.

23  Q    Okay.  Let's look at TRDX-213 which is in the new deck.

24  Are you with me?

25  A    Yes.

Page 61

1   Q    So you see that's a line extract from your Exhibit 4

2   and then a extract from the claim tracking spreadsheet for

3   the same loan?

4   A    Yes.

5   Q    So the information that's in the Columns C, B, and G

6   and Exhibit 4 are taken from the claims tracking

7   spreadsheet?

8   A    Yes, I see that.

9   Q    Incidentally, looking at the description in the claims

10  tracking spreadsheet, it says, "The 2007 tax returns confirm

11  the borrower's actual income for 2007 was 1,922 per month or

12  $23,064 annually."  Do you see that?

13  A    I do.

14  Q    So yesterday you testified you weren't attempting

15  conclusively to prove the borrower's actual income, but is

16  it your opinion that it is more likely than not that it is

17  the actual income number that's presented here in the claim

18  tracking spreadsheet?

19           MR. COSENZA:  Just --

20           THE COURT:  Hold on.

21           MR. COSENZA:  Objection.

22           THE COURT:  Yes.

23           MR. COSENZA:  Leading.

24           THE COURT:  That's fair.  Ask it a different way,

25  please, Mr. Shuster.

Page 62

1   Q    What is the number -- what are you referring to -- what

2   do you mean to convey when you say here, "The

3   (indiscernible) tax returns confirm the borrower's actual

4   income for 2007 was $1,922 per month"?

5   A    The actual income is intended to represent the income

6   number for that borrower that was derived from the forensic

7   loan review of the file that was compared to the represented

8   income to make a determination as to whether or not there

9   was a breach finding.

10  Q    And is it your opinion as to this actual income number

11  that was presented and the others that were presented that

12  it's more likely than not that that rather than the

13  represented number was the actual income number for the

14  borrower?

15       MR. COSENZA:  Same objection.  Leading.  I mean,

16  we're -- the horse is like out of the barn on this, so --

17       THE COURT:  Yeah.  Sure.  Come on up.

18   (Sidebar)

19       THE COURT:  Mr. Aronoff, if you recall the

20  question please answer it.  If not, Mr. Shuster will repeat

21  it yet again.

22       MR. ARONOFF:  I'm sorry, can I ask you to repeat

23  it again?  I think I know what it is, but I want to be

24  absolutely sure.

25       THE COURT:  Sure.

Page 63

1    Q    Is it your opinion as to this actual income number and

2    the others that were presented, that it's more likely than

3    not that that number rather than the number represented on

4    the loan application was the actual income for the borrower?

5    A    Let me be clear about answering this.  As I discussed

6    yesterday, the purpose of the forensic loan review with

7    respect to income was not to verify the actual income of the

8    borrower, but it was to make a determination whether it was

9    more likely than not that the stated income was

10   misrepresented.

11        So without getting too pedantic about the mean of

12   actual, this column was intended to designate the income

13   number that it was believed more accurately reflected the

14   borrower's income as opposed to the stated income and in

15   that was our belief and my understanding, the understanding

16   of the loan reviewer subject to our guidance as to how these

17   reviews would be done, how this analysis would be done.

18        It was also used -- that actual income number was

19   also used as the basis for assessing what the variance would

20   be.  Because remember we had the 5 percent variance test.

21   So to the extent the income believed to be more likely the

22   case than not based on the evidence in the file when

23   compared to the stated income if the variance was less than

24   5 percent, no claim, and there were some other tests in my

25   report where the variances were larger for certain

Page 64

1    categories of borrowers and if they were below that no claim

2    would've been presented.

3            So, I think the answer to my question is yes, but

4    I needed to qualify it in that manner.

5    Q    Thank you, Mr. Aronoff.

6            THE COURT:  Okay.  I think this is probably a good

7    time to stop and break for lunch, so -- and then roughly

8    speaking, to your finish line, Mr. Shuster --

9            MR. SHUSTER:  I hope under an hour.

10           THE COURT:  Okay.  Great.

11           MR. COSENZA:  We'll be ready to start with --

12           THE COURT:  You'll be ready to start promptly.

13   Okay, then why don't we come back just shy of 2:00 and we'll

14   take it from there.  Thank you very much.

15           MR. COSENZA:  Thank you, Your Honor.  Have a good

16   lunch.

17       (Recess)

18           THE COURT:  Ready.

19           CONT. DIRECT EXAMINATION OF JAMES ARONOF

20   BY MR. SHUSTER:

21   Q    Mr. Arnoff, we've been looking at Exhibit 4 and the

22   information on what it's based on.  Would you turn to Figure

23   1 in your affirmative report, which is on Page 45 of your

24   report or Page 50 of the exhibit.  TRX-601.

25   A    Okay.

Page 65

1    Q    And if you'd keep -- if you can keep TRDX-213 in front

2    of you so you have -- you have Exhibit 4 of your report in

3    mind as well.  It's the first page in the new deck.  Are you

4    with me?

5    A    213?

6    Q    Yeah.

7    A    Yes.

8    Q    Okay.  So is Figure 1 a summary of the

9    misrepresentation breach claims in Exhibit 4?

10   A    It's a summary -- well, it's derived -- it comes from

11   Column G and it shows the frequency with which each type of

12   evidence or supporting documentation was the primary source

13   of support for each of the 34,000 misrepresentation of

14   income breach findings.

15   Q    Very good.  And that's the -- some of what you just

16   said is in the substance of Footnote 63?

17   A    With respect to this chart and the other ones that

18   follow, yes.

19   Q    And then can you tell us what Figure 2 is, please?

20   A    Figure 2 is a bar chart that indicates the frequency

21   with which each income variance occurs within a bucketed

22   percentage of variance.

23   Q    And is that a summary of the monthly percentage

24   difference data listed in Exhibit 4?

25   A    That's correct.

1    Q     That would be Column F in Arnoff Exhibit 4?

2    A     That's correct.

3    Q     Okay.  Thank you.  Let's look at Arnoff Exhibit 5 and

4    that would be -- the demonstrative would be TRDX-215.  And

5    then the exhibit itself is TRX-609.  But why don't you start

6    with TRX-609 and tell us what that is.

7    A     Okay.  Again, as I said with respect to Exhibit 4, I

8    discussed, with respect to misrepresentation of debt breach

9    findings in the body of the report, certain types of

10   evidence that were used, excuse me.  And so this is an

11   individual listing, excuse me, of each misrep of debt

12   breaching finding and provides certain statistical

13   information about that.  The number of undisclosed debts per

14   breach finding, the evidence types that were cited or that

15   were available to support that.  And then to the extent

16   there were other breach findings on that loan, it lists

17   those as well.

18   Q     And as with Exhibit 4, does the information in Exhibit

19   5 come from the claim tracking spreadsheet or other

20   materials exchanged during the protocol process?

21   A     That's correct.

22   Q     And let me just -- just so we walk through, there's a

23   total -- if we're looking at the demonstrative, 215, TRDX-

24   215, sir?

25   A     Yes, I'm with you.

Page 67

1   Q    So there's a total undisclosed debt number there.  And

2   then the description in the claim tracking spreadsheet

3   refers to undisclosed monthly payments of 24,000; do you see

4   that?

5   A    I do.

6   Q    So let me direct your attention two pages forward in

7   what we're referring to as a paging anomaly.  And let -- you

8   saw -- so let me direct your attention to the --

9        THE COURT:  Is that the anomaly, that your pages

10  are actually in order?

11       MR. SHUSTER:  They are.  Well, that might be

12  anomalous at this point.

13  Q    But it's two pages forward and it's the second page for

14  Exhibit 5 for the same loan number 7711.  Are you with me?

15  So you have to skip over Exhibit 5 pages for 1672 and get to

16  the Exhibit 5 page for 7711, which is TRDX-218.  You with

17  me?

