Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5  In the Matter of:

6  LEHMAN BROTHERS HOLDINGS INC.,  Case No. 08-13555-scc

7              Debtor.

8  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                    United States Bankruptcy Court

11                    One Bowling Green

12                    New York, New York 10004-1408

13

14                    November 20, 2017

15                    10:00 AM

16

17

18

19

20

21

22

23  B E F O R E:

24  HON. SHELLEY C. CHAPMAN

25  U.S. BANKRUPTCY JUDGE

1   IN RE:   RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Dawn South, Sheila Orms, Lisa Beck

Page 3

```
 1    A P P E A R A N C E S :

 2    WILKIE FARR & GALLAGHER LLP

 3         Attorneys for the Plan Administrator

 4         787 Seventh Avenue

 5         New York, NY 10019-6099

 6

 7    BY:  TODD G. COSENZA, ESQ.

 8         BENJAMIN P. MCCALLEN, ESQ.

 9         JOSEPH G. DAVIS, ESQ.

10

11    HOLWELL SHUSTER & GOLDBERG LLP

12         Attorneys for the Trustees

13         750 Seventh Avenue, 26th Floor

14         New York, NY 10019

15

16    BY:  MICHAEL S. SHUSTER, ESQ.

17         DWIGHT A. HEALY, ESQ.

18         NEIL R. LIEBERMAN, ESQ.

19         DANIEL P. GOLDBERG, ESQ.

20

21

22

23

24

25
```

Page 4

1    ROLLIN BRASWELL FISHER LLC/PARTNER

2         8350 E. Crescent Parkway

3         Suite 100

4         Greenwood Village, CO 80111

5

6    BY:  MICHAEL ROLLIN, ESQ.

7         MARTIZA DOMINGUEZ BRASWELL, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
1                    P R O C E E D I N G S

2             THE COURT:  Good morning.

3         (A chorus of good morning)

4             THE COURT:  Please have a seat.  Well here we are

5    at last.  How's everybody?

6             MR. COSENZA:  Good.

7             THE COURT:  Good.

8             Okay.  So just to confirm how today is going to

9    proceed.  You had allotted two hours each for openings, yes?

10            MR. COSENZA:  Roughly, Your Honor, and you know,

11   plus or minus, but that's -- yes.

12            THE COURT:  Plus or minus, depending upon how much

13   I talk.

14            MR. COSENZA:  Yes.

15            THE COURT:  Okay.  And the trustees go first?

16            MR. COSENZA:  No, we go first.

17            THE COURT:  You go first.

18            MR. COSENZA:  We go first, Your Honor.

19            THE COURT:  That was by agreement?

20            MR. COSENZA:  Yes.

21            THE COURT:  That was by agreement.

22            Okay.  So the idea is going to be, Mr. Cosenza,

23   that you will argue before lunch and then we'll take a

24   break.

25            MR. COSENZA:  Correct.  Sounds good, yes.
```

Page 6

1          THE COURT:  Good.  So that we don't have

2    Mr. Shuster feeling lightheaded while he's making his

3    argument.

4          So there are a whole host of other issues that we

5    need to discuss.  My preference would be to put those to the

6    side and we have our arguments, and then after Mr. Shuster

7    concludes this afternoon we can take up all outstanding

8    issues and talk about other issues that we've accumulated

9    along the way.

10         MR. SHUSTER:  And I do not intend in my opening to

11   refer to any of the material that's in dispute.

12         THE COURT:  That's in dispute.

13         MR. COSENZA:  Okay.

14         THE COURT:  All right, Mr. Cosenza?

15         MR. COSENZA:  That's fine, Your Honor.

16         THE COURT:  I'd much preferred to that and get us

17   off to a good start.

18         MR. COSENZA:  May I approach, Your Honor?

19         THE COURT:  Please.

20     (Pause)

21         MR. COSENZA:  Your Honor, I'm just handing up a

22   slide deck.

23         THE COURT:  Okay.

24         MR. COSENZA:  It's part of the opening.

25         THE COURT:  Thank you.  Ready when you are.

Page 7

1                 MR. COSENZA:  Okay.  Great.

2                 May it please the Court, Todd Cosenza on behalf of

3      the plan administrator.

4                 Your Honor, the plan administrator is responsible

5      for, among other things, resolving disputed claims so that

6      those claims are allowed at the appropriate level and

7      creditors may receive distributions under the Chapter 11

8      plan.

9                 As the Court knows the plan administrator has been

10     working hard to resolve disputed claims at fair levels and

11     in an expeditious manner.

12                Consistent with that mandate we are here on the

13     plan administrator's motion under Section 502(c) of the

14     Bankruptcy Code to estimate the amount of the RNBS trustees

15     remaining claims had the claims protocol been completed.

16                THE COURT:  Can you say that again, Mr. Cosenza?

17                MR. COSENZA:  Sure.  Sure.  So we are here to

18     estimate the amount of the RNBS trustees remaining claims

19     had the claims protocol been completed.

20                THE COURT:  Do the trustees agree with that

21     formulation of the issue?

22                MR. COSENZA:  Yes.

23                THE COURT:  Okay.

24                MR. COSENZA:  Thank you.

25                In a Section 502 estimation proceeding the Court's

Page 8

1    principle consideration in estimating a claim should be to

2    promote a fair distribution to creditors to a realistic

3    assessment of uncertain claims.

4         There's no dispute that estimation under 502 is

5    appropriate here.  In fact both sides have agreed to ask the

6    Court to estimate the claim to further insure an expeditious

7    final resolution.

8         As both sides agree, estimation is appropriate

9    because it would be virtually impossible, Your Honor, for

10   the Court to hear and determine all the remaining 107,000

11   underlying disputed claims on 70,973 loans still in dispute.

12        It will be clear that the trustees' evidence will

13   not be sufficient to carry their burden to prove claims in

14   excess of the $300 million of claims the plan administrator

15   has passed to date as a result of the protocol.

16   Nevertheless, the plan administrator stands behind the terms

17   of our settlement agreement with the trustees and

18   institutional investors.  We are just asking the Court to

19   estimate the claims at $2.38 billion.

20        As Your Honor knows both sides have agreed not to

21   pursue a sampling methodology to establish the quantum of

22   the trustees' claims, thus in the absence of a trial on all

23   the claims by sampling or otherwise the plan administrator

24   believes the Court will need to assess a number of

25   guideposts to determine the appropriate level for these

1    claims.

2         As the evidence will show there are many

3    guideposts that all lead to a claim of $2.38 billion or

4    less.  The RNBS trustees maintain that their protocol

5    process has resulted in a claim of $11.4 billion.  Not one

6    guidepost would direct the Court towards a conclusion that

7    the RNBS trustees' claims could ever be anywhere near the

8    $11.4 billion that they are seeking here.  In fact it would

9    generate an enormous windfall at the expense of all other

10   creditors.  The plan administrator believes that fuller

11   guideposts lead to a claim amount of $2.38 billion or less.

12        Your Honor, I will come back to all of this at the

13   end of my presentation, but let me give you a brief overview

14   now.

15        The first guidepost is that the $2.3 billion that

16   the plan administrator is asking Your Honor to estimate the

17   claim at is equivalent to a settlement negotiated in October

18   2015 with the institutional investors.  The settlement was

19   reached with the largest and most sophisticated of Lehman

20   investors of Lehman RNBS.

21        The institutional investors moved the plan

22   administrator to the very top end of our range for these

23   claims, $2.44 billion, and that is where the plan

24   administrator elected to resolve these claims at after our

25   negotiations with the institutional investors.

Page 10

1              The second guidepost is that the 2.3 billion is at

2     the high end of various comparable global RNBS settlements.

3              In support of this guidepost Your Honor would hear

4     testimony from Professor Daniel Fischel.  By the way,

5     Professor Fischel has acted as an expert for the trustees in

6     connection with RNBS settlements they have sponsored.

7              Here he will testify that the recovery of $2.38

8     billion here as a percentage of expected lifetime losses for

9     the trust at issue, which he will refer to as the recovery

10    ratio, is 11.2 percent.  Again, the plan administrator will

11    show that the recovery ratio is at the high end of the range

12    of recoveries as compared to these global RNBS settlements

13    as reflected in this chart.

14             The evidence will show that what the trustees are

15    seeking, $11.4 billion, is far outside the range of all

16    other big bank global RNBS settlements and would result in a

17    recovery ratio more than four times the highest recovery

18    rate set forth on this chart.

19             The third guidepost is a pricing or value that the

20    trustees have themselves ascribed to their claims in

21    connection with six terminated trusts.

22             As the Court is aware, and as we described in our

23    brief, since the RNBS settlement was reached between the

24    trustees, institutional investors, and the plan

25    administrator a number of trusts that were subject to these

Page 11

1    proceedings have been cleaned up by the master servicer and

2    those trusts have been terminated.  These are the six

3    trusts.  And the RNBS trustees are no longer prosecuting

4    these claims because the trustees of the claims that have

5    been asserted in this proceeding -- sold -- sorry -- sold

6    these claims that have been asserted in the proceeding to

7    the master servicer and the clean up process.

8            Now, did the trustees sell the claims to these six

9    trusts based on the claim amount the trustees have proposed

10   to be allocated for each trust based on the trustees'

11   protocol output, the $11.4 billion that the trustees are

12   seeking here?  The answer is no.  The trustees sold these

13   claims at a value equivalent to each trusts allocable share

14   of the amount that the plan administrator is seeking

15   estimation here, $2.38 billion.

16           If the trustees thought that 11.4 billion was a

17   fair proxy of value, how could they allow the claims to be

18   sold at $2.38 billion level for these 6 terminated trusts?

19   As fiduciaries the trustees could not.

20           The fourth guidepost is Dr. Cornell's (ph)

21   analysis.  Dr. Cornell, who Your Honor will hear from in our

22   rebuttal case, is a leading expert in the fields of

23   structured finance and valuation of RNBS.

24           The plan administrator provided generous

25   assumptions to Dr. Cornell on the trustees' likelihood of

Page 12

1    success on their claims here.  Dr. Cornell assumed the

2    inflated purchase price calculations and assumed the

3    generous excess assumptions provided by the plan

4    administrator.  Using that information Dr. Cornell will

5    opine that the trustees' recovery on a loan by loan basis

6    would result in a claim within the range of $1.6 billion to

7    $2.5 billion.  In contrast we are confident that the

8    evidence will uncover that the trustees cannot support their

9    $11.4 billion claim.

10           In addition to the guideposts I've outlined the

11   evidence will show in particular first that the trustees had

12   a fundamentally flawed approach to the protocol.

13           Second, the trustees failure to carry their burden

14   of establishing proof.  As the trustees have conceded they

15   must prove that the loans at issue contain actual breaches

16   that have an adverse and material effect on the value of the

17   loan now when they brought their claims.

18           And third, the trustees grossly -- sure.

19           THE COURT:  Before you go to the third bullet

20   point.  So the plan administrator is not conceding any

21   deemed AMAs for any type of breach?

22           MR. COSENZA:  There are some deemed AMAs, Your

23   Honor, that we did approval during the protocol, but there

24   are some deemed AMAs that are still I believe at issue.

25           THE COURT:  Thank you.

1           MR. COSENZA:  Next the trustees grossly overstate

2    their damages.  Again, Your Honor, this includes among other

3    things, their use of the full purchase price, which I will

4    explain in more detail later.

5           Second, the trustees' unreliable methodology to

6    calculate losses on active loans.  These are loans, Your

7    Honor, that are still performing to this day, although they

8    may have been modified or changed in some sense.

9           And the trustees' wrongful inclusion of both

10   prepetition and post-petition unmatured interest.

11          I would now like to frame these issues before the

12   Court with just a little bit of history.

13          As Your Honor is aware the plan administrator has

14   been trying to resolve these claims in different ways for

15   years, both through settlement discussions and mediation.

16   The efforts began after the Lehman's bankruptcy filing on

17   September 15, 2008, and the trustees filing of over 300

18   proof of claims in 2009 through which the trustees sought to

19   recover billions of dollars across approximately 405 trusts.

20          The proofs of claims suffered from fundamental

21   defects.  The proof of claims did not provide notice of any

22   individualized loans nor evidence of any damages allegedly

23   caused.

24          From 2010 to 2014 the plan administrator made it

25   crystal clear that we required proof on a loan by loan basis

Page 14

1    to consider these claims for allowance.  Having not received

2    this proof the plan administrator moved in June 2011 to

3    disallow and expunge the claims brought by the RNBS

4    trustees.  Although at the time Judge Peck reserved decision

5    on most of the claims, he recognized that the governing

6    agreements required the trustees to put forth individualized

7    proof for each claim put forward.

8            As Judge Peck stated:

9            "If there are claims the trustees would be put to

10       their proof and whether they can actually succeed in

11       carrying a burden of proof establishing residential and

12       mortgage loan breaches would be extraordinarily

13       difficult."

14           The plan for Lehman was confirmed in December

15   2011.

16           And from 2012 to 2014 the plan administrator

17   negotiated directly with the RNBS trustees and engaged in

18   mediation in an attempt to resolve these claims.  Again, the

19   mediation process failed.

20           Then in August 2014 the trustee sought to increase

21   the reserve for these claims and estimated and allowed the

22   claims in an amount to be determined after an estimation

23   hearing.  The trustees argued that their claims were worth

24   no less than $12.143 billion based on a flawed sampling

25   methodology.  The trustees however had not actually

Page 15

1    identified the specific loans at issue or submitted proof of

2    the loans alleged breaches.

3         In response the plan administrator requested in

4    October 2014 the implementation of a protocol intended to

5    provide a process giving the trustees first, time to gather

6    and identify valid claims and submit sufficient detailed

7    proof for these claims.

8         Second, a process for resolution of each claim at

9    a fair level in non-legal business person to business person

10   meetings.

11        Third, a mediation forum for compromise or

12   resolution of each claim.

13        Fourth and finally, and only if necessary, a

14   resolution by the Court at trial on each remaining loan.

15        After a hearing on December 10th, 2014 the Court

16   indicated and wanted the protocol process to move forward.

17        The parties then negotiated the terms of the

18   protocol and the Court entered the protocol order on

19   December 29, 2014.  And Your Honor told the trustees that

20   the Court was available to assist in any way with the

21   trustees' collection of the documents required under the

22   protocol.

23        From March 2015 through March 2017 the parties

24   then engaged in the protocol process.  The parties also

25   provided status updates to the Court during that time

Page 16

1    period.  Again, as Your Honor is aware, the trustees flooded

2    the protocol with over 193,000 claims relating to 94,566

3    loans.  Again, many of the claims submitted by the trustees

4    were unfounded and were unsubstantiated.

5          This overwhelming submission of so many unfounded

6    claims also undermined the purpose behind the claims

7    resolution process in the protocol order.  The protocol was

8    intended to fairly and efficiently resolve most of the

9    claims without the need for a trial.  The trustees'

10   submissions also contravene the express words of the

11   protocol order which required the trustees to have a "good

12   faith basis" for every claim the trustees put forward.

13   However, despite these challenges the plan administrator

14   remained committed to resolving the claims fairly and

15   efficiently.

16         In 2015 the plan administrator reached out to the

17   trustees largest beneficiaries through their counsel.  This

18   was a group of 14 institutional investors, including among

19   them Goldman Sachs Asset Management, Black Rock, AGON,

20   PIMCO, MetLife, and LAMCO.  This group represents some of

21   the largest and most sophisticated investors in structured

22   finance and products.

23         These institutional investors are the parties with

24   a real financial interest in the claims, unlike the

25   trustees.  The institutional investors also have

Page 17

1    significance experience resolving RNBS claims of similar

2    scope and magnitude involving the trustees here, and I will

3    detail that later.

4              After engaging in negotiations for several months

5    the plan administrator and the institutional investors

6    struck a deal in October 2015.  As part of the deal the

7    institutional investors agreed to accept 2.44 billion for

8    their covered RNBS claims, subject to this proceeding, as

9    well as a transfer of loan RNBS claims.  As Your Honor is

10   aware the transfer of loan RNBS claims have been dealt with

11   in a separate proceeding.

12             The agreement was presented to the trustees for

13   consideration and approval; however, the trustees'

14   unwillingness to exercise discretion again frustrated the

15   deal.  The trustees would not accept a deal for a sufficient

16   number of trusts based on a purported expert report.  As the

17   Court is well aware the trustees to this day steadfastly

18   refuse to fully disclose that report.

19             Undeterred the plan administrator continued its

20   efforts to try to resolve these claims as efficiently and

21   fairly as possible.

22             As the protocol continued and the trustees

23   continued to make an overwhelming number of claims and take

24   aggressive and unsubstantiated positions, the plan

25   administrator renewed discussions with the institutional

Page 18

1    investors in the summer of 2016.  This resulted in a

2    settlement with the institutional investors in November of

3    2016 to establish a process to estimate the trustees'

4    covered loan claims.

5          After much negotiation with the trustees and

6    revisions to the agreement the trustees finally accepted the

7    revised settlement agreement on June 1, 2017, which

8    established the procedures for this estimation hearing.

9          After a 9019 hearing on July 6th, as the Court is

10   aware, the Court approved the revised settlement agreement

11   over a handful of objections that were subsequently resolved

12   or withdrawn.

13         Again, as the Court is aware, the settlement

14   establishes a streamline process to resolve the trustees'

15   covered loan claims submitted through the protocol.

16         It is not in dispute that the settlement provides

17   "numerous benefits to creditors, including providing a

18   framework for a prompt determination of the covered loan

19   claims in a fair and reasonable manner before this Court."

20         From the plan administrator's perspective it is

21   critical because it satisfies our objective of a timely and

22   fair resolution of the claims and attempts to insure that

23   this matter will be resolved before the next plan

24   distribution in March 2018.

25         Under the terms of the agreement the plan

Page 19

1    administrator agreed to seek estimation at $2.416 billion,

2    which is now adjusted to $2.38 billion based on various

3    subsequent events to the entering of the settlement

4    agreement.

5            It is important to note that while the plan

6    administrator is seeking to estimate the claims at 2.38

7    billion Your Honor is free to determine the correct amount

8    based again on the evidence presented.

9            The plan administrator believes and will present

10   evidence that the $2.38 billion amount represents a fair

11   estimation of the trustees' claims had the trustees properly

12   complied with the protocol order.

13           Based upon what the plan administrator has learned

14   of the trustees' claims and their process during our

15   preparation for this estimation hearing the plan

16   administrator believes the trustees' claims and process was

17   so riddled with flaws that the trustees may only be able to

18   prove or meet their burden to prove claims at a value of

19   $300 million.

20   However, pursuant to the plan administrator's obligations

21   under the settlement agreement with the institutional

22   investors and the trustees we ask the Court to estimate the

23   trustees' claims at $2.38 billion.

24           The plan administrator acknowledges that this

25   places it in an odd position.  We are seeking a claim value

Page 20

1    substantially higher than what we believe the trustees'

2    evidence will support based on their flawed process during

3    the protocol.  On the other hand we also believe the 2.38

4    billion represents a fair estimation and resolution of these

5    claims in an expeditious manner for both the plan

6    administrator and the institutional investors.

7            Your Honor, some of the unique features -- again,

8    you're aware of much of this -- of the RNBS settlement

9    agreement and process are first, each side has 49 hours to

10   present their case.  Other settlement agreements and

11   disputes involving RNBS are allowed into evidence.  The

12   October 2015 settlement for $2.44 billion between the plan

13   administrators and institutional investors is also allowed

14   into evidence.  And there are limited appeal rights.  The

15   plan administrator has waived its right to appeal to insure

16   the results from this proceeding can be reflected in the

17   March 2018 plan distribution.  And the trustees may appeal

18   only if the Court determines the trustees' proven claims are

19   valued at less than $2 billion.

20           Your Honor, the plan administrator is sympathetic

21   to the challenge facing the RNBS trustees and has always

22   tried to be reasonable.  The number and complexity of the

23   transactions underlying these claims are significant.

24           As the Court is aware we started with 405

25   different trusts populated with hundreds of thousands of

Page 21

1   mortgage loan files, each having unique and diverse

2   characteristics.  Again, this estimation proceeding is

3   intended to establish the value of the claims that would

4   have been resolved in steps three through five of the

5   protocol if the parties hadn't entered into this settlement

6   agreement.

7           The plan administrator is trying to be fair by

8   seeking estimation at the $2.38 billion level.  We were

9   trying to resolve the trustees' claims, which is one of the

10  largest outstanding claims against the estate expeditiously.

11  Again, this is why the plan administrator entered into this

12  streamline process so the results could be reflected in the

13  March 2018 distribution.  Yet the trustees have taken the

14  opposite approach, they seek a windfall by requesting a

15  claim of $11.4 billion.

16          To be clear, to get to the $11.4 billion that

17  would mean that the trustees had met their burden in the

18  protocol for every element of their claim for all 70,973

19  loans remaining at issue, and according to the trustees they

20  have no obligation for any of these claims to show any an

21  nexus between the breaches they allege and the damages they

22  seek.

23          The trustees have the burden of proving

24  entitlement to more than 2.38 billion that the plan

25  administrator seeks to estimate the claims at.  The evidence

Page 22

```
1    will show the trustees cannot do that.  And the evidence

2    will show that they cannot show entitlement to the $11.4

3    billion they are seeking here.

4             THE COURT:  So the $11 billion figure, that ties

5    out to a 100 percent success rate with respect to the

6    remaining loans in the pools?

7             MR. COSENZA:  Correct, Your Honor.

8             THE COURT:  And in order to get to that -- so

9    there are multiple breach -- for example, let's take a loan.

10            MR. COSENZA:  Yeah.

11            THE COURT:  There might be multiple breaches

12   asserted with respect to a loan, right?

13            MR. COSENZA:  Correct.

14            THE COURT:  So hypothetically that would mean that

15   the trustees would need to prevail -- would only need to

16   prevail -- well this is a question I guess.

17            MR. COSENZA:  Yes.

18            THE COURT:  They would only need to prevail on one

19   breach in order to prevail on that loan or alternatively in

20   order to demonstrate an AMA they might need to prevail on

21   more than one breach.  I'm asking.

