Joshua Dorchak
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York  10178
212.309.6000

Hearing Date: April 17, 2018 at 10:00 a.m.

*Attorneys for Deutsche Bank AG, London Branch*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | Jointly Administered |

### OBJECTION OF DEUTSCHE BANK AG, LONDON BRANCH TO MOTION OF THE PLAN ADMINISTRATOR FOR AN ORDER IN AID OF EXECUTION OF THE PLAN

Deutsche Bank AG, London Branch ("Deutsche Bank"), through its undersigned attorneys, hereby objects to the *Motion of the Plan Administrator for an Order in Aid of Execution of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* [Doc. No. 57036] (the "Motion"), based on the accompanying Declaration of Michael Sutton in Support of Objection of Deutsche Bank AG, London Branch to Motion of the Plan Administrator for an Order in Aid of Execution of the Plan (the "Sutton Declaration") and the points and authorities set out below.[1]

## PRELIMINARY STATEMENT

1.     Bankruptcy Code Section 1142 gives this Court authority to take action "as may be necessary or appropriate to enforce" the Plan. In the Motion, purportedly pursuant to Section 1142, the Plan Administrator asks this Court to permit LBHI to issue a type of stock that the Plan

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

expressly cancelled, pursuant to a contract that the Plan rejected, under a charter that the Plan expressly nullified and replaced with an amended charter and by-laws that, as required by Bankruptcy Code Section 1123(a)(6), expressly prohibit LBHI from issuing the same type of stock. Because the relief sought in the Motion blatantly contradicts the Plan that has governed this case for six years, that relief cannot be granted under Section 1142 or Section 105(a).

2. The reason for the Motion is this: if the holders are deprived of their ECAPS, LBHI will capture value from the Partnerships that would have gone to the ECAPS holders. LB UK III-V have value to distribute as a result of certain investments, and LB UK I-III may have value to distribute because of the massive surplus at LBIE, which may reach in succession LB Holdings Intermediate Limited ("LBHI2"), Lehman Brothers Holdings plc ("LBH"), and those Partnerships. To deprive the ECAPS holders of their ECAPS, the Plan Administrator must convince the High Court in London that the ECAPS must be replaced with the Substituted Preferred Stock. But the Substituted Preferred Stock does not exist (and never did). The Plan Administrator knows that LBHI's current charter and by-laws – and Bankruptcy Code Section 1123(a)(6) – prohibit the issuance of the Substituted Preferred Stock. So, as an initial step, the Plan Administrator has asked this Court for authority at some unspecified date in the future retroactively to (i) "issue the Substituted Preferred Stock under the Charter [that was nullified by the Plan]," "as if it had been issued on the Commencement Date [i.e., September 15, 2008]," and (ii) deem the Substituted Preferred Stock cancelled and converted to worthless "LBHI Class 12 Equity Interests under the Plan" as of the Effective Date (i.e., March 6, 2012). The Plan Administrator presumably would then attempt to convince the High Court to issue an order that in effect compels the ECAPS Holders to receive this deemed created, deemed cancelled

Substituted Preferred Stock in place of their ECAPS, purportedly pursuant to the Partnership Agreements.[2]

3.      The Plan Administrator's characterization of "issuing the Substituted Preferred Stock [as] an act in furtherance of the Plan but not expressly authorized by it" is beyond a stretch. The Plan and Confirmation Order (i) cancelled the type of securities that LBHI would now issue; (ii) fixed the constituents of LBHI Class 12 to which the ECAPS Holders would now be added; (iii) rejected the Partnership Agreements that LBHI apparently now intends to enforce, (iv) nullified the LBHI Charter under which LBHI would now issue securities; and (v) effected the LBHI Amended Charter and Amended By-Laws under which LBHI is expressly prohibited from issuing such securities. While the relief sought might eventually indirectly benefit LBHI's creditors, this Court cannot grant that relief without rewriting the Plan, rewriting the LBHI Amended Charter, rewriting the Amended By-Laws, rewriting the Confirmation Order, rewriting the Bankruptcy Code, and rewriting history. That end cannot justify these means. Indeed, granting such relief would require this Court to disregard fundamental principles of bankruptcy law. The Motion should be denied based on the terms of the confirmed, effective and substantially consummated Plan and applicable bankruptcy law.

4.      Even if the Plan were silent on the subject, this Court would doubtless have compunctions about permitting LBHI to travel back in time to 2008, in order to issue a few million shares of preferred stock on the first day of its chapter 11 case; then travel forward in time to 2012, so that those same shares could be cancelled and replaced with Class 12 interests when the Plan went effective (but without stopping off in 2011 to give the holders of those ill-

---

[2]    DB's position is that to the extent the Partnership Agreements remain in place, their terms do not permit or require any party to replace the ECAPS with Substituted Preferred Stock. This is a question of English law and is expected to be brought before the High Court in due course. But this Court should have no doubt that DB's position is that the parties' bargained-for rights under the Partnership Agreements do not allow for a Preferred Securities Substitution and that to allow such would provide a windfall to LBHI. *See* Sutton Decl., ¶ 27.

fated interests an opportunity to object to the Plan); and then travel forward again to 2018, in order to litigate in London in an attempt to bring about a Preferred Securities Substitution that will fail even if LBHI manages first to perform feats worthy of both Wells's Time Traveller and Shelley's Doctor Frankenstein. This Court should halt this misguided escapade now, purely on principles of bankruptcy law and the terms of the Plan, rather than indulge the Plan Administrator's revision of history, the Plan and the Bankruptcy Code. The Plan Administrator attempts to soothe the Court's compunctions with two bad arguments.

5.    First, the Plan Administrator asserts that the Lehman bankruptcy is of a "unique size and complexity," and the Debtors "could not have . . . imagined" the value of their UK affiliates' assets on the Effective Date, so the Motion is being brought "as soon as reasonably practicable after the Commencement Date" (that is, over nine years later). The complexities of this case are not a legitimate basis for *nunc pro tunc* do-overs under the Plan that the Debtors proposed and the creditors approved with much less knowledge of the Lehman universe than the Debtors had. Surely the Plan Administrator would object if a creditor asked for an exemption from the Plan to increase its claims because some unexpected events have occurred since 2012 or because the creditor wishes it had done some things differently in 2008.

