# EXHIBIT D

www.pwc.co.uk/lehman

# *Lehman Brothers International (Europe) – In Administration*

## Joint Administrators' tenth progress report for the period from 15 March 2013 to 14 September 2013

*11 October 2013*



## *Important notice*

Creditors will note that this report provides data relating to certain estimated future costs, recoveries and creditor claim amounts. Please note that there continue to be significant matters which remain unresolved which may materially impact any or all of these estimates and, in turn, the dividend prospects for Lehman Brothers International (Europe) creditors. For reasons of commercial sensitivity, confidentiality and/or legal privilege, the Administrators are unable to provide detailed commentary on certain of the matters referred to in this report, each of which could have a material bearing on the eventual outcome to creditors.

The Administrators continue to observe the secondary market pricing for claims against the LBIE estate and are aware that many market participants are currently of the view that the eventual return to unsecured creditors will be substantially more than the principal sum owed, on account of the payment of a certain amount of post-Administration interest. Whilst this outcome looks increasingly likely, it is by no means assured and on page 9 of this report, the Administrators have set out an updated range of indicative financial outcomes for unsecured creditors, for illustrative purposes only, which ignore the accrual of post-Administration interest.

The Administrators reserve all rights concerning the relevance of and the calculation of post-Administration interest and no conclusion should be drawn or inferred from this report as to their intended methodology for its assessment.

The Administrators again caution creditors against using data in this report as the sole basis of estimating the value of their claims or any likely dividend ranges. **LBIE, the Administrators, their firm, its members, partners and staff and advisers accept no liability to any party for any reliance placed upon this report.**

LBIE expressly reserves all of its rights against third parties (including Affiliates) on all matters and no conclusion should be drawn by third parties as to LBIE's position or legal arguments on any such matters from references made in this report.

Whilst amounts included in this report are stated in sterling, material elements of the Company's assets continue to be denominated in currencies other than sterling.

This report includes various defined terms as set out in the updated glossary of terms in Appendix F.

# *Contents*

| | | |
|---|---|---|
| *Section 1:* | *Purpose of the Administrators' report* | *4* |
| *Section 2:* | *Executive summary* | *5* |
| *Section 3:* | *Financial update* | *8* |
| *Section 4:* | *House Estate – Affiliates* | *11* |
| *Section 5:* | *House Estate – non-Affiliates* | |
| *Section 5.1:* | *Claims agreement* | *17* |
| *Section 5.2:* | *Post-Administration interest* | *20* |
| *Section 5.3:* | *Asset and debt recoveries* | *22* |
| *Section 6:* | *Client Assets estate* | |
| *Section 6.1:* | *Omnibus Trust* | *26* |
| *Section 6.2:* | *Other Client Assets* | *29* |
| *Section 7:* | *Client Money estate* | *32* |

*Appendices*

| | | |
|---|---|---|
| *Appendix A:* | *Receipts and payments: cumulative and 6 months to 14 September 2013* | *36* |
| *Appendix B:* | *Administrators' remuneration* | *44* |
| *Appendix C:* | *Future dividend payment dates* | *46* |
| *Appendix D:* | *Court update* | *47* |
| *Appendix E:* | *Statutory and other information* | *48* |
| *Appendix F:* | *Glossary of terms* | *49* |

# *Section 1:*
# Purpose of the Administrators' report

## *Introduction*

This report has been prepared by the Administrators of Lehman Brothers International (Europe) under Rule 2.47(3) of the Insolvency Rules 1986.

This is the tenth such formal update to unsecured creditors and it provides details of progress made in the 6-month period 15 March 2013 to 14 September 2013. The statutory receipts and payments accounts for the same period are attached at Appendix A.

Wherever possible, again the Administrators have sought not to duplicate information disclosed to creditors in previous updates and reports. A copy of previous progress reports and other important announcements can be found at *www.pwc.co.uk/lehman*.

The Administrators will host a one-hour webinar on 5 November 2013, giving creditors an opportunity to hear a summary of the current circumstances of the Administration and to participate in a Question and Answer session. Details of the webinar will be posted on the above website in the near future.

## *Objective of the Administration*

The Administrators continue to pursue the statutory objective and specific aims as set out in previous reports and which are summarised at Appendix E.

## *Creditors' Committee*

The Administrators continue to meet with the Committee to review progress and consult on major issues by way of physical meetings and audio conference calls.

We remain grateful to the members of the Committee for their significant continuing efforts in support of the Administration.

Details of the Committee members are listed in Appendix E. There has been no change in the Committee's constitution in the period.

## *Future report and updates*

The next formal progress report to creditors will be in 6 months' time.

In the interim, we will continue to provide ad hoc updates in the event of any material developments, through the website, or by other means as appropriate.

Signed:

*AV Lomas*
Joint Administrator
Lehman Brothers International (Europe)
In Administration

# Section 2:
# Executive summary

## Introduction

The momentum created in the Administration and outlined in our last progress report has continued apace over the past 6 months. The settlements of some of LBIE's most material Affiliate relationships have unlocked many issues which otherwise could have negatively impacted the eventual outcome for creditors. As a result, significant further value has been realised and the attendant risks have been eliminated, increasing the magnitude of the second unsecured interim dividend that was able to be paid and narrowing and improving the range of likely financial outcomes for creditors.

There is an increasing likelihood that there will be a significant surplus, after payment of all unsecured and Trust claims, which would be available to fund the payment of post-Administration interest and/or the claims of Shareholders. In view of this, the Administrators are considering the different ways in which the resulting significant complexities can be resolved and will communicate further with creditors on this, in due course. The outcome of the Waterfall Application, which is due to be heard in mid-November 2013, will help inform that process.

## Significant achievements in the period

The most significant achievements over the past 6 months are summarised below:

- a second unsecured creditor dividend of 43.3% was paid on 28 June 2013. 'Catch up' dividends continued for late-admitted creditors at the planned monthly payment dates, and the final SCSO payment has enabled a further 89 counterparties to receive 90% on their agreed claims. In total, £4.16bn of House funds were distributed to 1,299 counterparties in the period;

- the LBI settlement became effective on 7 June 2013, with settlement proceeds being received as expected during June 2013. The Consensual Proposal also became effective at the same time;

- immediate settlement cash proceeds were recovered from LBI for the House Customer Property claim of $0.50bn;

- the General Estate claim of $4.0bn against LBI was sold, realising $1.70bn;

- a portfolio of client securities was recovered from LBI as part of the Omnibus claim, in line with expectations, and was liquidated despite testing market conditions, resulting in net sales proceeds of $4.47bn. This, combined with cash recoveries, created an Omnibus Trust exceeding $9.0bn to be dealt with under the Common Terms;

- the payment of a first interim gross distribution of 100% to Omnibus Customer claimants under the Common Terms from the Omnibus Trust occurred on 26 September 2013, with $4.83bn distributed to 230 beneficiaries (after tax and appropriations);

- the LBF settlement became effective on 2 April 2013, resulting in a net expected recovery to LBIE of £0.19bn;

- an excluded item within the LB Lux settlement was agreed in principle in May 2013 which addresses its outstanding Trust Estate claim;

- the settlement with LBEF was approved by the Luxembourg Court on 23 April 2013, reducing its unsecured claim from £7.65bn to just £0.06bn;

- £1.27bn of further other House cash has been realised, including £0.74bn from House securities and receivables;

- unsecured claims totalling £1.57bn were admitted in the period, relating to 207 counterparties;

- the Extended Liens matter was concluded when an appeal made by an LBHI-related entity, 314 Commonwealth Avenue Inc., was withdrawn on 17 May 2013. This has enabled:

  - the release of unsecured interim dividends of £0.05bn to 38 creditors that had previously been withheld;
  - the transfer to the House Estate of ring-fenced cash and securities of £0.34bn, principally relating to LBI; and
  - LBIE to re-engage with LBHK on the return of assets pending resolution of LBHK's own extended liens related litigation;

- preparation for the Waterfall Application has continued, with the substantive hearing scheduled to commence on 11 November 2013;

- a significant financial and legal diligence exercise has commenced to build up a profile of creditors' post-Administration interest claims and to identify the basis for the Administrators to make a potential compromise offer to settle such claims;

- with a greater certainty of financial outcome, certain exposures have been actively managed by the use of financial hedges;

- Client Assets claimant debtors of $1.91bn have been agreed and were recovered under the first Omnibus Trust distribution to beneficiaries;

- c.620 lines of low value Client Assets totalling £0.15bn that were within the Administrators' control and $0.32bn of post-Administration Client Money were fully returned to LBIE clients;

- a first interim Client Money distribution of 23.2% was made on 23 April 2013 to 34 Client Money creditors. In addition, in the period 195 counterparties assigned to LBIE's nominee or waived their CME (total: $2.90bn) and

- the Administrators have continued to assess the basis upon which the Client Money estate might be substantively resolved.

Resulting from the further significant progress that has been made over the last 6 months, the Administrators plan to make a third interim distribution to unsecured creditors on or around 29 November 2013, with a cut-off date for proving of 31 October 2013.

## Overall progress since commencement of the Administration

Across the House Estate and the proprietary estates of Client Assets and Client Money, the key cumulative achievements to date are summarised below:

- c.£19.6bn of House cash realised (page 36);
- the majority of LBIE's highest value Affiliate relationships resolved through a combination of legal and consensual measures;
- c.£9.9bn of Claims Determination Deeds issued to unsecured creditors, resulting in c.£8.5bn of claims admitted (page 17);
- c.£5.9bn of interim dividends and SCSO payments made to unsecured creditors (page 36);
- c.£13.7bn of Client Assets returned/collateral released to clients through the CRA or through bilateral negotiation (page 29);
- c.$4.8bn returned to Omnibus Customer claimants (on 26 September 2013) (page 28);
- c.$3.0bn of non-Affiliate post-Administration Client Money recovered, and c.$2.5bn of this now returned to clients (page 41); and
- c.$1.2bn of pre-Administration Client Money recovered and Client Money Entitlements clarified (page 40).

## Indicative financial outcome

The updated indicative financial outcome range for unsecured creditors set out in Section 3 of this report reflects a number of positive developments in the period resulting in better than expected asset recoveries and a reduction in claim reserves. The range of indicative outcomes has narrowed in comparison with that set out in our previous report and has improved in both the Low and the High cases.

Subject to the various important assumptions, the potential range of House recoveries that could eventually be available for distribution to unsecured creditors is estimated to be between £15.87bn and £18.84bn. The potential range of claims that are expected to participate in any distribution is now estimated to be between £13.59bn and £17.0bn, excluding Shareholders' claims and claims for the payment of post-Administration interest.

**c.£19bn High case House recoveries, together with c.£21bn eventual Trust Asset and Client Money returns combined, are likely to result in final returns exceeding £40bn in the Administration.**

The recent strengthening in the financial position of the Administration now suggests that an outcome close to 100% recovery is likely in the Low case scenario, whilst in the High case scenario there would be sufficient funds to settle in full all ordinary ranking (unsubordinated) claims with a significant surplus available to fund claims by Shareholders and/or other unsecured creditors' claims for post-Administration interest. Pending resolution of the matters covered in the Waterfall Application and deciding on a solution for claims for post-Administration interest, there remains uncertainty regarding how such surplus funds will be applied.

The principal movements in the indicative financial outcome between this and our previous report are outlined in Section 3. Key assumptions and remaining risks are also highlighted in Section 3.

Readers of this report should be aware that there remains some downside and upside sensitivity to the updated range of indicative financial outcomes set out on page 9. Also, the Administrators caution that certain of the assumptions that will be used to determine the quantum of the third interim unsecured dividend are different to those used to derive the updated Low case financial outcome set out in this report.

## Priorities in the remainder of 2013 and into 2014

The immediate focus of the Administrators going forward is to facilitate:

- the prompt agreement and admission of outstanding *bona fide* claims;

- payment of the earliest and largest possible further interim distributions to unsecured creditors;

- resolution of matters to be addressed in the Waterfall Application;

- development of a solution for dealing with post-Administration interest claims of ordinary ranking creditors;

- payment of a second interim distribution to Omnibus Customer claimants under the Common Terms (the first distribution was made on 26 September 2013), once the outstanding US withholding tax issues have been resolved and their consequences understood and processed;

- next stage development of the LBIE wind-down plan, driving further operational simplification and cost reduction; and

- resolution of the Client Assets and Client Money estates by the finalisation and distribution of remaining entitlements together with appropriate court processes, as required, to wind up the Trust Estates.

## Court update

The Administrators are pleased that the settlements reached with Affiliates have considerably reduced the ongoing litigation, albeit litigation continues to be pursued where consensual agreement cannot be reached.

The UK Supreme Court judgment on the Lehman Brothers Pension Scheme deficit appeal was received in July 2013 and overturned the lower courts' ruling. It found that a pension fund deficit liability under a Financial Support Direction ('FSD') would constitute a provable debt in a company's administration and not an expense of the administration.

Certain other Lehman companies that are in UK administration have applied to the UK High Court for directions on whether the maximum liability under an FSD is £0.12bn (the debt claimed by the Pension Scheme against the scheme employer, LBL), or a higher figure, and if so whether this maximum amount applies to the liability of all FSD targets in total or as a separate maximum for the liability of each target company individually. LBIE has joined in this UK High Court application.

The only other multi-party litigation currently in progress in the UK courts is the Waterfall Application, which may have a material impact on the eventual outcome for LBIE's general unsecured creditors and for its Shareholders (LBL and LBHI2).

Litigation continues in Germany with LBB, albeit there has been no material progress made in the period. Resolution of this Affiliate relationship appears to be a considerable way off.

Litigation will also continue to be an important alternative to consensual resolution of disputes with counterparties and we expect more litigation to arise over the next period of the Administration. In particular, rejections of unsecured claims are expected to rise as a number of discussions currently underway with counterparties may end without consensual agreement.

## Investment and currency policies

The Administration's vulnerability to volatility in the financial markets has been significantly reduced during the last 6 months, following the conversion of substantially all remaining House foreign currency balances to sterling. Our investment policies continue to focus on keeping the estates' funds secure, utilising a combination of money market deposits and securities where appropriate.

An equity hedge was taken out in the period to protect the House's exposure on shortfall claims which were tied to the value of the LBI securities portfolio, pending its liquidation. This hedge was closed out following the liquidation of the securities, at no net cost to the Administration. A further hedge has been taken out on currency to manage known downstream House receipts denominated in US dollars. This remains open in part and is discussed in Section 6.2.

Funds in the Omnibus Trust remain denominated in US dollars and in the Client Money estate they are denominated largely in the currency originally recovered by LBIE.

A summary of the Administrators' investment policies is set out in Appendix A.

## Human resources

As at 14 September 2013, the LBIE staff and contractor headcount was 425 (479 at 14 March 2013), with the reduction reflecting reduced workloads due to the successful acceptance of the Consensual Proposal and settlements with certain major Affiliates.

The Administrators are grateful for the continuing support provided by staff and contractors and for their ongoing contribution to the Administration.

# *Section 3:*
# Financial update

## *Indicative financial outcome and basis of preparation*

For the purposes of this report, in the table on page 9 we have provided an updated range of indicative financial outcomes for the House Estate on a prudent but realistic basis, consistent with that reflected in our last report.

With the narrowing of the outcome range and a Low case not far away from a par recovery, we have highlighted below some of the bigger risk issues and assumptions that will play a significant part in determining the final outcome for creditors.

## *Movements in the indicative financial outcome*

The updated Low case outcome has materially improved since our previous report, largely due to LBI-related benefits concerning certain shortfall claims that are very unlikely now to crystallise and the favourable variance created by realising the value of the General Estate claim against LBI.

The updated High case outcome has also improved, due to better than expected recoveries in the period, an increase in the estimate of future recoveries and a reduction in claims, largely facilitated by the LBI settlement.

## *Key assumptions and risk issues*

Set out below are some (but not necessarily all) of the key assumptions in the updated indicative financial outcome and associated risk factors.

### Investment credit risk

As noted on page 7, funds are invested subject to strict investment policies. The House Estate is vulnerable to the credit risk of its own investment counterparties and, in extreme circumstances, losses could be suffered in the event of a failure by such a counterparty. This risk is kept under careful and constant review and will reduce in time as funds continue to be recovered and distributed to creditors (see Appendix A for further details).

