# EXHIBIT E

# *Lehman Brothers International (Europe) – In Administration*

## Joint Administrators' twelfth progress report for the period from 15 March 2014 to 14 September 2014

*10 October 2014*



## *Important notice*

Creditors will note that this report provides data relating to certain estimated future costs, recoveries and Senior unsecured creditor claim amounts. Please note that there continue to be significant matters which remain unresolved that may materially impact any or all of these estimates and, in turn, the overall return for LBIE creditors. Furthermore, for reasons of commercial sensitivity, confidentiality and/or legal privilege, the Administrators are unable to provide detailed commentary on certain of these matters.

On page 7 of this report, the Administrators have set out an updated illustrative range of the amount of surplus funds likely to be available after payment in full of the Senior unsecured claims of creditors. The precise amount of that surplus remains uncertain. The rights of Senior and subordinated creditors, including Subordinated Debt holders, to share in the eventual surplus remain to be determined.

The Administrators reserve all rights concerning the relevance and calculation of all claims against the LBIE estate that might eventually share in the surplus. No conclusion should be drawn or inferred from this report as to the way in which such claims will eventually be assessed.

**The Administrators continue to caution creditors against using data in this report as a basis for estimating the value of their claims or their likely eventual entitlement to payment from the surplus. LBIE, the Administrators, their firm, its members, partners and staff and advisers accept no liability to any party for any reliance placed upon this report.**

LBIE also expressly reserves all of its rights against third parties on all matters and no conclusion should be drawn by third parties as to LBIE's position or legal arguments on any such matters from references made in this report.

Whilst amounts included in this report are stated in sterling, certain elements of LBIE's assets continue to be denominated in currencies other than sterling.

This report includes various defined terms as set out in the updated glossary of terms in Appendix E.

# *Contents*

**Section 1:**      *Purpose of the Administrators' report*                                              *4*

**Section 2:**      *Executive summary and financial update*                                          *5*

**Section 3:**      *Counterparty resolution (including Affiliates)*

**Section 3.1:**    *House receivables*                                                                       *10*

**Section 3.2:**    *Senior unsecured creditors*                                                          *13*

**Section 4:**      *Future costs of the Administration and priority claims*              *18*

**Section 5:**      *Trust Estate*

**Section 5.1:**    *Omnibus Trust*                                                                          *21*

**Section 5.2:**    *Other Client Assets*                                                                   *23*

**Section 5.3:**    *Client Money estate*                                                                  *24*

**Section 6:**      *Surplus entitlements and related UK High Court process*           *26*

**Appendices**

**Appendix A:**    *Receipts and payments: cumulative and 6 months to 14 September 2014*    *30*

**Appendix B:**    *Supplemental schedules*                                                            *39*

**Appendix C:**    *Administrators' remuneration*                                                  *40*

**Appendix D:**    *Statutory and other information*                                              *43*

**Appendix E:**    *Glossary of terms*                                                                    *44*

# *Section 1:*
# Purpose of the Administrators' report

### Introduction

This report has been prepared by the Administrators of Lehman Brothers International (Europe) under Rule 2.47(3) of the Insolvency Rules.

This is the twelfth such formal update to unsecured creditors and it provides details of progress made in the 6-month period 15 March 2014 to 14 September 2014. The statutory receipts and payments accounts for the same period are attached at Appendix A.

Wherever possible, again the Administrators have sought not to duplicate information disclosed to creditors in previous updates and reports. A copy of previous progress reports and other important announcements can be found at *www.pwc.co.uk/lehman*.

The Administrators will host a 1-hour webinar on 29 October 2014, giving creditors an opportunity to hear a summary of the current circumstances of the Administration and to participate in a question and answer session. Details of the webinar will be posted on the above LBIE website.

### Objective of the Administration

The Administrators continue to pursue the statutory objective and specific aims as set out in previous reports and which are summarised at Appendix D.

### Creditors' Committee

The Administrators continue to meet with the Committee to review progress and consult on major issues by way of physical meetings, telepresence or audio conference calls.

The Administrators remain grateful to the members of the Committee for their continuing efforts in support of the Administration.

Details of the Committee members are listed in Appendix D.

### Future report and updates

The next formal progress report to creditors will be in 6 months' time.

In the interim, we will provide ad hoc updates in the event of any material developments concerning entitlements to the surplus or other significant matters through the LBIE website, or by other means as appropriate.

Signed:

*AV Lomas*
Joint Administrator
Lehman Brothers International (Europe)
In Administration

# *Section 2:*
# Executive summary and financial update

## *Overall progress since commencement of the Administration*

Across the House and the Trust Estates c.£34bn of value has now been returned to counterparties, with the potential for further returns of another c.£8-9bn of value ultimately. A fourth interim distribution was paid to Senior unsecured creditors in the period, bringing their dividend to 100p/£1, with a substantial surplus now remaining to be paid to creditors in due course. A comprehensive directions application was made to the UK High Court in the period, representing a significant step towards resolution of the complex, surplus entitlement question.

In addition, 106% of Best Claim values has now been paid to Omnibus Trust beneficiaries, and excess tax reserves of c.$0.9bn primarily held at the IRS have now been released and distributed.

The key cumulative returns to date and total indicative Low and High case final outcome returns are detailed below.

| | | Indicative final outcome | |
| | Returned to date £bn | Low £bn | High £bn |
| --- | --- | --- | --- |
| **House Estate returns[1]** | | | |
| Unsecured claims distributions | 11.52 | 18.50 | 19.95 |
| Overseas creditor settlements | 0.21 | 0.21 | 0.21 |
| **Trust Estate returns – third parties (excluding appropriations)** | | | |
| Client Assets[2] | 14.11 | 14.15 | 14.12 |
| Omnibus Trust | 3.85 | 4.25 | 4.25 |
| Pre-Administration Client Money (including payments in lieu thereof) | 0.06 | 0.08 | 0.08 |
| Post-Administration Client Money[2] | 1.86 | 1.90 | 1.89 |
| **Trust Estate returns – Affiliates (excluding appropriations)** | | | |
| Client Assets | 0.78 | 1.02 | 1.02 |
| Post-Administration Client Money[2] | 1.73 | 1.82 | 1.81 |
| **Total returns** | **34.12** | **41.93** | **43.33** |

1.   'House Estate returns' exclude the Pension Scheme deficit and other potential payments to counterparties included as priority claims.

2.   The Low case is higher than the High case as more appropriations are assumed on the High case basis.

The final outcome returns are indicative and creditors are reminded that such returns represent an estimate only and that significant matters remain unresolved that may materially impact this estimate.

## *Introduction*

The last 6 months have seen the commencement of a shift in the priorities of the Administration. Further good progress has resulted in Senior unsecured claims agreement and collection of House receivables moving towards their final stages, with only a relatively small number of each remaining compared to a year ago. Similarly, Client Assets and Omnibus Trust returns have been progressed materially, with those estates now well on the way towards conclusion, hopefully around mid-2015. Whilst the Client Money estate has also benefited from many more claims being resolved in the period, factors outside of the Administrators' control affecting the BarCap claim also need to be resolved before this estate can be finally closed. Our Surplus Entitlement Proposal circulated 6 months ago and subsequent efforts have not resulted in a consensual resolution. As a result, the alternative route of seeking a judicially-determined outcome was commenced in the period, comprising the Waterfall II Application and the Waterfall I Appeal.

This new phase of the Administration creates uncertainty from a planning perspective with the likely duration of court proceedings being unknown. The Administrators will take all reasonable steps in the intervening period to be in the best position possible to promptly distribute the surplus when the method of calculating individual entitlements is known.

## *Significant developments in the period*

Developments in the period in respect of the 3 most significant matters which will determine the eventual quantum of surplus available after repayment of creditors' Senior unsecured claims against the House Estate were as follows:

### 1.  House receivables (Section 3.1)

We have recovered a further £0.98bn and completed a further 258 Street and Exchanges debtor groups. A number of the largest unresolved debtor positions have been closed out on a negotiated basis, with outcomes marginally below the individual indicative High case estimates overall.

On the largest continuing debtor, AGR, the long-awaited Special Referee's decision was handed down. This has denied LBIE access to some of the material it sought, so an appeal has been made.

Significant progress has been made regarding other third party receivables ahead of the key sixth anniversary of the Administration. Litigation has commenced against a limited number of debtors and standstill arrangements have been entered into with other counterparties, where necessary, whilst negotiations continue to conclude debt recoveries on appropriate terms.

Also in the period, an agreement in principle was reached with LBHI relating mainly to outstanding issues on the LB Lux and LBB estate receivables. Since the period end, this agreement has been executed.

### 2. Senior unsecured creditors (Section 3.2)

The fourth interim unsecured dividend (at a rate of 7.8p/£1), totalling £0.80bn, was paid on 30 April 2014 to 1,509 claimants. Further 'catch-up' dividends of £1.81bn were also paid in the period.

Agreed/admitted claims have increased in number by 285 to 2,683, with the total agreed/admitted claim value increasing by £0.78bn to £11.73bn (excluding CME claims). This reflects increasing engagement via bilateral negotiation, the use of admittance letters for unresponsive claimants and resolving contingent Client Assets shortfall claims.

A further 61 claims (Proofs of Debt totalling £0.23bn) have been rejected in part or in whole, with legal proceedings to vary this decision being commenced by creditors in only a limited number of cases.

Approximately 330 claims remain to be agreed, which in value terms represent c.7% of the indicative High case outcome estimate of total Senior unsecured creditor claims.

The Pension Scheme deficit litigation was consensually settled in the period, with the settlement recently being approved by the Upper Tribunal. The settlement resulted in £0.08bn being payable by LBHI and LBEL, with LBIE contributing an amount expected to be in the region of £0.12bn as a priority claim of the Administration.

There remain frequent and regular UK High Court hearings on various bilateral counterparty issues, including appeals against rejections of Proofs of Debt, with less frequent hearings in other jurisdictions.

### 3. Future costs of the Administration and priority claims (Section 4)

Future Administration costs are estimated at £0.79bn in both the indicative High and Low case outcomes, with further detail provided in Section 4 of this update report.

The forecast costs are based on a series of forward-looking assumptions which may or may not prove valid. The Administrators therefore caution that significant uncertainties remain regarding litigation, other outcomes and timings, which could materially affect the actual future costs that will be incurred in concluding the Administration.

Priority claimants include the potential liability for certain indemnities given post-Administration and other potential claims (including tax provisions) that could crystallise in certain circumstances and be payable by the Administration. The Pension Scheme deficit Proof of Debt value is now being

treated as a priority claim of the Administration rather than as a Senior unsecured claim.

The following further progress has been made towards closure of LBIE's Trust Estate:

### 1. Omnibus Trust (Section 5.1)

The agreement of the US withholding tax treatment for the first Omnibus Trust distribution enabled a release of excess tax reserves held by the IRS, resulting in a 'true-up' gross distribution of a further $0.92bn being paid on 12 June 2014.

A further 'catch-up' gross distribution of $0.32bn was also paid on 12 June 2014 to eligible beneficiaries.

### 2. Other Client Assets (Section 5.2)

A significant number of other returns, including Client Assets released by LBHK, have been achieved in the period, continuing progress towards the cessation of LBIE's custodian activities.

### 3. Client Money estate (Section 5.3)

A further 188 CME counterparties (1,191 to date) have been agreed and resolved.

A second interim Client Money distribution was made at the rate of 25% (48.2% to date), with interim distributions totalling $0.54bn ($0.67bn to date) made to Client Money creditors (of which $0.53bn was paid to LBIE's nominee, as assignee of a large number of CME claims).

The principal impediment to moving forward with plans to finalise the Client Money estate continues to be resolution of the BarCap claim. The US appeal court judgment relating to the litigation between LBI and BarCap was handed down in August 2014 in favour of BarCap and LBI's subsequent application for a retrial was denied on 23 September 2014. At the date of this report, the next steps to be taken by the respective parties in the litigation are unclear. Accordingly, the ultimate impact of this for LBIE remains uncertain and the timing of any resolution to the LBI/BarCap dispute remains outside of LBIE's control.

### Surplus entitlements and related UK High Court process (Section 6)

Following continued engagement with a number of major creditors in the period, the position remains that a consensual compromise solution, in whole or part, to the rights of creditors to Post-Administration Interest and non-provable Currency Conversion Claims is currently unachievable.

As a result, various aspects of the 14 March 2014 Waterfall I Application judgment are now being appealed by several of the parties (including LBIE) and the Waterfall II Application has commenced, seeking answers to 39 questions related to the surplus entitlement issue.

## *Indicative financial outcome*

Set out in the table below is an updated summary of the indicative Low and High case financial outcome scenarios for Senior unsecured creditors. This should be read in conjunction with the narrative and assumptions set out below and elsewhere in this report.

The indicative Low and High case outcomes have increased by £1.44bn and £0.40bn, respectively, since our previous report, largely due to continued progression in Senior unsecured claims agreement at amounts below their originally claimed Proof of Debt values and release of Senior unsecured claim reserves related to Client Assets claimant creditors, together with certain improved assumed House receivables.

| Page | House Estate | Low £bn | High £bn | Difference £bn |
|---|---|---|---|---|
| 30 | Cash deposits and government bonds | 6.51 | 6.51 | - |
| 30/33 | Add back: interim dividends paid (£11.52bn) and accrued (£0.21bn) to date | 11.73 | 11.73 | - |
| | | 18.24 | 18.24 | - |
| | **Projected movements** | | | |
| 24 | Net Client Money benefit to the House Estate | 0.88 | 0.93 | 0.05 |
| 10 | House receivables | 0.84 | 1.72 | 0.88 |
| 39 | House securities | 0.03 | 0.05 | 0.02 |
| 18 | Future estimated costs | (0.79) | (0.79) | - |
| 19 | Priority claims | (0.70) | (0.20) | 0.50 |
| | | 0.26 | 1.71 | 1.45 |
| | **Funds available for Senior unsecured creditors** | **18.50** | **19.95** | **1.45** |
| 13 | Senior unsecured creditors | (13.56) | (12.56) | 1.00 |
| | **Surplus before Post-Administration Interest, Subordinated Debt and other non-provable claims** | **4.94** | **7.39** | **2.45** |

As the difference between the indicative Low and High case scenarios has reduced further, so too has the scope for the eventual outcome to be materially outside of this range.



