# EXHIBIT F

www.pwc.co.uk/lehman

# *Lehman Brothers International (Europe) – In Administration*

## Joint Administrators' eighteenth progress report, for the period from 15 March 2017 to 14 September 2017

*9 October 2017*



## *Important notice*

### Status of Administration

A Surplus arises in the Administration and rights to payment from that Surplus are currently being determined through the Waterfall court proceedings.

### Size of the Surplus

The precise amount of Surplus funds that will be available in due course remains uncertain. Due to commercial sensitivity, confidentiality and/or legal privilege, we are unable to provide detailed commentary on certain issues which will impact this.

### Claims against the Surplus

We reserve all rights concerning the relevance and calculation of all claims against the LBIE estate that might eventually share in the Surplus. No conclusion should be drawn or inferred from this report as to the way in which such claims will eventually be assessed or the allocation of the illustrative Surplus entitlements.

### Waterfall proceedings – LBIE's view

No inference should be taken or assumption made from the matters included in this report as to a view, conclusion or belief held by the Administrators with regard to the Waterfall proceedings.

### Reliance on data

**We caution creditors against using data in this report as a basis for estimating the value of their claims or their likely eventual entitlement to payment from the Surplus. LBIE, the Administrators, their firm, its members, partners, staff and advisers accept no liability to any party for any reliance placed upon this report.**

### Rights against third parties

LBIE also expressly reserves all of its rights against third parties on all matters and no conclusion should be drawn by third parties as to LBIE's position or legal arguments on any such matters from references made in this report.

### Currency risk

Whilst amounts included in this report are primarily stated in sterling, certain elements of LBIE's assets continue to be denominated in currencies other than sterling.

### Rounding

Unless it is clear otherwise, the figures within the report are now rounded to the nearest £1 million.

### Definitions

This report includes various defined terms as set out in the updated glossary of terms in Appendix F.

# *Contents*

**Section 1:**   *Introduction*                                                                     *4*

**Section 2:**   *Executive summary*                                                           *5*

**Section 3:**   *LBIE Surplus entitlements and Waterfall proceedings*              *10*

**Section 4:**   *LBIE 100p estate*                                                            *16*


**Appendices**

**Appendix A:**   *Receipts and payments: cumulative and 6 months to 14 September 2017*   *22*

**Appendix B:**   *Surplus-related court proceedings*                                 *27*

**Appendix C:**   *Other litigation summary*                                          *31*

**Appendix D:**   *Administrators' remuneration*                                      *32*

**Appendix E:**   *Statutory and other information*                                   *34*

**Appendix F:**   *Glossary of terms*                                                 *35*

# *Section 1:*
# Introduction

## *Introduction*

This report has been prepared by the Administrators of Lehman Brothers International (Europe) under Rule 18.3 of the Insolvency Rules.

This is the eighteenth such formal update to unsecured creditors and it provides details of progress made in the 6-month period from 15 March 2017 to 14 September 2017. The statutory receipts and payments accounts for the same period are attached at Appendix A.

Wherever possible, again, we have sought not to duplicate information disclosed to creditors in previous updates and reports. Copies of previous progress reports and other important announcements can be found at *www.pwc.co.uk/lehman.*

Creditors who do not have intimate knowledge of matters being dealt with in the Administration by virtue of involvement in the Waterfall court proceedings, and who desire to better understand these matters, are advised in the first instance to review our previous progress reports and other materials contained on the LBIE website where a significant amount of information has been posted for the benefit of all creditors.

We will host a 1-hour webinar on 26 October 2017, giving creditors an opportunity to hear a summary of the current circumstances of the Administration and activities that are planned for the next 6 months, and to participate in a question and answer session. Details of the webinar will be posted on the LBIE website in the usual way.

## *Objective of the Administration*

The Administrators continue to pursue the statutory objective and specific aims as set out in previous reports, which are summarised at Appendix E.

## *Creditors' Committee*

We continue to meet with Committee members to review progress and consult on major issues. The members continue to be assisted by an Adviser in approving the Administrators' fees and expenses requests and by two independent observers.

We remain grateful to all the participants of the Committee meetings for their continuing efforts in support of the Administration.

Details of the current Committee members are listed in Appendix E.

## *Future report and updates*

The next formal progress report to creditors will be in 6 months' time.

In the interim, we will provide ad hoc updates in the event of any material developments concerning entitlements to the Surplus or other significant matters, through the LBIE website or by other means as appropriate.

Signed:

*AV Lomas*
Joint Administrator
Lehman Brothers International (Europe)
In Administration

# Section 2:
# Executive summary

## Aims and priorities

The following aims and priorities of the Administrators continue unchanged:

### LBIE Surplus estate

To resolve entitlement disputes to the eventual Surplus through the Waterfall proceedings and other legal proceedings, if not otherwise settled through consensual resolution.

To distribute all or part of the Surplus funds either by way of an interim distribution subject to agreement with creditors or at the conclusion of the Waterfall and other related proceedings.

To maintain appropriate investment policies for LBIE's realised Surplus pending distribution.

### LBIE 100p estate

To realise all remaining House Estate assets and pay outstanding unsecured claims and Administration expenses in order to determine the eventual quantum of the Surplus remaining by:

- recovering remaining amounts owing;
- realising the value of remaining House securities;
- agreeing and admitting the small number of pending Senior and Shareholder claims;
- managing out and, where appropriate, releasing provisions and indemnities; and
- winding down LBIE's operation.

### LBIE Trust Estate

To settle outstanding CME issues (in particular BarCap's entitlement) in the Client Money estate and transfer residual funds to the House Estate.

To return remaining client securities after resolution of related House debtor litigation.

### LBIE costs

To efficiently manage ongoing Administration costs.

## Waterfall proceedings

There has been significant progress in various of the Waterfall legal proceedings in the period, as follows:

### Waterfall I Judgment

The final Waterfall I Judgment was handed down by the UK Supreme Court on 17 May 2017, which upheld the junior ranking of the Subordinated Debt (c.£1.24bn) but, contrary to previous rulings, found that CCCs (c.£2.5bn including interest) do not exist.

The elimination of c.£2.5bn of CCC entitlements against the Surplus has removed a major uncertainty and, subject to the continuing Waterfall proceedings, this has materially increased the prospects that a significant amount of the Surplus will be available to fund repayment of the Subordinated Debt in due course, notwithstanding its confirmed junior status in payment priority.

The Waterfall I Judgment also greatly reduced the chances of a contribution claim arising against LBIE's Shareholders and has brought further clarity to certain of the Administrators' priorities as a result of which the following steps were taken shortly after its receipt:

- the basis of the Waterfall III proceedings was revisited, and a renewed focus was put on exploring an overall consensual settlement;
- LBIE's currency hedging positions were reviewed and a series of conversions into sterling were made;
- an active small deed offer was closed, as it was no longer viable given the UK Supreme Court's conclusion on CCCs; and
- an update was provided to all creditors in which, amongst other things, the Administrators clearly set out their position on the appropriateness of continuing with the Administration rather than seeking an early liquidation, which would extinguish all claims to Post-Administration Interest that have accrued in the Administration period but which have not been paid due to the ongoing Waterfall proceedings.

**Waterfall III Application and related matters**

A UK High Court hearing of questions of law relating to contributory claims and other Affiliate matters was held in January 2017, with judgment reserved. The subsequent Waterfall I Judgment impacted both this application and the associated potential contribution claim settlement dialogue which had been reported to creditors, because, among other things, the UK Supreme Court held in the Waterfall I Judgment that:

- only a liquidator, not an Administrator, can prove in the estate of a Shareholder for a contribution claim;

- CCCs do not exist (and therefore could not form part of a contribution claim);

- there can be no contribution claim for unpaid Post-Administration Interest; and

- Post-Administration Interest accrued but not paid in the Administration would cease to be payable in any subsequent liquidation.

Due to the resulting limitations on the Administrators as to the quantum of a contribution claim and their ability to pursue such a claim, the interested parties no longer had any appetite to continue with the settlement terms that had been set out in the LBIE website update of 29 March 2017, and which included LBIE having access to a contribution recovery reserve of £913m.

Discussions continued in the period, to attempt to expeditiously settle the contribution claim matter and dismiss the associated Waterfall III proceedings. These ultimately resulted in an agreement which included all claims between LBIE and LBL being effectively withdrawn and LBHI providing a small capped indemnity in the unlikely event of a Surplus 'shortfall' arising. As part of the settlement transaction, the parties also agreed to the dismissal of the Waterfall III Application by consent upon the settlement becoming effective on 6 September 2017.

**Waterfall II appeals**

*Tranches A & B*

The Waterfall II tranches A and B appeal was held in early April 2017. The subsequent Waterfall I Judgment meant that certain of the matters being appealed fell away, primarily relating to CCCs, and the impact on certain other aspects of the Waterfall II appeal needed to be reconsidered in light of the rationale of the UK Supreme Court in reaching its decisions in Waterfall I. These other aspects were the subject of supplemental submissions by the parties to the UK Appeal Court during summer 2017.

The Waterfall II tranches A and B UK Appeal Court judgment is expected in the near future and should provide further clarification of the Bower v Marris dispute (£1.7bn+) and other issues in relation to the calculation of Post-Administration Interest.

Regardless of the appeal outcome, the Administrators expect the unsuccessful party will attempt to appeal it to the UK Supreme Court.

*Tranche C*

Various court filings have continued in the period, albeit the UK Appeal Court hearing of Waterfall II tranche C is some time away (scheduled for July 2018). When eventually received, the UK Appeal Court's judgment may affect the assessment of the potential incidence and quantum of cost of funding higher than the judgment rate of 8% simple p.a., which could give rise to additional Post-Administration Interest entitlements.

Bringing finality to one or both of the Waterfall II tranche A and tranche C proceedings is an essential step for the Administrators to be able to make a material level of distribution from the Surplus because, together, the Bower v Marris and cost of funding issues have theoretical potential to increase entitlements to Post-Administration Interest significantly beyond judgment rate of 8% simple p.a.

## *Illustrative Surplus entitlements*

In this report, we have updated and refined our illustrative Surplus entitlements analysis to:

- incorporate the impact of the Waterfall I Judgment;

- include Post-Administration Interest on the c.£36m Shareholder claim that was assigned to Wentworth by LBHI2 at the commencement of their joint venture; and

- distinguish between the amount of Surplus that would be available for distribution now (assuming majority creditor agreement) and the total amount of Surplus that might ultimately be available for distribution in due course when the Administration has run its full course.

On page 10 we provide an analysis of the Surplus available to admitted claimants, now and in due course, demonstrating that (on certain assumptions) there are sufficient funds already available in the LBIE 100p estate for c.£5.16bn of Post-Administration Interest to be paid, with c.£0.21bn remaining (rising to c.£2.40bn remaining when the Administration has run its full course, including resolution of the outstanding Client Money estate matters).

## Interim Surplus distribution

Outline terms of a CVA proposal, to facilitate an interim distribution of up to c.£4.5bn of Senior creditors' basic entitlements to Post-Administration Interest (i.e. at the judgment rate of 8% simple p.a.), were posted on the LBIE website on 29 March 2017. Following discussions, Wentworth confirmed it would not approve such a proposal. Because the SCG and Wentworth both have a blocking vote (i.e. aggregate claims held of greater than 25%, by value, of the total unsecured claims), the proposal could not proceed and so, by June 2017, it was withdrawn.

The respective appetites of these two groups for alternative terms to enable an interim distribution (via a Scheme of Arrangement) continue to be explored. We remain hopeful that the clarity and finality to certain matters that has been provided by the Waterfall I Judgment, together with the further clarity that should soon be provided to other matters by the UK Appeal Court judgment on Waterfall II tranches A and B, may help provide the necessary stimulus for the parties to agree alternative terms which would allow an interim distribution of Senior creditors' basic entitlements to Post-Administration Interest at least. Such an agreement could then leave disputes regarding enhanced entitlements to be determined at a later date.

