Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   LEHMAN BROTHERS HOLDINGS INC.,   Case No. 08-13555-scc

7            Debtor.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                  United States Bankruptcy Court

11                  One Bowling Green

12                  New York, New York 10004-1408

13

14                  December 6, 2017

15                  9:09 AM

16

17

18

19

20

21

22

23   B E F O R E:

24   HON. SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

1    IN RE:   RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South, Sheila Orms, and Lisa Beck

Page 3

```
 1    A P P E A R A N C E S :

 2    WILKIE FARR & GALLAGHER LLP

 3         Attorneys for the Plan Administrator

 4         787 Seventh Avenue

 5         New York, NY 10019-6099

 6

 7    BY:  TODD G. COSENZA, ESQ.

 8         BENJAMIN P. MCCALLEN, ESQ.

 9         JOSEPH G. DAVIS, ESQ.

10

11    HOLWELL SHUSTER & GOLDBERG LLP

12         Attorneys for the Trustees

13         750 Seventh Avenue, 26th Floor

14         New York, NY 10019

15

16    BY:  MICHAEL S. SHUSTER, ESQ.

17         DWIGHT A. HEALY, ESQ.

18         NEIL R. LIEBERMAN, ESQ.

19         DANIEL P. GOLDBERG, ESQ.

20

21

22

23

24

25
```

Page 4

1    ROLLIN BRASWELL FISHER LLC/PARTNER

2        8350 E. Crescent Parkway

3        Suite 100

4        Greenwood Village, CO 80111

5

6    BY:   MICHAEL ROLLIN, ESQ.

7        MARTIZA DOMINGUEZ BRASWELL, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2            THE COURT:  Good morning.  Please have a seat.

3    Good morning.

4        (A chorus of good morning)

5            THE COURT:  Welcome back.  Here we are again.  Do

6    we have Mr. Grice?

7              MR. SHUSTER:  Mr. Grice.  There he is.

8            THE COURT:  There he is.  Welcome back.

9            MR. SHUSTER:  May I?

10           THE COURT:  Sorry to the slight delay.  As I said

11   before, I have a few other things going on.

12           CHARLES H. GRICE, WITNESS, PREVIOUSLY SWORN

13                   CROSS-EXAMINATION, CONT'D.

14   BY MR. SHUSTER:

15   Q    Good morning, Mr. Grice.

16   A    Good morning.

17   Q    Mr. Grice, you have no personal experience originating

18   loans other than for people who worked for the financial

19   institutions you worked for; is that correct?

20   A    Sorry, I'm complying with the Court instructions here.

21   I apologize.  If you would please again.

22   Q    You have no personal experience originating loans other

23   than for people who worked for the financial institutions --

24           THE COURT:  Mr. Shuster, you're ahead of your

25   team.  Why don't you let them hand out the binders.

Page 6

1             THE WITNESS:  Thank you.

2             THE COURT:  Or your team is behind you.  I'll put

3     it that way.

4             MR. SHUSTER:  No, I think I was --

5             THE COURT:  Is that better?

6             MR. SHUSTER:  I thinks I was ahead of them.

7        (Pause)

8             THE COURT:  All right.  Now that we've distributed

9     a small forest.

10             MR. SHUSTER:  All right.

11     BY MR. SHUSTER:

12     Q    Mr. Grice, you have no personal experience originating

13     mortgage loans other than for people who worked for

14     financial institutions that you worked for, correct?

15     A    I was a consultant to the financial institutions, but

16     that's correct.

17     Q    You've never had the title loan underwriter?

18     A    That's correct.

19     Q    Never worked on an RMBS deal team?

20     A    That's correct.

21     Q    Never personally been responsible for the due diligence

22     on an RMBS offer?

23     A    That's correct.

24     Q    Never supervised the due diligence team for an RMBS

25     offer?

Page 7

1    A    That is correct.

2    Q    Never bought, bid, priced, or traded mortgage loans?

3    A    Certainly not.

4    Q    You say you've performed work for over 30 of the top 50

5    mortgage lenders, correct?

6    A    Correct.

7    Q    Was that in the period also from 2000 to 2008?

8    A    Much of it was certainly.

9    Q    Much of it was?

10   A    Yes, sir.

11   Q    You know that a number of the mortgage lenders from

12   that time period have gone belly up, right?

13   A    Certainly.

14   Q    So did you do work in that time period for Countrywide?

15   A    I can't disclose names of clients, sir.

16   Q    So would that be true there's a number of them what

17   went belly up, Countrywide, WAMU, National City, American

18   Home, New Century, IndyMac, Freemont, Greenpoint, and

19   various others.  You can't disclose whether you worked for

20   those banks in that time period?

21   A    I can't disclose the names of the clients.  Also just

22   to be clear, I think some of that list includes firms that

23   were purchased by other entities.  Some failed, but I think

24   a majority of those were acquired.

25   Q    They had been stand-alone entities before and they

Page 8

1    weren't after?

2    A    Correct.

3    Q    Some of them failed outright?

4    A    Yes, sir.

5    Q    You can't tell us which ones you worked for?

6    A    I cannot, no, sir.  I was able yesterday to name

7    institutions that I've trained, but not institutions that

8    I've consulted for.  And I've named entities for whom I've

9    done litigation related assignments.

10   Q    You also said that it's also true that from the early

11   2000's through 2007 you or your firm provided consulting

12   services concerning the assembly of RMBS to about half of

13   the top 25 biggest RMBS issuers or underwriters, right?

14   A    That's correct, yes, sir.

15   Q    And of course the RMBS that were assembled during that

16   time period, 2000 to 2007, have been the subject of

17   considerable litigation since then, right?

18   A    Yes, sir.

19   Q    They've also been the subject of government

20   investigations since then?

21   A    Yes, sir.

22   Q    Right?  Can you tell us what RMBS issuers or

23   underwriters you worked for in the period 2000 to 2007?

24   A    No, for the same reasons I described yesterday.

25   Q    Okay.  Now, during the last 15 years your work has also

Page 9

1    included consulting on presecuritization due diligence

2    processes for RMBS securitizations, right?

3    A    I think it's actually a little bit longer now, you may

4    be reading from an older document.  I think we're now up to

5    17 or 18 years.

6    Q    But it goes down to -- back to 2000 or 2002?

7    A    Yes, sir.

8    Q    Okay.  And there has been a lot of litigation over the

9    RMBS securitizations in connection with which you provided

10   consulting due diligence?

11   A    I don't quite understand the way you've asked that

12   question.  Could you rephrase it?

13   Q    You say that you've done consulting on

14   presecuritization due diligence processes for RMBS

15   securitizations.

16   A    Yes, sir.

17   Q    Those presecuritization due diligence processes have

18   been the subject of litigation by private parties, by

19   governmental entities, et cetera?

20   A    Yes, sir.  Some, but not all.  But yes, sir, by all

21   means.

22   Q    And it's RMBS in that same time period that are at

23   issue here?

24   A    Yes, sir.

25   Q    And some of those issuers who were sued by the Federal

Page 10

1   Housing Finance Authority on behalf of Fannie and Freddie,

2   right?

3   A     That's correct.

4   Q     Some of the ones you worked for?

5   AA     gain, I can't disclose clients.  Now, just to be clear,

6   in my list of litigation assignments I did do work on behalf

7   of some of the investment houses sued by FHFA.

8   Q     Right.  So for one of them, and I won't name it unless

9   I have to, you put in a report opining on that institution's

10   -- the reasonableness of that institution's

11   presecuritization due diligence processes on mortgage loans,

12   correct?

13   A     If you're not going to tell me who it is I can guess I

14   guess.

15   Q     Well you know you put in expert reports in FHFA?

16   A     I did.  I think in 6 or 7 of the 18 or 19 actions, yes,

17   sir.

18   Q     Okay.  So --

19   A     Some were specific to diligence processes, some were --

20   one was generic to the RMBS industry, and I had nothing to

21   do with the client investment bank.

22   Q     So one of the ones you put in that involves a prominent

23   investment bank you found no -- did you conduct there a

24   business process audit essentially to determine if the due

25   diligence was reasonable?

Page 11

```
 1   A     I mean I'm having a hard time understanding who you're

 2   speaking about.

 3   Q     Well for any of them be were you opined on due

 4   diligence processes?  I just don't want to name names.  But

 5   for any of them were you opined on due diligence processes?

 6   A     Was the wink for me, I just --

 7   Q     No.

 8   A     -- if there's a --

 9             THE COURT:  Hold on.  Hold on.  Time out.  Is

10   there a way we can do this so that you actually are

11   communicating with each other?  I mean --

12             MR. SHUSTER:  I'll be more specific.

13             THE COURT:  No, without -- I'm not trying to ask

14   Mr. Grice to reveal something he doesn't reveal, but I'm

15   trying to enable you --

16             MR. SHUSTER:  Yeah.

17             THE COURT:  -- to ask a question that you want to

18   ask.

19             MR. SHUSTER:  I think I'm more sensitive about it

20   than he is.  What he --

21   BY MR. SHUSTER:

22   Q     What you did in those cases where you put in those

23   expert reports, that's public, right?

24   A     Well the existence of the reports -- some of the

25   reports are in fact public, not by my choice --
```

Page 12

1    Q    Right.

2    A    -- but by the client who attached them to something or

3    they became part of a pleading or something.

4    Q    So, for example, you put one in for Goldman, right?

5    A    I did, yes, sir.

6    Q    And you opined on the reasonableness of its due

7    diligence processes?

8    A    I looked at the process and then I looked at the

9    empirical results of very specific trades.  So it was a

10   process review but with respect to very specific

11   securitizations.

12   Q    Was that a business process audit of the kind you say

13   you performed here?

14   A    Yes, sir.  Again, different circumstances, but I think

15   I would call that a business process audit.

16   Q    Okay.

17   A    You know, retrospective it looked at both the design,

18   the philosophy, and then the specific application and

19   specific securitization.

20   Q    Right.  So in that case you found through your business

21   process audit that the processes that that financial

22   institution had engaged in were reasonable and did not

23   violate the securities laws, correct?

24   A    I don't believe I went into securities laws, but I

25   talked about the reasonableness of the process and the

Page 13

1   results of my review of the empirical aspects of those

2   trades.

3   Q    Just to be clear, you found the due diligence processes

4   were reasonable, right?

5   A    Well if we're talking about Goldman, yes, sir.

6   Q    Okay.

7   A    I mean Goldman was --

8   Q    Well let's focus on that one.  And they -- that was in

9   a lawsuit brought by the Federal Housing Finance Agency on

10  behalf of Freddie and Fannie?

11  A    Correct.

12  Q    And Goldman ultimately settled with them?

13  A    I don't know the ultimate disposition of these cases --

14  Q    Okay.

15  A    -- but I don't believe there was an actual trial.

16  Q    You do know that they entered into a settlement with

17  the Department of Justice relating to those same practices

18  that you opined were reasonable?

19          THE COURT:  Mr. Shuster, I hate to interrupt you,

20  but I -- for the clarity of the record and me I don't know

21  what -- you're talking about a FHFA, I know they hate to be

22  called that --

23          MR. SHUSTER:  Yes.

24          THE COURT:  -- FHFA --

25          MR. SHUSTER:  Right.

1                THE COURT:  -- action against Goldman --

2                MR. SHUSTER:  Yes.

3                THE COURT:  -- or involving Goldman?

4                MR. SHUSTER:  Yes.  Yes.

5                THE COURT:  Okay.  And is that referenced anywhere

6    in Mr. Grice's CV?

7                MR. SHUSTER:  He describes the due diligence

8    processes.  He describes his expertise in this area.

9                THE COURT:  Okay.  So is it --

10               MR. SHUSTER:  And opining on --

11               THE COURT:  -- it's a lawsuit brought by FHFA on

12   behalf of Fannie and Freddie against Goldman only or as

13   Goldman as part of a group?

14               MR. SHUSTER:  There were separate actions,

15   Goldman, in that case I think it was --

16               THE WITNESS:  Yeah.  I think there was something

17   like 17 cases brought on 17 different banks --

18               THE COURT:  Yeah.

19               THE WITNESS:  -- that were brought, and they all

20   sort of --

21               THE COURT:  Okay.

22               THE WITNESS:  -- falling out over time.

23               THE COURT:  Okay.

24               THE WITNESS:  This -- and Nomura is the one that

25   actually received -- went to trial.

Page 15

```
 1              THE COURT:  Okay.  But, Mr. Shuster, Mr. Grice,

 2     you two know that you're talking about the same thing.

 3              THE WITNESS:  I hope so.  I believe so.  Yes.

 4              THE COURT:  Okay.

 5     BY MR. SHUSTER:

 6     Q    But I was saying that separate and apart from the FHFA

 7     action that entity, Goldman, also entered into a settlement

 8     with the Department of Justice substantially with respect to

 9     the due diligence processes that were the subject in part of

10     your opinion, yes?

11     A    I just don't know that.

12     Q    Okay.

13     A    I understand there was a settlement with DOJ, but I

14     don't know if it covered the transaction that I was

15     reviewing.

16     Q    Didn't you review about 40 securitizations there?

17     A    Sir, I've not seen that report in three or four years.

18     Q    You also provided a report in that case on behalf of

19     RBS?

20     A    I did, yes, sir.

21     Q    In an action brought by FHFA against Nomura and RBS?

22     A    That's correct.

23     Q    You also performed a due diligence -- a business

24     process audit there on the presecuritization that RBS

25     performed on mortgage loans?
```

Page 16

1    A    That's correct, with respect to specific

2    securitizations --

3    Q    Right.

4    A    -- and specific transactions.

5    Q    And that case went to trial?

6    A    I understand it went to trial, I understand it's on

7    appeal.  Or -- I just don't know the ultimate disposition.

8    Q    And the court find that RBS's due diligence processes

9    were not reasonable at the trial level?

10   A    I think that was in the first decision.  I just -- I

11   don't track where these end up, but I understand that's

12   either on appeal or is still being considered.

13   Q    You don't know that the Second Circuit affirmed that

14   opinion?

15   A    I'm not an attorney and I don't follow this as an avid

16   fan.

17   Q    Now, here we have claims in excess of $11 billion,

18   correct?

19   A    That's my understanding, yes, sir.

20   Q    Involving well over 200 securitizations, correct?

21   A    That's my understanding, yes, sir.

22   Q    You say you performed a business process audit,

23   correct?

24   A    Yes, sir.

25   Q    Before submitting your affirmative report you had one

```
 1    face-to-face meeting with Zachary Trumpp?  One?

 2    A    That's my recollection, yes, sir.

 3    Q    And a number of telephone calls?

 4    A    About a dozen, yes, sir.

 5    Q    A dozen calls ranging from one to two hours?

 6    A    Yes, sir.

 7    Q    And you say that two other people from his team

 8    participated in those meetings?

 9    A    Yes, sir.

10    Q    And at least as of your deposition you did not know how

11    many people were on his protocol with the team; is that

12    right?

13    A    That's correct.

14    Q    Does that remain the case today?

15    A    Yes, sir.  I have not pursued the number of people who

16    were on his review team at that time.

17    Q    Okay.  Now, RECOVCO reviewed over 60,000 loans here,

18    correct?

19    A    That's my understanding, yes, sir.

20    Q    And it, on its own, rejected over $5 billion worth of

21    claims, right?

22    A    I don't know that number, but I know they had the

23    authority to reject claims and claims were rejected.

24    Q    Okay.  Well you do know, because it's in your expert

25    report, that RECOVCO reviewed over 60,000 loans, that it put
```

Page 18

1    19,000 of those loans up to RBF, and that the rest it

2    rejected the claims on without any review by RBF, right?

3    A    Yes, sir.

4    Q    Okay.  And you can imagine that 45,000 -- the 45 odd

5    thousand claims, if rejected, represent billions of dollars

6    in claims, correct?

7    A    You're asking me if I can imagine that?  Is that --

8    Q    Do you know?

9    A    I don't know the dollar value, no, sir.

10   Q    All right.  Well let's just -- we can just stick with

11   the number of loans.

12        Before submitting your affirmative report you met with

13   Mr. Pino, the head of RECOVCO, for precisely one to two

14   hours, right?

15   A    Yes, sir, I told you that in my deposition.

16   Q    Right.  And that was over the phone, right?

17   A    It was indeed over the phone, yes, sir.

18   Q    Right.  You believed that other people were on the

19   telephone from RECOVCO but you don't know and none of them

20   spoke up, right?

21   A    I believe that's accurate.

22   Q    That's enough.

23   A    To the best of my recollection, sir.

24   Q    That's enough.  We'll come -- I want to come back to

25   RECOVCO, but just briefly.

Page 19

1       You also spoke with the lawyers for Lehman, RBF, right?

2    A    I did, yes, sir.

3    Q    You have no recollection at least at your deposition of

4    how many people were on the RBF team reviewing loans, right?

5    A    That's correct.

6    Q    And you weren't sure if you ever knew that number?

7    A    That's correct.

8    Q    Now, the plan administrator took the position as to

9    various loans and breaches that the breach wouldn't have

10   been material to the loan underwriting decision, right?

11   A    Yes, sir.

12   Q    You opined on that too from time to time?

13   A    Yes, sir.

14   Q    Without acquiescing in whether that is in any way,

15   shape, or form the governing standard, you opined, did you

16   not that on certain circumstances the loan would have been

17   made any ways?

18   A    I don't understand your question.

19   Q    Didn't you opine in certain circumstances that the loan

20   would have been made any ways?

21   A    Yes, sir, in my opinion.

22   Q    You did not ask for, did not receive, and did not

23   review any emails, correspondence, or internal memoranda

24   concerning Aurora's or Lehman's loan origination, loan

25   underwriting, or loan securitization practices; isn't that

1    correct?

