Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9         Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11    Case No. 08-01420-scc

12    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13    In the Matter of:

14

15    LEHMAN BROTHERS INC.,

16

17         Debtor.

18    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20

21

22

23

24

25

Page 2

1           United States Bankruptcy Court

2           One Bowling Green

3           New York, NY  10004

4

5           December 7, 2017

6           9:33 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    B E F O R E :

22    HON SHELLEY C. CHAPMAN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  JONATHAN

Page 3

1    HEARING re 08-01420-scc Doc #14442 Notice of Presentment of

2    Order Pursuant to SIPA Section 78fff-2(c) Authorizing the

3    Allocation and Transfer of the Remaining Customer Reserve to

4    the General Estate, Closing of the Customer Estate, and

5    Related Relief

6

7    HEARING re 08-01420-scc Doc #14443 Trustees Motion for an

8    Order Authorizing the Abandonment of Certain Discovery

9    Databases

10

11   HEARING re 08-01420-scc Doc #14444 Twenty-Fourth Application

12   of Hughes Hubbard & Reed LLP for Allowance of Interim

13   Compensation for Services Rendered and Reimbursement of

14   Actual and Necessary Expenses

15

16   HEARING re 08-01420-scc Doc #14445 Joint Notice of

17   Presentment of Tenth Amended Order Pursuant to Section

18   78eee(b)(5) of SIPA, Sections 105,330 and 331 of the

19   Bankruptcy Code, Bankruptcy Rule 2016(a) and Local

20   Bankruptcy Rule 201 6-1 Establishing Procedures Governing

21   Interim Monthly Compensation of Trustee and Hughes Hubbard &

22   Reed LLP

23

24   HEARING re 08-13555-scc RMBS Claims Estimation Trial

25   Transcribed by:  Sonya Ledanski Hyde

Page 4

1   A P P E A R A N C E S :

2

3   HUGHES HUBBARD & REED LLP

4       Attorneys for the Trustee

5       One Battery Park Plaza

6       New York, NY 10004

7

8   BY:  JEFFREY S. MARGOLIN

9

10  SECURITIES INVESTOR PROTECTION CORPORATION

11      1667 K Street N.W., Suite 1000

12      Washington, D.C. 20006

13

14  BY:  KENNETH J. CAPUTO

15

16  HOLWELL SHUSTER & GOLDBERG LLP

17      RMBS Trustees

18      750 Seventh Avenue, 26th Floor

19      New York, NY 10019

20

21  BY:  NEIL R. LIEBERMAN

22      DWIGHT A. HEALY

23      DANIEL P. GOLDBERG

24      MICHAEL S. SHUSTER

25

Page 5

```
 1   ROLLIN BRASWELL FISHER LLC

 2        Attorneys for the Debtor

 3        8350 E. Crescent Parkway, Suite 100

 4        Greenwood Village, CO 80111

 5

 6   BY:  MARITZA DOMINGUEZ-BRASWELL

 7        MICHAEL ROLLIN

 8

 9   WILLKIE FARR & GALLAGHER LLP

10        Attorneys for the Debtor

11        787 Seventh Avenue

12        New York, NY 10019

13

14   BY:  TODD G. COSENZA

15        BENJAMIN P. MCCALLEN

16        JOSEPH DAVIS

17

18   CHARLES H. GRICE, Witness

19

20

21

22

23

24

25
```

```
 1   ALSO PRESENT TELEPHONICALLY:

 2

 3   PATRICK MOHAN

 4   GRANT STEIN

 5   THOMAS ALSTON

 6   KYLE BURNS

 7   CELINE BUEHL

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 7

```
 1                      P R O C E E D I N G S

 2              THE COURT:  How are you?

 3              MR. MARGOLIN:  Well, thank you.  Should I go to

 4      the podium?

 5              THE COURT:  Well, we're in the middle of a trial.

 6              MR. MARGOLIN:  So does this work better?

 7              THE COURT:  Wherever you're most comfortable is

 8      fine.

 9              MR. MARGOLIN:  I can go to the podium, if you --

10              THE COURT:  Come to the podium.  That's fine.

11      That's fine.

12              MR. MARGOLIN:  Good morning, Your Honor.

13              THE COURT:  Good morning.

14              MR. MARGOLIN:  For the record, Jeffrey Margolin,

15      Hughes, Hubbard & Reed, for Mr. Giddens, the SIPA Trustee.

16      Joining me this morning is Mr. Caputo from SIPC.

17              MR. CAPUTO:  Good morning, Your Honor.

18              THE COURT:  Hello, Mr. Caputo.

19              MR. CAPUTO:  How are you?

20              MR. MARGOLIN:  We have four uncontested matters on

21      the calendar this morning, Your Honor.

22              THE COURT:  Yes.

23              MR. MARGOLIN:  But even for Lehman customers,

24      creditors, SIPC, and our team, this is a day of an

25      extraordinary milestone in a case really of extraordinary
```

Page 8

1   milestones, as we seek Your Honor's approval to the lar --

2   what is literally the largest customer estate in the history

3   of insolvency proceedings.

4           But that is a starting point, Your Honor.  Before

5   I turn to the agenda, if Your Honor would like, I would like

6   to provide a brief update on developments --

7           THE COURT:  Please.

8           MR. MARGOLIN:  -- for the appellate claims

9   litigations --

10           THE COURT:  Yes.

11           MR. MARGOLIN:  -- since were last before the Court

12   in September.

13           THE COURT:  Right.

14           MR. MARGOLIN:  As we previously noted, Your Honor,

15   there are no pending claims before Your Honor at the

16   Bankruptcy Court level --

17           THE COURT:  Right.

18           MR. MARGOLIN:  -- customer or general creditor.

19   In each of these appeals, the Trustee is an appellee.  So

20   there four matters that our team is currently working on in

21   representing the Trustee as appellee.  One recently closed;

22   that was the employee bonus claim litigation involving Mr.

23   Hoffman.  That, Your Honor's order has become final and not

24   appealable, both to Mr. Hoffman and to Mr. Judkins, and that

25   matter is closed.

Page 9

```
 1              Second, Your Honor --

 2              THE COURT:  Can I say, again, that I was right?

 3              MR. MARGOLIN:  You were right.  Second, the

 4   Trustee's counsel and Mr. Caputo presented oral argument in

 5   the District Court on what we call the ACATS claimants --

 6              THE COURT:  Yes.

 7              MR. MARGOLIN:  -- appeal on October 20th.

 8              THE COURT:  Okay.

 9              MR. MARGOLIN:  And we are now waiting Judge

10   Pauley's decision on that matter.

11              THE COURT:  Okay.

12              MR. MARGOLIN:  Third, this past Monday, Your

13   Honor, the Trustee filed his appellate brief in the District

14   Court in the ESEP appellate litigation.  The claimant's

15   reply brief is due, now due on January 12th.  There's also

16   not been any word, Your Honor -- we had a letter writing

17   campaign regarding the relatedness.

18              THE COURT:  Yes, there were three -- oh, I'm

19   sorry, I thought you were talking about RSU claimants that

20   were -- where the claims are spread out among three

21   different judges.

22              MR. MARGOLIN:  That's ESEP, Your Honor.

23              THE COURT:  Okay.

24              MR. MARGOLIN:  The ESEP claims that, yes, there

25   were three District Court judges; one which was assigned
```

1     Your Honor's appeal of the order granting the Trustee's

2     motion for summary judgment.  We filed our appellate brief

3     there this past Monday.

4              THE COURT:  And that's before?

5              MR. MARGOLIN:  That's before Judge Analisa Torres.

6              THE COURT:  Okay.

7              MR. MARGOLIN:  Then, Your Honor, we -- there was

8     an appeal of Your Honor's orders which reclassified these

9     claims from secured to unsecured.

10             THE COURT:  Right.

11             MR. MARGOLIN:  That's been fully briefed before

12    Judge Gardify since February 2016.

13             THE COURT:  Okay.

14             MR. MARGOLIN:  And then, Your Honor, there was

15    originally the ESEP claimants had moved to withdraw the

16    reference.

17             THE COURT:  Right.

18             MR. MARGOLIN:  That was assigned to Judge Ramos.

19             THE COURT:  Ramos, right.

20             MR. MARGOLIN:  And that matter, of course, Judge

21    Ramos denied the withdrawal of the reference.

22             THE COURT:  Right.

23             MR. MARGOLIN:  And we came back here for the

24    summary judgment arguments.

25             THE COURT:  Right.

