Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS INC.,   Case No. 08-13555-scc

7                 Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                        United States Bankruptcy Court

11                        One Bowling Green

12                        New York, New York 10004-1408

13

14                        December 18, 2017

15                        10:20 AM

16

17

18

19

20

21

22

23   B E F O R E:

24   HON. SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

1    IN RE:   RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Dawn South and Sherri L. Breach

Page 3

1    A P P E A R A N C E S :

2    WILKIE FARR & GALLAGHER LLP

3         Attorneys for the Plan Administrator

4         787 Seventh Avenue

5         New York, NY 10019-6099

6

7    BY:  TODD G. COSENZA, ESQ.

8         BENJAMIN P. MCCALLEN, ESQ.

9         JOSEPH G. DAVIS, ESQ.

10

11   HOLWELL SHUSTER & GOLDBERG LLP

12        Attorneys for the Trustees

13        750 Seventh Avenue, 26th Floor

14        New York, NY 10019

15

16   BY:  MICHAEL S. SHUSTER, ESQ.

17        DWIGHT A. HEALY, ESQ.

18        NEIL R. LIEBERMAN, ESQ.

19        DANIEL P. GOLDBERG, ESQ.

20        BENJAMIN F. HEIDLAGE, ESQ.

21

22

23

24

25

1    ROLLIN BRASWELL FISHER LLC/PARTNER

2         8350 E. Crescent Parkway

3         Suite 100

4         Greenwood Village, CO 80111

5

6    BY:   MICHAEL ROLLIN, ESQ.

7         MARTIZA DOMINGUEZ BRASWELL, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2              THE COURT:  Lehman folks, you can get in place,

3    I'll come back in five minutes and we'll get started.

4         (Recessed at 10:20 a.m.; reconvened at 10:26 a.m.)

5              THE COURT:  How's everyone?

6         (A chorus of good)

7              THE COURT:  Where is Mr. Aronoff?

8              MR. DAVIS:  Mr. Aronoff is coming up, we have a

9    few extra tabs to pass out --

10             THE COURT:  Okay.  Please, Mr. Aronoff, come on

11   up.

12             MR. DAVIS:  These are tabs for the large binder.

13             THE COURT:  Thank you.

14             MR. DAVIS:  Of the four.

15           JAMES H. ARONOFF, WITNESS, PREVIOUSLY SWORN

16             THE COURT:  Okay.  Mr. Aronoff, today is the day.

17   We're going to -- you're going to be released.  I hope you

18   had a good weekend.

19             THE WITNESS:  Thank you.  Before we start could I

20   just get a water?  Is there any water?  Thank you very much.

21   Thanks.

22             THE COURT:  Are you situated with your binders?

23             THE WITNESS:  I believe everything is where I left

24   it.

25             THE COURT:  Okay.

Page 6

1           THE WITNESS:  Except for this new stuff.

2           THE COURT:  Okay.  All right.  Everyone set?

3    Okay, Mr. Davis, go ahead.

4           MR. DAVIS:  All right.

5                   CROSS-EXAMINATION

6    BY MR. DAVIS:

7    Q    Good morning, Mr. Aronoff.

8    A    Good morning.

9    Q    I want to start with an exhibit that you were shown by

10   Mr. Shuster last week.  This is TRDX-213, which is up on the

11   screen.  It's also in your binder if you need to see it in

12   paper.  But, Mr. Aronoff, who created this demonstrative?

13   A    I don't know.

14   Q    Okay.  And this demonstrative has kind of two halves,

15   right, the top and the bottom.  Would you remind us since

16   it's been a few days, what is Aronoff Exhibit 4?

17   A    It's an exhibit to my affirmative report in which all

18   the misrepresentation of income breach findings are

19   summarized and certain additional information regarding

20   those breach findings is also included in that exhibit.

21   Q    Okay.  And what is the claim tracking spreadsheet?

22   A    My understanding is the claim tracking spreadsheet is a

23   document that was required to be submitted -- required under

24   the protocol to be submitted with each of the claims that

25   were submitted thereunder.

Page 7

1   Q    Okay.  So it was a document by which the parties

2   exchanged information during the protocol; is that fair?

3   A    Yes.

4   Q    Now, last week Mr. Shuster asked you with reference to

5   this exhibit, he said, so the information that's in Column

6   C, D, and G in Exhibit 4 are taken from the claims tracking

7   spreadsheet.  And I think you responded, yes, I see that.

8   Do you recall that exchange?

9   A    Not specifically.

10  Q    Okay.  Do you have any understanding of the purpose of

11  putting an excerpt from the claim tracking spreadsheet

12  underneath an excerpt of your Exhibit 4?

13  A    I think the purpose was to provide guidance and an

14  understanding of where certain data points that were

15  included in the exhibit were initially provided to the plan

16  administrator.

17  Q    Okay.  But Exhibit 4 was not created by extracting data

18  from the claims tracking spreadsheet, right?

19  A    I don't know that to be the case.

20  Q    Exhibit 4 is your exhibit, correct?

21  A    Exhibit 4 is my exhibit, that's correct.

22  Q    Do you know how data was extracted to create your

23  Exhibit 4?

24  A    My understanding is that Duff & Phelps extracted the

25  relevant data from, for lack of the better term, the

Page 8

1   database in which this data resided.

2   Q    Right.  And that database that you're referring to is

3   not the claims tracking spreadsheet is it?

4   A    It's the same database in which the information was in

5   the claims tracking data sheet was -- resides as well.

6   Q    I'm sorry, but that's not the question I asked.

7   Exhibit 4 was not extracted -- the data for Exhibit 4 was

8   not extracted from the claims tracking spreadsheet, correct?

9   A    As I said, I don't know that to be the case or not.

10  Q    You just told me that the data for Exhibit 4 was

11  extracted from a different database.  Isn't that what you

12  just said?

13  A    No, I don't think I did.

14  Q    Was the data for Exhibit 4 extracted from a different

15  database not from the claims tracking spreadsheet?

16  A    I asked for data to populate the fields in Exhibit 4.

17  That was the same data that was provided pursuant to the

18  protocol.  Where exactly that data was extracted from by

19  Duff & Phelps to prepare the exhibit I'm not entirely sure.

20  Q    Mr. Aronoff, in your deposition didn't you tell me that

21  the data for Exhibit 4 was extracted from a different

22  database?

23  A    My understanding is that the data that was -- the

24  source of data for the claim tracking spreadsheet was the

25  same database that was used to prepare the data points in

1   the exhibit.  But since I didn't physically create Exhibit 4

2   I'm somewhat uncertain as to what the priority of creation

3   of Exhibit 4 was.

4        I understand and I have for reason not to believe that

5   all of the same data was used in the claim tracking

6   spreadsheet, Exhibit 4, and resides in the database, but I

7   didn't create the exhibit.

8   Q    Okay.  So if there were differences between the claim

9   tracking -- the data in the claim tracking spreadsheet and

10  your Exhibit 4 that would be a problem for you wouldn't it?

11  A    It wouldn't be a problem for me, no.

12  Q    So you don't care with the data in the claims tracking

13  spreadsheet is the same as the data in Exhibit 4?

14  A    I'm not so long as it's the same -- they're all from

15  the same database and the data was extracted and it's the

16  same data, no.  I don't necessarily care whether the

17  sequence of events to prepare Exhibit 4 meant someone looked

18  at the claim tracking spreadsheet and extracted it from

19  there or they chose to extract the very same data from the

20  database that was used to create the claim tracking

21  spreadsheet.  No, I don't care.

22  Q    So if the data in the database from which your Exhibit

23  4 was extracted differs from the data that's in the claims

24  tracking spreadsheet that's of no moment to you?

25  A    Only to the extent that I wanted to make sure that the

Page 10

1   information in Exhibit 4 was information that had been

2   previously provided to the PA.  And to the extent there was

3   a difference that might not be the case.

4   Q    So the data in Exhibit 4 was extracted from a database

5   called Team Connect; is that right?

6   A    Some of it was.

7   Q    Okay.  And you didn't recheck the data from that

8   database, that Team Connect database when you imported it

9   into Exhibit 4 or any other of your exhibits, right?

10  A    No, that's not correct.

11  Q    Okay.

12        MR. DAVIS:  Your Honor, I'd like to read pages 405

13  beginning at line 15, to 406 ending at line 9.

14        THE COURT:  Okay.

15        MR. DAVIS:  Of his deposition.

16  BY MR. DAVIS:

17  Q    Okay.  Question, "I'm not talking about the QC process,

18  I'm talking about for purpose of constructing this chart.

19  What did you do to verify that the information was

20  accurately captured in this chart that is Exhibit 4?"

21        Answer, "To the extent the data was accurate in the

22  database it was the same data, it was all extracted and

23  stored in the same -- in the same database provided by the

24  QC firm that was checked before it was entered into Team

25  Connect into whatever form that was done.  It was further

Page 11

1    QC'd by the QC process that was included in the claims

2    package as the same information that was extracted from the

3    database to prepare this summary report."

4        Is that a question I asked and an answer you gave?

5            MR. SHUSTER:  Excuse me, objection.  The question

6    and answer Mr. Davis is reading is not inconsistent with the

7    answer that the witness just gave in his trial testimony.

8    So it's not clear if he's trying to impeach the witness, but

9    it's -- they're not inconsistent.

10            THE COURT:  Could you put that back up again?

11   Someone took the -- I think it is inconsistent actually.  If

12   you'd like me to explain how I'd be happy to do that.

13            MR. SHUSTER:  No, I'm happy to just be overruled

14   and leave it at that.

15            THE COURT:  Overruled.

16            MR. SHUSTER:  Thank you, Your Honor.

17   BY MR. DAVIS:

18   Q    Now, Mr. Aronoff, you did not provide that underlying

19   database to us when you issued your reports did you?

20   A    No.

21   Q    And as far as you know the database from which the data

22   were extracted for your exhibits was never produced to the

23   plan administrator, right?

24   A    I know significant portions of that data were in fact

25   provided to the plan administrator.

Page 12

1   Q    But don't know that the database was provided do you?

2   A    I just -- no, I don't.

3   Q    Mr. Aronoff, you're not offering any opinions on loss

4   calculations, correct?

5   A    I'm sorry, on what?

6   Q    Loss calculations.

7   A    No, I'm not.

8   Q    And you're not offering any opinion on statistical

9   sampling methodologies are you?

10  A    That's correct, I'm not.

11  Q    And you haven't amended your expert report since the

12  summer; is that right?

13  A    That's correct.

14  Q    Okay.  All right.  Now, I'd like to take a look at

15  Exhibit 4 in a little more detail, and you'll find an

16  excerpt of it in your binder, your large binder at tab 4.

17  And we'll put it on the screen too, so it's kind of easy to

18  see.

19          THE COURT:  Mr. Davis, I'm not following your --

20          MR. DAVIS:  Okay.

21          THE COURT:  -- binder terminology.  I'm there now.

22          MR. DAVIS:  The big binder is not very precise, I

23  realize that.

24          THE COURT:  I just hadn't noticed that the tabs

25  both had numbers and exhibit number.

Page 13

1          MR. DAVIS:  Yes.

2          THE COURT:  So I'm unconfused now.  Okay.

3    BY MR. DAVIS:

4    Q    Okay.  So this Exhibit 4 was created to convey certain

5    data points regarding the misrepresentation of the income

6    claims that are the subject of your report; is that right?

7    A    I'm just trying to match this page with my binder.  I

8    can't seem to locate it.  656 of 984?

9    Q    If you go to the first page of Exhibit 4.  We'll take

10   it down.  How about the first page.

11   A    Yeah, I have this.  I couldn't --

12   Q    Okay.

13   A    -- find that page, 656.

14   Q    All right.  Or we can just -- for now we can just look

15   at the first page, we don't need it on the screen if we

16   don't have it on the screen.  So just page 1.  I'm just

17   looking at the columns at this point, okay?  And the format

18   of the document.  So the bottom of the exhibit says it was

19   prepared by Duff & Phelps, right?

20   A    Yes.

21   Q    And Duff & Phelps prepared this exhibit for purposes of

22   the litigation, right?

23   A    They prepared it for inclusion in my report.

24   Q    Okay.  So this wasn't prepared while you were at Duff &

25   Phelps, right?

Page 14

1    A    This exhibit, no.

2    Q    Okay.  And focusing on the represented monthly income

3    column in Exhibit 4, that is supposed to reflect what the

4    loan review firms determined was the represented monthly

5    income based on their review of the loan files, right?

6    A    The stated income by the borrower, correct.

7    Q    Okay.  And you don't know what instructions were given

8    to the loan review firms in terms of how they would collect

9    this represented monthly income data, right?

10   A    They were to conduct the review and confirming with

11   industry custom and practice, so I think they had a fairly

12   clear understanding of what the monthly income was.

13          MR. DAVIS:  Your Honor, I'd like to read page 405

14   -- 406 -- I'm sorry -- of his deposition, lines 14 to 18.

15          THE COURT:  Okay.  If you'll put it up on the

16   screen.

17   BY MR. DAVIS:

18   Q    Question, "What instructions were given to the loan

19   review firms with respect to determining what the

20   represented monthly income was?"

21          Answer, "I don't know."

22          Did I ask that question and you gave that answer,

23   Mr. Aronoff?

24   A    Apparently, yes.

25   Q    Okay.  And you don't know who inputted data into that

Page 15

1    database we were discussing before from which your Exhibit 4

2    was created, correct?

3    A     I don't.  I think it was electronically transferred.  I

4    don't know if anyone specifically input it.

5    Q     Now, in Exhibit 4 there's a column called evidence

6    types, right?

7    A     Yes.

8    Q     And this contains a description of what you said I

9    think was the primary evidence cited by the trustees for

10   each of the breach findings in this chart; is that right?

11   A     That's what it was intended to contain, yes.

12   Q     Okay.  And it doesn't identify any information that

13   would be contradictory or inconsistent with the breach

14   claim, right?  That column.

15   A     It was the primary supporting evidence, so that's

16   correct.

17   Q     And it doesn't identify any of the corroborating

18   information that might be in the loan file, right?

19   A     That's correct.

20   Q     Okay.  I'm going to take you now to another tab in that

21   binder, tab 15.  And this is an excerpt of Exhibit 15 to

22   your opening report, which I believe you also testified last

23   week about.  Can you remind us what Exhibit 15 of your

24   opening report is?

25   A     It was the comprehensive schedule of each individual

Page 16

1   breach finding and each individual loan with some summary

2   information about each individual breach finding as well.

3   Q    Okay.  And Duff & Phelps also created Exhibit 15 for

4   purposes of supporting your report; is that right?

5   A    That's correct.

6   Q    Okay.

7          MR. DAVIS:  And I'll have to ask you to pull that

8   up for a minute and we'll come back to it.

9   BY MR. DAVIS:

10  Q    Now, I'm going to take you now to tab 29 in that big

11  binder, which is an exhibit of the claims tracking

12  spreadsheet.  And there should be three rows on the binder.

13  I'm going to ask you to -- I'm sorry -- on this excerpt, and

14  I'm going to ask you to look at the last of the three rows

15  first, which is a row for the loan ending in 9006.  You see

16  that?  And Jason will help you on the screen.

17       (Pause)

18  Q    Do you see that?

19  A    I do.

20  Q    Okay.  I want to take you to the alleged defect for

21  this loan which is in column A-C.  Do you see that it says

22  misrepresentation of income?

23  A    Yes.

24  Q    And you see the column that is A-E, and that's headed

25  contractual provisions breached?

Page 17

1    A    Yes.

2    Q    What information is in that column?  Just generically

3    first.

4    A    That column was supposed to contain the applicable rep

5    and warranty.

6    Q    Okay.  And in this case for this loan ending in 9006 it

7    says the applicable rep and warranty was the underwriting

8    methodology representation, right?

9    A    Yes.

10   Q    So on this loan ending in 9006, according to the claims

11   tracking spreadsheet, the trustees asserted the claim for

12   misrepresentation of income and cited the underwriting

13   methodology representation for this trust, which is LXS 2007

14   and trust, right?

15   A    That's what it looks like, yes.

16   Q    Now I want to take you back to tab 15.  And there are a

17   number of pages here.  About two-thirds of the way through

18   I'm going to ask you to look for row 59333.

19        (Pause)

20   A    I'm sorry, where?

21   Q    59333.

22   A    That's the loan number?

23   Q    That is the row number.  The loan number is 9006, the

24   same one we were just looking at.

25        (Pause)

Page 18

1   A     Okay.  I think I'm in that spot.

2   Q     You think you've got it.  Okay.  And do you see in the

3   lower number column, which is column B, it's the loan ending

4   in 9006, which is the loan we were still -- we were just

5   looking at?

6   A     I see that, 9006, yes.

7   Q     Okay.  And if you look at column D it says the breach

8   is misrepresentation of income, right?

9   A     I see that.

10  Q     Okay.  Now, if you look at column E under contractual

11  provisions breached it references the no event of default

12  representation.  Do you see that?

13  A     I do.

14  Q     So the underwriting methodology representation is not

15  listed there in column E, right?

16  A     It may not have been a breach finding that was the

17  subject of my report.

18  Q     This is the only breach finding of this loan, sir.

19  A     How do I know that?

20  Q     If you go back to the claims tracking spreadsheet

21  you'll see that there's only one breach on the loan.

22  A     That's the -- I didn't know if that was the entire

23  claim tracking spreadsheet or an excerpt from it.

24  Q     It's the whole tracking spreadsheet for that loan.

25        So the data in your Exhibit 15 for this loan doesn't

Page 19

1   match the loan level data in the claims tracking spreadsheet

2   that was exchanged during the protocol; is that right?

3   A    Again, I don't know, I don't know if that claim

4   tracking spreadsheet only contained one breach or not.

5   Q    Okay.  Well let's go back to the claims tracking

6   spreadsheet then.  If you look this is tab 29.  You can

7   follow the row across and you can see the actual basis for

8   defect number 1, the actual provisions breached in number 1.

9   And if you turn the page in that third row there's no number

10  2, there's no number 3.  You see that?

11       (Pause)

12  A    No, I see what's on the page here, I just don't know if

13  this excerpted row represents the entirety of the claim

14  submission with respect to this loan or not.

15            THE COURT:  Well let me -- well, Mr. Aronoff,

16  where else would it be?  I mean is the claims tracking

17  spreadsheet composed in a random manner?  I mean what --

18            THE WITNESS:  No.  This would have been an Excel

19  spreadsheet that contained all of the lines for a loan that

20  were submitted, and I don't know if this excerpt is the

21  entirety of the data with respect to that loan that was

22  submitted in that spreadsheet or not.

23            I understand this describes this particular defect

24  and this particular rep, but I don't know if there were

25  additional ones.  Loans often had a number of defects.

Page 20

1   BY MR. DAVIS:

2   Q    If you turn the page of exhibit -- tab 29 do you see

3   the rest of the row continues?  And do you see the columns

4   for the additional defects are blank?  Does that help you?

5   A    So the thing that ties them together is --

6   Q    The row number.

7   A    -- 2106?

8   Q    No, 2246.

9   A    I don't see a row number on the other side.

10  Q    Bottom left-hand corner of each page, sir.

11  A    Okay.  I see those columns are blank.

12  Q    Okay.  So the data in your Exhibit 15 for this loan

13  doesn't match the data in the claims tracking spreadsheet,

14  correct?

15  A    If this is a representation of the claims tracking

16  spreadsheet yes, that's correct.

17  Q    Do you have any idea how many differences like this

18  there are between your Exhibit 15 and your claims tracking

19  spreadsheet?

20  A    I don't.

21  Q    Okay.  We're still on I think tab 29 is what you still

22  have open.  And now let's look at row 2160, which is the

23  first of these three rows.  Okay.  And this is for the loan

24  ending in 0190.  Do you see that?

25  A    Yes.

Page 21

1   Q    Okay.  And if you look at column A-C you'll see an

2   alleged defect number 1 for misrepresentation of occupancy.

3   Do you see that?

4   A    Yes.

5   Q    Okay.  And just before -- just to do this if you'd turn

6   the page you'll see the row continues, and for this loan

7   there is no other breach loan.  Do you see that?

8   A    I do.

9   Q    Okay.  Now, for the misrepresentation of the occupancy

10  claim what are the contractual provisions breached according

11  to the claims tracking spreadsheet?

12  A    The no event of default rep and the no entry statement

13  rep.

14  Q    Okay.  It doesn't say no entry statement though did it,

15  sir?

16  A    No, but I know that's the same rep.

17  Q    It says no fraud, correct?

18  A    That's how it's titled here, that's correct.

19  Q    Okay.  So the denomination of that representation

20  changed between the claims tracking spreadsheet and your

21  reports, right?

22  A    I don't know, I didn't prepare the claim tracking

23  spreadsheet.

24  Q    Well you prepared your reports, correct?

25  A    I did.

Page 22

1   Q    And your reports refer to this as the no untrue

2   statement representation, right?

3   A    They do, and for this loan that would be in the

4   applicable trust Rec. 1.04 CV LXS 2006-10N.

5   Q    Sure.  Expect here it's called the no fraud

6   representation, right?

7   A    It appears so, yes.

8   Q    Okay.  So how many times did the name change from no

9   fraud in the claims tracking spreadsheet to no untrue

10  statement in your exhibits, do you have any idea?

11  A    None.

12  Q    Okay.  So to take us back there are two bases -- two

13  representations listed, right?  The no event of default and

14  no fraud or no untrue statement rep, right?

15       When you said none in response to my question about

16  knowing how many times this changed you meant you didn't

17  know how many times this changed between the two?  Let me

18  back up and ask the question again.

19       Do you know how many times the name no fraud changed

20  between the claims tracking spreadsheet and your exhibits to

21  no untrue statement?

22  A    I don't.

23  Q    Okay.  Thank you.

24       So we've got two representations listed, no event of

25  default and no fraud and no untrue statement.

1          Now let's go to tab 15 of your report.  Tab 15, which

2     is Exhibit 15 of your report, and now I'm going have to ask

3     you to hunt again for the row at 58226, which is about

4     halfway through.  And it's the top row of the page.

5          (Pause)

6     Q    Are you with me?

7     A    Yes.

8     Q    Okay.  And you see this is the excerpt from your

9     Exhibit 15 for that same loan ending in 0190?

10    A    I do.

11    Q    And column D confirms this is a misrepresentation of

12    occupancy claim, right?

13    A    Yes.

14    Q    Now, column E, which is entitled contractual provisions

15    breached lists three contractual provisions, right?  No

16    event of default, no untrue statement, and mortgage loan

17    schedule.  Do you see that?

18    A    Yes.

19    Q    So the mortgage loan schedule representation was not

20    cited as a basis for this claim in the claim tracking

21    spreadsheet but it is in your Exhibit 15, right?

22    A    To the extent the exhibit I looked at is a

23    representation of the claim tracking spreadsheet, yes,

24    that's correct.

25    Q    Okay.  And do you have any idea how many times your

Page 24

1    Exhibit 15 differs from the claim tracking spreadsheet in

2    this respect that a contractual provision breached was

3    added?

4    A    I don't know how many times it differed in this

5    respect, if at all, other than this one.

6             MR. DAVIS:  Your Honor, we have a supplement slide

7    which we'd like to pass out.

8             THE COURT:  Okay.  Sure.

9    BY MR. DAVIS:

10   Q    Mr. Aronoff, while that's coming I'm going to ask you

11   to -- and I hope it's here -- to --

12   A    Thank you.  Thanks.

13   Q    -- turn to tab 4 in the big binder and in that excerpt

14   of Exhibit 4 towards the back you'll see page 842 of 982.

15   Do you see that?

16            THE COURT:  I'm sorry --

17            THE WITNESS:  Sorry, what was the page?

18            THE COURT:  -- Mr. Davis, where are we?

19            MR. DAVIS:  We're in tab 4 of the large binder.

20            THE COURT:  Oh, we're in tab 4 of the large

21   binder.

22            MR. DAVIS:  Yeah.

23            THE COURT:  Okay.

24            THE WITNESS:  What page, please.

25   BY MR. DAVIS:

1    Q    842.

2         (Pause)

3    Q    Are you with me, sir?

4    A    I am.

5    Q    Okay.  And do you see count 29773?  It's towards the

6    top, and it's the loan ending 2262.

