Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - x

4   In the Matter of:

5   LEHMAN BROTHERS HOLDINGS INC.,      CASE NO. 08-13555-scc

6                Debtor.

7   - - - - - - - - - - - - - - - - - x

8                            United States Bankruptcy Court

9                            One Bowling Green

10                           New York, New York

11

12                           July 6, 2017

13                           9:02 AM

14

15

16

17

18

19

20

21   B E F O R E:

22   HON. SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO - MATTHEW

1    Hearing re:  Doc #55232 Motion of Lehman Brothers Holdings

2    Inc. for Entry of Order (A) Approving RMBS Settlement

3    Agreement, (B) Making Certain Required Findings Regarding

4    Decision of RMBS Trustees and LBHI Debtors to Enter into

5    RMBS Settlement Agreement, (C) Scheduling Estimation

6    Proceeding to Determine RMBS Claims and Approving Related

7    Procedures Regarding Conduct of Hearing, and (D) Granting

8    Related Relief (related document(s) 55154, 55096)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

Page 3

1  A P P E A R A N C E S :

2  WILLKIE FARR & GALLAGHER LLP

3      Attorneys for the Debtor

4      787 Seventh Avenue

5      New York, NY 10019-6099

6

7  BY:  TODD COSENZA, ESQ.

8      PAUL V. SHALHOUB, ESQ.

9

10  WEIL, GOTSHAL & MANGES LLP

11      Attorney for the Debtor and Affiliates

12      767 Fifth Avenue

13      New York, NY 10153-0119

14

15  BY:  JACQUELINE MARCUS, ESQ.

16

17  FENSTERSTOCK & PARTNERS LLP

18      Attorney for iFreedom Direct Corporation

19      100 Broadway

20      New York, NY 10005-4514

21

22  BY:  LANI A. ADLER, ESQ.

23

24

25

```
 1    SEWARD & KISSEL LLP

 2         Attorney for TMI Trust Company, Separate Trustee

 3         One Battery Park Plaza

 4         New York, NY 10004

 5

 6    BY:  M. WILLIAM MUNNO, ESQ.

 7

 8    CHAPMAN AND CUTLER LLP

 9         Attorney for U.S. Bank National Association as Trustee

10         111 West Monroe Street

11         Chicago, IL 60603-4080

12

13    BY:  FRANKLIN H. TOPP III, ESQ.

14

15    HOLWELL SHUSTER & GOLDBERG LLP

16         Attorney for U.S. Bank & Wilmington Trust

17         750 Seventh Avenue, 26th Floor

18         New York, NY 10019

19

20    BY:  MICHAEL S. SHUSTER, ESQ.

21

22

23

24

25
```

Page 5

```
 1    NIXON PEABODY LLP

 2         Attorney for Deutsche Bank

 3         437 Madison Avenue

 4         New York, NY 10022-7039

 5

 6    BY:  DENNIS J. DREBSKY, ESQ.

 7

 8    MORGAN LEWIS

 9         Attorneys for U.S. Bank National Association as Trustee

10         101 Park Avenue

11         New York, NY10178-0060

12

13    BY:  MICHAEL S. KRAUT, ESQ.

14         GLENN E. SIEGEL, ESQ.

15

16    ALSTON & BIRD LLP

17         Attorney for Wilmington Trust Company & Wilmington

18         Trust, N.A.

19         One Atlantic Center

20         1201 West Peachtree Street

21         Suite 4900

22         Atlanta, GA 30309-3424

23

24    BY:  JOHN C. WEITNAUER, ESQ.

25
```

Page 6

1    KASOWITZ BENSON TORRES LLP

2         Attorney for an Investor

3         1633 Broadway

4         New York, NY 10019-6799

5

6    BY:  DANIEL A. FLIMAN, ESQ.

7

8    CLARICK GUERON REISBAUM LLP

9         220 Fifth Avenue

10        New York, NY 10001

11

12   BY:  NICOLE GUERON, ESQ.

13

14   GIBBS & BRUNS LLP

15        Attorney for the Institutional Investors

16        1100 Louisiana, Suite 5300

17        Houston, TX 77002

18

19   BY:  ROBERT J. MADDEN, ESQ.

20

21   ALSO PRESENT TELEPHONICALLY:

22   ROBERT ROTHMAN, ESQ.

23   J. GARY GWILLIAM, ESQ.

24

25

Page 7

```
1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  Please have a seat.

3      Good morning everyone.

4         (A chorus of good morning)

5              THE COURT:  So we are still set up in trial mode

6      with the podium tilted, so probably be best if you speak

7      from counsel table.

8              MR. COSENZA:  Sure.

9              THE COURT:  All right?  Mr. Cosenza, how are you?

10             MR. COSENZA:  Good morning, Your Honor.  Todd

11     Cosenza from Willkie Farr & Gallagher for the plan

12     administrator, Lehman Brothers Holdings Inc.

13             We are here before Your Honor on the plan

14     administrator's motion for entry of an order approving the

15     RMBS settlement agreement to resolve the RMBS claims the

16     trustee submitted through the protocol.

17             For background, Your Honor, I can give some

18     background if you want me to speed things up let me know, I

19     just want to -- we'll go through it in various situations.

20             THE COURT:  I know that you know that I'm familiar

21     with the background.

22             MR. COSENZA:  Yes.

23             THE COURT:  But I think for the purposes of the

24     record --

25             MR. COSENZA:  Sure.
```

Page 8

1           THE COURT:  -- it would be useful for you to give

2     some background.

3           MR. COSENZA:  For background on November 30th,

4     2016 the plan administrator entered into an earlier version

5     of the settlement agreement now before the Court with

6     certain institutional investors, who are represented by

7     Mr. Madden, and presented that agreement to the trustees for

8     their consideration.

9           Thereafter the plan administrator, the trustees,

10    and the institutional ambassadors engaged in negotiations

11    regarding the terms of the proposed settlement.

12          On March 17th Lehman and the institutional

13    investors entered into a modified version of the settlement

14    agreement and presented the revised version of the agreement

15    to the trustees.

16          On March 22nd the plan administrator moved for an

17    entry of an order scheduling today's hearing and approving

18    notice proceedings with respect to this hearing.

19          The Court approved that motion on April 6th and

20    the plan administrator and trustees thereafter provided

21    extensive notice of today's hearing in accordance with the

22    scheduling order.

23          That notice included on April 27th the plan

24    administrator filing the 9019 motion before the Court

25    seeking approval of the settlement agreement.

Page 9

1          A handful of objections were filed, Your Honor,

2    and I'll --

3          THE COURT:  Yes.

4          MR. COSENZA:  -- I'm going to deal with those --

5          THE COURT:  Okay.

6          MR. COSENZA:  -- and explain the status of those

7    at the end.  But the objections for the most part have been

8    resolved, as detailed in our reply brief.

9          As part of our reply brief we have submitted

10   declarations dated June 30th, 2017 from Zachary Trump,

11   senior vice president in the residential mortgage group of

12   Lehman Brothers Holdings Inc., as well as for my colleague,

13   Paul Shalhoub.

14         Your Honor, I ask permission to hand those

15   declarations up to you and that they be admitted into

16   evidence.

17         THE COURT:  Okay.

18         MR. COSENZA:  And Exhibit 1 will be Mr. Trump's

19   declaration, Exhibit 2 will be Mr. Shalhoub's declaration.

20         THE COURT:  All right.  Is there any objection to

21   the admission into evidence of the Shalhoub affidavit and

22   the Trump affidavit?

23         All right.  Very good.

24      (Debtor's Exhibit Nos. 1 and 2 were received)

25         MR. COSENZA:  And I have copies for Mr. Kraut.

Page 10

1          MR. KRAUT:  Thank you.

2          MR. COSENZA:  And, Your Honor, Mr. Trump is in the

3   court today if anyone wants to examine him on his

4   declaration.

5          THE COURT:  Okay.  Does anyone wish to examine

6   Mr. Trump with respect to his declaration?

7          All right.  Very good.

8          MR. COSENZA:  Now, Your Honor, if approved the

9   settlement will establish a process to resolve claims on the

10  remaining approximately 73,000 loans or 73,100 loans in

11  residential mortgage backed securitizations in which Lehman

12  was a seller.  The trustee submitted the loans through the

13  protocol ordered by the Court in December 2014.

14          Under the agreement the parties had established a

15  process by which the plan administrator will request that

16  the Court estimate for purposes of allowance the claims for

17  the loans submitted through the protocol in an aggregate

18  amount of $2.38 billion.  And I know, Your Honor, that's

19  slightly different from the number that was in the

20  settlement agreement because various trusts have been

21  collapsed or have opted out of the settlement agreement.

