Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   Adv. Case No. 13-01676-scc

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC.,

9

10          Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  LEHMAN BROTHERS HOLDINGS INC. et al,

13              Plaintiff,

14          v.

15  CREDIT SUISSE AG et al,

16              Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

Page 2

1                    United States Bankruptcy Court

2                    One Bowling Green

3                    New York, NY   10004

4

5                    January 10, 2018

6                    10:43 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    B E F O R E :

22    HON SHELLEY C. CHAPMAN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:   SHEA H.

1    HEARING re RMBS Claims Estimation Trial

2

3    HEARING re Adversary Proceeding 13-01676-scc Lehman Brothers

4    Holdings Inc. et al v. Credit Suisse AG et al Conference

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   HOLWELL SHUSTER & GOLDBERG LLP

 4        RMBS Trustees

 5        750 Seventh Avenue, 26th Floor

 6        New York, NY 10019

 7

 8   BY:  DORIT UNGAR BLACK

 9        BRENDON DEMAY

10

11   WILLKIE FARR & GALLAGHER LLP

12        Attorneys for the Debtors

13        787 Seventh Avenue

14        New York, NY 10019

15

16   BY:  BENJAMIN P. MCCALLEN

17

18   KARL D. SNOW, Witness

19

20   HON. ROBERT S. SMITH, Witness

21

22   ALSO PRESENT TELEPHONICALLY:

23   KYLE BURNS

24   AMANDA DARWIN

25
```

Page 5

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Please, have a seat.  Good morning,
 3      everyone.  How are you?
 4              DR. SNOW:  Just fine, thank you.
 5              THE COURT:  Welcome back.
 6              MAN:  Good morning, Your Honor.
 7              THE COURT:  Ready?  We're going to go for a
 8      segment here, and then I'm going to have to take a five-
 9      minute break to do something on the record in -- you know, I
10      run two courtrooms at once; what can I say? -- in the other
11      courtroom.  And then we'll come back.  All right?  So, when
12      we get -- I'll let you know when we're -- when they're
13      getting ready, and we'll -- I'll ask you to stop at an
14      appropriate stopping point.  Okay?  Okay.
15              DIRECT EXAMINATION OF DR. KARL N. SNOW
16      BY MS. BLACK:
17      Q    Good morning, Dr. Snow.
18      A    Good morning.
19      Q    Welcome back.  Can we please have TRDX285?  Dr. Snow, I
20      believe yesterday you explained that, in your supplemental
21      report, you calculated the interest that the Plan
22      Administrator says is impermissibly included in your
23      purchase prices, right?
24      A    Well, I took the amount of accrued unpaid interest that
25      was in the liquidated loans before the application of
```

Page 6

1    liquidation proceeds, as well as the accrued unpaid interest

2    in the non-liquidated loans, and broke them out into various

3    categories.

4    Q    And, just so we are all on the same page, because the

5    term "interest" can refer to a number of different things,

6    to the extent your calculated purchase prices include

7    interest, what is the nature of such interest?

8    A    Again, it is interest that, by the time of liquidation,

9    or as of April 2017 for the non-liquidated loans, had -- you

10   know, was not paid by the borrower, what was -- but was

11   supposed to have been paid.

12   Q    So, again, we are talking about interest that the

13   homeowner, the borrower, was obligated to pay as part of his

14   or her monthly mortgage payments and did not pay?

15   A    That is correct.

16   Q    Now, you mentioned that, in your supplemental report,

17   you broke out the interest that the plan administrator

18   claims is impermissibly included in your purchase prices

19   into various categories.  And I would like you to walk us

20   through those categories.  So, let's start with TRDX311,

21   please.  Can you please walk us through what we see on this

22   page?

23   A    Yes.  Unless the Court would like more detail about

24   specific numbers, I'm just going to describe the categories.

25              THE COURT:  Whatever Ms. Black asks, I'll listen

Page 7

1    to.

2            DR. SNOW:   Okay.

3            THE COURT:   Okay?

4            DR. SNOW:   Okay.

5    A    So, for the non-liquidated loans -- and this was broken

6    out in my affirmative report -- the unpaid and advanced

7    interest was broken out into interest that had not been paid

8    by the borrower and interest that had been advanced by the

9    servicer but not reimbursed by the trustees.  I then took

10   those amounts and broke them out into subcategories:

11   amounts of interest that had accrued prepetition versus

12   post-petition, and then amounts that had accrued pre-

13   rejection and post-rejection.

14           Now, for the liquidated loans, I've done a similar

15   exercise.  But I want to emphasize this is the amount of

16   unpaid and advanced interest before the application of any

17   liquidation proceeds.  So, this is what was unpaid and

18   accrued at the time the loan liquidated.  And, again, I've

19   broken them into what was unpaid by the borrower and not

20   advanced by the servicer, and then what was advanced by the

21   servicer but not reimbursed by the trustee, and then the

22   temporal breakdowns of pre- and post-petition, and then pre-

23   rejection and post-rejection.

24   Q    And what is the significance of the distinction that

25   you're drawing between interest that is borrower unpaid and

Page 8

1    interest that the servicer advanced?

2    A    Well, the interest that the servicer advanced sometimes

3    is viewed as a fee.  I'm not taking any particular stand on

4    this.  I'm just, again, breaking it out for -- if the Court

5    wished to make that distinction.  So, it's been put into

6    those two categories.

7    Q    And, if you remember yesterday, from the slide that had

8    three buckets, or the three building blocks that constitute

9    a purchase price, where would the servicer-advanced interest

10   fall into, as opposed to the borrower unpaid interest?

11   A    Okay.  So, if we think of the three buckets, the unpaid

12   principal balance, accrued unpaid interest, and then

13   servicer advances and fees, then the servicer-advanced

14   interest would be in the last bucket.  So, it would be the -

15   - one of the first items to be repaid with liquidation

16   proceeds.

17   Q    Thank you.  Now let's have TRDX312, please.  Dr. Snow,

18   can you please walk us through what we see on this slide?

19   A    Yes. So, now I've taken the liquidated loans and broken

20   them into two different categories.  Liquidated loans, where

21   the realized loss at the time of liquidation is less than

22   the unpaid principal balance.  So, this would indicate that,

23   for these loans, the liquidation proceeds were sufficient to

24   retire the servicer advances and the accrued unpaid

25   interest, and then retire some of the unpaid principal

Page 9

1    balance.

2           And then the other category being the opposite,

3    those with realized loss greater than the unpaid principal

4    balance at liquidation.  This would mean that the

5    liquidation proceeds were not sufficient to completely

6    retire the servicing advances and/or the interest -- accrued

7    unpaid interest.

8           So, I then made that breakout.  I then calculated

9    the pre- and post-petition and the pre- and post-rejection

10   interest for those categories:  again, what was unpaid by

11   the borrower, what was not reimbursed to the servicer.  And

12   you can see that the totals will total up to 1.8 billion.

13   And that's the same total we had on the previous page for

14   the liquidated loans.

15          And, again, this is obviously before the

16   application of liquidated proceeds, liquidation proceeds,

17   because the total of the 1.4 billion, that is being retired

18   via the liquidation proceeds for these loans and is not

19   included in any of the purchase price calculations that I've

20   made for those loans.

21          THE COURT:  Can I ask a clarifying question?  You

22   -- I may -- might have missed it.  But what date is being

23   used for rejection?

24          DR. SNOW:  My record --

25          THE COURT:  You know, presumably you were supplied

1    with a date.

2              DR. SNOW:  Yes, I was supplied with a date.  It's

3    in the report.  It's the -- essentially the approval of the

4    bankruptcy.

5              THE COURT:  The confirmation of the plan?

6              DR. SNOW:  The -- I'm sorry, the confirmation of

7    the bankruptcy, yes.

8              THE COURT:  Confirmation of the plan?

9              DR. SNOW:  Yes, thank you.

10             THE COURT:  Okay.  The effective date of the plan?

11             DR. SNOW:  Yeah.

12             MS. BLACK:  Yes.

13             MR. SHUSTER:  I'm not sure if it's one or the

14   other.  But it's definitely --

15             MS. BLACK:  I can give you the date.

16             THE COURT:  Yes?

17             MS. BLACK:  March 6, 2012, which is the effective

18   date of the --

19             THE COURT:  Okay, the effective date of the plan,

20   okay.

21             DR. SNOW:  I knew it was 2012; I just couldn't

22   remember the exact month.

23             THE COURT:  Right.  Okay.  So, you've now all

24   learned a little of bankruptcy, so.

25   Q    Dr. Snow, looking at this slide, do I understand it

1    correctly that, for the majority of the 60,305 liquidated

2    loans that were the subject of your purchase price

3    calculation, that, for the majority of such loans, the

4    purchase price does not include any interest, according to

5    your calculations?

6              MR. MCCALLEN:  Objection.  Leading, Your Honor.

7              THE COURT:  Yeah, why don't you rephrase?

8    Q    Dr. Snow, can you explain to us the distribution of the

9    -- what you just explained, liquidated loans, where the

10   purchase price does not include interest versus liquidated

11   loans where the purchase price does include some component

12   of interest?

13   A    Yes.  So, for the loans where the realized loss is less

14   than the UPB -- that's the majority, that's nearly 39,000 of

15   the loans -- there was 1.4 billion, at the time of

16   liquidation, in accrued unpaid interest.  And, again, it's -

17   - I've broken it out into the various categories.  But the

18   liquidation proceeds were sufficient to cover that amount

19   for all of those loans.

20             For the 21,000-plus --

21             THE COURT:  Before you more on, though --

22             DR. SNOW:  Sure.

23             THE COURT:  So, the liquidation proceeds, though,

24   were applied to the number that's reflected on this chart

25   that includes post-rejection unpaid and advanced interest?

Page 12

1                    DR. SNOW:  That is correct.

2                    THE COURT:  Okay.  Thank you.

3                    DR. SNOW:  To the extent that pre- or post-

4        rejection or pre- or post-petition interest was in a

5        particular loan, then --

6                    THE COURT:  It was applied in that way?

7                    DR. SNOW:  It was applied in that way.

8                    THE COURT:  Thank you.  Okay.

9                    DR. SNOW:  But you can see the amounts that are

10       being applied in the breakdown.

11                   THE COURT:  Yeah.  Yes, thank you.

12       Q    Thank you.  Moving on to the last slide, TRDX313,

13       please?  Dr. Snow, can you walk us through what we see on

14       this slide?

15       A    Yes.  So, this is just a summary of the previous two

16       that, for the liquidated loans, there is no interest

17       included in the purchase price post-liquidation --

18       application of post-liquidation proceeds.  And then, for the

19       loans where the realized loss is greater than the unpaid

20       principal balance, effectively, there is 452 million, of

21       which 188 million was paid off via liquidation proceeds.

22       So, those loans contain $236 million in unpaid and accrued

23       interest in their purchase price.

24       Q    So, out of the $1.85 billion in interest on liquidated

25       loans that the plan administrator claims are impermissibly

1   included in your calculations, how much of it is interest

2   that is embedded in the purchase price?

3   A     Only 188 million of it.  Basically, 1 -- roughly 1.6

4   billion is being covered by the liquidation proceeds.

5   Q     I think you might have inverted the numbers.

6   A     Okay.

7           MR. MCCALLEN:  Objection, Your Honor.

8           THE COURT:  Yes, Mr. McCallen?

9           MR. MCCALLEN:  So, twofold objection to this.

10  First, it's -- this particular opinion here is not something

11  I believe was articulated in his report.  But, more

12  significantly, this is a legal argument about what

13  constitutes interest and what doesn't.

14          THE COURT:  Absolutely.

15          MR. MCCALLEN:  We have no objection to Mr. -- to

16  Dr. Snow quantifying these numbers and saying them.

17          THE COURT:  Right.

18          MR. MCCALLEN:  But, to the extent he's trying to

19  describe what is interest, for purposes of the relief we're

20  seeking --

21          THE COURT:  That's -- I'll decide that.

22          MR. MCCALLEN:  Okay.  Thank you, Your Honor.

23          THE COURT:  So, I'm just listening to the -- Dr.

24  Snow explaining where the numbers fall.

25          DR. SNOW:  Okay.

1            MR. MCCALLEN:  Thank you, Your Honor.

2            THE COURT:  I --

3            DR. SNOW:  And, Your Honor, may I say one thing?

4            THE COURT:  Sure.

5            DR. SNOW:  The 263.55 number, that is in my

6    supplemental report.

7            THE COURT:  Okay.  Yes, I didn't -- that --

8            DR. SNOW:  Yeah.

9            THE COURT:  I didn't respond to that first

10   argument.

11           DR. SNOW:  Yeah.

12           THE COURT:  Because I think this --

13           MS. BLACK:  I was just going to point that out.

14           THE COURT:  Yes.  Yeah.  I'm good on that.  Okay.

15   Let's keep going.

16   Q    In your supplemental report, you cite to the realized

17   loss definition and the waterfall provision therein, by

18   which liquidation proceeds are applied first to interest

19   before they are applied to retire principal.  Is there any

20   significance to this?  That is, does it matter in which

21   order they are applied?

22   A    Oh, it does, because it determines who gets repaid and

23   who receives what via the waterfall, in the -- you know, for

24   the trust, right?  That's the reason that, in the realized

25   loss, it is stated, first, the servicer, because they have

Page 15

1    the -- in a sense, the IOU; they're at the top.  Then

2    interest, because that affects, generally speaking, all

3    investors in a somewhat similar manner.  And then the

4    principal, because that affects different investors

5    differently.

6            MS. BLACK:  I believe I have, at this point,

7    concluded by direct examination.

8            THE COURT:  Okay.  Let me do this, finish making a

9    note here.  Why don't I take a moment to check with the

10   other folks?  And this would be a perfect time for me to

11   finish up with them.  And then we can start with the cross-

12   examination.

13           MR. SHUSTER:  That'd be great, Your Honor.

14           THE COURT:  All right?  So, why don't we just take

15   a 10-minute break, and I'll see if I can be done with them

16   during that 10-minute break?  All right?  Thank you.

17           MR. SHUSTER:  Thank you.

18       (Recess)

19           THE COURT:  Okay.  Please, have a seat.  Yes.

20   Okay.  Okay.  All right.  All right.  Shall we begin?

21           MR. MCCALLEN:  Yes.  Thank you, Your Honor.

22             CROSS-EXAMINATION OF DR. KARL N. SNOW

23   BY MR. MCCALLEN:

24   Q    Good morning, Dr. Snow.

25   A    Good morning.

Page 16

1    Q    And, again, as at your deposition, I'll endeavor to

2    call you Dr. Snow.  But, if I call you Mr. Snow, my

3    apologies in advance.

4    A    Again, I'm indifferent.

5    Q    Dr. Snow, could you please turn to Tab 5 in the binder

6    that's been placed in front of you?

7    A    Tab 5, which would be PA Exhibit 052?

8    Q    That's correct.

9    A    Okay.

10   Q    Now, this is the document that you talked about

11   yesterday.  It's a different exhibit number.  But this one

12   in particular is -- do you recognize this document?

13   A    I do.

14   Q    Okay.  This was Exhibit 2 to your opening report,

15   correct?

16   A    Correct.

17   Q    Okay.  And this document here that's up here, this is

18   actually an excerpt of that.  It just has certain of the

19   loans.  The entire document was quite big.

20   A    So, can I just focus on the excerpt, or the -- do you

21   want me to focus on the document?

22   Q    Let's focus on this document.  I'm going to show you,

23   though, some specific lines.

24   A    Okay.

25   Q    We'll talk about those.

Page 17

1    A    Sure.

2    Q    But, just to make sure that we're on the same page,

3    this is an excerpt.  The complete version, Exhibit 2,

4    contains the purchase price components for each liquidated

5    and non-liquidated loan that the Trustees are seeking

6    recovery for in this case; that's correct?

7    A    Per the calculations.  I mean, when you say "the

8    components," it does -- the specific components for the non-

9    liquidated loans, the realized loss for the liquidated

10   loans.

11   Q    Correct.  And, just to look on your -- on the sheet

12   itself, if you look in the middle, above Columns F, G, H, I,

13   and J, it says, "Purchase price components for non-

14   liquidated loans," right?

15   A    Yes.  Yeah.

16   Q    And then, a little further to the right, above Column

17   K, you see that's the purchase price components for the

18   liquidated loans.

19   A    Correct.

20   Q    Okay.  Now, let's take a look at the very first row,

21   Row 5, and that's the loan number ending in 4727.  Do you

22   see that?

23   A    Yes.

24   Q    And, if you look one column over, there is a column

25   called "Deal."  And that lists ARC2002-BC10 for this loan,

1    correct?

2    A    Correct.

3    Q    And that refers to the trust or securitization that

4    this loan is in, correct?

5    A    That is correct.

6    Q    And this loan is identified as a liquidated loan,

7    correct?

8    A    Correct.

9    Q    And, just to make sure we're on the same page, a

10   liquidated loan is one where the underlying property has

11   been foreclosed upon, and a loss has been realized for that

12   loan, correct?

13   A    Correct.

14   Q    And one column over, Column E, the liquidation date

15   represents the date when the loss is realized and is no

16   longer being accounted for in terms of the loans underlying

17   the securitization, correct?

18   A    That is correct.

19   Q    Okay.  Now, going forward further, Column K, this is

20   the column called Realized Loss.  You see that?

21   A    Yes, I do.

22   Q    And, for this loan, it reports a realized loss of

23   $90,436.60, correct?

24   A    Correct.

25   Q    Now, the information that appears in this Realized Loss

Page 19

1  column, you took that information directly from reports by

2  the master servicers, Nationstar or Wells Fargo, when you

3  had that data, correct?

4  A    That is correct.

5  Q    And, when you didn't have it from Nationstar or Wells

6  Fargo, you took it from Moody's or Intex, correct?

7  A    Correct.

8  Q    And, when Moody's or Intex got their data, they got it

9  from the servicers, correct?

10  A    That is my presumption, yes, because the data tends to

11  be consistent across these data sources.

12  Q    Okay.  And, in fact, let's use Nationstar as an

13  example.  The data recorded by Nationstar actually contains

14  a spreadsheet with a column that's called Realized Loss,

15  correct?

16  A    Yes.

17  Q    So, in order to fill in Column K of Exhibit 2 for loans

18  with -- for liquidated loans, your firm just simply copied

19  the information from that Realized Loss column in the

20  servicer data into your spreadsheet, right?

21  A    Well, I would say, as I mentioned in my deposition, we

22  would check to make sure that what is being reported there

23  as realized loss is what we think as being realized loss per

24  the definitions in the governing agreements.  And then, yes,

25  we took that number.

Page 20

1    Q    But, before your "calculation of purchase price," it

2    involved taking data from a column called Realized Loss in

3    the servicer data and putting it in -- as a column in your

4    spreadsheet called Realized Loss, correct?

5    A    Correct.

6    Q    Now, if you take a look at Column L, you see that that

7    column is called Purchase Price.  See that?

8    A    Yes.

9    Q    And, using this loan as an example, if you look, the

10   Realized Loss and Purchase Price are identical, correct?

11   A    That is correct.

12   Q    And, if you could sort of scroll down and look,

13   generally speaking, for the Realized Loss and Purchase

14   Price, for liquidated loans, the two numbers are the same,

15   right?

16   A    Yes.

17   Q    So, the purchase price is -- in order to calculate the

18   purchase price, you simply adopt the realized loss reported

19   by the servicers, correct?

20   A    Correct.

21   Q    And so, for your calculation of liquidated -- for your

22   -- strike that.  For your calculation of purchase price for

23   liquidated loans, beyond taking the realized loss

24   information as reported by Nationstar, Wells Fargo, or

25   Moody's, and pasting it into your price -- Purchase Price

Page 21

1   column, you didn't perform any additional calculations,

2   correct?

3   A    No, I would -- and I would just add and/or Intex as

4   well.

5   Q    Fair clarification.  In connection with issuing your

6   report and doing your purchase price calculation, you didn't

7   speak with any of the master or primary servicers to

8   determine how the data they reported was collected, correct?

9   A    No, I did not.

10  Q    And, when imputing the realized loss data from

11  Nationstar, you did conduct a few spot checks, correct?

12  A    With the trustee remittance reports, yes.

13  Q    Correct. And the purpose of those spot checks was to

14  confirm that the realized loss figure was consistent with

15  the trustee remittance reports, right?

