WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
Todd G. Cosenza
Joseph G. Davis (*pro hac vice*)
Benjamin P. McCallen

ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Telephone: (303) 945-7415
Facsimile: (303) 945-7468
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Debtors Lehman Brothers Holdings Inc.*
*and Certain of its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re | ) | Case No. 08-13555 (SCC) |
|  | ) |  |
| Lehman Brothers Holdings Inc., *et al.*, | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---------------------------------------------------------- x

**LEHMAN BROTHERS HOLDINGS INC.'S POST-TRIAL BRIEF IN SUPPORT OF**
**ESTIMATION OF THE REMAINING COVERED LOAN CLAIMS AT $2.38 BILLION**

# TABLE OF CONTENTS

**Page**

I.    PROCEDURAL POSTURE ................................................................2

II.   THE TRUSTEES' BREACH REVIEW PROCESS WAS UNRELIABLE......................4

III.  THE TRUSTEES' BREACH REVIEW PROCESS AS IMPLEMENTED
PRODUCED CLAIMS THAT FAILED TO MEET THE REQUIRED BURDEN
OF PROOF...............................................................................7

   A.   Determination Of Threshold Facts.................................................7

      1.   The Trustees Did Not Address Information Inconsistent With
The Asserted Threshold Fact. ...............................................7

      2.   The Trustees Gave Inadequate Weight To The Loan
Application.................................................................8

      3.   The Trustees Approach To Income Misrepresentation Claims
Was Inconsistent And Conclusory........................................9

      4.   The Trustees Incorrectly Determined Threshold Facts For Debt
Misrepresentation Claims. ...............................................10

      5.   The Trustees' DTI Claims Are Derivative Of Their Income
And Debt Misrepresentation Claims.....................................11

      6.   The Trustees Incorrectly Determined Threshold Facts For
Occupancy Claims. ......................................................11

      7.   The Trustees' Interpretation Of Evidence In Support Of
Threshold Facts Was Unreliable.........................................12

      8.   The Trustees' Missing Document Claims Are Unsupported............14

   B.   Application Of Representations And Warranties .................................16

      1.   The Trustees Misconstrue Key Contractual Provisions..................16

         a.    The Trustees Failed To Determine Materiality.......................16

         b.    The Trustees Failed To Demonstrate Seller's Knowledge. .....18

      2.   The Trustees Failed To Establish AMA On A Loan-By-Loan
Basis....................................................................19

         a.    The Trustees Conducted No Loan-Level Analysis Of AMA. .19

         b.    The Trustees Must Prove A Diminution In Loan Value, Not
Just An Increased Risk Of Loss..............................21

         c.    The Trustees Failed To Satisfy Their Own AMA Test...........24

IV.  THE PLAN ADMINISTRATOR'S RESPONSES TO THE TRUSTEES'
BREACH CLAIMS WERE REASONABLE .................................................26

   A.   The Plan Administrator's Process Was Well Constructed .........................26

   B.   The Trustees Failed To Provide The Required Documentation To
Review 24,000 Loans...................................................................28

V.      THE TRUSTEES WERE UNABLE TO VALIDATE THE RESULTS OF THEIR
        BREACH REVIEW PROCESS AT TRIAL ...................................................................30

        A.    The Trustees' Withdrew 40% Of Their Breach Claims.................................30

        B.    Flaws In Validation Through Mr. Aronoff ...................................................30

        C.    Flaws In Mr. Morrow's Analysis..................................................................31

        D.    The Trustees' Exemplar Loans Did Not Support Their Process...................32

VI.     THE TRUSTEES HAVE PROVIDED NO ROAD MAP TO A CLAIM OTHER
        THAN WHAT THEIR FLAWED PROCESS PRODUCED ...........................................34

VII.    THE TRUSTEES DID NOT ACCOUNT FOR PROXIMATE CAUSE, AN
        ESSENTIAL ELEMENT OF THEIR BREACH OF CONTRACT CLAIMS.................40

VIII.   THE TRUSTEES' DAMAGES CLAIMS ARE IMPROPERLY INFLATED
        AND UNRELIABLY QUANTIFIED ................................................................................42

        A.    The Trustees Solely Offer Evidence Of Purchase Price Calculations To
              Quantify Their Alleged Injury .....................................................................42

        B.    Use Of The Full Purchase Price Would Violate 11 U.S.C. § 502(b)(2)
              Because It Contains Approximately $2.1 Billion Of Impermissible
              Interest..........................................................................................................43

        C.    The Trustees' Damages Calculations For Non-Liquidated Loans Are
              Unreliable And Overstated ...........................................................................44

        D.    The Trustees Attempt To Charge The Estate For Loan Modifications
              Negotiated Completely Independently From LBHI ......................................46

IX.     THE PLAN ADMINISTRATOR'S PROPOSED $2.38 BILLION ALLOWED
        CLAIM IS FAIR AND REASONABLE............................................................................46

        A.    Settlement With The Institutional Investors .................................................47

        B.    Comparable Recovery Ratios In Similar RMBS Settlements.......................48

        C.    The Trustees' Acceptance Of The Collapsed Trusts' Claim Valuations....................48

        D.    Professor Cornell's Rates Of Success Scenarios .........................................49

X.      CONCLUSION...................................................................................................................50

## TABLE OF AUTHORITIES

**CASES**                                                                                              **PAGE(S)**

*In re Adelphia Commc'ns Corp.,*
　　368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...............................................................46

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB,*
　　892 F. Supp. 2d 596 (S.D.N.Y. 2012) ..............................................................20

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB,*
　　920 F. Supp. 2d 475 (S.D.N.Y. 2013) ..............................................................40

*In re Babcock & Wilcox Co.,*
　　274 B.R. 230 (Bankr. E.D. La. 2002) ...............................................................47

*Bank of Am., Nat'l Ass'n v. Wells Fargo Bank, N.A.,*
　　No. 12 C 9612, 2014 WL 3639190 (N.D. Ill. July 23, 2014) ...........................43

*Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc. ("Morgan Stanley"),*
　　No. 11 Civ. 0505 (CM) (FM), 2011 WL 2610661 (S.D.N.Y. June 27, 2011) .................22

*Bank of N.Y. Mellon v. WMC Mortg., LLC,*
　　No. 12-cv-7096 (DLC), 2015 WL 4163343 (S.D.N.Y. July 10, 2015) ...........................18

*BNY Mellon Trust Co., N.A. v. Morgan Stanley Mortg. Cap., Inc.,*
　　No. 11 Civ. 505 (CM) (GWG), 2017 WL 733227 (S.D.N.Y. Feb. 10, 2017) .................21

*In re Chemtura Corp.,*
　　448 B.R. 635 (Bankr. S.D.N.Y. 2011) ..............................................................47

*Conway Hosp., Inc. v. Lehman Bros. Holdings Inc.,*
　　531 B.R. 339 (S.D.N.Y. 2015) ..........................................................................44

*Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC,*
　　No. 14-cv-03020 (KBF), 2018 WL 583116 (S.D.N.Y. Jan. 25, 2018) ...............................3

*Ebewo v. Martinez,*
　　309 F. Supp. 2d 600 (S.D.N.Y. 2004) ..............................................................36

*Fagiola v. Nat'l Gypsum Co. AC & S.,*
　　906 F.2d 53 (2d Cir. 1990) ...............................................................................35

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,*
　　104 F. Supp. 3d 441 (S.D.N.Y. 2015) ..............................................................14

*FTC v. Med. Billers Network, Inc.,*
　　543 F. Supp. 2d 283 (S.D.N.Y. 2008) ..............................................................13

*Gordon v. United States,*
    438 F.2d 858 (5th Cir. 1971), *cert. denied*, 404 U.S. 828 (1971).......................................36

*Homeward Residential, Inc. v. Sand Canyon Corp.,*
    298 F.R.D. 116, 126-27 (S.D.N.Y. 2014)..............................................................................20

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.,*
    77 F. Supp. 2d 446 (S.D.N.Y. 1999).....................................................................................36

*LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.,*
    No. 01-cv-4389 (AGS), 2002 WL 181703 (S.D.N.Y. Feb. 5, 2002)................................22

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,*
    424 F.3d 195 (2d Cir. 2005).................................................................................................20

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,*
    47 A.D.3d 103 (N.Y. 1st Dep't 2007)..................................................................................18

*Lightbox Ventures, LLC v. 3rd Home Ltd.,*
    No. 16-cv-2379 (DLC), 2017 WL 5312187 (S.D.N.Y. Nov. 13, 2017)...........................45

*MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.,*
    No. 12-cv-7322 (PKC), 2015 WL 764665 (S.D.N.Y. Jan. 9, 2015).................................21

*MBIA Insurance. Corp. v. Countrywide Home Loans, Inc.,*
    105 A.D.3d 412 (1st Dept. 2013).........................................................................................21

*Nat'l Energy & Gas Transmission, Inc. v. Liberty Elec. Power, LLC (In re Nat'l Energy & Gas Transmission, Inc.),*
    492 F.3d 297 (4th Cir. 2007) ...............................................................................................43

*Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.,*
    133 A.D.3d 96 (N.Y. 1st Dep't 2015)..................................................................................40

*Oneida Ltd. v. Pension Benefit Guar. Corp. (In re Oneida Ltd.),*
    383 B.R. 29 (Bankr. S.D.N.Y. 2008), *rev'd on other grounds*, 562 F.3d 154 (2d Cir. 2009) .....................................................................................................................................24

*Peat, Inc. v. Vanguard Research, Inc.,*
    378 F.3d 1154 (11th Cir. 2004) ...........................................................................................35

*In re Ply Gem Holdings, Inc. Sec. Litig.,*
    135 F. Supp. 3d 145 (S.D.N.Y. 2015)..................................................................................17

*Resolution Trust Corp. v. Key Fin. Servs., Inc.,*
    280 F.3d 12 (1st Cir. 2002)...................................................................................................21

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi. v. Bank of N.Y. Mellon,*
    775 F.3d 154 (2d Cir. 2014).................................................................................................19

*Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC,*
    280 F.R.D. 147 (S.D.N.Y. 2012) ....................................................................36

*SEC v. Biovail Corp.,*
    No. 08 Civ. 2979 (LAK), 2010 WL 2465482 (S.D.N.Y. June 16, 2010).........17

*Severstal U.S. Holdings, LLC v. RG Steel, LLC,*
    865 F. Supp. 2d 430 (S.D.N.Y. 2012)..............................................................18

*Sharpe v. United States,*
    230 F.R.D. 452 (E.D. Va. 2005) .....................................................................36

*In re Shelley,*
    184 B.R. 356, 359 (9th Cir. 1995) .....................................................................9

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.,*
    73 F.3d 546 (5th Cir. 1996) ............................................................................36

*Syncora Guarantee Inc. v. EMC Mortg. Corp.,*
    874 F. Supp. 2d 328 (S.D.N.Y. 2012).......................................................20, 21

*In re U.S. Bank Nat'l Ass'n,*
    51 Misc. 3d 273 (Sup. Ct. N.Y. Cty. 2015) ...................................................24

*U.S. Bank Nat'l Ass'n v. Lehman Bros. Holdings Inc.,*
    566 B.R. 353 (S.D.N.Y. 2017) .......................................................................29

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc. ("MARM III"),*
    205 F. Supp. 3d 386 (S.D.N.Y. 2016)......................................................passim

*United States v. Conlin,*
    551 F.2d 534 (2d Cir. 1977)......................................................................36, 39

*United States v. Wainright,*
    351 F.3d 816 (8th Cir. 2003) ..........................................................................39

*Valente v. Textron, Inc.,*
    931 F. Supp. 2d 409 (E.D.N.Y. 2013), *aff'd*, 559 F. App'x 11 (2d Cir. 2014)...............46

*W. & S. Life Ins. Co. v. Bank of N.Y. Mellon,*
    No. A1302490, 2017 WL 3392855 (Ohio Ct. Com. Pl. Aug. 4, 2017) ...........22

*Wells Fargo Bank, N.A. v. Bank of Am., N.A.,*
    No. 10 Civ. 9584 (JPO), 2013 WL 1285289 (S.D.N.Y. Mar. 28, 2013), *vacated and
    remanded*, 627 F. App'x 27 (2d Cir. 2015) ....................................................44

*Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A. ("JPMorgan"),*
    No. 12 Civ. 6168 (MGC), 2014 WL 1259630 (S.D.N.Y. Mar. 27, 2014)......................21

*Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l. Ass'n,*
    No. CIV-08-1125-C, 2011 WL 3739170 (W.D. Okla. Aug. 23, 2011)............................44

**STATUTES**

I.R.C. § 860F(a)(2)(A)........................................................................................................22

Fed. R. Evid. 801(c)...........................................................................................................35

Fed. R. Evid. 803 ...............................................................................................................35

Fed. R. Evid. 1006 ................................................................................................34, 35, 39

11 U.S.C. § 502(b)(2) ...................................................................................................43, 44

11 U.S.C. § 502(c) .......................................................................................................2, 41, 47

11 U.S.C. § 502(g)(2) .........................................................................................................44

11 U.S.C. § 562(a) ..............................................................................................................44

**OTHER AUTHORITIES**

J. McLaughlin, J. Weinstein, & M. Berger, 6 WEINSTEIN'S FEDERAL EVIDENCE § 1006.03[3] (2d
ed. 2004..............................................................................................................................35

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

The Plan Administrator submits this Post-Trial Brief in support of its request that the

Court estimate at $2.38 billion the Covered Loan Claims[1] submitted by trustees on behalf of 222

settling trusts ("Trustees") sponsored by Lehman Brothers Holdings Inc. ("LBHI").[2]  This

request grew out of a previous agreement with the largest economic stakeholders in the Trusts to

settle the claims at that level.  While that agreement was never consummated, it led to the RMBS

Settlement Agreement, which provides certain terms, conditions, and procedures for this

Estimation Proceeding.  The evidence presented during 23 days of trial confirms that the Plan

Administrator's request should be granted.  An allowed claim of $2.38 billion would be

consistent with all comparable RMBS settlements and multiple indicia of value provided by the

relevant economic stakeholders, including the Trustees themselves.

The Estimation Proceeding further demonstrated that the Trustees failed to prove

damages supporting an estimated allowed claim higher than $2.38 billion.  The Trustees'

opposition to the Plan Administrator's request was grounded in a fundamentally flawed loan

review process, resulting in claims that were inappropriately framed and inadequately supported.

Indicative of this flawed process, the Trustees *withdrew 40% of the claims* generated by their

process even before expert reports were exchanged, and with no notice or explanation to the Plan

Administrator.  They then cloaked this decision in privilege, keeping it outside the scope of all of

the witnesses they proffered to validate their breach review process.[3]  Unsurprisingly, at trial,

---

[1]   Capitalized terms not otherwise defined shall have the same meaning assigned to them in *Lehman Brothers
     Holdings Inc.'s Pretrial Brief and Summary of Evidence in Support of Estimation of the Remaining Covered
     Loan Claims at $2.38 Billion* ("Plan Administrator's Pretrial Br.") [Dkt. No. 56842].

[2]   Pursuant to the RMBS Settlement Agreement, the Plan Administrator agreed to seek allowance for 91,151 loans
     and 188,317 breach claims at $2.416 billion, to be adjusted depending on the number of trusts that accepted the
     settlement.  Subsequently, a small number of trusts opted out, collapsed, or terminated, lowering the agreed
     upon estimation amount to $2.38 billion.

[3]   Letter from Todd G. Cosenza to Judge Chapman [Dkt. No. 56975] (Nov. 19, 2017).

their witnesses failed to substantiate the reliability of their process or the validity of the non-

withdrawn claims.  By any measure, the Trustees failed to show that a higher allowed claim is

warranted, much less an allowed claim of $11.4 billion, which would be several orders of

magnitude higher than any RMBS recovery of comparable scope.

