**[CORRECTED COPY]**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
:
In re                                                            :    **Chapter 11 Case. No.**
:
:
**LEHMAN BROTHERS HOLDINGS INC., et al.,** :    **08-13555 (SCC)**
:
:
Debtors.            :    **(Jointly Administered)**
:
-----------------------------------------------------------------x

**RMBS TRUSTEES' POST-HEARING BRIEF**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ..................................................................... 1

ARGUMENT ................................................................................................... 3

I.  THE COURT SHOULD ESTIMATE THE CLAIMS BASED ON THE EVIDENCE DEVELOPED DURING THE PROTOCOL AND PRESENTED DURING THE HEARING ............................................................................................... 3

    A.  The Appropriate Estimation Methodology Is to Determine the Amount of the Trustees' Recovery If the Claims Were Adjudicated at Trial ...................... 3

    B.  The Burden of Proof Is "Preponderance of the Evidence" ........................... 4

II.  THE TRUSTEES HAVE PROVEN WIDESPREAD BREACHES ............................. 5

    A.  The Trustees Proved Up Breaches Loan by Loan ...................................... 5

    B.  The Evidence of Breach Was Reliably Established ..................................... 11

    C.  The Trustees Also Proved Up Breaches Category by Category .................. 16

        1. Income ................................................................................................. 16

        2. Debt ..................................................................................................... 21

        3. Occupancy ........................................................................................... 24

        4. DTI ...................................................................................................... 26

    D.  The Evidence of Breach Is Admissible ..................................................... 27

III. THE TRUSTEES HAVE PROVEN THAT THE BREACHES MEET THE AMA TEST ....................................................................................................... 30

    A.  The Trustees Correctly Applied the Risk-of-Loss Test ............................. 30

    B.  The Standard Lehman Applied in its Own Putback Claims Is Entirely Consistent with the Trustees' Approach .................................................................. 32

    C.  The PA's Loss Causation Argument Has Been Rejected Multiple Times ................. 33

    D.  Mr. Castro's AMA Opinions Are Unsupported and Are Not Credible ..................... 35

    E.  As a Separate Basis for Meeting the AMA Test, the Evidence Supports the Inference that the Vast Majority of the Borrower Breaches Are Intentional ............................. 37

IV. ALL CLAIMS FOR THE "ON HOLD" LOANS SHOULD BE ALLOWED .......... 38

A. The Claims for the On-Hold Loans Are Unrebutted ................................................. 38

B. The PA Cannot Meet Its Burden to Have the Claims Expunged............................... 39

**V.  THE TRUSTEES HAVE PROPERLY CALCULATED THE NET PURCHASE
PRICE ................................................................................................................ 42**

A. The Trustees Reliably Calculated the Net Purchase Price for Each Loan ................. 42

B. The PA's Belated Argument that the Trustees' Purchase Prices Were Overstated
Because they Included "Unmatured Interest" Is an Afterthought and Is Wrong........ 43

**VI. THE TRUSTEES' ESTIMATION METHODOLOGY IS THE MOST
APPROPRIATE................................................................................................... 44**

A. The Court Should Estimate the Claims by Weighing the Evidence in Each Breach
Category and Estimating the Percentage of Claims that Would Be Proven at a Trial 44

B. The PA's Proposed Methodologies Do Not Address the Evidence........................... 47

**CONCLUSION ..................................................................................................... 50**

# TABLE OF AUTHORITIES

## CASES

*Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298 (2d Cir. 2009) ................................................. 39

*Ambac Assurance Corp. v. EMC Mortg. LLC*, 121 A.D.3d 514 (1st Dep't 2014) ...................... 35

*Assured Guar. Mun. Corp. v. Flagstar Bank,* 2011 WL 5335566 (S.D.N.Y. Oct. 31, 2011) ...... 35

*Assured Guar. Mun. Corp. v. Flagstar Bank,* 892 F. Supp. 2d 596 (S.D.N.Y. 2012) ........... 33, 35

*Assured Guar. Mun. Corp. v. Flagstar Bank*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013) 11, 14, 18, 22

*Aurora Comm. Corp. v. Lenox Fin. Mortg. Corp.*, No. 13-cv-1489 (E.D. Cal. Sept. 19, 2014) .. 34

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ................................................................................ 21

*Bittner v. Borne Chem. Co.*, 691 F.2d 134 (3d Cir. 1982) ........................................................... 35

*Butner v. U.S.*, 440 U.S. 48 (1979) ............................................................................................... 35

*Cass, Inc. v. Prod. Pattern & Foundry Co.*, No. 13-cv-701, 2017 WL 1128597 (D. Nev. Mar. 23,
2017) ......................................................................................................................................... 45

*Fagiola v. Nat'l Gypsum Co.*, 906 F.2d 53 (2d Cir. 1990). .......................................................... 29

*Fed. Election Comm'n v. Hall-Tyner Election Campaign Comm.*, 524 F. Supp. 955 (S.D.N.Y.
1981) ........................................................................................................................................... 9

*FHFA v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441 (S.D.N.Y. 2015) ....... 14, 18, 23, 25, 26

*Fischl v. Armitage*, 128 F.3d 50 (2d Cir. 1997) ............................................................................. 4

*Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.*, 803 F.2d 250 (6th Cir. 1986) .................... 45

*Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116 (S.D.N.Y 2014) ............... 33

*In re Chemtura Corp.*, 448 B.R. 635 (S.D.N.Y. 2011) ............................................................. 4, 29

*In re Chryst*, 177 B.R. 486 (Bankr. E.D. Pa. 1994) .................................................................... 22

*In re Del Mission Ltd.*, 998 F.2d 756 (9th Cir. 1993) .................................................................. 43

*In re Denenberg*, 37 B.R. 267 (Bankr. D. Mass. 1983) .............................................................. 21

*In re Enron Corp.*, 354 B.R. 652 (S.D.N.Y. 2006) ...................................................................... 44

*In re Iridium*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007) ................................................................. 50

*In re Lehman Bros. Inc.*, 574 B.R. 52 (Bankr. S.D.N.Y. 2017).................................................. 36

*In re Seaman Furniture Co.*, 160 B.R. 40 (S.D.N.Y. 1993) ........................................................ 28

*In re Trico Marine Servs.*, 450 B.R. 474 (Bankr. D. Del. 2011) ................................................ 43

*In re Windsor Plumbing Supply Co.*, 170 B.R. 503 (Bankr. E.D.N.Y. 1994) ......................... 4, 44

*Joseph Schachter & Co. v. John Hancock Mut. Life Ins. Co.*, 801 F.2d 563 (2d Cir. 1986)...... 5, 8

*Lexington Prods. Ltd. v. B.D. Commc'ns, Inc.*, 677 F.2d 251 (2d Cir. 1982) ............................. 43

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 105 A.D.3d 412 (1st Dep't 2013).............. 33

*Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171 (2d Cir. 1992) ...................................................... 5

*Reddy v. CFTC*, 191 F.3d 109 (2d Cir. 1999)................................................................................. 5

*U.S. Bank, N.A. v. UBS Real Estate Sec., Inc.*, 205 F. Supp. 3d 386 (S.D.N.Y. 2016) ......... passim

*U.S. Bank, N.A. v. UBS Real Estate Sec., Inc.*, 2015 WL764665 (S.D.N.Y. Jan. 9, 2015) .... 33, 34

*U.S. for Use & Benefit of Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95
    F.3d 153 (2d Cir. 1996) ...................................................................................................... 28, 29

*U.S. v. Bray*, 139 F.3d 1104 (6th Cir. 1998)......................................................................... 44, 45

*U.S. v. Oshatz*, 912 F.2d 534 (2d Cir. 1990)............................................................................... 29

*Wells Fargo Bank, N.A. v. Bank of Am.*, 2013 WL 1285289 (S.D.N.Y. Mar. 28, 2013) ....... 33, 35

*Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A.*, 2014 WL 1259630 (S.D.N.Y. Mar. 27,
    2014) ......................................................................................................................................... 33

## OTHER AUTHORITIES

4 Sand, *Modern Federal Jury Instructions* (2016) .................................................................... 4, 5

Federal Jury Practice and Instructions, § 104:02 ......................................................................... 5

## TRIAL EXHIBITS

TRX-1-38593117.......................................................................................................................... 20

TRX-1-Loan 124487836............................................................................................................... 24

TRX-2-Claim 122258742 ........................................................................................ 22

TRX-2-Claim 32953408 .......................................................................................... 26

TRX-2-Claim 38127452 .......................................................................................... 25

TRX-201 .......................................................................................................... 36, 42

TRX-231 .......................................................................................................... 24, 42

TRX-570 .................................................................................................................. 20

TRX 575 .................................................................................................................. 22

TRX-577 .................................................................................................................. 15

TRX-579 .................................................................................................................. 48

TRX-608 ................................................................................................... 6, 17, 38

TRX-609 ................................................................................................... 6, 22, 39

TRX-611 .................................................................................................................. 24

TRX-617 .................................................................................................................... 6

TRX-619 ........................................................................................................... passim

TRX-645 .................................................................................................................. 43

TRX-648 .................................................................................................................. 43

TRX-649 .................................................................................................................. 49

TRX-689 ........................................................................................... 6, 17, 22, 24

TRX-690 ........................................................................................... 6, 17, 22, 24

TRX-701 .......................................................................................................... 19, 23

TRX-712 .................................................................................................................. 32

TRX-713 .................................................................................................................. 32

TRX-714 .................................................................................................................. 32

TRX-734 .......................................................................................................... 18, 25

TRX 752 .................................................................................................................. 18

TRX-757 .................................................................................................................. 18

TRX-760 ............................................................................................................ 9, 23

TRX-767 .................................................................................................................. 10

TRX-768 .................................................................................................................. 10

TRX-769 .................................................................................................................. 10

TRX-807 .................................................................................................................... 6

TRX-816 ....................................................................................................................... 23

TRX-831 ................................................................................................................ 7, 41, 42

TRX-842 ....................................................................................................................... 35

TRX-871 ....................................................................................................................... 16

TRX-873 ....................................................................................................................... 16

TRX-875 ....................................................................................................................... 42

TRX-895 ....................................................................................................................... 18

TRX 912 ....................................................................................................................... 43

TRX 912-A ................................................................................................................... 43

TRX-921 ....................................................................................................................... 37

TRX-929 ................................................................................................................. 33, 34

TRX-972 .......................................................................................................... 33, 37, 38

TRX-998 ....................................................................................................................... 25

TRX-1007-12 ............................................................................................................... 25

TRX-1008 ............................................................................................................... 18, 19

TRX-1009 ..................................................................................................................... 19

TRX-1011 ..................................................................................................................... 18

TRX-1020 ..................................................................................................................... 18

TRX-1040 ..................................................................................................................... 25

TRX-1064 ..................................................................................................................... 41

TRX-1069 ..................................................................................................................... 41

TRX-1089 ..................................................................................................................... 41

TRX-1099 ............................................................................................................... 41, 42

TRX-1182 ....................................................................................................................... 9

TRX-1232 ..................................................................................................................... 37

TRX-1468 ..................................................................................................................... 44

TRX-1681 to TRX-1730 ............................................................................................... 42

TRX-2728 ..................................................................................................................... 18

TRX-2729 ..................................................................................................................... 18

TRX-2730 ..................................................................................................................... 18

**TRIAL DEMONSTRATIVES**

TRDX-30 ........................................................................................................................... 22

TRDX-124 ......................................................................................................................... 44

TRDX-185 ......................................................................................................................... 17

TRDX-173 ......................................................................................................................... 31

TRDX-174 ......................................................................................................................... 31

TRDX-175 ......................................................................................................................... 31

TRDX 176 ......................................................................................................................... 12

TRDX 180 ......................................................................................................................... 12

TRDX 181 ......................................................................................................................... 13

TRDX 183 ......................................................................................................................... 13

TRDX 184 ......................................................................................................................... 13

TRDX-186 ......................................................................................................................... 17

TRDX-204 ......................................................................................................................... 25

TRDX-205 ......................................................................................................................... 25

TRDX-206 ......................................................................................................................... 25

## PRELIMINARY STATEMENT

The loans Lehman securitized and sold to investors during the run up to the financial crisis were tainted by misstatements of income, debts, and occupancy.  Over 19 hearing days, the Trustees did exactly what they said they would do: present to the Court the loan-by-loan proof discovered during the Protocol and submitted to the Plan Administrator ("PA") supporting breach claims on over 70,000 loans.  The evidence showed that Lehman breached its representations and warranties on a massive scale.  The evidence further demonstrates that (1) the breach claims were the result of a reliable process conducted in accord with industry standards and in a manner approved by other courts; (2) the evidence types used are routinely relied on in the industry, have been relied on by Lehman and Aurora, and have repeatedly been credited by courts deciding putback cases; and (3) the standards used to determine the existence of a material and adverse effect of the breaches is the same standard used in the industry, confirmed by courts, and relied upon by Lehman and Aurora in their putback claims.  To provide additional assurance of the merit of the claims and reliability of the loan review, the Trustees subjected their findings to an independent review by a mortgage professional with decades of experience (Mr. Morrow), who confirmed the reliability of the Trustees' findings to a high degree of certainty based on a statistically representative sample.

During the Protocol, the PA rejected the Trustees' breach claims almost exclusively by seeking to impose a standard of proof that finds support neither in industry practice nor controlling case law.  The PA demanded that the Trustees' proof be "conclusive" or "definitive," that it must preclude the existence of hypothetical scenarios unsupported by evidence, and that the Trustees submit "corroborating" evidence to support breaches, when the applicable preponderance of the evidence standard contains no such requirements.  The PA and its experts took the same position during the hearing, acknowledging that the Trustees' proof existed and

1

contained the information the Trustees cited, but failing (except in few instances) to offer

rebuttal evidence.  Instead the PA and its experts largely relied on claims of insufficiency of

evidence and lack of "certainty," predicated on speculation about what might have happened to a

borrower after the loan was made.  And while the PA identified isolated mistakes, as is to be

expected given that 170,000 loans were reviewed by human beings, the PA failed to establish its

alternate defense that the Trustees' review and the resulting evidence were unreliably tainted by

a systematic lack of rigor.  Thus the PA offers no legitimate basis to avoid estimation of the

Trustees' claims based on the evidence now in the record and instead estimate them at the PA's

predetermined number that was calculated before the loan review process even began.

