Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY  10004

15

16                    February 9, 2018

17                    9:10 AM

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

```
 1    HEARING re RMBS Claims Estimation Trial

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde
```

1    A P P E A R A N C E S :

2

3    HOWELL SHUSTER & GOLDBERG LLP

4         Attorneys for RMBS

5         750 Seventh Avenue, 26th Floor

6         New York, NY 10019

7

8    BY:  DORIT UNGAR BLACK

9         DWIGHT A. HEALY

10        DANIEL P. GOLDBERG

11        NEIL R. LIEBERMAN

12        MICHAEL SHUSTER

13

14   WILLKIE FARR & GALLAGHER LLP

15        Attorneys for the Debtor

16        787 Seventh Avenue

17        New York, NY 10019

18

19   BY:  TODD G. COSENZA

20

21

22

23

24

25

Page 4

1    WILLKIE FARR & GALLAGHER LLP

2          Attorneys for the Debtor

3          1875 K Street, NW

4          Washington, DC 20006

5

6    BY:  JOSEPH G. DAVIS

7

8    ROLLIN BRASWELL FISHER LLC

9          Attorneys for Plan Administrators

10         8350 E Crescent Parkway, Suite 100

11         Greenwood Village, CO 80111

12

13   BY:  MICHAEL ROLLIN

14

15   ALSO PRESENT TELEPHONICALLY:

16

17   ROBERT MADDEN

18   CHRISTOPHER DESIDERIO

19   JANE STROBEL

20   JAMES MOORE

21   KYLE BURNS

22   SCOTT LEWIS

23   PATRICK MOHAN

24   PAUL SHALHOUB

25                          TRACY HENDERSON

Page 5

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Mr. Shuster.  Very good to see you.

 3              MR. SHUSTER:  Good to see you too, Your Honor.

 4              THE COURT:  Please have a seat, everyone.

 5              MR. SHUSTER:  I want to start by personally

 6    thanking the Court for rescheduling the closings.

 7              THE COURT:  No thanks necessary.  We're just very

 8    glad to see you.

 9              MR. SHUSTER:  Thank you.  I also want to thank the

10    Court on behalf of the Trustees for the Court's time and

11    attention and patience and good humor throughout these

12    proceedings, going all the way back.  And I want to say that

13    it has been a distinct pleasure for my team, my colleagues,

14    I should say, and me to contest these claims in Your Honor's

15    courtroom against such worthy adversaries from the Willkie

16    and Rollin Braswell firms.

17              And now I'd like to go on to say why we are right

18    and they are wrong --

19              [LAUGHTER]

20              -- about estimation of these claims.  So, Your

21    Honor, before I get into our slides --

22              THE COURT:  Sure.

23              MR. SHUSTER:  -- I wanted to give an overview of

24    how we see the case and the evidence.

