Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  February 8, 2018

17                  12:32 PM

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

1    HEARING re RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   WILLKIE FARR & GALLAGHER LLP

 4         Attorneys for the Debtor

 5         787 Seventh Avenue

 6         New York, NY 10019

 7

 8   BY:  TODD G. COSENZA

 9

10   WILLKIE FARR & GALLAGHER LLP

11         Attorneys for the Debtor

12         1875 K Street, NW

13         Washington, DC 20006

14

15   BY:  JOSEPH G. DAVIS

16

17   HOLWELL SHUSTER & GOLDBERG LLP

18         Attorneys for RMBS

19         750 Seventh Avenue, 26th Floor

20         New York, NY 10019

21

22   BY:  DORIT UNGER BLACK

23         DWIGHT A. HEALY

24         DANIEL P. GOLDBERG

25         NEIL R. LIEBERMAN
```

1   ROLLIN BRASWELL FISHER LLC

2       Attorneys for Plan Administrators

3       8350 E Crescent Parkway, Suite 100

4       Greenwood Village, CO 80111

5

6   BY:  MICHAEL ROLLIN

7

8   ALSO PRESENT TELEPHONICALLY:

9

10   ROBERT MADDEN

11   CHRISTOPHER DESIDERIO

12   KYLE BURNS

13   PATRICK MOHAN

14   PAUL SHALHOUB

15   TRACY HENDERSON

16

17

18

19

20

21

22

23

24

25

Page 5

1                        P R O C E E D I N G S

2              THE COURT:  Have a seat, please.  How is everyone?

3              MAN 1:  Well, thank you.

4              MR. COSENZA:  Good.  Thank you, Your Honor.

5              THE COURT:  All right, Mr. Cosenza, I'm ready

6       where you are.

7              MR. COSENZA:  This is (indiscernible) Your Honor,

8       and then Ms. Herman's going to hand out the slide decks for

9       part of our closing.  Thank you.

10             THE COURT:  There are a number of parties on the

11      phone in listen-only mode.  Okay.

12             MR. COSENZA:  Thank you, Your Honor.  May it

13      please the Court, Todd Cosenza from Willkie Farr &

14      Gallagher, on behalf of the plan administrator.  As an

15      initial matter, I want to thank you, Your Honor, you and

16      your clerks for your patience, efforts, and guidance during

17      this proceeding.  I also want to thank Your Honor for all

18      the resources you devoted to this matter so the parties can

19      have the results of this proceeding reflected in the plan

20      administrator's March 2018 distribution.

21             We appreciate the Herculean effort and sacrifice

22      on the Court's part to accommodate the party's request as

23      reflected in the settlement, to try to bring these claims to

24      a prompt resolution.  We are deeply appreciative.  We will

25      try, in light of that, not to take too much of Your Honor's

Page 6

```
 1    time up today.  And I've tried to winnow down as I reflect

 2    in my letter --

 3              THE COURT:  Okay.

 4              MR. COSENZA:  -- my presentation to hopefully be

 5    less than two hours.

 6              THE COURT:  Okay.

 7              MR. COSENZA:  Our intention, Your Honor, is to

 8    draw an emphasis on certain points raised in our briefing

 9    and to respond to some of the points raised by the Trustee's

10    post-trial brief, and, of course, to respond to Your Honor's

11    questions.  Your Honor --

12              THE COURT:  I intend to -- I know I say this

13    frequently and I don't do it, but I intend to be very quiet

14    so that you can maximize the amount of time that you have.

15              MR. COSENZA:  Sure.

16              THE COURT:  But I may ask a question or two.

17              MR. COSENZA:  No worries at all.  We've been at

18    this for many years so we know.

19              THE COURT:  Okay.

20              MR. COSENZA:  I always overpromise in terms of how

21    quick I'm going to be and--

22              THE COURT:  And I overpromise about how quiet I'm

23    going to be.

