**Cross-Motion Hearing Date: March 7, 2018 at 10:00 a.m. (EST)**
**Cross-Motion Objection Deadline: March 5, 2018 at 12:00 p.m. (EST)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case. No.
                                        :
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al., :    08-13555 (SCC)
                                        :
                                        :
                 Debtors.               :    (Jointly Administered)
                                        :
-----------------------------------------------------------------x
```

**OBJECTION OF WILMINGTON TRUST, NATIONAL
ASSOCIATION, AS TRUSTEE FOR STRUCTURED
ASSETS SECURITIES CORPORATION MORTGAGE
PASS-THROUGH CERTIFICATES, SERIES 2006-S4, TO
LEHMAN BROTHERS HOLDINGS INC.'S MOTION TO
ESTIMATE RMBS CLAIMS OF SASCO 2006-S4 FOR
RESERVE PURPOSES PURSUANT TO 11 U.S.C. § 502(C),
AND CROSS-MOTION TO ESTIMATE RMBS CLAIMS
FOR SASCO 2006-S4 FOR RESERVE PURPOSES AND
FOR RELIEF FROM THE PROTOCOL ORDER**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................................ **1**

**BACKGROUND** ............................................................................................ **5**

    A.  SASCO 2006-S4 ................................................................................ 5

    B.  Protocol ............................................................................................. 6

    C.  Settlement Agreement and Estimation Hearing ............................................... 9

**LEGAL STANDARD** ..................................................................................... **11**

**ARGUMENT** ................................................................................................ **12**

    A.  The Trust's Claims Should Be Reserved at Their Full Value ........................... 12

    B.  At A Minimum, There Is No Basis to Reduce the Reserve Below the Trust's
        Share of the Current Reserve .......................................................... 15

    C.  The Court Should Grant The Trustee's Cross-Motion to Estimate the Trust's
        Claims for Reserve Purposes and For Relief From The Protocol Order And The
        Parties Should Proceed To Binding Adjudication On The Merits .................... 17

**NOTICE** ...................................................................................................... **18**

**CONCLUSION** ............................................................................................. **18**

# TABLE OF AUTHORITIES

## CASES

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
   920 F. Supp. 2d 475 (S.D.N.Y. 2013) ................................................................ 12, 14

*Fed. Housing Fin. Agency v. Nomura Holding Am. Inc.*,
   104 F. Supp. 3d 441 (S.D.N.Y. 2015) ................................................................ 12, 13

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
   298 F.R.D. 116 (S.D.N.Y 2014) ................................................................................ 13

*In re Adelphia Business Solutions, Inc.*,
   341 B.R. 415 (Bankr. S.D.N.Y. 2003) ...................................................................... 11

*In re Chemtura Corp.*,
   448 B.R. 635 (Bankr. S.D.N.Y. 2011) ................................................................ 11, 12

*In re Enron Corp.*, No. 01-16034 (AJG),
   2006 WL 544463 (S.D.N.Y. Jan. 17, 2006) .............................................................. 11

*In re Ralph Lauren Womenswear, Inc.*,
   197 B.R. 771 (Bankr. S.D.N.Y. 1996) ...................................................................... 11

*In re Thomson McKinnon*,
   191 B.R. 330 (Bankr. S.D.N.Y. 1992) ...................................................................... 11

*Momentum Mfg. Corp. v. Emp. Creditors Comm.*,
   25 F.3d 1132 (2d Cir. 1994) ...................................................................................... 17

*O'Neill v. Continental Airlines, Inc.*,
   981 F.2d 1450 (5th Cir. 1993) .................................................................................... 11

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Securities, Inc. ("MARM")*,
   2015 WL 764665 (S.D.N.Y. Jan. 9, 2015) ................................................................ 13

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Securities, Inc. ("MARM")*,
   205 F. Supp. 3d 386 (S.D.N.Y. 2016) ............................................................ 12, 13, 14

*Wells Fargo Bank, N.A. v. Bank of Am., N.A.*,
   2013 WL 1285289 (S.D.N.Y. Mar. 28, 2013),
   *vacated and remanded on other grounds* 627 F. App'x 27 (2d Cir. 2015).............................. 14

*Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A.*,
   2014 WL 1259630 (S.D.N.Y. Mar. 27, 2014),
   *aff'd* 643 F. App'x 44 (2d Cir. 2016) ...................................................................... 13

## STATUTES

11 U.S.C. § 105(a) .................................................................................................... 17

**TRIAL EXHIBITS**

TRX-701 .................................................................................................................................... 13

TRX-734 .................................................................................................................................... 13

TRX-757 .................................................................................................................................... 13

TRX-760 .................................................................................................................................... 13

TRX-807 .................................................................................................................................... 16

TRX-821 ...................................................................................................................................... 2

TRX-929 ...................................................................................................................................... 4

