SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the matter of the application of<br><br>U.S. BANK NATIONAL ASSOCIATION, WELLS FARGO BANK, NATIONAL ASSOCIATION, WILMINGTON TRUST, NATIONAL ASSOCIATION, WILMINGTON TRUST COMPANY, and CITIBANK, N.A., (as Trustees, Indenture Trustees, Securities Administrators, Paying Agents, and/or Calculation Agents of Certain Residential Mortgage-Backed Securitization Trusts),<br><br>Petitioners,<br><br>For Judicial Instructions under CPLR Article 77 on the Administration and Distribution of a Settlement Payment. | Index No.<br><br>**PETITION** |

Petitioners U.S. Bank National Association ("U.S. Bank"); Wells Fargo Bank, National Association ("Wells Fargo"); Wilmington Trust, National Association ("WT"), Wilmington Trust Company ("WTC", and collectively with WT, "Wilmington Trust"); and Citibank, N.A. ("Citibank"), solely in their respective and various capacities as trustees, indenture trustees, successor trustees, securities administrators, paying agents, and/or calculation agents (collectively, the "Petitioners") of the residential mortgage-backed securitization trusts listed on Exhibit A hereto (each a "Subject Settlement Trust" and collectively, the "Subject Settlement Trusts"), as and for their Petition (the "Petition") for judicial instructions under Article 77 of the New York Civil Practice Law and Rules ("CPLR"), allege as follows:

## INTRODUCTION

1.  Certain of the Petitioners and other parties[1] (the "Accepting Trustees"), acting as trustees, indenture trustees, or separate trustees on behalf of certain residential mortgage-backed security trusts (the "Covered Loan Settlement Trusts"), accepted a settlement offer dated as of November 30, 2016 and modified as of March 17, 2017 (the "Covered Loan Settlement Agreement")[2] by and among a group of institutional investors and Lehman Brothers Holdings Inc. and other debtors (collectively, the "LBHI Debtors") in the bankruptcy cases in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), styled or related to *In re Lehman Brothers Holdings Inc., et al.* Chapter 11 Case No. 08-13555 (the "Bankruptcy Proceeding").

2.  The Covered Loan Settlement Agreement provided a mechanism to resolve claims asserting breaches of representations and warranties against the LBHI Debtors concerning loans in the Covered Loan Settlement Trusts.

3.  Pursuant to the Covered Loan Settlement Agreement, the LBHI Debtors agreed to participate in an estimation proceeding (the "Estimation Proceeding") before the Bankruptcy Court to establish the aggregate amount of allowed claims of the Covered Loan Settlement Trusts (the "Allowed Claim"). After the Bankruptcy Court, based on a formula in the Covered Loan Settlement Agreement, established the Allowed Claim, an allocable portion of the distributions on the Allowed Claim (the "Covered Loan Settlement Payment")[3] is to be

---

[1] U.S. Bank, Wilmington Trust and Deutsche Bank National Trust Company, together with TMI Trust Company ("TMI"), as successor to Law Debenture Trust Company of New York ("Law Debenture"), as separate trustee for the trusts for which Wells Fargo acts as trustee, were parties to the Covered Loan Settlement Agreement. TMI does not have any role in the trusts related to the issues in this Petition. Therefore, TMI is not one of the Petitioners

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Covered Loan Settlement Agreement. Attached hereto as Exhibit B is a copy of the Covered Loan Settlement Agreement.

[3] The Covered Loan Settlement Payment will be reduced by the amount of the Settlement Payment that would have been distributed to certain excluded trusts had they not been excluded from the Covered Loan Settlement Agreement. *See* Settlement Agreement, § 3.02(a).

2

transferred to each Covered Loan Settlement Trust. The Covered Loan Settlement Payment is

thereafter to be distributed to the holders of certificates, notes, or other securities[4] (the beneficial

owners thereof, "Certificateholders") issued by the Covered Loan Settlement Trusts[5] pursuant to

distribution provisions in the Covered Loan Settlement Agreement and the governing agreements

for the Covered Loan Settlement Trusts.

    4.    The Accepting Trustees, on behalf of certain residential mortgage-backed security

trusts (the "Transferor Loan Settlement Trusts"), some of which were also Covered Loan

Settlement Trusts, also entered into a separate settlement agreement with the LBHI Debtors,

dated September 5, 2017 and executed and accepted on October 13, 2017, to resolve breach of

representation and warranty claims concerning loans originated by third parties and acquired by

the LBHI Debtors before being deposited into the Transferor Loans Settlement Trusts (the

"Transferor Loan Settlement Agreement"). Pursuant to that agreement, the LBHI Debtors agreed

to an allowed unsecured claim in the Bankruptcy Proceeding of an amount equal to $13,000,000,

plus interest (the "Transferor Loan Settlement Payment," and collectively with the Covered Loan

Settlement Payment, the "Settlement Payments").[6] The Transferor Loan Settlement Agreement

---

[4] The term "certificates" is used in this Petition to refer to certificates, notes, or any other applicable securities.

[5] For each Subject Settlement Trust (which include both certain Covered Loan Settlement Trusts and Transferor Loan Settlement Trusts) the applicable governing agreements designate a party with the role of being responsible for all aspects of calculation, administration, and distribution of any payments for Certificateholders (defined herein for reference as, the "Payment Administrator"). The Payment Administrator is therefore the party that will administer and distribute the Settlement Payments. For some Subject Settlement Trusts, the Payment Administrator role is included within the role of the Trustee and performed by the Trustee. For other Subject Settlement Trusts, the Payment Administrator is a separate role performed by a securities administrator, paying agent, or calculation agent that is not the same party as the Trustee. Where the party performing the Payment Administrator role is different than the Trustee, the Petitioners are bringing this Petition in their respective and separate capacities as Payment Administrators and Trustees. Exhibit A hereto lists the Payment Administrator and Trustee for each Subject Settlement Trust.

[6] Attached hereto as Exhibit C is a copy of the Transferor Loan Settlement Agreement. The provisions in the Transferor Loan Settlement Agreement addressing the distribution of the Transferor Loan Settlement Payment to Trust beneficiaries are substantively identical to the distribution provisions in the Covered Loan Settlement Agreement.

and the Covered Loan Settlement Agreement are referred to collectively herein as the "Settlement Agreements."

5.    The Petition concerns the administration and distribution of the Settlement Payment (the "Settlement Payment Application Process") with respect to the Subject Settlement Trusts listed on Exhibit A hereto.[7]

6.    Each Subject Settlement Trust holds or owns one or more pools or groups (and in some instances subpools or subgroups) of residential mortgage loans.[8]  On or around the date the Subject Settlement Trusts were created, they issued multiple classes of certificates sold to investors, the proceeds of which were used to purchase such mortgage loans.  Pursuant to the agreements governing the Subject Settlement Trusts (the "Governing Agreements"),[9] the certificates represent an undivided interest in, or are otherwise secured by, the mortgage loans in the Subject Settlement Trusts.

