Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY  10004

15

16                   April 10, 2018

17                   4:09 PM

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  F. FERGUSON

1    HEARING re Doc #57838 Motion for Temporary Restraining Order

2    and Order to Show Cause filed by Chester B. Salomon on

3    behalf of Institutional Investors

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   BECKER, GLYNN, MUFFLY, CHASSIN & HOSINSKI LLP

 4        Attorneys for Institutional Investors

 5        299 Park Avenue

 6        New York, NY 10171

 7

 8   BY:  CHESTER B. SALOMON

 9        ALEC P. OSTROW

10

11   MORGAN, LEWIS & BOCKIUS LLP

12        Attorneys for U.S. Bank National Association

13        101 Park Avenue

14        New York, NY 10178

15

16   BY:  MICHAEL S. KRAUT

17

18   FAEGRE BAKER DANIELS LLP

19        Attorneys for Wells Fargo Bank NA

20        2200 Wells Fargo Center

21        90 S. Seventh Street

22        Minneapolis, MN 55402

23

24   BY:  ROBERT L. SCHNELL

25
```

Page 4

1    MAYER BROWN LLP

2         Attorneys for

3         7 Times Square

4         New York, NY 10036

5

6    BY:  CHRISTOPHER L. HOUPT

7

8    HAHN & HESSEN LLP

9         Attorneys for Wells Fargo Bank NA

10        488 Madison Avenue

11        New York, NY 10022

12

13   BY:  ZACHARY NEWMAN

14

15   ALSTON & BIRD

16        Attorneys for Wilmington Trust NA, Wilmington Trust

17        Company

18        90 Park Avenue

19        New York, NY 10016

20

21   BY:  ALEXANDER S. LORENZO

22        WILLIAM HAO

23

24

25

```
1   UNITED STATES DEPARTMENT OF JUSTICE
2        Attorney for the U.S. Trustee
3        201 Varick Street, Room 1006
4        New York, NY 10014
5
6   BY:  ANDREA B. SCHWARTZ
7
8   WILLKIE FARR & GALLAGHER LLP
9        Attorneys for the Debtors
10       787 Seventh Avenue
11       New York, NY 10019
12
13  BY:  TODD G. COSENZA
14
15  ALSO PRESENT TELEPHONICALLY:
16
17  KAELA MCCABE
18  KURT RADEMACHER
19  DAVID WENDER
20  WILLIAM HAO
21  LOREN HARMAN
22  PATRICK MOHAN
23
24
25
```

1              P R O C E E D I N G S

2              THE COURT:  Thank you for making yourselves

3     available on extremely short notice.  Let's see who's on the

4     phone.  Okay.  Well, there are a couple of folks on the

5     phone and a number of them are in live mode, so we'll wait

6     and see who wants to be heard, but why don't we start with

7     appearances please.  Hello, Mr. Ostrow.  How are you?

8              MR. OSTROW:  I'm well, Your Honor.  I hope you're

9     doing as well as you can be under the circumstances.

10             THE COURT:  Thank you, I appreciate it.

11             MR. OSTROW:  And thank you for hearing us on short

12     notice.  Alec Ostrow, along with Chester Solomon of Becker,

13     Glynn, Muffly, Chassin & Hosinski, on behalf of the

14     institutional investors.

15             THE COURT:  Thank you. Hello.

16             MR. KRAUT:  Good afternoon, Your Honor, Michael

17     Kraut, Morgan Lewis, here for US Bank National Association

18     as Trustee.

19             MR. NEWMAN:  Good afternoon, Your Honor, Zachary

20     Newman from Hahn & Hessen, representing Wells Fargo, along

21     with my co-counsel, Robert Schnell, from Faegre Baker

22     Daniels, who is not admitted in this Court, but would like

23     to be heard today if that's all right with Your Honor.

24             THE COURT:  Absolutely, Your Honor.  Welcome sir.

25             MR. SCHNELL:  Thank you, Your Honor.

Page 7

```
 1               MR. NEWMAN:  Thank you, Judge.

 2               MR. HOUPT:  Good afternoon, Your Honor,

 3   Christopher Houpt of Mayer Brown for Citibank.

 4               THE COURT:  Citi, okay.  All right.  Does -- yes,

 5   go ahead?

 6               MR. LORENZO:  Good afternoon, Your Honor.  Alex

 7   Lorenzo, Alston & Bird for Wilmington Trust.

 8               THE COURT:  All right.  Does anyone on the phone

 9   plan to participate in the hearing?

10               MR. RADEMACHER:  Good afternoon, Your Honor, this

11   is Kurt Rademacher from Morgan Lewis on behalf of the US

12   Bank National Association.  I do not expect to have to

13   speak, but I am available if there are any questions.

