BECKER, GLYNN, MUFFLY
CHASSIN & HOSINSKI LLP
299 Park Avenue
New York, New York 10171
Telephone: (212) 888-3033
Facsimile: (212) 888-0255
Chester B. Salomon
Alec P. Ostrow

**HEARING DATE AND TIME:**
**April 19, 2018, at 10:00 a.m.**

GIBBS & BRUNS, LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903
Kathy D. Patrick (admitted *pro hac vice*)
David Sheeren (admitted *pro hac vice*)

*Attorneys for the Institutional Investors*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
In re                                      :        Chapter 11
                                           :
LEHMAN BROTHERS HOLDINGS, INC., et al.,    :        Case No. 08-13555 (SCC)
                                           :
                              Debtors.     :        (Jointly Administered)
------------------------------------------------------------------x
```

**The Institutional Investors' Supplemental**
**Memorandum on the Issues to Be Addressed and This Court's Jurisdiction in**
**Further Support of the Institutional Investors' Motion to Enjoin the RMBS Trustees and**
**Related Transaction Parties from Prosecuting Their Article 77 Proceeding in State Court**

# TABLE OF CONTENTS

**I. FACTUAL BACKGROUND** ............................................................................................ **1**

**II. SUMMARY OF ARGUMENT** ..................................................................................... **5**

**III. ARGUMENT** ................................................................................................................ **7**

   A.   The Court has jurisdiction to interpret and enforce the Settlement Agreement, including its provisions relating to the distribution of Plan Payments to investors........ 7

     1.   The Court retained jurisdiction in the 9019 Order and Estimation Order. .................. 7

     2.   The Court's retained jurisdiction is proper under bankruptcy law. ............................ 9

     3.   The Trustees previously invoked this Court's core jurisdiction over distribution-related issues in these Cases. ................................................................................... 11

     4.   The Trustees previously invoked the bankruptcy court's jurisdiction over distribution-related issues in the ResCap bankruptcy................................................. 12

   B.   The Court should exercise jurisdiction over the threshold question whether the Trustees have met their burden under the Settlement Agreement to even seek judicial instructions................................................................................................................. 13

   C.   The Court should also exercise jurisdiction over the distribution issues raised in the Petition, which can be resolved through interpretation or enforcement of the Settlement Agreement.......................................................................................................... 16

     1.   The Order of Operations Issue is resolved by the Settlement Agreement................. 17

     2.   The ancillary issues related to the Order of Operations Issue are red herrings and do not require judicial instructions. ............................................................................... 18

       a.   The Trustees have not met their burden to demonstrate a need for judicial instructions with respect to their alleged concern over temporary overcollateralization............................................................................................ 18

       b.   The trustees have not met their burden to demonstrate a need for judicial instructions with respect to their alleged concern that the Plan Payments will exceed aggregate certificate balances. ................................................................ 20

     3.   The Zero Balance Issue is also resolved by the Settlement Agreement. ................... 21

**IV. ORAL ARGUMENT** ................................................................................................... **21**

**V. CONCLUSION** ............................................................................................................. **22**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*In the Matter of the Application of The Bank of New York Mellon*,
   N.Y. Sup. Ct., Index No. 150973/2016.................................................................14

*Beneficial Trust Deeds v. Franklin (In re Franklin)*,
   802 F.2d 324 (9th Cir. 1986) .................................................................................9

*Cromwell v. Cnty. of Sac*,
   94 U.S. 351 (1877).................................................................................................8

*Elliott v. Gen'l Motors LLC (In re Motors Liquidation Co.)*,
   829 F.3d 135 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1813 (2017) .........................9

*Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*,
   304 F.3d 223 (2d Cir. 2002)........................................................................9, 10, 11

*Nevada v. United States*,
   463 U.S. 110 (1983)...............................................................................................8

*In re Residential Capital, LLC, et. al.*,
   No. 12-12020 (MG) (S.D.N.Y.), Dkt. 6065 ..........................................................12

*Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*,
   68 F.3d 26 (2d Cir. 1995)......................................................................................10

*Travelers Indem. Co. v. Bailey*,
   557 U.S. 137 (2009)............................................................................................8, 9

*U.S. Lines, Inc. v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. (In re
   U.S. Lines, Inc.)*,
   197 F.3d 631 (2d Cir. 1999)..................................................................................10

*Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.)*,
   419 F.3d 83 (2d Cir. 2005).....................................................................................9

**Statutes**

11 U.S.C. § 105(a) .........................................................................................................1, 5

28 U.S.C. § 157(b) ..........................................................................................................13

28 U.S.C. § 1334..............................................................................................................13

28 U.S.C. § 157(b)(2)(C) ..................................................................................................9

28 U.S.C. § 157(b)(3) ...................................................................................................................11

28 U.S.C. § 1334(b) ......................................................................................................................9

The Institutional Investors[1] respectfully submit this supplemental memorandum in further support of their Motion under Section 105(a) of the Bankruptcy Code to enjoin the RMBS Trustees and Related Transaction Parties from prosecuting their Article 77 Proceeding in state court and respectfully show as follows:

## I.
## FACTUAL BACKGROUND

On November 30, 2016, the Institutional Investors entered into a settlement agreement with the LBHI Debtors whereby the RMBS Trusts' repurchase claims would be released in exchange for an allowed claim of approximately $2.4 billion.  The RMBS Trustees rejected that settlement in February 2017.

