**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| In re | ) | Chapter 11 Case No. |
| | ) | |
| Lehman Brothers Holdings Inc., et al., | ) | 08-13555 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

------------------------------------------------------------x

### TRUST ADMINISTRATORS' MEMORANDUM OF LAW IN OPPOSITION TO THE INSTITUTIONAL INVESTORS' MOTION FOR RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 4

ARGUMENT ........................................................................................................................ 9

    A.    The Filing of the Petition Was in Conformance with the CLSA and the
    Orders of this Court. ........................................................................................... 9

        i.    The Trust Administrators Commenced the Article 77 Proceeding
        as Expressly Contemplated by the CLSA. ................................................. 9

        ii.    The Petition Does Not Seek Interpretations of Orders of this Court,
        Nor of the Covered Loan Settlement Agreement. ................................... 10

    B.    The Article 77 Court Is an Efficient Forum for the Resolution of the Trust
    Agreement-Specific Issues Presented in the Petition........................................... 13

    C.    The Restraining Motion Does Not Meet the High Standard for an Anti-
    Suit Injunction................................................................................................... 16

CONCLUSION.................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Coast Line R.R. Co. v. Bhd. Of Locomotive Eng'rs,*
    398 U.S. 281 (1970)..................................................................................................18

*In re Bank of New York Mellon,*
    51 Misc.3d 356 (N.Y. Sup. Ct. 2017) ...................................................................5, 14, 15, 16

*Chick Kam Choo v. Exxon Corp.,*
    486 U.S. 140 (1988)..................................................................................................19

*Hanover Ins. Co. v. Olin Corp.,*
    No. 92 Civ. 4278 (AGS), 1995 WL 598984 (S.D.N.Y. Oct. 11, 1995)...................................19

*Kline v. Burke Constr. Co.,*
    260 U.S. 226 (1922)..................................................................................................18

*MLE Realty Assocs. v. Handler,*
    192 F.3d 259 (2d Cir. 1999)........................................................................................16

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy*
    *Mart Convenience Stores, Inc.),*
    351 F.3d 86 (2d Cir. 2003)..........................................................................................17

*Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.,*
    386 F.3d 419 (2d Cir. 2004)........................................................................................16

*Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs.,*
    *LLC),*
    423 F.3d 166 (2d Cir. 2005)........................................................................................17

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC,*
    445 F. Supp. 2d 356 (S.D.N.Y. 2006)...........................................................................18

*In re Telignet Servs., Inc.,*
    No. 09 Civ. 09674 (PKC), 2010 WL 2034509 (S.D.N.Y. May 13, 2010) .................17, 18, 19

*In re Wells Fargo Bank, National Association, et al.,*
    Index. No. 657387/2017 (N.Y. Sup. Ct.) ..........................................................................1, 8

*Wyly v. Weiss,*
    697 F.3d 131 (2d Cir. 2012)........................................................................................18

**Statutes**

11 U.S.C. § 105(a) ....................................................................................................1, 17

28 U.S.C. § 2283 ...........................................................................................................16

N.Y. C.P.L.R. Article 77...........................................................................................1, 3, 14

Citibank, N.A. ("Citibank"), Wells Fargo Bank ("Wells Fargo"), U.S. Bank National Association ("U.S. Bank"), and Wilmington Trust Company and Wilmington Trust, National Association ("Wilmington Trust"), solely in their respective capacities as securities administrators, paying agents, calculation agents, trustees, and/or indenture trustees (collectively, the "Trust Administrators") for the Subject Settlement Trusts (defined below), respectfully submit this memorandum of law in opposition to the *Institutional Investors' Motion under Section 105(a) to Enjoin the RMBS Trustees and Related Transaction Parties* [Docket No. 57838] (the "Restraining Motion") with respect to the 208 residential mortgage-backed securitization ("RMBS") trusts identified in Exhibit A to the Petition (defined below) (the "Subject Settlement Trusts").

## PRELIMINARY STATEMENT

1.      The Restraining Motion cannot withstand scrutiny and should be denied.

2.      The Trust Administrators have filed a petition (the "Petition") in New York State Supreme Court (the "Article 77 Court") pursuant to N.Y. C.P.L.R. Article 77 (the "Article 77 Proceeding") seeking judicial guidance concerning the trust agreements and indentures governing the Subject Settlement Trusts (the "Governing Agreements").  The Institutional Investors allege that the Petition seeks to "evade" this Court's jurisdiction over issues arising from the Plan Administrator's implementation of the RMBS Trust Settlement Agreement, executed on June 1, 2017 (the "Covered Loan Settlement Agreement" or "CLSA") or the interpretation of this Court's own orders.  The Restraining Motion, however, mischaracterizes the Petition and is contrary to the plain language of the Covered Loan Settlement Agreement itself, which contemplates just such a filing.

