Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS INC.,   Case No. 08-13555-scc

7              Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                    United States Bankruptcy Court

11                    One Bowling Green

12                    New York, New York 10004-1408

13

14                    January 9, 2017

15                    10:07 AM

16

17

18

19

20

21

22

23    B E F O R E:

24    HON. SHELLEY C. CHAPMAN

25    U.S. BANKRUPTCY JUDGE

1    IN RE:   RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sherri L. Breach & Jamie Gallagher

Page 3

```
 1   A P P E A R A N C E S :

 2   WILKIE FARR & GALLAGHER LLP

 3        Attorneys for the Plan Administrator

 4        787 Seventh Avenue

 5        New York, NY 10019-6099

 6

 7   BY:  TODD G. COSENZA, ESQ.

 8        JOSEPH G. DAVIS, ESQ.

 9

10   HOLWELL SHUSTER & GOLDBERG LLP

11        Attorneys for the Trustees

12        750 Seventh Avenue, 26th Floor

13        New York, NY 10019

14

15   BY:  DORIT VAGAR BLACK, ESQ.

16        MICHAEL S. SHUSTER, ESQ.

17        DWIGHT A. HEALY, ESQ.

18        NEIL R. LIEBERMAN, ESQ.

19        BENJAMIN F. HEIDLAGE, ESQ.

20

21

22

23

24

25
```

**Page 4**

1    ROLLIN BRASWELL FISHER LLC/PARTNER

2         8350 E. Crescent Parkway

3         Suite 100

4         Greenwood Village, CO 80111

5

6    BY:   MICHAEL ROLLIN, ESQ.

7          MARTIZA DOMINGUEZ BRASWELL, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                     P R O C E E D I N G S

 2              THE COURT:  Please have a seat.

 3              How's everyone today?

 4              Mr. Morrow, please come back.

 5         (Pause)

 6              THE COURT:  We got some warmer weather.  We get to

 7    look forward to the gray pools of slush part of the winter.

 8         (Laughter)

 9              THE WITNESS:  I know.

10              MR. ROLLIN:  Good morning.

11              THE COURT:  Good morning, Mr. Rollin.

12              MR. ROLLIN:  I'm going to start passing out some

13    exhibit binders.

14              THE COURT:  Sounds good.

15         (Pause)

16              THE COURT:  Do you have one for Ms. Chu?  Thanks.

17    Okay.

18              MR. ROLLIN:  Your Honor, for orientation on the

19    binders, if I may there are two binders -- what I've handed

20    are a copy of the deposition transcript and two binders.  We

21    may be toggling.  I think we're likely to toggle between the

22    two binders.  One primarily has loan materials as we talk

23    about loans and one has other exhibits.

24              THE COURT:  Okay.

25              MR. ROLLIN:  Okay.
```

Page 6

```
 1                THE COURT:  Very good.  Thank you.

 2                MR. ROLLIN:  I also have some exhibits that I may

 3     have to hand up individually.  I also may not.  We'll just

 4     have to see.

 5                THE COURT:  Very good.

 6                MR. ROLLIN:  Okay.

 7                THE COURT:  Okay.  Mr. Morrow, as no surprise

 8     you're still under oath.

 9                     CROSS-EXAMINATION, CONT'D.

10     BY MR. ROLLIN:

11     Q    Good morning, Mr. Morrow.

12     A    Good morning.

13     Q    I would like to show you what we've marked as

14     identification as Plan Exhibit -- Plan Administrator Exhibit

15     908.  It's also in your binder, the binder that's not the

16     loan documents.

17                MR. ROLLIN:  If I may approach just to --

18                THE COURT:  Sure.

19                MR. ROLLIN:  This is the loan binder so this will

20     be full of documents.

21                THE WITNESS:  Uh-huh.  Okay.

22                MR. ROLLIN:  This will be other documents.

23     BY MR. ROLLIN:

24     Q    This particular exhibit I believe is very difficult to

25     see in hard copy, so it's on the screen and we can enlarge
```

Page 7

```
 1    it.  And I've also brought you a magnifying glass.

 2    A    Well, how about the judge?

 3              THE COURT:  All right.  Now that --

 4         (Laughter)

 5              THE COURT:  -- that's a first.

 6              THE WITNESS:   That's a first?

 7              THE COURT:  That is the first time I've ever had a

 8    magnifying glass.  I've had a pool cue as a pointer.

 9              MR. ROLLIN:  This is a special case, Your Honor.

10              THE COURT:  Seriously.  This might be life-

11    changing.

12         (Laughter)

13              THE COURT:  Except I don't know how it works.

14              MR. ROLLIN:  You just set it right on it and

15    (indiscernible).  We're not going to talk about the details

16    of any of the words that are on the page, so everybody can

17    be comforted by that.

18    BY MR. ROLLIN:

19    Q    But, Mr. Morrow, I'll represent to you that this is a

20    -- an excerpt from your updated Exhibit D which you talked

21    about yesterday and which I believe is marked TRDX-1369.

22    Does that appear, in fact, to be an excerpt of the number of

23    pages from your updated Exhibit D?

24    A    Yeah.  It's not the same as though that was in the TX.

25    They're different pages.
```

Page 8

1    Q    That's correct.  And what we've done here, you'll see

2    if you look at Column I, is we had filtered the large

3    document which is many, many pages and in Column I where it

4    says disagree we've included all of the entries where you

5    disagreed with the trustees.  Okay?

6    A    Yes.

7    Q    And what you'll note, if you scroll over to the -- and

8    there were a number of instances, I think you testified

9    yesterday, 66 instances in which you disagreed with the

10   trustees' loan level determine -- claim level

11   determinations, correct?

12   A    Yeah.  Out of 891 I think.

13   Q    Right.  And if you scroll over to the column that says

14   Morrow notes --

15   A    Yes.

16   Q    -- and we've highlighted on the screen for you, what

17   you can see is that for the overwhelming majority of

18   instances in which you disagreed with the interpretation --

19   I'm sorry -- in which you disagreed with the claim level

20   conclusions of the trustees, rather than writing specific

21   notes about your analysis you wrote NA for not applicable --

22   A    That's -

23   Q    -- right?

24   A    -- incorrect.  That -- you have to go back to the notes

25   on the prior page before the -- well, I can't see it on this

Page 9

1    page.  Can you scroll back, please?

2    Q    Sure.  Absolutely.

3    A    To J, those are my notes of exactly why I disagreed.  I

4    did not restate my notes again.  I just put NA because I

5    already disagreed with it.

6    Q    Okay.  So the extent to which and the bases on which

7    you disagreed is in Column J, correct?

8    A    Yes.

9    Q    Understood.  And other than the information that's

10   contained in Column J you have no further information about

11   what aspect of the trustees' analysis you disagreed with,

12   right?

13   A    No.  If I disagreed I disagreed and I said why.

14   Q    Right.  And what I'm trying to confirm is that we can

15   rely on the notes in Exhibit J as a complete statement of

16   your basis for disagreeing?

17   A    If there's an N/A over it and it was a disagree

18   originally, yes.

19   Q    Thank you.

20        Now one of the opinions you were engaged to give

21   was as to the reliability of Mr. Aronoff's process, right?

22   You testified about that yesterday?

23   A    Yes.

24   Q    But you did not in the course of considering the --

25   that process you did not review any of the instructions that

Page 10

1   were provided to the five re-underwriting firms, did you?

2   A    NO.  They would have been the same as what -- re-

3   underwriting, I am familiar with re-underwriting and they

4   re-underwrote the loans to the industry standards of re-

5   underwriting.  Their instructions were that.

6   Q    Well --

7   A    Based on Mr. Aronoff's report.

8   Q    You don't know what instructions were given to the five

9   re-underwriting firms, do you?

10  A    I just said that I did based on Mr. Aronoff's report.

11  Working with them I know that they only underwrite to

12  industry standards.  Industry standards are the way he

13  underwrote, the same way I underwrite.

14  Q    This extent of what you know about the instructions

15  that they were given was that they were to underwrite to

16  industry standards?

17  A    Based on industry standards, yeah.

18  Q    Did you receive copies of any materials that were

19  provided to the five re-underwriting firms that contained

20  any guidance or instruction with respect to this particular

21  review project?

22  A    Well, I haven't worked with them -- I have never seen a

23  -- I have never given them instructions other than verbally,

24  so it was never in writing.  So I wouldn't expect that it

25  would.  But re-underwriting is according to industry

Page 11

1    standards and they do it that way as I explained.

2    Q    Is that another way of saying, no, I did not review any

3    of the instructions or guidance that was provided to the

4    review firms for this particular project?

5    A    Other than what Mr. Aronoff said in his expert report,

6    no.

7    Q    Okay.

8         MR. ROLLIN:  Can I apologize for a moment?  My

9    real time is not working.  Can we --

10        UNIDENTIFIED SPEAKER:  Neither is ours.  Sorry.

11        MR. ROLLIN:  May I, Your Honor?

12        THE COURT:  Yes, please.

13   (Pause)

14        MR. ROLLIN:  Okay.  Thank you.

15        UNIDENTIFIED SPEAKER:  Thank you.  Sorry.

16        THE COURT:  Thank you.

17        UNIDENTIFIED SPEAKER:  We got it.

18   BY MR. ROLLIN:

19   Q    And, Mr. Morrow, you did not review whatever internal

20   processes or procedures were implemented for purposes of

21   this review within the five re-underwriting firms, did you?

22   A    No.  That was not -- it was -- I was charged to do the

23   reliability of their work.

24   Q    You were charged to do an analysis of the reliability

25   of their work, but you did not review any internal processes

Page 12

1    or procedures that were implemented in connection with this

2    case?

3    A     No.  It wouldn't be necessary.

4    Q     And you did not --

5    A     That's not how you do quality control.

6    Q     And you did not review their particular quality control

7    procedures within the five re-underwriting firms?

8    A     What their standard is or -- I don't understand your

9    question.

10   Q     What they did in this case?

11   A     Well, based on Mr. Aronoff's report they did what they

12   do standard which is they -- they do quality control on ten

13   percent of the loan.  So I did not go into the other side.

14   No.

15   Q     So you understand that within the re-underwriting firms

16   they did quality control on ten percent of the loans?

17   A     That's what -- working with them that's what they do.

18   Q     But you did not review the particular quality control

19   procedures that were in place for this case?

20   A     No.  That's not what my reliability is.  My reliability

21   is what is their conclusions as far as material breaches.

22   Q     So you -- your reliability analysis was based on their

23   conclusions, not on their process?

24   A     No.  It's based on the process because the process is

25   the same throughout the industry for re-underwriting of

Page 13

1    loans.  And I did the process the way that they would do the

2    process because it's a standard within the industry and

3    arrived at the conclusions based on that, or the opinions

4    based on that.

5    Q    You didn't interview any of their people, right?

6    A    When?

7    Q    Anytime in connection with your engagement in this

8    case, the day that you were hired until today, you haven't

9    interviewed anybody at the re-underwriting firms, right?

10   A    No.  I interviewed everybody at ICG which is a re-

11   underwriting firm and they worked with me.

12   Q    You understand, sir, that I'm speaking of the five re-

13   underwriting firms that were engaged by the trustees in the

14   course of (indiscernible), right?

15   A    I have not talked to any of them and I wouldn't.

16   That's not -- you -- if you start talking to them and start

17   talk --

18          THE COURT:  Mr. Morrow, I'm going to stop you

19   because --

20          THE WITNESS:  Yeah.

21          THE COURT:  -- we're going to be here for a very

22   long time.  This is a cross-examination and Mr. Rollin is

23   entitled to ask you questions that call for yes or no

24   answers and for the most part short answers.  So I would

25   appreciate it if you would attempt to answer his questions

Page 14

1    yes or no and not engage in further narrative unless you

2    feel that it's necessary to fully clarify your answer.

3            If there is anything that needs to be -- that your

4    -- that counsel for the trustees feels is necessary to bring

5    out, they can do that when they get up and conduct your

6    redirect examination.  All right.

7            THE WITNESS:  Okay, Your Honor.

8            THE COURT:  Okay.  Go ahead, Mr. Rollin.

9    BY MR. ROLLIN:

10   Q    Your answer to my question was, no, you didn't

11   interview anybody at the re-underwriting firms?

12   A    Correct.

13   Q    You didn't interview anybody at Duff & Phelps, did you?

14   A    Not concerning this.  Not concerning that area.

15   Q    You didn't review whatever processes were in place at

16   Duff & Phelps for this case?

17   A    No, not other than the report (indiscernible).

18   Q    You didn't interview Mr. Aronoff in forming the

19   opinions set forth in your report?

20   A    No.

21   Q    You understand, sir, that the claim population has been

22   reduced by the trustees between the protocol population and

23   what's currently at issue in this case, correct?

24   A    That's my understanding.

25   Q    But you did not analyze any of those withdrawn claims,

Page 15

1    did you?

2    A    Yes, I did.

3    Q    Okay.  You analyzed the -- from within the population

4    of 90 plus thousand loans?

5    A    My understanding is the title insurance were withdrawn

6    and so I have reviewed those.

7    Q    Other than -- other than title insurance claims, then,

8    you have not reviewed any of the claims that were withdrawn

9    between those that were asserted in the protocol and those

10   that are at issue here?

11   A    Correct.

12   Q    And as the person auditing the trustees' claim process

13   you didn't think you could glean relevant --

14          THE COURT:  Mr. Rollin, could you keep your voice

15   up?  I think people in the back are having a hard time

16   hearing you.

17          MR. ROLLIN:  Sure.  Yeah.  I apologize for that.

18   BY MR. ROLLIN:

19   Q    Sir, as the person auditing the trustees' claim process

20   you did not think that you could glean relevant information

21   from a review of the claims that the trustees' withdrew?

22   A    No.

23   Q    You understand, don't you, that the outcome of your

24   review in terms of the number of agrees and disagrees could

25   have been different had you included in the population

Page 16

1    claims that had been withdrawn, right?

2    A    Not necessarily because I don't know what the claims

3    are.  I don't know if they're valid and they decided to

4    withdraw them or not.

5    Q    My question simply was if your 600 loan sample had been

6    drawn from the larger protocol population and not the more

7    narrow Aronoff population. you may have a different outcome.

8    Would you agree with that?

9    A    Of course.

10   Q    Now the trustees asserted claims for missing documents,

11   correct?

12   A    Yes.

13   Q    And Judge Chapman asked you about the missing documents

14   claims yesterday, right?

15   A    Yes.

16   Q    And you testified in your deposition that your review

17   of the -- that you did a careful evaluation with respect to

18   missing documents.  Do you remember that?

19   A    We went through the complete file.  Yeah.

20   Q    But as you told the Court the careful evaluation that

21   you did was you looked through the file and if the document

22   wasn't there you assumed that it was not there at

23   origination, correct?

24   A    That's the way the industry works.  Yes.

25   Q    Regardless of what the industry does, that's certainly

Page 17

```
 1    what you did, right?

 2    A    I -- yes.

 3    Q    And that's what the trustees did also in their process

 4    of reviewing claims?

 5    A    I don't know.  I -- the trustees, yes, that -- you're

 6    right.

 7    Q    And you believe that it's the plan administrator's

 8    burden to prove the document was not missing the

 9    origination, don't you?

10    A    Correct.

11              MR. ROLLIN:  Can we put up Plan Administrator 909?

12    BY MR. ROLLIN:

13    Q    Will you please turn to Plan Administrator 909 in your

14    binder?  It's another small one.  I apologize.  And I'll

15    represent to you that 909 is another filtering of your

16    updated Exhibit D with certain loans on it.  Do you see

17    that?

18    A    Yes.

19    Q    And these are also disagrees, but the specific basis on

20    which you disagreed was because you found the missing

21    document in the loan file.  Does that appear correct to you?

22    A    Yes.

23    Q    And I'll represent to you, but you're certainly welcome

24    to count, that there are 14 instances in which you found an

25    allegedly missing document in the loan file; is that a fair
```

Page 18

1    --

2    A    Yes.

3    Q    Correct?

4    A    I don't -- I accept your statement.

5    Q    So notwithstanding multiple layers of quality control,

6    both at the re-underwriting firms and within Duff & Phelps,

7    they made at least these 14 claims alleging a missing

8    document when, in fact, the document was not missing, right?

9    A    Yes.

10   Q    I would like to turn and talk about misrepresentation

11   claims.  You and your team reviewed certain of the

12   misrepresentation claims that were asserted by the trustees,

13   correct?

14   A    Yes.

15   Q    You did not get -- and your team is the team at ICG,

16   right?

17   A    And myself, yes.

18   Q    You did not give any written instructions to your team,

19   did you?

20   A    No.

21   Q    Instead what you did was you each reviewed the same 15

22   loans to see if you came out the same way in the analysis?

23   A    Yes.

24   Q    Now in the course of the review there were

25   disagreements between you and ICG, weren't there?

Page 19

1   A    Sometimes.

2   Q    And in those instances you overruled them?

3   A    No, not necessarily.  I made the final decision.

4   Q    I think you testified in deposition, he who testifies

5   wins, and that's a reference to you being the testifier and,

6   therefore, you get to decide?

7   A    I get to decide.  Right.  They may have differed with

8   me.  We discussed the difference and I make the decision as

9   to whether they're valid or not.  That's what I do.

10  Q    Now when performing your review you knew what the

11  claims were that were asserted by the trustees, right?

12  A    Yes.

13  Q    And so did your team at ICG, right?

14  A    Yes.

15  Q    And so they had the trustees' position and they had the

16  debtors' position, right?

17  A    Yes.

18  Q    And when I say they I mean to include you had that as

19  well, right?

20  A    Correct.

21  Q    And so your review of the claims was not blind in any

22  way?

23  A    We had knowledge of what the claims were.  Yes.  We

24  didn't underwrite to that.  Yes.

25  Q    You had knowledge of what the claims were and what the

Page 20

1    positions of the parties were at the time that you conducted

2    the review?

3    A    Yes.

4    Q    And so did ICG?

5    A    Yes.

6    Q    Now when you were reviewing the claims you wanted

7    access to all third party information that was collected by

8    the re-underwriters, didn't you?

9    A    If it was applicable, yes.

10   Q    You would not be happy if you did not receive all of

11   the third party information that was collected by the re-

12   underwriters, right?

13   A    My mood I don't --

14        (Laughter)

15   A    I would expect to receive all third party info --

16   Q    So you --

17   A    -- stuff that is relevant.

18   Q    In fact, Mr. Morrow, you would not offer an independent

19   opinion if you didn't have access to all of the third party

20   information that was collected by the re-underwriters, isn't

21   that right?

22   A    If it's relevant, yes.

23   Q    And if -- if you didn't see it, you know, you can't

24   assess whether it's relevant or not?

25   A    I have a tough time answering that question because the

Page 21

1    -- I just have a tough time answering the question.

2    Q    Well, you understand that the third party information

3    was run for the particular borrowers at issue, correct?

4    A    Third party information is sought on the borrower.

5    Yes.

6    Q    So let's assume for a moment that a re-underwriter

7    looks up DataVerify and Merz and Cydex.  You with me so far?

8    A    Yeah.

9    Q    But they only send you the Merz, right?

10   A    Yes.

11   Q    You don't know what's in the other two documents,

12   right?

13   A    If they ran the other two and the name did not come up,

14   there would not be a report.  So they would -- reports are

15   only generated if the name of the borrower is involved.  It

16   isn't re -- it isn't generated at all.  It doesn't even come

17   up as it.  So you wouldn't have a third party report for the

18   other two because they weren't present in that

19   (indiscernible).

20   Q    That assumes that there was no result.  But let's

21   assume for a moment that there was a result and there were

22   multiple documents for a given borrower.  Right.  You with

23   me?

24   A    Yeah.

25   Q    You would expect to see all of those, wouldn't you?

Page 22

```
 1    A    And I did.  They were in the file.  I had some in the

 2    file that had their names that were not detrimental or were

 3    in the file besides.  So I don't -- you know --

 4    Q    If they didn't send it to you you would have no idea

 5    whether it existed or not?

 6    A    If they didn't send it to me I don't have an idea of

 7    what it is.  I only know the -- what -- how they run their

 8    business and what they --

 9    Q    And my previous question was you would not offer an

10    independent opinion without access to all of the third party

11    information collected by the re-underwriters, right?

12    A    If it was relevant.

13         (Pause)

14    Q    Will you take a look at your deposition, page 134?  I'm

15    going to be looking at lines 10 through 17.  It's on the

16    screen if that's helpful as well.

17    A    Yes.

18    Q    And the question that you were asked in the deposition

19    at line 10 was:

20         "Would you have been willing to offer an

21         independent breach review opinion without access

22         to the third party information collected by the

23         trustees' loan reviewers?"

24         And after an objection you answer:  "Probably not

25    because the breaches, so many of the breaches are based on
```

Page 23

1    third party information."  That was through line 23.

2              THE COURT:  Yeah.  Mr. Lieberman.

3              MR. LIEBERMAN:  We object.  This isn't

4    inconsistent with the testimony he's given.

5              MR. ROLLIN:  It actually is, Your Honor.  He's --

6    he has now qualified to say that he only wants the

7    information if relevant.

8              THE COURT:  If it's relevant.  It's -- I agree.

9    You can keep going.

10   BY MR. ROLLIN:

11   Q    That was the question that you were asked and that was

12   the answer that you gave?

13   A    That --

14   Q    Right?

15   A    Yes.  As I said, relevant.

16   Q    And you didn't ask Mr. --

17             THE COURT:  Wait.  Wait.  Wait.  Wait.  Wait.

18   Wait.

19             MR. ROLLIN:  Thank you, Your Honor.

20             THE COURT:  Try it again.

21   BY MR. ROLLIN:

22   Q    That was the question that you were asked in deposition

23   and that was the answer that you gave?

24   A    Except I said it as a hypothetical, and you said a

25   hypothetical thing.  So it's not a complete -- it wasn't

Page 24

1    complete as to whether it was there and I said, probably

2    not.  So the probably not is relevance.

3    Q    So when you were asked under oath in your deposition

4    whether you would be willing to offer an independent breach

5    review opinion without access to the third party information

6    collected by the trustees' loan reviewers and you said,

7    probably not, what you really meant was only if it was

8    relevant?

9    A    Correct, which I got.

10   Q    Did you have a chance to review -- you didn't make any

11   corrections to your deposition transcript in the months

12   since you gave the deposition, right?

13   A    No.

14   Q    Now did you ask at any point Mr. Aronoff whether the

15   instructions to the loan reviewers were to provide all third

16   party information collected for the borrowers?

17   A    I never talked to Mr. Aronoff.

18   Q    So the answer is no?

19   A    Yes.

20   Q    I would like to show you a clip, a video clip.

21        THE COURT:  Hold on.  Hold on.  You want to give them a

22   cite, please.

23        MR. ROLLIN:  Yeah.  Thank you.  I do not have the

24   cite (indiscernible).

25        (Pause)

Page 25

1              MR. ROLLIN:  Thank you.

2              This is Mr. Aronoff, page 84, line 20, page 85,

3      line 9.

4              THE COURT:  Thank you.  Okay.

5         (Video clip played)

6      BY MR. ROLLIN:

7      Q    So, sir, had you asked Mr. Aronoff he would have told

8      you that the re-underwriting firms should to have sent all

9      third party information --

10     A    I don't read his --

11     Q    -- correct?

12     A    I don't -- sorry.  I don't read that as his.  I read it

13     as a fact that they're supposed to.

14     Q    You think that you interpret what Mr. Aronoff is saying

15     as it being we're supposed to?

16     A    Correct.

17     Q    If he had told you otherwise that, in fact, they were

18     not supposed to, that would have affected your willingness

19     to render an independent breach review opinion, wouldn't it?

20     A    Yes, because the reliability is the work of the

21     underwriting house.

22     Q    Right, because the third party information might --

23     third party documents might have information that's

24     inconsistent with other third party information that you're

25     reviewing and that would be important if you're trying to do

1    a quality review, don't you agree?

2    A    Yes, and that should have been in the file.  That would

3    have been in the file actually.

4    Q    Well, you don't know that because you didn't ask

5    anybody at the re-underwriting firms or Mr. Aronoff whether

6    that was the case, right?

7    A    Other than my knowledge of the underwriting house, no.

8    Q    In fact, if there was inconsistent information in the

9    files that you reviewed, you would actually disagree with

10   the trustees on their conclusion, right?

11   A    Yes.  That's (indiscernible).

12   Q    I'm sorry.  Your answer, sir.

13   A    Yes.  That's why we had a disagreement on 14 of the

14   documents.  We found documents in there.

15   Q    Well, separate and apart from finding documents, if you

16   found inconsistent information; that is, information that is

17   inconsistent with the claim being made by the trustees you

18   would disagree with the trustees, right?

19   A    Yes, I would have.

20   Q    Let's talk about third party sources for a moment.  You

21   take DataVerify as accurate, correct?

22   A    It's an accepted source in the industry.  Yes.

23   Q    Slightly different question.  You take DataVerify as

24   accurate, right?

25   A    I don't -- we -- I don't characterize anything as

Page 27

```
 1    accurate.  I characterize whether it's accepted in the

 2    industry.  I may have said accurate, but I won't say it's

 3    accepted as being accurate in the industry.

