Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS INC.,   Case No. 08-13555-scc

7              Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                       United States Bankruptcy Court

11                       One Bowling Green

12                       New York, New York 10004-1408

13

14                       January 11, 2018

15                       10:07 AM

16

17

18

19

20

21

22

23   B E F O R E:

24   HON. SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

1    IN RE:   RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Dawn South and Sherri L. Breach

1   A P P E A R A N C E S :

2   WILKIE FARR & GALLAGHER LLP

3        Attorneys for the Plan Administrator

4        787 Seventh Avenue

5        New York, NY 10019-6099

6

7   BY:  TODD G. COSENZA, ESQ.

8        BENJAMIN P. MCCALLEN, ESQ.

9        JONATHAN D. WAISNOR, ESQ.

10

11  HOLWELL SHUSTER & GOLDBERG LLP

12        Attorneys for the Trustees

13        750 Seventh Avenue, 26th Floor

14        New York, NY 10019

15

16  BY:  EILEEN MONAGHAN DELUCIA, ESQ.

17        DORIT UNGAR BLACK, ESQ.

18

19

20

21

22

23

24

25

08-13555-mg   Doc 57991   Filed 04/19/18   Entered 04/27/18 11:32:28   Main Document

```
 1                    P R O C E E D I N G S

 2            THE COURT:  everyone here that you need?

 3            MR. MCCALLEN:  Yes, thank you --

 4            THE COURT:  Okay.

 5            MR. MCCALLEN:  -- for Your Honor's intervention.

 6            THE COURT:  You're very welcome.  Any time.

 7            All right, please have a seat.  I'm ready when you

 8   are.

 9            MS. BLACK:  Your Honor --

10            THE COURT:  Yes.

11            MS. BLACK:  -- the trustees would like to call

12   Dr. Richard Ellson.

13            THE COURT:  Yes.  Dr. Ellson, please come up.

14            MS. BLACK:  May I approach --

15            THE COURT:  Yes.

16            MS. BLACK:  -- I have a few binders.

17            THE COURT:  Good morning.  How are you?

18            DR. ELLSON:  I'm fine, thank you.

19            THE COURT:  If you would step up and raise your

20   right hand, please.

21            DR. RICHARD WAYNE ELLSON, WITNESS, SWORN

22            THE COURT:  Very good.  Have a seat, make yourself

23   comfortable.  You have some water.  And if you would like a

24   break at any time let us know, you do not have to wait for

25   the lawyers to ask for one.
```

Page 5

```
 1              THE WITNESS:  And I appreciate that.

 2              THE COURT:  All right?

 3              MR. SHUSTER:  Thank you, Your Honor.

 4              THE COURT:  Thank you.  Okay, Ms. Black.

 5                       DIRECT EXAMINATION

 6   BY MS. BLACK:

 7   Q    Good morning, Dr. Ellson.  Would you please introduce

 8   yourself to the Court.

 9   A    Yes, my name is Richard Wayne Ellson.

10   Q    Where do you currently work?

11   A    I currently work as the principal of Ellson Consulting,

12   it's a consulting company that I formed in February of 2016,

13   and it focuses primarily on residential mortgage loans and

14   residential mortgage-back securities.

15   Q    Thank you.  I'd like to talk to you a little bit about

16   your background.  You have an exhibit binder in front of you

17   that I may refer to during the course of your direct.  For

18   now I would like to refer you to the document behind the tab

19   labelled TRX-641.  Let me know when you're there.

20   A    Yes.  I see it.

21   Q    What is this document, Dr. Ellson?

22   A    That is my resume.

23   Q    And is your professional experience and background

24   accurately summarized in the resume that is attached as

25   Appendix A to your affirmative expert report?
```

Page 6

1    A    Yes, it is.

2    Q    Okay.  In the interest of time I will focus on a few

3    key areas of your background starting with your educational

4    record.

5         MS. BLACK:  Can we please have TRDX-320.

6    BY MS. BLACK:

7    Q    Dr. Ellson, can you please walk us through your

8    academic background.

9    A    Yes.  In 1973 I earned a BA degree from Bucknell

10   University, I double majored in economics and international

11   relations.  I went to graduate school at the University of

12   Florida where I earned a master's degree in economics in

13   1975 and a Ph.D. degree in 1977.

14   Q    And what were you primary fields of study?

15   A    My primary fields were urban and regional economics,

16   which obviously assesses urban areas, housing markets, and

17   differentials between regional economies.  And another field

18   was econometrics, which is statistical modeling.

19   Q    And does any of your educational background bear upon

20   the opinions that you are offering in this matter?

21   A    Very much so, of the urban and regional field as well

22   econometrics both bear.

23   Q    Now, I understand that you lay out your professional

24   accomplishments in your resume.  I would like you to provide

25   a brief walk through of your career in academia as well as

Page 7

1    in the private sector.  Let's start with your economic

2    appointments.

3            MS. BLACK:  If we could have TRDX-321, please.

4    BY MS. BLACK:

5    Q    Can you please walk us through your academic

6    appointments.  Where did you teach and what did you lecture?

7    A    Okay.  In 1979 I was offered a position at the

8    University of South Carolina, it was a joint appointment

9    with the Division of Research in the College of Business

10   Administration and the Economics' Department.

11       In the Division of Research I was asked to develop a

12   forecast -- an economic forecasting model for the State of

13   South Carolina, and also my responsibilities included grant

14   research, which I also did, and the grants included one from

15   the National Science Foundation.

16       In the Economics' Department I taught both

17   undergraduate and graduate classes.  I also published in

18   journals, top economic academic journals, and as a result of

19   these efforts I was promoted to associate director in the

20   Division of Research and associate professor in the

21   Economics' Department with tenure.

22   Q    Thank you.  And what about the second academic

23   appointment?

24   A    In August of 2016 I was named an adjunct professor at

25   North Carolina State University.  I teach in the master's

Page 8

1    program in financial mathematics.  The course I teach is

2    bond markets and portfolio analysis.  And I'm on the

3    executive board of that particular program as well.

4    Q    Thank you.  And does any of your work as an academic

5    bear upon the opinions that you are offering in this matter?

6    A    Yes, very much so.  Again, it relates to housing

7    markets and buy markets, both of which are very important in

8    this context.

9              THE COURT:  Dr. Ellson, can I ask you to keep your

10   voice up a bit?  Perhaps pull the microphone towards you a

11   little more.

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  Thank you.

14             THE WITNESS:  Yes, Your Honor.

15   BY MS. BLACK:

16   Q    Okay.  Moving onto your professional experience in the

17   private sector.

18             MS. BLACK:  Can we please have TRDX-322.

19   BY MS. BLACK:

20   Q    When did your professional career in the private sector

21   begin, and in general terms what were the areas of your

22   professional experience?

23   A    Well it began in 1987, but I have very broad-based

24   experience that extended over, you know, approximately 30

25   years.  I worked both on the broker dealer side of the

Page 9

1    business or what's known as the sale side.  I've worked on

2    -- for banks and money managers and insurance company, which

3    is known as the buy side.  I did research, I did modeling, I

4    managed research, I traded, and I did portfolio management.

5    So my experience is very broad-based.

6    Q    Okay.  I would like you to walk us through your

7    experience in research trading as well as structured finance

8    in a little more detail.

9         MS. BLACK:  Can we please have TRDX-323.

10   BY MS. BLACK:

11   Q    Can you tell us, Dr. Ellson, about your experience --

12   professional experience in those areas?

13   A    Yes.  In the research side I managed asset-back and

14   mortgage-back securities research at two firms.

15        At CS First Boston I had a staff of 20 people, my group

16   is responsible for all modeling, analytics, and databases

17   that were used by the traders and the sales people.  I also

18   had a group that did market research.  This was a global

19   position, I was the global head of mortgage and asset-back

20   research.  I had a comparable position at UBS.

21        In terms of trading and portfolio management I had

22   three senior trading positions.  I was the head of the

23   trading desk at Hartford Investment Management Company,

24   which is a subsidiary of Hartford Insurance, I actively

25   traded securities, I managed the desk, all sectors of the

1    desk with the exception of high yield and money markets.

2    That would include corporates, treasuries, mortgage-back

3    securities, asset-back securities, commercial mortgage-back

4    securities, and so forth.

5         My third primary position was as the senior portfolio

6    manager for the residential loan portfolio at Washington

7    Mutual, that was a $90 billion portfolio.  I managed that

8    portfolio, I bought (indiscernible - 7:47) into that

9    portfolio, I sold non-performing loans from the portfolio,

10   and I also traded there as well.  I traded what's known as

11   mezzanine securities, which are securities not rated triple

12   A.  They -- the ratings on those securities go from double A

13   down to triple B, where triple B is the lowest investment

14   grade rating on the market.

15        In terms of structured finance I worked on a number of

16   different projects, primarily internationally.  I worked at

17   HypoVereinsbank, which is a German bank.  I did some

18   transactions there.  For example, we did a balance sheet

19   transaction for the bank as well as taking US domestic

20   assets and converting them from dollar to Euro and from

21   fixed rate to floating rate.

22        At Bear Stearns I also was involved in the first fixed

23   rate mortgage-back security transaction in the UK.

24   Q    Thank you.  Now, I'd like to focus on your background

25   in product and model development.

Page 11

1            MS. BLACK:  If we could have TRDX-324, please.

2     BY MS. BLACK:

3     Q    Can you please walk us through your background in those

4     areas.

5     A    Yes.  My career started at Bear Stearns and I was hired

6     to develop and maintain and upgrade prepayment models.  I

7     did the modeling.  Prepayment models are very important for

8     the valuation of mortgage-back securities.  Obviously each

9     month the borrower has multiple options, they can pay their

10    principal and interest, they could prepay.  For example,

11    they could refinance their mortgage in which the loan would

12    be terminated, or they could sell their home, again, the

13    loan could be terminated.  Prepayment modeling tries to get

14    at that timing in which prepayments would occur.  It's very

15    critical as I said for the valuation of mortgage-back

16    securities.  In that context I also met frequently with

17    clients given that importance.

18         At Donaldson, Lufkin & Jenrette I was the senior vice

19    president there.  I did prepayment modeling there as well.

20    I also got involved in portfolio strategies and again had

21    client contacts domestically and internationally.

22         At Credit Suisse First Boston as I mentioned I was the

23    global head of mortgage and asset-back research.  This was a

24    management role.  I moved from being the modeler to managing

25    the modeling process as well as the development of other

1    analytics.  Again, I oversaw a staff of 20 people in that

2    role.

3         And then at UBS is a very similar situation as Credit

4    Suisse First Boston, a smaller scale, but it's still

5    managing the research group and developing the valuation

6    models for mortgage-back securities.

7         And my last position was at Andrew Davidson & Co., I

8    was the head of a group called enhanced solutions group.

9    Within that group we did consulting work as well as new

10   product development, and LoanKinetics falls into the

11   category of new product development.  And I was the product

12   manager for LoanKinetics.

13   Q    Thank you.  And do I understand you correctly that

14   earlier in your career when you were at Bear Stearns and DLJ

15   you were a modeler whereas later in your career in your

16   positions at Credit Suisse, UBS, and  ADCO you oversaw

17   modeling in more of a supervisory or management role?

18   A    That's correct.

19   Q    Okay.  I'd like to focus now on your role at ADCO and

20   specifically with respect to LoanKinetics.

21           MS. BLACK:  Can we please have TRDX-325.

22   BY MS. BLACK:

23   Q    Can you tell us about it?

24   A    Yes.  I was the product manager for LoanKinetics.  As

25   -- in 2012 I was asked by Andy Davidson, the president of

Page 13

1    Andrew Davidson & Co., to investigate to see whether there

2    are market opportunities for our company in the area of

3    residential mortgage loans.  I met with clients, I met with

4    potential clients, I met with people at conferences and did

5    conference calls, and I identified opportunities or

6    applications that I felt would be of potential value to the

7    company.

8        As a result I wrote up a proposal for this project.

9    The proposal was accepted by the management committee.  When

10   that was done I wrote up a business plan, an explicit

11   business plan for the development of LoanKinetics.  That

12   plan defined what needed to get done, what resources needed

13   to be allocated, and how much time I thought it should take

14   at the time.

15       Again, ADCO was a very -- you know, it was a small

16   firm, it only had 20 people, you know, all of us worked on

17   multiple projects.  And so resource allocation was always a

18   serious issue and it was very important that I collaborate

19   with the heads of the other groups, including programming,

20   model development, and financial engineering.

21       So I was responsible for all the elements of

22   LoanKinetics from its inception, to its development, to its

23   testing, to its validation, and to its marketing.  I put

24   together the marketing material for LoanKinetics, I met with

25   -- I made over 50 presentations on LoanKinetics.  And when I

Page 14

1   left ADCO it was a successful product.  We had five clients,

2   one of whom was one of the 20 largest banks in the U.S.

3       The critical factor for LoanKinetics is the integration

4   of key ADCO models into this system, and those models

5   included LoanDynamix, which is a mortgage credit model, and

6   credit option adjusted spread, which is a valuation model.

7   Q    And were you involved in the development of those

8   models that are intergraded into LoanKinetics?

9   A    No, they were done before I joined ADCO.  So

10  LoanDynamix and credit option adjusted spread models were

11  done prior to my joining ADCO in 2009.

12  Q    So they were already used and in existence?

13  A    They were already used and in existence, yes.

14  Q    And did you -- in case I missed it I apologize.  When

15  did you join ADCO, what year?

16  A    I joined in 2009.

17  Q    2009.  And prior to joining ADCO in any of your

18  previous positions at the various institutions and firms

19  that we just saw on the previous slides did you have the

20  opportunity to work with any of the ADCO proprietary models

21  that you just mentioned?

22  A    Well I used the prepayment model when I was head of

23  research at UBS.  That was a temporary solution.  But I knew

24  the people at ADCO for many years.  I've known Andy Davidson

25  since 1990, and so I was very familiar with ADCO and its

Page 15

1    analytics.

2        When I was the credit trader at Vectors Research

3    Management, which is my -- another senior trading position,

4    I traded all securities that were again below triple A and I

5    used the credit model every day, the LoanDynamix model.  I

6    started in that trading position in August of 2007,

7    LoanDynamix was developed in 2006.

8    Q    So would it be fair to say that you had deep

9    familiarity with LoanDynamix prior to joining ADCO?

10   A    Very deep.  Again, I used it every day.

11   Q    Are you aware that another expert in this case, the

12   plan administrator's expert, Professor Fischel, using

13   LoanDynamix in the context of estimating future losses on

14   the non-liquidated loans that you valued?

15   A    Yes, I am aware of that.

16   Q    And does Professor Fischel use LoanDynamix for a

17   different purpose than the purpose for which you used it in

18   the context of LoanKinetics in valuing the loans?

19   A    No, it's the exactly the same thing.  You're

20   forecasting cash flows, and by cash flows I mean principal

21   and interest payments, prepayments, voluntary prepayments

22   again would be refinancing and home sales, or involuntary

23   prepayments, which would be a default, and if there's a

24   default whether there's a loss associated with that default.

25       So Dr. Fischel and I were doing exactly the same thing

Page 16

1    with LoanDynamix.

2    Q    When did you -- what year did you leave ADCO?

3    A    I left ADCO September 30th, 2015.

4    Q    And why did you leave the company?

5    A    Well first of all LoanKinetics had been successfully

6    launched, my children were grown up, and I wanted to semi-

7    retire, I'd been in the business for 28 years, as we all

8    know it's a very high-stress business, and I wanted to semi-

9    retire and move on and do other things.

10   Q    And shortly after you retired from ADCO you formed your

11   consulting company and assumed your teaching position at

12   North Carolina University?

13   A    North Carolina State, yes, the next year.  In February

14   for the company and August I began teaching.

15   Q    Dr. Ellson, were you approached by any other party in

16   this proceeding to function as a potential testifying

17   expert?

18   A    Yes, I was approached by Compass Lexecon, the

19   individual is Dr. Gerry Lumer.

20   Q    And can you tell us about that?

21   A    Yes.  At the end of the summer of 2016 I was contacted

22   by Dr. Lumer to value or provide an estimated value for

23   20,000 -- approximately 20,000 legacy loans.  Legacy loans

24   being loans that were originated prior to the financial

25   crisis, meaning predominantly prior to 2008.

Page 17

1            THE COURT:  Yes, Mr. McCallen?

2            MR. MCCALLEN:  I have several objections to this

3    line of questioning and the answers.

4            THE COURT:  Okay.

5            MR. MCCALLEN:  First of all this is eliciting

6    hearsay, this is -- he's basically repeating statements he

7    received from Dr. Lumer.  In effect I can see --

8            THE COURT:  Okay.  But not it being offered for

9    the truth, right?

10           MR. MCCALLEN:  Okay.

11           THE COURT:  Okay?

12           MR. MCCALLEN:  And beyond that, Your Honor, I

13   think what they're trying to do here is ultimately get at

14   what would be our legal strategy.  And so it --

15           THE COURT:  Okay.  You're going to have to help me

16   out and you're going to also have to tell me whether or not

17   we need to excuse Dr. Ellson for this purpose.  Because I

18   hear the words but I don't know what the significance is,

19   those names are meaningless to me.  So you might have told

20   me in openings or previously, but I don't know.  So if this

21   is a larger conversation you need to tell me.

22           MR. COSENZA:  Your Honor, I don't mean to -- I

23   don't have two people speaking at the same time, but I think

24   if we just had a one-minute side bar.  I don't want to -- we

25   want things to go quickly here.

Page 18

```
 1              THE COURT:  Okay.

 2              MR. COSENZA:  I think we can just -- we can keep

 3    Dr. Ellson here, I think that probably is the best course of

 4    action.

 5              THE COURT:  Okay.  Come on up.

 6              MR. COSENZA:  Sure.

 7         (At sidebar off the record.)

 8              THE COURT:  Okay, Ms. Black, you can keep going,

 9    please.

10              MS. BLACK:  Okay.

11    BY MS. BLACK:

12    Q    Can you tell us about the conversations that you had

13    with respect to a potential retention and as to which

14    Dr. Lumer contacted you?

15    A    Yes.  Again, this is the end of the summer, August and

16    September of 2016, I was asked if I was interested in being

17    retained to assess the value of approximately 20,000 legacy

18    loans.  Again, legacy loans are those that were originated

19    before the financial crisis.  I informed him that I'd be

20    loaning LoanKinetics to value these loans.  I was in

21    discussions with Andrew Davidson & Co. or ADCO to insure

22    that there was no conflict of interest in that -- using that

23    model.  And then shortly thereafter we were told to stand

24    down -- or I was told to stand down, that there would not be

25    any need for valuing these loans.
```

1         On March 30th of 2017 I was again contacted by

2    Dr. Lumer for doing exactly the same thing, to be a

3    testifying witness to support the accuracy and reliability

4    of LoanKinetics and to value approximately 20,000 loans

5    using LoanKinetics.

6         By this time I had been contacted by the trustees.  And

7    when Dr. Lumer contacted me at the end of the month I was in

8    the process of signing an engagement letter with the

9    trustees.

10        But the roles were exactly the same.  To be a

11   testifying witness as to the accuracy and reliability of

12   LoanKinetics and to value the pool of non-liquidated loans.

13   Q    Thank you, Dr. Ellson.

14            MS. BLACK:  Your Honor, I would like at this point

15   to tender Dr. Ellson as an expert on the valuation of the

16   non-liquidated loans at issue in this matter using the

17   LoanKinetics software.

18            THE COURT:  Okay, Mr. McCallen?

19            MR. MCCALLEN:  Your Honor, the plan administrator

20   objects, but in light of, you know, Your Honor's comments

21   about the unique nature of this case and given the fact that

22   we don't have all procedures available here under Exhibit G

23   for motions in limine, Daubert motions, et cetera, what we

24   would propose, Your Honor, is that our objection be

25   preserved and the trustees be able to continue with the

Page 20

1    examination and I'll cross-examine Dr. Ellson and Your Honor

2    can take the testimony for whatever you think is

3    appropriate.

4              THE COURT:  Okay.  Any objection to that way of

5    proceeding, Ms. Black?

6              MS. BLACK:  Well I believe that the other side,

7    the plan administrator had the opportunity to seek to

8    exclude Dr. Ellson prior to this proceeding, they did not do

9    so, they launched pretty heavy allegations with respect to

10   Dr. Ellson's qualifications in their pretrial brief.  I'm

11   not sure why we're hearing about this for the first time

12   today.

13             THE COURT:  I don't believe that there was any

14   requirement that there be motions in limine or motions to

15   preclude.  So we are where we are.  If the plan

16   administrator wanted to voir dire Dr. Ellson and seek to

17   object in his qualification they would be permitted to do

18   that.

19             I think it's far more sensible in light of the low

20   probability that I would grant such a motion that the

21   objection be stated, carried, and we just continue to

22   proceed, and I will give the testimony the weight that I

23   believe it deserves.  All right?

24             MS. BLACK:  Thank you, Your Honor.

25             MR. MCCALLEN:  Thank you, Your Honor.

Page 21

1    BY MS. BLACK:

2    Q    Dr. Ellson, I understand you submitted two reports in

3    this matter.  For the affirmative report I would like to

4    refer you to the exhibit binder and specifically the

5    documents labelled TRX-640 through 645.  Can you please take

6    a look and confirm that this is your affirmative report and

7    the appendices and exhibits thereto.

8    A    I can confirm that.

9    Q    Thank you.  And now with respect to your reply report

10   can you please look at TRX-646 through 648 and confirm

11   whether this is the reply report you submitted in this

12   matter, including the appendices thereto.

13   A    That is my reply report.

14   Q    Thank you.

15        MS. BLACK:  Now, can we have TRDX-326, please.

16   BY MS. BLACK:

17   Q    I would like to talk to you about the nature of your

18   engagement.  Can you tell us about what your expert mandate

19   in this matter was?

20   A    My mandate is to provide an estimated market value for

21   15,739 non-liquidated loans.  Again, these are legacy loans

22   originated prior to the financial crisis.

23   Q    Thank you.

24   A    Using LoanKinetics.

25   Q    Thank you.

Page 22

1         MS. BLACK:  Moving onto the next slide, TRDX-327,

2    please.

3    BY MS. BLACK:

4    Q    Why is it necessary to use modeling to establish a fair

5    market value for the non-liquidated loans that are at issue

6    here?

7    A    Because there's no active market for these loans and

8    there's no pricing available on these loans.  I mean this is

9    a very simple diagram, but it shows various markets in the

10   financial world, the commodity markets, there is an active

11   market, there are posted prices, obviously the stock market

12   the same thing holds.  And in the residential mortgage-back

13   securities market there is an active market both for legacy

14   residential mortgage-back securities as well as current

15   securitizations.  No such thing exists for legacy loans.

16   Q    Was there ever a market for legacy loans?

17   A    Yes, at the time the loans were originated.

18   Q    So prior to the financial crisis?

19   A    As they originated there was a market for those loans.

20   Q    And I understand that there is an accounting rule that

21   goes to this issue.  Can you please elaborate on that.

22   A    Yes, it's a very important rule that was issued in 2008

23   by the Financial Accounting Standards Board known as FASB,

24   and the rule is FASB 157.

25         Now, regulated institutions are required to value their

Page 23

1    assets, all of them, and the problem arises is when there's

2    no market for some of these assets and hence no market

3    price.  So FASB came up with three levels of pricing.

4        Level one pricing would be similar to what we have in

5    the commodities stock market and so forth.  Prices are

6    known, markets are active, and you know, the prices could be

7    utilized on that basis.

8        Level two pricing is when there's some comparable

9    assets in the market and that could be supplemented by some

10   model analysis.

11       Level three pricing is required when there's no market

12   and no pricing, and it requires the use of models in order

13   to estimate the market value of those assets for which

14   there's no market and no pricing.  LoanKinetics fulfills

15   those requirements.

16   Q    Thank you.  And when did the Financial Accounting

17   Standards Board promulgate FASB 157?

18   A    Again, this was done in 2008.

19   Q    So was this done in conjunction with the financial

20   crisis?

21   A    Absolutely.  Yeah, many markets deteriorated during the

22   crisis and this is just one of them.

23   Q    Thank you.

24             MS. BLACK:  Can we have TRDX-328, please.

25   BY MS. BLACK:

1    Q    Now, in very simple terms can you explain how you used

2    modeling to value the non-liquidated loans that are at issue

3    in this matter?

4    A    Well fundamentally they're two steps.  The first step

5    is to generate the cash flows, and by cash flows I mean they

6    give principal and interest payments, any prepayments, any

7    defaults, and any losses of principal associated with those

8    defaults.  That's step one.

9         Step two is to value those cash flows, and that's using

10   proprietary ADCO model called credit option adjusted spread.

11        Now, these two steps might seem very simple,

12   intuitively they are, but you have to understand that we're

13   looking at cash flows monthly to the final maturity of the

14   loan for 15,739 loans, it's a very complex process and

15   requires, you know, literally thousands of lines of code in

16   order to do these steps.

17   Q    And just so we are clear, is that done, this process,

18   is it being conducted on a loan level basis?

19   A    Absolutely.  Every loan has -- cash flows are generated

20   for every loan and there's a value or price assigned to

21   every loan.

22   Q    And not to oversimplify, but essentially in the first

23   step you predict how this loan is going to do in the future,

24   in the second step you put a price tag on these cash flows?

25   A    That's correct.

Page 25

1    Q     Thank you.

2              MS. BLACK:   Can we have TRDX-329, please.

3    BY MS. BLACK:

4    Q    I would like you to now explain very briefly again what

5    LoanKinetics is and what it does?

6    A    Well it's a multi-functional -- listed here multi-

7    functional residential for a loan application.  What that

8    means is that LoanKinetics has four primary functions.  It

9    assesses again a mortgage credit, it provides valuation, two

10   other functions are regulatory accounting, which is, you

11   know, creating financial statements, and the fourth function

12   is stress testing, which comes out of the Dodd-Frank

13   legislation as required by the Federal Reserve.

14       LoanKinetics is not a model, it calls models, it

15   communicated with models, if you will, and the two primary

16   models are the LoanDynamix model and the valuation model.

17       In these two steps obviously you can see the

18   performance of the loan over time and you can also, you

19   know, value those cash flows.

20   Q    Thank you.  Now --

21             THE COURT:   When you say you can -- excuse me.

22             MS. BLACK:   Go ahead.

23             THE COURT:   When you say you can see the

24   performance of the loan over time do you mean you can see a

25   prediction for the performance of the loan over time?

1           THE WITNESS:  Yes, Your Honor, that's very true.

2      We're forecasting cash flows.

3           THE COURT:  You're forecasting.

4           THE WITNESS:  Yes, Your Honor.

5           THE COURT:  Okay.  Thank you.

6           MS. BLACK:  Can we please have TRDX-330.

7      BY MS. BLACK:

8      Q    You mentioned the applications of LoanKinetics and I

9      just want to -- and I think you mentioned these four

10     applications -- I just want to make sure that we understand

11     what applications mean.  What -- can you explain?

12     A    Yeah.  They're the four functions of LoanKinetics.

13     Again, one is credit performance of the loan, the forecasted

14     credit performance of the loan.  The second is the valuation

15     of those forecasted cash flows.  And then the other two

16     functions are regulatory accounting and stress testing.

17     Those two functions are not used in this particular project.

18     Q    And again so we're clear, so functions means the

19     purposes for which LoanKinetics can be used?

20     A    That's correct.

21     Q    Thank you.

22          MS. BLACK:  Moving onto TRDX-331.

23     BY MS. BLACK:

24     Q    Dr. Ellson, can you please walk us through this diagram

25     and the individual components that are intergraded into

Page 27

1    LoanKinetics.

2    A    Yes.  Again, the step one, step two sound, you know,

3    very simplistic.  This indicates very well the complexity of

4    LoanKinetics.

5        If you look at the upper left-hand corner we start out

6    with information on each loan.  That information is as many

7    as 55 inputs on each loan, and there are loan

8    characteristics, borrower characteristics, and property

9    characteristics.  Loan characteristics would be things like

10   what the mortgage rate is, whether it's a fixed rate or

11   adjustable rate mortgage, what the balance is, and most

12   importantly what the loan to value ratio is, and the loan to

13   value ratio is defined by the amount of the loan divided by

14   the value of the property, and this is one of the strongest

15   indicators of default and potential loss.

