Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS INC.,   Case No. 08-13555-scc

7                Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                       United States Bankruptcy Court

11                       One Bowling Green

12                       New York, New York 10004-1408

13

14                       January 18, 2018

15                       9:34 AM

16

17

18

19

20

21

22

23    B E F O R E:

24    HON. SHELLEY C. CHAPMAN

25    U.S. BANKRUPTCY JUDGE

1    IN RE:   RMBS Claims Estimation Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Dawn South and Sherri L. Breach

1    A P P E A R A N C E S :

2    WILKIE FARR & GALLAGHER LLP

3         Attorneys for the Plan Administrator

4         787 Seventh Avenue

5         New York, NY 10019-6099

6

7    BY:  TODD G. COSENZA, ESQ.

8

9    HOLWELL SHUSTER & GOLDBERG LLP

10        Attorneys for the Trustees

11        750 Seventh Avenue, 26th Floor

12        New York, NY 10019

13

14   BY:  BENJAMIN F. HEIDLAGE, ESQ.

15        MICHAEL S. SHUSTER, ESQ.

16

17

18

19

20

21

22

23

24

25

Page 4

1              P R O C E E D I N G S

2              MR. COSENZA:  Good morning, Your Honor.

3              THE COURT:  How is everyone?

4              MR. COZENSA:  Great.

5              THE COURT:  Good.  Okay.  So have a seat.  Have a

6    seat.

7              So do we have a scheduling final game plan yet?

8              MR. SHUSTER:  Yes, Your Honor.  For Monday --

9              THE COURT:  If I missed it, I apologize.

10             MR. SHUSTER:  No.  No.  No. No.  No.

11             THE COURT:  Okay.

12             MR. SHUSTER:  So my understanding is we're to

13   start Monday at 12:30 and to have lunch before.

14             THE COURT:  Please.

15        (Laughter)

16             MR. SHUSTER:  And then we will -- we have -- we've

17   provided to the plan administrator video designations for

18   Mr. Castro which are about -- up -- no more than an hour in

19   length, and we're going to still try and cut.  But --

20             THE COURT:  Okay.

21             MR. SHUSTER:  And then we expect to put on Mr.

22   Aronoff in rebuttal for what we think will be about a half

23   an hour direct.

24             THE COURT:  Okay.

25             MR. SHUSTER:  So --

Page 5

1                THE COURT:  So we're on target to conclude --

2                MR. SHUSTER:  We are.

3                THE COURT:  -- on Monday?

4                MR. SHUSTER:  I have also -- yes.  I also --

5                THE COURT:  Great.

6                MR. SHUSTER:  -- also advised Mr. Cosenza and his

7     colleagues that Mr. Morow (ph) would make himself -- says he

8     will make himself available and San Antonio would be his

9     strong preference for a resumption of his testimony.  We

10    haven't engaged on that together yet, but either we'll do

11    that or we won't, I guess.

12               THE COURT:  Those would be the --

13               MR. SHUSTER:  Subject to --

14               THE COURT:  -- two choices.

15         (Laughter)

16               THE COURT:  Okay.

17               MR. COSENZA:  So, Your Honor, just on Mr. Castro,

18    we got the designations yesterday.  We're going to try to

19    exchange, too, with Mr. Shuster any video designations that

20    we think need to be --

21               THE COURT:  Sure.

22               MR. COSENZA:  -- done contemporaneously.  So we'll

23    try to work that out.

24               THE COURT:  Okay.

25               MR. COSENZA:  I think the schedule for Monday for

Page 6

1    Aronoff, I think we should complete it by Monday.  We were

2    told yesterday of the issues with Mr. Morow.  I think we

3    should have a further discussion on that --

4             THE COURT:  Sure.

5             MR. COSENZA:  -- because I -- I'm not sure if it

6    makes sense to continue Mr. Morow's examination given the --

7             THE COURT:  Yes.

8             MR. COSENZA:  -- given everything that's been

9    going on.

10            THE COURT:  Yeah.

11            MR. COSENZA:  But we can talk about that after --

12            THE COURT:  Sure.

13            MR. COSENZA:  -- we complete Dr. Cornell's --

14            THE COURT:  Okay.

15            MR. COSENZA:  -- examination.

16            THE COURT:  So in any event we are on track to

17   close the record on Monday afternoon.

18            MR. SHUSTER:  Yes.  Yes.

19            THE COURT:  Great.  Great.  Okay.

20            Terrific.  Okay.  So what shall we do today?

21            MR. COSENZA:  So, Your Honor, the plan

22   administrator as part of our rebuttal case is calling Dr.

23   Brad Cornell.

24            THE COURT:  Very good.  Okay.

25        (Pause)

1             THE COURT:  No.  No, sir.  Come over here.

2             Good morning.  Would you step up?  Step up and

3   raise your right hand, please.

4                  DR. BRAD CORNELL, WITNESS, SWORN

5             THE COURT:  Very good.  Have a seat, Dr. Cornell.

6   Make yourself comfortable.

7             If you need a break, please let me know.  You

8   don't have to wait till one of the lawyers asks to take a

9   break.

10            THE WITNESS:  I was going to say because I'm just

11  getting over bronchitis --

12            THE COURT:  Oh, dear.

13            THE WITNESS:  -- so I've got a little infirmary up

14  here and --

15            THE COURT:  That's --

16            THE WITNESS:  -- it may -- it may require me to

17  break for a minute or two to cough --

18            THE COURT:  Absolute --

19            THE WITNESS:  -- or to go the restroom.

20            THE COURT:  Absolutely.  Just -- absolutely.  Just

21  let us know and in light of that we should probably take

22  some frequent breaks so that you can recover your -- your

23  wind and your voice.

24            THE WITNESS:  Yeah.  I feel fine.  I have no

25  reason I can't testify.  But I may sound bad.

Page 8

1          THE COURT:  Okay.  Just stay away from all of us,

2     please.

3          (Laughter)

4          THE WITNESS:  I shouldn't be infectious at this

5     stage, according to my support who happens to also be a

6     physician.

7          THE COURT:  Very good.  Okay.  All right.

8          All yours, Mr. Cosenza.

9                    DIRECT EXAMINATION

10    BY MR. COSENZA:

11    Q    Good morning, Dr. Cornell.

12         MR. COSENZA:  I think we've already handed up in

13    advance a binder to the Court and to --

14         THE COURT:  We have it.

15         MR. COSENZA:  Okay.  Great.

16    BY MR. COSENZA:

17    Q    And you have it, Dr. Cornell?

18    A    I do.

19    Q    Okay.  So I may ask you at points to refer to certain

20    tabs or exhibits that are in your binder --

21    A    Sure.

22    Q    -- during my examination.

23         So, Dr. Cornell, where are you employed?

24    A    Well, three different places.  I'm a senior consultant

25    at Compass Lexecon which is an international finance and

Page 9

```
 1    economics consulting firm, and that's the -- really the role

 2    I'm here in today.  I'm a professor at the California

 3    Institute of Technology, and I run a small investment fund

 4    called San Marino Business Partners.

 5    Q    Okay.  And what do you do at Compass Lexecon, Dr.

 6    Cornell?

 7    A    It's primarily litigation related, but I serve as a

 8    financial economist in issues related to the one I'm

 9    testifying here today and other valuation related issues.

10    Q    Sure.  And you mentioned that you're a visiting

11    professor at Cal Tech?

12    A    Well, it's an odd position.  I'm a permanent visitor.

13    Every year we -- it -- since this is New York and you all

14    know what a repo is, we have a repo.  Every year --

15         (Laughter)

16    A    Every year I automatically revisit and either party can

17    decline the -- you know, the contract at that point.

18    Q    Yeah.  And --

19              THE COURT:  Can they hypothecate you to somewhere

20    else?

21              THE WITNESS:  Yeah.  That's right.  No.  There's

22    no -- there's no way to do that.  It's a two party.

23    BY MR. COSENZA:

24    Q    And what do you teach at Cal Tech?

25    A    I teach applied corporate finance and investment
```

Page 10

1  banking.

2  Q    Okay.  And have you held any other academic positions?

3  A    Several, but the primary one for many years I was a

4  Bank of America professor of finance at UCLA.

5  Q    Okay.  And beyond the courses that you've taught at --

6  re-teaching or taught at Cal Tech have you taught any other

7  courses during your academic --

8  A    Yeah.  Well, many over the years.  Corporate finance

9  theory, mergers and acquisitions, securities analysis,

10  corporate valuation, probably others as well.

11  Q    And have you held any other consulting positions prior

12  to your time at Compass Lexecon?

13  A    Yeah.  Originally I started my own firm called Finicon

14  (ph).  I then sold Finicon to Charles River Associates and

15  worked with them for a period of time before finally joining

16  Compass Lexecon.

17  Q    And you also mentioned that you run your own investment

18  fund; is that correct?

19  A    Yes.

20  Q    And what type of -- what kind of investments do you

21  focus on?  What's your investment funds?

22  A    Primarily technology companies.  It's kind of related

23  to my interests and of course my association with Cal Tech.

24  Q    Okay.  And, Dr. Cornell, have you authored any

25  publications?

Page 11

1    A    Yes.

2    Q    How many?

3    A    Over a hundred articles and two books so far.  I have a

4    third book that I'm working on right now.

5    Q    What are the two books that you've authored?

6    A    There's one on corporate valuation and another on the

7    equity risk premium.

8    Q    Okay.  And have you ever served as an editor for any

9    professional journals?

10   A    Yes.  Probably four or five during my time at UCLA

11   primarily.

12   Q    And which ones?  We don't have to go all of them, but

13   --

14   A    The Journal of Finance, Journal of Financial and

15   Quantitative Analysis, Review of Financial Studies and there

16   are several others.  I don't really recall which.

17   Q    Okay.  And can you briefly describe for the Court your

18   educational backgrounds, beginning with college?

19   A    I got all my degrees from Stanford University.

20   Undergraduate primarily physics and philosophy; a masters in

21   statistics; PhD in financial economics.

22   Q    And have you ever done any work relating to residential

23   mortgage backed securities?

24   A    Yes, following the financial crisis I worked on at

25   least four or five major RMBS cases.

Page 12

1   Q    And which cases have you worked on?  You don't have to

2   list all of them, but generally some of the major --

3   A    Well --

4   Q    -- ones?

5   A    -- I worked as an expert in the Citibank settlement.  I

6   worked on the Rescap bankruptcy.  I worked for Moody's (ph).

7   I worked for IndiMac.  Those are the main ones that I

8   recall.  There was one from Goldman Sachs.

9   Q    Okay.  And you mentioned Rescap.  Can you just describe

10  generally what your work was in that matter?

11  A    Well, in Rescap the primary focus of my work was to

12  measure the -- if a loan had material defects in its

13  underwriting and subsequently declined in price, how much of

14  that decline was due to the defects as opposed to general

15  economic conditions such as falling housing prices and

16  recession.

17  Q    And you also mentioned you worked on the Citigroup

18  matter.  Can you describe generally what you did in the

19  Citigroup RMBS matter?

20  A    I evaluated for the trustees whether or not it was

21  reasonable for them to accept the proposed settlement?

22  Q    Okay.  And in connection with these and other matters

23  have you testified in court before?

24  A    Actually not in Rescap or Citibank --

25  Q    Yeah.

1    A    -- but I've testified in court probably more than 50

2    times.

3    Q    Okay.

4         MR. COSENZA:  So, Your Honor, pursuant to Federal

5    Rule of Evidence 702 I am tendering Dr. Brad Cornell as an

6    expert in structured finance and valuation with respect to

7    residential mortgage backed securities.

8         THE COURT:  Okay.  Any objection?

9         MR. HEIDLAGE:  No objection, Your Honor.

10        THE COURT:  All right.  Very good.

11   BY MR. COSENZA:

12   Q    So, Dr. Cornell, you were given some assignments in

13   this case?

14   A    Yes.

15   Q    And can you describe generally for the Court, I think

16   there's a slide, PA Exhibit 978.  Is this an accurate

17   summary of the assignments you were provided in this -- in

18   this matter?

19   A    Yes, it is.

20   Q    Okay.  Do you -- do you want to describe for the Court

21   what your two primary assignments were here?

22   A    Sure.  The language says it pretty well.  I -- my first

23   task was to perform an independent economic analysis to

24   estimate the aggregate claim value of the non-terminated

25   trust covered loan claims using the trustees' purchase price

Page 14

1   calculations.

2   Q    And that was your first assignment?

3   A    That was my first.

4   Q    What was your second assignment?

5   A    My second was to work with the plan administrator to

6   design four estimation scenarios that illustrate how often

7   the trustees need to succeed on their claims in order to

8   achieve an aggregate claim value of approximately $2.38

9   billion.

