Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS INC.,

8

9        Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12              United States Bankruptcy Court

13              One Bowling Green

14              New York, NY  10004

15

16              January 8, 2018

17              10:06 AM

18

19

20

21  B E F O R E :

22  HON SHELLEY C. CHAPMAN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  SHEA H.

1    **HEARING re RMBS Claims Estimation Trial**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **Transcribed by:   Sonya Ledanski Hyde**

```
 1    A P P E A R A N C E S :

 2

 3    HOLWELL  SHUSTER  &  GOLDBERG  LLP

 4         RMBS  Trustees

 5         750  Seventh  Avenue,  26th  Floor

 6         New  York,  NY  10019

 7

 8    BY:   LANI  A.  PERLMAN

 9         DWIGHT  HEALY

10         MICHAEL  S.  SHUSTER

11         NEIL  R.  LIEBERMAN

12

13    WILLKIE  FARR  &  GALLAGHER  LLP

14         Attorneys  for  the  Debtor

15         787  Seventh  Avenue

16         New  York,  NY  10019

17

18    BY:   TODD  G.  COSENZA

19         JOSEPH  G.  DAVIS

20

21

22

23

24

25
```

Page 4

1   ROLLIN BRASWELL FISHER LLC

2        Attorneys for the Debtor

3        8350 E. Crescent Parkway, Suite 100

4        Greenwood Village, CO 80111

5

6   BY:  MICHAEL ROLLIN

7

8   WILLIAM SCHWERT, Witness

9

10   J. F. MORROW, Witness

11

12   ALSO PRESENT TELEPHONICALLY:

13

14   SCOTT LEWIS

15   AMANDA DARWIN

16   DENNIS J. DREBSKY

17

18

19

20

21

22

23

24

25

Page 5

 1                    P R O C E E D I N G S

 2              THE COURT:  Good morning.

 3              MR. COSENZA:  Good morning, Your Honor.

 4              THE COURT:  Happy New Year, everyone.

 5              MULTIPLE SPEAKERS:  Happy New Year.

 6              THE COURT:  Hope everyone has been okay during

 7    this tundra.

 8              MR. COSENZA:  Flu season.

 9              THE COURT:  Flu season, you name it, but I hope

10    you had some good time off.

11              MR. COSENZA:  Yes, yes, likewise.

12              THE COURT:  So, --

13              MR. COSENZA:  And we're happy to be back, and

14    aiming to get this done.

15              THE COURT:  Now, Mr. Cosenza, you have to be

16    truthful with the Court.  So, I'm -- we're reading to start

17    when you are.

18              MR. SHUSTER:  So, Your Honor, the Trustees call

19    William Schwert.  Ms. Perlman will conduct Professor

20    Schwert's examination.

21              MR. COSENZA:  Your Honor, before he takes the

22    stand --

23              THE COURT:  Yes?  Everyone, please have a seat.

24              MR. COSENZA:  Before he takes the stand -- before

25    he takes the stand, maybe just one minute of sidebar.  Just

Page 6

1    maybe we can --

2              THE COURT:  Sure.

3              MR. COSENZA:  I think it's outside of earshot.

4              (Sidebar and off-topic conversation)

5              THE COURT:  Okay, we're ready.

6              MS. PERLMAN:  The Trustees call Dr. Schwert.

7              THE COURT:  You need to let the witness get by.

8    Very good.  Good morning.

9              DR. SCHWERT:  Good morning.

10             THE COURT:  How are you?  Please step up.  Yes,

11   it's cozy.  Will you raise your right hand, sir, please?  Do

12   you solemnly swear or affirm that all the testimony you're

13   about to give before the Court shall be the truth, the whole

14   truth, and nothing but the truth?

15             DR. SCHWERT:  I do.

16             THE COURT:  Very good.  Have a seat, make yourself

17   comfortable.  I cannot tell if anyone's given you a bottle

18   of water.

19             DR. SCHWERT:  I have a can of Diet Coke, if that's

20   acceptable.

21             THE COURT:  A can of Diet Coke, that'll do,

22   that'll do it.  All right, let us know if you'd like a break

23   at any time, all right?

24             DR. SCHWERT:  Thank you.

25             THE COURT:  Okay.

Page 7

1               DIRECT EXAMINATION OF G. WILLIAM SCHWERT

2     BY MS. PERLMAN:

3     Q     Good morning, Dr. Schwert.

4     A     Good morning.

5     Q     You should have a binder and a copy of the

6     demonstratives, or I'm sorry -- Mr. Lieberman is now passing

7     out the demonstratives and the binders.  So, Dr. Schwert,

8     during the course of your testimony this morning, I may

9     refer to certain tabs in your binder, but for now you can

10    put it to the side, okay?  Could you please tell the Court

11    what your current position is?

12    A     Yes, I'm the Distinguished University Professor of

13    Finance and Statistics at the Simon Graduate School of

14    Business at the University of Rochester.

15    Q     Could you please describe your educational background,

16    beginning in college?

17    A     Yes, I attended Trinity College in Hartford,

18    Connecticut, and graduated in 1971 with a degree with honors

19    in economics.  At that point, I went to the Graduate School

20    of Business at the University of Chicago, and received an

21    MBA and a PhD degree in 1975.

22    Q     And during the --

23             THE COURT:  Excuse me, Ms. Perlman, I'm going to

24    ask you to just keep your voice up a little bit so everyone

25    in the back can hear you, okay?

Page 8

1            MS. PERLMAN:  Okay, sorry about that.  Dr.

2    Schwert, during the course of your studies, did you study

3    statistics?

4    A    Yes, I studied finance, economics, and statistics

5    during my doctoral studies in Chicago, yes.

6    Q    Is your educational background accurately summarized in

7    TRX-671, which is Appendix A to your rebuttal report?

8    A    Yes, it is.

9    Q    What did you do after earning your PhD?

10   A    So, I received my PhD in 1975, and for the 1975-75

11   academic year, I was on the faculty of the University of

12   Chicago as an assistant professor, which is a little

13   unusual.  They don't often hire their own graduates.  In

14   1976, I moved to the University of Rochester, and I've been

15   a faculty member at the University of Rochester in the Simon

16   Business School ever since.

17           I was an assistant professor there through 1979.

18   I was promoted to associate professor in 1979, received

19   tenure, I think in 1982.  I was appointed a full professor

20   in 1984.  I was appointed a chaired professor in 1986, and I

21   was appointed to the position of distinguished university

22   professor in 1998.

23   Q    In your current position, do you have any teaching

24   responsibilities?

25   A    Yes, I teach MBA students and PhD students.

Page 9

1    Q    And what subjects do you teach?

2    A    I teach finance, economics, and statistics.

3    Q    Could you tell the Court about what some of your

4    students have gone on to accomplish?

5    A    Yes, I'm actually very proud of where some of the

6    careers, some of my doctoral students have achieved.  If you

7    look at Pages, let's see, 8, 9, 10, and 11 of TRX-671,

8    you'll see a list of all of the doctoral students that I've

9    worked with, on their dissertation committees.

10            And you can see that many of them have achieved

11   named, chaired professor positions at leading universities,

12   like Harvard, Chicago, Wharton, Dartmouth, Michigan,

13   Northwestern, and so forth.

14   Q    In addition to your teaching responsibilities, are you

15   a member of any professional organizations?

16   A    Yes.  If you look at Page 12 of TRX 671, you'll see

17   that I am a member, have been a member of the American

18   Economics Association.  I'm a life member of American

19   Finance Association.  Ii was a member of the American

20   Statistical Association, the Econometrics Society, a member

21   of the Financial Management Association, and in fact, a -- I

22   think I've called it distinguished fellow, or something, of

23   that group, a fellow.  Member of the Society of Financial

24   Studies.

25            But probably most important, if you look on Page

1     11, you'll see, I've been an associate editor of -- well,

2     let me back up, I was a director of the American Finance

3     Association, I was the chair of the Business and Economics

4     Section of the American Statistical Association.  I've been

5     an associate editor of several leading journals, and since

6     1979, I've been one of the editors of the Journal of

7     Financial Economics.  Since 1995, I've been the managing

8     editor.

9              And if you look at the middle of Page 11, there's

10    some summary information about the rankings of the Journal

11    of Financial Economics.  It's one of the leading social

12    sciences journals in the world.  So, that's a lot of my

13    professional activities, I guess.

14    Q    Thank you.  I see that Appendix A, TRX-671 also lists

15    publications, it looks like beginning on Page 2, and going

16    to Page 7, is that correct?

17    A    Yes, I believe that's right.  Let me just check.  Yeah,

18    the publications start on Page 2, and they go through to the

19    beginning of Page 7.  I have quite a number of papers and

20    refereed journals.  Almost all of them involve statistical

21    analysis of economic or financial data.  Many of them have

22    won prizes of various sorts, form the different journals

23    they're published in, which span leading journals in

24    finance, economics, and statistics.

25              I haven't checked real recently, but the last time

Page 11

1    I looked, there's a service called Google Scholar, which

2    tracks citations from other academic papers to the papers of

3    an individual author, and my recollection is about, I had --

4    my papers have received about 29,000 citations on Google

5    Scholar.

6            THE COURT:  It might amuse you to hear that I have

7    actually heard of heteroscedasticity before.

8            DR. SCHWERT:  Awesome, that's --

9            THE COURT:  You are sitting in the same seat that

10   Robert Engle sat in.

11           DR. SCHWERT:  Okay, and Robert Engle's a good

12   friend of mine.

13           THE COURT:  And he got a prize for that, right?

14           DR. SCHWERT:  Yes, he did.  He absolutely did.

15   Good, okay.  So, even if we're not talking about

16   heteroscedasticity -- most of my students have never heard

17   the word.  So, I'm impressed, that's great.

18           THE COURT:  I have no idea what it is.

19           DR. SCHWERT:  If you want to take a minute, I can

20   explain it.

21           THE COURT:  You know, maybe we --

22           DR. SCHWERT:  It doesn't have much to do with the

23   case.

24           THE COURT:  Maybe we can talk about it on

25   (indiscernible) corrections later.

Page 12

1          DR. SCHWERT:  There you go, okay.

2          THE COURT:  Go ahead, go ahead, Ms. Perlman.

3    Q    Dr. Schwert, have you previously served as an expert

4    witness?

5    A    Yes, I have.

6    Q    Is that experience also reflected in TRX-671?

7    A    Yes, it is.  Starting on Page 13, and going through

8    Page 16 are a list of cases where I've either testified, or

9    produced a report that's publicly available, or done

10   research where the client was willing to let me reveal the

11   existence of my research activities.  This spans time all

12   the way back to 1993.

13   Q    Have you previously been found qualified by a Court to

14   serve as an expert witness?

15   A    Yes, many times.

16          MS. PERLMAN:  Your Honor, the Trustees move to

17   have Dr. Schwert qualified as an expert in statistics.

18          MR. COSENZA:  No objection, Your Honor.

19          THE COURT:  All right, very good.  Okay.

20   Q    Thank you.  Dr. Schwert, lets' move on to this matter.

21   A    Sure.

22   Q    Were you retained on behalf of the Trustees as an

23   expert witness in this case?

24   A    Yes, I was.

25   Q    Could you please tell the Court what you were asked to

Page 13

1    do?

2    A     Well, if you refer to TRX-670, which is the report --

3    excuse me, the rebuttal report that I produced in this case,

4    it outlines the questions I was asked to analyze, and draw

5    an opinion about.

6          Paragraph 1 on Page 1 indicates that there were

7    really four questions that I was asked to look at.  One was

8    to design and draw a sample form the set of 76,044 loans

9    that were studied by Mr. Aronoff.  The second question I was

10   asked, what was -- to study, was to evaluate the

11   representativeness of those loans with respect to the 12

12   most prevalent breach types identified by Mr. Aronoff.

13         My third assignment was to take the findings of

14   Mr. Morrow, who evaluated the loans in the sample I

15   selected, and to draw inferences about the entire pool of

16   loans that Mr. Aronoff had studied.  And my last been was to

17   evaluate whether the subsets of loans that had bene studied

18   by Mr. Grice and Mr. Castro were representative of the

19   population of mortgage loans that were studied by Mr.

20   Aronoff.

21   Q     Studied by Mr. Aronoff, or by Mr. Grice and Mr. Castro?

22   A     No, no, the question was whether the subsets of loans

23   identified by and studied by Mr. Grice and Mr. Castro were

24   representative of the population of loans studied by Mr.

25   Aronoff.

1   Q    Got it, got it, my apologies.

2   A    That's okay.

3   Q    Dr. Schwert, I'd like to walk through each part of your

4   assignment in turn, beginning with the first take that you

5   described --

6           THE COURT:  Can I just clarify.  Does Number 2

7   refer back to Number 1?

8           DR. SCHWERT:  Yes, it does.  It's a second step,

9   Your Honor.  The first step is to draw the sample, and then

10  the second step is to evaluate whether the sample, in sort

11  of Reader's Digest terms, looks like the population.

12          THE COURT:  And then Number 3, the reference to

13  the 600 sample loans, is that -- we're still talking about

14  the same group of loans drawn from Mr. Aronoff's population?

15          DR. SCHWERT:  That's exactly correct, Your Honor.

16  Yes.

17          THE COURT:  Okay, and then for 4, it's a different

18  group of loans.

19          DR. SCHWERT:  Correct, exactly right.

20          THE COURT:  Thank you.

21          DR. SCHWERT:  Yep.

22  Q    Let's talk about the first step of your assignment,

23  designing the sample.

24  A    Sure.

25  Q    Could you please tell the Court about how you designed

Page 15

1    your sample?

2    A    Yes.   The first question I had to address in

3    implementing this analysis was to decide what kind of sample

4    to draw from the population of loans that Mr. Aronoff had

5    analyzed.   I thought about it, and decided that for a

6    variety of reasons, it would be appropriate to use the

7    simplest possible approach to sampling, which is in fact

8    called a simple, random sample.

9            And so, having made the choice to use a simple,

10   random sample, the next question was okay, how big a simple,

11   random sample do I need, in order to achieve a certain level

12   of procession in drawing inferences about the larger

13   population of loans that Mr. Aronoff had analyzed.   And I

14   can take you thought that right now if you want, or we can

15   go back and do it in more detail later.

16   Q    Before we go on to that question, did you consider any

17   other sample designs, before deciding to use a simple,

18   random sample?

19   A    I did.   I thought about the possibility of doing a

20   stratified random sample, and I decided consciously not to

21   pursue that path, for a variety of reasons.

22   Q    And what were those reasons?

23   A    The potential advantage of a stratified sample is that

24   if you have a -- and I'll put in quotes, "good"

25   stratification scheme, then it is possible to get more

Page 16

1    reprise estimates of the characteristics of the population

2    that you're interested in, from the sample, with the

3    stratified sample.

4              But in order to do that, it requires knowledge of

5    the data to tell you what kind of stratification scheme to

6    use.

7              In order for stratified sample to be a significant

8    improvement, it has to be the case that the variation of the

9    observations within the strata are a lot less than the

10   variation between the strata.  So, there have to be common

11   groupings that make sense, in the stratification of the

12   sample.

13             And in thinking about a population of 76,000

14   mortgage loans, my conclusion was that there were many

15   possible stratification designs that one could use.  It

16   wasn't obvious to me that one of them would be the right one

17   or a good one, and any particular stratification system one

18   might choose would always run the risk of initiating debate

19   about whether that was the right stratification system.

20             My final decision was rather than have to deal

21   with the question of is this the right stratification, it

22   would be simpler and better to take the more straightforward

23   approach to drawing a simple, random sample, and so that's

24   what I did.

25   Q    Okay.

Page 17

```
 1              THE COURT:  Ms. Perlman, I hate to interrupt, but
 2    could we take a break for a moment, and could I confer with
 3    counsel in the conference room for a few minutes?  Okay, all
 4    right, Dr. Schwert, you're welcome to take a walk down the
 5    hall if you like.  For the entirety of your time on the
 6    witness stand you will remain under oath, and I ask that you
 7    not discuss your testimony or the case with anyone, or be in
 8    anyone's presence while they're doing the same.
 9              If you'd like to walk down the hall, someone from
10    the Trustee's counsel will come and find you in a few
11    minutes.
12              DR. SCHWERT:  I can just sit here, this is fine.
13              THE COURT:  That's perfectly fine, too.  And I
14    will also tell you what I tell every witness, which is
15    whenever there's an objection, or a colloquy, or a
16    conference it has nothing to do with anything that you have
17    or have not said, it's just something that occurs to me,
18    that I need to talk about it.
19              DR. SCHWERT:  That's fine.
20              THE COURT:  All right.  Give us about 10 minutes.
21         (Recess)
22              THE COURT:  Please, everyone, have a seat.  Okay,
23    Ms. Perlman, we're ready when you are.
24    Q    Dr. Schwert, thank you for your patience.
25    A    Sure.
```

1    Q      So, before we started talking about your decision to

2    draw a simple random sample, rather than some other kind of

3    sample.  You spoke about the size of the sample that you

4    were going to draw.  Could you discuss that with us?

5    A      Sure.  Let me just find the appropriate tab here.  If

6    you look at TRX-674, it's Appendix D to my report.  There's

7    two sections of this Appendix.  The one labelled Section 1,

8    Choosing a Sample Size, basically walks you through textbook

9    equations that are used to take the facts and circumstances

10   of a particular sampling situation, and translate that into

11   the answer, how big a sample do I need?

12            So, in this case, the particular numbers that are

13   peculiar to this case are the 76,044 loans Mr. Aronoff

14   analyzed, and really that's the only number that matters

15   here.  You can see that to achieve a five percent margin of

16   error, a sample of approximately 403 loans would be

17   necessary from the population of 76,044.

18            Based on that calculation, I decided that it would

19   be appropriate to draw a sample of 600 loans, which is

20   essentially 50 percent more than is necessary to achieve the

21   five percent margin of error.  So, by drawing a larger

22   sample, the result of drawing the sample would be even more

23   precise than what my initial target calculation was looking

24   at.

25            THE COURT:  Can I ask a question?

Page 19

1              DR. SCHWERT:  Sure.

2              THE COURT:  How does the extent to which the

3    population that you're designing a sample for, how does the

4    homogeneity, or lack thereof, of the population affect that

5    size of the sample?  In other words, if you were sampling

6    mortality in a population of patients, right, and the

7    underlying diseases were varied in the sample, that might

8    affect -- I'm asking, I don't know.

9              DR. SCHWERT:  Right.

10             THE COURT:  my overarching question is, to what

11   extent does the extent of the homogeneity in the population

12   affect the size of the sample?

13             DR. SCHWERT:  It really doesn't, Your Honor.

14             THE COURT:  It doesn't.

15             DR. SCHWERT:  It does not.  This calculation does

16   not involve that about the dispersion of the underlying

17   data, or anything like that.  It's purely a question of how

18   big a sample do you need in order to draw inferences about

19   the population form which it was drawn.  And I mean, that's

20   the sense in which -- I mean, it's the textbook formula

21   that's been around for, I think I referenced the 1964

22   version of Cochran's textbook, which is the one I used in

23   graduate school.  But that wasn't the first edition.

24             THE COURT:  Thank you.

25   Q    Dr. Schwert, you testified a few minutes ago about five

Page 20

1   percent margin of error.  What is the associated confidence

2   interval?

3   A    Well, the idea is that if you were to draw -- let's say

4   100 samples, of a particular size from this population of

5   76,044, the -- in this case, I'm calculating an agree rate.

6   But the estimate of the agree rate from those hundred

7   different samples would fall within this five percent error

8   bound, the 95 percent confidence interval, 95 times out of

9   100.  And so most of the time, if you draw a sample of 400

10  loans, it would be within five percent of whatever the agree

11  rate would be.

12          And I should point that this formula, and the way

13  I used it takes the most conservative approach, in a sense

14  that it assumes that the agree rate and therefore the

15  disagree rate are 0.5, that is, 50 percent, and that's the

16  case where the dispersion of the estimate from the sample is

17  greatest, to the extent that the agree rate and the disagree

18  rate are different from 50 percent, the dispersion of the

19  estimates from the sample would be smaller, will be smaller,

20  so.

21  Q    Thank you.

22  A    You're welcome.

23  Q    Dr. Schwert, did you do any analysis of your sample to

24  determine whether it was representative of the 76,044

25  mortgage loan population from which it was selected?

Page 21

1   A    I did.  Let me find the right exhibit for that.  If you

2   look at Trial Exhibit 675, TRX-675, which is Exhibit 1 from

3   my report -- do you want me to walk you through what's in

4   this exhibit?

5   Q    If you would.

6   A    Would that be the easiest thing?  Yes.  So, I was asked

7   to evaluate the extent to which my sample of 600 loans was

8   representative of the population of loans studied by Mr.

9   Aronoff.  And in order to do that, I used a chi-squared

10  test, which is a very standard test of association.  I'll

11  walk you through Exhibit 1, so that it makes sense.

12          Basically, what you're trying to do is to compare

13  how many loans you see in the sample, with how many you

14  would expect to see based on the population that you sampled

15  from.  So, for example, if we talk about misrepresentation

16  of income, there were 284 out of the 600 loans that had

17  breaches identified by Mr. Aronoff, associated with

18  misrepresentation of income.

19          In the total population of 76,044 loans that he

20  studied, the proportion of loans that had misrepresentation

21  of income breaches translates to expecting to see 271 loans

22  with that particular breach type in a sample of 600 loans.

23          And so now the question that we have to ask,

24  statistically is how does the actual number of loans, 284,

25  compare to the expected number of loans, 271?  So, the --

Page 22

1     what would it be, one, two three, the fourth column labeled

2     chi-squared test statistic, or test result, calculates the

3     statistic that you use to judge whether the actual number of

4     loans and the expected number of loans are different from

5     one another.  The formula for that test is identified and

6     described in Footnote 4 to the table.

7            And basically, the way this test works, if you get

8     big Chi-square statistics, the actual and suspected numbers

9     don't look similar if you get a small one, and this is a

10    small one, 1.14, then that's telling you the actual number

11    of loans and the expected number of loans are close to each

12    other, statistically.

13           The next column, labeled P-value of the test, is

14    the threshold value at which you would reject the hypothesis

15    that the actual number of loans and the expected number of

16    loans were the same.  In this case, it's 28.6 percent.  So,

17    unless you were doing a significance test at the 28.6

18    percent level, if you were doing a test at a lower level,

19    which is more common, you would not reject that hypothesis.

20           The last column in the table simply translates

21    those P-values into telling you whether the test statistic

22    is significant or not at the five percent level.  I picked

23    the five percent level because it's common, not because it's

24    magical, or better, or worse.  But at the five percent

25    level, 11 out of the 12 breach types are representatives of

Page 23

1    the Aronoff population.  The one that is not is the Breach

2    Type 10, loan fees under disclosed, where the actual number

3    of loans in the sample is eight, and based on the Aronoff

4    population, it should have been 18.

5            It's not surprising to me that if you do enough

6    tests, some of them will turn out to be "significant by

7    chance", because that's the whole idea.  If you do 20 tests

8    at the five percent level, one of them will be significant

9    by chance.

10           So, my conclusion, from looking at this entire

11   exhibit, is that my sample is in fact representative of the

12   Aronoff population, in this case, with regard to the 12

13   breach types I studied here.

14   Q    Would you expect your sample to be representative of

15   other characteristics of the Aronoff loan population?

16   A    Yes, that's the beauty and whole idea of simple random

17   sampling.  Effectively what you're doing is taking a slice

18   out of the pie that looks just like the overall pie.  And

19   so, no matter what the characteristics you're interested in,

20   like how many loans were originated in California, or how

21   many loans were taken out by borrowers whose last name

22   starts with the Letter A, or any other characteristic you

23   could think of, I would expect the sample to be

24   representative of the population.

