UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
In re                                              : Chapter 11 Case No.
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,       : 08-13555 (SCC)
                                                   :
        Debtors.                              : (Jointly Administered)
------------------------------------------------------------------x

## DECLARATION OF STEVEN MULLANEY

      Pursuant to 28 U.S.C. § 1746, I, Steven Mullaney, declare:

      1.      I am over the age of 18 years and make these statements of my own personal knowledge, my review of relevant business records of the Lehman Entities[1] and disclosures by the CS Entities[2] in the adversary proceeding captioned *Lehman Brothers Holdings Inc., et al. v. Credit Suisse, et al., (In re Lehman Brothers Holdings Inc.)*, Adv. No. 13-01676 (SCC) (Bankr. S.D.N.Y.) (the "Derivatives Litigation"), and my consultation with other employees of and advisors to the Chapter 11 Estates.[3]  If called to testify, I could testify to the truth of the matters set forth herein.

      2.      I submit this declaration in further support of LBHI's *Motion Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 105(a) of the Bankruptcy Code for Approval of Settlement Agreement Among Credit Suisse AG, and Certain of Its Affiliates,*

---

[1] As used herein, the term "Lehman Entities" means Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Commercial Corp. ("LBCC"), and Lehman Brothers Commodity Services Inc. ("LBCS").  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Motion.

[2] As used herein, the term "CS Entities" means Credit Suisse AG ("Credit Suisse"), Credit Suisse International ("CSI"), Credit Suisse Energy LLC ("CSE"), Credit Suisse Securities (Europe) Ltd. ("CSSE"), and Credit Suisse Loan Funding LLC ("CSLF").

[3] As used herein, the terms "Chapter 11 Estates" shall mean LBHI and its affiliated debtors in the above-captioned Chapter 11 proceedings.

*and Lehman Brothers Holdings Inc., and Certain of its Affiliates*, Ch. 11 Case No. 08-13555 (SCC) (Bankr. S.D.N.Y.) [Dkt. #58254] (the "Motion").

3. I am a Managing Director at LBHI. I joined LBHI in March 2009, and I am responsible for helping to manage the largest and most complex derivatives-related bankruptcy claims filed against the Chapter 11 Estates, by counterparties affiliated with large banking organizations ("Big Banks"), as well as managing a group of professionals who value all derivatives transactions in the Chapter 11 Estates. I have been deeply involved in derivatives-related litigations and mediation proceedings initiated by the Chapter 11 Estates, including, in particular, the Derivatives Litigation.

4. On December 16, 2008, the Court entered the *Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts*, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) [Dkt. #2257] (the "Derivatives Procedures Order"). The Derivatives Procedures Order authorized the Chapter 11 Estates, *inter alia*, to resolve derivatives contracts and to consummate such settlement transactions with the consent of the Official Creditors' Committee or the Court.

5. On September 17, 2009, the Court entered the *Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts*, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) [Dkt. #5207] (the "ADR Order") promulgating alternative dispute resolution ("ADR") procedures in order "to promote consensual recovery with respect to . . . Derivatives Contracts with Recovery Potential" for the Chapter 11 Estates.

6. On July 18, 2012, the Court entered the *Order Modifying Certain Existing Claims Orders*, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) [Dkt. #29505], which authorized the Plan Administrator to settle claims against the Chapter 11 Estates without prior

2

approval of the Court or any other party in interest where, *inter alia*, the allowed amount of the settled claim is less than or equal to $200 million.

7. Under the auspices of Court-sanctioned procedures, the Chapter 11 Estates have reached settlements with more than 6,000 counterparties who held open derivatives contracts with the Chapter 11 Estates at the time of LBHI's bankruptcy filing. The Chapter 11 Estates have received approximately $20 billion in cash as a result of these settlements, including approximately $3.3 billion in settlement receivables pursuant to the Court-ordered ADR process. Excluding the Settlement with the CS Entities, settlements reached with counterparties have reduced the aggregate amount of direct derivatives claims filed against the Chapter 11 estates by approximately $65.4 billion, plus a reduction of derivatives guarantee claims against LBHI by approximately $69.5 billion. None of the Chapter 11 Estates' derivatives-related settlements has met a successful challenge pursuant to an objection filed under Bankruptcy Rule 9019.

