# EXHIBIT E

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   Adv. Case No. 13-01676-scc

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC.,

9

10          Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   LEHMAN BROTHERS HOLDINGS INC. et al,

13               Plaintiff,

14          v.

15   CREDIT SUISSE AG et al,

16               Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

1          United States Bankruptcy Court

2          One Bowling Green

3          New York, NY  10004

4

5          January 10, 2018

6          10:43 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   SHEA H.

Page 107

1           THE COURT:  I'm going to ask both sides to

2      assemble the appropriate folks that are needed to discuss

3      these issues and meet me in the conference room in a couple

4      of minutes, please.

5           (Recess)

6           THE COURT:  Please, have a seat.  Okay, so, thank

7      you for staying and getting this done.  I know that you

8      weren't planning on spending the day here, but hopefully,

9      it's been productive.  So, who should I hear from?  Yes.

10          MS. CAFFERATA:  May I speak, Your Honor?

11          THE COURT:  Sure.

12          MS. CAFFERATA:  So, we have worked out some

13     language that we have agreed upon for certain of the issues,

14     but we have some things to discuss on part of it that I

15     think will maybe help us to resolve the remaining issues.

16          THE COURT:  Okay.  So, just for the purposes of

17     the record, what we're doing is we're going on the record

18     after the parties have been conferring for several hours

19     after there was an off-record conference this morning on the

20     subject of the letters that had been exchanged between the

21     parties with respect to Credit Suisse's compliance with the

22     Court's order regarding production of documents, and after

23     discussions in which I participated with all the parties,

24     the parties undertook to come to an agreement, and to put

25     certain language on the record that would reflect their

1   understandings going forward with respect to the nature of

2   the production and any additional exchanges that need to

3   take place and also with respect to certain matters in

4   relation to the conduct of the 30(b)(6) examinations.  So,

5   with that background for the record, we can just go through

6   the issues.

7            MS. CAFFERATA:  Thank you, Your Honor.  The

8   language that we can agree to go in the stipulation, is as

9   follows:  "Credit Suisse agrees that the compilation

10  spreadsheet received on January 9, 2018, constitutes what

11  Credit Suisse has in its possession, custody and control as

12  to, colon:  One, it's end-of day mids for September 12

13  through 19, 2008; two, it's closeout mids for the trades in

14  its claim; three, the final closeout amount for each trade,

15  and four, the Bates numbers for the files supporting those

16  figures.  In addition, Credit Suisse agrees to supplement

17  this spreadsheet by January 14, 2018, to include the risk

18  metrics associated with each trade that was recorded in the

19  ordinary course by Credit Suisse's systems, period."

20           THE COURT:  Can I ask a question on that?

21           MS. CAFFERATA:  Yes.

22           THE COURT:  Is it clear to both of you how that

23  supplement, what form it's going to take?  I don't want to

24  have another round of Lehman complaining that they've been

25  pointed a huge database and saying, "It's in there

Page 109

1    somewhere."

2             MS. CAFFERATA:  Good idea, Your Honor.  Our vision

3    is that this would be supplementing the spreadsheet that

4    we've already received by adding columns, including in this

5    risk metrics.

6             THE COURT:  Okay.

7             MR. MCATEE:  And that's what we intend to do, Your

8    Honor.

9             THE COURT:  Okay, great.

10            MS. CAFFERATA:  And then that would be qualified

11   by the following language:  "Provided, however, if

12   historical data or a mistake emerges in discovery, that in

13   good faith could not have been found previously, despite

14   reasonable efforts to locate it, Credit Suisse may seek to

15   amend the spreadsheet with that information."  That's the

16   shoebox.

17            MR. MCATEE:  Yes, Your Honor, that's agreeable.

18            THE COURT:  That seems perfect.

19            MS. CAFFERATA:  On the subject of the conference--

20            THE COURT:  Yes.

21            MS. CAFFERATA:  The language would be, "The

22   parties agree to schedule ...," think it should be 'hold,'

23   hold a conference.  Sorry about that.  "The parties agree to

24   hold an in-person or telephonic conference between counsel

25   prior ... five days prior to each 30(b)(6) deposition, in

Page 110

1    order for the testifying party to identify the documents and

2    information relevant to the designated topics."

3              THE COURT:  Okay.  Perfect.

4              MS. CAFFERATA:  So, that's our stipulated

5    language, Your Honor.  Then, we have an issue that we

6    thought of a way to maybe address the problems that we're

7    having with respect to the topics and address some of Credit

8    Suisse's concerns on the deposition topics.  And, so, we

9    proposed it, but Credit Suisse said it's not in a position

10   to agree to it yet, but we're thinking this might be a way

11   to deal with that set of issues.

