# EXHIBIT F

Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5  In the Matter of:

6  LEHMAN BROTHERS HOLDINGS INC.,     Case No. 08-13555-scc

7              Debtor.

8  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9  LEHMAN BROTHERS HOLDINGS, INC.,

10  ET AL

11     VS.                          Adv. No. 13-01676-scc

12  CREDIT SUISSE AG, ET AL.

13  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14

15                      United States Bankruptcy Court

16                      One Bowling Green

17                      New York, New York 10004-1408

18

19                      March 20, 2018

20                      1:29 PM

21

22

23  B E F O R E:

24  HON. SHELLEY C. CHAPMAN

25  U.S. BANKRUPTCY JUDGE

1    IN RE:   Adversary proceeding: 13-01676-scc, Lehman Brothers

2    Holdings, Inc., et al v. Credit Suisse AG, et al; Conference

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Pamela A. Skaw

```
 1   A P P E A R A N C E S :

 2   QUINN EMANUEL

 3        Attorneys for debtor

 4        51 Madison Avenue, 22nd Floor

 5        New York, NY 10010

 6

 7   BY:  DIANE CAFFERATA, ESQ.

 8        ANDREW ROSSMAN, ESQ.

 9

10   CRAVATH, SWAINE & MOORE, LLP

11        Attorney for Credit Suisse AG

12        825 Eighth Avenue

13        New York, NY 10019-7475

14

15   BY:  DARIN MCATEE, ESQ.

16

17

18

19

20

21

22

23

24

25
```

Page 4

1            P R O C E E D I N G S

2            THE COURT:  So, this is the discovery conference.

3     So, we're going to -- we're going to be not having the phone

4     plugged in but we're making a record.  Hi, Matt.

5            All right?  How is everyone?

6            MS. CAFFERATA:  Excuse me, Your Honor.

7            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

8            THE COURT:  Okay.  So, I understand that you've

9     worked out the issue with respect to the schedule for

10    completion of discovery; is that right?

11           MS. CAFFERATA:  The schedule.  Yes, Your Honor.

12           THE COURT:  Okay.  Can you let me know what you've

13    worked out?

14           MS. CAFFERATA:  Sure.  (Indiscernible) handy.

15           So, the completion of fact depositions would

16    extend from April 6th to May 7th.

17           THE COURT:  Okay.

18           MS. CARRERATA:  Defendant's expert reports would

19    be May 21st instead of the 4th.

20           Rebuttal expert reports would be July 2nd instead

21    of June 15.

22           Reply expert reports would be August 6th instead

23    of July 23rd.

24           Completion of expert depositions would be

25    September 17 instead of September 7th.

1           Dispositive motions would be August 6th instead of

2     July 30th.

3           Opposition for each would be August 27 instead of

4     August 20.

5           And reply briefs in support of dispositive motions

6     would be September 10 instead of September 3.

7           And the rest of the dates are the same.

8           THE COURT:  Okay.  And we can talk about this more

9     after we resolve what's still contested today but, even

10    though it's only March, October's remarkably around the

11    corner.  So, we have a lot of planning to do in terms of

12    getting ready for the actual trial.

13          So, that's just something that we're going to need

14    to talk about; not today, in full, but we're going to need

15    to start really planning so that you can appropriately

16    prepare and so that we can begin to block out the amount of

17    time that we need, which is substantial.

18          MS. CAFFERATA:  Thank you, Your Honor.

19          THE COURT:  All right.  Okay.

20          So, why don't you describe, I guess -- why don't

21    we have Lehman describe what's left of the matters that were

22    raised in the letters.

23          MS. CAFFERATA:  So, we resolved both the schedule

24    issue and the deposition issue.  And, so, the issues left

25    are with respect to the commodities compilation.

Page 6

1              And we've prepared a Power Point that we think

2     will help simplify and streamline the discussion of what is

3     wrong with it.

4              THE COURT:  Is it only -- is it only the

5     commodities compilation or is it the commodities compilation

6     as indicative of other compilations?

7              MS. CAFFERATA:  Right now, it's the commodities

8     compilation.  We're still reviewing some of the others.

9              THE COURT:  Have there been any compilations that

10    have been satisfactory to you?

11             MS. CAFFERATA:  I think we can say, not

12    completely.

13             Andy, would you like to address that issue?

14             MR. ROSSMAN:  Sure.

15             No, Your Honor.  I think the commodities one is

16    right and we've met and conferred on it and we've had a

17    chance to go through it in detail.

18             The other one, we're still plowing through and

19    we're pretty dissatisfied with those, too.  But they're not

20    ripe for a resolution of the dispute.

21             THE COURT:  So, explain to me how this works in

22    conjunction with being six weeks away from the completion of

23    all of the fact depositions because that's the part that I

24    don't understand.

25             So, my vision of this was that going into the fact

1   depositions, Credit Suisse would have provided what was, I

2   think, we agreed on in maybe the January conference.  In

3   other words, I don't like the word compilation. But Credit

4   Suisse would have provided the reliance materials.

5           In other words, what -- either by product or by

6   desk or by trader, however it is, and it could be a mix, on

7   what it is that Credit Suisse relied on, at the time, during

8   Lehman week, for the closeout as distinguished from what you

9   might introduce at trial to demonstrate the reasonableness

10  of what you, in fact, relied on, right?

11          So, that's what I thought was happening.  There

12  was some back and forth in the letters or in the meet and

13  confers about; well, it depends on what the meaning of

14  relied on is.

15          So, I'm confused as to how it could be that you

16  are rolling through these depositions without having that.

17  And I want to avoid -- I've wanted to avoid this for five

18  times now but I'm not succeeding.

19          So, I'm still going to keep trying.  So, can

20  someone help me out on that?  Mr. Rossman, I don't know if

21  it's you --

22          MR. ROSSMAN:  Your Honor --

23          THE COURT:  -- or Mr. McAtee.

24          MR. ROSSMAN:  Sure.  Your Honor, I'm going to

25  quickly turn this back over to Ms. Cafferata who's -- who is

Page 8

1    more prepared generally than I am, probably always the case.

2    But the issue that we confront, Your Honor, is that we have

3    been trying to work this out for quite a long time and work

4    it out outside of this courtroom.

5             And we've also been persevering in trying to get

6    as much as we possibly can get done done in the time period

7    and we've really just been japed meaning, you know, Credit

8    Suisse has stopped paying the compilations on us which we

9    find to be very unsatisfactory, very late.

10            We're trying to go forward and get depositions

11   done.  We've been doing as many as four a day to the extent

12   we can.  Our game plan of doing the 30(b)(6)s first and,

13   then, having some time and space to get ready for the fact

14   depositions --

15            THE COURT:  Right.

16            MS. ROSSMAN:  -- has been foiled as well as our

17   game plan of having the benefit of the compilations and,

18   then, take the fact depositions.

19            So, basically trying to do everything we can at

20   once to meet the schedule.

21            THE COURT:  So, here's --

22            MR. ROSSMAN:  And it's been a great prejudice to

23   Lehman.

24            THE COURT:  -- here's what -- okay.

25            So, here's what I'm worried about because the

1    issue of sanctions, preclusion, et cetera was raised.

2         So, what I don't want it to happen is, you know,

3    you take the 30(b)(6) -- you take the depositions that you

4    want to take based on what you have.

5         Then, we get to trial and, you know, Joe,

6    commodities trader, testifies and is shown a series of

7    documents and he gives testimony; oh, yes.  Those are the

8    documents I relied on which is going to -- which is -- I'm

9    -- this is hypothetical, which is contrary to the experience

10   that you had at the deposition either because the documents

11   hadn't been identified or the witness, at that time, didn't

12   know the answers.

13        And, then, I want to avoid the situation where you

14   say the testimony on this should be precluded because we

15   weren't given the opportunity to examine him in the

16   deposition and Credit Suisse says, no, no, no.  They had

17   everything they needed.  They just neglected to ask Joe

18   commodities trader the questions.

19        That's a situation I do not want to be.  So,

20   that's what need to -- we need to solve for a way to avoid

21   that because I cannot be in that position.  And I'm going to

22   find it, without prejudging, I mean, I'm going to find it

23   unsatisfying to come to the conclusion that the Lehman side

24   didn't know what they were doing when they took the

25   deposition.

Page 10

```
 1              It's going to be -- I'm going to be interested

 2    when, all of a sudden, a witness suddenly can testify to,

 3    you know, 200 screens and broker screens and emails that he

 4    says he relied on that was never identified to them.

 5              So, if I'm not making sense, please tell me now

 6    because it's better to correct me now before I keep going

 7    down this path, okay?

 8              MR. MCATEE:  Your Honor, I think you're making

 9    perfect sense.  We agree with everything you've said.

10              These compilations, as a tool to help them in

11    discovery, were first requested on January 10th, at a break.

12    I was here.  Counsel for Lehman was here.

13              THE COURT:  But here's the --

14              MR. MCATEE:  And we --

15              THE COURT:  -- thing.  And --

16              MR. MCATEE:  -- we --

17              THE COURT:  -- and, now, I feel like I'm -- I feel

18    like I'm the broken record.  I said this in January.  It

19    cannot be that ten years after the fact you are just

20    compiling this.

21              The closeouts took place on September 16th or

22    otherwise during Lehman week.  So, there exists this stuff,

23    these screens, these emails, these directions.  Whatever it

24    was.

25              So, the notion that Lehman just requested this --
```

Page 11

1    Lehman requested this in the DQ along with the proof of

2    claim.  It didn't get it not only for you but for a lot of

3    the larger counterparties.

4           They moved on from that and, then, everything

5    should have been provided.

6           So, I'm really not open to the idea that they only

7    just asked for it when that should have been produced to

8    them a long time before that.  So --

9           MR. MCATEE:  It was produced to them a long time

10   before that.  What wasn't done was identify on a trade-by-

11   trade basis, each Bates number, for each trade.  That's what

12   was requested on January 10th --

13          THE COURT:  So -- okay.

14          MR. MCATEE:  -- and we did it in 26 days for every

15   product.

16          THE COURT:  So, now what -- now what I'm hearing

17   Lehman complain about is that included in that compilation

18   or that production, however you want to characterize it, are

19   documents that could not have been relied upon because they,

20   for example, post date the closeout.

21          So, as an example, that's true.  It could not have

22   -- screens from the end of September could not have been

23   relied on, right?

24          MR. MCATEE:  I agree, Your Honor.  The ones that

25   they were talking about were screens actually from the 16th

1    that were really quotes from the 15th that were used to

2    verify the prices on the 15th.  And, in that sense, they

3    were relied upon.

4          But we've identified those and agreed to take

5    those out.

6          But they were relied upon because they were used

7    to validate the (indiscernible).  We didn't put in any from

8    the end of September.

9          THE COURT:  Go ahead, Ms. Cafferata.

10         MS. CAFFERATA:  Your Honor, this is a complex

11    issue and I renew my request to use our Power Point because

12    I think --

13         THE COURT:  Sure.

14         MS. CAFFERATA:  -- it helps.

15         THE COURT:  Let's do it.

16      (Pause.)

17         MS. CAFFERATA:  May I approach, Your Honor?

18      (Pause.)

19         THE COURT:  The other thing though is the mere

20    existence of screens and Bloomberg messages that have the

21    appropriate dates, without there being someone who can

22    testify that they, in fact, used them to do the closeout,

23    that doesn't carry the day on the issue of reasonable

24    process.

25          I've used the example before that you can't just

1    throw a dart at a dart board, you know, get a price and,

2    then, you know, go back and comb through all the screens

3    that you can find and say, oh, look, you know, we got the

4    dart board.  We got the dart to hit it in the right spot.

5             In my mind, subject to whatever arguments you're

6    going to make, it requires actual proof of what was done

7    actually on the day.

8             So, you know, reasonable process, reasonable

9    result in good faith.

10            So, that's my view of the burden of proof with

11   respect to the closeout.

12            So, I hear you on the post dating but there also

13   has to be linkage, right --

14            MR. MCATEE:  Yes.

15            THE COURT:  -- between what the compilation, to

16   use your word, and how it was used and who can own it, you

17   know, for that day.

18            MR. MCATEE:  We completely agree, Your Honor.

19            THE COURT:  Okay.

20            MR. MCATEE:  And there will be that linkage.  It's

21   not just throwing darts at a board.  We --

22            THE COURT:  I wasn't suggesting -- I use it as an

23   extreme illustrative example.

24            MR. MCATEE:  In commodities, the traders were

25   asked to gather quotes.  They did that.  They collected them

Page 14

1    and they used those to inform their judgment to mark the

2    positions at the end of the day.  That's what they did and

3    that's what the proof at trial will show.

4              THE COURT:  Are there -- is there proof of -- and

5    I'll let you get to your Power Point, Ms. Cafferata, I just

6    want to keep asking these questions.

7              Is there -- are there documents that evidence the

8    transmittal of the backup to person or persons who were in

9    charge of actually collecting it for the purposes of

10   documenting the closeout?

11             MR. MCATEE:  Yes.

12             THE COURT:  There are?

13             MR. MCATEE:  Yes, there are.

14             THE COURT:  Okay.

15             MR. MCATEE:  On the day.  It was sent to the COO,

16   Mr. Patel, who was deposed by counsel for Lehman, asked all

17   about it.  There's -- there was a spreadsheet that was then

18   prepared --

19             THE COURT:  Okay.

20             MR. MCATEE:  -- after that, several months after

21   that, but by a junior person to kind of collate and put all

22   that in one place.  It didn't have everything but it was a

23   decent effort and that was provided to Lehman as well.

24             THE COURT:  Okay.  Go ahead.

25             MS. CAFFERATA:  Thank you, Your Honor.

1          So, we basically covered the first two slides.

2          On page three, I think this goes to your point.

3    Credit Suisse absolutely had preserved the supporting

4    documentation for its claim.  They were instructed -- these

5    are high level --

6          THE COURT:  Uh-huh.

7          MS. CAFFERATA:  -- Credit Suisse people quoted to

8    save all documentation.

9          The Taoko (ph) spreadsheet is on page four and

10   this is Mr. Patel's actual testimony at deposition, contrary

11   to counsel's suggestion, that it wasn't everything.  It was

12   his best shot.

13         He said, following the default, I wanted to have a

14   single place where we stored all of the data, all of the

15   backup quotes, that we obtained for the Lehman bankruptcy.

16         And, then, in the highlighted language below; I

17   wanted to make sure that at least all the quotes that we had

18   obtained for Lehman were in one place.

19         So, the object of the Taoko spreadsheet that was

20   prepared in 2009 would have been the absolute total universe

21   of what was actually relief on which, we agree with Your

22   Honor, is the test here.  That was what they were required

23   to do.

24         THE COURT:  Okay.

25         MS. CAFFERATA:  And I think we can go past slide

Page 16

1   number 5 which is --

2          THE COURT:  So --

3          MS. CAFFERATA:  Yes.

4          THE COURT:  So, let's make sure we're saying the

5   same thing.

6          So, do you have this place?  Do you have this

7   data?

