Alex R. Rovira
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5959

Hearing Date: August 14, 2018 at 10:00 a.m.

*Attorneys for Attestor Capital LLP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | Jointly Administered |

**OBJECTION OF ATTESTOR CAPITAL LLP**
**TO MOTION OF THE PLAN ADMINISTRATOR FOR AN ORDER**
**IN AID OF EXECUTION OF THE PLAN**

Attestor Capital LLP, on behalf of funds under its management that hold Primary Claims and Guarantee Claims (collectively, the "Claimants"), through its undersigned attorneys, hereby objects to the *Motion of the Plan Administrator for an Order in Aid of Execution of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* [Doc. No. 58381] (the "Motion"), based on the points and authorities set out below.[1]

**PRELIMINARY STATEMENT**

1.     By the Motion, the Plan Administrator asks this Court to relieve LBHI of its obligation under Plan Sections 8.13(a) and (d) to make distributions to the Claimants in respect of the remaining portion of the Claimants' Guarantee Claims after deducting the agreed U.S. dollar ("USD") value of the principal payments made in British pounds sterling ("GBP") by the

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

Primary Obligor, LBIE.  The Plan Administrator does not dispute that such GBP payments by LBIE are required to be valued in USD using the applicable foreign exchange rate on the Plan Confirmation Date (the "Agreed FX Rate"), such that even after April 2014, when LBIE had paid 100% of the amounts of Claimants' admitted claims in GBP, the Plan required LBHI to pay USD 12.89 for every USD 100.00 of the Claimants' Guarantee Claims (the "Remaining Guarantee Obligation").

2.      In July 2018, however, due to the LBIE Scheme becoming effective, the holders of Primary Claims against LBIE, including the Claimants, received payments in respect of statutory interest, as compensation for the lengthy period during the LBIE Administration in which their admitted claims were unpaid (the "Statutory Interest Payments").  The Plan Administrator argues that the Remaining Guarantee Obligation should be satisfied by the Statutory Interest Payments, on the theory that the latter are "consideration provided on the [Claimants'] corresponding Primary Claim[s]."  But this theory is incorrect.

3.      The Statutory Interest Payments are not "consideration provided on the [Claimants'] corresponding Primary Claim[s]," based on the text, purpose, and economic substance of Plan Section 8.13, because statutory interest was never a component of the prepetition Primary Claims, is not paid toward satisfaction of any such Primary Claims, and therefore cannot operate to reduce any guarantee obligation in respect of such Primary Claims. Plan Section 8.13, properly interpreted, neither gives LBHI the windfall of having the LBIE's Administrators cover LBHI's Remaining Guarantee Obligation nor deprives the Claimants of the full value of the Statutory Interest Payments.  Accordingly, the Motion should be denied.

## BACKGROUND

**The Applicable Plan Provisions**

4.      Plan Section 8.13(a) provides (emphasis added):

> **An** (i) Allowed Claim that receives Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Claim) in the Allowed amount of such Claim or (ii) **Allowed Guarantee Claim that receives Distributions** (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Guarantee Claim) **that combined with Distributions or other consideration provided on the corresponding Primary Claim** (excluding Distributions contributed to the Plan Adjustment on account of such Primary Claim) **equal the Allowed amount of such Guarantee Claim** (or such amount as may be agreed to by a holder and the Debtors) **shall**, in each case, **be deemed satisfied in full as to** such Allowed Claim or **such Allowed Guarantee Claim against the applicable Debtor**. … Except as specifically provided with respect to LBHI's rights of subrogation set forth above, nothing contained herein shall in any way affect the rights of the holder of a Guarantee Claim with respect to a corresponding Primary Claim against a Primary Obligor that is not a Debtor.

The purpose of this provision is plainly to protect LBHI, as guarantor, from paying out funds to creditors whose Guarantee Claims have been "satisfied in full" (as defined in the Plan).

5.      Plan Section 8.13(d) provides (emphasis added):

> For purposes of determining whether an Allowed Claim has been satisfied in full in accordance with <u>Section 8.13(a)</u> of the Plan, all Distributions or other **consideration provided by a Primary Obligor in a currency other than the U.S. Dollar shall be converted to the U.S. Dollar applying the existing exchange rate** derived from Reuters existing at approximately 3:00 p.m. GMT **on the Confirmation Date**. Nothing contained in this provision shall affect the applicable exchange rate for determining the Allowed amount of any Claim under section 502(b) of the Bankruptcy Code.

The purpose of this provision is plainly (i) to provide LBHI certainty as to its exposure in USD in relation to the Guarantee Claims filed against it, notwithstanding further fluctuations in the foreign currency exchange rate; and (ii) to compensate creditors like the Claimants in respect of

the material depreciation that had already occurred in certain currencies (including GBP) against the USD since the petition date. Once the Plan went effective, the Agreed FX Rate for each relevant currency would be known and would never change.

6.      Together, Plan Sections 8.13(a) and (d) fix LBHI's maximum exposure in USD, as guarantor of Primary Claims not paid in USD, in respect of the corresponding Guarantee Claims – albeit, that exposure includes the Remaining Guarantee Obligation. Likewise, these Sections also fix the applicable creditors' maximum recovery from LBHI valued in USD on its Guarantee Claims. The fact that the Remaining Guarantee Obligation is blind to the actual exchange rates as of the times when the non-USD payments are made shows that the parties negotiating the Plan valued certainty in order to avoid any additional risk of exposure to LBHI if the applicable foreign currencies were to plummet versus the USD during the remainder of the chapter 11 case.