18  A    Yes, I am.  Surprisingly I am.

19  Q    Okay.  So -- you are and you have been.  Okay.

20       THE COURT:  Now, I'm allowed to pick on him,

21  you're not, Mr. Arnoff.

22       MR. ARONOFF:  No, it's I'm surprised there.  He --

23  his instructions were fine.

24       MR. SHUSTER:  That makes it --

25  Q    Okay.  So in the red box, are those the undisclosed

1    debts that add up to the total undisclosed debt number

2    that's reflected in Exhibit 5 for that loan?

3    A    I -- it looks like it.  I haven't done the math, but --

4    Q    Yeah.

5    A    -- assuming this is the claim package extract --

6    Q    Right.

7    A    -- that would be where those debts could be summed and,

8    you know, counted to see if there were 11.

9    Q    Right.  So -- and that was my next question that that

10   information, the information that leads up to the aggregate

11   total undisclosed debt number, that was provided in the

12   claim package?

13   A    Yes.

14   Q    And as with Arnoff Exhibit 4, that's true for all of

15   the line items in Arnoff Exhibit 5, comes from the claims

16   training spreadsheet, the claim package or Exhibit 15?

17   A    Or the loan file.

18   Q    Thank you.  Let me -- let's -- and again, what did --

19   was Exhibit 5, as you described with Exhibit 4, and I think

20   you said that was true for all the exhibits, but for Exhibit

21   5, was that prepared by your team working under your

22   direction and supervision with Duff & Phelps?

23   A    Yes.

24   Q    And that's true for all the exhibits in your report,

25   and figures and tables?  I think I asked you this, but

Page 69

1   forgive me.

2   A    Yes.

3   Q    And what did you do to satisfy yourself as to the

4   accuracy of the information in Arnoff Exhibit 5?

5   A    Similarly we compared the information in any one of the

6   number of exhibits to the data that we had regarding all of

7   the information that had been exchanged.

8   Q    And is that true for all the exhibits and figures and

9   tables in your report?

10  A    Yes.

11  Q    Can you turn, Mr. Aronoff, to --

12          THE COURT:  Can -- before you turn that page --

13          MR. SHUSTER:  Please.

14          THE COURT:  -- can I just -- I might have missed

15  it, the grab that you have --

16          MR. ARONOFF:  Okay.

17          THE COURT:  -- on TRDX-218, the grab from the

18  claim package, do you see at the top it says, Rental

19  Worksheet 5/8/2015?  In the bottom box where you list all

20  the debts, yeah, right there.  Right -- see, it says Rental

21  Worksheet, the heading?

22          MR. ARONOFF:  Yes, I see it.

23          THE COURT:  Does everyone -- do you see that?

24          MR. ARONOFF:  Yes.

25          THE COURT:  I'm waiting for Mr. Shuster.

Page 70

1          MR. SHUSTER:  Yes.  No, I'm with --

2          THE COURT:  Oh, yeah.

3          MR. SHUSTER:  -- you, Your Honor.  Thank you.

4          THE COURT:  I'm just -- my question is what's this

5     a grab of?  This thing that I mean looking at on the bottom,

6     what's that a grab from?

7          MR. ARONOFF:  I mean --

8          THE COURT:  And when I say grab, I mean like a --

9          MR. ARONOFF:  Yeah, yeah, it's -- without putting

10    it in context, all I know is it appears to be a grab from a

11    document in the claim package for this loan where the

12    undisclosed debt --

13         THE COURT:  Was listed?

14         MR. ARONOFF:  -- of the borrower was listed in

15    relation to properties that they may -- there may have been

16    rental income associated with.  I just don't know.

17         THE COURT:  Okay.  Okay.  Thank you.

18    Q    I'm pretty sure I got this, but I'll ask it again.

19    Just to make clear, I think you testified to this, but were

20    all the exhibits attached to your report produced to the

21    plan administrator in Excel format?

22    A    Yes.

23    Q    Okay.  Let's look at going back to the text of the

24    actual report itself, if we could.  And I want to find

25    Exhibit 5.  That -- not Exhibit 5, forgive me, Figure 3,

Page 71

1   which is on Page 54.  It's on numbered Page 54 of the report

2   which is Page 59 of TRX-601.  Sorry, go to Page -- forgive

3   me.  Let's go to Page 56, breach findings based on total

4   (indiscernible) debt balances.

5   A     I'm there.

6   Q     So what is that meant to convey?

7   A     For the population of misrepresentation of debt breach

8   findings, the bars indicate the frequency with which a

9   breach finding exists within the bracketed dollar amounts.

10  So for example, if we look at the column that says 80,001 to

11  160,000 that means that there are 3,512 breach findings that

12  exist in that range.

13  Q     And is the information that's used to populate that

14  figure derived from the undisclosed debt balance data in

15  your Exhibit 5?

16  A     That's correct.

17  Q     So I now want to cover Exhibit 7, which is TRDX-221 in

18  the deck.  And then it's TRX-611, which is Exhibit 7 to your

19  report.

20  A     Okay.

21  Q     Again, is -- does all of the information in Exhibit 7

22  come from Exhibit 15 or the other materials you've

23  described, claims tracking spreadsheet, claims package or in

24  some instances the loan file?

25  A     Yes.

1  Q    And now let's look at Figure 7, which is at Page 69 of

2  your report.  When you're ready, please tell us what Figure

3  7 is meant to convey.

4  A    For the loans that contain a misrepresentation of

5  occupancy breach finding, this is a chart that shows the

6  frequency with which each type of supporting documentation

7  was the primary support for each one of those breach

8  findings?

9  Q    Those -- is it a summary of information that appears in

10  Exhibit 7 as well as Exhibit 15 and the claims tracking

11  spreadsheet?

12  A    It's -- as noted in the footnote, it's a summary of the

13  information in Exhibit 7, which in part was derived from 15.

14  So, yes.

15  Q    Okay.  Let's look at Aronoff Exhibit 8, which is TRDX-

16  223, which is TRX-612.  TRX-612 is Exhibit 8 to your

17  affirmative report?

18  A    Yes, it is.

19  Q    Does all the information but for the information in the

20  DTI threshold and threshold exceeded by columns appear on

21  the claim tracking spreadsheets?  And you have an example in

22  TRDX-223.

23  A    I'm sorry, what was the first column you referenced in

24  your question?

25  Q    The DTI threshold.

1    A    Well DTI threshold would have come from the reference

2    to the appropriate rep and warranty, so that would come from

3    15 as well.  If you looked at the rep and warranty that was

4    referenced there to see it provided a maximum DTI

5    requirement.  But yes, the only calculated field that would

6    not have been in the information that was exchanged, would

7    be the threshold exceed by.

8    Q    And otherwise the information comes from Exhibit 15 or

9    the other sources you've identified?

10   A    That's correct.

11   Q    Let us look at Figure 8 in the body of your affirmative

12   report, which appears at Page 73 of the report.

13   A    Yes.

14   Q    Which is, just for the record, Page 78 of TRX-601 and

15   what is that intended to convey?

16   A    Again, for the 11,399 excessive DTI breach findings

17   that are the subject of the report, it intends to show the

18   frequency with which certainly supporting documentation was

19   cited to support those breach findings.

20   Q    And what's the source of the information?

21   A    The exhibit we just looked at.

22   Q    Would you please turn to Page 75 of your report?  Page

23   80 of TRX-601.  What does that show?

24   A    For the DTI -- excessive DTI Mr. -- excessive DTI

25   breach findings, it shows how many times a breach finding

Page 74

1   was in the four ranges that are identified.

2   Q    And what's the source of that information?  Is it

3   Exhibit 15 and the other -- and the claims tracking

4   spreadsheet?