22            MR. COSENZA:  That's correct, Your Honor.  I mean

23   just as a --

24            THE COURT:  In broad outline.

25            MR. COSENZA:  Yes, in broad terms you're correct.
```

Page 23

1    For example, and I'll just throw out a hypothetical here.

2    If there's a missing document claim --

3                  THE COURT:  Yes.

4                  MR. COSENZA:  -- that may have been there at

5    origination that went missing and they're pursuing that

6    claim in this proceeding and they're able to sustain their

7    burden on that file and there's a breach in theory they have

8    proven that that document should have been there and it's a

9    missing document claim.  Whether or not they have proven AMA

10   and whether or not they have proved that they're entitled to

11   the full damages based on the purchase price that's --

12                 THE COURT:  But the --

13                 MR. COSENZA:  Yeah.

14                 THE COURT:  -- but the $11 billion number assumes

15   a win --

16                 MR. COSENZA:  Yes.

17                 THE COURT:  -- on every loan --

18                 MR. COSENZA:  Correct.

19                 THE COURT:  -- remaining.

20                 MR. COSENZA:  Correct.

21                 THE COURT:  Okay.  Thank you.

22                 MR. COSENZA:  Your Honor, it is our understanding

23   that the trustees -- and this is based on their pretrial

24   brief -- will try to meet their burden by presenting certain

25   loans supported with general categories of proof.  Based on

1    these protocol exemplar loans the trustees will ask the

2    Court to extrapolate to the entire pool of loans and claims

3    based on the trustees' loan review process.  The evidence

4    will show however that the trustees will not be able to do

5    that because the trustees' process was fundamentally flawed

6    and unreliable.

7            Without having a sound and reliable process the

8    plan administrator believes that the trustees will attempt

9    to put forward an exemplar loan and then use certain types

10   of evidence to support a certain type of breach on that

11   loan.

12           Whatever the evidence will show for that

13   particular loan and whether the trustees have sustained

14   their burden on their breach claim for that loan will be up

15   to the Court.

16           What does not work here in the context of these

17   unique files with different factual circumstances and

18   evidence is to take whatever conclusion is reached on that

19   one loan file and extrapolate it out through thousands of

20   loan files containing the same alleged breach that relies on

21   similar evidence.

22           THE COURT:  Okay.  So this is an extremely

23   important point.  So exemplar sounds a lot like sample.

24   Same Latin root or whatever it is, right?

25           MR. COSENZA:  Yes.

1          THE COURT:  But we're not doing sampling, right?

2          MR. COSENZA:  That's correct, Your Honor.

3          THE COURT:  And we're also not -- this a question

4    -- we're also not over the next couple of months seeking to

5    create a record with respect to loan by loan proof, right?

6          MR. COSENZA:  That's correct, Your Honor.

7          THE COURT:  So we're estimating, but we're not

8    sampling, but we're using exemplars.

9          MR. COSENZA:  That's correct.  And -- well our

10   argument will be on that point, Your Honor, is the exemplar

11   approach could be successful if there's --

12         THE COURT:  If the -- if it could be proven --

13         MR. COSENZA:  Yes.

14         THE COURT:  -- that the process was close to

15   impeccable.

16         MR. COSENZA:  Yes, that's correct, Your Honor.

17         Indeed, Your Honor, we're going to present

18   evidence and loan files that show that the facts and

19   circumstances underlying each loan file is unique.  So the

20   evidence will show the trustees have a good process, which

21   they did not, the type of generalized proof they are using

22   to support a certain breach type will not be sufficient to

23   carry the trustees' burden of proof on each of the 70,973

24   loans at issue.

25         Furthermore, under the trustees' theory of the

Page 26

1    case a breach automatically entitles them to compensation at

2    the full purchase price under developing governing

3    agreements.  But, Your Honor, this is not a repurchase case.

4    As the trustees pointed out in the very first sentence of

5    their pretrial brief, "Each claim brought here, 107,000

6    claims on the 70,973 loans, is a 'straightforward breach of

7    contract claim'"  And that's from the trustees' brief.

8           The trustees are seeking breach of contract

9    damages, not the repurchase of the loan.

10          I will address this in more detail later, but the

11   highest level here are the contractual elements the trustees

12   must prove for a valid claim under the governing agreements.

13          One, that there was a material breach of a

14   representation and warranty.

15          Two, that the breach adversely and materially

16   affects the value of the loan at the time notice is given.

17   And as the plan administrator noted in its pretrial brief,

18   affects is used in the present tense, in other words affect

19   at the time a claim is made by the trustees, and that will

20   be important for reasons I will explain later, Your Honor.

21          And three, that the entirety of the amount of

22   damages claimed is compensable under applicable law.

23          The evidence will show that the trustees failed to

24   meet their burden during the protocol and that the $11.4

25   billion they are seeking is baseless.

1          Moreover, the $11.4 billion figure ignores the

2     billions and billions of dollars in interest that the

3     certificate holders have received on these loans since the

4     trust's inception and since Lehman's bankruptcy.  This is

5     especially unfair when one considers that the trustees have

6     nowhere acknowledged that they have been collecting interest

7     payments on all of these loans since the trust's inception

8     in the magnitude of billions of dollars.  Most of this again

9     since Lehman's bankruptcy.

10         Your Honor will hear testimony that the plan

11    administrator implemented a sound process to assess each

12    loan file and claim submitted during the protocol and

13    attempted to treat these claims fairly.

14         We would note, Your Honor, that the plan

15    administrator -- and I've said this throughout my numerous

16    status conferences before the Court -- that we had an

17    extremely difficult and demanding task given the

18    extraordinarily large number of claims the trustees put

19    forward in the protocol.

20         I'd now like to describe for the Court how the

21    parties got to the number of loans that are in dispute here

22    today, because these numbers seem to be jumping around in

23    terms of loans that went through the protocol or not so I'll

24    just provide you with a little bit of background.

25         Since the settlement was entered in March 2017, as

Page 28

1    we'll discuss later, the trustees have abandoned

2    approximately 15,570 loans and 73,245 claims.  The pool of

3    loans and claims at issue has also been diminished due to

4    the collapse of several trusts and opt out and loans that

5    have paid out in full.

6          So as I mentioned earlier, Your Honor, you will

7    hear that despite the protocol requiring the trustees to

8    submit their claims based on a good faith determination that

9    the relevant claim files contained material breaches, the

10   evidence will show that the trustees did not do that.

11         Indeed as we noted during our various status

12   conferences the plan administrator was concerned about the

13   volume and quality of the loans and claims that the trustees

14   were putting through the protocol; however, the trustees

15   made various representations to the Court about the high

16   quality of their process and the validity of every claim

17   submitted during the protocol process.

18         For example, and there are numerous examples of

19   this, in a September 2015 conference before Your Honor when

20   the plan administrator challenged the volume and types of

21   claims the trustees were putting forward that were bogging

22   down the protocol process the trustees' counsel repeatedly

23   defended the quality of the claims the trustees were putting

24   through the protocol.  In fact the trustees claim they were

25   "very measured in coming up material breaches," they also

1   told the Court that their process included a "quality

2   control program, and that all the claims asserted in the

3   process -- protocol process were strong."

4          The evidence will show that the plan administrator

5   was correct about the poor quality of the trustees' claims.

6   As we now understand the trustees have abandoned over 73,000

7   claims that were put through the protocol.  We believe this

8   demonstrates that the trustees' process was fundamentally

9   flawed.

10          As the Court is aware when we asked for an

11   explanation for the dropped claims back in July of this year

12   the trustees maintained the decision to drop the claims for

13   "by attorney/client privilege."  This is evidenced, Your

14   Honor, by a July 24, 2017 letter that is up here.

15          In that letter the trustees informed the plan

16   administrator that they would not provide any information

17   concerning the timing and rationale of the trustees'

18   decision to drop these claims and loans.

19          The trustees asserted, and you can see from this

20   letter, that they were under no obligation whether pursuant

21   to Exhibit G, the protocol, or other authority to provide

22   information concerning confidential and privileged

23   discussions, they will not do so.  And the trustees also

24   told the plan administrator in that letter that they would

25   not produce any witnesses to testify about this issue.

Page 30

1           The trustees followed through with this at all the

2    depositions.  Whenever the plan administrator asked the

3    trustees' witnesses about withdrawing loans and claims the

4    trustees steadfastly blocked discovery on the timing and

5    rationale to drop these claims and always invoked

6    attorney/client privilege.  This is remarkable.

7           Your Honor, both parties will present evidence to

8    support that their approach to the protocol process was more

9    likely to yield the appropriate number of compensable claims

10   under the governing agreements.  Hereto the parties have

11   taken two different approaches to how they will present the

12   evidence.

13          First, the plan administrator will present

14   testimony from Mr. Zachary Trumpp, who supervised the plan

15   administrator's review of the trustees' claims submissions

16   during the protocol.  Mr. Trumpp was involved in this matter

17   from the beginning, Your Honor.

18          You will hear him testimony that the plan

19   administrator repeatedly requested loan level evidence

20   sufficient to support each of the proofs of claim but the

21   trustees never provided it.

22          Determined to help bring these claims to

23   resolution Mr. Trumpp helped develop the protocol.  He was

24   also responsible for assembling the teams used by the plan

25   administrator that performed the loan review during the

Page 31

1    protocol.

2              In assembling, implementing, and overseeing the

3    protocol for the plan administrator Mr. Trumpp brought

4    significant experience in the mortgage loan industry.

5              Prior to the protocol Mr. Trumpp created and

6    managed the lost management department at Aurora Loan

7    Services, which identified and pursued claims against loan

8    originators.

9              Post bankruptcy Mr. Trumpp has overseen the plan

10   administrator's pursuit of recoveries on behalf of creditors

11   for mortgage loans on which LBHI suffered losses.

12             Therefore, long before the protocol Mr. Trumpp was

13   well versed in all aspects of identifying, evaluating, and

14   pursuing claims associated with breaches of representations

15   and warranties.

16             Importantly, Mr. Trumpp also knows from his

17   experience what type of claims for breaches of

18   representations and warranties typically are not pursued in

19   the mortgage industry.

20             Mr. Trumpp's years of experience taught him that

21   the outcome on a particular claim always depends on the

22   facts and circumstances of a particular loan and the

23   language of the governing agreements, which typically vary

24   from case to case.

25             Mr. Trumpp will testify that during the protocol

Page 32

1   process the plan administrator's teams reviewed each loan

2   file individually and undertook an analysis of all of the

3   relevant information in that loan file to determine whether

4   the information the trustees submitted supported the

5   elements of a breach.  This effort was extraordinarily

6   challenging because of the number and types of claims the

7   trustees put forward in step one of the protocol, over

8   193,000 claims and the lack of evidence the trustees

9   provided.

10          In an attempt to spin this the trustees make a

11  rather strange assertion in their pretrial brief that the

12  plan administrator did not refute the trustees' proof on

13  each loan during the protocol process.  This spins the

14  protocol on its head by attempting to invert the burden of

15  proof.

16          The trustees as an initial matter and as I

17  described earlier, did not make a "good faith determination"

18  on what types of claims they submitted and the types of

19  evidence they put forward.  Instead they flooded the

20  protocol in step one with an overwhelming number of claims.

21  That put, as I mentioned earlier, the plan administrator in

22  a bind, and the trustees' assertion that the plan

23  administrator did not provide sufficient responses is also

24  inaccurate.

25          Your Honor, you will hear from Mr. Trumpp next

1     week.  He will testify about the totality of the

2     communications between the plan administrator and the

3     trustees during step two and three of the protocol, which

4     belie the allegations made by the trustees their brief.

5          Your Honor will also hear testimony from an

6     independent expert the plan administrator retained,

7     Mr. Charles Grice.

8          Mr. Grice audited a broad subset of the trustees'

9     breach claims and the plan administrator's responses.

10         Mr. Grice will testify that based on his extensive

11    experience in the residential lending industry reviewing

12    mortgage loan files, analyzing claims of breaches of

13    representations and warranties, and conducting quality

14    control audits of loan reviews processes, that he believes

15    the plan administrator's process was sound and constructed

16    to maximize the likelihood that the plan administrator would

17    reach the appropriate result on each claim and loan.

18         He will also testify based on his audit of a broad

19    subset of the trustees' breach claims and the plan

20    administrator's responses that there were fundamental and

21    significant deficiencies in the trustees' breach analysis.

22         Mr. Grice will testify that this shows that the

23    trustees' process and procedures would tend to produce

24    unreliable results.

25         Mr. Grice will explain that the trustees'

Page 34

1    conflated relevance will sufficiency.  This false

2    equivalency largely defines a difference between the

3    trustees' position and the plan administrator's position on

4    the burden of proof just on the breach of claims issue, Your

5    Honor.

6             After hearing about the plan administrator's

7    process Your Honor will hear next what the trustees did

8    during their loan review process.

9             THE COURT:  Is Mr. Grice, does his testimony cover

10   both the issue of material breaches and adverse material

11   effect or only the materiality of breaches?

12            MR. COSENZA:  Only the material breaches, Your

13   Honor.  Mr. Castro, who I'll describe later, is covering the

14   AMA issues.

15            After hearing about the plan administrator's

16   process Your Honor will hear what the trustees did during

17   their loan review process.

18            Your Honor is aware the trustees hired Duff &

19   Phelps to manage their loan review process under the

20   protocol.  Mr. James Aronoff, who was at Duff & Phelps,

21   testified regarding his extensive role in the trustees'

22   protocol process.  Here are Mr. Aronoff's own words as he

23   describes his role in the protocol.

24        (Video deposition played)

25            MR. COSENZA:  So Mr. Aronoff testified he was

1      quote/unquote, the boss of the team responsible for managing

2      the trustees' loan review.  Not only was Mr. Aronoff the

3      boss of the trustees' process, he was also responsible --

4      and this is from his own testimony -- for the "substantive

5      aspects of the forensic loan reviews," which included --

6      according to Mr. Aronoff -- "both the breach findings and

7      the determinations whether those breach findings adversely

8      and materially effected the value of the loan, among other

9      things."

10             Mr. Aronoff was also responsible -- again, this is

11     according to his own testimony -- for "the sufficiency or

12     the use -- the appropriate use of any particular form of

13     supporting information or documentation as a basis for the

14     identification of a breach finding."  And in his words, "as

15     well as getting involved in the interpretation of various

16     informational sources, breach findings, scope of the reps

17     and warranties that amount to those breach findings, and the

18     like."  So that's at a mouthful, but I'm trying to get

19     through it quickly.

20             As Your Honor will hear Mr. Aronoff also was the

21     final decision maker on whether breaches satisfies the

22     adverse material effect or AMA element for the majority of

23     the loans submitted in the protocol.

24             Let's hear from Mr. Aronoff on this.

25         (Video deposition played)

Page 36

1                MR. COSENZA:  So Mr. Aronoff was intimately

2      involved in the trustees' process to review the loan files.

3      That is not disputed, Your Honor.

4                Despite his integral involvement in the process

5      Mr. Aronoff will be testifying as an expert as to the

6      validity of the trustees' representation of warranty breach

7      findings.

8                Mr. Aronoff has been put in an incredibly awkward

9      position of now being retained to opine on the process he

10     designed and oversaw.  Indeed he's playing a very odd hybrid

11     role here, which by definition lacks objectivity.  Not only

12     is Mr. Aronoff a critical fact witness, but the trustees

13     have retained him as their expert.

14               Your Honor, I have never encountered this in my

15     many years of practice, and it's quite odd that he'd be

16     serving as an expert on this.  Frankly this is no different

17     than an attorney accused of malpractice testifying as an

18     independent legal expert at his own malpractice trial.  But

19     Mr. Aronoff is not independent and cannot be an objective

20     witness about the quality of his own process that he

21     designed.

22               In addition to the odd role Mr. Aronoff is playing

23     Your Honor will hear evidence that the trustees' review

24     process was sufficient in many other ways.  I'm going to

25     explain the ways that the trustees' process was flawed based

Page 37

1    on their own admissions.

2            First, there was no uniform set of policies and

3    procedures provided to the five loan review firms retained

4    by the trustees.  Rather the loan review firms were left to

5    their own devices, practices, and judgment to decide when

6    there was a breach of a rep and warranty, and that's

7    according to Mr. Aronoff.

8            Second --

9            THE COURT:  Will there be actual evidence as to

10   what they were told to do?

11           MR. COSENZA:  To the extent that Mr. Aronoff

12   testified to that, Your Honor, it's --

13           THE COURT:  Okay.  I guess that's wait and see.

14           MR. COSENZA:  Yes.

15           THE COURT:  Okay.

16           MR. COSENZA:  Second, the initial quality control

17   reviewers, the so-called QC-1 teams, this is a group of 12

18   to 15 individuals that did initial quality reviews of breach

19   findings and claim submission packages, were directed not to

20   review the actual loan files and probably did not even have

21   access to them, because as Your Honor will hear, the QC-1

22   teams "weren't supposed to be poking around in the loan

23   files."

24           Let's hear from Mr. Aronoff on this.  Maybe we

25   won't.

Page 38

1          (Video deposition played)

2               MR. COSENZA:  That raises real questions as to the

3     efficacy of this quality control process, and Your Honor

4     will hear testimony on that during this proceeding.

5               Third, a significant failure of the trustees'

6     process relates to the trustees' failure to turn over to the

7     plan administrator all third-party information they

8     collected.  This is really important, Your Honor.

9               For example, the trustees used third-party sources

10    of information like the Bureau of Labor Statistics, which

11    we'll refer to in this proceeding as BLS data, which I will

12    discuss in more detail in a minute, and other third-party

13    data.

14              The trustees used this data to purportedly prove

15    that the borrowers made misrepresentations of one or more

16    facts such as about their income or debt.  But as

17    Mr. Aronoff testified, the loan review firms did not turn

18    over all third-party information to the plan administrator.

19    The trustees only turned over information that was used to

20    support a breach finding.

21              THE COURT:  So let me draw down on this, because

22    this was interesting to me when I read it in the opening

23    brief.

24              So what you're saying is that there's third-party

25    information, W-2s, tax returns, bankruptcy schedules, labor

1   statistics.

2            MR. COSENZA:  Yes.

3            THE COURT:  Okay.  And what you're saying is that

4   it's the plan administrator's position that the trustees

5   during the protocol may have only provided, for example, a

6   W-2 from two years after the loan administration that had

7   one figure, but there may have been a tax return or a

8   bankruptcy schedule that would support or -- that would

9   support the plan administrator's position or undermine the

10  trustees' position --

11           MR. COSENZA:  Correct.

12           THE COURT:  -- that was not submitted.

13           MR. COSENZA:  That's correct, Your Honor.

14           THE COURT:  Okay.  And could you explain just at

15  the level of preview --

16           MR. COSENZA:  Yes.

17           THE COURT:  -- how the Bureau of Labor Statistics'

18  information would have been proffered or used in connection

19  with establishing a DTI breach or another breach that was

20  related to that?

21           MR. COSENZA:  Sure.

22           THE COURT:  That wasn't clear to me.

23           MR. COSENZA:  So, Your Honor, you raise a very

24  good point, I'm going to get to that literally in three

25  minutes.

Page 40

1                    THE COURT:  Okay.  I will wait.

2                    MR. COSENZA:  So we will get to it.

3                    THE COURT:  All right.

4                    MR. COSENZA:  But that is an important point.

5                    THE COURT:  Okay.

6                    MR. COSENZA:  But in terms of -- again, the

7     trustees only turned over information that was used to

8     support a breach claim.

9                    Now let's hear from Mr. Aronoff on this.

10                   THE COURT:  Okay.

11        (Video deposition played)

12                   MR. COSENZA:  Again, the question was whether the

13    trustees included all of the third-party materials collected

14    under loan review firms for a loan with their breach finding

15    in the files transmitted to the plan administrator.

16    Mr. Aronoff testified that those documents should not have

17    been turned over to the plan administrator.  This means that

18    to the extent the trustees found information that could have

19    refuted or contradicted alleged misrepresentations they

20    likely did not turn them over to the plan administrator

21    during the protocol.

22                   Fourth -- now I'm going to get into more detail,

23    I'm actually going to answer your question, Your Honor, now

24    about BLS.

25                   THE COURT:  Okay.

Page 41

1           MR. COSENZA:  But it's coming.

2           THE COURT:  All right.

3           MR. COSENZA:  Fourth, the trustees relied on

4     sources of information that were not designed to prove their

5     claims.

6           Your Honor will hear from the plan administrator's

7     expert on this point, but the three examples are BLS data,

8     which I just mentioned, MIRS, and Accurint.

9           While sources such as these can sometimes be

10    evaluated within the totality of the loan file the trustees'

11    reliance on the data here was inappropriate.

12          As I just mentioned BLS data is a statistical

13    survey that gives general estimates of income for certain

14    categories of jobs in a given metropolitan area.

15          To support some of their misrepresentation of

16    income claims the trustees compared the borrower's stated

17    income at origination to the "90th percentile estimate in

18    the BLS data."  But Your Honor will hear testimony from

19    Mr. Grice that BLS was never designed for this purpose and

20    is therefore not a fully reliable source.

21          THE COURT:  Can --

22          MR. COSENZA:  Some of the problems --

23          THE COURT:  So can I just --

24          MR. COSENZA:  Yeah.

25          THE COURT:  -- interrupt you again?  So I'm trying

Page 42

1    to understand this.

2           So somebody might put down on a loan application

3    that they're a letter carrier.

4           MR. COSENZA:  That's correct.

5           THE COURT:  Right?  And might put down a number

6    for their -- is it their wages as a letter carrier or is it

7    their income?

8           MR. COSENZA:  It's supposed to -- I think it's

9    supposed to be their income.

10          THE COURT:  Okay.  So their wages as a letter

11   carrier might hypothetically be supplemented by working a

12   night shift at a convenient store.

13          MR. COSENZA:  That's correct.

14          THE COURT:  Or might be supplemented by rent that

15   they receive by renting out the basement apartment in their

16   two-family home.

17          MR. COSENZA:  That's correct.  As a son -- I was

18   the son of the captain of the fire department I can tell you

19   about numerous of my dad's friends on the fire department

20   who had second jobs, so it's just simply looking at what

21   they received.

22          THE COURT:  Okay.

23          MR. COSENZA:  Yeah.

24          THE COURT:  I'm just trying to --

25          MR. COSENZA:  Yeah.

1              THE COURT:  -- structurally understand --

2              MR. COSENZA:  You're right on it, Your Honor.

3              THE COURT:  -- the point, right?

4              MR. COSENZA:  The point is it's just simply, you

5     know, you don't look at all those other, you know, these

6     other potential sources of income when you're using BLS

7     data, it's just stating what the average --

8              THE COURT:  What that occupation --

9              MR. COSENZA:  Yes.

10             THE COURT:  -- statistically in a particular --

11             MR. COSENZA:  Yeah.

12             THE COURT:  -- metropolitan area --

13             MR. COSENZA:  Yeah.

14             THE COURT:  -- without regarding also I guess to

15    the particular seniority of the person --

16             MR. COSENZA:  Yeah.  That's correct.

17             THE COURT:  -- involved and those kinds of

18    factors.  Okay.

19             MR. COSENZA:  So, Your Honor, I can even put a

20    finer point on this.  Let me list some of the problems with

21    BLS data.

22             THE COURT:  Okay.

23             MR. COSENZA:  BLS data excludes significant

24    categories of compensation like overtime pay.

25    BLS doesn't capture employee experience or specific job

Page 44

1   responsibilities.  BLS is prone to user error because it

2   depends on the trustees' unidentified loan reviewers to

3   select the borrower's right occupation.  And most

4   importantly, BLS does not establish with any given -- what

5   any given borrower in this case earned at the time of

6   origination.

7           The trustees -- now I will next move on to MIRS,

8   which is another form of information the trustees relied on.

9   They used that source to prove that borrowers misrepresented

10  their debt obligations under applications by showing that

11  they had undisclosed mortgages.  But MIRS was never intended

12  for this purpose and is therefore not a reliable source.

13          Here is the disclaimer that MIRS provided to its

14  subscribers about its intended use.

15          THE COURT:  You might be the only person ever to

16  pronounce it mirrors.

17          MR. COSENZA:  I know that.  I've been criticized

18  by many of my own team.

19      (Laughter)

20          THE COURT:  Okay.  The world at large refers to it

21  as MIRS.

22          MR. COSENZA:  MIRS.

23          THE COURT:  All right?  If the other pronunciation

24  is hard-wired into your brain --

25          MR. COSENZA:  Yes.

1          THE COURT:  -- I'll accept it.  But for anyone

2     listening I think that Mr. Cosenza is talking about MIRS.

3          MR. COSENZA:  Yes.

4          So it was not intended to be used in this manner,

5     and the trustees -- if you look at this, Your Honor -- it

6     says the companies do not verify the accuracy of information

7     under link or system, nor do the companies warrant their

8     reliability of any information retrieved.  So it was not

9     intended to be used in the manner the trustees did to prove

10    that borrowers misrepresented their debt obligations on

11    their mortgage applications.

12         Next, Your Honor, the trustees similarly relied on

13    Accurint, and I can pronounce that one, an online search of

14    public records to find borrower's addresses to try to prove

15    misrepresentation of occupancy claims.

16         THE COURT:  So can you tell me more about this

17    database?  What is it?  How does it work?

18         MR. COSENZA:  It's some method to show -- it's on

19    online method to show how people or an individual is

20    associated with a particular property or address.  So you

21    basically want to search a person's name, any address that

22    the person would have been associated to, basically -- Your

23    Honor, I'm looking at the actual --

24         THE COURT:  Based on credit records, voting

25    records, driver's license --

1          MR. COSENZA:  Yes, some --

2          THE COURT:  -- anything like that.

3          MR. COSENZA:  -- cell phones is another one.

4    Based on a cell phone applications.

5          THE COURT:  Okay.

6          MR. COSENZA:  So it's like all sorts of databases

7    where this pulls from to try to associate --

8          THE COURT:  And then Accurint comes to a, I'll use

9    the word, conclusion as to what the person's primary address

10   is?

11         MR. COSENZA:  That's not my understanding, Your

12   Honor.  My understanding from looking at the files is it

13   simply gives a list of the person's name and all the

14   addresses associated with that person.  So there's no, you

15   know, conclusive link per se, but it just shows that that

16   person somehow was associated with that address and it

17   listed various addresses through --

18         THE COURT:  Okay.

19         MR. COSENZA:  -- keynote searches.

20         THE COURT:  And how is it that you're saying that

21   the trustees used this in connection with the occupancy

22   breaches?

23         MR. COSENZA:  So, for example, if I'm on a

24   mortgage application and someone claims that they're going

25   to use --

Page 47

1            THE COURT:  You're going to live in the home.

2            MR. COSENZA:  -- this other home --

3            THE COURT:  Right.

4            MR. COSENZA:  -- they are use Accurint to show

5    that during that same time period where the borrower

6    indicated they should be living at that address, they

7    instead were -- you know, their primary residence was at

8    some other address based on what was listed on the Accurint

9    data sheets.

10           THE COURT:  So they would -- okay.  I guess I'll

11   just have to wait and hear --

12           MR. COSENZA:  Yeah.

13           THE COURT:  -- where the burden of proof.  Because

14   it sounds like what you're saying is that either Accurint or

15   the trustees inferred that one address as opposed to another

16   was the primary address.

17           MR. COSENZA:  Based on -- yes, based on the

18   various cells you see from the Accurint report they tried

19   to --

20           THE COURT:  Okay.  All right.

21           MR. COSENZA:  -- link between the properties.

22           THE COURT:  Thank you.

23           MR. COSENZA:  But, Your Honor, Accurint expressly

24   states, "the system should not be relied upon as

25   definitively accurate."  Accurint admits that its data is

Page 48

1    sometimes poorly processed and generally not free from

2    defect.  It cannot be used as the trustees used it here to

3    definitively prove a misrepresentation of occupancy claim.

4    And this is the Accurint disclaimer, Your Honor.

5            This is just true of a number of the various data

6    sources used by the trustees.  These data sources have to be

7    analyzed in context.  They do not establish (indiscernible -

8    57:33) facts to prove a breach of a representation of

9    warranty.

10           Despite these material issues of reliability and

11   contrary to the trustees' claim that the plan administrator

12   disregarded such evidence, the plan administrator considered

13   these sources and gave them appropriate weight in the

14   context of all the facts and circumstances of each

15   borrower's loan file.

16           Your Honor, another critical flaw in the trustees'

17   process was that the trustees did not conduct an AMA -- as I

18   mentioned earlier -- adverse material effect analysis

19   separate from their breach analysis.

20           Your Honor, AMA means that a breach of a rep and

21   warranty adversely materially effects the value of the loan

22   for the interest of the certificate holders under relevant

23   trust at the time the trustees made their claim.

24           The trustees' approach to submitting claims in the

25   protocol almost completely ignored the provisions meaning,

Page 49

1    reading it out of the contracts.

2              As Your Honor will hear from Mr. Aronoff the

3    trustees did not conduct an individual assessment to

4    determine AMA.

5              Let's hear from Mr. Aronoff.

6         (Video deposition played)

7              MR. COSENZA:  So I will later --

8              THE COURT:  Could you do some math for me on this?

9              MR. COSENZA:  Yes.

10             THE COURT:  So he's referring to a five percent

11   threshold --

12             MR. COSENZA:  Correct.

13             THE COURT:  -- right?  So that means that a

14   borrower -- hypothetically a borrower represents income at

15   $100,000.

16             MR. COSENZA:  Okay.

17             THE COURT:  And if the trustees find proof in

18   their view that in fact the borrower at the time of

19   origination only had income of $90,000 --

20             MR. COSENZA:  Correct.

21             THE COURT:  -- that would probably violate --

22   thres (sic) the 5 percent threshold --

23             MR. COSENZA:  Correct.

24             THE COURT:  -- and that without any further

25   analysis the trustees' position is that that disparity

Page 50

1    materially had an adverse material effect on the certificate

2    holder's interest in the loan.

3            MR. COSENZA:  That's correct, Your Honor.  I will

4    later in my presentation detail the (indiscernible -

5    1:00:02) responses the trustees provided in the protocol

6    that they claim purportedly demonstrated AMA.

7            Next -- last what I will preview for Your Honor

8    today has to do with --

9            THE COURT:  Is there -- I'm sorry to keep

10   interrupting you --

11           MR. COSENZA:  No.

12           THE COURT:  -- I'm just trying to --

13           MR. COSENZA:  No worries.

14           THE COURT:  -- fix this in my mind.

15           So is there going to be proof by the trustees, if

16   you know, or argument by the plan administrator as to how

17   the -- that category of breach claims sorts?  In other words

18   how many loans -- as to how many loans was it a 5 percent

19   miss versus how many loans was it a 50 percent miss?  Is

20   there going to be data on that in the coming weeks?

21           MR. COSENZA:  There may be from the trustees, I

22   guess we'll have to wait and see.

23           THE COURT:  Okay.

24           MR. COSENZA:  Your Honor, the last flaw I'm going

25   to preview today has to do with the trustees' submission of

Page 51

1    missing document claims, which represents about 20 percent

2    of the claims still at issue here.

3          The evidence will show that the trustees typically

4    based their claim on the document being missing at the time

5    the trustees reviewed the files during the protocol, usually

6    7 to 14 years after the loan originated, but the trustee

7    seemingly ignored other evidence in a loan file that

8    indicated the missing document was there at origination.

9          For example, some of the files contained evidence

10   such as a contemporaneous checklist that indicated that the

11   particular document was in the file at origination.

12         The evidence will show that the trustees failed to

13   prove the chain of custody for the loan files, which courts

14   have found necessary to prove a missing document claim.

15         Your Honor will hear from Mr. Grice about why

16   proof of chain of custody is critical.

17         Well, Your Honor, we've put together a little

18   graphic to demonstrate, you know, the problem with the

19   trustees' theory.

20         The loans at issue originated between 2012 --

21   sorry -- 2002 and 2008.  The trustees sat idle through many

22   years and did not collect the loan files until 2015 and

23   2016.  During those many years when the trustees elected not

24   to pursue their claims the loan files changed hands many,

25   many times.

Page 52

1               I'm going to provide now a very, very simplified

2       description of what happened to these loans after they

3       originated, which is illustrated by this graphic.  And

4       Mr. Grice is going to testify to this in more detail, Your

5       Honor.