6.    Furthermore, as discussed below, there is in fact evidence that LBHI knew, or should have known, of the potential value at three of the Partnerships as early as 2008. The August 2008 accounts of those Partnerships showed assets that included significant investments in money market funds, which were redeemed for cash following an announcement on January 21, 2009. LBHI held these funds for these Partnerships and therefore knew or should have known of potential value in at least three of the Partnerships well before the Effective Date in 2012. Notwithstanding this knowledge, LBHI (the sole member of the GP) apparently permitted

the GPs of the Partnerships to be stricken from the Register of Companies without even distributing these investment proceeds.

7.    In any event, no matter how sympathetic the movant, the Bankruptcy Code prohibits the Plan from being amended today – which is what the Motion stealthily seeks – because the Plan has been substantially consummated.

8.    Second, the Plan Administrator assures this Court that the relief sought in the Motion is "exactly what the ECAPS [H]olders bargained for." Deutsche Bank completely disagrees. But the bargained-for rights of the parties to the Partnership Agreements are not before this Court and should be determined by an English Court, as the Plan Administrator acknowledges (Motion ¶ 22). It is relevant to this Court's consideration, however, that the current ECAPS Holders, including Deutsche Bank, acquired many of their ECAPS long after the Plan went effective, in the very reasonable expectation that the Plan (which rejected the Partnership Agreements and prohibits the Preferred Securities Substitution) would be binding on all parties in interest, including LBHI.

9.    In short, the Plan Administrator is not seeking relief under the Plan, it is seeking relief from the Plan, in order to pursue contractual rights that LBHI does not have (as a result of its rejection of the Partnership Agreements) at the expense of Deutsche Bank and the other ECAPS Holders.[3] This Court should deny the Motion as a matter of bankruptcy law, given that the Plan – which cancelled all of LBHI's authorized prepetition preferred shares, enacted an

---

[3]    Deutsche Bank does not expect the Plan Administrator to contest Deutsche Bank's standing, but solely in order to avoid silence being taken as a concession, Deutsche Bank states that it has statutory, constitutional and prudential standing to object to the Motion: as a longstanding creditor of LBHI, see 11 U.S.C. 1109(b); as a person that would become an LBHI Class 12 Interest holder under the Plan if the Motion were granted, see id.; as "the one[] with the pockets" into which the Motion would "allow [LBHI] to put its hands," see In re Global Indus. Tech., Inc., 645 F.3d 201, 204-05 (3d Cir. 2011); and as a person facing a "concrete, distinct and palpable, and actual or imminent" threat to its own (and not another person's) direct economic interests, see id.

amended charter that prohibits the issuance of nonvoting shares, and rejected the Partnership Agreements – has been effective and binding on LBHI since March 2012.

## BACKGROUND

### The ECAPS

10.      On different dates from 2005 to 2007, the five Partnerships at issue in the Motion, LB UK I – V, were formed pursuant to the Partnership Agreements.  Declaration of Richard Katz in Support of the Motion [Doc. No. 57037], ¶ 6, Exx. A, C, E, G, I.  The parties to the Partnership Agreements for LB UK I, II and III are LB GP No. 1 Ltd (the "GP"), Chase Nominees Limited ("CNL") (now Bank of New York and/or its affiliates, following a transfer of CNL's rights, obligations, liabilities and contractual arrangements in respect of the Partnership Agreements and the ECAPS pursuant to a Banking Business Transfer Scheme under the UK Financial Services and Markets Act 2000 in or around May 2007), LB Investment Holdings Ltd. (the "Preferential LP"), LBH, and LBHI.  *Id.,* ¶ 6, Exx. A, C, E.  The parties to the Partnership Agreements for LB UK IV and V are the GP, Bank of New York Depository (Nominees) Limited, the Preferential LP and LBHI as Guarantor.  *Id.,* ¶ 6, Exx. G, I.

11.      The GP is the general partner for each of the Partnerships.  *Id.,* ¶ 6, Exx. A, C, E, G, I.  The sole member of the GP is LBHI.  *Id.*

12.      Each of the Partnership Agreements for LB UK I, II and III includes the following recital: "neither the Guarantor [i.e., LBH] nor LBHI are, nor will either of them be or become, a partner (general or limited) in the Issuer [of the ECAPS], and each of the Guarantor and LBHI is a party to this Agreement solely for the purposes of acknowledging its terms, agreeing to any actions stated to be performed by the Guarantor and/or LBHI in Schedule 2 and, in the case of LBHI, clause 18 [governing the Preferred Securities Substitution]."  *Id.,* ¶ 6, Exx. A at 2, C at 2,

E at 2. Each of the Partnership Agreements for LB UK IV and V includes the following recital:

"LBHI is not, and will not become, a partner (general or limited) in the Issuer and LBHI is a party to this Agreement solely for the purposes of acknowledging its terms, agreeing to any actions stated to be performed by LBHI in the Conditions and clause 18 [governing the Preferred Securities Substitution]." *Id.,* ¶ 6, Exxs. G at 2, I at 2.

13.    Each of the Partnerships issued securities called ECAPS (Enhanced Capital Advantaged Preferred Securities) and used the proceeds to purchase Subordinated Notes of LBH (in the case of LB UK I-III) or LBHI (in the case of LB UK IV-V). *Id.,* ¶ 7.

14.    The Partnership Agreements provide for the possibility of a Preferred Securities Substitution, subject to certain terms and conditions, which would result in the ECAPS being exchanged for the Substituted Preferred Stock. *Id.,* ¶ 6, Exxs. A, C, E, G, I. As the Plan Administrator acknowledges, the Substituted Preferred Stock must be "fully-paid non-cumulative preferred stock issued directly by LBHI bearing a right to dividends calculated in the same manner as the [ECAPS], having no voting rights (except as required by law) and being subject to optional redemption in the same manner as the [ECAPS]." Motion ¶ 16 n.4.

15.    LB UK III-V also invested in certain money market funds, the proceeds of which were held by LBHI (the "Investment Proceeds"). *See* Sutton Decl., ¶ 29, Ex. B § 3.13 (GP Liquidators' Report). The August 29, 2008 account statements of LB UK III, LB UK IV and LB UK V showed the value of these investments as of November 30, 2007 as €12,247,900, €10,334,142 and $25,646,026, respectively. *Id.,* ¶ 30, Ex. H at 8, Ex. I at 8, Ex. J at 8. The Liquidators' report of November 13, 2017 states that the Investment Proceeds "post demise of the Group were held by or under the control of LBHI" and that "[d]espite LBHI's initial written confirmation in February 2017 that upon expiry of the fixed term deposit accounts (in May 2017)

the [Investment Proceeds] would be paid to the [Liquidators] on the maturity of the fixed term deposit accounts LBHI did not pay the [Investment Proceeds] to the [Liquidators]. This was on the basis that LBHI was (contrary to its earlier position) investigating whether in fact the [Investment Proceeds] were the property of the relevant Partnerships." *Id.,* ¶ 32, Ex. B, § 4.4. LBHI eventually paid the Investment Proceeds to the Liquidators (albeit, while purporting to reserve its rights) in September and October 2017. *Id.,* ¶ 33, Ex. B, §§ 4.8-4.11.