### Net Client Money impact (including LBB litigation)

The assumed outcomes are modelled on a win or lose basis for the Client Money litigation against LBB, assuming an expected LBB dividend rate of 80% in a win scenario. In the event that a settlement is reached outside of litigation, then the outcome may be different. If the litigation is lost then no recoveries will be made. This risk is managed by regular review of the merits in continuing the legal action and the continued attempts to develop a consensual solution.

The expected House recoveries from the Client Money estate are likely to be received in US dollars and euros and will need to be converted to sterling upon receipt. Some of these expected receipts are subject to a hedging arrangement to manage currency exposure.

### AGR recovery

This is a material claim that is subject to litigation in the courts of New York. The Low case scenario assumes the action is unsuccessful, and the High case assumes success. In the latter circumstance, no account of counterparty credit risk has been factored into the outcome.

### Affiliate debtors (including extended liens recoveries)

The material component of the remaining Affiliate debtors relates to the recovery of assets from LBHK and these are assumed to be achieved in both outcome scenarios. The recovery remains subject to resolution of the pending legal action in Hong Kong and the ongoing market and currency exposure on the portfolio.

### Client Assets claimant debtors

The ongoing exposure to these debtors has been greatly reduced following the recovery of $1.91bn on 26 September 2013, and the US dollar currency exposure on future recoveries is managed by active foreign exchange hedging.

### Creditors

At the present time, there is no 'hard' bar date for proving claims and a significant number of claims remain to be agreed. Accordingly, the total claims value reflected in the High case outcome may prove to be inaccurate. Also the statement is presented on the basis that all potential claims by Shareholders are subordinated to other unsecured creditors. In the event that this is not the case then returns for other unsecured creditors will reduce. In the updated High case scenario, a significant surplus is likely to arise, and the eventually agreed entitlements to this will have a material impact on the final total returns to creditors.

### Contingencies

Given the scale and complexity of the estates being managed by the Administrators, the risk of material unforeseen issues arising continues to exist.

## Indicative financial outcome

We set out in the table below a high-level analysis showing our current view of the Low and High case financial outcome scenarios for unsecured creditors. In the table and throughout the rest of the report, we have moved from reporting values in hundreds of millions to tens of millions. It is important to note that this is an indicative financial outcome range, subject to change, and excludes post-Administration interest that might become payable on claims. It should be read in conjunction with the notes on the next page and the narrative and assumptions set out elsewhere in this report.

| Page | House Estate | Notes | Low £bn | High £bn |
|------|--------------|-------|---------|----------|
| 36 | Cash deposits and short-dated government bonds | | 7.92 | 7.92 |
| 36/39 | Add back: interim dividends paid (£5.92bn) and accrued (£0.40bn) to date | | 6.32 | 6.32 |
| | Net Client Money impact on the House Estate | 1 | 0.52 | 1.06 |
| | **Projected future recoveries** | | | |
| 22 | House third party debtors | | 0.29 | 1.28 |
| 11 | Affiliate debtors | | 0.90 | 1.35 |
| 24 | House securities | | 0.09 | 0.31 |
| 30 | Client Assets claimant debtors | | 1.46 | 1.76 |
| | Other | 2 | 0.04 | 0.04 |
| | **Total projected recoveries** | | **17.54** | **20.04** |
| | Priority claimants | 3 | (0.47) | - |
| | Future estimated costs | 4 | (1.20) | (1.20) |
| | **Funds available for unsecured creditors** | | **15.87** | **18.84** |
| | **Creditors** | | | |
| 17 | Unsecured creditors | | (14.64) | (12.14) |
| 31 | Client Assets claimant shortfalls | | (0.24) | (0.08) |
| 12 | Affiliate creditors | | (2.12) | (1.37) |
| | **Total creditors** | | **(17.00)** | **(13.59)** |
| | **(Deficiency)/surplus before Shareholders' claims and post-Administration interest** | | **(1.13)** | **5.25** |
| | Reserve for post-Administration interest on unsecured claims | | - | uncertain |
| | Shareholders' claims | 5 | (1.65) | (1.37) |

## Reconciliation of movements between reporting dates

The table below provides an overview of the movements between the current range of indicative financial outcomes and that shown in our previous report.

| Movements in indicative financial outcome March 2013 – September 2013 | Low £bn | High £bn |
|-----------------------------------------------------------------------|---------|----------|
| (Deficiency)/surplus before Shareholders' claims and post-Administration interest as at 14 March 2013 | (7.40) | 2.30 |
| **Improvements** | | |
| Net recoveries realised in the period | 2.34 | 2.34 |
| Net projected future recoveries | 0.88 | (0.76) |
| Net Client Money impact on the House Estate | 0.62 | 0.56 |
| Costs and priority claimants | 0.33 | 0.20 |
| Unsecured creditors | 1.46 | 0.26 |
| Client Assets claimant shortfalls | 0.36 | 0.12 |
| Affiliate creditors | 0.28 | 0.23 |
| **Improvements in the period** | **6.27** | **2.95** |
| **(Deficiency)/surplus before Shareholders' claims and post-Administration interest at 14 September 2013** | **(1.13)** | **5.25** |

## Notes to indicative financial outcome

### 1. Net Client Money impact on the House Estate

We set out in the table below a high-level analysis showing illustrative Low and High case outcomes for the Client Money impact on the House Estate. No provision is made for Tracing into House funds. This illustrative outcome scenario is subject to change.

| Pre-Administration Client Money estate | Low $bn | High $bn |
|---|---|---|
| **Projected recoveries** | | |
| Funds held at 14 September 2013 | 1.20 | 1.20 |
| Add back: distributions made | 0.02 | 0.02 |
| Transfers from post-Administration Client Money | 0.16 | 0.16 |
| LBB/LBHI-related[1] | 0.15 | 0.95 |
| LBI-related | 0.02 | 0.02 |
| Other | 0.03 | 0.04 |
| **Total projected recoveries** | **1.58** | **2.39** |
| **Claims** | | |
| Claims (excluding assigned/waived) | (1.12) | (1.12) |
| **Surplus impact on House** | **0.46** | **1.27** |
| Projected further assignments[2] | 0.37 | 0.40 |
| **Estimated net House recovery   ($bn)** | **0.83** | **1.67** |
| (£bn) | **0.52** | **1.06** |

1. The High case scenario assumes that LBB eventually pays a total dividend of 80% against LBIE's claim of $1bn. Both the Low and High case scenarios assume that LBIE receives dividends on its LBHI guarantee claim because in both scenarios it is assumed that there remains a shortfall on LBIE's recovery direct from LBB.
2. This represents potential future assignments from counterparties indebted to the House Estate.

The general reserve of $0.3bn included in our previous analysis has been excluded above.

### 2. Other recoveries

Other recoveries principally represent potential future tax refunds.

### 3. Priority claimants

Priority claimants include the potential liability for certain indemnities given post-Administration and other potential claims that could crystallise in set circumstances and rank for payment in priority to ordinary unsecured creditors. The movement in the Low case in the period reflects:

| | £bn |
|---|---|
| Reported as at 14 March 2013 | 0.50 |
| Less: full Pension Fund deficit (now an unsecured claim) | (0.12) |
| Add: further contingent claims arising in the period | 0.09 |
| **Priority claimants at 14 September 2013** | **0.47** |

### 4. Future estimated costs

The estimate of future costs has reduced in the Low case outcome from £1.50bn to £1.20bn following the resolution of a number of material issues within the Administration, including settlements with a number of major Affiliates. At this stage in the Administration, our estimate of future costs is the same in both the High and Low case outcomes. Detailed planning continues in connection with the next stages of simplifying LBIE's ongoing business and operations through 2014, which will enable these cost estimates to be further refined.

### 5. Shareholders' claims

Shareholders' claims in the Low case scenario equate to the value of Proofs of Debt received from the Shareholders. The value has been reduced in the High case scenario to reflect an updated assessment of LBIE's view of LBL's claim (which has not been agreed by LBL).

# Section 4:
# House Estate – Affiliates

## Highlights

- LBI settlement signed on 21 February 2013 became effective on 7 June 2013. Substantially all settlement recoveries have been made and LBIE's General Estate claim against LBI has been realised.

- LBF settlement became effective on 2 April 2013, resulting in expected net recoveries of £0.19bn.

- LBEF settlement signed on 15 March 2013 received approval from the Luxembourg Court on 23 April 2013 and is now effective.

- The outstanding Trust claim from LB Lux has been agreed in principle and is progressing to final settlement that will enable LBIE to receive its first recoveries from LB Lux (via LBHI).

- Mable Commercial Funding Limited has agreed LBIE's unsecured claim in the amount of £0.60bn.

- The Extended Liens appeal has been withdrawn. This has allowed ring-fenced cash and assets to be released to the House Estate, principally recoveries under the LBI and LBF settlements, and has allowed the return of certain assets to Storm Funding Limited.

- The Waterfall Application has been progressed and is set for a substantive UK High Court hearing in November 2013.

## Indicative financial outcome from Affiliate relationships

The tables opposite and overleaf illustrate LBIE's current view of the range of likely outcomes from its different debtor and creditor Affiliate relationships as at 14 September 2013.

As a result of continuing progress being made, the Low case scenario shows a £2.01bn improvement in recoveries, principally due to the favourable realisations made from the disposal of the General Estate claim against LBI and the successful conclusion of the Extended Liens legal action. The corresponding benefit in the High case scenario is more limited, given the majority of this success had previously been assumed.

## Debtors

The table below shows the movements of the estimated recoveries from Affiliate estates since our last report and the recoveries made in the period.

| Affiliate recoveries | Sep 13 Low £bn | Sep 13 High £bn |
|---|---|---|
| Future estimated recoveries as at 14 March 2013 | 0.80 | 2.50 |
| Revaluations in the period | | |
| LBI | 1.05 | 0.31 |
| LBHK | 0.49 | 0.17 |
| Other | 0.47 | 0.28 |
| Total revaluations in the period | 2.01 | 0.76 |
| Less: recoveries in the period | | |
| LBI | (1.65) | (1.65) |
| LBF | (0.16) | (0.16) |
| Other | (0.10) | (0.10) |
| Total recoveries in the period | (1.91) | (1.91) |
| Future estimated recoveries at 14 September 2013 | 0.90 | 1.35 |
| Relating to | | |
| LBHK | 0.49 | 0.63 |
| LBB | - | 0.15 |
| LB Lux[1] | 0.18 | 0.21 |
| Mable Commercial Funding Limited | 0.06 | 0.11 |
| Other[2] | 0.17 | 0.25 |
| Future estimated recoveries at 14 September 2013 | 0.90 | 1.35 |

1. LBIE has no direct claim against LB Lux but will recover value from it indirectly through LBIE's separate settlement agreement with LBHI.

2. No recoveries are included relating to the Waterfall Application. The estimated recoveries principally relate to LBJ, LBHI and LBF.

## Creditors

Affiliate creditors comprise both settled and unresolved relationships, with an indicative range of outcomes as summarised below.

| Inbound claims[1] | Sep 13 Low £bn | Sep 13 High £bn |
|---|---|---|
| **Unresolved relationships** | | |
| LBB[2] | (0.58) | – |
| Others | (0.58) | (0.43) |
| **Settled relationships** | | |
| LB Lux | (0.06) | (0.06) |
| LBEF | (0.06) | (0.06) |
| LBJ | (0.29) | (0.29) |
| LBHI and others | (0.06) | (0.06) |
| LBHK | (0.20) | (0.18) |
| LBS | (0.05) | (0.05) |
| Others | (0.24) | (0.24) |
| **Total claims** | **(2.12)** | **(1.37)** |

1.  Inbound claims balances in currencies other than sterling are translated at exchange rates as at 15 September 2008.
2.  The balance comprises the LBB counterclaim and a £0.02bn inter-company balance.

The reduction in total claims estimates since the last progress report principally reflects progress in claims agreement with LBHK and LB Lux as detailed below.

## Progress (on debtor and creditor relationships)

### Unresolved relationships

Efforts have continued to negotiate a settlement with LBB in respect of LBIE's own Client Money and net unsecured claims into LBB, as well as LBB's £0.56bn counterclaim into LBIE.

LBB's pursuit of a £0.56bn ($1bn) claim into LBIE (effectively a counter to LBIE's $1bn Client Money claim against LBB) remains an obstacle to progress on an overall settlement. LBB's counterclaim was dismissed on jurisdiction grounds by the German Appeal Court in December 2012, but that court did grant LBB the right to appeal to the German Supreme Court, which LBB has now done. The German Supreme Court hearing is expected next year; however, no date has yet been set.

The estimated outcomes are modelled assuming a litigation determination and therefore they show the extremes of the potential outcome scenarios.

Inbound claims received from 35 other Affiliates remain pending. LBIE continues to engage with these Affiliates with the objective of resolving their claims as quickly as possible.

Other Affiliates include Storm Funding Limited. A settlement negotiation remains ongoing but, due to the complex nature of the valuation issues on both the asset shortfall and financing claim elements, its resolution is protracted.

Claims made by LBIE's Shareholders are discussed separately below and are not included in the inbound claims estimates in the table above.

### Settled relationships

#### LBI

The LBI settlement agreement became effective on 7 June 2013 following approval by the US Bankruptcy Court and an order from the UK High Court.

LBIE's exposure to LBI has almost been eliminated in the period, with the receipt of settlement proceeds, noted below, and through disposal of the General Estate claim.

Settlement cash for the House's Customer Property claim of $0.5bn has been received.

Following consultation with the Committee, we explored ways to realise the General Estate claim of $4.0bn through secondary debt trading channels rather than hold the claim and receive an uncertain future dividend flow from LBI.

Following:

- a review and assessment of the potential LBI General Estate assets and claims, including the litigation with BarCap, to assess potential future dividend prospects and underlying risks; and

- retaining Deutsche Bank to assist with the process of offering all or part of the claim to the market and obtaining offers,

the decision was taken to liquidate substantially all of the General Estate claim in 3 tranches during June 2013, generating net proceeds of £1.11bn. A $1m claim has been retained.

Other recoveries for the House of £0.22bn have been received from LBI in the period in accordance with the settlement agreement, including from the release of ring-fenced securities and derived income custodied at LBIE.

LBI's assignment of its Client Money claim against LBIE is discussed in Section 7.

We continue to liaise with LBI over a handful of other small value items.

#### LBF

Settlement with LBF became effective on 2 April 2013, resulting in a House recovery of £0.16bn net in the period with a further £0.03bn still to be recovered.

### LBHK

LBIE's recovery of its assets from LBHK is contingent on the outcome of the separate Hong Kong legal proceedings regarding extended liens.

Following the successful outcome from LBIE's UK High Court Extended Liens application in May 2013, progress has now been made in the Hong Kong proceedings. The LBHK liquidators have proposed an approach that may allow for the accelerated return of assets. Such an approach requires an uncontested determination of the matter in the Hong Kong courts and, at this point, there are no parties who have indicated that they will advance any arguments contrary to the liquidators' position. The court hearing is scheduled for 8 October 2013 and so was due to be heard at the time when this report went to print.

On this basis, we are cautiously optimistic that the LBIE assets held by LBHK may be recovered in early 2014. In the interim, our indicative financial outcome has been modified to show the recovery of these assets in both scenarios, whereas previously in the Low case these assets were shown as reducing our Affiliate creditor balances, making the assumption that they would be recovered by those same creditors, reflecting the potential impact of Hong Kong extended liens.

Further progress has been made with LBHK on the remaining post-settlement adjustments required to finalise the inbound claim of LBHK. These developments have resulted in a £0.50bn and £0.15bn further reduction for asset shortfall claims in the Low and High case scenarios, respectively. The few remaining issues are being addressed constructively, with a view to reaching final settlement in the near future.

### LBJ

LBIE had deferred paying any dividend on the LBJ inbound claim of £0.29bn until such time as Extended Liens were removed and its remaining asset returns from LBJ had been received.

Cash and assets of c.£0.06bn were received from LBJ on 25 September 2013, following resolution of Extended Liens. We are in the process of liquidating these positions. LBJ will receive a 'catch up' dividend in respect of both interim distributions in late October 2013.

### LB Lux

Settlement had been reached previously with LB Lux ending all litigation and enabling LBIE to share in LBHI's recoveries from its own claim into LB Lux. LB Lux's £0.22bn Trust claim against LBIE was excluded; however, settlement of this in principle has now also been agreed with LB Lux. This proposed settlement comprises:

- payment of £0.03bn by LBIE to LB Lux plus resolution of a number of disputes relating to underlying counterparties; and

- admission by LBIE of an inbound unsecured claim of £0.06bn, to be admitted once the LB Lux agreement is legally effective.