The key sensitivities to the eventual quantum of the Administration surplus are:

- the amount at which the remaining Senior unsecured creditor claims are finally determined;

- the outcome of receivables negotiations and litigation, notably with AGR which accounts for more than 60% of the current indicative outcome range between the Low and High case scenarios for House receivables;

- the ability of the Administrators to mitigate or eliminate priority claims; and

- the level of future costs in the Administration.

Creditors should note that their individual entitlement to share in any surplus is likely to depend upon the timing of distributions made to them, the nature of their underlying contracts and the terms of any agreements with LBIE that were entered into by the creditor post-Administration.

## Priorities in the remainder of 2014 and into 2015

The Administrators' priorities going forward are:

- the progression of the Waterfall I Appeal and Waterfall II Application in the most open, collaborative and efficient way possible, avoiding unnecessary costs and delay and the regular reappraisal of creditors' appetite for a consensual compromise surplus entitlement solution;

- the agreement and admittance of remaining, unresolved Senior unsecured claims and the diligent legal defence of claims that we consider are invalid;

- the diligent litigation of contested debtors;

- the finalisation and distribution of remaining Trust Estate entitlements including resolution of outstanding US withholding tax issues for the affected Omnibus Trust and unsecured claimant populations; and

- the ongoing simplification of Administration operations, driving cost reduction.

## Investment and currency policies

Our investment policies continue to focus on keeping the estates' funds secure, utilising a combination of money market deposits and securities where appropriate. During the period, the Administrators continued their hedging strategy, now largely related to the US dollar/euro to sterling currency risk represented by the expected pre-Administration Client Money funds which will transfer into the House Estate in due course.

The foreign currency holding in the House Estate has reduced significantly to £0.02bn (equivalent) compared to its reported peak since the commencement of the Administration of £6.74bn (equivalent) in the third progress report. The foreign currency holding in the pre-Administration Client Money estate is currently £0.46bn (equivalent).

# *Section 3:*
# Counterparty resolution (including Affiliates)

# Section 3.1:
# House receivables

## Introduction

Affiliate receivables, previously reported separately, are now reported together with all other LBIE House receivables.

In the period, we have recovered a further £0.98bn and completed a further 258 Street and Exchanges debtor groups. In addition, we have entered into standstill arrangements in order to avoid potential time-barring of claims governed by English law.

The future House receivables recoveries referred to below are indicative only and creditors are reminded that such recoveries represent an estimate only and that significant matters remain unresolved that may materially impact this estimate.

## Progress

Debtor receipts and securities recovered in the period, together with indicative future recoveries, are shown below.

| | Indicative future recoveries | |
| --- | --- | --- |
| | Low £bn | High £bn |
| Reported as at 14 March 2014 | 1.34 | 2.65 |
| **In the period** | | |
| **Recoveries** | | |
| Affiliates | (0.42) | (0.42) |
| Omnibus Trust appropriations/assignments | (0.17) | (0.17) |
| Other Client Assets appropriations/cash[1] | (0.10) | (0.10) |
| Street counterparties and Exchanges | (0.29) | (0.29) |
| | **(0.98)** | **(0.98)** |
| **Revisions[2]** | | |
| Affiliates | 0.09 | 0.04 |
| Client Assets claimant debtors | 0.14 | 0.04 |
| Street counterparties and Exchanges | 0.25 | (0.03) |
| | **0.48** | **0.05** |
| **Debtors at 14 September 2014** | **0.84** | **1.72** |

1. Includes £0.04bn of realised proceeds on the US dollar to sterling hedge.
2. Revisions in the period relate to updated estimates for indicative future recoveries since March 2014.

Continued progress was made by the Administrators to recover and negotiate debts owed to LBIE by Affiliate and non-Affiliate counterparties. A total of £0.98bn in cash and securities was received in the period and total indicative future recoveries of £0.84bn and £1.72bn are estimated in the Low and High cases, respectively.

### Affiliates

Recoveries from Affiliates included:

- £0.16bn received from LBHI as LBIE's share of distributions from the LB Lux estate;

- £0.12bn released to House from segregated cash relating to LBB;

- £0.06bn received from LBHK;

- £0.05bn of further distributions from MCF and LBSF; and

- £0.03bn of excess segregated assets and cash released to House.

The improvement in the indicative Low and High case outcomes mainly arises from higher estimates of future dividends to be paid by Affiliate estates.

### Client Assets claimant debtors

Client Assets claimant debtor recoveries principally related to appropriations and assignments arising from the first 'true-up' and further Omnibus Trust 'catch-up' distributions in the period (see Section 5.1). Other recoveries include £0.04bn of realised net proceeds on the US dollar to sterling hedge.

The improvement in the indicative Low case outcome reflects part resolution of the uncertainty over US withholding tax treatment relating to Omnibus Trust distributions. Additionally, no further recovery from the foreign exchange hedge was assumed in the previous indicative Low case outcome reported at 14 March 2014.

### Street counterparties and Exchanges

During the last 6 months, a total of 251 Street debtor groups and 7 Exchanges groups were completed. Of the groups that settled, highlights included settlement with:

- a single counterparty paying £0.08bn;

- a German asset manager paying £0.07bn in respect of a debt for which early stage recovery proceedings had been commenced in the UK High Court;

- an investment management division of a large German bank paying a combination of cash and securities totalling £0.04bn;

- a UK-based international bank and a major US bank paying in aggregate £0.02bn; and

- a European Exchanges group paying £0.01bn.

The Street debtor collection strategy has concentrated on those counterparties with the majority of the remaining value. This included implementing detailed escalation plans for a number of the remaining debtor groups to progress them to settlement, or, where necessary, litigation.

Additional resource was dedicated to concluding our review of smaller value positions to determine whether or not further sums were due. In a number of cases, additional amounts were claimed and pursued in accordance with our escalation policy.

The improvement in the indicative Low case outcome reflects the recovery of debts subject to litigation or overseas jurisdictions previously considered uncertain, and updated estimates reflecting the progress in negotiations with key outstanding debtors.

### Indicative outcome

House Estate debtors as at 14 September 2014 are set out below.

| | Rec'd in period £bn | Indicative future recoveries | |
|---|---|---|---|
| | | Low £bn | High £bn |
| **Street counterparties & Exchanges** | | | |
| AGR | - | - | 0.54 |
| LBIE Seoul Branch | - | 0.16 | 0.19 |
| LBIE Zurich Branch | - | 0.02 | 0.04 |
| In litigation | 0.07 | - | 0.03 |
| Standstill agreements | - | 0.16 | 0.20 |
| Other debtors | 0.22 | 0.05 | 0.05 |
| **Total Street & Exchanges** | **0.29** | **0.39** | **1.05** |
| **Affiliates** | | | |
| MCF | 0.03 | 0.12 | 0.22 |
| LBHK | 0.06 | 0.05 | 0.08 |
| LB Lux | 0.16 | 0.07 | 0.07 |
| LBB | 0.12 | 0.04 | 0.05 |
| Others | 0.05 | 0.09 | 0.14 |
| **Total Affiliates** | **0.42** | **0.37** | **0.56** |
| **Client Assets claimant debtors** | | | |
| Omnibus Trust appropriations/assignments | 0.17 | 0.05 | 0.05 |
| Other recoveries | 0.10 | 0.01 | 0.03 |
| **Total Client Assets claimant debtors** | **0.27** | **0.06** | **0.08** |
| **Tax assets** | **-** | **0.02** | **0.03** |
| **Debtors at 14 September 2014** | **0.98** | **0.84** | **1.72** |

### Street counterparties and Exchanges

#### AGR

Various information relating to this disputed receivable is available on the New York Supreme Court file (case number 653284/2011).

LBIE had previously issued a motion to compel AGR to disclose certain documents relating to AGR's third party advisers which were withheld from discovery by AGR in the New York court proceedings. On 28 August 2014, the court-appointed Special Referee's report and recommendations were filed in relation to this motion. The Special Referee recommended that documents relating to one of the advisers be disclosed. The Administrators lodged a motion to challenge the recommendation that the remaining documents be

withheld. AGR opposed LBIE's motion and has challenged the recommendation that any documents be disclosed. The New York Supreme Court will consider the Special Referee's report and the submissions of each party before making a ruling.

In the meantime, LBIE is seeking to progress other aspects of the case in parallel. A revised scheduling order, which sets out the principal next steps and timescales in the litigation, has recently been approved by the court. The scheduling order provides for the completion of fact discovery and the exchange of expert reports in early 2015. The scheduling order currently extends the timescale for dispositive motions through to September 2015, following which a trial date will be set. Accordingly, the timing of the eventual outcome of this litigation remains uncertain.

The indicative Low case outcome assumes nil recovery and the indicative High case outcome assumes full recovery of the filed claim amount (£0.54bn sterling equivalent of the US dollar denominated filed claim). Creditors are reminded that the eventual sum recovered could be anywhere within this range.

#### LBIE Seoul Branch

The liquidators have settled the majority of the unsecured creditor claims in the period, with only 2 disputed Affiliate claims (principally relating to LBF) yet to be resolved, and have continued to work to expedite the return of the remaining funds. Funds have continued to be held in the local branch pending their return to LBIE's House account.

Shortly after the period end, an audit of the branch accounts was completed enabling a repatriation of £0.03bn to be received by LBIE on 24 September 2014 from the funds held by the liquidators of the branch.

It is expected that the remaining forecast recoveries from the branch will be repatriated to LBIE upon resolving the disputed Affiliate claims and subsequent completion of the liquidation, the timing and quantum of which is dependent upon the resolution of regulatory compliance and receiving final local tax clearance.

#### LBIE Zurich Branch

The LBIE Zurich branch is in a liquidation process and surplus funds remain held in the Swiss jurisdiction pending local clearances being obtained. All known creditors have been paid in full by the liquidators, other than a single claimant from whom payment details are awaited.

LBIE has engaged with the local regulator to seek to agree the repatriation of the balance of funds held once the liquidation is completed. Discussions are ongoing to seek to satisfy the regulators' requirements.

### In litigation

A debt at the early stages of litigation was settled in the period.

There are currently 3 ongoing debtor litigation actions (excluding AGR) subject to UK or Greek court jurisdiction.

### Standstill agreements

15 September 2014 marked the 6-year anniversary of the Administration, which meant that certain claims could arguably be time-barred under English law after that date.

To protect the ability of LBIE to continue to pursue debts beyond this date, 11 separate standstill agreements have been entered into with unsettled debtor groups.

### Other debtors

Settlement with a Taiwanese Exchanges debtor has resulted in £0.05bn being remitted to LBIE's account in Taiwan in the period. These funds were repatriated shortly after the period end, net of associated costs.

## Affiliates

### MCF

A further distribution of £0.02bn on LBIE's £0.60bn claim has been received since the period end. The timing and quantum of future recoveries depend upon the realisation of value from the assets controlled by MCF, over which LBIE has only limited influence.

LBIE is continuing to explore alternative strategies to maximise and accelerate recovery of value from this claim.

### LBHK

Outstanding recoveries are expected to be received by the end of the first half of 2015.

### LB Lux

An agreement in principle was reached with LBHI, whereby LBIE will recover $0.12bn as its final share in the proceeds of the Luxembourg estate. Since the period end, this agreement has been executed.

### LBB

An agreement in principle was reached with LBHI as a precursor to LBIE supporting an overall resolution of the LBB estate, in a manner which deals appropriately with the particular issues that relate to creditors in LBB who have some or all of their claims guaranteed by LBHI. It is anticipated that this agreement will accelerate distributions from LBB to LBIE in respect of the LBIE House claim. Since the period end, this agreement was executed and a first distribution from LBB is expected by the end of 2014.

### Others

The majority of other future recoveries relate to estimated dividends on LBIE's $0.90bn claim into LBSF, in respect of which a distribution of $0.02bn has been received since the period end, and to the recovery of residual amounts due under the settlement agreement with LBF.

## Client Assets claimant debtors

The remaining Client Assets claimant debtors on an indicative Low case outcome principally comprise Omnibus Trust Non-Consenting beneficiaries and ineligible consenting beneficiaries. These are expected to settle once the US withholding tax treatment is resolved with the IRS.  In addition, there are 2 debtors with pending deed executions for whom collateral is held which will be appropriated.

The indicative High case outcome also includes assumed additional recoveries from debts that are subject to litigation in a German court jurisdiction.

# *Section 3.2:*
# Senior unsecured creditors

## *Introduction*

Certain cumulative financial information in this report section includes Affiliates data that was presented separately in previous Administration progress reports.

In the period, £0.78bn of unsecured claims (original Proofs of Debt totalling £1.11bn) was agreed and admitted for dividend, bringing the total admitted unsecured claims to £11.73bn. Approximately 330 other claims with Proofs of Debt totalling £1.83bn still remain to be agreed.

### Fourth interim dividend and monthly 'catch-up' dividends

On 28 February 2014, creditors were formally notified of the 28 March 2014 deadline for admission of claims for inclusion in the fourth interim distribution. As required by the Insolvency Rules, a notice of declaration of a dividend was sent on 23 April 2014 to all creditors that had proved their debt. For all claims on which the Administrators had yet to make a determination, a reserve of £3.70bn was made in determining the fourth interim dividend amount of 7.8p/£1 (cumulative dividend amount of 100p/£1).

On 30 April 2014, the fourth interim distribution (£0.80bn) was paid. Monthly 'catch-up' dividends (£1.81bn) were also paid in the period as further claims were admitted, bringing cumulative dividends paid to 14 September 2014 to £11.52bn.

There will continue to be a monthly cut-off and 'catch-up' dividend payment programme for eligible Senior unsecured claims yet to receive distributions.