Whilst Waterfall II matters remain unresolved (in particular Bower v Marris and higher rate cost of funding), any interim partial distribution of Post-Administration Interest which did not require majority (75%) creditor approval would likely require a very high level of reserves for potential Post-Administration Interest claims, that would cause any distribution to be relatively small. In the absence of any indication that the gap between the parties can be narrowed, we will continue to explore the possibility of making a first distribution from the Surplus without the need for majority creditor consent.

As noted on page 14, any distribution is likely to be impacted by deductions for withholding tax reserves.

## Surplus indicative financial outcome

On the basis that existing Waterfall judgments are all upheld on appeal, for illustrative purposes we estimate that c.£2.4bn Surplus will remain after payment of Post-Administration Interest entitlements to Senior creditors. For comparative purposes, in the table below, we estimate that no Surplus would remain if all Waterfall appeals were found in favour of the Senior creditors and c.£3.0bn Surplus would remain if all appeals were alternatively found in favour of Wentworth.

| Surplus | All existing Waterfall II judgments upheld £m | Pro-Senior appeal judgments £m | Pro-Wentworth appeal judgments £m |
|---|---|---|---|
| Assumed Surplus[1] | 7,692 | 7,692 | 7,692 |
| **Post-Administration Interest** | | | |
| 8% p.a. from later of ETD or 15/9/2008 | (4,650) | (4,650) | (4,650) |
| 8% p.a. from 15/9/2008 to ETD | (460) | (460) | - |
| Waterfall II tranche C cost of funds/Bower v Marris uplift | (180) | (2,582)[2] | - |
| **Senior claims recovery** | **(5,290)** | **(7,692)** | **(4,650)** |
| **Remaining Surplus** | **2,402** | **-** | **3,042** |
| **Wentworth junior claims** | | | |
| Subordinated Debt | (1,240) | - | (1,240) |
| Post-Administration Interest on Subordinated Debt[3] | (890) | - | (890) |
| Preferred and other equity[4] | (272) | - | (912) |
| **Wentworth junior claims recovery** | **(2,402)** | **-** | **(3,042)** |

1. Assumes the best case potential final outcome of c.£8.10bn, discounted by 5%, and that there are no non-provable claims that might result in a contribution claim.
2. Illustrative uplift includes the potential impact of higher rate cost of funding and Bower v Marris, with the actual combined uplift likely to exceed any remaining Surplus.
3. Assumes Post-Administration Interest at judgment rate of 8% simple p.a. paid on 14 September 2017.
4. Preferred and other equity claims are limited to the residual Surplus for illustrative purposes.

The comparison demonstrates that notwithstanding the definitive conclusion of Waterfall I, there remains a material spread of potential outcomes between the classes of creditor based on the assumptions made.

## LBIE 100p estate

The Administrators' updated indicative financial outcome Low and High case scenarios indicate a potential range of Surplus outcomes of between c.£7.07bn and c.£8.10bn (previously c.£7.05bn and c.£8.21bn, respectively, on a comparable basis).

The indicative financial outcome now includes Shareholder claims of c.£36m against LBIE, following the certainty created by the contribution claim settlement in the period, but continues to take no account of any potential contribution claim recoveries by a subsequent LBIE liquidator, reflecting the now likely remote possibility of such a claim ever being made.

The c.£55m improvement (before Shareholder claims) in the indicative Low case outcome results from improved forecast recoveries and cost estimates, offset in part by adverse foreign exchange movements on future recoveries denominated in foreign currencies. The c.£80m reduction (before Shareholder claims) in the indicative High case outcome reflects a revised reserving policy for indemnities and other priority claim reserves and adverse foreign exchange movements on future recoveries denominated in foreign currencies, offset in part by improved forecast cost estimates and certain priority claim reserve releases.

### Significant developments in the reporting period

The settlement reached in the period in respect of the Waterfall III matters has resulted in (amongst other things):

- agreement of the quantum (but not yet the admission) of both the LBHI2 claim at c.£36m and the Subordinated Debt claim at c.£1.24bn;

- the withdrawal of material cost recharge claims by LBL against LBIE, allowing LBIE to avoid reserving for these;

- the benefit of a £62m indemnity from LBHI in the unlikely event of a Surplus 'shortfall' arising before payment of the Subordinated Debt and Post-Administration Interest thereon;

- LBH paying a c.£23m dividend to LBIE in respect of LBIE's admitted claim; and

- litigation cost savings.

The long-awaited recovery of c.£47m on finalisation of the LBIE Zurich branch liquidation was received in the period.

Agreement was reached with the IRS relating to certain of LBIE's US tax liabilities, with associated settlement payments of c.£17m. The final payment of c.£7m was made to the third party pension provider that has assumed the Lehman UK Pension Fund liabilities.

## LBIE Trust Estate

### Client Assets

LBIE still holds client securities (c.£50m combined value) relating to certain debtors, pending conclusion of litigation with those debtors which we continue to progress as quickly as we are able. These client securities will be released to the relevant third parties when LBIE's own debt claims against those parties are also resolved.

### Client Money

Unresolved CME claimants comprise:

- a potential BarCap claim (c.$262m);

- 103 claims (c.$6m) relating to non-engaging counterparties in respect of which a UK High Court application for directions will be required;

- 14 other CME claimants (with combined claims of c.$4m) who have received a partial recovery of their CME from the Client Money estate. A settlement proposal developed by the House is currently on hold pending the outcome of the BarCap litigation; and

- 2 claims of nominal value relating to debtor counterparties that are subject to litigation.

The opportunity to expedite the resolution of the Client Money estate will continue to be explored, in parallel with ongoing attempts to prompt interim Surplus settlement discussions, in an attempt to increase the amount of funds that would be available for distribution in the near term.

## *Foreign currency*

After several 6-monthly reporting periods of favourable unrealised currency gains (largely reflecting the steadily rising sterling equivalent value of significant amounts of US dollars held as Client Money), a c.£90m adverse movement (of which c.£60m is unrealised) in the High case outcome is reported in the current period, principally relating to the continued exposure to US dollars in the House Estate relating both to third party receivables and to the Client Money surplus.

In our last report, we highlighted our policy of holding US dollars in both the House Estate and the Client Money estate as a currency hedge against the value of CCCs predominantly denominated in US dollars (in the event they were ultimately found to be admissible).

Following the Waterfall I Judgment in the period, we determined that the currency hedge was no longer merited. Accordingly, commencing from June 2017, we exchanged the majority of LBIE's foreign currency balances to sterling, subject to maintaining c.$270m to meet remaining potential future dollar payments.

# Section 3:
# LBIE Surplus entitlements and Waterfall proceedings

## Summary

In the absence of a commercial compromise, a series of UK court ('Waterfall') proceedings have been required with the objective of determining entitlements to the Surplus. Based on current judgments, claims against the Surplus rank in the following order:

i. Post-Administration Interest on senior ranking, provable claims;

ii. Non-provable claims (we are currently aware of none in the LBIE estate based on current judgments);

iii. Subordinated Debt and Post-Administration Interest thereon;

iv. Preferred equity; and

v. Equity.

In the event that the Surplus is insufficient to pay in full all claims against it, the Waterfall I Judgment confirmed that only a LBIE liquidator would be able to make a contribution claim against its unlimited liability Shareholders, LBL and LBHI2, and then only for outstanding non-provable and Subordinated Debt claims.

In the period, two of the separate Waterfall proceedings were concluded:

**Waterfall I** – ranking of Subordinated Debt and existence of CCCs (litigation completed); and
**Waterfall III** – contribution claim (settled).

The matters of most material financial significance in the remaining Waterfall proceedings are as follows:

**Waterfall II tranche A** – Bower v Marris (allocation of LBIE's 100p estate distributions as either interest or principal) and Post-Administration Interest start date;
**Waterfall II tranche B** – waiver of non-provable claim entitlements (if any) by CRA and CDD contracts; and
**Waterfall II tranche C** – cost of funding – Post-Administration Interest entitlement above judgment rate of 8% simple p.a.

Potentially, these continuing Waterfall II proceedings could run their natural course, through to the UK Supreme Court if appropriate, before it will become clear what creditor entitlements to the Surplus are and before any significant distributions can be made from it.

## Illustrative Surplus entitlements

The Waterfall I Judgment was handed down in the period, which amongst other matters upheld the junior ranking of the Subordinated Debt but, contrary to previous rulings, found that CCCs do not exist. Potential entitlements of up to £2.5bn for CCCs were reflected in previous reports.

Accordingly, in the table below, for illustrative purposes only, we have revised our analysis to reflect this judgment and to present, firstly, the Surplus that would currently be available for distribution to admitted creditors (if agreement to that distribution could be agreed between them) and, secondly, the higher amount that might ultimately become available, allocated between different categories of claimant.

| Surplus | Notes | Currently available (14 Sept. 2017) £m | Ultimately available £m |
|---|---|---|---|
| **Available Surplus** | | | |
| Low/High case Surplus outcome (see page 16) | | 7,073 | 8,097 |
| Future recoveries reversed (see page 16) | 1 | (1,242) | - |
| Assumed discount (5%) | 2 | - | (405) |
| **Adjusted illustrative Surplus** | | **5,831** | **7,692** |
| BarCap reserve | 3 | (414) | - |
| Accruing Post-Administration Interest reserve on 'pending' Senior/Shareholder claims | 4 | (50) | - |
| **Available Surplus to admitted creditors** | | **5,367** | **7,692** |
| **Post-Administration Interest on admitted claims** | | | |
| BarCap claim | 3 | - | (90) |
| Shareholder claim (LBHI2) | 5 | - | (40) |
| Admitted claims as at 14 September 2017 | 5 | (5,160) | (5,160) |
| | | (5,160) | (5,290) |
| **Available to repay Subordinated Debt and Post-Administration Interest thereon** | | **207** | **2,402** |

The key assumptions used for this analysis are set out below.

### Adjusted illustrative Surplus

**Note 1** - the 'currently available' scenario illustrates the funds potentially available as at the date of this report, being equivalent to the LBIE 100p estate Low case outcome estimated Surplus, revised to exclude all future forecast recoveries (including all future House recoveries from the Client Money estate).

**Note 2** - the 'ultimately available' scenario reflects the LBIE 100p estate High case outcome estimated Surplus, discounted by 5% consistent with the assumption used in previous reports.

### Note 3 - BarCap reserve

In deriving the LBIE 100p estate Low case outcome estimated Surplus of c.£7,073m, we assume that BarCap will have a CME claim (c.$262m) and not an unsecured claim. However, for the purposes of illustrating how much of the Surplus would be available to pay admitted creditors at 14 September 2017 (assuming creditor agreement), we would need to reserve c.£414m relating to BarCap, representing the maximum theoretical entitlements of BarCap against the Surplus. This reserve in the 'currently available' scenario comprises:

- an asserted unsecured BarCap claim of c.£84m;

- Post-Administration Interest of c.£90m on the asserted unsecured claim of c.£84m (assuming admission and payment of the claim in 2022); and

- a further amount for the potential Post-Administration Interest of c.£240m relating to the unresolved issue of the $777m paid directly by LBI to BarCap, against its LBIE claim.

The 'ultimately available' scenario assumes that BarCap pursues and is paid an admitted Senior claim of c.£84m/c.$150m, being the full amount claimed less $777m that it received from LBI. This admitted claim is included in deriving the LBIE 100p estate High case outcome estimated Surplus of c.£8,097m.

### Note 4 - Accruing Post-Administration Interest reserve on 'pending' Senior/Shareholder claims

The 'currently available' scenario assumes a reserve for accruing Post-Administration Interest on 'pending' unsecured claims, assuming admission and payment of the claims will occur in 2022, of:

- c.£40m Post-Administration Interest on the c.£36m Shareholder claim (LBHI2); and

- c.£10m Post-Administration Interest on the other Low case outcome Senior claims totalling c.£11m.

The 'ultimately available' scenario assumes that all eligible claims have been admitted (including 'pending' other Senior claims at a significantly reduced amount) and thus the reserve for accruing Post-Administration Interest is included in Post-Administration Interest on admitted claims.