2    A    Yes, sir, I believe we discussed that at my deposition.

3    Q    In your individual narratives you sometimes say the

4    loan would have been made any ways, right, under applicable

5    guidelines?

6    A    Is this the question you asked earlier?  Yes, sir, I

7    offered that opinion.

8    Q    You base that on your experience working in the market

9    rather than any familiarity with Aurora's or Lehman's actual

10   practices in applying their guidelines?

11   A    I don't know if I understand that question.  I

12   certainly saw the actual practice in the sense that these

13   were loans that had graduated from those processes, so I --

14   Q    So you saw them?

15   A    -- had some understanding.

16   Q    You don't know what happened in the field between loan

17   originators and borrowers do you?

18   A    No, and importantly neither does Mr. Aronoff or

19   Mr. Morrow.

20   Q    Okay.

21   A    We don't know that.

22   Q    You're here as an independent expert?

23   A    Yes, sir.

24   Q    Okay.  So the details of the underwriting process vary

25   considerably from institution to institution don't they,

Page 21

1    Mr. Grice?

2    A    Can you be more specific as to what you're referring

3    to?  Are you talking about Aurora?

4    Q    I'm saying that the details of the loan underwriting

5    process vary considerably from institution to institution;

6    isn't that true?

7    A    They certainly can, they can also be the same.  The

8    guidelines generally vary, the processes generally vary, the

9    practices generally vary.

10   Q    Well let me read a sentence to you and ask you if you

11   agree with it.

12        "Although the details of the underwriting process

13        vary considerably from institution to constitution and

14        over time within an constitution, based on your 30

15        years of experience it's the norm in the industry to

16        permit underwriters to use judgment in evaluating

17        loans."

18        Do you agree with that sentence in its entirety?

19   A    I do, yes, sir.

20   Q    All right.  So we'll focus on the second part of that

21   eventually, right now let's focus on the first part and I

22   want to make sure I have a clean answer.

23        Is your opinion that the details of the underwriting

24   process vary considerably from institution to institution

25   and over time within an institution, yes?

Page 22

1   A     Could you show me the paragraph?  Because I think the

2   context of -- I think it might be helpful in understanding

3   what the sentence is referring to.

4   Q     Either you agree or you don't agree or you can't say.

5              THE COURT:  Mr. Shuster, what are you reading

6   from?

7              MR. SHUSTER:  His expert report.

8              THE COURT:  I think we ought to let him have his

9   expert report --

10             MR. SHUSTER:  That's fine with me.

11             THE COURT:  -- if you're asking questions about

12  it.

13  BY MR. SHUSTER:

14  Q     It's in your expert report binder.

15  A     Do I have that?

16  Q     You should.

17             THE COURT:  It's one of the thin binders.

18             THE WITNESS:  Yes, sir.  Can you direct me to

19  where --

20  BY MR. SHUSTER:

21  Q     Yes.  It's paragraph 42, Mr. Grice, of your affirmative

22  report, on page 16.

23       (Pause)

24  A     And your question, please.

25  Q     I'm just asking you whether it is true that the details

Page 23

1   of the underwriting process vary considerably from

2   institution to institution and over time within an

3   institution.  Is that a true statement?

4   A    Yes, sir.

5   Q    Okay.  Now, do you know what entities originated the

6   loans here?

7   A    Many.  I mean primarily Aurora and BNC, but many.

8   Q    Many meaning that they had correspondents and brokers

9   out in the field?

10  A    Yes, sir, that's what I'm referring to.

11  Q    Exercising the subjective judgments you talk about?

12  A    Yes, sir.

13  Q    You don't know how many originators or underwriters

14  Aurora had in the field?

15  A    I don't have that number in any head, no.

16  Q    Many thousands?

17  A    I don't have a number.

18  Q    You don't know how many had delegated underwriting

19  authority do you?

20  A    No, sir, I've not tried to determine that.

21  Q    You don't know with respect to the loans at issue here

22  whether when making credit decisions the loan underwriters

23  were basing those decisions on their own standards and

24  practices or Lehman's?

25  A    Could you give that to me again, please.

Page 24

1  Q    You don't know with respect to the loans at issue here

2  whether when making credit decisions the loan underwriters

3  were basing those decisions on their own standards and

4  practices or Lehman's?

5  A    I've not tried to ascertain that.  I mean my

6  understanding from the facts in the case and the 2700 loan

7  files I looked at is they were compiling with the guidelines

8  that were relevant to those specific loans, which could

9  include a yes to both those questions.

10 Q    Let me ask you to turn to your deposition, Mr. Grice,

11 at page 119, the first day of your deposition.

12 A    Do I have that?

13 Q    It's a separate binder, but you should have it.

14 A    Yes, sir.  So which, day one?

15 Q    Day one, page 19.  No, sorry, 119.  And I asked you

16 when underwriters were making -- at line 7:

17        "When underwriters were making credit decisions

18        were they basing that on their own standards and

19        practices or Lehman's or do you know in the cases of

20        the loans at issue here?

21        And you answered, "I haven't studied that in this

22        case."

23        Do you see that?

24 A    I do, yes, sir.

25 Q    Did I ask that question, did you give that answer?

Page 25

1   A     Yes, sir.

2   Q     Okay.  Now, you say that for certain breach claims

3   reunderwriters or other reviewers must put themselves in the

4   shoes of the original underwriter or seller, correct?

5   A     Correct.

6   Q     Setting aside whether we agree with that standard,

7   that's the one you put out and you did nothing to

8   familiarize yourself with the loan origination practices or

9   the loan originators who originated the loans that are at

10  issue here; is that fair?

11  A     I could not, I did not, I was unable to, yes.

12  Q     You rely on the fact that Mr. Trumpp was heavily

13  involved in Aurora's put-back process and developed

14  knowledge and expertise in that process, correct?

15  A     Correct.

16  Q     You did not educate yourself as to what Aurora's put-

17  back practices and procedures were, correct?

18  A     I did not study that, no, sir.

19  Q     You also say Mr. Trumpp was the architect of Aurora

20  Loan Services' loss management function which managed

21  repurchase litigation for the master servicing unit, right?

22  A     I don't recall where that came up, but I recognize

23  that, yes, sir.

24  Q     It's in your reply report at paragraph 26, and if you'd

25  like to look at it you're free to do so.

Page 26

1    A    Thank you.  Yes, sir, I said that.

2    Q    In fact you said this was an important fact as you

3    consider the reasonableness of the plan administrator's

4    process, right?

5    A    Correct.

6    Q    You don't though recite in your report anything you did

7    to satisfy yourself concerning the efficacy of Aurora's loss

8    management function; is that right?

9    A    I did not study that, no, sir.

10   Q    You don't know how Lehman's or Aurora's loss management

11   functions identified breaching loans?

12   A    I don't think I knew that.  I don't think I -- I know I

13   didn't study that as a topic, and I don't believe I came to

14   a detailed understanding of that.

15   Q    You don't know if Aurora's loss management function

16   reliably uncovered breaches of representations and

17   warranties or mortgage loans?

18   A    I know that was part of their work product, that was

19   one of the results of their analysis.

20   Q    But you don't know if they did that in any reliable

21   way?

22   A    I did not audit that, that was not the subject of my

23   review.

24   Q    You don't know whether that loss management function

25   uncovered breaches at a higher rate than the plan

Page 27

1   administrator is allowing here?

2   AA   gain, I did not audit that or study it, so I have no

3   opinion.

4   Q    Or a lower rate, correct?

5   A    In either direction.

6   Q    Now, you mentioned that the idea of triaging loans is

7   between RECOVCO and RBF -- the idea behind that I should say

8   is simple.  One wants the greatest effort placed in its most

9   experienced reviewers focused on the most complicated

10  issues, right?

11  A    I do say that.  I don't recall where, but I would stand

12  on that.

13  Q    Affirmative report paragraph 62.

14       (Pause)

15  Q    You with me, sir?

16  A    Yes, sir.

17  Q    You even cite to a Fannie Mae selling guide in support

18  of that proposition, right?

19  A    Yes, sir, footnote 23.

20  Q    That same selling guide, you're familiar with it?

21  A    I can't -- I mean I -- yes, I've read it, I can't quote

22  from it.  But yes.

23  Q    That says "that loan selected for post closing

24  discretionary QC reviews must target areas that the lender

25  identifies as having a high potential for errors,

Page 28

1    misrepresentation, or fraud," right?

2    A    You're going to give me a minute I hope to catch up

3    with you?

4    Q    Sure.

5    A    Do you have the version that's relevant to 2002 to

6    2008?

7    Q    I have it.  It's TRX-2848 in your binder.  Volume 2.  I

8    was hoping to avoid pulling out the document, but it is what

9    it is.

10   A    So, I'm sorry.  So which tab?

11   Q    It's -- you can only look at -- find it by the exhibit

12   number, TRX-2848.

13   A    2848.  But my question to you is do you have the

14   version that's relevant to the time period 2002 to 2008?

15   Q    You know what we did, we took the cite in your report

16   and that's what we pulled.  So -- and I'll represent to you

17   that I did that myself.

18   A    Fair enough.  And where exactly are you directing that

19   I read?

20   Q    I'm directing you to the second page of the exhibit,

21   and I'm just simply pointing out that the exhibit says "that

22   loans selected for post closing review must target areas

23   that the lender identifies as having a higher potential for

24   errors, misrepresentation, or fraud," right?  Second page,

25   right in the middle of the page.  Under discretionary

1   mortgage selections there are two paragraphs that you cited,

2   correct?

3   A     Yes, sir.

4   Q     And then I'm focusing on the next sentence.

5   A     Yes, sir, it says that.

6   Q     Yeah.  So in any event coming back to the point,

7   because how I got off on this was you cited that document in

8   support of the proposition that one wants the greatest

9   effort placed and the most experienced reviewers focused on

10  the most complicated issues, right?

11  A     Yes, sir, this is referred to as a risk focused

12  reviews.

13  Q     And you were making that statement by way of endorsing

14  the structure wherein RECOVCO elevated to RBF the more

15  complex claims, right?

16  A     Correct.

17  Q     You did not address however whether Mr. Rollin or

18  Ms. Braswell at RBF have more experience and expertise than

19  Mr. Pino or others at RECOVCO; isn't that correct?

20  A     Experience at what I guess is -- in order to understand

21  your question.

22  Q     Well let me direct your attention to page 121,

23  Mr. Grice, of your deposition, first day.

24            THE COURT:  121?

25            MR. SHUSTER:  Yes, please.

Page 30

1          (Pause)

2                  THE WITNESS:  Okay.  I see 121.

3     BY MR. SHUSTER:

4     Q    So let me direct you attention to line 17.  I asked

5     you:

6              "So other than -- did you conclude that

7         Mr. Rollin or Ms. Braswell have more experience and

8         the expertise than does Mr. Pino or the other people at

9         RECOVCO?"

10        And you answered, "This was not my assignment nor was

11    this the way I choose to perform my analysis."

12        Do you see that?

13    A    I do.

14    Q    So I asked that question, you gave that answer, sir?

15    A    You did, and I did.

16    Q    Okay.  Now, as of your deposition at least you did not

17    recall how many people were on the RECOVCO team?

18    A    Correct.

19    Q    You didn't know if you ever knew how many people were

20    on the RECOVCO team in connection with your business process

21    audit, right?

22    A    That is true.

23    Q    You weren't even able to ballpark a number for me,

24    right?

25    A    Yes, sir, I said that wasn't something I tried to

Page 31

1   ascertain.

2   Q    Now, you mentioned that RECOVCO performed a review of

3   each loan file during which it may have identified certain

4   threshold facts, right?

5   A    If you could just help me read along with you that

6   would be helpful.

7   Q    Well it's in paragraph 57 but it was also -- of your

8   affirmative report -- but it was also in your testimony of

9   yesterday, Mr. Grice.  I think it's in one of your charts or

10  something.

11  A    Could you repeat your question, please, sir.

12  Q    You, in describing the loan review architecture that

13  the plan administrator implemented, you pointed out that

14  RECOVCO performed a review of each loan file during which it

15  may have identified certain threshold facts, right?

16  A    Correct.

17  Q    You didn't recall at least at your deposition whether

18  that was based on something Mr. Trumpp told you or something

19  Mr. Pino told you, right?

20  A    If you're asking me to verify things I said in the

21  transcript of the deposition if you can just direct me to

22  that.  I mean --

23  Q    Well do you remember whether that was something you

24  learned from Mr. Trumpp or in the two-hour -- one to two-

25  hour conversation you had with Mr. Pino?

1    A    I can't recall where I came to that understanding.

2    Q    You don't know how much time, at least you didn't at

3    your deposition, know how much time RECOVCO analysts spent

4    on average reviewing a loan and claim file?

5    A    I recall I did not, and I still do not know.

6    Q    You don't know how many people were in the first line

7    of review at RECOVCO and how many were higher up in the

8    review chain there?

9    A    I recall I did not know, and I still do not know that.

10   Q    You say in your reply report "that every loan reviewed

11   by RECOVCO underwent a second review by a quality control

12   reviewer," right?

13   AA   gain, if you can just direct me to --

14   Q    Well --

15   A    That's my understanding.  That was and that remaining

16   my understanding.

17   Q    Yeah.  Okay.  You couldn't recall what protocol the

18   RECOVCO QC reviewer followed in checking the work of the

19   first line reviewer, correct?

20   A    That was and remains my understanding.

21   Q    You don't know?

22   A    I mean I don't have a clear view of this, of the

23   protocol.

24   Q    You say the quality control reviews included -- bless

25   you whoever that is.  You say "the quality control reviews

Page 33

```
 1    included a checklist designed to ensure the breach reviewer
 2    performed the appropriate research steps and provided the
 3    correct classifications and supporting documentation to
 4    support his or her conclusion," right?
 5    A    I'm trying to be as cooperative.  I -- if you can just
 6    direct my to --
 7    Q    Okay.  Well it's --
 8    A    -- where you're --
 9    Q    -- paragraph 29 of your reply report, Mr. --
10    A    I -- thank you, that helps.
11         (Pause)
12    A    Yes, sir, I said that.
13    Q    So you say that the QC reviews included a checklist.
14    You hadn't seen that checklist as of the time you submitted
15    you reply report, correct?
16    A    That's correct.
17    Q    You hadn't so much as asked to see it, correct?
18    A    That's correct.
19    Q    You thought it was important enough to mention in your
20    report but not important enough to ask to see, right?
21    A    It was not something I studied or tried to analyze.
22    Q    It wasn't volunteered to you was it?
23    A    I didn't ask for it.
24    Q    That's a different answer.  It was not volunteered to
25    you?
```

Page 34

```
 1   A     To the best of my knowledge it wasn't volunteered to

 2   me.  I can't recall.

 3   Q     And at your deposition you could not describe to me

 4   what was in the quality control checklist that you referred

 5   to in paragraph 29 of your reply report, correct?

 6   A     Can you direct me to where you are just so I can read

 7   along?

 8   Q     Well do you know what is in the quality control

 9   checklist?

10   A     No, sir.

11   Q     Did you ever?

12   A     I don't believe I did.

13   Q     Okay.  A business process audit is not governed by any

14   governing body, right?

15   A     Not to my knowledge, no, sir.

16   Q     It's different in that sense, it's sort of different

17   from a CPA audit where there are governing bodies and at

18   least some hard and fast criteria?

19   A     I think that might be arguable, but there are governing

20   bodies over accounting firms and the accounting industry

21   both internationally and nationally, yes.

22   Q     You don't describe in your expert reports any

23   particular types of evidence that the plan administrator was

24   willing to accept in support of a breach, right?

25   A     I don't describe that, no, sir.
```

Page 35

1    Q    Did you see that in writing anywhere, the types of

2    evidence that the plan administrator would accept in support

3    of a breach?

4    A    No, sir.

5    Q    Had you seen it you would have disclosed it because you

6    know you were required to disclose anything that you relied

7    upon?

8    A    Yes, sir, this is the result of interviews.  My

9    understanding came there interviews and the review of 2700

10   loan files and 2700 determinations around breach claims.

11   Q    But we're talking about something else right now.  What

12   we're talking about is whether you saw a list or provided a

13   list of the types of evidentiary sources that the plan

14   administrator was prepared to accept in support of breach

15   claims.  That's the question for you.  What's the answer?

16   A    Can you give it to me again, please.  I'm sorry, it got

17   muddled.

18   Q    Whether you -- the question is whether you saw a list

19   or provided a list of the types of evidence that the plan

20   administrator was prepared to accept in support of breach

21   claims?

22   A    No, sir, I wasn't provided --

23   Q    Okay.

24   A    -- nor did I provide.

25   Q    Thank you.

1        In performing your business process audit you did not

2    identify in your expert reports any checklists, right, any

3    written checklists that you used in evaluating the

4    reliability and reasonableness of the plan administrator's

5    review, correct?

6    A    Yes, sir, I don't have one.

7    Q    Okay.  You also don't say in your reports if the plan

8    administrator was willing to accept one piece of evidence or

9    two for any breach, right?

10   A    I don't understand your question.

11   Q    You don't specify whether for certain types of breaches

12   one piece of evidence would have been enough for the plan

13   administrator or whether for other types of breaches two

14   pieces of evidence would have been enough, you don't provide

15   that detail, right?

16   A    I think you've asked the first part, I didn't see a

17   list of documents that in all circumstances would be

18   sufficient.

19   Q    You don't --

20   A    Nor is there an algorithm.  I don't believe there's a

21   written algorithm.

22   Q    Yes.  Okay.  Well we're talking about something a

23   little simpler, but you also don't say if the plan

24   administrator was willing to accept same year or near year

25   evidence in support of a breach, right?