```
 1                MR. MARGOLIN:  So we've not heard from the
 2    District Court regarding whether these appeals --
 3                THE COURT:  But there's nothing -- there's nothing
 4    -- there's not an appeal of the denial of the motion to
 5    withdraw.
 6                MR. MARGOLIN:  No, there's not.
 7                THE COURT:  Right?
 8                MR. MARGOLIN:  No, there's not.
 9                THE COURT:  So at least Judge Ramos is kind of out
10    of it.
11                MR. MARGOLIN:  Judge -- yeah, yes.
12                THE COURT:  He's not admitting, right?
13                MR. MARGOLIN:  He would be like -- he would be, if
14    you were ranking things like the third.
15                THE COURT:  Right.
16                MR. MARGOLIN:  And he's really out because that
17    matter is considered closed.
18                THE COURT:  Right.  So the only live overlapping
19    facts are between the matters between Judge Torres and Judge
20    Gardify, right?
21                MR. MARGOLIN:  Yes.
22                THE COURT:  Okay.
23                MR. MARGOLIN:  And we --
24                THE COURT:  And that's it, just those.
25                MR. MARGOLIN:  And we have one other, Your Honor,
```

1    which you mentioned, RSUs --

2             THE COURT:  Right.

3             MR. MARGOLIN: -- equity awards.  We have oral ar -

4    - the Second Circuit has scheduled oral argument on the

5    Trustee's appeal -- on the appeal of the Trustees'

6    determinations subordinating these claims for January 10th.

7             THE COURT:  And that's the group that's

8    represented by?

9             MR. MARGOLIN:  Mr. Schrager.

10            THE COURT:  Mr. Schrager.  And what date is that

11   at the Second Circuit?

12            MR. MARGOLIN:  January 10.

13            THE COURT:  And that's it.

14            MR. MARGOLIN:  That's it in the claims population.

15   So, of course, Your Honor --

16            THE COURT:  Is it -- is there a cost to keeping --

17   so after today, not to steal your thunder, but we're going

18   to close the customer estate.

19            MR. MARGOLIN:  Yes.

20            THE COURT:  Then you're going to have the general

21   creditor estate still open.  Is there a cost to keeping the

22   general estate still open?

23            MR. MARGOLIN:  Yes, Your Honor.  I would say that

24   there are, besides working on these litigations.

25            THE COURT:  Right.

1          MR. MARGOLIN:  The Trustee, as well as working on

2     -- and we were planning to probably come before Your Honor

3     at some point in the first quarter about monetizing certain

4     residential assets.

5          THE COURT:  Okay.

6          MR. MARGOLIN:  And then there is a cost in

7     connection, mostly with data management and maintenance; as

8     well as just as the natural things, as Your Honor would

9     know, in keeping a bankruptcy estate opening --

10         THE COURT:  Right.

11         MR. MARGOLIN:  -- open regarding reporting,

12    regarding internal controls, regarding compliance.

13         THE COURT:  But you have reserves?

14         MR. MARGOLIN:  Yes, Your Honor.

15         THE COURT:  You have reserves on account of these

16    claims in the event that there's a reversal on one or more

17    of them.

18         MR. MARGOLIN:  That's correct.  We are fully

19    reserved on these claims.  In fact, on the ESEP claims,

20    because Mr. (indiscernible)'s clients checked the secured

21    box, we are fully -- those claims are reserved at 100

22    percent.

23         THE COURT:  Dollar-for-dollar.

24         MR. MARGOLIN:  Yeah, dollar-for-dollar.  So we

25    continue, as Your Honor, these are all -- closing the --

Page 14

1    moving the estate towards a final distribution and closing

2    the estate is dependent really on the Appellate Court's

3    schedules and how these claims do that.  And the Trustee,

4    with Mr. Caputo, are trying to press these matters up

5    through the Appellate Courts as promptly as efficiently as

6    we can.

7              THE COURT:  I'm sure you are.  All right.

8              MR. MARGOLIN:  So turning to the agenda, Your

9    Honor, if I may?

10             THE COURT:  Yes.

11             MR. MARGOLIN:  The first uncontested matter is the

12   presentment of the proposed order where, pursuant to SIPA

13   Section 78FFF-2C authorizing the allocation and transfer of

14   the remaining customer reserve to the general estate,

15   closing of the customer estate, and related relief.

16             This request is a particularly extraordinary step,

17   given the uncertainty surrounding customer distributions,

18   which occurred at the beginning of the case through up until

19   we did not -- we were not in a position to effectuate

20   customer distributions until the LBIE and LBHI settlements

21   and allocation motion of allocating funds between the

22   customer estate and general estate became final, and we were

23   so able to make 100 percent distributions to customers

24   beginning in June of 2013.  Until those settlements were

25   approved given the vast customer claims filed by LBIE and

Page 15

1    LBHI based on reserves, it was really uncertain whether

2    there would be 100 percent distributions to public

3    customers.

4            So, Your Honor, through this order, the Trustee

5    seeks the Court's authority to allocate and transfer

6    approximately $69 million in remaining excess funds and any

7    additional interest accrued on the funds maintained or

8    reserved by the Trustee in the customer estate to the

9    general estate.

10           Nearly all of these funds were reserved in

11   connection with the FirstBank's customer claim litigation.

12   It was the last unresolved customer claim asserted against

13   the estate.  Your Honor's order disallowing and expunging

14   FirstBank's claim became final on September 20th when it

15   didn't seek assert to the Supreme Court.

16           The Trustee has made prior requests for

17   reallocation from customer reserves to the general estate in

18   the distribution motions approved by the Court.  To date,

19   based on the Court's ruling as to certain customer claims,

20   as well as subsequently confirmed in the Court's

21   distribution orders, the Trustee has reallocated

22   approximately $2.3 billion from the customer estate to the

23   general estate, and distributed such funds to unallowed

24   general unsecured claims.  This constitutes, Your Honor,

25   approximately 10 percentage points of the total 39 percent

Page 16

1   distribution to date to the general unsecured creditors.

2           Through this proposed order, Your Honor, the

3   Trustee also seeks a decree closing the LBI estate, as

4   you've mentioned.  The Trustee contends that he's satisfied

5   all of his duties to LBI's customer in the customer estate,

6   including those pursuant to SIPA, the Bankruptcy Code, and

7   other applicable law.

8           The customer estate has been fully administered,

9   and the Trustee submits its in the best interest of all

10  parties and interest to close the customer estate at this

11  time.  SIPC has maintained close oversight of the customer

12  estate, from reviewing claims and the Trustee's proposed

13  determinations during the early phase of the litigation, to

14  Mr. Caputo successfully arguing SIPC's position on customer

15  claims such as Repos and FirstBank, all the way to the

16  Second Circuit; and, actually in Repos case, to the Supreme

17  Court.

18          SIPC supports the closure of the customer estate.

19  Unless Your Honor has any questions, we respectfully request

20  the Court enter the order.

21          THE COURT:  Does Mr. Caputo wish to be heard?

22          MR. CAPUTO:  No, Your Honor, other than to say

23  that this is an extraordinary remarkable conclusion to a

24  remarkable year.  We're very, very proud of the efforts of

25  the Trustee.  We think he's done a remarkable job in moving

Page 17

1    this forward expeditiously, and we fully support the motion.

2            THE COURT:  Well, I'll add some observations to

3    that.  It is a remarkable day.  I almost can't find the

4    words.  As you're aware, I've been in this chair for four

5    years when Judge Peck handed me the baton.

6            And although the lion's share in connection with

7    the plan had been accomplished under his incredibly able

8    watch, he left with me rather a lot of litigation.  And I

9    have watched folks from SIPC and Hughes Hubbard firm and

10   others work through that, through both hearings and trials,

11   and leading to results which were then able to go up for

12   appellate review, and we are where we are.

13           I've said it before and I'll say it again.  I do

14   not think that in September of 2008 anyone would have

15   imagined that this would be the result where 100 percent of

16   customer claims have been paid; and there is, at this point,

17   just about 40 cents on the dollar available for the general

18   unsecured estate.

19           So not that we should all take this as an

20   indication that we would like this to ever happen again,

21   which we would not.  And I would add to that that it appears

22   that through the work of the various regulatory agencies who

23   have authority over our banking system, broker-dealers,

24   derivatives, and everything else that came together to form

25   -- to create the perfect storm that caused the financial

Page 18

1    crisis, from my perspective, the banks, the banking system

2    is much stronger.  Indeed, there is some evidence that if

3    there were another shock to the system of the order of

4    magnitude of Lehman that various financial -- large

5    financial institutions would be able to withstand that.

6            That notwithstanding, we don't want to ever been

7    in this position again, and I cannot say enough about the

8    efforts of SIPC and the attorneys who have been working

9    behind the scenes and in the forefront all of these years.

10    It's very worth a lot of folks understanding that, and

11    that's -- these results are net of the tremendous cost

12    that's been incurred.

13            And on that point, I would also add, as you folks

14    know I've said before, that oftentimes in large insolvency

15    cases, there is a focus on the amount of the fees, because

16    standing alone, they are breathtakingly large.  But it takes

17    a lot of work to resolve claims -- the number of claims and

18    the complexity of the claims that you were faced with.

19            So I will proudly and happily enter the order

20    providing for the closure of the customer estate.