7    A    Yes.

8    Q    Thank you.  And your Exhibit 4 says that for this loan

9    the represented monthly income was $5,653, right?

10   A    Yes.

11   Q    And it says that the actual monthly income for the loan

12   was $340; is that right?

13   A    Yes.

14   Q    Now, let's go back to tab 29, which is the claims

15   tracking spreadsheet, and we're going to look at the middle

16   row on the page, which is for the loan ending 2262.  Now for

17   this loan there are three alleged defects.  Do you see that?

18   A    Yes.

19   Q    Okay.  So we were in your Exhibit 4, which is

20   misrepresentation of income, right?

21   A    Yes.

22   Q    So we're going to look at the misrepresentation of

23   income allegation in the claims tracking spreadsheet, which

24   is I think defect number 3.  And I'll ask you to read

25   through that and then I'd like to have slide 4 put up,

Page 26

1    please, Jason.

2        (Pause)

3    Q    So, Mr. Aronoff, the factual basis alleged for this

4    loan --

5            MR. DAVIS:  Your Honor, are you with me?

6            THE COURT:  I am not.

7            MR. DAVIS:  Okay.  Let me help then.

8            THE COURT:  I am -- I'm trying to keep --

9            MR. DAVIS:  It is hard.

10           THE COURT:  Okay.  This segment began with Aronoff

11   Exhibit 4, right?

12           MR. DAVIS:  Correct.

13           THE COURT:  And it began with count 29773, which

14   is loan 2262.

15           MR. DAVIS:  Correct.

16           THE COURT:  And it was -- this is -- it's a breach

17   finding.

18           MR. DAVIS:  Correct.

19           THE COURT:  It's an income breach finding, right?

20           MR. DAVIS:  Correct.

21           THE COURT:  Fifty-six fifty-three versus 340.

22           MR. DAVIS:  Correct.

23           THE COURT:  Okay.  Then the next stop was the

24   claims tracking spreadsheet.

25           MR. DAVIS:  Correct.

Page 27

1                 THE COURT:  Right?  So now we're on the claims

2      tracking spreadsheet and you showed something, and now I'm

3      now looking at Aronoff Exhibit 4.

4                 MR. DAVIS:  Right.  If you look on the slide

5      you'll see it on the top.

6                 THE COURT:  And who -- this is the slides that

7      Mr. Shuster put in?

8                 MR. DAVIS:  No, no.  This is our supplemental --

9                 THE COURT:  This is yours.

10                MR. DAVIS:  -- slide deck from today.  Yeah.

11                THE COURT:  Okay.

12                MR. DAVIS:  So --

13                THE COURT:  So now I'm looking at all three

14     things.

15                MR. DAVIS:  Right.  So if you look at the slide on

16     the top you'll see there was the allegation that you just

17     repeated from Exhibit 4 for the loan ending 2262.

18                THE COURT:  Okay.  Hold on, because I'm still not

19     there.

20                MR. DAVIS:  Uh-huh.

21          (Pause)

22                THE COURT:  I apologize.

23                MR. DAVIS:  That's okay.

24                THE COURT:  Kind of a lot of paper up here.  All

25     right.

Page 28

1          MR. DAVIS:  I should be the one apologizing.

2          THE COURT:  So now I am where you are.  Okay.  Go

3     ahead.

4          MR. DAVIS:  Okay.

5     BY MR. DAVIS:

6     Q    So, Mr. Aronoff, the question is that the information

7     that's provided in the factual basis for this loan ending in

8     2262 does not match the alleged actual monthly income on

9     your Exhibit 4; is that right?

10    A    It appears not to, and I need to see the other

11    correspondence back and forth related to this loan to see if

12    I could discern why they're different.

13    Q    Okay.  So you would need to look at the file to figure

14    out why this difference exists, right?

15    A    No, not necessarily.

16    Q    What correspondence were you referring to, sir?

17    A    To the extent the plan administrator's rebuttal pointed

18    out that there was a misstatement in terms of the income

19    that was contained in the claim package or the file, and we

20    had an opportunity to look at that in step 2, made the

21    appropriate correction, the final corrected number would be

22    what's reflected in the database and what'd be reflected in

23    the exhibits to the report.

24         We had -- suffice to say, and I don't know if that's

25    the case with this loan, but suffice to say that to the

Page 29

1    extent information that was provided in the claim tracking

2    spreadsheet with the initial submission of a claim was later

3    updated either through the PAs pointing out on error or in

4    terms of reviewing the file in connection with the PA's

5    response, and that error was identified the database would

6    have been updated and that revised figure would have been

7    included in the exhibit.

8        I'm not saying that I know that that happened in this

9    case, I'm just explaining why there may be other than

10   mistake a potential difference in those -- in what appeared

11   in the claim tracking spreadsheet for any given breach

12   finding and what appeared in the exhibit with respect to

13   that breach finding.

14   Q    Okay.  But at least with respect to what we have in

15   front of us now, which is the excerpt from your Exhibit 4

16   and the excerpt from the claim tracking spreadsheet, they

17   don't match do they?

18   A    No.

19   Q    Okay.  Now, I don't know if you remember that bar chart

20   that Mr. Shuster put up showing misrepresentation of income

21   variances five percentage.  Do you remember that?  It's

22   TRBX-193.

23       MR. DAVIS:  Maybe we could put that up, Jason

24   would having people shuffle paper.

25   BY MR. DAVIS:

Page 30

1   Q    Okay.  So based on your Exhibit 4 and the differential

2   that was referenced in your Exhibit 4 this loan would have

3   fallen all the way over in that right-hand column, right?

4   A    Yeah, I think it was like 1500 percent, yes.

5   Q    Okay.  But that's an error, correct?

6   A    Again, I don't know without looking at the other

7   correspondence related to this loan.

8   Q    Well in terms of what you have in front of you, sir,

9   it's an error, correct?

10  A    It may not be an error.

11        THE COURT:  I'm sorry, what was that last answer?

12        THE WITNESS:  It may not be an error.

13        THE COURT:  What may not be an error?

14        THE WITNESS:  The error may be in the description

15  in the claim tracking spreadsheet, and that may have been

16  corrected.  And so the data point in the exhibit and the

17  resulting calculation may not be an error.

18        THE COURT:  Don't you think the error is probably

19  that somebody just dropped a zero?

20        THE WITNESS:  I don't know.

21        THE COURT:  If you add the two numbers on the

22  demonstrative you get 3400.  It's just an observation.

23        THE WITNESS:  Possibly.  I just don't know.

24        THE COURT:  Thank you.

25  BY MR. DAVIS:

Page 31

1   Q     Okay.  Well that sort of foreshadows the next one.

2   Let's take a look at again tab 4, and this time we're

3   looking for page 846 at tab 4.  So it's basically on the

4   backside of the page you were looking at before.  And about

5   two-thirds of the way down you will see count 29929 for the

6   loan ending in 3557.  You see that?

7   A     Yes.

8   Q     Okay.  And your Exhibit 4 says that the represented

9   monthly income for this loan is $21,500, right?

10  A     Yes.

11  Q     And it says that the actual monthly income for the loan

12  is $1,169, right?

13  A     Yes.

14  Q     And that the monthly percentage difference is 1738.79

15  percent, right?

16  A     That's correct.

17  Q     That will take it again all the way over to the far

18  right-hand column or block in that chart, correct?

19  A     Yes.

20  Q     Okay.  Now, if you'd turn to tab 30.  This is the claim

21  tracking spreadsheet excerpt for the loan ending in 3557.

22  See that?

23  A     Yes.

24  Q     And if you go -- it's a misrepresentation of income

25  claim, right, which you can see from column A-D?  You see

Page 32

1    that?

2    A    Yes.

3    Q    And if you look at column A-E it says that the

4    trustees' calculation of the actual or true income was based

5    on a 2007 income of 11,169.25.  Do you see that?

6    A    Yes.

7    Q    So again here there's a difference between the claims

8    tracking spreadsheet and your Exhibit 2, right?

9    A    Yes.

10   Q    Okay.  Now, I want to take you to tab 37, and we have

11   another excerpt of the claims tracking spreadsheet for the

12   loan ending in 7468.

13   A    Okay.  Where's tab 37?

14   Q    Thirty-seven, yes?

15   A    No, where is tab 37?  It's not in this binder.

16   Q    Oh, in the big binder.  I'm sorry.  Should be.  Should

17   be what we added to it today.

18   A    Oh, okay.

19        (Pause)

20   A    I'm there.

21   Q    Okay.  So just to orient you a bit there are three

22   breach claims on this loan.  You see that, the first alleged

23   defect number 1 in column A-D is failure to obtain first or

24   second lien.  See that?

25   A    Yes.

Page 33

1    Q    Okay.  And I believe that claim was withdrawn so we're

2    not going to be talking about that.

3         Then the second and the third defects are both

4    misrepresentation of income defects.  See that?

5    A    Yes.

6    Q    One is for the person who was denominated the co-

7    borrower and one is for the person who was denominated the

8    borrower.  You see that?

9    A    I do see that.

10   Q    Okay.  So for the co-borrower -- we'll start with the

11   co-borrower -- the stated monthly income, according to this

12   description, was $19,000.  See that?

13   A    Yes.

14   Q    And according to the trustees a post origination tax

15   return showed that the co-borrower was actually making only

16   $2,069 a month.  You see that?

17   A    Yes.

18   Q    And it's based on a tax return that they said showed

19   her with the same employer, right?

20   A    Yes.

21   Q    And the trustees also relied on an origination credit

22   report making an observation about the co-borrower's credit

23   utilization.  Do you see that?

24   A    I do.

25   Q    Okay.  Now, as for borrower, hopefully still in here,

1   the trustees alleged his stated income was 9,897 per month,

2   right?

3   A    Yes.

4   Q    And that the actual income was 7,573 per month, right?

5   A    Yes.

6   Q    And they said that was based on a same year audit

7   verification through a work number, right?

8   A    Yes.

9   Q    And they -- the trustees also cite an origination

10  credit report as support for this claim, correct?

11  A    Yes.

12  Q    Okay.

13          MR. DAVIS:  All right.  Now, let's have slide 8,

14  please.

15  BY MR. DAVIS:

16  Q    So on the slide in front of you, and I can take you to

17  the documents if you want to, but the information is on the

18  slide, you will see in an excerpt from your Exhibit 4 for

19  this loan on the top and that claims tracking spreadsheet

20  excerpt that we saw on the bottom.  You see that?

21  A    Well what about it again?

22  Q    I'm just asking whether you can see that at the top is

23  an excerpt from your Exhibit 4 for the co-borrower, okay,

24  whose represented monthly income was 19,000, and the alleged

25  actual monthly income was 2,069.

Page 35

1    A     I see that.

2    Q     Okay.  And you see that the evidence type listed in

3    support of that claim is a tax return, correct?

4    A     Yes.

5    Q     Okay.  And the origination credit report, which is in

6    the claim tracking spreadsheet, is not listed as an evidence

7    type, right?

8    A     That's correct.

9    Q     So someone made a determination that in this case the

10   tax return was primary and the origination credit report

11   wasn't worthy of being put as an evidence type on this

12   document, right?

13   A     No, I don't think that's right.

14   Q     Okay.

15   A     I think if you read it in context the only place -- and

16   you understand how these reviews are done -- the only place

17   the number, the $2,069 per month number appears is in the

18   tax return.

19         The observation that's being made is one I made in my

20   testimony last week where in addition to seeing whether the

21   stated income is reasonable or not it's very common for an

22   underwriter to look at the borrower's credit and assets to

23   see what the rest of the story is.  And here I think that's

24   what was being done.

25         The origination credit report would only talk to you

Page 36

1    about the credit situation of a borrower and comment whether

2    or not that credit utilization was consistent with someone

3    making the borrower's stated income.  But the source of

4    information regarding the difference in income, the 19,000 a

5    month versus 2,000 a month, the only document in the file

6    apparently that was cited in the factual basis -- and I

7    don't have the claim package in front of me so I don't know

8    if there were other documents -- is the tack return.  That

9    would be consistent with how I would expect the factual

10   basis for the claim in terms of the supporting -- the

11   evidence type would be cited.

12   Q    Okay.  So the origination credit report is just part of

13   the rest of the story?

14   A    It's -- I think it's telling in this case, but yes,

15   that's correct.

16   Q    Okay.  And the kinds of things you mentioned credit

17   reports and assets.  Are there other things that you would

18   be looking for for the rest of the story for a loan like

19   this?

20   A    I don't have the specific file in front of me, but

21   yeah, in terms of determining whether income is reasonable

22   or not you look at the entirety of the file, you look at the

23   borrower's age, you look at therapy education, you look at

24   their time on the job, you look at a whole range of factual

25   circumstances that again may or may not be dispositive, but

Page 37

1    to an experienced underwriter may have some impact as to how

2    they start to formulate what may be going on in the file.

3    Q    Job title or profession might be another thing you

4    would look at?

5    A    Maybe.

6    Q    Okay.  If we go to the next slide, hope we with do this

7    very quickly.  This slide just makes the same point with

8    respect to the comparison of Exhibit 4 for the borrower and

9    the claims tracking spreadsheet that once again the

10   origination credit report is not mentioned as an evidence

11   type, as you just explained.  Okay?  You see that?

12   A    Yes, I do, and that makes sense, because the work

13   number would be the document where the actual income number

14   that was being used as his actual income would be stated.

15   So it could be verified by the plan administrator to see if

16   in fact that document exists and if the number was

17   accurately reflected in the factual basis for the defect.

18   Q    Okay.  And if we can see the next slide all we're doing

19   here is putting together the two, the borrower and the co-

20   borrower allegations to show that the purported combined

21   actual income of this couple is just over $93,000.  Do you

22   see that?

23        (Pause)

24   A    Yeah, I see it.

25   Q    Okay.  So we're now going to look at --

1          THE COURT:  Mr. Davis --

2          MR. DAVIS:  Yes.

3          THE COURT:  -- could you come up for a second?

4          MR. DAVIS:  Sure.

5          THE COURT:  Mr. Shuster?

6      (At sidebar off the record)

7   BY MR. DAVIS:

8   Q    So, Mr. Aronoff, the Court has just pointed out that my

9   math as usual is bad.

10  A    Yeah, it can't be right.

11  Q    Yeah.  It's -- I think --

12  A    Ninety five hundred times 10 would be 95,000 and this

13  is --

14  Q    Right.  I think the correct when you add the two is

15  115,704 total combined income.

16  A    Okay.

17  Q    So my mistake.

18      All right.  I'm going to just ask you to turn now to

19  tab 34 of your binder, and we're still with this loan but

20  we're going to talk about a different exhibit that at least

21  we haven't talked about yet today, and that's Exhibit 17 to

22  your report.  Would you remind us what Exhibit 17 is?

23  A    It was a listing of all of the misrepresentation of

24  income breach findings that were the subject of the report

25  identifying certain summary information about those breach

1    findings and designated which of those claims were accepted

2    and which were rejected or still were the subject of

3    dispute.

4    Q     Are you sure that has all of the misrepresentation of

5    income claims, sir?

6    A     I think to the extent there were shared characteristics

7    it contains that universe.

8    Q     Right.  So it's a subset of the misrepresentation of

9    income claims to the extent you identified certain shared

10   characteristics, right?

11   A     You know without looking at the entire report I don't

12   recall.

13   Q     Okay.  Maybe we can come back to that when we go on to

14   your expert report.  But I will tell you that while the co-

15   borrower misrepresentation that we've been talking about is

16   listed in your Exhibit 17 the borrower misrepresentation is

17   not.  So we only have one of the two in your Exhibit 17 to

18   look at.

19         And you can see that about two-thirds of the way down

20   this loan 7468 is on your excerpt in your binder, but we'll

21   also put it up on the screen to make it easy.  So you can

22   see here that --

23   A     Which page of the exhibit?  I'm sorry.

24   Q     Well it's -- I think you only have one page of an

25   excerpt of Exhibit 17 in that tab.  And if you look at --

1     it's count 17645, you'll see the loan number ending 7468,

2     but we've also put it up on the screen.

3     A     All right.  Which tab is it?  I'm sorry.

4     Q     Thirty-four.

5     A     Okay.  That was my problem.

6           (Pause)

7     A     Okay.

8     Q     Okay.  So you mentioned that Exhibit 17 is about

9     certain characteristics of these breach claims, right?  Of

10    the misrepresentation of income breach claims?

11    A     Yes.

12    Q     And one of those characteristics is in that third

13    column over from the left on Exhibit 17 same year

14    evidence/near year evidence.  And what does that mean, sir?

15    A     It would be whether the evidence supporting the income

16    finding is in the same year of origination or a year near

17    the year of origination.

18    Q     Okay.

19    A     Either proceeding or subsequent to.

20    Q     So in this case for this loan you cannot extract from

21    the factual basis for the defect in the claims tracking

22    spreadsheet the fact that the tax return, right, which is

23    the evidence is near year as opposed to something that's not

24    near, right?  The factual basis just says post origination I

25    believe or post closing.

Page 41

1   A    Yeah, that would be in the claim file.

2   Q    Okay.  So --

3   A    That was submitted along with the claim tracking

4   spreadsheet.

5   Q    Right.  So to get that -- you couldn't extract that

6   information from the claims tracking spreadsheet, you have

7   to look in the file?

8   A    For this loan.

9   Q    For this loan.  Correct.

10  A    Not the loan file, the claim package.

11  Q    The claim package.

12       Okay.  And Exhibit 17 also says that the claim is

13  supported by -- well it says that the borrower is salaried,

14  right, that's the next column over?  You see that?

15  A    Yes.

16  Q    And in the description I think it says that the co-

17  borrower was employed with the same employer and employment

18  when the subject loan closed, although it doesn't

19  specifically say that she was salaried, right?

20  A    Well if you have an employer you're generally viewed as

21  salaried.

22  Q    Okay.

23  A    If you're unemployed you're viewed as self-employed.

24  But no, it doesn't say salaried or self-employed in the

25  narrative.

Page 42

1   Q     Okay.

2   A     That too would be information that could be gleaned

3   from either the claim package or the loan file or both.

4   Q     Okay.  Let's look at the claim package, which is tab

5   38.  It should be tab 38.

6   A     Thirty-eight?

7   Q     Yeah.  It's in the new package that you got this

8   morning.

9   A     Okay.

10  Q     Do you have it in front of you?

11  A     Yes.

12  Q     And can you see it says the plan package for the loan

13  ending in 7468?

14  A     I'm more familiar with the page -- page 2 of 20 as --

15  Q     Okay.

16  A     -- the cover page for a claim package, but --

17  Q     And I'll ask you when you're ready to turn to page 8 of

18  20, which I believe is the loan application.

19        (Pause)

20  A     Okay.

21  Q     Do you see that the loan closed on June 28th or at

22  least the application is dated June 28th, 2007?

23  A     Yes.

24  Q     And now I'm on Section 4, and Section 4 it says that

25  the co-borrower is a physician and the self-employed box is

Page 43

1    checked.  Do you see that?

2    A    Yes.

3    Q    Okay.  So the information on Exhibit 17 that we just

4    looked at that the borrower is salaried is somewhat

5    inconsistent with checking the self-employed box, right?

6    A    Maybe.  I don't know if there's a misrepresentation of

7    employment with respect to this loan to or not.

8    Q    There isn't, we saw all the misrepresentations and

9    there are only three and one is gone.

10   A    Okay.

11   Q    Yeah.  Okay.  So if you look at page 3 of 20, now I'm

12   going to take you back to the underwriting approval.  You

13   see that?  Do you see the underwriting approval?

14   A    I do.

15   Q    Okay.  And do you see that borrowers credit score is

16   reflected on that document?

17   A    Yes.

18   Q    Do you see that they're 766 and 708?

19   A    I see those as the middle scores for the borrower and

20   the co-borrower, yes.

21   Q    Okay.  And so even though the narratives reference the

22   utilization of credit they didn't reference those credit

23   scores which are pretty high, right?

24   A    Well yes, one thing has nothing to do with the other.

25   Q    Okay.  If you also notice on that page you see there's

Page 44

1    some subordinate financing?  It's sort of on the left-hand

2    side about a third of the way down.  One hundred and

3    seventy-eight thousand in subordinate financing?

4    A    I see that --

5    Q    Okay.

6    A    -- column there.  The notation.

7    Q    So if we turn to -- back to the loan application and

8    we're on Section 6 for assets and liabilities.  I'm sorry,

9    let's start with Section 7.  And you'll see that the cash

10   required at closing was over 300,000.  And if you subtract

11   the subordinate lien that indicates that the borrowers had

12   to put down well over $100,000 for this loan, right?

13              MR. DAVIS:  I hope my math is right, Your Honor.

14              THE WITNESS:  Okay.

15   BY MR. DAVIS:

16   Q    Okay.  And is it also shows in Section 6 that the

17   borrowers had about 40- or $50,000 of equity in real estate

18   by way of assets, right?

19   A    I'm sorry, where are you?

20   Q    Section 6, right above their loan application, assets

21   and liabilities.  You see real estate owned at the present

22   market value of 795,000 and mortgage and liens of 333,000?

23   Do you see that?

24   A    Yes.

25   Q    So those are fairly significant assets which are as you

Page 45

1    said are part of the story but they're not reflected in the

2    trustees' breach narrative, right?  Correct?

3    A    I don't know what the question is.

4    Q    The borrower's assets are not reflected in the

5    trustees' breach narrative, correct?

6    A    They're right here in the application.

7    Q    In the breach narrative.

8    A    No, the assets are not inconsistent with the analysis

9    that was done by the loan review firm.

10   Q    So the assets were not inconsistent with a purported

11   salary of a physician of $2,000 a month?

12   A    No.

13   Q    Okay.

14            THE COURT:  I want to ask it a different way.

15            In the breach narrative there's a statement that

16   there was -- based on a tax return -- that there was a

17   misrepresentation of income, right?  That's the headline in

18   the breach narrative.  And the evidence cited is a tax

19   return.  Mr. Davis asked you to confirm that you didn't

20   mention the next bit of the narrative which has to do with

21   the utilization rate of revolving credit, right?  Remember

22   that question and answer?

23            THE WITNESS:  That's in the narrative but it's not

24   in the evidence, yes.

25            THE COURT:  Right.  And you told Mr. Davis that

Page 46

1    that's understandable because the utilization rate is not a

2    piece of data on which the breach is based, the tax return

3    being the primary piece of evidence, right?

4              THE WITNESS:  Yes.

5              THE COURT:  Okay.  But now Mr. Davis is saying to

6    you the following, in the breach narrative you cited the

7    utilization of revolving credit as something that supported

8    the hypothesis that the borrower had lied about its income,

9    because why would somebody with the amount of stated income

10   that the borrower said he or she had have to use that much

11   credit, right?

12             THE WITNESS:  Yes.

13             THE COURT:  Okay.  And now Mr. Davis is saying to

14   you, but wait, here's a piece of evidence that would be

15   consistent with the stated income because this borrower has

16   $450,000 of equity in other real estate and he's asking you

17   to confirm that that piece of evidence cutting the other way

18   arguably also is not included, right?

19             THE WITNESS:  Yes, and I disagree that it's

20   cutting the other way.

21             THE COURT:  Okay.

22             THE WITNESS:  You can't use equity in a piece of

23   property to pay a mortgage.

24             THE COURT:  That's not my question, Mr. Aronoff.

25             The statement that the utilization of credit

Page 47

1   bolsters the hypothesis that the borrower misrepresented his

2   income is one thing, but when you find that the borrower in

3   fact is a property owner with significant equity that might

4   suggest that this borrower has some means, particularly when

5   you look at it this way, the amount of equity in these

6   properties versus the amount of debt, it might, we don't

7   know, it might suggest that this borrower does have the

8   income that was stated.

9          THE WITNESS:  I understand your analysis and just

10  respectfully as a mortgage loan underwriter --

11         THE COURT:  Okay.

12         THE WITNESS:  -- if this was cash in a bank

13  account that would go directly to the borrower's ability to

14  pay --

15         THE COURT:  It's not --

16         THE WITNESS:  -- and I don't think it's

17  dispositive one way or the other.  It's a fact, but I don't

18  think it's contradictory to the finding and I don't think it

19  supports the finding.