22          THE COURT:  Okay.

23          MR. COSENZA:  So the number is slightly different

24  from the number that was in the various documents --

25          THE COURT:  Okay.

Page 11

1           MR. COSENZA:  -- that we submitted.  And I think

2    for purpose of the estimation proceeding we're now down to

3    230 trusts and this number is fluid because trusts are

4    collapsing and the like.

5           THE COURT:  Okay.

6           MR. COSENZA:  As you know the estimation

7    proceeding is scheduled for October 2017.

8           THE COURT:  Yes.

9           MR. COSENZA:  And Mr. Kraut will explain the

10   trustee's views in dote after I complete my presentation.

11          THE COURT:  Okay.

12          MR. COSENZA:  For further background, Your Honor,

13   before the debtor's petition date -- and I'll give you

14   background, sort of the RMBS structures for the record and

15   what's sort of at issue in the estimation proceeding.

16          Certain of the debtors acquired mortgage loans and

17   securitized them.  They established trusts through other

18   special purpose vehicles that acquired loans, held them, and

19   issued securities supported by the loans proceeds.

20          The agreement (indiscernible) the trust contained

21   representations and warranties that the quality and nature

22   of loans were at a certain level or that there was certain

23   documentation in the loan files.

24          The agreements gave the trustees a remedy if a

25   loan breached one of those representations or warranties.

Page 12

1    And if the trustees claimed that one of those reps or

2    warranties were breached Lehman would have an opportunity to

3    cure the breach, repurchase the loan, or substitute a

4    performing loan for the breaching one.  And that's just

5    based on the terms of the contracts.

6            In general terms to assert a claim the trustees

7    have to prove one, a breach; the breach adversely and

8    materially affected the value of the loan; and three, that

9    the trustee gave prompt notice of the breach to Lehman.

10           On or around the bar date, September 22, 2009, the

11   trustees filed proofs of claims asserting $37 billion in

12   repurchased loans.

13           In 2010 the plan administrator asked the trustees

14   for evidentiary support for the breaches asserted.

15           Having not received satisfactory support the plan

16   administrator filed several objections to proofs of claims

17   on that basis and for other reasons.

18           In 2011 certain of the trustees' claims were

19   dismissed, but most of them remained.

20           For the next three years no progress was made on

21   resolving these claims.

22           In January 2012 after the plan was approved the

23   debtors moved to estimate the trustees' claims to establish

24   a reserve.  The debtor's estimated amount of claims was

25   valued between at that time 1.1 and 2.4 billion and proposed

1    a reserve of 2.4 billion.  The trustees argued for reserve

2    of at least 15.3 billion, the parties agreed on a reserve of

3    5 billion which the Court approved.

4            Then in July 2012 the debtors and trustees tried

5    to mediate the claims; however, those efforts, as Your Honor

6    is aware, failed.

7            In August 2014 the trustees moved to increase the

8    RMBS reserve and the plan administrator cross-moved to

9    establish a protocol to determine the claims on a loan by

10   loan level.

11           In December 2014 Your Honor heard arguments and

12   expert testimony at a hearing on those motions.  The plan

13   administrator argued for a loan by loan level review as

14   required by the trust's governing agreements.  The Court

15   agreed with our path and instructed the parties to negotiate

16   the terms of a loan by loan level review process.

17           Following significant negotiations between the

18   parties the Court then entered an order approving the plan

19   administrator's five-step protocol to reconcile and

20   determine the RMBS claims on a loan by loan basis.

21           THE COURT:  I just want to pause here to make a

22   note, because I think it's significant with respect to the

23   analysis that's required of me to approve the settlement

24   under 9019.

25           The history that you've just detailed,

Page 14

1   particularly the part of the story that picks up with the

2   cross- motions around the increase of the reserve and the

3   establishment of the protocol and also the proceedings that

4   were had with respect to the use of sampling are part of the

5   record in this matter and I think are significant in terms

6   of establishing my familiarity with the underlying dispute,

7   the complexity of the underlying dispute, the length of time

8   that it would take to resolve the loans on a loan by loan

9   basis, and also the challenges that would be associated with

10  coming up with a procedure that was something less than a

11  loan by loan review.

12          It has always been abundantly clear that purely in

13  terms of math it would be a virtual impossibility for one

14  person, no matter how hard he or she works, to resolve all

15  of these loans on a loan by loan basis.

16          Therefore the challenge that was always going to

17  exist was going to be in a absence of a settlement how does

18  this get done?  And I think that that's an important piece

19  of background as it informs my approach to reviewing the

20  reasonableness of the settlement.

21          MR. COSENZA:  The plan administrator agrees with

22  all of your points, Your Honor.

23          I'm going to delve back into the history of what

24  happened following --

25          THE COURT:  Sure.

Page 15

1          MR. COSENZA:  -- the entry of the protocol order.

2          During the -- and what led us to the settlement.

3          During the protocol the plan administrator and the

4    institutional ambassadors engaged in negotiations to try to

5    settlement the claims.

6          From January 2015 through October 2015 we engaged

7    in mediation with Mr. Madden before -- and his firm before

8    David Jeronimus.  That resulted in agreement which would

9    have allowed all claims in the amount of $2.44 billion.  The

10   $2.44 billion is roughly the same amount that's been

11   allocated here.  There was some amount that had been

12   allocated to the transfer of trusts that have now been

13   disallowed, as well as, as I mentioned before, a number of

14   trusts have fallen out of the process.

15         The parties agreed that the -- have agreed that

16   the October 26, 2015 agreement will be admitted into

17   evidence during the estimation proceeding.

18         The agreement was presented to the trustees who

19   engaged multiple experts to assist in evaluating that

20   settlement proposal; however, the trustees told the plan

21   administrator that an insufficient number of trusts would

22   accept a settlement so the plan administrator withdraw the

23   settlement agreement.

24         After withdrawal of the first proposed settlement

25   the plan administrator and institutional ambassadors

Page 16

1    committed themselves to resolving the claims as quickly as

2    efficiently as possible and we went back to work with the

3    institutional investors.

4           And I want to note, as Your Honor mentioned, the

5    protocol was critical to moving this process along because

6    it facilitated the resolution of these claims, because a

7    fixed universe of loan files are at issue and collected all

8    the evidence and arguments according to claims at issue.  So

9    I think we made both sides, you know, appreciate what was

10   actually at issue in the case and it provides all the data

11   necessary for the Court to estimate the claims at the

12   hearing in October.

13          As I mentioned the parties entered into another

14   RMBS settlement agreement on November 30th, 2016.

15          After further negotiations, as I mentioned

16   earlier, the plan administrator and institutional investors

17   entered into a modified form of the agreement dated

18   March 17, 2017, which is the agreement that's -- you know,

19   that facilitates this 9019 process.

20          Your Honor, getting now more into the merits.

21          The RMBS settlement agreement according to -- at

22   least to the plan administrator is fair and equitable, it

23   provides an estimation process that allows the plan

24   administrator to request allowance of the trustees' claims

25   at a level the institutional investors will accept.  The

Page 17

1   institutional investors support all aspects of the

2   settlement.  And as stated that the trustee findings and bar

3   order are "appropriate" and should be entered by the Court,

4   and that's from their statement dated June 29, 2017

5   paragraphs 1 and 2.

6           The trustees have also concluded, and Mr. Kraut

7   will present that, that the RMBS settlement agreement

8   provides a reasonable process to resolve the claims.

9           Under the agreements the plan administrator will

10  seek, as I mentioned before, estimation for purposes of

11  allowance of the covered loan claims through an estimation

12  proceeding under Section 502(c).

13          The plan administrator has agreed to seek

14  estimation in the amount of 2.38 billion as an allowed Class

15  VII general unsecured claim.

16          If the Court -- and this is -- something I'll go

17  over later on -- this is a somewhat unusual process -- but

18  if the Court estimates claims at two billion or more all

19  parties have waived their rights to appeal.  If the Court

20  estimates the claim at less than two billion only the

21  trustee may appeal.  And if the estimate is between 2 and

22  2.38 the plan administrator has agreed to allow a claim at

23  $2.38 billion.

24          The estimation proceedings will follow the

25  comprehensive procedures that are set forth in Exhibit G to

Page 18

1   the settlement agreement.

2          THE COURT:  And if the number is higher then the

3   plan administrator will not appeal.