16  A    In other words, what is being reported to investors and

17  affecting their distributions is consistent with what's

18  being reported on the monthly loan-level data

19  (indiscernible).

20  Q    Correct.  But your spot checks involved checking the

21  remittance reports on the one hand, and the servicer data on

22  the other, correct?

23  A    Correct.

24  Q    Now, you've never worked for a loan servicer, right?

25  A    No, I have not.

1   Q     And that would include those master servicers or

2   primary servicers?

3   A     That is correct.

4   Q     And, outside of cases where you've served as an expert

5   witness in litigation, you've never worked with either

6   primary or master servicers in any capacity, correct?

7   A     That is correct.

8   Q     And you have no experience personally interacting with

9   primary servicers or master servicers, correct?

10  A     That is correct.

11  Q     All right.  Let's go back to Plan Administrator 52,

12  which is Tab 5 in your binder.  And now I want to take a

13  look at what's Row 479.  If you're looking at the hard copy,

14  it's on Page 10.  But I think, if you're just going to look

15  at the screen, we can probably scroll down, and you can take

16  a look at it there.

17          Now I want to take a look at Row 479, and it's

18  with Loan Number ending in 5598.  You see that?

19  A     I do.

20  Q     Okay.  And this loan is part of Trust BNC2006-1,

21  correct?

22  A     Correct.

23  Q     And, if you look at Column D, this notes that this is a

24  non-liquidated loan, right?

25  A     That is correct.

Page 23

```
 1   Q    And I think you defined this yesterday, but a non-

 2   liquidated loan is one where the property has not yet been

 3   sold, at or after foreclosure, correct?

 4   A    Correct.

 5   Q    And that would include instances, potentially, where

 6   the borrower is currently paying on his or her loan,

 7   correct?

 8   A    That's what I mentioned yesterday, yes.

 9   Q    And now let's take a look at Column E, which is the

10   liquidation date.  For this one, it's blank, and that's

11   because there has been no liquidation, correct?

12   A    Hence the "non-liquidated" term.

13   Q    Exactly.  Now, Columns F, G, H, and I, these are filled

14   in for the non-liquidated rows -- for the non-liquidated

15   loans; I'm sorry.  Now, Column F, which is Unpaid Principal

16   Balance, that's Column F, is -- that relates to principal

17   that's not been paid by the borrower, correct?

18   A    Correct.

19   Q    And the amount of unpaid principal balance, that also

20   comes from Nationstar or Wells Fargo, correct?

21   A    Yes, components of it.

22   Q    Okay.  Well, in the Nationstar data, there's a field

23   called Schedule Imbalance, is there not?

24   A    Correct.

25   Q    And, from that field, Schedule Imbalance, you used that
```

Page 24

1   to populate Column F in this report, right?

2   A     Partially, yes.

3   Q     Okay.  And --

4   A     But I would add we also determined what was forgiven

5   principal.  And that is included in the unpaid principal

6   balance, for loans that have been modified.

7   Q     Okay.  And for loans where there was no forgiven

8   principal, but rather a principal was deferred, you did not

9   include that, correct?

10  A     That is correct.

11  Q     All right.

12  A     Because that doesn't -- that's not a realized loss, at

13  that point.  It gets deferred.  If it's forgiven, then the

14  trust recognizes it as a loss.

15  Q     Okay.  And, if it's just been deferred, that's not a

16  realized loss.

17  A     Correct.

18  Q     Now, I want to talk a little bit about the interest

19  calculation that you have here.  Looking again at PA52,

20  which is Tab 5, for the non-liquidated loans, this

21  information is recorded in Columns N and O, correct, which

22  is Interest Advanced and Accrued Interest?

23  A     Yes, it is.

24  Q     Okay.  And the information in these columns, again,

25  comes from Nationstar, who gets it from the underlying

Page 25

1   servicers, correct?

2   A    Or Wells Fargo.  The master servicer, yes.

3   Q    But, one way or another, from the servicers, correct?

4   A    Correct.

5   Q    And accrued interest begins to accrue when the borrower

6   misses a payment, correct?

7   A    Yes.

8   Q    And interest will continue to accrue as long as the

9   loan has not been liquidated and the borrower is making

10  payments, right?

11  A    I'm sorry, could you repeat the question?

12  Q    Sure.  Loan -- interest will continue to accrue as long

13  as the loan has not been liquidated and the borrower is

14  continuing to make payments -- I'm sorry, and the borrower

15  is not making payments, correct?

16  A    That's where I was confused.  Yes.

17  Q    My apologies.

18  A    Yes, that is correct.  It will -- I mean, I think a

19  better term would be that it would accumulate, as opposed --

20  it's not compounding.  It's just adding up.

21  Q    Okay.  But the term we use here is "accrued interest,"

22  correct?

23  A    Correct.  Yes.

24  Q    All right.  And the length of time for which interest

25  continues to accrue depends on when the borrower resumes

Page 26

1   payments, if ever, correct?

2   A    Yes.

3   Q    All right.  Now, the interest advanced is the interest

4   that's being advanced to the trust by the servicer, correct?

5   A    Correct.

6   Q    And the circumstances under which a servicer advances

7   interest is dependent upon the governing agreements for that

8   securitization, correct?

9   A    Typically, yes, and judgment of the servicer.

10  Generally, the governing agreements allow the servicer to

11  terminate advances if they believe that the probability of

12  recovery has gone to a -- you know, effectively zero.

13  Q    Right.  So, when they no longer think -- the general

14  rule is, when they no longer think they have a likelihood of

15  recovering their advances, they no longer have to make those

16  advances, correct?

17  A    That's correct.

18  Q    Okay.  Now, I want to look at the numbers on the loan

19  which is reflected in Row 479.  Here, if we look under

20  Columns F-J, we see, for this loan, that the unpaid

21  principal balance is approximately $412,000, correct?

22  A    Correct.

23  Q    And here, the accrued and advanced interest, which

24  appears in Column J?

25  A    Yes.

Page 27

1    Q    And that's tallied from the columns on the right-hand

2    side of the spreadsheet, right?

3    A    Correct.

4    Q    That comes to approximately $553,000, correct?

5    A    Correct.

6    Q    So, it's quite possible, for some of these non-

7    liquidated loans, that the interest can exceed the amount of

8    unpaid principal balance, correct?

9    A    That's entirely possible.  It depends upon when the

10   loan stops -- when the borrower stops making payments.

11   Q    Sure.  One circumstance where this might occur would be

12   when a loan foreclosure timeline is extended because of a

13   lengthy legal process, for example, and there's difficulty

14   in selling the underlying property, correct?

15   A    That could be one possibility.

16   Q    And, in your opening report, you calculated a purchase

17   price for all the loans that the Trustees are seeking to

18   recover for in this case, correct?

19   A    Correct.

20   Q    And the sum of the purchase prices for all those

21   liquidated loans is approximately $9 billion, is that right?

22   A    If -- which universe are we talking about, for the

23   76,000?

24   Q    The universe would be the liquidated loans.

25   A    Oh, the liquidated loans.

```
 1    Q    For which the Trustees are seeking recovery in this

 2    case.

 3    A    Yes.  Yes.

 4    Q    Approximately $9 billion, is that correct?

 5    A    That is correct.

 6    Q    And the sum of the purchase prices for all non-

 7    liquidated loans was approximately $5 billion, subject to an

 8    offset provided by Dr. Elsen, correct?

 9    A    Well, the purchase price was $5 billion.  If you take

10    that offset off the 5 billion, then you get a net purchase

11    price of a little over 2 billion.

12    Q    Understood.  And, at the time you issued your opening

13    report in this matter, you hadn't undertaken to calculate

14    what portion of the purchase price calculation for

15    liquidated loans consisted solely of interest, which you

16    just described for the Court a few minutes ago, correct?

17    A    As of my affirmative report?

18    Q    Yes.

19    A    No, I had not.  I had not seen any indication that that

20    was necessary, in both the expert reports that I had seen

21    and in filings.

22    Q    Now, when you issued your supplemental report on

23    November 16th, 2017, you did do that calculation, though,

24    correct?

25    A    That is correct.
```

1    Q     And I just want to take a look at what this looks like.

2    So, if we could take a look at Tab 6 of your binder, this is

3    PRX2726.  This was Exhibit 1 to your supplemental report,

4    correct?

5    A     Correct.

6    Q     And this exhibit breaks out the accrued and advanced

7    interest, prepetition and post-petition, based on the

8    September 15th, 2008, petition date, correct?

9    A     That is correct.

10   Q     Okay.  So, let's just look at one example, so we see

11   how this works.  Look at Row 10, which is the loan ending in

12   6598.  And, just to clarify, this is a liquidated loan,

13   correct?

14   A     Correct.

15   Q     And if you go to Column N, Accrued and Advanced

16   Interest, that column lists the total amount of accrued and

17   advanced interest for this liquidated loan, correct?

18   A     Correct.

19   Q     And that number is $48,970.75, correct?

20   A     That is correct.

21   Q     Okay.  Now, if you go out to Columns R and S, that

22   accrued interest portion is broken out into prepetition and

23   post-petition, correct?

24   A     Correct.

25   Q     And, for this particular loan, there is approximately

1    $41,000 of prepetition interest and approximately $7500 of

2    post-petition interest, correct?

3    A    Correct.  But let's be clear:  this is prior to the

4    application of liquidation proceeds.

5    Q    I understand that.  But --

6    A    Yes.  But yes, the --

7    Q    The prepetition column is 41,000, correct?

8    A    Yes.

9    Q    And the post-petition column is approximately 7500,

10   correct?

11   A    Correct, just to make sure that we're talking about the

12   same thing.

13   Q    Okay.  Now, if you aggregate those numbers across all

14   loans, prior to the application of liquidation proceeds --

15   A    Right.

16   Q    You calculate the prepetition portion of the interest

17   to be approximately 440 -- I'm sorry, to be approximately

18   $444 million, correct?

19   A    Correct.

20   Q    And the amount of post-petition interest would be

21   almost $1.7 billion, correct?

22   A    Yeah, roughly 1.8, again, prior to the application of

23   liquidation proceeds.

24   Q    And, collectively, it's about $2.1 billion when you add

25   the two together; is that right?

Page 31

1    A    Roughly speaking, yes.

2    Q    Okay.  Let's now take a look at TRX2727, which is in

3    Tab 7 of your binder.

4    A    Okay.

5    Q    And we can move through this quickly, (indiscernible)

6    notes.  It's -- this is Exhibit 2 of your supplemental

7    report.  Do you recognize that?

8    A    I do.

9    Q    And, similarly, this breaks out the interest

10   calculation into pre- and post-rejection date, correct?

11   A    That is correct.  And it's similar to the spreadsheet

12   we just looked at.  It's just using a different date for the

13   breakout.

14   Q    Exactly.  And we don't have to walk through an example,

15   because I think everybody probably understands what you're

16   doing here.  But, for your aggregate calculations, the post-

17   rejection interest you calculated to be $498.1 million,

18   correct?

19   A    Correct.

20   Q    Okay.

21   A    At least, that's my recollection, without the exact

22   number being in front of me.

23   Q    Would you like to look at your report?

24   A    No, I will -- I recall that's about the right number.

25   Q    Okay.  Now, you were retained by counsel for the

Page 32

1    Trustees to calculate the purchase price for each loan that

2    the Trustees are seeking recovery on in this case, correct?

3    A    I was provided a list, yes, of approximately 76,000

4    loans.

5    Q    Okay.

6    A    Which I understand that they are seeking recovery on,

7    that they're making claims on.

8    Q    And that list you referred to, that's Exhibit 1 to your

9    opening report?

10   A    Correct -- well, it has a list of the loans, yes.

11   Q    Correct.  And that list, for which you were calculating

12   the purchase price, that was provided to you by counsel?

13   A    Correct.

14   Q    You were in no way involved in the preparation of that

15   list, correct?

16   A    No, I was not.

17   Q    In connection with issuing your opening report, your

18   affirmative report in this matter, you did not review any

19   loan files associated with any of the loans in that list,

20   correct?

21   A    Correct.

22   Q    And, for the loans for which you're calculating the

23   purchase price, you're not offering any opinion as to

24   whether any of the loans contain breaches of representations

25   and warranties, correct?

Page 33

1   A     No, I understand that as the subject of other expert

2   and legal discussions.

3   Q     And you are also not offering an opinion about under

4   what conditions the Plan Administrator is required to

5   repurchase a loan, correct?

6   A     No, I am not.

7   Q     And you're also not opining about whether any of the

8   loans are actually compensable or not; you're just

9   calculating the purchase price, correct?

10  A     That was my mandate, as I explain both in my report and

11  in my direct testimony.

12  Q     And you're also not offering an opinion as to whether

13  any of those alleged breaches of representations and

14  warranties had a material, adverse effect on the value of

15  the loan, correct?

16  A     Correct.

17  Q     Now, you testified yesterday that you had served as an

18  expert in more than 20 cases, calculating purchase price

19  damages in the RMBS context.  Is that correct?

20  A     That is correct.

21  Q     And, in those cases, you performed a calculation

22  similar to the one you performed here, correct?

23  A     Yes, in -- generally speaking, yes.  Sometimes the data

24  is a little bit different, but it's essentially determining

25  what are the proper components of the purchase price and

Page 34

```
 1    making those calculations.

 2    Q    And the calculations you did in those cases are

 3    consistent with what you did here, correct?

 4    A    Yes, that's correct.

 5    Q    All right.  And you relied on your experience in those

 6    other cases in concluding that your calculation here was

 7    appropriate, correct?

 8    A    Partially, yes.  As I explained yesterday, though, that

 9    where I started was looking at the protocol order, the

10    governing agreements, and then at filings in this matter.

11    Q    Understood.  Now, you've offered no alternative method

12    of calculating damages, correct?  It's the method you've

13    offered, which is the purchase price calculation; that's it,

14    correct?

15    A    Well, let's be clear:  I'm -- I don't believe that I'm

16    offering an opinion on damages per se.  I was asked to

17    calculate the purchase price, again, you know, per the

18    protocol order and the governing agreements.  And that's

19    what I have done.

20    Q    So, you performed a purchase price calculation, and

21    that's it, correct?

22    A    Yes.

23    Q    But you understand that that's going to be used as a

24    measure -- Trustees are trying to use that as a measure for

25    damages in this case, correct?
```

Page 35

1    A    I understand that, yes.

2    Q    Okay.  So --

3    A    But there may be other -- in other words, I'm not

4    opinion on damages per se.  I am opining on what are the

5    purchase prices.

6    Q    Well, to the extent the Court were to determine that

7    the purchase price calculation is not an appropriate measure

8    in this case, you've offered no alternative method to

9    calculate damages in this case.  Is that correct?

10   A    No, I wouldn't say that's the case.  I would say it

11   depends on what the Court rules.  For example, in my

12   supplemental report, I have broken out the interest

13   components.  And, if the Court were to find that certain

14   components of interest were not appropriate, those could be

15   removed.  And that would be an alternative measure of the

16   purchase price.

17   Q    Well, putting the interest issue aside, but in terms of

18   the 76,000 loans that are in this case, correct?

19   A    Yes.

20   Q    You've offered no calculation of damages for those

21   loans separate and apart from the purchase price calculation

22   you've performed, correct?

23   A    And the interest rate breakouts, yes.

24   Q    Now, one more question:  the Exhibit 1, which we talked

25   about before, which was the list attached to your report?

Page 36

1    A    Yes.

2    Q    Do you recall that?  And that contained all the loans

3    for which you've provided a purchase price calculation?

4    A    Yes.

5    Q    When were you provided that list?

6    A    That I don't recall specifically.  Sometime in the

7    preparation of my affirmative report.

8    Q    And when were you retained in this case?

9    A    Sometime in the -- I think it was the first quarter of

10   this year.  But I can't tell you the exact date I received

11   the list without going back to my records.

12   Q    So, if the Court were to determine that an alleged

13   breach of representation or warranty for any given loan

14   caused only part of a loss as reported in the realized loss

15   of your data, that's not something your purchase price

16   calculation takes into account, correct?

17   A    Well, first of all, I'd just like to understand:  what

18   do you mean by "caused" here?

19   Q    So, to the extent that the Court determined that a

20   portion of the realized loss which you report is caused --

21   was not caused by the alleged breaches of representations

22   and warranties, I'm trying to understand whether you have

23   provided a basis to calculate that in your report.

24   A    Yeah, I'm not trying to be difficult, but my

25   understanding of causation is that the breach interacts with

Page 37

1   various what we would call trigger events.  It may be

2   macroeconomic, decline in housing prices; it may be

3   idiosyncratic in terms of, you know, a borrower losing their

4   job.  All those things interact.  So, saying that the breach

5   caused something or didn't is not something I quite

6   understand in terms of what you're asking.

7   Q    Well, the factors you just cited, you didn't take those

8   into consideration in any way in the calculation you

9   performed, correct?

10  A    That is correct.  I am not offering an opinion on

11  whether there was a material and adverse, you know, impact

12  of the breach.  I just calculated purchase price.

13  Q    And, separate and apart from material and adverse

14  impact, the other factors you cited, such as housing prices

15  and things like that, that's not a factor in any way into

16  your calculation, correct?

17  A    No, I was asked to calculate the purchase price.

18  Q    I'd like to discuss now your reliance on Mr. Elsen's

19  valuations of the active loans in this case.

20  A    Sure.

21  Q    In your June opening report, you performed a purchase

22  price calculation for all active loans as of that time.  Is

23  that right?

24  A    That is correct -- well, non -- what I refer to as non-

25  liquidated loans.

Page 38

1    Q    Non-liquidated loans.  If I refer to them as active

2    loans, you know what I'm referring to.

3    A    We're talking about the same thing, yes.

4    Q    And, just to make sure we're on the same page, you

5    added up the purchase price for all the active loans in the

6    case and then subtracted from that number the number

7    provided by Dr. Elsen, correct?

8    A    Correct.

9    Q    And Dr. Elsen estimated the current value of the non-

10   liquidated loans to be approximately $3 billion, is that

11   correct?

12   A    Correct.

13   Q    Now, you had no role in Dr. Elsen's calculation of the

14   estimated value of those non-liquidated loans, correct?

15   A    Correct.  That was not part of my expert mandate.

16   Q    Do you understand that Dr. Elsen used LoanKinetics

17   software to do that calculation?

18   A    I do.

19   Q    And you were asked by counsel to rely on those

20   calculations by Dr. Elsen, correct?

21   A    Correct.

22   Q    In connection with issuing your opening report, you

23   didn't review any of Dr. Elsen's calculations for accuracy

24   in any way, correct?

25   A    No, I did not.

1    Q    And you did not calculate any potential margin of error

2    around the figure provided by Dr. Elsen, correct?

3    A    No, I am not.

4    Q    And you did not review any materials regarding

5    LoanKinetics in connection with issuing your opening report,

6    correct?

7    A    No, I did not -- well, other than I am familiar with it

8    and I reviewed, you know, the basics of what it does and Dr.

9    Elsen's background.

10   Q    But, in connection with issuing your opening report in

11   this matter, you didn't review any materials regarding

12   LoanKinetics, did you?

13   A    I -- what do you mean by materials concerning

14   LoanKinetics?

15   Q    Any materials regarding LoanKinetics.  Did you review

16   any materials regarding LoanKinetics in connection with your

17   opening report?

18   A    I may have looked at their website.  I'm -- I was

19   familiar with them beforehand, and that would have been the

20   extent.

21   Q    Okay.  Are you aware that LoanKinetics is a product

22   developed by Andrew Davidson?

23   A    Yes, I am.

24   Q    Referred to as ADCo sometimes?

25   A    Yes.

1   Q    Did you speak with anybody at Andrew Davidson in

2   connection with issuing your opening report?

3   A    No.  I am relying on Dr. Elsen's work.

4   Q    And you have no personal experience with LoanKinetics,

5   right?

6   A    No, I do not.

7   Q    You've never used LoanKinetics in any other litigation?

8   A    No.  I am familiar with their product, but I have not

9   used it.

10  Q    And you did not speak with Dr. Elsen in connection with

11  issuing your report in this case, correct?