## I.    PROCEDURAL POSTURE

This Estimation Proceeding is being conducted in accordance with the RMBS Settlement

Agreement, which has been approved by this Court and the District Court as "reasonable, fair

and equitable and supported by adequate consideration."[4]  In 2015, consistent with its duty to

resolve all claims as efficiently and timely as possible, the Plan Administrator engaged in

extensive negotiations with the principal economic stakeholders, the Institutional Investors, to

find a way to resolve the nearly 200,000 claims the Trustees submitted to the Protocol.  That

process led to a heavily-negotiated proposed settlement that would have valued the Trustees'

claims at $2.4 billion, as adjusted.  For reasons that to this day they have not explained, the

Trustees rejected that proposed resolution.  Notwithstanding the Trustees' rejection of the 2015

settlement, the Plan Administrator continued negotiations, which ultimately led to the RMBS

Settlement Agreement.

The RMBS Settlement Agreement provided a mechanism to resolve the RMBS claims

through estimation under Section 502(c) of the Bankruptcy Code and by setting forth a unique

set of procedures that would govern this proceeding and ensure an expeditious resolution.  Under

the RMBS Settlement Agreement, LBHI agreed to "seek Estimation of the Covered Loan Claims

arising under or related to the Accepting Trusts" at a total amount of $2.38 billion, as adjusted.[5]

---

[4]    Order Approving RMBS Settlement Agreement and Including Certain Proposed Findings of Fact and
Conclusions of Law at 3 [Dkt. No. 55706]; Order Approving Certain Findings of Fact and Conclusions of Law
at 3, *In re Lehman Bros. Holdings, Inc.*, No. 1:17-cv-05889-PKC (S.D.N.Y. Aug. 28, 2017) [Dkt. No. 3].
[5]    RMBS Settlement Agreement at § 3.02(a) (TRX 810).

Critically, given the genesis of that valuation, the RMBS Settlement Agreement expressly permitted the Plan Administrator to offer into evidence the prior settlement with the Institutional Investors, as well as other comparable RMBS settlements. For their part, the Trustees were "entitled to seek estimation of the Covered Loan Claims of the Participating Trusts in the Estimation Proceeding at whatever sum they choose."[6] However, as all parties agree, the RMBS Settlement Agreement did not alter the Trustees' burden to prove the value of their claims by establishing "what would have happened to these claims . . . had they gone all the way through the protocol."[7] The parties agreed there would be no sampling, but rather the Trustees would be required to submit evidence to prove each breach claim for which they sought damages.

Although trustee claims alleging breaches of representations and warranties connected with the sale of mortgage loans into RMBS have been litigated often since the financial crisis,[8] this case is unique, not only because it is framed by a settlement, but also because of the nature and extent of the claims asserted by the Trustees in the context of this bankruptcy. As described below, the Trustees failed to demonstrate that the claims should be allowed at an amount greater than $2.38 billion. In sharp contrast, the Plan Administrator provided ample evidence that estimation of the claims at $2.38 billion is entirely consistent with where the most sophisticated parties value these claims and a fair and reasonable estimate of the aggregate allowed claim that would have resulted from the Protocol in light of all the evidence provided.

---

[6]    RMBS Settlement Agreement at § 3.02(b) (TRX 810).

[7]    Tr. 236:2-10 (Trustees' Opening); *see also* Tr. 211:10-23 (Trustees "not asking to be relieved from [the] burden" to "establish the amount of the claim" they seek to be allowed "on a loan-by-loan basis"); 214:5-9 (Trustees' Opening).

[8]    As one District Court recently recognized, RMBS litigation can be characterized by "a large and growing body of law" with issues of a "fact-intensive nature" and a "lack of controlling precedent." This results "in a body of disagreements large and small. It is impossible (and unnecessary) to reconcile every case, and reasonable minds can certainly differ on what the law should be for cases like this." *Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 14-cv-03020 (KBF), 2018 WL 583116, at *10 (S.D.N.Y. Jan. 25, 2018).

3

## II.    THE TRUSTEES' BREACH REVIEW PROCESS WAS UNRELIABLE.

The Trustees retained a Duff & Phelps ("D&P") team headed by Mr. James Aronoff to conduct their loan review and formulate their breach claims.[9]  The Trustees introduced no evidence at trial that they themselves or anyone else supervised D&P and Mr. Aronoff.

In 2015, D&P collected copies of files from various servicers for about 210,000 loans that were originated between 2002 and 2008.[10]  These loans were chosen because the Trustees determined they either had suffered losses already or might in the future suffer a loss.[11]

Mr. Aronoff had no involvement in the process of gathering the loan files; had no role in deciding what documents would be requested from the servicers; did not know whether D&P requested origination or servicing files from any source other than the servicers; did not know if D&P requested copies of the mortgage loan files from the Trustees; and did not know if the Trustees issued any subpoenas or sought the Court's assistance in gathering files.[12]  D&P did not review the loan files, but instead supervised five different loan review firms.[13]  The Trustees never established at trial who chose the review firms.[14]

Apart from periodic phone calls, D&P did very little, if anything, to supervise the work of the loan review firms.[15]  D&P concluded there was no need to provide written instructions to the loan review firms because "they knew what they were doing and they could be relied on to do what they did."[16]  Although collection and analysis of third-party information was an important

---

[9]    Tr. 1810:25-1812:18 (Esses); Tr. 2322:9-21 (Aronoff).
[10]   Tr. 405:6-20; 725:4-9 (Trumpp).
[11]   Tr. 2141:3-2142:10; 2145:20-2146:11 (Esses).
[12]   Tr. 2612:8-2613:17 (Aronoff).
[13]   Tr. 2321:24-2323:16; 2375:8-2377:16; 2617:20-23 (Aronoff); Tr. 1860:11-20 (Esses).
[14]   Tr. 2609:10-17 (Aronoff).
[15]   Tr. 2341:20-2342:25 (testified that "I don't think there was much discussion or concern about telling the senior loan reviewers at each of the loan review firms that was used how to conduct the review"); 2611:18-25 (testified, "There was no standardized set of guidelines" issued to the loan review firms); 2962:15-2964:16 (testified only that there was "ongoing guidance and feedback") (Aronoff).
[16]   Tr. 1850:10-1851:8 (Esses); Tr. 2611:9-2612:7; 2964:2-16 (Aronoff).

4

part of the review process, the loan review firms were given no direction on the evidence to use.[17]  D&P made no effort to ensure that all third-party documentation collected by the loan review firms was retained and passed on to the Plan Administrator, including any third-party information that might have been inconsistent with the asserted breach claims.[18]

Mr. Aronoff testified that each loan review firm had a QC process in place, but they differed and he did not direct or supervise them.[19]  Mr. Aronoff could provide no specifics about how many potential claims were rejected through the loan review firms' QC process.[20]  He also was unable to recollect the specifics of any conversations with the loan review QC teams.[21]  The Trustees did not call a single witness from the loan review firms.

The loan review firms provided breach recommendations ("Factual Basis") and a supporting "Claim Package" to D&P.[22]  The Claim Package and Factual Basis included only information the Trustees deemed to be their "primary evidence,"[23] and did not address information or documents that were inconsistent with the breach assertions.[24]

The loan review firms did not make AMA determinations.[25]  Mr. Aronoff testified that he made every AMA determination for every loan the Trustees submitted to the Protocol until he

---

[17]   Tr. 2090:4-13 (Esses); 2731:4-19 (Aronoff).
[18]   Tr. 2619:12-2620:13; 2731:24-2732:9 (admitted that he did not put into place any policy or procedure that required the loan review firms to give D&P third-party information); 2733:3-13 (admitted that the only time he would know what the loan review firms did with third-party information that they collected is if they used that information to support a breach claim) (Aronoff).
[19]   When asked by the Court, "What specific knowledge do you have of any QC function that was performed at any of the five review firms?" Mr. Aronoff could not identify specific knowledge and only cited "initial conversations" without any specifics as to who at D&P engaged in those conversations and what was said.  Tr. 2369:19-2373:24 (Aronoff).
[20]   Tr. 2622:10-23; 2623:12-25 (Aronoff).
[21]   Tr. 2372:6-2373:23 (Aronoff).  Mr. Esses was not a member of QC1 or QC2 and was primarily involved in the collection of the loan file documents and the operational aspects of submitting claims to the Plan Administrator.  Tr. 1863:23-1866:3 (Esses).  The third D&P witness to testify at trial, James Finkel, had no substantive involvement in the Protocol.  Tr. 3968:5-9 (Finkel).
[22]   Tr. 2078:18-2079:2; 2121:4-12 (Esses).
[23]   Tr. 2390:8-12; 2478:7-12 (Aronoff).
[24]   Tr. 1429:14-1430:12 (Grice).
[25]   Tr. 2001:20-2002:6 (Esses); Tr. 2376:9-2377:16 (Aronoff).

left D&P.  But, in Mr. Aronoff's view, each breach type was always "material for the same reasons," allowing him to "map the type of breach to the [AMA] basis asserted."[26]  The sum and substance of Mr. Aronoff's AMA "analysis" was to tie the alleged breach type to one of four stock explanations of how the alleged breach *may* affect loan performance or loss severity.[27]

Mr. Esses testified that D&P had two levels of QC.[28]  The QC1 team's primary responsibility was to check that the breach finding had been accurately described in the Factual Basis, and that all the documents cited in the Factual Basis were provided in the Claim Package.[29]  QC1 did not review the loan files; in fact they were not supposed to be "poking around" in the loan files.[30]  Entire categories of missing documents claims did not pass through QC1 because the Trustees felt it was not "cost effective."[31]

QC2 reviewed the Factual Basis for "clarity and consistency."[32]  QC2 did not review the entire loan file, except "on a spot check basis."[33] Neither Mr. Esses nor Mr. Aronoff participated in the QC process,[34] and the Trustees called no witness who did.[35]  Mr. Aronoff could not say how many claims were rejected at either QC1 or QC2.[36]

Mr. Aronoff left D&P at the end of December of 2015, and does not know how many claims went through the Protocol after he left.[37]  The Trustees did not replace him, but merely left the QC2 team to follow the protocols he had set up.[38]

---

[26]  Tr. 2001:22-2002:6 (Esses); Tr. 2376:7-2377:16; 2790:16-2793:11 (Aronoff).
[27]  Tr. 2785:16-24; 2788:5-19; 2792:14-2793:11 (Aronoff).
[28]  Tr. 1859:18-1860:10; 2001:6-2002:6 (Esses).
[29]  Tr. 2375:6-2376:2 (Aronoff); Tr. 1863:23-1864:12 (Esses).
[30]  Tr. 2617:24-2618:2 (Aronoff); *see also* Tr. 1906:4-6 (Esses).
[31]  Tr. 1862:6-18, 2085:9-15 (Esses).
[32]  Tr. 2001:22-2002:6, 2124:25-2125:6 (Esses); Tr. 2376:9-2377:16 (Aronoff).
[33]  Tr. 2932:19-2933:19 (Aronoff).
[34]  Tr. 2082:12-22 (Esses);  Tr. 2933:21-2934:3 (Aronoff).
[35]  Tr. 2112:17-2213:2 (Esses); Tr. 2621:2-2623:15 (Aronoff).
[36]  Tr. 2622:10-23 (Aronoff).
[37]  Tr. 2621:13-2622:2; 2730:19-2731:10; 2939:6-20 (Aronoff).
[38]  Tr. 1865:19-1866:3 (Esses); Tr. 2785:16-24 (Aronoff).

III.    **THE TRUSTEES' BREACH REVIEW PROCESS AS IMPLEMENTED PRODUCED CLAIMS THAT FAILED TO MEET THE REQUIRED BURDEN OF PROOF.**

A.    **Determination Of Threshold Facts.**

To prove breaches of the representations and warranties, the Trustees had the burden to show, on a loan-by-loan basis, a loan defect ("Threshold Fact") that constituted a breach of a representation or warranty in the applicable MLSAA.[39]  The validity of the Trustees' breach claims required accurate and reliable determinations of Threshold Facts.[40]  Instead, the Trustees failed to weigh all the relevant evidence when making their breach determinations and shifted their burden to the Plan Administrator based on mere inferences of breach.

1.    *The Trustees Did Not Address Information Inconsistent With The Asserted Threshold Fact.*

The Trustees operated under the mistaken assumption that they need only identify "evidence of" a Threshold Fact in the loan file or from third-party information, at which point the burden shifted to the Plan Administrator to rebut that evidence.[41]  As Mr. Aronoff admitted, the Trustees' breach narratives never expressly addressed information inconsistent with the asserted Threshold Fact —— not once in the tens of thousands of breach claims they submitted to the Protocol.[42]  Thus, as Mr. Grice observed, the Trustees did not "grapple with the inconsistent or contradictory information from the loan file."[43]  Despite Mr. Esses' admission that this would have been a "mistake,"[44] the Plan Administrator routinely found information in the loan file that was inconsistent with the asserted Threshold Fact,[45] a fact confirmed by the back and forth at

---

[39]    Tr. 1346:17-1347:2, 1347:15-1348:17 (Grice); Protocol Order at Ex. A § III(e)(iii) (PA 74).
[40]    Tr. 1346:17-1347:14 (Grice).
[41]    Tr. 3297:2-6; 3312:9-14; 3312:22-3313:20; 3345:9-23 (Morrow); Tr. 2735:16-25 (Aronoff); Trustees' Opening Slide Deck at 19.
[42]    Tr. 2646:12-17; 2686:6-14; 2718:23-2719:3; 2721:20-2722:11 (Aronoff).
[43]    Tr. 1337:21-24 (Grice).
[44]    Tr. 1922:20-1924:9 (Esses).
[45]    Tr. 471:19-472:3 (Trumpp); Tr. 1337:7-24 (Grice).

trial over exemplar loans.  Numerous exemplar loans contained inconsistencies that had not been addressed by the Trustees' breach submissions, and none could be analyzed solely with reference to the Trustees' breach narrative and Claim Package.[46]  In fact, several of the Trustees' expert witnesses admitted that to make a final breach determination it was necessary to resort to the loan file – the Factual Basis and Claim Package were not enough.[47]

### 2.    *The Trustees Gave Inadequate Weight To The Loan Application.*

To make matters worse, the Trustees' process treated the loan application itself not as evidence to be credited, but simply as the "datapoint that was being audited."[48]  As Mr. Grice opined, the Trustees failed to give the loan application appropriate weight, consistently choosing not to credit the loan application when weighing it against other information.[49]  For example, to the extent there was only one piece of information inconsistent with the loan application, the Trustees concluded that they had established a misrepresentation.[50]

The implications of this unsupportable position are far-reaching.  Many thousands of the Trustees' misrepresentation claims are based on a single piece of information in conflict with the loan application.[51]  It equates to an improper presupposition that borrowers were not truthful on their applications, which infected the Trustees' approach to all borrower misrepresentation claims.  On the other hand, the Trustees treated borrower representations on documents used to prove their claims as accurate and honest.  This inconsistent view is best exemplified by Mr.

---

[46]    Tr. 1483:11-1486:17; 1787:9-1789:10; 1790:15-1797:8 (Grice); Tr. 2817:4-2818:16; 2856:17-2857:24 (Aronoff); Short Sale App for Loan Ending 1643 (PA 839); Tr. 2925:12-2927:8 (Aronoff); Origination Credit Report for Loan Ending 8824 (PA 664); Tr. 2941:12-2943:9 (Aronoff).

[47]    Tr. 2311:18-2313:6; 2366:10-2367:13; 2390:8-2391:7; 2407:8-2408:6; 2567:5-15; 2618:9-24; 2711:2-19 (Aronoff); Morrow Depo. Tr. 110:19-112:2.

[48]    Tr. 2735:10-15 (Aronoff).

[49]    Tr. 1336:7-1337:3 (Grice).

[50]    Tr. 2734:18:-2735:9; 2735:16-25 (Aronoff); Tr. 236:20-237:3 (Trustees' Opening); Tr. 657:4-659:2; 978:2-979:3 (Trumpp); Tr. 1428:20-1430:12; 1518:22-1519:21 (Grice).

[51]    Tr. 657:4-659:2 (Trumpp).