As the PA expressly states in Exhibit G, the claims should be estimated based on the

realistic value of the claims "if the Parties were to adjudicate these claims in their entirety."  Had

the Trustees' claims proceeded to a full trial, their burden would be to show that an alleged

breach "more likely than not" is valid.  In the context of an estimation hearing, the standard is

cast as the probability of success of a claim if decided on the merits.  The evidence presented

during the hearing—as to the major breach categories, the types of evidence used to support

those breaches, and the expert testimony as to the material and adverse effect of breaches—

provides a sound basis for the Court to make judgments concerning the probable outcome of a

trial on the merits of the different breach claims and types of evidence.  Those assessments

readily can be used to estimate the aggregate value of categories of claims by applying filters to

the underlying data provided to the Court.  By doing so, the Court can reach a balanced estimate

of the probability of success on the various claims.

In contrast, the PA has not provided the Court with any rigorous or principled basis to

estimate the claims at the number the PA proposes.  Professor Fischel's approach, relying as it

does on inapposite settlements (this hearing is a product of, but is not itself, a settlement) and on the undisclosed, pre-discovery thinking of a subgroup of investors, is seriously flawed. Dr. Cornell has done nothing other than perform arithmetic based on unexplained assumptions provided to him by the PA's lawyers. These estimation approaches ignore the evidence presented to this Court, and they provide no basis to assess the likely outcome of the claims if adjudicated on the merits.

The most reliable approach to estimate the claims—and the only method that takes into consideration in any balanced way the record developed during the Protocol—is not to look to settlements in other cases but to look at the evidence in this case. If the Court finds that the evidence as to a category or subcategory of breach would be less likely to meet the preponderance standard at a full trial, it can adjust the value of the claims accordingly. The Trustees have created a demonstrative exhibit that will permit the Court to calculate the effects of each of the Court's findings. However the Court rules on breach categories, the Court should arrive at an estimation of the claims based on the evidence, rather than a methodology that is divorced from that evidence.

## ARGUMENT

I.    THE COURT SHOULD ESTIMATE THE CLAIMS BASED ON THE EVIDENCE
      DEVELOPED DURING THE PROTOCOL AND PRESENTED DURING THE HEARING

   A.    <u>The Appropriate Estimation Methodology Is to Determine the Amount of the Trustees'
         Recovery If the Claims Were Adjudicated at Trial</u>

Neither the Code nor case law provides definitive guidance on how to estimate a claim, other than the court is "bound by the legal rules that may govern the ultimate value of the claim." *In re Chemtura Corp.*, 448 B.R. 635, 649 (Bankr. S.D.N.Y. 2011) (Gerber, J.). Nonetheless, the method for estimation here necessarily is informed by the procedural history of the claims and the nature of the hearing agreed to by the parties in their Settlement Agreement. *See id.* ("courts

3

may use whatever method is best suited to the contingencies of the case").  This proceeding does

not arise in the context of plan approval before any real opportunity to examine or develop

evidence about the claim to be estimated.  To the contrary, the parties' agreement to have the

Court determine the amount of the claim in this proceeding follows a loan-by-loan review of

171,000 loans under a Protocol that envisioned the ultimate resolution of the claims by

adjudication on the merits.  The express purpose of this proceeding is to value those claims "if

the Parties were to adjudicate these claims in their entirety."  To accommodate the submission of

an evidentiary record on which to make that determination, the parties agreed to, and the Court

granted, 14 (eventually 19) hearing days and provided for the admission into evidence of the

Protocol-derived, loan-specific record.

      Particularly in these circumstances, the appropriate methodology to estimate the claims is

to evaluate "the probability of success" of the claims "if decided on the merits."  *Id.* at 650.  That

method involves determining "the amount of the claim diminished by [the] probability that it

may be sustainable only in part or not at all."  *In re Windsor Plumbing Supply Co.*, 170 B.R. 503,

521–22 (Bankr. E.D.N.Y. 1994).

   B.  The Burden of Proof Is "Preponderance of the Evidence"

      The burden of proof on breach of contract claims is preponderance of the evidence.

Under the preponderance standard, the test is whether a given fact is more likely to be true than

not true.  *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997).  If the proverbial feather tips the

scale "however slightly" in favor of a claim, then the claim has "been proved by a preponderance

of the evidence."  4 Sand, *Modern Federal Jury Instructions*, at Inst. 73-2 (2016); *Ostrowski v.*

*Atl. Mut. Ins. Cos.*, 968 F.2d 171, 186–87 (2d Cir. 1992).  Unlike the clear-and-convincing

standard, the preponderance standard does not require the factfinder to have "no substantial

4

doubt" or have "a firm belief or conviction" regarding the fact at issue.  Sand, at Inst. 73-3; Fed.

Jury Prac. & Instr., § 104:02 (6th ed.).  And, of course, the "beyond a reasonable doubt" standard

in criminal trials has no place in a proceeding for claims grounded in breach of contract.

The factfinder's "role is to separate what 'could have happened' from 'what the

preponderance of the evidence shows most likely did happen.'"  *Reddy v. CFTC*, 191 F.3d 109,

118 (2d Cir. 1999).  Speculation about hypothetical facts is insufficient to overcome evidence

showing what most likely occurred.  *See Joseph Schachter & Co. v. John Hancock Mut. Life Ins.

Co.*, 801 F.2d 563, 565 (2d Cir. 1986) (insurance company claim based on evidence the insured

committed suicide could not be defeated by the "spectre of homicide . . . .  The mere fact that

[the insurer] bore the burden of proof of establishing that [the] death was a suicide does not mean

that the jury should have been allowed to speculate on all other possible causes of death.").

Nor is there any requirement that "corroborating" evidence must be presented to satisfy

the preponderance standard: "[The preponderance of the evidence] refers to the quality and

persuasiveness of the evidence, not to the number of witnesses or documents."  Sand, at Inst. 73-

2.  Courts deciding similar claims for breaches of representations and warranties in RMBS cases

routinely find valid breaches based on one piece of evidence that contradicts the information in

the loan application.  *See infra* p. 10–11.

In the context of an estimation hearing, of course, the preponderance standard takes on a

slightly different character.  The question is not whether the claims *have been proven* by a

preponderance; rather the Court must *estimate the probability that the claims would be proven* by

a preponderance *if* each claim were to be resolved in a full trial.

II.  THE TRUSTEES HAVE PROVEN WIDESPREAD BREACHES.

A.  The Trustees Proved Up Breaches Loan by Loan

1.  *The Trustees Marshalled and Presented Evidence Supporting Each Breach Finding*

The Trustees have offered evidence identifying—for each breach on each loan—the breach finding, the representation breached, the facts supporting the breach, the basis on which the breach has a material and adverse effect on the value of the loan ("AMA"), the PA's response, and the status of the loan. For example, in loan 2823, the borrower stated an income of $9,542 per month but the borrower's tax return reflected monthly income of only $1,816. TRX-619, row 63365. For all claims, the Trustees submitted (1) a claim tracking spreadsheet containing loan information and a narrative explaining the facts and reasoning supporting the claim; (2) a claim package with the documents supporting the allegation; (3) the entire loan file provided by the servicer; and (4) a data tape from the Master Servicer containing loan-specific information to calculate the Purchase Price. Tr. 1868:24-1870:4; 1874:20-1877:20 (Esses). These materials are admissible under Exhibit G to the parties' Settlement Agreement (TRX-807 at 97-98), and they are the foundational loan-by-loan evidence in the case.

The Trustees have focused their case on core claims. Over 75% of the claims arise from borrower misrepresentations. TRX-619.[1] These are not trivial or technical breaches. The largest category is income misrepresentations; borrowers in over 90% of those claims overstated their income by at least 30%. TRX-608. The magnitude of the debt misstatements are similarly striking; over 85% of those claims involve failure to disclose at least $30,000 in debt. TRX-609.

2. *The Evidence of Breach Was Largely Uncontradicted by Contrary Evidence*

Mr. Trumpp testified the PA took a "holistic view" of the entire loan file and did not limit its review to the Trustees' claim packages. Tr. 428:20-429:15. Yet the PA's only responses to the vast majority of the claims are generalized statements such as "the evidence is unreliable and

---

[1] Figures based on TRX-608 through TRX-617, TRX-619, TRX-689, and TRX-690 reflect that, since the exhibits were prepared, trusts have terminated or opted out of this proceeding, or certain breaches have been rescinded.

insufficient because [it is] inadmissible and uncorroborated," with citations to documents that do not contradict the Trustees' threshold facts.[2]  Tr. 1912:17–1915:9 (Esses); TRX-619.

Only on the margins (less than 10% of the time) did the PA identify additional information to rebut the evidence, for example by responding that an "alleged debt was paid off before closing" or that a missing document was identified.[3]  For the four key borrower breaches, the claims were almost never answered with specificity—the PA provided particularized responses just over 4% of the time and otherwise did not respond with contrary evidence.[4]  The Trustees evaluated the particularized responses, and where they agreed the PA's response in fact rebutted the claim, the Trustees withdrew it, just as they did during the course of this proceeding in the handful of instances where the PA's expert identified an error in the Trustees' findings.[5]

   3.  *The PA's Attack on the Sufficiency of the Evidence Fails*

Having failed to rebut the evidence, the PA during the Protocol and in this proceeding has tried to undermine the claims by imposing a standard of proof that is fundamentally at odds with the preponderance standard, is unknown in the industry, and is contrary to the case law.

Although Mr. Trumpp acknowledged in the abstract that the correct standard is preponderance of the evidence, Tr. 626:5–17, 659:3–660:9, when it came down to evaluating specific loans, he advised the Trustees during the Protocol that their proof had to be

---

[2] TRX-619, filtered for "No" in "Particularized Response" column; Tr. 1912:17-1915:9 (Esses); 880:12-886:7 (Trumpp).

[3] TRX-619, filtered for "Yes" in "Particularized Response" column and "Status" column filtered to exclude accepted and "on hold" loans; *see, e.g.*, row 893; Tr. 2384:8-2385:23 (Aronoff).

[4] TRX-619, "Breach Finding" column filtered for misrepresentation of income, debt, occupancy, and excessive DTI, showing "Yes" in "Particularized Response" column, with "Status" column filtering out accepted and on-hold loans.

[5] The PA's argument that the Trustees failed to provide "contradictory" evidence supposedly in its possession is pure speculation and in any event is misdirected.  The Trustees did not put through the Protocol loans where the reviewers found inconsistent evidence that contradicted the breach findings.  Tr. 2720:5–2721:19 (Aronoff).  The PA did not cite any contradictory third-party evidence that was cited by the PA during the Protocol.  In the few instances where the PA or its experts cited evidence claimed to be contradictory, it came from the loan file provided to the PA during the Protocol, not third-party sources.  And the PA's review firm, Recovco, certainly had access to third-party sources.  Regardless, the Protocol requires the Trustees to provide the documents "supporting" the claims, and the Trustees complied.  TRX-831 at 10–11.

"conclusive." Tr. 1910:16-22 (Esses). And the PA asks the Court to adopt the construct that

unless the Trustees' proof is "certain" or "definitive" or provides "certain answers" or "strong

inferences" or "complete answers", then the breach claims are not valid. Tr. 73:10–14 (arguing

that the evidence does not "definitively prove" a breach); 1465:4–12, 1766:18, 1755:13–20

(Grice). That level of certainty is required, if anywhere, only for clear-and-convincing or

beyond-a-reasonable-doubt cases.

The PA's breach-level defenses rely heavily on speculation and metaphysical possibilities

that sound like attempts to raise "reasonable doubt" at a criminal trial. According to Mr.

Trumpp, despite evidence in the form of a physician's statement that the Stanley Steemer

driver's disability did not begin until December 2007, *maybe* the borrower became disabled

earlier, and *perhaps* that caused the borrower to miss significant amounts of work, such that the

income listed on the loan application *might have been* accurate. Tr. 863:7-865:4. And Mr. Grice

testified that he did not "know how to account for" a "discrepancy" between the names "Joe" and

"Joseph" even though both names had the same Social Security number. Tr. 1753:9–21. This

speculation has no place in a contract case. *See Joseph Schachter & Co.*, 801 F.2d at 565.

Under the controlling preponderance standard, when the Trustees put forth evidence such as a

tax return or a MERS report that shows the income or debts stated on the loan application were

incorrect, the PA may not avoid liability by hypothesizing—without evidence—possible

explanations for discrepancies the Trustees identified. Alternate theories are theories, not

evidence.

The PA's supposed "corroboration requirement" also contradicts industry practice,

including Lehman's own prior practice. In the mortgage industry, sponsors routinely buy back

loans based on a single piece of evidence showing that the loan application was incorrect. As

8

Mr. Morrow testified, relying on a single piece of evidence not contradicted by anything else in the loan file is a practice that "is valid and accepted in the industry." Tr. 3232:15-3234:8 (Morrow); *see also* Tr. 2734:13-2735:25 (Aronoff). Before and after the plan confirmation, Lehman and Aurora routinely asserted their repurchase rights based on one piece of evidence. *E.g.*, TRX-760 at 30-31; TRX-1040 at 9. Contrary to Mr. Trumpp's testimony, there is no requirement of "multiple pieces of information of different sources that point [] to the same thing." Tr. 655:13-16 (Trumpp). In fact, the approach the PA used to assess breaches was Mr. Trumpp's recent invention—a concept unfamiliar to Recovco and even Mr. Grice, who admitted that Mr. Trumpp taught Recovco how "to do a nuanced analysis unlike" anything he had ever seen before in the industry. Tr. 1601:6-16.