25              THE COURT:  Okay.
```

Page 6

1                   MR. SHUSTER:  First, we all know that it starts

2       with representations and warranties that Lehman made in

3       securitizations that it created, where it said that on every

4       single one of the hundreds and thousands of loans that it

5       securitized in these securitizations, there was no untrue

6       statement of material fact in the documents submitted for

7       loan underwriting, and that each borrower did not fail to

8       provide material information and did not misstate any

9       material information.

10                  THE COURT:  So, not to stop you before you even --

11                  MR. SHUSTER:  Yes.

12                  THE COURT:  -- get up a head of steam, so your

13      characterization of those directed warranties, does that

14      mean that effectively negates the requirement of seller

15      knowledge entirely?

16                  MR. SHUSTER:  Well, there is no requirement of

17      seller knowledge in the representations and the portions of

18      the representations that we're relying upon.  Yes, that's

19      our position.

20                  So, I said in my opening that we have provided in

21      the protocol, in which we had provided proof of breach of

22      the representations and warranties on a breach by breach

23      basis on roughly 105,000 breaches; that the evidence was

24      what we said it was, and we would show that to be true; and

25      that the plan administrator did not, in any specific

Page 7

1    evidentiary way, rebut the evidence on a breach by breach

2    basis.  Those things remain true.  We have --

3              THE COURT:  But this is where I just -- you're

4    going to have to help me, because you're going to have to

5    explain to me on what basis you think I can conclude that on

6    a breach by breach basis, you carried the burden of proof.

7    Because we all agree, you all agree, to not do samples.

8              So, all of the discussion in the case law about

9    sampling is okay, okay, just to be clear, it was never said

10   in this case before you arrived, at any point, that sampling

11   would never be okay.  Okay?

12             So, you all agreed in the 9019 settlement that you

13   weren't going to do sampling, right?

14             MR. SHUSTER:  I'd rather not get into that.  We

15   don't have any written agreement to that effect, but we did

16   not present a sample to prove a breach rate, yes.  We

17   presented a sample to prove an agree rate with our findings

18   by Mr. Morrow, but not a sample that would be used to

19   extrapolate a breach rate --

20             THE COURT:  Right.

21             MR. SHUSTER:  -- across the entire body of

22   securitized loans.

23             THE COURT:  Okay.  Instead, when your case started

24   in November, I believed that what you were doing was two

25   things.  One, presenting exemplar loans, okay -- exemplar

Page 8

1    coming from the same root as the word sample, but be that as

2    it may -- exemplar loans and evidence as to how good the

3    process was.  And that you were going to therefore say

4    exemplar loans, great process equals carrying a burden of

5    proof on every breach and every loan, right?

6              MR. SHUSTER:  I don't think I presented it that

7    way --

8              THE COURT:  Okay.

9              MR. SHUSTER:  -- in my opening.  I think --

10             THE COURT:  My goal here is to understand...  My

11   goal this morning is to allow you to convince me that you're

12   right.  So, I am just communicating to you these disconnects

13   where I don't -- when you make this very bold statement

14   about carrying the burden of proof, I don't understand it.

15             MR. SHUSTER:  Okay.

16             THE COURT:  Okay?  So, I'll try to stop talking

17   now.

18             MR. SHUSTER:  So, our burden, as we understand it

19   in this estimation proceeding, is to show that at trial we

20   could prove our claims.  I think that's the standard in an

21   estimation proceeding, and the parties agree that that's the

22   ultimate goal here.  So, we were never going to...

23             So, what we did is we provided the evidence, both

24   the actual evidence and a summary of the evidence, that we

25   would use to prove our breaches, and that we could use here

Page 9

1    to show the Court that we have evidence to prove our

2    breaches.  Which is why I start out by saying that we

3    provide breach by breach evidence.  We provided that to the

4    plan administrator.

5         One way the Court can look at whether we have

6    carried our burden, so to speak, is the plan administrator

7    did not, on an evidentiary level rebut our evidence, except

8    in total in perhaps seven percent of cases.  How do we know

9    that?  Because Mr. Aronoff, among other things...  Well,

10   there's a couple ways we know that.

11        Let me start with Mr. Aronoff.  He provided in his

12   spreadsheet in Exhibit 15 a column, was there a

13   particularized response from the plan administrator?  In

14   other words, did it provide an evidentiary rebuttal to the

15   breach descriptions and the and descriptions of the evidence

16   that the Trustees provided.  The plan administrator did so

17   in only seven percent of cases.  So, that's in Aronoff

18   Exhibit 15.

19        If it had, if the plan administrator had evidence

20   to negate the evidence that we had that we described, that

21   we expressly and specifically referred to, it would've come

22   forward with that evidence.  How did --

23        THE COURT:  Well, hold on.  Let's just take a

24   simple example, a missing documents loan.  There's a missing

25   till.  Okay?

Page 10

1           MR. SHUSTER:  Okay.

2           THE COURT:  Mr. Aronoff testified that he didn't

3    poke around in the loan files.  Okay?  So, why is it that

4    you think on a missing documents claim that when the

5    Trustees say there's a missing till, and now you presented

6    evidence where the person who I suppose I should look to as

7    the person who lays the foundation for my admitting that

8    evidence, says we didn't give the loan review firms specific

9    written instructions, they're good at this, they knew what

10   they were doing, they came out with an answer on a

11   particular loan file, we QC'd it but we didn't poke around

12   in the loan files.  That was QC1.  Then QC2 was we just

13   looked to see whether the description of what came out of

14   QC1 was accurate.

15           Why is it that you think that the plan

16   administrator at that point has the burden of going into the

17   loan file and poking around and finding a missing till?  Or

18   alternatively, there has been no proof of the history of the

19   life of the loan file.  There has been no proof that for

20   this particular pool, they were digitized at this particular

21   time, in this particular way, according to these parameters,

22   et cetera.  So, I've got all these gaps.  And moreover, how

23   am I supposed -- literally, I'm supposed to go through every

24   loan file myself?

25           MR. SHUSTER:  Well, certainly not.  I mean, that's

Page 11

1    not possible.  That wasn't possible in these proceedings,

2    which is part of the reason that we're relying on summary

3    evidence.  I mean, it would not be possible in an estimation

4    hearing to go through all of the evidence --

5              THE COURT:  But that's not -- but the fact that

6    there are a lot of loans, and even more breaches, cannot be

7    used to justify the use of a summary as a way of satisfying

8    a burden of proof in and of itself.

9              MR. SHUSTER:  Well --

10             THE COURT:  You can't just say there's a lot of

11   files and a lot of breaches, of course you can't go through

12   all of them, aha, we have a summary, without connecting the

13   summary to the evidence.

14             MR. SHUSTER:  Well, the summary is a -- I want to

15   take the example that Your Honor gave, and then I want to

16   come to the bigger point.  On the example, why is it their

17   burden?  It's what they said they did.  They said they went

18   through every loan file.

19             Mr. Trumpp testified here under oath, we went

20   through every loan file completely.  We consulted third-

21   party sources where necessary.  I specifically asked him,

22   did you hold back any evidence for steps 4 and 5 of the

23   protocol, and he said no.  The only thing to conclude for

24   that is that when they had rebuttal evidence, they provided

25   it.

1           But we start with our showing that we have the

2    evidence.  That's what we gave them in the protocol.  That's

3    what we provided the Court here.  The Court can look at our

4    descriptions.  The Court's not going to look at every one of

5    105,000 breach descriptions, clearly.

6           But the Court can look at any one of our

7    narratives, any one, and know exactly what evidence we're

8    relying upon, exactly what representation we're relying

9    upon, and exactly what breach we're asserting.  The Court

10   cannot look at the plan administrator's responses and know

11   what evidence the plan administrator is relying upon to

12   rebut our evidence.

13          So, we have breach descriptions that describe the

14   evidence.  The evidence is there.  That's not even seriously

15   contested.  For all the talk about our process and the so-

16   called fundamental flaws in our process, on the borrower

17   breaches when we say there is an affirmative piece of

18   evidence that we're relying upon, it's a tax return, it's a

19   W-2, it's a credit report, it's a MERS report; here's what

20   it says, that is inconsistent; here's what the borrower

21   said, here's what this piece of evidence is, and here's what

22   it said.  It's not even seriously contested that that

23   information that we provided was accurate.  That's enough to

24   show the Court that we can prove the breaches.  The Court

25   may not --

Page 13

1         THE COURT:  You don't think it's seriously

2    contested that what you provided is accurate?  There was

3    witness after witness where the plan administrator

4    introduced evidence or elicited testimony on cross-

5    examination that showed flaws with the use of BLS, flaws

6    with the VOEs, flaws with determination from supporting

7    third-party documents, levels of income, et cetera.  So, I

8    don't know how you can...  I just don't understand that

9    characterization of the evidence.

10        MR. SHUSTER:  So, what I'm saying, and I said this

11   at the beginning, that they wouldn't be able to show

12   otherwise.  First, when we say -- it simply is the case that

13   when we say the borrower said his or her debts were

14   $100,000, a MERS report shows an undisclosed mortgage of

15   $400,000, those facts that we stated are accurate.  And the

16   MERS report says what we said it says.  The income tax form

17   says what we said it says.

18        So, that's why I'm focused in part on the fact

19   that we didn't get specific responses saying, no, that's not

20   true, or that's not sufficient, or other evidence -- except

21   in seven percent of the cases.  We just didn't.  And the

22   testimony -- based on Mr. Trumpp's testimony here, he said

23   they looked through everything, they held back nothing in

24   the protocol process.

25        The only inference to be drawn from that is they

Page 14

1   didn't have contrary evidence.  If they had had it, they

2   would have cited to it.  And they did cite to it, seven

3   percent of the time.  The rest of the time, it went

4   unrebutted.  That's a showing by us in our respectful view

5   that we could prove at trial that there are breaches, that

6   we have evidence, that our process in fact was good --

7           THE COURT:  Then why were there the withdrawn

8   claims?

9           MR. SHUSTER:  So, the withdrawn claims.  First the

10  withdrawn claims are overwhelmingly...  As Mr. Grice showed,

11  the withdrawn claims are overwhelmingly and missing

12  documents in the compliance categories.  I understand that

13  chart was shown yesterday.  I'll show it today.

14          So, even on missing documents and compliance

15  breaches, for the most part it wasn't shown that the

16  document wasn't missing.  A couple -- one instance, I think,

17  one exemplar was shown.  But it wasn't shown the document

18  wasn't missing.  The arguments were made that it wasn't

19  necessary for it to be retained, or you can't be sure that

20  it wasn't there at the beginning, and so forth.

21          THE COURT:  Oh, Mr. Morrow's view was that if it's

22  not in the loan file, it never was.

23          MR. SHUSTER:  Yes.

24          THE COURT:  That's based on nothing.

25          MR. SHUSTER:  Right.  Well --

1          THE COURT:  That's based on nothing.  That's not

2   based on firsthand knowledge.  That's his rule.

3          MR. SHUSTER:  Right.

4          THE COURT:  That's his assumption.  So --

5          MR. SHUSTER:  So, that was --

6          THE COURT:  So how do I -- you have missing

7   documents claims left.  You've provided no explanation as to

8   why some missing documents claims made it through the

9   gauntlet and others didn't.  So what am -- I mean, it has to

10  be more than take my word for it.

11         MR. SHUSTER:  So, on missing documents, just to

12  finish the point.  I'll come to Mr. Morrow --

13         THE COURT:  Yeah.

14         MR. SHUSTER:  -- in a moment.  To finish the point

15  on withdrawn loans, even Mr. Grice said, "I don't know what

16  conclusions to draw from that."  He didn't offer an opinion.

17  At the end of the day, he did not offer an opinion, what it

18  meant that there were withdrawn claims.  He didn't.  All he

19  said was the process is changing, therefore it's unreliable.

20  But in that same paragraph of testimony, he goes on to say,

21  "I don't know what conclusions to draw from that.  I just

22  don't know what that means."  So, there's no affirmative

23  opinion from the other side.

24         THE COURT:  There couldn't be.  You refused to

25  characterize or shed any light on the reasons for the

Page 16

1    withdrawal of the claims other than saying that we still

2    think they were good, we just chose not to go forward with

3    them.  Mr. Aronoff didn't know about it.  You know, when he

4    got to the ballgame, he started at second base.  So --

5              MR. SHUSTER:  So, the fact remains, on the missing

6    document claims, the Court may have questions about whether

7    the missing documents were missing at the time, or you know,

8    whether the claim constitutes a breach of the rep.  But, you

9    know, we are here on the claims and breaches that remain,

10   and there again, what we rely on is the breach descriptions

11   and the responses that we got.

12             Now, I'm not saying that the Court, you know,

13   won't have any doubts on any of the missing document claims.

14   The missing document claims presents some thornier issues

15   that the borrower breaches don't present, because on the

16   borrower breaches we're talking about, you know, verifying a

17   few data points --

18             THE COURT:  Right.

19             MR. SHUSTER:  -- and affirmative evidence.  So,

20   there's a difference.  So, that's how I would respond that.

21   So, that's where we are.  I want to say, by the way, on the

22   subject of defending the breaches, it's not the plan

23   administrator's fault.  We're not assailing the plan

24   administrator.  This was the hand the plan administrator was

25   dealt.  It doesn't have people who originated the loans.

Page 17

1    The evidence is what it is, and the plan administrator and

2    its counsel are doing the best to defend the claims with

3    what they have.  So, you know, that's where we are on that.

4         So, we do have Mr. Morrow.  Whatever the Court

5    thinks about Mr. Morrow's opinion on the missing document

6    breaches, he did do an independent check on all of the

7    breaches, including large numbers of the borrower breaches,

8    what we call the big four breaches.

9         THE COURT:  But, Mr. Shuster -- and you know what

10   I'm going to say, because I've said it before -- Mr. Morrow

11   was handed a bunch of loan files and knew the answer before

12   he lifted his pencil to do anything.  He was not given a

13   bunch of loan files and said, tell me which ones have

14   breaches and tell me which ones don't.  So --

15        MR. SHUSTER:  So, I'll say two things --

16        THE COURT:  You know, I don't want -- you know,

17   this is a court of law.

18        MR. SHUSTER:  Yes.

19        THE COURT:  It's not a scientific laboratory.  But

20   there is something to having a process in which the person

21   being asked for an answer doesn't know the answer ahead of

22   time.  And I distinguish it from a situation that I get all

23   the time, which is two sets of combatants are trying to

24   convince the Court as to evaluation of assets, for example.

25   One expert is hired to come up with as high a number as

1     possible, and the other one is hired to come up with as low

2     a number as possible.  But in that situation, they have to

3     show their work and a decision can be made.

4              But here, the notion that giving him this pool of

5     loans, which I understand were selected by another expert as

6     random, how does that help?

7              MR. SHUSTER:  Well, I'll answer that a couple

8     ways.

9              THE COURT:  Okay.

10             MR. SHUSTER:  One, you know, Mr. Grice did the

11    same thing, but said that what he did was independent.  But

12    he did the exact same thing.

13             THE COURT:  I might have --

14             MR. SHUSTER:  I know --

15             THE COURT:  I make the same observation --

16             MR. SHUSTER:  Okay, so I --

17             THE COURT:  -- about Mr. Grice.

18             MR. SHUSTER:  Right.  But I note that Mr. Grice

19    said -- took a sample of loans, not randomly selected by a

20    statistician whose credentials were not challenged -- he

21    took a sample of loans.  I've reviewed these.  I am

22    independent.  I am an auditor.  You can -- right?

23             THE COURT:  I agree with you.

24             MR. SHUSTER:  So, what Mr. Morrow did, at a

25    minimum, is the mirror image of that, but it's at least more

1    empirical in that his sample was randomly selected by

2    someone else who has the expertise to do that.  We were not

3    presented -- if we wanted to present to the Court a breach

4    rate from scratch, then we could have pulled the sample from

5    the entire population of loans in the securitizations, had a

6    random sample, had Morrow review that, and come up with a

7    breach rate and say that's the breach rate.  That's not what

8    we did.

9           But, because we did a review, we did a review that

10   ruled out 77,000 loans to begin with.  Almost half the

11   loans.  So, there is a check right there.  You know, there

12   is a check right there.  I mean, the Trustees -- almost one

13   out of every two files they reviewed, they did not put

14   forward as breaching, for whatever reason.  Lack of

15   evidence, they could affirmative...

16          So, Morrow was given as a check to, you know, to

17   what extent he agreed.  You can evaluate Mr. Morrow's

18   credibility and whether he was going to sit there and say

19   what he thought the answer was supposed to be or come to his

20   own conclusions.  He disagreed seven percent of the time.

21          That happens to correspond pretty much exactly

22   with the rate at which the plan administrator provides

23   specific evidentiary rebuttals to the breach assertions.

24   That suggests something.  Is it perfect?  No.

25          The Court also, despite the testimony of Mr.

Page 20

1    Morrow or Mr. Aronoff, the Court might say, you may think

2    sine category of evidence is good enough; I don't.  You may

3    think some type of breach is good enough; I don't.  You may

4    think some, you know, magnitude of breach is good enough; I

5    don't.  That's why we're presenting the calculator tool,

6    because we think that enables the Court to make those

7    judgments.  The Court still has discretion and judgment to

8    exercise about what it's prepared to accept.

9            But that's what Mr. Morrow was asked to do.  He's

10   been in the business an awful long time.  He's a true

11   mortgage guy, not like Mr. Grice, who is a banking

12   consultant who did some mortgage stuff, and he's originated

13   loans and underwritten loans, and defended his opinions.

14   And you know, that's all we can offer is the evidence, a

15   description of the evidence, an expert who described the

16   process and presents the evidence, another expert who

17   provides a check on the evidence, and then we have two more

18   things.

19           We have the fact that for most types of evidence

20   we are relying upon, other courts have accepted that

21   evidence.  And I think, very importantly, Lehman and Aurora

22   pre and post-plan confirmation, relied on the same types of

23   evidence to prove the same types of claims.  That has to

24   matter.  That is evidence of industry practice from one of

25   the biggest, if not the biggest industry participant.  I'm

Page 21

1    going to come to that a little later.

2          So, that's what we have on evidence of breach.

3    So, on adverse and material effect, we're relying first and

4    foremost on the language of the documents.  The documents

5    say a material and adverse effect on the value of the loan.

6    The plan administrator is now reading that say a breach that

7    caused the loan to default.  Those are important words to

8    read into a contract.  If the parties wanted to elucidate

9    that standard, they knew how to do it.  Lawyers know how to,

10   you know, put in those requirements.  They didn't.  That's

11   an awful lot of meaning to read into the words that are

12   actually there.

13         So, again, we provided experts, Aronoff and

14   Morrow, who testified to the extent that term is viewed as a

15   term of art in the industry, the custom and practice of the

16   industry is to look at that as an increase in risk that

17   diminishes the value of the loan.  That's what they

18   testified to.

19         That's the same standard that the courts have

20   accepted.  All the courts.  The monoline courts, the non-

21   monoline courts.  They've all accepted that standard.  No

22   court that I'm aware of has looked at the language and read

23   it to mean what the plan administrator says here.

24         THE COURT:  Okay.  But there's a lot of daylight

25   between not accepting what the plan administrator says,

Page 22

1    which is, as you've put it, reading in the requirement that

2    there be a default.  And what Mr. Aronoff did, which was --

3    and he confirmed this on the witness stand -- there was not

4    a single instance in which he found a material breach where

5    he did not find an adverse material effect.  When he found a

6    material breach, there was an adverse material effect.  So,

7    he wrote out the language from the MLSAAs that said that

8    materially and adversely affects the value of the loan.

9          So, I could entirely agree with you, and there's a

10   lot of support in the case law for the notion that there

11   doesn't have to be a default.  There's a more nuanced

12   question about what's now come to be called the seasoning of

13   the loans, as to whether or not that counter act or offset

14   an adverse effect that may have existed at a certain time.

15         But you put up a slide with Mr. Aronoff, and it's

16   crystal clear that in effect, for Mr. Aronoff every material

17   breach is a deemed AMA.  And that's not what the documents

18   say.  And the only thing that I have that explains his view

19   on that is that Judge Castel was wrong.

20         MR. SHUSTER:  Well --

21         THE COURT:  I mean, that's kind of the basis -- or

22   not the basis, but something that he says in support of his

23   view.

24         MR. SHUSTER:  So, I respectfully disagree that he

25   read it out of the agreement what -- in the case of the

Page 23

1   borrower breaches, it happens that the same evidence goes to

2   both standards, for the most part.  So, the AMA requirement

3   applies to a wide array of breaches that are in the

4   securitization documents.

5              THE COURT:  Right.

6              MR. SHUSTER:  Two borrower breaches and all kinds

7   of other breaches --

8              THE COURT:  Absolutely.

9              MR. SHUSTER:  -- where there may be a more

10  pertinent question as to whether there's an AMA.  But

11  effectively, when a borrower, you know -- it's the same

12  evidence.  It's a misrepresentation of income.  That's what

13  breaches the no untrue statement rep or the no-default rep

14  that's predicated on the borrower covenant, and the same is

15  true for the few other categories of borrower breaches.

16  It's just the same evidence.  And how do we know that

17  independent of Mr. Aronoff?

18             And even independent -- first, Judge Castel did

19  say that when there is a misrepresentation of those types,

20  that has an impact on the risk of the loan, which is a

21  diminution in value, and that impact continues.  And he also

22  found that where you can infer intent, that that's, you

23  know, inherently a -- has an adverse and material effect.

24  And he infers that based on the magnitudes of the breaches.

25  And here, the magnitudes of the breaches that we're

Page 24

1    asserting are substantial.  Ninety percent of the income

2    breaches are over 30 percent.  Similar numbers, I think, 80

3    or 90 percent of the debt breaches are over $30,000.

4              So, the Court certainly can infer intent as that

5    construct is used in that case.  But then again, we have the

6    Lehman and Aurora admissions.  And those aren't just -- they

7    don't merely -- although it's highly significant that they

8    do -- they don't merely adopt our standard, adopt it.  They

9    used it before we used it.

10             They said, in sworn declarations submitted to

11   courts in the United States for purposes of gaining judicial

12   relief, when a borrower misrepresents his or her income or

13   debts or occupancy, that has a material and adverse effect

14   on the value of the loan, because the loan cannot be sold to

15   another purchaser or into a securitization except at a

16   discount.

17             That's not only the enunciation of a standard,

18   it's also a statement of a market fact.  It's a statement of

19   a market fact.  A misrepresentation of income, debt and

20   occupancy diminishes the value of the loan.  And Mr. Trumpp

21   conceded that's not curable.  And he also conceded you

22   wouldn't even make a loan to somebody who misrepresented

23   income or debt or occupancy.

24             So, that's how, you know, to the extent -- that's

25   how the evidence -- that's why the evidence --

1              THE COURT:  Did you put on testimony that there

2      was on a loan by loan basis a comparison of the loan to the

3      underwriting guidelines, so that you could affirmatively

4      prove that the loan would not of been made because the

5      appraisal didn't have a picture of, you know, the swimming

6      pool?

7              MR. SHUSTER:  No, but that's for purposes of

8      meeting the materiality standard at the rep level, right, of

9      the rep and warranty?

10             THE COURT:  No, I'm talking about you have an

11     appraisal that's not a qualified appraisal because it's

12     missing a picture.  Okay?  It's a breach, right?  Is it a

13     breach that adversely and materially affects the value of

14     the loan?  I don't know.  How do you -- I mean, without --

15     if one formulation of that standard -- which I don't know

16     which one you're picking -- but if one formulation of that

17     standard is you wouldn't have made the loan if you knew that

18     that picture of the swimming pool was missing, well, without

19     checking the underwriting guidelines, how do you know?

20             MR. SHUSTER:  We don't take on that burden.  We

21     don't have to take on that burden, as a matter of law.  The

22     courts -- you know, that's not the language of the

23     representation.  It's not the way the courts have viewed it.

24     And it's certainly not the way the Defendants, who are

25     effectively the Defendants, Lehman and Aurora, viewed it --

1              THE COURT:  But let me go back to the present

2    tense use of the word, because I just don't understand this.

3    And I know at trial, I gave this example.  If you have a

4    loan that's been performing for 10 years, notwithstanding

5    the fact that we know there wasn't a qualified appraisal in

6    the file, is it your position that you win on that loan

7    file, where you have performance for 10 years, never late,

8    no defaults --

9              MR. SHUSTER:  So, I'll say --

10             THE COURT:  -- that that breach -- you believe

11   that that breach materially and adversely affects the value

12   of the loan at the time the trust is seeking to put it back?

13             MR. SHUSTER:  So, I'll give two responses to that.

14             THE COURT:  Sure.

15             MR. SHUSTER:  One, that scenario is very, very

16   much the exception rather than the rule here.  Two --

17             THE COURT:  I'm not suggesting that it is the

18   rule.  I'd like to use an extreme example in order to --

19             MR. SHUSTER:  So, yes, I would continue to assert

20   that even there, where there was a material, you know,

21   misrepresentation or omission, that there is a breach and

22   that it had an adverse and material effect.  It's not the

23   same loan.  The loan would have had different terms.  To say

24   that that loan that was made, based --

25             THE COURT:  You just told me you didn't check the

Page 27

1    underwriting guidelines, so how can you --

2           MR. SHUSTER:  Because --

3           THE COURT:  How --

4           MR. SHUSTER:  Well, what I'm relying on his expert

5    testimony, Judge Castel's observations, and Lehman and

6    Aurora's own observations, and Mr. Trumpp's sworn testimony.

7    He said -- I asked him, and he said it would have a lower

8    value or a higher interest rate.  That's the answer.  So, it

9    wouldn't have been the same loan.

10          So, you know, that really is our position.  And

11   again, I'm doing this by way of introduction to our slides,

12   but that's our position.

13          [LAUGHTER]

14          That's our position on adverse --

15          THE COURT:  I didn't give you my standard rep and

16   warranty that I immediately breached yesterday --

17          MR. SHUSTER:  No, no, no, no, no.  I --

18          THE COURT:  -- about trying not to talk.

19          MR. SHUSTER:  I much --

20          THE COURT:  But I am now going to --

21          MR. SHUSTER:  -- much prefer --

22          THE COURT:  No, but I have time constraints, so I

23   am now going to try not to talk.

24          MR. SHUSTER:  I'd rather be interrupted and

25   addressed the points that --

1            THE COURT:  Well, I'd rather -- I'll let you get

2     to your presentation because I do have time constraints

3     today, so...

4            MR. SHUSTER:  Okay.  And look, if I -- I can also

5     race through --

6            THE COURT:  Don't race.

7            MR. SHUSTER:  -- the slides, but I do want to make

8     sure --

9            THE COURT:  Sure.

10            MR. SHUSTER:  -- we address the points that the

11     Court is most concerned with.  So, I want to address the on

12     hold loans.  The plan administrator did not review the on

13     hold loans.  It is in no position to contest the evidence

14     that was provided on the on hold loans, could have reviewed

15     the on hold loans.  Mr. Grice reviewed some on hold loans.

16     And to now say that the on hold loans, which comprise $3.2

17     billion of value should be wiped out, that is the -- seeking

18     the most aggressive possible remedy that would only be

19     imposed where there was the most egregious possible conduct.

20            Even if we had intentionally destroyed documents,

21     there would still need to be a showing of prejudice, and

22     that the remedy is proportionate to the prejudice.  That's

23     now the standard under Rule 37.  So, that's our position on

24     the on hold loans.

25            On purchase price, I'll get into it in the slides,

Page 29

1    which will be no surprise to the Court, our view is that Dr.

2    Snow correctly calculated the purchase price.  And so if,

3    all of that being said, then we come to an estimation

4    methodology.  So, I said at the outset in my opening that we

5    believe the estimation methodology ought to be something

6    that's tethered to the evidence and predicated on the

7    evidence, and the Court can make -- can resolve disputes

8    across groups of loans of the type that I described earlier,

9    certain types of breaches, certain types of evidence,

10   magnitudes of breaches, and so forth.

11            And further, you know, we've provided an agree

12   rate that on one side is a narrow rate, right, of seven

13   percent.  We have the plan administrator's.  So, we think

14   those are all metrics and methods that the Court can use to

15   arrive at an estimation that the Court is comfortable really

16   reflects the value of the claims based on the evidence the

17   Court have seen.

18            We respectfully submit that the methodology that

19   the plan administrator is proposing is not a methodology,

20   because first, to the extent it relies upon settlements

21   reached in other courtrooms, in other matters, that we

22   submit, as we said in our brief, the Court should decide

23   this case based on the evidence that was presented in this

24   courtroom, not in other courtrooms.

25            THE COURT:  But you all agreed.  You all agreed

Page 30

1      what evidence was admissible in this courtroom.

2               MR. SHUSTER:  And I'm not suggesting the evidence

3      is inadmissible.  I'm doing the same thing the plan

4      administrator is doing.  It agreed all our evidence is

5      admissible, and then it's making arguments about probative

6      value, weight --

7               THE COURT:  Right.

8               MR. SHUSTER:  -- creditability.  So, I --

9               THE COURT:  But you're suggesting that somehow

10     reliance on the comparable settlements or the 2015

11     settlement is not as legitimate as reliance on the Aronoff

12     exhibits.

13               MR. SHUSTER:  What we're suggesting is that, in

14     truth, is far less likely to yield an accurate estimation of

15     these claims than the evidence and arguments on these

16     claims.  That's essentially what we're saying.  They're not

17     true comparables because they were -- though settlements

18     were all in cases -- three out of the four were before there

19     was any litigation, before there were loan reviews.

20               Mr. Fischel, Professor Fischel, acknowledged that

21     large percentages of those trusts' claims were subject to

22     statute of limitations defenses that are not present here.

23     Even he said that caution -- in his report, that caution

24     should be exercised in applying those things as comparable

25     settlements because this is not a settlement, as such, which

Page 31

1    it's not.  We settled on a process.  We settled on the

2    admissibility of certain types of evidence.  We didn't

3    settle on a number.  The Trustees have not settled on a

4    number.  So, to look at settlements elsewhere, I don't -- I

5    respectfully submit is not going to reliably lead the Court

6    to an accurate estimation of these claims.

7           And then, to the extent that the plan

8    administrator relies on the 2015 settlement, it really

9    suffers from some of the same infirmities.  It was reached

10   before the evidence was presented.  The institutional

11   investors didn't see the evidence.  They haven't come into

12   this court to explain their thinking or what methodology

13   they used.  In fact, they --

14           THE COURT:  So, those institutional investors, who

15   manage trillions of dollars, they just picked a number out

16   of a hat, well let's hope it works out?  It defies logic,

17   common sense, and commercial practice to take the position

18   that those institutions, acting to protect their own

19   interests, they make a wrong call by a country mile by

20   settling a case at a 10 percent recovery, where, gee, had

21   the only thought about it more or done more due diligence,

22   they could have gotten a 50 cent recovery?  They're not

23   going to be in business very long.

24           So, it is not convincing to me the hypothesis that

25   had they only been smarter, had the only done more work,

Page 32

1    they wouldn't have settled at those levels.  It just defies

2    the reality of the way things work on Wall Street.

3              MR. SHUSTER:  Well, I'll say this --

4              THE COURT:  I mean, not that you're not that good.

5    You're that good, okay?  So, but the suggestion is that had

6    the only going to trial -- but they would have thought of

7    that.  It didn't not occur to them.

8              MR. SHUSTER:  Well, I will say this.  One, I'm not

9    saying that if they'd only been smarter, they would have

10   done something else.  They assessed their own self-interest

11   and did what they did.  We don't know what their -- first of

12   all, they're smart.  They're not infallible.

13             THE COURT:  Sure.

14             MR. SHUSTER:  I mean, those funds make mistakes

15   and lose people billions of dollars all the time.

16             THE COURT:  Sure.

17             MR. SHUSTER:  So, they're far from infallible.

18   And that group, whatever the dynamics of that group, which

19   is a quarter of all the certificate holders who are out

20   there, for whatever their dynamics and internal agreements

21   were, and their decision-making process, they decided at

22   that time --

23             THE COURT:  There was no evidence presented.

24   Judge Smith didn't present any evidence.  There was no

25   analysis of why that group, you know, somehow wasn't

Page 33

1    represented to.  I mean, there were slides put up about

2    where the holdings work, et cetera, et cetera.  But there

3    was no evidence put up as to why their view should be

4    disqualified as being not representative that they were in

5    particular trusts that have particular, you know, warts and

6    problems, et cetera, et cetera.  So --

7            MR. SHUSTER:  They were in a position to make

8    themselves unofficially representative by directing the

9    Trustees and taking on those responsibilities.  They had

10   those reps under the documents.  They didn't do it.  So,

11   they could have.  They could have put themselves --

12           THE COURT:  Well, now I think we're getting into

13   something that we really shouldn't talk about.

14           MR. SHUSTER:  Okay.

15           THE COURT:  It goes beyond the scope of anything

16   that was presented.

17           MR. SHUSTER:  But the fact is that they were

18   looking at -- they came to a number with the plan

19   administrator before seeing all of the evidence, before

20   seeing any of the evidence.  They had the opportunity to

21   come into this courtroom and explain themselves.  They

22   traded that away in order for the objectors not to come in

23   and explain themselves.  So, the Court -- I mean, there's

24   not really any evidence of what the institutional investors

25   did or thought, or whether they were smarter not, or they

Page 34

1    actually used --

2            THE COURT:  No, the only --

3            MR. SHUSTER:  -- models or didn't.

4            THE COURT:  The only fact in evidence is that they

5    agreed to that number.

6            MR. SHUSTER:  But it's also a fact that the

7    Trustees, who had more information and who are responsible

8    to the entire population of certificate holders, did not.

9            THE COURT:  Yeah, but you chose not to share your

10   thinking.

11           MR. SHUSTER:  But our thinking -- in fairness, our

12   thinking is attorney-client privileged just the way the plan

13   administrator doesn't come forward and say, "Let me explain,

14   you know, what was our thinking."  The plan administrator in

15   the protocol process said $300,000,000 of claims are good.

16   Now they're urging the Court to estimate the claims at eight

17   times that number.  There's got to be some thinking there,

18   you know, advised by counsel and so forth.  The Court

19   doesn't know what that thinking is because it's attorney-

20   client privileged.  It's work product.  And the -- that's

21   why the Trustees aren't going to come forward and reveal

22   whatever decisions they made that are based at least in part

23   probably on attorney-client advice and work product.  But

24   the Court can equally infer from the Trustees' rejection of

25   the offer that the Trustees believed it was inadequate.

Page 35