24              MR. COSENZA:  Yes.  So, Your Honor, you're going

25    to hear from both myself and Mr. Rollin today.
```

Page 7

1              THE COURT:  Okay, very good.

2              MR. COSENZA:  I will discuss the framework and

3    background that led to this proceeding and the parties'

4    respective approaches to this case.  Mr. Rollin will discuss

5    the parties' loan review processes, including how the

6    parties dealt with the termination breach in AMA.  And I

7    will then discuss why we believe, from the plan

8    administrator's perspective, that $2.3 billion is a fair and

9    appropriate amount to estimate these claims.

10             I may ask to call on my colleague, Mr. Davis, to

11   answer certain questions if Your Honor has some deep

12   questions about some of the case law, particularly on the

13   interest issues and on the approximate cost.

14             THE COURT:  All right.  And just to be clear,

15   since I try to enforce a one-speaker-only rule during the

16   trial, which I didn't successfully do at all times -- during

17   the closings tomorrow for the Trustees, if there -- if I ask

18   a question and someone else is in a better position to

19   answer it than Mr. Shuster, we can follow a similar

20   procedure.

21             MR. SHUSTER: Fair enough, Your Honor.  Thank you.

22             THE COURT:  All right?  Okay.

23             MR. COSENZA:  So, Your Honor, as I outlined in my

24   opening statement, this matter has a long history but the

25   history is critical to understanding the context of the

Page 8

1    current proceeding.  And so for the record, I'm going to

2    provide a very brief overview of what led to the settlement

3    that frames this proceeding.  As the Trustees have

4    acknowledged, the protocol provided them with a full and

5    fair opportunity to prove their claims on a loan-by-loan

6    basis with sufficient evidence, and the plan administrator

7    agrees with that.

8            As I will detail shortly, there were a number of

9    issues that led to a divergent of results during the

10   protocol.  Because of this divergence abuse, while the

11   protocol was ongoing, the plan administrator reached out to

12   the trust's largest beneficiaries, the institutional

13   investors, through their counsel, as it was clear that they

14   had played a critical role in resolving other comparable

15   RNBS disputes.

16           As Your Honor heard from Professor Fischel, the

17   institutional investors are some of the largest and most

18   sophisticated financial institutions in the world.  Sure.

19   Your Honor is very familiar with this, trying to -- I'll be

20   cognizant of the court reporter.  We're trying to speed this

21   up as quickly as possible.  But they include, as this

22   demonstrative shows, Goldman Sachs Asset Management,

23   BlackRock, Aegon, PIMCO, MetLife, and WAMCO.

24           After extensive negotiations, in October 2015, the

25   plan administrator and the institutional investors struck a

Page 9

1    deal to settle the covered RNBS claims subject to this

2    proceeding as well as a transfer loan RNBS claims for $2.44

3    billion.

4            As the Court is aware, the initial indications

5    were that the settlement would be consummated.  However, in

6    February 2016, the trustees informed us that they would not

7    accept the settlement, thus, rejecting the institutional

8    investors' views that the claims should be resolved at the

9    $2.4 billion level at that time.

10           Even after the October 2015 settlement was not

11   accepted by the Trustees, the plan administrator continued

12   negotiating with the institutional investors to resolve

13   these claims fairly and in a timely fashion.

14           The plan administrator then entered into another

15   settlement agreement with the institutional investors in

16   March 2017 which led to this unique proceeding.

17           After much negotiation and compromise from the

18   March settlement, the Trustees finally agreed to a revised

19   settlement agreement on June 1, 2017, which established the

20   procedures for this hearing.

21           That settlement provides the context for why we're

22   here today, Your Honor -- to resolve, as I mentioned

23   earlier, the plan administrator's motion under Section 502C

24   of the Bankruptcy Code to estimate the Trustees' claim at

25   $2.38 billion.

Page 10

1           The provisions of that settlement are quite

2      unique.  As I just mentioned, I think it's important to

3      highlight just a couple of points.  I went through this in

4      much more detail in my opening but to sum it up, the plan

5      administrator agreed to seek estimation at 2.416 billion,

6      which is now adjusted to the 2.38 billion amount that I

7      mentioned earlier.

8           As the demonstrative shows evidence, a key feature

9      of that settlement is that the parties agreed that the

10     October 2015 settlement for $2.44 billion between the plan

11     administrator and institutional investors and other

12     settlements in dispute involving RNBS were also allowed into

13     evidence.

14           Timing.  And this is an abridged version of what's

15     in the provision.  But the parties basically agreed they

16     would each have seven full hearing days to present their

17     respective cases so that the Court could issue its decision

18     in time for the plan administrator's March distribution.

19           The plan administrator appreciates that this

20     proceeding is somewhat of a divergence from the normal

21     procedures of Your Honor and this Court, and we greatly

22     appreciate the Court's accommodation.  But, again, the plan

23     administrator agreed to this process because it believes

24     this process provided the best vehicle for resolving these

25     claims by the March 2008 distribution deadline, consistent

Page 11

1   with its goals to resolve claims in the most efficient,

2   fair, and timely manner possible.

3            As I described in my opening, this really is an

4   unprecedented proceeding.  There are 70,863 loan files for

5   which the Trustees are bringing breach of contract claims

6   here.  When the protocol was entered, as Your Honor heard

7   from Mr. Trumpp, the plan administrator aimed to resolve the

8   vast majority of these claims without judicial intervention.

9            For most of the discovery phase in trial, and you

10  see this on the Trustees from their pretrial brief, the

11  Trustees have maintained that their protocol process was

12  robust, and based on their process, that their claim here is

13  worth $11.4 billion.

14           However, it became clear through discovery in this

15  proceeding and the evidence introduced at trial that the

16  Trustees' approach to the protocol was fundamentally

17  different than what the plan administrator expected.

18           The parties clearly have fundamental disagreements

19  about the types of claims, the types of evidence, and the

20  sufficiency of such evidence that was contemplated by the

21  protocol process.  As Mr. Trumpp testified, the plan

22  administrator was surprised to see so many atypical claims

23  and so many claims supported with such little loan level

24  evidence.

25           When asked what his expectation was for the

Page 12

1    protocol -- and this is from Mr. Trumpp's testimony, and

2    I'll go through this quickly -- he did not expect to see

3    claims on active loans that are still performing ten years

4    post-securitization; he didn't expect claims for missing

5    documents because, as he understood it, based on customer

6    practice in the industry, that information degrades in the

7    loan file and servicing file over time.  He didn't expect

8    claims for the types of regulatory issues that the plan

9    administrator saw from the Trustees; and he also did not

10   expect to see claims for misrepresentation of debts where

11   the additional debt was taken out post origination of the

12   subject loan.

13          These are just some of the examples identified by

14   Mr. Trumpp at trial and they're on these slides.  But we

15   will discuss the many issues that divide the Trustees and

16   plan administrator in more detail later in my presentation.

17   However, just to frame this fundamental difference in

18   approach at the process that both sides employed here at a

19   very high level, here are just some examples, Your Honor,

20   that you saw based on evidence at trial.

21          The plan administrator expected that the Trustees

22   would have explained to the plan administrator why evidence

23   inconsistent with their claim was outweighed by evidence in

24   support of it and share that information the Trustees

25   obtained from third party sources.  So, this is what we

1   expected to have seen through the protocol process and we

2   did not see this.

3           Next, we would have expected during the protocol

4   process that the Trustees would have marshalled sufficient

5   evidence to meet their burden for all elements of their

6   contractual claim.  We also expected the Trustees would've

7   put into place a much more robust QC program, including

8   supervision sufficient to ensure consistency across five

9   loan review firms.

10          We also expected that the Trustees would have

11  accounted for the significant period of time that passed

12  since the origination of the loans at issue here before

13  asserting their claims for missing documents, and consider

14  the possibility that the loans may have defaulted for

15  reasons unrelated to the alleged breach.

16          And, lastly, we would've expected that the

17  Trustees would have pursued claims only on liquidated loans,

18  given that most originations occurred almost a decade ago.

19              As the Court is aware, the Trustees have been

20  pursuing an 11-figure damages claim for years.  Indeed, the

21  Trustees' pretrial brief they asserted, as I mentioned

22  before, that the remedy for Lehman's breaches is a

23  contractually mandated purchase -- repurchase at the

24  approximately $11.4 billion purchase price.  And in their

25  opening statement the Trustees stated that they, quote,

Page 14

1    "Prefer a methodology that actually evaluates the evidence

2    that we've developed and are submitting rather than one

3    that's based on applying haircuts and discount percentages."

4              After the record made clear, Your Honor, that the

5    Trustees' process was not reliable and that the Trustees did

6    not --

7              THE COURT:  Can you explain your understanding of

8    what that sentence means?

9              MR. COSENZA:  What I understood that to mean is

10   that the Trustees were going to demonstrate the robustness

11   of their process to show how all the claims that went

12   through the protocol are -- you know, should be paid out at

13   the full purchase price, and that there shouldn't be

14   discounts provided based on quality of evidence or different

15   types of evidence.

16             THE COURT:  Okay.

17             MR. COSENZA:  After the process made clear that

18   the Trustees' process was not reliable -- and, Your Honor,

19   just to take a step back on that question.  You know, the

20   context of that statement is in the context of what was in

21   their pretrial brief, which was the full $11.4 billion.  So

22   they may have a different explanation for what was there.

23             THE COURT:  Okay.

24             MR. COSENZA:  But that was our understanding

25   sitting there with that --

Page 15

1           THE COURT:  Fair enough.

2           MR. COSENZA:  They asked for 11.4 and they say

3   we're going to prove it up.

4           THE COURT:  I see.  Okay, thank you.

5           MR. COSENZA:  The Trustees did not come close to

6   meeting that burden to show that they had proven valid

7   claims that exceed $2.38 billion.  The Trustees have now

8   backpedaled from the year's long pursuit of an 11-figure

9   claim in a different way.

10          Now, in their post-trial brief, the Trustees pivot

11  and suggest that haircutting may be appropriate.  And, Your

12  Honor, this is from the Trustee's post-trial brief.  You can

13  see the comparison between -- in this demonstrative, what

14  was in their opening statement and now what they're

15  suggesting in their post-trial brief.

16          And as the basis for this last minute pivot that's

17  reflected in their post-trial brief, the Trustees point to

18  a, quote, "Demonstrative exhibit that no witness has

19  testified to because it first appeared after live testimony

20  and this proceeding had closed."  But it's too late.  The

21  Trustees developed no record evidence to support any

22  justified haircutting of their inflated claim.

23          In any event, this exhibit suffers from a series

24  of fundamental problems and, Your Honor --

25          THE COURT:  This is the so-called -- the

Page 16

1    calculator?

2              MR. COSENZA:  Yes.

3              THE COURT:  Okay.

4              MR. COSENZA:  And, Your Honor, I'm going to detail

5    -- I'm going to spend a lot more time at the end of my

6    presentation detailing the problems with the calculator

7    approach.  But that's their basis for now for doing this.

8              In contrast to the lack of proof offered by the

9    Trustees, the plan administrator has provided ample evidence

10   demonstrating why the Trustees' claims should be estimated

11   at $2.38 billion or less.

12             As the Court may recall in my opening statement I

13   described four guideposts that would lead the Court to $2.38

14   billion or less.  These guideposts are now supported by

15   exactly the record evidence I promised in my opening

16   statement, which I'll describe again at the end of my

17   presentation in more detail -- and they provide, in our

18   view, a sound basis for estimating the Trustees' claims at

19   $2.38 billion or less now.

20             Your Honor, there was lots of discussion leading

21   up to this about the burden and there's some discussion in

22   the briefs, and Mr. Rollin will discuss that in a little bit

23   more detail during his presentation.

24             But just coming into this proceeding and where we

25   were, just to frame the issues, the Trustees had the burden

Page 17

1    to prove entitlement to more than $2.38 billion in contract

2    damages, but in our view they've utterly failed to meet that

3    burden.

4            As both parties agree, this is not a put-back

5    case.  The Trustees are not seeking to have the plan

6    administrator repurchase any of the loans at issue,

7    including the active loans for which the Trustees seek

8    contractual damages.  Instead, the parties are in Bankruptcy

9    Court before Your Honor and as the Trustees acknowledge in

10   the first line of their pre-trial brief, on straightforward

11   breaches of contract claims.

12           So, the Trustees are seeking monetary damages for

13   breaches of contract in the context of this bankruptcy

14   proceeding.

15           THE COURT:  When the Trustees say that it's a

16   breach of contract claim, they're talking about a breach of

17   the reps and warranties, not a breach incident to rejection

18   of the repurchase agreements.

19           MR. COSENZA:  That's correct, Your Honor.

20           THE COURT:  Right?

21           MR. COSENZA:  That's correct.  Consequently, the

22   Trustees have the burden of proof to demonstrate -- again,

23   this goes to what I mentioned earlier, given the magnitude

24   of this case -- 107,311 breach of contract claims on 70,863

25   loans still at issue that were generated by their loan

Page 18

1   review process.

2          Leading up to this proceeding, the parties agreed

3   that they would not use sampling to prove their allowed

4   claim.  In light of that, the Trustees knew that they would

5   need to demonstrate the robustness and reliability of their

6   process.

7          The evidence showed conclusively that the Trustees

8   were unable to demonstrate the integrity and quality of

9   their breach review process and, thus, the output of that

10  process cannot support a claim greater than $2.38 billion.

11         As Your Honor heard from Mr. Trumpp and Mr. Grice,

12  there are fundamental deficiencies in the Trustees' breach

13  analysis and that the Trustees' process produced unreliable

14  results.

15         THE COURT:  So, just -- the plan administrator

16  takes a position, and I don't know if I'm getting into Mr.

17  Rollin's area here -- but the plan administrator in broad

18  outline takes the position that the Trustees did not sustain

19  their burden of proof.  Right?

20         MR. COSENZA:  Correct.

21         THE COURT:  But for the settlement, therefore, and

22  this $2.38 million -- billion-dollar figure, would it be the

23  plan administrator's position that the claims should be

24  allowed at zero, or would it be the plan administrator's

25  position that the claims would be allowed at, I believe the

1    number was $300 million?

2              MR. COSENZA:  So, Your Honor, I'm going to address

3    that when I put the context of the introduction to the four

4    guideposts.  But I will answer very quickly --

5              THE COURT:  Okay.  Fair enough.

6              MR. COSENZA:  I will answer very quickly now.  Our

7    view is based on where we were in Steps 1 and 2 in the

8    protocol -- it would be in the range of 278 to 301 but

9    that's not what we're seeking here.  Because that was just

10   the first two steps of the protocol.

11             Our approach here has always been what is fair,

12   and given that there be Steps 3, 4, and 5 of the protocol,

13   what would the protocol have likely yielded?  And that's how

14   we get -- regenerate this.

15             THE COURT:  Okay.

16             MR. COSENZA:  So I think I'll explain that in more

17   detail.  But based on burden, where we are right now, we do

18   believe just on the plenary view of where the protocol was,

19   we'd be in that range of 278 to 301.

20             THE COURT:  Okay, thank you.

21             MR. COSENZA:  So, at the highest level, Your

22   Honor, the evidence at trial shows the Trustee's breach

23   review process was flawed -- and there's a graphic that's

24   going to go through just general terms of how their process

25   was structured.  Mr. Rollin will actually get more into the

Page 20

1    loan level issues.

2              But, first, the Trustees did not properly

3    supervise the five loan review firms.  There were no -- it's

4    undisputed on these points, Your Honor.  It's on the slide.

5    These are all from the Trustees' witnesses.  There were no

6    uniform guidelines that were issued to the loan review firms

7    and how to conduct a breach review, which Mr. Aronoff

8    testified to.

9              The Trustees offered no specificity as to the

10   content of or parties to the interactions between Duff &

11   Phelps and the loan review firms.  No direction was given to

12   the loan review firms on the use of third party sources.

13   And Duff & Phelps made no effort to ensure that all of the

14   third party documentation collected by the loan review firms

15   was retained and passed along to the plan administrator.

16             Your Honor, at that point, we thought under the

17   protocol we were going to get that information.  We never

18   received it.  That's just one of the expectations we had,

19   that such information would be passed along and -- passed

20   along to Duff & Phelps, to the Trustees, and then along to

21   us.  That never happened.

22             Second, there were additional problems with the

23   loan reviews.  The evidence showed that the Trustees did not

24   have a consistent proper method to calculate actual borrower

25   income.  As Mr. Aronoff testified, the loan review firms

Page 21

1    were not trying to calculate actual borrower income.  And

2    that's really important, Your Honor.  I'm going to explain

3    the implications of that later on in my presentation.

4          Third, there were inadequate quality controls at

5    Duff & Phelps.  Mr. Aronoff had no knowledge of how many

6    claims were filtered out of each QC level.  QC1 was not

7    permitted to poke around the loan files.  That quote has

8    gotten a lot of play from us, both in our opening and during

9    the trial.  And QC2 only reviewed the loan files on a spot-

10   check basis.  Despite uniform testimony from the experts on

11   both sides, that to confirm a claim was valid you must look

12   at the entire loan file.  QC1 also did not review any

13   missing document claims, one of the largest claim categories

14   generated by the Trustees' process.

15          Next, Your Honor, the Trustees also did not

16   properly consider inconsistent evidence, and Mr. Rollin will

17   detail this issue in his presentation.  Despite these gaping

18   holes in the credibility of their loan review process, the

19   Trustees asserted that they would demonstrate their

20   process's reliability through exemplar loans.  Again, as

21   we'll explain in some more detail later, that's not what

22   happened during the estimation proceeding.  If anything, the

23   reverse occurred.

24          To put a finer point on this, the Trustees

25   presented seven exemplar loans in their affirmative case

Page 22

1    from the 70,863 loans left at issue through Mr. Aronoff's

2    examination.  The Trustees handpicked these seven loans,

3    presumably, because the Trustees thought those loans

4    provided the most compelling examples of valid claims

5    produced by the Trustees' process and would best illustrate

6    why their process was sound and reliable.

7            What we saw, however, was that even among this

8    title faction of loans, seven out of 70,863 or 1/100th of

9    one percent that the Trustees had unfettered discretion to

10   pick for this purpose, several of their exemplars suffered

11   from significant deficiencies.

12           While the plan administrator expected going into

13   this proceeding -- I think I expressed this to Your Honor at

14   various pretrial conferences, we thought the Trustees were

15   going to present slam-dunk winners and the question would be

16   what would be the implication of that, given the small

17   number of loans that they've selected?  Instead, the

18   evidence showed that several of the exemplar loans presented

19   by the Trustees were at best jump-balls.

20           Rather than provide compelling evidence as a

21   reliability of the Trustees' protocol review process, which

22   the Trustees must do to prove they're entitled to estimation

23   of their claim at greater than 2.38 billion, these exemplars

24   showed that the results of the Trustees' process simply

25   can't be trusted even for the very, very best examples the

Page 23

1    Trustees can find.

2           Mr. Rollin will detail the parties' review

3    processes, including how they dealt with determinations of

4    breach at AMA now, and I mean, I'm going to turn those --

5    turn the podium over to him so he can address those issues

6    before I come back to complete the plan administrator's

7    presentation.  Thank you, Your Honor.

8           MR. ROLLIN: Thank you, Your Honor.

9           THE COURT:  Hello, Mr. Rollin.

10          MR. ROLLIN:  Your Honor, as Mr. Cosenza said, I

11   will address the divergence of use between the Trustees and

12   the plan administrator on questions of evidence of threshold

13   facts, the application of facts, the representations and

14   warranties, and on the question of AMA.  It will necessarily

15   be high level and, of course, I'd be happy to address any

16   questions Your Honor has.

17          Your Honor, during the protocol the Trustees did

18   not prove at least one required element for the vast

19   majority of claims, and in many instances none of them.  And

20   just to highlight these -- the three elements, on the

21   question of threshold facts, the Trustees and the plan

22   administrator fundamentally disagree on what evidence is

23   appropriate to use in this contact and the manner in which

24   one should resolve inconsistent and competing pieces of

25   evidence in and outside of a loan file.

Page 24

1          THE COURT:  One such an example being a statement

2     on the loan application versus a document that reflects

3     something inconsistent with a statement on a loan document?

4          MR. ROLLIN:  Yeah, that's exactly right.  Sure.

5     With respect to the application of the representations and

6     warranties, the parties have fundamentally different views,

7     even of what the words on the page say and how they need to

8     be applied, and we'll talk in a little while about

9     materiality and seller's knowledge, and things like that.

10         And with respect to AMA, again, we are of

11    completely different views on what the correct standard is,

12    and regardless of what the standard is, what evidence is

13    necessary to establish that standard -- indeed, whether any

14    evidence is necessary at all.

15         THE COURT:  And you're alluding to the fact that

16    you're going to tell me that the Trustees' position is that

17    no evidence is required?  That, in fact, once a threshold

18    fact which constitutes a material breach is found for

19    certain large categories of breaches, that then there is an

20    AMA?

21         MR. ROLLIN:  That is one of the issues I will

22    describe, and that is what I mean -- that there's no

23    independent evidence to establish AMA, to measure the

24    increased risk of loss, even if their standard is right --

25    even though these things are done in the industry and

Page 25

1    they're capable of doing it, and they didn't do it.

2            THE COURT:  Okay.

3            MR. ROLLIN:  Now, one thing we do agree on is that

4    the Trustees bear the burden of proof, and that burden looms

5    large in this case.  Because when you bear the burden of

6    proof, Your Honor, and you're looking at two inconsistent

7    pieces of evidence, it is your job to reconcile that

8    inconsistency.  And when you bear the burden of proof and

9    you have a piece of evidence that says it needs to be

10   independently verified to be relied upon, then what you have

11   to do when you bear the burden of proof is you have to

12   independently verify it.  And when you bear the burden of

13   proof and the question comes up, what did a borrower

14   disclose or not disclose in the course of filling out a loan

15   application or in that interaction, and you don't know, you

16   need to find that out.  That's what it means to bear the

17   burden of proof.  And as Your Honor saw so many times in

18   this case with the exemplar loans, that just didn't happen.

19           THE COURT:  But it's not enough to -- this is a

20   question -- it's not enough to shift the burden of proof

21   merely for the plan administrator to have come up with a

22   hypothesis, a hypothetical explanation for the inconsistency

23   in the file?  There was some -- there were some occasions in

24   which there was testimony presented by the plan

25   administrator that wasn't anchored in contrary proof but was

Page 26

1    anchored in an alternative hypothesis about what might have

2    happened with respect to occupancy or income and the like.

3         MR. ROLLIN:  I have two responses to that, Your

4    Honor.  One is there's an interesting portion in the

5    Trustees' brief where they talk about Mr. Trumpp and his

6    analysis, or as they put it, lack of analysis on certain

7    evidence in connection with the borrower -- and it may have

8    been -- I don't remember if it was the Stanley Steamer

9    borrower or one like that.

10        THE COURT:  Yeah.

11        MR. ROLLIN:  And what they -- what they say is

12   that Mr. Trumpp was hypothesizing.  Exactly what Your Honor

13   was concerned about.

14        THE COURT:  Right.

15        MR. ROLLIN:  But when you go back and you look at

16   Mr. Trumpp's testimony, what he's doing is he's actually

17   walking through the evidence.  And a comparison of what's

18   cited in the brief and how it's characterized, and what Mr.

19   Trumpp was actually doing -- remember, he was looking at the

20   hospital records and he was saying, oh, this person appears

21   to have been admitted on a stretcher in May of 2007, if I

22   remember correctly.  And the issue was, well, does that W2

23   show the full year income?

24        They say he's -- in that brief, he's

25   hypothesizing.  And, in fact, he's walking through evidence.

Page 27

1     So that's my first response to Your Honor's question, is

2     you've got to read, I think, the evidence very carefully and

3     deal with that as -- versus how it's characterized.

4               Secondly, the problem with the evidence in the

5     first place is it leaves so many holes.  So, yes, some

6     things could have happened.  The plan administrator, not

7     carrying a burden of proof, is not in a position to know

8     what happened in those evidentiary holes and so that's what

9     we've identified, is that there are evidentiary holes that

10    the party bearing the burden of proof would need to fill to

11    establish that, in fact, there was a breach.  That's the

12    issue around corroborative evidence.

13              We sought corroborative evidence not because you

14    have to have corroborative evidence to meet the burden of

15    proof necessarily; you could come with a single piece of

16    evidence that would be completely sufficient like a

17    deposition, as we did in the downstream cases, or other

18    forms of evidence that you can collect.  But when the

19    evidence is so flimsy, then you need corroboration to even

20    meet the standard.  And that's why there's this issue around

21    some hypothesizing.

22              THE COURT:  Okay.

23              MR. ROLLIN:  What -- I suppose this is a third

24    piece of that response, Your Honor.  What Mr. Morrow

25    testified to was that upon finding some evidence -- and this

1   was true both for him and for the Trustee's process -- upon

2   finding some evidence or an inference of a

3   misrepresentation, that would take the form of a claim and

4   it would be upon the plan administrator to disprove that.

5   And I do believe that's a burden shift.

6           It is -- the standard is not to come forward with

7   some piece of evidence, particularly where there are gaps in

8   the evidence and particularly where there's inconsistent

9   evidence.  Inconsistence evidence, by the way, which the QC

10  people wouldn't see because if it was considered at all, it

11  was considered in the black box of the loan review firms

12  about which even Mr. Aronoff couldn't testify what happened

13  at the loan review firms.  This is not the way the burden of

14  proof works.

15          Now, it may be the way counterparties to a

16  transaction interact with one another, and this did happen

17  historically between loan sellers and loan purchasers.  I

18  see there's a dispute with respect to this loan.  And they

19  open up a dialogue.  That's what these demand letters

20  between Aurora on the one hand and the sellers --

21          THE COURT:  Okay.  So you're getting to a point

22  that's of significant interest to me, which is how this

23  differs from the put-back process when everybody's still

24  alive and kicking.  Right?

25          MR. ROLLIN:  Sure.

```
1              THE COURT:  And what you're saying is that you

2     identify what I'll generically refer to as a problem,

3     something of interest, and it begins a dialogue about taking

4     back, putting back, etc.  And it feels that there's

5     something different about that process and this litigation.

6     Is that an accurate -- have I accurately stated your point?

7              MR. ROLLIN:  You have accurately stated -- that's

8     exactly right, Your Honor.  In the ordinary course -- I've

9     lived these cases now 11 years -- in the ordinary course,

10    when you have loan purchasers and loan sellers, they have

11    disputes about loans, and they go back and forth about the

12    loans, just like in the demand letters that were shown to

13    Mr. Trumpp.

14              And, yes, in those instances, Aurora, Lehman,

15    other counterparties would look at a piece of evidence like

16    the Trustees use here in order to initiate that dialogue.

17    Sometimes that resolved things; sometimes it didn't.

18              When it didn't and the parties went to litigation,

19    that wasn't the standard, and that certainly wasn't the

20    standard that Lehman applied.  You'll recall that Mr.

21    Shuster, in asking Mr. Trumpp questions on cross-

22    examination, showed him all of these examples.  And Ms.