TRX-998 .................................................................................................................................... 13

TRX-1007-12 ............................................................................................................................ 13

TRX-1008 .................................................................................................................................. 13

TRX-1011 .................................................................................................................................. 13

TRX-1020 .................................................................................................................................. 13

TRX-1040 .................................................................................................................................. 13

TRX-1369 .................................................................................................................................. 11

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Wilmington Trust, National Association, solely in its capacity as Trustee ("**Trustee**") of

the Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-S4

Trust ("**SASCO 2006-S4**" or the "**Trust**") hereby objects to Lehman Brothers Holdings Inc.'s

("**LBHI**") motion to estimate the Trust's claims for reserve purposes pursuant to 11 U.S.C. §

502(c), and cross-moves to estimate the Trust's claims for reserve purposes and for relief from

the Protocol Order.  In support of the relief sought herein, the Trustee respectfully states as

follows:

## PRELIMINARY STATEMENT

1.      Estimating the Trust's claims for reserve purposes at the level LBHI proposes

would be highly prejudicial to the Trust and its certificateholders.  LBHI seeks to estimate the

Trust's claims at a deep discount from the claim amount, using a plainly flawed methodology to

support its proposal, while stating that it will take years to actually determine the true value of

those claims.  Even though the Trustee is cross-moving to set a schedule that is designed to

adjudicate the claims as promptly as possible, final adjudication will take a significant period of

time, during which the assets of the Estate will be further diminished through semi-annual

distributions.  Accordingly, there is a significant risk that reserving for the Trust's claims at

anything less than the full amount of those claims will mean that, following allowance of those

claims, LBHI will not be able to pay the Trust on a pro-rata basis as required by the Plan.

2.      Conversely, estimating the Trust's claims at their actual amount for purposes of

setting a reserve would not disrupt the administration of the estate or cause harm to other

creditors.  The PA's most recent Operating Report reveals that setting aside cash and assets in an

amount equal to the Trust's approximately $192 million claim would not materially affect the recovery of other creditors. (D.E. 57594.)

3.  There is no rational basis to estimate the Trust's claims based on the outcome of the Estimation Proceeding. The Trust *opted out* of the Settlement Agreement for the obvious reason that it was not prepared to accept the terms of the Settlement Agreement. As an initial matter, one of LBHI's main rationales for its estimation at $2.416 billion was the Institutional Investors' 2015 settlement. But the Institutional Investors *did not report any holdings* in the Trust in connection with the Settlement Agreement. (TRX-821.) The Trust did not agree, as the Participating Trusts did, to proceed via the expedited procedures set forth in Exhibit G to the Settlement Agreement. The Trust did not agree, as the Participating Trusts did, in part, to forego appellate rights. To estimate the Trust's claims based on the outcome of a proceeding that this Trust opted out from would effectively deny the Trust its opt-out right, a right LBHI agreed to when it agreed to the opt-out provisions of the Settlement Agreement.

4.  LBHI is wrong that the Trust's claims are meritless. The Trust submitted claims, on a loan-by-loan basis as required by the Protocol, with a $191,793,928.61 total Purchase Price as of the end of April 2017.[1] The Trust has claims on 2,944 breaching loans, all of which are second-lien loans originated late in the subprime era. LBHI has accepted only 77 of these loans with a Purchase Price of $7,159,139.98 for repurchase, an approximate acceptance rate of just 2.6%, which speaks volumes as to the fundamental disagreements between the Parties.

---

[1] Exhibit 2 to the Snow Report submitted in connection with the Estimating Hearing on June 1, 2017 calculates the total Purchase Price for 2,831 loans in the Trust that were the subject of Mr. Aronoff's affirmative report, 2,729 of which were Liquidated Loans and 102 of which were Non-Liquidated Loans. For the 102 Non-Liquidated Loans, the total Purchase Price is $5,193,571.97. As set forth in Exhibit 3 to the Snow Report, the Net Purchase Price for the 102 Non-Liquidated Loans is $2,090,059.31. The majority of the 121 SASCO 2006-S4 loans not addressed by Mr. Aronoff are Liquidated Loans; 73 are Liquidated Loans and 48 are Non-Liquidated Loans, as reflected on Exhibit 1 to the Snow Declaration appended hereto. *See* Declaration of Karl N. Snow, Ph.D. at ¶ 13-14.

5.      Over two-thirds of those loans (2,146 loans with a total Purchase Price of $151,140,906.11) have breaches based on misrepresentations of key information regarding the borrower's income, debt obligations, occupancy status, and employment that materially and adversely affects the value of the loan.  In fact, many loans have multiple misrepresentations.

6.      There are 1,323 loans with 1,328 misrepresentation of income claims – 991 of these breach claims are based on a variance of 40% or more between the income claimed on the borrower's loan application and the income revealed in borrower tax returns, bankruptcy filings, employer W-2s or payroll stubs and other third-party sources (e.g., BLS), which were provided to LBHI in the Trust's Protocol claim submissions.  Declaration of Edmond Esses ("**Esses Decl.**") at ¶ 10.