7.    Each certificate generally has, or is assigned, a certificate principal balance equal to the total distribution of "principal amount" such certificate is entitled to receive.  Collections of "principal funds" received from the underlying mortgage loans and certain other collections are generally used to satisfy the total principal amount due to certificates.  Certificates cannot receive distributions of principal amount in excess of their original aggregate or total certificate

---

[7] The Covered Loan Settlement Agreement and the Transferor Loan Settlement Agreement also cover certain residential mortgage-backed securitization trusts that are not subject to this Petition (the "Non-Subject Settlement Trusts").  For the Non-Subject Settlement Trusts, the applicable Petitioners individually and respectively determined that, at this time, there are no material issues concerning the administration and distribution of the Settlement Payments that warrant judicial instruction, and the relief sought in this Petition is not intended to apply to the Non-Subject Settlement Trusts.  Attached hereto as Exhibit D is a schedule listing the Non-Subject Settlement Trusts, which are not the subject of this Petition.

[8] For ease of reference, "loan group" is used herein to refer to loan groups, subgroups, pools, subpools, and any other applicable grouping, pooling, or assemblage of loans.

[9] The Governing Agreements for the Subject Settlement Trusts usually include a "trust agreement" (a "Trust Agreement") or an "indenture." Because the total volume of the Governing Agreements is thousands of pages in length, the Petitioners will provide the Court with a compact disc containing electronic versions of the Governing Agreements.

principal balance. Each certificate also generally is entitled to receive a stated amount of interest distributions. The Governing Agreements contain specific "waterfall" provisions that dictate the principal amounts and interest amounts distributable to classes of certificates and the order or priority in which such amounts are distributed among such classes.

8.      With respect to distributions of principal amount, junior classes of certificates typically are not entitled to receive principal amounts until the classes of certificates senior to them have been paid in full.[10]  Generally, "Class A" is the most senior class and thereby the first class of certificates entitled to principal distributions, "Class M" is more junior and the second class entitled to principal distributions, and "Class B" is even more junior and the third class entitled to principal distributions.  For some Subject Settlement Trusts, there is only a single class of Class A certificates, but, for many of the Subject Settlement Trusts, there are multiple classes comprising Class A, *e.g.*, there are "Class A-1," "Class A-2," and "Class A-3" certificates.

9.      Each time a class of certificates receives a distribution of principal amount, the Governing Agreements require a corresponding reduction of the certificate principal balance to reflect the amount of the distribution received.

10.      Some Subject Settlement Trusts (the "OC Trusts") have an "overcollateralization" structure whereby the initial aggregate mortgage loan balances are greater than the initial aggregate certificate principal balances of certain classes of certificates.[11]  Overcollateralization

---

[10] For most of the Subject Settlement Trusts, the distributions described herein are performed under a waterfall that is in effect following a waterfall "trigger event," which generally is tied to the occurrence of cumulative realized losses or mortgage loan delinquencies reaching a certain specific percentage.

[11] Certain of the OC Trusts make use of an undercollateralization structure.  In these trusts, principal distributions can flow through a waterfall other than the ordinary principal amount waterfall when the certificate principal balance of a senior certificate or group of senior certificates exceeds the balance of the related mortgage loans. These distributions typically require that funds that would otherwise be payable to subordinate certificateholders be used to pay down the principal balances of the undercollateralized senior certificates instead.

is intended to function as credit enhancement. For these OC Trusts, principal funds collected on

mortgage loans can sometimes be distributed as "excess cashflow" instead of principal amount.

Excess cashflow is distributed under a waterfall separate from the principal amount waterfall and

may be distributed to pay, among other things, the unpaid principal balance of senior certificate

classes, unpaid realized loss amounts, interest shortfalls, and/or basis risk shortfalls.

11.     In certain circumstances, a Subject Settlement Trust may subsequently receive

funds constituting a recovery of a realized loss in respect of mortgage loans previously allocated

to the certificates—referred to in the Governing Agreements for most Subject Settlement Trusts

as a "subsequent recovery." When a subsequent recovery is realized, the principal balances of

certificates previously written down may be increased, or "written up," by the amount of the

subsequent recovery. This "write-up" accounts for the recovery of a realized loss with respect to

the mortgage loans that previously caused a decrease, or "write-down," in certificate principal

balances. The Governing Agreements generally provide a specific method by which to apply

such subsequent recovery write-ups to the certificates. Additionally, the Governing Agreements

contain waterfall provisions concerning the treatment and distribution of funds constituting

subsequent recoveries. Most often, subsequent recovery funds are treated as collections of

principal funds from mortgage loans and may be distributed as either principal amounts or excess

cashflow. The class of certificates entitled to distributions derived from any subsequent recovery

may not to be, and oftentimes is not, the same class of certificates that is written-up in

connection with such subsequent recovery.

12.     Here, the Settlement Agreements provide that the Petitioners are to distribute the

Settlement Payments "pursuant to the terms of the Governing Agreements, for further

distribution in accordance with the relevant provisions of the Governing Agreements as though

such Plan Payments are a subsequent recovery available for distribution on the related

distribution date . . . ." *See* Covered Loan Settlement Agreement, § 3.06(a).[12]

13.     The Settlement Agreements further provide that "to the extent permitted under

each Trust's Governing Agreement, the applicable [Petitioner] . . . will apply the amount of the

Plan Payment for that Trust to increase the balance of securities within that Trust . . . in the

reverse order of previously allocated losses . . . ." *See* Covered Loan Settlement Agreement, §

3.06(b).

14.     As described in detail below, the Petitioners have identified issues concerning (i)

the order of operations in applying the distribution of the Settlement Payment and the write-up of

certificate principal balances in connection therewith, and (ii) the treatment of certain certificate

classes that currently have, or will have in the future, a principal balance of zero. The resolution

of these issues is expected to affect which classes of certificates will receive distributions derived

from the Settlement Payments, and the amounts they will receive. The resolution of these issues

is also expected to affect which classes of certificates are written up and the extent of such write-

ups of certificate principal balances resulting from the distribution of the Settlement Payment,

the amount of such write-ups, and, ultimately, the resulting certificate principal balances of the

affected classes. The impact of these issues has the potential to be significant in at least some of

the Subject Settlement Trusts. In addition, certain Subject Settlement Trusts may be subject to a

"close-out call" during the pendency of this Petition, whereby the designated party to the

Governing Agreements purchases the remaining assets of the trust, which terminates the trust.

The impact of such a "close-out call" on the distribution of the Settlement Payments is currently

unclear.

---

[12] Plan Payments as defined in the Covered Loan Settlement Agreement are Settlement Payments as defined in this Petition.

7

15.     The Petitioners have filed this Petition to seek clarification and instruction from this Court concerning the Settlement Payment Application Process, and to provide Certificateholders in the Subject Settlement Trusts and other interested parties in the Subject Settlement Trusts an opportunity to express their views.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under CPLR Articles 4 and 77 to entertain a special proceeding to determine any matter relating to any express trust. The Subject Settlement Trusts are all express trusts within the meaning of CPLR Article 77.

17.     The laws of the State of New York govern the rights and obligations of the Petitioners and the Certificateholders under the Governing Agreements, and, upon information and belief, many Certificateholders are citizens of New York.

18.     Venue is proper in this Court under CPLR 503 because one of the Petitioners, Citibank, has its principal place of business in New York County.

## BACKGROUND CONCERNING
## THE SETTLEMENT AGREEMENT

19.     On June 1, 2017, the Accepting Trustees accepted the Covered Loan Settlement Agreement. The Accepting Trustees thereafter sought approval of their acceptance of this agreement on behalf of the Covered Loan Settlement Trusts before the Bankruptcy Court, which retained jurisdiction over the LBHI Debtors and claims against them.