14               THE COURT:  All right, very good.  Thank you.

15   Anyone else?  Okay, we'll leave it there for the moment.

16   Okay, so let me tell you what I know.  We'll go from there.

17   What I know I sonly what I have seen in the papers that were

18   filed by Mr. Solomon and Mr. Ostrow on behalf of the

19   institutional investors seeking emergency relief to enjoin

20   the Trustees, as they put it, from evading the Court's

21   exclusive jurisdiction over the R&BS settlement.  And

22   attached to the moving papers are, among other things, the

23   article 77 proceeding that was commenced, I believe, on

24   April 4th.  That's -- I'm gleaning that from the index

25   number and the received in the New York state court Filing
```

Page 8

1   System, April 4th.

2        MR. OSTROW:  That's correct.

3        THE COURT:  Okay.  And when I saw you all last, we

4   had spent many months of quality time together during the

5   trial.  And I think the -- I rendered the decision approving

6   the settlement on or about March 8th, right?  And then took

7   a little while for everyone to agree on a form of order, and

8   I think the form of order was entered around March 15th,

9   right.

10        MR. OSTROW:  Your Honor, that was the order

11   approving -- at the estimation hearing.

12        THE COURT:  At the estimation hearing.

13        MR. OSTROW:  The settlement was the previous July.

14        THE COURT:  Yes, the settlement was many, many

15   months ago.  Okay.  So, now, what it appears is that under

16   some but not all of the indentures, there's a lack of clear

17   understanding on behalf of the Trustees, as to how to apply

18   certain of the waterfall, what I'll call the waterfall

19   payment provisions.

20        MR. KRAUT:  Yes, Your Honor.  The only

21   clarification I would make is that in some of the trust, the

22   Trustee is not the party charged with distributing the

23   payments and so it would be another deal party, a paying

24   agent, but the Trustee or another deal party responsible for

25   distributing payments by the petitioners.

1           THE COURT:  Very good, thank you.  That's the

2    article 77 proceeding, which was condensed, is now with

3    Justice Friedman who, apparently, has the happy task of

4    doing this with respect to -- for other Trustees in other

5    proceedings.

6           MR. KRAUT:  Yes, involving some of the same

7    Trustees.  This is the third proceeding of this exact type

8    she's handling, where the institutional investors

9    (indiscernible).

10          THE COURT:  So, that's an interesting question

11   which I will come back to, which is that given that she's

12   been doing this for a couple of years and given that it's a

13   number of the same Trustees, I'm going to want to know why

14   this started on April 4th.  I do not understand that.  It's

15   really neither here nor there, but it's something that I'm

16   going to want to know because I don't understand it.

17          So, the predicate for the emergency relief is the

18   fact that tomorrow there's a hearing before Justice

19   Friedman, to move the money from, essentially, the Trustees'

20   overnight accounts into some sort of an escrow account?  Is

21   that what's happening, more or less?  And Mr. Ostrow, you

22   don't want the money to move from the one place to the other

23   place?

24          MR. OSTROW:  That's right, Your Honor.  This is

25   about preventing a delay in distribution after all these

Page 10

1    years.

2              THE COURT:  But what I don't understand is,

3    because I'm focused on the extreme emergency nature of this

4    application, this all came in, you know, a couple of ours

5    ago, and we had to do this today because there's a hearing

6    at 10 o'clock tomorrow morning.  What difference does it

7    make whether or not the money moves, where the money

8    continues to live?  I get that you're unhappy with the fact

9    that they're doing this at all, but just in terms of the

10   immediate movement of the money from the one account to the

11   other account, what difference does that make?  Bearing in

12   mind that, you know -- and I think this is true, and I see

13   Mr. Cosenza sitting in the back, so he can answer if his is

14   not true -- but the money has left Lehman -- correct?

15             MR. COSENZA:  That's correct. Todd Cosenza from

16   Willie Farr & Gallagher.

17             THE COURT:  Mr. Cosenza, come on up.

18             MR. COSENZA:  Good afternoon, Your Honor.

19             THE COURT:  To the microphone.  Hello, Mr.

20   Cosenza.  So, the money has left Lehman, right?

21             MR. COSENZA:  That's correct, Your Honor, to the

22   designated -- there's a whole process set up --

23             THE COURT:  Of course.

24             MR. COSENZA:  -- before -- in the context with the

25   estimation proceeding to get the money to the Trustees so

Page 11

1      they can deal with it as they need to deal with it.

2              THE COURT:  Okay.  So, why don't you sit up here

3      next to Ms. Schwartz, or wherever, in case I have to ask you

4      something else, okay.  So, Mr. Ostrow, let's go back to the

5      question of what difference it makes where the money lives

6      until this gets figured out.

7              MR. OSTROW:  Well, Your Honor, I want to preface

8      this by saying I'm probably the person in the room with the

9      least amount of knowledge about this, but this was done --

10     obviously, I was not here for any of the estimation

11     hearings.

12             THE COURT:  Very winning argument, Mr. Ostrow.

13             MR. OSTROW:  I understand that.  But I make it a

14     point to be as truthful as possible whenever I appear in

15     Court.  Obviously, Gibbs & Bruns from Houston, has been the

16     one who has been directing traffic on behalf of the

17     institutional investors.  They were the ones who were

18     spearheading the RMBS settlement, and my firm served as

19     local counsel.  And so, my understanding comes from them.

20     It doesn't come from anything that I have seen or observed.

21     So, my understanding from them is that what this -- they

22     believe what this is, it is a pretext just to avoid

23     distributing the funds.  And that, Your Honor --

24             THE COURT:  Which is the pretext -- the article 77

25     proceeding?

1           MR. OSTROW:  The request for instructions on how

2       to do it.

3           THE COURT:  To what end?  What's the hypothesis as

4       to why they want to avoid distributing the funds?

5           MR. OSTROW:  I can't speak to that, Your Honor.

6       The idea is that after all this time negotiating the RMBS

7       settlement, which was dated March of 2017, signed on June

8       1st, and had the hearing in July.  Now, suddenly, after all

9       this, and after the estimation hearing, there is certainly

10      some questions about how to distribute money.  And the

11      questions that are being asked are the questions that

12      related directly to the provisions of the RMBS settlement

13      agreement.  And you can see from the petition that was filed

14      in state court, all over the petition.  In many paragraphs

15      there are citations to quotations from the RMBS settlement

16      agreement.  They're asking the state court judge to

17      interpret that and direct them on how they should make the

18      distribution.  That, to us, obviously, is offensive to the

19      reservation of exclusive jurisdiction that Your Honor had

20      when Your Honor approved the RMBS settlement agreement and

21      that's the last decretal of the paragraph of the 9019 award.

22      So, to the extent that they had any questions at all, they

23      should come back here and ask them.  And if they come back

24      here and ask them, then those who are not running on an

25      emergency basis, such as myself, will be able to explain to

Page 13

1    Your Honor why these questions are either beside the point,

2    or why they don't matter, and why the important thing that

3    the institutional investors are interested in, is finally

4    getting their distribution, to which they are entitled, and

5    not having the money put in escrow for an indefinite period

6    of time, while some court who has no prior experience with

7    this particular agreement, tries to parse through the

8    various provisions.

9            This Court is the court that approved it.  This

10   Court is the court that reserved exclusive jurisdiction over

11   its interpretation.  And to the extent that there is a

12   legitimate question about how this should work, this Court

13   is the court that should answer that legitimate question.

14   And if there isn't a legitimate question, but rather a

15   pretext, then this is the court that will most easily see

16   through that, and order distribution to occur.

17           THE COURT:  All right, now I understand.  Thank

18   you.  So, let's see what we can agree on.  First of all,

19   there is no need to move the money tomorrow, is there?