On March 17, 2017, the Institutional Investors entered into an amended settlement agreement, in which the LBHI Debtors agreed to seek estimation of the claims in the amount of approximately $2.4 billion.  That settlement further provided that the Trustees could advocate for allowance of the claims in a higher amount, through a prescribed estimation procedure.

On June 1, 2017, the RMBS Trustees accepted that settlement agreement (the "Settlement Agreement") (annexed hereto as Exhibit A).

**Section 6.18** of the Settlement Agreement provides that the Trustees consented to the Bankruptcy Court's "exclusive jurisdiction" to "hear and determine any dispute regarding the interpretation or enforcement of this Settlement Agreement until the closing of the LBHI Debtors' bankruptcy cases."[2]

---

[1] The Institutional Investors are AEGON USA Investment Management, LLC; Blackrock Financial Management, Inc.; Cascade Investment, L.L.C.; The Federal Home Loan Bank of Atlanta; Goldman Sachs Asset Management, L.P.; Invesco Advisers, Inc.; Kore Advisors, L.P.; The Metropolitan Life Insurance Company; Pacific Investment Management, LLC; SeaLink Funding Limited; The TCW Group, Inc.; Thrivent Financial for Lutherans; Voya Investment Management (formerly known as ING Investment Management); and Western Asset Management Company.

[2] Unless otherwise noted, all emphasis herein is added.

1

On June 28, 2017, the Court ordered that the Institutional Investors are authorized to intervene and appear in all matters in this bankruptcy case that relate to, among other things, the Settlement Agreement.  *See* Dkt. 55667.

On July 6, 2017, the Court entered an Order Approving RMBS Settlement Agreement and Including Certain Proposed Findings of Fact and Conclusions of Law (Dkt.No. 55706) (the "9019 Order").  The 9019 Order provides that the "Court retains ___*exclusive* jurisdiction to hear and determine any dispute regarding the interpretation or enforcement of the RMBS Settlement Agreement___ until the closing of the LBHI Debtors' bankruptcy cases" and that the "Court otherwise retains jurisdiction with respect to all matters arising from or related to the implementation of this Order."

On March 8, 2018, following a 22-day estimation proceeding, this Court issued a decision from the bench, setting an allowed claim in favor of the underlying Lehman-sponsored RMBS Trusts in an aggregate amount of approximately $2.38 billion.  *See* Dkt. No. 57791 (transcript of March 8 hearing).

On March 15, 2018, the Court issued an Order Estimating Allowed Claim Pursuant to RMBS Settlement Agreement (the "Estimation Order").  *See* Dkt. No. 57785.  The Estimation Order states, among other things, that "the allocation and distribution of the Allowed Claim shall be conducted in accordance with the terms of the RMBS Settlement Agreement" and that the Court "shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order."  *Id.*

On the evening of April 4, 2018—without notice to this Court, the Institutional Investors, or apparently anyone else—the Trustees and Related Transaction Parties[3] filed a petition in New

---

[3] The Trustees who filed the Article 77 Petition and are parties to the RMBS Settlement Agreement are U.S. Bank National Association and Wilmington Trust, National Association.  In addition, Citibank, N.A.

2

York Supreme Court seeking judicial instructions under Article 77 concerning the interpretation of the Settlement Agreement in connection with the distribution of the Allowed Claim to investors (the "Petition"). *See In re application of U.S. Bank Nat'l Assoc. et al.*, Index No. 651625/2018.

The Trustees' Petition <u>extensively quotes</u> the Settlement Agreement. Key provisions of the Settlement Agreement discussed throughout the Petition are summarized below.

First, the Petition quotes **Section 3.01** of the Settlement Agreement, which states that "[t]o the extent any Accepting Trustee is the party responsible for distributing payments for a given Trust under the applicable Governing Agreement(s), that Accepting Trustee shall use its <u>reasonable best efforts to distribute</u> the amounts received from the LBHI Debtors on account of the Allocable Shares of the Net Allowed Claim <u>promptly.</u>" Petition ¶ 29.

The Petition also relies on an additional provision in **Section 3.01** of the Settlement Agreement, which states that "to the extent that any Accepting Trustee or other party responsible for calculating or distributing Plan Payments for a given Trust forms a <u>good-faith belief</u> that guidance from a court is <u>necessary or appropriate for resolving ambiguities or disputes</u> concerning the distribution of Plan Payments, the Accepting Trustee . . . shall have the right to seek guidance from a court of competent jurisdiction before distributing those amounts." Petition ¶ 30.

The Petition extensively quotes **Section 3.06(a)** of the Settlement Agreement, which states that "Plan Payments on each Participating Trust's Allocable Share shall be deposited into the related Trust's collection or distribution account pursuant to the terms of the Governing Agreements, for further distribution in accordance with the distribution provisions of the

---

and Wells Fargo Bank, National Association joined the Article 77 Petition in their capacities as trustee, securities administrator, paying agent, and/or calculation agent for the Trusts.

Governing Agreements <u>as though such Plan Payments are a subsequent recovery available for distribution on the related distribution date</u>" and further provides that if the Trusts' Governing Agreements do not include the concept of a subsequent recovery, the Plan Payments should be distributed as though they were unscheduled distributions of principal.  Petition ¶¶ 12, 31.