3.      The central issue in the Petition is the resolution of the "order of operations" issue (the question of how to perform certain distribution and write-up functions described in the

Governing Agreements).  Resolution of this issue does not require interpretation of the Covered

Loan Settlement Agreement.

4.      There is no factual or legal basis for the extraordinary injunctive relief the

Institutional Investors request, as the Restraining Motion does not meet the high standard for an

anti-suit injunction.  Among other reasons, the Trust Administrators seek judicial guidance *only*

on the interpretation of the Governing Agreements and do not assert or even suggest that the

Covered Loan Settlement Agreement or any order of this Court is ambiguous, unclear or requires

any interpretation at all.

5.      The Institutional Investors' argument relies entirely on the fact that the

"Background" section of the Petition includes references and citations to, and quotes from, the

CLSA, which the Trust Administrators included in the Petition solely for context.  The Trust

Administrators quoted the Covered Loan Settlement Agreement in the Petition not because they

seek an interpretation of it but merely to provide the Article 77 Court *background* on the source

of the funds to be distributed pursuant to the Governing Agreements.  The Trust Administrators

are seeking judicial instructions concerning only the internal affairs of the Subject Settlement

Trusts they administer because they are cognizant of competing claims among trust beneficiaries

over how the Governing Agreements function.

6.      The Covered Loan Settlement Agreement, which the Institutional Investors

negotiated and signed, specifically contemplates the Trust Administrators seeking exactly the

guidance that is the subject of the Petition.  The CLSA provides:

> Notwithstanding anything to the contrary set forth in this
> Section 3.06 or any other provision of this Settlement Agreement,
> each Accepting Trustee and/or the party responsible for such
> implementation shall be entitled, prior to implementing the
> forgoing Subsections 3.06(a)-(c), to seek further guidance ***from a
> court of competent jurisdiction*** regarding the applicable

> procedures under the Governing Agreements related to the
> distribution of Plan Payments or determining the balance of
> securities potentially affected by distribution of the Plan Payments.

Covered Loan Settlement Agreement, ¶ 3.06(d) (the "GA Guidance Clause") (emphasis added)

7.     The drafting parties' use of the term "court of competent jurisdiction" makes clear that they envisioned that the Trust Administrators could file an action in any court of competent jurisdiction for issues concerning interpretation of the Governing Agreements.  In this instance, the Trust Administrators did exactly what they have done in the past—ask a New York state court judge to interpret the waterfall language of Governing Agreements that are governed by New York law, invoking Article 77 of the N.Y. C.P.L.R., which is designed expressly to allow trustees to petition the state court for instructions.  Any feigned surprise by the Institutional Investors that the Trust Administrators filed the Article 77 Proceeding in state court is disingenuous as they actively participated as parties in each of the two prior Article 77 proceedings of the same nature, including one that is still ongoing.

8.     It is impossible to square the Institutional Investors' motion to restrain the Trust Administrators from seeking guidance from a court of competent jurisdiction (the Article 77 Court) regarding the applicable procedures under the Governing Agreements with the Institutional Investors' execution of a contract granting the Trust Administrators the express right to do so.  Notably, prior global settlement agreements negotiated by the Institutional Investors contained no similar express right to file such a proceeding.

9.     The relief sought in the Petition has no impact on the Plan Administrator's implementation of the Covered Loan Settlement Agreement, nor does it have any impact on the LBHI Debtors' estates.  Likewise, the Plan Administrator has not taken the position that the issues raised in the Petition have any bearing on the LBHI Debtors' estates, nor has it suggested

that there is any reason for this Court to decide the issues set forth in the Petition.  TRO Hr'g Tr.
40:23-41:6, Apr. 10, 2018.

10.     The Institutional Investors seek to enjoin a state court action, squarely within that
court's competence and jurisdiction, relating to issues of contract interpretation governed only by
New York law.  The extraordinary relief requested by the Institutional Investors falls squarely
outside the limited circumstances in which an anti-suit injunction can issue: it is not expressly
authorized by Congress, is not a necessary aid to this Court's jurisdiction, and does not avoid re-
litigation of issues already decided in federal court.

## STATEMENT OF FACTS

11.     In the winter and spring of 2017, the Plan Administrator and the Institutional
Investors negotiated the terms of what would become the Covered Loan Settlement Agreement.
Certain RMBS trustees, namely Deutsche Bank National Trust Company, Law Debenture Trust
Company of New York (which was later succeeded by TMI Trust Company), U.S. Bank, and
Wilmington Trust (ultimately, the "Accepting Trustees") provided comments to the settlement
agreement, many of which were included in a final version that was then executed by the Plan
Administrator and the Institutional Investors and delivered to the Accepting Trustees to review.