 4    Q    Your deposition, sir, page 463, line 25, going onto the

 5    next page:  "Question" -- tell me when you're there.  Sorry.

 6    I didn't mean to go too fast.

 7         (Pause)

 8    A    Yes.

 9    Q    "Question:  Right.  But the narrow point is that you

10    assume that the information provided by DataVerify is

11    accurate for purposes of your loan review?"  "Answer:

12    Yeah."  I --

13    A    Correct.

14    Q    I asked you that question and you gave me that answer?

15    A    Yes.

16    Q    So you do assume that the information in DataVerify is

17    accurate?

18    A    Correct.

19    Q    And you assume that the information in Merz is

20    accurate, right?

21    A    Yes.

22    Q    Even though they both say that the information should

23    be independently verified, right?

24    A    They make a disclaimer on there for legal purposes.

25    Yes.  So, yes.
```

Page 28

1   Q    But you don't independent -- independently verify with

2   third party sources, do you?

3   A    Not in the industry, no, not on a re-underwriting.

4   Q    You don't and the trustees didn't, right?

5   A    Correct.  That would be left to the PA.

6   Q    Meaning it is the burden of the plan administrator to

7   confirm the accuracy of the evidence sources cited by the

8   trustees in support of their claims in this case, correct?

9   A    Or disprove them.  Yes.

10  Q    You take audit credit reports as accurate, also, right?

11  A    Yes.

12  Q    But you understand there are errors.  There can be

13  errors in audit credit reports, right?

14  A    Yes.

15  Q    And, again, it's the plan administrator's burden to

16  either prove or disprove the accuracy of that information

17  source as well?

18  A    That's the industry.  Yes.

19  Q    That's what you did and that's what the trustees did?

20  A    Was that a question?

21  Q    Yes.  That's what you did in your analysis and that's

22  what the trustee did in theirs?

23  A    Right.

24  Q    You required that the Plan Administrator prove or

25  disprove the accuracy of an audit credit report is advanced

```
1    in support of a claim made by the trustees in this case?

2    A    No, I didn't say that.  I said that it - the -- if the

3    plan administrator' are the ones if they want to disprove

4    it, they have that obligation, trustee or -- or my re-

5    underwriting.  What's in the loan files is in the loan file.

6    Q    Even though you understand that audit credit reports

7    can contain errors, right?

8    A    Yes.

9    Q    There's another binder that's the loan documents.  I

10   would ask you to take a look at that one, please.  And if

11   you'll go to Plan Administrator Exhibit 911 and let me know

12   when you're ready, I would appreciate it.

13        (Pause)

14   A    Yes.

15   Q    And you've taken a moment to peruse the document?

16   A    Yes.

17   Q    And Plan Administrator 911 is an excerpt from a single

18   loan from your updated exhibits, correct?

19   A    Yes.

20   Q    And if you look at the first page, Column D, just to

21   confirm the loan number ends 3117, right?

22   A    Yes.

23   Q    And in -- sorry, in D what you'll see is this is a

24   claim for misrepresentation of income, correct?

25   A    Yes.
```

Page 30

1  Q    And the factual basis alleged for this claim is that a

2  person who identifies herself as a vice-president of a

3  company misrepresented her income when she wrote on a loan

4  application that it was $8,865, right?

5  A    Per month.  Yes.

6  Q    Per month.  Yeah.  And the claim is based on two

7  sources identified by the trustees, BLS and a W-2, correct?

8  A    Correct.

9  Q    Please turn to the next exhibit --

10         MR. LIEBERMAN:  Your Honor, I --

11         THE COURT:  Yes.

12         MR. LIEBERMAN:  -- have an objection.  The

13  description actually says W-2 and the tax return.

14         MR. ROLLIN:  Oh, sure.  If that's what it says --

15         THE COURT:  All right.  Thank you.

16         MR. ROLLIN:  -- that's fine.

17  BY MR. ROLLIN:

18  Q    So BLS, tax return and W-2, right?

19  A    Yes.

20  Q    Okay.  And if you'll turn to Plan Administrator 912

21  you'll find the claim package for this loan, correct?

22  A    Yes.

23  Q    Would you please turn to page 16 of the exhibit?

24     (Pause)

25  Q    Are you there?

 1    A     Yes.

 2    Q     Page 16 is the beginning of the loan application?

 3    A     Yes.

 4    Q     And if you look at the signature block at the end

 5    you'll see this loan was originated in July of 2006, right?

 6    A     That would be on which page?

 7    Q     Page --

 8    A     19.

 9    Q     -- 19 of the exhibit.  Yes.  Yes.  And if you turn to

10    page 26 of the exhibit you'll see this is the first page of

11    the BLS printout collected by the trustees' re-underwriter,

12    right?

13    A     Yes.

14    Q     All right.  Can you turn, please to -- do you have Plan

15    Administrator 132 there?

16         (Pause)

17    A     No.

18    Q     It might be in the other binder.  Just give me one

19    second.  It is.  In the other binder it's the very first

20    exhibit.

21         (Pause)

22    Q     Are you there?

23    A     Yes.

24    Q     And Plan Administrator 132 is a document titled survey

25    methods and reliability statement for the May 2016

Page 32

1    occupational employment statistics survey.  Do you see that?

2    A    Yes.

3    Q    Now this is a document published by BLS, right?

4    A    Bureau of Labor and Statistics.  Yes.  Every year.

5    Q    And you understand this document describes the

6    reliability and limitations on the use of BLS, right?

7    A    As of May of 2016, yes.

8    Q    And although you used BLS for misrepresentation claims,

9    you've never actually reviewed publications that describe

10   how to properly use BLS, right?

11   A    How it's used in the industry.  I know how it's used in

12   the industry.  I don't know if I had specific publications

13   regarding it.  I've read an awful lot of articles and I may

14   have, I may not.

15   Q    Let me show you a piece of your deposition.  This will

16   be at page 435, line 20 -- sorry, 345, line 20 to 348, 16.

17   I'm going to show it to you on the video.

18        (Video clip played)

19   Q    I asked you those questions and you gave me those

20   answers?

21   A    Yes.

22   Q    Now in any event even though you don't review BLS

23   documents on how BLS is supposed to be used, you do know

24   that BLS has limitations, right?

25   A    Yes.

Page 33

1   Q    You know that it doesn't give the income for any

2   particular borrower, right?

3   A    Correct.

4   Q    It's just an indicator of income?

5   A    It's an indicator of what -- for the -- for a specific

6   geographic area and occupation.

7   Q    It doesn't give the total compensation?

8   A    No, it does not.  There are certain things that it

9   eliminates.

10  Q    Ten -- when you look at the 90th percentile ten percent

11  of all wage earners, even if you've correctly identified the

12  geography and the occupation make more than the 90th

13  percentile by definition, right?

14  A    Yes.

15  Q    And how much more above the 90th percentile you don't

16  know?

17  A    Correct.

18  Q    The survey covers a three-year period not a one-year

19  period, right?

20  A    Yes.  It's much more conservative.  Yes.

21  Q    Now referring back to the loan application in this

22  case, you can go back to the loan document binder in PA-912.

23       (Pause)

24  Q    Are you there?

25  A    You want me to go to the front page?  Yes.

Page 34

1   Q    Plan Administrator Exhibit 912 in the loan level

2   binder, and specifically page 17 of the exhibit.

3   A    Yes.

4   Q    We're back at the loan application, correct?

5   A    Yes.

6   Q    And what the borrower identifies in her loan

7   application that she is the vice-president of the company,

8   correct?

9   A    Correct.

10  Q    And will you go Plan Administrator 938, just a few tabs

11  back?

12  A    The number again?

13  Q    938.

14  A    938.  Yes.

15  Q    You see that that is a verification of employment that

16  was done at origination?

17  A    It's a verification that she is employed there.  Yes.

18  Q    And it's a verification that she's employed as a vice-

19  president program director, right?

20  A    Yes.

21  Q    And now this isn't in the claim package, is it, sir?

22  This is in the loan file.  You can confirm.  You have the

23  claim package at 912.

24  A    I will take -- it probably isn't because it wouldn't be

25  relevant.  Yes.

Page 35

1   Q    It would not be relevant to the trustees' analysis that

2   a verification of employment was conducted at origination

3   which identified the person, the borrower as being a vice-

4   president program director.  Is that your testimony?

5   A    Yes, because that information is already on the

6   application and also on the tax return.

7   Q    So this is just confirmatory that she's a vice-

8   president?

9   A    Yes.

10  Q    Okay.  If you go back to the BLS which is Plan

11  Administrator 912, I'm going to focus you on page 30 of the

12  exhibit.

13       (Pause)

14  Q    Are you there?

15  A    Yes.

16  Q    That's the output from the re-underwriting firm's use

17  of BLS for this borrower, right?

18  A    It's one of the proofs on the income.  Yes.

19  Q    Just to very clear in the record this is the output

20  from the re-underwriting firm's use of BLS for this

21  borrower, correct?

22  A    Yes.  Yes.  I understand.  Yes.  I'm sorry.  I didn't

23  understand the question.  Yes.

24  Q    And what they did was they input the geography which is

25  New York, White Plains.  Do you see that section?

Page 36

1   A    Yes.

2   Q    And then they inputted occupation.  Do you see that?

3   A    Yes.

4   Q    And the occupation that they used was first line

5   supervisors/managers of office and administrative support

6   workers, correct?

7   A    Yes.

8   Q    For a borrower whose loan application and origination

9   VOE says that she's the vice-president of the company,

10  right?

11  A    Correct.

12       (Pause)

13  Q    And you don't know one way or the other whether this

14  particular borrower, whether in her case vice-

15  president/program director is the same thing as a first line

16  supervisor/manager of office and administrative support

17  workers, do you?

18  A    Based on my experience in doing this kind of

19  underwriting I would put her in that category.

20  Q    So -- okay.  You would take a person who has identified

21  herself as a vice-president and whose origination

22  verification of employment has identified her as vice-

23  president of a company and you would input first line

24  supervisors/managers of office and administrative support

25  workers in BLS to determine whether there's a

1    misrepresentation of income?

2    A    That --

3    Q    That's your practice?

4    A    That was the position that is best representative of

5    her type.

6    Q    Sir, if you could answer my question.  That is your

7    practice, to take a woman who is a vice-president of a

8    company and to insert in BLS that she is a supervisor of

9    office and administrative support workers, right?

10   A    The reason I can't answer your question like that is

11   because if you say that a person who -- with her company

12   that she works at is that type of company, yes.  If you work

13   for an engineering company I may or may not, or if it's a

14   thing -- so it's not -- you have to evaluate the total

15   person.

16   Q    What type of company is this?

17   A    It appears to be a administrative company, just like

18   the title here, the administration, and that's what it

19   appears to be.

20   Q    There's zero factual basis for the statement that you

21   just made, right?

22   A    Since I don't have the whole loan file I can't say one

23   way or the other.  I -- this is the best choice for this

24   person.

25   Q    Did you include any notes anywhere in your analysis

Page 38

1    that said, notwithstanding the fact that this person is

2    clearly the vice-president of a company, the nature of this

3    business is such that it is, as you said a moment ago, an

4    administrative company and, therefore, she's actually a

5    supervisor of office and administrative workers?

6    A    Can you ask the question again?  I'm sorry.

7    Q    Sure.  Did you include any notes anywhere in your

8    analysis that said, notwithstanding the fact that this

9    person is clearly the vice-president of a company, the

10   nature of this business is such that it is, as you said a

11   moment ago, an administrative company and, therefore, she is

12   actually a supervisor of office and administrative workers?

13   A    No.  We already had -- no.

14   Q    And you don't -- sir, you don't know what this company

15   is?

16   A    No.  We only have her tax returns that -- that -- for

17   the following year at the same company.

18   Q    And the one thing we know you didn't do is you didn't

19   call the borrower to ask, did you?

20   A    You would never call the borrower to ask.

21   Q    The answer to my question is no, you did not?

22   A    No.  You wouldn't.

23   Q    You didn't call the employer to ask, what kind of

24   company is this?

25   A    Excuse me.  I didn't -- I don't know if the

Page 39

1  underwriting house did or not.

2  Q    It's not indicated anywhere in their notes, is it?

3  You've got them right there.

4  A    I wouldn't expect it to be in their notes.  I would

5  expect it to possibly be in the loan file, but not in the

6  notes.

7  Q    And nobody called the company to find out was this

8  borrower a vice-president or a supervisor of office and

9  administrative workers?

10  A    That was not the purpose for -- she already told us

11  that she's only making $37,000 a year.  We gave her the

12  benefit of the doubt by going --

13          THE COURT:  Okay.  Okay.  Okay.

14          THE WITNESS:  Sorry.

15          THE COURT:  Stop.

16          THE WITNESS:  Sorry, Your Honor.  Sorry.

17          THE COURT:  We're not going to argue.  We're going

18  to have questions --

19          THE WITNESS:  I'm sorry.

20          THE COURT:  -- and we're going to have answers.

21          Mr. Rollin, when you get to an appropriate point

22  it's coming up on time for a break, perhaps not yet, but

23  soon.

24          MR. ROLLIN:  Thank you.  I will, Your Honor.

25  BY MR. ROLLIN:

Page 40

1    Q    I just want -- just answer this question.  Nobody on

2    behalf of the trustees called the company to find out

3    whether the borrower was a vice-president or something else,

4    right?

5    A    No.

6    Q    Because, as you said a moment ago, you would never do

7    that?

8    A    Correct.

9    Q    You wouldn't call the borrower.  You wouldn't call the

10   company.

11   A    I wouldn't, no.

12   Q    And the trustees didn't either?

13   A    I don't know.  They might have contacted the company.

14   Q    So in evaluating the trustees' process you did not

15   learn whether they contacted the company?

16   A    They would only include that if there was a response

17   from Global Comm or not.  They wouldn't include it if there

18   was no response.

19   Q    The bottom line is you don't know?

20   A    Correct.  Like I said I haven't got the whole loan file

21   to review.

22   Q    Now --

23   A    I'm sorry.  I'm not trying to argue.

24   Q    If the borrower had some information to provide it is

25   not part of your practice to collect that information,

Page 41

```
 1   right?

 2   A    I review what's in the loan file, what the borrower

 3   provided.

 4   Q    If, in the course of doing your review, the borrower

 5   had some information to provide that might be relevant to

 6   the lending transaction that you are reviewing, you wouldn't

 7   know that because you don't contact the borrower?

 8   A    Correct.

 9   Q    And it doesn't only apply to the borrower in this

10   claim.  That's a general practice, right?

11   A    In the industry.  Yes.

12   Q    It's the same general practice that the trustees

13   followed, correct?

14   A    Correct.

15   Q    It's also not part of your process to contact the loan

16   officers, right?

17   A    No.

18   Q    And that's the other person who was engaged in the

19   communication with the borrower in the lending transaction

20   under review, correct?

21   A    One of them.  Yes.

22   Q    And, in fact, you believe it would be absurd to merely

23   suggest that it might be appropriate to contact the parties

24   who were engaged in the transaction under review, right?

25   A    Yes.
```

1          MR. ROLLIN:  We can take a break, Your Honor.

2          THE COURT:  Okay.  What I would like to do is take

3    a ten minute break and then I'm going to need a 15 minute

4    break at noon to do a conference call.  We can either take

5    that as a 15 minute break or take that as an early lunch.

6    I'm inclined to keep going a little bit after 12:15 if

7    that's all right.   Okay.

8          MR. ROLLIN:  Whatever Your Honor's preference is

9    --

10         THE COURT:  Okay.

11         MR. ROLLIN:  -- is fine.

12         THE COURT:  So let's do ten minutes now and we'll

13   come back at 11:15.

14         THE WITNESS:  Thank you, Your Honor.

15      (Recess taken at 11:06 a.m.; reconvened at 11:21 a.m.)

16         THE COURT:  Have a seat, please.  We'll wait.

17         MR. DAVIS:  I'll e-mail.

18         THE COURT:  Okay.  Thank you, Mr. Davis.

19      (Pause)

20         MR. SHUSTER:  The pause that refreshes.

21         THE COURT:  Well put, Mr. Shuster.

22         Do you have enough water up there?  Something --

23         THE WITNESS:  Yes, Your Honor.

24         THE COURT:  Something stronger, Mr. Morrow?

25      (Laughter)

Page 43

1          THE WITNESS:  I don't drink so I can't -- it's --

2          THE COURT:  Never too late to start, I guess.

3     (Laughter)

4          THE WITNESS:  Well, as my wife says it's never too

5     late to stop.

6     (Pause)

7          MR. COSENZA:  I apologize, Your Honor.

8          THE COURT:  It's all right.

9     (Pause)

10         THE COURT:  We do have that restroom back here

11    that everyone's welcome to use to save the hike all the way

12    around.

13         THE WITNESS:  Oh, that's nice.

14         THE COURT:  One of the few perks of my position is

15    I have a nice piece of Manhattan real estate, a beautiful

16    view, a bathroom back there for the law clerks.

17         MR. COSENZA:  Your Honor, I do apologize.  Mr.

18    Rollin was pairing down.  That's why he's actually --

19         THE COURT:  Okay.

20         MR. COSENZA:  He was trying to pare down his --

21         THE COURT:  Okay.

22         MR. COSENZA:  -- things so I apologize for this.

23         THE COURT:  We'll just wait.

24    (Pause)

25         MR. ROLLIN:  Believe it or not, Your Honor, this

Page 44

1    is not my most embarrassing courtroom moment, but it is very

2    close.

3         (Laughter)

4             THE COURT:  Well, I don't consider this

5    embarrassing, so I would be interested to hear what the

6    other one was.

7         (Laughter)

8             MR. ROLLIN:  I apologize.

9             THE COURT:  I appreciate your apology.

10            MR. ROLLIN:  Thank you.

11            THE COURT:  I understand you were trying to pare

12   down your questions.

13            MR. ROLLIN:  I -- I am.  Yes.

14            THE COURT:  So it was time well spent.

15            MR. ROLLIN:  Thank you.

16            THE COURT:  All right.  I do have to stop at 12:00

17   for that phone call for 15 minutes --

18            MR. ROLLIN:  Okay.

19            THE COURT:  -- one way or the other.

20            MR. ROLLIN:  Thanks.

21            May I continue?

22            THE COURT:  Yes.

23            MR. ROLLIN:  Okay.

24   BY MR. ROLLIN:

25   Q    Mr. Morrow, we are still in the loan file that is --

Page 45

1   the last four digits are 3117 and I'll ask you to turn to

2   PA-912 which is the claim package, and specifically to page

3   22.

4        (Pause)

5   A    Yes.

6   Q    And on page 22 of the claim package is the W-2 that's

7   referenced in the breach findings provided by the trustees,

8   correct?

9   A    Yes.

10  Q    Now this loan, you'll recall, originated in July of

11  2006.  We saw that on the loan application, correct?

12  A    Yes.

13  Q    And this W-2 form is for the aggregate income for the

14  year 2007, correct?

15  A    Correct.

16  Q    So covering a period of time approximately 17 months

17  from origination, correct?

18  A    Correct.

19  Q    And for purposes of making the claim neither you nor

20  the trustees considered whether the income numbers taken

21  from the 2007 W-2 could have been affected in the course of

22  the 17 months between origination and the W-2, correct?

23  A    Yes.  That was the purpose of the BLS.

24  Q    You're saying that the purpose of the BLS was to

25  confirm the borrower's income at origination in 2006?

Page 46

1    A    No, to confirm the fact that she made a

2    misrepresentation at the date of the loan.

3    Q    So subject to all of the limitations and the manner in

4    which BLS was used, correct, you recognize as we talked

5    about before that there are limitations on BLS and it was

6    used by using a different occupancy -- I'm sorry --

7    occupation, right?

8    A    In my estimation it was used correctly so I -- I can't

9    agree with you on the fact of all the things.  There are no

10   exceptions is correct.

11   Q    Let's set aside BLS.  We already talked about it.  I

12   want to focus on the W-2.  Seventeen months passed between

13   origination and the time of this -- the income that this W-2

14   captures, right?

15   A    Correct.

16   Q    And you understand that in the passage of the 17 months

17   something could have happened such that the income stated at

18   origination may be accurate even if the numbers reflected on

19   a 2017 (sic) W-2 are different, right?

20   A    Yes, and we took that into consideration.  Yes.

21   Q    And what you used and what the trustee's used to assert

22   the income misrepresentation was one-twelfth of the

23   aggregate income for the year 2007, correct?

24   A    If she was still at the same employer -- employee --

25   company, yes.

Page 47

1   Q    And that is what happened in this case?

2   A    Correct.

3   Q    Okay.  And you took that aggregate income, you divided

4   it by 12 to come up with a monthly income, right?

5   A    Yes.

6   Q    And then you took that monthly income and you said,

7   this is what I'm going to assume was the borrower's income

8   at origination to determine whether or not there was a

9   misrepresentation, correct?

10  A    Correct.

11  Q    And that was the general practice of the trustees when

12  looking at an aggregate income figure.  They divided it by

13  12, took that one-twelfth and assumed it was the income at

14  origination for purposes of determining whether there was a

15  misrepresentation at origination, right?

16  A    Along with the fact that they were at the same

17  employed.

18  Q    So the --

19  A    Yes.

20  Q    -- the answer is yes.  And the trustees' review was not

21  designed to find out if anything happened in the borrower's

22  life between origination and that aggregate annual income

23  figure that could account for the decrease in income over

24  time, correct?

25  A    That's incorrect.  That's incorrect.

Page 48

1          (Pause)

2     Q    Let's take a look at your deposition, please, page 383.

3     And we're focusing on line 21.

4     A    Were you asking me the last question on this loan

5     because you didn't say that.  You said did -- did the --

6     that wasn't your question.  Are you saying this loan?

7     Q    Well, on this loan that didn't happen, right?

8     A    If it wasn't in the loan file we didn't do anything.

9     Yes.

10    Q    And in general the re-underwriting exercise that was

11    engaged in here by the trustees wasn't designed to find out

12    if anything happened in the borrower's life after

13    origination that could have affected her income, right?

14    A    For this loan, correct

15    Q    The whole re-underwriting exercise?

16    A    No, because we -- the -- we have letters from borrowers

17    saying, we have problems, here's our problem.  So they

18    indicated it.  In the file we would have hardship letters

19    and that and we would read those and utilize them.

20         So the answer is, yes, we -- we didn't look for those

21    and if they're in the file we considered them.

22    Q    Let's go back to the deposition then, 383, line 21.

23    Are you ready?

24    A    Yes.

25    Q    Beginning at line 21:

Page 49

1          "Question:  And the re-underwriting exercise that was

2          engaged in here by the trustees didn't -- wasn't

3          designed to find out if anything happened in the

4          borrower's life after origination that could have

5          affected her income?"

6          There's an objection.

7          "Right?"

8          Your answer:

9          "They took the loan file.  We took the loan file,

10         analyzed, re-underwrote the loan file for reps and

11         warranties, and applied that.  That is the duty of the

12         trustee in putting back a claim.  If Lehman wants to do

13         the next step of going back and figuring out what her

14         life is, that's up to Lehman to decide, not our

15         borrower.  They don't sell.  You don't establish a

16         value of the loan and see if it increased or decreased

17         based on running around doing what you are suggesting."

18         Did I ask you those questions and you gave me that

19    answer?

20    A    Yes.

21    Q    And it is your position that it is Lehman's burden to

22    determine if something happened in the intervening 17 months

23    with respect to this borrower to show that the income figure

24    used by the trustees is wrong, right?

25    A    Yes.

Page 50