16       For example, if the loan to value ratio is 50 percent

17   that means the homeowner has 50 percent equity.  If the

18   homeowner has LTD of 90 percent the homeowner has 10 percent

19   equity.  Clearly in the event of a default the latter loan

20   has considerably more risk.

21       These 55 inputs --

22           THE COURT:  Before you move on --

23           THE WITNESS:  Yes.

24           THE COURT:  -- okay?  Because I don't like things

25   simplified, I like to really understand them, okay?

Page 28

```
 1                THE WITNESS:  Yes, Your Honor.

 2                THE COURT:  So these are inputs going into ADCO.

 3                THE WITNESS:  Going into the LoanDynamix model.

 4                THE COURT:  Go into the LoanDynamix model --

 5                THE WITNESS:  Yes, Your Honor.

 6                THE COURT:  -- that's going to be used by

 7      LoanKinetics.

 8                THE WITNESS:  It --  LoanKinetics will call the

 9      mortgage credit (indiscernible - 36:26).

10                THE COURT:  Okay.  And so these inputs include the

11      loan to value you just said, right?

12                THE WITNESS:  Yes, Your Honor.

13                THE COURT:  How does that work?  Where is that

14      piece of information that LoanKinetics is grabbing from the

15      servicer information?

16                THE WITNESS:  Okay.  Well that piece of

17      information is done at origination, that's the original loan

18      to value.

19                THE COURT:  It's the original -- so that's the --

20      go ahead.

21                THE WITNESS:  I'm sorry, Your Honor.

22                THE COURT:  No.  So is it the original loan to

23      value?

24                THE WITNESS:  No, the original loan to value ratio

25      is updated monthly.
```

Page 29

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  Obviously housing prices come into

 3     play here.

 4              THE COURT:  Yes.

 5              THE WITNESS:  The value of the -- and the loan

 6     amortizes.  So yes, that loan to value ratio will vary over

 7     time depending on those factors.

 8              THE COURT:  And the servicer is the entity or

 9     person that updates the loan to value ratio as the loan goes

10     through its life?

11              THE WITNESS:  No, we would update it, but we would

12     update it according to housing prices that have occurred and

13     the servicer would provide the outstanding balance of the

14     loan.  ADCO would determine the value of the property as it

15     evolves.

16              THE COURT:  And how would it do that?

17              THE WITNESS:  It has the housing price forecasting

18     model.

19              THE COURT:  Okay.  Go ahead, Ms. Black.

20     BY MS. BLACK:

21     Q    Okay.  Can you continue, please, with I think you were

22     talking about the influence that go into loans and that

23     would be borrow, property, and loan specific inputs that go

24     into LoanDynamix.

25     A    Yeah, that's correct.  So there are 55 inputs of --
```

1    characteristics of the loan, there are also market inputs,

2    and those market inputs include housing prices and interest

3    rates.

4    Q    And is that what we see at the bottom in the green box

5    where it says macroeconomic assumptions?

6    A    That's correct. And the red box it's ADCO's housing

7    price model, and next to that is ADCO's term structure

8    model, which is a forecasted interest rates.

9    Q    And so are these ADCO proprietary models?

10    A    Yes, they are.

11    Q    Essentially everything that we see in the diagram in

12    red are ADCO proprietary models?

13    A    That's correct.

14    Q    Okay. And let's focus for a little bit on the housing

15    price model that you just mentioned. Where does ADCO take

16    the data from that feeds into the housing price model?

17    A    It's taken from data provided by the Federal Housing

18    Authority, that's the regulator for Fannie Mae and Freddie

19    Mac. They provide quarterly data, housing price data for

20    every MSA in the country, and MSA is the metropolitan

21    statistical area, and there are approximately 294 -- about

22    290 of these MSAs in the country.

23       This is extremely important because again housing

24    markets are local, and so you want to get down -- you drill

25    down as much as possible to get at the local housing market.

Page 31

1    The MSA level is the best that's available.

2         To give you an example during the financial crisis

3    housing prices declined 25 percent approximately nationally,

4    they declined 60 percent in Phoenix, they declined 60

5    percent in Las Vegas, and similar declines were exhibited in

6    parts of California and Florida.  Alternatively in Dallas,

7    Texas, for example, the price declines were less than 10

8    percent.

9         So again, it's very, very important to use as much

10   local data as you can to determine the loan to value ratio.

11   Q    And have housing prices recovered in all of the

12   metropolitan statistical areas that LoanKinetics -- or sorry

13   -- that LoanDynamix takes into account?

14   A    Not every one, no.  Again, work has been done by the

15   FHFA, which indicates that there's definitely some markets

16   that are still quote/unquote under water.

17   Q    And let's assume that once the loans that you valued,

18   one for 15,739 non-liquidated loans is located in Phoenix,

19   Arizona, what would LoanKinetics via the housing price model

20   take into account for that particular loan?

21   A    Well again it would -- it'd take into account the loan

22   characteristics, but it would also take into account the

23   housing price forecast for Phoenix.

24   Q    And not nationwide?

25   A    Not nationwide, definitely not.  The nationwide numbers

Page 32

1    have no relevance to this project.

2    Q    If a user of LoanKinetics disagrees with the

3    macroeconomic assumptions that are being provided by the

4    housing price model and the interest rate model, which is

5    titled term structure model, what are -- what options does

6    the user have?

7    A    A user has the option to change those forecasts.

8    Q    And did you change those macroeconomic forecasts for

9    purposes of your analysis?

10   A    No, I did not.  I used the default ADCO forecasts and

11   my understanding is Dr. Fischel did the same thing.

12   Q    And why did you think it was appropriate to use the

13   default settings?

14   A    I didn't want my personal opinions about the housing

15   market to have any bearing on the estimated value of the

16   loans.

17   Q    Same with interest rates?

18   A    That's correct.

19   Q    Thank you.  Now, once LoanDynamix gathers the loan

20   borrower property specific input and the macroeconomic

21   inputs what does LoanDynamix do with this information?

22   A    Well again, it generates the cash flows and it

23   forecasts loan performance, and again, loan performance is

24   whether or not the borrower makes a payment, whether the

25   borrower has a voluntary prepayment such as a refinancing or

1   moving, it forecasts delinquencies, and it forecasts

2   defaults.  And in the case of defaults it'll also determine

3   whether or not there's a loss associate would that default.

4   Q    And how far out does LoanDynamix generate these

5   forecasts?

6   A    To the final maturity of the loan.  So, for example, if

7   a loan had 20 years left on it it'd be 240 months.  And

8   again, that's very important because it points to the fact

9   that we're talking about many months of cash flows that need

10  to be generated for 15,739 loans, it speaks to the

11  complexity that's involved in this process.

12          THE COURT:  Can I interrupt and ask a question?

13  I'm trying to figure out how to formulate the question.

14          So experts come in here all the time to tell me

15  about the future, how business is going to perform, what

16  cash flows are going to be, what revenues are going to be,

17  and as a general matter the farther out in time their

18  estimates relate to the less reliable they are.  It's hard

19  to believe people when they tell me what's going to happen

20  in ten years.

21          So you're telling me against the backdrop of

22  obviously a tremendous amount of experience that these

23  models can with some degree of reliability predict value

24  over 20 years when life is decidedly unpredictable, right?

25          THE WITNESS:  You're correct, Your Honor.  I mean

1    I don't know what's going to happen tomorrow, but yes, it's

2    required though that financial institutions --

3            THE COURT:  Yes.

4            THE WITNESS:  -- value their assets, and yes,

5    these models do forecast out, you know, 10, 20 --

6            THE COURT:  Right.

7            THE WITNESS:  -- even 30 years.

8            THE COURT:  Right.

9            THE WITNESS:  And the importance is that the

10   modeling process itself is consistent and reliable, and that

11   basically gives you what's known as a base case forecast,

12   that's your expected outcome.

13           THE COURT:  Uh-huh.

14           THE WITNESS:  And then you run various scenarios

15   in addition to that base case to come up with an estimated

16   market value.

17           So you're absolutely right, Your Honor, nobody

18   knows the future and the farther out you go the less

19   reliable.

20           THE COURT:  I mean we could be -- in 6 months the

21   Dow could be at 30 or the Dow could be at 20.

22           THE WITNESS:  Exactly.  Exactly.  I mean --

23           THE COURT:  We all know what we hope.  Well I

24   don't -- that's --

25       (Laughter)

1          THE COURT:  So I'll leave it at that before we get

2     too far into that.  But thank you, I understand what you're

3     saying about -- certainly about the requirements of

4     financial accounting, and I appreciate your answer to my

5     question.

6          THE WITNESS:  Thank you.

7     BY MS. BLACK:

8     Q    On that point though because the Court just raised an

9     interesting point.  So does LoanKinetics via the various

10    models that it calls on factor in extreme economic

11    conditions, does it stress test for these unlikely economic

12    conditions?

13    A    Yes, it very much does.  It's a process that we have

14    embedded in LoanDynamix where we have the base case model

15    forecast and then we run a series of pessimistic scenarios

16    against that, and we run a series of optimistic forecasts

17    against that.  And so each of these scenarios has a

18    likelihood of occurring or a probability associated with it,

19    and so you come up with a cumulative result based on that.

20    Q    Okay.  So moving onto now LoanDynamix generates the

21    output and forecasts month by month by month for each loan,

22    how it's predicted to perform up until maturity.  That

23    information, according to the diagram, is being fed into

24    credit option adjusted spread, which you explained earlier

25    is the model that puts on the price tag, if you will.  What

Page 36

1    does credit option adjusted spread do?

2    A    Again it generates a price for giving the assumptions

3    and the output from LoanDynamix.

4        Now, one of the critical factors here is again there's

5    no market, there's no market pricing so how do you get a

6    benchmark value that you can use to price the loans?  And my

7    design was that you'd use legacy mortgage-back securities in

8    order to price legacy residential loans, and that's a

9    critical relationship, and in effect it's a mapping of value

10   of residential mortgage-back securities that were originated

11   -- or securitized at the same time as these legacy loans

12   were originated, and that value is fed into the credit

13   option adjusted spread model, and that results in a price

14   for every loan.

15   Q    So you're essentially comparing the loans to

16   securitizations that hold comparable loans?

17   A    Very much so.  The collateral of the underlying loans

18   in the NLL pool are very comparable to the securitizations

19   that occurred prior to the prices.  The loans were

20   originated at the same time.

21   Q    And again, are you doing that because securitizations

22   for the comparable loans are the closest financial product

23   that is out there that you can use to infer market pricing?

24   A    That's correct.

25   Q    Okay.  So then what does credit option adjusted spread

1     do and how do we get to the top box here in this diagram?

2               THE COURT:  Can I stop and ask another question?

3               MS. BLACK:  Uh-huh.

4               THE COURT:  So when you're looking at the prices

5     from the securities market are you looking at it on a

6     tranche basis?  These securitizations have different

7     priorities, waterfalls, tranches.  So -- and the pricing of

8     different slices of them is going to be different.  So the

9     loan --

10              THE WITNESS:  That's correct.

11              THE COURT:  -- is in there, it's in the pool with

12    hundreds and thousands of others, so I'm just a little

13    confused about how you relate a particular loan which is in

14    a bigger pool and that pool -- the securities related to

15    that trust that holds that pool of loans is trading.  Do you

16    understand my question?

17              THE WITNESS:  Yes, Your Honor, I do.

18              THE COURT:  Can you help me out?

19              THE WITNESS:  So first of all in the legacy

20    mortgage-back security markets you can basically generalize

21    a little bit and state that there are three classes of

22    securities.  One would be senior, those would be rated

23    triple A, and again mezzanine as I pointed out would be

24    double A down to triple B, they're investment grade and the

25    lower down you go of course the more risk.

Page 38

```
 1              THE COURT:  Right.

 2              THE WITNESS:  And then below triple B would be the

 3    subordinate tranches which are very risky and -- well even

 4    including the first loss piece.  So you have these three

 5    classes, if you will, of securities --

 6              THE COURT:  Right.

 7              THE WITNESS:  -- and there's pricing available for

 8    them.

 9              THE COURT:  Okay.

10              THE WITNESS:  And you know, ADCO has calculated

11    prices and they use over 100 securities in their sample to

12    generate values.  Now how does this map to the loans?

13              THE COURT:  Yes.

14              THE WITNESS:  Well again, what you want to do is

15    try to match up the loan characteristics to the securities.

16    And so within LoanDynamix each loan is divided into three

17    risk categories.  A senior component, a mezzanine component,

18    and a subordinate company.  The senior component is defined

19    as having no more than one-half of one percent likelihood of

20    loss.  A mezzanine tranche -- or mezzanine component of the

21    loan would be 95 percent probability of loss.  And the

22    subordinates of course are the first loss piece.  By doing

23    this you can map the securities market to the loan market,

24    and that's what was done.

25              THE COURT:  Thank you.
```

Page 39

1    BY MS. BLACK:

2    Q    And in fact I think there's a fancy word for that

3    within ADCO, it's called virtual securitization?

4    A    That's correct.

5    Q    Now, I believe you mentioned earlier that the

6    individual models which we see here, those are the various

7    figures that are in red, that LoanKinetics calls upon were

8    in existence, they were created before you joined the

9    company?

10   A    That's correct.

11   Q    And what's the basis for you being comfortable that

12   these models are reliable?

13   A    Well I used LoanDynamix again in my capacity as the

14   credit trader at the hedge fund Vectors Research Management,

15   and I used it ever day, so I was certainly well familiar

16   with that.

17       The credit option adjusted spread is a procedure that's

18   used throughout analytics from both the buy side and the

19   sell side, it's quite commonly used.

20       And furthermore, again, I previously worked with, I

21   knew the people that developed these models, so I was very

22   comfortable in using them and incorporating them into

23   LoanKinetics.

24   Q    But you personally were not involved in their

25   development, testing, and validation, correct?

Page 40

1    A    That's correct.

2    Q    And that's because that was all done before you ever

3    joined ADCO?

4    A    That's correct.

5    Q    Okay.  Now, with respect to LoanKinetics, which is your

6    brain child, if you will, throughout the course of this

7    proceeding the plan administrator has made the suggestion

8    that LoanKinetics was never properly validated by running it

9    against the historical performance of loans to see how the

10   predictions generated by LoanKinetics match up to what

11   happens in the real world.  Is there any truth to this

12   suggestion?

13   A    No, because LoanKinetics is not a model, it takes

14   output from the models, it takes the cash flows from

15   LoanDynamix, it takes the valuations from the option

16   adjusted spread model and it creates reports and analytics

17   that are demanded by the clients.  So it is not a model.

18   All the testing against, you know, back testing, historical

19   testing, forecasting, that was all done prior to my joining

20   ADCO, and the model validation was done prior to my joining

21   ADCO.

22       Now, validation of LoanKinetics is very critical

23   because again you have all of these cash flows and you have

24   to ensure that they match up dollar for dollar for the

25   output that's coming out of the models.  And that's the

1   validation of LoanKinetics, it's not real world losses or

2   whatever, that's done within LoanDynamix.  And again,

3   LoanKinetics is not a model, it's an executable, it

4   communicates with models, and hence the critical factor for

5   validating LoanKinetics is that there's no error in these

6   cash flows being generated to the dollar.

7   Q    And was that done under your supervision?

8   A    Yes, it was.

9   Q    And was LoanKinetics validated prior to its release to

10  clients in 2014?

11  A    Yes, it was.

12  Q    Okay.  And were you the person who did the validation

13  directly?

14  A    No, I was not.  In fact it's very important to have

15  independent validation of any model.

16  Q    So I guess my next question then is who did the

17  validation of LoanKinetics?

18  A    Well there was a person within ADCO that did that.

19  Q    And is that someone that you supervised?

20  A    He was in my group, yes.

21          THE COURT:  So when you say independent validation

22  of the model you don't mean that because LoanKinetics is not

23  a model.

24          THE WITNESS:  That's correct.

25          THE COURT:  Okay.

Page 42

1          THE WITNESS:  We continually conflate this.  It's

2     not a model.  It's the validation of LoanKinetics --

3          THE WITNESS:  The validation of LoanKinetics.  And

4     the validation of LoanKinetics involved basically verifying

5     that the operation of ADCO and the other one -- the --

6          THE WITNESS:  Right.

7          THE COURT:  -- right, worked as they were supposed

8     to work?  I don't understand what the validation of loan --

9     of what comprised the validation of LoanKinetics.

10         THE WITNESS:  Well it validates all the cash flows

11    and valuations that come out of the models, and it's very --

12         THE COURT:  How does it do that though?

13         THE WITNESS:  It's very important to understand

14    that, you know, you have to make sure that if LoanDynamix is

15    used within LoanKinetics that it calls exactly the same data

16    libraries, it matches up exactly by dates, and that all the

17    numbers are exact.  And I'll give you an --

18         THE COURT:  But here's what I don't understand.

19    The numbers are exact to what?

20         THE WITNESS:  Well again they're exact whether or

21    not you use LoanDynamix within LoanKinetics or external to

22    LoanKinetics.

23         THE COURT:  Do you mean -- I'm still struggling.

24    Do you mean that the numbers that ADCO is using are the same

25    numbers, there aren't mistakes in the LTV that's being

Page 43

1    dropped down into ADCO from whence it came?  Is that what

2    you mean?

3            THE WITNESS:  That would be part of it.  But

4    again, what you're validating is that the cash flow is

5    generated out of LoanDynamix either externally or within

6    LoanKinetics are exactly the same.  That's the critical

7    factor.  They have to match up dollar for dollar.

8            THE COURT:  I'm going to try one more time and

9    then I'm going to let you go on.  Matching up means you're

10   comparing one thing to another.  What are the two things

11   that I'm comparing to see are the same?

12           THE WITNESS:  You're comparing LoanDynamix outside

13   of LoanKinetics and you're comparing LoanDynamix within

14   LoanKinetics.

15           THE COURT:  And those are two different things?

16           THE WITNESS:  They can be if you're not careful.

17   If your code is not correct there could certainly be --

18           THE COURT:  Okay.

19           THE WITNESS:  -- significant errors that are

20   reached.  And it's critical that this be done.

21           For example, again, I mentioned, you know, the

22   first client being a top 20 bank, they relied on

23   LoanKinetics exclusively for their analysis of residential

24   loans.  In their risk management, in their trading, in their

25   regulatory accounting financial statements, and stress

Page 44

1    testing exclusively.

2          It's important I think maybe to view it this way.

3    If I was using LoanKinetics and they were using LoanKinetics

4    and we were looking at the same loan pool we'd get exactly

5    the same numbers to the dollar.  And it took quite a bit of

6    time to integrate LoanKinetics into that bank system.

7          THE COURT:  Okay.  Thank you.  Thank you for your

8    patience.  I understand.

9          THE WITNESS:  Thank you.

10   BY MS. BLACK:

11   Q    Just to follow up on this.  So LoanDynamix -- the

12   LoanDynamix model, which is the credit performance model

13   that generates the estimated future cash flows, can be used

14   as a stand-alone outside of LoanKinetics, correct?

15   A    That's correct.  There are some, you know, 20 to 25

16   clients that were using LoanDynamix independently.

17   Q    And so that's what Professor Fischel did, for instance,

18   he used LoanDynamix outside of LoanKinetics?

19   A    That's correct.

20   Q    Okay.  But whether as a stand-alone outside of

21   LoanKinetics or within LoanKinetics LoanDynamix performs the

22   same function?

23   A    It performs the same function and if it has the same

24   loans then Dr. Fischel's forecasted cash flows should be

25   exactly the same as mine.

1    Q    So would it be fair to say that one thing that you look

2    to when you validate LoanKinetics as a system since it calls

3    on all of these various models and integrates them and they

4    are communicating with each other is to make sure that

5    whatever goes in and whatever goes out matches to what these

6    individual models would produce or generate if they were

7    taken outside of LoanKinetics as a stand-alone?

8            MR. MCCALLEN:  Objection, Your Honor, leading.

9            THE COURT:  You can answer, Dr. Ellson.

10           THE WITNESS:  That is correct.

11           MS. BLACK:  I hope that this might have clarified

12   a little bit what the Court was asking about before.

13           THE COURT:  We have been going for about an hour,

14   so any time you think would be a good time for a break.

15           MS. BLACK:  Sure.

16           THE COURT:  Okay.

17           MS. BLACK:  This is a good time.

18           THE COURT:  All right.  We'll take about ten

19   minutes.

20           Dr. Ellson while you're with us you remain under

21   oath, please do not discuss the case or your testimony with

22   anyone or be in anyone's presence while they're doing the

23   same.

24           THE WITNESS:  Yes, Your Honor.

25           THE COURT:  All right?  Thank you.

Page 46

1          (Recessed at 11:07 a.m.; reconvened at 11:23 a.m.)

2                THE COURT:  Please be seated.  Okay.  Let's keep

3     going.

4                MS. BLACK:  Can we have TRDX-335, please.

5     BY MS. BLACK:

6     Q    Dr. Ellson, I would now like to go over the opinions

7     that you have formed in this matter.  Can you please walk

8     the Court through the summary of your opinions.  I think the

9     first one we covered pretty extensively already, so why

10    don't you start with the second bullet.

11    A    Yes.  LoanKinetics is reliable.  Hundreds of thousands

12    of loans were run through LoanKinetics during its

13    development.  Again, there are dozens of various types of

14    residential mortgages.  These mortgages were originated at a

15    variety of different points in origination.  Sometimes the

16    underwriting standards were very strong, sometimes they were

17    very weak.  LoanKinetics evaluated all types of loans over

18    all the periods that are relevant.

19    Q    Thank you.  Moving onto the third bullet, what can you

20    tell us about it?

21    A    I estimated the market value of the 15,739 loans NLL to

22    be $3,018,000,000.  Again, this is a weighted average price,

23    each loan has a price, the price is weighted by the balance

24    of each loan, and the total comes to $3,018,000,000.

25    Q    Thank you.

Page 47

1      MS. BLACK:  And if we could just pull up TRDX-336

2  real quickly.

3  BY MS. BLACK:

4  Q    Dr. Ellson, do you recognize this spreadsheet, and what

5  do you recognize it to be?

6  A    Yes, this is the spreadsheet that sums up the estimated

7  market values for each loan, and again, you see the total

8  sum being the 3,018,000,000.

9  Q    Is this an exhibit or appendix to any of your reports?

10 A    Yes, it's in my affirmative report.

11 Q    And so did you calculate the estimated market value for

12 each loan individually?

13 A    Every loan, 15,739.

14 Q    Thank you.

15      MS. BLACK:  Going back to TRDX-335, please.

16 BY MS. BLACK:

17 Q    Moving onto the fourth bullet can you explain this,

18 please.

19 A    Yes, the average estimated value or price for each loan

20 was 72 percent of par.  That means, for example, for a loan

21 that was $100,000 the loan would be valued at $72,000.  The

22 reason for this is the expectation of losses on these loans.

23 Q    And was every single loan among the 15,739 that you

24 valued at 72 percent of par?

25 A    No, of course not.  There are a significant number

Page 48

1  below 72 and a significant number above, that's the nature

2  of calculating an average.

3  Q    So 72 is just the weighted average?

4  A    It's the weighted average, that's correct.

5  Q    Okay.  And moving onto the next bullet?

6  A    Yes, 72 percent of par does indicate significant losses

7  in the pool.  I think it's important to recognize that 50

8  percent -- or almost 50 percent of the pool are subprime

9  borrowers, these are the weakest borrowers in the housing

10  market, 40 percent are what's known as all day loans, which

11  is really an amorphous category, basically filling the gap

12  between prime loans and subprime loans, and most importantly

13  prime loans only consist of 8 percent of the NLL.  And so

14  it's the weakest loans that drive the results that I

15  achieved.

16  Q    Okay.  And let's actually look at the distribution.

17          MS. BLACK:  Can we please have TRDX-337.

18  BY MS. BLACK:

19  Q    Dr. Ellson, do you recognize this table?

20  A    Yes, I do.

21  Q    What is it?

22  A    Well it's a summary of the loan types, the balances,

23  the number of loans, and the average price for each of the

24  prime major categories.  And again, you can see that the

25  average price across all the loans is 72.07, subprime loans

Page 49

1    are less than that figure at 70.9, all day loans at 70.69.

2    The prime loans are significantly higher, 84.8, but again,

3    prime loans are a small percentage of the NLL, and any type

4    of loan including prime has the probability of some loss.

5    Q    And again is the -- does every single loan within the

6    prime category, for instance, have a price of 84.8 or is

7    this again the average across the category?

8    A    It's the weighted average across the category.

9    Q    So some of the non-liquidated loans that you valued

10   have an average price that is higher than 84.8?

11   A    Oh, yes, definitely.

12   Q    And the flip side of it some of the non-liquidated

13   loans that you valued have an average price that is lower

14   than, for instance, what we see here for subprime loans?

15   A    That's correct.

16   Q    And again, is there any logic to why the average price

17   for the prime loans is higher than for -- subprime all day?

18   A    Yes, it's because they're better loans.  But again, all

19   loans carry some degree of risk in terms of loss, but

20   certainly the better quality loans would be prime.

21   Q    Is it possible that on certain loans -- that certain of

22   the loans that you valued using LoanKinetics are going to

23   perform better in the future than what LoanKinetics

24   predicted?

25   A    Well any particular loan would probably be predicted an

1    error.  As we discussed 1 loan out of 15,739, that's not the

2    point of evaluating and valuing this pool.  One loan is very

3    unlikely to perform as indicated by LoanDynamix or the

4    credit option adjusted spread model.

5    Q    So my question is, is it possible that the loans are

6    going -- some loans are going to perform better whereas

7    others are going to perform worse?

8    A    That's correct.

9    Q    Okay.

10              MS. BLACK:  Moving onto the next slide, TRDX-338,

11   please.

12   BY MS. BLACK:

13   Q    The plan administrator and its expert, Mr. Castro, take

14   the position that inclusion of the non-liquidated loans and

15   the repurchase mechanism is inappropriate because these

16   loans have been performing for years and are providing value

17   to investors and also that it's a virtual certainty that

18   they will not result in any losses to investors.  I

19   understand that you have addressed that point in your reply

20   report.  Can you please walk us through it.

21   A    Yes.  So first of all the vast majority of the loans in

22   the NLL are referred to as reperforming or modified.  In

23   fact 88 percent of the loans are done so.  That means that

24   they had significant issues historically and the terms of

25   the loans were changed in order to presumably assist the

Page 51

1    borrower with his ability -- his or her abilities to pay the

2    mortgage.

3         It's also important to recognize --

4              THE COURT:  Can I stop you, Dr. Ellson?  You said

5    presumably because you don't know, right?  You don't know

6    why there was a modification.

7              THE WITNESS:  Well there's a number of reasons

8    why, but usually there's a default issue.

9              THE COURT:  Okay.  But I am asking you, this is a

10   model, right?

11             THE WITNESS:  No, these are actual loans.

12             THE COURT:  Yeah -- no, I understand that.  But

13   there is -- as you sit here today you don't know directly in

14   terms of direct access to any particular datum whether a

15   particular -- why a particular loan was modified, whether it

16   was in default or not.

17             THE WITNESS:  That's correct.

18             THE COURT:  Thank you.

19   BY MS. BLACK:

20   Q    Please continue, Dr. Ellson.

21   A    Again, the idea that there have been no losses is

22   totally incorrect.  For example, 2,640 loans in the NLL

23   pool, the modification had to do with principal reduction,

24   those are losses that will never be recouped by investors.

25   And it's also important to recognize that the performance

Page 52

1    currently of this pool is quite weak.  There's -- as we'll

2    get into more detail later, but there's a significant number

3    of loans that are currently in foreclosure or REO, which is

4    real estate owned, that's when the lender takes possession

5    of the property.  There's a significant delinquency

6    pipeline.  And again, this is a very weak credit pool.

7    Q    And what is the credit risk?  In other words, what is

8    the risk of loss -- future loss associated with loans that

9    have this type of modification and delinquency history?

10   A    It's significant.  And again, loans that have been

11   modified, even if they're current, have a higher probability

12   of loss.

13        And I think I'd like to point out towards the end there

14   there's the statement performing loans would never be

15   subject to repurchased claims because they're actively

16   providing value.  Well they might be providing value but

17   they might not provide full value.

18              THE COURT:  Mr. McCallen?

19              MR. MCCALLEN:  Yes, Your Honor.  We have an

20   objection to this line of questioning.  The trustees have

21   sought to quality Dr. Ellson as an expert on the topic of

22   the valuation of the non-liquidated loans using

23   LoanKinetics.

24              THE COURT:  Yes.

25              MR. MCCALLEN:  And this line of examination is

Page 53

1    veering well outside of that and getting into Dr. Ellson's

2    views, his -- based on presumably his experience about these

3    types of loans generally and what kind of credit they are

4    and what kind of risk they pose.

5            That's not something that LoanKinetics quantified

6    in connection with his report, it's not something that falls

7    within the scope of his testimony, and so it's both a new

8    opinion and outside the scope of his testimony, Your Honor.

9            THE COURT:  Okay.  Ms. Black?

10           MS. BLACK:  Dr. Ellson sets this very opinion for

11   in his reply report.

12           THE COURT:  Can I see where, please.

13           MS. BLACK:  Sure.  If you turn to TRX-646.

14           THE COURT:  Okay.

15           MS. BLACK:  And in particular we are looking at

16   paragraphs 22 through 27 of his reply report.  And if you

17   want you can just focus on --

18           THE COURT:  If you could just give --

19           MS. BLACK:  -- paragraph 23 right now.

20           THE COURT:  On paragraph 23?

21           MS. BLACK:  Uh-huh.

22           THE COURT:  Okay.  If you would give me a moment.

23        (Pause)

24           THE COURT:  Okay.  Mr. McCallen?

25           MR. MCCALLEN:  Yes, Your Honor.

Page 54

1              THE COURT:  it is in the reply report.

2              MR. MCCALLEN:  Absolutely.  So with respect to the

3     objection about it being new reading this I will stand

4     corrected.

5              THE COURT:  Okay.

6              MR. MCCALLEN:  But the objection with respect to

7     the scope of the -- his testimony remains, Your Honor.

8     Because as I said, the grounds upon which they're seeking to

9     qualify him is solely for valuing these loans using

10    LoanKinetics.

11             THE COURT:  Right.

12             MR. MCCALLEN:  The fact that -- the reason why

13    this is in here really goes to the dual roles that

14    Mr. Castro is playing in the case because he's giving AMA

15    opinions and he also puts certain criticisms in his report

16    related to LoanKinetics.

17             So the fact that Dr. Ellson chose to respond to

18    things that Mr. Castro said that veered outside of

19    Dr. Ellson's expertise and put it in his report that doesn't

20    mean that it now falls within his area of expertise.

21             So the reason why this is in here and in his

22    report and he's responding to it is that he was responding

23    to parts of what Mr. Castro was saying, but it doesn't

24    change the fact that Dr. Ellson's views as to the credit

25    risk proposed by modified loans is just simply outside of

Page 55

1   the scope of his proffered expert testimony.

2            THE COURT:  Well I'm going to -- as my former

3   colleague, Judge Grover would say, slice it and dice it a

4   little bit.

5            Because I think that to the extent that Dr. Ellson

6   identifies facts from the remittance reports about current

7   delinquencies and the like I don't have a problem with that.

8            Where it begins to get a little more murky are

9   these blue bullets on TRDX-338 where Dr. Ellson is offering

10  what I would describe as qualitative views as to certain

11  attributes of non-performing loans and also certain opinions

12  about the affect of the loan modifications, et cetera.

13           So that's the way I'm going to respond to your

14  objection.

15           MR. MCCALLEN:  Thank you, Your Honor.

16           THE COURT:  I don't know if you can navigate that,

17  but that's my view.  You follow, Ms. Black?

18           MS. BLACK:  Yes.  All I'm trying to get at is why

19  Dr. Ellson believes that 72 percent as a weighted average

20  for this particular population of loans is not unreasonable.

21           THE COURT:  Right.  And what I'm saying is that to

22  the extent that he is citing to statistical data and/or

23  statistics that he has access to as part of employing

24  LoanKinetics that's fine.  It's not fine for him to draw on

25  his obviously vast expertise in the mortgage-back securities

Page 56

1    industry in order to embellish the conclusion as to the way

2    these loans may or may not act and may or may not affect

3    value.

4            MS. BLACK:  Okay.  I think I may cure it by just

5    -- the issue by pulling up the next slide --

6            THE COURT:  Okay.

7            MS. BLACK:  -- which is an analysis submitted with

8    his reply report and having him testify to that.

9            THE COURT:  Okay.  Fair enough.

10           MS. BLACK:  Can we TRDX-339, please.

11   BY MS. BLACK:

12   Q    Dr. Ellson, can you please tell us what this series of

13   table is and what the significance of these numbers is?

14   A    Well they're very significant because they demonstrate

15   what the performance of the non-liquidated loans has been,

16   and again, the top table is very important, it shows that

17   over 10 percent of the non-liquidated loans are currently in

18   REO and foreclosure, it's very likely that those loans would

19   sever losses, because when a homeowner is in default it's

20   very much going to be -- or very likely to be a distressed

21   sale.  Homeowners in default do not maintain their

22   properties, in fact they often strip their properties.

23         There's also a significant delinquency pipeline that

24   exceeds 10 percent.  Default pipeline -- at least some of

25   that default pipeline will end up in REO and foreclosure.

Page 57