10  Q    Dr. Cornell, were you asked to make any assumptions in

11  connection with the portions of these two assignments?

12  A    Yes, I was.

13  Q    Okay.  And are these assumptions reflected in the slide

14  that you helped prepare?

15  A    Yes, they are.

16  Q    And is this slide PA Exhibit 979; is that the summary

17  of the assumptions you used --

18  A    Yes, it is.

19  Q    -- in connection with your assignments?  Can you

20  explain the first assumption to the Court in connection

21  where you -- to what your assignments?

22  A    Well, to -- the first is to the extent that the

23  trustees meet their burden of proof and, therefore, can

24  recover damages on loans at issue in this case that I would

25  use the purchase price as proffered by the trustees in order

Page 15

1    to compute a measure of loss.

2        However, in doing that I wasn't offering any opinion

3    that that measure of loss was, in fact, the appropriate

4    legal measure of damages.  I was just doing the calculation.

5    Q    Okay.  And what was your second assumption, Dr.

6    Cornell?

7    A    That the plan administrator had bases to preclude the

8    recovery of damages in connection with certain non-

9    liquidated and on hold loans.

10   Q    And that's reflected -- the second assumption is

11   reflected in some of the estimation scenarios we're going to

12   discuss later?

13   A    Yes, it is.

14   Q    And what was the third assumption you were --

15   A    That the plan administrator provided success rates for

16   the trustees meeting their burden of proof for each category

17   of breach claim.

18   Q    All right.  And the next assumption?

19   A    And I should add that those success rates are going to

20   feed into my four scenarios analysis.

21   Q    Sure.  And that's part of your second assignment?

22   A    That's right.

23   Q    Okay.  And same for your second assignment.  The fourth

24   assumption listed here?

25   A    The plan administrator also provided success rates for

Page 16

1    the trustees meeting their burden of proof with regard to

2    AMA.

3    Q    Okay.  And there's a fifth assumption listed there and

4    do you just want to describe briefly for the Court what the

5    fifth assumption reflects?

6    A    Yeah.  This one is a little more tricky.  I'll explain

7    it more when we actually get -- get there.  But that for

8    many of the loans there's more than one breach claim.  So if

9    there's more than one breach claim you have to say, well,

10   how likely are the trustees to get over all the -- to get

11   over one of the breach claims which is enough to move to the

12   next level.  And that depends on whether the breach -- the

13   success rates are correlated or not.  I'm going to assume

14   they're not and I'll explain why I think that's conservative

15   for the trustees at the time we get to the calculation.

16           THE COURT:  Can I -- can I ask a question on this?

17   So for three and four the assumptions were provided to you.

18   Is what you're telling me is that for five that assumption

19   was not provided to you; that was an assumption that you

20   used and concluded was appropriate?

21           THE WITNESS:  Well, I actually proposed that one,

22   discussed it with the plan administrator and they agreed to

23   use it.

24           THE COURT:  Okay.

25           THE WITNESS:  But it wasn't one that was just

Page 17

1    given to me the way three and four were.

2            THE COURT:  Okay.  Thank you.

3    BY MR. COSENZA:

4    Q    So, Dr. Cornell, you provided I believe three expert

5    reports in this matter?

6    A    Yes.

7    Q    And the first one was issued on June 1, 2017, correct?

8    A    Correct.

9    Q    Okay.  And so we're now going to go to your first

10   assignment and walk through generally the numbers and the

11   loans at issue as of June 1st and walk through to the loans

12   at issue as of your last expert report.

13        So let's start with your first opinion based on your

14   first assignment.  Have you prepared a demonstrative that

15   summarizes the loans with compensable claims as of June 1,

16   2017 when you issued your initial report?

17   A    Yes.

18   Q    And is this your PA -- let's see here.  It's Tab 3 in

19   your binder, PA Exhibit 980, the demonstrative that you

20   prepared that identifies the mortgage loans with compensable

21   claims as of June 1?

22   A    Yes.

23   Q    Okay.  So these -- can we just walk through this

24   demonstrative, Dr. Cornell, and starting with the first row,

25   claims submitted by the trustees.  And do you see the 94,566

Page 18

1    loans.  You just want to start with that and explain to the

2    Court how you derive the loans with compensable claims as of

3    June 1, 2017?

4    A    Well, I started with that which was the total number of

5    claims submitted and then removed various categories for

6    various reasons.

7         The first group, for example, that I removed are things

8    that I don't think are in dispute, that the loans were

9    either rescinded, or the trustees accepted the plan

10    administrator's rebuttal, or the trusts were terminated and

11    so forth.

12    Q    And you also see .4.  There were also 723 loans that

13    were paid in full? Do --

14    A    Yes.

15    Q    -- you see that?

16    A    So --

17    Q    That's another category of loans that were removed from

18    the 94,566?

19    A    Yes.

20    Q    Okay.  And then that leaves you with the at issue

21    mortgage loans as of June 1, 91,151?

22    A    Correct.

23    Q    Okay.  And then what did you do next in order to get to

24    the total number of loans with compensable claims as of June

25    1?

Page 19

1    A    I removed at issue mortgage loans that the plan

2    administrator believed did not have sufficient documentation

3    to be able to review the loan.

4    Q    And those are described later on this chart, the

5    category of on hold loans?

6    A    They're called on hold loans.  Yes.  And this -- this

7    was an area of potential dispute --

8    Q    Sure.

9    A    -- unlike the previous group that I removed.

10   Q    So that gets you down to remaining mortgage loans

11   61,112?

12   A    Correct.

13   Q    And then what did you do next to the -- to the loan

14   population?

15   A    I removed those mortgage loans where experts for the

16   plan administrator, either the re-underwriters or RBF

17   claimed that the breach claims would not hold up, were

18   rejected or that the loans would not be AMA.  And that

19   removed a total of 60,055.

20   Q    Okay.  And then you took the 61,112 and subtracted out

21   the 60,055 that were rejected by the plan administrator

22   through its re-underwriting firm and RBF to get to a new

23   total?

24   A    That's correct.

25   Q    Okay.  And what was -- what's that total?

1   A    1,057.

2   Q    Okay.  And you added back in 63 loans.  Why did you do

3   that?

4   A    Because the plan administrator approved them in step

5   three of the protocol.

6   Q    So as of June 1 what was the total number of mortgage

7   loans with approved claims, compensable claims?

8   A    1,120.

9   Q    Okay.  And this -- so you have not yet applied the

10   purchase price calculation to those loans.  You took one

11   additional step?

12   A    Correct.

13   Q    And what was that, Dr. Cornell?

14   A    Well, the plan administrator believes that on certain

15   non-liquidated loans the -- there's not sufficient

16   documentation to accurately compute a net purchase price.

17   So I set to zero the damages on those loans so effectively I

18   subtracted those 44 loans out.

19   Q    Sure.  So now you have -- for the universe of loans

20   that have mortgage loans with compensable claims as of June

21   1, 2017 what was the total?

22   A    The total amount of loans was 1,076 with an aggregate

23   claim value of $236.8 million calculated using Dr. Snow's

24   prices.

25   Q    Okay.  And initially in your June 1st report you had

Page 21

1    included an offset for servicer related issues?

2    A    Yes, I had.

3    Q    And did you -- what did you -- so what -- the initial

4    report, what was the number of that when it's initially

5    reported as the amount aggregated claim value as of June 1?

6    A    I think it was 232.6.  But subsequently I learned that

7    that servicer issue was going to be dropped so I put the

8    amount back in to get the 236.8.

9    Q    All right.  So -- and you mentioned earlier in the

10   initial slide, when we were talking about your assumptions,

11   that you made an assumption with respect to the purchase

12   price.  Could you just describe again for the Court what

13   that assumption was?

14   A    The assumption was that I used Dr. Snow's purchase

15   price and here that's all I've used because I'm not doing

16   any non-liquidated loans.

17   Q    And are you opining as to whether it was appropriate to

18   use the purchase price as calculated by the trustees as the

19   input for calculating damages in this case?

20   A    No.  I'm just -- I'm using it, but I'm not saying that

21   it's in my opinion necessarily the proper measure of

22   damages.

23   Q    And do you have an understanding of the components of

24   the purchase price as calculated by the trustees and Dr.

25   Snow?

1    A     Yes.

2    Q     And what do you understand the components are?

3    A     It has three components:  Unpaid principal balance,

4    unpaid and accrued interest, and advance servicer fees.

5    Q     Do you understand that there's some components of that

6    calculation that still remain at issue even if we were to

7    use the purchase price?

8    A     Yes.  As we discussed at my deposition whether or not

9    the interest components should be in there is apparently a

10   legal question in dispute.

11   Q     Okay.  And after you submitted your report on June 1,

12   2017, you understand that there were then additional changes

13   to the loan population?

14   A     Yes.

15   Q     And the loan population for which there's -- there

16   would be an aggregated claim value for --

17   A     Yes.

18   Q     -- actual claims?

19   A     That's correct.

20   Q     And did you prepare a slide summarizing those changes?

21   A     Yes, I did.

22   Q     And is that slide reflected in PA Exhibit 981 which is

23   Tab 4 in your binder?

24   A     Yes, it is.

25   Q     Okay.  And could you describe for the Court what

Page 23

1    happened to the loan population after June 1, 2017 when you

2    issued your initial report?

3    A    Well, it starts with my 1,076 loans from the previous

4    slide.

5    Q    And there were certain loans that were removed.  Do you

6    know why they were removed?

7    A    Yeah.  They were -- the trusts were terminated or the

8    -- the claims -- the loans were withdrawn and that was 78

9    loans that came out, but in -- on the plus side the

10   additional mortgage loans were approved by the plan

11   administrator of 221.  So I take out the 78, add back the

12   221, and I get up to 1,219 loans with what I call

13   compensable claims.

14   Q    Okay.  And did you then calculate using Dr. Snow's

15   numbers the aggregate -- the claim value for those 1,219

16   loans?

17   A    I did.

18   Q    And what was that?

19   A    278.1 million.

20   Q    Okay.  I think we mentioned earlier there were 44 non-

21   liquidated loans that you initially removed from your

22   purchase price calculation in your June 1st report?

23   A    Correct.

24   Q    And you also did a calculation if you were to include

25   those 44 loans, correct?

Page 24

1   A    Right.  If I add those back in I get up to 1,263 loans,

2   and using Dr. Snow's net purchase price for the 44, the

3   total comes to 301.8 million.

4   Q    So these numbers here, the 278.1 million and the 301.8

5   million, these reflect the completion of your -- the first

6   assignment you were given in connection with your expert

7   work here to calculate the compensable claim based on, you

8   know, the loan population at issue as of the end of August?

9   A    Yes.

10  Q    And those numbers are 278.1 to 301.8 million?

11  A    Correct.

12  Q    And the variable is whether or not you include the 44

13  non-liquidated loans in your calculation?

14  A    That's right.  That explains the difference between the

15  two.

16  Q    Okay.  So, Dr. Cornell, I'm going to move now to your

17  second assignment in this matter.  And I know we touched

18  this -- touched on this earlier, but maybe you can describe

19  again what your second assignment was in this case.

20  A    Well, to design four estimation scenarios that

21  illustrate how often the trustees need to meet their burden

22  of proof in order to achieve an aggregate claim value of

23  approximately $2.38 billion.

24       And let me explain that this is somewhat of a reverse

25  engineering exercise that the plan administrator worked with

1   my team because we had a program that allowed us to compute

2   the -- I'll use the word damages even though I'm not opining

3   that it's necessarily damages.  But if we just keep the

4   presentation simpler, to compute the damages given inputs of

5   probabilities of success for the trustees.

6        And so the plan administrator and my team worked

7   together and came up with a set of assumptions for success

8   rates that would lead to an aggregate damages of about 2.38

9   billion or less.

10  Q    And, Dr. Cornell, what was the impetus -- I know -- I

11  think you put together a slide explaining the reasons why

12  you did this analysis as part of your reply report.  Do you

13  just want to describe for the Court what the impetus was for

14  you working on your -- including this in your reply report?

15  A    Sure.  Well, when I got my -- when I got the replies to

16  my initial report I noticed several things.  First was the

17  trustees had withdrawn another 15,107 loans.  So now my

18  numbers are going to be out of date, so I have to update

19  those.

20       Second, the trustees criticized my affirmative expert

21  report primarily because I just based it on the assumption

22  that the plan administrator would win on its claims as to

23  what loans should be compensated.

24       And, third, there were obviously large differences in

25  the aggregate claim value estimates between the trustees and

Page 26

1   the plan administrator so we hit upon the idea of finding

2   out what success rates would give you a number in the middle

3   closer to the $2.38 billion.

4   Q    So as a result of these criticisms you were asked to

5   design the estimation scenarios you described generally at

6   the onset of your examination?