25   Q    Do the tests that you performed for representativeness

1    support the conclusion that you can extrapolate from the

2    sample to the population from which it was selected?

3    A    Yes, they do.  And I should add that I think

4    fundamentally, the whole purpose of sampling is to be able

5    to allow you to extrapolate from the sample to the

6    population.  The whole purpose of doing sampling, is to

7    learn about the bigger population from which you do the

8    sample.

9    Q    Dr. Schwert, is the sampling design and methodology and

10   the representativeness testing that you've testified tom

11   this morning recognized and widely accepted among

12   statisticians?

13   A    Yes.

14   Q    Let's move on to the next part of your assignment,

15   which was to use the result of Mr. Morrow's review of the

16   600 sampled loans to extrapolate an agree rate to the larger

17   population form which that sample selected.  First, can you

18   explain to the Court what you were referring to when you

19   used the term agree rate?

20   A    Yes.  Basically, my understanding is that Mr. Morrow

21   took the sample of 600 loans that I identified, and then

22   analyzed them to see whether the breaches that Mr. Aronoff

23   had identified were ones that he agreed with.  If you look

24   at TRX-673, which is Appendix C to my report, this is

25   essentially a printout of a spreadsheet that identifies the

Page 25

1   loans in my sample, the breach numbers associated with them,

2   the names of the breaches, and in the far right-hand column,

3   whether or not Mr. Morrow determined that he agreed with Mr.

4   Aronoff.

5   Q    What can we infer about the population of 76,044 loans,

6   based on the agree rate?

7   A    Well, if you look back at the report, which is TRX-670,

8   in Paragraph 22, I described that the overall agree rate

9   between Mr. Morrow and Mr. Aronoff is 94.3 percent, meaning

10  that he agreed that 566 of the loans that Mr. Aronoff had

11  analyzed as having breached -- he agreed with at least one

12  breach in 566 out of the 600 loans, which is 94.3 percent.

13  Q    Are you aware that subsequent to your report being

14  submitted and your deposition being taken, Mr. Morrow

15  updated the number of breaches that he agreed with?

16  A    Yes, I am.

17  Q    Is it correct that while Mr. Morrow originally agreed

18  that 566 out of the 600 loans were breaching, he now agrees

19  that 556 out of the 600 loans are breaching?

20  A    That's my understanding, yes.

21  Q    What impact, if any, does that have on your analysis?

22  A    Well, the agree rate, based on the 556 number, is 92.7

23  percent.  And the 95 percent confidence interval around that

24  agree rate is a little lower.  It goes from 90.5 to 94.8

25  percent.

Page 26

1   Q    Based on your calculations, how many loans would Mr.

2   Morrow agree with Mr. Aronoff on if he were to review the

3   entire population?

4   A    Okay, using the lower bound of the 95 percent

5   confidence interval on the agree rate, the 90.5 percent

6   number.  If you multiply that by the 76,000 loans that Mr.

7   Aronoff analyzed, my inference is that Mr. Morrow would have

8   agreed with at least 68,819 of the mortgage loans, had he

9   looked at all 76,044 of them.

10            MR. COSENZA:  Your Honor?

11            THE COURT:  Yes.

12            MR. COSENZA:  I'd like to object.

13            THE COURT:  Okay.

14            MR. COSENZA:  This information that he just

15   testified to, I don't recall any of that being in his

16   report.  I think this is a new opinion.

17            THE COURT:  Be more specific, if you would, Mr.

18   Cosenza.

19            MR. COSENZA:  All this miscalculation, the last

20   three questions about the change in the agree rate, the

21   lower bound of confidence level about how it goes, whatever

22   agreed with, 68 out of the 76,000.  I know there are a lot

23   of reports going back and forth, but I don't recall any --

24            THE COURT:  Mr. Perlman, can you help Mr. Cosenza

25   out, and tie it to something in a report.

1          MS. PERLMAN:  Yes.  First of all, in Paragraph 26

2     of his report, Dr. Schwert reserves the right to supplement,

3     modify, or amend his report on the basis of new information.

4     And this case, Mr. Morrow submitted an updated report

5     shortly before his deposition, which was after the

6     submission of Dr. Schwert's report, and of Dr. Schwert's

7     deposition.  So, Dr. Schwert's new calculations apply, the

8     same logic and formulations, they're just updated with the

9     new Morrow numbers.

10          MR. COSENZA:  Your Honor, that's my point.  We

11     never had a chance to understand, look at these numbers,

12     understand the math, how we got to this confidence level.

13     This is all -- I think that confirms sort of my objection.

14     This is a new opinion, there was never a discussion about

15     supplementing, providing us with this new information, and

16     how this was calculated.

17          MS. PERLMAN:  Your Honor, the new Morrow numbers -

18     -

19          THE COURT:  So, at what point did the new Morrow

20     numbers come into existence?

21          MS. PERLMAN:  I believe it was October 19th,

22     shortly before Mr. Morrow's deposition on October 20th.  And

23     then based on the new numbers, the plan administrator

24     actually took a second deposition of Mr. Morrow, and I think

25     it was November.

```
1              THE COURT:  Give Mr. Cosenza a few minutes to look

2    at what you're saying.

3              MR. COSENZA:  Yeah, Your Honor, and I can have Ms.

4    Davis, can also go through it here.  And also, I don't think

5    in any of his reports, there's this, if you go to -- Slide

6    TRDX-273.

7              THE COURT:  In the deck?

8              MR. COSENZA:  And in the deck that's on the

9    screen, I don't think this whole calculation of the number

10   of loans that he now agrees with, based on --

11             THE COURT:  You mean the agree rate itself?

12             MR. COSENZA:  Yeah, but just that this -- if you

13   do this extrapolation of the 68,000 loans, that have one

14   breach, times -- that's 90.5 times 76,000, I don't recall

15   that being in --

16             THE COURT:  Well, let's take it one step at a

17   time.

18             MR. COSENZA:  Sure.

19             THE COURT:  The predicate fact is that based on

20   Mr. Morrow agrees with 556 of the 600 loans.  That's the

21   basic fact, or opinion, right?

22             MS. PERLMAN:  Correct.

23             THE COURT:  Yes.

24             MS. PERLMAN:  Correct.

25             THE COURT:  It's got nothing -- and that's not a
```

Page 29

1    determination that Dr. Schwert made.  That's what Mr. Morrow

2    said.  I've looked at the 600 loans, I agree that 556 are

3    breaching.  And then it's just math, that's 92.7 percent.

4    Then it looks like Dr. Schwert is just applying a confidence

5    interval, right?  And then doing the math, multiplying the

6    lower end of the confidence interval through the Aronoff

7    pool, coming up with 68,000 loans.

8             MR. HEALY:  Exactly, Your Honor, it's a pure --

9             THE COURT:  It's just math.

10            MR. HEALY:  A multiplication.

11            MR. COSENZA:  But we've never gotten an

12   understanding of how he did this confidence level, it

13   changed from the initial report to --

14            THE COURT:  Did the confidence -- I mean, a 95

15   confidence interval, I think Dr. Schwert's testifying, is a

16   standard confidence interval.  So, I don't -- I'm not given

17   to understand that the confidence interval --

18            MR. COSENZA:  But it changed.

19            THE COURT:  -- changed.

20            MR. COSENZA:  In that it changed 92.4 --

21            THE COURT:  That's a fair point.

22            MR. COSENZA:  To 96.3, to 90.5, to 94.8.  So,

23   that's new.  And then this also, this last step, of the

24   extrapolation, that we just -- frankly, this is also new,

25   and I don't think this was part of -- it's part of our

Page 30

```
 1   discussion in chambers.

 2           THE COURT:  Well, I think what I'm seeing

 3   happening, not to diminish it, looks like its math.  So, I

 4   think you ought to ask Dr. Schwert about it on cross-

 5   examination.  Didn't this is a big enough problem to merit

 6   derailing the rest of this.  All right, but I hear your

 7   objection, and it's preserved for the record, all right?

 8           MR. COSENZA:  Okay, thank you.

 9           THE COURT:  All right?

10           MR. COSENZA:  Thank you.

11           THE COURT:  Go ahead, Ms. Perlman.

12           MS. PERLMAN:  Thank you.  Dr. Schwert, I'd like to

13   move on from what you did in this case, to some arguments

14   criticizing what you did in this case.  Are you aware that

15   Dr. McCreary has submitted a report responding to your

16   sample and analysis?

17   A    Yes, I am.

18   Q    Have you reviewed Dr. McCreary's report and his

19   deposition testimony?

20   A    Yes, I have.

21   Q    Is it fair to say that Dr. McCreary advances four main

22   criticism -- four main arguments?  First, that you used a

23   simple random sample, rather than stratified sample?

24   Second, that you failed to take into account measurement

25   error.  Third, that you failed to take into account
```

Page 31

1    independence.  And fourth, that your sample is not

2    representative of a pool of 94,566 loans?

3    A    Yes.

4    Q    Let's walk through each of those in turn.  I know that

5    we -- you testified earlier this morning that stratified,

6    versus simple, random sampling.  And I'd like to start with

7    Dr. McCreary's argument that you should have used a

8    stratified sample.  What is your response?

9    A    Well, Dr. McCreary, in his report, made an impassioned

10   case for the benefits of using stratified sampling.  In the

11   end, however, my opinion still is that in this particular

12   application, the benefits of using a stratified sample

13   seemed to be outweighed by the potential costs of using a

14   stratified sample without knowledge of how to do the

15   stratification, and whether the stratification in fact would

16   yield the kinds of benefits that he's looking for, I see no

17   advantage to using a stratified sample.

18           The best it could do is increase the precision of

19   my estimates, which are already a lot more precise than I

20   started off aiming to do.  I used a sample 50 percent bigger

21   than was required for the target level of precision, and

22   because the agree rate's not close to 50 percent, it's even

23   more reprise than I was originally targeting.  So, saying,

24   "Well, maybe you could have sampled a different way and got

25   an even more precise estimate" seems like something that is

Page 32

1    a minor potential benefit.

2            The cost associated with the stratified sampling

3    approach, as I said earlier, is that you have to have a good

4    concept of why stratification would be beneficial, and what

5    kind of variables it's appropriate to stratify on.  And I

6    saw nothing in his report, and I'm not aware of anything

7    myself that implies a specific stratification structure that

8    would be an improvement in this case.

9    Q    Thank you.  Let's turn to Dr. McCreary's second

10   argument regarding measurement error.

11   A    Sure.

12   Q    Can you give the Court an example of what you consider

13   measurement error?

14   A    Yeah, I mean, there's lots of possible things that

15   could be measurement error.  Let me give you an example that

16   has made it into discussions in the popular press, and so

17   might be more relatable.  Every 10 years, the U.S.

18   government is charged with the assignment of counting the

19   population, it's called the census.  For various historic

20   reasons, I mean, dating all the way back to the beginning of

21   the country, the whole concept has been literally to count

22   everybody, not to sample and try and estimate, but to count

23   every person.  And as a result, there have been some

24   interesting statistical questions that have come up.

25           For example, there are lots of political programs

Page 33

1    that allocate spending across different districts of the

2    country as a function of population.  And so, the count in

3    the census turns out to be an important number for many

4    politicians, because their constituency receives benefits

5    from government programs in proportion to the number of

6    people who are in that area.  By the nature of human life,

7    there are some people who are easier to count than others.

8           I would imagine most of the people in this room

9    mostly live in one place, and sleep there every night, and

10   so for census-takers to find them and get information from

11   them is not too difficult.

12          There are other people who don't sleep in the same

13   place every night, and maybe don't like being talked to by

14   representatives of the government, for various reasons.

15   Perhaps they're homeless, and afraid of being put in a

16   shelter.  Perhaps they're illegal immigrants, and they're

17   afraid of being deported.  I mean, there's a variety of

18   motivations that people might have to avoid being counted in

19   the census.

20          And so, politicians who believe that their

21   district has a disproportionate number of these people who

22   don't want to be counted basically argue that's a source of

23   measurement error, that the census is under-counting their

24   constituents, because their constituents don't want to be

25   counted.  And so, they've argued that the census ought to

Page 34

1   make an adjustment to the numbers that they report for those

2   constituencies, so that when benefits from government

3   programs get handed out in proportion to the number of

4   people in the district, it's a more accurate reflection of

5   who's really there, as opposed to just who they were able to

6   count.

7            I mean, that's an example of measurement error

8   that I think, as I say, is really -- it's common, it's been

9   debated for the last two or three decades.  Every time we

10  have a census, there's going to be another debate about it.

11  And I, to the best of my knowledge, there's no really good

12  answer to how to solve it.  But it is a source of

13  measurement error that is easy to think about, and I

14  understand.

15  Q    Do you think that sort of measurement error has any

16  relationship to your work in this case?

17  A    No, I don't.

18  Q    Does Dr. McCreary articulate any potential measurement

19  error that you think you should have taken into account?

20  A    No, not really.  He identifies -- he talks a lot about

21  general concepts of measurement error.  In terms of his

22  relating that concept to the case, the closest I could come

23  to in his report was a statement that if different experts

24  looking at the same loans come to different conclusions, he

25  interprets that as measurement error.  I do not interpret

Page 35

1   that as measurement error, I interpret that as disagreement.

2   The fact that different experts can look at the same set of

3   facts and come to different conclusions shouldn't be

4   shocking to anybody who's ever been in a courtroom before,

5   and I don't think of that as measurement error.  I think of

6   that as disagreement.

7   Q    So, the possibility that Mr. Grice may look at the same

8   (indiscernible) and breach as Mr. Morrow and come to a

9   different determination is not measurement error, in your --

10  A    Not in my opinion, no.  Though I will say, he also

11  speculates that it is possible that a given expert might

12  look at the same loan, the same facts, at different points

13  in time, and presumably because he or she has Alzheimer's,

14  forgets that they've already looked at the same loan before

15  and come up with a different answer, and speculates that

16  that might be a source of measurement error.  I suppose it

17  could be.  I don't have any basis for imagining how that

18  hypothetical situation could occur, but I certainly see no

19  way to incorporate that into any sensible analysis of the

20  circumstances this case.

21          THE COURT:  Can I just clarify?  Because you're

22  not giving any opinion on what Mr. Morrow did or did not do,

23  right?

24          DR. SCHWERT:  No, I am not, Your Honor.

25          THE COURT:  Not at all.  So, we're just trying to

1   -- Ms. Perlman is just asking you questions about the

2   applicability of measurement error to your derivation of a

3   sample, that's all, right?

4            DR. SCHWERT:  That's correct, yes.

5            THE COURT:  So, whether or not Morrow could have

6   looked at the same folder twice and come to a different

7   conclusion, it's got nothing to do with anything you're

8   testifying about?

9            DR. SCHWERT:  The whole point of my sample and

10  extrapolation is to ask the question, what would Mr. Morrow

11  have done, had he looked at all 76,044 loans?  It has

12  nothing to do with some other person might have thought

13  about, looking at those 76,000 loans.

14           THE COURT:  Well, let me ask you one follow-up

15  question, then.  Suppose -- and there were two go-rounds

16  that Mr. Cosenza alluded to, right?

17           DR. SCHWERT:  Mm hmm.

18           THE COURT:  So, on the first go-round,

19  hypothetically, Mr. Morrow says, "I agree with 90 percent."

20           DR. SCHWERT:  Right.

21           THE COURT:  But on the second go-round, he says,

22  "You know what, I only agree with 75 percent."

23           DR. SCHWERT:  Mm hmm.

24           THE COURT:  You've got no opinion on whether Mr.

25  Morrow's 90 percent is right, or whether Mr. Morrow's 75

Page 37

1   percent is right, or what accounts for the difference?

2           DR. SCHWERT:  That's correct.

3           THE COURT:  Okay, thank you.

4           DR. SCHWERT:  Yep.

5   Q    In this case, Mr. Morrow did change his designation as

6   to 10 loans, isn't that right?

7   A    It's my understanding, yes.

8   Q    Do you interpret those changes that Mr. Morrow made as

9   substantiating Dr. McCreary's measurement error argument?

10  A    No, I don't.  my understanding is that Mr. Morrow

11  looked at a report that was produced by one of the experts

12  on the other side.  I'm going to say Mr. Grice, but, okay.

13  And having looked at the information in Mr. Grice's report,

14  reconsidered his evaluation of those 600 loans, and changed

15  his mind on 10 of the breaches.  I don't think of that as

16  analogous to my Alzheimer's example, where he literally

17  looked at the same facts twice, and forgot that he'd looked

18  at one of them before.  It's that he looked at the loans

19  again with new information, that is, Mr. Grice's report, and

20  changed his mind.  He had new facts to look at.

21  Q    Dr. Schwert, does the potential with measurement error

22  prevent you from reliably extrapolating the results of Mr.

23  Morrow's review?

24  A    I'm sorry, could you ask the question again?

25  Q    Does the potential of measurement error prevent you

1   from reliably extrapolating the results of Mr. Morrow's

2   review?

3   A    I'm not sure what you mean by potential of measurement

4   error.  I don't see anything that I'm aware of in this case

5   that prevents me from extrapolating Mr. Morrow's analysis of

6   the 600 loans to what he would have done, had he looked at

7   all 76,000.

8   Q    Do any of the sources that Dr. McCreary cites identify

9   measurement error of the sort he has identified?

10  A    Not that I'm aware of, no.

11  Q    Are you aware of any literature in the field that

12  supports Dr. McCreary's measurement error arguments?

13  A    Can you explain what you mean by in the field?

14  Q    In the field of statistics?

15  A    I'm not aware of any discussion of the kinds of

16  measurement error he's talking about, as it pertains to the

17  relationship between simple random samples, and the

18  population from which they've been drawn.

19  Q    Let's turn to Dr. McCreary's next argument about

20  independence.  Are you familiar with that argument?

21  A    Yes, I am.

22  Q    What is your response?

23  A    I think he -- well, I have two responses.  One, I think

24  he misses the point of the relationship between sampling and

25  population from which the data were sampled.  The

1    independence that matters is that the sample I have drawn --

2    the loans were drawn independently of one another.  They

3    were truly drawn randomly.

4            And so, in asking the question if I drew another

5    sample of 600 loans, or 100 more samples of 600 loans from

6    the population of 76,044 that Mr. Aronoff had analyzed, the

7    estimates of the agree rate from those samples would be --

8    behave just exactly the way my calculations tell you they

9    would.  By construction, there's no dependence in the set of

10   loans I've drawn from the sample.

11           Now, turn that around.  Suppose you were doing a

12   stratified random sample, where the loans were chosen

13   according to some characteristic underlying the data.  It's

14   possible that if you weren't careful in the way you dealt

15   with those stratified samples, that you would end up drawing

16   loans that had common factors in them, which would cause the

17   answer you get from the sampling exercise to be dependent on

18   the fact that you picked an odd -- a sample of loans that's

19   only random within the strata, not necessarily random across

20   the entire population.

21           And so, if anything, I think of the arguments he's

22   making about Mr. Morrow having common judgments about loans

23   that had common characteristics is an even better argument

24   for why simple random sampling is the better approach here.

25   Q    Does Dr. McCreary cite any sources in support of his

Page 40

1    dependence argument?

2    A    I did not see any, no.

3    Q    Do any of the sources that Dr. McCreary cited elsewhere

4    in his report suggest the existence of a dependence issue,

5    in the analysis that you performed?

6    A    I did not see any, no.

7    Q    Dr. Schwert, are you aware that Dr. Brad Cornell is

8    serving as an expert for the plan administrator in this

9    case?

10   A    Yes, I am.

11   Q    Have you reviewed Dr. Cornell's deposition in this

12   case?

13   A    Yes.

14   Q    Is it your understanding that at his deposition, Dr.

15   Cornell testified as to his work in the ResCap bankruptcy

16   case?

17   A    Yes.

18   Q    Is it your understanding that in ResCap, Dr. Cornell

19   selected a simple random sample of loans to be reviewed by

20   Mr. Morrow?

21   A    Yes.

22   Q    Is it also you understanding that in ResCap, Dr.

23   Cornell extrapolated the breach rate, from the sample

24   reviewed by Mr. Morrow to the rest of the population,

25   without making any changes to his calculations, because of

Page 41

1     measurement error, or dependence?

2              THE COURT:  Mr. Cosenza?

3              MR. COSENZA:  Yeah, Your Honor, this is beyond his

4     initial report.  And it's an extrapolation to the breach

5     rate from another case.  I also think it mischaracterizes

6     the work that was done in the ResCap case, and is incomplete

7     as to the work that was done, so I object on several levels.

8              MR. HEALY:  Well, Your Honor, the fact is that one

9     of the plan administrator's experts, Dr. Cornell, has in

10    fact, in his earlier work, drawn samples --

11             THE COURT:  In his earlier work in this case?

12             MR. HEALY:  In another case.

13             THE COURT:  In another case.

14             MR. HEALY:  In another case.

15             THE COURT:  But we're not talking about

16    extrapolation of breach rates here.

17             MR. HEALY:  No, but we are talking about --

18             THE COURT:  That was what the question was.

19             MR. HEALY:  we are talking about the use of -- or

20    the adjustment of the results of a sample, random sample for

21    measurement error in the context of RMBS kickback claims.

22    And the point that is being made by Dr. Schwert's reference

23    to this, and the questions is that Dr. Cornell, in another

24    bankruptcy proceeding which involved analysis of potential

25    kickback claims, drew a random sample, as opposed to a

1    stratified sample, and two, did not adjust the sample random

2    sample that was drawn, or the results from that in the

3    review of that sample for measurement error or dependence,

4    the two arguments that were advanced by Dr. McCreary on

5    behalf of the plan administrator here.  So, it's a simple

6    point.  It's a reference to what another expert -- one of

7    the plan administrator's experts had done.

8              THE COURT:  But why are we asking Dr. Schwert this

9    question?  We're asking Dr. Schwert a question that relates

10   to what Dr. Cornell did in another case.

11             MR. HEALY:  We certainly can ask Dr. Cornell that

12   question at his deposition.  It seems appropriate for an

13   expert testifying on a similar issue here to note what other

14   experts have done.  But we can certainly ask the question

15   from Dr. Cornell.

16             THE COURT:  Okay.  Why don't we do it that way,

17   all right?

18             MR. COSENZA:  I also disagree with the

19   characterization of what was done --

20             THE COURT:  Okay.  Well, rather than get going

21   over the river and through the woods, let's just move on,

22   all right?

23             MR. COSENZA:  Thank you, Your Honor.

24   Q    Dr. Schwert, let's move on to Dr. McCreary's fourth and

25   final argument, which is that your sample is not

Page 43

```
 1   representative of a population of 94,566 loans.  First, are

 2   you familiar with this argument?

 3   A    Yes.

 4   Q    What is your response?

 5   A    I wasn't asked to draw a sample from the population of

 6   94,566 loans.  I was asked to draw a sample from the set of

 7   loans analyzed by Mr. Aronoff, 76,044 loans.  And so, I

 8   wouldn't necessarily expect my sample to be representative

 9   of a different population of loans.

10   Q    Does the fact that your sample -- if your sample were

11   not representative of the population of 94,566 loans, would

12   it impact in any way your analysis as to whether it is

13   representative of the population of 76,044 loans?

14   A    No.

15   Q    If your sample were not representative of the larger

16   population of 94,566 loans, would it impact in any way your

17   extrapolation of the results of Mr. Morrow's review of the

18   sample to the larger population of 76,044 loans?

19   A    I'm sorry.  You're going to -- that was a complicated

20   question.  Could you repeat it, please?

21   Q    If your sample were not representative of the

22   population of 94,566 loans, would it impact in any way your

23   extrapolation of the results of Mr. Morrow's review of the

24   sample to the population of 76,044 loans?

25   A    No.
```

Page 44

1  Q    Dr. Schwert, let's move on to the last assignment that

2  you were given by the Trustees, which was to --

3         THE COURT:  Before you move on from that point,

4  though, but a random sample of the smaller population is not

5  equivalent to a random sample of the larger population?