8. The Chapter 11 Estates' success in achieving these settlements owes to the dedication and professionalism of the Chapter 11 Estates' directors, employees, legal counsel, and outside contractors. The Chapter 11 Estates made a concerted to hire seasoned derivative professionals with years, and in some instances decades, of experience in each type of derivatives transaction in the Lehman derivatives portfolio. These included experienced professionals in credit derivatives, interest rate derivatives, foreign exchange derivatives, commodity derivatives, and securitized products. The Estate retained top-quality legal counsel that was highly experienced in both bankruptcy and derivatives.

9. The Chapter 11 Estates' team of professionals spent years diligently analyzing derivatives receivables and claims filed against the Chapter 11 Estates. The team worked with legal counsel and outside contractors, including experts in various types of derivative

3

products, to develop a thoughtful and consistent approach to reviewing derivatives contracts. The team also supported outside counsel in instances where litigation was necessary to resolve claims. Over the years, the team became deeply experienced in analyzing and resolving derivatives-related disputes.

10. The Chapter 11 Estates' team of professionals also valued all of the terminated trades in Lehman's derivative portfolio. This portfolio consisted of over two million terminated derivatives transactions with over 6,000 counterparties. The team valued multiple types of derivatives transactions that ranged from the simplest trades to highly complex and exotic products. The team valued these trades in a consistent manner using industry-standard market information and analytical tools. The Chapter 11 Estates' methods and mid-market valuations were effectively verified through interactions with thousands of counterparties.

11. At May 2018 month-end, the Lehman Entities still employed or had active engagements with a large team of almost 40 professional employees or contractors, more than ten outside experts, plus in-house counsel and a team of lawyers at Quinn Emanuel Urquhart & Sullivan, LLP, who worked under my direction to evaluate the Settled Claims and to support the Lehman Entities' work on the Derivatives Litigation.

12. The Chapter 11 Estates have reached consensual resolution of derivatives-related bankruptcy claims filed by the Big Banks. On May 31, 2011, following extensive discussion and negotiation with the Big Banks, LBHI proposed the Derivatives Claims Settlement Framework (the "Settlement Framework") to thirteen Big Bank counterparties as a settlement approach with the intent of creating a standard, uniform and transparent methodology to fix unresolved derivatives-related bankruptcy claims filed by the Big Banks against the Lehman Entities and certain other affiliated debtors (the "Framework Debtors"). The Framework Debtors

4

developed the Settlement Framework after extensive analysis of market conditions around the time of the Lehman bankruptcy, extensive review of derivative trading pricing and activity, and analysis of how the Big Banks managed derivative portfolios. Additionally, the Framework Debtors engaged in months of discussions with representatives of the Big Banks, including senior traders in multiple types of derivatives, to reach a principled methodology for negotiating mutually consistent compromises with each Big Bank and thereby avoid complex and protracted litigation. The resulting Settlement Framework established: (i) common dates and times for calculation of mid-market values; (ii) a uniform approach to portfolio aggregation to derive groups of netted exposures; and (iii) a methodology for the calculation of allowable additional charges. *Accord Transcript* 13:6-11, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 19, 2011 10:02 AM) [Dkt. #21239] (Harvey Miller, Esq.) ("The derivatives framework provides, one, common dates and times for calculation of mid mark[et] values, two, a uniform approach to portfolio aggregation to derivative groups that netted exposures, and three, a methodology for calculation of allowable charges.").