12             And what it is, is to provide -- we asked for it

13   in the spreadsheet that we just described, along with the

14   risk metrics, to give us the Bates numbers of the supporting

15   materials that ... you know, the documents that provide the

16   support for their claim amounts, because we have the same

17   lack of roadmap with respect to that issue, and that would

18   seem like an easy way to just have it all in one place,

19   everyone can rely on it.  And then, this question of how

20   much the witness needs to prepare is quite a bit more

21   simple, because for each trade, on each line, you know, oh,

22   they used these two sources, or these ... this one source,

23   and they can speak more broadly to that issue.

24             THE COURT:  It seems sensible, if you think you

25   can accomplish that.

Page 111

1           MR. MCATEE:  What I told counsel was that the

2    first time that I had heard that request was in this

3    conference, and we're willing to consider the request and I

4    need to go back and talk to the team that has been doing

5    this --

6           THE COURT:  Sure.

7           MR. MCATEE:  -- my IT people, and figure out how

8    long it would take, because I'm not sure exactly how long it

9    would take, because I'm not sure exactly how long it would

10   take.

11          THE COURT:  Right.  I mean it's no small task.

12          MR. MCATEE:  It's not a small task.  It's not just

13   finding a mid.  It's finding every quote for ... that's the

14   supporting package for everything, and that's going to take

15   some time.

16          THE COURT:  Right.

17          MR. MCATEE:  But what I said to counsel was we're

18   going to undertake an effort to do that and provide them

19   with something, just don't know how long that will take.

20          THE COURT:  Sure.  I mean ... I think it's

21   sensible.  And it's ultimately, I would say, going to be

22   more efficient than having to construct it through a series

23   of witnesses to kind of do it.

24          MS. CAFFERATA:  Well, we thought, Your Honor, if

25   they could possibly do it by January 17th -- and I mean this

Page 112

1    is the stuff they should have in their DQ, so it should be a

2    matter of assembling it from that, I would think.  But if

3    they could have it by the 17th, then we could agree to

4    language about... that they've proposed about the witness

5    not being expected to testify as to every possible detail.

6    And it would basically address that issue.

7              THE COURT:  I mean, answering for Credit Suisse, I

8    would be surprised if, sitting here today, they could say

9    that they'd be able to accomplish it by the 17th.  I mean

10   that's a week.  So, I think that's a heavy lift.  So, can we

11   get around committing to that date?  I'm not comfortable

12   imposing that deadline.  I mean, certainly, it shouldn't be

13   another month or three months, but a week seems too

14   aggressive.  People are ... it's just, I don't think it's

15   capable of being accomplished.  So, how can we ...?

16             MS. CAFFERATA:  Well, when we asked about it an

17   hour ago, counsel didn't have any idea of when, you know,

18   couldn't put an estimate on when it might be available; he

19   needs to talk to people.  So, I understand that.  We just --

20   we're in deposition right now and we're trying to --

21             THE COURT:  Sure

22             MR. MCATEE:  -- (indiscernible) a quickly as we

23   can, so I don't -- something has to happen.

24             THE COURT:  Okay.  I'll take a representation that

25   you're going to make reasonable inquiry.  And what's today?

Page 113

1    Wednesday?  Can you get back to Lehman by, to counsel by the

2    end of the day on Friday?

3            MR. MCATEE:  Yes, Your Honor.

4            THE COURT:  And then, if it's not, if the

5    timeframe to you is not acceptable, I mean we can add

6    another call.  But I think a week is too short, I think a

7    month is too long, but I ... beyond that, it would be

8    presumptuous for me to pick a date.

9            MR. MCATEE:  Thank you, Your Honor, and we'll give

10   it our best effort to do it as soon as possible.  The one

11   caveat I want to make sure that I say on the record is,

12   we're going to do our best to have that whole list and have

13   all those Bates numbers.  It's a long list.  We're talking

14   thousands and thousands of documents.  I just don't want

15   that to be subject to the kind of same, that will never

16   change unless there's a mistake or something.  It's going to

17   be our best effort to put it all together, but that's kind

18   of a moving --

19           THE COURT:  That's a different topic.  I mean this

20   is a different topic.  This is mapping all of your documents

21   to particular trades.  I think that's ... I agree with that.