8          MS. CAFFERATA:  We have the Taoko spreadsheet

9   which they've disavowed.

10         MR. MCATEE:  We didn't disavow it, Your Honor.  We

11  just said it didn't have everything in it.  It was a best

12  effort at the time to compile what was sent to Mr. Patel.

13  But it didn't have everything.  But it was a good start and

14  they have it and they've had it for over a year.

15         THE COURT:  Okay.  Time out.  I don't understand

16  this.

17         So, in real time, not everything made it into the

18  spreadsheet.  Then what happened?  Then, in connection with

19  this litigation, people did what?  They went --

20         MR. MCATEE:  We restored databases.  We restored

21  email accounts.  We produced over 30 million pages.  And,

22  then, when they asked us for absolutely everything we had

23  that supported the closeout, we went and looked and found it

24  and added it.

25         THE COURT:  Okay.  Now, we're getting -- we're not

Page 17

1    using precise enough words.

2                 It's not everything that supported the closeout.

3    It's everything on which the traders relied to conduct the

4    closeout.

5                 So, we're back to the shoebox, right?  If

6    everything didn't make it into the spreadsheet, the only

7    additional data that should have gone into the spreadsheet

8    was data that traders or other persons engaged in the

9    closeout had that they, in fact, had used and had for some

10   reason failed to put in the spreadsheet.

11                It's not everything that everybody could find at

12   the time.  It's not market color.  It's not Bloomberg

13   messages that people didn't rely on.  It's not everything

14   that supports the claim.  That's a backward-looking thing.

15                We have -- it has to be everything that the

16   traders --

17                MR. MCATEE:  Sure.

18                THE COURT:  -- relied on.  It's a different thing.

19                MS. CAFFERATA:  Correct, Your Honor.

20                THE COURT:  I mean, I'm not saying that you're not

21   entitled to put that in at trial but they're entitled to

22   know what was relied on and what wasn't.

23                MS. CAFFERATA:  And that's what they were --

24                MR. MCATEE:  That's what we tried to do.

25                MS. CAFFERATA:  That's what --

1              MR. MCATEE:  That's what we tried to put in a

2    compilation.

3              MS. CAFFERATA:  That's what they were ordered to

4    do on January 10 and if it had been that the Taoko

5    spreadsheet was what they wanted to say they had actually

6    relied upon, they would have said; Your Honor, we're done.

7              But, instead, they argued to you, Your Honor, that

8    it would be thousands and thousands of documents.  And, as

9    you may recall, I argued, no, it's not.  It's a handful of

10   documents for each trade.  We're looking for what was

11   actually relied on.

12             THE COURT:  So, that's the thing.

13             MS. CAFFERATA:  So --

14             THE COURT:  It's a --

15             MS. CAFFERATA:  -- it's a red herring.

16             THE COURT:  -- it -- I mean, there's a lot --

17   there's a lot of trades.  But it really is a handful of

18   documents for each trade.

19             MR. MCATEE:  This is what it is, Your Honor.  This

20   is the compilation for commodities.  That's what we provided

21   to them.

22             THE COURT:  How many trades?

23             MR. MCATEE:  This is 1,240 trades and it's about

24   600 documents.

25             There are some spreadsheets that aren't in here

1    because I didn't print them.  But this is -- about the

2    ballpark quantity we're talking about.  It's not a gigantic

3    set as they portrayed in their letter.

4           It was the best effort that we had to come up with

5    what was relied upon at the time.  But it wasn't just one or

6    two quotes.  It was a lot of information because they had to

7    use their judgment to mark the books.

8           MS. CAFFERATA:  Your Honor, if I may continue, I

9    think I can --

10          THE COURT:  Okay.  Go --

11          MS. CAFFERATA:  -- provide some backup material

12   that's helpful.

13          THE COURT:  -- let's -- let's try to keep going.

14          MS. CAFFERATA:  On page six, there are quotes from

15   Mr. McAtee explaining what it is they did in preparing that

16   pile of documents.

17          They stated Cravath and Cornerstone, their

18   consultant, identified the documents to be included in the

19   PG&E spreadsheet, based on the guidance provided by

20   Mr. Patel and Mr. Allen in these conversations.

21          Credit Suisse never represented that a current

22   employee would be responsible for the mechanics of preparing

23   the spreadsheet and this emphasized to us that they -- in

24   order to produce these compilations in less than four weeks,

25   they had to distill from over three -- thirty million pages

1   of documents, and enormous databases of information, that

2   pile of documents.

3           And, when we asked Mr. Patel, well, was anyone at

4   Credit Suisse actually involved in the preparation of this

5   batch of documents?  When they came up with this pile, did

6   anyone actually lay eyes on it that was a trader or knew

7   anything about what they actually relied on?  He said, I'm

8   not aware that anyone at Credit Suisse reviewed this.

9           And, so, what we have on slide seven is an idea of

10  how many documents on the left side were identified for

11  however many trades.  So, for example, for 221 of the

12  trades, there were 150 documents that were identified as

13  claim support.  And the average number of documents that

14  were identified for each trade was 140.

15          THE COURT:  Where are you now?  I lost you.

16          MS. CAFFERATA:  This is on page seven.

17          THE COURT:  Yeah.  Could you start over again?  I

18  just -- I didn't --

19          MS. CAFFERATA:  Sure.

20          This -- on the right side, on this column, we show

21  the number of trades for which the -- this is the amount of

22  documents that were identified for each of those trades.

23          So, on the first line, for two of the trades, they

24  identified 155 documents to us.

25          The average, per trade, was 140.  That's in the

1    headline.  So, 140 documents we had to sift through and try

2    to figure out what made any sense preparing for our

3    depositions.

4           And, so, taking an example, on page eight, this

5    was for a California hub trade and 108 documents were

6    identified in the claim support for this one trade.  This is

7    the Venn diagram.

8           Then of them in the little circle were duplicates.

9    So, that leaves us with 98.  Of the 98, they suffered from

10   one or two major flaws, with the exception of 15 of them.

11   So, you can see 25 were on the wrong product; 16 had no

12   price data; 16 had no 9-15 values; 6 were postdated; and 22

13   were the wrong delivery period.  And there's some overlap

14   because sometimes they suffered from two of these defects.

15          The result, and this is being as generous as we

16   know how to be, 15 are things they plausibly could have

17   relied on.  This number includes things that a trader would

18   look at and say, no, not really.  But they just didn't

19   suffer from these huge defects.  So, 15 is generous.

20          Counsel has emphasized the postdating as something

21   he can cure by filtering and he sent us a letter saying,

22   they've now filtered that out and they've identified four as

23   the Bates numbers of the documents that just had the

24   postdating problem.  And that was 102 of the 608 documents

25   that they gave to us.

1          Turning to -- and that was slide nine.  Slide ten,

2     this is a cherrypicked trade.  This is -- and not only

3     cherrypicked, this is not just the one that they wanted to

4     trot out as a fine example.  This is the one trade where

5     they actually had a trader who looked at it and said, this

6     is what he actually did and actually looked at.

7          These are their bullet points from their letter to

8     the Court and this -- and, on the left side, in the red

9     boxes, are the truths about those documents.

10         Some of these items are just things you don't look

11    at the -- they couldn't have looked at at the time.  For

12    example, the closeout values for all the terminated trades.

13         We have system extracts which is not what traders

14    looked at at the time.

15         On the first line, we have ten quotes from dealers

16    and brokers; seven of the ten are duplicates or unrelated

17    quotes.  I mean, there's a whole bunch of chaff in here.

18    And, so, the upshot of this is that approximately ten of the

19    quoted documents are things that could have plausibly have

20    been relied upon at the time.

21         So, turning to slide eleven --

22         THE COURT:  I mean, how many do we -- for example,

23    this was a position closed out by Fred Allen.

24         MR. MCATEE:  Yes, Your Honor.

25         THE COURT:  Who's -- who was Fred Allen?

Page 23

1              MR. MCATEE:  He is the only power, gas and

2     emissions trader who is left at Credit Suisse.

3              THE COURT:  Who's left now?

4              MR. MCATEE:  Correct.

5              THE COURT:  Okay.  At the time, how many trades

6     did he have to closeout?

7              MR. MCATEE:  I'm not sure, Your Honor.  But he was

8     an emissions trader, not power and gas.

9              THE COURT:  Uh-huh.

10             MR. MCATEE:  But this is an emissions put option.

11    So, it would --

12             THE COURT:  Yeah.

13             MR. MCATEE:  -- have been one he would have closed

14    out.  And he was consulted in connection with preparing the

15    compilation.

16             THE COURT:  But I guess the point is that --

17             MR. MCATEE:  Maybe I can clear up if I -- one

18    point of confusion.

19             THE COURT:  Uh-huh.

20             MR. MCATEE:  Not all of these were to support the

21    backup because we had to do a compilation that had mid-

22    values.  It had to have the bid offer related information.

23    It had to have the risk metrics which they also asked for.

24             We identified the indoor extracts that related to

25    the particular trades.

1              All of those are included in this list of

2      documents.  And, at the top, are the kind of quotes and

3      price data.  Some of them were duplicates because they were

4      shared among traders.  They were sent around with emails

5      saying here are the quotes I got.  We listed all of those.

6              So, she's right.  There's -- a couple of those are

7      duplicates.

8              But this is the information, all in one place,

9      that relates to this one trade that informed Mr. Allen's

10     judgement in closing it out.  And that's what we thought we

11     were asked to do and, so, that's what we did.

12             THE COURT:  So, the testimony -- Mr. Allen will

13     testify that he relied on all -- that all -- each and every

14     one of these 40 documents, in real time, on -- in Lehman

15     week, when he was closing out, he relied on all these?

16             MR. MCATEE:  Some of the documents, Your Honor,

17     are the trade at -- are -- postdate that -- if they -- they

18     support the trade attributes in Credit Suisse's systems.

19     So, I want to separate that from the quotes and --

20             THE COURT:  What do you mean by --

21             MR. MCATEE:  -- the dealer runs.

22             THE COURT:  -- support the trade attributes in

23     Credit Suisse's system?

24             MR. MCATEE:  So, if they ask for where's your mid-

25     value, we'll cite the indoor database and give them a Bates

Page 25

1    number as to where the mid is in our system.

2              THE COURT:  Right.  But --

3              MR. MCATEE:  That wasn't relied upon.  That was

4    what was created after the trade was closed out.

5              THE COURT:  Right.  I -- I'm continuing to seek to

6    distinguish between broader support materials and what was

7    relied upon when the trade was closed out which in my

8    simple-minded way of thinking about it, you know, you got a

9    lot -- there was a lot of bid offer out there.  There were

10   broker screens.

11             The trader had evaluated what he was looking for

12   and he either -- you know, he hit the bid, he lifted the

13   offer.  There it was.  Done.  And, then, that's it.

14             It's just not -- I don't --

15             MR. MCATEE:  There were other things that went in

16   -- it was a little more complicated.  He had -- this was a

17   put option.  He had to have volatility information; that

18   some of these documents on this list were the volatility

19   numbers that he used.

20             THE COURT:  Okay.

21             MR. MCATEE:  So, yes, he will testify that the --

22   this was the source of data he had that informed his

23   judgment when closing out.  That's what he'll testify to.

24             MS. CAFFERATA:  So, I think Your Honor hit it

25   right on the head.  Mids, risk sensitivity spreadsheets are

Page 26

1    just entirely separate from what this exercise was supposed

2    to be.

3              MR. MCATEE:  You asked for it.

4              MS. CAFFERATA:  And we did --

5              MR. MCATEE:  They asked for all of it.

6              MS. CAFFERATA:  -- not ask for it.  I'm happy to

7    go back to January --

8              THE COURT:  Let's not talk over each other.

9              MS. CAFFERATA:  -- to -- yeah.  We can go back a

10   few slides and show what I actually argued to see the truth

11   of what I said.

12             But we did not ask for everything.  We did not ask

13   for comprehensive.  We asked for a complete set of what was

14   actually relied upon and, as Mr. McAtee has just argued, or,

15   I'm sorry, admitted, they did -- they included a bunch of

16   other things.

17             And this particular example is the one that

18   actually they had a trader left who could speak to it.

19             Now, if they don't know what they actually relied

20   on, and those traders have left, then the solution would be

21   to have zero documents identified in this spreadsheet.

22             If they really can't go back and tell us what they

23   actually relied upon, then that's their problem.  It's their

24   burden.

25             THE COURT:  So --

1                MS. CAFFERATA:  And that's not what they did.

2                THE COURT:  So, what -- okay.

3                MS. CAFFERATA:  This is the best example they'll

4     have, Your Honor.

5                THE COURT:  So, what -- what's the answer for not

6     having someone who can give testimony as to what was

7     actually relied upon?

8                MR. MCATEE:  I --

9                THE COURT:  Is the answer testimony from someone

10    who says this is what the trader would have relief upon?

11               MR. MCATEE:  There may be some of that at trial,

12    Your Honor.  But they're also -- Lehman is deposing and

13    we're asking -- we will ask questions at those depositions

14    of traders who were formerly at CS and they will testify

15    about what they relied upon.

16               So, they'll -- that will be part of the record as

17    well.  Some of those individuals are in New York.  They

18    could be subpoenaed to come to testify at trial.

19               THE COURT:  But it's your burden.  I mean, if you

20    can't --

21               MR. MCATEE:  I understand.

22               THE COURT:  -- put someone up there to say what

23    was -- what was relied upon.  I mean, you can argue

24    otherwise.  But --

25               Look, I mean, there's -- Mr. McAtee is correct

Page 28

1    that they needed to provide everything to you.  But

2    Ms. Cafferata is correct in that my direction was to provide

3    specifically the reliance materials and not having it be a

4    treasure hunt in a bigger data set to figure out what the

5    reliance materials were.

6            That literally they should have been -- be able to

7    go into each and every deposition with a packet this thick

8    and say, you know -- and go through all the screens and

9    whatever other communication there was relating to the

10   closeout.

11           If there were adjustments for liquidity or in the

12   -- you're mentioning volatility or whatever it was.

13           MR. MCATEE:  And, on that issue, Your Honor --

14           THE COURT: (Indiscernible).

15           MR. MCATEE:  -- I just want to mention that we

16   have had meet and confers on this and that is one of the

17   things that I offered to them.

18           If there was a different way to package this, to

19   put asterisks next to what they're really interested in, if

20   they really are interested in the quotes, I'll put asterisks

21   next to the quotes and so we don't have to worry about the

22   volatility or the trade attributes, I offered to do that.

23           THE COURT:  They're interested in knowing what the

24   trader relied on.  Period.  It's just not that complicated.

25   It's -- I -- I mean, it's not -- it can't be a guessing game

1     when they go into the deposition and, then, hear, for the

2     first time at trial, that we relied on this and we didn't

3     rely on that.

4           MR. MCATEE:   Okay.   So, in the instance of the

5     trade we were just talking about, the ten quotes, which are

6     really four or five because there was some sharing of the

7     same information; those have been identified.   They know

8     what they are.   They can ask the trader about those quotes.