7.      As an example, assume an undisputed, unsecured prepetition contractual claim of USD 100.00 in favor of Counterparty against LBIE, guaranteed by LBHI. Counterparty's Primary Claim is admitted in LBIE's Administration at GBP 55.75 (i.e., 1.00 / 1.7937) because English insolvency law requires all claims to be proved in GBP, using the exchange rates in effect on the commencement date (1.7937:1.00 USD:GBP). *See* Rule 14.21, Insolvency (England and Wales) Rules 2016 (previously rule 2.86 of the rules then applicable). Counterparty's Guarantee Claim is allowed in LBHI's chapter 11 case at USD 100.00, with no need for currency conversion. When LBIE has distributed GBP 55.75 to Counterparty, i.e., the full amount of LBIE's obligations on the Primary Claim to the extent admitted in LBIE's Administration, Plan Section 8.13(d) deems this amount to be valued at USD 87.11 by applying the Agreed FX Rate (1.5625:1.00 USD:GBP). LBHI's Remaining Guarantee Obligation is

therefore USD 12.89 (i.e., USD 100.00 – USD 87.11), assuming that LBHI has distributed nothing on the Guarantee Claim).[2]

8.    The Plan Administrator should not dispute the accuracy of the example above. Extrapolating from the example, at the point when LBIE has paid exactly 100% of the GBP admitted amounts of the Claimants' Primary Claims, LBHI's Remaining Guarantee Obligation is USD 12.89 for each USD 100.00 of their Guarantee Claims – that is, 12.89% of the aggregate amount of their Guarantee Claims.[3]

9.    The Plan Administrator should also agree that Plan Section 8.13, including the subsections at issue here, is the result of the substantial and complex negotiations – and compromises – that resulted in the Plan ultimately being confirmed without objection.[4]

**The Prior Motions**

10.    On June 10, 2015, the Plan Administrator filed its initial motion to estimate outstanding LBIE Guarantee Claims at zero (the "First Motion"). The First Motion was based on the Plan Administrator's avowed expectation that LBIE's estate would eventually pay out substantially more than 100% of the admitted amount of the related Primary Claims, and the argument that these future payments would necessarily relieve LBHI of the Remaining

---

[2]    The Plan Administrator and the Claimants have stipulated that USD 12.89 per USD 100.00 reflects the amount of the Remaining Guarantee Obligation.

[3]    The actual value in USD of the distributions made by LBIE during its Administration are not relevant because Plan Section 8.13(d) fixed the rate as of the Confirmation Date. However, as it happened, the actual exchange rate at the times of LBIE's four interim distributions shows approximately 12% as the average shortfall in the USD Guarantee Claims – very close to the shortfall resulting from the application of Plan Section 8.13(d).

[4]    The foreign exchange issues resolved in Plan Section 8.13 were significant, especially for creditors with LBIE Guarantee Claims. LBIE was by far the most significant Primary Obligor using a currency other than USD in its insolvency proceedings. LBIE's Administrators reported that 79% of the claims filed in the Administration reflect obligations originally denominated in USD. *See* LBIE Surplus Entitlement Proposal, PWC Presentation dated 10 March 2014, available at https://www.pwc.co.uk/assets/pdf/lbie-surplus-proposal-additional-information-140328.pdf. The reserves that LBHI set aside for LBIE Guarantee Claims were originally over USD 4.3 billion. *See* First Motion ¶ 3.

Guarantee Obligation (or any other obligation) for the corresponding Guarantee Claims (the "LBIE Guarantee Claims").

11. The Claimants jointly objected to the First Motion [ECF #50602], asserting that their LBIE Guarantee Claims were not contingent and thus not susceptible to estimation, and that, in any event, the First Motion was based on uncertain assumptions. The First Motion was withdrawn with respect to the Claimants, after the Plan Administrator and the Claimants reached a partial resolution of the Claimants' potential objection thereto. The parties agreed, among other things, that the reserves being held for the Claimants' LBIE Guarantee Claims (the "FX Reserves") would be reduced to reflect the USD equivalent of the admitted claims against LBIE. *See* DB Objection to Second Motion [ECF #55085] ¶ 10 n.2. This agreement freed up a substantial amount of reserves for distribution to LBHI's creditors.

12. On February 23, 2017, the Plan Administrator reiterated its motion to estimate outstanding LBIE Guarantee Claims at zero, based on the same assumptions and argument as in the First Motion (the "Second Motion"). Deutsche Bank [ECF #55085], joined by Attestor [ECF #55088], objected to the Second Motion, again asserting that, until the Waterfall Applications were resolved with finality, the nature and amount – if any – of subsequent payments from the LBIE estate were uncertain, and thus it was premature to determine the treatment of any such payments under the Plan. DB Objection ¶¶ 29-41. The Claimants also noted that, even as the Plan Administrator was telling this Court that a substantial further distribution from LBIE was inevitable, LBHI was litigating in LBIE's Administration to reduce or eliminate any such distribution entirely. DB Objection ¶ 36.

13. The Second Motion was also withdrawn with respect to the Claimants, after the Plan Administrator and the Claimants reached a further partial resolution of their disputes, which

included further reducing the FX Reserves so that they covered only the Remaining Guarantee Obligation – which freed up a further substantial amount of reserves for distribution to LBHI's creditors – and preserving as the only disputed issue the question presented by the current Motion. *See* Motion ¶ 22.