5   A    Directly it was created from Exhibit 8, which had the

6   sources we discussed.

7   Q    I want to skip to Exhibit 17, which is, in the deck

8   would be TRDX-234.  You have to skip ahead a number of pages

9   to get there.  What is Exhibit 17?

10  A    Is it in this Line 2 Binder?  Can I look at it?

11  Q    Yes, it's Volume 2, please.  And I'm sorry.

12  A    Okay.

13  Q    It's Volume 2, Mr. Aronoff, TRX -- the tab TRX-621,

14  that's the exhibits.

15  A    Um hmm.  Okay.  This is a list of -- I know it's an

16  excerpt, but this was meant to show the information with

17  respect to misrepresentation of income breach findings

18  that's listed in the header columns to allow a comparison of

19  those features with respect to loans that had been accepted

20  by the plan administrator pursuant to the protocol, and

21  those misrepresentation of income breach finding

22  characteristics with respect to loans that were still in

23  dispute.  And this helped to support the data by which I, in

24  the body of the report, discussed that topic.

25  Q    What is the source of the information in Exhibit 17?

Page 75

1   A    Again, except for the calculated monthly percentage

2   difference field, it was the same data sources that we

3   discussed previously.

4            THE COURT:  Can I -- I need to stop so I'll make

5   sure I understand this.  So the slide that I'm looking at

6   are lists of loans with breaches that the plan administrator

7   accepted?

8            MR. ARONOFF:  The red ones are accepted.

9            THE COURT:  Red ones?  So up on the screen here

10  they're all red, right?  So these are all -- so Aronoff

11  Exhibit 17 is a loan -- is a claim loan that was accepted by

12  the plan administrator, right?

13           MR. SHUSTER:  That -- there is --

14           MR. ARONOFF:  Yes.  And then if you go to the --

15           THE COURT:  In TRDX-233 is a description of loan

16  ending in, I can't tell if that's Q114 or 0114, right?  And

17  that's the top loan on TRX-621, borrower, self-employed

18  monthly income 35,000 versus monthly income according to

19  (indiscernible) 29,000, right?  No?

20           MR. ARONOFF:  I'm not on the same line as you.

21  I'm sorry.

22  Q    If you look at -- you may be, Mr. Aronoff, if you were

23  looking at TRX-233, and I may have directed you to 234.

24  A    You did.  Okay.

25           THE COURT:  It's TRDX-233.

Page 76

1              MR. SHUSTER:  DX-233.  My apologizes?

2              THE COURT:  Right?

3    Q    If you look at TRDX-233 --

4    A    I'm --

5    Q    -- you can see Her Honor is referencing Loan 0114 which

6    is an extract from Exhibit 17, TRX-621, and is the loan

7    that's identified on Line 1 of the exhibit, correct?

8    A    Yes.

9              THE COURT:  Okay.  And my question is that -- I'm

10   just trying to follow what the point of this is.  You -- the

11   question was something relating to that -- well the title

12   says it rejected misrepresentation of income breach findings

13   with the same characteristics as accepted misrepresentation

14   of income breach findings.  So the slide that I'm looking at

15   is all accepted ones?

16             MR. ARONOFF:  That --

17             THE COURT:  So what -- I don't -- I'm having a

18   hard time matching the title to anything.

19             MR. SHUSTER:  Mr. --

20             MR. ARONOFF:  I understand, Your Honor.

21             THE COURT:  Okay.

22             MR. ARONOFF:  If I can explain it?

23             THE COURT:  Well, let --

24             MR. SHUSTER:  Please.

25             THE COURT:  You want to ask a question?

Page 77

1    Q     Would you take us through TRX-621, Mr. Aronoff,

2    sufficiently to explain what Exhibit 621 shows and how it

3    does show?

4    A     Yes.  If you turn to Page 8 of 863 in that exhibit, you

5    can see the end of the 199 accepted loans and the beginning

6    of all of the rejected loans that follow, that constitute

7    the rest of the 863 pages.  So the accepted loans were

8    listed first, and that would allow anyone with this Excel

9    spreadsheet to sort by any of these categories to compare

10   accepted loans with rejected loans.

11           So this included both the accepted -- you can't

12   tell from the first page because it's all accepted, but this

13   -- the entire exhibit included all the accepted and rejected

14   loans that were the subject of the report and would allow

15   you to sort and filter Excel to compare any subset of those

16   accepted or rejected loans with respect to misrepresentation

17   of income.

18           THE COURT:  Okay.  So stated differently, though,

19   what you're saying is that I have a pile of loans and I can

20   fish out from the pile an accepted loan and a rejected loan.

21   And I can find an accepted loan that has a misrepresentation

22   of income of 20 percent based on a tax return, and I can

23   find a rejected loan that has a misrepresentation income of

24   20 percent based on a tax return?

25           MR. ARONOFF:  And attempt to see if there is any

Page 78

1   discernible difference as to why it was accepted or not

2   accepted.

3            THE COURT:  Okay.  But this chart, all it does is

4   sort -- it doesn't do that -- it doesn't do that, it just

5   collects them; is that right?

6            MR. ARONOFF:  That's correct, Your Honor.  This

7   provided the data that would enable, that enabled me and

8   enable -- and would enable the plan administrator to sort

9   the Excel spreadsheet in which this exhibit was provided to

10  engage in the --

11           THE COURT:  Okay.

12           MR. ARONOFF:  -- analysis you just described.

13           THE COURT:  Okay.

14  Q    And just to be clear, you offer an opinion in your

15  report, do you not, that the loans that are identified on

16  Exhibit 17, as having been rejected, do in fact share common

17  characteristics with the loans identified on Exhibit 17 as

18  having been accepted?

19  A    I'd offer that observation.

20  Q    That's why you're setting them forth in Exhibit 17 to

21  begin with?

22  A    That's correct.  There's discussion about my inability

23  to discern meaningful differences in different categories,

24  and so I provided the data that would enable anyone reading

25  the report, who has the Excel spreadsheet, to check my

Page 79

1   analysis and see if they disagree based on the same basis

2   for which I made my opinion -- my observations.

3   Q    And is --

4            THE COURT:  But, I'm sorry.  But without actually

5   looking at the files, I can't tell whether there's a

6   meaningful difference or not, right?  You're telling me that

7   your expert opinion is that there is no difference between a

8   loan with characteristics one through five that is accepted,

9   and a loan with characteristics one through five that is

10  rejected?

11           MR. ARONOFF:  Simply based on looking at these

12  data points.  I've -- I'm -- so to the extent someone's

13  saying, you can't use tax returns ever, and we have a number

14  of incidents of misrep of income breach findings that are

15  based on tax returns that we call into question whether that

16  was true for those loans.

17           THE COURT:  But the fact that -- okay.

18           MR. ARONOFF:  It's not making a final

19  determination.  I agree with you, you have to refer, as

20  we've said, to the totality of the file on each loan to make

21  the ultimate determination.

22           THE COURT:  Thank you.

23  Q    Mr. Arnoff, please turn to Exhibit 18 in your expert

24  report, which is TRX-622.

25  A    Yes, I'm there.

Page 80

1    Q    So again, this is -- well why don't you describe

2    (indiscernible).

3    A    Similar to the prior exhibit, this was an exhibit on a

4    breach finding by breach finding basis that would enable one

5    to compare the statistics cited in the spreadsheet between

6    rejected misrep of debt breach findings and accepted misrep

7    of debt breach findings.

8    Q    And again, what you did is you looked at certain

9    characteristics of accepted loans and you looked at certain

10   characteristics of rejected loans.  And the rejected loans

11   on which you made a finding there was a breach, right?

12   A    Yes.

13   Q    And you concluded that in your opinion, based on your

14   expertise you cannot distinguish between the accepted and

15   rejected loans, at least as to these -- the characteristics

16   you identify here?