6               After a loan was approved by the originator the

7       closing agent's copy of the file moved to the subsequent

8       loan purchaser.  Then the file was sent to a sponsor like

9       Lehman Brothers that securitized the loan.  Eventually the

10      loan file made its way to the master servicer or servicers

11      where a hard copy version of the documents were likely

12      removed from their file folders and then scanned.

13              It is important to note that in the protocol the

14      trustees only made their requests for the loan files from

15      the last servicer of the files.  Those are the only files

16      that the trustees collected.  The trustees have not

17      attempted to prove that the files provided by those

18      servicers contained the original contents of the files as of

19      origination, and there are obviously many documents in these

20      files moving to various places over time.

21              Your Honor will hear that documents missing from

22      the file in 2015 and 2016 very well may not have been missed

23      at origination, as I mentioned earlier.

24              Your Honor will hear that simply put there is no

25      chain of custody here, and there's no evidence as to what

Page 53

1    happened to missing documents in the loan files.  Were they

2    missing originally?  Would they go missing the 7 to 14 years

3    post origination before --

4              THE COURT:  So somebody on the second or third

5    hand off could have decided that an appraisal was too big to

6    copy.

7              MR. COSENZA:  Or spilled coffee on the file or

8    somehow when it got scanned a page went missing.

9              THE COURT:  And remind me what I read about any

10   indications as to whether or not a particular loan file was

11   digitized at a certain point in time.  It may -- I mean

12   certainly --

13             MR. COSENZA:  Yeah.

14             THE COURT:  -- we're back to 2002, it seems

15   unlikely that folks were digitizing things --

16             MR. COSENZA:  That's correct.

17             THE COURT:  -- back then.

18             MR. COSENZA:  That's correct, Your Honor.  And

19   we'll explain this more during Mr. Grice's testimony, but

20   there were a number of the files that were digitized.  I

21   can't give you a percentage as to what it was, but I think

22   it's at least over a third, if not more.

23             THE COURT:  Okay.

24             MR. COSENZA:  Despite the expert testimony Your

25   Honor will hear regarding the loan files movement and

Page 54

1    deterioration over time the trustees initially asserted

2    approximately 74,566 missing document claims.  These types

3    of claims flooded the protocol and created an enormous

4    burden on the plan administrator as we were trying to

5    respond to the claims put forward by the trustees in step

6    one of the protocol.

7              Indeed Your Honor will hear that the plan

8    administrator even located many of the allegedly missing

9    documents during step two of the protocol.  While it was

10   very challenging, Your Honor, we tried to do it.  And, Your

11   Honor, the trustees' dropped about 52,000 missing document

12   claims before they submitted their expert reports in this

13   proceeding.

14             As Your Honor knows the trustees failed to provide

15   an explanation for why they dropped those claims and cloaked

16   the decision in attorney/client privilege, as I mentioned

17   earlier.  But it's hard to understand why they still decided

18   to pursue the 18,540 missing documents claims here that

19   remain in the case today given the faulty chain of custody

20   and weak evidence for these claims.

21             Further, Your Honor will hear that the trustees

22   made the strategic decision only to collect documents from

23   the last servicer and not from anyone else.

24             Indeed Your Honor will hear from Mr. Edmond Esses,

25   who worked at Duff Phelps.  Mr. Esses was responsible for

Page 55

1    collecting loan files from the servicers.

2              Let's hear what Mr. Esses testified to about the

3    trustees -- about the efforts the trustees made to collect

4    files before asserting almost 75,000 missing document

5    claims.

6         (Video deposition played)

7              MR. COSENZA:  This is significant, Your Honor.  As

8    Mr. Esses testified, the trustees did not even consider any

9    other sources for missing documents besides the loans last

10   servicers.  This is striking given the intent of the

11   protocol and the Court's clear availability to assist the

12   trustees with their efforts to collect documents.

13             So the trustees elected not the establish a valid

14   chain of custody or do any additional work in collecting

15   loan files from other sources.  Instead they made the

16   strategic decision to flood the protocol with these claims.

17   A large number, Your Honor, that really burdened the

18   protocol and then later withdrew a large past of this -- of

19   those claims during this estimation proceeding.  For those

20   reasons all missing documents claims should be estimated at

21   zero.

22             Next, Your Honor, we'll hear testimony from the

23   plan administrator's review of the loan files that confirmed

24   what we told the Court in December 2014 when we moved to the

25   entry of the protocol order was correct.  Namely that every

Page 56

1    loan needs to be reviewed holistically, because each loan

2    has unique characteristics and requires an individual

3    analyze.  Indeed, Your Honor, each loan file is like a snow

4    flake.

5         In all seriousness, Your Honor, you will see that

6    these loan files are incredibly complicated and each one

7    tells a different story and is unique.  In essence each file

8    represents a fragmented snapshot of the borrower's financial

9    life.

10        Your Honor will hear testimony that the trustees'

11   and plan administrator's witnesses agree that each loan file

12   is unique.  When the trustees' expert, Mr. Driscoll was

13   asked to make a generalized assessment about whether

14   misstatement of income of six percent would be material he

15   testified:

16       (Video deposition played)

17        MR. COSENZA:  So the parties are in agreement on

18   this important point, which should come as no surprise.

19   Despite the parties' agreement on the uniqueness of each

20   loan file Your Honor will hear that instead of reviewing

21   files holistically the trustees reviewed them myopically.

22   The trustees tired only to find evidence that would support

23   a breach finding and they ignored contradictory evidence in

24   the file.  I'll describe one particular loan file as an

25   example for Your Honor.  This is loan ending in 8999.

Page 57

1              The trustees asserted a breach based on alleged

2    misrepresentation of employment.  The borrower stated on his

3    application, dated April 11, 2007 that he was employed as a

4    pastor.  Your Honor will hear that the pastor's employment

5    was verified when he applied -- this is back in 2007 --

6    through an origination verification of employment.  This is

7    often referred to as a VEO.  So this is a contemporaneous

8    VOE, Your Honor, from 2007.

9              The trustees here claim however that the pastor

10   misrepresented that employment.  What did the trustees rely

11   on to make that claim?  The trustees rely on a phone call

12   made by a forensic analyst in 2015 to a bookkeeper at the

13   pastor's church, a call made eight years after the loan was

14   issued.  The bookkeeper allegedly told the forensic analyst

15   that the pastor's employment ended approximately March 15,

16   2007, which is a month before the loan closed.

17             Just to be clear, despite having a verification of

18   employment obtained at origination the trustees elected to

19   obtain another verification of employment eight years later

20   and they fully credit that VOE discrediting the one that was

21   already in the file.

22             This is just one example of the trustees' flawed

23   process, which is structured to maximize the number of

24   claims put through the protocol.

25             I will not be spending much time on the specifics

Page 58

1   of each loan file in my opening, Your Honor, because as I

2   said, they're quite unique and difficult to walk through,

3   but Your Honor will hear evidence from Mr. Trumpp,

4   Mr. Grice, and Mr. Castro on particular loan files to

5   illustrate several different points about the trustees'

6   flawed loan review process.

7           As Your Honor knows from the trustees' brief the

8   trustees claim to be shifting their focus on the "big four

9   breaches."  Income, debt, occupancy, and excessive debt to

10  income ratio.

11          As I mentioned earlier, it is our understanding

12  that the trustees intend to prove their $11.4 billion in

13  claims by focusing on these breach types and proving that

14  the types of evidence the trustees submitted in the protocol

15  to support them are used in the industry.  But as Your Honor

16  will hear saying that the types of proof the trustees relied

17  on could be accepted in the industry does not mean that the

18  trustees proved a particular breach on a particular loan.

19  The trustees again conflate relevance with sufficiency.

20  This is a critical issue, Your Honor, and a pervasive

21  problem with the trustees' approach throughout the protocol.

22          Among other problems that Mr. Grice will testify

23  about, one overarching theme is the trustees systemically

24  credited any one piece of evidence in the loan file often

25  obtained many years after origination like the pastor's loan

Page 59

1   file we just discussed over the borrower's contemporaneous

2   statements on that loan application as well as the

3   information shared with the loan officer.

4           Although the Court is aware of much of this I want

5   to provide some background on the loan origination process

6   to put the trustees' claims into context.

7           Again, almost all the loans originated between

8   2003 and 2007.  The process typically began with the

9   borrower meeting with a loan officer to secure a mortgage to

10  buy a home.  The borrower's occupations span a very broad

11  range of job types and there are different facts and

12  circumstances surrounding each borrower's need for a

13  mortgage.  There are typically many interactions between the

14  borrower and loan officer before the decision was made to

15  issue the loan.

16          The trustees' disregard that the loan officer was

17  closer to the borrower and particular facts of the loan as

18  compared to the trustees' loan reviewers who were looking at

19  the file many years later, in some cases a decade or more,

20  after origination.  But the trustees are now trying to move

21  forward on their big four claim types without any specific

22  proof of intent arguing that these misrepresentations by

23  borrowers were intentional across the board.

24          The plan administrator acknowledges that a number

25  of borrowers made misrepresentations on their mortgage

Page 60

1    applications.  We are sure that Your Honor will hear about

2    some of those borrowers during this hearing, and in fact the

3    plan administrator has accepted many of the breach claims

4    put forward by the trustees, but the trustees are trying to

5    do something different here, Your Honor, they're trying to

6    have the Court assume that all of these borrowers made

7    intentional misrepresentations to support 70,000

8    misrepresentation claims.

9           Your Honor will not hear any evidence of any

10   borrowers at this point or from any loan officers.  Your

11   Honor will certainty not hear sufficient proof to find that

12   tens of thousands of borrowers made intentional

13   misrepresentations on their loan applications.

14          The trustees have been steadfastly trying to avoid

15   sustaining their burden of proof on these claims.  Instead

16   the trustees maintain that based on inference and argument

17   the trustees have met their burden on all of these

18   misrepresentation claims.  Your Honor, we've been hearing at

19   that for years, since 2009, without the trustees providing

20   sufficient proof, but the time for inference and argument

21   has passed.  And as Your Honor will hear, many of those

22   borrowers were gainfully employed individuals who took out a

23   mortgage and may not have been able to make their mortgage

24   payments due to life circumstances.  And Your Honor will

25   hear that the trustees have asserted claims with respect to

Page 61

1    more than 10,000 loans that are current today.  That means

2    the borrowers are still making payments on those loans.

3    In fact the trustees' expert, Mr. Morrow testified that in

4    his experience most borrowers do not lie.

5            The trustees' position -- I'll give you context

6    for his testimony that we're going to play now -- the

7    trustees' position as stated in their pretrial brief is that

8    the borrower's failure to disclose debt that closed after

9    the loan origination violates representations in the

10   governing agreements, but when Mr. Morrow was asked whether

11   as a banker he had ever sued a borrower for failure to

12   disclose debt that was planned but not yet undertaken at the

13   time of origination he could only remember one instance.

14   Instead he testified that clients or borrowers are most of

15   the time honest.

16           Let's here from Mr. Morrow.

17      (Video deposition played)

18           MR. COSENZA:  And that's it from Mr. Morrow, one

19   of the trustees' experts, it's his view that most of the

20   time borrowers do not lie or make misrepresentations.

21           Your Honor will hear about other problems with the

22   trustees' process and claims.  According to the trustees

23   their only burden is to prove a breach of a representation

24   or warranty, if they make that showing for a given loan the

25   trustees' theory is that they are entitled to be compensated

Page 62

1    for all losses on that loan in the form of the full

2    contractual purchase price as they calculate it, including

3    speculative future losses and unrecoverable interest.  This

4    is regardless of whether the alleged breach they proved had

5    anything to do with the losses.

6           The trustees' approach is flawed in at least three

7    fundamental respects.

8           First the trustees' contractual AMA analysis is

9    wrong.  In their view, as I mentioned to Your Honor earlier,

10   material breach necessarily adversely materially affects the

11   value of the loan.  The evidence will show this approach to

12   AMA cannot with reconciled with the language of the contract

13   and that the trustees' approach reads AMA out of the

14   contract.  The AMA language requires an additional

15   individualized explanation of how a particular loan breach

16   adversely and materially affects the value of the loan at

17   the time the breach claim is made.

18          The trustees' failure to do this analysis left

19   their claims devoid of a necessary aspect of their proof,

20   yet the plan administrator gave credit for the existence of

21   AMA when we independently saw it existed in a particular

22   file.  And this fundamental disagreement about the burden

23   imposed by this requirement is one of the key reasons why

24   the protocol process ultimately stalled.

25          Second, the trustees wrongfully demand breach of

Page 63

1    contract damages without proof of a nexus or relationship

2    between the alleged breach and the entitlement to collect

3    damages.

4              If there's one point that the parties agree on,

5    Your Honor, is that the trustees did not attempt to make any

6    showing that the asserted breach has a casual connection or

7    nexus to the claim losses even though the trustee stated in

8    the first line of their pretrial brief that this is, as I

9    mentioned earlier "a straightforward breach of contract

10   case."

11             The trustees are adamant --

12             THE COURT:  Isn't the trustees' position that

13   nothing in the governing loan documents requires causation?

14   That's their point, right?

15             MR. COSENZA:  That is their point, yes.

16             THE COURT:  And your point is that because -- even

17   though there may not be anything per se in the loan

18   documents that uses the word causation, you're saying that

19   we need to layer over this case first year contract --

20             MR. COSENZA:  Correct.

21             THE COURT:  -- law.

22             MR. COSENZA:  That's correct, Your Honor.

23             THE COURT:  Right.  Breach, causation --

24             MR. COSENZA:  Yes.

25             THE COURT:  -- damages equals claim.

Page 64

1           MR. COSENZA:  Yes.  And we discuss this in our

2     brief.  We had our Second Circuit case, this is not a

3     disputed issue of law that you have to prove proximate

4     causation for damages, and that's the Sterling National Bank

5     case from the Second Circuit that we've cited.

6           THE COURT:  Okay.

7           MR. COSENZA:  So if the Court agrees that the

8     trustees are required to make some showing of a nexus the

9     trustees are entirely without proof on this issue, which

10    affects each and every loan in their protocol.  This could

11    support estimating the trustees' claim at a level well below

12    $2.3 billion in and of itself.

13          The third way that the trustees' claims are

14    overreaching is how they're asking the Court to award

15    damages.

16          First, the evidence will show that the trustees'

17    calculation of their damages includes billions of dollars of

18    interest that is subject to disallowance under 502(b)(2) of

19    the Bankruptcy Code.

20          Second, some 20 percent of the loans at issue --

21    and I'm going to detail these more later, Your Honor.

22    Second, some of the 20 percent of the loans at issue are

23    still active -- as I had mentioned before -- and a

24    significant portion of them are still current.  In our view

25    it's extremely unlikely that the trustees are entitled to

Page 65

1    any damages on the vast majority of loans that have been

2    performing for ten years or more.  Of course the trustees

3    like to point out that a large number of these loans that

4    are still performing were modified in some way.  However,

5    the fact remains that these loans are still performing and

6    generating income streams for the RNBS trust.

7              THE COURT:  So let me stop you on that point.  So

8    you stated at the outset that this isn't a repurchase case,

9    it's a damages case, right?

10             MR. COSENZA:  That's correct, Your Honor.

11             THE COURT:  So just trying to understand what the

12   significant of that difference.

13             So in a particular loan where both sides would

14   agree that there's a material breach but the borrower

15   continues to pay ten years out, the trustees would take the

16   position that they could put back that loan if Lehman were

17   still in existence.

18             MR. COSENZA:  That's correct.

19             THE COURT:  Right?

20             THE COURT:  And Lehman takes the position that

21   with the loan still performing they wouldn't be able -- they

22   wouldn't have a put-back claim?

23             MR. COSENZA:  Your Honor --

24             THE COURT:  Is that where it begins to make a

25   difference that this is Lehman and not a live lender

Page 66

1    anymore?

2             MR. COSENZA:  So, Your Honor, this is improperly

3    disclosed in one of their expert reports, but as the

4    protocol process first started there was a discussion about

5    Lehman taking in the active loans as part of a repurchase

6    type approach and that was rejected by the trustees.  They

7    said that would be inequitable and they did not want that

8    approach.

9             THE COURT:  Oh, sure, I understand that.

10             MR. COSENZA:  Yeah.

11             THE COURT:  I'm not trying to -- that's not --

12             MR. COSENZA:  Yes.

13             THE COURT:  -- where I was going with the

14    question.  I'm just trying to understand what difference it

15    would make if there were hypothetically an ability to put

16    back a loan.  And I think what -- I think what the trustees

17    will argue, and they can tell me if this is not true -- is

18    that notwithstanding that a loan continues to perform, if

19    today they were to identify something that they believe is a

20    material breach they would have a put-back claim.  I think

21    that what's their position is, right?

22             MR. COSENZA:  Yes.  And I think if we go to the

23    second component of AMA and causation in order for them the

24    quantify what the damages would be on that particular loan.

25             THE COURT:  Got it.  Okay.

Page 67

1          MR. COSENZA:  Your Honor, last point on active

2     loans is that the trustees are asking the Court to estimate

3     their damages on those loans based on a clearly flawed

4     estimate of their current value, and we're going to discuss

5     that later.

6          Lastly, even though this is a Court sitting in

7     equity what the trustees fail to account for with their use

8     of the purchase prices as a proxy for damages is the

9     billions and billions of dollars in interest payment that

10     the trusts have been collecting on these loans, including

11     after Lehman's bankruptcy in 2008.

12          The trustees' purchase price calculations ignore

13     these cash flows despite the enormous benefit that the

14     trusts have received from them.  That the trustees fail to

15     take account of these cash flows in their brief and in their

16     purchase price calculation is not equitable.  I will discuss

17     each of those flaws in more detail now.

18          First, on the trustees' not conducting an AMA

19     analysis the evidence will show that the trustees did not

20     conduct an AMA analysis required under the governing

21     agreements and protocol order to prove a breach of contract.

22          Again, as we mentioned earlier, proving that a

23     loan sold into a trust violated or breached a representation

24     of warranty in the governing agreements is not sufficient to

25     show breach of the governing contracts, which all have an

Page 68

1    expressed additional requirement.

2            The second equally essential element of each of

3    the breach of contract claims that the trustees must prove

4    here is that the alleged breach adversely materially affects

5    the value of the loan when the claim is made.

6            And, Your Honor, we put up a sample language from

7    one of the MLSAAs, which shows that, you know, that the

8    breach must adversely materially affect the value of the

9    loan.

10           The evidence will show that the trustees elected

11   not to do a proper AMA analysis for the claims they

12   submitted in the protocol.

13           As I previewed for Your Honor before the trustees

14   instead elected to provide generalized mechanical statements

15   of AMA by breach type with no individualized showing of how

16   each of the rep and warranty breaches they were asserting

17   adversely and materially affects the value of the loans when

18   the trustees' made their protocol submissions.  The trustees

19   had clear notice going to protocol that such evidence would

20   be necessary to sustain their claim based on our 2014

21   protocol motion, the December 2014 hearing, and the protocol

22   order itself, which requires the trustees to provide how a

23   breach entitled them to a claim under the governing

24   agreements and applicable law.  Despite this clear notice

25   the trustees elected not to do the work on AMA during the

Page 69

1    protocol.

2            Your Honor will hear testimony that the

3    appropriate standard in the industry for determining whether

4    AMA exists is a finding that the breach one, led to a

5    default, delinquency, or some other loss on the loan; or

6    two, impeded the servicer's ability to enforce the terms of

7    the loan in default.

8            Your Honor is going to hear from Mr. Dan Castro,

9    an expert with other 30 years of experience, in the mortgage

10   finance industry.

11           THE COURT:  What were you just reading from?

12           MR. COSENZA:  I think that's from Mr. --

13           THE COURT:  Led to the delinquency.  Where is

14   that?  Were you reading the standard or were you reading --

15           MR. COSENZA:  Oh, no, I was reading from -- that's

16   from Mr. Castro's report.

17           THE COURT:  From his report.

18           MR. COSENZA:  Yes.

19           THE COURT:  Okay.  All right.  Mr. Cosenza, I'm

20   looking at the clock, I'm looking at the page number.  You

21   folks have been sitting here for almost two hours.  I think

22   maybe we ought to take a five-minute break.

23           MR. COSENZA:  Sure.

24           THE COURT:  Okay?  And then we'll come back.  And

25   to the extent that you go over the two hours either as a

Page 70

1    result of my questions or otherwise, Mr. Shuster, do you

2    have any objection to allowing Mr. Cosenza to finish,

3    obviously with you being afforded additional time as well?

4              MR. SHUSTER:  None whatsoever.

5              THE COURT:  Okay.  So why don't we take a --

6              MR. COSENZA:  Sure.

7              THE COURT:  -- we'll call it a ten-minute break

8    because we'll call it a ten-minute break.

9              MR. COSENZA:  Thank you, Your Honor.

10             THE COURT:  All right?  Thank you.

11        (Recessed at 11:27 a.m.; reconvened at 11:43 a.m.)

12   THE COURT:  Please have a seat.

13             MR. COSENZA:  Thank you, Your Honor.

14             THE COURT:  Okay.

15             MR. COSENZA:  So where we left off, Your Honor, I

16   had mentioned Mr. Castro and his expertise, and he's

17   evaluated numerous repurchase claims throughout his career.

18   At this point, Mr. Castro will testify that to determine the

19   presence of AMA, industry participants assess a multitude of

20   factors, macro-economic factors, borrower factors, property

21   factors, servicing factors, and loan factors, all of which

22   affect the value of the loan.

23             He will testify to make a determination on AMA,

24   one must review and consider the entire mix and weight of

25   evidence in the loan file.  Again, the evidence will show

1    that the trustees did not attempt to review the entirety of

2    the loan file to determine whether their alleged breaches

3    adversely and materially affected the value of the loans,

4    whether their claim losses were caused by some external

5    factors.

6            Indeed, Mr. Aronoff testified that for the AMA

7    analysis, that the trustees undertook during the protocol,

8    both the borrowers' payment history and servicing notes,

9    which include various interactions between servicer and

10   borrower and may have information on major life events,

11   affecting the borrower, that are not relevant to the

12   trustees' AMA analysis.  Let's hear from Mr. Aronoff.

13       (Video deposition played)

14           MR. COSENZA:  And even probably problematic is

15   what the trustees did in the protocol to state how an

16   alleged breach met their definition of AMA.  The trustee

17   simply gave the plan administrator these four stock

18   statements.  And we will call them out one-by-one, Your

19   Honor.

20           The first stock answer is that the breach

21   "increases the likelihood of default with respect to the

22   loan, thereby increasing your credit risk associated with

23   such loan.  The breach causing an increase in credit risk is

24   material and adverse to the value of the loan."

25           The second stock answer is that the breach

Page 72

1    "increases the expected potential loss severity and

2    likelihood of default with respect to the loan, thereby

3    increasing the credit risk associated with such loan, a

4    breach causing an increased credit risk is material and

5    adverse to the value of the loan."

6          The third stock answer is that the breach

7    "increases the potential loss severity and a likelihood of

8    default with respect to the loan, thereby increasing the

9    credit risk associated with such loan.  A breach causing an

10   increase in credit risk is material and adverse to the value

11   of the loan."

12         And the fourth stock answer is that the breach

13   "increases the potential loss severity with respect to the

14   loan, thereby increasing the credit risk associated with

15   such loan.  A breach causing an increase in credit risk is

16   material and adverse to the value of the loan."

17         Except for the deemed AMA claims, these are the

18   four stock answers the trustees provided to show AMA for all

19   the loans that remain at issue.  These formulaic stock

20   answers clearly are not sufficient to carry the trustees'

21   burden here.

22         These responses provide no meaningful analysis of

23   an individual finding AMA.  Again, this is what the trustees

24   believe carries their burden of showing AMA here in this

25   case for each of their loans.  Simply put, these responses

Page 73

1    fail to do so.

2              Moreover, as we can see in red here, these stock

3    responses are caveated in terms of "potential or likelihood

4    of a loss occurring."  Having failed to ground their claims

5    on quote actual losses, the trustees' position creates the

6    potential for an enormous windfall.  The trustee has accused

7    the plan administrator of providing similar stock responses

8    to the trustees' claims, but that is not a proper

9    comparison.

10             THE COURT:  So before you move off of this

11   slide --

12             MR. COSENZA:  Yes.

13             THE COURT:  -- I think that this is related, part

14   -- in part to some of the Monoline cases, right?

15             MR. COSENZA:  That's correct, Your Honor.

16             THE COURT:  And is it the plan administrator's

17   position that while this might work in a Monoline case, it

18   shouldn't work here?

19             MR. COSENZA:  That's correct, Your Honor.  And

20   even in the Monoline cases, you can look at Judge Rakoff's

21   decision in those cases.  There's still an element there

22   where he says there has to be some level of proof of a

23   proximate cause between the breach and the actual loss that

24   the parties were attempting to recover, even in the Monoline

25   cases, which are under an entirely different standard.

Page 74

1              So, Your Honor, this is what we had, this is what

2      we received in the protocol.  And with the burden of proof

3      on this issue, you know, it's the plan administrator's

4      position that the trustees must do more than give stop

5      positions to prove their claims.

6              As I discussed generally before, what the trustees

7      are trying to do here simply is show that the presence of a

8      breach increases the risk of loss on a loan, and that

9      adversely materially affects the loan's value.

10              As Your Honor will hear from Mr. Castro, this

11      approach is inconsistent with industry custom and practice

12      and improperly conflates the breach and AMA determinations.

13      Mr. Castro will testify that even if the risk of loss was

14      the appropriate standard, the trustees did nothing to

15      measure the alleged increase and risk of loss on each loan.

16              Mr. Castro will testify that an analysis would be

17      necessary, because to prove a claim the trustees have to

18      show the effect of the breach was both adverse and material.

19              Your Honor, you'll -- here's another fundamental

20      problem with the trustees' risk of loss approach to AMA,

21      that is the trustees measure AMA at the time of loan

22      securitization, rather and at the time the breach claim is

23      made.  That analysis is inconsistent with case law, and the

24      language of the contracts, which as I've mentioned several

25      times previously says affects in the presence tense, which

Page 75

1    is at the time the trustees made their claim.

2              There's no evidence, however, that the trustees

3    analyzed the presence of AMA at the time they submitted

4    their claims.  To justify this approach, Mr. Aronoff in his

5    expert report had to expressly disagree with the recent

6    decision of when AMA is measured issued by a District Court

7    Judge in the Southern District of New York.

8              Here's what Mr. Aronoff had to say in his expert

9    report:

10             "In my experience, AMA is assessed -- the AMA

11        assessment is made as of the time the transaction

12        closed.  I understand in a recent case Judge Castell

13        had suggested that materiality should be assessed at

14        the time a demand to repurchase is made.  That is not

15        my understanding, and in my view, is not consistent

16        with industry understanding."

17             To be clear as a finer point, there is no evidence

18    in the record that the trustees analyzed the presence of AMA

19    at the time they gave the notice of the alleged breach as

20    required by the case law.

21             Indeed, it's clear from Mr. Aronoff that he simply

22    disagrees with Judge Castell and filed what he believed to

23    be the appropriate industry standard.  And now as a result,

24    there's yet another fundamental deficiency in the trustees'

25    proof of AMA, given that the trustees never undertook the

Page 76

1    correct analysis during the protocol.

2            THE COURT:  So is it that the trustees through Mr.

3    Aronoff or otherwise, make the -- do not make an AMA

4    assessment, merely, in other words, jump to what I'll call a

5    deemed AMA, once you have material breach, or is it the case

6    that it was done in your view as of the wrong moment in

7    time?  I thought --

8            MR. COSENZA:  Your Honor, it's both.

9            THE COURT:  It's both?

10            MR. COSENZA:  It's both.

11            THE COURT:  Or either.

12            MR. COSENZA:  So you have one is that, they just

13    get us to the stock responses and didn't do any analysis of

14    AMA.  Second is, even looking at those stock responses and

15    what they claimed they did, they said they only did it as of

16    the time of origination or securitization.  They never did

17    in the context of the time that they actually provided

18    notice of their claim.

19            So there are two fundamental problems with how

20    they undertook their AMA analysis.  It all goes to proof, it

21    all goes to what was submitted in the protocol.  And our

22    argument is, you know, each independently would warrant a

23    finding that there's just a fundamental deficiency of proof

24    and how they proceed in the protocol, and how they can try

25    to prove up their claims in this proceeding.

Page 77

1           As demonstrated by the trustees in their pretrial

2     brief, it appears the trustees may attempt to rely very

3     heavily on the statements made by LBHI and its affiliate

4     employees in other repurchase litigation.

5           Your Honor, if the trustees try to introduce these

6     statements as they did in their pretrial brief into

7     evidence, there will be a series of evidentiary objections,

8     and the trustees will need to provide a proper foundation

9     for admission of these statements.

10          As Your Honor will hear, those statements are from

11    different cases and are often quoted by the trustees

12    selectively and out of context.  They are also highly

13    prejudicial to the plan administrator, and of little

14    probative value for several reasons.

15          First, in many of those cases, LBHI and its

16    affiliates were in the role of purchasers of whole loans,

17    intending to sell them to upstream purchasers for

18    securitizations.  For whole loans, LBHI acted as a

19    warehouse, and acquired the loans and then tried to

20    securitize them.

21          If LBHI was unable to securitize a loan, due to a

22    breach, it was clear the breach had a material and adverse

23    effect on the value of the loan.  As Mr. Castro will

24    testify, the AMA analysis here is completely different and

25    is much more nuanced.  The securitized loans at issue here

1    have no trading value.  To determine whether an alleged

2    breach adversely and materially affects the loans in this

3    context, one needs to analyze whether the breach affects the

4    loan's value to certificate holders.  Given this different

5    context, the prior LBHI statements related to whole loans

6    and do not correspond to the loans at issue.

7           Second, unlike many of the loans here, the loans

8    from the prior LBHI cases they cite involve loans that often

9    defaulted in a very short timeframe, following origination,

10   including early payment defaults or EPDs.  You'll hear from

11   Mr. Trumpp on that point.

12          Third, as Your Honor has heard repeatedly, every

13   loan is unique, and so too is the evidence necessary to

14   prove a breach.  So trying to extrapolate statements made

15   about different types of loans at issue and LBHI's Downtian

16   (ph) in cases to loans here is improper.

17          Fourth, the work done by LBHI to substantiate

18   their claims in the Downtian cases was generally more

19   substantial than the work done by the trustees here.  Thus,

20   LBHI's claims in those cases were based on a fuller record.

21          While the trustees likely argue that LBHI used the

22   same types of evidence in the Dowtian cases as those used by

23   the trustees here, again that assertion is incomplete.  LBHI

24   often conducted investigations of the facts and

25   circumstances surrounding the loans, much more deeply before

Page 79

1    pursuing claims.

2            For example, you'll hear from Mr. Trumpp, LBHI

3    often contacted borrowers and loan officers to better

4    understand their claims before pursuing them.  Something

5    that the trustees did not do in the protocol.

6            The next critical file will mention the trustees'

7    failure to prove is the trustees' failure to prove a nexus

8    between the breaches and the losses they claim.

9            THE COURT:  Can -- let me ask you a question.  So

10   one example that I recall from reading the briefs is the

11   trustees I believe take the position that in other cases, in

12   other context, LBHI has said bankruptcy schedules trump

13   borrower income statements.

14           MR. COSENZA:  Yes.

15           THE COURT:  Right?

16           MR. COSENZA:  Correct.

17           THE COURT:  And they point out I think that here

18   you're taking the opposite approach.

19           MR. COSENZA:  So, Your Honor, just two responses

20   to that.  One is, again every analysis of the loan file has

21   to be read holistically, so our reliance on a bankruptcy

22   file in that case, there would have to be, and we'll see

23   from Mr. Trumpp, typically other supporting evidence in

24   addition to bankruptcy filing, that would show what was made

25   in origination was inaccurate.