16.     Depending on the outcome of further litigation in the English Courts arising from the substantial surplus in LBIE's estate, it is likely that LBH will have sufficient funds to pay at least some of its subordinated obligations, including its Subordinated Notes held by LB UK I-III. *Id.,* ¶¶ 35-38. The most recent Progress Report of LBH, dated October 11, 2017, states that the Administrators of LBH "consider it possible that there may be a surplus available in due course for a distribution to subordinated creditors but . . . there remain a number of variables that would have a significant impact on the quantum of any such surplus." *Id.,* ¶ 35, Ex. G at 3.

**Events On and After the Commencement Date**

17.     The GP never took the requisite steps to bring about a Preferred Securities Substitution in September 2008 or at any time thereafter, and LBHI never expressed to the GP or the ECAPS Holders any interest in a Preferred Securities Substitution until many months after the GP had been restored to the Register of Companies. *Id.,* ¶ 23, Ex. B, §§ 5.4-5.6 (GP Liquidators' Report).

18.     On June 22, 2010, the GP was stricken from the Register of Companies on the basis that the Registrar had reasonable cause to believe that the GP was not carrying on any business. *Id.,* ¶ 24, Ex. A, § 3.16 (GP Liquidators' Report).

19.     In the Motion, the Plan Administrator states that, "[a]s of the dissolution of the GP in June 2010, LBHI believed that the Subordinated Notes had no value." Motion ¶ 12. However, as noted above, the August 29, 2008 accounts of LB UK III, LB UK IV and LB UK V showed assets in the form of money market funds, consistent with the descriptions in the relevant offering documents relating to the ECAPS issued by those Partnerships, and within five months of the Commencement Date it was known that these holdings would be redeemed as cash following a company announcement of Lehman Brothers Liquidity Funds plc on January 21, 2009. Sutton Decl. ¶¶ 30-31, Exx. H, I, J, K.   Also, LBHI presumably knew of the potential value at LBIE by February 18, 2013, when the Administrators of LBIE announced that LBHI was joined as a respondent to the first Waterfall Application to the High Court (relating to the priority of subordinated debt claims of LBHI2 in light of an expected surplus at LBIE).   *Id.* ¶ 37(a).   There were also indications that such value could in certain circumstances be available to LBH, and, in turn, certain of the Partnerships.   For example, the Statement of Administrator's Proposals of LBHI2 dated March 6, 2009 (the "Proposals") listed LBHI2's investment in LBIE as being financed by three sources of debt: (i) $730 million of fixed rate notes, (ii) $2.2 billion of loan facilities from LBH (the "LBH Loans") and (iii) $6.1 billion of floating rate subordinated notes (the "Floating Rate Notes").   *Id.* ¶ 38, Ex. C at 4.   The Proposals stated that "the Administrators understand that both the Floating Rate Notes and the LBH Loans are subordinated to all other creditors and that the Floating Rate Notes are, in turn, subordinated to the LBH Loans."   *Id.*

**The Plan**

20.    Substantial negotiations among the Debtors and their creditors before and during 2011 led to a confirmation hearing on December 6, 2011 at which this Court confirmed the Plan [Doc. No. 23023-1]; the Confirmation Order [Doc. No. 23023] was entered on the same date.

21.    Section 4.17(b) of the Plan provides:  "On the Effective Date, all LBHI Stock shall be cancelled and the Plan Trust Stock shall be issued to the Plan Trust, and that the Plan Trust Stock shall be cancelled on the date that LBHI's Chapter 11 Case is closed."  LBHI Stock is defined as "the common or preferred stock of LBHI outstanding on the Effective Date."  Plan §1.79.  Section 4.17(b) of the Plan further provides:  "On or promptly after the Effective Date, the Plan Administrator shall file with the Securities and Exchange Commission a Form 15 for the purpose of terminating the registration of any of LBHI's publicly traded securities."

22.    Paragraph 81 of the Confirmation Order provides:  "Equity Interests in LBHI.  On the Effective Date, the LBHI Stock shall be canceled and one new share of LBHI common stock shall be issued to the Plan Trust which will hold such share for the benefit of the holders of such former LBHI Stock consistent with their former relative priority and economic entitlements; *provided, however*, that the Plan Trust may not exercise any voting rights appurtenant thereto in conflict with Article VII of the Plan."

23.    Section 7.7 of the Plan provides:  "As of the Effective Date, the certificate of incorporation and by-laws of each Debtor shall be amended to the extent necessary to carry out the provisions of the Plan.  The amended certificate and by-laws of such Debtor (if any) shall be contained in the Plan Supplement."

24.    The Plan Supplement contains the form of Amended and Restated Certificate of Incorporation (the "Amended Charter") and Amended and Restated By-Laws for LBHI.  Doc. No. 21254, Ex. 1, Part A.

25.    Section 11.1 of the Plan provides that "all prepetition executory contracts and unexpired leases that exist between a Debtor and any person or entity shall be deemed rejected by such Debtor, as of the Effective Date, except for any prepetition executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed prior to the Confirmation Date, or (c) that is specifically designated in the Plan Supplement as a contract or lease to be assumed by the Debtor . . . ."

26.    None of the Partnership Agreements is included in the Plan Supplement as a contract to be assumed or potentially to be assumed.  *See* Plan Supplement, Ex. 2.

**The Amended Charter and Amended By-Laws**

27.    The Amended Charter expressly provides that the "purpose of the Corporation is to engage in any lawful act or activity (a) for which a corporation may be organized under the DGCL and (b) as contemplated by the Plan."  Sutton Decl., Ex. M at 1 [THIRD ¶].  The Amended Certificate may only be amended "subject to the requirements of the Bankruptcy Code and in accordance with the Plan …."  *Id.* at 4 [NINTH ¶].