We understand that this agreement, once signed, will overcome all remaining obstacles in the LB Lux estate, such that LB Lux is now targeting a first distribution by the end of the year.

LBIE continues to commit resource to working with the LB Lux liquidators and with LBHI to maximise the value that will accrue to LBIE in due course under its separate settlement with LBHI.

### LBEF

The settlement outlined previously has now received approval of the Luxembourg Court and therefore LBEF's inbound claim has been admitted at a value of £0.06bn, together with the satisfaction of conditions relating to the withdrawal of other claims made by LBEF.

Unfunded LBEF warrants within LBIE's control are in the process of being cancelled.

### Mable Commercial Funding Limited

LBIE's claim has been agreed in the amount of £0.60bn. A first dividend is expected by the end of 2013.

### LBS

Negotiations to agree a full and final settlement of the outstanding unsecured claim are expected to be finalised by the end of 2013.

### LBHI and its US debtor affiliates formerly in Chapter 11

Dividends of £0.02bn were received during the period from the US debtor affiliates.

## *Litigation*

The current status of legal proceedings relating to Affiliates is set out below.

### Shareholders' claims – £1.37bn - £1.65bn

LBIE has begun its review of the Proofs of Debt filed into LBIE by its Shareholders, LBHI2 and LBL, for £1.29bn and £0.36bn, respectively. These claims remain subject to ongoing due diligence to ascertain their appropriate quantum and the legal determination of their status.

In parallel, the parties to the Waterfall Application have been preparing for the substantive hearing set for November 2013. There has been extensive work on disclosure and interviewing current and former UK Lehman personnel, together with the preparation of position papers. Court papers in respect of this application may be found on our website.

The Administrators continue to argue that the interest claims of ordinary unsecured creditors should be paid in priority to Shareholders' claims, whereas LBHI2 and LBL hold the contrary position.

LBIE has also not yet made a contribution claim against either Shareholder, but reserves the right to do so, and no estimate of recovery from such a claim has been assumed in either the High or Low case scenarios in the indicative financial outcome.

The potential financial impact of a litigation outcome for LBIE (based on some simplifying assumptions) is set out below.

### *Recoveries*

LBIE may be able to claim against its Shareholders under rights of contribution for post-Administration interest payable on its ordinary unsecured creditor claims and/or on the subordinated debt claim of LBHI2.

### *Claims impact*

If LBIE's arguments prevail, then the claims of Shareholders will not rank as ordinary unsecured claims and will rank behind post-Administration interest due on all other such ordinary ranking unsecured claims.

If LBIE's arguments do not prevail, then ordinary ranking unsecured claims may increase by £0.12bn and the subordinated debt claim (which has not yet been agreed) of £1.25bn may be paid ahead of post-Administration interest on ordinary ranking unsecured claims.

### Lehman Brothers Pension Scheme deficit

LBIE is 1 of 6 Affiliates that the Pensions Regulator's Determinations Panel decided should receive an FSD, in connection with the Lehman Brothers Pension Scheme deficit. The status of such a claim, should it eventually be made, was the subject of a UK Supreme Court hearing in May 2013. The judgment on 24 July 2013 held that such a claim should be treated as a provable unsecured claim in the Administration and not, as previously ruled, as an expense of the Administration. We are liaising with other interested parties as to how this liability should be allocated across the wider Lehman group and in the interim we have assumed that the quantum of the claim is the Section 75 liability that has been notified to the principal employer, LBL, and that the full liability falls to LBIE for reserving purposes, as an unsecured claim.

Certain other Lehman companies that are in UK administration, which are at possible risk of liability under an FSD, have applied to the UK High Court for directions on whether the maximum liability under the FSD is £0.12bn (the Section 75 claim), or a higher figure, and whether this maximum reflects the liability of all FSD targets in aggregate or is a separate maximum liability of each target company individually. LBIE has joined in this UK High Court application.

### Extended Liens

A substantive UK High Court hearing took place in 2012. The judgment in November 2012, which was favourable to LBIE's wider interests, was initially subject to appeals by others but these appeals were withdrawn on 17 May 2013 and so the original judgment stands.

Resolution of Extended Liens: has facilitated progress in making distributions to certain counterparties which were previously obstructed by this matter; has enabled the release of certain assets to the House Estate that were previously ring-fenced; and may expedite resolution of LBIE's assets held by LBHK.

This progress is reflected in the tables set out overleaf.

## *Affiliate securities and cash ring-fencing*

Assets held in the House and Trust Estates which are still subject to Affiliate claims at 14 September 2013 have significantly reduced in the period following the resolution of Extended Liens. A summary of the remaining affected assets and expected outcome is set out below.

| | Securities £bn | Cash £bn | Total £bn |
|---|---|---|---|
| Reported as at 14 March 2013 | 0.83 | 1.11 | 1.94 |
| Sales, redemptions and income | (0.19) | 0.20 | 0.01 |
| Net changes to ring-fencing requirement | - | 0.16 | 0.16 |
| Revaluations[1] | 0.05 | (0.05) | - |
| Returns to Affiliates[2] | - | (0.21) | (0.21) |
| Ring-fencing releases to House[3] | (0.23) | (0.52) | (0.75) |
| **Ring-fenced at 14 September 2013** | **0.46** | **0.69** | **1.15** |

1.  Revaluations include re-translation of non-sterling cash balances.
2.  Principally a return to Storm Funding Limited of £0.15bn.
3.  Releases following resolution of Extended Liens and settlement agreements. LBI and LBF had significant releases in the period.

The remaining ring-fenced securities and cash comprise:

| | Securities £bn | Cash £bn | Total £bn |
|---|---|---|---|
| **Assets to be returned to** | | | |
| LBF | 0.23 | 0.27 | 0.50 |
| Storm Funding Limited | 0.08 | 0.02 | 0.10 |
| | **0.31** | **0.29** | **0.60** |
| **Assets to be retained by LBIE**[1] | | | |
| LBF-related | - | 0.03 | 0.03 |
| | **-** | **0.03** | **0.03** |
| **Assets pending resolution**[2] | **0.15** | **0.37** | **0.52** |
| **Assets at 14 September 2013** | **0.46** | **0.69** | **1.15** |

1.  The indicative financial outcome on page 9 includes this recovery in both the Low and High case scenarios.
2.  Includes LBHK and other Affiliates in respect of which zero recoveries have been assumed for LBIE in the indicative financial outcome.

The remaining ring-fenced assets are currently held in the Administration as follows:

| | Securities £bn | Cash £bn | Total £bn |
|---|---|---|---|
| House Estate (page 24) | 0.08 | - | 0.08 |
| Trust Estate (pages 29 & 33, respectively) | 0.38 | 0.69 | 1.07 |
| **Assets at 14 September 2013** | **0.46** | **0.69** | **1.15** |

# *Section 5:*
# House Estate – non-Affiliates

# *Section 5.1:*
# Claims agreement

## *Highlights*

- A second interim unsecured dividend (at a rate of 43.3%) and further SCSO payments, together totalling £3.48bn, were paid to 1,258 non-Affiliate claimants.

- The Administrators have continued to progress claims agreements in the 6 months under the Consensual Approach with:

  – claims totalling £1.57bn being admitted for 207 counterparties; and

  – offers with a total value of £1.65bn being made to a further 205 counterparties.

- Cumulatively, as at 14 September 2013, LBIE Determinations totalling £9.94bn had been prepared and offered to 2,672 counterparties, of which claims totalling £8.46bn had been agreed and admitted.

- The LBI settlement enabled the LBI pending trades issue to be substantially resolved and further progress made, accounting for 126 offers totalling £1.42bn that were made in the period (of which 89 claims totalling £1.30bn were admitted).

- Offers rejected under the Consensual Approach continue to be subject to ongoing diligence and review of supporting evidentiary documentation. 196 claims with a total Proof of Debt value of £2.96bn have entered this detailed review process, with 45 claims totalling £0.37bn being admitted to date (associated Proofs of Debt total £1.39bn).

## *Indicative outcome*

As at 14 September 2013, the estimated value of LBIE's liabilities was as shown below. This excludes claims from Affiliates or those arising in respect of Client Assets shortfalls.

| | | Indicative outcome | |
|---|---|---|---|
| **Unsecured claimants** | **Proof of Debt £bn** | **Low £bn** | **High £bn** |
| **Where Proofs of Debt have been filed** | | | |
| Street Creditors | (11.59) | (9.57) | (8.00) |
| Client Assets claimants[1] | (5.59) | (4.62) | (3.94) |
| Other third party creditors | (0.20) | (0.20) | (0.20) |
| **Where Proofs of Debt have not been filed** | | | |
| Street Creditors | n/a | (0.25) | - |
| Client Assets claimants[1] | n/a | - | - |
| Other third party creditors | n/a | - | - |
| **Total** | **(17.38)** | **(14.64)** | **(12.14)** |

1. In the majority of cases, this excludes unsecured claims arising from Client Assets shortfalls.

Where Proofs of Debt have been filed:

**Low case outcome:**

- assumes the aggregate of the higher of the values of (a) filed Proofs of Debt and (b) LBIE's assessment of the claim, combined with certain specific adjustments.

**High case outcome:**

- assumes that the Administrators are able to agree certain claims at amounts that are lower than the Proof of Debt values.

**Where no Proofs of Debt have been filed:** the Low case outcome represents LBIE's Consensual Approach value; the High case outcome excludes unfiled claims.

## *Claims agreement: status as at 14 September 2013*

The status of claims is summarised in the table below:

| Unsecured claimants | No offers made | | | Offers made but not yet agreed | | | Claims agreed but not yet admitted | | | Claims admitted[1, 2] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. of PODs | Proof of Debt £bn | LBIE view £bn | No. of offers | Proof of Debt £bn | LBIE offer £bn | No. of deeds | Proof of Debt £bn | Agreed claim[3] £bn | No. of deeds | Proof of Debt £bn | Admitted claim £bn |
| **Where Proofs of Debt have been filed** | | | | | | | | | | | | |
| Street Creditors[4] | 442 | (2.23) | (0.21) | 416 | (2.08) | (0.76) | 18 | (0.01) | (0.02) | 1,462 | (7.27) | (5.29) |
| Client Assets claimants | 132 | (0.48) | (0.05) | 139 | (0.96) | (0.69) | 8 | - | (0.01) | 356 | (4.15) | (3.14) |
| Other third party creditors[5] | 72 | (0.16) | (0.14) | 30 | (0.01) | - | - | - | - | 243 | (0.03) | (0.03) |
| **Total non-Affiliate creditors** | **646** | **(2.87)** | **(0.40)** | **585** | **(3.05)** | **(1.45)** | **26** | **(0.01)** | **(0.03)** | **2,061** | **(11.45)** | **(8.46)** |

1.  The claims admitted population includes 22 creditors that also have a CME ($0.04bn aggregate CME) and 845 creditors (£0.03bn aggregate value) that have accepted the SCSO.
2.  $0.57bn of non-Affiliate Client Money claims have been waived or assigned to LBIE's nominee in exchange for admission as an unsecured claim.
3.  Includes creditors that also have a CME (totalling $0.06bn).
4.  Included within Proofs of Debt is £0.1bn for an unsecured claim from BarCap. This represents the difference between BarCap's Proof of Debt and an indemnity for $0.78bn provided by LBI in respect of this claim.
5.  Includes 33 admitted preferential creditor claims (totalling<£1m) paid in full relating to certain former branch employees.

### *Progress*

The Administrators have admitted 2,061 claims against the House Estate totalling £8.46bn, £2.99bn less than the associated submitted Proof of Debt values.

In addition, 26 claims (totalling £0.03bn) were agreed in value. However, as these principally represent Client Money claims, the claims have not been admitted for unsecured creditor dividend purposes.

585 offers totalling £1.45bn have been made to, but not yet accepted by, claimants. The principal reason for this is differences in valuation methodology and approach.

646 creditors have submitted Proofs of Debt totalling £2.87bn where, due to specific legal, commercial and/or valuation issues, LBIE has not made offers to settle such claims.

#### *Street Creditors*

In the period there has continued to be much focus on concluding the agreement of claims under the Consensual Approach, including dealing with some of the more challenging issues, whilst at the same time reviewing further evidence provided by claimants under bilateral review and discussion. In particular:

*   60 offers totalling £0.22bn were made to creditors; and

*   97 claims (totalling £0.26bn) were admitted, resulting in a release of reserves totalling £0.70bn.

Street Creditors that are yet to receive offers include:

*   130 claims (Proofs of Debt of £0.49bn) viewed by LBIE as debtors and where LBIE is pursuing the monies it considers due to it and/or requesting evidence from counterparties in support of their claims; and

*   27 claims (Proofs of Debt of £0.81bn) relating to damages claims which LBIE views as having little or no merit. To date, 1 such claim has been rejected and is currently subject to appeal proceedings (claim of £0.12bn).

#### *Client Assets claimants*

Significant progress was achieved in the period, principally resulting from the substantial resolution of LBI pending trades following the LBI settlement.

In the period, 126 offers totalling £1.42bn were made to Client Assets claimants, with 89 claims totalling £1.30bn being admitted.

As a result, as at 14 September 2013, the Administrators had admitted £3.14bn of claims from Client Assets claimants (£1.01bn lower than the equivalent Proofs of Debt).

The majority of Client Assets claimant cases where no offer has been made relate to contingent shortfall claims. LBIE believes the actual asset shortfall will be a small proportion of the claimed amount and will seek, in the next 6 months, to agree and admit Client Assets shortfall claims (where possible) or agree the withdrawal of Proofs of Debt where Client Assets have been returned in full.

#### *Other third party creditors*

These claims relate to expense creditors and former overseas branch employees.

Other third party creditor claims where no offer has been made typically relate to where further information is required from claimants, where legal advice is being sought or where withdrawal of claims has been requested. Absent a counterparty agreeing to withdraw its claim or providing substantive evidence in support of its claim, it is likely that the Administrators will reject a significant number of other third party creditor claims in the next 6 months.

Following the UK Supreme Court ruling (see page 14), the Lehman Brothers Pension Scheme deficit Proof of Debt of £0.12bn has been reserved as an unsecured claim, in full, pending the outcome of the UK High Court application on this issue. Previously, the liability had been included in the indicative financial outcome as a priority claimant on the basis that it would be treated as an Administration expense.

## Second interim dividend and small claims settlements

On 26 April 2013, LBIE sought and obtained an order from the UK High Court granting permission to:

- make a second and subsequent interim distributions; and
- make further distributions notwithstanding outstanding appeals to Administrators' rejection notices, provided each such claim is reserved for in full until the appeal is concluded.

On 1 May 2013, creditors were formally notified of the deadline of 31 May 2013 for admission of claims for inclusion in the second interim distribution. As required by the Insolvency Rules, a notice of declaration of a dividend was sent on 19 June 2013 to all creditors that had proved their debt. For all claims yet to be admitted, the Administrators made a reserve of c.£9.3bn in determining the second interim dividend rate of 43.3% (cumulative dividend rate of 68.5%).

On 28 June 2013, the second interim distribution (£3.52bn) was paid to 1,138 unsecured creditors. In the period, less than £0.01bn was also paid to settle a further 88 non-Affiliate claims under the SCSO. Accordingly, with the SCSO closed to participants in March 2013, a total of 845 non-Affiliate creditors participated in the 'full and final' settlement offer.

Monthly 'catch up' dividends (in respect of both the first and second interim distributions) have continued to be paid in the period as further claims were admitted. In total, £3.82bn was paid to non-Affiliate creditors as dividends or SCSO payments in the period (cumulative payment to such creditors is £5.54bn to date). Appendix C includes a timetable for future 'catch up' dividends, including associated deadlines for the execution of transfer notices.

## Third interim distribution

The Administrators intend to pay a third interim distribution on or around 29 November 2013, with a cut-off date for

qualifying for the distribution of 31 October 2013. Pursuant to the Insolvency Rules, on declaring a third interim dividend, all unsecured creditors that have submitted Proofs of Debt will receive a written notice of declaration of the dividend.

## Outstanding claims and reserving

For all compliant Proofs of Debt received by the Administrators and where the claim has not been admitted, the Administrators continue to make an appropriate reserve, unless the claim has been formally rejected and the rejection appeal period has passed. Reserves are also made for all other relevant contingencies.

### Bilateral claims agreement

The focus of the bilateral negotiation process is to seek to reconcile and agree claims after requesting further evidence, without resorting to litigation. Engagement with claimants in the period has, in the majority of cases, been positive.