## *Indicative outcome*

The estimated range of values for LBIE's Senior unsecured liabilities shown in the table below is indicative only and creditors are reminded that significant matters remain unresolved that may materially impact this estimate.

| Senior unsecured creditors | Admitted /agreed to date[1] £bn | Pending[2] | | Indicative outcome[3] | |
|---|---|---|---|---|---|
| | | Low £bn | High £bn | Low £bn | High £bn |
| **Non-Affiliate creditors** | | | | | |
| Street Creditors | (6.63) | (1.35) | (0.58) | (7.98) | (7.21) |
| Client Assets claimant creditors[4] | (3.95) | (0.25) | (0.11) | (4.20) | (4.06) |
| Other third party creditors | (0.04) | (0.04) | (0.03) | (0.08) | (0.07) |
| **Total non-Affiliate creditors** | **(10.62)** | **(1.64)** | **(0.72)** | **(12.26)** | **(11.34)** |
| SCSO settled claims | (0.03) | - | - | (0.03) | (0.03) |
| **Affiliate creditors** | **(1.08)** | **(0.19)** | **(0.11)** | **(1.27)** | **(1.19)** |
| **Total** | **(11.73)** | **(1.83)** | **(0.83)** | **(13.56)** | **(12.56)** |

1. 'Admitted/agreed to date' includes claims agreed by Claims Determination Deeds and partial admittance letters where in certain cases legal challenge has been initiated by creditors on the balance of their Proof of Debt. The balance is included as a pending claim.

2. Proofs of Debt relating to pending claims total £1.83bn.

3. The indicative outcome includes the total value of the claims admitted to date and the indicative Low/High case value of pending claims.

4. 'Client Assets claimant creditors' includes pending unsecured claims arising from Client Assets shortfalls.

### Pending claims assumptions

For all compliant Proofs of Debt received by the Administrators where the claim has not yet been admitted or formally rejected and the rejection appeal period has passed, the Administrators continue to make an appropriate reserve. Reserves are also made for certain other contingencies.

### *Non-Affiliate creditors*

The indicative Low case outcome assumes the aggregate of the higher of the values of (a) filed Proofs of Debt and (b) LBIE's assessment of the pending claims, combined with certain specific adjustments.

The indicative High case outcome assumes:

(a) claims below a £4m Proof of Debt value will be agreed at £0.07bn in aggregate based on a high level analysis. It assumes CME is assigned, together with general percentage reductions or uplifts (in certain limited cases) being applied to the counterparty's Proof of Debt value. This population comprises 257 claims with a total Proof of Debt value of £0.09bn together with contingent and other claims which have a nil Proof of Debt value;

(b) 50 separate pending claims with individual Proof of Debt values in excess of £4m (£0.87bn in aggregate) remain subject to an ongoing detailed review with specific assumptions made on the eventual claims resolution, leading to an estimated outcome of £0.38bn; and

(c) 14 claims subject to litigation, including damages or compensation claims, reserved at £0.27bn on an overall basis compared to a total Proof of Debt value of £0.67bn. This is also based on a specific assessment.

A minimum of 25% of the Proof of Debt value, for illustrative outcome purposes only, has been reserved for items (b) and (c) above in each case, subject to 2 exceptions for which no value has been attributed.

### *Affiliate creditors*

The indicative Low case outcome assumes the aggregate of the higher of the values of (a) filed Proofs of Debt and (b) LBIE's assessment of the pending claims, combined with certain specific adjustments.

The indicative High case outcome additionally reflects a settlement with 6 entities that are under common control which was executed shortly after the period end, and assumes a specific disputed Client Assets claim is resolved in favour of LBIE.

## Claims agreement: status as at 14 September 2014

The status of non-Affiliate unsecured claims is summarised in the table below.

| Unsecured claimants | No offers made | | | Offers made not agreed[1] | | | Admitted/ agreed claims[2,3] | | | In litigation[4] | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. of PODs | Proof of Debt £bn | LBIE view £bn | No. of offers | Proof of Debt £bn | LBIE offer £bn | No. of deeds | Proof of Debt £bn | Agreed claim £bn | No. | Proof of Debt £bn | No. of PODs/ deeds | Proof of Debt £bn | LBIE view/ offer/ agreed £bn |
| **Where Proofs of Debt have been filed** | | | | | | | | | | | | | | |
| Street Creditors | 114 | (0.42) | (0.04) | 87 | (0.34) | (0.14) | 1,243 | (9.45) | (6.63) | 12 | (0.59) | 1,456 | (10.80) | (6.81) |
| Client Assets claimant creditors | 26 | (0.07) | - | 45 | (0.09) | (0.07) | 420 | (5.04) | (3.95) | 2 | (0.08) | 493 | (5.28) | (4.02) |
| Other third party creditors[5] | 31 | (0.04) | (0.02) | 4 | - | - | 93 | (0.04) | (0.04) | - | - | 128 | (0.08) | (0.06) |
| **Total non-Affiliate creditors** | **171** | **(0.53)** | **(0.06)** | **136** | **(0.43)** | **(0.21)** | **1,756** | **(14.53)** | **(10.62)** | **14** | **(0.67)** | **2,077** | **(16.16)** | **(10.89)** |

1. 'Offers made not agreed' includes 48 claims (in aggregate c.£1m) where CME offers have been made but counterparties are unresponsive. Accordingly, the claims are likely to be included in any application to the UK High Court to finalise the Client Money estate.
2. The admitted population excludes 860 creditors (£0.03bn aggregate value) that have accepted the SCSO. It includes 1 agreed claim (c.£1m) where CME has yet to be finalised.
3. $1.48bn of non-Affiliate Client Money claims has been waived or assigned to LBIE's nominee in exchange for admission as an unsecured claim.
4. Consistent with our previous progress reports, claims 'in litigation' include the £0.10bn difference between BarCap's claim amount and an indemnity for $0.78bn provided by LBI in respect of this claim. The ultimate impact of the BarCap claim for LBIE remains uncertain pending resolution of the LBI/BarCap dispute.
5. 'Other third party creditors' includes 33 admitted preferential creditor claims (totalling <£1m) paid in full relating to certain former branch employees.

The table below summarises the key improvements in the indicative outcome scenarios as compared to 14 March 2014.

| Movements in the period | Proof of Debt £bn | Indicative outcome | |
|---|---|---|---|
| | | Low £bn | High £bn |
| Senior unsecured creditors as at 14 March 2014[1] | (16.49) | (14.45) | (12.81) |
| **In the period** | | | |
| Admitted claims[2] | (0.07) | 0.38 | - |
| Rejections in full/withdrawals | 0.38 | 0.38 | 0.21 |
| New claims submitted[3] | (0.05) | - | (0.02) |
| Amendments to reserves for pending claims | 0.07 | 0.13 | 0.06 |
| **Movement in the period** | **0.33** | **0.89** | **0.25** |
| **Senior unsecured creditors as at 14 September 2014[1]** | **(16.16)** | **(13.56)** | **(12.56)** |

1. Affiliate Proof of Debt values are excluded as certain proofs were materially overstated and not formally revised prior to settlement. The indicative Low and High case outcomes include £1.27bn and £1.19bn, respectively, relating to Affiliate claims.
2. The difference between the indicative Low case outcome movement (£0.38bn) and the difference between the total admitted claim value in the period and corresponding Proof of Debt value (£0.33bn) reflects £0.05bn of admitted claims for which no Proofs of Debt were submitted but for which a reserve of similar value was made as at 14 March 2014.
3. The indicative Low case outcome is net of a £0.05bn release of other reserves for future claims provided at 14 March 2014.

## *Progress*

### Claims agreement

### *Non-Affiliate creditors*

In the period, the Administrators have agreed and admitted 280 claims against the House Estate totalling £0.78bn, for an aggregate amount of £0.33bn less than the associated submitted Proof of Debt values.

#### *Street Creditors*

Bilateral negotiation and Consensual Approach claims agreement processes have continued in the period, in particular:

- 90 offers following bilateral negotiation were issued in the period for £0.33bn (Proofs of Debt of £0.47bn); and

- 189 claims (totalling £0.47bn), including claims with a CME, were agreed and admitted under either the Consensual Approach or pursuant to bilaterally negotiated offers, resulting in a release of reserves totalling £0.34bn.

#### *Client Assets claimant creditors*

In the period, 8 new offers were made to Client Assets claimant creditors, with 64 claims, including those with CME, totalling £0.30bn being agreed and admitted.

Reserves in the indicative Low case scenario relating to 'no offers made' claims (£0.02bn) and LBI Over-Claims (£0.04bn) have been released in the period, reflecting progress in the Omnibus Trust and Client Assets estates significantly reducing LBIE's exposure to potential shortfall claims.

#### *Other third party creditors*

These claims relate to non-financial trading creditors and former overseas branch employees.

In the period, 20 offers totalling less than £0.01bn were made, with 27 claims totalling £0.01bn being admitted.

### *Affiliate creditors*

Of the 18 outstanding Affiliate claims previously reported in the period:

- 5 were admitted for a total of less than £10m;

- 1 was withdrawn and 1 was rejected;

- 6 were agreed with entities under common control and admitted shortly after the period end; and

- 5 remain outstanding.

### Withdrawals and rejections

The focus on seeking consensual withdrawals of invalid claims or, if necessary, formally rejecting such claims has continued. Over the past 6 months, 106 claims (Proofs of Debt totalling £0.22bn) were withdrawn, including the Pension Scheme deficit claim which is now treated as a priority claim of the Administration. Accordingly, as at 14 September 2014, a total of 470 claims had been withdrawn (Proofs of Debt totalling £0.91bn).

In addition, 28 full rejection notices (Proofs of Debt totalling £0.16bn) were issued in the period to claimants that had been unresponsive to withdrawal requests or that had failed to supply requested supporting evidence. None of these rejections were subject to appeal as at 14 September 2014. Consequently, as at 14 September 2014, a total of 197 claims (Proofs of Debt totalling £0.38bn) had been rejected in full and the related rejection appeal period had passed with no ongoing appeal being made.

LBIE has increased the issuance of partial admittance/ rejection letters in circumstances where full rejection was not appropriate. Over the past 6 months, 33 such letters (Proofs of Debt rejected totalling £0.07bn) were issued, with 2 subject to an appeal as at 14 September 2014.

### New claims submitted

The incidence of new claims being submitted is at a very low level with only 20 new claims submitted in the period (Proofs of Debt of £0.02bn) and a claim (Proof of Debt of £0.03bn) previously removed which has been reinstated following further investigation.

### Pending claims (excluding litigation)

#### *Non-Affiliate creditors*

171 creditors have submitted Proofs of Debt totalling £0.53bn for which, due to specific legal, commercial and/or valuation issues, LBIE has not made offers.

136 offers totalling £0.21bn have been made to, but not yet accepted by, claimants. Reasons for non-acceptance include legal disputes, valuation differences and set-off negotiations.

#### *Street Creditors*

Of the 201 unresolved Street claims (Proofs of Debt totalling £0.76bn), 74 claims (Proofs of Debt totalling £0.48bn) are currently subject to detailed bilateral negotiation with bilateral offers being made to 27 claimants and 47 claimants having had no bilateral offer made to date. Of these, further information has been received from 37 claimants which is subject to review. Information is still required from the remaining 10 claimants.

*Client Assets claimant creditors*

The 71 pending claims (Proofs of Debt totalling £0.16bn) include those pending the withdrawal of Proofs of Debt once Client Assets have been returned in full, but also 25 claims of nominal value where CME offers have been made but counterparties are currently unresponsive. Accordingly, these claims are likely to be included in any application to the UK High Court to finalise the Client Money estate.

*Other third party creditors*

The remaining 35 other third party creditor claims (Proofs of Debt totalling £0.04bn) from a value perspective principally relate to 2 overseas branch employees and 1 supplier in respect of which work to finalise LBIE's position is at an advanced stage.

### *Affiliate creditors*

Of the 11 outstanding Affiliate creditor claims, as discussed above, 6 were settled shortly after the period end.

Of the 5 remaining claims:

- 2 have been agreed in principle and are expected to be settled shortly; and

- 3 remain in negotiation with the counterparties and are expected to be settled by early 2015.

### Litigation

Claims 'in litigation' currently subject to UK or overseas based legal proceedings are summarised below.

| Type of claim[1] | Jurisdiction | No. | Proof of Debt £bn |
|---|---|---|---|
| Damages/compensation[2] | UK | 4 | (0.40) |
| LBI/BarCap[3] | US | 1 | (0.10) |
| Debtor recovery | UK/US | 3 | (0.05) |
| Other | UK | 6 | (0.12) |
| **Total** | | **14** | **(0.67)** |

1. Of the 14 litigation claims, 9 arise from appeals against rejections of claims by LBIE.

2. Claims relate to alleged fraudulent misrepresentation, negligent/false misstatements, indemnification and other issues.

3. See note 4 to the table at the top of page 14.

In the period, 2 new debt recovery proceedings were commenced by LBIE against debtors who have also submitted a Proof of Debt, offset by 2 debtor litigation Proofs of Debt reported as at 14 March 2014 being rejected in the period with no rejection appeal being made. In addition, 2 disputes previously reported were settled in the period including the Pension Scheme deficit claim (see below).

4 creditors with Proofs of Debt totalling £0.07bn appealed the Administrators' rejection of their claims to the UK High Court in the period with 1 claimant subsequently withdrawing its appeal. This results in a total of 9 ongoing appeals relating to Proofs of Debt totalling £0.41bn including 4 damages-related claims which comprise the majority of this total. Court proceedings are ongoing but may be subject to lengthy timelines for resolution, particularly if subject to appeal.

The claims process to finalise all remaining unresolved claims may ultimately require further court adjudication where the remaining unresolved parties cannot negotiate mutually agreeable resolutions.

The current status of legal proceedings relating to Affiliates is set out below.

### *Subordinated Debt claims against LBIE and contribution claims against Shareholders*

There has been limited engagement with LBIE's Shareholders in the period and in particular with LBL to advance its inbound claim, where an agreed reconciliation of the balances due and owing between LBIE and LBL has not yet been finalised.

There are interlinking issues impacting the determination of the claims relating to both Shareholders, their ranking in the eventual returns to creditors and the rights between the Shareholders themselves. Most of these issues will be considered in the Waterfall I Appeal and Waterfall II Application and their eventual resolution is expected to coincide with the resolution of the complex, surplus entitlement question.

***Lehman Brothers Pension Scheme deficit claim settlement***

As previously reported, the Pension Scheme had filed a deficit claim of £0.12bn against LBIE, as well as against various other Affiliates; this amount is equivalent to the claim brought against the main Pension Scheme employer under Section 75 of the Pensions Act 1995. In co-operation with the Pension Scheme trustees, the Pensions Regulator has sought to issue an FSD against LBIE and certain other Affiliates, including LBHI, which had granted a guarantee of the Pension Scheme's liabilities some months prior to the Lehman bankruptcy. The Section 75 liability was calculated as at 15 September 2008 and does not represent the current amount required to discharge all pension promises in full, which is significantly in excess of this amount.