### Note 5 - Post-Administration Interest on admitted claims

In the 'ultimately available' scenario:

- illustrative Post-Administration Interest of c.£5,290m includes judgment rate of 8% simple p.a. for most admitted creditors (c.£5,110m) (including the assumed entitlements of c.£90m and c.£40m on future admitted claims of BarCap and LBHI2 respectively) with only a small number able to claim a contractual cost of funding rate at an amount in excess of that (c.£180m); and

- it is assumed that no Post-Administration Interest will be paid on the $777m amount that has already been received by BarCap from LBI. In the event that this assumption is incorrect, then the incremental claim against the Surplus by BarCap could be c.£240m.

In the 'currently available' scenario, the illustrative Post-Administration Interest of c.£5,160m relates to entitlements on admitted claims as at 14 September 2017, and also includes c.£180m relating to higher rate cost of funding entitlements.

### Other entitlement assumptions

For illustrative purposes it is also assumed in both scenarios that:

- all future Waterfall II appeals will be unsuccessful;

- Senior and Shareholder claims (excluding the Subordinated Debt) are c.£12.4bn and no new claims will be submitted or revisions made; and

- no new disputes to LBIE's creditor claim disaggregation will be raised by creditors.

### Contribution claim assumption

No account of contribution claim recoveries is included in the illustrative outcome scenarios, as:

- the Waterfall I Judgment found that only a liquidator, not an Administrator, can prove in the estate of a Shareholder for a contribution claim, and that a contribution claim cannot be made in relation to unpaid Post-Administration Interest;

- our updated analysis suggests no Surplus 'shortfall' will arise based on current judgments; and

- Post-Administration Interest accrued but not paid in the Administration would cease to be payable in any subsequent liquidation, with the effect that the Administrators will object to any premature liquidation proposal prior to such interest being paid.

### Settlement discussions

Discussions in the period with interested parties (certain Affiliates and Wentworth, on account of its interest in LBHI2) initially concentrated on the contribution claim settlement terms as set out in the LBIE website update of 29 March 2017, which included LBIE having access to a contribution recovery reserve of £913m. Following the Waterfall I Judgment, the interested parties no longer sought to pursue this settlement proposal as the Administrators cannot pursue a contribution claim and the likelihood of LBIE moving into liquidation and any claim being made by a subsequent liquidator was considered to be very low.

Discussions resumed in summer 2017 to consider more restrictive settlement proposals. The commercial terms ultimately agreed included:

- LBL and LBIE to withdraw all claims against each other;

- LBHI to provide an indemnity to LBIE up to £62m in the unlikely event that a Surplus 'shortfall' arises before payment of the Subordinated Debt;

- the Subordinated Debt claim value to be agreed (though not admitted in the Administration) at c.£1.24bn, with associated Post-Administration Interest to be agreed in due course (if relevant);

- recourse in respect of the Subordinated Debt to be limited to the Surplus available after LBIE has made distributions in respect of all prior ranking claims;

- the transfer of LBL's single LBIE share to LBHI2 (agreed between the Shareholders); and

- an inter-Affiliate settlement (excluding LBIE) to allow distributions to creditors or shareholders in other estates without (in the case of LBL and LBHI2) reserving for a potential future contribution claim from LBIE, with LBIE not objecting to such distributions.

A settlement agreement and associated deeds containing the above terms were executed by the parties, which became fully effective on 6 September 2017.

**Key Surplus entitlement uncertainties**

*Waterfall II tranche A – Bower v Marris*

The allocation of LBIE's 100p estate distributions as Post-Administration Interest or principal has a significant impact on the total Post-Administration Interest potentially payable out of the Surplus. On the hypothetical assumption that the Surplus were to be distributed in September 2017 and that Post-Administration Interest is at the judgment rate of 8% simple p.a. for all claims, we estimate that, if distributions were ultimately to be treated as having related to Post-Administration Interest first (i.e. the Bower v Marris approach), then additional Post-Administration Interest entitlements of c.£1.7bn would arise. This additional amount would increase:

- by c.£0.4bn for every further year beyond September 2017 that the Surplus is not distributed; and

- potentially significantly, if some claims were also entitled to Post-Administration Interest at more than judgment rate of 8% simple p.a.

*Waterfall II tranche C – cost of funding*

Of LBIE's total admitted Senior claims of c.£12.31bn, c.£4.55bn by value relates to ISDA Master Agreements or similar agreements. If, for such agreements, Post-Administration Interest entitlement is ultimately found to be significantly above judgment rate of 8% simple p.a., in isolation this could have a major impact on the total Post-Administration Interest potentially payable out of the Surplus.

By way of illustration, if a compound contractual rate of 12% p.a. were applicable to all such claims, then additional Post-Administration Interest entitlements of c.£2.3bn would arise.

If these two factors were to be combined, requiring a Bower v Marris approach to the calculation of Post-Administration Interest and a high compound contractual rate of interest payable to creditors with ISDA Master Agreements or similar agreements, this could have a material impact on reserving.

## Certification of claims against the Surplus

In May 2017, on the LBIE website we published our preliminary guidance and observations for creditors who may now wish to make a certification for a contractual interest rate arising under ISDA Master Agreements or similar agreements which is higher than judgment rate of 8% simple p.a.

The guidance, by counterparty type, covers:

- our observations on the rates which we expect could be certified by creditors;

- the process likely to be followed for making certifications, including supporting evidence expected to be provided by creditors; and

- the process likely to be followed by the Administrators in reviewing certifications and the circumstances in which they may challenge a certification.

The guidance is not intended to be prescriptive or exhaustive, and is subject to future revision in light of appeals to the Waterfall II tranche C judgment.

We have received a variety of feedback on our guidance from Waterfall respondents and other interested parties ranging from overall support and/or agreement with the stance taken, through to strong disagreement in a limited number of cases. Specific engagement with counterparties continues.

## Small deed offer

An offer via LBNL was made to a population of c.160, principally low value Senior claims each below £0.5m, to acquire their admitted claims. In the period, 24 creditors accepted the offer before its withdrawal, with total Surplus entitlements of c.£2m being transferred to LBNL as a result.

## *Interim Surplus distribution*

The Administrators have continued to have conversations with the SCG and Wentworth to explore the prospect of an interim distribution or an overall resolution to the Waterfall proceedings that would unlock payments to creditors from the Surplus. The Administrators continue to believe that the interests of creditors as a whole would be best served by the resolution of the Surplus entitlement issues on consensual terms rather than through court judgments, with the inherent delay, risk and uncertainty that entails.

Following receipt of the Waterfall I Judgment, the Administrators increased engagement with Wentworth and the SCG to explore how a settlement (either interim, to facilitate a material payment of Post-Administration Interest, or overall, to conclude all matters) might proceed. It became clear early in these recent discussions that the gap between the parties currently remains too great to be conducive to developing a framework to settle all remaining issues. However, the exchanges usefully identified where some areas of common ground might exist that could eventually contribute to an agreement that would enable a payment of Post-Administration Interest. Whilst not conclusive, these discussions may be a helpful starting point to revisit once the UK Appeal Court judgment relating to Bower v Marris is received.

In high level terms, in these discussions the parties' attentions have focused on:

- a payment of Post-Administration Interest at judgment rate of 8% simple p.a. subject to withholding tax;

- an uplift on the Post-Administration Interest for holders of ISDA (and similar) claims to be paid to resolve those claims without certification and scrutiny of the cost of funding asserted;

- a material distribution on account in respect of the Subordinated Debt; and

- a continuing litigation of Bower v Marris.

In the event that sufficient of the Waterfall respondents were to be in favour of any consensual terms, we would be inclined to put them to the wider creditor community by way of a Scheme of Arrangement.

The Administrators will continue to assess what alternative bases might be feasible for making a distribution in the absence of a consensual resolution being reached. Such a distribution would likely be for a significantly lesser total Surplus amount than under a consensual resolution, given the necessary reserves for higher rate cost of funding claims and Bower v Marris that would be required to be made.

## *Waterfall and other related court proceedings*

### Waterfall I appeal – completed

The UK Supreme Court appeal judgment was received in the period. Amongst other things, the ranking of the Subordinated Debt was confirmed as being junior to Post-Administration Interest and non-provable claims, and the status of CCCs was clarified (they do not exist).

### Waterfall II appeals – in train

The UK Appeal Court hearing of tranches A and B matters was held in April 2017. Supplemental submissions were made by the parties in summer 2017, including an oral hearing on 25 July 2017, relating to matters impacted by the rationale used by the UK Supreme Court in reaching its decisions on the Waterfall I appeal. Judgment is expected in the near future. The appeal of tranche C matters (cost of funding) is scheduled to be heard by the UK Appeal Court in July 2018. The UK High Court judgment on foreign law matters is no longer the subject of an appeal, this having now been terminated by consent.

### Waterfall III Application – concluded by consent

The first UK High Court hearing in respect of tranche A (questions of law) was held in January/February 2017 with judgment reserved, with the tranche B hearing scheduled for September 2017.

The Waterfall I Judgment impacted this application as:

- the removal of CCC entitlements reduced the likelihood of a Surplus 'shortfall' arising; and
- only a liquidator (not an Administrator) can prove in the estate of a Shareholder for a contribution claim, there can be no contribution claim for unpaid Post-Administration Interest and Post-Administration Interest accrued not paid in the Administration would cease to be payable in any subsequent liquidation.

Following a hearing in late July 2017, the UK High Court directed that the Waterfall III Application be adjourned and the tranche B hearing scheduled for September 2017 be vacated. Subsequently, a settlement agreement and associated deeds were executed by the parties which became fully effective on 6 September 2017, with the parties also agreeing to the dismissal of the Waterfall III Application by consent.

### BarCap claims application – in train

This court application relates to the treatment of BarCap's claims into the LBIE House and Client Money estates. Matters not heavily reliant on evidence will be subject to an 8-day hearing scheduled for April 2018, with evidence-heavy matters stayed, to be dealt with at a later hearing if required.

The issues to be considered include:

- whether, in respect of claim elements which have the benefit of CME, BarCap has an alternative unsecured claim and the basis on which such a claim should be valued (first hearing);
- whether for claim elements for which BarCap has both CME and unsecured claim status, it is entitled to pursue an unsecured claim to the exclusion of a CME claim (first hearing);
- the manner and date from which the $777m LBI payment to BarCap is to be applied by way of reduction either to a CME claim or to an unsecured claim (first hearing);
- the extent to which BarCap has potential entitlements to claim against the Surplus (first hearing); and
- the 'threshold issue' (whether the debt claim that BarCap acquired from LBI in fact benefits from Client Money protection) and the status of Korean trades in the context of CME (later hearing).

### UK withholding tax directions appeal – in train

The HMRC appeal relating to the judgment that LBIE has no obligation to deduct UK withholding tax from payments of Post-Administration Interest is scheduled to be heard on 31 October/1 November 2017.

We emphasise that resolution of this matter is necessary before all Post-Administration Interest distributions to any party can be finalised, whether through a consensual arrangement or otherwise. If Post-Administration Interest distributions are made ahead of a final resolution, a withholding tax reserve of at least 20% will be necessary in most, if not all, cases.

### Claim currency directions application – not being pursued

Following the handing down of the Waterfall I Judgment in the period, this anticipated application has become unnecessary as it related to CCC issues.

## *Court process timetable*

Where appropriate, actual (**date**) and illustrative (half-year period) projected timelines are noted below for the Waterfall and other related court proceedings that are in train.

| Matter | Key issues | Status | UK Appeal Court hearing | UK Supreme Court hearing[1] |
|---|---|---|---|---|
| Waterfall II tranches A & B | Application of unsecured dividends to principal or interest first Post-Administration Interest start date<br>Release of non-provable liabilities by certain post-Administration contracts<br>Supplemental questions on calculation of claims | Appealed by SCG/York<br>Appealed by Wentworth<br>Appealed by Wentworth<br><br>Appealed by Wentworth/ SCG/York | Decision awaited | H2 2019 |
| Waterfall II tranche C | Impact of cost of funding on Post-Administration Interest claims | Appealed by SCG/ Goldman Sachs Int. | **3 July 2018** | H1 2020 |
| BarCap claims | Treatment of claims from BarCap | UK High Court hearings commencing between **16-20 April 2018** | H1 2020 | H1 2022 |
| UK withholding tax | Tax treatment of Post-Administration Interest | Appealed by HMRC | **31 October 2017** | H2 2019 |

1.    Assumes all matters will be ultimately determined by appeal to the UK Supreme Court.

In each of the proceedings, the earliest that judgments should be expected to be handed down is in a period 3 to 6 months after the respective hearing dates.