Page 37

1   A    I'm not sure if you're asking if I have that

2   understanding or if I saw it in a document.

3   Q    You didn't disclose it if your expert reports?

4   A    I didn't disclose a document, I don't have a document.

5   I have an understanding.  Are you asking if I disclosed what

6   I have?

7   Q    Yeah.

8   A    I didn't -- I don't have anything and therefore what I

9   have is an understanding.

10  Q    You know that RECOVCO was given the power to reject

11  breaches, you said so earlier, right?

12  A    Yes, sir.

13  Q    You don't describe in your reports in any detail the

14  evidentiary sources that RECOVCO looked at for purposes of

15  rejecting breaches do you?

16  A    I'm sorry, I'm trying to follow your question.  You're

17  asking if I disclosed?

18  Q    Do you know what evidentiary sources RECOVCO relied

19  upon in rejecting breaches?

20  A    I don't believe I have -- I don't believe so, if I

21  understand your question.

22  Q    Do you know what third-party sources not provided by

23  the trustees RECOVCO consulted for the purpose of evaluating

24  breach claims?

25  A    Sitting here I don't have a specific list.  I believe

1    data verify was run and I believe -- I don't want to

2    speculate.  I recall data verify being run commonly, but I

3    don't recall beyond that.

4    Q    You don't identify in your breach narrative the

5    documents that the plan administrator relied upon in

6    rejecting breaches, right?

7    A    If you're asking about the appendix in my --

8    Q    Yeah.

9    A    -- in the spreadsheets?  I do not.

10   Q    Now, do you know that -- you mentioned you reviewed

11   some 1800 loan, I think it's actually originally 1,879

12   breaches on 1,826 loans.  Does that sound right to you?

13   A    I'll take -- I don't remember the 1826, I remember the

14   1879.

15   Q    Okay.  And are you aware that 1100 of the breaches that

16   you reviewed went up to RBF?

17   A    I don't know that number, but I have a general

18   understanding that it was about that ratio.

19   Q    Okay.  So that suggested that those breaches were

20   determined by RECOVCO to have some complex issues or to

21   present a potential material and adverse effect, right?

22   A    Yes, sir.

23   Q    You did not in your breach otherwise -- narratives or

24   otherwise on a loan by loan basis attempt to assess whether

25   RECOVCO applied the simple complex determination

Page 39

1   consistently, right?

2   A   Correct.

3   Q   You didn't request or receive RECOVCO's notes, correct?

4   A   Correct.

5   Q   And of course you have no visibility whatsoever into

6   what RBF did on any individual breach, correct, other than

7   general descriptions?

8   A   Other than general descriptions, and there was an

9   exchange of findings, if you will, you know, I passed -- or

10  recommended a pass in about 104 or 5 instances between the

11  1879 and the Morrow loans.  That was the net result.  There

12  was a larger number where we sent files back to RBF for

13  additional review.  Some of those were active.  My

14  understanding, as I said yesterday, some of those loans were

15  passed as a result of our referral.  So in the end we're

16  down to 104 or 105 -- I might be off by a few -- but that

17  was a net.  So the gross number was larger.

18  Q   You didn't see RBF's analysis on any individual loan?

19  A   I did not, no, sir.

20  Q   And they didn't describe on any individual loan basis

21  their analysis to you did they?

22  A   That's correct.

23  Q   Now, you --

24          THE COURT:  Mr. Shuster, if I may.  So could you

25  describe -- so we started with 1879, 18 --

Page 40

1           MR. SHUSTER:  Well 1879 is --

2           THE COURT:  Okay.

3           MR. SHUSTER:  -- the number of breaches.

4           THE COURT:  Okay.  So 1879, and then a bunch,

5    right, get passed by RECOVCO, right?  A lot.

6           THE WITNESS:  Or elevated to RBF for their review.

7           THE COURT:  Right.  But they go through RECOVCO --

8    they have to go through RECOVCO to get to RBF, right?

9           THE WITNESS:  Yes, ma'am.

10          THE COURT:  Okay.  And I'm trying to understand.

11   So it's at RECOVCO, RECOVCO says thumbs up, we're sending

12   these onto RBF, for how many?

13          THE WITNESS:  So the 1879 Mr. Shuster is relating

14   and I don't have any reason to duty about 1100 of those --

15          THE COURT:  Right.  Okay.

16          THE WITNESS:  -- are the result of those

17   escalations.

18          THE COURT:  So 1100 make it through RECOVCO and

19   they're going to go on their merry way to RBF, right?

20          THE WITNESS:  Yes.  Yes, ma'am.

21          THE COURT:  What did you do when you looked at

22   those 1100 to determine that you agreed that they should

23   clear the RECOVCO hurdle and go onto RBF?

24          THE WITNESS:  I didn't focus on that at all.  I

25   was looking at the quality of the decision.  Did I agree

Page 41

1    with the ultimate decision being made by the plan

2    administrator?  So I was caring about the quality of the

3    ultimate determination of pass or fail the claim, not the

4    inner workings of the plan administrator's process.  So who

5    at RECOVCO or whether RECOVCO had a finding --

6              THE COURT:  So the 1100 goes up to RBF, RBF

7    accepts how many?  A lot.

8              MR. SHUSTER:  I can get you that number.

9              THE COURT:  Okay.

10             MR. SHUSTER:  But in that collection I don't know.

11   You know, proportionately I would guess -- I don't know.

12             THE COURT:  Ninety some percent, right?

13             MR. SHUSTER:  No.  No.  No.  No.  No.  No.  No.

14   Do you know, counsel, RBF accepted out of the 1100 from --

15             THE COURT:  I'm not trying to create evidence

16   here, I'm just trying to pose a question.

17             MR. SHUSTER:  No.  So the answer is I don't know

18   how many of those end up being passed by RBF and approved.

19             THE COURT:  Okay.  So --

20             MR. SHUSTER:  It's a relatively small number.

21             THE COURT:  Okay.

22             MR. SHUSTER:  Probably under 100 is my guess.

23             THE WITNESS:  If I could try I may have a way to

24   help with this.

25             THE COURT:  Here's the question I'm trying to ask.

Page 42

1              MR. SHUSTER:  Oh, they only reviewed rejected

2    claims, so none of them got passed by RBF.

3              THE COURT:  Okay.

4              MR. SHUSTER:  Sorry.

5              THE COURT:  So the claims stop at RBF and they get

6    either accepted or rejected or agreed or not agreed.  I mean

7    I think that's the problem with the terminology is that it's

8    a little confusing.

9              So at the end of the day you -- you're giving an

10   opinion on the fact that you agree based on different

11   sorting of the data 95 percent or 96 percent of the plan

12   administrator's determination.

13             THE WITNESS:  Correct.

14             THE COURT:  And could you tell me again on what

15   you based that conclusion?  Your opinion that that's -- that

16   the plan administrator was correct in 95 plus percent of its

17   determinations.

18             THE WITNESS:  So if I may, the way I performed

19   this review was to start with the claims package put forward

20   by the trustees to review the loan file to see independently

21   would I come to the -- I knew these had all failed, right,

22   these were all failed claims.

23             THE COURT:  Right.

24             THE WITNESS:  Would I agree with the determination

25   to fail the claim?

Page 43

1        I then read the plan administrator's formal

2   response.

3        THE COURT:  Okay.  So you've answered my question.

4   So what you're telling me is, in sum and substance, it was

5   irrelevant to your analysis, the rendering of your opinion,

6   whether RECOVCO had 2 people or 20 people or 200 people, you

7   conducted an independent review of the file, you got to the

8   finish line, you had a conclusion, you compared it to the

9   plan administrator's conclusion, and that's what generates

10  your agree or disagree rate.

11       THE WITNESS:  Yes, ma'am.

12       THE COURT:  Thank you.  Go ahead, Mr. Shuster.

13  BY MR. SHUSTER:

14  Q    So, Mr. Grice, you selected your loan population from

15  rejected loans, right, rejected breaches only?

16  A    Yes, sir.

17  Q    Eleven hundred of those rough and tough went up to RBF,

18  right?

19  A    I think we're getting lost.  The terminology it went up

20  to RBF may be part of the problem.

21       So a large number of the claims I reviewed were there

22  because they were failed by RECOVCO.  A larger number were

23  there because they ultimately were failed by RBF.  So it's

24  the two paths to being a failed claim, one goes just to

25  RECOVCO, and one goes to RECOVCO and RBF.  So that's the

Page 44

1    path that comes to failure.

2    Q    No, I guess -- but the ones that went to RBF in your

3    loan population, your review population was about 1100,

4    correct?

5    A    I believe that's appropriate.

6    Q    There on those loans you don't know if RECOVCO felt

7    that there was a breach?

8    A    Well I know it was elevated to RBF for their review.

9    Q    Which suggests that RECOVCO felt that there was a

10   breach?

11   A    There was evidence in support of the threshold fact

12   determination, and that's why it's going to RBF.

13   Q    So when you say you agree with the plan administrator

14   -- you're only operating at the breach level though, right?

15   AA    s I said yesterday, yes, sir.

16   Q    So when you -- and you're also saying you're not

17   opining on the ultimate repurchase decision by the plan

18   administrator, right?

19   A    Certainly not, yes, sir.

20   Q    So if 1100 loans in your population, if RECOVCO

21   determined that threshold facts have been established and

22   you say you agree with the plan administrator you actually

23   don't know if you're agreeing with the breach determination

24   that was made on those 1100 loans, right?

25   A    I'm trying to follow your question.  I guess it could

1    be that the loan is being failed for AMA reasons or outside

2    the breach that I reviewed.

3    Q    So you say you agree with the plan administrator but in

4    fact the breach may have been passed by RECOVCO at least,

5    right?

6    A    Yes, sir.

7              THE COURT:  I lost you.  The breach may have been

8    passed by RECOVCO.  You got to help me with the --

9              MR. SHUSTER:  Yes, I'm sorry.

10              THE COURT:  -- terminology.

11              THE WITNESS:  Yes.

12    BY MR. SHUSTER:

13    Q    So --

14              THE COURT:  You can pass which means no thanks, or

15    you can pass which means thank you --

16              MR. SHUSTER:  I'm using the pass, fail, you know,

17    that terminology.

18              THE COURT:  So if a breach is passed by RECOVCO

19    you intend to mean --

20              MR. SHUSTER:  That they -- that RECOVCO, you know,

21    as the witness testified a moment ago, RECOVCO made a

22    determination or may have made a determination that there

23    was sufficient threshold facts --

24              THE COURT:  Yes.

25              MR. SHUSTER:  -- to establish a breach.

 1   BY MR. SHUSTER:

 2   Q    Correct?

 3   A    No, sir.  I think this is where terminology is --

 4   RECOVCO cannot pass --

 5            THE COURT:  Hold on.

 6            MR. COSENZA:  There's some confusion here, Your

 7   Honor.

 8            THE COURT:  Okay.  Mr. Shuster, I think you ought

 9   to come up.

10       (Sidebar off the record)

11            THE COURT:  We're going to take -- the upshot of

12   this little side bar is that we're going to take a little

13   break for about 15 minutes and then we're going to resume.

14   Same rules apply today, Mr. Grice.

15       (Recessed at 10:07 a.m.; reconvened at 10:35 a.m.)

16            THE COURT:  Okay.  Rather longer than 15 minutes,

17   but we have a new and improved document access system.  It's

18   very high-tech.

19            UNIDENTIFIED SPEAKER:  Two thumbs up.

20            THE COURT:  Okay?  I hope it works.

21            Go ahead, Mr. Shuster.

22            MR. SHUSTER:  Thank you, Your Honor.

23   BY MR. SHUSTER:

24   Q    Mr. Grice, I want to just walk through a couple of

25   things slowly and make sure we're all on the same page.

Page 47

```
 1   A     Yes, sir.

 2   Q     So RECOVCO had the power to reject breaches on its own,

 3   correct?

 4   A     Yes, sir.

 5   Q     If RECOVCO made a determination that a breach claim had

 6   complex features such as potentially adequate threshold

 7   facts to make out a breach or that the breach claim had a

 8   potential AMA then it would send that loan to RBF, correct?

 9   A     That's my understanding, yes, sir.

10   Q     Okay.  And the 1100 of the loans in your review

11   population of 1,879 loans, roughly 1100 went to RBF from

12   RECOVCO, correct?

13   A     Yes, sir.

14   Q     So as to those loans RECOVCO made a determination --

15   RECOVCO did not reject the breach, correct?

16   A     Just to clarify.  So these are breaches, right?  So the

17   1100 breaches I think is what is the better term, but I'm

18   just trying to understand your question.

19   Q     Yeah.

20   A     So we're talking about the 1100 that had been forwarded

21   to RBF --

22   Q     Right.

23   A     -- I think is --

24   Q     So on those RECOVCO made the determination we spoke

25   about a moment ago that the breach either potentially was
```

1    established by threshold facts or potentially gave rise to

2    an AMA?

3    A    Yes, sir.  Or had a complexity that was outside their

4    assignment.

5    Q    And RECOVCO had the power to reject breaches, and those

6    breaches were not further reviewed?

7    A    They were QC'd internally, but there was no review

8    outside of RECOVCO.

9    Q    And then the -- so coming back to your review

10   population, what I was trying to elicit is that the -- as to

11   the 1100 breaches in your population that went to RBF you

12   don't know what determination RBF or the plan administrator

13   made with respect to those breaches, correct?

14   A    I know they failed.  I know in order to get to my

15   population they had to fail.

16   Q    You know that they -- that ultimately the determination

17   was made not to buy back those loans?

18   A    I'm not -- I don't know about that.  All I know about

19   is these are failed claims, so they were either failed by

20   RECOVCO or failed by kind of RECOVCO/RBF, and that's how

21   they make it to my universe.

22   Q    Were they failed breaches or failed loans?  My

23   understanding is they were failed loans, breaches on failed

24   loans.

25   A    My understanding is these were failed claims at the

Page 49

1   claim level.  So that's my understanding.  The way that I

2   could evaluate this was it was a failed claim.

3   QA   s to the failed claim you don't know whether RBF made a

4   determination that a breach was not shown or made a

5   determination that a breach was shown but there was no AMA?

6   A    Could you repeat it, please.

7   QA   s to the 1100 that went to RBF you don't know whether

8   they failed the claim based on finding there was no breach

9   or based on finding there was no AMA?

10  A    I don't know that.  I know it was a failed claim, but I

11  don't know anything outside that.

12  Q    So when you say you agree with the plan administrator

13  your analysis is at the breach level.

14  A    Yes, sir.

15  Q    But it's possible that the rejection of the claim was

16  at the AMA level?

17  A    It may have been rejected for AMA, yes, sir.

18  Q    Now, there's no precise definition of what complex

19  claims that went to RBF and what you and the plan

20  administrator characterize as simple claims that were simply

21  rejected by RECOVCO; is that right?

22  A    What precisely are you asking?

23  Q    I'm asking you, there's no precise -- extremely precise

24  definition to say what was complex and what was simple for

25  purposes of the plan administrator's process was?

1    A    I think there's -- I've not seen a detailed written

2    explanation and that's because we're dealing with unique

3    claims and unique loan files and fact and circumstance

4    determinations.

5         So not surprisingly, I've not seen a clear simple

6    written definition of what is an inherently complex process.

7    Q    Now, you don't know how the final loan level assessment

8    was made by the plan administrator, correct?

9    A    No, sir, I'm not looking at the ultimate loan level

10   determination.

11   Q    It is correct, is it not, that you did not randomly

12   select a sample for your reviewed population?

13   A    We discussed this yesterday.  I took -- my objective

14   was to get coverage across the various categories and

15   subcategories or buckets and sub-buckets of rejected claims.

16   And I so obtained a list of these major categories and

17   subcategories and then drew from within those subcategories

18   using randomization, but not for the purpose of creating a

19   statistically significant random sample.  I was performing a

20   judgmental analysis.

21   Q    So you have not arrived at any statistical conclusions

22   concerning the blue trade (ph)?

23   A    That's correct, I have no blue trade.

24   Q    You mentioned a moment ago that you were given

25   categories and subcategories, was that from the plan

Page 51

1    administrator?

2    A    Yes, sir, and it's in -- I think it's my reply report,

3    Exhibit 1 perhaps.

4    Q    Did they -- did the plan administrator give you a

5    spreadsheet that had those categories, or was that done

6    another way

7    A    I'm trying to think of what other way -- it was an

8    Excel list, and it's either identical or very similar to

9    what is reflected in my reply report.

10   Q    So did the spreadsheet you received have the buckets

11   and the categories that are identified in that exhibit to

12   your reply report, Exhibit 1?

13   A    Well, this is built on what I understood or received

14   from the plan administrator.  This is taking each of the

15   loans and breaches and tying them to these buckets and sub-

16   buckets.  But in sum and substance it's the third and fourth

17   columns that I received from the plan administrator.

18   Q    Did -- was the Excel that you were provided all of the

19   claims or just the population of claims that you ultimately

20   reviewed?

21   A    Can you help me with the question?

22   Q    Was the contents, the data contents of the Excel

23   spreadsheet that you were furnished with, did that include

24   all of the claims tendered by the trustees or merely the

25   population of claims that comprised your review population?

Page 52

1    A    It had no loan numbers or breach numbers at all, it was

2    simply the categories or the buckets and sub-buckets of the

3    claimed types and evidence types.

4        So what I did then was identify which claim I chose to

5    review, right, so I -- what I was given was kind of an

6    analytical framework of breach claim types and sampling

7    categories.  So instead of excessive DTI and alleged facts

8    refuted by contradictory document six times, I would see

9    that once.  That's a bucket and a sub-bucket.