21            MR. MARGOLIN:  Thank you, Your Honor.

22            MR. CAPUTO:  Thank you, Your Honor.

23            MR. MARGOLIN:  May I move on to the next agenda

24    item?

25            THE COURT:  Please.

1          MR. MARGOLIN:  Second up, Your Honor, is the

2     uncontested motion for authority to abandon and destroy

3     certain data and documents maintained by the LBI estate. As

4     Your Honor noted, with many phases of liquidation complete,

5     this motion is actually the fifth in a series of data

6     abandoning motions --

7          THE COURT:  Yes.

8          MR. MARGOLIN:  -- the Trustee anticipates filing

9     with the Court as his professional determine that certain

10    documents and data are no longer necessary to effectuate the

11    estate's remaining workstreams; and, thereby, ripe for

12    abandonment and destruction in furtherance of the Trustee's

13    goals of reducing administrative expenditures in closing the

14    estate.

15          Your Honor most recently approved the abandonment

16    motion back in July, and that has been fully effectuated.

17          The current motion seeks to abandon -- seeks this

18    Court's authority to abandon and destroy certain data and

19    documents, including those maintained at the request of

20    FirstBank or/and related litigation of claimants, such as

21    the employee bonus claimants, documents that were called in

22    connection with Mr. Hoff -- the litigation of Mr. Hoffman.

23          THE COURT:  Right.

24          MR. MARGOLIN:  These litigations have been fully

25    and finally resolved.  The abandonment of the estate and

Page 20

1    documents will provide additional cost savings to the LBI

2    estate and its creditors.

3              Your Honor, we serve this motion essentially on

4    the world to make sure that everyone is okay with it.

5    Anyone who's made a document request, third-party request,

6    to the estate, all pending claimants.  Otherwise, as Your

7    Honor could imagine, I get a lot of calls in connection with

8    this, particularly when we do this before Thanksgiving.  On

9    the Wednesday before Thanksgiving, I become a popular guy.

10   But all those informal inquiries were resolved.

11             THE COURT:  Okay.

12             MR. MARGOLIN:  And SIPC supports this motion.

13   And, thereby, unless the Court has any questions with

14   respect to this motion.

15             THE COURT:  So carved out in this are documents

16   that you might need or that the parties might need or ACATS

17   or ESEP or the RSU to come back down from the Appellate

18   Court?

19             MR. MARGOLIN:  These all relate to other

20   litigations.  And most of these documents, except for what

21   were called the Repo database which were productions in

22   connection with the Repo litigation, can be replicated

23   through the Trustee's access to legacy Lehman documents at

24   what we call the Iron Mountain Data Archive.

25             THE COURT:  Okay, all right.  So no one has

Page 21

1   objected, so this motion will be granted.

2            MR. MARGOLIN:  Thank you, Your Honor.  Your Honor,

3   next before the Court is the Hughes Hubbard's 24th

4   application and the Trustee's and SIPC's joint request to

5   amend the interim compensation procedures as to Hughes

6   Hubbard.  No objections have been filed to these requests.

7   SIPC filed its recommendation in support of the fee

8   application and is a party to the requested amendment to the

9   procedures order.

10            So the fee application for the period June 1

11   through September 30th, Hughes Hubbard expended 2927 hours,

12   for which approximately 182 were incurred by the Trustee,

13   for a total fee request of $2,166,787.35.  In addition to

14   the fees, the firm requests of total expenses of $40,053.74.

15            As Your Honor knows, the firm provides a 10

16   percent public interest discount, which is reflected in the

17   application.  In addition to that, we voluntarily adjusted

18   our fees by over 51,000, and also reduced expenses by

19   approximately 10,900.

20            The majority of work during the fee application

21   period was related to the very active claims litigation,

22   most notably the ACATS and the ESEP claims, including oral

23   argument before Your Honor on the ESEP claims during the

24   middle of the period.

25            The amendments of the procedures order follows the

Page 22

1    form of the prior amendments approved by the Court.  It does

2    leave a sizable holdback to my firm of $250,000 of, assuming

3    the Court approves these fees, of Court approved fees.

4              Unless the Court has any questions, we

5    respectfully request entry of orders approving both

6    requests.

7              THE COURT:  Okay.  Mr. Caputo, anything from you?

8              MR. CAPUTO:  No, Your Honor, other than to say we

9    support the motion.

10             THE COURT:  Okay, very good.  So both of those

11   applications will be.

12             MR. MARGOLIN:  Thank you very much, Your Honor.

13             THE COURT:  All right.

14             MR. MARGOLIN:  That concludes the matters before

15   the Court today.

16             THE COURT:  All right.  Well, keep us posted.

17             MR. MARGOLIN:  Great.  Thank you very much, Your

18   Honor.

19             THE COURT:  All right.

20             MR. MARGOLIN:  Happy holidays and happy new year.

21             THE COURT:  Thank you again.  Happy holidays to

22   you and your team.  Thank you.

23             MR. MARGOLIN:  Thank you very much.

24             MR. CAPUTO:  Thank you, Your Honor.

25             MR. MARGOLIN:  We'll submit orders by email to the

Page 23

1    Court.

2            THE COURT:  Very good.

3            MR. MARGOLIN:  Thank you.

4            THE COURT:  Thank you.  All right, Lehman other

5    folks, come on up.  I'll be back out in five minutes while

6    you get set up.

7        (BREAK)

8            MR. SHUSTER:  Good morning, Your Honor.

9            THE COURT:  Good morning, Mr. Shuster.

10           MR. SHUSTER:  Good morning, Mr. Grice.

11           THE COURT:  Good morning, Mr. Grice.

12           MR. GRICE:  Good morning.

13   [CROSS-EXAMINATION OF MR. GRICE BY MR. SHUSTER -- CONT]

14   Q    Mr. Grice, we were on Loan 3301, and you should have

15   your Exhibit D, Appendix D.  A promising start.  So do you

16   want to take a moment to look that over?

17   A    If I may.

18   Q    Please.

19   A    Thank you.  Yes, sir, whenever you're ready.

20   Q    Thank you, Mr. Grice.  So let's start as we do with the

21   extract from your Appendix D.  And there we have all of the

22   by now familiar rows and columns and boxes, culminating in

23   your review narrative in which you address the audit VOE and

24   state that you find it unreliable and say that there is

25   nothing in the file that points to a misrepresentation of

Page 24

1    income.  Are you with me?

2    A    Yes, sir.

3    Q    When you said there is nothing in the file that points

4    to a misrepresentation of income, sir, were you also taking

5    into account the additional information that was cited in

6    Mr. Aronoff's rebuttal, including the references to pay

7    stubs and other similar documents, tax returns?

8    A    I can't give you a specific answer as to what the

9    reviewer looked at, so I don't know kind of the background

10   to the formation of that sentence or what material was

11   reviewed.  As I look at it now, that last sentence appears

12   to be an error.  It seems to be incorrect in its breadth,

13   right?

14   Q    Very good.  Thank you, sir.  So would you turn to, in

15   the loan binder, to the claim package for 3301?  And I'll

16   direct your atten -- which is TRDX-2 incidentally, and I'll

17   direct your attention -- well, let's start off with getting

18   the binder.

19   A    Yes, sir.  I'm at the claim package for 3301.

20   Q    Okay.  So permit me to direct your attention, Mr.

21   Grice, to Page 1 of 13 in there.

22   A    Yes, sir.

23   Q    That's where we have the -- incidentally, when you

24   talked about the scope of the statement in your narrative

25   being apparently an error.  You're not, I take it, conceding

Page 25

1   that there's a breach on this loan; you're merely commenting

2   on that one sentence and its wording and scope.

3   A    I'm open to review of the facts.  I don't have the

4   file, so I don't have the --

5   Q    Okay, fair enough.

6   A    But, you know, I'm certainly open to a review of the

7   facts.

8   Q    Okay.  So I'll direct your attention then to Page 1 of

9   the loan application, Mr. Grice.

10  A    Yes, sir.

11  Q    Just so we can orient ourselves.  And we see the

12  borrower's name there, and then we see the name and address

13  of the borrower's employer.

14  A    Yes, sir.

15  Q    And the borrower's occupation, correct?

16  A    Yes, sir.

17  Q    And then on the next page, we see the -- an entry for

18  the borrower's income, which is 8,900 a month, which comes

19  out to, I guess, something in excess of $100,000 a year;

20  8,000 a month, right -- 8,900, right, rounded 9,000 a month

21  would be 108,000 a year, so it's somewhere over $100,000.

22  A    I'll take your representation, yes, sir.

23  Q    Okay.  And we see the borrower's signature on the next

24  page, Page 3 of 13, indicating that the loan was -- well,

25  the loan application at least is signed and dated 9/27/05.

Page 26

1    A    Yes, sir.

2    Q    And then if we -- if I could direct your attention, Mr.

3    Grice, to Pages 12 and 13 of the claim package.  You see

4    there there's a request for verification of employment and

5    earnings, and there is a completed form.  There is a form --

6    you're not going to -- you're not conceding it's completed,

7    but you're acknowledging there's information on it; is that

8    fair?

9    A    Absolutely.  Yes, sir, I agree with that.

10   Q    All right.  So, and on the form, we see the loan

11   applicant's name and the loan number referenced.

12   A    Yes, sir.

13   Q    And then the question, was the person listed above an

14   employee of the company.  The answer yes is circled,

15   correct?

16   A    Yes, sir.

17   Q    Was the employee currently employed in 2005?  It

18   appears that the word currently is struck, so that it -- the

19   question is, was the employee employed in 2005, and the

20   answer yes is circled.

21   A    Yes, sir.

22   Q    And then the third question is, what was the employee's

23   gross annual income?  And someone appears to have in

24   handwriting added in 2005; do you see that?

25   A    A question mark.  Yes, sir.

Page 27