20         THE COURT:  We are not -- we're not talking about

21  the borrower's able to pay, we're talking about marshalling

22  all the available evidence as a forensic loan reviewer to

23  try to figure out what the borrower's income was, and all

24  I'm saying, which I guess you're not going to agree with my

25  observation, that on the one hand we have utilization of

Page 48

1   credit, but on the other hand we have current mortgages and

2   significant equity, and you don't believe that the existence

3   of the ownership of two other properties showing significant

4   equity at all suggests that perhaps this borrower made on or

5   about as much money as he said he did.  You don't agree with

6   that.

7           THE WITNESS:  I don't agree with that, but having

8   said that I think it is important and it was important that

9   these loans not be underwritten or evaluated simply on the

10  short narrative, and that's why the claim package and the

11  loan files were submitted with each and every claim to give

12  the plan administrator the opportunity to do their own

13  review with their own experts and see if they could identify

14  facts that in fact proved we were wrong in our conclusion.

15          THE COURT:  Yes.  But to that point you're

16  perfectly fine with the fact that there was no narrative

17  that said but on the other hand there's also evidence in the

18  file of substantial equity owned by this borrower in other

19  properties with mortgages on which the borrower remains

20  current, that was not a piece of contrary evidence that you

21  felt might be useful to the plan administrator to evaluate

22  the claim.

23          THE WITNESS:  I agree, yes.

24          THE COURT:  Okay.  Thank you.

25  BY MR. DAVIS:

1   Q    Okay.  Now let's turn to page 15 of 20 in the

2   application and you'll see a 2008 tax return.

3   A    Fifteen of 20 in the claim package --

4   Q    Yes.

5   A    -- not the application.

6   Q    We're in the claim package.  Yeah.

7   A    Okay.

8   Q    I'm sorry, 15 of 20 in the claim package.  And you

9   recall this loan was originated in 2007, so this is the

10  following year's tax return, right?

11  A    Yes.

12  Q    Okay.  And it's the only tax return in the claim

13  package, so this is the tax return that the trustees were

14  relying on for the claim here, right?

15  A    I don't know what other income information might be in

16  the file or not.

17  Q    Okay.  This is the only tax return in the claim

18  package.  Are you with me?

19  A    Okay.

20  Q    Okay.  So on line 7 of this tax return what does it say

21  that the borrower's combined wages are?

22  A    Two zero eight five twenty-six.

23  Q    Okay.  And on line 12 it has a business income number,

24  do you see that?

25  A    Yes.

Page 50

```
 1    Q    And it has a calculation next to it, right?

 2    A    Yes.

 3    Q    And it's the loan review firm that drafted that

 4    compilation, correct?

 5    A    It appears so.

 6    Q    And that number of rounded $2,069, that is the alleged

 7    co-borrower's income that was listed in the actual income in

 8    the breach claim, right?

 9    A    I believe that's correct.

10    Q    Okay.  And there's another calculation on the bottom,

11    do you see that, in the box, 12 months equals almost

12    $20,000?

13    A    Yes.

14    Q    That calculation was also done by the loan review firm,

15    right?

16    A    Again, I don't know.  It appears so, I don't know.  I

17    don't know who did this calculation.

18    Q    Okay.  But that calculation or that number don't appear

19    anywhere in the claims tracking spreadsheet or on your

20    exhibits that we saw, right?

21    A    No.

22    Q    Okay.  And jumping back up to the business income for

23    the moment it references a Schedule C.  Do you see that?  In

24    line 12.

25    A    Yes.
```

Page 51

1    Q    But the Schedule C isn't attached here, right?

2    A    It's not in the two pages I'm looking at.  Again, I

3    don't know if it's elsewhere in the claim package or in the

4    loan file.

5    Q    Okay.  And in this case when the loan review firm did a

6    calculation of income based on this business income it

7    didn't add in any kind of depreciation, right?

8    A    I don't know if there was any.

9    Q    It just took the straight line business income reported

10   here and divided it by 12, right?

11   A    It looks like they simply divided 24,827 by 12.

12   Q    Okay.

13   A    But I don't know if there was any depreciation to add

14   back in.

15   Q    Okay.  Because you need the Schedule C, right, to make

16   that determination, or some other document?

17   A    I would need some evidence that there was in fact

18   depreciation, yes.

19   Q    Okay.  So now if you turn to the next page you will see

20   towards the bottom it says that the co-borrower is a medical

21   doctor.  Do you see that?

22   A    I see one of the parties to this tax return is a

23   medical doctor.  I don't know -- yeah, I don't remember

24   which was the co and which the borrower.

25   Q    Okay.  That's the co-borrower.

Page 52

1    A    Okay.

2    Q    But it doesn't say anywhere on this tax return who

3    employed this co-borrower does it?

4    A    No, not in a tax return.

5    Q    So that's inconsistent with the claim statement where

6    it says that the tax returns demonstrate she was employed

7    with the same employer and the same title, right?

8    A    Was the tax return cited as the source of that or --

9    Q    Yeah.

10          MR. DAVIS:  Can we bring that up?

11          THE WITNESS:  -- was it is basis for the use of

12   near year?  Employers don't typically appear on tax returns

13   unless there's a W-2 or pay stub attached to it.

14   BY MR. DAVIS:

15   Q    Right.  If you look at the excerpt of the claim

16   tracking spreadsheet it says, "The loan file contained post

17   closing federal tax return that verified the co-borrower was

18   employed with the same employer and employment title as when

19   the subject loan closed on 6/25/2007."  See that?

20   A    Yes.

21   Q    So that's a mistake, right?

22   A    It's a mistake to say that that was verified on the tax

23   return.  It was probably verified elsewhere in the file.

24   Q    Now, turn to page 12 of the claim package.  Can you

25   tell me what this is?

1    A    It looks like an audit verification of employment and

2    income.

3    Q    Do you know what kind of audit verification it is?

4    A    I'm not sure I understand the question.

5    Q    Do you know what this type of form is typically

6    referred to as?

7    A    It's an audit VOE.

8    Q    Do you understand that this is a work number

9    verification?

10   A    I don't know if this is the work number.

11   Q    Okay.  Fair enough.  It is the only audit verification

12   in the file -- or the claim file.  Do you see that?

13   A    Do I see what?

14   Q    Do you see that it's the only audit verification in the

15   claim file that you have in front of you?

16   A    That appears to be the case.

17   Q    Okay.  So if you turn to the last page you see another

18   one of those boxes there, which I believe is a calculation

19   by the loan review firm.  Do you see that?

20   A    Yes.

21   Q    Do you see the box says around the year 2006?

22   A    I see that.

23   Q    Okay.  So was the calculation conducted by using the

24   income in 2006?

25   A    I don't understand the question.

Page 54

1   Q    Was the calculation in this box conducted by using the

2   2006 income that's reported here for the work number?

3   A    It appears that they took that 90,884 number and

4   divided it by 12.

5   Q    Okay.  But this was a loan that closed in 2007, right?

6   A    I don't know, but based on the application date, yes.

7   Q    Okay.  So it's not accurate to say that the income

8   verification is same year, right?

9        (Pause)

10  A    Well they have same year right above it.  Looks pretty

11  much the same.

12  Q    It is incorrect.

13            THE COURT:  They put the wrong year.

14            THE WITNESS:  They picked the wrong box.

15            THE COURT:  Mr. Aronoff, they picked the wrong

16  box.

17            THE WITNESS:  They picked the wrong box it looks

18  like, yes.

19  BY MR. DAVIS:

20  Q    Yeah.  And by the way just the origination credit

21  report that we've spoken about is not in the claim file,

22  right?  You don't see it here in the claim file?

23  A    The origination credit report is not in the claim

24  package, that's correct.

25  Q    Okay.  So if we just look at the next slide just to

Page 55

1   summarize what we've seen here.  Looking at your Exhibit 4

2   excerpts starting with the borrower the actual monthly

3   income even based on the evidence that the trustees relied

4   on was inaccurate, right?  Because they chose the wrong

5   year.  And that makes the monthly differential and monthly

6   percentage inaccurate, correct?

7   A    The values are wrong, but the conclusion doesn't

8   change.

9   Q    Okay.  And the conclusion doesn't change, so your

10  conclusion on this loan doesn't change whatsoever based on

11  what you've seen?

12  A    Well not looking at the '07 income, which should have

13  been used.

14  Q    I'm talking about the loan overall.

15  A    Well based on this very limited insight into this loan

16  I don't see anything that leads me to believe that these

17  borrowers actually made anywhere near the income they

18  stated.

19      So I think the misrepresentation of income claim is

20  supported or the documentation of it at least with respect

21  to the claim tracking spreadsheet narrative was -- had some

22  factual errors in it, which we've identified by looking at

23  the very same documentation that was provided with the loan

24  that shows that in actuality there is a misrepresentation of

25  income here.

Page 56

1   Q     In your opinion, right?

2   A     In my opinion.

3   Q     Yeah.  So just to complete the story the actual monthly

4   income of 2,069 for the co-borrower, the doctor, is clearly

5   incorrect based on what we saw, right?

6   A     I don't remember saying it was clearly incorrect.

7   Q     You don't remember seeing $200,000 worth of income and

8   the number of $31,000 worth of business income between the

9   two borrowers?

10  A     I saw calculations of different income numbers on the

11  tax return, and the underwriter decided based on the

12  analysis of the loan file which income number was to be

13  used.

14  Q     So the underwriter chose to ignore about $100,000 worth

15  of wage income?

16  A     No, that's not fair, and that's not what I'm saying.

17  Q     Well the underwriter chose to use $31,000 worth of

18  business income to calculate -- or something like that -- to

19  calculate this borrower's -- co-borrower's income, right?

20  A     They used the income number that they believe looking

21  at the file reflected the borrower's income.  And to the

22  extent this borrower was self-employed the gross business

23  income is not the appropriate number to use.

24          THE COURT:  I'm sorry, I'm just beyond confused.

25  Beyond.

1                 There was a tax return shown that showed $280,000

2     of income, right?  Right?

3                 THE WITNESS:  Yes.

4                 THE COURT:  I'm not -- right?

5                 THE WITNESS:  As a --

6                 THE COURT:  Okay.  And in addition to that on the

7     tax return there was a business income of $24,000, right?

8     Right?

9                 MR. DAVIS:  Correct.

10                THE COURT:  Okay.  And what the little boxes that

11    were drawn around the business income showed was that

12    somebody decided that they could take that $24,000 and

13    multiply it by 12 and come up with a hypothetical income for

14    whom?

15                THE WITNESS:  For this borrower for the prior

16    year.

17                THE COURT:  For the self-employed physician for

18    the prior year?

19                THE WITNESS:  That's what the numbers look like,

20    yes.

21                THE COURT:  I just -- I just have no idea.  I am

22    not following this at all.

23                So the total adjusted gross income is $239,000,

24    right?  And divided by 12 you get $19,000, right?

25                THE WITNESS:  Yes.

1          THE COURT:  So where does that number come into

2    this analysis?

3          THE WITNESS:  Your Honor, I'd have to look at the

4    whole file.

5          THE COURT:  But on your -- on the chart some -- if

6    there's no relationship to anything on Exhibit 4 where

7    there's a represented monthly income of $7,500, which is the

8    engineer in this couple, right, and which Mr. Davis showed

9    was based on choosing the wrong year, right?  Right?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.  And then now we're looking at

12    our physician, and for the physician somebody decided that

13    the actual monthly income was $2,000 taking the $24,000

14    number and dividing it by 2 -- by 12, right?

15          THE WITNESS:  By 12, yes.

16          THE COURT:  Okay.  But where's all the -- where's

17    the rest of the income that's shown on the tax return?

18          THE WITNESS:  Again, it was an '08 return, so I

19    would have to see if there is a reason in the file why the

20    underwriter believed that only the business income was this

21    borrower's applicable income in '07.

22          THE COURT:  Well when you say the underwriter do

23    you mean the reunderwriter?

24          THE WITNESS:  The reunderwriter, the loan --

25          THE COURT:  Okay.

Page 59

1            THE WITNESS:  -- review firm, yes.

2            THE COURT:  And do you think that as a hypothesis

3    you could have a physician who actually earned that much

4    money but that in some sort of a separate business had

5    business income?

6            THE WITNESS:  Potentially, of course.  Of course.

7            THE COURT:  Go ahead, Mr. Davis.  I'm just trying

8    to understand apples to apples here.

9    BY MR. DAVIS:

10   Q    So just to complete the story if you look at your

11   Exhibit 17, right, it said that the tax return that it was

12   relying on was near year and in fact it was, but you could

13   not determine that from the claims tracking spreadsheet,

14   right, you had to go to the file.

15   A    Okay.

16   Q    And it said that the co-borrower was salaried and yet

17   it took a self-employed income for the co-borrower, right?

18   A    Yes, and the borrower checked self-employed on the box

19   on the application.

20   Q    And it said that the co-borrower's monthly income was

21   $2,069.  Are you standing behind that number?  Is that your

22   opinion based on what you've seen from this claim package

23   that this co-borrower, who was a physician, was earning

24   $2,069 a month based on what you've seen?

25   A    I can't make a determination based on what I've seen.

Page 60

1    Q    Okay.  And to the extent that you can't make a

2    determination about that you can't make a determination

3    about whether the monthly nominal difference or the monthly

4    percentage difference in your Exhibit 17 are accurate,

5    right?

6    A    Well I think the math is accurate if the 2,069 is

7    accurate.

8    Q    You just told me you couldn't make a determination.

9    A    Right.

10   Q    So my question is if you can't make a determination

11   then you can't also determine whether the monthly nominal

12   difference or the monthly percentage difference are

13   accurate, right?

14   A    That's right.

15        MR. DAVIS:  This would be a good time to take a

16   break if it's all right.

17        THE COURT:  It would.  All right.  Why don't we

18   take a broke for about 15 minutes and then we'll do one more

19   segment before the lunch break.  All right?

20        MR. DAVIS:  Thank you.

21        THE COURT:  So I can't exactly see, a little bit

22   after 20 minutes after the hour.  All right?  Thank you.

23        (recessed at 12:07 p.m.; reconvened at 12:27 p.m.)

24        THE COURT:  Please have a seat.  I apologize for

25   the disturbance.  It's a tradition that when one of my

Page 61

1     daughters gets into a professional school or gets an amazing

2     job they call me and I scream --

3          (Laughter)

4               THE COURT:  -- such that one time when my daughter

5     got into medical school the marshals came running --

6          (Laughter)

7               THE COURT:  -- to make sure that no one was

8     attacking me.

9               So I apologize.  I'm happy to share this very good

10    news with you that my daughter got a job.

11         (Laughter)

12              THE COURT:  Got a very, very amazing job.  So I

13    told her you all said congratulation.  She's in the middle

14    of an arraignment shift in the Bronx, so it's a busy day.  I

15    apologize.  Okay.

16    BY MR. DAVIS:

17    Q    Okay.  Mr. Aronoff, can you open to tab 4 again in your

18    binder.  Just again that excerpt of Exhibit 4.

19         (Pause)

20    Q    Okay.  And just looking at the first page for

21    illustrative purposes there are some rows in red, right?

22    A    Yes.

23    Q    And I think you testified last week that the red color

24    denotes examples of accepted loans, loans that were accepted

25    by the plan administrator, right?

Page 62

1    A    Yes.

2    Q    And in your report you say that the plan

3    administrator's acceptance of loans with a misrepresentation

4    of income breach claim, such as those that are in this

5    exhibit here, support the validity of this type of breach

6    finding and the types of evidentiary support used to assert

7    claims for this type of breach finding.  Do you remember

8    that opinion?

9    A    I remember statements to that effect, yes.

10   Q    Okay.  But I think as you testified in response to the

11   Court's questions last week you have to look at the totality

12   of the loan file to understand whether and to what extent

13   loans that share some characteristics can be compared with

14   one another.  Is that fair?

15   A    I don't think the context was comparison, I think it

16   was to make the actual determination as to whether there's a

17   breach finding or not I talked about looking at the totality

18   of the file, yes.

19   Q    Okay.  So in the context of making an actual breach

20   finding you do have to look at the totality of the file,

21   right?

22   A    We tried to do that, yes.

23   Q    Okay.  So to be clear by highlighting these accepted

24   loans you're not saying that just because the plan

25   administrator accepts one misrepresentation of income claim

Page 63

1    it should accept them all, right?

2    A    I don't think I came close to saying that, no.

3    Q    And you're not saying that because the trustees based

4    one misrepresentation of income claim that was accepted on a

5    particular kind of evidence like a bankruptcy filing, for

6    example, the plan administrator therefore should accept all

7    misrepresentation claims based on bankruptcy filings, right?

8    A    I stand by the language in my report and that's not --

9    I didn't say what you just said, no.

10   Q    Okay.  Let's take a look just again illustrative

11   purposes the column that says represented monthly income.

12   Do you see that?

13   A    Yes.

14   Q    Now, based on what's in this chart you can't tell me

15   here whether the income reflected is only the gross monthly

16   income or could include some other component of such income;

17   is that right?

18   A    I don't know how to distinguish, gross monthly income

19   would include other components of income if they were there.

20   So I don't know -- it was an either or, I don't know how to

21   answer it.

22        (Pause)

23        MR. DAVIS:  So I'd like to read page 402,

24   beginning at line 6, ending at line 18.

25   BY MR. DAVIS:

1  Q    Question, "What information is reflected in column C?"

2       Answer, "That will be stated income, the income

3  represented by the borrower in almost every case on the

4  application."

5       Question, "Is it the gross monthly income?"

6       Answer, "It may be.  It may include other components of

7  income that was used to underwrite the loan."

8       Question, "So it just depends on the file?"

9       Answer, "It in every case depending specifically on the

10 file."

11      Did I ask those question and did you give me those

12 answers?

13 A    Yes, and I think that's consistent with what I just

14 said.

15 Q    Okay.  And there's a column the second from the right

16 is the evidence side column, do you see that?

17 A    Yes.

18 Q    Now, I think as we kind of saw an example of already

19 that was just the primary evidence in support of the claim,

20 right?

21 A    Yes.

22 Q    And you have to look at the file to see if there's

23 additional evidence in support of the claim, right?

24 A    Not necessarily.  I think in every case the primary

25 evidence in and of itself is sufficient, but to understand

Page 65

1    the -- to try and understand and recreate the thought

2    processes and the analysis done by the forensic loan

3    reviewer I would advise anyone evaluating that work to look

4    at the totality of the file as well.

5    Q    Okay.  So -- yeah, so I'm not talking now about the

6    forensic loan reviewer's opinion, I'm talking about your

7    opinion as reflected in these exhibits, right?  Because

8    these exhibits reflect your opinions on each and every row

9    and that's the subject of your report, right?

10   A    What's the question?

11   Q    Do these exhibits reflect your opinion on each and

12   every loan that's the subject of your report?

13   A    They reflect the information on which I base my

14   opinions, yes.

15   Q    And you would have to look at each file to see if there

16   were some evidence aside from your primary evidence that's

17   listed here that supports the claim; is that right?

18   A    No.

19        (Pause)

20             THE COURT:  Mr. Davis, could you go back two,

21   maybe three questions?

22             MR. DAVIS:  Okay.

23             THE COURT:  I don't know if you have it on your

24   little screen there.  Was the question to Mr. Aronoff

25   whether this exhibit reflects his opinion on each and every

Page 66

1      loan?

2              MR. DAVIS:  Yes.

3              THE COURT:  And what was the answer?

4              THE WITNESS:  They reflect the information on

5      which I base any opinions.

6              THE COURT:  So is the answer to Mr. Davis'

7      question no, it does not reflect your opinion on each and

8      every loan?

9              THE WITNESS:  The exhibits don't have a conclusion

10     or an opinion in them, so I view it as I've opined that each

11     and every breach finding is the subject of my report

12     breaches the applicable rep and is material and adverse and

13     I've tried to provide in excruciating detail certain

14     information with respect to those loans on which I rely to

15     provide those opinions.

16             THE COURT:  Okay.  I'm -- I just want to

17     understand on the exhibit that's up on the screen, this loan

18     number count 1, loan ending 0294, does that reflect your

19     opinion that for that loan there's a misrepresentation of

20     employment and there's a -- I'm sorry -- income -- a

21     misrepresentation of income, a misrepresentation of

22     employment, and excessive DTI breach for this loan?

23             THE WITNESS:  Yes, but again, semantics.  It's not

24     exhibited here, this is a reflection of that.  Exhibit 15 is

25     really where all that information and -- is expressed as

Page 67

1    these are the loans and the breach findings that are the

2    subject that I'm opining on, these are the types of breach

3    findings with respect to those loans.

4              So yes, with respect to the data that you just

5    extracted from Exhibit 4 I am opining that this loan has a

6    misrepresentation of income breach, that's why it's on

7    Exhibit 4, and it also contains these other breach findings.

8              THE COURT:  Okay.  Thank you.

9    BY MR. DAVIS:

10   Q    And the evidence type column doesn't show other

11   corroborating evidence that you say may exist in any given

12   file, right?

13   A    It may or may not.

14   Q    And the only way you could tell the difference is if

15   you go into the file and look to see, right?

16   A    The claim package or the loan file, yes.

17   Q    Okay.  And the evidence type column doesn't list any

18   information in the loan file that may be inconsistent with

19   the claim, right?

20   A    That's correct.

21   Q    So to identify any inconsistent evidence that might

22   exist on any one of these breach claims you have to go into

23   the loan file, right?

24   A    Yes; however, to the extent there was sufficient

25   inconsistent information in the view of the forensic loan

Page 68

1   reviewer the claim never would have been made.

2   Q    Yeah.  And in your view as well?  Is that your opinion

3   that none of these claims would have been made if there were

4   sufficient inconsistent evidence?

5   A    Yes.

6   Q    Okay.  And so in your view for all of the 100 plus

7   thousands claims on all of these 72,000 loans had

8   insufficient inconsistent information to suggest that maybe

9   the claim is invalid?

10          MR. SHUSTER:  Objection to form.  I don't --

11   objection to form.  I don't understand the question.

12          THE COURT:  Okay.  Try it again, Mr. Davis.

13   BY MR. DAVIS:

14   Q    So it's your view that on all of the 100,000 plus

15   claims that are the subject of your report there is

16   insufficient inconsistent information in the loan file to

17   suggest that the breach claim is invalid?

18   A    Well let me try and answer it this way and tell me if

19   it appearances your question because there are too many

20   double negatives for me.

21      The guidance was given was we want the loan reviewers

22   to be thoughtful and fair and not cherry-pick data and try

23   and find a breach based on a single piece of data.  That's

24   not helpful to anyone, particularly me offering the opinion.

25      The guidance was look at the totality of the file.  To

Page 69

1    the extent you find information that may support a breach

2    maybe sure that in the context of the whole file there's not

3    inconsistent information that outweighs that.  To the extent

4    there was inconsistent information that outweighed the

5    information that may in isolation support a breach finding

6    those claims were not brought under the protocol.

7        So to the extent there is what appears to be

8    inconsistent information in a file with a claim that appears

9    to contradict the basis for that claim there was a

10   subjective judgment made that although on its face this

11   information may appear inconsistent it didn't rise to the

12   level of undermining the ultimate decision that there was in

13   fact sufficient evidence to support a breach finding.

14   Q    And that subjective determination regarding the weight

15   of inconsistent information for evidence is not reflected

16   anywhere on your exhibits, correct?

17   A    Other than in the results.

18   Q    Okay.  And that subjective determination that the

19   inconsistent information in a given file was insufficient to

20   outweigh the evidence in support of the breach claim, that

21   analysis is not in the breach claim submissions by the

22   trustees either in the narratives, right?

23   A    No, nor to my understanding wasn't required to be.

24   Q    Now, if you take an example of an evidence type such as

25   a tax return you can't tell from looking at this chart

Page 70

1   either whether there were one tax return that the trustees

2   were relying on or multiple tax returns, right?

3   A    As I said, I think that the evidence type by itself

4   that's cited for each breach finding is sufficient to

5   support the claim.  As to whether it was the sole factor in

6   reaching the conclusion there may be more information that's

7   available in the file that supports that conclusion.

8   Q    Yeah, I'm just asking a much simpler question, which is

9   where it says here tax return, right, does that indicate

10  there's a single tax return supporting the breach

11  determination or multiple tax returns or you can't tell?