4          MR. COSENZA:  That is correct, Your Honor.

5          The plan administrator and the trustees

6   extensively negotiated the procedures outlined in Exhibit G

7   to the settlement agreement.  It includes an expert

8   discovery schedule, pretrial briefing, and other

9   requirements regarding identification of witnesses and

10  exhibits.

11         Your Honor, each participating trust will get its

12  allocable share of the net allowed claim determined by the

13  Court.  These percentages are detailed in Exhibit H to the

14  settlement agreement.

15         And the settlement agreement provides a release of

16  all claims that were or could have been asserted in the

17  covered loan claims filed or asserted in the bankruptcy

18  proceeding or in the protocol except to the limited extent

19  set forth in Article 4 of the agreement.

20         As to the acceptance of the agreement, as I

21  mentioned, it was presented to the trustees on March 17,

22  2017.  The trustees had until June 1 to elect to participate

23  in the settlement.  The institutional investors expressed to

24  the trustees their support for the settlement process and

25  requested that each trustee participate.  The trustees were

Page 19

1    able to retain experts and solicit input from investors.

2         The accepting trustees have accepted the

3    settlement on behalf of the vast majority of the trusts at

4    issue, and based on my count 230 trusts remain, and as I

5    mentioned before that number is in flux to some degree, but

6    roughly 230 trusts are subject to the estimation proceeding

7    in October.

8         On April 27 the plan administrator filed a motion

9    seeking approval of the settlement agreement, and as I

10   mentioned, we'll get to the handful of objectors later.

11        Your Honor, moving now to some of the analysis of

12   the various factors and standards for whether or not a

13   settlement is fair and equitable and then we'll move on to

14   the Iridium factors --

15        THE COURT:  Okay.

16        MR. COSENZA:  -- and go through them in detail.

17        THE COURT:  Thank you.

18        MR. COSENZA:  The plan administrator believes that

19   the RMBS settlement satisfies the Second Circuit standard

20   for approval of a compromise under Bankruptcy Rule 9019.

21        Rule 9019(a) empowers the Court to approve a

22   settlement agreement entered into by a debtor if it (1), is

23   supported by adequate consideration; (2), is fair and

24   equitable, and (3), is in the best interest of the estate.

25        And we cited various cases in our brief.  I'm not

Page 20

1    going go through the various case cites.

2              But in the circuit the court must determine

3    whether the proposed settlement falls below the lowest point

4    in the range of reasonableness.  And to decide whether a

5    settlement falls within the range of reasonableness courts

6    consider the seven factors set forth in the Second Circuit's

7    decision in Iridium and they're also often called the

8    Iridium factors, which Your Honor is obviously quite

9    familiar with.

10             Going to the first Iridium factor, one, the

11   balance between the litigation's possibility of success and

12   the settlements of future benefits the plan administrator

13   believes that this strongly weighs in favor of approval.

14             As I mentioned a few minutes ago this settlement

15   is very unusual.  A typical situation starts with a dispute

16   between a creditor and a debtor or a trustee concerning the

17   amount of the creditor's claim.  When the economic

18   stakeholder in the claim reaches an agreement with the

19   trustee concerning the amount of the claim or the claim can

20   be settled pursuant to a dollar amount under Bankruptcy Rule

21   9019.

22             In this case the trustee, or in this case the plan

23   administrator, negotiated a settlement with meaningful

24   economic stakeholders back in October 2015.  For a number of

25   reasons that settlement was not consummated.

Page 21

1          In an effort to reach the same result for the

2     estate and these economic stakeholders the plan

3     administrator has agreed the Court to conduct an estimation

4     proceeding to allow these claims at the same level

5     negotiated with the stakeholders.

6          Ultimately the plan administrator determined that

7     the most expedient way to get these claims resolved at a

8     fair level would be to submit them to estimation by the

9     Court under the authority conferred by bankruptcy court

10    pursuant to Section 502(c) of the Bankruptcy Code.  The

11    institutional investors have agreed, Your Honor.

12         An estimation process necessarily requires the

13    Court to hear each sides' view as to what the claim should

14    be allowed at, and that'll be part of the estimation

15    proceeding in October.

16         So it's going to be again an unusual situation

17    because the Court will hear the plan administrator's case,

18    which will advocate potential outcomes much lower than the

19    $2.3 billion, but in a proceeding where the plan

20    administrator is asking the claim to be allowed at

21    $2.38 billion because we believe it's in the best interest

22    of everyone to move forward with the settlement at that

23    level.  The trustees will be advocating for a much higher

24    number.

25         In the end both sides will rely on the Court's

Page 22

1    determination for the appropriate level of allowance.

2            Nevertheless even in this atypical situation the

3    first factor, balancing likelihood of success and the

4    settlement's future benefits, is easily satisfied.

5            The RMBS settlement agreement is the product of a

6    hard fought arms length negotiation between sophisticated

7    parties, the plan administrator, the institutional

8    investors, and the trustees.  Each party concluded that the

9    determination of the net allowed claim as the agreement

10   provides is reasonable and appropriate.

11           They did so based on the assessment of the

12   possibility of success of the claim litigation and the

13   benefits of the settlement.

14           The terms reflect the plan administrator's

15   assessment of the risk, time, and expense of completing the

16   protocol, which would involve litigation and appeals in the

17   final step, and as Your Honor indicated before, it would

18   take quite some time and there's a lot of uncertainty as to

19   -- you know, as I'll mention later -- to the estate in terms

20   of its dissolving and paying out its remaining money to its

21   creditors.  And, you know, obviously there's a benefit to

22   all parties in the near term of a certain resolution of the

23   claims.

24           While the plan administrator believes that

25   completing the protocol will result in a net allowed claim

Page 23

1    significantly under 2.38 billion, the plan administrator

2    again believes that amount represents a fair resolution

3    given the wide range of potential outcomes and the time and

4    expense saved by the process.

5            If Your Honor does not approve the settlement the

6    parties would need to complete steps three and four of the

7    protocol, which are quite -- which would take quite some

8    time before we even get to step five and the difficulties

9    with trying to adjudicate potentially thousands of claim.

10           Given the divergence of the parties' views --

11           THE COURT:  Quite some time being counted not in

12   weeks, not in months, but most likely in years.

13           MR. COSENZA:  That is correct, Your Honor.

14           Given the divergence of the parties' views and the

15   validity of the claims it is very likely the Court would

16   need to determine thousands of claims.  That would involve

17   again a loan by loan level litigation, that again would take

18   many years.

19           The settlement and its intended Exhibit G dispense

20   with the uncertainty by prescribing detailed procedures for

21   the estimation hearing.

22           While the parties may differ as to the likely

23   outcome of the litigation process they agreed that the

24   proposed settlement will provide substantial benefits to the

25   plan administrator, participating trusts, and other

Page 24

1    stakeholders.

2            Iridium factor number 2, Your Honor, the

3    likelihood of complex and protracted litigation.  This again

4    weighs in favor of approval.  I outlined a bunch of those

5    issues earlier.  But litigating an alleged breach of rep and

6    warranty cases in the RMBS context is quite difficult,

7    complex as we've demonstrated during the December 2014

8    hearing.  Each loan file basically tells a different story,

9    and each trust theoretically has different governing

10   agreements and different language.

11           So this is a -- with that litigation that might

12   take a lot of time, it would take --

13           THE COURT:  And for that reason even if this

14   matter had to go down the litigation path it is certainly

15   possible, indeed likely, and I think contemplated certainly

16   by me and I think by the other parties that at a certain

17   point it would have been necessary to negotiate exactly the

18   type of trial procedure that has now been achieved in the

19   settlement because of the impossibility of -- virtual

20   impossibility of dealing with the loans on a loan by loan

21   basis something would have had been done -- would have had

22   to have been done whether it's called sampling or something

23   else.

24           What the parties have achieved by this settlement,

25   and I think that in this particular case sampling as it's

1    been applied in other contexts poses particular hurdles.

2    Not necessarily insurmountable hurdles, but they would have

3    been challenging and the parties would have been undoubtedly

4    loggerheads over a sampling methodology.

5            So what this settlement achieves among many things

6    is that the parties have agreed on a process that's not

7    called sampling, but it's a process that is well short of a

8    claim by claim review, and I think that that's worth

9    emphasizing as we move forward today.

10           MR. COSENZA:  We agree with that, Your Honor.  And

11   as you mentioned, the estimation proceeding avoids the

12   protracted litigation and sort of the various permutations

13   that could have resulted through litigating each claim and

14   with attempts to resolve the claims at approximately three

15   weeks with hearings before Your Honor.