12  A    No, I did not.

13  Q    You also assume that ADCo cross-validated the

14  LoanKinetics model by checking how accurately their model

15  performed against or within a sample set of loans, correct?

16  A    Correct.

17  Q    That's something you would assume that they would do.

18  A    That is absolutely correct.

19  Q    But you didn't actually look to see whether they did

20  that, so you don't know for sure whether ADCo did that,

21  correct?

22  A    I don't know absolutely for sure.  But given it's a

23  market-based product and in my experience as a statistician,

24  I'm virtually certain that they did.

25  Q    Okay.  I want to discuss now the on-hold loans.

Page 41

1   A    Okay.

2          MR. MCCALLEN:  We're doing okay with time, Your

3   Honor?

4          THE COURT:  We're doing okay.

5          MR. MCCALLEN:  Okay.

6          THE COURT:  I'm waiting on this other group, and

7   presumably they'll let me know when they're ready to talk to

8   me.  So, keep going.

9          MR. MCCALLEN:  Okay.

10  Q    Now, it is your understanding that the Plan

11  Administrator set aside loans as on-hold if the loans were

12  missing a loss certification, corporate expense log,

13  servicing notes, or payment history, correct?

14  A    Correct.

15  Q    Now, I want to take a look at your rebuttal report,

16  which is -- it's behind Tab 3 of the binder that I gave you.

17  A    Okay.

18  Q    And if you look at Page 12, Paragraph 24?

19  A    Page 12, Paragraph 24.

20  Q    Yeah.

21  A    Yes.

22  Q    And you see it says, "I selected a random sample of 160

23  loans from the population of 267 on-hold liquidated loans

24  that are breaching loans, and as to which the Plan

25  Administrator claims that both of -- both a loss certificate

1    and corporate expense log are present in the loan file," do

2    you see that?

3    A    I do.

4    Q    Is that an accurate statement of the analysis you

5    performed?

6    A    It is.

7    Q    Now, in preparation for your rebuttal report, you

8    reviewed the protocol order, correct?

9    A    Correct.  Well, I did -- I reviewed the protocol order

10   in preparation of my affirmative report.

11   Q    Okay.  So, in preparation for both, you reviewed it.

12   A    Yes.  Yes.

13   Q    But you're not offering the Court an opinion about

14   what's required or not required under the protocol order,

15   correct

16   A    Correct.  I'm -- I think that I've been very clear in

17   that I was asked to calculate a purchase price per the

18   relevant documents in this matter, and that's what I've

19   done.

20   Q    Okay.  You've also provided an opinion with respect to

21   the loans that were placed on hold, though, correct?

22   A    Well, with respect to the calculation of a purchase

23   price.  Whether or not those are needed for some other

24   reason is not part of my opinion.

25   Q    Okay.  And, in addition to reviewing the protocol, you

Page 43

1   have -- but you have not spoken with Trustees' counsel or

2   Duff & Phelps about what was required pursuant to the

3   protocol, correct?

4   A    Well, what do you mean by what was required, and what

5   dimensions?  I have had discussions with counsel about what

6   is required via the protocol.

7   Q    Okay.

8   A    Are you talking about a specific aspect of it?

9   Q    My question is whether, with respect to what's required

10  under the protocol for loss certificates and corporate

11  expense logs, whether you've had discussions with Trustees'

12  counsel or Duff & Phelps about what's required under the

13  protocol order.

14  A    I have.

15  Q    Okay.  Now, you were not involved, however, in any way,

16  in the process of attempting to obtain missing loss

17  certificates or corporate expense logs for the Trustees from

18  the servicers, correct?

19  A    That is correct.

20  Q    I want to take a minute to talk specifically about the

21  loss certificates.  Now, a loss certificate is a form that

22  details the loss associated with a loan, correct?

23  A    At that particular point in time, yes.

24  Q    Okay.  And prior to performing the work that's

25  described in your rebuttal report, you had never seen a loss

Page 44

1   certificate before, correct?

2   A    That is correct.  I think I've seen things akin to it.

3   A final determination recovery document but not a loss

4   certificate.

5   Q    Right.  You've never seen a loss certificate before you

6   did the calculation described in your rebuttal, correct?

7   A    That is correct.  It had not been necessary in any of

8   the other matters in which I'd worked in.

9   Q    Now, loss certificates provide support or backup for

10  the realized loss figure, correct?

11  A    Yes.  It is a summary of certain information that is

12  going into the realized loss.

13  Q    And we've already established from looking at your

14  Exhibit 2 to your opening report that the realized loss

15  number is the same as your purchase calculation for each

16  liquidated loan, correct?

17  A    Correct.

18  Q    Okay.  I want to take a look at what's behind Tab 10.

19  A    Tab 10?

20  Q    This is an example of a loss certificate.

21  A    Okay.

22  Q    It's PA Exhibit 661.  Okay.  And this is an example of

23  the loss certificate for loan ending in Number 2200,

24  correct?

25  A    That's what it appears to be, yes.

Page 45

```
 1    Q    All right.  And in terms of the information that
 2   appears in the loss certificate, if you look at the bottom
 3   right hand corner under where it says Total Amount Denied,
 4   you see that it shows the unpaid principal balance at the
 5   time of liquidation, do you see that?
 6   A    Yes.
 7   Q    And that number is -- that number is populated in this
 8   -- in this loss certificate, correct?
 9   A    Correct.
10   Q    And the next line down shows accrued interest, correct?
11   A    Correct.
12   Q    And that information is also available in this law
13   certificate, correct?
14   A    Correct.
15   Q    And a few lines down from that there's an entry for Net
16   Advances and Expenses Allowed, correct?
17   A    Correct.
18   Q    And further down, if you look -- you see the field
19   entitled Subtotal, that tallies up all of these individual
20   items, correct?
21   A    Correct.
22   Q    And if you look, you can also see the liquidation
23   proceeds.  This is off to the left, correct?
24   A    Correct.
25   Q    And that's also reported on the loss certificates,
```

Page 46

1    correct?

2    A    Correct.

3    Q    And if you look back to the right, there's a box called

4    --

5    A    Well, I want to just -- I said -- I haven't reviewed

6    every single loss certificate so I can't testify to exactly

7    what's on every loss certificate.  But on this particular

8    one, yes.

9    Q    And, generally, in your experience, that information --

10    A    Generally, in the ones I reviewed, yes.

11    Q    Okay, you reviewed 160?  Is that right?

12    A    154, to be precise, because six were not available.

13    Q    And you found that to be a statistically significant

14    sample, correct?

15    A    Yes, of the 267, yes.

16    Q    Okay.  So, let's take a look then -- to the right, you

17    say.  And there is a box called Net Gain Loss With Interest,

18    do you see that?

19    A    I do.

20    Q    And so that records the net gain and loss with

21    interest, right?

22    A    Yep.

23    Q    And that's also generally reported on these loss

24    certificates, correct?

25    A    That's my recollection.

1   Q    Okay.  And for this box it records specifically that

2   it's $122,931.43, correct?

3   A    Correct.

4   Q    And below that you see a box called Net Gain Loss

5   Without Interest, do you see that?

6   A    Yes, I do.

7   Q    And that box says approximately $101,000, correct?

8   A    Correct.

9   Q    Now, all of this information that is recorded here,

10  this is all useful in checking the calculation of realized

11  loss, correct?

12  A    Which I did in my report and that the realized loss

13  numbers that were reported to the investors are consistent

14  with --

15  Q    Right.  And all of these -- these numbers we've looked

16  at here, these are all components of realized loss, right?

17  A    That's correct.

18  Q    And so looking at these numbers allowed you to confirm

19  that actually the numbers are what was reported by the

20  servicer, correct?

21  A    Correct.  And that's what... Sorry.  The fact that

22  they are consistent is another reason why it's reliable to

23  rely on the realized loss numbers that are reported in terms

24  of calculating a purchase price for liquidated loans.

25              MR. MCCALLEN:  Your Honor, so I move to strike

Page 48

1   everything beyond the answer, correct, to that question?

2            THE COURT:  Fair enough, yes.

3   Q    Let's shift our discussion now to the corporate expense

4   logs.  That was another document that you reviewed in

5   connection with issuing your rebuttal report, correct?

6   A    Correct.

7   Q    And the corporate expense log contains -- contain

8   expenses associated with servicing the loan, correct?

9   A    Correct.

10  Q    It's your understanding that the primary servicer

11  creates the corporate expense logs as well, correct?

12  A    That is my understanding, yes.

13  Q    Okay, so let's look at an example of one of those.

14  This is actually within the same document so it's -- stay

15  within Tab 10 but just turn to Page 5.  And you have to turn

16  it sideways or you can look at the screen, and then you

17  don't have to turn your head for the binder.

18  A    I'll look at the screen.

19  Q    Okay.  So just to make sure we're on the same page, if

20  you look on the bottom left here, you see there's a loan

21  number and the beginning part is redacted.  Do you see that?

22  A    Yes, I do.

23  Q    But the final two numbers are 2200?

24  A    Yes.

25  Q    And that's the same loan you were just looking at for

Page 49

1    the loss certificate, correct?

2    A    Correct.

3    Q    All right.  And you understand that this shows -- that

4    this corporate expense logs shows the fee and costs

5    associated with servicing this particular loan, correct?

6    A    Yes.

7    Q    Okay.  And now, look specifically -- you see three

8    columns over there's a column called Taxes.  Do you see

9    that?

10   A    I do.

11   Q    And then immediately to the right of that there's a

12   column called Date Paid, right?

13   A    Yeah.

14   Q    And that records the date that the taxes were paid,

15   correct?

16   A    Correct.

17   Q    And then moving further to the right, there's a column

18   for Insurance.  Do you see that?

19   A    I do.

20   Q    And then another column for Date Paid?

21   A    Yes.

22   Q    And then if you look a few more columns to the right,

23   there's one for Attorneys' Fees and Costs.  Do you see that?

24   A    I do.

25   Q    And that information, Attorneys' Fees and Costs is also

Page 50

1    populated in here, correct?

2    A    That's correct.

3    Q    And do you see the column that says Inspections?  A

4    little further to the right.

5    A    I do.

6    Q    And that represents additional cost, correct, for

7    inspections?

8    A    Correct.

9    Q    All right.  And that's recorded there as well, right?

10   A    Correct.

11   Q    And if you look at these collectively with the dates

12   paid, it shows you how these costs are accrued over time,

13   correct?

14   A    Correct.

15   Q    You can see when they were actually recorded by the

16   servicer, correct?

17   A    Correct.

18   Q    Collectively, all these items -- all these details that

19   we've looked at in this corporate expense log itemize costs

20   that were incurred during the foreclosure and liquidation

21   process, correct?

22   A    Yes.  Or at least I believe so.  I mean, I don't know

23   the date of the liquidation but that's what it appears to

24   be.

25   Q    Sure.  And by reviewing this document you can confirm

Page 51

1    the accuracy of those charges, correct?

2    A    Yes.

3    Q    Now, I'm going to briefly discuss the other two

4    documents that if missing, resulted in the plan

5    administrator placing loans on hold, and those were payment

6    history and servicing notes.  You're familiar with that,

7    correct?

8    A    Yes.

9    Q    Your analysis of 160 loans did not look at either -- do

10   not look at payment history documents, correct?

11   A    Correct.

12   Q    So you were not offering any opinion regarding the

13   decision to put loans on hold for lack of a payment history,

14   correct?

15   A    That was not part of my opinion, no.

16   Q    And now turning to servicer notes, you're not an expert

17   in what information is recorded in servicer notes, right?

18   A    That's correct.

19   Q    And you're not offering an opinion regarding the plan

20   administrator's decision to put loans on hold for lacking

21   servicer notes, correct?

22   A    Correct.

23   Q    Okay.  Now, yesterday and today we've looked at various

24   different spreadsheets that showed your calculations for

25   purchase price, and all that -- all those calculations were

Page 52

1   done, with the exception of the interest calculation, as of

2   April 2017, correct?

3   A    The interest calculations were also done as of April

4   2017.

5   Q    I stand corrected.  All of your calculations were done

6   as of April 2017, correct?

7   A    That's correct.

8   Q    And by "as of April 2017" we mean you used performance

9   data as of April 2017, correct?

10  A    Right.  To be consistent with the other expert reports

11  in this matter.

12  Q    Okay.  But as of today, there would be more recent data

13  available, right?

14  A    Correct.

15  Q    So, after April you had data in May?

16  A    Correct.

17  Q    And then June, correct?  And every month up until

18  probably like, November at this point, is that right?

19  A    Let's see, the November date -- it would've come out

20  December -- roughly, around Christmas, so yes.  All through

21  December.

22  Q    Okay.  So you probably wouldn't have December data at

23  this point.  But you'd have data from May through November,

24  correct?

25  A    That is correct.

Page 53

1    Q    Now, you testified at your deposition that you intended

2    to update your calculations with subsequent performance data

3    available before today, correct?

4    A    Correct.

5    Q    But you didn't do that, right?

6    A    Correct.  I was not asked to do so by counsel.

7    Q    Now, if you had looked at the more recent performance

8    data, some of the loans that previously had been non-

9    liquidated loans probably would've moved over to the

10    liquidated category, correct?

11    A    Yes.  Some would have.

12    Q    Okay.  And to the extent one of those loans paid off in

13    full, you would not include it among the loans that you're

14    doing purchase price calculation for, correct?

15    A    That's correct.  The purchase price calculation has to

16    be made at a particular point in time, and it can change as

17    things change going into the future.

18    Q    Right.  But have you updated your calculations with

19    more recent performance data and loans had liquidated

20    without a loss, you'd have had to drop those from your

21    purchase price calculation?

22    A    That's correct.  And there would've been loans that --

23    non-liquidated loans that may have liquidated with losses

24    that may have increased the purchase price.  But all I can

25    say is the purchase prices may have been different.

1    Q     Okay.  In -- as a general matter, when housing prices

2    go up it's more likely that the servicer will receive more

3    consideration as part of a foreclosure, correct?

4    A     Other things being equal, yes.

5    Q     All things being equal, housing prices go up, you get

6    more money in foreclosure, correct?

7    A     Correct.

8    Q     And so, generally speaking, if housing prices are on

9    the rise, then all things being equal, it's more likely that

10   you will receive sufficient proceeds from liquidation to

11   cover unpaid principal balance than if housing prices are

12   not going up, correct?

13   A     The only caveat I would say is that that will still not

14   -- I mean, other things being equal, yes.  If we factor in

15   prior -- prior losses, those often are not covered with

16   liquidation proceeds.

17   Q     Thank you.

18           MR. MCCALLEN:  Your Honor, would this be a good

19   time for a break?

20           THE COURT:  Yeah, it would be a good time for a

21   break.  So, let's take a 10-minute break and then it's okay

22   to keep going today, right?

23           MR. SHUSTER:  Yes.

24           THE COURT:  Okay.  We'll come back in ten minutes.

25   And then how much more do you think you have, Mr. McCallen?

1          MR. MCCALLEN:  I think I -- less than an hour.

2          THE COURT:  Okay.  So then maybe that'll get us to

3     the lunchbreak.  Thank you.

4       (Recess)

5          THE COURT:  Have a seat.  Yes.

6  Q    Dr. Snow, as we were discussing earlier, you've served

7     as an expert in various other RMBS cases, right?

8  A    That is correct.

9  Q    And in cases outside of the RMBS context as well,

10    right?

11 A    That is correct.

12 Q    And you've served as an expert in doing calculations

13    such as a purchase price calculation, correct?

14 A    Yes, that's right.

15 Q    And you've also generally served as a damages expert,

16    too, is that correct?

17 A    I wouldn't say -- well, generally in RMBS matters, yes,

18    I have served as a damages expert.

19 Q    You performed calculations that were used by a court to

20    render a decision on damages, correct?

21 A    Correct.

22 Q    Now, whenever you are performing those calculations you

23    generally try to make sure that you check the components of

24    the calculations to make sure that they're accurate, right?

25 A    Yes.

Page 56

```
 1   Q    You think it's important to do that to make sure you

 2   get the numbers right, correct?

 3   A    Well, I think it's important to make sure that what's

 4   being reported at the loan level, line master servicer, is

 5   the same as what's being reported by the trustee

 6   administrator in terms of the remittance reports because

 7   that's what's determining the distributions to the

 8   investors.

 9   Q    Fair.  But as a general matter, in terms of the

10   calculations you perform, you endeavor as an expert in these

11   areas to make sure you check the numbers to get it right,

12   correct?

13   A    Yes.

14   Q    Because that's important, correct?

15   A    Correct.

16   Q    All right.  I'd like to turn to...

17        MR. MCCALLEN:  And, by the way, Your Honor, I was

18   able to significantly shorten this over the break.

19        THE COURT:  Okay, great.

20        MR. MCCALLEN:  So I think we just have a few more

21   minutes.

22        THE COURT:  Sure.

23        MR. MCCALLEN:  But that involves me moving around

24   a little bit.

25        THE COURT:  Okay.
```

Page 57

```
 1    Q    Let's now take a look at Tab 4 behind -- in your

 2    binder, and behind Tab 4 is (indiscernible) 51, which is

 3    your supplemental report.

 4    A    That's correct.

 5    Q    Now, I want to focus on Footnote 35.  In Footnote 35

 6    you cite to a series of documents and one of them there is

 7    the letter from Mr. Cosenza to Mr. Shuster and an Exhibit A,

 8    which is attached to that letter.

 9    A    Correct.

10    Q    Do you see that?  Now, you might have to sort of switch

11    between your two documents but if you look behind Tab 11 in

12    your binder you'll see a copy of that document.

13    A    Okay.

14    Q    Now, in Footnote 37 of your supplemental expert report

15    you say, "I understand that the plan administrator included

16    a footnote in Exhibits A indicating that the plan

17    administrator's calculating accounts for the remaining value

18    of the performing collateral." Do you see that?

19    A    I do.

20    Q    Now, turning back to -- and I'm sorry, one more.  And

21    then Footnote 38 you quote Footnote 2 from the letter from

22    Mr. Cosenza or the attachment to the letter from Mr.

23    Cosenza.  And you say, "I understand the plan administrator

24    included a footnote in Exhibits A indicating that the plan

25    administrator has determined that certain instances, the
```

1   harm caused by the trust's servicing failures warrants an

2   adjustment to the allowed claim amount.  In those instances

3   the plan administrator has applied the adjustment without

4   waiving its right to argue that the servicing failures were

5   the direct and proximate cause of losses to the trust." Do

6   you see that?

7   A    I do see that.

8   Q    Now, you reviewed the letter from Mr. Cosenza in the

9   attached exhibit in connection with your supplemental

10   report, correct?

11   A    Correct.

12   Q    Now, I just want to refer you to a couple of footnotes

13   which you didn't cite in your report.

14   A    Okay.

15   Q    The first is -- it's in -- if you look at Exhibit A,

16   the letter from Mr. Cosenza, it would be Row 8.  It says,

17   "The plan administrator's response hereby incorporates an

18   express reservation of all rights with respect to any and

19   all defenses, offsets, claims, indemnities, and all other

20   arguments that may exist with respect to the review files,

21   including any one or more of the claims submitted in review

22   files has not been made against the appropriate party, and

23   that the RMBS claims submitted on loans that have been

24   liquidated are not valid claims." Do you see that?

25   A    I do.

Page 59

1    Q    You didn't rely upon that in your supplemental report,

2    did you?

3    A    No, I'm taking the list of loans that I've been given

4    as a given and calculated the purchase prices.  I'm not --

5    I'm not making a determination of which are valid claims and

6    which are not.

7    Q    But you didn't cite that reservation, right?

8    A    That's correct.

9    Q    And, similarly, if you look down below that, there's

10   Footnote 2 in the same document.  You cite to the beginning

11   of the footnote but you don't cite the final sentence,

12   right?  "The plan administrator's review of the file and

13   supporting documentation supports a purchase price no

14   greater than the amount identified in the Debtor's adjusted

15   purchase price column." Do you see that?

16   A    I do.

17   Q    You also don't cite that in your --

18   A    That's correct.

19   Q    Is it your understanding that the purpose of this

20   estimation proceeding is to estimate what the size of the

21   claim would be had the protocol been completed?