Morrow's testimony, who conceded on the one hand that borrowers "are, most of the time, honest," and yet asserted that all borrower misstatements are "automatically" intentional.[52]

### 3. *The Trustees Approach To Income Misrepresentation Claims Was Inconsistent And Conclusory.*

The presumption of intentionality of misstatements may also explain the Trustees' inconsistent and conclusory approach to assessing borrower representations of "gross monthly income."  Mr. Aronoff testified that the term "gross monthly income" on the loan application was self-explanatory, whether the borrower was salaried, self-employed or both.[53]  Indeed, Mr. Aronoff opined that any borrower who does not understand the term gross monthly income "probably shouldn't get a loan."[54]  In any event, the Trustees apparently did not provide the loan review firms with any instructions regarding how to define the term,[55] and it is therefore unsurprising that the Trustees' loan reviewers did not have a consistent approach for calculating the gross monthly income of a borrower,[56] and at times may not have considered certain sources of income, such as revenue from side businesses and child support.[57]

When calculating a borrower's income from a tax return or a W-2, the loan review firms often mechanically identified an annual income number and divided by twelve, without

---

[52]   Morrow Depo. Tr. 194:16-195:4; 250:16-19.

[53]   Tr. 2736:11-2737:5 (Aronoff).  On the other hand, Mr. Morrow testified that there might be "some ambiguity in how" even an honest borrower reported information to the loan officer, and that loans were underwritten with "room for maneuver."  Tr. 3256:3-3258:7 (Morrow).

[54]   *Compare* Tr. 2736:11-18; 2738:14-24; 2740:25-2741:14 (Aronoff) *with* Tr. 1396:16-1397:22 (no precise definition of gross monthly income) (Grice); *also compare* Tr. 2736:7-10 ("Q. And in your view gross monthly income means 1/12 of the borrower's annualized income, right? A. Yes"); 2739:5-9 ("I think it's pretty clear if you want a loan and someone is asking you how much you get paid, you use your current income to the best you know what that is") (Aronoff); *with* Morrow Depo. Tr. 397:5-21 (borrower calculates base income by taking their prior year's income and dividing by 12); *see also In re Shelley*, 184 B.R. 356, 359 (9th Cir. 1995) ("the term 'gross income' should not convey the same definite and inflexible significance under all circumstance and wherever used.  It is a term whose construction and meaning depends on the context of the subject matter").

[55]   Tr. 2611:9-2612:7 (Aronoff).

[56]   Tr. 1401:6-1402:12; 1421:8-25 (Grice); Tr. 2712:20-2713:7; 2985:17-2986:16 (Aronoff).

[57]   Tr. 2713:2-25 (Aronoff).

considering whether that annualized number represented a full year of employment, or changes in the borrower's job between the date of the application and the date of the document they relied upon.[58]  Indeed, the Court saw instances where the Trustees' loan reviewers appear to have selected the lowest income number from a range of possible income numbers.[59]  Other forms of evidence offered by the Trustees were even less reliable, such that the Trustees offered no more than so-called "reference income number[s]."[60]  At trial, the Trustees abandoned their claim that they calculated the borrower's "actual income" at origination.[61]  This admission undermines reliance on any "tolerances," "magnitude of misstatement" charts, or DTI calculations.[62]

### 4.    *The Trustees Incorrectly Determined Threshold Facts For Debt Misrepresentation Claims.*

The Trustees' approach to misrepresentation of debt claims shifted the burden of proof to the Plan Administrator in two significant ways.  First, the Trustees systematically failed to verify that the alleged debt was outstanding at the time of origination or securitization.[63]  Second, many of these claims were based on debts that concededly did not come into existence until after the subject loan was closed.[64]  Because the loan application provides no opportunity for the borrower to disclose such future debts, the Trustees asserted that the borrower should have found some other way to communicate the existence of the debt outside of the application itself, yet

---

[58]   Tr. 1399:19-1402:12; 1425:3-1427:3 (Grice); *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Secs. Inc.*, 205 F. Supp. 3d 386, 487, 509, 518-19 (S.D.N.Y. 2016) ("*MARM III*") (questioning evidence of income misrepresentation where evidence from a year other than origination or for a borrower in a job that relied on variable income sources)

[59]   Tr. 2702:2-2706:4 (Aronoff).

[60]   Tr. 2402:9-2404:17; 2843:19-21, 2845:4-2846:6, 2848:2-25 (Aronoff).

[61]   Tr. 2402:9-2404:17; 2843:19-21, 2845:4-2846:2, 2848:2-12 (Aronoff).

[62]   Trustees' Pretrial Br. at 24; Tr. 2983:9-2984:17 (Aronoff).

[63]   Tr. 559:6-560:22 (Trumpp).

[64]   Trustees' Pretrial Br. at 25-26; Tr. 598:23-599:8 (Trumpp).

performed no investigation into whether the disclosure was made,[65] leaving the Plan

Administrator to find evidence of such a communication many years after the fact.[66]

5.    ***The Trustees' DTI Claims Are Derivative Of Their Income And Debt Misrepresentation Claims.***

The Trustees also assert claims that the borrower's DTI ratio at origination was greater

than was represented in the MLSAAs.[67]  As Mr. Grice testified, these "Excessive DTI" claims

are derivative of debt and income claims, meaning that they rely on the same proof and fail for

the same reasons as the underlying claims.[68]

6.    ***The Trustees Incorrectly Determined Threshold Facts For Occupancy Claims.***

The Trustees asserted claims for misrepresentation of occupancy, usually based on the

borrower's alleged failure to occupy the property as a primary residence within 60 days from and

for a year after closing.[69]  Under a typical deed of trust, however, where extenuating

circumstances, like death, job loss, or disability prevent the borrower from occupying the

property within the first year after origination, the borrower's failure to occupy the property is

not a default.[70]  Mr. Aronoff opined that extenuating circumstances do not apply if the borrower

executed an occupancy affidavit along with the mortgage, but he did not appreciate that while

some of those affidavits purport to eliminate the exception for extenuating circumstances, others

do not.[71]  Moreover, Mr. Aronoff did not seek any legal opinion on whether the terms of an

occupancy affidavit would override other provisions of the deeds of trust under the laws of each

---

[65]   Tr. 2878:3-2882:19 (Aronoff).
[66]   Tr. 563:13-25; 598:23-601:17 (Trumpp); Tr. 1379:25-1383:5; 1393:10-1395:15 (Grice); Tr. 2871:13-2874:5 (Aronoff).
[67]   Tr. 1486:25-1487:7 (Grice).
[68]   Tr. 1487:8-1488:2 (Grice); see supra, at pp. 9-10.
[69]   Tr. 2230:8-2231:20 (Aronoff).
[70]   Tr. 2742:2-6 (Aronoff).
[71]   Tr. 2742:7-2743:7; 2743:19-2746:7 (Aronoff); Occupancy and Financial Status Affidavit for Loan Ending 0033-A (PA 0033-A); Tr. 2746:8-19 (Aronoff).

state.[72]  Here, too, the Trustees shifted the burden of proving exceptions to the occupancy

requirements to the Plan Administrator.[73]

### 7.    *The Trustees' Interpretation Of Evidence In Support Of Threshold Facts Was Unreliable.*

In their loan reviews, and in their presentation during trial, the Trustees took the position

that because a particular piece of evidence may be probative of a breach in one context, it is a

"valid" evidence type, and a breach claim supported by "valid" evidence type is by definition

also "valid."[74]  This approach ignores the relative weight to be given all relevant evidence in a

loan file.  There is no dispute that every loan is unique, and every claim must be analyzed

individually.[75]  Equally critical, the evidence used to analyze a breach claim must be analyzed in

the context of each unique loan file, both to understand how the evidence is being used and to

assess what weight it should be given in light of how it is being used and the overall context of

the file.[76]  To support a breach claim, it is not enough that the claim is based on an evidence type

that is "widely used in the industry for both origination and forensic reviews," as Mr. Aronoff

and Mr. Morrow were repeatedly asked to affirm.[77]  Time and again at trial, the evidence

demonstrated that the Trustees improperly interpreted evidence "accepted . . . in the industry" as

---

[72]  Tr. 2747:7-2748:3 (Aronoff).

[73]  Tr. 3297:2-6 (Morrow).

[74]  Tr. 207:16-208:22, 216:20-217:17 (Trustees' Opening); Trustees' Opening Slide Deck at 36, 44, 56; Tr. 2313:7-2314:7 (Aronoff).

[75]  Tr. 1330:13-1331:13; 1590:12-24 (Grice); Tr. 2311:18-2313:6; 2439:19-2440:5; 2674:12-2675:5; 2985:17-2987:20 (Aronoff); Tr. 1832:25-1833:6 (Esses); Tr. 653:14-22 (Trumpp).

[76]  Tr. 2343:5-2344:13 ("To the extent there was contradictory evidence in the file,…don't cherrypick…View any piece of evidence or any document that you think supports a breach in the totality of the file"); 2449:8-22 ("tax returns in the file which were considered in the context of the whole file..."); 2478:7-20 ("red flags…would…be used again in reference to the totality of the file"); 2577:10-2578:11 ("You have to refer…to the totality of the file..."); 2618:14-24 (loan review firms expected to conduct "holistic review" of a particular piece of evidence in the context of the totality of the file) (Aronoff); Tr. 472:20-473:17; 428:20-429:15; 476:4-20 (Trumpp); Tr. 1338:18-22; 1449:6-11 (Grice).

[77]  Tr. 2346:4-24 (Aronoff); Tr. 3240:14-19; 3244:21-3245:2 (Morrow).

categorical "proof" of breach claims, conflating probative evidence with sufficient proof of breach, a flaw that permeated the Trustees' loan review process.[78]

For example, the Trustees treated general salary statistics from the Bureau of Labor Statistics ("BLS") as dispositive proof of a misrepresentation of income, even though BLS covers a limited number of job types that are often difficult to match to a borrower, provides only a range of salaries in a given metropolitan area, and does not include income from tips, overtime, bonuses, tuition reimbursements, or side businesses.[79]  As Mr. Grice illustrated, the Trustees alleged a misrepresentation of income based on BLS data for "salesperson," when the borrower was the president of a construction firm.[80]  *See FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 305-06 (S.D.N.Y. 2008) ("[I]t borders on the fanciful to contend [BLS], which report[s] the income of a broad category of 'Medical Records and Health Information Technicians,'. . . provide[s] a rational basis for estimating the earnings of freelance home billers . . . .").

The loan review firms also often improperly treated information in bankruptcy documents as conclusive support for misrepresentation of income, debts, and occupancy claims, without taking into account other evidence in the file and even in the bankruptcy document itself about the borrower's circumstances.[81]  *See MARM III*, 205 F. Supp. 3d at 446, 476.  Similarly, the loan review firms performed "audit verifications" by contacting the borrower's current employer or former employer *in 2015* to verify a borrower's employment or income *at origination*.[82]  Predictably, this resulted in information that was often incomplete, erroneous, or

---

[78]   Tr. 2346:4-2366:9; 2485:12-2486:3; 2892:9-23 (Aronoff).
[79]   Tr. 299:11-300:21 (Trustees' Opening); Tr. 1432:18-1434:12 (Grice); Tr. 2353:20-2354:15; 2835:4-12; 2854:20-2855:12 (Aronoff).
[80]   Tr. 1435:14-1437:5; 1441:22-1443:5 (Grice).
[81]   Tr. 630:13-632:7 (PA 667) (Trumpp); Tr. 1475:21-24; 1479:4-22 (Grice); Tr. 2518:12-2519:4 (Aronoff).
[82]   Tr. 1467:12-1468:4 (Grice).

prepared by someone who may not have had access to the borrower's complete and accurate employment information a decade later.[83]

A significant source of the Trustees' proof came from third-party databases like DataVerify, Accurint, CLEAR, LexisNexis, and Sitex, or audit credit reports. The Trustees often considered these sources sufficient, even though the data sources themselves disclaim their accuracy or warn that the data they provide cannot be used without being independently verified.[84] Such sources provide "associations" between borrowers and particular properties or liabilities.[85] As the Court heard at trial, such associations are by no means conclusive, as, for example, for purposes of a misrepresentation of occupancy claim when dozens of people are associated with a given property at the same time, including the borrower.[86]

### 8. *The Trustees' Missing Document Claims Are Unsupported.*

At trial, the Trustees did not address in any detail claims for missing or defective documents, which they categorize as "Lender Breaches."[87] Aside from borrower misrepresentations, missing documents claims make up the bulk of the Trustees' remaining proposed claims, and constitute most of the Deemed AMA breaches.[88]

The mere absence of a document in the file ten years after origination simply does not prove that the document was never there, particularly without establishing a chain of custody for

---

[83]   Tr. 1467:20-1468:4; 1472:11-1474:14 (Grice); Tr. 2116:23-2119:9 (Esses).
[84]   Tr. 1444:2-1445:18; 1449:12-1451:5 (Grice); Tr. 2091:22-2093:17 (Esses); CFPB Common Credit Report Errors (PA 136); Tr. 2094:7-2096:23 (Esses); Equifax Terms of Use (PA 682); Experian Legal Terms & Conditions (PA 683); TransUnion - Terms of Use (PA 688); Tr. 2097:10-2098:24 (Esses); MERS Terms and Conditions (PA 138); Tr. 2102:24-2103:23 (Esses); Disclaimer – Accurint Report (PA 694); Tr. 2101:19-2102:23 (Esses); Disclaimer – LexisNexis Report (PA 697); Tr. 2103:24-2104:18 (Esses); Salary.com (PA 800); Tr. 2107:20-2108:6 (Esses); 6/18/13 BLS Hearing – Testimony of Commissioner Groshen (PA 801); BLS Survey Methods May 2016 (PA 132); Tr. 2109:22-2110:22 (Esses); Tr. 2866:24-2867:18 (Aronoff); Disclaimer – LexisNexis Report (PA 697); Tr. 2892:5-2893:13 (Aronoff).
[85]   Tr. 245:20-246:9 (Trustees' Opening); Tr. 1446:25-1448:13; 1462:7-1465:3 (Grice).
[86]   Tr. 1446:25-1451:5; 1461:15-1465:3 (Grice).
[87]   Tr. 1488:22-1489:14 (Grice).
[88]   Trustees' Pretrial Br. at 29.

the files.[89] *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 531-32 (S.D.N.Y. 2015). The Trustees were unable to establish a chain of custody for the files here.[90] For example, they presented no evidence of the document retention practices of servicers or originators, did not document the travels of even one loan file, did not put on evidence concerning the form in which the files were maintained, did not explore any other potential sources of files, including the collateral files in their own possession, and did not provide securitization certifications that would have provided additional evidence that a document was missing at origination.[91] The Trustees also failed to account for the fact that missing or unsigned regulatory disclosure documents, like truth-in-lending ("TIL") or HUD-1 forms, may not have been present because these forms weren't actually required to be signed or retained.[92] Indeed, Mr. Aronoff did not even "know whether there is a retention requirement in any state law or federal law," even as he asserted that the alleged absence of these documents supports tens of thousands of breach claims.[93]

As a matter of process, the Trustees' improperly took the position that it was their job to identify when a document was missing, at which point the burden shifted to the Plan Administrator to locate it.[94] Even so, the Trustees lodged many missing documents claims for which the Plan Administrator or Mr. Grice located the documents in the loan file.[95] Consistent with their general failure to give weight to inconsistent evidence, the Trustees discounted

---

[89]  Tr. 603:22-604:3, 607:12-608:9 (Trumpp); Tr. 1488:8-21 (Grice).

[90]  Tr. 1490:25-1492:13 (Grice). For example, Judge Castel found that the Trustees in *MARM III* could meet their burden when they showed that the loan files "were digitized at the time of origination" and where the plaintiff asserted a document defect claim where a document was missing from each of eight sets of loan files gathered from certificate insurers, servicers, custodians, and originators. *MARM III,* 205 F. Supp. 3d at 453.

[91]  Tr. 2071:7-2074:15; 2076:9-2077:15; 2078:12-17 (Esses); Tr. 2912:13-20 (Aronoff); SASCO 2006-S3 Trust Agreement at § 2.02(b)-(d) (TRX 202); Protocol Order at Ex. A § III(e)(vi)(1) (PA 74).