The PA's corroboration argument is not only inconsistent with the preponderance standard and industry practice, it lacks common sense. The argument relies on a presumption of accuracy in the loan application for which there is no basis.[6] To adopt this presumption, the Court would need to ignore that the breaching mortgages were originated during an historic housing bubble that was due, in no small part, to what have been termed "liar loans."[7] That does not mean every borrower lied—and the Trustees assert no borrower breaches for the majority of loans they reviewed—but it does mean that the PA's position that the loan application is entitled to any presumption of accuracy is misplaced. Tr. 1474:15–1475:20 (Grice); 2734:18–2735:15

---

[6] As the only support for this presumption, Mr. Grice opined he would have done "a very careful reunderwriting" at origination. Tr. 1335:23-1337:3. Mr. Grice made no inquiry whatever into the actual loan origination practices at play here. Tr. 1547:11-19. Moreover, his characterization of mortgage industry practices in the runup to the financial crisis is badly out of step with established fact. *See infra* n.7.

[7] According to the United Stated Financial Crisis Inquiry Commission, in 2005 stated-income loans and minimal documentation loans—the vast majority of the loans here—"took on an entirely different character" and were "an 'open invitation to fraud.'" TRX-1182, at 138-39. The Court can take judicial notice of this report. *Fed. Election Comm'n v. Hall-Tyner Election Campaign Comm.*, 524 F. Supp. 955, 959 (S.D.N.Y. 1981) (Senate inquiry report).

9

08-13555-mg    Doc 57614    Filed 02/01/18    Entered 02/01/18 13:35:21    Main Document
Pg 18 of 59

(Aronoff).[8]  The Court would also need to ignore Lehman's own analyses showing that its

securitizations were rife with material misrepresentations; one internal review of 240 loans from

one of the same shelves at issue here showed that "*50% of the loans contained material*

*misrepresentations*."  Tr. 717:4-10; TRX-769 at 11 (emphasis added); TRX-767; TRX-768.  And

here, the evidence shows that borrower incomes were overstated by huge margins and borrower

debts were understated by huge margins.  In these circumstances, it is simply not plausible that

both the loan application and the tax return or MERS report are equally likely to be correct, and

there is no basis to believe that borrowers decided to lie on their tax returns yet tell the truth

when taking out mortgages in the runup to the financial crisis.  The entire notion strains

credulity.  The PA's position requires the Court to ignore the entire context of this proceeding.

    In every single previous RMBS case to weigh evidence of similar breaches, courts have

routinely found breaches based on one piece of evidence that contradicts the loan application,

and no court has held that one source of evidence is insufficient to prove a breach.  Judge

Castel's loan-level findings in *MARM* bear this out repeatedly:

- Loan 1456451:  Using only a tax return, the court found "a misstatement of the borrower's income" and "a valid basis to opine that the DTI ratio was 110.35%."  *U.S. Bank, N.A. v. UBS Real Estate Sec., Inc.*, 205 F. Supp. 3d 386, 480 (S.D.N.Y. 2016).

- Loan 40577613 (*Id.* at 482):

    o  Income.  Using only a tax return, the court concluded: "Given the difference between the borrower's stated income and the income reported on the borrower's Form 1040, the Court concludes that [the income breach] was well-founded."

    o  Debt.  Using only a MERS report showing three undisclosed mortgages, the court stated it "finds that it is more likely than not that . . . the debt used to calculate the DTI ratio was not correct."

- Loan 40599698:  Using only a MERS report showing an undisclosed mortgage, the court found that the additional undisclosed debt existed.  *Id.* at 485.

---

[8] Given the significant risks of submitting false information to the federal government under oath, including the IRS and the United States Bankruptcy Court, and given that the mortgage industry relies on tax returns and bankruptcy filings, it is odd that the PA's witnesses reject such evidence in favor of the unproven supposition that borrowers and lenders leading up to the financial crisis—who each had significant incentives to close a deal—always told the truth.

- Loan 1437593:  Using only the borrower's bankruptcy filings, the court found that the borrower's claimed income was overstated and that the DTI ratio was incorrect: "When the borrower's actual 2006 income is considered, as reflected in bankruptcy filings, the borrower's DTI ratio increases to 436.76%."  *Id.* at 524.

The same is true of *Assured Guar. Mun. Corp. v. Flagstar Bank*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013).  There the court accepted an income breach based only on BLS and an occupancy breach based only on Accurint.  *Id.* at 495.  The Court should reject the PA's invitation to adopt a contrary approach.[9]

B.  The Evidence of Breach Was Reliably Established

The Trustees' loan review professionals conducted a "reasonable and thoughtful" review "consistent with the way in which such loan reviews are conducted in the industry, including using the types of sources and analysis that are customarily used in reviews of this type."  Tr. 2377:17-2378:11 (Aronoff).  The review firms were instructed to evaluate the evidence and assess it in the totality of the entire loan file to determine whether there was adequate support to assert a breach.  Tr. 2366:21-2367:13 (Aronoff).  As Mr. Aronoff testified, the review firms were instructed not to "cherrypick.  Don't just show us documents that you think support a breach. View any piece of evidence or any document that you think supports a breach in the totality of the file."  Tr. 2343:5–2344:13.  Neither the firms nor Duff & Phelps nor Mr. Aronoff was incentivized to identify defects—none committed to finding a particular breach rate or was compensated based on the number of breaching loans.  Tr. 2319:18-2320:10 (Aronoff).  If a

---

[9] Borrower testimony is neither necessary nor appropriate.  Borrower testimony is not the industry standard for these breaches.  If the PA wanted the Trustees to prove their claims using borrower testimony, then the PA should have added borrower depositions to the Protocol; it did not do so.  Such an exercise would be viewed as harassment of borrowers, and in this case it would have been impractical—deposing 72,500 borrowers at a dozen per day would take 24 years.  The PA notes that Lehman in its putback claims sometimes took borrower depositions for individual loans here and there—and sometimes did not (Tr. 1037:23-1038:13, 1039:19–1040:5 (Trumpp))—but that is simply not comparable to this matter.

reviewer found there was no breach on a loan, then no further analysis was done—nobody swooped in and tried to 'resuscitate' the loan.  Tr. 2320:11-2321:12 (Aronoff).[10]

Each review firm is in the business of conducting such reviews and is staffed by experienced loan review professionals.  Tr. 2341:20-2342:10 (Aronoff).  Before being retained, each firm was vetted by Duff & Phelps and the Trustees to "ensur[e] that they had a seasoned underwriting staff who . . . had done and knew how to do these types of reviews."  Tr. 1839:24-1840:25 (Esses); 2323:17-2325:3 (Aronoff).

Mr. Aronoff served as the ultimate supervisor and decision-maker on substantive matters.  Day-to-day implementation of his policies was the responsibility of mortgage loan professionals who had substantial loan-review experience and had worked with Mr. Aronoff extensively.  Tr. 2321:24–2323:16; TRDX 176.  Members of Mr. Aronoff's team reviewed work product from the review firms as it came into Duff & Phelps and provided ongoing guidance to the firms, including via weekly calls.  Tr. 2964:18-2965:11.  After Mr. Aronoff departed, the Duff & Phelps team continued to execute the same process.  Tr. 1865:19-1866:17 (Esses).

Within each loan review firm, each loan went through multiple levels of review and quality control.  TRDX 180.  The first step was an initial loan review by an underwriting professional at a review firm.  The underwriter attempted to verify information provided at origination, identifying any material breach and preparing a narrative description of the defect and the supporting documentation.  Tr. 2362:15-2369:13 (Aronoff); TRDX 181.  After this initial review, but before being sent to Duff & Phelps, the loans were reviewed again by "an even more

---

[10] This approach stands in marked contrast to the PA's process, where Recovco only had authority to reject claims (and once rejected there was no review by the PA or anyone else).  If Recovco concluded there was evidence to support a breach, the loan was sent to trial counsel, who did a complete re-review and AMA analysis.  Tr. 747:16–748:7 (Trumpp).  That work was cloaked in privilege and was never explained to the Court.  By contrast, neither the Trustees nor their counsel had input into breach or AMA determinations.  Tr. 2317:18-2318:12 (Aronoff).

seasoned underwriter [who] review[ed] the supporting documentation [to ensure] that the supporting documentation supports the facts cited." Tr. 1843:12-1844:3 (Esses). In this second review, the reviewer did "a complete review of the loan file in either all loans or a substantial random sample [and conducted a] quality control level of review of the entire loan file"; the goal was to confirm "that there was no contradictory evidence in the loan file that, that calls into question the finding of the initial underwriter, and [do] a complete review of those loan files, in those instances." Tr. 1844:3-1844:16 (Esses). Then the firms conducted a "deliverable quality control"—a review of the breach narrative and another check to ensure the cited facts supported the finding. Tr. 1844:17-1845:7 (Esses).

Borrower breaches that survived the review firms' internal quality control were sent to Duff & Phelps, where they underwent two more levels of quality control. Tr. 1862:6-18 (Esses).[11] In QC1, the team made sure the breach finding was accurately described, reviewed the claim file, and ensured the supporting documents were there and cited correctly. Tr. 2375:6-2376:2 (Aronoff); TRDX 183. In QC2, Mr. Aronoff's team reviewed the breach narratives for clarity and consistency, confirmed that the breach finding was connected to one or more representations and warranties, addressed any questions raised by QC1, and made the final decision as to whether to accept or reject a breach finding and the existence of an AMA for such finding. Tr. 2376:7-2377:16; TRDX 184.

The Trustees have presented substantial evidence that they engaged in a careful review designed to identify significant misrepresentations. Tr. 2377:17-2378:11, 2644:18-2645:3 (Aronoff). The Trustees do not claim their results across all 72,500 loans are perfect. As the PA's expert Mr. Grice agreed, where humans are involved, some errors are likely, and he made

---

[11] Loans that had only missing document breaches may not have gone through the Duff & Phelps QC process because "[t]here simply was no supporting documentation to review." Tr. 1862:14-18 (Esses).

errors too.  Tr. 1622:24-1623:5.  The Protocol was designed to allow the PA to review the

Trustees' submissions and to point to contradictory evidence or errors, and in those instances

where the Trustees concluded that the PA had identified a mistake, the breach claim was

withdrawn.  Tr. 2962:7–13 (Aronoff).  At trial, the PA pointed to only a handful of errors across

*tens of thousands* of "Big Four" borrower breaches regarding income, debts, occupancy, or

DTI.[12]  The PA's experts presented no evidence of pervasive errors in the core breaches or errors

of a magnitude that would call the entire review, or even a substantial portion, into question.[13]

Other courts have credited breach findings identified by such a generally reliable review,

even where "occasional errors would slip by, but there [was] no showing that such errors were

either frequent or material."  *Flagstar*, 920 F. Supp. 2d at 506; *see also FHFA v. Nomura

Holding Am., Inc.*, 104 F. Supp. 3d 441, 531 (S.D.N.Y. 2015) (noting that plaintiff's

reunderwriting expert's "methodology was essentially sound").  In *MARM*, Judge Castel found

that in some instances all breaches asserted on a given loan were invalid, but he did not find that

those errors affected similar findings on other loans, and he credited the evidence as to other

loans.  *Compare* 205 F. Supp. 3d 386 at 504–06 (finding "no breach" despite plaintiff's assertion

of income breach) *with id.* at 502–04 (affirming income breach on a different loan).

The reliability of the Trustees' process is further confirmed by Mr. Morrow's

independent review of a 600-loan random sample designed by Dr. Schwert to be representative

of the Aronoff loans.  Mr. Morrow agreed the loans had a valid breach 92.7% of the time, and

---

[12] Even in those instances, either the loan was still breaching despite the supposed error, or the evidence in the claim file showed that the review firm made an effort to identify that issue before submitting the breach.  Tr. 2972:25-2973:20 (Aronoff).  That is not a basis to find any systematic flaw.

[13] In response to a pointed question from the Court whether Mr. Grice aimed to determine whether the PA's conclusions were reliable in the sense of "accurate" as opposed to merely "consistent", he confirmed that he was focused on consistency, not accuracy.  Tr. 1321:18-1324:6.  Moreover, he did not review a statistically selected sample of breaches that would permit the results to be extrapolated across the remainder.  Tr. 1591:6–25.  Therefore, any conclusions he reached are limited to the actual loans reviewed.  Tr. 3097:12-3098:25 (Schwert).

14

Dr. Schwert extrapolated that result to the entire population, concluding at a 95% confidence

level that Mr. Morrow would agree that 90.5% to 94.8% of the loan population had a valid

breach. Tr. 3065:9-15 (Schwert). In performing his review, Mr. Morrow and his team reviewed

not just the supporting documents identified by the Trustees, but the entire loan file, and made an

independent assessment of whether a breach and AMA existed. Tr. 3220:19-3222:25 (Morrow).

His review provides the only metric supporting a statistically reliable "error rate."

      In light of the extensive unrebutted proof, the PA's pre-trial theory that the "withdrawn

loans" undermine the validity of the remaining claims falls flat. The only PA witness who

discussed this issue was Mr. Grice. Although he danced around the point, he never, not once,

testified that the withdrawal of certain loans gives rise to a credible inference that any of the

remaining breaches is invalid. That was the heart of the PA's position, but Mr. Grice simply

never gave that opinion. He certainly never testified that the withdrawn claims based on missing

documents—which account for almost 90% of the withdrawn breaches (TRX-577)—say

anything about the accuracy of the Big Four borrower breaches. In fact, Mr. Grice expressly

refused to draw *any* inferences about whether the withdrawal of some claims speaks to the

strength of any of the remaining claims: "I don't know what that speaks to." Tr. 1515:5–24.

There is simply no competent evidence to support the conclusion that, because some claims were

withdrawn, the process or the remaining claims are invalid. "I don't know" is not enough.

      The numbers show that the Trustees' volume of claims is realistic and credible. The

Trustees reviewed 171,000 loans and now assert claims on only 42%. That rate undercuts the

assertion that the Trustees flooded the Protocol with weak claims; if anything, the review was

conservative and restrained. The numbers also confirm that the PA's conclusions are not reliable

indicators of the true strength of the claims. Although the Trustees do not expect the PA to agree

15

on every loan, the PA's acceptance of only 0.7% of the 171,000 loans in the Protocol (or 2.0% of the more than 70,000 loans presented for estimation) speaks volumes. For the PA's acceptance rate to be realistic, the loans in Lehman's securitizations would need to be virtually untouched by the defects plaguing loans securitized by every other major Wall Street bank in the years leading to the financial crisis. There is, to put it mildly, no evidence to support that conclusion.