```
 1    That's just as valid an inference made on the same basis and

 2    the same amount of evidence --

 3              THE COURT:  I can't -- I cannot come to that

 4    conclusion.  I can't come to that conclusion.  I can come up

 5    with several alternative hypotheses for why the Trustees

 6    rejected it but as you just said, and I agree with you, I

 7    cannot go there.  I do not know.  So, I cannot infer that

 8    they concluded that it was inadequate.  There could be a

 9    host of other reasons why that settlement did not go

10    forward.  So, it would be improper for me to draw that

11    inference because I have -- all I know is that there was a

12    settlement and it didn't go forward.  That's it.

13              MR. SHUSTER:  But that is certainly the same --

14    the same can be said about the settlement reached by the

15    institutional investors.  No more is known.  It's an equally

16    blank slate.  I -- you know, it's what a number --

17              THE COURT:  Okay.  Well, we're -- maybe for the

18    first time in an hour we're in agreement.

19              MR. SHUSTER:  Okay.  Well, I'll leave it there.

20    So -- I definitely will leave it there.  So -- and then Dr.

21    Cornell -- you know, Dr. Cornell is over-qualified to do

22    what he did which was basic math.  He was given -- you know,

23    he was given percentages.  Assume -- you know, assume these

24    various discounts and -- which, you know, weren't explained

25    to him.
```

1          THE COURT:  Well, it's not discount.  Success

2      rate.

3          MR. SHUSTER:  Success rates.  But -- right.  But

4      net, you know, when you get down to it assume that the

5      claims fail about 80 percent of the time.

6          THE COURT:  Right.  But it was -- but then I have

7      Mr. Aronoff who told me that every single one of his claims

8      -- I -- was going to win.  Well, I've never had a

9      litigation, right, where one of the parties says, "I am 100

10     percent right on 100 percent of every aspect of my claim."

11     So, that's not helpful either.

12         MR. SHUSTER:  Well, it --

13         THE COURT:  You yourself -- we've seen mistakes.

14     We've seen flaws.  We've seen evidence that doesn't stand

15     up.  So, that statement that I'm right 100 percent of the

16     time is incredible.  It -- I cannot credit that opinion that

17     he has given about how good his own work was because there's

18     been evidence that demonstrates it's not 100 percent.

19         MR. SHUSTER:  Well, he said that it's his opinion

20     that all the breaches are valid.  He did acknowledge that

21     there are going to be arrows, and Morrow acknowledged that

22     there are going to be errors.  It's loan re-underwriting.  I

23     mean, it's -- on the one hand, it's not rocket science.  But

24     on the other hand it's painstaking, you know, piecework and

25     there are going to be mistakes.  Mr. Grice said he made

Page 37

1    mistakes and he reviewed 1800 loans over two months.

2    Trustees reviewed 105 -- you know, 171,000 loans over 10

3    months, I think.  There were mistakes.

4            So, Mr. Aronoff acknowledged that there were

5    mistakes which is effectively acknowledging that not every

6    one of the breaches at the end of the day is going to be

7    born out, but the other side has to show that with evidence.

8    Based on the evidence he saw, the process he knew, the

9    evidentiary sources that were relied upon, the process as he

10   understood it, it was his view that prima facie every one of

11   the breaches was good.  But he acknowledged that he was not

12   -- that the process would not be infallible.

13           So -- but that's different from Mr. Cornell -- Dr.

14   Cornell just getting, you know, success rates --

15           THE COURT:  He was given assumptions and applied

16   them.

17           MR. SHUSTER:  -- and saying -- right.  So, that

18   completes my overview.  Happy to keep going now or --

19           THE COURT:  I'm happy to keep going.

20           MR. SHUSTER:  Sure.

21           THE COURT:  If there's a sense that we need to

22   take a break, someone should let me know but we otherwise

23   should keep going.

24           MR. SHUSTER:  Okay.  So, we have decks, slides to

25   beat the band.  So, I -- let's leave it there for a moment.

Page 38

1    I'm pulling back to -- how much time do I have?  Another

2    hour?

3              THE COURT:  At noon.  You have until noon and then

4    I have to take a conference call for 15 minutes.  And then

5    there's going to be no more than a half an hour rebuttal and

6    no more than 15 minutes of sur-rebuttal.  That was what Mr.

7    Goldberg negotiated in your absence.

8              MR. SHUSTER:  Sounds good.  Thank you, Your Honor.

9    So, I just want to pull back because -- and look at, you

10   know, this period in -- we've had testimony about the

11   careful process for Mr. Grice, among others, the careful

12   process between the broker and the borrower and, you know,

13   making this careful effort to get it right.  That's not what

14   the market was doing in that period of time.  And that's not

15   what, frankly, Lehman and Aurora were doing in that period

16   of time, either.  So, I'm starting with the report of the

17   Financial Crisis Inquiry Commission to Congress,

18   commissioned by Congress, reporting to Congress.  The Court

19   can certainly take judicial notice of it.  I'm not going to

20   dwell on it but I just want to show a couple of findings if

21   we could on Slide 4.

22              So, there were findings of systemic breakdowns in

23   the mortgage origination market.  There were findings that a

24   significant percentage of the sampled loans did meet

25   originator's own standards or the standards of the

1    investment banks that securitized the loans, and nonetheless

2    they sold the securities to investors.  So -- and here we

3    have a little bit more.  The significance of this, among

4    other things, is to show that the loan application isn't

5    entitled to particular and certainly not any

6    disproportionate deference because in that period of time

7    the -- there are widespread deficiencies and breakdowns in

8    origination practices.  And as some congressional testimony

9    showed, originators invented information, occupations and

10   income and so forth.  And --

11          THE COURT:  You're painting with a very broad

12   brush here.

13          MR. SHUSTER:  Yes.  But I'm going to show it also

14   out of the mouths of Lehman and Aurora and its own

15   borrowers, the borrowers on loans that are at issue here.

16          THE COURT:  But I just -- as you've started out by

17   telling me and I thoroughly agree with you, what I decide

18   has to be based on evidence, okay?  Yes, I can take judicial

19   notice of this and of the fact there was this big financial

20   crisis, but what we have is loans that were originated over

21   a period of time.  So, even if I were to focus in on this

22   sweeping characterization of what everybody agrees was, you

23   know, not a great thing, right, you would have to go back

24   and look at what we have and look at the loans that

25   originated in 2001 and 2002 and 2003, 2004, and do some

Page 40

1    serious analysis of when this stuff kicked in.

2              Sure, there was a point where the hunger for these

3    loans, you know, exceeded the available food supply, right,

4    so all of this started to happen even more.  I have no idea

5    what was going on -- you know, how to correlate what was

6    going on when.  So, I take your general point.  I don't

7    disagree with your general point.  I just don't know -- it's

8    a useful device on your part to remind me that this was

9    overall not a good thing that we hope never happens again.

10             MR. SHUSTER:  And you know, the -- I think all of

11   the loans here were originated in the run-up to the mortgage

12   crisis.  I mean, overwhelmingly it was --

13             THE COURT:  Right, but they were -- there's 2002,

14   2003, right?  So --

15             MR. SHUSTER:  Yes.  Most of them -- most of these

16   securitizations are from '05 to '07.

17             THE COURT:  There are a lot of '05, '06, '07.

18   Yes, you're right.

19             MR. SHUSTER:  Yeah.  So, Lehman had an originate-

20   to-distribute model which enabled it to get the loans off of

21   its own books.  You know, that model was itself found to

22   encourage shoddiness and undermine responsibility.  Lehman

23   was a, you know, huge player in the market obviously.  And,

24   you know, we have evidence -- we only have a handful of

25   Lehman and Aurora documents.  We either got the documents

Page 41

1    because they were made public by the examiner or we found

2    them on the -- back up one -- we found them on the dockets

3    of the -- you know, the public docket.  So, this just shows

4    generally that Lehman had a preeminent role in the market.

5           This was an article that was on Slide 8 that was

6    relied upon by Dr. Cornell.  I think it was shown to him by

7    Mr. Heidlage.  And, you know, it shows that even among poor

8    performers in some respects Lehman was an outlier and this

9    is -- goes to the asset categories here or the breach types

10   or occupancy and undisclosed second liens by borrowers.  And

11   then in their own internal documents -- and again, we only

12   have a tiny handful -- but for example we have on Slide 9

13   from February of '07 an internal comparison of LXS and many

14   of the securitizations here are off the LXS shelf compared

15   to countrywide and the highlighted language says the -- if

16   you look at the comparison we have a substantial data set.

17   The performance has worsened versus our largest competitor.

18   The bucket is not only worse than countrywide but

19   underperforms the aggregate sub-prime market.  And we are

20   creating worse performance than sub-prime while the rating

21   agencies assume our performance should be substantially

22   better.  That's obviously troubling.

23          And then on the next slide there's more internal

24   acknowledgement that Aurora is originating risky loans and

25   that it's originating its riskiest loans ever when the rest

Page 42

1    of the industry is pulling back, which suggests --

2             THE COURT:  Okay.  But again this goes to -- yeah,

3    it's a Lehman document.

4             MR. SHUSTER:  Yeah.

5             THE COURT:  The story is ugly.  But you're not

6    presenting me with any evidence of which loans that Aurora

7    originated in the last four months are at issue here.

8             MR. SHUSTER:  Well, the --

9             THE COURT:  so, that would be -- you know, if 90

10   percent of the loan that I'm trying to figure out were --

11            MR. SHUSTER:  Well, yeah.  I -- the -- Slide 9

12   talks about all of '06 production and Slide 10 then goes to

13   '07 production.  And then we have on Slide 11 -- the --

14   Slide 11 then is an internal risk review, Aurora and BNC,

15   and Aurora and BNC are the Lehman loan origination

16   affiliates that originated the overwhelming number of loans

17   here.  And they say that Special Investigations, which is a

18   unit within Aurora, completed a review of 240 LXS loans and

19   half the loans have material misrepresentations and that the

20   trading desk asked for a review of more loans.  This will

21   result in even higher repurchase volume.

22            There is -- you know, there's -- that's a fair

23   amount of evidence considering that it's -- these are

24   snapshots that, you know, there was trouble in paradise.

25   Let's put it that way.

1          THE COURT:  But again -- it's a snapshot but it's

2     the -- you know, it's the child seeing the painting at his

3     eye-level and, you know, seeing one tiny thing and there's a

4     whole elephant.

5          MR. SHUSTER:  Yes.

6          THE COURT:  So, that's great but it doesn't -- you

7     know, this gets back to the whole issue of going from a

8     small thing and extrapolating to a large thing.

9          MR. SHUSTER:  Well, part of what all of this is

10    intended to show -- a couple of things.  One is that there -

11    - you know, there was testimony by both Mr. Trumpp and Mr.

12    Grice about the loan origination process and this careful

13    process between the broker and the borrower.  And, you know,

14    there wasn't much behind that.  And I'm suggesting based on

15    this that there's nothing behind that.  There's no evidence

16    to support that in the record and there's no evidence that

17    would suggest that the loan applications should be given the

18    benefit of the doubt, certainly not coming out of this time

19    period and certainly not coming from these originations.

20    That's, you know, a big part of why we're --

21         THE COURT:  And again, I -- not -- I don't want to

22    belabor the point.

23         MR. SHUSTER:  Yeah.  Understood.

24         THE COURT:  You've shown me a very narrow slice

25    from 2007 where things you just got done telling me had

Page 44

1    gotten to a point that was worse ever.  It has -- says

2    nothing about what happened in 2002, 2003, 2004 or -- I

3    mean, what you're suggesting is that there were lots of

4    originators out there, right?  It wasn't just Aurora.  There

5    were lots of what I would call Mom and Pop originators.  And

6    what you're suggesting to me is they were all doing the same

7    thing.  And I actually don't believe that.  I do not believe

8    that around the country where folks were originating loans

9    that they set out to engage in a shoddy process and that

10   they set out to purposefully make loans that -- you know, to

11   folks that they knew were lying or that they misled them

12   into it.  Did that happen?  I'm sure it did.  But --

13              MR. SHUSTER:  Well, it had to have happened on a

14   massive scale.  And at least the report to congress says it

15   did.  I mean, it says it was systemic.  I mean, those were

16   the findings.  I'm not suggesting -- I don't know, but when

17   we talk about Mom and Pops, so Aurora had its own loan

18   origination.  It had core respondents.  It had its wholesale

19   network.  There were a lot of people.  All I can show the

20   Court is its own internal evidence saying we're -- our

21   production is worse than countrywide's for '06.  Our

22   production in '07 is very bad.  We've reviewed half -- you

23   know, a sampling --

24              THE COURT:  Okay.  But I can't -- you know, but I

25   can't decide this case based on the fact that this was

Page 45

1    really bad, Lehman and its affiliate were bad actors,

2    therefore you win.  I mean, that's just not --

3              MR. SHUSTER:  I'm not asking for that.  I'm very

4    content --

5              THE COURT:  -- you know, and a conclusion -- the

6    opposite conclusion is not going to constitute, you know, a

7    benediction that, you know, whatever happened happened.

8    This is about a case with -- you know, with a damage claim

9    and that has a burden of proof requirement.  So --

10             MR. SHUSTER:  Yes.  No, look, we're content to

11   rely on the specific, you know --

12             THE COURT:  Well, we have to.

13             MR. SHUSTER:  -- case-specific evidence that we

14   presented.  But they did present an expert who said, "You've

15   got to give the loan application the benefit of the doubt

16   because of this careful process."  He didn't support that

17   with anything.  He didn't look at Aurora's loan origination

18   practices.  He admits that.  He didn't look at their

19   policies and procedures.  He made no effort to verify that.

20   I have internal documents from Aurora that suggest strongly

21   otherwise.  We've got other findings that suggest otherwise.

22   And I think that Mr. Grice's opinion on the deference or,

23   you know, credence that should be accorded the loan

24   application is not worth very much.  That's what I'm

25   suggesting.

Page 46

```
1              THE COURT:  Okay.