23    Braswell then on redirect showed actually in those cases,

24    once it got past the pleading stage, the lawyers went out

25    and got evidence from primary sources in order to establish
```

Page 30

1    the actual facts and carry our burden of proof, whether it

2    was borrowers' depositions or affidavits.

3              Some of these affidavits, Your Honor, were a

4    couple of lines.  But we went out and found the borrower, we

5    got the person to swear under oath in an affidavit that they

6    didn't intend to occupy the property, or they didn't make as

7    much money, we offered that into evidence.  That's evidence.

8    That's evidence.

9              That's also consistent with Lehman and Aurora's

10   approach.  You'll recall, Your Honor, this document is a

11   2006 document from Aurora's files.  And what it talks about

12   is what did Aurora do in the ordinary course of business in

13   dealing with securitized loans?  And these very trusts or

14   trusts like them, for which it acted as the master servicer

15   and the servicer.

16             And once it got past the quality control level, if

17   there was a claim to be made, what Aurora did -- and Lehman

18   and Aurora were working together prepetition on these issues

19   -- was they would get evidence sufficient to carry their

20   burden of proof in court.  There's also a detailed

21   discussion of how we handled AMA in the ordinary course of

22   business.  This may be the only document in the case, by the

23   way, that actually shows what industry participants were

24   doing at the relevant time.

25             And I do want to pause on the distinction that

Page 31

1    Your Honor drew a little while ago because it also goes to

2    the question of pleading versus proving a claim.  It is one

3    thing to put your counterparty on notice of a claim, to

4    identify some evidence that a person with reasonable beliefs

5    indicates there was a breach of a representation and

6    warranty.  It is an entirely different thing to prove a case

7    with that type of information.

8            And I note in the Trustee's brief, they talk about

9    -- they said the types of evidence they use was used by

10   Lehman in the same manner.  I think that's the quote.  "In

11   the same manner." It was not used by Lehman in the same

12   manner; it was used by Lehman to open a dialogue, it was

13   used by Lehman to plead cases but it was not used by Lehman

14   to prove cases.  That's a fundamental distinction I think

15   that the Trustees missed.

16           In response to the burden-shifting point that

17   we've made throughout the course of the case, Your Honor,

18   the Trustees have done three things in their brief, all of

19   which constitute other forms of burden-shifting.  The first

20   thing they did was they set up sort of a straw burden.  They

21   say we acted as though we were requiring proof beyond a

22   reasonable doubt.

23           They say that we adopted their evidence.  And they

24   say that -- they've created sort of a presumption around the

25   issue of so-called liar loans.  And I want to take each of

Page 32

1    those things -- each of those things.  They are efforts to

2    shift the burden to the plan administrator once again.

3           The position taken by the Trustees with respect to

4    a straw higher burden comes from a statement that was made

5    by Mr. Esses.  He was recalling a conversation that he had

6    with Mr. Trumpp during the course of the protocol, and he

7    said that Mr. Trumpp said the evidence had to be conclusive.

8    That's not consistent with Mr. Trumpp's testimony on this

9    issue.

10          But aside from that, it's not consistent with the

11   evidence that we saw during the course of the case.  With

12   respect to the exemplars, the Trustees presumably, as Mr.

13   Cosenza said, brought exemplar loans that would be most

14   demonstrative of the quality of their process.  71,000 --

15   they could draw from 71,000 after the withdrawal of claims.

16   But all we saw was an evidentiary ping-pong match.  There's

17   something in the loan files for everybody.  They'd point to

18   something, we'd point to something, they'd point to

19   something, we'd point to something.  It's inconclusive

20   whether it was -- and not only inconclusive, but much of it

21   was subject to unfulfilled requirements that independently

22   verified the information.

23          That doesn't meet a preponderance of the evidence

24   standard, that doesn't tip the scales.  We weren't trying to

25   hold them to any higher standard than that.  And there were

Page 33

1    actually quite a number of passes in the protocol.  That's

2    where the approximately $300 million number comes from.

3    That's from passes.  If we were higher -- holding them to a

4    standard any higher than the preponderance of the evidence -

5    - and I think we were lenient on that at times -- that

6    number would be much lower and I think Mr. Trumpp testified

7    to that effect.

8             What really happened was that the Trustees failed

9    to meet the burden imposed by law both by giving -- both by

10   shifting the burden and also by giving too much weight to

11   evidence sources of questionable value and not enough weight

12   to either inconsistent evidence or evidence that was

13   actually contrary to the claim in the file, including the

14   loan application itself.

15            So, one of the things that the Trustees do again

16   in their brief is to say, look, it would've been impossible

17   for us to collect evidence from primary sources.  It would

18   take -- if we had to take depositions of borrowers, it would

19   take 24 years.

20            That is not even remotely our point.  Our point is

21   that the Trustees accuse tens of thousands of borrowers of

22   lying on their loan applications, but didn't contact even

23   one.  Didn't do that extra diligence to find out whether

24   that was true.  It's quite a remarkable accusation when you

25   think about it.  They come from this premise that borrowers

1    make misrepresentations and yet don't do some basic

2    diligence.  The tools for that exist.  It doesn't require

3    depositions of everybody; it doesn't -- there are much

4    easier means to go about at least testing the theory.

5            THE COURT:  What about in the extreme cases?

6    There are any number of charts that were presented on

7    breaches -- income breaches, and debt breaches, and DTI as

8    well, where you have, you know, 600 times -- you know, 600

9    percent misrepresentation or 600 times, you know, a DTI.

10   Certainly at the extremes, you're not suggesting that -- you

11   know, where there's smoke in those cases, there's probably

12   fire?

13           MR. ROLLIN:  Yeah.  No, not -- on the extremes,

14   not at all.  You still have to look at the individual case,

15   you still have to look at the evidence.  If they use BLS to

16   say that there's a 300 percent misrepresentation of income,

17   BLS is a -- not a useful piece of information on which to

18   draw any conclusion.  And so, sure, at the extremes, if

19   supported by evidence that Your Honor finds sufficiently

20   weighty, sure, okay -- there's no question about that.

21           The question is on a loan-by-loan basis, did the

22   Trustees find the right evidence source and do the diligence

23   to be able to reach that conclusion?

24           Your Honor, I spoke of several types of burden

25   shifting.  I want to talk about this one.  Maybe it's not a

1    burden shift but it's equally unusual.  Slide 19, please?

2    19.  One of the things the Trustees say in their brief is

3    that we've somehow adopted or accepted the evidence because

4    Mr. Trumpp testified using information from Mr. Aronoff's

5    charts.  And that's just an untenable proposition.

6          Mr. Trumpp -- and we have the chart that he was

7    referring to.  It's this one.  Here, what Mr. Trumpp is

8    saying is that Mr. Aronoff on the Trustee's case relies in

9    many, many instances, either on a single piece of evidence

10   or on a single type of evidence without any type of

11   corroboration from another source to triangulate around the

12   threshold facts and figure out if it's more likely than not

13   true.

14          This is in no way an endorsement of the

15   information.  And it's certainly not unusual for a party in

16   litigation to point to the other side's evidence to

17   demonstrate how weak it is.  That's what was going on here.

18   It is an incredible stretch for the Trustees to suggest that

19   by doing this or pointing to other pieces of evidence that

20   they've offered in demonstrating its weakness, that we

21   somehow endorse that.

22          And I don't know how you can go through the months

23   of trial and the years of exchanges in the protocol that

24   we've gone through and come away from that with the

25   conclusion that we somehow believe that the evidence is

Page 36

1    reliable or sufficient to carry the burden of proof.

2              THE COURT:  Okay, so let me make sure I understand

3    what you're saying.  I think this is an important point.

4    This is -- this is an Aronoff exhibit that summarizes

5    evidence types?

6              MR. ROLLIN:  This is a Trumpp exhibit assembled

7    from information provided by Aronoff.

8              THE COURT:  Right.  But the underlying exhibits

9    are Aronoff exhibits.

10             MR. ROLLIN:  That's right, yes.

11             THE COURT:  They are Mr. Aronoff -- they are

12   bucketings by Mr. Aronoff of types of claims, income debt,

13   employment occupancy that are separated out into here's the

14   type of evidence that the Trustees are relying on for these

15   claims?

16             MR. ROLLIN:  Exactly right.

17             THE COURT:  Okay.  So -- I mean, maybe this is for

18   me to take up with the Trustees but I have a hard time

19   understanding the statement that they're relying on.  What

20   Mr. Trumpp's point was, that was pointing out that according

21   to Mr. Aronoff, here's the support for these claims.  That's

22   it, right?  I mean, I'm just trying to understand this.

23             MR. ROLLIN:  That's it.  That's right.

24             THE COURT:  This has kind of mystified me from the

25   very beginning.  But you have no -- Mr. Trumpp nor any other

Page 37

1    plan administrator export -- expert has any basis...  So,

2    just to look at the first one where you're looking at income

3    claims, Mr. Trumpp is not saying that he independently has

4    verified and agrees with the fact that for 35 claims,

5    Accurint is cited in support of the claim?

6              MR. ROLLIN:  That's true.

7              THE COURT:  It's just -- right?

8              MR. ROLLIN:  It's just sorted from --

9              THE COURT:  It's just sorted from Mr. Aronoff.

10   It's just Mr. Aronoff's sorting?

11             MR. ROLLIN:  That's right.

12             THE COURT:  Okay.

13             MR. ROLLIN:  That's exactly right.

14             THE COURT:  All right.

15             MR. ROLLIN:  And, of course, Your Honor, there's

16   nothing about our presentation at any time in this case that

17   suggests that we think that this -- that these sources,

18   particularly when you're relying on one source, is adequate.

19             THE COURT:  These are one-source claims, right?

20             MR. ROLLIN:  That's right.

21             THE COURT:  These are -- each of these are one-

22   source claims.  So there's not -- where there's employment

23   evidence and occupancy evidence?  There's not both?

24             MR. ROLLIN:  That's correct.

25             THE COURT:  This is single-source support?

Page 38

1          MR. ROLLIN:  That's right.  That's exactly right.

2     Your Honor, as we've shown throughout the course of the

3     hearing, the third party sources that the Trustees rely upon

4     are particularly weak forms of proof.  We showed, for

5     example, that they have disclaimers and warnings.  They

6     don't know in some cases even the source of the information,

7     and they're certainly not vouching for it themselves.  They

8     say that it's to be independently verified before relied

9     upon.

10          It's true with respect to these.  The next slide

11     is Accurint.  It's also true with respect to credit reports.

12     I know Mr. Aronoff testified that there's -- credit reports

13     are used.  Of course, credit reports are commonly used, but

14     they're usually not used in isolation.  And, in any event,

15     the credit reporting agencies themselves acknowledge that

16     the information is not necessarily error-free.

17          THE COURT:  So, if I were to agree with you on

18     this point and effectively give effect to the legal

19     disclaimers, which would lead me to give no effect to the

20     use of this type of third party information that's

21     supporting the claim, would I be the first judge in the

22     history of put-back litigation to take that position?

23          MR. ROLLIN:  I can't answer that question.  I know

24     that there is an opinion that I believe that the Trustees

25     cite and what it says is -- and nothing more than this, and

Page 39

1    we agree with that -- is that these are admissible.  You can

2    consider them.  We agree that you can consider them.  We

3    considered them throughout the protocol.  There was no

4    evidence type -- and Mr. Trumpp testified about this -- that

5    we automatically dismissed.

6            Even BLS, we would consider it in the mix of the

7    information, and we would consider this in the mix of

8    information, but we would also do something that the

9    Trustees didn't do:  We would consider its -- the problems

10   with its reliability.

11           The Trustees take it as true.  Mr. Morrow

12   confirmed that.  I believe Mr. Aronoff confirmed it as well.

13   They take this as true, notwithstanding the caveats,

14   notwithstanding the disclaimer language, notwithstanding the

15   requirements that independently verify that the companies

16   themselves advise people of.

17           It's not only, by the way, the third party

18   sources, because even information within the loan files is

19   not necessarily conclusive of any particular fact and has to

20   be viewed in light of the entire mix of information.  We

21   talked about -- Mr. Cosenza spoke briefly about the fact

22   that the Trustees didn't verify income.  And he'll talk

23   further about the ramifications of that.  We also saw

24   instances where the Trust --

25           THE COURT:  I think you misspoke.  The Trustees

Page 40

1    did not determine actual income.  You said the Trustees

2    didn't verify income.

3              MAN 1: That's correct.

4              MR. ROLLIN:  Well, it started one way and then it

5    moved to something else.

6              THE COURT:  Right.  It morphed a little bit.

7              MR. ROLLIN:  That's right.  First, in their

8    initial slides, Mr. Esses said that they verified actual

9    income.  I don't think that held any water.  And so they

10   later said we weren't trying to verify actual income; we

11   were coming up with a referent or reference income in order

12   to create DTI calculations and tolerances.

13             THE COURT:  Yes.

14             MR. ROLLIN:  The Trustees -- we saw an instance or

15   two where there was a preexisting debt that was allegedly

16   undisclosed, but that debt had been closed by the time of

17   origination.  A very good example we saw was the VOE.

18   Remember the Employment Development Department where the

19   person wrote in their application that they were a senior

20   project manager of litigation?  This is a primary document

21   in the loan file that was misinterpreted.  And these are

22   just a few examples in the interest of time.

23             Now, Mr. Aronoff, by the way, on this one, after

24   quite a bit of discussion both with me and with Your Honor,

25   admitted that it was a mistake.  And, in fact, mistakes

Page 41

1    happen but that's not the headline here.  That mistakes

2    happen in a process like this is not the headline; the

3    headline is that the process wasn't designed to get down to

4    the actual threshold facts and then support them in court to

5    establish a breach of contract case.

6            The other issue I'll raise very briefly, again, in

7    the interest of time is this argument in the Trustees' brief

8    that these are liar loans.  That because they were

9    originated at a particular time, the borrowers necessarily

10   lied.  And they create -- this creates a false presumption

11   that we somehow need to get over that there are

12   misrepresentations in the loan applications.  And it really

13   reveals a key issue in the Trustees' process -- is that they

14   go into this thinking that there's a misrepresentation.  And

15   when you go into an analysis thinking there's a

16   misrepresentation, that's going to frame your view of

17   whatever evidence you might find in your third party sources

18   or when you find something in the loan file.

19           THE COURT:  What's your basis for characterizing

20   the Trustees' lens this way?  What's your basis for that?

21           MR. ROLLIN:  The Trustees talk in their -- I

22   believe the context in which they raise it is not giving any

23   credit to the loan application.

24           THE COURT:  Okay.

25           MR. ROLLIN:  On a presupposition that the loan

Page 42

1   applications are false.  There's zero record evidence for

2   that presupposition and it constitutes creating this

3   presumption and, again, this lens that infects the way they

4   look at the loan file and they look at the evidence that the

5   find in the third party sources.

6          We saw plenty of instances in the course of just

7   the few exemplars where the borrower hadn't made a

8   misrepresentation at all, the evidence was misinterpreted,

9   like the VOE, like the borrower -- you'll remember the

10  borrower that lived in Washington, D.C.  and was going to

11  move to Arizona.  And what was not in the claim package and

12  what was not shown to the witness was the letter from the

13  borrower's employer saying, acknowledging that the person

14  was moving to Arizona and it wouldn't affect his income.

15         There was the nurse -- there was a lot of

16  speculation by Mr. Aronoff about her credit card debt and

17  her bank account balance aren't consistent with somebody who

18  should -- who's earning what they say that they earned, and,

19  in fact, she was caring for elderly and ill parents in the

20  Philippines and her high-school aged brother.

21         There was the gentleman who had the HVAC business

22  and there was the question about how did he know what, off

23  of his Schedule C he was supposed to write on the loan

24  application?  Holding regular people to a standard that

25  they're supposed to somehow understand exactly what Mr.

Page 43

1   Aronoff thinks they were supposed to write down.

2          There's no evidence that these people are liars or

3   made misrepresentations at all.  There's evidence that the

4   Trustees interpret documents in a certain way and they

5   interpret them as being misrepresentations.  By the way,

6   those last three, those are Trustee exemplars -- those last

7   three examples:  The nurse, the HVAC, and the person who

8   moved to Arizona.

9          Your Honor, there's this narrative that we've

10  identified isolated mistakes.  There's no evidence that

11  these are isolated mistakes.  There's no evidence -- the

12  narrative is these are isolated mistakes and, therefore,

13  everything else in Mr. Aronoff's charts are true and you

14  shouldn't allow a claim based on all of that.  But there's

15  no evidence beyond that.

16         What you saw where the exemplars, and even the

17  Trustees' exemplars demonstrated flaws, deep flaws in their

18  process in the way they went about doing this analysis.

19         Once you get past the threshold facts you have to

20  deal with the breach analysis, and I'm going to skip over

21  this as much as I possibly can to move along.  But when you

22  do the breach analysis you have to read the words in the

23  representation and warranty.  For the no-default and the no-

24  fraud reps which deal with the Big Four, you have to read

25  the word materiality and you have to give it some

Page 44

1    application.  You have to read in the no-fraud rep the

2    requirement to prove seller's knowledge.

3          But instead of doing that, they rename it.  They

4    don't want to call it the no-fraud rep anymore; they want to

5    call it the no-untrue statement rep so they can separate

6    out, surgically cut out the last sentence of the

7    representation and warranty that says that you need to show

8    seller knowledge.

9          On the question of materiality, just to focus on

10   this, Mr. Esses testified that the credit decision is guided

11   by the underwriting guidelines and by the product profiles.

12   Those are the documents that tell underwriters when to

13   approve a loan and on what terms.  And yet, he also

14   testified that the Trustees did not review the underwriting

15   guidelines or the product profiles in connection with making

16   their materiality decisions.  That's a critical omission.

17   That's -- those are the documents that matter in that

18   determination.

19          Now, they did review with respect to three trusts

20   but only with respect to underwriting claims, most of which

21   have been withdrawn.  But even then, as he conceded, they

22   used the wrong set of guidelines.

23          Moving on to AMA.

24          THE COURT:  Moving on to what?

25          MR. ROLLIN:  AMA.  I'll do this as quickly as I

Page 45

1    can, Your Honor.  There are three issues I'll touch on.  The

2    first is the parties just read the provision in the contract

3    very differently.  The second, the law -- the parties read

4    the law very differently.  And, third, I believe the

5    Trustees don't consider the applicable commercial context.

6    And this goes to whole loans and securitized loans, and I'll

7    hit each of those topics.

8            One of the things the Trustees did very little of

9    during the course of the case is talk about the specific