7.      There are 858 loans with misrepresentation of debt claims, including 559 based on undisclosed mortgage debt incurred before the subject loan closed.  *Id.* at ¶ 11.

8.      There are 354 loans with misrepresentation of occupancy claims.  *Id.* at ¶ 12.

9.      There are 264 misrepresentation of employment claims, including 138 where the borrower did not work at the employer he represented on his loan application.  *Id.* at ¶ 13.

10.      All of these claims are based on sources widely relied on by industry professionals and LBHI and its affiliates in their own putback claims and accepted by every court that has evaluated claims of this type.

11.      New York courts have routinely accepted similar types of breaches as materially and adversely affecting the value of the loans with which they are associated, LBHI and its affiliates have based their own repurchase demands on these types of breaches and, indeed, Mr. Trumpp testified at the Estimation Hearing that these types of breaches would cause a loan to be

sold at a lower value if they were known at the time the loans were sold into securitizations like the Trust.  (Tr. 785:12-16; 786:6-10; 809:11-18; TRX-929.)

12.     There are also a significant number of claims based on the absence of key documents from the loan files, such as a HUD-1 or Truth In Lending Act disclosure form. Because an absence of such documents can delay, impede, and increase the costs associated with foreclosure on the underlying property, such breaches materially and adversely affect the value of the loan.  In contrast with the majority of the "missing document" claims that were the subject of the Estimation Hearing, 847 loans with "missing document" claims that remain unresolved were serviced by Aurora Loan Services and therefore deemed complete by LBHI during the Protocol.  Esses Decl. at ¶ 5.  Only a small number, 9 of the 1,048 outstanding loans with "missing document" claims, were placed on-hold by LBHI based on a claim that the files were missing critical documents.  *Id.* at ¶ 9.  Especially given these facts, LBHI will be hard-pressed to rebut the Trust's position that if a key document was missing from the loan file when it was reviewed, then it was never there in the first place.

13.     The amount of the reserve should reflect the strength of these claims and ensure that, should the Trust prevail on the merits, there will be adequate funds for a distribution equal to other creditors in Class 7.  Accordingly, the Trust cross-moves the Court to reserve $191,793,928.61 for its claims.

14.     The Trustee also hereby cross-moves for relief from Steps 3 and 4 of the Protocol Order and to set a schedule for adjudication of the Trust's claims on the merits that will provide sufficient time for relevant fact and expert discovery.  The Trustee believes it would be fruitless to proceed with Steps 3 and 4 of the Protocol as the parties have diametrically opposed views on key points that they are unable to resolve based on further discussions.  Indeed, Mr. Trumpp

testified as such during the Estimation Hearing.  (Tr. at 648:15-21.)  That testimony finds support

in the Step 3 record, during which LBHI and the Trustee were able to resolve *only eight of the*

*ninety-nine* disputed loans in SASCO 2006-S4 that they discussed, with LBHI accepting only

one loan.  Esses Decl. at ¶ 4.  That is not surprising given their fundamental disagreements

regarding the meaning of the governing documents, numerous points of applicable law, the proof

required for breach and AMA, and various other key points.  The inescapable conclusion is that

requiring the parties to continue with Step 3 of the Protocol will be fruitless.  Proceeding to a

Claims Facilitator, as prescribed in Step 4 would be equally futile, as that process is non-binding

as well, and the history of the Protocol demonstrates that the Parties are unable to resolve the

vast majority of the claims in light of their diametrically opposed views of the issues noted

above, and others.  For these reasons, the Trustee respectfully submits that scheduling the claims

for adjudication on the merits is the most efficient means to resolve the Parties' disputes.

## **BACKGROUND**

A. <u>SASCO 2006-S4</u>

15.    The Trust closed on December 1, 2006.  The Depositor, Structured Asset

Securities Corporation ("**SASCO**"), acquired mortgage loans from the seller and sponsor, LBHI.

Aurora Loan Services LLC, a Lehman affiliate, was the master servicer.  *See* Declaration of Neil

R. Lieberman ("**Lieberman Decl.**"), Exhibit 1 (Trust Agreement) at 1.

16.    The corpus of the Trust consisted of 9,145 conventional second lien, fixed rate

residential mortgage loans, with a balance of approximately $531,581,697 as of the closing date.

Lieberman Decl., Exhibit 2 (Pro Supp.) at S-4.  Lehman Brothers Bank, FSB, was one of the

originators.  *Id.* at S-41.

17.    In the Mortgage Loan Sale and Assignment Agreement ("**MLSAA**"), LBHI made

a series of representations and warranties about the quality and characteristics of the SASC 2006-

S4 loans.  Lieberman Decl., Exhibit 3 (MLSAA).  Among other things, LBHI represented that

for each of the loans that it sold to SASCO (that were deposited into the trust by SASCO[2]):

- The documents, instruments and agreements submitted for loan underwriting were
  not falsified and contain no untrue statement of material fact or omit to state a
  material fact required to be stated therein or necessary to make the information and
  statements therein not misleading.  (*Id.* at §1.04(c)(v).)