20.     As provided for in the Covered Loan Settlement Agreement, consideration for the release of Covered Loan Settlement Trusts' claims against the LBHI Debtors consisted of an allowed general unsecured claim in the Bankruptcy Proceeding against the LBHI Debtors in an amount to be determined by the Bankruptcy Court in the Estimation Proceeding. The LBHI Debtors agreed in the Covered Loan Settlement Agreement to seek an estimation of the allowed

8

claim at a total amount of $2.416 billion, to be reduced by an amount allocable to any trusts that

were the subject of the settlement offer but did not become Covered Loan Settlement Trusts, or

terminated after accepting the offer.  Under the terms of the Covered Loan Settlement

Agreement, the Bankruptcy Court's decision could be appealed by the Trustees only if the

estimation was for an amount less than $2 billion.  *See* Covered Loan Settlement Agreement, §

3.02.  The LBHI Debtors waived their right to appeal the Bankruptcy Court's decision. *Id.*

21.     Each Covered Loan Settlement Trust's share of the allowed claim (its "Allocable

Share") would be distributed in subsequent distributions ("Plan Payments") under the LBHI

Debtors' third amended joint chapter 11 plan confirmed by the Bankruptcy Court on December

6, 2011.  *See* Covered Loan Settlement Agreement §§ 1.27, 1.28, 3.06.

22.     In return, the Covered Loan Settlement Agreement called for the Accepting

Trustees to release, on behalf of any accepting trust, claims concerning breaches of

representations and warranties made by the LBHI Debtors concerning loans in the trusts.

23.     On July 6, 2017, the Bankruptcy Court approved the Covered Loan Settlement

Agreement and found that "[e]ach of the . . . Trustees acted within the bounds of its discretion,

reasonably, and in good faith with respect to its evaluation and acceptance of the RMBS

Settlement Agreement concerning the applicable Accepting Trust(s)." *In re Lehman Brothers

Holdings Inc., et al.*, Dkt. # 55706, Order Approving RMBS Settlement Agreement and

Including Certain Proposed Findings of Fact and Conclusions of Law (July 6, 2017), at 3-4

(Chapman, J.).

24.     Subsequently, on October 13, 2017, the Accepting Trustees entered into the

Transferor Loan Settlement Agreement, releasing claims in respect of Transferor Loans held in

the Transferor Loan Settlement Trusts in return for an allocable share of an allowed claim of

$13,000,000. *See* Transferor Loan Settlement Agreement, § 3.01.

    25.    The estimation proceeding with respect to the Covered Loan claims began before

the Bankruptcy Court on November 20, 2017. The Trustees and LBHI Debtors each presented

evidence concerning the proper valuation of the Allowed Claim, with the LBHI Debtors seeking

an Allowed Claim of $2.38 billion (the amount contemplated by the Covered Loan Settlement

Agreement, reflecting certain trusts that did not accept that agreement or that terminated after

accepting that offer prior to the estimation proceeding).

    26.    On March 8, 2018, the Bankruptcy Court issued a decision from the bench, setting

an allowed claim with respect to the claims at issue in the Covered Loan Settlement Agreement

of $2.38 billion. A copy of the Bankruptcy Court's order estimating and allowing the Allowed

Claims is attached hereto as Exhibit E. As a result of the Bankruptcy's Court's ruling, as

contemplated by the Covered Loan Settlement Agreement, the Allowed Claim amount is final,

and no party may appeal its decision.

    27.    As contemplated by the Covered Loan Settlement Agreement, an expert firm

retained by the Accepting Trustees calculated the Allocable Shares of the Allowed Claims for

each of the Covered Loan Settlement Trusts. A copy of an April 2, 2018 notice to

Certificateholders setting forth those Allocable Shares is attached hereto as Exhibit F.

    28.    The LBHI Debtors have scheduled the next distribution of Plan Payments for

April 5, 2018. Petitioners are informed and believe that this distribution will include payments

Settlement Payments in respect of the Subject Settlement Trusts.

10

## KEY SETTLEMENT PAYMENT TERMS OF THE SETTLEMENT AGREEMENT

29.     Upon the Accepting Trustees' receipt of the Settlement Payments with respect to the Subject Settlement Trusts, the Settlement Agreements provide that each Accepting Trustee "shall use its reasonable best efforts to distribute the amounts received from the LBHI Debtors on account of the Allocable Shares of the Net Allowed Claim promptly." *See* Covered Loan Settlement Agreement, § 3.01.

30.     The Covered Loan Settlement Agreement further provides, "Notwithstanding the foregoing, to the extent that any Accepting Trustee or other party responsible for calculating or distributing Plan Payments for a given Trust forms a good-faith belief that guidance from a court is necessary or appropriate for resolving ambiguities or disputes concerning the distribution of Plan Payments, the Accepting Trustee or other party responsible for calculating or distributing such Plan Payments shall have the right to seek guidance from a court of competent jurisdiction before distributing those amounts." *Id.*

31.     Section 3.06(a) of the Covered Loan Settlement Agreement provides the following concerning the distribution of the Settlement Payments:

> Plan Payments on each Participating Trust's Allocable Share shall be deposited into the related Trust's collection or distribution account pursuant to the terms of the Governing Agreements, for further distribution in accordance with the distribution provisions of the Governing Agreements as though such Plan Payments are a subsequent recovery available for distribution on the related distribution date; and further provided that if the Governing Agreement for such a Trust does not include the concept of "subsequent recovery," Plan Payments to such Trust shall be distributed as though they are unscheduled principal available for distribution on the related distribution date), subject to Section 3.04.[13]

32.     As discussed above, the then-outstanding certificate principal balances of certain certificates in each Subject Settlement Trust generally will, pursuant to the Governing

---

[13] *See also* Transferor Loan Settlement Agreement, § 3.06(a).

11

Agreements, also need to be written up in the amount of the applicable Allocable Share of each

Plan Payment to account for such additional funds (the "Settlement Payment Write-Up").

33.     Section 3.06(b) of the Covered Loan Settlement Agreement provides the

following concerning the Settlement Payment Write-Up:

> In connection with the distribution of Plan Payments to Participating Trusts pursuant to Subsection 3.06(a), to the extent permitted under each Trust's Governing Agreement, the applicable Accepting Trustee, or the party responsible for calculating certificate balances pursuant to the terms of the Governing Agreements of a given Participating Trust, will apply the amount of the Plan Payment for that Trust to increase the balance of securities within that Trust (other than any class of REMIC residual interests) in the reverse order of previously allocated losses, as though such Plan Payment was a subsequent recovery; and further provided that if the Governing Agreement for a particular Participating Trust does not include the concept of "subsequent recovery," to the extent permitted under each Trust's Governing Agreement, the securities for such Trust shall be increased, in reverse order of previously allocated losses, as though the Plan Payment was distributed as though it was unscheduled principal), but in each case by not more than the amount of such losses previously allocated to that class of securities pursuant to the Governing Agreements. (Emphasis added.)[14]

**THE ORDER OF THE DISTRIBUTION OF THE SETTLEMENT PAYMENT AND THE WRITE-UP OF CERTIFICATE PRINCIPAL BALANCES**

34.     As shown above, Section 3.06 of the Settlement Agreements specifies two

operations that must be performed in connection with the Settlement Payment:   (i) the

distribution of the funds constituting Settlement Payments to Certificateholders, and (ii) the

writing up of certificate principal balances in the amount of the Settlement Payment Write-Up.