20           MR. HOUPT:  Well, I was planning to answer Your

21   Honor's first question, which is what happens tomorrow?

22           THE COURT:  I'm just trying to deal with the most

23   urgent things first.  And the most urgent thing right now is

24   the notion that tomorrow this money could move in a way that

25   I am being told would, in not so many words, irreparably

Page 14

1   harm the institutional investors because it will set the

2   stage for what they're characterizing as further delay.  So,

3   the best answer to that is to preserve the status quo and

4   not do that until there can be a thoughtful process around

5   figuring out whether what Mr. Ostrow says is accurate or

6   inaccurate in the following respect:  If it is true that --

7   and I cannot tell you, okay -- if it is true that the only

8   thing that needs to be interpreted is the RMBS settlement

9   agreement, I'm doing that.  Justice Friedman is not doing

10  that.  On the other hand, if it is the case that there is

11  ambiguity or holes in the RMBS settlement agreement, that

12  require the interpretation of the indentures, under New York

13  State Law, that's another question.  I believe that I have

14  jurisdiction to do that, and I can decide to do that, or to

15  abstain.  But, it's more complicated than that, and I'll

16  just give you all of my thoughts and you can respond to that

17  in any order that you like.

18          Because I'm not happy.  These claims have been out

19  there for 10 years.  The indentures haven't changed.  There

20  was a settlement in 2015 involving these same indentures.

21  As many of you know, that settlement didn't work.  There was

22  the so-called RMBS settlement.  That did work.  That was

23  approved almost a year ago.  Then we had the lead up to

24  trial.  Everyone knew this was coming.  Not only that, but I

25  ruled on March 8th.  You filed these papers on April 4th.  I

Page 15

1    just am -- and I fully understand and I know that many of

2    you who've been with this process for a long time, and there

3    are new faces and there are old faces, but that I have

4    repeatedly expressed frustration with the seeming inability

5    of the Trustees to move forward.  And here we are.  And

6    you're back.  The money has moved out of the estate.  We

7    still have the opt-out trust to deal with, which is not for

8    today.  The last thing I want to do is to interpret the

9    governing indentures, but I will not -- I do not want to be

10   placed in the position of relinquishing my jurisdiction over

11   the settlement agreement.  And at this moment, I can't tell

12   which is which.  I am very disinclined to get involved with

13   rendering a decision under New York State law, on the

14   meaning of provisions in the indenture.  But I don't know,

15   at this moment, whether and to what extent there is that

16   lack of clarity in the RMBS settlement agreement.

17          So, the first order of business is to figure out

18   how to get me out of the jam that I'm in right now, because

19   there is no reason, as far as I can discern, that that money

20   has to move tomorrow at 10 o'clock in the morning.

21          MR. KRAUT:  Your Honor, let me try to address some

22   of the concerns you have.

23          THE COURT:  Sure.

24          MR. KRAUT:  I don't think there's any question

25   that this Court has jurisdiction to interpret its own order,

Page 16

1    as is in the moving parties' papers, or that the Court has

2    jurisdiction to adjudicate disputes as to the interpretation

3    and enforcement of the settlement agreement.  That's not

4    what this is about, and I understand that that's the

5    Petitioner's position here.  That's not what this is about.

6    This is dispute about the interpretation of the trust

7    agreements.  It's not --

8              THE COURT:  But my point is, that that's what you

9    say, and that's different from what the institutional

10   investors say.

11             MR. KRAUT:  I understand, Your Honor, and that's

12   why I'm going to try to help you through this.  If you --

13             THE COURT:  I do not need your help through this,

14   all right.  You can make arguments, but I do not need your

15   help.

16             MR. KRAUT:  Understood, Your Honor.

17             THE COURT:  Go ahead.

18             MR. KRAUT:  There's a section of the settlement

19   agreement, 306(d) that expressly set forth what the parties

20   to this settlement agreement understood what happened in a

21   situation like this.  The parties are the institutional

22   investors, the plan administrator and the Trustees.  And it

23   provides that notwithstanding anything to the contrary set

24   forth above, each accepting Trustee and/or the part

25   responsible for implementation, shall be entitled, prior to

Page 17

1    implementing the payment terms, to seek further guidance

2    from a court of competence jurisdiction regarding the

3    procedures under the governing agreements related to this.

4    And so, it was always understood that if one of the parties

5    who was going to making the distribution had a question

6    about how that distribution should occur, that they would

7    have the ability to do that.  When the parties wanted to say

8    the bankruptcy court shall enter findings of fact, the

9    bankruptcy court shall, they said that.  There's no dispute

10   as to the interpretation of this provision.  The dispute is,

11   how, within the internal affairs of trust, how the Trustee,

12   now having resolved the claims, now having received the

13   money, how the Trustee should be allocating payments within

14   a trust, solely the internal affairs of the trust.  This

15   doesn't involve --

16          THE COURT:  I understand and I understood that for

17   several hours now.  But it still doesn't answer the question

18   of which side of the ledger the dispute falls on, because it

19   is the institutional investors' position that this is not

20   implicated.  So, I agree with you.  I don't disagree with

21   you.  But what I'm saying to you is, at this moment, I

22   cannot figure out whether this can be -- whether there are,

23   indeed, questions that need to be placed in that bucket,

24   versus the argument that, to simplify, the RMBS settlement

25   agreement is playing on its face and, therefore, the

Page 18

1    distributions ought to take place in one certain way.  I'm

2    not entertaining that question this afternoon.  I just

3    can't.  So, I still would like an answer to the question of

4    why the money needs tomorrow.  Why can we not -- because

5    what you're telling me is, fundamentally, everything has to

6    stop anyway for there to be an Article 77 proceeding, right?

7    And what the institutional investors are saying is simply,

8    just don't move the money from where it is now into this

9    escrow account.  And again, I said to Mr. Ostrow, I don't

10   fully understand what the difference is, because the money

11   has let Lehman.  The money is already over on your side.

12   So, I'm just not sure what difference it really makes.

13          MR. KRAUT:  I'll turn it over to Mr. Houpt, but

14   the basis of some pretext is the first I'm hearing of it as

15   our rationale, is new.  But he idea that somehow the

16   institutional investors would be prejudiced by money being

17   moved into an interest-bearing escrow account, that escapes

18   me.

19          MR. HOUPT:  That's right, you know.  And I think

20   that you asked the correct question at the outset which is,

21   what is the emergency?  What's happening tomorrow that's

22   irreversible?  We have proposed an order to show cause to

23   Justice Friedman which I'd certainly counsel as co-counsel

24   has.  And it asks for three things:  One is that the Court

25   approve a notice program so that all investors can receive

Page 19

1    notice of the proceeding; the second is that it approve the

2    escrow agreements, and the third is that it approve the

3    investment of the escrowed funds in a, basically, AAA US

4    Treasury-backed money market funds, so that they can earn

5    some interest for however long the Article 77 lasts.

6    Perhaps the Article 77 will end next week and you'll enter a

7    permanent injunction.  Perhaps it will go on for six months.

8    But as we have done in previous similar proceedings, with

9    never any objection from any investor, we thought that it

10   was prudent and appropriate, although not expressly

11   authorized by any agreement, to put the money in an

12   interest-bearing account, for the benefit of investors.

13   We're not distributing the money to the four winds tomorrow.

14   We're not putting it somewhere where it cannot be recovered.

15   We're putting it in the safest and most liquid investments

16   that we could find.  That's all that's happening tomorrow.

17   We're certainly not asking the Court to interpret any

18   agreement, let alone the settlement agreement.  Nor has

19   counsel identified any way in which our petition -- and I