Finally, the Petition extensively quotes **<u>Section 3.06(b)</u>** of the Settlement Agreement, which requires that "[i]n connection with the distribution of Plan Payments to Participating Trusts pursuant to Subsection 3.06(a), to the extent permitted under each Trust's Governing Agreement, the applicable Trustee . . . will apply the amount of the Plan Payment for that Trust to increase the balance of securities within that Trust . . . *in the reverse order of* previously allocated losses, as though such Plan Payment was a subsequent recovery."  Petition ¶ 33; *see also id.* ¶¶ 13, 32.

The Institutional Investors learned that the Article 77 Petition was filed at approximately 7:00 p.m. ET on April 5, 2018, but only after they affirmatively asked the Trustees whether any such proceeding had been filed.

Through the Article 77 Petition and accompanying order to show cause, the Trustees also sought interim relief in New York Supreme Court on an ex parte basis, including entry of escrow orders permitting the Trustees to divert the Allowed Claims away from the RMBS Trusts pending resolution of the issues raised in the Petition.  The Trustees attached the Estimation Order to the Petition, but failed to cite the jurisdictional provisions of the Estimation Order in their Petition or accompanying Memorandum of Law.  The Trustees did not attach the 9019 Order to their Petition, much less cite its exclusive jurisdictional provision in their Petition or accompanying Memorandum of Law.

4

On April 10, 2018, the Institutional Investors filed a Motion under Section 105(a) to enjoin the Trustees from proceeding with the state court action. *See* Dkt. No. 57840. The Court held a hearing on that motion the very same afternoon and ruled, among other things, that the Trustees "delay the transfer of the funds from the accounts in which the funds currently reside by 10 days" and that the "status quo" should be preserved for that period. Tr. of Apr. 10, 2018 Hrg. at 38:10-12, 18 (annexed hereto as Exhibit B). The Court set a further hearing for 10:00 a.m. on April 19, 2018 on the scope of this Court's jurisdiction and ordered the parties to submit simultaneous briefs on those issues by April 17, 2018.

On April 11, 2018, a hearing was held before the Honorable Justice Marcy S. Friedman in the New York Supreme Court, Part 60. Justice Friedman did not enter the proposed order to show cause or proposed escrow orders submitted by the Trustees. Rather, she ordered the parties to call her Chambers on April 23 to update her on the outcome of the April 19 hearing before this Court. Further, she directed the parties to address various issues related to the form of the order to show cause submitted by the Trustees and asked that the parties submit a revised order to show cause by April 16, 2018 or to inform Justice Friedman that more time would be necessary.

## II.
## SUMMARY OF ARGUMENT

Pursuant to the 9019 Order, Estimation Order, and applicable law, this Court has exclusive jurisdiction to decide all matters relating to the interpretation and enforcement of the Settlement Agreement, including the alleged distribution waterfall issues raised in the Trustees' Petition. Even though the Court has jurisdiction to interpret the Trusts' distribution waterfalls, however, it need not do so to resolve the issues raised in the Petition, which can be resolved *exclusively* by the plain terms of the Settlement Agreement.

5

Importantly, before even reaching the distribution questions in the Petition, a threshold question for the Court is whether the Trustees have met their burden under the Settlement Agreement to demonstrate that they are entitled to even *seek* judicial instructions in connection with distributing Plan Payments. Specifically, Section 3.01 of the Settlement Agreement requires that the Trustees use their "reasonable best efforts" to "promptly" distribute Plan Payments to investors and further requires the Trustees to form a "good-faith belief" that real "ambiguities or disputes" exist before seeking judicial instructions. As explained below, the Institutional Investors respectfully submit that the Trustees cannot meet this threshold burden, because among other reasons, (1) there is no excuse for the Trustees' 10-month delay in filing the Petition and the resulting delay in distributing over $800 million in cash to the true economic creditors of the LBHI Debtors, and (2) many of the issues raised in the Petition appear to be merely *hypothetical*, because the Trustees have not done the basic legwork to determine whether the alleged issues have any impact whatsoever on distributions to investors. In any event, this Court is uniquely situated to assess whether, in light of the history of the various proposed RMBS settlement agreements over the past several years, the Section 9019 process, and the recent estimation process, the Trustees have made the threshold showing under Section 3.01 of the Settlement Agreement that would even entitle them to *seek* judicial instructions.

Assuming the Court is persuaded that the Trustees are entitled to seek judicial instructions, it should nonetheless retain jurisdiction over the substantive issues in the Petition. Contrary to the Trustees' suggestion at the April 10 hearing, the Trustees allege only two core distribution issues in the Petition, both of which can be resolved by the plain terms of the Settlement Agreement itself, without any need to analyze the underlying trust indentures. The first issue is whether the Trustees should Pay First or Write-Up First; however, that issue is

6

resolved conclusively by the last sentence of Section 3.06(b) of the Settlement Agreement, which states that the certificate write-up contemplated by Section 3.06(b) shall not have any impact on the distribution of Plan Payments to investors—which necessarily means that the write-up must occur *after* the distribution of Plan Payments to investors (lest the write-up impact the distribution of Plan Payments to investors). The second issue, which is whether the Trustees should <u>enforce</u> a plain term of the Governing Agreements they concede would prevent distributions to zero-balance certificates, is even more straightforward: the Trustees should comply with the clear term of the Governing Agreements they have identified.

## III.
## ARGUMENT

**A.    The Court has jurisdiction to interpret and enforce the Settlement Agreement, including its provisions relating to the distribution of Plan Payments to investors.**

**1.    The Court retained jurisdiction in the 9019 Order and Estimation Order.**

On July 6, 2017, this Court entered the 9019 Order (Dkt. No. 55706), through which the Court retained "***exclusive*** <u>jurisdiction to hear and determine any dispute regarding the interpretation or enforcement of the RMBS Settlement Agreement</u> until the closing of the LBHI Debtors' bankruptcy cases." The 9019 Order further provides that this "Court <u>otherwise retains jurisdiction with respect to all matters arising from or related to the implementation of this Order</u>."