12.     Moreover, while the CLSA was being negotiated, The Bank of New York Mellon
("BNYM"), an RMBS trustee not then involved in pursuing claims against the LBHI Debtors,
initiated an Article 77 proceeding seeking guidance concerning the distribution of settlement
proceeds it had received in settling claims with respect to approximately 530 RMBS trusts
involving Bank of America and Countrywide (the "Countrywide Article 77"), and including
when to adjust certificate balances to reflect those distributions.[1]  BNYM filed its action after it

---

[1] These interpretive issues were described broadly as the "order of operations," *see In re Bank of New York Mellon*,
51 Misc.3d 356, 359 (N.Y. Sup. Ct. 2017), and were the subject of a substantial dispute among investors, because

received the settlement funds, five years after filing the initial proceeding seeking court approval of its settlement. Because the Countrywide Article 77 was still pending, with investors taking both sides of these questions, the parties to the CLSA could not resolve them in the CLSA without running a substantial risk that they would end up dictating a result that would be contrary to the Countrywide court's ultimate resolution of similar questions on similar contracts. To avoid delaying an orderly resolution of claims against the LBHI estates, and the distribution of funds from the estates, the parties instead included within the CLSA the GA Guidance Clause making clear that the parties responsible for distributions could seek further court guidance if necessary before undertaking distributions.

13.      The Plan Administrator and the Institutional Investors presented the Covered Loan Settlement Agreement to the Accepting Trustees on March 17, 2017. That offer included the GA Guidance Clause, which permitted filing of a judicial action in a "court of competent jurisdiction" concerning the distribution and implementation of the settlement payment under the various Subject Settlement Trusts' Governing Agreements. CLSA § 3.06(d).

14.      After thoroughly evaluating the CLSA, on June 1, 2017, the Accepting Trustees accepted the Covered Loan Settlement Agreement on behalf of certain RMBS trusts. The acceptance of the CLSA was subject to Final Court Approval (as defined in the CLSA). After a hearing on July 6, 2017, this Court approved the LBHI Debtors' entry into the CLSA and made certain proposed findings and conclusions (the "9019 Order"). By order dated August 28, 2017, the United States District Court for the Southern District of New York approved the 9019 Order.

15.      On October 13, 2017, the Accepting Trustees also accepted a separate settlement agreement concerning certain RMBS trusts holding "transferor" loans (the "Transferor Loan

---

the sponsors of the RMBS trusts had not anticipated either such large losses incurred by trusts, or subsequent and corresponding large recoveries flowing through the trusts in a single month.

Settlement Agreement").[2]  The Transferor Loan Settlement Agreement concerns some of the same trusts subject to the Covered Loan Settlement Agreement, along with certain additional trusts.  The Subject Settlement Trusts include trusts subject to the Transferor Loan Settlement Agreement, the CLSA, or both agreements, but do not include all of the trusts subject to the Transferor Loan Agreement and the CLSA.

16.     Following the estimation hearing, the Court estimated and allowed the Accepting Trustees' claim in the gross amount of $2,375,114,115.67, which may be adjusted pursuant to CLSA Section 3.02 to reflect any subsequently terminating trusts (the "Allowed Claim"). Pursuant to CLSA Section 6.05, counsel to the Institutional Investors received legal fees consisting of 4.75% of the Allowed Claim.  The legal fees reduce the Allowed Claim to $2,262,296,195.17.

17.     Under CLSA Section 3.04, within 30 days after the entry of the Estimation Order, the Accepting Trustees' expert was required to determine the Final Allocation Percentages (as defined in the CLSA).  Soon after the Final Expert Calculation (as defined in the CLSA) was made, on April 4, 2018, consistent with the GA Guidance Clause, the Trust Administrators, in their capacities as trustees, securities administrators, paying agents, or other similar roles, initiated the Article 77 Proceeding.  The Petition seeks judicial guidance on two classes of issues arising under the Governing Agreements: (1) "order of operations" issues concerning whether, on each trust, the Governing Agreements mandate distribution of the settlement payment before

---

[2] The term "transferor loans" refers to mortgage loans originated by third parties unaffiliated with LBHI, for which loans the LBHI Debtors made only limited representations and warranties and passed through to the RMBS trusts loan-level representations and warranties made by third parties and the right to "put back" the mortgage loans to those third parties.  These loans are distinguishable from the "covered loans," which concern mortgage loans for which the LBHI Debtors have acknowledged that they would be the responsible party, if any, for repurchase liability due to breaches of loan-level representations or warranties and the additional mortgage loans identified as "Covered Loans" in the *Status Report of the RMBS Trustees with respect to Compliance with the Protocol and Motion to Extend the Overall Claim File Cut-Off Date for Certain Loans under the Protocol Order and Grant Related Relief*, filed on March 24, 2016 [Docket No. 52342].

or after certificate balances are increased, and (2) "zero distribution" issues concerning whether provisions present in some of the Governing Agreements mandate that, once certificates are written down to zero, they are ineligible to be written up and to receive any future distributions.