```
 1   Q    And based on the BLS and the W-2 that are in this file
 2   you have no idea what this borrower actually made at
 3   origination, right?
 4   A    No, we don't, other than the -- well, no.
 5   Q    And under the industry standard that guides your work
 6   in this case, once there's an indication of a
 7   misrepresentation it is the sellers, it is the plan
 8   administrator, it is Lehman's burden to disprove it, right?
 9   A    When it's this big of a dis -- misrepresentation, yes.
10   Q    In your deposition, 367, please.
11        (Pause)
12   Q    You with me, line 10?
13   A    Okay.
14   Q    My question:
15        "My question is whether under the industry standard
16        that guides your work whether, if there's an indication
17        of a misrepresentation it then becomes the seller's
18        obligation to disprove it?"
19        There's an objection.
20        I say on page 367 at line 3, "Mr. Morrow, please answer
21   the question."  Your answer, "In the industry if the loan is
22   put back for a claim like this, that is an exemplar.  It is
23   up to the seller to prove that it is wrong," correct?
24   A    Correct.
25   Q    That's the industry standard, right?
```

Page 51

1    A    Yes.

2    Q    And that's the standard that you applied and that's the

3    standard that the trustees applied, right?

4    A    Correct.

5    Q    Would you please turn to Plan Administrator 133?

6         (Pause)

7    Q    Are you there?

8    A    Yes.

9    Q    This is the borrower's hardship letter, correct?

10   A    In 2011, yes.

11   Q    And it's -- it's in the loan file, but not in the claim

12   package, right?

13   A    Correct.

14   Q    So re-underwriters had access to it and you had access

15   to it, right?

16   A    My understanding everybody had access to it, but --

17   Q    Including the --

18   A    -- the PA, too?

19   Q    Sure.   Including the trustees' re-underwriters, yes?

20   A    Yes.

21   Q    Including Duff & Phelps, yes?

22   A    Everybody had it.

23   Q    Include --

24   A    Yes.

25   Q    Including Mr. Morrow?

Page 52

1    A    Yes.

2    Q    And including ICG?

3    A    Yes.

4    Q    Now didn't you testify yesterday you re-underwrote the

5    files four times?

6    A    We did.

7    Q    Four times.  And here's what the borrower writes in her

8    hardship letter.  And I apologize.  It's a little lengthy,

9    but it matters.

10        "I'm writing this letter to explain my current

11        financial situation.  I purchased my home in July 2006.

12        The slowdown of the economy resulted in my new

13        position with my company to be terminated.  This

14        position would have increased my financial income

15        substantially.

16        "Unfortunately, the economy didn't improve and by 2007

17        my company decided to close our New York office and

18        merge with our Greenwich, Connecticut office."

19        Are you with me so far?

20    A    Yes.

21    Q    So what she's saying is by 2007 my office decided to

22    close, correct?

23    A    Yes.  And she moved to Greenwich.

24    Q    And so she's speaking to that period of time between

25    origination and the W-2, right?

Page 53

```
1    A    No.  She's speaking to -- in 2011 as to what happened

2    and she moved to Greenwich -- she had to move to Greenwich,

3    Connecticut.

4              THE COURT:  Where does it say that --

5              THE WITNESS:  Her job.  They closed the New York

6    to merge to Connecticut and Greenwich Village, Connecticut.

7    She didn't say she lost her job.

8              THE COURT:  She didn't say she moved, did she?

9              THE WITNESS:  No.  I'm saying she had to go to

10   Greenwich.  She had to travel to Greenwich.  I'm sorry, Your

11   Honor.

12   BY MR. ROLLIN:

13   Q    In the year 2007, right?  Right?

14   A    This is written two -- I don't know how to answer the

15   question.  Is it a partial question?  In the year 2007 I

16   just -- I'm sorry.

17   Q    In the year --

18   A    Can you finish the question or restate the question?

19   Q    "The economy didn't improve and by 2007 my company

20   decided to close our New York office and merge with our

21   Greenwich office," right?  That's what she said.

22   A    Yeah.  She moved to Greenwich.  She had to travel to

23   Greenwich.

24   Q    In the year 2007, right?

25   A    Yes.
```

Page 54

```
 1    Q    Which is the period of time between origination and the
 2    W-2, right?
 3    A    And -- yeah.  She had moved to Greenwich.
 4    Q    Her company is obviously experiencing a problem because
 5    of the economy in 2007.  That's what she's saying in her
 6    letter, right?
 7    A    The company is having problems.  Yes.  She doesn't say
 8    she got a cut in pay.
 9    Q    Oh, well, it goes on.  She goes on to talk about having
10    had -- let's see.
11         "After dealing with the relocation of my job, I was
12          sick for a while and had to run back and forth to the
13          doctor.  It all started when I was unable to lift my
14          right arm and had experienced some sharp pains in my
15          chest," right?
16    A    Yes.
17    Q    She's -- this borrower is describing the effect of the
18    economic downturn and health problems.  And if you see it
19    goes on other problems that she is experiencing, correct?
20    A    Which she's describing in 2011.  Yes.
21    Q    She's speaking to a time in the past, sir, correct?
22    A    Yes.  What the timing is, we don't know.
23    Q    And even though -- okay.  You don't know the timing
24    even though it says by 2007, those words --
25              MR. LIEBERMAN:  Object.
```

Page 55

1    BY MR. ROLLIN:

2    Q    -- correct?

3              MR. LIEBERMAN:  Objection, Your Honor.  It

4    misstates the document and it says the -- the sentence he

5    just read is precluded by a sentence that says, at -- at

6    this time, which is 2011.

7              THE COURT:  Okay.  Listen we're going to keep

8    reading this document --

9              THE WITNESS:  Uh-huh.

10             THE COURT:  -- until we have a clear record as to

11   what this document says.

12             Mr. Rollin, you can start over again as far as I'm

13   concerned because there's been a statement made about how it

14   affected the position.  And I don't think that that's

15   accurate either.  So we're going to keep going until we get

16   this whole document right.

17             All right.  There's no dispute.  We can scroll

18   down and see the date on the document, the date it was

19   written.  Right.  There's no dispute that it was written in

20   2011.  Okay.  Let's put that aside.

21             Keep going, Mr. Rolling.

22   BY MR. ROLLIN:

23   Q    You understand this is a borrower communication

24   describing a financial hardship, correct?

25   A    Yes.  They're requesting -- requesting modification.

Page 56

1   Q    And she discusses a slowdown of the economy resulting

2   in a -- an effect on her position in her company in the

3   first couple of lines of this document, correct?

4   A    Yes.

5   Q    And the time frame that she's referencing is by 2007

6   the company decided to close the New York office and merge

7   with the Greenwich office, right?

8   A    Yes.

9   Q    So she is speaking to the period of time between

10  origination and the W-2 that the trustees rely on to assert

11  the claim, right?

12  A    She's speaking in a period of -- yeah.

13  Q    She is also communicating that after dealing with the

14  job relocation she started to experience some health

15  problems, correct?

16  A    Yes.

17  Q    And they're detailed here quite clearly without going

18  into the borrower's particular health problems, right?

19  A    Except for time frame, yes.

20  Q    Right.  The time frame of the health problems isn't

21  clearly spelled out except that it happened after dealing

22  with the relocation of her job, correct?

23  A    Right.

24  Q    And there was nothing in your process that was designed

25  to take a look at these facts and find out whether they

```
 1    effected her income in -- during the passage of the 17

 2    months from origination to the income that you used to make

 3    the claim, right?

 4    A    No, but I -- well, I -- the thing is, if she had a

 5    decline in income she would stated here.  All she did is say

 6    that she changed -- she had to go to the -- to Greenwich to

 7    keep her job.  There's no indication she made less money

 8    than she was making than when she was in New York.

 9    Q    The words, "if she had a decline in income she would

10    have stated it here," is speculation on her part, correct?

11    A    I'm reading the document.  It is not there.  So it's

12    speculation?  Well, having worked -- well, I don't want to

13    get in an argument.

14    Q    It's speculation.  You don't know what she would have

15    done or what she was thinking when she wrote this, right?

16    A    No, but I work with borrowers for years and they would

17    say, I had a decline in income.  She didn't.

18              THE COURT:  I'm sorry.  I'm just not getting this.

19    Okay.  This person starts this letter by saying, I purchased

20    my home in July of 2006.  The very next sentence says,

21    albeit somewhat inarticulately, okay, and we have no idea

22    whether this is English as a second language or what, but

23    the words on the page say:

24        "With slow down of the economy resulted in my new

25         position with my company to be terminated.  This
```

1          position would have increased my financial income

2          substantially."

3          What part of that is un -- is unclear?

4               THE WITNESS:  Okay.

5               THE COURT:  I'm not --

6               THE WITNESS:  I --

7               THE COURT:  I'm not trying to --

8               THE WITNESS:  I -- I'm not --

9               THE COURT:  -- argue with you either.

10              THE WITNESS:  I'm not, Judge.

11              THE COURT:  I am literally not understanding --

12              THE WITNESS:  What --

13              THE COURT:  -- what the implication of that

14     statement is other than I had a position, I was going to

15     make more money, the economy slowed down, I'm not going to

16     make that money anymore, and on top of everything the New

17     York office closed and merged with the Greenwich office,

18     which we -- is corroborated by the W-2 because it shows part

19     year income from New York and part year income from

20     Connecticut, right?

21              THE WITNESS:  Right.  But that's why we did the

22     BLS to show that what would have been -- BLS shows much

23     higher income than what she had on her thing so that we

24     could see and she still is far exceeding what BLS --

25              THE COURT:  And did you notice that on the BLS

```
 1    this woman is -- has a Bronx address and she worked in

 2    Manhattan and the BLS was for White Plains and Wayne, New

 3    Jersey?

 4              THE WITNESS:  I know.  I know.

 5              THE COURT:  I'm sorry.

 6              THE WITNESS:  I understand.

 7              THE COURT:  Go ahead, Mr. Rollin.

 8    BY MR. ROLLIN:

 9    Q    By the way when you said you -- that's why you ran the

10    BLS, you don't mean that's why you ran the BLS.  The BLS was

11    run by the re-underwriting firm?

12    A    We checked every one.

13    Q    The BLS was run was run by the re-underwriting firm?

14    A    Yes, but it was checked by us.

15    Q    That wasn't my point.  You don't know --

16    A    Yes.

17    Q    -- you don't know why the re-underwriting firm ran the

18    BLS?

19    A    All I know is they ran it.  Yes.

20    Q    All right.  You don't know why because you didn't ask

21    them?

22    A    No.  I didn't ask because I was there.

23    Q    Now all of this information, and I won't read the whole

24    letter into the record.  It goes on in substantial detail

25    about other hardships as well, none of this information
```

Page 60

1  would affect your analysis of this claim at all, would it?

2  A    Not that there was misrepresentation at the date of

3  origination, no, it wouldn't.

4  Q    And when you say at the date of origination you mean

5  July 2006 and you base your statement that there was a

6  misrepresentation on 2007 income, right?

7  A    And the BLS.  Yes.

8  Q    Do you not view this as inconsistent evidence?

9  A    No.  I consider it that there's part of the evidence

10  that is in the total loan package.

11  Q    Okay.  So in performing the review that you performed,

12  if you had information like -- like this you wouldn't

13  consider it as in -- this is not what you mean when you say

14  inconsistent evidence?

15  A    I didn't say inconsistent -- I don't think I've used

16  that word.

17  Q    I asked you, is this inconsistent evidence and you said

18  no?

19  A    I said the whole file was there.  Based on the whole

20  file it's part of the -- the evidence we had.  This is the

21  only loan that I can remember that we had letters like this,

22  but, yeah.

23  Q    This is the only loan you remember where there was a

24  hardship letter?

25  A    No.  I said a letter like this.

Page 61

1  Q    So let's back up a little bit.  This letter, is it a

2  piece of inconsistent evidence or not?

3  A    I don't think it's inconsistent with the decision that

4  she was -- that she made a misrepresentation of income on

5  the date that it was there.

6  Q    Even though you don't know what her actual income was

7  at origination?

8  A    Correct.

9  Q    I'll represent to you, Mr. Morrow, that this loan

10  performed for nine years, nine years.  Would you take my

11  representation for purposes of this question?

12  A    Fine.

13  Q    Does that matter to you?

14  A    What --

15  Q    Does that matter to your analysis of this loan at all

16  that it performed for nine years?

17  A    No.

18  Q    We've talked a bit about industry custom and practice

19  and specifically about not contacting borrowers and

20  originators.  Do you remember that?

21  A    Yes.

22  Q    In fact, you testified earlier that you think it would

23  be absurd to do so, right?

24  A    I didn't --

25  Q    Well, you --

Page 62

1   A    I don't know if I used the word absurd.  It's not done

2   in the industry on a re-underwriting like we did.

3   Q    You do recall testifying that even the idea of

4   contacting the loan officers was absurd, don't you?

5   A    Yes, because so many of them aren't even in the

6   industry anymore.

7   Q    Do you think that it's impossible to find the

8   originators?

9   A    There's a difference between an originator and a loan

10  officer.

11  Q    Well, the originators have records from the lending

12  operations, don't they?

13  A    They should.

14  Q    And do you think we can't track originators down and

15  say, bring them into court or issue a subpoena?

16  A    But that's different than contacting the loan officer.

17  Q    I'm ask -- I asked you a different question.  Do you

18  think that it's impossible to find the originators of the

19  loans, send them a subpoena, bring them to court, do what

20  you have to do to get the information from them?

21  A    No.  I've done that work.

22  Q    Okay.  So that is possible.  You just didn't do it?

23  A    I wouldn't do that.  I did re-underwriting.  I'm not an

24  attorney.

25  Q    To collect the information from the originators neither

Page 63

1    you nor the trustees issued any subpoenas or did any of that

2    to collect the information that the originators had, right?

3    A    No.  We didn't -- I -- all I got was what was provided.

4    Q    Now you understand that Lehman is a participant in the

5    RMBS market, right, was?

6    A    Yes.

7    Q    And it is part of the industry that participates in

8    this type of repurchase litigation, right?

9    A    Yes.

10   Q    And, in fact, you testified that you were an expert

11   witness for Lehman in one case, correct?

12   A    Well, actually, there were four.  But, yes, one.

13   Q    You know that Aurora is not Lehman, right?

14   A    Well, that's fine.  Okay.

15   Q    And you know that Lehman regularly obtained information

16   directly from borrowers, directly from employers, directly

17   from the originators?

18              MR. LIEBERMAN:  Objection.

19              THE COURT:  Yes.  What's the objection?

20              MR. LIEBERMAN:  Lack of foundation.

21              THE COURT:  I'm sorry.

22              MR. LIEBERMAN:  Lack of foundation.

23              THE COURT:  All right.

24              MR. ROLLIN:  Mr. Morrow was an expert in a case

25   where, in fact, Lehman --

```
 1                THE COURT:  You can lay the foundation.

 2                MR. ROLLIN:  Okay.  I was trying to speed things

 3     up, but I --

 4                THE COURT:  Understood.

 5                MR. ROLLIN:  -- I will.

 6     BY MR. ROLLIN:

 7     Q    Mr. Morrow, will you please identify in your binder,

 8     not the loan binder but the other binder, TRX-10 --

 9     A    Oh, you're talking about --

10                MR. ROLLIN:  Your Honor, this might be an

11     opportune time.

12                THE COURT:  Okay.

13                MR. ROLLIN:  This is a little bit of a lengthy

14     examination.

15                THE COURT:  All right.  So then is it still

16     alright with you, Mr. Rollin, to come back at 12:15?

17                Mr. Morrow, my concern is more with you.  Are you

18     okay to keep going at 12:15 for another segment before you

19     take a lunch break?

20                THE WITNESS:  Sure.

21                THE COURT:  Okay.

22                THE WITNESS:  Okay.

23                THE COURT:  All right.  We'll come back at 12:15

24     and we'll take lunch after that.

25                THE WITNESS:  Thank you, Your Honor.
```

Page 65

1          THE COURT:  All right.  Thank you.

2          (Recess taken at 11:56 a.m.; reconvened at 12:17 p.m.)

3          THE COURT:  Please have a seat.

4          THE WITNESS:  Okay.

5          THE COURT:  Okay.

6    BY MR. ROLLIN:

7    Q    Mr. Rollin, did you read Mr. Trumpp's trial testimony?

8    A    No.

9    Q    And you weren't here for it?

10   A    Correct.

11   Q    Do you know what Lehman's practices are related to the

12   collection of information from borrowers, employers, and

13   others?

14   A    No.  I mean, it's so long ago I don't remember.

15   Q    In assessing what the industry standard is or what

16   industry custom and practice is you did not research what

17   Lehman's practices were in that regard, did you?

18   A    I do not believe it is available online, so, no.

19   Q    Did you ask anybody that you worked with at the

20   trustees what they might have known about Lehman's practices

21   in this regard?

22   A    No.

23   Q    So you didn't feel it was important for you to know

24   what Lehman's practices as a member of the industry on which

25   you're giving an opinion were in this regard?

Page 66

1   A    No.

2   Q    Mr. Morrow, some of the binders that you have are from

3   yesterday's examination that were by the -- in your direct,

4   and included within them, one of them -- oh, I'm looking for

5   Volume I which contains your expert report.

6   A    Yes.

7   Q    Do you see that?  And if you look at the tab marked F,

8   that's an exhibit from your report and we talked about it

9   yesterday.  Do you remember that?

10  A    Yes.

11  Q    And this is for the excessive DTI claims, right?

12  A    No.  This was a -- no.  That's --

13  Q    What --

14  A    -- incorrect information.

15  Q    What is it -- what is Exhibit F?

16  A    F is to demonstrate Mr. Grice's assertion that the

17  loans would have been made anyway because they were under

18  the maximum DTI was incorrect.

19  Q    And in order to perform that DTI calculation you have

20  actual DTI in the far right-hand column, correct?

21  A    Yes.

22  Q    And the D in DTI stands for debt and the I in DTI

23  stands for income, correct?

24  A    Correct.

25  Q    And so what you would need to know is the actual debt

Page 67

1   and the actual income at origination in order to perform a

2   DTI calculation, correct?

3   A    For this chart, no.

4   Q    For this chart you do not need to know what the actual

5   debts or the actual income of the borrowers --

6   A    It is --

7   Q    -- was?

8   A    It is the actual debts of the borrower identified and

9   found and the income that was verified through the re-

10  underwriting.

11  Q    Let's focus on the word actual.  Actual means, and I

12  think you actually testified to this yesterday, real?

13  A    Right.

14  Q    In fact, verified means real?

15  A    Yes.

16  Q    But you don't know the actual income of a borrower at

17  origination, do you?

18  A    Based on the industry you do.

19  Q    No.  No.  I would like -- let's focus on what you know,

20  what you -- and what you don't know.  What you don't know

21  based on the types of information collected by the trustees

22  in this process is how much money the borrower made at

23  origination.  You have inference?

24  A    That's correct.  We know that misrepresent -- that it

25  was misrepresented, but we do not know what it actually is.

Page 68

1   Q    You have inference, right?

2   A    In some cases we actually have tax returns --

3   Q    Well --

4   A    -- for the year that the loan was made, so we do have

5   proof.

6   Q    Let --

7   A    That's why I have a problem with your question.

8   Q    Let's separate tax returns.  Other than tax -- and

9   we'll talk about those in a minute.  Other than tax returns

10  you have an inference of what the borrower made at

11  origination?

12  A    Well, we may also have bankruptcy filings that show

13  what it is.  So that's why I'm having difficulty answering

14  your question.  Not all of these are strictly inference.

15  Q    We'll take them one at a time.  Tax returns, we already

16  had a tax return example today, right, and in that tax

17  return you cited aggregate income in 2007 to tell you what

18  you thought origination income was in July of 2006, right?

19  A    That would be inference.  I said 2006 in my answer --

20  Q    And you --

21  A    -- for a 2006 loan.

22  Q    It was a 2006 loan and 2007 income, and so you have

23  inference of what the income was at origination, correct?

24  A    Correct.

25  Q    Let's talk about a bankruptcy petition.  In bankruptcy

Page 69

1    petitions you also have aggregate, generally aggregate year

2    income, correct?

3    A    For each individual year, yes.

4    Q    And you have to divide that by 12 to come up with a

5    monthly income --

6    A    That's --

7    Q    -- correct?

8    A    -- how the industry does it.

9    Q    I understand.  But in dividing it by 12 you don't know

10   necessarily that that's what the borrower made at

11   origination.  It is an inference?

12   A    You -- I'm having a problem answering your question

13   because what the borrower made at that is a monthly income,

14   not a let's take a -- it's not a camera shot and every other

15   month isn't.  It's the industry says you take the tax

16   returns for 12 months, one-twelfth of your income.  It is

17   not a one month.

18   Q    I think Judge Chapman may have asked you a question

19   yesterday about whether there are any instructions on the

20   loan application with respect to how you -- what the

21   borrower is supposed to know to put down in the income

22   section, and you agree, don't you, that there is nothing in

23   the loan application that gives the borrower instruction to

24   divide their annual income in the manner in which you

25   suggest?

Page 70

1    A    No.  That's why the loan officer is involved in helping

2    them fill out the application.

3    Q    Okay.  Let's do this one at a time.  First of all, no

4    instructions to the borrower, right?

5    A    I would like to look at a loan application and see if

6    there isn't any instructions.  It may be there.  Quite often

7    they have a information on base income or at the bottom it

8    says, monthly income.  As a matter of fact it does say on

9    the application monthly income.

10   Q    Let's (indiscernible).

11        (Pause)

12   Q    Will you turn to your loan binder, please?

13   A    Okay.

14   Q    And turn to Plan Administrator 913, please?  Are you

15   there, sir?

16   A    No, because I don't see that I have a 913 in here.

17   Q    No.  But there are two binders.  One is with the loan

18   documentation.

19   A    I have the loan documentation.

20   Q    It's --

21   A    I'm looking for --

22   Q    It's about --

23        THE COURT:  Mr. Rollin, it would be perfectly fine

24   to go help Mr. Morrow find it.

25        MR. ROLLIN:  Thank you.

Page 71

1       (Pause)

2             THE WITNESS:  Yes.

3    BY MR. ROLLIN:

4    Q    Okay.  916 is an excerpt from your updated Exhibit D,

5    correct?

6    A    Yes.

7    Q    And the loan number ends in 3550, just so we all stay

8    on the same page as we go through various documents?

9    A    Yes.

10   Q    Okay.  It is a misrepresentation of income claim,

11   correct?

12   A    And the factual basis says the borrower stated income

13   as a medical equipment services earning $6,500 per month.

14   The loan file contained a tax return submitted from loss

15   mitigation review.  According to the borrower's 2006 tax

16   return the total income for the year was $22,060 which is

17   $1,838.33 per month.  The borrower is in the same position.

18   The recalculated DTI is 137 and 33 percent.

19        Do you see that?

20   A    Yes.

21   Q    Now the fact that the borrower is in the same position

22   is listed there because it's material, right?

23   A    It's one of the considerations we have to make sure

24   that there isn't any reason not to believe the tax return is

25   for the work he's done.  Yes.

Page 72

1    Q    What is the borrower's position?

2    A    It says here medical services, whatever.  Medical

3    equipment services.

4    Q    Right.  What's the borrower's -- that's -- that's a

5    type of service or a business.  What's the --

6    A    His --

7    Q    -- borrower's position?

8    A    His tax return said that he was in medical equipment

9    servicing as I remember.  I mean, if I have the whole file I

10   can look at it.

11   Q    So you can't tell what the borrower's position was

12   although you can tell he was in the medical equipment

13   services field?

14   A    Yes.

15   Q    Now this claim is based on the same year tax return,

16   correct?

17   A    Yes.

18   Q    So what you can see is that the loan originated in July

19   of 2006, and if you -- if you would like to you can go to

20   Column M in that same exhibit on the back of the page, just

21   a --

22   A    Yes.

23   Q    Now -- and if you go to Plan Administrator 914, that's

24   the claim package.

25   A    Yes.

Page 73

```
 1    Q    And if you go to page 11 that's the tax return that the

 2    trustees are relying on?