```
 1    And there's only been 62 percent that have been current for

 2    the past year.  That doesn't suggest that they've been

 3    current beyond for the year.

 4         In table two --

 5              MR. MCCALLEN:  Your Honor, we're going to make the

 6    same objection again.  Obviously this is something that was

 7    in his reply report, but again, you know, Dr. Ellson is

 8    looking generally speaking at issues related to the

 9    performance of the loans and it's outside of actually his

10    proffered expert testimony, which is the use of the

11    LoanKinetics software.

12              MS. BLACK:  May I respond?

13              THE COURT:  Hold on just a second.

14         (Pause)

15              THE COURT:  Dr. Ellson, how did you access this

16    data?

17              THE WITNESS:  It was taken from the servicer

18    reports, Your Honor.

19              THE COURT:  Was it taken from the servicer reports

20    as they were available -- as they were made available to you

21    for input into ADCO/LoanKinetics?

22              THE WITNESS:  That's correct, Your Honor.

23    Historical performance data --

24              THE COURT:  Right.

25              THE WITNESS:  -- of every loan does go into
```

1   LoanDynamix and hence LoanKinetics.

2              THE COURT:  Okay.  Mr. McCallen, I'm going to

3   stand by my prior stratification of this issue.  This is

4   data, it is what it is.  Unless you believe that there's an

5   error in the reflection of the data I'm going to let

6   Dr. Ellson testify about it.

7              MR. MCCALLEN:  Thank you, Your Honor.

8              THE COURT:  All right?  Go ahead.

9   BY MS. BLACK:

10  Q    Please continue.

11  A    On table number 2 it just again gives a little bit more

12  information, in particular when serious delinquencies occur.

13  Obviously when delinquencies start they become more serious

14  over time, and 7,378 loans had been serious by delinquent

15  within 36 months.

16       The fourth table is again particularly important, it

17  demonstrates that 88 percent of the loans had been modified,

18  that's a very high number.

19       Again, within LoanDynamix loans that had been modified

20  even if they're current are referred to as blemished current

21  because in the statistical analysis that was done blemished

22  current loans have a higher probability of default and loss

23  than ones that weren't modified.

24       And then finally we go to modification information.

25  The most common is some adjustment to the mortgage rate

1     being paid at either reduced or it was changed from a

2     floating rate adjustable mortgage to fixed rate.

3          Extremely important here is the fact that there's a

4     principal balance reduction for 2,640 loans, that again is

5     an actual loss to investors, that's not going to be

6     recouped.

7     Q     And again, when you had mentioned earlier today that

8     there are 55 inputs that are -- that go into LoanDynamix so

9     that LoanDynamix can perform its magic and generate the

10    future cash flows, is the data that we have seen on these

11    tables among the inputs that are being fed into LoanDynamix?

12    A     Very much so.  Delinquency history is one of the key

13    inputs to LoanDynamix.

14    Q     And how does the fact that -- how does the status of

15    the non-liquidated loans as well as the history of

16    modifications and delinquencies factor into your opinion

17    that 72 percent of par value across the 15,739 non-

18    liquidated loans is a reasonable number for LoanKinetics to

19    have (indiscernible - 1:20:24) that?

20    A     Well it's reasonable from several different

21    perspectives.  Again, 88 percent of the loans had been

22    modified, there's a significant foreclosure REO pipeline

23    exceeding 10 percent, there will be extraordinary likelihood

24    there'll be losses experienced there, and then there's also

25    a delinquency pipeline exceeding 10 percent, and a

Page 60

1    significant number of those loans will enter into

2    foreclosure REO.

3    Q    And in light of that is it your opinion that 72 percent

4    weighted average across the pool of loans that we're dealing

5    with here is reasonable?

6    A    Yes, I do.

7              THE COURT:  Mr. McCallen?

8              MR. MCCALLEN:  So objection, Your Honor, on this.

9    It's -- so Dr. Ellson has -- we'll get into this on cross-

10   examination -- Dr. Ellson has run LoanKinetics and that's

11   provided a value for these loans which the trustees is

12   offering in this case, and that is the subject matter of his

13   report, that is what his testimony is being offered.

14             Now he's coming in and offering testimony looking

15   at other information that he sees in the marketplace and

16   using that to try to support the reliability and explain why

17   he thinks LoanKinetics is reliable, and that's -- now he is

18   sort of putting on both hats.  He is wearing a hat as the

19   person who says he's the brain child of LoanKinetics and

20   he's here to explain how it works, and now he's coming in

21   and saying I have industry experience and I'm looking at all

22   of these different variables such as, you know, performance

23   of the modified loans and looking at the indicators, and

24   this tells me that this number that LoanKinetics gives me is

25   reliable, and he just has not been qualified to testify in

Page 61

1   this court to Your Honor about why the number that's been

2   generated by LoanKinetics is something that the Court can

3   rely upon.

4           THE COURT:  Time out.  Dr. Ellson, how'd you like

5   to take a walk down the hall?

6           THE WITNESS:  Yes.  Certainly.

7           THE COURT:  All right?  Just give us a couple

8   minutes.  It's easier to do this without having to be up at

9   the bench.  Someone will come and get you, sir, in about

10  five minutes.  Yes, please.

11      (Witness leaves room)

12          THE COURT:  Here's what I don't understand.

13          MR. MCCALLEN:  Uh-huh.

14          THE COURT:  The trustees are presenting him as an

15  expert.

16          MR. MCCALLEN:  Uh-huh.

17          THE COURT:  Right?  On -- for the valuation of the

18  non-liquidated loans.  He has a non-model.  He has a

19  structure that's not a model --

20          MR. MCCALLEN:  Assist in the calls on models.

21          THE COURT:  Assist in the calls on models.  Thank

22  you.  And you've attacked it --

23          MR. MCCALLEN:  Uh-huh.

24          THE COURT:  -- and you said it's not -- the number

25  that he has generated is not a good number, and one of the

Page 62

1   ways that he is now defending his number is by saying, okay,

2   well here's the number that my system that calls on models

3   generated and here are other things that I'm looking at to

4   reassure myself that my system that calls on these models

5   isn't completely out of whack.

6          So why isn't that exactly what -- I don't know if

7   this is what you were going to say, Ms. Black --

8          MS. BLACK:  I could not have phrased it any

9   better.

10     (Laughter)

11         THE COURT:  That's nice of you to say that, but I

12  think that you could.

13         But why isn't that exactly this is what you do

14  when you have an expert who gets attacked and then you say,

15  okay, I'll tell you six reasons why what I did is right?

16  And as the architect of LoanKinetics he testified

17  extensively to the process that he went through in order to

18  put it out as a product.

19         So if you on cross-examination want to go into

20  that with him, the how do you know aspect of it, or if you

21  want to, as I'm sure you will, point out the discrepancies

22  between what the model predict and what happened in reality,

23  because we have the -- you know, we have the time frame

24  issue here where you could do that, that's for cross-

25  examination.  I just don't understand why -- how I can cut

Page 63

1      off -- cut this off wholesale.

2             MR. MCCALLEN:  Fair enough, Your Honor.  And I

3      don't want to belabor the point and I recognize we want to

4      get through this efficiently.

5             What's happening here is there's through the

6      course of the examination today there's been a slow creep in

7      terms of the scope of Dr. Ellson's testimony.  When you read

8      his report and take his deposition --

9             THE COURT:  Uh-huh.

10            MR. MCCALLEN:  -- as I did, it's very clear that

11     he's the person who, as he had said, you know, came up with

12     the idea and marketed it --

13            THE COURT:  Uh-huh.

14            MR. MCCALLEN:  -- and went around and sold it to

15     people and pitched it and all of that.

16            THE COURT:  Uh-huh.

17            MR. MCCALLEN:  He's not the guy who modeled it,

18     didn't put it together --

19            THE COURT:  Uh-huh.

20            MR. MCCALLEN:  -- and he doesn't really have an

21     understanding as -- I think Ms. Black already elicited

22     testimony that he wasn't involved in the testing or the

23     validation of LoanKinetics in any way.  So it's something he

24     oversaw but he didn't see it.

25            THE COURT:  Do you mean LoanKinetics --

Page 64

1           MR. MCCALLEN:  I'm sorry.

2           THE COURT:  -- or do you mean LoanDynamix?

3           MR. MCCALLEN:  I made --

4           THE COURT:  You mean loan --

5           MR. MCCALLEN:  -- the same mistake.  The models --

6     he wasn't involved in the testing or validation --

7           THE COURT:  Of the underlying models.

8           MR. MCCALLEN:  -- of the models that --

9           THE COURT:  Right.

10          MR. MCCALLEN:  -- LoanKinetics calls upon.

11          And so his report -- and this is one of the

12    reasons why we don't think ultimately his testimony is

13    admissible -- because what he's actually doing is he runs

14    LoanKinetics and gives us the number, right?

15          THE COURT:  Yes.

16          MR. MCCALLEN:  And then his report basically

17    explains here's how LoanKinetics works.

18          THE COURT:  Right.

19          MR. MCCALLEN:  And that was the scope of his

20    report.

21          Now we come in here and the first issue that

22    starts happening, and the objection I made was he starts

23    opining upon risk of loss and basically saying that there's

24    -- he's looking out there and seeing, you know, the

25    likelihood that a loan is going to suffer a loss based on

Page 65

1    the fact of all these different variables and it's not

2    something that he -- it's not within his expertise there.

3    And now he's coming in and basically --

4              THE COURT:  But he -- those answers were in

5    response some to my questions and some to Ms. Black's

6    questions in order to explain how the models, including

7    LoanDynamix, work.  Because it's all well and good to say

8    there are these 55 inputs, you know, you put all these

9    ingredients in and the sausage comes out, and his answers

10   were to explain what he's talking about, because otherwise

11   it's just a black box.

12             And my view is, and I think we ought to move it

13   along, is that in large measure, not in every one, and I

14   tried to identify some areas in which I think he is getting

15   too broad a brush and calling on his general expertise, in

16   large measure I think the answers are to illuminate exactly

17   what's in the black box.  For example, the answer he gave

18   with respect to how you map loans to the price of mortgage-

19   back securities, because that was very obtuse until he

20   explained it.  So he understands how you bucket the loans

21   into the three different classes, et cetera.  I don't think

22   that's outside the scope of what he should be able to

23   explain.

24             MR. MCCALLEN:  And the plan administrator agrees

25   with that.

Page 66

1          THE COURT:  Okay.  So I think the long and the

2     short of it is that you can have as much fun as you like on

3     cross-examination, but we ought to let him keep going.

4          MR. MCCALLEN:  Thank you, Your Honor.

5          THE COURT:  All right?

6          All right.  So I have a sense that probably

7     partially due to my fault we're moving more slowly than you

8     anticipated because I asked a number of questions, but this

9     is --

10          MS. BLACK:  But they were all good.  They were all

11     good questions.

12     (Laughter)

13          THE COURT:  You do not have to -- those are the

14     lines that --

15          MS. BLACK:  He taught me well.

16          THE COURT:  I guess I'm a little bit gun shy after

17     things that have happened about not stressing witnesses too

18     much.  What shall we plan to do?  Keep going for now?  Do

19     you want to talk to your friends over there?

20          MR. MCCALLEN:  How much more do you have?

21          MS. BLACK:  I would like to get through this --

22     the rest of my direct as quickly as possible.

23          THE COURT:  Okay.  Best guess?

24          MS. BLACK:  Fifteen to 20 minutes tops.

25          THE COURT:  Oh, wonderful.  Okay.  If you would --

Page 67

1    if someone would go get Dr. Ellson that would be great.

2        (Witness re-enters room)

3            THE COURT:  Thank you, Dr. Ellson.  The good news

4    is you get to keep testifying.

5        (Laughter)

6            THE COURT:  The bad news is you get the keep

7    testifying.

8        (Laughter)

9            THE COURT:  Go ahead, Ms. Black.

10           MS. BLACK:  Thank you so much.  TRDX-340, please.

11   BY MS. BLACK:

12   Q    Dr. Ellson, the plan administrator has criticized you

13   and asserted that your work played virtually no role in the

14   models and testing of LoanKinetics and have only a general

15   understanding of how that software works.  What is your

16   response to this criticism?

17   A    Well I think it's -- quite frankly I think it's

18   ridiculous.  I was designed, I was conceived LoanKinetics, I

19   did the business plan on LoanKinetics, I had to sign off on

20   every task as it was completed in the development of

21   LoanKinetics, I did the marketing material on LoanKinetics.

22   Again, I met with over 50 clients.  So their whole statement

23   is totally inaccurate.

24           It was very important, again, ADCO being a small

25   company, that people had -- most everyone had multiple tasks

1    to work on, so coordinating the work on LoanKinetics were

2    very difficult.  I coordinated very closely with the heads

3    of the modeling group, the programmers in financial

4    engineering in order to get the project done.  And again,

5    ADCO is a very small firm, we acted as a team, these group

6    leaders sat about ten feet away from me.

7    Q    And did you communicate with them on a regular basis?

8    A    Every day, and we also had weekly staff meetings and

9    weekly management committee meetings, and I was on the

10   management committee.

11   Q    And in your role as a member of the management

12   committee meeting and in your role as the head of the

13   enhanced solutions group did you also have occasion to speak

14   with the heads of the financial engineering groups and the

15   modeling groups about the models that are being integrated

16   into LoanKinetics?

17   A    Yes, that was done, and again, resource allocation was

18   a critical factor in the development of LoanKinetics, and we

19   had those discussions in the management committee meetings.

20        MS. BLACK:  Can we please have TRDX-345.

21   BY MS. BLACK:

22   Q    The plan administrator has also criticized you and

23   stated that you cannot attest to the reliability or accuracy

24   of the values that you used -- sorry -- that you generated

25   using LoanKinetics.  What is your response to that?

Page 69

1    A    Well I don't know what they mean by unreliable.  Again,

2    LoanKinetics communicates or calls with models, the

3    LoanDynamix model, the valuation models, it ties out to the

4    dollar.  When I valued the NLL pool I used the default

5    settings for LoanDynamix, I used the default forecasts of

6    Andrew Davidson & Co., and so did Dr. Fischel, to my

7    understanding, and so the results are very consistent, very

8    accurate, and very reliable.

9    Q    In its pretrial brief the plan administrator provides

10   two examples that we have not previously seen in any of the

11   plan administrator's expert reports which the plan

12   administrator uses to argue that unreliability of

13   LoanKinetics was starring you in the face and you simply

14   chose to ignore it.  Are you aware of that?

15   A    Yes, I am.

16   Q    Okay.  So the two examples are relatively similar in

17   nature so why don't we just focus on the second one.

18            MS. BLACK:  Can we have TRDX-347, please.

19   BY MS. BLACK:

20   Q    Can you just explain to us what the argument is as you

21   understand it, what is the argument that is being made by

22   the plan administrator?

23   A    Well this is from data -- servicing data from May of

24   2017 through September of 2017.  In that period they argue

25   that 804 loans have liquidated, I did my report using April

Page 70

1    data, so this is the subsequent months.  They argue that

2    there were $94 million in realized losses.  Realized losses

3    are actual losses.  And they claim that there's a 400 -- 144

4    million claim purchase price -- net purchase price which

5    should be the purchase price minus the credit.  Then they

6    argue that Lehman argues that LoanKinetics is not reliable.

7    Q    And so these 804 loans are loans that the claim --

8    sorry -- that the plan administrator claims have liquidated

9    since you did your analysis?

10   A    Well they used the term liquidated, the 804 loans have

11   terminated.

12   Q    Okay.  And that's out of the universe of the 15,739

13   loans that you valued?

14   A    That's correct.

15   Q    Okay.  So I understand that you looked into this issue.

16          MS. BLACK:  And can we please have TRDX-348.

17   BY MS. BLACK:

18   Q    What did you find when you investigated this criticism

19   by the plan administrator?

20   A    Well first of all, you know, this is a relatively small

21   number of loans and they're basically ad hoc terminations,

22   they're random terminations, if you will.  In order to

23   properly assess LoanKinetics you would have to draw a proper

24   sample of the NLL and follow those loans out to the final

25   maturity of those loans.

Page 71

1      You know, moreover, their argument that there's $94

2  million in losses totally contradicts Mr. Castro's assertion

3  that they would not experience any losses.

4      And finally comparing the net purchase price to actual

5  realized losses is not a proper comparison, it's apples and

6  oranges.  It should be actual realized losses versus

7  estimated losses from LoanKinetics.

8            MR. MCCALLEN:  Your Honor?

9            THE COURT:  Yes.

10            MR. MCCALLEN:  I'd just like to assert an

11  objection.  All of this is new, but in light of the fact

12  that he's responding to things in our pretrial brief --

13            THE COURT:  Yes.

14            MR. MCCALLEN:  -- we're going to let it go.  But

15  there is one portion of what he said with respect to

16  responding to Mr. Castro's assertion which is an AMA

17  argument about their experiencing any losses with respect to

18  the active loans.

19            Again, new and outside the scope of his report and

20  the subject matter of his proffered testimony, Your Honor.

21            THE COURT:  Which piece of testimony corresponds

22  to that objection?

23            MR. MCCALLEN:  Let me just scroll up, Your Honor.

24  When he says moreover -- and I see it at line 3508, Your

25  Honor.  Moreover, their argument that there's 94 million in

Page 72

1   losses totally contradicts Mr. Castro's assertion that they

2   would not experience any losses.  I understand and I don't

3   want to --

4           THE COURT:  It's just an observation.  Well it's

5   his observation, I don't know if it's meaningful or not.

6   But -- so --

7           MR. MCCALLEN:  To the extent that it's being

8   offered under the rubric of expert testimony to Your Honor I

9   think it's outside of the scope of his testimony, but I

10  don't want to overly dwell on it.

11          THE COURT:  Yeah.  Okay.  Let's just keep going.

12          MR. MCCALLEN:  Thank you, Your Honor.

13  BY MS. BLACK:

14  Q   Were you able to tie out the numbers that you saw in

15  the plan administrator's pretrial brief, the 804 loans, the

16  94 million, the 144 million net purchase price?

17  A   No, my team attempted to do so, we were unable to tie

18  out exactly, and we saw nothing in any of the documents

19  provided by the plan administrator that would -- that

20  support those numbers.

21  Q   Thank you.  And I believe you testified something to

22  the effect of these were ad hoc terminations, they're not

23  statistically relevant.  How can you determine the

24  predictive power of a model or system as LoanKinetics, how

25  do you know that it has good predictive power?

Page 73

1    A    Well you would compare actual realized losses to

2    estimated losses for LoanKinetics.

3    Q    Okay.  And does that go to your response that this is

4    not the correct comparison that the plan administrator seeks

5    to draw is not a good comparison, not a valid comparison?

6    A    That's correct.

7    Q    Okay.  And --

8    A    It should be actual losses versus estimated losses.

9    Q    Okay.

10            MS. BLACK:  Can we please have TRDX-352.

11   BY MS. BLACK:

12   Q    So I would like you to elaborate on that a little bit

13   and explain to us how will you be able to compare actual

14   realized losses that are recorded by the servicer when a

15   non-liquidated loan goes from being an NLL to being a

16   liquidated loan to what LoanKinetics predicted.

17   A    Well there are two columns that you need to look at.

18   One would be the current balance on the loan, and the other

19   would be the loss severity, and that would be the estimated

20   or predicted value of the loss as done by LoanKinetics.

21   Q    Are these outputs that were generated by LoanKinetics?

22   A    That's correct.

23   Q    And were these outputs available to the plan

24   administrator?

25   A    Yes, they were available in the affirmative report.

Page 74

1   Q    So those were outputs that you provided with your

2   affirmative report?

3   A    That's correct.  We provided this output for every loan

4   in the NLL pool.

5   Q    So if the plan administrator had wanted to compare the

6   actual realized losses to just the loss portion that

7   LoanKinetics predicted on these very loans it could have

8   been done so?

9   A    Yes, they could have.

10  Q    Okay.  Now --

11           THE COURT:  Can we slow down a minute?

12           MS. BLACK:  Uh-huh.

13           THE COURT:  I'm not following this.  If you go

14  back -- could you go back to TRDX-347, please.

15           So, Dr. Ellson, you're saying that the comparison

16  of $94 million to $144 million is not the right comparison?

17           THE WITNESS:  That's correct, Your Honor.

18           THE COURT:  Are you saying -- are you quarrelling

19  with the $94 million?

20           THE WITNESS:  No, I'm quarrelling with the fact

21  that the net purchase price was used as the point of

22  comparison.  It --

23           THE COURT:  What -- so what should -- what -- so

24  when we go back to the previous slide then what would that

25  number be?

1              THE WITNESS:  Well we'll discuss that number in

2      another slide, but there is a predicted value that comes out

3      of LoanKinetics that we can compare to the 94 million in

4      realized losses.

5              THE COURT:  Well why don't you keep going and I'll

6      see if you clarify my confusion.  Go ahead.

7              MS. BLACK:  I will try to do that now.

8              THE COURT:  Okay.

9      BY MS. BLACK:

10     Q    Dr. Ellson, LoanKinetics generates I think over 70

11     outputs, correct?

12     A    Yes.

13     Q    Okay.  And among those outputs is there -- are there

14     any outputs with respect to -- and the totality of those

15     outputs is the future estimated cash flows month by month up

16     until maturity?

17     A    That's correct.

18     Q    Okay.  Is there any portion of these outputs that

19     factors in just the possibility of the magnitude of losses

20     that would be suffered if the loan -- if the only fate this

21     loan could suffer is to go into default and liquidate?

22     A    Yes, that's referred to as loss severity, which is the

23     percentage of outstanding balance so it would be written

24     off.

25     Q    So if you wanted to compare what happened in real life

Page 76

1     this loan after you valued it went into default, liquidated,

2     maybe it was already in default, and liquidated, and the

3     property was sold and an actual realized loss was reported

4     by the servicer to what LoanKinetics predicted would happen

5     in the event that that loan -- that very loan would default,

6     liquidate, the property would be sold, and what the loss

7     severity would be.  Is that possible?

8     A    Yes, it's quit possible.  You simply have to multiply

9     the loss severity times the principal balance -- the

10    outstanding principal balance.

11    Q    Now, did you do that?  Did you investigate these

12    numbers by the plan administrator and look at what

13    LoanKinetics predicted --

14    A    Yes.

15    Q    -- in terms of the predicted loss in the event of

16    liquidation?

17    A    Yes, I did.

18    Q    Okay.

19         MS. BLACK:  Can we please have TRDX-353.

20    BY MS. BLACK:

21    Q    What did you find, Dr. Ellson?

22    A    Well first of all we did not find that there were $94

23    million in losses as Lehman asserted, we actually calculated

24    actual realized losses are 84.9 million or just short of 85

25    million.  Again, we could not replicate Lehman's numbers

Page 77

1     that were discussed previously.  LoanKinetics predicted

2     realized losses of 78.34, that represents 92 percent of

3     actual realized losses.  So in other words, LoanKinetics

4     predicted an estimate that was within 92 percent of the

5     actual realized losses in these loans.

6     Q    And I understand you also conducted this exercise for

7     the other example that the plan administrator provides,

8     which is the example of loans that liquidated since the

9     trustees provided the LoanKinetics value during the protocol

10    process and that liquidated between that point in time and

11    when you submitted your report?

12          MR. MCCALLEN:  Objection, your Honor.  I'm going

13    to object to this as a new opinion, and I'm drawing a

14    distinction here, Your Honor, because previously I said with

15    respect to his prior testimony he was responding to

16    something we had put in our pretrial brief and I assumed

17    Your Honor would want to hear his response to it.

18          With respect to this analysis, Your Honor, this

19    appears nowhere in his reports and actually we asked him

20    about this at his deposition and I said:

21                "Did you conduct any sort of analysis to

22          compare whether the loans that liquidated between

23          September of 2016 and April of 2017 liquidated at

24          a value consistent with the LoanKinetics valuation

25          that you provided?"

Page 78

1              And his answer was, "No, I did not do that."

2              And the citation for that is his deposition

3     transcript at page 166, line 12 through 19, and I can give

4     Your Honor a copy if you want.

5              But for that analysis he didn't do it in his

6     report, I asked him about it at his deposition and he hadn't

7     done it, and if he's going to come along now and try to

8     explain that the analysis either could have been or it was

9     irrelevant and let me tell you why it's irrelevant that's

10    something that we should have understood at the deposition,

11    that we understood in his report, and we didn't.

12             So, Your Honor, I'm going to object to this line

13    of testimony as new.

14             THE COURT:  Okay.  Ms. Black?

15             MS. BLACK:  Again, he was asked a hypothetical

16    question in his deposition.  The numbers were for the first

17    time presented in the pretrial brief.  That being said I'm

18    happy to just focus on the second example.

19             THE COURT:  What do you mean the second example?

20             MS. BLACK:  Which is the loans that liquidated

21    since -- that he valued and that liquidated since he valued

22    these loans.

23             THE COURT:  But the portion of the -- but at his

24    deposition he indicated that he hadn't done anything on that

25    point.

1          MS. BLACK:  That was with respect to loans that

2     the trustees had valued during the protocol process and that

3     had liquidated.

4               So there are two sets.  One is loans that were

5     valued by the trustees during the protocol process

6     liquidated since, the other set is loans that he valued

7     liquidated since.  He was only asked the question at his

8     deposition with regard to the first set, and that's what I

9     understand counsel for the plan administrator to take issue

10    with.

11              THE COURT:  You've lost me.  You've all lost me.

12    Sorry.

13              So with specificity somebody tell me what pool --

14    what loans are we talking about?

15              MR. MCCALLEN:  So there's two sets of loans that

16    are being discussed here, Your Honor.  The first one --

17    and --

18              THE COURT:  Are you talking about the 804 loans

19    that are on --

20              MR. MCCALLEN:  So let's call that the first one.

21              THE COURT:  Okay.

22              MR. MCCALLEN:  So that set of loans are loans that

23    liquidated between the date that Dr. Ellson did his

24    report --

25              THE COURT:  Right.

1            MR. MCCALLEN:  -- which is June, and it was as of

2    I think around the time we did our pretrial brief, so there

3    was about four months or five months during that time

4    period.

5            THE COURT:  Okay.

6            MR. MCCALLEN:  That was 804 loans.

7            There's this second set of loans, and I'll call it

8    second but it actually happened before, so we're looking at

9    a different period of time here, and that's April of 2016

10   through June of 2017, and I'll explain those dates.

11           April 2016 is the first time that we know that

12   Duff & Phelps, on behalf of the plan administrator, ran

13   LoanKinetics -- I'm sorry -- on behalf of the trustees ran

14   LoanKinetics through the pool of active loans.  At that

15   point the pool of active loans was more than 20,000.

16           Then the second date we're using is Dr. Ellson's

17   report, which is June of 2017.  So the issue there is

18   whether when we look at what happened between April 2016

19   whenever the trustees first ran LoanKinetics and a year

20   later when Dr. Ellson looked at it, did the results match

21   up?  In other words, did LoanKinetics accurately predict

22   what was going to happen with those 1800 odd loans that