7   A    Yes.

8   Q    And have you prepared a demonstrative that shows your

9   identification of the disputed loans to which you applied

10  the four estimation scenarios?

11  A    Yes.

12  Q    I would just refer you to Tab 7.  I think it's PA

13  Exhibit 984.  Is this the summary that you put together

14  identifying the disputed loans?

15  A    It is.  Yes.

16  Q    Okay.  So, again, we start -- we just want to walk

17  through the part, again, we're starting with the 94,566

18  loans that were submitted into protocol.  We just want to

19  walk through these various categories as to how we got to

20  the disputed loan population.

21  A    Well, the 94 and the 91 come right off the previous

22  slide that I had.  So what's new here is there's 15,107

23  removed by Aronoff so that gets me down to 76,044.  And then

24  there were added removals due to terminated trusts and

25  withdrawn trusts.  That takes out 146 and 283.  And then

1    there were loans that paid in full after the Aronoff report

2    of June 1, so those come out.  And then I take out the ones

3    where the plan administrator agreed the loans should be paid

4    so they -- they are not in dispute.  So those come out.

5        When I take all those out I get 71,663 loans of which

6    there's still an ongoing dispute as of the time of this

7    analysis because I understand there's been more removals

8    since, so in some sense this may have to be updated if you

9    want it to be totally current.

10   Q    Sure.  So, Dr. Cornell, just to take a step back, the

11   removed loans not in dispute, this 1,263, that's what was

12   reflected on your earlier slide in terms of loans that have

13   been approved by the plan administrator?

14   A    Yeah.

15   Q    And that's the -- the numbers --

16   A    If you want to go back a couple of slides you'll see

17   that number --

18   Q    Yes.

19   A    -- and that will --

20   Q    So the loans that are in dispute, the 71,663, I think

21   you just mentioned that that loan population is continuing

22   to change.  You know, why are they -- why is the loan

23   population continuing to change?

24   A    Same reason.  The things are being withdrawn or trusts

25   are terminating or loans are being paid off.  So it's a

Page 28

1   moving target.

2   Q    Okay.  But as of the end of August, August 28th when

3   you submitted your reply report this was the number of loans

4   that were at issue?

5   A    That's right.

6   Q    Okay.  So after you identified the disputed loans at

7   issue, what did you do next?

8   A    Well, the plan administrator and their counsel then

9   gave me success rates that had come out of their joint work

10  with my support team to run through the model.

11  Q    Yeah.  And the success rates -- do you understand how

12  the success rates were derived?

13  A    Well, like I say there was joint work between my -- my

14  team, counsel for the plan administrator and the plan

15  administrator.  The plan administrator using their knowledge

16  of, you know, the different types of claims and their legal

17  strafe and us providing the software and the -- they

18  developed the schedule that, if we go to the next slide,

19  that is shown here.

20  Q    And this is a demonstrative that you created showing

21  the success rates that you applied depend -- based on claim

22  category?

23  A    Yes.  The claims were bucketed into 12 categories and

24  then there were success rates for both the breach claim and

25  the AMA for each of those categories.

Page 29

1   Q    Okay.  And to be clear the breach claim success rate

2   and AMA success rates, who provided those -- those success

3   rates to you, Dr. Cornell?

4   A    I got them from counsel for the plan administrator.

5   Q    Okay.  And just to walk through what does the claim

6   category, you said there were 12 categories, what does that

7   represent?

8   A    It represents loans for which there was a claim of that

9   type.  So in Category A would be any loan where there was a

10  claim of misrepresentation of income.

11  Q    Okay.

12  A    And B would be any loan where there was a claim of

13  misrepresentation of debt.  And some loans can go into

14  several categories because there may be multiple claims.

15  Q    Okay.  And moving to the next column, breach claim

16  success rates, could you just describe what -- what that

17  column represents for the Court?

18  A    That is the probability that any claim of that type,

19  the trustees will meet their burden of proof and be

20  successful in their legal claim.

21  Q    So for claim categories A through G here, your scenario

22  assumed that the trustees would succeed at the breach level,

23  the breach claim level 40 percent of the time?

24  A    Correct.

25  Q    Okay.  And moving on to the next column, what does the

1    adversely and materially affects or AMA success rate column

2    tell us?

3    A    It gives you the probability that the trustees will

4    succeed in proving that the breach had an adverse and

5    material affect.

6    Q    And just looking at, again, why don't we look through

7    misrepresentation of income of debt and excessive DTI and

8    misrepresentation employment claims and misrepresentation of

9    assets claims, could you explain to the Court how the AMA

10   success rates worked?

11   A    Well, there's a little complication here because it's

12   well known that the seasoning of a loan affects whether or

13   not a defect is likely to impact that loan.  As people pay

14   more and more it becomes less and less likely that any

15   original defect is going to affect the loan.

16        And this is one way to adjust for that.  So you see

17   that if the loan has been paying -- let's take the first

18   one, misrepresentation of income.  If the loan has been

19   paying for less than 18 months it assumes that the trustees

20   are going to succeed 50 percent of the time because it's

21   more likely that the breach had an effect early on.

22        But after 18 months they -- and beyond, however far

23   beyond, the succeed only 15 percent of the time.

24             THE COURT:  Can I -- I need to understand this.

25             MR. COSENZA:  Sure.

1              THE COURT:  So all these loans were originated a

2      long time ago?

3              THE WITNESS:  Yes.

4              THE COURT:  So is everything in the 15 percent

5      category?

6              THE WITNESS:  No.  It would be at the time that

7      the claim was made how many months had they been paying.

8              THE COURT:  At the time the claim was made, so for

9      our purposes that's the date that the trustees filed their

10     proof of claim?  I'm just trying to determine --

11             THE WITNESS:  You know --

12             THE COURT:  -- if the --

13             THE WITNESS:  -- that's a -- that's a good

14     question.  And I'm not a hundred percent sure myself.  I

15     don't know if --

16             THE COURT:  Okay.  Mr. Cosenza, I'll leave it to

17     you, but I just need to understand --

18             MR. COSENZA:  Yeah.  No.  I'm going to --

19             THE COURT:  -- exactly what his --

20             MR. COSENZA:  Can we just go through --

21             THE COURT:  -- assumption is.

22             MR. COSENZA:  I just want to go through --

23         (Pause)

24             THE WITNESS:  I even have even more medication.

25             THE COURT:  Do you?

```
 1                    THE WITNESS:  No.  No.  I just -- your reporter

 2      just gave me something new.

 3                    THE COURT:  Oh.  I have --

 4                    THE WITNESS:  I have -- I have all sorts of stuff.

 5                    THE COURT:  I have some good stuff up here, too.

 6                    MR. COSENZA:  I'm trying to direct him to the --

 7                    THE COURT:  We can come back to it, Mr. Cosenza.

 8      I don't --

 9                    MR. COSENZA:  Yeah.  I --

10                    THE COURT:  -- mean to derail your --

11                    MR. COSENZA:  -- I think it's addressed in his --

12                    THE COURT:  -- examination.

13                    MR. COSENZA:  -- report.  I just wanted to refer

14      him to his report --

15                    THE COURT:  Sure.  Not a problem.

16                    MR. COSENZA:  -- but I -- it's -- it's basically

17      18 months from origination.  But I'll go through the report

18      --

19                    THE COURT:  Okay.

20                    MR. COSENZA:  -- and get to that.

21                    THE COURT:  All right.  Mr. Cosenza, I would like

22      to hear from the witness.

23                    MR. COSENZA:  I understand.

24                    THE COURT:  Okay.

25                    THE WITNESS:  And I'll have to check that.  If we
```

Page 33

1    have a break I can probably look and --

2              THE COURT:  Okay.

3              THE WITNESS:  -- get back to you.

4              THE COURT:  I'm going to throw it back to you, Mr.

5    Cosenza.

6              MR. COSENZA:  Sure.

7         (Pause)

8    BY MR. COSENZA:

9    Q    Dr. Cornell, did you do anything to test the success

10   rates that the plan administrator provided to you?

11   A    Well, other than noting that I thought that seasoning

12   is an important factor because I've done some previous

13   research on that, I didn't do anything else.

14   Q    Okay.  And, Dr. Cornell, you mentioned very earlier

15   your last assumption in terms of claim correlation, that you

16   made an assumption with respect to claim success

17   correlation.  What was that assumption?  If you could

18   describe in more detail for the Court.

19   A    Well, let me take an example.  That's always the

20   easiest thing for me where there are three different claims.

21   So let's say that a particular loan is in all the top three

22   buckets, misrepresentation of income, misrepresentation of

23   debt, and excess DTI.  So I assume that the trustees

24   basically have three independent bites at the apple.

25        So if they have a 40 percent success rate that means

1     they have a 60 percent failure rate.  So they have a 60

2     percent chance of failing on A, B or C.  But if they're all

3     independent their chance of failing on all three is .6 times

4     .6 times .6 which is about 36 percent, I think, but I would

5     have -- I would have to do the calculation.  But it reduces

6     the probability of them failing dramatically.

7          If they were all correlated, for -- if they were

8     perfectly correlated, then if they failed on

9     misrepresentation of income they would fail on all of them.

10    So they would have a 60 percent chance of failing, not a .6

11    times .6 times .6 chance of failing, which now that I've

12    done the calculation I think is only about 21 percent chance

13    of failing.

14    Q    Do you have a practical, real life example of how

15    success correlation works out -- works outside the RMBS

16    context?

17    A    Well, I think of it -- I'm a basketball fan so I think

18    of it in terms of free throwing.  And if a --

19    Q    So we used a 40 percent.  Why don't we use like

20    Shaquille O'Neal or De'Andre Jordan or someone like that?

21         (Laughter)

22    A    Yeah.  So, yeah, the chance of -- if Shaquille shoots

23    at 40 percent, which he does about, the chance of him

24    missing if he has -- if he was fouled on a three-pointer and

25    has three free throws, the chance of him missing them all is

Page 35

1    .6 times .6 times .6 or about 21 percent.

2    Q    So he's getting three shots --

3    A    Three bites at the apple.

4    Q    Where if there was a correlation in essence it would be

5    more like a one in one -- in the old days --

6    A    Yeah.  It's like you only get the other shots if you

7    made the first.

8    Q    Yeah.  And why is this assumption beneficial to the

9    trustees?

10   A    Because it increases the estimate of the probability

11   that at least one of their claims will get through the door

12   and move on to the next stage.

13   Q    And so what do you -- this claim correlation

14   assumption, how does it impact the aggregate claim values in

15   your various estimation scenarios?

16   A    It's going to tend to increase the aggregate claim

17   value because it makes it more likely that the trustees will

18   success on something.

19   Q    Okay.  And I think you mentioned earlier that this is

20   something that you raised.  And why was this assumption used

21   when you raised it with the plan administrator?

22   A    Well, first off it's -- quite frankly it's simpler

23   because you don't have to -- if there's correlation you have

24   to try to figure out what it is.  It would certainly be

25   positive because the chance of succeeding on these claims

Page 36

1    are going to be positive related.  But it would be very hard

2    to estimate and a little bit speculative.  So rather than

3    try to do that, I just gave the trustees the benefit of the

4    doubt and said I'll assume they're independent.

5    Q    Yeah.  Could you give an example for the Court of how

6    this work for a loan that had breaches in, you know, two

7    breach categories?

8    A    Well, if it has loans, for example, in

9    misrepresentation and misrepresent -- and misrepresentation

10   in debt, if you fail on misrepresentation of income it's

11   probably more like you're going to fail on misrepresentation

12   of debt, but I don't assume that.  Each one is a totally

13   fresh bite at the apple with a 40 percent success rate

14   chance.

15   Q    And -- and the similar shoe with income and excess and

16   debt, there are two claims, another claim (indiscernible)

17   DTI, correct?

18   A    Yes.  And that -- even that one would be given a

19   complete independent shot, though if you failed on the first

20   two you would almost certainly fail on excessive DTI.  But

21   I'm not trying to take account of that complexity.

22   Q    So a misrepresentation on -- a loan that has a claim

23   for misrepresentation of income and excessive DTI, what is

24   the breach claim success rate on that particular loan using

25   your -- in your estimation standards?

1   A    Well, if you're just looking at the breach claim part

2   it would be the 60 percent chance of failing times the 60

3   percent chance of failing.  That's a 36 percent chance of

4   failing, so it would be a 64 percent chance of succeeding.

5   Q    And if there were -- if those numbers were increased,

6   if there were other loans that had more than two breaches on

7   them it would be --

8   A    The --

9   Q    -- higher than 64 percent?

10  A    Yeah.  The more breaches the more it goes up.

11  Q    Yeah.  And you mentioned that as part of your reply

12  report you used the success assumptions to calculate a

13  different estimation scenarios?