6         MR. SCHWERT:  Exactly, Your Honor.

7         THE COURT:  Thank you.

8         MR. SCHWERT:  That is --

9         THE COURT:  Okay.  That's all.

10        MR. SCHWERT:  Bingo.

11        THE COURT:  Thank you.

12  Q    Dr. Schwert, did you also analyze the subsets of loans

13  reviewed by Mr. Grice and Mr. Castro?

14  A    I did.

15  Q    What can you tell us about their subsets?

16  A    Well, if you look at -- let's see -- trial Exhibit 676

17  and 677.

18  Q    Mm hmm.

19  A    Perhaps the easiest thing to do would be to start with

20  677, which was labeled Exhibit 2B in my original report.

21  Essentially what I did here was to analyze 1624 loans that

22  were studied by Mr. Grice and 366 loans studied by Mr.

23  Castro to see whether they were representative of the 76,044

24  loans analyzed by Mr. Aronoff.

25        And then I did exactly the same kinds of

1    representativeness tests that we talked about earlier from

2    my sample, 12 tests for the 12 most prevalent breach types.

3    And what you can see -- perhaps the easiest thing would be

4    to just start with Mr. Grice.

5        What you can see is that in his sample he has more

6    actual loans with misrepresentations of income than would be

7    expected from the Aronoff sample, substantially more loans

8    with excess debt-to-income ratio, and go down the list.  I

9    mean, you can just compare actuals to expecteds and draw

10    your own conclusions about that.

11        If you do the test for representativeness, only two of

12    the twelve categories indicate representativeness and ten of

13    the twelve do not.  What does that mean?  It means that to

14    take the set of loans that he analyzed and try and draw

15    inferences about the larger population studied by Mr.

16    Aronoff would be inappropriate because this sample is not

17    representative of the population of loans Mr. Aronoff

18    studied.

19        If you look at the bottom part of this exhibit, the

20    sample or the subset of loans studied by Mr. Castro,

21    basically it's the same exercise.  You compare the expected

22    number of loans among those 366, the actual number of loans

23    with certain breach types, and whether or not the

24    significance test for representativeness is rejected.  In

25    his case, I believe eight out of the twelve tests are

Page 46

1    rejected at the five percent level.

2         So, broadly speaking, his subset of loans is also not

3    representative of the loans from the population that Mr.

4    Aronoff analyzed.  If you look back at trial Exhibit 676,

5    counsel pointed out to me that at the time Mr. Grice and Mr.

6    Castro were preparing their reports, they did not have

7    access to Mr. Aronoff's report.

8         And so, it's perhaps unfair to ask whether or not the

9    subset of loans they looked at were representative of the

10   loans analyzed by Mr. Aronoff because they didn't know what

11   loans Mr. Aronoff had studied.  It seems like a reasonable

12   question.

13        And so, they provided me with a larger set of loans,

14   the 91,390 notice loans, and asked me if the subset of loans

15   studied by Mr. Grice and the subset identified by Mr.

16   Castro, which is a slightly larger subset now because some

17   of the loans analyzed by Mr. Grice and Mr. Castro indeed are

18   in the notice loan group but not in Mr. Aronoff's sample.

19        In any case, the bottom line conclusion is even against

20   this alternative potential population, the subsets of loans

21   identified by Mr. Grice and studied by Mr. Grice and Mr.

22   Castro are not representative of the broader population from

23   which they were drawn.

24   Q    What is the significance from your perspective as an

25   expert in statistics of the fact that neither the Grice nor

Page 47

1    Castro subsets are representative?

2    A    Well, let's take a step back for a minute and talk

3    about what was the -- what's the whole purpose of doing

4    sampling in the first place?  It's to try and learn about

5    the population from which you're sampling.

6              And so, to the extent that the way you draw the

7    sample isn't representative of the population that you're

8    interested in, extrapolating or drawing conclusions about

9    the broader population from the sample you analyze is

10   inappropriate.

11       I should add that in reading their reports I found it

12   very difficult to figure out what their -- they claim to

13   have chosen random samples from subsets of loans in these

14   pools, but I could not figure out how to reproduce their

15   sampling strategy based on the description that they give of

16   the subset of loans from which they say they drew random

17   samples.

18   Q    And what is the significance of that?

19   A    I think it limits the conclusions that you can draw

20   from their analysis to -- the relevance of their analysis is

21   limited to the set of loans that they analyze.  I don't

22   think you can extrapolate from the set of loans that they

23   analyzed to draw broader conclusions about the larger

24   population of loans.

25             MS. PERLMAN:  Thank you, Dr. Schwert.  That's all.

Page 48

1            THE COURT:  Okay.  Thank you.  You want a brief

2    break, Mr. Cosenza?

3            MR. COSENZA:  Yeah, okay.  I'd just -- I'd like to

4    make one statement for the record, Your Honor --

5            THE COURT:  Okay.

6            MR. COSENZA:  -- in light of some of the

7    statements that have been made in reference to my sidebar.

8    I just want to be very clear what the Trustees represented

9    to us --

10           THE COURT:  Go ahead.

11           MR. COSENZA:  -- on August 7, 2017, and I can hand

12   up a copy of the letter to Your Honor.

13           THE COURT:  That's okay.  You can just read it

14   into the record.

15           MR. COSENZA:  When we questioned whether or not

16   they were attempting to use Mr. Morrow or Mr. Schwert for a

17   sampling exercise, the response we got from the Trustees was

18   as follows, and this is again from the August 7, 2017

19   letter, "...nor do the rebuttal reports of J.F. Morrow, the

20   Morrow rebuttal report, and Schwert rebuttal report, attempt

21   to provide an estimation through sampling.  Rather, those

22   reports properly rebut affirmative arguments made by Mr.

23   Grice, and the Trustees' protocol process was deficient and

24   produced unreliable results based on Mr. Grice's audit of

25   certain breaches, the method and criteria for the selection

Page 49

1    of which remain a mystery.

2            "In contrast to Mr. Grice's assertions in his

3    affirmative report, Mr. Morrow's conclusion that the

4    Trustee's process was reliable is based on a review of a

5    random sample selected according to a fully disclosed and

6    commonly accepted empirical method as supported by the

7    Schwert rebuttal report.

8            "The basis for your complaint that Mr. Aronoff

9    also offered a rebuttal report to Mr. Grice is difficult to

10   understand.  Nothing in Exhibit G proscribed the parties

11   from submitting more than one rebuttal or addressing a

12   particular affirmative report.  And we note that both Mr.

13   Castro and Mr. Grice have offered rebuttal arguments to Mr.

14   Aronoff."

15           The point, Your Honor, is there were various

16   representations made that the exercise here that was put

17   forward by Mr. Schwert and Mr. Morrow was a rebuttal to the

18   work that was done by Mr. Grice and that this is not a

19   sampling exercise.

20      We've now seen various points raised during Mr.

21   Schwert's deposition -- examination that I will assume will

22   carry forward to Mr. Morrow that this is in fact the

23   backdoor way to sample and extrapolate out a breach

24   (indiscernible).  Thank you.

25           THE COURT:  All right.  Well, I'm not inclined to

Page 50

1    go into it any more right now.  I hear you and I know what

2    the response is on the other side.  So, do you want to take

3    a brief break and then get into cross-examination?  I think

4    it's a little too early to take the lunch break.

5              MR. COSENZA:  That would be perfect, Your Honor.

6              THE COURT:  All right.  How long would you like,

7    Mr. Cosenza?

8              MR. COSENZA:  Ten minutes?

9              THE COURT:  Ten minutes?  All right.  Let's come

10   back at about 15 minutes before the hour, all right?

11             MR. COSENZA:  Thanks.

12             THE COURT:  Thank you.

13             [RECESS]

14             THE COURT:  Okay.  Mr. Davis?

15               CROSS-EXAMINATION OF G. WILLIAM SCHWERT

16   BY MR. DAVIS:

17   Q    Good morning, Dr. Schwert.

18   A    Good morning.

19   Q    Now, Dr. Schwert, you don't have any experience in

20   auditing RMBS breach claims, correct?

21   A    That's correct.

22   Q    And you don't hold yourself out as someone who

23   regularly engages in audits of loan review processes,

24   correct?

25   A    That's correct.

1    Q    And you didn't rely on any loan files in forming your

2    opinions for this case, right?

3    A    That's correct.

4    Q    In fact, you didn't review any of the relevant loan

5    files in this case, right?

6    A    That's correct.

7    Q    And you did not believe that understanding how the

8    underlying breach determinations were made through loan file

9    reviews was relevant to your assignment, correct?

10   A    That's correct.

11   Q    And you didn't rely on any of the relevant

12   securitization agreements in forming your opinions to this

13   matter, right?

14   A    That's correct.

15   Q    Now, you'd agree, wouldn't you, that it's important to

16   select a sample from the relevant population of

17   observations, right?

18   A    Can you be more specific about what you're -- you know,

19   it's kind of a general statement.  Can you be more specific

20   about what you mean?

21   Q    You're trying to draw a sample to test a population.

22   A    Right.

23   Q    You ought to draw the sample from the right population

24   that you're trying to test, correct?

25   A    Yes.  That makes sense.

Page 52

```
1    Q    Okay.  Now, one of your tasks in this matter was to

2    assign and draw a sample from the population of 76,044

3    mortgage loans studied in Mr. Aronoff's report, right?

4    A    That's correct.

5    Q    But you were aware at the time that Mr. Castro and Mr.

6    Grice issued their opening reports that they were working

7    from a larger set of loans, right?

8    A    Yeah, I guess so.

9    Q    And you were aware at the time you issued your report

10   that that larger set of loans was over 94,000 loans; is that

11   right?

12   A    I can't say as we sit here today that I was aware of

13   that particular number, but I guess that's true.

14   Q    Okay.  And so, you must understand that the 76,044 loan

15   Aronoff population is a subset of the loans that the

16   Trustees originally submitted to the protocol, right?

17   A    I assume that's the case.

18   Q    But you weren't asked to analyze that population of

19   loans that was originally submitted by the Trustees to the

20   plan administrator or to compare the Aronoff subset to those

21   original loans and claims, right?

22   A    That's correct.

23   Q    In fact, you never even received a data set containing

24   all of the claims submitted by the Trustees to the plan

25   administrator, right?
```

Page 53

1    A    I believe that's correct, yes.

2    Q    And you have no opinion on whether the population of

3    loans originally submitted by the Trustees to the protocol

4    was significantly different from the population of loans

5    addressed by Mr. Aronoff in his report, right?

6    A    That's correct.

7    Q    And in particular you have no opinion on whether Mr.

8    Aronoff's 76,044 loan subset, the set from which you drew

9    Mr. Morrow's sample, is representative of the entire set of

10   loans that the Trustee submitted to the protocol, right?

11   A    That was a long enough question that I'm going to ask

12   you to repeat it just so I'm sure I get the right answer.

13   Q    You have no opinion about whether Mr. Aronoff's 76,044

14   loan subset, which is the subset from which you drew

15   Morrow's sample, is representative of the entire set of

16   loans that the Trustees submitted to the protocol, right?

17   A    That's correct.

18   Q    And when you issued your opinion, you were also not

19   aware that in addition to the loan level differences --

20   strike that.  When you issued your opinion, you weren't

21   aware that in addition to the loan level differences between

22   the Aronoff subset and the set of loans the Trustees

23   submitted to the protocol, there were also breach level

24   differences, right?

25             MS. PERLMAN:   Objection.

Page 54

1          THE COURT:  Yes.  What's the objection?

2          MS. PERLMAN:  Beyond the scope of Dr. Schwert's

3   report.

4          THE COURT:  Overruled.

5   A    Can I ask you just to repeat the question?

6   Q    Sure.  You weren't aware when you issued your opinion

7   that in addition to there being a difference at the loan

8   level between the loans submitted by the Trustees to the

9   protocol and the loans Mr. Aronoff analyzed, there were also

10  differences at the breach level?  You weren't aware of that,

11  correct?

12  A    That's correct.

13  Q    And therefore you didn't analyze those breach level

14  differences, right?

15  A    That's correct.

16  Q    Dr. Schwert, you didn't review the protocol order in

17  connection with forming your opinions in this case, right?

18  A    That's correct.

19  Q    You did not rely on any of the plan administrator's

20  responses to the Trustee's claims, right?

21  A    That's correct.

22  Q    You didn't speak with anyone about the Trustees breach

23  claim submission process in connection with designing your

24  sample or forming your opinion, right?

25  A    That's correct.

Page 55

1    Q    In fact, you don't really know anything about the

2    Trustee's claim submission process, right?

3    A    That's correct.

4    Q    And to be very clear about this, you were not

5    instructed to design a sample that would allow someone to

6    test the Trustee's process of identifying claims they

7    submitted to the protocol, right?

8    A    Yes, that's correct.

9    Q    And because you know nothing about the Trustee's

10   process, you wouldn't want to speculate about how you would

11   have designed a sample that would have allowed someone to

12   test the Trustee's process in identifying breach claims,

13   right?

14   A    Again, I'm going to ask you to repeat it just so I'm

15   sure I'm answering the question you're asking.

16   Q    And because you don't know anything about the Trustee's

17   breach claim process, you wouldn't want to speculate about

18   how you would have designed a sample that would have allowed

19   someone to test the Trustee's process in identifying breach

20   claims, right?

21   A    That's correct, yes.

22   Q    And you have no opinion about whether your analysis can

23   be used to make statements concerning the validity of the

24   Trustee's process on the original population of breach

25   claims, right?

Page 56

1   A    That's correct.

2   Q    So, I take it you were unaware when you issued your

3   opinion and drew your sample that Mr. Morrow was going to

4   reach conclusions about the soundness and reliability of the

5   Trustee's breach claim process, right?

6   A    I'm sorry.  Could you again repeat it just so I'm sure

7   I'm answering the question you're asking?

8   Q    I take it you are unaware when you drew your sample and

9   issued your opinion that Mr. Morrow, based on the sample of

10  loans you drew for him, was going to reach conclusions about

11  the soundness and reliability of the Trustee's breach review

12  process, right?

13  A    That's correct.

14  Q    Now, one of the opinions you gave today was that the

15  sample of 600 loans you created, the sampled loans I think

16  you called them, were proportionally represented --

17  representative of 11 of the 12 most pervasive type of breach

18  findings at the 5 percent significance level; is that right?

19  A    Yes.  I believe that's right.  Yeah.

20          MR. DAVIS:  I don't think we passed out binders.

21          THE COURT:  We did not.

22          MR. DAVIS:  Let's do it.  I'm sorry.

23  Q    I apologize for giving you another binder with

24  essentially the same information.

25  A    That's okay.  Actually, I don't have it yet, so you

Page 57

1   want me to -- okay.  That's -- I've got one.  It's -- now

2   you can apologize for giving me the same information.

3   Q    All right.  So, I think the results of your

4   representativeness analysis are set out in tab 2 of this

5   binder behind the sub-tab that says exhibits at Exhibit 1 --

6   A    Okay.

7   Q    -- on page 13 of 51.  So, I just want to take you to

8   your Exhibit 1.

9   A    Sure.  Let me -- can I just rearrange what I've got up

10  here --

11  Q    Absolutely.

12  A    -- so that I've got a little more space?  This is not

13  the most generous workspace.

14          THE COURT:  They have heard my complaints loudly

15  and clearly about (indiscernible).

16          MR. SCHWERT:  Well, thank you, Your Honor.  It's

17  very considerate of --

18          THE COURT:  You're not the first person to --

19          MR. SCHWERT:  Make that observation?

20          THE COURT:  -- be uncomfortable in there and I

21  apologize for that, but nobody asked me when they designed

22  this courtroom.

23          MR. SCHWERT:  I understand.

24          THE COURT:  What exhibit -- what's our tab number?

25          MR. DAVIS:  It's tab 2 exhibits.  So, we broke it

Page 58

1    up so you could find it easier.  Just go to the tab that

2    says exhibits.

3              THE COURT:  02 exhibits?

4              MR. DAVIS:  Yes.

5              THE COURT:  Okay.  Thank you.

6              MR. DAVIS:  And it's the first (indiscernible).

7    Q    So, Dr. Schwert, is this in fact Exhibit 1 to your

8    expert report?

9    A    It looks like it, yes.

10   Q    Okay.  And here you set out 12 categories of breach

11   types, right?

12   A    That's correct.

13   Q    Now, you didn't have any involvement in the process by

14   which Mr. Aronoff defined the 12 breach categories, right?

15   A    That's correct.

16   Q    You just analyzed those 12 breach categories because

17   Trustee's counsel asked you to analyze them, right?

18   A    That's correct.

19   Q    And you didn't test to see whether the 12 breach types

20   on the list were actually the 12 most prevalent breach types

21   in the Aronoff subset, right?

22   A    I did not, no.

23   Q    And you also, of course, didn't determine whether these

24   12 categories of breach claims were the most prevalent in

25   the original set of loans submitted by the Trustees to the

1   protocol, right?

2   A    That's correct.

3   Q    Now, you haven't confirmed, I take it, that these 12

4   categories of breach claims are still the 12 most prevalent

5   categories in Mr. Aronoff's subset, right?

6   A    That's correct.

7   Q    Okay.  So, were you -- you were not, then, aware of the

8   fact that the Trustees withdrew all claims in 1 of the 12

9   categories on your Exhibit 1?

10  A    I'm sorry.  Could you repeat the question so I'm sure I

11  know what you're asking so I can answer it correctly?

12  Q    I take it you were not aware that since the time you

13  issued your report the Trustees withdrew all of the claims

14  in one of these breach type categories that's on your list?

15  A    That's correct.

16  Q    And you would have to -- if you were asked to, you

17  would have to re-run your representativeness analysis to

18  account for that withdrawal, right?

19  A    No.  The -- each of the rows in this exhibit represents

20  one test.  And so, each row is independent of each of the

21  other rows.  There's no -- I mean, you might say well, just

22  ignore row -- whatever row it is, 7 let's say.  But

23  otherwise the remaining rows would be totally unchanged by

24  that.

25  Q    Totally unchanged even if you withdrew several hundred

Page 60

```
 1    loans from the claim -- from the population of loans?

 2    A    No.  That's a different question.  The -- what this

 3    test is doing is asking is the sample of 600 loans

 4    representative of the 76,044 from which it was drawn, and

 5    those tests remain exactly the same as they were before.  If

 6    you're asking me if you changed the population and then also

 7    the sample to eliminate some subset of loans, would that

 8    potentially change the results, it might.  I don't expect it

 9    would, but it could.

10    Q    Would it depend on how many loans were withdrawn?  What

11    would it depend on?

12    A    It depends on how many loans are withdrawn from the

13    population and how many loans are withdrawn from the sample.

14    Q    Okay.  But you didn't do any of that analysis?

15    A    No.

16    Q    Now, you also had no involvement in the process by

17    which Mr. Aronoff decided which loans fell into each of

18    these 12 breach types identified in your Exhibit 1, right?

19    A    Okay.  I'm going to -- again, I apologize for being --

20    asking you to repeat yourself, but that was a long question.

21    Q    You had no involvement --

22    A    Yeah.

23    Q    -- in the process by which Mr. Aronoff decided which

24    loans fell into each of the 12 breach type categories

25    identified in your exhibits?
```

Page 61

1    A      That's correct.

2    Q      Okay.  So, you don't have any idea whether Mr. Aronoff

3    accurately bucketed any given loan into one of these 12

4    categories, right?

5    A      That's correct.

6    Q      For example, you have no opinion whether a loan that

7    Mr. Aronoff bucketed in the category of failure to provide

8    qualified appraisal, right, which is one of these

9    categories, might be more accurately characterized or

10   bucketed as a missing documents claim, right?

11   A      That's correct.

12   Q      Nevertheless, the accuracy of your representativeness

13   calculations depends on the accuracy of the bucketing

14   process, doesn't it?

15   A      No, not really.  The whole point here is whatever

16   created the 76,044 population of loans, whatever that was,

17   whatever that process was, the question is if you sampled at

18   random 600 loans, does the 600 loans look like the 76,044?

19   And that's what representativeness means.  So, if there's

20   misbucketing -- well, whatever hypothetical question you

21   have in mind, the question of whether the sample reflects

22   whatever this issue is, is similar to the way this would

23   occur in the population.  That's what the representativeness

24   test is doing.

25              THE COURT:  Dr. Schwert, can I just follow up?

Page 62

1    Because I don't understand that answer.  If, for example --

2              MR. SCHWERT:  Sure.  Yeah.

3              THE COURT:  -- you take row 3, excessive DTI,

4    okay?

5              MR. SCHWERT:  Sure.

6              THE COURT:  And I think what Mr. Davis is asking

7    you is if in fact you delve into that and it turns out that

8    of the actual loans or the expected loans, whichever one you

9    want to say, 50 of them are improperly categorized as

10   excessive DTI, then it would affect your (indiscernible)

11   test result, wouldn't it?

12             MR. SCHWERT:  Well, I mean, if you tell me that

13   the raw data, Mr. Aronoff's data, changed, it would

14   certainly change the numbers, but it would probably change

15   both the expected number and the actual number in the

16   sample.  And so, the question of whether the sample is

17   representative of the population remains exactly the same as

18   it was before.  And because I drew a simple, random sample,

19   I have no reason to believe that the sample isn't still

20   representative of the new population.

21             THE COURT:  Okay.

22             MR. SCHWERT:  That's the issue.

23             THE COURT:  Thank you.

24   Q    Mr. -- I'm sorry, but I don't think you've answered

25   either the Court's question or my question.

Page 63

1    A    Okay.

2    Q    I'm not talking about the representativeness of the

3    sample overall.  The question is the representativeness of

4    the sample as it relates to each of the 12 breach

5    categories.

6    A    Right.  And what I'm telling you is if you, you know,

7    give me let's call it a corrected Aronoff sample or

8    corrected Aronoff population and then compare my sample to

9    the corrected population, I would expect it to be

10   representative of the corrected population because, again,

11   it's a simple, random sample.  The details of the test will

12   depend on the data but there's no reason to believe that

13   it's -- the simple random sample won't be representative of

14   the new population.  That's the point.

15   Q    The question is whether the excessive DTI actual loans

16   would be what you would have expected if that data changes.

17   A    I have no reason to think they wouldn't be.  I mean,

18   the --

19   Q    Okay, so --

20   A    -- I mean, again, the whole question is does the sample

21   look like the population?  If you tell me the population

22   changed, I expect the sample will change, too, in similar

23   ways.  That's the whole point.

24   Q    Now, by the way, you didn't do any analysis of the

25   evidence types on which the Trustee's breach claims were

Page 64

1   based, right?

2   A    I'm sorry.  I'm going to ask you to repeat it one more

3   time.

4   Q    Sure.  You didn't do any analysis on the evidence types

5   on which the Trustee's breach claims were based?

6   A    That's correct.

7   Q    And you never tested the sample you gave to Mr. Morrow

8   to determine whether each of the major evidence types

9   supporting the breach claims were proportionally

10  represented, right?

11  A    I did not.  That's correct.

12  Q    Now, I think you would agree -- have agreed that

13  stratifying the sample of loans would have allowed you more

14  control over the types of loans reviewed, right?