    13. Following negotiations between the Framework Debtors and the Big Banks, the Framework Debtors proposed to allow the Big Banks' derivatives-related claims, including the Settled Claims asserted by the CS Entities, in amounts calculated pursuant to the principles set forth in the Settlement Framework, plus an additional 11.25% (the "Modified Framework Values"), and to execute settlement agreements between the Framework Debtors and the Big Banks that agreed. Exhibit A annexed hereto is a true and correct copy of an e-mail and attachment sent on June 30, 2011 by Steve T. Incontro of LAMCO LLC, a subsidiary of the Plan Administrator, to Charles Bender of Credit Suisse conveying an offer to allow the CS Claims at

5

the Modified Framework Values in an aggregate amount of $543.6 million.[4] The CS Entities did not accept the Framework Debtors' offer of settlement at the Modified Framework Values.

14. The Framework Debtors reached Court-approved settlement agreements based on the Settlement Framework with ten out of thirteen Big Banks, including affiliates of Bank of America Corp., Barclays PLC, BNP Paribas, Deutsche Bank AG, Goldman Sachs Group Inc., Merrill Lynch & Co., Inc., Morgan Stanley, Royal Bank of Scotland Group PLC, Société Générale, and UBS AG. These settlements were effectuated pursuant to the Derivatives Procedures Order, and the Court specifically approved settlement agreements based on the Settlement Framework with Bank of America, N.A. and Merrill Lynch International and certain of its affiliates pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). *Order Approving Settlement Agreement with Bank of America, N.A.*, Chapter 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) [Dkt. #21030]; *Order Approving Settlement Agreement with Merrill Lynch International and its Affiliates*, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) [Dkt. #21031].

15. Settlements pursuant to the Settlement Framework resulted in the reduction of approximately $15 billion of derivatives-related claims filed against the Chapter 11 Estates to under $8 billion and allowed the Chapter 11 Estates to recover over $500 million in cash. As counsel for the Framework Debtors stated at the October 19, 2011 hearing on the *Debtors' Motion for Approval of Settlement Agreements with (i) Bank of America, N.A. and (ii) Merrill Lynch*

---

[4] On August 11, 2017, LBHI purchased Proof of Claim number 22849, which was based on the contract designated as "051697CFBELBCC" in Exhibit A hereto and had a Modified Framework Value of $6.9 million, and the associated guarantee claim (number 22847) was expunged. After deducting this amount, the Modified Framework Values for the Settled Claims total $536.4 million.

6

*International and its Affiliates*, Chapter 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.) [Dkt. #204367], to the Court's approval:

> The derivatives framework has been extremely valuable in enabling the debtors to reach the resolution with bank counterparties . . . . In addition, it has been material in reaching the subject compromises with Bank of America and Merrill Lynch.
>
> . . .
>
> . . . [T]he . . . the proposed compromises meet the standards for approval under Bankruptcy Rule 9019 and the applicable precedents in this circuit. The results of the compromises are well above the lowest rank of reasonableness. The compromises represent fair, reasonable exercises of prudent business judgment on the part of the debtors . . . .

*Transcript* 13:12-17 & 15:9-15, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 19, 2011 10:02 AM) [Dkt. #21239] (Harvey Miller, Esq.). *See id.* at 15:22 (Hon. James M. Peck) ("It's approved.").

16. Of the thirteen Big Banks, three did not agree to the Framework Debtors' offers of settlement at the Modified Framework Values: JPMorgan Chase Bank, N.A. ("JPMorgan"), Citibank, N.A. ("Citibank"), and Credit Suisse. Litigation ensued between the Chapter 11 Estates and each of the three remaining Big Banks.

17. The Derivatives Litigation against certain of the CS Entities commenced with the filing of the *Adversary Complaint and Objection to Claims*, Adv. No. 13-01676 (SCC) (Bankr. S.D.N.Y.), on November 6, 2013 [Dkt. #1]. As a result of the Derivatives Litigation, the parties have reached a Settlement that is more favorable to the Lehman Entities than the Modified Framework Values calculated and previously offered to the CS Entities pursuant to the Settlement Framework. The aggregate Allowed Amounts provided by the Settlement Agreement for the Non-Guarantee Claims and the Guarantee Claims are approximately 28% and 32% lower, respectively (more favorable to the Chapter 11 Estates) than the Modified Framework Values.