22   It's different than having you commit to what the basis of

23   your claim, essentially, is.  I mean whether or not you

24   specify -- let me give you an example.  Hypothetically,

25   Credit Suisse may not identify particular policies and

Page 114

1    procedures as having anything to do with the calculation of

2    a particular closeout.  Lehman might decide that they think

3    that they are.  Well, they can't ... you have different

4    theories of the case, so that there might be different

5    documents that Lehman thinks that should be put into

6    evidence, either in support of or in opposition to the

7    closeout amount.  So, I think that goes too far to the

8    extreme of having Credit Suisse kind of do the final trial

9    preparation at this stage.  I think if we go down that path,

10   then we're undercutting where we started.  Where we started

11   was where you needed to be, which is the complete record,

12   except for the shoebox.  You've got that.  Now, we are in,

13   in lieu of the 30(b)(6) witnesses, saying, "Here are the

14   documents I'm going to talk about," right, you're going to

15   have an index created.  They can't be held to 100 percent on

16   that, I don't think.

17             MS. CAFFERATA:  I think so, Your Honor.  I mean

18   this is what we ... what we mean by support.  I think if you

19   have a particular name, let's say, that you're valuing --

20             THE COURT:  Right.

21             MS. CAFFERATA:  -- and you have, the trader used,

22   you know, this screen shot and this other source, and they

23   have a general process of how they put together their number

24   for that name.  That's something we would expect to be able

25   to ask a question of, "Oh, how did you do this?", right?

Page 115

1      And the spreadsheet would, therefore, have -- it would point

2      us, for those trades, it would point us to the screenshot

3      and whatever the other thing was.  And, so we're dealing

4      with just, usually a couple of items.  I mean, I'm not

5      really sure -- talks about thousands, I'm not really sure

6      what he's talking about.

7                   THE COURT:  Let's use your example.  If they, say,

8      for a particular position, there are a dozen screen shots,

9      right, what's the right answer for what they're supposed to

10     say?  Is it the one screen shot, or is it more than one

11     screen shot to show that they didn't selectively pick a

12     screen shot from a particular time of day?  So, I think

13     that, I would think that you would have the capability --

14     they have to produce all those screen shots to you, right?

15                  MR. MCATEE:  Yes, and we have --

16                  THE COURT:  Yeah.  S, if they've produced all the

17     screen shots, then that's --

18                  MS. CAFFERATA:  But we're just asking for the one

19     they were light on.  We should be able to know which one

20     they relied on.

21                  THE COURT:  But you've got that in the

22     compilation.

23                  MS. CAFFERATA:  That's what I'm saying.  In the

24     compilation that's what we would expect.

25                  THE COURT:  You've got that in the compilation.

Page 116

1   I'm talking about the road mapping of the documents for the

2   purpose of a deposition.  You're not taking away, in the

3   second one what you gave in the first one, right?

4           MR. MCATEE:  I was not intending to, Your Honor.

5           THE COURT:  No, I --

6           MS. CAFFERATA:  These are two different things.

7           THE COURT:  Two different things, right.  So, in

8   the first one, you've got what they're relying on.  That is

9   what they are undertaking to do.  So, that in the

10  deposition, it cannot be that the trader is going to say --

11  it's going to be bad, if the trader says it's not the screen

12  shot from, you know, from 12 o'clock on the 15th, it's the

13  screenshot from four o'clock on the 15th.  They are supposed

14  to have told you in the compilation which screenshot they're

15  relying on.

16          MS. CAFFERATA:  Right, except they're not agreeing

17  to that.  What they are agreeing to provide, and the part

18  that we stipulated to, is the Bates number support for their

19  closeout mids, and for their end-of-day mids.  What they

20  have not agreed to produce is what I think the Court is

21  referring to, and that we're suggesting is a good idea, is

22  to have a similar spreadsheet that has, on a trade-by-trade

23  basis, the Bates numbers of the support:  the things that

24  they relied on to support their claim numbers, total claim

25  numbers, not just their mid.  So that if they, you know, if

1    they used this spreadsheet over here to justify a bid or

2    offer charge or whatever else they added on above their

3    mids, then somebody is going to be able to testify to that.

4    This is what they were supposed to produce in their DQ,

5    right?  We asked for this money and we have support for it.

6    So, that's what they're trying to package up so that we can

7    then rely on it, use it with the witness and have the

8    witness explain.  These are the three things I looked for

9    and this is how we put together the numbers for this group

10   of trades.  These other ones we did in this other way using

11   these four documents, or one document, or whatever.  But

12   there aren't really thousands and thousands of anything that

13   I can think of that fit within that framework.  It's just,

14   what did the traders use to support?  And so, we don't need

15   the policies that they may be using.  I mean we understand

16   there will be facts around what guidance they had but that

17   doesn't need to be --

18            THE COURT:  What's the purpose of the conference?

19   The purpose of the conference is, we're giving you this

20   witness, here's the universe of documents that this witness

21   is going to talk to about.  It's going to include all the

22   screen shots, all the different sources for the marks, all

23   of the corresponding -- I'm making this up -- all the

24   corresponding entries in the risk management systems, all

25   the hedges, all the email back and forth to people on other

Page 118

1    desks.  It's going to be the whole canon on information and

2    things that were generated around that particular closing.