9     That has been done.

10          The history of this compilation though goes back

11    to a much broader set of materials than just those quotes.

12          Her -- Ms. Cafferata's letter to me, which was on

13    the 15th, it was four days after; we had nine days to put

14    this together.   This was in the middle of that period.   It

15    must include any data or documentation relied upon in

16    calculating closeout values, including any and all screen

17    shots; any and all Bloombergs; market data feeds; third

18    party data; auction results; bid offer quotes; other emails;

19    other communications; anything used by Credit Suisse to

20    support its closeout value -- valuations.

21          That's the letter we got.   That's what we thought

22    we were doing and that's what we provided.

23          THE COURT:   Okay.   I feel like that you're running

24    in circles and --

25          MS. CAFFERATA:   Your Honor, may I --

1          THE COURT:  -- and my view of it is that you were

2     obligated to give them everything and you were obligated to

3     give them specifically what was relied on, in real time, to

4     do the closeout.  Those two things.  You were -- it is not

5     view that it was going to be okay to provide the broader

6     data set or a broader set of Bates numbers and for them to

7     have to figure out what might have been relied on.  That's

8     my view.

9          If that -- if the latter, what I just described,

10    has not happened yet, that's a problem.

11         MS. CAFFERATA:  Your Honor, may -- may I make two

12    points?

13         THE COURT:  Yes.  Go ahead.

14         MS. CAFFERATA:  Two things.  One is that it's not

15    -- well, the main point is that it is not an inclusiveness

16    issue.

17         My first point is, yes, I think the way -- the

18    best way to look at it or -- and maybe this is an over

19    simplification, but if I ask you for the complete train

20    schedule, I expect the train schedule.  I don't expect a

21    bunch of other things about trains and how many trains they

22    had coming out of each station at -- at different times for

23    different reasons.  I expected the train schedule and I

24    expect to be able to see that.

25         And, so, all of these arguments about everything

Page 31

```
 1    and we asked for a comprehensive thing is really just

 2    muddying the waters.

 3             The bigger point is that it's really not an over

 4    inclusiveness problem alone.  It's also that now their

 5    witnesses have run away from the claim support.

 6             So, for example, in credit, we had Steven Feinberg

 7    (ph).  If you turn to page twelve of the Power Point, we put

 8    in front of him some of the items that had been identified

 9    as claim support for a particular trade.  And he took one

10    look at it and he said, I don't know what GSLECX-2 is.  So,

11    I wouldn't rely on it because I don't know what it is.

12             Clearly, he'd never laid eyes on the pile of

13    documents.

14             THE COURT:  What's that?  Just for me further

15    education; what's pie grade trading?

16             MR. MCATEE:  It's a credit product, Your Honor.

17    It doesn't relate to the commodities compilation.

18             MS. CAFFERATA:  This is -- yes.  This is another

19    product.  But this -- I'm trying to explain where this is

20    going.

21             THE COURT:  Yeah.  No.  I understand.

22             MS. CAFFERATA:  Because I think it's very

23    instructive.

24             THE COURT:  I -- no.  I understand.  So --

25             MS. CAFFERATA:  Yep.
```

Page 32

1          THE COURT:  -- that's -- this is my question about

2     how you're going to roll through the depositions without

3     having the reliance materials because you're stuck with

4     every document --

5          MS. CAFFERATA:  Well --

6          THE COURT:  -- in the compilation and that you

7     have to literally go through the deposition and say; did you

8     rely on this?  Did you rely on this?  Right?

9          MS. CAFFERATA:  Right.  And you'll see what the

10    witness does and where we're going with this and why they're

11    going to need -- there needs to be some kind of preclusive

12    sanction.  That's the only answer.

13          They have the burden in providing this.  They

14    haven't provided it and they're not going to be able explain

15    it.  The witnesses cannot support what they've done here.

16          So -- I don't need that.

17          And this -- on page thirteen -- all right.

18          There were 531 documents that were provided for

19    Goldman Sachs.  And we had identified to them, in response

20    to their request that their 30(b)(6)s have some kind of

21    example to look at in terms of their preparation; what they

22    were really going to be responsible for answering to at

23    their deposition.  We were -- we'll relate it to an example.

24    And we said fine.

25          So, this was pertaining to that example and 531

Page 33

1    documents were identified for this particular trade

2    (indiscernible).

3              And, so, on a second document that we pulled out,

4    we pulled out another example and if you can see if there --

5    it's just clearly not something that's pertinent and

6    Mr. Feinberg agrees.  This looks to me like something around

7    currency trading.  So, no.  I wouldn't have used this in the

8    closeout.

9              And we put about 20 documents in front.  These are

10   just a few examples.

11             On fourteen -- actually, skip over fourteen.

12   That's a different example.

13             On page fifteen, Your Honor, we put in front of

14   him what is in the right top corner.  This is his run and

15   these are the prices at which he was hoping to supposedly

16   buy.  And we asked; if this is -- do you know if this is one

17   of the documents that you relied on in pricing your Lehman

18   position?  And he admits this was his 1123X potentially it

19   was included.

20             So, he starts to embrace this document as; there's

21   the support, even though all those documents were not things

22   I would have looked at or did look at.

23             Then, on cross-examination, Mr. Nassab (ph)asked

24   him; I wanted to draw your attention to the time.  This was

25   supposed to be an 11 a.m. closeout.  And ask whether that

1    changes your answer.

2              And the witness said, it would change my answer

3    because it was already past the time we had done the

4    closeout.

5              And, you see, that's because this -- these numbers

6    were actually the numbers at which they would have sold and

7    it's not a good document for them.

8              And, so, they ran away from it.  And you can see

9    that on the follow up examination, Mr. Feinberg had

10   disavowed the document that he thought he had potentially

11   used.

12             And, so, what we're seeing here is counsel and

13   consultants came up with, you know, not just came up with,

14   combed through 30 million documents, ran some searches, you

15   know, run everything that has GS in it.  Dump it on us and,

16   then, when we actually are able to figure out, okay; well,

17   here are the handful of documents that we think you might

18   actually have used, they didn't use those things.  Or they

19   have some other explanation.

20             And the explanation has been that there's a little

21   bit different definition around relied upon and we just --

22   we just don't know how it's possible that all of us seem to

23   understand what it was that was actually required here.

24   It's wilful.  You know, Credit Suisse has told us they had a

25   partner approve this and so they included all these things

1    knowing full well that this could be the result.

2            And, at the last hearing, I explained that, at

3    some point, Credit Suisse needs to shoulder its own burdens

4    instead of Lehman.  We have -- you know, we're trying to put

5    on a very complex case with thousands of trades.  This is

6    something they should have done way back in the day; not

7    something they should have created and given to us now.

8            And they're the ones asking for a billion dollars.

9    They're the ones who have the burden.  And the time has come

10   for them to deal with the consequences of not having any

11   adequate story around what they did.  If they don't have a

12   reasonable basis, they don't have a reasonable basis.  And

13   that is what is required here.

14           So, we seek leave, Your Honor, to brief the issues

15   so that we can address the issues of the appropriate

16   monetary sanctions that we -- as we've wasted a lot of money

17   dealing with this frivolous production and also the question

18   of how to deal with the preclusion issue.

19      (Pause)

20           MR. MCATEE:  Your Honor, all of the examples she

21   just went through were credit.  That's a completely

22   different product area.  I thought we were here to talk

23   about commodities.

24           I think there's an answer to all of those.  It's

25   just that this wasn't shared with us in advance and I don't

Page 36

1    know what the answer is.  But there is an answer to those

2    very few examples she just -- she just pointed out.

3              It's not true that the credit compilation was

4    prepared by just Cravath and Cornerstone.  We had multiple

5    CS employees there at the time who worked on these trades

6    help us prepare the compilation and put the right documents

7    in.

8              THE COURT:  Yeah.  Look.  Let me --

9              MR. MCATEE:  So --

10             THE COURT:  Let me --

11             MR. MCATEE:  -- that's what happened.

12             THE COURT:  -- let me --

13             MS. CAFFERATA:  Your Honor, if you look on page

14   eleven --

15             THE COURT:  Uh-huh.

16             MS. CAFFERATA:  -- this is the commodities

17   closeout where they just disavowed the support completely.

18   This is their 30(b)(6) on the subject and he -- and we asked

19   him; are there any SP15 quotes in this document?  I could

20   tell you.

21             And that if this is included in the documents,

22   then these would be relevant for that pricing.  And we

23   asked; well, what gives you that confidence?  Because this

24   would have been prepared by counsel and by Cornerstone, our

25   consultant.

1              And, then, we said; were the values in this email,

2     in fact, used to value this trade explicitly?  I don't know.

3              So, that's what we're dealing with commodities and

4     I just jumped over it because I think the credit example

5     that we have of Feinberg is really telling that they're --

6     they're just going to try to change their story and never

7     identify what support they have.

8              THE COURT:  But --

9              MR. MCATEE:  Can I just address that example

10    because --

11             THE COURT:  Yes.

12             MR. MCATEE:  -- I did come ready for that when I

13    looked at that one.  That is a commodities example.  She

14    asked that question.  It was a gas quote and it was a power

15    trade.

16             Mr. Patel was not a trader.  He was the COO.  He

17    was our 30(b)(6) but he was not a trader.

18             If you would ask a trader about that document, you

19    -- she would have learned that gas quotes can be used for

20    power trades because they're -- the markets are inter-

21    related and those -- those quotes can be used for both

22    purposes.

23             So, that's the answer to that one.  That's why

24    it's in the backup.  It wasn't just randomly plucked and put

25    in there to deliberately confuse them.

 1              THE COURT:  Okay.

 2              MS. CAFFERATA:  Well, that's a 30(b)96).  He

 3     should have been prepared on that then and been able to

 4     testify to it.

 5              THE COURT:  Look.  I -- this is -- from where I am

 6     sitting, I'm in an impossible situation because this is the

 7     continuing -- this is the same theme and the same words that

 8     we've had in every conference.

 9              And, you know, as I said to you before, in all of

10     the derivative cases, this is now the seventh one, combined,

11     I didn't have this much trouble.

12              So, I continue to not understand this.  I just

13     don't -- I just don't understand it.

14              But I do -- will tell you is in turning to page

15     eighteen of this Power Point, where Lehman's requesting

16     motion for leave to file for sanctions seeking -- including

17     that Credit Suisse should be precluded from offering its

18     compilation as evidence of the information its traders

19     relied on, there's no way the compilation is going to

20     evidence.

21              MR. MCATEE:  We're not asking for that, Your

22     Honor.

23              THE COURT:  Okay.  I mean, there -- there is no

24     way.  I mean, it -- the only thing that comes in as evidence

25     in the form of a "compilation" is something as to which

Page 39

1    somebody can testify was created at the time.

2         If a desk had a spreadsheet.  If a unit -- I don't

3    know how business is organized, if a trader had a log,

4    whatever it was, that comes in.  But not something that was

5    created by counsel.  So, that's a non-issue.  That's just --

6    that's a complete non-issue.

7         MS. CAFFERATA:  Well, I think, Your Honor, we're

8    -- and we would like the opportunity to brief this so that

9    we can be more delicate --

10        THE COURT:  Well, I'm --

11        MS. CAFFERATA:  -- in how we explain this.  But

12   what we're saying is the information in the compilation, the

13   piles and piles of documents that clearly don't relate and

14   the ones that they want -- disavowed later, all of those

15   should be eliminated because they were asked to provide what

16   they actually relied on --

17        THE COURT:  Well, now, I'm not --

18        MS. CAFFERATA:  -- and they failed.  So, if they

19   failed, they failed.

20        THE COURT:  But, now, that's different from the

21   words on this page.  Being that now we're confronting the

22   situation where they're going to put on a witness to give

23   testimony about the -- a particular part of the closeout and

24   he's going to be shown a bunch of documents and he's going

25   say those are what I relied on, right?

1          And, then, I'm going to be confronted with the

2    issue I want to avoid which is that they had no way of

3    knowing that those were the particular documents a trader

4    was going to rely on.  And if they took the deposition of

5    that person, it had to have been the case that, at the time

6    of the deposition, they were able to show the witness that

7    set of documents.

8          If that's not true, then that witness's testimony

9    is going to be precluded.  That's the blueprint.  That's

10   just -- that's the blueprint.

11         So, if they can't do it because they have a

12   thousand documents for one witness who closed out five

13   trades, they can't do it.

14              MR. MCATEE:  They --

15              THE COURT:  I mean, it's just --

16              MR. MCATEE:  They have 600 documents for 1,200

17   trades.  It's that pile right there.  They know which

18   traders closed out the -- which positions.  We've listed

19   each Bates number by trade.  They know how to depose

20   witnesses.  They've done it.  They've asked the traders

21   about those documents.

22              THE COURT:  Okay.  I hear you.

23              MR. MCATEE:  They know.

24              THE COURT:  We -- that's not an unreasonable pile

25   for a thousand trades.  I agree with you.

1                    MR. MCATEE:  And the piles for rates and FX and

2      the other areas are less.

3                    THE COURT:  Then, what --

4                    MR. MCATEE:  There's only 60 documents for all of

5      rates.

6                    THE COURT:  Then, why are we talking -- but here's

7      the disconnect.  Why are you telling me that you had to comb

8      through 30 million documents?  I don't understand that.

9                    MR. MCATEE:  Because at the time the -- back in

10     September of 2008, when we made an effort, Mr. Taoko did it.

11     He didn't include all the quotes.  He only had most of them.

12                   So, we went back through the files, found the

13     quotes that were also used, also relied upon on the 15th and

14     added those to the stack.

15                   THE COURT:  Where does the 30 million documents

16     come in?

17                   MR. MCATEE:  That's what was -- that's the

18     databases and the emails that were restored in archive over

19     the course of the last year.

20                   We searched those for September 15th, found the

21     quotes, put those with the right trades and added those to

22     the spreadsheet.  And it ended up with this pile of

23     documents right here.

24                   It's a little bigger than that because there are

25     some spreadsheets and things that aren't in here.  But

Page 42

1    that's the right size.  This isn't a game.  They're not in

2    the dark.  They're -- and all the things she wrote in her

3    brief about they're completely unaware is not true.

4           This is the stack.  They've been using them in

5    depositions.  There is no prejudice, Your Honor.

6           MS. CAFFERATA:  Your Honor, by his own admission,

7    we saw the letter, he said that 122 of the 608 documents

8    were postdated.  They did not exist at the time.  They're

9    not what was relied on.

10          Why are you combing through 30 million documents?

11   Why?  Because you're telling a story.  Because the answer is

12   that you don't have support for what you did.  And you don't

13   want to show the documentation that those senior business

14   people said, make sure you save all the documentation.

15   Instead of pulling that out, and making sure it was

16   delivered --

17          THE COURT:  And, see, here's the part -- here's

18   the part I don't understand.

19          MS. CAFFERATA:  -- we got a pile.

20          THE COURT:  Here's the part I don't understand.

21   If you -- I think it's in the book.  There's an email that

22   says everybody save your screens and then send them to me.