**The LBIE Scheme**

14.     After the Second Motion was resolved, further issues in the Waterfall Applications were determined by the UK Courts or settled.  Most pertinent to the current Motion, the UK Supreme Court overturned the decisions of the lower courts to the effect that a creditor could make a non-provable claim against LBIE in respect of any currency shortfall suffered as a consequence of being required to prove their debt (and receive dividends) in GBP even though the original Primary Claim was in USD. *See Joint Administrators of Lehman Brothers Limited v Lehman Brothers International (Europe) (In Administration) and others* [2017] UKSC 38 ("*Waterfall I*").  It held that the only amounts payable to LBIE's unsecured creditors beyond the principal amounts of their GBP proved debts (i.e., their contractual claims) was for statutory interest pursuant to Insolvency Rule 14.23(7) (previously rule 2.88 of the rules then applicable), payable by LBIE's Administrators during the applicable portion of LBIE's Administration at a minimum of 8% per annum (the "Statutory Interest Obligation").  *See* Motion ¶ 40 (citing *Waterfall I* High Court Judgment).

15.     Thereafter, in late October 2017, LBHI's joint venture began formal efforts to convert LBIE's insolvency proceedings from an Administration to a Liquidation – the express purpose being, to nullify the Statutory Interest Obligation entirely, so that the same value would flow to LBHI's joint venture instead. *See* LBIE Administrators' 1 December 2017 Update.[5]  In

---

[5]     Available at https://www.pwc.co.uk/services/business-recovery/administrations/lehman/update-lbie-announces-an-application-concerning-the-statutory-interest-lacuna-1-december-2017.html.

response, LBIE's Administrators, who considered such a conversion inappropriate and unfair, made an application to the High Court to determine whether the Conversion was properly sought or property effected (the "Lacuna[6] Application"). *See id.* Despite LBHI having represented to this Court for three years running that a massive surplus would inevitably be paid to LBIE's general unsecured creditors, LBHI's joint venture forced the Lacuna Application with the express purpose of nullifying the Statutory Interest Obligation (and thus nullifying any further recovery by LBIE's general unsecured creditors) by terminating the Administration.

16.     If the Lacuna Application had been decided entirely in LBHI's favor, (a) at least GBP 5.1 billion formerly allocated to the Statutory Interest Obligation would have flowed instead to LBHI and its fellow joint venturers, as subordinated creditors or equity holders, and (b) LBHI would still have owed all holders of LBIE Guarantee Claims the Remaining Guarantee Obligation under Plan Section 8.13(d) – except that virtually all LBIE Guarantee Claims other than the Claimants' had been expunged by the orders granting the First Motion and the Second Motion based on LBHI's purported certainty of substantial further distributions to LBIE's creditors.

17.     The LBIE Scheme established a procedure to resolve all outstanding litigation and issues in the LBIE estate that were delaying distribution of Statutory Interest, including the Lacuna Application. Thus, until June 20, 2018, when the LBIE Scheme became effective, there was a real possibility that LBIE's general unsecured creditors would not receive any further payments, and thus that LBHI would undisputedly owe the Claimants the Remaining Guarantee Obligation. For the Plan Administrator to argue otherwise would be to admit that LBHI's joint venture's attempt to prevail in the Lacuna Application was frivolous.

---

[6]     The Lacuna Application is called that because the English legislation did not expressly address the disposition of accrued but unpaid statutory interest upon conversion of an administration to a liquidation. That is, there was a gap in the statute.

18.    For purposes of the current Motion, the LBIE Scheme has now clarified that (i) the Statutory Interest Payments will be the only payments that will be received by LBIE's general unsecured creditors in addition to the 100 pence in the pound of their admitted claims, and (ii) the amount of the Statutory Interest Payments will be no less than 38.43% of the relevant GBP admitted claims (reflecting the statutory rate of 8% over the relevant period), less a deduction in respect of withholding tax where applicable.  *See* Motion ¶ 13.

**The Open Issue**

19.    In short, the unresolved dispute between the parties is whether the recent payments of statutory interest should or should not be credited against LBHI's obligation to true up the claimants' recovery in USD as part of their Guarantee Claims.   The two potential outcomes are:

- If the Statutory Interest Payments <u>are</u> "consideration provided on the corresponding Primary Claim[s]" under Plan Section 8.13(a), then over one-third of the Statutory Interest Payments, instead of the FX Reserves, will be used to satisfy the Remaining Guarantee Obligation that LBHI would undisputedly be required to pay the Claimants under Plan Section 8.13(d) in the absence of any further payments from the LBIE estate.

- If the Statutory Interest Payments are <u>not</u> "consideration provided on the corresponding Primary Claim[s]" under Plan Section 8.13(a), then the FX Reserves will be used to satisfy the Remaining Guarantee Obligation payable to the Claimants under Plan Section 8.13(d), and the entirety of the Statutory Interest Payments will be used to satisfy their statutory purpose under the Insolvency Rules.

20.    Because the latter conclusion (the Claimants' position) is consistent with the nature of the Statutory Interest Payments and the text and purpose of Plan Section 8.13, whereas the former conclusion (the Plan Administrator's position) is not, the Motion should be denied.