17   A    Based on these characteristics -- the observation of

18   these characteristics only, that's correct.

19   Q    And was TRX-622 -- going back to TRX-621 and for that

20   exhibit, 622, 623 and 624, did what you say earlier about

21   the preparation and the exhibits of your reports apply here

22   too?

23   A    Yes, all the same database, all the same, you know,

24   team working with Duff and all the same careful

25   consideration to try and avoid error.

Page 81

```
 1              MR. SHUSTER:  Okay.  Your Honor, may I have a

 2    couple of minutes?

 3              THE COURT:  Of course.

 4              MR. SHUSTER:  Five minutes (indiscernible).

 5              THE COURT:  Okay.  I might, if you don't mind, I

 6    might stay put.

 7              MR. SHUSTER:  Of course.

 8         (Pause)

 9              MR. SHUSTER:  Your Honor, that concludes the

10    Trustees' direct examination of Mr. Aronoff.

11              THE COURT:  Congratulations, Mr. Shuster.

12              MR. SHUSTER:  Thank you.

13              THE COURT:  Okay.  So are you folks ready?

14              MR. DAVIS:  Yeah.

15              THE COURT:  Who am I going to --

16              MR. DAVIS:  I mean, we could take a few minutes.

17    I'm going to do it.  If you want to take a few minutes, we

18    can --

19              THE COURT:  Sure.  You're going to --

20              MR. DAVIS:  -- get our binders up and circulated.

21              THE COURT:  -- go first, Mr. Davis?  Okay.  So

22    just help Mr. Aronoff, in terms of his binder situation.  If

23    you're going to go back to all of these binders or have new

24    binders, let's just get him set up.  All right?

25              MR. DAVIS:  We have a new set of binders.
```

1              THE COURT:  I'm delighted.  So let's -- why don't

2    we take a good ten minutes to get established and if it

3    helps the restroom through the door is available.

4         (Recess)

5              THE COURT:  Please, have a seat.  There's a lot of

6    books.

7              MR. DAVIS:  A lot of books.  We're going to try to

8    move quickly, though, Your Honor.

9              THE COURT:  Okay.  I'm ready if you  --

10             MR. DAVIS:  All right.

11             THE COURT:  -- or do you want to wait for the

12   books?

13             MR. DAVIS:  We do have to pass out the books, I

14   think.

15             MR. ARONOFF:  Thank you so much.

16        (Counsel confer)

17             THE COURT:  Okay.  I'm ready when you are, Mr.

18   Davis.

19   CROSS EXAMINATION OF JAMES ARONOFF

20   BY MR. DAVIS:

21   Q    Good afternoon, Mr. Aronoff.

22   A    Good afternoon.

23   Q    Mr. Aronoff, you don't know if you reviewed any loan

24   file in its entirety in preparation to this case, correct?

25   A    That's correct.

Page 83

1   Q    And yet you offered an expert opinion in your opening

2   report in this case that every single one of the 76,044

3   loans that are the subject of your report had one or more

4   breaches of representations and warranties made by Lehman;

5   is that correct?

6   A    Yes.

7   Q    And you also offered an opinion that as to each of

8   these breach claims, on every one of those loans the AMA

9   requirement was satisfied; is that right?

10  A    Yes.

11  Q    And you didn't qualify that in your reports of any kind

12  of error rate; is that correct?

13  A    That's correct.

14  Q    So on the 76,044 loans that were the subject of the

15  opening report, your breach rate was a hundred percent when

16  you issued your report; is that correct?

17  A    All of the loans on which I offered an opinion were

18  found to have breaches, but not all of the loans that were

19  reviewed, pursuant to the forensic loan review, contained

20  breaches.

21  Q    Okay.  Let's take a look at TRDX-163.

22  A    Which binder is that in?

23  Q    You'll see it on the screen, actually.  I believe it's

24  Tab 8 of your small binder, if you want to see it.  I'm not

25  going to dwell on it long.

Page 84

```
 1    A     Okay.

 2    Q     Do you want to see it?

 3    A     No.  I --

 4    Q     So this is the summary of opinions that you put up in

 5    the beginning of your testimony the other day, correct?

 6    A     Yes.

 7    Q     So even though this summary of opinions seems to repeat

 8    the opinion we just discussed, I think you softened that

 9    position a little bit and you said you agreed with Mr. Grice

10    on about 30 loans; do you remember that?

11    A     I agreed that his analysis, upon further review of the

12    -- I agreed that the loans contained, in some cases, the

13    errors that were identified by Mr. Grice in his analysis.

14    Q     Okay.  So you now agree that the loan population that

15    you looked at does not have a hundred percent

16    (indiscernible); is that right?

17    A     Not necessarily.

18    Q     You disagree with that?

19    A     The assessment was made with respect to particular

20    breach findings so that if I agree that a particular breach

21    finding contained a mistake, and that loan had other breach

22    findings, that loan would not have been removed from the

23    population, only the breach finding would have been removed

24    from the population.

25    Q     So you don't recall that as to about 65 of these loans
```

Page 85

1    you agreed there was no valid breach anymore after reviewing

2    Mr. Grice's work?

3    A    I don't recall that number.  I thought it was about

4    half of that.

5    Q    Okay.  But you do recall that for some number of loans

6    you now agree there is now no valid breach, correct?

7    A    I agree that the -- with respect to those loans that

8    there was a mistake made in the process with respect to the

9    threshold fact that was the basis for that breach.  And

10   since that fact was incorrectly identified as the basis for

11   the breach, the breach finding, and therefore the breach, no

12   longer existed.

13   Q    So are you saying there still may be breaches on those

14   loans?

15   A    If there are, they weren't identified or claimed in the

16   process and they weren't the subject of my report.

17   Q    Now since you submitted your affirmative report in the

18   case, you issued two more, a rebuttal and reply; is that

19   right?

20   A    Yes.

21   Q    Mr. Grice issued some reports, correct?

22   A    A rebuttal and reply and an affirmative, yes.

23   Q    And you had some back and forth with Mr. Grice about

24   loans in those reports; is that right?

25   A    Yes.

Page 86

1    Q    Mr. Castro issued some reports; do you know that?

2    A    I do.

3    Q    You had some back and forth in -- with Mr. Castro about

4    some loans?

5    A    That's correct.

6    Q    And I took your deposition over a few days; do you

7    remember that?

8    A    I do.

9    Q    And we talked about some loans during your deposition?

10   A    We did.

11   Q    You've been attending parts of this trial I think,

12   right?

13   A    I have.

14   Q    You saw the opening statements?

15   A    Some of those opening statements.

16   Q    You saw -- you've seen some of the evidence come in?

17   A    Yes.

18   Q    You've seen Mr. Trumpp testify, I think?

19   A    Very little of his testimony.

20   Q    You saw Mr. Grice testify?

21   A    Most of his testimony.

22   Q    You've been responding to some of the Court's questions

23   about loans just over the last few days, right?

24   A    Yes.

25   Q    And yet nothing you've seen in this litigation so far

Page 87

1    suggests the 100 percent or a 99 percent breach rate is

2    overstated; is that right?

3    A    I didn't offer a breach rate in any of my documents.

4    I've offered opinions on each individual loan and each

5    individual breach finding.  I never opined as to a rate.

6    Q    Okay.

7              THE COURT:  You're not talking this -- you're

8    talking past each other right now.  When Mr. Davis is

9    talking about breach rate, I believe you're referring to the

10   fact that you were asking Mr. Aronoff if he stands by his

11   I'll call it opening opinion that 100 percent of the loans

12   that have been presented by the Trustees for this trial have

13   a breach with -- and an AMA, right?  Isn't that what you're

14   asking?