```
 1              THE COURT:  So I guess my concern is that when we

 2    get to this inflexion points as you --

 3              MR. COSENZA:  Yes.

 4              THE COURT:  -- gave me the coming attraction --

 5              MR. COSENZA:  Yes.

 6              THE COURT:  -- that we're going to have these

 7    evidentiary issues, am I going to have actually drill down

 8    and make a determination as to what LBHI did or did not do

 9    in some other context?  That sounds like --

10              MR. COSENZA:  Yes.

11              THE COURT:  -- a classic kind of trial within a

12    trial that will be --

13              MR. COSENZA:  Well we --

14              THE COURT:  -- challenging.

15              MR. COSENZA:  You know, we agree with you, Your

16    Honor.

17              THE COURT:  Okay.

18              MR. COSENZA:  I think when you get statement-by-

19    statement and see how it's being used, in order to assess

20    whether there's a proper foundation, whether it's out of

21    context, whether the parole evidence rule applies, so

22    there's going to be a lot of, you know, we just have to sort

23    of do it as it comes, and hopefully we'll get some, you

24    know, guiding rulings from Your Honor about how to handle --

25              THE COURT:  Okay.
```

Page 81

1          MR. COSENZA:  -- this going forward.

2          Your Honor, the next critical file I think I

3     mentioned this later, is to prove that the trustees did not

4     prove any nexus between the breaches and the losses they

5     claim.  The consequence of the trustees' flat application of

6     the AMA provision is that the trustees' claim suffered from

7     an incurable failure of proof.  They have not provided any

8     evidence to establish the necessary link between the alleged

9     breaches and claim losses.

10          As I mentioned earlier, the trustees currently

11    assert that the plan administrator is liable $11.4 billion

12    of damages, based on breaches of reps and warranties for

13    over 70,973 loans.

14          The trustees' position to protocol and in this

15    proceeding, is that they're not required to prove the

16    alleged breaches and any connection or nexus to a default or

17    the losses suffered on the loans.

18          As I mentioned before, the trustees' position is

19    that a proof of breach will significantly increase the risk

20    of loss on the loan at the time it was securitized, they are

21    entitled to recover all losses on the loan, in the amount of

22    the full purchase price in the governing agreements.

23          The loan I'm about to describe to you is an

24    example of why the trustees' view does not make any sense.

25    This is loan ending in 5164 that the trustees asserted had a

Page 82

1    misrepresentation of debt.

2           The loan was taken out by a couple from a small

3    town in Massachusetts.  They co-owned a local bakery and

4    that was actually in New Hampshire for over 30 years.  The

5    loan closed in July 2005.  The trustees allege that the

6    couple did not disclose debt they acquired two months prior

7    to the subject loan.

8           However, the couple went on to make timely

9    payments on their loan for over seven years.  And why did

10   the payment eventually stop?  Your Honor, as the wife

11   explains in this hardship letter, her husband unfortunately

12   passed away and she stated, that she could no longer afford

13   to keep the property.

14          An astonishing revelation of the inappropriate

15   nature of the trustees' approach, when the trustees asserted

16   their claim on this file for misrepresentation, they did not

17   even include the hardship letter in their claim file, which

18   shows that the loss of the loan was not related to whatever

19   breaches the trustees asserted.  Yet, the trustees are still

20   seeking the full purchase price of this loan as damages in

21   this case.

22          As Your Honor can see from this example, the

23   adoption of the trustees' position here that they can

24   recover the full purchase price for every loan leads to

25   absurd results and is particularly inappropriate in the

Page 83

1      context of a bankruptcy, given the windfall that follows.

2      It is also contrary to applicable law, as we describe in our

3      pretrial brief.

4              THE COURT:  In the Monoline case, though, right,

5      assuming the facts are as you represented them, there would

6      be a valid put-back claim, right?  Because at the moment of

7      origination, the issue would be stated one way, whether or

8      not the loan would have been made.

9              MR. COSENZA:  So, Your Honor, on this loan --

10             THE COURT:  I know I keep going back to the

11     Monoline cases --

12             MR. COSENZA:  Yeah, I know, but in this loan, I

13     think there actually wouldn't be a claim theoretically

14     because the statute of limitation would knock it out.

15             THE COURT:  Different issue.

16             MR. COSENZA:  Right, that's a different issue.

17             THE COURT:  Different issue.

18             MR. COSENZA:  But theoretically using that the --

19     you're correct, that there would be -- there could

20     theoretically be a recovery on this, assuming that there's

21     some proximate cause between the breach and the loss that

22     they would have met the -- you know, the breach requirement.

23             THE COURT:  Yep.

24             MR. COSENZA:  So, Your Honor, the trustees have a

25     breach of contract claim under New York law, and they're not

Page 84

1    bringing a repurchase claim.  It's clear under New York law

2    that trustees had to demonstrate a causal connection between

3    the breach claims they asserted and the claim losses.

4    Instead of doing that, the trustees did not take causation

5    into account when presenting their claims.  Instead, they

6    claimed the burden of proof will satisfy by identifying the

7    type of breach and asserting such breach by definition tends

8    to increase the risk of loss on a loan.  The trustees'

9    breach claims then suffer from another fundamental failure

10   of proof.

11           Your Honor, I want to mention another issue that

12   the trustees' argument to the plan administrators quote 1

13   percent acceptance rate in the protocol is absurd, and this

14   is from the trustees' brief.  I just want to put that in

15   context.

16           This assertion is misleading and irrelevant.  This

17   has nothing to do what the plan administrator is seeking

18   here.  But first, let me go through the math.

19           As Your Honor is aware as I mentioned earlier, the

20   trustees flooded the protocol process with an unreasonable

21   number of claims.  Over 193,000 claims on 94,566 loans so we

22   started with an inflated number of loans and a denominator

23   of the trustees' equation.

24           Putting that problem with the premise of their

25   math aside, the plan administrator actually found breaches

Page 85

1    at a much higher percentage in this case than the trustees

2    asserted in their brief.

3            First, as I will explain in more detail shortly,

4    the plan administrator did not review approximately one-

5    third of the loans at issue because of the trustees' failure

6    to comply with the requirements of the protocol order.

7            There are approximately 30,000 loans which the

8    trustees failed to comply with the order, and the plan

9    administrator did not review those loans because of the

10   trustees' failure.  So those have to be removed from the

11   denominator.

12           During steps two and three of the protocol, the

13   trustees also rescinded loans, and there were a number of

14   trusts that collapsed and loans that liquidated without a

15   loss.  So those have to be removed from the denominator as

16   well.

17           In addition, as I mentioned several times, Your

18   Honor is aware the trustees abandoned 15,107 loans before

19   they submitted their expert reports.

20           So reducing the denominator to reflect the loans

21   reviewed by the plan administrator during the protocol that

22   may have compensable claims results in a much lower number,

23   approximately 47,775 loans or half, roughly, that the

24   trustees asserted in their brief.

25           Now, we have a proper denominator, even using the

Page 86

1    inflated number of claims put forward by the trustees in the

2    protocol.

3              Next, we will now move on to calculate the

4    appropriate numerator.  We start with the fact that the plan

5    administrator approved 1,260 loans during the protocol

6    process and subsequently this summer.  In addition, the plan

7    administrator, and this is important, agreed that there was

8    a valid breach claim for another 3,000 or so claims, so that

9    increases the numerator in this equation.  However, for

10   those 3,000 or so loans, the trustees failed to demonstrate

11   AMA for reasons I just explained.

12             So even though the plan administrator agreed on

13   the breach, we didn't approve that claim because there was

14   no AMA to determine proper AMA foundation for that claim.

15             So the number of loans for which a plan

16   administrator actually agreed that the trustees' breach

17   findings is actually 4,339.

18             THE COURT:  But now I'm getting confused.

19             MR. COSENZA:  Yes.

20             THE COURT:  Okay.  Because I feel like I've got

21   oranges and apples.  In the denominator I've got loans,

22   right.

23             MR. COSENZA:  Yes.

24             THE COURT:  And the numerator now, I thought I

25   just heard you add loans and breach claims.

1             MR. COSENZA:  I'm sorry.

2             THE COURT:  Did I get that wrong?

3             MR. COSENZA:  I may have misspoke, but these are

4      loan totals, so I've not conflated the loan and breach

5      claims.  I may have said breach claims --

6             THE COURT:  Yes.

7             MR. COSENZA:  -- so we approved the breach claims

8      for those 3,000 and so they were passed at that point, but

9      they were not fully approved as a claim because they failed

10     on the AMA issue.

11            So we have 1,200 or so loans, Your Honor, that

12     have been approved by the plan administrator --

13            THE COURT:  Right.

14            MR. COSENZA:  -- both on breach and AMA, then you

15     have another 3,000 --

16            THE COURT:  Okay.

17            MR. COSENZA:  -- that we approved on breach, but

18     because there's no AMA analysis they sort of remain in limbo

19     as part of this proceeding.  So you have --

20            THE COURT:  Okay.  So this is supposed to depict

21     as a percentage of the --

22            MR. COSENZA:  Loans reviewed.

23            THE COURT:  -- loans reviewed.

24            MR. COSENZA:  That they can be compensated for,

25     the number of loans that we agreed under breach

Page 88

1    determination.

2              THE COURT:  So stick with me for a minute.

3              MR. COSENZA:  Sure, sure.

4              THE COURT:  Because I'm still trying to decide if

5    you can have -- if the numerator is breach claims, then why

6    isn't the denominator breach claims?  I just feel like it's

7    a percentage with apples in the numerator and oranges in the

8    denominator or vice versa.  I get what you're saying --

9              MR. COSENZA:  Yeah.

10             THE COURT:  -- about the breach claim.

11             So you're saying that we approved -- we, the plan

12   administrator --

13             MR. COSENZA:  Agreed.

14             THE COURT:  -- approved those breach claims --

15             MR. COSENZA:  Yeah.

16             THE COURT:  -- right?  We don't get to AMA, but

17   look at all these breach claims we agreed with.

18             MR. COSENZA:  Yes.

19             THE COURT:  Right?  But then you're comparing a

20   percentage -- a number of breach claims as a percentage of

21   approved loan claims, and that's where it's a squirrely

22   fraction in my mind.

23             MR. COSENZA:  Sure, no, I understand, Your Honor.

24   This is just intended to illustrate that on their breach

25   level, as percentage of loans that we reviewed --

1            THE COURT:  Breach level, okay.

2            MR. COSENZA:  -- what we actually for the loans,

3    how many we agreed on with the trustees.

4            THE COURT:  All right.

5            MR. COSENZA:  I understand your concerns.  These

6    are not -- the point is they're not approved loans and

7    there's other complexities here.

8            THE COURT:  Right.  But I'm just trying to connect

9    up what the trustees have said about breach.  If they're

10   characterizing it this way, then okay, I'm comparing --

11           MR. COSENZA:  Yes.

12           THE COURT:  -- two numbers represented -- that the

13   representation of the number is what you're both talking

14   about.

15           MR. COSENZA:  Sure.

16           THE COURT:  As opposed to breaches that you agreed

17   with as a percentage of breaches that they asserted, which

18   is many, many times larger.

19           MR. COSENZA:  Yes, that's correct.

20           THE COURT:  Because the denominator would be many,

21   many times larger, right?

22           MR. COSENZA:  That's correct, Your Honor.

23           THE COURT:  Okay.  I understand what you're

24   saying.

25           MR. COSENZA:  Okay.  Doing the math that reflects

Page 90

1    a 9.1 percent breach pass rate, which is an agreed rate nine

2    times higher than what the trustees asserted in their brief.

3              But, Your Honor, this is actually the most

4    important point of this analysis, and further evidence of

5    the plan administrator's efforts to be fair in this

6    proceeding, the assumptions that Dr. Cornell that you'll

7    hear about during his testimony, used to generate a claim

8    value in the $2.38 billion range that the plan administrator

9    is seeking to estimate the claims, Professor Cornell on

10   their big four the trustees rely on, he uses a breach

11   agreement rate of over 40 percent on those claims.  And

12   that's -- reflects the $2.38 billion number they were

13   seeking estimation on.

14             So any characterizations made -- the trustees make

15   about the unfairness of our process in the breach pass rates

16   do not hold water.

17             Now, I'm going to speak about the trustees'

18   damages calculation.  The trustees will offer testimony from

19   Dr. Carl Snow on the alleged losses suffered by the trust.

20   However, the evidence will show that the trustees have not

21   met their burden to prove the quantum of damages they seek.

22             First, the trustees use the full purchase price to

23   calculate their damages.  The use of the full purchase price

24   in this matter ignores the realities of the protocol.

25             As I mentioned earlier during this -- during my

Page 91

1    presentation, that this estimation proceeding is intended in

2    part to estimate what the protocol would have yielded if the

3    parties completed steps three through five of the protocol

4    process.

5            During steps three and four of the protocol, the

6    parties were supposed to engage in business person-to-

7    business person settlement discussions for each loan.  And

8    then if that failed, a mediation process for the parties to

9    come to a compromise on the appropriate value for each loan.

10           As part of that process, the parties were supposed

11   to evaluate the strengths and weaknesses of each breach

12   claim, AMA, causation, and a sufficiency of the evidence put

13   forward by the trustees during the protocol, in the context

14   of each individual loan file.

15           Based on that analysis and the parties'

16   discussions, the parties would work to reach an agreement

17   about the value of the claims on each loan.  However, here

18   the trustees failed to account for steps three and four of

19   the protocol and want a windfall with every loan at every

20   issue by seeking the value of the full purchase price on all

21   70,973 loans at issue.

22           Your Honor, there are other fundamental problems

23   with the trustees' assertion of the full purchase price.

24   Here are the elements of the purchase price.

25           It reflects the unpaid principal balance of the

1      loan, unpaid and accrued interest at the applicable loan

2      rate.  And three, unreimbursed servicer advances.

3              Instead of breaking up these three components in

4      his analysis, as he's required to do, Dr. Snow initially

5      calculated the trustees' alleged damages, he testified that

6      he did not disaggregate these three components.  Rather --

7              THE COURT:  So let me stop you there.  So the

8      first component, before we even get to the disaggregate.

9      The unpaid principal balance of the mortgage loan as of

10     when?

11             MR. COSENZA:  As of after its liquidated or

12     whatever, you know, after --

13             THE COURT:  As of today?

14             MR. COSENZA:  Well, I think it depends on the

15     loan.  So it's the unpaid principal balance of the mortgage

16     loan would be post -- you know, after you take into account

17     the liquidation proceeds, so the -- for a liquidated loan,

18     it would be --

19             THE COURT:  Right.

20             MR. COSENZA:  -- once they actually experience the

21     loss.

22             THE COURT:  But how did they -- this is my

23     confusion.

24             MR. COSENZA:  Yes.

25             THE COURT:  Did someone actually look to see what

Page 93

1      the -- on a particular loan during a protocol, did anybody

2      look at what the actual unpaid principal balance was?

3                  MR. COSENZA:  Yeah.  So there's supposed to be a

4      document, it's like a loss certification that actually --

5                  THE COURT:  Yeah.

6                  MR. COSENZA:  -- breaks down to some degree some

7      of the losses, and there's also like servicing expense log,

8      it also breaks down the expenses, so you can try to tie to,

9      you know, the losses that the trustees were seeking here.

10                 THE COURT:  But is it based on simply an

11     amortization schedule, or would it be based on reality?

12                 MR. COSENZA:  I think it would be based on

13     reality.

14                 THE COURT:  Okay.  Okay.  So now you --

15                 MR. COSENZA:  But again, just to be clear, that's

16     on the liquidated loans, not on the active loans.

17                 THE COURT:  Right.

18                 MR. COSENZA:  The active loans are in a different

19     category.

20                 THE COURT:  Right, okay.

21                 MR. COSENZA:  So instead of breaking up these

22     three components --

23                 THE COURT:  Hang on a second.  This is the

24     balancing test we have between air and noise so.

25                 MR. COSENZA:  Sure.

Page 94

1              THE COURT:  Okay.  So you were making the point

2      about failure to disaggregate.

3              MR. COSENZA:  Yes.  So Mr. -- Dr. Snow testified

4      that he used a realized loss data from the sur-reserves,

5      which includes all of these elements combined less

6      liquidation proceeds to get to the purchase price.

7              Particularly problematic for Dr. Snow's

8      calculations that leads to the $11.4 billion in damages is

9      that the date he relied on includes interest components that

10     are not recoverable against a plan administrator in

11     bankruptcy.

12             As the Court is aware, Section 502 of the

13     Bankruptcy Code directs that claims be allowed as of the

14     commencement date in U.S. dollars.  For interest that

15     accrued post-petition, the trustees cannot recover for this

16     amount because the trustees had not yet provided the

17     contractually required notice, and accordingly the claim for

18     interest was unmatured.

19             Section 502(b)(2) of the Bankruptcy Code expressly

20     prohibits the allowance of "unmatured interest."  Yet, Dr.

21     Snow initially did not separate -- separately calculate the

22     interest component of the trustees' claim, either on a

23     prepetition or post-petition basis.

24             The plan administrator's calculations indicate

25     that the unrecoverable interest component is at least $2

Page 95

1      billion of the claimed $11.4 billion in damages here on the

2      liquidated loans.

3              It appears from the analysis that we received from

4      Dr. Snow on Thursday evening that the trustees' calculation

5      of unrecoverable interest is similar, approximately $2

6      billion.  We're still reviewing this, in light of the late

7      production of this request, and considering whether or not

8      Dr. Snow's calculations were correct and need for rebuttal.

9              Second, the trustees have alleged billions of

10     dollars of damages on active loans that we talked about

11     earlier, Your Honor.  The trustees have submitted claims on

12     almost 14,500 active loans that remain at issue, which is

13     about 20 percent of the loans still in this case, and

14     they've alleged several billion dollars in damages on these

15     loans.

16             The trustees relied on Dr. Elson (ph) to provide

17     an estimated market value for these active loans.  Mr.

18     Castro will testify that these active loans are typically

19     not subject to damages claims, because they provide

20     investors with the value they sought in the first place.

21             Indeed, the trustees have been getting some sense

22     of free option on these active loans, by collecting cash

23     flows in the former principal and substantial interest

24     payments for many years.

25             Beyond that, the evidence will show the trustees

Page 96

1    have not carried their burden to prove damages for this

2    category of loans.  The evidence will show that the

3    calculation of alleged losses and active loans is based on

4    an unreliable method used to calculate their value.

5            The Court will hear testimony that the model used

6    Adco's Loan Kinetics must be continually tuned and back-

7    fitted by adjusting the model's output of the magnitude and

8    likelihood of losses to match recent data.

9            The Court will also hear evidence of the windfall

10   the trustees seek by pursuing claims on active loans.

11   Indeed about 1,366 loans in which the trustees previously

12   made claims of approximately $416 million have liquidated

13   without a loss.  Had the plan administrator paid out those

14   claims when the trustees put them through the protocol, the

15   trustees would have received a windfall of nearly half a

16   billion dollars at the expense of other creditors.

17           I'm now going to go through the category of loans

18   I'd mentioned earlier, Your Honor, the loans the plan

19   administrator put on hold during the protocol.

20           All these on hold loans are subject to the

21   defenses I described earlier, but I'll explain why the plan

22   administrator put them on hold, and why the claims on these

23   loans should be disallowed and estimated at zero because of

24   the trustees' failure to comply with the protocol order.

25           Your Honor will hear testimony that the trustees

1    did not submit critical documents for the plan administrator

2    to evaluate the claims on these loans during the protocol.

3    First, this is Your Honor's question highlighted as before,

4    the loss certifications.  I'm going to detail all these in a

5    minute.

6            Second, the corporate expense logs.  Third,

7    servicing notes and fourth payment history.  These are

8    documents that any prudent servicer should have or could

9    easily generate.

10            I will talk more about the significance of these

11    documents in a minute.  But to give some more background,

12    Your Honor will hear that the trustees' WARN notice since at

13    least 2005, that the plan administrator could not review

14    claims submitted by the trustees in the protocol without

15    these documents.

16            As I mentioned earlier, Your Honor made clear to

17    the parties at the onset of the protocol process that the

18    Court would be available to assist the trustees to gather

19    the necessary documents.

20            Despite being on notice all this time, the

21    trustees elected not to obtain these documents.  Your Honor

22    will hear that the protocol required the trustees to

23    produce, to the extent available and applicable, 41

24    documents.  But after negotiations, the plan administrator

25    was reasonable.  The plan administrator agreed to compromise

Page 98

1    and review of claims filed submitted by trustee in the

2    protocol, if that claim file consisted of four categories of

3    documents I mentioned earlier.

4            Your Honor will hear testimony that these

5    documents were critical to evaluate AMA, breach, causation

6    and damages, often providing the only contemporaneous record

7    of what happened between loan origination and default.  It

8    also provides on the evidence for the amount unpaid on the

9    loan and other relevant factors.

10           Let me explain why each document is important.

11   Loss certifications.  This has a servicer's calculation of

12   the final loss on the loan, including a breakdown of unpaid

13   principal balance at the time of foreclosure or liquidation,

14   any accrued interest that remains unpaid and servicing fees.

15           The document is necessary to validate the purchase

16   price calculation proffered by the trustees.

17           Corporate expense log, again, it reflects amounts

18   that the servicer or their agents, like attorneys or

19   appraisers have incurred in servicing the loan.  Again, this

20   is necessary to validate the purchase price calculation.

21           Next, servicing notes.  Your Honor, these are

22   important obviously for AMA and causation issues, because

23   they reflect the servicing history of the loan.  They

24   include summaries of interactions between servicer and

25   borrower, and may contain information on major life events

Page 99

1   affecting the borrower, and records of other actions taken

2   by the servicer relating to that loan.

3           Again, critical to us for AMA and proximate

4   cause, as well as you could go to the breach analysis, and

5   then they also shed light on whether the alleged breach

6   claim by the trustee is valid.

7           Last is the payment history.  It's a ledger of

8   each payment or transaction made related to a loan,

9   including payments of principal and interest by the

10  borrower.  This is necessary for AMA history, it's also

11  necessary to calculate damages and part of our proximate

12  cause analysis.

13          The trustees did not provide these documents, and

14  the reason is because Mr. Esses, who was responsible for

15  among other things, collecting loan files from servicers

16  said that he did not believe these documents were necessary

17  despite the protocol order.

18          Mr. Esses testified that he knew the plan

19  administrator wanted the critical documents, otherwise, we

20  would put the loans on hold.  Despite being on notice of

21  this issue during the protocol process, the trustee sat idle

22  and never sought judicial assistance.

23          As a result, over a year ago on August 30th, 2016

24  we filed a motion to disallow and expunge the claims on

25  these loans, which was pending before the Court before the

Page 100

```
 1    parties entered into the settlement agreement.

 2              In light of Your Honor's decision regarding the

 3    expungement of the transfer loan claims, which was affirmed

 4    by Judge McMahon, the consequence for not submitting

 5    complete claim files prior to the protocol deadline was the

 6    expungement and disallowance of those claims.

 7              In our August 2016 motion, we requested the

 8    expungement and disallowance of the claims for the on hold

 9    files.  Just to be clear, Your Honor, it's the plan

10    administrator's position that the claims for the on hold

11    files should be estimated at zero.

12              The evidence will show that the trustees failed to

13    comply with the terms of the protocol and failed to provide

14    sufficient proof to meet their burden on these claims.

15    Again, the trustees took no action to gather the necessary

16    documents for these loans, despite repeatedly being put on

17    notice by the plan administrator.