28.    The Amended Charter expressly limits LBHI's shares of capital stock to one common share, to be issued to the Plan Trust, and further expressly provides:  "The Corporation shall not be authorized to issue any non-voting capital stock of any class, series or other designation to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code; provided,

however, that the foregoing restriction shall (i) have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code and (ii) only have such force and effect to the extent and for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applies to the Corporation." *Id.* at 2 [FOURTH ¶]. Section 1123(a)(6), in relevant part, mandates that the charter of a reorganized corporation "prohibit[] the issuance of nonvoting equity securities."

29.     The Amended By-Laws expressly prohibit LBHI from issuing any form of capital stock to any person other than the Plan Trust: "Unless otherwise required by law, no capital stock of the Corporation shall be issuable or transferable to any person other than the Plan Trust (as defined in the Plan)." Sutton Decl., Ex. N, § 6.1.

### Events On and After the Effective Date

30.     The Plan went effective on the Effective Date, i.e., March 6, 2012.

31.     On the Effective Date, LBHI filed with the SEC Form 15 publicly confirming that its common and preferred stock was cancelled. Sutton Decl., Ex. L, Item 3.03.

32.     On October 11, 2013, the LBIE Administrators issued their Tenth Progress Report indicating a possible surplus in LBIE: "The recent strengthening in the financial position of the Administration now suggests that an outcome close to 100% recovery is likely in the Low case scenario, whilst in the High case scenario there would be sufficient funds to settle in full all ordinary ranking (unsubordinated) claims with a significant surplus available." Sutton Decl., ¶ 37(b), Ex. D at 6.

33.     On October 10, 2014, the LBIE Administrators released their Twelfth Progress Report, showing that LBIE's estate would have a low case surplus (before post-administration

interest, non-provable claims, and subordinated debt) of £4.94 billion and a high case surplus of £7.39 billion. *Id.,* ¶ 37(c), Ex. E at 7.

34.    On February 3, 2017, the GP was restored to the Register of Companies, as the result of efforts undertaken by [Deutsche Bank], in its capacity as an ECAPS Holder, beginning in June 2016. *Id.,* ¶ 25, Ex. A, §§ 3.18-3.19 (GP Liquidators' Report).

35.    On February 28, 2017, Bruce Alexander Mackay and Matthew Robert Haw of RSM Restructuring Advisory LLP were appointed as Joint Liquidators of the GP (the "Liquidators"), pursuant to a special resolution of the GP's sole member, LBHI. *Id.,* ¶ 26, Ex. A, § 3.1 (GP Liquidators' Report).    This appointment was ratified by the GP's creditors at a creditors' meeting on April 12, 2017. *Id.*

36.    In October 2017, after eight months of the Liquidators' efforts, the Plan Administrator finally released the last of the Investment Proceeds to the GP, while purporting to reserve its rights and obtaining the Liquidators' agreement not to distribute the Investment Proceeds until all competing claims to them have been resolved, in the amounts of €12.8 million, €10.8 million and $26.7 million, on behalf of LB UK III, LB UK IV and LB UK V, respectively. *Id.,* ¶ 33, Ex. B, §§ 4.8-4.11 (GP Liquidators' Report).

37.    As explained in detail in the Sutton Declaration, some portion of what could be a £8 billion surplus at LBIE may reach LB UK I, LB UK II and LB UK III, through LBHI2 and LBH.  Sutton Decl. ¶¶ 34-38.

38.    Deutsche Bank understands that the Liquidators consider that there are a number of points that would need to be addressed by the English Court before any Preferred Securities Substitution could be effected, which proceedings are likely to be commenced in due course. *Id.,* ¶ 28.

**ARGUMENT**

39.     The Motion should be denied because at best it can be construed as a motion to amend a substantially consummated chapter 11 plan, which the Bankruptcy Code prohibits, and at worst it is a request to rewrite virtually every relevant document, including the Plan, and even to rewrite history in order to give LBHI rights that it never had even before the Effective Date, much less afterward.  This Court cannot grant the relief sought under Section 105(a) or Section 1142, because the Motion directly contradicts the Plan that it purports to seek to enforce.

### I.      The Motion Directly Contradicts the Pertinent Components of the Plan.

40.     The Plan Administrator proposes to have LBHI issue stock at some unspecified point in or after 2018 under its corporate charter as it existed prior to being amended and superseded on the Effective Date in March 2012, "as if it had been issued on the Commencement Date" in September 2008 and then cancelled in exchange for Class 12 Equity Interests on the Effective Date in March 2012.  At a later point in or after 2018, notwithstanding its deemed cancellation on the Effective Date in March 2012, the same stock would somehow be offered by LBHI to the ECAPS Holders as Substituted Preferred Stock under the Partnership Agreements that LBHI rejected on the Effective Date in March 2012.  This proposal would not "execute" the Plan; it would ignore and even violate the Plan in several respects.  And the Bankruptcy Code bars any amendment of the Plan.  Accordingly, the Motion should be denied.

### A.      The Plan Nullified What the Motion Proposes to Revive.

41.     The Plan (1) nullified the prepetition charter under which LBHI proposes to issue the Substituted Preferred Stock, Plan § 7.7; Plan Suppl., Ex. 1, Part A, and (2) cancelled all of the common and preferred stock of LBHI that was outstanding as of the Effective Date (except for a single share of common stock held by the Plan Trust), Plan §§ 1.79, 4.17(b).  Indeed, as

noted above, on the Effective Date, LBHI filed a form 15 with the Securities and Exchange Commission publicly disclosing and notifying the world that its preferred shares were cancelled. The only securities that the Plan contemplates any Debtor ever issuing are "New Securities" that may be issued to holders of Claims against Debtors whose assets are being transferred to investment vehicles. Plan § 15.2. There is not the slightest hint in the Plan (or its Disclosure Statement) that Post-Effective-Date LBHI might someday issue any form of equity _in itself_ for any reason - much less retroactively issue prospectively cancelled stock. In no way and on no theory is the Motion consistent with the Plan.

42.    The Plan Administrator cannot solve this problem by blithely proposing that the Substituted Preferred Stock be issued "under the [Pre-Effective-Date] Charter" and treated "as if it had been issued on the Commencement Date" (Motion ¶ 20), such that "it would have been treated as LBHI Class 12 Equity Interests under the Plan" (Motion ¶ 19). This equates to proposing that the Plan can be turned on and off, and Pre-Effective-Date conditions restored, as the Plan Administrator thinks best. The Plan Administrator's authority, while broad, does not extend so far. From start to finish, the Plan describes the Plan Administrator's authority as being "to carry out and implement all provisions of the Plan," including making Distributions "in accordance with the Plan," and "perform[ing] such other duties and functions that are consistent with the Plan." Plan § 6.1(b).