196 offers made under the Consensual Approach but rejected by claimants (the associated Proofs of Debt total £2.96bn) were subject to the continuing bilateral negotiation process as at 14 September 2013.

As at 14 September 2013:

- further evidentiary documentation had been received and reviewed by LBIE for 114 claimants (Proofs of Debt of £2.46bn);
- revised offers had been issued to 72 claimants for £0.46bn (Proofs of Debt of £1.45bn); and
- 45 claims had been admitted for £0.37bn (Proofs of Debt of £1.39bn).

### Withdrawals, rejections and litigation

The process of seeking withdrawals or, if necessary, formally rejecting claims has continued. In the period, 93 claim withdrawals were requested, with 92 claims being withdrawn. Accordingly, as at 14 September 2013, a total of 164 claims had been withdrawn (Proofs of Debt totalling £0.21bn).

In addition, 71 rejection notices were issued in the period to claimants that had been unresponsive to withdrawal requests or that had failed to supply requested supporting evidence. Consequently, as at 14 September 2013, a total of 125 claims (totalling £0.17bn) had been rejected and the rejection appeal period has passed. In certain cases, the claims process may ultimately require court adjudication if the parties cannot negotiate a mutually agreeable resolution.

As previously reported, 1 creditor has appealed the Administrators' rejection notice to the UK High Court (a damages claim of £0.12bn). Court procedures are ongoing but there have been no significant developments in the period.

# Section 5.2:
# Post-Administration interest

## Introduction

In the event that a surplus arises, after the payment of ordinary unsecured creditor claims, the priorities for the application of this surplus are uncertain pending resolution of the Waterfall Application (see Section 4). The Administrators' view is that post-Administration interest on ordinary unsecured creditors' claims is payable in priority to Shareholders' claims. Given the possibility that cumulative dividends on unsecured claims are likely to reach 100% some time in 2014, the Administrators are developing a methodology for resolving (on an equitable basis) the determination of post-Administration interest claims that become payable pursuant to the Insolvency Rules (Rule 2.88) and the surplus distribution priorities.

Set out below are some of the issues relevant to the determination of post-Administration interest claims and a summary of the principal steps that the Administrators are taking towards resolution of such claims for ordinary unsecured creditors.

## Issues

The situation is complicated by a number of factors including the following:

### Quantum

In its simplest form, application of Rule 2.88 would result in the accrual of simple interest at 8% per annum in respect of the periods during which the relevant claims were outstanding since the date of Administration. However, Rule 2.88 also makes provision that if the underlying contract between LBIE and a creditor provides for a rate that is higher than 8% per annum, that rate should be used as the basis for the interest calculation. This could affect claims arising from certain OTC derivative agreements, principally ISDA master agreements (1992 and 2002), under which the relevant rate is typically cited as the counterparty's cost of funds plus 1% per annum.

### Duration

In addition, it is unclear from what date a creditor's post-Administration interest claim is to be calculated. Under one interpretation of the underlying contracts, any claims arising from master agreements (which constitute the majority of LBIE's trading contracts) did not represent outstanding debts until at least the date of termination under the close-out netting provisions of the relevant contracts, or, alternatively, the date on which the net amount was determined and notified to LBIE. On this basis, the commencement date for the determination of accrued post-Administration interest could be the termination date, or, in the alternative, the notification date, as opposed to the date of Administration. The Administrators are aware that there are different legal views on this point.

## Progress

In the past 6 months, the Administrators have taken advice on a range of legal issues in order to understand the various disputes that could arise between LBIE and its creditors in relation to post-Administration interest claims. LBIE has also completed a review of standard documentation covering c.2,500 master agreements, to identify those where the appropriate rate might deviate from the statutory judgment rate of 8%.

In addition, LBIE has commenced a review to assess the profile of claims against the key parameters that would potentially impact the calculation of post-Administration interest to assist in identifying the optimal and equitable solution for all qualifying creditors of LBIE.

## Planned resolution

Given the lack of clear precedent for the calculation of post-Administration interest in circumstances as complex as these, and the potentially significant amounts involved, it is clear that attempting to obtain resolution of the multiple issues referred to above from the UK High Court would very substantially delay the payment of post-Administration interest. Consequently, the Administrators consider that the interests of the creditors are best served by them developing a simplifying methodology to determine creditors' post-Administration interest claims.

## Next steps

Various scenarios will now be modelled in order to develop a post-Administration interest resolution mechanism that the Administrators consider is equitable to unsecured creditors as a whole. This process will be informed by engagement with counterparties and in consultation with the Committee. The objectives of this approach are to facilitate:

- accelerated payment of post-Administration interest on unsecured claims (assuming that the result of the Waterfall Application hearing and the financial outcome of the Administration enable this);

- a reduction in the administrative burden on unsecured creditors required to agree a post-Administration interest claim amount; and

- a material reduction in Administration and counterparty costs of determining post-Administration interest on unsecured claims.

It is possible that the chosen post-Administration interest resolution mechanism will be implemented by a Company Voluntary Arrangement or a Scheme of Arrangement. Alternatively, a consensual solution may also be possible.

The Administrators will separately update creditors periodically, with regard to development of the planned resolution mechanism.

Factors such as the outcome of the Waterfall Application, the timing and quantum of the further unsecured creditor distributions, the agreement or rejection of further unsecured claims and material changes to the indicative financial outcome will each contribute to the Administrators' ability to resolve this matter expeditiously.

# Section 5.3:
# Asset and debt recoveries

### Highlights

- Negotiations with a further 125 Street debtor groups have completed, including 6 in the 'top 150'.

- LBIE has recovered £0.07bn from receivables in the period and £0.37bn from the sale or redemption of House securities.

## House third party debtors

Debtors (excluding Affiliates) within the House Estate comprise the following:

| | Cpty No. | Group No. | Mid-market LBIE value £bn | Rec'd to date £bn | Indicative future recoveries Low £bn | Indicative future recoveries High £bn |
|---|---|---|---|---|---|---|
| **Street counterparties** | | | | | | |
| Completed[1] | 1,052 | 657 | 6.61 | 5.40 | 0.01 | 0.01 |
| Not completed[1] | 683 | 483 | 3.67 | 0.94 | 0.27 | 1.22 |
| | 1,735 | 1,140 | 10.28 | 6.34 | 0.28 | 1.23 |
| Exchanges[2] | 35 | 18 | 1.25 | 1.24 | 0.01 | 0.05 |
| Client Assets claimants[3] | 100 | 100 | 0.31 | 0.26 | - | - |
| **Total** | **1,870** | **1,258** | **11.84** | **7.84** | **0.29** | **1.28** |

1. Street counterparties are discussed below.
2. Receivables from Exchanges principally relate to funds receivable from a Taiwanese counterparty (see House securities on page 24).
3. Receivables from Client Assets claimants represent amounts due to LBIE in excess of those secured by Client Assets liens. Recoveries under liens are included within Client Assets claimant debtors' future indicative recoveries (see Section 6.2).

## Street counterparties

### Progress

During the period, the Administrators continued to recover and negotiate debts owed to LBIE. As at 14 September 2013, £5.40bn had been recovered from settled counterparties and £0.94bn had been received on account where final settlement negotiations or litigation are ongoing.

In the period since the previous progress report, the total recovered to date increased by £0.05bn. This represented cash recoveries of £0.07bn for completed groups, offset by £0.01bn of cash transfers from House to Trust Estate and £0.01bn of other adjustments including re-classifications, bringing the total recovered to date to £6.34bn.

## Completed Street counterparties

Total recoveries from completed Street counterparties, together with the movements since the previous progress report, are summarised below:

| | Cpty No. | Group No. | Mid-market LBIE value £bn | Rec'd in the period £bn | Rec'd to date £bn |
|---|---|---|---|---|---|
| Completed 'top 150' | 338 | 97 | 6.07 | - | 4.92 |
| Completed 'other' | 584 | 442 | 0.37 | - | 0.39 |
| **Total completed at 14 March 2013** | **922** | **539** | **6.44** | **-** | **5.31** |
| New completions 'top 150' | 12 | 6 | 0.13 | 0.04 | 0.07 |
| New completions 'other'[1] | 128 | 119 | 0.07 | 0.02 | 0.03 |
| Further recoveries from previously completed groups[1] | - | - | 0.01 | 0.01 |
| Re-classification of previously completed groups[2] | (10) | (7) | (0.03) | - | (0.02) |
| **Total movements in period** | **130** | **118** | **0.17** | **0.07** | **0.09** |
| **Total completed at 14 September 2013** | **1,052** | **657** | **6.61** | **0.07** | **5.40** |
| **Comprising** | | | | | |
| Completed 'top 150' | 340 | 102 | 6.14 | 0.05 | 4.96 |
| Completed 'other' | 712 | 555 | 0.47 | 0.02 | 0.44 |
| **Total completed at 14 September 2013** | **1,052** | **657** | **6.61** | **0.07** | **5.40** |

1. The amount received in the period represents cash collected since 15 March 2013. The amount received to date comprises the amount received since 15 March 2013 plus any cash collected previously on account (i.e. before the counterparties were classified as complete).
2. Re-classifications of previously completed groups represent revisions to the counterparty composition of the debtor groups, reallocation of balances to appropriate counterparties, movement of certain cash balances from House to Trust Estate (£0.01bn) and other minor internal adjustments to the composition of the debtor groups in the population.

Settlements were reached in the period with 6 'top 150' debtor groups and a further 119 'other' debtor groups. Of the 'top 150' groups settled, highlights included:

- settlement with a major Middle Eastern bank with a total recovery of £0.02bn;

- conclusion of substantial debtor and Client Money positions following settlement with an asset management group. This produced a net cash recovery of £0.01bn, together with agreement of a number of creditor claims with related entities; and

- reaching a settlement, via court proceedings, with a Taiwanese bank, resulting in further cash receipts of £0.01bn.

## *Not completed Street counterparties*

Indicative future recoveries from not completed Street counterparties are summarised as follows:

| | Note | Cpty No. | Group No. | Mid-market LBIE value £bn | Rec'd to date £bn | Required adjustments[1] Low £bn | Required adjustments[1] High £bn | Indicative future recoveries Low £bn | Indicative future recoveries High £bn |
|---|---|---|---|---|---|---|---|---|---|
| AGR | 1 | 1 | 1 | 0.88 | - | (0.88) | (0.31) | - | 0.57 |
| Other litigation | 2 | 9 | 7 | 0.50 | 0.27 | (0.23) | (0.10) | - | 0.13 |
| Korea | 3 | 3 | 3 | 0.23 | - | (0.12) | (0.02) | 0.11 | 0.21 |
| Non-mutual set-off | 4 | 33 | 17 | 0.56 | 0.29 | (0.23) | (0.19) | 0.04 | 0.08 |
| Live positions | 5 | 68 | 67 | 0.06 | - | (0.06) | (0.04) | - | 0.02 |
| Remaining 'top 150' | 6 | 159 | 31 | 1.26 | 0.32 | (0.82) | (0.73) | 0.12 | 0.21 |
| Remaining 'other' | 6 | 410 | 357 | 0.18 | 0.06 | (0.12) | (0.12) | - | - |
| **Total not completed at 14 September 2013** | | **683** | **483** | **3.67** | **0.94** | **(2.46)** | **(1.51)** | **0.27** | **1.22** |

1.    Required adjustments represent revisions for bid/offer spreads, credit charges, pricing variances, bad debt provisions and other commercial differences arising during negotiation.

### 1.    AG Financial Products Inc ('AGR')

LBIE decided not to appeal the Supreme Court of New York's decision to grant a motion to dismiss relating to 1 of the 3 causes of action brought against AGR. This decision does not change the indicative future recoveries, as the impact of the motion was reflected in the previous progress report. The discovery process in respect of the remaining issues continues. During the period, LBIE filed a motion with the Supreme Court of New York to compel disclosure of certain documents. To date, AGR has withheld these documents from discovery on the grounds of privilege. It is uncertain when the motion may ultimately be decided, and what impact it may have on the timing of the substantive hearing, which otherwise is now expected to take place in 2014.

### 2.    Other litigation

A small number of other disputes are currently in litigation across various jurisdictions. In addition, the Administrators are preparing to commence legal proceedings against a number of other debtor groups. The Administrators are mindful that litigation can become protracted and costly, so the decision to commence litigation against a counterparty will only be taken once all other reasonable routes to settlement have been exhausted.

### 3.    Korea

The settlement agreement referred to in the previous progress report became effective in April 2013 upon the fulfilment of a final condition precedent. Subsequently, the application for the solvent liquidation of the LBIE Seoul Branch was submitted to the Korean Court in July 2013. On 30 August 2013, the Korean Court appointed RE McHenry and PD Copley (one of the Administrators) as joint liquidators to the LBIE Seoul Branch.

LBIE currently anticipates that the maximum distribution to it from the liquidation may be in the order of £0.20bn. Any recoveries would be subject to local regulators' approval, securing local tax clearance, settling of claims and movement in exchange rates.

### 4.    Non-mutual set-off

The Administrators continue to seek consensual resolution to unresolved disputes over non-mutual set-off. During the period, in part assisted by the seemingly robust secondary market in unsecured claims against LBIE, counterparties have become more willing to consider 'unwinding' non-mutual set-off and then trading the resulting unsecured claim(s).

### 5.    Live positions

LBIE continues to explore commercial solutions to resolve the remaining live, not terminated, derivative positions.

### 6.    Remaining 'top 150' and 'other'

For the majority of the remaining debtor groups which are yet to settle, significant and/or complex issues remain to be addressed. Whilst the Administrators continue to negotiate these positions to settlement, the nature of the outstanding issues is impacting the speed of resolution. For the purposes of this report, the Administrators have assumed no further indicative future recoveries in respect of 'other' Street groups but continue to pursue further settlements with these counterparties.

## *House securities*

### *Progress*

As at 14 September 2013, remaining House securities and depot-related asset recoveries are summarised as follows:

| | Note | Book value Mar 13 £bn | Extended Liens releases £bn | Other releases £bn | Client & segregated asset transfers £bn | Sales or redemptions £bn | Other movements[1] £bn | Book value Sep 13 £bn | Indicative future recoveries[2] Low £bn | High £bn |
|---|---|---|---|---|---|---|---|---|---|---|
| Available for sale | 1 | 0.23 | 0.15 | 0.08 | 0.05 | (0.37) | - | 0.14 | 0.09 | 0.13 |
| Residual assets held at Citibank | 2 | 0.15 | - | - | - | - | - | 0.15 | - | 0.15 |
| Held subject to client disputes | 3 | 0.05 | - | - | (0.02) | - | - | 0.03 | - | 0.03 |
| Held subject to Affiliate disputes | 3 | 0.10 | - | - | (0.02) | (0.01) | 0.01 | 0.08 | - | - |
| Physical assets | | 0.02 | - | - | - | - | - | 0.02 | - | - |
| **Total** | | **0.55** | **0.15** | **0.08** | **0.01** | **(0.38)** | **0.01** | **0.42** | **0.09** | **0.31** |

1. Other movements represent pricing adjustments during the period, changes in reserving requirements and transfers of assets and securities to and from other custodians.

2. The indicative future recoveries for 'available for sale' assets and residual assets held at Citibank represent expected outcomes following adjustments for illiquid and potentially irrecoverable assets. Recoveries include future depot-related cash realisations.

### 1.    Available for Sale

Following the decision by the UK High Court in respect of Extended Liens (see Section 4), £0.15bn of securities was released to the House, which included releases from LBI (£0.11bn), LBF (£0.02bn) and LBSF (£0.01bn).

In addition, following further negotiations and diligence on inbound Affiliate asset claims, other releases of £0.08bn of securities to the House were made in the period.

In total, and including the security releases above, £0.37bn was realised from the sale or redemption of 'available for sale' securities during the period.

### 2.    Residual assets held at Citibank

Residual assets held at Citibank principally relate to disputed securities and derived cash held in Taiwan. The Taiwanese Supreme Court has now delivered a formal written judgment, which is consistent with all previous judgments and is favourable to LBIE.

As a consequence, the Administrators anticipate that LBIE is now more likely to be able to recover an additional £0.04bn in Exchange receivables and £0.15bn of House assets and cash (currently trapped in Taiwan) than previously thought.