At various times since 15 September 2008, LBIE and certain other targeted Affiliates have taken steps to have the UK courts determine whether or not they should be subjected to an FSD, in what amount and with what priority ranking.

As previously reported, a series of separate UK court processes have decided that, in the event that LBIE is ultimately found to be a valid target for an FSD, then:

- any claim ultimately made against LBIE will rank as a provable, unsecured claim (decided in the UK Supreme Court); and

- the maximum quantum of claim that can be made against LBIE (or any other targeted Affiliate) is the amount of the Section 75 liability. However, the Pension Scheme trustees are entitled to recover more than this amount in aggregate from its various targets (decided in the UK High Court).

LBIE, together with other relevant Affiliates, has defended the Pensions Regulator's attempt to target it with an FSD. The Pensions Regulator's Determinations Panel determined that an FSD should be issued, but this decision was referred to the Upper Tribunal, where a full hearing was scheduled to be heard in February 2015.

LBIE's concern throughout has been that as a UK registered company, being the largest, most significant and most valuable target entity, formerly utilising the largest proportion of the UK Lehman labour force, it could become the primary target for recovery actions, possibly ultimately having to bear primary responsibility and thereafter having to seek contribution claims against its fellow Affiliates with many of which it had already reached all-encompassing, past and future claims settlements.

As a result of these uncertainties, over the past 24 months LBIE has developed settlement discussions with certain of its Affiliates. These negotiations ultimately proved successful with the resulting settlement being consented to by the Upper Tribunal on 18 August 2014. LBHI and LBEL have contributed £0.03bn and £0.05bn, respectively, towards the Pension Scheme deficit and LBIE will pay the balance, which is expected to be in the region of £0.12bn.

Negotiations are underway to purchase a bulk annuity policy with a third party insurance company, at which point the precise quantum of LBIE's own contribution will be determined. LBIE's contribution will be paid as a priority claim of the Administration rather than as a Senior unsecured claim as shown in previous reports and, as a result, no further sums will be payable in respect of this claim after the bulk annuity policy has been arranged. Steps have been taken to hedge the deficit valuation risk, on an appropriate basis, over the period between settlement agreement and annuity purchase.

# *Section 4:*
# Future costs of the Administration and priority claims

## *Introduction*

On a calendar year basis, the Administrators prepare a detailed annual cost budget and a long-term forecast estimating the costs to complete the Administration. These forecasts are reviewed and updated at 6-monthly intervals and are referred to below. Receipts and payments included at Appendix A are reported for 6-monthly periods ended 14 September and 14 March.

The Administrators caution that significant uncertainties remain regarding the Waterfall I and II court processes, counterparty litigation and other outcomes and timings, which could materially affect future Administration costs.

## *Future estimated costs at 14 September 2014*

|  | Low £bn | High £bn |
|---|---|---|
| Reported as at 14 March 2014[1] | (0.95) | (0.95) |
| **In the period** | | |
| Costs incurred[2] | 0.15 | 0.15 |
| Movements in creditors and accruals | 0.01 | 0.01 |
| **Costs paid in the period** | **0.16** | **0.16** |
| **Future estimated costs at 14 September 2014[3]** | **(0.79)** | **(0.79)** |

1.  Future cost estimate as at 1 January 2014.
2.  Actual costs incurred in the 6 months to 30 June 2014.
3.  Future cost estimate as at 1 July 2014.

### Key assumptions

The key assumptions underlying the cost estimate are that:

*   the majority of counterparties will be resolved on a consensual basis by the end of 2014;

*   a certain amount of litigation will be required to resolve those outstanding debtor and creditor counterparty relationships which are not concluded in 2014;

*   an extended litigation appeal process will be required to settle the surplus entitlement resulting in a final UK Supreme Court judgment;

*   the Trust Estate activities will be completed by mid-2015;

*   support functions and infrastructure will be scaled back, including office floor space at Canary Wharf, in line with the assumed progress of counterparty resolution and operational simplification and the associated human resource reductions; and

*   the core activities of the Administration will enter their 'tail state' by the end of 2016, with completion by 2020.

In the event that extended litigation is not required to settle the surplus entitlement matter, the core activities of the Administration should enter their 'tail state' earlier than the end of 2016.

## *Short-term cost forecast*

In response to a specific creditor request made earlier in the current reporting period, in this report we have set out details of the Administrators' short-term cost forecast for the 6 months ending 31 December 2014, together with comparative actual costs for the 2 preceding 6-month calendar periods. In addition, we have included a summary narrative explaining the key movements between the current and prior period.

The table below provides a summary of the major categories of Administration costs for the current and previous calendar half-year periods and forecast for the next half-year period.

|  | Actual | | Forecast |
|---|---|---|---|
|  | Prior 6 months to 31 Dec 2013 £bn | Current 6 months to 30 Jun 2014 £bn | 6 months to 31 Dec 2014 £bn |
| **Costs** | | | |
| Employee | (0.04) | (0.04) | (0.03) |
| Administrators | (0.07) | (0.07) | (0.06) |
| Legal and professional | (0.01) | (0.02) | (0.02) |
| Building and occupancy | (0.01) | (0.01) | (0.01) |
| Contingency and other | (0.01) | (0.01) | (0.02) |
| **Total** | **(0.14)** | **(0.15)** | **(0.14)** |

### Movements between the current and prior period

### *Employee and Administrators' costs*

The principal drivers of cost are headcount. These costs represented 73% of the total incurred in the current period. The trend of reducing costs reflects the timely release of headcount as Administration tasks are completed. A combination of Lehman employees, fixed term contractors and PwC partners and staff are deployed across the various Administration work streams.

Whilst the type of work activity has continuously changed over the course of the Administration, the volumes (and therefore total headcount) have remained high throughout. A permanent change began at the start of this calendar year, and as the number of remaining unresolved counterparties has materially reduced, we have begun to reduce certain of our human resources (Lehman employees, fixed term contractors and PwC). We anticipate continuing significant reductions through to the second half of 2015, by which time we hope to have resolved all Trust Estate matters and agreed all Senior unsecured claims and debtor balances, other than those which will have required litigation.

Until we have completed our efforts to reach consensual agreement on the outstanding, unagreed Senior unsecured claim amounts, and until we have received the courts' judgments in respect of the Waterfall I and II Applications, the Administration costs outlook beyond the second half of 2015 is particularly uncertain. We have made reasonably prudent assumptions in this regard, in preparing the indicative outcome future costs estimates contained in this report.

### Legal and professional costs

Legal and professional costs comprise the cost of external legal advice together with valuation and other expert advice. The cost trend reflects the increasing incidence of counterparty litigation (potential and actual) together with the court activity associated with the Waterfall I and II Applications.

### Building occupancy and other costs

These costs comprise the real estate, IT and other costs necessary to maintain the operational infrastructure. Over the life of the Administration to date, significant effort has been made to reduce costs to the current level. These costs are forecast to remain largely unchanged in the short term.

## *Priority claims*

Priority claimants include the potential liability for certain indemnities given post-Administration and other potential claims (including tax provisions) that could crystallise in certain circumstances and rank for payment in priority to Senior unsecured creditors. The movements in the period are summarised below, but the principal increase reflects the Pension Scheme deficit Proof of Debt value now being treated as a priority claim rather than as a Senior unsecured claim.

| | Low £bn | High £bn |
|---|---|---|
| Reported as at 14 March 2014 | (0.50) | (0.12) |
| **In the period** | | |
| Lehman Brothers Pension Scheme deficit Proof of Debt (see page 17) | (0.12) | (0.12) |
| Tax provision reassessment | (0.06) | 0.04 |
| Other | (0.02) | - |
| **Movement in the period** | **(0.20)** | **(0.08)** |
| **Priority claims at 14 September 2014** | **(0.70)** | **(0.20)** |

# *Section 5:*
# Trust Estate

# Section 5.1:
# Omnibus Trust

## Introduction

Agreement was reached with the IRS during the period, resolving the US withholding tax treatment of the first (100%) interim distribution from the Omnibus Trust. This agreement enabled the Administrators to make a first 'true-up' distribution to Omnibus Trust claimants where withholding tax reserve adjustments had been made. A further 'catch-up' distribution was also paid in the period to claimants whose claims were not agreed at the time of the first interim distribution. Further such distributions have recently been announced to be paid later in October 2014.

LBIE continues to work with the IRS in respect of additional guidance required on the US withholding tax treatment of distributions in excess of 100% of Best Claim value.

## Progress

### Claims

The total claims in the Omnibus Trust at Best Claim value as at 14 March 2014 comprised $8.53bn of agreed claims value and $0.14bn of claims value (representing 12 counterparties) relating to Non-Consenting beneficiaries.

4 previously unresolved Non-Consenting beneficiaries' claims ($0.12bn Best Claim value) were agreed in the period.

Of the remaining 8 unresolved Non-Consenting beneficiaries ($0.02bn Best Claim value, $0.03bn reserved value), 5 are involved in ongoing negotiations and 3 have claims for zero-valued securities.

### Recoveries

The outstanding recovery from LBI has now been agreed and received in the period following a facilitated mediation.

A small number of mainly illiquid securities remain to be realised or await settlement. Efforts in the period have enabled a revaluation of remaining securities for which c.$0.03bn is now expected to be recovered. $0.01bn of proceeds was received shortly after the period end on 16 September 2014.

## Indicative final outcome

The indicative High case final outcome estimate is summarised below.

| Omnibus Trust | High case final outcome $bn |
|---|---|
| **Recoveries** | |
| Cash in hand[1] | 9.49 |
| Future recoveries | 0.03 |
| | 9.52 |
| **Less** | |
| Bilateral settlement[2] | (0.22) |
| **Available for beneficiaries** | **9.30** |
| Total of beneficiaries' Best Claim values[3] | (8.44) |
| **Gross distribution as a % of claims** | **110.1%** |

1. 'Cash in hand' includes add back of earlier distributions.
2. A bilateral settlement was agreed with a counterparty resulting in the claim return being restricted to 100% of the agreed value.
3. Resolution of valuation disputes in the period with consenting beneficiaries (from prior periods) resulted in a net reduction in Best Claim values of $0.01bn.

The indicative High case final outcome assumes remaining consenting beneficiaries' disputed claims and Non-Consenting beneficiaries' claims are agreed at current Best Claim values and no further direct payments are made relating to tax or other liabilities.

## First 'true-up' distribution and further 'catch-up' distribution

A first 'true-up' distribution of $0.92bn has been made following the release of significant funds on deposit with the IRS or ring-fenced by the Omnibus Trust and held as potential tax reserves, and a further 'catch-up' distribution of $0.32bn was paid to eligible consenting beneficiaries on 12 June 2014 as set out below.

| Distributions on 12 June 2014 | Cpty No. | $bn | $bn |
|---|---|---|---|
| Gross first 'true-up' distribution[1] | 117 | 0.92 | |
| Gross 'catch-up' distribution | 14 | 0.32 | |
| **Total distribution to eligible consenting beneficiaries before deductions and appropriations[2]** | **131** | | **1.24** |
| **Less** | | | |
| US withholding tax reserve[3] | | | (0.07) |
| **Recovered by House Estate** | | | |
| House debtor appropriations | | (0.14) | |
| Assigned claims and fees recovered | | (0.15) | |
| **Total recoveries to House Estate** | | | **(0.29)** |
| **Net cash distribution to beneficiaries** | | | **0.88** |

1.  Release of excess funds from the $0.95bn held by the IRS or ring-fenced funds held in the Omnibus Trust on account of potential US withholding tax, following agreement on 7 April 2014 of the tax treatment for the first distribution made in September 2013.
2.  2 counterparties received both types of distribution resulting in 129 unique counterparties receiving distributions.
3.  'Catch-up' distributions were subject to a 30% tax deposit reserve for US withholding tax purposes, unless form W-9 was provided by the beneficiaries.

## Future distributions

Our intention to make a further 'true-up' distribution and 'catch-up' distribution has recently been announced and these will be paid on or around 30 October 2014 to eligible beneficiaries.

The final distribution is only able to be made after the US withholding tax treatment of distributions in excess of 100% of Best Claim value is finally agreed by the IRS, claims of all Non-Consenting beneficiaries are concluded and remaining reserves are settled.

## Tax developments

### US withholding tax

LBIE continues to work with the IRS and its withholding agent in respect of additional guidance required on distributions in excess of 100% of Best Claim value and other areas where formal guidance may be needed.

### UK tax issues

LBIE has now agreed the status of the Omnibus Trust for UK tax purposes with HMRC with no material tax liabilities expected. A small income tax liability in respect of income earned on funds received from LBI will be payable.

# *Section 5.2:*
# Other Client Assets

## *Introduction*

We continue to return Client Assets and related post-Administration income as we resolve the last components of certain counterparties' claims. A significant number of relatively low value returns have been achieved over the past 6 months, representing material progress towards being able to eventually cease LBIE's custodian activities and terminate the associated costs.

## *Progress*

### Client Assets analysis

Movements in the client depot during the period (excluding Omnibus Trust and segregated Affiliate assets) are summarised below.

| | £bn | £bn |
|---|---|---|
| Reported as at 14 March 2014 | | 0.17 |
| **In the period** | | |
| Returns to clients and redemptions | (0.11) | |
| Transfers to House and segregated for Affiliates depots | (0.02) | |
| Revaluation and other adjustments | 0.01 | |
| **Movement in the period** | | **(0.12)** |
| **Client Assets at 14 September 2014**[1] | | **0.05** |

1.    Includes remaining excess segregated Client Assets and is net of claims for Client Assets shortfalls.

### Client Assets returns

In the period, 677 individual Client Assets holdings were returned and an additional 28 holdings were partially returned to counterparties, with a total value of £0.11bn. To date, a total of c.9,500 individual holdings have been fully returned to counterparties representing a total value of c.£14.1bn.

Remaining Client Assets yet to be returned are blocked by outstanding deed executions, non-responsive counterparties or competing claims relating to Affiliate entities. Through settlement negotiations or litigation, LBIE continues to address all remaining Client Assets positions to facilitate a targeted resolution by early 2015.