# Section 4:
# LBIE 100p estate

## Introduction

An updated summary of the indicative Low and High case financial outcome scenarios for unsecured creditors in the LBIE 100p estate is set out below. This should be read in conjunction with the assumptions and commentary set out overleaf.

## Summary

| Page | House Estate at 14 September 2017 | Notes | Low £m | High £m | Difference £m |
|---|---|---|---|---|---|
| 22 | **Total cash in hand** | | **6,605** | **6,605** | **-** |
| | **Projected future movements** | | | | |
| 17 | Net Client Money benefit to the House Estate | 1 | 938 | 1,148 | 210 |
| 17 | House receivables | 2 | 269 | 751 | 482 |
| 18 | House securities | 3 | 35 | 54 | 19 |
| | **Future recoveries expected** | | **1,242** | **1,953** | **711** |
| 18 | Future estimated costs | 4 | (254) | (254) | - |
| 19 | Priority claims^ | 5 | (473) | (85) | 388 |
| | **Total future cash expected to be recovered** | | **515** | **1,614** | **1,099** |
| | **Funds available** | | **7,120** | **8,219** | **1,099** |
| 20 | Pending Senior claims | 6 | (11) | (86) | (75) |
| 20 | Pending Shareholder claims | 7 | (36) | (36) | - |
| | **Surplus before Post-Administration Interest, non-provable claims, and the Subordinated Debt** | | **7,073** | **8,097** | **1,024** |

^ Amounts included in priority claims do not rank for Post-Administration Interest.

Based on the aggregate c.£6.60bn cash deposits and government bonds in hand at 14 September 2017, less the c.£0.77bn Low case reserve for future costs, priority claims and pending claims, c.£5.83bn is the already realised Surplus that would be currently 'available' for distribution to admitted claims (if majority creditor agreement could be reached), subject to reserving both for the potential BarCap claim (included in the Client Money estate in the Low case) and for the accruing Post-Administration Interest entitlements on all pending claims. This 'available' Surplus would increase to c.£6.75bn if the pre-Administration Client Money estate were to be fully resolved and the surplus funds transferred to the House, consistent with the Low case outcome (excluding the assumed future Client Money recoveries).

## Low and High case movements in the period

The updated indicative Low and High case Surplus outcomes in the table above are c.£7.07bn and c.£8.10bn, respectively. The principal changes in the indicative outcomes over the reporting period are as follows:

| | Low £m | High £m | Comments |
|---|---|---|---|
| **Indicative Surplus as at 14 March 2017** | **7,054** | **8,213** | Categories previously rounded to nearest £10m revised to nearest £1m |
| **Movements in the period** | | | |
| Net Client Money benefit to the House Estate | (23) | (45) | Mainly adverse realised foreign exchange movements |
| House receivables | 37 | (4) | Improved forecast future recoveries net of adverse unrealised foreign exchange movements |
| House securities | 5 | - | Unrealised market value movements on remaining securities |
| Future estimated costs | 29 | 29 | Mainly reduced Surplus litigation cost estimates |
| Priority claims | 5 | (62) | Tax, pension and indemnity releases net of reserve revisions |
| Other | 2 | 2 | Mainly interest and dividend receipts offset by foreign exchange translation differences |
| **Movement – before new claims** | **55** | **(80)** | |
| Pending Shareholder claims | (36) | (36) | New claims included following the Waterfall I Judgment |
| **Movement – after new claims** | **19** | **(116)** | |
| **Indicative Surplus at 14 September 2017** | **7,073** | **8,097** | |

## Assumptions and commentary

The assumptions underlying indicative future cash recoveries/payments and the resolution of pending Senior and Shareholder claims are set out overleaf.

## Note 1 - Net Client Money benefit to the House Estate

| Pre-Administration Client Money estate | Low $m | High $m |
|---|---|---|
| **Projected Client Money available to distribute[1]** | | |
| Funds held at 14 September 2017[2] | 1,484 | 1,484 |
| LBHI/LBB future recoveries[3] | 25 | 39 |
| | **1,509** | **1,523** |
| **Less future third party distributions** | | |
| Potential BarCap CME[4] | (262) | - |
| Future distributions of retained CME claims[5] and estimated funds to be paid to the UK High Court[6] | (8) | (8) |
| | **(270)** | **(8)** |
| **Projected future transfer to the House Estate ($m)** | **1,239** | **1,515** |
| **(£m)** | **938** | **1,148** |

1. It is assumed that the Administrators will not be required to trace and recover assets from the House Estate for the benefit of the Client Money pool.
2. Funds are predominantly now held in sterling, with c.$270m retained in US dollars to meet potential future CME liabilities.
3. This represents the combined potential future dividends on LBIE's LBHI guarantee claim of c.$1.01bn and LBB unsecured claim of c.€400m.
4. The potential BarCap CME claim is an assessment by LBIE as detailed below.
5. Future final distributions to 14 claimants with retained CME at a rate of 51.8% of total CME claims of c.$4m.
6. Includes 103 non-engaging counterparties with total CME claims of c.$6m and 2 counterparties subject to overseas court proceedings.

### Potential BarCap CME

The Low case outcome scenario continues to assume that the BarCap maximum CME claim will be in the region of c.$262m. This amount represents an agreed and reconciled gross CME claim of c.$1.04bn less the $777m paid to BarCap by LBI. Included in the c.$1.04bn claim is an amount of c.$146m relating to transactions in Korea which may, or may not, be subject to Client Money protection.

In the High case outcome scenario, BarCap is assumed to hold a Senior claim rather than a CME claim.

A number of simplifying assumptions have been made for the illustrations above. Full details of the BarCap claims are set out in the UK High Court filings which can be found on the LBIE website.

## Note 2 - House receivables

House Estate receivables as at 14 September 2017, referred to below, are indicative only and significant matters remain unresolved, predominantly relating to litigation, which may materially impact this estimate.

| House receivables | Rec'd in period £m | Indicative future recoveries | |
|---|---|---|---|
| | | Low £m | High £m |
| **Litigation** | | | |
| AGR | - | - | 364 |
| Others | - | 1 | 32 |
| | **-** | **1** | **396** |
| **Affiliates and branches** | | | |
| MCF | - | 240 | 290 |
| Other Affiliates | 24 | 28 | 42 |
| LBIE Zurich branch | 47 | - | - |
| | **71** | **268** | **332** |
| **Client Assets claimants** | **-** | **-** | **23** |
| **Receivables at 14 September 2017[1]** | **71** | **269** | **751** |

1. Excluded from the above are:
- 10 counterparties with an aggregate c.£69m owing to LBIE where payment is not forthcoming because of the ISDA Section 2(a)(iii) issue. LBIE continues to explore options for realising value from such claims; and
- 2 claims with nominal values against insolvent/restructured debtors and 1 claim of c.£126m against another insolvent debtor, where the potential return to its creditors, including LBIE, is extremely uncertain.

### AGR litigation

As previously reported, AGR filed a dispositive motion seeking summary judgment in its favour and the decision of the Supreme Court of the State of New York on the motion still remains outstanding.

As noted in our last report, mediation commenced in April 2017. The Administrators' view is that the decision referred to above will need to be handed down before further discussions take place.

The indicative Low case outcome assumes nil recovery from AGR and the indicative High case outcome assumes c.£364m, which represents full recovery of the LBIE expert's valuation of c.$498m (net of unpaid premiums), excluding judgment rate interest that could be due on any award.

No account is taken of AGR credit risk and accordingly no credit value adjustment is reflected. Should that become relevant, a pre-interest claim value in excess of c.$200m (c.£152m) would be appropriate, in the view of LBIE's expert.

Absent a material movement of position by either side (none is expected), this matter is likely to be one of the last issues to be resolved in the Administration.

**Others in litigation**

A Korean debtor is subject to recovery proceedings. A number of appeal hearings were held in the period and a judgment is awaited. The indicative Low case outcome assumes c.£1m recovery and the indicative High case outcome assumes c.£29m. In addition, enforcement of a favourable US court judgment against a debtor domiciled in Saudi Arabia is continuing. The indicative Low case outcome assumes nil recovery and the indicative High case outcome assumes c.£3m.

**MCF**

MCF forecasts future recoveries, including from the run-off of the portfolio of mortgage-related assets in its solvent subsidiaries, which should give rise to future distributions to LBIE of between c.£240m and c.£290m.

LBIE and LBHI, together holding the majority interest in MCF, continue to jointly review progress on a periodic basis and explore opportunities to enhance the value or expedite the timing of this ongoing realisation process.

**LBIE Zurich branch**

Following continued engagement with FINMA in the period, surplus funds of c.£47m were successfully recovered by LBIE relating to the liquidation of its Zurich branch.

**Other Affiliates**

LBH paid a c.£23m distribution to LBIE following the Waterfall III settlement.

LBIE has provided funding of c.£4m via LBNL to acquire certain Senior claims under the small deed offer and the LBNL employee offer initiatives. The LBNL receivable will be recovered by LBIE principally upon receipt by LBNL of Post-Administration Interest from LBIE on the acquired claims.

Other expected future recoveries relate to further assumed distributions from LBSF and from other insolvent Affiliate estates.

**Client Assets claimants**

The indicative High case outcome assumes recovery of debts that remain subject to ongoing litigation in a German court. A court hearing in June 2017 considered the issue of the quantum of the termination value owed to LBIE, and follow up briefing papers and expert witness nominations have been submitted.

## Note 3 - House securities

| Securities | Low £m | High £m |
|---|---|---|
| Available for sale | 16 | 35 |
| Subject to litigation in Korea | 19 | 19 |
| House securities at 14 September 2017 | 35 | 54 |

All remaining securities 'available for sale' have specific issues attaching to them which remain to be resolved, albeit the majority of this remaining value rests in a single asset holding.

## Note 4 - Future estimated costs

| Future costs | Legal £m | Admin. fees £m | Other £m | Total £m |
|---|---|---|---|---|
| Estimated costs by year | | | | |
| 2017 (6 months) | (10) | (11) | (11) | (32) |
| 2018 | (18) | (15) | (17) | (50) |
| 2019 | (23) | (12) | (16) | (51) |
| 2020 | (16) | (13) | (15) | (44) |
| 2021 | (8) | (18) | (14) | (40) |
| 2022 | (5) | (9) | (3) | (17) |
| | (80) | (78) | (76) | (234) |
| Costs accrued at 30 June 2017 | | | | (31) |
| Costs paid in period to 14 September 2017 | | | | 11 |
| Future estimated costs at 14 September 2017 | | | | (254) |

The same assumptions have been made for the Low and High case outcomes reflecting continuing uncertainties regarding the future cost impact of the Waterfall proceedings, other counterparty litigation and the outcomes and timings of other matters.

On a calendar year basis, we prepare a detailed cost budget and a long-term forecast of the costs to complete the Administration. These forecasts are reviewed and updated at 6-monthly intervals and are discussed with the Committee.

The key assumptions underlying the costs estimate remain consistent with the last progress report, namely:

- the litigation required to resolve the remaining disputed receivables and creditor claims will require due legal processes, involving hearings at first instance, appeals, delays and cost awards;

- a full court appeal process will be required to settle the Surplus entitlements matter (Waterfall II) culminating at the UK Supreme Court;

- further Surplus-related directions hearings will be required; and

- the Administration and related processes will be completed by the end of 2022.