10   Q    So is it the case -- are you saying that the

11   spreadsheet simply consisted of the information in columns 3

12   and 4 and did not have loan numbers or claim numbers?

13   A    That's correct, in the first instance.  And then my

14   objective was to make sure I got sufficient insight into

15   each of those combinations, and that's why I say it was

16   ultimately a judgmental evaluation, randomization when used

17   to make sure I was getting a randomly selected claim from

18   within that bucket, sub-bucket combination.

19   Q    So time permitted I might get back to this document,

20   but I don't want to spend a lot of time on it now, but I did

21   have a question about one category on page 5, Mr. Grice.

22   A    Yes, sir.

23   Q    And if you look, it's actually the one -- the category

24   that juts out furthest to the right, it says "evidence

25   supporting claim is other than the bucketed categories for

Page 53

```
 1    this defect."  Do you see that?

 2    A    I do.

 3    Q    Do you know what that refers to?

 4    A    I have known, I looked at nine of these to get an

 5    understanding, that's why I looked at nine and not one, but

 6    I confess I can't recall what that is.  It appears to be a

 7    poorly manufactured claim that somehow the evidence is not

 8    tied to the defect, but I don't want to speculate.

 9    Q    When you say bucketed categories for these defect,

10    whose bucketed categories?

11    A    Well, it's saying, I don't know who's -- the bucketing

12    is done by the plan administrator.  This identification of

13    the nature -- so the trustee says it's a misrepresentation

14    of debt claim.  And then the subcategories within that deal

15    with types of evidence or challenges about that claim.  This

16    is a problem or a challenge about that claim, that the

17    evidence for some reason doesn't match --

18    Q    I get that.

19    A    -- the claim type.

20    Q    I get that.  But what I'm really focused on is, you

21    know, what is bucketed categories?  What does that refer to?

22    A    Well, we're looking at the bucketed categories, right.

23    These are the misrepresentation of debt and then the

24    evidence is not related to that misrepresentation of debt.

25    Q    And whose terminology is that, yours or the plan
```

Page 54

1    administrator's?

2    A    I believe this is the plan administrator's, the label,

3    yes.  And then my determination was to look at nine of these

4    to get sufficient understanding.  I apologize I don't recall

5    what that is.

6    Q    No, no, not at all.  How many line items, if you can

7    recall generally, how many line items were in the

8    spreadsheet that you referenced a moment ago?

9    A    My recollection was it was 60 something.

10   Q    Okay.  So --

11   A    I believe it's in the sixties.

12   Q    And all, for -- to enable us to have this discussion, I

13   believe that somewhere it was represented to us, I think

14   it's in your report, or somewhere, that there were 62

15   categories.  But in any event, those came to you in a

16   spreadsheet provided by the plan administrator?

17   A    Yes, that's correct.

18   Q    Now, coming back to the process.  You state in your

19   report that Mr. Trumpp -- I'm going to pass that.

20        Do you recall that I asked you in your deposition

21   whether RECOVCO knew how to do a sophisticated loan file

22   review before it was engaged by the plan administrator, and

23   that you stated your opinion was that this was more nuanced

24   than what they had done previously?

25   A    I recall Q&A's about my kind of perspective on the

Page 55

1   nuanced nature of this assignment.

2   Q    Do you recall testifying that RECOVCO had not done this

3   kind of nuanced analysis before?

4   A    I do recall making that statement.

5   Q    And that Mr. Trumpp talked what RECOVCO thinks it

6   didn't already know about reviewing mortgage loan files,

7   right?

8   A    I remember something to that effect, I don't recall

9   tying the mortgage files in particular, but I recall talking

10  about the interaction between Mr. Trumpp and RECOVCO.

11  Q    Let me just direct your attention, if I may, sir, to

12  page 179 of your transcript.  I thought we had a functioning

13  binder system, but it's --

14  A    I'm still learning where the library is.

15  Q    -- also a work flow in process.

16  A    Thank you.

17          MR. COSENZA:  Your Honor, before --

18          THE COURT:  Yes?

19          MR. COSENZA:  -- I object, just for completeness

20  purposes I think we're going to hear a snippet from page

21  179.  I think it actually start, for completeness purposes,

22  at page 178, line 12.

23          THE COURT:  Mr. Shuster, have you said what the

24  line was?

25          MR. SHUSTER:  No, I hadn't yet.

Page 56

1             THE COURT:  Okay.

2             MR. SHUSTER:  What I was going for was 179, 8 to

3    15.

4             THE COURT:  8 to 15?  Okay.

5             MR. SHUSTER:  Yes.

6             THE COURT:  Mr. Cosenza, what do you say for

7    completeness?

8             MR. COSENZA:  And I'm suggesting it should start

9    on 178, line 12.

10            THE COURT:  Okay.

11            MR. COSENZA:  The point he was trying to make --

12   yeah.

13            THE COURT:  You're at line 8, Mr. Shuster?

14            MR. SHUSTER:  Line 8, 179, Your Honor.

15            THE COURT:  All right.  Give me a moment.

16            MR. SHUSTER:  Yes.

17        (Pause)

18            THE COURT:  Okay.  Ask your question, Mr. Shuster.

19   BY MR. SHUSTER:

20   Q    So, Mr. --

21            MR. SHUSTER:  Thank you, Your Honor.

22   Q    So, Mr. Trumpp -- there we go.  Mr. Grice, page 179,

23   line 8,

24            "Q   You think, Mr. Trumpp -- I asked do you think

25       Mr. Trumpp caught a couple of things that we didn't

Page 57

```
1          know already about reviewing mortgage loan files."
2          And you answered,
3              "I hadn't asked that question of Mr. Trumpp, but
4          in my professional opinion would be yes, they learned
5          to do a nuanced analysis unlike what I'd certainly
6          seen before in the marketplace."
7          I asked that question, you gave that answer, sir?
8    A     Yes, sir, I'm happy to explain it further.
9    Q     You can on redirect and I'm sure you will but --
10   A     Thank you.
11   Q     -- the -- incidentally you were not trying to perform a
12   breach analysis on individual loans for purposes of coming
13   up with the answer to what extent these loans have breaches;
14   is that correct?
15   A     Can you ask the question a different way please?  I got
16   lost in the negatives.
17   Q     Let me ask it this way -- well, you were not trying to
18   perform a breach analysis on individual loans for the
19   purpose of coming up with the answer to what extent those
20   loans have breaches; is that fair?
21   A     Let me be very clear.  As I testified yesterday and
22   again today, this is a breach level analysis of already
23   denied claims.  I was not looking -- I was not doing the,
24   you know, bottom-up analysis of a loan and whether and to
25   what extent that loan had a breach if that's your question.
```

Page 58

1    I was doing a very targeted analysis on loans that had been

2    or breaches that had been determined to have failed a

3    specific process.

4    Q    And you were not trying to validate the plan

5    administrator's results, correct?

6    A    That wasn't my objective.  Mr. Shuster, if I could --

7              THE COURT:  Hold on.  The last question and answer

8    reflects that you were not trying to validate the plan

9    administrator's result, right?  That --

10             THE WITNESS:  That was the question.

11             THE COURT:  But just to be clear, do you -- by

12   that question and answer, do you mean by that you weren't

13   setting out assuming the conclusion?  In other words, you

14   weren't endeavoring to validate the results, but you were

15   auditing them to determine the extent to which you agreed

16   with them or not, right?

17             THE WITNESS:  Yes, ma'am.  If I may add, my

18   question about the question was what kind of -- are we

19   talking about breach level results or loan level results.

20   His prior question dealt with a loan level determination.

21   I'm certainly not trying to understand --

22             THE COURT:  Okay.  I was focusing on something

23   entirely different.  I was focusing on the nature of your

24   assignment, right.  If you give me an assignment, here's a

25   data set, try to agree with as much of it as possible versus

Page 59

1   here's a data set, tell me what you think.

2           So I don't know if Mr. Shuster was asking -- not

3   asking that question or not or if his focus was as you're

4   pointing out, loan level versus claim level versus breach

5   level.  So I'll stop and let you continue.  I'll leave it

6   there.

7           MR. SHUSTER:  Thank you.

8   BY MR. SHUSTER:

9   Q   Mr. Grice, you mentioned that a loan underwriter

10  evaluates a borrower's willingness and ability to repay the

11  loan, just yes or no?

12  A   I don't know where I said that, I certainly believe

13  that, yes, sir.

14  Q   And among other reasons that the loan underwriter

15  evaluates the borrower's willingness and ability to pay is

16  risk.

17  A   Yes, sir, certainly.

18  Q   Now, it is the case that certain criteria like FICO,

19  LTV and DTI are objective criteria.

20          THE COURT:  What was the second one, Mr. Shuster?

21          MR. SHUSTER:  FICO, LTV.

22          THE COURT:  LTV, yes, and DTI?

23          MR. SHUSTER:  And DTI.

24          THE COURT:  Thank you.

25          THE WITNESS:  Yes, sir, but I guess subject to the

Page 60

1    proviso what we discussed yesterday, with the issue I raised

2    yesterday with the Court about FICO being objective.  I

3    mean, there's I think inherent measurement bias inside FICO,

4    but it's a quantitative evaluation of something, it's

5    attempting to be an objective measurement.

6    BY MR. SHUSTER:

7    Q    Let's just look at paragraph 39 if we could of your

8    affirmative report.  So you say there in the second

9    sentence, do you not, sir, that lenders underwriting

10   guidelines typically set ranges for objective criteria, such

11   as FICO scores, LTVs and DTI ratios.

12   A    Yes, sir.

13   Q    And an income number, once established, is an objective

14   fact too, once it's established?

15   A    That's difficult to answer.  It's certainly a numerical

16   to quantity and it's one that the bank has pointed to, and

17   they're saying they're relying upon it.  Objective fact may

18   be outside my expert -- my philosophy.

19   Q    Well --

20   A    But I -- it's an understanding, it's what I verified or

21   I'm making my decision based upon.

22   Q    Okay.  Well, let me just adopt the Lexicon of your

23   report.  Once an income number is established, it's an

24   objective criterion.

25   A    Yes, sir.

Page 61

1    Q    And the same is true once a debt number is established,

2    that's an objective criterion, right?

3    A    By objective criterion, we mean this is the thing that

4    I'm going to reference, that's my reference point, yes, sir.

5    Q    Same with the borrower's residency, the borrower's

6    address?

7    A    Yes, sir, it's the thing I'm understanding.

8    Q    Now, you've referenced compensating factors, have you

9    not?

10   A    I have.

11   Q    You agree with Mr. Aronoff's statement in his rebuttal

12   expert report that no compensating factors can be used to

13   compensate for a material omission on the part of a

14   borrower?

15   A    Can you show me where he says that?  I'm not disputing

16   it, I just want to understand the context.

17   Q    Well, let me direct your attention initially to your

18   deposition, page 225.  I'm looking at line 11 on page 225,

19   Mr. Grice.

20        I asked you, line 11,

21             "In the Aronoff rebuttal he says no compensating

22        factors can be used to compensate for a material

23        omission on the part of the borrower."

24        Do you see that?  And you said,

25             "I do."

Page 62

```
 1        I asked,

 2            "Do you agree with that?"

 3        And you said -- there's objections.

 4            "Once a determination that has been made that

 5        it's a material omission on the part of the borrower

 6        I think that's a true statement."

 7        I asked you that question and you gave that answer?

 8   A    Yes, sir.

 9            MR. COSENZA:  Your Honor, I just refer to the last

10   three lines of that testimony.

11            THE COURT:  Yeah, I think for completeness.

12            MR. COSENZA:  Continuing on lines 22 to 24, he

13   said,

14                "I think that's a true statement, but is

15                there agreement that that constitutes a material

16                omission on the part of the borrower."

17        And that's the complete answer and that goes

18   through line 24.

19            THE COURT:  Thank you.

20   BY MR. SHUSTER:

21   Q    And you would agree that assuming that the borrower

22   misrepresents his or her indebtedness, assuming that's

23   established you can't cure that.

24   A    Well, we're back to the judgment problem again and how

25   I'm coming to understand that I know this.
```

Page 63

1    Q    Well, let me direct your attention to page 206 of your

2    deposition, line 7.

3    A    Yes, sir.

4    Q    So the question there is,

5              "First of all, if the borrower misrepresents

6         his or her indebtedness, you can't cure that, can

7         you?

8              "A    No, but you have to get over the bridge

9         of did it actually occur, did they actually

10        misrepresent their indebtedness."

11        And my question to you a moment ago, I'm assuming they

12   did, right?  Then I said,

13             "Of course, but if that's the case if the

14        borrower did misrepresent his or her indebtedness you

15        can't cure that, can you?

16             "A    I can't cure it."

17        Do you see that?

18   A    Yes, sir.

19   Q    I asked those questions, you gave those answers?

20   A    I did, and I continued on for quite some time asserting

21   that you've asked me to assume the conclusion --

22   Q    Of course, yes, I did.

23   A    -- and if that's the question then --

24   Q    I did, I did.

25   A    Yes.

1          THE COURT:  So for the -- Mr. Cosenza, you're

2     standing, but haven't spoken.

3          MR. COSENZA:  Your Honor, just for completeness

4     that answer again was the first four words of the answer,

5     there's another paragraph, I can read it for completeness.

6          THE COURT:  Why don't you give us the page and the

7     line.

8          MR. COSENZA:  Yeah, it's 206, lines 19 all the way

9     through 25, then on to page 207, lines 1 through 3.

10         THE COURT:  Okay.  Thank you.

11         MR. COSENZA:  Thank you.

12         THE COURT:  Can I ask a clarifying question?  So

13    Mr. Shuster is now asking you focusing on this, that you

14    can't cure it.  Okay.  My question is, what's the it?  Is

15    the it the fact that it is established that a borrower

16    failed to disclose a debt?  You cannot cure the fact that

17    the borrower failed to disclose the debt, right, is that

18    what you mean?

19         THE WITNESS:  I mean slightly more than that,

20    which is it's willful or intentional, it's not accidental,

21    it's not a I forgot, it's a misrepresentation as I would

22    define it is there's an intent or willfulness involved.

23         THE COURT:  Let me ask, let me break it down then.

24    In a review of a loan file, it is determined, no one would

25    disagree, that in fact, there was a debt in existence at

Page 65

1   closing that the borrower failed to disclose.  What you're

2   saying now is that whether or not you can cure that omission

3   might depend on whether it was a slip up or an intentional

4   omission?

5           THE WITNESS:  If I may, I have to get over a kind

6   of a materiality aspect of this.

7           THE COURT:  No, no, forget about materiality.

8           THE WITNESS:  Sure.

9           THE COURT:  I'm just trying to -- and I'm not

10  trying to expand Mr. Shuster's question, I'm just trying to

11  understand what this represents.

12          Question, if it's the case, if the borrower did

13  misrepresent his or her indebtedness, you can't cure that,

14  can you, and you say I can't cure it.  And are you -- you're

15  focusing just narrowly on the omission, right, without

16  regard to anything else.  That doesn't mean that we're into

17  materiality or anything else down the road in the analysis.

18  Is that what you mean?

19          THE WITNESS:  That's what I mean.  You know, if a

20  dollar of debt is not disclosed that --

21          THE COURT:  You can't cure it.

22          THE WITNESS:  I can't fix that.

23          THE COURT:  Okay.

24          THE WITNESS:  But the question is, what does it

25  mean later, the question.

1           THE COURT:  Okay.  Go ahead, Mr. Shuster.

2           MR. SHUSTER:  Thank you.

3    BY MR. SHUSTER:

4    Q    Mr. Grice, underwriting deficiencies are the

5    responsibility of the lender since the broker is limited to

6    the role of gathering and processing the application package

7    not underwriting the loan; is that correct?

8    A    I think ultimately yes, that's correct.

9    Q    There are certain red flags of borrower fraud; is that

10   correct?

11   A    I've discussed those elsewhere, but yes.

12   Q    Borrower fraud includes failure to disclose other debt,

13   false claims regarding owner occupancy, misrepresentation of

14   income or assets or at least can.

15   A    Yes, sir.

16   Q    And in most cases, the red flags should have caused an

17   underwriter to ask for more information, investigate

18   discrepancies or anomalies, obtain clarification from the

19   applicant or deny the loan, right?

20   A    I think those are all reasonable reactions to those

21   characteristics.

22   Q    Now, we may have to have two of your reports in hand at

23   the same time, but we can put them up on the screen.  You

24   say -- I think we've gone over the first part of this.  You

25   say in paragraph 50 of your affirmative report, that "to

Page 67

1    successfully establish breach claims, stemming from the

2    underwriting of the issue loans, one would first need to

3    create as closely as possible the original decision-making

4    process including practices and procedural requirements of

5    the lending institution."

6        That's at paragraph 50 of your affirmative report --

7    A    Yes, sir.

8    Q    -- are you with me?

9    A    Uh-huh.

10   Q    Now, first of all, except to the extent that you drew

11   inferences from loans you reviewed, you did not look at the

12   practices of the lending institutions here, correct?

13   A    I said I wouldn't agree the way you've characterized

14   that.

15   Q    Okay.  Now, you obviously in reciting your standard,

16   I'm not adopting your standard, but let me direct your --

17   but you were criticized, were you not, by Mr. Aronoff for

18   blessing a loan review process that had the trial lawyers

19   for the plan administrator reviewing loans.  Do you recall

20   that criticism?

21   A    You lost me in the question.  If you could do it again.

22   Q    Do you recall that Mr. Aronoff criticized you in his

23   rebuttal report for blessing a review process that had

24   lawyers doing a review of loans.

25   A    Yes, sir.

Page 68

1   Q    Okay.  And you responded to that criticism in your

2   reply report, right?