```
 1   Q    Yes.  Now, I take that to be that the person completing

 2   the form was completing the question as what was the

 3   employee's gross annual income in 2005.  Is that the way you

 4   read it?

 5   A    I'm -- I certainly understand that interpretation.  I

 6   don't -- I can't get inside the mind of Heather V.  I

 7   probably can't contact her either.  But the letter

 8   requesting this information specifically says 2005, so I

 9   don't think the year 2005 is in question.  So I just don't

10   know.

11   Q    Okay.  So then we have -- and there's an income number

12   reflected there of $50,318.69, right?

13   A    Yes, sir.

14   Q    And then there's a question as to the employee is still

15   employed, and the answer yes is circled.

16   A    Yes, sir.

17   Q    So, and the form is dated 6/10/2015, correct?

18   A    Correct.

19   Q    So, then if I could direct your attention, Mr. Grice,

20   to page -- sorry, to the loan file excerpt, which is the

21   next tab, and to Page 297 of that.  You can see that it's a

22   1040, a U.S. individual tax return for 2008, correct?

23   A    Yes, sir, also unsigned.

24   Q    The paid preparer's use box is filled out; do you see

25   that?
```

Page 28

1   A    I do.

2   Q    Does, so does that indicate to you that there was a

3   paid preparer who filled out this tax form?

4   A    Yes, sir.  They provided a PTIN number, which is

5   helpful.

6   Q    And do you know that it's a common practice for paid

7   preparers to e-file tax returns on behalf of taxpayers?

8   A    I understand that.  Yes, sir.

9   Q    And then you see there's an income number on Line 7 for

10  wages and so forth for the year 2008, right?

11  A    The 70,372 you're referring to?

12  Q    Right, yes.  So we're going forward three calendar

13  years from 2005 when the loan was taken out.  And if the

14  2005 VOE is accurate, then it looks like the borrower's

15  compensation would have increased over the course of three

16  years.  And in 2008, the number if 70,000 and change, right?

17  A    That's correct.  Again, we're three years and, like,

18  three months forward from the date of the application being

19  signed.

20  Q    Right.  So, and then the borrower's name is there.  You

21  recognize the name from the loan application?

22  A    I do.

23  Q    And there's an indication of the borrower's occupation

24  in a couple of lines above the paid preparer's signature?

25  A    Yes, sir.  I see that.

Page 29

1   Q    And then there's a tax return for '09 at Page 255, Mr.

2   Grice, if I could direct your attention to that.

3   A    Yes, sir.

4   Q    And that, again, shows the borrower's name, and

5   indicates that it was -- the form was prepared by a paid

6   prepared, same paid preparer, and there's, again, a

7   reference to the borrower's occupation, correct?

8   A    Correct.

9   Q    And then there's an income number, which is higher than

10  the income number in 2005, right?

11  A    Yes, sir.

12  Q    Looks like it's about $8,000 higher.

13  A    Yes, sir.

14  Q    So then permit me to direct your attention, Mr. Grice,

15  to Page 253.  And that's a 2010 pay stub, correct?

16  A    Yes, sir.

17  Q    Same employer, same -- you see an indication same, the

18  name of the borrower, correct?

19  A    Correct.

20  Q    I'm not going to do the math there, but that's for the

21  first -- that's for the first two months and six days of the

22  year, right?

23  A    Yes, sir.

24  Q    So you could project that out over the course of the

25  year, and you'd get a number in the vicinity of $80,000 or

Page 30

1   something like that.

2   A    That's correct.

3   Q    And then if we could look at Page 290.  That's another

4   pay stub for 2011, same employer, correct?

5   A    Correct.

6   Q    And that shows income for greater part of the year that

7   runs through the end of October.  And it shows an income

8   number of $70,000, right?

9   A    Yes, sir.

10  Q    Up to that point in time.

11  A    That's correct.

12  Q    So if you projected that out, that would come out to

13  something like 84,000 for the year.

14  A    Yeah, it looks like the rate of pay for 80 hours has

15  gone up to 2,925 from 2,789 in 2010.

16  Q    Right.  And then there is a hardship letter on the

17  opposite page.  Do you see that, Page 261?

18  A    I do.

19  Q    And you see that the hardship letter is directed to

20  Aurora Loan Services loss mitigation dated April 4, 2009?

21  A    Yes, sir.

22  Q    Same, you see the borrower's name down there?

23  A    I do.

24  Q    There's no reference in the hardship letter to any drop

25  off in income or loss of job or anything or change of job or

Page 31

1    anything like that, correct?

2    A    No, I agree.  He's discussing his -- the hardship he's

3    facing, but that appears to be the increase in costs and a

4    loss of equity in the property.

5    Q    Right.  And he refers in the fourth line up from the

6    bottom of the first paragraph to the fact that he has a good

7    income.

8    A    I see that.  Yes, sir.

9    Q    And then if you flip back a couple of pages to Page

10   258.

11   A    Yes, sir.

12   Q    There's a hardship letter submitted for the -- forgive

13   me -- a hardship affidavit, correct?

14   A    Correct.

15   Q    And that's submitted to Aurora Loan Services, and

16   signed by the borrower on Page 260?

17   A    Yes, sir.

18   Q    And there, the borrower is asked to check certain boxes

19   as to whether there's been a loss of income, for example.

20   So the first line, my income has been reduced or lost, and

21   then it goes on to say, for example, unemployment,

22   underemployment, reduced job hours, reduced pay, et cetera.

23   And the box no is checked, right?

24   A    I see that.  Yes, sir.

25   Q    And so based on this, you concluded that there was no

1   breach.  Do you stick with that?

2   A    I don't, having looked at this and thought about it

3   since we reviewed the documents yesterday.  We've not

4   pointed out some inconsistent facts.  There's evidence that

5   his employer may, in fact, not be simply a hospital; but

6   may, in fact, be a service.  There's a reference -- I don't

7   want to name the -- it seems to be an employment agency for

8   respiratory therapists perhaps, which is referenced a couple

9   of times in the documents.  But setting -- I mean, having

10  reviewed all of this, I think this is a situation where more

11  likely than not, he misrepresented his income at

12  origination.

13  Q    Okay.  Thank you, sir.  So let us --

14          MR. SHUSTER:  May I just have a brief moment, Your

15  Honor?

16          THE COURT:  Sure.

17          MR. SHUSTER:  Thank you.

18  Q    Thank you, Mr. Grice.  I'll now direct your attention,

19  Mr. Grice, if I could to Loan 8455.  And in connection with

20  that loan, the extract from your Appendix D is TRDX-30,

21  which Mr. Lieberman is handing out.

22          THE COURT:  I'm sorry.  What was the loan number,

23  Mr. Shuster?

24          MR. SHUSTER:  The loan number, Your Honor, is

25  8455.

1   Q    It's a bit of a heavy lift to read through this.  I'll

2   give you a moment.  Please let me know.

3           THE COURT:  All right.  I need a little more help.

4   Where is -- is there anything related to this loan in the

5   binder?

6           MR. SHUSTER:  It's the first tab.

7           THE COURT:  I see, okay.  Mr. Shuster, I'm sorry

8   to do this.  But is there a difference between this loan

9   file excerpt that was handed to me and what's in the binder?

10          MS. BRASWELL:  What the replacement, the original

11  loan file excerpt --

12          THE COURT:  Yes.

13          MS. BRASWELL:  -- had a misprinting.

14          THE COURT:  Okay.  So take this one out and put

15  the other one in.

16          MS. BRASWELL:  Right.

17          THE COURT:  Thank you.

18  Q    If you're done reading the narrative, sir, we can walk

19  through the loan file together.  I see you're starting to do

20  that, and I certainly don't want to stop you, but we will be

21  going through it together.  If there's any part of you want

22  to refer to, you're certainly free to.

23  A    Good.  I may need to stop the clock, but let's go ahead

24  and proceed.

25  Q    Okay.  So just by way of orienting us, this is a

Page 34

1   misrepresentation of debt claim by the Trustees?

2   A     Yes, sir.

3   Q     And it's predicated on two pieces of evidence -- a MERS

4   report and a credit report, as well as, of course, the loan

5   application itself.

6   A     Bear with me.

7   Q     Yes, this one's a slug.

8   A     So it's based on a MERS report and an audit credit

9   report pulled April 13, 2015.

10  Q     And the assertion is that the loan application fails to

11  disclose mortgage debt that are reflected on the MERS

12  reports and the audit credit report, correct?

13  A     Correct.

14  Q     And the Trustees' estimate a mortgage payment for the

15  debt that they say is reflected on the MERS report and the

16  credit report, correct?

17  A     Correct, and I cite that in my response.

18  Q     Right, so you cite that.  You don't contest the

19  estimate you adopted.  And then you -- that you adopted at

20  least for purposes of your response -- and then you estimate

21  rent on the property and you do some math using the

22  Trustees' estimated mortgage payment on the alleged

23  undisclosed debt, fair?

24  A     That's correct.  We calculate the fair market rent, we

25  adjust it for vacancy, and come to this net income

Page 35

1    representation of a positive number that's reflected in the

2    third paragraph of my response.

3    Q    The -- you don't appear to contest the fact that the

4    MERS report and the credit report are in the file and that

5    they say what the Trustees say they say.

6    A    I'm not disputing that they're in the file.  It's

7    always the question of what weight you place on the

8    interpretation of those facts and documents.  But their

9    presence in the file is not in dispute, or that the data

10   reflected on them is the data reflected on them.

11   Q    Okay.  And you also, in fairness, you referred to what

12   you view to be compensating factors.

13   A    I discuss that in the last paragraph.  Yes, sir.

14   Q    So let's now walk through the loan file, the claim

15   file, Mr. Grice.  And we'll start at the loan file excerpt

16   if we could, which has the loan application.  So there's a

17   tab loan, right?

18   A    And here, I'm not using the substituted application; is

19   that correct?

20   Q    This is the replace -- you should have a signed loan

21   application in there, and it should bear Page numbers 126

22   through 128 of 673.  And if it doesn't, I apologize.

23   A    That's right.  So I will apply the new version of the

24   file up to the loan application to -- I thought that was

25   supposed to go to the claim package excerpt, but I will now

Page 36

1    place it in my loan file excerpt for the subject loan.

2    Q     Thank you.  So we have there some information that we

3    need to look at to walk through this.  There's a loan

4    amount, you see that, of 142,400.

5    A     Yes, sir.

6    Q     There's the subject property; that is to say, the

7    property that's the subject of the mortgage loan, right?

8    A     Correct.

9    Q     And the address for that, the borrower's name --

10   A     Correct.

11   Q     -- further down the page, and the borrower's, what is

12   identified as the borrower's present address, correct?

13   A     Correct.

14   Q     And then on the next page, there is -- that's where it

15   calls for the borrower to disclose liabilities.

16   A     Yes, sir.

17   Q     And if the Trustees are right about that MERS report

18   and the audit credit report reflect mortgage debt of the

19   borrower that predates the closing, then that mortgage --

20   that preclose mortgage debt is not identified where it

21   should be on the loan application, correct?

22   A     That's correct.  Yes, sir.

23   Q     And if I may direct your attention to the next page of

24   the loan application, Mr. Grice, you see there at the top

25   that the borrower's present address is identified as a

Page 37

1    rental property, correct?

2    A    Correct, with a rental income associated with it.

3    Q    Do you know if -- okay, with a rental income associated

4    with it, correct.  Then I'll just point out to you, if you

5    go into below that, details of transaction, you'll see in

6    Line J, there's a reference to subordinate financing.

7    A    Yes, sir.

8    Q    Does that indicate to you that a second mortgage or a

9    second lien applies to the same property and was part of

10   this transaction?

11   A    That would be my understanding.

12   Q    Okay.  And that number is 35,600.

13   A    Correct.

14   Q    And the loan closed on June 4, 2004, correct?

15   A    Yes, sir.

16   Q    Well, I should say the application is signed.

17   A    The application is signed.

18   Q    Right, June 4, 2004.  So then if we could go into the

19   claim package.  Oh, I should have pointed out, Mr. Grice, my

20   apologies.  But in the loan application we were looking at a

21   moment ago, there was no rental income identified for the

22   property that the -- that would be the subject of what the

23   Trustees allege is the undisclosed mortgage.

24   A    That's correct.

25   Q    And that property is not identified at all there in the

1    rental income section of the loan application.

2    A    That's correct.

3    Q    So then if we -- well, we're now at Page 14 in the

4    claim package tab for Loan 8455, so that's the prior tab in

5    the binder, at least I hope it is.

6    A    I'm sorry, which page?

7    Q    So we'll be at Page 14 of 27.

8    A    I'm there.

9    Q    Thank you.  So this is, you recognize this as a credit

10   report?

11   A    This is the, I believe, the audit credit report pulled

12   on April 13 of 2015.

13   Q    So we see there the borrower's name?

14   A    Yes, sir.

15   Q    And the borrower's social security number?

16   A    Yes, sir.

17   Q    Are social security numbers customarily used as the

18   basis to pull credit reports?

19   A    Yes.

20   Q    And then we see the subject property address; do we

21   not?  You might have to refer back.

22            THE COURT:  Where are we looking for that, Mr.

23   Shuster?

24            MR. SHUSTER:  It's on the credit report on the

25   left side.

1          THE COURT:  What's the page number?

2          MR. SHUSTER:  14 of 27, there's a box there,

3    applicant.  And under that, there is the borrower's name,

4    the borrower's social security number.

5          THE COURT:  I see.  Thank you.

6    Q    And the subject property address, correct?

7    A    So the subject property is 5915.

8    Q    Oh, yeah.

9    A    I'm not naming the street.

10   Q    Okay, good.  Yeah.

11   A    And is it on -- I'm just trying to find it on the audit

12   credit report.

13   Q    You can --

14   A    Oh, I see it.

15   Q    You see it?

16   A    Yes, yes.

17   Q    Okay.

18   A    There's some numbers on this page.

19   Q    There are a lot of numbers on this page and a lot of

20   pages in this file.

21   A    I did locate it.

22   Q    And then there is the current address.  You see a

23   current address number.

24   A    Yes, sir.

25   Q    And that's the property that is disclosed as a rental

Page 40

1   property on the loan application.  Do you see that?

2   A    That was the departing address.

3   Q    Right.  Then there's two other previous addresses.  Do

4   you understand from the credit report that those previous

5   addresses were properties that the borrower owned?

6   A    Or rented or was associated with.

7   Q    Okay.  So, then let's turn, if we could, to Page 15,

8   which is the very next page.  It should be the facing page

9   of the credit report.  And if we go down to the fourth and

10  fifth rows, we see the subject debt, correct?

11  A    These are the highlighted in gray rows?

12  Q    Those are highlighted in gray, yeah.  There the two

13  adjacent rows highlighted in gray?

14  A    Yes, sir.

15  Q    And we see the date is consonant with the date the loan

16  application was signed?

17  A    Yes, sir.

18  Q    And then we see the loan amounts for both liens, the

19  142.4 and the 35.6 that we looked at earlier, correct?

20  A    Yes, sir.

21           THE COURT:  I'm sorry.  Where is that?

22           MR. SHUSTER:  Your Honor, that's at --

23           THE COURT:  I'm looking at two things that say

24  Aurora Bank, right?

25           MR. SHUSTER:  Right.  So, there's Aurora bank and

Page 41

```
 1   then the --

 2              THE COURT:  Okay.

 3              MR. SHUSTER:  -- the creditor account column, and

 4   then their fourth --

 5              THE COURT:  Okay.

 6              MR. SHUSTER:  -- column across, opened --

 7              THE COURT:  Okay.

 8              MR. SHUSTER:  -- that has the dates.  And then

 9   limit or highest credit that has the amounts.

10              THE COURT:  Okay.

11   Q    So, that is -- you've identified that, sir, as the

12   subject matter, correct?

13   A    Yes, sir.

14   Q    And then, if we look down further, we see two

15   additional rows for Aurora, only one of which is

16   highlighted, but both of which are identified as

17   undisclosed.  Do you see that?

18   A    I do.

19   Q    And --

20              THE COURT:  I'm sorry.  I'm just not following

21   you.