12  A    It indicates there's at least one tax return that

13  supports the tax finding.

14  Q    Okay.  So there could be multiple tax returns but in

15  order to do that you'd have to open up the claim file or the

16  loan file, right?

17  A    Yes.

18  Q    And when you're looking at the actual monthly income

19  column on this chart if you wanted to answer the question

20  whether the loan review firms were taking into account in

21  that calculation some kind of a side business that the

22  borrower might have you'd also have to look at the claim

23  file or the loan file, right?

24  A    It depends.  To the extent the evidence type cited

25  contained all of the sufficient information for the

Page 71

1    analysis, no.  But to the extent it didn't then yes.

2    Q    Yeah, so I'm not talking about the evidence type now

3    per se, I'm talking about what's in the third column.  And

4    sorry if I wasn't clear about that.

5        So we're on the third column represented monthly income

6    and that's the column where the loan review firm entered

7    data about what they said the borrower was representing

8    their income as, correct?

9    A    Yes.  In almost every case that would come from the

10   application.

11   Q    Okay.  And in the actual monthly income that's the

12   column where the loan review firms made a determination that

13   based on whatever evidence they were using it was less than

14   the represented monthly income, right?  For purposes of this

15   misrepresentation of income chart.

16   A    Yeah, I think the determination they made was that this

17   is the income which is supported in the file that is other

18   than the stated income.

19   Q    Okay.  But this chart itself doesn't tell you how they

20   made that determination.  You can't tell from this chart

21   what components of the borrower's actual monthly income the

22   loan reviewers were counting when they calculated actual

23   monthly income, right?

24   A    That's correct.

25   Q    Okay.  So, for example, you'd have to look at the loan

1    file to see in the firms were taking into account things

2    like alimony or child support, right?

3    A    Yes.

4    (Pause)

5    Q    And I'm sorry, so back to the evidence type column

6    again, you can't tell where it says tax return whether that

7    tax return is complete, right?

8    A    No.  If I understand what you mean by complete, no.

9    Q    Meaning it has all it constituent parts, that's what I

10   mean by complete.

11   A    As we discussed in prior dates some of these tax

12   returns are complete for the purposes for which they're used

13   because there's other corroborating information to show that

14   the information we're gleaming from it is reliable.  But no,

15   you can't tell whether it's signed or dated or has other

16   features of I think what you mean by complete.

17   Q    Right.  From this chart you'd have to go into the loan

18   file to figure that out, right?

19   A    Yes.

20   Q    And similarly where the evidence type is a W-2 that

21   could mean one W-2 or it could be multiple W-2s, right?

22   A    Yes.

23   Q    You'd have to go into the loan file to look at that,

24   right?

25   A    To look at whether the claim was based simply on the

Page 73

1   one that's cited, which would be sufficient, or if there

2   were other ones that corroborate the single W-2, yes, you'd

3   have to go into the file to determine that.

4   Q    Well sometimes the claims cite more than one W-2 don't

5   they?

6   A    I don't know.  I don't know what the -- I mean I just

7   -- I saw W-2, I don't know if the evidence type ever listed

8   nine W-2s or not.

9   Q    Yeah.  I mean I guess I didn't ask about nine W-2s.  I

10  just asked whether sometimes you were citing multiple W-2s

11  as the primary evidence to your claim.  Do you know?

12  A    I don't recall.

13  Q    Okay.  And you can't tell from seeing the term W-2

14  listed in this evidence type how exactly the loan review

15  firm took that W-2 and calculated actual monthly income,

16  right, you have to look at the loan review -- you have to

17  look at the file?

18  A    I'm not sure I understand the question.

19  Q    Well you can't tell how the calculation was made by

20  using the W-2 can you, by just the fact that a W-2 was used?

21  A    There's fairly discrete well labeled information on a

22  W-2, but I guess no is the answer to your question, you

23  can't.

24  Q    Okay.  So let's talk about third-party information a

25  bit.  The loan review firms consulted what you called in

Page 74

1    your testimony last week third-party information sources in

2    connection with their breach findings, right?

3              THE COURT:  Can you hold on one second?  Mr. Davis

4    and Mr. Shuster, could you come up for a second?

5        (At sidebar off the record)

6              THE COURT:  So this is about lunch, nothing about

7    -- I got a thumbs up from the witness.  I'm very observant I

8    think, Mr. Aronoff.

9              So we're going to come back.  We're going to cheat

10   it by an hour by five minutes and we're going to try to

11   start up again at a quarter to 2:00, because everyone is

12   determined to say goodbye to you today.

13             THE WITNESS:  And I'll be less cranky after I have

14   something to eat.

15             THE COURT:  Your crankiness was not in the

16   record --

17       (Laughter)

18             THE COURT:  -- but let's call it lunch and we'll

19   see you at a quarter to 2:00.  All right?

20             THE WITNESS:  Thank you.

21             MR. DAVIS:  Thank you, Your Honor.

22       (Recessed at 12:52 p.m.; reconvened at 1:50 p.m.)

23             THE COURT:  Okay.

24   BY MR. DAVIS:

25   Q    Okay.  Mr. Aronoff, I just want to start briefly with

Page 75

1     your -- just the detail of your biography.  So I think you

2     said that you left Duff & Phelps in December of 2015; is

3     that right?

4     A     Yes.

5     Q     And after you left Duff & Phelps from December 2015

6     through May of 2016 you had nothing to do with the loan

7     reviewers in this case, right?

8     A     Yes.

9     Q     So you weren't involved in overseeing the loan

10    reviewers during that period of time, right?

11    A     That's correct.

12    Q     So when we're talking about third party sources that

13    you discussed in your testimony last week, Mr. Aronoff, do

14    you know how many loans passed through the protocol in the

15    time period between December 2015 and May of 2016?

16    A     No.

17    Q     To your knowledge did Duff & Phelps -- strike that.

18          To your knowledge Duff & Phelps did not provide the

19    loan review firms with a list of third party sources they

20    were permitted to use, right?

21    A     To my knowledge that's correct.

22    Q     And you don't know whether the loan review firms

23    reviewed third party sources for every loan amount, right?

24    A     That's right.

25    Q     And you didn't put into place any policy or procedure

1    that required the loan review firms to give Duff & Phelps

2    all of the information that they gathered from third party

3    sources in connection with any given loan, right?

4    A    That's right.  That -- and that policy did not ask for

5    everything potentially as consistent with industry custom

6    and practice.

7    Q    Okay.  I'm not sure what policy you're referring to

8    because, in fact, you didn't put into place any policy and

9    procedure that required the loan review firms to give Duff &

10    Phelps all of the information they gathered from third party

11    sources, right?

12    A    Yes.  And not requiring them to do that was consistent

13    with industry custom and practice.

14    Q    And what industry you referring to?

15    A    Forensic loan reviews of -- forensic loan reviews with

16    the purpose of determining conformity with reps and

17    warranties and private label RMBS transactions.

18    Q    Okay.  And, in fact, you understood that the loan

19    review firms were not passing all of the third party

20    information they collected to Duff & Phelps, right?

21    A    Yes.

22    Q    The only time you would know what the loan review firms

23    did with the third party information they collected was if

24    they used that information to support a breach claim, right?

25    A    Initially, yes.

Page 77

1        (Pause)

2    Q    What the loan review firms did with third party

3    information in those cases where that information -- where

4    the information in the file was accurate or they didn't feel

5    the third party tool provided them with the necessity

6    clarity -- necessary clarity of decisioning (sic) that they

7    needed, you don't know what they did with the third party

8    information, right?

9    A    Can I hear that question again, please?

10   Q    Sure.  What the loan review firms did with third party

11   information in those cases where the information in the loan

12   file was accurate or they didn't feel the third party tool

13   provided them with the necessary clarity of decisioning

14   (sic) you don't know, right?

15   A    Unless the loan review firm provided a third party tool

16   they used in support of a breach claim they were asserting

17   we didn't see what they pulled or if they pulled third party

18   tools.

19   Q    Now, Mr. Aronoff, the trustees at times submitted

20   breach claims that relied on one piece of evidence to

21   support the claim, right?

22   A    I believe so.  Yes.

23   Q    And in cases where the claim rested on a single piece

24   of evidence, that claim would only be brought if there was

25   no information that could reasonably be interpreted to

Page 78

1    contradict that single piece of evidence in the loan file,

2    right?

3    A    With sufficient weight to make that document not say

4    what it was purported to say.  There may have been

5    information that one could say appears to contradict it, but

6    in the judgment of the forensic reviewer and our QC the --

7    it was not sufficient to override for lack of a better term

8    the evidence that was used to support the breach claim.

9    Q    But in such a case the loan application would not be a

10   piece of contradictory evidence, right?

11   A    The loan application was in most cases the data point

12   that was being audited.

13   Q    So to the extent you found a single piece of evidence

14   of the kind you've been testifying about, a same year tax

15   return, for example, that contradicted the income stated on

16   the loan application you could and at times did conclude

17   that the income reflected in that single source would be

18   sufficient to prove the breach claim, right?

19   A    Yes.

20   Q    Now the standard form mortgage loan application during

21   the relevant period asked borrowers to provide their gross

22   monthly income, correct?

23   A    Yes.  I believe so.

24   Q    And in your view gross monthly income means one-twelfth

25   of the borrower's annualized income, right?

Page 79

1  A    Yes.

2  Q    And in your experience it's not common for a lender and

3  a borrower to have a discussion about how to interpret the

4  phrase, gross monthly income, for purposes of the loan

5  application, right?

6  A    Yes.  It's not usually the subject of a tremendous

7  amount of misunderstanding.

8  Q    In fact, your view is that it would be unreasonable for

9  a borrower to inquire whether the gross monthly income

10  they're supposed to provide on the loan application is to be

11  projected for the current year or based on the prior 12

12  months or something else, right?

13  A    I don't know if it's unreasonable for the borrower to

14  ask the question, but in my experience they often know what

15  their income is.

16        THE COURT:  But, Mr. Aronoff, just as a matter of

17  taking a random example, do you think it's obvious if

18  somebody has -- supplements their income by occasional, I'm

19  trying to think of something, I don't know back in the good

20  old days selling Tupperware or babysitting for the

21  neighbor's child or something like that?  Do you think it's

22  clear to a borrower how to treat that for the purposes of

23  the loan application?

24        THE WITNESS:  I think it is, but I think to the

25  extent the borrower had additional sources of income in

Page 80

1    addition to their base income it wouldn't be unreasonable to

2    ask, should I include babysitting or should I include

3    tutoring to the extent they want that considered.  But that

4    -- there are appropriate spots on the application to include

5    that type of income.

6            THE COURT:  Okay.

7    BY MR. DAVIS:

8    Q    So I would like to read page 310, line 18 to 311, line

9    9.

10   A    Can you give me one second to get --

11   Q    Sure.  Take your time.

12        (Pause)

13   Q    "Question:  So you don't think it's reasonable for a

14        borrower to ask whether the gross monthly income they

15   are  supposed -- they are asked to provide here is supposed

16   to   be projected for the current year or based on the prior

17        12 months or something else?"

18        "Answer:  No."

19        Did I ask that question and did you give that answer?

20   A    Yes.

             And that doesn't deal with the components of the

21   income.  It deals with if they should use their income from

22   ten years ago versus their current income.  And I think it's

23   pretty clear if you want a loan and someone's asking how

24   much you get paid you use your current income to the best

25   you know what that is.

Page 81

1   Q    And your opinion is that the term gross means the same

2   thing for a self-employed borrower as it does for a salaried

3   borrower, right?

4   A    Yes.

5   Q    But whether a self-employed borrower is supposed to

6   report his business income really depends on their tax

7   status and corporate structure, correct?

8   A    What an individual's gross income is, yes, depends on

9   how much they -- whether they take all or some of the

10  business income that is attributed to them.  And just

11  looking at their business income doesn't necessarily tell

12  you what the borrower's gross income is.  That's correct.

13  Q    Right.  So in part it depends on tax status and

14  corporate structure of the borrower, right?

15  A    To determine the gross income, yes.

16  Q    And you also understand that a self-employed borrower's

17  income is less predictable and more subject to variability

18  than the salaried employee, right?

19  A    It may be.

20  Q    But in your experience most borrowers don't have a

21  problem understanding what their gross monthly income is for

22  purposes of filling out the loan application, right?

23  A    That's my experience.

24  Q    And in your view determining gross monthly income is a

25  simple calculation, right?

Page 82

1    A    For most borrowers it is, yes.

2    Q    And your position is that anyone who is applying for a

3    loan that doesn't understand what their gross monthly income

4    is probably shouldn't get a loan because they probably won't

5    understand what the monthly payment obligation on a loan is,

6    correct?

7    A    I still believe that.

8    Q    In your opinion only in the litigation context could

9    there be some confusion over how to calculate gross monthly

10   income, right?

11   A    As to what it means on a 1003, yes.  A 1003 is a loan

12   application.

13   Q    Mr. Aronoff, you testified last week about breach of

14   occupancy claims.  Do you recall that?

15   A    Yes.

16   Q    And you said that sometimes the trustees relied on

17   occupancy affidavits to support those claims because they

18   contain different terms than are provided in the deed of

19   trust of mortgage, right?

20   A    I'll -- yes.

21   Q    And the standard form in trust typically provided for a

22   promise to occupy except in the event of extenuating

23   circumstances, right?

24   A    Yes.

25   Q    And you say in your reply report that in many instances

Page 83

1    where the plan administrator has identified extenuating

2    circumstances the borrower completed an occupancy affidavit

3    that contains an unqualified occupancy commitment without

4    extenuating circumstances; is that right?

5    A    Yes.

6    Q    So if there's a loan file that has an occupancy

7    affidavit that doesn't contain extenuating circumstances

8    exceptions and also provided that a breach of a promise

9    would constitute a default under the deed of trust, the

10   trustees might bring a misrepresentation of occupancy claim

11   even if there were extenuating circumstances present,

12   correct?

13   A    Yes.

14   Q    Now some of the occupancy affidavits do contain

15   extenuating circumstances exceptions, right?

16   A    They may.  I don't recall seeing any that had that

17   language in it.

18   Q    Take a look at page -- Tab 39 in your big binder.  This

19   is PA Exhibit 0033 --

20           THE COURT:  Mr. Aronoff, it's in the additional --

21           MR. DAVIS:  -- -A.

22           THE COURT:  -- packet that Mr. Davis gave you this

23   morning.

24           THE WITNESS:  Yeah.  I threw it into the binder

25   because there's too much moving stuff on this table.

Page 84

```
 1              THE COURT:  I agree.

 2        (Pause)

 3              THE WITNESS:  Thank you.

 4   BY MR. DAVIS:

 5   Q    Do you recognize this as an occupancy affidavit of the

 6   sort we've been discussing?

 7   A    It's a -- it appears to be an occupancy affidavit.

 8   It's not the typical form, but it -- I'll -- it is what it

 9   says it is, I'll assume.

10   Q    And it does contain an extenuating circumstances

11   exception.  Do you see that in the tab marked 2 where the

12   box is checked?

13        (Pause)

14   A    This isn't really the same thing as the language that

15   appears in the mortgage.

16   Q    It's not the same thing as what?  I'm sorry.  I

17   couldn't hear you.

18   A    As the carve out in the standard form mortgage which

19   says -- this talks about the borrower is unaware of any

20   events or circumstances that would impair their ability to

21   fulfill the loan obligations.

22              THE COURT:  I'm sorry.  Where are you reading from,

23   Mr. Aronoff?

24              THE WITNESS:  Am I in the wrong paragraph?  I'm in

25   three.
```

Page 85

1          MR. DAVIS:  No.  You should be in two.

2          THE WITNESS:  Oh, sorry.

3          MR. DAVIS:  And it's on the screen, or it was on

4    the screen.

5          THE WITNESS:  I see it.  Yeah.  That -- that tracks

6    pretty closely to the language of the mortgage.

7          MR. DAVIS:  Okay.

8    BY MR. DAVIS:

9    Q    And so as it turns out some occupancy affidavits do

10   provide exceptions for extenuating circumstances, right?

11   A    Yes.

12   Q    And some occupancy affidavits, while they may not

13   provide an exception for extenuating circumstances, they

14   don't expressly say that a breach of the affidavit or the

15   promise in the affidavit will constitute a default under the

16   deed of trust, right?

17   A    They may.  I'm not aware of those types of affidavits

18   in this deal.  Those would have been two important

19   considerations for any loan reviewer is that to the extent

20   there were extenuating circumstances to make sure that the

21   affidavit didn't include them.  If it did, that wouldn't be

22   the -- a basis for a breach.

23        And, similarly, if the analysis was that there was not

24   a breach of the mortgage and there was only a breach of the

25   affidavit, but the affidavit didn't result in a breach of

Page 86

1    the mortgage or note, then there wouldn't be the underlying

2    threshold fact for a breach of the note and fault rep.

3    Q    Okay.  So in your view the affidavit would have to say

4    both that extenuating circumstances don't apply or omit, I

5    suppose, and that a breach of the affidavit would constitute

6    a default under the deed of trust in order to essentially

7    override the terms of the deed of trust?

8    A    To result in a breach of solely the no default rep.  It

9    still may result in a breach of the no untrue statement rep.

10   Q    Now the Court asked you a question last week regarding

11   what happens in the event of a conflict between the

12   affidavit and the deed of trust.  Do you remember that

13   question?

14   A    Yes.

15   Q    And you understand that the mortgage industry is a

16   highly regulated industry under both federal and state law,

17   right?

18   A    Yes.

19   Q    And when you were approving breach of occupancy claims

20   based on affidavits with terms different than the deed of

21   trust you didn't seek any legal opinion concerning whether

22   under the laws that governed that particular loan in that

23   particular state under those laws the affidavit could, in

24   fact, override the deed of trust, did you?

25   A    No.  I didn't make a legal determination as to the

Page 87

1    efficacy of the affidavit.  I used industry custom and

2    practice and my experience that -- that the affidavit signed

3    by a borrower is taken for what it says and that a lender

4    can declare a default based upon the terms of the affidavit

5    being violated if that's in the affidavit.

6    Q    And you didn't seek any legal opinion on that subject,

7    did you?

8    A    I personally did not.  No.

9    Q    Okay.

10         THE COURT:  But can I just ask one more on this?

11   So if the deed of trust has no extenuating circumstances

12   exception, but the affidavit does, and there are extenuating

13   circumstances, is there an occupancy default or not?  The

14   deed of trust says thou shalt occupy.  The affidavit says

15   thou shalt occupy unless extenuating circumstances.

16         THE WITNESS:  Given the priority that I've

17   attributed to the affidavit, in that case we would have to

18   give benefit to.  I mean, your question last week troubled

19   me because I thought there was no notwithstanding or any

20   language, but there isn't.  It's just --

21         THE COURT:  Well, I'm --

22         THE WITNESS:  -- as a matter of course from an

23   industry standpoint, not from a legal standpoint, the

24   affidavit is viewed as controlling and overriding similar

25   language in the mortgage.

Page 88

1            So given your hypothetical we would have to look

2      for an exception because of the affidavit containing it

3      regardless of whether or not the mortgage did.

4            THE COURT:  Okay.

5            THE WITNESS:  We can't have it both ways.  But in -

6      -

7            THE COURT:  Okay.  I -- you know, I'm just speaking

8      hypothetically --

9            THE WITNESS:  Yes.

10           THE COURT:  -- because my recollection, and we can

11     stop on this, but my recollection from when I asked the

12     question before was not the same as the testimony that you

13     gave now.  But the record speaks for itself.  So we can move

14     forward.

15           THE WITNESS:  Yeah.

16           THE COURT:  So right now you're saying that the

17     affidavit not based on legal opinion, but based on what's

18     customary in the industry, the affidavit would trump so to

19     speak the deed of trust?

20           THE WITNESS:  Yes, Your Honor.  I think the

21     confusion is that it was the other way around last time;

22     that the mortgage contained the exception and the affidavit

23     did not.

24           THE COURT:  Right.  Thank you.  Okay.

25     BY MR. DAVIS:

Page 89

1    Q     Mr. Aronoff, let's go to your opening report at page

2    31.  So I'm sorry to say I think that's in a different

3    binder.

4          (Pause)

5    Q     Are you with me on page 31?

6    A     Yes, I am.

7    Q     Okay.  And here you set out an example of the no

8    default representation, right?

9    A     Yes.

10   Q     Okay.  And you say here that the no default

11   representation is that there is no -- there was no default

12   breach violation or event of acceleration existing under the

13   mortgage or the related mortgage note or any event which

14   would constitute any of those things with the passage of

15   time, right?

16   A     Yes.

17   Q     And then below you set out an example of a mortgage,

18   right, continuing it onto page 32, correct?

19   A     Yes.

20   Q     And the mortgage speaks of default in the event of

21   materially false, misleading or inaccurate information or

22   statements by the borrower to the lender, right?

23   A     Yes.

24   Q     And in your view the materiality that's being

25   referenced in the mortgage speaks to whether the information

Page 90

1    was omitted or misstated would be material to the decision

2    of the lender to provide credit or make a loan to that

3    borrower, right?

4    A    Yes.

5    Q    So in your view only information that was misstated

6    that's material to the credit decision on the underlying

7    loan would provide a breach of this covenant, right?

8    A    Yes.   The credit risk of the loan.

9    Q    And if this covenant were breached that, in turn, would

10   result in a breach of the no default representation, right?

11   A    Yes.

12   Q    And the breach of the no default representation would

13   be subjected to the same standard that every other breach

14   finding would be subjected to which is whether that breach

15   materially and adversely affects the value of the loan or

16   the interest of the certificate holders, right?

17   A    Yes.

18   Q    Okay.   Now let's look at page 34.   And there you set

19   out an example of what you refer to as the no untrue

20   statement representation, right?

21   A    Yes.

22   Q    And that representation in your view in the next

23   sentence there provides that where it is discovered that the

24   borrower made a material -- made a misrepresentation of a

25   material fact at the time the loan was originated or omitted

Page 91

1   to state a material fact the representation and warranty is

2   breached, right?

3   A     Not quite.

4   Q     Okay.  Did I --

5   A     It doesn't have to be --

6   Q     -- botch the reading?

7   A     -- something the borrower states.  It's that the

8   documents, instruments and agreements submitted for loan

9   underwriting don't contain those problems.

10  Q    Okay.  Either a misrepresentation of material fact or

11  an omission of material fact, right?

12  A    Yes.

13  Q    Okay.  And, again, so in your view in the context of

14  the no untrue statement representation material also means

15  material to the credit decision, right?

16  A    Yes.

17  Q    And a breach of the no untrue statement representation

18  also is subject to a determination of an AMA, right?

19  A    I'm sorry.  Can I hear that again?

20  Q    And a breach of the no untrue statement representation

21  also is subject to a determination of AMA --

22  A    Yes.

23  Q    -- right?

24  A    All breaches are.

25  Q    Okay.  So I want to focus now not on AMA but on

1    materiality under the two representations that we just

2    discussed.

3    A     Okay.  I'm with you.

4    Q     Okay.  So let's talk about misrepresentation of income.

5    In your view even a misrepresentation of income of less than

6    five percent would be valid, right?

7    A     In my personal view or --

8    Q     In your opinion?

9    A     That wasn't the opinion here.  No.  In my personal view

10   it would, but we imposed a tolerance around so that -- so

11   that the trigger wasn't as severe as it would be if there

12   was no trigger.

13        But any misrep of income was not cited as a breach

14   finding here.  At a minimum it had to be five percent and

15   then depending upon certain other factors it might have been

16   even greater.

17   Q     So your opinion is that it would be a breach, but you

18   didn't assert that kind of a claim here in this case?

19   A     No.  My opinion in this case is clear that a

20   misrepresentation of income of the type described that was

21   cited would result in a breach of these loans with respect

22   to these reps and warranties.

23   Q     So in your view is not that a misrepresentation of an

24   income less than five percent would still be a valid breach

25   in this case?