16           THE COURT:  But your estimates are always wrong,

17   so it will be longer than three weeks I'm quite sure.

18           MR. COSENZA:  We will try.

19           Further promoting efficiency as of now the plan

20   administrator has waived its appeal rights, as I mentioned

21   earlier, and the trustees will waive their rights provided

22   that the net allowed claim is two billion or higher.

23           Although the plan administrator again believes

24   that the Court could estimate the claims at well below

25   $2.38 billion again we've agreed to seek this amount for

Page 26

1    finality and favorable -- get a reasonable result to all

2    certificate holders.

3            And I'm moving on to Iridium factor number 3,

4    paramount interest of creditors.  We also believe this

5    weighs in favor of approval.

6            The proposed agreement is highly beneficial to the

7    Lehman estate and their stakeholders because it resolves one

8    of the largest groups of unsecured claims outstanding

9    against Lehman.  This provides the much needed

10   predictability regarding the plan administrator's future

11   distributions.  And materially accelerates resolution of

12   this massive and factually intensive claim, thus avoiding

13   the need to set aside reserves for potential payment of

14   covered loans, which has delayed and reduced recoveries for

15   other creditors.

16           Again, this allows for the prompt determination of

17   the covered loan claims in a fair and reasonable manner.

18           Lastly a loan by loan level litigation of the

19   claims would significantly delay the winding down of the

20   estate and burden the estate with substantial legal expenses

21   jeopardizing creditors' interests.

22           For all these reasons the settlement is in the

23   paramount interest of creditors.

24           Moving on to Iridium factor number 4, whether

25   other parties in interest support the settlement.  We also

1    believe this strongly weighs in favor of approval.

2            The trustee is the only other parties besides the

3    plan administrator who had standing to litigate this action,

4    enter this settlement agreement, and support the estimation

5    process it established.

6            The agreement is further supported by 14

7    institutional investors who are holders and/or authorized

8    investment managers for holders of over $6 billion in

9    certificates in the trust regarding the covered loan claims.

10           This factor does weigh in favor of approval.

11           Moving on to Iridium factor number 5, the nature

12   and breadth of releases to be obtained by officers and

13   directors.  We again strongly believe this weighs in favor

14   of approval.

15           The settlement agreement has a broad release

16   provision, it releases the LBHI debtors, non-debtor

17   affiliates, and LBI debtor's officers and directors of any

18   and other claims that were asserted or could have been

19   asserted by the trust related to the covered loan claims,

20   except to the limited extent set forth in Article 4 of the

21   agreement, and the release provides certainty and finality

22   to the debtor's estate.

23           Iridium factor number 6, the consistency and

24   experience of counsel supporting and experience and

25   knowledge of the bankruptcy court judge reviewing the

1    settlement.  Respectfully we believe that weighs in favor of

2    settlement.

3            The parties here -- the trustees and institutional

4    investors, I won't speak for the plan administrator, are

5    represented by sophisticated counsel in the RMBS matters,

6    it's up for Your Honor to decide whether the plan

7    administrator is represented by sophisticated counsel.

8            The trustee has also retained experts to analyze

9    the benefits and burdens of the settlement which they will

10   discuss later.

11           And obviously, Your Honor, we believe that based

12   on your experience in handling this case over the last few

13   years and your general commercial experience that you

14   possess the experience and knowledge to review the

15   settlement, you know, and also the ability to oversee the

16   estimation proceeding.

17           Iridium factor number 7, the extent to which a

18   settlement is a part of an arms length bargaining.

19           I've covered this in some detail earlier, but the

20   parties heavily negotiated this at arms length and in good

21   faith and put in several months negotiating the settlement

22   agreement.

23           All the parties to the agreement who hold seemly

24   different views of the value of their claims again were

25   represented by experienced counsel, and there was much

Page 29

1    negotiation and shifting of the settlement agreement.

2           Your Honor, I've gone through the Iridium factors,

3    I'm now going to transition over to the status of the

4    various objections --

5           THE COURT:  Sure.

6           MR. COSENZA:  -- that were filed by the court.

7           THE COURT:  Thank you.

8           MR. COSENZA:  And as you're aware there were five

9    objections --

10          THE COURT:  Yes.

11          MR. COSENZA:  -- that have been filed.  We believe

12   that almost all of them have been resolved or are meritless.

13   There's -- and I'll list them all.

14          There was the preliminary investor objection.

15          THE COURT:  Yes.

16          MR. COSENZA:  Two, the Royal Park objection.

17   Three, the BNC claimants objection.  Four, the Five Points

18   objections.  And five, the iFreedom objection.

19          THE COURT:  Yes.

20          MR. COSENZA:  As to the investor objection they

21   are represented by the Kasowitz firm and they filed a

22   preliminary objection claiming that it needed discovery to

23   determine the propriety of the findings in the settlement.

24          We believe that that objection was without merit,

25   nevertheless we engaged in discussions with the trustees and

Page 30

```
 1    the Kasowitz firm to alleviate their concerns and to avoid

 2    the potential for distraction, cost, and delay related to

 3    their requested discovery.

 4            The settlement between the parties is set out in

 5    the letter drafted by the Kasowitz firm, which was

 6    negotiated at arms length by the parties and filed with the

 7    court.

 8            THE COURT:  It's entered at docket 55650?

 9            MR. COSENZA:  That's correct, Your Honor.

10            THE COURT:  Dated June 27th.

11            MR. COSENZA:  That's correct.

12            The Royal Park --

13            THE COURT:  Before you move on is there someone

14    from the Kasowitz firm here?

15            MR. FLIMAN:  Yes, Your Honor.

16            THE COURT:  How are you, Mr. Fliman?

17            MR. FLIMAN:  Good morning, Your Honor.

18            THE COURT:  I have a question for you.  Did you

19    file a Rule 9019 -- a 2019 statement?

20            MR. FLIMAN:  We have not filed one, Your Honor.

21    We most certainly can.

22            THE COURT:  Okay.  Yes, you certainly will.

23            MR. FLIMAN:  We will.

24            THE COURT:  All right?

25            MR. FLIMAN:  Thank you.
```

1          THE COURT:  Thank you.  When you file it please

2    make sure that a copy is send to my chambers, all right?

3          MR. FLIMAN:  That's fine.

4          THE COURT:  Thank you.  Okay.  Next?

5          MR. COSENZA:  Moving on to the Royal Park

6    objection.  Royal Park is the named plaintiff and class

7    representative in a class action against Wells Fargo --

8          THE COURT:  Yes.

9          MR. COSENZA:  -- that's been pending in The

10   Southern District.

11         Royal Park's concern with the proposed settlement

12   is whether releases and findings made pursuant to the motion

13   would somehow impact their rights in a district court case

14   versus Wells Fargo.

15         THE COURT:  Yes.

16         MR. COSENZA:  The parties have negotiated these

17   issues.

18         In exchange for withdrawing the objection they've

19   agreed to language in the proposed order that makes clear

20   that the agreement does not release the claims that Royal

21   Park is pursuing.  So I think we've resolved that objection,

22   Your Honor.

23         THE COURT:  Okay.  Mr. Adkin (ph), how are you?

24         MR. ADKIN:  Good, Your Honor.

25         THE COURT:  Does Mr. Cosenza have it right?

Page 32

1          MR. ADKIN:  I believe so, except that -- sorry.

2     Sorry, didn't mean to interrupt.  Just one thing, Your

3     Honor.

4          THE COURT:  Sure.

5          MR. ADKIN:  There were two objections filed.

6          THE COURT:  Yes.

7          MR. ADKIN:  One by my firm and the Robbins Geller

8     firm --

9          THE COURT:  Yes.

10         MR. ADKIN:  -- with respect to the Wells Fargo --

11         THE COURT:  Uh-huh.

12         MR. ADKIN:  -- litigation, another by the Robbins

13    Geller firm with respect to the U.S. Bank litigation.

14         THE COURT:  Okay.

15         MR. ADKIN:  What is now paragraph J of the revised

16    proposed order is the language that was negotiated to

17    resolve the objections.

18         We did file last night a withdrawal of our limited

19    objection based upon our review of the language --

20         THE COURT:  Okay.

21         MR. ADKIN:  -- which is what was negotiated.

22         I believe Mr. Rothman of the Robbins Geller firm

23    is on the phone.  They have not yet filed a formal

24    withdrawal of the objection, but I believe that -- assuming

25    he's there --

Page 33

1            THE COURT:  He is.

2            MR. ADKIN:  -- that he can confirm that --

3            THE COURT:  Okay.

4            MR. ADKIN:  -- the objection is withdrawn as well.

5            THE COURT:  Very good.

6            Mr. Rothman, are you there, sir?

7            MR. ROTHMAN:  I am, Your Honor.

8            THE COURT:  Can you confirm that you're going to

9    withdraw your objection?