22   A    Roughly speaking, yes.

23   Q    And in connection with putting together your report in

24   this case, you reviewed the protocol, right?

25   A    Correct.

Page 60

1    Q    And you're aware that Step One of the protocol involved

2    the production and review of claims filed by the Trustees?

3    A    Correct.

4    Q    And Step Two involved the review of claim files by the

5    plan administrator, correct?

6    A    Correct.  And I understand Step Two be that the plan

7    administrator would either accept the purchase price or put

8    forward an alternative purchase price.

9    Q    Okay.  And Step Three of the protocol involved a

10   nonbinding negotiation procedure for rejected claims and

11   disputed approved claims. Are you aware of that?

12   A    I am.

13   Q    Now, did your calculation in this case seek to take

14   into consideration what would happen in that stage of the

15   protocol?

16   A    My expert mandate was to calculate purchase prices per

17   the protocol order.

18   Q    So you didn't take into consideration anything you

19   understood would happen in Stage Three, correct?

20   A    No, I did not.

21   Q    Similarly, with Step Four of the protocol, a nonbinding

22   dispute resolution procedure, your purchase price

23   calculation didn't seek to take into consideration in any

24   way what would happen in Step Four of the protocol, correct?

25   A    Correct.

Page 61

1   Q    And, finally, Dr. Snow, you understand that ultimately

2   as part of the final step of the protocol there would be a

3   potential trial on this matter where a full adjudication of

4   the claims and all defenses would occur, correct?

5   A    Correct.

6   Q    And your purchase price calculation didn't seek to take

7   into consideration in any way what would happen in Step Five

8   of the protocol, correct?

9   A    No.  I was asked to calculate purchase prices, and I

10  understand that those may be used in this estimation hearing

11  for the purposes of assessing damages.

12  Q    Okay.

13          MR. MCCALLEN:  No further questions, Your Honor.

14          THE COURT:  Thank you.  All right.  How much

15  redirect to you think that you have Ms. Black?  Do you want

16  to take a few minutes?  The reason I'm asking is because I

17  need to make a record in the other courtroom that'll take,

18  hopefully, just five or ten minutes.  So my only question is

19  whether we keep going now or I do that and we come back.

20  Obviously, I think we want to finish Dr. Snow before the

21  lunchbreak.

22          MS. BLACK:  I believe no more than 15 minutes.

23  That's my rough estimate.

24          THE COURT:  Okay.  All right.  Would you mind if I

25  went off and did this other thing so that that group can

Page 62

1    leave, you can collect your notes, I'll come back by 12:30,

2    we'll finish with Dr.  Snow, and then we'll take the

3    lunchbreak?  All right?  Yes, Mr. Shuster?

4               MR. SHUSTER:  Can I raise one scheduling issue?

5               THE COURT:  Of course.

6               MR. SHUSTER:  So, we're prepared to call Judge

7    Smith this afternoon after lunch.

8               THE COURT:  Okay.

9               MR. SHUSTER:  But we won't be prepared to bring in

10   another witness after that.

11              THE COURT:  Okay.

12              MR. SHUSTER:  So, tomorrow we would have Ellison

13   and Finkel, both of whom are short.

14              THE COURT:  That sounds fine.  Any issues?  Mr.

15   Cosenza?

16              MR. COSENZA:  Well, Your Honor, my only issue with

17   that is running out of days.  Ellison was scheduled to

18   commence after Smith.  Everyone knew Smith was a short

19   witness, if at all a permissible witness.  And I just think,

20   you know, there's two or three hours of potential time with

21   Ellison that we're losing this afternoon.

22              THE COURT:  Is there any chance of not finishing

23   the other two witnesses tomorrow?

24              MR. SHUSTER:  I don't think so.  And, candidly, we

25   got thrown off a little bit because we --

Page 63

1          THE COURT:  Yeah.

2          MR. SHUSTER:  Because of yesterday and Ms. Black

3     is putting on Mr. Ellison, Dr. Ellison --

4          THE COURT:  Dr. Ellison.

5          MR. SHUSTER:  And so that's why we're a little bit

6     in this bind.  So, but I'm confident -- I mean, the direct

7     of Ellison is an hour to an hour and a half, and the Finkel

8     direct is no more than an hour.  So...

9          THE COURT:  Okay.

10         MR. COSENZA:  Would they also -- what about mister

11    -- I really -- I apologize, Your Honor, I should've raised

12    this yesterday because I suspected something like this would

13    happen, to prevent further delay.  Who is their next witness

14    after Finkel and can we be sure he's available tomorrow?  In

15    case this goes quickly --

16         THE COURT:  Okay, why don't I go -- why don't I go

17    take care of what I need to take care of?  Why don't you

18    folks talk to each other and then we'll try to release Dr.

19    Snow, and then we can take it up further if you're not on

20    the same page.

21         MR. SHUSTER:  Thank you.

22         THE COURT:  All right?  Okay, I'll be back in ten

23    minutes.

24      (Recess)

25         THE COURT:  Please, have a seat.  Okay, Ms. Black.

1              RE-EXAMINATION OF DR. KARL N. SNOW

2    BY MS. BLACK:

3    Q    Dr. Snow, counsel for the plan administrator asked you

4    earlier about the performance data that you relied on for

5    purposes of calculating your purchase prices, specifically

6    the master servicing monthly loan level data, the Moody's

7    data, INTAX, and the Trustee remittance reports, remember

8    that?

9    A    I do.

10   Q    Have you seen any evidence put forward by the plan

11   administrator or any of its experts on even one of the

12   76,044 loans for which you calculated a purchase price

13   showing that such data is inaccurate?

14   A    No, I have not.

15   Q    You calculated a purchase price for 60,305 liquidated

16   loans using the realized loss number reported by the

17   servicer that you gathered from the servicing data, Moody's,

18   INTAX, Trustee remittance reports, as the case may be,

19   correct?

20   A    Correct.

21   Q    Did Dr. Cornell or any other plan administrator expert

22   for that matter identify any errors in the purchase prices

23   you calculated for any of the liquidated loans based on

24   information from a loss certificate?

25   A    No.  And, in fact, in Dr. Cornell's reply report he

Page 65

1    adopted some of my numbers and said he would not have done

2    so had there been errors, and he had, in fact, examined to

3    see if there had been errors.

4    Q    Thank you.  You reviewed loss certificates for 154

5    loans in connection with the sample that you drew.  Do loss

6    certificates in general report the prorated interest that

7    accrued in the month of liquidation?

8    A    I would say that it's kind of hit and miss on that.  We

9    saw many that reported the interest for that month and some

10   that did not.

11   Q    And is that information, the prorated interest that

12   accrued in a month of liquidation, generally reported in the

13   servicing data that you relied on?

14   A    It is.

15   Q    And in that sense, when it comes to the interest

16   component, which data source is more accurate, the loss

17   certificate or the servicing data?

18   A    Well, I would say the servicing data.  And especially

19   if one wanted to do some sort of temporal analysis like the

20   post and prepetition, post and pre-rejection, that you would

21   not see in a loss certificate.  That would have to go to the

22   underlying master servicing data to calculate.

23   Q    And is that what you did in connection with your

24   supplemental report?

25   A    It is.

Page 66

1   Q    Are there any other ways in which a loss certificate is

2   less accurate and less up to date than the current servicing

3   data?

4   A    Yes.  As I have explained previously, the loss

5   certificates are a snapshot at a point in time.  It does not

6   account for subsequent losses and recoveries on a loan.  And

7   that is reflected in the master servicing data and trustee

8   remittance reports.

9   Q    Does the fact that you were able to tie out the loss

10  certificate data to the realized loss reported by the

11  servicer in the servicing data for the 154 loans once you

12  factored in the trailing recoveries and expenses support

13  your position that the servicer reported realized loss is

14  reliable?

15  A    Yes, I do.

16          MS. BLACK:  I don't have any further questions at

17  this time.

18          THE COURT:  Okay.  Excellent.  Mr. McCallen,

19  anything more?

20          MR. MCCALLEN:  Nothing further, Your Honor.

21          THE COURT:  Okay.  Mr. Shuster?  It would be

22  surprising but okay.  Dr.  Snow, thank you very much, sir.

23  You're excused.

24          DR.  SNOW:  Thank you.

25          THE COURT:  Enjoy the rest of your day.  Okay, is

1    there anything we need to talk about before we break?

2             MR. COSENZA:  No, we actually -- we had a

3    discussion and we're going to try to work out our schedule

4    and try to create more certainty, and we're going to

5    continue to talk after lunch.

6             THE COURT:  Okay.  It would be helpful to me if I

7    could have a little more leeway to take care of this other

8    matter during this lunch hour.  Would it be possible to

9    resume at 2 o'clock instead of in an hour?

10            MR. SHUSTER:  That would be fine, Your Honor.

11            MAN 1:  Great.

12            THE COURT:  Wonderful.  All right, we'll see you

13   back here at 2 o'clock.

14            MR. SHUSTER:  Thank you.

15       (Recess)

16            THE COURT:  All right, thank you for giving me a

17   little more time to get that other matter resolved.  Please,

18   have a seat.  Ready to go when you are.

19            MR. SHUSTER:  Your Honor, the Trustees will call

20   Robert Smith and Mr. DeMay will conduct the examination.

21            THE COURT:  Very good.

22            MR. DEMAY:  Good afternoon, Your Honor.

23            THE COURT:  Hello.  Hello, Judge Smith, how are

24   you?

25            MR. SMITH:  Okay.  How are you?

1        THE COURT:  Pretty good.  Please, come on up.

2    Would you raise your right hand, please?  Do you solemnly

3    swear or affirm that all the testimony you're about to give

4    before the Court shall be the truth, the whole truth, and

5    nothing but the truth?

6        MR. SMITH:  I do.

7        THE COURT:  Very good.  Please have a seat.  Make

8    yourself comfortable.  Adjust that microphone up a little

9    bit.  Very good.

10        MR. SMITH:  Is it working?

11        THE COURT:  It's working.  Let us know if you need

12    a break at any time.

13        MR. SMITH:  Thank you.

14        THE COURT:  Do you have a binder?  Thank you.

15        MR. DEMAY:  May I proceed?

16        THE COURT:  Yes, go ahead.

17        DIRECT EXAMINATION OF HON. ROBERT S. SMITH

18    BY MR. DEMAY:

19    Q    Good afternoon, Judge Smith.

20    A    Good afternoon.

21    Q    Can you please describe your educational background?

22    A    I'm a graduate of Stanford University and Columbia Law

23    School.

24    Q    And what did you do following law school?

25    A    I went to work at Paul Weiss and remained there for --

Page 69

1     with a year's leave in the middle, for about 34 years.

2     Q     And what was the nature of your practice?

3     A     Litigation.  Principally civil commercial litigation.

4     Q     And did you serve on the judiciary?

5     A     Yes.  I became a judge of the New York Court of Appeals

6     in 2004 and served until mandatory retirement in 2014.

7     Q     And since stepping away from the bench have you

8     continued to practice as a trial attorney?

9     A     Yes.  I'm back practicing law.

10    Q     And where is that?

11    A     The Friedman Kaplan firm.

12    Q     Have you taught courses at any law schools?

13    A     Yes, I've taught at both Columbia and Cardozo.

14    Q     And what did you teach at Columbia?

15    A     At Columbia I taught contracts, civil procedure, and a

16    seminar that took on various names -- it started as a

17    seminar for complex litigation and I tried to change the

18    name to get more students to take it.

19              THE COURT:  Did it work?

20              MR. SMITH:  Not all that well.  Word leaked out

21    that there were two papers.

22    Q     How long did you teach at Columbia Law School?

23    A     Full-time for a year, that was the year I was on leave

24    from Paul Weiss, and after that I taught the seminar for

25    nine more years.

Page 70

1    Q    And did you teach anywhere else other than Colombia?

2    A    Yes, I taught at Cardozo in -- from 2006 to I think

3    2010.  I taught the course in state constitutional law.  And

4    after that I co-taught with Professor David Rubenstein a

5    class that generally dealt with constitutional law issues.

6    Q    And did you practice any -- anywhere between Paul Weiss

7    and the time you served on the bench?

8    A    Yes, only for a few months, although that wasn't the

9    way I planned it.  I left Paul Weiss and I became an

10   individual practitioner, and also had a kind of a special

11   counsel relationship with a firm called Korstein Veisz

12   Wexler & Pollard.

13   Q    In total, approximately how many years have you worked

14   as a trial attorney, judge, or in academia?

15   A    Well, it'll be 50 years this September.  I'm sorry,

16   December.

17   Q    In your 50-year career, approximately how many cases

18   have you tried?

19   A    I don't have to be approximate.  I think it's 52.  I

20   keep a list.

21   Q    And in the field of complex commercial litigation, is

22   that a normal amount in your experience?

23   A    I think for a big firm litigator it's very high.  I

24   think it's unusual.

25   Q    And how many appeals have you argued in your career?

Page 71

1    A    I think that's...I can't be quite precise but it's over

2    50.  Between 50 and 55, I would say.

3    Q    And in what types of courts have you argued appeals?

4    A    Well, I argued twice in the United States Supreme

5    Court, I've argued I think six times in the New York Court

6    of Appeals, I've argued in all four of the Appellate

7    Divisions, and in the -- also a couple of times in the

8    Appellate Term in the New York State Court system.  I've

9    argued in -- I like to keep...the 1st, 2nd, 4th, 5th, 6th,

10   7th, and 8th Circuits in the Federal Court, and I've argued

11   in Appellate Courts in New Jersey and Massachusetts, and

12   also in Texas and Virginia.

13   Q    In addition to trying cases, do you have experience in

14   negotiating settlements of litigated and threatened disputes

15   on behalf of your clients?

16   A    Yes, I do.

17   Q    And would that include on behalf of both plaintiffs and

18   defendants?

19   A    Yes.

20   Q    Can you estimate how many cases you have settled or

21   engaged in active settlement discussions in during your

22   career as a trial attorney?

23   A    I can't be any more precise than hundreds.  Certainly

24   hundreds.

25   Q    And what about since stepping away from the bench?

Page 72

1    A    Yes, I've continued to do that.  I've been a mediator

2    in three cases, two of which settled, and I've -- I can call

3    to mind immediately three or four cases I worked on in which

4    I also negotiated settlements.  There are probably more.

5    Q    Is it fair to say that you have extensive experience in

6    advising clients concerning the settlement of litigated and

7    threatened disputes?

8    A    Yes.

9    Q    In your experience settling hundreds of cases and

10   trying over 50, have you developed expertise in how

11   litigants' views of the merits and of the prospect of

12   settlement develop as a case progresses?

13   A    Yes, I think I have.

14   Q    In your experience settling hundreds of cases and

15   trying over 50, have you developed expertise in making

16   realistic assessments of the likely outcome of a case?

17   A    I hope so.  I'm not infallible but I have developed

18   some expertise.

19   Q    And today, do you intend to opine on any legal

20   standards or questions of law?

21   A    No, I don't.

22        MR. DEMAY:  Your Honor, the Trustees proffer Judge

23   Smith as an expert in the negotiation and evaluation of

24   litigation settlements.

25        THE COURT:  Okay.  Mr. Cosenza?

1          MR. COSENZA:  Your Honor, we object.  I'd like to

2     voir dire the witness.

3          THE COURT:  Okay, go ahead.

4          MR. COSENZA:  I think we should also hand out our

5     binders.  In case you have a reference to a deposition, the

6     transcript will have that.  May I approach?

7          THE COURT:  Yes.  Mr. DeMay, can I ask you to come

8     up and you can bring one of your colleagues if you like.

9     Okay, go ahead, Mr. Cosenza.

10          MR. COSENZA:  Yes.

11               VOIR DIRE OF HON. ROBERT S. SMITH

12     BY MR. COSENZA:

13     Q     Good afternoon.

14     A     Good afternoon.

15     Q     Mr. Smith, you don't have any decrees in economics,

16     correct?

17     A     I do not.

18     Q     And you have no formal economic training, correct?

19     A     Well, I'll -- the answer I gave at my deposition, I

20     took Economics 101 in college.

21     Q     Okay, but beyond that, nothing?

22     A     Beyond that, nothing.

23     Q     You don't view yourself as an economist, correct?

24     A     I'm not an economist.

25     Q     And you performed no quantitative calculations for the

Page 74

1  purpose of issuing your report in this case, correct?

2  A    I believe that's correct.

3  Q    Okay.  And there's no specific professional academic or

4  other experience that you were drawing upon in issuing your

5  expert report that was not part of your experience as a

6  commercial litigator or a judge, correct?

7  A    I think that's right.  I mean, we all draw on our

8  general life experiences but I can't identify anything more

9  specific.

10 Q    And I think in your deposition you stated that you

11 defined the subject matter of your expertise here as trying

12 to predict an outcome of a case, correct?

13 A    Yes.

14 Q    And someone who practiced as a bankruptcy lawyer could

15 have comparable experience and expertise in trying to

16 predict an outcome of a case, correct?

17 A    I would think so, yes.

18 Q    And, hypothetically, any Bankruptcy Court judge could

19 have similar experience in trying to predict the outcome of

20 a case, correct?

21 A    Perhaps similar experience isn't correct.  All our

22 experiences are different, but they certainly are --

23 certainly anyone who is a bankruptcy judge probably does

24 have some expertise in trying to predict the outcome of a

25 case.

1    Q     And in part that's because you cannot identify any

2    credentials that would qualify someone as an expert in

3    trying to predict the outcome of a case, correct?

4    A     That is correct.

5    Q     And you cannot point to any particular objective

6    metrics that would allow someone to know when a person has

7    gained sufficient experience or expertise in trying to

8    predict an outcome of a case, correct?

9    A     That is correct.

10   Q     And, therefore, you would consider your peers with

11   respect to the subject matter area here of trying to predict

12   an outcome of a case to be any experienced lawyer, correct?

13   A     In a sense -- in a sense that's fair.  Any experienced

14   lawyer certainly has some of the expertise I'm talking

15   about.  Whether that lawyer has the same expertise that I

16   may have would depend on a lot of things.

17   Q     Okay.  Mr. Smith, I think in Tab 1 of your binder --

18   I'm going to refer you to your deposition, Page 27, Lines

19   14-18.  And I'll give you a minute to get to it.  It's Tab 1

20   in your binder.  I just handed it...

21   A     Well, my tabs don't have number on them but it's the

22   first tab?

23   Q     Yeah, it's the first tab.

24   A     Oh, I see.

25   Q     Okay, it's Page 27, Lines 14-18.

Page 76

1    A    27, you said?

2    Q    Yes.

3    A    14 through 18, okay.

4    Q    And you were asked this question, right?  "With respect

5    to the subject matter -- or subject matter area of trying to

6    predict an outcome of a case, who do you consider to be your

7    peers in that field?" And you answered, "Any experienced

8    lawyer."

9    A    Yes.

10   Q    You were asked that question and you gave that answer?

11   A    Yes.

12          MR. DEMAY:  Your Honor, I think for completeness

13   the next question and answer should be read.

14          THE COURT:  Okay, would you read that, Mr.

15   Cosenza, please?

16          MR. COSENZA:  Yes.

17   Q    "Question:  How would you define, quote, 'experienced

18   lawyer'?" Closed quote.  "Someone who has been doing it a

19   long time.  And how do I define a long time?  I do not have

20   a specific definition but I think most people would get the

21   idea."

22          And, Your Honor, Judge Chapman would certainly

23   meet that criteria, correct?

24   A    Certainly.

25   Q    Therefore, you do not know whether your opinion

Page 77

1  provides Judge Chapman with any analysis that she lacks the

2  expertise to perform herself, correct?

3  A    I would not -- I do not know, no.  I think that's up to

4  her to decide.

5          MR. COSENZA:  Your Honor, I just think under rule

6  -- my motion is under Rule 702.  It requires that an expert

7  witness's testimony will, quote, "help the trier of fact

8  understand the evidence or to determine a fact at issue".

9  As I mentioned, the trier of fact here is Your Honor, and as

10  you just heard from Mr. Smith, he admits that a Bankruptcy

11  Court judge would be just as qualified in his field of

12  expertise because his purported expert testimony cannot

13  assist or provide great assistance to the trier of fact, we

14  move to strike it as inadmissible.