[92]  Tr. 1500:9-1503:6; 1508:23-1509:8; 1509:16-1510:20 (Grice).

[93]  Tr. 2901:19-2902:19 (Aronoff).

[94]  Tr. 2899:20-2901:8 (Aronoff); Tr. 3297:2-6 (Morrow).

[95]  Tr. 603:3-9 (Trumpp); Tr. 1489:15-1490:4; 1498:24-1499:16; 1505:13-24 (Grice).

evidence that the document was present ("document footprints"), insisting on nothing short of a copy of the missing document itself.[96]

### B.    Application Of Representations And Warranties.

#### 1.    *The Trustees Misconstrue Key Contractual Provisions.*

##### a.    *The Trustees Failed To Determine Materiality.*

The Trustees' misrepresentation of income, debt and employment claims are based on breaches of two representations: the No Default Representation[97] and the No Fraud Representation,[98] each of which has a materiality qualifier.[99]  Notably, the typical deed of trust specifically defined "representations concerning Borrower's occupancy of the Property as Borrower's principal residence" as material.[100]

There is no dispute that both representations require proof of "material" misrepresentations, statements, or omissions.[101]  *See e.g., MARM III*, 205 F. Supp. 3d at 467. The Trustees and the Plan Administrator also agree that the standard for analyzing the materiality

---

[96]    Tr. 1490:12-1491:7 (Grice); Tr. 2899:20-2901:8; 2911:13-20 (Aronoff).
[97]    The No Default representation reads:
>    There is no default (other than delinquency in payment), breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and neither the Seller nor its predecessors has waived any default, breach, violation or event of acceleration.  *See, e.g.*, SASCO 2006-S3 MLSAA at § 1.04(c)(vii) (TRX 232).

>    While the No Default Representation does not mention borrower misstatements, the underlying deed of trust typically provides that "Borrower shall be in default if, during the Loan application process, Borrower . . . . gave *materially false, misleading, or inaccurate information or statements* to Lender (or failed to provide Lender with material information) in connection with the Loan."  Deed of Trust at § 8 (PA 252) (emphasis added).

[98]    The No Fraud Representation provides that:
>    The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of *material fact* or omit to state a *material fact* required to be stated therein or necessary to make the information and statements therein not misleading.  *To the best of Seller's knowledge*, no fraud was committed in connection with the origination of the Mortgage Loan.  *See, e.g.*, SASCO 2006-S3 MLSAA at § 1.04(c)(v) (TRX 232) (emphasis added).

[99]    SASCO 2006-S3 MLSAA at § 1.04(c)(v), (vii) (TRX 232); Deed of Trust at § 8 (PA 252).
[100]    Tr. 2228:9-15 (Aronoff); Deed of Trust at § 8 (PA 252).
[101]    Trustees' Pretrial Br. at 1, 2; *See, e.g.*, SASCO 2006-S3 MLSAA § 1.04(c)(v),(vii) (TRX 232); Deed of Trust at § 8 (PA 252).

of a breach of one of these representations is whether the misrepresentation was material to the origination credit decision.[102]

The Plan Administrator's approach to assessing the Trustees' breach claims gave meaning to both the materiality and seller's knowledge requirements.[103]  As Mr. Grice testified, to determine whether the misstatement was material to the credit decision, the reviewer must analyze the underwriting guidelines for the particular loan product at issue, consider borrower-specific facts bearing on the borrower's ability to repay the loan (known as "compensating factors"), and in light of that information determine whether, had the misstated fact been known, the same loan would have been made.[104]  The Plan Administrator performed this analysis.

The Trustees' position is that if "the misstatement or omission relates to 'material' information," which "includes any information about income, debts or occupancy" then the materiality requirement is satisfied.[105]  This approach misreads the deed of trust, which characterizes as a default the provision or omission by the borrower of materially false information, and which categorically defines only primary occupancy breaches as material.[106]  In other words, the question is not whether the category of information misstated can be material, but whether in context the magnitude of the misrepresentation is material to the credit decision.

The Trustees offered no evidence of fact-specific materiality either in the Protocol or at trial.  The Trustees did not consider DTI, underwriting guidelines, or compensating factors in performing their materiality analysis; indeed they were adamant that underwriting guidelines

---

[102]  Tr. 481:22-482:24 (Trumpp); Tr. 2248:3-25; 2751:10-2752:20; 2753:22-2754:2 (Aronoff).
[103]  Tr. 1351:17-1352:17 (Grice).
[104]  Tr. 494:5-22 (Trumpp); Tr. 1347:15-1352:11 (Grice); Tr. 2130:25-2131:5 (Esses).
[105]  Trustees' Pretrial Br. at 11.
[106]  Tr. 2228:1-15 (Aronoff).  It is also at odds with the commonly-understood concept of materiality as a fact- and context-specific inquiry.  *Cf. SEC v. Biovail Corp.*, No. 08 Civ. 2979 (LAK), 2010 WL 2465482, at *2 (S.D.N.Y. June 16, 2010); *In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015).

17

were "irrelevant" to the materiality determination.[107]  Although Mr. Aronoff asked the loan

review firms to impose certain "tolerances," including a 5% "tolerance" on misrepresentation of

income claims, he did this to weed out "trivial" differences, not to satisfy the materiality

requirement.[108]  (And, in any event, these "tolerances" were meaningless because the Trustees

did not prove actual income.)  These errors infected the vast majority of the claims.

### b.    *The Trustees Failed To Demonstrate Seller's Knowledge.*

The No Fraud Representation also has a requirement that the Trustees prove the Seller's

actual knowledge of the misrepresentation.  *See LaSalle Bank Nat'l Ass'n v. Nomura Asset*

*Capital Corp.*, 47 A.D.3d 103, 105-06 (N.Y. 1st Dep't 2007).  The Trustees admittedly made no

attempt to prove the seller's knowledge of any misrepresentations.[109]  The Trustees took the

position that the No Fraud Representation was really two separate representations, a "No Untrue

Statement Representation," which covers "misrepresentations,"[110] and a separate no fraud

representation for which they admit they must prove seller's knowledge.[111]  This reading

conflicts with the plain language of the No Fraud Representation, and renders it duplicative of

the No Default Representation, because there would be two representations that cover material

borrower misrepresentations.  *See Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096

(DLC), 2015 WL 4163343, at *3 (S.D.N.Y. July 10, 2015); *see also Severstal U.S. Holdings,*

*LLC v. RG Steel, LLC*, 865 F. Supp. 2d 430, 443 (S.D.N.Y. 2012).[112]

---

[107]  Tr. 1338:18-1339:19 (Grice); Tr. 2128:2-22 (Esses); Tr. 2758:19-2759:9 (Aronoff).
[108]  Tr. 2754:16-2758:10; 2758:19-2759:19 (Aronoff).
[109]  Tr. 479:12-480:20 (Trumpp); Tr. 2760:5-19 (Aronoff).
[110]  Trustees' Pretrial Br. at 9-10, n.6.
[111]  Trustees' Pretrial Br. at 9; Tr. 2236:5-2237:18; 2760:5-19; 2761:8-19 (Aronoff).  Revealingly, after referring to this representation as the No Fraud Representation consistently throughout the Protocol, for purposes of this litigation the Trustees changed the name to "No Untrue Statement," a change in terminology that Mr. Aronoff could not (or would not) explain.  Tr. 2654:14-2526:17 (Aronoff).
[112]  Tr. 479:12-480:9 (Trumpp).

### 2.    *The Trustees Failed To Establish AMA On A Loan-By-Loan Basis.*

After establishing a Threshold Fact and breach of a representation and warranty, the

Trustees were required to prove that the breach "adversely and materially affects the value of the

related Mortgage Loan" ("AMA"), unless the breach was deemed to materially and adversely

affect the value of the loan ("Deemed AMA").[113]  Few of the breach claims—and none of the

misrepresentation claims—are Deemed AMA.

### a.    *The Trustees Conducted No Loan-Level Analysis Of AMA.*

Unless deemed, it is necessary to prove AMA for each breach.  AMA must be "analyzed

separately from the materiality requirement contained in individual representations and

warranties."  *MARM III*, 205 F. Supp. 3d at 467; *see also* Protocol Order at Ex. A § III(e)(iii).[114]

While the Trustees' witnesses claimed they made AMA determinations on "a loan-by-loan" and

"breach finding by breach finding basis,"[115] the evidence showed otherwise.  Rather, the Trustees

asserted AMA based on breach *type*,[116] and conflated the question of whether a

misrepresentation was "material" with the separate element of whether that breach, if proved,

adversely and materially "affects" the value of the loan.[117]

As Mr. Trumpp observed, the Trustees did not analyze AMA with respect to the specific

loan, the loan's history, the borrower, or any evidence in the loan file.[118] For example, the

Trustees concluded that all missing appraisals satisfied the AMA requirement, and for the same

---

[113]   SASCO 2006-S3 MLSAA at §1.04(d) (TRX 232); Protocol Order at Ex. A §§ III(e)(ii), (vi)(3) (PA 74); *see, e.g.*, *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 162 (2d Cir. 2014).

[114]   *Contra* Tr. 2004:2-2005:21 (Esses).

[115]   Tr. 1902:9-17 (Esses); Tr. 2308:21-24 (Aronoff).

[116]   Tr. 416:5-17; 420:3-22 (Trumpp); *see also* Castro Aff. Rep. at ¶ 95 (PA 951).

[117]   Tr. 2309:7-2310:10; 2776:9-2777:3 (Aronoff).

[118]   Tr. 420:3-22 (Trumpp); Tr. 2788:5-19 (Aronoff).

reasons.[119]  The same was true for misrepresentation claims.[120]  In short, the Trustees' AMA

analysis merely involved matching a breach type to one of four stock AMA recitals, without

regard for the particular circumstances or timing of the analysis.[121]

      The Trustees' formulaic approach to AMA is inconsistent with the MLSAAs and the

Protocol, and contrary to cases interpreting similar language in the repurchase context.  No court

has approved this approach or the Trustees' conflation of material misrepresentations with AMA;

on the contrary, courts have found material misrepresentations that did not also satisfy AMA.

*See, e.g.*, *MARM III*, 205 F. Supp. 3d at 484, 495, 497, 501-02, 512 (S.D.N.Y. 2016). To hold

otherwise would be to write the AMA requirement out of the contract, and render Deemed AMA

meaningless.  *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206

(2d Cir. 2005).  It would also render meaningless the requirement that AMA be assessed at the

time of notice of the breach.  *MARM III*, 205 F. Supp. 3d at 465.

      As discussed below, the parties disagree on the appropriate standard for proving AMA.

But regardless of how that standard is defined, the Trustees unquestionably misapplied the

requirement by not conducting the required loan-by-loan analysis, measuring any alleged

increase in the risk of loss (under their own AMA theory), or assessing AMA as of the time of

notice.  These failures infect all but the small percentage of Deemed AMA claims, rendering the

Trustees' proof of AMA pervasively unreliable and insufficient.

---

[119]  Tr. 420:3-22; 601:24-602:21; 603:10-21 (Trumpp); Tr. 2310:11-25; 2788:5-19 (Aronoff).

[120]  Misrepresentation of income claims were made based on certain arbitrary and ultimately unsupported "variances" between income as stated on the loan application and "actual" or "verified" income, which, as shown at trial, was neither.  Tr. 2776:9-2777:3 (Aronoff).

[121]  Tr. 2785:16-24; 2792:14-2793:11 (Aronoff).

b.    ***The Trustees Must Prove A Diminution In Loan Value, Not Just An Increased Risk Of Loss.***

The Trustees advocate for a risk of loss standard drawn inappropriately from case law that addresses repurchase claims by monoline insurers. *See* Trustees' Pretrial Br. at 36 (citing *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 338 (S.D.N.Y. 2012) (applying risk-of-loss standard in monoline case); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F. Supp. 2d 596, 601-02 (S.D.N.Y. 2012) ("*Flagstar*") (same)).[122] None of these courts considered or analyzed the fact that the risk of loss framework arose from insurance law.[123]

The risk of loss standard is rooted in protections afforded to insurers under New York insurance law ("NYIL"). In *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, the court concluded that monoline insurers had a statutory right under NYIL to accurate disclosures from the loan seller. 105 A.D.3d 412, 413 (1st Dept. 2013). A material increase in the risk of loss constituted AMA because the lack of disclosure affected the insurer's decision-making, a

---

[122]    The non-monoline cases that the Trustees cite in their pre-trial brief rely on monoline case law and its progeny. *See* Trustees' Pretrial Br. at 36. (citing *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126-27, 131 (S.D.N.Y. 2014) (relying on *Syncora*); *Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A.* ("*JPMorgan*"), No. 12 Civ. 6168(MGC), 2014 WL 1259630, at *4 (S.D.N.Y. Mar. 27, 2014 (relying on *Homeward*, *MBIA*, *Flagstar*, and *Syncora*); *MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322 (PKC), 2015 WL 764665, at *15 (relying on *JP Morgan*, *Homeward*, *Flagstar*, *Syncora*)). The Trustees' final case, *Resolution Trust Corp. v. Key Financial Services, Inc.*, neither involves an AMA provision nor endorses a risk of loss test. *See* 280 F.3d 12, 18 n.14 (1st Cir. 2002).

[123]    In most of the Trustees' non-monoline cases, the measure of loss was whether the breach materially and adversely affects the "interests of the Certificateholders." *See, e.g.*, *MARM III*, 205 F. Supp. 3d at 464. That language is similar to the "interests of the bond insurer" provisions in monoline cases. *See MBIA*, 105 A.D.3d at 413 ("the inaccuracy [underlying the repurchase request] materially and adversely affect[] the interest of" the bond insurer) (alterations in original). Here, however, none of the at-issue MLSAAs contain an "interests of the Certificateholders" provision in the AMA requirement and only a few contain a similar "interests of the Depositor" provision. Rather, the overwhelming majority of the MLSAAs use a "value of the related Mortgage Loan" provision. Courts recognize that the distinction between loss-in-value and the interests-of-certificateholders formulations. *See BNY Mellon Trust Co., N.A. v. Morgan Stanley Mortg. Cap., Inc.*, No. 11 Civ. 505 (CM) (GWG), 2017 WL 733227, at *1 (S.D.N.Y. Feb. 10, 2017) (trust agreement had "two different definitions of 'material breach'" with one "related to whether the value of a specially serviced loan is materially affected by the breach" and the other related to "the interests of the holders of the certificates in the related Mortgage Loan"). Thus, to the extent monoline analysis has been imported into interests-of-certificateholders analysis, there is no case law to support extending it into the loss-in-value context.

21

protection expressly afforded by NYIL.  The *Syncora* court similarly noted that a monoline insurer's interests are "legally distinct" from those of investors.  874 F. Supp. 2d at 338.

The critical distinction between monoline and non-monoline cases was crystalized in an expert report issued on behalf of the Trustees in another case, in which Justice Anthony Carpinello stated, "for Trustees suing on behalf of certificate holders for breaches of representations and warranties, [the] causality element is usually defined as requiring proof that the breached representations had an adverse [e]ffect on the value of the underlying mortgage loans even if the loans themselves had not actually defaulted."[124]  "In contrast, monoline insurers have no requirement to prove proximately caused damages of this type . . . because as insurers, they enjoy the benefits of N.Y. Insurance Law Sections 3105 and 3106."[125]

The weight of non-monoline authority, the MLSAAs, industry custom and practice, and the parties' business practices, demonstrate that the Trustees' risk of loss standard is inapplicable here.  Courts recognize that a non-monoline plaintiff must prove that a breach cause a diminution in loan value, not just an increased risk of loss.[126]  The diminution in value standard comports with a plain reading of the MLSAAs, which require that the breach "adversely and materially affects the value of the related Mortgage Loan" or—in a small handful of cases—that adversely and materially affects the interests of the Depositor.