C. <u>The Trustees Also Proved Up Breaches Category by Category</u>

In addition to proving breaches one-by-one, the Trustees grouped the breaches by breach type, evidence used, and magnitude of the misstatements. The Court can use that information to assess the value of the claims. Tr. 2313:10–2314:7 (Aronoff).

Notwithstanding the PA's current assertion that every loan is a "snowflake," the Court should estimate the claims by, in part, ruling on general disputes that are common across loans. This estimation methodology always was contemplated by the PA and was cited as a basis for conducting an efficient loan review: "if Court involvement [were to be] necessary, it [would] likely [be] to decide categories of disputes, not individual disputed loans." TRX-873 at ¶ 58. The PA's expert stated that, as "patterns will likely develop for similar loans . . . disputes will center around categories of loans instead of on specific loans." TRX-871 at 10. Surely in the context of an estimation hearing, focusing on such patterns and categories is more than sensible. The nature of, and bases for, breach findings in each major category are discussed below.

1. <u>Income</u>

Over 32,000 loans contain income breaches, with a total net Purchase Price of over $5.5 billion. TRX-608; TRX-619; TRX-689; TRX-690.

*Examples*. Although the borrower in loan 1955 stated income as a social services worker earning $10,750/mo. as of July 2006, the borrower's tax return for that same year reflected

16

income of $48,602, or just $4,050/mo.  TRDX-185; TRDX-186; Tr. 2389:11-2392:7 (Aronoff).

Even speculating that the borrower lost her job the day after origination—and there is no

evidentiary basis for such speculation—the income would still be overstated significantly

($10,750 versus $8,000, or 34%).  Although corroboration that the tax return makes it more

likely than not that the borrower's claimed income was misstated is unnecessary, such evidence

appears in the materials submitted to the PA: a 2006 W-2, 2007 tax return, 2008 tax return, 2009

tax return and W-2, and 2010 paystubs from the *same employer* all show that the borrower never

came close to earning the amount she put on her application.  TRDX-186; Tr. 2392:8-2396:20.

The PA's own exemplars also support the soundness of the Trustees' findings.  At the

hearing, the parties discussed the Stanley Steemer driver who stated income of $6,500/mo. as of

November 2006.  Tr. 565:11-24 (Trumpp).  A 2007 W-2, however, showed income of $31,946

for the year, or just $2,662/mo.  Tr. 565:25-566:12.  Mr. Trumpp speculated that "the borrower

did not work all twelve months of the year" but had a medical event and left after five months.

Tr. 576:11-577:7.[14]  In fact, the borrower's doctor and employer confirmed that the borrower

worked full-time in 2007 into December, as reflected in a signed form that also corroborates the

income shown on the borrower's 2007 W-2.  Tr. 863:7-865:11.  The file also contains a 2008 W-

2, 2009 tax transcript, and a 2010 W-2 showing that the income number put forth by the Trustees

for 2007 was correct.  Tr. 869:14-17; TRX-2728, TRX-2729, TRX-2730.

*Evidence Sources Are Reliable.*  The most common sources of evidence for income

breaches are tax returns, W-2s, bankruptcy filings, BLS, audit documentation, and The Work

---

[14] The PA suggests there is some fundamental flaw in taking the annual income of a borrower shown on a tax return or similar source, dividing by 12, and comparing the result to the monthly income on the loan application.  But the PA never offered any evidence that this industry-standard calculation, which has been used by other courts without reservation (*MARM*, 205 F. Supp. 3d at 481), did not produce a reliable result on any loan.  While it is theoretically possible that in any particular case it might not produce a reliable result, there is no basis to believe that all or any substantial portion of 30,000 borrowers all lost their jobs during the year in which the annual income was reported.

Number.  TRX-608.  Each source is standard in the industry.  Tr. 2357:18-2359:15 (tax returns

and W-2s); 2351:20-2352:9, 2354:16-2355:10 (BLS); 2357:2-8 (audit documentation); 2359:18-

2360:20 (Work Number); 3241:7-3242:4 (bankruptcy filings, tax returns, W-2s).  The Trustees

carefully applied and used each source in accordance with industry practice, as both Mr. Aronoff

and Mr. Morrow verified.  Tr. 2358:25-2359:15 (Aronoff); 3244:21-3245:8 (Morrow).

        Lehman and Aurora routinely used each of these sources in the same manner for their

own putback claims.  TRX-1008, at 5; TRX-734, at 16; TRX-757, at 1; TRX-1020, at 2; TRX-

1011, at 6 (BLS).  Courts have approved each of these sources.  *MARM*, 205 F. Supp. 3d at 445,

444; *Flagstar*, 920 F. Supp. 2d at 489, 506; *Nomura*, 104 F. Supp. 3d at 445, 528–30.

        *Near-Year Evidence Is Valid*.  The Court should reject the PA's invitation to disallow

income breaches based on near-year evidence.  When pursuing its own repurchase claims,

Lehman relied on near-year tax documents to verify income, explaining that such documents are

"key piece[s] of evidence" that the borrower "was not earning the income he claimed on his

application."  TRX 752 at 2.  Likewise, the PA accepted loans with standalone income breaches

based on narratives that identify only near-year evidence.  TRX-619 row 65350; TRX-895 at 18.

        The Trustees' review carefully limited their near-year income claims.  Near-year breach

findings "for a salaried borrower" required evidence "that they're at the same employer, [and

the] same or better job title" or, in the case of a self-employed borrower, "that they are receiving

their income from the same [] source."  Tr. 1852:11–24 (Esses).  Such measures provide a "level

of confidence that you're looking at a similar situation."  Tr. 2449:23–2450:16 (Aronoff).  In the

loans at issue here, the massive disparities between the stated income and the income shown in

the Trustees' evidence cannot plausibly be explained by ordinary income fluctuations.

In *MARM*, Judge Castel repeatedly approved near-year evidence that the Trustees used in the same manner. 205 F. Supp. 3d at 514 (accepting income breach based on audit verification of 2008 income for a 2007 loan because "the borrower held the same job"); *id.* at 516–17 (accepting 2007 evidence because "the borrowers' incomes were likely stable" and "'it was reasonable to assume' that the borrowers earned similar income in 2006").

*Income Breaches for Self-Employed Borrowers Are Valid.*  Lehman's own repurchase claims show that claims involving self-employed borrowers are commonplace.  Like the Trustees, Lehman also relied on Schedule C net profits to verify self-employed borrowers' gross monthly income. *See, e.g.*, TRX-1008 at ¶13(e) & TRX-1009.  Aurora's policies and procedures confirm exactly that, instructing quality control reviewers to verify income the same way: "Does business income not agree with Schedule C?"  Tr. 841:9-842:9 (Trumpp); TRX-701 at 14-15.

As Mr. Morrow explained, industry participants look to "net income at the bottom of a Schedule C" because that figure accounts for expenses and matches the business income that sole proprietors disclose on their personal tax return.  Tr. 3251:12- 3252:11 ("You never use gross. It's always net."); Tr. 3252:8-11.  Courts agree.  In *MARM*, Judge Castel found a breach where the plaintiff's expert "opined that instead of listing his actual personal income, the borrower likely listed the total gross revenue of his handyman business."  205 F. Supp. 3d at 516.

The Trustees were conservative in their approach to self-employed borrowers, for example giving borrowers credit for "depreciation because that could have represented available cash [the borrower] had for that year but for accounting purposes was deducted from the taxable income."  Tr. 2427:4-15 (Aronoff).  The Trustees also accounted for ordinary fluctuations self-employed borrowers might experience by requiring income to be "from the same source," and

again, the massive income disparities here cannot plausibly be explained by ordinary fluctuations.  Tr. 1852:21-24 (Esses); 2449:8-2450:16 (Aronoff).

By contrast, the PA's approach was to speculate.  Mr. Grice hypothesized on one loan that the economy and seasonal fluctuations might have affected the borrower's earnings during 2006 (the origination year), TRX-570 at 11, but Mr. Grice ignored the hardship letter, which confirms that the borrower's "business was excellent until late 2007."  Tr. 2470:3–2472:4.[15]

*Breach-Level Materiality.*  As the Court is aware, the Governing Agreements impose a materiality requirement at the AMA level and, in some instances, at the breach level.  The only claims with a materiality element at the breach level are those based on misrepresentation under the No Untrue Statement representation or the No Default representation (if a statement violates the "no misstatement" covenant in the mortgage).[16]  Under these provisions, Mr. Aronoff testified that what makes a misrepresentation or omission material is whether it is "material to the credit risk of the loan *as it related to the origination process*"—in other words, an underwriter wants to know the true facts before extending credit.  Tr. 2248:3-25 (emphasis added).  Accordingly, the Trustees' assertion of material breaches under these two provisions was "limited to those facts that go to those critical areas of assessing the borrower's ability to pay and other aspects of the borrower that go to the credit risk of the loan," including income, debt, employment, and assets.  Tr. 2229:3–23.[17]  That approach is entirely consistent with long

---

[15] The PA's cross-examination of Mr. Morrow likewise ignored evidence in the file.  Although Mr. Morrow was cross-examined on a 2011 hardship letter (not cited by Mr. Grice), the PA ignored a 2009 modification request where the borrower made no mention of loss of income from job relocation.  TRX-1-38593117 at 947.

[16] Thus only borrower misrepresentations of income, debt, employment, and assets have a materiality provision at the breach level.  By contrast, the DTI representation states that no loan has a DTI over a certain threshold (such as 60%).  Also, because occupancy breaches are supported by a separate mortgage covenant (and often an occupancy affidavit) that has no embedded materiality language, there is no materiality requirement for an occupancy breach.  Nor is there any materiality requirement in other representations, such as those relating to compliance with law.

[17] To be sure, credit risk also relates to AMA in that the value of a loan depends on the loan's credit risk.  In the context of breaches that go to core elements of the decision to extend credit on particular terms, materiality at the breach level and the AMA level will frequently overlap but are distinct: whether a prospective borrower's financial

established materiality principles. *See In re Denenberg*, 37 B.R. 267, 271 (Bankr. D. Mass. 1983) (financial statement materially false because information therein "is typically important and necessary information used by a lender in deciding to extend credit"). To be material under those principles, the fact at issue would have significantly altered the total mix of information, but not necessarily changed the ultimate outcome. *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Judge Castel adopted this approach in *MARM*, finding that a borrower had intentionally concealed post-closing debt because he knew or should have known that such information was "important to the underwriting process." 205 F. Supp. 3d at 521.

By contrast, the PA's standard—that a breach is not material if the mortgage would have been made anyway—is contrary to law: "While it is true that materiality is established by evidence that a loan would not have been made but for the false [financial information], the converse (i.e., the loan would have been made regardless of the false [financial information]) does not refute materiality." *In re Chryst*, 177 B.R. 486, 499 n.13 (Bankr. E.D. Pa. 1994).

## 2. Debt

Over 20,000 loans contain debt breaches, with a total net Purchase Price of over $3 billion. TRX-609; TRX-619; TRX-689; TRX-690.

*Examples*. On the loan application for loan 8742, the borrower was careful to include his gym membership as a monthly obligation but 'forgot' to mention two existing mortgages totaling $205,900. Tr. 2490:5–2491:13. The undisclosed mortgages were uncovered through DataVerify and an audit credit report. Tr. 2490:5–2492:21; TRX-2-Claim 122258742 at 11 and 15. Mr. Grice did not dispute that the undisclosed debt existed. Tr. 2502:3–2503:10. His only response

---

condition is important to a lender is analytically distinct from the question whether a particular fact is regarded as increasing risk or adversely affecting value.

was based on a hypothetical-rental-income analysis, TRX-575 at row 606, column M (i.e.,

assuming the undisclosed property was an investment property, assuming that the property was

in fact rented, and guessing what the rent was), but Mr. Grice admitted he had *never heard of*

*such an argument before his work on this litigation* and that the idea came from the PA.  Tr.

1373:25-1375:16.  That rental "analysis"—employed routinely by the PA and Mr. Grice at the

PA's suggestion—is pure speculation.  *See Flagstar*, 920 F. Supp. 2d at 511 ("disregarding

[defendant's] speculative assumption of potential rental income").

In loan 8455, a MERS report showed the borrower failed to disclose two mortgages

totaling $185,000.  Tr. 1725:24-1726:8 (Grice); TRDX-30.  The breach also was supported by a

credit report in the claim file, even though the report was not cited in the breach narrative.  Tr.

1786:4-15.  Mr. Grice admitted he had no evidence that the borrower did not in fact have two

undisclosed mortgages totaling $185,000.  Tr. 1755:21–1756:6.

*Evidence Sources Are Reliable*.  The most common sources of evidence for debt breaches

are MERS, credit reports, DataVerify, Lexis-Nexis databases (Accurint, CLEAR), and SiteX.

Each source is standard in the industry.  Tr. 2346:4-2350:11 (MERS, Accurint, LexisNexis);

2360:21-2361:16 (DataVerify); 2365:6-2366:9 (SiteX); 3242:9-3243:17 (MERS, LexisNexis,

credit reports).  And although credit reports are not entirely free from error, nevertheless the

"[m]ulti-trillion dollar consumer lending industry is driven by credit reports."  Tr. 2362:4–6

(Aronoff).  Lehman and Aurora used these sources when pursuing their own claims.  Tr. 795:11-

796:4 (Trumpp), TRX 760 (credit reports); Tr. 816:18-22 (claims based on Lexis-Nexis, audit

credit report, and Accurint); TRX 701 at 12-15 (Accurint).  Recovco, the PA's firm, used

DataVerify "commonly".  Tr. 1572:17-1573:2 (Grice).  Courts have approved each of these

sources as generally reliable. *MARM*, 205 F. Supp. 3d at 441–42 (MERS, DataVerify, SiteX, LexisNexis); *id.* at 442–43 (credit reports); *id.* at 521 (audit credit report).

*"Disclaimers" on Websites Do Not Make the Sources Unreliable.* While the PA seizes upon legalese website disclaimers to discredit generally accepted sources, Judge Cote squarely rejected this argument in *Nomura*: "Such stock disclaimers, however, do not render these reports devoid of evidentiary value or make them inadmissible." *Nomura*, 104 F. Supp. 3d at 529. The PA did not present any evidence that supports a contrary finding here, and the Court need not ignore common sense: these companies use disclaimers to limit their liability, but they publish information so that users, including mortgage professionals, rely on it.