2              MR. SHUSTER:  So, then we have the borrower's own

3    words from the loan files that are in evidence that -- not -

4    - again, are intended to provide a sense of context and a

5    window into the practices that were engaged in at the time.

6    So, "When the original loan was given they took my fiancé's

7    income and added it to mine so it looked like I made a lot

8    of money."  That's from a hardship letter.  "One form said

9    the home would be our primary residence.  We said that's not

10   true."  The young woman said, "You mean to tell me there's

11   absolutely no possibility you'd ever move into the house for

12   even a week?"  Here, "This loan was a stated income loan.

13   The mortgage broker was aware I was unable to work at the

14   time due to medical reasons.  We were told not to worry

15   about that."

16              I just have a couple more and then we'll move past

17   this.  "I came across my financial information where she

18   inputted that I make $7750 a month.  I do not make close to

19   this amount as the financial information I have provided

20   proves."  Therefore, this -- and so forth.  So, there's a

21   whole series of these.  We can just proceed.

22              The BNC -- right?  That's okay.  No, I meant to

23   run through the entire -- we've got --

24              THE COURT:  But what am I suppose to do with that?

25   What am I supposed to do with that?
```

1          MR. SHUSTER:  This is context.  That's all it is.

2     It's context and it does -- you know, it is at least

3     evidence.  It's contrary evidence again --

4          THE COURT:  On those loans.

5          MR. SHUSTER:  Well, it's evidence of practices.  I

6     mean, between the --

7          THE COURT:  What one loan officer did is not --

8     does not speak to what another loan officer did.  If one

9     loan officer said, "Don't worry about it.  I -- don't worry

10    about it.  I'm going to give you the loan anyway," okay, it

11    doesn't speak to what another loan officer did.  It was

12    happening.  I agree with you.  It was happening.  But what I

13    do with that I just don't know.

14         MR. SHUSTER:  Well, I -- all I can say is that,

15    you know, we went from, you know, industry-wide findings in

16    a congressional report to, you know, evidence that Lehman

17    was a big player in that industry, some indication that it

18    was even an outlier in terms of bad originations, then its

19    own internal --

20         THE COURT:  But Mr. Shuster --

21         MR. SHUSTER:  -- company documents saying that it

22    knows that it's got misrepresentations and bad practices and

23    then borrowers saying that.  So, I'm not building a complete

24    case saying, "Rely on this.  Don't look at the breach

25    evidence."

1          THE COURT:  But this is kind of extraordinary that

2     on our last day you're putting on a different case from the

3     case that you put on.

4          MR. SHUSTER:  I --

5          THE COURT:  This is an entirely different case.

6          MR. SHUSTER:  Well, I did show this in my opening.

7     I did show some of these in my opening.  And I want -- you

8     know, I showed some of this at least to Mr. Trumpp.  But I'm

9     not -- it's not a different case.  It's context.  It's

10    context and it's addressing a specific evidentiary assertion

11    that was made by the plan administrator, that an argument

12    was unsupported but which I want to make sure to negate.

13         THE COURT:  Okay.  And that is that the --

14         MR. SHUSTER:  Loan application.

15         THE COURT:  -- loan application should be --

16         MR. SHUSTER:  Right.  That's what this all goes

17    to.

18         THE COURT:  Okay.  All right.

19         MR. SHUSTER:  So, the standard of proof as the

20    Court well knows is preponderance of the evidence.  The

21    Court's very familiar with it.

22         But, you know, the showing that we have to make

23    here in the estimation hearing and that we'd have to make at

24    trial is that it's more likely than not that we're right and

25    they're wrong and that the scales tip ever so slightly in

Page 49

1    our favor.

2           So, we say that that's largely a matter of common

3    sense.  It's certainly a standard that a jury can apply and

4    a trier of fact on a jury can apply, and that here where --

5    this is a loan that I covered in my opening -- here where

6    the application says that the borrower made $10,750 a month

7    and a 2006 tax return shows $4,050 a month that the tax

8    return reasonably can be believed.

9           A GAIN service worker is a social worker.  GAIN

10   stands for Greater Avenues for Independence.  It's a social

11   worker in Los Angeles.

12          So, we say that it's a common sense standard that

13   when a borrower states in her bankruptcy filing that she

14   lives in New Jersey and works in New Jersey and owns a

15   second home in Las Vegas in her own words that her primary

16   residence is not in that second home.

17          If (indiscernible) shows the subject debt and

18   other undisclosed debts, the undisclosed debts likely exist.

19   And so forth, that if a borrower states in her bankruptcy

20   filing that her income is $25,000 a year and that's what her

21   tax returns show and that's what her W-2s show, that's

22   probably what her income is.  And so forth.

23          Multiple pieces of evidence are not a requirement

24   under the preponderance of the evidence standard.  It's not

25   necessary to prove any -- establish any evidentiary fact

Page 50

1    with any particular number of documents.  It's about the

2    quality and sufficiency of the evidence.  And Courts

3    routinely find breaches in these types of cases based on a

4    single piece of evidence.  And on Page 28, Lehman and Aurora

5    routinely asserted breach claims based on a single piece of

6    evidence.

7              And then, you know, this fleshes out what we were

8    talking about earlier that -- or what I was talking about

9    earlier that the Trustees provided loan-by-loan evidence of

10   breach.  This is a typical description on Slide 30 of a

11   breach that the Trustees asserted and their specific

12   description of the evidence, what the borrower's loan

13   application said, what the document that the Trustees are

14   relying upon say -- says, and so forth.  And the evidence is

15   what it -- we said it is.

16             So, Mr. Aronoff did opine that the Trustees'

17   reviews were reasonable and thoughtful and consistent with

18   industry standards.  He does have deep experience in all

19   sectors of the mortgage industry:  originating,

20   underwriting, securitizing, putting back breach claims --

21   putting back loans I should say, responding to breach claims

22   and so forth.  A

23             nd indeed, on the subject that the review was

24   reasonable and thoughtful, the Trustees reviewed 171,000

25   loan files and on 77,000 of them set them aside as not

1    breaching.  That's more loan files than non-breaching loans.

2    That's more loan files than the plan administrator reviewed

3    in total.  Those are just the ones we set aside as non-

4    breaching.

5              So, it is the case that the plan -- that the

6    Trustees' breach evidence was unrebutted in the protocol and

7    on a loan breach-by-breach basis remains so.  And as Mr.

8    Trumpp testified, the plan administrator was not holding

9    anything back.  So, if it had the evidence, it provided it.

10   And where it didn't, it can reasonably be understood that it

11   didn't have it.

12             The plan administrator stated -- I think it's in

13   their post-trial brief -- that the Trustees did not address

14   inconsistent information.  That's not accurate.  First of

15   all, as a matter of practice the loan review firms were

16   instructed to and did review all the information in the loan

17   file and acknowledged in breach descriptions such as the

18   ones that are shown here that there was other information

19   bearing on it but nonetheless the reviewer felt there was a

20   breach.  I should also note that --

21             THE COURT:  But Mr. Aronoff was quite clear that

22   once the claim package left the loan reviewer, he didn't go

23   back in and poke around the loan file.

24             MR. SHUSTER:  The loan reviewer did.  The loan

25   reviewer did, so --

Page 52

1              THE COURT:  You didn't put on any loan reviewers.

2              MR. SHUSTER:  No.  But he described the process

3      that the loan review firms went through.  They were all --

4              THE COURT:  But this conception of quality

5      control.

6              MR. SHUSTER:  But there were two levels at --

7              THE COURT:  Yes, there were two levels.

8              MR. SHUSTER:  -- at the loan review firm before it

9      got to Duff & Phelps.

10             THE COURT:  But Mr. Aronoff was the only one who

11     was in this courtroom telling me about quality control and

12     what he said was his quality control did not involve getting

13     a set of loan files from each of the loan reviewers and

14     doing his own review to see if what made it from the loan

15     file into the claim file was what he thought was correct.

16     That's what quality control is.  It's not just taking what

17     you have, right, and verifying that you have what you have.

18     And he -- I mean, there's no dispute about that.  And he

19     quite adamantly urged that it was frankly absurd to question

20     what the loan review firms did because this is what they do

21     and they're good at it.  And everybody knows that they do

22     what they do and they know what they do.  And they were so

23     good at it that we didn't even have to get them all in a

24     room and say, "You're all doing this.  We need consistency.

25     Here's a road map."

Page 53

```
 1              Nobody did that.  Mr. Esses admitted that they

 2      didn't do that.  Although there was an impression that was

 3      made that they were given guidance, they weren't.  Everybody

 4      -- the Trustees' approach, Duff & Phelps approach, was that

 5      we hired these experienced loan review firms and they knew

 6      what they were doing.  Period.

 7              MR. SHUSTER:  Well, there is testimony that they

 8      were given some guidance.  And, I mean, they were told

 9      generally what approach to take.  They were told -- they

10      were given breach mapping.  They were told certain

11      magnitudes to ignore.  There were regular calls with the

12      loan review firms every week.  There was a back and forth

13      process.  And they saw the results.  The loan review firms

14      were good enough not to assert breaches on 77,000 claims.

15      Everything they did was at least subject to some review.

16      They looked at their descriptions of the evidence every

17      time.  They made sure that their claims descriptions and the

18      claim package was right.  And it turned out it was.  It was.

19      The plan --

20              THE COURT:  But if a loan review firm -- if

21      there's a loan file at loan review firm 1 and in that loan

22      file there exists a hardship letter, and for whatever reason

23      the loan reviewer does not decide to include the hardship

24      letter in the claim package, that's just -- that's not

25      something that would have been corrected by the QC1 or QC2
```

Page 54

1    at Duff & Phelps, right?  Mr. Aronoff told me, "We didn't go

2    poking around the loan files."

3              MR. SHUSTER:  Well, I will say this -- a couple

4    thins on that.  One -- a few things.  One, there is no way

5    that the QC could have reviewed every loan file.  I mean,

6    that would have taken forever.  So, they implemented a spot

7    check process that's different to some degree from the one

8    that the Court is describing.  Nobody on the other side --

9    but the Court doesn't have an --

10             THE COURT:  Mr. Shuster, you know how much I like

11   you, right?  Okay.  There was no spot check process.  There

12   was no -- I agree with you.  You could QC until the cows

13   come home.  You could have 16 guys redoing what everybody

14   does.  But what you just said, a spot check, there was no

15   spot check.  Not even one.  There was no spot check that

16   crossed the line, Duff & Phelps -- at Duff & Phelps between

17   the claim file and the loan file.  Spot check would have

18   been nice.  It didn't happen.

19             MR. SHUSTER:  Well, look.  I --

20             THE COURT:  No, we don't have to belabor it.

21             MR. SHUSTER:  No.  Well, I -- but I want to in a

22   couple of ways.  One, this is how experts -- in these cases,

23   this is how they conduct these reviews.  And two, it was

24   good enough for the plan administrator.  They had the same

25   process with Recovco.  Recovco took 45,000 loans.  They're a

Page 55

1    loan review firm.  It's industry practice.  They said they

2    did it according to industry practice.  They looked at

3    45,000 files and set it aside.  No one reviewed that.

4              The only time anybody reviewed anything above that

5    was when God forbid Recovco found a potential breach.  Then

6    suddenly all the legal talent was put on it and they tried

7    to figure out is there really a breach there.  And low and

8    behold, even out of the 20,000-odd files where Recovco said

9    there might be a breach, 12 -- you know, 1000 made it

10   through.

11             So, that's industry practice.  That's what I'll

12   say on that.  And that's the way it is done.  But it would

13   not have been -- and the other thing is part of what the

14   Court can rely on and part of what I rely on is the process

15   between the parties.  If there were all these flaws, show

16   me.  Where are they?  Mr. Cosenza said in his opening eight

17   or ten times fundamentally flawed.  Then how come the plan

18   administrator which reviewed all the evidence, which held

19   nothing back, only identified flaws seven percent of the

20   time?

21             So, Mr. Grice agrees -- we say the PA agrees on

22   Chart 39 that the Trustees' evidence is what the Trustees

23   say it is.  He said repeatedly he's not -- Mr. Grice did --

24   that he's not contesting that the evidence is what he says

25   it is and that -- I asked him many times and on Slide 39 we

1    have all of his responses.

2             So, it's been an hour and a half.  I find myself

3    flagging just a tad.

4             THE COURT:  Take a break?

5             MR. SHUSTER:  Thank you.

6             THE COURT:  All right.  Ten minutes?  Will that do

7    it?

8             MR. SHUSTER:  Yes, please.

9             THE COURT:  You sure?  Ten minutes?

10            MR. SHUSTER:  Yes.

11            THE COURT:  Okay.  Very good.

12       [RECESS]

13            MR. SHUSTER:  I'm wondering if I've left anything

14   unsaid, but I'm going to keep talking anyways.  But --

15            THE COURT:  Well, we have a whole deck, Mr.

16   Shuster.

17            MR. SHUSTER:  We do have a whole deck.  And this

18   is our skinnied down deck.  We actually -- because we

19   thought -- so, the whole --

20            THE COURT:  Now you're breaking my heart.

21            MR. SHUSTER:  -- the whole -- the day-long deck we

22   have which we will submit -- so, you'll -- the Court may

23   notice that the page numbers in this --

24            THE COURT:  Is that an agreement that you have

25   with the plan administrator?

Page 57

1             MR. SHUSTER:  Yes.

2             THE COURT:  Yes?

3             MAN 1:  We have no objection, Your Honor,

4     (indiscernible).

5             THE COURT:  Okay.

6             MR. SHUSTER:  So --

7             MAN 1:  I do just want to note to the extent that

8     there is briefing, that's additional (indiscernible)

9     briefing versus the slide presentation.  We haven't seen

10    their full deck so, you know --

11            THE COURT:  Well, I'm just going to assume that it

12    doesn't cross that line.

13            MAN 1:  Sure.  With that, Your Honor, we're fine.

14            THE COURT:  Okay.

15            MAN 1:  Thank you.

16            THE COURT:  All right.

17            MR. SHUSTER:  So, I'm on Slide 40.  I note that

18    part of the reason I just mentioned there's a bigger deck is

19    because the slides jump around and they're out of order in

20    the deck light but --

21            THE COURT:  Oh, I see.  Okay.

22            MR. SHUSTER:  Yes.  But I'm on Slide 40 now.

23            THE COURT:  Okay.

24            MR. SHUSTER:  And so, this goes really to the

25    preponderance point.

1           THE COURT:  Okay.  So, now you've lost me.  So,

2     where is Slide 40?  It's not --

3           MR. SHUSTER:  Okay.  So, Slide 40 is after 39 but

4     before 58, which is before 33.  So, that's -- it's right

5     after the Grice side that the PA agrees that the evidence --

6     the Trustees' evidence is what the Trustees say it is.

7           THE COURT:  Road map --

8           MR. SHUSTER:  Yeah, you're -- the Court is --

9     you're on your way.

10          THE COURT:  Multiple pieces of evidence.  Trustees

11    provided -- I'm with you now.

12          MR. SHUSTER:  Excellent.  So, this really goes to

13    the preponderance point and to some of the exemplars and

14    narratives that were described -- that were discussed at

15    trial where there were repeated observation that maybe some

16    other fact or set of facts was true.  But, you know, maybe

17    it's not really good enough to rebut evidence.  And the fact

18    that someone can posit a plausible alternative scenario is

19    not enough to -- it doesn't cut it on a preponderance

20    standard.  It might on a reasonable doubt standard.

21          So, Slide 33 is further to the same theme which is

22    that we thought that Mr. Grice speculated in many instances

23    about what was going on with these loans and saying that I

24    don't know if something is true or if something else might

25    be true does not constitute an evidentiary rebuttal.  And

Page 59

1     the Slide 33 goes to the same point.  There was speculation

2     about whether borrowers' circumstances have changed, the

3     same on 42.  It's the same type of evidence going to the

4     same point.

5           So, then we come back to use of the word material

6     in the representations and warranties themselves.  And we

7     make the point that income debt occupancy are material to

8     the underwriting decision.  It's -- by showing that, that we

9     meet the standard.  And indeed, as Mr. Aronoff testified,

10    the selection of what data points in the loan application to

11    verify was made with an eye to materiality and to what is

12    material to the underwriting decision itself.

13          The misrepresentations of income, we -- I think I

14    showed this in my opening and during Mr. Aronoff's

15    testimony, but the misrepresentations are substantial.

16    We're not talking about -- you know, on the 30,000 income

17    breaches we're not talking about five to ten percent

18    overstatements of income.  We're talking about

19    overstatements that are really dramatic, of a dramatic

20    magnitude and among other things would enable the Court to

21    draw the inference of intent because it's not credible that

22    these were accidental or inadvertent overstatements of

23    income.

24          This is a point on 46 that I've made -- you know,

25    we've made before that goes to the fact that the evidentiary

Page 60

1    sources that the Trustees rely upon are in wide use in the

2    industry, accepted by the Courts, and were used by Lehman

3    and Aurora themselves in the ordinary course of business,

4    which is evidence of industry custom and practice with

5    respect to use of those evidentiary sources.  So, we then

6    have essentially the same sequence of slides and arguments

7    with respect to debt as we do with respect to income.

8             So, on Page 76, debt is material to the

9    underwriting decision and that comes from our experts, it

10   comes from the courts, and it comes from -- out of Lehman

11   and Aurora's own mouth in contemporaneous documents and in

12   these case -- in the case here it's a sworn affidavit by Mr.

13   Trumpp talking about the materiality of income to meet --

14            AUTOMATED VOICE:  You'll need to connect to the

15   internet first.

16            MAN 2:  That is not my phone.

17            MR. SHUSTER:  It's on airplane mode so I'm not

18   quite sure why it did that but I apologize.  But it is on

19   airplane mode.  So, I don't know --

20            MAN 2:  Siri had a question.

21            THE COURT:  Siri has a question for you.  It's

22   your luck day, Mr. Shuster.

23            MR. SHUSTER:  I've got my hands full.

24            THE COURT:  It's not bad enough that I have

25   questions for you.

1          MR. SHUSTER:  So, the misrepresentations of debt

2     were substantial.  You know, predominately they're 30,000 or

3     more, 50,000 or more.  Most of them are in the 100,000 to

4     500,000 range.  A good deal of them are in excess of

5     $500,000.  Those are really dramatic misrepresentations of

6     debt.  The -- on Slide 78, the -- we show again the same --

7     that -- for the evidentiary sources that we used to

8     establish the debt breaches, those are use in the industry,

9     used -- accepted by the courts and were used by Lehman and

10    Aurora, which again is potent evidence of custom and

11    practice in the industry with respect to use of those

12    evidentiary sources.

13          THE COURT:  Mr. Shuster, are you going to get to a

14    slide -- and I think you've done this in the opening -- are

15    you going to tie on Slide 45 with respect to income and on

16    Slide 40 -- I'm sorry, 77 with respect to debt, is your

17    calculator going to tie these bar amounts to actual amounts

18    to actual dollars?

19          MR. SHUSTER:  You know what?  Let's jump to the

20    calculator.  I can jump to the calculator and then if --

21          THE COURT:  Okay.  If you're going to get to it,

22    that's fine.

23          MR. SHUSTER:  Well, I -- but you know what?  I

24    want to make sure that there's time enough for the

25    calculator and then I can come back and go over some other

Page 62