10   language of the AMA provision.  They talked a lot about what

11   they thought it meant but not what it said.  And I want --

12   there are a number of issues, interpretive issues, but I

13   really just want to focus on two.

14           The first one is that under a plain reading of the

15   contract, the finding of a breach is separate from the

16   finding of AMA.  That's what Judge Castel found, and that's

17   just obvious from --

18           THE COURT:  Well, Mr. Aronoff said he was wrong.

19   Did he not?

20           MR. ROLLIN:  Mr. Aronoff believes that the judge

21   is wrong on that.  But if you don't want to rely on Judge

22   Castel you don't have to because you can just look at the

23   language.  It says breach, that adversely and materially

24   affects the value of the loan.  If the drafters didn't want

25   to have a separate consideration of AMA they could've just

Page 46

1    struck that and that's effectively what Mr. Aronoff does in

2    his analysis.

3           There was a point in time, Your Honor, in the case

4    where you asked Mr. Aronoff something and he -- and you

5    said, are you talking about materiality of the breach or are

6    you talking about AMA?  And I was on the edge of my seat.  I

7    couldn't wait to hear the answer to this question because

8    it's been conflated and merged throughout.  This was true at

9    the beginning of the protocol, through the protocol, and

10   through this entire case.

11          THE COURT:  So what was his answer?

12          MR. ROLLIN:  I think he said AMA.  I think he said

13   it was AMA in that instance.  But it didn't really matter

14   because they mean the same thing.  That they mean the same

15   thing is actually reiterated in the Trustees' most recent

16   brief.  There's a section where they talk about -- Page 20,

17   they talk about what is breach level materiality.  And they

18   talk about it going to the credit risk of the loan.

19          And then they drop a footnote, 17, and they say

20   credit risk goes to AMA, also.  That's exactly right.  They

21   interpret them to mean the same thing, even though the

22   drafters of the contract have them as different things.

23          Now, the second interpretive problem goes to

24   timing, the timing of the AMA analysis.  As we've talked

25   about, the word affects is in the present tense.  Does the

Page 47

1   breach adversely and materially affect upon discovery --

2   right at the beginning of the sentence...  At the beginning

3   of the AMA provision it says upon discovery, and then it

4   says affects.  That's the drafter's tie -- the present tense

5   affects to the period of time upon discovery, which is

6   sometimes months or years after origination.  But they -- if

7   the drafters wanted it to go back to the time of

8   origination, which is what Mr. Aronoff and Mr. Morrow said

9   they were supposed to do, it should've said affected or it

10  should've said at the time of origination or at the time of

11  securitization, and it doesn't say those things.

12         And so by reading it in that way, the Trustees

13  omit from their analysis all of the intervening events that

14  affect the value of the loan, and they importantly affect --

15  omit the importance of loan seasoning.  Mr. Castro cited to

16  credit rating agencies -- talks about how important loan

17  seasoning is to predicting future performance, such that

18  once you're past 18 months or so, the original refs are

19  significantly of less value in determining the future

20  performance of the loan.

21         And, frankly, those interpretive errors are

22  dispositive on the issue of whether the Trustees have

23  submitted proof to establish AMA.  If you misread by

24  conflation or you misread by doing the analysis at the wrong

25  time, that demonstrates the failure of the Trustee's proof.

1          THE COURT:  Is it the plan administrator's

2     position that if I were to disagree with you on how to

3     determine threshold facts and material breaches, and to find

4     that based on some combination of the exemplar loans, the

5     robust process, and using the charts and the calculator,

6     that they have, in fact, established every single material

7     breach, right -- you would say, nonetheless, they still lose

8     because their AMA analysis was entirely flawed?  Is that

9     true?

10          MR. ROLLIN:  Yeah.  That's true.  Now, I suppose -

11     - you talk about individual loans and the detail but, again,

12     it's still loan-specific.  But in terms of what evidence

13     have they produced --

14          THE COURT:  But that's my point exactly.  My point

15     exactly is that if I were to find that they -- that they

16     have carried their burden of proof with respect to breach,

17     you would nonetheless say that they haven't carried their

18     burden of proof with respect to AMA because the entirety of

19     their AMA case is material breach equals AMA?

20          MR. ROLLIN:  With two exceptions.

21          THE COURT:  Okay.

22          MR. ROLLIN:  One, loans that the plan

23     administrator has already approved within the 300 million.

24          THE COURT:  Right.  And deemed AMA?

25          MR. ROLLIN:  And two -- and deemed AMA.  That's

1    right.

2              THE COURT:  Actual deemed AMA?

3              MR. ROLLIN:  That's right.  That's exactly right.

4    Now, Your Honor, the reason that the Trustees didn't apply

5    the right standard is because they drew it for monoline

6    cases.  I'll speak briefly about the monoline cases and why

7    they don't apply here.

8              In the monoline cases, the protection that's

9    afforded to insurers is rooted in New York insurance law.

10   In MBAI v. Countrywide and other cases, the courts concluded

11   that monoline insurance had a statutory right under the NYIL

12   to accurate disclosures from the loan seller.

13             By the way, that standard has been carved back

14   quite a bit in subsequent cases.  Those are early monoline

15   cases wrestling with this issue.

16             By the way, that standard has been carved back

17   quite a bit in subsequent cases.  Those are early Monoline

18   cases wrestling with this issue in the first place, since

19   the laws are somewhat all over the place.

20             Importantly, in Syncora Guarantee v. EMC, the

21   Court said that insurers have a legally distinct interest

22   from investors or trustees.  But the Trustees, at no time,

23   have explained how that legally distinct interest should be

24   imported into this case.

25             Now, there are some non-Monoline cases that the

Page 50

1    Trustees cite that apply a risk of loss standard, but none

2    of those courts have wrestled with this issue.  They've not

3    analyzed the insurance law origins of the risk of loss;

4    they've not considered the legally distinct interest;

5    they've not explained how you can bring 3105 and 3106 of the

6    Insurance Law into a non-insurance context.  I call that

7    Monoline creep.

8            THE COURT:  Monoline creep.

9            MR. ROLLIN:  That the Monoline case law has crept

10   into non-Monoline cases, which out explanation.

11           THE COURT:  Sounds like a horror movie, the

12   Monoline creep.

13           MR. ROLLIN:  We'll see.  But here's what -- I want

14   to take a step back about this Monoline issue because I

15   think it's important, Your Honor.  In 2014, the Trustees

16   were presented with the opportunity to settle another large

17   RMBS case; this one was with J.P. Morgan across hundreds of

18   trusts.

19           And on the one hand, they had investors who were

20   saying, risk of loss, risk of loss, the standard is risk of

21   loss.  And on the other hand, they were dealing with banks

22   who were saying, no, you have to prove that there was a

23   strict default; there's a strict default requirement.  And,

24   by the way, they suggest that we hold them to a strict

25   default requirement, which we do not.

Page 51

1           But that was the situation the Trustees were

2    presented with when they went to settle this case with J.P.

3    Morgan.  And so what they did was they went to a respected

4    jurist, Judge Carpinello, and they asked him, what do we do

5    under New York law with these competing views?

6           And he issued a report to the same Trustees -- and

7    he, by the way, was hired in this case to evaluate the 2015

8    settlement.  And what he told them was, the banks are wrong.

9    It is not a strict default standard, but it does -- there

10   has to be some proximate causation to a harm or damage.

11          But importantly, what he said was, the investors

12   are wrong too.  It's not risk of loss.  Risk of loss applies

13   to Monolines, not in a non-Monoline context.  And that's the

14   opinion that they had; that's the opinion they submitted to

15   Justice Friedman in the Commercial Division to have that

16   settlement approved.  And that's the information they had

17   when they came to this case.

18          But instead of taking that same position, the

19   position they took was the investor's position -- risk of

20   loss, risk of loss, risk of loss -- and try to convince Your

21   Honor that that's the standard under which you should decide

22   this case.

23          Now, briefly, about whole loans and securitized

24   loans.  There's been a lot of talk about the distinction

25   between the two of them.  What Lehman has done in its

Page 52

1    downstream cases when it held whole loans, and how the

2    question of AMA should be analyzed with respect to

3    securitized loans.

4            And according to the Trustees, a loan is a loan is

5    a loan and it doesn't matter.  But the truth is, a loan is a

6    way of making an investment; it has a commercial purpose.

7    And so, when a loan is a whole loan, it has a price because

8    you're trading it.  And different things -- lots of

9    different things affect its price or its value.

10           You could even see that in Dr. Elson's model; 55

11   different inputs affect price.  One or two maybe related to

12   breach; lots relate to other market factors and supply and

13   demand and things like that.  But in a whole loan context,

14   you can measure a price and you can measure its diminution

15   in value by virtue of breaches and anything else.

16           The securitized loan can't be sold.  The Trustees

17   can't sell a securitized loan, it would violate the IRS

18   Code.  Even Dr. Elson conceded there's no market for these

19   loans.  Its value isn't measured in a price.  Its value is

20   measured in its ability to produce cash; that's what

21   investors want out of it -- produce cash.  And the longer it

22   performs, the more cash it produces, particularly in

23   interest.

24           And so, they are different, and the estate has

25   always treated them and recognized that difference.

Page 53

1              THE COURT:  But wouldn't the Trustees say that

2       you're exactly right.  And that a borrower who has massively

3       misrepresented income or debt is far less likely to repay

4       the loan, which means that the cash flow on which the

5       certificate holders are relying, is less certain.  So they

6       would say, you've conceded their point.  Isn't that what

7       they would say in response to that?

8              MR. ROLLIN:  Well, that turns on adopting a risk

9       of loss approach to the question in the first place.  The

10      point is, and Mr. Castro makes this point, that the longer a

11      loan performs, the more value investors get out of it.  And

12      so, maybe you have an increased risk of loss, but we don't

13      believe that's the right standard.  But even if you had an

14      increased risk of loss, something that happens in the

15      future, that's not the role of it.

16             THE COURT:  Well, but then we get back to the

17      point in time at which you should determine it.  Because

18      they would say that if you're taking your slice at

19      origination, the future is irrelevant.  You say under the

20      governing documents, you're not looking at the slice -- the

21      snapshot, rather, at origination; you're looking at the

22      moment the conversation around the potential default begins,

23      right?

24             MR. ROLLIN:  And not only under the governing

25      documents, Your Honor, but under the commercial practice of

Page 54

1    the party.  One of the things we cite, I think it's in our

2    brief, is in 2011 when we had an objection hearing in front

3    of Judge Peck, one of the things that counsel for the

4    Trustees, one of the points that they made is why would we

5    take a performing loan out of a trust and look to see

6    whether there's a defect; it's producing cash.

7            So it's not just how you read the contract; it's

8    how the parties actually act in the commercial reality in

9    which these loans live.

10           Even assuming a risk of loss standard applied,

11   there's no proof that there was a significant increase in

12   the risk of loss, which is the standard that the Trustees

13   say applies, or that there would be any price change and

14   certainly not by the breach.  As I said, many factors -- and

15   there's testimony in Mr. O'Driscoll's designations that

16   we'll submit to you.

17           THE COURT:  I was going to say that.

18           MR. ROLLIN:  They're coming.

19           THE COURT:  Still coming, okay.

20           MR. ROLLIN:  They're still coming.  That many

21   factors affect the risk of loss.  We start with a baseline

22   risk, and then you have to measure it to determine whether

23   or not there's been an increase that's sufficient to trigger

24   AMA, even under their theory.

25           And I -- Mr. Castro describes in his report the

1    fact that you have to consider lots of factors, that there

2    are models to do this.  And one of the things the Trustees

3    said was, this is -- Mr. O'Driscoll called it a castle in

4    the sky.  It's imposs- -- it's would be impossible to ever

5    pursue a repurchase claim if you had to consider many

6    factors that could lead to an increased risk of loss, and

7    then measure the difference between the baseline and the

8    revised breach base risk of loss, and that fell apart in

9    deposition.

10              And I'm going to apologize in advance.  We have a

11   clip of Mr. O'Driscoll that Your Honor has not had the

12   opportunity to see.  And I'd like to show it because it

13   bears directly on this issue of the Trustees have the tools

14   to quantify a risk of loss and failing to do so.

15              [VIDEO PLAYS]

16              Q    And you write Eisner, all that Mr. Castro has

17   created a test that (indiscernible) cannot be passed, right?

18              A    Yes.

19              Q    There's no methodology that could apply a

20   multifactor test to quantify the risk of loss.

21              MAN 1:  Objection to form.

22              A    You know, tests I've ever been in all the

23   time, but not in the context of this industry.

24              Q    What's this industry?

25              A    The industry during the relevant period over

Page 56

1    which purchased loans in bulk and securitized.

2            Q    So when are tests like that done all the

3    time?

4            A    If I got a test like that be done all the

5    time.

6            Q    You just testified no tests like that are

7    done all the time, but not in the context of this industry.

8            A    Maybe if there is a test like that, why don't

9    (indiscernible) them.

10           Q    In what context?

11           A    In the context of evaluating the performance

12   of other (indiscernible).

13           Q    And you quantify the risk of loss in

14   different scenarios, don't you?

15           A    That's hard to generalize, but some would,

16   some would not.

17           Q    Meaning some firms would and some firms would

18   not.

19           A    Yes.

20           Q    What's in (indiscernible).

21           MAN 1:  Objection, calls for speculation.

22           A    It's certainly possible.

23           Q    Not only possible, it has been done in your

24   experience.

25           A    It's been done for -- it is a tool that is

Page 57

1    used for (indiscernible), yes (indiscernible).

2            Q    So the answer is yes.  It's not only

3    possible, but it has been done in your experience.

4            (indiscernible)

5                      Q    You performed a multifactor

6    analysis to estimate attempt to quantify the risk of loss in

7    your different scenarios, right?

8            MAN 1:  Objection to form (indiscernible), vague,

9    ambiguous, (indiscernible).

10           A    One can and people do built models to

11   quantify the risk of loss far more (indiscernible).

12           Q    How's the risk of loss (indiscernible).  In

13   fact, you can and have built models to quantify the risk of

14   loss in mortgage (indiscernible) case, haven't you?

15           A    Yeah.

16           Q    Have you been involved in the construction of

17   such models?

18           A    Yes.

19           Q    In what role?

20           A    In working with our public asset backed

21   securities research teams, who built a model to quantify

22   losses for -- that investors did produce as a tool to

23   evaluate our investors.

24           Q    It's evaluated loss of line it is.

25           A    Yes.

1              [VIDEO ENDS]

2              MR. ROLLIN:  Your Honor doesn't have to pick a

3    standard; they haven't met their own standard.  They can do

4    it; they didn't do it.  Your Honor, that concludes AMA.  I

5    have a brief discussion on-hold loans.

6              THE COURT:  Okay.

7              MR. ROLLIN:  All right, on AMA and a very brief

8    on-hold loans.

9              Your Honor, as we explain in detail in our brief

10   and it's some -- as we went over at some length with Mr.

11   Esses, there is a group of loans that were set aside as

12   incomplete because they were missing one of four -- one or

13   more, four critical documents to the plan administrator's

14   review: servicing notes, payment history, loss

15   certifications, and corporate expenses.

16             When the Trustees submitted partial filings during

17   the protocol, the plan administrator had to make a decision:

18   were we going to expend resources on doing a partial review

19   of a loan; or were we going to set those aside and then do a

20   full review of the loan, if and when the Trustees produced

21   all of the necessary documents?  So we decide to do the

22   latter, put in on hold, and save the resources for -- and be

23   more efficient in that regard.

24             As we've talked about the four critical documents,

25   two of them go very much to AMA, the servicing notes and the

Page 59

1    payment histories are view of AMA, of course, and two of

2    them go to being able to validate the damages numbers.  You

3    remember, Mr. Esses testified that the Trustees didn't

4    validate any of the damages numbers that they got from the

5    servicers at all; they just copied them from one spreadsheet

6    into another one.  And so, the plan administrator wanted to

7    be in a position to audit those numbers and insisted upon

8    those documents.

9           We only required four out of the 41 in the

10   protocol.  Those were all documents that -- or information

11   that the servicers keep in the ordinary course of business.

12   Mr. Esses had to ultimately acknowledge that this is the

13   type of information that servicers keep.

14          Mr. Burnett, the servicing expert who was also

15   taken off of the list, confirmed that as well based on his

16   servicing experience, and you'll see that in the

17   designations.

18          Your Honor offered your own assistance to the

19   Trustees -- they didn't take it -- in getting these

20   documents.  They didn't send subpoenas.  In two instances, I

21   think, where they did send subpoenas for origination

22   records, those subpoenas were very effective.  And I think

23   sending subpoenas would have been effective to obtain the

24   information from the servicers as well, but that's not what

25   they chose to do.  And so, the parties placed those loans on

Page 60

1    hold, and you may remember, by agreement.

2            We would now ask -- we certainly think it's not

3    reasonable for the Trustees to suggest that all of those

4    claims are valid and should become valid claims.  Because

5    they weren't reviewed particularly under those

6    circumstances, we would actually ask the opposite.

7            The Trustees didn't comply with the terms of the

8    protocol in terms of what they needed to produce; they

9    didn't follow the procedures that were available for them to

10   follow; and we'd ask that those be disallowed.

11           I'll turn it back over to Mr. Cosenza.

12           THE COURT:  Thank you.

13           MR. ROLLIN:  Thank you, Your Honor.

14           THE COURT:  Let me ask.  I'm fine to keep going.

15   But would folks like to take a brief break?  I'm getting a

16   yes from this person sitting right below me.  I won't cut

17   you off at 2:30.

18           MR. COSENZA:  I'm find with taking, if you need a

19   break.  I'm ready to go, whatever.

20           THE COURT:  Okay.  Would you like a break?  Sure.

21           MR. COSENZA:  Okay.  That'd be great, Your Honor.

22           THE COURT:  Let's take a 10-minute break for

23   everyone's comfort, and we'll resume at 2:00.  All right?

24           MR. COSENZA:  Sure.

25           THE COURT:  And if it goes a little off, we'll

Page 61

1    repay the favor tomorrow.  All right?

2         [BREAK]

3              THE COURT:  I got detained by a Monoline creep.

4    That is definitely going to be my Halloween costume next

5    year.

6              MR. ROLLIN:  You're welcome, Your Honor.

7              THE COURT:  Who's that, Mr. Rollins?  Well, maybe

8    Mr. Shuster can come up with something equally pithy

9    tomorrow.

10             MR. COSENZA:  Knowing him, he will.

11             THE COURT:  And just let me say that we'll be very

12   happy to have -- that the circumstances are such that we're