- There is no default (other than delinquency in payment), breach, violation or event of
  acceleration existing under the Mortgage or the Mortgage Note and no event which,
  with the passage of time or with notice and the expiration of any grace or cure period,
  would constitute a default, breach, violation or event of acceleration, and neither the
  Seller nor its predecessors has waived any default, breach, violation or event of
  acceleration…. (*Id.* at §1.04(c)(vii).)[3]

B.    Protocol

18.    On December 29, 2014, this Court entered the Protocol Order. (D.E. 47569).  The

RMBS Trustees and LBHI participated in the Protocol from December 2014 until March 30,

2017, when they informed the Court of the existence of the Settlement Agreement and their

mutual belief that it was appropriate to suspend the Protocol. (D.E. 55232 at ¶ 25).

19.    Pursuant to the Protocol, the Trustee submitted 5,173 claims affecting 3,385 loans

on behalf of SASCO 2006-S4.  Esses Decl. at ¶ 4.  At the conclusion of the Protocol, there were

---

[2] The representations and warranties made by LBHI to SASCO were assigned to the Trust.  Lieberman Decl.,
Exhibit 1 (Trust Agreement) at 1.

[3] In the industry standard form of deed of trust/mortgage, borrowers covenant that they "shall be in default if, during
the Loan application process, Borrower . . . gave materially false, misleading, or inaccurate information or
statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material
representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as
Borrower's principal residence."  Declaration of James H. Aronoff ("**Aronoff Decl.**"), Exhibit 1 (Aronoff Report) at
31-32.  Likewise, in the industry standard form of deed of trust/mortgage for first-lien, owner-occupied homes,
borrowers covenant that they "shall occupy" the subject property within 60 days.  *Id.* at 32. Second lien deeds of
trust, in turn, require that the "Borrower shall perform all of Borrower's obligations under any mortgage, deed of
trust or other security agreement with a lien which has priority of this Deed of Trust." Lieberman Decl., Exhibit 5
(Dead of Trust for loan number XXXXXX0477) at ¶ 4.

3,046 SASCO 2006-S4 loans with 4,402 claims that remained outstanding.  *Id.*  As noted above,

only eight loans out of the ninety-nine discussed in Step 3 were resolved by agreement of the

parties.  Between the end of the Protocol and the end of January 2018, 19 of those loans paid off

in full, and 83 loans are no longer being pursued, leaving 2,944 outstanding SASCO 2006-S4

loans.[4]

20.    The loan review process applicable to loans in SASCO 2006-S4 was designed and

overseen by Mr. James Aronoff.  As he testified: "[M]y primary responsibility was the oversight

and to serve as the subject matter expert with respect to the forensic loan review portion of the

claims process that was under the [P]rotocol."  (Tr. 2321:24-2322:25, Aronoff Decl., Exhibit 1

(Aronoff Report) at 7.)

21.    Edmond Esses of Duff & Phelps was the project manager.  (Esses Decl. ¶ 2.)

Both Mr. Aronoff and Mr. Esses have testified at length as to the structure of the Trustees' loan

review and how it was executed, including multiple levels of quality-control.  (Aronoff Tr.

2320:11-2325:3; 2333:17-2345:9; 2366:10-2378:20; 2958:23-2967:16); (Esses Tr. 1838:15-

1847:19; 1850:10-1870:4.)  As Mr. Aronoff testified, "the conclusions drawn or the breach

findings that were the result of the loan review process were reasonable and thoughtful because

they were conducted by experienced loan review professionals, consistent with the way in which

such loan reviews are conducted in the industry, including using the types of sources and

analysis that are customarily used in reviews of this type." (Tr. 2377:17-2378:11.)

22.    The parties were able to complete Steps 0, 1 and 2 of the Protocol, which included

the review of 3,385 SASCO 2006-S4 loans.  (Esses Decl. ¶ 4.)

---

[4] The Trustee is no longer pursuing Failure to Obtain First or Second Lien Note breach claims as well as SASCO
2006-S4 breach claims not pursued in Mr. Aronoff's Rebuttal Report.

23.     At the conclusion of Step 2, the RMBS Trustees and LBHI were left with 2,987 loans with unresolved SASCO 2006-S4 claims, meaning loans as to which the Trustees maintained there was a breach and LBHI disagreed or had placed the loan on-hold. (Esses Decl. ¶ 4.)  LBHI accepted only 1 SASCO 2006-S4 loan during Step 3.  *Id.*

24.     The vast majority of the outstanding SASCO 2006-S4 loans, 2,146, have breach claims based on borrower misrepresentations of key facts regarding income, debt, occupancy and employment.  Together, these borrower misrepresentation breach claim loans have a total Purchase Price of $151,140,906.11.

25.     The largest breach category is misrepresentation of income.  There are 1,328 misrepresentation of income claims on 1,323 loans, 1,027 of which are based on evidence from the same year as origination and 991 with a variance of 40% or more between the represented and reverified income.  Esses Decl., Exhibit 3.