What is left unaddressed, however, is whether or the Governing Agreements themselves require

the Petitioners to apply the Settlement Payment Write-Up *after* making a distribution of the

Settlement Payment to Certificateholders of those Subject Settlement Trusts, or *before*

determining principal distribution amounts for each class of Certificateholders.

---

[14] *See also* Transferor Loan Settlement Agreement, § 3.06(b).

35.     As a result, the Petitioners are faced with two different possible approaches to perform these operations: the Petitioners could first distribute funds constituting the Settlement Payments based on certificate principal balances that do not account for the Settlement Payment Write-Up and thereafter apply the Settlement Payment Write-Up to the pertinent certificate principal balances (the "Pay First Method"); or, in the alternative, first apply the Settlement Payment Write-Up to the pertinent certificate principal balances and thereafter determine the distribution of the Settlement Payments based on the newly written up certificate principal balances (the "Write-Up First Method").

36.     For trusts with Governing Agreements that clearly specify a particular order of operations, the foregoing issue is not problematic—Petitioners intend to follow the provisions of the Governing Agreements for such trusts.  However, the Governing Agreements for the Subject Settlement Trusts listed on Exhibit A hereto do not clearly specify whether the Petitioners should use the Pay First Method or the Write-Up First Method in this circumstance.   Given the unusually large amount of money to be distributed in connection with the Settlement Payments, whether the Petitioners use the Pay First Method or Write-Up First Method may have a significant impact on the distribution of the Settlement Payments and the resulting certificate principal balances following such distribution.

     (i)      **Potential For Settlement Payments To Be Distributed As Excess Cashflow**

37.     In most Subject Settlement Trusts, subsequent recoveries are treated as principal funds collected on mortgage loans or similar funds.  Principal funds are typically distributed as principal amount on certificates.  However, the OC Trusts have an overcollateralization structure whereby in certain circumstances  a portion of principal funds can sometimes be distributed under the excess cashflow provisions.

FILED: NEW YORK COUNTY CLERK 04/04/2018 09:22 PM
INDEX NO. 651625/2018
NYSCEF DOC. NO. 1
08-13555-mg    Doc 57838-3    Filed 04/10/18    Entered 04/10/18 12:27:07    Exhibit
Exhibit C- Article 77 Petition    Pg 14 of 35
RECEIVED NYSCEF: 04/04/2018

38.    In the OC Trusts, the initial aggregate mortgage loan balances (the collateral or assets of the trust) are greater than the initial aggregate certificate principal balances of the Class A, Class M, and Class B certificates (the liabilities of the trust).  The excess of aggregate mortgage loan balances over the aforementioned aggregate certificate principal balances as of any date is often referred to as the "overcollateralization amount."  *See, e.g.*, SASCO 2005-GEL2 PSA, § 1.01, Definition of Overcollateralization Amount.  The OC Trusts also have a specific class of certificates with an initial certificate principal balance equal to the initial overcollateralization amount.[15]  These classes are usually designated as Class X (referred to herein for reference as, "Class X"), and the certificate principal balances of such classes are not included in the calculation of the overcollateralization amount. *See, e.g.*, *id.* § 1.01, Definition of Overcollateralization Amount.

39.    The OC Trusts also have a specified "overcollateralization target" representing the dollar amount that the OC Trust has "targeted" to be overcollateralized as of each period. *See, e.g.*, *id.* § 1.01, Definition of Targeted Overcollateralization Amount.   Any overcollateralization amount in excess of the specified target constitutes "overcollateralization release amount," which is typically distributed as excess cashflow, and which as a result may not be distributed as principal amount in any given month. *See, e.g.*, *id.* §§ 1.01, Definition of Monthly Excess Cashflow, Definition of Aggregate Overcollateralization Release Amount, 5.02(d).

40.    As a result of cumulative losses realized on the mortgage loans in the OC Trusts, many of the OC Trusts have little or no current overcollateralization amount, meaning that the aggregate mortgage loan balances are less than or equal to the aggregate certificate principal

---

[15] These certificates may also have an additional notional balance that generally would not impact whether they receive any portion of the Settlement Payment.

balances of the Class A, Class M, and Class B certificates. For many of the OC Trusts, the overcollateralization target has not been met or exceeded for many years and, as a result, there have been no recent overcollateralization release amounts and no excess cashflow distributions.

41.     However, the Pay First Method may cause the OC Trusts to appear to be temporarily overcollateralized. As explained, the overcollateralization amount for a given distribution date is calculated as the excess of the aggregate mortgage loan balances over the pertinent aggregate certificate principal balances. The applicable Governing Agreements provide that in determining the amount of the aggregate certificate principal balances for this calculation, it should be assumed that all of the applicable period's principal funds are being applied as principal amount to reduce such balances.[16]   The Settlement Payment is treated as though it is a subsequent recovery included in any principal funds and, as a result, the aggregate certificate principal balances are therefore reduced by the amount of the Settlement Payment. Applying the Pay First Method to the OC Trusts would make it appear that the overcollateralization amount includes the entire amount of the Settlement Payment, to the extent that the unchanged aggregate mortgage loan balances would exceed the adjusted aggregate certificate principal balances as reduced by amount of the Settlement Payment. Therefore, any portion of the Settlement Payment (*i.e.*, overcollateralization amount) in excess of the

---

[16]   *See, e.g.*, SASCO 2005-GEL2 PSA, § 1.01, Definition of Overcollateralization Amount ("With respect to any Distribution Date, the amount, if any, by which (x) the Pool Balance for such Distribution Date exceeds (y) the aggregate Class Principal Amount of the Offered Certificates *after giving effect to distributions on such Distribution Date*.") (emphasis added), Definition of Aggregate Overcollateralization Release Amount ("With respect to any Distribution Date, the lesser of (x) the Principal Remittance Amount for such Distribution Date and (y) the amount, if any, by which (i) the Overcollateralization Amount for such date, *calculated for this purpose on the basis of the assumption that 100% of the Principal Remittance Amount for such Distribution Date is applied on such date in reduction of the aggregate Certificate Principal Amount of the Offered Certificates*, exceeds (ii) the Targeted Overcollateralization Amount for such Distribution Date.") (Emphasis added); LXS 2005-2 PSA, § 1.01, Definition of Pool 1 Overcollateralization Amount (similar); Definition of Pool 1 Overcollateralization Release Amount (similar).

overcollateralization target would constitute overcollateralization release amount and be distributed as excess cashflow.

42.     This issue with the Pay First Method can be illustrated through the following hypothetical. Assume an OC Trust has $100 million in aggregate mortgage loan balances and the Class A, Class M, and Class B certificates have $100 million in aggregate certificate principal balances, *i.e.*, there currently is no overcollateralization amount. Also, assume the overcollateralization target is $10 million, and the Settlement Payment for the OC Trust is $20 million. For purposes of calculating the overcollateralization amount using the Pay First Method, the applicable aggregate certificate principal balances would be treated as if decreased by $20 million to $80 million to account for the incoming Settlement Payment and the aggregate mortgage loan balances would remain at $100 million. The OC Trust would thus appear to have $20 million (the amount of the Settlement Payment) in overcollateralization amount and $10 million in overcollateralization release amount (the overcollateralization amount ($20 million) less the overcollateralization target amount ($10 million)). The $10 million in overcollateralization release amount would be distributed as excess cashflow, which may be applied to pay interest shortfalls or reimburse previously-recognized realized losses and not a principal distribution amount. However, if the Write-Up First Method were used, the aggregate certificate principal balances would first be written up to $120 million. Again, for the purposes of calculating overcollateralization amount, the applicable aggregate certificate principal balances would be decreased by $20 million to $100 million to account for the application of the Settlement Payment. However, unlike the Pay First Method, there would be no overcollateralization amount because the aggregate mortgage loan balances ($100 million) would equal the aggregate certificate principal balances ($100 million). The entire $20 million

Settlement Payment would thus be distributed as principal amount and there would be no excess cashflow distribution.