20   don't think that you want to do this today, but we can

21   discuss the questions that we've actually, the substantive

22   questions that we put to the state court, none of them have

23   anything to do with interpreting the settlement agreement.

24   The settlement agreements --

25             THE COURT:  We have a sharp disagreement on that.

Page 20

1          MR. HOUPT:  We have a dispute about that, but I

2    submit that the investors have not identified any way in

3    which even the substantive questions, that will be decided

4    down the road, let alone the preliminary questions that will

5    be decided at the order to show cause, implicate

6    interpretation of the settlement agreement in any way.

7          THE COURT:  Which order to show cause?  The one

8    that you're here on today or the one that's going to be

9    heard tomorrow?

10          MR. HOUPT:  I'm sorry. The state court -- the

11    order to show cause before Justice Friedman.  That has

12    nothing to do with interpreting any contract at all.

13          THE COURT:  Okay.  I get that.  Tomorrow is all

14    about moving the money, and that's why I started where I

15    started with you, Mr. Ostrow, because I still don't

16    understand why putting money in an interest-bearing account

17    is a bad thing, or prejudices the institutional investors,

18    as long as it is understood that it's not prejudicial to

19    you.  One thing that's clear is I'm not going to -- there is

20    -- this money has left Lehman.  So, I have little, if

21    anything, to say about it from that perspective.  I have the

22    retention of exclusive jurisdiction.  So, the only question

23    is whether this is interpretation of the RMBS settlement

24    agreement, or interpretation of the indenture.  And my main

25    point to you today is that I can't tell yet.  I am not

Page 21

1    inclined to involved in the interpretation of these

2    indentures.  However, I am extremely -- I am mystified by

3    the Trustee's conduct.  I'm mystified.  How could it be that

4    we are here in April, and you have only just begun the

5    process of figuring out what to do with the money that you

6    knew was coming?  The RMBS settlement agreement -- remember?

7    It was going to be $2 billion or it was going to be $11.4

8    billion.  And, as you pointed out, Justice Friedman has been

9    busy doing this for other indentures by the same clients

10   that you're representing here today.  I just don't

11   understand it.  Hence, I guess the suspicion that there is

12   something else going on.  I don't know what that else would

13   be, other than I understand that the Trustees are very

14   cautious about proceeding in the face of what they determine

15   is ambiguity.  So, I'm not suggesting any bad faith on your

16   part, but I really don't understand how this happened.

17   We've all known this was coming for years.

18              MR. KRAUT:  Let me try, Your Honor.

19              THE COURT:  Could you?

20              MR. KRAUT:  Yeah.  At the time the settlement was

21   being discussed, there were three sets of parties.

22              THE COURT:  The RMBS settlement?

23              MR. KRAUT:  Yes, Your Honor.  There were the

24   Trustees, Lehman and the institutional investors -- all

25   worked on this settlement.  There were hundreds of trusts

1      involved in that settlement agreement.  A decision was made

2      that Paragraph D of 306 was the way to deal with this issue,

3      rather than trying to have an agreement that the parties

4      were eager to move forward, not knowing whether this issue

5      was going to be something that was going to affect one or

6      all the trusts.  And so, rather than try to put in a process

7      that would separately interpret what needs to happen for

8      somewhere between 100 and 400 different trusts, this was

9      meant to be the way to deal with this issue.

10             At the time the settlement agreement as

11     negotiated, it wasn't clear whether Trustees were going to

12     accept on behalf of some of the trusts, all of the trusts.

13     And so, it wouldn't have been possible to build an agreement

14     that accounted for every one of these without being over

15     inclusive in that way.

16             THE COURT:  Okay, but wait.  But when the RMBS

17     settlement agreement was entered into in June?

18             MR. KRAUT:  Signed, I think in -- we signed on in

19     July.

20             THE COURT:  Right.  But it was entered into

21     between Lehman, on the one hand, and the institutional

22     investors on the other hand, March or April.

23             MR. COSENZA:  March 17th.  And the proceeding --

24             THE COURT:  March of 2017.

25             MR. COSENZA:  And then 9019 was in early July,

Page 23

1   like July 6th or 7th.

2           THE COURT:  By that time, that was the window for

3   the Trustees to accept or not, right?

4           MR. COSENZA:  Correct, yes.

5           THE COURT:  So, at that point, when I approved the

6   9019 settlement, we knew who was in, and we knew who was

7   out.  So, at that point, the universe of trust was fixed,

8   right?

9           MR. KRAUT:  Subject to Your Honor's approval, yes.

10           THE COURT:  Right. Okay.  So, when I approved the

11   9019 settlement, we were then on the path to the trial,

12   which was going to result in a distribution.  And the only

13   question was, how much?  So, at that point in time, the

14   Trustees knew that they were going to have to figure out how

15   to give out the money, right?

16           MR. KRAUT:  Correct.

17           THE COURT:  And so, what's the explanation for why

18   they did nothing between then and April 4th?

19           MR. KRAUT:  I don't think that the Trustee did

20   nothing.  I think the Trustees anticipated that this issue

21   was playing out in front of Justice Friedman, and in the JP

22   Morgan matter.  The Trustees understood that to the extent

23   that these issues were going to happen, they were going to

24   be brought, as they were in those other proceedings, as

25   follow-ons after the distribution was made.

1           THE COURT:  Did you communicate that to the

2     institutional investors?

3           MR. KRAUT:  They were parties in the JP Morgan

4     matter.  They were parties in the Bank of America

5     proceeding, and this is consistent with how this played out

6     in those as well.

7           THE COURT:  So, you didn't answer my question.

8     There was an extensive negotiation with the institutional

9     investors here, and with the Trustees.  And when we did this

10    for the first go-round in the 2015 settlement, people, folks

11    were talking about article 77 proceedings and similar

12    proceedings in other jurisdictions.  And the beauty of the

13    9019 settlement, I believed, was that it was going to avoid

14    all of that.  So, that turns out to not be true.  And my

15    question is, which is neither here not there, but just of

16    historical interest, is whether or not that was

17    communicated, whether the institutional investors had any

18    idea that there was going to have to be an article 77

19    proceeding as a follow-on to everything we did here.  I

20    don't know if Mr. Ostrow knows that because he wasn't

21    involved at that juncture, so I'm not going to put him in

22    the position of having to answer that.

23          But it just really goes to kind of a balancing of

24    you know, of the prejudice and explanation for why it is

25    that I think the institutional investors have reacted the

1    way they have.  But let's try to get back to what I really

2    have to deal with today.  And let me go back to Mr. Ostrow

3    for a moment.  I don't understand that there's any emergency

4    or prejudice to the institutional investors in allowing the

5    funds to be investigated in an escrow account, with all of

6    your rights reserved, to continue to try to convince me that

7    I ought to decide the open issues.

8           MR. OSTROW:  Your Honor, obviously, we're not

9    contending that the money is going to be stolen.  The point

10   that we are concerned about is obviously an indefinite delay

11   in front of a court that really shouldn't be doing this

12   matter.  Now, if they came here, and asked Your Honor to say

13   could we put this in escrow for a little while we figure out

14   whether this belongs in this Court or in the state court, I

15   don't know that -- you know, I haven't talked to the

16   institutional investors, but it's hard for me to imagine how

17   there would be a problem with that as long as the money can

18   be taken out readily.

19          THE COURT:  So, you feel more comfortable if the

20   money goes into escrow pursuant to my order as opposed to

21   Justice Friedman's order?

22          MR. OSTROW:  Yes, because once something is

23   started in the state court -- and again, and I mentioned

24   this in my affidavit, because one of the things we started

25   to look at first was can we remove the Article 77?  And, you