The 9019 Order's exclusive jurisdiction provision tracks **<u>Section 6.18</u>** of the Settlement Agreement, through which the Trustees <u>expressly consented</u> to the Bankruptcy Court's "exclusive jurisdiction" to "hear and determine any dispute regarding the interpretation or enforcement of this Settlement Agreement until the closing of the LBHI Debtors' bankruptcy cases."

The 9019 Order also "approved" the RMBS Settlement Agreement (Paragraph B) and ruled that "[t]his Order and the RMBS Settlement Agreement are binding and effective on the LBHI Debtors, the Institutional Investors, and the Accepting Trustees" (Paragraph E). Additionally, at the urging of the Trustees, the 9019 Order barred investors "from asserting claims against the Accepting Trustees with respect to their evaluation and acceptance of the RMBS Settlement Agreement and implementation of the RMBS Settlement Agreement in accordance with its terms."

The scope of the Court's retention of exclusive jurisdiction in the 9019 Order includes "all matters arising from or related to the implementation" of the order, which necessarily includes the provisions of the Settlement Agreement governing distribution of Plan Payments to investors that are expressly described in Sections 3.01, 3.06(a), and 3.06(b) of the Settlement Agreement—all of which feature centrally in the Petition.

When the 9019 Order became final, after the opportunity for direct review, it became "res judicata to the 'parties and those in privity with them, not only as to every matter which was offered to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152 (2009) (quoting *Nevada v. United States*, 463 U.S. 110, 130 (1983), in turn quoting *Cromwell v. Cnty. of Sac*, 94 U.S. 351, 352 (1877)). Consequently, the reservation of exclusive jurisdiction to interpret and enforce the Settlement Agreement is binding and not susceptible to collateral attack. *Id.*

Finally, the Court's retention of jurisdiction over the interpretation or enforcement of the Settlement Agreement was confirmed in the Estimation Order, which the Court entered following a 22-day estimation proceeding. *See* Dkt. No. 57785. The Estimation Order states,

among other things, that "the allocation and distribution of the Allowed Claim shall be conducted in accordance with the terms of the RMBS Settlement Agreement."[4]

    **2.    The Court's retained jurisdiction is proper under bankruptcy law.**

This Court plainly has jurisdiction to interpret and enforce its own prior 9019 Order and Estimation Order. *See Travelers Indem. Co.*, 557 U.S. at 151; *Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.)*, 419 F.3d 83, 97 (2d Cir. 2005) (citing *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 230 (2d Cir. 2002)). When a prior order derives from the bankruptcy court's exercise of a core bankruptcy function, the jurisdiction to interpret and enforce the prior order is "arising in" jurisdiction under 28 U.S.C. § 1334(b) and core jurisdiction under 28 U.S.C. § 157(b). *See Elliott v. Gen'l Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 153 (2d Cir. 2016) ("arising in" jurisdiction to enforce prior sale order), *cert. denied*, 137 S. Ct. 1813 (2017). *Cf. Beneficial Trust Deeds v. Franklin (In re Franklin)*, 802 F.2d 324, 326-27 (9th Cir. 1986) (upholding jurisdiction of bankruptcy court to interpret and enforce prior orders as "arising under" jurisdiction). The 9019 Order was grounded in this Court's core bankruptcy function of the allowance of claims against debtor estates. *See* 28 U.S.C. § 157(b)(2)(C). Thus, this Court's core jurisdiction to interpret and enforce the RMBS Settlement Agreement is without question.

Even *if* this Court were called upon to interpret trust indenture provisions, in connection with its interpretation and enforcement of the Settlement Agreement, this Court has jurisdiction

---

[4] Like the 9019 Order, the Court's retention of jurisdiction in the Estimation Order broadly reaches "all matters arising from or related to the implementation of this Order." The Estimation Order directed the Trustees to distribute the Allowed Claim to investors in accordance with the Settlement Agreement. The Settlement Agreement, in turn, provides detailed instructions to the Trustees concerning how to distribute the Allowed Claim to investors. *See, e.g.*, §§ 3.01, 3.06(a), and 3.06(b). So, the Petition squarely "aris[es] from" and is "related to" the "implementation" of the Estimation Order.

to do so as well.  *See Petrie*, 304 F.3d at 230-31.  In *In re Petrie Retail, Inc.*, the Second Circuit affirmed the assertion of post-confirmation core jurisdiction to enjoin an action between two non-debtors concerning a dispute over one of the debtor's leases.  The court of appeals first observed that core jurisdiction is to be given "a broad interpretation that is 'close to or congruent with constitutional limits.'"  *Id.* at 229 (quoting *U.S. Lines, Inc. v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. (In re U.S. Lines, Inc.)*, 197 F.3d 631, 637 (2d Cir. 1999), in turn quoting *Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 68 F.3d 26, 31 (2d Cir. 1995)).  The court next discussed the bankruptcy court's power to enjoin a contract action pending outside the bankruptcy court.  "[W]hether a contract proceeding is core depends on (1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization."  *Id.* (quoting *U.S. Lines*, 197 F.3d at 637) (internal citations omitted).  The degree of independence depends on the nature of the proceeding.  "Proceedings can be core by virtue of their nature if either (1) the type of proceeding is unique or uniquely affected by the bankruptcy proceedings, . . . or (2) the proceedings directly affect a core bankruptcy function."  *Id.* (quoting *U.S. Lines*, 197 F.3d at 637) (internal citations omitted).