18.     Neither Citibank nor Wells Fargo was a party to the Covered Loan Settlement Agreement or to the proceedings before this Court that gave rise to the 9019 Order or the Estimation Order.  U.S. Bank filed the Petition not just in its capacity as an Accepting Trustee (the capacity in which it accepted the Covered Loan Settlement Agreement), but also in its capacity as securities administrator for a trust for which Wilmington Trust is Accepting Trustee, and in its capacity as trustee of certain trusts subject *only* to the Transferor Loan Settlement Agreement.  *See*, Petition, Ex. A.  Similarly, Wells Fargo filed the Petition in its capacity as securities administrator for dozens of trusts for which U.S. Bank serves as trustee.  *Id.*

19.     The Petition also concerns dozens of trusts that were subject to the Transferor Loan Settlement Agreement but were not part of the Covered Loan Settlement Agreement, and therefore were not subject to the 9019 Order or the Estimation Order.

20.     The Petition seeks judicial instruction concerning how distribution issues "should be resolved under the terms of the Governing Agreements."  Petition, ¶ 60.  Nowhere in the Petition do the Trust Administrators seek judicial interpretation of either (i) the Covered Loan Settlement Agreement or (ii) any orders of this Court.

21.     The Article 77 Proceeding was assigned to Justice Marcy Friedman, who is currently presiding over another similar multi-trust instruction proceeding, this one seeking guidance concerning distribution issues associated with the global RMBS settlement with J.P. Morgan Chase & Co., captioned *In re Wells Fargo Bank, National Association, et al.,* Index. No. 657387/2017 (N.Y. Sup. Ct.) (the "JPMorgan Article 77").  The trust administrators in that

proceeding filed the JPMorgan Article 77 days before they received the settlement funds.  The

JPMorgan Article 77 seeks judicial guidance on a range of issues concerning interpretation of

trust agreements, including "order of operations" and an issue similar to the "zero distribution"

question posed in the Petition.  The Institutional Investors are parties to the JPMorgan Article 77

and have already obtained orders in the JPMorgan Article 77 resolving the distributions issues

for a large number of the trusts subject to that proceeding.

22.    Nonetheless, on April 10, 2018, the Institutional Investors filed the Restraining

Motion seeking to enjoin the Trust Administrators from pursuing guidance from the Article 77

Court that is very experienced in adjudicating these complex waterfall issues.  At the expedited

hearing on April 10, 2018, the Institutional Investors further asserted an inchoate charge that the

Trust Administrators filing of the Petition was a "pretext."  TRO Hr'g Tr. 11:22, April 10, 2018.

The Institutional Investors did nothing to substantiate this serious charge, nor could they identify

the nature of the alleged "pretext" for the filing of the Petition.

23.    When commencing the Article 77 Proceeding, the Trust Administrators filed an

affidavit making clear that, aside from the benefit of the requested judicial ruling and guidance

concerning the disputed Governing Agreement provisions, they stand to gain nothing from the

filing of the Petition.  The Institutional Investors sought to enjoin the Trust Administrators from

seeking entry of an order to hold the disputed amounts pursuant to escrow arrangements under

which the Trust Administrators *waived* all fees, and would have permitted investment of the

affected funds in interest-bearing investments *for the benefit of certificateholders like the*

*Institutional Investors*.

## ARGUMENT

**A.     The Filing of the Petition Was in Conformance with the CLSA and the Orders of this Court.**

    *i.     The Trust Administrators Commenced the Article 77 Proceeding as Expressly Contemplated by the CLSA.*

24.     As noted above, the GA Guidance Clause provides that prior to implementing the payments through the Accepting Trusts' waterfalls, the Trust Administrators could "seek further guidance *from a court of competent jurisdiction* regarding the applicable procedures under the Governing Agreements related to the distribution of Plan Payments or determining the balance of securities potentially affected by distribution of the Plan Payments."  CLSA § 3.06(d).  The use of the term "court of competent jurisdiction" is telling: where the CLSA mandates that a given action occur specifically in the Bankruptcy Court, it says so explicitly.[3]  In short, the parties to the CLSA did not intend that an action seeking interpretations of the underlying Governing Agreements could only be filed before this Court, and indeed, the Institutional Investors had every reason to know that the Article 77 Court could exercise jurisdiction over New York common law trusts like those here, since it was doing so in the Countrywide Article 77 *at the time the Institutional Investors offered the CLSA.*

25.     Moreover, if the Institutional Investors believed that the Trust Administrators should have sought their judicial guidance on the Governing Agreements at some earlier time than they did, they could have provided for such a limitation in the GA Guidance Clause.  At the time that the CLSA was negotiated, the Institutional Investors were aware that, in the Countrywide Article 77, BNYM filed the petition around the time BNYM received the