 3    A    Yes.

 4    Q    And the trustees, just like we've described, use the

 5    aggregate year income for 2006 to derive an assumed monthly

 6    income for purposes of determining whether the borrower made

 7    a misrepresentation?

 8    A    Yes.

 9    Q    Now in July of 2006 when the borrower made the

10    application he didn't necessarily know what it was going to

11    be on his tax return that's filed in April of 2007, right?

12    A    No, he wouldn't.

13    Q    And you understand that the borrower's income could

14    have changed between July 2006 and the end of 2006, right?

15    A    Yeah. It could have changed.

16    Q    Okay.

17    A    Yes.

18    Q    And you don't know the borrower's income at

19    origination, do you?

20    A    Yeah.  Yes, for -- through July -- through June we do

21    know what his income should be based on his application.

22    Q    You don't know the borrower's income at origination, do

23    you?

24    A    Yes, we do.  His monthly income was $6,500 a month.  If

25    you multiply that times six he should be making somewhere
```

Page 74

1    around 42, $43,000 minimally at that time.  He doesn't even

2    show that on his tax return.

3    Q    I'm going to show you a piece of deposition,  For

4    everybody's benefit it is on page 403, line 20, and we'll

5    show through 404, line 5.

6         (Video clip played)

7    BY MR. ROLLIN:

8    Q    I asked you that question and you gave me that answer?

9    A    Yes, I did.

10            MR. LIEBERMAN:  Objection.  Is -- is this

11    testimony about the same loan file?

12            MR. ROLLIN:  It is.  Yeah.

13            THE COURT:  Is there any question about that?

14            MR. LIEBERMAN:  I don't know.  Can you point me to

15    that part in the deposition?

16            MR. ROLLIN:  I will.

17         (Pause)

18            MR. ROLLIN:  You can see the lead up to it is all

19    talking about this period between July of '06 and December

20    of '06, but I'll find you the loan application shortly.

21            MR. LIEBERMAN:  In the meantime there's something

22    else I would like to read into the record.

23            MR. ROLLIN:  Do you want me to do this first?

24            THE COURT:  Okay.  Hold on a second.

25            MR. ROLLIN:  The reference -- the -- it appears

Page 75

1    the first reference to this loan in the examination is on

2    page 390 of the deposition, line 5.

3         (Pause)

4              MR. LIEBERMAN:  Got it.  Thank you.

5              THE COURT:  Okay.  And then what is it that you

6    want to read into the record?

7              MR. LIEBERMAN:  It's later testimony from the

8    deposition that's consistent with this.

9              THE COURT:  Why don't you identify the passage for

10   Mr. Rollin before you read it.

11             MR. LIEBERMAN:  Sure.  It's 404 -- the question is

12   404, 6 and the answer goes to 404, 17.

13             THE COURT:  Any objection, Mr. Rollin?

14             MR. ROLLIN:  Yeah.  I'll have a little bit after

15   that through 405, 4 and Mr. Lieberman can read the --

16             THE COURT:  Why don't you just read the whole

17   thing, Mr. Rollin?

18             MR. ROLLIN:  I'll be happy to.  Sure.  Beginning

19   at 404, 6:

20             "You would say that, but you actually have no

21   idea?"  There's an objection at line 9 -- at 8, and at 9 he

22   continues, "Yes, I do.  I have his tax return."

23             "Question:  And we've established the tax returns

24             for the whole year?"

25             "Answer:  Yes, and that he couldn't make $6,500 a

Page 76

1           month based on the fact that he made 22,000.  If

2           he's making 65 --$6,500 a month he would have had

3           a far greater income than 22,000."

4           Question at line 18:  Assuming that it wasn't

5    substantially curtailed?"

6           Objection at line 20 and 21.  "Answer: I have

7    answered it as best I can answer it.  I don't want to get

8    into an argument."

9           Question at line 25:  "Let's say he is self-

10   employed.  He could have made $6,500 in a single month."

11          "Answer:  I don't know."

12          THE COURT:  Okay.

13   BY MR. ROLLIN:

14   Q    You were asked those questions and you gave those

15   answers in deposition, right?

16   A    Yes.

17   Q    Now under your approach to reviewing claims that are

18   asserted based on tax returns, when you have the loan

19   application in the one hand and you have a tax return in the

20   other hand, you take the tax return as being true and the

21   loan application as being false, right?

22   A    The loan application is proved false by the tax return.

23   So, yes.

24   Q    It is an assumption that you make that the loan

25   application is false and the tax return is true as part of

Page 77

1    the way you re-underwrite?

2    A    That's how the industry re-underwrites.  I underwrite

3    to the industry standards.  Tax returns are taken, if you

4    want to say as gospel.  Applications, based on subsequent

5    verifications which is the nature of quality, may show

6    misrepresentation in the application.

7    Q    But your experience, in fact, tells you that most of

8    the time, sir, borrowers don't lie?

9    A    What I said was -- I know what your reference is.  What

10   I said is you don't start a loan package with the assumption

11   that the borrower lied.  You -- or you wouldn't make the

12   loan.  And that's -- that's the essence of it.  That's why

13   you do quality control and verifications and re-

14   underwriting, to verify that information.

15   Q    Your experience tells you that most of the time

16   borrower's don't lie, isn't that right?

17   A    Most mortgage loans borrowers do not lie on their

18   application because they're full doc or they're going to

19   Fanny or whatever.  Yes.

20          MR. ROLLIN:  Can I have just a moment, Your Honor?

21          THE COURT:  Sure.

22          MR. ROLLIN:  We got a little out of order.

23          THE COURT:  Okay.  No problem.

24       (Pause)

25          THE WITNESS:  Your Honor, can we take a break?

Page 78

```
 1                 THE COURT:  Yes.

 2                 THE WITNESS:  I -- I desperately need one.

 3                 THE COURT:  Fair enough, Mr. Morrow.  We apologize

 4     for --

 5                 THE WITNESS:  No.  That's fine.

 6                 THE COURT:  -- for going too long.  I think

 7     probably now would be a good time to take the lunch break.

 8                 THE WITNESS:  Thank you.

 9                 THE COURT:  I think you would agree with

10     everybody.

11                 So let's take a good hour.

12                 THE WITNESS:  Thank you.

13                 THE COURT:  Okay.  And, Mr. Rollin, just give us

14     some sense of the coming attractions.

15                 MR. ROLLIN:  I -- maybe a half an hour or so would

16     be my expectation.

17                 THE COURT:  Okay.  And would you folks be able to

18     start right in after that with a brief break?

19                 MR. LIEBERMAN:  Yes.

20                 THE COURT:  All right.  So we will be able to let

21     Mr. Morrow go back to life after today, right?

22                 MR. LIEBERMAN:  Yes.

23                 MR. ROLLIN:  Yes.

24                 THE COURT:  Okay.

25                 MR. SHUSTER:  A question, Your Honor.
```

```
 1              THE COURT:  Sure.  Mr. Morrow, you can step down.
 2    Thank you, sir.
 3              MR. SHUSTER:  If I recall from yesterday --
 4              THE COURT:  Yeah.
 5              MR. SHUSTER:  -- Your Honor has a call --
 6              THE COURT:  I have a call at 4:15 and I can again
 7    do the -- I'll hang up on them after 15 minute thing if --
 8    so that we can keep going later than --
 9              MR. SHUSTER:  Okay.
10              THE COURT:  -- that if that --
11              UNIDENTIFIED SPEAKER:  That would be great.
12              THE COURT:  -- if that works for you.
13              UNIDENTIFIED SPEAKER:  Thank you.
14              MR. SHUSTER:  Thank you.
15              THE COURT:  All right.
16              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.
17              THE COURT:  Okay.  So we'll see you in an hour.
18              UNIDENTIFIED SPEAKER:  Thank you.
19         (Recessed at 12:40 p.m.; reconvened at 1:46 p.m.)
20              THE COURT:  Please have a seat.
21              Okay.  Mr. Shuster.
22              MR. SHUSTER:  Your Honor, the trustees will call
23    Dr. Karl Snow --
24              THE COURT:  Very good.
25              MR. SHUSTER:  -- and Ms. Black will conduct the
```

1    examination.

2              THE COURT:  Yeah.  Let's do that.  We're still

3    struggling with temperature control, so we're going to crack

4    the window in the back which I know the challenge to

5    hearing, but let's see what we can do.

6              Good morning, Dr. Snow.

7              MR. SHUSTER:  I've told the people in the back

8    they're welcome to move up, but --

9              THE COURT:  Yes.  Like the back benchers in law

10   school.

11        (Laugher)

12             THE COURT:  Dr. Snow, would you raise your right

13   hand, please.

14                  DR. KARL SNOW, WITNESS, SWORN

15             THE COURT:  All right.  Very good.  Please make

16   yourself comfortable including if you're warm you're welcome

17   to take your jacket off.

18             THE WITNESS:  I'm good, but thank you.

19             THE COURT:  Okay.  And you have some water, and if

20   you need a break please let us know.  All right.

21             THE WITNESS:  Okay.  Thank you.

22             MS. BLACK:  Your Honor, may I approach?  I have

23   some --

24             THE COURT:  Yes.

25             MS. BLACK:  -- binders and --

Page 81

1                THE COURT:  Of course.

2                MS. BLACK:  -- (indiscernible).

3                THE COURT:  You have one more set?

4                UNIDENTIFIED SPEAKER:  Do we have another set?

5           (Pause)

6                THE COURT:  Ready when you are.

7                MS. BLACK:  Thank you.

8                     DIRECT EXAMINATION

9      BY MS. BLACK:

10     Q    Good afternoon, Dr. Snow.  Would you please introduce

11     yourself to the Court?

12     A    Yes.  My name is Karl Snow.

13     Q    And where are you currently employed?

14     A    I am currently employed at Bates White Economic

15     Consulting, a consulting firm located in Washington, D.C.

16     Q    And what is your role at Bates White?

17     A    I'm a partner and I am the leader of the finance

18     practice in Bates White.

19     Q    Can you describe what type of consulting services Bates

20     White engages in?

21     A    Yes.  Bates White provides economic, financial and

22     statistical analysis typically on matters related to

23     litigation.

24     Q    Now I would like to talk to you a little bit about your

25     background.  And, for starters, I am going to refer you

Page 82

1    during the course of this direct, on occasion I will refer

2    you to certain documents in the exhibit binder that is in

3    front of you.  For now I would like you to turn to the

4    document that is labeled TRX-683.

5        (Pause)

6    Q    Let me know when you're ready.

7    A    I'm there.  Thank you.

8    Q    What is TRX-683, Dr. Snow?

9    A    This is a copy of my curriculum vitae that was attached

10    to my affirmative report in this matter.

11    Q    And is your professional experience and background

12    accurately summarized in the curriculum vitae that you

13    submitted with your affirmative report?

14    A    It is.

15    Q    Now in the interest of time I will not walk you through

16    the entire -- your entire resume.  I would like to focus on

17    a few key points.

18        MS. BLACK:  Can we please have TRDX-280.

19    BY MS. BLACK:

20    Q    Dr. Snow, can you please walk us through your

21    educational record?

22    A    Yes.  I received a BA in economics from Brigham Young

23    University.  I immediately thereafter enrolled at the

24    University of Chicago where I received an MA and PhD in

25    economics, and my PhD focused on econometrics which is

1    statistical work related to financial and economic problems

2    and financial economics.

3    Q    Thank you.

4        Now I understand that you lay out your professional

5    accomplishments in your curriculum vitae.  I would like you

6    to provide a brief walk through of your career and academia

7    in the private sector.  Let's start with academia.

8            MS. BLACK:  Can we please have TRDX-281?

9    BY MS. BLACK:

10   Q    I understand that you have spent a large portion of

11   your career in academia.  Can you tell us about it?

12   A    Yes.  I spent the first ten years of my career in

13   academics.  I started off as an assistant professor of

14   finance at the business school of the University of North

15   Carolina-Chapel Hill.  I then went to my alma mater, Brigham

16   Young University, where I was an assistant professor of

17   economics.  And while I was at BYU I took a year's leave and

18   was a visiting assistant professor of finance at the

19   Stockholm School of Economics.

20       Subsequent to my leaving academics in 2000 I have

21   occasionally worked as an adjunct professor teaching courses

22   at a American University, Johns Hopkins University, and the

23   Business School at the University of Maryland.

24   Q    Thank you.

25       And what type of courses have you taught over your

Page 84

1    career?

2    A    I've taught undergraduate, MBA, PhD and executive MBA

3    courses on topics typically related to financial economics,

4    statistics and economics in general.

5    Q    And have you given any presentations during the course

6    of your academic career?

7    A    Yes.  I have presented my academic research at

8    workshops or seminars at universities in the United States

9    and in Europe and at various conferences.

10   Q    And I would like to talk a little bit about your

11   academic research and publications.  Have you had any

12   particular focus?

13   A    Yes.  The focus of my research was on the valuation of

14   financial assets and I published papers in the Journal of

15   Finance, Financial Analyst Journal and economic letters on

16   this broad topic.

17   Q    Thank you.

18        Now I would like to move on to your professional

19   experience in the private sector.

20             MS. BLACK:  Could we please have TRDX-282?

21   BY MS. BLACK:

22   Q    Can you walk us through your professional experience in

23   the private sector, including the areas in which you

24   specialize?

25   A    Yes.  So as it notes I've had over 25 years working as

```
 1    a professional economist.  Since leaving academics I have

 2    worked both in the investment and mortgage banking industry

 3    as well as a consultant on a variety of topics, including

 4    financial securities, insurance, mortgage markets,

 5    structured product hedge funds, et cetera.

 6    Q    Thank you.

 7         Now I would like you to walk us through the various

 8    employments that you have held over the course of --

 9              THE COURT:  Can I ask you to hold on for one

10    second?

11              MS. BLACK:  Sure.

12              THE COURT:  One second.

13         (Pause)

14              THE COURT:  Thank you, Dr. Snow.  Sorry for the

15    interruption.

16              Go ahead.

17              MS. BLACK:  Your Honor, before I resume I do not

18    in any way intend to not show the appropriate decorum.

19    Would it be all right with you if I took off my jacket?

20              THE COURT:  Absolutely.  Yes.  I've ordered people

21    to take their jacket off.

22         (Laughter)