23   liquidated during that time period?

24           THE COURT:  Okay.

25           MR. MCCALLEN:  And so to get to the point of what

Page 81

1   we're objecting to for the questioning, that second group

2   we're talking about between April -- the 1800 between April

3   of 2016 through June of 2017 I'm objecting to his testimony

4   with respect to those loans because I specifically asked him

5   about that at his deposition.  I'm happy to give Your Honor

6   a copy of the transcript --

7              THE COURT:  Okay.

8              MR. MCCALLEN:  -- so you can see it.

9              THE COURT:  No, I heard that.

10             MR. MCCALLEN:  Uh-huh.

11             THE COURT:  So we're not going to go into that.

12             MS. BLACK:  It's just to illustrate the point,

13   it's really the same point with regard to, so I'm very happy

14   to just focus on the second set, which is the loans that he

15   valued and that liquidated since.  It's -- I can make my

16   point just with one example.  And it will shorten.

17             Just one thing I do want to repeat.  Though he was

18   asked a hypothetical question with regards to that earlier

19   set in his deposition, the numbers were never presented

20   until --

21             THE COURT:  This is beyond.  He was offered an

22   opportunity in the deposition to describe whether or not he

23   had done this comparison or these analytics and the answer

24   was no, so he can't do them now for the first time.

25             MS. BLACK:  He was asked the question but they had

Page 82

1    not presented numbers in order to draw the comparison until

2    their pretrial brief.

3            THE COURT:  Could you read it again, Mr. McCallen?

4            MR. MCCALLEN:  Of course, Your Honor.  Would you

5    like a copy, Your Honor?

6            THE COURT:  No, if you could just read it I would

7    appreciate it.

8            MR. MCCALLEN:  Okay.  The question is:

9                "Did you conduct any sort of analysis to

10               compare whether the loans that liquidated between

11               September of 2016 and April of 2017 liquidated at

12               a value consistent with the LoanKinetics valuation

13               that you provided?"

14           Objection from Ms. Black.

15           Answer, "No, I did not do that."

16           THE COURT:  Okay.  That's the end of it.  He

17   didn't do it, he's not going to testify about it today.

18   Okay?  It doesn't matter that it was a hypothetical, it was

19   asked in a qualitative way, in other words, did you

20   independently perform this analysis in order to double

21   check, back check, stress test the output of LoanKinetics

22   and the answer was no.  So we're not going to do it for the

23   first time today.

24           MS. BLACK:  Can I have -- just ask a clarifying

25   question?

Page 83

1          THE COURT:  Could you please come up?

2      (At sidebar off the record)

3  BY MS. BLACK:

4  Q    Dr. Ellson, going back to my previous question.  So you

5  compared the actual realized losses on a set of loans that

6  liquidated since you valued them through LoanKinetics to

7  what LoanKinetics predicted was going to be the loss in the

8  event of liquidation.  Can you just talk about that -- just

9  that set and what did you find?

10  A    Yes.  Well again we calculated actual realized losses

11  of $193 million, again, this is -- differs from what Lehman

12  argued, which is $244 million.  LoanKinetics predicted

13  realized losses of $168 million, which is 92 percent of

14  actual.  So the estimated losses were 92 percent of actual

15  losses.

16  Q    And how does this --

17  A    Oh, I'm sorry I was looking at the other one.

18  Q    Okay.  Go ahead, yes.

19  A    I apologize.  Actual realized losses were -- we

20  calculated to be just short of $85 million, LoanKinetics

21  predicted $78.3 million, and again that's 92 percent of the

22  actual losses.

23  Q    And what does the fact that the LoanKinetics predicted

24  loss was within 92 percent of the actual realized loss?  How

25  does this in fact inform you with respect to the values that

Page 84

1    you generated using LoanKinetics?

2    A    Well I think it points to the accuracy and reliability

3    of LoanKinetics.

4    Q    And how does the fact that the loans ended up

5    liquidated -- liquidating at a higher realized loss than

6    what LoanKinetics predicted factor into the value generated

7    by LoanKinetics?

8    A    Well the value of LoanKinetics, the value that it

9    generated was obviously contingent upon the characteristics

10   of the loans and the assumptions that went into the models.

11   And again, 92 percent is highly accurate in this context and

12   that was a very important element that we discovered and

13   calculated.

14   Q    Let me ask you differently.  Had LoanKinetics known

15   that the actual realized loss would be 85 million rather

16   than 78 million, would the value generated by LoanKinetics

17   for these loans have been higher or lower?

18   A    Well they would be -- if they were lower losses or

19   expected losses the value of those loans would be higher.

20   Q    So the value that was actually generated by you using

21   LoanKinetics was higher than it would have been had

22   LoanKinetics known that these loans were liquidated --

23   liquidate just a mere month later at a higher loss?

24   A    That's correct.

25   Q    Okay.

Page 85

1          MS. BLACK:  Your Honor, I have concluded by direct

2     examination at this point.

3          THE COURT:  Okay.  Very good.

4          All right.  I think this would be a good time to

5     take the lunch break.  We will -- is an hour sufficient?

6          MR. MCCALLEN:  Certainly works for us.

7          THE COURT:  Is an hour okay?

8          MR. MCCALLEN:  Certainly is for us, Your Honor.

9          MR. COSENZA:  That's fine, Your Honor.

10         THE COURT:  Okay?

11         MR. MCCALLEN:  Thank you, Your Honor.

12         THE COURT:  All right?  Dr. Ellson, same rules

13    apply to your lunch.  We'll see you back here in an hour.

14         THE WITNESS:  Yes, Your Honor.  Thank you.

15         THE COURT:  Thank you.

16      (Recessed at 12:20 p.m.; reconvened at 1:28 p.m.)

17         THE COURT:  Hello.  Please have a seat.  All set?

18         MR. MCCALLEN:  All set, Your Honor.

19         THE COURT:  Okay.  Let's keep going.  Go ahead,

20    Mr. McCallen.  Do you have a binder?

21         MR. MCCALLEN:  Oh, yes.  Yes.  So, Your Honor,

22    just to let you know in advance --

23         THE COURT:  Uh-huh.

24         MR. MCCALLEN:  -- I think I made a lot of progress

25    in cutting this down over lunch and so I'm going to try and

Page 86

1    do this in an hour.

2              THE COURT:  All right.

3              MR. MCCALLEN:  I know we have Mr. Finkel scheduled

4    for this afternoon and we would like to --

5              THE COURT:  Yes.

6              MR. MCCALLEN:  -- proceed with him as soon as

7    possible.

8              THE COURT:  Okay.  Thank you.

9         (Pause)

10             MR. MCCALLEN:  Okay?

11             THE COURT:  Okay.

12                       CROSS-EXAMINATION

13   BY MR. MCCALLEN:

14   Q    Good afternoon, Dr. Ellson.

15   A    Mr. McCallen, how are you?

16   Q    Good.  Prepared to proceed?

17   A    Yes, I am.

18   Q    Okay.  Dr. Ellson, you arrived at the estimated market

19   value calculation that you offered to the Court in your

20   expert report using the LoanKinetics software from Andrew

21   Davidson, correct?

22   A    That's correct.

23   Q    In addition to ADCO's LoanKinetics there are other

24   products available to value residential mortgage loans,

25   correct?

Page 87

1    A    To value residential mortgage loans, no, that is the

2    product.

3    Q    There are not four or five similar products available

4    from different companies?

5    A    To value?

6    Q    Yes.

7    A    No.

8    Q    Mr. Ellson -- I'm sorry -- Dr. Ellson, could you just

9    look at the --

10   A    Whatever you prefer.

11   Q    -- binder that was just placed in front of you, and

12   behind the first tab there is a deposition transcript.

13   A    Yes.

14   Q    I'd like you to take a look at page 11, line 12.

15   Question --

16   A    Sorry, which page are you referring to?

17   Q    I'm sorry.  So it's page 11 of the transcript.

18   A    That would be right in the beginning.

19   Q    Line 12, and I'm going to read the transcript to you,

20   sir.

21   A    All right.

22   Q    "Are there other methods available to valuing

23   residential loans other than LoanKinetics?"

24        Ms. Black, "Object to form."

25        Answer, "Other firms have comparable models."

Page 88

1     Question, "What other firms?"

2     "CoreLogic has one, RiskSpan has one, there are others

3  that I can't think of right at this minute."

4     Question, "How many are you aware of in general?"

5     Ms. Black, "Objection, asked and answered."

6     Answer, "In general probably, you know, four or five

7  similar models, that's a guess."

8     I asked you those questions ask you gave me those

9  answers, correct?

10  A    That's correct.

11  Q    Now, in connection with issuing your expert report in

12  this case you did not run any of those other models to come

13  up with an estimated value for the loans at issue, correct?

14  A    That's correct.

15  Q    Is it -- and it's possible that one of the competing

16  models would have come up with a different value for the

17  loans at issue than the LoanKinetics, correct?

18  A    It is possible.

19  Q    In fact in addition to not running any of those other

20  models in connection with issuing your opening report in

21  this matter you didn't consider doing any other tests or any

22  other potential methodology of valuing the active loans at

23  issue in this case, correct?

24  A    That's because I was using LoanKinetics strictly.

25  Q    Understood.  But you didn't consider any other

Page 89

1    potential methods, correct?

2    A    No.

3    Q    Okay.

4    A    Potential methods referring to what?  Other --

5    Q    Any other --

6    A    -- firms?

7    Q    -- whether it be any of the other products that are out

8    there or any other models or valuations that you either know

9    of or could have come up with to value the loans at issue in

10   this case.

11   A    That's correct.

12   Q    Dr. Ellson, you left ADCO in 2015, correct?

13   A    Yes, I did.

14   Q    And as I think you testified earlier you were the

15   product manager at ADCO while you were there, correct?

16   A    For LoanKinetics, yes.

17   Q    For LoanKinetics.  Thank you to the clarification.

18       Now, ADCO has a modeling group and a financial

19   engineering group, correct?

20   A    That's correct.

21   Q    The modeling group and financial engineering group

22   handled the modeling of the loans that LoanKinetics calls

23   upon, right?

24   A    What do you mean by handles?

25   Q    They were responsible for the modeling of the models

Page 90

1    that LoanKinetics calls upon?

2    A    That's correct.

3    Q    And you were not in the modeling group or the financial

4    engineering group at ADCO, correct?

5    A    No, I was not.

6    Q    Dr. Ellson, you provided testimony this morning which I

7    think would help me shortcut this a little bit, but with

8    respect to LoanDynamix in particular you testified about

9    LoanDynamix this morning, right?

10   A    That's correct.

11   Q    And LoanDynamix is the model that projects the credit

12   performance, right?

13   A    That's correct.

14   Q    And ADCO's modeling group was responsible for modeling

15   of LoanDynamix, right?

16   A    That is correct.

17   Q    And again you weren't in the ADCO modeling group,

18   right?

19   A    That is correct.

20   Q    Okay.  And then with respect to -- I'm going to

21   actually point you to your opening report in this case, that

22   is going to be PA Exhibit 1, which is behind tab 2 of your

23   binder.  And if you can take a look at, it's page 8 of 12

24   using --

25   A    I'm sorry, tab 2 of the binder?

Page 91

1    Q    Tab 2 of the binder, PA Exhibit 1.  You're the first

2    deposition and first exhibit of the case.

3    A    Is this your binder or the one I was using before?

4    Q    Our binder.  I'm sorry.  From here on it'll be our

5    binder.

6    A    Got it.  Appreciate that.  Thank you.  All right.

7    Q    And if you could take a look at page 8 of 22.

8    A    Page 8 of 22.

9    Q    Do you see the figure that's here?  This is similar to

10   the figure you had up in front of the Court this morning

11   when you were describing LoanDynamix and LoanKinetics,

12   correct?

13   A    That's correct.

14   Q    Okay.  Now, if you look on the left-hand side you see

15   box 2 it talks about various loan characteristics.  Do you

16   see that?

17   A    That's correct.

18   Q    And then in box number 3 which appears in the lower

19   right-hand corner you'll see macroeconomic assumptions in

20   there.  Do you see that?

21   A    Yes.

22   Q    And in box 4 the cumulative probabilities.  Do you see

23   that as well?

24   A    Yes.

25   Q    Now, you didn't select the inputs that went into all of

Page 92

1  those different features all feeding the LoanDynamix,

2  correct?

3  A    Yes, they do.

4  Q    And you didn't select the inputs that went into

5  LoanDynamix, correct?

6  A    That is true.

7  Q    And in addition to LoanDynamix LoanKinetics calls on

8  the credit auction adjusted spread model as well, that's

9  right?

10  A    Yes.

11  Q    And the modeling group developed that model as well to,

12  right?

13  A    Financial engineering group developed that model.

14  Q    The model and financial engineering group.  Thank you

15  for the clarification.

16      And as you testified earlier you weren't in that group,

17  correct?

18  A    That's true.

19  Q    And quickly just to cover a couple of the other models

20  that LoanKinetics called upon I believe you testified to the

21  HPI (sic) model?

22  A    The housing price model, yes.

23  Q    Correct.  And that model is important for generating

24  accurate results for LoanKinetics, correct?

25  A    It's important to have that model integrated, yes, into

Page 93

1    LoanKinetics, yes.  Accurate and consistent.

2    Q    So it's important that it be accurate and consistent,

3    correct?

4    A    That's correct.

5    Q    And the modeling group and financial -- modeling and --

6    A    Financial engineering.

7    Q    -- financial engineering group developed that model as

8    well, correct?

9    A    That's correct.

10   Q    And one final model, Dr. Ellson, the term structure

11   model, I think that's also a model that LoanKinetics calls

12   upon; is that right?

13   A    Yes.

14   Q    Was that model also involved -- sorry -- was that model

15   also developed by the modeling and financial engineering

16   group?

17   A    Yes.

18   Q    And you were not involved in that as well, right?

19   A    That's true.

20   Q    When you were employed at ADCO you believed that ADCO

21   conducted testing or validation of the models that

22   LoanKinetics calls upon, right?

23   A    Yes, I do.

24   Q    And that included stress tests on the models?

25   A    Yes, that would be part of development.

Page 94

1    Q    And that would include changing input parameters like

2    housing pricing shocks or interest rates to see how stable

3    the results are, correct?

4    A    That would be one of many tests.

5    Q    And the validation of LoanKinetics also involved

6    forecasting credit performance; is that correct?

7    A    It doesn't forecast anything.

8    Q    The validation of LoanKinetics --

9    A    It doesn't forecast, it takes output from the

10   LoanDynamix model and output from the valuation models and

11   generates output and analysis as required by the client.  It

12   does not generate anything to do with the projected cash

13   flows.

14   Q    My question is with respect to the process of

15   validation that occurred at ADCO.  Whether the process of

16   the validation of LoanKinetics involved forecasting and

17   credit performance.

18   A    At ADCO for LoanDynamix model?

19   Q    Yes.

20   A    The LoanDynamix model was developed, tested, and

21   validated.  All the models that LoanKinetics called were

22   tested and validated.

23   Q    Okay.  The process involves -- the process

24   (indiscernible - 2:06:38) involves stress testing some of

25   the inputs into the model like housing prices and interest

1    rates, correct?

2    A    Among others, yes.

3    Q    You don't know the methodology used to stress test the

4    housing prices generated by the HP model to determine

5    whether they were in a range of acceptable outcomes,

6    correct?

7    A    That was all done prior to my employment.

8    Q    So the answer is no?

9    A    That's correct.

10   Q    You don't know the methodology used to stress test

11   interest rates to determine if the results for that model

12   were within the range of acceptable outcomes either, right?

13   A    They were done before my employment, that's right.

14   Q    Again, so the answer is no?

15   A    The answer is no.

16   Q    You also don't know what margin of error in the results

17   from LoanKinetics were deemed acceptable in order to

18   determine that LoanKinetics was valid and could be put on

19   the market, correct?

20   A    There is no margin of error.  The numbers had the tie

21   out to the dollar, as I testified earlier.

22   Q    Okay.  I'd like you to take a look of your testimony

23   again.

24           THE COURT:  Okay.  I think you're talking past

25   each other.  Okay?  I think that Dr. Ellson just gave an

Page 96

1    answer that speaks to the operation of LoanDynamix on a

2    stand-alone basis and the operation of LoanDynamix within

3    the construct of LoanKinetics.  Is that what your answer was

4    about?

5              THE WITNESS:  Yes, Your Honor.

6              THE COURT:  Okay.  I don't think that was the

7    answer that you were asking.

8              MR. MCCALLEN:  It wasn't, Your Honor.  Thank you

9    for the clarification.

10             THE COURT:  Okay.  All right.

11             MR. MCCALLEN:  Maybe -- I'm going to try to ask a

12   better question.

13   BY MR. MCCALLEN:

14   Q    So again I'm talking in the context of the testing that

15   took place at the time that LoanKinetics was validated,

16   right?

17   A    The testing in what context?  Again, the models were

18   tested and validated and they were integrated into

19   LoanKinetics, hundreds of thousands of loans were tested by

20   LoanKinetics calling those models, and again the objective

21   of that was to verify that the numbers were exactly the same

22   to the dollar.  Whatever internal or external use was of the

23   models.

24   Q    So LoanKinetics provides an estimated market value for

25   any given loan, correct?

1    A    It takes those values from the valuation models.  It

2    does not generate again the value.  The option adjusted

3    spread model, the credit option adjusted spread model is the

4    one that generates the values.

5    Q    Okay.  So I'm trying to get a clear understanding,

6    Doctor.  So you provided to the Court an estimated market

7    value on a loan by loan basis, correct?

8    A    That's correct.

9    Q    All right.  Did you use LoanKinetics for that?

10   A    Yes, I did.

11   Q    Okay.  So LoanKinetics provides then an estimated

12   market value on a loan by loan basis, right?

13   A    That's output that's delivered to LoanKinetics, yes.

14   Q    Okay.  So my question is whether you know what margin

15   of error was deemed acceptable for ADCO in determining

16   whether LoanKinetics was valid, it could be put to the

17   market with respect to the accuracy of the estimated market

18   value that it produces.

19   A    Again, you're asking a question that's not applicable

20   to LoanKinetics.  LoanKinetics takes the output from

21   LoanDynamix, that's the credit analysis, it takes the values

22   from credit option adjusted spread and creates reports and

23   analysis from that output.

24   Q    Was there any testing done to determine whether the

25   estimated market value produced by LoanKinetics was getting

Page 98

1    it right?

2    A    What do you mean by getting it right?

3    Q    Was it producing a number that was accurate?

4    A    Well there's no market, and what LoanKinetics does is

5    totally consistent with level three pricing, the FASB 157.

6    There is no market.

7    Q    So it's your view there was no way to test the accuracy

8    of LoanKinetics?

9    A    What do you mean by accurate?  There's no market.

10   Q    I mean whether or not the estimated market value that

11   LoanKinetics produces is in fact an accurate prediction of

12   the value that the loan will liquidate at eventually.

13   A    It's an accurate prediction based on ADCO models, the

14   assumptions that were used, the forecasts that were used.

15   It's very accurate, to the dollar.

16   Q    Dr. Ellson, you've discussed your experience while you

17   were employed at ADCO.  I want to talk specifically about

18   and draw a distinction between that time and the work you

19   performed in connection with your report here.

20   A    Okay.

21   Q    That you've done in this case.

22        So as of June 1st, 2017 when you issued your report in

23   the case you didn't do anything to verify the reliability of

24   the valuation numbers LoanKinetics generated for the loans

25   in your report, you relied on the modelers at ADCO to get it

Page 99

1    right, correct?

2    A    The valuations came out of the models.

3    Q    Right.  Did you do anything to test the reliability?

4    A    To test the reliability again in what context?  The

5    models are monitored, developed, and tested by the

6    appropriate groups.  I relied on them.  I knew these people

7    and I relied on their expertise.

8    Q    So you relied on them but you personally didn't perform

9    any calculations to test the reliability of the numbers that

10   LoanKinetics generated?

11   A    I did not have access to the models in this basis to

12   perform those types of tests, that's done within the

13   appropriate groups.

14   Q    So I'm -- so the answer to my question is that no you

15   didn't personally perform any calculations to check the

16   reliability of those numbers?

17   A    Again, what do you mean by reliable?  The numbers

18   are --

19   Q    My question is whether you --

20   A    -- consistent, the numbers are accurate, and it

21   produced a very appropriate estimated market value.

22   Q    So, Dr. Ellson, the question that I'm asking is whether

23   you performed any calculations to check the reliability of

24   the figures from ADCO's LoanKinetics?

25   A    The reliability of LoanKinetics depends on the

Page 100

1   reliability of the models that it calls, and no, I did not

2   test those.

3   Q    Since you left ADCO in 2015 you haven't had any

4   involvement in testing of LoanKinetics since that time,

5   correct?

6   A    That's correct.

7   Q    Dr. Ellson, your opinion does not include any margin of

8   error for the estimated market value figure calculated for

9   each loan in your report, correct?

10  A    I was asked to provide an estimate, not a range of

11  estimates.

12  Q    I understand, sir, but my question was whether you

13  provided a margin of error in your opinion?

14  A    Again, there is no margin of error.  The output comes

15  from the models and it ties out to the dollar.

16  Q    Okay.  So the answer is no?

17  A    In the way you framed the question the answer is no.  I

18  don't believe that your question is appropriate.

19          THE COURT:  Mr. Ellson -- Dr. Ellson, so I'll

20  decide whether his questions are appropriate.

21          THE WITNESS:  Okay.  I'm sorry, Your Honor.

22          THE COURT:  Okay?  This is cross-examination and

23  this is difficult stuff so Mr. McCallen is trying to form

24  questions, some of them may or may not be perfect questions.

25          I think the question ultimately that Mr. McCallen

Page 101

1    is putting is that if there were a glitch in the machine, if

2    there were a glitch in LoanDynamix LoanKinetics would take

3    that glitch and when it called on LoanDynamix somehow that

4    glitch would not get translated into the output from

5    LoanKinetics, right?

6              THE WITNESS:  If there is a glitch or an error --

7              THE COURT:  Right.

8              THE WITNESS:  -- say the wrong -- you know, some

9    of the wrong data or the dates didn't line up.

10             THE COURT:  Or a piece of code, you know, was

11   wrong.

12             THE WITNESS:  Okay.  But in validating

13   LoanKinetics you would test that --

14             THE COURT:  Sure.

15             THE WITNESS:  -- externally.

16             THE COURT:  I understand.

17             THE WITNESS:  But in the context of doing the

18   analysis, no, that would not have been captured.

19             MR. MCCALLEN:  Okay.  I can proceed, Your Honor.

20             THE COURT:  Okay?

21             MR. MCCALLEN:  Yes.

22             THE COURT:  Okay.  Let me ask a different

23   question.

24             So we have -- and I'm going to block a name of the

25   mortgage-back security pricing part of it.  There's

Page 102

1     LoanDynamix and there's --

2              THE WITNESS:  Credit option adjusted spread.

3              THE COURT:  -- credit option adjusted spread.

4     Okay.  So if I have -- so I have credit option adjusted

5     spread and I have LoanDynamix and they work together in

6     LoanKinetics, right?

7              THE WITNESS:  That's correct, right.

8              THE COURT:  Okay.  And you explained very clearly

9     this morning how the credit option pricing spread does its

10    thing on the loans.  I get that.  And then something comes

11    out and LoanKinetics tells you what that is, right?

12             THE WITNESS:  That's correct.

13             THE COURT:  And that's what generates the answer

14    that you provided to the trustees in this case, right?

15             THE WITNESS:  That's correct.

16             THE COURT:  Okay.  So simplistically -- very

17    simplistically if you have two chemicals, right, you have

18    chemical A and chemical B, right, and you put them into

19    something and they come out you might have chemical A and

20    chemical B or you might have some third chemical, right, you

21    don't really know how the chemicals are going to react.

22             You're telling me that you know how those two

23    models react and that the way they react provides a --

24    generates an output from LoanKinetics that is valid, right?

25             THE WITNESS:  That's correct, Your Honor.

Page 103

1    THE COURT:  Okay.  And that interaction in your

2    view has itself been validated.  In other words, the

3    integrity of each of those models and the way those models

4    talk to each other and then get called up by LoanKinetics.

5    THE WITNESS:  That's correct, Your Honor.

6    THE COURT:  Okay.

7    MR. MCCALLEN:  Thank you, Your Honor.

8    BY MR. MCCALLEN:

9    Q    In connection with the report that you issued on

10   June 1st you didn't personally run the LoanKinetics

11   software, correct?

12   A    My team did.

13   Q    At Duff & Phelps?

14   A    That's correct.

15   Q    Okay.  So your team is at Duff & Phelps?

16   A    For this particular project, yes.

17   Q    And when you had Duff & Phelps run LoanKinetics on the

18   loans at issue here you relied on ADCO's default tuning

19   settings, correct?

20   A    Yes.

21   Q    And during your time at ADCO you were not involved in

22   the setting or determination of those default settings,

23   correct?

24   A    That's true.

25   Q    In connection with valuing the pool of non-liquidated

Page 104

1  loans at issue here and specifically in connection with the

2  report that you issued you did not review the default tuning

3  settings to determine whether or not you thought they were

4  appropriate, correct?

5  A    That's correct.

6  Q    Similarly you did not change any of the default

7  settings that ADCO permits you to change to test for

8  sensitivities to those changes, correct?

9  A    I did not want to impose my views on settings or the

10  assumptions or the forecasts.

11  Q    I understand, sir, but my question was different.  My

12  question was whether you adjusted the default settings in

13  any way to test for sensitivities to see if you changed

14  those settings how that would impact the ultimate results.

15  You didn't do that, correct?

16  A    No, I did not.

17  Q    Thank you.

18       Dr. Ellson, please take a look at plan administrator

19  Exhibit 3, which is behind tab 4.  This document is called

20  LoanKinetics validation.

21  A    Yes.

22  Q    And it's by -- I'm going to try to get it right.  I

23  believe it's Etna Delbase (ph).

24  A    That's correct.

25  Q    Did I say that correct?  Great.  Thank you.  You're

Page 105

1    familiar with this document, correct?

2    A    Yes.

3    Q    Let's take a look at page 9 of 28, and I'm counting 9

4    based on the numbers on the bottom of the document.  Are you

5    there, sir?

6    A    Yes.  Does that start with the previous validated

7    components?

8    Q    Yeah.  So I'm in the -- so in the very last paragraph

9    is where I'm going to focus, and particularly what starts

10   with LDM allows, and you can also look at the screen, sir,

11   if that's easier for you too, we'll have it up there.

12   A    Okay.  But I'd like to see it here.

13   Q    Sure.

14   A    I'm not sure I have the right page.

15          MR. MCCALLEN:  Can you zoom out?

16          THE WITNESS:  So is it page 9 or is it page 11 or

17   28?

18   BY MR. MCCALLEN:

19   Q    So it's page 9 counting from the bottom.  You see where

20   it says page 9 of 28?  And then --

21   A    Okay.

22   Q    -- if you look on the second --

23   A    Okay.  I have it now.  Thank you.

24   Q    Okay.  And it says, "LDM user" -- pardon me, strike

25   that.

Page 106

1              "LDM allows users to tune model parameters in

2        order to express their views about collateral

3        performance or market conditions.  The tuning

4        parameters also allow users to perform sensitivity

5        analysis.  This feature is particularly valuable for

6        periods when market conditions deviate drastically from

7        historical averages."

8        Do you see that?

9   A    Yes, I do.

10  Q    You did not perform any sensitivity analysis or any of

11  the other type of analyses described in that section of the

12  LoanKinetics document in connection with issuing your

13  report, correct?

14  A    That's correct.

15  Q    I want to continue reading in that document.  It says:

16             "The website also provides advance tools for

17        measuring model fit and a number of dimensions.  These

18        tools allow users to one, validate the fit of LDM to

19        historical loan types and cohorts."

20       In connection with issuing your report in this case you

21  didn't use any of the tools in LoanDynamix to validate the

22  fit of LoanDynamix to historical loan types and cohorts,

23  correct?

24  A    That's correct.

25  Q    Continuing on the passage says "that the tools allow

Page 107