14  A    Yes.

15  Q    And how many estimation scenarios did you -- did you

16  calculate?

17  A    I used four.

18  Q    Okay.  And did you create a slide summarizing those

19  estimation scenarios?

20  A    Yes.

21  Q    And is that PA Exhibit 986?

22  A    Yes.

23  Q    And do you want to just explain for the Court what

24  these four scenarios represent?

25  A    Well, they're just buckets of the total loans.  The

Page 38

1    first bucket is all the loans, nothing taken out, all the

2    disputed loans are analyzed.

3         The second bucket is excluding the on hold loans, just

4    the on hold loans for the reason that the plan administrator

5    believes they should be excluded.

6         The third bucket is putting the on hold back in and now

7    excluding the non-liquidated because the plan administrator

8    believes there isn't sufficient data to compute the damages

9    on those.

10        And then the fourth bucket is excluding both, the on

11   hold and the non-liquidated.

12   Q    Okay.  And what inputs did you use to calculate the

13   claim value of the disputed loans for each estimation

14   scenario?

15   A    I used the disputed loans that we computed before, the

16   71,663.  I used the probabilities we just showed, and I ran

17   the calculation for all these four buckets of loans.

18   Q    And was those -- and those calculations were run in a

19   program that you and your team worked on?

20   A    Yes.

21   Q    And have you prepared a demonstrative that reflects

22   your estimation scenarios in further detail?

23   A    Yes.

24   Q    Okay.  And I would refer you to Tab 10, PA Exhibit 987.

25   Is this the demonstrative that you prepared?

1    A    Yes.

2    Q    So let's start with the first row.  If you just want to

3    walk through and explain, you know, what this represents.

4    A    So what are you referring to as the first row --

5    Q    The --

6    A    -- the headings or the numbers?

7    Q    Why don't we start with what each -- the different

8    categories on top, loan population and --

9    A    So that -- that's just a repeat of what I just showed.

10   All loans excluding non-liquidated, excluding on hold and

11   then excluding both.

12   Q    So that's tied to the four categories you just talked

13   about in your --

14   A    Those are the --

15   Q    -- prior testimony?

16   A    -- four categories.  Yes.

17   Q    And then next let's look at the first substantive row

18   of the chart with numbers.  It's described value of claims

19   assuming a hundred percent success.  What do those numbers

20   represent in that row, Dr. Cornell?

21   A    These represent the aggregate claim value calculated

22   using Dr. Snow's prices or the trustees' prices and assuming

23   one hundred percent success by the trustees meeting their

24   burden of proof in every single case.

25   Q    So we start -- so it's all loans and a hundred percent

Page 40

1   success.  You start with the $11.1 billion number?

2   A    Correct.

3   Q    Then moving over a hundred percent rate success

4   excluding the non-liquidated loans you get to 8.8 billion as

5   your starting point?

6   A    Yes.

7   Q    And then excluding the on hold loans, but including the

8   non-liquidated loans you start at $7.8 billion?

9   A    Yes.

10  Q    And if you exclude both categories your starting point

11  for your estimation scenarios was 6.19 billion?

12  A    Correct.

13  Q    Okay.  So now let's move to the second row.  And what

14  does the second row with numbers, I guess the third row on

15  the chart, the value of claims applying success assumptions,

16  what does that represent, Dr. Cornell?

17  A    Well, I've now gone through and rather than assuming a

18  hundred percent success across the board I've applied the

19  success assumptions that we just saw in the previous slide.

20  Q    Can you just refer back to the prior slide?

21  A    One more slide back refers back --

22  Q    So these are the -- these are the success ratios you

23  applied --

24  A    That's exactly right.

25  Q    -- to the numbers?

Page 41

1   A    Correct.

2   Q    So if you can just move in.  And applied those success

3   rates to all loans, what's the value of the claims applying

4   the success assumptions?

5   A    2.195 billion.

6   Q    Okay.  And then if you exclude the non-liquidated loans

7   the plan to success rate assumptions?

8   A    1.836 billion.

9   Q    Excluding the on hold loans?

10  A    1.68 -- 18 billion.

11  Q    And then if you exclude both the on holds and the non-

12  liquidated loans the plan to success rates what's the value?

13  A    1.349 billion.

14  Q    Okay.  Now there's a next row here, right, because that

15  doesn't end when you -- the exercise in terms of valuing the

16  claim here.  What does the next row represent?

17  A    Well, that previous calculation that we did was just

18  for the disputed loans, the 71,663.  There's also the loans

19  that aren't in dispute, so that's what the next row is.

20  That's where you see the 301 and the 278 that we calculated

21  earlier.

22  Q    And that's the -- that's from the loans, they were from

23  the initial charts we saw of the loans that -- the

24  compensable claim based on the loans that are not in dispute

25  and that have been approved by the plan administrator?

1    A    Right.  And remember the difference between the 301 and

2    the 278 were the 44 non-liquidated loans.  So they go out.

3    Whenever there's a non-liquidated you use the 278.  When

4    there's not a non-liquidated you use the 301.

5    Q    And that's referred to here and do you see the 278

6    that's the -- one of the columns excluding non-liquidated

7    loans and also the column excluding both?

8    A    Right.

9    Q    Okay.  So adding that line back in to the aggregate

10   claim value of claims approved by the plan administrator,

11   that's -- you tally that number to the row above it to get

12   to the aggregate claim value under your four estimation

13   scenarios?

14   A    Right.  You add the estimate of the value for the

15   disputed loans to the undisputed loans and you get the

16   aggregate claim value.

17   Q    Okay.  And the aggregate claim values under your four

18   scenarios, I just want to walk through their range based on

19   your four estimation scenarios of the aggregate claim value.

20   A    Sure.

21   Q    Let's start with all loans.

22   A    It's $2.497 billion.

23   Q    What about excluding the non-liquidated loans, what's

24   the --

25   A    When you --

1    Q    -- aggregate claim value?

2    A    -- exclude the non-liquidateds it's 2.114 billion.

3    Q    Excluding the on-hold loans?

4    A    1.920 billion.

5    Q    And if you exclude both the on holds and the non-

6    liquidated loans what's the aggregate claim value under that

7    estimation scenario?

8    A    1.627 billion.

9    Q    So looking at these numbers, these reflect a completion

10   of what your second assignment was in terms of looking at

11   the aggregate claim value running different estimation

12   scenarios?

13   A    Yes.

14   Q    And what does this illustrate or demonstrate to you,

15   Dr. Cornell?

16   A    That with those success probabilities you get numbers

17   approximately equal to or meaningfully less than the $2.38

18   billion settlement value.

19   Q    Okay.  So, Dr. Cornell, I don't know if -- do you want

20   to take a two -- I'm moving to a different topic.  Do you

21   want to take a two-minute break or do you want to continue

22   to go forward?

23   A    I'm doing okay now so maybe --

24   Q    Okay.

25   A    -- we -- while we're --

Page 44

1    Q    While we're hot we might as well --

2    A    Yeah.

3    Q    -- keep on going.

4    A    While the weather's good let's keep going.

5    Q    So after your deposition did you review Dr. Snow's

6    supplemental report?

7    A    I did.

8    Q    Okay.  And did you review his purchase price

9    calculations and the implications of his report on interest?

10   A    Yes.

11   Q    And do you recall that Dr. Snow's supplemental report

12   calculated that the aggregate purchase price number of --

13   and this is the top column here of the 1 -- 11. -- 11

14   billion dollar number included potentially impermissible

15   interest?

16   A    Yes.  I'm aware of that.

17   Q    And do you recall what -- generally what in the range

18   and magnitude what the amount was?

19   A    It was on the order of like $2.1 billion.

20   Q    Okay.

21   A    That's what I recall.

22   Q    And do you have any understanding of whether the

23   payment of this interest is permitted in a bankruptcy

24   proceeding?

25   A    That would be a legal question.  I have no expertise in

Page 45

1    that.

2    Q    And that's up to the Court?

3    A    Yes.

4    Q    Okay.  And did you adjust your totals here in your four

5    estimation scenarios to back out the impact of essentially

6    impermissible interest?

7    A    No, I did not.

8    Q    Okay.  But if you were asked to back out the

9    impermissible interest amounts how would that affect the

10   totals here in the last line of your -- of this chart on

11   aggregated claim values?

12   A    Well, to do it with precision I would have to actually

13   run the program.

14   Q    Uh-huh.

15   A    But because interest tends to pass through the entire

16   program somewhat linearly, if the interest accounts for

17   about 20 percent of the total, which is what Dr. Snow had

18   calculated, then it's going to -- to a back of the envelope

19   approximation reduce all the numbers by 20 percent.

20           MR. HEIDLAGE:  Objection, Your Honor.

21           THE COURT:  Yes.

22           MR. HEIDLAGE:  We haven't received any notice of

23   this particular opinion including the magnitude or anything

24   like that.

25           THE COURT:  Okay.  Mr. Cosenza.

1           MR. COSENZA:  Your Honor, this is the report by

2     Dr. Snow that was submitted in November.  He's -- we're not

3     issuing a new opinion.  He's simply reacting back of the

4     envelope as to what those numbers are.  There was a

5     supplemental report from Dr. Cornell where he looked at Dr.

6     Snow's numbers and calculations to make sure they were in

7     the range of reasonableness.  So I'm just simply asking one

8     or two questions as to how --

9           THE COURT:  So was his --

10          MR. COSENZA:  -- they would impact --

11          THE COURT:  -- math in the supplemental report?

12          MR. COSENZA:  Dr. Cornell's math in terms of the

13    implications to each of the --

14          THE COURT:  Yes.

15          MR. COSENZA:  -- each of his scenarios is not in

16    the report.

17          THE COURT:  Okay.  Then --

18          MR. COSENZA:  We did -- we did ask the trustees if

19    they wanted us to do this and they never got back to us

20    until Tuesday afternoon.  So it's just one or two questions

21    just to talk generally about the magnitude.  I mean, it's a

22    20 percent number.  I think it's --

23          THE COURT:  Okay.  Why don't we leave it right

24    there.  I think you should move on to the next topic.

25          MR. COSENZA:  Okay.  Thank you.

1          THE COURT:  Thank you.

2      (Pause)

3          MR. COSENZA:  Your Honor, I think this is covered

4  in his supplemental report, just one topic -- one question.

5          THE COURT:  Okay.

6  BY MR. COSENZA:

7  Q    The $2.1 billion that Dr. Snow calculated in his

8  supplemental report, what would be the impact on the value

9  of claims assuming one hundred percent success level?  At

10  the top this $11 billion number.

11  A    You would just deduct the 2.1 billion, so it would be

12  about nine.

13  Q    SO that would be the starting point for that deck

14  that's --

15  A    Yes.

16      (Pause)

17  Q    Now if we reduce the starting point -- to nine billion

18  in order to get to an estimation scenario of 2.4 what would

19  you have to do to the success rates that we already had on a

20  prior chart?

21          MR. HEIDLAGE:  Objection.

22          THE COURT:  Yeah.

23          MR. HEIDLAGE:  He submitted -- Dr. Cornell

24  submitted a supplemental report after Dr. Snow's report on

25  interest.  If any of the analysis as to what the effect

1   would be on his estimation scenarios, if you want to

2   disclose it, if you want to update it, you could have done

3   it then.  He didn't.  So we object to this testimony as

4   being a new --

5           THE COURT:  I'm not asking --

6           THE COURT:  Come on up.

7     (Sidebar off the record)

8   BY MR. COSENZA:

9   Q   So, Dr. Cornell, just referring you back to your -- the

10   prior slide that had your success rate assumptions, I think

11   it was three slides before this --

12   A   This one?

13   Q   Yes.  So if you were starting at a lower number here

14   with the $9 billion you just testified to, in order to get

15   to the $2 billion -- I'm sorry, the $2.4 billion number what

16   impact would it have on applying the bridge claim success

17   rates in order to get to the $2.4 billion?

18   A   Well, you're going to have to increase those success

19   rates on the order of 20 percent somehow.

20   Q   Thank you.

21           MR. COSENZA:  Okay.  Changing topics, Your Honor.

22           THE COURT:  Okay.

23   BY MR. COSENZA:

24   Q   Did you review Dr. Snow's trial testimony with respect

25   to the non-liquidated active loans?

Page 49

1   A    Yes.

2   Q    The non-liquidated, sometimes called active.  I think

3   formally they're non-liquidated but they've also been

4   described as active in the court.  I'm going to show you a

5   slide from Dr. Snow's direct examination.  It's Tab 16 in

6   your binder.  Do you see the third column, second row here

7   where it says that historical losses on the non-liquidated

8   loans was $772 million?

9   A    I do.

10  Q    Okay.  And do you recall reviewing Dr. Snow's testimony

11  about this slide?