15  A    I'm sorry.  Could you repeat the question?  I'm not

16  sure I agreed to that statement, but perhaps.  Go ahead.  I

17  mean, you said you thought I agreed to something but I'm not

18  sure I remember agreeing to it.

19  Q    Okay.  That stratifying the sample of loans would have

20  allowed you more control over the types of loans reviewed?

21  A    I mean, I'm sure there's a sense in which that's true,

22  yes.

23  Q    And had you stratified the sample by Mr. Aronoff's

24  breach type categories, you could have ensured that you

25  ended up with a sample containing representative numbers of

Page 65

1    the loans by breach type, right?

2    A    No because even within strata you're still doing random

3    sampling.  And so, you -- apart from the question of how you

4    do the stratified random sampling, which is potentially a

5    problem, testing for representativeness if you basically

6    force the sample to be representative doesn't allow you to

7    judge whether your sample really is representative.

8    Q    So, you could not have designed a stratified sample in

9    a way that would have ensured you ended up with a sample

10   containing representative numbers of the loans by breach

11   type?

12   A    You might have been able to do that, but you couldn't

13   conclude from that that the sample you -- that you resulted

14   -- that resulted from that process was representative of the

15   population in any meaningful way because, again, you're

16   manipulating the structure of the sample so that it has a

17   particular outcome.  That's the disadvantage of stratified

18   sampling.

19   Q    Now, at the time you drew the sample, you didn't know

20   that you were going to be asked to evaluate the

21   representativeness of the sample with respect to the 12

22   breach categories, correct?

23   A    You know, I don't honestly remember whether I knew that

24   part of the assignment when I drew the sample or not.

25   Q    And at the time you drew the sample, you didn't know

1    who Mr. Morrow was, but you had some understanding that

2    someone other than Mr. Aronoff was going to review the

3    sampled loans, right?

4    A    That's correct.

5    Q    And at the time you drew the loan sample for Mr.

6    Morrow, you did not know that you were later going to be

7    asked to extrapolate what you'd call an agree rate, right?

8    A    I'm sorry.  Could you repeat the question just so I'm

9    sure I understand it?

10   Q    At the time you drew the loan sample for Mr. Morrow,

11   you did not know that you were later going to be asked to

12   extrapolate an agree rate, correct?

13   A    That's probably true, although I think as I testified

14   earlier, a very normal part of statistical sampling is to

15   draw inferences from the sample about the population.  So,

16   whether I specifically had come to the conclusion that

17   extrapolation of an agree rate would be part of the

18   assignment or not, I'm sure I understood, that drawing

19   inferences about the population from the sample was part of

20   my assignment.

21           MR. DAVIS:  Your Honor, I move to strike

22   everything after, "That's probably true."

23           THE COURT:  Okay.  It's stricken.

24   Q    Now, the agreed rate that you determined was your

25   estimation of the proportion of the loans in Mr. Aronoff's

Page 67

1   76,044 loan set that Mr. Morrow agreed had at least one

2   valid breach finding in there, right?

3   A    Again, I'm going to ask you to repeat it just so I'm

4   sure I know what I'm answering.

5   Q    The agree rate that you were determining was your

6   estimation of the proportion of loans in Mr. Aronoff's

7   76,044 loan set that Mr. Morrow agreed had at least one

8   valid breach finding, right?

9   A    I believe that's correct, yes.

10  Q    Okay.  So, in other words, what you were trying to

11  measure when you extrapolated that agree rate was the extent

12  to which these two people, Mr. Morrow and Mr. Aronoff,

13  agreed there was at least one valid breach finding on the

14  loans in the Aronoff subset, right?

15  A    That's correct.

16  Q    And you were not asked to consider, and you didn't

17  consider, whether or to what extent Mr. Aronoff and Mr.

18  Morrow agreed for the same reasons on their breach

19  determinations, correct?

20  A    That's correct.

21  Q    And you were not asked to consider and you didn't

22  consider whether and to what extent Mr. Morrow and Mr.

23  Aronoff agreed in reliance on the same evidence, right?

24  A    That's correct.

25  Q    So, you did not design your sample to allow Mr. Morrow

Page 68

```
 1    to determine the extent to which he agreed or disagreed with

 2    Mr. Aronoff's reliance on particular evidence types to

 3    support the breach determinations, right?

 4    A    I'm sorry.  Could you repeat the question again?  I'm -

 5    - I --

 6    Q    Sure.

 7    A    -- I may have lost part of it in midstream.

 8    Q    You did not design your sample to allow Mr. Morrow to

 9    determine the extent to which he agreed or disagreed with

10    Mr. Aronoff's reliance on particular evidence types to

11    support the breach determinations, right?

12    A    Yeah, I don't honestly know what you mean by allowed

13    Mr. Morrow.

14    Q    Okay.

15    A    I mean, I think the answer to your question is no, I

16    did not design it with that purpose.  But I'm not sure I

17    understand what the question is so I'm -- it's a little hard

18    to know.

19    Q    And I think you talked about this a little bit in your

20    direct, but you understand that Mr. Grice reviewed the same

21    sample of loans that you pulled for Mr. Morrow, right?

22    A    I'm sorry.  Repeat that for me?

23    Q    You understand that Mr. Grice, okay, reviewed the same

24    sample of loans that you pulled for Mr. Morrow?

25    A    Yes.  I guess I'm aware of that.
```

Page 69

```
 1    Q    Okay.  And you understand that Mr. Grice reached very

 2    different conclusions than Mr. Morrow about the same set of

 3    loans, right?

 4    A    Yes, I do.

 5    Q    But the fact that Mr. Grice and Mr. Morrow reached very

 6    different conclusions did not impact the way about -- the

 7    way you went about drawing your sample or calculating the

 8    agree rate and margin of error, right?

 9    A    That's true, although I guess I would point out that

10    Mr. Grice's disagreement with Mr. Morrow occurred long after

11    I drew the sample and calculated agree rates and so on, so

12    it's a little -- just in terms of the timing of things, it

13    would have been impossible to take that into account.

14    Q    And in fact, the agree rate does not take into account

15    anyone's opinions on the breach claims other than Mr.

16    Aronoff and Mr. Morrow, right?

17    A    That's correct.

18    Q    Now, you would agree that an accurate margin of error

19    is an essential part of a statistical exercise, wouldn't

20    you?

21    A    Yes.

22    Q    And you would also agree that using a procedure that

23    doesn't generate a biased result is also an essential part

24    of a statistical exercise, right?

25    A    In general, yes, although sometimes bias isn't the only
```

Page 70

1   characteristic of a statistic.  You could have a statistic

2   that was biased but perhaps more precisely measured than an

3   alternative unbiased estimate.  But I don't -- I mean, I

4   don't want to get into statistical esoterica.  So, --

5   Q    And I appreciate that.

6   A    Thank you.  You're welcome.

7   Q    And just to be clear, so bias in the context of

8   sampling occurs when the center of the distribution of

9   results is off-target.  Is that a fair way to put it?

10  A    That's a layman's -- I mean, that's probably a

11  reasonable layman's interpretation, sure.

12  Q    I'll accept that.

13  A    Okay.

14  Q    So, is it fair to say that one of your goals in

15  constructing the loan sample for Mr. Morrow was to generate

16  a sample that was unbiased with an acceptable and correctly

17  determined margin of error?

18  A    Yes.

19  Q    In the context of the agree/disagree determinations you

20  were analyzing, the concept of statistical independence is

21  that each of those agree/disagree determinations are

22  independent of the others; is that right?

23  A    It depends.  I mean, how -- why don't I just say it

24  depends and you can ask more questions?

25  Q    To be clear, I'm -- I guess I'm asking the question in

Page 71

1   the context of the work that you did, if that helps.

2   A    Okay.

3   Q    I'm asking whether in that context the concept of

4   statistical independence is that each of the agree/disagree

5   determinations is independent of the others?

6   A    Not really.  What's important is that the sample

7   observations are selected independently of each other so

8   that in asking the question, "Does the sample represent the

9   population?" the sample observations are chosen

10  independently of one another.  The observations in the

11  population can be correlated with each other through some

12  common characteristic, but the question is whether the

13  sample represents the population.

14          THE COURT:  You two are talking past each other as

15  far as I can tell.  I didn't hear an answer to your

16  question, did you?

17          MR. SCHWERT:  I said no.

18          MR. DAVIS:  I think I did, honestly.

19          THE COURT:  Could you ask the question again?

20          MR. DAVIS:  Sure.

21  Q    So, in the context of the work that you were doing --

22  A    Yes.

23  Q    -- the concept of statistical independence is that each

24  of the agree/disagree determinations is independent of the

25  others?

1                THE COURT:  And what's the answer?

2                MR. SCHWERT:  The answer is no, that's not the

3       relevant independence issue that matters in this situation.

4       The independence issue that matters in this situation is

5       that the observations chosen for the sample are independent

6       of each other, and that's what a simple random sample does,

7       so that if you're asking the question, "Does the sample look

8       like the population?" even if the observations in some sense

9       are correlation with each other, you know --

10               THE COURT:  This is where my confusion is.  I

11      don't believe Mr. Davis, you're asking, about the randomness

12      of the sample.  You're asking about the agree rate.

13               MR. DAVIS:  I'm asking about the agree/disagree

14      determinations.

15               THE COURT:  Yes.

16               MR. DAVIS:  And asking --

17               THE COURT:  So, if we all agree it's a random

18      sample, period, full stop --

19               MR. SCHWERT:  Right.

20               THE COURT:  -- Mr. Davis is asking about the agree

21      rate if we all agree that it's a random sample.

22               MR. SCHWERT:  Okay.

23               THE COURT:  And asking whether or not the agree

24      rate is affected in any way by interdependence factors, my

25      paraphrase.

Page 73

1              MR. SCHWERT:  I don't think that's what he was

2     asking, Your Honor.  I think --

3     Q    That is in fact what I was asking.

4     A    Okay.  Well, go ahead.

5              THE COURT:  That's why I just don't think --

6     A    Okay.  All right.  Well, try it one more time and I'll

7     try one more time.

8     Q    Whether or not the agree rate is affected in any way by

9     the interdependence factors.  That's the question.

10    A    Okay.  Why don't you ask me the whole question one more

11    time?

12    Q    Sure.  Well, the question we started with was --

13    A    Yes?

14    Q    -- in the context of the work you were doing --

15    A    Yes.

16    Q    -- the concept of statistical independence is that each

17    of those agree/disagree determinations is independent of the

18    others.

19    A    Right.  And I'm telling you that is not a necessary

20    assumption for the work I was doing.

21    Q    Whether it's a necessary assumption or not for the work

22    you're doing, I'm asking you whether it is in fact

23    essentially an example of a concept of statistical

24    independence that each of those agree/disagree

25    determinations is independent of the others?

Page 74

1   A    We really are talking in cross-purposes.

2             THE COURT:  Let me try it this way, okay?

3             MR. SCHWERT:  Yeah.

4             THE COURT:  If we have a pool of coin tosses --

5             MR. SCHWERT:  Yes.  Those are independent.

6             THE COURT:  They are totally independent, right?

7             MR. SCHWERT:  Right.

8             THE COURT:  So, if you ask a second -- you toss

9   the coin and you've got 600 of the coins lined up and you

10  ask somebody else, "Heads or tails?" --

11            MR. SCHWERT:  Yeah.

12            THE COURT:  -- that person each time is going to

13  say heads or tails, okay?

14            MR. SCHWERT:  Yes.

15            THE COURT:  It's not affected.

16            MR. SCHWERT:  Exactly.

17            THE COURT:  If we did a coin toss with a coin that

18  instead of having heads and tails had a green side and a red

19  side --

20            MR. SCHWERT:  Yeah.

21            THE COURT:  -- right, and we found out that our

22  second guesser was colorblind, right?

23            MR. SCHWERT:  Okay.

24            THE COURT:  The bias that would be introduced

25  would be that the second guesser had an inability to make

Page 75

1    the correct determination independently.  This is not

2    exactly the right answer, but the point is --

3            MR. SCHWERT:  Right.

4            THE COURT:  -- right, that what Mr. Davis is

5    trying to ask you is if that -- if the agree/disagree rate

6    is affected or infected by a particular bias -- that has a

7    negative sounding tilt, slant, outlook, informed by, that

8    that outlook will affect the agree or disagree rate and

9    therefore it's not independent the way our person is who's

10   looking at the 600 coins lined up.  I --

11           MR. SCHWERT:  Right.

12           THE COURT:  -- Mr. Davis, you absolutely have to

13   correct me if that's not what you're trying to get at.

14           MR. DAVIS:  You're doing a much better job than I

15   was, Your Honor.

16           THE COURT:  No -- no.

17           MR. SCHWERT:  Okay.  Now let me try and give you -

18   -

19           THE COURT:  And remember, we all agree that your

20   sample is random.

21           MR. SCHWERT:  Right.  No, no.  Right.  So, let me

22   try and provide an answer that will help clarify this pretty

23   murky topic.  Whatever the characteristics of the agree

24   rate, suppose two analysts look at something and for

25   whatever reason they think there's something wrong with big

Page 76

1   loans relative to small loans or whatever it would be and so

2   observations about agreement on big loans might be different

3   than observations on small loans to again try and put it in

4   the context of this case, it is not necessary in the work

5   I'm doing, and that was the question he asked, that the

6   assessment of agreement or not be uncorrelated with the size

7   of the loan, for example because I'm drawing the sample

8   independently.  And so, the question I'm asking is, "Does my

9   sample look like what would be true in the population

10  whatever the characteristics of the correlation are?"  So,

11  Mr. -- if Mr. Morrow and Mr. Aronoff had both evaluated

12  76,000 loans, they might have -- sorry -- they might have

13  this call it bias towards thinking that large loans and

14  small loans were different and agree more or less or

15  whatever it would be.  My sample is going to reflect that

16  even though the data underlying -- sorry -- underlying the

17  population -- talking with your hands too much -- even

18  though the data underlying the population might have

19  characteristics that are correlated.  And so, saying that

20  the data in the underlying population have to be

21  uncorrelated is not -- is sort of a red herring.  It has

22  nothing to do with my analysis or the problem I'm analyzing.

23  And the predicate of his question was something about this

24  has to do with your analysis or your -- this assumption has

25  something to do with your analysis.  And that's why I'm

1    saying no.  Does that help?

2    Q    Sure.  I'll take away the predicate then.

3    A    Okay.  So, then what's the question?

4    Q    That same question without the predicate.

5    A    Well --

6    Q    So, --

7    A    -- give it to me without the --

8    Q    -- the concept of statistical independence is that each

9    of your agree/disagree determinations is independent of the

10   others.

11   A    Well, that would be -- if they were independent then

12   that would be true.

13   Q    Okay.  You assume they were independent for purposes of

14   your analysis, right?

15   A    No, I do not.  That's what I was trying -- when I say

16   "no," that's what I'm trying to tell you.  The sample is

17   drawn independently.

18   Q    Well, you assumed for your analysis --

19           MR. DAVIS:  Well, let me read this from his

20   testimony, Your Honor.

21           THE COURT:  Give us a page.

22           MR. DAVIS:  This is at line -- page 162, line 24

23   to 163, line 20.

24           THE COURT:  All right.  Ms. Perlman, are you

25   there?

Page 78

1          MS. PERLMAN:  Yes.

2     Q     Question: "Does your analysis assume that Mr. Morrow's

3     decisions on each of the breaches he reviewed are

4     statistically independent of one another?"  Answer: "The

5     only part of the analysis that might be considered to be

6     based on that assumption of statistical independence is the

7     calculation of the precision of the estimates, not the

8     calculation of the agree rate."  "Well, to the extent you

9     made that assumption, on what basis did you make the

10    assumption of independence?"  "I had no basis for assuming

11    anything different than that.  And while Mr. Mr. McCrary

12    complained loudly about that assumption, he also didn't

13    propose any alternative approach to assessing precision of

14    the estimates, so I interpreted his complaint as what's the

15    way -- what's the right way to put this politely?  A

16    possibility theory."  Did I ask those questions and did you

17    give me those answers?

18    A     You did and I did.

19    Q     Okay.  Let me try this.

20    A     Yes.

21    Q     If we were to assume that Mr. Morrow decided that he

22    was mistaken about the reliability of a particular piece of

23    evidence used to prove a type of breach claim and as a

24    result change his agree/disagree determinations on multiple

25    claims because they were supported by that same unreliable

Page 79

```
 1    piece of evidence, wouldn't that be inconsistent with your

 2    assumption of independence?

 3    A    Well, I mean, let me back up and say that after

 4    reflecting on the deposition testimony, I thought more about

 5    the problem and concluded that the assumption of

 6    independence wasn't necessary, which is what I was trying to

 7    describe to you before.  But I don't interpret Mr. Morrow

 8    revising his assessment of 10 of the 600 loans as being a

 9    substantial change.  But to the extent that it's a change,

10    it does change the agree rate and the confidence interval

11    associated with it.

12    Q    Okay.  But that's not the question I asked you.

13    A    Okay.  So, --

14    Q    The question I asked you --

15    A    Yes.

16    Q    -- was -- had nothing to do with the 10 loans, so put

17    those to the side for the moment.

18    A    Oh, okay.  Sorry.  Okay.

19    Q    If Mr. Morrow were to decide that he was mistaken about

20    the reliability about a particular piece of evidence to

21    prove a type of breach claim and as a result changed his

22    agree/disagree determinations on multiple claims because

23    they were supported by that same unreliable evidence type,

24    that would be inconsistent with your assumption of

25    independence, right?
```

1   A    I hate to be repetitive, but it's perhaps inconsistent

2   with the concept that each of the observations is

3   independent of each other.  It's not problematic in

4   interpreting the sample that was drawn independently and

5   randomly as a reflection of the underlying population.  It's

6   simply a statement that Mr. Morrow and Mr. Aronoff agreed

7   less.

8   Q    So, it would be inconsistent with the concept that each

9   of the observations is independent of one another, right?

10  A    It's perhaps an indication of one source of dependence,

11  yes.

12  Q    Let's talk about measurement error for a moment.

13  A    Sure.

14  Q    It's fair to say that some measurement processes are

15  more likely than others to yield the same results

16  consistently, right?

17  A    I'm sure that must be true.

18  Q    So, for example, counting the number of pages in a

19  calculus textbook is performed by multiple people or by the

20  same person at different times should lead to the same

21  result, right?

22  A    Hypothetically yes, probably.

23  Q    Okay.  By contrast, if you asked multiple people or

24  even the same person at different times to determine what

25  percent -- what percentage of the problems set out in that

1    textbook were properly solved, that measurement process

2    might be less likely to lead to the same result, right?

3    A    Possibly, sure.

4    Q    So, measurement error occurs when two independent

5    measurements of the same item have the potential to yield

6    different results, correct?

7    A    That would be one way to think about it, I suppose.

8    Q    And in your opinion, it's at least possible that

9    measurement error would be an issue to be addressed if there

10   were evidence that Mr. Morrow, when presented with the same

11   loan file on two different occasions reached different

12   agree/disagree determinations, right?

13   A    Okay.  I'm going to have to ask you to repeat it so I'm

14   sure I know what you're asking.

15   Q    In your opinion it's at least possible that measurement

16   error would be an issue to be addressed if there were

17   evidence that Mr. Morrow, when presented with the same loan

18   file on two different occasions reached different

19   agree/disagree determinations, correct?

20   A    I think it depends on the circumstances involved.  If

21   it were truly analyzing the -- I think we covered this in my

22   direct testimony, but if it were truly analyzing the same

23   file without any additional information and having

24   Alzheimer's so that you forgot that you've already seen the

25   file and coming to different conclusions, that would

Page 82

1    probably be a good definition of measurement error.  If the

2    hypothetical is Mr. Morrow is presented with additional

3    information like the report of Mr. Grice, reassesses the

4    information and comes to a different conclusion, I'm not

5    sure I would call that measurement error.

6    Q    So, in your view, it would take something like a

7    terrible disease such as Alzheimer's to make someone sit

8    down and look at a loan file on two different occasions and

9    reach two different results?

10   A    I mean I used Alzheimer's because it's something

11   unfortunately we can all relate to and as you get older,

12   you'll get more sensitive to that issue.  But, you know,

13   it's hard in the absence of Alzheimer's or something like it

14   to think about the hypothetical of somebody looking at the

15   same file twice and not remembering they saw it before.  And

16   so, asking for two independent measurements of the same

17   thing by a different -- you know, by the same person is a

18   hard thing to think about in the absence of something like

19   Alzheimer's.

20   Q    So, you never looked at one of these (indiscernible),

21   right?

22   A    I have not.

23   Q    And yet you think it's difficult (indiscernible) that

24   someone who had 600 of them coming back to one that he had

25   read before wouldn't remember it?

1    A    You know, I haven't done it.  I've read lots of journal

2    articles.  I don't remember all of them, but I'm likely to

3    remember having seen it if I see it a second time.

4    Q    So, I don't think you've answered my questions.

5    A     Okay.

6    Q    So, let me come back to it.

7    A    Sure.

8    Q    All right.  And if you need to assume this as a

9    hypothetical, you can assume it as a hypothetical.

10   A     Sure.

11   Q    But is your view that it's at least possible that

12   measurement error will be an issue to be addressed if there

13   were evidence that Mr. Morrow when presented with the same

14   loan file on two different occasions reached different

15   agree/disagree determinations, right?

16   A    Could you repeat the words associated with "measurement

17   error is an issue"?

18   Q    That measurement error will be an issue to be

19   addressed.

20   A    To be addressed, okay.

21        If I thought that the frequency of random decision

22   making, you know, was a predominant characteristic, I might

23   worry about it.  But, again, to the extent that my

24   assignment was to draw a sample and from the results of the

25   sample extrapolate back to the population, a process was

Page 84

1    observing.  In this case, the process I was observing was

2    Mr. Morrow reviewing assessments that had been done by Mr.

3    Aronoff.  If Mr. Morrow has measurement error in his

4    assessments in the sample, he'll have them in the

5    population, too.  So, the question of how to extrapolate

6    from the sample to the population really isn't affected

7    much, if at all, by idiosyncrasies of Mr. Morrow.

8         I can't comment at all about what Mr. Morrow did or

9    whether what Mr. Morrow did was correct or not.  What I can

10   tell you is if he did the same thing with the 76,000 loans

11   that he did with the 600 loans, you know, followed the same

12   process, the 600 would be able to be extrapolated to the

13   76,000.

14   Q    With the same embedded mistakes, is that what you're

15   saying?

16   A    Yeah, I mean whatever they are.  I mean whatever the

17   process is, and I'm not here to comment on what Mr. Morrow

18   did.  It's simply a question of the relation between what

19   you see in the sample of 600 and what you would see had he

20   done the same thing 76,000 times.

21             MR. DAVIS:  Your Honor, I'd like to read from the

22   deposition again.

23             THE COURT:  Go ahead.

24   Q    Page 133, line 17 to 134, line 6:

25   "Q    Well in the context of this case, what you are trying

Page 85

1   to calculate an agree rate?

2   "A   Uh-huh.

3   "Q   Would measurement error be an issue if Mr. Morrow

4   provided with the same loan file on two different occasions

5   would have reached two different conclusions?

6   "A   I suppose it's possible, although that's just a thought

7   experiment at the moment.  I don't know that we have any

8   evidence that that would have happened, and I didn't see any

9   evidence in Mr. McCreary's report indicating that he had any

10  evidence that would happen."