7

18.     Comparison with the Settlement Framework is a meaningful and sufficient way of assessing the reasonableness of the Settlement with the CS Entities.  The Settlement Framework established a uniform methodology for calculating the allowed amounts of the Big Banks' derivatives-related claims—a methodology on which the Chapter 11 Estates reached agreement with ten of the thirteen Big Banks.  The Settlement Agreement provides for a greater reduction of the Settled Claims than the reduction dictated by the Settlement Framework.  Consequently, the Settlement Agreement is necessarily more favorable to the Lehman Entities than were the settlements reached with the ten Big Banks pursuant to the Settlement Framework.

19.     The Plan Administrator believes the derivatives trades underlying each Big Bank's claims should be valued based on common methodological considerations.  However, in litigation, each Big Bank argued that there were facts and circumstances which invalidated the Chapter 11 Estates' common methodological approach, and the extent to which the Big Banks' claims were reduced depends in large part on how extensively the particular bank inflated the size of its claim, which varied substantially.  Additionally, while Citibank and JPMorgan both advanced the contention (disputed by the Chapter 11 Estates) that their derivatives claims were secured by cash and assets in their possession, there is no dispute that the CS Claims are unsecured.  Therefore, the costs of proceeding with the Derivatives Litigation represent a larger percentage of the amount at issue than in the Citibank and JPMorgan matters.  Accordingly, while the Modified Framework Values provide an objective, transparent benchmark for evaluating the reasonableness of the Settlement Agreement, the terms of other settlements, such as those with JPMorgan and Citibank, would need to be substantially adjusted to account for myriad differences between those cases and this one. That process would be extremely labor-intensive, complicated and somewhat speculative.  Accordingly, the Settlement Framework is a more meaningful, transparent, and

8

objective benchmark for evaluating the reasonableness of the terms of the Settlement Agreement. The Plan Administrator believes that comparison with the Settlement Framework is sufficient to indicate that the Settlement is well within the range of reasonableness required by Bankruptcy Rule 9019.

20. While the Plan Administrator believes that the CS Entities asserted claims in greatly overstated amounts and that, if litigated to finality, the claims might be reduced by amounts greater than those provided for by the Settlement Agreement, the Plan Administrator recognizes, upon careful analysis, that the litigation poses significant risks, costs, and uncertainties.

21. First, a significant amount of the dispute in the Derivatives Litigation is related to the dates and times as of which certain derivative trades are valued for the purposes of calculating Close-out Amounts. For example, the Plan Administrator believes that approximately $150 million of the valuation difference is attributable to the CS Entities' determination to value certain interest rate trades, including the bulk of its US dollar-denominated interest rate swap and swaptions transactions, at 11:00 am New York time on September 15, 2008, rather than at the close of business that same day, and contends that the CS Entities selected this valuation time in order to maximize the size of their claims against the Lehman Entities. The Plan Administrator also believes that approximately $350 million of the valuation difference is attributable to the CS Entities' determination to value the bulk of the credit default swaps on days other than September 15, 2008, and contends that this determination was unjustified. While the Plan Administrator contends that all trades should have been valued as of the close of business on September 15, 2008, it recognizes that the CS Entities strongly contend that their valuation dates and times were reasonable under the circumstances and determined in good faith. Accordingly, there can be no assurance that the Court will set aside the CS Entities' valuation dates and times. If the Court were

to find that the CS Entities' valuation dates and times are legally permissible, this finding alone could increase the valuation of the Settled Claims by approximately $500 million in favor of the CS Entities versus the valuation alleged by the Lehman Entities.