3    So, I just don't, I'm just not understanding -- so, you have

4    the general universe, and then you take that and you, you

5    know, you conduct the deposition of the person.  You closed

6    out these positions.

7         MS. CAFFERATA:  What we try to do is we had asked

8    for the support that they used for their claim amounts a few

9    months ago.  And they asked the same thing of us, we

10   produced it.  They said, "No, we're not going to provide

11   that."  So, then we used the 30(b)(6) topics to say, okay,

12   well, provide that through testimony and then they say it's

13   impossible.

14        THE COURT:  I kind of missed this because I guess

15   I conflated, in my mind, the compilation, in fact, reflected

16   what the support was.  So, that's not the case?

17        MR. MCATEE:  The compilation, Your Honor, has the

18   mids, both end-of-day for the 12th through the 19th, and

19   also the closeout, the closeout amounts; if there was a bid

20   offer calculated it has that in it.

21        THE COURT:  If there was a bid offer, if there was

22   liquidity.

23        MR. MCATEE:  If it has risk metrics that were

24   associated with it and saved in or system that's going to be

25   put into the compilation.  We'll have all of that in one

Page 119

1   place.

2           THE COURT:  Okay.  So, if you have ... so, you

3   have a mid, and you had a bid offer charge, whatever, that

4   number had to come from somewhere, right?

5           MR. MCATEE:  Correct, Your Honor.

6           THE COURT:  So, why is it that you can't identify

7   where that came from?  I keep going back to my idea about

8   the way this happened.  In real time, somebody decided how

9   to calculate that number based on something.  So, why is

10  that?  So, either each trader had a log, or each trader had

11  a book, or something.  There's ... it just, to me, just

12  seems logical that that is something that exists that you

13  should be able to specifically identify for them, by desk or

14  by name, or just by some stratification.

15          MR. MCATEE:  Your Honor, what I would say is that

16  I agree with you, it exists.  We, ourselves, are in the

17  process of identifying all of that for all the products that

18  are at issue.  We're not complete yet, but we're in the

19  process, we're not done and that's why I said I don't know

20  how long it's going to take, but I can promise them that we

21  will provide that kind of backup -- the list of Bates

22  numbers, and everything, the quotes and the Bloombergs and

23  the emails and everything.  We can get that to them, I'm

24  just not sure how long it's going to take.

25          THE COURT:  It is frustrating because that is,

Page 120

1    that should have been done pursuant to the order.  I mean

2    that's just a big -- that's a miss.  That's just a big miss.

3              MR. MCATEE:  Well, pursuant to the order, we did

4    provide all the documents.  Those have all been produced.

5    It's just a matter of now compiling it in a list of Bates

6    numbers is what I'm talking about, and that's what we're

7    committing to do.  I just need a little more time with my

8    team to know how long.

9              THE COURT:  This needs to be the last go round

10   though.  I mean we have this record now and it, now is, in

11   my mind, crystal clear that that needs to be done.  So, when

12   you get back --

13             MR. MCATEE:  End of day Friday, yes, Your Honor.

14             THE COURT:  That's the best I can do, Ms.

15   Cafferata.  I can't -- I don't have a time machine or a

16   freeze frame.  I understand your frustration and I apologize

17   for my confusion, but I thought that that had been done.  If

18   you want to prioritize among deponents as a way of not

19   losing ground and time, that's certainly something I think

20   that you could do.  If you know that you are getting to some

21   names later than other names, then I don't know if that --

22             MR. MCATEE:  Yes, Your Honor, and I will commit to

23   work with them.  If we have some deponents coming up, or

24   this issue affects that, I'll frontload that so that they

25   don't have to redo the deposition a second time.

Page 121

1              THE COURT:  That's what I mean.

2              MR. MCATEE:  No problem.

3              MS. CAFFERATA:  Okay.  But at some point, it

4    should be Credit Suisse and not Lehman that has to shoulder

5    the burden of Credit Suisse's failures.  I mean we are now

6    jammed in putting on what is a very complex case, with

7    thousands of trades, because for whatever reason they didn't

8    think we deserved these figures and these numbers and this

9    support.  This is something that should have been in the DQ.