23   I think --

24          MR. MCATEE:  True.

25          THE COURT:  Right?

1              MR. MCATEE:  Yes.

2              THE COURT:  I don't understand why it would take

3    combing through 30 million documents when you can search for

4    those custodians and those senders and those -- I just -- I

5    don't understand it.

6              If -- everything I've seen before this case

7    involved discreet deliveries of documents to desk heads or

8    whoever it was that went up the chain that then put it into

9    the spreadsheets that led to the claim.  Not 30 million

10   documents.

11             Sure.  A bigger data set when you're talking about

12   justifying, you know, adding liquidity premium or however

13   else you're going to, you know, adjust your price or your

14   closeout.

15             But for just the basic closeout, I just -- I don't

16   understand it and it's not going to be very credible just to

17   have somebody look at a screen that has the right date and

18   say; well, I must have relied on it.

19             MR. MCATEE:  I don't think we're saying that, Your

20   Honor.

21             And the 30 million was just a reference to how we

22   found the other quotes.

23             THE COURT:  Yeah.  I get it.  Yeah.  I get it.

24             MR. MCATEE:  So, Mr. Taoko and others, back at the

25   time, did their best --

1          THE COURT:  Well, what's your response to --

2          MR. MCATEE:  -- but they missed a few.

3          THE COURT:  -- the fact that Ms. Cafferata has

4    identified a set of documents and demonstrated that a whole

5    bunch of them could not possibly have been relied on?

6          MR. MCATEE:  So, if that's -- I'm glad you

7    mentioned that, Your Honor.  I mentioned that earlier.

8          But that's what I was referring to when it depends

9    -- and I said it depends upon your definition of relied

10   upon.  Those were the documents that came in on the 16th

11   with prices for the 15th that were relied upon in order to

12   validate the numbers used on the 15th.  That's why those

13   were included.

14         Counsel sent me a letter about that.  I agreed to

15   take those out.  I identified which ones they were.  And,

16   so, those are now -- should not be an issue.  Those are out.

17   But they were relied upon because they were used to validate

18   the numbers.  That's what that issue is.

19         MS. CAFFERATA:  Well, Your Honor, if we look back

20   at slide eight, there are a number of problems.  That's just

21   one of the problems and it's a relatively small one.

22         There are -- there are issues about -- there's no

23   price data in many of these documents.  It's the wrong

24   delivery period.  It's the wrong product.

25         THE COURT:  Right.  So, let's look at the wrong

Page 45

1   product.  So, the documents relating to the wrong product

2   could not possibly have been used to validate the right

3   product, right?

4           MR. MCATEE:  Well, Your Honor, I need to go back

5   and look at the documents in the example.  But the answer to

6   that is sometimes they are.

7           If you have a west power quote and that's the best

8   you could do on this day because it was very volatile and

9   you want to price an east power position, you might use the

10  west to price the east and then adjust it for some

11  correlation factor.

12          So, just because it's a different product doesn't

13  necessarily --

14          THE COURT:  Okay.

15          MR. MCATEE:  -- mean it's irrelevant.

16          MS. CAFFERATA:  But that's not what their witness

17  testified to, Your Honor.

18          MR. MCATEE:  That --

19          MS. CAFFERATA:  So, that's completely speculative

20  coming --

21          MR. MCATEE: That --

22          MS. CAFFERATA:  -- you know, I mean, that's --

23  that's a post hac explanation.

24          MR. MCATEE:  That is what the witnesses testified

25  to, Your Honor.

1          MS. CAFFERATA:  No.  He's --

2          THE COURT:  My question for you is how we're going

3     to get through this pile because this is -- this is

4     untenable.

5          (Pause)

6          THE COURT:  I don't know what else to say other

7     than, Ms. Cafferata, you're going to have to make your

8     motion and that the -- there will be preclusion of testimony

9     to the extent that the witnesses cannot give specific

10    testimony that, in fact, with respect to the documents

11    they're being shown, that they relied upon them to conduct

12    the closeout.

13          Not broad market color that was generally

14    available.  Not after the fact rationalizations.

15          I hear you on the point about using a different

16    position or product as a basis for a closeout.  That's

17    something that I can understand that that would -- that that

18    might be the case.

19          I'm not saying that you won't disagree but I hear

20    you and I understand the point.

21          I don't know what else to do.  I literally -- but

22    I don't -- do not understand.  We're six weeks away.  All

23    the witnesses that you've testified; have you been unable to

24    identify, through their testimony, the documents on which

25    they say they relied for closeout?

1                MS. CAFFERATA:  You should address this.

2                MR. ROSSMAN:  Yeah.  Can I address that, Your

3      Honor?

4                THE COURT:  Yeah.

5                MR. ROSSMAN:  The Feinberg -- the example of

6      Mr. Feinberg who is their -- effectively their flow credit

7      head.

8                THE COURT:  Yeah.

9                MR. ROSSMAN:  Okay?  Is -- illustrates the problem

10     of trying to achieve this in depositions which is even if

11     you zero in on one particular name; I had two days to take

12     Mr. Feinberg's deposition, okay?

13               We told them Goldman Sachs was going to be our

14     example that we're going to use.  They knew that ahead time.

15     There were 531 documents in their spreadsheet that they

16     labelled with Bates numbers to say this is what they relied

17     on.  And you're turning over a document, a document, a

18     document and the witness is disavowing, saying it has

19     nothing to do with Goldman Sachs.  I didn't rely on it.

20     It's the wrong time period.  This is currency trading.

21               So, we tried to zero in on what we thought perhaps

22     he relied on.  So, we actually showed him his run.  The

23     11:23, that was that example.

24               And, then, what we get is where it's favorable to

25     us, or unfavorable to them, then they realize that during

1    deposition and, then, walk away from it on cross-

2    examination.

3            So, what I don't want to do is I don't want to

4    show up at trial and I've got a moving target because even

5    that, it looks like I have larger sets of documents in my

6    office.  I'm certain you in chambers, Your Honor.  It's not

7    the size of the document.  It the permutations that are

8    there which defeats the ability to know what the witness's

9    testimony's going to be.

10           So, for every given trade, there are 140 different

11   sources of information that are being cited in that pile as

12   things that the trader might say he's going to rely on and

13   we won't know that until the trader hits the stand.  That's

14   a tough cross-examination.

15           I'll tell you, it's frustrated our ability to be

16   effective in the depositions because all we're effectively

17   getting from the trader witnesses is a disavowal of the

18   claim support spreadsheet.  I didn't put that together.

19   Their consultants did.

20           And, then, when you ask them with specifics, you

21   couldn't have enough days of deposition testimony to

22   possibly get meaningful information because --

23           THE COURT:  So --

24           MR. ROSSMAN:  -- there's too many documents.

25           THE COURT:  Okay.  So, if we were to go to trial

1    tomorrow, and you're going to put on whoever you're going to

2    put on, traders, desk heads; you're going to have to --

3    there's going to be an exhibit binder, right?  And you're

4    going to show them documents, right?

5              MR. MCATEE:  Yes, Your Honor.

6              THE COURT:  Okay.  And, again, not saying that, at

7    this point in the run up, you have to have completed it.

8    But before the deposition, they need -- I've said it so many

9    -- I feel like I'm just a broken record.

10             They need to not have to go through that.  They

11   need to have the specific documents on which the trader

12   relied.

13             I just -- when you're prepping the witness, aren't

14   you going through that with the person?

15             MR. MCATEE:  Yes, Your Honor.  And they had it.

16   It was in the spreadsheet.  He had the -- however many

17   documents there were for each position.  There are 1200

18   names.

19             THE COURT:  But I --

20             MR. MCATEE:  They had all the documents.

21             THE COURT:  But what are we --

22             MR. MCATEE:  They had them.

23             THE COURT:  This is nonsensical.  Mr. Rossman just

24   stood and gave chapter and verse about a witness disavowing

25   document after document after document.

1          So, what's happening here?

2          MR. MCATEE:  I think in the deposition he talked

3    about an awful lot of them and there were a couple that

4    didn't match.  I'm not -- I'm not credit.  I'm the

5    commodities partner.

6          But my understanding of that deposition was he did

7    a good job with all the documents.  There were a couple of

8    examples where they were pointing out these that they

9    perhaps shouldn't have been in there.  But the vast majority

10   of them were spot on.  That's what happened.

11         That doesn't mean we didn't do a good job with the

12   compilation.  It's just means we might have missed a few.

13   But, overall, we did a very good putting this together and

14   giving them a road map to the various trades.

15         I was there for the commodities one.  They put up

16   the trades, the back up.  They went through all of them,

17   trade-by-trade.  The witness talked about them.

18         They had the road map.

19         MR. ROSSMAN:  I don't know what to say other than

20   that absolutely was not true with respect to the credit

21   trader that I spent two days taking.  And the difficulty

22   that we have with it is we have two discovery tools we're

23   trying to use effectively to put us in a position to

24   understand what their case is going to be for this, you

25   know, claim larger than a billion dollars that they've put

1   to the estate.

2          And forget about the DQ and the proof of claim

3   which they should have done, you know, way back in 2009.

4   But, even in this discovery exercise, they understood.  Your

5   Honor instructed them that they were supposed to identify

6   for us the specific supports that would go behind the claim

7   values that they associated with these trades.

8          Now, Goldman's a significant dispute of ours.

9   This is, you know, something that was identified to them in

10  advance.  I try to use it as the one where we should be able

11  to identify each other.  And I -- I welcome Your Honor to

12  read the two days' worth of transcript and I'm confident

13  that you'll come to the same conclusion that I came to which

14  is the exercise was completely frustrated.  You could not

15  extract from the witness --

16          THE COURT:  So --

17          MR. ROSSMAN:  -- the documents the witness relied

18  on.

19          THE COURT:  -- today -- so that deposition is

20  completed.

21          MR. ROSSMAN:  The 30(b)(6).

22          THE COURT:  The 30(b)(6).

23          MR. ROSSMAN:  That's right.  Uh-huh.

24          THE COURT:  Okay.  But is there going to be

25  another deposition of -- with respect to Goldman?

Page 52

1          MR. ROSSMAN:  There'll be a fact witness.  There

2    will be 30(b)(1) of that individual and we'll try our best

3    to zero in on what we can get done.

4          But the whole idea of the 30(b)(6)s was that they

5    would have someone who was supposed to show up with the

6    institution's knowledge and identify for us the specific

7    support that they're -- that they relied on back in 2008 for

8    formulating this claim.

9          THE COURT:  And you're saying that that was not

10   accomplished in that deposition.

11         MR. ROSSMAN:  Absolutely not.

12         THE COURT:  And you --

13         MR. ROSSMAN:  Un-accomplishable, I would say.

14         THE COURT:  -- disagree?  You disagree?

15         MR. MCATEE:  Absolutely, Your Honor.  We -- the

16   30(b)(6) issue was teed up.  We sent them the letter showing

17   how much we prepared our witnesses.  I personally spent days

18   and days with the witnesses to get them ready.

19         I was there at many of the depositions.  They took

20   that off the table.  That's not in dispute.

21         We did a good job with 30(b)(6) witnesses.

22         THE COURT:  Now, you're talking past each other.

23         My question --

24         MR. MCATEE:  They took the --

25         THE COURT:  My question for Mr. Rossman is having

1    spent two days with that individual; do you now know what

2    the reliance materials are?

3              MR. ROSSMAN:  Absolutely not.  I'm still left with

4    a complete guessing game.

5              It's a massive -- just so Your Honor understands,

6    what we were given is a massive spreadsheet with, in the

7    case of Goldman Sachs, 531 columns of Bates numbers.  So,

8    just for that one name, you'd have to break out 531

9    documents and show them to the witness one at a time.

10             So, we tried -- we couldn't possibly mark 531

11   exhibits in a deposition and expect to get it done in two

12   days.  So, we tried to identify some things that clearly

13   didn't seem to be relevant.  Then, we tried to identify some

14   things which we thought were clearly relevant.

15             And when we thought we had something that we could

16   rely on, and started making conclusions from that, then

17   suddenly, at the end of the deposition, they disavowed it.

18             The point is I think it defies any -- and I'm not

19   saying that I would be the greatest deposition taker in the

20   world.  But I've taken a few.  And I would suggest, Your

21   Honor. it defies anyone's abilities to accomplish in a

22   30(b)96) deposition in two days or less to ferret out what

23   their claim reliance is.

24             THE COURT:  But you see --

25             MR. ROSSMAN:  When that should be on the document.

Page 54

1            THE COURT:  -- here's the part I don't -- here's

2      the part I don't understand.  None of that should have been

3      necessary during the deposition.

4            They should have gone into the deposition with

5      just the documents that literally every one when they were

6      handed to the witness, the witness would have said; yes.

7      That was one of the documents we relied on for the closeout

8      and here's why.

9            So, to the extent that there's truth to what

10     Mr. Rossman is saying, and he has been known to tell the

11     truth, from time to time, and be accurate, then what

12     happened here?  I mean --

13            MR. MCATEE:  My understanding, Your Honor, of

14     credit is that there were a lot of quotes that came in that

15     morning, the 15th.

16            THE COURT:  But you cannot --

17            MR. MCATEE:  And we identified those and the

18     trader will say; I looked at those quotes and I used them

19     for my judgment and I marked my books fairly in order to,

20     you know, to find a middle point between what came in, what

21     was being, you know, being traded around the time I closed

22     out.  Not just one quote because there were a lot of market

23     quotes that came in.

24            They took the totality of it and marked the books

25     fairly somewhere in the range that was coming in.  That's

Page 55

1   what the witness will say and we identified all of the

2   documents for every name that was traded in credit that the

3   traders used to mark the books.

4            THE COURT:  But if he's saying that he showed this

5   witness document after document and the witness said; no, we

6   didn't rely on that.  No, we didn't rely on --

7            MR. MCATEE:  I think there were a couple in the

8   wrong place, Your Honor.  But the vast majority were spot on

9   for that credit, for that morning and they had those and

10  they could have examined --

11           THE COURT:  So, which is it?  Is it --

12           MR. MCATEE:  -- him on it.

13           THE COURT:  -- what -- you're going to have to

14  give me the transcript.  I mean, I can't -- I can't --

15           MR. ROSSMAN:  I'd be glad to do that, Your Honor.

16           THE COURT:  I can't cut through this.

17           MR. ROSSMAN:  It's self-evident from the

18  transcript.

19           THE COURT:  I can't cut through this.  One of you

20  is not being accurate.

21           MR. ROSSMAN:  And --

22           THE COURT:  Either there were a few outliers that

23  he didn't rely on or there were virtually no inliers.  I

24  mean, it's one or the other.

25           So, I'll read the transcript.  It's less painful

Page 56

1      than doing this.

2              MR. ROSSMAN:  But, Your Honor, it's -- it's -- I'm

3      confident the transcript is going to validate me on this.

4      But putting aside the documents we particularly showed to

5      the witness, when you look at what the witness described as

6      the process that he went through, in terms of marking his

7      curves that day --

8              THE COURT:  Yeah.

9              MR. ROSSMAN:  -- there couldn't conceivably be 531

10     documents that he could rely on.