## <u>ARGUMENT</u>

21.    The Motion should be denied because the Statutory Interest Payments are not "consideration provided on the corresponding Primary Claim[s]" under Plan Section 8.13(a) and

thus cannot be used to subsidize LBHI's Remaining Guarantee Obligation in respect of the Claimants' Guarantee Claims under Plan Section 8.13(d).  The Plan Administrator's reading of the Plan is wrong because it misreads the text and defined terms in the Plan, mischaracterizes the Statutory Interest Payments, and nullifies the purpose of the Agreed FX Rate to ensure full payment in USD of the Guarantee Claims.

## I.    **LBHI's Reading Contradicts the Plain Language of Plan Section 8.13.**

22.    The dispute before the Court is a matter of contract interpretation under New York law.  "When interpreting a contract, our primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.  The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.,* 773 F.3d 110, 113–14 (2d Cir. 2015).  Here, giving all of the relevant provisions of Plan Section 8.13 – including the defined terms used therein – their full meaning, it is clear that the Statutory Interest Payments are not "consideration provided on the[ir] corresponding Primary Claim[s]."

### A.    **As a Matter of English Insolvency Law, the Statutory Interest Payments Do Not Satisfy the Claimants' Primary Claims.**

23.    The Court's first question should be that addressed by the Plan Administrator mainly at the end of the Motion:  What is the nature of these Statutory Interest Payments? Although the Plan is to be interpreted pursuant to New York contract law, the Statutory Interest Payments are entirely a product of English insolvency law.   The Plan Administrator mischaracterizes the Statutory Interest Payments, as a matter of English insolvency law, in several ways.

24.     It should be undisputed that statutory interest is not a prepetition, provable debt. As a matter of English insolvency law, provable debts are limited to the debtor's debts or liabilities existing as of the commencement of the administration or liquidation. Rules 14.1(3), 14.2, Insolvency (England & Wales) Rules 2016. Rather, the Statutory Interest Obligation is a mandatory obligation placed on the LBIE Administrators, which arises postpetition and ceases to apply when LBIE exits administration. *See, e.g., Waterfall 1* [2017] UKSC 38, ¶ 117. As the Plan Administrator notes, the "policy behind statutory interest is to compensate creditors for the delay in payment to them of their debts on account of the insolvency process." Motion ¶ 40 (quoting *In the Matter of Lehman Brothers International (Europe) (in Administration)* [2014] EWHC 704 (Ch) ¶ 86).

25.     The Statutory Interest Obligation arises <u>only</u> if a surplus remains after all admitted claims are paid in full. Rule 14.23 Insolvency (England & Wales) Rules 2016. It is simple logic that the payment of statutory interest cannot satisfy an admitted claim that by definition has already been paid in full.

26.     The English High Court also held in the Waterfall IIA Application that the payment of statutory interest cannot operate to reduce any contractual claim that the creditor may have had to principal (or a shortfall in principal) in the original contract currency after payment in full of the admitted claim in the administration (a "currency conversion claim"). *See, e.g., In re Lehman Brothers International (Europe) No 5* (Ch D) [2016] Bus LR 17, ¶¶ 228, 231 ("<u>*Waterfall IIA*</u>"). Thus, the fundamental proposition of the Motion – that the Statutory Interest Payments can be treated as satisfying a claim referable to a principal debt – has been rejected by the English High Court.

27.    In *Waterfall IIA*, LBHI's joint venture "submit[ted] that the currency conversion claim should take into account the payment of statutory interest." *Id.*, ¶ 228.  The High Court disagreed, finding that Rule 14.23 of the Insolvency (England & Wales) Rules 2016 is "a complete code for the payment of post-administration interest," which "replaces all prior rights, including all contractual rights," and thus "there is no comparison to be made between the foreign currency equivalent of the statutory interest and the foreign currency interest … under the contract." *Id.*  The High Court accordingly held:

> If the contractual right of the creditor was to receive, say, US$1m on a particular date and if it received dividends equivalent to US $900,000, there remains outstanding a debt of US$100,000.  A currency conversion claim is not a claim for damages, it is a claim for payment of the unpaid portion of its debt.  **A subsequent payment of interest in sterling which, if converted at the prevailing rate on the day of payment, produced a higher sum than the contractual entitlement, does not discharge the earlier unpaid debt.**
>
> **I therefore conclude that the calculation of a currency conversion claim should not take into account the statutory interest paid to the relevant creditor.**

*Id.* ¶ 230-31 (emphasis added).

28.    The High Court issued this decision before the UK Supreme Court in *Waterfall I* held that a creditor whose admitted claim had been paid in full has no residual right to a currency conversion claim based on its original contractual rights.  However, the UK Supreme Court's decision does not call into doubt the existence of the Remaining Guarantee Obligation (which is expressly provided by the Plan) or the principle that the payment of statutory interest does not operate to discharge any part of the principal debt.

29.    Granted, the Remaining Guarantee Obligation arises from the Plan, and the Plan is not governed by English law.  But the Statutory Interest Payments are created by English law, and as a matter of English law, the Statutory Interest Obligation is a statutory postpetition

obligation taking effect by way of a direction given to LBIE's Administrators.  Rule 14.1(3), 14.2, Insolvency (England & Wales) Rules 2016.  As stated above, the policy behind statutory interest is to compensate creditors for the delay in payment to them of their debts as a result of the insolvency process.  Because the postpetition Statutory Interest Obligation is legally distinct from the underlying prepetition Primary Claims, the Plan Administrator presumably would agree that LBHI never purported to guarantee, and cannot now have any liability in respect of, the Statutory Interest Obligation.  For LBHI to apply a payment of interest (including statutory interest) in satisfaction of a guarantee obligation would be illogical.