15             MR. DAVIS:  That's the question, Your Honor.  Yes.

16             THE COURT:  Okay.  So let's not go off on a track

17   of breach rate, that's a different issue.  Okay?  So with

18   that in mind, ask the question one more time, Mr. Davis.

19             MR. DAVIS:  I can't say it any better than you

20   did, Your Honor.

21             THE COURT:  Well --

22   Q    So after everything you've seen, after everything

23   you've seen in this litigation, do you stand by your opinion

24   that every loan and every breach that was submitted by the

25   Trustees in this case were valid, save for the 30 or so that

Page 88

1    you changed your mind on with respect to your back and forth

2    with Mr. Grice?

3    A     To the extent the threshold fact is accurate, yes.

4    Q     So Mr. Aronoff, to support your opinions in this case,

5    you say you're bringing to bear your experience in the

6    residential mortgage industry; is that right?

7    A     Among other industries, yes.

8    Q     Okay.  And to support your opinions in this case you

9    say you're also bringing to bear your experience in the

10   securitization industry, to the extent it relates to RMBS,

11   right?

12   A     Yes.

13   Q     And to support your positions in this case you also say

14   you're bringing to bear your experience in the cottage

15   industry that's developed, post financial crisis, with

16   respect to forensic reviews of loan pools, right?

17   A     Well, part of my statement I was referring to the

18   cottage industry in the context of adjectives.  The industry

19   isn't defined that way in my mind, it's the forensic loan

20   review industry.

21   Q     And you mean by that industry that subsequent to the

22   financial crisis a large number of litigation matters

23   related to putback claims required not only expertise with

24   residential mortgage lending, but expertise in the conduct -

25   - in the context of forensic loan reviews; is that right?

1   A    As the sole purpose of their -- as the sole business

2   purpose of any particular entity, that's correct.

3   Q    And in your opinion, the plan administrator's loan

4   review dramatically deviated from the standards and practice

5   in this cottage industry of forensic loan reviews, right?

6   A    I think that the process as I understand it deviated

7   from my understanding of custom and practice with respect to

8   forensic loan reviews.

9   Q    You opine in this case that Mr. Grice conducted his

10   review in a manner that's inconsistent with guidelines

11   provided by the courts, correct?  That was your opinion?

12   A    In some respects, yes.

13   Q    And you believe you're qualified to offer the opinion

14   that Mr. Grice conducted his review in a manner inconsistent

15   with guidelines provided by the courts.  You believe you're

16   qualified to give that opinion; is that right?

17   A    To the extent Mr. Grice engaged in activities that

18   would be conducted in the course of a forensic loan review,

19   and to the extent courts have provided guidance, not as

20   judicial precedent, because I'm not providing legal

21   opinions, but as a description of industry custom and

22   practice or as a confirmation of the recognition of industry

23   custom and practice, yes, I stand by that opinion.

24   Q    Okay.  But I didn't ask you to the extent, I asked you

25   whether you think you're qualified to opine that Mr. Grice

1    conducted his review in a manner inconsistent with

2    guidelines provided by the courts.  Are you qualified to

3    give that opinion?

4    A    In the context, as I just qualified it, yes.

5    Q    And you feel it's your 30 years of experience in the

6    residential mortgage lending industry, the securitization

7    industry, to the extent that it relates to RMBS and the

8    cottage industry of forensic loan reviews that qualifies you

9    to offer that opinion, right?

10   A    I'm not sure I understand why you keep repeat the

11   cottage industry, so I don't know how to answer that

12   question.

13   Q    Mr. Aronoff, you're trained as a lawyer, correct?

14   A    I went to law school and practiced law.

15   Q    But you're not offering a legal opinion in this case,

16   as I think you just said, right?

17   A    That's correct.

18   Q    Specifically, you're not offering a legal opinion about

19   the representations and warranties at issue in this case,

20   right?

21   A    That's correct.  I'm offering the commercial

22   understanding.

23   Q    And you haven't practiced law since 1987, right?

24   A    That's correct.

25   Q    On the other hand, you offered an opinion in this case,

1    in your report, concerning whether the plan administrator or

2    Mr. Castro are interpreting materiality standard, meaning

3    AMA, in a manner consistent with relevant case law, didn't

4    you?

5    A    I don't believe I did so.

6    Q    Okay.  Would you turn now, you'll find a binder in

7    there which is your reply report, it has your rebuttal

8    report in it, it's in the report's binder.  And if you would

9    turn to Page 77.  Paragraph 51 you write, "As I noted in the

10   Aronoff affirmative report --"

11           THE COURT:  Hold on a second, Mr. Davis.

12           MR. DAVIS:  I'm sorry.

13           THE COURT:  Mr. Aronoff's --

14           MR. DAVIS:  I'm sorry.

15           THE COURT:  -- getting his place.

16           MR. DAVIS:  I'm sorry.

17           MR. ARONOFF:  Okay.  Thank you, I'm with you.

18   Q    As I noted in the Aronoff report, "With respect to its

19   own repurchase claims, the plan administrator interpreted

20   the materiality standard in a manner consistent with the

21   Trustees' interpretation, industry practice and the relevant

22   case law in which directly contravenes the opinions

23   expressed by Mr. Castro in this report."  Do you see this?

24   A    I do.

25   Q    Is that your opinion?

Page 92

1    A    I do see that.

2    Q    And when discussing two of the key representations in

3    the case, the no default representation and what you call

4    the no untrue statement representation.  You opine that the

5    language of these two representations is clear and does not

6    require explanation by the courts, correct?

7    A    From the perspective an industry participant, and in my

8    experience, that's correct.

9    Q    And when responding to Mr. Castro's opinion on AMA, you

10   said you don't believe the Court needs Mr. Castro's help to

11   understand the meaning of the contract clauses that are the

12   subject in Mr. Castro's report, right?

13   A    I don't recall that specifically.

14   Q    And if you'd look at Page 66 of your rebuttal report.

15   Paragraph 124, are you with me?

16   A    I see it.

17   Q    "As explained below the contract clauses that are the

18   subject of the Castro report are written in plain English.

19   They contain little, if any, industry jargon.  I do not

20   believe the Court needs Mr. Castro's help to understand what

21   these clauses mean."  Is that your opinion, sir, in this

22   report?

23   A    Yes.

24   Q    Please take a look at Appendix C now to your opening

25   report.  So if you'd flip back to your opening, you should

Page 93

1    find the appendixes in the back of your report.  And if you

2    -- well first of all, do you recognize this as Appendix C to

3    your opening report?

4    A    It appears to be.

5    Q    Okay.  And if you look at -- well and in Appendix C,

6    right, you tried to set out all the material on which you

7    relied to issue your opinion, correct?

8    A    In addition to the exhibits, yes.

9    Q    Okay.  Now, if you turn to Page 29, you list here,

10   right, starting on that page, a number of cases which you

11   relied on to form your opinion in this matter, right?  A

12   number of legal cases?

13   A    Yes.

14   Q    And your subsequent two reports, your rebuttal and

15   reply reports also cite a number of legal cases, correct?

16   A    That's correct.

17   Q    And you rely on those legal decisions to support your

18   opinions in this case, right?

19   A    Yes.

20   Q    Mr. Aronoff, at the time the protocol was put in place,

21   you were the boss of the Duff & Phelps team, right,

22   responsible for managing the Trustees' loan review?

23   A    The forensic loan review portion, that's correct.

24   Q    And you had significant input into the design  of the

25   Trustees' loan review during the protocol, correct?

Page 94

1    A    Can I hear that question again, please?

2    Q    You had significant input into the design of the

3    Trustees' loan review --

4    A    Yeah.

5    Q    -- during the protocol?

6    A    Yes.

7    Q    Now, when this estimation hearing or proceeding began,

8    you were no longer with Duff & Phelps; is that right?