18              THE COURT:  So let me understand what you're

19    saying, that -- to go back to where we started.  If the

20    primary purpose or the sole purpose of this exercise is to

21    determine what number would have resulted from the

22    protocol --

23              MR. COSENZA:  Correct.

24              THE COURT:  -- then what you're saying is that

25    under the protocol, this population of loans would have
```

Page 101

1    failed.

2            MR. COSENZA:  That's correct, Your Honor.

3            THE COURT:  So is that what I am -- is that a

4    finding that I need to make, or now that we are in the world

5    of a settlement, am I supposed to be looking at those loans,

6    what I'll call on the merits notwithstanding the failure to

7    do what was necessary under the protocol and putting aside

8    the overarching issues having to do with exemplars, et

9    cetera?

10            MR. COSENZA:  Sure.

11            THE COURT:  Do you understand that question?

12            MR. COSENZA:  Yes.  So I can take it in different

13    pieces.  So our view is these loans, if they're not entered

14    to the settlement, would have not --

15            THE COURT:  Would have failed.

16            MR. COSENZA:  Would have failed and they would've

17    been expunged.

18            THE COURT:  And they would've been disallowed.

19            MR. COSENZA:  They would've been disallowed.  In

20    the context of these -- this proceeding Your Honor I think

21    can just consider the strength of our -- of the plan

22    administrator's position that these loans would've been

23    expunged based on your prior order, and the fact that it was

24    upheld by Judge McMahon on these issues and the compliance

25    necessary for the trustees to produce documents by a certain

Page 102

1 point, otherwise, the claims would be expunged.

2   So I think it's our view that they should be out

3 of their case because of the failure to comply.  But I think

4 for your purposes, just something to consider in the total

5 mix as you're trying to estimate these claims.

6   THE COURT:  Thank you.

7   MR. COSENZA:  Okay.  Your Honor, I've just

8 highlighted many of the deficiencies in the trustees'

9 process of submitting claims, as well as a number of

10 fundamental deficiencies in the trustees' proof.

11   Again, as I said earlier, we're going to an

12 adversarial process against the trustees, and they'd have to

13 prove their claims loan-by-loan, pursuant to the protocol.

14 It is the plan administrator's position that the trustees'

15 claims, based on their approach to the protocol and the

16 current evidence they've presented would be in the

17 neighborhood of $300 million.

18   But as Your Honor just mentioned, the parties are

19 now in the settlement context, following a 9019 hearing.

20 The plan administrator is not seeking to be punitive here,

21 based on the trustees' evidence and their conduct during the

22 protocol.  We are trying to be fair.

23   We believe that we are requesting appropriate

24 value that the protocol would have yielded had the trustees

25 properly pursued their claims.

Page 103

1           The plan administrator is duty bound to ensure

2    that the trustees did not receive a windfall at the expense

3    of other creditors.  This challenge is not unlike other

4    situations where the plan administrator has had to confront

5    the estimation of monumental complex claims.

6           Within the context of the largest bankruptcy

7    filing in U.S. history, the plan administrator has again

8    always tried to be fair.  Lehman does not exist anymore.  It

9    is the plan administrator trying to distribute assets and do

10   it equitably.

11          As the trustees' expert, Mr. Aronoff noted in his

12   deposition this is "note a normal put-back case."  This is

13   an estimation hearing within the context of a settlement

14   agreement.  And there are equitable principles of bankruptcy

15   in play here.

16          Here is Mr. Aronoff's testimony on this point.

17      (Video deposition played)

18          MR. COSENZA:  So Mr. Aronoff testified, and it

19   should come as no surprise, he did not know how the

20   governing documents play out in bankruptcy court here.  And

21   Mr. Aronoff has testified that the purchase price proffered

22   by the trustees may not be the appropriate remedy here,

23   given that we are in bankruptcy and this is not a repurchase

24   case.

25          Let's hear from Aronoff on the appropriate remedy.

Page 104

1      (Video deposition played)

2           MR. COSENZA:  So as Your Honor and as the parties

3   seem to agree, it's now up to you to fashion the appropriate

4   remedy in this unique and complex proceeding.

5           As the Court is aware, there been a number of

6   outside claims brought against Lehman during Lehman's

7   bankruptcy.  They were brought at an exaggerated level, like

8   a twelve foot person.

9           The plan administrator has always tried its best

10  to be fair and equitable with all counterparties.  The plan

11  administrator has achieved fair resolution across an

12  enormous number and range of claims.  One of the few claims

13  that we haven't been able to resolve is the claim brought by

14  the trustees that is the subject of these proceedings.

15          In fact, the plan administrator did reach a

16  resolution in 2015 with the institutional investors to

17  right-size this claim as that issue here, as we've discussed

18  during this proceeding.  But we couldn't get a settlement

19  done, because the trustees wouldn't accept a settlement for

20  enough trust at issue.  And now the trustees' claim is

21  exaggerated again and is now back up to $11.4 billion.

22          Your Honor, based on everything you will hear, it

23  will be impractical to come to a conclusion on breach, AMA,

24  damages and sufficiency of the proof for each of the 70,973

25  loans that are at issue.  That is not the purpose of this

1    proceeding.

2            The purpose of this proceeding, which is in the

3    context again of a settlement agreement is to estimate the

4    claims based on what would have happened during the protocol

5    and a fair level for all creditors.

6            Indeed as I mentioned earlier, there are four

7    guideposts that support estimation at $2.3 billion or less

8    and will now provide more detail on each one.

9            First, the amount is equivalent to the settlement

10   I just referenced between the plan administrator and

11   institutional investors negotiated in October 2015.  The

12   institutional investigators agreed to accept 2.44 billion

13   for the covered and transfer loan claims.  Now this claim is

14   at $2.38 billion because of a collapsed trust and an opt

15   out.

16           And Professional Fischel will testify about the

17   significance of the institutional investor support.

18           MR. SHUSTER:  Your Honor, I sincerely apologize to

19   you and to Mr. Consenza.  I gave Mr. Consenza notice of this

20   at the break.  A plan administrator entered into an

21   agreement with the objecting investors in which they agreed

22   to withdraw their objections, and the plan administrator

23   agreed not to put into evidence the institutional investors

24   views concerning this settlement, whether they considered it

25   fair and reasonable.

Page 106

1            So I'm invoking that agreement and objecting on

2    that basis.

3            THE COURT:  Objecting to what?

4            MR. SHUSTER:  To any statements by counsel for the

5    plan administrator concerning the institutional investors

6    support for the settlement here or belief that 2.44 billion

7    is the right number and is a fair number.

8            THE COURT:  Okay.

9            MR. COSENZA:  I can deal with this in a minute,

10   Your Honor, if that would help.

11           THE COURT:  Okay.  I'm not accustomed of having to

12   have an argument in the middle of an opening statement.

13           MR. SHUSTER:  I apologize.  I just thought we had

14   to make the objection.

15           THE COURT:  Okay.  Mr. Cosenza, could -- my

16   hearing was that you said there was a settlement.

17           MR. COSENZA:  Yes, back in October of 2015.

18           THE COURT:  Right.  And I didn't hear you say

19   anything about what they think today.

20           MR. COSENZA:  That's correct, Your Honor.

21           THE COURT:  So there's no -- then there's nothing

22   to talk about at this moment.

23           MR. COSENZA:  That's our view, Your Honor --

24           THE COURT:  Okay?

25           MR. COSENZA:  -- in the settlement agreement

Page 107

1    there's an express carve-out to allow this into evidence in

2    this settlement agreement.

3         THE COURT:  Okay.  All right.  Well, to the extent

4    that I'm not properly understanding this, Mr. Shuster, you

5    can revisit it at a later point, but we're going to keep

6    going.  Okay?  Go ahead, Mr. Consenza.

7         MR. COSENZA:  Your Honor, the Court will hear that

8    the institutional investors are holders of approximately $6

9    billion in certificates in 85 percent of the participating

10   remaining trust.

11        As Professor Fischel will testify, the large

12   economic state in the trust gives them a powerful incentive

13   to advocate for the best possible outcome for the trust.

14        Again, as I mentioned earlier, these are 14 of the

15   largest and most sophisticated investors in structured

16   finance, including Goldman Sachs Asset Management, Black

17   Rock Financial Management, AGON, PIMPCO, MetLife and LAMCO,

18   in fact the Court will hear that these institutional

19   investors own or manage a combined total of more than $10

20   trillion in assets.

21        As I said earlier, the institutional investors

22   also have significant experience in settling these types of

23   RMBS claims.  In fact, these same trustees relied on these

24   institutional investors and their counsel in settling

25   several other global RMBS disputes.  For instance, in the

Page 108

1    JPMorgan matter, all the trustees here were parties to that

2    settlement.

3            In Citigroup, three of the trustees here were

4    parties to the settlement, and ResCap, U.S. Bank and

5    Deutsche Bank were parties to that settlement.  But in this

6    case, the trustees refuse to accept the institutional

7    investor's views back in October 2015.

8            As I mentioned previously, this is based on a

9    purported expert report from 2016 that the trustees have

10   steadfastly refused to disclose in this estimation

11   proceeding.  One wonders why the trustees have refused to

12   produce that report.

13           As Professor Fischel will testify, the

14   institutional investors are the parties with a real

15   financial interest here, not the trustees.  And the Court

16   will hear that the institutional investors previously in

17   support estimation of the claims at the $2.38 billion level.

18           Second, Professor Fischel will also testify to the

19   reasonableness of estimation at $2.38 billion in relation to

20   all other large global RMBS settlements.  In fact, Professor

21   Fischel will explain how he determined that $2.38 billion is

22   at the high end of the range of these comparable

23   settlements.

24           He will testify that he analyzed all of the other

25   large global RMBS settlements, which were subject to Court

Page 109

1   approval, and he determined how those amounts compared to

2   the settlement amounts in this case.

3          Even if there are differences across the

4   litigations, which one would expect, given the complexities

5   of these cases and that no cases are identical, Professor

6   Fischel determined that $2.38 billion was a generous

7   recovery by comparing the percentage of expected lifetime

8   losses incurred by the trust, that were then recovered in

9   each settlement, which he calls the recovery ratio.

10         To the similar percentage that would be recovered

11  under the plan administrator's proposal and the trustees'

12  $11.4 billion claim.

13         Professor Fischel will testify that the comparable

14  settlements had recovery ratios ranging from 6.9 to 13.2

15  percent.  Professor Fischel will also testify that the plan

16  administrator's proposed allowed claim is at the high end of

17  the range of recovery ratios, and the trustees' proposed

18  allowed claim is several orders of magnitude higher.

19         Professor Fischel will testify that the $2.38

20  billion amounts to a recovery ratio here of 11.2 percent.

21  As you can see on this chart, this is substantially above

22  the recovery ratios for JPMorgan, Citigroup and ResCap

23  matters.  It's in line with the Countrywide settlement and

24  two points below the ratio for the settlement relating to

25  Washington Mutual.

1          Professor Fischel will also testify that the

2     trustees' proposal of $11.4 billion amounts to a recovery

3     ratio of 55 percent, which is more than four times as high

4     as the largest recovery rate implied by any of the other

5     settlements examined.

6          The Court will hear that the trustees' expert, Mr.

7     Finkel (ph) admitted that the recovery ratio of 11.2 percent

8     is within the range of settlements obtained by trustees'

9     counsel and other RMBS cases.

10          In particular, in Depolt (ph) 2007, 083 and Depolt

11     2007, 084, the trustees represented by their counsel here

12     where it sued on behalf of all certificate holders, not just

13     a single group.  Nevertheless, even on the most favorable

14     assumptions, the recovery ratio in those cases was 12.47

15     percent and 13 percent respectively.

16          As Your Honor can see, these recovery ratios

17     agreed to by trustees' counsel are very similar to the plan

18     administrator's proposed recovery rate of 11.2 percent.

19     Remarkably, as the Court will hear, the trustees' counsel

20     failed to provide their expert Mr. Finkel with these

21     settlements and cases, the trustees' counsel have previously

22     litigated.

23          THE COURT:  So spoiler alert question, so what are

24     the trustees going to tell me that justifies the difference

25     between the previous settlements and the proposed allowed

Page 111

1    claims?

2              MR. COSENZA:  I can't speculate on -- I know for

3    the ones --

4              THE COURT:  Is there any -- have I read anything

5    yet?

6              MR. COSENZA:  I know for the ones that have been

7    part of Mr. Finkel's report, I know they're from individual

8    trusts, from a particular trustee using a certain type of

9    loan, maybe they're going to make, you know, some

10   distinction.  I think they're going to also make some

11   distinction that here there's been a loan review process, so

12   somehow all these other settlements are of no probative

13   value, which you have a long protocol and process.  I'm just

14   guessing --

15             THE COURT:  Okay.

16             MR. COSENZA:  -- I think those are the arguments.

17             THE COURT:  But I haven't read anything --

18             MR. COSENZA:  Yes.

19             THE COURT:  -- on this, right?

20             MR. COSENZA:  Yes, that's correct, Your Honor.

21             THE COURT:  In the opening briefs or --

22             MR. COSENZA:  That's correct.

23             THE COURT:  Okay.

24             MR. COSENZA:  Your Honor, as a follow-up, you're

25   going to hear from Mr. Finkel, the trustees' expert, that

Page 112

1   other cases selected by the trustees' counsel are somehow

2   the appropriate benchmarks.  However, those cases are wholly

3   distinguishable and involve only certain groups of loans

4   with an individual trust from 2007, an entirely different

5   collateral, home equity loans.

6          These are not comparable to the other global RMBS

7   settlements discussed and analyzed by Professor Fischel.  As

8   a result, the self-selected cases put forward by Mr. Finkel

9   should be given little weight, and we show that during this

10  hearing, and the global RMBS settlements examined by

11  Professor Fischel should be given significant weight in this

12  estimation proceeding.

13         Third, as I mentioned earlier, the Court will hear

14  evidence that outside of the context of this litigation, the

15  trustees have accepted equivalent evaluations for identical

16  RMBS claims in connection with the sale of RMBS claims owned

17  by terminated trusts.

18         Now, as Your Honor knows, we have these six trusts

19  that terminated during the pendency of this estimation

20  proceeding.  They are listed here.  And Your Honor has heard

21  that the trustees believe their claims are worth $11.4

22  billion, based on the protocol output.

23         However, the trustees sold each and every one of

24  these trust claims at the exact amount or less than what the

25  trust's allocable share would have been using the $2.38

Page 113

1    billion level, at which the plan administrator is seeking

2    estimation here.

3              Let me provide you with more background on this

4    process related to the terminated trust and explain this to

5    you in more detail.

6              For these particular trusts, the master servicer

7    exercises its quote/unquote finical option (ph).  This is a

8    right whereby the master servicer purchased all the trust's

9    remaining assets.  The assets include all active loans,

10   regardless of whether or not they were in default and any

11   other assets in the trust, like the RMBS claims that the

12   trustee submitted under protocol for that particular trust.

13             The price for the loan process is easy to

14   calculate, it's simply the unpaid principal balance on the

15   subject loan files.  However, the clean-up option requires a

16   process whereby the servicer identifies an appraiser to

17   evaluate the trustees', the trust damages claims.  The

18   trustee has the right and obligation to accept or reject the

19   appraiser.

20             Thereafter, the appraiser is directed to come up

21   with a fair price or value for the sale of the claim by the

22   trustee to the servicer.

23             Your Honor, I'm going to go through this process

24   for each of the trusts.  Let's look at Sorum 2004-5 (ph).

25   The trustees asserted $13.5 million worth of claims through

Page 114

1    the protocol for this trust.

2              Again, this reflects what the trust, you know,

3    based on the $11.4 billion output in the protocol, that's

4    the amount that's attributable to this trust.  Yet in the

5    clean-up call, the claims were appraised for that trust at

6    $1.49 million.  And the trustees accepted the appraisal and

7    sold their claims to the master servicer at that value.

8              Now, what is the value for this particular trust

9    claim, based on a plan administrator's proposed estimation

10   amount of $2.38 billion using the allocation proposed by the

11   trustees as to what each trust should receive?  It's $1.49

12   million.

13             After the first trust was appraised, the trustees

14   had the right to reject the master services appraiser.  Yet,

15   even after this initial evaluation, the trustees gave their

16   consent to use the same appraiser.

17             Now, let's go to Escasco 2003-17A (ph).  The

18   trustees asserted $1.2 million worth of claims through the

19   protocol for this trust.  Yet in the clean-up call, the

20   claims were appraised for that trust at $558,000.  Again,

21   the trustees accepted the appraisal and sold their claims to

22   the master servicer for that amount.

23             Now, what is the value for this particular trust

24   claim, based on the plan administrator's proposed estimation

25   amount of $2.38 billion based on the allocation proposed by

Page 115

1     the trustees, it's $558,000.

2              We move on to Escasco 2004-15 trust.  The

3     trustees' asserted $3.3 million worth of claims to the

4     protocol for that trust.  Yet, in the clean-up call, the

5     claims were appraised for that trust at $97,000.  And the

6     trustees again accepted that appraisal and sold their claims

7     to the master servicer for that amount.

8              Now, what is the value for this particular trust

9     claim, based on the plan administrator's proposed estimation

10    amount of $2.38 billion using the allocation proposed by the

11    trustees?  It's $316,000.

12             This is significantly higher than what the

13    trustees' claims were appraised for.  So to put a finer

14    point on this, had that trust had remained in this

15    proceeding and the Court agreed to estimate the claims at

16    the $2.38 billion, this trust would have received three

17    times more than what the trustee sold this claim for.

18             Moving on to Escasco 2004-282 -- I'm sorry, 28C,

19    the trustees asserted $7.8 million --

20             THE COURT:  So just to pause on that last point,

21    because it's the outlier on this chart, right?

22             MR. COSENZA:  That's correct, Your Honor.

23             THE COURT:  Okay.  So that supports the concept

24    that the plan administrator is being more than fair.

25             MR. COSENZA:  That's correct, Your Honor.  That's

Page 116

1    correct.

2         For this trust, the trustees asserted $7.8 million

3    worth of claims to the protocol.  Again, this is based on,

4    you know, the level of this $11.4 billion claim that the

5    trustees are seeking here.  Yet, in the clean-up call, the

6    claims were appraised for that trust at roughly $1 million.

7    And the trustees accepted that appraisal and sold their

8    claims to the master servicer for that amount.

9         Now, what is the value for this particular trust

10   claims, based on the plan administrator proposed estimation

11   amount of $2.38 billion, based on the allocation proposed by

12   the trustees?  $1 million.

13        Same for Labs 2004-1 (ph), that trust.  There the

14   trustees asserted $2.6 million worth of claims to the

15   protocol.  Yet, in the clean-up call, the claims were

16   appraised for that trust of almost $400,000.  The trustees

17   accepted the appraisal and sold their claims to the master

18   servicer for that amount.

19        Now, what is the value for this particular trust

20   claims, based on the plan administrator's estimation amount

21   of $2.38 billion, based on the allocation proposed by the

22   trustees?  It's $400,000.

23        Your Honor, the same could be said for the last

24   trust, Escasco 2003-28XS, they asserted $1.1 million worth

25   of claims for the protocol, the claims were appraised in

Page 117

1    that trust at $113,000, and the trustees accepted that

2    appraisal and sold their claims to the master servicer for

3    that amount.  And I think we all can guess, except for the

4    one outlier what the trust would have received under the

5    plan administrator's proposed $2.38 billion estimation

6    amount, it's the same amount $113,000.

7              Five times the trustees authorized the assessment

8    of other claims value at precisely the level the plan

9    administrator seeks here, and in one instance, significantly

10   less.  The fact that the trustees sold the trust claims at

11   the exact same value or less is a strong indication that

12   $2.38 billion is fair and reasonable.  And to put a finer

13   point on this, Your Honor, this value in the second column

14   here of this chart is the price at which a willing seller

15   sold an asset to a willing buyer.  There's generally no

16   better evidence of value than that, as stated by Judge Peck

17   in the Iridium case.

18              The next --

19              THE COURT:  Do you have that data for every trust?

20   I'm sorry, I stated that incorrectly.  Is this -- does this

21   represent the entire dataset for this --

22              MR. COSENZA:  For these six, they are six

23   terminated trusts, that's correct.

24              THE COURT:  Okay.

25              MR. COSENZA:  There's actually one other trust,

Page 118

1    Your Honor, but we can't understand who's speaking for that

2    trust, there have actually been seven that are terminated.

3              THE COURT:  Okay.  But this dataset is complete?

4              MR. COSENZA:  Yes, yes.

5              THE COURT:  Okay.

6              MR. COSENZA:  The next guidepost to demonstrate

7    that estimation -- so I'm going to move off from the

8    terminated trusts, and I'm going to move to the next

9    guidepost, to demonstrate the estimation of $2.38 billion or

10   less is appropriate and that's Dr. Cornell's work.

11             The plan administrator had Dr. Cornell calculate

12   the amount of success the trustees would need to achieve on

13   their breach claims to reach a claim value in the $2.38

14   billion range.  And Your Honor will hear that Dr. Cornell

15   even accepted for the purposes of his calculations all the

16   trustees' purchase price, which as I mentioned earlier has

17   several flaws, as those numbers are inflated.

18             Your Honor can see from this chart that the plan

19   administrator told Dr. Cornell to assume that the trustees

20   can succeed under big four breach claim findings 40 percent

21   of the time, and that the trustees would satisfy the AMA

22   element, either 50 or 15 percent of the time, depending on

23   how many payments were made on these loans.

24             Using these generous assumptions -- sorry, using

25   these generous assumptions on all the trustees' claims, Dr.

1  Cornell calculated that the trustees' recovery would fall in

2  the range of 1.6 to $2.5 billion.

3          Your Honor will hear testimony from Dr. Cornell on

4  this, but to provide a little bit more detail and context

5  for this, Dr. Cornell grouped the trustees' claims into the

6  categories listed here on category -- I'm sorry, on column

7  one of this chart.

8          Again, Dr. Cornell was given the assumptions by

9  the plan administrator about the percent success rate for

10 each of the trustees' types of claims, that's the

11 information that's in column 2.

12         For example, for loans with a trustees' claim of

13 misrepresentations of income, Dr. Cornell was told to assume

14 that 40 percent of them would pass the plan administrator's

15 defenses on a breach claim.

16         Next, despite the trustees' failure to provide any

17 particularized evidence of AMA, the plan administrator

18 assumed for these loans that satisfied the breach element,

19 and had paid for less than 18 months, the trustees could

20 meet their AMA burden at a rate of 50 percent.

21         As we will discuss, the relationship between a

22 breach --

23         THE COURT:  50 percent of the 40 percent.

24         MR. COSENZA:  Correct.  As we will discuss the

25 relationship between a breach and a compensable loss lessens

Page 120

1    as time goes on, so Dr. Cornell was told to assume that

2    loans are paid per 18 months or more would meet AMA and a

3    rate of 15 percent.

4            Dr. Cornell made such assumptions as he will

5    testify for all the different claims provided by the

6    trustees.  Based on these generous assumptions and applying

7    the trustees' inflated purchase price calculations, Dr.

8    Cornell calculated the aggregate claim value under four

9    scenarios.  They are referenced on this chart.

10           First, he calculated a claim value without on hold

11   loans and without active loans, so we just removed those two

12   categories from the calculation.  That resulted in a

13   recovery for the trustees of $1.63 billion.  Next, again he

14   used the same assumptions in this chart, but he calculated a

15   claim value without the on hold loans but then he included

16   the active loans, and his calculation came on that scenario

17   to $1.92 billion.

18           Next, again using the same assumptions, he

19   calculated a claim value including the on-hold loans, but

20   not the active loans, and his calculation came to $2.11

21   billion.

22           Lastly, he included all of the on-hold loans, all

23   the active loans, and again he applied the generous

24   assumptions on this chart from the plan administrator.  His

25   calculation came to $2.49 billion.

1          As I mentioned earlier, Section 502(b)(2)

2     prohibits awarding a matured interest which all these

3     scenarios include.  So all these scenarios were before we

4     got the breakdown on the interest issue.

5          Given the trustees' produced unmatured interest

6     calculations on Thursday evening, we're still in the process

7     of fully understanding the import of those and how they

8     impact Dr. Cornell's scenarios.

9          But the plan administrator's initial estimate and

10    based on an understanding of the claim values, all four of

11    Dr. Cornell's estimation scenarios would be reduced

12    somewhere in the neighborhood of 15 to 20 percent, to take

13    into account a matured interest.

14          THE COURT:  So by the time we get to this, and how

15    is this going to be handled?  How are we going to

16    desegregate or understand how the inclusion of what you

17    characterize as unmature interest affects these?  Because

18    what it does is kind of put a collar around -- well, it

19    informs how I would view challenges to the assumption -- to

20    the success assumptions.

21          MR. COSENZA:  Correct.

22          THE COURT:  Right?

23          MR. COSENZA:  Correct.

24          THE COURT:  So --

25          MR. COSENZA:  So, Your Honor, I guess my best

Page 122

1    answer for you is --

2              THE COURT:  -- I mean --

3              MR. COSENZA:  -- maybe we can discuss this

4    after --

5              THE COURT:  Just we'll wait and see.

6              MR. COSENZA:  -- but I think the --

7              THE COURT:  That's fair.

8              MR. COSENZA:  -- what you were trying to

9    understand how to deal with this.

10             THE COURT:  Okay.  Somebody add this to the list

11   of things we need to talk about later.

12             MR. COSENZA:  Yes.  Your Honor, just to conclude

13   on the Dr. Cornell analysis, we believe all these scenarios

14   demonstrate again that the plan administrator's request to

15   estimate the claim at $2.3 billion or less is fair and

16   reasonable.

17             In conclusion, Your Honor, for all the reasons

18   I've outlined above, the $11.4 billion the trustees seek to

19   estimate their claims at is without support.  As I have

20   discussed in detail and Your Honor will see during this

21   hearing, there were significant number of flaws in the

22   trustees' process.

23             There is no evidence in the record the trustees

24   conducted a proper AMA analysis.  There is no evidence in

25   the record the trustees demonstrated any nexus between

Page 123

1    alleged breaches and loss.

2              There are significant issues with the trustees'

3    damages calculations for both active and liquidated loans,

4    and there is significant deficiencies with the claims the

5    trustees put in their protocol that the plan administrator

6    put on hold.

7              All these reasons indicate why the $11.4 billion

8    the trustee seeks, which again reflects a full purchase

9    price and the trustees meeting their burden for every one of

10   the 70,973 loans at issue provides no basis for the

11   estimation of these claims at $11.4 billion level.

12             On the other hand, the evidence at the hearing

13   will show the plan administrator's metrics including the

14   four guideposts on the chart, all support estimation at

15   $2.38 billion.  The institutional investors support for

16   settlement at $2.44 billion in October 2015, the comparable

17   RMBS settlements, that the trustees have accepted equivalent

18   evaluations of identical RMBS claims, when selling claims

19   owned by terminated trusts, and looking at the generous

20   assumptions provided to Dr. Cornell and the resulting

21   recoveries and Dr. Cornell's estimation scenarios.

22             All of these guideposts support estimation of the

23   trustees' claims at $2.38 billion or less.  The plan

24   administrator therefore asks the Court that based on the

25   evidence Your Honor will hear, and after considering the

Page 124

1    equities of this case, Your Honor estimate and allow the

2    trustees' claim at $2.38 billion.

3              Thank you, Your Honor.

4              THE COURT:  All right.  Thank you very much, Mr.

5    Cosenza.

6              Okay.  So it's ten minutes before 1.  Mr. Shuster,

7    your call, you're the one that has to speak after the lunch

8    break.

9              MR. SHUSTER:  An hour or so?

10             THE COURT:  An hour.  Why don't we do an hour.  So

11   we'll resume at ten minutes before 2, and we'll go to the

12   end.

13             MR. COSENZA:  Great, thank you, Your Honor.

14             THE COURT:  You can obviously leave all of your

15   things here.

16             MR. SHUSTER:  Thank you.

17             THE COURT:  Thank you.

18       (Recessed at 12:52 p.m.; reconvened at 1:55 p.m.)

19             THE COURT:  Please, have a seat.

20             So the sun is swinging around.  If anybody finds

21   themselves uncomfortably in the sun, let us know and I can

22   already see somebody did my favorite least thing to my

23   curtains.

24             MR. SHUSTER:  Not me.

25             THE COURT:  Okay.  We have somebody admitting

Page 125

1    guilt back there.  Are you ready, Mr. Shuster?

2              MR. SHUSTER:  Yes, Your Honor.  May I?

3              THE COURT:  Please come up.

4              MR. SHUSTER:  May it please the Court.  Your

5    Honor, I want to begin by telling the Court how grateful the

6    trustees are for the opportunity to present these claims.

7    They're grateful to the Court for all the time and effort

8    the Court has put into these claims thus far and all the

9    time and effort the Court is committed to putting in going

10   forward.

11             THE COURT:  Of course.

12             MR. SHUSTER:  Your Honor, this hearing is about

13   defective mortgages that Lehman sold to investors.  The

14   evidence will show that Lehman materially breached its

15   representations and warranties for tens of thousands of

16   loans that it securitized.  Stated simply, Lehman sold

17   investors riskier loans than they agreed to purchase.

18             The trustees are here on behalf of all investors

19   in these trusts.  The total aggregate amount of certificates

20   is $23 billion.  So there are investor groups that have

21   appeared here to some degree, they hold in the aggregate $6

22   billion, there's a great silent majority out there holding

23   another $17 billion in paper, and their interests are

24   directly at stake in this estimation proceeding.

25             To prove the trustees' claims, Your Honor, we're

Page 126

1    going to show that -- we'll walk the Court through the --

2              THE COURT:  Can I just ask a question --

3              MR. SHUSTER:  Yes.

4              THE COURT:  -- and I -- perhaps I should have

5    asked it of Mr. Cosenza, but this is the first time I'm

6    hearing more of the numbers around that.

7              So I'm not hearing anything or considering

8    anything, nor should I, with respect to how the paper has

9    moved around, right?

10             MR. SHUSTER:  Correct.

11             THE COURT:  So the current holders, some of them

12   might be original holders and some of them might be

13   secondary or tertiary, so to speak holders.

14             MR. SHUSTER:  Absolutely, yes, that's correct.

15             THE COURT:  So we're just -- we're just talking

16   about face, par, notional amount --

17             MR. SHUSTER:  Correct, yes.

18             THE COURT:  -- however you want to talk about it.

19             MR. SHUSTER:  Yes.

20             THE COURT:  Very good.

21             MR. SHUSTER:  Thank you.

22             So to prove our claims, Your Honor, we'll walk the

23   Court through the trustees' process and show that it did

24   generate reliable evidence that proves Lehman's breaches.

25   We'll show the Court that the evidence that the trustees'

Page 127

1    have amassed is probative of breach and is largely

2    unrebutted, that the trustees drew valid and reasonable

3    inferences from that evidence, and that those inferences and

4    the evidence prove a material breach.

5            Now, of course, we will not attempt to show that

6    on a loan-by-loan basis, or we would be here until the end

7    of time.  But what we will attempt to do is we'll ask the --

8    Your Honor to make judgments about types of breaches that

9    are common across groups of loans, and that's how we propose

10   that the Court get to an estimation here.

11           So there are, in fact, common types of breaches

12   proved with common types of evidence across large groups of

13   loans.  There are common disputes between the parties on

14   those breaches, on those evidence types, and on those loans,

15   and we think that those disputes can be resolved as to types

16   of breaches and groups of loans.

17           THE COURT:  So this is the fundamental thing that

18   we keep coming back to again and again, and as I've told you

19   before, and I'll keep saying it throughout the trial, you

20   know, this might just be me, but your statement of what

21   you're going to show sounds to be at odds with the

22   countervailing statement that every loan file is unique.

23           So I am continuing to struggle with the every loan

24   file is unique, a snowflake, whatever you want to call it,

25   compared to common types of breaches and a -- I won't say a

Page 128

1    sampling or an -- a methodology that includes extrapolating

2    from something small to something larger that you will then

3    tell me adds up to your claim.  I'm genuinely having a hard

4    time reconciling that.  Okay?

5            MR. SHUSTER:  Yes, I hear that.  And I -- in the

6    course of what I'm going to say, I hope I can put -- make

7    that more concrete and show the Court why -- what we're

8    proposing is practicable and reasonable.

9            THE COURT:  Okay.  So let me ask one or two

10   follow-up questions.

11           MR. SHUSTER:  Sure.

12           THE COURT:  So if we weren't in a normal situation

13   either where a claimant against Lehman filed a proof of

14   claim, right, you have the burden of proof, no question

15   about it --

16           MR. SHUSTER:  Yes.

17           THE COURT:  -- right?

18           MR. SHUSTER:  Yes.

19           THE COURT:  And if you submitted ten proofs of

20   claim, you would have ten separate burdens of proof, right?

21   So then you have the fact that there are so many loans, so

22   many claims and the additional complexity of it's a

23   settlement reflecting the fact that we're doing an

24   estimation.  Is that what makes this --

25           MR. SHUSTER:  Well --

Page 129

```
 1              THE COURT:  -- different from -- putting aside we

 2    would be here until the end of time issue.

 3              MR. SHUSTER:  Yes.

 4              THE COURT:  There's nothing that relieves a

 5    claimant of -- let me ask it as a question.  Is there

 6    anything in the procedural posture of this case that

 7    relieves the trustees of the burden on a loan-by-loan basis

 8    to establish the amount of the claim you think ought to be

 9    allowed?

10              MR. SHUSTER:  So I don't know that there is, but

11    we're not asking to be relieved from that burden.

12              THE COURT:  Okay.

13              MR. SHUSTER:  And let me explain how and why.  And

14    actually -- and I'll walk through this in a very concrete

15    way.  But what the -- we have submitted actually summaries

16    that summarize each and every breach claim on each and every

17    loan.

18              Now, those summaries come in a couple of forms.

19    There is a claims tracking spreadsheet that was maintained

20    between the parties during the protocol process.  So that

21    comes into evidence actually under Exhibit G under Section 7

22    --

23              THE COURT:  Right, that's the unwieldy big thing,

24    right?

25              MR. SHUSTER:  Okay.  But it does provide --
```

Page 130

1              THE COURT:  But that's the document you're talking

2       about.

3              MR. SHUSTER:  Well, that's one document.

4              THE COURT:  Okay.

5              MR. SHUSTER:  Then there are two exhibits in the

6       original Aronoff report, Exhibit 15 and Exhibit 4, which

7       also summarize on a loan-by-loan and breach-by-breach basis

8       every breach.  And those in our view, are admissible under

9       Federal Rule of Evidence 1006 and those summaries themselves

10      constitute evidence of loan-by-loan breach.

11             So we strongly believe that we have developed and

12      are providing loan-by-loan evidence of breach.  And we've

13      talked a lot about the protocol, and I think I've said it

14      before, but I know I want to say it today.

15             As trial counsel for the trustees I'm delighted by

16      the protocol, because we were made to go out and get loan-

17      by-loan evidence of breach and that's what we did.  The

18      claims that we have today are much stronger than the claims

19      than we had in say December 2014, before we went out and got

20      all of the evidence of breach.

21             So we're actually -- we're not asking to be

22      relieved of the burden of providing loan-by-loan and breach-

23      by-breach evidence of breach.  I think there's a

24      practicality here which is that it's not humanly possible

25      for the Court to go line-by-line through that thing and say

Page 131

```
1    yea or nay.

2              THE COURT:  Right.  But in UBS --

3              MR. SHUSTER:  But the proof has been provided.

4              THE COURT:  In UBS, though, right?

5              MR. SHUSTER:  Yes.

6              THE COURT:  Just Castell he had one of these,

7    right?

8              MR. SHUSTER:  Yes.

9              THE COURT:  And he went loan-by-loan and then he

10   said, the next couple of thousands of these, go and talk to

11   a special master.

12             MR. SHUSTER:  Right.

13             THE COURT:  So he did actually do loan-by-loan,

14   right?

15             MR. SHUSTER:  Well, he and the special master did.

16   I have been monitoring that case actually for a client.

17             THE COURT:  I have.  I've just read the copy that

18   you've put in my binder.