43.    The Plan is binding on all parties in interest, including the Plan Administrator and post-Effective-Date LBHI. Plan § 13.2. It would be entirely irrelevant, if it were true, that LBHI could have issued millions of shares of LBHI preferred stock between the Commencement Date and the Effective Date, "all in accordance with the laws of the State of Delaware" (as the pre-Effective-Date Charter required) – not to mention applicable securities regulations, not to

mention the Bankruptcy Code. LBHI could have done any number of things prior to the Effective Date that it cannot do today.

44.    Because the relief sought in the Motion is decidedly not "consistent with the Plan," that relief cannot be granted under Section 1142. *See, e.g., In re U.S. Brass Corp. v. Travelers Ins. Grp. (In re U.S. Brass Corp.)*, 301 F.3d 296, 305–06 (5th Cir. 2002) ("We find, however, that § 1142(b) does not confer substantive rights so much as it empowers the bankruptcy court to enforce the unperformed terms of a confirmed plan."); *Goodman v. Phillip R. Curtis Enterprises, Inc.*, 809 F.2d 228, 232 (4th Cir. 1987) ("[Section 1142] thus undoubtedly limits the authority of the court to matters concerning the implementation or execution of a confirmed plan.") (citations omitted). Because the Plan Administrator does not (and cannot) cite any other provisions of the Bankruptcy Code on which to base the Motion, that relief cannot be granted under Section 105(a) either. As the Second Circuit has emphasized, Section 105(a) does not grant the bankruptcy court a "roving commission to do equity"; it must be used "in carrying out the provisions of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing." *New England Dairies Inc. v. Dairy Mart Convenience Stores Inc. (In re Dairy Mart Convenience Stores Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003) (quoting *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986)).

45.    This is all that is needed for this Court to determine that the Motion must be denied. But further examination of the Motion only reinforces how improper it is.

**B.    The Plan Affirmatively Prohibits the Issuance of Nonvoting Stock.**

46.    The Motion does not only contradict the Plan by attempting to render it selectively inapplicable; the Motion attempts to do what the Plan – and the Bankruptcy Code – affirmatively prohibits LBHI from doing. That is why the Plan Administrator does not ask this

Court for authority to have Post-Effective-Date LBHI issue the Substituted Preferred Stock under its Post-Effective-Date Charter.

47.     For the six years since the Effective Date, LBHI has been governed by the Amended Charter and Amended By-Laws included in the Plan Supplement, which are expressly incorporated into the Plan. *See* Plan § 7.7. The Amended By-Laws provide: "**Unless otherwise required by law, no capital stock of the Corporation shall be issuable or transferable to any person other than the Plan Trust (as defined in the Plan)**." Sutton Decl., Ex. N, § 6.1 (emphasis added).    There is, obviously, no law requiring LBHI to engage in a Preferred Securities Substitution.  Moreover, the Amended Charter provides: "**The Corporation shall not be authorized to issue any non-voting capital stock of any class**, series or other designation to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code [for so long as that statute applies to LBHI]."  Sutton Decl., Ex. M at 2 (FOURTH ¶) (emphasis added).    Section 1123(a)(6), in relevant part, dictates that a chapter 11 plan "shall --- . . . provide for the inclusion in the charter of the debtor, if the debtor is a corporation, . . . of a provision **prohibiting the issuance of nonvoting securities** . . . ."  11 U.S.C. § 1123(a)(6) (emphasis added).

48.     As the Plan Administrator acknowledges only in a footnote, the Substituted Preferred Stock must be "fully-paid non-cumulative preferred stock issued directly by LBHI bearing a right to dividends calculated in the same manner as the [ECAPS], **having no voting rights** (except as required by law) and being subject to optional redemption in the same manner as the [ECAPS]."  Motion ¶ 16 n.4.  Thus, LBHI's issuance of the Substituted Preferred Stock today would violate the Amended Charter that actually governs LBHI today, and thereby would

violate the Plan that effected that Amended Charter, not to mention the Bankruptcy Code – or the Delaware General Corporation Law, or SEC regulations.[4]

49.    The Amended Charter's prohibition on the issuance of nonvoting securities cannot be amended away, because LBHI's right to amend that governing document is expressly "subject to the requirements of the Bankruptcy Code [which includes section 1123(a)(6)] and in accordance with the Plan [which includes section 4.17(b)]." Sutton Decl., Ex. M at 4 (NINTH ¶); see Plan § 7.7 (initial charter and by-laws "shall be amended to the extent necessary to carry out the provisions of the Plan").

50.    The Motion should be denied for the further reason that it does not just ask for permission to ignore the Plan, it asks for permission to violate the Plan.

### C.    The Plan Cannot Be Amended.

51.    It is clear that what the Plan Administrator actually wants is to amend the Plan to give itself discretion to create and destroy LBHI equity interests with selectively retroactive effect when it believes that doing so might eventually benefit its creditors. The Court does not have to reach this issue, because the Motion does not seek this relief. But to be clear, the relief that the Plan Administrator is actually seeking is prohibited by the Bankruptcy Code. That is presumably why the Plan Administrator did not move this Court to amend the Plan.

52.    The purpose of Section 1127(b) is "to safeguard the finality of plan confirmation." *Antiquities of Nevada, Inc. v. Bala Cynwyd Corp. (In re Antiquities of Nevada, Inc.),* 173 B.R. 926, 928 (B.A.P. 9th Cir. 1994). It provides:

---

[4]    The Court need not reach the issue, but Deutsche Bank disputes that either Delaware law or SEC regulations would permit the issuance of stock nunc pro tunc as of ten years ago so as to be cancelled nunc pro tunc as of six years ago. *See, e.g., Boris v. Schaheen,* 2013 WL 6331287, at *14 (Del. Ch. Dec. 2, 2013) ("It is a well-established principle of current Delaware law that stock issued without authority of law is void and a nullity . . . [and] a court cannot imbue void stock with the attributes of valid shares.").