### 3.    Held subject to disputes

Assets held subject to client or Affiliate disputes are securities to which a client or an Affiliate may have an ownership claim, notwithstanding the fact that they were held by LBIE in a 'House' account prior to the Administration. Movements in the period mainly relate to the:

- transfer of securities to Client Assets (£0.02bn), in order to comply with FCA Client Assets sourcebook ('CASS') requirements relating to the segregation of Client Assets;

- transfer of securities to segregated Affiliate accounts (£0.02bn); and

- redemption of ring-fenced securities for Affiliates under interim management agreements (£0.01bn).

The assumption underlying the estimates for securities held subject to both client and Affiliate disputes in the Low case is that the majority will be returned to the relevant third parties in due course.

# *Section 6:*
## Client Assets estate

# *Section 6.1:*
# Omnibus Trust

## Highlights

- The Consensual Proposal was accepted by c.95% by Best Claim value.

- The LBI settlement agreement became effective on 7 June 2013 following approval by the US Bankruptcy Court and an order from the UK High Court.

- The Common Terms under the Consensual Proposal became effective on 7 June 2013.

- Cash was recovered from LBI on 10 June 2013 and all securities were substantially recovered on 13 June 2013.

- Liquidation of securities commenced immediately with realisations to date of $4.47bn. Remaining securities (valued at 14 September 2013) of $0.14bn comprise $0.13bn ring-fenced in respect of disputed claims from Non-Consenting beneficiaries and $0.01bn yet to be liquidated.

- A first gross distribution of $7.81bn at 100% of Best Claim values of beneficiaries was paid on 26 September 2013. $4.83bn was distributed to beneficiaries, net of appropriations for House debtors, reserves for US withholding tax purposes and other permitted deductions totalling $2.98bn.

- The level of Best Claims has increased marginally following adjustments for disputes and certain other issues.

- Resolution was reached (after the period end) with the largest individual Non-Consenting beneficiary, at a claim value higher than the Best Claim value but below its submitted claim, in time for the first distribution.

- There are 20 remaining Non-Consenting beneficiaries, of which only 4 have claims over $0.01bn.

- Significant progress has been made resolving the US withholding tax issue, with an interim solution of a tax deposit mechanism agreed to facilitate the first distribution.

## *Progress*

### LBI settlement agreement approvals

At a hearing on 16 April 2013, the US Bankruptcy Court approved both the settlement agreements between LBI and LBIE and between LBI and LBHI.

On 1 May 2013, at a UK High Court hearing, an application by the Administrators for directions to cause LBIE to perform its obligations under the LBI settlement agreement was granted and an order made in the terms sought.

### *Consensual Proposal acceptance and non-acceptance*

LBIE accepted offers from c.95% of eligible beneficiaries, which exceeded the acceptance threshold stated in the Common Terms. This, coupled with the court approvals and the amendment to the CRA, meant that all conditions to the effectiveness of the LBI settlement had been met and the Common Terms became effective from 7 June 2013.

The current status of the total claims in the Omnibus Trust is:

| | Notes | $bn | $bn |
|---|---|---|---|
| Best Claim values per offer | | | 8.64 |
| **Adjustments** | | | |
| Disputes and other changes | 1 | 0.06 | |
| Dual depot | 2 | (0.02) | |
| PIK notes | 3 | (0.01) | |
| **Total adjustments** | | | 0.03 |
| **Revised Best Claim values** | **4** | | **8.67** |

1.  The disputes adjustment is shown on a net basis, as a limited number of claims have been revised downwards. An agreed adjustment to determine the claim of a counterparty that did not make an Omnibus Settlement Agreement offer has also been made.

2.  The dual depot adjustment is as set out in the Common Terms.

3.  The PIK notes relate to a limited number of counterparties with duplicated corporate events where claims have been consensually adjusted.

4.  Value is shown before reserves for unagreed claims.

Of the revised Best Claim value, $8.42bn of claims value (97%) is agreed and $0.25bn (representing 20 counterparties) of claims value (3%) relates to Non-Consenting beneficiaries.

## LBI asset recoveries

As at 14 September 2013, the total value of Omnibus claim securities and cash recoveries is set out below:

| | Notes | Estimated value at 28 Mar 2013 $bn | Recoveries to 14 Sept 2013 $bn |
|---|---|---|---|
| Equity securities | 1 | 3.85 | 3.83 |
| Fixed income securities | 1 | 0.64 | 0.64 |
| Cash | | 4.79 | 4.80 |
| Securities not liquidated | | - | 0.14 |
| Total Omnibus Trust | | 9.28 | 9.41 |

1.  Securities recoveries include corporate actions since 28 March 2013 attributable to the securities held at that date. $0.33bn of corporate actions has been allocated, including $0.17bn of corporate actions included in the cash recovery from LBI on 10 June 2013.

In light of the smooth transfer of the securities portfolio from LBI, LBIE was able to commence the liquidation process immediately on 13 June 2013. The majority of the liquidation was achieved with the execution of 4 significant equity portfolio trades within a week of receipt of the securities.

Trades were placed on an agency basis through 4 dealers. The results achieved outperformed in aggregate the trading day's volume weighted average price across the portfolio.

Fixed income securities which had a final maturity date within 2 months of receipt were held to maturity. The remainder of the portfolio was liquidated through a competitive bid process.

We are continuing to liaise with LBI over certain relatively minor issues relating to the settlement.

As at 14 September 2013, a limited number of securities with an estimated value of $0.13bn were reserved in respect of Non-Consenting beneficiaries pending determination of their rights. Virtually all of the value related to 2 securities linked to the recent settlement achieved with the largest Non-Consenting beneficiary. Following that settlement, the 2 securities have been sold.

## Tax developments

### US withholding tax

LBIE has requested guidance from the US Internal Revenue Service ('IRS') with regard to tax issues related to the character and source of the settlement payments. Owing to the complexity and uniqueness of the arrangements, this issue is expected to take some time to resolve conclusively although we continue to make progress.

In order to facilitate a timely and substantial return of value to clients, and in lieu of a final determination, LBIE has reserved up to approximately 30% of the Best Claim value of each beneficiary, dependent upon tax status, for potential US withholding taxes.

Once the US withholding tax treatment of the first interim distribution, which was made on 26 September 2013, is finally agreed by the IRS, then LBIE should be in a position to release any excess reserves made in respect of US withholding tax back to customers, net of the appropriate tax. We remain hopeful that we may be able to conclude this by the end of 2013 so that amounts may be timely reported for US federal income tax purposes. We will continue to work with the IRS in respect of additional guidance required on subsequent distributions once the issues on the first interim distribution are resolved.

### UK tax issues

LBIE is working closely with HMRC to agree the status of the Omnibus Trust for UK tax purposes. Whilst there is a risk that the trust could be subject to income tax, inheritance tax or capital gains tax in the UK, we consider the risk of material UK tax liabilities arising to be low.

## First interim distribution and indicative estimated final outcome

On 1 August 2013, the Administrators confirmed their intention to make a first interim distribution under the Common Terms on or around 26 September 2013 at a gross value equal to 100% of the Best Claim value of beneficiaries.

The basis used for calculating the first distribution rate and the High case final outcome estimate is summarised below:

| Omnibus Trust | First interim distribution $bn | High case final outcome $bn |
|---|---|---|
| **Recoveries** | | |
| Cash in hand | 9.27 | 9.27 |
| Securities held | - | 0.14 |
| Future recoveries from LBI[1] | - | 0.04 |
| | **9.27** | **9.45** |
| **Less: reserves** | | |
| General provision[2] | (0.42) | - |
| Reserves for Non-Consenting beneficiaries[3] | (0.43) | - |
| | **(0.85)** | **-** |
| **Available for beneficiaries** | **8.42** | **9.45** |
| **Total of beneficiaries' Best Claim values** | **(8.42)** | **(8.67)** |
| **Gross distribution as a % of claims** | **100%** | **108.9%** |

1. Future recoveries from LBI remain subject to final diligence and agreement.
2. The general provision includes an estimate of potential UK tax liabilities.
3. Reserves for Non-Consenting beneficiaries are in excess of Best Claim value and reflect a conservative view of the specific issues relating to each beneficiary.

The High case final outcome assumes Non-Consenting beneficiaries' claims are agreed at Best Claim values and only a limited general provision is utilised.

### Distribution issues

Following acceptance of the Consensual Proposal in April 2013, focus shifted to operational issues, including preparing the IT infrastructure and designing and testing the processes required to effect a first and subsequent distributions.

Targeted communication campaigns with counterparties were undertaken to maximise the population eligible to participate in the first distribution. To be eligible, beneficiaries were required to have settled any outstanding disputes, supplied valid US tax forms and agreed their other outstanding positions with LBIE.

The first interim distribution was paid to beneficiaries on 26 September 2013 as follows:

| First interim distribution | Cpty No. | $bn | $bn |
|---|---|---|---|
| Gross distribution to beneficiaries | 264 | | 8.42 |
| Less: non-eligible consenting beneficiaries[1] | (34) | | (0.61) |
| **Adjusted distribution to beneficiaries before deductions and appropriations** | **230** | | **7.81** |
| **Less:** | | | |
| US withholding tax reserve[2] | | | (0.96) |
| **Recovered by House Estate** | | | |
| House debtor appropriations | | (1.91) | |
| Assigned claims | | (0.05) | |
| Fees recovered | | (0.06) | |
| **Total recoveries to House Estate** | | | **(2.02)** |
| **Net cash distribution to beneficiaries** | | | **4.83** |

1. Non-eligible consenting beneficiaries relate to parties with unresolved House debts or House claims.
2. Distributions were subject to a 30% tax deposit reserve for US withholding tax purposes, unless beneficiaries provided a validly executed US tax form. This amount was paid to the IRS on 26 September 2013.

Further distributions are only likely to occur after the US withholding tax treatment of distributions is finally determined by the IRS, claims of Non-Consenting beneficiaries are concluded and remaining reserves are settled.

# Section 6.2:
# Other Client Assets

## Highlights

- The LBI settlement and wide acceptance of the Consensual Proposal has enabled progression of Client Assets claimant issues, in particular:

  - Client Assets previously blocked by LBI-related issues are now being returned to counterparties, subject to standard preconditions being met;
  - House Estate recoveries from debtors, who are also Client Assets claimants, have increased in the Low and High case indicative financial outcomes by £0.66bn and £0.36bn, respectively; and
  - reserves for Client Assets claimant shortfalls have decreased in the Low and High case indicative financial outcomes by £0.40bn and £0.08bn, respectively.

- Over-Claims of £0.59bn were materially resolved and/or reconciled in the period, principally resulting from the Common Terms becoming effective.

- Approximately 620 individual holdings of Client Assets, within the control of the Administrators, were fully returned in the period with a total value of £0.15bn.

- 3 individual client holdings, with a value of £0.02bn, were appropriated into the House Estate during the period in settlement of debts owed by Client Assets claimants.

## Progress

There has been considerable progress achieved in the period, particularly following the LBI settlement becoming effective, which has allowed LBIE to accelerate the resolution of remaining key issues in the Client Assets estate. Moreover, the inherent former uncertainties around potential outcomes have, to a great extent, been eliminated with the consequence that the range of outcomes on these impacted issues has narrowed greatly.

## Segregated Affiliate assets

| | Notes | £bn |
|---|---|---|
| Reported as at 14 March 2013 | | 0.72 |
| Transfers to House depot | 1 | (0.23) |
| Sales and redemptions in the period | | (0.19) |
| Revaluations and transfers from House depot | | 0.08 |
| **Segregated Affiliate assets at 14 September 2013** | | **0.38** |

1. Releases following the resolution of Extended Liens and Affiliate settlements.

Certain securities relating to Affiliate claims are held in the client depot to comply with FCA Client Assets sourcebook ('CASS') requirements. The eventual return of these securities to Affiliates or the House Estate is dependent on the resolution of outstanding disputes and final settlements being agreed with LBIE.

## Client Assets analysis

Movements in the client depot during the period (excluding Omnibus Trust and segregated Affiliate assets) were as follows:

| | Notes | £bn |
|---|---|---|
| Reported as at 14 March 2013 | | 0.75 |
| Returns to clients and redemptions in the period | | (0.17) |
| Revaluation, exchange rate and other adjustments | 1 | (0.10) |
| **Client Assets at 14 September 2013** | 2 | **0.48** |

1. Relates to reductions principally due to LBI disputed accounts settlements and removal of dual listed securities, mark-to-market adjustments and security reconciliations.

2. Includes securities controlled by LBHK of £0.08bn (valued as at 12 September 2008) and is shown after claims for Client Assets shortfalls.

## Client Assets returns

In the period, 623 individual Client Assets holdings were fully returned and an additional 259 holdings were partially returned to counterparties, with a total value of £0.16bn. To date, a total of c.7,500 individual holdings have now been fully returned to counterparties representing a total value of c.£13.7bn.

Prior to the LBI settlement, for some clients it was uncertain as to whether they were a creditor of LBI or LBIE. The LBI settlement has provided resolution on the competing claims issue and agreement has been reached between LBIE and LBI as to which of the 2 entities is required to return assets to the affected counterparties. LBIE is currently in the process of agreeing positions with individual clients and returning assets to them directly or transferring assets to LBI once client consent has been obtained.

LBI will likewise be transferring other assets to LBIE for onward return to other counterparties under the reciprocal arrangement.

An exercise to agree allocations of securities that are in partial shortfall across non-CRA counterparties has also commenced. Subject to agreement with impacted counterparties, this programme will enable Client Assets affected by partial shortfalls to be returned and for remaining asset shortfall claims against the House Estate to be finalised.

### Client Assets claimant debtors

A number of Client Assets claimants are also debtors of the House Estate. We have made significant progress with the agreement of debtor balances, resulting in an improvement to the estimate of future House recoveries that will be made from Client Assets claimant debtors by £0.66bn and £0.36bn in the Low and High case scenarios, respectively, as shown below.

| | Low £bn | High £bn |
|---|---|---|
| **Target recoveries** | | |
| Debtor balances agreed to date | 1.70 | 1.70 |
| Forecast future agreed balances | 0.30 | 0.60 |
| | **2.00** | **2.30** |
| **Less: recoveries and set-offs to date** | | |
| Receipts on account (including appropriations of Client Assets and derived income) | (0.30) | (0.30) |
| Assignments of pre-Administration Client Money | (0.20) | (0.20) |
| Client Assets claimant shortfalls agreed | (0.04) | (0.04) |
| **Estimated future House recoveries from Client Assets claimant debtors at 14 September 2013** | **1.46** | **1.76** |
| Previous estimate as at 14 March 2013 | 0.80 | 1.40 |
| **Increase (excluding future set-offs)** | **0.66** | **0.36** |

LBIE is continuing its efforts to agree the debts owed by counterparties and is seeking settlement through:

- appropriations from the Omnibus Trust or of debtors' Client Assets;

- an indebtedness determination programme; or

- a simplified letter process for smaller debtors.

As part of the programme to make the first distribution from the Omnibus Trust, counterparties have engaged meaningfully to agree their debtor balances and associated interest payable.

The majority have been agreed since the Common Terms and LBI settlement brought certainty to counterparties' exposures to LBI and LBIE.

On 26 September 2013, $1.91bn (£1.19bn) was received from debtors, outstanding as at 14 September 2013, as a result of appropriations from the first Omnibus Trust distribution to beneficiaries. LBIE hedged the US dollar to sterling movements in the period and successfully eliminated the impact of the strengthening of sterling in the period since the liquidation of the LBI assets.

### Excess segregated Client Assets

The ongoing identification of securities held in the client depot that were over-segregated at the point of LBIE's Administration has resulted in a further modest transfer to the House depot (less than £0.01bn) in the period (£0.46bn to date).

No further material releases are anticipated.

### Over-Claims and ring-fencing

For certain Client Assets, LBIE has received duplicate claims for the same security. Until these Over-Claims are resolved or expunged, the affected Client Assets cannot be returned to their rightful claimants. To the extent that LBIE holds equivalent House securities, these are fully ring-fenced and are excluded from the House Estate.

An analysis of Over-Claims is set out below:

| | £bn |
|---|---|
| Over-Claims at 14 March 2013 | 0.82 |
| Over-Claims resolved or reconciled in the period | (0.59) |
| **Total Over-Claims remaining at 14 September 2013** | **0.23** |
| **Comprising** | |
| Over-Claims asserted for assets within LBIE's control | 0.05 |
| Over-Claims asserted for assets outside of LBIE's control | 0.18 |
| **Total Over-Claims remaining at 14 September 2013** | **0.23** |

In the period, Over-Claims on assets outside of LBIE's control reduced by £0.58bn resulting from the LBI settlement becoming effective and individual Over-Claimants approving the terms of the Consensual Proposal. Over-Claims on assets within LBIE's control also reduced by £0.01bn in the period.