### *LBHK*

345 individual holdings of LBHK released Client Assets, with a value of £0.10bn, were returned to counterparties in the period as part of the above returns.

LBF has competing claims in respect of certain assets (aggregate total value of less than £1m) yet to be returned from LBHK. LBIE expects to expedite resolution of the claims issues and the return of the impacted assets in the next 6 months.

### Excess segregated Client Assets

The ongoing identification of securities held in the client depot that exceed current client entitlements has resulted in further transfers to the House Estate of £0.01bn in the period (£0.52bn to date).

### Over-Claims and ring-fencing

For certain Client Assets, LBIE has received disputed claims or duplicate claims for the same security which, until resolved or expunged, prevent the affected Client Assets being returned. An analysis of continuing Over-Claims is set out below.

| | £bn |
|---|---|
| Over-Claims at 14 March 2014 | 0.07 |
| Over-Claims resolved or reconciled in the period | (0.02) |
| **Total Over-Claims remaining at 14 September 2014** | **0.05** |

Remaining Over-Claims relate to 2 counterparties with claims related to LBHK and LBI. LBIE is continuing to liaise with the counterparties to resolve these disputes as expeditiously as possible.

# *Section 5.3:*
# Client Money estate

## Introduction

The Client Money estate continues to be held separate from House funds, pending resolution of a number of outstanding matters, the most significant of which relates to the BarCap Client Money claim. On eventual resolution of that claim and after remaining Client Money claimants have been repaid in full, the residual Client Money funds and any future Client Money recoveries are expected to be transferred to the House Estate, for the benefit of Senior unsecured creditors.

The Administrators set out in the table below a high-level analysis showing illustrative indicative Low and High case outcomes for the net Client Money impact on the House Estate.

| Pre-Administration Client Money estate | Low $bn | High $bn |
|---|---|---|
| Projected Client Money to distribute | | |
| Funds held at 14 September 2014 | 0.97 | 0.97 |
| LBB/LBHI future recoveries[1] | 0.47 | 0.56 |
| Other recoveries | 0.02 | 0.02 |
| Projected Client Money to distribute[2] | 1.46 | 1.55 |
| Less | | |
| Future distributions to claimants with retained CME | (0.01) | (0.01) |
| Estimated funds to be paid to the UK High Court | (0.01) | (0.01) |
| | (0.02) | (0.02) |
| Projected future distributions to the House Estate ($bn) | 1.44 | 1.53 |

1. This represents the combined future dividends on LBIE's LBHI guarantee claim of $1.01bn and the LBB £0.40bn unsecured claim and is subject to the conclusion of the LBHI supplementary agreement.
2. The illustration assumes that the Administrators will not be required to trace and recover assets from the House Estate for the benefit of the Client Money pool.

| Projected House impact of the Client Money estate | Low £bn | High £bn |
|---|---|---|
| Estimated future House recovery (£bn) | 0.88 | 0.93 |

The Administrators expect the majority of the outstanding CME to either be assigned to LBIE's nominee in satisfaction of indebtedness due to the House or be exchanged for the admission of an unsecured claim, with less than $0.01bn remaining to be paid into the UK High Court for 'orphaned' type claims/obligations.

## Progress

### Pre-Administration Client Money

At the date of the last report, 55 counterparties had a retained CME. A Client Money settlement offer was made in February 2014 to settle those counterparties at 100% of their CME (plus, where applicable, a currency allowance) in exchange for an assignment of their CME to LBIE's nominee. 54 of the 55 counterparties accepted the settlement offer and payment was made on 10 April 2014.

### CM Determinations agreement

Continued progress has been made in engaging with counterparties with unresolved CME. A total of 188 CME claims (value $0.15bn) have been resolved in the period. 132 claims (value $0.04bn) remain outstanding, 89 of which, where engagement has not been possible, will require court directions.

| | Mar 14 | | Sep 14 | |
|---|---|---|---|---|
| CME population | Cpty No. | CME $bn | Cpty No. | CME $bn |
| Resolved | | | | |
| Resolved - repaid/assigned/waived[1] | 948 | 4.10 | 1,139 | 4.33 |
| Resolved - CME retained | 55 | 0.09 | 52 | 0.01 |
| | 1,003 | 4.19 | 1,191 | 4.34 |
| Outstanding | | | | |
| In progress[2] | 172 | 0.28 | 43 | 0.03 |
| Court directions required[3] | 140 | 0.03 | 89 | 0.01 |
| | 312 | 0.31 | 132 | 0.04 |
| Total | 1,315 | 4.50 | 1,323 | 4.38 |

1. The LBI and LBF entitlement values continue to be LBIE estimates.
2. Includes 11 counterparties where CME is contingent upon the outcome of matters that have not yet been resolved (e.g. depot breaks/litigation).
3. Counterparties with which LBIE has been unable to establish contact, counterparties that refuse to engage or counterparties that are dissolved.

### Second interim Client Money distribution

A second interim Client Money distribution was made on 27 June 2014 to Client Money creditors at the rate of 25%.

During the period, interim distributions totalling $0.54bn have been made to Client Money creditors (of which $0.53bn was paid to LBIE's nominee, as assignee of a large number of CME claims).

Total distributions of $0.67bn have been paid to Client Money creditors to date.

### Client Money settlement offer

The Administrators agreed to rerun the Client Money settlement offer for the 51 counterparties who retained their CME in the period. At the date of this report, 12 counterparties have accepted the offer and the offer is now closed.

### Recoveries

The pre-Administration Client Money pool at 14 September 2014 was $0.97bn. This includes both recoveries and interest on funds held, including in the period:

- a distribution from LBHI of $0.21bn in respect of an agreed guarantee claim against LBHI relating to Client Money placed with LBB pre-Administration; and

- recoveries related to LBI disputed client accounts.

Future recoveries will arise from:

#### LBB

Under the terms of the settlement agreement, 50% of LBIE's €0.81bn Client Money claim has been admitted as an unsecured claim in the LBB estate. An agreement in principle was reached with LBHI in September 2014, including in relation to the LBIE Client Money-related unsecured claim into LBB. It is anticipated that this agreement with LBHI will accelerate 'catch-up' distributions from LBB to LBIE. To date LBB has made distributions to unsecured creditors totalling 54.5%. Since the period end, this agreement was executed and a first distribution from LBB is expected by the end of 2014.

#### LBHI

Further distributions under the guarantee claim are expected in due course.

#### Taiwan

The final amount due from LBIE's operations in Taiwan ($0.02bn) was recovered shortly after the period end.

In the period, Client Money held in currencies other than sterling and US dollars has been converted into sterling.

### BarCap

BarCap has asserted that it acquired LBI's CME in accordance with the terms of a sale and purchase agreement entered into in September 2008.

The US appeal court judgment relating to the litigation between LBI and BarCap was handed down in August 2014 in favour of BarCap and LBI's subsequent application for a retrial was denied on 23 September 2014. At the date of this report, the next steps to be taken by the respective parties in the litigation are unclear. Accordingly, the ultimate impact of this for LBIE remains uncertain and the timing of any resolution to the LBI/BarCap dispute remains outside of LBIE's control.

### Post-Administration Client Money recoveries and returns

The post-Administration Client Money pool has continued to reduce on account of funds being returned to clients or to the House Estate.

The table below provides a breakdown of the post-Administration Client Money movements during the period.

| | $bn | $bn |
|---|---|---|
| Balance as at 14 March 2014 | | 0.15 |
| **In the period** | | |
| Returns[1] | (0.13) | |
| Receipts | 0.05 | |
| Exchange rate and other adjustments | (0.01) | |
| **Movement in the period** | | **(0.09)** |
| **Balance as at 14 September 2014[2]** | | **0.06** |

1. The funds have been distributed as follows: $0.07bn has been returned to clients and $0.06bn has been transferred to the House Estate (see page 35: House transfers as detailed at note 5 and certain funds retained by House as detailed at note 8).

2. The balance comprises principally client funds.

# Section 6:
# Surplus entitlements and related UK High Court process

## Surplus Entitlement Proposal and subsequent Interest-only Proposal

Following our eleventh progress report, the Administrators continued to engage with creditors to assess the potential for reaching a compromise in respect of the determination of entitlements to Post-Administration Interest and Currency Conversion Claims, and the development of a strategy that can facilitate a consensual agreement for the distribution of the surplus funds in the Administration.

Unfortunately, it became apparent shortly after the presentation of the Surplus Entitlement Proposal to some of the major creditors and its publication on the LBIE website on 28 March 2014, that a solution, acceptable to the relevant majority of creditors, is unlikely to be achievable without directions from the UK High Court. This resulted in the decision in April 2014 to prepare and issue the Waterfall II Application outlined below.

Of the estimated indicative surplus of between £4.94bn and £7.39bn at the end of the Administration, it is anticipated that LBIE will have at least c.£3.5bn of surplus cash available for distribution by the end of 2014 and the Administrators wish to make payments of Post-Administration Interest as expeditiously as possible. However, LBIE is unable to make such payments until it can quantify the reserves that are required, particularly in relation to ISDA claims.

With a view to determining a basis for fixing a reserve for ISDA interest claims and making an interim distribution of Post-Administration Interest, LBIE developed a more limited, Interest-only Proposal that was shared with certain major creditors during June and July 2014. The primary purpose of that proposal was (by using a company voluntary arrangement) to put a cap on ISDA interest claims and to establish a hard bar date for all unsecured claims, leaving the most significant remaining issues open for determination under the Waterfall II Application. The Administrators estimated that, under the Interest-only Proposal, a first interest distribution totalling c.£0.5bn would be possible in Q4 2014/Q1 2015, with additional amounts becoming available for distribution as further progress is made on claims agreement, asset realisation and resolution of other issues such as the Waterfall I Appeal, which is currently requiring the Administrators to reserve for the Subordinated Debt and interest thereon.

The feedback from the creditors with whom the Interest-only Proposal was discussed made it clear that there was insufficient support for even limited compromise at this stage. Consequently, the focus has in recent months and will in the future continue to be on the resolution of the complex issues regarding entitlements to Post-Administration Interest and Currency Conversion Claims through seeking court directions.

## Waterfall court process

### Waterfall I Appeal

Permission to appeal all issues in respect of the Waterfall I Application judgment was granted at a UK High Court hearing on 19 May 2014. The parties subsequently filed appeal notices on 19 June 2014 to progress the matter.

The appeal will be heard in late-March 2015 and judgment will not likely be handed down until mid-2015. There is a possibility that a further appeal to the UK Supreme Court could then be made on some or all of the issues.

### Waterfall II Application

As the Surplus Entitlement Proposal did not secure support from a sufficient number of creditors to make it a viable proposition, LBIE and its legal advisers have consulted with relevant creditor groups and their legal advisers in order to:

- prepare a comprehensive application (the Waterfall II Application) to the UK High Court for directions on all issues not dealt with in the earlier Waterfall I Application proceedings, that impact upon the nature and extent of creditors' entitlements to share in the distribution of the surplus; and

- identify appropriate respondents to the Waterfall II Application who represent the majority of the competing points of view on the relevant issues and are suitably equipped to pursue arguments in support of those views.

The Waterfall II Application was made to the UK High Court on 12 June 2014 and the first case management hearing took place on 25 June 2014 to obtain directions in respect of the procedural steps for LBIE and the 5 respondents, namely (i) Burlington Loan Management Limited (ii) CVI GVF (LUX) Masters SARL (iii) Hutchinson Investors, LLC (together referred to as the Senior Creditor Group) (iv) Wentworth Sons Sub-Debt SARL, and (v) York Global Finance BDH.LLC.

The Waterfall II Application raises 39 different questions but in broad terms, the principal issues on which LBIE has sought the UK High Court's directions relate to:

- how to calculate the rate and full extent of a creditor's entitlement to Post-Administration Interest (including contractual entitlements under *inter alia* the ISDA Master Agreement);

- the date from which Post-Administration Interest should accrue;

- how Currency Conversion Claims are to be quantified and whether such claims are reduced by Post-Administration Interest received; and

- the effect of release clauses contained in Claims Determination Deeds and the CRA.

These issues reflect matters where either LBIE considers that there is some uncertainty as to the answer or a proposition on one or more of these issues has been put forward by the respondents that LBIE has concluded cannot in the circumstances be determined without directions from the UK High Court.

At the 25 June 2014 hearing, a timetable was fixed for the service of position papers and witness statements by the parties. The Administrators filed a statement by Anthony Lomas on 25 July 2014. The respondents filed their position papers (with supporting evidence) on 19 September 2014. LBIE filed its position paper on 10 October 2014. All relevant documents are available to creditors on the LBIE website.

The respondents have until 31 October 2014 to file reply position papers and further evidence upon which they may wish to rely.

There will be a second case management hearing, on 21 November 2014, to consider the next steps in the application. At that hearing, it is expected that Mr Justice David Richards will give directions for the hearing of the application.

# *Appendices*

# *Appendix A:*
# Receipts and payments: cumulative and 6 months to 14 September 2014

## House Estate receipts and payments: cumulative and 6 months to 14 September 2014

| House Estate | Notes | Cumulative - 15 September 2008 to 14 March 2014 (GBP equivalent) £m | Period - 6 months to 14 September 2014 (GBP equivalent) £m | Cumulative - 15 September 2008 to 14 September 2014 (GBP equivalent) £m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Counterparties | 1 | 10,518 | 797 | 11,315 |
| Depot securities | 2 | 9,101 | 840 | 9,941 |
| Affiliate-related transfers from post-Administration Client Money | 3 | 700 | 136 | 836 |
| Post-Administration Client Money and collateral for onward distribution | 4 | 502 * | 26 | 528 |
| Pre-Administration Client Money distributions on assigned claims | 5 | 72 | 376 | 448 |
| Other income | 6 | 1,113 * | 169 | 1,282 |
| **Total receipts for the period/to date** | | **22,006** | **2,344** | **24,350** |
| **Payments** | | | | |
| Dividends paid | 7 | (8,901) | (2,614) | (11,515) |
| Affiliate-related transfers to post-Administration Client Money | 8 | (1,350) | (34) | (1,384) |
| Affiliate settlements | 9 | (928) | (1) | (929) |
| Distribution of post-Administration Client Money and collateral | 10 | (505) * | (26) | (531) |
| Administrators' remuneration | 11 | (796) | (67) | (863) |
| Payroll and employee costs | 12 | (524) | (22) | (546) |
| Legal and professional costs | 13 | (311) | (15) | (326) |
| Building and occupancy costs | 14 | (248) | (10) | (258) |
| Other payments | 15 | (888) * | (214) | (1,102) |
| **Total payments for the period/to date** | | **(14,451)** | **(3,003)** | **(17,454)** |
| **Net movement in the period/to date** | | **7,555** | **(659)** | **6,896** |
| Foreign exchange translation differences | | (138) ^ | 2 ^ | (136) ^ |
| **Total balances** | **16** | **7,417** | **(657)** | **6,760** |
| Less: Funds held subject to potential third party claims | 17 | (997) | 746 | (251) |
| **Total House Estate cash deposits and government bonds (see Section 2)** | | **6,420** ~ | **89** | **6,509** # |

* The opening balances reflect a net reclassification between receipts and payments categories of £5m relating to the Client Money return scheme following a detailed reconciliation exercise in the period.