## Note 5 - Priority claims

These are claims which could crystallise in certain circumstances and would rank for payment in priority to unsecured creditors. The movements in the period are summarised below.

| Priority claims | Low £m | High £m |
|---|---|---|
| Reported as at 14 March 2017 | (502) | (47) |
| **Movements in the period** | | |
| Tax payments | 17 | 17 |
| Tax provisions releases | 28 | 5 |
| Post-Administration indemnities | 45 | (40) |
| Pension Fund payments | 7 | 7 |
| Pension Fund provision releases | 5 | 5 |
| Other reserves | (80) | (34) |
| Foreign exchange movements | 7 | 2 |
| | 29 | (38) |
| **Priority claims at 14 September 2017** | (473) | (85) |
| **Comprising** | | |
| Tax provisions | (173) | (8) |
| Post-Administration indemnities | (160) | (40) |
| Pension Fund provision | (3) | (3) |
| Other reserves | (137) | (34) |
| **Priority claims at 14 September 2017** | (473) | (85) |

### Tax provisions

The Low case outcome assumes that the majority of LBIE's potential outstanding tax liabilities in various jurisdictions ultimately will become payable to the relevant taxing authorities.

In the High case outcome, the assumption is that the majority of these tax liabilities, ultimately, will not be assessed.

In the period, we have:

- agreed with the IRS penalties and interest relating to certain of LBIE's US income tax liabilities, with payments of c.£17m enabling us to release tax provisions of c.£28m and c.£5m in the Low case and High case, respectively;

- continued dialogue with the Italian and French tax authorities seeking to ultimately agree tax repayments to LBIE; and

- received correspondence from the German public prosecutor, on behalf of the German tax authorities, regarding transactions allegedly involving LBIE. We are liaising with the German authorities to obtain further information before considering our next steps.

### Post-Administration indemnities

Indemnities have been provided to:

- suppliers of post-Administration IT, valuation and property services to LBIE;

- third parties, branches and Affiliates in order to facilitate the release of assets to LBIE's Administrators;

- nominees of LBIE, acting on its behalf including in respect of the return of assets to counterparties; and

- LBNL in relation to the LBIE admitted claims auctions, LBNL employee offer and small deed offer.

In the period, an obligation fell away upon expiry of the term set out in the contract, enabling us to reduce provisions by c.£45m in the Low case outcome.

Pending finalisation of all exposures, we have revised our reserving policy and assume in the High case outcome that some claims against the indemnities will crystallise.

### Pension Fund provision

A final c.£7m payment was made to the third party pension provider that is assuming the pension liabilities, which enabled a release of c.£5m reserves. The third party has now taken direct responsibility for paying benefits to members.

Work is now focusing on winding up the Pension Fund itself, including the payment of residual outstanding trustee costs and effecting trustee liability insurance cover which is anticipated to be completed within the next reporting period.

### Other reserves

In the Low case outcome, other reserves relate to a range of litigious issues, the outcome of which remain uncertain including adverse litigation (non-Waterfall) cost exposures.

In the High case outcome, a new and more prudent reserving policy in line with that adopted for post-Administration indemnities has been applied.

## Note 6 - Pending Senior claims

The majority of pending Senior claims by value are subject to litigation, and their eventual outcome may materially impact the estimates below.

| Senior claims | POD £m | Low £m | High £m |
|---|---|---|---|
| BarCap claim | (517) | - | (84) |
| Other creditors' claims | (21) | (11) | (2) |
| Total | (538) | (11) | (86) |

### Proofs of Debt

11 creditors have submitted Proofs of Debt totalling c.£538m in response to which LBIE has yet to admit, reject or agree withdrawal. The largest claim relates to BarCap (c.£517m).

The other creditors' claims of c.£21m comprise:

- 2 claims that are subject to litigation either in the US or Italy (totalling c.£19m). Further details are provided at Appendix C;
- 7 claims in the aggregate sum of c.£2m from counterparties to which CME offers have also been made, but those counterparties are currently unresponsive. Accordingly, these claims may require an application to the UK High Court in order to finalise them; and
- 1 Affiliate claim (nominal claim value).

On 19 September 2017, the Administrators received notice of an application by Wentworth to inspect the Proof of Debt and challenge the admitted (and paid) claim value (c.£555m) of the largest single Senior creditor in the LBIE 100p estate. The Insolvency Rules make provision for any creditor to inspect Proofs of Debt lodged and also to challenge another creditor's admitted claim value.

### Reserves

The reserves for pending claims remain unchanged from our last progress report, including for the BarCap claim a nil value in the Low case (it is assumed to be withdrawn in favour of a CME claim) and a value of c.£84m in the High case (being the amount claimed, less the $777m payment made directly by LBI to BarCap).

The reserves exclude any provision for a request made by Lehman Brothers Australia Limited to amend the value of its admitted claim (by a modest amount) which is subject to a UK High Court application. The application was heard on 30 June 2017 and judgment is awaited. Further details are provided at Appendix C.

## Note 7 - Pending Shareholder claims

With the certainty created by the Waterfall I Judgment and the subsequent contribution claim settlement, we have now included Shareholder claims in the financial outcome scenarios for the first time, as follows:

| Shareholder claims | POD £m | Low £m | High £m |
|---|---|---|---|
| LBHI2 Senior claim[1] | (38) | (36) | (36) |
| LBL claim[2] | (10,934) | - | - |
| Total | (10,972) | (36) | (36) |

1. We are informed that LBHI2 has assigned its Senior claim to Wentworth.
2. Whilst LBIE has considered LBL to be a significant debtor until recently, this has been an area of dispute with LBL. To facilitate a settlement, this claim was agreed at nil, subject to an indemnity of £62m being provided by LBHI to LBIE in the event of a contribution claim arising due to a Surplus 'shortfall' to third parties before payment of the Subordinated Debt. No claim under the indemnity is assumed above, because such a 'shortfall' is not expected to arise based on the current Waterfall judgments.

### LBHI2 claim

The c.£38m Proof of Debt value submitted by LBHI2 included, in error, accrued pre-Administration interest relating to the Subordinated Debt. An adjusted unsecured claim value of c.£36m has now been agreed by LBIE. We expect that the claim will be admitted and paid in due course once it is clear that no contribution claim will arise.

LBIE's contingent contribution claim into LBHI2 (£10bn) has been withdrawn, following the ruling in the Waterfall I Judgment that LBIE cannot pursue a contribution claim whilst in Administration.

Both of these matters were documented in the contribution claim settlement.

### LBL claim

LBL submitted to LBIE a revised Proof of Debt of c.£10.93bn in 2015 which included recharges of:

- LBIE's own contingent contribution claim into LBL (£10bn), which for the reasons above LBIE could not pursue whilst in Administration; and
- a third party landlord claim (c.£212m), which was resolved at a lesser amount following the settlement by LBL with its landlord.

The balance of the disputed LBL claim, c.£722m, was subject to the Waterfall III Application and subsequent settlement discussions between the parties. The subsequent contribution claim settlement provided for both LBIE and LBL to effectively withdraw their Proofs of Debt from each other's estate.

Also, LBL transferred its shareholding in LBIE (one share) to LBHI2 on 7 September 2017 and LBL ceased to be a member of LBIE.

# *Appendices*

# *Appendix A:*
# Receipts and payments: cumulative and 6 months to 14 September 2017

## *House Estate receipts and payments: cumulative and 6 months to 14 September 2017*

| House Estate | Notes | Cumulative - 15 September 2008 to 14 March 2017 (GBP equivalent) £m | Period - 6 months to 14 September 2017 (GBP equivalent) £m | Cumulative - 15 September 2008 to 14 September 2017 (GBP equivalent) £m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Counterparties | 1 | 12,292 | 71 | 12,363 |
| Other receipts | 2 | 13,476 | 14 | 13,490 |
| **Total receipts for the period** | | **25,768** | **85** | **25,853** |
| **Payments** | | | | |
| Dividends paid | | (12,306) | - | (12,306) |
| Administrators' remuneration and disbursements | 3 | (1,013) | (13) | (1,026) |
| Payroll and employee costs | 4 | (645) | (2) | (647) |
| Legal and professional costs | 5 | (401) | (8) | (409) |
| Pension Fund settlement | 6 | (115) | (7) | (122) |
| Other payments | 7 | (4,577) | (29) | (4,606) |
| **Total payments for the period** | | **(19,057)** | **(59)** | **(19,116)** |
| **Net movement in the period** | | **6,711** | **26** | **6,737** |
| Foreign exchange translation differences^ | | (127) | (5) | (132) |
| **Total balances** | **8** | **6,584** | **21** | **6,605** |
| Less: Funds held subject to third party claims | 9 | (1) | 1 | - |
| **Total House Estate cash deposits and government bonds** | | **6,583~** | **22** | **6,605#** |

^  At this stage in the Administration, material receipts and payments in foreign currencies are converted to sterling as soon as practicable after receipt. Where currency sums are held for a short period, small translation differences can arise.

~  Balances held in foreign currencies at 14 March 2017 were c.$115m and various other currencies c.£11m (equivalent).

#  Balances held in foreign currencies at 14 September 2017 were c.$4m and various other currencies c.£1m (equivalent). The reduction in US dollars reflects conversion to sterling of balances previously held to provide a currency hedge against the value of CCCs.

## *Statement of expenses incurred in the 6 months to 14 September 2017*

The following table provides details of expenses incurred in the reporting period.

The table excludes the Pension Fund settlement payment (c.£7m) and overseas tax payments (c.£17m) as they relate to prior periods, recoverable VAT (c.£3m) and c.£4m of funding via LBNL of the employee offer and the small deed offer in the period.

| Expenses | Movement in accruals in 6 months to 14 September 2017 £m | Paid in 6 months to 14 September 2017 £m | Incurred in 6 months to 14 September 2017 £m |
|---|---|---|---|
| Administrators' remuneration and disbursements[1] | 2 | (13) | (11) |
| Payroll and employee costs[2] | (1) | (2) | (3) |
| Legal and professional costs | - | (8) | (8) |
| Other payments | - | (5) | (5) |
| **Total** | **1** | **(28)** | **(27)** |

Movement in accruals relates to:

1.  Payment of 2016 deferred fees in the period.
2.  Accrual of staff bonuses in the period.

## *Notes*

### General

Foreign currency transactions are reported in sterling at the rate prevailing on the relevant transaction date.

The transactions within the LBIE estate in the period:

- are reported on a cash receipts and payments basis and in accordance with the Insolvency Rules and best practice; and
- were completed in accounts established and controlled by the Administrators.

Separate bank accounts are held for realisations from the House Estate and the Trust Estate.

### 1.  Counterparties

Receipts in the period principally comprise:

- c.£47m of recoveries from the LBIE Zurich branch;
- c.£23m distribution from LBH; and
- c.£1m of further distributions from LBSF.

### 2.  Other receipts

Other receipts principally comprise:

- c.£5m of bank and bond interest received;
- c.£3m of realised gain following close-out of the interest rate hedge that was used to manage the Pension Fund deficit valuation risk;
- c.£2m of VAT repayments received from HMRC; and
- c.£4m of other realisations.

### 3.  Administrators' remuneration and disbursements

Payment deferral terms (as agreed with the Committee and referred to on page 33 of this report) account for differences between costs incurred and payments made in the period.

Out-of-pocket disbursements of less than £1m were paid in the period.

### 4.  Payroll and employee costs

Payments relate to salary and benefits for UK-based employees and third party contractors. This includes employee-related costs incurred on behalf of Affiliates, which are recovered by LBIE and included as other realisations.

### 5.  Legal and professional costs

Legal and other advisers' costs relate to advice given, and to court proceedings and litigation conducted, in numerous jurisdictions by a number of professional firms in connection with a range of issues across the Administration.

### 6.  Pension Fund settlement

Payments of c.£7m were made under the settlement agreement relating to the Pension Fund transfer to a third party.

### 7.  Other payments

Other payments comprise:

- c.£17m of overseas tax payments;
- c.£5m of VAT paid on invoices;
- c.£4m to fund the employee offer and the small deed offer (and associated costs) via LBNL;
- c.£2m of occupancy and infrastructure costs; and
- c.£1m of other net sundry payments and reclassifications.

## 8. Investment profile

### Current investment strategy

For immediate liquidity requirements, LBIE invests in short-term money market deposits. For other requirements, investments are held in UK government, quasi-government debt securities and supranational debt.