3   A    And yesterday, yes.

4   Q    Yes.  Okay.  So let me direct your attention to

5   paragraph 40 of your reply report, Mr. Grice.  Let's -- what

6   you said in the first sentence there is that Mr. Aronoff's

7   criticism also ignores that the review under the RMBS

8   protocol was a review of repurchased claims not a lender's

9   origination decisions.  Do you see that?

10  A    I do.

11  Q    You said that.

12  A    Yes, sir.

13  Q    Did you say it?

14  A    I said it, yes.

15  Q    Okay.  You also stated that the review and analysis of

16  repurchased claims is done in a narrower context, narrower

17  and very specific context.  Didn't you say that?

18  A    I did say that, yes, sir.

19  Q    And yesterday you testified about the experience that

20  you had in repurchase reviews, right?

21  A    Yes, sir.

22  Q    Okay.  Now, there are different kinds of -- you

23  obviously disagreed with the trustees' evidence on most of

24  the loans that you reviewed, correct?

25  A    I'd have to say I wouldn't disagree with the evidence,

Page 69

1    I disagreed with the weight that was given to it.

2    Q    Okay.  Well, fair enough.  Now, there are different

3    kinds of disagreements, right?  There are disagreements

4    where you disagree with the judgments that were made or the

5    inferences that were drawn, correct?

6    A    Okay.

7    Q    And then there are disagreements where you say, for

8    example, the trustee said a 2017 document is in the file and

9    it's really a 2008 document, right?

10   A    You're distinguishing between judgment disagreements

11   and sort of factual --

12   Q    Errors.

13   A    Errors, of course.

14   Q    So the latter which I call sort of errors, not

15   disagreements of judgment, or disagreements of opinion, you

16   do not have any idea what percentage of the time the

17   trustees made errors, though?

18   A    I didn't tabulate those.

19   Q    Or whether it was higher or lower than the number of

20   times that the plan administrator made errors like that?

21   A    That just wasn't the objective of my assignment.

22   Q    It's possible, isn't it that RECOVCO identified

23   threshold facts that may have meant there was a basis for a

24   breach claim, and that the loan in question was not elevated

25   up to RBF; isn't that correct?

Page 70

1    A    You're asking is it possible that RECOVCO made an error

2    or --

3    Q    I'm asking something more specific.  Whether it's

4    possible RECOVCO identified threshold facts that may have

5    meant there was a basis for a breach claim, and that the

6    loan in question was not elevated up to RBF?

7    A    I'm -- yes.  I'm used to working with people, people

8    don't always do everything consistently, so of course, I

9    think that's a safe assumption.

10   Q    And if that occurred, that would be a potential breach

11   that was not properly managed under the process, correct?

12   A    As you've characterized it, yes, that would be, or as

13   I'm charactering that.  But I agree that it would, in fact,

14   be a potential breach that was not properly processed.

15   Q    You don't know how often that occurred?

16   A    No, sir.

17   Q    You didn't do that analysis?

18   A    No, sir.

19   Q    You know that the plan administrator, you referenced it

20   earlier, the plan administrator accepted a certain number of

21   loans over the summer that it had previously rejected,

22   right, you know that?

23   A    Are you talking about the claims that were passed as a

24   consequence of my review?

25   Q    No.  Do you know that the plan administrator sent two

Page 71

1    letters to the trustees on July 21 and August 21 over the

2    summer, and that in the aggregate the plan administrator

3    said that it would accept for repurchase 222 loans that it

4    had previously rejected.  Do you know that?

5    A    I had that general understanding but not the dates or

6    the numbers, yes, sir.

7    Q    Do you know that 137 of those loans were reviewed by

8    RECOVCO only?

9    A    No, sir.

10   Q    Now, while we're on the subject of errors, you made

11   errors too, didn't you?

12   A    I'm sure I have.  I'm not aware of it as I sit here,

13   but I'm a human too.

14   Q    And you pointed out to me in the -- in your deposition

15   that you did your first review of 1,879 breaches for your

16   June 1 report in a very compressed timeframe.  Do you

17   remember telling me that?

18   A    During six or seven weeks, yes, sir.

19   Q    And that timeframe was April and May of this year,

20   correct?

21   A    Correct.

22   Q    So over a two month period you reviewed 1,879 loans,

23   breaches I should say, right?

24   A    Yes, sir.

25   Q    You also made an error I think in your affirmative

1    report concerning the plan administrator's activities in

2    step two of the process, right?

3    A     Are you referencing footnote 18 --

4    Q     18 not page 19.

5    A     Yes, sir.  So I'm agreeing that it's footnote 18.  I

6    don't understand that to be an error.

7    Q     Okay.  Well, let's look at it.  I'm looking at the

8    wrong report.

9              THE COURT:  We're in the affirmative report, yes?

10             MR. SHUSTER:  Yes.

11   BY MR. SHUSTER:

12   Q     So in cliff note 18, you say "I understand that the

13   plan administrator helped develop and oversaw step 2 but did

14   not directly review any loans until step 3."  Do you see

15   that?

16   A     Yes, sir.

17   Q     Do you recall that by the time I deposed you, I had

18   deposed Mr. Trumpp who said that was erroneous, that

19   characterization?

20   A     I recall that.

21   Q     Okay.  And, in fact, the plan administrator did review

22   loans in step 2, or at least Mr. Trumpp has so stated under

23   oath, correct?

24   A     Yes, sir.

25   Q     So you were mistaken concerning the process that was

Page 73

1   engaged in by the plan administrator in step 2.

2   A    My -- what I'm saying in footnote 18 is that he was not

3   charged with reviewing loans until step 3 of the protocol.

4   Q    So when you said he did not -- that he helped and

5   develop and oversaw step 2, but he did not directly review

6   any loans until step 3 but you meant to say that -- what you

7   meant to say was under the protocol he was not required to

8   review loans in step 2?

9   A    That was not his assignment.  He was not uniquely

10  responsible for that, by he, I mean the plan administrator.

11  So that Mr. Trumpp -- my understanding was that Mr. Trumpp

12  reviewed loan files and claims and the results of that

13  analysis in step 2, but was not charged with it, responsible

14  for it until step 3 of the protocol.

15  Q    You recall that when I asked you in your deposition

16  about this, you said your understanding was step 2 was

17  performed by the plan administrator's team, which included

18  RECOVCO and RBF, right?

19  A    Yes, sir, I recall that.

20  Q    You did not say that then, and I think you're not

21  saying now that -- well, let me back up.

22      When you said in your deposition that the plan

23  administrator helped develop and oversaw step 2, you said

24  you were referring to RECOVCO, RBF and Mr. Trumpp's team.

25  A    Yes, sir.

Page 74

1    Q    Is that right?

2    A    Yes, sir, that's my recollection.

3    Q    So you're saying now -- so what you were saying then

4    and I think you're saying now is that when the plan

5    administrator helped develop and oversaw step 2, by plan

6    administrator you're saying you meant RECOVCO and RBF and

7    the plan administrator, all three?

8    A    I admit I'm lost.  My recollection of this exchange in

9    the deposition was you were asking if Mr. Trumpp personally

10   reviewed loan files.  I thought that was the Q&A in the

11   deposition.  I may be mistaken, but I thought that's what

12   you were trying to get at in the deposition.  And that was

13   the basis for the disagreement between Mr. Trumpp and

14   myself, was whether he did, he personally opened files and

15   did an analysis or review.

16   Q    By plan administrator in footnote 18, did you mean to

17   say Mr. Trumpp personally or Mr. Trumpp and his team at the

18   plan administrator?

19   A    I think in the footnote I mean Mr. Trumpp.

20   Q    Personally?

21   A    Personally.

22   Q    Even that was wrong, though, right, because he did?

23   A    I'm sorry, this is several months ago.  My best

24   recollection is that in the deposition, we were talking

25   about Mr. Trumpp's personal involvement.  I don't recall

1   what I was thinking as I wrote footnote 18.

2       I mean, my understanding certainly is that step 3, the

3   plan administrator not RBF, RECOVCO is the responsible party

4   in step 3 of the protocol.  It's step 2, it's a team, and I

5   thought in the deposition you were asking about particular

6   responsibilities for Mr. Trumpp, did Mr. Trumpp review any.

7   I thought in your deposition with Mr. Trumpp you asked him

8   if he personally reviewed any loan files in step 2.

9   Q    Mr. Grice, is it the case that your main critique of

10  the claimant's use of documentation is they often relied

11  solely on one piece of documentation, apparently without

12  considering it in the broader context of the loan file, is

13  that a true statement?

14  A    Yes, sir.

15  Q    You do also acknowledge that sometimes they relied on

16  multiple pieces of evidence, don't you?

17  A    They certainly do.

18  Q    Now you state in your rebuttal report that Mr. Aronoff

19  did not conduct the proper functional audit of the claims

20  process, right?

21  A    Can you direct me to where you are?  I'm not disputing

22  it, I would just like to get some context.

23  Q    Okay.  It's the rebuttal report, Mr. Grice, paragraph

24  8.  You said that.

25  A    Oh, yes, sir.

Page 76

```
 1   Q    But he did not say he was performing a functional

 2   audit, did he?

 3   A    He did not.

 4   Q    Right.  So --

 5            THE COURT:  Okay.  Can you -- is there a

 6   difference between a functional audit and an audit?

 7            MR. SHUSTER:  No, I think it's the difference

 8   between --

 9            THE COURT:  Oh, why don't -- I'm delighted to have

10   you answer the question, Mr. Shuster, but --

11            MR. SHUSTER:  I'm following this.

12            THE COURT:  -- maybe Mr. Grice can take a shot.

13   Is there a -- is that just -- are those just words or is it

14   a distinction being made between a functional audit and some

15   other kind of audit?

16            THE WITNESS:  I think -- I'm using functional

17   audit and process audit interchangeably, that it's a review.

18   Audit is a vague word --

19            THE COURT:  It is.

20            THE WITNESS:  -- right, it means many things to

21   many people.

22            THE COURT:  Right.

23            THE WITNESS:  I'm meaning, did Mr. Aronoff seek to

24   understand how the claimants process was designed and

25   implemented.
```

1          THE COURT:  Okay.  Thank you.

2    BY MR. SHUSTER:

3    Q    Now, you understand what Mr. Aronoff is saying is, I

4    understand the process because I was there at its creation,

5    right, and I participated in it?  You understand that's what

6    he's saying?

7    A    I'm not understanding which process you're referring

8    to.

9    Q    The trustees' loan review process.

10   A    Yes, sir.  He says he's the boss, I understand --

11   Q    Right.

12   A    -- that's my understanding what he said.

13   Q    It's their favorite quote that Mr. Aronoff testified

14   that he's the boss, but the point is what his testimony

15   means in substance is he's saying he was there at the

16   creation, he participated in the design and structuring of

17   the trustees' loan review audit and he understands it fully

18   from that perspective, right?

19   A    That would be my understanding at a minimum.

20          THE COURT:  Can I clarify again?

21          MR. SHUSTER:  Please.

22          THE COURT:  Now you're talking about -- both of

23   you are talking about the protocol.  Not some other process

24   --

25          MR. SHUSTER:  Correct.

Page 78

1          THE COURT:  -- the trustees underwent.

2          MR. SHUSTER:  Yes.

3          THE COURT:  The process in connection with working

4    through the protocol.

5          MR. SHUSTER:  Yes.

6          THE COURT:  Thank you.

7          THE WITNESS:  I'm understanding that the question

8    was not about the protocol but about the trustees'

9    particular process.

10   BY MR. SHUSTER:

11   Q    And that is exactly right.  It's the trustees' -- when

12   I say -- when I'm asking you do you understand that Mr.

13   Aronoff's position is he understands the trustees' loan

14   review process for purposes of the protocol, because he

15   participated in the design and implementation of that

16   process, right?

17   A    We're in agreement, yes, sir.

18          THE COURT:  Okay.  So we enter an order that says,

19   here's a protocol, do it.

20          THE WITNESS:  Right.

21          THE COURT:  And Mr. Aronoff designs the process

22   pursuant to which the trustees comply with the protocol

23   order.  Yes?

24          MR. SHUSTER:  Yes.

25          THE WITNESS:  Yes, ma'am.

Page 79

1              THE COURT:  Great.

2    BY MR. SHUSTER:

3    Q    Do you understand that at the inception of the

4    trustees' process certain screens were set of various kinds?

5    A    Could you be more specific?

6    Q    Like only putting income breaches of a certain

7    magnitude or that kind of thing?

8    A    Yes, sir.

9    Q    And you understand that Mr. Aronoff would know what

10   those screens are, right?

11   A    If anybody does, he would, yes.

12   Q    You don't know of any screens that the plan

13   administrator applied from a magnitude of any others, do

14   you?

15   A    Nothing that resembles what I understand Mr. Aronoff's

16   screens to have been.

17   Q    You didn't review on hold loans?

18   A    No, sir.

19   Q    That's fully a third of the loans that were put into

20   the protocol process by the trustees, right?

21   A    That's my general understanding, yes.

22   Q    You spent like a grand total of ten minutes on the

23   subject of on hold loans, correct?

24   A    I think I estimated that when you and I were having our

25   day together and discussing what I can recall from my

Page 80

1    conversation with Mr. Trumpp in February.  But, yes, I came

2    to an understanding that this on hold population had been

3    created because of the incomplete nature of the files that

4    this bucket was created and that loans could emerge from

5    that upon the receipt of the documents that would cure any

6    document deficiency.

7    Q    Now, you say yourself the completeness of the loan file

8    or the servicing file may degrade over time, right?

9    A    One more time, please.

10   Q    You say yourself that the completeness of the file may

11   degrade over time?

12   A    Of loan files of various sorts, yes.

13   Q    You don't know if there's any industry custom and

14   practice in placing loans or disputed claims on hold, right?

15   A    I'm not really sure I understand what you're asking.

16   Q    In your deposition I asked at page 285, line 20 --

17   A    I'm sorry, 280 --

18        THE COURT:  285, line 20.

19   Q    285, line 20.  I asked you,

20        "Was the on hold determination that the plan

21        administrator made in conformity with industry

22        custom and practice for put-back claims."

23        You answered,

24        "I have no way of answering that question.  I

25        don't know if there is an industry custom or practice

Page 81

1        on placing loans and disputed claims on hold.  This is

2        a sort of a unique circumstance that arises out of

3        this dispute."

4        I asked that question, you gave that answer.

5    A    I did, yes.

6    Q    Okay.  You didn't look at on hold loans, right, at all?

7    A    Just to be clear, I said that a moment ago I did not

8    look at on hold --

9    Q    But --

10   A    Let me clarify.

11   Q    Yeah, I was about to go there.

12   A    So in the 1879 there were no on hold loans or claims by

13   design.  Your expert, Mr. Morrow produced an analysis of 600

14   loans with 800 and some odd breaches.  My understanding 197

15   of those were on hold loans that were in his population.

16   Q    And you reviewed those loans?

17   A    I did.  And they're -- and all the claims associated

18   with them.

19   Q    And you were able to make a determination based on the

20   review of those on hold loans that they, in your view, did

21   not make -- that the trustees did not make breach claims on

22   those loans?

23   A    Well, we provided the breakdown yesterday of the

24   results.  I think it was a 95 percent disagree or agree rate

25   with the plan administrator and his failing determination.

1   Q    But the point is, you were -- you made a substantive

2   review of the on hold loans and you came to a view on the

3   breaches asserted on those loans?

4   A    Yes, sir.

5   Q    You also didn't look at -- so you know the on hold

6   loans is roughly a third of the $11.6 billion claim, you

7   know that?

8   A    I don't know the dollars ever, but as a percentage I

9   understand that by count that's about right.

10  Q    Okay.  And you also didn't look at and come to a view

11  on the ultimate determination made by the plan administrator

12  on the loans that went to RBF, correct?

13  A    I don't understand the question.

14  Q    You didn't come to a view on whether as to the 19,000

15  plus loans that went to RBF with all of the various breaches

16  that were asserted, you didn't come to a view as to whether

17  the plan administrator was correct in its ultimate

18  determination on those loans.

19  A    Well, two things.  I didn't look at the 19,000 loans.

20  I looked at the sample I looked at, the population I looked

21  at.  And I didn't look at the ultimate AMA analysis, so I

22  don't have any insight and I wasn't trying to understand

23  that piece of the process.  I'm focusing on again the

24  threshold fact determination at a breach level.

25  Q    And just to do the math, there were roughly 32,000 on

1   hold loans; is that right?  And about 19,000 loans that went

2   up to RBF, right?  Do those numbers sound right to you?

3   A    I don't have any basis to challenge that as I sit here.

4   Q    Well, I'm going to start getting into loan files.

5   So --

6            THE COURT:  Okay.  So what's our extended game

7   plan for today?  Are we going to conclude at 2 o'clock

8   today?

9            MR. SHUSTER:  Well, I think the plan is to

10  conclude at 2.

11           THE COURT:  Okay.

12           MR. SHUSTER:  I won't conclude though.

13           THE COURT:  Right, but you won't conclude.

14           MR. SHUSTER:  Yes.

15           THE COURT:  Okay.  Now, just by way of

16  housekeeping, a reminder that I have another Lehman tomorrow

17  morning briefly starting at 9:30, and I think we've told you

18  that we can start you at 9:45.

19           MR. SHUSTER:  Yes.

20           THE COURT:  So let's -- do you want to take a

21  short lunch break now?

22           MR. SHUSTER:  Me, I'd rather just take a short

23  break and maybe push the lunch break.