22              MR. SHUSTER:  I'm sorry, Your Honor.

23              THE COURT:  We're going to have to come up with a

24   better --

25              MR. SHUSTER:  It's the --
```

1          THE COURT:  Okay, okay, but there -- okay.

2          MR. SHUSTER:  This is seventh and eighth rows --

3          THE COURT:  Okay.

4          MR. SHUSTER:  -- and in the first column, creditor

5     account number, there is the word undisclosed --

6          THE COURT:  Okay.

7          MR. SHUSTER:  -- in both of those lines.

8          THE COURT:  One is Aurora and one is Bank of

9     America?

10         MR. SHUSTER:  Yes.

11         THE COURT:  Okay.

12    Q    Do you understand, Mr. Grice, that those words,

13    undisclosed, were put there by someone involved in the

14    Trustees' loan and review process and were not there on the

15    credit report that was pulled originally?

16    A    That's my understanding.

17    Q    And so, if you would look at the opened column, you'll

18    see that the opened date that's given is May of '04,

19    correct?

20    A    Correct.

21    Q    And the subject that was June of '04.

22    A    Correct.

23    Q    So, if the Trustees are correct that these two lines in

24    the credit report reflect undisclosed debt of the borrower,

25    then that debt would have predated at least the signing of

Page 43

1    the loan application by a month?

2    A    Yes, sir.

3              THE COURT:  Can I ask a question, because I'm not

4    following this.  You established by looking at the loan

5    application that June 4 was the date that the loan

6    application was signed.  Now we're looking at these two

7    loans that were marked undisclosed, right?

8              MR. SHUSTER:  Yes.

9              THE COURT:  And the opened column, which is the

10   fourth column over, fifth column over, it says opened, O-P-

11   N-D, right?

12             MR. SHUSTER:  Yes.

13             THE COURT:  And they say May 4, okay?

14             MR. SHUSTER:  Correct.

15             THE COURT:  What is there that tells when any of

16   these loans closed?

17             MR. SHUSTER:  Well --

18             THE COURT:  That's question number 1.  And

19   question number 2 is, Mr. Grice, do you have an

20   understanding of the other notations on the rows for each of

21   the two loans that are indicated to be undisclosed?  The

22   Aurora Bank loan says transferred conventional real estate

23   mortgage, and the Bank of America loan says transferred.

24   So, I just would love to have a better understanding of what

25   I'm looking at here.

Page 44

1          MR. SHUSTER:  Understood.

2          MR. GRICE:  And I can't give you an accurate

3     answer, Your Honor, of -- each one of these credit bureaus

4     uses very specific vocabulary and very specific code

5     language.  So, I don't have an interpretation that I can

6     offer.

7     Q    Do you know, sir, whether the expression transferred

8     conventional real estate mortgage indicates that the

9     mortgage was originated or not originated by Aurora, or

10    might been transferred to Aurora from another entity?  Do

11    you know?

12    A    I'm not sure what you're asking.  I'm sorry.

13    Q    Well, can you tell from the words transferred

14    conventional real estate mortgage whether Aurora was the

15    originator or whether another bank -- another entity might

16    have been the originator?

17    A    I can't tell specifically.

18    Q    And then --

19          THE COURT:  Can you -- I mean, can you tell, on

20    this kind of a credit report, the -- first of all, what's

21    ECOA, the column that's farthest to the left?  What does

22    ECOA stand for?  Do you know?

23          MR. GRICE:  That's the Equal Credit Opportunity

24    Act.  So, it's a -- this is a flag on the credit report for

25    loans that would be subject to the terms of the ECOA.

Page 45

 1                THE COURT:  Okay.  And then creditor and account

 2     number.  And what's RPTD?  Seems like it's a shortened

 3     version of reported.  What does that refer to?

 4                MR. GRICE:  In my -- again, each bureau is

 5     different, but typically, that's the date that the bureau

 6     last received a report from a creditor about that account.

 7                THE COURT:  Okay.  And then what's the last

 8     column, last ACT?

 9                MR. GRICE:  I don't know how this firm is using

10     that phrase.  Sometimes there are glossaries attached, and I

11     don't believe we have one here.

12                THE COURT:  Okay.  And opened -- what does that

13     mean?

14                MR. GRICE:  That's the month that the

15     relationship, the credit was born, according to the credit

16     bureau.

17                THE COURT:  Okay.  Thank you.  Go ahead Mr.

18     Shuster.

19                MR. SHUSTER:  Thank you, Your Honor.

20     Q    I'll note, Mr. Grice -- not to complicate matters --

21     but that there is a further debt that seems to be a post-

22     closing mortgage debt on 8/4.  Do you see that?  That's

23     above the first undisclosed loan.

24     A    I'm sorry.  So, you're trying to point out that in the

25     row above the first undisclosed row, there is an -- you're

Page 46

1   saying it's an additional undisclosed debt?

2   Q    Well, it's an additional debt.  It's post-closing,

3   right?

4   A    Correct.  This would be August of '04.

5           THE COURT:  Okay.  But we -- I'm sorry.  I don't -

6   - do I have in the record when this loan -- when the subject

7   loan --

8           MR. SHUSTER:  Subject loan.

9           THE COURT:  -- closed?

10          MR. SHUSTER:  Yes.  Yes, so if Your Honor turns to

11  Page 24 at the same tab, that has a note date of June 3,

12  2004, and on Page 27, it shows the borrower's signature.

13          THE COURT:  My question stands.  When did the loan

14  close?

15          MR. SHUSTER:  Well, I mean, I'm not going to --

16  I'll see if I can find something else.  We usually go by the

17  note date with the loan application, the final signed loan

18  application, because typically, those are executed at

19  closing.

20          MR. COSENZA:  Your Honor --

21          THE COURT:  Hello, Mr. Consenza.

22          MR. COSENZA:  -- (indiscernible) this is very

23  confusing.  We have an unsigned loan application.  We have a

24  signed loan application --

25          THE COURT:  Okay, hold on, hold on.  Why don't you

Page 47

1    come up?

2        (Bench Conference)

3    Q    Mr. Grice, is there a sort of an industry standard for

4    understanding when a mortgage closed?  Would that usually be

5    the note date?

6    A    I would not say there's a clear industry standard.  I'd

7    say there are at least two, maybe three, you know, the note

8    date.  If there are closing documents, and I don't see any

9    closing documents here, it may be that the application was

10   signed at the closing itself, which would not be uncommon.

11   Q    Very good.  So, we've identified, I think, the alleged

12   undisclosed debt, correct?

13   A    Obviously, there are data entries on both an audit

14   credit report from the future and from MERS that reflect

15   what may be undisclosed debt --

16   Q    Right.

17   A    -- a week to 10 days prior to June 3rd or June 4th.

18   Q    Right.  So, I'm glad you brought up -- I think I'm glad

19   you brought up the MERS credit report.  Let's have a look at

20   that, if we could, which is at Page 21 of 27.  So, there we

21   have -- so, would you identify what MIN stands for?

22   A    That's the mortgage identification number.  It's the

23   unique number for that mortgage.

24   Q    So, we see -- and we see the borrower's name there at

25   the -- for the subject property.  You see the subject

1     property address 5195?  It's the first one identified.

2     A     Oh, thank you.  Yes, sir.

3     Q     Primary borrower, and we see the borrower's name?

4     A     Yes, sir.

5     Q     And I'll just note over to the right there is a note

6     date.

7     A     Correct.

8     Q     So, what does that signify to you?

9     A     That's the date that MERS understands that there was a

10    note signed.

11    Q     Would the -- okay, so --

12    A     That's what's being reported by the lender to MERS as

13    the date of the obligation, ostensibly, I mean,

14    theoretically.

15    Q     Yes.  And then we see another line for the subject

16    property, and so we have again there the two tiers of

17    financing for that property, right?  The 142.4 and the 35.6

18    that we've seen previously on the loan application and on

19    the credit report?

20    A     Yes, sir.

21    Q     And then we see the property that is identified on the

22    loan application as the departing property, correct?  It's

23    the third address down.  You've got 5915, 5915, 4238.

24    A     This is the 4238 address, yes, sir.

25    Q     And that's the one that was identified as the borrowers

Page 49

1    departing property, and that was identified as the source of

2    rental income on Page 3 of the loan application that we

3    looked at together?

4    A     Correct.

5    Q     And then we had the property --

6              THE COURT:  Whoa, whoa, whoa, whoa, whoa, whoa.

7              MR. SHUSTER:  Sorry.

8              THE COURT:  Let's finish, okay?  We're at the

9    property that's 4238, right?

10             MR. SHUSTER:  Yes.

11             THE COURT:  And that's been flagged in the credit

12   report as undisclosed, yes?  No?

13             MR. SHUSTER:  No, it's the next one that's

14   undisclosed, the 42 --

15             THE COURT:  Okay, what's the 4238?

16   Q     The 4238, Mr. Grice, is identified in the loan

17   application as the borrower's current address, which is to

18   say the address he's departing, correct?

19   A     Correct.  I just observed that the note date for the

20   departing address is in the future.  It's two months after

21   the closing of the subject property.

22   Q     Right.  And there's a note amount there?

23   A     Of the 128?

24   Q     Right.

25             THE COURT:  Right.

Page 50

1   Q    So, do you think it's possible that that means that the

2   borrower refinanced that property?

3           MR. COSENZA:  Your Honor, I can object to every

4   one of these questions.  I don't want to bog things down,

5   but this calls for speculation, lack of foundation.  We

6   don't know what the borrower, where he was --

7           THE COURT:  Okay, well --

8           MR. COSENZA:  I could do this all -- I don't want

9   to interrupt all day.

10          THE COURT:  You need to ask a different question.

11  We're not going to ask whether he thinks -- I mean, it's

12  just --

13          MR. SHUSTER:  Okay.

14          THE COURT:  Okay?

15          MR. SHUSTER:  Yes.  An amount is -- that's fair.

16          THE COURT:  I'm glad you think so, Mr. Shuster.

17          MR. SHUSTER:  No, I don't -- I'm sorry, Your

18  Honor, I'm just -- I was a step back responding to Mr.

19  Consenza.  Anything you say is fair.

20          THE COURT:  I'm sure it is.

21  Q    So, let's -- you've noted that.  Mr. Grice, let's keep

22  going.  Then we have identified what the Trustees allege is

23  the undisclosed debt, right?

24  A    Yes, sir.

25  Q    That's the 1530?

1   A   Thank you.  Yes, sir.

2   Q   And there is another entry for 1530 on the next page?

3   A   Yes, sir.

4   Q   And both of those show a note date of May 21, 2004?

5   A   They do.

6   Q   And in the credit report, these mortgages were

7   identified as having been opened in May of 2004?

8   A   Yes.  That appears to be the same.

9   Q   Okay.  So, that's the basis for the Trustees' assertion

10  that there is an undisclosed debt, correct, those reports,

11  those entries in those reports?

12  A   That is the evidence they point to.  Yes, sir.

13  Q   So, before we get to your calculation of rental income

14  for the undisclosed property, do you accept, yes or no, that

15  the credit report and the MERS report, read together, make

16  it more likely than not that the borrower had undisclosed

17  pre-closing mortgage debt here?

18          MR. COSENZA:  Your Honor, just on that question, I

19  object to -- we've had all sorts of questions on the

20  reliability of these sources.

21          THE COURT:  Well, I'm going to overrule your

22  objection, Mr. Cosenza.  I mean, this goes to the heart of

23  the type of valuation that Mr. Grice was doing.

24          MR. COSENZA:  Thank you, Your Honor.

25          THE COURT:  Okay.  Could you repeat the question

Page 52

1      please, Mr. Shuster?

2              MR. SHUSTER:  Yes.

3      Q    So, before we get to your calculation of rental income

4      for this property --

5      A    Yes, sir.

6      Q    -- do you accept, yes or no, that the credit report and

7      the MERS report, read together, make it more likely than not

8      that the borrower had undisclosed pre-closing mortgage debt?

9      A    I can't go quite that far, and the reason is there are

10     some question raised by the MERS data.  I mean, for example,

11     if you'd notice between the 5195 address and the 4238

12     address and the 1530 address, the borrower name is

13     inconsistent.  It's Joseph in two instances and in the

14     undisclosed property it's -- I'm sorry, it's Joseph in the

15     two disclosed, and in the one undisclosed, or allegedly

16     undisclosed, it's Joe.  I don't know how to account for

17     that.

18              There's also an empirical question that could be

19     resolved.  Courthouses maintain copies of mortgage document

20     registration and would be the ultimate source, I think, for

21     whether the undisclosed debt in fact exists.  I don't have

22     that information for what the courthouse would have in Las

23     Vegas, but that would be a part of the analysis I'd want to

24     perform.

25     Q    So, you see a discrepancy between the names Joe and

Page 53

1    Joseph?  You acknowledge that debt amounts that are

2    reflected for the 1530 property are in the same amounts as

3    the debt amounts that are reflected on the audit credit

4    report, yes?

5    A    Yes, sir.

6    Q    And you also acknowledge that the audit credit report

7    was run based on the social security number of the person

8    named Joseph, correct

9    A    Yes, sir.

10   Q    Okay.  So, now, you then go on in your narrative to say

11   that the audit credit report does not -- by the way, do you

12   see any evidence that shows -- have you seen any evidence in

13   the file that shows that these are not debts of Joseph?

14   Anything to show that they're debts of another person?

15              MR. COSENZA:  Your Honor?

16              THE COURT:  I'm sorry.  Yes.

17              MR. COSENZA:  Just a side bar for one second on

18   this?

19              THE COURT:  Okay.

20              MR. COSENZA:  I don't want to -- because this

21   could affect the witness, I think it's --

22              THE COURT:  All right.

23         (Bench Conference)

24   Q    Mr. Grice, I asked you a question, which is do you see

25   any evidence that indicates that the alleged undisclosed

Page 54

```
 1   debt was undisclosed debt of another borrower?  Based at

 2   least -- I don't see in your narrative where you point to

 3   any such evidence.  Do you?

 4   A    I don't point in my narrative to whether another --

 5   whether it's disclosed or undisclosed debt of another

 6   borrower.  Just a -- I mean, it's a decidedly different

 7   question I'm answering, but I don't point to any evidence

 8   that there may be someone else who's obligated.