Page 93

```
 1   A     Not in this case.

 2           MR. DAVIS:  Your Honor, I would like to read pages

 3   606, line 22 to 607, line 12.

 4   BY MR. DAVIS:

 5   Q     In your deposition the trustees' counsel asked you:

 6         "Do you have a view as to whether a misrepresentation

 7   of   income that was less than five percent would still be a

 8         valid breach?

 9         "Answer:  Yes.

10         "Question: What's your view?

11         "Answer:  It still is a valid breach claim because it

12         would, to the extent there was a misstatement of income

13         that was material and adverse to the interest of

14         investors, that would provide a claim.  There is no

15         variance in the rep or there is no variance in fact in

16         custom and practice."

17         Were you asked those questions and did you give those

18   answers at the deposition?

19   A     Yes.  And that's my personal view.  However, it was

20   modified for purposes of making the opinion here; that, of

21   course, if I think any variance is a -- is material, then a

22   variance of five percent or greater would be material.

23           THE COURT:  I'm sorry.  I need to understand what's

24   going on here.

25           It's your view, Mr. Aronoff, that a income breach
```

Page 94

1   of .05 percent is a material breach.

2          THE WITNESS:  Theoretically it increases the risk

3   of loss.

4          THE COURT:  That's -- but for the fact that somehow

5   there was a tolerance imposed you would have -- it would

6   have been your opinion, your recommendation to submit a loan

7   that contained a .05 percent misrepresentation of income as

8   a claim in this case?

9          THE WITNESS:  No, Your Honor.  There's always a

10  tolerance imposed.  There's always a tolerance imposed for

11  this very reason; that -- to stay away from trivial actual

12  differences.  But in point of fact --

13         THE COURT:  How do we know what the tolerance is?

14         THE WITNESS:  In any case where these types of

15  reviews are done, it's incumbent upon the expert who is

16  making the opinion to explain what the redlines that were

17  drawn were.

18         THE COURT:  So -- and in none of my question -- I'm

19  merely trying to clarify.  Are you saying that you imposed

20  the five percent tolerance in this case?  You personally?

21         THE WITNESS:  Yes.

22         THE COURT:  Thank you.

23         THE WITNESS:  At --

24         THE COURT:  Go ahead.

25         THE WITNESS:  -- Duff.

Page 95

1              THE COURT:   Okay.   Thank you.

2     BY MR. DAVIS:

3     Q    And that tolerance that you imposed on this case had

4     nothing to do with the underwriting guidelines for the loans

5     that were at issue, right?

6     A    No.   The underwriting guidelines are irrelevant to a

7     consideration of misrepresentation of income.

8     Q    So neither Duff & Phelps nor the loan review firms

9     looked to the applicable underwriting guidelines to

10    determine whether a given misrepresentation of income was

11    material to the credit decision, right?

12    A    That's correct.

13    Q    So except for breaches of the underwriting guideline

14    representation the underwriting guidelines were not

15    consulted to determine whether a breach was material under

16    the terms of the no default or no untrue statement

17    representations, right?

18    A    That's correct and that's consistent with industry

19    custom and practice.

20    Q    Now if we look again at page 34 where you set out the -

21    - what you call the no untrue statement representation, the

22    last sentence there says to the best of seller's knowledge

23    no fraud was committed in connection with the origination of

24    the mortgage loan.   Do you see that?

25    A    I do.

Page 96

```
 1   Q     And in your view the trustees did not have to prove

 2   seller knowledge to demonstrate that a misstatement or

 3   omission reached what you call the no untrue statement

 4   representation, right?

 5   A     Yes.

 6   Q     So there was no seller knowledge qualified mapped into

 7   the misrepresentation of breach findings for purposes of the

 8   trustees loan review, right?

 9   A     Unless to the extent that someone wanted to argue that

10   the fourth sentence was violated and then knowledge would be

11   required.

12   Q     Was it or was it not mapped into the trustees'

13   misrepresentation of breach findings, sir?

14   A     To the extent there was a finding of fraud it would

15   have breached the fourth sentence and that would have had to

16   have been shown.

17   Q     I'm not asking you in theory to the extent.  I'm asking

18   you in actuality was it mapped?

19   A     I don't understand your question.

20   Q     Okay.  Did you have a protocol by which for any

21   misrepresentation claim the loan review firms were

22   instructed to identify seller knowledge?

23   A     Same answer.  If the reason for the breach was fraud,

24   mortgage fraud, then knowledge would have been required.

25   Q     But did you bring any claims based on mortgage fraud
```

Page 97

```
 1    such that knowledge would be required?

 2    A    I don't believe so.  I don't know offhand.

 3    Q    Okay.  So now let's talk about AMA.  The opinion you

 4    gave in your reports in this case was that the AMA standard

 5    is met when the related breach finding identifies that the

 6    deviation of the actual loan characteristics from the

 7    characteristics that the loan was represented to have

 8    significantly increases the risk of loss on the loan; is

 9    that right?

10    A    Yes.

11    Q    Okay.  But when you articulated the standard here in

12    court the other day you left out the term significantly.  So

13    have you changed your opinion?

14    A    No, I haven't changed my opinion.

15    Q    Okay.  So there must be a significant increase in the

16    risk of loss in your view, right?

17    A    Yes.  That's why the tolerances were imposed to meet

18    that standard.

19    Q    So the tolerances were imposed both to meet the term

20    material in the underlying reps and AMA simultaneously?

21    A    I don't think that's what I'm saying.  And maybe I

22    don't understand your question.

23    Q    Well, when I was asking you questions about materiality

24    before we were talking about the term materially or material

25    in the representations themselves.  We were not talking
```

Page 98

1   about AMA.

2   A    I understand that.

3   Q    And you raised the point about tolerances in that

4   context.

5            MR. SHUSTER:  Objection.  I'm not sure that's

6   accurate that Mr. Aronoff raised that .

7            THE COURT:  I think Mr. Davis is recalling the

8   testimony correctly.  So let's keep going and try to get

9   this clear.

10           Go ahead, Mr. Davis.

11  BY MR. DAVIS:

12  Q    The term risk of loss doesn't appear in the MLSA-A's,

13  right?

14  A    At least I know it doesn't -- I don't know.  I know it

15  doesn't appear in the repurchase provisions.  I don't know

16  if it appears elsewhere in the documents.

17  Q    And the risk of loss you're referring to here is the

18  risk of loss to the certificate holders; is that right?

19  A    In terms -- with respect to AMA, yes.

20  Q    Yes.  We're on AMA now.

21       And in your opinion the risk in the term risk of loss

22  need never come to pass, correct?

23  A    Yes.  That's correct.  It's expected risk of loss.

24  Q    Now every loan involves some risk of loss, right?

25  A    Yes.

1   Q     And any securitized loan involves some risk of loss to

2   the secure -- the certificate holders, right?

3   A     Yes.

4   Q     And therefore every securitized loan has embedded in it

5   a baseline risk of loss, right?

6   A     If I follow your logic that's correct.

7   Q     Now in your view the term significantly, right, means a

8   meaningful increase, a substantial increase, an increase

9   that isn't trivial or technical.  I think that's how you

10  described it to me, right?

11  A     Sounds like something I would say.  Yes.

12  Q     But your opinion is that there is no requirement in the

13  repurchase provisions that AMA be quantified and you did not

14  do so, correct?

15  A     That's correct.

16  Q     Okay.  Let's put up TRDX-174 which is your slide.  If

17  you need to look at it it's in your binder, the small

18  binder, but I think it suffices on the screen.

19        This is a slide you discussed last week, right?

20  A     Yes.

21  Q     And you used it last week to explain your definition of

22  AMA, right?

23  A     Yes.

24  Q     This formula, though, appears nowhere in your expert

25  reports, correct?

Page 100

1    A     It does in words.  It may not in this form, but it is

2    certainly explained in my expert reports.

3    Q     This calculation that you have here with the

4    multiplication sign and the equal, that doesn't appear in

5    your expert reports, does it?

6    A     Again, it does textually.  It doesn't appear in this

7    form.

8    Q     Okay.  You didn't apply this calculation that you have

9    up here on a quantitative basis to a single loan in the

10   case, right?

11   A     I applied this formulation to every single breach

12   finding in the case.

13   Q     Did you put numbers with respect to any loan into this

14   formula?

15   A     No.

16   Q     Okay.  Now let's talk about when risk of loss is

17   measured under your view of AMA.  In your opinion because

18   there are no certificate holders until the RMBS is created,

19   risk of loss should not be measured as of the date of

20   origination, right?

21   A     Are you talking about origination of the loan?

22   Q     Yes.

23   A     Well, I don't know if that's the reason, but, no.  AMA

24   with respect to certificate holders is measured as of the

25   issue date of the securitization.

Page 101

1   Q    So in your view it can't be measured, risk of loss

2   can't be measured at the time the loan is originated because

3   the bond hasn't come into existence yet, right?

4   A    It can be assessed, but it has no meaning in terms of

5   certificate holders because there aren't any certificate

6   holders.

7   Q    So in your view AMA is measured on the date of

8   securitization for purposes of the lead purchase claim,

9   right?

10  A    With respect to certificate holders, yes.

11  Q    And while you cite Judge Castel's opinion in the

12  (indiscernible) case in your expert reports on this issue,

13  on the issue of when to measure AMA you expressly disagree

14  with him, right?

15  A    Not expressly.  I note the conundrum where he initially

16  discusses that the reference date for AMA with respect to

17  certificate holders is the date the breach is identified,

18  but then goes on to say, in essence, there's -- there's no

19  difference between that day and the issue date because the

20  damage is done when the loan is deposited in the trust with

21  the promises broken and the investor provides consideration

22  for the loan on that date.

23  Q    You say in your report that Judge Castel's view of when

24  to measure AMA is not consistent with industry

25  understanding, correct?

Page 102

1   A    With respect to the reference date, but then in the

2   footnote I talk about how I believe he gets to the same

3   place.

4   Q    Okay.  Let's take a look at -- actually, I think we're

5   already on page 34 -- page 40, to note 56.  And you say:

6        "I understand that in a recent case Judge Castel

7        suggested -- in a recent case that Judge Castel

8   suggested    that materiality should be assessed at the

9   time a demand  to repurchase is made.  That is not my

10  understanding and   in my view not consistent with industry

11  understanding."

12       You go on to say you think it's not a meaningful

13  distinction.  But, in fact, you do say it's not your view

14  and not consistent with industry practice, right?

15  A    I think if you read the entire footnote, particularly

16  the last sentence, it comports with exactly how I just

17  explained the position that you're asking me about.

18  Q    Now when the trustees presented their claims in the

19  protocol they didn't provide any separate analysis of AMA

20  related facts as of the time of securitization, right?

21  A    The -- all of the assessments were made as of the time

22  of securitization.

23  Q    Did the trustees analyze the state of affairs at the

24  time of securitization in their breach narratives?

25  A    I'm sorry.  I don't understand the question.

Page 103

1    Q     Well, let me give you an example.  For a

2    misrepresentation of debt claim did the -- the trustees

3    didn't confirm and document that the debt was still

4    outstanding at the time of securitization, right?

5    A     No, but that -- the analysis has to do with what the

6    reps say and what the promises say.  And the reps talk about

7    misrepresentations of debt in connection with the

8    application process, the origination process.  So for

9    purposes of identifying whether or not there was a

10   misrepresentation, the factual threshold that supports that,

11   you look at the origination date of the loan.

12        To the extent that misrepresentation was made when the

13   loan was made and it continues when the loan is deposited in

14   the trust, at that point in time when the certificate

15   holders buy a security -- a certificate supported by loans

16   that do not meet the promises made by the sponsor, that's

17   the point at which you determine whether or not the non-

18   conforming loan as you now know it to be has increased the

19   risk of loss or the value of the loan to the certificate

20   holder as of the time they purchased the certificates.

21   Q     So if the trustees brought a misrepresentation of debt

22   claim that was omitted from the loan application, but which

23   debt was resolved prior to securitization of the loan it

24   wouldn't affect your analysis at all?

25   A     That's correct.

Page 104

1   Q     And by the way the trustees, when they were presenting

2   their claims in the protocol, they didn't provide any

3   separate analysis of AMA related facts as of the time the

4   claim was made either, right?

5   A     No, they didn't.

6   Q     Now when the trustees brought misrepresentation claims

7   they did not distinguish between intentional and

8   unintentional misrepresentations in their submissions to the

9   protocol for purposes of determining AMA, right?

10  A     Not based on the standard rep and warranty.  There

11  might have been some reps that didn't contain the third

12  sentence of the no untrue statement rep we're talking about.

13  It only contained the first two and the seller's knowledge

14  piece.  And in those cases to the extent we found a defect

15  of the type we're talking about here there wouldn't have

16  been a claim based on that.

17  Q     Were there any such non-standard representations and

18  warranties?

19  A     I -- maybe a handful.

20  Q     So you're sure or you're not sure?

21  A     Can I hear the question again?

22  Q     Were there any such non-standard representations and

23  warranties of the sort that you described a few moments ago?

24  A     I'm not sure.

25  Q     And there was no attempt to document the determination

Page 105

1   that a misstatement was intentional because in your view the

2   breach existed whether or not the misstatement was

3   intentional based on the language of the standard

4   representations, right?

5   A    That's correct.

6   Q    And you do not agree that the facts of the 70,000 or so

7   misrepresentation claims from the subject loans supported

8   the inference that the vast majority of those alleged

9   misrepresentations were intentional, correct?

10  A    No.  That's not correct.

11  Q    Okay.

12  A    I think that whether or not we had to reach a finding

13  as to whether or not the misstatement was intentional.  In

14  many instances just based on the type of statement and the

15  egregious nature of the statement one could reasonably

16  conclude that it was an intentional misstatement.

17         MR. DAVIS:  Your Honor, I would like to actually

18  play this clip from the deposition.

19         THE COURT:  Okay.

20         MR. DAVIS:  Page 303, line 7 to 14.

21     (Pause)

22         MR. DAVIS:  No clip?  Okay.  I'll just read it.

23         "Question:  So in your opinion that -- is it your

24      opinion that the facts of these 70,000

25      misrepresentation breach findings listed on table

Page 106

1       one here support the inference that the vast

2       majority of those alleged misrepresentations were

3       intentional?

4            "Answer:  No.  We discussed this in my prior

5       deposition."

6   BY MR. DAVIS:

7   Q    Did I ask you that question and did you give me that

8   answer?

9   A    Yes.  And that wasn't my opinion.  That's not to say

10  that you could draw a reasonable inference looking at the

11  facts that they were intentional.

12  Q    So any inference that you would draw is not your

13  opinion?

14  A    No.  I'm very clear as to what my opinions were.  I

15  didn't have to reach that conclusion to offer the opinion as

16  to whether or not there's a breach of rep and warranty here.

17  Q    You didn't have to and you didn't, in fact, reach that

18  conclusion, correct?

19  A    That's correct.

20  Q    Now let's talk for a moment about the tolerances that

21  you mentioned before.  You testified briefly about some

22  tolerances, one of which is the example we heard where the

23  trustees would not assert a misrepresentation of income

24  claim unless the difference between what you determined to

25  be the represented income and what you determined to be the

Page 107

```
1    actual income was greater than five percent, right?

2    A    Yes.

3    Q    And in your opinion every misstatement of income that

4    passed the five percent threshold that you set up would

5    adversely and materially affect the value of the loan based

6    on the representations and warranties in this case, correct?

7    A    That was the conclusion that was drawn.  That wasn't

8    the reason.

9    Q    Is it your opinion that every misstatement of income

10   that passed the five percent threshold that you set up would

11   adversely and materially affect the value of the loan based

12   on the representations and warranties in this case?

13   A    In this case every misrepresentation of income that was

14   included in my report met the AMA test.

15           THE COURT:  By definition or --

16           THE WITNESS:  No.

17           THE COURT:  -- based on a separate analysis of each

18   and every one?

19           THE WITNESS:  The latter.  That's a distinction I'm

20   trying to make and not very well, I guess.

21           THE COURT:  Thank you.

22           THE WITNESS:  The determination was made on a loan

23   by loan basis, not by definition.

24   BY MR. DAVIS:

25   Q    And that would be true regardless of what happened to
```

Page 108

1    the borrower's income after origination, correct?

2    A    Yes.

3    Q    And it's true regardless of whether that misstatement

4    was the cause of any loss on the loan, right?

5    A    That's correct.

6    Q    And it's true regardless of whether the loan is still

7    performing, right?

8    A    Yes.

9    Q    Now there wasn't any strict variance set up for

10   misrepresentation of debt claims, right?

11   A    There was a -- there was no set standard, but as I said

12   before there was a direction that they shouldn't include

13   trivial differences and that was reinforced at the QC-2

14   level where QC-2 had the ability if they thought the

15   difference in debt was not significant to kick that claim.

16   Q    How many claims at the QC-2 level were rejected based

17   on the tolerance, do you know?

18   A    No, I don't.

19   Q    And I think you told me that that determination was

20   subjective to the underwriter, but de minimis or small

21   misrepresentation of debt claims should not have been

22   brought, right?

23   A    That was the guidance.  Yes.

24   Q    And there was not a hard and fast tolerance for

25   misrepresentation of assets, but the threshold was left to

Page 109

1  the discretion of the loan reviewers as confirmed by Duff &

2  Phelps, right?

3  A    That's correct.

4  Q    And you don't know whether these tolerances we've been

5  discussing were written down anywhere before you drafted

6  your report in this proceeding, right?

7  A    That's correct.

8  Q    Okay.  Now we also talked about a gloss on these

9  tolerances.  Do you remember I was talking about that?

10  A    I don't.

11  Q    Okay.  You said the gloss was that in the event there

12  was more than one potential misrepresentation breach finding

13  and the evidence was deemed sufficient to support one of

14  them, all of the other potential breach claims on that loan

15  would be made regardless of whether those other claims would

16  have been made on a stand-alone basis.  Do you remember

17  discussing that?

18  A    Yes, I do now.

19  Q    Okay.  And did I articulate it correctly?

20  A    It was very close.  Yes.

21  Q    Okay.  And you told me that the basis for that gloss

22  comes right out of some legal opinions, right?

23  A    I don't know if I said it comes out of legal opinions.

24  I probably referred to legal opinions where that notion had

25  been articulated and accepted.  But it's fairly standard in

Page 110

1   the industry and I think in -- I don't recall which opinion,

2   there was a discussion of the totality of misrepresentation

3   breaches may, in fact, result in a breach even if any one of

4   them standing alone would not be deemed significant.

5   Q    So given this guidance that you took out of the case

6   law the trustees assert a misrepresentation breach claims in

7   the protocol that standing alone would not have been

8   brought, correct?

9   A    My -- I'm only quibbling with your reference to

10  guidance that we took out of the case law.  This is -- this

11  is based on my experience and accepted practice in terms of

12  analyzing whether there's a loan that just, you know, dies a

13  death of a thousand cuts even if not one cut would be

14  sufficient on a stand-alone basis.

15       And I -- again, I think my reference to it was that

16  that notion was picked up in one of the three opinions we

17  have where we get some guidance from courts as to what they

18  accepted as industry custom and practice in guiding them in

19  their decisions.

20  Q    Okay.  So you were basing this on the guidance that

21  comes out of the case law then?

22  A    Again, no, I wasn't.

23  Q    Okay.

24       MR. DAVIS:  Your Honor, I would like to read the

25  deposition from the transcript again, pages 418, lines 2 and

Page 111

1    419, line 19.

2              THE WITNESS:  I'm sorry.  Where are we?

3              MR. DAVIS:  We're in the deposition transcript.

4    I'm going to read it in a moment.

5              "Question:  Okay.  Let's take a look at Row 13.

6              It's count ten.  Here it says the represented

7              employment was three years on the job and the

8    actual   employment was 2.7 years on the job.  Is it your

9              opinion that that difference is material?

10             "Answer:  When I said generally there was also a --

11             there was also guidance that to the extent you

12   found    other information in the file regarding a

13   particular          breach finding in loans where there were

14   other        misrepresentation breach findings, to cite

15   every        misrepresentation whether or not on a stand-

16   alone    basis it would have resulted in a claim for that

17             loan.  And that's the guidance that was provided

18             right out of the few cases we see where the judges

19             talk about that very specific circumstance where

20   you     may have a collection of misrepresentation breach

21          findings on any given loan that individually none

22          would rise to the level of an acceptable or actual

23          breach finding.

24             "But the fact that you have a collected number of

25          misrepresentations by the same borrower in the same

Page 112

1      loan may provide sufficient grounds for a finding

2      that this loan is defective and should be

3      repurchased.  So the instruction was -- and that may

4      be the case here.  Again, I'm not saying it is.  I

5      would have to look at the specifics of that -- of

6      that loan file.  But I think the fact that it is

7      linked with two other breach findings is the reason

8      that this discrepancy between what the borrower said

9      and what was found to be the actual case is cited as

10     corroborating evidence of the fact there was a

11     problem with this loan and probably strengthens the

12     misrepresentation of income and excessive DTI breach

13     findings."

14   BY MR. DAVIS:

15   Q    And did I ask that question and did you give that

16   answer in your deposition?

17   A    Yes.

18   Q    Mr. Aronoff, up until the time you left Duff & Phelps

19   you made the final decision on whether a particular breach

20   finding materially and adversely affected the value of the

21   loan, correct?

22   A    QC-2 did on each individual breach finding.  It was my

23   guidance and policy that they were using, but I didn't make

24   the final determination with respect to every single loan.

25             MR. DAVIS:  Your Honor, I would like to read the

Page 113

1    deposition, page 85, line 23 to 86, line 2.

2         "Question:  Who made the final decision on whether

3    a    particular breach finding materially and adversely

4         affected the value of the loan?

5         "Answer:  I did up until the time I left."

6    BY MR. DAVIS:

7    Q    Did I ask that question and did you give me that answer

8    in your deposition?

9    A    Yes.

10   Q    Now after you left Duff & Phelps it was your

11   understanding that there had been a sufficiently large

12   number of every type of breach finding that those who

13   followed you could use the findings you had already

14   developed to map the breach types to the correct materiality

15   determination, right?

16   A    Yes.

17   Q    Now we tried to -- let's put up PA Exhibit 811, which

18   is I think Tab 5 in the small binder.  And I think I showed

19   you a variant of this or maybe this very thing in your

20   deposition.  But we went through your Exhibit 15 which is

21   quite large and as far as we can tell these are the only

22   formulations of the statements for materiality, supporting

23   materiality in your Exhibit 15.  Does that look right to

24   you?

25   A    Yes.

Page 114

1   Q     And that's because these are, in your opinion, all the

2   possible ways a breach finding could be material and adverse

3   with respect to the loans that you examined, right?

4   A     Yes.

5   Q     To determine whether the risk of loss increases in your

6   opinion there are only two levers that can be adjusted,

7   whether the breach affected the likelihood of default,

8   potential loss severity or both, right?

9   A     Correct.

10  Q     So to the extent you have the same sets of

11  representations and warranties that apply to a pool of

12  loans, all you need to know is that there was a breach and

13  then you can make a determination based on the type of the

14  breach, whether it affected the likelihood of default, loss

15  severity or both, right?

16  A     I'm sorry.  Can I hear the beginning of the question

17  again?

18  Q     Sure.  I'll give it to you again completely.

19        So to the extent that you have the same sets of

20  representations and warranties that apply to a pool of loans

21  all you need to know is that there was a breach and then you

22  can make a determination based on the type of the breach,

23  whether it affected the likelihood of default, loss severity

24  or both?

25  A     I don't think that's quite right.  It may be, but I'm

Page 115

1    not sure what you mean when you're using certain of those

2    words.

3    Q    And which words are confusing you?

4    A    Breach.

5    Q    And what's confusing about breach?

6    A    Oh, I -- I try and be careful to use breach finding as

7    the term that means there is a particular type of finding.

8    And a breach finding would by definition be a material

9    adverse breach of a rep and warranty.  And so the answer to

10   your question using breach finding as I've used it in my

11   reports is, yes.

12        But the first has to be that materiality determination

13   with respect to the underlying breach finding to -- in

14   essence you have to -- breach finding already assumes it

15   meets AMA on a loan by loan basis.  You can have a breach, a

16   potential breach that is analyzed and the determination on

17   that loan is determined that it is material and then that

18   breach finding will always map into one or more of the reps

19   and warranties in that transaction.

20   Q    Let me try asking it with a slight twist and maybe it

21   will help.

22        So to the extent that you have the same sets of

23   representations and warranties that apply to a pool of

24   loans, all you need to know is that there was a breach of

25   the representations and warranties and then you can make a

Page 116

1    determination based on the type of breach, whether it

2    affected the likelihood of default, loss severity or both?