10           MR. ROTHMAN:  That's correct, Your Honor.  We have

11   no objection to the revised proposed order as reflected in

12   docket number 55699.

13           THE COURT:  Very good.  Thank you.

14           MR. ADKIN:  Thank you, Your Honor.

15           MR. ROTHMAN:  Thank you, Your Honor.

16           THE COURT:  Thank you, Mr. Adkin.

17           Okay.  Mr. Cosenza?

18           MR. COSENZA:  Moving on, Your Honor, to the

19   objection that was filed by Five Points LLC.

20           Five Points LLC is the beneficial owner of

21   certificates.  Had objected to the motion to the extent that

22   the agreement modifies the payment protocol in the governing

23   agreements, but that is not the intent of Section 3.06 of to

24   settlement agreement.  And the parties confirmed to Five

25   Points that the provisions of the governing agreements,

Page 34

1    including the provisions regarding the trust proceeds,

2    control over any conflict between the settlement agreement

3    and governing agreements.

4            And Five Points has informed the parties that all

5    of its objections are resolved.  And it has, my

6    understanding, yesterday evening withdrawn its objection.

7            THE COURT:  Okay.

8            MR. COSENZA:  Okay.  Moving on to the BNC

9    claimant's objection.

10            THE COURT:  Yes.

11            MR. COSENZA:  That objection has not been

12    resolved.

13            While we -- the plan administrator believe that is

14    the BNC claimant's objection is meritless and should be

15    overruled.  The objection was filed by individuals alleging

16    to be former employees of BNC mortgage who filed proofs of

17    claim asserting $4.5 million against the BNC estate.  The

18    objection is based on the silence of the settlement

19    agreement as to what portion of the net allowed claim, if

20    any, will be allocated to which LBHI debtor, including BNC.

21            We believe that this objection should be overruled

22    for several reasons.

23            First, the Court only has to consider whether a

24    settlement agreement should be approved.  The agreement does

25    not determine any liability of any debtor besides LBHI.

Page 35

1    Instead the agreement establishes a process for the Court to

2    estimate and determine the allowed amount of the covered

3    loan claims.

4           Second, the covered loan claims were asserted only

5    against LBHI, not against any other LBHI debtor.  Any

6    liability on the part of BNC does not arise from the covered

7    loan claims and is not the subject of this hearing.

8           Third, the ultimate settlement consideration that

9    will be determined by this Court will be an allowed Class

10   VII general unsecured claim against LBHI, not against any

11   other LBHI debtor.  This again will be done through the

12   estimation proceeding.  Nothing is being determined at this

13   hearing or in the settlement agreement that impacts BNC in

14   any way.

15          So we respectfully request that the BNC objection

16   be overruled.

17          And the last --

18          THE COURT:  Well it appears that I have

19   Mr. Gwilliam on the phone.  Are you there, Mr. Gwilliam?

20          MR. GWILLIAM:  Yes, Your Honor, I'm here.  Thank

21   you.

22          THE COURT:  Well, Mr. Gwilliam, you had been

23   invited to come and participate in the hearing but it

24   appears that you determined just to appear on the phone.  By

25   that should I assume that you have nothing further that you

Page 36

1    want to argue and that I should just resolve this objection

2    based on what you put in your papers?

3              MR. GWILLIAM:  Well our objection does speak for

4    itself.  I do think that if you allow me to that we do feel

5    that the BNC debtor claims are impacted by this.  As the

6    Court knows from our case that that's been --

7              THE COURT:  Mr. Gwilliam, I think it was

8    communicated to you that if you wished to make an argument

9    in this courtroom, which is quite full, that you needed to

10   be here in person.  Those are my rules and I'm not inclined

11   to depart from them today.  So I have --

12             MR. GWILLIAM:  I was informed of that yesterday

13   morning.

14             THE COURT:  All right.  Well I -- those are my

15   rules, I have read your objection, and I've listened to

16   Mr. Cosenza's argument and read the submission by the plan

17   administrator, and for all of the reasons that the plan

18   administrator has set forth your objection will be overruled

19   in the order that will be entered.

20             Go ahead, Mr. Cosenza.

21             MR. GWILLIAM:  All right.

22             MR. COSENZA:  Thank you, Your Honor.

23             The last objection is the iFreedom objection.  I

24   think this one is in a state of flux, Your Honor, because we

25   had thought that we had alleviated iFreedom's concern, but

Page 37

1    let me go through the background on this and see if there's

2    still an objection that's in place.

3            THE COURT:  Okay.  Well just to expedite things

4    since I do have any eye on the clock, I have read the

5    iFreedom objection, I have read in the proposed order the

6    language that has been asserted which -- in paragraph K on

7    page 13 which as far as I can tell tries to make it crystal

8    clear that the entry of this order is totally without

9    prejudice to any rights that iFreedom may have with respect

10   to subsequent proceedings that may or may not occur.

11           So I frankly am at a loss to understand why this

12   wouldn't resolve the objection.  Hello, Ms. Adler.

13           MR. ADLER:  Good morning, Your Honor.  May I speak

14   to the question that you just posed?

15           THE COURT:  Sure.

16           MS. ADLER:  Okay.  There are -- the objection was

17   about two things.  One you've just addressed, which was we

18   wanted the record to be clear that no rights were being

19   objected.

20           But the second piece of it is that LBHI by serving

21   copies of the RMBS motion papers on iFreedom purported to

22   give iFreedom "notice," notice in quotes, of this

23   proceeding.

24           What we wanted to make clear was that this

25   proceeding is not a proceeding in which iFreedom is being

1   afforded an opportunity to come in and defend against claims

2   that it may have breached loans that are the subject of the

3   RMBS motion and the estimation proceeding.

4        THE COURT:  Well I think that that goes without

5   saying, because this is a 9019 motion that is procedural, it

6   is not settling any -- it is not dealing with any of the

7   underlying claims.  There is no opportunity, there is no

8   piece of this that would conceivably allow or enable you to

9   engage in that exercise.  So it's a bit of ships passing in

10  the night.

11       I hear your concern and that's why this language I

12  think fully protects you, because it's impossible to imagine

13  a way in which you could do what you've just outlined here

14  today or in connection with the settlement.

15       When we get to the estimation proceeding itself

16  you of course are free to raise -- file whatever you believe

17  you can file.  I don't even believe it would be ripe at that

18  moment, but I understand where you're coming from.

19       So my intent, and I think the plan administrator's

20  intent, speaking for the plan administrator, who can speak

21  for himself, is to assure you that nothing that's happening

22  here today or in the estimation proceeding will in any way

23  change, diminish, expand, affect your rights in any way.  It

24  can't be used against you.  It can't be used.  It can't

25  change anything.  So --

1                 MS. ADLER:  Subject to the Court's assurance, Your

2       Honor --

3                 THE COURT:  You had it.

4                 MS. ADLER:  -- that's acceptable.  Then we can

5       withdraw the objection.  The language that was in there left

6       issues at least in our view unclear.  But subject to the

7       assurances --

8                 THE COURT:  Well the language --

9                 MS. ADLER:  -- on the record --

10                THE COURT:  All right.

11                MS. ADLER:  -- we can live with that.

12                THE COURT:  Well I will so order the record in

13      that regard because I'd like to make a few changes to the

14      order as possible.  But you have my assurance on the record.

15      And I think the language does it, I think that's what it's

16      intended to do, but I understand that you wanted to be 101

17      percent sure.

18                MS. ADLER:  Thank you, Your Honor.

19                THE COURT:  All right?

20                MS. ADLER:  Appreciate that.

21                THE COURT:  Thank you.

22                MS. ADLER:  Thank you.

23                THE COURT:  Okay.  Mr. Cosenza?

24                MR. COSENZA:  Yeah.  With that, Your Honor, I just

25      have one minute and I will complete my presentation.

Page 40

1          THE COURT:  Okay.

2          MR. COSENZA:  Just one administrative issue I

3   wanted to flag.

4          As the Court is aware the settlement agreement

5   requires that the trustee findings be submitted in proposed

6   findings and conclusions to the district court for approval.