15          THE COURT:  Mr. DeMay?

16          MR. DEMAY:  Your Honor, in a bench trial, Rule 702

17  does not require the drastic step of excluding Judge Smith's

18  testimony.  Judge Smith is one of the most esteemed

19  litigators in the state and in the country.  In his 50-year

20  career he's practiced complex commercial litigation at the

21  highest levels and has served with distinction on the

22  state's highest court.  He's tried over 50 cases, he has

23  settled hundreds more.

24          Giving due respect to his career, there are few,

25  if any, individuals with the breadth and depth of his

Page 78

1   experience regarding the negotiation and evaluation of

2   litigation settlements.  He has substantial insight into why

3   cases settle where they do and what inferences can be

4   reliably drawn from the fact of a settlement.

5        He is responding to the opinion of Professor

6   Fischel.  Professor Fischel opines that based on the fact of

7   a settlement, certain inferences can be drawn, in fact, from

8   the fact of that settlement.  Judge Smith will testify that

9   Professor Fischel has made a lot of assumptions about

10  preconditions that are necessary for those inferences to be

11  validly drawn, and Judge Smith will explain in his extensive

12  experience that those preconditions generally do not exist

13  in the real world and they don't exist in this case.  He is

14  not opining on -- he's not trying to predict the outcome of

15  this case; he is critiquing Professor Fischel's methodology

16  that Professor Fischel believes will help the Court --

17        THE COURT:  But he is trying to predict the

18  outcome of the case.  He's trying to -- you're asking Judge

19  Smith to convince me that the outcome of the case is not --

20  would not be what the plan administrator says it would be.

21        MR. DEMAY:  That is not what Judge Smith will be

22  testifying to, Your Honor.  We haven't gotten to his

23  testimony yet.  All he is doing is critiquing the

24  assumptions that Professor Fischel makes and explaining why

25  the inferences that Professor Fischel draws are not based in

1   reality.  They are economists' theories.  They do not

2   comport with the way that settlements work in the real

3   world.  And because of that, reliable inferences cannot be

4   drawn from Professor Fischel's testimony and from Professor

5   Fischel's opinions.

6          That's all he's doing.  He's not explaining what

7   the right results should be in this case or in any case.

8   All he's doing is explaining that Professor Fischel does not

9   provide any testimony that is reliable to any point the

10  Court is deciding.

11         THE COURT:  Mr. Cosenza, briefly?

12         MR. COSENZA:  I have a very brief response.  I am

13  not challenging Mr. Smith as a capable jurist and a lawyer.

14  That's not the point of the exercise here.  What the point

15  is is his subject matter expertise, as stated, is to predict

16  the outcome of the case and now we're even saying he's not

17  going to be helping predict the outcome of this case.  He's

18  not an economist, he has no experience in RMBS settlement

19  context.

20         THE COURT:  Okay, look --

21         MR. COSENZA:  How he's satisfied 702 and our

22  motion to exclude him on that basis stands, Your Honor.

23         THE COURT:  All right.

24         MR. DEMAY:  May I respond very briefly, Your

25  Honor?

Page 80

1              THE COURT:  Very briefly.

2              MR. DEMAY:  The 2nd Circuit -- in the 2nd Circuit

3     the law is clear that Rule 702 applies much more flexibly in

4     a bench trial.  And the Trustees are convinced that the

5     Court is very capable of listening to Judge Smith's

6     testimony, deciding what is helpful, and if there's anything

7     the Court believes is unhelpful, giving that testimony

8     little or no weight.

9              THE COURT:  Well, my inclination in this case is

10    that it's a privilege to have Judge Smith sitting in the

11    witness box.  I'm happy to listen to what he has to say.  I

12    have reservations, I would say, with respect to this entire

13    area of your case and of the plan administrator's case but

14    I've said it before and I'll say it again:  This is a very

15    unusual case.  It's not a garden variety complex litigation,

16    it's not a garden variety put-back litigation, if there is

17    such a thing.  And because of the highly unusual nature of

18    the case and because of certain agreements that the parties

19    have entered into leading to this day, I'm going to hear

20    Judge Smith's testimony and I'll give it the weight that

21    believe that it deserves.  All right?

22             MR. DEMAY:  Thank you, Your Honor.

23             THE COURT:  Okay, thank you.

24             MR. DEMAY:  Your Honor, may I continue?

25             THE COURT:  Yes.

Page 81

1          MR. DEMAY:  Thank you.

2          DIRECT EXAMINATION OF HON. ROBERT S. SMITH

3    BY MR. DEMAY:

4    Q    Judge Smith, what were you asked to do in this matter?

5    A    I was asked to read Professor Fischel's report and to

6    give my opinion about it.

7    Q    And did you prepare an expert report?

8    A    Yes, I did.

9    Q    And can you please look in the binder we gave you at

10   the beginning at the second tab, which is TRX700?

11   A    Yes.

12   Q    Is this a copy of the final report you prepared?

13   A    Yes.

14   Q    How many views expressed by Professor Fischel were you

15   asked to address?

16   A    Well, depending on how you count but I would say two.

17   Q    And what are those?

18   A    He opined, as I remember, that the behavior of the

19   institutional investors in connection with a 2015 abortive

20   settlement was an indication that that settlement valued the

21   case appropriately, and that the level -- that that proposed

22   settlement and the Trustees'...  I'm sorry, the plan

23   administrator's proposed estimate -- estimation here is

24   within the range of what Professor Fischel calls comparable

25   settlements; and that the Trustees' proposed estimation is

Page 82

```
1    well outside that range.  Those are my recollection of his
2    two opinions.
3    Q    And did you form an opinion of those two views
4    expressed in Professor Fischel's report?
5    A    Well, yes.  Although maybe I would say that my -- my
6    more -- the -- I formed an opinion really with the
7    assumption, which I take to be implicit in his report, that
8    those two opinions are a reasonable guide to what I take to
9    be the purpose of this hearing -- what I'm assuming to be
10   the purpose of this hearing, and the purpose I'm assuming is
11   the one that the plan administrator or Lehman stated in its
12   position statement, which I'm now reading from Paragraph 9
13   of my report where I quote the plan administrator saying
14   that the purpose is to make a realistic assessment of the
15   outcome of the Trustees' claims without the undue delay that
16   would likely occur if the parties were to adjudicate these
17   claims in their entirety.
18           So, I'm assuming that that's a correct statement
19   of the purpose of this estimation proceeding.  And I'm -- my
20   opinion is that Professor Fischel's -- Professor Fischel's
21   opinion is of relatively little use in that enterprise.
22   Q    Let's talk about his first -- Professor Fischel's first
23   opinion regarding the behavior of the institutional
24   investors.  In your opinion, is the behavior of the
25   institutional investors the most appropriate or useful
```

Page 83

1    guidepost here?

2    A    Well, I would think not.  Yeah, I would say no.

3    Q    Are there other actors whose behavior you do think is

4    more relevant?

5    A    To me, the obvious actor whose behavior would be

6    relevant is -- is the Trustees themselves.  That is, as I

7    understand Professor Fischel's opinion, he explains that in

8    his view the institutional investors have such large -- a

9    large interest in the Plaintiff trusts that their interests

10   are aligned to a very substantial degree and they have a lot

11   at stake with the Plaintiffs.  But nobody's more aligned

12   with the Plaintiffs than the Plaintiffs.  And the fact that

13   the Plaintiffs rejected the settlement in 2015 seems at

14   least as relevant a behavior as the institutional investor's

15   willingness to accept it.

16   Q    And in your experience negotiating hundreds of

17   settlements, what is the usual reason that a party does not

18   accept a settlement?

19   A    The usual reason, it's not good enough.

20   Q    And what did the Debtors do that you believe is

21   relevant?

22   A    Well, the Debtor, after the 2015 settlement, failed and

23   they basically to some degree sweetened the deal, which

24   suggests to me that the Debtor at least thought that it was

25   -- that the claims here merited somewhat more value than

1   they had in the original 2015 settlement.

2   Q   And does the Trustees' rejection of the 2015 settlement

3   tell you anything about the consideration offered in that

4   settlement?

5   A   To me it's -- I should explain I'm not convinced that

6   this is the -- that any of this is -- that this whole

7   approach to predicting the outcome is the best.  But it does

8   seem prima facie that the Trustees' rejection of the

9   settlement would indicate that they did not think it was

10  good enough.

11  Q   Did Professor Fischel address this in his report?

12  A   He did not address the Trustees' behavior in his

13  report.

14  Q   And did Professor Fischel discuss the implications of

15  the Debtor's decision to, as you said, "sweeten the deal"?

16  A   No, he did not.

17  Q   On the Claimant's side, do you have an opinion on

18  whether it was appropriate for Professor Fischel to consider

19  the behavior of the institutional investors but not the

20  behavior of the Trustees?

21  A   I would not want to opine that what he did was

22  inappropriate but to me it weakens -- it weakens the value

23  of his opinions considerably that he did not do that.

24  Q   Which actor do you think is more appropriate in this

25  context to consider, the institutional investors or the

Page 85

1   Trustees?

2   A    I would think the Plaintiffs themselves would be the

3   obvious ones to consider, if you're going to take that

4   approach.  Again, I want to be clear that I'm not -- I'm not

5   involved with that approach.

6   Q    And you explained why Professor Fischel thought the

7   institutional investors were the most relevant actor due to

8   the size of their holdings.  Do you remember that?

9   A    Well, he did -- he certainly did talk about the size of

10  their holdings.

11  Q    Wouldn't the views of the institutional investors

12  benefit all certificate holders equally?

13  A    Well, if I understand your question, the answer is I do

14  not know.  They might not.  That is, it is certainly

15  possible -- I don't know.  But it's certainly possible that

16  the institutional investors would have perhaps a more senior

17  position in the capital structure to that a settlement would

18  be much -- any particular settlement might offer them a much

19  more attractive return than people lower down the food

20  chain.

21  Q    Did Professor Fischel address this in his report?

22  A    He did not.

23  Q    Let's assume that the institutional investors are a

24  relevant litigant to look at; not the Trustees.  Would

25  looking at the 2015 settlement that was accepted by the

Page 86

1    institutional investors but rejected by the Trustees be a

2    proper method of measuring the likely outcome of a case?

3    A    Well, I think it would have some serious deficiencies.

4    Even...  Well, I'll withdraw the "even".  I think it would

5    have some serious deficiencies.

6    Q    And why is that?

7    A    Well, first, as I understand it, the information

8    available to the institutional investors in 2015 was much

9    less than the information that would be available -- was

10   available even before this trial started.  And that the --

11   I'm informed that the Trustees had conducted a very detailed

12   review of all the very many, many loan files in the case and

13   I don't know whether that had been done at the time the

14   institutional investors made their judgment on the

15   settlement.  But I am -- I do understand that they did not

16   have access to the results of it.

17   Q    What would be an example in this context of more

18   complete information?

19   A    Well, I guess, if you had the results, which I want to

20   stress I haven't seen myself -- but if there has been a

21   detailed review of the facts of the case, an analysis by

22   competent people of how good the case is, it seems to me

23   that's rather a valuable source of information in deciding

24   what the case is worth.

25   Q    And are there any other individuals involved in this

Page 87

1    case who would have that information that the institutional

2    investors would not?

3    A    Well, I guess -- I'm not sure I understand your

4    question.  But I guess anybody who's read the outcome of the

5    loan review would have more information than the Trustee,

6    that the institutional investors had then.

7    Q    And do you have any understanding of the persons

8    involved in the case who will have access to the results of

9    the loan review?

10   A    Well, I assume that Judge Chapman will be among those

11   people.  And the other -- I guess, to continue an answer to

12   your earlier question, apart from the additional information

13   that came in more extensive -- much more extensive

14   preparation from the case -- for the case than had occurred

15   in 2015, the mere fact that there will be some degree of

16   testing of both sides' cases in an adversary proceeding, the

17   one we're sitting in here now, to me seems very, very

18   important.  Much more -- you know, whatever comes out of

19   this trial, assuming that it's the trial -- something more

20   than Professor Fischel indeed debating whether his report is

21   useful -- I would think that whatever can be learned about

22   the case in this proceeding would be much more valuable than

23   whatever even the most sophisticated investors could have

24   figured out in 2015.

25   Q    What would that level of information about the loan

Page 88

1   level review allow someone to do?

2   A    Well, to me, the -- I guess what I'm really saying is

3   that if you want to figure -- if you want the best idea you

4   can possibly have of how a case is going to come out,

5   there's really no substitute for knowing the case.  Knowing

6   the facts and the applicable law.  And the facts are very

7   often much more important.

8            I understand that the facts in this case are

9   enormous and that there would be very serious disadvantage

10  trying to assimilate them all.  But the more you can --

11  frankly, the more you can get inside your head, the better

12  you're able to judge the case.  It's as simple as that.

13  Q    Let's assume a settling plaintiff does have complete

14  information about its case.  In your experience, would a

15  virtually fully informed plaintiff who accepts a settlement

16  be a reliable indicator of the value of that party's claims?

17  A    Yeah, it would be a more imperfect indicator than you

18  might think because in my experience, plaintiffs,

19  particularly plaintiffs with good cases tend to take a

20  bigger discount than a purely mathematical, logical analysis

21  would predict.

22  Q    What do you mean by the "purely mathematical, logical

23  analysis"?

24  A    I mean, well, I mean that I can understand the theory

25  that says the settlement to which a plaintiff or a defendant

Page 89

```
 1    would agree is nothing more than the amount in controversy

 2    discounted by the probability of success.  It's my

 3    experience that obviously no one ever does that perfectly

 4    because no one ever has perfect information and perfect

 5    predictive powers, but that plaintiffs tend to be more

 6    conservative than defendants.  That plaintiffs are -- the

 7    plaintiff, perhaps because he's -- perhaps because he's

 8    getting something more than he has now, he, or she, or it,

 9    more than it has now, is less -- is more likely to take a

10    more conservative view of what's acceptable.

11              And, again, I have seen it happen more than once

12    that a plaintiff who believed itself to have a very good

13    case, a significantly better than 50/50 chance of winning,

14    was nevertheless perfectly happy to take half or even a

15    shade less in settlement.  I've almost never seen except in

16    -- you know, I guess I've never -- I don't remember seeing

17    except in very unusual circumstances a case where a

18    plaintiff will turn down 50 cents on the dollars.  Of

19    course, you know, there are cases where you will where

20    you've got a promissory note with no real defenses to it or

21    with -- it's a mortgage foreclosure or a judgment.  But

22    there are very few litigations where a plaintiff won't take

23    50 cents on the dollar.

24    Q    Can you describe from your years of experience an

25    example of this phenomenon?
```

1    A    Yeah.  I mean it's -- I have a tendency to remember

2    things that happened early in my career before all things

3    start to blend together.  But I remember a case I tried some

4    40 years ago with a more senior colleague at Paul Weiss, and

5    it was a suit on a -- by a small bank on an -- against an

6    insurance company on a Fidelity bond.  And it's easy to use

7    for this purpose because there was no doubt about the

8    damages because the loss incurred by the plaintiff was in

9    excess of the policy limits, at least that's the way I

10    remember it.

11         And the -- and we thought we had an excellent

12    case.  We ultimately won the case.  And I would have been

13    very surprised and disappointed if we would have lost it.

14    But we -- after consulting with the client and when the

15    judge asked for our settlement position at the outcome of

16    the trial, we said if you can get the defendant down to

17    half, we'll take it.  He could not get the defendant down to

18    half.  We didn't take it, and we won the case.

19    Q    Based on your --

20    A    I guess I should have said you get the defendant up,

21    you get the plaintiff down, but you know what I meant.

22    Q    Based on your experience, what conclusions about the

23    value of the claims here do you think can be reliably

24    inferred from the institutional investors' decision to

25    accept $2.4 billion to compromise the Trustees' claims?

Page 91

1    A    Very little could be reliably inferred about the value

2    of the claims.

3    Q    Judge Smith, let's turn to Professor Fischel's

4    comparable settlements.  In your opinion, does Professor

5    Fischel's analysis of what he calls "comparable settlements"

6    offer an appropriate or useful guide post to value the

7    claims here?

8    A    I would say his analysis does not.

9    Q    And why not?

10   A    Well, because he doesn't -- it's not clear that the

11   settlements are indeed comparable in any -- in any important

12   sense.  That is, he describes in purely qualitative terms a

13   great many very important differences between this case and

14   the other -- and the others.  And he says while some of them

15   are -- some of them would make the settlement higher and

16   some of them would make the settlement lower, but he doesn't

17   attach any numbers to them.

18        He doesn't -- he does not say that he's done an

19   analysis and concluded that the positive and negative

20   factors balance out.  He just says there are differences,

21   and that seems to me to render the whole exercise a very

22   limited use.

23   Q    In your 50 years of litigation experience, do you think

24   there are better methods for making a realistic assessment

25   of the outcome of litigation compared to something that

1   happened in a previous case?

2   A    Yes.  I mean as I've said earlier, I prefer the old-

3   fashioned way, which is you just learn as much as you can

4   about the case and also that if where you have the --

5   because usually when you're deciding to settle a case, you

6   don't have the advantage of testing an adversary proceeding.

7   That's sort of the -- in the nature of a settlement.

8          But it is undoubtedly a fact that you can prepare

9   for a trial -- prepare for a case for five years and then it

10  goes to trial.  And by the third day of trial, you have a

11  lot better understanding of how good your case is than you

12  got in the previous five years.

13  Q    Are you aware whether the Trustees have offered their

14  own set of settlements that the Trustees believe are more

15  comparable than Professor Fischel's?

16  A    I understand that they have done that.

17  Q    Do you have any understanding of which factors went

18  into the Trustees' analysis on that (indiscernible)?

19  A    Well, only -- only what I've been told.  I have not --

20  I have not done any -- any such analysis myself.  But I -- I

21  -- I'm informed that the Trustees have -- have presented an

22  analysis in which they rely on the -- they stress as

23  differences from other settlements or similarities to some

24  that they say are similar the absence of any statute of

25  limitations defense, the absence of any risk that the --

1   that the certificate holders will not direct the trustee to

2   bring the action, and the amount of -- of the actual

3   preparation, the actual work that's been done.

4           I understand that a tremendous effort -- as I said

5   before, there's been a huge effort put into reviewing loan

6   files.  And it's my -- it's my understanding of the

7   Trustees' position is that that differentiates this case

8   from the ones Professor Fischel relies on and makes it more

9   similar to the ones the Trustees are relying on.

10  Q    In your experience, are the types of factors you just

11  listed the types of factors that might be considered when

12  evaluating the likely outcome of a case?

13  A    Well, yes, and I believe Professor Fischel thinks the

14  same.  He -- he mentioned those factors, too.

15  Q    In your experience, if you were comparing cases based

16  on similarities and differences when trying to assess the

17  likely outcome of a case, would you do any work to try and

18  reduce those differences to dollar values?

19  A    If you were going to do that exercise at all, I would

20  think it would be more useful to do it perhaps the way a

21  real estate appraiser uses comparables all the time.  Again,

22  I'm not -- to make it clear, I'm not in love with using

23  comparable settlements as the best yardstick for evaluating

24  a case, but if you're going to do comparables, I think what

25  I would do is I would pretend I was a real estate appraiser

Page 94

1    and say, okay, well, you know, the appraiser says these two

2    apartments are alike except this one has a better view and

3    this one's on a higher floor and, therefore, I'd give a

4    bonus of 11 percent.  And this one's a little further away

5    from the river, and I -- I decrease the assessment by 12

6    percent.  There's nothing inherently impossible about doing

7    that with lawsuits if you're going to compare lawsuits.

8    Q    Do you have any understanding whether that's some

9    analysis that the Trustees have tried to perform?

10   A    My -- I have not seen the analysis, but I do understand

11   that the Trustees have tried to perform it.

12   Q    And as a whole, based on your experience, does

13   Professor Fischel's report contain the kind of analysis that

14   is customarily employed in the field when making a realistic

15   assessment of the likely outcome of a case?

16   A    No.

17            MR. DEMAY:  Your Honor, the Trustees have no

18   further questions.