---

[124]  Expert Report of Hon. Anthony J. Carpinello (Ret.) re: Proposed RMBS Settlement Agreement at 3 (May 27, 2014) (TRX 1145)

[125]  *Id.*

[126]  *See, e.g., LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.* ("*Citicorp*"), No. 01 Civ. 4389 (AGS), 2002 WL 181073, *4-5 (S.D.N.Y. Feb. 5, 2002) (breach "contributed to the loss of the Holiday Inn franchise, . . . [and] that failure contributed to the default on the mortgage loan"); *W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*, No. A1302490, 2017 WL 3392855, at *12 (Ohio Ct. Com. Pl. Aug. 4, 2017) (plaintiffs did not prove material and adverse effect because their expert "never determined, or sought to determine, whether any alleged breach caused or did not cause a default, or had or could have had any impact on loan performance."); *Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.* ("*Morgan Stanley*"), No. 11 Civ. 0505 (CM) (FM), 2011 WL 2610661, *6-7 (S.D.N.Y. June 27, 2011) (there must be a "causal link between the defendant's alleged wrongful conduct and the plaintiff's alleged damages").

Mr. Castro explained that a loan's value depends entirely on the commercial context in which the determination is being made.[127] Once a loan is securitized and until the trust's maturity, the trust cannot sell or otherwise trade loans as if they were individual assets. Indeed, such a transaction would violate the Internal Revenue Code.[128] For this reason, one cannot value a securitized loan as if it could be purchased or sold on the market.[129] Rather, the value of a securitized loan is bound up in its performance—the cash flows the loan generates for the benefit of investors in the RMBS.[130] AMA in this context requires that the breach "either (i) led to an actual default, delinquency, or other significant loss on a particular mortgage loan; or (ii) impeded the servicer's ability to enforce the terms of the mortgage loan in default."[131]

This standard comports with industry custom and practice. Industry participants understood that repurchase of securitized mortgage loans would not be pursued until the Trust suffered a loss because so long as a loan performed, investors were benefitting from the cash flows in which they had invested.[132] Prematurely removing a cash-producing loan from a Trust operates like a prepayment, and deprives investors of continuing interest payments and eliminates the credit protection generated by such cash flows.[133] That is why "[i]n the ordinary course of business, purchasers did not put loans back unless and until they were severely delinquent or defaulted."[134] Likewise, in the context of securitized loans, LBHI's affiliate Aurora evaluated AMA separately from breach and often when loans performed for more than

---

[127]   Castro Aff. Rep. at ¶¶ 22, 28 (PA 951); Castro Rebuttal Rep. at ¶ 57 (PA 1004).
[128]   Castro Aff. Rep. at ¶ 89 (PA 951) (citing I.R.C. § 860F(a)(2)(A)).
[129]   *Id.*
[130]   *Id.*
[131]   *Id.* ¶ 17.
[132]   *Id.* ¶¶ 28-29.
[133]   *Id.* ¶¶ 32-35; *see also* Burnett Depo. Tr. 29:13-15 (conceding investors benefit more from performance of a breaching loan than from putting it back); *id.* at 56-57 (argument of U.S. Bank); *see also id.* (arguing that notice of repurchase demand to the Debtors was not required until loans went into default).
[134]   Castro Reply Rep. at ¶ 11 (PA 953).

18 months, such performance history would make an AMA finding less likely.[135]  Two of the

Trustees themselves have said as much *in this very case*, arguing there was no reason to audit

performing loans or remove them from a portfolio.[136]

   The Trustees have argued that the Plan Administrator should be estopped from adopting a

position on AMA different from positions taken by it and its affiliate in whole loan cases.[137]  The

Trustees have made no showing of the requirements of judicial estoppel: (1) a "clearly

inconsistent position," (2) "that a court in an earlier proceeding has adopted," and (3) the party

"would derive an unfair advantage or impose an unfair detriment on the opposing party if not

estopped."  *See In re Oneida Ltd.*, 383 B.R. 29, 45 (Bankr. S.D.N.Y. 2008), *rev'd on other

grounds*, 562 F.3d 154 (2d Cir. 2009).  Rather, Mr. Trumpp explained that whole loans are

tradeable assets that derive their value based on individual loan sales on the secondary market,

whereas securitized loans are not tradeable assets and derive their value through cash flows

received by the Trust.[138]  Given this distinction, there is a different value assessment in

determining AMA for whole loans versus securitized loans.[139]  There is no inconsistency

between the Plan Administrator's current position as to securitized loans and the position it and

Aurora adopted in distinguishable proceedings as to whole loans.

### c.    *The Trustees Failed To Satisfy Their Own AMA Test.*

   Even if the Trustees' risk of loss standard were the correct standard, which it is not, the

Trustees' proof failed to meet it.  While the Trustees admit that every loan has a baseline risk of

---

[135]  Tr. 906:13-911:20 (Trumpp); Aurora Policies & Procedures Deck AMA Analysis (PA 658).

[136]  Transcript of Proceedings at 48 (June 30, 2011) (argument of Citigroup, as predecessor Trustee to Wilmington Trust Company) (TRX 842).

[137]  If anything, the Trustees, having prevailed in *In re U.S. Bank National Association*, 51 Misc. 3d 273, 280 (Sup. Ct. N.Y. Cty. 2015), by relying on the expert opinion of Judge Carpinello, should be estopped from taking a different position on the identical issue of AMA on non-bond insured securitized loans in this case.  *See* Trustees' Pretrial Br. at 38.

[138]  Tr. 899:12-903:24 (Trumpp).

[139]  Tr. 903:6-24 (Trumpp).

loss,[140] the Trustees performed no calculation quantifying how an alleged breach would increase the risk of loss beyond the baseline risk, let alone significantly increase the risk of loss.[141] Likewise, while the Trustees conceded that the alleged relationship between value and risk of loss "might be different for any given transaction,"[142] they demonstrated that alleged relationship with only "a drawing of the theoretical" unsupported by any mathematical model or data.[143] Two of the Trustees' own experts undermined Mr. Aronoff's claimed relationship between breaches and risk of loss when they admitted that risk of loss and even loan values are affected by many factors unrelated to breach,[144] none of which the Trustees considered at all.

Additionally, the passage of time is relevant in a risk-of-loss regime, because once a loan is seasoned 12 to 24 months, the chance of there being a material link between the breach and the loan's risk of loss diminishes.[145] This, too, the Trustees ignored. Rather than consider whether and how the risk of loss on a loan may change over time, the Trustees advocate for a risk of loss analysis "made as of the time of securitization."[146] This is contrary to case law on which they purport to rely. Judge Castel ruled that "the determination of whether the breach materially and adversely affects the interests of the Certificateholders . . . is assessed as of the cure-repurchase period." *MARM III*, 205 F. Supp. 3d at 464 (internal citation and quotations omitted). "The timing of a material adverse effect is grounded in the language of the PSAs, which uses the word 'affects' in the present tense." *Id*. at 465. And even if, as Mr. Aronoff testified, the risk-of-loss analysis was to be made at securitization, the Trustees failed to perform that analysis at all.[147]

---

[140]   Tr. 2764:11-22 (Aronoff).
[141]   Tr. 2764:11-2765:11; 2766:16-18 (Aronoff).
[142]   Tr. 2294:20-22 (Aronoff).
[143]   Tr. 2292:19-2295:11 (Aronoff); *see* Value is a Function of Expected Loss Demonstrative (TRDX 175).
[144]   Morrow Depo. Tr. 97:5-13; 97:17-98:6; 98:10-13; 178:23-179:8; 179:11-23; O'Driscoll Depo. Tr. 73:2-10; 73:13-17; 73:21-23; 121:8-122:6; 122:8-11; 122:13-14; 122:17-123:12; 123:14-16; 123:18.
[145]   Castro Aff. Rep. at ¶ 90.
[146]   Tr. 2769:22-2770:4 (Aronoff).
[147]   Tr. 2770:11-2771:16 (Aronoff).

The Trustees downplay the timing of their AMA analysis by arguing that harm from a
breach carries on indefinitely because the Trusts allegedly did not receive what they bargained
for on a given loan.[148]  For this proposition, the Trustees rely on *MARM III*,[149] but omit Judge
Castel's finding that "[n]o witness for the Trusts offered credible evidence as to how a defect
would have caused a higher rate of interest to be charged or other loan terms to be different."
*See MARM III*, 205 F. Supp. 3d at 468.  The same is true here.  "The Trustees did not perform
any analysis related to … what the loan prices would be … in light of the breach allegations,"
and "no one on behalf of the Trustees performed any kind of a calculation to determine what
interest rates would have applied to the loans … based on the allegations of breach . . . ."[150]

The Trustees also rely on *MARM III* for the proposition that intentional
misrepresentations may have an ongoing effect,[151] but the Trustees did not attempt to prove that
any of the alleged misrepresentations were intentional.  Mr. Aronoff admitted the Trustees did
not distinguish between intentional and unintentional misrepresentations in their Protocol
submissions,[152] and Mr. Morrow conceded that unintentional misrepresentations do *not* have an
on-going effect.[153]

## IV.    THE PLAN ADMINISTRATOR'S RESPONSES TO THE TRUSTEES' BREACH CLAIMS WERE REASONABLE.

### A.    The Plan Administrator's Process Was Well Constructed.

The Plan Administrator designed its review process to ensure that claims would be
accepted and allowed only if they (a) were submitted in compliance with the requirements of the
Protocol, and (b) established a loss that was compensable under the terms and conditions of the

---

[148]  Trustees' Pretrial Br. at 42; Tr. 3269:13-3271:18 (Morrow).
[149]  Trustees' Pretrial Br. at 42.
[150]  Tr. 2140:3-18 (Esses).
[151]  Trustees' Pretrial Br. at 37, 42.
[152]  Tr. 2772:7-22; 2773:11-18 (Aronoff).
[153]  Morrow Depo. Tr. 48:13-18.

applicable agreements.[154]  The Plan Administrator assembled a multi-layer review team.  It

engaged Recovco Mortgage Management ("Recovco"), an experienced loan review firm, to

conduct an initial review of threshold facts alleged by the Trustees.[155] The Plan Administrator

also engaged Rollin Braswell Fisher LLC ("RBF"), a law firm experienced in repurchase

litigation, to weigh evidence, apply the Threshold Facts to the representations and warranties,

and perform an assessment of AMA on certain loans.[156]  The Plan Administrator's process was

overseen by Zachary Trumpp, who had over a decade of experience supervising the

administration of repurchase claims in both a litigation and business context.[157]  The Plan

Administrator's quality control process was extensive, including two layers of review at Recovco

and two at RBF,[158] including access to the entire loan file.[159]

        The Plan Administrator's review process gave meaning to the phrase "each loan is a

snowflake."[160]  The Plan Administrator did not deem any evidence automatically sufficient or

insufficient to show a breach,[161] and weighed all evidence presented by the Trustees with the

entire loan file before making a decision.[162]   In this process, all evidence was considered, even

evidence favorable to the Trustees that they failed to cite.[163]  The Plan Administrator performed a

fact-intensive assessment of the elements of the representations and warranties alleged to be

breached, like materiality and seller's knowledge, that the Trustees' did not.[164]  The Plan

Administrator also conducted a loan-by-loan analysis of all information in the file to determine

---

[154]  *See* Tr. 373:16-374:12; 464:19-465:8; 488:19-489:11 (Trumpp).
[155]  Tr. 489:17-491:5 (Trumpp).
[156]  Tr. 487:3-23; 493:2-19 (Trumpp).
[157]  Tr. 349:10-351:16; 352:13-354:16 (Trumpp).
[158]  Tr. 487:24-488:18 (Trumpp).
[159]  Tr. 488:19-489:11 (Trumpp).
[160]  Tr. 474:22-25 (Trumpp).
[161]  Tr. 472:20-473:17; 475:11-17 (Trumpp).
[162]  Tr. 470:25-472:19 (Trumpp).
[163]  Tr. 476:21-477:16 (Trumpp).
[164]  Tr. 477:20-479:11; 482:6-483:16 (Trumpp).

whether the Trustees established that the alleged breach had an adverse and material effect on the value of the loan,[165] including information about the borrowers' circumstances, performance history, and the broader economic environment.[166]

Mr. Grice, an expert in mortgage loan and breach review processes, testified that the Plan Administrator's multi-tiered review structure was "well-constructed" and "well designed."[167] Mr. Castro, an industry expert in the valuation of securitized loans, found the Plan Administrator's AMA review to be "robust and comprehensive."[168]

The Trustees promised to show the Court that the Plan Administrator's acceptance of only a small percentage of claims they put forth was unreasonably low.[169]  Aside from the Trustees' misunderstanding the Plan Administrator's true breach rate,[170] the evidence at trial demonstrated that the low acceptance rate was first and foremost a function of the Trustees' process, which produced inconsistent and inaccurate results and claims.[171]

### B. The Trustees Failed To Provide The Required Documentation To Review 24,000 Loans.

The Trustees have argued that they are entitled to recover the full value of their claims on approximately 24,000 on-hold loans.[172]  The Trustees admit, however, that they failed to provide the "Critical Documents" -- loss certifications, corporate expense logs, servicing notes, and payment histories -- required for the Plan Administrator's review, even after the Plan Administrator advised that loan files missing any of the four Critical Documents could not be

---

[165]   Tr. 421:11-422:4; 485:5-25; 592:16-594:4; 770:3-7 (Trumpp).
[166]   Tr. 592:16-593:21 (Trumpp).
[167]   Tr. 1366:12-25 (Grice).
[168]   Castro Aff. Rep. at ¶ 20 (PA 951).
[169]   Trustees' Pretrial Br. at 33-34; Tr. 334:20-25 (Trustees' Opening).
[170]   Tr. 334:20-25 (Trustees' Opening); Tr. 394:10-15 (Trumpp).
[171]   Tr. 389:18-393:18; 394:10-400:3 (Trumpp).
[172]   Tr. 308:23-310:4 (Trustees' Opening).

reviewed.[173]  Moreover, the Trustees agreed with the Plan Administrator to place these files on hold, pending some solution.[174]  And some solutions were found.  For example, the Plan Administrator accepted substitute information, such as payment history data from a third-party vendor, rather than the servicer payment histories required by the Protocol.[175]

The Trustees primarily try to excuse their failure to comply with the Protocol by claiming that these documents were not required and were unnecessary to the Plan Administrator's review.  The Plan Administrator has shown otherwise.[176]  In any event, it cannot be disputed that the Trustees did not, as they claimed, "diligently [seek] to obtain these documents in an effort to limit the issues to be put before the Court."[177]  At no point did the Trustees subpoena servicers for the Critical Documents or ask the Court to intervene, despite the fact that subpoenas had been successful in compelling the production of loan files.[178]  If the Trustees had a good faith belief that these documents were not necessary under the Protocol Order, it was incumbent upon them to raise this issue with the Court, but they did not.[179]

This Court would be justified in estimating the Trustees' claims on the on hold loans at zero.[180]  In any event, there is certainly no basis to find that the Trustees should recover their full claimed damages on loans where they failed to fulfill their obligations under the Protocol.[181]

---

[173]  Tr. 434:3-435:10; 459:3-462:7 (Trumpp); Tr. 2022:11-20 (Esses); Apr. 29, 2015 Email from Pfeiffer to Trumpp (PA 544); Tr. 2024:5-15 (Esses).

[174]  Tr. 1959:21-1960:19; 2022:21-2023 (Esses); Apr. 29, 2015 Email from Pfeiffer to Trumpp (PA 544).

[175]  Tr. 441:6-442:6; 442:18-24 (Trumpp); *see also*, Tr. 1965:6-12 (Esses).

[176]  Tr. 436:11-438:18; 440:2-22; 451:25-454:6 (Trumpp); Protocol Order at Ex. A. (PA 74); Tr. 442:25-443:25; 445:8-446:5 (Trumpp); Tr. 2055:21-2056:20; 2059:24-2060:12 (Esses).

[177]  Trustees' Pretrial Br. at 50.

[178]  Tr. 462:8-13 (Trumpp); Tr. 2061:2-2062:13; 2064:14-2065:8 (Esses).