*Post-Closing Debt.* Both the No Default representation (via the borrower covenant) and No Untrue Statement representation include a broad provision that the borrower did not fail to provide material information in the loan process. Tr. 2509:5–2511:8; TRX-231 at 14 (loan documents do not "omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading"); TRX-1-Loan 124487836 at 941 § 8 (borrower did not "fail[] to provide Lender with material information"). Mortgage obligations incurred shortly after closing (i.e, where it is clear the borrower contemplated the additional mortgage when closing the subject loan) speak directly to the borrower's capacity to pay the subject mortgage, and they would be material information to any reasonable lender. Tr. 2506:17–2509:4 (Aronoff); 2504:19–2511:8 (discussing borrower with $1.27 million in four undisclosed mortgages, each of which closed within three to four weeks after the subject loan, including a $475,000 mortgage that closed the *day after* the subject loan application was signed). Accordingly, this type of borrower omission is routinely treated in the industry as a breach of these representations. Tr. 2506:17–2507:20 (Aronoff) (lenders require borrowers to disclose

"stacking closings" where the borrower takes out additional loans after closing the subject loan);

Tr. 3261:21-3264:4 (Morrow). Judge Castel came to the same conclusion in *MARM*, holding

that breaches based on undisclosed debt incurred within 30 days of origination were valid. 205

F. Supp. 3d at 518–21. The claimed absence in the loan application of a specific line item for

impending debt ignores the text of the representations—that no borrower failed to provide

material information, which clearly includes impending debts.

      3.  Occupancy

Over 6,000 loans contain occupancy breaches, with a total net Purchase Price of over

$1.2 billion. TRX-611; TRX-619; TRX-689; TRX-690.

*Example.* The borrower of loan 7452 was a waitress in New Jersey who purchased a

home in Las Vegas, supposedly as her primary residence. Tr. 2514:25–2521:8 (Aronoff). At

origination, she signed (in addition to the mortgage itself) an occupancy affidavit making the

failure to move into the Nevada property within 60 days a default under the mortgage. TRX-2-

Claim 38127452 at 52–53. Less than two years later, she filed for bankruptcy; in her filings, she

listed her New Jersey residence as her current residence and stated she had not moved in the

previous three years. Tr. 2519:5–2521:8; TRDX-204–206.

*Evidence Sources Are Reliable.* The most common sources of evidence for occupancy

breaches are tax returns, bankruptcy filings, public records, and hardship letters. Each source is

used commonly in the industry. Tr. 2357:18-2359:15 (tax returns); 3241:7-3241:24 (bankruptcy

filings); 3242:6-3243:4 (public records). Lehman and Aurora used each of these sources when

pursuing their own putback claims. TRX-1040 at 8 (tax returns); TRX-734 at 16 (bankruptcy

filings); TRX-1007-12 (hardship letter); TRX-998 at 3, loan 0927 (public records). Courts have

approved each of these sources as generally reliable. *MARM*, 205 F. Supp. 3d at 441-42, 445-47,

485-86 (MERS, SiteX, tax returns, hardship letters); *Nomura*, 104 F. Supp. 3d at 529-30

(bankruptcy filings, public records).  In response, Mr. Grice relies on rank speculation; for

instance, he testified that a tax return showing the borrower still lives at the departure address

was unreliable because maybe the "tax preparer hasn't updated their database."  Tr. 1467:7–11.

    *Failure to Occupy the Property Constitutes an Occupancy Breach*.  The test is whether

the borrower occupied the subject property as represented.  The Trustees need not provide

evidence regarding whether the borrower subjectively intended or believed or hoped to occupy

the property as a primary residence.  In addition to a covenant that the borrower has not made

any misstatement, the standard mortgage states that the borrower "*shall occupy*, establish, and

use the Property as Borrower's principal residence within 60 days [and] shall continue to occupy

the Property as Borrower's principal residence for at least one year."  TRX-2-Claim 32953408 at

42 § 6 (emphasis added).[18]  That covenant says nothing about subjective "intent" to occupy.[19]

Failure to comply is a violation of the terms of the mortgage, giving rise to a breach of the No

Default representation.  The reason for such provisions is plain: "It is universally recognized that

owner occupancy is a critical factor in assessing credit risk.  Mortgage lenders and investors

understand that borrowers have a greater incentive to make their mortgage payments when the

failure to do so risks the loss of the family home."  *Nomura,* 104 F. Supp. 3d at 528.

    Although the standard mortgage suggests that the borrower need not comply with the

occupancy requirement if "extenuating circumstances exist which are beyond Borrower's

control," that language does not undermine the claims.  First, as Mr. Morrow testified, he has not

seen this scenario arise except "once or twice in 50 years."  Tr. 3264:5–13.  Second, the review

---

[18] In *MARM*, the language of the mortgage was not at issue, so the court had no occasion to consider it.

[19] In the face of Mr. Aronoff's testimony that this is the industry understanding as well (Tr. 2232:2-2233:22), the PA provided no evidence—none—that the custom and practice in the industry requires a showing of the borrower's subjective intent for a valid occupancy breach.

firms were instructed to search the loan file for evidence of "extenuating circumstances" that were beyond a borrower's control and to refrain from asserting an occupancy breach if such evidence existed.  Tr. 2231:21–2233:22 (Aronoff).  Third, the PA has not presented evidence for any loan that the borrower was excused from occupying the subject property under the governing documents.  The Trustees need not prove the negative.  Speculation that the borrower might have failed to occupy because of uncontrollable extenuating circumstances does not defeat the claim.  And even if it could, the occupancy affidavit commonly signed at origination does not include any "extenuating circumstances" language.  Mr. Aronoff testified that, based on his 34 years of experience, "[t]he commercial understanding as a practitioner" is that the borrower must comply with the requirements in "[t]he affidavit".  Tr. 2233:23–2234:9; Tr. 2747:7–24; Tr. 2748:6–10.

4.  DTI

The general disputes regarding DTI breaches track the disputes regarding income and debt breaches discussed above.  Two differences, however, merit discussion.  First, DTI breaches do not impose any "materiality" requirement at the breach level.  *See supra* n.16.  Second, the PA argues that because Mr. Aronoff did not attempt to "verify actual income," the Trustees supposedly cannot prove DTI breaches.  That is incorrect for several reasons.  To begin, many DTI breaches are not based on misrepresentations but are asserted because the originator calculated the DTI incorrectly (using correct income and debt information), or a loan with a DTI over the limit was included in the trust when it shouldn't have been.  Those examples trigger DTI breaches even if the income and debts on the loan application were correct.  In any event, Mr. Aronoff testified that the reviewers cited a breach if they determined that the income listed in a tax return, W-2, paystub, or other source "was more likely than not to be the borrower's income at the time the loan was made."  Tr. 2847:3-10; 2554:17-22 ("So to the extent the income

believed to be more likely the case than not based on the evidence in the file, when compared to the stated income if the variance was less than five percent [then there would be] no claim."). Mr. Aronoff testified that it was standard in the mortgage industry to follow this methodology when asserting putback rights based on DTI breaches, particularly given the large disparities between the stated income and the income shown on the tax return or similar document in the loans in this proceeding. Tr. 2981:24–2982:20; 2985:4–16. Mr. Aronoff's testimony that this method is standard in the industry is unrebutted. Mr. Grice did not criticize this aspect of the Trustees' review. In fact, the PA used the same approach: "Recovco routinely would calculate what they thought the more accurate DTI was." Tr. 1377:17–20 (Grice).

D. The Evidence of Breach Is Admissible

The primary evidence of breach—the building blocks for the Trustees' claims—are the actual documents in the loan files or supporting documentation that establish each breach. These documents are contained in the Claim Files, as defined in the Protocol Order. As was shown during the hearing, additional evidence of breach is contained in the loan files themselves. All of this evidence has been admitted into the record pursuant to Exhibit G, as have been the claim tracking spreadsheet and the Master Servicer data tapes exchanged during the Protocol.

In a trial on the merits, the foundational evidence described above would be presented to the court or special masters to establish the claims on a breach-by-breach basis. In the context of an estimation hearing, however, it is not possible to physically review each piece of evidence. For this reason, the Trustees' expert prepared a series of exhibits (TRX-605–624), which were the subject of extensive examination and which summarize data contained in the documentary evidence already in the record on a breach-by-breach and category-by-category basis.

The use of such summaries is particularly appropriate in an estimation hearing for the

simple reason that it is a summary proceeding which precludes either party from proving or

defending each breach claim in a traditional fashion.  It is well-established that a bankruptcy

court may use "whatever method is best suited to the circumstances" to arrive at its estimation.

*In re Seaman Furniture Co.*, 160 B.R. 40, 42 (S.D.N.Y. 1993).  Given the millions of pages of

evidence in this case, spreadsheets summarizing that evidence are more than appropriate.

Wholly aside from the unique circumstances of an estimation hearing, Second Circuit

precedent is clear that the use of summaries is generally permitted in an ordinary trial under Rule

1006 where doing so is "necessary to make sense out of a mass of documentary matters." *U.S.*

*for Use & Benefit of Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d

153, 163 (2d Cir. 1996).  In *Evergreen*, summaries of some 5,000 exhibits were admissible under

Rule 1006 when "the documents supporting this evidence existed, were admissible, [and] had

been made available to defendant . . . ."  *Id.*  As Mr. Aronoff testified, the exhibits summarize

data in the materials exchanged during the Protocol, all of which are admitted into evidence by

the parties' agreement.  That data is of course housed in a secure location for storing data, but the

data on his exhibits ultimately comes from and is contained in documents exchanged during the

Protocol.  Tr. 2995:5–3001:2.[20]  The exhibits thus meet the Rule 1006 test that summaries are

---

[20] As Mr. Aronoff testified, the exhibits were derived from data contained in the materials exchanged during the
Protocol, all of which are admissible under Exhibit G.  See, e.g., Tr. 2526:5-2527:22, Tr. 2534:10-2535:10, Tr.
2547:12-6, Tr. 2560:3-7, Tr. 2566:22-2567:4, Tr. 2567:23-2569:3, Tr. 2571:10-15, Tr. 2579:17-25.  During the
Protocol the Trustees delivered the following documents to the PA: (1) the claims tracking spreadsheets; (2) the
entire loan file obtained from the servicer; (3) the claim package containing the documents supporting the breach
claim; and (4) the master servicer loan data tape.  Tr. 1868:24-1870:4; 1876:14-1877:16 (Esses).  As Mr.
Aronoff testified, the loan review firms provided Duff & Phelps with certain information from the loan files and
materials analyzed during the loan review.  Tr. 2998:16-21.  That information was input into a Duff & Phelps
database, together with information about the loans from the master servicer data tape (delivered to the PA), and,
later, information from the PA's responses to the Trustees' breach claims.  Tr. 1885:24-1887:4; Tr.1893:9-1893:24
(Esses).  That "data was the source of data for the claim tracking spreadsheet, was the same database that was used to
prepare the datapoints in" in the exhibits to Aronoff's report.  Tr. 2636:19-12.  The same holds true for the other
exhibits and tables in Mr. Aronoff's report.  All of the exhibits to Mr. Aronoff's report, as well as the tables and

accompanied by "foundation testimony connecting [them] with the underlying evidence summarized." *Fagiola v. Nat'l Gypsum Co.*, 906 F.2d 53, 57 (2d Cir. 1990).

Admitting the Aronoff exhibits under Rule 1006 does *not* mean the Court thereby accepts as true that every loan on those exhibits is in fact breaching. The PA preserves any and all arguments that the evidence of breach is insufficient under the preponderance standard or that the Trustees have interpreted the evidence incorrectly. The exhibits provide a mechanism to calculate the amount of the estimated value of the claims after the Court excises any information it deems unusable and estimates the percentage of claims that would likely succeed at a trial.

Consistent with the pragmatic approach underlying the Rules of Evidence, Rule 1006 requires that summary charts be generally accurate but not perfectly accurate. *See Fagiola*, 906 F.2d at 57–58. Mr. Aronoff and his team "took as much care as [they] possibly could to assure that the data was accurate and matched" the underlying source documents by "taking into account the enormous size of data" and performing sufficient "spot checks and audits [] to satisfy [Mr. Aronoff] that the data was accurate." Tr. 2548:25-2550:10. Any objections that a summary chart does "not fairly represent the documents" are exaggerated and, in any event, "go more to its weight than to its admissibility." *Fagiola*, 906 F.2d at 58; *see Evergreen*, 95 F.3d at 163 (defendant "had an ample and fair opportunity to cross-examine. Rules 1006, 703 and 705 require no more"); *U.S. v. Oshatz*, 912 F.2d 534, 543 (2d Cir. 1990) (summaries properly admitted where defendant "cross-examine[d] the Government's witness concerning errors in his calculations. And . . . the Court permitted the Government to amend any incorrect figures in the chart before ultimately admitting the exhibit"). The PA during its extensive cross-examination pointed out no more than a handful of errors out of hundreds of thousands of Excel rows,

---

computations included in his report, were created at his request by Duff & Phelps under the supervision of Mr. Aronoff's team. Tr. 2525:2-4, 2546:19-2547:3; 2548:24-2550:10 (Aronoff).

confirming that the exhibits are generally reliable for purposes of summarizing the loan-by-loan proof that has been placed into evidence.  Tr. 2658:17–2708:16 (Aronoff).

Despite having months to analyze the Aronoff exhibits, not one of the PA's experts ever gave any testimony questioning their accuracy and never gave any opinion that the exhibits suffer from any systematic errors.  To the contrary, the PA *affirmatively relied on the Aronoff exhibits* during Mr. Trumpp's testimony, offering data from the exhibits as a reliable breakdown of the claims.  Tr. 654:4–659:2.  The PA cannot now complain the exhibits are unreliable, inadmissible, or are an improper basis for reaching a reasoned estimate of the claims.