```
 1    stuff.  But since Your Honor raised the question -- so, what

 2    the calculator does, if I -- if we just flip ahead briefly

 3    at least to, say, Slide 238, just by way of -- as an example

 4    or --

 5             THE COURT:  The big four?

 6             MR. SHUSTER:  Right.

 7             THE COURT:  Okay.

 8             MR. SHUSTER:  So, Your Honor can see there if you

 9    -- there are the breach categories, the evidence source,

10    status, and the percentage of overstatement for income and

11    the dollar numbers for debt.  So, clicking -- unclicking any

12    of these -- unclicking a breach category will change the

13    dollar number.  And we run through this in sequence.

14    Unclicking any of the evidentiary sources will change the

15    dollar number.  Some of them don't change it very much.  But

16    certainly the ones that are in the most common evidence --

17    above the line in the evidence column.

18             So, yes, if we flip forward, we then run through a

19    number of scenarios.  And do we have the calculator loaded

20    on a -- you know, we can run it live.  So, we can --

21             THE COURT:  Because your brief -- I couldn't make

22    sense of what you said in your brief.  Let me see if I can

23    find the page.  There it is.  So, do you have your post-

24    trial brief handy?

25             MR. SHUSTER:  I'm sure we do.  But I -- do we have
```

1    our brief handy?  Thank you.  47 or 46?

2              THE COURT:  46, yeah.

3              MR. SHUSTER:  Yeah.

4              THE COURT:  So, the text under the chart.

5              MR. SHUSTER:  Yes.

6              THE COURT:  It says, "If the Court decides to

7    apply different limitations regarding evidence sources or

8    variance thresholds, then the calculator will generate

9    revised numbers for the running total column."

10             MR. SHUSTER:  That's the product of our best legal

11   minds.  So --

12             THE COURT:  So, then the next column -- I don't

13   know what next means -- is simple subtraction.  For example,

14   the $903 million figure for occupancy breaches is the

15   difference between the running total for accepted debt

16   occupancy loans.

17             MR. SHUSTER:  So, here's --

18             THE COURT:  And I can't follow that.  I -- so --

19             MR. SHUSTER:  This -- so -- and rightfully so

20   because there's a typo there.  The 903 should be 896.  It

21   should reflect the actual number because I think we might

22   have been fiddling with a different scenario.  So --

23             THE COURT:  Okay.

24             MR. SHUSTER:  -- and we -- yeah.

25             THE COURT:  So, yeah.

Page 64

1           MR. SHUSTER:  So, the Court is right.

2           THE COURT:  Okay.

3           MR. SHUSTER:  That doesn't work.

4           THE COURT:  Okay.  So --

5           MR. SHUSTER:  It should be 896 million figure for

6   occupancy is different.  So, what I've done -- what we've

7   done in the deck is we start out at Page 234 with all loans

8   and with everything checked.  And then with the -- all

9   values for debt and occupancy.  And then on the next page we

10  have the two columns that are in our brief with those

11  values.  And then we start to uncheck, as much as it pained

12  us to do so -- so, we unchecked BLS and then we showed

13  income as a percent overstatement at least 30 percent income

14  and at least 30,000 of undisclosed debt.  And then -- so,

15  that, you know, yields a net purchase price of 10.5 rather

16  than 11.3, and that is then reflected in the table on 237.

17  And then we got to some further scenarios which is we just

18  had the big four breach categories checked, the borrower

19  breaches, and all values in terms of income and debt.  And

20  that yields 9 million 170.  And then we go to the big four

21  again but we uncheck BLS and we've unchecked something else.

22  And that's not much of a difference there at 8.8.

23           And then we have the big four.  We uncheck BLS.

24  This is on 244.  We have 30 -- at least 30 percent for

25  income overstatement, at least 30,000 for debt.  That yields

1   a number of 8,005,000,000.  And then we have a table that

2   reflects that.  And then we go from there.  So, then we

3   increase the magnitude thresholds for 50 percent for income

4   and 50,000 for debt.  And that takes us to $7.6 billion with

5   a corresponding table on Page 243.  And then we can provide

6   the Court the calculator.  It's loaded onto a device and

7   there's nothing else on there but the calculator.  It's the

8   same information we provided to the plan administrator.

9           I also have with me, though we didn't put it in

10  the deck, a slide that takes out the on-hold loans and shows

11  what the magnitude of difference would be there if we did

12  that.  So, I'm happy --

13          THE COURT:  Is there a slide for unchecking -- I

14  must have missed it.  The missing document breaches?

15          MR. SHUSTER:  So, most of the scenarios that we

16  provide, the missing documents are unchecked.  There --

17  we're not including them in the numbers.  So, if --

18          THE COURT:  Well, I mean --

19          MR. SHUSTER:  -- Your Honor looks at the breach

20  category column to the furthest left under the blue bars --

21          THE COURT:  Okay.  So -- I see.

22          MR. SHUSTER:  -- for most of the scenarios we

23  present --

24          THE COURT:  So, in the big four all of those are

25  unchecked?

1          MR. SHUSTER:  So, the big four are all checked and

2     then all the others are --

3          THE COURT:  And then all the others are unchecked.

4          MR. SHUSTER:  -- yeah, are unchecked.  And we

5     provide that a number of times.  Mostly -- we use as a

6     consistent example taking out BLS, just plucked one from

7     thin air, and then we use scenarios -- we give all the

8     different scenarios from all values, 30 percent and 50

9     percent of income and 30K --

10          THE COURT:  But nothing on this differentiates,

11     for example, in the debt bucket --

12          MR. SHUSTER:  Pre and post.

13          THE COURT:  -- pre-closing or post-closing debt?

14          MR. SHUSTER:  No.

15          THE COURT:  And nothing in here deals with the

16     argument that from Mr. Aronoff's testimony there was not an

17     effort to identify actual income as that word is regularly,

18     commonly used in English language.

19          MR. SHUSTER:  So, by --

20          THE COURT:  It was merely to find sufficient

21     evidence to -- for Mr. Aronoff to conclude that the income

22     that the borrower indicated was incorrect.

23          MR. SHUSTER:  So, that's correct about the

24     calculator.

25          THE COURT:  Okay.

1              MR. SHUSTER:  I think -- you know, I'm going to

2       come to some of what I think --

3              THE COURT:  Okay.

4              MR. SHUSTER:  -- Mr. Aronoff said on the subject -

5       -

6              THE COURT:  Okay.

7              MR. SHUSTER:  -- of the reference.

8              THE COURT:  So, that was really helpful to take me

9       through the calculations.

10             MR. SHUSTER:  Right.  So, that's --

11             THE COURT:  And you weren't here but I'm sure you

12      were told by Mr. Goldberg and your team that Mr. Cosenza had

13      a lot to say about why I shouldn't consider any of this.

14      But he's doing a good job of not popping up and saying that

15      now.  So -- but I thank you for doing that.  I understand

16      this and the mechanics of how it works.

17             MR. SHUSTER:  And, you know, we -- it -- we have

18      the calculator to hand up to the Court with our deck.

19             THE COURT:  Yeah.  I mean, I don't frankly think

20      it would be appropriate for me to drive around the

21      calculator myself because the record has to be a static

22      thing.

23             MR. SHUSTER:  Okay.  Well --

24             THE COURT:  So, I'll accept these slides as a

25      product of what the calculator does.

1            MR. SHUSTER:  And of course, to the extent that

2    the Court wants us to run any other scenario with the

3    calculator, that can easily and very quickly be done.

4            THE COURT:  Okay.  Thank you.

5            MR. SHUSTER:  So, I think we're back in debt,

6    which is at Page 77.  And then -- right.  So, we were

7    roughly here when the Court asked about the calculator.  And

8    then -- so, if one looks at this, at the debt chart, the

9    Court could either under the calculator take all the

10   borrower's -- take the 30K and up or the 50K and up.

11           Then we make the same points about evidentiary

12   sources for debt, and I think I've already covered that

13   frankly, and then again addressed the point that there is --

14   there was from the other side speculation in some cases --

15   in many cases -- about alternative scenarios and our view is

16   that that's insufficient under the preponderance standard to

17   rebut the evidence that preponderates.  So, then we --

18   that's 89 and then Slide 90, and then we come to DTI.

19           And again, the DTI discrepancies were substantial

20   as Chart 97 shows.  Most of them are 75 percent or greater.

21   That is to say, a DTI of 75 percent or greater, not a

22   discrepancy of 75 percent or greater but a DTI of 75 percent

23   or greater, and that the -- Mr. Aronoff here describes how

24   DTI was calculated and -- on Slide 98 and he does repeated

25   say that they used the number that they believed more

Page 69

1    accurately reflected the borrower's income, that was more

2    likely than not to be the borrower's income, and that the

3    income that was believed to be more likely the case than not

4    with appropriate citations.  So, that was for DTI.

5            And then occupancy, again we address the

6    materiality of occupancy to the underwriting decision

7    relying on our expert, Mr. Aronoff, on in this case the

8    Nomura decision of Judge Cote and on a sworn declaration

9    submitted by Aurora.  Our evidentiary sources for occupancy

10   are commonly used in the industry, accepted by the courts,

11   and were used by Lehman itself which is evidence of their

12   wide use in the industry.  The borrower's covenant that he

13   or she -- here we say they because that's the new convention

14   -- that he or she shall continue to occupy the property,

15   shall occupy within 60 days and shall continue to occupy for

16   at least one year.

17           So, intent doesn't enter into it.  There are

18   occupancy affidavits that further underscore the point.  But

19   regardless, the affidavits are not uniform across all of the

20   occupancy breaches but the borrower covenant is.  And it's

21   the shall occupy within 60 days and shall remain in the

22   property for a year language that we principally rely upon.

23   And frankly, we put in the affidavits only to the extent

24   there's any concern that we have to deal with intent or

25   anything like that.  But -- because the occupancy affidavits

Page 70

1    also don't speak of intent.

2            So, Mr. Morrow -- and I -- and we've gone over

3    this, Slide 118.  Mr. Morrow confirmed the reliability of

4    the Trustees' review process.  He did conduct his own

5    review.  He did review loans by himself and with a team and

6    has ultimately agreed with the Trustees' findings on 92.7

7    percent of the loans.  That's on Slide 118.  And that

8    percentage was even higher on the borrower breaches where

9    his disagree rate was more like in the 4 percent range.

10           And Mr. Morrow, as Slide 119 shows, has extensive

11   experience -- true mortgage loan origination and

12   underwriting experience.  Slide 120 shows his agree rate

13   overall, 92.7 percent, and his agree rates pulled out for

14   the big four breach categories, the borrowing breaches.

15           THE COURT:  Wasn't -- maybe this is as good a time

16   as any to talk about this point but a lot of what -- my

17   recollection of what he talked about was the put-back

18   process, right, where there's a -- where the -- earlier in

19   time, right, where there's actually going to be a put-back,

20   right?  Do you think there's any difference between a

21   living, breathing put-back process and what we're doing

22   here?  There's not going to be a put-back.  We're setting a

23   damage number.

24           MR. SHUSTER:  No, I don't think --

25           THE COURT:  You don't think so?

1           MR. SHUSTER:  No.  I don't think -- I don't think

2   as a practical matter there can or should be any difference.

3   Same process, same legal standards, same contractual

4   language.  I don't think so.

5           THE COURT:  Okay.

6           MR. SHUSTER:  So, the Slide 122, we say that the

7   PA -- the plan administrator had every opportunity to rebut

8   the Trustees' claims, which of course it did in the protocol

9   process and it did again in response to the Aronoff reports,

10  Aronoff's Exhibit 15.  And Exhibits 4 through 13 were

11  provided with his affirmative report on June 1 and no more

12  specific responses or rebuttals to the breach descriptions

13  were provided in response to his report.  He also in his

14  rebuttal report which was provided on July 25th added a

15  column for particularized response, yes or no, by which he

16  meant a response that -- as he testified that specifically

17  addressed the evidence rather than stated the plan

18  administrator's positions on a more generic basis.  The --

19  his counts -- his findings here were unchallenged.  I mean,

20  he offered this as an expert opinion and his conclusions as

21  to the percent of the time that the plan administrator

22  provided a specific response were not challenged by the plan

23  administrator or any of its witnesses.

24          The Trustees' evidence is admissible under -- by

25  agreement of the parties under Exhibit G, and then as

Page 72

1    summarized in the Aronoff exhibits and it's our respectful

2    view that those summaries are admissible under FRE-1006 and

3    under applicable caselaw, and they were provided on June 1,

4    and they weren't challenged by any expert of the plan

5    administrator.

6              THE COURT:  And now you're talking about the

7    Aronoff exhibits?

8              MR. SHUSTER:  Yes.  Exhibit 15, Exhibits 4 through

9    --

10             THE COURT:  When Mr. Aronoff testified that he

11   didn't prepare them.

12             MR. SHUSTER:  He testified they were prepared at

13   his request and direction and under his supervision, and

14   with the participation of his immediate subordinates.

15             THE COURT:  And they were -- he agreed that they

16   were prepared from -- not the claims tracking spreadsheet --

17             MR. SHUSTER:  He --

18             THE COURT:  -- but the 1.46.38 connect database.

19             MR. SHUSTER:  He testified that they were -- all

20   of them were based on the evidence that was exchanged in the

21   protocol and some of that may have been taken from the Duff

22   and Phelps -- a Duff and Phelps database, but it was the

23   same and only the same evidence that was provided to the

24   plan administrator during the protocol process and that has

25   been submitted to the Court under Exhibit G.  That's all

Page 73

1    that's in his exhibits, what the other side has and got.

2    There's nothing else.

3           I do note, as we noted in our brief, and I

4    understand there was some discussion of this yesterday, but

5    the fact is that Mr. Trumpp took Mr. Aronoff's Exhibit 15

6    and created evidence that the plan administrator presented

7    to the Court, which is his chart of how many loans relied on

8    a single piece of evidence, how many breaches relied on a

9    single piece of evidence.

10          THE COURT:  All he did was summarize what could be

11   derived from Aronoff's --

12          MR. SHUSTER:  Right.

13          THE COURT:  -- exhibits.

14          MR. SHUSTER:  But he presented that as accurate

15   evidence to the Court.

16          THE COURT:  No, he did not.  I beg to differ with

17   you.  He presented that as an accurate summary of what

18   appeared in Aronoff's exhibits.  He did not independently

19   bless what appeared in Aronoff's exhibits, in the sense of

20   that -- acknowledging or agreeing that what was in Aronoff's

21   exhibits was an accurate summary of the universe of

22   documents.

23          MR. SHUSTER:  Well, we may be talking past each

24   other.

25          THE COURT:  Yeah.

Page 74

1                 MR. SHUSTER:  What he did is he went -- he sorted

2      the Aronoff Exhibit 15.

3                 THE COURT:  That's what he did.

4                 MR. SHUSTER:  And --

5                 THE COURT:  He sorted.

6                 MR. SHUSTER:  But he said, "This shows me and I'm

7      telling the Court that here's how many breaches in these

8      different categories rely on one piece of evidence."

9                 THE COURT:  He's say how many breaches Aronoff

10     says --

11                MR. SHUSTER:  Yes.

12                THE COURT:  -- rely.

13                MR. SHUSTER:  Yes.

14                THE COURT:  Right.

15                MR. SHUSTER:  But he presented that as accurate

16     evidence to the Court, which --

17                THE COURT:  He presented it as an accurate summary

18     of what Aronoff said, not as an accurate summary of what the

19     underlying documents said.  If Aronoff got it wrong and

20     there were, instead of 1,000 document -- 1,000 loans or

21     claim -- 1,000 loans that relied on BLS only and in fact

22     there were 2,000, nothing that was said adopts or says that

23     Aronoff got that right.  He simply summarized, as you said,

24     what Aronoff said.

25                MR. SHUSTER:  Well, I do not remember Mr. Trumpp

Page 75

1    reserving and saying, you know, I -- this may not be

2    accurate, I'm just taking what Mr. Aronoff said.  He said,

3    "I prepared a table that shows how many loans are supported

4    by one piece of evidence or by two -- breaches are supported

5    by one piece of evidence or by two or more.  These are the

6    numbers.  This is evidence.  We're presenting it to the

7    Court.  The Court can rely on this evidence."

8              That's what he did, and the evidence was presented

9    to the Court.  They didn't say to the Court, don't rely on

10   this evidence; it may not be accurate.  Or we have all these

11   reservations or qualifications.  They asked the Court to --

12   presented it so that the Court could see how many pieces of

13   evidence --

14             THE COURT:  You see, this is similar to the

15   delightful discussion that we had about the $772 million

16   where there's a dispute as to whether or not the plan

17   administrator is, you know, adopting a number as opposed to

18   merely taking a number that's been presented and making

19   observations about it.

20             So, I think we should move on from this point.

21   I'll have to go back into the record and decide whether I

22   believe that Mr. Trumpp adopted and made his own those

23   numbers or whether he simply was presenting a sort -- a

24   sorting of Mr. Aronoff's numbers.

25             MR. SHUSTER:  Thank you.

Page 76

1              THE COURT:  All right?

2              MR. SHUSTER:  Yes.

3              THE COURT:  Okay.

4              MR. SHUSTER:  So, I'm at 150, the AMA requirement.

5    We quote, initially, the language and I stated the Trustees'

6    position with respect to the language and the language that

7    we think is being red into the language by the other side

8    earlier, and then we had testimony from Mr. Trumpp which is

9    quoted on Page 155 which we think is quite strong in showing

10   that a loan with a misrepresentation has a lower value.

11   This is separate and apart from the many sworn declarations

12   that Lehman and Aurora submitted including declarations

13   sworn to by Mr. Trumpp and including declarations submitted

14   by my good friend, Mr. Rollin, where the -- Lehman and

15   Aurora said the same thing.

16              THE COURT:  So, what they're -- what someone's

17   going to tell me is that he said this about whole loans, not

18   securitized loans.

19              MR. SHUSTER:  I --

20              THE COURT:  And you're going to tell me it doesn't

21   matter.

22              MR. SHUSTER:  I don't see how it does or can.  I

23   really don't.  And all I can say is -- and it hasn't -- and

24   I respectfully submit it hasn't been explained in any way

25   where it should make a difference.  They said -- they said

Page 77

1    in sworn declarations, once a loan has a known

2    misrepresentation, it can't be sold into a securitization

3    except at a discount.

4           So, these are loans with unknown representations

5    that were sold into the securitization without a discount.

6    Clearly, those loans, had the misrepresentations been known,

7    would've had to be sold in -- at a discount.  And it doesn't

8    matter if it's a whole loan.  And it doesn't matter that it

9    becomes a securitized loan.  It surely can't be the case

10   that you can say to the person who sold the loan to you, you