13   going to have Mr. Shuster back with us tomorrow.  Okay, Mr.

14   Cosenza.

15             MR. COSENZA:  Okay.  Thank you, Your Honor.

16             Your Honor, while the parties disagree on many

17   things about the record in this case and the nature and the

18   validity of the Trustees' claims during the protocol, there

19   is one issue on which both sides agree.  The Trustees made

20   no attempts to establish a nexus between the breach claims

21   they submitted to the protocol and the losses on the loans

22   that they sought to recover as damages for their claims.

23             Mr. Esses made this point very clear during his

24   trial testimony, and here's the relevant excerpt.  He was

25   asked:

Page 62

1          Q    On losses to the trust on account of any of

2     these loans could be caused by something completely

3     unrelated to any conduct of a debtor, right?

4          A    It's possible, yes.

5               You don't know that.

6          A    I don't know that.

7          Q    It wasn't part of the Trustees' process to

8     find that out.

9          A    That is correct.

10         Q    And yet, you asked the Lehman estate to

11    compensate the trust for all the losses, right?

12         A    Yes.

13              MR. COSENZA:  So what does this mean in the

14    context of what's been going on in these proceedings?  This

15    has been an issue that hasn't been fully discussed before

16    Your Honor, but I think there are origins in this case that

17    we did back in 2014.

18              It means that the Trustees are asking the Court to

19    order the estate to pay them for damages that Lehman did not

20    cause.  And, Your Honor, whether viewed under the

21    perspective of AMA or from under the MLSAAs or under black

22    letter law, the Trustees may not avoid the requirement that

23    governs every breach of contract case.  A plaintiff must

24    establish some nexus between the breach and the claim

25    losses.

Page 63

1           During trial, the Court heard a number of

2    hypotheticals that were posed to Mr. Aronoff and other

3    Trustee witnesses that made crystal clear that the Trustees

4    would assert breach claims for the full purchase price, even

5    if the evidence clearly demonstrated that the breach did not

6    cause any loss.

7           I won't repeat all of those here, but I just want

8    to emphasize that the absence of this nexus is not a

9    hypothetical problem.  The Court heard examples of borrowers

10   who were unable to meet their loan obligations for reasons

11   undeniably unconnected to the loan application.  The

12   employee who developed cancer; the wife and the baker in New

13   Hampshire whose husband passed away and wasn't able to make

14   the monthly payment -- that's an active loan, by the way;

15   and the real estate agent whose business collapsed, just to

16   name a few.

17          But the implication of the Trustees' positions

18   were far reaching and not limited to circumstances that

19   involved unfortunate life events of borrowers.  For example,

20   the Trustees submitted tens of thousands of missing document

21   claims that they say entitled them to recover the full

22   purchase price of the loan.  If the Trustees could not find

23   an appraisal in the file, the Trustees would bring a claim

24   in the full purchase price of the loan.  If the appraisal is

25   missing pictures, we heard testimony, the Trustees would

Page 64

1    bring a claim for the full purchase price of the loan.  If

2    the Trustees could not find a truth in lending verification

3    or a HUD-1 form in the file, again, the Trustees would bring

4    a claim for the full purchase price of the loan.

5            It's hard to imagine that missing appraisals or

6    tills or HUD-1 disclosures had much to do with causing the

7    losses on any significant number of these loans.

8            In short, the evidence at trial demonstrate that

9    the Trustees' position that there be no nexus led them to

10   submit untold tens of thousands of breach claims in the

11   protocol.  The Trustees now ask the Court to allow them to

12   collect damages under a rejected contract in bankruptcy

13   without any proof of a nexus between the claim breaches and

14   the asserted losses.

15           THE COURT:  So let's stop and focus on this

16   because this is -- I think this is an important point.  Does

17   the plan administrator believe that there should be a

18   different analysis leading to a different result here

19   because we're in a bankruptcy, then if this were being

20   conducted outside of the bankruptcy?

21           And I'm not talking about the points around post-

22   rejection interest and post-confirmation interest.  I'm

23   merely talking about the construct of a rejected contract,

24   right, is deemed a breached contract.

25           MR. COSENZA:  Yup.

Page 65

1           THE COURT:  And in bankruptcy, you're entitled to

2    assert prepetition -- it's deemed a prepetition breach, et

3    cetera, et cetera.  You're all familiar with it.

4           So should this putback litigation, should this

5    lead to a different result under a different analytical

6    framework on that point because it's here versus elsewhere?

7    Also, putting aside the fact that the claim's going to be

8    paid in bankruptcy dollars versus hundred-cent dollars,

9    which absolutely has no bearing on it.

10          I mean, just to be clear, and I don't think the

11   Trustees dispute this.  The fact that what we are driving

12   towards is an allowed claim, as opposed to a hundred-cent

13   dollar cash price, has no bearing.  You don't get to gross

14   up your claim because you're not getting paid in one-hundred

15   cent dollars.  But just on the question of the bankruptcy

16   framework, shouldn't I come to the same result -- should I

17   or should I not come to the same result that I would if I

18   were sitting at some other -- in some other court.

19          MR. COSENZA:  So, Your Honor, I have a twofold

20   response.  I think the answer is yes, you would come to the

21   same result.  I think there's an additional issue here in

22   terms of the equities, in terms of a lot of the cases that

23   have been cited by the Trustees really talk about situations

24   where they're trying to use the purchase price as a proxy

25   for damages is because those loans had defaulted, and you

Page 66

1    can't really use the repurchase remedy.  And they basically

2    say, well, we're going to enforce it basically as a super-

3    performance using the proxy of the purchase price.

4           THE COURT:  Right, it's a proxy, right.

5           MR. COSENZA:  And part of that rationale is they

6    want to want to make depositors do not act in that manner,

7    and to make sure that they are held accountable for their

8    misconduct.

9           And in this case, you know, that's an equitable

10   consideration that should be held against Lehman because

11   Lehman doesn't exist anymore.  We're just the plan

12   administrator acting on behalf of all creditors.  So that

13   equitable consideration that was considered in those other

14   cases to enhance the remedy against the depositor and the

15   sponsors; that's not a factor that should be used against

16   us.

17          So I think as -- my point is, it's the same legal

18   framework.  I just don't think, you know, that there's

19   equities to be considered here.  And I think why I'm

20   bringing up this issue of nexus in the context of the

21   equities is that there's this gaping hole in the evidence

22   that's never been presented.

23          And it just, based on how things were set up in

24   the frame -- in the protocol in 2014, there was an

25   understanding, as we described to Mr. Trumpp's slides, that

Page 67

1    there would be some level of evidence here to try to cause a

2    link between the breach and the harm that they're seeking to

3    -- that the Trustees are seeking to be compensated for.  And

4    here, there was just an absence of proof.

5              And, frankly, Your Honor, I understand what

6    happened in the protocol, but they doubled and tripled down

7    on that approach.  During expert discovery and also during

8    trial, they never put any witness on to explain this and how

9    this works and why they're not getting a windfall; they just

10   said, we just get the full purchase price.

11             So there are many, I think, levels to this.  And,

12   frankly, we've struggled in trying to articulate this to you

13   because it's purely a legal issue in some sense, so you

14   can't explain it during much of the testimony.

15             THE COURT:  Testimony, right.

16             MR. COSENZA:  But that's, and I think we've tried

17   to cover this in a little bit more detail in our brief and

18   I'm happy to have this colloquy with you.  But that's how I

19   think -- why it's important in this context to consider that

20   Lehman doesn't exist anymore.  And, you know, to punish or

21   to hold Lehman accountable is -- you know, the way the other

22   courts have held depositors and sponsors just doesn't make

23   sense here.

24             THE COURT:  Okay.

25             MR. COSENZA:  So, Your Honor, moving on, I think -

Page 68

1   - by the way, your question, I expect through the next few

2   points in my outline, so moving on.

3              THE COURT:  All right.

4              MR. COSENZA:  I'm trying to be fast.  I'm going to

5   move on to the drawn loans and claims.

6              THE COURT:  Sure.

7              MR. COSENZA:  Excuse me, withdrawn loans.  In

8   addition to all the problems with the Trustees' process and

9   the claims they submitted during the protocol that we have

10  discussed earlier, when expert's reports were issued in this

11  case, the Trustees abandon 15,107 loans and 72,088 claims

12  that were put through the protocol.

13             This represented approximately 40 percent of the

14  claims the Trustees submitted to the plan administrator for

15  review and analysis.  The Trustees withdrew these loans and

16  claims without any notice or explanation and left it to the

17  plan administrator to figure out that the Trustees were no

18  longer pursuing these loans and claims based on their expert

19  submissions on June 1, 2017.

20             As the Court is aware, when the plan administrator

21  asked for an explanation for the dropped claims back in July

22  of 2017, the Trustees cloaked that decision in privilege.

23  And this -- here's the letter the Trustees sent to us about

24  that decision.

25             The Trustees maintained this position through

Page 69

1    trial, and none of their witnesses testified about the

2    withdrawn loans and claims.  The Trustees asserted in their

3    pretrial brief that they withdrew these claims to streamline

4    their case.  But that rationale does not pass muster, and it

5    does not answer the question of how their process could have

6    generated so many claims that were so easily dropped.

7            Mr. Grice compared the loans the Trustees withdrew

8    with the loans that remained at issue.  He could not

9    distinguish meaningful differences between the two groups

10   and could not determine why the Trustees withdrew the loans

11   they did.  This is a slide, Your Honor, as part of Mr.

12   Grice's report.  And as Your Honor can see, the Trustees

13   withdrew claims across all major categories and continued to

14   pursue 31 categories of breaches.  So there's no

15   streamlining of this proceeding through the withdrawal of

16   the claims.

17           Despite the Trustees shrouding this highly

18   material decision in secrecy, the plan administrator did the

19   best it could through Mr. Grice to address the significance

20   and implication of that decision.

21           Your Honor, I'm not going to walk through the

22   details of this, but you may recall this slide from Mr.

23   Grice's testimony.  The slide shows that there are 1,977

24   till claims that were withdrawn.  And based on Mr. Grice's

25   audit, there was no way for him to discern a difference

1    between the loans that remain in the case and the loans that

2    were withdrawn by the Trustees.

3            Mr. Grice also testified that he did not

4    understand why 20 percent were withdrawn and not 100

5    percent.  And during his examination, Mr. Grice was asked

6    the following question about whether he could opine on a

7    process where 40 percent of the claims were withdrawn.  And

8    Mr. Grice testified, it's hard to imagine how.

9            Mr. Grice further testified that the impact of the

10   Trustees' withdrawal of 40 percent of the breach claims and

11   what it tells him about the breach claim process.  He

12   testified, obviously, that it's unreliable in the sense that

13   it's changing.

14           So what do the Trustees say about this in their

15   post-trial brief?

16           THE COURT:  What about the -- I mean, I do recall

17   the Trustees' argument on this point.  Which was basically

18   that all of the breach claims in the original submission fit

19   the target if we're playing darts.  They all the target,

20   right?  But that what they merely elected to do was to

21   concentrate on the bullseyes and the next area out.  I'm not

22   familiar with darts.

23           But the point is that they -- I think they were

24   trying to make was, look, all these claims are good and

25   we're just going to focus on those that are great.  So why

1   shouldn't I accept -- and I think that's their argument.

2            MR. COSENZA:  Yeah.

3            THE COURT:  I'm sure Mr. Shuster will correct me

4   if I got that wrong.  So why shouldn't I accept that as an

5   adequate explanation?

6            MR. COSENZA:  So, Your Honor, as we saw in those

7   charts, they withdrew the claims across all the categories.

8   The ones that remain in the case are not different than the

9   ones that were pulled out; it's the result of a flawed

10  process.  We've continually asked for an explanation from

11  the Trustees, and they cloaked it in privilege.

12           So moving on, that's why I think just this idea of

13  just them pulling out ones that they through were not in the

14  bullseye, you know, from our perspective doesn't make any

15  sense.  Because when you have a process that was set up in

16  the way it was set up by the Trustees, to just disavow that

17  many numb- -- 40 percent of the claims and say, oh yes, we

18  got it right now, without understanding what they did and

19  how they did and cloaking it in privilege, to us, just

20  simply doesn't make any sense.

21           And, Your Honor, they actually turned -- the

22  Trustees --

23           THE COURT:  Can you remind of the level of Mr.

24  Aronoff's knowledge?  Mr. Aronoff just knew that he was to

25  work with those claims that were left, right?

Page 72

1           MR. COSENZA:  That's my understanding, correct.

2           THE COURT:  So he came into the picture post-

3    withdrawal of those claims.  So he did not have any -- he

4    was not asked to, nor did he himself have any insight into

5    what was withdrawn, correct?

6           MR. COSENZA:  That's correct, Your Honor.  So,

7    Your Honor, I think I do want to hit on this very quickly,

8    jumping around the comment that was in the Trustees' post-

9    trial brief.  And they say, there is simply no competent

10   evidence to support the conclusion that the -- that because

11   some claims were withdrawn, the process or the remaining

12   claims are invalid.

13          This completely turns the obvious implications of

14   this massive abandonment of so many claims from the loan

15   review process on its head.  They also ignored Mr. Grice's

16   chart on the withdrawn loans and the claims and the

17   categories.  They also ignore Mr. Grice's testimony on the

18   till claims and how he couldn't discern a difference between

19   the ones that were in and why they were out.  They also

20   ignore Mr. Grice's testimony that the Trustees' process was

21   unreliable in the sense that it is consistently changing.

22          So the basic premise of the Trustees' approach in

23   their brief is they abandoned 40 percent of the claims from

24   the output of their loan review process without any

25   explanation.  The plan administrator sought discovery to

Page 73

1    understand why the Trustees made that decision.  The

2    Trustees blocked that discovery and cloaked their decision

3    in privilege, refusing to provide the real reasons for their

4    decision.  The Trustees offered no witness or evidence on

5    this point.

6         And now, the Trustees placed a burden on the plan

7    administrator to provide a detailed explanation as to why

8    this abandonment does not reflect on the quality of their

9    loan review process.

10        Your Honor, I guess to you that no one can figure

11   out what was done and why this withdrawal makes any sense,

12   other than it was an unsuccessful attempt to try to clean up

13   the results of a significantly flawed process.

14        The next problem with the Trustees' expert report

15   was a dual role Mr. Aronoff played.  Your Honor, I'm not

16   going to go through all this again here.  I'll try to

17   shorten this because I raise significant concerns about this

18   in my opening about Mr. Aronoff's independence, given that

19   he's basically opining on the reliability or process that he

20   designed.

21        In their opening, Trustees' counsel responded by

22   saying that Mr. Aronoff's dual expert role was typical in

23   these RMBS cases.  Your Honor invited the Trustees to share

24   their cases that support their view this is the way it's

25   done in RMBS cases, and here is the colloquy on that point.

Page 74

1    We have now reviewed the Trustees' post-trial brief, and

2    maybe we'll hear from them tomorrow on this.

3         But tellingly, the Trustees provided no

4    explanation or justification in their brief for the dual

5    role played by Mr. Aronoff.  In our view, it's a glaring

6    omission.

7         THE COURT:  Well, I think that the point was --

8    and, again, maybe this is something we'll take up with Mr.

9    Shuster tomorrow.  But I think the point that was made by

10   the Trustees was that it's absolutely ordinary, and it would

11   have to be the case that the person who does the review

12   process comes in and testifies as to what they did.

13        I agree with that entirely, but there's an

14   additional layer here.  Because at least where we started,

15   the process itself was being put on trial.  So in that

16   sense, Mr. Aronoff, I believe, was testifying that that

17   process, the details of which he was testifying to as a fact

18   witness, that that process he was giving his expert opinion

19   was a good process.

20        MR. COSENZA:  We agree with that, Your Honor.

21        THE COURT:  Right?

22        MR. COSENZA:  Yes.

23        THE COURT:  So that's kind of the two layers.

24        MR. COSENZA:  Correct.

25        THE COURT:  And then you get to Mr. Morrow.

Page 75

1          MR. COSENZA:  Yes.

2          THE COURT:  Are you going to --

3          MR. COSENZA:  Yes, I do.

4          THE COURT:  -- discuss Mr. Morrow?

5          MR. COSENZA:  Yeah, I'm going to raise Mr. Morrow.

6   But I just want to raise another evidentiary point that came

7   out during trial.  You know, the Trustees' counsel said that

8   Aronoff was put in this position, so he could oversee and

9   execute the review before he could testify to it.

10         And, Your Honor, that explanation does not make

11  sense based on the record.  Despite his comment that he was

12  the boss of the protocol process, Mr. Aronoff was not in a

13  position to execute the review because, as he testified, he

14  wasn't part of the Trustees' protocol process for six months

15  while the protocol was ongoing, and here is his testimony on

16  this point.

17         And I think that's, you know, an interesting, you

18  know, turn that, you know, if he is indeed he's put in this

19  role so he can oversee and manage the process, you know, the

20  protocol was only going on for, you know, an 18-month

21  period, and he was gone for a third of it, roughly a third

22  of it.

23         THE COURT:  Mr. Aronoff also testified at the

24  protocol hearing way back in the day, didn't he?

25         MR. COSENZA:  That's correct, Your Honor.

Page 76

1          THE COURT:  Wasn't a fan from the very beginning.

2          MR. COSENZA:  He was not a fan, Your Honor.  My

3  colleague, Mr. (indiscernible) and him had a pretty vivid

4  back and forth about the propriety of the protocol.

5          Moreover, Your Honor, in the Trustees' post-trial

6  brief, and I don't want to overplay this, but I think it was

7  like a telling statement in their brief.  And it's on --

8  they talk about, and they almost implicitly acknowledge, Mr.

9  Aronoff's lack of independence and objectivity.  Because

10  when they talk about the loan review being done by an

11  independent person, if you look at their brief, they list

12  only Mr. Morrow and not Mr. Aronoff.  Which I think proves

13  the point that here, when they had to go to an independent

14  person to look at this, they decided to bring in Mr. Morrow.

15          THE COURT:  Well, I think that they would say --

16  they would say this is belt and suspenders.  That only does

17  Mr. Aronoff confirm that the process was good, that that Mr.

18  Morrow does an independent review.  But if I'm remembering

19  correctly -- and you should correct me if I'm not -- Mr.

20  Morrow reviewed a selection of files that he knew --

21          MR. COSENZA:  Yes.

22          THE COURT:  -- contained breaches.

23          MR. COSENZA:  That's correct, Your Honor.  And Mr.

24  Morrow's sample was not designed for the purpose of testing

25  this.  As an initial matter, it wasn't even designed to test

Page 77

1    the process of identifying breach claims.  He didn't review

2    the Trustees' process of identifying breach claims.  He

3    didn't talk to anyone from Duff & Phelps, any involvement in

4    QC, didn't look to see if the loan review firms did.  He

5    didn't do any of that.

6           So just before I answer your question about what

7    he did, so this is a case about the Trustees' loan review