26.     There are 858 misrepresentation of debt claims, 685 of which are based on an undisclosed mortgage debt and 559 of which are based on an undisclosed mortgage debt incurred before the subject loan closed.  Esses Decl., Exhibit 4.

27.     There are also 354 misrepresentation of occupancy claims; and 264 misrepresentation of employment claims, including 138 based on the fact that the borrower did not work where he represented that he did on the loan application. Esses Decl., Exhibits 5 and 6.

28.     The remaining 1,449 claims have various other breaches based on, for example, missing forms required by law, such as HUD-1s and Truth In Lending Act disclosure forms, or failure to obtain a qualified appraisal performed by a licensed appraiser.   Esses Decl., Exhibit 2.

29.     Additionally, although 2,556 of the remaining unresolved SASCO 2006-S4 loans were serviced by Aurora and LBHI deemed the loan files complete for purposes of the Protocol, there are 847 loans affected by at least one missing document claim.  Esses Decl. at ¶ 5.

30.     As evidenced by the failure to resolve more than eight loans out of 99 after the Step 3 negotiations, and by the words of Mr. Trumpp, requiring the parties to go back to Step 3 will serve no purpose: "[Step 3] was an opportunity for both sides to feel each other out and understand what the arguments were.  But the clear indication is that the end of the day I understand your opinions, they understand my opinions, *but there was a gulf*."  Tr. 648:15-21 (emphasis added).  A handful of claims may be resolved by agreement, but the vast majority of the claims will remain to be adjudicated; the ultimate resolution of the claims should not await a fruitless exercise.  Similarly, the Court should dispense with Step 4, which contemplates non-binding mediation.  The Parties have had ample time to reach a settlement amount, but there is no settlement and no prospects for one given the disagreements noted above.

C.  Settlement Agreement and Estimation Hearing

31.     On April 27, 2017, LBHI moved for approval of a settlement agreement with the RMBS Trustees.  (D.E. 55232).  The Settlement Agreement contained an allocation methodology for distribution of the aggregate claim allowed by the Court.  (D.E. 55232 ¶¶ 36-37).  The allocation formula was based on the number of outstanding claims for each trust, including SASCO 2006-S4 (since the ability of a trust to opt out was a subsequent step under the Settlement Agreement) at the conclusion of the Protocol and Duff & Phelps' estimate of the total Purchase Price (for Liquidated Loans) or the Purchase Price net of the value of the Non-Liquidated Loans.  SASCO 2006-S4's allocation was 1.465131%.  Applying that percentage to the current reserve associated with the RMBS Trustees' claims of $4.75 billion, the reserve

associated with SASCO 2006-S4 is $69,587,500, over twice the floor amount proposed by LBHI in its motion.

32.    Those trusts participating in the Settlement Agreement agreed to waive their appellate rights so long as the Court allows a claim of at least $2 billion (which would then result in an allowed claim of $2.38 billion).  (D.E. 55232 ¶¶ 33-34).  While the Settlement Agreement was supported by 14 institutional investors, none of them have any investment or interest in the Trust.  (D.E. 55232 ¶ 62).  The Trust elected not to participate in the Settlement Agreement and Estimation Hearing.

33.    On June 22, 2017, the Trustee of SASCO 2006-S4 informed LBHI and the institutional investors that it was exercising its right to opt-out of the Settlement Agreement on behalf of SASCO 2006-S4.  Lieberman Decl., Exhibit 4 (Opt-Out Letter).  SASCO 2006-S4 was the only trust to opt-out.

34.    The Court approved the Settlement Agreement on July 6, 2017 (D.E. 55706) and subsequently held a 23-day estimation hearing, which concluded on February 9, 2018.

35.    Initial expert reports in advance of the commencement of the Estimation Hearing were exchanged on June 1, 2017, before SASCO 2006-S4 exercised its opt-out right. Accordingly, 2,831 SASCO 2006-S4 loans were addressed in the opening expert report of James Aronoff, the Trustees' loan review expert, and in the Purchase Price calculations presented by Dr. Karl Snow and Dr. Richard Ellson.[5]  In addition, J.F. Morrow, the Trustees' independent loan review expert who evaluated the breaches on a randomly-selected sample of 600 loans,

---

[5] Because SASCO 2006-S4 opted out of the Estimation Hearing and did not participate in that proceeding, the fact that Mr. Aronoff's initial report did not opine on 118 outstanding SASCO 2006-S4 loans has no bearing on the existence or merit of the breaches asserted with respect to those loans.

reviewed 21 SASCO 2006-S4 loans and agreed that all were affected by at least one material breach.  TRX-1369.