43.    Importantly, the distribution of excess cashflow is performed under its own waterfall separate and apart from the waterfall applicable to principal distribution amounts. Under this separate provision, excess cashflow may be distributed to Class A certificates to pay any interest shortfalls and then is distributed to Class A certificates to reimburse previously recognized realized loss amounts.    Excess cashflow thereafter is distributed to pay certain other interest shortfalls, basis risk shortfalls, and other similar types of items.    Any remaining excess cashflow is typically distributed to the Class X certificates (and if there is any excess cashflow still remaining thereafter, to residual certificates[17]).

44.    For the OC Trusts with an undercollateralization feature, a mirror image of the same issue exists.    For these OC Trusts, the senior certificates of a group are an "Undercollateralized Group" on a distribution date if the certificate principal amount of those senior certificates exceeds the principal balance of the group's mortgage loans. Undercollateralized Groups are entitled to an "Undercollateralization Distribution" which essentially shifts amounts that would otherwise be payable to subordinate certificates to the Undercollateralized Group of senior certificates.[18]    For these OC Trusts, a write-up first order of operations could cause the senior certificates in a group to appear to be undercollateralized.

---

[17] The Settlement Agreements prohibit distributions of the Settlement Payments to residual certificates.  *See* Covered Loan Settlement Agreement, § 3.06(a) ("If distribution of Plan Payments to a trust would become payable to a class of REMIC residual interests, whether on the initial distribution of such Plan Payments or on any subsequent distribution date that is not the final distribution date under the Governing Agreement for such Trust, such Plan Payment shall be maintained in the distribution account, and the party responsible for distributing payments under the Governing Agreements of a given trust shall distribute it on the next distribution date according to the provisions of this Subsection 3.06(a).").

[18] *See*, SARM 2005-22 Trust Agreement, § 1.01, Definition of Undercollateralized Group, Undercollateralized Distribution, and §5.02(f)(ii)(A).

45. The distribution of any portion of the Settlement Payments for an OC Trust through the excess cashflow waterfall instead of the principal amount waterfall could have significant impacts on the resulting distribution of funds constituting the Settlement Payment for the OC Trust.

46. First, the distribution of the Settlement Payment to OC Trusts with multiple classes of Class A certificates could be impacted. Distributions to Class A certificates under the principal amount waterfall can differ from distributions to Class A certificates under the excess cashflow waterfall.

47. Second, the distribution of the Settlement Payment for OC Trusts could be impacted where the excess cashflow distribution is greater than aggregate unpaid realized losses of the Class A certificates. Excess cashflow distributions to reimburse unpaid realized losses to Class A certificates cannot exceed the aggregate outstanding amount of such losses. As a result, if unpaid realized losses of the Class A certificates are particularly small and the excess cashflow distribution large, there is a potential that some portion, and even perhaps a large portion, of the Settlement Payments for an OC Trust could be distributed to the Class X certificates.

48. Third, distribution of the Settlement Payment for the OC Trusts with undercollateralization provisions could cause amounts that would otherwise be payable to subordinate certificates to be distributed to the senior certificates instead.

**(ii)    Potential For Differing Distributions Of Principal Amount**

49. The distribution of the Settlement Payments as principal amount, in part or in whole, may also be impacted depending on whether the Petitioners use the Pay First Method or the Write-Up First Method.

50.     The certificate principal balance of a Class A (or Class M or Class B) certificate represents the maximum amount—or ceiling—of principal amount that such certificate is entitled to receive.  The certificate principal balance therefore represents a ceiling on the amount of the Settlement Payments that the certificates can receive in the form of principal amount.  If the Pay First Method were used, this ceiling would always be lower than if the Write-Up First method were used, because the certificate principal balance would not be increased by the Settlement Payment Write-Up until after distribution of the Settlement Payments.  That may result in a diminished recovery from the Settlement Payments for some Certificateholders.

51.     This can be illustrated through the following hypothetical.  Assume a Subject Settlement Trust has Class A-1 certificates with $5 million in aggregate outstanding certificate principal balances and $5 million in realized losses and Class A-2 certificates with $2 million in aggregate outstanding certificate principal balances and $8 million in realized losses.  Assume also that the Settlement Payment for the Subject Settlement Trust is $6 million and, for the purposes of this hypothetical, that the Settlement Payment would be distributed entirely as principal amount (and no portion thereof would be distributed as excess cashflow).  Principal amount is distributed sequentially first to Class A-1 and second to Class A-2, and any write-ups would be applied first to Class A-1 and then second to Class A-2.  If the Pay First Method is used, $5 million would be distributed to the Class A-1 certificates, resulting in remaining Class A-1 certificate principal balance of zero, and the remaining $1 million would be distributed to the Class A-2 certificates, resulting in a remaining Class A-2 certificate principal balance of $1 million.  Thereafter, the Settlement Payment Write-Up would be applied, and the aggregate certificate principal balances of the Class A-1 certificates would be restored to $5 million (applying the Settlement Payment Write-Up up to the amount of the $5 million in realized losses

on such class) and the aggregate certificate principal balances of the Class A-2 certificates would be restored to $2 million (applying the remaining Settlement Payment Write-Up to such class). If the Write-Up First Method is used, first the aggregate certificate principal balances of the Class A-1 certificates would be increased by $5 million (applying the Settlement Payment Write-Up up to the amount of the $5 million in realized losses on such class) to $10 million and the aggregate certificate principal balances of the Class A-2 certificates would be increased by $1 million (applying the remaining Settlement Payment Write-Up to such class) to $3 million. The entire $6 million Settlement Payment would then be distributed to the Class A-1 certificates and the aggregate certificate principal balance of the Class A-1 Certificates would then be reduced to $4 million. The Class A-2 certificates, however, would receive no amount of the Settlement Payment and the aggregate outstanding Class A-2 certificate principal balance would remain at $3 million.

### (iii)   Potential For Portions Of The Settlement Payment To Be Without Any Clear Method For Distribution

52.     If the Pay First Method were used, it would be unclear how to distribute any portion of the Settlement Payment for a particular Subject Settlement Trust that exceeds the then-outstanding aggregate certificate principal balances of the classes of certificates of such Subject Settlement Trust.

53.     In this scenario, the Settlement Payments could only be distributed as principal amount up to the amount of the then-outstanding aggregate certificate principal balances, as previously explained, and any portion of the Settlement Payments that exceeds such balances would remain. It appears that there could be many different approaches to distribute this remaining amount. For example, it could potentially be distributed as excess cashflow, though it is not clear under the Governing Agreements that it should be distributed as such. Or, it could be

08-13555-mg    Doc 57838-3    Filed 04/10/18    Entered 04/10/18 12:27:07    Exhibit
Exhibit C- Article 77 Petition    Pg 21 of 35

held over until the next distribution period and distributed following the application of at least some portion of the Settlement Payment Write-Up. But, it is likewise unclear whether such a holdover would be permissible under the Governing Agreements.