```
 1    know, the mysteries of being a party to an Article 77 is

 2    something that's a little intractable to me.  But

 3    apparently, the only parties at the moment are the

 4    petitioners in the state court -- the RMBS Trustees and the

 5    related transaction parties.

 6              THE COURT:  But counsel indicated that part of the

 7    relief being sought was to establish notice procedures.  I

 8    guess that's different from an individual investor,

 9    noteholder, becoming a party.

10              MR. OSTROW:  My understanding is sort of

11    rudimentary.  But my understanding is there is a process

12    that one has to go through if you're not a petitioner, to

13    become a party.  And that process takes some time.  There's

14    also a clock in Rule 9027, a 30-day clock, to remove

15    something, and only a party, under 28 USC 1452 can remove

16    something.  So, we would be, obviously, coming here with an

17    application under Rule 9006 to extend the time, and Rule

18    9027 to remove something.

19              But the problem is, you know, we believe that this

20    Court is the Court that should make the decision, should

21    direct the traffic.  Because, as Your Honor says, if you

22    decide you should abstain, you can abstain.

23              But we think that this is something that Your

24    Honor reserved exclusive jurisdiction on, and we have our

25    doubts as to whether these questions are legitimate, that
```

Page 27

1    would result in a prolonged, indefinite delay of the day of

2    distribution.

3              But to the extent the questions are legitimate,

4    they belong here, or at least they belong before Your Honor

5    so that Your Honor can decide whether you should decide

6    them, or the State Court should decide them.

7              THE COURT:  So, this is where I am.  I want time

8    to be able to decide whether and to what extent I need to

9    decide.  I said this at the top.  To the extent that I would

10   conclude that what's required is interpretation of the RMBS

11   settlement agreement and order which I entered, I ought to

12   do that.  To the extent that I conclude, after having more

13   than four hours with the papers, that this is indeed a hole

14   in the RMBS settlement agreement and it was contemplated

15   that a court of competent jurisdiction would make the call,

16   then that's what we should do.

17             Why can't I enter an order directing that the

18   money be put into escrow pending further decision of this

19   Court on that threshold question of whether and to what

20   extent I am going to act?  And if you wish to proceed in the

21   State Court with respect to your noticing procedures, Mr.

22   Ostrow, I don't see why that would concern you.  They ought

23   to start, and notice is good.  It's chicken soup.

24             MR. OSTROW:  There may be, Your Honor, but the

25   question is how many proceedings should run simultaneously?

Page 28

1    And again, that's for Your Honor to decide.  But we don't

2    want to be in two places --

3              THE COURT:  I under --

4              MR. OSTROW:  -- at the same time.

5              THE COURT:  Right.  I understand.  But now I'm

6    trying to address your concern.  You answered that you would

7    feel less prejudiced by my entering an order directing or

8    authorizing - perhaps authorizing, but not directing -- that

9    the money be put into an escrow, subject to further order of

10   this Court.  So, is that something that the Trustees are

11   able to agree to, or amenable to not objecting to?

12             MR. SCHNELL:  Your Honor, Robert Schnell from --

13             THE COURT:  Yes.

14             MR. SCHNELL:  -- Faegre, on behalf of Wells Fargo.

15   I wasn't here for the underlying proceedings.

16             THE COURT:  Yes, lucky you.

17             MR. SCHNELL:  Lucky me.  Let me just respond to

18   the question you just asked, and then let me give a little

19   context for your underlying concern about why this is taking

20   so long.

21             In terms of the question you just asked, we've

22   commenced the proceeding in Article 77; we've published

23   notice on the website.  People are told if you want to be

24   heard on this, show up at 10:00 tomorrow in front of Justice

25   Friedman.  All this is going to happen.

Page 29