In *Petrie*, the contract proceeding at issue was one in which the landlord sought to collect prepetition rent arrears from the debtor's bankruptcy-court-approved assignee, which was protected by both a prior bankruptcy court lease assignment order, which provided that the prepetition arrears were not assumed liabilities, and the order confirming the debtor's plan, which incorporated the terms of the lease assignment order.  *See* 230 F.2d at 226-27.  Even though the lease was a prepetition contract, the Second Circuit upheld core jurisdiction because (i) the dispute involved rights established by a prior bankruptcy court, (ii) the bankruptcy court

had jurisdiction to enforce its prior orders, and (iii) the dispute involved an issue already before the court as part of its consideration of the landlord's claim against the estate.  *See id.* at 230-31.

Similarly, in the present case, although the trust indentures are prepetition contracts, a proceeding involving their interpretation is incidental to this Court's prior 9019 Order, which approved the Settlement Agreement, and therefore (i) the dispute involves rights established by the Settlement Agreement, (ii) this Court has jurisdiction to enforce its 9019 Order (as discussed above), and (iii) the dispute involves issues that have already been before the Court as part of the allowance of the RMBS Trustees' claims against the estate, specifically in connection with both the 9019 Order and the Estimation Order.

Consequently, even if this Court is called upon to interpret the trust indentures incidental to its interpretation of the Settlement Agreement, it has core jurisdiction to do so under *Petrie. See also* 28 U.S.C. § 157(b)(3) ("A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.").

**3.      The Trustees previously invoked this Court's core jurisdiction over distribution-related issues in these Cases.**

In fact, the Trustees themselves have previously invoked this Court's core jurisdiction in connection with the Trustees' distribution of Plan Payments to investors under the Trusts' distribution waterfalls in connection with the Settlement Agreement.

Specifically, the Trustees successfully bargained for Section 6.04 of the Settlement Agreement, which states that "compliance with this Settlement Agreement and its Exhibits, including the provisions relating to Plan Payments, <u>shall be deemed compliance with the applicable Governing Agreements and no party or Investor shall make any subsequent claim to the contrary</u>."   In other words, the Trustees successfully sought an order from this Court

expressly finding that the Trustees' distribution of Plan Payments in compliance with the Settlement Agreement would be "deemed" to comply with the distribution waterfalls themselves.

Further, the Trustees successfully bargained for a provision in the 9019 Order barring investors "from asserting claims against the Accepting Trustees with respect to their evaluation and acceptance of the RMBS Settlement Agreement and <u>implementation of the RMBS Settlement Agreement in accordance with its terms</u>." 9019 Bar Order ¶ F. So, not only did the Trustees previously seek an order from this Court blessing their distribution of Plan Payments under the distribution waterfalls, but they also received a <u>bar order</u> from this Court to the same effect.

The Trustees' previous invocation of the Court's core jurisdiction to bar claims against the Trustees for distributing the Plan Payments under the Trust's distribution waterfalls cannot be squared with their current attempt to evade this Court's jurisdiction over similar distribution-related issues.

    **4.    The Trustees previously invoked the bankruptcy court's jurisdiction over distribution-related issues in the ResCap bankruptcy.**

As this Court may be aware, in the ResCap bankruptcy, the RMBS Trustees similarly entered into a global settlement of representation and warranty claims, in exchange for an allowed claim of approximately $7.3 billion. *See In re Residential Capital, LLC, et. al.*, No. 12-12020 (MG) (S.D.N.Y.), Dkt. No. 6065, Second Amended Joint Chapter 11 Plan, art. IV.C (p. 65 of 265) (exhibit to Order Confirming Second Amended Joint Chapter 11 Plan).

Under the ResCap Chapter 11 Plan, the RMBS Trustees were similarly required to distribute the settlement payments to investors as though they were "Subsequent Recoveries." *Id.* at art. IV.C(3)(e) (p. 68 of 265). In June 2015, after the approval of the global RMBS settlement and the confirmation of the ResCap Chapter 11 Plan, the RMBS Trustees filed a

12

Motion for Approval of Certain Non-Material Plan Modifications with the bankruptcy court, seeking judicial clarification concerning, among other things, an alleged "ambiguity in the distribution waterfall" related to the distribution of "Subsequent Recoveries." *Id.*, Dkt. No. 8675, filed June 1, 2015, ¶ 5 (annexed hereto as Exhibit C, together with a supplemental memorandum of law annexed hereto as Exhibit D). Additionally, the ResCap RMBS Trustees also expressly sought judicial clarification that "certificates with a zero balance at the time of the distribution . . . shall be eligible to be written up unless the Governing agreements expressly prohibit writing up zero balance certificates." *Id.* at Annex 1, p. ii.

Judge Glenn granted the RMBS Trustees' motion seeking clarifications concerning the alleged distribution waterfall "ambiguity" related to subsequent recoveries and zero balance certificates. *See id.*, Dkt. No. 9139 (ruling in the order's preamble that the court had jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and that consideration of the Motion and the requested relief was a core proceeding under 28 U.S.C. 157(b)) (annexed hereto as Exhibit E).