---

[3] *See, e.g.*, CLSA, §§ 1.12 ("Estimation Proceeding" to occur in Bankruptcy Court); 1.37 ("Trustee Findings Order" to be entered by District Court based on "findings of fact and conclusions of law submitted by the Bankruptcy Court"); 2.01 (settlement agreement "binding and effective" "subject to Bankruptcy Court approval"); 2.03(a) (procedure for seeking settlement approval before the Bankruptcy Court); 3.01 (estimation proceeding before Bankruptcy Court).

settlement proceeds. Subsequently the same sequencing and timing occurred in the JPMorgan Article 77. However, the GA Guidance Clause is silent on timing aside from specifying that the Trust Administrators may seek judicial guidance "prior to implementing" the distribution of the funds. The Institutional Investors' reasons for not seeking resolution of the waterfall issues earlier is not clear, but presumably they, like the Accepting Trustees, recognized that the full scope and magnitude of the waterfall issues could not be known until after the amount of the Allowed Claim was determined. The reasons why the Institutional Investors were comfortable with the terms of the agreement on this point are academic; the GA Guidance Clause plainly contemplates that the Trust Administrators could do precisely as they did. Accordingly, the Institutional Investors' attacks on the Trust Administrators for allegedly seeking to "evade" the jurisdiction of *this* Court are unfounded and unwarranted.

> ### ii.    The Petition Does Not Seek Interpretations of Orders of this Court, Nor of the Covered Loan Settlement Agreement.

26.    The Institutional Investors assert in the Restraining Motion that "Interpretation of the RMBS Settlement Agreement in connection with the distribution of the Allowed Claim to investors is the core relief sought by the Trustees in New York Supreme Court." Motion, ¶ 13. This contention is easily dispensed by a review of the Petition's description of the "Need For Judicial Instruction," which summarizes what Trust Administrators are actually seeking: "As demonstrated above, there are significant issues concerning the Settlement Payment Application Process,[4] and it is unclear how those issues should be resolved **under the terms of the Governing Agreements**." Pet. ¶ 60 (emphasis added). Nowhere in the section of the Petition

---

[4] The "Settlement Payment Application Process is defined as "the administration and distribution of the Settlement Payment." Pet. ¶ 5. The "Settlement Payment" is defined as the "allocable portion of the distributions on the Allowed Claim" from *both* the Covered Loan Settlement Agreements and the Transferor Loan Settlement Agreement. Pet. ¶¶ 3-4. In other words, the "Settlement Payment Application Process" does not relate to the payment by the LBHI Debtors' to the Accepting Trustees under the Covered Loan Settlement Agreement, but rather to the administration by the Trust Administrators of the "allocable portion" of amounts received from multiple sources *within* the Subject Settlement Trusts.

that actually seeks judicial instructions do the Trust Administrators request *any* interpretation of the Covered Loan Settlement Agreements or this Court's implementing orders.  *See* Petition ¶¶ 60-63.  This is further bolstered by the "Settlement Payment Instruction" requested in the "Request for Relief," which seeks judicial guidance only on issues arising under the *Governing Agreements.  See* Petition, Request for Relief, ¶ 5.

27.    The Institutional Investors' contention to the contrary relies on the fact that the Trust Administrators purportedly "extensively quote numerous provisions in the RMBS Settlement Agreement . . . ."  Mot. at ¶ 13.  The Trust Administrators do indeed quote from the Covered Loan Settlement Agreement, but context is key: these quotations and citations are contained in a section of the Petition titled "Background Concerning the Settlement Agreement." *See* Petition, ¶¶ 19-33.  In that section, the Trust Administrators informed the Article 77 Court of the source of the settlement funds only as background.

28.    The Covered Loan Settlement Agreement is cited *once* in the remainder of the Petition, and even in that mention makes explicit that the contractual ambiguity arises when the Trust Administrators seek to apply the disputed amounts under their trusts' *Governing Agreements*:

> As shown above, Section 3.06 of the Settlement Agreements specifies two operations that must be performed in connection with the Settlement Payment: (i) the distribution of the funds constituting Settlement Payments to Certificateholders, and (ii) the writing up of certificate principal balances in the amount of the Settlement Payment Write-Up.  What is left unaddressed, however, is whether . . . **the Governing Agreements themselves require** the Trust Administrators to apply the Settlement Payment Write-Up after making a distribution of the Settlement Payment to Certificateholders of those Subject Settlement Trusts, or before determining principal distribution amounts for each class of Certificateholders.

Petition, ¶ 34 (emphasis added).