23              THE COURT:  We're no --

24              MS. BLACK:  I think I might be the first one to

25    take you up on that.
```

Page 86

1           UNIDENTIFIED SPEAKER:  No.  I think --

2           THE COURT:  No.

3           UNIDENTIFIED SPEAKER:  -- (indiscernible).

4           THE COURT:  No.  No.  We've had before.  It's just

5    in -- it's just -- it's a hundred year old building.  We

6    cannot control the temperature.  When the sun swings around,

7    you know --

8           UNIDENTIFIED SPEAKER:  It's pretty warm.

9           THE COURT:  -- it --it's a lovely building.  I

10   love the old ones, but I'm glad you spoke up.

11          MS. BLACK:  Thank you, Your Honor.  I appreciate

12   it.

13   BY MS. BLACK:

14   Q    Dr. Snow, going back to my previous question I would

15   like to talk to you about the positions that you have held

16   with various firms and institutions in the private sector.

17   And for that purpose let's have TRDX-283.  Can you please

18   walk us through this?

19   A    Sure.  I -- when I left academics I joined UBS Warburg

20   which is now UBS Investment Bank where I was a director of

21   financial markets education, essentially teaching internal

22   courses and working with clients of the bank on a variety of

23   issues related to financial securities.

24       I left UBS and joined Welch Consulting where I worked

25   for two years.  But sandwiched in between that was a year

Page 87

1   working at Freddie Mac in their housing analysis and

2   research group.

3       After leaving Welch Consulting, another economic

4   consulting firm I joined Bates White where I have been since

5   July of 2006 and have been a partner since 2011.

6   Q   Thank you.

7       Now I understand this is not the first time that you

8   are testifying in court as an expert.  Can you tell us about

9   your experience as a testifying expert?

10  A   Yes.  I have been, you know, retained on -- as an

11  expert on probably 40 to 50 matters.  I have been deposed

12  probably 20 times and have testified in court or an

13  arbitration eight times.

14  Q   And generally speaking what are the areas in which you

15  have been retained as a testifying expert?

16  A   Broadly speaking, again, economics, finance and

17  statistical analysis.  So this ranges from testifying about

18  automated valuation models that are used to value

19  residential properties to claims of discrimination --

20  assessing claims of discrimination in mortgage lending,

21  valuation of assets in a bankruptcy context, and in the MARM

22  or master arm's trial in front of Judge Castel I testified

23  as to purchase prices and damages.

24  Q   How many times have you been retained as a testifying

25  expert in matters involving residential mortgage backed

1    securities?

2    A    I would say roughly 25 to 30 times.

3    Q    And how many of those matters specifically concerned

4    the calculation of a purchase price?

5    A    Probably 20 to 25 of those.

6    Q    And can you give us a couple of examples of recent

7    engagements in which you were retained as a testifying

8    expert and called upon to calculate the purchase price?

9    A    Yes.  In addition to the MARM v UBS matter I have been

10   retained as an expert in a US Bank versus Merrill Lynch

11   matter as well as Syncora -- I was previously retained in

12   Syncora v EMC.

13   Q    And did you testify in court in any of these three

14   matters?

15   A    Only in the MARM trial.  Yes.

16   Q    And I believe you mentioned earlier that you have

17   testified in court or in arbitration approximately eight

18   times?

19   A    That's correct.

20   Q    To your knowledge in those matters in which you were

21   testified -- or actually let me withdraw that.

22       Was it in state court, federal court or both for those

23   matters in which you testified in court?

24   A    It was both.  It was -- I have testified in federal

25   court or federal bankruptcy court five times and state court

1    once.

2    Q    Thank you.

3          And to your knowledge in those mattes were you

4    qualified to testify by the courts?

5    A    I was.

6    Q    And does that also include the recent MARM matter in

7    front of Judge Castel?

8    A    It does.

9          MS. BLACK:  At this point, Your Honor, I would

10   like to tender Dr. Snow as a expert on the calculation of

11   purchase prices for liquidated and non-liquidated loans in

12   this matter.

13          THE COURT:  All right.

14          MR. COSENZA:  No objection, Your Honor.

15          THE COURT:  All right.  Very good.  Thank you.

16   BY MS. BLACK:

17   Q    Dr. Snow, I understand that you have submitted three

18   expert reports in this matter?

19   A    That is correct.

20   Q    Okay.  So I would just like you to authenticate them.

21   If I could refer you to the exhibit binder and first to TRX-

22   682 through 690. Please take a look and let me know whether

23   you can confirm this to be the affirmative report that

24   you've submitted including appendices.

25   A     It appears to be a complete copy of my affirmative

Page 90

1    report.

2    Q    Thank you.

3         Now with respect to your rebuttal report I would like

4    to refer you to TRX-691 through 695.  Let me know if this is

5    a complete copy of your rebuttal report including the

6    appendices thereto.

7    A    Again, it appears to be so.

8    Q    Thank you.

9         And, finally, your supplemental report which you

10   submitted most recently.  I will refer you to TRX-2725

11   through 2727.  Let me know if you recognize this as your

12   supplemental report including the exhibits or appendices

13   thereto.

14   A    Again, it appears to be a complete copy of my

15   supplemental reporting.

16   Q    Thank you.

17        Now we're going to spend some time this afternoon

18   discussing the analysis that you have performed and the

19   opinions that you have arrived at in this case.  For now I

20   would like to pull up here DX-284 which is a demonstrative

21   describing your expert mandate.  Starting with your

22   affirmative report can you describe to the Court what your

23   expert mandate in this matter was, what were you asked to

24   do?

25   A    I was provided a list of loans by the trustees -- by

Page 91

1    counsel for the trustees and I was asked to calculate

2    purchase prices for each one of those loans, and for the

3    non-liquidated loans I was asked to subtract an estimate of

4    the market value of that loan to calculate a net purchase

5    price.

6    Q    And how many loans in total, liquidated and non-

7    liquidated did you calculate a purchase price for?

8    A    Roughly 75,000 loans, 15 of the -- 15,000 of those were

9    non-liquidated and 60,000 approximately were liquidated

10   loans.

11   Q    Thank you.

12        Now let's talk a little bit about basics.  What is a

13   liquidated loan?

14   A    Roughly speaking just think of it as a loan where the

15   underlying property has gone through foreclosure and the

16   property has been sold.

17   Q    And in contrast what is a non-liquidated loan?

18   A    That would just be the (indiscernible) of the

19   liquidated loan, so a loan that is -- has not been

20   liquidated and, hence, it -- it could be severely

21   delinquent.  It could be in foreclosure, but it -- the loss

22   on the loan has not been recognized yet by the trustees.

23   Q    Would it be fair to characterize a non-liquidated loan

24   as a performing loan?

25   A    Some of them may be performing, but some may be

Page 92

1    severely delinquent, some may be what we refer to as  re-

2    performing loans.  In other words, if they were delinquent

3    in the past and then some modification of the terms of the

4    loan were made such that the borrower could then again begin

5    making payments.

6            So I wouldn't necessary classify all the non-

7    liquidated loans as being performing per se.

8    Q    And specifically with regard to the approximately

9    15,000 non-liquidated loans that were the subject of your

10   analysis, would the description that you just provided be

11   true of our population of non-liquidated loans?

12   A    That would be the case.  You know, I think two-thirds

13   of them, of the non-liquidated loans had experienced some

14   type of modification.  Thousands are currently delinquent

15   30, 60, 90 days and many plus 90 days delinquent.

16   Q    Now you mentioned before as part of your affirmative

17   report you calculated a net purchase price --

18           THE COURT:  Can I ask one clarifying question?  In

19   the liquidated category --

20           THE WITNESS:  Yes.

21           THE COURT:  -- you gave the example of

22   foreclosure.  Is it also possible that the loan was paid off

23   either through a refinancing or some other transaction other

24   than involuntarily through a liquidation?

25           THE WITNESS:  Yes.  So you could broadly think of

Page 93

1    it that way.  Typically I would refer to those as paid in

2    full loans --

3              THE COURT:  Paid in full.

4              THE WITNESS:  -- as opposed to -- the liquidated

5    loans that I have focused on are loans that have not paid in

6    full.

7              THE COURT:  Okay.  So liquidated does not include

8    paid in full loans?

9              THE WITNESS:  Not in the universe that I have used

10   in my calculations.

11             THE COURT:  Very good.  Thank --

12             THE WITNESS:  No.

13             THE COURT:  -- you.

14   BY MS. BLACK:

15   Q    You mentioned before that you calculated a net purchase

16   price for the non-liquidated loans, the population of

17   approximately 15,000.  Can you describe how you went about

18   that?

19   A    Yes.  I looked at various documents to get an

20   understanding of how I might go about calculating a purchase

21   price that would be relevant for this particular proceeding.

22   Q    I think you might have misunderstood my question.

23   A    Okay.

24   Q    And we'll get --

25   A    I'm sorry.

Page 94

1   Q     -- to that.  My question is you calculated a net

2   purchase price --

3   A     Oh, the net --

4   Q     -- for the --

5   A     -- purchase price.

6   Q     -- non-liquidated loans.  How did you go about that --

7   A     Oh, I'm sorry.

8   Q     -- just generally speaking.

9   A     Yes.  So the net purchase price, I calculated a

10  purchase price and then subtracted from that an estimate of

11  the market value of the loan.

12  Q    And where did you get that estimate of the market value

13  for the loan from?

14  A    For the non-liquidated loans that were the subject of

15  my analysis counsel provided me a list of market value that

16  my understanding were generated by Dr. Elson.

17  Q    Okay.  And did you feel comfortable relying on those

18  market values that you were provided?

19  A    I did.  I didn't have any reason to think that they

20  would be unreliable.  I reviewed Dr. Elson's qualifications.

21  I looked at the software program that he used to calculate

22  the loan values.  It is a market-based program that is used

23  by professionals in the industry and is fairly well known,

24  so I had no reason to think that they were unreliable.

25  Q    Now moving on to your rebuttal report can you just

Page 95

1    briefly describe what you were asked to do in the context of

2    your rebuttal report?

3    A    Yes.  So Dr. Bradford Cornell submitted an affirmative

4    report where he relied upon two assumptions that were given

5    to him by counsel and I was asked by counsel for the

6    trustees to assess those two assumptions to see whether they

7    were reasonable from an economic standpoint.

8    Q    And we will get -- we will get into those assumptions

9    in further detail later, but can you just briefly describe

10   what those assumptions were that you address in your

11   rebuttal report?

12   A    Sure.  There has been an assertion that the law

13   certificates and corporate expense logs associated with the

14   loan file are necessary to calculate a reliable purchase

15   price.

16       The second was that the trustees had not put forward a

17   reliable estimate of value of the non-liquidated loans and,

18   hence, the non-liquidated loan purchase price should be set

19   to zero.

20   Q    Now moving on to your supplemental report can you

21   describe your mandate with respect to your most recent

22   report?

23   A    Yes.  The counsel for the trustees asked me to look at

24   accrued unpaid interest, interest that either the borrower

25   had failed to pay as part of their monthly mortgage payment

1    or had been advanced by the servicer, and to examine that in

2    terms of how much would be -- of that would be included in

3    the purchase prices that I had calculated as well as looking

4    at categories based on some temporal distinctions.  Say, for

5    example, pre and post the petition in this matter.

6    Q     Thanks.

7          Now I would like to walk through the opinions that you

8    have formed in this matter.

9          MS. BLACK:  Can we please have TRDX-285?

10   BY MS. BLACK:

11   Q     And starting again with your affirmative report -- let

12   me ask you a preliminary question.  You have been involved

13   in numerous matters in which you were asked to calculate a

14   purchase price, correct?

15   A     That is correct.

16   Q     And in your experience what are the general components

17   of the purchase price?

18   A     The general components of a purchase price, you know,

19   could potentially differ from trust to trust.  But as a sort

20   of a general matter it includes three major components: The

21   unpaid principal balance, the balance that has not been paid

22   by the borrower or advanced by the servicer; the unpaid

23   accrued interest, again, interest that historically should

24   have been paid by the borrower but was not and was not

25   advanced by the servicer; and then any advances or payments

Page 97

1    that the servicer makes on behalf of the borrower or to

2    manage the property and foreclosure, to mitigate losses,

3    servicing the loan, et cetera.  It's an obligation that the

4    servicer has and that's part of why they are giving a

5    servicing fee s part of the securitization.

6    Q    Thank you.

7         And we're going to talk about the individual components

8    in a little bit.  For now I would like to understand what

9    did you -- and, by the way, is the -- your general

10   understanding from previous experience, including as a

11   testifying expert of the composition of the purchase price

12   consistent with your understanding of the composition of the

13   purchase price here?

14   A    Yes, it is.

15   Q    And what did you do to get yourself comfortable as to

16   what the proper composition of the purchase price was for

17   this matter?

18   A    To understand how purchase price should be calculated

19   in this matter I first reviewed the protocol order which

20   detail -- which my understanding is detailed the process by

21   which the trustees would submit claims to the plan

22   administrator and then there was a process for either

23   approving or making a counter-proposal in terms of the

24   purchase price, et cetera.

25        In the protocol order it mentioned in a few places that

Page 98

1      the purchase price should be calculated in accordance with

2      the governing agreements or the legal documents surrounding

3      the securitization.  So my next step was then to review the

4      governing agreements for each of the securitization where

5      there were loans that I had been asked to calculate a

6      purchase price for.  So I reviewed the purchase price

7      definition for each one of those trusts per their governing

8      agreements.

9           I then reviewed other filings in this matter, in

10     particular the motion to expunge and found statements

11     related to the calculation of purchase price.

12     Q    And focusing on your starting point which was the

13     protocol order, what in the protocol order was it that

14     guided your understanding as to how purchase price should be

15     calculated in this case?

16     A    I saw in the protocol order that it was a multi-step

17     process and in the first step it required the trustees to

18     calculate a purchase price for any loan for which they

19     wished to submit a claim in accordance with the governing

20     agreements.

21     Q    All right.  So let's take a look at the protocol order.

22             MS. BLACK:  Can we have TRX-831?

23     BY MS. BLACK:

24     Q    My first question to you is this the document that you

25     referred to as the protocol order?

1    A     Yes, it is.

2    Q     Okay.  And let's go to page 11 of 24.  And can you

3    point us to the language that you relied on in understanding

4    -- coming to an understanding as to how purchase price

5    should be calculated in this case?

6    A     Yes.

7          (Pause)

8    A     So in point number 4, roughly the middle of the page, a

9    calculation of the purchase price as defined in the

10   governing agreement with supporting documentation.

11   Q     Thank you.

12         And was there anything else in the protocol order that

13   guided your understanding as to how purchase price should be

14   calculated?

15   A     Yes.  My understanding is in the next step of the

16   protocol was that after the trustees had submitted a claim

17   with a purchase price the plan administrator was to either

18   accept that or it was to make a -- in a sense a counter

19   proposal or make another calculation that they felt was more

20   appropriate in accordance with the governing agreements.

21   Q     And can you point us to the language that you just

22   referred to?

23   A     Okay.  So in little i number one, for each approved

24   claim the plan administrator shall either approve the

25   purchase price or revise the purchase price calculation in

Page 100

1    accordance with the formula in the governing agreement.

2    Q    Okay.  So with that in mind what was your next step in

3    getting yourself comfortable as to how purchase price should

4    be calculated?

5    A    Well since the protocol order referenced that purchase

6    price should be calculated in accordance with the governing

7    agreements, and that has been my experience in literally

8    every RMBS case that I have worked on where I've been asked

9    to calculate purchase prices, I reviewed the governing

10   agreements.

11   Q    And did you review the governing agreement for each and

12   every -- the governing agreements for each and every trust

13   that holds loans that you calculated a purchase price for?

14   A    Well, I can't say that I reviewed every single, you

15   know, page of the governing agreements, but I went to the

16   purchase price definition for -- in the governing agreements

17   for each and every one of the trusts.

18   Q    And generally speaking was the definition of purchase

19   price in the various governing agreements consistent?

20   A    Yes.  It -- every one of the purchase price definitions

21   in the governing agreements had the three components that

22   we've talked about:  Unpaid principal balance, accrued

23   interest -- accrued unpaid interest and servicing fees and

24   advances.

25   Q    Okay.  So I would like to look at an example.  Can we

Page 101

1    please have TRX-201?  I have put up on the screen a trust

2    agreement from the LXS 2615 trust.  Do you recognize this

3    document?

4    A    I do.

5    Q    And is this one of the trusts that consists of loans

6    that were the subject of your analysis?

7    A    It is.

8    Q    Okay.  So let's turn to page 57 of 222.

9         Dr. Snow, you see here at the bottom there is a

10   definition of purchase price.  Is this a representative

11   example of the definition of purchase price that you looked

12   at in the context of your charge here?

13   A    It is.  It's very similar to the other definitions of

14   purchase price that I saw.  It contained the three major

15   elements:  A hundred percent of the unpaid principal

16   balance, accrued interest, thereon at the applicable

17   mortgage rate, and unreimbursed servicer advances.

18   Q    And you mentioned earlier that you also --

19           THE COURT:  Can I ask a -- just a clarifying --

20           THE WITNESS:  Uh-huh.

21           THE COURT:  -- purely a clarifying question.

22           THE WITNESS:  Sure.

23           THE COURT:  And you might get to this, and if you

24   are we can move on.  But to the extent that there has been a

25   mortgage modification on a voluntary basis between a

Page 102

1   borrower and a lender, and mortgage modification can take

2   any one of an infinite number of forms, how does that factor

3   in when you -- to the application of purchase price since at

4   least in this definition there's no specific proviso or

5   provision that tells you what to do?

6           THE WITNESS:  Okay.  I can address that question.

7           This says unpaid principal balance --

8           THE COURT:  Yes.

9           THE WITNESS:  -- so if there was, say, principal

10   forgiveness --

11          THE COURT:  Yes.

12          THE WITNESS:  -- that would still be principal

13   balance that was unpaid.

14          THE COURT:  Okay.

15          THE WITNESS:  Now with -- so that would be say

16   with the principal modification.

17          THE COURT:  Sure.  Right.

18          THE WITNESS:  If there was say like a term

19   modification, the loan was extended for 30 years, that is

20   not something that I took into account.

21          THE COURT:  Okay.

22          THE WITNESS:  One could make an argument that

23   there might be a loss there because the -- you know,

24   principal --

25          THE COURT:  Well, I guess my --

Page 103

1                 THE WITNESS:  -- would be coming in the future.

2                 THE COURT:  Right.  So my question is if the

3     interest rate were lowered --

4                 THE WITNESS:  Ah.

5                 THE COURT:  -- what --

6                 THE WITNESS:  So that --

7                 THE COURT:  -- what happens if the interest rate

8     is lowered?

9                 THE WITNESS:  That -- that's a good question in

10    that --

11                THE COURT:  Thank you.

12                THE WITNESS:  -- in that you'll notice here it

13    says, at the applicable mortgage rate.

14                THE COURT:  Yes.

15                THE WITNESS:  So it often is dependent upon the

16    specific securitization because that's a defined term.  In

17    some -- and sometimes that will not be a defined term.

18    Sometimes it is.  So in my calculations because there was

19    some heterogeneity in terms of how that was treated, I did

20    not include losses associated with or accrued unpaid

21    interest that you could assign to a reduction in a

22    modification of an interest rate.

23                So in that sense they were conservative for some

24    trusts.  For other trusts the language would basically --

25    you would look at mortgage rate and it would say the current

Page 104

1      mortgage rate.  So it -- it would be trust specific.

2              THE COURT:  Very good.  Thank you.  That was very

3      helpful.

4      BY MS. BLACK:

5      Q    Dr. Snow, I would like to now talk about the filings

6      that you undertook to get yourself comfortable with how you

7      should calculate purchase price in this matter and what the

8      appropriate components of the purchase price are.  I believe

9      you had mentioned the plan administrator's motion to

10     expunge.  Can you explain?

11     A    Yes.  I read various documents related to this matter

12     and saw in the motion to expunge that the plan administrator

13     had put forth, again, a general definition of purchase price

14     which was consistent with what I saw in the protocol order

15     and consistent with what I saw in the purchase price

16     definitions in the governing agreements.

17     Q    Okay.  And let's just look at that.

18              MS. BLACK:  Can we have TRX-875, please?

19     BY MS. BLACK:

20     Q    Is this the plan administrator's motion to expunge that

21     you relied upon in coming to that understanding?

22     A    It is.

23     Q    Okay.  And let's pull up page 15 of 26.  And can you

24     point us to the language that gave you comfort that you

25     should calculate purchase price consistent with how you had

Page 105

1    done it in other engagements?

2    A    Okay.  It's the last full sentence on the last

3    paragraph starting with, although, and this is consistent

4    again with what I've described across the different

5    governing agreements.  The precise definition does vary at

6    the margins, but it typically is the sum of unpaid principal

7    balance or UPB of the mortgage loan, accrued interest

8    outstanding at the time of repurchase and outstanding

9    service fees or the servicing advances.

10   Q    And was there any other filing or submission by the

11   plan administrator that informs you or that confirms your

12   understanding as to how purchase price should be calculated

13   in this matter?

14   A    Yes.  After submitting my initial report I also saw a

15   motion to establish a protocol submitted by the plan

16   administrator.

17   Q    And that was similar language?

18   A    And it had similar language to what I saw in the motion

19   to expunge.

20   Q    Okay.  And so let's just look at that.  Also --

21          MR. COSENZA:  Your Honor --

22          THE COURT:  Yes.

23          MR. COSENZA:  -- I object to this slide.  I think

24   it's misleading.  This was the cross-motion to establish the

25   protocol and this paragraph was in response to the motion

1   made by the trustees to estimate the claims based on their

2   sample and to include the reserve.  This is not a paragraph

3   that was in response to -- that was in support of our motion

4   to establish the protocol.  This was a cross-motion for us

5   to establish the protocol, but this paragraph 83 is in

6   response to the trustees' initial motion to use their sample

7   to increase the reserve and estimate the claims at over $12

8   billion.

9              THE COURT:  I guess I -- okay.

10             MR. COSENZA:  Yeah.

11             THE COURT:  But what difference does it make, Mr.

12   Cosenza?

13             MR. COSENZA:  Well, it's just the motion to

14   establish protocol was actually -- this was the part that

15   was in opposition to the motion where the trustees were

16   seeking estimation.

17             THE COURT:  Okay.  So we will deem the slide --

18             MR. COSENZA:  Okay.

19             THE COURT:  -- to correct it in that way.

20             MR. COSENZA:  Thank you, Your Honor.

21             THE COURT:  But otherwise you're not taking issue

22   with the text that's quoted?

23             MR. COSENZA:  No, Your Honor.

24             THE COURT:  Okay.  Go ahead.

25             MS. BLACK:  And since Mr. Cosenza already

1     addressed the slide, why don't we just pull it up?  The

2     motion to establish protocol, just for you to confirm that

3     that is the language that you relied upon.  Can we have the

4     slide?

5     BY MS. BLACK:

6     Q     Is this the language in the motion to establish

7     protocol that enhances your understanding as to how purchase

8     price should be calculated in this matter?

9     A     Yes.  Again, these statements are consistent with what

10    I had seen both in the protocol order and in the governing

11    agreements that the purchase price consisted of typically

12    those three major elements, unpaid principal balance,

13    accrued interest and unreimbursed servicing advances.

14    Q     Thank you.

15          Now I would like to talk about the individual

16    components of the purchase price.

17          MS. BLACK:  Can we have TRDX-290, please?

18    BY MS. BLACK:

19    Q     And focusing on the first element, unpaid principal

20    balance, can you just broadly explain to us what unpaid

21    principal balance is?

22    A     Okay.  So when the borrower takes out the mortgage and

23    receives money they are required to pay the principal back

24    in full.  And so this represents the amount of unpaid

25    principal balance or balance -- the principal that has not

Page 108

1   yet been repaid by the borrower or advanced by the servicer.

2   Q    And what about unpaid accrued interest?

3   A    Okay.  This is interest historically, so if the

4   borrower misses a payment and part of that payment was

5   interest and part of the payment is principal, then that

6   part that is interest would then become accrued unpaid

7   interest.  It was interest that was owed on the mortgage and

8   wasn't paid and wasn't advanced by the servicer either.

9   Q    So to be clear is the interest that is a component of

10  the purchase price interest on the trustees' claim in this

11  proceeding?

12  A    No.  It is a calculation of the purchase price or

13  monies that the trust was entitled to receive from the

14  borrower, but didn't.  So, for example, suppose that a

15  borrower had a $2,000 monthly mortgage payment, 1,200 of

16  which was interest and 800 which -- of which was principal.

17  So if they missed one payment, then the accrued unpaid

18  interest would be $1,200.  If they missed the next month the

19  accrued unpaid interest would become $2,400.  But there

20  wouldn't be any additional interest paid on the first $1,200

21  missed.  It would just cumulate from that point.

22  Q    So it is -- would it be fair to say that it is not

23  compound interest.  It's accumulated interest?

24  A    Yes.  It's accumulating the interest.

25  Q    Okay.  And from an economic point of view why are

Page 109

1  unpaid principal balance and accrued unpaid interest a part

2  of the purchase price?

3  A    Well, I think to understand it from an economic

4  perspective it's important to understand the economic

5  perspective behind a representation and warranty in a

6  mortgage securitization.

7      So the trust is effectively buying the mortgages or the

8  -- you know, the trust, ergo the certificate holders.

9  Right.  They're putting up the money which is financing the

10  mortgages.  When they do that they agree to take on the risk

11  associated with conforming or loans that conform to the

12  representations and warranties.  They don't agree to take on

13  the risk associated with loans that don't conform.  That's

14  the representation and warranty and that's why there's a put

15  back mechanism.

16     So you can view the purchase price as once a loan has

17  been determined to materially breach the representations and

18  warranties that you're in a sense reimbursing the

19  certificate holders and trust for any losses that have

20  occurred on liquidated loans.  So that would be unpaid

21  principal balance and interest that the borrower should have

22  paid prior to liquidation, but didn't, or for a non-

23  liquidated loan it's doing the same thing, reimbursing for

24  any unpaid principal balance that should have been paid and

25  likewise for interest, but also the remaining unpaid

Page 110

1    principal balance, in a sense putting back the mortgage to

2    the sponsor or the originator so that the sponsor or

3    originator will then take on the risk of that loan, and the

4    trust and the certificate holders then have been reimbursed

5    for the money in the sense that they lent out to begin with.

6              MS. BLACK:  Can we have Slide 89 from the plan

7    administrator's opening deck?

8    BY MS. BLACK:

9    Q    Dr. Snow, are you aware that the plan administrator has

10   argued to this court that the purchase price proffered by

11   the trustees through you is not equitable because it fails

12   to account for billions and billions of dollars in interest

13   payments that the trust have received over the years?

14   A    I'm aware of the argument.  Yes.

15   Q    And what do you make of this argument?

16   A    I really don't understand the argument because I think

17   that exactly the opposite is true.  When a borrower makes a

18   payment, right, and if they keep making the payment and

19   let's say they pay off their loan, then the purchase price

20   is zero.  There's no unpaid interest.  There's no unpaid

21   principal balance.

22        So the purchase price is only accounting for what

23   didn't get paid.  What did get paid doesn't function --

24   doesn't figure into the calculation of the purchase price

25   other than it's reducing the unpaid principal balance and

Page 111

1   keeping current on the interest payments that the borrower

2   is supposed to make.

3   Q     So no double recovery?

4   A     No.  There's no double recovery.  This is just recovery

5   for monies or cash flows that should have been paid by the

6   borrower but were not.

7   Q     Can we go back to TRDX-290, please?  Now moving onto

8   the third element, unreimbursed servicer advances, I know

9   you touched upon it earlier.  Can you explain what these

10  are?

11  A     Okay.  So as I explained earlier the servicer in its

12  role as servicer for the securitization is paid a servicing

13  fee to service the loans.  But part of that servicing fee is

14  also to ensure that they fulfill a responsibility which is

15  if a -- if there is a temporary halt in the payment of a

16  mortgage, the borrower goes delinquent 30, 60, 90 days, that

17  the servicer will advance the money.  And essentially it's a

18  loan to the trust.  They pay for it on behalf of the

19  borrower, but then the servicer takes essentially an I owe U

20  that the trust then will have to repay the borrower, say

21  from the liquidation proceeds of a loan if it ever

22  liquidates or if the borrower fully catches up from those

23  funds.

24       So this is done so that the cash flows of the

25  securitization don't fluctuate do to typically minor --

Page 112

1    minor hiccups in the payments of mortgages.

2        So those monies that are advanced as well as expenses

3    that the servicer incurs in say maintaining the property in

4    foreclosure, to mitigate losses, those are monies for which

5    the servicer is supposed to be compensated and, hence, the

6    trust -- if the trust receives the purchase price for the

7    loan, part of that has to go back to the servicer if there

8    are unreimbursed servicing advances.

9    Q    So in that sense is the trust the pass through?

10   A    The trust is purely a pass through and you -- and you

11   see this in the definition of purchase price; that it

12   sometimes will say that the trust -- trustee must pay the

13   servicer the unreimbursed advances out of any purchase price

14   if the loan is put back.

15   Q    Can we go back to TRDX-285, please?  Going back to the

16   summary of your opinions, what data did you rely on for the

17   three components of the purchase price?

18   A    So in order to determine the purchase price, and this

19   is similar to, again, other matters in which I've calculated

20   purchase price I relied on monthly loan level data that is

21   produced by the master servicer typically as well as the

22   monthly trustee remittance reports.  And where the data

23   wasn't -- was missing sometimes for certain loans it was

24   supplemented with data from Moody's or Intex which are

25   common -- commonly used data providers on mortgage

Page 113

1    performance.

2    Q    And why were you comfortable relying on such data?

3    A    One, this is data that is made public and, in

4    particular, to investors and this data is what determines

5    the distribution to the investors and also determines what

6    losses they will or will not suffer on their certificates.

7    So it goes through a fair amount of scrutiny.

8         Second, in my experience I have tried to tie out the

9    loan level data -- loan level monthly servicing data, right,

10   which is disaggregate with the aggregate data recorded by

11   the -- in the trustee remittance report.  So you can view it

12   as -- the loan level servicing data is detailing the cash

13   flows that come out of the mortgages on a loan by loan basis

14   and the trustee remittance report will say, here's the

15   aggregate amount of principal and interest that came into

16   the trust which then will flow through the distribution, the

17   waterfall rules, to the investors.

18        I've tidied this out in, you know, two to three hundred

19   instances and the data is almost always perfectly

20   consistent.  And that's not surprising because, again, this

21   data has a fair amount of scrutiny because it's what

22   investors are relying on to make sure that the trustee is

23   doing the correct thing in terms of their distributions.

24   Q    Thank you.

25             MS. BLACK:  Can we have TDX-291, please?

Page 114

1    BY MS. BLACK:

2    Q    Dr. Snow, did you calculate purchase price the same way

3    for non-liquidated loans and liquidated loans?

4    A    Conceptually, yes, but in practice for liquidated loans

5    the master servicer will also publish a summary statistic

6    which is effectively the sum of the unpaid principal

7    balance, the accrued unpaid interest and the unreimbursed

8    servicer advances.  This is because when a loan liquidates

9    the liquidation proceeds are used to first pay the

10   unreimbursed servicer advances, then any unpaid accrued

11   interest, and then if there's anything left over the unpaid

12   principal balance.  And the master servicer then just

13   reports what's left over.

14   Q    Is there any logic to this waterfall that you just

15   described in which liquidation proceeds are applied?

16   A    Absolutely.  One, the servicer advances because it's,

17   in effect, a loan to the trust.  There's an obligation to

18   repay it so they're kind of at the top of the waterfall.

19        The second is, you know, accrued interest and whether

20   something is treated as interest or principal matters in

21   terms of the securitization.  And so interest is often paid

22   pro rata to the certificate holders whereas balance -- the

23   un -- the principal that comes in may be paid to say the

24   senior certificate holders before it's paid to the junior

25   certificate holders.

1         So there's a logic in this waterfall and it makes

2    economic sense.

3    Q    And is there any predicate for this waterfall in the

4    governing agreements?  In other words, is there anything in

5    the governing agreements that -- that describes this

6    waterfall?

7    A    Yes.  One -- the defining term in virtually all of the

8    governing agreements is realized loss.  And if you look at

9    the realized loss definition it will often say that in our

10   calculating realized loss which is the sum of these three

11   items how liquidation proceeds should be treated.

12   Q    Okay.  I would like to look at an example.

13            MS. BLACK:  Can we have TRX (indiscernible),

14   please?  This is the trust agreement for LXS-2615 that we

15   had previously looked at.  And can we go to page 60 of

16   (indiscernible)?

17   BY MS. BLACK:

18   Q    Dr. Snow, we have the definition of realized loss in

19   front of us now.  Can you point us to where in this

20   definition of realized loss one would find waterfall?

21   A    Yes.  So in the last sentence in determining whether a

22   realized loss is a realized loss of principal, so in other

23   words are there sufficient proceeds to reduce the unpaid

24   principal balance liquidation proceeds shall be allocated,

25   first, the payment of expenses related to liquidated

Page 116

1    mortgage loan or in other words the servicer advances and

2    expenses, then accrued unpaid interest and then finally to

3    reduce the principal balance of the mortgage loan.

4    Q    And is this a representative example of a definition of

5    realized loss that you have seen throughout the governing

6    agreements applicable to the trusts holding loans that you

7    calculated a purchase price for?

8    A    It is.

9    Q    So with that definition in mind can we have TRDX-292,

10   please?

11        Dr. Snow, I understand that this is a demonstrative

12   that you assisted in putting together to illustrate the

13   point.  And I would ask you to walk us through what we see

14   on this slide.

15   A    Sure.  So this is a -- an example of how liquidation

16   proceeds would be allocated according to the waterfall rule

17   that we've just discussed.  So imagine a property goes

18   through foreclosure.  It's sold, hence the loan is

19   liquidated.  The liquidation proceeds again are assumed to

20   be $200,000.  Well, the first thing that is paid from those

21   liquidation proceeds are the service -- servicer expenses

22   and advances.

23        So let's suppose that the expenses related to the

24   liquidation, whether they're attorney fees or maintaining

25   the property were $10,000 and that the unreimbursed

1    servicing advances were $30,000.  So that first $40,000

2    would be paid out of the liquidation proceeds, which would

3    leave us with net liquidation proceeds at that point of

4    160,000.

5         Then if there is accrued unpaid interest, the

6    liquidation proceeds would be applied for that account.  So

7    in this example, $50,000 would be used out of the

8    liquidation proceeds to retire the unpaid accrued interest

9    account.  Now we're left with net liquidation proceeds of

10   110,000 and supposing that the UPD or unpaid principal

11   balance is 150,000, the $110,000 would then be treated as

12   principal to reduce that unpaid principal balance leaving a

13   realized loss of $40,000.

14   Q    Thank you.

15        I would like to move on now to the purchase prices that

16   you calculated.  Let's talk numbers.

17             MS. BLACK:  Can we have TRX-689, please?

18   BY MS. BLACK:

19   Q    Dr. Snow, do you recognize this --

20   A    I --

21   Q    -- spreadsheet?

22   A    I do.  It was an exhibit to my affirmative report.

23   Q    And can you explain generally speaking what is this

24   spreadsheet?

25   A    This spreadsheet, in particular Column L, contains my

Page 118

1    purchase price calculation for the roughly 75, 76,000 loans

2    for which I was asked to calculate a purchase price.

3    Q    And what is the aggregate purchase price that you

4    calculated for the roughly 76,000 liquidated and non-

5    liquidated loans?

6    A    Okay.  So since you've highlighted Column L, you can

7    see down below Column L there's the sum which is $14.6

8    billion.

9    Q    Thank you.

10            MS. BLACK:  And, Your Honor, we have a screen

11   capture of the spreadsheet in the deck --

12            THE COURT:  Okay.

13            MS. BLACK:  -- at TRDX-295.

14            THE COURT:  Okay.  Great.

15   BY MS. BLACK:

16   Q    Now moving on to liquidated loans what was the

17   aggregate purchase price that you calculated for the

18   liquidated loans?  And let's -- let's stay on the

19   spreadsheet, please.

20   A    Okay.  So we can use the same spreadsheet to get that

21   amount.  So we would now go to Column D and filter just on

22   the liquidated loans so that we would be showing only the

23   liquidated loans.  And, again, if we highlight Column L and

24   look at the sum down at the bottom we see that that sum is

25   roughly $9.2 billion.

Page 119

1   Q    And that is for approximately how many liquidated loans

2   within that universe of 76,000?

3   A    A little over 60,300.

4   Q    Thank you.

5           MS. BLACK:  And, Your Honor, again, we have a

6   screenshot of the spreadsheet at TRDX-296 in your deck.

7           THE COURT:  Very good.

8           MR. COSENZA:  Your Honor, I'm -- I'm just --

9           THE COURT:  Yeah.

10          MR. COSENZA:  -- not to slow things down, are

11  there -- I'm having trouble on the screenshots getting --

12  seeing on our screen the actual totals.

13          THE COURT:  If you look at the bottom, Mr. Cosenza

14  --

15          MR. COSENZA:  Oh, I see.

16          THE COURT:  -- of my screen you see average count

17  and then sum?

18          MR. COSENZA:  Okay.  Bad eyesight.  I see it.

19  Thank you.

20          MS. BLACK:  That is, among others, why we have

21  this as well --

22      (Laughter)

23          MS. BLACK:  -- of offering the slides because it's

24  difficult to see.

25  BY MS. BLACK:

Page 120

1    Q    So moving on to the non-liquidated loans can we perform

2    the same exercise?

3    A    We can perform the same exercise with Column B.  Now we

4    just filter on the non-liquidated loans as opposed to the

5    liquidated loans.  And we see that there are roughly 15,000

6    liquidated loans -- non-liquidated loans and that the

7    purchase price for those loans is roughly $5.4 billion.

8    Q    Thank you.

9           MS. BLACK:  And, again, we have a screen capture

10   in the back as TRDX-297.

11   BY MS. BLACK:

12   Q    Now for the non-liquidated loans how is the number, the

13   $5.38 billion number arrived at if you look at the

14   spreadsheet?

15   A    Generally speaking it's just summing up the components

16   that we have in Columns F through J.  So the unpaid

17   principal balance, the corporate advance balance, the escrow

18   advance balance, the principal advance balance and then the

19   accrued and advanced interest.

20   Q    Thank you.

21          And not everyone might be familiar with these terms, so

22   maybe you can just walk us through what these terms mean.

23   What is the corporate advance balance?

24   A    So these would be advances made in the day to day

25   working -- day to day servicing of the loan, expenses that

Page 121

1   the servicer is bearing.

2   Q    Would that include expenses related to maintaining the

3   property during foreclosure or expenses related to the

4   liquidation of the property?

5   A    Yes.  For liquidated loans that would be the case.

6   Q    Okay.  And moving on to the next column, escrow advance

7   balance, what is that?

8   A    Well, this is the escrow component of the mortgage

9   payment, the insurance property taxes component that the

10  servicer is advancing.

11  Q    To the extent that they are rolled into the mortgage?

12  A    To the extent that they are rolled into the mortgage.

13  Q    Okay.  And then I believe the next two columns are

14  probably pretty self-explanatory, but why don't you go ahead

15  and explain?

16  A    Sure.  The Column I is the principal advanced by the

17  servicer and then Column J is both the interest advanced by

18  the servicer as well as accrued unpaid interest from the

19  borrower that was not advanced by the servicer.

20  Q    And you broke that out further in Columns N and O?

21  A    That is correct.  So those two amounts are disentangled

22  at the right-hand side of the spreadsheet.

23          THE COURT:  Can I just clarify, there's an

24  indication on the upper left that these are the purchase

25  prices as of the end of April 2017.

Page 122

1                    THE WITNESS:  That is correct.

2                    THE COURT:  So in the very first row that we see

3       which is -- appears to be Row 18 on the spreadsheet we have

4       a loan that looks like it's from a 2002 trust.

5                    THE WITNESS:  That's correct.

6                    THE COURT:  Right.  So the purchase price of

7       $153,000 represents 15 years of stuff related to this

8       particular loan?

9                    THE WITNESS:  Yes and now.  It depends -- I guess

10      it depends on what we mean by stuff.  So it could --

11                   THE COURT:  Well, you have the columns here.

12                   THE WITNESS:  Yes.

13                   THE COURT:  The corporate -- the unpaid principal

14      balance, the corporate advance, the accrued and unpaid

15      interest, everything that still remain --

16                   THE WITNESS:  Correct, after 15 years and that --

17                   THE COURT:  -- after 15 years.

18                   THE WITNESS:  -- that could have occurred over the

19      entire 15 year -- it could have occurred over the last six

20      months in the sense that the borrower went delinquent

21      recently and stopped making payments and that's what those

22      numbers reflect.  I == I don't have that level of detail

23      within this data so I can't say exactly when these things

24      occurred.  But --

25                   THE COURT:  Thank you.

Page 123

1              THE WITNESS:  Well, I can with respect to the

2    principal and interest which --

3              THE COURT:  Okay.

4              THE WITNESS:  -- I'll talk about a little later

5    on.

6              THE COURT:  Okay.  Thank you.

7    BY MS. BLACK:

8    Q    For non-liquidated loans you broke the purchase price

9    up into its individual elements including the interest

10   component, but for liquidated loans you presented the

11   realized loss number without breaking out interest.  Why?

12   A    Right.  So could we go to the -- filter on the

13   liquidated loans?

14        Okay.  So here you'll see for the liquidated loans we

15   don't have the breakout of the servicer advances, the

16   principal advances, et cetera, but what we do have is a

17   realized loss number.  And, again, as I discussed earlier

18   that realized loss number is rolling all of these components

19   into one.  It is the amount of unpaid servicer advances and

20   expenses accrued unpaid interest and unpaid principal

21   balance that remains after the liquidation proceeds have

22   been applied per the waterfall rules that we talked about.

23   Q    You told us earlier about the various documents that

24   you reviewed in getting yourself comfortable how purchase

25   price should be calculated in this matter.  Was there

Page 124

1    anything that you had seen in the materials that you relied

2    upon that gave you reason to believe that you needed to

3    break out interest on the liquidated loans?

4    A     No.  There was nothing I saw in the documents.  There

5    was nothing I saw in opposing expert reports that indicated

6    that for a liquidated loan it would be necessary to break

7    out these components individually,  rather that this could

8    be used as a summary statistic for the purchase price.

9    Q     And you submitted your purchase price calculations with

10   your affirmative report.  What was the response of the plan

11   administrator's experts to your calculations of purchase

12   price?

13   A     To my knowledge no one has rebutted my calculations.

14   Q     And did that surprise you?

15   A     No.  It didn't particularly surprise me.  This -- as

16   you can see once you've determined the components or

17   identified the correct data is a somewhat straightforward

18   calculation.

19   Q     Did any of the plan administrator's experts have any

20   response in any of their reports to your purchase price

21   calculations?

22   A     Yes.  Dr. Cornell in his reply report actually adopted

23   my numbers and testified at his deposition that if there had

24   been errors in my calculates he would not have adopted them.

25   and that he did look for such errors.

Page 125

1   Q    Did he adopt your numbers for liquidated loans, non-

2   liquidated loans or both?

3   A    For both.

4   Q    And was there any set of loans for which Dr. Cornell

5   independently calculated a purchase price rather than

6   adopting your numbers?

7   A    Yes,  There was a small set of loans that had

8   liquidated -- that were non-liquidated in April of 2017 that

9   subsequently liquidated and that he calculated a purchase

10  price as of their -- as of August.  And he used the realized

11  loss number that was reported by MBS data which is something

12  akin to Moody's or Intext which again is consistent with the

13  data published by the master servicer.

14  Q    And in doing so did he break out or net out the

15  interest component?

16  A    No.  He did not  Hew just report the realized -- the

17  purchase price as being equal to the realized loss number as

18  reported in the MBS dataset.

19           MS. BLACK:  I would like to have TRX-690, please?

20  BY MS. BLACK:

21  Q    Dr. Snow, I've put a different spreadsheet up on the

22  screen.  I neglected to ask you a question of my -- again,

23  it might not be obvious to everyone in this courtroom.  Can

24  you explain what you mean by MBS data?

25  A    Sure.  So MBS data is just the name of a dataset that

Page 126

1    contains loan level loan performance data on many -- on the

2    loans that are at issue in this matter.

3    Q    And is it your understanding that it is a subscription

4    service similar to the subscription services that you are

5    used to using in gathering data for calculating purchase

6    prices?

7    A    Yes.  It's similar to Moody's.  It's similar to Intex.

8    That data, my understanding is, it's essentially coming from

9    the same place that publicly reported data published by the

10   trust administrator or the master servicer.

11   Q    Thank you.

12        Now moving on to the spreadsheet that we have on the

13   screen, do you recognize this spreadsheet?

14   A    I do.

15   Q    And what is it?

16   A    This is a spreadsheet that I calc -- that I created

17   again as part of my expert -- my affirmative expert report

18   which calculates the -- what I refer to as the net purchase

19   price.

20   Q    And can you explain what is the net purchase price and

21   how do you arrive at it?

22   A    Well, Column E has the purchase price for the non-

23   liquidated loans.  And this is the same numbers that we

24   would have seen if we had just filtered on non-liquidated

25   loans in the previous spreadsheet.

Page 127

1      Column F contains value -- estimates of the market

2    value of the loans as supplied to me through counsel from

3    Mr. -- from Dr. Elson.  And then Column G is just the

4    difference between Column E and Column F.  So it is the

5    purchase price after accounting for the value of the loan.

6           And I -- my understanding is that this calculating

7    -- I was asked to do this calculation because the plan

8    administrator may not take the loans -- the breaching loans

9    back and hence it may be economically appropriate to

10   compensate the plan administrator for the fact that the

11   trustees will keep the loans.

12   Q    Are your purchase price calculations in any way

13   dependent on Dr. Elson's values?

14   A    No.  So column -- the numbers in Column E do not depend

15   at all on the numbers in Column F.  Those are independent

16   calculations.  In fact the purchase price is a -- in many

17   ways a backward looking calculation.  It says, as of a point

18   in time what historically has not been paid either in terms

19   of principal or interest or reimbursements to the servicer.

20      Whereas, Column F is a forward looking calculation.  It

21   is what are the expected cash flows and conversely the

22   expected losses associated with the loan into the future.

23   Q    Okay.

24           MS. BLACK:  Your Honor, I am at a breaking point.

25   I am happy to proceed or I don't know if --

Page 128