```
 1   two, to measure the extent to which their loan performance

 2   is similar to those LDM relies on."  We'll stop there.

 3        You did not do anything to measure the extent to which

 4   the loan performance of the loans at issue here is similar

 5   to the loan performance of the loans LDM relies upon,

 6   correct?

 7   A    What do you mean LDM relies upon?

 8   Q    I'm reading exactly what the document says, sir.

 9   A    Well I'm not sure of the context of that statement.

10   Q    So my question is, you did not do anything to measure

11   the extent to which the loan performance of the loans at

12   issue here is similar to the loan performance of the loans

13   that LDM relies upon, correct?

14   A    That's correct.

15   Q    And then further point three, "Adjust tunings

16   accordingly to ensure best fit."  You did not do any -- you

17   did not make any adjustments at all to the tuning settings

18   in connection with issuing your opinion in this case,

19   correct?

20   A    That's correct, I relied on the modelers at ADCO.

21   Q    I want to now turn to page 15 and 16.  It's the

22   paragraph that begins on 15 and carries over, but the

23   language I'm going to focus on is on 16.  And it says, "We

24   have not specifically tested model accuracy on seasoned and

25   low balance loan pools."  Do you believe that's an accurate
```

Page 108

```
 1    statement, sir?

 2    A    It's accurate, but it's not relevant here.

 3    Q    Okay.  My question was do you believe that that's an

 4    accurate statement?

 5    A    It's accurate in the sense that it did not look at

 6    pools, it looked at loans.

 7    Q    So you believe that when ADCO writes in there loan

 8    validation LoanKinetics document that we have not

 9    specifically tested model accuracy on seasoned loan --

10    season and low balance pools that they were referring to

11    loans and not pools?

12    A    Well they were referring to pools, but certainly the

13    analysis was done on season and low balance loans.

14    Q    Okay.  Sir, I'd like to direct your attention to your

15    deposition, and that's at page 144, line 17.

16    A    I'm sorry.

17    Q    Sorry, 144, line 17.

18    A    Get back to this deposition.  I'm sorry, I have a --

19    I'm there.

20    Q    Question, "Do you know whether the results of

21    LoanKinetics have been tested on season loan pools?"

22         "Has it been tested?"

23         I'm sorry.  Answer, "Has it been tested?"

24         Question, "Yes."

25         Answer, "We valued legacy loans when I was there, so if
```

Page 109

1    you want to call that testing."

2        Question, "I'm not just using the word that ADCO uses

3    in its own document, right?  ADCO says 'we have not

4    specifically tested model accuracy on season and low balance

5    loan pools,' so I'm asking whether or not you're aware that

6    this is true, that ADCO specifically tested model accuracy

7    on season loan pools."

8        Ms. Black, "Objection, mischaracterizes the document."

9        Answer, "I don't know."

10       I asked you those questions ask you gave me those

11   answers, correct, sir?

12   A    That's correct, because it was done on pools.  Pools

13   test differently than loans.

14   Q    So my question was whether I had asked you those

15   questions and you gave me those answers at the deposition?

16   A    That's right.

17   Q    Thank you, sir.

18       When LoanKinetics was developed ADCO used a base case

19   of loans in that model development, correct?

20   A    A base case?  I don't know what you mean by that.

21   Q    So was there a set universe of loans that ADCO tested

22   to see if they were getting the results right?

23   A    We used hundreds of thousands of loans, some of which

24   we had in your database and some of which were given to us

25   by potential clients.

1    Q     Okay.  You currently don't have access to that body of

2    loans, correct?

3    A     That's correct.

4    Q     And you didn't have access to that body of loans

5    whenever you issued your report in this case, correct?

6    A     That's correct.

7    Q     So in connection with issuing your report you didn't

8    make any comparison between the loans that are at issue in

9    this case and the loans that were used by ADCO to develop

10   the models that LoanKinetics calls upon, correct?

11   A     Comparable loans that had been analyzed in the testing

12   period.  Comparable loans to the NLL.  We tested legacy

13   loans.

14   Q     My question, sir, was whether in connection with

15   issuing your report whether you compared the loans that are

16   at issue in this case with the loans that ADCO used to

17   develop the LoanKinetics -- develop LoanKinetics and the

18   models LoanKinetics calls upon to see whether or not those

19   are comparable?  You didn't do that, correct?

20   A     That would have been within LoanDynamix, not

21   LoanKinetics.

22   Q     My question was whether you did that, sir?

23   A     No, I did not.

24   Q     I'd like to direct your attention to paragraph 17 of

25   your opening report, which should be behind tab 2.

1   A     I'm sorry, what -- am I in your binder still?

2   Q     I'm sorry.  So it's PA-1, which is behind tab 2 in the

3   binder that I gave you.

4   A     Okay.  Yes.

5   Q     And we're looking specifically at paragraph 16 -- I'm

6   sorry -- paragraph 17.

7   A     Again, is that my expert report that I'm referring to

8   here?

9   Q     Yes.  I'm sorry.

10          THE COURT:  Mr. McCallen, why don't you give

11  Dr. Ellson an assist.

12          THE WITNESS:  Okay.  I'm on --

13          THE COURT:  Are you there Dr. Ellson?

14          THE WITNESS:  I believe so.  It's underneath the

15  overview of analytics and models utilized?

16  BY MR. MCCALLEN:

17  Q     Correct.  It's paragraph 17.

18  A     Yes.

19  Q     And there's one sentence in particular I want to focus

20  on, which we'll highlight on the screen for you.

21          "LoanKinetics is being used by mortgage banks,

22      mortgage loan insurers, and buy side firms for loan

23      valuations for financial reporting and investment

24      purposes."

25          See that sentence?

Page 112

1   A     That's correct.

2   Q     And is that statement accurate?

3   A     It was -- we had five clients at the time I left ADCO,

4   one of which was a -- like I mentioned a top 20 bank, there

5   were two other banks, there was a money manager, a hedge

6   fund, and we were in negotiations with mortgage insurers.

7         You have to understand that LoanKinetics is a six-

8   figure investment for a one-year lease, people don't take

9   that type of investment lightly.

10            MR. MCCALLEN:  Your Honor, so I'll move the strike

11   the portions of the answer which were non-responsive.  My

12   question was whether it was an accurate statement.

13            THE COURT:  I think I'll let it stand.

14            MR. MCCALLEN:  Okay.

15            THE COURT:  All right?

16            MR. MCCALLEN:  Thank you, Your Honor.

17   BY MR. MCCALLEN:

18   Q     When you left ADCO in 2015 there were no mortgage loan

19   insurers that used LoanKinetics for loan valuation, for

20   financial reporting, and investment purposes, correct?

21   A     That's correct.

22   Q     And the bank that you refer to, can you tell us who it

23   is?

24   A     No.

25   Q     Why?

Page 113

1    A    Not permitted to by my separation agreement.

2    Q    LoanKinetics is also used for valuation for trading

3    purposes, right?

4    A    It's valuation for trading purposes, yes.

5    Q    And again when you left ADCO one client used

6    LoanKinetics for valuation for trading purposes on a regular

7    basis, correct?

8    A    Potentially more than one, because the bank that took

9    in the first client that took in LoanKinetics had a trading

10   operation on loans, they might well have used it there, and

11   there's a money manager and a hedge fund, both of who could

12   have used it for trading purposes.  But when they lease a

13   model we don't over -- I don't oversee them.

14   Q    When you left -- my question was when you left there

15   was one client that used LoanKinetics for valuation for

16   trading purposes on a regular basis, correct?

17   A    I think there potentially could have been more than

18   one.  Again, I don't -- once they lease the model it's in

19   their hands.

20   Q    So it's hypothetically possible that --

21   A    It's hypothetically --

22   Q    -- they had other people --

23   A    -- possible.

24   Q    -- using their license?

25   A    That's correct.

Page 114

1    Q    But as far as you are aware, sir, there was one client

2    who was using it for trading purposes at the time you --

3    A    One that I was --

4    Q    -- left?

5    A    -- totally aware of.  Yes.

6    Q    Dr. Ellson, I want to turn to Plan Administrator

7    Exhibit 2, which is behind Tab 3 of your report.  And this

8    is your reply report in this case.

9    A    Okay.

10   Q    Do you recognize that, sir?

11   A    Yes, I do.

12   Q    In particular, paragraph 12 on page 5 of 14.

13   A    Okay.

14   Q    You state here, "When divergence between actual and

15   model results are reserved, the modeler will 'tune' the

16   model to obviate the discrepancy and continue to monitor it

17   to observe whether the variation is temporary or a real

18   trend."  Is that a true and accurate statement, sir?

19   A    Yes, it's true.  There are, you know, again, dozens of

20   loan types over a variety of origination years.  The model

21   needs to be turned in some of the cases for some of the loan

22   types and some of the origination years.  And tuning is a

23   common practice in this type of work.

24   Q    Right.  So I'm reading from your reply report and my

25   question is whether this is a true statement.  Is that a

Page 115

1    true statement, sir?

2    A    That's correct.

3    Q    And I believe you just testified you believe some

4    tunings at ADCO occur semi-annually to annually; is that

5    correct?

6    A    I -- they occur infrequently, but, yes, semi-annual or

7    annual would probably be correct.

8    Q    Okay.  So I would like you now to turn to Tab 12 of

9    your binder, which is PA Exhibit 11.  We're going to put it

10   up on the screen, but you also have access to it in your

11   binder.

12        (Pause)

13   Q    Do you see the first line, and I -- I apologize.  I

14   know it's a difficult document to make sense of.  But at the

15   top there's a line that says, tuning values_2.1.text.  Do

16   you see that?

17   A    Yes, I do.

18   Q    Now this is the ADCO tuning file provided to clients

19   showing the tunings to ADCO models, correct?

20   A    I believe these are the tunings to the LoanDynamix

21   model, but I'm not sure.

22   Q    But you have no reason to doubt that this -- these are

23   --

24   A    These are --

25   Q    -- the ADCO --

Page 116

1    A    -- the tunings --

2    Q    -- tunings, correct?

3    A    -- to the LDM.  That's correct.

4    Q    You did not review these tunings before or in

5    connection with issuing your report in this matter, correct?

6    A    No, I did not.

7    Q    Now each row in this document, which is 40 pages long,

8    represents individual tunings that were done on LoanKinetics

9    model -- ADCO models or models that LoanKinetics calls upon,

10   correct?

11   A    They are LoanDynamix.

12   Q    Okay.

13   A    The tunings were on LoanDynamix, not on LoanKinetics.

14   Q    So let me ask a cleaner question.  So each of -- each

15   line in this document represents a tuning that was done on

16   LoanDynamix, correct?

17   A    That's correct.

18   Q    Let's take a look at one of these.  I would like to

19   turn to page 2 of the document.  About halfway down there

20   are various entries for LoanDynamix option arm.  Do you see

21   that?

22   A    Yes, I do.

23   Q    That refers to a specific type of loan, right, option -

24   -

25   A    Yes.

Page 117

1   Q    -- arm?

2   A    Yes.

3   Q    And what kind of loan is that?

4   A    Well, it's a -- well, let me put it this way.  When I

5   was at Washington Mutual in the portfolio there were $60

6   billion worth of option arms.  And with these particular

7   loans the borrower has the option of paying a fully

8   amortizing principal and interest, or they can pay interest

9   only, or they can pay something less than interest only, or

10  they can just make some minimum payment.

11  Q    Okay.  So thank you for that answer.  That -- but this

12  is -- this type of loan is called a pay option arm, correct?

13  A    That's correct.

14  Q    All right.  So now towards the end of this subset of

15  loans that we're looking at for the LoanDynamix option arms

16  you'll see a line, if you look to the right it says, tune

17  severity.  Do you see that?

18  A    Okay.  Yes, I do.

19  Q    Now that refers to the tuning or modification of loss

20  severity for that type of loan, correct, tune severity?

21  A    I would think so, yes, but I have no way of knowing

22  that for sure.

23  Q    Okay.  So you don't know -- you didn't personally

24  determine whether or not the tune severity designation on

25  this document refers to loss severity as recorded in

Page 118

1    LoanDynamix, correct?

2    A    I do not -- would not know that for sure.  That's

3    correct.

4    Q    Now loss severe -- loss severity is the amount of loss

5    that would be suffered on a loan in the event of default,

6    correct?

7    A    That's correct.

8    Q    Would you agree to loss --

9    A    Or foreclosure.

10   Q    Would you agree that loss severity is an important

11   variable in measuring the value of a loan?

12   A    Measuring the value, yes.

13   Q    Now moving across -- from left to right across the row

14   you'll see that there are different tuning parameters

15   associated with different dates beginning with 5 of 2007 and

16   ending with 12 of 2014.  Do you see that?

17   A    Yes, I do.

18   Q    Now looking, for example, at the first one which is

19   5/2007 or May 20, 2007, the value is .6.  Now, sir, my

20   question is what this document shows is that if you ran

21   LoanKinetics in May of 2007 you would have to reduce the

22   loss severity outcome that LoanDynamix produces for option

23   arms securities by 40 percent to get to the correct result,

24   correct?

25   A    I have no way of knowing that, what that .6 represents.

Page 119

1    I was not involved in the model or the tunings.

2    Q    Okay.  So let's slide a little further on this

3    spreadsheet to the right.  And you'll see for June 2012 the

4    value is 1.4.  So the question is, again, if you ran

5    LoanKinetics in June of 2014 and you got the result for the

6    loss severity on the option arms securities, you have to

7    reduce or you have to increase the outcome by 40 percent in

8    order to get the correct value, correct?

9    A    I have no idea whether your statement is correct or

10   not.

11   Q    Okay.  And just one more, sir, moving a little further

12   to the right, now as of December 2014 and the value says

13   2.2.  That indicates that you need to multiply the loss

14   severity output for option arms by a factor of 2.2 for the

15   output from LoanDynamix to be accurate, correct?

16   A    That's not -- I have no idea.  It's not verified.  I do

17   not know what that 2.2 represents.

18   Q    Let's take a look at another one.  I would like to look

19   at page 6 of the document.  About a quarter of the way down

20   there's an entry for LoanDynamix subprime 228's.  Do you see

21   that?

22   A    I'm getting there.

23   Q    Okay.  Take your time.  I know it's a cumbersome

24   document.

25        (Pause)

Page 120

```
 1    A      Okay.  I'm -- yes.  I'm there.

 2    Q      And to the right of one of those entries you'll see it

 3    says tune prob loss TD.  Do you see that?

 4    A      That's correct.  I see it.

 5    Q      Okay.  Now this refers to a particular type of

 6    security, a subprime 228, right?

 7    A      That's right.

 8    Q      And the column that says tune prob loss, that refers to

 9    tuning the probability of loss in termination to default for

10    that security, correct?

11    A      I can't guarantee that, but I would infer that.

12    Q      That makes sense to you, right?

13    A      It makes sense to me.

14    Q      And to the right of that it says, always.  Do you see

15    that?

16    A      Yes.

17    Q      And to the right of that it says 2.0, right?

18    A      Yes.

19    Q      And, sir, does that indicate that the value that

20    LoanDynamix calculates for subprime 228s with respect to

21    probability of loss needs to be multiplied by a factor of

22    two to be accurate?