12  A    Yes.

13  Q    Okay.  I would like to show you testimony from Dr.

14  Snow.  It's Dr. Snow's trial testimony, page 3514, 15 to 22

15  and it's Tab 15 in his binder.  And it's on your screen.

16  And what do you understand Dr. Snow to be saying here about

17  this number?

18  A    That they are principal modifications, as he says.

19  Let's see.  Yes.  My understanding is that these are

20  principal modifications.  That would be the 772.

21  Q    Did you --

22          MR. HEIDLAGE:  Objection, Your Honor.  I believe

23  this is completely beyond the scope of his -- Dr. Cornell's

24  reports.

25          MR. COSENZA:  I can --

Page 50

1              THE COURT:  Come on up.

2        (Sidebar off the record)

3              THE COURT:  Okay.  You can go ahead, Mr. Cosenza.

4              MR. COSENZA:  Thank you.

5    BY MR. COSENZA:

6    Q    As you -- just to -- I think we asked this question,

7    but just to continue.  This is Dr. Snow's trial testimony,

8    page 3514, lines 15 to 22.  I think you answered this

9    question, but what do you understand Dr. Snow to be saying

10   in this Q and A?

11   A    That the $772 million lifetime losses associated with

12   these non-liquidated loans are due to principal

13   modifications.

14   Q    Okay.  And do you have any reaction to this testimony

15   by Dr. Snow?

16   A    Well, I knew that Dr. Snow had distinguished between

17   principal forgiveness and principal deferral.  And so now

18   he's using a new word, modifications.  So how does that

19   relate to forgiveness and deferrals, and it's important

20   because he testified that forgiveness should be in the

21   realized losses and deferrals should not.

22   Q    Okay.  But does 772 includes both --

23   A    That --

24   Q    -- deferred and forgived (sic), correct?

25   A    That's the way I understood it.  Yes.

1    Q    Okay.  I would like to show you additional testimony

2    from Dr. Snow.  This is Tab 15 again, Snow trial transcript

3    at 3553, lines 25 to 3554, line 19.  Just take a minute to

4    review that.

5         (Pause)

6    A    Yeah.  He's explaining here --

7    Q    So let me ask you a question.  What do you understand

8    Dr. Snow to be saying here?

9    A    He's explaining here that he wants to include the

10   forgiven principal in the realized losses, but not the

11   deferred principal because the deferred principal is not a

12   recognized loss.

13   Q    Okay.  So the 772 number -- maybe we can go back to Tab

14   16, TRDX-305.  So this 772 number that Dr. Snow put on his

15   historical losses is -- what is -- does that -- what

16   component of that is deferred principal and what part of

17   that is, you know, forgive -- principal forgiveness?

18             THE COURT:  Yes.

19             MR. HEIDLAGE:  I only object because I think the

20   testimony that he previously read was referring to

21   liquidated loans where he is now attempting to suggest it's

22   related to a non-liquidated loan analysis.

23             THE COURT:  I thought we've been talking about

24   non-liquidated loans this entire time.

25             MR. COSENZA:  That's -- that's what I'm doing,

1    Your Honor.

2            MR. HEIDLAGE:  Okay.  Well, maybe I --

3            THE COURT:  Okay.  I --

4            MR. HEIDLAGE:  I can --

5            THE COURT:  Well, we have each a 40 percent chance

6    of being wrong, so --

7        (Laughter)

8            THE COURT:  -- I'm happy to have you take a

9    moment, Mr. Heidlage, to check it out.

10           MR. HEIDLAGE:  I would appreciate that, just --

11           THE COURT:  Yeah.  Okay.  Why don't we take a

12   first break --

13           MR. COSENZA:  Oh, Your Honor, I really have two

14   additional questions --

15           THE COURT:  Okay.

16           MR. COSENZA:  -- and then I think -- beyond that I

17   think I may be able to wrap up.

18           THE COURT:  Okay.  Fair enough.

19           MR. COSENZA:  So just to wrap up --

20           THE COURT:  And then during the --

21           MR. COSENZA:  -- to just wrapping one AMA question

22   that you raised.

23           THE COURT:  Sure.

24           MR. COSENZA:  Okay.  Why -- you can look at it

25   during the break and we can --

 1          MR. HEIDLAGE:  Sure.

 2          THE COURT:  -- revisit that.

 3          MR. HEIDLAGE:  Thank you very much.

 4          MR. COSENZA:  Sure.

 5   BY MR. COSENZA:

 6   Q    So based on Dr. Snow's testimony can you tell how much

 7   of the 772 in "historical losses" that you see for non-

 8   liquidated loans are attributable to deferred versus

 9   forgiven principal?

10   A    No.  There's no way to tell.

11   Q    Do you know how much of this about, this 772 is

12   deferred versus forgiven principal?

13   A    Well, I understand from a conversation with Mr. Trumpp

14   that most of it is deferred --

15          MR. HEIDLAGE:  Objection.

16          THE WITNESS:  -- but I don't know --

17          MR. HEIDLAGE:  Objection.

18          THE WITNESS:  -- the number.

19          MR. HEIDLAGE:  I mean --

20          MR. COSENZA:  Your Honor, could I have a -- if we

21   can take a break and I think -- but I -- I really just want

22   to note this was a new opinion issued by Dr. Snow, this 772.

23   He's responding to how the purchase price -- these are

24   purchase prices that were calculated by Dr. Snow --

25          THE COURT:  All right.  We're --

1            MR. COSENZA:  -- initially.

2            THE COURT:  You're going to -- I don't know what

3      this objection is to the extent that you are going to tell

4      me it's a hearsay objection.  Is that what you're going to

5      tell me?

6            MR. HEIDLAGE:  That's part of it.

7            THE COURT:  Okay.  It's not -- I'm not -- it's not

8      coming in for the truth.  Okay.  So let's have Mr. Cosenza

9      ask his one more question --

10            MR. COSENZA:  Sure.

11            MR. HEIDLAGE:  Okay.

12            THE COURT:  -- and then we can come back and have

13      a chat before this continues.

14            MR. COSENZA:  Sure.

15      BY MR. COSENZA:

16      Q    So leaving aside your discussions with Mr. Trumpp, do

17      you know how much of this 772 is deferred versus forgiven

18      principal?

19      A    No.

20      Q    Okay.

21            MR. COSENZA:  So, Your Honor, subject to we can

22      take a break now.

23            THE COURT:  Okay.  Let's take a break --

24            MR. COSENZA:  I think I'm close to wrapping up

25      with --

Page 55

1                    THE COURT:  And --

2                    MR. COSENZA:  -- that one topic on AMA.  I'll go

3       back to his report to address and then we'll come back in

4       ten minutes.

5                    THE COURT:  Okay.  All right.  So let's come back

6       in ten minutes, take some time to clarify the issue about

7       the non-liquidated loans versus the liquidated loans and

8       anything else.

9                    Yes, Mr. Shuster.

10                   MR. SHUSTER:  Could we have 15 --

11                   THE COURT:  Yes.  You can have 15.

12                   MR. SHUSTER:  -- please?  Thank you, Your Honor.

13                   THE COURT:  Absolutely.  All right.  So we'll come

14      back at ten minutes or so before the hour.

15                   Dr. Cornell, as I'm sure you're aware, you remain

16      under oath during the breaks.  Please do not discuss the

17      case or your testimony with anyone or be in anyone's

18      presence while they're doing the same.

19                   THE WITNESS:  What about (indiscernible) answer

20      your question about the --

21                   THE COURT:  No.  Let -- no.  No.  All right.

22      Thank you, sir.  All right.

23                   MR. COSENZA:  Thank you.

24          (Recessed at 10:37 a.m.; reconvened at 10:56 a.m.)

25                   THE COURT:  Have a seat.

```
 1              All right.  You ready, Mr. Cosenza?

 2              MR. COSENZA:  Yes.  Yes, Your Honor.

 3              THE COURT:  Okay.

 4    BY MR. COSENZA:

 5    Q    Could we just pull back up TRX-985?  I -- we discussed

 6    this earlier, Dr. Cornell, and I think there was a question

 7    about the adverse and materially affects (indiscernible)

 8    success rate and when that was measured.  Do you recall

 9    those --

10    A    Yeah.

11    Q    -- those questions?

12    A    When the 18 or 36 months --

13    Q    Yes.

14    A    -- started measuring.  Yes.

15    Q    So, Dr. Cornell, can I refer you to your amended reply

16    report which is TRX-941?  And if you could look at page 11,

17    Footnote 45, and if you could just take two minutes to read

18    the text and the associated footnote.

19         (Pause)

20    A    Yeah.  That's the correct answer.

21    Q    Okay.  So just --

22    A    I just didn't recall.

23    Q    -- just to -- let me ask you a question.  Just does

24    that refresh your recollection as to when the AMA was

25    measured?
```

Page 57

1   A    What the -- how the number of months was measured.

2   Yes.

3   Q    Yes.  And could you describe for the Court how -- you

4   know, what was -- how the AMA was measured in terms of

5   payment history and number of months?

6   A    Well, the -- it's relatively complicated.  It -- it's

7   basically the origination date if that's available.  And

8   then where it's not it's as described in Footnote 45.

9   Q    So it's number of payments made at -- as of the dates

10  -- measuring from the date of origination --

11  A    Yes.

12  Q    -- correct?  So I think you mentioned earlier it could

13  be when the claim was made, but that was --

14  A    That would seem correct.

15  Q    -- that was incorrect.  So it's -- it's time from

16  origination.  That was the -- that was the payment -- that

17  date that was used?

18  A    Yes.

19  Q    Okay.

20          MR. COSENZA:  I think with that, Your Honor, I've

21  completed my direct examination.

22          THE COURT:  Okay.  Thank you.

23          MR. COSENZA:  Thank you.

24          THE COURT:  Okay.

25      (Pause)

1              THE COURT:  Are you ready, Mr. Heidlage?

2              MR. HEIDLAGE:  Yes.  Yes, Your Honor.

3              THE COURT:  Okay.

4              MR. HEIDLAGE:  If you don't mind I'll be taking a

5     few minutes --

6              THE COURT:  Sure.  No problem.

7              MR. HEIDLAGE:  -- just to get set up.

8              THE COURT:  No problem.

9         (Pause)

10             MR. HEIDLAGE:  Excuse me, Your Honor.  We're --

11             THE COURT:  Yes.

12             MR. HEIDLAGE:  -- going to hand out a few binders.

13             THE COURT:  Sure.

14             MR. HEIDLAGE:  Thank you.

15             THE COURT:  Ready?  Okay.

16             MR. HEIDLAGE:  Good morning.

17                       CROSS-EXAMINATION

18     BY MR. HEIDLAGE:

19     Q    Good morning, Dr. Cornell.

20     A    Good morning.

21     Q    We met at your deposition a while ago.  I hope you're

22     doing well.

23     A    Well, I'm not doing that well, but we did meet at my

24     deposition.

25     Q    Fair enough.

Page 59

1          (Laughter)

2    A     Compared to some of the other people in this case I'm

3    doing, I think, very well.

4    Q     You were assisted by a team at Compass Lexecon,

5    correct?

6    A     Yes.

7    Q     And that team was headed by Dr. Gerry Lumer, correct?

8    A     Yes.

9    Q     And I want to talk about some of the conclusions you

10   had in your affirmative report that you discussed with Mr.

11   Cosenza.  In your affirmative report you concluded that the

12   aggregate claim value was approximately 236.8 million; is

13   that correct?

14   A     Actually, it was 232.6 because I had the servicer fee

15   adjustment out and later amended it to 236.8.

16   Q     Okay.  And that amount was for the approximately 1,076

17   loans that you referred to as compensable claims, correct?

18   A     Correct.

19   Q     Okay.  And those are the loans for which claims were

20   submitted during the protocol and as to which you understand

21   the plan administrator accepts that there is a

22   representation and warranty breach that adversely and

23   materially affects the value of the loan and where the plan

24   administrator also accepts the trustees' calculated purchase

25   price, correct?

Page 60

1    A    Correct.

2    Q    And you're not offering an opinion on the meaning of

3    any of the governing agreements in this case, correct?

4    A    I am not.

5    Q    And you're not offering an opinion on the meaning of

6    any of the representations and warranties in this case,

7    correct?

8    A    I am not.

9    Q    You're not offering an opinion as to when a loan must

10   be -- may be repurchased, correct?

11   A    As to what?

12   Q    When a loan must be repurchased?

13   A    No, I'm not.

14   Q    Okay.  You're not offering an opinion on what

15   constitutes a breach of one or more of the representations

16   and warranties, correct?

17   A    Correct.

18   Q    And you're not offering an opinion as to what

19   constitutes prompt notice of a breach, correct?