11      Did I ask that question?  Did you give that answer?

12  A   Yes.

13  Q   And you agree --

14          MS. PERLMAN:  (Indiscernible).

15          UNIDENTIFIED SPEAKER:  I just want to observe --

16          THE COURT:  Wait, what is happening over here?

17          UNIDENTIFIED SPEAKER:  Well, go ahead, Ms.

18  Perlman.

19          MS. PERLMAN:  For the sake of completeness, I

20  think that the next question and answer beginning on line 7

21  and continuing through line 16 --

22          THE COURT:  I want --

23          MS. PERLMAN:  -- is also important for context.

24          MR. DAVIS:  I can read it, Your Honor.

25          THE COURT:  Read that, Mr. Davis.  Thank you.

Page 86

1    Q    "Q   If there were evidence that would happen, would

2    that affect your analysis of the agree rate?

3    "A   You know, it's hard to know.  It depends on how

4    frequently, you know, those observations would happen

5    relative to the frequency with which you didn't see them."

6         Right?  And you, in fact, agree that if there were

7    evidence that Mr. Aronoff, okay, misclassified breaches --

8    again, meaning one day he looked at a loan file and

9    determined there was a breach and on another day, looked at

10   the same file and determined there was not a breach, say 10

11   or 20 percent of the time, there would be an issue of

12   measurement error to deal with, right?

13   A    Did you mean Mr. Aronoff or Mr. Morrow?

14   Q    I meant Mr. Aronoff.

15   A    Okay.  In truth, it doesn't matter which one we're

16   talking about.  I suppose it's possible in the sense that

17   the process you're measuring then is one that has error in

18   it, but that would be reflected in the population as well as

19   in the sample.

20   Q    Okay.  So, in the work you did for this case,

21   measurement error was not an issue, correct?

22   A    Not in my mind.  That's correct.

23   Q    You have no information or opinion on the process that

24   Mr. Morrow followed to make his agree or disagree

25   determinations, right?

Page 87

1    A    That's correct.

2    Q    And the only information you used from Mr. Morrow's

3    report was the spreadsheet that's at the back of your report

4    denominated as Appendix C that contains his agree or

5    disagree determinations, right?

6    A    That's correct.

7    Q    And you have no opinion or information on how complex

8    or time-consuming Mr. Morrow's review process was, right?

9    A    That's correct.

10   Q    And the complexity of Mr. Morrow's analysis was not

11   relevant to your opinion, right?

12   A    That's correct.

13   Q    So, in your view, the complexity and difficulty of the

14   agree/disagree determinations Mr. Morrow was making don't

15   bear on the question whether it would be more or less likely

16   that confronted with the same loan file on two different

17   occasions he would make different agree/disagree

18   determinations; is that right?

19   A    I'm sorry.  Just repeat the last question so I'm sure I

20   understand what you said.

21   Q    I'll say it slowly.

22   A    Yeah.

23   Q    In your view --

24   A    Yes.

25   Q    -- the complexity and difficulty of the agree/disagree

Page 88

1    determinations Mr. Morrow was making don't bear on the

2    question whether it would be more or less likely that

3    confronted with the same loan file on two different

4    occasions he would make different agree/disagree

5    determinations?

6    A    That's correct.

7    Q    And I think you told me when I deposed you, you had

8    seen no evidence that Mr. Morrow or Mr. Aronoff reviewing

9    the same loan file twice on two different days would reach

10   two different conclusions, right?

11   A    That's correct.

12   Q    So, you were unaware that Mr. Aronoff changed his views

13   on certain loan files, both in the reports he submitted and

14   during this trial, right?

15   A    I guess that's true, yes.

16   Q    And you don't have an opinion on how it would have

17   affected your analysis if Mr. Morrow made a mistake in

18   classifying even one percent of the loans he reviewed,

19   right?

20   A    I'm sorry.  Could you repeat the question?

21   Q    You do not have an opinion on how it would have

22   affected your analysis if Mr. Morrow misclassified even one

23   percent of the loans he reviewed, correct?

24   A    If you mean by misclassified he said agree when he

25   meant disagree, is that what you mean by --

1   Q    Yes.

2   A    -- misclassifying?  Well, it would lower -- if he said

3   agree when he meant disagree one percent of the time, then

4   it would lower the agree rate by one percent.

5         MR. DAVIS:  Your Honor, I'd like to read from the

6   transcript again.

7         THE COURT:  Okay.

8   Q    Page 153, line 21 to 154, line 3.

9   "Q   If Mr. Morrow made a mistake in classifying one percent

10  of the loans he reviewed, how will that have impacted your

11  calculations?

12  "A   I haven't been asked to think about that.  I haven't

13  thought about that.  So, I don't really have a good answer

14  for you as we sit here today."

15       Did I ask you that question, and did you give me that

16  answer?

17         MS. PERLMAN:  Objection.  That's not contradictory

18  to what he's --

19         MR. DAVIS:  It's absolutely contradictory.  He

20  just offered an opinion he said he didn't form.

21         MS. PERLMAN:  And at the deposition he said, "I

22  haven't thought about it" and "didn't have a good answer as

23  we sit here today".

24         THE COURT:  Okay.  We're going to let the answer

25  stand, okay.  I don't know if it qualifies as impeachment or

Page 90

```
 1    not, but let's move on.  Okay.  Mr. Davis, and we're getting

 2    close to the lunch hour.  I don't know how much more you

 3    have.  It looks like a fair amount.

 4            MR. DAVIS:  A fair amount.

 5            THE COURT:  All right.  Well, I'm going to leave

 6    it to you to get to a good stopping point sometime in the

 7    next 10 to 15 minutes, all right.

 8            MR. DAVIS:  I'm happy to stop now and take up

 9    after lunch.  That would be fine.

10            THE COURT:  Okay.  All right.  Should we -- do you

11    want to take a full hour?

12            UNIDENTIFIED SPEAKER:  We might as well.

13            UNIDENTIFIED SPEAKER:  Whatever's good for Your

14    Honor.

15            MR. DAVIS:  I think so.

16            THE COURT:  All right.  Why don't we take a full

17    hour?  We'll come back in ten minutes to the hour.  The same

18    rules apply during your lunch break, all right.

19            DR. SCHWERT:  Yeah.

20            THE COURT:  Thank you.

21            MR. DAVIS:  Thank you.

22         (Recess at 12:48 p.m., recommencing at 1:51 p.m.)

23            THE COURT:  Okay.  Mr. Davis, I'm ready when you

24    are.

25            MR. DAVIS:  Thank you.
```

Page 91

```
 1                  CONTINUED DIRECT EXAMINATION

 2    BY MR. DAVIS:

 3    Q    So, Dr. Schwert, you calculated the agree rate based on

 4    the whole Aronoff population, correct?

 5    A    No.  I calculated the agree rate based on the 600 firms

 6    that were in my sample.

 7    Q    And you measured that against the whole Aronoff

 8    population?

 9    A    I measured that against the 600 firms that were in my

10    sample.

11    Q    When you extrapolated the agree rate, you extrapolated

12    that rate across the whole Aronoff population, correct?

13    A    That's true, yes.

14    Q    Okay.  And so, your extrapolated agree rate is

15    effectively a blended rate of all of the breach categories,

16    not just the 12 that you had on those exhibit lists, right?

17    A    That's correct.

18    Q    Okay.  And you didn't do the analysis necessary to

19    determine the individual agree rates by breach category,

20    right?

21    A    Not that I can recall, no.

22    Q    Okay.  Now when you were considering whether to use a

23    stratified random sample, you didn't consult with Mr.

24    Aronoff or Mr. Morrow, correct?

25    A    That's correct.
```

1    Q    So, let's talk about your opinion regarding Mr. Grice

2    and Mr. Castro.

3    A    Sure.

4    Q    You were not asked to assess how or why Mr. Grice and

5    Mr. Castro selected the sample of loans that they reviewed,

6    right?

7    A    I'm sorry.  I'm going to ask you to repeat it just so

8    I'm --

9    Q    Sure.

10   A    -- sure I understand.

11   Q    You were not asked to assess how or why Mr. Grice and

12   Mr. Castro selected the samples of loans that they reviewed,

13   right?

14   A    That's correct.

15   Q    You were not asked to examine whether Mr. Grice or Mr.

16   Castro conducted loan level or breach level reviews,

17   correct?

18   A    That's correct.

19   Q    And it didn't matter for purposes of your opinion

20   whether Mr. Grice or Mr. Castro was conducting a breach

21   level or loan level review, right?

22   A    For the purposes of my analysis, no.

23   Q    So, in reaching the opinions you gave in this case, you

24   did not consider the purposes for which Mr. Castro and Mr.

25   Grice state they selected the breach claims that they were

Page 93

1   reviewing, correct?

2   A    That's correct.

3   Q    Now let's take a look at your Exhibits 2A and 2B, which

4   are in that same Tab 2 behind the exhibits subtab.

5   A    Okay.

6   Q    Now these exhibits show the results of the

7   representativeness tests you performed on the loans that Mr.

8   Grice and Mr. Castro had reviewed before you issued your

9   report, right?

10  A    I'm sorry.  I'm going to -- I lost the -- repeat it,

11  would you, please?

12  Q    The question is --

13  A    Yeah.

14  Q    -- these exhibits --

15  A    Uh-huh.

16  Q    -- show the results of the representativeness tests you

17  performed on the loans that Mr. Grice and Mr. Castro had

18  reviewed before you issued your report, right?

19  A    That's correct.

20  Q    And here again you relied entirely on the data given to

21  you by the Trustees to determine both the categories

22  themselves and the loans that fell into each of the

23  categories, right?

24  A    That's correct.

25  Q    And you didn't consider whether Mr. Grice or Mr. Castro

Page 94

1     may have bucketed the loans in a different way when they

2     selected their review sets than the way in which Mr. Aronoff

3     bucketed them, right?

4     A     That's correct.

5     Q     And you have no idea from which set of loans Mr. Grice

6     and Mr. Castro were drawing their sample breaches and sample

7     loans, correct?

8     A     I'm sorry.  Just repeat the question so I'm sure I --

9     Q     You have no idea from which set of loans Mr. Grice and

10    Mr. Castro were drawing the sample breaches and sample loans

11    they analyzed, right?

12    A     That's correct.

13    Q     So, you have no idea of the size or other parameters of

14    the loan sets from which Mr. Grice and Mr. Castro drew the

15    loans they reviewed, right?

16    A     That's correct.

17    Q     And if it turns out, as it in fact does, that Mr. Grice

18    and Mr. Castro were drawing their sample breaches and sample

19    loans from loan sets that were differently defined than what

20    you've laid out here in Exhibits 2A and 2B, you can't

21    provide any opinion whether their subsets are representative

22    of the sets from which they were originally drawn, correct?

23    A     That's correct.  Yeah.

24    Q     Okay.  Let's start with 2A.  Now here you're comparing

25    the Grice and Castro subsets to a set of 91,290 loans you

Page 95

```
 1   called notice loans, right?

 2   A    I think it's 300 and -- 91,390.

 3   Q    Three hundred and ninety.

 4   A    Yeah.

 5   Q    Excuse me.

 6   A    Yeah.

 7   Q    Now I think we've already established that the Trustee

 8   submitted more than 91,390 loans to the protocol, right?

 9   A    I guess so, yes.

10   Q    And you don't know what the 91,390 set loan reflects;

11   do you?

12   A    Not specifically, no.

13   Q    Trustee's counsel just told you that Mr. Grice and Mr.

14   Castro should have known about this 91,390 loan set, right?

15   A    Basically, yes.

16   Q    And you assumed that this 91,390 loan set had some

17   meaning in the context of this case; is that right?

18   A    I guess so.

19   Q    Let's look at Mr. Grice's section on Exhibit 2A.

20   A    Uh-huh.

21   Q    And let's focus on actual loans versus expected loans.

22   So, are you with me there?

23   A    I am.

24   Q    So, just taking the first category, this shows that Mr.

25   Grice reviewed 900 misrepresentation of income loans which
```

Page 96

1    is more than your expected 724 loans; is that right?

2    A    Yes.

3    Q    And it also shows that Mr. Grice reviewed more loans

4    than expected based on your analysis in the

5    misrepresentation of employment, occupancy, and excessive

6    DTI categories, right?

7    A    It looks like that, yes.

8    Q    And loans involving, for example, failure to provide

9    HUD-1, failure to provide final TIL are underrepresented

10   according to your analysis, right?

11   A    That's correct.

12   Q    Okay.  And if we skip down to Mr. Castro's section, it

13   appears that Mr. Castro reviewed more income, debt,

14   occupancy, DTI, and employment claims than you expected,

15   right?

16   A    I'm sorry.  Could you go over that list slowly so I can

17   --

18   Q    Sure.

19   A    -- be sure what I'm agreeing to?

20   Q    Income?

21   A    Yes.

22   Q    Debt?

23   A    Yeah.

24   Q    Occupancy, DTI, and employment?

25   A    Yes.

Page 97

1   Q     Okay.  And, likewise, Mr. Castro reviewed fewer than

2   expected loans in many of the same categories as Mr. Grice

3   like failure to provide HUD-1 and failure to provide final

4   TIL, right?

5   A     Yeah.  There are some similarities and some differences

6   between the two, but it's --

7   Q     We can see that from looking at your chart, right?

8   A     Right.

9   Q     Okay.

10  A     That's correct.

11  Q     And let's just take a quick look at 2B.  This is the

12  one where you are drawing conclusions about the

13  representativeness of Mr. Grice and Mr. Castro's subsets

14  measured against the 76,044 mortgage loans and Mr. i

15  included in his affirmative report, right?

16  A     Yes.  That's correct.

17  Q     And is it fair to say that there is a similar pattern

18  of over and under representation as we just saw in Exhibit

19  2A?

20  A     Yeah, I think that's fair.  Sure.

21  Q     Now, Dr. Schwert, did you review your deposition

22  transcripts in preparing for testifying today?

23  A     Yes.

24  Q     When I took your deposition, you could not tell me when

25  you were retained in this matter except to say it was in the

1    last 12 months.  Is that right?

2    A    Yes.

3    Q    Now you're a rebuttal expert in this case, right?

4    A    Yes.

5    Q    Meaning experts had issued one set of reports before

6    you issued yours.

7    A    That's correct.

8    Q    Okay.  And, in fact, in your "Materials Relied Upon"

9    section in your report, you cite to Mr. Aronoff's report,

10   Mr. Grice's report, and Mr. Castro's opening reports, right?

11   A    Subject to check.  I mean it's -- I believe --

12   Q    Sure.  Let's take a look at it.

13   A    Sure.

14   Q    That's in the appendix section at page 32 of 51 if

15   you're looking on the bottom.  Did just see here that you

16   are listing in this Appendix B --

17   A    Yes.  I see it.

18   Q    -- those three reports?

19   A    Yes.

20   Q    And you see those reports are all dated on June 1 --

21   A    Yes.

22   Q    -- 2017?  But at your deposition you couldn't tell me

23   whether you were retained before or after those reports were

24   written, right?

25   A    That's correct.

Page 99

1    Q    And you couldn't tell me whether you were retained

2    before or after the class you were teaching ended in June of

3    2017, right?  Do you remember that?

4    A    Yes, probably.

5    Q    You couldn't tell me whether you'd signed a retention

6    letter in the matter, right?

7    A    That's correct.

8    Q    You couldn't tell me when counsel provided you with the

9    data from which you identified the loan sample, right?

10   A    This is the Aronoff data; is that what you're asking

11   about?

12   Q    Correct.

13   A    That's correct.

14   Q    And you could not remember when you provided the sample

15   loan list to counsel, right?

16   A    I could not.

17   Q    You could also not remember when you received back from

18   counsel the results of Mr. Morrow's agree/disagree

19   determinations, right?

20   A    That's correct.

21   Q    Do you have any better answers for the Court today,

22   sir, on what date did you begin to work on this matter?

23   A    I haven't gone back and checked on any of those dates.

24   Q    When did you send the sample of loans for Mr. Morrow to

25   analyze back to counsel?

Page 100

1    A    I really don't remember.

2    Q    When did you receive Mr. Morrow's results from what you

3    extrapolated an agree rate?

4    A    I don't remember that either.

5    Q    So, you have no idea how long it took for Mr. Morrow

6    and his team to review the 600 loan files you identified for

7    him?

8    A    I do not.

9              MR. DAVIS:  No further questions, Your Honor.

10             THE COURT:  Thank you.  Ms. Perlman?

11             MS. PERLMAN:  Your Honor, could we have a short

12    break?

13             THE COURT:  Sure.  How much time would you like?

14             MS. PERLMAN:  Five minutes.

15             UNIDENTIFIED SPEAKER:  Five minutes.

16             THE COURT:  Just five minutes?  Okay.

17             MS. PERLMAN:  Thank you.

18             THE COURT:  Well, we'll call it seven.

19             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

20        (Recess at 2:03 p.m., recommencing at 2:15 p.m.)

21             THE COURT:  Please have a seat.  Ready?

22             MS. PERLMAN:  Yep.

23             THE COURT:  Okay.

24                       CROSS-EXAMINATION

25    BY MS. PERLMAN:

Page 101

1   Q    Good afternoon, Dr. Schwert.

2   A    Good afternoon.

3   Q    At the time you pulled your sample, did you understand

4   that you might be asked to draw inferences about the larger

5   population?

6   A    Yes.

7   Q    Did that impact your sample design?

8           MR. DAVIS:  Did that impact your what?

9           MS. PERLMAN:  Sample design.

10  A    Yes.  I mean I suppose.  I mean it was a factor I took

11  into consideration, yes.

12  Q    Do you consider it measurement error if Mr. Aronoff in

13  response to the review of another expert changed his bridge

14  designation?

15  A    I do not, no.

16  Q    Does Dr. McCreary suggest in his report any change that

17  should have been made to your analysis or sample design

18  because of measurement error or independence?

19  A    Not that I'm aware of, no.

20          MS. PERLMAN:  That's all.  Thank you.

21          THE COURT:  Okay.  Mr. Davis?

22          MR. DAVIS:  Nothing.

23          THE COURT:  Very good.

24          DR. SCHWERT:  Thank you.

25          THE COURT:  You are done, sir.

Page 102

1               DR. SCHWERT:  Okay.

2               THE COURT:  Thank you very much.

3               DR. SCHWERT:  Thank you.

4               THE COURT:  Have a pleasant trip home.

5               DR. SCHWERT:  Yeah.  Thank you.  I hope so.  Good

6      luck here.  I hope it warms up.

7               THE COURT:  It always does.

8               DR. SCHWERT:  Eventually.

9               THE COURT:  Thank you.

10              DR. SCHWERT:  Thank you.

11              THE COURT:  You can just leave everything there

12     and we'll take care of it for you.

13          (Pause)

14              THE COURT:  All right.  What shall we do next?

15              MR. LIEBERMAN:  Your Honor, the Trustees would

16     like to call Mr. J. F. Chip Morrow.

17              THE COURT:  Okay.

18              Mr. Morrow, what are all those goodies you're

19     bringing with you up there?

20              MR. MORROW:  They're reference books that I used

21     in my report.  I don't think we plan on --

22              THE COURT:  All right.  Well, why don't you put

23     those over -- put everything over on counsel table and

24     you're going to --

25              MR. LIEBERMAN:  That includes the --

Page 103

1          THE COURT:  Yep.  And we'll give you everything

2   that you need.

3          Would you please raise your right hand, sir?  Do

4   you solemnly swear or affirm that all the testimony you're

5   about to give before the Court shall be the truth, the whole

6   truth, and nothing but the truth?

7          MR. MORROW:  As God as my witness, yes.

8          THE COURT:  Okay.  Very good.  Have a seat.  Make

9   yourself comfortable.  I see you have some water.  If you'd

10  like to take a break at any time, just let us know.  You do

11  not have to wait for one of the lawyers to suggest it.

12         MR. MORROW:  Oh, thank you.

13         THE COURT:  Okay.

14     (Pause)

15         THE COURT:  Can we have one more of the deck?  Oh,

16  there's two volumes.  Okay.  I totally messed it up.  Thank

17  you.

18     (Pause)

19                    DIRECT EXAMINATION

20  BY MR. LIEBERMAN:

21  Q    Mr. Morrow, can you please give the Court an overview

22  of your educational background since graduating from high

23  school?

24  A    I attended UCLA and received a degree in the '60s.  It

25  started in the '60s, received a bachelor of science degree

Page 104

1    in management engineering.  The emphasis was computer

2    science, real estate, and economics.  I then took advanced

3    courses in accounting from UCLA and have taken many courses

4    in banking, financial institutions regarding mortgage

5    lending.

6            I also have attended and got a certificate from

7    the University of Washington Pacific Coast Bankers School,

8    which is comparable to a master's extension program

9    sponsored by the New York Bankers Association and University

10   of Washington.

11   Q    Thank you.  And did you begin working in financial

12   institutions during college?

13   A    Yes.  I started at Bank of America in 1967 -- it sounds

14   a long time ago -- 1967 as a teller, note person.  I worked

15   my way through my last three years of college doing that.

16   Q    I want to get to the rest of your career, but I just

17   wanted to --

18   A    Right.  That's fine.

19   Q    -- do an overview.

20   A    Okay.

21   Q    How long have you worked in the residential mortgage

22   lending industry?

23   A    I made my first residential mortgage lending loan in

24   1971.

25   Q    And how long have you been involved in subprime

Page 105

1    mortgage lending?

2    A    Since 1978.

3    Q    And when did you begin serving as a consultant for

4    clients in the residential mortgage loan industry?

5    A    In 1995.

6    Q    Mr. Morrow, I'd ask you to turn to TRX-1368, which is

7    in your first binder.  And specifically -- well, that's sort

8    of in there and then --

9    A    Yes.

10   Q    Do you recognize this document?

11   A    Yes.  This is the rebuttal report I filed on July -- in

12   July --

13   Q    Great.

14   A    -- 2017.

15   Q    Will you please turn to page 62 of that document?

16   A    And that's Exhibit A?

17   Q    Yes.

18   A    Yes.

19   Q    Does that accurately reflect the experience that we've

20   been discussing?

21   A    Yes.

22   Q    I'm sorry.  What is this document?

23   A    This is my resume of pertinent information with my

24   career.  It isn't everything, but it's pertinent to this.

25   Q    So, you had a long career.  I want to focus on a few of

Page 106

1    the positions and aspects that -- and their

2    responsibilities.  Can you tell me what your

3    responsibilities were during your time at the Bank of

4    America?

5    A    At Bank of America, I was the youngest branch manager

6    they had in the whole system.  And I had responsibility for

7    loan portfolios and quality control of those loan

8    portfolios, which included real estate mortgages.  At that

9    time, they didn't have them centralized.  They were -- the

10   local offices had them.

11        I -- my last position with the bank was to do large

12   clients.  I had warehousing -- warehouse housing where we

13   did mortgage lending to them for warehousing their loan so

14   they could resell them, United Artists, MGM.  And then we

15   also had a large real estate portfolio there I was

16   responsible for.

17   Q    During the course of your career there, did you

18   originate and underwrite residential mortgage loans?

19   A    Yeah.  I -- yes.  I've done it my whole career.

20   Q    And did you conduct quality control and due diligence

21   reviews of residential mortgage loan pools?

22   A    Yes, at the various entities I've been at.  Yes.

23   Q    I wanted to talk to you next about Imperial Bank.  What

24   did you do there?

25   A    Well, Imperial Bank I had a better opportunity.  I went

Page 107

1    there.  That's a large regional bank.  It was then.  It's

2    since been bought out.  I was a credit administrator in

3    charge of loans, which included residential mortgage loans.