22.     Second, a significant amount of the dispute in the Derivatives Litigation is related to the method by which the CS Entities aggregated the terminated trades for the purposes of calculating Close-out Amounts. While the Plan Administrator contends that the CS Entities unreasonably failed to net certain offsetting derivatives trades, and that the method by which the CS Entities aggregated the terminated trades violated the terms of the underlying ISDA Master Agreements, it recognizes that there can be no assurance that the Court will set aside the CS Entities' method of portfolio aggregation. The CS Entities contend that their method of portfolio aggregation was commercially reasonable, and that in any event the overall amounts of the Settled Claims are commercially reasonable, whether viewed on a trade-by-trade basis or in the aggregate. If the Court were to find that the CS Entities' portfolio aggregation methodology is legally permissible and produced a commercially reasonable result, such finding could significantly reduce the remaining difference between the parties' valuations of the Settled Claims by significantly increasing the valuation of the Settled Claims in favor of the CS Entities versus the valuation alleged by the Lehman Entities.

23.     Third, a significant amount of the dispute in the Derivatives Litigation is related to the inclusion in the close-out calculations by the CS Entities of charges other than mid-market values ("Add-on Charges"), including bid/offer spreads, and the allowable amounts of those Add-on Charges. The Plan Administrator contends that the underlying ISDA Master Agreements do not allow the CS Entities to include such Add-on Charges, and that as a market-making derivatives dealer Credit Suisse did not incur and would not have incurred such Add-on

Charges. The Plan Administrator further contends that the CS Entities' Add-on Charges lack adequate support and/or are greatly inflated. The foregoing contentions are integral to the Lehman Entities' allegation that "the total value of Credit Suisse's claim was only $75 million, and with respect to claims of two of the Credit Suisse entities, Lehman had a receivable with an aggregate value of approximately $150 million."[5] However, the CS Entities strenuously disagree with the Plan Administrator as to the permissibility of Add-on Charges, and they further contend that the Add-on Charges are adequately supported by market data and the judgment of the CS Entities' traders. As such, there can be no assurance that the Court will rule that the CS Entities' calculated Add-on Charges are impermissible, or find that the Add-on Charges are unsupported and/or inflated. If the Court were to determine that some or all of the CS Entities' Add-on Charges are permissible, are adequately supported, and are not greatly inflated, such findings could significantly reduce the remaining difference between the parties' valuations of the Settled Claims by significantly increasing the valuation of the Settled Claims in favor of the CS Entities versus the valuation alleged by the Lehman Entities.

24. Fourth, the parties have substantial disputes regarding the meaning and interpretation of the ISDA Master Agreements that govern their derivatives trades. A further source of complexity and risk is the fact that the majority of the trades were executed pursuant to ISDA Master Agreements governed by English law, which may require the Court to hear competing expert opinions on English legal principles and to make a determination of foreign

---

[5] *Objection of CarVal Entities and Empyrean Capital Partners, LP to Lehman Brothers Holdings Inc.'s Motion Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 105(a) of the Bankruptcy Code for Approval of Settlement Agreement Among Credit Suisse AG, and Certain of its Affiliates, and Lehman Brothers Holdings Inc., and Certain of its Affiliates*, Adv. Pro. No. 13-01676 (SCC) (Bankr. S.D.N.Y. June 20, 2018) [Dkt. #120] (citing *Amended Adversary and Objection to Claims* ¶ 56, Adv. Pro. No. 13-01676 (SCC) (Bankr. S.D.N.Y. March 17, 2017) [Dkt. #43]).

11

law. The meaning and interpretation of the parties' contract as ultimately determined by the Court has a potentially significant impact on the ultimate value of the Settled Claims.

25. Finally, any trial of this matter would involve extensive fact and expert testimony at trial and the Court's determination of the credibility of each party's witnesses is another substantial risk inherent in proceeding through trial.