10   It's, you don't hand over a bill for a billion dollars and

11   say, "We just think you should give it to us."  So, at some

12   point there should just be a cutoff date and if they can't--

13   if they don't have the resources to pull it together, then

14   that's kind of their problem.  But we've spent thousands of

15   hours trying to sift through all their stuff with no

16   explanation of, you know, oh, by the way, a bunch of those

17   files were just irrelevant.  We've wasted tons of money --

18              THE COURT:  I agree.

19              MS. CAFFERATA:  -- and so this is a recipe for

20   wasting more money.  And at some point, there should just be

21   a cutoff.  And I bet they comply with it.  I bet they do.

22              THE COURT:  I agree.  I'm seeing a new person

23   every time we have one of these.  I have ... I am cautiously

24   optimistic that we're going to get the finish line now,

25   because I agree with you, we need to be done.  It's been

Page 122

1    troubling.  I think Credit Suisse now has heightened

2    urgency.  Stakes are very high.

3              MR. MCATEE:  I agree, Your Honor.

4              THE COURT:  The stakes are very high.  There is a

5    level of --

6              MR. MCATEE:  And there is, Your Honor.  We've

7    added people, both at Cravath and inhouse and --

8              THE COURT:  I mean, I've said it out loud before,

9    is that to the extent that there was ever a thought that

10   this would be easy because Credit Suisse was the last big

11   bank counterparty standing.  That's not the case.  And it's

12   alarming that 10 years out you're in the state that you're

13   in.  So, I think the bottom line is you got to fix it, you

14   got to fix it really quickly or there are, you know, I'll

15   entertain appropriate motions for consequences.  So, get

16   back to Ms. Cafferata by the end of the day on Friday.  And

17   if you're unsatisfied with the timeframe, which I expect to

18   be very aggressive, I'll be here next week, not on Monday,

19   but I'll be here next week.

20             MR. MCATEE:  Yes, Your Honor.

21             THE COURT:  All right.

22             MS. CAFFERATA:  Thank you, Your Honor.

23             THE COURT:  Okay, is that it?

24             MS. CAFFERATA:  So, we have one topic that we can

25   agree to as far as the scope, and that is topic D5,

Page 123

1    identification of documents reflecting the trades executed

2    between September 15, 2008 and the present date, with the

3    purpose of managing, hedging or replacing Credit Suisse's

4    derivatives-related risk resulting from the termination of

5    the terminated Lehman trades, including the dates and times

6    and prices or levels at which any such trades were executed,

7    and the organization, purpose and function of the identified

8    documents, including the sources of the information

9    contained therein.

10            THE COURT:  Okay, great.  So, that resolves the

11   last paragraph, the issue that was raised in the January 8th

12   letter.

13            MS. CAFFERATA:  Correct.

14            MR. MCATEE:  Your Honor, the only caveat to that

15   is -- and I told counsel this when we were conferring -- she

16   used the term, "The present date," and what I said was that

17   although we believed that there was hedging activities after

18   the end of 2008, we were not going to argue that at trial,

19   so, we're not going to restore our databases all the way out

20   to the --

21            THE COURT:  Yes, well, that was point of our

22   previous discussion.  Is that we --

23            MR. MCATEE:  Yes, Your Honor.  But we will be

24   prepared to meet that topic through the end of 2008.

25            MS. CAFFERATA:  And they agree that they will be

Page 124

1    precluded from any evidence to contrary.

2            THE COURT:  Precluded from arguing that you were

3    managing the risk beyond that date, yes?

4            MR. MCATEE:  Yes, Your Honor.  Even though we

5    believe it happened, we're not going to argue it at trial.

6            THE COURT:  That's what I'm saying.

7            MR. MCATEE:  Yes, Your Honor.

8            THE COURT:  Okay, all right.  Thank you very much.

9    I need to release you folks so that you can eat.  Thank you

10   very much for staying here and working towards this.  And I

11   hope you take this right way, but I hope not to hear from

12   you early next week, all right.  Thank you.

13           MR. MCATEE:  Thank you, Your Honor.

14           MS. CAFFERATA:  Thank you, Your Honor.

15           THE COURT:  Keep Miss Eisen posted about the

16   estimation stipulation.  Thank you.

17       (Recess)

18           CLERK:  All rise.

19           THE COURT:  All right.  Welcome back.  Judge

20   Smith, please have a seat.  Mr. Cosenza, back to you.

21           MR. COSENZA:  Yes, Your Honor.

22   Q    I think we left off talking about Justice Carpinello's

23   report and the notice that was provided by the Trustees to

24   the certificate holders that you cited in your expert

25   report.  In that notice, there's also a reference to Judge