11             THE COURT:  There -- that's my point.  You cannot

12     -- you--

13             MR. ROSSMAN:  Right.

14             THE COURT:  You could not possibly look at that

15     many documents and mark them that day.  That's just not how

16     it worked.  It's just not how it worked.

17             MR. MCATEE:  Your Honor, I -- I was not there at

18     that deposition.

19             THE COURT:  Okay.

20             MR. MCATEE:  It's about a different product area.

21     I'm doing --

22             THE COURT:  It --

23             MR. MCATEE:  -- my best to tell you what I think

24     happened --

25             THE COURT:  I hear you.

1          MR. MCATEE:  -- which is we prepared a

2     compilation.  We gave them all the quotes for those

3     particular names and it was marked somewhere in the range

4     that came in that morning.

5          THE COURT:  But it -- as a practical matter, okay,

6     it was chaos, right?  And everybody was trying to mark these

7     positions in a very narrow window of time.  There is no way

8     for a particular position that somebody looked at 500

9     documents.  It's just -- it just didn't happen.  It just did

10    not happen.  So --

11         MS. CAFFERATA:  Your Honor, they already admitted

12    that they included a bunch of things that they couldn't have

13    -- have just relied on.  In their opening letter, and this

14    is on slide sixteen, they say all information that PG&E

15    traders reviewed and relied upon.  They didn't say actually

16    relied upon or relied upon.

17         THE COURT:  I get it.

18         MS. CAFFERATA:  They said reviewed and.  So,

19    they've already admitted this.

20         THE COURT:  I get it.  But here -- but the point

21    is now we're barrelling towards the conclusion of these

22    depositions and I've made it clear that it's going to be

23    problematic if a witness gets on the witness stand and you

24    can demonstrate that in the deposition the witness had no

25    recollection or could not identify the documents that they

1    relied on; the testimony's going to be precluded or it's

2    going to be afforded the weight it deserves which is not

3    much.

4            It's not going to be the case that you can prepare

5    a witness for trial by showing him or her a bunch of

6    documents that he can assume or would conclude would have

7    been relied on to close out a position of this type.

8            That's just not -- that's not going to be

9    something that carries the burden of proof for the prong

10   that has to do with, you know, what the process was and that

11   the process was reasonable.

12           So, beyond that, I don't -- I literally do not

13   know what to do today other than to have you for the

14   depositions yet to be completed to, once again, do what I

15   thought I had told you to do several months ago, which is to

16   identify to them specifically the universe of documents on

17   which the traders relied to effect the closeout in real

18   time.

19           I don't know how I can say it more clearly than

20   that.  And that, to the extent that that is not done and

21   they're prejudiced, then I'll listen to a motion in limine,

22   motion to preclude, you know, before trial, or during trial.

23   That's the best I can do.  I don't know what else to do.

24           If you want me to attend the deposition, I'll come

25   and be a fly on the wall.  If you want me to read a

Page 59

1    transcript, I'll read a transcript.  I'll do whatever I can

2    to help you.  But I don't know what more I can say.

3              MR. MCATEE:  Understood, Your Honor.  And I think

4    we have done that and, in addition, there was an extra layer

5    of sending documents identified in advance that we're using

6    to prepare the witness and then we had a meet and confer and

7    then counsel for Lehman sent us a list of documents.  And we

8    got the witnesses ready on those documents.

9              So, there has been a process in place to make sure

10   the depositions run smoothly.

11             MS. CAFFERATA:  Your Honor, we're most of the way

12   through the 30(b)(6) depositions.  We have our record.  We'd

13   like the opportunity to brief it and --

14             THE COURT:  Sure.

15             MS. CAFFERATA:  -- show the Court what we think

16   how we should proceed.

17             THE COURT:  That's fine.  Yeah.  That's fine.

18   That's fine.

19             Okay.  So, there is nothing more for me to do

20   today.

21             But you mentioned, and I think I react every time

22   you mention it, dispositive motions.  What do you have in

23   mind?  Is that something that we -- it may not be ripe for

24   discussion yet.  But I'm going to want --

25             MR. MCATEE:  The one I have in mind, Your Honor,

Page 60

1      is the as of issue, the closing out on the 16th as of the

2      15th.  That issue may be candidate.  That's one potential.

3      There may be others.  But that's one that I had in mind.

4                  THE COURT:  Okay.

5                  MR. ROSSMAN:  I think our expectation is there

6      aren't going to be dispositive motions.  That's not to say

7      that we're not going to continue to study it and think about

8      it.

9                  THE COURT:  Yes.

10                 MR. ROSSMAN:  But that's my initial reaction.

11                 THE COURT:  Okay.  All right.  That's better.

12                 All right.  Well, then, why don't we call it a day

13     and, then, at some point, later in the spring, when it's not

14     about to snow, we should sit down and just really kind of

15     figure out what you think the trial is going to look like in

16     terms of the length, you know, what you have in mind.  Time

17     limitations.  No time limitations.

18                 I would love there to be time limitations.  I

19     don't think it's practical.

20                 But we're just going to have to figure it out

21     because it's in -- it's a long, long period of time.  So --

22                 That being said, are there any business to

23     business discussions going on?  Not so much, huh?

24                 MR. MCATEE:  I'm not privy to them, Your Honor.

25     There could be.  I just am not privy.

 1            THE COURT:  I'm getting a little nod back there.

 2            MR. ROSSMAN:  I think people are sensitive to the

 3    fact that we're on the record.

 4            THE COURT:  Got it.  Okay.  Thank you for coming

 5    in.  Stay safe in the snow.

 6            MR. MCATEE:  Thank you, Your Honor.

 7            MS. CAFFERATA:  Thank you.

 8        (Whereupon, these proceedings were concluded at 2:33

 9    p.m.)

10                            * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 62

1                    C E R T I F I C A T I O N

2

3    I, Pamela A. Skaw, certifies that the foregoing transcript

4    is a true and accurate record of the proceedings.

5    Pamela Skaw    Digitally signed by Pamela Skaw
                    DN: cn=Pamela Skaw, o, ou,
6    _____    email=digital@veritext.com, c=US
                    Date: 2018.03.22 13:01:38 -04'00'

7    Pamela A. Skaw

8

9

10

11   Date:  March 22, 2018

12

13

14

15

16

17   Veritext Legal Solutions

18   330 Old Country Road

19   Suite 300

20   Mineola, NY 11501

21

22

23

24

25

| & | | |
|---|---|---|
| **&**  3:10 | | |

| 0 | | |
|---|---|---|
| **08-13555**  1:6 | | |

| 1 | | |
|---|---|---|

**1**  52:2
**1,200**  40:16
**1,240**  18:23
**10**  5:6 18:4
**10004-1408**  1:17
**10010**  3:5
**10019-7475**  3:13
**102**  21:24
**108**  21:5
**10th**  10:11 11:12
**11**  33:25
**1123x**  33:18
**11501**  62:20
**11:23**  47:23
**1200**  49:17
**122**  42:7
**13-01676**  1:11 2:1
**140**  20:14,25 21:1
   48:10
**15**  4:21 21:10,16
   21:19
**150**  20:12
**155**  20:24
**15th**  12:1,2 29:13
   41:13,20 44:11,12
   54:15 60:2
**16**  21:11,12
**16th**  10:21 11:25
   44:10 60:1
**17**  4:25
**1:29**  1:20

| 2 | | |
|---|---|---|

**2**  31:10
**20**  1:19 5:4 33:9
**200**  10:3
**2008**  41:10 52:7

**2009**  15:20 51:3
**2018**  1:19 62:11
**21st**  4:19
**22**  21:12 62:11
**221**  20:11
**22nd**  3:4
**23rd**  4:23
**25**  21:11
**26**  11:14
**27**  5:3
**2nd**  4:20

| 3 | | |
|---|---|---|

**3**  5:6
**30**  8:12 9:3 16:21
   32:20 34:14 36:18
   37:17 38:2 41:8
   41:15 42:10 43:3
   43:9,21 51:21,22
   52:2,4,16,21
   53:22 59:12
**300**  62:19
**30th**  5:2
**330**  62:18

| 4 | | |
|---|---|---|

**40**  24:14
**4th**  4:19

| 5 | | |
|---|---|---|

**5**  16:1
**500**  57:8
**51**  3:4
**531**  32:18,25
   47:15 53:7,8,10
   56:9

| 6 | | |
|---|---|---|

**6**  8:12 9:3 21:12
   32:20 36:18 37:17
   51:21,22 52:4,16
   52:21 59:12
**60**  41:4
**600**  18:24 40:16
**608**  21:24 42:7

**6th**  4:16,22 5:1

| 7 | | |
|---|---|---|

**7th**  4:16,25

| 8 | | |
|---|---|---|

**825**  3:12

| 9 | | |
|---|---|---|

**9-15**  21:12
**96**  38:2 53:22
**98**  21:9,9

| a | | |
|---|---|---|

**a.m.**  33:25
**abilities**  53:21
**ability**  48:8,15
**able**  28:6 30:24
   32:14 34:16 38:3
   40:6 51:10
**absolute**  15:20
**absolutely**  15:3
   16:22 50:20 52:11
   52:15 53:3
**accomplish**  53:21
**accomplishable**
   52:13
**accomplished**
   52:10
**accounts**  16:21
**accurate**  54:11
   55:20 62:4
**achieve**  47:10
**actual**  5:12 13:6
   15:10
**added**  16:24
   41:14,21
**adding**  43:12
**addition**  59:4
**additional**  17:7
**address**  6:13
   35:15 37:9 47:1,2
**adequate**  35:11
**adjust**  43:13
   45:10

**adjustments**
   28:11
**admission**  42:6
**admits**  33:18
**admitted**  26:15
   57:11,19
**adv**  1:11
**advance**  35:25
   51:10 59:5
**adversary**  2:1
**afforded**  58:2
**ag**  1:12 2:2 3:11
**ago**  58:15
**agree**  10:9 11:24
   13:18 15:21 40:25
**agreed**  7:2 12:4
   44:14
**agrees**  33:6
**ahead**  12:9 14:24
   30:13 47:14
**al**  1:10,12 2:2,2
**allen**  19:20 22:23
   22:25 24:12
**allen's**  24:9
**amount**  5:16
   20:21
**andrew**  3:8
**andy**  6:13
**answer**  27:5,9
   32:12 34:1,2
   35:24 36:1,1
   37:23 42:11 45:5
**answering**  32:22
**answers**  9:12
**anyone's**  53:21
**approach**  12:17
**appropriate**
   12:21 35:15
**appropriately**
   5:15
**approve**  34:25
**approximately**
   22:18

april 4:16
archive 41:18
area 35:22 56:20
areas 41:2
argue 27:23
argued 18:7,9
  26:10,14
arguments 13:5
  30:25
aside 56:4
asked 11:7 13:25
  14:16 16:22 20:3
  23:23 24:11 26:3
  26:5,13 31:1
  33:16,23 36:18,23
  37:14 39:15 40:20
asking 14:6 27:13
  35:8 38:21
associated 51:7
assume 58:6
asterisks 28:19,20
attend 58:24
attention 33:24
attorney 3:11
attorneys 3:3
attributes 24:18
  24:22 28:22
auction 29:18
august 4:22 5:1,3
  5:4
available 46:14
avenue 3:4,12
average 20:13,25
avoid 7:17,17
  9:13,20 40:2
aware 20:8
awful 50:3

**b**

b 1:23 8:12 9:3
  32:20 36:18 37:17
  38:2 51:21,22
  52:2,4,16,21
  53:22 59:12

back 7:12,25 13:2
  17:5 26:7,9,22
  29:10 35:6 41:9
  41:12 43:24 44:19
  45:4 50:16 51:3
  52:7 61:1
backup 14:8
  15:15 19:11 23:21
  37:24
backward 17:14
ballpark 19:2
bankruptcy 1:1
  1:15,25 15:15
barrelling 57:21
based 9:4 19:19
basic 43:15
basically 8:19
  15:1
basis 11:11 35:12
  35:12 46:16
batch 20:5
bates 11:11 21:23
  24:25 30:6 40:19
  47:16 53:7
benefit 8:17
best 15:12 16:11
  19:4 27:3 30:18
  43:25 45:7 52:2
  56:23 58:23
better 10:6 60:11
beyond 58:12
bid 23:22 25:9,12
  29:18
bigger 28:4 31:3
  41:24 43:11
billion 35:8 50:25
binder 49:3
bit 34:21
block 5:16
bloomberg 12:20
  17:12
bloombergs 29:17

blueprint 40:9,10
board 13:1,4,21
book 42:21
books 19:7 54:19
  54:24 55:3
bowling 1:16
boxes 22:9
break 10:11 53:8
brief 35:14 39:8
  42:3 59:13
briefs 5:5
broad 46:13
broader 25:6
  29:11 30:5,6
broken 10:18 49:9
broker 10:3 25:10
brokers 22:16
brothers 1:6,9 2:1
bullet 22:7
bunch 22:17
  26:15 30:21 39:24
  44:5 57:12 58:5
burden 13:10
  26:24 27:19 32:13
  35:9 58:9
burdens 35:3
business 39:3
  42:13 60:22,23
buy 33:16

**c**

c 1:24 3:1 4:1 62:1
  62:1
cafferata 3:7 4:6
  4:11,14 5:18,23
  6:7,11 7:25 12:9
  12:10,14,17 14:5
  14:25 15:7,25
  16:3,8 17:19,23
  17:25 18:3,13,15
  19:8,11,14 20:16
  20:19 25:24 26:4
  26:6,9 27:1,3 28:2
  29:25 30:11,14

31:18,22,25 32:5
  32:9 36:13,16
  38:2 39:7,11,18
  42:6,19 44:3,19
  45:16,19,22 46:1
  46:7 47:1 57:11
  57:18 59:11,15
  61:7
cafferata's 29:12
calculating 29:16
california 21:5
call 60:12
candidate 60:2
carrerata 4:18
carries 58:9
carry 12:23
case 1:6 8:1 35:5
  40:5 43:6 46:18
  50:24 53:7 58:4
cases 38:10
certain 48:6
certifies 62:3
cetera 9:1
chaff 22:17
chain 43:8
chambers 48:6
chance 6:17
change 34:2 37:6
changes 34:1
chaos 57:6
chapman 1:24
chapter 49:24
characterize
  11:18
charge 14:9
cherrypicked
  22:2,3
circle 21:8
circles 29:24
cite 24:25
cited 48:11
claim 11:2 15:4
  17:14 20:13 21:6