### B.    The Statutory Interest Obligations Are Not Components of the Primary Claims, as Defined in the Plan.

30.    With the nature of the Statutory Interest Payments clarified, the Court's next question should be:  What is the relationship between those payments and the Claimants' Primary Claims?  Certainly there is some such relationship.  But for their Primary Claims, to the extent admitted in LBIE's Administration, the Claimants would have no right to the Statutory Interest Payments; and amounts of their Statutory Interest Payments are calculated based on the amounts of their "provable debt[s] which gave rise to the alleged guarantee claim[s]."  *See* Motion ¶¶ 15, 41.  But it does not necessarily follow that the Statutory Interest Payments are "provided on" the Primary Claims.  This is the relationship that the Plan Administrator must show in order for LBHI to evade its Remaining Guarantee Obligation – not merely that the Statutory Interest Payments are "provided in connection with" the Primary Claims.

31.    The relationship between the Statutory Interest Payments and the Primary Claims depends on the nature of both.  The nature of the Primary Claims depends on the definition of that term in the Plan.  But nowhere in its six-page exegesis of Plan Section 8.13 does the Plan Administrator so much as mention this definition.

13

32.     "Primary Claim means a Claim against a Primary Obligor **for which a corresponding Guarantee Claim has been asserted**."   Plan § 1.125 (emphasis added). "Claim" shall have the meaning assigned to such term in section 101(5) of the Bankruptcy Code. Plan § 1.22. "Primary Obligor means an entity other than LBHI that is purportedly obligated or liable on a Claim **with respect to which a Guarantee Claim has been asserted**."  Plan § 1.126 (emphasis added).  "Guarantee Claim" means a Claim asserted against LBHI on the basis of a guarantee, promise, pledge, indemnity or similar agreement by LBHI (a) to satisfy an obligation or liability of another entity or (b) with respect to asset values, collection or net worth of another entity.  Plan § 1.62.

33.     The Claimants have not asserted Guarantee Claims "for" or "with respect to" the Statutory Interest Obligation.  *See* Plan §§ 1.125-1.126.  Accordingly, any claims (as defined in the Bankruptcy Code) that the Claimants have to the Statutory Interest Payments are not "Primary Claims" under the Plan.

34.     As noted above, the Plan Administrator and the Claimants have stipulated to the amounts of the Claimants' Primary Claims and Guarantee Claims.  Those stipulated amounts do not include statutory interest pursuant to UK Insolvency Rule 14.23(7).  Nor do the underlying proofs of claim against LBHI.[7]  If they did, the Plan Administrator presumably would assert that any such claims would not be properly included in a proof of claim against LBHI.  In fact, the Plan provides that an Allowed Claim "shall not, for any purpose under the Plan, include interest on such … Claim from and after the Commencement Date."  Plan § 1.4.  The Statutory Interest Obligation cannot be the subject of an Allowed Guarantee Claim under the Plan.  *See id.*

---

[7]     Although some of the Guarantee Claims may purport to assert an entitlement to postpetition interest, that refers to postpetition interest payable by LBHI in the chapter 11 case, not to LBHI's guarantee of postpetition interest payable by the Primary Obligor.

35.     The distributions in GBP that LBIE made to the Claimants on their admitted claims <u>were</u> consideration provided on "Primary Claims," because those distributions were paid towards satisfaction of such Primary Claims to the extent admitted in the administration of LBIE, the Primary Obligor.  But the same is not true for the Statutory Interest Payments.

### C.     The Statutory Interest Payments Are Not "Consideration" and Are Not Provided "on" the Primary Claims.

36.     With the nature of the Statutory Interest Payments and the nature of the Primary Claims clarified, the dispositive issue can be decided:   the former are <u>not</u> "consideration provided on" the latter under Plan Section 8.13(a).

### 1.     The Statutory Interest Payments Are Not "Consideration."

37.     The Plan Administrator's assertion that it is "beyond a doubt that a cash payment is a type of consideration" is an overstatement, which ignores the description of "consideration" that the Plan Administrator itself quotes.  *See* Motion ¶ 31.  Consideration is a term of "contract law," which is "most often associated with … something (such as an act, forbearance, or a return promise) bargained for and received," and involves "parties [ ] exchang[ing] value."  *See* Motion ¶ 30 n.9 (citing *Goldman Sachs Grp., Inc. v. Almah LLC,* 85 A.D.3d 424, 427 (1st Dep't 2011) and Black's Law Dictionary).   A gratuitous transfer in the form of a "cash payment," for example, is not "consideration," because there is no bargain or exchange.  *See id.*  Thus, although the term "consideration" may be very broad with respect to <u>what</u> is given (e.g., cash or securities), it cannot be so broad with respect to <u>why</u> it is given (i.e., consideration must have the effect of discharging the principal debt).