9    A    I'm not sure I know when this estimation proceeding

10   began.

11   Q    When did you leave Duff & Phelps?

12   A    The end of December 2015.

13   Q    And when the Trustees retained you for purposes of this

14   estimation proceeding, you were with Baker Tilly, correct?

15   A    Yes.

16   Q    And the Trustees could have hired anyone with

17   experience in RMBS origination or repurchase claims to

18   independently evaluate the breach claim submission process,

19   right?

20   A    I don't know what they knew or didn't know.  I assume

21   so.

22   Q    But they decided to hire you to give that opinion,

23   correct?

24   A    Apparently.  Yes.

25   Q    Mr. Grice (sic), please turn to Page 7 of your reply

1    report now, so that should be the last report in your --

2    A    Okay.  You want me to do it or Mr. Grice?

3    Q    Oh, I'm sorry.  Mr. Aronoff.

4    A    You asked Mr. Grice.

5    Q    I knew I was going to do that.

6              THE COURT:  Touché, Mr. Aronoff.

7              MR. DAVIS:  I knew I was going to do that.

8              THE COURT:  You even made Mr. Shuster smile.

9              MR. DAVIS:  It was bound to happen.

10   Q    And if you would, just take a moment to review

11   Paragraph 8.

12   A    On Page 7?

13   Q    Yep, Page 7 of your reply.

14   A    Oh, reply.  Sorry, I'm in the wrong report.

15   Q    That's okay.

16   A    Okay.

17   Q    So in your review, as expressed in this report, "It's

18   absurd to posit, as Mr. Grice does, that the testifying

19   expert cannot manage and have significant input into the

20   design and implementation of the loan review being

21   conducted, in order for such expert to formulate and support

22   the opinions to be offered to the Court."  Is that right?

23   A    I stand by that statement.

24   Q    And your view, "Requiring an expert with no firsthand

25   knowledge of the underlying work would turn the industry

1    standard for forensic loan review on its head."  Is that

2    right?

3    A    Yes.

4    Q    And the industry we're talking about here is the

5    forensic loan -- RMBS forensic loan review industry, right?

6    A    Well, I think it's more than that.  I talk about a

7    forensic review and -- so that could touch on the forensic

8    review industry.  It would also touch on the context in

9    which the forensic review is conducted, that is to determine

10   whether or not there is a breach of representation and

11   warranties in an RMBS securitization, which in turn depends

12   on knowledge and experience, to a large extent, in

13   residential lending.  So I don't think it's limited to the

14   forensic loan review industry.

15   Q    Now, in Paragraph 9 you go on to say, "It is my

16   understanding that courts have criticized experts with

17   limited to no involvement with the underlying loan review."

18   That's your opinion, right?

19   A    That's my observation.

20   Q    You get this understanding you reference here from your

21   reading of some court opinions, don't you?

22   A    As well as participation in the industry as an expert

23   witness.

24   Q    In fact, you believe that your personal involvement in

25   the loan review process during the protocol should lead the

Page 97

1   Court to conclude that you're actually better positioned to

2   evaluate the Trustees' loan review process than Mr. Grice or

3   Mr. Castro, correct?

4   A    Certainly better than Mr. Grice or Mr. Castro to

5   evaluate the Trustees' loan review process, yes.

6   Q    Now, you told me, back in November, that you have no

7   way --

8            THE COURT:  I'm sorry, are -- were you just making

9   a distinction between your loan review process and the

10  Trustees' loan review process?

11           MR. ARONOFF:  No, no.  I was -- I was -- I was

12  just commenting that I think I was in a better position to -

13  -

14           THE COURT:  Evaluate the process (indiscernible).

15           MR. ARONOFF:  -- evaluate the process than Mr.

16  Grice or Mr. Castro was.

17           THE COURT:  You think you were in a better

18  position to evaluate the process that you designed than Mr.

19  Castro or Mr. Grice was?

20           MR. ARONOFF:  Evaluate whether or not there were

21  breach findings with respect to the loans.

22           THE COURT:  No, that's not Mr. Davis's question.

23  So go ahead, Mr. Davis.

24  Q    Now, you told me, back in November, that you have no

25  understanding, one way or another, whether the Court is

Page 98

1    likely to make a finding on the quality of the Trustees'

2    loan review process, right?

3    A    I don't recall saying that.

4    Q    Do you have an understanding, sitting here, whether the

5    Court is likely to make a finding on the quality of the

6    Trustee's loan review process?

7    A    I don't know one way or the other.

8    Q    So you have no understanding then whether the Trustees'

9    loan review process, that you helped design and supervise,

10   is essentially on trial in this proceeding?

11   A    I would agree with that.

12   Q    You agree with that?

13   A    And you don't believe you have a vested interest in the

14   outcome of this matter?

15   A    I don't have a vested interest in the outcome of this

16   matter, no.

17   Q    Mr. Shuster asked you at your compensation the other

18   day; do you remember that?

19   A    Yes.

20   Q    You said you were being compensated hourly, right?

21   A    That's correct.

22   Q    In fact, I think it's Baker Tilly that's being

23   compensated for your work in this matter; is that right?

24   A    That's absolutely right.

25   Q    Okay.  And Baker Tilly's charging your time at an

Page 99

1   hourly rate of $985; is that correct?

2   A    I believe so.

3   Q    When I asked you in October at your deposition how much

4   you had been paid in connection with your work on this

5   proceeding, you told me you had no idea, right?

6   A    That's correct.

7   Q    And you could not give me even a ballpark estimate,

8   right?

9   A    That's correct.

10  Q    And in October you also could not tell me how many

11  hours you'd work on this estimation proceeding, right?

12  A    That sounds right.

13  Q    Now, you're fully responsible for this engagement, as

14  far as Baker Tilly is concerned, right?

15  A    From an administrative standpoint, that's correct.

16  Q    But when I asked you, in November, your second

17  deposition, you couldn't tell me how much Baker Tilly has

18  billed the Trustees for its work on this engagement,

19  correct?

20  A    That's correct.

21  Q    And when you I asked you, in November, how many hours

22  you believed for this engagement, you could not tell me,

23  except to say it was more than last time, right?

24  A    Yes.

25  Q    Now, in December 2014 you testified at a hearing in

Page 100

1    this bankruptcy case; do you recall that?

2    A     I do.

3    Q     Do you recall, prior to that hearing, you submitted a

4    declaration in connection with a motion leading to the

5    hearing related to the loan review protocol?

6    A     Yes.

7    Q     Okay.  I'm going to ask you to go to Tab 2 of your

8    small binder.  You should find the declaration in there.

9    It's PA-71.

10   A     I am there.

11   Q     Do you recall this declaration?

12   A     Not specifically, but looking at it it looks like what

13   I best remember.

14   Q     Is that your signature on the --

15   A     It is.

16   Q     It is?  And this is a declaration made under oath,

17   right?

18   A     Yes.

19   Q     So if you look at Page 5 of this declaration, you

20   stated here that the loan review protocol that was being

21   proposed by Lehman was "commercially unreasonable,

22   cumbersome and unnecessarily bureaucratic."  That's what you

23   said in this declaration, right?

24   A     Yes, it is.

25   Q     And you also the proposed protocol, "ignores well-

Page 101

1    established industry custom and practice with respect to the

2    administration of putback claims," right?

3    A    Yes.

4    Q    But when I asked you about this in your deposition you

5    told me you didn't have an opinion whether this protocol

6    process that occurred, the process in which you were

7    involved, was in fact commercially unreasonable, cumbersome

8    and unnecessarily bureaucratic; is that right?

9    A    I don't know if that's exactly what I said.  I think I

10   said I wasn't asked to provide that opinion for purposes of

11   this engagement.