19             MR. SHUSTER:  But I'm quite confident they got to

20   the point that they were resolving claims on a category

21   basis.  And I think honestly when the protocol was urged

22   upon the Court that the plan administrator said that claims

23   could be resolved, but in categories and groups and types of

24   breach.  That's -- and they submitted among other things, an

25   expert affidavit from Mr. Penot (ph) the head of RECAFCO who
```

Page 132

1    said that explicitly.  That was part of why the protocol was

2    supposed to work, because the parties were going to get to a

3    point where they had, you know, common disputes on types of

4    breaches and groups of claims, and they would make an effort

5    to resolve those one way or the other.

6            I don't think that's how it ended up quite

7    working.  We have probably a strong difference of opinion

8    with the plan administrator as to why that was, but --

9            THE COURT:  Okay.

10           MR. SHUSTER:  So, yes.  So, you know, we will ask

11   the Court to look at types of breaches and common disputes

12   across those types of breaches, and across groups of loans.

13           So, for example, if you have a loan where a tax

14   return shows that the borrower misstated his or her income

15   by 20 percent or more, say you have a tax return from the

16   same calendar year as the loan was originated.  We say

17   that's good and sufficient evidence of breach.  The plan

18   administrator says it isn't.

19           You can -- the Court can resolve that issue, and

20   on that basis I think estimate a subgroup of the claims, and

21   that's how we would propose that the Court get an

22   estimation.  The same is true if you're using say a MIRS

23   report to establish preclosing mortgage debt of the

24   borrower.  And the question is, is the evidence reliable, is

25   there -- have the trustee shown a material and adverse

Page 133

1    effect, is that type of breach or that breach of the type

2    that constitutes a material and adverse effect on the value

3    of the loan, and do Lehman's -- are Lehman's defenses

4    persuasive.

5           So that's how we propose that the Court go about

6    it.  I would like to start off by walking through one

7    individual loan just to illustrate.  So now I'm going to

8    operate the clicker.  Here we go.  Oh, yes, may Mr. DeMay

9    approach --

10          THE COURT:  Yes, of course.

11          MR. SHUSTER:  -- and hand the Court a couple of

12   binders and --

13          THE COURT:  Thank you very much.

14          MR. SHUSTER:  -- we have copies for our colleagues

15   on the other side.

16          Okay.  So here's a loan for a property on

17   Nickerbocker Avenue in Patterson, New Jersey.  The borrower

18   is Yen ET (ph), we have redacted the borrower's surname for

19   privacy purposes.  Subject loan amount is $448,000, it's a

20   primary residence, supposed to be a primary residence.  The

21   closing date is January 25th, 2007.

22          So here is the loan application where the borrower

23   indicates, if you can see at the bottom there, that she is

24   employed at St. Joseph Regional Medical Center.  No, sorry,

25   I've got to remember to do this.  I'll try to remember.

Page 134

1           As a radiology technician and clerk.  And then if

2     we go to the next page, you can see that the borrower

3     represents her monthly income on the loan application at

4     $9,542 and there's -- she actually identifies other income

5     which borrowers are asked to do, when in fact, they do have

6     a secondary source of income.  There's the total number.  So

7     that's a monthly and then we annualize the number just to

8     give a sense of the magnitude.

9           The -- we then have the borrower's individual tax

10    return for the calendar year leading up to, so the loan was

11    taken out in January '07.  This is the tax return for '06,

12    so it would show her income or tend to show her income for,

13    you know, the months immediately prior to the loan, and then

14    we have a W-2 for the year the loan was taken out.

15           THE COURT:  When was the --

16           MR. SHUSTER:  The loan was closed in January of

17    '07.  This tax return is for calendar '06.

18           THE COURT:  Okay.

19           MR. SHUSTER:  So it shows an aggregate income

20    number, just a gross income of $21,796, which is monthly

21    under $2,000 a month.  Then we have a W-2 that shows that

22    the -- for 2007 shows the same job, same borrower, and

23    $23,000 in wages, which obviously is just under $2,000 a

24    month.

25           There is additional evidence in the loan file, let

Page 135

1    me just note, not that it's particularly dispositive one way

2    or the other, but this information when we have tax return

3    information, W-2's things like that, that's already in the

4    loan file that we got, we didn't go out and get it, I'm not

5    sure we would have been able to do that.

6           So there, if you look at then this -- the

7    following chart, we've noted the 2006 tax return, the 2007

8    W-2, there's other borrower supplied information in the file

9    for subsequent years that shows -- which I just, in the

10   interest of time, I didn't make copies of here, but which

11   shows a consistent story in terms of the borrower's level of

12   monthly income and the borrower's occupation.

13          So this income misrepresentation finding went

14   through multiple layers of review.  The loan files were

15   obtained by the servicer, went to Duff & Phelps.  Duff &

16   Phelps provide the loan files to the loan review firms with

17   instructions.  The loan review firms determined, verified

18   the borrower information, determined whether or not there

19   was a breach.

20          Where they found there was a breach, they

21   assembled the evidence of breach, claim package, the loan

22   file and passed that on to Duff & Phelps.  Duff & Phelps

23   performed two levels of QC.  The first level was to

24   determine whether the claim file had all the contents that

25   it said it had, whether the breach description was accurate,

Page 136

1    and whether all materials were there, and the second was to

2    determine conclusively whether there was a material breach.

3    And then where that determination was made, it went on to

4    Lehman.

5              This is what was submitted to Lehman, the claims

6    package, which contain the supporting documentation.  The --

7    which would've been the relevant pages from the loan file,

8    the loan application and whatever the tax returns and W-2s

9    and other additional material, and then a breach narrative

10   that would've identified the defect and then described the

11   breach and the evidence supporting the breach.

12             It says here that there's alleged defect number

13   two, misrepresentation of income, it happens on this loan

14   that there was an alleged defect number one, which was the

15   DTI calculation, a recalculation of the DTI.

16             So Lehman rejected the claim and its rejection of

17   the claim, the responses that it provided here are

18   representative certainly and we'll obviously be looking at

19   these in considerably greater detail, but it says that the

20   evidence is unreliable and insufficient because income

21   stated in a non-origination year tax return does not prove

22   origination income.

23             There's no reference here to the other evidence

24   that's in the file, but for present purposes that's actually

25   not my point, I just want to walk through how this all gets

Page 137

1    up to the summaries.

2          So this is identified in the claims tracking

3    spreadsheet, and then the breach and the description of the

4    breach, and the supporting information is reflected in, as I

5    mentioned, Exhibits 15 and 4 to the Aronoff report.

6          So then the question is or at least a question is,

7    how can the Court be sure that the evidence is what we say

8    it is.  Leaving aside even the question of whether it's sort

9    of sufficiently probative.

10          The evidence was presented to Lehman, together

11    with a description of the claim, and the basis for the claim

12    is mandated by the protocol order.  It is summarized in the

13    claims tracking spreadsheet.  Those materials come into

14    evidence under Exhibit G.  It's summarized in Aronoff 15 and

15    4, which we submit come into evidence under Federal Rule of

16    Evidence 1006, which allows for the admission of summaries,

17    as proof of the underlying materials.

18          And for us, this is a very important point, point

19    five, Lehman does not in the vast majority of cases,

20    challenge whether our evidence says what we say it says,

21    particularly for the borrower breaches.  If we say there's a

22    tax return in the file that says X, there's a W-2.  They

23    don't dispute that.  What they dispute is the sufficiency of

24    the evidence.

25          Mr. Cosenza drew a distinction between relevant

Page 138

1    and sufficient evidence and it's the plan administrator's

2    position that this evidence is not sufficient.  But in terms

3    of whether it's actually there, whether it says what we say

4    it says, and whether it is what it purports to be, I don't

5    think that is materially disputed between the parties.

6              THE COURT:  Can you help me out here, going back

7    to slide -- it's on page 11 headed "Lehman rejected the

8    claim."  When it says "debtor findings number 2" so the

9    evidence does not support a breach of the no fraud

10   representation.

11             MR. SHUSTER:  Right.

12             THE COURT:  So to your point, which I accept that

13   they're not saying that the documents not forged, the

14   underlying documents, is what Lehman is saying here that

15   there's no -- the next paragraph down, the no fraud

16   representation requires seller knowledge.

17             Can you help me out in terms of if this was a

18   misrepresentation as to income, and you could through a

19   crystal ball discern that there was no seller knowledge,

20   what happens in that instance?

21             MR. SHUSTER:  There -- the -- there's no seller

22   knowledge requirement.  So this is referred to by shorthand

23   as the no fraud --

24             THE COURT:  As the no fraud, right.

25             MR. SHUSTER:  Right.  But it's actually the no

1    untrue statement representation and I'm going to ask my

2    colleagues --

3              THE COURT:  Okay.

4              MR. SHUSTER:  -- if they can pull that up.

5              THE COURT:  Okay.

6              MR. SHUSTER:  Let's -- we can take a look.

7              THE COURT:  So even if this -- you could get

8    beyond the hurdle on no fraud because no seller knowledge,

9    right?

10             MR. SHUSTER:  Right.  So --

11             THE COURT:  You would say that this -- the

12   underlying facts would demonstrate another kind of breach.

13             MR. SHUSTER:  Yes.  So the -- this is 104(c)(5)

14   typically of the applicable loan agreements, we've got it up

15   on the screen now, chart 22.  It -- what Lehman is referring

16   to is the last sentence of sub 5 there.  There are four

17   independent representations in section five that the note

18   and the mortgage are genuine, that everyone had the legal

19   capacity to enter into it.  Then there's a specific

20   representation that the documents, instruments, and

21   agreements submitted for loan underwriting contain no untrue

22   statement of material fact or omitted to state a material

23   fact.

24             That's what we're relying upon.  What Lehman is

25   relying up in saying you have to establish seller knowledge

Page 140

1   is the fourth sentence.  And they're saying that the fourth

2   sentence states the standard even as to sentence three, and

3   it's our position as a matter of straight forward contract

4   interpretation that that's not the case.

5           THE COURT:  Okay.  Thank you.

6           MR. SHUSTER:  Of course.  So if we could then go

7   back to chart 12, please.  No.  Let's go further to 13.  15.

8   Yes.  All right.  13.

9           So now we assert the breach has a material and

10  adverse effect.  That's what the trustee's asserted in the

11  protocol.  They made a determination that -- a breach

12  finding that goes to a misrepresentation of income or debt

13  or occupancy has a material and adverse effect on the value

14  of the loan.  We will have experts testify on the issue.

15  Importantly for us, Lehman itself -- Lehman and Aurora both

16  used the same standard in pursuing put-back claims.  In

17  fact, they used a more liberal standard than we use.  I will

18  come back to that.  For present purposes, it's enough that

19  we believe we establish that there's a material and adverse

20  effect of the breach.

21          So there are certain general -- coming back to our

22  proposed estimation methodology, as it were, there are

23  certain general disputes that are illustrated by this

24  example.  Are tax returns sufficient to show a borrower's

25  income and, frankly, we might have added W-2s and pay stubs

Page 141

1    which are also in the file.  But for simplicity sake, does

2    the misstatement of income have a material and adverse

3    effect and do the clients overcome Lehman's defenses -- the

4    Lehman's defenses or knock us off the claim?

5              THE COURT:  But is that -- on the second point,

6    does the misstatement of income have a material adverse

7    effect --

8              MR. SHUSTER:  Yes.

9              THE COURT:  Going back to something I asked this

10   morning, are you telling me that this is, in effect, a

11   deemed AMA if there's a misstatement above -- that breaches

12   a certain threshold?

13             MR. SHUSTER:  As a practical matter, that's what

14   it amounts to, that when a loan -- when a borrower

15   misrepresents his or her income or debt or occupancy --

16   well, occupancy --

17             THE COURT:  On this -- right  now, let's --

18             MR. SHUSTER:  Yes.

19             THE COURT:  That's a --

20             MR. SHUSTER:  Income.

21             THE COURT:  -- different kettle of fish.

22             MR. SHUSTER:  Yeah.  Income and --

23             THE COURT:  So right now I'm just talking about

24   income.

25             MR. SHUSTER:  Income.  When a borrower

Page 142

1    misrepresents his or her income in a non-trivial way above a

2    certain threshold, that misrepresentation has a material and

3    adverse effect on the value of the loan.

4            THE COURT:  But this is my issue.  You're stating

5    that as a principle.

6            MR. SHUSTER:  Well, we have --

7            THE COURT:  Right?

8            MR. SHUSTER:  -- finding to that -- what we have

9    are expert opinions --

10           THE COURT:  Yeah.

11           MR. SHUSTER:  -- saying that when a borrower

12   misstates his income or his debt, that increases the risk of

13   loss on the loan.

14           THE COURT:  So but is that -- going behind that,

15   though, is that because statistically, based on analyses

16   that underwriters and loan originators and servicers have

17   done, you can then track -- well, you can do a launch to and

18   a study of the loans over their life and you can correlate

19   higher default rates to -- and track them back to

20   misstatements of income?  Or, is that simply kind of FIA

21   that, by definition, above a certain threshold, the position

22   is taken that that increases the risks on the loan and

23   therefore it's a deemed AMA?

24           MR. SHUSTER:  Well, that's the effect that the

25   misrepresentation has on the value of the loan in the

Page 143

1    market.  So that is what -- in the market and -- that is

2    what Lehman, for example, says in its declarations on the

3    subject.  It says that when you have a misrepresentation of

4    income, it has a material and adverse effect on the value of

5    the loan.  The loan cannot be sold into a securitization

6    except at a substantial discount.  Those are the words

7    Lehman uses.

8               THE COURT:  But that --

9               MR. SHUSTER:  That language --

10              THE COURT:  But that goes back to what -- I think

11   what Mr. Cosenza was saying about for the purposes of

12   selling it into a securitization versus calculating damages

13   in a put-back context.  I think the point made was that

14   those are different.

15              MR. SHUSTER:  Okay.  Well -- and I'll -- I'll be

16   happy to take that on --

17              THE COURT:  I'm going to try and stop

18   interrupting.

19              MR. SHUSTER:  No, no, not at all.  I mean, I'm

20   happy to engage on these issues and, to us, it does --

21              THE COURT:  It doesn't matter.

22              MR. SHUSTER:  A loan is a loan.

23              THE COURT:  Okay.

24              MR. SHUSTER:  And when Lehman says, sure, it's a

25   whole loan, it's a standalone, but they're the ones who are

Page 144

1    saying I can't put it into a securitization except that it's

2    at a substantial discount.  But it was put into these

3    securitizations without that discount.  And so there was an

4    effect -- the trusts overpaid for those loans.  They paid a

5    higher price than they should have paid.  That's a

6    continuing effect.  Whenever it's assessed, it's always true

7    that they paid a higher price than they should have paid.

8            So we agree that the purpose of the hearing is to

9    estimate the value -- I have a roadmap here.  First item in

10   the roadmap is the purpose of the hearing and that the

11   purpose of the hearing is to estimate the value of the

12   trustee's RMBS claims.  We're happy to take on the standard

13   of what would have happened to these claims because had they

14   gone all the way through the protocol, because we believe we

15   do have, as I said, breach -- evidence of breach on a loan

16   by loan and breach by breach basis.

17           So we prefer a methodology that actually evaluates

18   the evidence that we've developed and are submitting rather

19   than one that is based on applying haircuts and discount

20   percentages.  We'd rather see something that is more closely

21   tethered to the proof.

22           So the trustee's claims have four elements.  First

23   is the representations and warranties, then evidence of

24   breach of those representations and warranties, meeting the

25   material and adverse effect standard and the purchase price.

Page 145

1      And the repurchase protocol makes clear that where there is

2      a breach of the representation of warranty that has a

3      material and adverse effect, the remedy is either cure,

4      which is not at issue here.  And really, these types of

5      breaches can't be cured.  There are certain types that can

6      be cured but this type can't be cured.  Cure -- within the

7      first two years, the sponsor can substitute in a different

8      loan under the REMIC regs and then, alternatively,

9      repurchased.

10          So the no untrue statement representation we

11     looked at a moment ago.  The only comment I'll make is that

12     it is a broad and sweeping representation of the

13     truthfulness of the documents that were submitted for loan

14     underwriting.  The statement is that there is no untrue

15     statement.  There is no material.

16          Then the other principal representation and

17     warranty that we rely upon, particularly for the borrower,

18     breach is predicated on borrower misstatements or omissions

19     is the no-default representation.  This is also a standard

20     representation in these deals and it says there's no default

21     under the mortgage or the mortgage note.  And then, in the

22     mortgage and the deed of trust, there are borrower

23     covenants.  One of the borrower covenants expressly provides

24     the borrower shall be in default if he gives materially,

25     false, misleading or inaccurate information or fails to

Page 146

1   provide accurate information and that material

2   misrepresentations include, but are not limited to,

3   representations concerning the borrower's occupancy.

4            So those are the principal representations that we

5   rely upon.  Those -- or representations were not made by

6   chance.  They're in every single one of these

7   securitizations.  They were a necessity for marketing

8   securities to investors.  Judge Cote commented in the FHFA,

9   the Deutsche Bank case, that are used -- these

10  representations are used to market and sell securities to

11  investors.  And they're made, in part, because investors,

12  given the nature of these securitizations, the speed and the

13  confidentiality, the information to investors were not in a

14  position to, and it was not the practice, for the investors

15  to do due diligence on the loan by loan basis.

16           The securitization documents allocate the risk of

17  loss on breaching loans to Lehman.

18           I'm going to put this down 'cause whoever is

19  making this app is doing it better than I am.  It's good to

20  have colleagues.

21           THE COURT:  Younger colleagues.

22           MR. SHUSTER:  Yes, indeed.

23           So -- which most of mine are.

24           So the securitization documents allocate the risk

25  of loss on breaching loans to Lehman.  If there's a loan

Page 147

1   that breaches this representation or warranty, that's

2   Lehman's problem.  If the loan doesn't breach the

3   misrepresentation and warranty but doesn't perform, that's

4   investor's problem.  That's essentially the allocation of

5   risk that is reflected in --

6          THE COURT:  But --

7          MR. SHUSTER:  -- the reps and warranties.

8          THE COURT:  -- there's also the AMA.

9          MR. SHUSTER:  Yes.  But the --

10         THE COURT:  You're not intending to leave that

11  out.

12         MR. SHUSTER:  No.  I'm not intending to leave that

13  out.  The breach of representation on warranty has to have a

14  material and adverse impact, for sure.  But that does not

15  mean that the trustees have to show that the breach caused

16  the loss, that it -- and, in Judge Castel's words, that

17  there was a loss.  In fact, it was caused by the breach or

18  that the breach caused the loan to default.  That's not part

19  of the equation.  There's an -- it has to have some impact

20  on the value of the loan but it does not have to cause the

21  loan to incur a loss or to default.

22         So --

23         THE COURT:  Just thinking about it.  Just thinking

24  about what it would mean at origination, say, in 2003,

25  right, for there to be, I don't know, a six percent

Page 148

1    misrepresentation on income.  Right?  And now here we are in

2    2017, or wherever you want to start the countdown clock,

3    2015, whenever the -- for the purposes of my hypothetical,

4    you understand the point.

5              MR. SHUSTER:  Yes.  Yes.

6              THE COURT:  And then you go and look at the -- you

7    go and look at what you have and you have a loan mortgage

8    history, perfect payments every month --

9              MR. SHUSTER:  Right.

10             THE COURT:  -- to this day.

11             MR. SHUSTER:  Right.

12             THE COURT:  Right?  So your position is doesn't

13   matter.  Breach, greater risk, put-back, doesn't matter in

14   terms of the riskiness of the loan that you have this -- I'm

15   making this up.

16             MR. SHUSTER:  Yes.

17             THE COURT:  Just for illustrative purposes.

18             MR. SHUSTER:  Yes, yes.  Of course.

19             THE COURT:  That you have this countervailing body

20   of information that says, wow, this is a really good

21   borrower.  Right?  I mean --

22             MR. SHUSTER:  I --

23             THE COURT:  You agree with that, right?

24             MR. SHUSTER:  I agree with that.

25             THE COURT:  Okay.

```
 1              MR. SHUSTER:  If it had a material and adverse
 2    effect on the risk of loss or on the price, the value of the
 3    loan, all of which sort of amount to the same thing, risk
 4    value, are two sides of the same coin, then, yes, that's
 5    true.  I will say that that scenario is very much the
 6    exception rather than the rule.
 7              So, you know, all -- but for --
 8              THE COURT:  I was stating it in --
 9              MR. SHUSTER:  But it pushed --
10              THE COURT:  -- the extreme --
11              MR. SHUSTER:  -- yes.
12              THE COURT:  -- for -- yes.
13              MR. SHUSTER:  Yes.  I absolutely --
14              THE COURT:  Yes.
15              MR. SHUSTER:  I would say that.
16              THE COURT:  Okay.
17              MR. SHUSTER:  So evidence of breach.
18              We have two broad categories of breaches as we
19    said in our pretrial brief.  We called -- or the breach is
20    predicated on borrower misstatements and omissions, the big
21    four.  And those are income, debt, occupancy,
22    misrepresentations and excessive DTI.  And then there are
23    breaches that tend to be based on lender omissions of
24    documents or provision of defective documents.
25              So these and the categories of breaches -- and
```

Page 150

1    there are other breaches.  There are other miscellaneous

2    categories.  These are the large -- largest ones that

3    comprise the vast bulk of the claims.

4         So there are different processes for establishing

5    these breaches.  For the borrower breaches are predicated on

6    affirmative evidence of breach.  The loan reviewers were

7    instructed to, and did, attempt to verify whether the

8    information set forth, the borrower information set forth in

9    the loan application was accurate.  They did that by looking

10   through the loan file.  And then, to the extent necessary,

11   going and consulting various third party sources that, in

12   our view, are in customary and wide use in the industry.

13   Lender breach -- and the borrower breaches are always

14   predicated on the two representations and warranties that we

15   looked at a moment ago.

16        Lender breaches -- there are more potential reps

17   and warranties that come into play compliance with federal

18   law, compliance with state law, truth in lending.  There

19   might be a specific appraisal breach, appraisal rep.  There

20   might be another rep that applies.  And it's a matter of

21   mappings or reps to that specific transaction.  Determining

22   what documents are called for, attempting to identify

23   whether those documents are in the loan file.  Sometimes in

24   these loan files a document will appear in partial form

25   multiple times.  They have to be signed.  Is it signed?  Is

Page 151

1    it there?  But that's the process.  It's trying to prove a

2    negative in some way and to determine whether the documents

3    that are required to be there are there rather than on the

4    borrower's side, you have some data points, you attempt to

5    verify them based on what's in the file or what you can

6    determine from third parties.

7                    THE COURT:  How do you -- on a wholesale basis and

8    the missing or defective documents --

9                    MR. SHUSTER:  Yes.

10                   THE COURT:  -- category -- let's try to make it

11   easier.  Missing.

12                   MR. SHUSTER:  Yes.

13                   THE COURT:  How do you get over the issue of that

14   was then, this is now?

15                   MR. SHUSTER:  So --

16                   THE COURT:  I mean, that's a tough issue --

17                   MR. SHUSTER:  It is.

18                   THE COURT:  -- right?

19                   MR. SHUSTER:  It is.  And it's one that Judge

20   Castel struggled with and it is.  So the -- ultimately, the

21   way we get there is by trying to establish that the loan

22   file is substantially complete but it's missing -- you know,

23   it partly is a function of what else is in the loan file.

24   So that's one way that we deal with it.

25                   I will note that on 50,000 of the loans at issue

Page 152

1    here, they're Aurora loans.  And Aurora acknowledged --

2    Lehman acknowledged in the Protocol that the Aurora loans

3    were -- loan files were substantially complete.  But there

4    are other loan files, too.  We'll put on an expert witness,

5    Bernette (ph) who will testify to how servicers maintain

6    loan files.  They're not cavalier with loan files.  They try

7    not to spill coffee on loan files.  And in the chain of

8    custody that Mr. Cosenza showed you, there's the mortgage

9    broker and the borrower sitting at a table.  It goes to the

10   originator.  It goes to the funder which is Lehman Bank in

11   the vast number of cases.  It goes to the sponsor, then from

12   the sponsor to the servicer.  So actually, in principle,

13   nothing should get lost along the way even though we know in

14   fairness and candor that that happens.  But the way we deal

15   with that is based on other indicia that the loan file is

16   otherwise complete.

17          THE COURT:  So you -- there are other indicia that

18   the loan files are otherwise complete and therefore you're

19   asking me to draw an inference --

20          MR. SHUSTER:  Correct.  Yes.

21          THE COURT:  -- that in otherwise good files, if

22   this is missing, I can conclude that it was actually

23   missing.

24          MR. SHUSTER:  Yes.

25          THE COURT:  Okay.

Page 153

1            MR. SHUSTER:  That's fair.

2            THE COURT:  So that's that.  And then on the AMA

3    prong, you are -- let me ask it as a question.  So take a

4    failure to provide -- that there's not an indication that

5    there was a right of rescission provided.  Are you going to

6    be putting in evidence that that, absence of a document,

7    assuming that it was an at origination thing -- right?

8    We've gotten over the first hurdle.  Now we're at the second

9    hurdle, right?  So now are you going to be putting in

10   evidence or giving me a basis on which to find that that

11   fact, the absence of the right of rescission, had an -- has

12   a continuing adverse material effect on the loan?

13           MR. SHUSTER:  Yes.  So we would say that, first,

14   approximately 75 percent of the missing document breaches,

15   the breach is deemed material.  So by the document -- by the

16   governing documents.

17           THE COURT:  Okay.

18           MR. SHUSTER:  So we have in 25 percent.  And then,

19   yes.  Our experts will opine that if that document is

20   missing, it has a material and adverse effect on the value

21   of the

22   loan --

23           THE COURT:  But that's a truism.  So what is the

24   -- why?  What --

25           MR. SHUSTER:  Because it affects the ability to --

Page 154

1    it introduces risk into the value of the loan because it

2    affects the ability, for example, to enforce the loan terms,

3    to foreclose on the loan, to enforce the terms against the

4    borrower and so forth.  If --

5              THE COURT:  Meaning that you go to foreclose and

6    there's no right of rescission in there.  And the --

7              MR. SHUSTER:  If there's not --

8              THE COURT:  And the borrower says

9              MR. SHUSTER:  That was --

10             THE COURT:  -- you're out of luck.  Free house.

11             MR. SHUSTER:  Yes.

12             THE COURT:  There's no right of rescission in the

13   file.

14             MR. SHUSTER:  Well, not free house but they can --

15             THE COURT:  You can't enforce.

16             MR. SHUSTER:  You can't enforce or they can make

17   it difficult or you have to incur more expense or you have

18   to enforce on different terms.  That's where the material --

19   and the value of the loan in the market -- if you -- you

20   know, there are scratch and dent securitizations where loans

21   that are --

22             THE COURT:  That's a new one.  What does that

23   mean?

24             MR. SHUSTER:  Loans that are more necked up where

25   they are known to be breaches of representations and

Page 155

 1    warranties or defective documentation.  That's where those

 2    go.  You know, it's the Island of Lost Toys.  But that's

 3    where those go.  And they --

 4              THE COURT:  But what --

 5              MR. SHUSTER:  And they fetch a lower price.

 6              THE COURT:  Okay.  So -- but --

 7              MR. SHUSTER:  That's what our -- that what our --

 8              THE COURT:  Now --

 9              MR. SHUSTER:  -- experts will say.

10              THE COURT:  And not keeping my promise to

11    interrupt you less.

12              MR. SHUSTER:  I welcome it.

13              THE COURT:  I'm just trying to stick with you

14    here.  But now it does sound like not only on the

15    borrower/breach category which, intellectually -- even

16    though I obviously haven't made a decision yet -- on the

17    deemed AMA and the proof of AMA, it sounds a lot worse, kind

18    of we're at large where you have a 50 percent

19    misrepresentation of income.  That sounds bad, right?

20    Doesn't sound as bad to that piece of paper missing in the

21    file.  But it sounds like you're leading me to demonstrate

22    breach.  You have adverse material effect.  It does not

23    sound like those are two separate things that you're going

24    to say -- that you're going to, in fact, show or feel that

25    you need to show in every category.

Page 156

```
 1              MR. SHUSTER:  Well, I'll say two things.  One, if
 2    where you end up -- where Your Honor ends up is that 50
 3    percent income misrep sounds worse than a missing document,
 4    I think that's a fair statement.  But at the same time, we
 5    do show this on a loan by loan basis.  It looks like we're
 6    just saying it 'cause we're saying it for so many loans.
 7    But, in fact, this is the industry custom and practice.
 8    This is the legal standard.  It's the one that our experts
 9    will say is --
10              THE COURT:  I'm sorry.  We're competing with the
11    garbage truck now.
12              MR. SHUSTER:  So --
13              THE COURT:  I'm trying to understand.  Whether --
14    something being the industry standard doesn't answer the
15    question as a matter of law.  What do I do with a document
16    in MLSAA, or whatever the acronym is, that says you have a
17    material breach that adversely affects, present tense, the
18    value of the interest holders, the certificate holders,
19    whatever --
20              MR. SHUSTER:  Yes.  Well --
21              THE COURT:  -- it says.
22              MR. SHUSTER:  We have to rely for that on expert
23    testimony that if a Truth in Lending Act disclosure is not
24    there or defective and that it's not deemed material, it's
25    material on this loan because it has -- because it increases
```

Page 157

1    the risk on the loan and it diminishes the value of the

2    loan.  So it is a distinct showing and a distinct finding

3    but -- so that's the way I would --

4              THE COURT:  Okay.

5              MR. SHUSTER:  -- I would say it.

6              So on -- if we could move on to the -- what we

7    call the big four breaches.  They are overwhelmingly income

8    and debt.  That's by far the largest the number.  We have --

9    this is really self-explanatory but nine billion, roughly 9

10   point almost 2 billion of the 11.6 billion of the income,

11   debt, occupancy and DTI breaches.  And most of it is income

12   and debt.

13             So the trustee's loan review process.  We have

14   receipts of claims files from the servicers and then

15   production and review of claim files by the trustee.  We can

16   fill the rest of that in because I'm only -- I'm stopping at

17   1 for this purpose.

18             So the trustees were required to obtain and review

19   loan files and that's what they did.  And then if we look at

20   the next chart, so the trustees reviewed originally 171,000

21   loan files.  I think it's important -- we think it's

22   important for purposes of assessing the trustee's loan

23   review process and the good faith and punctiliousness with

24   which they approached the Protocol, that they went through

25   the loan files and for 77,000 loans, which is almost half,

Page 158

1    they found no breach.  So half of 171,000 is 85,500.  And on

2    77,000 loan files, the trustees found no breach.  No missing

3    documents, no inconsistency in income, debt, occupancy or

4    DTI.  And they did not put those loans through the protocol.

5    They found breaches on 94,506 -- or what we have here

6    rounded to 94,000 loans.  And now the number that's

7    presented for estimation is 72,500.  About 8,000 of the

8    loans that dropped off dropped off because there's an opt-

9    out trust that has the claims on 3,000 loans.  Then there

10   are terminated trusts and there are paid off loans.  And

11   then there is the withdrawn loans that has received not

12   inconsiderable attention.  So that's how we get to the

13   number that's -- the number of loans that's presented for

14   estimation.  I will come to the withdrawn loans in a bit.

15         The loan reviews were conducted by experienced

16   firms supervised by Duff & Phelps.  So Duff & Phelps

17   interviewed, was engaged by the trustees to manage and

18   supervise the loan review process.  I think it interviewed

19   eight firms to determine whether they had the expertise and

20   capacity to participate in the loan review.  And these are

21   the ones that they selected.  These are well known in the

22   industry.  And at least a few of them, their work has at

23   least been cited, been reported decisions.  I mean, they are

24   established loan review firms in the industry.

25         The loan review process then, as reflected here in

Page 159

1    this engaging funnel chart, 171,000 loan files.  The loan

2    review firms performed a complete review of the loan file

3    and an initial loan review on a second level -- loan review

4    to verify borrower information and to ascertain whether

5    there were missing or defective documents called for by the

6    representations and warranties for any particular deal.

7            We will have two witnesses testify to the

8    trustees' loan review process which they're both originally

9    from Duff & Phelps.  Mr. Esses will testify as a fact

10   witness; Mr. Aronoff as an expert witness.  Duff & Phelps

11   performed two levels of QC as I've described earlier on the

12   loans.  94,000 originally made it through.  77,000 were

13   found not to be breaching.

14           Just an observation.  Mr. Cosenza mentioned that

15   he finds it highly unusual in his experience that someone

16   who participated in the design and execution of the loan

17   review should now be opining on the validity of the claims.

18   But I can honestly say that in these cases, that's how it's

19   done.

20           Let me start with the reported cases.

21           So in the MARM (ph) case, the testifying witness

22   was Ira Holt.  He designed and executed the review and then

23   testified to it.

24           THE COURT:  But hold on.  But hold on --

25           MR. SHUSTER:  Yes.

Page 160

1           THE COURT:  -- 'cause this is an important point.

2    In those cases, I find it not surprising that he would

3    testify to it as to here's what we did.  But this is

4    different because in this case, we have the issue of using

5    the process itself to extrapolate the number.  So in that

6    sense, it is more like I did a great job over there.  When I

7    was first hired to design this protocol, it was a great

8    design.

9           MR. SHUSTER:  I don't --

10          THE COURT:  It's different.  No?

11          MR. SHUSTER:  I don't see it.

12          THE COURT:  Well, maybe --

13          MR. SHUSTER:  And, you know --

14          THE COURT:  -- you could make a note --

15          MR. SHUSTER:  Yes.

16          THE COURT:  -- for some time later on --

17          MR. SHUSTER:  Yes.

18          THE COURT:  -- to show me --

19          MR. SHUSTER:  Yes.

20          THE COURT:  -- in some of the cases --

21          MR. SHUSTER:  Yes.

22          THE COURT:  -- which I have read -- see, as

23    indicated by the yellow page --

24          MR. SHUSTER:  Yes.

25          THE COURT:  - marked.  You could show me in the

Page 161

1    cases where that's a thing that was done that is less

2    remarkable than Mr. Cosenza would have me believe.

3              MR. SHUSTER:  Yes.

4              THE COURT:  And then the other thing is, and maybe

5    you were going to get to this, Mr. Cosenza made a big point

6    of highlighting the fact that for at least one of the two

7    levels of QC, there was no mucking around in the loan files.

8    Which is also interesting because I don't really understand

9    how you could QC something without at least, on some level,

10   kind of spot checking the underlying data.  So if you could

11   address that, too --

12             MR. SHUSTER:  Yes.

13             THE COURT:  -- I would be grateful.

14             MR. SHUSTER:  Yes.  So just to finish the thought

15   on --

16             THE COURT:  Yes.

17             MR. SHUSTER:  -- Mr. Aronoff, this is a bigger

18   loan review process.  But it was always anticipated that, at

19   the end of the day, the trustees might have to prove their

20   claims in an adversarial process.  And the expert would have

21   to opine on the appropriateness of the process, the extent

22   to which it conforms to industry practice and so forth.

23             In that respect, it's bigger but it's no different

24   in design or in principle from what was done in those other

25   cases.  I'm highly familiar with pretty much all the cases.

Page 162

1    And it's done -- I mean, I'm liaison counsel in part 16, the

2    commercial division and there's about --

3              THE COURT:  That's lovely

4              MR. SHUSTER:  Well --

5              THE COURT:  You're not an expert --

6              MR. SHUSTER:  No.  But -- but --

7              THE COURT:  -- and I only -- I only know what I'm

8    going to -- what you're going to tell me.

9              MR. SHUSTER:  The only reason I say that is

10   because my friend on the other side said this is unique in

11   his experience.  And I'm saying it's not in my --

12             THE COURT:  Okay.  But I can't take your word for

13   it.

14             MR. SHUSTER:  Of course not.

15             THE COURT:  You have to --

16             MR. SHUSTER:  Of course not.  Mr. --

17             THE COURT:  And I'm saying that --

18             MR. SHUSTER:  Yes.

19             THE COURT:  -- please make me smarter --

20             MR. SHUSTER:  Yes.

21             THE COURT:  -- on the points.

22             MR. SHUSTER:  Yes.  Yes.

23             So as far as the QC goes, the first level of QC

24   was that the QC team looked at the claim package, looked at

25   whether it was complete, whether the information -- the loan

Page 163

1    application was in there and whatever other information bore

2    on the issue of whether there was a borrower

3    misrepresentation.  So that had to be reflected in the claim

4    package.  And that would have been gleaned from the loan

5    file or it would have been obtained from third party

6    sources.  And then whether the description was correct,

7    whether the mapping to representations and warranties was

8    correct and whether the breach claim appeared to be -- the

9    alternative to that is essentially to entirely re-underwrite

10   the loan file.  And that would -- in our view, there were

11   two levels of review at the loan firms themselves.  It's not

12   a defect in the design of their review not to do that, not

13   to have the first level of QC go back through and re-

14   underwrite the loan file entirely.

15            THE COURT:  So let me ask a different question and

16   maybe whosoever operating the clicker could click back to --

17   I'm not going to be able to find it.  There's a slide that

18   shows Duff & Phelps and all the firms that --

19            MR. SHUSTER:  Yes.  That's --

20            THE COURT:  -- actually did the underwriting.

21            MR. SHUSTER:  Right.  Couple slides -- right.

22            THE COURT:  So -- yeah.  That's the one.

23            So another point that Mr. Cosenza emphasized was

24   no uniform standards.  So you can agree or disagree with

25   that.  That's point number one.

Page 164

1           And then point number 2 is, so how do you QC --

2      are you looking for -- are you QC'ing Digital Risk for what

3      Digital Risk did across their portfolio versus comparing

4      what Digital Risk did with what Opus did and trying to

5      generate some kind of a consistent answer?

6           MR. SHUSTER:  So I won't say that the reviews were

7      absolutely uniform in all particulars but instructions were

8      given to the loan review firms and how to carry out the

9      reviews.

10          THE COURT:  And there'll be evidence on that?

11          MR. SHUSTER:  And there will be testimony on that.

12     Fact testimony and expert testimony.  And there was also

13     regular weekly or almost weekly calls and reviews between

14     Duff and the review firms where to the extent that revisions

15     or modifications had to be made or questions came up that

16     they were addressed.  So there was considerable -- you know,

17     I won't say 100 percent but considerable uniformity among

18     the review firms in terms of what they were told to do and

19     what they did.

20          Most fundamentally, they were told to do two

21     things.  Look at the loan application, verify the key

22     information that's in there by looking through the loan file

23     or by going to any one of a number of third party sources.

24     And, separately, identify the reps and warranties for that

25     deal, determine what loan file -- what documents were called

Page 165

1    for and determine if those documents are in there in their

2    proper form, whether they're there, whether they're

3    defective.  Broadly speaking, those were the instructions

4    that were given.

5                THE COURT:  Okay.

6                MR. SHUSTER:  So the loan review process -- I

7    think I've been over this now.  And if I haven't been over

8    it earlier, I just said it again.  So let's, if we could,

9    look then at income.

10               So misrepresentation of income.  So these are the

11   types of proof that the trustees relied upon.  I'm going to

12   shortly show what these translate into from a dollar number

13   standpoint.  They are ranked here in order from most used to

14   least used.  And, you know, we will have certainly expert

15   testimony that these are commonly and widely used in the

16   mortgage industry.  Actually, at various phases.  Loan

17   origination and underwriting servicing of loans, forensic

18   reviews, put-back claims.  These types of proof have been

19   accepted by other courts including, in particular, the three

20   federal courts that have tried cases in this area:  Judge

21   Cote in FHFA v. Nomura, Judge Castel and Judge Rakoff.  And

22   from our point of view, importantly --

23               THE COURT:  So Rakoff was a monoline, right?

24               MR. SHUSTER:  Rakoff was a monoline -- yes.

25               THE COURT:  I know you don't think it makes any

Page 166

1   difference --

2          MR. SHUSTER:  I don't.

3          THE COURT:  -- but --

4          MR. SHUSTER:  I don't because they're the same

5   reps and warranties and the same remedies.  I mean, that --

6   you know, that's --

7          THE COURT:  Well -- I hear you.

8          MR. SHUSTER:  That's my expression but okay.

9          So -- and then importantly to us, we think, in

10  corroborating what we say, these types of evidence were used

11  by Lehman and Aurora in prosecuting their own put-back

12  claims.  And in many instances, they weren't merely used but

13  Aurora's policies and procedures manuals say use these

14  sources of evidence.

15         So we've looked generally -- we've already looked

16  at this for purposes of the exemplar so I don't need to

17  dwell on it here other than my point is only that generally,

18  Lehman addressed types of evidence in a generic or

19  categorical way rather than in a granular and specific way

20  where it said, no, the loan -- the tax return doesn't say

21  that or, in fact, this borrower earned a different amount or

22  so forth.  And I think, from our point of view, that's

23  helpful in that it delineates -- it sort of delineates

24  disputes, fundamental disputes, about the sufficiency of

25  different types of evidence.

Page 167

1              So then we get to -- this is where we sort of map

2      the evidence for income to dollar numbers.  So it's a bit of

3      a slog but if you look at, say, Your Honor, salaried

4      employees -- and we rely on same year accrued for salaried

5      employees, you can see the number of loans that are

6      supported by tax return evidence.  And again, that's same

7      calendar year evidence.

8              Bureau of Labor Statistics evidence, bankruptcy

9      filings, audit documentation typically as a credit report or

10     a similar document, W-2s and --

11             THE COURT:  Well all know how good the credit

12     rating agencies operate, right?

13             MR. SHUSTER:  Well, they may not be good

14     maintaining information but we think they're good enough

15     providing information.  So whether they protect its privacy

16     is another matter.  But they -- certainly, credit reports

17     are widely used and relied upon in the mortgage industry.

18             Your Honor can see that most of the dollars are in

19     the top sort of half a dozen.  And the same is true for

20     salaried employees.  Sorry.  Just pop back up -- near year.

21     You've got tax returns, bankruptcy documents.  It's almost

22     all I those top three or four categories.

23             THE COURT:  How do you define near year?

24             MR. SHUSTER:  Near year is --

25             THE COURT:  Two years or less.

Page 168