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and **before substantial consummation** of such plan, but may not modify such plan so that such plan as modified fails to meet the **requirements of sections 1122 and 1123 of this title**. Such plan as modified under this subsection becomes the plan **only if circumstances warrant such modification** and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

As the courts agree, Section 1127(b) prohibits <u>any</u> modification of a plan <u>after</u> its substantial consummation, and this rule is proven by the exception in Section 1127(e), which permits modification of a plan "whether or not the plan has been substantially consummated," only "[i]f the debtor is an individual." *E.g., In re Rickel & Assocs., Inc.,* 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001) (collecting cases); *see, e.g., In re Boylan Int'l, Ltd.,* 452 B.R. 43, 48 (Bankr. S.D.N.Y. 2011) (citing 7 Collier on Bankruptcy ¶ 1127.03[1][a]).

53.     Further, courts have held that by permitting a party to modify a provision in a plan that was explicitly incorporated into the plan, the court would be permitting circumvention of the bankruptcy process. *Doral Ctr., Inc. v. Ionosphere Clubs, Inc., (In re Ionosphere Clubs, Inc.),* 208 B.R. 812, 816 (S.D.N.Y. 1997) (holding that modification of a plan was not allowed to provide for an extension of time to assume or reject a lease); *see also Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.),* 177 B.R. 791, 802 (S.D.N.Y.1995) ("The court cannot adopt any modification that materially alters the plan and adversely affects a claimant's treatment.") (citations omitted); *SCH Corp. v. CFI Class Action Claimants*, 597 F. App'x 143, 148 (3d Cir. 2015) (holding that a settlement was, in fact, a modification of confirmed plan and that a modification that allegedly provides greater economic benefits for the estate and its creditors remains a plan modification).

54.     The title of the Motion is, of course, irrelevant. "A plan proponent or debtor cannot circumvent section 1127(b) and change the plan merely by calling its request a motion to

modify the confirmation order, or a motion for reconsideration or to modify a plan related document, or any application that nonetheless affects rights under the plan, such as a motion to clarify or a motion to classify claims." Collier on Bankruptcy ¶ 1127.03 (footnotes omitted) (citing cases, including *Rickel,* 260 B.R. at 677 ("Regardless of what the debtor chooses to call it, the motion is one to modify the Plan, and is subject to § 1127(b).")); *see also In re Joint E. and S. District Asbestos Litig.,* 982 F.2d 721, 748 (2d Cir. 1992) (rejecting the argument that "a change that would contravene section 1127(b) if made in the provisions of a plan can be accomplished by modifying the provisions of a plan-related document."). Nor can the rule be evaded by invoking Section 105(a). *Rickel,* 260 B.R. at 678. In fact, the prohibition on modification of a chapter 11 plan after its substantial consummation is so fundamental that the Courts of Appeals have prohibited debtors from filing a new chapter 11 case in order to evade the rule. *See Elmwood Dev. Co. v. Gen. Elec. Pension Trust (In re Elmwood Dev. Co.),* 964 F.2d 508 (5th Cir. 1992); *Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.),* 886 F.2d 859 (7th Cir. 1989).

55.    The Bankruptcy Code defines substantial consummation to mean: (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan. 11 U.S.C. § 1101(2).

56.    The courts have observed a potential inconsistency between items (A) and (C). "If substantially all funds must be disbursed prior to [item] (A)'s being satisfied, what is the purpose of the requirement in [item] (C) that there have been 'commencement of distribution under the Plan?'" *Boylan,* 452 B.R. at 48-49 (quoting 7 Collier on Bankruptcy ¶ 1101.03[b]).

District Courts and Bankruptcy Courts within the Second Circuit, like the majority of courts, have adopted the logical conclusion that item (A) "was not intended to apply to payments to be made under the plan over a period of time." *Id.* (citing *WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)*, 1997 WL 599386, at *3 (S.D.N.Y. Sept. 29, 1997); *In re Fansal Shoe Corp.*, 119 B.R. 28, 30-31 (Bankr. S.D.N.Y. 1990)). Instead, item (A) refers to transfers other than distributions, if any, required by the Plan to occur promptly upon its effectiveness. *See Fansal Shoe*, 119 B.R. at 30-31.

57.    In this case, the Plan Administrator would have, and could not meet, the burden to show that substantial consummation of the Plan had not occurred. *See, e.g., Boylan*, 452 B.R. at 48. It is plain that item (A) occurred on the Effective Date, when "all Property of the Estate of a Debtor shall vest in that Debtor free and clear," *see* Plan § 13.1, item (B) occurred on the Effective Date, when "the Debtors, acting through the Plan Administrator, may take any action, including, without limitation, the operation of their businesses," *see id.; id.* § 6.1(b) (activities under Plan Administrator's authority, including "to direct and control the wind down, liquidation, sale and/or abandonment of the assets of the Debtors"), and item (C) occurred upon the initial distribution to creditors on April 17, 2012. *See, e.g., Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 863-64 (E.D.N.Y. 2008) (debtor's liquidation plan was substantially consummated because, under the plan's procedures, "(1) the Liquidation Trust was funded by the transfer of the Debtor's money to the Trustee; (2) the Trustee assumed management and control over the Debtor's assets in the Liquidation Trust; and (3) the Trustee began to distribute funds from the Liquidation Trust"); *Indu Craft, Inc. v. Bank of Baroda (In re Indu Craft, Inc.)*, 2012 WL 3070387, at *9, 13-15 (S.D.N.Y. July 27, 2012) (substantial consummation had occurred because: (1) indemnification was transferred to

reorganized debtor; (2) reorganized debtor had assumed management of related litigation and, by extension, debtor's business; and (3) reorganized debtor had commenced distributions under plan); *see also Fansal Shoe,* 119 B.R. at 31 (substantial consummation had occurred because [among other things] "the debtor . . . commenced distribution under the plan and has fully paid the class of administrative claims as well as the priority tax claimants"). Because the Plan has been substantially consummated – for six years, at that – the Plan cannot be modified, period. *See id.*

58.    Even if the Plan Administrator somehow convinced this Court that the Plan has not been substantially consummated after six years and about $100 billion of distributions to creditors, Section 1127(b) would prohibit the modification that the Plan Administrator seeks. Most basically, the debtor "may not modify [the] plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title." As noted above, section 1123(a)(6) requires a plan to prohibit a post-effective-date debtor corporation from issuing nonvoting equity securities, which is exactly what the Plan Administrator proposes to have LBHI do. More broadly, modification may be granted "only if circumstances warrant such modification," and attempts to circumvent the terms of the plan, as here, cannot satisfy this standard. *See, e.g., In re Legend Radio Group, Inc.,* 248 B.R. 281 (W.D. Va. 1999). Finally, modification may not be granted without resolicitation, the opportunity to object, and a hearing – which, obviously, the Plan Administrator has not requested. *See* 11 U.S.C. §§ 1127(c), 1125, 1129. And even if the Plan Administrator somehow cleared all of these factual and procedural hurdles, the Second Circuit's instruction has applied for over half a century that the court's "discretion [to approve post-effective-date modifications] should be sparingly exercised." *Prudence-Bonds Corp. v. City Bank Farmers Trust Co.,* 186 F.2d 525, 528 (2d Cir. 1951); *see, e.g., Rickel.* 260 B.R. at 677

(collecting cases).  Given the remarkable progress that the Plan Administrator has made since the Effective Date, this is hardly a case in which the Court should feel compelled to grant extraordinary relief from a longstanding plan.