No specific reserves are included in the House indicative financial outcome for Over-Claims noted above.

**Client Assets claimant shortfalls**

During the period there has been a reduction to the Low and High case estimated Client Assets claimant shortfalls impacting the House Estate by £0.40bn and £0.08bn, respectively.

| | Notes | Low £bn | High £bn |
|---|---|---|---|
| Reported as at 14 March 2013 | | (0.64) | (0.16) |
| Reduced provisions following LBI settlement | 1 | 0.27 | 0.10 |
| Impact of resolution of Over-Claims | 2 | 0.11 | - |
| Other provision movements | | 0.02 | (0.02) |
| Net reduction in the period | | 0.40 | 0.08 |
| Client Assets claimant shortfalls at 14 September 2013 | | (0.24) | (0.08) |

1.  Reflects 100% payout to Omnibus Trust beneficiaries eliminating potential shortfalls.

2.  Withdrawals of Over-Claims principally from agreements reached as part of the Consensual Proposal.

£0.08bn of the remaining potential Client Assets shortfalls relates to assets within LBIE's control. The remainder relates to potential shortfalls in the Omnibus Trust for Non-Consenting beneficiaries.

Non-Consenting beneficiaries have not compromised their rights to a shortfall claim with respect to the Omnibus Trust.

**LBHK**

The extended liens litigation in Hong Kong continues to prevent the release of Client Assets held by LBHK on behalf of LBIE's clients. The third party securities interest hearing in the Hong Kong court is scheduled for 8 October 2013.

# *Section 7:*
# Client Money estate

## *Highlights*

- Made the first interim Client Money distribution on 23 April 2013.
- Removed the roadblocks preventing the determination of CME for 181 counterparties.
- Agreed and resolved CME for a further 208 counterparties (809 to date).
- Progressed development of a plan for resolution of the Client Money estate.
- Returned post-Administration Client Money of $0.32bn to clients and $0.36bn to House facilitated by resolution of a number of legal and other entitlement issues.
- Returned post-Administration segregated Affiliate funds of $1.04bn to House and $0.31bn to Affiliates.

## *Progress*

### Pre-Administration Client Money

#### *First interim Client Money distribution*

The first interim Client Money distribution was made on 23 April 2013 to 34 Client Money creditors at the rate of 23.2%. During the period there has been a 'catch up' dividend paid to 9 counterparties.

The total number of counterparties that have retained their CME as at 14 September 2013 is 44, of which 43 have received distributions of $0.02bn in total to date.

#### *CM Determinations agreement*

Work has continued to engage with clients to enable them to agree their CME and participate in the distributions.

The number of clients retaining their entitlement is relatively small and a significant number of other clients have elected to take an unsecured claim and assign their Client Money claims to LBIE's nominee. In aggregate, CME has been agreed and resolved for 61% (by number) of clients with a CME.

| CME population | Note | Mar 13 Cpty No. | Mar 13 CME $bn | Sep 13 Cpty No. | Sep 13 CME $bn |
|---|---|---|---|---|---|
| Third parties | | 1,309 | 1.73 | 1,316 | 1.65 |
| Affiliates | | 12 | 0.07 | 9 | 0.04 |
| LBI/LBF | 1 | 2 | 2.81 | 2 | 2.81 |
| **Total** | | **1,323** | **4.61** | **1,327** | **4.50** |
| **Comprising** | | | | | |
| Resolved – assigned/waived | | 570 | 0.48 | 765 | 3.38 |
| Resolved – CME retained | | 31 | 0.07 | 44 | 0.09 |
| Roadblocked | 2 | 220 | 3.77 | 39 | 0.53 |
| Outstanding | 3 | 502 | 0.29 | 479 | 0.50 |
| **Total** | | **1,323** | **4.61** | **1,327** | **4.50** |

1. The LBI and LBF claims included in the table continue to be LBIE estimates, based on a review of accounting records only. A number of complex legal questions would need to be resolved before these claims could finally be determined.

2. As at March 2013, there were a number of clients whose CME was contingent upon the outcome of matters which had not been resolved (e.g. depot breaks or the completion of the LBI settlement). Those clients were unable to participate in the first interim Client Money distribution and were advised accordingly. Many of these issues were resolved during the period and the majority of the Client Money population previously reported as 'roadblocked' are now in the process of being agreed.

3. LBIE has engaged with this population, with the exception of a small group for which no contact details are available. The population includes a significant number of clients where settlement offers have been made to agree the level of their CME, which may rank for a distribution from the Client Money estate (at 14 September 2013: 161 counterparties).

The Administrators' ability to progress the remainder of the population continues to be largely dependent on continuing engagement by clients across the various LBIE Administration work streams.

### *Affiliates*

#### *LBI*

Following the LBI settlement becoming effective on 7 June 2013, LBI's Client Money claim, if any, has been assigned to a nominee of LBIE.

BarCap has previously asserted that the business it acquired from LBI included the activities from which LBI's Client Money claim is derived. This assertion is disputed by LBI. BarCap has notified LBIE that it considers itself accordingly to be a beneficiary in the Client Money estate. The Administrators continue to engage with LBI and BarCap to resolve this matter.

A Client Money balance of $0.02bn is due to be recovered under the LBI settlement.

#### *LBF*

LBF has assigned its Client Money claims to LBIE's nominee under the terms of the settlement, effective from 2 April 2013.

### Resolution of the Client Money estate

There are a large number of complex matters (many of which can only be resolved by reference to the UK High Court) which have to be addressed before the Client Money estate can be resolved.

During the period, the Administrators have actively explored the potential to deliver a consensual resolution of the Client Money estate to avoid the need for lengthy and expensive litigation. In outline, subject to resolution of the majority of the remaining outstanding Client Money population, the Administrators propose to make an application seeking UK High Court confirmation that, having made the 'final payment' to all third party claimants, and having deposited an appropriate amount with the UK High Court for uncontactable counterparties, and having returned any surplus to the House, the trustee (i.e. LBIE) has discharged its statutory trust obligations.

### Recoveries

After payment of the first Client Money distribution, the pre-Administration Client Money pool at 14 September 2013 was $1.20bn. This includes both recoveries and interest on funds held. Future recoveries may arise from:

#### LBB/LBHI

Appeal proceedings continue in the German Courts regarding $1.0bn of pre-Administration Client Money held by LBB. The Frankfurt Court has previously ruled that the $1.0bn LBIE Client Money claim into LBB should rank *pari passu* with other unsecured claims. The date for the next hearing of LBB's appeal in the Frankfurt Higher Regional Court has been postponed from June 2013 to November 2013.

LBIE has a stipulated guarantee claim against LBHI to the extent that it is unable to recover all of the Client Money deposited with LBB pre-Administration.

#### Other recoveries

As at 14 September 2013, a balance of $0.16bn was held in the post-Administration Client Money account, which the Administrators now consider to be funds relating to the pre-Administration Client Money pool. Subject to pending legal advice, it is likely that these funds will be transferred to the pre-Administration Client Money pool by the end of 2013.

The indicative financial outcome for the pre-Administration Client Money Estate set out on page 10, makes reference to this likely future recovery. The corresponding CME is included in the claims line on the same page and in the table on page 32.

Recovery of a small number of outstanding Client Money balances in Korea and Taiwan continue to be pursued.

Further commentary on LBIE's affairs in Korea and Taiwan is provided in Section 5.3.

### Post-Administration Client Money recoveries and returns

#### Post-Administration third party funds

Significant progress has been made during the period, with $0.68bn being returned either to clients or to House from the post-Administration Client Money pool.

The table below provides a breakdown of the post-Administration Client Money movements during the period:

| | Notes | $bn | $bn |
|---|---|---|---|
| Balance as at 14 March 2013 | | | 1.16 |
| Returns | 1 | (0.68) | |
| Receipts | | 0.14 | |
| **Movement in the period** | | | **(0.54)** |
| **Balance as at 14 September 2013** | **2** | | **0.62** |

1. The funds have been distributed as follows: $0.32bn has been returned to clients and $0.36bn has been returned to House following the resolution of a number of legal and other entitlement issues.

2. The balance comprises $0.56bn of client funds and $0.06bn relating to House and segregated Affiliate funds. $0.46bn is returnable now that many of the complex issues previously reported have been resolved, with only completion of internal procedures and increased engagement with counterparties required before the funds can be returned. The remaining balance of $0.16bn is expected to be transferred to the pre-Administration Client Money account by the end of 2013.

#### Post-Administration segregated Affiliate funds

Segregated Affiliate accounts movements in the period comprise:

| | Notes | $bn | $bn |
|---|---|---|---|
| Balance as at 14 March 2013 | | | 1.56 |
| Releases | 1 | (1.35) | |
| Receipts | 2 | 0.88 | |
| Foreign exchange gain in the period | | 0.01 | |
| **Movement in the period** | | | **(0.46)** |
| **Balance as at 14 September 2013** | **3** | | **1.10** |

1. Releases have been facilitated by settlements reached with Affiliates and the resolution of Extended Liens litigation. The releases comprise returns to Affiliates (principally Storm Funding Limited) and releases to House, principally in relation to LBI and LBF.

2. Receipts comprise funds relating to the disposal or redemption of securities and derived income identified as belonging to Affiliates ($0.48bn), corporate events on segregated Affiliate securities ($0.26bn) and funds segregated for clients of Affiliates ($0.14bn).

3. The remaining balance will be returned to House or to the relevant Affiliates, following resolution of disputes, legal proceedings or conditions in settlement agreements being satisfied.

# *Appendices*

# *Appendix A:*
# Receipts and payments: cumulative and 6 months to 14 September 2013

### House Estate receipts and payments: cumulative and 6 months to 14 September 2013

| House Estate | Notes | Period - 6 months to 14 September 2013 (GBP equivalent) £m | Cumulative - 15 September 2008 to 14 September 2013 (GBP equivalent) £m |
|---|---|---|---|
| **Receipts** | | | |
| Counterparties | 1 | 1,634 | 8,705 |
| Depot securities | 2 | 677* | 8,734 |
| Affiliate-related transfers from post-Administration Client Money | 3 | 668 | 686 |
| Post-Administration Client Money for onward distribution | 4 | 107 | 436 |
| Other income | 5 | 26 | 1,051 |
| **Total receipts for the period/to date** | | **3,112** | **19,612** |
| **Payments** | | | |
| Dividends paid | 6 | (4,164) | (5,917) |
| Affiliate-related transfers to post-Administration Client Money | 7 | (317) | (1,323) |
| Affiliate settlements | 8 | (138) | (866) |
| Distribution of post-Administration Client Money | 9 | (107) | (436) |
| Administrators' remuneration | 10 | (62) | (714) |
| Payroll and employee costs | 11 | (24) | (472) |
| Legal costs | 12 | (19) | (295) |
| Building and occupancy costs | 13 | (10) | (237) |
| Other payments | 14 | (182) | (794) |
| **Total payments for the period/to date** | | **(5,023)** | **(11,054)** |
| **Net movement in the period/to date** | | **(1,911)** | **8,558** |
| Balance at bank as at 14 March 2013 as previously reported | | 10,380~ | |
| Foreign exchange loss in the period/to date | | (43)^ | (132)^ |
| **Total balances as at 14 September 2013** | 15 | **8,426** | **8,426** |
| Less: Funds held subject to potential third party claims | 16 | (509) | (509) |
| **Total House Estate cash and bonds (see Section 3)** | | **7,917\*** | **7,917\*** |

\*    Includes an aggregate amount of £5m arising in the period which is potentially subject to Affiliate or other third party claims.

~    Balances held in foreign currencies at 14 March 2013 were €1,253m, $562m and various other currencies £61m (equivalent).

^    Receipts and payments in foreign currencies are reported in sterling at the rate prevailing on the relevant transaction date. Foreign exchange gains and losses have arisen from holding foreign currency cash balances for a period of time following receipt, largely due to their potential to be traced as Client Money.
    Following finalisation of the LBI and LBF settlements, and the consequent material reduction in the likelihood of an extensive Tracing exercise, the remaining significant foreign currency cash balances were converted into sterling. Ongoing House Estate foreign currency receipts are converted into sterling as soon as practicable after receipt.

\*    Balances held in foreign currencies at 14 September 2013 were €4m, $1m and various currencies £5m (equivalent).

> c.£19bn High case House recoveries, together with c.£21bn eventual Trust Asset and Client Money returns combined, are likely to result in final returns exceeding £40bn in the Administration.

## Notes to House Estate receipts and payments account

### General

Following the conversion of the majority of the House Estate foreign currency holdings into sterling during this reporting period, the Administrators are now able to provide a cumulative receipts and payments account for the period since the commencement of the Administration. As previously, a receipts and payments account for the 6-month period is also provided.

Foreign currency transactions are reported in sterling at the rate prevailing on the relevant transaction date on both period and cumulative bases.

The transactions within the LBIE estate in the period:

* are reported on a cash receipts and payments basis in accordance with the Insolvency Act and Insolvency Rules; and

* were all completed in the period, in cleared funds, in accounts established and controlled by the Administrators.

Separate bank accounts are held for realisations from the House Estate and the Trust Estate.

### 1.  Counterparties

Receipts include:

* £1,114m from the sale of the LBI General Estate claim;

* £322m from settlement of the LBI House Customer Property claim;

* £67m related to Street counterparties; and

* £16m further distributions from US debtor affiliates of LBHI.

### 2.  Depot securities – sales and related income

Realisations of £677m relate to the disposal or redemption of securities and derived income from depot holdings for the benefit of the House Estate or third parties.

### 3.  Affiliate-related transfers from post-Administration Client Money

£668m of funds previously held in post-Administration Client Money, segregated for potential Affiliate claims, were transferred to the House Estate following Affiliate settlements becoming effective and resolution of Extended Liens.

### 4.  Post-Administration Client Money for onward distribution

Under certain client agreements, Client Money is transferred from the post-Administration Client Money account to LBIE's nominee. Under a separate agreement, funds are transferred from LBIE's nominee to the House account. The House makes a separate payment to the client to give value for its Client Money under the client agreements (see note 9).

### 5.  Other income

Other income comprises:

* £22m of recovered or redirected funds which were mistakenly paid (by third parties) into House accounts;

* £16m of bank and bond interest received;

* £5m of transfers from post-Administration Client Money resulting from clients waiving their entitlement in consideration for an unsecured claim into the House Estate;

* £13m of corporation tax, income tax and VAT repayments received from HMRC and other European tax authorities in the period; and

* £34m of other recent realisations including items under investigation.

The above amounts are offset by £64m of other income received in prior periods that has been reclassified as Client Money for onward distribution in the current reporting period.

### 6.  Dividends paid

£4,162m of interim unsecured dividends and £2m of settlements under the SCSO were paid in the period.

### 7.  Affiliate-related transfers to post-Administration Client Money

£317m of funds were transferred to the post-Administration segregated Affiliate accounts, relating to the disposal or redemption of securities and derived income received into the House account identified as belonging to Affiliates.

### 8.  Affiliate settlements

£132m relates to the LBF settlement, with the balance of the payments relating to asset return agreements with 2 other Affiliates.

### 9.  Distribution of post-Administration Client Money

Relates to returns to clients under the Client Money return scheme (see note 4).

## 10. Administrators' remuneration and expenses

Payment deferral terms, as agreed with the Committee and referred to on page 44 of this report, account for differences between costs incurred and payments made in the period.

Out-of-pocket expenses of £2m were paid in the period.

## 11. Payroll and employee costs

Payments relate to salary and employee-related benefits for UK-based employees and third party contractors.

## 12. Legal costs

Legal costs relate to advice given, and to court proceedings and litigation conducted, in numerous jurisdictions by a number of legal firms in connection with a range of issues across the Administration.

## 13. Building and occupancy costs

This relates to occupancy and infrastructure costs, primarily related to the Canary Wharf offices occupied by LBIE.

## 14. Other payments

Other payments comprise:

- repayment of £71m of recovered or redirected funds which were mistakenly paid (by third parties) into House accounts (see other income);

- £61m premium paid to hedge the foreign exchange exposure on future US dollar denominated receipts for a 12-month period (£34m subsequently recovered through the recent termination of part of that hedge);

- £21m of funding deficit positions in obtaining repatriations of £128m (included in depot securities receipts) from legacy 'nostro' bank accounts;

- £17m of VAT paid on invoices; and

- £12m of other sundry payments.