^ At this stage in the Administration, material receipts and payments in foreign currencies are converted to sterling as soon as practicable after receipt. Where small currency sums are held for a short period or where currency collateral is held for a counterparty, small translation differences can arise.

~ Balances held in foreign currencies at 14 March 2014 were €6m, $4m and various currencies £12m (equivalent).

# Balances held in foreign currencies at 14 September 2014 were $33m and various currencies £4m (equivalent).

## Notes to House Estate receipts and payments account

### General

Foreign currency transactions are reported in sterling at the rate prevailing on the relevant transaction date.

The transactions within the LBIE estate in the period:

- are reported on a cash receipts and payments basis in accordance with the Insolvency Act and Insolvency Rules; and

- were completed in accounts established and controlled by the Administrators.

Separate bank accounts are held for realisations from the House Estate and the Trust Estate.

### 1. Counterparties

Receipts in the period comprise:

- £274m of distributions from debtor Affiliates;

- £253m related to House and Exchanges third party debtors;

- £169m of House debtor appropriations and House assignments from the Omnibus Trust estate;

- £40m of net receipts through the utilisation of a hedge against US dollar exposure;

- £33m of Client Assets claimant debtor receipts;

- £16m of House debt appropriations of collateral received from clients in prior periods (see note 6); and

- £12m of Client Assets claimant debtor appropriations transferred from post-Administration Client Money.

### 2. Depot securities – sales and related income

Realisations of £840m relate to the disposal or redemption of securities and derived income from depot holdings for the benefit of the House Estate or third parties. Significant proceeds include £468m relating to securities returned from LBHK, which were subject to forward sale contracts, and £163m from repatriated securities previously held at Citibank Taiwan.

### 3. Affiliate-related transfers from post-Administration Client Money

£136m of funds previously held in post-Administration Client Money, segregated for potential Affiliate claims or clients of Affiliates, was transferred to the House Estate.

### 4. Post-Administration Client Money and collateral for onward distribution

Under certain client agreements, Client Money is transferred from the post-Administration Client Money account to LBIE's nominee. Under a separate agreement, funds are transferred from LBIE's nominee to the House account. The House makes a separate payment to the client to give value for its Client Money under the client agreements (see note 10).

### 5. Pre-Administration Client Money distributions on assigned claims

£312m of pre-Administration Client Money interim distributions on CME assigned claims was received via LBIE's nominee in the period. A net hedge receipt of £64m on the expected total US dollar recoveries was also attributed. In our last 6-monthly report to creditors, such distributions were included within 'other income', however, due to the increasing significance of these distributions, a separate disclosure of the opening balance and receipts in the period has been made in this report.

### 6. Other income

Other income comprises:

- an £80m contribution received from LBHI and LBEL towards the Pension Scheme deficit (see note 15);

- £67m of recovered or redirected funds which was mistakenly paid (by third parties) into House accounts;

- £12m of VAT repayments received from HMRC;

- £13m of bank and bond interest received; and

- £13m of other realisations.

The above amounts are offset by £16m of collateral received from clients in prior periods that has been appropriated to the House Estate in the current period (see note 1).

### 7. Dividends paid

£2,614m of interim unsecured dividends was paid in the period.

## 8. Affiliate-related transfers to post-Administration Client Money

£34m of funds was transferred to the post-Administration segregated Affiliate account, relating to the disposal or redemption of securities and derived income received into the House account identified as belonging to Affiliates.

## 9. Affiliate settlements

The payments relate to Affiliate settlements and asset return agreements.

## 10. Distribution of post-Administration Client Money and collateral

This relates to returns to clients of collateral and funds under the Client Money return scheme (see note 4).

## 11. Administrators' remuneration and expenses

Payment deferral terms, as agreed with the Committee and referred to on page 42 of this report, account for differences between costs incurred and payments made in the period.

Out-of-pocket expenses of £2m were paid in the period.

## 12. Payroll and employee costs

Payments relate to salary and employee-related benefits for UK-based employees and third party contractors. This includes costs incurred on behalf of Affiliates, which are recovered by LBIE and included as 'other income'.

## 13. Legal and professional costs

Legal and other advisers' costs relate to advice given, and to court proceedings and litigation conducted, in numerous jurisdictions by a number of professional firms in connection with a range of issues across the Administration.

## 14. Building and occupancy costs

This relates to occupancy and infrastructure costs, primarily related to the Canary Wharf offices occupied by LBIE and includes costs incurred on behalf of Affiliates, which are recovered by LBIE and included as 'other income'.

## 15. Other payments

Other payments comprise:

- an onward transfer of the £80m Pension Scheme deficit contribution (see note 6) to the Pension Scheme trustees;

- repayment of £66m of recovered or redirected funds which was mistakenly paid by third parties into House accounts (see note 6);

- £40m paid to counterparties with retained CME under the Client Money settlement offer in exchange for an assignment of their CME (see Section 5.3);

- £17m of VAT paid on invoices;

- £4m of counterparty settlements; and

- £7m of other net sundry payments and reclassifications.

## 16. Investment profile

### Current investment strategy

For short-term liquidity requirements, LBIE invests in short-dated money market deposits. For longer term requirements, investments are made in short-dated government securities.

### Total balances

| House Estate | GBP equivalent £m |
|---|---|
| Short-dated government bonds[1] | 6,153 |
| Long-dated government bonds | 150 |
| Short-term deposits[2] | 396 |
| Interest-bearing accounts | 61 |
| Total | 6,760 |

1.  Average rate of return (net of fund manager fees) for 6 months ending 14 September 2014 on sterling of 0.42%.

2.  Average rate of return for 6 months ending 14 September 2014 on sterling of 0.31%.

### Cash management and investment policies

Subject to meeting regulatory requirements, the continuing objectives of the policies are to provide:

- security for Administration funds;

- liquidity as required by the Administration; and

- appropriate returns (positive yield net of fees).

The primary objective continues to be ensuring the security of Administration funds. To meet this objective, a comprehensive counterparty credit risk policy is in place with clear limits on counterparties, instruments, amounts and duration. Compliance with policy is measured on at least a daily basis using live indicators, and any breaches arising from market movements are reported immediately to the Administrators.

The cash is managed by a team of treasury professionals which meets with the Administrators on a regular basis.

*Instruments used in the period*

- interest-bearing accounts;

- short-term bank deposits; and

- government and quasi-government bonds.

*Policy for interest-bearing accounts and short-term deposits*

Permitted banks must meet 5 key criteria:

- be headquartered in a sovereign state where the average long-term ratings from S&P, Moody's and Fitch are in the top 4 available tiers (AAA to AA-);

- have a blended average long-term rating from S&P, Moody's and Fitch within the top 4 available tiers (AA- to A-);

- be a Prudential Regulation Authority approved counterparty;

- have a 5-year CDS price below a specified (prudent) threshold; and

- have a minimum market capitalisation above a specified (prudent) threshold.

To ensure diversification, the counterparty limits for monies invested are based on the credit rating, CDS price and market capitalisation of each of the banks used.

Short-term deposits are placed for a maximum duration of 12 weeks with only those banks that meet strict criteria – currently only 2 out of our 12 dealing counterparties.

*Policy for government bonds*

Eligible investments for the bond portfolios are short-dated government debt issued by the UK and quasi-government debt securities benefiting from an explicit, unconditional and irrevocable guarantee from the UK government.

The bond portfolio is managed on a day-to-day basis by an independent fund manager.

In addition, long-term government bonds have been purchased in the period to hedge against the interest rate and inflation risks associated with the Pension Scheme deficit (see page 17).

## 17. Funds held subject to potential third party claims

| House Estate | £m |
|---|---|
| Reserve for unpaid dividends | 212 |
| Ring-fenced for Client Assets claimants | 20 |
| Cash collateral from Client Assets claimant debtors | 19 |
| **Total** | **251** |

## Post-Administration Client Money receipts and payments: cumulative and 6 months to 14 September 2014

| Post-Administration Client Money | Notes | Cumulative - 15 September 2008 to 14 March 2014 (USD equivalent) USD $m | Period - 6 months to 14 September 2014 (USD equivalent) USD $m | Cumulative - 15 September 2008 to 14 September 2014 (USD equivalent) USD $m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Redemptions, coupons, dividends and investment income | 1 | 4,295 | 52 | 4,347 |
| Affiliate-related transfers from the House | 2 | 2,119 | 57 | 2,176 |
| Affiliate-related | 3 | 573 | 88 | 661 |
| Collateral received from clients | | 321 | - | 321 |
| Funds received in error | | 114 | 4 | 118 |
| **Total receipts for the period/to date** | | **7,422** | **201** | **7,623** |
| **Payments** | | | | |
| Transfers to clients direct | 4 | (2,023)* | (27) | (2,050) |
| Other transfers to the House | 5 | (1,305)* | (38) | (1,343) |
| Affiliate-related transfers to the House | 6 | (1,089) | (226) | (1,315) |
| Affiliate settlements | 7 | (617) | (692) | (1,309) |
| Transfers to clients via LBIE's nominee | 8 | (710)* | (68) | (778) |
| Return of collateral received from clients | | (323) | - | (323) |
| Transfers to pre-Administration Client Money | | (167) | - | (167) |
| Return of funds received in error | | (114) | (4) | (118) |
| Other | | (4) | - | (4) |
| **Total payments for the period/to date** | | **(6,352)** | **(1,055)** | **(7,407)** |
| **Net movement in the period/to date** | | **1,070** | **(854)** | **216** |
| Foreign exchange translation differences | | 60^ | (10)^ | 50^ |
| **Total balances** | 9 | **1,130~** | **(864)** | **266#** |
| Comprising | | | | |
| Segregated Affiliate post-Administration Client Money balance | | 984 | (780) | 204 |
| Other third party post-Administration Client Money balance | | 146 | (84) | 62 |
| **Total balances** | | **1,130** | **(864)** | **266** |

\* The opening balances reflect a reclassification between payment categories of $9m relating to the Client Money return scheme following a detailed reconciliation exercise in the period.

^ The translation differences set out above principally arise from translating other currencies into US dollars, for reporting purposes only.

~ Balances held in currencies other than US dollars at 14 March 2014 were €256m, £10m and various currencies $81m (equivalent).

# Balances held in currencies other than US dollars at 14 September 2014 were €18m, £2m and various currencies $26m (equivalent). In the period, $11m was transferred from 'Other third party post-Administration Client Money' to 'Segregated Affiliate post-Administration Client Money'.

## Notes to post-Administration Client Money receipts and payments account

**1.   Redemptions, coupons, dividends and investment income**

Realisations relating to the disposal or redemption of securities and to derived income received directly into the segregated post-Administration Client Money accounts.

**2.   Affiliate-related transfers from the House**

Transfer of cash originally received in the House account, relating to the disposal or redemption of securities and to derived income identified as belonging to Affiliates.

**3.   Affiliate-related**

Amounts relating to the disposal or redemption of securities and to derived income received directly into the segregated Affiliate accounts.

**4.   Transfers to clients direct**

Return of post-Administration Client Money direct to clients including debtor appropriations to the House.

**5.   Other transfers to the House**

Transfers relate to either funds determined not to be post-Administration Client Money following investigation, fees payable to the House, or releases following a waiver of client rights in consideration for an unsecured claim into the House.

**6.   Affiliate-related transfers to the House**

Funds previously held subject to potential Affiliate claims or clients of Affiliates, which were transferred to the House Estate following settlements with Affiliates.

**7.   Affiliate settlements**

Return of funds to Affiliates under the terms of settlement agreements with those Affiliates.

**8.   Transfers to clients via LBIE's nominee**

Return of post-Administration Client Money via LBIE's nominee, where funds are transferred to the House Estate for onward distribution to clients, net of certain funds retained by the House in respect of fees payable, debtor appropriations and releases following a waiver of client rights in consideration for an unsecured claim into the House.

**9.   Investment profile**

*Total balances*

| Post-Administration Client Money | USD equivalent $m |
|---|---|
| Short-term deposits | 222 |
| Interest-bearing accounts | 44 |
| **Total** | **266** |

*Cash management and investment policies for client funds*

The Client Money cash management policies for short-term deposits and interest-bearing accounts are based on those used for the House Estate, modified to comply with the additional Client Money regulatory requirements.

Client Money is not eligible for investment in government bonds. Client monies can be placed on money market deposits for a maximum duration of 4 weeks.

## *Pre-Administration Client Money receipts and payments: cumulative and 6 months to 14 September 2014*

| Pre-Administration Client Money | Notes | Cumulative - 15 September 2008 to 14 March 2014 (USD equivalent) USD $m | Period - 6 months to 14 September 2014 (USD equivalent) USD $m | Cumulative - 15 September 2008 to 14 September 2014 (USD equivalent) USD $m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Client Money pool recoveries | 1 | 1,425 | 217 | 1,642 |
| Interest | | 7 | 1 | 8 |
| **Total receipts for the period/to date** | | **1,432** | **218** | **1,650** |
| **Payments** | | | | |
| Client Money interim distribution | 2 | (137) | (538) | (675) |
| Legal costs | | (10) | - | (10) |
| **Total payments for the period/to date** | | **(147)** | **(538)** | **(685)** |
| **Net movement in the period/to date** | | **1,285** | **(320)** | **965** |
| Foreign exchange translation differences | | 9^ | (5)^ | 4^ |
| **Total balances** | 3 | **1,294¯** | **(325)** | **969#** |

^ The translation differences principally arise from translating other currencies into US dollars, for reporting purposes only.