### Total balances

| House Estate | GBP equivalent £m |
|---|---|
| Short-dated bonds[1] | 6,394 |
| Short-term deposits[2] | 201 |
| Interest-bearing accounts | 10 |
| **Total** | **6,605** |

1.  Average rate of return on bonds yet to mature (net of fund manager fees) of 0.162%.
2.  Average rate of return for 6 months ending 14 September 2017 of 0.15% for sterling deposits and 0.92% for US dollar deposits.

### Cash management and investment policy

Subject to meeting regulatory requirements, the continuing objectives of the policy are to provide:

*   security for Administration funds;
*   liquidity as required by the Administration; and
*   appropriate returns (positive yield net of fees).

The primary objective continues to be ensuring the security of Administration funds. To meet this objective, a comprehensive counterparty credit risk policy is in place with clear limits on counterparties, instruments, amounts and duration. Compliance with policy is measured on at least a daily basis using live indicators, and any material breaches arising from market movements are reported immediately to the Administrators.

The cash is managed by a team of treasury professionals which meets with the Administrators on a regular basis.

### Policy for interest-bearing accounts and short-term deposits/notice accounts

Permitted banks must meet 4 key criteria:

*   be headquartered in a sovereign state where the average long-term ratings from S&P, Moody's and Fitch are in the top 4 available tiers (AAA to AA-);
*   be headquartered in a sovereign state within the top 3 tiers of the S&P banking industry country risk assessment;
*   have a blended average long-term rating from S&P, Moody's and Fitch within the top 4 available tiers (AA to A); and
*   be a Prudential Regulation Authority or European Banking Authority approved counterparty.

The counterparties are ranked in 3 tiers (1-3) based on their risk score (1 being least risky) which is calculated by assessing their 5-year credit default swap prices, bond yields, equity volatility, capital buffers and financial ratios. To ensure diversification, counterparty limits are based on the tier to which they belong:

*   20% of funds under management with any single tier 1 or tier 2 bank; and
*   15% of funds under management with any single tier 3 bank.

In the period, funds were placed on short-term deposits/notice accounts for a maximum duration of 12 weeks with tier 1 banks, 8 weeks with tier 2 banks and 4 weeks with tier 3 banks.

### Policy for bond portfolio

Eligible investments for the bond portfolios are short-dated government debt issued by the UK, supranational debt and quasi-government debt securities benefiting from an explicit, unconditional and irrevocable guarantee from the sovereign government.

The bond portfolio is managed on a day-to-day basis by an independent fund manager.

## 9. Funds held subject to third party claims

This reserve relates to unpaid dividends on admitted unsecured claims.

## Post-Administration Client Money receipts and payments: cumulative and 6 months to 14 September 2017

| Post-Administration Client Money | Notes | Cumulative - 15 September 2008 to 14 March 2017 (USD equivalent) $m | Period - 6 months to 14 September 2017 (USD equivalent) $m | Cumulative - 15 September 2008 to 14 September 2017 (USD equivalent) $m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Affiliate-related | | 724 | - | 724 |
| Other receipts | 1 | 7,057 | 1 | 7,058 |
| **Total receipts for the period** | | **7,781** | **1** | **7,782** |
| **Payments** | | | | |
| Transfers to the House | | (2,772) | - | (2,772) |
| Affiliate settlements | | (1,544) | - | (1,544) |
| Other payments | | (3,497) | - | (3,497) |
| **Total payments for the period** | | **(7,813)** | **-** | **(7,813)** |
| **Net movement in the period** | | **(32)** | **1** | **(31)** |
| Foreign exchange translation differences^ | | 42 | 1 | 43 |
| **Total third party balances**∞ | **2** | **10**~ | **2** | **12**# |

^  The translation differences arise from translating other currencies into US dollars for reporting purposes.
∞  Relating to clients subject to debt recovery litigation in Germany.
~  Balances held in currencies other than US dollars at 14 March 2017 were c.€10m.
#  Balances held in currencies other than US dollars at 14 September 2017 were c.€10m.

## Notes

### 1.  Other receipts

Derived income on securities received directly into the post-Administration Client Money account.

### 2.  Investment profile

#### Total balances

| Post-Administration Client Money | USD equivalent $m |
|---|---|
| Interest-bearing accounts | 12 |
| **Total** | **12** |

#### Cash management and investment policies for client funds

The Client Money cash management policy for interest-bearing accounts is based on that used for the House Estate, modified to comply with the additional Client Money regulatory requirements. Client Money is not eligible for investment in government bonds and can be placed on money market deposits for a maximum duration of 30 days.

## Pre-Administration Client Money receipts and payments: cumulative and 6 months to 14 September 2017

Until recently, pre-Administration Client Money receipts have been retained in the currency of receipt. Originally, this was done on the basis that the funds would eventually need to be returned to Client Money claimants. As progressively more such claimants alternatively agreed unsecured claims against LBIE, it became apparent that these client monies would eventually be transferred to the House Estate, against which claims are made and paid in sterling. From that point on, we have continued to hold Client Money in US dollars as a hedge against potential future CCCs. Because the recent Waterfall I Judgment disallows CCCs, our need for a currency hedge is now limited largely to us needing to manage our currency exposure on the continuing claim by BarCap. As a result, during the period, a significant proportion of all Client Money was converted from foreign currency into sterling.

Because there continue to be a number of small, residual claims against the Client Money estate that are denominated in US dollars, we continue to present the receipts and payments account in US dollars for the time being, but will keep this under review.

| Pre-Administration Client Money | Notes | Cumulative - 15 September 2008 to 14 March 2017 (USD equivalent) $m | Period - 6 months to 14 September 2017 (USD equivalent) $m | Cumulative - 15 September 2008 to 14 September 2017 (USD equivalent) $m |
|---|---|---|---|---|
| **Receipts** | | | | |
| Client Money pool recoveries | 1 | 2,245 | 11 | 2,256 |
| Funds received for the House | | 77 | - | 77 |
| Interest | | 16 | 3 | 19 |
| **Total receipts for the period** | | **2,338** | **14** | **2,352** |
| **Payments** | | | | |
| Client Money interim distribution | | (675) | - | (675) |
| Funds paid to the House | | (76) | - | (76) |
| Legal costs | | (10) | - | (10) |
| **Total payments for the period** | | **(761)** | **-** | **(761)** |
| **Net movement in the period** | | **1,577** | **14** | **1,591** |
| Foreign exchange translation differences^ | | (172) | 65 | (107) |
| **Total balances** | **2** | **1,405~** | **79** | **1,484#** |

^  The cumulative translation differences principally arise from translating other currencies into US dollars for reporting purposes.
~  Balances held in currencies other than US dollars at 14 March 2017 were c.£396m and c.€47m.
#  Balances held in currencies other than US dollars at 14 September 2017 were c.£919m. The increase in sterling principally reflects conversion of US dollars previously held to provide a currency hedge against the value of CCCs.

## Notes

### 1. Client Money pool recoveries

Receipts in the period comprised a twelfth distribution from LBHI in respect of LBIE's guarantee claim and an eleventh distribution from LBB on LBIE's unsecured claim.

### 2. Investment profile

| Pre-Administration Client Money | USD equivalent $m |
|---|---|
| Short-term deposits^ | 1,484 |
| **Total~** | **1,484** |

^  Average rate of return for 6 months ending 14 September 2017 of 0.12% for sterling deposits and 0.93% for US dollar deposits.
~  Balance includes funds of less than $1m held on interest-bearing accounts.

# *Appendix B:*
# Surplus-related court proceedings

## Waterfall I UK Supreme Court proceedings milestones

### Milestones in the current reporting period:

| | |
|---|---|
| *17 May 2017* | Judgment of the UK Supreme Court |

## Waterfall II UK Appeal Court proceedings milestones

### Milestones in the current reporting period:

| | |
|---|---|
| *3 Apr. 2017* | 7-day UK Appeal Court hearing on tranches A & B issues (including supplemental issues) |
| *12 May 2017* | Senior Creditor Group, Goldman Sachs and Hutchinson Investors, LLC filed their appellant's skeleton arguments (tranche C) |
| *18 May 2017* | CVI GVF (LUX) Master SARL and Hutchinson Investors, LLC filed their application to amend their appellant's notice (tranche C) |
| *19 May 2017* | Burlington Loan Management Ltd filed its application to amend its appellant's notice (tranche C) |
| *25 Jul. 2017* | Further UK Appeal Court hearing in relation to tranche A issues |
| *28 Jul. 2017* | LBIE Administrators and Wentworth filed their respondent's skeleton arguments (tranche C) |

### Milestones expected in future reporting periods:

| | |
|---|---|
| *Q4 2017* | Judgment of the UK Appeal Court to be handed down in respect of tranches A & B issues |
| *Q1 2018* | UK Supreme Court appeal notices to be filed in respect of tranches A & B issues, with decision from the UK Supreme Court whether to allow an appeal following c.3 months after submission |
| *Jul. 2018* | 3-day UK Appeal Court hearing on tranche C issues to commence |

# Waterfall III UK High Court proceedings milestones

## Milestones in the current reporting period:

| | |
|---|---|
| *17 Mar. 2017* | LBH Administrators filed position paper in respect of part B issues |
| *19 Apr. 2017* | LBL Administrators filed position paper in reply to LBH Administrators' position paper in respect of part B issues |
| *3 May 2017* | LBL Administrators filed witness evidence |
| *16 May 2017* | LBL Administrators filed expert evidence |
| *7 Jun. 2017* | Administrators of LBIE, LBHI2, LBEL and LBH filed witness evidence |
| *16 Jun. 2017* | LBIE Administrators filed expert evidence |
| *16 Jun. 2017* | Administrators of LBIE, LBHI2, LBEL, LBL and LBH filed skeleton arguments in advance of the procedural hearing on 19 June |
| *19 Jun. 2017* | Procedural hearing to discuss the future of the proceedings in light of the UK Supreme Court Waterfall I Judgment |
| *5 Jul. 2017* | LBL Administrators filed reply witness evidence |
| *24 Jul. 2017* | Hearing of applications by the Administrators of LBIE, LBHI2 and LBL in relation to the settlement of Waterfall III |
| *28 Jul. 2017* | Pre-trial review at which Mr Justice Hildyard was invited to adjourn the Waterfall III Application and vacate the part B trial listed for 11 September |
| *1 Aug. 2017* | Order made by Mr Justice Hildyard pursuant to the pre-trial review to adjourn the Waterfall III Application and vacate the part B trial listing |
| *3 Aug. 2017* | Judgment of Mr Justice Hildyard in relation to the settlement of the Waterfall III Application |
| *6 Sep. 2017* | LBIE Administrators filed order for dismissal by consent of the Waterfall III Application |

# UK withholding tax application UK Appeal Court proceedings milestones

## Milestones expected in future reporting periods:

| | |
|---|---|
| *31 Oct. 2017* | 2-day UK Appeal Court hearing |
| *H1 2018* | Judgment of the UK Appeal Court |

## BarCap claims application UK High Court proceedings milestones

### Milestones in the current reporting period:

| | |
|---|---|
| *5 May 2017* | BarCap and Wentworth filed their position papers in respect of the initial issues |
| *30 Jun. 2017* | LBIE Administrators filed their reply position paper |
| *11 Aug. 2017* | LBIE Administrators and BarCap filed and exchanged witness statements from witnesses of fact |

### Milestones expected in future reporting periods:

| | |
|---|---|
| *15 Sep. 2017* | Parties (if so advised) to file and exchange reply witness statements |
| *27 Oct. 2017* | Parties to file their expert reports |
| *17 Nov. 2017* | Parties (if so advised) to file their supplemental expert reports |
| *15 Dec. 2017* | Parties' experts to file a joint memorandum identifying the points of agreement and disagreement |
| *16-20 Apr. 2018* | c.8-day UK High Court hearing to commence |