24           MR. COSENZA:  That's fine with us, Your Honor.

25  Can I raise one issue on that, on sidebar?

Page 84

1          THE COURT:  Yeah, sure.

2      (Sidebar off the record)

3          THE COURT:  All right.  So we're going to take a

4   15 minute break and we're going to come back at five minutes

5   of if I'm doing the math correctly.  Thank you.

6      (Recessed at 11:40 a.m.; reconvened at 12:01 p.m.)

7          THE COURT:  Mr. Shuster, all yours.

8          MR. SHUSTER:  Thank you, Your Honor.

9   BY MR. SHUSTER:

10  Q    So we're going to go through some loans.  We have a

11  binder, Mr. Grice, with loans.  Mr. Liberman can help you

12  with that, and we're going to --

13          MR. SHUSTER:  May we approach, Your Honor, to hand

14  up a demonstrative?

15          THE COURT:  Sure.  And I should also have the book

16  entitled loan set?  Okay.  Thank you very much.

17  Q    And we're going to loan number, Mr. Grice, 3811.

18  A    Okay.

19  Q    Ending in 3811.

20  A    So the binder, I just have this, right?

21  Q    We'll do both.  We can start there.

22  A    Okay.

23          THE COURT:  It's a good time to remind Mr.

24  Goldberg about his homework.

25          MR. GOLDBERG:  I've been advised and they're in

Page 85

1    process.

2              THE COURT:  Very good, thank you.

3              Someone's phone is ringing.

4         (Pause)

5              MR. SHUSTER:  So we have a binder and we'll

6    probably hand out a few of these --

7              THE COURT:  Sure.

8              MR. SHUSTER:  -- and then we'll get the Court a

9    binder.

10             THE COURT:  Okay.  Great.  So I'm looking at TRDX-

11   32.

12             MR. SHUSTER:  Yes.

13   BY MR. SHUSTER:

14   Q    As I trust you are, sir.

15   A    Yes, sir, thank you.

16   Q    Please, I see you're reviewing it, and take a moment.

17   It's painstaking reading.

18        (Pause)

19        You're free to continue.  We're going to walk through

20   it slowly in any event.  So as you, you know, but I don't

21   want to cut you off if you're still in the midst of

22   reviewing it.

23   A    No, ready when you are, sir.

24   Q    Thank you.

25        So, Mr. Grice, you recognize TR-DX?  It's a excerpt

Page 86

1      from the Appendix D to your reply report?

2           A     Yes, sir.

3           Q     Okay.  So if we just quickly work through some of

4      this, you see the loan number and the trustees' breach

5      number reading from left to right, the PA's number, the

6      trust, the alleged defect, the contractual provisions that

7      the trustees alleged are breached and then the factual basis

8      for the breach.  And the factual basis that's asserted for

9      the breach is an income misstatement predicated on a

10     bankruptcy file, right?

11          A     What is it predicated -- so the allegation is

12     framed -- it's the statement on the application versus what

13     you pulled from a bankruptcy filing.

14          Q     Yeah.  I think that's fair.

15          A     Yes, sir.  I agree.

16          Q     So there's also a recalculation of DTI even though

17     this breach that's asserted is not a DTI breach, it's just a

18     misrepresentation of income breach.  Do you see that?

19          A     Yes, sir.

20          Q     So let's just focus on income.  So we have the

21     trustees' description of the breach.  And then we have the

22     planned administrator's response.  And then we have -- and

23     the plan administrator's response to the evidence is that

24     the evidence is unreliable and insufficient because a year-

25     end salary divided by 12 doesn't prove origination income

Page 87

1    and origination income -- year income stated in the

2    bankruptcy petition does not prove origination income.  Do

3    you see that?

4         A    Yes, sir.

5         Q    Okay.  So it's the PA, you're saying, based on the

6    evidence, there's not a breach, right?

7              Now if we flip to the other side, we see "Aronoff

8    Rebuttal" and Grice and then citations and then "Grice

9    Review Narrative", right?

10        A    Yes, sir.

11        Q    Okay.  Sequentially, as this occurred the Aronoff

12   rebuttal was actually drafted before your review narrative

13   was provided, right?  You're familiar with that sequence?

14        A    Yes, sir.

15        Q    So you understand that the Aronoff rebuttal was

16   put together based on the Bates citations that we received

17   from you some weeks after the submission of your affirmative

18   report.

19        A    On June 1, yes, sir.

20        Q    Right.  June 1 was your affirmative report.  And

21   we got the Bates citations roughly five weeks later, right?

22        A    I don't know when but --

23        Q    Right.

24        A    -- I know it was subsequent.

25        Q    So then Mr. Aronoff set forth a rebuttal inferring

Page 88

1    from your Bates citations what your position was and then

2    you respond to that in your breach narrative, correct?

3         A    Correct.

4         Q    Okay.  So -- and you conclude that Mr. Aronoff

5    failed to show that the borrower misrepresented her income

6    at origination --

7         A    Yes, sir.

8         Q    -- right?  And in the course of doing that, you

9    sort of parse through the evidence of -- piece by piece,

10   right?

11        A    I don't know what you mean by parse.  I fully

12   reviewed it and I'm responding to it.

13        Q    So you point out, for example, that the income

14   information and the bankruptcy petition is stated and not

15   verified, right?

16        A    Yes, sir.

17        Q    You also make a reference to child support.

18        A    Yes, sir.

19        Q    You say it's unclear if the borrower had a loss of

20   income such as a lack of overtime or bonus earnings after

21   origination, right?

22        A    Yes, sir.

23        Q    We'll look at the file -- you don't point out

24   here, do you, any evidence that the borrower actually did

25   have a lack of overtime or bonus earnings after origination,

1  right?

2      A    No.  We don't have -- we can't find anything in

3  the loan file that answers that question.

4      Q   Right.  Incidentally, in your narrative, you do

5  not question that there is, in fact, a bankruptcy filing in

6  the file that does, in fact, say what the trustees say it

7  says, right?

8      A   I think that's undisputed that the bankruptcy

9  document says what it says.

10     Q   You then go on to say that you acknowledge that

11  the borrower is still employed with the same company,

12  Michigan Sugar, right?

13     A   Yes, sir.

14         MR. DAVIS:  Your Honor, since we're trying to

15  protect the privacy of the people who are listed on this,

16  I'm not sure it's a great idea to use the name of the

17  employer in full when discussing these various --

18         THE COURT:  Okay.  We can just say --

19         MR. DAVIS:  -- documents.

20         THE COURT:  -- the employer.

21         MR. SHUSTER:  Sure.  Thank you.  And if I do that

22  again --

23         MR. DAVIS:  I'll jump up again.

24         MR. SHUSTER:  -- please interrupt me again.

25  BY MR. SHUSTER:

Page 90

1      Q    The -- and then you say the tax return is not

2    signed, right?

3      A    Correct.

4      Q    And then you go on to say that you refer to a

5    later tax return that is in the loan file, the '09 return.

6      A    I think I would say even later.  So the --

7      Q    Yeah.

8      A    -- first tax return is '08.  The second tax return

9    is --

10      Q    '09.

11      A    -- '09.

12      Q    And then there's an '09 pay stub and a 2010 pay

13    stub.  And you take the position that these documents do not

14    verify what the borrower's income was, right?

15      A    That's what --

16      Q    You take the evidence, you weigh it and you

17    conclude that the evidence does not establish what the

18    borrower's income was in 2005, right?

19      A    Yes, sir.  I think they're questions about the

20    reliability and certain insufficiencies.

21      Q    I understand.  What you say is that these

22    documents do not verify what the borrower's income was.  You

23    assert that position, right?

24      A    Yes, sir.

25      Q    So let's look at the file, Mr. Grice.  So again,

Page 91

1    we're at 3811, the claim package tab.

2        A    Do I have that?

3        Q    You should.  I hope you do.

4            THE COURT:  I think it says "Loan Set".

5            THE WITNESS:  Oh.  Thank you.  I have been

6    provided --

7            THE COURT:  Could --

8            MR. SHUSTER:  Well, actually --

9            THE COURT:  Could you -- take the books that are

10   on the floor and let's make a nice complete set.  And if

11   there are any that don't belong there, then let's get rid of

12   them.

13           Thank you.

14   BY MR. SHUSTER:

15       Q    Mr. Grice, I'm actually -- apologies.  I'm going

16   to direct you to the loan file excerpt to start.  Not the

17   claim package but the next tab.

18       A    Yes, sir.  I see it.

19       Q    Okay.  So if I may direct your attention to page

20   719 of 918.  And I will tell you that for this loan file and

21   for others, we don't include the entire loan file in the

22   binder.  We only excerpt the pages that we -- you know, bear

23   on the discussion.

24           THE COURT:  So we're in 8455 "Loan File Excerpt",

25   right?  No?

Page 92

1              MR. SHUSTER:  No.

2              THE COURT:  Okay.

3              MR. SHUSTER:  We're in 3811 "Loan File Excerpt".

4              THE COURT:  38 --

5              MR. SHUSTER:  Yeah.  I didn't start at the

6    beginning.

7              THE COURT:  Got it.

8              MR. SHUSTER:  Just to make it easier.

9              THE COURT:  And the page number that we're on

10   is --

11             MR. SHUSTER:  Is 719 of 918.

12             THE WITNESS:  And may I ask?  Is my version the

13   unredacted version and is there a redacted version that --

14             MR. SHUSTER:  Your version is unredacted.  We are

15   not putting the unredacted version on the screen.

16             THE WITNESS:  Thank you.

17        (Pause)

18   BY MR. SHUSTER:

19        Q    So are you with me, sir, at page 719?

20        A    Yes, sir.  I'm just trying to understand the

21   nature of the excerpt and why we've come to these excerpts.

22   But I've -- I'm at 719.

23        Q    Okay.  So we have -- you see there?  We have the

24   loan application and about the middle of the page, we have

25   the borrower's name.

1      A     Yes, sir.

2      Q     And then on the next page, page 720 -- well,

3   sorry.  No.  Let me back up.  On that same page, the

4   borrower -- the subject -- the loan amount and the subject

5   property is identified, right?

6      A     Yes, sir.

7      Q     And then on the next page, the borrower sets forth

8   her income, her monthly income.

9           THE COURT:  What page is that?

10          MR. SHUSTER:  That's on page 720 in the loan

11  application right at the top.  $4500.

12  BY MR. SHUSTER:

13     Q     And the loan application is signed by the borrower

14  on the next page.  And the date of the loan is set forth

15  which is April 29, '05.

16          So then, Mr. Grice, if I could direct your

17  attention to the claim package, and, in particular, to page

18  20 --

19     (Pause)

20     A     Yes, sir.

21     Q     -- you see, that's a bankruptcy court filing.

22  You'll see in the upper left the borrower's name, correct?

23     A     Correct.

24     Q     And I don't think you dispute, and you did not in

25  your narrative, that this is the same individual.

Page 94

```
1          A    I'm not disputing that.

2          Q    And then at page 25 of the bankruptcy filing is

3     the identification of the subject property.  And then on

4     page 40 is the income information set forth by the borrower

5     that served as the initial basis for the claim, correct?

6          A    Yes, sir.

7               THE COURT:  I'm sorry.  Could you repeat that

8     last --

9               MR. SHUSTER:  Yes.  The -- on page 40 of the

10    bankruptcy --

11              MR. DAVIS:  Your Honor, sorry.  I'm just going

12    to -- I'll take Mr. Shuster's invitation again.  So we're

13    now projecting on the screen the personally identifying

14    information.

15              MR. SHUSTER:  But this is not.

16              THE COURT:  Okay.

17              MR. SHUSTER:  Okay?

18              THE COURT:  All right.  So --

19              MR. SHUSTER:  Thank you, Joe.

20         (Pause)

21              THE COURT:  Okay?

22    BY MR. SHUSTER:

23         Q    So the borrower there identified -- sets -- there

24    is set forth the income information that serves as the

25    initial basis for the trustees' claim, correct?
```

Page 95

1          A     Correct.

2          Q     And it shows $25,000 for 2005.  And if that number

3     is correct, that would work out to slightly over $2000 a

4     month, correct?

5          A     Yes, sir.

6          Q     Which would be substantially below -- would be

7     substantially below the $4500 dollar a month number that is

8     indicated on the loan application, right?

9          A     Correct.

10         Q     And then the bankruptcy filing also sets forth a

11    slightly higher number for 2006.  Same employer.

12         A     Yes, sir.

13         Q     And then a partial number, which looks like a

14    year-to-date number of $11,823, right?

15         A     Yes, sir.

16         Q     And we can see that there's a filing date for the

17    bankruptcy document of June 29, '07 --

18         A     Correct.

19         Q     -- which would account for the partial year number

20    for '07, right?

21         A     Yes, sir.

22         Q     Now then on the next page is the child support

23    number that you referred to.  And you point out that child

24    support number in your breach narrative, right?

25         A     Yes, sir.

1        Q     The loan application specifically states that if

2    you want child support to be considered as part of your

3    income to state it, to set it forth, right?

4        A     Yes, sir.

5        Q     There's express language to that effect?

6        A     Yes.

7              THE COURT:  Can you put that up?  Can you point me

8    to that out, Mr. Shuster?

9              MR. SHUSTER:  Sure.  Yes.

10             THE COURT:  So I want to go back in the --

11             MR. SHUSTER:  It's --

12             THE COURT:  -- in the loan file --

13             MR. SHUSTER:  -- in the loan file, yep.

14             THE COURT:  -- excerpt, right?

15             MR. SHUSTER:  And that's at page -- it should be

16    719.

17             THE COURT:  Okay.

18             MR. SHUSTER:  720.

19             THE COURT:  Okay.  And so are you referring to

20    that block of text?

21             MR. SHUSTER:  Yeah.  Describe other income notice.

22    So under --

23             THE COURT:  Yeah.  It's -- unfortunately, I can't

24    read all of those words.

25             MR. SHUSTER:  Right.

```
 1              THE COURT:  Can you?  It says "Alimony, child
 2    support" --
 3              MR. SHUSTER:  Child support or --
 4              THE COURT:  -- "separate maintenance income need
 5    not be" something.
 6              MR. SHUSTER:  I think it's "need not be revealed
 7    if the borrower or co-borrower does not choose to have it
 8    considered for repaying this loan".
 9              THE COURT:  Okay.
10    BY MR. SHUSTER:
11        Q    So coming back then to the bankruptcy filing,
12    sir --
13        A    Yes, sir.
14        Q    -- I'll direct your attention to page 47.
15        A    Yes, sir.
16        Q    And that's a declaration under penalty of perjury
17    by the individual debtor.  You'll agree with me that that
18    language is in larger font and more prominently displayed
19    than it is on -- the equivalent language is on the loan
20    application?
21        A    It's certainly easier to read, yes, sir.
22        Q    And then there's a date and electronic signature
23    by the borrower, right?
24        A    Correct.
25        Q    Okay.  Now the plan administrator took the
```

Page 98

1    position that that was insufficient evidence to make out a

2    claim, correct?  And so did you?

3         A    Unreliable and insufficient, yes.

4         Q    And there was other information in the loan file

5    that was pointed out by Mr. Aronoff in responding to your --

6    at least your Bates numbers for purposes of having this

7    dialogue between experts concerning this particular breach

8    claim --

9         A    Yes.

10        Q    -- right?

11        A    That's correct.

12        Q    Okay.  And he points to a variety of documents so

13   let's have a look at them.

14        A    Please.

15        Q    So let's start with -- in the loan file excerpt,

16   Mr. Grice, page 2005.

17        A    Excuse me?  Page 2005?

18        Q    Sorry.  I'm so sorry.  Page 205.  I misspoke.

19        (Pause)

20             MR. SHUSTER:  Is it there?

21             THE COURT:  It's me.  I am -- I'm in the loan file

22   excerpt for loan --

23             MR. SHUSTER:  3811.

24             THE COURT:  -- 3811.  And you say we should be

25   looking at page --

1            MR. SHUSTER:  205 of 918.

2            THE COURT:  Okay.  I got it.

3    BY MR. SHUSTER:

4        Q    And there is -- on that document, there is

5    information set forth including the borrower's -- it a 2008

6    income tax return, right?

7        A    Yeah.  The summary form 1040, yes, sir.

8        Q    Yes.  Now it's -- by the way, do you know why this

9    got in the file?

10       A    Which file are you referring to?

11       Q    The loan file.

12       A    I don't know.

13       Q    Is it reasonable to infer that it got in the file

14   because either the servicer requested it or the borrower

15   tendered it for purposes of obtaining some relief on the

16   loan terms?

17       A    I think that's reasonable as part of a hardship

18   modification, for example.

19            THE COURT:  Just to be clear -- and this is

20   complete speculation.  If anybody knows, I'd be happy to

21   hear it.  But --

22            MR. SHUSTER:  Well, we know that it's in the file

23   that was provided by the servicer.

24            THE COURT:  I understand.  But unless you can lay

25   a foundation for somebody actually knowing, then it's

Page 100

1    anybody's guess.

2              MR. COSENZA:  I don't mean to delay things but

3    this is the point on our objection.  There's no chain of

4    custody describing how --

5              THE COURT:  Okay.

6              MR. COSENZA:  -- these files got --

7              THE COURT:  I mean, it's fine if there's a

8    foundation.  If not --

9              MR. COSENZA:  Right.

10              THE COURT:  -- then it's anybody's guess.

11              MR. COSENZA:  Thank you, Your Honor.

12              MR. SHUSTER:  Yeah.  I mean, it's not dissimilar

13    from documents we looked at Mr. Trumpp's direct, for

14    example, hardship letters and so forth.  So, you know,

15    they're documents that come from the loan file.

16              THE COURT:  If there's a hardship letter that's

17    written by the borrower to the lender, that's different.