 9           Again, just to be clear, the mortgage record for

10   that alleged undisclosed property is sitting in a

11   courthouse.  I believe Las Vegas is not a courthouse.  It is

12   online and requires somebody to physically go to the Las

13   Vegas, and then pull the document.

14           What the mortgage which show is who has an

15   ownership interest.  It would not show us who is on the

16   note.  And so, in a perfect world, we would have access to

17   the note for the undisclosed property.  Those aren't public.

18   So, I can't come to a complete answer to that question.

19   Q    All right.  But my question was actually different.  My

20   question was in your narrative, you don't point to any

21   evidence that shows that the alleged undisclosed debt of

22   this borrower was in fact debt of another person, correct?

23   A    And I answer that, sir.

24   Q    And the answer is I'm correct?

25   A    Correct.
```

Page 55

1    Q    Good.  So, what you then do is you calculate fair

2    market rent on the undisclosed property, right?

3    A    Yes, sir.

4    Q    You don't know that the borrower rented out the

5    undisclosed property, correct?

6    A    There are many things we don't know.  That's one of the

7    things --

8    Q    Right.

9    A    -- we don't know.  That's one of the things --

10   Q    I'm just --

11   A    -- we don't know.

12   Q    -- focusing on what you don't know --

13   A    Yes, sir.

14   Q    -- with respect to the rent that you calculated though.

15   A    Yes.

16   Q    Okay?

17   A    It's an estimation.

18   Q    You don't know that the borrower rented out that

19   property, correct?

20   A    Correct.

21   Q    The borrower identified on the loan application a

22   property that he was renting out, right?

23   A    That's correct.

24   Q    Did not identify the property that is the subject of

25   the undisclosed debt on the loan application as a property

1    that he was renting out, correct?

2    A    That's correct.

3    Q    If he wanted to identify that property as a source of

4    rental income, he was certainly free to do so, correct?

5    A    Nothing bars him from that.

6    Q    And he does not do so?

7    A    It's not on the application, correct.

8    Q    Okay.  So, you then -- when you calculate undisclosed

9    debt, you go to some public source for that information?

10   A    The Department of Housing and Urban Development.

11   Q    Okay.  So, that just gives general statistics of rents

12   for that area?

13   A    By characteristics of the property.

14   Q    By characteristics of the property.  So, but that

15   doesn't identify that that borrower actually rented that

16   property at that price?

17   A    Exactly.

18   Q    Okay.  Now, then you go ahead and you point to

19   compensating factors, what you identify as compensating

20   factors, right?

21   A    Yes, sir.

22   Q    But if the loan underwriter didn't know about

23   undisclosed debt in the approximate amount of $177,000, he

24   could not have weighed that debt when assessing compensating

25   factors, correct?

Page 57

1    A    Or she.  Correct.

2    Q    Okay.  Incidentally, the plan administrator says that

3    the evidence -- in its response on this loan, says the

4    evidence is unreliable and insufficient because it relies on

5    an inadmissible, uncorroborated report, and it fails to show

6    undisclosed debt at origination.  Do you see that?

7

8    A    Yes, sir.

9    Q    When you said that you agree with the plan

10   administrator, I take it you are not opining that the

11   evidence is inadmissible in court?

12   A    I'm not an attorney, so I can't speak to the

13   admissibility of evidence.

14   Q    Let's go to the next loan, Mr. Grice, which is 7599.

15           MR. SHUSTER:  And for that, we will need TRDX-43.

16           THE COURT:  Ah.

17           MR. SHUSTER:  Upgrade here.  Thank you.

18           THE COURT:  Thank you.

19   Q    Mr. Grice?

20   A    Yes, sir.

21   Q    So, this is an occupancy -- alleged occupancy breach

22   put forward by the Trustees?

23   A    Yes, sir.

24   Q    And you agreed with the plan administrator's rejection

25   of this breach?

Page 58

1    A    Correct.

2    Q    So, let's look at the evidence, Mr. Grice.  In the

3    claim package, at Page 17, you'll find the loan application.

4    At least I hope you will.

5    A    Yes, sir.

6    Q    So, that -- the loan application shows the subject

7    property as in Arizona and the borrower's present address is

8    in Washington D.C., correct?

9    A    Yes, sir.

10   Q    And the borrower checks the box that the Arizona

11   property, which is to say the subject property, will be his

12   primary residence, correct?

13   A    Yes, sir.

14   Q    And he identifies his employer as a company in

15   Washington, D.C.?

16   A    Yes.

17   Q    And he signs the loan application on Janaury 27, 2005.

18   A    That's correct.

19   Q    And then if we go to Page 23 of the claim package,

20   that's an Accurint report?

21   A    Yes, sir.

22   Q    And that is run on the borrower's Social Security

23   number, correct?

24   A    Yes, sir.

25   Q    And there's -- both the subject property address

Page 59

1    (indiscernible) the borrower's existing address are

2    reflected on that report, correct?

3    A    Correct.  I believe the Trustees have put a circle

4    around the subject property and a box around the departing

5    property.

6    Q    Correct.  Thank you, sir.  And then there is another

7    Accurint report that appears at Page 25, correct?

8    A    Yes, sir.

9    Q    And that Accurint report has -- was also run on the

10   borrower's Social Security number, right?

11   A    Correct.

12   Q    And there the Trustee's loan reviewers placed a

13   rectangular box around the information relating to the

14   borrower's employer as it was identified on the January '05

15   loan application, right?

16   A    Yes, sir.

17   Q    And this associates the borrower with as general

18   manager of that entity from the period September of '04 to

19   July of 2012, correct?

20   A    That's what is stated on the page.

21   Q    And then if we turn to Page 29 -- just if the

22   borrower's still working in D.C., then it's hard to believe

23   that he was -- his principal residence was in Arizona,

24   correct?

25            MR. COSENZA:  Objection.  Calls for speculation.

Page 60

1          MR. SHUSTER:  I think it calls for the witness to

2     draw the same types of inferences he's been drawing from

3     other evidence.

4          THE COURT:  Ask the question a different way, Mr.

5     Shuster, please.

6     Q    Can you draw an inference, Mr. Grice, of the sort that

7     you say you can draw that the -- if the borrower was --

8     continued to be employed in Washington D.C., then a property

9     in Arizona was unlikely to be --

10         THE COURT:  Let me -- can I --

11         MR. SHUSTER:  -- his primary residence?

12         THE COURT:  Can you tell me direct, Mr. Grice, to

13    the specific piece of information from which you're asking

14    him to draw the inference that the borrower was employed in

15    Washington D.C.

16         MR. SHUSTER:  I'm looking at the Accurint report

17    that's at Page 25, Your Honor.

18         THE COURT:  Okay.  Page 25?

19         MR. SHUSTER:  Yes.  The rectangular box in the

20    middle of the page.

21         THE COURT:  Okay.  So, you're asking the witness

22    based on that can he draw a conclusion or does he have an

23    inference as to where the borrower was employed, right?

24         MR. SHUSTER:  Not as to where he was employed.  We

25    covered that, although I'm happy to have you answer that

Page 61

1    question, too.

2            THE COURT:  Well, I'm sorry, what was your

3    question?

4            MR. SHUSTER:  Was question was if the borrower is

5    in fact -- continued to be employed in Washington D.C. --

6            THE COURT:  Okay.  But that's what I'm trying to

7    get to.

8            MR. SHUSTER:  Yes.

9            THE COURT:  You are saying he was employed in

10   Washington D.C.

11           MR. SHUSTER:  Yes.

12           THE COURT:  My paycheck comes from Washington D.C.

13           MR. SHUSTER:  Yes.

14           THE COURT:  I'm obviously not there right now.

15           MR. SHUSTER:  Right.  But --

16           THE COURT:  So, that's what I'm asking for

17   clarification about.

18           MR. SHUSTER:  Right.  Okay.

19   Q    Well, can you conclude -- can you infer from the

20   Accurint report that identifies the borrower as the general

21   manager of JCC Georgetown from September '04 to -- from

22   September 2004 to July 2012, that he was employed by that

23   entity in that time period?

24   A    I could draw an inference of very low quality.  These

25   reports are very unreliable.  I hope I made that clear in

Page 62

```
 1   the direct.  Accurint reports are very unreliable.  So,

 2   there is some -- somebody is reporting a relationship

 3   between that employer and this individual .  As to where he

 4   -- and I -- separately, I don't see a claim for

 5   misrepresentation of employment.  If that's the issue, I'd

 6   like to see the evidence that gets to where he was actually

 7   employed.  Nevertheless, I can't conclude that there's a lot

 8   of inferential value in the Accurint report.

 9   Q    Well, let me just -- going to the other point that was

10   raised, that entity, JCC Georgetown, does that strike you as

11   a federal government entity, Mr. Grice?

12   A    I have no idea.  I mean, I'm not sure why you're asking

13   about that.  I -- it could be a federal agency.  I don't --

14   I'm not aware of a federal agency called that.  I just don't

15   know what that -- I don't know what JJC is, if it's a retail

16   establishment, the headquarters of a consulting firm.  I

17   just don't think you can draw strong inferences based on a

18   reporting -- a report that comes up through unknown source -

19   - undisclosed sources.

20   Q    Okay.  Well, let's look in the loan file excerpt, Mr.

21   Grice, for loan 7599 at Page 481 and 482.

22   A    Okay.  I see tax-related documents.

23   Q    Right.  So, Page 482, Mr. Grice, is a W-2.  You see

24   that?

25   A    Yes, sir.
```

Page 63

1    Q    For the borrower?

2    A    Yes, sir.

3    Q    From 2010?

4    A    Yes, sir.

5    Q    That was -- that identifies his employer as the entity

6    that he identified as his employer on the 2005 tax return,

7    correct?

8    A    Correct.

9    Q    And it shows $40,587 in income, right?

10   A    That's what it shows.

11   Q    And there's another document on the left that shows an

12   address in Virginia, correct, for this borrower?

13   A    Correct.

14   Q    And then let's flip forward one page to Page 483.

15   That's a tax return, right?

16   A    Yes, sir.

17   Q    That tax return shows the borrower's address in 2010?

18   A    In Virginia, yes, sir.

19   Q    And that address matches the 2010 W-2 that we saw on

20   just the prior pages, correct?

21   A    It does.

22   Q    Yes or no, you're unprepared to infer from that that

23   the borrower continued to reside and work in the D.C. area

24   in 2010?  Yes or no?  2005.

25   A    I thought I said --

Page 64

1        THE COURT:  Hold on.  Hold on.

2        MR. SHUSTER:  2005.

3        THE COURT:  Well, that --

4        MR. SHUSTER:  Well, either, all right?

5        THE COURT:  No.  But the --

6        MR. SHUSTER:  Are you prepared -- we'll do it --

7        THE COURT:  Break it down.

8        MR. SHUSTER:  -- one step at a time.

9    Q    Are you prepared to infer from those documents that the

10   borrower resided in the D.C. area in 2010?  Yes or no?

11   A    For at least some piece of a year, yes, sir.  He

12   generated income in 2010 in Virginia or from a Virginia

13   address.

14   Q    Now, let's look to a hardship letter at Page 342.  And

15   this hardship letter is dated 2012, correct?

16   A    Correct.

17   Q    Signed by the borrower?

18   A    Yes, sir.

19   Q    And he refers there to his 2010 tax return and he says

20   that the business that's referenced in that return was

21   closed in September 2010, correct?

22   A    Correct.

23   Q    And he says the reason for closing the business was

24   that, "We were planning to move to Arizona."  You see that?

25   A    I do.

Page 65

```
 1   Q    And yes or no, based on that evidence and the other

 2   evidence we've seen, you don't think it's fair to draw an

 3   inference that it's more likely than not that the borrower

 4   did not use the subject property in Arizona as his primary

 5   residence at the time of the loan or during the year

 6   thereafter?  Yes or no?