3    Did that help?

4    A    No.  I mean, I under -- I think I understood what you

5    said and that's not correct.

6    Q    And why is it not correct?

7    A    Because the materiality is determined based on the

8    specific breach finding as it relates to a specific loan.

9    And then if you determine you have a material breach finding

10   you're finished.  I mean, the reps and warranties, the --

11   whether or not, whether or not there is a breach finding as

12   I've used the term with respect to a particular rep and

13   warranty already includes a finding of materiality.

14        So all of the misrepresentation of income breach

15   findings that were the subject of my report are material and

16   adverse not because they're called misrep of income, but

17   because if they weren't found to be material on a loan by

18   loan basis, meet AMA on a loan by loan basis they wouldn't

19   have been included as misrepresentation of income breach

20   findings in the report.  They would -- never would have

21   showed up.

22   Q    You told me you were able to, based on the type of

23   breach, map the materiality basis to the breach.

24   A    Type of breach finding.

25   Q    You're able then to map the type of breach to the

Page 117

```
 1    materiality basis asserted, correct?

 2    A     Yes.

 3    Q     And you did that mapping in this case, correct?

 4    A     Now you're confusing me with the word mapping.  What

 5    are we mapping to what?  I mapped breach findings to reps

 6    and warranties.  Is that what

 7    Q     You were matching --

 8    A     -- you're talking about?

 9    Q     You were matching --

10          THE COURT:  Okay.  Hold on.  We're not going to

11    argue with each other.  There's a question and an answer.

12    Okay.  This is about as clear as mud right now and by my

13    count there have been any number of inconsistent responses

14    given to the questions which I'm willing to chalk up to the

15    fact that we're not communicating well.

16          So let's everybody settle down.  Mr. Davis, look

17    back at all the questions and answers that you have and keep

18    at it.  But right now there is no clarity.  I can ask a

19    question, but I'm not gonna.  So, Mr. Davis, you can keep

20    trying.

21          MR. DAVIS:  Okay.

22    BY MR. DAVIS:

23    Q     To the extent you have the same sets of reps and

24    warranties that apply to a pool of loans and to the extent

25    you identify similar characteristics across the pool that
```

Page 118

1    are defective and breach that rep, they will be material for

2    the same reasons.  They will breach the rep and it will be

3    material for the same reasons, correct?

4        (Pause)

5    A    They may be material for the same reasons.

6    Q    Let me try the deposition testimony at page 230, lines

7    2 to 16.

8        "Question:  So all you need to know is that there was a

9        breach and then you can make a determination based on

10   the  type of breach, whether it affected the likelihood of

11       default, the loss of severity or both?"

12       "Answer:  To the extent you have the same sets of reps

13       and warranties that apply to a pool of loans, and to

14   the  extent you identify similar characteristics across the

15       pool that are defective and breach that rep, they will

16   be   material for the same reasons.  They will breach the

17   rep  and it will be material for the same reasons."

18       Did I ask that question and did you give me that

19   answer?

20   A    Yes.

21   Q    And in the materiality bases, which we saw up on that

22   slide before --

23           THE COURT:  When you are at a stopping point let's

24   take a break.  All right.

25           MR. DAVIS:  Okay.  We're -- I'm happy to -- I'm

Page 119

```
 1    happy to stop.

 2            THE COURT:  Okay.  All right.  We're going to take

 3    a break.  We'll come back in ten minutes.

 4            THE WITNESS:  Thank you, Your Honor.

 5            THE COURT:  All right.  Okay.  Thank you.

 6       (Recessed at 2:58 p.m.; reconvened at 3:15 p.m.)

 7            THE COURT:  Okay.

 8    BY MR. DAVIS:

 9    Q    Mr. Aronoff, let me take you back to Exhibit 15 of your

10    report which is at Tab 15 of your binder.

11        (Pause)

12    A    Okay.

13    Q    Okay.  Do you see the column that's headed, G

14    Materiality Basis for Defect?

15    A    Yes.

16    Q    What information is supposed to be in that column?

17    A    It was supposed to be the materiality statement that

18    was required pursuant to the protocol --

19    Q    Okay.  So that --

20    A    -- which each claim that was submitted.

21    Q    Okay.  So that -- that column reflects the materiality

22    bases for the defects that the trustees provided to the plan

23    administrator when they submitted their claims, right?

24    A    Yes.

25    Q    Okay.  And the only information in these statements is
```

Page 120

1   an identification of the type of breach and then a statement

2   of the sort that we saw on the demonstrative a few moments

3   ago, how that particular breach type affects credit risk,

4   right?

5   A    Yes.

6   Q    Okay.  And that's true for all these hundred plus

7   thousand breach claims that the trustees submitted, right?

8   A    Yes.

9   Q    Okay.  So just to summarize your opinion, the AMA

10  standard of the governing agreements in this case is met

11  when the related breach finding significantly increases the

12  loss on the loan at the time of securitization of the loan

13  whether or not such increased risk ever results in a loss,

14  right?

15  A    I think that fairly paraphrases how I say it in the

16  reports.

17  Q    But you do agree that the single most important factor

18  to an RMBS investor is the certainty of the cash flow

19  produced by the related underlying mortgage pool, right?

20  A    The potential certainty of cash flow.  The cash flow

21  that they're going to receive, not the cash flow they

22  actually receive.

23          THE COURT:  It's not the potential certainty, it's

24  the certainty of the potential cash flow.

25          THE WITNESS:  Correct.

Page 121

1           THE COURT:  The certainty of the expected cash

2    flow.  Better?

3           THE WITNESS:  Yes.  Yes, better.

4       (Pause)

5    BY MR. DAVIS:

6    Q    I would like to read from the deposition transcript on

7    page 40 at line 18 through page 41, line 7.  And here we're

8    reading from a prior affidavit.

9       "Question:  Okay.  And please take a look -- Question:

10       Okay.  Please take a look at paragraph 40.  The middle

11       sentence there says, 'In my experience the single most

12       important factor to an RMBS investor is the certainty

13    of   the cash flow produced by the related underlying

14    mortgage

              pool.'  Do you see that?

15       "Answer:  I do.

16       "And was that your opinion in August of 2014?

17       "Answer:  Yes.

18       "Is it still opinion -- your opinion today?

19       "Answer:  It is."

20       Did I ask you those questions and did you give me those

21    answers?

22    A    Yes.

23    Q    So I'm going to pose a hypothetical.  Suppose that a

24    loan performed for five years despite an income

25    misrepresentation that shows that the borrower made six

Page 122

1   percent less than what was reflected on his loan

2   application.  After five years the borrower gets hit by a

3   bus and dies.  The loan defaults and the breach claim is

4   asserted.

5        In your opinion those facts and circumstances would

6   lead you to conclude that the income misrepresentation

7   materially and adversely affected the value of the loan,

8   correct?

9   A    Based on your hypothetical I would say there is a

10  material adverse breach, but it's not based on the facts you

11  just read.  Some of those facts are irrelevant in my

12  consideration.

13  Q    Given the facts I just read you would still say it

14  materially and adversely affects the value of the loan,

15  correct?

16  A    That's correct.

17  Q    Okay.  And to be clear it's your opinion that this

18  misrepresentation materially and adversely affects the value

19  of the loan even though the loan defaulted for a reason

20  other than the breach, right?

21  A    Yes.

22  Q    And that's because in your view it is not relevant that

23  the risk associated with the breach ever come to pass and,

24  in fact, that the loan defaulted for another reason, right?

25  A    Can I hear that question again, please?

Page 123

1    Q    And this is because in your view it is not relevant

2    that the risk associated with the breach ever came to pass

3    and, in fact, that the loan defaulted for another reason,

4    correct?

5    A    I'm not sure how to answer that because that's not the

6    reason that I think there's a breach, but the fact that the

7    -- the fact that there was an increased risk of loss based

8    on the misrepresentation and the borrower never got the

9    benefit of their bargain for assuming that the loan

10   conformed with the reps and warranties, given your fact

11   pattern would result in a material adverse breach to the

12   borrower -- to the investor, I'm sorry.  I'm (indiscernible)

13   Aronoff with bar investors.  Sorry about that.

14   Q    Okay.  But notwithstanding the fact that the loan

15   defaulted for another reason, right?

16   A    Yes.  The reason why the loan ever defaulted at all, if

17   it did, is irrelevant to my AMA analysis.

18   Q    And if this claim under the circumstances we were just

19   talking about passed through the loan review process during

20   the protocol and reached your desk you would have decided

21   that this claim satisfied AMA, right?

22   A    That's what I don't know based on just the six percent

23   breach.  I would -- I would -- if there was a valid breach

24   finding of misrep of income, yes.

25   Q    So I'm going to pose another hypothetical.  Suppose

Page 124

1    that a loan file indicated that the borrower had

2    misrepresented his debt by $10,000 but the file also

3    indicated that the borrower had $5 million in liquid assets.

4    Your view is that the risk of loss would materially increase

5    as a result of the misrepresentation of the $10,000 debt,

6    correct?

7    A    Yes.  That would be a valid breach finding.

8    Q    And that's true even though the likelihood of default

9    may be very small to start with given the $5 million in

10   liquid assets, right?

11   A    That would be true because whatever the risk of loss

12   was at origination based on the breach of the rep and

13   warranty, the loan is worse in terms of credit risk than it

14   was at origination.  So, yes.

15   Q    Let me walk through one more hypothetical and they're

16   going to put it up on the screen so you can follow.

17        So let's assume -- and this, by the way, is drawn from

18   a loan in the case.  Let's assume that the borrowers are a

19   middle age husband and wife.  They purchase a home as an

20   investment property for $139,000.  Let's assume their FICO

21   score is 738.  There DTI is 39.5 percent.  The minimum FICO

22   on this process was -- on this product was 620 and the max

23   DTI was 50 percent.

24        Now let's assume that the borrowers misstated their

25   debt on the loan application and the additional debt would

Page 125

1    raise their DTI to 74 percent.  Nonetheless, the borrowers

2    pay on that loan for over eight years.  After eight years of

3    payment the servicing company receives a letter from the

4    wife stating that her husband had passed away and she could

5    no longer make ends meet.

6        Let's assume that the last payment the couple made on

7    the subject loan was the month before the husband's passing.

8    In your view, the misstatement of debt on this loan would

9    satisfy the AMA requirement, right?

10   A    Yes.

11   Q    And in your view this would be a valid breach claim,

12   correct?

13   A    Yes.

14        THE COURT:  Would your answer be the same, Mr.

15   Aronoff, if in this hypothetical, assuming that this is,

16   I'll make it up, what I'll call a conventional 15 year

17   mortgage, 15 years instead of 30 years, and the loans were

18   made for 14 years and six months when the husband passed

19   away, your answer would stay the same, right?

20        THE WITNESS:  Yes.

21        THE COURT:  Thank you.

22   BY MR. DAVIS:

23   Q    Now in your deposition I asked you whether there was a

24   significant risk of a windfall to the trustees if the breach

25   that's claimed has nothing to do with the loss that occurs

Page 126

1    in connection with the loan.  Do you remember me asking you

2    that?

3    A    Vaguely.

4    Q    Do you remember responding that you didn't know and

5    that you didn't investigate whether their rights under the

6    agreement would result in a windfall?

7    A    I don't recall that answer.

8    Q    Okay.

9              MR. DAVIS:  So, Your Honor, let me read deposition

10   transcript page 231, 23 to 232, 20.

11             "Question:  In the context of this case in this

12             estimation proceeding isn't there a significant

13   risk    of a windfall to the trustees if the breach that's

14             claimed has nothing to do with the loss that occurs

15             in connection with the loan?

16             "Answer:  I don't know.  And I haven't considered

17   if      that's a reason to change the documents.  All I can

18             -- all I opined on is what the documents said, and

19             to the extent the certificate holders are not

20             getting the benefit of their bargain or not is the

21             extent to which my analysis went.  I didn't -- I

22             didn't investigate what the -- whether or not

23             enforcing their rights under the agreement would

24             result in a windfall to the party that does that or

25             not.  But typically that's not a reason to change

1          the terms of the document.  I guess Bankruptcy Court

2          might be the exception.  I just don't know."

3     BY MR. DAVIS:

4     Q    Did I ask you that question and did you give me that

5     answer?

6     A    You asked me that question, but it was a little

7     different

8     than the question you asked me prior to showing the

9     testimony.

10    Q    Okay.  Did you do any investigation to determine

11    whether or not enforcing the rights -- their rights

12    (indiscernible) rights under this agreement would result in

13    a windfall to them or not since I took your deposition?

14    A    I haven't done any investigation as to that matter.

15    No.

16    Q    In fact, Mr. Aronoff, you don't have an understanding

17    as to what a proof of claim in the bankruptcy context is,

18    correct?

19    A    No.

20    Q    And you have not seen the proofs of claim filed in this

21    case by the trustees, right?

22    A    I don't believe I have.

23    Q    And to be clear you did not have an opinion whether the

24    breach claims that you reviewed and analyzed should give

25    rise to a remedy for the trustees in this Bankruptcy Court

Page 128

1   estimation proceeding, correct?

2   A    Only to the extent that my opinions as to how the

3   repurchase price would be paid under the normal repurchase

4   remedies that are found in the governing documents would

5   translate into those things.  But, no, I don't know how that

6   repurchase price would play through the rules of this

7   estimation hearing.

8   Q    And one of the reasons you don't have an opinion on the

9   appropriate remedies in this case is that you understand

10  this bankruptcy case is not a straight up put back case to

11  use your words, correct?

12  A    In terms of my understanding that there is a

13  significant likelihood that the trustees on behalf of

14  certificate holders won't get the full repurchase price to

15  which they're entitled under the documents, that's correct.

16  Q    You haven't been asked to provide any insight as to the

17  appropriate remedy, the amount of that remedy or anything

18  else of that kind, correct?

19  A    That's correct.

20  Q    And you have no idea how the governing documents at

21  issue in this case play out in the Bankruptcy Court,

22  correct?

23  A    I wouldn't be so bold as to offer a view as to how that

24  would -- as to what would happen.  No.

25  Q    And you don't know anything about an appropriate remedy

Page 129

1    in the context of this bankruptcy proceeding, right?

2             MR. SHUSTER:  Objection.  Asked and answered.

3             THE COURT:  I'll allow it.  Go ahead, Mr. Aronoff.

4             THE WITNESS:  No, I --

5             THE COURT:  -- if you recall.

6             THE WITNESS:  -- don't.

7             THE COURT:  Okay.

8             MR. DAVIS:  May I have a moment, Your Honor?

9             THE COURT:  Sure.

10       (Pause)

11            MR. DAVIS:  Your Honor, I'm done.  So I'm done with

12    my questions, Your Honor.  Mr. Rollin had some questions

13    about some loans.

14            THE COURT:  Thank you.

15            MR. ROLLIN:  Are you ready to proceed now, Mr.

16    Rollin?

17            MR. ROLLIN:  I'm just going to pass out some

18    binders --

19            THE COURT:  Okay.

20            MR. ROLLIN:  -- and, Your Honor, what we wanted to

21    do was make sure that (indiscernible) non-public information

22    is displayed so if we could just disconnect to the viewing -

23    -

24            THE COURT:  Sure.

25            MR. ROLLIN:  -- (indiscernible).

Page 130

1          THE COURT:  Whoever does that, ask them to do it,

2     please.

3          (Pause)

4          THE COURT:  While we're getting set up, Mr. Shuster

5     and Mr. Rollin, could you come up for a second, please?

6          (Sidebar off the record)

7          THE COURT:  Somebody needs to -- okay.  Here come

8     our binders.  Somebody needs to make sure that Mr. Aronoff

9     has what he needs.

10         Mr. Aronoff, just -- they're going to take --

11    they're going to get you set up.  All right.

12         THE WITNESS:  Yes.

13         (Pause)

14         THE WITNESS:  I was given two new ones.  I wonder

15    if I could get rid of any.

16         THE COURT:  That -- the holistic approach to Mr.

17    Aronoff's witness box was that somebody should take away

18    from him what he doesn't need so he can be a little more

19    comfortable.  There you go.

20         THE WITNESS:  I don't know.  Are they going to need

21    these anymore?  Okay.  Thank you.  Thanks.  Thank you.

22         THE COURT:  Okay.  All right.  And now I can't tell

23    how anyone else feels about the temperature in the

24    courtroom.  If you are warm, just take your jacket off.

25         THE WITNESS:  Thank you.

1          THE COURT:  Okay.  It's a little warmer, right?  Is

2     the heat on?  Let's turn the heat off.  Yes, because we have

3     the sun coming around now.  At least we don't have a toxic

4     spill today.

5          THE WITNESS:  I was going to say, the air quality

6     is superb today --

7        (Laughter)

8          THE WITNESS:  -- relative to when we last met.

9          THE COURT:  But we could -- we haven't had a fire

10    alarm yet in this trial.  Usually I promise one fire alarm,

11    false alarm per trial.

12         MR. ROLLIN:  Okay.

13         THE COURT:  Okay.

14         MR. ROLLIN:  Just to confirm, everybody has their

15    binders.  You should --

16         THE COURT:  We --

17         MR. ROLLIN:  -- have two volumes --

18         THE COURT:  Yes, we do.

19         MR. ROLLIN:  -- just to review.

20         Mr. Aronoff, do you have two volumes?

21         THE WITNESS:  Yes, I do.

22         MR. ROLLIN:  Excellent.  Thank you.

23         May I proceed?

24         THE COURT:  Yes.

25         MR. ROLLIN:  Very well.

Page 132

1                        CROSS-EXAMINATION

2     BY MR. ROLLIN:

3     Q     Mr. Aronoff, will you please turn to plan exhibit --

4     plan administrator Exhibit 825 in the first volume?

5           (Pause)

6     Q     Are you there, sir?

7     A     Yes.

8     Q     Okay.  And if you -- this is an excerpt, a single line

9     excerpt from the claims tracking spreadsheet, correct?

10    A     I don't know.

11    Q     Are you unfamiliar with this format for the claims

12    tracking spreadsheet?

13    A     Yeah.  I didn't prepare the claims tracking

14    spreadsheets.  I've seen some excerpts, but --

15    Q     I will represent to you that Mr. Esses confirmed that

16    this is the manner in which a single loan is displayed in

17    the PDFs of the claims tracking spreadsheet.  Okay.  And if

18    you'll turn to page -- and you'll see the loan number ends

19    in 2963, right?

20    A     Yes.

21    Q     And if you turn to the second page, the page 2 of 2,

22    you can see that the claim made here is a misrepresentation

23    of employment, right?

24    A     Yes.  I see that.

25    Q     And that's the only claim made with respect to this

Page 133

1   one, right?

2   A    Okay.  And you see that the factual basis is that the

3   borrower represented himself as being a senior project

4   manager, but the loan -- in the loan file in the origination

5   VOE it was found that he was an EDD, and then (employment

6   development department manager), correct?

7   A    Yes.

8   Q    And if you go down further to the second to the last

9   line in the factual statement there is an assertion that an

10   EDD manager is in human resources.  Do you see that?

11   A    Okay.  I see it.

12   Q    And as I said, do you note that the evidence type being

13   offered in support of this claim is the origination

14   verification of the employment?

15   A    Okay.  I see that.

16   Q    And if you'll flip to plan administrator 826 you will

17   find there a single line excerpt from Exhibit 19 to your

18   expert report.  Do you see that?

19   A    Yes.

20   Q    And you can see the loan number is the same last four,

21   2963, right?

22   A    Okay.  Yes.

23   Q    And the represented employment is senior project

24   manager, right?

25   A    Yes.

Page 134

1    Q    And the actual employment is EDD manager, right?

2    A    I see that.

3    Q    And the evidence type is the origination VOE, right?

4    A    Yes.

5    Q    And that's the basis for the claim?

6    A    Yes.

7    Q    And I'll ask you to turn please to plan administrator

8    827 and confirm for me, please, that you find there the

9    breach package provided by the trustees in support of this

10    claim?

11    A    Yes.

12    Q    Would you please turn to page 21 of your exhibit; that

13    is, 21 of 36 based on the pagination in the bottom middle,

14    the footer?  Are you there?

15    A    I am.

16    Q    And this is the origination VOE, right?

17    A    Yes.  It appears to be.

18    Q    And if you see in Section 3(e) there's a handwritten

19    note that says EDD manager, correct?

20    A    Yes.

21    Q    And that appears to have been handwritten by the loan

22    processor who signed the document at origination, correct?

23    A    It looks like the same handwriting.  Yes.

24    Q    And next to it is a typewritten note that says

25    employment development department (human

Page 135

1    resources/recruiter), correct?

2    A    Yes.  I see that.

3    Q    And that's the same typewritten note we've seen

4    throughout your examination that was added by the trustees'

5    loan re-underwriters in the protocol, right?

6    A    Well, they're usually bigger and boxed, but it could

7    be.

8    Q    It's consistent with what you've seen in these files

9    that when the re-underwriters had some annotating to do they

10   would include this type of type on the original underlying

11   documents that they were looking at, correct?

12   A    That's correct.

13   Q    And, in fact, you can see if you turn just briefly to

14   plan administrator 828 it's the same VOE but without that

15   annotation, right?

16   A    It looks like it.  Yes.

17   Q    So this is the one from the loan file and the one that

18   we just looked at in the claim package is from the claim

19   package, right?

20   A    Okay.

21   Q    Does that look right to you?

22   A    It's in the claim package.

23   Q    And that's the dispute, right?  The question is, is the

24   borrower a senior project manager as reflected in the loan

25   application or is the borrower in human resources as

Page 136

1    reflected in the notes indicated by the loan re-underwriters

2    hired by the trustees, right?

3    A    That appears to be the case.  Yes.

4    Q    But there's nothing on the VOE that says that he the

5    manager has anything at all to do with human resources,

6    right?

7    A    That's right.

8    Q    This is just an inference that's made by the re-

9    underwriters?

10   A    Probably not.

11   Q    You think they did some research --

12   A    I do.

13   Q    -- to come up with this?

14   A    I don't know that, but generally to the extent they

15   could find information based on some kind of other research

16   they would do that.

17   Q    Can you please turn to the loan application in the

18   claim package, and specifically to page 16 of 36?

19        (Pause)

20   Q    Are you there?

21   A    I am.

22   Q    Do you see the employment section in the left-hand

23   side, bottom quarter or so, bottom third of the page?

24   A    Yes.

25   Q    And the position title or type of business is senior

Page 137

```
 1    project manager/litigation, right?

 2    A    Yes.  I see that.

 3    Q    And the reference to litigation is not included in the

 4    breach finding section, the factual statement on the claims

 5    tracking spreadsheet, right?

 6    A    Right.

 7    Q    And it's not reflected in your Exhibit 19, the excerpt

 8    that I showed you, right?

 9    A    That's correct.

10    Q    And, in fact, the name of the employer which I will not

11    say in public is in the box immediately above the title,

12    correct?

13    A    Yes.

14    Q    Are you familiar -- looking at the name of that company

15    are you familiar with it?

16    A    No.

17    Q    But the loan application is clear that that's where the

18    borrower worked and it has the borrower's prior employer

19    right below the title, right?

20    A    It does.

21    Q    And you recognize that name, don't you?

22    A    Yes, I do.

23    Q    That's a big law firm here in town, right?

24    A    Well, they're in town.

25    Q    And by the way, if you look at the VOE, the origination
```

Page 138

1    VOE which is again claim package page 21, it has the name of

2    the employer right there at the top.  Do you see that?

3    A    Yes.

4    Q    Would you please turn to plan administrator 837?

5         (Pause)

6    Q    Are you there?

7    A    I am.

8    Q    And 837 is just a Google search of that employer,

9    right?

10   A    It appears to be.

11   Q    And if you flip from page 1 over to page 2 you can see

12   what this employer does, right?

13   A    Okay.

14   Q    And this employer is a litigation consulting firm,

15   correct?

16   A    Apparently.

17   Q    Have you ever heard the term electronic data discovery?

18   A    No.

19   Q    If you wanted to shorten electronic data discovery to

20   initials would you call it EDD?

21   A    You could.

22   Q    And the borrower said he was a senior project manager

23   litigation, right?