7          And in conclusion, Your Honor, for all the reasons

8   I've just described and more fully set forth in our briefs

9   and Mr. Trump's declaration, the plan administrator

10   respectfully requests that the Court enter the proposed

11   order approving the RMBS settlement agreement, and we filed

12   a revised proposed order yesterday containing detailed

13   findings.  And if there are any issues with those, you know,

14   please let us know.

15          THE COURT:  Okay.

16          MR. COSENZA:  Thank you for your time --

17          THE COURT:  All right.

18          MR. COSENZA:  -- and making yourself available --

19          THE COURT:  Sure.

20          MR. COSENZA:  -- for this, Your Honor.

21          THE COURT:  Okay.

22          MR. COSENZA:  Thank you.

23          THE COURT:  Good morning.

24          MR. KRAUT:  Good morning, Your Honor.  Michael

25   Kraut of Morgan Lewis, we represent U.S. Bank in this

1    matter.  I'll be speaking today on behalf of all the

2    trustees.  I'm focused on the trustee findings and the bar

3    order, which are referenced in paragraphs 1 through 4 and

4    paragraph G of the proposed order.

5            In the submission we made last Thursday we refer

6    to those together, the trustee findings and the bar order as

7    the trustee relief.  So if I use that term --

8            THE COURT:  Sure.

9            MR. KRAUT:  -- that's what I mean by that.

10           And when we prepared that submission last

11   Thursday, Your Honor, we didn't hold back anything for

12   today's argument.  And so in addition to the 44-page brief

13   that we submitted we filed 7 affidavits and declarations.

14           THE COURT:  Yes.

15           MR. KRAUT:  A declaration from the trustee's

16   bankruptcy expert, Judge Judith Fitzgerald.  In that

17   declaration she described her credentials, how she analyzed

18   the settlement agreement, with ultimately recommending that

19   the trustees accept it for the accepting trusts, and her

20   declaration attaches that report.

21           THE COURT:  Yes.

22           MR. KRAUT:  We submitted affidavits from trust

23   officers from the four trustees --

24           THE COURT:  Yes.

25           MR. KRAUT:  -- explaining their process for

Page 42

1   evaluating the settlement and how they decided to accept it

2   in reliance on Judge Fitzgerald's recommendation.

3            And two other affidavits, Your Honor.  An

4   affidavit from Edmon Esses (ph), the trustee's financial

5   expert, Duff & Phelps, explaining in part how Duff & Phelps

6   assisted the trustees and Judge Fitzgerald in reviewing the

7   settlement offer.

8            And last an affidavit from Jose Feraga (ph) of the

9   Garden City Group, which the trustee retained to comply with

10  Court's notice order and to generally facilitate the

11  trustees' communications with investors.

12           We have copies of those.  You have them?

13           THE COURT:  I have them all.  Thank you.

14           MR. KRAUT:  Fair enough.  Okay.  Well as --

15           THE COURT:  As a formal matter I think you want to

16  -- you're going to want to enter them into the record.

17           MR. KRAUT:  That's right.  So I have them here if

18  you want to hand them up to her.  We is do this now.  I

19  don't have them stamped because I didn't know what number

20  we'd be picking up.  So --

21           THE COURT:  That's okay.

22           MR. KRAUT:  -- should we do this afterwards or

23  hand them up now?

24           THE COURT:  You can do it afterwards.

25           MR. KRAUT:  Okay.  We'll provide copies.

1          THE COURT:  I think we have just plain old one and

2     two, so we can do three through what've you have.

3          MR. KRAUT:  We'll have copies delivered to

4     chambers today --

5          THE COURT:  Okay.

6          MR. KRAUT:  -- starting with Exhibit 3.

7          THE COURT:  Very good.

8          MR. KRAUT:  Well as Mr. Cosenza explained we're

9     pleased to report that all objections that relate in any way

10    to the trustee relief have been resolved.

11         We think the submission that we made last Thursday

12    is more than sufficient basis for the Court to --

13         THE COURT:  Well it's not only sufficient, it's

14    impressively robust, I have to say.

15         First and foremost, I have read most of the

16    submissions, but I have read cover to cover Judge

17    Fitzgerald's report, which was particularly striking to me

18    inasmuch as it revealed a true informed and also intuitive I

19    think understanding of what we all have been through

20    together in the last couple of years and what would have

21    been facing the Court and the parties had this not come

22    together.

23         And on that note I think it's worth noting that

24    the trustees and their counsel deserve a lot of credit for

25    working together in this process under significant

Page 44

1    circumstances.

2           There was certainly not peace in the valley at all

3    times.  There were many times where there was something

4    other than peace in the valley, and when certainly I felt

5    discouraged that there ever would be this kind of an

6    agreement.

7           So I think it's a great credit to the

8    determination of the trustees and their counsel and their

9    experts to have gotten through this, even though they were

10   stymied at many turns of this litigation.

11          This is really difficult stuff, and I think that

12   everybody is well aware of what it looks like for litigation

13   to not settle.  If you don't take a look around.

14          So I really am grateful and I think this

15   represents the best of lawyering.  It required thinking

16   outside the box in significant ways.  I think Mr. Cosenza

17   has mentioned a number of times, and I agree, that this is a

18   highly unusual 9019 settlement and that's a testament to the

19   creativeness of the trustees and their counsel in coming up

20   with something that addresses the needs and concerns of all

21   the parties, which were quite divergent.

22          So any way, I'll let you continue.

23          MR. KRAUT:  Thank you.  We appreciate the kind

24   remarks, Your Honor.

25          Since Your Honor is obviously familiar with the

1  papers we submitted I won't belabor this, but I think it's

2  worth spending just a few moments highlighting why we

3  believe the trustee relief is -- should be included in the

4  order.

5        THE COURT:  Sure.

6        MR. KRAUT:  This is not the first time a court has

7  been asked to issue findings concerning an RMBS trustee's

8  evaluation of a settlement, it's not even one of the first

9  times.

10        As the first department recognized years -- a few

11  years ago in a case that's become known as Countrywide, and

12  this is a quote:

13            "The ultimate issue for determination is

14            whether the trustee's discretionary power was

15            exercised reasonably and in good faith.  It is not

16            the task of the Court to decide whether we agree

17            with the trustee's judgment, rather our task and

18            limited to ensuring that the trustee has not acted

19            in bad faith such that his conduct constituted an

20            abuse of discretion."

21        So it's clear the Court is not expected to

22  substitute its own judgment for that of the trustee's, the

23  question really comes down to reasonableness and good faith.

24  And when courts have considered whether trustees have acted

25  reasonably and in good faith in considering RMBS settlements

Page 46

1    courts have looked at a few elements of the trustee's

2    process, and I'm going to focus on what I think are the four

3    major ones.

4            One, have they provided notice to investors,

5    offered them a chance to weigh in and consider their views?

6            Number 2, have the trustees retained experienced

7    counsel to assist with their evaluation?

8            Number 3, have the trustees retained experts in

9    their area of core competency to advice on appropriate

10   issues and have they followed the advice they received from

11   their experts?

12           And four, did they identify suitable personnel

13   within their organizations to decide whether to accept the

14   settlement on a trust by trust basis?

15           And Your Honor, in each instance in which trustees

16   have taken those steps courts have found that they acted

17   reasonably and in good faith, and that's exactly what

18   happened here.  And the seven affidavits and declaration

19   walk through those steps, and I'm just going to touch

20   briefly on each of the four.

21           First the trustees provided substantial notice to

22   investors.  As Mr. Cosenza explained the trustees received

23   the settlement agreement in its modified form on the -- I

24   don't know if he said it this way -- but it's the same point

25   -- in the evening of March 17, it was a Friday, I remember,

Page 47

1    after the close of business and then the next business day

2    we put a notice out to investors.  That notice let them know

3    about the settlement agreement, that we had retained Judge

4    Fitzgerald, that we welcomed their comments and actually

5    wanted them before May 5th, almost a -- on May 5th, almost a

6    month before we would have to decide so that they could be

7    considered.  The trustee sent multiple notices.  Not just

8    that one, there was one in April, which was specifically

9    responding to inquiries we had received from investors, so

10   we knew that the notices were working, we were hearing from

11   investors.

12            And so the notices provided information, responded

13   to questions and requests, and alerted investors to

14   important dates and deadlines coming up in the course of

15   milestones that were leading up to today.

16            Happy to walk through any of those notices if you

17   have questions, but I know they're attached to the

18   declarations.

19            And the trustees also set up a website to post

20   information and documents for investors to review, which

21   also led to questions.  And again, so we knew that this was

22   working.

23            Investors shared their views of the settlement

24   agreement with the trustees in write, the trustees and their

25   experts carefully reviewed them.  So we believe the notice

Page 48

1    element is certainly satisfied.