19            THE COURT:  Okay.  Thank you, Mr. DeMay.

20            Are you okay to continue --

21            MR. SMITH:  Yes.

22            THE COURT:  -- Judge Smith?

23            MR. SMITH:  I'm fine.  Thanks.

24            THE COURT:  Okay.  Mr. Cosenza?

25   CROSS-EXAMINATION OF HON. ROBERT S. SMITH

1   BY MR. COSENZA:

2   Q    Good afternoon again, Mr. Smith.

3   A    Good afternoon again.

4   Q    During your time in private practice, you worked on

5   several bankruptcy matters, correct?

6   A    Yes.

7   Q    And you mostly represented creditors in those cases,

8   correct?

9   A    I -- I can't think of a case where I represented a

10  debtor.  I think it's probably all creditors.

11  Q    Thank you.  And you do not recall representing a

12  trustee, whether it be in bankruptcy court or in any other

13  litigation --

14  A    That's correct.

15  Q    -- correct?

16  A    That's correct.

17  Q    Nor do you ever --

18  A    Oh, did I represent a trustee in other litigation?  I

19  don't think so, no.

20  Q    Nor did you ever represent a party in an estimation

21  proceeding, correct?

22  A    No.  I never did.

23  Q    And you're not sure what the legal standard is in an

24  estimation proceeding, correct?

25  A    Well, I'm not -- I'm not sure, not because I haven't

Page 96

1    looked but because when I looked, I found it less than

2    crystal clear.  But I am not sure.

3    Q    And Mr. -- I just want to be very clear, in the

4    context, you understand that this proceeding is the

5    byproduct of a settlement agreement?

6    A    Yes.

7    Q    And you're aware of that.  And you're aware of --

8    A    That this is a byproduct of a settlement agreement

9    subsequent to the one that was rejected is my understanding,

10   yes.

11   Q    Correct.  And you understand as part of that settlement

12   agreement, comparable settlements were allowed into

13   evidence?

14   A    Actually I didn't -- I don't remember knowing that, but

15   I'm not surprised to hear it.

16   Q    Did you review Exhibit G to the protocol order?

17   A    Yes.  I do remember reviewing it once in my life, but I

18   don't -- I haven't reviewed it recently.

19   Q    Okay.  So you're just not familiar with -- with what

20   was allowed into evidence under Exhibit G?

21   A    I did -- I do not remember worrying about what is

22   allowed into evidence in this proceeding except as it might

23   affect my own testimony --

24   Q    Okay.

25   A    -- or Professor Fischel's.

Page 97

1    Q    But isn't Professor Fischel's testimony on comparable

2    settlements and the fact that it's admitted under Exhibit G,

3    doesn't that impact your analysis?

4    A    Well, the fact that -- the fact that the evidence he

5    relies on is admissible does not really impact my analysis.

6    I was not assuming it was inadmissible.  I was suggesting

7    that his analysis is of limited use.

8    Q    Okay.  And it's up to the Court to -- to weigh the

9    evidence?

10   A    Of course.

11   Q    And you're currently serving as co-counsel with Holwell

12   Shuster under RMBS's case; is that correct?

13   A    Well, I said that at my deposition, and I to my

14   embarrassment, I'm not sure.  I do not know whether I was

15   right.  I have since learned that Holwell Shuster is not of

16   record in the case.  I am working with Holwell Shuster on a

17   case, and I do not know whether they are counsel for the

18   same client or whether they are counsel for another client

19   aligned in interest with that client.

20   Q    So you --

21        THE COURT:  Mr. Shuster, perhaps you could clarify

22   that after Judge Smith is done.

23   Q    But during your deposition, you -- you noted that you

24   were working with Holwell Shuster as co-counsel in an RMBS

25   case?

Page 98

1    A     Yes.  I certainly have been working with Mr. DeMay, as

2    a matter of fact, on a case in which we -- we certainly felt

3    like co-counsel, but I now realize that I don't actually

4    know whether he's literally representing the same client or

5    is representing a client aligned in interest.

6    Q     Have you had a chance to review your deposition

7    transcript?

8    A     Yes.

9    Q     Did you amend your deposition transcript to fix this

10   error?

11   A     No, I didn't.  I just -- I just reviewed it the day

12   before yesterday.  But no, I have not amended it.

13   Q     Do you intend on doing that now in light of this

14   testimony?

15   A     Well, I think maybe I just did, but if I should do it

16   more formally, I'd be happy to.

17   Q     Okay.  And the case you're talking about, that's

18   pending in the New York Court of Appeals?

19   A     Yes.

20   Q     And in that case, you represent Deutsche Bank as a

21   trustee for a trust, correct?

22   A     Yes.

23   Q     And you're aware that Deutsche Bank is one of the

24   trustees here?

25   A     Yes.

1   Q    And that didn't inhibit you from taking on this role as

2   an expert?

3   A    No, it did not.  I did not think that that was either

4   disqualifying or likely to -- likely to taint my opinion.

5   Q    Did you do any analysis as to whether or not that was a

6   conflict for current purposes?

7   A    Well, it depends what you mean by analysis.  But I

8   certainly did give thought to that question and concluded

9   that it's not inappropriate to have a -- to represent one

10  trust in one case and to be an expert in other trusts in

11  another case, you know, even though the -- the same entity

12  is trustee.

13  Q    Are you fees in that case, the other case you're

14  working on, are they being paid by Deutsche Bank?

15  A    I am billing Deutsche.  Well, I guess -- I assume that

16  they will be paid by the trust.

17  Q    Okay.  So you don't know who's paying those fees right

18  now?  Do you know who you're sending the bill to?

19  A    I hope somebody has, but I have not -- I do not

20  remember seeing a check.

21  Q    Okay.  And other than this case we just discussed, you

22  have not appeared for a party in any other RMBS case; is

23  that correct?

24  A    I think that -- I think that's my best recollection.  I

25  don't think I've appeared for a party in other RMBS case.

Page 100

1   Q    Okay.  When you served on the Court of Appeals, there

2   were no RMBS cases that were decided by you, correct?

3   A    To the best of my recollection, that's correct.

4   Q    I'm not going to refer you to paragraph 26 of your

5   report, and that's Tab 2 in the binder that I handed over to

6   you.

7   A    Let me use your binder.

8   Q    I think it's on page 10.

9   A    I'm sorry.  Which -- what's the exhibit --

10  Q    I'm sorry.

11  A    -- number?

12  Q    Tab 2.  It's the second tab.

13  A    Well, let's see.  Oh, they do -- they do have numbers

14  on the tabs.

15  Q    I know you said your tabs are not numbered.

16  A    Okay.

17  Q    It's paragraph 26, but I'm really looking at page 10,

18  the little Roman numeral 2.

19  A    Page 10, Roman numeral 2.  Yes.

20  Q    And the second sentence there, it states that the

21  Trustees assert that this case is essentially trial-ready,

22  that they could proceed on relatively short notice with not

23  just an estimation hearing but a full trial in which they

24  could prove their case as to every one of the approximately

25  76,000 loans on which they rely.  Do you see that?

Page 101

1    A    I do.

2    Q    Did you do anything to get comfortable with the

3    statement that the Trustees could prove their case as to

4    every one of the 76,000 loans at issue in this estimation

5    proceeding?

6    A    No, and I think I made it clear that I was merely

7    reflecting that that was -- that was their position.

8    Indeed, I -- you know, the --

9    Q    I know you've made that clear, but, you know, a few

10   minutes ago you testified that you believe in the old-

11   fashioned way, which is you just learn as much as possible

12   about the case and the best way to make a real assessment of

13   the outcome of litigation is to dig deep and understand what

14   the facts are.

15   A    Yes.

16   Q    But you didn't do that here, correct?

17   A    No, nor did I -- nor do I purport to make an assessment

18   of what the outcome of the case will be.

19   Q    But that would be the best way of getting an assessment

20   of the case is to --

21   A    Yes.

22   Q    -- actually dig in?

23   A    Yes.

24   Q    You didn't do any of that here?

25   A    I did not.

Page 102

1   Q    And you were not informed that the Trustees here are

2   seeking billions of dollars of interest including post-

3   petition interest that might not be recoverable as part of

4   their damages claim?

5   A    I don't -- I don't think I remember any discussion of

6   post-petition interest.

7   Q    Okay.  So you were not advised of that before you

8   issued your report?

9   A    Not to my recollection.

10  Q    Did you testify at your deposition that based on your

11  experience litigating cases engaging in settlement

12  discussions, that the recurrability of interest is a factor

13  that the parties consider when they engage in the settlement

14  discussions, correct?

15  A    I did, although I also said that it perhaps sometimes

16  gets less weight than it deserves.  But yes.

17  Q    And you understand that New York law requires there to

18  be a connection between the breach of a contract and the

19  damages that are suffered, correct?

20  A    Well, I -- well, I am not testifying to give a legal

21  opinion, but I do understand that there should be a

22  connection.

23  Q    Okay.  And as part of drafting your expert report, you

24  were not specifically informed that the plan administrator's

25  arguing that the Trustees have failed to establish any such

Page 103

1    causal connection with respect to all 76,000 loans at

2    issues, correct?

3    A    You inserted the word "causal" the second time.  I --

4    but it's true that I -- the whole causation issue was not

5    one that came up in the course of my preparation of my

6    report.

7    Q    And you didn't find it relevant to the analysis you

8    performed, correct?

9    A    Not at all, no.

10   Q    Let's look at paragraph 14 of your amended report.

11   That's Tab 2.  I think you've testified to this a few

12   minutes ago.  And you state that it's your impression that

13   the Trustees did not accept a settlement from October 2015

14   because the Trustees thought the plan administrator's

15   settlement with the institutional investors was not good

16   enough, correct?

17   A    Let's see.  I think I testified a few minutes ago that

18   that was the likeliest reason.  I --

19   Q    Yes.

20   A    I --

21   Q    But that's really just a general --

22   A    I'm not exactly --

23   Q    But that's really just -- I'm sorry for -- anything

24   else?

25   A    No, go ahead.

Page 104

1   Q    Okay.  That's really just speculation based on little

2   more than an inference from the fact that that's the usual

3   reason for people rejecting settlements, correct?

4   A    I would quibble with the word "speculation", but it is

5   the usual reason, and that's really the only basis I have,

6   yes.

7   Q    And that's the only -- just to be clear, that's the

8   only basis you have proffered, correct?

9   A    The only basis I have for thinking that was the reason

10  is --

11  Q    Yes.

12  A    -- that's usually the reason people -- yes, that's the

13  only one I can think of, yes.

14  Q    Okay.  You did not have any conversations with any of

15  the Trustees or their representatives about why the Trustees

16  did not accept the October 2015 settlement, correct?

17  A    Correct.

18  Q    I want to refer you to your original report that you

19  submitted in this case.  If you just want to turn to

20  paragraph 3 -- sorry, paragraph 13.

21  A    What's -- what's the tab?

22  Q    It's Tab 3, paragraph 13.  It's at the bottom of page

23  4, and I'll give you a minute to -- to catch up.

24  A    Okay.

25  Q    Okay.  And there's a quote from the April 21, 2017

Page 105

1    notice that the Trustees provided to investors that cites to

2    three different expert reports.  Do you see that?

3    A    Yes.

4    Q    And those are the expert reports of the Honorable

5    Anthony J. Carpinello, the Honorable Arthur Gonzalez, and

6    Ronald Greenspan, correct?

7    A    Yes.

8    Q    And these are the expert reports the Trustees used in

9    deciding not to accept the October 2015 settlement, correct?

10   A    Well, all I know is what it says there.  And it says

11   that they worked with experienced counsel to consider the

12   offer, that they retained experts, that they named the

13   experts.  That -- that was my understanding, yes.

14   Q    And you have not read or seen Justice Carpinello's

15   expert report, correct?

16   A    I sure haven't read it, and I don't think I've seen it.

17          MR. DEMAY:  Well, objection, Your Honor.  Judge

18   Smith was precluded from discussing his materials, and it's,

19   therefore, an improper subject of cross-examination.

20          THE COURT:  Better come up.

21        (Sidebar Conference)

22   Q    So I think we were on Justice Carpinello's report.  Do

23   you recall seeing that report?

24   A    I do not recall seeing it.  I -- I am sure I did not

25   read it.  It is -- I may or may not have had a copy of some

Page 106

1   report by Justice Carpinello -- well, when I say a copy, I

2   mean an electronic copy.  I'm not sure I ever had it.  I

3   don't know if it's the same report, and I'm sure I've never

4   read it.

5   Q    So sitting here today, you're not sure if you had -- if

6   you have seen Justice Carpinello's report?

7   A    That's correct.

8   Q    Did you have any discussions -- I'm just asking for a

9   yes/no -- with counsel about the substance of Justice

10  Carpinello's reports?

11  A    I had discussions with counsel about the substance of a

12  report of Justice Carpinello.  I do not know whether it was

13  this one.

14          THE COURT:  We're going to take a break right now.

15  Judge Smith, if you don't mind, if you could take a lovely

16  stroll --

17          MR. SMITH:  Sure.

18          THE COURT:  -- down the corridor which is filled

19  with furniture while they recarpet an office, someone will

20  come and get you in the next ten minutes or so.  And I know

21  I don't have to tell you this, but during your testimony,

22  you remain under oath.  Please do not discuss the case or

23  your testimony with anyone or be in anyone's presence while

24  they're doing the same.  All right?  Thank you.

25          (Pause)

Page 107

1           THE COURT:  I'm going to ask both sides to

2    assemble the appropriate folks that are needed to discuss

3    these issues and meet me in the conference room in a couple

4    of minutes, please.

5       (Recess)

6           THE COURT:  Please, have a seat.  Okay, so, thank

7    you for staying and getting this done.  I know that you

8    weren't planning on spending the day here, but hopefully,

9    it's been productive.  So, who should I hear from?  Yes.

10          MS. CAFFERATA:  May I speak, Your Honor?

11          THE COURT:  Sure.

12          MS. CAFFERATA:  So, we have worked out some

13   language that we have agreed upon for certain of the issues,

14   but we have some things to discuss on part of it that I

15   think will maybe help us to resolve the remaining issues.

16          THE COURT:  Okay.  So, just for the purposes of

17   the record, what we're doing is we're going on the record

18   after the parties have been conferring for several hours

19   after there was an off-record conference this morning on the

20   subject of the letters that had been exchanged between the

21   parties with respect to Credit Suisse's compliance with the

22   Court's order regarding production of documents, and after

23   discussions in which I participated with all the parties,

24   the parties undertook to come to an agreement, and to put

25   certain language on the record that would reflect their

Page 108

1    understandings going forward with respect to the nature of

2    the production and any additional exchanges that need to

3    take place and also with respect to certain matters in

4    relation to the conduct of the 30(b)(6) examinations.  So,

5    with that background for the record, we can just go through

6    the issues.

7              MS. CAFFERATA:  Thank you, Your Honor.  The

8    language that we can agree to go in the stipulation, is as

9    follows:  "Credit Suisse agrees that the compilation

10   spreadsheet received on January 9, 2018, constitutes what

11   Credit Suisse has in its possession, custody and control as

12   to, colon:  One, it's end-of day mids for September 12

13   through 19, 2008; two, it's closeout mids for the trades in

14   its claim; three, the final closeout amount for each trade,

15   and four, the Bates numbers for the files supporting those

16   figures.  In addition, Credit Suisse agrees to supplement

17   this spreadsheet by January 14, 2018, to include the risk

18   metrics associated with each trade that was recorded in the

19   ordinary course by Credit Suisse's systems, period."

20             THE COURT:  Can I ask a question on that?

21             MS. CAFFERATA:  Yes.

22             THE COURT:  Is it clear to both of you how that

23   supplement, what form it's going to take?  I don't want to

24   have another round of Lehman complaining that they've been

25   pointed a huge database and saying, "It's in there

Page 109

1    somewhere."

2             MS. CAFFERATA:  Good idea, Your Honor.  Our vision

3    is that this would be supplementing the spreadsheet that

4    we've already received by adding columns, including in this

5    risk metrics.

6             THE COURT:  Okay.

7             MR. MCATEE:  And that's what we intend to do, Your

8    Honor.

9             THE COURT:  Okay, great.

10            MS. CAFFERATA:  And then that would be qualified

11   by the following language:  "Provided, however, if

12   historical data or a mistake emerges in discovery, that in

13   good faith could not have been found previously, despite

14   reasonable efforts to locate it, Credit Suisse may seek to

15   amend the spreadsheet with that information."  That's the

16   shoebox.

17            MR. MCATEE:  Yes, Your Honor, that's agreeable.

18            THE COURT:  That seems perfect.

19            MS. CAFFERATA:  On the subject of the conference--

20            THE COURT:  Yes.

21            MS. CAFFERATA:  The language would be, "The

22   parties agree to schedule ...," think it should be 'hold,'

23   hold a conference.  Sorry about that.  "The parties agree to

24   hold an in-person or telephonic conference between counsel

25   prior ... five days prior to each 30(b)(6) deposition, in

Page 110

1    order for the testifying party to identify the documents and

2    information relevant to the designated topics."

3                THE COURT:  Okay.  Perfect.

4                MS. CAFFERATA:  So, that's our stipulated

5    language, Your Honor.  Then, we have an issue that we

6    thought of a way to maybe address the problems that we're

7    having with respect to the topics and address some of Credit

8    Suisse's concerns on the deposition topics.  And, so, we

9    proposed it, but Credit Suisse said it's not in a position

10   to agree to it yet, but we're thinking this might be a way

11   to deal with that set of issues.

12               And what it is, is to provide -- we asked for it

13   in the spreadsheet that we just described, along with the

14   risk metrics, to give us the Bates numbers of the supporting

15   materials that ... you know, the documents that provide the

16   support for their claim amounts, because we have the same

17   lack of roadmap with respect to that issue, and that would

18   seem like an easy way to just have it all in one place,

19   everyone can rely on it.  And then, this question of how

20   much the witness needs to prepare is quite a bit more

21   simple, because for each trade, on each line, you know, oh,

22   they used these two sources, or these ... this one source,

23   and they can speak more broadly to that issue.

24               THE COURT:  It seems sensible, if you think you

25   can accomplish that.

Page 111

```
 1              MR. MCATEE:  What I told counsel was that the

 2     first time that I had heard that request was in this

 3     conference, and we're willing to consider the request and I

 4     need to go back and talk to the team that has been doing

 5     this --

 6              THE COURT:  Sure.

 7              MR. MCATEE:  -- my IT people, and figure out how

 8     long it would take, because I'm not sure exactly how long it

 9     would take, because I'm not sure exactly how long it would

10     take.

11              THE COURT:  Right.  I mean it's no small task.

12              MR. MCATEE:  It's not a small task.  It's not just

13     finding a mid.  It's finding every quote for ... that's the

14     supporting package for everything, and that's going to take

15     some time.

16              THE COURT:  Right.

17              MR. MCATEE:  But what I said to counsel was we're

18     going to undertake an effort to do that and provide them

19     with something, just don't know how long that will take.

20              THE COURT:  Sure.  I mean ... I think it's

21     sensible.  And it's ultimately, I would say, going to be

22     more efficient than having to construct it through a series

23     of witnesses to kind of do it.

24              MS. CAFFERATA:  Well, we thought, Your Honor, if

25     they could possibly do it by January 17th -- and I mean this
```

Page 112

1    is the stuff they should have in their DQ, so it should be a

2    matter of assembling it from that, I would think.  But if

3    they could have it by the 17th, then we could agree to

4    language about... that they've proposed about the witness

5    not being expected to testify as to every possible detail.

6    And it would basically address that issue.

7              THE COURT:  I mean, answering for Credit Suisse, I

8    would be surprised if, sitting here today, they could say

9    that they'd be able to accomplish it by the 17th.  I mean

10   that's a week.  So, I think that's a heavy lift.  So, can we

11   get around committing to that date?  I'm not comfortable

12   imposing that deadline.  I mean, certainly, it shouldn't be

13   another month or three months, but a week seems too

14   aggressive.  People are ... it's just, I don't think it's

15   capable of being accomplished.  So, how can we ...?

16             MS. CAFFERATA:  Well, when we asked about it an

17   hour ago, counsel didn't have any idea of when, you know,

18   couldn't put an estimate on when it might be available; he

19   needs to talk to people.  So, I understand that.  We just --

20   we're in deposition right now and we're trying to --

21             THE COURT:  Sure

22             MR. MCATEE:  -- (indiscernible) a quickly as we

23   can, so I don't -- something has to happen.