[179]  Tr. 2027:6-25; 2028:18-24; 2030:4-12; 2031:25-2032:8;.2063:6-2064:10; 2064:14-2065:8 (Esses); RMBS Trustees' Status Reports ([Dkt. No. 50348] (TRX 861); [Dkt. No. 50931] (TRX 860); [Dkt. No. 51640] (TRX 858); [Dkt. No. 52342] (TRX 1111)).

[180]  *See U.S. Bank Nat'l Ass'n v. Lehman Brothers Holdings, Inc.*, 566 B.R. 353, 367 (S.D.N.Y. 2017) ("The RMBS Trustees had numerous opportunities to preserve their Transferor Loan claims or clarify the scope of the Protocol Order. They chose not to seek clarification until it was too late.").

[181]  *See id.*

## V.    THE TRUSTEES WERE UNABLE TO VALIDATE THE RESULTS OF THEIR BREACH REVIEW PROCESS AT TRIAL.

### A.    The Trustees' Withdrew 40% Of Their Breach Claims.

Further demonstrating the Trustees' flawed process, prior to the submission of expert reports, but without notice to the Plan Administrator, the Trustees withdrew 40% of the breach claims they asserted during the Protocol.[182]  The Trustees asserted privilege over the decision-making process in withdrawing these loans.[183]  Thus, none of the Trustees' experts could explain the withdrawal or factor the withdrawal into their analyses of the Trustees' process.[184]

### B.    Flaws In Validation Through Mr. Aronoff.

The Trustees' evidence that their claims process was valid was presented largely through the testimony of Mr. Aronoff.  Mr. Aronoff, however, is not an objective observer; he designed and supervised the process, and therefore, despite his protests, had a professional stake in what the Court might conclude about that process.[185]  Although Mr. Aronoff claimed his personal involvement in the Protocol process put him in a better position to opine on it, he also understood that the Trustees' process was effectively on trial.[186]  In this context, it is difficult to imagine how he could be completely objective in evaluating his own work.  His initial opinion that "every single one of the 76,044 loans that [were] the subject of [his] report" contained one or more breaches that met the AMA standard, without reviewing a single loan file in its entirety in preparing that opinion, certainly suggests confirmation bias and a lack of objectivity.[187]

---

[182]  Tr. 1515:25-1516:16 (Grice).
[183]  Letter from Todd G. Cosenza to Judge Chapman [Dkt. No. 56975] (Nov. 19, 2017).
[184]  Tr. 651:14-652:22 (Trumpp); Tr. 1515:5-1516:16 (Grice).  The number of breach claims and loans at issue also has decreased due to (1) the Trustees' decision in October to drop claims based on the failure to obtain title insurance, Tr. 3293:22-3294:5 (Morrow); (2) additional Trust collapses and terminations, Tr. 650:25-651:13 (Trumpp); (3) the withdrawal of one Trust from the estimation proceeding, Tr. 4018:21-4019:17 (Cornell); and (4) liquidation without a loss of active loans on which claims had been submitted for the full Purchase Price. Tr. 4018:21-4019:17 (Cornell).
[185]  Tr. 1340:18-24 (Grice); Tr. 2597:19-2598:10; 2603:24-2604:5 (Aronoff).
[186]  Tr. 2601:25-2602:10; 2603:18-2604:5 (Aronoff).
[187]  Tr. 2582:5-2583:8; 2581:24-2583:8 (Aronoff).

Beyond his personal involvement, Mr. Aronoff based his expert opinion largely on knowledge of "industry custom and practice[s]" he gained in the "forensic loan review" industry, which he describes as a "cottage industry" that has developed to perform repurchase reviews in the context of RMBS litigation.[188]  Whatever industry he claims to be a part of, his review was decidedly one-sided and designed to set and meet the lowest possible burden, or shift the burden. And although Mr. Aronoff claimed that he was not giving legal opinions,[189] he opined regarding how the Court should read the governing documents, about unduly forgiving sufficiency of the evidence standards, and about aspects of decided cases with which he agreed and disagreed.[190]

### C.    Flaws In Mr. Morrow's Analysis.

Acknowledging Mr. Aronoff's inherent lack of objectivity, the Trustees retained Mr. Morrow to provide an "independent" opinion on their process.  Mr. Morrow, however, did nothing to review the Trustees' process.  He did not speak to Mr. Aronoff, Mr. Esses, or anyone at D&P, the loan review firms, or the Trustees about the process he was evaluating.[191]  Mr. Morrow's only assignment was to review a sample of loans drawn by Dr. Schwert, who admitted that the sample was not designed to test the Trustees' breach review process.[192]  And this was far from a double-blind sampling exercise.[193]  Dr. Schwert drew the sample *only* from the 76,044 loans submitted as part of Mr. Aronoff's report, and Mr. Morrow used Mr. Aronoff's findings as the baseline against which he decided whether to "agree" or "disagree."[194]  Moreover, Mr. Morrow's analysis of the Trustees' process included no control for biases.[195]

---

[188]  Tr. 2214:9-20; 2318:13-2319:17; 2589:24-2590:22; 2600:15-2601:12 (Aronoff).
[189]  Tr. 2593:8-17 (Aronoff).
[190]  Tr. 2594:16-2595:15; 2767:24-2768:24 (Aronoff).
[191]  Tr. 3288:14-3293:15 (Morrow).
[192]  Tr. 3109:16-22; 3104:16-22 (Schwert).
[193]  Tr. 3300:16-3301:3 (Morrow).
[194]  Tr. 3045:9-21; 3063:18-23; 3064:9-20 (Schwert).
[195]  Tr. 3300:16-3300:25 (Morrow).

Mr. Morrow's approach to the breach review was equally as flawed as the Trustees' process.[196]  In particular, Mr. Morrow assumed the burden of proof shifted to the Plan Administrator if the Trustees showed an inference of a breach, assumed that the loan files were complete and conclusive, did not review loan program or underwriting guidelines with respect to misrepresentation claims, conducted no separate materiality analysis, and assumed all borrower misrepresentations were intentional.[197]  Mr. Grice reviewed Mr. Morrow's Breach Findings, and concluded that they suffered from the same flaws as the Trustees' submissions.[198]

### D.    The Trustees' Exemplar Loans Did Not Support Their Process.

The Trustees' offered evidence of a small number of exemplar loans at trial.[199] Presumably, the Trustees picked the strongest exemplar loans they could find from the 72,000 disputed loans, and yet even these hand-picked loans failed to conclusively show valid claims.

The Court may recall loan XXXX7599, which was an occupancy misrepresentation claim involving a borrower living in Washington, D.C. who purchased a house in Arizona as a new primary residence.[200]  Although they cited a number of pieces of unreliable circumstantial evidence supporting their claim that the borrower never intended to move to Arizona, the Trustees missed a clear indication they were wrong – a contemporaneous letter from his employer supporting the borrower's move.[201]  The Court may also recall loan XXXX2979, an income misrepresentation claim for a self-employed HVAC repairman who stated a gross

---

[196]  Tr. 3290:17-3291:4 (Morrow); Tr. 1339:19-1340:3; 1395:8-15; 1399:21-14 (Grice).
[197]  Tr. 3216:21-3217:7; 3297:2-6 (Morrow); Tr. 3229:11-12; 3344:22-3345:25 (Morrow); Morrow Depo. Tr. 48:7-12; 170:22-171:5; 181:22-182:18; 184:19-185:15; 194:16-195; Tr. 3218:20-3219:7 (Morrow) ("if it isn't in the file, it didn't exist at origination").
[198]  Tr. 1339:19-1340:3 (Grice).
[199]  Tr. 2387:8-2425:21; 2425:22-2447:3; 2447:22-2459:25; 2475:16-2498:14; 2489:15-2504:12; 2504:13-2514:2; 2515:2-2521:8 (Aronoff).
[200]  Tr. 1759:14-1762:12 (Grice); Claim File for Loan Ending 7599 (TRX-1-Claim XXXX7599).
[201]  Tr. 1788:13-1789:10 (Grice); Explanation Letter for Loan Ending 7599 (PA 7599-A).

monthly income of $7,966 per month on a 2006 loan application.[202]  The Trustees identified an

income of $3,996 per month on the borrower's 2006 tax return based upon adding the borrower's

net business income to depreciation and dividing by 12, ignoring evidence that the borrower's

business brought in gross sales of over $12,000 per month in that year.[203]  Mr. Aronoff admitted

that even after this "complicated" calculation "we don't know . . . with any certainty" what the

borrower's income was in 2006.[204]  Although there was a hardship letter in the loan file

indicating the borrower's income had fallen, Mr. Aronoff missed it, instead criticizing Mr. Grice

for making "macroeconomic observation[s]" that this borrower's income may have fallen

because of the economy in 2006 or 2007, ironically based on his own macroeconomic

observation that the economic downturn would likely not have affected the borrower's income

until 2008 or 2009.[205]

On the misrepresentation of income claim on loan XXXX9621, Mr. Aronoff concluded

that the borrower, a self-employed realtor in California, was not making $12,000 per month in

2004.[206]  Mr. Aronoff could only reach this conclusion by (1) selectively "discounting" $95,000

of what he termed "nonrecurring . . . income" from a tax return, (2) discounting the borrower's

hardship letter because in Mr. Aronoff's subjective opinion the economy did not decline until

2007 (contradicting his answer with respect to loan XXXX2979), and (3) assuming that the

borrower was inexperienced because he listed only three years of employment history on his loan

application.[207]  The Trustees also ignored critical evidence with respect to the misrepresentation

---

[202]   Tr. 1422:6-1423:25 (Grice); Claim File for Loan Ending 2979 (PA 631).
[203]   Tr. 1422:23-1425:18 (Grice); Claim File for Loan Ending 2979 (PA 631); Tr. 2426:16-2427:17 (Aronoff).
[204]   Tr. 2437:24-2439:22 (Aronoff).
[205]   Tr. 2444:19-2447:3 (Aronoff).
[206]   Tr. 2448:11-2489:7 (Aronoff).
[207]   Tr. 2448:11-2450:16; 2452:14-2453:18; 2454:24-2455:6 (Aronoff); Claim File for Loan Ending 9621 (TRX-2-Claim XXXX9621).  The loan application Mr. Aronoff was referencing requires the borrower to list additional employment history only if employed at his current job for less than two years.

of income on loan XXXX3811: that the borrower had additional sources of income beyond her salary (child support income and money from operating a day care center), a very strong credit score of 700, and had suffered a decrease in income that led to a financial hardship after the loan closed.[208]  These exemplar loans best exemplify the types of deficiencies in the Trustees' proof.

## VI.    THE TRUSTEES HAVE PROVIDED NO ROAD MAP TO A CLAIM OTHER THAN WHAT THEIR FLAWED PROCESS PRODUCED.

The Trustees failed to deliver on their promise to provide a "roadmap" for the Court to an estimation amount greater than $2.38 billion.[209]  Their approach was predicated on so-called "summaries," purportedly admissible pursuant to FRE 1006, showing "types of breaches that are common across groups of loans."[210]  As demonstrated below, the Trustees failed to lay a foundation through a witness that any such summaries were reliable.  Any effort to resurrect this approach at closing through newly-disclosed demonstratives should be given no weight.

The Trustees first sought to create an evidentiary basis for the admissibility of summaries through Mr. Esses.  That effort was soon abandoned once it became clear that, among other problems, the summaries were based on a database ("TeamConnect") never produced to the Plan Administrator.[211]  Subsequently, the Trustees attempted to elicit testimony from Mr. Aronoff that would allow the Court to conclude that the exhibits to his report accurately summarized information in the Claims Tracking Spreadsheet exchanged in the Protocol.  But Mr. Aronoff's testimony revealed myriad problems with this approach:

- Not all of the data in the Aronoff exhibits were on the Claims Tracking Spreadsheet.[212]

---

[208]  Tr. 1791:23-1796:20 (Grice); Claim File for Loan Ending 3811 (TRX-2-Claim XXXX3811); Request for Modification of Affidavit for Loan Ending 3811 (PA 3811-J).
[209]  Tr. 207:25-208:11; 235:18-25; 338:22-339:5 (Trustees' Opening).
[210]  Tr. 207:25-208:11 (Trustees' Opening).
[211]  Tr. 1887:5-18 (Esses); Tr. 2641:7-21 (Aronoff).
[212]  Tr. 2562:15-20; 2653:9-14 (Aronoff).

- Mr. Aronoff did not "physically create exhibit 4," and "[w]here exactly that data was extracted from by Duff & Phelps to prepare the exhibit, I'm not entirely sure."[213]  Further demonstrating his lack of knowledge about the process, he loosely attested that the loan review firms had a "system," and they "push a button," then it "pops up in the queue" of another person, but Mr. Aronoff could not describe that system with any specificity.[214]

- Mr. Aronoff did not know whether "some fields were not extracted directly from the system in which the information was stored.  I just don't know."[215]

- Mr. Aronoff did not know whether exhibit 4 was extracted from the Claims Tracking Spreadsheet but has an "understanding" that the information in that exhibit and the Claims Tracking Spreadsheet came from the same database.[216]

The data in the TeamConnect database was created by D&P and five different loan review firms,[217] and was never produced to the Plan Administrator.[218]  That database is inadmissible hearsay not falling under any exception. Fed. R. Evid. 801(c), 803, and Rule 1006 do not permit the Trustees to turn inadmissible evidence into admissible evidence through summarization.  *Fagiola v. Nat'l Gypsum Co. AC & S.*, 906 F.2d 53, 57 (2d Cir. 1990) (internal citations and quotations omitted) ("A summary must of course be based on foundation testimony connecting it with the underlying evidence summarized and must be based upon and fairly represent competent evidence already before the [fact-finder]." ); *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004) (stating that 1006 "is not a back-door vehicle for introduction of evidence which is otherwise inadmissible" and "[c]harts, summaries, and calculations are only admissible when based on original or duplicate materials that are themselves admissible evidence") (quoting J. McLaughlin, J. Weinstein, & M. Berger, 6 WEINSTEIN'S FEDERAL EVIDENCE § 1006.03[3] (2d ed. 2004)).

---

[213]  Tr. 2637:3-6; 2636:9-18 (Aronoff).
[214]  Tr. 2995:21-2999:8 (Aronoff).
[215]  Tr. 3000:3-17 (Aronoff).
[216]  Tr. 2635:21-2637:12 (Aronoff).
[217]  Tr. 1885:24-1887:18 (Esses)
[218]  Tr. 1887:5-18 (Objection); Tr. 2635:8-2637:12; 2639:14-2640:10; 2641:7-21 (Aronoff).

Thus, the Trustees were left with no witness who could testify to the accuracy of any summaries of their claims. After the last day of testimony, the Trustees informed the Court and the Plan Administrator that they intended to present certain "demonstratives" at closing arguments. The demonstratives would group together categories of claims based on information in the Aronoff exhibits, interwoven with purchase price calculations provided by Drs. Snow and Ellson, to create never-before-disclosed "purchase price scenarios" at values above $2.38 billion. These demonstratives are new, unadmitted and undisclosed expert opinions.[219]

Three days before submission of post-trial briefs, the Trustees provided the Plan Administrator *thirty-six* purchase price scenarios, without committing to the use of any or all of them, leaving the Plan Administrator to address their new demonstratives for the first time at closing. While the Trustees attempt to portray these demonstratives as mere summaries of evidence already in the record, they are in reality several levels removed from any record evidence, and each level suffers from problems rendering the summaries unreliable.