## III. THE TRUSTEES HAVE PROVEN THAT THE BREACHES MEET THE AMA TEST

### A. The Trustees Correctly Applied the Risk-of-Loss Test

The Trustees applied the prevailing industry standard for determining whether a breach adversely and materially affects the value of the loan (an "AMA Breach").  Mr. Aronoff testified that the industry's accepted understanding of the AMA requirement is that the breach significantly increases the risk of loss, either by increasing the likelihood of default or the potential loss severity.  Tr. 2289:5-2291:17.[21]  He further testified that there is a direct, inverse relationship between increased risk of loss and the value of the loan.  Tr. 2291:14-2295:20; 2296:8-2297:8; TRDX-175.  Industry participants, including investors, rating agencies, bond insurers and lenders, rely on expected risk of loss to evaluate their exposure.  Tr. 2289:20-2292:14; TRDX-174.  Mr. Aronoff and his team applied that standard when determining whether a breach was an AMA Breach.  Tr. 2307:6-2309:6.[22]

---

[21] Other specific breaches satisfy AMA because they are deemed AMA under the governing documents. TRDX-173.
[22] The Trustees performed exactly the same level of analysis that Judge Castel performed in his loan-by-loan AMA discussion in *MARM*.  *See, e.g.*, 205 F. Supp. 3d at 523 (finding an AMA due to undisclosed debt and DTI).

New York courts have repeatedly applied the same standard in assessing putback claims. As Judge Castel and others have held, in order to make out an AMA Breach, the trust may "prove that the breach increased the risk of loss." *E.g.*, *MARM*, 205 F. Supp. 3d at 468. In relying on that standard, the Trustees need not quantify the amount of the impact. *Id.* at 468.

There is no real question that the understatement of debt or overstatement of income— which drive DTI higher—or misstatements of occupancy or employment all increase the risk of loss. In support of their own putback claims, Lehman and Aurora repeatedly asserted that misrepresentations of key characteristics such as income, debt, employment and occupancy increased the risk of loss on loans. For example, in putting back a loan in 2014 due to occupancy breaches, Lehman emphasized that loans secured by investment properties as opposed to primary residences were higher risk loans. TRX-713 ¶17. It made similar statements with respect to other breaches that went to the borrower's ability to repay the loan.[23] And, ironically, in light of the PA's criticisms of the Trustees' formulation of the AMA basis for its breach claims, Lehman did not quantify or otherwise explain the basis for these statements, for the simple reason that the effect of such breaches was accepted among industry professionals and needed no further proof.

Likewise, the Trustees have established that an AMA at the time of securitization typically carries on indefinitely. As Lehman and Aurora asserted in their own putback claims, and as Mr. Aronoff testified, "[t]o the extent there was an unknown breach, a material adverse breach, then that would imply that the investors overpaid for that loan." Tr. 2296:8-2297:8. By definition, that effect cannot change over time. Rather, the "only thing that might change over

---

[23] *See* TRX-713 ¶16; TRX-714 ¶10 ("Misrepresentations of borrower income have a material and adverse effect … for several reasons. . . .[W]hen borrowers misrepresent their income, they will usually not be able to make payments on the loan and it will go into default."); TRX-712 ¶¶19-21 ("Information regarding a borrower's employment as well as a borrower's income and ability to repay the debt is material to LBB's decision to purchase loans from correspondent lenders such as Direct Mortgage. . . .").

time is that once that defect is discovered, at that time the investor understands they've not received the benefit of their bargain and potentially overpaid for a defective loan." Tr. 2297:9-14. This is precisely the conclusion Judge Castel reached. 205 F. Supp. 3d at 466–68 (the trusts may suffer a "material and ongoing harm because the trusts paid a higher price than they should have to acquire a given loan in their respective pools."). The PA did not rebut this analysis.

B. The Standard Lehman Applied in its Own Putback Claims Is Entirely Consistent with the Trustees' Approach

The standard the Trustees applied is consistent with the standard Lehman and Aurora applied in pursuing their own putback claims. Lehman and Aurora did not attempt to demonstrate that the breach caused a loss. Instead they relied on the market truism that loans with borrower misrepresentations are worth less—whether sold in the whole loan market or to a securitization.[24] And as noted above Lehman cited in support for its position the fact that such loans were riskier. In numerous court filings—many of which were submitted by Mr. Rollin, the PA's current litigation counsel—Lehman and Aurora repeatedly affirmed that misrepresentations of income "have a material and adverse effect on the value of the loan because the loan cannot be sold at full value to another purchaser or to a securitization once a misrepresentation is known; a substantial discount will be applied given the misrepresentation. In addition, misrepresentations have a material and adverse effect upon the interests of [Lehman]." Tr. 808:22-809:19; TRX-929 ¶16. For the same reason, information about a borrower's income was material to Lehman's decision to purchase loans. Tr. 808:6-21; TRX-929 ¶15. Under oath, Lehman and Aurora submitted virtually identical explanations about the material and adverse effect of misrepresentations of borrower debt, occupancy status, assets, and employment. Tr. 809:11-18;

---

[24] The PA's expert supports this position, acknowledging that so-called scratch and dent loans (loans that did not conform to securitization parameters) sold at a discount. TRX-972, 315:2-10. Mr. Trumpp agreed. Tr. 1044:6-15.

TRX-929, ¶15; *see supra* n.23. As Mr. Trumpp testified, loans with known misrepresentations cannot be sold at full value, and loans with a lower price have a lower value. Tr. 785:12-16; 786:6-10. The PA's argument that Lehman's own putback claims are distinguishable because they relate to whole loans—which have virtually all of the characteristics as mortgage loans that have been sold to a securitization—makes no sense, and the PA cites no precedent that has *ever* accepted this distinction without a difference. Tr. 784:2-785:11.[25]

C. The PA's Loss Causation Argument Has Been Rejected Multiple Times

The PA argues the AMA provision requires proof of an actual loss on the loan, and then of loss causation tying the breach to that actual loss. The Court should make no mistake: this is an argument that was once raised by putback defendants but has been soundly rejected by every single court to address the issue. The uniform New York rule is that the performance of a loan is irrelevant to AMA. *See MARM*, 2015 WL764665, at *14–15 (S.D.N.Y. Jan. 9, 2015); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 131 (S.D.N.Y 2014); *Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A.*, 2014 WL 1259630, at *4 (S.D.N.Y. Mar. 27, 2014), *aff'd* 643 F. App'x 44 (2d Cir. 2016); *Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, 2013 WL 1285289, at *10 (S.D.N.Y. Mar. 28, 2013), *vacated and remanded on other grounds* 627 F. App'x 27 (2d Cir. 2015). The Trustees "need not show that the breach cause an actual loss, nor that any actual loss suffered was caused by the breach." *MARM*, 205 F. Supp. 3d at 468.[26] To rule for the PA, the Court would need to depart from settled law.

---

[25] The PA's unelaborated and facially unpersuasive distinction ignores a central point—if, as Lehman concedes, loans with a disclosed misrepresentation breach will sell for less to a securitization, then the trusts (and their investors) that purchased a loan with an *undisclosed* breach overpaid for the loan. The result is that the yield on that loan will be less than it would have been had the price paid reflected the existence of the breach. That ongoing effect does not disappear when the loan is in the application.

[26] This is the same rule that applies in monoline cases, where the contract provisions are materially identical. *See Assured Guar. Mun. Corp. v. Flagstar Bank*, 892 F. Supp. 2d 596, 602 (S.D.N.Y. 2012); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 105 A.D.3d 412, 413 (1st Dep't 2013).

33

It should come as no surprise to the PA that loss causation is not required. Elsewhere the PA affirmatively argued in November 2012 that "New York law does not mandate proof of proximate, direct-loss causation" in order to recover for loan-level breaches of representations and warranties. TRX-1028 at 3. The PA also argued in 2014 that "causation, in the context of the loan representation contract before it, does not require 'actual pecuniary loss resulting from a breach.'" Mem., *Aurora Comm. Corp. v. Lenox Fin. Mortg. Corp.*, No. 13-cv-1489, Dkt. 52 at 21 (E.D. Cal. Feb. 3, 2014) (quoting *Assured*, 892 F. Supp. 2d at 601). *The PA in fact prevailed on this point*. *Id.*, Dkt. 60 at 13 (Sept. 19, 2014) (holding that the argument that the breach did not cause a loss "misses the mark"). In a 2011 hearing before Judge Peck in this very bankruptcy case, the PA's counsel, Mr. Rollin, stated—repeatedly—that "a default isn't necessary to have a breach, you can have a breach without a default." TRX-842 at 35:3-14. The PA's new, completely opposite position is not credible.

The PA suggests the rule should be different for loans that, in this proceeding, will not be repurchased because Lehman is out of business, but the PA cites no case in which the court changed the elements of the cause of action by requiring a trustee to prove loss causation in order to obtain monetary relief in lieu of repurchase where repurchase is impractical. To the contrary, cases holding that trustees may obtain the monetary equivalent of repurchase have also held that trustees need not show loss causation. *See, e.g.*, *MARM*, 2015 WL764665, at *12, *15 (holding that the trustee may recover the purchase price in lieu of repurchase and that the trustee need not show that a breach caused a default). Quite simply, trustees are not required to prove loss causation to obtain specific performance, and they are not required to prove loss causation to obtain the monetary equivalent. This result conforms with the most basic of contract principles: the terms of the parties' agreement govern. Under the express language of the repurchase

provisions, the "causal" requirement is satisfied by showing that the breach caused the adverse material effect. *Wells Fargo*, 2013 WL 1285289, at *10.[27]

The Court should reject the PA's argument, raised for the first time in its pretrial brief, that the Court may impose a loss causation element because the "equities" in bankruptcy court are "different". Pretrial Br. at 16. A bankruptcy court's equitable power to administer the claims does not include the discretion to discard state law that sets the metes and bounds of the claims themselves. *See In re Lehman Bros. Inc.*, 574 B.R. 52, 57 (Bankr. S.D.N.Y. 2017) (the Court "has obligations under the law to administer the LBI case in accordance with applicable law"); *Butner v. U.S.*, 440 U.S. 48, 53, 55 (1979) (rejecting argument that a "federal rule of equity" should trump state law in bankruptcy proceedings); *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 137 n.8 (3d Cir. 1982) (bankruptcy courts may not use "equitable considerations" as grounds for estimating claims for less than they are worth).[28] New York law affords plaintiffs the monetary equivalent of repurchase not as an improvised remedy, but rather because that is what the contracting parties agreed at the time of contracting; interpreting the repurchase protocol as the PA proposes "cannot have been what the parties intended when they entered into their agreements." *Assured Guar. Mun. Corp. v. Flagstar Bank*, 2011 WL 5335566, at *7 (S.D.N.Y. Oct. 31, 2011). The elements of the cause of action do not change in bankruptcy court.

D. <u>Mr. Castro's AMA Opinions Are Unsupported and Are Not Credible</u>

---

[27] The Governing Agreements make clear that where the parties wanted to impose a loss causation requirement, they knew how to do so. Provisions in the Governing Agreements impose loss causation requirements in order to support a claim for failure to deliver any of a small number of enumerated documents defined as part of the Mortgage File. *See, e.g.*, TRX-201 at § 2.02(c) (repurchase required "if such loss is attributable to" the breach). The repurchase provision has no such language, and that difference in language "must be deemed an intentional choice of the parties." *See, e.g.*, *Ambac Assurance Corp. v. EMC Mortg. LLC*, 121 A.D.3d 514, 518 (1st Dep't 2014).

[28] The debtor in *ResCap*, the bankruptcy matter that addressed RMBS putback claims, effectively conceded that, based on the weight of case law, the trustees would not be required to prove loss causation, and never suggested that "equitable considerations" in the Code override state law. *See* Debtors' Reply Brief In Support of Motion for Approval of RMBS Settlement, *In re ResCap*, 12-12020, Dkt. 2803 at 45 (Bankr. S.D.N.Y. Feb 1, 2013).

The PA's only witness to discuss AMA was its expert, Daniel Castro.  He first argues that as a matter of industry practice loans that were "performing" were not the subject of putback claims, but he was not sure if he had been told that Lehman itself put back performing loans, TRX-972 at 109:19–110:6; 207:23–209:8, nor could he recall whether he knew of Mr. Rollin's statements to Judge Peck that "a default isn't necessary to have a breach, you can have a breach without a default."  TRX-972 at 200:23-203:6.  When asked to explain how putting back a securitized loan was somehow different than putting back a whole loan (as both Mr. Castro and the PA contend), Mr. Castro said he "didn't look into it."  TRX-972 at 117:12–119:2.

Much of the basis for Mr. Castro's position is his claim that after 18–24 months the effect of original loan characteristics ceases to be significant, but Mr. Castro as well as the rating agencies he cites contradict the argument.  Mr. Castro himself states that "in the case of an at risk borrower, the lender's risk grows with the length of exposure to that credit."  TRX-925 at 17; TRX-972 at 332:13-336:12.  And in a 2015 publication Fitch stated that—far from origination factors becoming obsolete over time, as Mr. Castro contends—loan-level data from origination actually remains relevant to the estimation of losses: "The analysis showed all attributes retained their relevance to default behavior over time."  TRX-1232 at 31.

Mr. Castro's alternative argument is equally misguided.  He proffers a test that "would need" to be used if increased risk of loss in fact was the standard (which he denies), opining that the party seeking relief would have to first establish a "baseline risk of loss" for each loan using a 21-factor analysis and then quantify whether the breach—as distinct from any other factor— increased that risk.  TRX-921 at § VII.B.1.  Nowhere in Mr. Castro's three reports—totaling well over a hundred pages—does he suggest that anyone actually employed such a test.[29]  As Mr.

---

[29] At his deposition, he attempted to cure this deficiency by stating he had recently talked to one unnamed individual at one bond insurer, but he could give no details of what analysis the individual performed, and no details of others

Aronoff points out, this hypothetical test would be fundamentally inconsistent with the purpose

of the repurchase provision and would undermine the straightforward and efficient remedy

provided to trustees and certificateholders in the governing documents.  Tr. 2283:23-2286:2.  Mr.

Castro's hypothetical approach is also at odds with the cases, which hold that it is not necessary

to quantify the impact of a breach.  *MARM*, 205 F. Supp. 3d at 468.