11   have to take it back because I can't sell it into a

12   securitization except at a discount.

13          And then when it's in the securitization, say that

14   loan doesn't have a diminished value.  I mean, you cannot

15   make that argument.  There's no way, I think, to get around

16   that.

17          THE COURT:  Okay.

18          MR. SHUSTER:  So, Lehman itself sold defective

19   loans at a discount as Mr. Trumpp testified, and he -- on

20   Chart 157, Mr. Trumpp agrees with the Trustees that a

21   riskier loan has a lower price or a higher interest rate.

22   That's why, as I said earlier, it's not the same loan.  It

23   would never be the same loan if the misrepresentation were

24   known.

25          That's why the seasoning point actually doesn't go

Page 78

1  to the heart of it, because the loan should either have been

2  sold at a lower price or there should've been a higher

3  yield.  It's a dead instrument.  It's riskier.  You either

4  pay less or get more.  And those effects are continuing, as

5  Judge Castel found in MARM and we quote that at Page 158.

6         Mr. Trumpp also testified there's no way to cure a

7  misrepresentation of debt or income.  The effect of the harm

8  is continuing.  Once you've paid a higher price, you've paid

9  a higher price.  Once you're getting less than you should be

10  getting, that doesn't change.  They make a big point about

11  how you can't sell the loan out of the securitization.

12  That's the whole point.  You're stuck with it.  You can't

13  sell it out to the person who sold it to the trust via the

14  put-back remedy.

15         So, on loss causation.  You know, it's not in the

16  governing agreements.  It's not part of industry customer

17  practice.  It's not consistent with Lehman's own sworn

18  statements or relevant caselaw.  And all of the cases adopt

19  the interpretation of AMA, essentially that Judge Castel

20  elucidated and that other courts have -- the monoline cases

21  themselves, as we say on Page 163, rely on put-back

22  precedents.

23         You know, the Syncora case cites the LaSalle case,

24  for example, which is a put-back case for purposes of

25  establishing the standard.  The parties know how to put a

1  loss -- proximate loss or proximate cause or loss causation

2  standard in the documents when they want one.  They had one,

3  for example, in LXS 2,615 in the Trust Document.  That's

4  excerpted on Slide 164.

5         And Mr. (indiscernible) himself admitted that that

6  language could've been in other deals, was in other deals,

7  and wasn't in these deals.  And then I have -- we have the

8  language from the various affidavits which I've already

9  quoted and referred to, but tough to get around.  And that's

10  on Slide 170 with respect to income and on 171 with respect

11  to debts and on 172 with respect to occupancy and on 173.

12  So, you know, I'm not --

13         THE COURT:  But let me --

14         MR. SHUSTER:  Yes.

15         THE COURT:  But let me understand this, though.

16  Because then what I don't understand is -- I'm with you

17  slide after slide here, okay.  What I don't understand is

18  the concept of deemed AMA.  Because some of the things that

19  fall into deemed AMA just kind of on a, you know, holistic

20  basis, are a lot less worse than the big four.  So, I just,

21  like, intellectually and logically, why is there a category

22  of deemed AMA?

23         From what you are telling me, even though I stay

24  here all day and you won't admit it, is that essentially

25  this -- you are telling me when there's a material breach

1    there is an adverse material effect.  You are asking me to

2    read that language in a different way, and I -- I'm

3    struggling with that, so --

4            MR. SHUSTER:  Well, I'm not --

5            THE COURT:  So, splain, as Ricky used to say to

6    Lucy.

7            MR. SHUSTER:  Yes.  We're not -- we're certainly -

8    -

9            THE COURT:  You're lawyers -- you put -- you just

10   said it, right?  Lawyers know how to draft documents.  So,

11   why is there a bucket of deemed AMA and not just --

12           MR. SHUSTER:  So, the deemed AMA are breach

13   specific.  The AMA -- so, they carve out, out of the broader

14   AMA --

15           THE COURT:  Yeah.

16           MR. SHUSTER:  -- requirement.  They're breach

17   specific for a handful of breaches where there's a legal

18   requirement, essentially.  That's what's deemed AMA.  Until

19   a HUD-1 or something like an appraisal where you, you know,

20   something fundamental like that is missing.  But then AMA

21   applies across the board to a whole range of other --

22           THE COURT:  But is it --

23           MR. SHUSTER:  Right.

24           THE COURT:  But it could be deemed across the

25   board.

Page 81

1          MR. SHUSTER:  It could be.  But there would be

2     breaches.  There could be other breaches.  For breach, there

3     are, for example, in a lot of these loans they're state-

4     specific breaches.  You know, Ohio -- the Ohio, you know,

5     Lender Liability Act or whatever where it may not be.  You

6     have to say that you're complying with it, but it may not be

7     -- but it's not been deemed --

8          THE COURT:  (Indiscernible).

9          MR. SHUSTER:  But it's not deemed --

10          THE COURT:  Right.  You could say other than with

11     respect to requirements --

12          MR. SHUSTER:  You could.

13          THE COURT:  -- under applicable state law --

14          MR. SHUSTER:  You could.

15          THE COURT:  -- every material breach of income,

16     debt, or DTI is --

17          MR. SHUSTER:  Yes.

18          THE COURT:  -- deemed AMA.

19          MR. SHUSTER:  Look, the --

20          THE COURT:  You know.

21          MR. SHUSTER:  Yes.  This -- you know, I don't

22     think somebody really, really smart sat there at the

23     beginning and said, this is how we're going to do it.  These

24     -- you know, these documents evolve and forms develop and

25     then the get adopted and they get modified, but, you know,

Page 82

1    on the subject of the borrower breaches, again, as a

2    practical matter the evidence goes to the same points.

3    Income evidence is material to the underwriting decision,

4    and if it's misrepresented one way or another, that's a

5    material breech of the rep.

6            But a misrepresentation of income also goes to

7    whether there's an adverse material effect, and I'm not --

8    we're not saying that the Court should either conceptually

9    or linguistically say these are deemed, but it is -- you

10   know, but we do have out of, effectively, the defendant's

11   own words, that it is a market fact -- it's a fact -- that

12   if there's a misrepresentation of income, debt --

13           THE COURT:  But let -- so let me give you one --

14   let me give you a hypothetical which you've heard from me

15   before.

16           So, we have a loan and we agree that there was a

17   breach -- and income breach.  A modest one.  Not a huge one,

18   a modest one.  And, you know, Josephine Borrower makes it

19   through the crisis and she's paying and she's working three

20   jobs and we love, her, right?  She's -- and here we are 10

21   years out and someone wants to sell that paper.  Someone

22   wants to sell that loan.  There's that breach.  There it

23   was, at the time, right, and now what we have is perfect

24   performance on that loan.

25           And, not only that, but Josephine came into some

Page 83

1   money and now, you know, her sister lives with her.  Her

2   sister works and contributes to the household and

3   everything's great.  Irrelevant?  When somebody's going to

4   buy that paper, right, they're only going to look at what

5   happened 10 years ago and say, "Oh, look.  There was a

6   misrepresentation of income 10 years ago.  I'm going to

7   ignore the performance of this loan and I'm not going to pay

8   full par value -- what's remaining of par."  Because if you

9   layer that kind of analysis onto other assets and other

10  commercial transactions, that's just not the way a market

11  acts, and so I'm struggling --

12          MR. SHUSTER:  Right.

13          THE COURT:  -- with that.

14          MR. SHUSTER:  So, all I can say is, one, it is a

15  fact, the trust isn't going to go and sell the loan.

16          THE COURT:  Understood.

17          MR. SHUSTER:  Its paid too much for the loan or

18  it's gotten too low a yield on the loan.  Those are facts.

19  That's what Lehman itself says.  I -- you know, I have an

20  asset.  The asset may be performing, you know, but I paid

21  too much.  I paid for a Caddy, I got a Chevy.  You know, I'm

22  not --

23          THE COURT:  And how are the certificate holders

24  who have gotten that cash flow for 10 years -- how are they

25  harmed?

Page 84

1          MR. SHUSTER:  The certificate holders are harmed

2     because they should either have paid less -- it affects

3     their ultimate yield on their paper.  They should've paid

4     less for the loan or they should have gotten a higher

5     interest rate on the loan.  That's the point, essentially.

6     I mean, that's why they're harmed.  They -- you know,

7     they're getting paid out on a loan that would've had, you

8     know, different terms.

9          It was riskier, and you would've had to -- Lehman

10    itself says, you would've had to sell it at a discount or --

11    Mr. Trumpp says or give a higher interest rate.  One or the

12    other has to be true.  That's what makes -- that's what

13    accounts for it.

14          So, we have that.  On 173, Mr. Trumpp acknowledged

15    that Aurora and Lehman asserted put-back rights with respect

16    to both liquidated and active loans.  There's no requirement

17    that AMA be quantified, that -- you know, the Courts have

18    been very clear on that.  And so then jumping ahead to 183,

19    where essentially, you know, we're saying that the PA should

20    be estopped from, you know, disavowing its own statements

21    for purposes of obtaining judicial relief.  I just wanted to

22    come briefly to the subject of the settled trusts now, so

23    I'm moving onto estimation methods.  Said what I had to say

24    for the moment about breach and AMA.

25          This is the SARM Trust, and the point here in the

Page 85

1    language that we highlight is that the master servicer --

2          THE COURT:  Just as a technical matter, estoppel

3    only applies where it's the same party, right?

4          MR. SHUSTER:  Same party and it's been successful

5    in obtaining judicial relief.  Yeah.  Yes.

6          THE COURT:  Okay.

7          MR. SHUSTER:  The SARM loan just shows -- the

8    Trustees didn't exercise discretion, didn't have the right

9    to exercise discretion with respect to the appraisals, and

10   they were not a fair market value.  They were not an

11   independent analysis.  There was not an independent

12   appraisal.  No evidence was provided of how the appraisals

13   were done, but it is obvious that they simply took the plan

14   administrator's recommended settlement percentage and that's

15   what they --

16         THE COURT:  Trustees get to consent to the

17   appraiser, though.

18         MR. SHUSTER:  To the appraiser.

19         THE COURT:  To the appraiser.

20         MR. SHUSTER:  Yes.

21         THE COURT:  Right.  Okay.

22         MR. SHUSTER:  Or object.  They get to object --

23         THE COURT:  Yeah.

24         MR. SHUSTER:  -- to the appraiser.  So, here's our

25   point about the institutional investors, I think, that I

1    made earlier which we submit that their views are not

2    particularly informative in light of what -- particularly in

3    light of what they didn't know and what has transpired

4    since.  We say that the -- on Slide 226 -- that the plan

5    administrator's comparable settlements are not comparable

6    because of the differences that we identify here.  There

7    were significant statute of limitations issues.  They were

8    prelitigation in three out of the four cases.  And those are

9    the best comparables they have, but they're not particularly

10   comparable.

11            So, then we flesh out the point that they were

12   subject to statute of limitations defenses.  That is --

13   there's the evidentiary support in the record for that

14   argument.  That was Mr. Fischel -- Professor Fischel

15   testifying and these were his concessions under cross

16   examination.

17            THE COURT:  But what he is saying was that they

18   were asserted statute of limitations defenses.

19            MR. SHUSTER:  Yes.  He's -- there were potential

20   bona fide statute of limitations defenses.

21            THE COURT:  Potential bona fide.  There were

22   potential statute of limitations defenses, and a statute of

23   limitations defense is a defense like any other.  It's just

24   feels like it's more of a defense.  It's a defense.

25            MR. SHUSTER:  I think that -- well, look, I'm not

Page 87

1    -- I can't testify.

2                THE COURT:  No.

3                MR. SHUSTER:  This is what we have in the record.

4    He acknowledged that there were such defenses.  And he

5    himself, as I said --

6                THE COURT:  Potential defenses.

7                MR. SHUSTER:  Yes.  Yes.  Yes.  He acknowledged

8    that there were such potential defenses, but, you know, one

9    assumes that defendants and their lawyer aren't asserting --

10               THE COURT:  But what was --

11               MR. SHUSTER:  -- aren't asserting defenses in back

12   faith and that they have a good faith basis to assert them.

13               THE COURT:  Sure.

14               MR. SHUSTER:  And I'm not saying they're winners

15   necessarily.

16               THE COURT:  What was the recovery percent -- what

17   was the recovery ratio for JPM -- for the JPM settlement, do

18   you remember?

19               MR. SHUSTER:  Low.  I know that.  Unpardonably

20   low.  No -- I kid, but it was --

21               THE COURT:  Yeah, so JPM was 7 percent, okay.  So,

22   if I take your argument, right, 50 percent, okay.  So, then

23   I say, okay, so doesn't get me to 55 percent.

24               MR. SHUSTER:  No, not on the pure math.  But it

25   suggests that they're not comparable settlements.  I mean,

Page 88

1    apart from the fact that it's a black box.  What were those

2    claims?  What were the dynamics?  What were the dynamics of

3    the settlement?  What were the concerns about those claims?

4           Those loans hadn't been reviewed at all except a

5    limited review in the WaMu case, none in the other cases.

6    So, you know, yes on the math there, yes.  But there's a lot

7    more to why they're not comparable.  But they had statute of

8    limitations defenses.  They -- the fact that there were no

9    loan reviews and that these were prelitigation settlements,

10   that has to count for a lot.  Once, you know, we're at a

11   dramatically different point.  The parties here agree and

12   this is important and this is why I was very happy with this

13   from the start.  But the parties agree.

14          Mr. Cosenza said in his opening that the question

15   is what would've happened to these claims had they gone

16   through stages three, four, and five of the protocol, five

17   being a trial?  And the Court asked, did both sides agree on

18   that.  I said, "I'm very happy with that," in the opening.

19   Mr. Trumpp testified to that.

20          So, we're talking about what these claims would be

21   worth if they were tried, and so considerable evidence has

22   been presented here on that subject.  Really, what do

23   prelitigation global settlements elsewhere say about that?

24   They don't say anything about these securitizations, these

25   loans, the evidence that we have here.

1          That's our argument.  And, you know, in that

2     sense, it's an estimation like any other where ultimately

3     you're trying to -- the Court is trying to decide what are

4     these claims worth if they're tried.

5          So, the -- we show that the opt-outs and Professor

6     Fischel testified to this, that the -- I think he testified.

7     He may have testified he didn't know; I don't remember.  But

8     we showed, in any event, as an evidentiary matter that

9     parties who opted out of those global settlements did

10    consider -- you know, got a substantial premium above those

11    settlement levels.  And then we go on to say that the

12    litigated case settlements, you know, would support a

13    valuation of at least $5 billion.  That's on Slide 229.

14          THE COURT:  These were the Finkel ones?

15          MR. SHUSTER:  These were the Finkel ones.  Now,

16    admittedly, these cases were litigated by expert counsel,

17    but --

18          THE COURT:  Were itty, bitty cases --

19          MR. SHUSTER:  Well --

20          THE COURT:  -- litigated by some fly-by-night law

21    firm.

22          MR. SHUSTER:  You know, these are -- it's still a

23    lot of loans and a lot of money, and you're talking in the

24    Ace cases, those are all Deutsche Bank, you know,

25    settlements and you know, the cases were litigated.  Those

1   were the amounts.  Here that --

2           THE COURT:  But Mr. Shuster --

3           MR. SHUSTER:  But that's -- right.

4           THE COURT:  Okay, 23 and 55, there's just a huge

5   difference.

6           MR. SHUSTER:  Well, that -- there is.  That's a

7   settlement number.  You know, 23, 24, that's a settlement

8   number with everything that's built into settlement.  These

9   were pretrial, you know.  This -- they didn't go through the

10  same process that we went through here, but if -- the point

11  is -- our point is, if the Court is going to look at

12  settlements, it ought to look at settlements in cases where

13  -- that are nearer to this case in that there were loans --

14  loan reviews of thousands and thousands of loans in these

15  cases, and the settlement yielded a much higher value

16  relative to realized losses in the pools.

17          So, we're not advocating estimating the claims by

18  looking at other settlements, but we're saying if the Court

19  is to do that, it should take into account, respectfully,

20  settlements that have -- were made when the parties were

21  much further along in the process and had completed the same

22  steps that are -- that have been completed here.  And the

23  MARMS -- the proposed MARMs settlement at Slide 230 is at

24  roughly the same level.

25          MR. COSENZA:  Your Honor?

1          THE COURT:  Yes, Mr. Cosenza?

2          MR. COSENZA:  I can do it after, but this was not

3    allowed into evidence during trial.

4          THE COURT:  I don't even know what this is.

5          MR. COSENZA:  This MARM.  Sorry, there was a

6    discussion.  There was something never been produced before.

7    This was during the discussion with Mr. Finkel.  This was

8    not included into evidence.  (Indiscernible) behind the pay

9    wall, they said everyone had this.  This is generally

10   available.  You had to be an investor.

11         THE COURT:  Oh, that's right.  You're right.

12         MR. COSENZA:  So, I don't know how this is here.

13         THE COURT:  Yeah, you're right.

14         MR. COSENZA:  I apologize for that.

15         THE COURT:  No, you're right.  You're right.  Yep.

16   It wasn't generally available.

17         MR. SHUSTER:  So, I think our view is that this

18   should come in under Exhibit G like any other settlement,

19   and it was on our exhibit list.  That's --

20         MR. COSENZA:  Your Honor --

21         THE COURT:  No.

22         MR. SHUSTER:  Okay.  Understood.  Okay.  So,

23   coming back to the estimation process on Page 232, I'm more

24   than certain that we're not saying on Page 232 the Court

25   doesn't know better than we do.

1           And then on Page 233 we're talking about what I

2    already outlined which is, you know, our suggestion of how

3    the Court should estimate the claims by making rulings on

4    breach types, evidence types, magnitudes, and then to the

5    extent the Court wishes to apply an error rate or a

6    discount, we think that would best be done using Morrow and

7    Morrow's disagree rate and the plan administrator's own

8    specific rebuttal rate.

9           And that is -- that's what we have.  Then we have

10   the calculator charts and that's what we've got.  The Morrow

11   disagree rate and PAs rebuttal rate are on Slide 256.  So,

12   again, thank you, Your Honor.

13           THE COURT:  So, Mr. Shuster, this deck is very

14   helpful to me.  I'm questioning whether or not a larger deck

15   would really help me.  How strongly do you feel about that?

16           MR. SHUSTER:  There's how strongly I feel and

17   there's how strongly they feel.

18           THE COURT:  You're the boss.

19           MR. SHUSTER:  Man, I wish that were true.  Often

20   doesn't feel that way.  Can we confer?

21           THE COURT:  Sure.

22           MR. SHUSTER:  And maybe, you know, we'll -- right

23   --

24           THE COURT:  Okay.

25           MR. SHUSTER:  -- after rebuttal, I'll --

Page 93