8    process; that was the framework for this proceeding when we

9    talked about it over the last -- before even started the

10   trial.

11          This is a case, again, where the Trustees have the

12   burden.  The Trustees do not have an independent expert,

13   from our perspective, on the soundness of the protocol

14   process.

15          Moreover, then we get to the work that Mr. Morrow

16   did, Your Honor.  His sample was drawn only from the 76,044

17   loans submitted as part of Mr. Aronoff's report.  There was

18   no non-breaching control group.  Mr. Morrow's sample was not

19   double blind; thus, he was fully aware that the samples

20   solely included loans with breach findings.

21          Still, even with all that backdrop, he knew where

22   he was going.  He was told that these were all breach in

23   claims.  He still disagreed with Mr. Aronoff around 7

24   percent of the time, which, you know, was interesting from

25   our perspective.

Page 78

1            Beyond all this, there's a fundamental problem

2    with Mr. Aronoff's opinion regarding the Trustees' breach

3    findings in the protocol.  And I think, Your Honor, this was

4    one of the most important parts of this cross-examination.

5    He testified that to make the ultimate breach determination,

6    one must look at the totality of the loan files.  That's

7    what he said during his examination, and here's his

8    testimony on this and he said this a few times.

9            However, as Your Honor can see here on this

10   testimony during his cross-examination, he admitted that he

11   did not know if he reviewed any loan file in its entirely in

12   preparation for this case, even though he opined that every

13   single one of the 76,044 loans that were subject to his

14   report had one or more valid breach findings.

15           So to summarize this, Your Honor, Mr. Aronoff

16   opined that every single one of the 76,044 loans subject of

17   his report had one or more valid breach claims, and then

18   testified to determine that a breach claim is valid, you

19   have to look at the totality of the loan file.  But he also

20   testified, he said he did not know if he reviewed one loan

21   file in its entirety in preparation for this case.  At a

22   minimum, this significantly undercuts any weight to be given

23   to his opinion.

24           Your Honor, I'm now going to move on to the

25   Aronoff summaries, which has got a lot of play, particularly

Page 79

1    in light of the recent demonstrative exhibit, but I'm going

2    to walk through the history of this for just a few minutes.

3           Your Honor, it's our view that the Trustees cannot

4    rely on the summaries contained in the exhibits to Mr.

5    Aronoff's report.  On Page 13 of the Trustees' pretrial

6    brief, the Trustees said they were going to provide, quote,

7    concrete breach specific proof through documents that have

8    been provided to the plan administrator during the protocol.

9           This is from their brief.  And, Your Honor, the

10   Trustees claimed that this proof would be admissible through

11   Federal Rule of Evidence 1006, relying on the approach taken

12   in the Marm case.  This is Judge (indiscernible)'s case that

13   we refer to consistently in these proceedings.

14          Under Rule 1006, such summaries must be based on

15   evidence in the record and there must be a witness who can

16   testify to a foundation for the summary, and here are

17   excerpts from some of the key cases.  And in fact, the

18   National Gypsum case that's listed here, this is one of the

19   cases cited by the Trustees in their post-trial brief.

20          At opening, just for context here, the Trustees

21   put up flow charts that had never been provided to the plan

22   administrator during the protocol or expert discovery to

23   support their purported damages claims.  The Trustees

24   informed the Court that they would prove their claims

25   through these flow charts.

Page 80

1           Here are two of the slides, Your Honor, if you

2    recall them.  And the Trustees tried to introduce these flow

3    charts through Mr. Esses.  But Mr. Esses' testimony showed

4    these flow charts were not generated from the claims

5    tracking spreadsheet provided to the plan administrator.

6    Instead, the Trustees created the charts through a database

7    they called Team Connect.

8           This database was never produced to the plan

9    administrator.  In their pretrial brief and opening, the

10   Trustees made no mention of the database.  And, Your Honor,

11   Mr. Esses started to testify about the Team Connect database

12   at trial.  I was curiously listening to that, and it took me

13   a minute or two to understand and object to his testimony

14   because the database had never been produced to us.

15          Once we understood what he was testifying to,

16   again, I objected, and that objection was sustained.  Thus,

17   the Trustees could lay no foundation for testimony about the

18   data from the unproduced database.  Without that foundation,

19   the Trustees never again discussed the flow charts they used

20   in opening.

21          The Trustees next sought to rely on a series of

22   summaries of data attached as exhibits to Mr. Aronoff's

23   opening report.  At trial, Mr. Aronoff seemed to testify

24   that the source used to create those summaries was the same

25   Team Connect database.  Here is Mr. Aronoff's testimony, and

Page 81

1   to speed things up, I'm going to focus on the relevant Q&A

2   in the middle here:

3         Q    Mr. Aronoff, in your deposition, didn't you

4   tell me that the data for Exhibit 4 was extracted from a

5   different database?

6         My understanding is that the data that was the

7   source of data for the claims tracking spreadsheet was the

8   same database that was used to prepare the data points in

9   the exhibit.  And then he goes on to say: But since I didn't

10  physically create Exhibit 4, I'm somewhat uncertain as to

11  what the priority of creation of Exhibit 4 was.

12        In any event, at various times, the Trustees have

13  tried to argue that there really is no difference between

14  the data in the claims tracking spreadsheet that was

15  produced to the plan administrator during the protocol and

16  the Team Connect database.

17        At trial, the plan administrator demonstrated that

18  the data in Team Connect did not match the claims tracking

19  spreadsheet.  Here are just two examples of data found in

20  Mr. Aronoff's Exhibit 5 that was not found in the claims

21  tracking spreadsheet.  This is -- here's a slide for loan

22  ending in 4680.  This is a misrepresentation of debt claim

23  where the Trustees claim a total undisclosed debt of over $3

24  million.  It's not found anywhere on the claims tracking

25  spreadsheet.  Next, loan 6910.  Here is another

Page 82

1    misrepresentation of debts claim, with total debt of over

2    $500,000 that isn't anywhere on the claims tracking

3    spreadsheet.  Also, the side text evidence that the Trustees

4    are citing does not appear anywhere on the claims tracking

5    spreadsheet, but it's in Mr. Aronoff's exhibit.

6            Apparently, the Team Connect database changed

7    after the claims tracking spreadsheet was provided to the

8    plan administrator, but before the data was extracted from

9    it for Mr. Aronoff's summaries.

10           I'd like to back up a second, Your Honor, and go

11   back to the case that the Trustees cited in their pretrial

12   brief.  This is the case that they relied on, they were

13   going to try to show that these types of summaries are

14   allowed into evidence in RMBS cases under Federal Rule of

15   Evidence 1006.  Again, this is the Marm case.

16           THE COURT:  This is in Marm 3?

17           MR. COSENZA:  Yeah, I believe so, Your Honor.

18           THE COURT:  Nope.

19           MR. COSENZA:  It may not be.  Marm --

20           THE COURT:  Yeah, it is.  It's Marm 3.

21           MR. COSENZA:  Yes, yes, it is.  Yes, it is.  But

22   let me explain what happened in Marm.  In the Marm case, the

23   Court accepted some reason to evidence under Federal Rules

24   of Evidence 1006 only after the Trustee designated a witness

25   who described his method for summarizing the data.  That

Page 83

1    witness provided a declaration and detailed his work.

2              And in Marm, even more importantly, the underlying

3    databases were actually received into evidence by the Court

4    and provided to the other party.  That party had an

5    opportunity to review, challenge, and confirm the accuracy

6    of the underlying data.

7              None of that happened here, Your Honor.  After

8    years of the protocol, six months of expert discovery, over

9    a dozen expert reports, numerous exchanges of data and

10   materials, and trial, the Trustees failed to lay a

11   foundation for the database that supports their summaries

12   and failed to provide that database to the plan

13   administrator.  And as a result, we were not afforded an

14   opportunity to test their database.

15             Now in their post-trial brief, and this is a very

16   confusing footnote.  It's Footnote 20, and it's very long.

17   It takes up a big chunk of the page.  There are lots of

18   concessions in here.  And it's actually, Your Honor, it took

19   me several times to read this to try --

20             THE COURT:  Footnote 20?

21             MR. COSENZA:  Yeah.  I had some difficulty

22   figuring this out, but I'm going to try to work through it

23   as quickly as I can.

24             It concedes that the information in the Aronoff

25   spreadsheets were, quote, derived from all the loan files

Page 84

1    and all the other information exchanged in the protocol, so

2    that's over 20 million pages of loan files, plus everything

3    else.

4              THE COURT:  Right.

5              MR. COSENZA:  Again, it concedes that the database

6    that drew from this enormous of volume of documents and was

7    a direct source for the summaries was never produced to the

8    plan administrator.  And, further, it illustrates, if

9    anything, that Mr. Aronoff provided no foundational

10   testimony for how the data went into the Team Connect

11   database; and then from the Team Connect database, somehow

12   into these summaries.

13             Your Honor, in addition to being inadmissible

14   under Federal Rule of Evidence 1006 --

15             THE COURT:  Well, let's go back to the very

16   beginning because this is difficult.

17             MR. COSENZA:  Yes.

18             THE COURT:  Isn't the Trustees' point -- and,

19   again, Mr. Shuster can address this tomorrow, I'm sure.  But

20   kind of the story begins and ends in the first sentence.  My

21   impression of the argument that we've had on this point up

22   to this point, was that the exhibits, because the exhibits

23   were derived from the data contained in the materials

24   exchanged during the protocol, all of which are admissible

25   under Exhibit G, that's all that needs to be done to

1   establish a predicate for the so-called summary.

2           That's my impression of what the argument is, that

3   over here are 20 million documents, and over here is a

4   summary of them.  And no one in their right mind could

5   suggest that someone's going to go through 20 million

6   documents, so here's a summary.

7           MR. COSENZA:  So on that --

8           THE COURT:  I mean, that's kind of --

9           MR. COSENZA:  I agree with you, that is the

10  argument.  But I think it misses two foundational principles

11  of Federal Rule of Evidence 1006, which is there is no

12  foundational witness to explain how it went from 20 million

13  pages of stuff into this spreadsheet, which I think is sort

14  of an important point.

15          And I also just think, you know, beyond -- and I'm

16  going to move to the second point, Your Honor, which I think

17  is also -- second point is also the database was never

18  produce here, so we never had a chance to really test the

19  validity of the database.  But I want to move on, because I

20  know we've dealt -- we've had some issues on the 1006, to

21  move on to --

22          THE COURT:  But don't you -- I just -- I'm going

23  to force you to stay on this point for a minute because it's

24  so important.  Leading up to today, didn't you -- didn't the

25  plan administrator also make the argument that this is no

Page 86

1   ordinary database.  I, in the past, have used the example of

2   weather data, which is actual data over time, geographic

3   locations, et cetera, et cetera.

4            But I thought part of your point was also that

5   there were subjective determinations that went into the very

6   creation of the initial -- the database.

7            MR. COSENZA:  That's absolutely correct, Your

8   Honor.

9            THE COURT:  That's another --

10           MR. COSENZA:  So I want to just -- I'm trying to

11   break this into two things.

12           THE COURT:  Okay.

13           MR. COSENZA:  One is --

14           THE COURT:  I apologize.

15           MR. COSENZA:  No, no.  You understand I'm trying

16   to -- maybe I'm not being artful enough.  First, I'm trying

17   to explain why under 1006 really these things shouldn't be

18   allowed into evidence.  My next prong of my argument will

19   be, even if you were to allow these 1006, sort of the

20   inherent unreliability and the issues associated with using

21   these summaries.

22           THE COURT:  I'm going to try to enforce my own

23   promise to not talk because I need to get you out of here.

24           MR. COSENZA:  No.  But Your Honor's question is

25   the right question because it's basically the next graphic

1      I'm going to go through.

2            THE COURT:  Okay.

3            MR. COSENZA:  Which shows, you know, that here are

4      some of the other fundamental problems that show Mr.

5      Aronoff's summaries are unreliable.  He testified that the

6      data in these summaries were entered into Team Connect.  And

7      as Your Honor just mentioned, this is an argument we made

8      before, that they're based on subjective judgments of the

9      loan review firms whose job it was was to generate evidence

10     in favor of a breach.

11           The loan review firms did not list any

12     contradictory evidence in the database.  The loan review

13     firms did not even list all the evidence supporting their

14     claim.  And the loan review firms manually inputting certain

15     data fields from the loan and claim files into Team Connect,

16     and that resulted in mistakes that we saw at trial.  The

17     Trustees provided no evidence that there was a consistent

18     approach or policy from which the data was taken from the

19     loan file and put into Team Connect.

20           Also, the monthly income numbers in the summaries

21     do not state the actual income of the borrower, and I'm

22     going to explain that.  I promised you before, I'm going to

23     explain that to you in a couple of minutes.  So there's no

24     way these summaries can be used to prove the magnitude of

25     misstatement of income.

Page 88

1          Then, Your Honor, as you showed at trial -- I'm

2    going to go through these very quickly.  They're just the

3    basic errors in the database that we went through Mr.

4    Aronoff to show that there were mistakes.  There was loan

5    file ending in 2262 that had a series of entry mistakes and

6    aggregation of number mistakes.  And also, loan file 3557,

7    there's another misrepresentation of income claim where a

8    zero was dropped and the numbers were off.

9          So, Your Honor, the Aronoff summaries are not

10   admissible in our view under 1006.  And even if the Court

11   were to admit them in a bench trial and, you know, we

12   understand, in our view, they should not be given any weight

13   given the number of material issues undermine their

14   reliability.

15         So, Your Honor, I'm now going to move on from

16   these Aronoff exhibits to the newly introduced

17   demonstrative.  And it's our view that the Trustees should

18   not be allowed to introduce into evidence a previously

19   undisclosed demonstrative that they intend, we understand,

20   to use at closing.

21         The Trustees now try to combine the information

22   and the unreliable Aronoff summaries with the purchase price

23   put together by Dr. Snow, which, in turn, relies on data

24   from Dr. Elson, and a new model that they've indicated they

25   will offer for the first time in closing.

Page 89

1            Like the Aronoff summaries, the Trustees never

2    offered any witness to provide a foundation for this model,

3    and only disclosed that they would be using something like

4    this after the last live witness testified.

5            And, Your Honor, I struggled to try to simplify

6    this because it's hard to do with what they're trying to do.

7    But just to put context for this model, I'm just going to

8    make sure I have this right.  The model purports to

9    summarize the data in the Aronoff summaries, which are

10   themselves a summary of Team Connect, which is just a

11   compilation of subjective judgments from 20 million pages of

12   loan files.  And not only that, for the first time, it then

13   graphs on to the Aronoff exhibits the Snow purchase price

14   calculations and then the underlying data from Dr. Elson.

15           So we had no opportunity during discovery or trial

16   to test this model or to examine the people who created it.

17   There's no evidentiary support for any of the particular

18   purchase price scenarios that the Trustees are planning to

19   present.  And the Trustees want the Court, as I showed you

20   earlier, to now use this model to apply various discounts.

21           In any event, there are a number of additional

22   problems with this demonstrative.  First, and I said a few

23   times I'm going to go through this in detail, but it relies

24   on the magnitude of breach data based on the difference

25   between actual income and the income listed on the mortgage

1    application.

2              And, Your Honor, you touched on this with Mr.

3    Rollin.  Mr. Aronoff made very clear, however, that the loan

4    review firms were not tasked with verifying borrowers'

5    actual incomes.  Here is his testimony.

6              THE COURT:  Mr. Cosenza, hold on one second.

7              MR. COSENZA:  Yes.

8              THE COURT:  So it's been longer than two hours.  I

9    sense that you're talking faster because you're aware of

10   that.

11             MR. COSENZA:  Yes, yes.

12             THE COURT:  So just slow down.

13             MR. COSENZA:  Sure.

14             THE COURT:  Finish what you have.

15             MR. COSENZA:  Okay.

16             THE COURT:  And we'll make sure that, to the

17   extent that Mr. Shuster would like a longer time period, it

18   will be fair and equal.  Okay?

19             MR. COSENZA:  I appreciate that Your Honor.  I'll

20   slow down a little.

21             THE COURT:  So just slow down.

22             MR. COSENZA:  Sure.  So, Your Honor, to go through

23   what Mr. Aronoff had made clear that the loan reviewers were

24   not tasked with verifying borrowers' actual incomes.  Here

25   is his testimony.  Because, again, as Mr. Rollin said some

Page 91

1      confusion about this, about his charts, what were listed on

2      his column from his reports what Mr. Esses had testified to

3      and what was said in opening.

4              And he said, let me be clear about answering this.

5      As I discussed yesterday, the purpose of the investigation

6      of the forensic loan review with respect to income was not

7      to verify the actual income of the borrower, but it was to

8      make a determination whether it was more likely than not

9      that the stated income was misrepresented.

10             It is important to note that the predicate for the

11     Trustees' 32,213 misrepresentation of income claims and for

12     the 10,859 DTI claims is the determination of actual

13     borrower income as compared to the income the borrower

14     stated on his or her loan application.

15             Without an actual income number, the Trustees have

16     no evidentiary basis for presenting any alleged magnitude of

17     misstatement or income or any categories in this

18     demonstrative reflecting the number of income breaches over

19     a certain magnitude.  That is critical because their model -

20     - and, again, we'll see how they use it tomorrow, but this

21     is how we understand it -- is predicated on assertions that

22     the borrower breaches exceeded certain percent thresholds.

23             Based on the Trustees own admissions, there is no

24     evidentiary foundation for those calculations and they

25     should be disregarded.

Page 92

1        Another major problem with this model is that it's

2    approach of grouping claims and evidence types together was

3    repeatedly contradicted by their primary witness.  And, Your

4    Honor, taking a step back, they're basically saying you can

5    take a certain piece of evidence and a certain breach type,

6    check two boxes, and get to a number.  That's what this

7    model does.

8        But Mr. Aronoff said that the purpose of his

9    summaries is not to group claims together and say that if

10   the Trustees win on one claim, they win on all claims in a

11   particular breach category.  Here's what Mr. Aronoff said

12   when he was cross examined:

13       So to be clear, by highlighting these accepted

14   loans, you're not saying that just because the plan

15   administrator accepts one misrepresentation of the income

16   claim, it should accept them all, right?  I don't think I

17   came close to saying that.  And you're not saying because

18   the Trustees base one misrepresentation of income claim that

19   was accepted on a particular kind of evidence, like a

20   bankruptcy filing, for example, the plan administrator

21   therefore should accept all misrepresentation claims based

22   on a bankruptcy filing, right?  I stand by the language in

23   my report, and that's not -- I didn't say what you just

24   said, no.

25       THE COURT:  I don't think I'm following you on

Page 93