## LEGAL STANDARD

36.     One of the purposes in establishing a reserve is to "promote a fair distribution to creditors through a realistic assessment of uncertain claims."  *In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 544463, at *3 (S.D.N.Y. Jan. 17, 2006) (quoting *O'Neill v. Continental Airlines, Inc.*, 981 F.2d 1450, 1461 (5th Cir. 1993)).  To do so, courts in this district have rejected the binary, all-or-nothing approach and, to the contrary, "estimate the expected value of a claim based on the probability of the success of various potential outcomes if decided on the merits."  *In re Chemtura Corp.,* 448 B.R. 635, 650 (Bankr. S.D.N.Y. 2011).  With respect to disputed facts, the court "must take into account the likelihood that each party's version might or might not be accepted by a trier of fact.  The estimated value of a claim is then the amount of the claim diminished by probability that it may be sustainable only in part or not at all."  *Id.* (quoting *In re Thomson McKinnon*, 191 B.R. 330, 521 (Bankr. S.D.N.Y. 1992)); *see In re Adelphia Business Solutions, Inc.,* 341 B.R. 415, 424-25 (Bankr. S.D.N.Y. 2003) (adopting the same approach); *In re Ralph Lauren Womenswear, Inc.,* 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) (adopting the same approach).  With respect to disputed legal issues, the issue is "correctness as a matter of governing law," taking into account the possibility that an appellate court will come to a different conclusion than the bankruptcy court.  *Chemtura Corp.,* 448 B.R. at 651 (quoting and discussing *Ralph Lauren Womenswear,* 197 B.R. at 775).

37.     As the *Chemtura* court recognized, "when estimation is undertaken for the purpose of setting a claims reserve, and value can leave the estate to the extent that it hasn't been held back as a reserve, the creditor whose claim was estimated can be prejudiced if an appellate

court later concludes that a claim would be allowed in an amount greater than the amount upon

which the reserve was established." 448 B.R. at 669.

## **ARGUMENT**

A. <u>The Trust's Claims Should Be Reserved at Their Full Value</u>

38.     The evidence supports estimating for reserve purposes the Trust's claims at their

full amount, and in any event, setting a higher reserve than LBHI proposes.  First and foremost,

the Trust's claims are meritorious, and by and large are not subject to the many of the defenses

raised by LBHI during the Estimation Hearing.  Nearly sixty percent of the Trust's claims are

based on substantial borrower misrepresentations of key facts regarding their income, debt

obligations, and occupancy.  The outstanding claims include: 1,328 misrepresentation of income

breaches, 991 have a variance of 40% or more; 858 misrepresentation of debt claims, including

559 based on undisclosed mortgage debt incurred before the closing of the subject loan; 354

misrepresentation of occupancy claims.

39.     The courts addressing RMBS representation and warranty claims have repeatedly

recognize the merit of such claims.  For example, the Trust's claims premised on

misrepresentations of income are based on evidence that is standard in the industry and was used

by Lehman and Aurora in the same manner (tax returns and W-2s, bankruptcy filings, BLS, audit

documentation, The Work Number) and have been widely accepted by courts.  *U.S. Bank, Nat'l*

*Ass'n v. UBS Real Estate Securities, Inc. ("MARM")*, 205 F. Supp. 3d 386, 444-45 (S.D.N.Y.

2016); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 489, 506

(S.D.N.Y. 2013); *Fed. Housing Fin. Agency v. Nomura Holding Am. Inc.*, 104 F. Supp. 3d 441,

445, 528-30 (S.D.N.Y. 2015).  (Tr. 2357:18-2359:15 (tax returns and W-2s); 2351:20-2352:9,

2354:16-2355:10 (BLS); 2357:2-8 (audit documentation); 2359:18-2360:20 (Work Number);

3241:7-3242:4 (bankruptcy filings, tax returns, W-2s); TRX-1008, at 5; TRX-734, at 16; TRX-757, at 1; TRX-1020, at 2; TRX-1011, at 6 (BLS).)

40.     Similarly, the Trust's claims based on misrepresentations of debt and occupancy are supported by evidence types that are standard in the industry, used by Lehman and Aurora in the same manner, and have been accepted by Courts addressing such claims.  *MARM,* 205 F. Supp. 3d at 441–42 (MERS, DataVerify, SiteX, LexisNexis); 442–43 (credit reports); 445-47 (tax returns); 485-86 (hardship letters); 521 (audit credit report); *Nomura*, 104 F. Supp. 3d at 529-30 (bankruptcy filings, public records).  (Tr. 2346:4-2350:11 (MERS, Accurint, LexisNexis); 2360:21-2361:16 (DataVerify); 2365:6-2366:9 (SiteX); 3242:9-3243:17 (MERS, LexisNexis, credit reports); 2357:18-2359:15 (tax returns); 3241:7-3241:24 (bankruptcy filings); 3242:6-3243:4 (public records); Tr. 795:11-796:4 (Trumpp), TRX-760 (credit reports); Tr. 816:18-22 (claims based on Lexis-Nexis, audit credit report, and Accurint); TRX-701 at 12-15 (Accurint); TRX-1040 at 8 (tax returns); TRX-734 at 16 (bankruptcy filings); TRX-1007-12 (hardship letter); TRX-998 at 3, loan 0927 (public records).)