54.     If the Write-Up First Method were used, this issue would not arise. Because the Settlement Payment Write-Up would be applied prior to determining the distribution of the Settlement Payments, the Settlement Payments for a particular Subject Settlement Trust would necessarily be less than or equal to the newly written-up aggregate certificate principal balances.

## THE ORDER OF THE DISTRIBUTION OF THE SETTLEMENT PAYMENT AND THE WRITE-UP OF CERTIFICATE PRINCIPAL BALANCES

55.     Petitioners have also identified a number of issues related to classes of certificates or loan groups with current aggregate certificate principal balances of zero.

56.     First, for certain of the Subject Settlement Trusts, the applicable Governing Agreements contain a provision substantially similar to the following:

> If on any Distribution Date the Class Principal Amount of the Class or Classes of Non-AP Senior Certificates related to any Mortgage Pool have been reduced to zero, the Senior Principal Distribution Amount for such Class or Classes of Non-AP Senior Certificates for such date (following such reduction) and each subsequent Distribution Date *shall be zero.*

*See, e.g.*, SASC 2004-12H, §1.01 (definition of Senior Principal Distribution Amount) (emphasis added). This is referred to for reference herein as the "Zero Distribution Provision."

57.     The Zero Distribution Provision appears to preclude any further distributions to any Class or Classes of "Non-AP Senior Certificates" (or similarly designated certificates) if the aggregate certificate principal balance of such class has been reduced to zero ("Zero Balance Classes"), no matter whether the Zero Balance Classes have been reduced to zero as a result of

realized losses or because they have been paid in full as to their initial certificate principal

balance.

58.     The Zero Distribution Provision could arguably prevent Zero Balance Classes

from receiving any distribution of the Settlement Payments or any application of the Settlement

Payment Write-Up, but it is not clear whether or how such provision should apply in this

circumstance.

59.     Exhibit G hereto contains a list of all Subject Settlement Trusts potentially

impacted by a Zero Distribution Provision.

## NEED FOR JUDICIAL INSTRUCTION

60.     As demonstrated above, there are significant issues concerning the Settlement

Payment Application Process, and it is unclear how those issues should be resolved under the

terms of the Governing Agreements.

61.     The resolution of these issues may ultimately have an impact on which

Certificateholders receive and the corresponding amount of any principal distribution attributable

to the Settlement Payments.   There may also be an impact on which certificates are written up

and the amount of any write-ups applied to certificates in connection with the Settlement

Payment Write-Up.   Certificateholders and other interested parties—the direct economic

beneficiaries of the Settlement Payments—may have competing views concerning how the

issues should be resolved, depending on the particular classes of certificates that they hold and

how those classes may be impacted.

62.     There have also been other recent judicial instruction proceedings concerning

issues similar to those identified in this Petition in the context of settlement payments for

residential mortgage-backed securitization settlements.   Those proceedings, which sometimes

adopted the positions taken by the appearing certificateholders, have yielded conflicting results in some respects and have shown that investors hold different views on contractual distribution provisions that are in some ways similar those contained in the Governing Agreements at issue here.[19]

63.   In light of the evident uncertainty surrounding the resolution of the issues identified in this Petition and the potential for disagreements among Certificateholders and other interested parties, judicial instructions are necessary to clarify the Petitioners' contractual obligations in this regard and to facilitate the ultimate administration and distribution of the Settlement Payment in a final and binding manner.   Absent instructions, there is a significant risk of challenges to the Settlement Payment Application Process following receipt of the Settlement Payments by Certificateholders and other interested parties.   This could result in divergent rulings across multiple jurisdictions and create uncertainty surrounding whether the Settlement Payments could ultimately be clawed-back or otherwise subject to disputed claims.   A single Article 77 proceeding in this Court is the most appropriate forum to facilitate and provide a resolution.[20]   It will permit all interested parties to appear and be heard in an orderly and efficient process, and will result in a uniform, final judgment.

---

[19] *Compare In the matter of Loan Group I of the Bear Stearns Mortgage Funding Trust 2007-SL1 and Bear Stearns Asset Backed Securities I Trust 2007-AQ2*, Court File No. 27-TR-CV-17-29 (Minn. Dist. Court, Hennepin County), Order (Sept. 26, 2017) (instructing and authorizing trustee to "apply the 'write-up first method'" for the applicable settlement payment, pursuant to the corresponding settlement agreement and governing agreements), *and In the matter of Loan Group I of the Bear Stearns Mortgage Funding Trust 2007-SL1 and Bear Stearns Asset Backed Securities I Trust 2007-AQ2*, Court File No. 27-TR-CV-17-29 (Minn. Dist. Court, Hennepin County), Order (Sept. 11, 2017) (same), *and In the matter of the trusteeship created by Bear Stearns Asset Backed Securities I LLC relating to the issuance of certificates by SACO I Trust 2006-7 pursuant to a Pooling and Servicing Agreement dated as of June 1, 2006*, Court File No. 27-TR-CV-15-309 (Minn. Dist. Court, Hennepin County), Order (May 30, 2017) (instructing trustee "to withdraw the Settlement Payment from the [a]ccount and apply the Settlement Payment in accordance with the 'write up first, pay second' method"), *with In re Bank of New York Mellon*, Index No. 150973/2016 (N.Y. Sup. Court), Decision (April 4, 2017) (applicable settlement agreement "directed the Trustee to pay out the Allocable Share first, and then to write up the certificates in the amount of the Allocable Share") (Notice of Appeal filed October 25, 2017).

[20] *See* CPLR 7701 (an Article 77 "special proceeding may be brought to determine a matter relating to any express trust . . ."); *BlackRock Fin. Mgmt. Inc.*, et al. *v. Segregated Account of Ambac Assurance Corporation*, et al., 673

## NEED FOR ESCROW ARRANGEMENTS
## PENDING FINAL DETERMINATION

64.     The Covered Loan Settlement Agreement provides that:

> To the extent that any Accepting Trustee is the party responsible for distributing payments for a given Trust under the applicable Governing Agreement(s), that Accepting Trustee shall use its reasonable best efforts to distribute the amounts received from the LBHI Debtors on account of the Allocable Shares of the Net Allowed Claim promptly.

Settlement Agreement, § 3.01 (emphasis added).

65.     Each Petitioner charged with distributing the Settlement Payments for each of the Settlement Trusts, expects to enter into separate "escrow agreements" substantially in the forms attached as Exhibit 1 to the Affidavit of Robert L. Schnell, Jr. filed contemporaneously herewith (the "Schnell Affidavit") (each, an "Escrow Agreement," and together, the "Escrow Agreements"). Each Petitioner, solely in its individual, non-trustee capacity unrelated to any of the Settlement Trusts, is designated as the "Escrow Agent" under the Escrow Agreement applicable to the Settlement Trusts for which such Petitioner is trustee, indenture trustee, successor trustee, paying agent, or securities administrator. The Accepting Trustees have provided the account information for the escrows to the LBHI Debtors. The next scheduled distribution date of the LBHI Debtors' estate is scheduled for April 5, 2018.