```
 1              We think it's important to give notice.  No one's
 2      had notice of this proceeding, other than us here a couple
 3      of hours ago.  I think it would be useful to go ahead with
 4      the Article 77 proceeding because I don't see, as I think
 5      you don't see, any prejudice to the institutional investors
 6      if the money's invested.  It should be invested.  There
 7      should be interest.
 8              And I note, just for your understanding, that
 9      we're not going to get any fees out of this.  There's
10      nothing in this for the Trustees in this escrow arrangement.
11              THE COURT:  Okay, but here's my -- I keep going
12      back to the same question.  We can all agree that having the
13      two-plus billion dollars in an interest-bearing account
14      would be a good thing.
15              MR. SCHNELL:  It's not that much, Your Honor, but
16      yes, it would be a good thing
17              THE COURT:  Okay.
18              MR. SCHNELL:  Because it's $2 billion discounted,
19      right, it's about $700 million, I think.
20              THE COURT:  You're quite right.  Thank you.  So,
21      let's get interest on it, right?  Okay.
22              MR. SCHNELL:  It should be invested, right?
23              THE COURT:  Right.
24              MR. SCHNELL:  And now it's not, and we want to put
25      it in the -- we've got the affidavits --
```

1              THE COURT:  Okay.

2              MR. SCHNELL:  -- from Professor Hubbard at

3    Columbia.  This is the best place.  It's very liquid.  If

4    this Court were to later order that something else should

5    happen with the money, it's in the most liquid investment

6    possible if we invest it that way.

7              And plus, we'll have a hearing.  There will be

8    notice.  There should be a notice protocol.  We don't want

9    to delay that.  It's the same notice protocol we've used in

10   these other cases.  So, we want to get that started.  We

11   have no more interest in delay than the institutional

12   investors do.  People have shown up in these proceedings and

13   taken positions quite contrary to the institutional

14   investors, which gets me to my point of why we're here now,

15   right?  Because there's no point in starting this procedure

16   until you know how much money is involved.

17             We've run through the waterfalls.  There are

18   hundreds of trusts that are not here because we ran through

19   the waterfall to see whether it made a difference or not.

20   It didn't.  We figured it out internally.  You know, if the

21   difference in distribution is $50,000 or less, we're not

22   going to put the trust into the proceeding.  We couldn't do

23   that until we knew what the money was.

24             Folks aren't going to show up and object or take a

25   position, hire lawyers, until they know they have some money

Page 31

```
 1    in the game.  So, until there's some money to be

 2    distributed, the point of doing this proceeding is really

 3    just a theoretical exercise.  And that's not what we're here

 4    for.

 5              We're here for an actual exercise, where people

 6    have some skin in the game.  And until there is a

 7    distribution, an amount we can run through the numbers,

 8    people can see what's involved, it's premature to start.  So

 9    that's --

10              THE COURT:  You know, I think --

11              MR. SCHNELL:  -- my understanding of the delay.

12              THE COURT:  But I think it's kind of -- I think

13    it's still beside the point of the issue surrounding the

14    movement of the money from one account to the other account.

15    And I'm not following your argument because the amount that

16    was approved after the estimation proceeding was the lowest

17    amount that could be approved.

18              MR. SCHNELL:  Right.  But if it had been the

19    higher number, we'd be --

20              THE COURT:  You --

21              MR. SCHNELL:  -- here with a different set of

22    trusts, I think.