In ResCap, the RMBS Trustees expressly invoked the core jurisdiction of the bankruptcy court to resolve alleged ambiguities in the Trusts' distribution waterfalls with respect to "subsequent recoveries" and "zero balance" certificates—precisely the same relief they seek in the Petition. Yet, they resist this Court's jurisdiction over the same issues here.[5]

## B.    The Court should exercise jurisdiction over the threshold question whether the Trustees have met their burden under the Settlement Agreement to even seek judicial instructions.

Although the Settlement Agreement contemplates that the Trustees could seek further judicial instructions concerning the distribution of Plan Payments, that right is not absolute. Rather, Section 3.01 of the Settlement Agreement requires the Trustees to use their "reasonable

---

[5] The RMBS Trustees in ResCap included U.S. Bank and Wells Fargo, the two trustees here with the largest number of trusts.

best efforts" to "promptly" distribute Plan Payments to investors and further requires the Trustees to form a "good-faith belief" that further judicial guidance is necessary or advisable to resolve "ambiguities or disputes" concerning the distribution of Plan Payments.

The Trustees inexplicably filed the Petition less than 24 hours before receiving the first Plan Payment (exceeding $800 million for the Trusts included in the Petition)—despite letting 10 months pass since their entry into the Settlement Agreement on June 1, 2017.

As the Court correctly suggested in the April 10 hearing, **nothing** prevented the Trustees from seeking earlier judicial guidance concerning the two alleged distribution questions raised in the Petition.  *See* Tr. of Apr. 10, 2018 Hrg. (annexed hereto as Exhibit B) at 14:18-25, 23:10-18. On or about June 1, 2017, the Trustees posted to a public settlement website the trust-by-trust allocation.[6]  On or about April 2, 2018, the final allocation was posted to the same settlement website.[7]  Each Trust's final share of the Plan Payments set forth in the April 2, 2018 allocation disclosure appeared to be identical to the June 1, 2017 estimate.  As the Court correctly observed in the April 10 hearing, because the Allowed Claim was set at the bottom of the possible range, the universe of trusts affected by the alleged issues in the Petition is the smallest subset of trusts that could have been affected by such issues.  *See id.* at 32:1-7.

Further, the Article 77 proceeding concerning distribution issues in the $8.5-billion Countywide global RMBS Settlement had been filed in February 2016 – long before the Trustees' June 2017 acceptance of the Settlement Agreement – raised similar issues.  *See In the Matter of the Application of The Bank of New York Mellon*, N.Y. Sup. Ct., Index No.

---

[6] The estimated allocation is available here:
 http://www.lbhirmbssettlement.com/pdflib/Posting_of_Posting_Additional_Materials.pdf.

[7] The final allocation is available here:
http://www.lbhirmbssettlement.com/pdflib/RMBSTrusteesNotice4.2.18.pdf.

150973/2016.  Among the issues raised in that case was whether the trustee should employ the Pay First or Write-Up First methods.  *Id.*[8]

Also, in <u>December 2016</u>, the RMBS Trustees (including U.S. Bank) involved in the $1.125-billion global settlement with Citigroup had already distributed the settlement payment to investors *without* having filed a judicial instruction proceeding concerning distribution-related issues.  Finally, as discussed above, the Trustees had filed an eerily similar request for relief in the ResCap bankruptcy in <u>June 2015</u>, involving alleged ambiguities with subsequent recoveries and zero balance certificates.  Needless to say, the alleged distribution issues raised in the Petition were well known to the RMBS Trustees by June 2017, so if they believed there were real ambiguities that required judicial clarification, they should have sought judicial instructions at that time—not 10 months later, the ***evening before*** $800 million in Plan Payments were made to the Trustees.

Likewise, the Institutional Investors do not believe that the Trustees can meet their burden to demonstrate they have formed the requisite "<u>good-faith belief</u>" that they are somehow confused about how to distribute subsequent recoveries, as the Settlement Agreement requires. Each and every time the Trustees receive post-liquidation proceeds on a mortgage loan for which realized losses have already been passed on to investors, the Trustees are required to remit those proceeds to investors as subsequent recoveries.  And, each and every time the Trustees have distributed subsequent recoveries in that way over the past 10 years, <u>they have had to choose whether to pay first or write-up first</u>.  There is nothing unique about the distribution of Plan Payments that newly requires the Trustees to choose pay first or write-up first.  The notion that the Trustees are now somehow confused as to how to distribute subsequent recoveries strains

<hr/>

[8]    *See*    Verified    Petition,    Dkt.    No.    1,    ¶    21,    available    at <u>http://cwrmbssettlement.com/docs/VerifiedPetition.pdf</u>

credulity.  Accordingly, it is doubtful whether, under Section 3.01 of the Settlement Agreement, the Trustees have formed the requisite "good-faith belief" that a *real* "ambiguity or dispute" concerning the distribution of subsequent recoveries requires further judicial instructions.

In sum, the Institutional Investors respectfully submit that this Court should retain jurisdiction to determine whether the Trustees have met their dual burden under Section 3.01 of the Settlement Agreement before they are entitled to even seek judicial instructions concerning the distribution of Plan Payments: (1) to employ their "reasonable best efforts" to distribute the Plan Payments "promptly" and (2) to form a "good-faith belief" that real "ambiguities or disputes"—not merely hypothetical ones—exist and require judicial intervention.

## C.    The Court should also exercise jurisdiction over the distribution issues raised in the Petition, which can be resolved through interpretation or enforcement of the Settlement Agreement.