29.    Indeed, under the Covered Loan Settlement Agreement, questions concerning the internal affairs of the trusts are *necessarily* governed by the terms of the Governing Agreements, and not the terms of the Covered Loan Settlement Agreement, since, in contrast to prior global agreements negotiated by the Institutional Investors, the Covered Loan Settlement Agreement expressly grants primacy to the underlying Governing Agreements:

> Should the party responsible for calculating distributions and/or making distributions . . . determine that the payment procedure described [in the settlement agreement] may not conform to the terms of the Governing Agreement for a particular Accepting Trust, the distribution described above shall be modified to distribute that Trust's Plan Payments . . . as the party responsible for calculating distributions under the terms of the Governing Agreements of a given Trust or a court should determine is in conformance with the terms of the Governing Agreement for a particular Trust.").

Covered Loan Settlement Agreement, § 3.06(c).

30.    Consistent with this limitation, both the payment distribution clause (Section 3.06(a)) and certificate write-up clause (Section 3.06(b)) in the Covered Loan Settlement Agreement are prefaced with language mandating that these functions be undertaken as provided in the *Governing Agreements*.  *See* Covered Loan Settlement Agreement, §§ 3.06(a) ("Plan Payments . . . shall be deposited . . . for further distribution in accordance with the distribution provisions of the Governing Agreements . . . ."); § 3.06(b) ("[T]o the extent permitted under each Trust's Governing Agreement, the applicable . . . party responsible for calculating certificate balances pursuant to the terms of the Governing Agreements of a given Participating Trust, will apply the amount of the Plan Payment for that Trust to increase the balance of securities within that Trust . . . .").

31.    In sum, the Institutional Investors' contention that the Petition violates the Court's 9019 Order, and its retention of jurisdiction "regarding the interpretation or enforcement of the

[Covered Loan] Settlement Agreement," Mot. at ¶ 14, cannot be squared with the Petition, which seeks *only* judicial interpretation of the various Governing Agreements, or with the Covered Loan Settlement Agreement itself, which expressly defers to the Governing Agreements for purposes of distribution of the settlement payments, *see* ¶¶ 28 - 29, *supra*.

32.    The Petition only involves competing claims among beneficial holders of securities of the Subject Settlement Trusts to the payment that the Plan Administrator already made in resolving its liability to those trusts.  In other words, the Petition does not involve any claim of, or against, any debtor.  Moreover, the clarity the Trust Administrators seek concerning the Governing Agreement may require judicial analysis on a trust-by-trust basis, applying New York governing law to the complex contracts at issue—precisely the sort of analysis already being undertaken by the Article 77 Court in the JPMorgan Article 77.

**B.    The Article 77 Court Is an Efficient Forum for the Resolution of the Trust Agreement-Specific Issues Presented in the Petition**

33.    The Article 77 Court's significant experience and established procedures for addressing disputes in the interpretation of RMBS governing agreements positions it to efficiently and quickly resolve the interpretive issues raised in the Petition.  These issues necessarily turn on interpretations of the Governing Agreements, which are all governed by New York law.  Prior proceedings in New York State Supreme Court have demonstrated both that (i) investors have asserted different, and often diametrically opposed, views on contractual distribution provisions that are similar to those contained in the Governing Agreements at issue here; and (ii) outcomes can vary on a trust-by-trust basis, depending on the specific language at issue and whether there is any dispute among appearing investors with particular trusts. Specifically, similar past proceedings have turned on a granular analysis on a trust-by-trust basis of the applicable governing agreements as well as the positions advanced by appearing interested

parties.  Those proceedings have not implicated the interests of the party that paid the settlement proceeds.

34.     First, the judge in the Article 77 Proceeding also is administering the JPMorgan Article 77.  The JPMorgan Article 77, which seeks guidance on both "order of operations" and issues similar to the "zero distribution" issue described in the Petition, also includes procedural issues likely to arise here.  As a result, that court is already familiar with the attendant issues and administrative challenges surrounding the efficient distribution of the settlement payment to certificateholders.  For example, in the ongoing JPMorgan Article 77 proceeding, various appearing parties (including the Institutional Investors) are moving to exclude other appearing parties on standing grounds, arguing that a party seeking to assert a position in the proceeding must directly hold certificates in a subject trust and not via some other investment vehicle.  Put another way, the appearing parties are calling on the court in the JPMorgan Article 77 to rule not just on issues of contract interpretation governed by New York law, but also on the reach of N.Y. C.P.L.R. Art. 77 itself.