```
 1              THE COURT:  Hopefully you're at a stopping point
 2      and not a breaking point.
 3          (Laughter)
 4              THE COURT:  A stopping point.  Can you just give
 5      me one second?  Are you --
 6              MS. BLACK:  Absolutely.
 7              THE COURT:  -- going to be continuing on this
 8      slide?
 9              MS. BLACK:  Not on this slide, so let's put it --
10              THE COURT:  Could you put --
11              MS. BLACK:  -- up again?
12              THE COURT:  -- the slide back on for one second?
13              MS. BLACK:  That's what happens when you have a
14      note -- a non-native speaker in the courtroom.
15              THE COURT:  You're speaking far better than any of
16      us.  If I could just try to understand, make sure I
17      understand what you just said, Dr. Snow.
18              THE WITNESS:  Okay.
19              THE COURT:  So let me look at the loan that's
20      about seven down that's a million dollars.  It's loan number
21      ending 617.  Yes.  Line 11.  Thank you.
22              So what you said was the purchase price is the
23      combination of the three components or the -- if you get
24      more granular the components that we saw before.
25              THE WITNESS:  Correct.
```

Page 129

1          THE COURT:  And that's not dependent on anything?

2          THE WITNESS:  On any --

3          THE COURT:  And then --

4          THE WITNESS:  On any future event.

5          THE COURT:  On any future event.

6          THE WITNESS:  Right.

7          THE COURT:  Okay.  And then Column F is some

8     prediction if you will of if the property sells what you

9     would --

10         THE WITNESS:  Well, it would --

11         THE COURT:  -- net against the purchase price?

12         THE WITNESS:  It -- that will be part of the

13    inclusion, but it's really what cash flows do we expect to

14    come from the mortgage.  So part of it would be how many

15    payments do we expect the borrower to make?  And if the

16    borrower -- there's some probability that the borrower might

17    default and, if so, what do we expect to recover from that.

18    So it is an expectation of the cash flows generated by the

19    loan.

20         THE COURT:  And that's credited against the

21    purchase price so that the plan administrator doesn't

22    overpay so to speak?

23         THE WITNESS:  Correct.  So that they are

24    reimbursed for the value of those cash flows.

25         THE COURT:  Well, I'm trying to understand the

Page 130

1    scenario in which the purchase price would be over a million

2    dollars and the expected cash flows would be a quarter of a

3    million dollars.  I'm just trying to understand what that

4    might look like.  You -- you don't have a view about what

5    that loan looks like or what the history of it is or what --

6    what's driving those numbers other than the aggregate number

7    that yields the purchase price?

8              THE WITNESS:  Yes and no.  For that particular

9    loan I can only hypothesize.  I -- we do have the loan level

10   data that would tell us, you know, we could look at the

11   history of this loan--

12             THE COURT:  So one hypothesis for this loan was --

13   I obviously have no idea.  But a hypothesis would be that it

14   went into default almost immediately --

15             THE WITNESS:  Yes.

16             THE COURT:  -- in 2007.  And who knows what the

17   original mortgage amount was, but low and behold here we are

18   and the purchase price is a million dollars.

19             THE WITNESS:  Right.

20             THE COURT:  And the market value of the property

21   is a quarter of a million dollars.  That's a hypothesis.

22             THE WITNESS:  That is a hypothesis.  Right.

23             THE COURT:  Okay.

24             THE WITNESS:  And we expect to get very little in

25   terms of the payments, but there is a -- there's collateral

Page 131

```
 1    sitting underneath the --

 2              THE COURT:  Something there.

 3              THE WITNESS:  -- mortgage.

 4              THE COURT:  Okay.

 5              THE WITNESS:  That would be one scenario.

 6              THE COURT:  Right.  But we don't know.

 7              THE WITNESS:  We don't know.

 8              THE COURT:  Okay.  All right.

 9              Now would be a great time to take a break.

10              MS. BLACK:  Thank you.

11              THE COURT:  How much time would you like?

12              MS. BLACK:  Ten, ten minutes.

13              THE COURT:  Sure.  Okay.  Ten minutes.  Dr. Snow,

14    you remain under oath the entire time that you're giving

15    your testimony.  Please do not discuss the case or your

16    testimony with anyone or be in anyone's presence while

17    they're doing the same.

18              THE WITNESS:  I will do so.

19              THE COURT:  All right.  Thank you.

20          (Recess taken at 2:57 p.m.; reconvened at 3:17 p.m.)