23    A      I can't attest to that at all.

24    Q      Sir, you testified in your deposition -- or sorry.  You

25    stated in your report that when divergence between actual
```

1    and model results are observed the model -- it will tune the

2    model to obviate the discrepancy and continue to monitor it

3    to observe whether the variation is temporary or a real

4    trend.  If the divergence persists then it is systematic and

5    that element of the model will be modified and recalibrated

6    through proper model estimate procedures as appropriate.

7        If the tuning factors that I just showed you and

8    represented to you are accurate and, for instance, need to

9    be multiplied by a factor of two to produce the correct

10   result from now and always, does that represent the kind of

11   persistent divergence between model results and actual

12   results that --

13   A    Well, I can't --

14   Q    -- requires recalibration?

15   A    -- I can't make that determination.  I don't know what

16   those numbers represent.

17   Q    Well, I'm asking you hypothetically, sir.

18   A    Well, hypothetically could you repeat the question?

19   Q    Sure.  If LoanDynamix subprime 228 where it says that

20   the tuning of the loss probability needs to be multiplied by

21   a factor of two to be accurate regardless of what date you

22   use in order to run the calculation.  If that's true does

23   that represent a persistent divergence between model results

24   and actual results that require recalibration of the

25   underlying model?

Page 122

1    A    Hypothetically, yes.

2    Q    As far as you know the last time that any of the models

3    that LoanKinetics calls on were recalibrated was in 2012,

4    correct?

5    A    It was recalibrated in 2010 and 2012, so that was the

6    last time.  And there's only certain elements that were

7    recalibrated.  For example, there's a transition from

8    seriously delinquent to terminated.  That's the transition

9    that was re-estimated in 2010, and the loss severity

10   equation was the one that was re-estimated in 2012.

11   Q    So the recalibrations that happened in 2012 were

12   limited then, correct?

13   A    Well, limited to loss severity which is extremely

14   important.

15   Q    And nothing else since then as far as you're aware of?

16   A    Not that I'm aware of.

17            MR. MCCALLEN:  So, Your Honor, I think we've been

18   going close to an hour.  What I was going to suggest is I'm

19   trying to shorten it.  I think --

20            THE COURT:  Yeah.

21            MR. MCCALLEN:  -- if we take --

22            THE COURT:  We've been --

23            MR. MCCALLEN:  -- a short break then I can --

24            THE COURT:  We've been going for about 50 minutes

25   so we can take a short break particularly in the service of

Page 123

1      trying to shorten things.

2              So we'll come back in ten minutes and hopefully

3      conclude with Dr. Ellson then.

4          (Recess taken at 2:13 p.m.; reconvened at 2:34 p.m.)

5              THE COURT:  Mr. McCallen.

6              MR. MCCALLEN:  Thank you, Your Honor.

7      BY MR. MCCALLEN:

8      Q    Dr. Ellson, before you were retained in this matter

9      were you aware that the trustees ran LoanKinetics on a pool

10     of non-liquidated loans that were submitted into the

11     protocol in this case?

12     A    That was prior to?

13     Q    Prior to your retention are you aware of that?

14     A    No, I was not aware.

15             THE COURT:  Dr. Ellson, would you pull that mic

16     back towards --

17             THE WITNESS:  I'm sorry.

18             THE COURT:  -- you, please.  Thank you.

19             THE WITNESS:  Sorry, Your Honor.

20     BY MR. MCCALLEN:

21     Q    So you were not aware that when the trustees ran loan -

22     - the trustees ran LoanKinetics through a pool of loans that

23     are still at issue in this case in 2016?

24     A    I was not aware of it when I was initially contacted at

25     the end of the summer in 2016.

Page 124

1    Q    And when you started to do your analysis in June of

2    2017 or -- strike that.

3         When you started to perform your analysis in connection

4    with providing your affirmative report in this case were you

5    made aware that a prior run of LoanKinetics took place in

6    2016 on a similar pool of loans?

7    A    I was made aware.

8    Q    Okay.  Are you aware how many loans it was -- that were

9    in the case and were run through LoanKinetics at that time?

10   A    I don't know the exact number.  I assumed it was

11   greater than 20,000.

12   Q    Does about 20,800 loans, does that sound right?

13   A    It sounds reasonable.

14   Q    And when you issued your report in this case were --

15   did you ask to get access to the results of that 2016 run of

16   LoanKinetics?

17   A    No, I did not.

18   Q    So you do not use the results you -- that were obtained

19   from LoanKinetics in 2016 in any way to test the accuracy of

20   the results that you obtained from LoanKinetics in 2017,

21   correct?

22   A    Again, what do you mean by testing the accuracy?

23   Q    My question is whether you conducted any tests?

24   A    No, I did not.

25   Q    Are you aware how many loans liquidated between the

Page 125

1    period of April 2016 when that run of LoanKinetics took

2    place and June -- or April 2017 whenever you calculated the

3    loan position and space (sic)?

4    A    From April to April?

5    Q    Yes.

6    A    '16 to '17, I believe that there were 1,800 loans

7    roughly that terminated or liquidated, I believe liquidated.

8    Q    And when you conducted -- strike that.

9         Whenever you submitted your expert report in this case

10   did you look at the performance of those 1,800 loans to see

11   whether it supported or did not support the LoanKinetics

12   valuations being offered to the Court?

13   A    No, I did not.

14   Q    Now are you also aware that in April of 2016 the

15   trustee -- the trustees also provided the plan administrator

16   a purchase price calculation?

17   A    I'm aware that they provided one.

18   Q    Okay.  And they provided a LoanKinetics valuation for

19   20,000 loans, correct?

20   A    I can't speak to that.  I don't know what they did.

21   Q    Are you aware in this case that Dr. Snow has relied

22   upon your estimated market value in order to calculate the

23   potential damages to the trustees in this case?

24   A    Yes.  I'm aware of that.

25   Q    Okay.  And you understand that he took the net purchase

Page 126

1    price of all of the non-liquidated loans at issue in the

2    case and subtracted your estimated value from that number;

3    is that correct?

4    A     The net purchase price would be the purchase price

5    minus my number.  My number served as a credit to the plan

6    administrator.

7    Q     Okay.  So you --

8    A     That's my understanding.

9    Q     -- you understand that he calculated the purchase price

10   for all of the active loans in the case and then reduced

11   from that amount your estimated market value, and the amount

12   that's left is what the trustees are seeking a recovery for

13   on the non-liquidated loans; is that correct?

14   A     I believe that's correct.

15   Q     And you understand that -- strike that.

16         (Pause)

17   Q     In connection with issuing your report did you check to

18   see how many of the loans that were run through LoanKinetics

19   in 2016 liquidated without a loss subsequently?

20   A     No, I did not.

21   Q     So you did not consider that information in determining

22   whether LoanKinetics provided a reliable result, correct?

23   A     That's correct.

24   Q     Dr. Ellson, I would like to take a look at your -- a

25   slide that you testified about this morning during your

Page 127

1    direct testimony.  It's TRDX-352.

2        (Pause)

3    Q    Do you recall testifying about this slide this morning?

4    A    Yes, I do.

5    Q    And I want to take a look at the third bullet point on

6    your slide there.  Do you see where it says, and I'm turning

7    into longhand the abbreviations, but current balance times

8    loss severity equals LoanKinetics predicted realized loss.

9    Do you see that?

10   A    That's correct.

11   Q    And so it was your testimony this morning, correct,

12   that by multiplying the figure in the current balance column

13   times the loss severity column you were able to get an

14   accurate statement of realized loss, correct?

15   A    Yes, because all those loans had liquidated.

16   Q    So that's correct --

17   A    That's correct.

18   Q    -- right?  Now do you know that Dr. Snow in this case

19   has also done a calculation of realized loss for the

20   trustees?

21   A    I don't know.

22   Q    Okay.  So you don't know that Dr. Snow has done a

23   calculation of realized loss --

24   A    I am not aware --

25   Q    -- in this case for the trustees?

Page 128

1    A    -- of Dr. Snow's mandate.

2    Q    Do you know the formula that he used to calculate

3    realized loss in this case?

4    A    No, I don't.

5    Q    Do you know whether he used the formula that you used

6    here?

7    A    Well, that -- this formula is different because it

8    deals strictly with terminated loans.  We know that they --

9    not terminated.  We know they liquidated and so this

10   calculation works in that context.  If you wanted to broaden

11   this out to loans in general it would be current balance

12   times default rate times loss severity.

13   Q    When you say terminated loans you mean liquidated

14   loans?

15   A    Liquid -- well, termination can be a number of things.

16   It can be loans that are prepaid or they could be loans that

17   liquidated.

18   Q    But it can include liquidated loans, right?  A

19   liquidated loan is a terminated loan?

20   A    That's correct.

21   Q    So it's your testimony that taking the current balance

22   times loss severity is an accurate way to calculate realized

23   loss; is that correct?

24   A    For liquidated loans.

25   Q    For liquidated loans?

Page 129

1   A    That's correct.

2   Q    Do you understand that Dr. Snow used a formula of

3   unpaid principal balance plus interest plus servicer fees to

4   calculate realized loss?

5   A    I am not aware of the specific calculation.

6   Q    Are you aware whether taking the current balance times

7   loss severity in the LoanKinetics output would always give

8   you the unpaid principal balance plus interest plus servicer

9   fees?

10  A    No, it wouldn't include -- it wouldn't include foregone

11  interest and it wouldn't include servicer fees.

12  Q    But otherwise the calculations would be the same?

13  A    I would have to look at it.

14  Q    And you didn't look at it, correct?

15  A    No.

16          MR. MCCALLEN:  I have nothing further, Your Honor.

17          THE COURT:  Okay.  Thank you.

18          Ms. Black, anything?

19          MS. BLACK:  I believe I am ready to go.

20          THE COURT:  Okay.

21       (Pause)

22          MS. BLACK:  Can we have TRDX-352, please?

23                    REDIRECT EXAMINATION

24  BY MS. BLACK:

25  Q    Dr. Ellson, you were just asked by counsel for the plan

Page 130

1    administrator whether using the formula that we see here

2    which is the current balance times the LoanKinetics

3    predicted loss severity or rather the LoanDynamix predicted

4    loss severity is an accurate way to calculate realized loss

5    for purposes of this proceeding.  Do you remember that

6    question?

7    A    Yes, I do.

8    Q    And just so we are clear, the calculation that we see

9    here, that is the estimated loss in the event of default; is

10   that correct?

11   A    That's correct.  It's estimated.

12   Q    So it's not the actual numbers.  What happens in the

13   event of an actual liquidation is just LoanKinetics

14   prediction of what might happen or what loss severity might

15   be in the event that it happens, correct?

16   A    That's correct.

17   Q    Thank you.

18        Dr. Ellson, if you could please open the binder from

19   the plan administrator and if I could refer you to Tab 4

20   which is Plan Administrator Exhibit 3.

21        (Pause)

22   Q    And if we could turn to page 7 of that document which

23   is, I guess, page 9 of 28, sorry, 9 of 28.  And within --

24   A    Wait a second.  I'm sorry.

25   Q    Sorry.  Yes.  Let me know when you're ready.

Page 131

1    A    Page 7?

2    Q    It is page 7 of the paper, but it is labeled --

3    A    Page 9 of 28.

4    Q    -- page 9 of 28.

5    A    Okay.  I'm there.

6    Q    And I will refer you to the paragraph that you were

7    examined about by Mr. McCallen.  In this paper by ADCO

8    regarding LDM validation it says, "ADCO provides recommended

9    tunings for LDM on its website by loan type."  Do you see

10   that?

11   A    Yes, I do.

12   Q    And just so we are clear LDM refers to LoanDynamix?

13   A    Yes.

14   Q    And the recommended tunings from ADCO is what you used

15   for purposes of your analysis, correct?

16   A    That's correct.

17   Q    And as far as you are aware Professor Fischel also used

18   those recommended ADCO tunings for LoanDynamix when he ran

19   his analysis?

20   A    As far as I know, yes.

21   Q    And, again, just so we are clear Professor Fischel used

22   LoanDynamix to estimate future losses on the very loans that

23   you calculated a market value for, correct?

24   A    Yes.  That's true.

25   Q    And the purpose for which he used LoanDynamix

Page 132

1    calculating future losses is the same purpose that you used

2    LoanDynamix for within LoanKinetics?

3    A    That's true.

4    Q    And he felt comfortable relying on those ADCO

5    recommended values?

6                MR. MCCALLEN:  Objection.  Foundation.

7                MS. BLACK:  Okay.

8                THE COURT:  You want to lay the foundation for that

9    last question?

10               MS. BLACK:  I'm going to withdraw it.

11               THE COURT:  Okay.

12   BY MS. BLACK:

13   Q    Moving on to Plan Administrator Exhibit 11 which is in

14   Tab 12 of the binder.

15        So this document contains the ADCO recommended tunings

16   for LoanDynamix, correct?

17   A    That's correct.

18   Q    That's what we saw being referred to in the paper that

19   we just looked at?

20   A    Yes.

21   Q    And these are the tunings that you relied on for

22   purposes of your analysis?

23   A    That's correct.

24   Q    And, again, as far as you are aware it's this -- these

25   very tunings that Professor Fischel also relied on for

Page 133

1    purposes of his analysis using LoanDynamix?

2    A    Yes.

3            MR. MCCALLEN:  Objection.  Your Honor, can we

4    approach for one second?

5            THE COURT:  Yes.

6        (Sidebar off the record)

7    BY MS. BLACK:

8    Q    Have you seen any evidence put forward by any of the

9    plan administrator's experts suggesting that the recommend -

10   - the LoanDynamix -- let me rephrase that.

11       Have you seen any evidence put forward by the -- any of

12   the plan administrator's experts showing that the ADCO

13   recommended tunings for LDM are inappropriate or inaccurate

14   in any way?

15   A    No, I have not seen any.

16   Q    And we've heard a lot --

17           THE COURT:  Apologies.

18   BY MS. BLACK:

19   Q    We've heard a lot about tuning today.  I just want to

20   make sure that we have the basics down.  So can you just

21   explain briefly what does tuning mean?  What does tuning and

22   model mean?

23   A    Tuning means you're making an adjustment to reflect

24   idiosyncratic conditions.  For example, as I pointed out on

25   several occasions there are dozens of loan types and these

Page 134

1   were done over a multiple of origination years under varying

2   underwriting circumstances.  Tunings are used to account for

3   some of the errors that might be developed in terms of some

4   of these loan categories.  Again, it's -- there are dozens

5   of loan categories.  This is a widespread tool.

6   Q    And does --

7            THE COURT:  Can I --

8            MS. BLACK:  Uh-huh.

9            THE COURT:  -- interrupt and ask a very narrow

10  question.

11           So, for example, an idiosyncrasy that you could

12  tune for -- this is a question, I have no idea -- would be

13  to account for something like a natural disaster in Houston

14  that would have a -- an idiosyncratic effect on, to your

15  point much earlier today, kind of a microgeographic area of

16  homes?

17           THE WITNESS:  That's correct, Your Honor.  It

18  definitely would be used to adjust for an event like that.

19           THE COURT:  Okay.  Thank you.

20           MS. BLACK:  I believe I have one last question.

21  BY MS. BLACK:

22  Q    Does tuning and model mean that there is anything

23  fundamentally wrong, that there is a fundamental flaw with

24  the core algorithm of the model?

25  A    No.  Tunings are again commonly done.  It's a practice

Page 135

1    and it indicates nothing is wrong with the core of the

2    model.

3    Q    Thank you.

4              MS. BLACK:  I don't have any further questions --

5              THE COURT:  Thank --

6              MS. BLACK:  -- at this time.

7              THE COURT:  Thank you.

8              Mr. McCallen.

9              MR. MCCALLEN:  Nothing further, Your Honor.

10             THE COURT:  Very good.

11             Dr. Ellson, thank you very much.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  You are excused.  Please enjoy the rest

14   of your day.  Thank you for your patience and good will here

15   today, good humor.

16             THE WITNESS:  Thank you.

17             THE COURT:  Okay.  So what are we doing next?

18             MR. SHUSTER:  Next we'll have Mr. Finkel --

19             THE COURT:  Okay.

20             MR. SHUSTER:  -- who is present in the courtroom.

21   Ms. DeLucia will conduct Mr. Finkel's examination.  We'll --

22   if we can just have a few minutes to set up we'll be ready

23   to go.

24             THE COURT:  Okay.  Could I ask a collection of you

25   to come up?

Page 136

1          (Laughter)

2               UNIDENTIFIED SPEAKER:  Yes.

3          (Sidebar off the record)

4          (Recess taken at 2:52 p.m.; reconvened at 3:23 p.m.)

5               THE COURT:  All right.  Please everyone have a

6     seat.  Thank you for your patience.

7               Ready when you are.

8               MS. DELUCIA:  Good afternoon, Your Honor.  The

9     trustees would like to call James Finkel.

10              THE COURT:  Okay.  Mr. Finkel, come on up.

11              MS. DELUCIA:  And we have some books and --

12              THE COURT:  Okay.

13              MS. DELUCIA:  -- (indiscernible).

14              THE COURT:  Hello.  How are you, sir?  Please step

15    up.  Would you raise your right hand, please?

16                   JAMES K. FINKEL, WITNESS, SWORN

17              THE COURT:  Very good.  Have a seat.  Make --

18              THE WITNESS:  Thank you.

19              THE COURT:  -- yourself comfortable.  Adjust the

20    mic so we can hear you.

21              THE WITNESS:  Sure.

22              THE COURT:  And if you would like to take a break

23    at any time please let us know.  You do not need to wait for

24    one of the lawyers to ask you.

25              THE WITNESS:  Okay.

Page 137

1      THE COURT:  Okay.  Thank you.

2                    DIRECT EXAMINATION

3   BY MS. DELUCIA:

4   Q    Good afternoon, Mr. Finkel.

5   A    Good afternoon.

6   Q    Do you understand you are here to testify today as an

7   expert on behalf of the trustees?

8   A    I do.

9   Q    Can you turn to TRDX-370, please?

10       (Pause)

11  Q    Mr. Finkel, is TRDX-370 a summary of your educational

12  background?

13  A    It is.

14  Q    Would you mind walking the Court through your

15  educational background beginning with after high school and

16  continuing to any post-graduate work, please?

17  A    Sure.  I obtained my bachelor of arts in international

18  political economy from Colorado College in 1982, and I went

19  directly on to graduate school at the London School of

20  Economics.  I received a master's of science in 1983 in

21  international politics.  I went right from the LSE to the

22  University of Miami law school, graduated in 1986 with

23  honors, served on the law review, and then as a young

24  associate working at a law firm here in New York.  At night

25  I studied and obtained my LOM in taxation which I received

Page 138

1    in 1990 from NYU.

2    Q    And broadly speaking can you describe for the court the

3    nature of your work history over the past 30 years?  We'll

4    talk about the specifics in a moment.  If you could just

5    give the Court a sense of the kind of work you've been

6    engaged in.

7    A    Sure.  I've been affiliated or associated with complex

8    fixed income securities pretty much my whole 30 year career.

9    I began my career as a tax associate at (indiscernible)

10   mainly working on mortgage backed securities deals.  Then I

11   was a banker for 12 years at three investment banks and also

12   one small broker/dealer, again mainly working in mortgage

13   backed securities, residential mortgage backed securities

14   and other securitized products.  I spent five years in

15   London as a securitization banker.

16       And then the next phase of my career I started and co-

17   founded an investment management firm which largely invested

18   in residential mortgage backed securities.  I ran that for

19   seven years, converted it to a consulting business and then

20   sold that consulting business to Duff & Phelps where I've

21   been acting as a managing director in largely fixed income

22   and capital markets consulting for the last seven years.

23   Q    Mr. Finkel, can you describe your experience in terms

24   of RMBS and securitized products specifically, please?

25   A    Sure.  I was firm introduced to this product in 1987.

Page 139

1   As a tax lawyer I worked on about 350 mortgage backed

2   securities transactions analyzing the cash flows and the

3   capital structures.  I was very intrigued with the business

4   side of the product and was fortunate enough to get a job in

5   (indiscernible) securities where I actually had three roles

6   in mortgage finance. I was our banker and transaction

7   manager for all of our agency residential mortgage backed

8   securities as well as the private label issuances.  I worked

9   on the secondary market desk obtaining distressed mortgages

10  and mortgage securities and repackaging them.  And finally I

11  ran a mortgage origination finance facility where we

12  actually lent money to mortgage originators against their

13  production which eventually were turned into mortgage backed

14  securities.

15      And I was there for about three years, two and a half

16  years, went to a small broker/dealer where I almost

17  exclusively worked in sales and trading of some of the most

18  complex residential mortgage backed securities and also did

19  some advisory work for some government agencies.  And then I

20  was at Bear Stearns for five years working on a variety of

21  securitized products, both residential mortgage backed

22  securities, but also CDOs and CLOs involving high yield debt

23  and emerging market debt, European bank debt.

24      I went to Europe as the Euro currency came into effect

25  and started developing securitized products in the Euro

Page 140

1    currency in 1998 and 1999 and did that for five years,

2    returning to the U.S. in 2003 where I started the money

3    management business.  And there I got deeply involved again

4    with residential mortgage backed securities.  As now a

5    buysider (sic) we ended up running about five billion of

6    investments, four billion of which were residential mortgage

7    backed securities.

8         And as the consulting business -- side of that business

9    ended up growing we ended up analyzing approximately 50

10   billion residential mortgage backed securities as

11   consultants.  I led many of those projects.  And then

12   finally as the consulting business was acquired by Duff &

13   Phelps I ran a valuation group for a year which valued

14   mortgage loans and mortgage backed securities, and then for

15   the last five or six years at Duff & Phelps I've been

16   chiefly doing litigation consulting and testifying.

17        I still do -- I would say about 20 percent of my time I

18   still do transactional business as well.

19   Q    And the consulting business you referred to before Duff

20   & Phelps, that was at Dynamic (sic) Credit Partners; is that

21   right?

22   A    That's correct.

23   Q    And in 2010 Duff & Phelps acquired Dynamic Credit; is

24   that right?

25   A    That's right.

Page 141

1    Q    Are you currently employed at Duff & Phelps?

2    A    I am.

3    Q    What's the nature of your work at Duff & Phelps today?

4    A    Today, again, predominantly I work as a consultant and

5    testifier in a wide variety of largely capital -- financial

6    crisis related disputes involving complex securities or

7    asset management issues.  Sometimes they may involve post-

8    M&A disputes.  They can -- I've worked on some international

9    projects as well regarding securitized product.  And as I

10   said about 20 percent of time I do transactional business

11   trying to land advisory work or liquidation business.

12   Q    And the Court is obviously familiar with Duff & Phelps,

13   but can you give the Court a sense of Duff & Phelps'

14    global business generally?

15   A    Sure.  It's become since I've been there seven years

16   quite a large firm.  We have about 2,500 employees now.

17   We're considered the largest valuation firm, independent

18   valuation firm in the world.  We also have investment

19   banking business with sale side advisory, fairness opinions,

20   solvency opinions.  We have a real estate practice, a tax

21   practice, and a fairly extensive disputes and investigations

22   practice which is also global ranging from forensic work

23   through consulting and testifying in commercial disputes.

24   Q    Mr. Finkel, during the course of your career have you

25   had occasion to use financial models?

Page 142

1    A    Yes, I have.

2    Q    What kinds of financial models?

3    A    I've used both what I call off the shelf financial

4    models as well as proprietary models.  Some of the earliest

5    models that I worked with go back to pre-Excel.  They go

6    back to Lotus 1-2-3 that I worked on as a tax lawyer in the

7    80s.  But when I was a financial professional on Wall Street

8    I often used Bloomberg in the early days to run a variety of

9    cash flows on RMBS.  I worked with other systems such as

10   Wall Street analytics.

11       I developed my own tax models for RMBS and ran those.

12   I've worked with TREP on commercial mortgage backed

13   securities.  I -- the investment banks, we had proprietary

14   models such as yield book or HYDRA that the investment banks

15   developed.

16       Ultimately I ended up working with Intex which became

17   the predominant off the shelf model for RMBS and CDOs, and

18   I've also worked with the Andrew Davidson models.

19   Q    And for what purposes have you generally used financial

20   models?

21   A    Generally to either assess risk -- risk metrics or to

22   conduct valuations.  Generally, you know, running cash flows

23   using different credit assumptions, discounting them back to

24   -- for market-clearing yields for valuation purposes.

25   Sometimes we use models for hedging purposes.  And largely -

Page 143

```
 1    - and also sometimes for portfolio analytics, for group

 2    analytics.

 3    Q    And you mentioned the Andrew Davidson & Co models.

 4    Have you -- and if I refer to those as ADCO you'll

 5    understand what I mean?

 6    A    Yes.

 7    Q    Have you found the ADCO models to be reliable?

 8    A    I have.

 9    Q    Have you found that the ADCO models are used routinely

10    in the RMBS industry?

11    A    You know, ADCO's own advertising through its website

12    and other publications indicate that it's widely used.  I

13    think as an industry participant for the last 25 years I

14    know anecdotally of a lot of entities, financial entities

15    and market participants that have used ADCO as well.

16    Q    Mr. Finkel, have you ever been invited to lecture to

17    various audiences?

18    A    I have.

19    Q    And to which audiences and on what subject matters have

20    you lectured?

21    A    I've lectured quite often on capital markets and

22    complex securities issues, both at industry conferences and

23    to academic groups, whether graduate or undergraduate.

24    Q    Are you licensed by any professional boards or bars,

25    sir?
```

Page 144

1    A    I am.

2    Q    Which professional boards or bars?

3    A    Excuse me.  I'm a Series 52 registered representative

4    with FINRA so I can offer and execute on private placements,

5    dead instruments and certain equities.  I'm also a member of

6    the bar since 1987, although I have inactive status.  I'm a

7    member of the Academy of Economic and Financial Experts.

8    I'm also a former member of the American Securitization

9    Forum and the Alternative Investment Management Association.

10   Q    Mr. Finkel, have you previously testified as an expert

11   witness?

12   A    I have.

13   Q    Have you been qualified by any courts to testify as an

14   expert witness?

15   A    I have been.

16   Q    Which courts have qualified you to testify as an expert

17   witness?

18   A    I have been qualified in U.S. Federal Court Southern

19   District.  I have been qualified in U.S. Federal Bankruptcy

20   Court Southern District, this court --

21           THE COURT:  Really?

22           THE WITNESS:  Yes.  In the --

23       (Laughter)

24           THE WITNESS:  -- in the GSC matter --

25           THE COURT:  Yes.

Page 145

1           THE WITNESS:  -- about three years ago.

2           THE COURT:  Thank you for reminding me.

3       (Laughter)

4           THE WITNESS:  And I've been qualified in New York

5   State Supreme Court, Connecticut State Court, Delaware

6   Chancery Court and Federal Court in Australia.

7   BY MS. DELUCIA:

8   Q    And approximately how many times have you testified as

9   an expert witness?

10  A    In courtroom testimony six times.

11  Q    And have you testified in any arbitration proceedings?

12  A    Yes, I have.

13  Q    And how many times have you testified in court --

14  excuse me -- in arbitration proceedings as an expert?

15  A    I believe four times.

16  Q    What were the subject matters of the engagements where

17  you've testified as an expert witness, sir?

18  A    In many of the cases it involved residential mortgage

19  backed securities or CDOs backed by residential mortgage

20  backed securities.  Often they involved damages estimation

21  or loss estimation.  I also have testified on synthetic CDOs

22  and CLOs as well as CMBS.  But virtually all of them

23  securitized product related.

24          MS. DELUCIA:  Your Honor, the trustees would like

25  to tender Mr. Finkel as an expert on the subject of running

Page 146

1   financial models for the purposes of deriving recovery

2   ratios for RMBS elements.

3           THE COURT:  Mr. Cosenza.

4           MR. COSENZA:  Your Honor, we have no objection.

5   And, also, Jonathan Waisnor, who is an associate at Willke,

6   is going to be conducting the cross.

7           THE COURT:  Okay.

8           MR. COSENZA:  So just to follow Your Honor's rules

9   he's going to be doing any objections during the

10  examination.

11          THE COURT:  Okay.

12          MR. COSENZA:  He'll be --

13          THE COURT:  Sounds good.

14          MR. COSENZA:  He'll be the one.

15          THE COURT:  Very good.

16          MR. COSENZA:  Thank you.

17          THE COURT:  Okay.  All right.

18          MS. DELUCIA:  Thank you.

19  BY MS. DELUCIA:

20  Q    Mr. Finkel, did you submit a report in connection with

21  this proceeding?

22  A    I did.

23  Q    And would it be helpful for purposes of your testimony

24  today to have a copy of that report handy?

25  A    Yes, it would be.

1    Q    You have a binder in front of you.  Would you mind

2    flipping to TRX-649, please, sir?

3    A    Okay.

4        (Pause)

5    Q    Mr. Finkel, is TRX-649 a copy of the report that you

6    submitted in this proceeding?

7    A    Yes. It's a copy of the body of the report.  I think

8    the exhibits follow in the binder.

9    Q    Okay.  Let's discuss the opinions that you're offering

10   here.

11        MS. DELUCIA:  Can you show TRDX-372, please?

12   BY MS. DELUCIA:

13   Q    Mr. Finkel, please take a look at TRDX-372.  Is this a

14   summary of your opinions that you're offering here today?

15   A    Yes, it is.

16   Q    Can you walk us through them briefly understanding that

17   we'll return to them in greater detail in a few moments,

18   please?

19   A    Sure.  As numbered here I've provided four separate

20   opinions.  My first task was to reconcile the lifetime

21   losses of the Lehman loans that Professor Fischel conducted

22   using the same Andrew Davidson LoanDynamix model that he

23   used on the non-liquidated portion of the Lehman loans.  And

24   I effectively tied out to his methodology and his numbers

25   following his -- what I derive to be his methodology.

Page 148

1          I then made certain corrections to the data that

2     Professor Fischel used to more accurately project and create

3     an independent projection of the lifetime losses using the

4     same ADCO LDM toolkit.  I came out with a slightly different

5     number, a slightly lower loss number than Professor Fischel.

6          I then used the same ADCO model and the same

7     methodology to derive projected losses for the non-

8     liquidated loans held in other RMBS trusts, certain other

9     RMBS trusts that had litigation settlements, and then using

10    those independently derived estimated lifetime losses I

11    compared the settlement amounts in those cases to those

12    lifetime losses and derived recovery ratios from -- from

13    those other settlements.  I -- the ranges stated here that I

14    arrived at in those recovery ratios.

15         And then finally I applied that range of recovery

16    ratios to the estimated lifetime losses for the Lehman loans

17    that I had calculated and came up with an amount, a

18    benchmark settlement amount of approximately 2.5, $2.6

19    billion higher than the claim administrator -- the plan

20    administrator's proposed claim amount.

21    Q    Thank you.

22         Mr. Finkel, did you review a report submitted by

23    Professor Fischel on behalf of the plan administrator in

24    connection with this case?

25    A    I did.

Page 149

1    Q    And as they pertain to your opinions here what's the

2    nature of Professor Fischel's opinions?

3    A    Well, pertinent to my opinions Professor Fischel took

4    certain RMBS litigation settlements and used the recovery

5    ratios that he derived from those matters and applied it to

6    his estimate of lifetime losses of the Lehman loans in an

7    attempt to demonstrate whether the proposed claim amount of

8    the plan administrator was in line with some other

9    settlements that he chose.

10   Q    And do you know how Professor Fischel went about

11   calculating a recovery ratio for the RMBS settlements that

12   he identified?

13   A    Yes.  He had to do what you always do to determine

14   lifetime losses.  You combine historic losses plus projected

15   losses.

16        So for the first component he took Dr. Snow's historic

17   losses on a portion of Lehman loans that Dr. Snow had

18   calculated and then he referred to some other data to pick

19   up the remaining lifetime losses of the other loans that Dr.

20   Snow had not addressed.

21        And then for the second component for his -- Professor

22   Fischel's projected losses he used the LoanDynamix model and

23   in so doing projected losses for the loans and added those

24   two components up for a total lifetime loss amount.  And

25   then, you know, derived a recovery ratio off that.

Page 150

1    Q    And how do you know that Professor Fischel used the

2    ADCO LDM model in calculating projected losses?

3    A    Well, it was evident in his production of the data

4    inputs that were provided in production as well as some of

5    the outputs from the LDM model.  We were familiar -- I and

6    my team were familiar with the LDM model and we could tell

7    that that's what was used and I understand that that's been

8    confirmed that that is what he -- the model he, in fact, did

9    use.

10   Q    Let's look at TRX-649 which is your report in this

11   proceeding, and particularly to paragraph 17 and Footnote 2,

12   please.

13        Does that reflect your understanding of how Professor

14   Fischel calculated projected losses in this proceeding?

15   A    Yes.  As I mentioned this would be the second component

16   in the calculation of total lifetime projected losses.  The

17   projected losses that Professor Fischel calculated were

18   different than the ones I independently calculated. I

19   believe that's largely due to Professor Fischel or his team

20   using a one-month different ADCO default tuning parameters

21   than what should have been used.  His calculation date was

22   as of April 2017 and he should have used the April 2017

23   tuning parameters.

24        I couldn't tie out to the numbers using those tuning

25   parameters because I went one month forward and then got

1   very, very close to his numbers and that's how I assumed

2   that he was just a month off using the tuning parameters.

3   But we were quite close, you know, within about, you know,

4   1.2 percent difference.

5   Q    And so using the May 2017 tuning parameters were you

6   able to replicate basically Professor Fischel's projected

7   losses for the non-liquidated loans in this case?

8   A    Yes, to a very, very close number.

9   Q    And did you take any steps to independently calculate

10  what the projected losses were using the April 2017 default

11  tuning parameters, sir?

12  A    Yes.  As I mentioned and as the footnote states through

13  the independent projection I made using the April tuning

14  parameters I came up with a slightly larger amount of

15  expected future losses than Professor Fischel.

16  Q    And what's the number that you arrived at when you did

17  that independent calculation?

18  A    1.454 billion as --

19  Q    And how --

20  A    -- opposed to Professor Fischel's 1.437.  Excuse me.

21  Q    Mr. Finkel, did you perform another calculations

22  concerning the non-liquidated loans at issue in this case?

23  A    Yes, I did.

24  Q    And what did you do?

25  A    Well, the data inputs that I observe from Professor

Page 152

1     Fischel that had to go into the LDM model had certain

2     errors, four predominant ones.  So I corrected those errors

3     having independently reviewed the data and ran those through

4     the model independently to come up with a different

5     estimated projected loss.

6     Q     And are those four corrections that you made reflected

7     anywhere in your report, sir?

8     A     They are.  They are listed in Exhibit 1.

9     Q     If you would turn in your binder to TRX-652, please.

10    Is that Exhibit 1 to your report, sir?

11    A     That is.

12    Q     Can you walk the Court through the differences in the

13    data fields that you used as compared to the fields that

14    Professor Fischel used?

15    A     Sure.  The first data field as titled the coupon type

16    really reflects whether the loans were of a fixed or

17    floating rate.  And for about 8,000 loans Professor Fischel

18    had it backwards.  He classified about 2,700 fixed rate

19    loans as floating and 5,400 floating rate loans as fixed.

20    So I just corrected those to what the actual coupon type was

21    and reset the data in that regard.

22         The second category was the actual numeric coupon

23    itself, and that really was more of a transcription error on

24    Professor Fischel or his team's part where about 1,400 loans

25    were -- had a mis-expressed coupon sometimes varying by a

Page 153

1    couple of decimal places.  So my team and I corrected that

2    as well.

3        The third correction was the modification of the term

4    of the loan.  As many, many loans were restructured or

5    renegotiated their terms were extended and it appeared that

6    Professor Fischel's team or he did not pick up those

7    modifications in about 20,000 loans.  And I extended the

8    term correctly to the modified date on those 20,000.

9        And then finally the loan balances needed to be

10   corrected on about 13, almost 14,000 loans.  There was quite

11   a lot of forbearance loans where a certain principal amount

12   was effectively forgiven and with those the loss severity is

13   obviously a hundred percent because it's effectively a

14   write-off.  And my observation was that Professor Fischel

15   had not picked that up and had left those amounts on the

16   loan balances so he to some extent understated the loss

17   severity of those loans.  So we corrected that as well.

18   Q    Now, Mr. Finkel, what would be the effect, if any, of

19   Professor Fischel using inaccurate inputs like those

20   reflected in your corrections in TRX-652 and his

21   calculations of the lifetime losses?

22   A    Well, in the aggregate it caused Professor Fischel to

23   overstate the losses, the lifetime losses, and effectively

24   overstate the -- in particular the projected losses for

25   these loans.

Page 154

```
 1   Q    And what would be the effect of an overstatement of

 2   lifetime losses on the recovery ratio that Professor Fischel

 3   calculated for the loans at issue in this case?