20   A    Correct.

21   Q    You're not offering an opinion as to whether the

22   trustees properly complied with any aspect of the protocol,

23   correct?

24   A    Correct.

25   Q    You're also not offering an opinion as to what standard

Page 61

1  the Court should use to estimate the value of the trustees'

2  claims, correct?

3  A    I think that's correct.  Yes.

4  Q    Now for each of the loans you included as a compensable

5  claim you understood the claim value of that loan to be

6  equal to its purchase price, correct?

7  A    I assumed that it was, more than I -- I guess if you --

8  by -- I understood that was given to me as an assumption

9  that I accepted.

10  Q    Okay.  And you wrote in your affirmative report that

11  the governing agreements defined purchase price as the sum

12  of the unpaid principal balance of the loan, accrued

13  interest, costs incurred by the trust in connection with any

14  violations of the law related to the law and any un-

15  reimbursed servicing advances made by the servicer of the

16  loan, correct?

17  A    Correct.

18  Q    And you did not find any errors in the trustees'

19  calculation of the purchase price, correct?

20  A    No mathematical errors.  Correct.

21  Q    Now as part of your assumptions in your affirmative

22  report you did not net out any amount of interest, correct?

23  A    Correct.

24  Q    And that's because you didn't understand that to be a

25  factor at the time, correct?

Page 62

1   A    I did -- wasn't aware of it being a factor at the time.

2   Q    In fact, the first time you learned netting out of the

3   interest might be necessary, according to the plan

4   administrator, was the day prior to your deposition in

5   October, correct?

6   A    That's right.

7   Q    And, in fact, your impression at the time of your

8   deposition was that the plan administrator's position as to

9   the proper components of the purchase price had changed from

10  the time you provided your affirmative report, correct?

11  A    That was my impression.

12  Q    Now in your reply report you adopted the purchase

13  prices calculated by Dr. Snow for purposes of generating

14  your estimation scenarios, correct?

15  A    I did.

16  Q    And as part of your work on the reply report you or

17  your team checked Dr. Snow's arithmetic for the calculation

18  of the purchase price, correct?

19  A    Yes.

20  Q    Okay.  And you didn't find any errors in Dr. Snow's

21  arithmetic, correct?

22  A    Correct.

23  Q    And you have no reason to believe that the data Dr.

24  Snow relied on was unreliable or contained any inaccuracies,

25  correct?

Page 63

1   A    As I sit here now, no, I don't.

2   Q    Now there were a small number of loans which were non-

3   liquidated loans at the time Dr. Snow calculated his

4   purchase prices, but which had liquidated by the time you

5   prepared your reply report, correct?

6   A    Yes.

7   Q    And for those loans you calculated the purchase price

8   yourself, correct?

9   A    Yes.

10  Q    And you did that because for such loans you did not

11  have a post-liquidation purchase price from Dr. Snow,

12  correct?

13  A    Correct.

14  Q    And you applied the same approach as Dr. Snow, correct?

15  A    Correct.  I tried to make it as consistent as possible

16  with the other parts of my report where I relied on Dr.

17  Snow.

18  Q    Okay.  And, again, you did not -- you included interest

19  in the calculation, correct?  You didn't net it out?

20  A    Correct.

21  Q    Okay.  You used MBS data to calculate the purchase

22  price, correct?

23  A    Yes.

24  Q    And as far as you know the MBS data is reliable?

25  A    Yes.

Page 64

1    Q    And for loans for which MBS data did not have a

2    realized loss number to use for the purchase price you used

3    Nationstar data instead, correct?

4    A    That's what I -- I would have to double check to be

5    sure, but that's what I recall.

6    Q    Okay.  And you have no reason to believe the Nationstar

7    data was not reliable, correct?

8    A    I don't.  No.

9    Q    Okay.  And you understand that the Nationstar master

10   servicing data is one of the data sources that Dr. Snow

11   relied on for purposes of calculating his purchase prices,

12   correct?

13   A    Yes.

14   Q    Okay.  And your team at Compass Lexecon would have

15   reviewed the Nationstar data and chosen to rely on it,

16   correct?

17   A    Yes.

18   Q    Okay.  And your team never reported any inaccuracies in

19   the Nationstar data, correct?

20   A    Not to me, no.

21   Q    And you agree that remittance data published by the

22   trusts is generally used by experts in the RMBS data -- I'm

23   sorry -- withdrawn.  Let me restart that question.

24        You agree that remittance data published by the trusts

25   is generally used by experts in the RMBS industry to

1    calculate damages or losses, correct?

2    A    I think that's true, but it's not something I recall

3    checking recently.

4    Q    Okay.  Do you recall me asking you a question about

5    this at your deposition?

6    A    No.

7    Q    Okay.  Could we show TRX-973, page 86 at line 21 to 87,

8    5?

9              MR. COSENZA:  Your Honor, I --

10             THE COURT:  Yes.

11             MR. COSENZA:  -- I don't think this is proper

12   impeachment.  The witness said I think that's true, but he

13   did not check it recently.  I don't know how this testimony

14   is impeachment.

15             THE COURT:  Well, let's see what it says.

16             THE WITNESS:  Sure.

17   BY MR. HEIDLAGE:

18   Q    I asked the question, "Would you agree that remittance

19   data published by the trust is generally used by experts in

20   the RMBS industry to calculate damages or losses, correct?"

21   Mr. Cosenza objected.  And you responded, "In my limited

22   experience on that, that's true."

23        Did I ask that question and did you give that answer?

24   A    Yes.

25   Q    Thank you.

Page 66

```
 1              MR. COSENZA:  Same objection, Your Honor.  I don't
 2   see it as being impeachment.
 3              THE COURT:  Overruled, Mr. Cosenza.
 4   BY MR. HEIDLAGE:
 5   Q    And, in fact, you personally used data from remittance
 6   reports for calculating loan level historical losses in the
 7   Citigroup matter, correct?
 8   A    As I recall, yes.
 9   Q    Now you did not analyze any loss certificates or
10   corporate expense logs in performing your purchase price
11   calculation here, correct?
12   A    Correct.
13   Q    Now one group of loans that you removed in your
14   affirmative report as not compensable were loans where you
15   understood the plan administrator found the trustees failed
16   to provide sufficient documentation to allow the plan
17   administrator to review such loans, correct?
18   A    Yes.
19   Q    These are the on hold loans that Mr. Cosenza referenced
20   earlier?
21   A    Yes.
22   Q    Okay.  And those include loans that were -- the plan
23   administrator alleges were missing corporate expense logs or
24   loss certificates.  Are you aware of that?  Is that correct?
25   A    Not specifically, no.
```

Page 67

1    Q    Okay.  You're not opining that any of the documents

2    identified by the plan administrator that were supposedly

3    missing as to cause the loan to be put on hold are, in fact,

4    necessary either to calculate the purchase price or for any

5    other reason, correct?

6    A    I'm not appointing -- opining on that one way or the

7    other.

8    Q    Okay.  And it's correct that you only know generally

9    what a loss certificate is; is that fair?

10   A    That's fair.

11   Q    Okay.  And you never reviewed a loss -- a final loss

12   certificate in the context of your work, correct?

13   A    Correct.

14   Q    You have never used a loss certificate to confirm the

15   loss numbers in any way in any of your prior matters,

16   correct?

17   A    Not that I recall, no.

18   Q    Okay.  And, in fact, you never even requested a final

19   loss certificate in the context of your work, correct?

20   A    I don't recall ever requesting one.

21   Q    Now you're aware that Dr. Snow performed a comparison

22   of the data on the loss certificates from the loans at issue

23   here in the data used by Dr. Snow, correct?

24   A    I think so.  I don't specifically recall.

25   Q    Okay.  You didn't do any comparison of the data on any

Page 68

```
 1    loss certificates to the data on a -- used by Dr. Snow,

 2    correct?

 3    A     No, I did not.

 4    Q     And it's -- it's true that you do not know what a

 5    corporate expense log is the context of RMBS, correct?

 6    A     I don't think so.

 7    Q     Okay.  You never requested a corporate expense log in

 8    the context of your RMBS work?

 9    A     No, not that I recall.

10    Q     And you cannot recall using corporate expense logs to

11    confirm loss numbers in your prior matters, correct?

12    A     That's correct.

13    Q     Now another group of loans you excluded in your

14    affirmative report as non-compensable were non-liquidated

15    loans, correct?

16    A     Yes.

17    Q     And you're not offering an opinion as to whether non-

18    liquidated loans should be excluded or should not be

19    excluded, correct?

20    A     That's correct.

21    Q     And you're not offering an opinion as to whether Dr.

22    Ellson's valuation of such loans is reasonable, correct?

23    A     That's correct.

24    Q     And you don't have an opinion as to whether or not Mr.

25    Castro was correct with respect to his critiques of Dr.
```

Page 69

1    Ellson, correct?

2    A    No.  I haven't weighed in on that.

3    Q    Okay.  You mentioned earlier the servicer issue.  I

4    would like to ask you about that.  To the best of your

5    knowledge, I think you testified this, the servicer issue is

6    completely out of the litigation, correct?

7    A    That's my understanding.

8    Q    Okay.  And in your issuing your affirmative report and

9    identify -- and where you assume that $4.2 million, you did

10   no analysis to identify whether or not that 4.2 number was

11   reasonable, correct?

12   A    I don't remember doing so.

13   Q    Okay.  So I'm going to switch topics to your estimation

14   scenarios at the moment.  Okay.

15        Now I think the way that you described is that the PA

16   asked you to design estimation scenarios that illustrate how

17   often the trustees need to succeed on their claims in order

18   to achieve an aggregate claim value of approximately 2.38

19   billion, correct?

20   A    Yes.

21   Q    Okay.  And they also provided you with each of the

22   success percentages, correct?

23   A    Yes.  They worked with my team to develop those.

24        (Pause)

25   Q    Okay.  Do you recall me asking a question at your

1    deposition about how you received the success assumptions?

2    A    No.

3    Q    Okay.  Do you recall testifying previously that the

4    plan administrator simply gave you the assumptions?

5    A    Well, that is what ultimately happened.  Yes.

6    Q    Okay.  So counsel both gave you the $2.38 billion

7    target and then also the percentages that got you to reach

8    that target, correct?

9    A    Well, I was aware of the target, but they then gave me

10   the percentages.  Yes.

11   Q    Well, you were made aware of the target by the plan

12   administrator, correct?

13   A    I think so.

14   Q    Now I believe that we saw earlier that there were two

15   steps, correct, the breach defenses and then the AMA

16   defenses?

17   A    Yes.

18   Q    Okay.  You're not opining as to what the trustees must

19   do to get over either one of those steps, correct?

20   A    No, I'm not.

21   Q    And you're not opining as to what constitutes a valid

22   defense of threshold facts, correct?

23   A    Correct.  I'm not.

24   Q    And you're not offering an opinion as to whether the

25   PA's provided a defense to a threshold fact with respect to

Page 71

```
 1    any loan, correct?

 2    A    Correct.

 3    Q    Nor are you opining as to what constitutes a valid

 4    defense for the representations and warranties, correct?

 5    A    Correct.

 6    Q    And you're not opining as to whether the PA's provided

 7    a valid defense to any of the representations and warranties

 8    with respect to any of the loans, correct?

 9    A    Correct.

10    Q    And you're not offering an opinion as to what

11    constitutes a valid AMA defense, correct?

12    A    That's right.

13    Q    Okay.  And you're not offering an opinion as to what

14    constitutes an adverse and material effect on the value of a

15    mortgage loan in this case, correct?

16    A    Correct.

17    Q    You understand that Mr. Castro and the trustees'

18    experts disagree on the question of what constitutes AMA,

19    correct?

20    A    I'm aware they disagree.

21    Q    Okay.  But you don't have an opinion one way or the

22    other as to who is right or wrong, correct?

23    A    Correct.

24    Q    Okay.

25         (Pause)
```

1              MR. HEIDLAGE:  Could we show Exhibit B to the

2      amended reply report, TRX-941?

3      BY MR. HEIDLAGE:

4      Q    Okay.  And this is the -- it's effectively the slide

5      that was put up earlier with the various success assumptions

6      that you had, correct?

7      A    Yeah.  It looks like the same thing.

8      Q    Okay.  And --

9      A    It's the same thing.

10     Q    -- just so the record is absolutely clear every single

11     one of the numbers on the percentage of breach claim to

12     overcome breach defenses, the 40, 40, 40, 40 all the way

13     down to the ten, those were all provided to you by the -- by

14     counsel, correct?

15     A    That's correct.

16     Q    And the same thing goes with the AMA defense, 50, 50,

17     15, 15, all the way down to the other ten, the tens on the

18     bottom, those were all provided to you by counsel, correct?