4    And then I ended up being the vice-president in charge of

5    the East San Fernando Valley in Los Angeles.  We had -- this

6    is where I started doing subprime lending.  At that time, it

7    was -- it wasn't called subprime lending.  It was --

8    actually it just was non-conventional lending.  And we had

9    lines of credit for various what we would today call

10   subprime brokers, originators.  And we would put together

11   packages and then they'd sell them off the fleet or HFC or

12   private investors.

13   Q    I want to delve into the lines of credit.  Can you

14   explain how that would work?  What was your relationship to

15   the originator?

16   A    Well, any time -- in financial institutions, if you

17   have a line of credit, you're required by the entities that

18   are involved, FDIC and others, you've got to re-underwrite

19   the mortgage.  Even though you've got a line of credit of,

20   say, $10 million and you have a loan of 50,000, you still

21   have to re-underwrite that $50,000 loan as if it was the

22   loan that you were making.

23        So, a line of credit, although it sounds like all you

24   do is just take and give them money, you can't.  It is --

25   you have to re-underwrite the loan just like we did in this

Page 108

1    case, re-underwrite the loan to make sure that the

2    parameters for the underwriting guidelines and the REPSA

3    warranties if you were selling it to beneficial or fleet or

4    whoever.

5    Q    Okay.  Let me break this down a little bit.  Can you --

6    is it fair to say that Imperial offered lines of credit to

7    mortgage companies that then underwrote loans?

8    A    Yes.  Yes.  And yes.

9    Q    And then -- and that allowed them to pool -- to --

10   A    Yeah.  Because you'd get a better price if you can pool

11   the loans and sell them as a package because if they get $5

12   million in loans all at once, it's cheaper than the onesies

13   --

14   Q    And --

15   A    -- one loan at a time.

16   Q    Okay.  And you said at Imperial you were required to

17   re-underwrite each of those --

18   A    Well, at all of the banks I've been at.  I mean at

19   Marathon we did the same type thing and other institutions.

20   And it's just a requirement that you have to do.

21   Q    And these were pools of loans that then were sold to

22   investors, right?

23   A    Yes.  And that's in addition to just making regular

24   residential mortgage loans which all the institutions have

25   done that, too.

Page 109

1    Q    And those sales, those pools, would they have reps and

2    warranties associated with them?

3    A    If you were selling them, yes, they did, specific reps

4    and warranties.  As a matter of fact, we had reps and

5    warranties with the originators ourselves for the warehouse

6    line to make sure that the loans that they were giving us

7    met the criterias because sometimes, you know, the ultimate

8    buyer would return a loan and then we'd have to return it

9    back to them because we didn't take ownership of the loan.

10   Q    This pre-dated securitization; is that right?

11   A    Yeah.  Securitization didn't come around till the '90s.

12   This was something that has been around -- you know --

13   Q    And --

14   A    It was an evolution of now with securitizations.

15   Q    At Imperial did you have the opportunity to enforce or

16   receive purchase claims?

17   A    At Imperial, yeah, but that was a long time ago, so I

18   couldn't really tell you.  I know we had some, but I

19   couldn't tell you the particulars.

20   Q    Okay.  Moving on, did there come a time when you

21   started your own bank?

22   A    Yeah.  That's Marathon National Bank.  For 11 years I

23   was the founding president, director.  We had a mortgage

24   company.  We did subprime lending.  We also made residential

25   mortgage loans and sold them off into the secondary market.

Page 110

1    We did pools.

2    Q    And what are some of your responsibilities there?

3    A    Well, as president, I was responsible for everything.

4    But when we first started, we only had 11 people, so I did a

5    little bit of everything including janitor.  But with prime,

6    we had a staff of what, 120 people working in that area, not

7    in that area but for the bank.  And we had a mortgage

8    company which was producing mortgage loans for sale into the

9    secondary market.

10   Q    And did you also buy mortgage loans at Marathon?

11   A    Yes.  We had quite a few brokers that we -- or loan

12   originators that were selling into the secondary market.  At

13   that time it was -- well, the same place we reside, Fleet,

14   Beneficial, HFC, for example.

15   Q    When you were at Marathon buying and selling loans,

16   were representations and warranties made to the purchaser of

17   the loans?

18   A    Yes.  Actually, they're very similar.  We had reps and

19   warranties between ourselves and the originators and then

20   reps and warranties between ourselves and the purchasers.

21   So, I'm very familiar with reps and warranties under these

22   programs.

23   Q    Did you negotiate those reps and warranties?

24   A    In actuality, yes.

25   Q    And were they similar to the reps and warranties that

Page 111

1   you saw here?

2   A    Yes.

3   Q    Did you pursue or receive --

4   A    I have to say to the most part --

5   Q    Okay.

6   A    -- because I haven't compared the two, but for the most

7   part, they're very similar.

8   Q    Are there similar types of reps and warranties that you

9   see --

10  A    Yes.  Misrepresentation certain guidelines of following

11  underwriting or DTI requirements, that kind of thing.  Yes,

12  they would be in there.

13  Q    At Marathon, did you pursue or receive for purchase

14  claims?

15  A    Yes.  Both.

16  Q    Okay.  And what did you do after Marathon?

17  A    I started -- well, I left Marathon because my wife had

18  stomach cancer and I decided she's my wife over my career.

19  After she died, I ended up being -- setting up and

20  organizing a banker's bank which basically provided --

21  eventually provided lines of credit for mortgage bankers.

22  And I worked for two other banks.

23       At the same time, I was setting up one of the original

24  directors for ICBA Mortgage, which is a mortgage company

25  that represents 1500 -- or did then -- 1500 banks across the

Page 112

1    United States, which would sell loans to ICBA Mortgage who

2    then would offer them to PHH Mortgage at the time.  I think

3    it's called One Mortgage now.  And then PHH would sell the

4    package into the secondary market.

5    Q    Were the loans originated under sort of ICBA's umbrella

6    subject to representations and warranties?

7    A    Oh, yes.  We had those and an agreement with PHH also

8    on the repurchase, if necessary.

9    Q    Did you negotiate those representations and warranties?

10   A    Yes, because I had the experience to do it so I got

11   involved.

12   Q    Were those also similar to the representations and

13   warranties you saw here?

14   A    Yes.

15   Q    Did there come a time when you started your own

16   consulting firm?

17   A    Yes.  I started being a consultant expert witness in

18   1995.  Part of this time when I started, my wife was still

19   going through chemo, so I had to find something to do and I

20   did that.  But I enjoy the work, and I stayed with it.  And

21   I had banks who would call me up and come in and do

22   consulting work, do quality control audits on their loan

23   portfolio, that kind of thing.

24   Q    In addition to financial institutions, did you do

25   consulting work for the GSEs?

Page 113

1    A    Yeah.  I've worked for Fannie Mae, Freddie Mac, VA,

2    FHA, all of them in doing either putbacks or -- well, mostly

3    putbacks with them over the years.

4    Q    Did that work involve reviewing pools of loans for

5    potential guidelines, breaches?

6    A    Yes.  That's exactly what it was is that they had reps

7    and warranties and underwriting and we were putting them

8    back for breaching of the reps and warranties and

9    underwriting.

10   Q    And I'll get to your expert work.  But in addition to

11   these financial institution positions, have you ever been

12   involved in other organizations in the mortgage industry?

13   A    Yeah.  I'm an associate member of the Mortgage Bankers

14   Association.  I was in some years ago the chairman of the

15   California -- excuse me -- Bankers Real Estate Committee.

16   As I said, I'm involved in the mortgage company.  I've been

17   involved in mortgages for years.

18   Q    Just so we have a clear summary here.  During the

19   course of your career, did you have occasion to develop

20   expertise in mortgage loan origination and underwriting?

21   A    Yes.

22   Q    Did you have the occasion to develop expertise in due

23   diligence and quality control reviews of loan portfolios?

24   A    Yes.  That's part of what I've been doing.

25   Q    During the course of your career, did you have the

Page 114

1    occasion to develop expertise in buying, selling, and

2    pricing mortgage loans?

3    A    Yes.

4    Q    How about the factors affecting mortgage loan and

5    pricing?

6    A    Yes.  Well, that's true of all loans, so mortgage loans

7    are no different than anything else, the risk involved and

8    the, you know, terms and that kind of thing.  So, yes.

9    Q    You may have answered this next question, but did you

10   develop expertise in evaluating this mortgage loan?

11   A    Yes.

12   Q    Did you develop expertise in the effect of borrower

13   misrepresentations or other defects on mortgage loans

14   including their materiality under applicable reps and

15   warrants or adverse and material effect standard?

16   A    Yes.

17   Q    And have you developed expertise in connection with the

18   purchase claims and the standards and evidence customarily

19   used in the mortgage banking industry for such claims?

20   A    Yes.

21   Q    Does that experience include repurchase claims both

22   before and after the financial crisis in 2008?

23   A    Yes.

24   Q    Does it include repurchase claims for both active and

25   liquidated loans?

Page 115

1   A    Yes.

2   Q    When did you begin serving as an expert in residential

3   mortgage loan repurchase litigation?

4   A    About 2000 -- well, actually it goes even before that,

5   but you're talking about if it's -- are you talking about

6   RMBS's or are you talking about just repurchase?

7   Q    Repurchase.

8   A    Gosh, I've been involved in that through my whole

9   career putting back loans that are that way.  But I would

10  say that based on a package of loans, probably in 2005,

11  2006.

12  Q    Have you been qualified as an expert in those types of

13  cases?

14  A    In some instances.  I've been fortunate that a lot of

15  the cases that are involved get settled before I go to

16  court.  I've given a lot of depositions, but I haven't had

17  too many court cases.

18  Q    So, you have been qualified, correct?

19  A    Yes.

20  Q    And just as an overview, which types of courts have you

21  been qualified?

22  A    Bankruptcy, federal court, state courts.

23  Q    And you're an expert regarding the underwriting on

24  behalf of the Unofficial Creditors Committee in ResCap

25  bankruptcy, correct?

Page 116

1    A    Yes.

2    Q    What was your assignment in that case?

3    A    Was to -- was to evaluate a random sampling that was

4    provided by Brad -- Dr. Brad Cornell for reliability of a

5    putback pool.

6    Q    Was that -- were you underwriting to reps and warrants

7    in that case or to guidelines?

8    A    Guidelines unless there was -- some of the reps -- the

9    rep and warranty covered guidelines there and they may have

10   duplicity in the sense that it may say that you have to have

11   underwriting but also you have to have an appraisal and

12   that.  So, it was basically the guidelines and there was a

13   misrepresentation, of course, rep and warranty that we also

14   underwrote to.

15   Q    And you have been retained by Lehman or Aurora four

16   times, correct?

17   A    Correct.

18   Q    And are the matters listed on TRDX-253?  That's the --

19   A    (Indiscernible).

20   Q    It's on the screen in front of you.

21   A    No, it's --

22          MR. LIEBERMAN:  His screen's off.  Does he have a

23   --

24   A    What did you say, TRX what?

25   Q    No, no.  It's --

Page 117

1   A     Oh, okay.  Oh, I do have one here.  I do have it.

2   Never mind.

3         (Off Topic Conversation)

4   Q     Do you need me to repeat the question?

5   A     No.  I've worked for -- I've been hired as an expert

6   for Lehman Brothers and twice for Aurora Bank and once for

7   Aurora Commercial Court.

8   Q     Okay.  Thank you very much.  And what was the nature of

9   your assignments in those cases?

10  A     These were putback assignments.

11  Q     So, can you be more specific?

12  A     Yeah.  Basically, it was --

13              MR. ROLLIN:  Your Honor?

14              THE COURT:  Yes --

15              MR. ROLLIN:  I object --

16              THE COURT:  -- Mr. Rollin?

17              MR. ROLLIN:  Thank you, Your Honor.  I object to

18  any questions answered with respect to the particulars of

19  any work for Aurora.  During deposition, Mr. Morrow asserted

20  that there was confidentiality and wouldn't testify about

21  details absent a waiver.  He's not been approached about

22  that by counsel in the interim, so I'd ask that with respect

23  to Aurora, with respect to details that that not be granted.

24              MR. LIEBERMAN:  What I had planned on asking him,

25  that's all publicly available on PACER dockets.  So, I'm not

Page 118

1    going to ask him anything (indiscernible).

2              THE COURT:  If he was not permitted to answer

3    during the deposition, why should you be permitted to elicit

4    that testimony now?

5              MR. HEALY:  Your Honor, I don't think that he was

6    asked specifically about this, and it was the second day of

7    his deposition.  My recollection is he specifically noted

8    that he had done work for Aurora or OBHI.  I don't think

9    there were any questions about it.  He certainly was not

10   asked about any public filings that had been made or any

11   report that he has submitted.

12             THE COURT:  Well, why don't we -- Mr. Rollin seems

13   to have something in mind, so why don't we hear what it is

14   and then we can figure out the answer.

15             Mr. Rollin?

16             MR. ROLLIN:  Thank you, Your Honor.  The

17   questioning happens at page 279 of the first day of Mr.

18   Morrow's deposition.  It goes on to 280.  The question is by

19   Mr. Davis.

20   "Q   What matters that you are referring to?

21   "A   Aurora Commercial Corporation versus Universal American

22   Mortgage Company.

23             It's on the first page about halfway down.

24   "Q   Tell me what you did in that case.  What was your role?

25   "A   As I remember, although I have a confidentiality, do

Page 119

1    you want to waive the confidentiality for Aurora?  I have to

2    disclose it here, but particulars, I don't know if I can.

3    "Q   Was that case publicly filed?  It looks like it.

4    "A   Yeah.  I filed my depo, so I don't know if it's

5    publicly filed or not, but you know it's there."

6            And then there were some questions about -- I'll

7    just read it.

8    "Q   So, you had your deposition taken in that case?

9    "A   Yes.

10   "Q   Who were the lawyers you were working with?

11   "A   I have no idea.  I don't keep records like that.

12   "Q   Do you remember the name of the law firm at all?

13   "A   No.

14   "Q   Did you have to testify about the trial in that case?

15   "A   No."

16           That's the series of questions with respect to

17   that issue.  But what he's asserting on page 280 at line 5

18   is he has confidentiality.  He's asking for a waiver, and

19   he's not going to disclose for it.

20           MR. LIEBERMAN:  I don't think I'm asking him

21   anything beyond what he actually testified to on that.

22           MR. ROLLIN:  No, well, you're asking -- Mr.

23   Lieberman is asking him for the specifics, in fact, I think

24   important in the last series of questions, to go into some

25   of the specifics of the work that he did.

Page 120

1          THE COURT:  that was the question.

2          MR. ROLLIN:  With respect to LBHI, I have no

3  objection.  With respect to Aurora --

4          MR. HEALY:  Your Honor, I think this will be

5  obviated because Mr. Lieberman is going to be referencing a

6  public filing made by counsel for Aurora which describes

7  generally that Mr. Morrow was being -- for what purpose he's

8  being offered.  I think that is all a matter of public

9  record.  Mr. Morrow was not asked about and was not

10 prevented from answering any questions about any public

11 filing.

12         THE COURT:  Are you going to show him this

13 document?

14         MR. LIEBERMAN:  I can do that now.  I was going to

15 get there, but.

16         MR. ROLLIN:  Your Honor, my objection stands.  He

17 asserted that there was confidentiality.  He asked for a

18 waiver of confidentiality from lawyers who don't have the

19 authority in the deposition to give a waiver.  And in the

20 intervening several months --

21         THE COURT:  Well, that's why I think it's not

22 appropriate to put it on the witness to determine the line

23 between what's confidential and what's not.  I don't really

24 see what purpose it serves to show him a public document and

25 ask him questions about it.  I just don't.  You want to show

Page 121

1    him a public document and have him say what, it's a public

2    document?

3              MR. LIEBERMAN:  Yes, I would -- and it details --

4              THE COURT:  How --

5              MR. LIEBERMAN:  -- the work that he did in one of

6    the cases.  It's not one of that was asked about here.

7              MR. HEALY:  Then that'll breach the

8    confidentiality.  He said he wasn't --

9              THE COURT:  Could you approach, please?

10        (Sidebar conference from 2:45 p.m. to 2:47 p.m. - not

11   transcribed)

12   Q    Mr. Morrow, can you please turn to Document TRX-1034 in

13   your binder?  It's in Volume 2.

14   A    Yes.

15   Q    Do you recognize this document?

16   A    Yes.

17   Q    What is it?

18   A    It's my designation as an expert witness for -- under

19   Rule 26 -- for Aurora Commercial Corp.

20   Q    Can you read me the highlighted sentences from

21   paragraph 1, starting with "Mr. Morrow"?

22   A    Okay.  "Mr. Morrow has been qualified in various courts

23   as an expert for mortgage and real estate lending matters

24   including, among other things, underwriting, funding,

25   servicing, correspondent lending and broker duties,

Page 122

1    secondary market purchasing, mortgage warehouse lending.  He

2    is expected" -- "he is expected to testify herein as to his

3    education, training, background, experience, and knowledge

4    of the industry and its standards as applicable to the

5    purchase -- loan purchase agreement and the related

6    contractual agreements between the parties in this case."

7    Q    Can you read the last sentence, please?

8    A    "Morse specifically, he's expected to testify that each

9    of the specific loans in this action materially breached

10   terms of Aurora's Seller's Guide and to provide testimony in

11   accordance with his March 13th, 2014 expert report of J.F.

12   Chip Morrow filed herein" -- "herewith."  I'm sorry.

13   Q    Thank you very much.  Did you file that -- did you file

14   the report in that case?

15   A    The attorneys did.  I didn't.

16   Q    Thank you.

17            MR. LIEBERMAN:  Your Honor, the Trustees offer Mr.

18   Morrow as an expert in the residential mortgage banking

19   industry, including residential mortgage loan origination,

20   underwriting, the buying, selling, repurchase of mortgage

21   loans as well as residential mortgage lending, due

22   diligence, quality control, and forensic reviews.

23            THE COURT:  Okay.  Any objection?

24            MR. COSENZA:  No objection, Your Honor.

25            THE COURT:  Okay.

Page 123

1    Q    Mr. Morrow, I'd like now to talk about your engagement

2    in this matter.  Can you turn to TRX-1368 which we've

3    already identified as your affirmative report?

4    A    Yes.

5    Q    And can you tell me what you were engaged to do in this

6    case?

7    A    Well, I was engaged to -- we underwrite 600 sample

8    loans of the approximately 76,000 sample loans that Dr.

9    Schwert identified.  Second, I was to address Mr. Grice's

10   assertions regarding the Trustees or the Trustees' process,

11   which I guess everybody's picked up Aronoff's process and

12   identified the breaches that were either agreed to or

13   disagreed with the breaches that he found regarding the

14   loans on an individual basis.  And then to give an

15   independent assessment as to the reliability of Mr.

16   Aronoff's process.

17   Q    And when were you first engaged to conduct this work?

18   A    About June 2nd I believe of last year.

19   Q    Thank you.  You testified earlier that you have

20   experience conducting loan reviews in connection with

21   litigation, correct?

22   A    Yes.

23   Q    And was this engagement similar to -- the review

24   conducted in this engagement similar to those other reviews?

25   A    Yes.  Yes.

Page 124

1    Q    And you also testified that you have experience

2    conducting due diligence and quality control reviews more

3    generally of the mortgage loan --

4    A    Yes.  I've done it for RMBS's, but I've also done it

5    just for loan portfolios in general.

6    Q    And based on that experience, is it industry practice

7    to conduct quality control reviews or audits of mortgage

8    loan pools using a simple random sample?

9    A    It's absolutely essential.  If you are involved with

10   any federal agency, including FHA, Fannie Mae, Freddie Mac,

11   all of them say that you're required to do a random sampling

12   of the loans for your quality control.  And it specifically

13   says that if -- it's a random sampling.  No statistical

14   sampling; it's random sampling.

15   Q    Do you mean the stratified sampling?

16   A    Whatever.  It's random sampling.

17   Q    Okay, let's turn to a summary of your opinions.  Could

18   you provide the Court with an overview of the affirmative

19   opinions that you offered?

20   A    Yes.  My opinion.  This is based on Mr. Grice's --

21   having considered Mr. Grice's responses, which came after --

22   actually, way after my report filed to the individual loans.

23   So, this number is 92.6 percent of the 897 individual reach

24   findings identified by Mr. Arnold's process; 831 of those I

25   found that I agreed with.  That's a very high agree rate.

Page 125

1    It's actually normal for the industry if you're underwriting

2    loans for per the industry.  For...

3           And then I found based on that, of course, is that

4    the -- that those breaches that I agreed with were

5    materially affected the value -- the risk and the actual

6    value of the loan.  And then I -- and of that, 556 or 44

7    loans...  92...  Well, actually, 556, 92.7 of the loans had

8    material breaches.  So, that's a very reliable number.

9    Q    Just to -- we'll get into this in more detail but just

10   to touch on something that you alluded to.  You filed a

11   rebuttal report and you had done an initial review, I think

12   -- and then after that, Mr. Grice responded, correct?

13   A    Yes.

14   Q    And then this represents your sort of final tally after

15   Mr. Grice responded?

16   A    Correct.

17   Q    Okay.  We'll get to the details of that.  Thank you.

18   And then based on the conduct of your review, did you read

19   some conclusions about at least the 76 -- the process used

20   to identify the 76,000 loans?

21   A    Not on the 76.  You mean as far as the -- the 600 shows

22   that the 76 had a higher liability for the breach findings

23   on those loans.

24   Q    Okay.  And did you reach any conclusions about how that

25   process was conducted, based on what you saw?

Page 126

```
 1   A    Well, that it was conducted according to industry

 2   standards and practices.  That it was done correctly.  I've

 3   had a lot of experience with the underwriting houses that

 4   were involved with -- in doing the original Aronoff --

 5   Aronoff process.  And they follow the industry and I

 6   verified that through my 600 loans that I did re-

 7   underwriting of.

 8   Q    Thank you.  Did you also file a reply report in this

 9   case?

10   A    Yes, I did.

11   Q    And can you turn to TRX660?  That should be in the

12   first binder.  Do you recognize this document?

13   A    Yes.

14   Q    What is it?

15   A    It's my -- it's an expert reply report to Mr. Grice's

16   criticisms of Mr. Aronoff -- Aronoff's, sorry, Aronoff's

17   process where he states that Mr. Aronoff was not

18   independent, that there wasn't a -- which isn't true.

19   That's not...  And he wasn't involved in the process.  And I

20   responded to that.

21   Q    Did you -- you offered an opinion?

22   A    Yeah.  That it...  He -- the way Mr. Aronoff designed

23   the program, ran the program is the same way I've run

24   programs for well over 20-25 different RNBSes.

25   Q    Did -- and you also offered your view that your review
```

Page 127

1    was independent?

2    A    Oh, yes.  That was part of why we -- I was -- I did an

3    independent review.  So, that was a double check on Mr.

4    Aronoff's process.

5    Q    Let's move on to the details of your loan review.  You

6    testified that you were contacted and engaged in early June?

7    A    Correct.

8    Q    Okay.  And did you have assistance in conducting your

9    review?

10   A    Yes.  The -- a firm that I had worked with before in

11   doing re-underwriting quality control, ICG, which is here in

12   New York -- been in business for, what?  Since '99.  So, 18

13   years.  They were employed to work with me in this program.

14   I personally interviewed all the loan underwriters that were

15   involved.  I had worked with all the loan underwriters in

16   prior engagements so I knew them.  So, that's who was

17   involved besides myself.

18   Q    And you were familiar with their work prior to this

19   project?

20   A    Yes.

21   Q    And what else did you do to satisfy yourself the team

22   would be able to conduct the work according to your

23   standards?