26. Against these potential risks, the Plan Administrator has weighed the impact of the Settlement Agreement on the interests of the Lehman Entities and their respective estates and creditors including the anticipated costs of complex, costly, and protracted litigation. The transactions underlying the Derivatives Litigation comprise more than thirty thousand (30,000) derivatives trades, including products ranging from structured credit products, to exotic interest rate options, to commodities basket options. On May 21, 2018, the CS Entities served seven expert reports totaling roughly 1,535 pages that strongly defended the calculations underlying the Settled Claims. The *Seventh Amended Scheduling Order and Discovery Plan* in the Derivatives Litigation, Adv. Pro. No. 13-01676 (SCC) [Dkt. #101] (the "Scheduling Order"), required the Lehman Entities to complete depositions of overseas witnesses, respond to the CS Entities' expert reports, potentially litigate dispositive motions, conduct pretrial exchanges, and serve pretrial briefs by mid-September 2018, a little over three months after the date of the Settlement Agreement, with trial to commence on October 29, 2018. The Plan Administrator reasonably determined that the legal fees, expert costs, expenditures of internal resources, and other anticipated expenses associated with the complex proceedings would reduce any inherently uncertain economic advantage that the Lehman Entities might gain through continued litigation versus the Settlement.

27. In evaluating the reasonableness of the Settlement Agreement, the Plan Administrator also took into account the impact of a protracted trial schedule, and possible appellate litigation, on the timing of a judicial resolution of the Derivatives Litigation and the Chapter 11 Estates. The Chapter 11 Estates were required pursuant to the Plan to set aside cash and assets as reserves ("Reserves") against the amounts of creditors' claims, including the Settled Claims, rendering such Reserves unavailable for distribution to other creditors. The Lehman Entities attempted to reduce the amount of Reserves required to be held against the Settled Claims by filing the Motion to Estimate on December 11, 2017. Nonetheless, on the date of the Settlement Agreement, the Lehman Entities were still required to hold Reserves against the Settled Claims including approximately $561 million in cash.

28. While the Plan Administrator believes that litigating the Settled Claims to finality would result in the release of a portion of these Reserves for distribution to creditors other than the CS Entities, it recognizes that not only the amount, but also the timing of such release, is inherently uncertain. The Scheduling Order provides that trial in the Derivatives Litigation shall commence on October 29, 2018 but given the expedited litigation schedule and the impending holidays, the Plan Administrator recognizes the likelihood that the trial date could be delayed until early 2019. The Plan Administrator further recognizes that trial in the Derivatives Litigation could take well over six months. In *Lehman Brothers Holdings Inc., et al. v. Citibank, N.A., et al. (In re Lehman Brothers Holdings, Inc.)*, Adv. Pro. No. 12-01044 (SCC) (Bankr. S.D.N.Y.) (the "Citibank Litigation"), approximately 42 days of trial days spanning nearly four calendar months elapsed before the parties finished presenting evidence regarding corporate and sovereign credit default swaps. Had the parties to the Citibank Litigation not reached a settlement, the presentation of evidence regarding interest rate derivatives, securitized products, foreign exchange derivatives,

13

and various commodity derivatives could have roughly tripled the length of the trial calendar, not including months or years of potential appellate litigation.  Accordingly, trial in the Derivatives Litigation, which resembles the Citibank Litigation in subject matter and complexity, could last until late 2019, and the Chapter 11 Estates could wait additional months or years for a decision to be rendered and for appeals to be finally adjudicated.  Given these uncertainties, potential costs, and the time value of money, the Plan Administrator determined that it would be advantageous to the Chapter 11 Estates and their creditors to enter into the Settlement Agreement, which represents a reasonable resolution of the parties' dispute, avoids all of the risks and substantial costs of continued litigation described above and, subject to final Court approval, would speed recoveries to creditors of the Chapter 11 Estates by releasing approximately $280 million in Reserves for distribution to creditors other than the CS Entities on the next distribution date.

       I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

       Executed on this 29th day of June 2018.

/s/ Steven Mullaney
Steven Mullaney