31:5,9 43:9 48:18
50:25 51:2,6 52:8
53:23
**clear**  23:17 57:22
**clearly**  31:12 33:5
39:13 53:12,14
58:19
**close**  58:7
**closed**  22:23
23:13 25:4,7
40:12,18 54:21
**closeout**  7:8 11:20
12:22 13:11 14:10
16:23 17:2,4,9
22:12 23:6 28:10
29:16,20 30:4
33:8,25 34:4
36:17 39:23 43:14
43:15 46:12,16,25
54:7 58:17
**closeouts**  10:21
**closing**  24:10,15
25:23 60:1
**collate**  14:21
**collected**  13:25
**collecting**  14:9
**color**  17:12 46:13
**column**  20:20
**columns**  53:7
**comb**  13:2 41:7
**combed**  34:14
**combined**  38:10
**combing**  42:10
43:3
**come**  9:23 19:4
27:18 35:9 37:12
41:16 51:13 58:24
**comes**  38:24 39:4
**coming**  30:22
45:20 54:25 61:4
**commodities**  5:25
6:5,5,7,15 9:6,18
13:24 18:20 31:17

35:23 36:16 37:3
37:13 50:5,15
**communication**
28:9
**communications**
29:19
**compilation**  5:25
6:5,5,8 7:3 11:17
13:15 18:2,20
23:15,21 29:10
31:17 32:6 36:3,6
38:18,19,25 39:12
50:12 57:2
**compilations**  6:6
6:9 8:8,17 10:10
19:24
**compile**  16:12
**compiling**  10:20
**complain**  11:17
**complete**  26:13
30:19 39:6 53:4
**completed**  49:7
51:20 58:14
**completely**  6:12
13:18 35:21 36:17
42:3 45:19 51:14
**completion**  4:10
4:15,24 6:22
**complex**  12:10
35:5
**complicated**
25:16 28:24
**comprehensive**
26:13 31:1
**conceivably**  56:9
**conclude**  58:6
**concluded**  61:8
**conclusion**  9:23
51:13 57:21
**conclusions**  53:16
**conduct**  17:3
46:11

**confer**  59:6
**conference**  2:2
4:2 7:2 38:8
**conferred**  6:16
**confers**  7:13
28:16
**confidence**  36:23
**confident**  51:12
56:3
**confront**  8:2
**confronted**  40:1
**confronting**  39:21
**confuse**  37:25
**confused**  7:15
**confusion**  23:18
**conjunction**  6:22
**connection**  16:18
23:14
**consequences**
35:10
**consultant**  19:18
36:25
**consultants**  34:13
48:19
**consulted**  23:14
**contested**  5:9
**continue**  19:8
38:12 60:7
**continuing**  25:5
38:7
**contrary**  9:9
15:10
**conversations**
19:20
**coo**  14:15 37:16
**corner**  5:11 33:14
**cornerstone**  19:17
36:4,24
**correct**  10:6 17:19
23:4 27:25 28:2
**correlation**  45:11
**counsel**  10:12
14:16 21:20 34:12

36:24 39:5 44:14
59:7
**counsel's**  15:11
**counterparties**
11:3
**country**  62:18
**couple**  24:6 50:3,7
55:7
**course**  41:19
**court**  1:1,15 4:2,8
4:12,17 5:8,19 6:4
6:9,21 7:23 8:15
8:21,24 10:13,15
10:17 11:13,16
12:9,13,15,19
13:15,19,22 14:4
14:12,14,19,24
15:6,24 16:2,4,15
16:25 17:18,20
18:12,14,16,22
19:10,13 20:15,17
22:8,22,25 23:3,5
23:9,12,16,19
24:12,20,22 25:2
25:5,20 26:8,25
27:2,5,9,19,22
28:14,23 29:23
30:1,13 31:14,21
31:24 32:1,6 36:8
36:10,12,15 37:8
37:11 38:1,5,23
39:10,17,20 40:15
40:22,24 41:3,6
41:15 42:17,20,25
43:2,23 44:1,3,25
45:14 46:2,6 47:4
47:8 48:23,25
49:6,19,21,23
51:16,19,22,24
52:9,12,14,22,25
53:24 54:1,16
55:4,11,13,16,19
55:22 56:8,11,14

[court - documents]

56:19,22,25 57:5
57:17,20 59:14,15
59:17 60:4,9,11
61:1,4
**courtroom** 8:4
**covered** 15:1
**cravath** 3:10
19:17 36:4
**created** 25:4 35:7
39:1,5
**credible** 43:16
**credit** 1:12 2:2
3:11 7:1,3,7 8:7
9:16 15:3,7 19:21
20:4,8 23:2 24:18
24:23 29:19 31:6
31:16 34:24 35:3
35:21 36:3 37:4
38:17 47:6 50:4
50:20 54:14 55:2
55:9
**cross** 33:23 48:1
48:14
**cs** 27:14 36:5
**cure** 21:21
**currency** 33:7
47:20
**current** 19:21
**curves** 56:7
**custodians** 43:4
**cut** 55:16,19

**d**

**d** 4:1
**darin** 3:15
**dark** 42:2
**dart** 13:1,1,4,4
**darts** 13:21
**data** 15:14 16:7
17:7,8 21:12 24:3
25:22 28:4 29:15
29:17,18 30:6
43:11 44:23

**database** 24:25
**databases** 16:20
20:1 41:18
**date** 11:20 43:17
62:11
**dates** 5:7 12:21
**dating** 13:12
**day** 8:11 12:23
13:7,17 14:2,15
35:6 45:8 56:7,15
60:12
**days** 11:14 29:13
29:13 47:11 48:21
50:21 51:12 52:17
52:18 53:1,12,22
**deal** 35:10,18
**dealer** 24:21
**dealers** 22:15
**dealing** 35:17
37:3
**debtor** 1:7 3:3
**decent** 14:23
**default** 15:13
**defeats** 48:8
**defects** 21:14,19
**defendant's** 4:18
**defies** 53:18,21
**definition** 34:21
44:9
**deliberately** 37:25
**delicate** 39:9
**delivered** 42:16
**deliveries** 43:7
**delivery** 21:13
44:24
**demonstrate** 7:9
57:24
**demonstrated**
44:4
**depends** 7:13 44:8
44:9
**depose** 40:19

**deposed** 14:16
**deposing** 27:12
**deposition** 5:24
9:10,16,25 15:10
28:7 29:1 32:7,23
40:4,6 47:12 48:1
48:21 49:8 50:2,6
51:19,25 52:10
53:11,17,19,22
54:3,4 56:18
57:24 58:24
**depositions** 4:15
4:24 6:23 7:1,16
8:10,14,18 9:3
21:3 27:13 32:2
42:5 47:10 48:16
52:19 57:22 58:14
59:10,12
**derivative** 38:10
**describe** 5:20,21
**described** 30:9
56:5
**deserves** 58:2
**desk** 7:6 39:2 43:7
49:2
**detail** 6:17
**diagram** 21:7
**diane** 3:7
**different** 17:18
28:18 30:22,23
33:12 34:21 35:22
39:20 45:12 46:15
48:10 56:20
**difficulty** 50:21
**direction** 28:2
**directions** 10:23
**disagree** 46:19
52:14,14
**disavow** 16:10
**disavowal** 48:17
**disavowed** 16:9
34:10 36:17 39:14
53:17

**disavowing** 47:18
49:24
**disconnect** 41:7
**discovery** 4:2,10
10:11 50:22 51:4
**discreet** 43:7
**discussion** 6:2
59:24
**discussions** 60:23
**dispositive** 5:1,5
59:22 60:6
**dispute** 6:20 51:8
52:20
**dissatisfied** 6:19
**distill** 19:25
**distinguish** 25:6
**distinguished** 7:8
**district** 1:2
**document** 32:4
33:3,20 34:7,10
36:19 37:18 47:17
47:17,18 48:7
49:25,25,25 53:25
55:5,5
**documentation**
15:4,8 29:15
42:13,14
**documenting**
14:10
**documents** 9:7,8
9:10 11:19 14:7
18:8,10,18,24
19:16,18 20:1,2,5
20:10,12,13,22,24
21:1,5,23,24 22:9
22:19 24:2,14,16
25:18 26:21 31:13
32:18 33:1,9,17
33:21 34:14,17
36:6,21 39:13,24
40:3,7,12,16,21
41:4,8,15,23 42:7
42:10 43:3,7,10

44:4,10,23 45:1,5
46:10,24 47:15
48:5,24 49:4,11
49:17,20 50:7
51:17 53:9 54:5,7
55:2 56:4,10,15
57:9,25 58:6,16
59:5,7,8
**doing** 8:11,12
9:24 29:22 56:1
56:21
**dollars** 35:8 50:25
**dq** 11:1 51:2
**draw** 33:24
**dump** 34:15
**duplicates** 21:8
22:16 24:3,7

**e**

**e** 1:23,23 3:1,1 4:1
4:1 62:1
**earlier** 44:7
**east** 45:9,10
**education** 31:15
**effect** 58:17
**effective** 48:16
**effectively** 47:6
48:16 50:23
**effort** 14:23 16:12
19:4 41:10
**eight** 21:4 44:20
**eighteen** 38:15
**eighth** 3:12
**either** 7:5 9:10
25:12 55:22
**eleven** 22:21
36:14
**eliminated** 39:15
**email** 16:21 37:1
42:21
**emails** 10:3,23
24:4 29:18 41:18
**emanuel** 3:2

**embrace** 33:20
**emissions** 23:2,8
23:10
**emphasized** 19:23
21:20
**employee** 19:22
**employees** 36:5
**ended** 41:22
**engaged** 17:8
**enormous** 20:1
**entirely** 26:1
**entitled** 17:21,21
**esq** 3:7,8,15
**estate** 51:1
**et** 1:10,12 2:2,2
9:1
**evaluated** 25:11
**everybody** 17:11
42:22 57:6
**evidence** 14:7
38:18,20,24
**evident** 55:17
**examination**
33:23 34:9 48:2
48:14
**examine** 9:15
**examined** 55:10
**example** 11:20,21
12:25 13:23 20:11
21:4 22:4,12,22
26:17 27:3 31:6
32:21,23,25 33:4
33:12 37:4,9,13
45:5 47:5,14,23
**examples** 33:10
35:20 36:2 50:8
**exception** 21:10
**excuse** 4:6
**exercise** 26:1 51:4
51:14
**exhibit** 49:3
**exhibits** 53:11

**exist** 42:8
**existence** 12:20
**exists** 10:22
**expect** 30:20,20
30:24 53:11
**expectation** 60:5
**expected** 30:23
**experience** 9:9
**expert** 4:18,20,22
4:24
**explain** 6:21
31:19 32:14 39:11
**explained** 35:2
**explaining** 19:15
**explanation** 34:19
34:20 45:23
**explicitly** 37:2
**extend** 4:16
**extent** 8:11 46:9
54:9 58:20
**extra** 59:4
**extract** 51:15
**extracts** 22:13
23:24
**extreme** 13:23
**eyes** 20:6 31:12

**f**

**f** 1:23 62:1
**fact** 4:15 6:23,25
7:10 8:13,18
10:19 12:22 17:9
37:2 44:3 46:10
46:14 52:1 61:3
**factor** 45:11
**failed** 17:10 39:18
39:19,19
**fairly** 54:19,25
**faith** 13:9
**favorable** 47:24
**feeds** 29:17
**feel** 10:17,17
29:23 49:9

**feinberg** 31:6 33:6
34:9 37:5 47:5,6
**feinberg's** 47:12
**ferret** 53:22
**fifteen** 33:13
**figure** 21:2 28:4
30:7 34:16 60:15
60:20
**file** 38:16
**files** 41:12
**filtered** 21:22
**filtering** 21:21
**find** 8:9 9:22,22
13:3 17:11 54:20
**fine** 22:4 32:24
59:17,17,18
**first** 8:12 10:11
15:1 20:23 22:15
29:2 30:17
**five** 7:17 29:6
40:12
**flaws** 21:10
**floor** 3:4
**flow** 47:6
**fly** 58:25
**foiled** 8:16
**follow** 34:9
**following** 15:13
**foregoing** 62:3
**forget** 51:2
**form** 38:25
**formerly** 27:14
**formulating** 52:8
**forth** 7:12
**forward** 8:10
**found** 16:23 41:12
41:20 43:22
**four** 8:11 15:9
19:24 21:22 29:6
29:13
**fourteen** 33:11,11
**fred** 22:23,25

**frivolous**  35:17
**front**  31:8 33:9,13
**frustrated**  48:15
  51:14
**full**  5:14 35:1
**further**  31:14
**fx**  41:1

**g**

**g**  4:1
**game**  8:12,17
  28:25 42:1 53:4
**gas**  23:1,8 37:14
  37:19
**gather**  13:25
**generally**  8:1
  46:13
**generous**  21:15,19
**getting**  5:12 16:25
  48:17 61:1
**gigantic**  19:2
**give**  24:25 27:6
  30:2,3 39:22 46:9
  55:14
**given**  9:15 35:7
  48:10 53:6
**gives**  9:7 36:23
**giving**  50:14
**glad**  44:6 55:15
**go**  6:17 8:10 12:9
  13:2 14:24 15:25
  19:10 26:7,9,22
  28:7,8 29:1 30:13
  32:7 45:4 48:25
  49:10 51:6
**goes**  15:2 29:10
**going**  4:3,3 5:13
  5:14 6:25 7:19,24
  9:8,21,22 10:1,1,6
  13:6 19:13 30:5
  31:20 32:2,10,11
  32:14,22 37:6
  38:19 39:22,24,24
  40:1,4,9 43:13,16

46:2,7 47:13,14
48:9,12 49:1,1,2,3
49:4,14 50:24
51:24 55:13 56:3
57:22 58:1,2,4,8
59:24 60:6,7,15
60:20,23
**goldman**  32:19
  47:13,19 51:25
  53:7
**goldman's**  51:8
**good**  13:9 16:13
  34:7 50:7,11,13
  52:21
**grade**  31:15
**great**  8:22
**greatest**  53:19
**green**  1:16
**gs**  34:15
**gslecx**  31:10
**guess**  5:20 23:16
**guessing**  28:25
  53:4
**guidance**  19:19

**h**

**hac**  45:23
**handed**  54:6
**handful**  18:9,17
  34:17
**handy**  4:14
**happen**  9:2 57:9
  57:10
**happened**  16:18
  30:10 36:11 50:10
  54:12 56:24
**happening**  7:11
  50:1
**happy**  26:6
**he'll**  25:23
**head**  25:25 47:7
**headline**  21:1
**heads**  43:7 49:2

**hear**  13:12 29:1
  40:22 46:15,19
  56:25
**hearing**  11:16
  35:2
**help**  6:2 7:20
  10:10 36:6 59:2
**helpful**  19:12
**helps**  12:14
**herring**  18:15
**hi**  4:4
**high**  15:5
**highlighted**  15:16
**history**  29:10
**hit**  13:4 25:12,24
**hits**  48:13
**holdings**  1:6,9 2:2
**hon**  1:24
**honor**  4:6,7,11
  5:18 6:15 7:22,24
  8:2 10:8 11:24
  12:10,17 13:18
  14:25 15:22 16:10
  17:19 18:6,7,19
  19:8 22:24 23:7
  24:16 25:24 27:4
  27:12 28:13 29:25
  30:11 31:16 33:13
  35:14,20 36:13
  38:22 39:7 42:5,6
  43:20 44:7,19
  45:4,17,25 47:3
  48:6 49:5,15 51:5
  51:11 52:15 53:5
  53:21 54:13 55:8
  55:15 56:2,17
  57:11 59:3,11,25
  60:24 61:6
**hoping**  33:15
**hub**  21:5
**huge**  21:19
**huh**  15:6 23:9,19
  36:15 51:23 60:23