38.     While a chapter 11 plan (or an insolvency scheme) can be considered a bargained-for exchange and while distributions under a chapter 11 plan (or in an Administration) on account of a prepetition claim can be considered an exchange of value, there is no such quid pro

quo underlying the Statutory Interest Payments. The Claimants never gave anything to LBIE or its Administrators in order to obtain the Statutory Interest Payments. The Statutory Interest Obligation is unilateral and arises from a statute; it is not a bilateral obligation arising from any bargain or exchange; it is even payable whether the underlying obligation was interest-bearing or not. *See Waterfall I* ¶ 86. Nor is it based on a claim: the Claimants are entitled to the Statutory Interest Payments whether they made an affirmative claim for them or not. *See id.*; Rules 14.1(3), 14.2, Insolvency (England & Wales) Rules 2016. Accordingly, the Statutory Interest Payments – unlike distributions on admitted debts – are not "consideration" at all. *See id.*; *Goldman Sachs,* 85 A.D.3d at 427. Because they are not "consideration," they are not "consideration provided on" the Primary Claims (or anything else).

39.    Because the Statutory Interest Payments are not "consideration," as that term is used in Plan Section 8.13(a), the Motion should be denied.

## 2.    The Statutory Interest Payments Are Not Provided "on" the Primary Claims.

40.    Even if statutory interest payments could generally be a form of "consideration," when read in the context of the phrase, "consideration provided on the corresponding Primary Claim," and in the context of a provision that seeks to limit the amount payable in respect of Allowed Guarantee Claims, "consideration" was clearly not intended to capture interest payments that do not operate to satisfy any part of the Primary Claim.

41.    The term "on" in the phrase "consideration provided on the corresponding Primary Claim" is used to describe the relationship between a payment and an obligation. As used in Plan Section 8.13(a), the term "on" is clearly narrower than "in connection with" or "relating to" or "with respect to." These terms collectively are used 119 times in the Plan as a whole (including once within Section 8.13(a), discussed below), and surely would have been

16

used here if a broad relationship between payments from LBIE and the Primary Claims had been intended.  Thus it is clear that "provided on the Primary Claim[s]" means something narrower than the mere fact that the Statutory Interest Payments "correspond to" the Primary Claims, or that the Statutory Interest Payments are "calculated based on" the amounts of Primary Claims. *Cf.* Motion ¶¶ 15, 41.

42.    The plain meaning of "on," in the sense of a payment "on" a claim, is "in satisfaction of."  Payments, in whatever form, made "on" a claim <u>reduce</u> the amount of that claim.  This is the natural, intuitive meaning of a payment being provided "on" a claim.  The Plan Administrator partially agrees with this interpretation, glossing "consideration provided on" as "a payment towards."  *See* Motion ¶ 32.  The gloss is correct, but the argument is wrong, because the Statutory Interest Payments clearly are not payments "towards" any Primary Claim, as was demonstrated in detail above.

43.    Perhaps recognizing this problem, the Plan Administrator further glosses "on" as "calculated based on the amount of."  The term "on" can have this meaning, as in the sense of interest "on" a debt.  *See* Motion ¶¶ 33 ("… postpetition **interest on** the Allowed amount of such Claims …"), 35 (… postpetition **interest *on*** the Allowed Claim …[8]), 40 ("… **interest on** those [prepetition] debts."  *See* Motion ¶ 40 (emphasis added).  But in this usage of "on," the interest <u>supplements</u> the debt.  That is the opposite of the usage in Plan Section 8.13(a), where "consideration provided on" the claims means "payment towards" the claims, which <u>reduce</u> the debt underlying the Primary Claims.

---

[8]    The Claimants do not consider the Court Orders cited here to be legitimate evidence.  A phrase dropped by debtors' counsel into a proposed order granting an uncontested motion and submitted to the Court for signature without any indication that the phrase was supposedly significant cannot fairly or reasonably be used against other adversaries in other contested matters.

44.    The Statutory Interest Payments <u>cannot</u> be provided "in satisfaction of" the Primary Claims, because (i) as demonstrated above, the Statutory Interest Payments were never components of the Primary Claims, and, in any event, (ii) LBIE has <u>already</u> satisfied the admitted claims – as the Plan Administrator emphasizes, that occurred in April 2014.  Motion ¶ 1.  Because the Statutory Interest Payments are not being provided in full or partial satisfaction of any Primary Claim, they are not "provided on the corresponding Primary Claim[s]."  For this further reason, the Motion should be denied.

## II.    <u>LBHI's Reading Is Inconsistent with the Business Purposes of Plan Section 8.13.</u>

45.    This Court has instructed, and the Claimants and the Plan Administrator agree, that the "meaning of particular language … should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes."  Motion ¶ 36 (citing [*Lehman Bros. Special Fin. Inc. v. Bank of Am., N.A. (In re Lehman Bros. Holdings Inc.),* 553 B.R. 476, 498-99 (Bankr. S.D.N.Y. 2016)); *see SR Int'l Bus. Ins. Co. v. Allianz Ins. Co., L.L.C.,* 343 Fed. Appx. 629, 632 (2d Cir. 2009).  Likewise, contracts should be construed "in a manner that accords the words their fair and reasonable meaning and achieves a practical interpretation of the expressions of the parties.  Put otherwise, a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."  *E.g., Greenwich Capital Fin. Prods., Inc. v. Negrin,* 903 N.Y.S.2d 346, 348 (1st Dep't 2010) (internal quotations and citations omitted).