12   Q    Mr. Grice, oh boy, I keep doing it.  Mr. Aronoff, you

13   don't know who, on behalf of the Trustees, made the final

14   decision about which loan review firms to select, correct?

15   A    My understanding is that the Trustees did not make the

16   final determination as to which loan review firms to use in

17   connection with the forensic review.

18   Q    Mr. Grice, at your deposition --

19          THE COURT:  Not Mr. Grice.

20          MR. DAVIS:  Oh, gosh.

21   Q    Mr. Aronoff, I'm sorry, at your deposition did I ask

22   you the following question and did you give me the following

23   answer:  "Do you know who made the --"

24   A    Is it --

25          THE COURT:  Yeah, let's have a page and line

Page 102

1    reference.

2            MR. DAVIS:  Sorry.  Page 68, Line 7 to 9.

3            THE COURT:  Thank you.

4            MR. ARONOFF:  Which deposition?

5            MR. DAVIS:  This is your first deposition.

6    Q    "Do you know who made the final decision about which

7    firms to select?"  Answer:  "I don't."  Did I ask you that

8    question and did you give me that answer?

9    A    I see the question and I see the answer.

10   Q    Now, you testified here in court on Tuesday, that for

11   occupancy claims --

12           THE COURT:  I'm sorry.  Let's just -- that -- was

13   -- is the answer to Mr. Davis's question yes or is the

14   answer only that you see the words on the page?

15           MR. ARONOFF:  I see the words on the page.  The --

16   I thought the question went to who at Duff & Phelps made the

17   final decision.  The -- and so that's the answer I gave.  I

18   did not -- it wasn't me, I didn't know if it was another

19   member of the Duff & Phelps team.  But my understanding was,

20   and continues to be that Duff & Phelps engaged the firms to

21   conduct the loan reviews.

22           THE COURT:  Okay.  Thank you.

23   Q    Now, you testified here in court on Tuesday that for

24   occupancy claims, loan reviewers were instructed to look for

25   evidence of extenuating circumstances; do you recall that

Page 103

1    testimony?

2    A    Yes.

3    Q    And if we could take a look at TRDX-178, which is --

4    it's in Tab 10 of your binder, it's your slide that's up on

5    the screen.  The second bullet on this slide references

6    specific instructions for certain breach categories; do you

7    see that?

8    A    Yes.

9    Q    And that's reference specific instructions for loan --

10   provided to the law review firms for certain breach

11   categories, correct?

12   A    Yes.

13   Q    Yet when I took your deposition you told me that you

14   did not provide the loan review firms with a written set of

15   policies and procedures pursuant to which those firms would

16   identify and support the breach findings under the protocol

17   from a substantive standpoint; is that right?

18   A    I believe that's correct.

19   Q    And you said that to your knowledge there was no

20   standardized set of written guidelines issued to the loan

21   review firms by which they would be instructed to identify

22   and support the breach findings, correct?

23   A    There was no standardized set of guidelines, that's

24   correct.

25   Q    In fact, you said, "It wasn't as Duff & Phelps gave the

Page 104

1    loan review firms a policies and procedures or instruction

2    manual to tell them how to run their loan reviews," correct?

3    A    That's correct.

4    Q    Now, Mr. Aronoff, you had no involvement at all in the

5    process of gathering the loan files at issue here, right?

6    A    I'm sorry, can I hear the question again?

7    Q    You had no involvement at all in the process of

8    gathering the loan files that are at issue in this case?

9    A    That's accurate.

10   Q    Okay.  And you had no role in deciding what documents

11   would be requested from the servicers under the protocol,

12   correct?

13   A    Yes.

14   Q    And you have no idea whether Duff & Phelps requested

15   origination or servicing files from any source other than

16   the servicers, correct?

17   A    Yes.

18   Q    And you don't know whether Duff & Phelps requested

19   copies of the mortgage loan files from the Trustees, right?

20   A    That's correct.

21   Q    And you don't know whether the Trustees ever issued

22   some subpoenas for the production of loan files, right?

23   A    Right.

24   Q    And you don't know whether the Trustees asked this

25   Court for any assistance in gathering loan files, correct?

Page 105

1   A    That's correct.

2   Q    You don't know how the loans that were sent to the loan

3   review firms were chosen; is that right?

4   A    That's not entirely correct.

5   Q    Okay.  Page 160 of --

6        THE COURT:  Deposition, I believe.

7   Q    -- of your deposition transcript.  I'm sorry.

8   A    Same one?

9   Q    160, first deposition transcript, 160, Line 22.  Did I

10  ask you this question, and did you give the answer?

11  Question:  "Do you know how the loans that were sent to the

12  loan review firms were chosen?"  Answer:  "No."

13  A    I -- I'm sorry, I must be in the wrong place.

14  Q    It's Page 160.

15  A    Right.

16  Q    Line 22, towards the bottom of that page.

17  A    Okay.  I see that.

18  Q    Did I ask you that question and did you give that

19  answer?

20  A    Yes.

21  Q    And you don't know how the loan review firms had access

22  to the loan files they were assigned to review, right?

23  A    No.

24  Q    Now, Mr. Grice, Duff & -- Mr. Aronoff --

25       THE COURT:  This is very interesting, Mr. Davis.

Page 106

1                MR. DAVIS:  I know, there's something going on.

2                THE COURT:  Can we get some therapy overnight

3      tonight?

4                MR. DAVIS:  Or medication, one or the other.

5      Q    Now, Duff & Phelps had two levels of QC, correct?

6      A    Yes.

7      Q    They were called QC1 and QC2?

8      A    That's correct.

9      Q    Okay.  Would you turn to Page 22 of your opening

10     report, please?  Are you there with me?

11     A    Yes.

12     Q    Okay.  And is this where you describe the Duff & Phelps

13     QC process in your report?

14     A    I definitely described it here, I don't know if this is

15     the only place I described it.

16     Q    Okay.  Let me direct your attention to the sentence

17     that's about two-thirds of the way down.  You -- actually a

18     couple of sentence -- you said here, "When the breach

19     findings and claim submission packages were received by Duff

20     & Phelps, the QC1 team examined these materials.  The QC1

21     team determined whether the supporting documents and the

22     description of the breach findings supported the cited

23     breaches, reviewed the descriptions of the breach findings

24     to assure they clearly articulated the basis or bases for

25     the breach findings."  Did I get that right?

Page 107

```
 1   A    Yes.

 2   Q    Okay.  So let's break that down for a minute. First of

 3   all, it's not really true that the QC1 team reviewed all the

 4   breach findings, is it?

 5   A    I believe they did.

 6   Q    Well Mr. Esses has testified that certain missing

 7   document claims were not sent to the QC team.  Is he

 8   mistaken?

 9   A    I don't know.

10   Q    Now, if he's right that certain missing document claims

11   were not QC'ed, that might help explain why the plan

12   administrator found a lot of the documents that the Trustees

13   said were missing, correct?

14   A    I don't know.  I don't know that to be the case.

15   Q    Now, you say here that, "The QC1 team reviewed the

16   supporting documents and the descriptions of the breach

17   findings," right?

18   A    Yes.

19   Q    But the QC1 team did not review the underlying loan

20   files as part of their process, correct?

21   A    That's correct.

22   Q    You didn't want the QC1 team poking around in the loan

23   files, right?

24   A    Not unnecessarily, no.

25   Q    Now, yesterday Mr. Shuster spoke with you a bit about
```

Page 108

1   evidence types.  Do you remember there was a slide up there

2   that we had a list of evidence types?

3   A    I do.

4   Q    And at the end of that discussion he asked you whether

5   the Trustees' forensic loan reviews were holistic.  Do you

6   remember that question?

7   A    I do.

8   Q    And you told us that, "If a holistic review means to

9   consider a particular piece of supporting evidence in the

10  context of the totality of the entire file, then yes, it was

11  holistic."  That's the answer you gave, right?