```
 1              MR. SHUSTER:  It's two years or less.  Exactly.

 2              Okay.  Then self-employed.  We have again, tax

 3    returns, bankruptcy documents are by far the biggest items

 4    for same year proof and for near year proof.

 5              So that's --

 6              THE COURT:  So for the bankruptcy documents --

 7              MR. SHUSTER:  Yes.

 8              THE COURT:  -- what you're saying in broad outline

 9    is that they represented on their loan application that they

10    made $100,000 a year.  And then either same year or near

11    year, they file for bankruptcy.  And on their -- on some

12    bankruptcy document, they state lower income?

13              MR. SHUSTER:  Yes.  So it's not same year and near

14    year for bankruptcy documents.  It's actually not when they

15    filed but what they say about -- are they making a statement

16    about the calendar year or we say a subsequent.  Their

17    income in the calendar year in which the loan was made or a

18    subsequent year.  Just for clarity, that's what same year --

19              THE COURT:  Right.  But I'm just trying to --

20              MR. SHUSTER:  Yes.  But -- yes.

21              THE COURT:  I'm just trying to understand --

22              MR. SHUSTER:  If they have in their financial

23    statement, if they represent my income in 2007 was x and

24    that is, you know, materially lower than what was

25    represented on the loan application then we would rely on
```

Page 169

1    that document to establish an income breach unless there's

2    something else in the file that shows --

3            THE COURT:  But how would you be able to tell if

4    someone has a job and they apply for a loan in January and

5    the loan closed in March and then in June, they were -- you

6    know, there was a reduction in force or they got laid off

7    and then they put that fact on their bankruptcy document,

8    what -- I mean, that's not --

9            MR. SHUSTER:  No.  That --

10           THE COURT:  That's not a breach.

11           MR. SHUSTER:  That may not be sufficiently -- if

12   they say that much then you may not -- we may not have put

13   that forward as a breach.

14           THE COURT:  But you wouldn't -- you wouldn't see

15   that in a -- again, we're getting really into the weeds here

16   --

17           MR. SHUSTER:  Yes.

18           THE COURT:  -- whether it's a Chapter 13 or a

19   Chapter 7 or an individual 11, whatever it is.  You wouldn't

20   necessarily see that sweeping a description of things in a -

21   - what you're calling a bankruptcy document.

22           MR. SHUSTER:  Well, typically -- well, first,

23   they're --

24           THE COURT:  Remember who you're telling

25   "typically" --

Page 170

1          MR. SHUSTER:  Yes.  No.  Of course.

2          THE COURT:  -- okay?

3          MR. SHUSTER:  Yeah.  No.  Of course.  I hope you

4     find bankruptcy filings sufficient and probative.  But --

5          THE COURT:  I'm just trying to understand --

6          MR. SHUSTER:  -- oftentimes --

7          THE COURT:  -- how --

8          MR. SHUSTER:  -- there's other information in the

9     bankruptcy filing that may indicate whether the borrower has

10    the same job, for example.

11         THE COURT:  Sure.

12         MR. SHUSTER:  But the income is actually lower

13    than the borrower represented it to be.  Sometimes there's

14    other corroborating evidence in the file.  Typically, a

15    bankruptcy document is in the file either because it's been

16    provided to -- if it's in the loan file -- and that's not

17    always the case -- sometimes you go and get it off the

18    docket.  But oftentimes, it's in the loan file and it's

19    either been obtained by the servicer for purposes of

20    verifying the borrower's income or debts to determine

21    whether to make a loan modification and, if so, in what way.

22    Or it's provided affirmatively by the borrower for the same

23    purpose.  So oftentimes, it's rarely that -- you know, it is

24    sort of one naked piece of information that when you look at

25    it, you say I'm not comfortable that this alone establishes

Page 171

1    the borrower's income.

2              THE COURT:  Okay.  Why don't we move on?

3              MR. SHUSTER:  And, you know, we'll look at

4    examples and they'll bring forward examples.  But generally,

5    the information where we put it forward from a bankruptcy

6    filing, we think it shows that the borrower was in the same

7    job or had the same job for enough of the calendar year that

8    you can draw reasonable inference that the borrower's income

9    from that job was not what the borrower represented it to be

10   on the loan application.

11             So that is -- so then Your Honor asked a question

12   about whether we would show the magnitude of income

13   breaches.  And so here is a breakdown.  As the Court can

14   see, there's a -- the smallest number actually is in the 5

15   to 20 percent range.  And then it gets bigger quickly from

16   there.  We could, you know, break it down above 121 percent

17   but we make the point, you know, it goes up from there.  But

18   generally, we're talking about significant overstatements of

19   income by borrowers.  And to borrow a word from Judge

20   Castel, a misrepresentation of income of a certain magnitude

21   bespeaks of intent and these are substantial overstatements

22   of income.  Not that it's our burden to establish intent.

23   It is not.  But we're talking -- you know, we -- we're

24   talking about meaning overstatements of income.

25             So the integrity of the process.  And I may be

Page 172

1    belaboring this at this point, but we have the loan review

2    firm that verified the income.  And I'm just focusing on

3    income as one category and one aspect of the process.  We

4    had the QC I and II at Duff & Phelps.

5            Now the -- we did bring someone in.  We did bring

6    in an expert witness to run an independent check on what had

7    been done.  That's Chip Morrow.  You saw snippets of Mr.

8    Morrow's testimony during Mr. Cosenza's opening.  Mr. Morrow

9    has 40 years of experience in loan origination and

10   underwriting.  He reviewed a sample of loans as a --

11           THE COURT:  How did he get the sample?

12           MR. SHUSTER:  The sample was selected for him

13   using techniques designed to ensure a random and

14   representative sample by Dr. Schwert.  I forget his first

15   name but he's an econometrician on the faculty -- the

16   finance faculty at the University of Rochester.  He will

17   testify to how the sample was polled.  We're not using the

18   sample and the breach rate, the agree rate of Mr. Morrow.

19   We're not arguing that that's a breach rate that the Court

20   should rely upon.  It's an agree rate.  It's an independent

21   check on the integrity and reliability of the trustees'

22   review, the trustees' process, the trustees' evidence.  It's

23   for that purpose that we're putting forward Mr. Morrow.

24           THE COURT:  But this was not done -- I mean, maybe

25   this is no different from any other expert.  But this was

Page 173

1    not double blind in any sense, right?  He knew.  He knew

2    that best case scenario was close to 100 percent, right?

3                 MR. SHUSTER:  I don't know what that means.  You

4    mean that he was --

5                 THE COURT:  What that means?

6                 MR. SHUSTER:  No.  I don't think he -- I mean,

7    you'll have to evaluate him and his independence --

8                 THE COURT:  But it wasn't -- it wasn't a double

9    blind evaluation.  Here are a set of loans.  Right?

10   Determine whether or not there was a breach.  I mean, he --

11                MR. SHUSTER:  He was running a check --

12                THE COURT:  He knew the destination --

13                MR. SHUSTER:  Well, I don't know if he --

14                THE COURT:  -- when he set out on the journey.

15                MR. SHUSTER:  I don't know if he knew the

16   destination.  He knew what the population was that he was

17   looking at.  He knew that the sample was drawn from a

18   population of loans that had been identified as breaching.

19   So that's fair.  But I think he -- you know, it's our view

20   and you'll have to evaluate -- the Court will have to

21   evaluate his credibility and integrity but he made his own

22   call.  Once he looked at the loan file and once he looked at

23   the claim, he decided whether or not he agreed that there

24   was a breach.  He's a pretty independent guy and that's what

25   he did.

Page 174

```
 1              So --

 2              THE COURT:  There was no, you know, control group

 3    where he was given loans that were -- a loan population

 4    where there were no breaches and breaches.

 5              MR. SHUSTER:  I don't believe so.  He was just

 6    given -- he was -- the breaches that he got were selected

 7    from our top 12 breach categories using --

 8              THE COURT:  Okay.

 9              MR. SHUSTER:  -- a random number generator,

10    essentially, and that was the sub-population that he

11    reviewed for this purpose.

12              THE COURT:  Okay.

13              MR. SHUSTER:  So misrepresentation of debt.

14              THE COURT:  Do you want to take a break, Mr.

15    Shuster?

16              MR. SHUSTER:  No.  I'm fine.  I'm just --

17              THE COURT:  Well, you let --

18              MR. SHUSTER:  -- mindful of the time.

19              THE COURT:  No, no, no.  You --

20              MR. SHUSTER:  If I'm going on too long --

21              THE COURT:  But you let me know when --

22              MR. SHUSTER:  So far so good.

23              THE COURT:  -- you want to take a break.  Okay?

24              MR. SHUSTER:  Thank you very much.

25              So misrepresentation of debt.  Same type of thing.
```

Page 175

1     Same category -- similar categories of types of proof,

2     again, organized in order of most commonly used.  We'll have

3     expert testimony that they're used in the industry.  We'll

4     show that they're accepted by the Courts and that they were

5     used by Lehman in the ordinary course in pursuing its put-

6     back claims.

7             So here, I'm going to walk through a debt exemplar

8     in a moment just for illustrative purposes.  Here is a

9     excerpt from the claims tracking spreadsheet.  And this

10    shows that a review of a merge report revealed undisclosed

11    mortgages.

12            And then we have a response from the plan

13    administrator that it relies on an inadmissible

14    uncorroborated report.  So it's sort of rejected MERS as a

15    type of evidence.

16            Now I'd like to actually jump ahead to the

17    exemplar and then I'll come back to the breakdown.  So if we

18    look at the exemplar, it relates to a property in Spring

19    Park, Minnesota.  The borrower, Joseph L., $84,000 loan on a

20    primary residence taken out in August of 2006.  The loan

21    application calls for the borrower to disclose his or her

22    debts.  These are the debts that the borrower disclosed for

23    different debts totaling -- a total unpaid principal balance

24    of $21,303.  And then there's the borrower's name and

25    signature.

Page 176

1          We then have excerpts from the evidence of breach

2     that was provided in the claims package.

3          So "Data Verify" is a service that runs checks

4     using the borrower's social security number and gives you

5     various reports including MERS.  So it's a MERS report that

6     was obtained through a data verify search.  The MERS report

7     shows the same borrower and it shows "Undisclosed Mortgage

8     Debt of the Borrower".

9          And then there's a credit report also run with the

10    borrower's social security number.  And the credit report

11    also shows two items of undisclosed pre-closing debt also

12    taken out in August of 2006.  And again, the loan closed --

13    the subject closed on --

14          THE COURT:  You know, I'm just trying to --

15          MR. SHUSTER:  Yes.  Yes.

16          THE COURT:  I'm just --

17          MR. SHUSTER:  Sorry.  Yeah.  Let me slow --

18          THE COURT:  I'm just trying to follow this.

19          MR. SHUSTER:  Yeah.  So the subject loan, if we go

20    back to the cover page, closed on August 24, 2006.

21          THE COURT:  Okay.

22          MR. SHUSTER:  And then if we jump ahead to the

23    MERS report on the left.  And you look in the upper left

24    corner of the MERS report, there's a Rich --

25          THE COURT:  A-14.

Page 177

1           MR. SHUSTER:  -- A-14.

2           THE COURT:  Right.

3           MR. SHUSTER:  Right.  And the same is true for the

4    second item.  And the credit report shows, on the top line,

5    the fourth column over, "Opened".  It shows that it opened

6    in August of 2006, the loan.

7           THE COURT:  Okay.  Tell me once again when did

8    this close?

9           MR. SHUSTER:  The loan closed on August 24th,

10   2006.

11          So --

12          THE COURT:  Okay.

13          MR. SHUSTER:  -- this is the sort of evidence that

14   we relied upon.  Now if we could just back up to the same

15   year/near year breakdown, I have the same breakdown -- we

16   have the same breakdown for misrepresentation of debt that

17   we did for income.  And a good deal of the pre-closing

18   mortgage debt is based on these MERS and data verify reports

19   or on credit reports.  And then there is pre-closing

20   installment debt which is to say non-mortgage debt.  And

21   then there is post-closing mortgage and installment debt and

22   that is established yet similar types of evidence.

23          So then if we jump past the exemplar to the

24   magnitude chart, this chart breaks down the magnitude of the

25   nondisclosed debt breaches that we're looking at.  And as

1     the Court can see, most of them are in the $20,000 or more

2     category.

3              The debt went through -- the misrepresentation of

4     debt breaches were subject to the same loan review and QC

5     process and were also reviewed by Mr. Morrow.

6              Occupancy.  Same categories of evidence.  We make

7     the same points in terms of their industry use, judicial

8     acceptance and use by Lehman.  Here, we have -- again, we

9     pulled out an example that's based on a tax return but there

10    are, you know, occupancy breaches that are supported in

11    other documents.  But here, it says that the loan file

12    contained post-closing 2006 and '7 tax returns along with

13    the Schedule E which reflected the subject property as a

14    rental when it was supposed to be the primary residence.

15             The response was that the tax return evidence is

16    unreliable and insufficient.  And again, what the plan

17    administrator did not say is no, it's not in there or it

18    doesn't say what you say it says.

19             So the -- here is the loan.  Borrower, Antonia E.

20    Property in -- sorry.  I skipped over the map -- in

21    Northwest 24th Avenue in Miami, Florida.  And there are the

22    details concerning the loan which had a closing date of June

23    12th, 2006.

24             So we have the loan application which shows that

25    the property will be the borrower's primary residence, the

Page 179

1      subject property address and the borrower's present address.

2      So the borrower's present address is Southwest 14th Street.

3      We're relying on, as I mentioned, obviously, the no untrue

4      statement and no default reps.  But there is also what we

5      have here is an occupancy covenant that's in the mortgage

6      where the borrower is required to occupy within 60 days and

7      then for a full year and for the vast majority of the

8      occupancy breaches, we have occupancy affidavits where the

9      borrower affirms that, under oath, that he or she will

10     occupy the property and acknowledges that not doing so is a

11     breach of his or her covenants.

12              So the evidence then of breach, the tax return,

13     it's a 2006 tax return, a 1040.  Again, the loan had a

14     closing date of June of that same calendar year.  And the

15     borrower's address is listed at her prior address which is

16     on Southwest 14th Street.  So that establishes that she did

17     not occupy the property within 60 days and certainly not

18     continuously for a year.  And then there is, moreover, in

19     the same tax filing a Schedule E that shows that the subject

20     property was used as a rental property and generated rental

21     income.

22              And then there is evidence from 2007.  Again, a

23     tax return to the same effect showing the borrower's prior

24     address and showing the subject address -- prior address as

25     her residence and the subject address as her rental home.

Page 180

1        So the story the loan file tells is the one that

2   we just saw.  It went through the same loan review and QC

3   process and was -- it's not that this loan was passed upon

4   by Mr. Morrow, in particular, but he looked at property

5   occupancy breaches in the course of his review and had the

6   agree rate that's specified there.

7        So then moving to breaches that are predicated on

8   more on lender conduct which is to say missing or defective

9   documentation.  This is set of those breaches breakdown from

10  a numerical standpoint.  They're principally in these four

11  categories, HUD-1, till right of rescission and appraisal.

12  And they break down between Aurora-originated loans and

13  other loans and those -- I gave you that -- Your Honor, that

14  number earlier.  And the percentage that are deemed material

15  and adverse.

16        So, you know, now might be a good time --

17            THE COURT:  Okay.

18            MR. SHUSTER:  -- for a break, I think.

19            THE COURT:  You have a rough estimate of how --

20            MR. SHUSTER:  -- for the sake of all concerned.

21            THE COURT:  -- much longer you have?  What page

22  are you on?

23            MR. SHUSTER:  Let's see.  I'm on page 70-ish of

24  120.  I don't know.  Maybe 45 minutes.

25            THE COURT:  Sounds good.  Okay.  Let's take a 10-

Page 181

1    minute break and then we'll resume.

2            MR. SHUSTER:  Thank you, Your Honor.

3        (Recess from 3:17 p.m. until 3:41 p.m.)

4            THE COURT:  I apologize.  What happens when I go

5    back in there is 50 things -- please have a seat -- 50

6    things that people want me to do instantly, so I apologize.

7            MR. SHUSTER:  Not at all, Your Honor.  Thank you.

8    May I continue?

9            So turning now to Lehman's process, Lehman

10   declined to review a third of the loans, what it refers to

11   as the on-hold loans which I will come to in detail.  So a

12   third of the loans did not get reviewed in the protocol at

13   all by Lehman, 32,000 loans.

14           THE COURT:  How does that map to what -- the loans

15   that are being presented for estimation?

16           MR. SHUSTER:  24,000 now.  So it's 24 --

17           THE COURT:  Say it again.

18           MR. SHUSTER:  24,000 of the loans being presented

19   for estimation were not reviewed by the --

20           THE COURT:  So that's a third.

21           MR. SHUSTER:  Yes.

22           THE COURT:  24 of 72.

23           MR. SHUSTER:  Yes.

24           THE COURT:  Okay.

25           MR. SHUSTER:  Yes.

Page 182

1           Lehman's loan review firm was Recovco.  Recovco

2      reviewed loans and if it determined that there was no basis

3      for a breach, it set the loan aside.  If it determined that

4      there might be a basis for a breach, it elevated the loan up

5      to Rollin Braswell, Lehman's trial counsel's firm, to review

6      and make a final determination on the loan.  That is

7      described in detail in Mr. Grice's expert report and in the

8      testimony of Mr. Trumpp and Mr. Grice.  And Lehman

9      ultimately ended up with something below a 2 percent

10     acceptance rate.  And that remains the acceptance rate

11     today.  If you just take 72,500 loans and the fewer than

12     2,000 loans on which Lehman has accepted breaches, the

13     acceptance rate remains where it is.  We don't think that

14     acceptance rate is credible for a variety of reasons some of

15     which I will come to.

16           Lehman -- so, you know, one of our principal

17     points in asking the Court and suggesting that the Court can

18     resolve common disputes -- general disputes that are common

19     to groups of loans is that we put forward various types of

20     proof and we get a sort of a generic response for that

21     category.  What we didn't get are evidence to actually

22     refute the breach findings that the trustees put forward.

23           So it's -- was Aurora's practice -- in fact, it

24     was in Aurora's policies and procedures manuals relating to

25     put-back claims.  And then it was in the letters that it

Page 183

1    sent out making put-back demands that it asked that the

2    obligor either provide evidence to refute our findings and

3    if you cannot provide evidence to refute our findings then

4    you must repurchase the loan.  But what we got, for the most

5    part, back, what the plan administrator provided were the

6    sorts of responses that are quoted on the next chart as to

7    categories or types of evidence.

8            So -- but these same types of evidence, tax

9    returns, credit reports, bankruptcy documents, verifications

10   of employment, work number, Acurints and so forth, were

11   relied upon and put forward by Aurora in support -- or

12   Lehman -- LBHI -- in support of their own put-back claims.

13           So here is an affidavit submitted by an LBHI

14   employee referring to tax returns that prove a borrower

15   breach.  And obviously, we will go through these in greater

16   detail and our cross-examinations of Lehman's witnesses --

17   which is not revealing estate secret.  We all know that

18   we're going to be talking about these documents.

19           Here is a letter from an Aurora employee, Sean

20   Kelmurray (ph), the borrower's bankruptcy filing reflects

21   how much the borrower made.  And that's put forward as the

22   basis for the assertion of a violation of a representation

23   and warranty.  I should note the representation and

24   warranty, particularly the no untrue statement

25   representation and warranty, is the same one that Aurora

Page 184

1    received from the entities from which it purchased loans, is

2    set forth in Aurora's seller guide, same representation and

3    warranty.  Virtually the same and the same material and

4    adverse effect language.

5            Here is a letter signed by Mr. Trumpp on Lehman

6    Brothers letterhead verifying income through the work

7    number.

8            Here is one relying on a reverification of the

9    borrower's employment at the time that notice of breach was

10   being provided.

11           Next is a letter from Mr. Trumpp on Lehman

12   Brothers' letterhead to an obligor, Belvedere, relying on an

13   Accurint search to establish the borrower's residency.

14           And then another letter from Mr. Trumpp relying on

15   a credit report to establish undisclosed loan debt.

16           And then a Bureau of Labor statistics.  The

17   relevance of this is that this corroborates what our experts

18   are saying that these types of evidence were used and are

19   used in the industry or commonly and widely used in the

20   industry.  And these are the sorts of common disputes that

21   are -- general disputes that are common to groups of loans

22   that we think the Court can resolve.

23           So we will obviously get into that.

24           THE COURT:  But just go back --

25           MR. SHUSTER:  Yes.

Page 185

1          THE COURT:  Go back one --

2          MR. SHUSTER:  Of course.

3          THE COURT:  -- slide.  So this is an interesting

4    one, right?  So the part that you don't highlight, it looks

5    like the person indicated that they were earning 6850 a

6    month or 822 a year as a dental lab technician.

7          MR. SHUSTER:  Right.

8          THE COURT:  And then there's a BLS statistic that

9    shows this virtually meaningless range.  Right?  So the fact

10   that, as you said, it's not that Lehman is saying -- they're

11   rejecting the authenticity of the evidence.  But the mere

12   fact that this was used them, I don't necessarily have to

13   say it's good now, right?

14         MR. SHUSTER:  Clearly not.  I mean, ultimately,

15   it's for Your Honor to decide.  All we can -- I mean --

16         THE COURT:  All you can say is, like, look,

17   they're now saying this is bad but they used this in the

18   past.

19         MR. SHUSTER:  They used it and our experts are

20   going to say that this evidence is reliable.  You know, it's

21   not used in all cases but we do use it in a certain number

22   of cases to establish income.  Your range -- that's an

23   unusually wide range for BLS.  But BLS provides an income

24   number at different percentiles.  I don't -- I think it's

25   60, 75 and 90.  So generally, when we -- when we use it,

Page 186

1    we're always using the 90th percentile.  So we're assuming

2    that we're at least at that level.  Ultimately, of course,

3    it's for the Court to decide.  But the fact that we have a

4    blanket outright rejection of this type of evidence which

5    is, we think, a little difficult to square with the fact

6    that when pursuing its own put-back claims, the evidence

7    seemed to be good enough.  And --

8              THE COURT:  Okay.

9              MR. SHUSTER:  So the so-called on-hold loans, this

10   is simply a breakdown of how many were on hold and how many

11   were not.  And it's not the case that -- well, let me start

12   with the protocol.  The protocol describes -- the protocol

13   order describes what a mortgage file shall include.  And it

14   says, at a minimum, all the loan documents the RMBS trustees

15   received.  There's no suggestion that the trustees failed to

16   comply with that and failed to turn over all of the

17   documents that they received from the various servicers.

18              The trustees went back and forth and back and

19   forth with the servicers and where they could not obtain

20   documents, the servicers told them there are no more

21   documents.  They didn't ignore the trustees.  They didn't

22   stonewall them.  They simply said we're out of paper.  We

23   have nothing left.

24              The protocol order adds that it may include the

25   documentation identified in Exhibit B to the extent such

1    documentation is available and applicable".  Exhibit B is a

2    -- as the Court well knows, is a more itemized list of

3    documentation.  But the protocol does not make it mandatory

4    and set as a precondition that every document set forth on

5    Exhibit B must be available in order for a loan to be

6    subject to review in the loan protocol process.  And --

7                    THE COURT:  Is there a defined -- is mortgage loan

8    file a defined term in the protocol?

9                    MR. SHUSTER:  "Mortgage loan file" is a defined

10   term.  It is a defined term.  I don't remember what that

11   definition says but it's a defined term.  So let me -- I'm

12   going to ask one of my colleagues to --

13                   THE COURT:  Okay.

14                   MR. SHUSTER:  No.  Let me see if I can find it.

15   It should be --

16       (Pause)

17                   MR. SHUSTER:  I'll ask one of my colleagues to do

18   that while I continue.

19                   So the idea that these documents are, you know,

20   absolutely necessary in order for a loan file to be reviewed

21   is just not tenable.  I mean, do you have -- in these loan

22   files -- we didn't review a loan file and assert a borrower

23   breach unless there was a loan application on the mortgage

24   and a mortgage note and certain other key documents.  If you

25   have a borrower who misstated her or his income or misstated

Page 188

 1    her or his debt and you have something establishing that,

 2    you don't kneed a payment history or a servicer note to

 3    establish that there was a breach.

 4              Now -- and the only way that these documents are

 5    pertinent is if the Court accepts Lehman's argument -- even

 6    arguably pertinent, is if the Court accepts Lehman's

 7    argument that the trustees are required to establish what

 8    caused a default.  But --

 9              THE COURT:  Well, I think that Mr. Cosenza would

10    say it differently, that you're saying what caused the

11    default.  They're saying the continuing existence of an

12    adverse material effect.

13              MR. SHUSTER:  They can -- well, I don't know if

14    that's how they articulate it.  But even if they do, even if

15    they do, if there's an income breach, there's an income

16    breach.  That affects the price of the loan.  That affects

17    the value of the loan.  That doesn't change.  It doesn't

18    change whether -- for most of these cases, we don't have a

19    situation where the loan is still current and paid.  So the

20    effect that was there that, for example, Judge Castel found

21    was that there was an effect on price, there was an effect

22    on value, and that was a continuing effect to the time of

23    notice.

24              But these documents, there's nothing in the

25    Court's protocol order that permits Lehman to simply refuse

Page 189

1    to review a loan file if it's missing these documents.  They

2    may not be there.  The servicer didn't have them.  If Lehman

3    thought -- you know, Lehman was certainly -- we made our

4    burden to establish that there was a breach and we put it

5    through the loan protocol, they are free to adduce whatever

6    evidence they wish to adduce to rebuke -- to rebut that

7    breach finding.  As they say themselves in their own

8    repurchase letters, if you can provide evidence to rebut our

9    findings, please do so.  If not, please pay up.  But there's

10   nothing in the protocol that says that you could -- that

11   Lehman could give itself a waiver from reviewing a third of

12   the loan files that were put through where the trustees

13   asserted that there were breaches.  That's what the

14   servicing notes and the borrower payment histories go to.

15          The other documents -- now we're talking about the

16   corporate expense reports.  Those are expense logs of the

17   servicer and loss certifications where the servicer

18   certifies the amount of loss on a loan.  That information is

19   reflected in the remittance reports that are provided to

20   investors in the trusts.  Those are what -- and our expert

21   will testify those are what the -- our expert used to

22   calculate purchase price.  Those reports go to investors.

23   It is specified in the prospectus supplements for these

24   transactions that remittance reports will be provided to

25   investors.  It's called for by the governing documents which

Page 190

1    make express that the trustees can rely on remittance

2    reports.  But moreover, those reports are sufficient to tell

3    an investor your certificates are wiped out.  Your

4    certificates are out of the money.  You're holding mezzanine

5    paper that isn't worth a thing.  If they're good enough for

6    that purpose, they're good enough for calculating the

7    purchase price on a loan which is all we're talking about.

8    And sure, they may feel -- and the document -- the

9    information that is in the remittance reports comes from the

10   servicer.  It comes from the primary servicer.  It goes to

11   the master servicer and it goes into the remittance report.

12   Those numbers are built up to, in part, by including

13   corporate expense logs, information from corporate expense

14   logs and loss certifications.

15            THE COURT:  So if I agree with you, right, then I

16   take these 24,000 loans, Lehman says zero.  Right?  You have

17   a different amount.

18            MR. SHUSTER:  Our amount --

19            THE COURT:  Right?

20            MR. SHUSTER:  Yes.

21            THE COURT:  Yes.  You have a --

22            MR. SHUSTER:  Yes.  Yes.

23            THE COURT:  You have an amount that ties --

24            MR. SHUSTER:  Decidedly so.

25            THE COURT:  -- to the 24,000 loans.

Page 191

1                    MR. SHUSTER:  Yes.

2                    THE COURT:  So then how do I tell what is embedded

3       in that amount on account of what Lehman says is a matured

4       interest --

5                    MR. SHUSTER:  Right.

6                    THE COURT:  -- right?

7                    MR. SHUSTER:  So it's our position -- it's our

8       legal position that we're now claiming the sort of unmatured

9       interest that is foreclosed by 502(c).  The purchase price

10      calculation, we say and they say and have said in documents

11      that they filed with the court, is a liquidated damages

12      provision.  And in that provision, there is an interest

13      component that is built into it.  We're not seeking interest

14      over and above the number that is spit out by the purchase

15      price formula itself.  But --

16                   THE COURT:  So this is --

17                   MR. SHUSTER:  -- if --

18                   THE COURT:  -- a liquidated damages amount?  It's

19      not an actual damages amount?

20                   MR. SHUSTER:  The purchase price calculation is

21      not an actual damages amount.  It's a liquidated -- it's a

22      formula for returning -- for returning the loan to the

23      sponsor less whatever has already been received on the loan

24      to the extent that anything has.  And --

25                   THE COURT:  But I always thought, you know, that

Page 192

1    you did liquidated damages when you couldn't calculate

2    actual damages.

3            MR. SHUSTER:  Well, this is -- it's not a

4    calculation of damage.  It's a -- it's part of the

5    repurchased protocol.  If there's a breach, you take the

6    loan back.  This is the formula for how we calculate the

7    purchase price.  You don't -- you don't -- there's no

8    causation element in our -- you know, in our review.  It's

9    simply a formula for determining what is the number that is

10   applied to that particular loan.

11           THE COURT:  So --

12           MR. SHUSTER:  And --

13           MR. SHUSTER:  -- they have characterized it --

14           THE COURT:  -- in theory then, I could be, if I

15   accept your amount, I won't know whether that -- whether or

16   to what extent that exceeds the actual damages that were

17   suffered by the trustees --

18           MR. SHUSTER:  Well --

19           THE COURT:  -- and the certificate holders?

20           MR. SHUSTER:  -- you will know.  You will know.

21   The purchase price formula is fundamentally unpaid principal

22   balance on the loan plus interest plus expenses.  So you

23   will know what the actual loss will be because, say, the

24   loan is $400,000, there will be a realized loss on the loan

25   and that's what the purchase price will pick up plus

Page 193

1    expenses.

2              THE COURT:  So but -- but let me understand this.

3    And maybe we -- I don't want to get off track.  But so if

4    there has been -- there's a breach, something that we can

5    say that's a breach, no argument.  But we've got one of

6    these, you know, oh, look, the loan is still performing.

7    Right?  You say don't look -- as the wizard of Oz would say,

8    don't look behind the curtain, right?  We have a breach.

9    Just look at the breach.  So is it possible in that scenario

10   that notwithstanding that interest has continued to be paid

11   and we liquidated pursuant to the formula liquidated here,

12   isn't that going to be a windfall to the certificate

13   holders?

14             MR. SHUSTER:  No, because any interest, like any

15   principal that's already been received, is, by definition,

16   netted out of the calculation.  Impossible for that to

17   happen.  If that -- that should not happen.

18             THE COURT:  Okay.

19             MR. SHUSTER:  It's not supposed to happen.  So no.

20             But to come back to your --

21             THE COURT:  But will the amount of damages, if you

22   prevail, will that exactly equal to the amount of actual

23   damages suffered by the certificate holders?

24             MR. SHUSTER:  Yes.  The actual loss suffered by

25   the certificate holders, yes.  It will.  Absolutely.

Page 194

1            THE COURT:  Okay.  Why don't --

2            MR. SHUSTER:  That's what -- it will be the

3    realized loss on the loan plus the additional items.  But

4    that's what it will be.  It will not include any recovered

5    principal, any recovered interest.  Absolutely not.

6            And there's -- so -- but just coming back on this

7    question.  Your Honor asked if you disagree with us, is the

8    interest number disaggregated.  So in the recent report that

9    -- no.  I know.  It's Professor Snow.  I was trying to

10   remember if it was Professor, Dr. or Mr. -- provided he does

11   disaggregate the interest.  So if the Court disagrees with

12   our position, Your Honor will know --

13           THE COURT:  Okay.

14           MR. SHUSTER:  -- how to pull that number out.

15           So that's our view on the on-hold loans.  And then

16   we establish those breaches with the same evidence and we

17   offer that evidence and the same summaries as we do all the

18   other loans.  The way we approach those loans, there's no

19   difference except that we assert there's also no defense on

20   those loans.  None has been offered.

21           So coming to materiality.  And we have spent a

22   good deal of time discussing materiality so I will -- the

23   material --

24           THE COURT:  Materiality.  You mean --

25           MR. SHUSTER:  -- and adverse effect --

Page 195

1            THE COURT:  --adverse material effect.

2            MR. SHUSTER:  -- standard, yes.

3            THE COURT:  Uh-huh.

4            MR. SHUSTER:  Starts with the language that's in

5    the agreement.  And it refers to breaches that materially

6    and adversely affects the value of the related mortgage

7    loan.  It doesn't say causes losses on the loan or causes

8    the loss -- the loan to default.

9            That language has, of course, been interpreted by

10   several courts including Judge Castel who specifically says

11   it means that the breach would have altered the price or

12   increased the risk on the loan and that the trusts need not

13   show that the breach caused a loss or that if there was a

14   loss, it was caused by the breach.

15           And then Judge Rakoff makes clear that whatever

16   caused the loans to default, if they defaulted, is

17   irrelevant.  The issue is that the plaintiff faced a greater

18   risk than was warranted on the loans.

19           The trustees' experts will testify that the

20   trustees meet their material and adverse effect burden.

21   They have all set forth their opinions in their expert

22   reports.

23           Mr. Aronoff, I respectfully submit, has more

24   experience in the mortgage industry than anyone by far, than

25   anyone the Court will hear from and certainly more broad-

Page 196

1   based experience.  He originated loans, underwrote loans,

2   securitized loans, purchased and sold loans.  He's done it

3   all in the industry and his experience is broader and deeper

4   than that of anyone else and certainly, with all due

5   respect, Mr. Grice, the plan administrator's principal

6   mortgage industry expert.

7            Mr. O'Driscoll has extensive and deep experience

8   in the securitization of mortgage loans, mortgage loans

9   securitizations.  And he, too, will offer, and has offered,

10  his opinion on the material and adverse effects of the types

11  of breaches that the trustees put forward.  And so did Mr.

12  Morrow, who, as I mentioned, has 40 years experience in the

13  origination and underwriting of mortgage loans.

14           So I referred earlier -- or borrowed earlier from

15  Judge Castel's lexicon.  He referred to the sheer size of

16  the disparity and income bespeaks of an intentional

17  misrepresentation.  And just to remind the Court, we're

18  looking at misstatements of income and non-disclosures of

19  debt that are of a substantial magnitude.  The significance

20  of Judge Castel's referring to intentional

21  misrepresentations, as he says -- His Honor says that if

22  there was an intentional breach, it's almost inherently has

23  a material and adverse effect and a continuing and adverse

24  effect.

25           THE COURT:  Can you put back one slide --

Page 197