59.    Because the Plan Administrator would be barred as a matter of law from the relief that it would be seeking if the Motion were straightforward (i.e., to modify the Plan), the Motion should be denied.

### D.    The Confirmation Order Cannot Be Modified.

60.    Just as the Plan is a contract that binds the Debtors and can no longer be amended, the Confirmation Order is a judgment that binds the Debtors and can no longer be modified.  The relief sought by the Plan Administrator would necessarily modify the Confirmation Order, which expressly provides that:  "On the Effective Date, the LBHI Stock shall be canceled." Confirmation Order, ¶ 81.  This requirement cannot be read as permitting LBHI Stock to be issued after the Effective Date, and cannot be changed.

61.    "The confirmation of a plan of reorganization has the equivalent effect of a judgment by the court, binding both the debtor and its creditors." *In re 401 East 89th Street Owners, Inc.*, 223 B.R. 75, 79 (Bankr. S.D.N.Y. 1998).  "Not surprisingly, because an order of confirmation is in its effect a judgment, equitable relief from a confirmed plan is appropriate only if the same circumstances would warrant relief from a judgment. . . .  The moving party must establish that one of the enumerated grounds for relief under [F.R.C.P.] 60(b) exists and that the harm to the movant outweighs the necessity for finality in orders of confirmation." *Id.* (citations omitted).  Thus, the Motion should be deemed to be a motion under Federal Rule of Civil Procedure ("F.R.CP.") 60, made applicable to bankruptcy cases through Bankruptcy Rule 9024.

62.     The Plan Administrator's excuse for making the Motion ten years late is that "the current value of [the Debtors' claims and interests in Non-Controlled Affiliates] could not have been imagined on the Effective Date." Motion ¶ 21. This is a remarkable assertion, given the knowledge that LBHI had concerning value (in the form of the Investment Proceeds) at three of the Partnerships prior to the Effective Date, as shown above. Even taking the Plan Administrator at its word that LBHI misunderstood the relevant economics, the basis for modifying the Confirmation Order (if the Motion were straightforward) would be "mistake, inadvertence, surprise, or excusable neglect" under F.R.C.P. 60(b)(1) or "newly discovered evidence" under F.R.C.P. 60(b)(2). A motion under F.R.C.P. 60(b) "must be made within a reasonable time – and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." F.R.C.P. 60(b)(c)(1) (emphasis added).[5] The Confirmation Order was entered on December 6, 2011. LBHI knew by 2008 that there was significant value in three of the Partnerships in the form of the Investment Proceeds, well before December 6, 2011, but later made no attempt to modify the Confirmation Order or the Plan as a result of that knowledge. The Plan Administrator has no excuse for missing the deadline by five years. *See* Sutton Decl., ¶¶ 29-30.[6]

---

[5]    The Plan Administrator could not invoke subsection (6) with its open timeframe, because "Motions made under Rule 60(b)(6) must "not be premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 863 (1988) (footnote omitted). In particular, Rule 60(b)(1) and 60(b)(6) are "mutually exclusive," such "that any conduct which generally falls under the former cannot stand as a ground for relief under the latter." *Stevens v. Miller,* 676 F.3d 62, 67 (2d Cir. 2012) (quoting *United States v. Cirami,* 535 F.2d 736, 740 (2d Cir. 1976)).

[6]    Even if a Rule 60 motion could be timely at this point, the Plan Administrator would have, and could not meet, the burden of demonstrating "exceptional circumstances," and specifically that the "evidence in support of the motion [is] highly convincing, that the movant [has] show[n] good cause for the failure to act sooner, and that no undue hardship [would] be imposed on the other parties as a result." *See SIPC v. Madoff Investment Securities LLC (In re Madoff),* 2017 WL 6205381, at *3 (Bankr. S.D.N.Y. Dec. 6, 2017) (quoting *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1142 (2d Cir. 1994) and *Freedom, N.Y., Inc. v. U.S.,* 438 F. Supp. 2d 457, 462-63 (S.D.N.Y. 2006)).

II. **Under the Bankruptcy Code and the Plan, LBHI Does Not Have the Right to Enforce the Partnership Agreements.**

63.     Moreover, LBHI cannot enforce the Partnership Agreements, as conceived by the Plan Administrator, as a matter of bankruptcy law.  Assuming that LBHI and the General Partner had mutual material obligations to each other (as the Plan Administrator appears to believe), the Partnership Agreements would have been executory contracts as of the Commencement Date.  If so, LBHI rejected those contracts as of the Effective Date, by not including them in the lists of assumed contracts in the Plan Supplement.  *See* Plan § 11.1.

64.     Section 11.1 of the Plan expressly provides that "all prepetition executory contracts and unexpired leases that exist between a Debtor and any person or entity shall be deemed rejected by such Debtor, as of the Effective Date, except for any prepetition executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed prior to the Confirmation Date, or (c) that is specifically designated in the Plan Supplement as a contract or lease to be assumed by the Debtor ...."  Any rights under the Plan to amend the Plan Supplement to remove or add a contract to the Plan Supplement expired as of the Confirmation Date. *See* Plan §11.1; *In re Worldcom, Inc.*, 2006 WL 898029, at *3-4 (S.D.N.Y. Mar. 9, 2006) (denying post-confirmation rejection of contract where all contracts not explicitly rejected were assumed and "rejection of the [contract] clearly was not sought prior to confirmation of the [p]lan and [was] not provided for in the [p]lan itself"); *see also* Collier on Bankruptcy ¶ 365.10[5] ("[O]nce a contract is rejected it stays rejected.").