## 15. Investment profile

### Current investment strategy

For short-term liquidity requirements, LBIE invests in short-dated money market deposits. For longer term requirements, investments are made in short-dated government securities.

### Total balances

| House Estate | Notes | GBP equivalent £m |
|---|---|---|
| Government bonds – short-dated | | 8,025 |
| Short-term deposits | 1 | 297 |
| Interest-bearing accounts | | 104 |
| **Total** | | **8,426** |

1. Average rate of return for 6 months ending 14 September 2013: euros 0.02%, sterling 0.31% and US dollars 0.10%.

### Cash management and investment policies

Subject to meeting regulatory requirements, the continuing objectives of the policies are to provide:

- security for Administration funds;

- liquidity as required by the Administration; and

- appropriate returns (positive yield net of fees).

The primary objective continues to be ensuring the security of Administration funds. To meet this objective, a comprehensive counterparty credit risk policy is in place with clear limits on counterparties, instruments, amounts and duration. Compliance with policy is measured on at least a daily basis using live indicators, and any breaches arising from market movements are reported immediately to the Administrators.

The cash is managed by a team of treasury professionals, which meets with the Administrators on a regular basis.

### Instruments used in the period

- interest-bearing accounts;

- short-term bank deposits; and

- government and quasi-government bonds.

### Policy for interest-bearing accounts and short-term deposits

Permitted banks must meet 4 key criteria:

- be headquartered in a sovereign state where the average long-term ratings from S&P, Moody's and Fitch are AA+ or above;

- have a blended average long-term rating from S&P, Moody's and Fitch at AA- or above;

- have a 5-year CDS price below a specified (prudent) threshold; and

- have a minimum market capitalisation above a specified (prudent) threshold.

To ensure diversification, the counterparty limits for monies invested are based on the credit rating, CDS price and market capitalisation of each of the banks used.

Short-term deposits are placed for a maximum duration of 12 weeks with only those banks that meet strict criteria – currently only 2 out of our 12 dealing counterparties.

### Policy for government bonds

Eligible investments for the bond portfolios are short-dated government debt issued by the UK and sterling debt securities issued by institutions benefiting from an explicit, unconditional and irrevocable guarantee from the governments of the UK or Germany.

Bond portfolios are managed on a day-to-day basis by independent fund managers.

### 16.  Funds held subject to potential third party claims

| House Estate | £m |
|---|---|
| Funds held subject to potential Affiliate claims | 4 |
| **Funds held subject to potential other third party claims:** | |
| Reserve for unpaid dividends | 405 |
| Cash collateral from Client Assets claimant debtors | 89 |
| Ring-fenced for Trust Property claimants | 11 |
| **Total** | **509** |

## Pre-Administration Client Money receipts and payments: cumulative and 6 months to 14 September 2013

| Pre-Administration Client Money | Notes | Period - 6 months to 14 September 2013 (USD equivalent) USD $m | Cumulative - 15 September 2008 to 14 September 2013 (USD equivalent) USD $m |
|---|---|---|---|
| **Receipts** | | | |
| Client Money pool recoveries | 1 | 44 | 1,216 |
| Interest | | 1 | 6 |
| **Total receipts for the period/to date** | | **45** | **1,222** |
| **Payments** | | | |
| Client Money interim distribution | 2 | (21) | (21) |
| Legal costs | | - | (10) |
| **Total payments for the period/to date** | | **(21)** | **(31)** |
| **Net movement in the period/to date** | | **24** | **1,191** |
| Balance at bank as at 14 March 2013 as previously reported | | 1,172¨ | |
| Foreign exchange gain in the period/to date | | 2^ | 7^ |
| **Total balances as at 14 September 2013** | **3** | **1,198\*** | **1,198\*** |

¨  Balances held in currencies other than US dollars at 14 March 2013 were €27m, £9m and various other currencies $11m (equivalent).

^  Receipts and payments in currencies other than US dollars are shown in US dollars as at their transaction date. The reported foreign exchange gains arise from translation of non-US dollar denominated balances into the reporting currency of US dollars at 14 September 2013.

\*  Balances held in currencies other than US dollars at 14 September 2013 were €27m, £9m and various currencies $11m (equivalent).

## Notes to pre-Administration Client Money receipts and payments account

**1.   Client Money pool recoveries**

Client Money recovered in the period, arising from the LBI settlement.

**2.   Client Money interim distribution**

A Client Money first interim dividend at a rate of 23.2% was paid in the period.

**3.   Investment profile**

| Pre-Administration Client Money | USD equivalent $m |
|---|---|
| Short-term deposits | 49 |
| Interest-bearing accounts | 1,149 |
| **Total** | **1,198** |

## *Post-Administration Client Money receipts and payments: cumulative and 6 months to 14 September 2013*

| Post-Administration Client Money | Notes | Period - 6 months to 14 September 2013 (USD equivalent) USD $m | Cumulative - 15 September 2008 to 14 September 2013 (USD equivalent) USD $m |
|---|---|---|---|
| **Receipts** | | | |
| Affiliate-related transfers from House | 1 | 486 | 2,075 |
| Affiliate-related | 2 | 397 | 415 |
| Redemptions, coupons, dividends and investment income | | 140 | 4,283* |
| Collateral received from clients | | - | 258 |
| Funds received in error | | 24 | 113 |
| **Total receipts for the period/to date** | | **1,047** | **7,144** |
| **Payments** | | | |
| Affiliate-related transfers to House | 3 | (1,040) | (1,066) |
| Other transfers to House | 4 | (361) | (1,237) |
| Affiliate settlements | 5 | (311) | (311) |
| Transfers to clients direct | 6 | (259) | (1,901)° |
| Transfers to clients via LBIE's nominee | 7 | (57) | (571)° |
| Return of collateral received from clients | | - | (258) |
| Return of funds received in error | | (24) | (113) |
| Other | | (3) | (7) |
| **Total payments for the period/to date** | | **(2,055)** | **(5,464)** |
| **Net movement in the period/to date** | | **(1,008)** | **1,680** |
| Balance at bank as at 14 March 2013 as previously reported | | 2,711~ | |
| Foreign exchange gain in the period/to date | | 10^ | 33^ |
| **Total balances as at 14 September 2013** | 8 | **1,713#** | **1,713#** |
| Comprising: | | | |
| Segregated Affiliate post-Administration Client Money balance | | 1,097 | 1,097 |
| Other third party post-Administration Client Money balance | | 616 | 616 |
| **Total balances as at 14 September 2013** | | **1,713** | **1,713** |

~   Balances held in currencies other than US dollars at 14 March 2013 were €551m, £261m and various other currencies £514m (equivalent).

^   Receipts and payments in currencies other than US dollars are shown in US dollars, as at their transaction date, for reporting purposes only. The reported foreign exchange gains arise from translation of non-US dollar denominated balances into the reporting currency of US dollars. Post-Administration Client Money continues to be held in the currency of receipt and will be paid to the relevant eventual recipient, in that same currency, thereby ensuring that no actual exchange gain or loss materialises in the process.

#   Balances held in currencies other than US dollars at 14 September 2013 were €329m, £57m and various currencies £419m (equivalent). In the period, $62m was transferred from other third party post-Administration Client Money to segregated Affiliate post-Administration Client Money.

*   Comprises non-Affiliate related receipts of $3,034m plus $1,249m of investment income relating to the House Estate.

°   Non-Affiliate related returns of $2,472m have been made to date.

## Notes to post-Administration Client Money receipts and payments account

### 1. Affiliate-related transfers from House

Transfer of cash originally received in the House account, relating to the disposal or redemption of securities and to derived income identified as belonging to Affiliates.

### 2. Affiliate-related

Amounts relating to the disposal or redemption of securities and to derived income received directly into the segregated Affiliate accounts.

### 3. Affiliate-related transfers to House

Funds previously held subject to potential Affiliate claims were transferred to the House Estate following the Affiliate settlements becoming effective and resolution of Extended Liens.

### 4. Other transfers to House

Transfer of funds to the House Estate determined not to be post-Administration Client Money following full investigation.

### 5. Affiliate settlements

Return of funds to Affiliates under the terms of settlement agreements with those Affiliates.

### 6. Transfers to clients direct

Return of post-Administration Client Money direct to clients.

### 7. Transfers to clients via LBIE's nominee

Return of post-Administration Client Money via LBIE's nominee, where funds are transferred for onward distribution by the House Estate.

### 8. Investment profile

#### Total balances

| Post-Administration Client Money | USD equivalent $m |
|---|---|
| Short-term deposits | 511 |
| Interest-bearing accounts | 1,202 |
| **Total** | **1,713** |

### Cash management and investment policies for client funds

The Client Money investment policies for short-term deposits and interest-bearing accounts are based on those used for the House Estate, modified to comply with the additional Client Money regulatory requirements.

Client Money is not eligible for investment in government bonds. Client monies can be placed on money market deposits for a maximum duration of 4 weeks.

## *Omnibus Trust receipts and payments: 6 months to 14 September 2013*

| Omnibus Trust | Notes | 6 months to 14 September 2013 (USD equivalent) USD $m |
|---|---|---|
| **Receipts** | | |
| Cash transferred from LBI | 1 | 4,795 |
| Sale of equity securities returned by LBI | 2 | 3,828 |
| Sale of fixed income securities returned by LBI | 2 | 643 |
| Funds received in error | 3 | 34 |
| Interest | | 1 |
| **Total receipts** | | **9,301** |
| **Payments** | | |
| Costs relating to disposal of securities | 4 | (1) |
| Return of funds received in error | 3 | (34) |
| **Total payments** | | **(35)** |
| **Total balances as at 14 September 2013** | **5** | **9,266** |

## *Notes to Omnibus Trust receipts and payments account*

### 1.  Cash transferred from LBI

A total of $4,961m cash was physically returned by LBI, including $166m relating to corporate actions from 28 March 2013 to 10 June 2013 (i.e. $4,795m excluding corporate actions).

### 2.  Sale of equity and fixed income securities returned by LBI

Sale of securities that were last valued prior to recovery on 28 March 2013 by LBIE and presented to beneficiaries in the web update of 14 May 2013. Corporate actions have generated $326m in the period from 28 March 2013 to 14 September 2013 and are included in full within 'sale of securities' realisations. In addition, $14m of derived income received since 13 June 2013 is included within 'sale of securities' realisations.

### 3.  Funds received in error

Funds received into the Omnibus Trust account in error subsequently transferred to the House account.

### 4.  Costs relating to disposal of securities

Commission and tax deductions incurred on the sale of securities.

### 5.  Investment profile

| Omnibus Trust | USD equivalent $m |
|---|---|
| Short-term deposits | 8,739 |
| Interest-bearing accounts | 527 |
| **Total** | **9,266** |

### *Cash management and investment policies for Omnibus Trust funds*

The investment policies for short-term deposits and interest-bearing accounts are focused on preserving the security of the funds. This is achieved by the application of a comprehensive credit risk model as used in the House Estate, subject to consideration of any other regulatory requirements.

# *Appendix B:*
# Administrators' remuneration

## Background

Details of the statutory framework for the approval of the Administrators' remuneration, the role of the Adviser and the level and detail of disclosure provided by the Administrators are set out in the Administrators' earlier reports.

The Administrators continue to provide the Committee and its Adviser with detailed information relating to their remuneration and to Category 2 disbursements, in accordance with SIP 9, on a quarterly basis.

The remuneration information contained in this report is extracted from the Q1 and Q2 2013 data packs which have been provided to the Committee and its Adviser.

## Approvals by the Creditors' Committee

As previously reported, the Committee approved the 2013 remuneration arrangements, which require deferral of a significant proportion of the Administrators' 2013 time costs to be considered for approval in early 2014.

The Committee has been provided with Category 2 disbursement information relating to the 6-month period to 30 June 2013 amounting to £881,215, of which it has approved £451,904 for payment to date.

## Analysis of time costs

In the 6 months to 30 June 2013, time costs of £71,423,625 have accrued, totalling 213,356 hours at an average hourly rate of £335 (previously £332).

The Administrators' time costs reduced by 2% in the period compared with the previous 6 months. This reduction reflected the net effect of:

- reduced activity in Trust and Affiliates work streams following the successful acceptance of the Consensual Proposal and the settlements with certain major Affiliates; offset in part by:

- increased activity in support functions, in large part, related to receiving, liquidating and distributing the Omnibus claim proceeds.

The analysis excludes a further £718,441 (1,773 hours) of time costs deducted from taxation refunds received by LBIE from the Lehman tax group representative member, LBL. This amount was paid to PwC by LBL in respect of work done relating to the tax reclaim, and has been recharged to LBIE by deduction from the tax recoveries eventually refunded to it.

Cumulative time costs accrued to 30 June 2013 are £693m. Total Administrators' remuneration and disbursements paid to 14 September 2013 are £714m.

The continuing complexity of the issues facing the Administration has required the continued engagement of specialist resource staff. During the 6-month period, some 607 (c.215 full-time equivalents) different UK and overseas staff members have been involved in the Administration to assist with the key work stream activities.

## *Analysis of Administrators' remuneration*

The table below provides an analysis of the Administrators' total hours incurred and the associated cost by staff grade, in respect of the period 1 January 2013 to 30 June 2013.

| Grade | Period 1 January 2013 to 30 June 2013 | |
| --- | --- | --- |
| | Hours | £'000 |
| Partner | 8,744 | 6,693 |
| Director | 12,960 | 7,616 |
| Senior Manager | 37,189 | 17,020 |
| Manager | 53,213 | 18,910 |
| Senior Associate | 63,253 | 15,406 |
| Associate | 37,997 | 5,779 |
| Total | 213,356 | 71,424 |

The following table allocates hours and associated costs by work activity in the same period.

| Activity | | Period 1 January 2013 to 30 June 2013 | |
| --- | --- | --- | --- |
| | | Hours | £'000 |
| Counterparties | Street | 33,566 | 10,972 |
| | Trust | 33,950 | 11,172 |
| | Affiliates | 5,849 | 2,057 |
| | Valuations | 16,647 | 5,331 |
| | Branches | 2,328 | 1,002 |
| Middle Office | Middle Office | 27,275 | 9,306 |
| Transaction Processing and Control | Transaction processing and control | 21,816 | 7,513 |
| COO | Administrators | 9,278 | 4,705 |
| | Chief operating officers | 5,901 | 2,090 |
| | Performance improvement and control | 18,194 | 5,322 |
| | Treasury | 7,319 | 2,253 |
| Other support functions | Tax | 3,853 | 2,415 |
| | Regulatory and compliance | 4,446 | 1,284 |
| | Information technology | 18,960 | 4,598 |
| | Shared activities* (see below) | 3,974 | 1,404 |
| Total | | 213,356 | 71,424 |

* LBL recharged LBIE for its allocation of shared work stream costs until 31 May 2013. Effective from 1 June 2013, LBIE assumed responsibility from LBL for managing the 3 shared work streams and providing services to other Affiliates and recharging costs to them accordingly. The time and costs disclosed continue to be the proportion relating to LBIE only.

| Shared activities | Period 1 January 2013 to 30 June 2013 | |
| --- | --- | --- |
| | Hours | £'000 |
| Employees | 1,708 | 749 |
| Estate accounting | 634 | 225 |
| Group services management | 1,632 | 430 |
| Total | 3,974 | 1,404 |

# *Appendix C:*
# Future dividend payment dates

The timetable for future 'catch up' dividends, including the date for the execution of transfer notices, is set out below:

| Cut-off date for claims agreement | Transfer notice deadline | Payment date (on or around) | Unsecured creditors 'Catch up' dividend | Client Money claimants 'Catch up' distribution |
|---|---|---|---|---|
| 30-Aug-13 | 30-Aug-13 | 27-Sep-13 | ✓ | ✓ |
| 27-Sep-13 | 27-Sep-13 | 31-Oct-13 | ✓ | ✓ |
| 31-Oct-13 | 31-Oct-13 | 29-Nov-13 | ✓ | ✓ |
| 29-Nov-13 | 29-Nov-13 | 20-Dec-13 | ✓ | ✓ |
| 20-Dec-13 | 20-Dec-13 | 31-Jan-14 | ✓ | ✓ |
| 31-Jan-14 | 31-Jan-14 | 28-Feb-14 | ✓ | ✓ |
| 28-Feb-14 | 28-Feb-14 | 28-Mar-14 | ✓ | ✓ |
| 28-Mar-14 | 28-Mar-14 | 30-Apr-14 | ✓ | ✓ |

Please note that the 29 November 2013 payment date will coincide with the third interim distribution.