¯ Balances held in currencies other than US dollars at 14 March 2014 were £139m and various currencies $1m (equivalent).

# Balances held in currencies other than US dollars at 14 September 2014 were £140m.

## *Notes to pre-Administration Client Money receipts and payments account*

### 1.   Client Money pool recoveries
Client Money recovered in the period principally relates to a distribution from LBHI in respect of LBIE's guarantee claim.

### 2.   Client Money interim distribution
A second interim distribution of 25%, together with monthly 'catch-up' distributions, was paid in the period. This included $0.53bn ($0.65bn total to date) paid to the House Estate via LBIE's nominee.

### 3.   Investment profile

| Pre-Administration Client Money | USD equivalent $m |
|---|---|
| Short-term deposits | 968 |
| Interest-bearing accounts | 1 |
| **Total** | **969** |

## *Omnibus Trust receipts and payments: cumulative and 6 months to 14 September 2014*

| Omnibus Trust | Notes | Cumulative - 15 September 2008 to 14 March 2014 (USD equivalent) USD $m | Period - 6 months to 14 September 2014 (USD equivalent) USD $m | Cumulative - 15 September 2008 to 14 September 2014 (USD equivalent) USD $m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Cash transferred from LBI | | 4,796 | 19 | 4,815 |
| Sale of equity securities returned by LBI | 1 | 3,977 | 3 | 3,980 |
| Sale of fixed income securities returned by LBI | 1 | 691 | - | 691 |
| Transfers | 2 | 40 | 20 | 60 |
| Interest | | 2 | 1 | 3 |
| **Total receipts** | | **9,506** | **43** | **9,549** |
| **Payments** | | | | |
| Distributions to beneficiaries | 3 | (5,323) | (881) | (6,204) |
| House debtor appropriations | 4 | (2,184) | (139) | (2,323) |
| House assigned claims | 4 | (48) | (145) | (193) |
| US withholding tax reserve | 5 | (950) | 846 | (104) |
| Fees recovered | 4 | (68) | (1) | (69) |
| Transfers | 2 | (40) | (20) | (60) |
| Costs relating to disposal of securities | | (1) | - | (1) |
| **Total payments** | | **(8,614)** | **(340)** | **(8,954)** |
| **Period end balance** | 6 | **892** | **(297)** | **595** |

## *Notes to Omnibus Trust receipts and payments account*

**1.   Sale of equity and fixed income securities returned by LBI**
Realisations in the period relate to the disposal or redemption of securities.

**2.   Transfers**
Funds received in error into the Omnibus Trust account that do not form part of the Omnibus Trust estate receipts for distribution purposes.

**3.   Distributions to beneficiaries**
A first 'true-up' distribution of released withholding tax reserves and a further 'catch-up' distribution were paid on 12 June 2014.

**4.   House debtor appropriations/House assigned claims/fees recovered**
Under the Common Terms, certain deductions against gross distributions to beneficiaries were allowed for onward payment to the House.

**5.   US withholding tax reserve**
The IRS has approved that the first distribution of 100% of the Best Claim value can be made subject only to specific deductions for withholding tax. This facilitated a release of $0.85bn in the period of the $0.95bn previously on deposit with the IRS.

## 6.  Investment profile

### *Total balances*

| Omnibus Trust | USD equivalent $m |
|---|---|
| Short-term deposits | 233 |
| Interest-bearing accounts | 362 |
| **Total** | **595** |

### *Cash management and investment policies for Omnibus Trust funds*

The investment policies for short-term deposits and interest-bearing accounts are focused on preserving the security of the funds. This is achieved by the application of a comprehensive credit risk model as used in the House Estate, subject to consideration of any other regulatory requirements.

# *Appendix B:*
# Supplemental schedules

## *House securities*

As at 14 September 2014, remaining House securities and depot-related asset recoveries are summarised as follows:

| | Book value Mar 14 £bn | Sales/ redemptions £bn | HK hedge release £bn | Client depot transfers[1] £bn | Other movements[2] £bn | Book value Sep 14 £bn | Indicative future recoveries[3] Low £bn | High £bn |
|---|---|---|---|---|---|---|---|---|
| Available for sale | 0.11 | (0.60) | 0.47 | 0.01 | 0.06 | 0.05 | 0.03 | 0.05 |
| Residual assets held at Citibank[4] | 0.16 | (0.16) | - | - | - | - | - | - |
| Reserved for clients[5] | 0.56 | - | (0.47) | (0.09) | - | - | - | - |
| Reserved for Affiliates | 0.06 | (0.01) | - | - | - | 0.05 | - | - |
| **Total** | **0.89** | **(0.77)** | **-** | **(0.08)** | **0.06** | **0.10** | **0.03** | **0.05** |

1. £0.01bn was released to House from excess segregated securities in Client Assets.
2. 'Other movements' represent securities received in settlement of amounts due from House debtors and pricing adjustments in the period.
3. The indicative future recoveries for 'available for sale' assets represent an expected outcome following adjustments for illiquid and potentially irrecoverable assets.
4. Following regulatory and tax clearances, the majority of remaining securities held in Taiwan were repatriated and liquidated in the period.
5. Assets released by LBHK were pre-sold prior to 14 March 2014 under a forward sale arrangement.

## *Affiliate securities and cash ring-fencing*

Assets held in the House and Trust Estates, which are still subject to Affiliate claims at 14 September 2014, are set out below.

| | Securities £bn | Cash £bn | Total £bn |
|---|---|---|---|
| Reported as at 14 March 2014 | 0.33 | 0.59 | 0.92 |
| Sales, redemptions and derived income | (0.03) | 0.08[1] | 0.05 |
| Transfers from client depot | 0.01 | - | 0.01 |
| Returns to Affiliates[2] | (0.05) | (0.41) | (0.46) |
| Ring-fencing releases to House[3] | - | (0.14) | (0.14) |
| **Ring-fenced at 14 September 2014[4]** | **0.26** | **0.12** | **0.38** |
| **Assets to be returned to** | | | |
| LBF | 0.19 | 0.03 | 0.22 |
| Other | 0.04 | 0.02 | 0.06 |
| | **0.23** | **0.05** | **0.28** |
| **Assets to be retained by LBIE[5]** | **0.02** | **0.02** | **0.04** |
| **Assets pending resolution** | | | |
| LBF-related | - | 0.05 | 0.05 |
| Other | 0.01 | - | 0.01 |
| | **0.01** | **0.05** | **0.06** |
| **Assets at 14 September 2014** | **0.26** | **0.12** | **0.38** |

1. Receipts comprise the proceeds of sale, redemption or related derived income of securities segregated for Affiliates of £0.05bn (principally LBF and Storm), and transfers from House of £0.03bn (principally relating to LBHI and LBF) and clients of Affiliates.
2. Principally returns to LBF, LBHI, Storm and LBHK.
3. Principally releases following settlement with LBB (£0.12bn).
4. The securities are held in: House depot £0.05bn and client depot, segregated for Affiliates, £0.21bn. The cash is held in post-Administration Client Money (segregated Affiliate funds).
5. The indicative financial outcome on page 7 includes this recovery in both the indicative Low and High case scenarios.

# *Appendix C:*
# Administrators' remuneration

## *Introduction*

In response to a specific creditor request, in this report we have set out the previous period comparative data as well as a forecast for the next 6-month calendar period (commencing 1 July 2014). In addition, we have included a narrative explaining the differences between time spent working in each work stream in the current and prior periods.

## *Analysis of Administrators' remuneration by grade and work activity*

The table below provides an analysis of the Administrators' total hours incurred and the associated cost by staff grade and work activity for the previous time reporting period, the current period and the forecast for the next period.

| | Prior | | Current | | Forecast | |
| --- | --- | --- | --- | --- | --- | --- |
| | 1 July 2013 to 31 December 2013 | | 1 Jan 2014 to 30 June 2014 | | 1 July 2014 to 31 December 2014 | |
| | Hours | £'000 | Hours | £'000 | Hours | £'000 |
| **By grade** | | | | | | |
| Partner | 6,496 | 5,339 | 6,146 | 5,151 | 5,933 | 4,877 |
| Director | 11,217 | 6,941 | 14,672 | 9,312 | 12,243 | 7,946 |
| Senior Manager | 36,922 | 17,731 | 36,387 | 17,598 | 28,988 | 14,261 |
| Manager | 49,562 | 17,943 | 48,113 | 17,673 | 37,105 | 13,768 |
| Senior Associate | 65,438 | 15,852 | 60,615 | 15,106 | 44,034 | 11,274 |
| Associate | 27,971 | 4,353 | 30,113 | 4,684 | 21,928 | 3,477 |
| **Total** | **197,606** | **68,159** | **196,046** | **69,524** | **150,231** | **55,603** |
| **Average hourly rate** | | **£345** | | **£355** | | **£370** |
| **By work activity**[1] | | | | | | |
| Counterparty resolution | 41,770 | 14,197 | 32,745 | 11,560 | 24,369 | 8,847 |
| Middle Office | 23,418 | 8,335 | 26,709 | 9,025 | 15,637 | 5,419 |
| Valuations | 13,787 | 4,843 | 13,211 | 4,502 | 10,156 | 3,799 |
| Surplus | 2,697 | 1,221 | 9,635 | 4,471 | 12,679 | 4,721 |
| Simplification/data governance | 14,198 | 4,475 | 14,770 | 4,898 | 11,086 | 3,847 |
| Transaction processing and control | 42,345 | 13,833 | 32,797 | 10,670 | 18,220 | 6,104 |
| *Information technology* | *23,839* | *6,377* | *22,916* | *6,641* | *18,228* | *5,864* |
| *Insolvency* | *15,051* | *5,613* | *16,886* | *5,846* | *16,340* | *5,728* |
| *Tax, VAT and pensions* | *5,275* | *3,368* | *8,260* | *4,841* | *8,010* | *4,857* |
| *Other back office functions* | *15,226* | *5,897* | *18,117* | *7,070* | *15,506* | *6,417* |
| Total other support functions | 59,391 | 21,255 | 66,179 | 24,398 | 58,084 | 22,866 |
| **Total** | **197,606** | **68,159** | **196,046** | **69,524** | **150,231** | **55,603** |

1.    The work activity summary now reflects the new LBIE operating model effective from 1 January 2014. The prior 6-month time has been restated in the new format to provide a meaningful comparison. As a result, the work activities shown do not incorporate the same underlying sub-activities as prior periods.

## *Staff headcount profile*

The table below provides a summary of the staff headcount profile for the previous time reporting period, the current period and the forecast for the next time reporting period.

| | Actual | | Forecast |
|---|---|---|---|
| | Prior period ended 31 Dec 2013 | Current period ended 30 Jun 2014 | In the period ending 31 Dec 2014 |
| **Staff profile** | | | |
| LBIE staff (including contractors) | 406 | 320 | 263 |
| PwC staff[1] | 193 | 198 | 148 |
| Ratio of LBIE to PwC staff | 2.1 | 1.6 | 1.8 |

1.    PwC staff numbers are calculated on the basis of 8 worked man-hours being equal to 1 full-time equivalent man-day.

The Administrators estimate that in the period ending 31 December 2014 the LBIE headcount will have reduced by 35% compared to the headcount in the period ended 31 December 2013. In the corresponding period, the PwC staff will have reduced by 23%.

The movement in the ratio of LBIE to PwC staff, in part, reflects timing of the release of LBIE staff. The Administrators assess the LBIE staff resource requirements twice a year, with redundancies taking place on 31 December and 31 July each year. By comparison, the PwC resource is released at shorter notice, as and when tasks or activities are completed.

## *Administrators' remuneration movements between the current period and the prior period*

In the current time reporting period to 30 June 2014, a 1% reduction in total hours compared to the period ended 31 December 2013 occurred, and an increase in total costs of 2%.

The principal areas of reduced activity in the period were:

•    counterparty resolution, as the number of outstanding matters has reduced; and

•    transaction processing and control, as resolution of the Trust Estate continued and the volume of assets and income under the Administrators' control has reduced.

Principal areas where activities have increased comprised:

•    middle office delivery of the fourth interim distribution and resolution of the associated US withholding tax issues;

•    operational simplification, in connection with the orderly wind-down of the Administration's infrastructure;

•    the surplus project, relating to the development of consensual solution options and the Waterfall I and II court proceedings; and

•    the Pension Scheme deficit claim resolution.

## *Administrators' remuneration forecast for the next period*

The forecast 6-monthly time reporting period to December 2014 indicates a 23% reduction in hours and a 20% reduction in costs compared with the current period.

Activity across almost all work streams is forecast to reduce, with the exception of the surplus project as the Administration continues to transition to a 'tail-state' operating model.

Costs for the surplus work stream are forecast to increase by 6% as compared with the current period. This is driven by ongoing support for the Waterfall II Application and the related witness statements. This work commenced in the last 2 months of the current period, and is expected to continue for the whole of the forecast period, thus driving an increase in work stream costs compared to the current period.

Part of the forecast decrease across all work streams reflects a higher level of planned staff absences (principally holiday) in this period, as it covers the summer and Christmas periods.

## *Administrators' remuneration approval*

Details of the statutory framework for the approval of the Administrators' remuneration, the role of the Creditors' Committee Adviser and the level and detail of disclosure provided by the Administrators are set out in the Administrators' earlier reports.

The Administrators continue to provide the Committee and its Adviser with detailed information relating to their remuneration and to Category 2 disbursements, in accordance with SIP 9, on a quarterly basis.

The remuneration information contained in this report is extracted from the Q1 and Q2 2014 data packs which have been provided to the Committee and its Adviser.

## *Approvals by the Creditors' Committee*

As previously reported, the Committee has approved the 2014 remuneration arrangements, which require deferral of a significant proportion of the Administrators' 2014 time costs to be considered for approval in early 2015, enabling the Committee to reflect on the Administrators' achievements across the whole of the 2014 calendar year.

The Committee has been provided with Category 2 disbursement information relating to the 6-month period to 30 June 2014 amounting to £992,038, with disbursements of £463,228 being approved for payment in the period.