# Waterfall I Judgment received

| UK Appeal Court judgment | UK Supreme Court judgment |
|---|---|
| Subordinated Debt ranks below Post-Administration Interest and non-provable claims | **Upheld** |
| Subordinated Debt can prove on a contingent basis, such proof to be valued at zero pending payment in full of Post-Administration Interest and non-provable claims | **Overturned:** Subordinated Debt is not permitted to prove unless and until Post-Administration Interest and non-provable claims have been paid in full |
| CCCs exist and rank below Post-Administration Interest and *pari passu* with other non-provable claims | **Overturned:** CCCs do not exist |
| Post-Administration Interest accrued but unpaid in an administration is payable in a subsequent liquidation from the Surplus held by a liquidator | **Overturned:** Post-Administration Interest accrued but unpaid in an administration will cease to be payable in a subsequent liquidation |
| Shareholders' contribution claim liability extends to Post-Administration Interest and non-provable claims | **Part overturned:** Shareholders' contribution claim liability extends to non-provable claims but not to Post-Administration Interest |
| LBIE in administration may prove in the respective estates of its Shareholders in respect of contributory claims | **Overturned:** LBIE in administration may not prove in the respective estates of its Shareholders in respect of contributory claims |
| The contributory rule does not apply – LBIE in administration cannot refuse to admit Shareholders' proofs on the basis of the contributory rule | **Overturned:** The contributory rule does apply – LBIE in administration can refuse to admit Shareholders' proofs on the basis of the contributory rule |
| Contributory claims can be set off against Shareholders' proofs | **Overturned:** In administration, prospective contributory claims cannot be set off against Shareholders' proofs |

# Waterfall II tranches A & B appeal judgment pending

| UK High Court judgment | UK Appeal Court judgment |
|---|---|
| **Tranche A – insolvency law matters** | |
| The rule in *Bower v Marris* is not applicable: Post-Administration Interest is not to be calculated on the basis of a notional allocation of dividends to interest first | **Pending** |
| Rule 2.88 provides a complete code for the payment of Post-Administration Interest on proved debts: there is no scope for a non-provable claim for further interest on a provable claim | **Pending** |
| Foreign judgment rate of interest is only available where a judgment was actually obtained pre-Administration | **Pending** |
| Applicable date for commencement of Post-Administration Interest on all debts including contingent debts and future debts is the date of administration | **Pending** |
| **Tranche B – post-Administration contract releases** | |
| Neither CRA nor CDD contracts have the effect of releasing non-provable claims (if any) as a matter of construction | **Pending** |
| If releases relating to claims for Post-Administration Interest were effective, the Court would direct administrators not to enforce such releases: under the principle in *Ex parte James* and Para. 74 of Schedule B1 of the Insolvency Act | **Pending** |

# *Appendix C:*
# Other litigation summary

The following litigation is a matter of public record in the relevant legal jurisdiction noted below.

| Counterparty | Claim amount/ (POD value) | Type | Commenced | Court | Court reference |
|---|---|---|---|---|---|
| AG Financial Products Inc. | $500m/£(16)m | Debtor/Creditor | Nov. 2011 | Supreme Court of the State of New York | 653284/2011 |
| Kumho Industrial Co. Limited | KRW71bn | Debtor | Jul. 2015 | Seoul Central District Court | |
| Dietmar Hopp Stiftung GmbH <br> DH Besitzgesellschaft AG & Co KG | €26m | Trust debtors | Aug. 2010 | German Supreme Court | BGH XI ZR 9/14 |
| Employee[1] | £(3)m | Creditor - rejection appeal | Dec. 2014 | UK High Court | 7942 of 2008 |
| Lehman Brothers Australia Limited (in liquidation) | £(2)m | Creditor | Dec. 2016 | UK High Court | 7942 of 2008 |
| Exotix Partners LLP | $9m | Post-Administration claim | May 2017 | UK High Court | 1407 of 2017 |

1.    The UK High Court proceedings have been stayed pending a determination by the Milan Labour Court. Various hearings have taken place in Milan in the period. Outline settlement terms have been recently agreed and are in the course of being finalised.

# *Appendix D:*
# Administrators' remuneration

## *Analysis of Administrators' remuneration by grade and work activity*

The basis of Administrators' remuneration approved by the Committee is by reference to the time properly given by the Administrators' or their staff in attending to matters arising in the Administration. The table below provides an analysis of the Administrators' total hours incurred and the associated cost by staff grade and work activity for the previous time reporting period (to 31 December 2016) and the current period (to 30 June 2017), together with the forecast for the current and next period (to 31 December 2017).

| | Prior actual | | Current actual | | Current forecast | | Future forecast | |
| | 1 July 2016 to 31 December 2016 | | 1 January 2017 to 30 June 2017 | | 1 January 2017 to 30 June 2017 | | 1 July 2017 to 31 December 2017 | |
| | Hours | £'000 | Hours | £'000 | Hours | £'000 | Hours | £'000 |
|---|---|---|---|---|---|---|---|---|
| **By grade** | | | | | | | | |
| Partner | 1,542 | 1,403 | 1,614 | 1,482 | 1,460 | 1,325 | 1,767 | 1,623 |
| Director | 2,956 | 2,056 | 2,938 | 2,050 | 3,486 | 2,361 | 2,647 | 1,910 |
| Senior Manager | 7,232 | 3,831 | 6,435 | 3,309 | 7,173 | 3,679 | 5,885 | 3,117 |
| Manager | 5,351 | 2,166 | 5,094 | 2,090 | 5,399 | 2,252 | 4,978 | 2,132 |
| Senior Associate | 6,110 | 1,758 | 6,605 | 1,953 | 5,179 | 1,568 | 5,118 | 1,635 |
| Associate | 4,498 | 535 | 2,856 | 433 | 1,304 | 283 | 2,060 | 388 |
| **Total** | **27,689** | **11,749** | **25,542** | **11,317** | **24,001** | **11,468** | **22,455** | **10,805** |
| **Average hourly rate** | | **£424** | | **£443** | | **£478** | | **£481** |
| **By work activity** | | | | | | | | |
| Resolution of the LBIE 100p estate | 826 | 536 | 781 | 525 | 874 | 599 | 655 | 467 |
| Surplus | 5,861 | 3,264 | 7,194 | 3,707 | 8,805 | 4,788 | 6,883 | 3,944 |
| Finance and reporting | 2,935 | 1,359 | 2,933 | 1,396 | 2,885 | 1,315 | 4,266 | 1,937 |
| Infrastructure[1] | 18,067 | 6,590 | 14,634 | 5,689 | 11,437 | 4,766 | 10,651 | 4,457 |
| **Total** | **27,689** | **11,749** | **25,542** | **11,317** | **24,001** | **11,468** | **22,455** | **10,805** |

1.    Infrastructure includes specialist PwC resource relating to information technology, forensics, tax, pensions and certain other back office functions. In the period, these specialists settled certain tax exposures with the IRS and finalised transfer of the Pension Fund (together enabling Low case reserve releases of c.£33m), and forensic data support contributed to the eventual Waterfall III settlement.

## *Staff profile*

The table below provides a summary of the average staff numbers for the previous and current time reporting periods and the forecast average for the current and next time reporting periods.

| | Actual | | Forecast | |
| | Prior period ended 31 Dec. 2016 | Current period ended 30 Jun. 2017 | Current period ended 30 Jun. 2017 | Future period ending 31 Dec. 2017 |
|---|---|---|---|---|
| **Staff profile** | | | | |
| LBIE staff (including contractors)[1] | 42 | 30 | 30 | 24 |
| PwC staff [2] | 27 | 26 | 24 | 22 |
| Ratio of LBIE to PwC staff | 1.6 | 1.2 | 1.3 | 1.1 |

1.    Staff numbers are shown on a full-time equivalent basis.
2.    PwC staff numbers are calculated on the basis of 8 worked man-hours being equal to 1 full-time equivalent man-day.

In the 6 months to 30 June 2017, the LBIE resource reduced in line with forecast with the 8% additional PwC resource above forecast reflecting further specialist forensics PwC resource being required in support of the Waterfall III proceedings and prolonged pension liability transfer activity (not known at the time of the forecast preparation), offset by reduced Surplus support. PwC forensics support relating to the BarCap claims and other litigation is anticipated to continue for the remainder of 2017 and into 2018.

## Administrators' remuneration in the current period

In the current time reporting period to 30 June 2017, total hours reduced by 8% compared to the period ended 31 December 2016; total costs in the same period reduced by 4%. The lower cost reduction and higher average cost per hour reflects a change in grade mix principally as usage of junior forensic resource lessened in the period.

Actual hours and costs by work activity in the period are broadly in line with the forecast except for:

- Surplus, where anticipated additional resource forecast to manage the expected workload was avoided by efficient use of existing LBIE resource; and
- infrastructure, where additional junior forensic resource was required to support the Waterfall III proceedings, as discovery and disclosure demands exceeded expectations, together with additional pension and tax activity necessary to deal with close-out issues.

## Administrators' remuneration forecast for the next period

The forecast 6-monthly time reporting period to 31 December 2017 indicates a 12% reduction in hours and a 5% reduction in costs compared with the current period. This reflects a forecast:

- reduction in pensions activity and forensics work related to the BarCap claims and other litigation; offset in part by
- a temporary increase in reporting activity during a transition to an offsite reporting team structure.

The forecast increase of 9% in the average hourly rate predominantly reflects a grade mix change, as junior forensic resource utilised is forecast to reduce and a 4% increase in hourly charging rates, agreed with the Committee and effective from 1 July 2017.

## Administrators' remuneration approval

Details of the statutory framework for the approval of the Administrators' remuneration, the role of the Adviser to the Committee and the level and detail of disclosure provided by the Administrators are set out in our earlier reports.

Total time costs incurred in the 6-month reporting period are c.£10.13m, which includes time costs incurred from 1 July 2017 to 14 September 2017, not reported in detail on page 32, of c.£3.6m. A full analysis of these costs will be included as part of the 6-month period to 31 December 2017 in the next progress report.

Cumulative time costs accrued to 30 June 2017 are c.£992m. Total Administrators' remuneration and disbursements paid to 14 September 2017 are c.£1.03bn.

We continue to provide the Committee and its Adviser with detailed information relating to our remuneration and to Category 2 disbursements, in accordance with SIP 9.

## Creditors' rights

Creditors have the right to ask for more information about remuneration or expenses within 21 days of receiving this report as set out in Rule 18.9 of the Insolvency Rules. Any request must be in writing. Creditors can also challenge remuneration and expenses within 8 weeks of receiving this report as set out in Rule 18.34 of the Insolvency Rules.

An explanatory note on the rights of creditors in relation to an administrator's remuneration and expenses and how to request further information can be found online at:
*https://www.icaew.com/-/media/corporate/files/technical/ insolvency/creditors-guides/creditors-guide-administrators- fees-final.ashx?la=en*

This guide is for appointments on or after 1 November 2011 and whilst not all of the provisions apply to the LBIE Administration (which commenced on 15 September 2008) it is the most appropriate guide currently available following the changes made by the Insolvency (England and Wales) Rules 2016.

You can also get a copy free of charge by telephoning Lesley Bingham on 0203 036 2661.

## Approvals by the Creditors' Committee

In the period, the Committee approved remuneration arrangements for 2017, which again require deferral of a significant proportion of the Administrators' time costs that will be incurred in the calendar year to be considered for approval in 2018 based upon performance.

The Committee has been provided with Category 2 disbursements information relating to the 9-month period to 30 June 2017 amounting to £537,194, of which £209,128 has been approved for payment in the reporting period.

In addition, Category 1 disbursements of £191,373 were incurred in the 6-month period to 30 June 2017 and paid in the reporting period.

In total, c.£196,000 of Category 1 disbursements and c.£315,000 of Category 2 disbursements were incurred in the 6-month reporting period.