18    The fact that a tax return from a subsequent year, in this

19    case, 2008 on account of 2007 taxes, without a foundation,

20    no idea.

21              So --

22              MR. SHUSTER:  Okay.

23              THE COURT:  -- happy to have you --

24              MR. SHUSTER:  Well --

25              THE COURT:  -- lay a foundation but not happy to

Page 101

1    have both you and the witness speculate as to --

2              MR. SHUSTER:  Yeah.

3              THE COURT:  -- how or why it's in here.

4              MR. SHUSTER:  Well, I'll lay a -- I'll lay a

5    foundation or attempt to this way.

6    BY MR. SHUSTER:

7         Q    Is it the case that in the ordinary course in

8    considering loan modification servicers would, from time to

9    time, request information like tax returns, W-2s, pay stubs

10   or other similar information?

11        A    Yes, sir.  That occurred.

12        Q    And is it also the case that in the ordinary

13   course, borrowers would submit such documents for purposes

14   of seeking or obtaining loan modification?

15        A    Yes, sir.  That has occurred.

16        Q    So this document, in any event, is an '08 return.

17   It has the borrower's name, correct?

18        A    If I may, I mean, it's unsigned.  It may be --

19   well, I know it's incomplete.  But it is a -- at least a

20   draft 2008 tax return.

21        Q    Okay.  We don't know whether this was the final

22   but it is -- there's no signature reflected there, right?

23        A    That's correct.

24        Q    You -- that's what you're pointing out.

25        A    Well, I'm pointing out also the incompleteness.

Page 102

1    We don't have -- if you look at line 12, there is a

2    "Business Income" reflected, attached Schedule C and there

3    is no Schedule C attached.

4        Q    Okay.  In any event, that's a negative number,

5    right?

6        A    It's a negative number but, again, if you're

7    considering somebody's -- this is that case of the partial

8    self-employment.  You know, I'd want to know both the

9    revenue and the expenses that could be meaningful.

10       Q    The borrower did not identify any self-employment

11   revenue on her income application?

12       A    She didn't.  But she did in the bankruptcy filing

13   we just looked at a moment ago.

14       Q    Okay.  So, in any event, this shows an income

15   number of 27,001 on line 7?

16       A    Yes, sir.

17       Q    -- which is very much in line with the numbers

18   that we saw in the bankruptcy filing, correct?

19       A    Correct.

20       Q    And then if I could direct your attention to page

21   252 which is two pages forward.

22       A    Yes, sir.

23       Q    That's a W-2 --

24       A    Yes, sir.

25       Q    -- for the same calendar year as the tax return

Page 103

1    form --

2         A    Correct.

3         Q    -- reflecting virtually the identical number by

4    way of wages and salaries, right, $27,000?

5         A    Yes, sir.

6         Q    And that document doesn't need to be signed,

7    right, by the borrower?

8         A    Correct.  That's produced by the employer.

9         Q    And then if we look at page 251, Mr. Grice, that's

10   a W-2 wage and tax statement for 2009, correct.

11        Q    And that also has a number that is in line with

12   the income numbers that were set forth on the bankruptcy

13   petition --

14        A    That's correct.

15        Q    -- correct?  And then if we look at page 200,

16   there is a pay stub from the following calendar year towards

17   the very end of the year that shows another income number

18   that is in line with -- it's not complete for the year but

19   it shows the pay-by-pay period and it shows an aggregate

20   number, correct?

21        A    Correct.  I guess I feel I should point out

22   there's other information reflected on this such as a

23   different job title than we've seen prior to this.  About 15

24   percent of the way down the page, in the middle column, the

25   job title is now "line operator BC", which I believe stands

Page 104

1    for the city where the factory is located.

2          Q    Okay.

3          A    And then the hourly pay of 11.36, I think this is

4    the first time we see the hourly compensation.

5          Q    So same borrower's name?

6          A    Same borrower's name.

7          Q    Same employer?

8          A    Yes, sir.

9          Q    And income roughly in line with the numbers that

10   we've seen to this point, right?

11         A    Correct.

12         Q    And then if you look at page 156, you have an '09

13   tax return, right?

14         A    Yes, sir.

15         Q    The '09 tax return is signed, correct?

16         A    Correct.

17         Q    That one shows the borrower's occupation as

18   quality control which is what we saw for prior years,

19   correct?

20         A    That's correct.

21         Q    And on line 7, that shows an income number of

22   $25,259 which is also in line with what we saw in the

23   bankruptcy petition, right?

24         A    I'm sorry.  Which line are you directing me to?

25         Q    I'm sorry.  Line 7, sir, in the tax return.

Page 105

1      A    Yes, sir.

2      Q    And then on page 141, we have another pay stub for

3  2010, same borrower with similar numbers in terms of an

4  hourly wage and an aggregate wage number to that point in

5  the year, right?

6      A    Correct.  But again, now she, again, is a line

7  operator in Bay City.

8      Q    So that may be how the company is identifying her.

9  But there's little doubt, is there, Mr. Grice, that this is

10  the same borrower working at the same employer?

11     A    I'm not challenging that.  It's the same borrower

12  working at the same employer.

13     Q    Okay.  I'll point out that there is a loan

14  application, if you flip back to the -- or I guess we're in

15  the same -- you have to flip back to the claim package.

16     A    Yes, sir.

17     Q    There's a loan application at page 54.  Are you

18  with me?

19     A    Yes, sir.

20     Q    So that, again, you can see is the same borrower.

21  And if you look at the -- this was not -- does not appear to

22  be the final loan application and does not match up with the

23  loan date or the note date.  Can you tell that?

24     A    That's correct.  There are also handwritten

25  numbers --

1      Q     Right.

2      A     -- and the income is different.

3      Q     Okay.  Yes.  So that has a different income

4  number.  The one on the final loan application is 4500 and

5  here, the income number that's reflected is 5000, right?

6      A     Yes, sir.  And the loan file tells the story of

7  that adjustment.

8      Q     So --

9            MR. SHUSTER:  Can we just put up a demonstrative

10  -- do we have a chart that shows -- put this on the screen,

11  this document?

12  BY MR. SHUSTER:

13      Q     So just based on the evidence which I understand

14  it's your view that that evidence fails to show that the

15  borrower misrepresented her income, but purely from a data

16  standpoint, this accurately reflects what we just looked at,

17  right?

18  A     Yeah, you've taken any income representation that you

19  or Mr. Aronoff had pointed to and divided by 12, so that's

20  where the monthly black dots come from, and the red dot of

21  4,500 is from Ms. Tee's (ph) represented income after being

22  adjusted by the underwriter.

23  Q     Is it fair to say that in your breach narrative you

24  don't expressly at least discuss the plan administrator's

25  process or the trustee's process?  Is that fair you don't

1    say -- you discuss the evidence, right?

2    A    So I'm clear on what you're asking.  I discussed the

3    evidence.  The narrative is intended to address the breach.

4    Q    Okay.  Your conclusion on this loan forms part of your

5    opinion that the trustees' loan review process is

6    unreliable, correct?

7    A    Yes, sir.

8    Q    You don't dispute that any of the evidence that

9    Mr. Aronoff points out as also in the loan file is in the

10   loan file and says what it says, right?

11   A    I need to be careful here because he's drawing

12   inferences.  He has a certain understanding of these data

13   points that are represented on the diagram.

14   Q    So there -- in other words there is a W-2, there is a

15   pay stub, there is a tax return.  Those documents are

16   actually in the file?

17   A    They are actually in the file.  The issue is can you

18   draw certain conclusions about Ms. Tee's actual earnings at

19   the time she applied for the loan based on those data

20   points.

21   Q    So not agree with you.  Thank you, Mr. Grice.

22          MR. SHUSTER:  So I'm going to have more.  Maybe

23   now we should have a short lunch break and then come back,

24   or I can --

25          THE COURT:  Oh, that's fine.

Page 108

1          MR. SHUSTER:  -- or I can --

2          THE COURT:  No, that's fine.  So a half an hour?

3          MR. SHUSTER:  Yes.

4          THE COURT:  And then we'll continue until twoish.

5     All right.  So let's call it 20 minute to 1:00.  We'll come

6     back at 10 minute after 1:00.

7          MR. SHUSTER:  Great.

8          THE COURT:  Did I get that right?

9          MR. SHUSTER:  Yes.

10         THE COURT:  Okay.  Thank you.

11       (Recessed at 12:37 p.m.; reconvened at 1:19 p.m.)

12         THE COURT:  Please have a seat.  Okay.  So we're

13    going to try to continue until about 2:30.

14         MR. COSENZA:  Yes, Your Honor.

15         THE COURT:  Excellent.  Ready when you are.

16         MR. SHUSTER:  Thank you, Your Honor.

17    BY MR. SHUSTER:

18    Q   Mr. Grice, I meant to ask you on the last loan we

19    looked at, the quality control person from Michigan.  Do you

20    know if that breach went up to -- well do you have an

21    understanding based on your understanding of the distinction

22    between simple and complex claims, do you have an

23    understanding whether that claim was simple or complex?

24    A   I would imagine it's complex just by virtue of the

25    number of pieces of evidence, but I don't know that for

Page 109

1   certain.

2   Q    Okay.  Let us look, Mr. Grice, at loan 7669.  And we're

3   going to hand up TRX-34.  So why don't you take a moment,

4   sir, to refamiliarize yourself, if you would.

5   A    Yes, sir.

6        (Pause)

7   A    Yes, sir.

8   Q    Thank you.

9        So if we start -- well this is a claim put forward by

10  the trustees, an occupancy breach, correct?

11  A    Correct.

12  Q    And the evidence they submit in support is a hardship

13  letter from the borrower, correct?

14  A    Correct.

15  Q    And then you make -- and then we have Mr. Aronoff's

16  rebuttal, which is based on your Bate citations and predates

17  your narrative, correct?

18  A    Correct.

19  Q    And then we have your narrative?

20  A    Yes, sir.

21  Q    And in your narrative you state a variety of things.

22  One thing you don't state, you don't contest that the

23  hardship letter that the trustees say is in the file is

24  actually in the file?

25  A    Yeah, we don't say that.  We're not disputes its

Page 110

1    presence in the file.

2    Q    Or that it says what the trustees say it says, right?

3    Just simply in terms of the language that's used in the

4    letter?

5    A    Yeah, there's not a dispute about the words on the

6    page.

7    Q    Right.  So let me direct your -- let's just go through,

8    if we could, the claim package.  And I will confess that I

9    somehow got myself at sixes and sevens here.

10             MR. SHUSTER:  So just give me a moment.

11             THE COURT:  Sure.

12             MR. SHUSTER:  I'm looking at the wrong page.  At

13   the wrong loan.

14             THE COURT:  There's a claim package in here.

15             MR. SHUSTER:  Yeah, no.  I was looking at the

16   wrong loan number entirely.

17             THE COURT:  Okay.

18             MR. SHUSTER:  So now I'm with everyone else.

19   Okay.

20        (Laughter)

21   BY MR. SHUSTER:

22   Q    So in the claim package, Mr. Grice, we have -- we start

23   with the loan application at page 1, correct?

24   A    No, sir, we start with the summary of the guidelines.

25   On page 2 of 30?

Page 111

1          MR. SHUSTER:  I somehow got myself --

2          THE COURT:  Can anyone help Mr. Shuster?

3          MR. SHUSTER:  Yeah.  I need help.

4     (Pause)

5          MR. SHUSTER:  All right.  Okay.  I will not say

6     it.  Okay.  I won't say it.

7     BY MR. SHUSTER:

8     Q    Okay.  So thank you for bearing with me, Mr. Grice.

9     A    Happy to help.

10    Q    And Your Honor.

11         So we're looking at the loan application, which is on

12    page 17, as you pointed out so helpfully.  And there you see

13    the borrower's name, there's a description of the purpose of

14    the loan, which is a few lines above that, and the loan is

15    identified as being -- for the borrower's secondary

16    residence, correct?

17    A    Yes, sir.

18    Q    And then there's the borrower's address, which is in

19    Milano, Texas?

20    A    Yes, sir.

21    Q    And the subject property is in Houston, as it's

22    indicated above?

23    A    Correct.

24    Q    Borrower works in Milano.  Do you have any sense of how

25    far apart Milano and how Houston are?

Page 112

1    A    I was born in Houston and raised in Texas, I don't know

2    Milano.

3    Q    Okay.

4    A    I apologize.

5    Q    Well I'll represent to you that Google says it's a 2

6    hour and 25 minute drive, but you don't have take that as a

7    gospel.

8         And then on page 3 the loan application is signed you

9    see?

10   A    Yes, sir.

11   Q    And it's signed by an attorney in fact for the

12   borrower?

13   A    Yes, sir.

14   Q    The same surname, and it looks like the first name I

15   read that as Tammy.  Do you read that as Tammy?

16   A    You're asking about the name on the right?

17   Q    Yeah.

18   A    I could live with that.

19   Q    Okay.  And then on the next page there's an attorney in

20   fact form, which also seems to suggest that it's a person

21   with the same last name, first name Tammy.

22   A    Yes, sir.

23   Q    Okay.  And then there is -- there's an original letter

24   that goes with the loan application that says that the

25   property will be -- that he's purchasing the property as a

Page 113

1   second home and there you go.

2        And then the evidence that the trustees rely upon is on

3   the next page, at page 22 and 23, right?

4   A    Yes, sir.

5   Q    And there the borrower sets forth in some detail a set

6   of facts concerning the circumstances around the taking out

7   of the original loan on the property, right?

8   A    Yes, sir.

9   Q    And he says, "I purchased the home several years back

10  to help my brother, (redacted name) and his family."

11             MR. SHUSTER:  Oh, my goodness.

12             THE COURT:  Okay, keep going.

13             MR. SHUSTER:  Yeah, I'm -- my apologizes.

14  BY MR. SHUSTER:

15  Q    "He had some credit problems in the past and could not

16  obtain financing.  Our goal was after several years his

17  credit" --

18             THE COURT:  Can you hold on for just a second?

19             MR. SHUSTER:  Yes.

20             THE COURT:  So to whoever is listening in on this,

21  and I know that at least one reporter is, and this is not a

22  violation, attempt to violate your First Amendment rights,

23  to the extent that there are inadvertent disclosures, as

24  there just was, of an individual's name, I'm requesting that

25  that not appear in anything that anybody is reporting.

Page 114

1    There is no good purpose to be served by that.

2              Go ahead, Mr. Shuster.

3              MR. SHUSTER:  Thank you.

4              THE COURT:  I don't know if there was a pending

5    question.

6              MR. SHUSTER:  No.  No.

7    BY MR. SHUSTER:

8    Q    And then the borrower adds:

9              "He had some credit problems in the past and could

10        not obtain financing.  Our goal was after several years

11        his credit and employment record would satisfy and

12        could purchase the home from myself."

13        And then he says that his brother and his wife, who

14   appears to have been the attorney in fact signatory on the

15   loan application, made all payments for several years until

16   the brother became unemployed, and all correspondence

17   pertaining to the mortgage was mailed to that address.

18             "I live nearly two and a half hours from the home.

19        Did not receive any notification of my brother's

20        unemployed status or his delinquent payments to

21        Aurora."

22        So you understand that based on this the trustees put

23   this forward as evidence that suggests it's more likely than

24   not that the borrower did not purchase the home as a second

25   residence but in fact purchased the home for his brother and

Page 115

1   his brother's family to live in, right?  You understand that

2   that's how the trustees are using this letter?

3   A    Yes, sir, I understand that's how they're using this

4   letter.

5   Q    Okay.  And he notes, among other things, that all

6   correspondence pertaining to the mortgage was mailed to the

7   Houston address, right?

8   A    The subject property.

9   Q    Right.  Which would suggest that the address -- that

10  whoever was residing at that address would receive that

11  mail, correct?

12  A    Correct.

13  Q    And he also said that it was -- the persons residing at

14  that address, his brother and his brother's family, who were

15  to make the payments and did make the payments, right?

16  A    That's what's reflected in the content of the letter.

17  Q    And this is addressed to Aurora Loan Services Loss

18  Mitigation, right?

19  A    Yes, sir.

20  Q    Do you -- you can infer from that, can't you, that the

21  letter was obtained and in fact it expressly says it's being

22  submitted?  The letter was submitted for the purpose of

23  obtaining some relief on the loan?

24  A    Yeah, the potential short sale.

25  Q    Yeah.  And to the extent that there's an assertion of

1    -- there are assertions of fact in this letter, including

2    where the correspondence pertaining to the mortgage was

3    mailed and who paid the mortgage, right?

4    A    I'm not disputing that that's addressed in the letter.

5    Q    Right.  And those would have been facts that would have

6    been verifiable by Aurora Loan Services, correct?

7    A    I'm not sure what -- I don't follow that particular

8    question.

9    Q    Wasn't Aurora Loan Services the servicer on the loan?

10   A    Yes.

11   Q    So if the borrower says to the servicer all the mail on

12   this mortgage is going to X address in a hardship letter the

13   servicer can look that up and see if that's true.

14   A    Certainly.

15   Q    Right?  And if the borrower says my brother is making

16   the payments then the servicer can also look that up and see

17   where the payments are coming from?

18   A    Potentially.  I mean you can't always sort of reverse

19   engineer the source of payments.