 7   A    Just give me the beginning of the question again,

 8   please?  Can I draw an inference about where he actually

 9   lived?

10   Q    Based on that evidence and the other evidence we've

11   seen, you don't think it's fair to drawn an inference that

12   it's more likely than not that the borrower did not use the

13   subject property in Arizona as his primary residence prior

14   to the date of his hardship letter?

15            THE COURT:  Mr. Cosenza?

16            MR. COSENZA:  I have a standing objection.  I

17   don't want to constantly interrupt Mr. Shuster.  It's -- the

18   questions continue to say based on evidence.  I just want to

19   make sure --

20            THE COURT:  Based on --

21            MR. COSENZA:  -- I want to make --

22            THE COURT:  -- based on the document that he's

23   pointing to right now.

24            MR. COSENZA:  Yeah.  I would just object that it's

25   not evidence in the technical evidentiary sense of -- I
```

1    think there's, you know, problems with the admissibility and

2    reliability of all of this and I just want to make sure

3    that's preserved.  I don't want to interrupt his question

4    every time.

5              THE COURT:  Okay.  You're -- I hear you.  You can

6    answer the question, Mr. Grice.

7              MR. GRICE:  Would you repeat it again, please,

8    sir?

9    Q    Yes.  Based on the evidence we've seen, hardship letter

10   and the other evidence we've seen, Mr. Grice, you don't

11   think it's fair to draw an inference that it's more likely

12   than not that the borrower did not use the subject property

13   in his -- in Arizona as his primary residence prior to the

14   date, say, of this hardship letter?  Yes or no?

15   A    The answer has to be no.  I can't draw --

16   Q    You can't draw that inference?

17   A    I can't draw any conclusions based on this evidence.

18   Q    And your conclusion -- your conclusions on this loan --

19   oh, sorry.  I skipped some evidence there.  Mr. Grice, let

20   me also direct your attention to -- I'm sorry.  Just give me

21   a moment.  Page 341 at the same tab.

22   A    3-4-1?

23   Q    Yes.  It's the page opposite the hardship letter.  Are

24   you --

25   A    Okay.

1    Q    -- are you prepared to draw an inference from this

2    letter, yes or no, that the borrower was using the property

3    in Arizona as a rental property?

4    A    In 2012, yes, sir.

5    Q    Yes.

6    A    Yes.  I will infer he was renting it as he says in the

7    letter in 2012.

8    Q    Let's look at Page 498, Mr. Grice.

9    A    I'm sorry.  Page 498.  Let me just take a minute and

10   read this.  It's a multi-page document, I presume.

11   Q    I'm just looking at the information on 498.

12   A    But that's part of a much larger document, I believe,

13   part of a 10-page -- no, it's part of a much larger -- an

14   18-page document.

15   Q    You with me, Mr. Grice?

16   A    I'm almost finished.  Another moment.  We're talking

17   about this exemption detail that appears on 498?  Is that

18   what you're --

19   Q    I'm -- yeah, I'm referring to the information that

20   suggests that a foster child was placed with the borrower by

21   a Maryland agency in 2010.  Do you see that?

22            THE COURT:  I think you misspoke.  Was placed in

23   2008.

24            MR. SHUSTER:  Sorry.  Thank you, Your Honor.  My

25   apologies.

Page 68

1          MR. GRICE:  I see that.  So -- and you're --

2     Q    Yes or no, this piece of evidence combined with the

3     other evidence we've seen doesn't enable you to draw an

4     inference that the borrower lived in Washington D.C. all the

5     way through to 2012 or some time in that time period and

6     never occupied the subject property in Arizona as his

7     primary residence in that time period?  Yes or no?

8          MR. COSENZA:  I object.  It's compound, vague.

9     There are three different questions in that question.

10         THE COURT:  The question is -- that Mr. Shuster is

11    asking Mr. Grice is whether, based on the evidence that he

12    has shown you today, whether you can draw an inference that

13    at no time from the origination of the loan through the

14    dates of these documents did the borrower occupy the subject

15    property in Arizona as his primary residence.

16         MR. GRICE:  Thank you, Your Honor.  No, I can't

17    draw that -- you're asking me for a conclusion.  I can't

18    draw that conclusion.

19    Q    Okay.  Now, you -- Mr. Grice, let's go back to --

20         THE COURT:  Mr. Shuster, now, I don't know if

21    you're moving on.  We're getting to the point where we have

22    to have a break.

23         MR. SHUSTER:  Yes.

24         THE COURT:  All right?

25         MR. SHUSTER:  I just will -- one or two more on

Page 69

1     this loan?

2              THE COURT:  Perfect.  Thank you.

3              MR. SHUSTER:  Thank you, Your Honor.

4     Q    Mr. Grice, let me direct your attention back to your

5     breach narrative.

6     A    Okay.  Yes, sir?

7     Q    You say in line 2 of your narrative, the Accurint

8     report also indicated that the borrower remained at his

9     employer, JJC Georgetown, until July 2012.  You see that?

10    A    Yes, sir.

11    Q    Your words that you wrote or somebody working under

12    your direction and supervision, correct?

13    A    Yes, sir.

14    Q    Okay.  You -- and that's the Accurint report, you

15    remember, that we looked at a few moments ago with the

16    rectangular box around the information that associated the

17    borrower with JCC Georgetown from September '04 until a date

18    in 2012.  Do you remember that?

19    A    Yes, sir.  I agree that there was an association until

20    2012.

21    Q    Good.  And then you go on to say in your narrative, "It

22    does not indicate if this was continuous employment or if

23    the employer also had an Arizona location."  You see that?

24    A    I do.

25    Q    So, you're questioning whether JCC -- you understand

Page 70

1    that Georgetown is in Washington D.C.?

2    A    I've lived there.  Yes, sir.

3    Q    Okay.  So, you're suggesting that maybe JCC Georgetown

4    --

5              THE COURT:  Mr. Shuster, I'm going to correct you.

6    It's not JCC.  They're -- we're not talking about the Jewish

7    Community Center, okay?  It is --

8              MR. SHUSTER:  I'm sure they have one, though.

9              THE COURT:  The undoubtedly do, but Mr. Grice has

10   gotten it right.  It's JJC --

11             MR. SHUSTER:  JJC Georgetown.  Thank you, Your

12   Honor.

13   Q    You're questioning whether it's possible, as part of

14   your breach narrative that forms the basis for your opinion

15   that the Trustee's breach review is unreliable.  You're

16   suggesting that we don't know -- that it's somehow relevant

17   and possible that JJC Georgetown has an Arizona location,

18   right?

19   A    I say that as one --

20   Q    Okay.

21   A    -- possible consideration.  Yes, sir.

22   Q    Yes, you do.  Do you have any basis whatsoever to

23   believe that JJC Georgetown does have an Arizona location?

24   A    Sitting here, no.

25   Q    Did you ever look that up?

Page 71

1          THE COURT:  Hold on.  Mr. Cosenza.

2          MR. COSENZA:  We've gotten to the point of

3   argumentative and --

4          THE COURT:  I'm going to allow it.  Mr. Shuster's

5   just asking follow-up questions.  Go ahead.

6   Q    Did you -- since you posited the question, did your

7   team make any attempt to ascertain whether JJC Georgetown

8   has a location in Maricopa, Arizona?

9   A    No, sir, nor do I see an affidavit that they don't have

10  one.

11  Q    Thank you.  No, but that's not the question.

12         THE COURT:  Okay.

13  Q    What else you didn't see is not the question.  My

14  question was given the fact that you raised the point

15  whether your team troubled itself to follow up on that

16  point.  Is the answer no?

17  A    I don't have evidence that demonstrates a JJC business

18  location in Maricopa.

19         MR. SHUSTER:  All right.  Good time for a break if

20  --

21         THE COURT:  Okay.  Great.  All right.  So, 15

22  minutes?  Is that all right?

23         MR. COSENZA:  That would be great, Your Honor.

24         THE COURT:  Okay.  So, let's come back at 20

25  minutes before the hour.

Page 72

```
 1                MR. SHUSTER:  Thank you.

 2                THE COURT:  Thank you.

 3         (Recess)

 4                THE COURT:  Mr. Shuster?

 5                MR. SHUSTER:  I have no further questions for Mr.

 6     Grice.

 7                THE COURT:  Okay.  Thank you.

 8                MR. COSENZA:  Your Honor, could we have a few

 9     minutes to get our documents together then?

10                THE COURT:  Yes, of course.  Can I not leave?  I'm

11     going to not leave.

12                MR. COSENZA:  Okay.

13                THE COURT:  How -- well, quantify a few.  If you

14     really mean ten then --

15                MR. DAVIS:  Yeah.  I think it would be better if

16     we took the lunch break and -- would that be all right if --

17     and then came back?

18                THE COURT:  That's as they say a horse of a

19     different color.  Okay.  We can take the lunch break now.  I

20     have a conference call I have to be on at 2:00.  If we're

21     not done by 2:00, I can be on the call for about 15 minutes

22     and then we can come back in and resume.  So, I don't know

23     how much you have.