24   A    On the application, yes.

25   Q    And there's nothing that suggest anywhere in the

Page 139

1    application or the VOE that this borrower is engaged in

2    human resources, right?

3    A    We haven't seen anything that would indicate that.

4    Q    Right.  That was an assumption or an inference made by

5    the re-underwriter than then rolled into the trustees'

6    analysis and even your own Exhibit 16 in your expert report,

7    right?

8    A    I don't know that to be true.

9    Q    You don't know if it was an inference drawn by the re-

10   underwriter?

11   A    I don't know if there's something in the loan file that

12   may support what they thought it was or if --

13   Q    You actually --

14   A    -- it's just a mistake.

15   Q    I'm sorry for interrupting.

16        You actually have no idea what the re-underwriter did

17   to reach the conclusion that this person who identified

18   themselves as a senior project manager litigation was, in

19   fact, in human resources, do you?

20   A    In this case, no, I don't.

21   Q    And that's because it wasn't part of your process to

22   find out exactly what the re-underwriters were thinking when

23   they performed these analyses, right?

24   A    No.  That's not entirely true.

25   Q    So you -- you do know what the underwriter was thinking

Page 140

1    when they performed this analysis and came up with the wrong

2    occupation?

3    A    That's not what I said.  I don't know what they

4    thought.

5    Q    You --

6    A    I'm saying that in QC-1 to the extent there was not

7    sufficient information in the file to support the inference

8    or the conclusion that was drawn by the loan review firm it

9    should have been questioned.

10   Q    So QC-1 didn't catch this, right?

11   A    Not this one, no.

12   Q    And QC-2 didn't catch this, right?

13   A    I don't know.  I don't know what's in the loan file.

14   Q    QC-2 didn't see this and withdraw the claim, did they?

15   A    I'm sorry

16   Q    QC-2 didn't see this and say, we're not going to make

17   this claim because, in fact, this person is a senior project

18   manager litigation working for a litigation consulting firm

19   rather than an employee in human resources?

20   A    QC-2 did not withdraw this claim.

21   Q    So it made it through QC-1.  It made it through QC-2.

22   And it made it onto your Exhibit 19, right?

23   A    Yes.

24   Q    Can you turn to plan administrator 829, please?  Do you

25   see plan administrator 829?

Page 141

1    A    I do.

2    Q    And this is a Google search for EDD, right?

3    A    It looks like.

4    Q    And the first hit is employment development department,

5    right?

6    A    I see that.

7    Q    So it could be that the amount of research that the re-

8    underwriters did was to Google EDD, see that it was

9    employment development department and then list that on the

10   VOE and ultimately in the claim, right?

11   A    I don't know what was done.

12   Q    But what we do know if they had just Googled instead of

13   EDD, the name of the employer and made a link between the

14   represented income as senior project manager litigation and

15   the type of work that that employer engaged in, there might

16   be no claim at all?

17   A    I'm sorry.  Can I hear that question again?

18   Q    Sure.  What we do know is that if the loan re-

19   underwriters hired by the trustees had just Googled the name

20   of the employer, seeing that the employer was a litigation

21   consulting firm and see that the represented employment was

22   senior project manager litigation they may have been able to

23   resolve this claim with a Google search?

24   A    They may have, but I don't know if they just Googled

25   EDD to come up with that or not.  I just don't know.

Page 142

1   Q     Well, we do know they didn't Google the employer,

2   right?

3   A     No.  I don't know that.

4   Q     You think they Googled the employer, found that it was

5   a litigation consulting firm and still made this claim?

6   A     No. I said I don't know.

7   Q     Because you have no idea what they did.

8   A     On this particular file without looking at the loan

9   file I don't know.

10  Q     But you managed -- you were able to file and assert the

11  opinion that over 100,000 claims are valid without looking

12  at the loan files and yet when I ask you questions you need

13  to look at the loan file?

14  A     In order to assess what was done with respect to this

15  loan it would help clarify my answer as to whether or not

16  this is a mistake or whether there was some reasonable basis

17  for the notation we saw by looking at the loan file.

18  Q     That raises an important point.  The loan reviewers had

19  copies of the loan file and Duff & Phelps had separate

20  copies of the loan file, right?

21  A     I don't know.  I don't know if that's the case or not.

22  Q     Mr. Esses would know the answer to that question,

23  right?

24  A     I don't know what you mean by separate, but he probably

25  would.  I don't know.

Page 143

1   Q    The loan reviewers had a copy of the file and Duff &

2   Phelps had a copy of the file, correct?

3   A    I don't know if it was the same digital version or not.

4   Q    So you're not sure that this loan files that both were

5   looking at were the same?

6   A    I can only assume they were both looking at the same

7   loan file.

8   Q    But you're making an assumption.  That's not something

9   that you know?

10  A    That's correct.

11  Q    And when the loan reviewers communicated their findings

12  to Duff & Phelps they didn't send their copy of the loan

13  file, right?  They only sent the breach findings, whatever

14  data points were captured in the data base and the claim

15  package, right?

16  A    I don't know.

17  Q    You don't know the answer to that question?

18  A    I don't.

19  Q    Would Mr. Esses be in a better position to know the

20  answer to that question than you?

21  A    I don't know.

22  Q    But in any event whatever work the loan re-underwriters

23  did they put in the claim package, correct?

24  A    The supporting documentation was supposed to be

25  included in the claim package.  That's correct.

Page 144

1   Q    And the supporting documentation with respect to this

2   claim is the origination VOE?

3   A    Along with some other documents.  That's correct.

4   Q    But there's nothing in the other documents, and please

5   feel free to look through the claim file, that demonstrates

6   any of the research that was done by the re-underwriting

7   firms to reach the conclusion that this borrower rather than

8   being a senior project manager litigation was, in fact,

9   employed in human resources?

10  A    Okay.

11  Q    Is that a yes?

12  A    I don't know.

13  Q    Look at your copies.

14  A    And what's the question?

15  Q    The question is there's nothing in the claim file that

16  demonstrates any of the research that was done by the re-

17  underwriting firms to reach the conclusion that this

18  borrower rather than being a senior project manager

19  litigation as represented was, in fact, employed in human

20  resources?

21  A    Other than the notation made by the loan review firm,

22  that's correct.

23  Q    But the underlying whatever research was done to inform

24  that notation, that's nowhere to be found in the claim file?

25  A    I don't think it's in the 20, however many pages.  I

Page 145

1    didn't see it.

2    Q    Will you please confirm the answer to that question?

3    A    Sure.

4         (Pause)

5    A    No, it's not in here.

6    Q    You still willing to say this is a valid claim?

7    A    Yes, until I see the loan file and see if there's any

8    basis for what the employment status of the borrower was.

9    But based on just the claim file it could be a mistake.

10   Q    I'm prepared to show you the loan file.  I'll show you

11   the loan file.

12           MR. ROLLIN:  Your Honor, may I approach?

13           THE COURT:  Yes.

14           MR. ROLLIN:  Thank you.

15        (Sidebar off the record)

16   BY MR. ROLLIN:

17   Q    Mr. Aronoff, I'm going to move on for the moment and we

18   may or may not come back to that loan file now or on

19   redirect.  For the moment will you please turn to plan

20   administrator Exhibit 833?

21        (Pause)

22   Q    Are you there?

23   A    Yes.

24   Q    And this is a claims tracking spreadsheet again?

25   A    Yes.

Page 146

1    Q    And the loan number is 9621?

2    A    Yes.

3    Q    If you turn to the second page of the claims tracking

4    spreadsheet you'll see that the allegation is for

5    misrepresentation of income, correct?

6    A    Yes.

7    Q    And it is supported by a tax return from the year 2005,

8    correct?

9    A    Yes.

10   Q    And will you please turn to Exhibit PA-834 and confirm

11   that that's the claim package for this loan?  Are you there?

12   A    Yeah.

13   Q    And is that -- is this, in fact, a claim package for

14   this loan?

15   A    It's the same loan number.

16   Q    Would you please turn to page 16 of the claim package

17   using the number at the footer 16 of 29.

18   A    Yes.

19   Q    And do you see the employment section?

20   A    I do.

21   Q    And this borrower is self-employed, right?

22   A    Yes.

23   Q    He's a self-employed realtor, right?

24   A    Appears so.

25   Q    He's a self-employed realtor in Folsom, California,

Page 147

1    right?

2    A    Yes.

3    Q    He takes out this loan in December of 2004, right?

4    A    Yes.

5    Q    And he states a monthly income or provides on his loan

6    application a monthly income of $12,000, right?

7    A    Yes.

8    Q    And you don't know what the borrower was thinking in

9    terms of what figure is supposed to go there, do you?

10   A    I don't know what the borrower was thinking.

11   Q    Because it wasn't part of the trustees' process to

12   figure out what the borrower was thinking, right?

13   A    No, it was not.

14   Q    And if you -- as we saw a moment ago in the claims

15   tracking spreadsheet the breach narrative refers to the

16   borrower's 2005 tax return, correct?

17   A    Yes.

18   Q    And now for the calendar year 2005, so that's generally

19   filed in April of 2006, right?

20   A    That's the latest it should be filed.

21   Q    Now you don't know how much the borrower made in 2004,

22   do you?

23   A    That's correct.

24   Q    You don't know how much the borrower made in any given

25   month in the year 2004, do you?

Page 148

1   A     No.

2   Q     Or the year 2005 for that matter?

3   A     No.  I just have the tax return that shows what their

4   income for 2005 was.

5   Q     Their aggregate income for the entire year 2005?

6   A     That's correct.

7   Q     But not broken down by month?

8   A     No.

9   Q     And certainly not for the month of December 2004,

10  right?

11  A     That wouldn't be on the '05.  That's correct.

12  Q     And that isn't anywhere in the claim package, is it?

13  A     Evidence of them making $12,000 in December of '04?

14  Q     Evidence of how much money the borrower made in any

15  month of 2004 including December?

16  A     No.  There's no evidence of the actual income number

17  the borrower earned in 2004.  That's correct.

18  Q     The only evidence of how much the borrower made that

19  can be found in 2004, in December of 2004 that can be found

20  anywhere in the claim package is the loan application,

21  right?

22  A     Yes.

23  Q     Which you gave no weight?

24  A     Given the other information in the file that's correct.

25  We thought the $12,000 figure was a misstatement.

Page 149

1    Q    Based on everything else in the claim package?

2    A    Based on the entire package, the '05 return, the '06

3    return, the hardship letter and all the other information

4    relating to this file.

5    Q    Now the claim file also has a BLS report.  Do you see

6    that?  That's 834, the same exhibit on page 28.

7         (Pause)

8    Q    Are you there?

9    A    Yes.  I see that.

10   Q    It's not cited in the breach finding, but it's in the

11   claim package, right?

12   A    That's correct.

13   Q    And it says the area that he picked is Sacramento,

14   right?

15   A    I see that.

16   Q    And the position chosen is real estate agent and the

17   income at the ninetieth percentile for real estate agents

18   according to BLS is $96,300 a year, right?

19   A    I see that.

20   Q    But, of course, BLS doesn't show this borrower's income

21   in 2004, right?

22   A    No, it wouldn't.

23   Q    It doesn't show this borrower's income at any time,

24   right?

25   A    That's correct.

Page 150

```
 1   Q    It doesn't show any borrower's income at any time, does

 2   it?

 3   A    That's correct.

 4   Q    But even if it did by definition ten percent of

 5   realtors in Sacramento, California at this time make more

 6   than the ninetieth percentile, right?

 7   A    Yes.

 8   Q    And that's true with every -- every time you use the

 9   ninetieth percentile in BLS, every single time ten percent

10   of people in that location at that time in that job make

11   more than what's reflected at the ninetieth percentile,

12   agreed?

13   A    Ten percent do, ninety percent make less.

14   Q    If you could look at plan administrator 132, please.

15   Are you there?

16   A    Yes.

17   Q    Have you ever studied the survey methods and

18   reliability statements issued with respect to BLS?

19   A    No.

20   Q    Mr. Aronoff, you testified a few minutes ago that you

21   reached the conclusion that borrower had made a

22   misrepresentation of income based on subsequent year tax

23   returns and hardship letters found in the claim file.  And

24   can you please take a look at the claim file and tell me

25   what document specifically you're referring to?
```

Page 151

1   A    I don't think I said claim file.  They're in the loan

2   file.

3   Q    You remember this loan file?

4   A    I do.  It was one of the exemplars we discussed on

5   direct.

6   Q    Are you sure?

7   A    I'm pretty sure.

8   Q    So you think there's other evidence in the loan file

9   not put in this claim file that supports the claim?  That's

10  your testimony?

11  A    Yes.

12  Q    You appreciate, don't you, that realtors suffered a

13  downturn in their income in the years running up to the

14  financial crisis, right?

15  A    I think we had this discussion.  Yes.

16  Q    And probably the earliest hit profession, wouldn't you

17  agree?

18  A    I don't know that to be a fact one way or the other.  A

19  lot of my colleagues on Wall Street may say they were hit

20  pretty early on, too.

21  Q    Sure.  People involved in the mortgage business and the

22  real estate business were the first to experience the

23  effects of what would later become the financial crisis,

24  don't you agree with that?

25  A    Yes.

Page 152

1    Q    And you don't know what happened to the borrower during

2    the course of 2005 that may have affected his 2005 and

3    subsequent year income, do you?

4    A    Only what he said in the hardship letter which is that

5    he wasn't effected until sometime later than that.

6    Q    You think that's this loan?

7    A    I do.

8    Q    But in any event with respect to the tax returns that

9    you've cited you would expect to see a decrease in income

10   over the course of '05, '06 and '07 for somebody who is in

11   the real estate business, wouldn't you?

12   A    Not necessarily.  '04 and '05 were arguably peak years

13   for real estate --

14   Q    So --

15   A    -- in California before the crash.  But reasonable

16   people would differ on that opinion.

17   Q    And here's the key, with respect to this borrower you

18   have no idea?

19   A    Again, we as -- we looked at '05.  We looked at '06.

20   We looked at the hardship letter and in the two prior years

21   working for the same real estate company in the same

22   location he never made anywhere close to $144,000 a year.

23        And so the decision was made based on the totality of

24   the file that it was more likely than not that this borrower

25   misrepresented his income.

Page 153

1   Q    So let's be clear about this.  You've got a 2005 tax

2   return, correct?

3   A    Yes.

4   Q    And at any point in time between origination and the

5   end of 2004 and the end of 2005 this borrower could have

6   experienced a decrease in income that would be reflected in

7   the aggregate number reported in April of 2006, correct?

8   A    Yes, including the NOL he noted in the '05 return for a

9   loss in '04.

10  Q    And that is a fact, a fact that I just asked you about,

11  the potential decrease in income over the course of 2005

12  that would affect his 2005 tax return, that is a fact that

13  you don't know?  You don't know what happened to the

14  borrower's income in 2005, right?

15  A    That's correct.

16  Q    Will you please turn to plan administrator 830?

17        MR. ROLLIN:  Excuse me, Your Honor.  I'm just going

18  to step back to speak with my client.

19        THE COURT:  Sure.

20    (Pause)

21        MR. ROLLIN:  Thank you, Your Honor.  And I

22  apologize.

23        THE COURT:  Okay.

24  BY MR. ROLLIN:

25  Q    Are we at 830?

Page 154

1    A    I am.

2            MR. SHUSTER:  I don't have it in my binder.

3            MR. ROLLIN:  No?

4            THE COURT:  It's in the new binder.  It's --

5            MR. ROLLIN:  Volume I.

6            THE COURT:  There's a -- it's the second green tab.

7    It's --

8            MR. SHUSTER:  Oh.

9            MR. ROLLIN:  Thank you, Your Honor.

10            THE COURT:  You're welcome.

11            MR. ROLLIN:  Let me skip it.  I'm going to go to

12    831.  Can you go to PA-831?

13            THE COURT:  Well, Mr. Shuster went to the trouble

14    of finding it.

15            MR. ROLLIN:  I did that to him on purpose.

16        (Laughter)

17            THE COURT:  Okay.  831.

18    BY MR. ROLLIN:

19    Q    And 831 is the claims tracking spreadsheet for a loan

20    that ends 1643, right?

21    A    Yes.

22    Q    And if you turn to the second page you can see that the

23    allegations are misrepresentation of income, correct?

24    A    Yes.

25    Q    Based on BLS, right?

Page 155

1   A     Yes.

2   Q     And if you turn to plan administrator 832 we've

3   confirmed that's the claim package for this loan?

4   A     Yes.  It appears to be.

5   Q     And if you go to page 5 of that exhibit, so 5 of 48,

6   that looks like the first page of the loan application,

7   right?

8   A     It does.

9   Q     If you turn to the next page up at the very top you see

10  this borrower is a registered nurse, right?

11  A     I see that.

12  Q     And if you look to the income section the amount of

13  income listed is $13,783.33, correct?

14  A     Yes.

15  Q     And this is one we talked about the other day, do you

16  remember?

17  A     Yes, I do.

18  Q     And the borrower resides and works in the Los Angeles

19  area, right?

20  A     I believe so.

21  Q     If you look at page 9 of the claim package, 9 of 48 you

22  see that the loan was taken out in July of 2006, correct?

23  A     Yes.

24  Q     And here again we don't know what the borrower was

25  thinking when she completed the loan application, right?

Page 156

1    A    That's right.

2    Q    Because that wasn't part of the trustees' process,

3    right?

4    A    I don't know if it was or whether we could determine

5    that or not, but it wasn't.  You're right.

6    Q    Can you think of any means by which to find out the

7    borrower's actual income?

8    A    Not offhand, but that wasn't the objective.

9    Q    The objective was not to find the actual income?

10   A    That's correct.

11   Q    Trustee opening slide 41, please.  You were here for

12   opening, right?

13   A    Some parts of it.

14   Q    And you see here in the opening slide by the trustees

15   the very first thing that was done by the -- the very first

16   thing listed with number one is the job that the loan review

17   firms did, right, for misrep income claims?

18   A    Yeah, I see that.

19   Q    And they verified borrower income using widely accepted

20   methods and sources, correct?

21   A    Yes.

22   Q    In fact, you can't do a debt to income ratio

23   calculation without knowing the borrower's actual income,

24   can you?

25   A    You need an income number to do a debt to income ratio

Page 157

1   calculation.  That's correct.

2   Q    And if you want it to be an accurate debt to income

3   ratio number you need the actual income, right?

4   A    Or a proxy of that income.  Yes.

5          THE COURT:  What's a proxy of that income?

6          THE WITNESS:  An estimation.  Again, we -- the goal

7   -- it was to verify the borrower income and to test that

8   data point and see if based on the information in the file

9   it was more likely than not that that income number was

10   misrepresented.  And that's what the exercise was.  The

11   exercise was not to verify that that number was accurate.

12          Again, to the extent there was no evidence in the

13   file that there was anything wrong with that number it was,

14   in fact, verified to the extent it was going to be verified.

15   But it -- the process is slightly different because the

16   determination of the actual income number in a forensic

17   review is almost impossible given the limitations on time

18   and resources that are evident in most of these cases.

19   BY MR. ROLLIN:

20   Q    So you -- you weren't trying to get an accurate real

21   income number?

22   A    We were verifying the income number that was used to

23   make the loan.

24   Q    Verified borrower income refers to what the borrower's

25   true income is as contrasted with what in your view would be

Page 158

1    the misrepresented income on the loan application, right?

2    A    No. I disagree with you.

3    Q    So when you say -- when the loan review firms verified

4    the borrower income they weren't verifying the borrower's

5    true income.  Do I have that right?

6    A    I don't understand what you mean by true income or

7    actual income.  There was a data point that was used to

8    underwrite the loan.  It was the income number on the

9    application.  And to the extent there was nothing in the

10   file to make it appear more likely than not that the income

11   was misrepresented, nothing was done with that loan.

12        To the extent there was information that the borrower -

13   - that supported the conclusion the borrower misrepresented

14   that income and that some other income was more likely than

15   not to be the borrower's income at the time the loan was

16   made, then the conclusion was made that that income was

17   misrepresented.

18   Q    An amount of money that a borrower makes is a fact that

19   can be verified.  You can ask me how much money I make and I

20   can tell you and that's a fact, right?

21   A    One would assume and that's the same number that the

22   borrower would write down on the application where asked how

23   much money they make.

24   Q    Please just answer the question I'm asking you.  A --

25   the amount of money that a borrower makes in a given month

Page 159

1    or in a given year is something that can be determined,

2    right?

3    A     In theory, yes.

4    Q     That's what I mean when I say actual income in the next

5    question.  You were not trying to find the borrower's actual

6    income?

7    A     That's correct.

8    Q     And verified income does not in this slide 41 from the

9    trustees' opening, verified borrower income does not refer

10   to verifying the borrower's actual income?

11   A     As explained, that's correct.

12   Q     And so if you're trying to derive an actual DTI for a

13   borrower you can't do it unless you have the actual income,

14   right?

15   A     Correct.

16   Q     And if you're trying to get the magnitude of a

17   misrepresentation, five percent or thirty percent or fifty

18   percent, you can't do that unless you have the actual income

19   number?

20   A     Well, you can't do it unless you have a referent income

21   number which is what --

22   Q     No.

23   A     -- we did.

24   Q     No, sir.  You can't do it unless you have the actual

25   income number.  You can't find the actual variance unless

Page 160

1    you have actual income number, isn't that true?

2    A    No.  That's not true.

3    Q    You can find the actual variance using an estimated

4    income number?

5    A    We did in about 34,000 cases in this review.

6    Q    That's not quite the answer -- that may be an answer to

7    a different question, but not the one that I asked.

8         Are you telling me that you can determine an actual

9    variance between represented income and actual income

10   without having the actual income number?

11   A    To the extent you define actual income as we did in

12   this case as the number that the borrower put on the

13   application for the loan, yes.

14   Q    So actual income in this case -- strike that.

15        Let's start over again.  I -- my question was about

16   actual income and your answer was about represented income

17   so let's start all over again.

18        Are you telling me that you can determine the actual

19   variance, the real facts, the actual variance between a

20   borrower's represented income and their actual income

21   without knowing their actual income?

22   A    No.

23             THE COURT:  No, you are not telling him that or no,

24   you cannot?

25             THE WITNESS:  Without a referent income you can't

Page 161

1    calculate a variance.

2    BY MR. ROLLIN:

3    Q    I'm not asking about a referent income.  I'm talking

4    about an actual income.  If you're using an estimate of my

5    income and you're comparing it to a represented income, then

6    the degree of variance might be four percent in real -- in

7    real life, or it might be six percent, but you don't know

8    because you're just using an estimate of the income, right?

9    A    I don't know what your question is.

10   Q    Let's try it again.  Maybe I'll go back to the Court's

11   question.

12        Here's my question again.  Are you telling me that you

13   can determine the actual variance, the real facts, the

14   actual variance between a borrower's represented income and

15   their actual income without knowing their actual income?

16   A    You can't do that.

17   Q    Thank you.

18        MR. DAVIS:  Can't?

19        THE WITNESS:  Cannot do that.

20        THE COURT:  I hate to interject, but it's -- it has

21   been about an hour and 15 minutes.

22        MR. ROLLIN:  That was fast.

23        THE COURT:  Yes.  And I'm concerned that Mr.

24   Aronoff needs a break.

25        So, Mr. Aronoff, why don't you embark on your break

Page 162

1    and I'll talk to these folks about what our game plan is for

2    the --

3              THE WITNESS:  Thank you.

4              THE COURT:  -- rest of the day.  All right.

5              THE WITNESS:  Like ten minutes, five minutes?

6              THE COURT:  Yeah.  Sure.

7              Mr. Shuster, could you come up?

8         (Recessed at 4:28 p.m.; reconvened at 4:42 p.m.)

9              THE COURT:  Thank you everyone for your patience.

10   For the benefit of everyone so you have an understanding of

11   what timing we're talking about, especially you, Mr.

12   Aronoff, what we're going to do is go to about 5:15 today,

13   get to a stopping point.  It's been a very long day and then

14   we're going to resume tomorrow at around 11:30, on or about,

15   subject to when you can actually be here.

16              Is that consistent with your conversations with Mr.

17   Shuster?

18              THE WITNESS:  Yes, it is.

19              THE COURT:  Okay.  And with my gratitude.  I know

20   it's a lot longer than frankly any of us had anticipated.