2            Two, the trustees worked with experienced counsel

3    that brought different experience to the table.  The

4    different trustee counsel you see before you have some

5    bankruptcy experience, some others have experience in

6    resolving repurchased claims, and others generally advice

7    trustees and deal with issues and have experience in

8    resolving settlements of this nature.  And so again, all

9    this is set forth in the client affidavits and declaration.

10           Number 3, experts.  Besides the financial experts,

11   Duff & Phelps that I mentioned before, the trustees decided

12   to retain a bankruptcy litigation expert to advice them

13   about the settlement and also other alternatives to the

14   settlement if the settlement was not accepted.

15           After considering a number of options the trustees

16   decided to retain Judge Fitzgerald.  Her credentials are

17   impeccable, her experience is highly relevant for today.  I

18   could go on and talk about her credentials but not within

19   the time that I'm allotted for today, and so you'll just

20   have to read that in the report.

21           Judge Fitzgerald established a methodology for

22   analyzing whether the settlement was reasonable.  She

23   reviewed many documents, participated in numerous calls and

24   meetings with the trustees, their counsel, and the trustee's

25   financial experts, and as her report explains she carefully

Page 49

1    considered all views of investors who offered any views.

2           Finally Judge Fitzgerald wrote and delivered to

3    the trustees a report in which she concluded to a reasonable

4    degree of professional certainty the RMBS settlement sets

5    forth a reasonable methodology to liquidate the disputed

6    RMBS claims and entry into the RMBS settlement and the

7    circumstances of the bankruptcy proceeding would be

8    appropriate for the accepting trusts.

9           Finally the trustees appointed qualified trustee

10   personnel to evaluate the settlement.  The trustees selected

11   senior trust officers to make is ultimate decision whether

12   to accept it or reject it as to any given trust, and also

13   identified qualified employees to manage and coordinate the

14   process for receipt of the offer up through the settlement.

15          The trustees spoke regularly with their counsel,

16   had opportunities to ask questions of Judge Fitzgerald,

17   communicated with any investors who reached out, reviewed

18   the correspondence that investors sent in writing, and of

19   course spent time reading Judge Fitzgerald's report quite

20   carefully.

21          As you know ultimately the trustees agreed with

22   Judge Fitzgerald's recommendation to accept the settlement

23   for 238 trusts and to reject as to others.  And as

24   Mr. Cosenza noted, that number has changes -- has changed

25   and may change slightly over time, but in terms of the

Page 50

1    decision the trustees made we accept it as to 238 trusts.

2              In closing, Your Honor, I just want to touch

3    briefly on why we believe the narrowly tailored bar order

4    would be appropriate in this case.

5              Under the governing agreements under which the

6    trustees operate we're not expected to risk our own funds.

7    The purpose of the findings, the whole process leading up to

8    today, other than the 9019 specific and the robust notice

9    program, was to tell investors that if you have a problem

10   with how the trustees are going about this come to court --

11   file your submission on June 22nd and come to court.

12             From the time we gave the first notice of March

13   20th to today is over three months.  It's plenty of time.

14   And June 22nd, which was the deadline for submitting

15   objections, was actually their second chance.  As I

16   mentioned we asked for comments by May 5th.

17             Investors also had the opportunity under the

18   settlement agreement to try to offer directions to the

19   trustee to terminate the settlement as to any trust.  And so

20   really there have been three opportunities for investors to

21   have their views heard.

22             Again, as Mr. Cosenza said, the few objections

23   that were raised have been satisfied.  And so to be clear no

24   one objects to a bar order, and the only parties here

25   support it.

Page 51

1             So we think it wouldn't be fair for investors to

2    not contact us when we solicited views, not object and then

3    sue later, and the bar order protects against that kind of

4    unfair surprise.

5             As the institutional investors made clear in their

6    submission last Thursday the bar order is important not just

7    for trustees but for investor protection too, because if the

8    trustees were sued for accepting the settlement then the

9    trustees have a right to be indemnified by trust funds.

10            And just finally, Your Honor, we think that the

11   bar order is consistent with what courts have done in each

12   of these multi-trust settlements that followed Countrywide,

13   and it's also consistent with prior orders by the Court in

14   this proceeding.

15            THE COURT:  I think the record entirely supports

16   the bar order that you sought, and as you indicated, there

17   were several levels of notice and due process.  Concerns

18   have surely been satisfied given everything that's been

19   done.

20            MR. KRAUT:  So unless Your Honor has questions for

21   us we'll complete our presentation.

22            THE COURT:  All right.  Anyone else wish to be

23   heard?

24            MR. MUNNO:  Your Honor, just a moment for the

25   record.

Page 52

1          THE COURT:  Yes.

2          MR. MADDEN:  I just want to put on the record the

3    institutional investors support the settlement.

4          THE COURT:  Please.

5          MR. MADDEN:  I'm Robert Madden of Gibbs & Bruns, I

6    represent the institutional investors, they're 14 large

7    holders of the certificates that are -- were the underlying

8    economic stakeholders, not for all of it but a very big part

9    of it.  My clients hold six and a half billion dollars in

10   securities and 196 of the trust that are at issue here.

11         We support the 9019 motion.  We support the

12   settlement agreement.  We support the trustee findings.  And

13   we support the bar order.

14         We think that the settlement agreement provides

15   for a fair, equitable, efficient, and expeditious resolution

16   of these claims, and we ask the Court to enter the proposed

17   order as was submitted.

18         Thank you, Your Honor.

19         THE COURT:  All right.  Thank you.

20         Well that is very significant in terms of the case

21   generally and specifically in terms of satisfaction and

22   analysis of the fourth Iridium factor which requires me to

23   consider the level of support for the settlement.  So the

24   fact that the parties with the economic -- true economic

25   stake in the amount of $6 billion have stood up and

Page 53

1    supported the settlement and appeared to have actively

2    participated in causing this to come together is a

3    significant factor and goes a long way to lend support for

4    the reasonableness of the settlement.  So I appreciate that.

5            All right.  Does anyone else wish to be heard?

6    All right.

7            MR. MADDEN:  That's all from us, Your Honor.

8            THE COURT:  Very good.

9            So ordinarily what I would do is read a decision

10   into the record.  Because of the late breaking nature of a

11   lot of -- of the submissions I'm not going to be able to do

12   that today.

13           That notwithstanding happily the proposed order

14   that was sent to me says exactly what I would have said as

15   it goes through each of the Iridium factors, which is what a

16   bench decision covering the disposition of this motion would

17   look like as it's incumbent upon me to consider the evidence

18   that's been offered and to marshal and it to go through each

19   of the Iridium factors.  And the proposed order does that I

20   think in a perfectly acceptable way.  And it's bolstered at

21   every turn, as I mentioned before, by Judge Fitzgerald's

22   expert opinion report.

23           So the record I think is very robust with all the

24   reasons why it's not even close that the settlement

25   satisfies the Iridium factors and falls well above the

Page 54

1    lowest point in the range of reasonableness.

2              I would like to discuss and I think I'll discuss

3    it with you, Mr. Cosenza, or all of you, some minor changes

4    that I'd like to make to the order, which I have had an

5    opportunity to read over night.

6              MR. COSENZA:  Sure.

7              THE COURT:  And I can just --

8              MR. COSENZA:  Absolutely.

9              THE COURT:  -- give them to you and see if they're

10   okay with you, and I think that's just the most expeditious

11   way to do it.

12             So procedurally.  I want to talk about

13   procedurally, because what we're doing with respect to the

14   findings is a little unusual and I want to make sure that we

15   get it right in terms of the mechanics.  All right?

16             So the mechanics here in this court after there

17   would be the entry of proposed findings of fact and

18   conclusions of law is the issuance of a notice, right, that

19   starts the time period running.

20             MR. COSENZA:  Okay.

21             THE COURT:  Okay?  So you're all -- I just -- I

22   never know how much counsel are familiar with how this

23   actually works.  So --

24             MR. COSENZA:  You won't offend me by over

25   explaining.

1          THE COURT:  Okay.  So what happens is that there

2     will be an order that gets issued indicating that proposed

3     findings of fact and conclusions of law have been filed, and

4     an essence of proceeding begins at the district court and

5     there's a time period in which parties can object, and after

6     that time period lapses then the order, presumably, would be

7     considered and would be -- the findings would be considered

8     and would be entered by the district court.

9          The slight wrinkle here is that this is a core

10    proceeding.  I unquestionably have the authority to enter an

11    order approving the RMBS settlement.