24             THE COURT:  Okay.  I'll take a representation that

25   you're going to make reasonable inquiry.  And what's today?

1   Wednesday?  Can you get back to Lehman by, to counsel by the

2   end of the day on Friday?

3           MR. MCATEE:  Yes, Your Honor.

4           THE COURT:  And then, if it's not, if the

5   timeframe to you is not acceptable, I mean we can add

6   another call.  But I think a week is too short, I think a

7   month is too long, but I ... beyond that, it would be

8   presumptuous for me to pick a date.

9           MR. MCATEE:  Thank you, Your Honor, and we'll give

10  it our best effort to do it as soon as possible.  The one

11  caveat I want to make sure that I say on the record is,

12  we're going to do our best to have that whole list and have

13  all those Bates numbers.  It's a long list.  We're talking

14  thousands and thousands of documents.  I just don't want

15  that to be subject to the kind of same, that will never

16  change unless there's a mistake or something.  It's going to

17  be our best effort to put it all together, but that's kind

18  of a moving --

19          THE COURT:  That's a different topic.  I mean this

20  is a different topic.  This is mapping all of your documents

21  to particular trades.  I think that's ... I agree with that.

22  It's different than having you commit to what the basis of

23  your claim, essentially, is.  I mean whether or not you

24  specify -- let me give you an example.  Hypothetically,

25  Credit Suisse may not identify particular policies and

1    procedures as having anything to do with the calculation of

2    a particular closeout.  Lehman might decide that they think

3    that they are.  Well, they can't ... you have different

4    theories of the case, so that there might be different

5    documents that Lehman thinks that should be put into

6    evidence, either in support of or in opposition to the

7    closeout amount.  So, I think that goes too far to the

8    extreme of having Credit Suisse kind of do the final trial

9    preparation at this stage.  I think if we go down that path,

10   then we're undercutting where we started.  Where we started

11   was where you needed to be, which is the complete record,

12   except for the shoebox.  You've got that.  Now, we are in,

13   in lieu of the 30(b)(6) witnesses, saying, "Here are the

14   documents I'm going to talk about," right, you're going to

15   have an index created.  They can't be held to 100 percent on

16   that, I don't think.

17           MS. CAFFERATA:  I think so, Your Honor.  I mean

18   this is what we ... what we mean by support.  I think if you

19   have a particular name, let's say, that you're valuing --

20           THE COURT:  Right.

21           MS. CAFFERATA:  -- and you have, the trader used,

22   you know, this screen shot and this other source, and they

23   have a general process of how they put together their number

24   for that name.  That's something we would expect to be able

25   to ask a question of, "Oh, how did you do this?", right?

Page 115

1    And the spreadsheet would, therefore, have -- it would point

2    us, for those trades, it would point us to the screenshot

3    and whatever the other thing was.  And, so we're dealing

4    with just, usually a couple of items.  I mean, I'm not

5    really sure -- talks about thousands, I'm not really sure

6    what he's talking about.

7              THE COURT:  Let's use your example.  If they, say,

8    for a particular position, there are a dozen screen shots,

9    right, what's the right answer for what they're supposed to

10   say?  Is it the one screen shot, or is it more than one

11   screen shot to show that they didn't selectively pick a

12   screen shot from a particular time of day?  So, I think

13   that, I would think that you would have the capability --

14   they have to produce all those screen shots to you, right?

15             MR. MCATEE:  Yes, and we have --

16             THE COURT:  Yeah.  S, if they've produced all the

17   screen shots, then that's --

18             MS. CAFFERATA:  But we're just asking for the one

19   they were light on.  We should be able to know which one

20   they relied on.

21             THE COURT:  But you've got that in the

22   compilation.

23             MS. CAFFERATA:  That's what I'm saying.  In the

24   compilation that's what we would expect.

25             THE COURT:  You've got that in the compilation.

Page 116

1    I'm talking about the road mapping of the documents for the

2    purpose of a deposition.  You're not taking away, in the

3    second one what you gave in the first one, right?

4              MR. MCATEE:  I was not intending to, Your Honor.

5              THE COURT:  No, I --

6              MS. CAFFERATA:  These are two different things.

7              THE COURT:  Two different things, right.  So, in

8    the first one, you've got what they're relying on.  That is

9    what they are undertaking to do.  So, that in the

10   deposition, it cannot be that the trader is going to say --

11   it's going to be bad, if the trader says it's not the screen

12   shot from, you know, from 12 o'clock on the 15th, it's the

13   screenshot from four o'clock on the 15th.  They are supposed

14   to have told you in the compilation which screenshot they're

15   relying on.

16             MS. CAFFERATA:  Right, except they're not agreeing

17   to that.  What they are agreeing to provide, and the part

18   that we stipulated to, is the Bates number support for their

19   closeout mids, and for their end-of-day mids.  What they

20   have not agreed to produce is what I think the Court is

21   referring to, and that we're suggesting is a good idea, is

22   to have a similar spreadsheet that has, on a trade-by-trade

23   basis, the Bates numbers of the support:  the things that

24   they relied on to support their claim numbers, total claim

25   numbers, not just their mid.  So that if they, you know, if

Page 117

1    they used this spreadsheet over here to justify a bid or

2    offer charge or whatever else they added on above their

3    mids, then somebody is going to be able to testify to that.

4    This is what they were supposed to produce in their DQ,

5    right?  We asked for this money and we have support for it.

6    So, that's what they're trying to package up so that we can

7    then rely on it, use it with the witness and have the

8    witness explain.  These are the three things I looked for

9    and this is how we put together the numbers for this group

10   of trades.  These other ones we did in this other way using

11   these four documents, or one document, or whatever.  But

12   there aren't really thousands and thousands of anything that

13   I can think of that fit within that framework.  It's just,

14   what did the traders use to support?  And so, we don't need

15   the policies that they may be using.  I mean we understand

16   there will be facts around what guidance they had but that

17   doesn't need to be --

18            THE COURT:  What's the purpose of the conference?

19   The purpose of the conference is, we're giving you this

20   witness, here's the universe of documents that this witness

21   is going to talk to about.  It's going to include all the

22   screen shots, all the different sources for the marks, all

23   of the corresponding -- I'm making this up -- all the

24   corresponding entries in the risk management systems, all

25   the hedges, all the email back and forth to people on other

Page 118

```
 1    desks.  It's going to be the whole canon on information and
 2    things that were generated around that particular closing.
 3    So, I just don't, I'm just not understanding -- so, you have
 4    the general universe, and then you take that and you, you
 5    know, you conduct the deposition of the person.  You closed
 6    out these positions.
 7              MS. CAFFERATA:  What we try to do is we had asked
 8    for the support that they used for their claim amounts a few
 9    months ago.  And they asked the same thing of us, we
10    produced it.  They said, "No, we're not going to provide
11    that."  So, then we used the 30(b)(6) topics to say, okay,
12    well, provide that through testimony and then they say it's
13    impossible.
14              THE COURT:  I kind of missed this because I guess
15    I conflated, in my mind, the compilation, in fact, reflected
16    what the support was.  So, that's not the case?
17              MR. MCATEE:  The compilation, Your Honor, has the
18    mids, both end-of-day for the 12th through the 19th, and
19    also the closeout, the closeout amounts; if there was a bid
20    offer calculated it has that in it.
21              THE COURT:  If there was a bid offer, if there was
22    liquidity.
23              MR. MCATEE:  If it has risk metrics that were
24    associated with it and saved in or system that's going to be
25    put into the compilation.  We'll have all of that in one
```

1    place.

2              THE COURT:  Okay.  So, if you have ... so, you

3    have a mid, and you had a bid offer charge, whatever, that

4    number had to come from somewhere, right?

5              MR. MCATEE:  Correct, Your Honor.

6              THE COURT:  So, why is it that you can't identify

7    where that came from?  I keep going back to my idea about

8    the way this happened.  In real time, somebody decided how

9    to calculate that number based on something.  So, why is

10   that?  So, either each trader had a log, or each trader had

11   a book, or something.  There's ... it just, to me, just

12   seems logical that that is something that exists that you

13   should be able to specifically identify for them, by desk or

14   by name, or just by some stratification.

15             MR. MCATEE:  Your Honor, what I would say is that

16   I agree with you, it exists.  We, ourselves, are in the

17   process of identifying all of that for all the products that

18   are at issue.  We're not complete yet, but we're in the

19   process, we're not done and that's why I said I don't know

20   how long it's going to take, but I can promise them that we

21   will provide that kind of backup -- the list of Bates

22   numbers, and everything, the quotes and the Bloombergs and

23   the emails and everything.  We can get that to them, I'm

24   just not sure how long it's going to take.

25             THE COURT:  It is frustrating because that is,

Page 120

1    that should have been done pursuant to the order.  I mean

2    that's just a big -- that's a miss.  That's just a big miss.

3              MR. MCATEE:  Well, pursuant to the order, we did

4    provide all the documents.  Those have all been produced.

5    It's just a matter of now compiling it in a list of Bates

6    numbers is what I'm talking about, and that's what we're

7    committing to do.  I just need a little more time with my

8    team to know how long.

9              THE COURT:  This needs to be the last go round

10   though.  I mean we have this record now and it, now is, in

11   my mind, crystal clear that that needs to be done.  So, when

12   you get back --

13             MR. MCATEE:  End of day Friday, yes, Your Honor.

14             THE COURT:  That's the best I can do, Ms.

15   Cafferata.  I can't -- I don't have a time machine or a

16   freeze frame.  I understand your frustration and I apologize

17   for my confusion, but I thought that that had been done.  If

18   you want to prioritize among deponents as a way of not

19   losing ground and time, that's certainly something I think

20   that you could do.  If you know that you are getting to some

21   names later than other names, then I don't know if that --

22             MR. MCATEE:  Yes, Your Honor, and I will commit to

23   work with them.  If we have some deponents coming up, or

24   this issue affects that, I'll frontload that so that they

25   don't have to redo the deposition a second time.

Page 121

```
 1                THE COURT:  That's what I mean.

 2                MR. MCATEE:  No problem.

 3                MS. CAFFERATA:  Okay.  But at some point, it

 4     should be Credit Suisse and not Lehman that has to shoulder

 5     the burden of Credit Suisse's failures.  I mean we are now

 6     jammed in putting on what is a very complex case, with

 7     thousands of trades, because for whatever reason they didn't

 8     think we deserved these figures and these numbers and this

 9     support.  This is something that should have been in the DQ.

10     It's, you don't hand over a bill for a billion dollars and

11     say, "We just think you should give it to us."  So, at some

12     point there should just be a cutoff date and if they can't--

13     if they don't have the resources to pull it together, then

14     that's kind of their problem.  But we've spent thousands of

15     hours trying to sift through all their stuff with no

16     explanation of, you know, oh, by the way, a bunch of those

17     files were just irrelevant.  We've wasted tons of money --

18                THE COURT:  I agree.

19                MS. CAFFERATA:  -- and so this is a recipe for

20     wasting more money.  And at some point, there should just be

21     a cutoff.  And I bet they comply with it.  I bet they do.

22                THE COURT:  I agree.  I'm seeing a new person

23     every time we have one of these.  I have ... I am cautiously

24     optimistic that we're going to get the finish line now,

25     because I agree with you, we need to be done.  It's been
```

Page 122

1   troubling.  I think Credit Suisse now has heightened

2   urgency.  Stakes are very high.

3          MR. MCATEE:  I agree, Your Honor.

4          THE COURT:  The stakes are very high.  There is a

5   level of --

6          MR. MCATEE:  And there is, Your Honor.  We've

7   added people, both at Cravath and inhouse and --

8          THE COURT:  I mean, I've said it out loud before,

9   is that to the extent that there was ever a thought that

10  this would be easy because Credit Suisse was the last big

11  bank counterparty standing.  That's not the case.  And it's

12  alarming that 10 years out you're in the state that you're

13  in.  So, I think the bottom line is you got to fix it, you

14  got to fix it really quickly or there are, you know, I'll

15  entertain appropriate motions for consequences.  So, get

16  back to Ms. Cafferata by the end of the day on Friday.  And

17  if you're unsatisfied with the timeframe, which I expect to

18  be very aggressive, I'll be here next week, not on Monday,

19  but I'll be here next week.

20         MR. MCATEE:  Yes, Your Honor.

21         THE COURT:  All right.

22         MS. CAFFERATA:  Thank you, Your Honor.

23         THE COURT:  Okay, is that it?

24         MS. CAFFERATA:  So, we have one topic that we can

25  agree to as far as the scope, and that is topic D5,

Page 123

1    identification of documents reflecting the trades executed

2    between September 15, 2008 and the present date, with the

3    purpose of managing, hedging or replacing Credit Suisse's

4    derivatives-related risk resulting from the termination of

5    the terminated Lehman trades, including the dates and times

6    and prices or levels at which any such trades were executed,

7    and the organization, purpose and function of the identified

8    documents, including the sources of the information

9    contained therein.

10            THE COURT:  Okay, great.  So, that resolves the

11   last paragraph, the issue that was raised in the January 8th

12   letter.

13            MS. CAFFERATA:  Correct.

14            MR. MCATEE:  Your Honor, the only caveat to that

15   is -- and I told counsel this when we were conferring -- she

16   used the term, "The present date," and what I said was that

17   although we believed that there was hedging activities after

18   the end of 2008, we were not going to argue that at trial,

19   so, we're not going to restore our databases all the way out

20   to the --

21            THE COURT:  Yes, well, that was point of our

22   previous discussion.  Is that we --

23            MR. MCATEE:  Yes, Your Honor.  But we will be

24   prepared to meet that topic through the end of 2008.

25            MS. CAFFERATA:  And they agree that they will be

Page 124

1    precluded from any evidence to contrary.

2              THE COURT:  Precluded from arguing that you were

3    managing the risk beyond that date, yes?

4              MR. MCATEE:  Yes, Your Honor.  Even though we

5    believe it happened, we're not going to argue it at trial.

6              THE COURT:  That's what I'm saying.

7              MR. MCATEE:  Yes, Your Honor.

8              THE COURT:  Okay, all right.  Thank you very much.

9    I need to release you folks so that you can eat.  Thank you

10   very much for staying here and working towards this.  And I

11   hope you take this right way, but I hope not to hear from

12   you early next week, all right.  Thank you.

13             MR. MCATEE:  Thank you, Your Honor.

14             MS. CAFFERATA:  Thank you, Your Honor.

15             THE COURT:  Keep Miss Eisen posted about the

16   estimation stipulation.  Thank you.

17        (Recess)

18             CLERK:  All rise.

19             THE COURT:  All right.  Welcome back.  Judge

20   Smith, please have a seat.  Mr. Cosenza, back to you.

21             MR. COSENZA:  Yes, Your Honor.

22   Q    I think we left off talking about Justice Carpinello's

23   report and the notice that was provided by the Trustees to

24   the certificate holders that you cited in your expert

25   report.  In that notice, there's also a reference to Judge

Page 125

1    Gonzalez's expert report.  And you have not read or seen

2    Judge Gonzalez's expert report, correct?

3    A    I have not.

4    Q    And you have not read or seen Mr. Greenspan's expert

5    report that's referenced in that notice, correct?

6    A    Correct.

7    Q    And although you never reviewed the three expert

8    reports that were identified in that notice, you have no

9    doubt that the Trustees gave the October 2015 settlement

10   careful consideration, correct?

11   A    I have no doubt they gave it careful consideration.

12   Q    And that conclusion is based on what you believe is

13   common sense, correct?

14   A    Yes.

15   Q    And in connection with the Trustees' rejection of the

16   October 2015 settlement, you did not know whether the

17   Trustees considered potential liability from certificate

18   holders if they had accepted the settlement, correct?

19   A    That's correct.  I don't.

20   Q    But you assumed that every Trustee had potential

21   liability considerations working in their minds when the

22   Trustees rejected the October 2015 settlement, correct?

23   A    Well, I assumed that anyone who serves as a trustee in

24   a matter this economic significant has somewhere in his or

25   her mind the possibility of liability.

Page 126

```
 1   Q    Okay.  And you -- you appreciate that the real parties

 2   and financial interests here are in the certificate holders,

 3   correct?

 4   A    And I think that's right, yes.

 5   Q    So I just -- I just want you to assume that the

 6   Trustees had previously told the Court that their claims

 7   were worth $12 billion in August 2014 and they were then

 8   presented with a settlement for $2.4 billion in October

 9   2015.  In your opinion, the Trustees' concern for potential

10   liability would be relevant in not accepting the October

11   2015 settlement, correct?

12   A    I'm not sure I can answer that with a simple yes or no.

13   Q    How would you answer it?

14   A    I guess I'd answer by saying that it -- it might or

15   might not be relevant depending on what was going on.  That

16   in general, as a proposition which there are exceptions, the

17   best way for a trustee to protect itself from liability is

18   by doing the right thing for its certificate holders.

19   Q    And the fact that the -- if the Trustees had told the

20   Court that their claims were worth six times what the

21   purported settlement that was presented to them a year and a

22   half later, you don't think it has any relevance to whether

23   or not they accepted or rejected the October 2015

24   settlement?

25   A    I don't know whether it has any relevance.
```

1   Q    Can you turn to paragraph 20 of your amended report?

2   And you testified to this earlier today, but if you look at

3   the second sentence, you state that, "In my experience, it

4   is not uncommon for a litigant who justifiably believes that

5   he or she is much more likely to win" --

6   A    Now what paragraph are you -- Oh, I'm sorry.  I guess

7   I'm in the -- I'm in the --

8   Q    The original?

9   A    I'm in the original report.  You want paragraph 20 of

10  the amended --

11  Q    Yes.

12  A    -- amended report?

13  Q    And it's the second sentence --

14  A    Okay.

15  Q    -- Mr. Smith.  And you state that, "In my experience,

16  it is not uncommon for a litigant who justifiably believes

17  that he or she is much more likely to win than lose a case

18  to accept a settlement of 50 percent or less of the amount

19  of claims."  Do you see that?

20  A    Yes.

21  Q    And that 50 percent or less, what you described in your

22  report, that only applies to good cases, correct?

23  A    I feel more comfortable giving that opinion in good

24  cases, yes.

25  Q    Okay.  And you're not talking about what you just

Page 128

1   talking in your deposition about bad cases?

2   A    That's right.

3   Q    And the basis for this statement in your report, I

4   think, is you testified is both an overall impression but

5   also a number of specific examples from your experience as a

6   practitioner, correct?

7   A    Yes.  That's -- there's also an area between the

8   overall impressions and specific examples which are -- the

9   specific cases I can't remember, but I'm sure --

10   Q    Okay.

11   A    -- there are some.

12   Q    So we're going to walk through the examples you gave in

13   your deposition.  I don't know if you recall that or not,

14   but I think you, in this opinion, you were able to cite five

15   examples.  I think one of them was talked about earlier.

16           And one of the examples you cited is a 1974

17   employment contract case where you represent an individual

18   who lost his job; is that correct?

19   A    Yes.

20   Q    And that case went to verdict for an amount of $45,000,

21   correct?

22   A    That was my -- (indiscernible) is my best recollection.

23   Q    Sure.

24   A    I have not checked it.

25   Q    But it's your belief that if offered, your client would

Page 129

1   have accepted a settlement offer in the low $20,000 range,

2   correct?

3   A    That sounds right.  I don't remember exactly what I

4   said, but that -- that is consistent with my recollection.

5   Q    All right.  And the second example was a case in 1977.

6   It's an insurance case involving a Fidelity bond --

7   A    Yes.

8   Q    -- correct?  And in that case you represented the

9   plaintiff, Fidelity Deposit Insurance Company, against

10  Midland Bank and Trust Company; is that correct?

11  A    The plaintiff was Midland Bank and Trust Company.  The

12  defendant was Fidelity Deposit Insurance Company.

13  Q    And who did you represent?

14  A    The plaintiff.

15  Q    You represented the plaintiff.  And that case was

16  ultimately decided non-jury in your client's favor, correct?

17  A    Yes.

18  Q    But it's your view that your client would have accepted

19  less than half to settle the case before the verdict came

20  in?

21  A    It's more than my view.  We said that to the judge.

22  Q    Okay.  And your third example, you believe that

23  sometime in the 1980s you represented an insurance company

24  and in that case you represented the defendant?