The first level of "evidence" relied upon by the Trustees are the more than 72,000 loan files themselves, some of which are thousands of pages long.[220] Apart from a small handful of exemplar loans, these materials generally were not presented to any witnesses at the hearing, and many suffer from evidentiary problems that typically would create challenges to their

---

[219]  Fed. R. Civ. P. 26; Fed. R. Civ. P. 37(c); *see Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012) ("The purpose of Rule 37(c) is to prevent the practice of 'sandbagging' an adversary with new evidence."); *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d 446, 458–59 (S.D.N.Y. 1999); *Sharpe v. United States*, 230 F.R.D. 452, 458–59 (E.D. Va. 2005) (Expert reports must be "sufficiently detailed and complete enough to enable adequate preparation by the [other party]."); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996) (citing Fed. R. Civ. P. 26 Adv. Comm. Notes); *see also United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977) ("[W]hen summaries are used . . . the court must ascertain with certainty that they are based upon and fairly represent competent evidence already before the [fact-finder]") (quoting *Gordon v. United States*, 438 F.2d 858, 876 (5th Cir. 1971), *cert. denied*, 404 U.S. 828 (1971)).
[220]  Tr. 430:13-431:5 (Trumpp).

admissibility.[221]  To obtain the settlement that led to this estimation proceeding, however, the

Plan Administrator agreed that those loan files are admissible under Exhibit G, with the

important caveat that the parties "reserve[d] all rights to present arguments as to their reliability,

competency, weight, relevance, timeliness or any other arguments concerning the Court's

consideration of such evidence."[222]  Even if admissible, the loan files do not lend themselves to

such easy, reliable summary, as was demonstrated at trial by the testimony on the few exemplar

loans addressed by the Trustees' witnesses.

All relevant fact and expert witnesses agreed that every breach claim must be reviewed

individually, and that the files and borrowers must be viewed holistically;[223] every loan file is

unique.[224]  The trial further demonstrated that the reliability of a particular piece of evidence

used to support a breach claim was highly variable, depending on how and in what context the

evidence was used.[225]  For instance, the tax returns on which the Trustees relied were

characterized by varying degrees of completeness, temporal proximity to origination, and

complexity of interpretation, often depending on the nature of the borrower's income sources.[226]

At times, the Trustees used tax returns to prove occupancy claims, which implicates different

reliability concerns.[227]  Even when used to prove income, the Trustees employed no consistent

methodology to determine whether the tax return was inconsistent with the income stated on the

---

[221]  The original materials in the loan files consist of unauthenticated hearsay and multiple hearsay, either as found in the loan files which themselves had no chain of custody, or collected by loan reviewers who never appeared in Court to provide any indicia of the reliability of their evidence collection process.  Indeed, most of the third party materials relied upon by the Trustees are prone to error and expressly disclaim their own reliability.

[222]  RMBS Settlement Agreement at Ex. G § VII (TRX 810).

[223]  Tr. 2618:9-24; 2366:10-2367:13; 2711:2-19 (Aronoff); Tr. 1518:22-1519:21 (Grice); Morrow Depo. Tr. 110:19-112:2; Tr. 428:20-429:15 (Trumpp); Tr. 1330:13-21 (Grice).

[224]  Tr. 1330:14-1331:13 (Grice). "[I]n order to prepare a breach claim or evaluate a breach claim, you have to consider all of those factors, all of the complexity of really the borrower and the contents of the loan file"; Tr. 1331:15-1333:18, 1391:23-1393:9, 1393:13-1394:6 (Grice).

[225]  Tr. 1518:22-1519:21 (Grice).

[226]  Tr. 1398:20-1399:18, 1418:12-1419:20, 1421:8-25, 1417:5-16 (Grice) ("a 2007 tax return has more value than a 2010 tax return" to a loan originating in 2006); Tr. 2431:7-15 (Aronoff).

[227]  Tr. 1466:13-1467:11 (Grice).

loan application.  For one of their income claim exemplar loans, the Trustees conducted a

"depreciation calculation" using information from a self-employed borrower's Schedule C to

arrive at an estimate of income;[228] for another, they ignored depreciation and estimated a self-

employed borrower's income two different ways interpreting two tax returns in the same file.[229]

These are just a few examples from the less than .0005% of loan files at issue that were

actually presented to the Court.  As demonstrated in Sections II and III, *supra*, the Trustees'

process was inconsistent, error-filled and based on subjective judgments by loan reviewers who

were not supplied a consistent set of guidelines—all taking place against a backdrop of

overzealous legal positions and a failure to grapple with inconsistent evidence.  These problems

alone would be enough to render a summary based directly on the loan files unreliable.  But there

is more.  In fact, the demonstratives that the Trustees intend to present are not based on the loan

files, but on the data that was first entered into TeamConnect, then the Claims Tracking

Spreadsheet, and finally the exhibits to the Aronoff report.

The evidence shows that the transfer of data through these multiple layers created

additional errors and unreliable judgment calls, separate and apart from the issues that infected

the loan review.  The data presented in the Aronoff exhibits were the result of the exercise of

subjective judgment by individual loan reviewers, who at times did not input the data into

TeamConnect accurately or reliably.[230]  At trial, the Plan Administrator demonstrated the

differences between the data in the Claims Tracking Spreadsheet and the data in the Aronoff

---

[228] *See* Loan XXXX2979; Tr. 2432:4-2438:16; 1426:21-1427:3 (Grice)

[229] *See* Loan XXXX9621; For the 2005 tax return, the Trustees simply lift the figure in line 12, "Business income or loss. Attach Schedule C," and divide by 12. *See* TRX-2-Claim XXXX9621 at 20. For the 2006 tax return, the Trustees conduct a calculation that "control[s]" for a "capital gain" and subtract this income. *See* Story the Loan Tells for XXXX9621 Demonstrative (TRDX-189); TRX-1-Loan XXXX9621 at 776-77; Tr. 2452:17-2453:18 (Aronoff) ("So this $95,000 which is the lion's share of the 108 that Mr. Grice would ask us to consider, is a one time nonrecurring type of income that should fairly not be considered in trying to ascertain what the year over year income as a real estate broker is of this borrower").

[230] Tr. 2703:4-2706:10; 2713:8-2714:6; 2714:16-2715:3; 2718:13-22; 2719:4-12; 2726:3-2727:5 (Aronoff).

exhibits, which also contained basic errors.[231]  And even had they not committed such errors, the

data extracted and summarized were not complete; the data purported to describe only the

"primary evidence" (again, based on a judgment call) on which the Trustees relied, omitting any

other relevant evidence.[232]  Mr. Aronoff could not say how many claims for which the Trustees

would need to rely on corroborative evidence that was not included in the Claim Package or the

Factual Basis,[233] but as the Court saw at trial, this occurred frequently.

The materials from which the charts were derived contain widespread errors and do not

fairly or accurately represent the diverse underlying evidence.  Thus, the demonstratives cannot

be relied upon "to prove the content of voluminous writings . . . that cannot be conveniently

examined in court."  Fed. R. Evid. 1006; *see Conlin*, 551 F.2d at 539 ("A chart which for any

reason presents an unfair picture can be a potent weapon for harm, and permitting [its

consideration] is error;") *see United States v. Wainright*, 351 F.3d 816, 821 (8th Cir. 2003) (a

summary must be "fair, accurate, correct and nonmisleading").   Even if the demonstratives

themselves were reliable summaries of the underlying data, the Trustees used them in a way that

would require the Court to conclude that they are entitled to recover on each and every breach

claim within a dozen or more categories.  The model provides no adjustments for, among other

possibilities, the fact that the Trustees' claims were improperly categorized or based on

inadequate evidence or on legal positions that the Court concludes were incorrect.  The

demonstratives should be given no weight by the Court.

---

[231]  Tr. 2662:18-2663:3, 2665:19-2666:21;2700:13-2701:23 (Aronoff).
[232]  Tr. 2646:2-21 (Aronoff)
[233]  Tr. 2920:8-16; 2567:5-14, 2390:8-12; 2407:12-14 (Aronoff).

## VII.    THE TRUSTEES DID NOT ACCOUNT FOR PROXIMATE CAUSE, AN ESSENTIAL ELEMENT OF THEIR BREACH OF CONTRACT CLAIMS.

As discussed in LBHI's Pretrial Brief, proximate cause is an essential element of the Trustees' damages claims, which the Trustees were required to prove not just under the "governing agreements," but also under "applicable law."[234]  Nonetheless, the Trustees argue strenuously that proximate cause is not an element of their breach of contract claims: "You don't—there's no causation element, in our, you know, in our view."[235]  Witnesses repeatedly confirmed that the Trustees submitted breach claims to the Protocol with no regard for whether there was a causal connection between the alleged breach and the claimed losses.[236]

The Trustees base their position on their interpretation of monoline cases, *Flagstar* in particular, arguing that the MLSAAs do not require proof of a causal connection between the breach and an actual loss before the obligation to repurchase arises.[237]  The Trustees also cite non-bankruptcy cases in which courts have been willing to impose a damages remedy in lieu of specific performance of a repurchase remedy where a loan has been liquidated and repurchase is impossible.[238]  In those cases, the issue was whether any remedy at all was possible where a loan was liquidated and repurchase was the "sole" or "exclusive" remedy under the governing contracts.  *See MARM III*, 205 F. Supp. 3d at 414; *Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96, 105–06 (1st Dep't 2015).  In equity, those courts permitted a damages remedy to substitute for repurchase to preclude what courts characterized as "a perverse incentive for an RMBS sponsor 'to fill the Trust with junk mortgages that would

---

[234]  Plan Administrator's Pretrial Br. at 10-16; Protocol Order at Ex. A § III(e)(vi)(3) (PA 74).

[235]  Tr. 311:3-5 (Trustees' Opening).

[236]  Tr. 1910:16-22; 2066:4-2067:3 (Esses); Tr. 3669:8-23 (Smith); Tr., 3360:6-17 (Morrow); *see also* Trustees' Opening Slide Deck at 19.

[237]  Trustees' Pretrial Br. at 40 (citing *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 493, 511 (S.D.N.Y. 2013)).

[238]  Trustees' Pretrial Br. at 44-46 (citing *MARM III*, 205 F. Supp. 3d at 414; *Nomura*, 133 A.D.3d at 105–06).

expeditiously default so that they could be ... [l]iquidated before a repurchase claim is made.'"
*Nomura*, 133 A.D.3d at 106; *see MARM III*, 205 F. Supp. 3d at 415.

Those cases are inapposite. This is not a repurchase case; it is an estimation proceeding
in Bankruptcy Court under Section 502(c) of thousands of claims for breach of contract for
which the Trustees seek damages, not enforcement of the repurchase provisions of the MLSAAs.
No case suggests that a claim for breach of contract under a rejected contract in bankruptcy can
be sustained absent proof of proximate cause, and if the Trustees can prove valid breach of
contract claims, there is no risk they will be left without a remedy. To the contrary, equitable
principles dictate that the Trustees be required to demonstrate a causal connection between the
asserted breaches and claimed losses.[239] Mr. Aronoff in fact recognized that this is not a
"straight-up putback case," rendering him unable to provide "any insight as to the appropriate
remedy, the amount of that remedy, or anything else of that kind . . . ."[240]

Having made the strategic decision to exempt their claims from any form of causation,
the Trustees were left to defend the results their proposed approach would produce. When asked
to "[s]uppose that a loan performed for five years despite [a 6%] income misrepresentation," but
the loan then defaults due to the borrower's untimely death resulting in a loss, Mr. Aronoff
maintained that there would still be "a material adverse breach" affecting the value of the loan—
"even though the loan defaulted for a reason other than the breach . . . ."[241] Even "a loan file
[which] indicated that the borrower had misrepresented his debt by $10,000" but "also indicated
that the borrower had $5 million in liquid assets,"[242] would "be a valid breach finding . . .
whatever the risk of loss was at origination . . . ."[243] Mr. Aronoff believed that there would be a

---

[239]   Plan Administrator's Pretrial Br. at 16.
[240]   Tr. 2806:20-2808:5 (Aronoff).
[241]   Tr. 2797:15-2798:23 (Aronoff).
[242]   Tr. 2800:17-2801:14 (Aronoff).
[243]   Tr. 2800:17-2801:14 (Aronoff).

claim based on an alleged misrepresentation of debt where a couple was a "middle-aged husband and wife" who purchased a home as an "investment property for $13,000," had a FICO score of 738, a DTI of 39.5%, a minimum FICO of 620 and a maximum DTI of 50%, where the borrowers paid for eight years and the ultimate default was caused because the wife was unable to make payments after her husband passed.[244]  In the Trustees' view, the original misstatement of debt entitles them to recovery of the full Purchase Price as damages, despite the "significant risk of windfall" to them at the expense of the estate's other creditors.[245]

Given their position that proof of AMA required no causal connection,[246] the Trustees submitted claims to the Protocol without any evidence that the asserted breaches caused losses.[247]  At trial, the Trustees made no attempt to remedy this now incurable deficiency.

## VIII.    THE TRUSTEES' DAMAGES CLAIMS ARE IMPROPERLY INFLATED AND UNRELIABLY QUANTIFIED.

### A.    The Trustees Solely Offer Evidence Of Purchase Price Calculations To Quantify Their Alleged Injury.

Both parties agree that the purpose of the estimation hearing is to "estimate the amount of the RMBS Trustees' remaining claims had the claims protocol been completed."[248] Nevertheless, the Trustees provided only calculations of the *full* Purchase Price for each loan.[249] The Trustees did not attempt to discount their claims for the compromises that would have resulted from the business-to-business negotiations and non-binding dispute resolution to which they agreed.[250]  The Trustees' damages experts ignore this critical context for estimation.

---

[244]  Tr. 2801:15-2803:11 (Aronoff).
[245]  Tr. 2803:12-2805:20 (Aronoff).
[246]  Tr. 2777:19-2778:7 (Aronoff); Tr. 1910:16-22, 1953:24-1954:18 (Esses).
[247]  *See* Tr. 1910:16-22, 1953:24-1954:18, 2066:4-2067:3 (Esses); Tr. 3669:8-23 (Smith); Tr. 3360:6-17 (Morrow); Trustees' Opening Slide Deck at 19.
[248]  Tr. 6:13-20 (Plan Administrator's Opening).
[249]  Tr. 1877:8-20 (Esses); Tr. 3413:24-3414:9 (Snow); Tr. 4012:6-16 (Cornell).
[250]  Protocol Order at Ex. A §§ V-VII (PA 74); Tr. 3604:18-3607:9 (Snow).

**B.    Use Of The Full Purchase Price Would Violate 11 U.S.C. § 502(b)(2) Because It Contains Approximately $2.1 Billion Of Impermissible Interest.**

The experts agree on the amount of accrued and advanced interest that is included in the Trustees' Purchase Price calculation: approximately $445 million in interest pre-dating LBHI's bankruptcy petition, and $1.785 billion of post-petition interest.[251]   As set forth in the Plan Administrator's pretrial brief, pre-petition interest is not recoverable because the Trustees did not provide the contractually-required notice before the petition date, thus rendering such interest "unmatured," and section 502(b) bars the recovery of post-petition interest in its entirety.[252]

The Trustees respond that the "accrued and advanced interest" portion of their Purchase Price calculation is not, in fact, "interest."   They are wrong.   Courts look at the economic substance of a claim to determine if it violates section 502(b)(2).   In *In re National Energy & Gas Transmission Inc. v. Liberty Electric Power, LLC (In re National Energy & Gas Transmission, Inc.*, 492 F.3d 297 (4th Cir. 2007), a creditor was awarded a $140 million arbitration judgment, plus interest, against a guarantor, which was also a subsidiary of a debtor. When the guarantor was sold, the $140 million was placed in escrow and then transferred to the creditor.  *Id*. at 300. The creditor sought to apply the $140 million payment first to interest that had accrued on the arbitration award, then to the principal, and then to seek the remaining $17 million in "principal" from the debtor.  *Id.*   Citing the policy interest of fair allocation of assets among creditors underlying section 502(b)(2), the Fourth Circuit found this to be an impermissible attempt to collect post-petition interest.  *Id*. at 303.

Similarly, the Trustees seek to use proceeds collected from the liquidation of collateral to first reduce the interest accrued on their claims, and then collect any remaining unpaid principal

---

[251]   Tr. 3562:21-3563:14 (Snow).
[252]   Plan Administrator's Pretrial Br. at 38-39.

from the debtor's estate.  As in *In re National Energy & Gas Transmission*, the Court should

"look behind [the Trustees'] claim here to find that the claim really constitutes post-petition

interest disguised as unpaid principal."[253]  *Id.*

The Trustees next argue that even if "accrued and advanced interest" is "interest," section

562(a) entitles the Trustees to post-petition interest through the Effective Date of the Plan

because certain Governing Agreements qualify as "securities contracts," which were not rejected

until March 2012.  This argument fails as well.  Section 562(a), one of the Bankruptcy Code's

"safe harbor provisions," provides, "[i]f the trustee rejects a … securities contract … damages

shall be measured as of . . . the date of such rejection." 11 U.S.C. § 562(a).  Even if *arguendo* the

agreements at issue here are "securities contracts," section 502(g)(2) provides that section 562

damages are to be treated as prepetition claims, which are *not* entitled to post-petition interest.