E.    As a Separate Basis for Meeting the AMA Test, the Evidence Supports the Inference that
the Vast Majority of the Borrower Breaches Are Intentional

Although not required to establish AMA, the Trustees have amassed evidence supporting

the inference that the vast majority of the borrower misrepresentations were intentional and by

definition are AMA Breaches.  *MARM*, 205 F. Supp. 3d at 470 (holding that "if the Trusts can

prove that it is more likely than not that a borrower intentionally misstated information as part of

the underwriting process, they will have proved a material and adverse effect").  This approach

conforms with industry practice.  Tr. 2256:18-2257:5; 2774:4-10 (Aronoff).  As a matter of

common sense, borrowers generally know how much they make, how much they owe, where

they live, and where they work.  A borrower taking out a mortgage during the housing boom

does not accidentally forget that he makes $100,000 rather than $130,000.  And yet, over 90% of

the income breaches involve overstatements of 30% or more.  TRX-608.  A borrower taking out

a mortgage does not just forget that she owes $30,000 in car payments or has other mortgage

debt; yet over 85% of the debt claims involve more than $30,000 of undisclosed debt.  TRX-609.

---

that supposedly used this analysis.  TRX-972 at 255:24-256:18; 256:20-24; 257:16-259:13; 259:19-20; 259:22-
261:06; 268:22-279:17.  And Lehman's own practice was inconsistent with any such approach.  Lehman did not
proffer any quantitative analysis of the impact of a breach when it put back loans; it simply asserted that the breach
adversely affected the price at which the loan could be sold to a securitization.  The PA offered no such quantitative
analysis for any loan in this proceeding.  There are other issues with Mr. Castro's credibility.  For example, he
refused to acknowledge that he even knows what the phrase "at-risk borrower" means even though he used it in his
reports, and he testified that he did not necessarily agree with the statement that risk grows with time of exposure
before he realized that was his own statement in his own reports.  *Id.* 31:20-40:3; 331:20-336:12.

And Mr. Trumpp admitted "Aurora wouldn't even have made the loan to a borrower that it knew had lied about income, debt or occupancy." Tr. 786:22-787:3.

Judge Castel carefully considered the importance of accurate and truthful information in the underwriting of mortgage loans and the impact of intentional misrepresentations on the riskiness of such loans: "In assessing a credit risk, an underwriter looks at the borrower's ability and intention to repay the loan. It is important to the underwriter to have an understanding of the borrower's true financial picture with respect to the property and the loan. Deceit by a borrower undermines the ability to trust other statements by a borrower." 205 F. Supp. 3d at 470. In accordance with this uncontroversial view, the court repeatedly found—using documentary evidence rather than borrower or lender depositions—that it was more likely than not that borrowers had intentionally misstated their income, debts, and occupancy. *E.g.*, *id.* at 521 (finding that the borrower intentionally failed to disclose post-closing debt because "[i]t is more likely than not that he was in the process of applying for this additional loan while the subject loan was being underwritten [and] he knew or should have known that the status of additional property or mortgages was important to the underwriting process"); *id.* at 522–23 ("the omission [of other debt] was likely intentional deceit on the part of the borrower"); *id.* at 482–83 (intentional income misrepresentation); *id.* at 486 (occupancy breach "bespeaks of an intentional misrepresentation").

## IV. ALL CLAIMS FOR THE "ON HOLD" LOANS SHOULD BE ALLOWED

### A. The Claims for the On-Hold Loans Are Unrebutted

For the 25,000 on-hold loans, the Trustees provided at the hearing, as in the Protocol, detailed allegations of breaches and the required supporting documents. TRX-619; Tr. 1868:24-1870:4 (Esses). The PA offers no loan-level response whatsoever. There is no basis—none—to conclude that the on-hold loans would have failed had they been put through the Protocol. As

with any loan, each claim for those loans can be evaluated on its face, as Mr. Grice admitted.  Tr. 1637:18–1638:20; 2668:19-2708:16 (crossing Aronoff on on-hold loan).  Mr. Trumpp also conceded that putting the loans on hold "was not intended to be a defense."  Tr. 458:9-15.

**B.    The PA Cannot Meet Its Burden to Have the Claims Expunged**

The PA effectively requests the Court order the harshest form of sanctions—dismissal of claims amounting to billions of dollars—notwithstanding that the documents were not required by the Protocol, the Trustees nevertheless worked extensively to obtain the documents, and the documents bear little actual relevance to the resolution of the Trustees' claims.  *See Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) ("[D]ismissal with prejudice is a harsh remedy to be used only in extreme situations, and then only when a court finds willfulness, bad faith, or any fault by the non-compliant litigant.").  It would be extraordinary to dispose of over $3 billion in claims based solely on the absence of third-party documents.  The documents the Trustees *did* provide establish breaches.  Those breaches—misrepresentations of income, debt, DTI, and occupancy—and the calculation of the Purchase Price on those breaches, should not be discarded simply because the PA insisted on third-party documents that the Trustees were unable to procure and which have not even been shown to *exist*, much less bear on AMA (applying the correct standard) or on the Purchase Price calculation (as shown by Dr. Snow).

**1.    There Is No Basis to Conclude that the Trustees Violated Any Court Order**

The Protocol does not require any specific document for any loan.  Rather, it requires the Trustees to submit the documents received from the servicer, "which may include the documentation identified in Exhibit B, *to the extent such documentation is available . . . .*"  TRX-831 at 10, Protocol § III(e)(vi)(1) (emphasis added).  Exhibit B *does not include loss certificates* among the 41 documents listed.  TRX-831 at 17, Protocol Ex. B.  The Direction Letter to the

servicers, which the PA co-drafted, doesn't even mention loss certificates or corporate expense logs. Tr. 1822:8-1823:5, 1959:10-20 (Esses); TRX-1064 at 9. Aurora loan files, held out as a "template" for a "complete file," were frequently missing each of the demanded documents. TRX-831 at 7; Tr. 1833:7-1834:13; 1957:17-1958:5(Esses). If the documents were in fact "critical" the PA would have insisted the Protocol require them—it did not. The Trustees cannot now be held to a standard not previously contemplated or ordered.

Furthermore, the demanded documents were often actually in the loan file. Tr. 1962:4-14; 1968:21-1969:5 (Esses). And the PA failed to show which loan files it asserted were missing which documents. The PA therefore cannot meet its burden to expunge any claims.

###### 2.  There Is No Evidence of Willful Misconduct

The Trustees worked diligently to obtain the documents. They asked servicers for the complete origination and servicing files, emphasizing the Court's order. Tr. 1823:6-17, 1824:3-22 (Esses); TRX-1069. They followed up with the servicers again and again. Tr. 1825:7-14; 1826:3-1837:16; 1828:22-1829:17 (Esses). The Trustees specifically requested the four documents the PA demanded. Tr. 1960:23-1961:22 (Esses); TRX-1089. They followed up again and again. Tr. 2155:11-2156:4 (Esses). In response, the servicers assured the Trustees that the documents were either in the loan files already produced or did not exist in the format the PA wanted. Tr. 1961:23–1963:7, 1968:16–1969:5 (Esses); TRX-1099. The PA's argument is that 25,000 claims should be expunged because the Trustees did not seek a subpoena to obtain the information the PA demanded in the form the PA desired after the Trustees had been told such information did not exist. Tr. 612:8–613:5 (Trumpp); 2064:14–20 (Esses). Given the existing Court order to the servicers, the servicers' cooperation in responding to the Court's order and to the Trustees' requests, and the assurances of their esteemed counsel, there is no basis to find a

subpoena would have elicited a different response or that the Trustees acted in bad faith in taking

the course they did.  Tr. 2156:5–16 (Esses); TRX-1099.

3.  <u>The PA Failed to Show It Suffered Any Prejudice</u>

*Servicing Notes and Payment Histories*.  The PA asserts it needed servicing notes and

payment histories to support its loss causation defense.  Tr. 436:11–438:2; 440:2–22 (Trumpp).

Loss causation, however, is not an element of the claims.  And when the PA moved to expunge

certain types of on-hold loans, it never sought to expunge loans based on a lack of these

documents.  TRX-875.  At the hearing Mr. Trumpp also argued that servicing notes may be

relevant to the existence of a breach, but he testified they were relevant to *proving* breaches, not

disproving them.  Tr. 437:8–20.  The record fails to support the apparent contention that the

absence of servicing notes somehow hampered the ability of the PA to respond to the claims.  Of

the more than 60,000 loans the PA reviewed and responded to, it never mentioned servicing

notes in its responses to support the PA's position, except to say that such notes were unreliable,

belying any notion the PA suffered prejudice.  *See* TRX-619; *see also* TRX-1681 to TRX-1730.

*Loss Certificates and Expense Logs*.  The PA first argued it wanted these materials to

look for "servicer errors," but the PA found only twelve supposed "errors" out of tens of

thousands of loans, and the PA in this proceeding *abandoned that defense*.  Tr. 442:25–443:25;

453:13-455:7; 854:20-855:21 (Trumpp); 1986:16-1987:12 (Esses); 4073:18-24 (Cornell).  In any

event, nothing in the Protocol or Governing Agreements allows the sponsor to alter the Purchase

Price based on a subjective assessment of servicer conduct.  TRX-831, TRX-201; TRX-231.

The PA also said it wanted the documents to "audit" the Trustees' Purchase Price

calculations, but the testimony showed that this is a snipe hunt.  Tr. 442:25–443:25, 453:13–

455:7 (Trumpp).  For the 1,263 loans the PA accepted, *not once* did the PA identify an error in

the numbers based on information in a loss certificate or expense log.  Tr. 3612:10-21 (Snow); 1985:4–1987:12 (Esses).  Nor did the PA identify any error in the nearly *60,000* loans it reviewed.  Tr. 3612:10-21 (Snow); 1983:7–22 (Esses).  Dr. Cornell did not identify any errors in the Trustees' calculations.  Tr. 4063:7-11, 4064:16-24.  He barely knew what the supposed "critical documents" even were.  Tr. 4071:4-4072:20.  In fact, as Dr. Snow explained, it is the loss certificates that are often inaccurate because they do not include recoveries or expenses incurred after the certificate is issued.  Tr. 3469:20-3471:14; 3614:4-14.[30]

## V.  THE TRUSTEES HAVE PROPERLY CALCULATED THE NET PURCHASE PRICE

### A.  The Trustees Reliably Calculated the Net Purchase Price for Each Loan

Dr. Snow's Purchase Price calculations are unrefuted and were adopted by the PA's expert, who examined the numbers and found no errors.  Tr. 3447:20-25, 3612:10-21 (Snow); 4064:11-24 (Cornell); 3611:19-25 (Snow); 4064:25-4065:6, 4067:3-17 (Cornell).  Although the PA criticizes the offset for Non-Liquidated Loans calculated by Dr. Ellson (TRX-645, TRX-648), no PA witness offered any concrete evidence showing that LoanKinetics is unreliable or that Dr. Ellson's values are unreasonable.  To the contrary, the PA's expert used a key component of LoanKinetics to calculate losses on the very loans at issue.  Tr. 1146:15-1147:11, 1153:3-7 (Fischel), 3727:7-3728:5, 3769:23-3770:10 (Ellson).  Finally, the PA offered no alternative valuation.  If there were any doubt about Dr. Ellson's valuation, however, the appropriate remedy would not be to deny recovery as to all Non-Liquidated Loans (many of

---

[30] In the *one* instance during the Protocol when the PA asked about a difference between the loss certificate and servicing data for four loans, the Trustees walked the PA through a reconciliation and explained, to the PA's satisfaction, that the Trustees' numbers were correct.  Tr. 1969:6–1983:6 (Esses); TRX 912; TRX 912-A.

42

which have been modified) but to adjust the credit. Certainty is not required when calculating a

recovery. *See Lexington Prods. Ltd. v. B.D. Commc'ns, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982).[31]

B. <u>The PA's Belated Argument that the Trustees' Purchase Prices Were Overstated Because
they Included "Unmatured Interest" Is an Afterthought and Is Wrong</u>

Throughout the Protocol—and during this proceeding until six weeks before the

hearing—the PA and its expert Dr. Cornell accepted the method used by the Trustees (and their

expert) to calculate the Purchase Price, which included accrued but unpaid interest on the

mortgages at issue. *See* Tr. 1945:19-1946:6 (Esses); TRX-1468 (claim tracking spreadsheet); Tr.

1945:19-1946:6 (Esses); 1985:4–1987:12 (Esses); TRDX-124; Tr. 3423:10-3430:20 (Snow);

4063:12-16; 4065:7-4066:9; 4062:20-4063:6; 4064:4-10; 4065:7-4066:9 (Cornell).

The reason the PA did not object earlier is clear. The Trustees' claims are for breaches of

representations and warranties, for which the remedy is the payment of the contractually defined

Purchase Price. The Trustees are not seeking interest on the Purchase Price or on unpaid debts

owed by Lehman. This is not a § 502(b)(2) situation. *See In re Del Mission Ltd.*, 998 F.2d 756,

757 (9th Cir. 1993) (prohibiting "postpetition interest on unsecured claims"); *see also In re Trico

Marine Servs.*, 450 B.R. 474, 481 (Bankr. D. Del. 2011). The "interest" at issue is not

unmatured interest on the Trustees' claims; rather it is accrued interest owed by the mortgagor to

the lender as part and parcel of obtaining the mortgage.

Even if unmatured interest on the amount of the Trustees' claims were sought (and it is

not), the mortgage-sale and mortgage-securitization contracts are "securities contracts" within

the meaning of § 741(7), and therefore under § 502(g) and § 562(a) there would be no basis to

---

[31] The PA has suggested the Trustees failed to show they provided "prompt notice," but prompt notice is not an
element of the claim. *DBNTC v. WMC Mortg., LLC*, 2015 WL 1650835, at *39 (D. Conn. Apr. 14, 2015). In any
event, there is no evidence the Trustees failed to provide such notice. TRX-201; Tr. 1948:25-1950:8 (Esses).

exclude borrower interest that accrued before the plan confirmation in March 2012. *In re Enron Corp.*, 354 B.R. 652, 658-59 (S.D.N.Y. 2006).