```
 1              THE COURT:  Well, yeah.  Okay.  Why don't we do
 2       that, and -- why don't we do that.
 3              MR. SHUSTER:  Thank you so much, Your Honor.
 4              THE COURT:  Okay, so --
 5              MR. SHUSTER:  Thank you for your attention.
 6              THE COURT:  I'll come back at about 12:15.  Mr.
 7       Cosenza?
 8              MR. COSENZA:  I'll try to be as quick as possible,
 9       Your Honor.
10              THE COURT:  Okay.  But no more than half an hour,
11       and then do you think you're going to want to -- you don't
12       know.
13              MR. SHUSTER:  No, but I certainly understand --
14              THE COURT:  Okay.  All right.
15              MR. SHUSTER:  -- the dynamics.
16              THE COURT:  Okay.
17              MR. SHUSTER:  Thank you, Your Honor.
18              THE COURT:  We'll see you at 12:15.
19              (Recess)
20              THE COURT:  I'm in the midst of planning for the
21       Federal Judicial Center's annual education program, and one
22       of the topics that we're presenting is a 10-year review of
23       the financial crisis.  What happened, could it happen again.
24              MR. SHUSTER:  You're now the expert.
25              THE COURT:  So, I think they found it kind of
```

Page 94

1    funny that I had to jump off the call to come back and do

2    this.  Yeah.

3            MR. COSENZA:  You definitely after this case, you

4    know, should be the expert on that panel -- moderating it.

5            THE COURT:  As the teenagers would say, whatever.

6    I remind you before everyone scatters when we conclude

7    today, folks still owe me evidence, right?

8            MR. ROLLIN:  Right.  We're going to hand them up.

9            THE COURT:  You are?

10           MR. ROLLIN:  As soon as we're done.

11           THE COURT:  Excellent.

12           MR. ROLLIN:  Yeah.

13           THE COURT:  And from your part as well, all

14   together.

15           MR. GOLDBERG:  I believe Mr. Rollin is handing

16   them all up.

17           THE COURT:  All up.  Okay, great.  Okay.

18           MR. COSENZA:  Teamwork.  Finally, at the end.

19   Finally.  Your Honor, I just have a few brief points to

20   make.

21           THE COURT:  Please.

22           MR. COSENZA:  I'll try to be as quick as possible.

23   First, Your Honor, Mr. Shuster said that there was -- or he

24   sort of hedged that there was no agreement not to sample by

25   the parties.  There was an agreement between the parties.

Page 95

1    He's hedged on this point several times during the

2    proceedings.

3            Just want to make very clear, there's a letter on

4    this point that was sent where we questioned what Mr. Morrow

5    and Mr. Schwert were doing.  He sent it in exchange to us,

6    and we're going to highlight the relevant portion, hopefully

7    (indiscernible) doing this on the fly, that there's -- a

8    section here -- was not using the sample and Morrow analysis

9    extrapolate.  We can get to (indiscernible) things towards

10   the end.  We are going this on the fly so it may take a

11   little bit longer.  If we can just...

12           And you see here, this really (indiscernible) I

13   want to point to.  "Nor to the (indiscernible) expert

14   reports of Morrow and Schwert tend to provide an estimation

15   to a sampling."  Your Honor, the understanding by the

16   parties here was, this is not ever -- there was no one who

17   was using sampling to prove up their claims here, and this

18   is confirmed in various discussions that we had with the

19   Court and with the parties.  And so, the point here is

20   Morrow and Schwert were not engaging in estimation through

21   sampling.

22           Second, Mr. Shuster made a number of statements

23   about Mr. Trumpp's testimony that I'd like to just address.

24   He cites Mr. Trumpp's testimony which he characterized as

25   indicating that the plan administrator did not hold any

Page 96

1    evidence back in the protocol, and based on that he comes to

2    his 93/7 percent ratio.

3              What he neglects to tell the Court is that the

4    plan administrator sent, throughout the protocol, a number

5    of responsive documents listing tens of thousands of

6    documents showing information where we disagreed with their

7    characterization.  So even though it wasn't a particularized

8    narrative rebuttal, there were cites to various documents in

9    the loan file that were exchanged during the protocol

10   showing why we disagreed with the Trustees' assertion.  Mr.

11   Trumpp testified to that.

12             So, then the extent this 93/7 percent thing has

13   any accuracy, that's not true and it's not -- you know, Mr.

14   Trumpp testified this extensively both at deposition and at

15   trial, so we find that to be highly misleading.

16             Next, Mr. Shuster said that the Court saw only one

17   missing document claim where the plan administrator found

18   that the document was missing.  As Mr. Trumpp testifies and

19   as we've shown throughout the proceedings here, the plan

20   administrator found missing documents thousands of times,

21   missing document claims that were sent over.  There were

22   thousands of instances where we found the missing documents

23   in the file, so it's not just, you know, this one example

24   that Mr. Shuster references.  And it also just shows the

25   whole problem with using the exemplar approach.

1          You know, so you show one file where there was a

2     missing document found by the plan administrator and he

3     says, oh, we only showed one, but there were thousands

4     during the protocol process where that occurred -- where we

5     found the missing document that was in the file.  That ties

6     directly to the lack of QC1 and QC2 by Duff and Phelps in

7     looking for any missing document files.  Instead, they just

8     sent those over to the plan administrator.

9          On the withdrawn loans, Your Honor, if there is a

10    good explanation as to why that was done, why didn't Mr.

11    Aronoff give that explanation at trial?  He designed and

12    oversaw the process, yet he was shielded from the decisions

13    on the withdrawal of loans at trial.  You would expect a

14    primary expert to speak on the withdrawal of tens of

15    thousands of claims.

16         And Mr. Shuster also mischaracterizes Mr. Grice's

17    slide.  There were thousands -- few thousand claims from the

18    big four categories that were withdrawn as part of this mass

19    abandonment of claims, so it infected the entirety of the

20    claims that went through protocol.  I wasn't as -- you know,

21    this misleading impression, it was just simply the missing

22    document claims.  And we don't have any explanation from

23    this, Your Honor, as you know, because this decision was

24    cloaked in privilege and we never got any discovery on this

25    point.

1          Mr. Shuster also criticizes Mr. Trumpp and Mr.

2    Grice for what he calls speculation, and that's not enough

3    to rebut the Trustees' claims, but Your Honor, we find this

4    very, very ironic.  Mr. Rollin touched on this, and we have

5    a slide.  Mr. Aronoff throughout his examination speculated

6    many, many times and I would just put up a few here, and

7    obviously this is all being done very quickly.  And we cite

8    to the various aspects of the hearing transcript.

9          He speculated that a self-employed borrower

10   improperly forecasting his income, having suffered a

11   temporary downturn in income due to fluctuating business.

12   He speculated that a real estate broker in California

13   misstated his income in 2004 because he's only on the job

14   for three years.  So, there's a red flag as to how someone

15   inexperienced could make that much money.  And he also

16   speculated that a nurse's income was out of line with what

17   he would expect a nurse to make.

18          These are the -- the Trustees had the burden.

19   This is from his testimony on trial from the exemplars about

20   their conclusions about there are breaches, and these are

21   mostly tied to their biggest of their big four, breach of --

22   misrep of income claims -- and this is rampant speculation

23   in order to try to meet your burden.

24          THE COURT:  Mr. Cosenza --

25          MR. COSENZA:  This is based on what they say is

1    unrebutted evidence.

2         THE COURT:  Let me push back on you just a bit,

3    okay?  And I go back -- I'm not going to be able to find

4    them, but bar charts of the big four where the Trustees

5    bucket the percentage of income misrepresentation or debt

6    misrepresentation, and there's some very big numbers.

7         How can I ignore that?  I mean, without kind of

8    buying into where Mr. Shuster started which was a kind of a

9    table setting of, look, everybody knows what happened in the

10   financial crisis and what happened in these mortgage

11   securitizations.  It was really bad and the closer you got

12   to 2007, the worse it was.  Without buying into that general

13   proposition as an evidentiary matter, when I'm looking at

14   what is being presented to me as 17,000 loans where there's

15   a 100 percent misrepresentation of income, how do I not view

16   that as something that --

17        MR. COSENZA:  Sure.

18        THE COURT:  -- that I -- basically, you're telling

19   me I should ignore that.

20        MR. COSENZA:  So, Your Honor, I guess there are

21   two answers to that.  One I think is -- goes on a very micro

22   level and one goes on a much more macro level.

23        On the micro level, what the exercise here from

24   the Trustees -- we've demonstrated there are all sorts of

25   issues with the process, but the fundamental predicate for

Page 100

1    all those calculations is actually having a baseline, actual

2    income number that you can then sort of go through and do --

3    and calculate all the various variances that they use to

4    show 100 percent.

5           And Mr. Aronoff testified very clearly there was

6    never -- there's all sorts of testimony that was confusing

7    on this point.  Aronoff cleared it up and said the exercise

8    was never to determine the actual borrower income.  It was

9    to determine whether more likely than not the borrower's

10   income was, based on the representation in the loan file,

11   was inaccurate.

12          So that is the determination he made in terms of -

13   - the exercise that was done in terms of determining whether

14   or not there was a breach.  To then take that number, that

15   number that they tried to pinpoint, and they try to

16   extrapolate it out to say, "Oh, now we have a 50 percent

17   variation based on what the initial exercise was."

18          From our perspective, that doesn't work and, you

19   know, that's -- you know, I think that's just a fundamental

20   problem with their evidence and their approach.  It may be

21   enough to show that more likely than not there was a breach

22   for a number of these, but it doesn't show -- these

23   magnitude slides are wholly -- they're totally misleading

24   given the exercise.

25          And the second point I'll just take it to a very,

Page 101

1    very high level, Your Honor.  We're at $300 million in the

2    protocol, right, the $278 to $300 million range.  We

3    understand.  We are trying to be fair here to get to the

4    right number.  If we thought, you know, there weren't any

5    other breaches -- be frank, if there weren't any other

6    breaches in these files, we would say that's our number and

7    we are done.

8         We are trying to get to the right number, and that

9    2.38 number that we're trying to be fair at, encapsulates

10   and captures the fact there are loans here where there are

11   various breaches of misreps of income or debt, and that is

12   what we're -- you can look at those slides, take them for

13   what they're worth.  I don't think the calculations are

14   accurate.  I think they're wholly misleading in terms of the

15   percentage -- stipulated percentage deviations, but these

16   files -- there are files that have breaches in them, and

17   that's -- we're trying to be fair by offering the $2.38

18   billion number.

19        So, moving on, Your Honor, to beyond Mr. Aronoff's

20   speculation.  And I do think, by the way, the burden is

21   important in this context because to put up speculation and

22   then say, "We've proven our claim and now we win," I mean

23   this is -- the protocol is intended to go through additional

24   steps.  There's going to be a meeting confer -- there're

25   going to be various discussions to confirm the evidence and

Page 102

1   then this trial.  So, this type of speculation would not

2   have carried weight and the Trustees would have had to do a

3   lot more than they did.  They just don't automatically move

4   to say, "We're at Step 5, and we win at trial."

5            Your Honor, on AMA, their (indiscernible)

6   statement to AMA existed for particular loans.  Remember the

7   charts we saw from Mr. Aronoff didn't include any of the

8   language from the actual contractual provision.  It speaks

9   entirely of risk of loss.  Now, if we can put these back up,

10  these are the stock responses.  This is how they viewed AMA

11  in order to say they've met the AMA provision.  There's

12  nothing in there that captures the actual language, the

13  adverse materially affects the value of the loan.  Instead,

14  it's all based on risk of loss and, you know, potential

15  likelihood and potential loss severity.

16           They did no individualized AMA analysis, and I

17  would submit, Your Honor, if you look at all the cases, this

18  is not sufficient to meet your burden in AMA context and it

19  does not comport with the language of the contract.  They

20  impose and just say risk of loss is basically what the

21  language means, and that's how they applied it.

22           Your Honor, Mr. Shuster also talks about the

23  damages and what they've done here in terms of -- again,

24  this is all they put forward to get the full purchase price.

25  But he also mentions the pricing issue, that there're things

Page 103

1    that have been priced differently --

2            THE COURT:  Yes.

3            MR. COSENZA:  -- at the beginning of the thing,

4    but the Trustees here are not seeking damages that have any

5    connection to any increase in pricing, interest rates, or

6    loan terms.  They're seeking the full purchase -- repurchase

7    remedy and the full purchase price.  There was no analysis

8    done as it should've been done (indiscernible) the case,

9    particularly for these loans that have performed for a long

10   period of time, what their actual out of pocket damages

11   were.

12           And I think you obviously brought forward a number

13   of hypotheticals that we would agree with, that those are

14   claims that should not have been brought and to the extent

15   there even is a claim, it would be the difference between

16   what, you know, what should've been done on day one in terms

17   of pricing the loan versus what the trust -- what the

18   certificate holder, you know, paid for that particular loan.

19           And Your Honor, I just also want to cite very

20   quickly the MARM --

21           THE COURT:  So what -- so, hold on a second.  So,

22   what you're saying is that Mr. Shuster and I had this

23   exchange about damages and he didn't agree with my

24   hypothetical about the perfectly performing 10 year loan.

25   And the response was that, that all doesn't matter because

Page 104

1  at the time of origination the pricing of the loan would've

2  been different had everyone known what the borrower's true

3  income was.

4          So, what you just said was that therefore if

5  that's their theory, then the damage measure ought to be

6  that difference.  In other words, the loan would've been

7  priced differently.  It would've been -- the borrower

8  would've been charged an eighth of a point more interest and

9  that therefore that would've affected the loan price.

10         MR. COSENZA:  That's absolutely correct, Your

11 Honor.  Again, we don't agree with their theory, but if that

12 -- taking their theory to a logical extent, there's no proof

13 on this.  They just decided not to do that and they decided

14 to go for the full purchase price, and that has

15 consequences.  There's just no evidence of that.  If you

16 look at what -- I'm going to go quickly.  I didn't mean to

17 do this, but I think in light of your question, I'm going to

18 cover this.  Judge Castel's decision in the MARM 3 case, he

19 talks about this particular issue.  I don't know if we have

20 this slide, if we can pull it up.  We can pull it up.  And,

21 Your Honor, this issue --

22         THE COURT:  Before you move on, not to overly

23 obsess with this hypo, but in my hypo, if that loan supports

24 a piece of the damage claim, there's a netting for the

25 current value of the loan, right?

Page 105

1               MR. COSENZA:  Correct.

2               THE COURT:  So, then how -- which way does that

3  cut?

4               MR. COSENZA:  Well, I think in your -- in the

5  hypothetical, if you have the -- a higher -- there should've

6  been theoretically higher interest rate and this loan is

7  still performing, I think it would be relatively straight --

8  nothing's straightforward -- but to get some sort of

9  calculation as to what -- you look at the original

10  underwriting guidelines --

11              THE COURT:  The loan is not under the

12  hypothetical, right, that would've been charged had everyone

13  known about the misrepresentation.  But right now you've got

14  income breach, you've got a performing loan, right --

15              MR. COSENZA:  Yeah.

16              THE COURT:  -- so you've got what's remained of

17  outstanding principal balance, right, and paid on accrued

18  interest which should be nothing --

19              MR. COSENZA:  Yeah.

20              THE COURT:  -- because it's performing.  So, the

21  value of that loan -- there's going to be no damage

22  component.

23              MR. COSENZA:  Yes.  I would agree with that, Your

24  Honor.  So --

25              THE COURT:  Okay.  All right.  I'll have to think

Page 106

1    about it a little more.  I don't know where that -- I don't

2    know how that helps, but you can keep going.

3              MR. COSENZA:  Okay.  Your Honor, just in the MARM

4    case, this issue was raised and Judge Castel -- and this is

5    not something the Trustees cited to -- but this is about the

6    pricing issue on AMA.  They said no witness for the trust

7    offered credible evidence as to how a defect would've caused

8    a higher rate of interest to be charged or other loan terms

9    to be different.

10             The closest person who came to this was Ira Holt

11   using a hypothetical example.  He testified that there could

12   be a higher rate or additional fees collected by the

13   originator.  If you go to the end, the Trustees -- the trust

14   have not pointed to any specific content of any originator's

15   rate sheet or guidelines that show that any loan among the

16   thousands at issue would've issued at a higher interest rate

17   or fee.

18             And that's, you know, going to the core point I

19   was trying to answer, I guess inartfully, before, is you'd

20   have to do an exercise of going back, would this loan have

21   been issued on the original guidelines.  What would've

22   happened?  What program would've been (indiscernible).

23   Would it have been a different interest rate?  There's -- I

24   mean, as in this case, there's no evidence ever put forward

25   by the Trustees on this point.

Page 107