```
 1    this point.

 2              MR. COSENZA:  Sure.

 3              THE COURT:  Isn't it we have the flip.  I mean,

 4    here, he's testifying about the plan administrator, but

 5    aren't these summaries the calculator that I think I'm going

 6    to see tomorrow, doesn't it do the opposite; doesn't it say

 7    that --

 8              MR. COSENZA:  But I think, so --

 9              THE COURT:  That I should accept the Trustees'

10    proof on a category by category?

11              MR. COSENZA:  What I think this -- this is in

12    context of looking at the plan administrator accepting one

13    claim.

14              THE COURT:  Right.

15              MR. COSENZA:  And he says based on one breach type

16    using one form of evidence.  And we then asked him, are you

17    saying that if we accept a loan that has a certain breach

18    with certain evidence, we should accept them all?  And he

19    says, no, you can't do it that way.  That's what he is

20    saying in his testimony.

21              THE COURT:  Okay.  So you're saying that this

22    testimony undermines the calculator approach --

23              MR. COSENZA:  Correct.

24              THE COURT:  -- that's now going to be presented to

25    me because it does that very thing.  It says buckets by
```

Page 94

1    breach type and says here's one, they're all the same.

2            MR. COSENZA:  Correct.

3            THE COURT:  Apply that sorting and get to a number

4    on that particular breach type.

5            MR. COSENZA:  That's correct, Your Honor.  And I'm

6    going to explain why, you know, why what Mr. Aronoff said

7    makes total sense in the context of what we've heard this

8    entire proceeding.

9            Although the Trustees seem to dispute this in

10   their post-trial brief, the evidence in the record

11   demonstrated that every loan file is unique and breaches in

12   AMA must be reviewed within the context of the whole loan

13   file.  As Mr. Rollin described earlier, whether a particular

14   piece of evidence is reliable and sufficient to prove a

15   breach depends on all the other information in the file.

16           We talked about the demonstrative we had at

17   opening to snowflakes.  Even Mr. Aronoff always comes back

18   to this, as we mentioned earlier in our presentation.  Here

19   is his testimony when he was cross examined about

20   understanding whether a claim was correct.  He goes back to,

21   upon questions from Your Honor, I'll have to look at the

22   whole loan file.

23           Yet, the Trustees seek to use the scenarios

24   generated by the model to do precisely what their primary

25   expert on liability says cannot be done: prove breach claims

1    based on summaries that isolate one or a few pieces of

2    evidence divorced from the file as conclusive proof of their

3    entitlement to billions of dollars in damages.

4         In conclusion, the demonstrative the Trustees are

5    offering is not even evidence.  And even if admissible, it

6    should be given no weight.

7         Your Honor, I'm going to, in light of your

8    comments, I'm going to move very quickly through.  I had a

9    section on damages, but I think our briefs do cover that in

10   sufficient detail.  But I do want to note that the Trustees

11   offered no loan-by-loan measure of damages, other than the

12   full purchase price.  And that the full purchase price, in

13   fact, cannot be the proper measure of damages here, at least

14   in part because it includes interest that's not recoverable

15   under 502(b)(2) of the Bankruptcy Code, and we cover that at

16   length in our brief.  And I think the Trustees' arguments

17   and response are sufficiently dealt with in our brief.

18        And then moving on to the Trustees' damages

19   calculation for active loans and how they were unreliable

20   and overstated.  Again, this is detailed in our briefs, but

21   I want to give --

22        THE COURT:  I mean, I don't want to delay our

23   being done here today.

24        MR. COSENZA:  Sure.

25        THE COURT:  But, you know, 502(b)(2), we're not

1     talking about debt of the debtor here.  These are -- this is

2     underlying debt in these mortgage pools, so I don't think we

3     have to spend a lot of time on this point; that I just

4     wanted to not let it fly by without making that comment.

5           MR. COSENZA:  But I just -- my only response to

6     that, Your Honor, would be that we are still being held

7     accountable for the interest that is accruing on these loans

8     for years, and the interest is being charged through to the

9     plan administrator.

10          Next, I want to touch on the Trustees' damages

11    calculations for active loans and how they are unreliable

12    and overstated.  Again, as in our brief, for the non-

13    liquidated loans, the parties agree that the purchase price

14    formula is not alone sufficient because it fails to take

15    into consideration the fact that the Trustees are not

16    putting back the loans, nor have they liquidated.  Thus, the

17    trust will recede any future cash flows and liquidation

18    proceeds on these loans, in addition to any recovery in this

19    action.

20          At trial and our post-trial brief, the plan

21    administrator presented evidence that the Trustees never

22    tested the accuracy of their damages methodology, by

23    comparing the predictions of losses on active loans to the

24    realized losses that were actually reported on those loans

25    after liquidation.  In fact, if we look at loans that Dr.

1   Elson values that have liquidated since his opening report,

2   the Trustees' damages methodology predicted damages on those

3   loans that exceeded the actual losses by approximately 70

4   percent.

5          In our view, the Trustees have failed that they've

6   offered the Court a reliable measure of damages on the

7   population of non-liquidated loans.

8          Your Honor, as I mentioned in my opening, Lehman

9   does not exist anymore.  We're the plan administrator trying

10  to put a fair number on the Trustees' claims.  As we

11  outlined above, there were a number of fundamental

12  disagreements that the plan administrator has about how the

13  Trustees designed their loan review process and how they

14  generated claims.

15         The plan administrator does understand that, as

16  advocated for the trust at issue, the Trustees took a

17  zealous approach to asserting claims.

18         For all the reasons outlined above, the Trustees'

19  approach simply did not work, and they did not meet their

20  burden of proof for anything in excess, in our view, of the

21  compensable claims approved by the plan administrator in the

22  protocol, which is between $278.1 and $301.8 million.  This

23  range was based on the claims approved by the plan

24  administrator during the protocol.  And Dr. Cornell

25  testified to this chart identifying the mortgage loans with

Page 98

1    compensable claims.

2         However, Your Honor, as we previewed earlier, the

3    value -- this is the value that was associated with the

4    preliminary results of steps one, two, and the very

5    beginning of step three of the protocol.

6         Since the purpose of this proceeding is to

7    estimate what the protocol would have yielded had steps

8    three to five been completed, which would have presumably

9    involved compromise of a significant number of the disputed

10   claims and judicial resolution of unresolved claims, the

11   plan administrator believes the claim value -- sorry.

12        The plan administrator believes that the claim

13   value ultimately would have been higher than the $278.1 to

14   $301.8 million range reflected on this chart, so the plan

15   administrator is not seeking to estimate the claim in that

16   range.  We are trying to be fair.

17        So the preliminary results of the protocol at the

18   point the protocol was suspended provide only extreme

19   bookends of value.  As I described in my opening, the plan

20   administrator believes there are other benchmarks of value

21   that are reliable and fair metrics for estimating this

22   claim.  As described in my opening, the plan administrator

23   has now provided record evidence of those guideposts, and

24   here they are again.  This is the slide I used in my

25   opening, Your Honor.

Page 99

1          There is a critical factor in the plan

2   administrator's decision to enter into the settlement that

3   all parties agreed that the plan administrator be permitted

4   to introduce into evidence several metrics to demonstrate

5   why the $2.38 billion-dollar number was a reasonable level

6   at which to resolve the Trustees' claims.  Because the plan

7   administrator believes those are the most reliable and

8   appropriate bases to estimate this claim in light of all the

9   issues I described about the Trustees' process and results.

10          This is why, as I mentioned at the beginning of my

11   closing, Your Honor, it was an unusual move, but we

12   negotiated for the entry into evidence of certain data

13   points that typically courts are not allowed to use in

14   adjudicating claims.  So by the parties agreement, Exhibit

15   G, allowed both parties to introduce comparable global RMBS

16   settlements, and the plan administrator's settlement with

17   the institutional investors from October 2015 into evidence.

18          As we have said throughout these proceedings, the

19   plan administrator's estimate of $2.38 billion is supported

20   by the four guideposts.  Again, the first guidepost is the -

21   - this is the amount equivalent to the settlement negotiated

22   in October of 2015 for $2.4 billion with the institutional

23   investors for covered and transferred loan claims, as

24   Professor Fischel testified.

25          Again, as I previewed in my opening, Professor

Page 100

```
 1    Fischel gave highly credible testimony supporting the

 2    reasonableness of settlement at $2.38 billion dollars.  He

 3    testified that the institutional investors have a strong

 4    incentive to advocate for the best possible result for the

 5    trust because they have the largest economic stake in the

 6    proposed claim.