41.     The cases also have uniformly rejected LBHI's core defenses.  For example, no court has held that the fact a loan has not suffered a loss or that the loss suffered was not caused by the breach, or that the loan performed for some time period before defaulting and suffering a loss, precludes recovery for breach.  The uniform New York rule is that the performance of a loan is irrelevant to a determination of breach or the adverse and material effect of the breach. *See MARM*, 2015 WL 764665, at *14–15 (S.D.N.Y. Jan. 9, 2015); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 131 (S.D.N.Y 2014); *Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A.*, 2014 WL 1259630, at *4 (S.D.N.Y. Mar. 27, 2014), *aff'd* 643 F. App'x 44 (2d Cir. 2016); *Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, 2013 WL 1285289, at *10 (S.D.N.Y.

Mar. 28, 2013), *vacated and remanded on other grounds* 627 F. App'x 27 (2d Cir. 2015).  And courts have also repeatedly sustained breach claims on the basis of only one piece of evidence, effectively rejecting LBHI's argument to the contrary.  *See, e.g.*, *MARM*, 205 F. Supp. 3d at 480-82 (misrepresentations of income premised on tax returns); 482-85 (misrepresentations of debt premised on MERS reports); *Flagstar*, 920 F. Supp. 2d at 495 (accepting an income breach based only on BLS and an occupancy breach based only on Accurint).

42.    Moreover, the Trust's breach claims premised on missing documents are free of issues raised by LBHI during the Estimation Proceeding, as 2,632 of the 2,944 files were serviced and provided by Aurora and deemed complete by LBHI.  Relatedly, only 36 of these loans from this Trust were placed on hold during the Protocol.  Although the Trustees in the Estimation Hearing argued, and certainly believe, that there was no basis to place loans on hold, let alone to deny claims on the basis that the Plan Administrator refused to review claims because of the asserted absence of documents the Plan Administrator claimed to be "critical" to review, the on hold loan issue is simply irrelevant to the vast majority of the claims of SASCO 2006-S4.

43.    SASCO 2006-S4's decision to opt out means that the Trust is not subject to the expedited discovery and trial procedures negotiated during the Settlement, or the agreement that permitted consideration of the views of the Institutional Investors in 2015 – entities that have no stake in the outcome of the Trust's claims.  Additionally, the Trust retains its full appellate rights.

44.    Third, failing to reserve the Trust's claims at their full value would significantly prejudice the Trust, while doing so will have little or no impact on the administrator of the estate or the interests of other creditors.  Accordingly, the balance of equities favors estimation at full

value for a reserve of $192 million.  At this juncture, it is critical to protect the interests of the

SASCO 2006-S4 certificateholders to secure a reserve that protects the full value of their claim.

Allowing a full reserve will not meaningfully impact the amount of distributions, but it will

provide meaningful protection to the SASCO 2006-S4 creditors.

45.    Contrary to LBHI's assertion, the length of time needed to adjudicate these claims

does not support a smaller reserve; rather, it supports a larger one.  While the Trustee does not

agree that the amount of time needed to adjudicate these claims should be measured in years, as

discussed below, it will require a significant amount of time to prepare the case for trial.  During

that period, there is a very real risk that, given the status of the estate and the semi-annual

distribution schedule, SASCO 2006-S4 will prevail on its claims and be left with a recovery that

is not equal to the distributions made to other creditors in the same class.

46.    If, on the other hand, "resolution of the merits" ends up "tak[ing] years" as LBHI

warns, that too weighs in favor of a substantial reserve. (D.E. 57682 at ¶ 22).  In that case, there

is even more risk that there will be insufficient estate assets to provide SASCO 2006-S4 a

recovery equal to other creditors in its class – the money will be gone.  There is no

countervailing concern for other creditors because holding the full $192 million for SASCO

2006-S4's claims will not meaningfully delay distributions to other creditors.  LBHI does not

even argue that reserving the full amount of the SASCO 2006-S4 claims would preclude

distributions to other creditors.  (*See* D.E. 57682 at ¶ 3).

B.    At A Minimum, There Is No Basis to Reduce the Reserve Below the Trust's Share of the
Current Reserve

47.    Pursuant to the Settlement Agreement, the parties agreed to an allocation

methodology that assigned the SASCO 2006-S4 claims 1.465131% of the RMBS Trustees' total

claims.  TRX-807, at 114.  Applying this percentage to the existing reserve of $4.75 billion comes to $69,597,500 for the Trust's claims.

48.    LBHI's argument to reduce the SASCO 2006-S4 reserve below its current allocable share is solely based on the outcome of the Estimation Hearing.  But there is simply no basis to reduce the amount of the SASCO 2006-S4 reserve based on the outcome of a hearing that it did not participate in and which will not result in an adjudication of its claims.  Indeed, when coupled with the risk that the Trust may not be able to recover beyond the amount that is reserved for its claims, setting the reserve based on the Estimation Hearing essentially robs the Trust of the benefit of its right to opt out.