66.     This proceeding's purpose—to obtain the Court's guidance on the Settlement Payment Application Process—would be frustrated if the Settlement Payments for the Subject Settlement Trusts were immediately routed from escrow to the Settlement Trusts and distributed to Certificateholders without this Court's direction. Immediate distribution using any of the various approaches to the Settlement Payment Application Process discussed above would

---

F.3d 169, 174 (2012) ("Permissible uses of Article 77 are broadly construed to cover any matter of interest to trustees, beneficiaries or adverse claimants concerning the trust . . . . Such proceedings are used by trustees to obtain instruction as to whether a future course of conduct is proper, and . . . to obtain interpretations of the meaning of trust documents.") (citations omitted).

24

irreversibly alter the status quo, as it would be impracticable for the Petitioners to claw-back and redistribute the Settlement Payments (which, over time, are likely to exceed $1 billion) from the Certificateholders of the Settlement Trusts in the face of a contrary judicial instruction.

67.    Therefore, to maintain the status quo, the Petitioners request that the Court immediately order each Petitioner, through the applicable Escrow Agent, to maintain the Allocable Shares of the Settlement Payments for the applicable Subject Settlement Trusts as a deposit in escrow pursuant to such Petitioner's Escrow Agreement until such time as the Court enters an order concerning the Settlement Payment Application Process and directing the transfer of the Settlement Payments to the applicable collection accounts or distribution accounts for the related Settlement Trusts.  It is necessary for the Settlement Payments for the Subject Settlement Trusts to be held outside of the collection accounts and distribution accounts because under the Governing Agreements and Settlement Agreements, any funds deposited in such accounts must generally be distributed to Certificateholders in a matter of days or weeks.

68.    The Escrow Agreements contemplate that the Settlement Payments cannot be invested unless and until a direction is provided by this Court concerning such investment. Consistent therewith, the Petitioners request that the Court direct each of the Escrow Agents to use commercially reasonable efforts to cause the Settlement Payments for the Subject Settlement Trusts to be invested and reinvested in the high quality money market funds described in the proposed Order filed contemporaneously herewith (for each Escrow Agent, the "Approved Funds"). The Approved Funds are among the highest rated money market funds.  The liquidity of these money market funds will facilitate the ability of the Petitioners to make an interim or final distribution to Certificateholders during the pendency of this proceeding subject to further orders of this Court.

FILED: NEW YORK COUNTY CLERK 04/04/2018 09:22 PM
NYSCEF DOC. NO. 1
08-13555-mg    Doc 57838-3    Filed 04/10/18    Entered 04/10/18 12:27:07    Exhibit
INDEX NO. 651625/2018
RECEIVED NYSCEF: 04/04/2018
Exhibit C- Article 77 Petition    Pg 26 of 35

69.    The Governing Agreements of many of the Subject Settlement Trusts provide that earnings derived from the investment of any amount received by a Subject Settlement Trust on the mortgage loans are payable as additional compensation to the servicer, the securities administrator, or another administrator of the Subject Settlement Trust rather than to the Certificateholders.  These provisions were intended to apply to relatively small amounts that were invested for a matter of days or weeks pending the next monthly distribution date.  The investment earnings on the Settlement Payments, which might be invested for a much longer period, are likely to be significantly higher than the earnings on the temporary investment of proceeds from the mortgage loans.

70.    The Petitioners request that this Court direct that any interest earned on the investments held in escrow be re-invested and inure to the benefit of Certificateholders.  Further, in order for the Petitioners to be able to write-up the certificate principal balance of the certificates appropriately, the investment earnings accruing on the escrowed funds will be included in each Settlement Trust's Allocable Share under the Settlement Agreements and treated as subsequent recoveries received on the mortgage loans.  The Petitioners request that the Court direct that, upon a final determination of this Court concerning the Settlement Payment Application Process, the full amount released from escrow to a Subject Settlement Trust be treated as that Subject Settlement Trust's Allocable Shares under the Settlement Agreements.  With respect to each Petitioner, the Escrow Agreements provide a mechanism to allocate earnings proportionally among the Subject Settlement Trusts.  The Escrow Agents will not receive any fees, interest or other monetary benefit under the Escrow Agreements and neither will the Petitioners, servicers, securities administrators, or other administrators of the Settlement Trusts.

71.     In addition to the foregoing, future direction by the Court may be necessary concerning the Escrow Agreements in certain circumstances.

72.     For federal income tax purposes, many of the Subject Settlement Trusts are comprised of one or more "real estate mortgage investment conduits" ("REMICs"), as defined in Section 860D of the Internal Revenue Code (the "IRC") (each such Subject Settlement Trust, a "REMIC Trust").   REMICs must meet certain criteria to maintain their status as REMICs, including a requirement that no more than a *de minimis* amount of a REMIC's assets consist of assets other than qualified mortgages and "permitted investments."  IRC § 860D(a)(4); 26 CFR § 1.860D-1(b)(3).   Permitted investments include only certain assets, including "cash flow investments."  IRC § 860G(a)(5).   Cash flow investments are defined as "any investment of amounts received under qualified mortgages for a temporary period before distribution to holders of interests in the REMIC."   IRC § 860G(a)(6).   The regulations implementing the REMIC provisions state that a "temporary period may not exceed 13 months."  26 CFR § 1.860G-2(g)(1)(iii).

73.     Each REMIC Trust received a ruling from the Internal Revenue Service that the REMIC Trust's Allocable Share is to be treated for tax purposes as amounts received on qualified mortgages held by the REMIC Trusts.  As a result, if the Settlement Payments are held in escrow undistributed for longer than thirteen months, it could arguably jeopardize the REMIC Trusts' statuses as qualified REMICs.

74.     Out of an abundance of caution, if it appears that the Settlement Payments for any of the REMIC Trusts may be held for a period longer than thirteen months, the Petitioners anticipate seeking further guidance from this Court with respect to such REMIC Trusts.  The Petitioners expect that they will request direction from the Court that requires the Settlement

27

Payments for such REMIC Trusts to be treated as distributed to Certificateholders solely for federal, state, and local income tax purposes. This type of a direction would permit the applicable Settlement Payments to be held undistributed for a further period of time without implicating potential REMIC issues.

### REQUEST FOR RELIEF

**WHEREFORE**, pursuant to the provisions of CPLR Art. 77 and all other applicable law, the Petitioners respectfully request that this Court:

1. Conclude that it has exclusive jurisdiction over the subject matter of this Article 77 proceeding, all parties to this proceeding, the Petitioners, and all certificateholders, noteholders, and other parties claiming rights in the Subject Settlement Trusts, for the purposes of rendering such additional instructions as are necessary and/or appropriate in the administration of the Subject Settlement Trusts and, further, retain jurisdiction to enforce the terms of its judgment;

2. Direct, as an interim measure necessary to permit the Court to direct the Petitioners on the administration and distribution of the Allocable Shares for each Settlement Trust, each Trustee to maintain, through the Escrow Agent, the applicable Allocable Shares of all Subject Settlement Trusts as a deposit in escrow pursuant to the Escrow Agreements substantially in the forms attached as Exhibit 1 to the Schnell Affidavit until such time as the Court enters an order directing the transfer of the Allocable Shares to the applicable collection accounts or distribution accounts for the related Settlement Trusts;

3. Direct each of the Escrow Agents to use commercially reasonable efforts to keep the Allocable Shares invested and reinvested in the high quality money market funds described in Exhibit 2 to the Schnell Affidavit;

4.  Hold that the Petitioners and Escrow Agents are entitled to exculpation from liability for placing, receiving, holding, investing, and/or reinvesting the Allocable Shares for the Settlement Trusts in escrow in accordance with the Court's direction;