23              THE COURT:  Yes, you would have had more trusts.

24              MR. SCHNELL:  Maybe.  It all depends on how the

25    waterfalls work.
```

```
1              THE COURT:  But -- no, but stick with me here.  I
2    approved -- the range was $2.38 billion to $11.4 billion,
3    right?  I approved $2.38 billion.  Your rationale for not
4    going ahead was you didn't know which trust.  Well, you have
5    the fewest trusts that you could've possibly had.  You would
6    rather have the high-class problem of having had more
7    trusts, right?
8              MR. SCHNELL:  Sure.
9              THE COURT:  Right.  But that doesn't provide a
10   reason for not having figured out what you would need to do
11   with these trusts that are here right now.
12             MR. SCHNELL:  But to do that, we have to start a
13   proceeding, Your Honor, because the underlying governing
14   agreements don't tell us.  That's the problem.  And you
15   wouldn't start a proceeding for some trusts that might need
16   to be here, and we don't know, there might be some others
17   that have to get added, depending on what you rule.  Until
18   we know what you're going to rule --
19             THE COURT:  Okay, look, I'm certainly not in a
20   position, you know, to get in the weeds of the operation of
21   these trusts, which is the essence of the problem that I
22   have.
23             MR. SCHNELL:  It is, Your Honor.
24             THE COURT:  Because I do not want to do that.  I
25   only want a reasonable period of time to figure out to what
```

Page 33

1    extent I need to interpret the settlement agreement or not.

2              I have to say that I'm not entirely convinced by

3    your argument.  You knew that there were going to be a

4    minimum number of trusts involved.  And I don't know enough

5    about Article 77 proceedings to know whether and to what

6    extent it would have been impossible or impractical to begin

7    an Article 77 proceeding for those trusts whom you knew were

8    going to be in the money.

9              And in addition, I will say that...  Well, let me

10   leave it at that, because we could -- this is very

11   interesting, and you and I could keep discussing this, but I

12   don't think --

13             MR. SCHNELL:  Right, Your Honor.

14             THE COURT:  -- it would bear any fruit.  Tell me

15   what your objection would be to my ordering or authorizing

16   the deposit of the money into the escrow accounts, at least

17   on a temporary basis, until I can figure out to what extent

18   I'm keeping this and to what extent I would abstain.

19             MR. SCHNELL:  And Your Honor, of course there's

20   more that we want from Justice Friedman.

21             THE COURT:  Yes.

22             MR. SCHNELL:  And I assume we'll go ahead with

23   those other things.  My biggest concern about that piece --

24             THE COURT:  Yeah.

25             MR. SCHNELL:  -- is there's no notice to anyone.

Page 34

1    There will be some notice of the proceeding tomorrow.  It's

2    been up for a couple of days.  And I think it's important

3    that we get as much protection as we can in terms of notice

4    to having people come.

5            And I don't see any reason not to have Justice

6    Friedman enter the order because, again, if the

7    institutional investors are right and this belongs here,

8    there's nothing in that order that prevents this case from

9    being adjudicated here.  And we have given notice of the

10   proceeding in front of Justice Friedman.  I think it makes

11   sense to go ahead there.

12           Now, if you order that we put the money into

13   escrow pursuant to the escrow agreements and the investments

14   that the parties have indicated they're going to make, of

15   course, we'll do that.

16           MR. OSTROW:  Your Honor, the problem that I have

17   is that if there is an order of a court of coordinate

18   jurisdiction, then if we come back here and say there's

19   something wrong with that, it's not entirely clear that this

20   Court would be able to fix it, because this Court's not an

21   appellate court to the State Court.

22           THE COURT:  No.  That's absolutely right.

23           MR. OSTROW:  And --

24           THE COURT:  That's absolutely right.  So, I don't

25   -- so, let's -- so, we all agree that the money ought to go

1    into escrow.  I'm not convinced, Mr. Ostrow, that there is

2    that much difference, but I hear your concerns and you

3    continuing to express them.

4         I think the best solution, albeit imperfect -- and

5    I understand you've noticed it and you want to go ahead.

6    And I understand that Justice Friedman knows how to do this,

7    and I don't.  So, we can all agree on that.  What I would

8    like is just a very narrow window of time for the parties to

9    address on the merits, with more than four hours to think

10   about it, the parameters of the dispute.  To what extent is

11   this interpretation of the RMBS settlement agreement, and to

12   what extent is it not?

13        So, can you not agree to delay the transfer into

14   the escrow account for 10 days?  Let me put it slightly

15   differently.  If I order you to do that, then presumably you

16   would follow my order, right?

17        MR. SCHNELL:  You can count on it.

18        THE COURT:  Okay.  All right.  So, very good.  So,

19   I'm going to enter an order incident to the order to show

20   cause today that's been brought on by the institutional

21   investors, directing that the Trustees, to the extent the

22   relief they seek in the order to show cause to be heard

23   before Justice Friedman tomorrow is granted, that the

24   Trustees delay the transfer of the funds from the accounts

25   in which it is currently held to an escrow account to a date

Page 36

1    no earlier than 10 days from today, except as otherwise

2    ordered by this Court.

3            MR. HOUPT:  Your Honor, I have a substantive

4    objection to that, but I just need to say that for Citibank,

5    at least, the money is already in an account that is all

6    escrow account.  And what we were asking is to move into the

7    money market fund.  So, we just want to keep it where it is

8    now.

9            THE COURT:  Yes, keep it -- thank you for that

10   clarification.  So, the money will not move from where it is

11   today for 10 days, unless earlier contrary order of this

12   Court.  And in that period of time, for better or worse, you

13   can have time to brief the issue as we've teed it up today.

14   I don't think that there's much agreement about the issue.

15           And Mr. Ostrow, the institutional investors can

16   make arguments as to whether or not I should abstain, but I

17   think that's where the action is.  Because everybody agrees

18   that I have jurisdiction, and I think everybody agrees,

19   hypothetically, that to the extent that its interpretation

20   of the order and the RMBS settlement agreement, that's in my

21   bailiwick.  And to the extent that it's not, Mr. Ostrow is

22   going to argue that it still should be in my bailiwick, but

23   that that's a different thing.

24           So, can we agree on a briefing schedule?

25           MR. OSTROW:  Certainly, but I want to ask Your

1    Honor why the proceeding is going to go forward in the State

2    Court tomorrow, because --

3            THE COURT:  Because I just -- your most acute

4    concern was with the money moving.

5            MR. OSTROW:  That is true.

6            THE COURT:  Okay.  And I don't --

7            MR. OSTROW:  But that's not the entirety.

8            THE COURT:  I understand, but you can't have