Contrary to the Trustees' suggestion at the April 10 hearing, the substantive distribution questions raised in the Petition are not complicated and can be resolved through "interpretation or enforcement" of the Settlement Agreement, without any need to delve into the Trusts' Governing Agreements.

There are two substantive distribution questions raised in the Petition: (1) whether, in distributing the Plan Payments as subsequent recoveries, the Trustees should first pay the settlement money and then write-up certificate balances ("Pay First"), or first write-up certificate balances and then pay the settlement money ("Write-Up First") (together, the "Order of Operations Issue"), and (2) whether the Trustees should comply with a term of the Governing Agreements they have identified for some trusts which says that zero-balance certificates are not entitled to distributions (the "Zero Balance Issue").

16

**1.      The Order of Operations Issue is resolved by the Settlement Agreement.**

As to the Order of Operations Issue, the Settlement Agreement itself is dispositive, so the Court need not delve into the Governing Agreements, which the Trustees concede are <u>silent</u> regarding the Order of Operations Issue.

Section 3.06(a) of the Settlement Agreement requires the Trustees to distribute Plan Payments as though they were subsequent recoveries available for distribution.  As discussed above, the Trustees <u>routinely</u> distribute subsequent recoveries to investors.

The Petition extensively quotes Sections 3.06(a) (payment to investors) and 3.06(b) (certificate write-up) of the Settlement Agreement, which detail the two "Operations" performed, but it does not cite a single provision of the Governing Agreements that speak to the Order of Operations Issue.  Rather, the Trustees concede that the Governing Agreements are <u>silent</u> as to the Order of Operations Issue.[9]  Obviously, if the Governing Agreements are silent as to the Order of Operations Issue, the Court need not analyze those Governing Agreements to resolve that issue.

More to the point, the last sentence of Section 3.06(b) of the <u>Settlement Agreement</u> resolves the Order of Operations Issue.  That sentence plainly states that the certificate write-up detailed in Section 3.06(b) "shall not affect the distribution of Plan Payments" and is "intended only to increase the balance of the related classes of securities."  That sentence alone makes clear that the certificate write-up <u>cannot</u> occur before payment to investors, because writing-up certificates before distributing the Plan Payments to investors would necessarily "***affect*** the distribution of Plan Payments."  Thus, the Settlement Agreement itself is clear that the certificate

---

[9] *See* Petition ¶ 36 ("the Governing Agreements for the Subject Settlement Trusts listed on Exhibit A hereto do not clearly specify whether the Petitioners should use the Pay First Method or the Write-Up First Method in this circumstance").

write-up should occur *after* the distribution of the settlement payment to investors.  One need not refer to a single Governing Agreement to resolve the Order of Operations, which is apparent on the face of the Settlement Agreement itself.

> **2.      The ancillary issues related to the Order of Operations Issue are red herrings and do not require judicial instructions.**

In the section of the Petition devoted to the Order of Operations Issue, the Trustees describe several ancillary issues that *might* be encountered depending on whether Pay First or Write-Up First is employed.  Although the Trustees cite to various provisions of the Governing Agreements in this section of the Petition, these issues are red herrings, and the Trustees have not met their burden under Section 3.01 of the Settlement Agreement to demonstrate a need for judicial instructions with respect to these purely *hypothetical* concerns.

> **a.      The Trustees have not met their burden to demonstrate a need for judicial instructions with respect to their alleged concern over temporary overcollateralization.**

For example, the Trustees spend considerable ink concerning whether a "Pay First" Order of Operations might cause Trusts with an overcollateralization structure (the "OC Trusts") "to appear to be temporarily overcollateralized."  Petition ¶ 41.  On the Trustees' own admission, however, this hypothetical concern over the creation of "temporary" overcollateralization only applies with respect to Trusts for which the Trusts' Plan Payments <u>exceed</u> the Trusts' overcollateralization target amount.[10]  Each Trust's overcollateralization target amount is a known, fixed-dollar figure, which appears in each Trust's monthly remittance report.

In the Petition, the Trustees fail to even allege <u>which</u> Trusts have an overcollateralization structure, much less <u>which</u> of the OC Trusts will receive Plan Payments in excess of their

---

[10] *See* Petition ¶¶ 39-41 (describing how subsequent recoveries in excess of the overcollateralization target amounts could constitute an overcollateralization release amount and be distributed as excess cash flow).

overcollateralization target amounts.  However, the Institutional Investors believe that the Plan Payments will not exceed the overcollateralization target amounts for the <u>vast majority</u> of the OC Trusts included in the Petition.  Thus, the concern raised in the Petition appears to be only a hypothetical one that would not make any difference whatsoever to investors' distributions for at least the vast majority of Trusts under any scenario.

Remarkably, the Trustees did not even attempt to estimate whether the Plan Payment for each OC Trust exceeds such Trust's overcollateralization target amounts.  This would have been a simple task: back in June 2017, the Trustees could have compared the range of possible distribution amounts with each Trust's target overcollateralization amounts.  They could have confirmed those comparisons in March 2018, shortly after the Estimation Order was entered, to confirm that the Plan Payment exceeded the target overcollateralization amounts.  They chose not to do so.

The Trustees' failure to do the basic legwork to identify whether their concern over "temporary" overcollateralization is ***real***, and not merely ***hypothetical***, further belies the Trustees' requisite "good-faith belief" that judicial instructions are necessary here and is strong evidence that they have not employed their "reasonable best efforts" to "promptly distribute" the Plan Payment to investors, as required by Section 3.01 of the Settlement Agreement.