35.     The Countrywide Article 77 demonstrated that the resolution of these issues requires trust-by-trust analysis, including interpretation of each governing agreement for any trust for which a distribution method is disputed.  After severing the trusts for which no dispute materialized, the Countrywide Article 77 court analyzed the applicable governing agreements for the remaining trusts.  *See In re Bank of New York Mellon*, 51 N.Y.S. 3d at 362-68.  The court discussed the interplay between the applicable settlement agreement (an analysis unnecessary with respect to the CLSA, given that it provides that the Governing Agreements alone govern distribution issues) and the waterfall provisions in the applicable governing agreements and

noted the differing readings of the governing documents forwarded by the various interested

parties:

> The main dispute between the parties concerns how much of the
> Allocable Share [from the settlement agreement] will be
> apportioned to the second category for distribution — the Principal
> Distribution Amount [under certain governing agreements]….
> Tilden Park, Prosiris, and Blue Mountain contend that the Principal
> Distribution Amount is calculated using the certificate balances
> "immediately prior" to the Distribution Date, as expressly stated in
> the Principal Distribution Amount definition. They further assert
> that the Principal Distribution Amount should be calculated using
> the simplified formula: Certificate Balance less (-) Loan Balance
> plus (+) OT Target.  In contrast, AIG and the Institutional
> Investors argue that the Principal Distribution Amount should be
> calculated using certificate balances that have first been adjusted
> upward in the amount of the Allocable Share on the Distribution
> Date, and the Principal Distribution Amount should then be paid
> out based on pre-distribution certificate balances. AIG and the
> Institutional Investors argue that this distribution method is
> consistent with the text of the Governing Agreements, as well as
> the overcollateralization and subordination features of the Fourteen
> Trusts.

*Id.* at 363-64.

36.    In the JPMorgan Article 77, the Article 77 Court is now considering arguments

raised not only by the Institutional Investors, but also by other investors who have appeared to

assert contrary trust-level positions concerning the trusts and governing agreements at issue in

that proceeding.  Given that these issues have no impact on the LBHI bankruptcy estates, the

implementation of the CLSA or this Court's orders by the Plan Administrator, the substantial

potential efficiencies of hearing similar disputes in the same forum far outweigh whatever

unarticulated interest the Institutional Investors seek to advance through the Motion.

37.    Moreover, in light of these intensely disputed interpretative issues, the

Institutional Investors' assertion that the Trust Administrators' filing was a "pretext" merits no

credit.  Rather, the Institutional Investors' hostility to the state court forum may simply result

from the fact that, after they extended the CLSA to the Accepting Trustees, that forum ruled against them and in favor of numerous other investors in a similar proceeding.  *See In re Bank of N.Y. Mellon*, 56 Misc.3d 210 (N.Y. Sup. Ct. 2017).

**C.    The Restraining Motion Does Not Meet
the High Standard for an Anti-Suit Injunction.**

38.    A federal court is permitted to enjoin a state court proceeding only: (1) "as expressly authorized by Act of Congress," (2) "where necessary in aid of its jurisdiction," or (3) "to protect or effectuate the federal court's judgment." 28 U.S.C. § 2283.  The third exception is described as the "relitigation exception," because it applies only where a party proposes to litigate an issue that was already decided in federal court.  "The [Anti-Injunction] Act is 'an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions.'"  *MLE Realty Assocs. v. Handler*, 192 F.3d 259, 261 (2d Cir. 1999) (quoting *Atl. Coast Line R.R. Co. v. Bhd. Of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970)).  "Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy."  *Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.*, 386 F.3d 419, 425-26 (2d Cir. 2004) (quoting *Atl. Coast Line R.R. Co.*, 398 U.S. at 297).

*i.    The Proposed Injunction Does Not Fall Within the "Express Authorization" Exception.*

39.    While Bankruptcy Code section 105 authorizes bankruptcy courts to issue injunctions, it applies only to injunctions that are "necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The Second Circuit "has long recognized that Section 105 limits the bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy Code.  It does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or

constitute a roving commission to do equity." *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003) (quotations and citations omitted).

40.    This means that, for a bankruptcy court to bar a state court proceeding under section 105, the injunction must "be tied to another Bankruptcy Code section and not merely to a general bankruptcy context or objective." *Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 183-84 (2d Cir. 2005) (internal quotation marks omitted); *see also In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d at 92 ("The equitable power conferred on the bankruptcy court by section 105(a) is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing.").

41.    Accordingly, the "express authorization" exception is not satisfied where, as here, the movant "does not point to any other provision of the Bankruptcy Code or identify . . . authority for its position that the court should rely on the 'basic purpose' of Section 105(a), which [the movant asserts] 'is to enable to court to do whatever is necessary to aid in its jurisdiction, *i.e.*, anything arising in or relating to a bankruptcy case.'" *In re Telignet Servs., Inc.*, No. 09 Civ. 09674 (PKC), 2010 WL 2034509, at *9 (S.D.N.Y. May 13, 2010) (quoting brief).