21              THE COURT:  Have a seat, please.

22    BY MS. BLACK:

23    Q    Dr. Snow, I would actually like to go back to the

24    spreadsheet that we had looked at before the break and ask a

25    couple of follow up questions on that spreadsheet.
```

Page 132

1              MS. BLACK:  Can we have TRX-690, please?

2    BY MS. BLACK:

3    Q    So the Court asked you about this loan, Loan Number

4    121820617 which has a purchase price that you calculated at

5    a little over a million dollars and a market value

6    calculated by loan schematics off about a quarter a million

7    dollars.

8         With that loan in mind and perhaps we can just pull up

9    so we can look at them simultaneously we can look at this

10   loan in the deck.  It's TRX-298, 911, and let's pull up a

11   different spreadsheet on the screen, TRX-2726 which is

12   Exhibit 1 to your supplemental report.

13   A    Okay.

14   Q    And specifically go to line, I believe it is line 55.

15              MS. BLACK:  Can we highlight that and also make it

16   a little larger?

17        (Pause)

18   BY MS. BLACK:

19   Q    And, Dr. Snow, can you confirm that this is the same

20   loan?

21   A    It appears to be the same loan.

22   Q    Okay.  And do you remember that the court asked you

23   what possible reason there could be that there would be so

24   much in purchase price versus only a quarter of a million in

25   the market value.  Can you see in here at what point in time

Page 133

1    this borrower last made a payment on the loan?

2    A    Yes.  That would be in Column F, the next due date.

3    Q    And so when was that?

4    A    So it would be that they made a payment in September of

5    2010.

6    Q    So this loan has been delinquent since October of 2010?

7    A    That is correct.

8    Q    And is it possible that this loan had previous

9    modifications even prior to October of 2010?

10   A    It is possible.

11   Q    So in this case the borrower has not made payments for

12   over seven years?

13   A    That is correct and that would explain why the accrued

14   and advanced interest in Column K is as large as it is.

15   Q    And nonetheless this is a non-liquidated loan within

16   our pool?

17   A    Correct.

18   Q    Even though it has not been performing for over seven

19   years?

20   A    That is correct.  There could be a whole host of

21   reasons as to why it hasn't formally liquidated.

22   Q    Now going back to TRX-690, please, the schedule of net

23   purchase prices to your affirmative report, and I may have

24   asked you before but just so we have it clearly on the

25   record, so the purchase price that you calculated for the

Page 134

1    non-liquidated loans as we had seen in a previous

2    spreadsheet and we can see it on this spreadsheet if we

3    place the cursor over Column A -- I'm sorry, Column E, I

4    apologize --

5    A    Yes.

6    Q    -- is 5. -- roughly $5.4 billion.

7    A    Yes.

8    Q    Okay.  And that is the aggregate purchase price that

9    you calculated for all of the non-liquidated loans?

10   A    That is correct.  That's consistent with the

11   spreadsheet that we looked at earlier.

12   Q    Okay.  And let's just look at what is the aggregate

13   market value calculated by Dr. Elson for these loans?  And

14   what is that?

15   A    Roughly three billion.

16   Q    And from there you calculated a net purchase price for

17   the non-liquidated loans and how much is that?

18   A    Again, roughly 2.4 billion.

19   Q    And just so we are clear you did the account -- I

20   believe you had mentioned that before you did that to

21   account for the possibility that if the non-liquidated loans

22   that are at issue, at issue in this proceeding are not going

23   to be returned to the Lehman estate as part of the

24   repurchase mechanism that it may be appropriate to provide a

25   credit to account for the fact that they are not getting the

Page 135

1  loans back and the loans remain with the trusts.=

2  Q    Correct.  That's my -- at least my understanding from

3  counsel that that, you know, could potentially be the case.

4  And if it is then it might be economically appropriate.  It

5  would be a compensation for the expected cash flows that

6  could be generated by the loan.

7  Q    And we will get into that and hear more fully about it

8  from Dr. Elson, but do you have a general understanding of

9  how the (indiscernible) software generates these market

10 values?

11 A    Yes.  I have a general understanding.

12 Q    Can you explain?

13 A    It's essentially forecasting, making a forecast of

14 expected cash flows and then discounting those back to the

15 present.

16 Q    And the Court asked you before what possible scenarios

17 there could be on any given non-liquidated loans.  I believe

18 you discussed that the loan going into default and being

19 liquidated would be one.  Would hater scenarios are there?

20 A    Well, there are the scenarios that the loan prepays,

21 the loan continues to make payments, or the loan defaults.

22 And typically this is kind of referred to as a competing

23 hazard situation.  In other words, there are different

24 outcomes that could occur each month.  And if the loan

25 prepays or defaults that's the end of the loan, but if it

1    continues to survive then the borrower makes payments.

2    Q    Now moving on to your rebuttal report if we could put

3    TRDX-285 on the screen again.

4         (Pause)

5    Q    Can you walk us through what it was in Dr. Cornell's

6    report that you addressed in your rebuttal report?

7    A    Again, Dr. Cornell was asked to make two assumptions

8    which, to be clear, these are assumptions that he adopted

9    from counsel that one, that the law certificates and

10   corporate expense logs were necessary to calculate the

11   reliable purchase price.

12              And that, second, that the trustees had not put

13   forward a reliable measure of the market value of the loan.

14   Therefore, the purchase price for the non-liquidated loans

15   should be set to zero.

16   Q    And how are these assumptions relevant to Dr. Cornell's

17   affirmative report?

18   A    They affect the value of what he calls the compensable

19   claims.  He basically removes them from a purchase price

20   calculation saying that effectively they have a value of

21   zero.

22              MS. BLACK:  Let's have TRDX-299, please.

23   BY MS. BLACK:

24   Q    You mentioned loans with compensable claims.  Can you

25   please elaborate on what you mean by that?

Page 137

1   A    Okay.  So this is a phrase or a term that Dr. Cornell

2   used in his report.  So at the bottom the 1,076 loans, these

3   are loans where the plan administrator agrees with the

4   trustee that there is some material breach associated with

5   the loan and accepts the purchase price that had been put

6   forward as of January 1st -- or January of 2017.

7   Q    And are the 1,076 loans that Dr. Cornell refers to as

8   loans with compensable claims liquidated loans, non-

9   liquidated loans or both?

10  A    These are all liquidated loans because as I discussed

11  earlier he operates under the assumption that because the

12  allegation -- because of the allegation that the trustees

13  have not put forward a credible market value of the non-

14  liquidated loan, that its purchase price should be set to

15  zero.

16  Q    Okay.  And if you could just walk us briefly through

17  what we see on this table and how Dr. Cornell starts off at

18  94,566 loans being the claims submitted by the trustees

19  during the protocol process and then arrives at a subset of

20  1,076 loans as loans with compensable claims.

21  A    Before I do I just want to make clear that the first

22  two columns of this table were produced in Dr. Cornell's

23  affirmative report.  I have added the third column which is

24  what are the purchase prices that I have calculated

25  associated with those loans.

Page 138

1   Q     That you have calculated --

2   A     Oh, sorry.

3   Q     -- or that Dr. --

4   A     No.  Let me --

5   Q     -- Cornell has calculated?

6   A     That the trustee had calculated as of January of 2017.

7   I misspoke.

8         So we start off with 94,566 loans and my understanding

9   is that these were the loans that were initially submitted

10  as claims in the protocol process.  There were various loans

11  that were removed from the protocol process either because

12  of the trustees' actions or the plan administrator's

13  actions.  So that will get us to the at issue mortgage loans

14  of roughly 91,000.

15        From this 91,000 Dr. Cornell removes 30,000 loans, so

16  that would be the first yellow highlighted line that

17  allegedly don't have sufficient documentation.  Of those

18  30,000, 15,000 are removed because they don't -- the loan

19  files didn't contain a loss certificate or a corporate

20  expense log.

21        There were then 60,000 loans removed because the plan

22  administrator did not accept the fact that they were -- or

23  contested the fact that they were breaching loans.  When --

24  he goes on to then add and subtract various loans, including

25  in the second yellow highlighted loan.  44 loans, these are

Page 139

1    all non-liquidated loans, which as I've said before, he set

2    the purchase price of those loans equal to zero to arrive

3    then at 1,076 loans.

4         Q    And in arriving at his purchase price for these

5    1,076 loans, I believe you mentioned that Dr. Cornell used

6    purchase price as put forward by the trustees in January of

7    2017?

8         A    That is correct.

9         Q    And does Dr. Cornell in any way challenge or take

10   issue with the Trustee's purchase price?

11        A    Not to my knowledge, no.

12        Q    More specifically, does he take issue with any

13   interest that may be embedded in such purchase price?

14        A    Again to my knowledge, Dr. Cornell does not break

15   out $236 million associated with the mortgage loans with

16   compensable claims -- does not break that out into separate

17   components.  These are liquidated loans and he is just using

18   the purchase price associated with those loans.

19        Q    Okay.  So I would like to start off with his first

20   assumption that a reliable purchase price cannot be

21   calculated without a loss certificate or corporate expense

22   log.

23        A    Yes.

24        Q    I believe you mentioned that this is an assumption

25   that was provided to Dr. Cornell by counsel.

Page 140

1       A    Yes, that's correct.

2       Q    Does Dr. Cornell justify this assumption in any

3   way?

4       A    No.  He provides no analysis.  He accepts the

5   assumption.

6       Q    And what -- when you responded to Dr. Cornell's

7   report in your rebuttal report, what did you understand the

8   plan administrator's position to be with respect to the

9   necessity of corporate expense logs and loss certificates?

10      A    My understanding is that the plan administrator

11  argues that the corporate expense logs and the loss

12  certificates are necessary to both audit and to calculate a

13  reliable purchase price.

14      Q    And is that position put forward in any of the

15  materials that you had reviewed?

16      A    Yes.

17      Q    And where would that be?

18      A    I believe in the motion to expunge.

19      Q    Okay.  If we would put up TRDX-300, please.  I have

20  put in front of you an excerpt from -- two excerpts from the

21  plan administrator's motion to expunge.  Can you explain

22  whether these are the statements that informed your

23  understanding as to what the plan administrator's position

24  was with respect to these two documents?

25      A    Yeah.  So the first in paragraph 8 notes that the

Page 141

1    trustee's failure to provide the documents, the plan

2    administrator can't evaluate whether the purchase price is

3    accurate or fair.  And then in paragraph 45, and also

4    without the documents, it can't evaluate the purchase price

5    calculation nor can it break it out into its constituent

6    components.

7         Q    And what is your opinion with respect to the plan

8    administrator's position as adopted by Dr. Cornell?

9         A    I disagree with the position.

10        Q    And why is that?

11        A    As I have demonstrated both in my analysis and in

12   prior analysis in prior cases, a reliable purchase price can

13   be calculated using the monthly servicing and monthly

14   trustee remittance reports.  The loss certificates and

15   corporate expense logs are, in fact, static documents that

16   occur when the loan is liquidated.  And they do not account

17   for subsequent recoveries, subsequent losses that occur on

18   the loan post the time that the loss certificate was issued.

19   So, in fact, the loss certificate is in some ways an

20   outdated document for, in fact, the majority of the loans.

21   And looking at the loans, roughly 80 percent of the loans

22   for which I calculated purchase prices, had some type of

23   trailing recovery or expense.

24        Q    You just mentioned trailing recoveries and

25   expenses, and you refer to them as subsequent recoveries and

Page 142

1    expenses.  Can you elaborate what you mean by that?  What

2    type of expenses and recoveries would there be after the

3    liquidation of the subject property?

4        A    Well, I can't speak to any individual loan.  I can

5    just say first that I have seen this pattern across hundreds

6    of trusts that the liquidation event in some sense isn't the

7    final say on how much the loan generates in terms of a

8    realized loss.  This could be because of a later insurance

9    recovery.  It could be because there was a tax dispute, you

10   know, that the borrower had with the taxing authority, that

11   was resolved in one way or another after liquidation.  I

12   mean, there could be a whole host of different types of

13   events.  It could be just administrative practices.

14       But what I can say for sure is in the data, this is a

15   regular occurrence.  And the monthly servicing data and

16   monthly trustee reports reflect this information.

17       Q    And how long after the liquidation event, and after

18   a loss certificate is issued by the servicer, can such

19   subsequent recoveries and expenses occur?

20       A    Empirically in the data, it can be years.  You

21   know, it's often, say, within the first year after

22   liquidation, but it can be a significant time afterwards.

23   It's somewhat idiosyncratic to the loan.

24       Q    Now, I understand that you have investigated the

25   issue, what did you do?

Page 143

1       A    What I did was I looked at the universe of loans

2    where the plan administrator didn't contest the fact that

3    the loss certificate and the corporate expense log were in

4    the loan files.  And this was the universe of 260 some odd

5    loans.  I took a random sample of those loans to look at the

6    corporate expense log and the loss certificate and compare

7    what I could see there about realized loss with the data,

8    and the monthly servicing reports, and the monthly trustee

9    remittance reports.

10      Q    And what did you find based on your investigation?

11      A    What I found was for some of the loans, they

12   matched up with -- almost perfectly, within plus or minus

13   $5.  And that for the majority of the loans, I could

14   reconcile the two, but only after accounting for the

15   subsequent losses and/or recoveries that occurred post the

16   date of the loss certificate.  For some, I couldn't

17   perfectly reconcile the numbers in the two data sources, but

18   the differences were somewhat de minimis.  It was about one

19   percent of the total realized loss.

20      Q    Could we have TRDX-301, please?  Dr. Snow, does

21   this slide accurately summarize your findings with regards

22   to this sample?

23      A    It does.  So for -- of the 160 loans, again,

24   roughly half -- a little less than half, 74, the realized

25   amounts were identical.  What was reported on the loss

Page 144

1    certificate and what was reported in the monthly servicing

2    data and/or monthly trustee remittance reports?  For roughly

3    65 loans, I could reconcile within $100 based upon

4    subsequent gains or losses associated with those loans that

5    were not included in the loss certificate or corporate

6    expense log.  And for 14 loans, I couldn't reconcile things

7    within $100.  But as I mentioned earlier, it was roughly --

8    the difference -- total difference between the two data

9    sources was roughly one percent.  And for 6 loans, the loss

10   certificate didn't exist in the loan file.

11        Q    And having conducted this investigation, and also

12   based on your prior experience in other put back matters,

13   what opinion did you form with respect to the utility of

14   corporate expense logs and loss certificates in validating

15   or calculating a purchase price?

16        A    Basically, I had not seen loss certificates used in

17   any prior case that I had been involved with.  After

18   investigating the issue, I don't believe that there is

19   utility in them above and beyond the information that is

20   contained in the data published by the master servicer.  And

21   in fact, my analysis shows that the data published by the

22   master servicer is more current, takes into account the

23   subsequent gains and losses associated with the loan.  And

24   as I said before, I feel comfortable with that data given

25   that it is relied upon by market participants.

Page 145

1      Q    Now, you provided this analysis in your rebuttal

2    report.  What was the response of the plan administrator's

3    experts to your investigation on this issue: both in numbers

4    and generally the opinions that you formed in this regard?

5      A    To the best of my knowledge, no one has rebutted

6    these findings.

7      Q    Are you aware that in his testimony to this Court,

8    Mr. Trumpp, the plan administrator's fact witness, stated

9    that loss certificates and corporate expense logs are

10   necessary because they break out in granularity things such

11   as the interest or any losses that may be attributable to

12   the servicer, for instance the servicer taking too long to

13   foreclose on a property?

14     A    Yes.  I'm aware of the arguments.

15     Q    And what do you make of -- focusing on the first

16   point, what do you make of Mr. Trumpp's statements that

17   these documents are necessary to determine the borrower

18   interest component of the purchase price?

19     A    First of all, as I demonstrate in my supplemental

20   report, they are not necessary.  That that can be -- those

21   components can be broken out using the monthly loan level

22   servicing data and the monthly trustee remittance reports.

23   Second, with respect to the servicer errors, I don't know

24   quite what to make of this particular argument.  I

25   understand that these documents might be able to illuminate

Page 146

1   how long it took to liquidate a loan and some actions that

2   the servicer took, but I have not seen any factual evidence

3   or any expert evidence regarding whether or not there were,

4   in fact, servicing errors.  And if so, how would one go

5   about using that information to determine whether the

6   servicer made an error or not.

7        In particular, when Dr. Cornell submitted his

8   affirmative report -- if we could go back to the table from

9   Dr. Cornell, the report with the column that I added to it.

10       Q    Sure.  That is TRDX-299, please.

11       A    So from the $236 million, at the bottom here, Dr.

12   Cornell subtracted 3 to $4 million for what he termed a

13   servicing error offset.  When I saw that initially in his

14   affirmative report, I looked in his backup materials and saw

15   nothing that described how, nor illuminated how that was

16   calculated.  And there was nothing in the text of his

17   report.  There was nothing in his backup materials.  So I

18   asked counsel to ask -- counsel for the trustees to ask the

19   counsel for the plan administrator for that backup material

20   so I could analyze how this was -- this number was arrived

21   at.

22       After what I understand was some back and forth, I was

23   shown a letter from counsel for the plan administrator that

24   said that they were dropping their -- that amount for

25   service  -- that servicer error offset.  And that's what --

Page 147

1   that's the only evidence I have seen regarding whether or

2   not there were servicer errors.

3       Q    And so based on that letter, was it your

4   understanding that that argument was still in the case?

5       A    I -- given that I had not seen any factual evidence

6   or any expert evidence, I had no reason to believe that that

7   argument was still in the case.

8       Q    Let's just take a look at the letter.  Can we have

9   TRX-894, please?  Is this July 14, 2017 letter, the document

10  that you had just referred to?

11      A    It is.

12      Q    And can we please move to page 3 of the document?

13  Can you point us to the language that you took to mean that

14  the service error argument had been abandoned?

15      A    Right.  It's the first paragraph right after number

16  four, and in particular the last sentence, that the plan

17  administrator confirms it no longer plans to apply the

18  servicer error offset to the aggregate claim value of debt

19  applied in the Cornell report.

20      Q    Thank you.  And going back to the first statement

21  made by Mr. Trumpp with regard to loss certificates and

22  corporate expense logs being necessary in order to

23  disaggregate the interest component of the purchase price,

24  to the extent it's included in the purchase price.  You

25  mentioned that you calculated interest in the context of

Page 148

1    your supplemental report?

2        A    That is correct?

3        Q    And in the context of calculating -- in calculating

4    interest, including its individual components and supped

5    components in your supplemental report, did you look at a

6    single loss certificate or corporate expense log?

7        A    I did not.

8        Q    And --

9        A    I would also note that Dr. Cornell reviewed my

10   calculations of determining the interest components, said

11   that the approach was reasonable and it would be the one

12   that he would adopt.  We had some minor disagreements which

13   I think we'll talk about later.

14       Q    And did that minor disagreement have anything to do

15   with corporate expense logs and loss certificates?

16       A    It did not.

17       Q    And going back to this issue of loss certificates

18   and corporate expense log, based on the work that you have

19   done in this matter, as well as your general expertise in

20   put back matters, what if any purpose -- in your opinion,

21   what if any purpose can these documents serve with respect

22   to the calculation of purchase price or any of its

23   constituent components that cannot be accomplished by

24   looking at the loan level data found in the master servicers

25   monthly performance data or trustee remittance reports?

Page 149

1      A    Based upon my prior experience in over 25 put back

2   matters, and my examination of the data here, I don't

3   believe that there is anything above and beyond than what's

4   in the loan level servicing data and trustee remittance

5   reports that would be necessary to either calculate the

6   purchase price or to back out individual components.

7      Q    Now, I would like to move to the second assumption

8   that we saw in -- with respect to Dr. Cornell's affirmative

9   report, which was the assumption that led Dr. Cornell to set

10  the purchase price for non-liquidated loans at zero.  Can we

11  please have TRX-939, please?  I've put Dr. Cornell's

12  affirmative report up on the screen.  Dr. Snow, do you

13  recognize this document?

14     A    I do.

15     Q    Okay.  And now, let's move to page 19 of the

16  document.  What is your understanding as to the basis -- let

17  me rephrase that.  What do you understand was the basis for

18  Dr. Cornell to set the purchase price for all the non-

19  liquidated loans at zero?

20     A    I understand that the plan administrator's position

21  is as stated here, that they didn't provide sufficient data

22  to establish a claim value and that they didn't provide

23  information that could reliably estimate the loss on an

24  active mortgage loan, which that term is used in the same

25  context that I use non-liquidated claims.

Page 150

1        Q    And can you just point us to where it is in this

2    document that we would find the basis for Dr. Cornell's

3    assumption that the purchase price from non-liquidated

4    should be set at zero?

5        A    Sure.  This would be the second to last sentence in

6    paragraph 35.

7        Q    Can you read it?

8        A    Where he says, "Therefore, I set the claim value on

9    all active mortgage loans to zero, including the 44 active

10    mortgage loans where the plan administration concluded there

11    were approved claims.

12        Q    Okay.  And the premise for that is that he says

13    that valuations are not now reliable indications of the

14    current value, and because he further understands that the

15    valuations do not reliably estimate losses?

16        A    That is correct.

17        Q    Okay.  So let's focus on the first part, that the

18    valuations provided by the trustees are not now reliable

19    indications of the current value of the active mortgage

20    loans.  What is your response to that?

21        A    My response -- well, to be fair, the estimates and

22    mark of value were a year old at the time of Dr. Cornell's

23    report.  However, these can be easily updated and, in fact,

24    Dr. Elson's affirmative report did that, in fact.  He

25    updated those values to April of 2017 to make it

Page 151

1    contemporaneous with the calculations of the experts in this

2    matter.

3        So the prices -- or the values may have been stale, but

4    I don't see that as being an insuperable problem, especially

5    given that it can be updated rather easily.

6        Q   And what about the second basis for the assumption

7    that led him to set the purchase price for non-liquidated

8    loans at zero, which is that the claim value is not reliable

9    -- a reliable estimate of losses?

10       A   So first of all, I mean, it's sort of -- as an

11   initial matter, I have not seen any evidence that, you know,

12   proffered by any of the experts that the losses that are

13   estimated as part of Dr. Elson's analysis, are estimated

14   reliably.  I have not seen any analysis.  I have not seen

15   any factual evidence.

16            THE COURT:  Can I interrupt for a moment?  And this

17   is not your fault.  This is -- well, my fault, but also that

18   the witnesses aren't exactly going all in order.  So I'm

19   hearing about things that I haven't heard about yet.  So for

20   what are being referred to in this paragraph that I'm

21   looking at on the screen as active mortgage loans, right?

22            THE WITNESS:  Yes.

23            THE COURT:  Those are non-liquidated loans?

24            THE WITNESS:  Correct.

25            THE COURT:  And in some instance, the borrower may

Page 152

1    be paying.

2              THE WITNESS:  Yes.

3              THE COURT:  And in some instances, not.

4              THE WITNESS:  Correct.

5              THE COURT:  So, therefore, is the number that I

6    guess it's you supplied by Dr. Elson, maybe it's Dr.

7    Cornell, I don't know.  But the number that's being used to

8    represent the value that should be netted against the

9    purchase price, right?  The expected cash flow is one way

10   that you've described it.

11             THE WITNESS:  Yes.

12             THE COURT:  For an active performing loan where Joe

13   Borrower is paying month after month, is that number the --

14   I'll use the word appraised in a lay sentence -- the

15   appraised value of the property, or is that number a

16   discounted cash flow of the remaining mortgage payments on

17   the assumption that Joe Borrower is going to continue to

18   make the payments.  In theory, you're the economist, I'm

19   not.  Those should kind of converge, maybe or maybe not.  In

20   some instances, yes, but we're talking about a real estate

21   market that's subject to a lot of different factors.

22             So the -- my main question is what are we talking

23   about?  Are we talking about the collateral value or are we

24   talking about a discounted cash flow of what we think Joe

25   Borrower is going to do?

Page 153

1           THE WITNESS:  So my answer would be both.  So let

2    me just try to do a --

3           THE COURT:  And if I -- if that question doesn't

4    make sense, tell me one that does.

5           THE WITNESS:  No, it makes perfect sense.

6           THE COURT:  Okay.

7           THE WITNESS:  Let me do a rather stylized simple

8    example.

9           THE COURT:  Sure.

10          THE WITNESS:  Suppose that there was a 50 -- it's

11   just a one period mortgage to make life easy for us.

12          THE COURT:  Okay.

13          THE WITNESS:  Now, let's say that there's 50

14   percent probability that the borrower makes the mortgage

15   payment and a 50 percent probability that they don't.

16   Right?  Then you might say that -- and let's say the

17   mortgage payment is $1,000.  So we might say in that

18   instance that the expected mortgage payment is $500.  Okay?

19   Now, it becomes more complicated when we start adding in

20   more periods and more things can happen, right?  That

21   there's a probability that the borrower could prepay, say

22   refinance the mortgage.  There's a probability that they

23   could continue to make mortgage payments.  There's a

24   probability that they could become delinquent.  There's a

25   probability that they could default.  Those are all rolled

Page 154

1    in to calculating the expected cash flow.

2          So again coming back, the answer is it's taking

3    into account all of those things.  Now, if the borrower has

4    been, you know, never delinquent and is making payments,

5    then the probability that they're going to become delinquent

6    and that they're going to default is relatively low compared

7    to someone who has defaulted in the past.

8          THE COURT:  So let me ask a follow up, though.  If

9    -- we now have a borrower whose home is in a recovered real

10   estate market.  So the collateral -- there's equity.

11         THE WITNESS:  Yes.

12         THE COURT:  Joe Borrower has equity.  SO whether or

13   not he pays or he doesn't pay, the lender is going to be

14   made whole.  In my hypothetical, the lender is going to be

15   made whole because if we got the property appraised, there

16   would be two to one debt to collateral -- loan to value

17   ratio, however you want to look at it.  There's

18   unquestionably equity value.

19         So wouldn't in that instance, we don't have to

20   worry about what Joe Borrower may or may not do, the

21   borrower is going to be made whole at the end of the day

22   because there's so much collateral value?

23         THE WITNESS:  Yes.  I -- if we just sort of extract

24   what the probability of housing prices do in the future.

25   But yeah --

Page 155

1          THE COURT:  Right.

2          THE WITNESS:  -- assuming that they just kind of

3    nice, steady increase into the future, yes, then it becomes

4    sort of the discounted, you know, stream of payments and/or

5    a  -- you could view it as a pre-payment at some point

6    because --

7          THE COURT:  Right.

8          THE WITNESS:  -- the loan liquidates the collateral

9    value as sufficient to pay off the rest of the mortgage.

10          THE COURT:  Right.

11          THE WITNESS:  So yes, that would --

12          THE COURT:  Equity commission sufficient to take

13    care of any problem that --

14          THE WITNESS:  Yeah.  That would be part of the

15    mortgage value.  And then you would expect to have a

16    relatively higher mortgage value than someone that you think

17    is going to default.

18          THE COURT:  Thank you.  Thank you.

19          MR. COSENZA:  Your Honor, could I have one --

20          THE COURT:  Yeah.

21          MR. COSENZA:  -- clarification just to --

22          THE COURT:  Sure.

23          MR. COSENZA:  -- because of the order of this.  The

24    Dr. Cornell report that's being referred to here was part of

25    the initial round of expert reports.

Page 156

```
 1              THE COURT:  Yes.

 2              MR. COSENZA:  It was done on June 1st.

 3              THE COURT:  Okay.

 4              MR. COSENZA:  So two things just to clarify.  The

 5     chart that's here -- first of all, it doesn't have -- the

 6     chart that Dr. Cornell used didn't have the purchase prices.

 7     But also the loans at issue included all of the loans that

 8     were put through the protocol.  And part of the issue that

 9     Dr. Cornell was explaining in his report was during the

10     protocol process, the trustees for active loans had taken

11     different approaches as to how to value them.  At one point,

12     sought the entire purchase price without any offset based on

13     any model.  There are problems with that model that we'll

14     talk about later.

15              THE COURT:  Okay.

16              MR. COSENZA:  But there is -- you know, there's

17     something in here about the chronology.  This is -- just to

18     be clear, Dr. Cornell's June 1 report is before -- or

19     contemporaneous with the Elson and Snow reports.  So this is

20     -- just to put that chronology --

21              THE COURT:  Okay.  As I said, you know, we're

22     running before we walk in some instances.  So I'm trying to

23     follow it as best as I can.