 4   A    Right.  Well, if you have an overstated lifetime loss

 5   amount and you apply the same settlement amount to it,

 6   you're going to have an understated recovery ratio.

 7   Q    Let's turn back to your report which is TRX-649,

 8   please, and in particular we'll look at paragraph 34.

 9   A    Okay.

10   Q    Does this reflect the calculations you performed for --

11   to arrive at the projected losses related to non-liquidated

12   loans in this action?

13   A    Yes.

14   Q    And is this the methodology that in your report you

15   refer to as the Finkel ADCO method?

16   A    Yes.  I'm not sure ADCO would like having me call it

17   that, but that's what I call it.

18   Q    We'll put a little TM for --

19   A    Yeah.

20   Q    Let's move down a little bit on the page to paragraph

21   36.  Did you also perform a calculation of the historic

22   losses relating to liquidated loans in this proceeding?

23   A    Yes.

24   Q    And what was the result of those calculations?

25   A    I have a slightly different number than Professor
```

Page 155

1    Fischel's calculation of historic losses.  And my number is

2    slightly higher by almost $17 million.

3    Q    And how did you derive at your total number for

4    historic losses?

5    A    The historic losses as I mentioned were kind of a two-

6    part process.  One was picking up Dr. Snow's losses on the

7    loans he analyzed, and then for the remaining loans I used

8    the losses as reflected in servicer data from Nationstar and

9    Wells Fargo.

10   Q    And looking at paragraph 37, sir, did you perform any

11   calculations to arrive at the total lifetime losses for the

12   loans at issue in this proceeding?

13   A    Yes.  So I took --

14   Q    And did -- sorry.

15   A    -- the historic losses we just talked about and --

16   which I independently calculated with my independently

17   calculated projected losses and came to a total estimated

18   loss -- lifetime loss number of $21.115 billion.

19   Q    And how does your total estimated lifetime losses

20   compare to what -- the number that Professor Fischel arrived

21   at for lifetime losses?

22   A    It's approximately $50 million lower than Professor

23   Fischel.

24   Q    Mr. Finkel, let's discuss the other put back

25   settlements that you identified in your report.  If we could

Page 156

1    turn to page 10 of 12 using the TRX numbers at the bottom of

2    the page.

3    A     Yes.

4    Q     And look at the table at the top of the page.  Does

5    this table identify the settlements that you evaluated, sir?

6    A     Yes, it does.

7    Q     And can you explain for the Court what your evaluation

8    of these settlements entailed?

9    A     Sure.  I looked at a couple of different things.

10   Obviously the trustee notice of settlement and I picked up a

11   few things from that, the dollar amounts of the settlements

12   as reflected here, the settlement dates as reflected here,

13   and the -- and the loan groups involved in those.

14       I then independently took the loans in those loan

15   groups and ran them through the ADCO model to estimate their

16   projected losses and I added that to their historic losses

17   that I had picked up from servicer data to come up with a --

18   again, an estimated lifetime loss using the same ADCO LDM

19   toolkit and methodology consistent with what I did with the

20   Lehman loans.

21       From one of the transactions I actually didn't need to

22   calculate an estimated lifetime loss because it was

23   presented in the trustee notice.

24   Q     And which transaction was that which had the lifetime

25   losses presented in the notice?

1    A    That's footnoted in Footnote 11 as the GEWMC 061

2    transaction.

3    Q    Now why did you need to calculate lifetime losses for

4    these trusts for which there had been settlements?

5    A    Well, they weren't present as they were -- it wasn't

6    presented, the number of lifetime losses wasn't presented in

7    the trustee notice or anywhere else.  So the only way to

8    come up with a recovery ratio for these settlements would

9    have required an independent calculation of expected

10   lifetime losses.

11   Q    Now did you calculate the estimated lifetime losses for

12   these trusts for which there had been settlements as of any

13   particular date?

14   A    Yes.  In fact, I calculated it as of two dates, one

15   being the same calculation date as Professor Fischel used in

16   April of 2017, but also I used the month that those RMBS

17   litigations actually settled.

18   Q    Now let's look at your report, TRX-649 and at page 11

19   of 12.  There are two tables for the top of that page.  Do

20   these tables from your report reflect your calculations of

21   the lifetime losses for these trusts?

22   A    Yes.

23   Q    And did you perform any further calculations beyond

24   determining the lifetime losses for these trusts that were

25   the subject of settlements?

Page 158

1    A    Yes, I did.  I then divided those expected lifetime

2    losses by the settlement amounts to arrive at recovery

3    ratios.

4    Q    And what did your calculations yield in terms of the

5    range of recovery ratios for these trusts for which there

6    had been settlements?

7    A    Well, I came up with a range as presented here from 23

8    percent recovery ratio to 23.75 percent.

9    Q    And how does that range compare to Professor Fischel's

10   recovery ratio for the Lehman proposed allowed claim in this

11   proceeding?

12   A    This 23 to 23.75 percent is substantially higher than

13   Professor Fischel's 11.24 percent and it's consistently

14   higher looking at the tight range across these six

15   settlements.

16   Q    If you could turn to page 12 of 12 of your report, sir,

17   and turn our attention to the table at the top of that page,

18   did you do anything else with respect to the recovery ratios

19   that you calculated for the other trusts for which there had

20   been settlements?

21   A    Yes, I did.  I took those derived recovery ratios and

22   then I applied them to the estimated lifetime losses that I

23   had independently derived for the Lehman loans.  And in so

24   doing I arrived at a benchmark settlement amount, applying

25   any one of the six recovery ratios as listed on this -- on

Page 159

1   this table.  And I also showed the difference between that

2   new benchmark settlement amount using these recovery ratios.

3   I showed the excess over the plan administrator's proposed

4   claim amount.

5   Q    And what did that excess show?

6   A    It showed a range of approximately 2.475 billion to two

7   point almost seven billion dollars of excess over the plan

8   administrator's proposed claim amount.

9   Q    Mr. Finkel, are you familiar with a recent RMBS put

10  back case that was tried before Judge Castel in the Southern

11  District of New York?

12          THE COURT:  Yes, Mr. Waisnor.

13          MR. WAISNOR:  Your Honor, this -- I think we're

14  going to get into the (indiscernible) settlement that wasn't

15  disclosed to us and I asked Mr. Finkel at his deposition --

16          THE COURT:  Going to get into the I'm sorry, I

17  didn't hear the words?

18          MR. WAISNOR:  We're going to -- I'm sorry, Your

19  Honor.  We're going to get into the calculation of the

20  recovery ratio for a settlement that was not disclosed in

21  Mr. Finkel's report.  And I actually asked him at his

22  deposition whether he had calculated any recovery ratios for

23  any additional settlements that weren't in his report and he

24  said he had not.

25          MS. DELUCIA:  Your Honor, with all due respect to

Page 160

1    the --

2              THE COURT:  Yeah.

3              MS. DELUCIA:  -- notice, the public notice

4    pertaining to the MARM settlement amount came out on the day

5    of Mr. Finkel's deposition.  He could not have testified

6    about it at that time.

7              THE COURT:  Okay.  But that doesn't cure the

8    problem that he can't offer a new opinion here today without

9    counsel having had an opportunity to test it before today.

10             MS. DELUCIA:  For purposes of the MARM settlement

11   actually Mr. Finkel did not calculate the recovery ratio.

12   The recovery ratio is presented in a public document.  He's

13   actually just doing the same math that he did to derive a

14   benchmark settlement amount.

15             THE COURT:  Come on up.

16        (Sidebar off the record)

17             THE COURT:  Okay.  I'm sure that Mr. Finkel can't

18   remember the question.  It has to do with MARM.  So, Ms.

19   DeLucia, if you could repeat the question, please.

20             MS. DELUCIA:  I don't remember the question myself.

21             THE COURT:  You asked if Dr. -- if Mr. Finkel --

22             MS. DELUCIA:  Yeah.

23             THE COURT:  -- was familiar with the settlement and

24   litigation before Judge Castel involving the loans

25   affectionately known as MARM.

Page 161

1          MS. DELUCIA:  Your Honor is --

2          THE COURT:  Right?

3          MS. DELUCIA:  -- more on the ball --

4          THE COURT:  Okay.

5          MS. DELUCIA:  -- than I am.

6     (Laughter)

7  BY MS. DELUCIA:

8  Q    Mr. Finkel, can you answer the Court's question?

9          MR. WAISNOR:  I just want to state for the record -

10 -

11         THE COURT:  Yes.

12         MR. WAISNOR:  -- that this settlement has not been

13 disclosed as part of Mr. Finkel's opinion.  We have not had

14 a chance to test any of the assumptions.  We frankly just

15 got it today in the binder and we would just like to put

16 that on the record.  Given some considerations I understand,

17 you know, the --

18         THE COURT:  All right.

19         MR. WAISNOR:  -- (indiscernible).

20         THE COURT:  Ms. DeLucia is going to be permitted to

21 ask Mr. Finkel a limited number of questions about this that

22 do not in any way seek to elicit any analysis of the numbers

23 that may be apparent in reading public documents in the MARM

24 case.

25         MS. DELUCIA:  Understood.

Page 162

```
 1              THE COURT:  Okay.

 2   BY MS. DELUCIA:

 3   Q    Mr. Finkel, what's your understanding of the MARM case,

 4   just generally?

 5   A    It's an RMBS put back action.

 6   Q    Have you reviewed any notices to holders in connection

 7   with the MARM case, sir?

 8   A    I have.

 9   Q    And are the notices to holders that you've reviewed

10   available publicly?

11   A    Yes.

12   Q    Where are they available?

13   A    On CTS link.

14   Q    And what is CTS link?

15   A    It's a website that's supported by Wells Fargo that

16   anybody can log in after they make certain representations,

17   but anyone can log in.  And once you're in you can access a

18   variety of reports and notices regarding a large number of

19   mortgage backed securities transactions.

20              THE COURT:  Yes.

21              MR. WAISNOR:  Your Honor, I just want to object and

22   say I'm not sure this is publicly available, but if you need

23   to make representations --

24              THE COURT:  Is it --

25              MR. WAISNOR:  -- (indiscernible) --
```

Page 163

1          THE COURT:  Is it a publicly available document in

2     that I could go on the PACER website and get it --

3          THE WITNESS:  I --

4          THE COURT:  -- because that's not --

5          THE WITNESS:  You can go in -- yes, on the CTS

6     website and get it.  When I said you make representations,

7     you just have to click I accept like with many websites, but

8     --

9          THE COURT:  But is it a -- is it a document that's

10    filed in a court somewhere?

11         THE WITNESS:  That I'm unaware of.  It's publicly

12    available through the -- the CTS website is a business

13    website, not a legal website as far as I know.

14         MR. WAISNOR:  I just have some -- a little bit of

15    knowledge of this.  This -- I mean, I think you have to

16    create an account and have a password and just log in.

17         THE COURT:  Okay.

18         MR. WAISNOR:  I think -- I don't think this is --

19         THE COURT:  Unless this is a --

20         MR. WAISNOR:  -- publicly available.  I was given

21    to understand that this was on a docket somewhere.

22         THE COURT:  That's what -- when I -- I was

23    operating under the assumption that it was on a docket.

24    That's in the sense that I was assuming that it was publicly

25    available.  If it's not on a docket, then we're not going to

Page 164

```
 1    have questions about it.

 2             MS. DELUCIA:  It is not on a docket --

 3             THE COURT:  Okay.

 4             MS. DELUCIA:  -- as far as I know.

 5             THE COURT:  All right.  Then I think we're going to

 6    move on.

 7             MS. DELUCIA:  Okay.

 8             MR. WAISNOR:  Thank you, Your Honor.

 9         (Pause)

10             MS. DELUCIA:  I think we'll conclude our direct.

11             THE COURT:  Okay.  Thank you.

12             Mr. Waisnor, are you ready to start right in or do

13    you need a few minutes?

14             MR. WAISNOR:  Just like a minute or two to get set

15    up, Your Honor.

16             THE COURT:  Okay.

17             MR. WAISNOR:  So --

18             THE COURT:  I'm going to stay put if you don't

19    mind.

20             MR. WAISNOR:  Oh, no worries.

21             Can Mr. Berns approach and hand up some binders?

22             THE COURT:  Sure.

23             MR. WAISNOR:  Thank you.

24         (Pause)

25             THE COURT:  Ready when you are.
```

Page 165

1        MR. WAISNOR:  May I proceed?

2        THE COURT:  Please.

3                        CROSS-EXAMINATION

4   BY MR. WAISNOR:

5   Q    Good afternoon, Mr. Finkel.

6   A    Hello, Mr. Waisnor.

7   Q    We're going to put up on the screen now a chart from

8   page 29 of Professor Fischel's rebuttal report which is Tab

9   2 of your binder, Plan Administrator Exhibit 82.

10  A    Okay.

11  Q    So you're familiar with this chart, correct?

12  A    Yes.

13  Q    And in the first row on this chart, Column D, that sets

14  forth Professor Fischel's estimated expected lifetime losses

15  for the approximately 15 -- 415,000 loans and 235 trusts at

16  issue in this case; is that correct?

17  A    Correct.

18  Q    Okay.  And Professor Fischel calculated those expected

19  lifetime losses to be $21.165 billion, correct?

20  A    Correct.

21  Q    And one part of your assignment here was to recreate

22  Professor Fischel's calculation of expected lifetime losses;

23  is that right?

24  A    Yes.

25  Q    And you calculated the expected lifetime losses for the

Page 166

1    loans and the trusts that are involved in this case as

2    $21.115 billion, correct?

3    A    I think that's correct.  If I can just quickly refer to

4    that number, but I --

5    Q    Of course.

6    A    It sounds right.

7         (Pause)

8    A    That's correct.

9    Q    Okay.  So you were able to replicate Professor

10   Fischel's expected lifetime loss calculations to within a

11   very small difference; is that right?

12   A    Within $50 million on 21 billion, yes.

13   Q    Is that a very small difference in your mind?

14   A    It's all relative depending on who's involved.  To me

15   $50 million is a lot of money, but it's -- as a percentage

16   of 21 billion it's very -- it's a small percentage.

17   Q    Okay.  Generally the estimated lifetime loss number is

18   just the sum of projected losses and historic losses; is

19   that right?

20   A    Correct.

21   Q    And you calculated that 19.745 billion of the estimated

22   lifetime losses were historical losses; is that correct?

23   A    Correct.

24   Q    And historical losses are just another way of saying

25   the reported realized losses after liquidation of the loans,

Page 167

1    correct?

2    A    Correct.

3    Q    And realized losses of the loan are just the difference

4    between the net liquidation proceedings and the outstanding

5    principal balance of the loan at the time of liquidation; is

6    that correct?

7    A    It's the reported amount to the trust.  It -- net

8    liquidation -- it -- you know, depending on how you use your

9    definitions my understanding of a calculation of a loss on a

10   loan in RBMS transaction isn't just the, you know,

11   foreclosure proceeds, but it also involves expenses, re-

12   compensation of servicer advances, other elements.

13   Q    Mr. Finkel, in Tab A of your binder you'll find your

14   deposition transcript.  Can you please turn to page 106,

15   line 17?

16   A    I'm sorry.  This -- tab --

17   Q    Tab A?

18   A    Tab A.  Okay.  And page?

19   Q    Page 106.

20   A    Okay.

21   Q    I'm going to read from your deposition, "Question:  Do

22   you know what the elements of the realized loss figure are?"

23   This is on line 17.

24        "Answer:  I assume you're asking what --effectively how

25   a    realized loss number is arrived at.

Page 168

1          "Question:  Yeah.  That's a good --

2          "Answer:  Well, it's generally the difference between

3    the  net liquidation proceeds, the current outstanding

4          principal balance of a loan.  The net liquidation

5          proceeds have, you know, as you know, as you probably

6          know several elements to them."

7          Did I ask that question and did you give that answer?

8    A    Yes.

9    Q    All right.  And to calculate the historical losses you

10   used the same data sources that Dr. Snow used with some

11   small adjustments to a cap or gaps in his data, correct?

12   A    Yes.  That's correct.

13   Q    Turning --

14   A    Can you repeat your question one more time?  I'm sorry.

15   You went a little --

16   Q    Oh, I'm sorry.

17   A    -- quickly there.

18   Q    So to calculate the historical losses you used the same

19   data sources that Dr. Snow used with some small adjustments

20   to a cap or some gaps in his data; is that correct?

21   A    Well, it's a little more precise than that.  I used Dr.

22   Snow's losses which only covered a portion of the 415,000

23   loans, and for the remainder I used the servicer data from

24   Wells Fargo and Nationstar.

25   Q    So in turning to your calculation of projected losses

Page 169

1    Professor Fischel used Andrew Davidson's LoanDynamix model

2    to calculate projected losses on the active loans on all the

3    trusts at issue in this case, correct?

4    A    Yes.

5    Q    And you also calculated projected losses by running

6    LoanDynamix on the active loans, correct?

7    A    Correct.

8    Q    And as of the date of your report there were

9    approximately 65,000 active loans in the population that was

10   the subject of your report; is that correct?

11   A    That's correct.

12   Q    For purposes of your report the term active loan means

13   a non-liquidated loan; is that correct?

14   A    Correct.

15   Q    And your calculation of projected losses on all the

16   active loans was $1.371 billion, correct?

17   A    That's correct.

18   Q    And using LoanDynamix you were able to replicate

19   Professor Fischel's calculation of projected losses to

20   within .036 percent; is that correct?

21   A    That's correct.

22   Q    You view this difference as de minimis, correct?

23   A    Correct.

24   Q    Prior to this case you had no personal experience using

25   LoanDynamix in any of your work, correct?

Page 170

1   A    I use other -- I used other loan -- ADCO models.  Did

2   you mention LoanDynamix or --

3   Q    LoanDynamix.

4   A    LoanDynamix?  I don't think I had used the LDM model

5   previously.  I had used other Andrew Davidson models.

6   Q    Okay.  But you had no personal experience using

7   LoanDynamix in any of your work; is that right?

8   A    Previous to this project, no.

9   Q    Okay.  And you learned how LoanDynamix worked for the

10  purposes of this product -- project, sorry, by reading some

11  descriptive materials from Andrew Davidson and talking to

12  someone on your team who had used it before; is that

13  correct?

14  A    It was a little more than that, but that's largely how

15  I learned about it.  Yeah.

16  Q    For issuing your report in this case on August 28th you

17  did not review Dr. Ellson's report for the purpose of

18  informing yourself about how LoanDynamix worked; is that

19  correct?

20  A    I had reviewed a draft of Dr. Ellson's report and I did

21  learn some things about certainly the LoanKinetics model.

22  I'm not sure that the LoanDynamix model was referenced in

23  there.

24  Q    You're not giving an opinion here today about the

25  reliability of the LoanDynamix model, correct?

Page 171

1    A    I -- well, I was asked today by counsel if I found it

2    to be reliable and my answer was yes.  But that wasn't --

3    that wasn't an explicit -- it was not an explicit opinion in

4    my report, no.

5    Q    Thanks.

6         (Pause)

7    Q    Was Dr. Ellson's draft report listed in your materials

8    relied upon?

9    A    I can't recall.

10   Q    We'll take a look at TRX-651.  I think it was in the

11   binder that your counsel handed to you.

12   A    Yeah.

13   Q    Do you see Dr. -- any of Dr. Ellson's reports listed

14   there?

15   A    No.

16   Q    Okay.  Now can we turn back to the chart on page 29

17   that we looked at earlier in Tab 2 of your binder?

18   A    Sure.  Okay.

19   Q    So Professor Fischel --

20   A    I'm sorry.  It was --

21   Q    Oh.

22   A    -- page 29, right?  Okay.  Here we are.

23   Q    Professor Fischel also calculates recovery ratios for

24   some other settlements; is that correct?

25   A    Yes.

Page 172

1  Q    You understand that Professor Fischel is giving an

2  opinion that the other settlements in this chart are

3  comparable to the present case; is that right?

4  A    Yes.  I understand that to be an opinion he's rendering

5  in this report.

6  Q    Thanks.

7       And aside from calculating lifetime losses for the

8  trust at issue in this case you did not perform any analysis

9  of the other settlements listed in the chart in Professor

10  Fischel's report that we're looking at, correct?

11  A    That's correct.

12  Q    You're not offering any opinion about comparable

13  settlements, correct?

14  A    Correct.

15  Q    In fact, you're not replying at all to Professor

16  Fischel's opinion on comparable settlements; is that right?

17  A    That's correct.

18  Q    You actually don't view your opinion as directly

19  contradicting anything in his opinion; is that correct?

20  A    I've made corrections to certain things that we -- I

21  have discussed in my testimony here today.  I would consider

22  I suppose a correction to something he did a form of

23  contradiction.

24  Q    Can you turn back to Tab A, page 87?

25  A    Sure.

Page 173

```
 1   Q    Actually, we're going to go to page 86, line 18.

 2   A    Okay.

 3   Q    All right.

 4        "Question:  So without consulting Dr. Fischel's report,

 5        Professor Fischel's report, what opinion do you

 6        understand him to be giving in this case?

 7        "Answer:  I understand, you know, I wasn't asked to

 8   rebut   his report.  I was just asked to do some

 9   calculations   effectively alongside what he did.  So my

10   overall views   were that he was opining as to how investors

11   might   consider litigation settlements and specifically

12   address   some of the particular investor groups in this

13        litigation, and he also more relevant to my work

14   compared

             various RMBS put back settlements to his lifetime

15   loss    numbers that he calculated from Lehman portfolio

16   and laid

             out the results of those, what he called comparable

17        settlement percentage -- percentages and recovery

18   ratios   and settlement, ultimate settlement numbers,

19   settlement    percentages.

20        "Question:  So you said that you weren't asked to rebut

21        his report, but if you go back to PA-81 you did issue a

22        reply report in this case; is that correct?

23        "Answer:  It's not called a reply report.  It's called

24   --   it's an expert report.

25        "Question:  Is it replying at all to Professor Fischel?
```

1          "Answer:  It's tying out to some of his numbers and

2     it's    making my own comparisons of other settlements that

3     he   used in stating different amounts of the settlement

4          recovery ratios and other settlements that he sets

5     forth,   but it's not an attempt to directly contradict him.

6     I    think it just states different recovery ratios than he

7          states."

8          Did I ask that question and did you give that answer?

9     A    In the deposition those were the answers I gave.

10    Q    Thank you.

11         Now we're going to go to TRX-649, page 10.

12         Mr. Finkel, you calculated recovery ratios for the six

13    settlements set forth in the chart at the top of this page,

14    correct?

15    A    Correct.  Yes, I did.

16    Q    Is this -- I'm sorry.  I think it's page 10 of the

17    exhibit, page 9 is your report.  Sorry, Mr. Finkel.

18         And you're aware that the plan administrators agreed to

19    seek estimation in this case at approximately $2.38 billion;

20    is that correct?

21    A    Yes.

22    Q    And you did not actually calculate the recovery ratio

23    for the Lehman proposed allowed claim, correct?

24    A    Well, I have a -- not in this table, no.

25    Q    Okay.  You just adopted Professor Fischel's recovery

Page 175

1   ratio of 11.24 percent; is that right?

2   A   Correct.

3   Q   And you did not review the RMBS settlement agreement

4   between Lehman, the trustees and the institutional investors

5   before issuing your report, correct?

6   A   Correct.

7   Q   And you would call the recovery ratios in this chart

8   your computational conclusions; is that a fair assessment?

9   A   Yes.  I believe I referred to them as such in my

10  deposition.

11  Q   And you view your computational conclusions and your

12  opinion as the same thing; is that right?

13  A   Yes.

14  Q   Now speaking generally the recovery ratio is the

15  settlement amount for a trust divided by the estimated

16  lifetime losses for that trust, correct?

17  A   Yes.

18  Q   And prior to your work in this case you have never been

19  asked to nor did you calculate a recovery ratio for any RMBS

20  put back settlements; is that right?

21  A   That's correct.

22  Q   Okay.  So the chart on page 10 of TRX-649 lists the six

23  settlements for which you calculated recovery ratios; is

24  that correct?

25  A   Yes.

Page 176

```
 1   Q    And for the settlements listed in this chart you found

 2   the settlement amount by reviewing the settlement notices

 3   that the trustees sent to the investors; is that correct?

 4   A    That the trustee issued --

 5   Q    That were provided to --

 6   A    Right.

 7   Q    For the settlements listed in this chart you found the

 8   settlement amount by reviewing the settlement notices that

 9   were provided to investors by the trustees, correct?

10   A    Again, they're issued.  They don't directly provide

11   them to the investors.  They count on others to provide them

12   to investors.  Sorry for the small --

13   Q    I understand.

14   A    -- distinction.

15   Q    It's complicated.

16   A    Okay.

17   Q    The settlement notices that are listed in your

18   materials were relied upon, correct?

19   A    Yes.

20   Q    And you understand that these are settlements in

21   residential mortgage put back cases involving individual

22   trusts, correct?