19     A    Yes.

20     Q    Okay.  And you're not opining as to whether or not any

21     one of those numbers, any one of those assumptions was, in

22     fact, a reasonable assumption, correct?

23     A    With one caveat.  As I said I think some seasoning

24     assumption is reasonable because I've done previous work on

25     seasoning.  But that would be the extent of it.

1    Q    Well, just to be clear, you don't have an opinion as to

2    what constitutes an AMA defense, correct?

3    A    Correct.

4    Q    So you're not offering an opinion as to whether or not

5    seasoning is relevant in this case, correct, based on what

6    an AMA defense is, isn't that true?

7    A    Based on what an AMA defense is I'm not.

8    Q    It could or could not be.  You don't know.

9    A    As to an AMA defense I don't know.

10   Q    Okay.  And, in fact, I asked you at the deposition

11   whether or not that 18 number was, in fact, consistent with

12   your prior experience and you said it was not, correct?

13   A    I don't remember.

14        (Pause)

15            MR. HEIDLAGE:  Can you show TRX-97 -- 973, page 25

16   to -- line 25 to 26, 4, page 25, line 25, page 26, 4?

17   BY MR. HEIDLAGE:

18   Q    Okay.  I asked the question, "Is the 18 months

19   specifically consistent with what you had found in the

20   past?"  "Answer:  Not that specific number, no."

21            THE COURT:  Mr. Cosenza.

22            MR. COSENZA:  Could we just -- I -- just to avoid,

23   could we just read the question before that starting at line

24   21 just for completeness.

25            THE COURT:  Yes.

Page 74

1           MR. HEIDLAGE:  Sure.  Can you add line 21, please?

2   BY MR. HEIDLAGE:

3   Q     You had stated it was -- okay.

4         "You had stated it was consistent with things you had

5         found in the past; is that correct?"

6         "Answer: Yes."

7         "Is the 18 months specifically consistent with what you

8         had found in the past?

9         "Answer:  Not that specific number, no."

10        Did I ask those questions and did you give those

11        answers?

12  A     I did.

13  Q     Okay.  Now going back to Exhibit B for a moment --

14           MR. HEIDLAGE:  Can you go back to Exhibit B,

15  please?

16  BY MR. HEIDLAGE:

17  Q     Okay.  You did not make any changes to the success

18  assumptions after you received them, correct?

19  A     I did not.

20  Q     Okay.  And you're not offering an opinion as to the

21  likelihood that the Court would apply any particular success

22  rate, correct?

23  A     I'm not offering any judgment to what the Court would

24  --

25  Q     And you're not offering --

Page 75

1    A     -- decide to do.

2    Q     I'm sorry.  I didn't mean to cut you off.

3    A     For what the Court might decide to do.

4    Q     And you're not offering an opinion as to the most

5    appropriate success rate that the Court should apply,

6    correct?

7    A     Correct.

8    Q     And to understand why one assumption was chosen as

9    opposed to a different number we would have to talk to the

10   plan administrator's counsel, correct?

11   A     I think so.  Yes.

12   Q     In fact, you don't know in any way how the success

13   assumptions you provided were derived, correct?

14   A     Not specifically, no.

15   Q     And, therefore, you do not know how the Court's

16   determination that any particular defense raised by the plan

17   administrator, if the Court determined that it was not a

18   valid defense, that it was devoid of legal merit, you don't

19   know how that determination would affect any of the success

20   assumptions here, correct?

21   A     No, I don't.

22   Q     Okay.  And you don't break out how many loans are

23   affected by any particular defense raised by the plan

24   administrator, correct?

25   A     Breakout by defense, no, I don't.

Page 76

1    Q    Okay.  The Court could resolve some of the disputes

2    between the parties but for reaching an estimate of the

3    value of the claims, correct?

4    A    As far as I know.

5    Q    And you agree that if the Court were to adopt your

6    approach it's important to get the success assumptions that

7    most accurately reflect reality, correct?

8    A    That seems like a fair characterization.

9    Q    Okay.  But, again, you don't have any opinion, again

10   assuming the Court adopts your approach, as to how the Court

11   is to determine what the appropriate success assumption

12   should be at either level, correct?

13   A    No, that would be her judgment.

14   Q    Now I just want to make sure I understand the math on

15   some of these correctly.  So looking at the

16   misrepresentation of income at the moment, you have a 40

17   percent and then a 50 percent and then a 15 percent number?

18   A    Yes.

19   Q    Okay.  So we can use this to calculate the overall rate

20   of success by the trustees, correct?

21   A    What do you mean by the overall?

22   Q    Sure.  So for misrepresentation of income where there

23   was payments over 18 months, according to your calculation

24   the trustees would -- your -- by your calculation would have

25   a success rate of 20 percent, correct, 40 times 50?

Page 77

1   A    Well, you said over 18 so it would be 40 times --

2   Q    I'm sorry.  I apologize.  That was my mistake.  I

3   misspoke.  Let me re-ask the question.

4        For where there was a -- for the loans with

5   misrepresentation of income breach claim where there were

6   payment -- payments less than 18 months it would be 20

7   percent, correct, overall --

8   A    Yes.

9   Q    -- success rate?  And for where there were payments

10  that over -- over 18 months, for example, 19 months, 20

11  months, et cetera, that would be six percent, correct?

12  A    Correct.

13  Q    And we could do the math all the way down for each one

14  of these.  I'm not going to do that, but you're just

15  effectively multiplying the two percentages together,

16  correct, for the overall success rate?

17  A    Yes.

18  Q    Okay.  And then you apply those overall success rates

19  to effectively apply a haircut to the trustees' claims,

20  correct?

21  A    Well, it works out that way.

22  Q    Yeah.  I understand.  So -- and the haircuts range from

23  either an 80 percent haircut all the way down to a 99

24  percent haircut, correct?

25  A    In certain circumstances like underwriting it would be

Page 78

```
 1    99.

 2    Q    It would be a 99 percent haircut, correct?

 3    A    Yes.

 4    Q    Okay.  And the smallest haircut that you apply is an 80

 5    percent haircut?

 6    A    The smallest is --

 7    Q    Like 40 --

 8    A    Well, but, you see, because that's before adjusting for

 9    the multiple claims.  On an individual -- so --

10    Q    I understand.  I'm saying on a claim by claim basis --

11    A    On a claim basis the smallest haircut would be 80

12    percent.

13    Q    Okay.  And then I want to talk to you about -- you

14    mentioned the correlation and I think that's what you were

15    about to get to ask -- to mention.

16    A    And if I could just take a couple of minute break.

17    I've drunk so much water --

18              THE COURT:  Yes.

19              THE WITNESS:  -- that the --

20              THE COURT:  Sure.

21              THE WITNESS:  -- this may be a good place for me

22    to --

23              THE COURT:  Yes.

24              THE WITNESS:  -- take a -- so I'll just literally

25    be --
```

1          THE COURT:  Ten minutes.  We'll all come back in

2     ten minutes.

3          THE COURT:  It doesn't have to be that long for

4     me.

5          THE COURT:  It's hard to make it shorter given the

6     size of the crowd.

7          THE WITNESS:  Okay.

8          THE COURT:  So we'll call it ten minutes.  Not a

9     problem.

10        (Recessed at 11:25 a.m.; reconvened at 11:35 a.m.)

11         THE COURT:  Please have a seat.

12        (Pause)

13         THE COURT:  Go ahead.

14         MR. HEIDLAGE:  Okay.

15    BY MR. HEIDLAGE:

16    Q    Dr. Cornell, you've read a lot of material on the RMBS

17    industry and are generally familiar with industry sources,

18    correct?

19    A    Yes.

20    Q    To the extent you cite sources in your opinions you

21    believe they're reliable, correct?

22    A    Well, it varies.  It depends on the source and the --

23    how I cited it.

24    Q    Well, to the extent you cite the source for the

25    position -- for the point on which you cite it you believe

Page 80

1    it's reliable, correct?

2    A    Generally, yes.

3    Q    Okay.  And in your work you generally cite those

4    sources that you believe are the most relevant and

5    informative, correct?

6    A    I try to.

7    Q    Yeah.  And earlier you mentioned that you were a -- I

8    believe an associate at the Journal of Finance, correct?

9    A    Yes.

10   Q    Okay.  And the Journal of Finance is one of the premier

11   journals in finance?

12   A    Yes.

13   Q    And it's a peer review publication, correct?

14   A    Yes.

15   Q    Okay.  And one of the jobs that you had or one of the

16   jobs the associate editors had was to make recommendations

17   as to what papers to publish, correct?

18   A    Yes.

19   Q    And part of that is to determine that the articles that

20   are being published are well founded, correct?

21   A    Yes, and consistent with current research and so forth.

22   Q    Okay.  Now you offered an opinion in the Citigroup RMBS

23   case.  We discussed that earlier?

24   A    Yes.

25   Q    Okay.  And that was part of an RMBS put back matter,

Page 81

1    correct?

2    A    Yes.

3    Q    And in supporting your opinion you relied on a study by

4    Professor Kamaz Biscorski (ph) of Columbia Business School

5    Asset Quality Misrepresentation by Financial Intermediaries

6    Evidenced From RMBS Market.  Is that -- do you recall that?

7    A    No.

8    Q    Okay.

9         MR. HEIDLAGE:  Could we put up TRX-1146 at page 71

10   -- well, page 70, please, 70 and 71?

11   BY MR. HEIDLAGE:

12   Q    Okay.  Do you see in Footnote 20 you cited that article

13   that I just discussed?

14   A    You said Footnote 20.

15        THE COURT:  Footnote 200.

16        MR. HEIDLAGE:  I'm sorry.  I really botched that

17   one.  Footnote 200.  Yes.

18        THE WITNESS:  I do.

19   BY MR. HEIDLAGE:

20   Q    Okay.  And, in fact, they used a -- you noted that the

21   study used the same sources that you used for your analysis,

22   correct?

23   A    Yes.

24   Q    Okay.  And then in Footnote 4 -- 204 you cited the

25   article -- the figure 5 of that article to show mis -- rate

1    of misrepresentations of approximately eight percent of the

2    loans collateralizing RMBS underwritten by Citigroup,

3    correct?

4    A    That's what it says.  Yes.

5    Q    Okay.  And if we look up to your -- the top of the

6    paragraph 114 of your Citigroup report you note that it's a

7    -- evidence of the borrower's intent to occupy the property

8    or the existence that -- of a second lien being misstated.

9    Do you see that?

10   A    Yes.

11   Q    That's the misrepresentations that are being discussed?

12   A    It looks like it.  Yes.

13   Q    Okay.  Can we put up figure 5 to the Biscorski article,

14   please?  And this is TR -- TRX-1252 at page 64 of the

15   exhibit.

16       Okay.  And this is the figure that you had cited.  Do

17   you see that the Citigroup is right down there at around

18   eight percent?

19   A    Yeah.  I see it.  What page is it on in the actual

20   paper?

21   Q    62, I believe, of the paper of TRX-1252.

22   A    12 -- the pages are numbered 2658 and so forth.

23   Q    I think you may be looking at the wrong -- so this

24   paper when you cited it was a working -- a working paper.

25   A    Oh, so you're not citing the published version.  You're

Page 83

1    citing the --

2    Q    Well, I wanted just to point you to the provision that

3    you cited in your report?

4    A    Okay.  So what page is that?

5    Q    Sure.  That is page 64 of the actual -- of the exhibit,

6    I believe.

7    A    Okay.  I think I see it.

8    Q    Okay.  And this is where you got your eight percent

9    number approximately from Citigroup.  Do you see that?

10   A    It may be.  I haven't looked back at this article --

11   Q    Sure.

12   A    -- in recent days.

13   Q    Sure.  This is figure 5.  Do you see that?

14   A    Yes.

15   Q    Okay.  And you had cited figure 5 in your report?

16   A    Yes.

17   Q    Okay.  And now it also has Biscorski did an analysis

18   for other institutions, correct?

19   A    Yes.

20   Q    Okay.  And one of those institutions, for example, was

21   Countrywide and it's somewhere around 11 percent.  Do you

22   see that?

23   A    Yes.

24   Q    Okay.  And then we also have Lehman Brothers.  Do you

25   see that?

Page 84

1   A     Yes.

2   Q     Okay.  And that number is around 16 percent, correct?

3   A     It looks like it.

4   Q     It's a little bit of an outlier on this figure,

5   correct?

6   A     It looks like it.  Yes.

7   Q     Okay.  And Biscorski also broke these out just by

8   evidence of misrepresentations of non-owner occupants by

9   underwriter, correct?  Do you recall that?

10  A     No, I don't.

11  Q     Okay.  Can we turn to figure 3?

12             THE COURT:  Mr. Cosenza.

13             MR. COSENZA:  Your Honor, I'm going to object to

14  this.  This is beyond the scope of his expert report here.