24   A    The way to run a quality control audit or re-

25   underwriting is with -- this is my opinion, this is the way

Page 128

1    I run it, and this is the way that I've actually had the

2    various GSEs that look for (indiscernible) -- is that we

3    always did a smaller group of loans.  In this case we did 15

4    loans we re-underwrited -- re-underwrote.  ICG re-underwrote

5    15, I re-underwrote 15 independently.  So, if you want to

6    call it a cold -- cold look.

7            After we -- they arrived at their conclusions and

8    I arrived at my conclusions, then we compared the two to see

9    if they're on the same page as I did.  They -- as I

10   remember, the 15, they found the same conclusions I did as

11   far as the loans are concerned.  We then started re-

12   underwriting batches of loans of about 50-70 at once.  Or

13   they undertook it and I undertook 50-70, and we continued to

14   basically do independent re-underwriting for the whole

15   portfolio.

16   Q    When you say re-underwriting, can you describe that

17   that process included?

18   A    Well, basically, re-underwriting is taking the existing

19   loan package, taking the loan package...  You don't re-

20   underwrite guessing what's missing or what should be there

21   or maybe; it's all based on what's in the loan file.  And

22   that's what we had.  So, we underwrite -- wrote to that --

23   to that.  And a loan file can be -- as a matter of fact, I

24   think the loan file -- we have one loan file with a note

25   (indiscernible) it was like, 12 pages.  But then we had

Page 129

1   others that had 3,000 pages.  So, sometimes you could do a

2   re-underwriting in, you know, a half hour; sometimes it took

3   you many hours.  So...

4   Q    Did that also depend on the nature of the things that

5   you were reviewing?

6   A    Well, we didn't...  We went and actually audited before

7   we even said that there was the claim.  Our goal was to

8   audit the file to see if we agreed; not audit -- agree and

9   then audit the file.  So, that's the way I work.  I don't --

10  if you want to hire somebody who's a yes-man, then you don't

11  want me.  I always take a file as what's in it, review it,

12  and then I check to see if I agree or disagree.

13          THE COURT:  Can I ask a follow-up question on that

14  specific point?  You said no guessing.  What's in the file

15  is what you are looking at.

16          MR. MORROW:  Yes.

17          THE COURT:  So, to the extent that any number of

18  these files among your sample were contained -- it's kind of

19  a misnomer -- contained missing documents, had documents

20  that were not in the file?

21          MR. MORROW:  Correct.

22          THE COURT:  What was your convention, or

23  assumption, or direction, or conclusion in those instances

24  as to the existence or not of that missing document, as to

25  whether or not it was in the file at origination?

Page 130

1          MR. MORROW:  It -- when you do re-underwriting,

2    and this is -- I base it on the Fannie Mae-Freddie Mac.  If

3    it isn't in the file, it didn't exist at origination.  And -

4    -

5          THE COURT:  So, if it's not in the file the moment

6    that you had it in your hands, your conclusion was that it

7    wasn't in the file at origination?

8          MR. MORROW:  Right.  And you would go back to the

9    originator and say, "Originator, we don't have this.  Give

10   us your copy." And if they don't produce it, you could give

11   the loan back because that's the way...  They're supposed to

12   keep a copy somewhere.  I don't know...  You know, most of

13   us do, in the industry, have computers now and everything's

14   on microfiche or computer things.  So, they can go look at

15   their file -- the loan file and produce it from the

16   originator's point of view or whatever.  But it's not the

17   responsibility in the industry for the re-underwriter to

18   decide well, it should've or could've, whatever.  It's

19   what's in there is...  If it's not there, it's not there.

20         THE COURT:  Thank you.

21   Q    Just to step back a second, did you vet the reviewers

22   you worked with?

23   A    Yes, I did.  I interviewed all of them.  I actually had

24   worked with them before and I did talk with all of them

25   again.  Actually, two interviews.

Page 131

1    Q    When you say you were reviewing a file, did you review

2    every page of every loan file?

3    A    I... No, I didn't.  Personally, me, no.  ICG, which is

4    the underwriter, they did.  I wouldn't necessarily review

5    the whole file.  If it was 3,000 pages and I -- I found a

6    material breach early on in the file, I didn't necessarily

7    go through the full 3,000 pages or whatever it was.  So,

8    that's experience, I guess, as to what it is.  But I did

9    look at every file and either found it or didn't find it.

10             If I disagreed with the file, I had gone through,

11   completely through the file to see if I could find --

12   through the file.  Because if I disagreed, I wondered why I

13   disagreed and maybe there was something else in the file.

14   Q    If you agreed, though, you would have reviewed -- did

15   you review the portions...?  How did you calibrate --

16   A    Well, it's the portions that were there.  If I reviewed

17   the file on a basis and there's obviously an income

18   misrepresentation because we've got a tax return for 2006

19   sitting in the file that says they're making a lot less than

20   what they put on the application -- I would still review the

21   file for it, but basically that's proof that there's a

22   misrepresentation and it supports -- supporting Mr.

23   Aronoff's process.

24   Q    And so since you were working in conjunction with ICG,

25   who made the file decision as to agree or disagree?

1   A    I did.  They would put forward their information and I

2   made the final decision for agree or disagree as well as

3   whether it was material or not.

4   Q    And what's the result of these reviews?  Were those

5   reflected in Exhibit D to your affirmative reports?

6   A    Yes.

7        THE COURT:  When you said also as to whether it

8   was material or not, do you mean as to whether a breach was

9   material or whether a material breach had an adverse and

10  material effect on a loan?

11       MR. MORROW:  The second.

12       THE COURT:  The second.  Thank you.

13  Q    So, I'd like you to turn to TRDX1369, which is in your

14  binder, the second binder.  And I will...  If you'll take my

15  word for it, this is an excerpt from a very large exhibit,

16  but I don't think anyone needs to be (indiscernible) for the

17  points I want you to go through.  But do you recognize this?

18  A    Yes.

19  Q    What is it?

20  A    I read it too many times.

21  Q    Yeah.  What is it?

22  A    It basically is a summary of the findings...  It's a

23  lot more than that.  It's -- what this is is the process

24  that Aronoff went through with the responses to the Debtor's

25  position and then Mr. -- then our notes, the notes there.

Page 133

1   Do you want me to go through the columns?

2   Q    Let's take it by piece.

3   A    Okay.

4   Q    Piece by piece.  What information on this --

5        MR. COSENZA:  Your Honor, can I clarify -- I just

6   want to make sure for the record.

7        THE COURT:  Yeah.

8        MR. COSENZA:  Is this the version that was

9   produced the day before his deposition?

10       MR. LIEBERMAN:  Yes, it's updated.

11       MR. COSENZA:  Updated.  Okay, so this is the one

12  that was produced right before his deposition?

13       MR. LIEBERMAN:  Correct.

14       MR. COSENZA:  Okay, thank you.

15  Q    Sorry.  What information were you provided at the

16  outside of your review?

17  A    I was provided the column from loan number to Debtor

18  position.  What it is is this is a loan number, breach

19  number, which is for computer use, the trust, what the

20  breach finding was, what the provision of the reps and

21  warranties was breached; then the factual basis is a summary

22  of what the Aronoff audit found.  This next line is why it's

23  material.  And then the Debtor's position.  And this is very

24  simple -- this is why -- the Debtor's position is really not

25  an analysis of the loan; it's just a statement, in my

1    opinion.

2    Q     And then moving on, is this Agree/Disagree column,

3    those are your findings?

4    A     Those are my findings.  And the notes are my notes from

5    my audit, and from ICG's -- or from my re-underwriting and

6    ICG's re-underwriting.

7    Q     Who prepared the notes?

8    A     ICG prepared the notes.  I reviewed it and made final

9    decisions on that.  The next column is the source documents.

10   These are the Bates-Numbered documents that support the

11   notes and would support the factual basis.  So, we actually

12   gave where you go to get information -- where you would go

13   in the loan file to get the information that is involved.

14   Q     And did there come a time that Mr. Grice responded to

15   your review?

16   A     Yes.  But it was sometime in September, I believe.

17   Q     With his reply report?

18   A     No, it was after -- his reply report we got the

19   information on.  I don't think at the same time even.

20   Q     Did -- and is that reflected as you turn the page to

21   the next...?

22   A     Well, actually it's reflected.  One is the loan status.

23   That unresolved is from -- that's the PA's or Debtor's

24   position whether it's unresolved or not.  And then the back

25   page, the light blue is Grice's review response.  And then

Page 135

1    the next line is documents that he says support his

2    position.  We found on over 95 percent of the time that he

3    was giving the same documents that we cite, he's citing.

4    Q    Did -- so you reviewed Mr. Grice's responses?

5    A    Yes.  Individually.  And rewrote -- at that time, we

6    decided that the best way to incorporate Grice's comments on

7    each loan and do it, is to re-underwrite each loan.  So, ICG

8    went back and re-underwrote the loans, and I on a second

9    time re-underwrote all the loans.

10   Q    When you say --

11   A    So, we've had four underwritings of these -- of each of

12   these 600 loans to arrive at our conclusions here.

13   Q    And that means, when you say re-underwrite, what do

14   you...?

15   A    Well, I mean that we -- ICG re-underwrote the same loan

16   file that they had originally along with any information

17   provided by Lehman Brothers subsequently, also, was

18   included.  And they did it twice.  Once for the first -- for

19   my rebuttal report and then for this final updated Exhibit

20   D.  And I also did both.  I did it for my report and then I

21   did it for this updated D.

22   Q    So, based on the review after Mr. Grice's comments, did

23   you reexamine or change any of your conclusions?

24   A    Yes, I did change ten loans -- were based on Mr. Grice

25   and also documents provided us by Lehman after the fact.  We

Page 136

1    changed 13 breaches.

2    Q    On ten loans?

3    A    On ten loans.

4    Q    And, generally, what was the basis for those types of

5    changes?

6    A    We -- generally, they were appraisal.  We -- there were

7    more than one appraisals in a file and -- or appraisal pages

8    were missing, and Mr. Grice pointed out the other appraisal

9    pages.  They were...  They were documents that were pointed

10   out by Mr. Grice.

11   Q    Okay.  And outside of those particular instances,

12   generally, what -- how did -- what did you think of Mr.

13   Grice's criticisms?

14   A    Well, Mr. Grice's comments are, in my opinion, not

15   according to the industry.  You don't speculate on why

16   someone's occupancy wasn't done, why somebody didn't occupy

17   the property; you don't speculate that a tax return is

18   untruthful or bankruptcy's untruthful, or certain things you

19   don't -- that's not your job in re-underwriting.  Re-

20   underwriting is the loan file speaks for itself.

21   Q    I want to look at one example.  For everyone's benefit,

22   I don't want to delve back into loan files.  But on TRD --

23   TRDX1369, the first page that's excerpted is Page 137.

24   A    Yes.

25   Q    Okay.  And if you could take a look at the loan number

Page 137

1   ending 4602, it's the first row of -- on that page.

2   A    Yes.

3   Q    And review the breach narrative and tell us -- just

4   give us a summary.

5   A    Well, we have a -- the borrower provided us with a W-2

6   statement for 2006, which is the same year as the loan is

7   concerned.

8   Q    Okay.

9   A    He has said that his income was 11,500.  Base income.

10  Base income.  When we took his W-2, he was making 72 -- 72 -

11  - 7,252 a month.

12  Q    And now I'd like you to turn to Mr. Grice's review

13  response, and I just want to take -- he's got two points

14  here, so if you'd take the first point first.

15  A    Well, his first point is that his employment was

16  verified by calling up and saying, "Are you employed?" And

17  they don't verify income.  They verify -- they don't even

18  verify years necessary, but they verify -- "Have you been

19  working there more than two years?" and "Are you currently

20  employed?" That's all.  It doesn't -- years don't matter --

21  I mean, and they do not verify dollar amount.

22  Q    Okay.  At least here we don't see Mr. Grice identifying

23  that income was verified, correct?

24  A    No, but he implies it based on the earlier one.

25  Q    Okay.  And then let's move to the second point he makes

Page 138

1    here.

2    A    Well, his point is that the W-2 isn't reflective of

3    what -- may not be reflective of what money he makes on an

4    ongoing basis.  However, when we redid the -- when we did

5    the underwriting, this is part of what you do for

6    underwriting, is we verified that Mr. -- that the borrower

7    was still working for the same company in 2007.

8           So, if you're working for the same company in 2007

9    as you are in 2006, why wouldn't you be able to use -- in

10   the industry you use -- you can use 2006 as an indication of

11   whether the guy made a misrepresentation or not.  You have

12   another party for verification.  But you don't necessarily

13   put all that down in your thing.  It's normally enough that

14   you get a W-2.  In the industry, you put it back.

15   Q    Does Mr. Grice contest that the W-2 is there or that it

16   says what the Trustee said it said?

17   A    No.  He always gives some kind of speculation as to why

18   it couldn't be totally trusted.  Therefore, it's been --

19   yeah.  Speculation has nothing to do with re-underwriting.

20   Q    And can you read the last sentence of the...?

21   A    It says the 2006 W-2 is uncollaborated, it's not

22   representative of the borrower's income at the time of

23   origination.  As I said, we didn't just cite 2006 W-2s just

24   to cite; we had to had something of 2007 that we would call

25   and say, "Yeah, we're still working here" or something so

Page 139

```
 1   that we had an indication, yeah, it was for years.

 2   Q    Do you need to have -- if you had something like this

 3   in your W-2, do you need to have corroborating evidence?

 4   A    No, because the borrower provided this to -- provided

 5   it to the servicer.  That's the only way they would get it.

 6   And if he only -- if he lost his job or something, he's

 7   going to write a letter saying -- it's obvious that he

 8   provided it.  The only reason that the servicer would have

 9   it is the borrower's having a problem making the payments

10   and wants to get some kind of modification or something else

11   like that.

12            Based on that, there would be comments if there

13   was something unusual that you couldn't depend on the W-2.

14   And there was nothing in the file that indicated that this

15   W-2 was not representative of what he made that year.  Also

16   note that we're giving him credit for his full pay W-2.  So,

17   this full pay includes overtime, any bonuses he would get,

18   any commission, and it still is way under.

19            So, there's -- you can't have a...this is...our

20   arriving at this conclusion is valid and accepted in the

21   industry.

22   Q    That it's based on your experience in the industry?

23   A    Absolutely.

24   Q    Did Mr. Grice's criticism cause you to change your

25   judgment as to whether certain types of evidence were
```

Page 140

1   sufficient to support breach findings?

2   A    No.  Not unless there were specific documents provided

3   that were in -- that were in the loan file or were part of a

4   loan file that wasn't originally produced to us.  That's the

5   only way that we would change our opinion.

6   Q    Okay.  Let's take a look at sort of the overall

7   conclusions from your review, which I think will come up as

8   TRDX259.  It'll be in your packet.  Do you recognize this

9   chart?

10  A    Yes.  Sorry.

11  Q    Is it from your report.

12  A    Could we take a break?

13  Q    Sure.

14  A    I would appreciate...

15          THE COURT:  Yes.  I was just going to suggest...

16  I'm going to turn the heat off because it's getting -- it's

17  getting to be a little like a sauna in here.

18          MR. MORROW:  Thank you.  I appreciate it.

19          THE COURT:  So, why don't we take a good ten

20  minutes and come back at 3:30.  And could I have some

21  indication of what the rest of the day looks like?

22          MR. LIEBERMAN:  I think we probably have 45

23  minutes.

24          THE COURT:  45 minutes to complete Mr. Morrow's

25  direct?

Page 141

1              MR. LIEBERMAN:  Yeah, Mr. Morrow's.  Right.

2              THE COURT:  Okay.  And would it be your intention

3       -- I don't know who I'm talking to over here.  Mr. Rollin,

4       is it you?

5              MR. ROLLIN:  It's Mr. Rollin.

6              THE COURT:  To start the cross-examination today

7       or did you want to call it a day?

8              MR. ROLLIN:  I probably want to call it a day, but

9       maybe more of a game time decision, Your Honor.

10              THE COURT:  Okay.  Let's come back at 3:30 and

11       we'll go from there.  And you are welcome to take your

12       jacket off, Mr. Morrow.

13              MR. MORROW:  Oh, thank you.

14              (Recess)

15              THE COURT:  Okay.

16              MR. LIEBERMAN:  Thank you very much, Your Honor.

17       Q    Before we left we were going to look at TRDX259.  And

18       just so you're clear, do you recognize this chart, Mr.

19       Morrow?  It's on the screen, Your Honor.

20       A    Yeah.

21       Q    Is it from your affirmative report?

22       A    Yes.

23       Q    Thanks.  And it reflects that you agreed in the bottom

24       there with 831 of the 897 breaches that you reviewed?

25       A    Yes.

Page 142

1    Q    And this is after you've made the adjustments sort of

2    responding to Mr. Grice, correct?

3    A    Yes.

4    Q    In general, can you tell me the types of breach

5    findings that you disagreed with?

6    A    Well, they're on there --

7    Q    But rather than categories can you just tell me like,

8    things that you saw in the file as a general matter that

9    caused you to disagree with the finding?

10   A    Well, in general, we would find an additional document

11   -- sometimes it was because we got additional files or

12   additional documents provided to us by Lehman; sometimes it

13   was -- we just got additional documents.  And that's

14   basically why we disagreed -- disagreed with the finding.

15   Q    And so this was -- I'm sorry, when you talk about

16   additional documents, sometimes they were in the file?

17   A    Sometimes they were in the file, sometimes they weren't

18   in the file.  It depended on -- as I said, we would have one

19   appraisal and then Mr. Grice may point out that there's

20   another appraisal 300 pages back.  And we were missing a

21   page or the signature page of the appraiser, as I remember,

22   on one and it happened to be a separate sheet back -- way

23   back in the back of the file.  We ended up finding it and

24   that's why we took it off.

25   Q    Somebody missed it?

Page 143

1    A    Yeah.  And that's why -- yes.

2    Q    Okay.  And just -- in your experience conducting

3    quality control reviews, did you expect that you would find

4    a 100 percent agree rate?

5    A    No.  You...  If you do, something's wrong.  You haven't

6    got humans involved.  No, you don't.  That's why quality

7    control is 95 percent -- you do random sampling, you do a

8    sampling of 95 percent comfort level, and then you do it.

9    And I have never seen it where you don't have it there.

10            What normally happens here is that the ones that

11   we disagreed with, you would -- we may end up being able to

12   find documents produced by the other party.  In this case

13   it'd be the Debtor.  And that's what happened here.

14            We pointed out documents that were there that the

15   Debtor -- some of these loans that were 600 were unresolved

16   and we ended up finding documents to make them, for all

17   intents and purposes, resolved.  So, it never is 100

18   percent.

19   Q    And as we discussed earlier, based on these results,

20   you concluded that the process for identifying the 76,000

21   loans, breach findings for the 76,000 loans was performed

22   according to industry standards?

23   A    Based on...  My reliability standard is -- yeah, based

24   on the industry, it would be a very good sample of what --

25   of the accuracy of Mr. Aronoff's, Aronoff's process.  Was

Page 144

1    definitely validated.

2    Q     And you saw verification methods and types of evidence

3    being used that you used and are common in the industry?

4    A     Yes.   Third party -- everything that is there, yes.

5    Q     Okay.   I would like to drill down on some of these

6    sources of methods with respect to what we've been referring

7    to here as sort of the big four borrow breaches.   Do you

8    understand what I mean by that?

9    A     Yes.

10   Q     Do you want to just -- misrep of income, misrep of

11   debt, DTI, and misrep of occupancy?

12   A     Yeah, excessive DTI.

13   Q     Excessive DTI.   Can you -- when you -- with these types

14   of breaches, can you describe the industry practices for

15   conducting a review to identify whether there are borrower

16   misrepresentations in the file?

17   A     Well, basically, we use either information provided by

18   the borrower, or information on a reverification of

19   information, or third-party information.

20   Q     Let's take this -- what type of information would be

21   provided by the borrower?

22   A     Well, in response to a request for a modification of

23   his loan he would forward a copy of his tax returns, or W-

24   2s, or bankruptcy papers.   They sometimes forward those.

25   Q     And other forms of proof of income like paystubs?

Page 145

1   A     That's W-2s.  I'm sorry.  I wasn't... Yeah, any kind

2   of income information would be provided by the borrower.

3   Q     Thank you.  And you referred to third party sources as

4   well.  What --

5   A     Well, third party sources would be Accurint and

6   LexisNexis, a lot of different third-party sources that

7   basically search public records and provide that information

8   to lenders.  In addition, you may have credit reports that

9   are run subsequent that show new debt that was there, the

10  date of the debt, that kind of information.

11        You also would have third party -- would be that

12  you -- it's a form -- but it's reverification of income.

13  You'll send a direct letter to the employer and say, "Here's

14  what they said.  Could you verify it?" You'd be surprised

15  how many employers will answer those kinds of letters and

16  say, "Yeah, Sally worked here and here's what she made." So,

17  you do -- basically, you do whatever you can to get

18  information to validate.

19  Q     Did -- in terms of the third-party sources, would those

20  include MERS?

21  A     Yeah, MERS is -- MERS -- basically most of the -- all

22  the big mortgage companies put their loans into MERS or

23  record them into MERS.  That way they save costs when they

24  sell a loan to somebody else.  There's a big controversy on

25  that.  But anyway, but the records are public records and

Page 146

1    they're available and they're through -- MERS will provide

2    it to you and sometimes LexisNexis has it on, and others.

3    Q    And the Work Number?

4    A    Work Number is a payroll service type information they

5    keep information on -- employers give their information to

6    it, and you can call them up or you go online and you can

7    get the information on employees.

8    Q    And did you use BLS in your career?

9    A    Yes.  BLS is the Bureau of Labor Standards.  That's

10   used in re-underwriting because it's not -- it keeps

11   statistics over the years and you can look at it and see

12   what the person's making or what the profession is making in

13   its geographic area and it's by percentages.

14           So, it -- a lot of -- you can't use like,

15   Salary.com because Salary.com is contemporary with the loan

16   that's involved.  You can only use it if you got it in 2006.

17   But BLS gives you information that you could utilize to see

18   if the salary is excessive based on what the employee makes

19   in that area of the country.

20   Q    And are all those types of documents you've used during

21   the course of your career -- the ones that you --

22   A    Extensively.  Every time.  Actually, I've used it -- I

23   know that the FDIC and Fannie uses it.

24   Q    And from what you saw during your review, were these

25   sources used appropriately by the Trustees?

Page 147

1    A     Yes.  That's part of what we checked on the 600, to see

2    if it was appropriate to be used.

3    Q     And in your experience, was it required by industry

4    practice to contact the borrower if you had other evidence

5    that there was a misstatement?

6    A     I have never -- on a quality control the documents in

7    the loan file are what speaks.  And you never contact the

8    borrower.  That -- no.  The borrower isn't contacted.  The

9    borrower -- like I said, the borrower may provide you

10   documents like their tax returns after the fact.  That you

11   would utilize.  But as far as you contacting the borrower or

12   even the originator, you never do.

13   Q     With respect -- thank you.  I wanted to talk about one

14   specific type of misrepresentation of income that we've been

15   discussing here.  You're aware that Mr. Grice testified

16   regarding how to verify income for a self-employed borrower?

17   A     Yeah, I was told.  Yes.

18   Q     Okay.

19          MR. LIEBERMAN:  I want to use an exemplar loan

20   that the Trustees disclosed to the plan administrator.  It

21   is not one of Mr. Morrow's loans that Mr. Morrow has

22   reviewed it.  It's not one of the 600 but it was one that we

23   disclosed to be used at trial to show how Mr. Morrow would

24   verify income.