**hunt**  28:4
**hypothetical**  9:9

**i**

**idea**  11:6 20:9
  52:4
**identified**  9:11
  10:4 12:4 19:18
  20:10,12,14,22,24
  21:6,22 23:24
  26:21 29:7 31:8
  32:19 33:1 44:4
  44:15 51:9 54:17
  55:1 59:5
**identify**  11:10
  37:7 46:24 51:5
  51:11 52:6 53:12
  53:13 57:25 58:16
**illustrates**  47:9
**illustrative**  13:23
**impossible**  38:6
**include**  29:15
  41:11
**included**  11:17
  19:18 24:1 26:15
  33:19 34:25 36:21
  44:13 57:12
**includes**  21:17
**including**  29:16
  38:16
**inclusiveness**
  30:15 31:4
**indicative**  6:6
**indiscernible**  4:14
  12:7 28:14 33:2
**individual**  52:2
  53:1
**individuals**  27:17
**indoor**  23:24
  24:25
**inform**  14:1
**information**  19:6
  20:1 23:22 24:8
  25:17 29:7 38:18

08-13555-mg    Doc 58366-6    Filed 06/29/18    Entered 06/29/18 18:35:56    Exhibit F
transcript    Pg 70 of 77
[information - matters]                                                    Page 7

39:12 48:11,22
57:14
**informed**   24:9
25:22
**initial**   60:10
**inliers**   55:23
**instance**   29:4
**institution's**   52:6
**instructed**   15:4
51:5
**instructive**   31:23
**inter**   37:20
**interested**   10:1
28:19,20,23
**introduce**   7:9
**involved**   20:4
43:7
**irrelevant**   45:15
**issue**   4:9 5:24,24
6:13 8:2 9:1 12:11
12:23 28:13 30:16
35:18 39:5,6 40:2
44:16,18 52:16
60:1,2
**issues**   5:24 35:14
35:15 44:22
**items**   22:10 31:8

### j

**january**   7:2 10:11
10:18 11:12 18:4
26:7
**japed**   8:7
**job**   50:7,11 52:21
**joe**   9:5,17
**judge**   1:25
**judgement**   24:10
**judgment**   14:1
19:7 25:23 54:19
**july**   4:20,23 5:2
**jumped**   37:4
**june**   4:21
**junior**   14:21

**justifying**   43:12

### k

**keep**   7:19 10:6
14:6 19:13
**kind**   14:21 24:2
32:11,20 60:14
**knew**   20:6 47:14
**know**   4:12 7:20
8:7 9:2,5,12,24
10:3 13:1,2,3,8,17
17:22 21:16 25:8
25:12 26:19 28:8
29:7 31:10,11
33:16 34:13,15,22
34:24 35:4 36:1
37:2 38:9 39:3
40:17,19,23 43:12
43:13 45:22 46:6
46:21 48:8,13
50:19,25 51:3,9
53:1 54:20,21
58:10,13,19,22,23
59:2 60:16
**knowing**   28:23
35:1 40:3
**knowledge**   52:6
**known**   54:10

### l

**labelled**   47:16
**laid**   31:12
**language**   15:16
**larger**   11:3 48:5
50:25
**late**   8:9
**lay**   20:6
**layer**   59:4
**learned**   37:19
**leave**   35:14 38:16
**leaves**   21:9
**led**   43:9
**left**   5:21,24 20:10
22:8 23:2,3 26:18
26:20 53:3

**legal**   62:17
**lehman**   1:6,9 2:1
5:21 7:8 8:23 9:23
10:12,22,25 11:1
11:17 14:16,23
15:15,18 24:14
27:12 33:17 35:4
59:7
**lehman's**   38:15
**length**   60:16
**letter**   19:3 21:21
22:7 29:12,21
42:7 44:14 52:16
57:13
**letters**   5:22 7:12
**level**   15:5
**lifted**   25:12
**limine**   58:21
**limitations**   60:17
60:17,18
**line**   20:23 22:15
**linkage**   13:13,20
**liquidity**   28:11
43:12
**list**   24:1 25:18
59:7
**listed**   24:5 40:18
**listen**   58:21
**literally**   28:6 32:7
46:21 54:5 58:12
**litigation**   16:19
**little**   21:8 25:16
34:20 41:24 61:1
**llp**   3:10
**log**   39:3
**long**   8:3 11:8,9
60:21,21
**look**   13:3 21:18
22:10 27:25 30:18
31:10 32:21 33:22
36:8,13 38:5
43:17 44:19,25
45:5 56:5,14

60:15
**looked**   16:23 22:5
22:6,11,14 33:22
37:13 54:18 57:8
**looking**   17:14
18:10 25:11
**looks**   33:6 48:5
**lost**   20:15
**lot**   5:11 11:2
18:16,17 19:6
25:9,9 35:16 50:3
54:14,22
**love**   60:18

### m

**madison**   3:4
**main**   30:15
**major**   21:10
**majority**   50:9
55:8
**making**   4:4 10:5,8
42:15 53:16
**map**   50:14,18
**march**   1:19 5:10
62:11
**mark**   14:1 19:7
53:10 55:3 56:15
57:6
**marked**   54:19,24
57:3
**market**   17:12
29:17 46:13 54:22
**markets**   37:20
**marking**   56:6
**massive**   53:5,6
**match**   50:4
**material**   19:11
**materials**   7:4 25:6
28:3,5 29:11 32:3
53:2
**matt**   4:4
**matter**   1:5 57:5
**matters**   5:21

[mcatee - part]                                                    Page 8

mcatee   3:15 7:23
10:8,14,16 11:9
11:14,24 13:14,18
13:20,24 14:11,13
14:15,20 16:10,20
17:17,24 18:1,19
18:23 19:15 22:24
23:1,4,7,10,13,17
23:20 24:16,21,24
25:3,15,21 26:3,5
26:14 27:8,11,21
27:25 28:13,15
29:4 31:16 35:20
36:9,11 37:9,12
38:21 40:14,16,23
41:1,4,9,17 42:24
43:1,19,24 44:2,6
45:4,15,18,21,24
49:5,15,20,22
50:2 52:15,24
54:13,17 55:7,12
56:17,20,23 57:1
59:3,25 60:24
61:6
mean   9:22 17:20
18:16 22:17,22
24:20 27:19,23,25
28:25 38:23,24
40:15 45:15,22
50:11 54:12 55:14
55:24
meaning   7:13 8:7
meaningful   48:22
means   50:12
mechanics   19:22
meet   7:12 8:20
28:16 59:6
mention   28:15
59:22
mentioned   44:7,7
59:21
mentioning   28:12

mere   12:19
messages   12:20
17:13
met   6:16
metrics   23:23
mid   23:21 24:24
25:1
middle   29:14
54:20
mids   25:25
million   16:21
19:25 34:14 41:8
41:15 42:10 43:3
43:9,21
mind   13:5 59:23
59:25 60:3,16
minded   25:8
mineola   62:20
missed   44:2 50:12
mix   7:6
monetary   35:16
money   35:16
months   14:20
58:15
moore   3:10
morning   54:15
55:9 57:4
motion   38:16 46:8
58:21,22
motions   5:1,5
59:22 60:6
moved   11:4
moving   48:4
muddying   31:2
multiple   36:4

n

n   3:1 4:1 62:1
name   47:11 53:8
55:2
names   49:18 57:3
narrow   57:7
nassab   33:23

necessarily   45:13
necessary   54:3
need   5:13,14,17
9:20,20 32:11,16
45:4 49:8,10,11
needed   9:17 28:1
needs   32:11 35:3
neglected   9:17
never   10:4 19:21
31:12 37:6
new   1:2,17,17 3:5
3:13 27:17
nine   22:1 29:13
nod   61:1
non   39:5,6
nonsensical   49:23
notion   10:25
number   11:11
16:1 20:13,21
21:17 25:1 40:19
44:20
numbers   21:23
25:19 30:6 34:5,6
44:12,18 47:16
53:7
ny   3:5,13 62:20

o

o   1:23 4:1 62:1
object   15:19
obligated   30:2,2
obtained   15:15,18
october's   5:10
offer   23:22 25:9
25:13 29:18
offered   28:17,22
offering   38:17
office   48:6
oh   9:7 13:3
okay   4:8,12,17 5:8
5:19 8:24 10:7
11:13 13:19 14:14
14:19,24 15:24
16:15,25 19:10

23:5 25:20 27:2
29:4,23 30:5
34:16 38:1,23
40:22 45:14 47:9
47:12 48:25 49:6
51:24 56:19 57:5
59:19 60:4,11
61:4
old   62:18
once   8:20 58:14
ones   11:24 35:8,9
39:14 44:15
open   11:6
opening   57:13
opportunity   9:15
39:8 59:13
opposition   5:3
option   23:10
25:17
order   19:24 44:11
54:19
ordered   18:3
organized   39:3
outliers   55:22
outside   8:4
overall   50:13
overlap   21:13

p

p   3:1,1 4:1
p.m.   61:9
package   28:18
packet   28:7
page   15:2,9 19:14
20:16 21:4 31:7
32:17 33:13 36:13
38:14 39:21
pages   16:21 19:25
painful   55:25
pamela   2:25 62:3
62:7
part   6:23 27:16
39:23 42:17,18,20
54:1,2

**particular** 23:25
26:17 31:9 33:1
39:23 40:3 47:11
57:3,8
**particularly** 56:4
**partner** 34:25
50:5
**party** 29:18
**patel** 14:16 16:12
19:20 20:3 37:16
**patel's** 15:10
**path** 10:7
**pause** 12:16,18
35:19 46:5
**paying** 8:8
**people** 15:7 16:19
17:13 42:14 61:2
**perfect** 10:9
**period** 8:6 21:13
28:24 29:14 44:24
47:20 60:21
**permutations**
48:7
**persevering** 8:5
**person** 14:8,21
40:5 49:14
**personally** 52:17
**persons** 14:8 17:8
**pertaining** 32:25
**pertinent** 33:5
**pg&e** 19:19 57:14
**ph** 15:9 31:7
33:23
**phone** 4:3
**pie** 31:15
**pile** 19:16 20:2,5
31:12 40:17,24
41:22 42:19 46:3
48:11
**piles** 39:13,13
41:1
**place** 10:21 14:22
15:14,18 16:6

24:8 55:8 59:9
**plan** 8:12,17
**planning** 5:11,15
**plausibly** 21:16
22:19
**please** 10:5
**plowing** 6:18
**plucked** 37:24
**plugged** 4:4
**pm** 1:20
**point** 6:1 12:11
14:5 15:2 23:16
23:18 30:15,17
31:3,7 35:3 38:15
46:15,20 49:7
53:18 54:20 56:11
57:20 60:13
**pointed** 36:2
**pointing** 50:8
**points** 22:7 30:12
**portrayed** 19:3
**position** 9:21
22:23 33:18 45:9
46:16 49:17 50:23
57:8 58:7
**positions** 14:2
40:18 57:7
**possible** 34:22
**possibly** 8:6 44:5
45:2 48:22 53:10
56:14
**post** 11:20 13:12
45:23
**postdate** 24:17
**postdated** 21:12
42:8
**postdating** 21:20
21:24
**potential** 60:2
**potentially** 33:18
34:10
**power** 6:1 12:11
14:5 23:1,8 31:7

37:14,20 38:15
45:7,9
**practical** 57:5
60:19
**precise** 17:1
**preclude** 58:22
**precluded** 9:14
38:17 40:9 58:1
**preclusion** 9:1
35:18 46:8
**preclusive** 32:11
**prejudging** 9:22
**prejudice** 8:22
42:5
**prejudiced** 58:21
**premium** 43:12
**preparation** 20:4
32:21
**prepare** 5:16 36:6
58:4 59:6
**prepared** 6:1 8:1
14:18 15:20 36:4
36:24 38:3 52:17
57:1
**preparing** 19:15
19:22 21:2 23:14
**prepping** 49:13
**preserved** 15:3
**pretty** 6:19
**price** 13:1 21:12
24:3 43:13 44:23
45:9,10
**prices** 12:2 33:15
44:11
**pricing** 33:17
36:22
**print** 19:1
**privy** 60:24,25
**probably** 8:1
**problem** 21:24
26:23 30:10 31:4
47:9

**problematic**
57:23
**problems** 44:20
44:21
**proceed** 59:16
**proceeding** 2:1
**proceedings** 61:8
62:4
**process** 12:24
13:8 56:6 58:10
58:11 59:9
**produce** 19:24
**produced** 11:7,9
16:21
**product** 7:5 11:15
21:11 31:16,19
35:22 44:24 45:1
45:1,3,12 46:16
56:20
**production** 11:18
35:17
**prong** 58:9
**proof** 11:1 13:6
13:10 14:3,4 51:2
58:9
**provide** 19:11
28:1,2 30:5 39:15
**provided** 7:1,4
11:5 14:23 18:20
19:19 29:22 32:14
32:18
**providing** 32:13
**pulled** 33:3,4
**pulling** 42:15
**purposes** 14:9
37:22
**put** 12:7 14:21
17:10,21 18:1
23:10 25:17 27:22
28:19,20 29:13
31:7 33:9,13 35:4
36:6 37:24 39:22
41:21 43:8 48:18

49:1,2 50:15,23
50:25
**putting** 50:13
56:4

## q

**quantity** 19:2
**question** 32:1
35:17 37:14 46:2
52:23,25
**questions** 9:18
14:6 27:13
**quickly** 7:25
**quinn** 3:2
**quite** 8:3
**quote** 37:14 45:7
54:22
**quoted** 15:7 22:19
**quotes** 12:1 13:25
15:15,17 19:6,14
22:15,17 24:2,5
24:19 28:20,21
29:5,8,11,18
36:19 37:19,21
41:11,13,21 43:22
54:14,18,23 57:2

## r

**r** 1:23 3:1 4:1 62:1
**raised** 5:22 9:1
**ran** 34:8,14
**randomly** 37:24
**range** 54:25 57:3
**rates** 41:1,5
**rationalizations**
46:14
**react** 59:21
**reaction** 60:10
**read** 51:12 55:25
58:25 59:1
**ready** 5:12 8:13
37:12 52:18 59:8
**real** 16:17 24:14
30:3 58:17