46.    The Claimants further agree with the Plan Administrator that <u>a</u> (but not the <u>only</u>) "purpose of section 8.13 was to limit the holders of the Guarantee Claims, among many others, to a single satisfaction of their Guarantee Claims and to avoid a double recovery at the expense of other creditors."  *Id.*  The fatal flaw in the Plan Administrator's argument on this point is to

equate the "purpose of section 8.13" with the purpose of Plan Section 8.13(a) alone. The Plan Administrator completely omits Plan Section 8.13(d) from the discussion, even though Plan Section 8.13(d) is undeniably part of "section 8.13" and is even cross-referenced with Plan Section 8.13(a).

47.    Plan Section 8.13(d) shows that it is plainly <u>also</u> a "purpose of section 8.13" to protect the specific subset of creditors holding Guarantee Claims whose corresponding Primary Claims are not paid in USD from the depreciation of the foreign currency against the USD from the Petition Date to the Confirmation Date. This is clearly a "business purpose sought to be achieved by the parties." *See LBSF* at 498-99. LBHI provides that protection by paying the Remaining Guarantee Obligation based on the Agreed FX Rate. Thus, the "single satisfaction" on a Guarantee Claim enforced by Plan Section 8.13 <u>includes</u> the Remaining Guarantee Obligation; by the same token, for LBHI to honor its Remaining Guarantee Obligation cannot be a form of "double recovery."[9]

48.    Instead of taking Plan Section 8.13(d) into account, as it should, the Plan Administrator attempts to buttress its "single satisfaction" argument with two purported big-picture points.

49.    First, the Plan Administrator argues that the phrase "other consideration" was purposely written broadly because the "corporate context" – i.e., the fact that "LBHI was the parent company of a global business" – meant that LBHI didn't know what to expect in foreign affiliate insolvency proceedings. *See* Motion ¶ 37. This is only correct in a limited and uninformative sense. The word "consideration" is used so as to encompass whatever types of property or value (cash, securities, other) might be distributed in foreign proceedings to

---

[9]    The Claimants have no burden to prove they are seeking a single satisfaction, only that they are seeking what they are entitled to under the Plan. If the confirmed and effective Plan provided the Claimants with a quadruple recovery, that is what they would be entitled to.

discharge the Primary Claim (i.e., the principal debt), but does not for that reason overreach to payments of postpetition statutory interest that LBHI never guaranteed.

50.     Second, the Plan Administrator argues that "virtually" everyone other than the Claimants abandoned their claims for the Remaining Guarantee Obligation, and so "section 8.13(a)'s meaning in practice" is the same as the Plan Administrator's reading. Neither "meaning in practice" nor "majority rules" is a principle of New York contract interpretation.

51.     The Plan Administrator's only argument that is actually based on other sections of the Plan is that the term "Distributions" is broad enough to include payments by the Subsidiary Debtors, if any, "in satisfaction of postpetition interest [on the Allowed amount of such Claims]" pursuant to Plan Section 8.13(c). Motion ¶ 33. The Plan Administrator goes on to incorrectly infer that (i) postpetition interest paid by a Subsidiary Debtor counts under Plan Section 8.13(a) and (ii), since postpetition interest counts as a Distribution, it makes no sense to read 'other consideration' to exclude that very type of payment on a claim." Motion ¶ 34. The words "Distributions" and "other consideration" are certainly in parallel, but the conclusion is demonstrably wrong. Although "Distribution" includes postpetition interest within Plan Section 8.13(c), it is clear from the use of the term in Plan Section 8.13 as a whole that "Distribution" need not include postpetition interest and in fact cannot include postpetition interest within Plan Section 8.13(a).

52.     In Plan Section 8.13(c), the Subsidiary Debtors' postpetition interest obligations arise only after full payment of all Allowed Claims – in other words, when the deemed satisfaction contemplated by Plan Section 8.13(a) has been completed. In Plan Section 8.13(a), "Distributions" can only be made by a Debtor. Both the Primary Claim and the Allowed Guarantee Claim would therefore be a claim of the same amount allowed in USD against LBHI

or the Subsidiary Debtor.  Payment of either the Allowed Guarantee Claim or the Primary Claim in full by LBHI or a Subsidiary Debtor would therefore result in the other being satisfied in full, before any potential obligation to pay postpetition interest on either claim arises.  Postpetition interest cannot therefore be relevant to the concept of "Distributions" as used in 8.13(a), because it would not arise until after the Allowed Guarantee Claim or the Primary Claim has been satisfied in full.

53.    The same is true of Plan Section 8.13(b), where reading "Distributions" so as to include postpetition interest would be nonsensical.  For example, in Plan Section 8.13(b)(i), "In no event shall (i) an Allowed Claim receive Distributions … in excess of the Allowed amount of such Claim."  If "Distributions" here included postpetition interest, Plan Section 8.13(b) would prevent any postpetition interest from ever being paid, because Plan Section 8.13(c) states that postpetition interest is never paid until "after all Allowed Claims against that Debtor have been satisfied in full in accordance with <u>Section 8.13(a)</u> of the Plan."

54.    The Plan Administrators' argument from the term "Distribution" (*see* Motion ¶¶ 33-345) is therefore unsustainable, as the Plan plainly uses "Distributions" in some places to include postpetition interest, but not in others.  Within Plan Section 8.13(a), "Distributions … provided on the corresponding Primary Claim" must <u>predate</u> payment in full of Allowed Claims; Plan Section 8.13(b) dictates that Allowed Claims <u>cannot</u> include postpetition interest; and Plan Section 8.13(c) dictates that postpetition interest on Allowed Claims must <u>postdate</u> payment in full of a Debtor's Allowed Claims.   The Plan should be read so as to avoid internal inconsistencies, if possible.   *See, e.g., U.S. Bank Trust N.A. v. Am. Airlines, Inc. (In re AMR Corp.),* 485 B.R. 279, 289 (Bankr. S.D.N.Y. 2013) (quoting *Barrow v. Lawrence United Corp.,* 538 N.Y.S.2d 363, 365 (3d Dep't 1989)).