12  A    That sounds familiar.

13  Q    You also told us that the loan review firms were

14  expected to conduct such a holistic review, correct?

15  A    Yes.

16  Q    And then you said, "To the extent it was believed or

17  discovered in QC that there was any kind of failure to

18  evaluate the sufficiency or meaning of any of these sources

19  of evidence properly, in the context of the entire file,

20  that was something that was communicated back to the loan

21  review firms," and that's what you said yesterday, right?

22  A    I don't recall that specifically.

23  Q    Okay.  Well, since the QC team was not looking at the

24  loan file, there was no way for the QC team to assess

25  whether the evidence being used to support the breach claims

Page 109

1   that had in fact been considered, had in fact been

2   considered in the context of the totality of the entire

3   file; that's true, right?

4   A    That's true, but that wasn't part of the scope of QC1's

5   review.

6   Q    Okay.  And if the QC team did not look at loan files,

7   they would have no way of knowing, for example, that a

8   document thought missing was actually in the loan file,

9   right?

10  A    The QC1 review team would have no way of knowing if a

11  document missing was actually in the file, that's correct.

12  Q    And if the QC1 team did not look in the loan files,

13  they would have no way of confirming whether there was

14  information, inconsistent with the breach claim, in the loan

15  file that was not included in the claim package, right?

16  A    At the QC1 level, that's correct.

17  Q    Let's take a look at TRDX-18, please.  This is also

18  your slide from yesterday or the day before, right?

19  A    I recognize it.  Yes.

20  Q    So Mr. Aronoff, you can't give the Court any sense of

21  how many breaches Duff & Phelps declined to submit to the

22  protocol because the identified breaches did not result in

23  AMA as a result of the QC process, can you?

24  A    I don't think I -- I don't understand the question.

25  Q    Okay.  You can't give the Court any sense of how many

1    breaches Duff & Phelps -- breaches that came up from the

2    loan review firms, Duff & Phelps declined to submit to the

3    protocol, because the identified breaches did not result in

4    AMA, can you?

5    A    That's not information that was -- that was provided to

6    me in the preparation of this report.  That's correct.

7    Q    How many claims --

8         THE COURT:  I'm sorry.  Now I'm lost.  What's the

9    "that information" in your answer?

10        MR. ARONOFF:  Well, I left Duff & Phelps before

11   the process was completed.  And so I don't know what

12   happened during that intervening period and why certain

13   claims might not have ultimately been provided through the

14   protocol, even if they made it up to QC2.  QC2 is where the

15   final AMA determination would have been made.

16        THE COURT:  Go ahead, Mr. Davis.

17   Q    Mr. Grice (sic), how many -- looking at your chart, how

18   many claims were filtered out at the second level review

19   stage?

20   A    I don't know.

21   Q    How many claims were filtered out at the QC1 level

22   review stage?

23   A    I don't have that data.

24   Q    How many claims were filtered out at the QC2 level

25   stage?

Page 111

1    A    Oh, I thought that's the first one we were talking

2    about.

3    Q    No.

4    A    I misunderstood your question.

5    Q    How many claims were filtered out at the QC1 level?

6    A    I don't know.

7    Q    How many claims were filtered out at the QC2 level?

8    A    I don't know.

9    Q    So you don't know, whether in reality this chart

10   actually looks like a funnel, correct?

11   A    I do.

12   Q    Excuse me?

13   A    I do know it looks like a funnel.

14   Q    Why is that, sir?

15   A    Because it started at the top with 170,000, it ended

16   with 92,000 and along the way, at each level of review, a

17   breach finding could have been rejected.

18   Q    You can't tell me at what level of review any given

19   breach finding was rejected, can you?

20   A    That's correct.

21   Q    They could all have been rejected at the initial loan

22   review stage; is that right?

23   A    They could have, but I know that not to be the case.

24   Q    How many are you aware of what filtered out of the

25   process after the initial loan review stage?  How many

Page 112

```
 1   claims?

 2   A    I just said I don't know.

 3   Q    Okay.

 4   A    But I know some were.

 5   Q    Mr. Grice (sic), the loan review firms --

 6             THE COURT:  Not Mr. Grice.

 7             MR. DAVIS:  Oh my gosh.  Mr. Aronoff.

 8             THE COURT:  We should just stipulate that for the

 9   purposes of this --

10             MR. DAVIS:  Yeah.

11             THE COURT:  -- proceeding you shall be called Mr.

12   Grice.

13             MR. SHUSTER:  I object.

14             THE COURT:  Not your first choice.  Mr. Shuster,

15   welcome back.

16             MR. SHUSTER:  Thank you.

17             THE COURT:  This is the point in the --

18             MR. DAVIS:  I now have it on a sticky in front of

19   me.

20             THE COURT:  -- this is the point in the case where

21   everybody's getting punchy.  So hopefully not at your

22   expense.

23             MR. DAVIS:  And now I have it on two stickies.

24             MR. ARONOFF:  Along those lines, if we're at a

25   natural breaking point at about 4, can we take a break?
```

Page 113

```
 1              THE COURT:  We can take a -- would you prefer a

 2    break right now?

 3              MR. ARONOFF:  Sure.  If that's okay with --

 4              MR. DAVIS:  Whenever is convenient.

 5              THE COURT:  And Mr. Davis can go practice calling

 6    you Mr. Aronoff.

 7              Let's take a break right now and we'll come back

 8    in ten minutes, all right?

 9         (Recess)

10              THE COURT:  Folks.  Everyone?  If I could ask you

11    for a moment, so it's been determined that there was a spill

12    of cleaning solution right near whatever it is that pushes

13    air through the vents and they're going to have to --

14    they're in the midst of trying to clean it up.  But I don't

15    think it's a good idea to continue to stay here, because

16    it's pretty hard to take.

17              So they've assured me that it will not be like

18    this tomorrow -- I'm sorry, on Monday, because we're not

19    here tomorrow.  So then that does cut us short by about an

20    hour today, so that the concept is that we would resume on

21    Monday, with thanks to Mr. Aronoff, at 10:15 and hopefully

22    conclude his cross and redirect by the end of Monday.  All

23    right?

24              Okay.  Thank you all very much.

25              GROUP:  Thank you, Your Honor.
```

Page 114

```
 1              THE COURT:  Have a good couple of days.

 2              MR. ARONOFF:  Your Honor?

 3              THE COURT:  Yes.

 4              MR. ARONOFF:  I had one question?

 5              THE COURT:  Yes, sir.

 6              MR. ARONOFF:  I know I'm bound not to talk to

 7    anyone over the weekend --

 8              THE COURT:  Yeah.

 9              MR. ARONOFF:  -- and I haven't been talking to

10    anyone about anything, but I wanted to know if it was all

11    right if I talk to my Baker Tilly colleagues about other

12    matters.

13              MR. SHUSTER:  He has other reports due in other

14    matters.  If that's okay with you, Your Honor?

15              MR. DAVIS:  Yeah, I mean if there's no -- nothing

16    -- no overlap --

17              THE COURT:  Right.

18              MR. ARONOFF:  No, no.

19              MR. DAVIS:  -- with what's going on here in this

20    issue.

21              THE COURT:  About other matters I have no problem

22    with that and we have that on the record.

23              MR. ARONOFF:  Yeah.

24              THE COURT:  Okay.  Thank you for asking.  Okay.

25    Thank you, folks.
```

1          (Whereupon these proceedings were concluded at 4:02 PM)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 116

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya                    Digitally signed by Sonya
                              Ledanski Hyde
                              DN: cn=Sonya Ledanski Hyde, o,
     Ledanski Hyde            ou, email=digital1@veritext.com,
7                             c=US
                              Date: 2017.12.18 16:54:24 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 18, 2017