```
1                    MR. SHUSTER:  Of course.

2                    THE COURT:  -- please to 91?  So these are

3       breaches, right?

4                    MR. SHUSTER:  Yes.

5                    THE COURT:  Do you know -- what's the then diagram

6       -- what's the overlap between income overstatements and

7       undisclosed debt?

8                    MR. SHUSTER:  So --

9                    THE COURT:  I don't mean to put you on the spot.

10                   MR. SHUSTER:  No, no, no, no.  There should --

11                   THE COURT:  But these are not -- they're not

12      28,000 loans here and a different 20,000 loans there.

13      There's some overlap.

14                   MR. SHUSTER:  So there is overlap as it's

15      reflected on this chart.  And actually, had I noticed that,

16      I might have changed that.  But generally, we have -- the

17      way we've organized these is we have  33,000 income

18      breaches.  And then there are 17,000 debt breaches that are

19      not overlapping with the income breaches.

20                   So in one of the earlier charts, that's how we set

21      it forth --

22                   THE COURT:  Okay.

23                   MR. SHUSTER:  -- so the Court can see it that way.

24                   THE COURT:  All right.  So I don't look at this --

25                   MR. SHUSTER:  But here, there are --
```

Page 198

```
 1              THE COURT:  I don't add 28 to 20 and get 48,000
 2    loans based on this chart?
 3              MR. SHUSTER:  I think this adds up roughly to the
 4    same number of roughly  50,000 income and debt breaches.
 5    But these charts, there will -- there is some degree of
 6    overlap between these charts.
 7              THE COURT:  Right.  But 50,000 breaches versus
 8    50,000 loans.  That's what I'm --
 9              MR. SHUSTER:  I'm sorry.  This should -- this is -
10    - these are loans.
11              THE COURT:  These are loans.
12              MR. SHUSTER:  These are loans.  So we have -- if
13    we go back to the earlier chart that shows the breakdown of
14    income debt, the borrower breaches -- right.  So this is
15    non-overlapping as --
16              THE COURT:  Non -- okay.
17              MR. SHUSTER:  -- as to loans.
18              THE COURT:  Thank you.
19              MR. SHUSTER:  Right.  Okay.
20              So coming back to where we are, these are Judge
21    Castel's statements concerning materially and ongoing harm
22    and the harm -- the material and adverse effect that
23    certificates experienced at the time of discovery from the
24    established breaches of income and occupancy.
25              Now I referred earlier to Lehman's own statements
```

Page 199

1    on this point.  And the purpose of this is not to establish

2    a gotcha because, as the Court said a few moments ago,

3    ultimately Your Honor has to decide what Your Honor feels

4    is, you know, reliable evidence and the correct standard.

5    But what I'm suggesting -- what we're suggesting is that

6    Lehman got the standard right here.  And that the standard

7    is pretty much four square with what the trustees are saying

8    and what Judge Castel said.  In fact, it's more liberal.

9            And this is not loan specific and context

10   specific.  These are broad general statements about the

11   material and adverse effect of an income misrepresentation.

12   The loan can't be sold at full value to another purchaser or

13   a securitization.  A substantial discount will be applied.

14   The borrower usually will not be able to pay.  The same

15   broad statement is made by Lehman concerning a

16   misrepresentation of mortgage debt.

17           So it's virtually identical language.  And this

18   was -- these statements were submitted by I'll say

19   knowledgeable counsel including counsel sitting to my right.

20   So they know what they're talking about.

21           And then we have the same sworn -- another sworn

22   declaration concerning occupancy.  That's on slide 95.  And

23   here, it says that "if a borrower misrepresents his intent

24   to occupy, it has a material and adverse effect for the same

25   reason an occupancy misrepresentation is inherently

Page 200

1   material".

2         So before we get here, just stay at the roadmap.

3   There we go.

4         So Lehman makes various attacks on the trustees'

5   process some of which I've already responded to.  But one of

6   which is that there were errors, that the trustees committed

7   errors.  And I will say that in any large loan review, there

8   will be errors.  We will show that Lehman made errors.  Mr.

9   Grice who criticizes us for making errors made errors.  In

10  the MARM case, Judge Castel observes that Ira Holt made

11  errors.  That doesn't mean he threw out all of the results

12  of Mr. Holt's review.  In the Flagstar case, Judge Rakoff

13  noted that Ms. Walzak made some errors.  That's the way it

14  goes.

15        Moreover, in proposing the protocol to the Court,

16  Lehman actually anticipated errors.  It submitted, for

17  example, a declaration from Mr. Pino, the head of Recovco,

18  and he said, "For document defect claims, such as loan file

19  documents, such as a HUD-1 settlement statement, are

20  allegedly missing or appraisal is allegedly missing, it is

21  my view based on my prior experience" -- and he describes

22  his experience not so much in this document but elsewhere.

23  He says he's done five loan reviews well in excess of a

24  billion dollars and so forth.  Recovco's certainly a shop

25  with a lot of experience -- "that the plan administrator

Page 201

1     will be able to locate many of the documents asserted in

2     missing".

3               So, you know, he is saying that based on his

4     experience with large scale loan reviews, there are going to

5     be some mistakes.  Mistakes cannot impugn the entirety of

6     the trustees' process.  And moreover, most of the mistakes

7     that Lehman and its experts refer to and its witnesses refer

8     to are on the missing document side of the ledger not -- not

9     -- on the borrower breaches side of the ledger.  There,

10    there were very few assertions that the trustees incorrectly

11    identified evidence or said that a piece of evidence said

12    something that it didn't say.  Exceedingly rare that

13    assertions of errors are made with respect to breaches

14    predicated on borrower misstatements or omissions.

15              THE COURT:  But here, you're telling me that your

16    error rate is really low.  Really low.  Boy, are you guys

17    good.  Right?

18              MR. SHUSTER:  Certainly --

19              THE COURT:  So much so --

20              MR. SHUSTER:  -- on the borrower side.

21              THE COURT:  Right.  So much so that the amount

22    that you're seeking is markedly out of line with comparable

23    settlements across prior RMBS cases.

24              MR. SHUSTER:  I'm actually -- I'm --

25              THE COURT:  You're getting there?

Page 202

```
 1            MR. SHUSTER:  No.

 2            THE COURT:  No?

 3            MR. SHUSTER:  But I'm glad you asked actually.

 4   And it's one of my notes that I wanted to make sure to

 5   cover.

 6            THE COURT:  Right.  So, I mean, there's that -- I

 7   won't call it a fact.  There's that observation --

 8            MR. SHUSTER:  Yes.

 9            THE COURT:  -- by the plan administrator.

10            MR. SHUSTER:  Yes.

11            THE COURT:  And then there's the additional

12   observation of comparing these amounts sought now to the

13   amount at which the six trusts were liquidated which Mr.

14   Cosenza --

15            MR. SHUSTER:  Yes.  And I -

16            THE COURT:  -- went through line by line and --

17            MR. SHUSTER:  Right.

18            THE COURT:  -- asked me to conclude that, if

19   anything, the plan administrator was being generous.  So if

20   you could just --

21            MR. SHUSTER:  Yes.

22            THE COURT:  -- save a few minutes to address those

23   --

24            MR. SHUSTER:  Well, why don't -- if I may --

25            THE COURT:  Sure.
```

1              MR. SHUSTER:  So first, on the settlements, I'll

2     say three things.  One, those are global settlements.  This

3     is a settlement but it's not a settlement.  As I've said

4     before, this is -- we have agreed on a proceeding to arrive

5     at the actual value of the claims.  We didn't agree to

6     discount the claims.  We didn't' agree to put a haircut on

7     the claims.  That's why I'm perfectly happy with the plan

8     administrator's statement that we're here to determine what

9     actually would have happened with these claims.

10             THE COURT:  Right.  And the trustees left a whole

11    lot of money on the table --

12             MR. SHUSTER:  No.

13             THE COURT:  -- in these other cases.

14             MR. SHUSTER:  In those other -- well, there are

15    two things at least about those other cases.  One, there

16    were no loan reviews.  None.

17             THE COURT:  I stand by statement.

18             MR. SHUSTER:  Well, that -- well, but, you know,

19    there was --

20             THE COURT:  You can't -- I mean, you can't add the

21    -- much as you remind me from time to time about how onerous

22    the protocol was notwithstanding the fact that you today

23    told me you would delighted to participate in the protocol.

24    So a little bit of a change of a characterization than what

25    was said before --

Page 204

 1            MR. SHUSTER:  I'm happy with the evidence we

 2    obtained.

 3            THE COURT:  -- before you arrived.  Okay?  You

 4    can't take the cost of going through the protocol and add it

 5    to the prior recovery rate and still you don't at all bridge

 6    -- you know, don't do a lot to bridge the gap between those

 7    levels and the other levels.  You know, I could make all

 8    kinds of observations, valid or not, about the different

 9    recovery levels.  And here's -- you know, countrywide is a

10    lot higher than city.  Whatever.

11            But --

12            MR. SHUSTER:  Well, but that's why the trustees

13    here, having been through the protocol and knowing what they

14    know about the loans here, were not prepared to settle at a

15    flat number.  They wanted the opportunity to prove the

16    actual value of the claims.  So there is a difference.  But

17    it is significant that in those other global settlements

18    there had been no loan reviews.  So that was a decision --

19    that was made by both sides that they were going to resolve

20    those sets of claims without that.

21            There were also statute of limitations issues

22    there as Lehman's expert, Professor Fischel, acknowledges

23    that are not present here.  And actions haven't been filed.

24    So those cases are at an entirely different stage.  Now

25    maybe the parties could have agreed and certificate holders

Page 205

1    were free to weigh in, but that's where those ended up.  But

2    those are material distinctions.  And I will say that

3    Professor Fischel, I'm sure, will have his ups -- our ups

4    and downs with him when he's on the stand.  And he's

5    certainly, you know, a very capable and eminent expert

6    witness.  But he, in his report, said that in comparing

7    those settlements to this estimation hearing, care must be

8    exercised 'cause this isn't a settlement.  It's a hearing to

9    estimate the claims.  And there are other differences

10   between those settlements and this one.

11              THE COURT:  Yes.

12              MR. SHUSTER:  The Court will see that.

13              THE COURT:  Okay.

14              MR. SHUSTER:  And then as far as the settled

15   trusts go, the process in those instances is where a trust

16   typically gets below a 10 percent level in terms of what

17   remains in the securitization, the master servicer has the

18   compulsory right to close out the trust and purchase the

19   loans and purchase all the other property in the trust.  The

20   trustee doesn't agree with that.  They don't negotiate the

21   price.  The master servicer is the contractual right to get

22   an appraiser to arrive at a value and the trustee can object

23   to the selection of the appraiser but not to the appraisal.

24   And what the appraiser did in those instances is precisely,

25   he looked at the settlement agreement here.  He looked at

Page 206

1    the number that Lehman recommended here.  And he

2    extrapolated from that to a purchase price for the claims.

3    We don't agree with that appraisal.  We don't agree with the

4    number here.  But it's far from a concession by the trustees

5    that the claims actually have that value.  And it is not --

6    it's not the sort of arm's length transaction that it was

7    suggested to be.  And that's exactly what the appraiser did.

8    I forget his name but that's what he did.

9              THE COURT:  Okay.  I'm going to impose on you to

10   try to finish up by 4:30.  Can you do that?

11             MR. SHUSTER:  Yes, I can.

12             THE COURT:  Okay.

13             MR. SHUSTER:  I'm going to skip how errors are

14   unavoidable in loan reviews 'cause I've made these points.

15             The withdrawn loans.  I've made the point that the

16   withdrawn loans are overwhelmingly in the missing documents

17   and defective documents in compliance areas.  We know that

18   because that's set forth in Mr. Grice's own report in

19   Exhibit 3, if we could just quickly go to that page.  But we

20   would respectfully maintain again that there's a clear

21   process distinction between missing documents and a

22   defective document -- the claims that are predicated on

23   missing and defective documents, that is to say, material

24   missing from the loan file and breaches that are proven by

25   affirmative evidence that is either in the loan file or

```
 1    third party evidence.  Very few borrower breaches were

 2    withdrawn as this chart shows.  And these are points I've

 3    already made that the withdrawn loans do not affect the

 4    overall presentation.  And had we gone through the protocol

 5    process, loans and, frankly, groups of loans should have

 6    dropped off if the parties joined issue enough.  That was

 7    the purpose of the protocol was, among other things, to get

 8    to a whittling down of the claims.

 9           So Lehman has a high rejection rate.  We don't

10    have documents from Lehman's files the way we normally would

11    in a litigation.  We have a handful of documents that were

12    made public by the examiner who reviewed files from Lehman

13    and Aurora just for a very narrow period of time, just a

14    little snapshot, for purposes of addressing certain matters.

15    But those documents reveal certain things that suggest, at

16    least, that a two percent breach rate is simply not credible

17    given what Lehman said about its own securitizations.

18           So, for example, this is a document from Lehman's

19    files.  An internal review where it says "Special

20    Investigations" -- that was a unit within Lehman --

21    "completed the review of 240 LXS loans."  They reviewed

22    these loans.  In fact, in reviewing loans, they used the

23    statistical sample.  They used statistical sampling

24    methodologies which we will see when we go through these

25    documents.
```

Page 208

1          And LXS loans, many of the securitizations here

2   are LXS designated securitizations.  And many of the other

3   securitizations come off the same securitization shelf as

4   the LXS securitizations.  And their review found that 50

5   percent of the loans contained material misrepresentations.

6          It's suggestive.  I'm not suggesting it's

7   probative of a breach rate.

8          Here's an e-mail, an internal Lehman e-mail from

9   January of 2007 which refers to the fact that "In the last

10  four months, Aurora has originated the riskiest loans ever.

11  The industry meanwhile has pulled back.  During the time, I

12  can see performance for Aurora-originated loans to become

13  even worse.  In looking at the trends on originations and

14  linking them to pay them, the picture is ugly."

15         Another e-mail -- and I am mindful of the time, so

16  forgive me if I'm rushing through -- from Mr. McKinney to

17  himself which he then forwarded to others.  He says "our

18  aggregate LXS performance has worsened versus largest

19  competitor on '06 production" -- mortgage maker is what was

20  one of Lehman's mortgage products.  "Worsened versus the

21  largest competitor on '06 production."  The largest

22  competitor is Countrywide as designated in the subject line.

23  "That is, we are creating worse performance than sub-prime

24  while the rating agencies assume our performance should be

25  substantially better."

Page 209

```
 1              So in the hierarchy of loan products, most of the
 2    loans here are Alt-A loans.  They're supposed to be of a
 3    higher quality than sub-prime loans.  And here, the Lehman
 4    officer is suggesting that, in fact, the ones they're
 5    originating are of a lower quality.
 6              THE COURT:  What percent of the loans that we're
 7    looking at are Aurora originations?  Do you know off the top
 8    of your head?
 9              MR. SHUSTER:  Over 50 percent.
10              THE COURT:  Fifty percent.
11              MR. SHUSTER:  Over 50 percent.
12              THE COURT:  Over 50 percent.
13              MR. SHUSTER:  I think it's 50,000 of the remaining
14    72,000 loans are Aurora-originated loans.  No?
15              Huh?
16              Less than that.  Okay.  I'll get that number --
17              THE COURT:  We'll get there.
18              MR. SHUSTER:  -- but it's a high number.
19              THE COURT:  It's a big number.
20              MR. SHUSTER:  Yes.
21              THE COURT:  Okay.
22              MR. SHUSTER:  The purchase price, Your Honor, I
23    think we have gone through perhaps in sufficient detail.
24    For purposes of the opening, we're going to have witnesses
25    address that.  We do make the point in here that Lehman's
```

Page 210

1   position on interest is an entirely new position that was

2   developed.  On the eve of trial, Dr. Cornell, another very

3   capable witness, testified that he learned about that change

4   in position for the first time the day before his deposition

5   testimony.

6           So let me see where I am.  Okay.  I'm done pretty

7   much.  We say that the claims should be -- are worth 11.4

8   billion.  I have a breakdown there of how you get up to that

9   number, if you accept every last one of the trustees'

10  claims.  And I don't feel the need to make a big finish but,

11  you know, this is where we are and this is the way we will

12  present our case to the Court.

13          THE COURT:  Okay.

14          MR. SHUSTER:  Thank you, Your Honor.

15          THE COURT:  Very clear.  Thank you very much.

16          Okay.  So we resume on the 27th after

17  Thanksgiving.  Yes?  At 10 o'clock in the morning?

18          MR. COSENZA:  Yes.

19          THE COURT:  Okay.

20      (Pause)

21          THE COURT:  So as we go through this, there will

22  be variations in start times that come up from day to day so

23  that I can accommodate various urgent matters that have a

24  way of arising.  I'll do my best to keep those to a minimum.

25          Today, for example, I have a full calendar

Page 211

1    tomorrow.  So I have to ask you to totally clean up.  Most

2    nights you won't have to do that.  I'll just kind of ask you

3    to tidy up as opposed to fully clean up.  I'm going to try

4    to make this as easy for you as possible.

5            So thank you very much.  That was very interesting

6    and detailed and wonderful.  And have a happy Thanksgiving

7    to those of you who may not come back next week.

8        (A chorus of thank you)

9            THE COURT:  Thank you.

10        (Whereupon, these proceedings were concluded at 4:26

11    p.m.)

12                            * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 212

1                              I N D E X

2                                                              PAGE

3    OPENING STATEMENTS:

4    BY MR. COSENZA                                              7

5    BY MR. SHUSTER                                            125

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 213

1                    C E R T I F I C A T I O N

2

3    We, Dawn South, Sheila Orms, and Lisa Beck certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o, ou,
                   email=digital1@veritext.com, c=US
7    ──────────────Date: 2017.12.26 16:30:40 -05'00'──────────

8    Dawn South

9    Certified Electronic Transcriber

10   Sheila Orms   Digitally signed by Sheila Orms
                   DN: cn=Sheila Orms, o, ou,
                   email=digital1@veritext.com, c=US
                   Date: 2017.12.26 16:31:11 -05'00'

11

     Sheila Orms

12

     Certified Electronic Transcriber

13   Lisa Beck     Digitally signed by Lisa Beck
                   DN: cn=Lisa Beck, o, ou,
                   email=digital1@veritext.com,
14   ──────────────c=US─────────────────────────────────────
                   Date: 2017.12.26 16:31:47 -05'00'

15

     Lisa Beck (CET*D-486)

16

     AAERT Certified Electronic Transcriber

17

18

     Date:  November 22, 2017

19

20

     Veritext Legal Solutions

21

     330 Old Country Road

22

     Suite 300

23

     Mineola, NY 11501

24

25