65.     A debtor that has rejected an executory contract without assuming it first is in material breach of that contract, *see* 11 U.S.C. § 365(g)(1), and cannot compel the counterparty's

performance thereafter, as a matter of law, *e.g., COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 379 (2d Cir. 2008) (adopting *Countryman* test, such that breach by one party "excus[es] performance of the other"); *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386-87 (2d Cir. 1997) (decision to reject is decision to avoid "the price of obtaining the continuing benefits of the non-debtor party's performance"); 3 Collier on Bankruptcy ¶ 365.02[1]. Indeed, "[a] rejected contract or lease is treated as abandoned and not a part of the bankruptcy estate." *In re Old Carco LLC*, 424 B.R. 633, 638-39 (Bankr. S.D.N.Y. 2010) (citing *In re Ciena Capital LLC*, 2009 WL 2905759, at *5 (Bankr. S.D.N.Y. 2009)); *see In re Stoltz*, 315 F.3d 80, 86 n.1 (2d Cir. 2002) ("A rejected lease is abandoned and no longer property of estate."). Accordingly, and irrespective of whether LBHI has any rights under English law (which Deutsche Bank denies), under the Bankruptcy Code it is beyond doubt that LBHI has no right to purportedly enforce a Preferred Securities Substitution today, six years after LBHI's rejection and abandonment of the Partnership Agreements.

66.    For the foregoing reasons, even if the relief sought in the Motion were otherwise consistent with the Plan (which it decidedly is not), this Court can and should find based on the plain language of the Bankruptcy Code, that the actions that the Plan Administrator proposes to have LBHI take are barred as a matter of bankruptcy law. *See Penn Traffic*, 524 F.3d at 379; *Lavigne,* 114 F.3d at 386-87; *Old Carco*, 424 B.R. at 638-39.

### III.    The Motion Upsets the ECAPS Holders' Expectations and, More Importantly, Violates Their Rights.

67.    The Plan Administrator attempts to smooth over the numerous flaws in the Motion with assurances that a Preferred Securities Substitution "is exactly what the ECAPS holders bargained for" and that the ECAPS Holders would "suffer[] no prejudice" if they were

deprived of their ECAPS in favor of the worthless Substituted Preferred Stock after a "delay" of ten years. *See* Motion ¶¶ 20-21. These editorial comments have no weight.

68.    First, exactly what the ECAPS Holders bargained for is set forth in the Partnership Agreements and the Prospectus, and as noted above, if such rights are to be interpreted and determined, that should be done by the English Courts. Suffice it to say here that the ECAPS Holders are confident that they would prevail in any litigation over the parties' rights under the Partnership Agreements. *See* Sutton Decl., ¶¶ 5, 27. But for the reasons given above, this Court should not rewrite the Plan so as to permit that litigation to go forward.

69.    Second, this Court should also reject the implicit argument that the unique nature of the Lehman Bankruptcy is grounds for exemption from the same Bankruptcy Code that applies to all chapter 11 debtors. It is possible that LBHI did not realize in 2008 or 2011 that there might be a benefit to its creditors if there were a Preferred Securities Substitution – although, as shown above, there was substantial evidence of value at certain of the Partnerships as early as August 2008, and evidence to suggest LBHI was aware of a potential surplus at LBIE by February 2013 at the latest. Short-sightedness may be the reason why LBHI did not pursue the matter in 2008 (leaving aside whether this Court would have permitted LBHI to issue equity securities postpetition) and did not attempt to build an option to pursue the matter into the proposed Plan (leaving aside whether creditors or interest holders would have objected). The case law is clear that an unexpected economic upturn or downturn is not a legitimate basis to modify a plan, even prior to its effectiveness; and after its substantial consummation, a plan cannot be modified even to provide a recovery to equity holders that otherwise would have none. *E.g., Rickel,* 260 B.R. at 677-78; *SCH Corp.,* 597 F. App'x at 148. Here, the Debtors' failure to appreciate the degree to which LBIE would be solvent is simply not a sufficient excuse for

retroactively creating a new group of equity holders who will have <u>no</u> recovery, contrary to the terms of the Plan and the Amended Charter, simply to incrementally increase the already much greater than expected recoveries to LBHI's creditors. *See id.*

## RESERVATION OF RIGHTS

70.    Deutsche Bank reserves all of its rights and remedies in connection with the subject matter of the Objection and/or under and in respect of the Partnership Agreements and all documents related thereto (whether such rights and remedies exist in the laws of any jurisdiction, in equity, contract or otherwise, whether or not pleaded in this Objection).    Nothing stated or omitted in this Objection or in connection with the Motion generally is intended to be or should be construed as a waiver of any of such rights or remedies, acceptance of any breach of contractual terms or other duties or affirmation of the existence of any contractual relationship. In the Motion, the Plan Administrator concedes that interpretation of the rights and remedies under the Partnership Agreements are for the English Court to determine.    Accordingly, nothing in this Objection is intended to waive, limit, restrict or otherwise prejudice any arguments, rights or remedies which Deutsche Bank may have under or in respect of the Partnership Agreements including their true meaning and effectiveness or under English law generally.    This Objection is filed without prejudice to any other factual and legal statements, arguments or evidence which Deutsche Bank may place before the English Court in connection with the Partnership and/or the Partnership Agreements.

71.    Because the Motion does not raise issues of English law, if the Court were inclined to grant the Motion, its approval order should not purport to resolve any English law issues.    The Plan Administrator's proposed order improperly attempts to provide LBHI with an advantage in the upcoming litigation in the High Court.    This Court cannot find that any

securities issues by LBHI will actually "constitute Substituted Preferred Stock" in the current circumstances, because that begs a question to be decided in the High Court. Likewise, this Court should not authorize "the Plan Administrator and any other party [to] take any other action that is necessary or appropriate to effectuate the issuance of the Substituted Preferred Stock" – that is dangerously vague and open-ended and, again, overlooks the fact that the High Court has not determined several underlying issues.

## CONCLUSION

For the reasons set forth above, Deutsche Bank respectfully requests that this Court deny the Motion in its entirety.

Dated:    January 17, 2018
          New York, New York

                                    MORGAN, LEWIS & BOCKIUS LLP


                                    By: */s/ Joshua Dorchak*
                                        Joshua Dorchak
                                        101 Park Avenue
                                        New York, New York 10178
                                        212.309.6000
                                        joshua.dorchak@morganlewis.com

                                        *Attorneys for Deutsche Bank AG,*
                                        *London Branch*