# *Appendix D:*
# Court update

Summary of major court proceedings involving LBIE and its Affiliates in the reporting period:

| | | |
|---|---|---|
| **Q2 2013** | **UK High Court** | Court application in connection with LBIE/LBI settlement |
| | **UK Appeal Court** | Judgment dismissing appeal by certain LBIE Affiliates to strike out a Lehman Brothers Pension Scheme trustees reference to the Upper Tribunal to impose liabilities on certain Affiliates |
| | **UK Supreme Court** | Appeal hearing on status of liabilities connected with the Lehman Brothers Pension Scheme deficit |
| | **Hong Kong High Court** | Directions hearing for the Third Party Security Interest application made on behalf of the Liquidators of LBHK |
| | **Luxembourg Court** | Court approval of the LBEF settlement |
| | **US Bankruptcy Court** | Court hearing and approval of the LBIE/LBI settlement |
| **Q3 2013** | **UK Supreme Court** | Judgment on status of liabilities connected with the Lehman Brothers Pension Scheme deficit. The UK Supreme Court held unanimously that the liabilities ranked as provable debts, payable alongside the claims of ordinary unsecured creditors. The orders of the Courts below (that the liabilities ranked as administration expenses) were overturned |

Summary of major court proceedings involving LBIE and its Affiliates in future reporting periods:

| | | |
|---|---|---|
| **Q4 2013** | **UK High Court** | Substantive hearing of the Waterfall Application |
| | | Substantive hearing of Administrators' application for directions regarding the extent of liabilities connected with the Lehman Brothers Pension Scheme |
| | **German Higher Regional Court, Frankfurt** | Hearing in the LBB Client Money proceedings |
| | **Hong Kong High Court** | Further directions hearing for the Third Party Security Interest application made on behalf of the Liquidators of LBHK |
| **Unknown** | **UK Upper Tribunal (Tax and Chancery)** | Reference by LBIE and others to the Upper Tribunal of a determination by the Pensions Regulator to issue an FSD against them (stayed pending outcome of UK Supreme Court case above) |
| | **German Supreme Court** | Appeal by LBB of judgment relating to LBB's counterclaim into LBIE. Currently, there is no indication when LBIE needs to file its submissions, when the German Supreme Court will hear the case and when it will make its decision |

Note that the above tables exclude certain Street counterparty actual or potential litigation which is referred to in Section 5.

# *Appendix E:*
# Statutory and other information

| | |
|---|---|
| **Court details for the Administration:** | High Court of Justice, Chancery Division, Companies Court. Court case number 7942 of 2008 |
| **Full name:** | Lehman Brothers International (Europe) |
| **Trading name:** | Lehman Brothers International (Europe) |
| **Registered number:** | 02538254 |
| **Registered address:** | Level 23, 25 Canada Square, London E14 5LQ |
| **Date of the Administration appointment:** | 15 September 2008 |
| **Administrators' names and addresses:** | AV Lomas, SA Pearson (both appointed 15 September 2008), PD Copley and R Downs (both appointed 2 November 2011) and JG Parr (appointed on 22 March 2013) of PricewaterhouseCoopers LLP, 7 More London Riverside, London SE1 2RT. MJA Jervis and DY Schwarzmann ceased to act on 2 November 2011. DA Howell ceased to act on 22 March 2013 |
| **Appointor's name and address:** | High Court of Justice, Chancery Division, Companies Court on the application of LBIE's directors |
| **Objective being pursued by the Administrators:** | Achieving a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration) |
| **Aims of the Administration:** | Recover and/or realise all House assets, including cash, securities and in-the-money financial contracts, on a managed basis<br>Admit unsecured creditors' claims and make distributions to creditors<br>Recover Client Assets and Client Money, assess the claims to such property and return all such property to its rightful owners on a systematic basis |
| **Division of the Administrators' responsibilities:** | In relation to paragraph 100(2) of Schedule B1 to the Insolvency Act, during the period for which the Administration is in force, any act required or authorised under any enactment to be done by either or all of the Administrators may be done by any one or more of the persons for the time being holding that office |
| **Details of any extensions for the initial period of appointment:** | The UK High Court on 2 November 2011 granted an extension of the Administration to 30 November 2016 |
| **Proposed end of the Administration:** | The Administrators have yet to determine the most appropriate exit |
| **Estimated dividend for unsecured creditors:** | Interim dividends paid to date at a cumulative rate of 68.5%. Creditors are referred to Section 3 for the illustrative range of outcomes |
| **Estimated values of the prescribed part and LBIE's net property:** | The estimated value of LBIE's net property remains uncertain |
| **Whether and why the Administrators intend to apply to court under Section 176A(5) of the Insolvency Act:** | Such an application is considered unlikely |
| **The European Regulation on Insolvency Proceedings (Council Regulation (EC) No. 1346/2000 of 29 May 2000):** | The European Regulation on Insolvency Proceedings does not apply to this Administration as LBIE is an investment undertaking |
| **Creditors' Committee members:** | Lehman Commercial Paper Inc.<br>Ramius LLC<br>GLG European Long Short Fund<br>Lehman Brothers Asia Holdings Ltd |

# *Appendix F:*
# Glossary of terms

| Abbreviation | Term | Definition |
|---|---|---|
| Administration | Administration | UK corporate insolvency process governed by the Insolvency Act 1986 applicable to LBIE following the granting of an administration order dated 15 September 2008 |
| Administrators | Joint Administrators | AV Lomas and SA Pearson were appointed as Joint Administrators of LBIE on 15 September 2008. PD Copley and R Downs were appointed on 2 November 2011. JG Parr was appointed on 22 March 2013. All are licensed in the United Kingdom to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales and are partners of PricewaterhouseCoopers LLP |
| Adviser | Adviser | An adviser retained to assist the Committee in considering the Administrators' remuneration requests |
| Affiliates | Affiliate entities | Various subsidiaries and affiliates of Lehman Brothers Holdings Inc. |
| BarCap | Barclays Capital Inc. | Investment banking business of Barclays Bank PLC |
| Best Claim value | Best Claim value | A customer's claim for the purposes of the Consensual Proposal is the higher of either: the value of the accepting customer's claim on 19 September 2008 (and, for the avoidance of doubt, excluding income accruing after 19 September 2008); and the market value of an accepting customer's claim, including income, on 30 November 2012 |
| Category 2 disbursements | Administrators' Category 2 disbursements | Costs that are directly referable to the Administration but not to a payment to an independent third party. They may include shared or allocated costs that can be allocated to the Administration on a proper and reasonable basis |
| Citibank | Citibank, N.A. | Subsidiary of Citigroup Inc., an LBIE counterparty with significant business relationships governed by various trading and custody agreements |
| Claims Determination Deed | Claims Determination Deed | A standardised legal document for agreeing claims under the Consensual Approach |
| Client Assets | Client Assets | Client securities which LBIE should have held as at 15 September 2008 |
| Client Money | Client Money | Client cash balances held by LBIE as at 15 September 2008 or received thereafter by LBIE and which are in each case subject to the UK FCA's client money rules and/or applicable client money distribution rules |
| CM Determination | Client Money Determination | The Administrators' assessments of the quantum of Client Money Entitlement of a financial trading counterparty based on published principles |
| CME | Client Money Entitlement | The entitlement to receive a distribution from the pre-Administration Client Money pool |
| Committee | Creditors' Committee | Creditors voted to represent the general body of creditors of LBIE to assist the Administrators in discharging their functions set out in the Insolvency Act 1986 |
| Common Terms | Common Terms | Common terms between LBIE and consenting beneficiaries to the Consensual Proposal |
| Consensual Approach | Consensual Approach | A framework developed for the expedient resolution of the unsecured claims of financial trading counterparties |
| Consensual Proposal | Consensual Proposal | Proposal to LBI Omnibus claimants to settle on a consensual basis their claims in respect of securities and/or cash positions. In settlement of the claims, each customer which is a party to the Consensual Proposal will be entitled to have allocated to it a share of the proceeds of the securities and cash received by LBIE from LBI and potentially to have a shortfall claim against LBIE in limited circumstances |
| COO | Chief Operating Officers | Functions responsible for managing the operations of the organisation, allocating resources and supporting the other teams within the operating model |
| CRA | Claim Resolution Agreement | The claim resolution framework which governs the return of Client Assets. The CRA was proposed by the Administrators to clients in November 2009 and was accepted by over 90% of eligible Client Assets claimants |
| Customer Property | Customer Property as defined in SIPA | A combination of claims to securities and certain cash amounts relating to securities, as defined in SIPA |
| ETD | Early Termination Date | As defined in the close-out provisions of the standard ISDA documentation |
| Extended Liens | Extended Liens | Assertion by certain Affiliate claimants to benefit from the rights conferred on LBIE to assert lien and other security entitlements over securities held by LBIE on behalf of other Affiliates, in order for the Affiliate claimants to recover debts owed to them by other Affiliates |
| FCA | Financial Conduct Authority (previously the Financial Services Authority) | Regulator of providers of certain financial services in the UK, name change with effect from 1 April 2013 |

| Abbreviation | Term | Definition |
| --- | --- | --- |
| General Estate | General Estate as defined in SIPA | Claims to a certain pool of assets available to satisfy general non-Customer Property creditors' claims including any potential deficiencies in Customer Property claims |
| HMRC | HM Revenue & Customs | Organisation of the UK Government primarily responsible for the collection of taxes |
| House Estate (also referred to as House) | House Estate | Dealings that relate to LBIE's general unsecured estate |
| Insolvency Act | Insolvency Act 1986 | Statutory legislation that provides the legal platform for matters relating to personal and corporate insolvency in the UK |
| Insolvency Rules | Insolvency Rules 1986 | Statutory rules that provide the legal platform for matters relating to personal and corporate insolvency in the UK |
| ISDA | International Swaps and Derivatives Association | Global trade association for OTC derivatives and maintainers of the industry standard ISDA documentation |
| LB Lux | Lehman Brothers (Luxembourg) S.A. | Affiliate entity subject to insolvency proceedings in Luxembourg |
| LBB (also referred to as Bankhaus) | Lehman Brothers Bankhaus A.G. | Affiliate entity subject to insolvency proceedings in Germany |
| LBEF | Lehman Brothers (Luxembourg) Equity Finance S.A. | Affiliate entity subject to insolvency proceedings in Luxembourg |
| LBF | Lehman Brothers Finance S.A. (Switzerland) | Affiliate entity subject to insolvency proceedings in Switzerland |
| LBHI | Lehman Brothers Holdings Inc. | Ultimate parent of the Lehman group, incorporated in the US and formerly subject to Chapter 11 bankruptcy protection from 15 September 2008. The Plan of Reorganisation became effective on 6 March 2012 |
| LBHI2 | LB Holdings Intermediate 2 Limited | Affiliate entity subject to insolvency proceedings in the UK |
| LBHK | Lehman Brothers Hong Kong | Collective group of affiliate entities subject to insolvency proceedings in Hong Kong: Lehman Brothers Asia Holdings Ltd, Lehman Brothers Commercial Corporation Asia Ltd, Lehman Brothers Asia Capital Company Ltd, Lehman Brothers Securities Asia Ltd, Lehman Brothers Futures Asia Ltd, Lehman Brothers Asia Ltd and Lehman Brothers Nominees (H.K.) Ltd |
| LBI | Lehman Brothers Inc. | US broker-dealer affiliate entity, incorporated in the US which entered SIPA trusteeship on 19 September 2008 |
| LBIE (also referred to as the Company) | Lehman Brothers International (Europe) – In Administration | Private unlimited UK subsidiary of LBHI, acting as its main European broker dealer, subject to an administration order dated 15 September 2008 |
| LBIE Determination | LBIE Determination | Value of eligible unsecured claim determined by LBIE, derived from LBIE's own valuation methodology |
| LBJ | Lehman Brothers Japan Inc. | Affiliate entity subject to insolvency proceedings in Japan |
| LBL | Lehman Brothers Limited | UK service entity for the Lehman Administration Companies. LBL was placed into Administration on 15 September 2008 |
| LBS | Lehman Brothers Securities N.V. | Affiliate subject to insolvency proceedings in Curaçao, Kingdom of the Netherlands |
| LBSF | Lehman Brothers Special Financing Inc. | Affiliate entity subject to insolvency proceedings in the US |
| Non-Consenting beneficiaries | Non-Consenting beneficiaries | Potential beneficiary under the Omnibus Settlement Agreement whose offer has yet to be accepted by LBIE |
| Omnibus Customer claim (also referred to as the Omnibus claim) | Omnibus Customer claim | Element of LBI SIPA Customer Property claim relating to LBIE client positions |
| Omnibus Trust | Omnibus Trust | Trust under which the asset returns to LBIE by LBI of SIPA Customer Property relating to LBIE client positions are held and the assets constituting the Trust Property thereof |
| OTC | Over-the-counter | A market in which securities, or other financial products, are traded by direct dealer-to-dealer communications |

| Abbreviation | Term | Definition |
|---|---|---|
| Over-Claims | Over-Claims | Proprietary claims made for or in respect of securities in an amount which exceeds the amount which appears as the claim entitlement to securities of that type as documented in LBIE's books and records |
| Proof of Debt (also referred to as POD) | Proof of Debt or Statement of Claim | A formal document prescribed by the Insolvency Rules 1986 submitted to the Administrators by a creditor wishing to prove their claim. The form is made in writing or electronically under the responsibility of a creditor and signed by an authorised person |
| SCSO | Small Claims Settlement Offer | An initiative for creditors with agreed claims up to £150,000 to be offered a one-off payment of 90% of their agreed claim in full and final settlement |
| Section 75 liability or claim | Section 75 liability or claim | Section 75 of the Pensions Act 1995 provides that where a defined benefit pension scheme has insufficient assets to meet its liabilities and a 'relevant event' occurs, such as commencement of an insolvency procedure, then a debt in the amount of the deficiency becomes due from the employer to the trustees of the pension scheme |
| Shareholder(s) | Shareholder(s) of LBIE | LBL and/or LBHI2 |
| SIP 9 | Statement of Insolvency Practice 9 | Rules issued by the Joint Insolvency Committee which provide guidance to insolvency practitioners and creditors' committees in relation to the remuneration of, *inter alios*, administrators |
| SIPA | Securities Investor Protection Act 1970 | A US legal proceeding for handling the liquidation of a broker-dealer |
| Street | Street counterparties | Third party counterparties consisting of financial institutions, including asset managers, custodians and banks; and non-banking financial institutions, including pension funds and corporate entities |
| Street Creditors | Street Creditors | Unsecured creditors with financial trading claims without Client Assets |
| Tracing | Tracing | Identification of unsegregated Client Money (or its substitute) within the House Estate |
| Trust Estate | Trust Estate | Refers to both Client Assets and Client Money |
| Trust Property | Trust Property | Refers to both Client Assets and Client Money |
| UK Appeal Court | Court of Appeal of England and Wales | The second most senior court in the English legal system for civil cases. Permission to appeal is required, either from the lower court or the Court of Appeal itself |
| UK High Court | High Court of England and Wales | Court of England and Wales which deals with all high value and high importance cases, and also has a supervisory jurisdiction over all subordinate courts |
| UK Supreme Court | Supreme Court of the United Kingdom | This is the court of last resort and highest appellate court in the United Kingdom for civil cases |
| VAT | Value Added Tax | A consumption tax levied on the sale of goods and services in the UK |
| Waterfall Application | Waterfall Application | A joint application by LBIE, LBL and LBHI2 to the UK High Court issued on 14 February 2013 seeking a determination on statutory interest priority, contribution rights and other issues relating to LBIE and its Shareholders |

www.pwc.co.uk/lehman

© 2013 PwC. All rights reserved. Not for further distribution without the permission of PwC.
"PwC" refers to the network of member firms of PricewaterhouseCoopers International
Limited (PwCIL), or, as the context requires, individual member firms of the PwC network.
Each member firm is a separate legal entity and does not act as agent of PwCIL or any other
member firm. PwCIL does not provide any services to clients. PwCIL is not responsible or
liable for the acts or omissions of any of its member firms nor can it control the exercise of
their professional judgment or bind them in any way. No member firm is responsible or liable
for the acts or omissions of any other member firm nor can it control the exercise of another
member firm's professional judgment or bind another member firm or PwCIL in any way.

131007-141958-JH-UK