Cumulative time costs accrued to 30 June 2014 are c.£830m. Total Administrators' remuneration and disbursements paid to 14 September 2014 are c.£863m.

# *Appendix D:*
# Statutory and other information

| | |
|---|---|
| **Court details for the Administration:** | High Court of Justice, Chancery Division, Companies Court<br>Court case number 7942 of 2008 |
| **Full name:** | Lehman Brothers International (Europe) |
| **Trading name:** | Lehman Brothers International (Europe) |
| **Registered number:** | 02538254 |
| **Registered address:** | Level 23, 25 Canada Square, London E14 5LQ |
| **Date of the Administration appointment:** | 15 September 2008 |
| **Administrators' names and addresses:** | AV Lomas, SA Pearson (both appointed 15 September 2008), PD Copley and R Downs (both appointed 2 November 2011) and JG Parr (appointed on 22 March 2013) of PricewaterhouseCoopers LLP, 7 More London Riverside, London SE1 2RT. MJA Jervis and DY Schwarzmann ceased to act on 2 November 2011. DA Howell ceased to act on 22 March 2013 |
| **Appointor's name and address:** | High Court of Justice, Chancery Division, Companies Court on the application of LBIE's directors |
| **Objective being pursued by the Administrators:** | Achieving a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration) |
| **Aims of the Administration:** | Recover and/or realise all House assets, including cash, securities and in-the-money financial contracts, on a managed basis<br>Admit unsecured creditors' claims and make distributions to creditors<br>Recover Client Assets and Client Money, assess the claims to such property and return all such property to its rightful owners on a systematic basis |
| **Division of the Administrators' responsibilities:** | In relation to paragraph 100(2) of Schedule B1 to the Insolvency Act, during the period for which the Administration is in force, any act required or authorised under any enactment to be done by either or all of the Administrators may be done by any one or more of the persons for the time being holding that office |
| **Details of any extensions for the initial period of appointment:** | The UK High Court on 2 November 2011 granted an extension of the Administration to 30 November 2016 |
| **Proposed end of the Administration:** | The Administrators have yet to determine the most appropriate exit |
| **Estimated dividend for unsecured creditors:** | Interim dividends paid to date at a cumulative rate of 100p/£1. Creditors are referred to Section 2 for the illustrative range of outcomes |
| **Estimated values of the prescribed part and LBIE's net property:** | The estimated value of LBIE's net property remains uncertain |
| **Whether and why the Administrators intend to apply to court under Section 176A(5) of the Insolvency Act:** | Such an application is considered unlikely |
| **The European Regulation on Insolvency Proceedings (Council Regulation (EC) No. 1346/2000 of 29 May 2000):** | The European Regulation on Insolvency Proceedings does not apply to this Administration as LBIE is an investment undertaking |
| **Creditors' Committee members:** | Lehman Commercial Paper Inc.<br>Ramius LLC<br>Lehman Brothers Asia Holdings Ltd |

# *Appendix E:*
# Glossary of terms

| Abbreviation | Term | Definition |
|---|---|---|
| Administration | Administration | UK corporate insolvency process governed by the Insolvency Act 1986 applicable to LBIE following the granting of an administration order dated 15 September 2008 |
| Administrators | Joint Administrators | AV Lomas and SA Pearson were appointed as Joint Administrators of LBIE on 15 September 2008. PD Copley and R Downs were appointed on 2 November 2011. JG Parr was appointed on 22 March 2013. All are licensed in the United Kingdom to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales and are partners of PricewaterhouseCoopers LLP |
| Adviser | Adviser | An adviser retained to assist the Committee in considering the Administrators' remuneration requests |
| Affiliates | Affiliate entities | Various subsidiaries and affiliates of Lehman Brothers Holdings Inc. |
| AGR | AG Financial Products Inc. | A US-based affiliate of Assured Guaranty Corp. which provided credit protection to counterparties under credit default swaps |
| BarCap | Barclays Capital Inc. | Investment banking business of Barclays Bank PLC |
| Best Claim value | Best Claim value | A customer's claim for the purposes of the Consensual Proposal is the higher of either: the value of the accepting customer's claim on 19 September 2008 (and, for the avoidance of doubt, excluding income accruing after 19 September 2008); and the market value of an accepting customer's claim, including income, on 30 November 2012 |
| Category 2 disbursements | Administrators' Category 2 disbursements | Costs that are directly referable to the Administration but not to a payment to an independent third party. They may include shared or allocated costs that can be allocated to the Administration on a proper and reasonable basis |
| Citibank | Citibank | Citibank Inc. and any of its subsidiary entities |
| Claims Determination Deed | Claims Determination Deed | A standardised legal document for agreeing claims under the Consensual Approach |
| Client Assets | Client Assets | Client securities which LBIE should have held as at 15 September 2008 |
| Client Money | Client Money | Client cash balances held by LBIE as at 15 September 2008 or received thereafter by LBIE and which are in each case subject to the UK Financial Conduct Authority's client money rules and/or applicable client money distribution rules |
| CM Determination | Client Money Determination | The Administrators' assessments of the quantum of Client Money Entitlement of a financial trading counterparty based on published principles |
| CME | Client Money Entitlement | The entitlement to receive a distribution from the pre-Administration Client Money pool |
| Committee | Creditors' Committee | Creditors voted to represent the general body of creditors of LBIE to assist the Administrators in discharging their functions set out in the Insolvency Act 1986 |
| Common Terms | Common Terms | Common terms between LBIE and consenting beneficiaries to the Consensual Proposal |
| Consensual Approach | Consensual Approach | A framework developed for the expedient resolution of the unsecured claims of financial trading counterparties |
| Consensual Proposal | Consensual Proposal | Proposal to Omnibus Trust claimants to settle on a consensual basis their claims in respect of securities and/or cash positions under the Common Terms. In settlement of the claims, each customer which is a party to the Common Terms is entitled to have allocated to it a share of the proceeds of the securities and cash received by LBIE from LBI |
| CRA | Claim Resolution Agreement | The claim resolution framework which governs the return of Client Assets. The CRA was proposed by the Administrators to clients in November 2009 and was accepted by over 90% of eligible Client Assets claimants |
| Currency Conversion Claims | Currency Conversion Claims | Non-provable claims derived from contractual rights to be paid in a currency other than sterling, where the value of sterling has declined as against the currency of the claim between the date of Administration and the date(s) of payment of distributions in respect of the claim |
| Customer Property | Customer Property as defined in SIPA | A combination of claims to securities and certain cash amounts relating to securities, as defined in SIPA |
| FSD | Financial Support Direction | Direction determined by the Pensions Regulator requiring financial support to be put in place for the purpose of maintaining the solvency of a defined benefit scheme in accordance with the Pensions Act 2004 |
| HMRC | HM Revenue & Customs | Organisation of the UK government primarily responsible for the collection of taxes |
| House Estate (also referred to as House) | House Estate | Dealings that relate to LBIE's general unsecured estate |
| Insolvency Act | Insolvency Act 1986 | Statutory legislation that provides the legal platform for matters relating to personal and corporate insolvency in the UK |

| Abbreviation | Term | Definition |
|---|---|---|
| Insolvency Rules | Insolvency Rules 1986 | Statutory rules that provide the legal platform for matters relating to personal and corporate insolvency in the UK |
| Interest-only Proposal | Interest-only Proposal | Draft proposed interim solution to provide an early distribution of part of the surplus arising after the payment of Senior unsecured claims in full, pending the most significant issues being determined |
| IRS | Internal Revenue Service | A bureau of the Department of the Treasury of the United States federal government with responsibility for collecting taxes and the interpretation and enforcement of the internal revenue code |
| ISDA (also referred to as ISDA Master Agreement) | International Swaps and Derivatives Association Master Agreement | Global trade association for over-the-counter derivatives standard documentation |
| LB Lux | Lehman Brothers (Luxembourg) S.A. | Affiliate entity subject to insolvency proceedings in Luxembourg |
| LBB | Lehman Brothers Bankhaus A.G. | Affiliate entity subject to insolvency proceedings in Germany |
| LBEL | Lehman Brothers Europe Limited | Affiliate entity subject to insolvency proceedings in the UK |
| LBF | Lehman Brothers Finance S.A. (Switzerland) | Affiliate entity subject to insolvency proceedings in Switzerland |
| LBHI | Lehman Brothers Holdings Inc. | Ultimate parent of the Lehman group, incorporated in the US and formerly subject to Chapter 11 bankruptcy protection from 15 September 2008. The Plan of Reorganisation became effective on 6 March 2012 |
| LBHI2 | LB Holdings Intermediate 2 Limited | Affiliate entity subject to insolvency proceedings in the UK |
| LBHK | Lehman Brothers Hong Kong | Collective group of affiliate entities subject to insolvency proceedings in Hong Kong: Lehman Brothers Asia Holdings Ltd, Lehman Brothers Commercial Corporation Asia Ltd, Lehman Brothers Asia Capital Company Ltd, Lehman Brothers Securities Asia Ltd, Lehman Brothers Futures Asia Ltd, Lehman Brothers Asia Ltd and Lehman Brothers Nominees (H.K.) Ltd |
| LBI | Lehman Brothers Inc. | US broker-dealer affiliate entity, incorporated in the US which entered SIPA trusteeship on 19 September 2008 |
| LBIE | Lehman Brothers International (Europe) – In Administration | Private unlimited UK subsidiary of LBHI, acting as its main European broker dealer, subject to an administration order dated 15 September 2008 |
| LBL | Lehman Brothers Limited | UK service entity for the Lehman Administration Companies. LBL was placed into Administration on 15 September 2008 |
| LBSF | Lehman Brothers Special Financing Inc. | Affiliate entity subject to insolvency proceedings in the US |
| MCF | Mable Commercial Funding Limited | Affiliate entity subject to insolvency proceedings in the UK |
| Non-Consenting beneficiaries | Non-Consenting beneficiaries | Potential beneficiary under the Omnibus Settlement Agreement that did not make an offer to LBIE and therefore is not a party to the Common Terms |
| Omnibus Trust | Omnibus Trust | Trust under which the asset returns to LBIE by LBI of SIPA Customer Property relating to LBIE client positions are held and the assets constituting the trust property thereof |
| Over-Claims | Over-Claims | Proprietary claims made for or in respect of securities in an amount which exceeds the amount which appears as the claim entitlement to securities of that type as documented in LBIE's books and records |
| Pension Scheme | Lehman Brothers Pension Scheme | Group pension scheme for employees of UK Lehman entities |
| Post-Administration Interest | Post-Administration Interest | Statutory interest payable pursuant to Rule 2.88(7) of the Insolvency Rules |
| Proof of Debt (also referred to as POD) | Proof of Debt or Statement of Claim | A formal document prescribed by the Insolvency Rules submitted to the Administrators by a creditor wishing to prove their claim. The form is made in writing or electronically under the responsibility of a creditor and signed by an authorised person |
| SCSO | Small Claims Settlement Offer | An initiative under which creditors with agreed claims up to £150,000 were offered a one-off payment of 90% of their agreed claim in full and final settlement |
| Senior | Senior unsecured creditor | Unsecured, non-preferential, unsubordinated creditor |
| Shareholder(s) | Shareholder(s) of LBIE | LBL and/or LBHI2 |

| Abbreviation | Term | Definition |
|---|---|---|
| SIP 9 | Statement of Insolvency Practice 9 | Rules issued by the Joint Insolvency Committee which provide guidance to insolvency practitioners and creditors' committees in relation to the remuneration of, *inter alios*, administrators |
| SIPA | Securities Investor Protection Act 1970 | A US legal proceeding for handling the liquidation of a broker-dealer |
| Storm | Storm Funding Limited | Affiliate entity subject to insolvency proceedings in the UK |
| Street | Street counterparties | Third party counterparties consisting of financial institutions, including asset managers, custodians and banks; and non-banking financial institutions, including pension funds and corporate entities |
| Street Creditors | Street Creditors | Senior unsecured creditors with financial trading claims without Client Assets |
| Subordinated Debt | Subordinated Debt | The subordinated liabilities arising pursuant to 3 intercompany loan agreements entered into between LBIE and LBHI2, each dated 1 November 2006, and which have been assigned by LBHI2 to the Wentworth joint venture companies |
| Surplus Entitlement Proposal | Surplus Entitlement Proposal | Draft proposed solution for determination of creditors' entitlements to participate in the surplus arising after the payment of Senior unsecured claims in full, published by LBIE on 28 March 2014 |
| Trust Estate | Trust Estate | Refers to Client Assets, Client Money and Omnibus Trust |
| UK High Court | High Court of England and Wales | Court of England and Wales which deals with all high value and high importance cases, and also has a supervisory jurisdiction over all subordinate courts |
| UK Supreme Court | Supreme Court of the United Kingdom | This is the court of last resort and highest appellate court in the United Kingdom for civil cases |
| VAT | Value Added Tax | A consumption tax levied on the sale of goods and services in the UK |
| Waterfall I Appeal | Waterfall I Appeal | Appeal proceedings of all issues in respect of the Waterfall Application judgment granted by the UK High Court on 19 May 2014 |
| Waterfall I Application | Waterfall I Application | A joint application by LBIE, LBL and LBHI2 to the UK High Court issued on 14 February 2013 seeking a determination on statutory interest priority, contribution rights and other issues relating to LBIE and its Shareholders |
| Waterfall II Application | Waterfall II Application | An application to the UK High Court issued on 12 June 2014 seeking a further determination on issues that impact the rights of creditors to payment from the surplus and the distribution of that surplus in a timely manner |

www.pwc.co.uk/lehman

© 2014 PwC. All rights reserved. Not for further distribution without the permission of PwC.
"PwC" refers to the network of member firms of PricewaterhouseCoopers International
Limited (PwCIL), or, as the context requires, individual member firms of the PwC network.
Each member firm is a separate legal entity and does not act as agent of PwCIL or any other
member firm. PwCIL does not provide any services to clients. PwCIL is not responsible or
liable for the acts or omissions of any of its member firms nor can it control the exercise of
their professional judgment or bind them in any way. No member firm is responsible or liable
for the acts or omissions of any other member firm nor can it control the exercise of another
member firm's professional judgment or bind another member firm or PwCIL in any way.