# *Appendix E:*
# Statutory and other information

| | |
|---|---|
| **Court details for the Administration:** | High Court of Justice, Chancery Division, Companies Court<br>Court case number 7942 of 2008 |
| **Full name:** | Lehman Brothers International (Europe) |
| **Trading name:** | Lehman Brothers International (Europe) |
| **Registered number:** | 02538254 |
| **Registered address:** | Level 23, 25 Canada Square, London E14 5LQ |
| **Contact address:** | Lehman Brothers International (Europe) – in Administration, Level 23, 25 Canada Square, London E14 5LQ |
| **Contact telephone/email** | +44 (0)20 3036 2000/generalqueries@lbia-eu.com |
| **Date of the Administration appointment:** | 15 September 2008 |
| **Administrators' names and addresses:** | AV Lomas, SA Pearson (both appointed 15 September 2008), R Downs (appointed 2 November 2011) and JG Parr (appointed 22 March 2013) of PricewaterhouseCoopers LLP, 7 More London Riverside, London SE1 2RT. MJA Jervis and DY Schwarzmann ceased to act on 2 November 2011. DA Howell ceased to act on 22 March 2013. PD Copley ceased to act on 24 June 2016 |
| **Appointor's name and address:** | High Court of Justice, Chancery Division, Companies Court on the application of LBIE's directors |
| **Objective being pursued by the Administrators:** | Achieving a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration) |
| **Aims of the Administration:** | Recover and/or realise all House assets, including cash, securities and in-the-money financial contracts, on a managed basis<br>Admit unsecured creditors' claims and make distributions to creditors including any Surplus<br>Recover Client Assets and Client Money, assess the claims to such property and return all such property to its rightful owners on a systematic basis |
| **Division of the Administrators' responsibilities:** | In relation to paragraph 100(2) of Schedule B1 to the Insolvency Act, during the period for which the Administration is in force, any act required or authorised under any enactment to be done by either or all of the Administrators may be done by any one or more of the persons for the time being holding that office |
| **Details of any extensions for the initial period of appointment:** | The UK High Court on 4 November 2016 granted a further extension of the Administration to 30 November 2022 |
| **Proposed end of the Administration:** | The Administrators have yet to determine the most appropriate exit |
| **Estimated dividend for unsecured creditors:** | Interim dividends paid to date at a cumulative rate of 100p/£1 |
| **Estimated values of the prescribed part and LBIE's net property:** | The prescribed part is not considered to be relevant as all Senior admitted creditors have been paid or reserved for at a rate of 100p/£1 |
| **Whether and why the Administrators intend to apply to court under Section 176A(5) of the Insolvency Act:** | Not applicable |
| **The European Regulation on Insolvency Proceedings (Council Regulation (EC) No. 1346/2000 of 29 May 2000):** | The European Regulation on Insolvency Proceedings does not apply to this Administration as LBIE is an investment undertaking |
| **Creditors' Committee members:** | Lehman Brothers Holdings Inc.<br>Ramius LLC<br>Lehman Brothers Commercial Corporation Asia Limited |

# *Appendix F:*
# Glossary of terms

| Abbreviation | Term | Definition |
|---|---|---|
| Administration | Administration | UK corporate insolvency process governed by the Insolvency Act 1986 applicable to LBIE following the granting of an administration order dated 15 September 2008 |
| Administrators | Joint Administrators | AV Lomas and SA Pearson were appointed as Joint Administrators of LBIE on 15 September 2008. R Downs was appointed on 2 November 2011. JG Parr was appointed on 22 March 2013. All are licensed in the United Kingdom to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales |
| Adviser | Adviser | An adviser retained to assist the Committee in considering the Administrators' remuneration requests |
| Affiliates | Affiliate entities | Various subsidiaries and affiliates of Lehman Brothers Holdings Inc. |
| AGR | AG Financial Products Inc. | A US-based affiliate of Assured Guaranty Corp. which provided credit protection to counterparties under credit default swaps |
| BarCap | Barclays Capital Inc. | Investment banking business of Barclays Bank PLC |
| Category 1 disbursements | Administrators' Category 1 disbursements | Costs that are directly referable to the Administration supplied by and paid to external third parties |
| Category 2 disbursements | Administrators' Category 2 disbursements | Costs that are directly referable to the Administration but not to a payment to an independent third party. They may include shared or allocated costs that can be allocated to the Administration on a proper and reasonable basis |
| CCC | Currency Conversion Claim | Non-provable claim derived from contractual rights to be paid in a currency other than sterling, where the value of sterling has declined as against the currency of the claim between the date of Administration and the date(s) of payment of distributions in respect of the claim |
| CDD | Claims Determination Deed | A standardised legal document for agreeing Senior claims |
| Client Assets | Client Assets | Client securities which LBIE should have held as at 15 September 2008 |
| Client Money | Client Money | Client cash balances held by LBIE as at 15 September 2008 or received thereafter by LBIE and which are, in each case, subject to the UK Financial Conduct Authority's client money rules and/or applicable client money distribution rules |
| CME | Client Money Entitlement | The entitlement to receive a distribution from the pre-Administration Client Money pool |
| Committee | Creditors' Committee | Creditors voted to represent the general body of creditors of LBIE to assist the Administrators in discharging their functions set out in the Insolvency Act |
| CRA | Claim Resolution Agreement | The claim resolution framework which governs the return of Client Assets. The CRA was proposed by the Administrators to clients in November 2009 and was accepted by over 90% of eligible Client Assets claimants |
| CVA | Company Voluntary Arrangement | Insolvency procedure as set out in the Insolvency Act and Insolvency Rules which allows a company to come to an arrangement/compromise with its creditors over the payment of its debts |
| ETD | Early Termination Date | As defined in the close-out provisions of the standard ISDA documentation |
| FINMA | FINMA | Swiss Financial Market Supervisory Authority FINMA |
| HMRC | HM Revenue & Customs | Organisation of the UK government primarily responsible for the collection of taxes |
| House Estate/House | House Estate | Dealings that relate to LBIE's general unsecured estate |
| Insolvency Act | Insolvency Act 1986 | Statutory legislation that provides the legal platform for matters relating to personal and corporate insolvency in the UK |
| Insolvency Rules | Insolvency (England and Wales) Rules 2016 | Statutory rules that provide the legal platform for matters relating to personal and corporate insolvency in England and Wales |
| IRS | Internal Revenue Service | A bureau of the Department of the Treasury of the United States federal government with responsibility for collecting taxes and the interpretation and enforcement of the internal revenue code |
| ISDA Master Agreement | International Swaps and Derivatives Association Master Agreement | Global trade association for over-the-counter derivatives standard documentation |
| LBB | Lehman Brothers Bankhaus A.G. | Affiliate entity subject to insolvency proceedings in Germany |
| LBEL | Lehman Brothers Europe Limited | Affiliate entity subject to insolvency proceedings in the UK |
| LBH | Lehman Brothers Holdings plc | Affiliate entity subject to insolvency proceedings in the UK |
| LBHI | Lehman Brothers Holdings Inc. | Ultimate parent of the Lehman group, incorporated in the USA and formerly subject to Chapter 11 bankruptcy protection from 15 September 2008. The plan of reorganisation became effective on 6 March 2012 |

| Abbreviation | Term | Definition |
|---|---|---|
| LBHI2 | LB Holdings Intermediate 2 Limited | Affiliate entity subject to insolvency proceedings in the UK |
| LBI | Lehman Brothers Inc. | US broker-dealer affiliate entity, incorporated in the USA which entered Securities Investor Protection Act 1970 trusteeship on 19 September 2008 |
| LBIE | Lehman Brothers International (Europe) – In Administration | Private unlimited UK subsidiary of LBHI, acting as its main European broker dealer, subject to an administration order dated 15 September 2008 |
| LBL | Lehman Brothers Limited | UK service entity for the Lehman UK entities. LBL was placed into Administration on 15 September 2008 |
| LBNL | Lehman Brothers Nominees Limited | UK Affiliate entity that is a wholly owned subsidiary of LBIE |
| LBSF | Lehman Brothers Special Financing Inc. | Affiliate entity subject to insolvency proceedings in the USA |
| MCF | Mable Commercial Funding Limited | Affiliate entity subject to insolvency proceedings in the UK |
| Pension Fund | Lehman Brothers Pension Scheme | Group pension scheme for employees of UK Lehman entities |
| Post-Administration Interest | Post-Administration Interest | Statutory interest payable pursuant to Rule 14.23(7) of the Insolvency Rules |
| Proof of Debt/POD | Proof of Debt or Statement of Claim | A formal document prescribed by the Insolvency Rules submitted to the Administrators by a creditor wishing to prove their claim. The form is made in writing or electronically under the responsibility of a creditor and signed by an authorised person |
| Scheme of Arrangement | Scheme of Arrangement | Statutory procedure under Part 26 of the Companies Act 2006 for a court-approved agreement between a company and its creditors |
| Senior | Senior unsecured creditor | Unsecured, non-preferential, non-Shareholder, not subordinated creditor |
| Senior Creditor Group/ SCG | Senior Creditor Group | Collectively 3 respondents to the Waterfall II Application: Burlington Loan Management Limited, CVI GVF (Lux) Master SARL and Hutchinson Investors, LLC |
| Shareholder(s) | Shareholder(s) of LBIE | Formerly LBL and/or LBHI2; LBL ceased to be a LBIE member on 7 September 2017 |
| SIP 9 | Statement of Insolvency Practice 9 | Rules issued by the Joint Insolvency Committee which provide guidance to insolvency practitioners and creditors' committees in relation to the remuneration of, *inter alios*, administrators |
| Street | Street counterparties | Third party counterparties consisting of financial institutions, including asset managers, custodians and banks; and non-banking financial institutions, including pension funds and corporate entities |
| Subordinated Debt | Subordinated Debt | The subordinated liabilities arising pursuant to 3 intercompany loan agreements entered into between LBIE and LBHI2, each dated 1 November 2006, and which have been assigned by LBHI2 to Wentworth |
| Surplus | Surplus | Assets remaining after the payment in full of Senior claims and Shareholder claims but before Post-Administration Interest, non-provable claims, and the Subordinated Debt |
| Trust Estate | Trust Estate | Client Assets and Client Money |
| UK Appeal Court | Court of Appeal of England and Wales | The second most senior court in the English legal system for civil cases. Permission to appeal is required, either from the lower court or the Court of Appeal itself |
| UK High Court | High Court of England and Wales | Court of England and Wales which deals with all high value and high importance cases, and also has a supervisory jurisdiction over all subordinate courts |
| UK Supreme Court | Supreme Court of the United Kingdom | Court of last resort and highest appellate court in the United Kingdom for civil cases |
| VAT | Value Added Tax | A consumption tax levied on the sale of goods and services in the UK |
| Waterfall | Waterfall | Waterfall I, II and III legal proceedings |
| Waterfall I Application/ Waterfall I | Waterfall I Application | A joint application by LBIE, LBL and LBHI2 to the UK High Court issued on 14 February 2013 seeking a determination on statutory interest priority, contribution rights and other issues relating to LBIE and its Shareholders |
| Waterfall I Judgment | Waterfall I Judgment | Waterfall I appeal judgment handed down by the UK Supreme Court on 17 May 2017 |
| Waterfall II Application/ Waterfall II | Waterfall II Application | An application to the UK High Court issued on 12 June 2014 seeking a further determination on issues that impact the rights of creditors to payment from the Surplus and the distribution of that Surplus in a timely manner |
| Waterfall III Application/ Waterfall III | Waterfall III Application | An application to the UK High Court issued on 25 April 2016 seeking a determination on issues relating to contributory claims |

| Abbreviation | Term | Definition |
|---|---|---|
| **Wentworth** | Wentworth Joint Venture | A joint venture between Elliott Management Corporation, King Street Capital Management L.P., LBHI and LBHI2 to align their interests in LBIE using vehicles including Wentworth Sons Sub-Debt S.a.r.l, a respondent to the Waterfall II Application, and Wentworth Sons Senior Claims S.a.r.l. |
| **York** | York | York Global Finance BDH, LLC, a respondent to the Waterfall II Application |

www.pwc.co.uk/lehman

© 2017 PwC. All rights reserved. Not for further distribution without the permission of PwC. "PwC" refers to the network of member firms of PricewaterhouseCoopers International Limited (PwCIL), or, as the context requires, individual member firms of the PwC network. Each member firm is a separate legal entity and does not act as agent of PwCIL or any other member firm. PwCIL does not provide any services to clients. PwCIL is not responsible or liable for the acts or omissions of any of its member firms nor can it control the exercise of their professional judgment or bind them in any way. No member firm is responsible or liable for the acts or omissions of any other member firm nor can it control the exercise of another member firm's professional judgment or bind another member firm or PwCIL in any way.