20   Q    Okay.

21   A    I mean I've testified in other matters that that

22   doesn't of itself mean anything.  But I don't disagree that

23   Aurora was in a position to have some information.

24   Q    And then my point is if to the extent that the borrower

25   is setting forth information that was verifiable by Aurora

Page 117

```
 1    it would have not been very helpful to set forth false facts

 2    in the hardship letter that Aurora could verify and

 3    establish were false, right?

 4               MR. COSENZA:  Your Honor, I object.

 5               THE COURT:  Yes, Mr. Cosenza.

 6               MR. COSENZA:  This calls for false speculation.

 7    There's no evidence at all as to what this borrower

 8    intended.  It was truthful in 2005.  Or I can go to side bar

 9    unless --

10               THE COURT:  No, I think it's a fair objection.  Do

11    you want to try it a different way --

12               MR. SHUSTER:  Yeah, sure.

13               THE COURT:  -- Mr. Shuster?

14    BY MR. SHUSTER:

15    Q    The borrow stated in the last paragraph of the

16    letter --

17               MR. SHUSTER:  I make that yes, sure.

18    BY MR. SHUSTER:

19    Q    The borrower stated in the last paragraph -- forgive me

20    -- the last paragraph of the letter "that it was strictly

21    intended for my brother to handle the loan," right?

22    A    That is what is stated.

23    Q    Okay.  So you found that the statement in the hardship

24    letter does not outweigh the occupancy indicated at

25    origination and the supporting and the other documentation?
```

Page 118

1    A    Yes, sir.

2    Q    So you weighed the evidence?

3    A    Yes, sir.

4    Q    And you determined that the hardship letter dated

5    April 1, 2012 in your view was not enough to establish to a

6    preponderance of the evidence that occupancy -- that the

7    purpose of the loan was misstated in the loan application?

8    A    Correct.

9    Q    You pointed -- and this loan also forms part of the

10   basis for your opinion that the trustees' loan review

11   process and evidence was unreliable, does it not?

12   A    If you could repeat the question again, I think it's an

13   important one.

14   Q    This -- your conclusions as to this loan formed part of

15   the basis of your opinion that the trustees' loan review was

16   unreliable?

17   A    Yes, sir.

18   Q    Now --

19              THE COURT:  Mr. Shuster, can we just roll back a

20   little bit?

21              MR. SHUSTER:  Of course.

22              THE COURT:  So, Mr. Grice, can you just take me

23   back to the predicate fact -- threshold fact that we're

24   looking at?  Is it the -- on the loan application the box

25   that was checked says second home?

Page 119

1          THE WITNESS:  Yes, sir.  I mean, I'm sorry, yes,

2     ma'am.  It's been a long day.

3          THE COURT:  It's been a long day.

4     (Laughter)

5          THE WITNESS:  I apologize.

6          THE COURT:  That's no problem.

7          Okay.  Can you tell me as a matter of -- based on

8     your experience, what does that mean?  I understand what

9     primary residence means.  That means I'm representing that

10    I'm going to live there most of the time, right?  More than

11    half of the 365 days in the year.  In the plain English

12    meaning word of primary.  But when I check the box second

13    home, not as a matter of your personal opinion, but based on

14    your experience, what does that mean?  What is that a

15    representation of?

16          THE WITNESS:  To my knowledge there's no common

17    definition that would apply in mortgage banking as to the

18    meaning of that.  They're tax definitions, you know, 1ten

19    weeks or less per year, and now we have Air B&B type

20    situations.  So there are a whole variety of other kind of

21    considerations, but in banking I don't think that means

22    anything in particular, and it doesn't rule out I could live

23    there part of the year.  Why somebody would want to go to

24    Houston for the summer I don't understand, but setting that

25    aside, I could go there for the summers and my brother could

Page 120

1    be living there also.  I don't think it's exclusive of that.

2           So I don't think that the secondary home helps us

3    very much in understanding what he can and can't do from a

4    banking point of view.

5           THE COURT:  Thank you.

6    BY MR. SHUSTER:

7    Q    Just to follow-up on that, Mr. Grice.  The loan

8    application, purpose of the loan has various options, one of

9    which is investment, right?

10   A    Yes, sir.

11   Q    So there's a box that a borrower can check if he or she

12   is purchasing the home not for his or her personal primary

13   or secondary residence, but as an investment property to

14   lend out or do something else with, I mean, to rent out or

15   do something else with.

16   A    Yes, sir.

17   Q    Okay.  Now --

18           THE COURT:  Well, let me ask a question on that.

19   Is that a -- if I own a primary home, no question about it.

20   I own a second home in the Poconos.  I want to buy a third

21   home.  As a matter of how loan applications work, I can't

22   check the box second home, even if I want to spend my

23   summers in the Poconos and my winters in Boca Raton, right?

24   Do I have to -- this is a question.  Do I have to check the

25   investment property box because I already have two homes?

Page 121

```
 1              THE WITNESS:  No.  My understanding --

 2              THE COURT:  Am I not able to have a second second

 3    home?

 4              THE WITNESS:  Yes, ma'am.  My understanding is you

 5    can have three or four second homes.  So this is not

 6    counting --

 7              THE COURT:  Right.  So how do I distinguish

 8    between something that's a second home and something that's

 9    an investment property, as those words are used on a loan

10    application?

11              THE WITNESS:  In my understanding, an investment

12    property generates income, and again, there's a tax issue of

13    how much residency is occurring there by the owner versus

14    how often it's being rented out.  But my understanding, I

15    can have one primary home where I'm principally, and then I

16    could have X number of secondary residences.

17              THE COURT:  I'm answering my own statements.

18              MR. SHUSTER:  Are these statements of fact, by the

19    way, second and third home?

20              THE COURT:  For me?  No.  I'll leave it there.

21    All I'm trying to do is try to gain an understanding based

22    on your expertise of what the words in the loan application

23    mean, that's all.

24    BY MR. SHUSTER:

25    Q    So, Mr. Grice, do you know based know we've looked at
```

Page 122

1   the file, we've looked at your narrative and so forth, would

2   this have been a simpler or complex claim?

3   A    I don't want to give you a casual judgment, because I

4   need to look at the entire loan file to kind of give you

5   that judgment.  In my narrative, I'm referencing several

6   pieces or a few pieces of inconsistent information, you

7   know, reconciling the information on the loan application

8   against the information in the hardship letter versus other

9   information such as the insurance contract and so forth that

10  covered the property.  All of that I think goes into the

11  consideration.

12       So I can't prejudge whether that would be a RECOVCO --

13  Q    So you -- okay.

14  A    -- a RECOVCO fail or an RBF fail.

15  Q    I did not mean to cut you off, apologies.

16       So in the additional pieces of information you

17  reference are Lexus Nexus person search, right?

18  A    Yes, sir.

19  Q    Which at least seems to suggest, at least seems to

20  associate the author of the hardship letter with the second

21  property going well back in time, right?

22  A    Well put, it's associated.  He's associated.

23  Q    And then you also point to the hazard insurance that

24  the borrower took out on the subject residence, the subject

25  property which you note does not have coverage for loss of I

Page 123

1    think rental --

2    A    Rental income, but does cover personal property.

3    Q    Right.  And so you suggest that that -- you draw an

4    inference from that, or you suggest that's at least

5    countervailing evidence.

6    A    It has some weight.  It's not dispositive, but it has

7    some significance here.  I have to pay for that, so you

8    know, as the homeowner, I've got to purchase that and elect

9    it.

10   Q    If the brother's family was in dire straits and the

11   borrower was, you know, purchased the house, it's possible

12   that the borrower -- it's at least possible the borrower

13   would've taken out insurance and not covered rental income,

14   right?

15   A    It's certainly possible, yes, sir.

16   Q    So having had now talked about those additional items

17   of -- items, at least in the file, can you -- are you in a

18   better position to offer a view as to whether this was a

19   complex or simple claim as you understood that distinction

20   was made during the plan administrator's loan review

21   process?

22   A    Frankly, no, I still want to review the loan file and

23   not excerpts from the claim package or the loan file itself.

24   Q    So you agreed with the plan administrator on this loan,

25   correct?

Page 124

1    A    Yes, sir.

2    Q    The -- so this was I'll represent to you and you know

3    counsel on the other side is certainly free to find

4    contradictory evidence, but I will represent to you based on

5    the information and data that we've seen, that this was a

6    loan that was only reviewed by RECOVCO.  And then the loan

7    was subsequently accepted for repurchase by the plan

8    administrator.

9        If the plan administrator ultimately determined that

10   the loan was worthy of repurchase, doesn't that almost mean

11   by definition that it should have gone to RBF for review?

12   A    Again, I'm not looking at AMA or the repurchase

13   determinations at all, but I do note there are additional

14   claims on this file.  There's a straw purchaser transaction

15   claim which in order to give you a complete answer I'd have

16   to look at that.  And I think that -- again, I don't want to

17   give you speculation, but these straw purchaser claims are

18   weighty, they're significant.  And that was also one of the

19   areas of friction I guess or slight disagreement of approach

20   between my team and I and the plan administrator.

21       So we sent back several straw purchaser allegations

22   with the recommendation that these be reconsidered.  Again,

23   I don't want to prejudge this, but the fact that there's a

24   straw purchaser transaction as well tells me that -- it

25   doesn't tell me anything about the RECOVCO treatment of it,

Page 125

1    that or if that's potentially improper.  I think that may be

2    entirely proper and what's happening is either the straw

3    purchaser transaction tips the scale or it's AMA at work.

4              THE COURT:  You're talking about something as to

5    which I don't have any background, right.  You've said the

6    word straw purchaser transactions.  So could you explain

7    what a straw purchaser transaction is?

8              THE WITNESS:  Yes, ma'am.  This is where the buyer

9    of the property and either, for example, the seller or the

10   real estate agent or the broker, some other interested

11   person in the transaction is a blood relative or a close

12   personal connection.  And so therefore, it makes lenders

13   nervous that the transaction may not be at arm's length.  It

14   may be among insiders.  So, for example, if you and I were

15   relatives and I purchased your house from you.  That sales

16   price would not be considered a real sales price potentially

17   because you may be selling it for nothing, or I may be

18   buying it for a fortune, even though it's not reflective of

19   the actual value.

20             In this case, obviously we have a brother and a

21   brother, and I don't know -- and we have the wife of the

22   brother who I think is the attorney in fact.  I don't know

23   the facts of that straw purchase allegation.

24             THE COURT:  Okay.  Let me try to understand this.

25   So it's not a straw purchaser transaction just by virtue of

Page 126

1    the fact, I'm speaking hypothetically here, it's not a straw

2    purchaser transaction just by virtue of the fact that there

3    is an indication in the file by the hardship letter that the

4    purchasing brother purchased it for the occupying brother.

5    Is that the straw purchaser aspect of it, or is it --

6            THE WITNESS:  Certainly the letter tells us that

7    he may be admitting that he's purchasing the home not for

8    himself but for someone else.  And so -- his brother.  So --

9            THE COURT:  Right.

10           THE WITNESS:  -- this may be a kind of confession

11   to that kind of transaction.  Just I don't know the file

12   well enough and I don't know if there are any other aspects

13   of this that would point to the straw purchaser.

14           THE COURT:  But that's different from what you

15   said a few moments ago, which is that there's something in

16   the nature of the transaction among non-arm's length parties

17   that would cause you to question the purchase price.

18           THE WITNESS:  Or anything about the transaction.

19   Here it's not about the purchase price or the contours of

20   the transactions for the ultimate purpose of the

21   transaction, but I think of it is the group is non-arm's

22   length transaction.  This is a specific kind of occupancy or

23   the purpose of the transaction is to assist someone, the

24   real buyer, quote/unquote, is not the ostensible buyer or

25   the purported buyer.

1          MR. COSENZA:  Your Honor, can I just have a

2     sidebar for one minute?

3          THE COURT:  Yeah, sure.

4     (Sidebar off the record)

5     BY MR. SHUSTER:

6     Q    Mr. Grice, to the extent there would've been a straw

7     purchaser transaction, do you have any sense whether it

8     would've been -- sorry, I should say a straw purchaser

9     breach claim, do you have any sense of whether it would've

10    been predicated on the same evidence?

11    A    I just don't have -- I mean, I think certainly the

12    evidence we looked at I would imagine would be part of that,

13    but I don't know what other evidence there is.

14    Q    Was it your understanding that when a loan applicant

15    checks the box for a secondary residence the message being

16    sent is that the second home will be for the personal use of

17    the applicant?

18    A    At least from time to time, at least some part of the

19    year.

20    Q    Let's see if we can try one more.  This time 3301.  And

21    we're going to start with the -- sorry, it's TRX --

22          MR. SHUSTER:  I have it here somewhere.

23          THE COURT:  Sure you do.

24          MR. SHUSTER:  I do.  Ms. Sibaski (ph)?

25          MS. SIBASKI:  You're looking for the demonstrative

Page 128

1    number?

2           MR. SHUSTER:   Yeah, 36, TRDX-36.

3        (Pause)

4    BY MR. SHUSTER:

5    Q    Mr. Grice --

6    A    Yes, sir.

7    Q    -- are you ready to proceed?

8    A    I am, yes.

9    Q    Thank you, sir.  So if we -- this is a

10   misrepresentation of income claimed that's predicated on an

11   audit verification of employment, correct?

12   A    Correct.

13   Q    And then you have by now the familiar columns of the

14   claimant's factual basis, the plan administrator's response,

15   the claimant's rebuttal.  We then have Mr. Aronoff's

16   rebuttal which sequentially comes after you provide your

17   Bates numbers, but before you provide your breach narrative,

18   correct?

19   A    Correct.

20   Q    And Mr. Aronoff says what he says, and you raise a

21   question about the audit verification of employment, right?

22   A    Yes, sir.

23   Q    And you say that there is nothing that -- the last

24   sentence, "there is nothing in the loan -- in the file that

25   points to a misrepresentation of income," correct?

Page 129

1   A    I say that, yes.

2   Q    And Mr. Aronoff did refer to other -- in his narrative

3   does refer to other evidence in the file that in his view

4   corroborates the audit VOE, correct?

5   A    Correct.

6   Q    You don't take on that evidence in your breach

7   narrative, other than with the assertion that there's

8   nothing else there, correct?

9   A    Well, not yet, right.  So I write my narrative which is

10  intended as talking points or a memory aid in June.  He then

11  writes his rebuttal to my narrative and provided additional

12  support.  And I have not yet had the opportunity to answer

13  Mr. Aronoff.

14          THE COURT:  So can I understand this?  Just to get

15  the sequence --

16          MR. SHUSTER:  I don't think -- yeah.

17          THE COURT:  Yeah.  When you wrote your narrative,

18  that was before Mr. Aronoff wrote his rebuttal, is that what

19  you're saying?

20          THE WITNESS:  I wrote it before he wrote his

21  rebuttal.

22          THE COURT:  Before he wrote his rebuttal.

23          THE WITNESS:  He received it -- we talked about

24  this in my deposition.  I think -- I don't know when he

25  received it.  I know initially we did not provide the

Page 130

1   narrative, we provided the conclusion that I agreed with the

2   plan administrator or did not.  So that I -- the sequence

3   may be -- I may be off on the sequence.  But my recollection

4   was we wrote the narrative, he did not see it until after

5   he'd finished his -- well, I apologize, I may be confused.

6   BY MR. SHUSTER:

7   Q    Yes, so let's get the sequence right.

8              THE COURT:  Yeah.

9   Q    You submitted your report, your affirmative report on

10  June 1 this year.

11  A    That's correct.

12  Q    Okay.  Five weeks, roughly five weeks later you

13  provided Bates numbers -- identifying documents you relied

14  upon for purposes of arriving at your conclusions on each of

15  the individual loans in your Appendix D, correct?

16  A    That's correct.

17  Q    Mr. Aronoff submitted a rebuttal report on what, July

18  29?

19             UNIDENTIFIED SPEAKER:  July 27.

20  Q    July 27, thank you.  And in that he took your Exhibit D

21  and added a column in which he set forth Aronoff -- an

22  Aronoff rebuttal to your conclusion and based on your Bates

23  numbers, correct?

24  A    Correct.

25  Q    The narrative that is in your Grice review narrative

Page 131

1    was provided to us actually on September 1 after you served

2    your reply report on us, correct?

3    A    That's my understanding.

4    Q    Okay.

5              THE COURT:  Mr. Cosenza?

6              MR. COSENZA:  Your Honor, can we have a sidebar on

7    this please for one minute?

8              THE COURT:  Yeah.

9              MR. COSENZA:  I don't think the witness --

10        (Sidebar off the record)

11             THE COURT:  Yeah, that's fine.  We're just going

12   to take a short break to discuss something and we'll be back

13   in ten minutes.  Everyone is welcome to just remain in place

14   or take a walk, but if you're going to take a walk please

15   come back in ten minutes.

16        (Whereupon, these proceedings were concluded at 2:02

17   p.m.)

18                            * * * * *

19

20

21

22

23

24

25

Page 132

1                        I N D E X

2                     T E S T I M O N Y

3     DEBTOR'S

4     WITNESS                 EXAM BY                    PAGE

5     CHARLES H. GRICE        MR. SHUSTER                  5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 133

1                    C E R T I F I C A T I O N

2

3    We, Dawn South, Sheila Orms, and Lisa Beck, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o, ou,
                   email=digital@veritext.com, c=US
7    _____ Date: 2017.12.08 13:31:04 -05'00'

8    Dawn South

9    Certified Electronic Transcriber

     Shelia Orms    Digitally signed by Shelia Orms
                    DN: cn=Shelia Orms, o, ou,
                    email=digital@veritedt.com, c=US
10   _____ Date: 2017.12.08 13:31:22 -05'00'

11   Sheila Orms

12   Certified Electronic Transcriber

     Lisa Beck    Digitally signed by Lisa Beck
                  DN: cn=Lisa Beck, o, ou,
                  email=digital@veritext.com, c=US
13   _____ Date: 2017.12.08 13:40:49 -05'00'

14   Lisa Beck (CET*D-486)

15   AAERT Certified Electronic Transcriber

16

17

18   Date:  December 7, 2017

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501