24                MR. COSENZA:  It will be short, yes.

25                MR. DAVIS:  We'll be done before 2.
```

Page 73

```
 1              THE COURT:  You'll be done by then.  Okay.  So,
 2    how much tmie would you like then?
 3              MR. DAVIS:  20 minutes?
 4              MR. COSENZA:  Half an hour?
 5              THE COURT:  Okay.  Half an hour or at the latest
 6    we'll resume at 12:30?
 7              MR. COSENZA:  Yes.  That would be great, Your
 8    Honor.  Thank you.
 9              THE COURT:  All right?  Okay.  Very good.
10              MR. SCHUSTER:  Thank you, Your Honor.
11         (Recess)
12              THE COURT:  Yeah, so on the scheduling issue, it's
13    been brought to my attention that you folks would like to be
14    here on the 18th?  Maybe like is too strong a word.  Need to
15    be here on the 18th.  It's fine with us.  We had a
16    confirmation hearing scheduled for that morning but we'll
17    move it.
18              MR. DAVIS:  Thank you, Your Honor.
19              THE COURT:  All right?  So, as we go through next
20    week maybe we'll be able to size the amount of time that you
21    think you might need on the 18th so we can be more efficient
22    about it.  Okay.  All right, Mr. Davis.  I'm ready when you
23    are.
24              REDIRECT EXAMINATION OF CHARLES GRICE
25    BY MR. DAVIS:
```

Page 74

1    Q    Mr. Grice, can I -- may I ask you to take out the

2    binder that is the Grice expert reports binder and that has

3    your expert reports in it?

4    A    Yes, sir.

5    Q    (Indiscernible) Trustees.  Would you tell me please

6    what the first document in this binder is?

7    A    The first tab is my affirmative report from June 1 of

8    this year.

9    Q    Okay.  And may I ask you to turn to Tab C?

10   A    This is the documents relied upon for that same

11   affirmative report.

12   Q    And is this a list of the documents you relied upon in

13   forming your opinions in this case?

14   A    Yes, sir.

15   Q    Do you see there is a category that begins on the first

16   page of that document that is labeled underwriting

17   guidelines and product profiles?

18   A    Yes, sir.

19   Q    It continues on for about another page and a half.  Do

20   you see that?

21   A    I do.

22   Q    And are these documents on which you relied in forming

23   your opinions?

24   A    They are.  Yes, sir.

25   Q    And do these include the underwriting guidelines for

Page 75

1    the loans at issue in the case?

2    A    Correct.

3    Q    I'm going to ask you to turn to or pull out TRDX-30,

4    which is a spreadsheet concerning one of the loans Mr.

5    Shuster asked you about.

6    A    The 8455?

7    Q    8455, correct.  Do you have that?

8    A    I do.  Yes, sir.

9    Q    Remember, this was a loan involving a Las Vegas

10   property?

11   A    Yes, sir.

12   Q    And do you remember Mr. Shuster asked you a series of

13   questions in the beginning of your examination that related

14   to pairing two pieces of information, a MERS report and an

15   audit credit report?  Do you recall that?

16   A    I do.

17   Q    If you direct your attention to claimant's factual

18   basis, did the Trustee cite the audit credit report in their

19   factual basis for this claim?

20   A    No, sir.

21   Q    Could you turn to TRDX-43, which is the spreadsheet for

22   the loan ending in 7599?

23            THE COURT:  I'm sorry.  Where can I find that, Mr.

24   Davis?

25            MR. DAVIS:  It's in a pull-out, I think,

Page 76

1    spreadsheet --

2              THE COURT:  Right, but attached to which loan is

3    it?

4              MR. DAVIS:  7599.  I think it was delivered

5    separately by Mr. Shuster.

6              MR. GRICE:  Joe, I have an extra one if you want

7    to give it.

8              THE COURT:  I have it.  Thank you.

9              MR. DAVIS:  You have it?  Okay.

10   Q    Mr. Grice, do you recall that in connection with this

11   loan Mr. Shuster showed you some tax documents?

12   A    Yes, sir.

13   Q    Do you recall that he showed you a hardship letter?

14   A    I do.

15   Q    That he showed you some documents related to rental

16   lease matters?

17   A    Yes, sir.

18   Q    And some other tax-related documents?

19   A    I do.

20   Q    Would you direct your attention to claimant's factual

21   basis and let me know whether any of those documents were

22   cited by the Trustee when they brought this claim?

23   A    Yeah, the only references in the factual basis are to

24   the Accurint search, the hardship letter, and the audit

25   credit report.

Page 77

1   Q    Thank you.  Now, I have another document to show you in

2   connection with this loan.

3          MR. DAVIS:  Your Honor, may we approach and

4   distribute it?

5          THE COURT:  Yes.  Thank you.

6          MR. GRICE:  Thank you.

7   Q    Now, Mr. Grice, you recall this is a misrepresentation

8   of occupancy claim?

9   A    Yes, sir.  This is the JJC --

10  Q    I guess I would prefer not to say the name of --

11  A    Oh, I'm sorry.

12  Q    That's all right.

13  A    Forgive me.  My mistake.

14  Q    That's all right.

15  A    Yes, sir.

16  Q    But, it's about a borrower who was purchasing a

17  property in Arizona.  Do you recall that?

18  A    Yes, sir.

19  Q    And I put in front of you a document from the loan file

20  for this particular borrower.  Did the Trustee show you this

21  document?

22  A    They did not.

23  Q    Is this document in the Trustee's claim file?

24  A    No, sir.

25  Q    Okay, Mr. Grice.  I want to take you back to a document

Page 78

1    -- a loan that was discussed yesterday and I'm going to ask

2    you to take out our binders for this loan, so it's the one

3    that you had in the direct.

4              THE COURT:  He probably -- Mr. Grice probably

5    doesn't begin to know where to find those.

6              MR. DAVIS:  That's a good question.

7              MR. GRICE:  Those went away.

8              MR. DAVIS:  We'll hand you some new ones.

9              MR. GRICE:  Thank you.

10             THE COURT:  Which of the binders, Mr. Davis; do

11   you know?

12             MR. DAVIS:  Well, we're going to start in Tab 4.

13             THE COURT:  Is that Binder 1?

14             MR. DAVIS:  That would be Binder 1, yes.

15             THE COURT:  Thank you.

16             MR. DAVIS:  Unfortunately, I have a mega set of

17   the combined.

18             THE COURT:  Yeah.  So, they look like this.  You

19   have it?

20             MR. GRICE:  I do.

21             THE COURT:  Okay.

22             MR. GRICE:  It was just provided by counsel.

23             THE COURT:  Okay.

24   Q    Mr. Grice, do you recall yesterday speaking with Mr.

25   Shuster about the loan ending in 3811?

Page 79

1    A    I do.

2    Q    Okay.  May I ask you to turn to Page 17 of 73 --

3    A    Yes, sir.

4    Q    -- in Tab 4, which is PA Exhibit 626?  Do you have that

5    in front of you?

6    A    I do.  Yes, sir.

7    Q    Did Mr. Shuster discuss this with you yesterday?

8    A    Yes.  We went through this.

9    Q    Okay.  Would you take a look at the bottom two-thirds

10   of the document?  What is it that's noted there about the

11   borrower's credit score?

12   A    So, this is in the underwriter comments section of the

13   underwriter -- I'm sorry, the uniform underwriting and

14   transmittal summary.  And it provides, as is common, the

15   three credit scores for this borrower.  The low score is

16   682, which is about -- I think the high end of the range of

17   the national average, then 700 and 718.

18   Q    Okay.  Did Mr. Shuster discuss these credit scores with

19   you yesterday?

20   A    No.  We didn't have a chance to discuss it.

21   Q    Okay.  What does the borrower's credit score tell you

22   here?

23   A    It's very strong.

24   Q    Okay.  Can I ask you to turn back a few pages?  We're

25   going to look at that bankruptcy filing that you saw

Page 80

1    yesterday, statement of financial affairs --

2    A    Yes, sir.

3    Q    -- which begins on Page 40 of 73.  Do you see that?

4    A    I do.

5    Q    Do you recall discussing this document with Mr.

6    Shuster?

7    A    Yes, sir.

8    Q    Do you recall discussing on Page 41 of 43 the child

9    support information that's indicated there?

10   A    Yes, sir.

11   Q    Does this document tell us when in the period of 2000

12   to 2007 that child support came in the door?

13   A    No.  It just provides a range.

14   Q    Did the Trustees reference the child support payments

15   in their claims submission?

16   A    They did not.

17   Q    Please turn to Page 45 of 73, if you would?

18   A    Yes, sir.

19   Q    You see at the -- in the top half of the page what is

20   referenced there?

21   A    I do.

22   Q    And what is it?

23   A    The -- in this case the applicant for the bankruptcy,

24   the petitioner, or our borrower, is describing that she

25   operated a child care business between 2005 and 2006.

Page 81

```
 1    Q    Did the Trustees reference this business as a source of

 2    income potentially in their claims submission?

 3    A    No, sir.

 4    Q    Did Mr. Aronoff reference this fact in his discussion

 5    of this loan?

 6    A    I believe no.

 7    Q    Mr. Grice, I'm going to ask you to take a look at

 8    another document we have in redacted form.

 9    A    Did you say redacted or --

10    Q    Redacted.  We're going to hand you a redacted document.

11    A    Thank you.

12    Q    Mr. Grice, what is this -- this is, by the way, PA

13    Exhibit 3811-K.  Mr. Grice, what is this document?

14    A    This is a 1099, you know, a federal tax reporting form

15    prepared by a payer.  In this case the Michigan Department

16    of Human Services paid the borrower in this transaction 2000

17    -- and I think it's 35 dollars in miscellaneous income

18    during 2008.

19    Q    Is this a document the Trustees reference in their

20    claims submission?

21    A    No, sir.

22    Q    Mr. Grice, I'd like you to turn to Tab 51 of our

23    binder.

24    A    Do you know which number that is?

25    Q    It's in Binder 3.
```

Page 82

1   A      Okay.   Thank you.

2   Q      It's almost the last thing, I believe.

3   A      Yes, sir.

4   Q      Do you recognize this document, Mr. Grice?

5   A      I do.

6   Q      And what is it?

7   A      This is the borrower for the loan ending in 31 -- 3811.

8   It's her request for modification and affidavit under the

9   Making Home Affordable Program, so it's a request for a

10  modification dated in 2010.

11  Q      Now, Mr. Shuster didn't show you this document

12  yesterday, did he?

13  A      I don't believe so.   No, sir.

14  Q      And is this document referenced in the Trustee's

15  submission?   That's at Tab 39, if you'd like to check.

16  A      No, sir.

17  Q      Mr. Grice, what does this hardship document tell us

18  about this borrower?

19  A      You can learn quite a bit.   I can't use her name.

20  She's applying for a -- obviously a modification.   This is a

21  questionnaire prepared by the Federal HAMP program, I

22  believe.   And she fills out -- she's requested to fill out

23  or complete a number of boxes.   There's a commentary at the

24  bottom -- well, there are four questions -- four boxes at

25  the bottom of this page.   Like in Page 1 of 4 she checks

Page 83

```
1    three of them, the first being that "My household income has

2    been reduced," the second "My monthly debt payments are

3    excessive."  I'm only reading a few words.  The third is,

4    "My expenses have increased."  And then she provides

5    "other."  This continues onto the next page where she

6    prepares a budget and then on Page 3 of 4 there's a -- quite

7    an extensive acknowledgement and agreement where she attests

8    to the accuracy under penalty of perjury of all the

9    information and documents, that they're truthful, the events

10   identified are accurate, et cetera, and she understands that

11   this -- there are serious consequences for misrepresenting

12   information on this report.

13   Q    Mr. Grice, remind us, what was the type of breach claim

14   on this loan?

15   A    It was a misrepresentation of income.

16   Q    Mr. Grice, do you have an understanding of the current

17   status of this loan?

18   A    I do.

19   Q    And what is it?

20   A    It's performing.  She's paying as agreed under the

21   terms of the modification.

22           MR. DAVIS:  Thank you.  No further questions.

23           THE COURT:  Thank you.

24           MR. SHUSTER:  Five minutes?

25           THE COURT:  Sure.
```

1            MR. SHUSTER:  Please?

2            THE COURT:  I'm just going to stay put.

3            MR. SHUSTER:  Okay.

4            THE COURT:  Okay?

5            MR. SHUSTER:  Thank you, Your Honor.  I don't

6     think I have anything.  Thank you.

7            THE COURT:  Okay.  Thank you.  All right.  So, Mr.

8     Grice, thank you very much.

9            MR. GRICE:  Thank you.

10           THE COURT:  You may step down.  So, we have

11    nothing more for today?

12           MR. COSENZA:  I believe so, Your Honor.

13           THE COURT:  Okay.

14           MR. COSENZA:  And Monday we'll start with

15    (indiscernible).  We'll stand down in our affirmative case

16    and --

17           THE COURT:  Okay.  So, you're -- so, just for the

18    record, so the plan administrator has as of now completed

19    its affirmative case?

20           MR. COSENZA:  Pending the issue we've raised with

21    Mr. Castro due to his health issue.  He'll be --

22           THE COURT:  Understood.

23           MR. COSENZA:  -- coming in part of our rebuttal

24    case.

25           THE COURT:  Okay.  All right.  So -- and on Monday

Page 85

1    at 10:00 we will begin with Mr. --

2              MR. SHUSTER:  Esses.

3              THE COURT:  -- Mr. Esses.  Okay.  Very good.

4              MR. SHUSTER:  Thank you, Your Honor.

5              THE COURT:  Okay.  Thank you.

6              MR. DAVIS:  Thank you.

7              THE COURT:  Have a good weekend.

8              MR. DAVIS:  Thank you.

9              (Whereupon these proceedings were concluded at

10   12:52 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 86

C E R T I F I C A T I O N

1

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

# Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2017.12.08 15:04:36 -05'00'

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  December 8, 2017