21   And I appreciate your willingness to keep coming back.

22              Okay.  Back to you, Mr. Rollin.

23              MR. ROLLIN:  Thank you, Your Honor.

24   BY MR. ROLLIN:

25   Q    Mr. Aronoff, the income figures that you used in the

Page 163

1    course of this process came from the evidence types,

2    whatever they were, provided by the re-underwriting firms,

3    right?

4    A    Yes, and the application.

5    Q    Can you please look to plan administrator I think it's

6    832 that refers to the claim package.  Maybe it's 834.

7    A    832 or 834?

8    Q    834.  And specifically page 28.  I'm sorry.  I'm taking

9    you to the wrong file.  Stop and I'll help you get to the

10   right place.  832, please.

11   A    Okay.

12   Q    And can you find at page I think it's 13 the DLS that

13   was used in respect to this loan?  Are you there?

14   A    Yes.

15   Q    And I just want to confirm that, in fact, what's

16   reflected there is the income figure and the source of the

17   income figure used by the trustees for purposes of asserting

18   this claim?

19   A    I don't know.  Let me just look.  Okay.  This appears

20   to be the BLS that was in the claim package.  Yes.

21   Q    And that's the income figure and the source of the

22   income figure that was used to pursue this claim, correct?

23   A    Yeah.  I can't do that math in my head, but it looks

24   about right.  Now I can't find it.  Here it is.  So 95,3

25   divided by 12, 8096.  Yeah.  That looks close.

Page 164

1    Q    And you understand among other things BLS doesn't show

2    overtime, right?

3    A    Yes.

4    Q    Or bonuses?

5    A    Generally not.

6    Q    It doesn't show total compensation at all?

7    A    It's used to show wage to wage.

8    Q    Is that another way of saying it does not show total

9    compensation?

10   A    It may show total compensation.

11   Q    Well, what we do know is it doesn't include overtime.

12   It doesn't include bonuses.

13   A    That's correct.

14   Q    Now yesterday in reference to this loan Mr. Shuster

15   showed you TRDX-191.  Do you see that up on the screen?

16   A    Yes.

17   Q    And this was a demonstrative that you used to describe

18   some analysis that you had done with respect to this loan,

19   correct?

20   A    Yes.

21   Q    The red flags, that analysis, was it done in the

22   protocol or was it done in preparation for your expert

23   testimony?

24   A    I don't know if it was done in the protocol.  I did it

25   in preparation for my testimony.

Page 165

1   Q    So if it was done in the protocol you're not the person

2   who did it?

3   A    That's correct.  It would have been done by the

4   forensic loan reviewer.

5   Q    And it's not in the claim package anywhere, is it, this

6   analysis?

7   A    Well, it is.  It's all based on -- off information on

8   the application.

9   Q    It's not in the -- sorry.  It's not in the claim

10  description that was provided?

11  A    That's correct.

12  Q    Now do you remember the Court asked you some questions

13  about maybe the borrower, maybe this could be explained

14  because the borrower was putting children through private

15  school or caring for elderly parents?

16  A    I do.

17  Q    Will you please take a look at plan administrator 839?

18       (Pause)

19  Q    Do you see that 839 contains some hardship

20  documentation?  Did you find that?  For example, if you take

21  a look at page 5 of 28 in that document.

22  A    Okay.  I see that.

23  Q    Do you see that letter?  And you see in the middle

24  paragraph, right about in the middle of the middle paragraph

25  it says, "I am supporting my parents who both retired early

Page 166

1    due to medical problems.  Not only that, I am supporting my

2    younger brother who is just starting high school."

3          MR. SHUSTER:  Mr. Rollin, did you say 839?

4          MR. ROLLIN:  Yes.

5          MR. SHUSTER:  Can you give a page reference?

6          MR. ROLLIN: (Indiscernible).

7          MR. SHUSTER:  Thank you.

8    BY MR. ROLLIN:

9    Q    Do you see that?

10   A    I do.

11   Q    The Court's hypothetical was spot on.

12   A    Five years later.

13   Q    Well, you don't know when the borrower specifically

14   began supporting her parents or they had medical problems or

15   began supporting her younger brother or any of the other

16   life circumstances that she reports in this hardship letter,

17   do you?

18   A    Well, the first paragraph references to the current

19   slowdown in the economy as the reason she's cash strapped at

20   this point in time.

21   Q    So --

22   A    And the letter is dated December 2009.

23   Q    The letter doesn't say when the borrower started

24   supporting her parents or when they had their medical

25   problems or when she started supporting her younger brother

Page 167

1   or any of the other life issues that she's experiencing,

2   right?

3   A    No.  But it raised -- I think it raises a whole bunch

4   of new questions like the fact that she admits in this

5   letter that her brother has been helping her make half the

6   mortgage payments and now she can't make them because he's

7   moved out which would cut the other way and indicate that

8   she never had sufficient income to pay this loan.

9   Q    Can you answer my question, please?

10   A    Can I hear it again, please?

11   Q    This letter doesn't say when she started supporting her

12   parents, when they began experiencing medical problems, when

13   she began supporting her younger brother, right?

14   A    Not specifically, no.

15   Q    There are all kinds of life circumstances happening

16   that trustees didn't drill down on in their review because

17   they didn't speak to the borrower, right?

18   A    The second part of that is true, they didn't speak to

19   the borrower.  The first part is not true.  To the extent

20   there was information in the file that was evidence of

21   certain life experiences that would point to the

22   consideration of the analysis of the loan, then it was

23   certainly considered.

24   Q    Only to the extent there was information about the life

25   experience of a borrower was in the file did the trustees

Page 168

```
 1    consider it at all, correct?

 2    A    Or evident from some publicly available third party

 3    tool.

 4    Q    But one of the things you didn't do which you just

 5    admitted was you certainly did not talk to the borrower,

 6    right?

 7    A    That's correct.

 8    Q    You didn't talk to anybody who was involved in the

 9    underlying loan transaction at all, did you?

10    A    Not to my knowledge --

11    Q    And so --

12    A    -- with the --

13    Q    -- some things may be included in a file about a

14    borrower's life and there may be other things that don't

15    happen to be included in the loan file about a borrower's

16    life that the trustees never got to, correct?

17    A     If it wasn't in the file or available through the types

18    of third party tools I discussed it wasn't looked at.

19    Q    Because that wasn't part of the trustees' process, was

20    it?

21    A    That's correct.

22    Q    And there are plenty of borrowers, don't you agree, who

23    have life circumstances who simply may not apply for a loan

24    modification and, therefore, hardship letters like this

25    wouldn't be found in the file at all?
```

Page 169

1    A    Perhaps.

2    Q    And you would never find out about any of it in your

3    process?

4    A    Perhaps that's true if that -- if those circumstances

5    existed and there was no documentation in the file we would

6    never would have seen it.

7    Q    And therefore was not part of your analysis?

8    A    We didn't look at what wasn't there.  That's correct.

9    Q    Can you please turn to 821, PA-821?

10       (Pause)

11   Q    Are you there?

12   A    Yes.

13   Q    821 is an excerpt from your Exhibit 15 to your

14   affirmative report, correct?

15   A    It appears to be.  Yes.

16   Q    And the breach allegation is in Column F, correct?

17   A    The factual basis is in F, yes.

18   Q    And the factual basis for this claim is that the

19   borrower did not disclose a loan that was originated after

20   the subject loan, right?

21   A    That's apparently correct.

22   Q    Now this loan -- if you'll turn to TRX-601 which should

23   be the next tab in your binder you will find your expert

24   report, your affirmative report.

25   A    I'm sorry.  Where am I turning?

Page 170

1    Q     TRX-601 which I hope is the next tab in your binder.

2    A     In the same binder?

3    Q     Yes, sir.

4    A     No.  The next tab is PA-697.

5          (Pause)

6    Q     Mr. Aronoff, will you look more forward in the binder

7    towards the beginning and see if you can find TRX-601?  I

8    just led you to the wrong place.

9          (Pause)

10   A     Got it.

11   Q     Are you there?

12   A     Yes, I am.

13   Q     Okay.  And that's your affirmative expert report?

14   A     Yes.

15   Q     Now using the numbers, the exhibit numbers at the

16   bottom as a reference would you please turn to page 62 of

17   96?  And you see this is that same loan?  I'm sorry.  I'll

18   make it easier.  The second to the last bullet on page 62 of

19   the exhibit, which is page 57 of your report if you prefer

20   to look for it that way, is this same loan that I'm asking

21   you about.

22   A     Okay.  Which tab are we in with the loan, please?

23   Q     Tab with the loan is PA-821.

24   A     Got it.

25   Q     And have you found the page in your expert report where

1   this loan is identified?

2   A    Yes.

3   Q    And it's that an ultimate bullet on page 62 of the

4   exhibit, 57 of your report, correct?

5   A    I see it.

6   Q    And you chose this loan specifically to be an example

7   in your expert report?

8   A    Okay.

9   Q    And you can see that the claim here that this

10  undisclosed loan closed nine days after the subject loan,

11  correct?

12  A    That's what it says.

13  Q    And the evidence to support that is a LexisNexis

14  report, correct?

15  A    Yes.  That's what it says.

16  Q    And if you want to check the finding in Exhibit PA-821

17  you'll see there as well that the evidence cited is the

18  LexisNexis report.

19  A    Okay.  What did you just refer to, the other tab?

20  Q    The other tab that shows the loan, PA-821, Column F.

21  A    Yeah.  It just says audit review.  It doesn't say

22  LexisNexis on my copy.

23  Q    Okay.  Let's turn to the claim package, PA-803.

24  A    Okay.

25  Q    And I'll direct your attention to page 18 of 19.  Are

Page 172

1    you there?

2    A    I am.

3    Q    And that's the LexisNexis report upon which this claim

4    is based, correct?

5    A    It looks like it is.  Yes.

6    Q    Okay.  You can see LexisNexis on page 19 at the

7    copyright sign, right?

8    A    Yes.

9    Q    And the allegedly undisclosed post-closing debt is

10   about the bottom third on page 18 of 19, correct?

11   A    Yes.

12   Q    And it's your opinion, isn't it, that a LexisNexis

13   report like this is sufficient evidence to prove the claim

14   without any verification from any other source, correct?

15   A    It can be.  Yes.

16   Q    Can you please turn to PA-697?

17   A    PA-697?

18   Q    Yes.

19          THE COURT:  It's about six tabs from the back of

20   the binder, Mr. Aronoff.

21          THE WITNESS:  Okay.

22          MR. ROLLIN:  Thank you, Your Honor.

23          THE WITNESS:  Okay.  I'm with you.

24   BY MR. ROLLIN:

25   Q    Great.  Thanks.  Sorry about that.

Page 173

1    A     That's okay.

2    Q     And when you get to it you'll see 697 is just a few

3    pages from a 105 page document that we've shortened just to

4    save part of the tree.

5          Now I'll ask you to turn to page 105 and let me know

6    when you're there.

7    A     Okay.

8    Q     And on page 105 there's a notice from LexisNexis

9    titled, important.  Do you see that?

10   A     Yes.

11   Q     And right in the middle there's a sentence that begins,

12   this system should not.  Do you see that?

13   A     Yeah, I see it.

14   Q     And it says, "This system should not be relied upon as

15   definitively accurate.  Before relying on any data this

16   system supplies it should be independently verified."  Do

17   you see that?

18   A     Yes.

19   Q     And the trustees for this claim did not independently

20   verify the LexisNexis report, did they?

21   A     I don't know.

22   Q     There's certainly nothing in the claim package

23   suggesting independent verification.

24   A     Okay.  It doesn't say this, but there may be something

25   in the loan file.

Page 174

1    Q    First of all, is there anything in the claim package

2    that shows independent verification?

3    A    I don't know.  I can look.  I was going to take your

4    representation to that effect.  But I don't know.  I -- is

5    the whole claim package here?

6    Q    Yeah.

7    A    Okay.  Then I would assume there's not if you're asking

8    me that.

9    Q    And, again, the loan review firms didn't add anything

10   to the loan files because you had your own loan files.  They

11   just sent you the claim packages, right?

12   A    This page that I just looked at, is this for a

13   different loan, 105, does this relate to the loan we're

14   talking about?

15   Q    You're talking about PA-697?

16   A    Yes.

17   Q    No.  That's just from LexisNexis.  That's not related

18   to this loan except to the extent that you relied on

19   LexisNexis.

20   A    Okay.  There is a disclaimer on the LexisNexis page for

21   the loan we looked at as well.  I don't know if it had the

22   same language.  In fact, it said one of the permitted uses

23   was litigation.

24   Q    Does that mean that it doesn't have to be independently

25   verified?

Page 175

```
 1   A     No.  It means that like with all these documents it

 2   should be used in a responsible manner and the underwriters

 3   and those professionals involved in this industry understand

 4   that there are sometimes mistakes in documents.  And they

 5   should take that into consideration and they should assess

 6   the evidence in the context in which -- in which it's

 7   offered as well.

 8   Q    Oh, I understand that's what you're saying they should

 9   do.  My question now is, is that what they did?

10   A    I believe that the loan review firms that were used in

11   this review acted responsibly and thoughtfully and in

12   accordance with industry custom and practice.

13   Q    Is that your -- is that a fact or is that an opinion?

14   A    It's my opinion.

15   Q    You're giving that as opinion testimony, not fact

16   testimony?

17   A    That's correct.

18   Q    But if I asked you what happened specifically with

19   respect to this loan and whether there was independent

20   verification your answer to that would be, I don't know,

21   correct?

22   A    Yes.

23   Q    And there's nothing in this claim package other than

24   the LexisNexis report to support the allegation that this

25   debt was taken out by this borrower in this amount on the
```

Page 176

1    date stated in the breach finding, right?

2    A    Yeah.  Which claim package are we talking about now?

3    Q    The claim package is plan administrator 803.

4         (Pause)

5    A    I think that's -- that's correct.  I lost the claim

6    package.  I can't find it.

7    Q    Now -- well, sorry.  It's PA-803 and I'm going to ask

8    you another question about it so you should find it.

9    A    How far -- oh, here it is.  Go ahead.  I'm in the claim

10   package now.

11   Q    Do you have the loan application at the very beginning

12   of the packet?

13   A    Yes. I'm in the loan application.

14   Q    And on page 3 of 19 is the real estate owned section,

15   right at --

16   A    Yes.

17   Q    -- the bottom?

18   A    Yes.

19   Q    And there's no place in the real estate owned section

20   or anywhere on the loan application where the borrower is

21   supposed to write down a debt that she has not yet incurred,

22   correct?

23   A    There's nothing that precludes them from writing debt

24   they know about in this spot.

25   Q    There's no place in the real estate owned section where

Page 177

1   you write down a debt that you haven't taken out yet, right?

2   A    No.  I'm saying there's nothing in that section that

3   precludes a borrower from being honest about debt they know

4   is going to close within a few days of the subject.

5   Q    When it says the words, schedule of real estate owned,

6   do you interpret that to be schedule of real estate to be

7   owned?

8   A    It can be.  It's -- it -- there -- as I said there's

9   nothing that precludes them from doing it.

10  Q    But that's -- that's what you -- that's different from

11  the words that are used on the page.  The words that are

12  used on the page are, schedule of real estate owned, not

13  schedule of real estate to be owned.

14  A    That's correct.

15  Q    And there's no section that says, this is where you

16  write down the debts you think you're going to take out in

17  the future --

18  A    That's correct.

19  Q    -- right?  There's also no place where you write down,

20  I might get a promotion, right?

21  A    That's correct.

22  Q    Or I might get a divorce?

23  A    That's true.

24  Q    Or one of my elder parents is going to need care in the

25  near future, right?

Page 178

1    A     That's correct.

2    Q     The loan application doesn't call for future facts.  It

3    calls for the facts as they exist.

4    A     And to the extent a borrower knew that they were going

5    to incur debt within a short time after the subject they

6    should disclose that.  And the failure to do so is a

7    misrepresentation of debt.

8    Q     Right.  But there's no place on the loan application

9    for that.  And --

10   A     Again --

11   Q     -- you may assert that they have a duty to disclose,

12   but I'm focusing on something more narrow and that is

13   whether there's a place on the loan application to list

14   future events, positive and negative?

15   A     Again, there is a place one could list it if they

16   wanted to.  It's not required by the language of the

17   application to do so.

18   Q     And likewise there's no place where you write down you

19   might get a promotion or a raise or a divorce or anything

20   else in the future, right?

21   A     Well, again, if you knew that to be so then that's

22   probably something to the -- and to the extent it

23   substantially increased your income then you could

24   demonstrate that I've been promoted.  It's going to happen

25   next month.  That's probably something you would want to

Page 179

1   share with the lender.

2   Q    I'm trying to draw a careful distinction here.  There

3   is -- what you share with the lender, in other words what

4   you write down on the loan application, there's no place on

5   the -- and I'll talk about what you share with the lender in

6   a minute, so.  But there's no place on the loan application

7   to write down your future debt.

8   A    Again, we disagree on that.  You could write it down

9   there.

10  Q    There's certainly no instruction that says, you should

11  read schedule of real estate owned to be a place where you

12  write down future debts that you haven't taken out yet.

13  A    That's correct.

14  Q    Now there may be other borrower disclosures that are

15  given to the lender outside of the loan application, right?

16  A    Yes.

17  Q    They talk, right?

18  A    Not anymore.  No.

19  Q    When people take out mortgage loans they typically talk

20  to their lender.  They have an interview.  They exchange

21  information, correct?

22  A    That's just not true anymore.  No.

23  Q    What's anymore?

24  A    The -- you're harkening back to when you walked into

25  your local thrift in the 50s.  Loans are made more -- loans

Page 180

1    are generally made now without the borrower ever meeting the

2    ultimate lender.

3    Q    Did this borrower meet the lender?

4    A    Don't know.

5    Q    When you gave loans did you meet the borrowers?

6    A    Personally, not frequently, no.

7    Q    But you understand that in mortgage lending there is a

8    process by which the lender and the borrower communicate,

9    correct?

10   A    Not to the extent there's a broker involved which is

11   most of these loans.

12   Q    The borrower could be communicating with the broker and

13   they could be communicating with the lender directly, either

14   way.

15   A    Generally if there was a broker involved there was no

16   communication between the borrower and the lender.

17   Q    They would provide the broker information and the

18   broker would pass that information onto the lender, correct?

19   A    That's right.

20   Q    Or if they were speaking directly to the lender they

21   would give information to the lender?

22   A    Perhaps.

23   Q    And some of the communications, whether it's with the

24   broker or with the lender, are verbal?

25   A    And they can be written outside of the application

Page 181

1  requirements as well.

2  Q    So they can be both a verbal discussion and written

3  outside of the application, agreed?

4  A    Yeah.

5  Q    And so you don't know what disclosures this borrower

6  made or any borrower made outside of what's in the loan

7  application, right?

8  A    Outside of what's in the file.

9  Q    So if the borrower made a disclosure verbally or in

10 writing and it wasn't included in the file you would have no

11 way of knowing that?

12 A    Other than looking at the DTI that was used and

13 noticing that that soon to be incurred debt wasn't included

14 in the DTI.  That's correct.

15 Q    You don't know what disclosures were made to the

16 borrower unless -- or were made to the lender or the broker

17 unless those disclosures are put in the file that you

18 reviewed, correct?

19 A    Yes.

20 Q    Now the file that you reviewed was the servicer's

21 scanned copy, correct?

22 A    I don't know.

23 Q    You don't know whether this file that you reviewed or

24 any file that you reviewed was the same as it was at

25 origination, do you?

Page 182

```
 1    A    That's correct.

 2    Q    You don't know its travels, correct?

 3    A    No, I don't.

 4    Q    You don't know that all of it was scanned?

 5    A    I don't understand that question.

 6    Q    You don't know that all of it was -- all of the hard

 7    copy documents were actually scanned into what you

 8    ultimately reviewed?

 9    A    Right.  I don't know that.

10    Q    And the trustees as part of this process didn't collect

11    any documents that the originator had, right?

12    A    I don't believe that to be the case.  I think you're

13    wrong.

14    Q    Do you believe that with respect to the loans that were

15    reviewed in this case you reviewed documents that came

16    directly from the originator?

17    A    As I just said I don't know what the providence of the

18    documents that were in the file we reviewed were.  They --

19    in many cases they appeared to be the original credit file

20    that came from the originator, but I don't know that to be

21    the case.

22    Q    I understand.  You did not give any direction with

23    respect to this loan review to make sure that all of the

24    copies of the file that existed were collected for purposes

25    of your review, did you?
```

Page 183

1    A    No.  I don't --

2    Q    And --

3    A    -- know -- I'm -- no.

4    Q    And as far as you know nobody gave that direction?

5    A    I know there was a concerted effort to obtain complete

6    files prior to embarking on the review.  I know there was a

7    representation made about the completeness of about 50,000

8    files before embarking on the review.  But beyond that I

9    don't know what efforts were made to obtain every piece of

10   paper that pertained to that loan during the life of that

11   loan.  That's correct.

12   Q    And you do know that at closing multiple files are

13   typically made, multiple copies of the loan file are

14   typically made, right?

15   A    Sometimes.

16   Q    The borrower gets one, right?

17   A    Yes.

18   Q    You didn't give any instructions to collect that one,

19   did you?

20   A    I didn't give instructions to collect anything.  So,

21   no.

22   Q    And as far as you know those weren't collected, right?

23   A    I don't believe borrowers were contacted to ask for

24   their file copies of loan files.  No.

25   Q    Now in addition to loan files that originators may have

Page 184

1  and then pass on as they sell the loan, they also keep other

2  records, correct?

3  A    They may.

4  Q    Outside of the loan file, correct?

5  A    They may.

6  Q    You don't know, right?

7  A    I don't know what?

8  Q    You don't know whether the originators that originated

9  these loans kept files outside of the loan files that

10  pertained to these borrowers or these loans?

11  A    You mean secret credit files?  I don't understand the

12  question.

13  Q    I mean, a place where they keep notes.  You don't know

14  that, right?

15  A    Is that a question?

16  Q    Yeah.  You don't know --

17  A    Yes.  That's correct.  I don't know that.

18  Q    And it wasn't part of the trustees' process to find

19  out, right?

20  A    That's correct.  It was not.

21       MR. ROLLIN:  Your Honor, I think based on our

22  previous discussion this is a good time to stop.

23       THE COURT:  I agree.

24       All right.  Thank you.

25       Thank you again, Mr. Aronoff.  We'll resume at

Page 185

1    11:30 or as soon thereafter as you're able to get here.  I

2    appreciate your ongoing cooperation with this process which

3    has taken longer than anyone anticipated.

4            Do I have someone -- you can just leave -- leave

5    all your things the way they are.  We'll just --

6            MR. ROLLIN:  Thank you, Your Honor.

7            THE COURT:  -- we'll just work around you.  Yeah.

8    Thank you.

9            MR. ROLLIN:  Thank you, Your Honor.

10           THE COURT:  Have a good evening.

11           MR. ROLLIN:  Thank you.

12        (Whereupon, these proceedings concluded at 5:19 p.m.)

13                            *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

1                      I N D E X

2                  T E S T I M O N Y

3    DEBTOR'S

4    WITNESS                 EXAM BY                    PAGE

5    JAMES H. ARONOFF        MR. DAVIS                    6

6                            MR. ROLLIN                  132

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 187

1                C E R T I F I C A T I O N

2

3       We, Dawn South and Sherri L. Breach, certify that the

4   foregoing transcript is a true and accurate record of the

5   proceedings.

6   **Dawn South**

    Digitally signed by Dawn South
    DN: cn=Dawn South, o, ou,
    email=digital@veritext.com, c=US
7   _____ Date: 2017.12.20 15:21:57 -05'00'

8   Dawn South

9   Certified Electronic Transcriber

10  **Sherri L. Breach**

    Digitally signed by Sherri L. Breach
    DN: cn=Sherri L. Breach, o, ou,
    email=digital@veritext.com, c=US
11  _____ Date: 2017.12.20 15:27:07 -05'00'

12  Sherri L. Breach

13  AAERT Certified Electronic Reporter & Transcriber CERT*D-397

14

15

16

17  Date:  December 20, 2017

18

19

20

21

22  Veritext Legal Solutions

23  330 Old Country Road

24  Suite 300

25  Mineola, NY 11501