12         MR. COSENZA:  That's right.

13         THE COURT:  The order by its term is effective

14    upon entry.  That notwithstanding we still need to have the

15    findings entered by the district court.

16         So what I've been told is that once I enter my

17    order and that proceeding starts the parties can send a

18    letter to the district court explaining what it is that

19    you're doing.

20         MR. COSENZA:  Uh-huh.

21         THE COURT:  Even though it's set forth in the

22    order, let's just say it won't necessarily be obvious to the

23    district court judge who's lucky enough to draw this, what

24    exactly it is that he or she is doing.

25         For that reason and because I do not want to

Page 56

1   create any impression that the bankruptcy court doesn't have

2   authority to enter a 9019 settlement, what I would like to

3   do is call this document order approving RMBS settlement

4   agreement and including certain proposed findings of fact

5   and conclusions of law.  Does that sit all right with all of

6   you?

7           MR. COSENZA:  That makes sense, Your Honor.

8           MR. KRAUT:  Yes, Your Honor.

9           THE COURT:  All right?  Okay.  So that was point

10  number 1.

11          I had a concern that it be clear that the entirety

12  of the litigation that we had around what led to the

13  protocol and in connection with the estimation motion very

14  much be part of the record here.  I think it comes in in a

15  number of ways.  It's been cited to and discussed by at

16  least two of the declarants, Judge Fitzgerald speaks about

17  it, I think Mr. Trump speaks about it, and possibly others,

18  and I know it's been discussed at length in the briefs.  So

19  I'm satisfied that it's part of the record.  Just think

20  about that for a couple of minutes and if you believe that

21  more specific citations ought to be added you can add them.

22  I believe that they're incorporated by reference -- by the

23  references to the paragraphs in the various affidavits.  So

24  I'm okay, I'm just sharing my thought process with you.

25          I'm going to give you some real nits, ready?

Page 57

1          MR. COSENZA:  Sure.

2          MR. KRAUT:  Sure.

3          THE COURT:  Okay.  And I am trying to see if I'm

4   looking -- I'm looking at a clean, not the blackline.  At

5   the very bottom of the first page of the clean there's an

6   extra space before "the BNC", and if you turn the page at

7   the top there's an extra space after the parenthetical that

8   includes docket number 55609.

9          MR. KRAUT:  I wonder if those are because of the

10  full left and right justifying.

11         THE COURT:  Yeah, maybe it's because the printing.

12         On page 3 -- or page 7 of 32 you say "and the RMBS

13  settlement agreement requiring that this Court submit the

14  trustee findings."  I'd like you to change that word to

15  requesting.  Okay?

16         I'll spare you over what I consider to be purely

17  typo type corrections.  We'll take care of those for you.

18         On page 7 at the -- about 6 lines up from the

19  bottom of numbered paragraph 6 there's part of sentence

20  which reads "which will conclude the LBHI debtor's cases

21  significantly sooner."  I think you should add the word

22  "help," which will help conclude.  You with me?

23         MR. KRAUT:  Yeah.

24         THE COURT:  And then several lines after that you

25  mention taxing the Court.  Please take that out.  I get paid

Page 58

1    to be taxed.  But let's say which would be expensive, time

2    consuming, and would delay recoveries for other creditors.

3            At the end of paragraph 10 we're going to add a

4    sentence that reads, "The Court finds the releases contained

5    in the RMBS settlement agreement to be appropriate."

6            Similarly at the end of paragraph 12 we're going

7    to add a sentence that says, "That the record is devoid of

8    any evidence that the settlement was not reduced by arms

9    length negotiations."

10           In paragraph E -- in decretal paragraph E, this is

11   a question for you.  I don't know that I have the authority

12   under Section 105 or otherwise to find or order that the

13   accepting trustees are authorized to do anything.

14           MR. KRAUT:  This was in the version we saw, we saw

15   no reason to strike it, but admittedly I don't know that it

16   adds anything.  I'm happy to have it drop out, Your Honor.

17           THE COURT:  I just don't think that I can say

18   that.  So do we want to make that -- I don't know what to do

19   with this.  If you want it it's not something that I can

20   really --

21           MR. COSENZA:  Let's just delete it.  Let's make it

22   simple, Your Honor, and just take that out.

23           THE COURT:  All right.  And then -- and this is a

24   real fine point, but decretal paragraph M as in Mary by its

25   terms this says that the Court retains exclusive

Page 59

1    jurisdiction, court otherwise retains jurisdiction.  I think

2    we need to at least mention in passing other than with

3    respect to the entry of the findings.

4             MR. KRAUT:  Fair enough, Your Honor, that's a good

5    point.

6             THE COURT:  Right?  It's just --

7             MR. KRAUT:  Yes, absolutely.

8             THE COURT:  You know, just let's make them

9    connect --

10            MR. KRAUT:  Yes.

11            THE COURT:  -- up to each other, otherwise on its

12   face it looks like that I'm saying that the district court

13   can't do what we know the district court needs to do.

14            MR. KRAUT:  No objection to that, Your Honor.

15            THE COURT:  Okay?  So is it conclusion overall is

16   that the settlement agreement is in the best interest of the

17   LBHI debtors and the creditors.  It establishes a thoughtful

18   and robust process for estimating the RMBS claims for the

19   purpose of allowance, and it minimizes the risks, the

20   tremendous costs, and delays that would be associated with

21   the litigation that otherwise would ensue were the

22   settlement not approved.

23            I think the record abundantly supports the

24   conclusion that the trustees have acted reasonably and in

25   good faith and in every respect are entitled to the trustee

Page 60

1    findings that they seek and that will be part of what

2    enables this process to move forward.

3              Anything else?

4              MR. KRAUT:  No, Your Honor.

5              MR. COSENZA:  No.  Thank you, Your Honor.

6              THE COURT:  All right.  Well again let me express

7    my appreciation for all the hard work that went into this.

8    We will be seeing a lot of each other.

9              MR. KRAUT:  Yes.

10             THE COURT:  I think once we get further into the

11   summer and into the late summer if you would contact

12   chambers about getting together to talk on a pretrial basis,

13   hopefully not about disputes, but just about mechanics and

14   processes for streamlining the trial.

15             We have I think about four weeks reserved for you

16   on the calendar and hopefully we'll be able to get it --

17   everything done within that allotted time, and we can take

18   care of a lot of things I think by talking about -- talking

19   them through before we get started.  So --

20             MR. MUNNO:  We're definitely starting on the 16th?

21   October 16th?

22             THE COURT:  You are definitely starting on the

23   16th, although in the interest of full disclosure I must

24   tell you that before we put that date on the calendar I had

25   committed to do an ABI conference in Washington on the 17th.

Page 61

1    Mr. Cantor is looking at me with tremendous consternation.

2    My panel is first thing in the morning.  I will immediately

3    get back on the train and we can have a session in the

4    afternoon that day.

5              MR. MUNNO:  Thank you.

6              MR. COSENZA:  Okay.  Thank you, Your Honor.

7              THE COURT:  All right?  Thank you all very much,

8    and again, well done.

9              MR. COSENZA:  Thank you.

10              THE COURT:  Thank you.

11        (Whereupon these proceedings were concluded at 10:07

12    AM)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 62

1                              I N D E X

2

3                          E X H I B I T S

4    PARTY       NO    DESCRIPTION                         EVID.

5    Debtor      1     Zachary Trump Declaration            9

6                2     Paul Shalhoub Declaration            9

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4                                                          PAGE

5    Doc #55232 Motion of Lehman Brothers Holdings Inc.

6    for Entry of Order (A) Approving RMBS Settlement

7    Agreement, (B) Making Certain Required Findings

8    Regarding Decision of RMBS Trustees and LBHI Debtors

9    to Enter into RMBS Settlement Agreement, (C)

10   Scheduling Estimation Proceeding to Determine RMBS

11   Claims and Approving Related Procedures Regarding

12   Conduct of Hearing, and (D) Granting Related Relief

13   (related document(s) 55154, 55096)                    53-59

14

15

16

17

18

19

20

21

22

23

24

25

Page 64

1                    C E R T I F I C A T I O N

2

3     I, Dawn South, certify that the foregoing transcript is a

4     true and accurate record of the proceedings.

5        Dawn South          Digitally signed by Dawn South
                             DN: cn=Dawn South, o, ou,
                             email=digital1@veritext.com, c=US
6     _____ Date: 2017.12.26 14:46:37 -05'00' _____

7     Dawn South

8     AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12    Date:  July 10, 2017

13

14

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501