25  A    Yeah.  Yes.  I'm not -- I'm not sure -- I'm not sure

Page 130

1    that a litigation was actually brought.  That may have been

2    a pre-litigation negotiation.

3    Q    Sure.  And in that case, the plaintiff had a good case

4    and was willing to accept half --

5    A    Yes.

6    Q    -- correct?  And the fourth example you cited was a

7    case from 1991 in which you won a verdict of about $3.5

8    million on an action for a brokerage fee?

9    A    Yes.

10   Q    But you believe that your client -- you represented the

11   plaintiff there -- would have settled for half that amount,

12   correct?

13   A    Less than half.

14   Q    Less than half.  And the fifth example and the last

15   example was another case from 1991 in which you represented

16   former partners in an Iranian architecture firm seeking to

17   recover part of an award from the Hague Tribunal, correct?

18   A    Correct.

19   Q    And in that case your client settled for less than half

20   of the total claim and was delighted, correct?

21   A    Yes.

22   Q    And that's a full list of cases you cited, if you

23   recall, at your deposition, correct?

24   A    Those were the ones that I was then able to recall and

25   I haven't recalled any more since.

Page 131

1   Q     Good.  And all those cases are from over 25 years ago,

2   correct?

3   A     That's right.  It seems amazing, yes.

4   Q     And none of those cases are RMBS cases?

5   A     Right.

6   Q     And none of those cases were bankruptcy cases, correct?

7   A     That's right.

8   Q     And none of those cases were seeking damages in the

9   range that are at issues in this case, correct?

10  A     The damages and the amounts at issues in this case, no,

11  certainly not.

12  Q     And there's no definitive way to prove or disprove your

13  theory that a plaintiff with a better than even chance to

14  win will normally take half or less than that in a

15  settlement, correct?

16  A     If there's a definitive way, I do not know what it is.

17  Q     And you have not performed any quantitative analysis in

18  support of your opinion regarding a plaintiff's willingness

19  to accept a settlement of 50 percent of less for a good

20  case, correct?

21  A     That's correct.

22  Q     And plaintiffs -- you just touched on this --

23  plaintiffs with bad cases, you put them in an entirely

24  different category, correct?

25  A     I think that's fair, at least I -- I feel less

Page 132

1    comfortable giving an -- yeah, plaintiffs with bad cases --

2    plaintiffs with bad cases who brought the cases already and

3    they have questionable judgments, that makes it harder to

4    evaluate.

5    Q    Okay.  And you don't know sitting here today whether

6    the Trustees' claim here is a good case or a bad case.

7    A    I -- I do not know, although it's a lot of money to

8    offer for a bad case, but I do not know.

9    Q    Okay.  But you sitting here, you don't know?

10   A    I do not.  I have not reviewed and do not have an

11   opinion on the merits of the claim.

12   Q    So let's turn to paragraph 17 of your amended report,

13   and this is your discussion of the institutional investors.

14   A    I'm sorry.  Let me get your binder.  Paragraph 17?

15   Q    Yeah.  And -- and you do not have an opinion here as to

16   how close the interest of the institutional investors are

17   aligned with those of the trust, correct?

18   A    Correct.

19   Q    If you look at paragraph 19 of your amended report, and

20   I think it states -- you can start with the second sentence.

21   You state, "I am informed that the institutional investors

22   accepted the 2015 proposed settlement before the Trustees

23   completed a detailed loan-by-loan review of the loan files

24   that are at the heart of the covered claim."  Do you see

25   that?

Page 133

1    A    Yes.

2    Q    Other than that, you didn't have any knowledge about

3    what information the institutional investors had available

4    to them when they accepted the settlement in October of

5    2015, correct?

6    A    It jumped.  I don't remember knowing anything specific.

7    Q    And --

8    A    If there's something in particular that might refresh

9    my recollection.  I don't think I know anything specific.

10   Q    Okay.  And are you aware, by the way, that the loan

11   level review that was done by the Trustees when that was

12   completed in this case?

13   A    That it was never completed?

14   Q    When it was completed?

15   A    When it was completed?  No, I may -- I may once have

16   known, but I do not remember.

17   Q    And if the loan level review was not completed before

18   the Trustees rejected or did not accept the plan

19   administrator's settlement with the institutional investors,

20   would that impact your analysis?

21   A    Well, it wouldn't change the opinion I've expressed,

22   but it's a relevant -- it's relevant, would mean that the

23   Trustees' information was to that extent also imperfect.

24   Q    And just assume for current purposes that the loan

25   level review was not completed until the middle of 2016.

Page 134

1    Would that have been a fact that you would have wanted to

2    have known in putting together your report?

3    A    Well, I'm not sure I didn't know it.  It would

4    certainly not alter the opinions I expressed.  The -- the

5    deficiency of information and the identity of the actors are

6    two -- two separate facts.  I think I assumed that -- I did

7    not assume that the Trustees had more information than the

8    institutional investors.

9              I simply give the opinion that the Trustees are

10   more likely to be perfectly aligned with the plaintiffs

11   because the trusts are the plaintiffs than the institutional

12   investors.  The question of the information available is

13   sort of a separate subject, which I also discussed.

14   Q    But you noted in your report that institutional

15   investors accepted the proposed settlement before the

16   Trustees completed a detailed loan-by-loan level review of

17   the loan files.

18   A    Yes.

19   Q    Yes.  And assuming the Trustees had not completed their

20   loan level review and they had not accepted the settlement,

21   would that impact your analysis at all?

22   A    Well, I think what I just said was that the -- I think

23   I have always assumed or certainly never assumed the

24   contrary that the level of information of both parties back

25   in 2015 was similar.  I did not assume any difference in

Page 135

1    information.  I -- I have given two separate reasons for

2    attaching relatively little weight to the institutional

3    investors' decision.

4            One is that they had deficient information, and

5    the other is that their interests may not have been

6    perfectly aligned with the plaintiffs.  Those are

7    independent reasons.

8    Q    Okay.  Talking about the first issue you raised about

9    the -- I guess the deficient information, assume that the

10   Trustees have not completed their loan level review before

11   they decided not to accept the settlement, would that have

12   been a fact you wanted to have known before you included

13   this in paragraph 19 of your amended expert report?

14   A    I wouldn't have minded knowing it, but it's not

15   inconsistent with anything I assumed.  I mean you're -- the

16   point I'm trying to make is that there are two separate

17   reasons why I -- I criticized Professor Fischel's reliance

18   on the institutional investors' behavior.  One is that he

19   seems to pick their behavior and ignoring the Trustees, and

20   for that purpose, I'm perfectly happy to assume that the

21   level of information between the Trustees and the

22   institutional investors was identical.  I never really

23   suggested otherwise.

24           Another reason is that the institutional investors

25   lacked perfect information.  And I was not comparing it to

Page 136

```
 1    what the Trustees knew then.  I was comparing it really

 2    essentially to what your Judge Chapman knows or will know by

 3    the time this trial is over.

 4    Q    And other than what's in paragraph 19 here, you did not

 5    perform any research or investigation to determine what the

 6    institutional investors knew or didn't know about the

 7    potential value of their claim, correct?

 8    A    That's correct.

 9    Q    And at the time of your deposition, you did not know

10    who the institutional investors were, correct?

11    A    That's correct.

12    Q    All you knew when you issued your report was that in

13    October of 2015 the institutional investors accepted a deal

14    at $2.4 billion, correct?

15    A    Well, that's all I knew, that's maybe a sweeping

16    statement, but that was -- that's certainly the -- I -- I

17    knew -- I probably remembered better then than I do now

18    exactly what Professor Fischel had said about who the

19    institutional investors were and what they did.  But

20    certainly, the central fact was that they -- that they

21    accepted the deal.

22    Q    Now are you now aware that the institutional investors

23    include Goldman Sachs Asset Management, BlackRock, Aegon,

24    PIMCO, MetLife, Wamco?  Are you now aware of that?

25    A    Well, and I can now infer it from your asking the
```

1    question.  And I inferred part of it from the questions that

2    I was asked at my deposition.  Some of those names were

3    mentioned at my deposition.

4    Q    And you agree that BlackRock is a sophisticated

5    financial institution that can make its own independent

6    financial judgments, correct?

7    A    Yes.

8    Q    And you agree the same to PIMCO well, correct?

9    A    Yes.

10   Q    And you agree the same thing about Goldman Sachs Asset

11   Management, correct?

12   A    Yes.

13   Q    Same question about Wamco?

14   A    Yes.

15   Q    Okay.

16   A    Well, actually, I'm sorry.  Tell me again who I -- who

17   I just said was --

18   Q    Wamco.  Wamco, Western Asset Management Company.

19   A    I -- I -- I don't actually -- I should admit this.  I

20   don't recognize the name.

21   Q    That's --

22   A    But if you --

23   Q    They're --

24   A    I -- I have a feeling that if they're people Fischel

25   calls institutional investors, they're pretty sophisticated.

Page 138

```
 1   Q    Okay.  And you are aware that the institutional

 2   investors have experience valuing and resolving similar RMBS

 3   claims, correct?

 4   A    I assume that to be correct.

 5   Q    And that does not impact your analysis here?

 6   A    It does not change my analysis.

 7   Q    Does it impact your analysis at all?

 8   A    I -- well, you're telling me now doesn't -- it doesn't

 9   impact my analysis at all because it's something I would

10   have assumed.

11   Q    Okay.  And you're aware that the Trustees have relied

12   on the support of many of these same institutional investors

13   in accepting global RMBS settlements, correct?

14   A    I'm not sure I was specifically aware of it.  I'm not

15   at all surprised to hear it, and I may have been

16   specifically aware.

17   Q    And, again, that doesn't impact your analysis?

18   A    It does not.

19   Q    Okay.  And here it's your opinion that these

20   institutional investors are large bureaucratic institutions

21   and might be even more cautious than an individual when it

22   comes to reaching a settlement, correct?

23   A    Well, it did.  That's a thought that occurred to me at

24   my deposition, and I think it -- I do think it makes a

25   certain amount of sense that if you're going to make a --
```

Page 139

1    yeah, that if you are -- prima facie the question is who

2    would be more cautious, an institutional investor with its

3    client's money and a person or entity with its own money.

4    It is my judgment the bureaucrats would generally be more

5    cautious.

6    Q    And you don't think the RMBS Trustees here fall in the

7    category of large bureaucratic institutions?

8    A    Well, they may.  I did not suggest they didn't.

9    Q    Okay.  And you are not offering an opinion as to

10   whether the settlements that Professor Fischel examined are,

11   in fact, comparable or not comparable to this case, correct?

12   A    I am not offering an opinion as to whether they are

13   comparable.  I am offering the opinion that he does not show

14   that they are comparable in a meaningful way.

15   Q    But they may be comparable in your view?  You just

16   don't agree with the analysis?

17   A    I -- they may be.  They may resemble this case as

18   substantially more than is at all clear from his report, but

19   that's pure speculation.

20   Q    I'm going to put up TRX Exhibit 778, and I just want to

21   look at the five settlements that Professor Fischel

22   identifies as comparable: Countrywide, JP Morgan, Citi

23   Group, ResCap, and Washington Mutual.  Have you seen this

24   exhibit before, Mr. Smith?

25   A    I've certainly seen something that looks like it.

Page 140

1    Q    And do you see in column E, there's a recovery ratio

2    used by Professor Fischel to compare these different RMBS

3    settlements?

4    A    In the last two columns there?

5    Q    Yes.

6    A    Yes.

7    Q    And do you see the recovery ratio here at the $2.4

8    billion level?  Is that the high end of the recovery ratios

9    in looking at these other settlements?

10   A    Well, I remember that from what he said.  It would take

11   me a minute to find it on this chart.

12   Q    I just -- to assist you --

13   A    Yeah.  Yes.  Okay.  I see the point, yes.

14   Q    And you're not disputing these calculations?

15   A    I'm sorry.

16   Q    And you're not disputing the underlying calculations?

17   A    No.  I have no doubt that he did the math correctly.

18   Q    Okay.  And you're aware that the same Trustees that are

19   here today supported the settlements that are referred to on

20   this chart, these other global RMBS settlements set forth in

21   TRX778 at the recovery ratios identified here?

22   A    I'm not surprised.  I don't actually know that all

23   these Trustees were involved in all these settlements, but

24   it does not surprise me.  Of course, the -- there were

25   Trustees of different trusts apart from -- apart from other

1    things.

2    Q    But -- that's correct.  But you're aware that some of

3    the same -- are you not aware or are you --

4    A    I -- I'm sure that many, if not all, of the same

5    Trustees were involved.

6    Q    And are you aware that the same Trustees relied on

7    Professor Fischel's opinion in several of these other global

8    RMBS settlements?

9    A    Yes.

10   Q    And are you aware that these recovery ratios listed on

11   Professor Fischel's exhibit here are frequently used by

12   financial analysts in analyzing and comparing global RMBS

13   settlements?

14   A    I believe that Professor Fischel may have said that or

15   maybe I just assumed it.  But I'm not surprised to hear it.

16   Q    You're not surprised to hear that.  So you're aware

17   that these financial analysts use the same method that

18   Professor Fischel used to analyze the settlements?

19   A    Which financial analysts are you talking about?

20   Q    Okay.  Let's -- let's refer you to Tab 6, 7, and 8 of

21   your binder.

22            MR. COSENZA:  And for the record, they're Plan

23   Administrator Exhibits 42 -- sorry -- 432, Plan

24   Administrator Exhibit 433, Plan Administrator Exhibit 434.

25   Q    We'll look at the first one, and that's a report from

Page 142

1    Credit Suisse.  And I guess my first question for you is

2    have you seen this report before?

3    A    Not to my recollection.

4    Q    Same question on Exhibit 433, have you seen this report

5    from Deutsche Bank regarding the outlook in MBS in

6    securitized products?

7    A    Not to my recollection.

8    Q    And have you looked at Exhibit -- Plan Administrator

9    Exhibit 434 from Morgan Stanley talking about the

10   implications of the Citi Group settlement?

11   A    I do not remember seeing it.

12   Q    So you have not seen any of these?

13   A    Not to my recollection.

14   Q    Would it impact your analysis and your opinion that

15   market participants used these settlements as benchmarks in

16   use of the recovery ratios in their analysis?

17   A    You asked two questions, if they used these settlements

18   as benchmarks --

19   Q    Yes.

20   A    -- or as recovery ratios?  Which is it?

21   Q    The recovery ratios that reflect on these settlements?

22   A    That they used recovery ratios would not impact my

23   opinion at all.

24   Q    It would not?

25   A    No.

Page 143

1   Q    And the fact that the settlements Professor Fischel

2   offers as comparable all involve the same macroeconomic

3   factors, the financial crisis, that does not sway your

4   opinion as to whether or not these settlements are

5   comparable?

6   A    It does not.

7   Q    But you agree that the macroeconomic context --

8   A    Actually, as you mentioned earlier, I have not

9   specifically expressed an opinion whether they are

10  comparable.  I -- I have expressed the opinion that

11  Professor Fischel does not show that they are comparable.

12  Q    Okay.  But you agree that the macroeconomic context in

13  which these claims occurred is a relevant factor to

14  determine whether or not the claims and settlements are

15  comparable, correct?

16  A    In the sense that if they had occurred in a different

17  macroeconomic environment, that might be distinguishing

18  factor.  Frankly, I haven't thought about that.

19  Q    Okay.  I'd just refer you to Tab 1 of your -- this is

20  your deposition transcript.  Page 95, lines 21 over to page

21  96, line 2.  I'll give you a minute to -- to get there, Mr.

22  Smith.

23  A    I'm sorry.  Page?

24  Q    Page 95, line 21.

25  A    95, line 21.  Okay.

Page 144

```
 1    Q    And you were asked, "Do you think the macroeconomic

 2    context in which the claims occurred is a relevant factor to

 3    look at to determine whether or not the claims are

 4    comparable and the settlements are comparable?"  And you

 5    answered, "I would think so, yes."

 6    A    Yes.

 7    Q    Were you asked that question and you gave that answer?

 8    A    Yes.

 9    Q    Thank you.  And just to be clear, you're not saying

10    that these settlements that Professor Fischel relied on

11    could never be used as comparables in an analysis, correct?

12    A    I'm not saying that, no.

13    Q    Yes.  You choose not -- you choose to not find the

14    weight that Professor Fischel did his analysis to be

15    enlightening for your opinion, correct?  In your opinion.

16    A    That's -- that's -- I would say I did not find his

17    analysis to be enlightening, to be -- to be of great value.

18    Q    Now let's turn to paragraph 26 of your report and look

19    at the first sentence.

20    A    I see it.

21    Q    Okay.  And it states that the -- that you understand

22    from Trustees' counsel they have no similar reluctance to

23    address this question and that Trustees expect to show at

24    the hearing.  We're not conceding that the issue is

25    relevant, that the claims of the Trustees are much more
```

Page 145

1    likely to succeed than those of the plaintiffs in the cases

2    Professor Fischel describes as comparable.  Do you see that?

3    A    I do.

4    Q    And that's -- but that's not your opinion, correct?

5    A    No, that's -- that's -- that is my report of what I was

6    informed by the Trustees' counsel.

7    Q    And that's just the position that Holwell Shuster and

8    the Trustees provided to you, correct?  That's the --

9    A    Yes.

10   Q    -- position that was reported --

11   A    Yes.

12   Q    -- to you?

13   A    Yes.

14   Q    You just simply reflected that in paragraph 26 of your

15   report?

16   A    Yes.

17   Q    And, again, you did not undertake any analysis to

18   determine whether the Trustee's claims here are, in fact,

19   good or bad, correct?

20   A    Correct.

21   Q    And for the purposes of your opinion, it does not

22   matter whether the Trustee's claims are great or horrible,

23   correct?

24   A    Oh, I wouldn't say that.  No.  If you -- if I -- if

25   either fact were demonstrated to me, that would make a

Page 146

1    difference to my opinion and neither one has.

2    Q    So I'm going to refer you to page 99 of your

3    deposition, lines 11 through 22.  I'll give you a minute to

4    get there.

5    A    11 to 22.

6    Q    Yeah.  And you were asked, "So for purposes of your

7    opinion in this case, it doesn't matter whether the

8    Trustees' claims are great or whether they are horrible; is

9    that right?"  Skip the objection.  Answer, "I think that's

10   in a sense that's true.  Yeah, they could be.  They could be

11   great or they could be horrible.  In either case Professor

12   Fischel's report would have very little value in figuring

13   out which one was true."

14           Did you give that answer to that question?

15   A    Yes.  Yes, I did.  It's a better answer than I gave

16   here today, yes.

17   Q    Okay.

18           MR. COSENZA:  That's all I have, Your Honor.

19   Thank you.

20           THE COURT:  Okay.  Thank you, Mr. Cosenza.  Any

21   redirect?

22           MR. DEMAY:  No, Your Honor.

23           THE COURT:  All right.  Thank you, Mr. DeMay.

24   Judge Smith, thank you very much.

25           MR. SMITH:  Thank you.

Page 147

 1              THE COURT:  Delightful to see you.  Enjoy the rest

 2       of your evening.

 3              MR. SMITH:  Thank you very much.

 4              THE COURT:  Okay.  So that's all we have for

 5       today, yes?

 6              MR. DEMAY:  That's correct, Your Honor.

 7              THE COURT:  Okay.  And you're going to be talking

 8       to each other about coming attractions, but for tomorrow's

 9       purposes, we're reconvening at 10:00.  Yes?  Okay.  And no

10       one will be coming in after or before you, so you don't have

11       to entirely clean up.  Okay?  Thank you very much.

12              MR. COSENZA:  Thank you, Your Honor.

13              MR. DEMAY:  Thank you.

14              THE COURT:  Have a good evening.  Thank you.

15       (Whereupon these proceedings were concluded at 3:58 PM)

16

17

18

19

20

21

22

23

24

25

Page 148

```
1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   Sonya                    Digitally signed by Sonya
                             Ledanski Hyde
    Ledanski Hyde            DN: cn=Sonya Ledanski Hyde, o,
7                            ou, email=digital1@veritext.com,
                             c=US
                             Date: 2018.01.12 15:34:44 -05'00'
8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  January 12, 2018
```