11 U.S.C. § 502(g)(2); *see also Conway Hosp., Inc. v. Lehman Bros. Holdings Inc.*, 531 B.R.

339, 344 (S.D.N.Y. 2015) (rejecting argument that 502(g)(2) claims are treated differently from

other prepetition claims).  The Plan Administrator is unaware of a single case in which a court

has found that section 562 permits an undersecured creditor to recover post-petition interest.

### C.    The Trustees' Damages Calculations For Non-Liquidated Loans Are Unreliable And Overstated.

For non-liquidated loans, the Trustees seek to recover the Purchase Price for each loan,

less that loan's estimated market value.[254]  The Trustees offer an estimated market value

calculated by Dr. Ellson using LoanKinetics and related models.[255]  The Plan Administrator

---

[253]  To the extent the Trustees seek to avoid section 502(b)(2) by classifying their Purchase Price claim as liquidated damages, (Tr. 309:13-313:8 (Trustees' Opening)), various courts have rejected that approach.  *See, e.g.*, *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. Civ-08-1125-C, 2011 WL 3739170, at *4 (W.D. Okla. Aug. 23, 2011); *Bank of Am., Nat'l Ass'n v. Wells Fargo Bank, N.A.*, No. 12 C 9612, 2014 WL 3639190, at *6 (N.D. Ill. July 23, 2014) (citations omitted); *Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 10 Civ. 9584 JPO, 2013 WL 1285289, at *10 (S.D.N.Y. Mar. 28, 2013), *vacated and remanded*, 627 F. App'x 27 (2d Cir. 2015).
[254]  Tr. 3404:16-3405:9 (Snow).
[255]  Tr. 3736:2-13 (Ellson).

44

demonstrated the Trustees' methodology is unreliable because it produced a damages calculation that overestimated by more than 50% the actual realized losses suffered on loans that liquidated after the filing of Dr. Ellson's reports.[256]  The Trustees responded at trial by pointing to a single output of LoanKinetics that supposedly reflects the model's calculation of estimated realized loss, and comparing that figure to the loss that was reported on the loans.[257]  That response is beside the point because the Trustees did not offer that output as their calculation of damages.

In addition to the unreliability of the Trustees' methodology, Dr. Ellson's calculations of market value should be deemed inadmissible or given no weight for various other reasons.  The Trustees offered Dr. Ellson as an expert in estimating the market value for non-liquidated loans, but he relied on only one of several products available in the market to value those loans.[258]  Dr. Ellson, who offered no credentials as a valuation expert other than his familiarity with LoanKinetics, conducted no independent checks on the results of LoanKinetics, stating that such calculations were impossible because there is no market value for the loans.[259]  Furthermore, Dr. Ellson's failure to test the accuracy of his market value calculations, confirm the appropriateness of the default setting of LoanKinetics,[260] compare the loans at issue to the loans used to develop LoanKinetics,[261] or to stress test key inputs (such as housing prices and interest rates) in the models LoanKinetics calls on,[262] renders these calculations unreliable.  *See, e.g., Lightbox Ventures, LLC v. 3rd Home Ltd.*, No. 16-cv-2379 (DLC), 2017 WL 5312187, at *10 (S.D.N.Y.

---

[256]  The 50% figure is derived by comparing the amount the Trustees are seeking on these 804 formerly active loans (referred to by Dr. Snow as "Net Purchase Price," contained in TRX 690) with the amount of reported realized loss on those loans.  While the Plan Administrator stated the realized loss would be $94 million, Dr. Ellson testified at trial that he calculated the amount to be $84.9 million.  Tr. 3815:20-3816:10 (Ellson).  If accurate, that would *increase* the amount by which the Trustees' claimed recovery exceeds actual losses suffered.

[257]  Tr. 3805:7-3807:25; 3809:22-3816:10 (Ellson); Lehman Allegations Regarding LoanKinetics Values Provided by Dr. Ellson Demonstrative (TRDX 347); Apples-to-Apples Comparison is LoanKinetics Predicted Realized Loss Output (TRDX-352).

[258]  Tr. 3832:14-19, 3833:11-22, 3736:2-13 (Ellson).

[259]  Tr. 3764:16-20, 3833:23-3834:5, 3840:18-3842:5, 3845:10-25, 3848:7-20 (Ellson).

[260]  Tr. 3840:9-3842:5 (Ellson).

[261]  Tr. 3863:10-23 (Ellson).

[262]  Tr. 3840:9-3842:5 (Ellson).

Nov. 13, 2017); *Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 424-25 (E.D.N.Y. 2013), *aff'd*,

559 F. App'x 11 (2d Cir. 2014).

### D.    The Trustees Attempt To Charge The Estate For Loan Modifications Negotiated Completely Independently From LBHI.

The Trustees may argue that Professor Fischel, as part of his calculation of recovery

ratios for the Trusts at issue here, agreed that certain principal modifications to active loans

constituted realized losses.[263]  But Professor Fischel did not confirm or calculate any losses on

the active loans, he merely relied on third-party data.[264]  More significantly, any modifications

on these loans were done by agreement between the borrowers and servicers—modifications the

servicers negotiated independently of LBHI.[265]  Moreover, the Trustees adduced no evidence that

these modifications were caused by the alleged breaches.  Therefore, the Trustees have neither

shown that these alleged losses are cognizable damages nor why the estate should be responsible

for any such losses when it had nothing to do with the modifications that generated them.[266]

### IX.    THE PLAN ADMINISTRATOR'S PROPOSED $2.38 BILLION ALLOWED CLAIM IS FAIR AND REASONABLE.

Bankruptcy courts have broad discretion in estimating claims, "so long as the procedure

is consistent with the fundamental policy of Chapter 11 that a reorganization must be

accomplished quickly and efficiently."  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 278

(Bankr. S.D.N.Y. 2007) (citation omitted).  Without a specific methodology prescribed in section

---

[263]   Decl. of Karl N. Snow, Ph.D. at FN. 17, [Dkt. No. 57562]; Tr. 1276:17-1277:7 (Fischel); *see* Aug. 15, 2017 Email from O. Ndau to N. Lieberman and T. Cosenza (TRX 2818); Lehman Covered 235 Output (TRX 582); Exhibit 1 to the Fischel Rebuttal Report - Historical Losses (TRX 586).

[264]   Tr. 1277:18-1278:10 (Fischel).

[265]   Tr. 2175:17-2176:5 (Esses); *see e.g.* SASCO 2006-S3 Trust Agreement at § 9.04(b) (TRX 202).

[266]   The alleged losses are *de minimis* in any event.  The $772 million realized loss figure reflects both forgiven and deferred principal.  Tr. 4049:23-4050:13 (Cornell).  Using the most recent Nationstar data provided by the Trustees during the Protocol, Mr. Trumpp determined that, of the $730,3331,726 in principal modifications on the 15,507 Nationstar loans as of Professor Fischel's report, only $60,673,079 (8.31%) was forgiven principal.  (Decl. of Zachary Trumpp at ¶¶ 3, 8, [Dkt. No. 57537])  Dr. Snow testified that only forgiven principal is treated as a loss, while deferred principal is not because the lender still has the opportunity to recover that balance.  (Tr. 3554:6-19 (Snow).)

502(c), a court's authority to estimate claims is only limited by "the legal rules that may govern the ultimate value of the claim" and "those general principles which should inform all decisions made pursuant to the [Bankruptcy] Code." *In re Chemtura Corp.*, 448 B.R. 635, 649-50 (Bankr. S.D.N.Y. 2011). LBHI's proposed allowed claim of $2.38 billion is supported by multiple factors, some unique to the circumstances of this case, that demonstrate that the proposed allowed claim is reasonable and fair as an estimation of what the Protocol would have yielded.

### A.    Settlement With The Institutional Investors.

In October 2015, the Plan Administrator and Institutional Investors entered into a settlement agreement pursuant to which the Covered Loan Claims and the Transferor Loan Claims would be settled for $2.44 billion.[267] The Trustees did not agree to this settlement, although they have refused to provide the expert report supporting their decision.[268]

Professor Daniel Fischel is uniquely situated to opine on the reasonableness of a settlement at this level, having served as an expert witness in numerous other significant RMBS cases.[269] As Professor Fischel explained, the Institutional Investors have a strong incentive to advocate for the best possible outcome for the Trusts because they have "the largest economic stake in the proposed claim," are some of the most sophisticated and experienced investors in RMBS, have been involved in every prior comparable settlement, and have no incentive to "leave money on the table."[270] The Institutional Investors' willingness to settle their claim for $2.44 billion in 2015 is therefore entitled to weight.[271] *Cf. In re Babcock & Wilcox Co.*, 274 B.R. 230 (Bankr. E.D. La. 2002).

---

[267]   9019 Motion at ¶ 5, [Dkt. No. 55232]; Tr. 1088:2-13 (Fischel).
[268]   Tr. 1088:14-1089:9 (Fischel).
[269]   Tr. 1077:15-1083:11 (Fischel).
[270]   Tr. 1087:2-18 (Fischel).
[271]   Tr. 1087:19-1088:13 (Fischel).

### B.    Comparable Recovery Ratios In Similar RMBS Settlements.

Professor Fischel also compared LBHI's proposed estimation amount to recent comparable settlements.  Professor Fischel judged these settlements to be comparable because they involved similar trustee claims arising in similar legal and macroeconomic circumstances.[272]

Professor Fischel concluded that the "Recovery Ratios"[273] for the recent comparable settlements were consistent with LBHI's proposed allowed claim, while the Trustees' proposed allowed claim was a "complete outlier."[274]  LBHI's proposed allowed claim is approximately 11.2% of expected lifetime losses on the Covered Loans, which is substantially above the Recovery Ratios for the JPM (7.1%), Citigroup (8.3%) and ResCap settlements (6.9%), within the range for the Countrywide settlement (7.9%-17.1%) and two percentage points below the Washington Mutual settlement (13.2%).[275]  By contrast, the Trustees' proposed allowed claim of $11.65 billion *would be three times as high* as the largest Recovery Ratio (55%).[276]  Professor Fischel concluded that "Lehman's proposed allowed claim is well within the range of all the other comparable settlements, if anything toward the high end, and the Trustees' proposed allowed claim is many multiples greater than any of the other comparable settlements."[277]

### C.    The Trustees' Acceptance Of The Collapsed Trusts' Claim Valuations.

The Trustees' acceptance of valuations for claims sold in connection with collapsing trusts further supports estimation at $2.38 billion.[278]  The Trust Agreements allow the master servicer to exercise a "clean-up call option" when the outstanding principal balance of the

---

[272]  Tr. 1104:4-16 (Fischel).
[273]  The Recovery Ratios reflect the ratios of the settlement consideration to the expected lifetime losses on the loans in the trusts that were releasing claims.  Tr. 1110:8-24 (Fischel).
[274]  Tr. 1107:18-1108:13 (Fischel).
[275]  Tr. 1104:18-1109:6 (Fischel).
[276]  Tr. 1107:18-21 (Fischel).
[277]  Tr. 1108:5-13 (Fischel).
[278]  Tr. 1139:5-1140:2 (Fischel); Tr. 662:2-674:5 (Trumpp).

remaining mortgage loans in the Trusts drops below a specified amount.[279]  Prior to the

Estimation Proceeding, the master servicer and applicable Trustees agreed to hire an independent

appraiser for the collapsed trusts.[280]  For each of six collapsed trusts, the independent appraiser

determined that the value of the trusts' claims was either equal to or substantially less than the

Plan Administrator's requested allowance at the estimation proceeding (based on what would

have been the collapsed trusts' allocable share of the $2.38 billion).[281]  The applicable Trustees

sold the trusts' claims to New Residential Investment Corp. ("NRZ") using those values,[282] and

since the "clean-up" calls were consummated, the Plan Administrator and NRZ have reached an

agreement regarding those claims and specific Trusts, which the Court has approved.[283]

### D.   Professor Cornell's Rates Of Success Scenarios.

The four estimation scenarios designed by Professor Bradford Cornell highlight the

reasonableness of the Plan Administrator's position.  The scenarios illustrate how often the

Trustees would need to meet their burden of proof on disputed claims to achieve a total claim

value of approximately $2.38 billion.[284]  For purposes of this calculation, Professor Cornell used

the Purchase Price amounts provided by the Trustees' expert, Dr. Karl Snow.[285]  Professor

Cornell also applied various success rates he received from the Plan Administrator for both

breach-level defenses and defenses related to AMA.[286]

---

[279]  Plan Administrator's Pretrial Br. at 49.
[280]  Motion for Approval of Stipulation and Agreed Order with NRZ Regarding Claims Settlement at ¶¶ 11-12, [Dkt. No. 56248]; Tr. 665:11-22 (Trumpp).
[281]  Tr. 665:23-674:4 (Trumpp).
[282]  Motion for Approval of Stipulation and Agreed Order with NRZ Regarding Claims Settlement at ¶ 12, [Dkt. No. 56248].
[283]  Order Approving NRZ Settlement Agreement at 4-5, [Dkt. No. 56276].
[284]  Tr. 4001:11-19 (Cornell).
[285]  Although Dr. Cornell used Dr. Snow's purchase price calculations for the purpose of his analysis, he did not opine on whether the Trustees' Purchase Price calculation was the correct measure of damages in this case.  Tr. 4002:8-23 (Cornell).
[286]  Tr. 4021:23-4022:6 (Cornell).

Professor Cornell's assumptions were conservative.[287]  For example, Professor Cornell assumed that 40% percent of the Trustees' Misrepresentation of Income claims on disputed loans would overcome breach-level defenses and 50% of those would overcome the AMA defense if the loan had fewer than 18 payments, but 15% if the loan had greater than 18 payments.[288] Further, Professor Cornell assumed that the probability of success on multiple breach claims on the same loan is not correlated,[289] which likely overestimated the Aggregate Claim Value.[290] Professor Cornell also varied his Estimation Scenarios in two ways—whether the Trustees could recover on non-liquidated loans and whether they could recover on "on hold" loans.[291]

Taking into account all of the success rates and variations, Professor Cornell arrived at a range of possible estimation scenarios that were "approximately equal to or meaningfully less than the $2.38 billion settlement value."[292]  Additionally, Professor Cornell's estimation numbers assumed that the Trustees could recover on potentially impermissible interest.  If Professor Cornell were to remove the approximately $2.1 billion in interest from his totals, he estimated that the success assumptions would need to increase by 20% or more to reach $2.38 billion.[293]

## X.    CONCLUSION

WHEREFORE, the Plan Administrator submits that the Estimation Motion should be granted and the Covered Loan Claims should be allowed at an amount of $2.38 billion.

---

[287]  Tr. 4001:20-4005:17 (Cornell).
[288]  Tr. 4023:6-4024:25 (Cornell).
[289]  Tr. 4027:12-4028:24 (Cornell).
[290]  Tr. at 4030:6-13 (Cornell).
[291]  Tr. 4033:11-4034:5 (Cornell).
[292]  Tr. 4041:5-11 (Cornell).
[293]  Tr. 4047:6-16 (Cornell).

Dated: February 1, 2018

/s/ Todd G. Cosenza
Todd G. Cosenza
Joseph G. Davis (*pro hac vice*)
Benjamin P. McCallen
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111

Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)
ROLLIN BRASWELL FISHER LLC
8350 East Crescent Parkway, Suite 100
Greenwood Village, Colorado 80111
Telephone: (303) 945-7415
Facsimile: (303) 945-7468

*Attorneys for Debtors Lehman Brothers Holdings
Inc. and Certain of its Affiliates*