## VI. THE TRUSTEES' ESTIMATION METHODOLOGY IS THE MOST APPROPRIATE

The most common estimation methodology—and the one most suitable here—is to begin with the total amount of the claims and, on a claim-by-claim or category-by-category basis, estimate the probability that they will succeed, in full or in part, on the merits. *In re Windsor*, 170 B.R. at 521–22. The Trustees recognize that, given the various legal and evidentiary issues in play, the Court may choose not to award the entire $11.4 billion amount. In arriving at an estimation value, however, the Court should apply a methodology that addresses the validity of the various categories and subcategories of claims and evidence presented to the Court. The Trustees will address that methodology, as well as the approaches proposed by the PA, in further detail at the closing.

### A. The Court Should Estimate the Claims by Weighing the Evidence in Each Breach Category and Estimating the Percentage of Claims that Would Be Proven at a Trial

The Trustees propose that the Court estimate the claims in the following manner:

- Determine which types of evidence the Court is prepared to accept (in full or in part) for each type of breach (income, debt, DTI, occupancy, etc.);
- Using the Trustees' demonstrative or other evidence provided by the Trustees, arrive at a dollar value for the claims based on those determinations;
- Apply such discounts, if any, as the Court in its discretion deems appropriate, relying on guideposts such as Mr. Morrow's disagree rate (7.3%) or the rate at which the PA provided particularized responses during the Protocol (3% for borrower breaches).

The Trustees have created a demonstrative exhibit to enable counsel to present various estimation scenarios and to assist the Court in estimating the claims. That calculator tool applies a series of filters on the Excel versions of the Aronoff exhibits submitted during the hearing.[32]

---

[32] The data underlying the calculator are taken from exhibits offered into evidence. *See supra* pp.27–30. Under Federal Rule of Evidence 611, the calculator is an "illustrative" device that acts "as an aid to the presentation and understanding of the evidence." *U.S. v. Bray*, 139 F.3d 1104, 1111–12 (6th Cir. 1998). The use of such "illustrative

The calculator allows the Trustees to calculate the net Purchase Price for categories of claims and types of evidence on a non-overlapping basis.[33]

Purely for illustrative purposes, the following page shows one possible scenario the Court might consider after assessing the evidence:

---

aids" is common: "Quite often they are used on summation." *Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.*, 803 F.2d 250, 257–58 (6th Cir. 1986). Such devices need not meet the requirements of summary evidence under Rule 1006. *Bray*, 139 F.3d at 1111–12. Spreadsheets are a particularly useful type of demonstrative aid, particularly when totaling up the dollar amounts associated with large amounts of individual pieces of evidence. *See Cass, Inc. v. Prod. Pattern & Foundry Co.*, No. 13-cv-701, 2017 WL 1128597, at *20 (D. Nev. Mar. 23, 2017) (permitting plaintiff to use as a demonstrative aid an Excel spreadsheet that compiles data listed in invoices); *Bray*, 139 F.3d at 1112 (listing "calculations" as a classic example of a demonstrative).

[33] The calculator avoids "doublecounting" and "undercounting" loans. For example, if a loan contains an income breach and an occupancy breach both based on tax returns, then if the Court checks those breach and evidence types, the loan will be counted only once. Conversely, if a loan contains an income breach based on BLS and a debt breach based on MERS, and if the Court selects those options except BLS, then the loan will not be stricken and instead will be counted once due to the debt breach. Also, the calculator does not count any loans in the Aronoff exhibits that are in trusts that have since terminated or opted out, as well as any breaches that were since rescinded.

| Criteria<br>Exclude breaches relying solely on BLS<br>Exclude income breaches where the borrower overstated income by less than 30%<br>Exclude debt breaches where the borrower understated debts by less than $30,000 | | |
|---|---|---|
| | Running Total excluding overlapping loans, per calculator | Amount of Claim by Breach Type, excluding overlapping loans |
| *Accepted by the PA* | *$ 301,895,170* | *$301,895,170* |
| Debt | $ 3,027,031,002 | $ 2,725,135,832 |
| Occupancy | $ 3,923,438,758 | $ 896,407,756 |
| Income | $ 7,519,865,558 | $ 3,596,426,800 |
| DTI | $ 8,005,898,331 | $ 486,032,773 |
| Employment & Other Borrower Breaches | $ 8,349,312,005 | $ 343,413,674 |
| Compliance | $ 8,628,378,704 | $ 279,066,699 |
| Underwriting | $ 8,721,778,369 | $ 93,399,665 |
| Missing Documents | $ 10,347,565,092 | $ 1,625,786,723 |
| Other | $ 10,520,686,683 | $ 173,121,591 |
| Total | $ 10,520,686,683 | $ 10,520,686,683 |

If the Court decides to apply different limitations regarding evidence sources or variance thresholds, then the calculator will generate revised numbers for the "Running Total" column. The next column is simple subtraction—for example, the $903 million figure for occupancy breaches is the difference between the running total for Accepted/Debt/Occupancy loans ($3.79 billion) and the running total for Accepted/Debt loans ($2.89 billion). If the Court wishes, it may then apply a discount to those numbers using Mr. Morrow's disagree rate, or another percentage

in the Court's judgment, using a standard calculator. This approach enables the Court to arrive at a precise estimation based on the evidence.

B. The PA's Proposed Methodologies Do Not Address the Evidence

Whereas the Trustees ask the Court to estimate the claims based on the evidence adduced at the hearing the Court just conducted, the PA asks the Court to estimate the claims as if the hearing never took place and instead rely on methods that are divorced from the evidence.

Prof. Fischel suggests the Court estimate the claims at $2.38 billion because 24% of holders (the "Minority Holders") agreed to resolve the claims at that amount in 2015 as a way of settling, before the effort to complete the Protocol was accomplished and before its results were known. The Minority Holders' views carry little weight because they are divorced from the evidence; there is no dispute that when they landed on $2.38 billion, they did not know the results of the loan review.[34]  Tr. 1157:22–1158:22 (Fischel).  Without knowing those key facts, it does not matter how "sophisticated" the Minority Holders are.  Tr. 3645:3–3646:17 (Smith).[35]  In contrast, the Court heard evidence for 19 days.  The Court is in a far better position than any set of holders to reach a reasoned and informed view of the likelihood of success of the claims in a trial on the merits.  There is no reason why the Court should rely on the Minority Holders' view and forgo its own analysis of the evidence.

Prof. Fischel also invites the Court to compare the $2.38 billion figure with settlements of other putback claims, but that approach is misconceived.  Whereas his analysis is an estimation

---

[34] Prof. Fischel admits he did not speak to the Minority Holders to understand why they agreed to that amount. Tr. 1158:23–1159:3.  There is no evidence showing whether the Minority Holders' position in the trust waterfalls entitles them to a disproportionate share of the recovery, which could influence them to settle on a basis neither fair nor reasonable to other holders. Tr. 3644:9–3645:2 (Smith).

[35] Prof. Fischel's reliance on the views of the Minority Holders ignores the far more significant fact that the Trustees—who were far more informed and who represent all investors—did not accept a settlement at $2.4 billion. Tr. 3641:2–3645:2; 3678:8–13 (Smith).  They insisted on and obtained a more favorable arrangement and agreed to resolve the claims only if they would have the ability to present evidence showing the actual value of the claims.

47

merely of what a pre-litigation settlement might be, the question before the Court is the likely

outcome of an adjudication on the merits, not an analysis of an appropriate settlement value.

Prof. Fischel effectively admits that other settlements may not be a valid basis for comparison at

all: "An analysis of settlements should be interpreted with caution in this context because the

purpose of the Estimation Proceeding is not to determine whether a particular settlement is

within the range of comparable settlements, but rather analysis of Lehman's and Trustees'

Proposed Allowed Claims." TRX-579 ¶ 34; Tr. 1162:13-1168:21. And he made clear that his

comparison was essentially a "qualitative" exercise completely divorced from the evidence

developed during the Protocol. Tr. 1125:21-1127:23. As Prof. Fischel concedes, his settlement

analysis cannot help determine whether any loan contains a breach. Tr. 1168:17–1169:4. The

Settlement Agreement requires the Court to estimate the value of the claims had they proceeded

through the Protocol, including weighing the evidence at trial. In their own RMBS cases, Judge

Cote, Judge Castel, and Judge Rakoff weighed the evidence after trial. That is what the Trustees

ask the Court to do here.

        If the Court nevertheless concludes that estimation based on prior settlements is

appropriate, the Court should analyze such settlements with more thoughtfulness and rigor—and

inclusiveness—than Prof. Fischel applied. His analysis suffers from three obvious flaws.

        First, Prof. Fischel chose to analogize to settlements reached over claims that were

generally time-barred and faced other fatal legal obstacles not present here. Tr. 1183:2–7 (statute

of limitations); 1181:9–1182:11 (direction threshold); 1201:25–1202:19 (half of JPM claims

time-barred); 1202:20–1204:14 (57% of Citi claims time-barred); 1204:15–1207:18 (75% of

WaMu claims time-barred). That choice is, in a word, indefensible.

48

Even less defensible is Prof. Fischel's decision to ignore the evidence that several trusts that were originally included in those settlements—but were not time-barred—opted out and eventually proceeded through litigation, where they obtained far higher recoveries. Tr. 1223:21–1225:10 (did no analysis of opt-out trusts); 1225:11–1232:22 (trust litigated through expert reports, increasing recovery by 89%); 1233:2–1236:6 (trust litigated through summary judgment briefing, increasing recovery by 90%).

Second, Prof. Fischel ignored a significant number of other settlements of claims that were not time-barred and that settled for much higher amounts. Tr. 3924:22-3929:19 (Finkel); TRX-649 at 11–12. Using the 23–24% settlement percentage from those non-time-barred cases, a proper settlement analysis points to $5 billion. *Id.*

Third, as Prof. Fischel conceded, an "apples to apples" comparison requires examining "the amount of cash ultimately received by the creditors [the Trustees]" and the amount of cash received in the prior settlements. Tr. 1216:7–1219:2. With one exception, the settlements Prof. Fischel analyzed were payments of 100% of the settlement amount. By contrast, the $2.38 billion figure proposed here is not a cash recovery—it is a claim allowance subject to the distribution percentage for allowed claims. There is no dispute, however, that (a) Prof. Fischel did not conduct that apples-to-apples comparison even though he did so when determining a recovery percentage for the WaMu settlement (where one defendant was insolvent), and (b) if he had, it would have shown that the recovery on the PA's proposed estimation amount would be only 4.5%, far below the range of recovery in the settlements he examined. Tr. 1210:24-1220:9.

In sum, if Prof. Fischel had done a complete and correct analysis, he would have focused on non-time-barred claims that litigated through discovery, would have determined that the PA's

49

proposed number should be increased to $5 billion, and then would have made an upward

adjustment because the $2.38 billion figure does not represent a full cash recovery.

The PA's alternative suggestion that so-called "appraisals" of terminated trusts are

accurate indicators of the merits was completely undermined at trial. These "appraisals" were

not appraisals at all. As Mr. Trumpp admitted, each "appraisal" specifically disclaimed

conducting an assessment of the merits of the claims. Tr. 857:14-858:6. That is hardly the kind

of arm's-length negotiation the PA alluded to in its invocation of a willing buyer and seller as an

asset-valuation methodology under *In re Iridium*, Tr. 192, which relies on the efficient-markets

assumption that asset prices reflect all available information. *See* 373 B.R. 283, 347 (Bankr.

S.D.N.Y. 2007). The "appraisals" here flunk that condition for reasons that should be obvious:

there is no evidence that the non-public, loan-by-loan Protocol results were available to the

appraiser. And there is no evidence the Trustees had any authority to reject the appraisals and

substitute their own appraisal. These appraisals-in-name-only say nothing about the merits.

Lastly, Prof. Cornell's testimony is unhelpful. His gerrymandered "assumptions" were

given to him by counsel; he testified he had no knowledge of the basis, if any, on which the PA's

counsel generated the assumptions, and he expressed no opinion as to whether they are sound.

The PA failed to provide the Court with a native copy of his spreadsheet that would allow the

Court to input different assumptions and view the results. Unless the Court agrees with every

single one of the contestable assumptions the PA's lawyers made, his testimony is of no value.

The Court should use the Trustees' proposed methodology, based on the evidence.

## CONCLUSION

The Trustees have established claims that should be estimated at $11.4 billion or an

amount far in excess of the $2.38 billion sum the PA proposes.

Dated:          February 1, 2018


HOLWELL SHUSTER & GOLDBERG LLP

By:____/s/ Michael S. Shuster_____
    Michael S. Shuster
    Dwight A. Healy
    Dorit Ungar Black
    Brendon DeMay
    Karen A. Sebaski
    750 Seventh Avenue, 26th Floor
    New York, NY 10019
    Tel.: (646) 837-5151
    Fax: (646) 837-5150

*Counsel for RMBS Trustees*

CHAPMAN AND CUTLER LLP

    Franklin H. Top III (admitted *pro hac vice*)
    Scott A. Lewis (admitted *pro hac vice*)
    111 West Monroe Street
    Chicago, Illinois  60603
    Telephone: (312) 845-3000

*Counsel for U.S. Bank National Association,
solely in its capacity as Indenture Trustee for
Certain Mortgage-Backed Securities Trusts*

SEWARD & KISSEL LLP

    M. William Munno
    One Battery Park Plaza
    New York, New York  10004
    Telephone: (212) 574-1587

*Counsel for Law Debenture Trust Company
of New York, solely in its capacity as Separate
Trustee for Certain Mortgage-Backed
Securities Trusts*

ALSTON & BIRD LLP

    John C. Weitnauer (admitted *pro hac vice*)
    Jason Solomon (admitted *pro hac vice*)
    1201 West Peachtree Street
    Atlanta, Georgia  30309
    Telephone: (404) 881-7000

*Counsel for Wilmington Trust Company and
Wilmington Trust, National Association, each
solely in its capacity as Trustee for Certain
Mortgage-Backed Securities Trusts*

NIXON PEABODY LLP

    Richard C. Pedone (admitted *pro hac vice*)
    Christopher Desiderio
    437 Madison Avenue
    New York, New York  10022
    Telephone: (212) 940-3085

*Counsel for Deutsche Bank National Trust
Company, solely in its capacity as Trustee for
Certain Mortgage-Backed Securities Trusts*

51