```
 1              So, Your Honor, just going through my notes very

 2     quickly, I believe I covered what I intended to cover.

 3              THE COURT:  Okay.

 4              MR. COSENZA:  I tried to do this rebuttal as

 5     quickly as possible and I want to again thank you for your

 6     time.

 7              THE COURT:  Okay, thank you, Mr. Cosenza.  Mr.

 8     Shuster.

 9              MR. SHUSTER:  Nothing.

10              THE COURT:  All right, so now it's my turn to

11     thank you.  We've been at this since -- please, have a seat.

12     We've been at this since --

13              MR. SHUSTER:  There was one day off.

14              THE COURT:  -- November.

15              MR. SHUSTER:  Sorry.

16              THE COURT:  Mr. Goldberg?

17              MR. GOLDBERG:  Apologies, Your Honor.

18              MR. SHUSTER:  We did want to put in the full deck

19     --

20              MR. GOLDBERG:  I thought I was going to say that.

21              MR. SHUSTER:  We did want to put in the full deck

22     because we pared this down with the idea that the full deck

23     would go in.

24              THE COURT:  Okay.

25              MR. SHUSTER:  But we have to pull out one sheet
```

Page 108

```
 1    which is Page 180 out of the deck you have.

 2              THE COURT:  Okay.

 3              MR. SHUSTER:  We were going -- I was considering

 4    making an argument about that but I'm not going to.

 5              THE COURT:  Okay.

 6              MR. SHUSTER:  So, Page 180, Your Honor, should

 7    just pull out --

 8              THE COURT:  Of this deck?

 9              MR. SHUSTER:  Yeah, and we're going to pull it out

10    of the complete deck, too.

11              THE COURT:  Hold on.

12              MR. SHUSTER:  And with that, I really do have

13    nothing further.

14              THE COURT:  Okay.  So, do you folks want to give

15    us the (indiscernible) ---

16              MR. SHUSTER:  Yeah --

17              THE COURT:  -- other materials?

18              MR. ROLLIN:  We do have them now.

19              THE COURT:  Want to just bring them into chambers

20    or hand them up --

21              MR. ROLLIN:  I'd be happy to hand them up.

22              THE COURT:  Whatever you want to do.

23              MR. ROLLIN:  I'm happy to bring them to chambers.

24              THE COURT:  Okay, so just bring them into

25    chambers.
```

1          MR. ROLLIN:  Thanks, Your Honor.

2          THE COURT:  And then you give us a couple copies

3    of the full deck.  That's just so Mr. Shuster can take the

4    position that he's playing with a full deck, right?

5          MR. SHUSTER:  Yes.

6          THE COURT:  180, that's this page?

7          MR. SHUSTER:  Yes.

8          THE COURT:  So, take this out?

9          MR. COSENZA:  Sorry, wasn't there also the MARM

10   slides here, right?

11         THE COURT:  I took the MARM slide out.

12         MR. COSENZA:  Took that out?  Okay.

13         THE COURT:  Yep.  I took the MARM slide out.

14         MR. COSENZA:  The Court (indiscernible) slide, the

15   MARM slide.

16         THE COURT:  You can trust me.  Okay, we'll take

17   those two out of this deck.  Thank you very much.  Okay, so

18   my turn to say thank you.  We've been at this since

19   November, and Ms. Eisen is not here today, not because she

20   didn't want to be, but we had a lot of schedule changes and

21   we didn't want to -- I didn't want to disrupt her schedule

22   changes.

23         But, this trial has been unusual in many respects.

24   Number one, first and foremost, degree of difficulty.

25   Certainly, one of the most difficult if not the most

1   difficult things that I've ever done even though I've been

2   now presiding over Lehman for -- you can say happy

3   anniversary -- four years.

4           Secondly, the quality of the lawyering was superb,

5   and notwithstanding the degree of difficulty and the many

6   heated exchanges that we had and conferences that we had, I

7   truly am greatly appreciative of how hard everyone worked

8   and how earnest everyone was in their efforts, and to the

9   extent that my patients or good humor flagged, I sincerely

10  apologize.  I pride myself on being attentive and being with

11  you every step of the way and sometimes when I feel that I'm

12  not doing as good a job as I could be doing, I get angry at

13  myself and I take that out on others.  You can ask my

14  husband.  He will verify that phenomenon.

15          Thank you to all of the support folks, lawyers,

16  legal assistants, technical staff.  I know this stuff just

17  doesn't appear, and we appreciate how smoothly that went.

18  And I appreciate the clients who have been coming every day

19  and listening in and so, thank you.  I'm very happy to

20  release you from captivity.

21          The other thing that bears mention is that there

22  were a number of unusual personal challenges that witnesses

23  and counsel faced, and notwithstanding we managed to

24  navigate through that and everybody worked cooperatively to

25  juggle schedules and just get through this.  But I've never

Page 111

1    experienced anything like that before and hope that I don't

2    and that you don't ever again.

3             So, with that, we have a lot of work to do.  We

4    have established that I'm going to deliver a decision to you

5    on March 8th.  Most likely that's going to take the form of

6    my reading to you for many hours.  You are not obligated to

7    come down here.  It is not fun.  I've done it before, but

8    it's in the service of getting something to you consistent

9    with the deadline and in enough detail that I think

10   acknowledges how much this work has been.

11            But, being somewhat of a perfectionist, I'm not

12   willing to -- I cannot be done in a publishable

13   (indiscernible) decision form by March 8th.  It's simply not

14   possible, so I'm going to give you the next best thing,

15   which is to read something that's very detailed.  You

16   absolutely are not obligated to come down here.  You can

17   dial in.  You can come, you can leave.  You know, whatever

18   it is.

19            We had discussed, though, that this all proceeded

20   in order to enable the plan administrator to make a

21   distribution on the timetable in March, and for that we've

22   discussed before that my understanding is that various

23   pieces of paper have to be given to the plan administrator

24   by the Trustee Group and my suggestion, although I don't

25   have any authority to order it, is that you please get that

Page 112

1    done as soon as possible, in any event no later than March

2    1st so the plan administrator has some leeway to make sure

3    that it's all there.

4              Is there anything more that I should say in that

5    regard?  Okay.  have a wonderful weekend.  Enjoy the

6    Olympics.  Get some rest.

7              MR. SHUSTER:  Thank you, Your Honor.

8              THE COURT:  We'll see you in a couple weeks.

9              MR. COSENZA:  Thank you, Your Honor.

10             THE COURT:  Thank you very much.

11

12             (Whereupon these proceedings were concluded at

13    12:47 PM)

14

15

16

17

18

19

20

21

22

23

24

25

Page 113

## C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing

transcript is a true and accurate record of the proceedings.


Sonya
Ledanski Hyde

Digitally signed by Sonya
Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o,
ou, email=digital1@veritext.com,
c=US
Date: 2018.02.14 16:29:36 -05'00'

Sonya Ledanski Hyde


Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501


Date:  February 14, 2018