 7           This demonstrative shows that the institutional

 8    investors own 23.97 percent of these certificates issued by

 9    the trust.  And Professor Fischel also explained that the

10    institutional investors are some of the most sophisticated

11    and experienced investors in RMBS.

12           The plan administrator maintains that this

13    settlement with the institutional investors is a sound basis

14    for the Court to use to estimate these claims.  This

15    guidepost provides a real-world proxy for how sophisticated

16    parties with a financial interest in this litigation value

17    the claims here.  The plan administrator maintains that this

18    is very similar to the purpose of this estimation

19    proceeding.  All of these reasons, as Professor Fischel

20    opined --

21           THE COURT:  What about the argument that this

22    really shouldn't count very much because those -- the

23    institutional investors in this settlement didn't have the

24    benefit of all the data, the loan review process that's

25    occurred here; and had they only done that, they presumably
```

Page 101

1    wouldn't have settled at that level.

2            MR. COSENZA:  Yeah.  So, Your Honor, on that

3    point, I think Professor Fischel, who acted as the expert

4    for the Trustees in those cases, he testified that -- this

5    is in the comparable cases, he said that some of those cases

6    did have loan level review.  And he said, even in those

7    cases that did have some level of loan level review, it

8    wasn't clear whether review really contribute one way or

9    another to making a settlement lower or higher;

10   specifically, where there's such a disparate opinion about

11   the results of loan file reviews because so much subjective

12   judgment is required.

13           So, Your Honor, moving on to the second guidepost

14   is Professor Fishel's comparison of the plan administrator's

15   proposed settlement amount to other comparable global RMBS

16   settlements.  Professor Fishel is uniquely qualified to

17   opine on the reasonableness of settlements in this context.

18   He has served as an expert witness in numerous other

19   significant RMBS cases.  He testified that he served as an

20   expert for many of the same Trustees here, and the Bank of

21   America, WAMU, and J.P. Morgan global RMBS settlements.

22           Professor Fishel performed his analysis here by

23   comparing recovery ratios, a calculation of the settlement

24   amount, divided by the expected lifetime losses for the

25   trust at issue.  Professor Fishel concluded that the

Page 102

1    recovery ratios for the recent comparable settlements are

2    consistent with LBHI's proposed allowed claim, while the

3    Trustees' proposed allowed claim was a complete outlier.

4            As Your Honor can see from this chart, LBHI's

5    proposed allowed claim is approximately 11.2 percent of

6    expected lifetime losses on the covered loans, which is

7    substantially above the recovery ratios for J.P. Morgan,

8    Citigroup, and Res Cap, and within the range of

9    Countrywide's settlement and two percentage points below the

10   Washington Mutual settlement.

11           The Trustees' proposed allowed claim, which they

12   sought here at 11.4 billion is three times as high as the

13   largest recovery ratio -- 55 percent.  Professor Fishel

14   concluded that Lehman's proposed allowed claim is well

15   within the range of all the other comparable settlements,

16   and if anything, toward the high end of the range, and that

17   Trustees' proposed allowed claims is many multiples greater

18   than any of the other comparable settlements.

19           In their opening statement and brief, the Trustees

20   argued that these settlements were not comparable because of

21   the effort Your Honor just talked about, they were made to

22   look at loan files.  As Professor Fishel testified, the loan

23   file review, we don't think, makes much of a difference,

24   especially given the fundamental disagreements here and what

25   claims should have been put through the protocol.

Page 103

1          In response to Professor Fishel's analysis, the

2     Trustees also put forward an expert, Mr. Finkel, to show

3     that the recovery ratio of 11.2 percent was too low.  The

4     proffered settlements put forward by the Trustees' expert,

5     Mr. Finkel, are not comparable.

6          First of all, the six settlements put forward were

7     residential mortgage putback cases involving individual

8     trusts, not global RMBS settlements.  Second, they all

9     covered only one group of loans in each of those trusts, all

10    of which were securitized in 2007.  Third, they allowed

11    different types of collateral, home equity lines of credit.

12    And lastly, the trustee for five of those six trusts was

13    Deutsche Bank, which as Mr. Finkel admitted, was subject to

14    a DOJ consent decree for its conduct as a sponsor of RMBS.

15         Further, and I think this was, you know, one of

16    the more important moments of Mr. Finkel's examination.  He

17    ignored other settlements obtained by the Trustees' counsel

18    and other RMBS cases that he was told not to analyze where

19    the plaintiffs allege that they had conducted loan reviews

20    with high rates for breaches and which had recovery ratios

21    in line with Lehman's proposed amount, even under the most

22    favorable assumptions.  And, Your Honor, that's the Debolt

23    2007-083 trust and the Debolt 2007-084 trust.  And you can

24    see the recovery ratios on this chart.

25         Finally, the Trustees make a few new arguments in

Page 104

1    their post-trial brief as to why Professor Fishel's

2    methodology was flawed.  None of those are persuasive

3    attacks on Professor Fishel's methodology or conclusions.

4         The Trustees argue that the claims underlying the

5    settlements that Professor Fishel used as comparable were,

6    quote, generally time barred.  This is highly misleading,

7    Your Honor.  The settlements considered by Professor Fishel

8    did contain some trusts for which a statute of limitations

9    defense was asserted at the time of the settlements.

10        THE COURT:  Yeah, so I was -- I noticed that in

11   the briefs, is there any testimony on those -- on the point

12   of the percentages of claims that were time barred in the

13   comparable settlements?  Or maybe I'll ask Mr. Shuster about

14   that tomorrow.

15        MR. COSENZA:  Yeah, I do believe, at least at the

16   time of the expert reports, the statute of limitations issue

17   had not been adjudicated, and we can ask Mr. Shuster about

18   that tomorrow.

19        THE COURT:  Okay.

20        MR. COSENZA:  And the settlements contained many

21   other -- and, Your Honor, the other point is, the

22   settlements contained many other trusts that did not have

23   claims subject to the statute of limitations defense.  And

24   the same Trustees here still recommended acceptance of the

25   settlements for the accepting trust in those cases,

Page 105

1  including those with no statute of limitation defense,

2  weighing all of the applicable defenses.

3          At trial, Professor Fishel acknowledged the

4  statute of limitations defense applicable in those other

5  cases, so this is not like a new groundbreaking thing in

6  their brief.  But he also noted in this case that the

7  Trustees are not entitled to prejudgment interest, which the

8  Trustees ignored in their breach and which constituted very

9  substantial exposure for the non-debtor defendants in those

10  comparable cases.

11          Your Honor, I think you touched this.  But the

12  Trustees also claim that Professor Fishel's methodology is

13  flawed because he did not make an upward adjustment for the

14  fact that the Trustees will not receive the full cash value

15  of their claim, but will instead receive a claim in

16  bankruptcy dollars.

17          Your Honor, I think that should just be rejected.

18  The Trustees represented to the Court they would not seek to

19  be placed in a better position than other creditors and

20  there's no case law supporting that.

21          I'll move on to the third guidepost.  It's that

22  the Trustees accepted equivalent valuations for identical

23  RMBS claims in connection with the sale of RMBS claims owned

24  by terminated trusts.  We discussed this in my opening in

25  detail.  I went through this very long chart.

1          There was testimony from both Mr. Trumpp and

2     Professor Fishel that six trusts had terminated as of the

3     start of this proceeding.  And Dr. Fishel -- Professor

4     Fishel testified that he was aware of this, and that claims

5     by outside appraiser were valued by five of the six trusts

6     at the level of Lehman's proposed claim, and one of the six

7     were valued at a much lower value.

8          Dr. Fisher -- Professor Fishel testified that,

9     again, this is just consistent with the other evidence I

10    reviewed of the different pieces of data, also for Lehman's

11    proposed allowed claim.

12         As I explained in my opening, for these collapsed

13    trusts, the master servicer exercises its cleanup call

14    option.  A part of this process involves the hiring of an

15    appraiser to value the property of the trust, which includes

16    the trust's RMBS claims at issue here.  The master servicer

17    identifies an appraiser to identify the trusts' damages

18    claims.

19         Despite the Trustees' complaints here and in their

20    post-trial brief, the Trustees have the right and obligation

21    to accept or reject the appraiser.  And Your Honor can see

22    this from the trust agreement for the Sorem 2004-05 trust,

23    one of the trusts that collapsed, in Section 7.1(b) whether

24    Trustees have a consent right over the appraiser.

25    Thereafter, the appraiser is directed to come up with a fair

Page 107

1    price or value for the sale of the claim by the trustee to

2    the servicer.

3              Five times -- and this is a chart I showed in

4    opening -- the Trustees authorized the assessment of the

5    trusts claims value at precisely the level the plan

6    administrator seeks; and in one instance, at a significantly

7    lower level.  And Professor Fishel said that this indicates

8    to him that the $2.3 billion that Lehman seeks to estimate

9    the Trustees' claim indicates to him that it's fair and

10   reasonable.

11             At trial, the Trustees' counsel claimed, quote,

12   they don't agree with that appraisal.  The Trustees also

13   stated in their post-trial brief that Lehman's evidence

14   regarding the collapsed trust was completely undermined at

15   trial.  And that's from Page 50 of their brief.

16             Your Honor, that statement is baffling.  Despite

17   having the opportunity at trial, the Trustees have offered

18   not witness to testify that the Trustees disagreed with any

19   of the appraisals or that they ever raised an objection with

20   the choice of the appraiser, which the Trustees had the

21   right to do after they received the first appraisal, but

22   they never did.

23             In fact, if the Trustees thought that the $11.4

24   billion that they were seeking here was a fair proxy of

25   value, how could they allow the claims to be sold at a level

Page 108

1    proportionate to the $2.38 billion or lower for these six

2    terminated trusts?  As fiduciaries, the Trustees could not.

3            The Trustees sold the trust assets to a willing

4    buyer for each of these six trusts based on the appraisal.

5    If the transaction between the Trustees and a willing buyer

6    that serves as a guidepost for the court to use in this

7    estimation proceeding.

8            Next, the Trustees argue in their brief that the

9    appraisals used for these transactions should be given no

10   weight because there's no evidence that the non-public loan

11   level protocol results were available to the appraiser.

12   This argument confuses the issue.  The point here is that

13   the Trustees are on one side of the transaction did have the

14   results of the loan level protocol review, did not challenge

15   the appraisal, the use of this same appraiser, or that

16   appraiser's methods.

17           THE COURT:  Did the Trustees have the right to

18   object to the appraisal?

19           MR. COSENZA:  They had the right, Your Honor,

20   after the appraiser came back with the first appraisal; for

21   subsequent appraisals, they had the right to object to that

22   appraiser or tell the appraisers that the methods he's using

23   are inappropriate.  And I would also suggest, Your Honor,

24   that the first appraisal came well below the value.  As

25   fiduciaries, they could not have sold those assets at such a

Page 109

```
 1    significant discount.  They would have had to have raised an
 2    issue.
 3              Again, Your Honor, there's the critical point
 4    here.  There are no witnesses offered by the Trustees to
 5    indicate that the Trustees, consistent with their fiduciary
 6    duties, did anything beyond selling the trust assets to a
 7    willing buyer at a price set by an independent appraiser,
 8    who they could have removed after receiving the first
 9    assessment and before he generated subsequent appraisals for
10    subsequent deals.
11              So, Your Honor, as I mentioned in my opening, this
12    column, Column 2 to this chart, this is what we think is an
13    indication of what a willing buyer paid for these assets
14    from a willing seller based on the appraisal.  And if this
15    was not the appropriate value, the Trustees were obligated
16    to either object to the selection of the appraisal, raise
17    issues with the appraiser's methodology, or do something
18    except sell these claims at this value.
19              The last guidepost, Your Honor, is Dr. Cornell's
20    estimation scenarios.  After applying very generous success
21    assumptions provided by the plan administrator designed to
22    illustrate the success rates necessary to achieve a result
23    in line with the plan administrator's proposed claim, Dr.
24    Cornell opined that the Trustees' recovery in the four
25    scenarios ranged from $1.6 billion to $2.5 billion.
```

1            And, Your Honor, as Dr. Cornell used in his

2    demonstrative, he had four scenarios: one was for all loans

3    in the loan population at issue; two was for excluding the

4    on-hold loans, but included the non-liquidated loans; the

5    third scenario was excluding the non-liquidated loans, but

6    included the on-hold loans; and fourth was excluding both

7    the on-hold loans and non-liquidated loans from the

8    population.

9            For his first estimation scenario, which included

10   all of the loans at issue and using the generous assumpions

11   provided by the plan administrator, Dr. Cornell's

12   calculation came to $2.49 billion.  Next, this is reflected

13   in this chart, testified that using the same assumptions,

14   but including the on-hold loans and not the active loans,

15   his calculation came to $2.11 billion.

16           In the third scenario, Dr. Cornell included active

17   loans, but not the on-hold loan population; that calculation

18   came to $1.92 billion.  In the fourth scenario, Dr. Cornell

19   testified that he calculated a claim value and excluded both

20   the on-hold loans and the active loan population, and that

21   resulted in a recovery for the Trustees of $1.63 billion.

22           As Dr. Cornell testified, his analysis assumed

23   that the claims were uncorrelated, despite the fact that Dr.

24   Cornell actually believed many of the claims likely did have

25   a positive correlation.  As a result, Dr. Cornell adopted

Page 111

1    the generous assumptions stated concluded that the Trustees

2    were given multiple opportunities to prove their claims on

3    loans with multiple breach assertions.

4              In addition, as I discussed briefly earlier, Your

5    Honor, Dr. Cornell's calculations here do not account for

6    the fact that we believe that Section 502(b)(2) prohibits

7    awarding interest here, which all the scenarios include.

8              And it would be our view and based on Dr.

9    Cornell's testimony and just looking at Dr. Snow's

10   calculations, that if you were to agree with us on the

11   502(b)(2) issue, all of these numbers would have to be

12   reduced by 20 percent.

13             Your Honor, we submit that these scenarios

14   demonstrate, again, that the plan administrator's request to

15   estimate the claim at $2.38 billion or less is fair and

16   reasonable.

17             In conclusion, Your Honor, for all the reasons

18   I've outlined above, the Trustees have not met their burden

19   to estimate their claims at more than $2.38 billion.  The

20   plan administrator respectfully requests that the Court,

21   based on the evidence Your Honor heard at trial and after

22   considering the equities of this case, estimate and allow

23   the Trustees' claim at $2.38 billion.

24             THE COURT:  All right.

25             MR. COSENZA:  Thank you, Your Honor.

Page 112

1          THE COURT:  Thank you very much, Mr. Cosenza and

2     Mr. Rollin.  So, it is 3:15, not -- well, off the mark, but

3     by an understandable amount.  But for the purposes of

4     planning tomorrow, Mr. Goldberg and to let Mr. Shuster know,

5     we are going to start at 9:00.  Right?  I do have a

6     conference call that I have to take at noon.  So depending

7     upon how -- he doesn't necessarily have to use equal time

8     that Mr. Cosenza did, but he'll be afforded that.  I'm going

9     to have to take a break at noon for, I would say, 15 minutes

10    to do this conference call.  And then we could resume and,

11    hopefully, rebuttal and so rebuttal can be kept to an

12    absolute minimum.

13          MR. COSENZA:  Sure, understood, Your Honor.

14          THE COURT:  All right?

15          MR. COSENZA:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          MR. COSENZA:  Sorry for speaking so quickly, but I

18    wanted to get it down.

19          THE COURT:  No, that's fine.

20          MR. COSENZA:  I apologize to you.

21          THE COURT:  That's fine.  Okay, so we'll see you

22    tomorrow morning at 9:00.  Okay, very good.  Thank you.

23

24          (Whereupon these proceedings were concluded at

25    3:17 PM)

Page 113

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya

6    Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2018.02.14 16:36:56 -05'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 14, 2018