49.    LBHI's argument ignores that the support of the Institutional Investors for the Settlement Agreement is irrelevant.  One of the key arguments advanced in favor of an allowed aggregate claim of the Participating Trusts in the amount of $2.38 billion was the support of Institutional Investors for a claim in that amount in 2015.  LBHI Post-Trial Br. at 47.  Those investors, however, do not hold any interest, let alone a significant one, in SASCO 2006-S4 and their views, whatever relevance (if any) they may have to a determination of the allowed claims of the Participating Trusts, is irrelevant to the merits of the SASCO 2006-S4 claims.  To the contrary, the investors with a particular interest in this trust made the decision that the terms of the Settlement Agreement were insufficient.

50.    LBHI also fails to appreciate that this trust is differently situated than the hundreds of Participating Trusts.  In addition to the fact that the views of the Institutional Investors cannot have any place in the determination of this Trust's claims, SASCO 2006-S4 has not waived any appellate rights and is not subject to the Estimation Hearing's expedited schedule and truncated discovery.  It may take additional discovery of LBHI and Aurora and develop a

different factual record than was presented at the Estimation Hearing.  The outcome of the

Estimation Hearing may surely inform SASCO 2006-S4's presentation of its claims.

C.  <u>The Court Should Grant The Trustee's Cross-Motion to Estimate the Trust's Claims for
Reserve Purposes and For Relief From The Protocol Order And The Parties Should
Proceed To Binding Adjudication On The Merits</u>

51.    The Trustee cross-moves for entry of an order for relief from the Protocol, to set a

schedule for adjudication of the Trust's claims on the merits, and, for all of the reasons set forth

above, to set the reserve at $191 million.

52.    Section 105(a) of the Bankruptcy Code provides that the "Court may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title."  11 U.S.C. § 105(a).  Accordingly, this Court has broad equitable powers to promote a fair

and just reorganization process.  *See, e.g., Momentum Mfg. Corp. v. Emp. Creditors Comm.*, 25

F.3d 1132, 1136 (2d Cir. 1994) ("[B]ankruptcy courts are courts of equity, empowered to invoke

equitable principles to achieve fairness and justice in the reorganization process.").  Without

question, the order sought by the Trustee meets this standard under the circumstances.

53.    LBHI argues that the SASCO 2006-S4 remains subject to the Protocol and that

the parties should resume Step 3 of the Protocol.  As LBHI's own witness testified under oath,

that would be pointless.  It is clear that the parties are at odds as to fundamental matters that will

not be resolved through further business-to-business negotiations or the non-binding claims

resolution proceeding contemplated by Step 4 of the Protocol.  There is no basis to believe that

now resuming Step 3, or proceeding with Step 4, would result in a different outcome.  Rather,

the most likely scenario is a significant delay with no resolution while the estate's assets

diminish.

54.     Accordingly, the Trustee hereby cross-moves for the Court to curtail the Protocol and permit the parties to proceed to a binding adjudication of the claims on their merits either by the Court or by a mutually agreed-upon third-party neutral.

**NOTICE**

55.     No trustee has been appointed in these Chapter 11 cases.  SASCO 2006-S4 has or will provide notice of this Objection and Cross-Motion on (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) counsel for LBHI; and (vi) all other parties entitled to notice in accordance with the procedures set forth in the Second Amended Order, entered on June 17, 2010, governing case management and administrative procedures for these cases.  (D.E. 9635.)  The Trust submits that no other or further notice need be provided.

56.     No previous request for the relief sought herein has been made to this Court or any other court.

57.     The Trust has cited to the legal authorities upon which it relies within the body of this Objection and Cross Motion.   Accordingly, the Trust respectfully submits that the Objection and Cross-Motion satisfy the requirement of Local Bankruptcy Rule 9013-1(b) that a memorandum of law be submitted herewith.

**CONCLUSION**

58.     For the reasons set forth above, the Trustee maintains that the claim of SASCO 2006-S4 be reserved at the full value of the claims it submitted in the Protocol and that the Court should enter an order, substantially in the form annexed hereto as <u>Exhibit A</u> to order the Protocol foreshortened and to set a schedule for adjudication of the Trust's claims on the merits that will provide sufficient time for relevant fact and expert discovery.

Dated:          February 28, 2018


HOLWELL SHUSTER & GOLDBERG LLP

By:_____/s/ Michael S. Shuster_____
     Michael S. Shuster
     Dwight A. Healy
     Neil R. Lieberman
     Lani A. Perlman
     750 Seventh Avenue, 26th Floor
     New York, NY 10019
     Tel.: (646) 837-5151
     Fax: (646) 637-5150


ALSTON & BIRD LLP

     John C. Weitnauer (admitted *pro hac vice*)
     Jason Solomon (admitted *pro hac vice*)
     1201 West Peachtree Street
     Atlanta, Georgia 30309
     Telephone: (404) 881-7000

*Counsel for Wilmington Trust, National*
*Association, solely in its capacity as Trustee*
*for SASCO 2006-S4*