5.  At such designated time and place, make and enter an order instructing and authorizing the Petitioners to (the "Settlement Payment Instruction"):

    a.  with respect to the Subject Settlement Trusts listed on Exhibit A hereto, administer and distribute the applicable Allocable Shares using the Pay First Method, the Write-Up First Method, or a different method authorized by this Court (and if the Pay First Method or Write-Up First Method is used, apply adjustments as may be necessary at the time of the distribution of the Allocable Shares, if and to the extent so ordered, to account for OC issues, issues related to classes of certificates or loan groups that have an aggregate certificate principal balance of zero and issues related to Settlement Trusts in which aggregate certificate principal balances of the outstanding classes are currently less than the applicable Allocable Shares);

    b.  comply with any other instruction from this Court concerning the distribution or administration of the Allocable Shares;

    c.  with respect to the Subject Settlement Trusts listed on Exhibit G hereto, (x) administer and distribute the pertinent Allocable Shares, including any applicable increases to certificate principal balances, without applying or giving any effect whatsoever to the Zero Distribution Provision; (y) apply the Zero Distribution Provision to prevent distribution of the applicable Allocable Shares to any applicable classes of certificates with aggregate certificate principal balances of

FILED: NEW YORK COUNTY CLERK 04/04/2018 09:22 PM
INDEX NO. 651625/2018
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 04/04/2018

08-13555-mg    Doc 57838-3    Filed 04/10/18    Entered 04/10/18 12:27:07    Exhibit
Exhibit C- Article 77 Petition    Pg 30 of 35

zero at the time of the distribution of the Allocable Shares and to prevent any portion of the Settlement Payment Write-Up from being applied to any such classes of certificates; or (z) use a different method authorized by this Court to address the Zero Distribution Provision; and

    d.   comply with any other instruction from this Court concerning the distribution or administration of the Allocable Shares.

6.   Instruct, authorize, and order the Petitioners and any other party responsible for administering payments with respect to the Subject Settlement Trusts to administer and distribute the Allocable Shares for the Subject Settlement Trusts in accordance with the Settlement Payment Instructions as promptly as reasonably possible taking into account the working time necessary to administer and distribute the Allocable Shares and any adjustments required to effectuate the Settlement Payment Instructions for any Settlement Trust, including verification and testing to the extent necessary;

7.   Order that certificateholders, noteholders, and any other parties claiming rights in the Settlement Trusts are barred from asserting claims against any Petitioner with respect to such Petitioner's administration and distribution of the Settlement Payments, so long as such administration and distribution is consistent with the Settlement Payment Instructions and any other orders of the Court; and

8.   Grant any other, additional, and different relief this Court deems just and proper.

HAHN & HESSEN LLP

Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
(212) 478-7200

FAEGRE BAKER DANIELS LLP

Robert L. Schnell*
Stephen M. Mertz*
Michael F. Doty*
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-6000

*Attorneys for Petitioner Wells Fargo Bank,
National Association*

* pro hac vice forthcoming

MAYER BROWN LLP

Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. (212) 506-2500

*Attorneys for Petitioner Citibank, N.A.*

ALSTON & BIRD LLP

Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel.: 212-910-9400

*Attorneys for Petitioners Wilmington Trust,
National Association and Wilmington Trust
Company*

MORGAN, LEWIS & BOCKIUS LLP

Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York 10178
Tel.: 212-309-6000

Kurt W. Rademacher
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel.: 215-963-5000

*Attorneys for Petitioner U.S. Bank National
Association*

31

08-13555-mg    Doc 57838-3    Filed 04/10/18    Entered 04/10/18 12:27:07    Exhibit
Exhibit C- Article 77 Petition    Pg 32 of 35

HAHN & HESSEN LLP

Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
(212) 478-7200

FAEGRE BAKER DANIELS LLP

Robert L. Schnell*
Stephen M. Mertz*
Michael F. Doty*
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-6000

*Attorneys for Petitioner Wells Fargo Bank,
National Association*

* pro hac vice forthcoming

MAYER BROWN LLP

Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. (212) 506-2500

*Attorneys for Petitioner Citibank, N.A.*

ALSTON & BIRD LLP

Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel.: 212-910-9400

*Attorneys for Petitioners Wilmington Trust,
National Association and Wilmington Trust
Company*

MORGAN, LEWIS & BOCKIUS LLP

Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York 10178
Tel.: 212-309-6000

Kurt W. Rademacher
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel.: 215-963-5000

*Attorneys for Petitioner U.S. Bank National
Association*

31

HAHN & HESSEN LLP


Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
(212) 478-7200

FAEGRE BAKER DANIELS LLP


Robert L. Schnell*
Stephen M. Mertz*
Michael F. Doty*
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-6000

*Attorneys for Petitioner Wells Fargo Bank,
National Association*

* pro hac vice forthcoming

MAYER BROWN LLP


Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. (212) 506-2500

*Attorneys for Petitioner Citibank, N.A.*

ALSTON & BIRD LLP


Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel.: 212-910-9400


*Attorneys for Petitioners Wilmington Trust,
National Association and Wilmington Trust
Company*


MORGAN, LEWIS & BOCKIUS LLP


Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York 10178
Tel.: 212-309-6000

Kurt W. Rademacher
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel.: 215-963-5000

*Attorneys for Petitioner U.S. Bank National
Association*

31

FILED: NEW YORK COUNTY CLERK 04/04/2018 09:22 PM
NYSCEF DOC. NO. 1

INDEX NO. 651625/2018

RECEIVED NYSCEF: 04/04/2018

08-13555-mg    Doc 57838-3    Filed 04/10/18    Entered 04/10/18 12:27:07    Exhibit
Exhibit C- Article 77 Petition    Pg 34 of 35

HAHN & HESSEN LLP

_____
Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
(212) 478-7200

FAEGRE BAKER DANIELS LLP

_____
Robert L. Schnell*
Stephen M. Mertz*
Michael F. Doty*
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-6000

*Attorneys for Petitioner Wells Fargo Bank, National Association*

* pro hac vice forthcoming

MAYER BROWN LLP

_____
Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. (212) 506-2500

*Attorneys for Petitioner Citibank, N.A.*

ALSTON & BIRD LLP

_____
Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel.: 212-910-9400

*Attorneys for Petitioners Wilmington Trust, National Association and Wilmington Trust Company*

MORGAN, LEWIS & BOCKIUS LLP

_____
Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York 10178
Tel.: 212-309-6000

Kurt W. Rademacher
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel.: 215-963-5000

*Attorneys for Petitioner U.S. Bank National Association*

HAHN & HESSEN LLP

Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
(212) 478-7200

FAEGRE BAKER DANIELS LLP

Robert L. Schnell*
Stephen M. Mertz*
Michael F. Doty*
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-6000

*Attorneys for Petitioner Wells Fargo Bank,
National Association*

* pro hac vice forthcoming

MAYER BROWN LLP

Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. (212) 506-2500

*Attorneys for Petitioner Citibank, N.A.*

ALSTON & BIRD LLP

Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel.: 212-910-9400

*Attorneys for Petitioners Wilmington Trust,
National Association and Wilmington Trust
Company*

MORGAN, LEWIS & BOCKIUS LLP

Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York 10178
Tel.: 212-309-6000

Kurt W. Rademacher
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel.: 215-963-5000

*Attorneys for Petitioner U.S. Bank National
Association*