9    everything you wish for all the time.  So, I -- and I very

10   much believe in -- I don't -- it's of concern to me that

11   this has been fully noticed.

12            And to pick up on the point there are other

13   investors and certificate holders other than those that you

14   represent, I don't see any prejudice in allowing the

15   proceeding to at least begin.  And to the extent,

16   hypothetically, that you come back here, and I say I'm going

17   to decide these issues, I'm going to decide the issues.

18            MR. OSTROW:  I understand that.  I just want to

19   point out, Your Honor, that nothing has been signed in the

20   State Court.  The order to show cause has not been signed.

21   Tomorrow's hearing is to consider whether to sign the order

22   to show cause and what preliminary relief should be granted.

23            THE COURT:  Well, but --

24            MR. OSTROW:  So --

25            THE COURT:  -- you can go tomorrow and tell

Page 38

1    Justice Friedman, here's what happened yesterday --

2          MR. OSTROW:  Hopefully, we'll have a transcript to

3    do that, but I'm -- maybe not.

4          THE COURT:  Well, I mean, you can each give your

5    very honest, you know, recitations of what happened.  And if

6    you want to get together tonight and prepare a short order

7    reflecting the 10-day delay, that to the extent that Justice

8    Friedman determines to grant the relief that's been

9    requested in the order to show cause, that the parties here

10   have been directed by me to delay the transfer of the funds

11   from the accounts in which the funds currently reside by 10

12   days, in order to enable this Court to determine whether or

13   not -- whether and to what extent I will exercise

14   jurisdiction on the issues raised with respect to the

15   interpretation of the settlement agreement and/or the

16   indenture.

17         And that's the best that I can do in terms of

18   preserving the status quo as best as possible and, frankly,

19   respecting, you know, Justice Friedman's purview, you know,

20   over the issues.

21         I have to confess I don't know that you'll be able

22   to get a transcript tonight.  If we had been smarter, we

23   could have had a, you know, real-time reporter here.  But

24   this was rather rushed.

25         MR. SCHNELL:  I think that's just fine, Your

1   Honor.  We can certainly agree on a briefing schedule.  Do

2   you have any druthers as to what you'd like?

3            THE COURT:  Well, okay, let's see.  Let's work

4   backwards from a hearing date, okay?

5            MR. SCHNELL:  Sounds good.

6            THE COURT:  So, what's today?  Today is April

7   10th?

8            MAN 1:  Yes.

9            THE COURT:  Okay.  So, April 19th; that's day

10  nine.  Conveniently enough, I have it available.

11           MR. OSTROW:  You're not going to be at the ABI in

12  D.C.?

13           THE COURT:  I was going to be at the ABI in D.C.,

14  where you see my name on the list of people who are going to

15  be there, but I can't travel because of this.  So, that day

16  is now wonderfully open.  Oh, are you going to be at the

17  ABI?

18           MR. OSTROW:  No, I'm not, actually.

19           THE COURT:  Okay.  All right, so I can give you

20  April 19th at 10:00.  I don't know that -- so, you tell me

21  what you'd prefer to do.  Do you want to do somebody goes

22  first and somebody goes second, or do you want to do

23  simultaneous?  And you're going to have to...  I'm on trial

24  through the end of the day on the 18th, so I'm going to need

25  more than a couple of hours to review your submissions.  So,

Page 40

1    you tell me.

2            MR. SCHNELL:  (indiscernible)

3            THE COURT:  Yeah.

4            MR. SCHNELL:  (indiscernible)

5            THE COURT:  I'd like to have the last thing filed

6    in by 4:00 PM on Tuesday the 17th.  Hmm?  I think the best

7    thing would be simultaneous submissions, and then at the

8    argument on the 19th, you can respond to what each other

9    said.  That just seems to me to make the most sense and give

10   you the most time to lay out your arguments.

11           MR. KRAUT:  I think that's --

12           THE COURT:  You think that's okay?

13           MR. KRAUT:  I think that's fine and --

14           THE COURT:  Mr. Ostrow?

15           MR. OSTROW:  Yes, Your Honor, that's fine.

16           MR. KRAUT:  I don't know if the plan administrator

17   would want to put papers in.  They were parties to the

18   agreement --

19           THE COURT:  I'm going to take a wild guess that

20   they're going to say no.  They're not even paying attention.

21   Mr. Cantor?

22           MR. CANTOR:  I'm looking at my calendar.

23           THE COURT:  The question on the table is whether

24   or not the plan administrator was going to put in papers,

25   and my guess was the answer would be no.

1          MR. CANTOR:  Yes.  We have no -- unless you'd like

2     us to, we'd rather not (indiscernible) --

3          THE COURT:  Mr. Cosenza?

4          MR. COSENZA:  Your Honor, (indiscernible) our

5     preference is not to, but if the Court would like us to, we

6     will.

7          THE COURT:  I just wanted to make sure you were

8     included in the timing, so...

9          MR. SCHNELL:  How long would you like the briefs

10    to be, Your Honor?

11         THE COURT:  I won't give you a page limit.

12         MR. SCHNELL:  Okay.

13         THE COURT:  Okay.

14         MR. SCHNELL:  Thank you, Your Honor.

15         THE COURT:  Just do your best to give me a roadmap

16    around the various provisions, both in the settlement

17    agreement and in the indenture, so that I can do the best

18    job possible to figure out what's what.

19         MR. SCHNELL:  Certainly, Your Honor.

20         THE COURT:  All right.  Okay.  What about -- shall

21    I -- I'm going to so order the record.  All right.  And do

22    you want to -- I always am nervous when I ask the lawyers to

23    go and prepare an order in a circumstance like this.

24         Are you content to proceed with the record being

25    so ordered, knowing that you can get a transcript of it at a

Page 42

1      later date, rather than -- it just seems to me to be a

2      better way to go than to have you try to reduce this to an

3      order and put you at peril of feeling that it isn't exactly

4      right.

5              MR. SCHNELL:  I think that's fine, Your Honor.  We

6      understand, I believe, what Your Honor has ordered, and I

7      don't think we need any more.

8              MR. OSTROW:  That's fine, Your Honor.

9              THE COURT:  All right.  Very good.  Please send my

10     regards to Justice Friedman.  And we'll see you at 10:00 on

11     the 19th.  And if by any chance you come to an agreement

12     that obviates the need for a hearing on the 19th, you'll let

13     us know if that happens, all right?

14             Thank you so much for making yourselves available

15     on such short notice, particularly the Trustees, and I

16     appreciate it.  All right?

17             ALL:  Thank you, Your Honor.

18             THE COURT:  Thank you very much.

19

20             (Whereupon these proceedings were concluded at

21     5:00 PM)

22

23

24

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya                 Digitally signed by Sonya Ledanski
                           Hyde
                           DN: cn=Sonya Ledanski Hyde, o, ou,
7    Ledanski Hyde         email=digital@veritext.com, c=US
                           Date: 2018.04.13 11:49:34 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 13, 2018