Therefore, the Institutional Investors respectfully submit that the Trustees have not demonstrated they are entitled to the relief sought with respect to their alleged concern over temporary overcollateralization under the Pay First Order of Operations.

**b.    The Trustees have not met their burden to demonstrate a need for judicial instructions with respect to their alleged concern that the Plan Payments will exceed aggregate certificate balances.**

Likewise, in paragraphs 49 through 54 of the Petition, the Trustees allege that under the Pay First Method, the "certificate principal balance [] represents a ceiling on the amount of the Settlement Payments that the certificates can receive in the form of principal amount," Petition ¶ 50; and that "it would be unclear how to distribute any portion of the Settlement Payment for a particular Subject Settlement Trust that exceeds the then-outstanding aggregate certificate principal balances of the class of certificates of such Subject Settlement Trust," *id.* ¶ 52.

Again, the Trustees have raised only a hypothetical issue, not a real one.  They have not identified a <u>single Trust</u> for which the outstanding certificate balances would act as a "ceiling" or for which the Plan Payment exceeds the total outstanding principal balance of the outstanding certificates.  The Institutional Investors believe that this will not be a real issue for the vast majority of Trusts included in the Petition.

Instead of actually doing the basic work to identify Trusts with this alleged issue, the Trustees have essentially thrown up their hands and asked the Court to figure it out.  That tactic does not reflect that the Trustees have employed "<u>reasonable best efforts</u>" to "<u>promptly</u>" distribute the settlement payments or that they have formed a "<u>good-faith belief</u>" that real ambiguities or disputes exist, as required by Section 3.01 of the Settlement Agreement.

Therefore, the Institutional Investors submit that the Trustees have not demonstrated that they are entitled to the relief sought with respect to their alleged concern that under the Pay First Order of Operations, the aggregate certificate balances may act as a "ceiling" on the amount that can be distributed to certain investors or that the Plan Payment might exceed a particular Trust's aggregate certificate balances.

08-13555-mg    Doc 57880    Filed 04/17/18    Entered 04/17/18 14:16:12    Main Document
Pg 25 of 26

3.      **The Zero Balance Issue is also resolved by the Settlement Agreement.**

The second alleged distribution question in the Petition—the Zero Balance Issue—can likewise be resolved through interpretation or enforcement of the Settlement Agreement, without parsing the Governing Agreements.

As to the Zero Balance Issue, the Petition itself states that the zero-balance provision "appears to preclude any further distributions" to zero-balance certificates.  *See* Petition ¶ 57. The Trustees' only question appears to be whether the Trustees should <u>comply</u> with that provision.  The answer is easy: Section 6.04 of the Settlement Agreement states that it is not intended to amend any term of the Governing Agreements.  Accordingly, the Trustees should simply enforce the term of the Governing Agreements they have identified, which they concede "<u>appears to preclude any further distributions</u>" to zero-balance certificates.  Petition ¶ 57.

One need not parse trust indentures to answer the simple question whether the Trustees should follow a clear term of the Governing Agreements.  Of course they should.

Once again, it is highly questionable whether the Trustees have met their dual burden under Section 3.01 of the Settlement Agreement with respect to the Zero Balance Issue raised in the Petition, because (1) the Trustees would be hard pressed to demonstrate a "<u>good-faith belief</u>" that they question whether they should follow a clear term of the Governing Agreements, and (2) there is no reason whatsoever that the Trustees could not have raised this issue 10 months ago, in satisfaction of their obligation to employ their "<u>reasonable best efforts</u>" to "<u>promptly</u>" distribute the Plan Payments to investors.

**IV.**
<u>**ORAL ARGUMENT**</u>

Finally, the Institutional Investors respectfully request that the Court permit (1) David M. Sheeren of the Gibbs & Bruns LLP firm, national counsel to the Institutional Investors and

21

admitted pro hac vice in these cases, to argue the substantive issues in connection with the Settlement Agreement, the Trustees' request for relief, and the distribution-related questions raised in the Petition and (2) Alec P. Ostrow of the Becker, Glynn, Muffly, Chassin & Hosinski, LLP firm to argue the more general bankruptcy jurisdictional issues that may arise.

**V.**

**<u>CONCLUSION</u>**

WHEREFORE, the Institutional Investors respectfully request that the Court should exercise its exclusive jurisdiction over the matters raised in the Petition, including (1) whether the Trustees have made the threshold showing under Section 3.01 of the Settlement Agreement that they are even entitled to *seek* judicial instructions, and (2) the two alleged distribution issues raised in the Petition (i.e., the Order of Operations and the Zero Balance Issues), which the Institutional Investors respectfully submit can be resolved by the Settlement Agreement alone.

Dated: April 17, 2018
New York, New York

Respectfully submitted,

By:    /s/ Alec P. Ostrow_____
      Alec P. Ostrow
      Chester B. Salomon
      BECKER, GLYNN, MUFFLY,
      CHASSIN & HOSINSKI, LLP
      299 Park Avenue
      New York, New York 10171
      Telephone: (212) 888-3033
      Facsimile: (212) 888-0255

      /s/ Kathy D. Patrick_____
      Kathy D. Patrick (admitted *pro hac vice*)
      David Sheeren (admitted *pro hac vice*)
      GIBBS & BRUNS, LLP
      1100 Louisiana, Suite 5300
      Houston, Texas 77002
      Telephone: (713) 650-8805
      Facsimile: (713) 750-0903
      *Attorneys for the Institutional Investors*