### *ii.    The Proposed Injunction Does Not Fall Within the In-Aid-Of-Jurisdiction Exception.*

42.    In *Atlantic Coast Line*, the Supreme Court emphasized that the in-aid-of-jurisdiction exception applies only where the injunction is "necessary" to the federal court's jurisdiction: "it is not enough that the requested injunction is related to that jurisdiction." 398 U.S. at 295. "The exception has been construed narrowly by the Supreme Court and the Second Circuit—limited to cases based on *in rem* or *quasi in rem* jurisdiction, and the rare occasion

when the litigation itself can be treated as a *res*, most notably in complex multidistrict actions on the verge of settlement." *Id.*; *see also Kline v. Burke Constr. Co.*, 260 U.S. 226, 230 (1922) (reversing grant of injunction; "a controversy is not a thing, and a controversy over a mere question of personal liability does not involve the possession or control of a thing.")

43.    The Anti-Injunction Act does not permit an injunction even where the state action "might dispose of issues that will preclude this [federal] court from ruling on those issues." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 445 F. Supp. 2d 356, 360 (S.D.N.Y. 2006). Nor does a federal court's order approving a settlement and expressly retaining exclusive jurisdiction "over the parties and the Settlement Class Members for all matters relating to the Actions" permit an injunction under this exception. *Wyly v. Weiss*, 697 F.3d 131, 137-38 (2d Cir. 2012). The Second Circuit "ha[s] never held that a district court's involvement in complex litigation justifies, without more, issuance of an injunction 'in aid of' the court's jurisdiction, and we decline to create such a rule here." *Id.* (reversing grant of injunction); *see also In re Teligent*, 2010 WL 2034509, at *9 ("[Movant] argues that an injunction is necessary to maintain the Bankruptcy Court's jurisdiction . . . . Because the Bankruptcy Court did not determine the validity of the Proceeds Assignment, any litigation of that issue will not affect the validity of the Settlement Order.") (emphasis added)

44.    The proposed injunction here is not necessary to any exercise of jurisdiction by this Court. The Article 77 Proceeding only addresses how to distribute funds once they have gone out of the estate and are no longer subject to any interest of the Debtors. It cannot disrupt the Covered Loan Settlement Agreement, nor, as set out in Part A above, does it even seek an interpretation of that agreement. Therefore, there is no conceivable "res" over which both courts would assert jurisdiction, and this second exception does not apply.

18

### iii.    The Proposed Injunction Does Not Fall Within the "Relitigation" Exception.

45.    Finally, the "relitigation exception" permits "a federal court to prevent state litigation of an issue that was presented to and decided by the federal court."  *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988).  In *Chick Kam Choo*, the Supreme Court held that "an *essential* prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings *actually have been decided* by the federal court."  *Chick Kam Choo*, 486 U.S. at 148 (emphasis added).  Where that prerequisite is absent, courts will decline to enjoin state litigation.  *See, e.g.*, *Hanover Ins. Co. v. Olin Corp.*, No. 92 Civ. 4278 (AGS), 1995 WL 598984, at *2 (S.D.N.Y. Oct. 11, 1995) (denying motion, pursuant to relitigation exception, because there "ha[d] been no determination of the . . . issue.");  *In re Teligent*, 2010 WL 2034509, at *9 ("Because the *issue* was not decided by the Bankruptcy Court, the relitigation exception to the Anti-Injunction Act does not authorize an injunction of state proceedings.") (emphasis added).

46.    The Institutional Investors do not, and cannot, claim that any of the issues raised in the Petition were decided by this Court.

## CONCLUSION

47.    The Institutional Investors' contention that the Trust Administrators' filing of the Petition violates this Court's orders fails to withstand even cursory scrutiny, given the plain relief sought in the Petition, which calls for interpretation *only* of the Governing Agreements.  In the interest of efficiency, that matter was filed before a court that is currently considering similar issues.  This Court should enter an order denying the extraordinary relief sought in the Motion.

Dated:  New York, New York
            April 17, 2018

HAHN & HESSEN LLP

 /s/ Zachary G. Newman
Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
Tel. 212.478.7200

*Of Counsel*:
FAEGRE BAKER DANIELS LLP
Robert L. Schnell*
Stephen M. Mertz
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
Tel. 612.766.6000

*\*Pro hac* admission pending

*Attorneys for Wells Fargo Bank, National Association*

Dated:  New York, New York
            April 17, 2018

MORGAN, LEWIS & BOCKIUS LLP

 /s/ Michael S. Kraut
Glenn E. Siegel
Michael S. Kraut
James O. Moore
101 Park Avenue
New York, New York 10178
Tel. 212.309.6000

*Attorneys for U.S. Bank National Association*

Dated: New York, New York
April 17, 2018

MAYER BROWN LLP

 /s/ Christopher J. Houpt
Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. 212.506.2500

*Attorneys for Citibank, N.A.*

Dated: New York, New York
April 17, 2018

ALSTON & BIRD LLP

 /s/ Alexander S. Lorenzo
Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel. 212.910.9400

*Attorneys for Wilmington Trust Company and Wilmington Trust, National Association, each acting solely in its trustee capacity of certain Accepting Trusts*