24              MR. COSENZA:  Thank you, Your Honor.

25              THE COURT:  Thank you.  Okay, thank you.  Go ahead.
```

Page 157

BY MS. BLACK:

      Q    The plan administrator -- are you aware that the
plan administrator's position is that the values calculated
by Dr. Elson are too low?

      A    Yes.  I have seen the argument made.

      Q    Okay.  And if one were to assume that these are
great loans and they are worth 100 percent of their par
value, simply $1 on each dollar --

      A    Yes.

      Q    -- would that lead and allow Dr. Cornell to
conclude that the net purchase price for the non-liquidated
loans should be zero?

      A    No, that would not be the case.

      Q    Can you explain that, please?

      A    Yes.  I calculate the net -- well, if we -- let's
go to the spreadsheet that had the calculations of the net
purchase price.

      Q    Okay.  That is 690 -- TRX-690.

           MR. COSENZA:  Your Honor, I hate to do this, but I
think this is -- you know, I've read the report several
times.  I don't recall this issue -- this question being
within -- covered by Dr. Snow in his expert reports, the
question that the values calculated by Dr. Elson are too
low.  I don't think there's anything in Dr. Snow's report
that talk about the challenges to Dr. Elson's work.  I think

Page 158

1   that's something that Dr. Elson will have to explain when

2   he's here as an expert.

3            THE COURT:  Why don't you come up for a second?

4        (Sidebar off the record)

5            THE COURT:  Just to be clear, I did cancel my 4:15

6   call.  So I can keep going, but I don't want to keep going

7   if folks are getting tired, or need a break, or what have

8   you.  So whenever folks are ready.  Are you doing okay, Dr.

9   Snow?

10            THE WITNESS:  I'm doing fine.  Thank you.

11            THE COURT:  Okay.  Are you okay?  Do you need a

12  break?

13            MS. BLACK:  Yes.  May I proceed?

14            THE COURT:  Yes, go ahead.

15  BY MS. BLACK:

16       Q   Dr. Snow, I had previously had asked you a

17  question.  So if one were to assume that -- in an ideal

18  world that the non-liquidated loans that you calculated

19  purchase price for where -- are valued at 100 percent of

20  par.

21       A   Yes.

22       Q   Would that justify setting the purchase price if

23  you calculated from a non-liquidated nulls at zero?

24       A   No, it would not.  There would still be a

25  significant net purchase price even if you made a somewhat

Page 159

1   severe assumption that the loans should be valued at par.

2        Q    And can you elaborate on that in terms of numbers?

3        A    Yes.  So if we can go back to the spreadsheet where

4   I calculated the net purchase price.

5        Q    That would be TRX-690.

6        A    Okay.  So if we highlight column F, you'll be able

7   to see that the sum of that is roughly $3 billion.  So that

8   is what Dr. Elson calculates the value of these, again

9   roughly 15,000, on liquidated loans to be.  Dr. Elson also

10  reported that that number represented 72 percent of par or

11  of the current principal balance associated with these

12  loans.

13       So it's rather now a straightforward mathematical

14  operation to say, well, suppose it's not valued at 72

15  percent, suppose it's valued at 100 percent.  And that would

16  just be equivalent to taking this $3 billion number and

17  dividing by .72.  And then that would give you what Dr.

18  Elson would calculate if he assumed that all of the loans

19  would be worth 100 percent of par, which is almost the

20  equivalent of saying that you expect every single one of the

21  non-liquidated loans to pay off in full at some point.

22       Q    And are you able to do that math in your head

23  roughly?  To take --

24       A    I am.  So if you take 3 billion, divide by .72, you

25  come up with roughly $4.2.

Page 160

1      Q    And so if the market value of the loans were $4.2

2   billion rather than $3 billion, what would be the net

3   purchase price on these loans?

4      A    Okay.  So if we go to column E and highlight that,

5   so you'll see that's 5.3 or nearly $5.4 billion, so if you

6   were to subtract 4.2 billion, you're still left with roughly

7   $1.2 billion.

8           THE COURT:  So I've got to try to understand this.

9   So you're saying that if you -- even if the loans are valued

10  at par, you still end up with a net purchase price.

11          THE WITNESS:  That's correct.

12          THE COURT:  Well, that's simply because there's

13  accrued interest and expenses that haven't been paid.

14          THE WITNESS:  There are multiple factors.  One is

15  accrued interest.  One is loan modifications, right, because

16  --

17          THE COURT:  Which may or may not count based on

18  your earlier testimony.

19          THE WITNESS:  Well, the principal modifications.

20          THE COURT:  Principal modifications.

21          THE WITNESS:  Principal modifications, servicer

22  advances.  Any of those things, because again that's the

23  backward looking portion.  Those are not accounted for in a

24  forward looking estimate of value because it -- imagine if

25  you were to sell that loan, the individual who took the loan

Page 161

1    would not be entitled to any repayments, you know,

2    associated with servicer advances, accrued interest.  That

3    would be the previous owner.

4            THE COURT:  Okay.  But just to tweak this question

5    slightly, if you have a loan that's valued at par and it's a

6    performing loan --

7            THE WITNESS:  Yes.

8            THE COURT:  -- and assuming there are no odd,

9    straggler expenses, then you would get to a net purchase

10   price of zero?

11           THE WITNESS:  Roughly speaking, yes.  I mean,

12   because even if you had a borrower that's current, there's

13   still some probability that some idiosyncratic event --

14           THE COURT:  Right.  But then we get back to my

15   earlier hypothetical about --

16           THE WITNESS:  Yeah.

17           THE COURT:  -- huge equity cushion and then you --

18           THE WITNESS:  Yes.  Yes, you have to go to -- I

19   wouldn't necessarily say an extreme condition, but --

20           THE COURT:  Okay.

21           THE WITNESS:  -- a somewhat unusual condition.

22           THE COURT:  Okay.  Thank you.

23           THE WITNESS:  Okay.

24   BY MS. BLACK:

25       Q    Actually, following up on that question, so if you

Page 162

1  have a loan that is performing right now, but you have a

2  previous modification that resulted in a reduction of

3  principal, would that be a part of the purchase price?

4      A   That would be a part of the purchase price, but it

5  would not be a part of the current market value because the

6  current market value is looking forward at -- to cash flows,

7  not looking to reimburse.  So in other words, the market

8  value and the purchase price are doing two different things.

9  One is compensating for future cash flows.  The other is

10 compensating for past losses.

11     Q   Now, I believe you had mentioned before that you

12 had not seen any evidence indicating to you that the market

13 values calculated by Dr. Elson that you use as an offset to

14 your purchase price were unreliable.  Have you seen any

15 evidence to the contrary?

16     A   I have.  I've seen some evidence that indicates

17 that.  These non-liquidated loans, in fact, have suffered

18 losses and will continue to suffer losses.

19     Q   And what is the evidence that you have seen?

20     A   Well, first it's just my review of the data in

21 calculating the purchase prices.  But the second is

22 testimony put forward by Professor Fischel.

23     Q   And can you elaborate on that?

24     A   Yes.  Professor Fischel estimated or calculated the

25 historic losses on 415,000 loans.  And that was every loan

Page 163

1    that was in a covered trust associated with the bankruptcy.

2    A subset of those loans are the liquidated loans and the

3    non-liquidated loans for which I calculated purchase prices.

4    And Dr. Fischel calculated the historic and estimated the

5    future losses on each and every one of these loans.

6              THE COURT:  Mr. Cosenza?

7              MR. COSENZA:  Again, Your Honor, this is not

8    covered in either of Dr. Snow's reports.  Professor Fischel

9    issued his report on -- at the end of July.  There was a

10   full chance for Dr. Snow to rebut and he did not.  So this

11   is, in essence, a new opinion issued by Dr. Snow.

12             THE COURT:  Response?

13             MR. BLACK:  Dr. Snow is not issuing an opinion.  He

14   took numbers put forward by Dr. -- Professor Fischel.  I

15   don't think he take issue with those numbers.  All he did

16   was to look at those numbers, extract out of that pool,

17   which is a much larger universe of loans than the loans that

18   were the subject of Dr. Snow's analysis to see what the

19   numbers were that Professor Fischel came up with for those

20   loans.

21             I think that not only does he not disagree with

22   Professor Fischel, he actually agrees there was no reason

23   for him to put in a reply to Professor Fischel because there

24   was nothing in Professor Fischel's calculations that Dr.

25   Snow disagrees with.

Page 164

1          THE COURT:  But he's describing an operation that

2     he performed that's beyond the scope of anything that was

3     written and the plan administrator hasn't had the ability to

4     examine him or test him about it.  So I think this is in a

5     slightly different category than the last block of

6     questions.  Did you have more on this point?

7          MS. BLACK:  I do.  This is the subject that we

8     attempted to venture into with Professor Fischel at his

9     deposition and we were not able to -- we were not successful

10    because, again, the spreadsheets extracting out the numbers

11    -- Professor Fischel's numbers for just the non-liquidated

12    loans that are at issue in this proceeding were put together

13    by Dr. Snow and his time.  Professor Fischel did not

14    recognize them as his own spreadsheets and therefore

15    declined to testify about them.

16          My partner then -- Goldberg again attempted to talk

17    to Professor Fischel about that at trial and again, since

18    these were spreadsheets that were generated by Dr. Snow,

19    Professor Fischel was not in a position to talk about the

20    competence of those spreadsheets.

21          THE COURT:  Now you -- now I'm totally lost.  If

22    we're talking about spreadsheets that Dr. Snow generated

23    that Dr. Fischel couldn't figure out --

24          MS. BLACK:  So Professor Fischel has one

25    spreadsheet, which is his spreadsheet of historical losses

Page 165

1    for a universe of over 415,000 loans.  That's the covered

2    loans and all of the covered trusts that were originally at

3    issue in this proceeding.  A small subset of that remains at

4    issue.  So the 76,000 loans that Dr. Snow calculated at --

5              THE COURT:  Time out.

6              MR. COSENZA:  Yeah.  Can we have a sidebar, Your

7    Honor?

8              THE COURT:  Yeah, I think -- this would be a good

9    time for a break.  So why don't we take a 10 minute break

10   and why don't we go into the conference room and see if I

11   can follow what you're talking about.  All right?  10

12   minutes, please.

13        (Recessed at 4:11 p.m.; reconvened at 4:30 p.m.)

14             THE COURT:  We're going to -- please, everyone have

15   a seat.  We're going to start up in a few minutes.  People

16   just need a few more minutes.

17        (Pause)

18   BY MS. BLACK:

19        Q    Dr. Snow, you had mentioned before some data that

20   you had seen in one of or several of Professor Fischel's

21   exhibits and let's get back to that.  So can you just

22   elaborate what you had seen or summarize for us and let's

23   put TRDX-305 on the screen.  Can you explain what it is that

24   you had seen in the data provided by Professor Fischel and

25   what did you do with that data?

1      A    So Professor Fischel had calculated historic losses

2    and estimated future losses on a universe of 415,000 plus

3    loans.  He estimated total lifetime losses to be roughly

4    21.1 billion.  From his backup materials, you're able -- we

5    were able to get the breakout between what was historic

6    losses and what was estimated future losses, with the

7    historic losses on these loans being a little over 19

8    billion and estimated future losses roughly one and a half

9    billion.

10      What we did was to do nothing more than take Professor

11    Fischel's analysis and subset it down to the loans for which

12    he had calculated historic and/or estimated future losses,

13    and where we had also calculated -- where I had calculated

14    the purchase price.  And that's what's in the last column.

15    So of the 415,000 loans, 15,000 plus were loans where I

16    calculated a purchase price.  These again are all non-

17    liquidated loans.  Of those non-liquidated loans, they have

18    suffered 770 million in historic losses according to Dr. --

19    to Professor Fischel, and were estimated to lose over 600

20    million in the future.

21      Q    And I'd just like to go through technically or

22    mechanically how you pulled those numbers out of Professor

23    Fischel's data and let's -- hopefully we can get through

24    this quickly.  Let's put TRX-580 on the screen.  Dr. Snow,

25    what is the spreadsheet that I've just put up on the screen?

Page 167

1        A    This spreadsheet is a spreadsheet that was part of

2    the backup materials for Professor Fischel's affirmative

3    report.

4        Q    And what does this -- what are the contents of this

5    spreadsheet?

6        A    The contents in the column A lists all of the

7    loans.  And if we highlight column A, we can see that there

8    are over 415,000 loans.  Column C details what Professor

9    Fischel has entitled realized loss.  For the liquidated

10    loans, this realized loss number is similar to the realized

11    loss number that I calculated in calculating the purchase

12    price of liquidated loans.  For a non-liquidated loan, that

13    is a loss that has been recognized potentially due to a

14    modification.

15        Q    And just so we are clear, so this spreadsheet

16    containing 415 -- data with respect to over 415,000 loans

17    includes both liquidated and non-liquidated loans?

18        A    Yes.  It includes -- if I remember correctly, you

19    know, roughly 65,000 non-liquidated loans and you know

20    350,000 liquidated loans.

21        Q    And so, again, the aggregate of the historical

22    losses on these 415,000 liquidated and non-liquidated loans

23    is how much?

24        A    Is 19.7 billion dollars.  And that's what was

25    presented in the table on the previous slide.

Page 168

1        Q     Thank you.  And, Your Honor, we have again a screen

2    capture of the spreadsheet in the (indiscernible) is TRDX-

3    307.  Now, in terms of the non-liquidated loans, what did

4    you do with the spreadsheet?

5        A     For the non-liquidated loans, I basically matched

6    the loan IDs that were within Professor Fischel's universe

7    of loans with those for which I had calculated a purchase

8    price.  So this would then subset this spreadsheet down to a

9    smaller set of loans.  So I want to be clear, I'm not doing

10   any calculation.  I'm just using Dr. -- or Professor

11   Fischel's numbers for loans that I have calculated a

12   purchase price for.

13       Q     And did you create that as a new document?

14       A     Yes, I did.

15       Q     Okay.  Can we have TRX-586, please?  And, Dr. Snow,

16   do you recognize this document and what do you recognize it

17   to be?

18       A     I recognize it to be -- well, this is the subset of

19   non-liquidated loans, not the liquidated ones.

20       Q     Correct.

21       A     Yes.  This is the subset of non-liquidated loans

22   for which I have calculated purchase price where Professor

23   Fischel had also estimated historic losses.

24       Q     And what is the aggregate of the historical losses

25   on this overlap between you and Professor Fischel of 50,000

Page 169

1    plus loans?

2        A    Okay.  If we highlight column C, you can see that's

3    772 million in historic losses.

4        Q    I apologize.  And again, Your Honor, we have a

5    screen capture of this in the (indiscernible) as TRDX-308.

6    Now, did every one of the non-liquidated loans at issue

7    suffer a historical loss?

8        A    No, as you can readily see in the spreadsheet

9    that's up, many of the lines are zero.

10       Q    And did you investigate why some of the non-

11   liquidated loans that are at issue in this proceeding have a

12   historical loss while others don't?

13       A    The ones that have a realized loss --

14           MR. COSENZA:  I mean, Your Honor, we just had it in

15   chambers.

16           THE COURT:  Yeah, I'm going to --

17           MR. COSENZA:  This is an entirely new --

18           THE COURT:  I'm going to sustain the -- this

19   objection.  So if you could move on to another question,

20   Ms. Black.  I don't think this is within the scope for an

21   appropriate extension of Dr. Snow's opinions.  Any

22   investigation that he did to explain the difference between

23   loans that had a realized loss and loans that did not.

24           MS. BLACK:  Okay.  Thanks.  So I will ask a

25   different question.

1          THE COURT:  Please.

2     BY MS. BLACK:

3          Q    Do you have an understanding of what the realized

4     loss with respect to those non-liquidated loans that do have

5     a realized or do have entry into realized loss

6     (indiscernible), do you have an understanding of what that

7     relates to?

8          A    Yes.  My understanding is that these are principal

9     modifications.

10         Q    Okay.  And now going back to TRDX-305, which is the

11    summary slide.  We have now covered the historical losses.

12    I would like to talk about the estimated future losses now

13    and how you went about extracting the $626 million number

14    from the larger $1.4 billion, can you explain that, please?

15         A    Sure.  So again, Dr. Fischel or Professor Fischel

16    produced a spreadsheet in his backup materials that had the

17    components or the output from the ADCO loan dynamics program

18    that forecasted the future losses of these loans.  He also

19    included computer code that described how to put those

20    components together to get the forecasted loss for each

21    loan.

22         So I took his spreadsheet and his code and put the two

23    together for the 15,629 (indiscernible).

24         Q    Okay.  And if we could put up TRX-591.  Dr. Snow,

25    is this the resulting spreadsheet that you created with the

Page 171

1    formula and the ADCO output?

2        A    Yes.

3        Q    And what -- go ahead.

4        A    So column A through J are taken directly from the

5    ADCO output that Dr. Fischel provided.  I have calculated

6    column X, which is per the formula that the computer code

7    said columns A through J should be combined together to get

8    the cumulative loss for each loan.

9            THE COURT:  Where did that computer code come from?

10           THE WITNESS:  From Dr. Fischel's backup material.

11           MR. COSENZA:  This is the same issue.  This is --

12   we never had a chance to cross-examine his opinion that's

13   subsequent to the issuance of his report.

14           THE COURT:  I thought all we were going to do was

15   filter the spreadsheet.  But now we're applying a new

16   operation --

17           MR. COSENZA:  Yes.

18           THE COURT:  -- to the spreadsheet that goes beyond

19   filtering.  So --

20           MR. SHUSTER:  Can we just have a moment?

21           THE COURT:  Yes.

22       (Pause)

23   BY MS. BLACK:

24       Q   Dr. Snow, after your deposition and after the

25   expert's (indiscernible) was concluded, you submitted a

Page 172

1    supplemental report, correct?

2        A    That is correct.

3        Q    Why?

4        A    I was asked by counsel to look into issues related

5    to accrued and unpaid interest.

6        Q    And do you have an understanding as to why you were

7    asked to look into issues related to accrued and unpaid

8    interest?

9        A    I do.  I understand there is a dispute about how

10   interest should be treated on this matter.  So I created

11   various breakouts of the interest component that was part of

12   either accrued and unpaid interest before liquidation

13   proceeds or after liquidation proceeds into various buckets

14   to allow the Court options on how to treat the interest

15   component.

16       Q    Can we have TRDX-285, please?  Can you walk us

17   through the summary of your opinions that you formed in

18   connection with your supplemental report?

19       A    Yes.  So first of all, that the purchase price, as

20   we talked about earlier, the interest -- the accrued, unpaid

21   interest that the borrower failed to pay is part of the

22   contractual purchase price definition that is listed in the

23   governing agreements.  I have broken out the interest rate

24   component, especially for liquidated loans.  I had already

25   done that for non-liquidated loans.  That was part of my

Page 173

1   affirmative report.  But for liquidated loans, I had broken

2   it out.  And I've also demonstrated that for the majority of

3   the liquidated loans at issue for which I've calculated a

4   purchase price, the purchase price doesn't contain any

5   accrued, unpaid interest.

6        In other words, the liquidation proceeds were

7   sufficient to retire the servicing advances, as well as the

8   accrued unpaid interest.

9        Q    If the Court were to determine that interest is an

10  impermissible component of the purchase price and removed it

11  from the purchase price, how would that affect the trusts

12  and investors?

13       A    That would be a loss to the trust and the

14  investors.  Those were cash flows that --

15            THE COURT:  Okay.  Hold on.  Hold on.  First of

16  all, I don't understand the question in terms of using the

17  word interest.  Second of all, I don't know that Dr. Snow

18  has been qualified as an expert to give a view as to how the

19  scenario that you described would affect the waterfall in

20  the trust.

21            So let's go back to the predicate question which is

22  when you say taking out interest, could you be more precise?

23  In other words, where -- the plan administrator has made a

24  claim in broad-brush that the claim of the trustee's

25  includes  -- impermissibly includes post-petition interest.

Page 174

```
 1              MR. COSENZA:  Yes.

 2              THE COURT:  Yes?

 3              MR. COSENZA:  That's correct, Your Honor.

 4              THE COURT:  Okay.

 5              MR. COSENZA:  Or unmatured interest.

 6              THE COURT:  Or unmatured interest?

 7              MR. COSENZA:  Yes.

 8              THE COURT:  Okay.  So I don't exactly know what

 9    that means.  But what you're saying through Dr. -- your

10    questions to Dr. Snow and Dr. Snow has confirmed, is that

11    the only interest that he's talking about is interest on

12    loans -- accrued interest on loans, right?

13              MS. BLACK:  The interest that is a component -- one

14    of the building blocks of the purchase price.

15              THE COURT:  Of the purchase price.  Okay.  So --

16              MR. SHUSTER:  I have a different suggestion.  My

17    suggestion is we break until --

18              THE COURT:  Tomorrow?

19              MR. SHUSTER:  Because it's a new topic and -- yeah,

20    that we --

21              THE COURT:  Okay.

22              MR. SHUSTER:  -- since we're only going for less

23    than another 15 minutes.

24              THE COURT:  Okay.  Let's go -- just if you look --

25    Ms. Black if you go -- my stumbling block before anybody
```

Page 175

```
 1    else spoke was in your question, you referred to interest.

 2    And to me, there was just an ambiguity in that question.  So

 3    that's what I would leave you with.  And then you can decide

 4    where you want to go tomorrow.

 5             MR. COSENZA:  And, Your Honor, just to be clear.

 6             THE COURT:  Yeah.

 7             MR. COSENZA:  Sorry.  To be clear on the record,

 8    the question that elicited my objection beyond ambiguity was

 9    this new opinion --

10             THE COURT:  About the effects.

11             MR. COSENZA:  -- of talking about the interest of

12    the trust, and certificate holders, and that was a new

13    opinion.

14             THE COURT:  I mean --

15             MR. COSENZA:  He is a calculator on the issue on

16    interest.  And to go give legal opinions or opinions about

17    certificate holders and the like is --

18             THE COURT:  I think that it's -- I think that Dr.

19    Snow testified this morning or early this afternoon, rather,

20    to his understanding of how cash flows work and how proceeds

21    are applied in terms of a waterfall within the trust.  So he

22    clearly has an understanding as to that.

23             To the extent that this was going to seek anything

24    more along the lines of a legal opinion, that's obviously

25    not something that he's qualified to give us.
```

Page 176

1          MR. COSENZA:  Thank you, Your Honor.

2          MS. BLACK:  That was not -- it was on the same

3     lines.

4          THE COURT:  I understand.  Okay.  So it's been a

5     long day.  It's 10 to 5:00.  We'll call it a day.  I'm going

6     to have my 9:30 people in a different courtroom, so you can

7     leave all of your stuff where it is and then we'll resume at

8     10:30 tomorrow.  Dr. Snow, same rules apply overnight.  All

9     right?  Thank you very much.

10         (Chorus of thank you)

11         (Whereupon, these proceedings were concluded at 4:51

12     p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 177

```
 1                          I N D E X

 2                        T E S T I M O N Y

 3   DEBTOR'S

 4   WITNESS                EXAM BY                    PAGE

 5   J.F. Morrow            Mr. Rollin                   6

 6

 7   Karl N. Snow           Ms. Black                   81

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 178

1                    C E R T I F I C A T I O N

2

3        We, Sherri L. Breach and Jamie Gallagher, certify that

4    the foregoing transcript is a true and accurate record of

5    the proceedings.

6    Sherri L         Digitally signed by Sherri L Breach
                       DN: cn=Sherri L Breach, o, ou,
                       email=digital1@veritext.com,
7    Breach            c=US
                       Date: 2018.01.11 12:29:51 -05'00'

8    Sherri L. Breach

9    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10
     Jamie             Digitally signed by Jamie
                       Gallagher
11                     DN: cn=Jamie Gallagher, o, ou,
     Gallagher         email=digital1@veritext.com,
                       c=US
12                     Date: 2018.01.11 12:30:33 -05'00'

13   Jamie Gallagher

14   Certified Electronic Transcriber

15

16

17   Date:  January 11, 2018

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501