23   A    Yes.

24   Q    And these six settlements were provided to you by your

25   counsel at Holwell Shuster, correct?
```

1    A    Correct.

2    Q    And you and your team did not look for any other

3    settlements; is that right?

4    A    That's correct.

5    Q    Now the first five settlements listed on this chart

6    begin with Ace 2007; is that right?

7    A    2007 HE1.

8    Q    Yeah.  Well Ace 2007 HE, well, just Ace 2007?

9    A    Right.

10   Q    Okay.  And that would indicate to you that these are

11   from the Ace 2007 shelf; is that right?

12   A    Yes.

13   Q    And it is not relevant to your opinion at all that

14   these settlements came from the same shelf; is that right?

15   A    No.

16   Q    And the settlement date for each of the Ace 2007

17   settlements is the same date, September 29th of 2016; is

18   that correct?

19   A    Correct.

20   Q    And it's not important in your opinion to know why

21   these settlements all have the same settlement date; is that

22   correct?

23   A    It's -- no.  It doesn't influence my calculation -- my

24   computations.  No.

25   Q    Now for all these settlements except for GEWMC 2006-1,

Page 178

1    Holwell Shuster was counsel for the plaintiff; is that

2    correct?

3    A    That's my understanding.

4    Q    And the fact that the trustees' counsel here was

5    counsel in all of these cases was not important in your

6    opinion either, correct?

7    A    It was not relevant for my computations.  That's

8    correct.

9    Q    The second column on the -- from the left on this chart

10   is called loan group, correct?

11   A    Correct.

12   Q    And the loan group for all six settlements is group 2;

13   is that correct?

14   A    Correct.

15   Q    Well, that means these settlements covered only one

16   group of loans in each of these trusts, correct?

17   A    Correct.

18   Q    So for these other put back litigation settlements

19   you're not offering any analysis of how the procedural

20   posture to litigations at the time the settlements were

21   entered into might have affected the ultimate settlement

22   amount; is that right?

23   A    That's correct.

24   Q    And you said earlier you were -- you were a lawyer and

25   a member of the bar, but you were inactive; is that right?

Page 179

1    A    I am inactive.

2    Q    And you're not offering any legal opinions in this

3    case?

4    A    No.

5    Q    Okay.  So you didn't analyze the default rates on the

6    loans in those trusts, correct?

7    A    That's correct.  I think we covered that in deposition

8    testimony as well, except for the fact that the losses in

9    those trusts obviously were part of my computations.

10   Q    Right.  But you didn't analyze them for purposes of

11   your report, correct?

12   A    No.  I didn't independently determine the default rate

13   per se.

14   Q    And the types of collateral that were in those trusts,

15   that was not relevant to your analysis here either, correct?

16   A    No.

17   Q    And the vintage of the loans at issue in those

18   settlements was not relevant to your analysis either; is

19   that right?

20   A    That's correct.

21   Q    And you didn't do any analysis of which entities

22   originated the loans in these trusts, correct?

23   A    No.  And if I could say something on the vintage, you

24   know, the vintage effect, the vintage and the loan types as

25   you run through the ADCO model, you know, are relevant for

Page 180

1    that model.  But they were -- for my purposes they were just

2    inputs.

3    Q    Okay.  Fair clarification.

4         So it wasn't relevant to your opinion what proportion

5    of the settlement award in these six cases was allocated to

6    attorneys' fees or to reimburse any party other than the

7    certificate holders; is that right?

8    A    That's correct.

9    Q    Would you turn to, I think it's Tab 15, TRX-806.

10   A    Okay.

11        (Pause)

12   A    Yes.  I'm there.

13   Q    Okay.  And this is the holder notice for the GEWMC

14   trust 2006-1, correct?

15   A    Correct.

16   Q    And that was a trust that was one of the settlements

17   you calculated recovery ratios for, correct?

18   A    Yes.

19   Q    Thank you.

20        And if you turn to page 3 of TRX-806 and look down at

21   the bottom of the page do you see where it says starting

22   about four lines from the bottom, approximately 16.6 million

23   of the settlement payment represents reimbursement of

24   certain fees and expenses incurred by the series 2006-1

25   trust or the trustee on its behalf in connection with

Page 181

1    pursuing the group two litigation claims?  Do you see that?

2    A    Yes.

3    Q    And you did not subtract the 16.6 million in

4    reimbursements from the settlement payment when you

5    calculated your recovery ratio, right?

6    A    No.

7    Q    And the 16.6 million, that represents about 20 percent

8    of the 80.5 million settlement payment?

9    A    Yes.  I think we went over this as well, but, yes, that

10   sounds about right.

11   Q    Okay.  So it wasn't relevant to your opinion about any

12   of the six settlements, whether the trustees in any of those

13   cases had received direction from any certificate holders to

14   pursue or settle litigations, right?

15   A    No.

16        MR. WAISNOR:  Can we put -- can we put up the chart

17   again from Tab 1 on page 10?

18        (Pause)

19        MR. WAISNOR:  It's -- yeah.

20   BY MR. WAISNOR:

21   Q    So for the Ace 2000 settlement you understand that the

22   issuer in that case was Deutsche Bank, correct?

23   A    Yes.

24   Q    It was not relevant to your opinion whether Deutsche

25   Bank was involved in litigation with any governmental agency

Page 182

1   relating to their RBMS practices, correct?

2   A    It was not relevant.  Yes.  That's correct.  It was not

3   relevant to my computations.

4   Q    In fact, you're aware that Deutsche Bank settled with

5   the DOJ earlier this year an investigation relating to RMBS

6   practices, correct?

7   A    I am.

8   Q    And you're aware that it submitted a statement of facts

9   in connection with that settlement, correct?

10  A    I am.

11  Q    And were you aware when you gave your report that all

12  of the Ace 2000 settlements you calculated recovery ratios

13  for were covered by the settlement with the DOJ?

14  A    Again, the DOJ settlement would have -- that happened

15  in January of this year, right?  And my report was in

16  August.  I don't -- can you repeat the question again?  I'm

17  just trying to understand the --

18  Q    Yeah.  Were you aware that all of the Ace 2000

19  settlements you calculated recovery ratios for recovered by

20  the DOH -- DOJ settlement at the date you issued your expert

21  report in this case?

22  A    I wasn't -- it wasn't relevant for my computations.

23  Q    So you weren't aware, correct?

24  A    I -- no.

25  Q    But whether you were not -- would not matter to your

Page 183

1    opinion in this case at all, correct?

2    A    No.  I -- it wouldn't matter for the opinions I've

3    given.

4    Q    Okay.  So taking again a look at the chart up on the

5    screen here, besides comparing their recovery ratios to the

6    recovery ratio calculated by Professor Fischel, you did not

7    do anything else to compare these six settlements to the

8    Lehman proposed allowed claim here, correct?

9    A    Correct.  I simply calculated the estimated lifetime

10   losses by the settlement amounts of those and created the

11   range that I did.

12   Q    Okay.  Could you take a look at page 21 through 23 of

13   Professor Fischel's report?

14   A    Sure.  What tab are we on now, back to --

15   Q    Tab 2 again.

16   A    Okay.  Yeah.

17        (Pause)

18   A    I'm sorry.  What page, sir?

19   Q    It is page 21.

20   A    Okay.

21   Q    21 through 23.

22   A    Report page 21, not exhibit page?

23   Q    No, the exhibit page.

24   A    Yeah.  Exhibit page 21.  Okay.

25   Q    If you could just flip through it.

Page 184

1   A      Oh, it's a settlement.  Okay.

2   Q      So do you recognize these nine factors?

3   A      Yes.

4   Q      You did not analyze any of these factors for the

5   settlements for which you calculated recovery ratios,

6   correct?

7   A      Correct.

8   Q      Okay.  Sorry to make you keep turning back, but if you

9   could go to page 11 of TRX-649.

10  A      Sure.  Page 11?  Sure.

11         (Pause)

12  A      Yeah.

13  Q      And look at paragraph 42, please.

14  A      Yes.

15  Q      Now you say in paragraph 42 that the recovery

16  percentages you calculated are consistently and materially

17  higher than the 11.24 percent recovery percentage based on

18  the Lehman allowed claim amount, correct?

19  A      Correct.

20  Q      And you base the statement that these recovery

21  percentages are consistently and materially higher on your

22  common sense view as a finance professional, right?

23  A      Yes.  That would be --

24  Q      You have not done any analysis of whether the recovery

25  ratio for Lehman proposed allowed claim is materially

Page 185

1    different from the recovery ratios that you were asked to

2    calculate for the six settlements that are part of your

3    report, correct?

4    A    I'm not sure what you mean by that.  If you could

5    repeat the question, please.

6    Q    You had not done any analysis of whether the recovery

7    ratio for Lehman's proposed allowed claim is materially

8    different from the recovery ratios that you were asked to

9    calculate for the six settlements as to any particular

10   investor or trust?

11   A    Not as to any particular investor or trust.  That's

12   correct.

13   Q    Okay.  You're not giving an opinion on whether the

14   difference -- sorry.  Strike that.

15        You're not offering any opinion about how to determine

16   if one recovery ratio is considered materially or

17   consistently higher than another recovery ratio, correct?

18   A    Well, I'm -- I've certainly stated that 23 to 23.75

19   percent is materially higher than 11.24.  So I would have to

20   answer that, that that is one comparison I've made that I've

21   said is materially different.

22        MR. WAISNOR:  Your Honor, I just have one more

23   module, I think.

24        THE COURT:  Okay.  Did you want to take a brief

25   break?

Page 186

1          MR. WAISNOR:  Oh, no.  I can keep going if --

2          THE COURT:  Mr. Finkel, how are you doing?

3          THE WITNESS:  I'm doing great.

4          THE COURT:  Are you sure?

5          THE WITNESS:  Yeah.

6          THE COURT:  Everyone okay over here or do you want

7   a break?

8          Mr. Cosenza, a descending vote.

9          MR. COSENZA:  I think it would be good for --

10         THE COURT:  All right.

11         MR. COSENZA:  -- five minutes.

12         THE COURT:  Let's take a -- let's take a five-

13   minute break and then we'll go to conclusion.

14         MR. COSENZA:  Sure.

15         THE COURT:  All right.  We'll surely be done before

16   5:30, yes?

17         MR. WAISNOR:  Yes.

18         THE COURT:  Thank you.

19         MR. COSENZA:  Thank you, Your Honor.

20         THE COURT:  Be back in five minutes.

21       (Recess taken at 4:31 p.m.; reconvened at 4:41 p.m.)

22         THE COURT:  All right.  Let's keep going.

23         MR. WAISNOR:  Thank you, Your Honor.

24   BY MR. WAISNOR:

25   Q    Mr. Finkel, you testified earlier that you have given

Page 187

1    opinions in other RMBS put back cases; is that correct?

2    A    I have.

3    Q    Okay.  And you're not giving any opinion in this case

4    about whether there were breaches of representations and

5    warranties on any of the loans in this case, correct?

6    A    Correct.

7    Q    And you're not offering any opinion as to whether any

8    of the breaches had a material and adverse effect; is that

9    correct?

10   A    That's correct.

11   Q    And you're not offering any opinion regarding

12   statistical sampling; is that correct?

13   A    That's correct.

14   Q    You're not offering any opinion on the appropriate

15   measure of damages in this case, correct?

16   A    Correct.

17   Q    You're not offering any opinion on the commercial

18   understanding of any of the clauses in the agreements

19   covering the trusts at issue in this case, correct?

20   A    Correct.

21   Q    You're not offering any opinions about the calculation

22   of the repurchase price, correct?

23   A    Correct.

24   Q    Now prior to being hired by Duff & Phelps you were CEO

25   and managing member of Dynamic Credit Partners, correct?

Page 188

1   A    Correct.  I'm still technically the CEO and --

2   Q    Right.

3   A    -- it still exists.

4   Q    Dynamic Credit Partners is still an investment manager,

5   correct?

6   A    Correct.

7   Q    2010 you were hired by Duff & Phelps, correct?

8   A    Correct.

9   Q    2012 you became the leader of Duff & Phelps financial

10  crisis disputes practice, correct?

11  A    Correct.

12  Q    And that's a group within Duff & Phelps; is that right?

13  A    It's part of our disputes and investigations business

14  unit.  Yes.

15  Q    Okay.  And one of the people who worked for you in

16  financial crisis disputes was Edmond Esses; is that right?

17  A    Correct.  He's still a colleague.

18  Q    Okay.  And during the 2014 time up until this year you

19  were aware that Mr. Esses was working on a loan level review

20  protocol in connection with the Lehman bankruptcy, correct?

21  A    Yes.

22  Q    And aside from your expert work in connection with this

23  estimation proceeding you had no formal role in the protocol

24  review project, correct?

25  A    Correct, no formal role.

Page 189

```
 1   Q    Okay.  You did not work with Mr. Aronoff on any

 2   projects when he was at Duff & Phelps, correct?

 3   A    I collaborated with him a little bit, but we

 4   collaborated and shared ideas, things like that.

 5   Q    Can we go to your deposition page 202, line 3?

 6   A    Sure.  Sorry, this is tab -- yeah, here we go.

 7   Q    It says Tab A.

 8   A    And page?  I'm sorry.  Which page again?

 9   Q    And you are on -- actually, can we go to 201, line 8,

10   please?  "Question:  You said you brought in some external

11   people regarding financial crisis disputes.  Was one of them

12   Jim Aronoff?"

13   A    Yes.

14   Q    "Answer:  I did have a role in bringing Jim Aronoff

15   into    the firm.  He didn't work on my team.  He had his

16   own  practice.  He certainly worked on financial crisis

17        related disputes.

18        "Question:  Did he report directly to you?

19        "Answer:  No.

20        "Question:  Was he a lower title than you or the same

21        title?

22        "Answer:  He was managing director.  I was still

23        technically when I hired him the national practice

24        leader.

25        "Question:  Were you also a managing director?
```

Page 190

1       "Answer:  I was also a managing director.

2       "Question:  Did you ever work together on any projects?

3       "Answer:  We really didn't.  We obviously spoke with

4    each    other, but we didn't really work together per se on

5       projects."

6       Did I ask those questions and did you give those

7    answers?

8    A    Yes.  And I think it's consistent with -- that we

9    collaborated and shared ideas.

10   Q    Okay.  You had no supervisory and management role in

11   connection with the protocol, correct?

12   A    Correct.

13   Q    Okay.  Other than your expert work you were not

14   otherwise involved in the protocol, correct?

15   A    Correct.

16   Q    Okay.  And you didn't receive any updates about how the

17   protocol was going, any formal updates about how the

18   protocol was going?  Sorry.

19   A    No.

20   Q    And when I asked you at deposition you didn't know how

21   much Duff & Phelps had earned for its work in connection

22   with the protocol or how many hours it worked on the

23   protocol, correct?

24   A    Correct.

25   Q    Mr. Finkel, you testified earlier that you were asked

Page 191

1    by Holwell Shuster to calculate recovery ratios for six put

2    back settlements; is that correct?

3    A    Yes.

4    Q    You did not calculate a recovery ratio for the Deutsche

5    Vault A Securities Mortgage Loan Trust Series 2007 OA3,

6    correct?

7    A    I don't believe so.

8    Q    Okay.  And so we save everyone some time if I call this

9    the DVault 2007OA3 trust you'll be able to follow me?

10   A    Sure.

11   Q    Okay.  Would you turn to Tab 3, PA-88?

12   A    I'm there.

13   Q    Mr. Finkel, do you recognize this as the settlement

14   notice for DVault 2007OA3 that was shown to you during your

15   deposition?

16   A    I'm sorry.  I see 07OA3.

17   Q    Oh.

18   A    I think you just said O8; is that right?

19   Q    I think I said 07, but, yes, it's 2007OA3.

20   A    Okay.  Yes.  I recognize this as that.

21   Q    Okay.  Can you turn to page 10 of the exhibit, please?

22   A    Okay.

23   Q    Do you see in the first paragraph where it says HSBC

24   Bank USA is the trustee?

25   A    Yes.

Page 192

1   Q    Okay.  Now if you look down at Paragraph B you can see

2   that it says that the trust, by and through the trustee, has

3   asserted certain claims against DBSP in the United States

4   District Court of the Southern District of New York; is that

5   right?

6   A    Yes.

7   Q    Okay.  And you understand DBSP to refer to Deutsch Bank

8   Structured Providence; is that correct?

9   A    Yes.

10  Q    Okay.  Can you turn to page 16, please?

11       (Pause)

12  A    Okay.

13  Q    Do you see in paragraph 4 a payment where it says that

14  DBSP shall pay to the trust $52.52 million?

15  A    Yes.  Yes, I do.

16  Q    In that --

17  A    Sorry.

18  Q    In that same paragraph there's no indication that this

19  payment is being made for the benefit of any particular

20  group of loans in the trust; is that correct?

21  A    I would have to look at -- not in this paragraph.

22  Q    Okay.

23  A    I would have to look at the entire notice to see if it

24  -- what group it covered.

25  Q    And on page 27, if you go to that, on the left hand

Page 193

1    side do you see a signature block for Holwell Shuster &

2    Goldberg as attorneys for plaintiff?

3    A    Yes.

4    Q    Okay.  Can you turn to Tab 4, please?

5    A    Okay.

6    Q    Mr. Finkel, this looks like -- does this look like a

7    September 2017 remittance report for the DVault 2007OA3

8    trust?

9    A    It does.

10   Q    And remittance reports are provided to certificate

11   holders each month, correct?

12          MS. DELUCIA:  Your Honor, we object on the same

13   basis that we were precluded from questioning Mr. Finkel

14   about the MARM certificate holder notice.  This I presume

15   would be accessible via the same CDS link database.

16          THE COURT:  Was this shown to him during his

17   deposition?

18          MS. DELUCIA:  I don't believe this document was.

19          MR. WAISNOR:  This was not, Your Honor.   It was

20   disclosed on our exhibit list, but it was not shown to him

21   during the deposition.

22          THE COURT:  Well, if it wasn't shown to him during

23   his deposition then the sauce for the goose rule applies and

24   you can't take him through it.  All right.

25          MR. WAISNOR:  Thank you, Your Honor.

Page 194

1          (Pause)

2              MR. WAISNOR:  Your Honor, could I have a moment to

3      confer with --

4              THE COURT:  Sure.

5              MR. WAISNOR:  -- (indiscernible)?

6              THE COURT:  Yes.  Of course.

7          (Pause)

8      BY MR. WAISNOR:

9      Q    Mr. Finkel, do you recall during your deposition I

10     asked you to calculate a recovery ratio for the 2007OA3

11     trust?

12     A    Vaguely.

13     Q    Okay.  Could you take a look at page 184 of your

14     deposition transcript, line 19?

15         (Pause)

16             MS. DELUCIA:  Your Honor, if I may?

17             THE COURT:  Yes.

18             MS. DELUCIA:  If Mr. Waisnor is planning to ask Mr.

19     Finkel to calculate a recovery ratio on the fly for which

20     there are no established facts about lifetime losses or the

21     like, that seems inappropriate.

22             THE COURT:  Okay.  But so far we're just looking at

23     a Q&A in a deposition, so let's -- we'll see where it --

24     let's see where it goes.

25             Go ahead, Mr. Waisnor.

Page 195

1    BY MR. WAISNOR:

2    Q    Do you call -- do you recall in this deposition I asked

3    you to assume that the estimated lifetime losses on this

4    trust were $421 million?

5    A    Yes.  Looking at the page is very helpful to refresh my

6    recollection.  Yes.

7    Q    And do you recall that you did this calculation in your

8    deposition and you calculated that the recovery ratio taking

9    52.52 million into 421 million was 12.47 percent?

10   A    Right.  I think you had me out -- with my calculator

11   doing that.  Yes.

12   Q    Okay.  Thank you.

13        Would you please turn to -- do you have any reason to

14   think this is not the property recovery ratio for the -- for

15   this case?

16   A    Well, yes, because you're asking me to assume the

17   lifetime losses so I can't be sure that it's a valid

18   recovery ratio.

19   Q    Okay.

20   A    I was -- it's based off of a -- it's -- you know, off

21   an assumption.

22   Q    But if you were provided with 421 million as the

23   lifetime losses though, then it wouldn't -- it wouldn't be

24   hypothetical anymore, right?

25   A    Right.  If I could either estimate them independently

Page 196

1    or it was represented to me in some other way, yes.

2    Q    Yes.  Mr. Finkel, can you just turn to Tab 5, PA-89?

3    A    Tab 5?

4         (Pause)

5    A    And what page, I'm sorry?

6    Q    This is just page one.

7    A    Okay.

8    Q    Do you recall that this is a settlement notice for

9    Deutsche All Day Securities Mortgage Loan Trust Series

10   2007OA4 that was also shown to you during your deposition?

11   A    Yes.  I -- the same kind of vague recollection.

12   Q    Okay.  And if you look on the first page there it says

13   this notice is being sent to certificate holders by Wells

14   Fargo on July 15, 2015, correct?

15   A    I'm sorry.  Could you refer me to that?

16   Q    It's just the first line on page 1.

17   A    On -- I'm sorry.  I'm sorry to be slow.  On page 1 of -

18   -

19   Q    Oh, on page 1 of the exhibit.

20   A    Okay.  Yes.  From HSBC Bank as trustee.

21   Q    And, again, if I refer to this as DVault 2007OA4 you'll

22   know what I mean, correct?

23   A    Yes.

24   Q    Now Holwell Shuster also did not ask you to calculate a

25   recovery ration for DVault 2007OA4; is that right?

Page 197

1    A     That's correct.

2    Q     And this trust again was issued by Deutsche Bank; is

3    that right?

4    A     It would have been another Deutsche Bank RMBS issuance,

5    yes.

6    Q     Yes.  If you would turn to page 10 it says HSBC --

7    actually, could you turn to page 10, please?

8    A     Okay.

9    Q     And, again, in the first paragraph there it says that

10   HSBC is the trustee?

11   A     Yes.

12         (Pause)

13   Q     Paragraph B says that the trust is asserting claims

14   against DBSP in an action in the Southern District of New

15   York, correct?

16   A     Yes.

17   Q     Okay.  If you turn to page 16, paragraph 4 it says that

18   DBSP shall pay to the trust 91.18 million, correct?

19   A     Correct.

20   Q     And that's -- the later part of the sentence says it

21   shall be allocated to certificates backed by group one,

22   group two and group three loans; is that right?

23   A     Yes.

24   Q     Okay.  If you would turn to page 27 and you see on the

25   left there's another signature block here for some attorneys

Page 198

1    at Holwell Shuster, correct?

2    A    Yes.

3    Q    And if you turn to Tab 6 is this -- does this look like

4    another remittance report for the 2007OA4 trust?

5            THE COURT:  Ms. DeLucia.

6            MS. DELUCIA:  Objection.

7            THE COURT:  Same objection?

8            MS. DELUCIA:  Same objection.

9            THE COURT:  Same answer, Mr. Waisnor?

10           MR. WAISNOR:  No.  It was not shown to him during

11   his deposition, Your Honor, but I think this goes to

12   impeachment and credibility.  These were settlements that

13   were not shown to him and he didn't analyze by Holwell

14   Shuster.  I think it's fair to show him these documents and

15   ask --

16           THE COURT:  I'll --

17           MR. WAISNOR:  -- him the recovery to recovery

18   ratio.

19           THE COURT:  I think it's fair to show him -- to --

20   I think you have demonstrated that he has not done any

21   calculation with respect to these settlements.  And the

22   observation that you can make further in that regard is an

23   observation that you can make further in that regard.

24           But I don't think it's appropriate to ask Mr.

25   Finkel to do any calculation based on a document that he

Page 199

```
 1    wasn't shown in his deposition unless you had him run

 2    through the calculation in the deposition.

 3              MR. WAISNOR:  All right.  Can I --

 4              THE COURT:  Sure.

 5         (Sidebar off the record)

 6              THE COURT:  Todd, you've been overruled.

 7         (Laughter)

 8              THE COURT:  It's 5:00.

 9              MR. WAISNOR:  We'll move on, Your Honor.

10              MR. COSENZA:  Almost, Your Honor.

11              THE COURT:  Yes.

12              MR. WAISNOR:  We'll move on and get this done.

13    BY MR. WAISNOR:

14    Q    Mr. Finkel, can you turn to -- again, to Tab A, page

15    188 of your deposition transcript, please?

16    A    Okay.

17         (Pause)

18    Q    And do you recall at your deposition I asked you to

19    divide the 91.18 million number by 702 million and calculate

20    a recovery ratio?

21    A    Yes.

22    Q    And do you recall that that recovery ratio was 12.99

23    percent?

24    A    That was the number I calculated with the few caveats

25    following certain other questions.  Yes.
```

Page 200

```
 1    Q    Okay.  Did Holwell Shuster ask you to calculate a

 2    recovery ratio for any other settlements?

 3    A    No.

 4           MR. WAISNOR:  Your Honor, may I just have a minute?

 5           THE COURT:  Sure.

 6        (Pause)

 7           MR. WAISNOR:  No further questions.

 8           THE COURT:  Okay.  Thank you, Mr. Waisnor.

 9           Ms. DeLucia, do you have anything?

10           MS. DELUCIA:  Two quick questions.

11           THE COURT:  Sure.

12           MS. DELUCIA:  Less than five minutes.

13           THE COURT:  No problem.

14        (Pause)

15                      REDIRECT EXAMINATION

16    BY MS. DELUCIA:

17    Q    Mr. Finkel, a moment ago Mr. Waisnor asked you about

18    Deutsche Bank's settlement with the DOJ and the statement of

19    facts that it submitted therewith.  Do you remember that

20    testimony?

21    A    Yes.

22    Q    Are you aware, sir, that the DOJ settlement became

23    public after the Ace cases that you considered were settled?

24    A    Oh, yes.  Absolutely they -- these cases were the prior

25    year at least.
```

Page 201

1    Q    Mr. Waisnor also asked you some questions about the

2    settlements that Professor Fischel considered.  Do you

3    remember that?

4    A    Yes.

5    Q    Are you aware whether Professor Fischel deducted the

6    four percent or more counsel fees that were paid out from

7    those settlement numbers before he calculated his recovery

8    ratios?

9    A    I don't believe he did.

10   Q    Okay.

11           MS. DELUCIA:  Nothing further.

12           THE COURT:  Okay.  Thank you very much.

13           Mr. Waisnor, I assume nothing further?

14           MR. WAISNOR:  No further questions, Your Honor.

15           THE COURT:  Very good.

16           Thank you, Mr. Finkel.

17           THE WITNESS:  Thank you, Your Honor.

18           THE COURT:  It was nice to see you again.

19           THE WITNESS:  Nice to see you.

20        (Laughter)

21           THE COURT:  Okay.  So do we have any further

22   housekeeping?

23           MR. SHUSTER:  I --

24           THE COURT:  We do.

25           MR. SHUSTER:  Yeah.  If we could take a moment to -

```
 1    -

 2              THE COURT:  Should we --

 3              MR. SHUSTER:  -- discuss scheduling with Your

 4    Honor?

 5              THE COURT:  Sure.  Absolutely.  But we can close --

 6              MR. SHUSTER:  Yes.

 7              THE COURT:  -- we can close the record for tonight.

 8              MR. SHUSTER:  Yes.

 9              THE COURT:  Yes.  So just for those folks who are

10    following the bouncing ball, there will be no trial on

11    Tuesday and there -- I'm not otherwise asking you to file a

12    notice of that on the docket.  So I'm making that statement

13    now and everybody's confirming that that's the case and that

14    we will resume on Wednesday, whatever that date is, next

15    Wednesday, at 10:00, Wednesday, the 17th of January.

16              MR. SHUSTER:  Although that's in part what I wanted

17    to --

18              THE COURT:  I see.

19              MR. SHUSTER:  -- speak to the Court about.

20              THE COURT:  Okay.

21              MR. SHUSTER:  But certainly we will not be --

22              THE COURT:  If there's -- if it's something other

23    than Wednesday, January 17th then I'm just going to ask --

24    I'll ask you to file a notice on the docket so the public

25    knows.
```

Page 203

1              MR. COSENZA:  We will do that, Your Honor.

2              THE COURT:  Okay.  All right.  So other folks are

3       excused and I'll meet you back in the conference room.

4              MR. SHUSTER:  Thank you, Your Honor.

5              THE COURT:  Thank you, again, Mr. Finkel.

6         (Whereupon, these proceedings concluded at 5:03 p.m.)

7                          * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2                       T E S T I M O N Y

 3    DEBTOR'S

 4    WITNESS                 EXAM BY                  PAGE

 5    DR. RICHARD WAYNE

 6    ELLSON                  MS. BLACK                  5

 7                            MR. MCCALLEN              86

 8                            MS. BLACK               129

 9

10    JAMES K.

11    FINKEL                  MS. DELUCIA             137

12                            MR. WAISNOR             165

13                            MS. DELUCIA             200

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 205

1                        C E R T I F I C A T I O N

2

3       We, Dawn South and Sherri L. Breach, certify that the

4       foregoing transcript is a true and accurate record of the

5       proceedings.

6       Dawn South        Digitally signed by Dawn South
                          DN: cn=Dawn South, o, ou,
                          email=digital@veritext.com, c=US
7       _____Date: 2018.01.15 13:08:40 -05'00'_____

8       Dawn South

9       Certified Electronic Transcriber

10      Sherri L.         Digitally signed by Sherri L. Breach
                          DN: cn=Sherri L. Breach, o, ou,
11      Breach            email=digital@veritext.com, c=US
                          Date: 2018.01.15 13:09:00 -05'00'
12      _____

13      Sherri L. Breach

14      AAERT Certified Electronic Reporter & Transcriber CERT*D-397

15

16      Date:  January 13, 2018

17

18

19

20

21

22      Veritext Legal Solutions

23      330 Old Country Road

24      Suite 300

25      Mineola, NY 11501