15  This is something he relied on in a different case.  This is

16  not even -- to the extent he relied on it he cited it and

17  the author of this article who did this analysis is not

18  here.  I don't know what relevance this has to the opinions

19  he's offered in this case in terms of his calculation

20  (indiscernible) estimation scenarios.  And, again, this is

21  not his work.  This is simply an article he cited in a

22  different expert report in a different matter.

23             So I think this is beyond the scope of, you know,

24  his reports here and his direct examination.

25             MR. HEIDLAGE:  So I have a couple of things.  One

1    is that I have two more questions on this that -- but --

2              THE COURT:  It's the two-question -- I only have

3    two more questions --

4              MR. HEIDLAGE:  -- but I think more important --

5         (Laughter)

6              THE COURT:  -- rule which didn't work for Mr.

7    Cosenza.

8              MR. HEIDLAGE:  That's fair.  But more importantly,

9    I think, Dr. Cornell relied on this as his -- as a source

10   that he believed was reliable as evidence of

11   misrepresentations of occupancy and the prevalancy of

12   misrepresentations of occupancy for -- in the Citigroup

13   matter.

14             THE COURT:  That's right.

15             MR. HEIDLAGE:  He has now made various assumptions

16   on whether or not, I think, in part, there are the trustees

17   could be successful on misrepresentations of occupancy

18   claims.

19             THE COURT:  He was supplied assumptions --

20             MR. HEIDLAGE:  I agree.  And --

21             THE COURT:  -- and did mathematic -- did a

22   mathematical calculation based on a model using those

23   supplied assumptions.

24             MR. HEIDLAGE:  I understand that, Your Honor.  I

25   think we would argue that to the extent that he was aware of

Page 86

1    evidence that we would have believed suggested those

2    assumptions were unreasonable that we should be able to get

3    that in on cross and then it can be taken as it may.  But we

4    believe that this evidence is both reliable.  Dr. Cornell

5    testified that he relied on it for the --

6              THE COURT:  You --

7              MR. HEIDLAGE:  -- this point.

8              THE COURT:  If we were to go down that path then

9    we would have had -- we would have to come back for 20 more

10   days because then both sides would be able to get into

11   evidence that they have identified in order to be able to

12   try to establish that the assumptions supplied that the

13   testifying expert had reason to believe the assumptions were

14   unreasonable, and I think that that dramatically expands the

15   scope.

16             So Dr. Cornell has testified I think rather

17   specifically that he's relied on what he cited for the

18   proposition he cited it and I don't think we're going to

19   take it beyond that, whether it's two questions or not.

20             Okay.

21             MR. HEIDLAGE:  Understood.

22             THE COURT:  Thank you.

23   BY MR. HEIDLAGE:

24   Q    You talked with Mr. Cosenza a little earlier about Dr.

25   Snow's supplemental report on interest.  Do you recall that?

1    A    Yes.

2    Q    Okay.  And you responded to Dr. Snow's calculation and

3    largely adopted it; is that fair?

4    A    His calculation on interest?

5    Q    On interest.

6    A    I didn't really adopt it because I haven't adjusted

7    anything for interest at this point.

8    Q    Okay.  You confirmed that the -- that Dr. Snow's

9    approach to calculating interest was the approach that you

10   would have taken, correct?

11   A    Basically, yes.

12   Q    Okay.  Now you're aware that Dr. Snow opined that

13   approximately 65 percent of the 60,305 liquidated loans

14   liquidated with a realized loss of principal only.  Do you

15   recall that?  That was one of the opinions that Dr. Snow

16   gave.

17   A    I recall that opinion.

18   Q    Okay.  And in your rebuttal you didn't challenge that

19   finding, correct?

20   A    I just didn't address it.

21   Q    Right.  You didn't address it either way?

22   A    Correct.

23   Q    Okay.

24        (Pause)

25             MR. HEIDLAGE:  I apologize for skipping around.  I

```
 1    meant to address this earlier.

 2    BY MR. HEIDLAGE:

 3    Q    We talked a little bit about the assumption you made

 4    about correlation.  Do you recall that?

 5    A    Yes.

 6    Q    Okay.  And you -- you didn't do any analysis to

 7    determine to what extent the breaches in this case were

 8    correlated at all, correct?

 9    A    No.  I thought for general principals they would be

10    positively correlated, but I didn't attempt to estimate that

11    or to use that.

12    Q    Okay.  So to what extent they may or may not be

13    positively correlated you don't offer an opinion on it?

14    A    That's right.

15    Q    Okay.  And you're not opining on the extent to which

16    they're correlated, correct?

17    A    That's right.

18    Q    Okay.

19              MR. HEIDLAGE:  Could I have just one moment?

20              THE COURT:  Sure.

21         (Pause)

22    BY MR. HEIDLAGE:

23    Q    Earlier Mr. Cosenza asked you a few questions about the

24    seven -- $172 million historical losses figure.  Do you

25    recall that?
```

Page 89

1    A    Yes.

2    Q    And those numbers came from Dr. Fischel, correct?

3    A    Well, the numbers in the first column came from

4    Fischel.  I'm not sure that the second column did.

5    Q    You don't know where they came from; is that fair?

6    A    Well, it could be -- let's bring up the document.

7    Q    Sure.

8    A    Just so I can see it again.

9         (Pause)

10   Q    This is TRDX-305.

11   A    So the first -- second column where it says loan

12   subject to Professor Fischel's analysis, that I know came

13   from Fischel.  But breaking it down to the non-liquidated

14   loans, I don't know whether Fischel or one of your experts

15   did that.

16   Q    I understand.  So whatever the testimony is about these

17   derived you're not offering an opinion as to whether or not

18   that's accurate or not; is that --

19   A    Correct.

20   Q    Okay.  Now the 70 -- this column I think as you've just

21   acknowledged was -- relates to non-liquidated loans,

22   correct?

23   A    Yes.

24   Q    Okay.  And how does Dr. Snow calculate the purchase

25   price for non-liquidated loans?

Page 90

1   A    You mean with regard to principal modifications?

2   Q    With regard to any?

3   A    Well, it's unpaid principal plus unpaid interest plus

4   servicer advances.

5   Q    Okay.  And you didn't challenge any of his calculations

6   on this, correct?

7   A    Correct.

8   Q    You actually went and checked his arithmetic and they

9   all tied out, correct?

10  A    Arithmetic tied out.

11  Q    Okay.  And what constitutes realized loss in Dr.

12  Fischel's spreadsheet, that was something that Dr. Snow was

13  just explaining as to how he read Dr. Fischel's spreadsheet,

14  correct?

15  A    I couldn't testify one way or the other on that.

16  Q    Okay.  So you don't know when he referred to realized

17  losses and what was in realized losses or what wasn't in

18  realized losses, you don't know whether or not he was just

19  explaining what was in Dr. Fischel's spreadsheet or anything

20  else, correct?

21  A    Well, that was the problem.  He used the word

22  modifications and I didn't know if it included forgiven

23  principal, deferred principal or both.

24  Q    And you don't know, just to be clear, how much of the

25  172 million is forgiven principal versus deferred principal,

1   correct?  You didn't do that analysis?

2   A    I haven't done it.  I understand that Mr. Trumpp is

3   going to look at that.

4   Q    Okay.  And you recognize that deferred principal is --

5   that there is a risk that it won't be recovered, correct?

6   A    Yes.

7           MR. HEIDLAGE:  I have no further questions at this

8   time.

9           THE COURT:  All right.  Thank you very much.

10           MR. COSENZA:  Your Honor, could we take five

11   minutes?  I think I'm going to have -- if I have something

12   it's going to be less than five or ten minutes.  I may not

13   have anything.

14           THE COURT:  Okay.

15           MR. COSENZA:  I just want to --

16           THE COURT:  All right.  Then let's call it ten.

17   We'll come back at noon and we'll see what you have to say,

18   Mr. Cosenza.

19           MR. COSENZA:  Great.  Thank you.

20           THE COURT:  Thank you.

21           Do -- are we done for the day after this?

22           MR. COSENZA:  Yes.

23           THE COURT:  Okay.

24           MR. COSENZA:  I do think we should after Mr. --

25   Dr. Cornell is completed --

Page 92

1           THE COURT:  Sure.

2           MR. COSENZA:  -- just to caucus on --

3           THE COURT:  Absolutely.  Okay.

4           MR. COSENZA:  Yeah.

5           THE COURT:  We'll come back in ten minutes.

6      (Recessed at 11:49 a.m.; reconvened at 12:03 p.m.)

7           THE COURT:  Please have a seat.

8           MR. COSENZA:  Your Honor, I hopefully have less

9  than five questions --

10          THE COURT:  Okay.

11          MR. COSENZA:  -- and that will be very quick.  I

12  just want clarification.

13          UNIDENTIFIED SPEAKER:  It's not two?

14          MR. COSENZA:  Not two.  This time it's five.

15  When you're trying to get away with something you say two.

16     (Laughter)

17                    REDIRECT EXAMINATION

18  BY MR. COSENZA:

19  Q    So, Dr. Cornell, during your cross-examination you were

20  questioned about Dr. Snow's supplemental report they did on

21  interest.  Do you recall that?

22  A    Yes.

23  Q    Okay.  And you were asked a question about confirming

24  Dr. Snow's approach to calculating interest and whether

25  that's an approach you would have taken.  Do you recall that

Page 93

1   question?

2   A    Yes.

3   Q    Okay.  And when you were responding to that question

4   you were talking about the math and calculations relating to

5   Dr. Snow's approach, correct?

6   A    Yes.  And when you add up all the interest you got to

7   about 2.1 billion.  Whatever that number was I could -- that

8   looked correct to me.

9   Q    And you understand Dr. Snow in his supplemental report

10  also had a series of other possible permutations for

11  approaches for approaches for handling interest with

12  different date cut-offs?

13  A    Yes.

14  Q    And you weren't adopting those positions, correct?

15  A    No.  I was just looking at his calculations of the

16  total interest paid.

17  Q    Okay.  And that's an issue that's going -- the issue

18  about which is the proper approach and what the different

19  cut-offs, you understand that to be a legal issue to be

20  decided by the Court?  That's the last question.

21            THE COURT:  That's the last question rule.

22       (Laughter)

23            THE WITNESS:  I do.

24            MR. COSENZA:  Okay.  Thank you, Your Honor.

25            THE COURT:  All right.

```
 1              MR. COSENZA:  I was trying to do it quickly.  I
 2    apologize.
 3              THE COURT:  All right.  Thank you.
 4              Anything further?
 5              MR. HEIDLAGE:  We have no further questions.
 6              THE COURT:  Okay.  Very good.
 7              Dr. Cornell, thank you very much.
 8              THE WITNESS:  Thank you, Your Honor.
 9              THE COURT:  Hope you feel better.
10              THE WITNESS:  I actually don't feel that bad.
11    It's just my sounds.
12              THE COURT:  Okay.  So did you want to continue on
13    the record or did you want to just chat?
14              MR. SHUSTER:  It wasn't even my idea.
15         (Laughter)
16              THE COURT:  Fair enough.
17              MR. COSENZA:  I think, Your Honor, given some of
18    the sensitivities --
19              THE COURT:  Okay.
20              MR. COSENZA:  -- it may make sense to --
21              THE COURT:  All right.  Then let's --
22              MR. COSENZA:  -- do this in chambers.
23              THE COURT:  -- conclude for the day and whoever
24    needs to discuss the scheduling matters we can continue.
25              So just for the public record, though, we're going
```

Page 95

1   to resume Monday at 12:30 and we will conclude, I have a

2   hard stop at about five and that shouldn't be difficult,

3   right?

4           MR. SHUSTER:  Correct.

5           THE COURT:  Okay.  All right.

6           MR. SHUSTER:  Thank you, Your Honor.

7           THE COURT:  Very good.  Okay.

8       (Whereupon, these proceedings concluded at 12:06 p.m.)

9                       *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 96

1                           I N D E X

2                     T E S T I M O N Y

3    DEBTOR'S

4    WITNESS                 EXAM BY                      PAGE

5    Dr. Brad Cornell        Mr. Cosenza                   8

6                            Mr. Heidlage                  58

7                            Mr. Cosenza                   92

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 97

1                      C E R T I F I C A T I O N

2

3         I, Sherri L. Breach, certify that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sherri L.        Digitally signed by Sherri L. Breach

6    Breach           DN: cn=Sherri L. Breach, o, ou,
                      email=digital@veritext.com, c=US
                      Date: 2018.01.22 13:53:06 -05'00'
7    _____

8    Sherri L. Breach

9    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10

11   Date:  January 20, 2018

12

13

14

15

16

17

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501