25          THE COURT:  Give me the description again of where

Page 148

1   this falls in the universe of loans.  It's not one of the

2   ones that Mr. Morrow reviewed but it is...?

3            MR. LIEBERMAN:  It is -- the parties agreed and

4   exchanged -- identified exemplar loans that they would use

5   during direct examinations of witnesses.  And so, this was a

6   loan that was disclosed to them as one we might use on a

7   direct examination.  So, I'd like to use it with him to...

8            MR. COSENZA:  Your Honor, the parties did identify

9   exemplar loans, but this is not one that he opined on in his

10  report.  We were never given notice that Mr. Morrow would

11  look at this loan.

12           THE COURT:  I don't understand.  We seem to have

13  two competing sets of pretrial disclosures then.  I don't

14  know -- how can he give an opinion on something that he

15  hasn't previously given an opinion on before?

16           MR. LIEBERMAN:  I'm not really -- I'm asking him

17  to go through the documents and show how -- to the Court how

18  he would look at self-employed borrower's -- to verify --

19           THE COURT:  Did any part of Mr. Morrow's report

20  include his opinions on how he would review a self-employed

21  borrower?

22           MR. LIEBERMAN:  Mr. Morrow did review loans where

23  he reviewed self-employed borrowers.

24           THE COURT:  Then why can't he use one of those

25  loans instead of something new?

Page 149

1          MR. LIEBERMAN:  We didn't identify one of those

2     loans as a (indiscernible) so we wanted to use something

3     that had -- out of concern that if he previously disclosed

4     to the plan administrator as one that we were going to use

5     on direct.  And we didn't know --

6          THE COURT:  I just don't understand how you can

7     expand the scope of his opinion by pointing to a disclosure

8     of the use of loans.  The disclosure on the use of the

9     exemplar loans was a narrowing exercise so that everybody

10    knew what everybody else was going to do.  It wasn't

11    supposed to be an exercise that expanded things.  I don't

12    think this is a big deal, frankly, but I think that it does

13    expand...  It's asking Mr. Morrow to talk for the first time

14    now about something he's never talked about before.

15         MR. COSENZA:  That's -- from our perspective, Your

16    Honor, that's correct.  And I want to highlight that there

17    are 600 loans here, including many self-employed loans that

18    could've been used and used as exemplars.  And just the

19    history here is -- we were dumped -- all these narratives

20    were dumped to us the day before his deposition, which was

21    very -- almost coextensive with --

22         THE COURT:  We're not going to go through a new

23    loan for the first time today, notwithstanding that it was

24    on a disclosure.  If you want to take Mr. Morrow through a

25    loan involving a self-employed borrower that was part of his

Page 150

1    -- the loans that he reviewed, that's totally fine.

2              MR. COSENZA:  Thank you, Your Honor.

3              THE COURT:  Do you want a minute?

4              MR. LIEBERMAN:  Yeah, I want a minute, please.

5              THE COURT:  Sure.

6              MR. LIEBERMAN:  Thank you, Your Honor.

7              THE COURT:  Mm hmm.

8    Q    Mr. Morrow, we may come back...

9              THE COURT:  Okay.

10   Q    We'll -- I'm just going to ask the question generally.

11   Mr. Morrow, when you have a self-employed borrower -- first

12   of all, have you made loans to self-employed borrowers

13   during the course of your career?

14   A    Hundreds of thousands probably.

15   Q    And have you done quality control reviews involving --

16   A    Yes.

17   Q    -- loans of self-employed borrowers?

18   A    Yes.

19   Q    And did you review loans to self-employed borrowers

20   among the 600 loans that you reviewed for this case?

21   A    Yes.

22   Q    What information would you look to if you were trying

23   to audit the income figure for a self-employed borrower?

24   A    All right, this is a sole proprietorship.  We're

25   talking about Schedule C in the tax return.  It's the net

Page 151

```
 1    income at the bottom of a Schedule C.  It would -- it may

 2    show, you know, that he started making 45,000 but his net is

 3    30.  It's the 30,000 is what you would take as his income,

 4    not the 45.  Gross income is overstated because he has

 5    expenses and things.  And you would also verify that that

 6    30,000 or whatever it was also, I think, on Line 16 of his

 7    front tax returns.  That's the number to use.

 8          You never use gross.  It's always net.  And that's

 9    what I found when I reviewed Mr. Grice's comments on loans.

10    He was using gross and not net.

11    Q    And when you say never, is that based on your

12    experience in the industry?

13    A    Yes.  I reviewed 2 or 300 sets of underwriting

14    guidelines, and all of them have that.

15    Q    Okay.  I wanted to show you TRX1008.  And this is a

16    statement in court from Lehman seeking repurchase of a loan

17    to self-employed borrow.

18          THE COURT:  Can I ask you a question out of

19    curiosity, Mr. Morrow?  You've been doing this a lot longer

20    than I have, but I've seen a few of these loans now.  And I

21    find these loan applications confusing.  They're not a model

22    of clarity.  Is there anything in your experience that gives

23    a borrower guidance on how to fill out the loan application?

24    Is it -- you know, you think about it -- you talk about back

25    in the days when you were a young banker and a person
```

Page 152

1    might've come into your office and sat across from you, and

2    you helped them fill out the loan application.  I haven't

3    gotten the sense that that's a lot of what went on here.

4                MR. MORROW:  Oh, no, that's exactly what goes on.

5                THE COURT:  So, is that what went on?

6                MR. MORROW:  The originator, whoever's originating

7    loan officer, actually normally takes it over the phone or

8    in person.

9                THE COURT:  Okay.

10               MR. MORROW:  And does a handwritten application.

11               THE COURT:  Okay.

12               MR. MORROW:  Okay, based on the information that

13   the borrower gave them.  Then when -- and normally the

14   borrower signs that handwritten application and the

15   interviewer, and then they forward it to whoever's going to

16   underwrite it.

17               And then just before the loan is closed formally,

18   the application, which is typewritten based on the

19   information they got in the written application, it's

20   presented to the borrower and the borrower is required to

21   sign.  And the originator is -- signs also, saying that he

22   did it.

23               So, the cross-check is there to make sure that --

24   the information is gotten from the borrower; not from the

25   originator on a loan application.  And that's why -- exactly

1   what you said -- that's why the originator's involved and

2   gets paid.

3           THE COURT:  Okay, thank you.

4   Q    So, just to ask a follow-up on that.  So, in your

5   experience the mortgage broker originator is getting the

6   information from the applicant and filling out the form?

7   A    Directly from them.  And then --

8   Q    Okay.  And that originator or broker is -- you know,

9   this is what they do for a living, is fill out these forms?

10  A    That's what they do for a living, but the borrower

11  still has the obligation, because they're signing that under

12  perjury, to review it.  And I'm -- you know, income is

13  something that catches your eye, I mean, or what properties

14  you own, that kind of thing.  Yeah.  The borrowers review it

15  before they sign it.

16  Q    And you said it catches your eye when the borrower

17  would --

18  A    Well, it's a pretty prevalent number.  It's right at

19  the top of the second page.

20  Q    And was it something that you assume a borrower knows?

21  A    Yeah.  If it's wrong, you would think that the borrower

22  would say this is not correct because I'm signing this under

23  that.  And I know --

24          THE COURT:  Well, I guess the point is -- not to

25  interrupt you -- the ambiguity comes in, is if somebody has

Page 154

1     a salaried position, for example, and they might have

2     variable overtime or they might have variable miscellaneous

3     income that might be reported on a 1099.

4          So, one might have pause what's the honest way to

5     answer the question because at the time, say, you're having

6     -- I'm having this conversation with my banker, Mr. Morrow

7     in March, right, and I don't exactly know how much

8     miscellaneous income I'm going to have, or I don't know how

9     much overtime I'm going to have because, you know, there's a

10    downturn in the manufacturing for automotive parts or some

11    such thing.

12         All I'm saying is the honest borrower might --

13    there might be some ambiguity in how you report to the loan

14    officer, with everybody trying to do the right thing, right?

15         MR. MORROW:  Okay.  I agree with you.

16         THE COURT:  So, unless someone tells you -- right?

17    -- unless someone tells you do it this way --

18         MR. MORROW:  Yeah, but there's two -- there's two

19    things.  One is the loan application -- when the loan

20    officer asks them "What's your base salary?" they're going

21    to -- whatever it is they say, okay?

22         THE COURT:  Right.

23         MR. MORROW:  There's another line for overtime.

24    There's another line for DTM, the 1099.  And they're

25    supposed to put that down.

Page 155

1          We -- when we underwrite these, we don't

2     underwrite the loans with the idea that there isn't any room

3     for -- I mean...

4               THE COURT:  Sure, sure.  There's some flex.

5               MR. MORROW:  We had some flex in it to start with,

6     but we had such a -- you know, they say 2,000 and made -- or

7     11,000 and they made 2.  So, we try to take into

8     consideration that.  Because the goal isn't to -- well, the

9     goal is to be fair.  At least I try to do it that way.

10              THE COURT:  Thank you very much.

11    Q    Thank you.  So, if you could turn to TRX1008.

12    A    Yes.

13    Q    And you've seen this document before?

14    A    Yes, I reviewed it a couple days ago.

15    Q    And this is -- can you tell me what it is?

16    A    It's an affidavit filed by Lehman Brothers against

17    Residential Plus Mortgage.

18    Q    And is it seeking repurchase of a loan?

19    A    Yes, based on -- on an unsigned tax return.

20    Q    Can we look at 13E, please?  And is that...?

21    A    Yes, this is -- 13E says that there's -- that the

22    borrower didn't -- only made 4,000 in 2005 and 26,673 in

23    2006.  And the only exhibit that was attached was TRX1009.

24    Q    That's the --

25              MR. ROLLIN:  Excuse me?

Page 156

1                THE COURT:  Yeah?  Sorry, Mr. Rollin.

2                MR. ROLLIN:  Objection, Your Honor.  This is not a

3     disclosed document or opinion in connection with Mr.

4     Morrow's opinion.  It's not a document that's in his

5     materials relied upon.  And this is completely new with

6     respect to this witness.

7                THE COURT:  Okay, let's check that out.

8                MR. LIEBERMAN:  It is -- it's on our exhibit list.

9     It was referenced in our opening.  It's not part of the

10    exhibit list.

11               MR. ROLLIN:  It's not on his materials relied upon

12    for his expert report.  Whether or not it's on the their

13    exhibit list is irrelevant.

14               MR. LIEBERMAN:  Your Honor, we're responding to --

15    there's testimony at great length from Mr. Grice on December

16    5th from 1423-9 to 1427-3, where he talks about how it's

17    impossible to know what the income is for a self-employed

18    borrower.

19               Mr. Morrow is testifying about his experience in

20    the industry.  We happen to have this document, which is --

21               THE COURT:  But happening to have a document isn't

22    the way that it works.  He either relied on it or it was

23    part of the disclosures incident to his opinion.  You can't

24    expand what he's done by finding a document that happens to

25    be relevant.  You could have shown Mr. Grice this document

Page 157

1   on his cross-examination.  So, it's a little late.  Right?

2   So, I don't think I'm going to allow you to question him

3   about this document.

4           Mr. ROLLIN:  Thank you, Your Honor.

5           THE COURT:  Okay?

6   Q    Okay.  So, I'd now like to move to another category,

7   which is -- I'd like to discuss misrepresentations of debt

8   and, specifically, debt that -- misrepresentations of debt

9   that involve post-close, that is debt that closed after the

10  subject loan.  And for that I'd like you to take a look --

11  again, we're not going to go to the file but it's one of the

12  loans you reviewed.  It's in TRDX1369 and it's the second

13  page of the excerpt.  The first line, loan ending 0217.  And

14  I think you can take a moment to review, but I think Mr.

15  Grice's response sort of encapsulates both the nature of the

16  breach and the position that he takes.  Can you tell me what

17  position he's taking?

18  A    Well, he's taking a position that this loan closed

19  after the loan that was made.  The loan was made May 27th.

20  This loan -- the loan -- the loan that is made -- that the

21  borrower took after is June 7th.

22  Q    So, he doesn't contest that the June 7th loan actually

23  was taken out by --

24  A    No, he doesn't contest it.  What he says is that it

25  wasn't -- it wasn't a loan at that date.  Except in the

Page 158

1   industry you have material fact.  The borrower is supposed

2   to keep us informed -- keep the borrower -- the originator

3   informed.  This loan had to be -- a contract had to be

4   existing prior to May 27th to purchase a property on June

5   7th.  So, he knew he was going to take on the additional

6   debt.  He did not inform the originator that he had the

7   additional debt.  There's no place in there.  And that is

8   not acceptable.  That's not -- that's in two places.  One is

9   in the deed of trust, and the other is in the loan

10  application.  It says, "Any -- any material fact that could

11  affect the loan, you'll tell us about prior to the loan

12  being made." And this person did not do that.

13  Q    And in your view, the existence or the intent to obtain

14  a new mortgage would be a material fact?

15  A    Yeah.  He contracted to get the loan -- or to buy the

16  property before this loan.  He didn't disclose it.  So, in

17  the industry we -- this is a major -- a material breach.

18  Q    Thank you.  And with respect to -- moving on to

19  occupancy breaches, in your experience underwriting and

20  reviewing loans, how many times have you seen a borrower to

21  be unable to move into their new primary residence due to

22  extenuating circumstances?

23  A    Probably once or twice in 50 years.  But they would

24  notify us that they have extenuating circumstances and ask

25  to do it.  And I think one time the guy got transferred out

Page 159

1    of the area, but the other one I don't even remember.  But,

2    yeah, it's not -- it just doesn't happen.

3    Q    Thank you.  And then just a question about

4    misrepresentation generally.  In your experience, how does

5    the industry view the types of -- sort of significant

6    misstatements of income or omissions that you saw in your

7    review?

8    A    Well, whenever it's discovered, you consider it to be

9    occurred on -- at origination.  Misrepresentation makes the

10   whole -- taints the whole loan.  It's not something that --

11   there are no gray areas.  This is either black or white.

12   Either you made a misrepresentation and the value, and the

13   risk of the loan -- the risk has gone up and the value's

14   gone down.

15   Q    We will -- I want to get to sort of the AMA standard.

16   But I'd like to discuss excessive DTI breaches, and for that

17   discussion I'd like to turn to TRX1368, which is your

18   affirmative report, and the last page of that report --

19   sorry, Page 64.  Do you recognize this paper?

20   A    Yes.  I prepared it.

21   Q    What is it?

22   A    Mr. Grice stated in his rebuttal -- in his affirmative

23   action or in his first report that DTI -- that the DTI

24   breaches that were cited for the loans would not have -- the

25   loans still would've been made because it met it in the part

Page 160

1    of the criteria based on the underwriting guidelines.

2            So, what I did was I went through each loan file

3    that had DTI and found if there was underwriting guidelines

4    and a DTI -- if it had a DTI rep warranty.  And then we

5    analyzed the loan.  And these are all the loans that were

6    there.

7            What we found out of 31 loans -- 33 out of 31 --

8    31 out of 33, sorry, that you can see the maximum DTIs were

9    exceeded in every one of them.  His assertion was totally

10   not applicable and that's what the analysis is, is that they

11   -- the reason that there's one at 50 percent -- that one had

12   an underwriting guidelines rep warranty.  The rest are --

13   well, all the rest -- most of the rest are -- there's a DTI

14   rep and warranty.  But there's -- they far exceeded it.

15   Q    Just as a general matter, how does -- how do you

16   calculate DTI?  Just -- sort of at a basic level.

17   A    Well, you take -- you did -- you go -- basic level, you

18   take all the monthly debt payments and you divide it by the

19   monthly income.  But it's the monthly income that you

20   identify, that is real.

21   Q    So, but if you were doing it at origination, you'd use

22   those figures from the application?

23   A    Yes.

24   Q    Okay.  And if you have a document that shows -- if you

25   do a review and you have a document that shows that there

Page 161

1    was a misstatement of income or debt, is it industry

2    practice to use the income and debt reflected on that

3    document to recalculate DTI?

4    A    Absolutely.  That's part of what the re-underwriting is

5    for, is to -- if it is a misrepresentation, you use that --

6    the actual DTI for the loan.

7    Q    Now I'd like to turn to your -- what we've been

8    referring here, to the AMA or Adverse Material Effect (Sic)

9    analysis.  What is the applicable standard for determining

10   an Adverse Material Effect in the industry?

11   A    In the industry, if it -- if it significantly increases

12   the risk or lowers -- and/or lowers the value of the loan,

13   then you would say that it had a material -- it would be a

14   material breach.

15   Q    And does the loans payment history or reasons why a

16   loan defaulted impact the materiality analysis?

17   A    No.  It would -- materiality is -- the fact data?  No.

18   Q    Why is that?

19   A    Because the misrepresentation, or the missing document,

20   or whatever it is that's involved occurred at the beginning.

21   And that risk is there -- risk and value is established

22   then.  If someone makes payments for 24 months, it doesn't

23   improve the fact that that loan still has a higher risk and

24   less of a value.  So, it's just not there.  Even if the loan

25   was repaid 24 months later because the person sold the --

Page 162

1  you still have -- the loan at origination was still riskier

2  and had a lower value than it probably should've because of

3  the misrepresentation of it.

4  Q   Now, so if you were an originator and you were

5  revealing a file and you discovered that an income was less

6  or there were more debts, would that lower the value in the

7  sense that the law would be written on different terms?

8  A   It may not qualify for the program that it was in.  It

9  should've been in a different program.  If you found out

10  that there was a misrepresentation of income (indiscernible)

11  it'll go into a full loan.  So, it wouldn't even be in

12  there.  So, yeah, it would change how the loan was

13  underwritten and it would change the pricing on the loan

14  most likely also, because the risk is higher.

15  Q   Meaning that --

16          THE COURT:  So, when you're looking at this

17  determination of risk, which is whether or not a breach

18  adversely -- materially and adversely affects the value of

19  the loan, you're looking at it as of origination, not as of

20  the time that a breach has been noticed, for example?

21          MR. MORROW:  The way the industry looks at it,

22  that breach existed, you just didn't know about it at the

23  beginning.  So, yes, it's as of the origination, not --

24          THE COURT:  So, in other words, we're ten years

25  into a 30-year loan, the borrower has a perfect record of

Page 163

1    payment, borrower won the lottery, has it in treasury bills,

2    but the loan file appears to be missing a signature on its

3    appraisal.  Adverse material effect on the value of the loan

4    for that borrower at that time?

5              MR. MORROW:  Yes, because if you were trying to

6    sell the loan, whoever came in would see that the appraisal

7    doesn't meet the standards of USPAP at the time that the

8    loan was made and, therefore, if it was worth less, he would

9    pay less than would it would be at that point.

10             THE COURT:  Okay.

11             MR. MORROW:  So, it just is the nature of it, in

12   purchasing of loans, yes.

13             THE COURT:  Thank you.

14   Q    I'd like to just in terms -- go back to your last

15   answer.  So, prior to the Court's question.  You said still,

16   even if the person paid 24 months, you'd still have the loan

17   at origination was riskier and had a lower value that it

18   probably should've had.  And so, when you say a lower value,

19   it would've been priced differently?

20   A    It would've been priced.  For example, if the person

21   didn't move into the property but kept it as a separate

22   property, you know, non-occupant, that is obvious.  I mean,

23   everybody has a higher -- knows that there's a higher risk

24   and there's a higher interest rate.  So, there would be --

25   if someone was purchasing it they would pay less for it than

Page 164

1   what it was originally written for.  And the person

2   should've been paying a higher interest rate for a non-

3   occupied property.

4   Q    So, for example, a purchaser like the trust in these

5   cases, they paid -- they should've paid a lower price or

6   received more interest in that instance?

7   A    On those loans they should've done that, yes.  Get more

8   interest because of the problems.

9   Q    And that's true whether the borrower pays at the terms

10  on which the loan was actually made?

11  A    Right.  Because it's less than -- the repayment doesn't

12  pay, really pay for the risk that was involved in the loan.

13  The loan had a higher risk, should've been a higher pricing,

14  and the risk was transferred to the investor and the

15  investor got less than what they bargained for.

16  Q    And how did -- what conclusion did you reach regarding

17  applying this standard in this case?  For -- what did you

18  reach -- in terms of the breach findings you reviewed, what

19  was your conclusion?

20  A    My conclusion was on 831 of the breaches that they were

21  material breaches.  That they would've either raised the

22  risk and/or also decreased the value of the loan.

23  Q    Okay, finally, I'd like you to turn to TRX1035.  Do you

24  recognize this document?

25  A    Yes.

Page 165

1    Q    What is it?

2    A    It's my expert report in the Aurora Commercial v.

3    Standard Pacific.

4    Q    And can you please turn to Paragraph 34 of that report?

5    A    Yes.

6           MR. ROLLIN:  Objection.

7           THE COURT:  I'm sorry.

8           MR. SHUSTER:  May we have a moment, Your Honor?

9           THE COURT:  Before I hear the objection?

10          MR. SHUSTER:  No, no.  Sorry.  I'm getting ahead

11  of myself.  I anticipated.

12          THE COURT:  Okay.  Yes.  Mr. Rollin?

13          MR. ROLLIN:  Thank you, Your Honor.  Two things:

14  one, none of this material is replied upon; and, two, the

15  same objection I opposed earlier with respect to the lower

16  cases and the assertion of confidentiality cases.

17          THE COURT:  So, why are we back -- why are we --

18          MR. SHUSTER:  Now, if I could have that moment,

19  maybe we'll -- we can...

20          MR. LIEBERMAN:  Your Honor, we'll just leave it.

21          THE COURT:  All right.

22          MR. LIEBERMAN:  And with that, his direct

23  examination is complete.

24          THE COURT:  All right, thank you very much.  Okay,

25  it's almost 4:30.  Mr. Rollin, it's going to be your cross-

Page 166

1   examination?

2           MR. ROLLIN:  It is going to be my cross-

3   examination.  And I think in light of the direct, I can

4   spend the evening trying to narrow it a little bit and start

5   tomorrow.

6           THE COURT:  Sure.  Okay.  And then we will have

7   another witness tomorrow, Mr. Shuster?

8           MR. SHUSTER:  Yes, we'll have -- I think it's

9   Snow.  Dr. Snow.

10          THE COURT:  Dr. Snow, not actual snow.  Okay.

11          MR. SHUSTER:  I'm not calling for snow.

12          THE COURT:  Right, okay.  All right, then we'll

13  call it a night tonight.  Mr. Morrow, the same rules apply

14  throughout the evening.  So, it's football, or politics, or

15  some other boring thing you can partake of.  Thank you, sir.

16          MR. MORROW:  Thank you.

17          THE COURT:  Have a good night, everyone.

18          MR. COSENZA:  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          MR. CONSENZA:  And we'll endeavor, Your Honor --

21  we'll talk to Mr. Shuster and send you a list of the

22  schedule.

23          THE COURT:  That's fine.  I'm squeezing in a

24  couple of conference calls this week on various matters.  At

25  the beginning of every day I'll let you know.  I think

Page 167

1      tomorrow I have one at noon and one at 4:15, so if we could

2      work around those I would greatly appreciate it.  All right?

3                    MR. COSENZA:  We will, Your Honor.  Thank you.

4                    THE COURT:  Have a good evening.

5                    MR. COSENZA:  Thank you.

6                    MAN 1: Thanks so much, Your Honor.

7

8                    (Whereupon these proceedings were concluded at

9      4:27 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 168

1                    C E R T I F I C A T I O N

2

3         I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya

7    Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2018.04.30 11:42:07 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 10, 2018