**realize** 47:25
**really** 5:15 8:7
11:6 12:1 18:17
21:18 26:22 28:19
28:20 29:6 31:1,3
32:22 37:5 60:14
**reason** 17:10
**reasonable** 12:23
13:8,8 35:12,12
58:11
**reasonableness**
7:9
**reasons** 30:23
**rebuttal** 4:20
**recall** 18:9
**recollection** 57:25
**record** 4:4 10:18
27:16 49:9 59:12
61:3 62:4
**red** 18:15 22:8
**reference** 43:21
**referring** 44:8
**relate** 31:17 32:23
39:13
**related** 23:22,24
37:21
**relates** 24:9
**relating** 28:9 45:1
**relatively** 44:21
**relevant** 36:22
53:13,14
**reliance** 7:4 28:3
28:5 32:3 53:2,23
**relied** 7:7,10,14
9:8 10:4 11:19,23
12:3,6 17:3,18,22
18:6,11 19:5 20:7
21:17 22:20 24:13
24:15 25:3,7
26:14,19,23 27:7
27:15,23 28:24
29:2,15 30:3,7
33:17 34:21 38:19

39:16,25 41:13
42:9 43:18 44:5,9
44:11,17 46:11,25
47:16,22 49:12
51:17 52:7 54:7
57:13,15,16,16
58:1,7,17
**relief** 15:21 27:10
**rely** 17:13 29:3
31:11 32:8,8 40:4
47:19 48:12 53:16
55:6,6,23 56:10
**remarkably** 5:10
**renew** 12:11
**reply** 4:22 5:5
**reports** 4:18,20
4:22
**represented** 19:21
**request** 12:11
32:20
**requested** 10:11
10:25 11:1,12
**requesting** 38:15
**required** 15:22
34:23 35:13
**requires** 13:6
**resolution** 6:20
**resolve** 5:9
**resolved** 5:23
**respect** 4:9 5:25
13:11 46:10 50:20
51:25
**response** 32:19
44:1
**responsible** 19:22
32:22
**rest** 5:7
**restored** 16:20,20
41:18
**result** 13:9 21:15
35:1
**results** 29:18

**reviewed** 20:8
57:15,18
**reviewing** 6:8
**right** 4:5,10 5:19
6:7,16 7:10 8:15
11:23 13:4,13
17:5 20:20 24:6
25:2,5,25 32:8,9
32:17 33:14 36:6
39:25 40:17 41:21
41:23 42:1,25
43:17 44:25 45:2
45:3 49:3,4 51:23
56:13 57:6 60:11
60:12
**ripe** 6:20 59:23
**risk** 23:23 25:25
**road** 50:14,18
62:18
**roll** 32:2
**rolling** 7:16
**rossman** 3:8 6:14
7:20,22,24 8:16
8:22 47:2,5,9
48:24 49:23 50:19
51:17,21,23 52:1
52:11,13,25 53:3
53:25 54:10 55:15
55:17,21 56:2,9
56:13 60:5,10
61:2
**run** 31:5 33:14
34:15 47:22 49:7
59:10
**running** 29:23
**runs** 24:21

## s

**s** 3:1 4:1 8:12
32:20 52:4
**sachs** 32:19 47:13
47:19 53:7
**safe** 61:5

sanction   32:12
sanctions   9:1
    35:16 38:16
satisfactory   6:10
save   15:8 42:14
    42:22
saw   42:7
saying   16:4 17:20
    21:21 24:5 39:12
    43:19 46:19 47:18
    49:6 52:9 53:19
    54:10 55:4
says   9:16 10:4
    27:10 42:22
scc   1:6,11 2:1
schedule   4:9,11
    5:23 8:20 30:20
    30:20,23
screen   29:16
    43:17
screens   10:3,3,23
    11:22,25 12:20
    13:2 25:10 28:8
    42:22
search   43:3
searched   41:20
searches   34:14
second   33:3
see   21:11 26:10
    30:24 32:9 33:4
    34:5,8 42:17
    53:24
seeing   34:12
seek   25:5 35:14
seeking   38:16
seen   43:6
self   55:17
send   42:22
senders   43:4
sending   59:5
senior   42:13
sense   10:5,9 12:2
    21:2

sensitive   61:2
sensitivity   25:25
sent   14:15 16:12
    21:21 24:4 44:14
    52:16 59:7
separate   24:19
    26:1
september   4:25
    4:25 5:6,6 10:21
    11:22 12:8 41:10
    41:20
series   9:6
set   19:3 26:13
    28:4 29:11 30:6,6
    40:7 43:11 44:4
sets   48:5
seven   20:9,16
    22:16
seventh   38:10
shared   24:4 35:25
sharing   29:6
shelley   1:24
shoebox   17:5
shot   15:12
shots   29:17
shoulder   35:3
show   14:3 20:20
    26:10 40:6 42:13
    48:4 49:4 52:5
    53:9 59:15
showed   47:22
    55:4 56:4
showing   52:16
    58:5
shown   9:6 39:24
    46:11
side   9:23 20:10,20
    22:8
sift   21:1
significant   51:8
simple   25:8
simplification
    30:19

simplify   6:2
single   15:14
sit   60:14
sitting   38:6
situation   9:13,19
    38:6 39:22
six   6:22 19:14
    46:22
sixteen   57:14
size   42:1 48:7
skaw   2:25 62:3,7
skip   33:11
slide   15:25 20:9
    22:1,1,21 44:20
    57:14
slides   15:1 26:10
small   44:21
smoothly   59:10
snow   60:14 61:5
sold   34:6
solution   26:20
solutions   62:17
solve   9:20
somebody   39:1
    43:17 57:8
sorry   26:15
source   25:22
sources   48:11
southern   1:2
sp15   36:19
space   8:13
speak   26:18
speaker   4:7
specific   46:9
    49:11 51:6 52:6
specifically   28:3
    30:3 58:16
specifics   48:20
speculative   45:19
spent   50:21 52:17
    53:1
spot   13:4 50:10
    55:8

spreadsheet   14:17
    15:9,19 16:8,18
    17:6,7,10 18:5
    19:19,23 26:21
    39:2 41:22 47:15
    48:18 49:16 53:6
spreadsheets
    18:25 25:25 41:25
    43:9
spring   60:13
stack   41:14 42:4
stand   48:13 57:23
start   5:15 16:13
    20:17
started   53:16
starts   33:20
stated   19:17
states   1:1,15
station   30:22
stay   61:5
steven   31:6
stood   49:24
stopped   8:8
stored   15:14
story   35:11 37:6
    42:11
streamline   6:2
stuck   32:3
study   60:7
stuff   10:22
subject   13:5 36:18
subpoenaed   27:18
substantial   5:17
succeeding   7:18
sudden   10:2
suddenly   10:2
    53:17
suffer   21:19
suffered   21:9,14
suggest   53:20
suggesting   13:22
suggestion   15:11

**suisse**  1:12 2:2
3:11 7:1,4,7 8:8
9:16 15:3,7 19:21
20:4,8 23:2 29:19
34:24 35:3 38:17
**suisse's**  24:18,23
**suite**  62:19
**support**  5:5 20:13
21:6 23:20 24:18
24:22 25:6 29:20
31:5,9 32:15
33:21 36:17 37:7
42:12 48:18 52:7
**supported**  16:23
17:2
**supporting**  15:3
**supports**  17:14
51:6
**supposed**  26:1
33:25 51:5 52:5
**supposedly**  33:15
**sure**  4:14 6:14
7:24 12:13 15:17
16:4 17:17 20:19
23:7 42:14,15
43:11 59:9,14
**swaine**  3:10
**system**  22:13
24:23 25:1
**systems**  24:18

**t**

**t**  62:1,1
**table**  52:20
**take**  8:18 9:3,3,4
12:4 43:2 44:15
47:11
**taken**  53:20
**taker**  53:19
**talk**  5:8,14 26:8
35:22
**talked**  50:2,17
**talking**  11:25 19:2
29:5 41:6 43:11

52:22
**taoko**  15:9,19
16:8 18:4 41:10
43:24
**target**  48:4
**teed**  52:16
**tell**  10:5 26:22
36:20 38:14 48:15
54:10 56:23
**telling**  37:5 41:7
42:11
**ten**  10:19 22:1,15
22:16,18 29:5
**terminated**  22:12
**terms**  5:11 32:21
56:6 60:16
**test**  15:22
**testified**  45:17,24
46:23
**testifies**  9:6
**testify**  10:2 12:22
24:13 25:21,23
27:14,18 38:4
39:1
**testimony**  9:7,14
15:10 24:12 27:6
27:9 39:23 40:8
46:8,10,24 48:21
**testimony's**  48:9
58:1
**thank**  4:7 5:18
14:25 61:4,6,7
**theme**  38:7
**thick**  28:7
**thing**  10:15 12:19
16:5 17:14,18
18:12 31:1 38:24
**things**  21:16,17
22:10,19 25:15
26:16 28:17 30:4
30:14,21 33:21
34:18,25 41:25
42:2 48:12 53:12

53:14 57:12
**think**  6:1,11,15
7:2 10:8 12:12
15:2,25 19:9
25:24 30:17 31:22
34:17 35:24 37:4
39:7 42:21,23
43:19 50:2 53:18
55:7 56:23 59:3
59:15,21 60:5,7
60:15,19 61:2
**thinking**  25:8
**third**  29:17
**thirteen**  32:17
**thirty**  19:25
**thought**  7:11
24:10 29:21 34:10
35:22 47:21 53:14
53:15 58:15
**thousand**  40:12
40:25
**thousands**  18:8,8
35:5
**three**  15:2 19:25
**throw**  13:1
**throwing**  13:21
**time**  5:17 7:7 8:3
8:6,13 9:11 11:8,9
16:12,15,17 17:12
19:5 22:11,14,20
23:5 24:14 29:2
30:3 33:24 34:3
35:9 36:5 39:1
40:5 41:9 42:8
43:25 47:14,20
53:9 54:11,11,21
57:7 58:18 59:21
60:16,17,18,21
**times**  7:18 30:22
**today**  5:9,14
51:19 58:13 59:20
**told**  34:24 47:13
58:15

**tomorrow**  49:1
**tool**  10:10
**tools**  50:22
**top**  24:2 33:14
**total**  15:20
**totality**  54:24
**tough**  48:14
**trade**  11:10,11,11
18:10,18 20:14,25
21:5,6 22:2,4 24:9
24:17,18,22 25:4
25:7 28:22 29:5
31:9 33:1 37:2,15
40:19 48:10 50:17
50:17
**traded**  54:21 55:2
**trader**  7:6 9:6,18
20:6 21:17 22:5
23:2,8 25:11
26:18 27:10 28:24
29:8 37:16,17,18
39:3 40:3 48:12
48:13,17 49:11
50:21 54:18
**traders**  13:24
17:3,8,16 22:13
24:4 26:20 27:14
38:18 40:18,20
49:2 55:3 57:15
58:17
**trades**  18:17,22
18:23 20:11,12,21
20:22,23 22:12
23:5,25 35:5 36:5
37:20 40:13,17,25
41:21 50:14,16
51:7
**trading**  31:15
33:7 47:20
**train**  30:19,20,23
**trains**  30:21,21
**transcribed**  2:25

**transcript** 51:12
55:14,18,25 56:3
59:1,1 62:3
**transmittal** 14:8
**treasure** 28:4
**trial** 5:12 7:9 9:5
14:3 17:21 27:11
27:18 29:2 48:4
48:25 58:5,22,22
60:15
**tried** 17:24 18:1
47:21 53:10,12,13
**trot** 22:4
**trouble** 38:11
**true** 11:21 36:3
40:8 42:3,24
50:20 62:4
**truth** 26:10 54:9
54:11
**truths** 22:9
**try** 19:13 21:1
37:6 51:10 52:2
**trying** 7:19 8:3,5
8:10,19 31:19
35:4 47:10 50:23
57:6
**turn** 7:25 31:7
**turning** 22:1,21
38:14 47:17
**twelve** 31:7
**two** 15:1 19:6
20:23 21:10,14
30:4,11,14 47:11
50:21,22 51:12
53:1,11,22
**type** 58:7

**u**

**u.s.** 1:25
**uh** 15:6 23:9,19
36:15 51:23
**un** 52:13
**unable** 46:23

**unaware** 42:3
**understand** 4:8
6:24 16:15 27:21
31:21,24 34:23
38:12,13 41:8
42:18,20 43:2,5
43:16 46:17,20,22
50:24 54:2
**understanding**
50:6 54:13
**understands** 53:5
**understood** 51:4
59:3
**unfavorable**
47:25
**unidentified** 4:7
**unit** 39:2
**united** 1:1,15
**universe** 15:20
58:16
**unreasonable**
40:24
**unrelated** 22:16
**unsatisfactory** 8:9
**unsatisfying** 9:23
**untenable** 46:4
**upshot** 22:18
**use** 12:11 13:16
13:22 19:7 34:18
45:9 47:14 50:23
51:10

**v**

**v** 2:2
**validate** 12:7
44:12,17 45:2
56:3
**valuations** 29:20
**value** 24:25 29:20
37:2
**values** 21:12
22:12 23:22 29:16
37:1 51:7

**various** 50:14
**vast** 50:9 55:8
**venn** 21:7
**verify** 12:2
**veritext** 62:17
**verse** 49:24
**view** 13:10 30:1,5
30:8
**virtually** 55:23
**vision** 6:25
**volatile** 45:8
**volatility** 25:17,18
28:12,22
**vs** 1:11

**w**

**walk** 48:1
**wall** 58:25
**want** 7:17 9:2,4
9:13,19 11:18
14:6 24:19 28:15
39:14 40:2 42:13
45:9 48:3,3 58:24
58:25 59:24
**wanted** 7:17
15:13,17 18:5
22:3 33:24
**wasted** 35:16
**waters** 31:2
**way** 9:20 25:8
28:18 30:17,18
35:6 38:19,24
40:2 51:3 57:7
59:11
**we've** 6:1,16,16
8:5,7,11 12:4
35:16 38:8 40:18
**week** 7:8 10:22
24:15
**weeks** 6:22 19:24
46:22
**weight** 58:2
**welcome** 51:11

**went** 16:19,23
25:15 35:21 41:12
43:8 50:16 56:6
**west** 45:7,10
**wilful** 34:24
**window** 57:7
**witness** 9:11 10:2
32:10 34:2 39:22
40:6,12 45:16
47:18 49:13,24
50:17 51:15,17
52:1 53:9 54:6,6
55:1,5,5 56:5,5
57:23,23,24 58:5
59:6
**witness's** 40:8
48:8
**witnesses** 31:5
32:15 40:20 45:24
46:9,23 48:17
52:17,18,21 59:8
**word** 7:3 13:16
**words** 7:3,5 17:1
38:7 39:21
**work** 8:3,3
**worked** 4:9,13
36:5 56:16,16
**works** 6:21
**world** 53:20
**worried** 8:25
**worry** 28:21
**worth** 51:12
**wrong** 6:3 21:11
21:13 44:23,24,25
45:1 47:20 55:8
**wrote** 42:2

**x**

**x** 1:4,8,13

**y**

**yeah** 20:17 23:12
26:9 31:21 36:8
43:23,23 47:2,4,8
56:8 59:17

| | |
|---|---|
| **year** | 16:14 41:19 |
| **years** | 10:19 |
| **yep** | 31:25 |
| **york** | 1:2,17,17 3:5 |
| | 3:13 27:17 |

**z**

| | |
|---|---|
| **zero** | 26:21 47:11 |
| | 47:21 52:3 |