55.     The only reading of Plan Section 8.13(a) that avoids a blatant inconsistency with Plan Sections 8.13(b) and (c) is that "Distributions or other consideration provided on the corresponding Primary Claim" in Plan Section 8.13(a) excludes postpetition interest.   The Claimants' interpretation of the Statutory Interest Payments as not being "consideration provided on" the underlying principal claims is entirely consistent with this reading.   The exclusion of postpetition interest from the meaning of "Distribution" (and "consideration") here is not merely inferred – it is explicit, because that is precisely the thrust of "provided on the corresponding Primary Claim," as demonstrated above.   Because "Distribution" within Plan Section 8.13(a) cannot include postpetition interest paid by Debtors, "consideration" in the same section cannot include postpetition interest paid by foreign affiliates.

56.     Finally, if the Statutory Interest Payments are used to subsidize LBHI's Remaining Guarantee Obligation, the Claimants will actually have less than a single satisfaction of their claims.   Over one third of the 38.43% Statutory Interest Payments, an amount equal to 12.89% of the Guarantee Claims in USD, would be reallocated to cover the Remaining Guarantee Obligation.   The Claimants' Guarantee Claims would be "satisfied in full" only because they paid themselves.   The remainder of the Statutory Interest Payments would be applied as intended, to compensate the Claimants for the delay in LBIE's Administration.   But the creditors in LBIE's Administration generally are receiving the entire 38.43% for that purpose.   The Claimants would effectively receive less compensation from LBIE's estate than its creditors that lack Guarantee Claims against LBHI, because the Claimants must channel one third of their Statutory Interest Payments to cover LBHI's Remaining Guarantee Obligation in the Plan.

57.    The proviso at the end of Plan Section 8.13(a) makes it even clearer the parties' business purpose and reasonable expectation cannot have been for distributions on obligations not guaranteed by LBHI to subsidize LBHI's Remaining Guarantee Obligation. *See Greenwich Capital,* 903 N.Y.S.2d at 348; *LBSF* at 498-99. This proviso states (emphasis added): "Except as specifically provided with respect to LBHI's rights of subrogation set forth above,[10] **nothing contained herein shall in any way affect the rights of a holder of a Guarantee Claim with respect to a corresponding Primary Claim** against a Primary Obligor that is not a Debtor." There should be no dispute that the Statutory Interest Payments are "rights of [the Claimants] with respect to [their] Primary Claim[s]."[11] The proviso plainly prohibits those rights from being affected by the preceding provisions of the section.

58.    If the Plan Administrator's broad reading of "provided on the corresponding Primary Claims" were correct, then the Statutory Interest Payments would be used to cover LBHI's Remaining Guarantee Obligation. But this would undeniably "affect" – indeed, it would substantially impair – the Claimants' Statutory Interest Payments, by reducing their effective value by one third, as shown above. Because "specific clauses of a contract are to be read consistently with the over-all manifest purpose of the parties' agreement," the Remaining Guarantee Obligation incorporated into Plan Section 8.13(a) cannot be read to impair the Statutory Interest Payments. *See, e.g., AMR Corp.,* 485 B.R. at 289 (quoting *Barrow,* 538 N.Y.S.2d at 365).

---

[10] LBHI's subrogation rights are irrelevant, as LBHI has not made any distributions on the subject Guarantee Claims.

[11] Here, in contrast with "on the corresponding Primary Claim" at the outset of the Section, the indisputably broader term "with respect to a corresponding Primary Claim" is used (emphasis added).

59.    For the foregoing reasons, the Claimants' reading is, and the Plan Administrator's reading is not, consistent with the business purposes of Plan Section 8.13.  For this additional reason, the Motion should be denied.

## RESERVATION OF RIGHTS

60.    The Claimants reserves all of their rights and remedies in connection with the subject matter of the Objection and all documents related thereto (whether such rights and remedies exist in the laws of any jurisdiction, in equity, contract or otherwise, whether or not pleaded in this Objection).  Nothing in this Objection is intended to waive, limit, restrict or otherwise prejudice any arguments, evidence, rights or remedies which the Claimants may have under or in respect of other disputes with LBHI or others related to LBIE or otherwise.

## <u>CONCLUSION</u>

For the reasons set forth above, the Claimants respectfully request that this Court find that the Statutory Interest Payments to be received by the Claimants are not "other consideration provided on the corresponding Primary Claim" with respect to the Claimants' LBIE Guarantee Claims and, accordingly, deny the Motion in its entirety.

Dated: July 31, 2018                                    Respectfully Submitted,
      New York, New York

                                              **SIDLEY AUSTIN LLP**

                                              */s/ Alex R. Rovira*
                                              Alex R. Rovira (arovira@sidley.com)
                                              787 Seventh Avenue
                                              New York, New York 10019
                                              Telephone: (212) 839-5300
                                              Facsimile: (212) 839-5599

                                              *Attorneys for Attestor Capital LLP*

25