WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail
Richard L. Levine

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                  :

**In re**                         :          **Chapter 11 Case No.**

                                  :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :         **08-13555 (SCC)**

                                  :

                      **Debtors.**    :          **(Jointly Administered)**

                                  :
-------------------------------------------------------------------x

### APPELLEE-PLAN ADMINISTRATOR'S COUNTER-DESIGNATION OF ADDITIONAL ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL[1]

      Appellee Lehman Brothers Holdings Inc., as Plan Administrator under the

Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors ("LBHI"), hereby designates, pursuant to Rule 8009(a)(2) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the following additional items to be

included in the record on the appeals separately filed by Attestor Capital LLP and Deutsche

Bank AG and its Affiliates (collectively, the "Appellants")[2]:

---

[1] The items designated for inclusion in the record herein are in reference to two related appeals to be heard jointly: (1) *Attestor Capital LLP v. Lehman Brothers Holdings Inc.*, Case No. 1:18-cv-07682-KPF and (2) *Deutsche Bank AG v. Lehman Brothers Holdings Inc.*, Case No. 1:18-cv-07804-KPF. Please transmit the items designated herein to the docket of each appeal.

[2] Although LBHI disagrees with aspects of the statement of issue on appeal as asserted by Appellants, LBHI has not stated the issue on appeal more accurately herein because Rule 8009 of the Bankruptcy Rules does not provide for the filing of an appellee's statement of the issues (absent a cross-appeal). LBHI, therefore, reserves its right to properly state the issues on appeal in its appellate brief.

## <u>COUNTER-DESIGNATION OF RECORD</u>

LBHI does not hereby re-designate any items that it may rely upon that already have been designated by the Appellants in their Joint Designation Of Items To Be Included In Record On Appeal And Statement Of Issues On Appeal (ECF No. 58776) but, rather, will rely on the Appellants' designations as to such items. The Appellants' designation of the record, however, did not specify whether it was including all exhibits and attachments to the items designated. For the avoidance of doubt, for the items designated by either LBHI or the Appellants, LBHI treats the designations as including **all** exhibits and attachments to such items, whether listed or not by either LBHI or the Appellants. Moreover, while LBHI does not, at this time, object to any items designated by the Appellants, LBHI does not concede the relevance of any such items.

LBHI also designates the following additional items to be included in the record:

| Designation Number | ECF Number | Date of Filing | Description |
|---|---|---|---|
| 1. | 47968 | 1/23/2015 | Order Granting The Plan Administrators Four Hundred Eighty-Sixth Omnibus Objection to Claims (Satisfied Claims) Solely as to Certain Claims |
| 2. | 48322 | 2/19/2015 | Order Granting The Plan Administrators Four Hundred Eighty-Sixth Omnibus Objection to Claims (Satisfied Claims) |
| 3. | 49954 | 1/10/2015 | Motion of Plan Administrator Pursuant to Sections 8.4, 9.3, and 14.1 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors to Estimate Claims for Reserve and Distribution Purposes |
| 4. | 50166 | 6/30/2015 | Supplemental Order Sustaining The Plan Administrators Four Hundred Eighty-Sixth Omnibus Objection to Claims (Satisfied Claims) |

| Designation Number | ECF Number | Date of Filing | Description |
|---|---|---|---|
| 5. | 50298 | 7/15/2015 | Order Pursuant to Sections 8.4, 9.3, and 14.1 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors to Estimate Claims for Reserve and Distribution Purposes |
| 6. | 50824 | 8/24/2015 | Order Pursuant to Sections 8.4, 9.3, and 14.1 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors to Estimate Claims for Reserve and Distribution Purposes |
| 7. | 50948 | 9/15/2015 | Order Pursuant to Sections 8.4, 9.3, and 14.1 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors to Estimate Claims for Reserve and Distribution Purposes |
| 8. | 50977 | 9/22/2015 | Order Pursuant to Sections 8.4, 9.3, and 14.1 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors to Estimate Claims for Reserve and Distribution Purposes |
| 9. | 50978 | 9/22/2015 | Order Pursuant to Sections 8.4, 9.3, and 14.1 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors to Estimate Claims for Reserve and Distribution Purposes |
| 10. | 52980 | 6/6/2016 | Plan Administrators Five Hundred Eighteenth Omnibus Objection to Claims (Satisfied Guaranty Claims) |
| 11. | 54525 | 1/12/2017 | Order Sustaining Plan Administrators Objection to Demands for Postpetition Interest Related to Claim No. 28308 |
| 12. | 54904 | 2/23/2017 | Motion of Plan Administrator Pursuant to Sections 8.4, 9.3, and 14.1 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors to Estimate Claims for Reserve and Distribution Purposes |
| 13. | 55085 | 3/21/2017 | Objection to Motion of Deutsche Bank AG and Affiliates to Motion of Plan Administrator to Estimate Claims for Reserve and Distribution Purposes |

| Designation Number | ECF Number | Date of Filing | Description |
|---|---|---|---|
| 14. | Exhibit A | N/A | Declaration of Russell Downs in Support of Verified Chapter 15 Petition and Related Relief (Bankr. S.D.N.Y., Case No. 18-11470, ECF No. 4) |
| 15. | Exhibit B | N/A | Order Recognizing Foreign Proceeding and Granting Related Relief (Bankr. S.D.N.Y., Case No. 18-11470, ECF No. 15) |
| 16. | Exhibit C | N/A | Lehman Brothers International (Europe) surplus distribution scheme of Arrangement (the "LBIE Scheme") |
| 17. | Exhibit D | N/A | Notification of Effective Date (LBIE Scheme) https://www.pwc.co.uk/services/business-recovery/administrations/lehman/update-announcement-of-the-proposed-scheme-of-arrangement-pursuant-to-part-26-payment-of-statutory-interest-date-20june-2018.html |

Dated:  September 18, 2018
       New York, New York

                /s/ *Garrett A. Fail*
               WEIL, GOTSHAL & MANGES LLP
               767 Fifth Avenue
               New York, New York 10153
               Telephone: (212) 310-8000
               Facsimile: (212) 310-8007
               Garrett A. Fail
               (Garrett.Fail@Weil.com)
               Richard L. Levine
               (Richard.Levine@Weil.com)

               Attorneys for Lehman Brothers Holdings Inc. and Certain of Its Affiliates

**<u>Exhibit A</u>**

Declaration of Russell Downs

Amy Edgy
Robert H. Trust
Christopher J. Hunker
**LINKLATERS LLP**
1345 Avenue of the Americas
New York, NY 10105
(212) 903-9000 (Tel)
(212) 903-9100 (Fax)

*Counsel to the Foreign Representative*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

*In re*

Lehman Brothers International (Europe) (in administration),[1]

　　　Debtor in a Foreign Proceeding.

Chapter 15

Case No. 18-11470 (SCC)

---

## DECLARATION OF RUSSELL DOWNS
## IN SUPPORT OF VERIFIED CHAPTER 15 PETITION AND RELATED RELIEF

　　　I, Russell Downs, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury

under the laws of the United States of America, as follows:

　　　1.　　　I serve as one of the joint administrators (the "Administrators")[2] of Lehman

Brothers International (Europe) (in administration) (the "Debtor"), which entered

administration in the U.K. on September 15, 2008 (the "Administration"). I have served as an

Administrator of the Debtor since November 2, 2011 pursuant to an order of the High Court of

---

[1]　The last four digits of the Debtor's England and Wales company registration number are 8254. The location of the Debtor's registered office is Level 23, 25 Canada Square, London E14 5LQ, United Kingdom.

[2]　The other Administrators are Anthony Victor Lomas, Steven Anthony Pearson and Julian Guy Parr, who were appointed to serve as Administrators pursuant to orders of the High Court dated September 15, 2008, November 2, 2011 and March 22, 2013, respectively. Most recently, Lomas and I have been the Administrators typically with the greatest involvement in the key decisions made with respect to the Debtor, while Pearson and Parr have more limited day-to-day responsibilities.

England and Wales (the "<u>High Court</u>").  I am a licensed insolvency practitioner with over 25

years of experience and a partner at PricewaterhouseCoopers LLP ("<u>PwC</u>"), a professional

services firm, in PwC's office located at 7 More London Riverside, SE1 2RT, London, England.

2.     In my capacity as an Administrator, I am responsible for, among other things,

overseeing the distribution of the Debtor's assets to its creditors.  In this capacity, I have been

extensively involved in the settlement negotiations that have culminated in, among other things,

the scheme of arrangement (the "<u>Scheme</u>") that is currently pending in proceedings before the

High Court (the "<u>English Proceeding</u>").[3]  I have detailed knowledge of, and experience with,

the Debtor's affairs and its creditors.

3.     On May 2, 2018, the Debtor filed an application under part 26 of the Companies

Act 2006 of England and Wales commencing the English Proceeding and requesting that the

High Court approve the Debtor's request to convene meetings (the "<u>Scheme Meetings</u>") of the

Debtor's creditors (the "<u>Scheme Creditors</u>")[4] for the purpose of obtaining the requisite votes in

favor of the Scheme.  On May 9 and 10, 2018, the High Court held the Convening Hearing and

entered an order (the "<u>Convening Order</u>") dated May 11, 2018 authorizing the Debtor to

convene the Scheme Meetings on June 5, 2018.   The Convening Order approved my

appointment as the "foreign representative" as defined in section 101(24) of title 11 of the

United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") and authorized me to

seek chapter 15 recognition of the English Proceeding.  Pursuant to that authority, today (the

"<u>Petition Date</u>"), the Debtor commenced this chapter 15 case (the "<u>Chapter 15 Case</u>") by filing

---

[3]   The term "English Proceeding" describes only the Scheme and not the Administration, which is a separate
proceeding under English insolvency law.

[4]   The Scheme Creditors include any creditor that could prove its claims in the Administration (the "<u>Provable
Claims</u>"), regardless of whether such claim is (i) an admitted claim (collectively, the "<u>Admitted Claims</u>"), (ii)
awaiting adjudication by the Administrators, (iii) rejected by the Administrators but is subject to appeal or
within the time limited to be appealed or (iv) yet to be proven in the Administration.

a petition seeking recognition of the English Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

4.      I submit this declaration in support of the *Verified Petition Under Chapter 15 For Recognition Of A Foreign Main Proceeding and Related Relief* (the "Verified Petition" and together with the Form of Voluntary Petition [Dkt. No. 1], the "Petition")[5] to provide an overview of the Debtor and the Scheme.  I have reviewed the Petition, and it is my belief that the relief sought therein is necessary to implement the settlement described herein.

5.      Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the Debtor, or my opinion based upon experience, knowledge, and information concerning the Debtor.  I am authorized to submit this declaration on behalf of the Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

6.      Section I of this declaration describes the Debtor and the Administration.  Section II describes events leading up to the Scheme, including a description of the various litigations and claims that are being settled in the Scheme.  Section III describes the origins and development of the Scheme.  Section IV provides an overview of the Scheme, including a description of the key elements of the Scheme.  Section V provides specific information about the Debtor's headquarters and connections to the United States.  Finally, section VI describes the need for chapter 15 relief.

---

[5]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition.

## I.   Introduction to the Debtor and the Administration

### A.   The Debtor

7.     Prior to the commencement of the Administration on September 15, 2008, the Debtor was the principal trading company in Europe within the Lehman Brothers' group of entities (the "Lehman Group"), of which Lehman Brothers Holdings, Inc. ("LBHI") was the ultimate parent.  The Lehman Group provided investment banking services to clients (including corporate customers, institutions, governments, hedge funds and private clients) on a global basis.  The Lehman Group was headquartered in New York with regional headquarters in London and Tokyo and many regional offices in North America, Europe, the Middle East, Latin America and the Asia-Pacific region.  Until its collapse, the Lehman Group was among the largest investment banks in the United States.

8.     Investment banking was at the core of the Lehman Group's business.  It operated in a market that depended heavily on investor and market confidence.  In the period immediately prior to the Administration, there was an escalating loss of confidence in the Lehman Group, as evidenced by a significant deterioration in LBHI's share price on the New York Stock Exchange of almost 80% during the week from September 5, 2008 to September 12, 2008.  On September 9, 2008 alone, LBHI's share price fell 45% following reports that negotiations with the Korean Development Bank regarding a potential major investment in the Lehman Group had been suspended.  The following day, the Lehman Group announced a third quarter loss of $3.9 billion.  Simultaneously, the Lehman Group announced plans to sell a majority stake in its investment management business and to spin off the majority of its commercial real estate assets into a new, separate public company.  These measures failed to restore investor confidence, and LBHI's share price fell a further 7% on September 10, 2008.

Following the close of business that day, Moody's Investor Service announced that it intended to downgrade the Lehman Group's credit rating in the absence of a purchase of the Lehman Group.

9.      The Lehman Group took various steps in an attempt to resolve the Lehman Group's dire situation, including holding discussions in New York with potential investors in, and purchasers of, the Lehman Group's businesses (or parts thereof).  At the same time, the Administrators' firm, PwC, met with the Debtor's directors to consider steps that should be taken if the Lehman Group's efforts to save itself were unsuccessful.  Because LBHI centrally managed substantially all of the Lehman Group's cash, a failure of LBHI to settle obligations on behalf of the Debtor would cause the Debtor to be unable to meet its obligations as they became due.  Accordingly, on September 14, 2008, the Debtor's directors sought LBHI's assurances that payments to be made by LBHI on behalf of the Debtor would be made.  At approximately 12:30 a.m. (London time) on September 15, 2008, LBHI informed the Debtor that LBHI would no longer make payments to or for the Debtor or on behalf of any other Lehman Group entity and that LBHI was preparing to file a petition for relief under chapter 11 of the Bankruptcy Code.  Overnight, preparations were made by the directors, employees and advisors of a number of Lehman Group companies in the United Kingdom (including the Debtor) for those companies to seek the protection of an administration order on the basis that those Lehman Group companies would be unable to meet their debts as they became due.

**B.      The Administration and Interim Distributions**

10.      At 7:56 a.m. (London time) on September 15, 2008, upon an application filed by the Debtor's directors, the Debtor was placed into the Administration under the supervision of the High Court.  The original administrators (Anthony Victor Lomas, Steven Anthony Pearson,

18-11470-scc    Doc 483    Filed 05/14/18    Entered 05/14/18 09:49:27    Main Document
Pg 6 of 31

Dan Yoram Schwarzmann and Michael Andrew Jervis) were appointed pursuant to an order of the High Court (the "<u>Administration Order</u>").  Those original administrators immediately assumed responsibility for the Debtor's affairs and began the process of liquidating assets, reconciling claims and making distributions to creditors as well as managing client money and returning it to the rightful owners.

11.    On December 2, 2009, the Administrators obtained an order from the High Court permitting distributions to be made to unsecured creditors.  Following entry of that order, the Administrators notified all parties they believed may have had a pre-Administration relationship with the Debtor that they needed to file proofs of debt against the Debtor no later than December 31, 2010, which was subsequently extended to December 31, 2012.  The Administrators then undertook an extensive claims reconciliation process to determine the quantum of claims against the Debtor.  Beginning in November 2012,[6] the Administrators made distributions to creditors in the aggregate amount of approximately £12.6 billion, repaying the principal amount of all Admitted Claims against the Debtor.

## II.    <u>Events Leading to the Development of the Scheme</u>

12.    Around the time that interim distributions began, the Administrators determined that the Debtor might have a surplus sufficient to enable a payment to creditors in respect of their statutory interest entitlements (the "<u>Surplus</u>").[7]  The Administrators estimate that the currently available Surplus is approximately £6.070 billion (after establishing adequate reserves for higher ranking claims).  In recognition of the potential Surplus, the Administrators

---

[6]  The four interim distributions were made on November 26, 2012, June 19, 2013, June 28, 2013 and November 21, 2013.

[7]  The Surplus is the amount of cash and other assets in excess of the amount required to repay in full the principal amount of the Admitted Claims, expenses of the Administration and all preferential debts.

commenced proceedings to determine certain issues relating to creditors' entitlements to the Surplus (the "Waterfall I Proceedings").  Further proceedings were subsequently commenced to determine additional questions related to such entitlements (the "Waterfall II Proceedings" and the "Waterfall III Proceedings," and together with the Waterfall I Proceedings, collectively, the "Waterfall Proceedings").  As of the date hereof, the Waterfall I Proceedings and the Waterfall III Proceedings have concluded.  The Waterfall II Proceedings consist of several parts (referred to as Tranche A, Tranche B, and Tranche C), only one of which (Tranche B) has concluded.  The Tranche A and Tranche C parts of the Waterfall II Proceedings remain pending.  The Administrators have been advised that the Waterfall II Proceedings will remain pending until at least 2020 if that litigation is not settled as contemplated by the Scheme.  As described more fully below, the Scheme implements a settlement of the pending litigation that will provide a swift conclusion to those proceedings and enable the Administrators to distribute the Surplus quickly and efficiently to Scheme Creditors.

**A.      The Waterfall I Proceedings Have Concluded**

13.     The Administrators commenced the Waterfall I Proceedings in February 2013 to resolve issues relating to, among other things, (i) the ranking and payment of subordinated liabilities arising under certain intercompany loan agreements between the Debtor and LB Holdings Intermediate 2 Limited (in administration) ("LBHI2"), which LBHI2 assigned to Wentworth Sons Sub-Debt S.a.r.l. (the "Subordinated Creditor") in January 2014 (the "Subordinated Debt") and (ii) the impact of a liquidation on claims to statutory interest under applicable English insolvency law ("Statutory Interest") as a result of the Surplus.  The Waterfall I Proceedings were litigated in the High Court and were appealed to the Court of

Appeal of England and Wales (the "<u>Court of Appeal</u>") and the Supreme Court of the United

Kingdom (the "<u>Supreme Court</u>") (collectively, the "<u>English Courts</u>").

14.    In 2014, the High Court held that (a) the Subordinated Debt ranked behind (i) all

creditors that hold Provable Claims, (ii) any claims to Statutory Interest and (iii) claims that are

not provable in the Administration, but that are payable in the Administration after payment of

Statutory Interest (the "<u>Non-Provable Claims</u>") and (b) those senior liabilities would have to be

paid in full before the Subordinated Creditor could submit a proof of debt for the Subordinated

Debt.  Following an appeal to the Court of Appeal (which overturned certain of the High Court's

findings), in May 2017, the Supreme Court affirmed the High Court's ruling.  The Supreme

Court also affirmed the High Court's ruling that, if the Debtor moved from administration into

liquidation, any claim to Statutory Interest that had become payable during the Administration

(as a result of the Surplus) but had not been paid prior to the commencement of the liquidation

could not subsequently be paid or proved in the liquidation.  Following the Supreme Court's

ruling, the Waterfall I Proceedings concluded, and no further rights of appeal exist.  As such,

the Scheme does not settle any of the issues that arose in the Waterfall I Proceedings.  The

Scheme is consistent with the English Courts' rulings in the Waterfall I Proceedings.

**B.    The Waterfall II Proceedings**

15.    The Administrators commenced the Waterfall II Proceedings in June 2014.  As

noted above, those proceedings fall into three "tranches" of issues, of which Tranche A and

Tranche C remain pending.

### i.    *Tranche A Remains Pending*

16.    The Tranche A proceedings primarily deal with the issues regarding the

calculation of Statutory Interest to be paid from the Surplus and seeks further guidance as to

the proper distribution of the Surplus.  The issues raised in the Tranche A proceedings include, among other things, (i) how distributions paid in the Administration are to be applied in respect of debts proved against the Debtor, (ii) where the relevant interest rate to be applied is a compounding rate, whether Statutory Interest continues to accrue following the payment in full of the principal amount of a creditor's Provable Claim and (iii) the date from which Statutory Interest on admitted future and contingent claims is calculated.  In 2015, the High Court held that (i) distributions to a creditor in the Administration are applied first to the principal amount of the creditor's Provable Claim, (ii) Statutory Interest does not continue to compound following the payment of the principal amount of the Provable Claim and (iii) Statutory Interest is calculated from the date of the Administration.  In October 2017, the Court of Appeal upheld the High Court's ruling.

17.    Certain creditors have filed an application to appeal the Court of Appeal's decision to the Supreme Court.  The Court of Appeal denied the application for permission to appeal to the Supreme Court.  Following the Court of Appeal's denial of the request for permission to appeal, those creditors made an application for permission to appeal directly to the Supreme Court.  That application now is pending before the Supreme Court itself.  Following agreement on the settlement of the outstanding issues in the Tranche A proceedings to be implemented through the Scheme and execution of the Lock-Up Agreement (as defined below), the Supreme Court granted the parties' request to defer its decision on the application for permission to appeal pending implementation of the Scheme.  If the Scheme becomes effective, the applications for permission to appeal will be withdrawn.  If the Scheme does not become effective, the Supreme Court will decide those applications.

### ii.    Tranche B Has Been Settled

18.    The Tranche B proceedings deal with the construction and effect of release clauses in various agreements made between the Debtor and a large number of its creditors in respect of their Admitted Claims after the commencement of the Administration, including whether the releases in those agreements precluded creditors from asserting certain Non-Provable Claims that otherwise carry a right to claim an entitlement against the Surplus. The High Court issued a ruling on the Tranche B issues, which was appealed to the Court of Appeal. However, that appeal was rendered moot following the Supreme Court's decision in the Waterfall I Proceedings, and no parties are pursuing any of the Tranche B issues. Accordingly, the Tranche B proceedings have concluded, and the Scheme has no effect on the issues raised in the Tranche B proceedings.

### iii.    Tranche C Remains Pending

19.    The Tranche C proceedings deal with, among other things, the construction of English and New York law ISDA Master Agreements (as defined in the Scheme), which may give rise to an entitlement to Statutory Interest on debts owed by the Debtor at an annual rate of higher than 8% per annum. The High Court was asked to interpret the definition of "Default Rate" under the ISDA Master Agreements, which is defined as the "*rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.*" The High Court held, among other things, that (i) the relevant payee for purposes of the certification was the original counterparty to the ISDA Master Agreement, not an assignee, (ii) the cost of funding does not include the cost of equity funding and (iii) a certification was conclusive unless it was made

irrationally or in bad faith, contained a manifest error or did not comply with the High Court's findings on the "cost of funding" issue.

20.     Certain parties to the Tranche C proceedings appealed the High Court's holding that the "Default Rate" provisions of the ISDA Master Agreements referring to the parties' "cost of funding" do not include cost of equity funding.[8]  The Court of Appeal is scheduled to hear that appeal in July 2018.  The Scheme provides for a full and final settlement of the Tranche C proceedings in a manner consistent with the High Court's rulings on these issues. Therefore, if the Scheme becomes effective, the appeal will be withdrawn.  If the Scheme does not become effective, the Court of Appeal hearing in respect of the appeal of the Tranche C proceedings will proceed.

## C.     The Waterfall III Proceedings Have Been Settled

21.     The Administrators commenced the Waterfall III Proceedings in April 2016 to resolve issues relating to certain contributory claims and other affiliate issues, including, among other things, (i) the scope of contribution claims that the Debtor might make against LBHI2 and Lehman Brothers Limited (in administration) ("LBL"), as shareholders of the Debtor,[9] (ii) the set-off rights of the Debtor, LBL and LBHI2 against each other, (iii) the claims of LBL and LBHI2 against each other with respect to any contribution they are required to make to the Debtor, (iv) the existence of LBL's claim against the Debtor and other members of the Lehman Group to recharge certain liabilities against them and (v) whether LBL was the Debtor's shareholder such that it is liable for contribution claims.  The Waterfall III Proceedings were

---

[8]  That appeal does not challenge the High Court's ruling regarding the identity of the relevant payee and the grounds for challenging a certification.

[9]  LBHI2 is now the sole shareholder of the Debtor.  LBL previously held a single share in the Debtor, but that share was transferred to LBHI2 in 2017.

18-13547-scc    Doc 4836    Filed 05/14/18    Entered 05/14/18 01:49:27    Main Document
Pg 12 of 35

divided into two parts – Part A, which concerned legal issues and was heard at a trial commencing in January 2017, and Part B, which concerned factual issues and was scheduled to be heard at a trial commencing in September 2017.

22.     Following the conclusion of the Part A trial (but before the High Court issued its ruling on the Part A issues and held the Part B trial), the parties reached a settlement of the Waterfall III Proceedings.  The settlement was approved by the High Court in August 2017 and became effective in September 2017.  The Waterfall III Proceedings were subsequently dismissed pursuant to a December 2017 order of the High Court.  Given the dismissal, the Scheme has no effect on the Waterfall III Proceedings.

**D.      The Lacuna Application Remains Pending**

23.     The Lacuna Application (as defined below) arose out of the Supreme Court's determination in May 2017 that any unpaid Statutory Interest arising in the Administration cannot constitute a claim or be paid in a subsequent liquidation.  The impact of this finding was that, upon commencement of a liquidation, any sums that would otherwise be payable as Statutory Interest in the Administration would instead flow down to the Subordinated Creditor, and depending on the amount of such sums, to the Debtor's shareholder.  In October 2017, the Subordinated Creditor sent a written request to the Administrators to seek a creditors' decision on whether to terminate the Administration and commence a liquidation under applicable English insolvency law.  In response, the Administrators filed an application (the "Lacuna Application") seeking directions from the High Court in respect of (i) the Administrators' obligations to comply with the request and (ii) the Subordinated Creditor's ability to make the request or take other steps to initiate the liquidation of the Debtor.

24.     In January 2018, the High Court granted a request by the Administrators and the

Subordinated Creditor to stay the proceedings regarding the Lacuna Application pending implementation of the Scheme, which provides for a full and final settlement of the Lacuna Application.  If the Scheme becomes effective, the Lacuna Application will be dismissed.  If the Scheme does not become effective, the parties will apply to lift the stay of the proceedings with respect to the Lacuna Application.

### E.        The Olivant Application Remains Pending

25.      In addition to the three Waterfall Proceedings and the Lacuna Application, the Administrators also have a pending application commenced by the Subordinated Creditor on the issue of the Administrators' decision to admit the largest ordinary unsecured claim in the Administration.  On September 19, 2017, the Subordinated Creditor filed an application (the "Olivant Application") seeking to reverse or modify the Administrators' decision to admit a proof of debt submitted by Olivant Investment Switzerland S.A. ("Olivant") for an agreed amount of £555,250,000.  Olivant had originally submitted a proof of debt in the amount of over £800 million.  However, the £555,250,000 amount was agreed between Olivant and the Debtor through a claims negotiation process (the "Claim Determination").

26.      There are several open issues related to the Olivant Application.  One of these issues is whether a third-party, such as the Subordinated Creditor, may challenge a creditor's claim, like Olivant's claim, that has been agreed upon by the Debtor and the relevant creditor through the Claim Determination.  Following a preliminary case management hearing, the High Court scheduled a trial on certain preliminary issues in June 2018, with the remainder of the issues addressed at a hearing to be held in 2019.

27.      In January 2018, the High Court granted a request by the Administrators and the Subordinated Creditor to stay the proceedings regarding the Olivant Application, pending

implementation of the Scheme, which provides for a full and final settlement of the Olivant Application.  If the Scheme becomes effective, the Olivant Application will be dismissed.  If the Scheme does not become effective, the parties will apply to lift the stay of the proceedings with respect to the Olivant Application.  The Scheme includes a provision that will prevent Scheme Creditors from challenging claims of other creditors which have been admitted prior to a specified date, including Olivant's claim.  This provision will provide certainty with respect to the amount of Admitted Claims, which will enable the Administrators to calculate the total amount of Statutory Interest liability and make distributions of the Surplus on the basis of that calculation.

### III.    Origins and Development of the Scheme

28.    As noted above, if the Waterfall II Proceedings, the Lacuna Application and the Olivant Application were litigated to conclusion, it is likely that those proceedings would not end until 2020 at the earliest, resulting in significant additional costs and further delay in making distributions of the Surplus to Scheme Creditors.  Accordingly, the Administrators determined in late 2017 to engage in negotiations with the Debtor's largest creditors, including the "Senior Creditors Group" (the "SCG")[10] and the "Wentworth Group"[11] in an effort to reach a consensual resolution regarding creditors' entitlement to the Surplus.  The SCG and the Subordinated Creditor are the principal participants (together with York Global Finance BDH LLC and Goldman Sachs International) in the Waterfall II Proceedings, and certain members of the Wentworth Group are party to the Olivant Application and the Lacuna Application.

---

[10]  The SCG consists of a number of creditors holding Admitted Claims ranking *pari passu* with the other ordinary unsecured claims.

[11]  The Wentworth Group consists of (i) holders of Admitted Claims that rank *pari passu* with all other ordinary unsecured claims and (ii) the Subordinated Creditor, whose Subordinated Debt claim is valued at £1.24 billion (excluding interest).

29.   Following extensive arm's-length negotiations, the Administrators successfully reached an agreement with the SCG and the Wentworth Group on the terms of a consensual settlement of the issues related to creditors' entitlements to the Surplus.  Those terms were memorialized in a term sheet that was attached to the Lock-Up Agreement dated December 22, 2017 (the "Lock-Up Agreement") by and among the Debtor, the SCG and the Wentworth Group.  Under the Lock-Up Agreement, the parties agreed to support the implementation of the settlement through the Scheme, including agreeing to stay the Tranche A Waterfall II Proceedings, the Lacuna Application and the Olivant Application.  Although the Tranche C Waterfall II Proceedings are not stayed, the next hearing is scheduled for July 2018, by which time it is anticipated that the Scheme will be approved and effective.  The Lock-Up Agreement terminates on June 30, 2018 (or such later date as may be agreed in writing between the original parties to the Lock-Up Agreement).  The Wentworth Group and the SCG are not entitled to any fee, payment (other than payments made under the terms of the Scheme) or other inducements from the Debtor in exchange for executing the Lock-Up Agreement and supporting the Scheme, but the SCG is receiving a payment from the Wentworth Group as described in paragraph 32 below.

30.   The SCG and the Wentworth Group together hold approximately 78% by value of all Admitted Claims.  The SCG collectively holds or controls approximately 40% by value of all Admitted Claims, and the Wentworth Group holds or controls approximately 38% by value of all Admitted Claims.  Accordingly, each of the SCG and the Wentworth Group is in a position to block any attempted consensual resolution.

## IV.     Overview and Key Elements of the Scheme

31.     With the support of an overwhelming majority of holders of Admitted Claims, the Debtor filed the Scheme to implement the agreed settlement that will swiftly end the ongoing litigation and permit the Administrators to calculate the amount of Statutory Interest in respect of Admitted Claims and make distributions of the Surplus without further cost or delay.

### A.     Practice Statement Letter

32.     The Administrators issued the Practice Statement Letter dated April 18, 2018 (the "PSL"), which was distributed to all persons who the Administrators believe are Scheme Creditors for the purposes of notifying those parties of (i) the Administrators' decision to cause the Debtor to propose the Scheme, (ii) the objectives the Scheme is designed to achieve and (iii) the composition of the Scheme Meetings that the Debtor intends to convene, subject to High Court approval, for Scheme Creditors to vote on the Scheme.  On May 2, 2018, the Debtor issued an update to the PSL.  The update informed Scheme Creditors that the Subordinated Creditor, certain other members of the Wentworth Group and certain of the SCG creditors had entered into a separate settlement agreement in parallel with the Lock-Up Agreement which provided, among other things, that some of the entities that make up the SCG would receive from those Wentworth Group parties a £35 million "consent fee" in the event that the Scheme becomes effective (the "Arrangement").[12]  In light of the Arrangement, the Administrators determined that the SCG will be classified in a separate fourth class of creditors and vote at a separate Scheme Meeting from other Scheme Creditors.

---

[12] The Administrators first became aware of the Arrangement on April 25, 2018 and received a copy of the agreement implementing the Arrangement on April 29, 2018.

**B.     Purpose of the Scheme**

33.     The primary purpose of the Scheme is to facilitate an expedited payment to Scheme Creditors in respect of their entitlements to Statutory Interest by (i) bringing an end to the Waterfall II Proceedings, the Lacuna Application and the Olivant Application, (ii) barring challenges by Scheme Creditors to the validity or amount of any Admitted Claim admitted prior to a specified date, (iii) providing a Certification Option (as defined below) to determine the amount of a Higher Rate Claim in respect of the ISDA Master Agreements (and certain other contracts with similar features) and a dispute resolution procedure to adjudicate any issues arising from such certification, (iv) releasing the Debtor from any further claims by Scheme Creditors by establishing a bar date (the "Bar Date")[13] for asserting claims against the Debtor and (v) providing a framework to make payments to creditors on their Statutory Interest claims.

**C.     Scheme Creditors and Scheme Parties**

34.     In addition to the Scheme Creditors, the Scheme is binding on Storm Funding Limited (collectively, with the Scheme Creditors, the "Scheme Parties").  LBHI2 has also agreed to enter into an undertaking pursuant to which it will consent to the Scheme and, on and after the Effective Date, will undertake certain obligations in connection with the Scheme.

35.     The Scheme recognizes four different types of Scheme Creditors: (i) Scheme Creditors (other than the Subordinated Creditor) with claims that cannot give rise to a contractual rate of interest greater than 8% per annum (the "8% Interest Claims," and the

---

[13] The imposition of the Bar Date is key to establishing the universe of creditors entitled to share in the Surplus, which then facilitates the payment of Statutory Interest to those who have proved their claims prior to the Bar Date.  In the absence of the Bar Date, Scheme Creditors would be exposed to the risk of new claims being admitted which could decrease the amount payable to them. The Bar Date is proposed to be the effective date of the Scheme (the "Effective Date").  If the Scheme becomes effective, all claims (other than certain claims not affected by the Scheme and certain future or contingent expense claims) will need to be proved for (or in the case of Non-Provable Claims and expense claims, notified to the Debtor) by this date.  Scheme Creditors failing to do so will not be entitled to assert such claims.

Scheme Creditors holding such claims, the "8% Creditors"); (ii) Scheme Creditors with claims

under contracts that entitle them to a specified fixed or floating rate of interest that results in an

entitlement to Statutory Interest greater than 8% (the "Specified Interest Claims," and the

Scheme Creditors holding such claims, the "Specified Interest Creditors")[14]; (iii) Scheme

Creditors with claims under 1992 or 2002 ISDA Master Agreements, or certain French Master

Agreements (as defined in the Scheme), which give rise to a right to Statutory Interest

calculated by reference to costs specific to the particular party as opposed to a fixed or floating

rate (the "Higher Rate Claims," and the Scheme Creditors holding such claims, the "Higher

Rate Creditors"); and (iv) the Subordinated Creditor.  As stated above, the SCG will vote in a

separate class than other Scheme Creditors in respect of 8% Interest Claims, Specified Interest

Claims and Higher Rate Claims that they hold in light of the Arrangement.

36.    The Scheme Creditors do not include (i) creditors who do not have a Provable

Claim, but do have either (a) claims which are payable as expenses of the Administration (the

"Expense Claims") or (b) claims that are not provable in the Administration, which are also not

Expense Claims, but are payable from the Surplus, (ii) employees of the Debtor who are

domiciled in a European Union member state other than the United Kingdom and who have not

submitted a proof of claim in the Administration prior to the Bar Date, (iii) creditors with a

contractual claim under a contract that is exclusively governed by a jurisdiction in a European

Union member state other than the United Kingdom and who have not submitted a proof of

claim in the Administration prior to the Bar Date, (iv) LBHI2, as a shareholder of the Debtor

---

[14] Currently, the only contract known to the Administrators that gives rise to a Specified Interest Claim is owned by LBHI.

and (v) a creditor named Storm Funding Limited that has a Provable Claim in the Administration.

**D.    Key Elements of the Scheme**

    *i.    Entitlements to Interest Under the Scheme*

37.    The Scheme provides for distributions to Scheme Creditors that are consistent with the existing judgments in the Waterfall Proceedings.  Specifically:

- 8% Creditors will receive payment of Statutory Interest at a rate of 8% per annum on the principal amount of their Provable Claim, calculated from the Administration Date to the date when the principal amount of such 8% Interest Claim is paid in full, with such calculation being done in accordance with the Relevant Principles (as defined below);

- Specified Interest Creditors will receive payment of Statutory Interest at the interest rate specified in the contract under which the claim arises, calculated from the Administration Date to the date when the principal amount of such Specified Interest Claim is paid in full, with such calculation being done in accordance with the Relevant Principles and

- Higher Rate Creditors will elect either to:

  - receive a payment in full and final settlement of their Statutory Interest entitlements calculated by applying a simple rate of 8% per annum (calculated in the same manner as 8% Interest Claims) plus an additional settlement payment of 2.5% of the value of their Admitted Claims in consideration for electing not to pursue the Certification Option described below (the "Settlement Payment Option"); or

  - submit a certification for the rate and amount of interest applicable to their Higher Rate Claims (the "Certification Option").  Such certification should be made, to the extent relevant, in accordance with (i) the judgments in Tranche A and Tranche C of the Waterfall II Proceedings, (ii) the agreed position in relation to certain French Master Agreements (as defined in the Scheme) and (iii) the principle that a contractual compounding rate of interest continues to compound on claims that have been paid in part by interim dividends until the principal amount of such claims has been paid in full (collectively, the "Relevant Principles").  Where a holder of a Higher Rate Claim elects the Certification Option,

it will receive a payment in respect of its Statutory Interest entitlements consistent with one of the following:

- the rate(s) and amount of interest specified in its certification, where such rate(s) and amount is agreed to by the Debtor or where (in the absence of an agreement between the parties) that rate(s) and amount is approved by an independent adjudicator (the "<u>Adjudicator</u>") pursuant to the Dispute Resolution Procedure set forth in the Scheme and described more fully below (the "<u>Dispute Resolution Procedure</u>");

- the rate(s) and amount counteroffered by the Debtor, where such rate(s) and amount are agreed to by the relevant Higher Rate Creditor or where (in the absence of an agreement) the relevant rate(s) and amount is approved pursuant to the Dispute Resolution Procedure; or

- payment of interest at the statutory minimum rate (8%) in circumstances where a certification is rejected by the Debtor and either such rejection is not appealed pursuant to the Dispute Resolution Procedure or an appeal of such rejection is unsuccessful.

38.     If a Higher Rate Creditor does not elect the Settlement Payment Option or the Certification Option within the deadline specified in the Scheme, the Higher Rate Creditor will be deemed to have elected the Settlement Payment Option. A Higher Rate Creditor is required to make the same election in respect of all of its Higher Rate Claims; it cannot elect the Settlement Payment Option for some of its Higher Rate Claims and the Certification Option for other Higher Rate Claims. In no event will a Higher Rate Creditor receive (a) less than the minimum Statutory Interest of 8% per annum (subject to applicable cost deductions) or (b) in the event the Higher Rate Creditor elects the Certification Option, the 2.5% settlement payment. Pursuant to the Lock-Up Agreement, the Wentworth Group and the SCG have agreed to accept the Settlement Payment Option in respect of all of their Higher Rate Claims.

39.     No payments of Statutory Interest will be made in respect of the Subordinated

Debt unless and until (i) all possible claims that are senior are either paid or reserved for in full

and (ii) the principal amount of the Subordinated Debt has been paid.

### ii.        *Distributions to Scheme Creditors*

40.     The Administrators anticipate making payments on account of the 8% Interest

Claims, the Specified Interest Claims and the Higher Rate Claims (where such Higher Rate

Creditor has elected the Settlement Payment Option) within 20 business days after the

Administrators have determined that there are sufficient funds available (after reserving for all

claims that may be proved or payable in priority to, or *pari passu* with, such claims, including

Higher Rate Claims in respect of which the Certification Option has been elected).  Payments

to Higher Rate Creditors that elect the Certification Option will be made within 20 business

days after the applicable rate has been determined in accordance with the Dispute Resolution

Procedure, provided the Debtor has sufficient funds to make such payments.  All payments to

Scheme Creditors are subject to the Administrators' receipt of payment instructions and KYC

information.

### iii.       *Dispute Resolution Procedure*

41.     The Debtor will appoint the Adjudicator in the Dispute Resolution Procedure to

resolve disputes in relation to certifications made by Higher Rate Creditors.  The Debtor will

use reasonable efforts to appoint (in order of priority) Sir Bernard Rix, Michael Brindle Queens

Counsel ("QC") or Tim Howe QC as the Adjudicator.  If those individuals are not able to accept

the appointment, then another suitably qualified candidate (such as another former judge or

English law qualified QC) will be appointed in consultation with the Subordinated Creditor.

42.    In reaching his or her decision, the Adjudicator will consider, without an oral hearing, the material submitted by the parties.  The Adjudicator will act as an expert and not an arbitrator for these purposes.  The Adjudicator may (but is not obligated to) appoint a support team to assist his or her review of the materials presented.

43.    Consistent with the terms of the Scheme, the Adjudicator must (except in certain very limited circumstances – such as where there has been a mathematical or numerical error in either party's submission, in which case he or she may correct it) either uphold the case of the Higher Rate Creditor in its entirety or uphold the Debtor's case in its entirety.  The Administrators consider this to be an appropriate approach on the basis that (i) it allows for the certification process to be dealt with quickly and efficiently and (ii) it encourages all parties to propose figures that are reasonable in the first instance, rather than figures that are speculative and submitted on the basis that the Adjudicator will seek to find a "middle ground."

44.    In terms of determining which party's submission to accept, the Adjudicator will only be permitted to uphold the Debtor's case if he or she is satisfied on the balance of probabilities that the certification of the Higher Rate Creditor has been made in bad faith, irrationally or, without justification, other than in accordance with the Relevant Principles.  If the Debtor does not satisfy this burden of proof, then the Adjudicator must uphold the Higher Rate Creditor's case (corrected for any mathematical or numerical errors, as applicable).

45.    Any decision by the Adjudicator will be final and binding on the Debtor, the Administrators, the Higher Rate Creditor and all other parties to the Scheme.  The Adjudicator's decision can only be revisited in very limited circumstances (such as a clerical error, miscalculation or mistake made by the Adjudicator and that issue is brought to the Adjudicator's attention within ten business days of the decision being issued).

46.     If the Adjudicator finds in favor of the Higher Rate Creditor, then the Debtor will

bear, as an expense of the Administration (i) its own costs, (ii) the reasonable legal costs of the

Higher Rate Creditor incurred in connection with the Dispute Resolution Procedure (on an

indemnity basis) and (iii) the fees, costs and expenses (inclusive of any VAT) of the Adjudicator

and his or her support team.  If the Adjudicator finds in favor of the Debtor, then the Higher

Rate Creditor will bear (i) its own costs, (ii) the reasonable legal costs of the Debtor incurred

in connection with the Dispute Resolution Procedure (on an indemnity basis) and (iii) the fees,

costs and expenses (inclusive of any VAT) of the Adjudicator and his or her support team.

### iv.      *Scheme Releases*

47.     The Scheme provides for certain releases to be given by all Scheme Creditors,

including:

- a full release of all rights in respect of the Waterfall Proceedings, the Olivant Application, the Lacuna Application and any other proceedings (other than certain excluded proceedings) which have been formally commenced against the Debtor on or prior to the Bar Date (including any right to seek to put the Debtor into liquidation before statutory interest has been paid in full or otherwise provided for);

- a full release of all rights or claims against the Debtor (excluding those claims notified to the Debtor prior to the Bar Date and certain other Retained Claims (as defined in the Scheme));

- a full release of all rights to require any future liquidator to bring contributory proceedings under applicable English insolvency law (to provide finality regarding the scope of the assets to be distributed);

- a full release by all Scheme Creditors of any right to bring actions or disputes in the future in respect of: (i) their Admitted Claims; and (ii) the Admitted Claims of any other Scheme Creditor that were admitted by the Administrators prior to the Record Date (as defined in the Scheme) and

- a full release (to the extent permitted by law) of any right to appeal first instance decisions (subject to certain exceptions) of any court of competent jurisdiction

which relate to an exercise of the Administrators' powers or functions after the Effective Date, including an application by the Administrators to the High Court for directions or an appeal by a creditor to the High Court against the Administrators' decision in relation to a proof of debt.

48.     In addition, each Scheme Creditor will provide a full release of:

• any claim against the Administrators, their firm and their advisors and certain other connected parties, arising from actions taken between the commencement of the Administration and the Bar Date and in respect of which the relevant person would have an indemnity or similar claim against the Debtor; and

• any claim against the Administrators, their firm, the parties to the Lock-Up Agreement and their respective advisors and certain other connected parties, arising from actions taken on or after November 1, 2017 with respect to the promotion or implementation of the Scheme (but not including (i) claims for breach of a term of the Scheme or (ii) certain claims between parties to the Lock-Up Agreement).

### v.     *Role of the Subordinated Creditor*

49.     The Wentworth Group's agreement to sign the Lock-Up Agreement and support the Scheme was conditioned on the Administrators' agreement to grant the Subordinated Creditor consultation rights with respect to the determination of matters likely to impact its ultimate recovery in respect of the Subordinated Debt.  To facilitate the Subordinated Creditor's involvement, the Scheme provides that the Debtor must engage with the Subordinated Creditor with respect to various matters, including:

• the right to be consulted in relation to the Debtor's decision on whether or not to accept a certification in relation to a Higher Rate Claim, although discretion as to whether or not to accept any certification ultimately rests with the Debtor);

• determining any counteroffer made to a certifying Higher Rate Creditor (the Debtor must consult with the Subordinated Creditor to determine the counteroffer and, if agreement cannot be reached, make a counteroffer at the level proposed by the Subordinated Creditor);

• the appointment of an alternative Adjudicator in the event that none of the three individuals named in paragraph 41 above are able to accept the appointment (but

the final decision as to the appointment of the Adjudicator rests with the Debtor
if agreement cannot be reached); and

- the approval of the Administrators' remuneration after it becomes clear that there
  are sufficient funds for a payment to be made in respect of the Subordinated Debt.

50.    The Administrators are content to afford such rights to the Subordinated Creditor
as part of the overall set of compromises reached given (i) the potential economic impact upon
the Subordinated Creditor and (ii) that the Wentworth Group would not have supported the
Scheme if it did not provide such rights to the Subordinated Creditor.

### vi.    *Classification and Voting*

51.    For purposes of organizing the Scheme Meetings, the Debtor proposes to have
the following four classes: (i) 8% Creditors and Specified Interest Creditors (other than the
SCG); (ii) Higher Rate Creditors (other than the SCG); (iii) the SCG; and (iv) the Subordinated
Creditor.  For each class, there will be a separate Scheme Meeting at which Scheme Creditors
will consider approval of the Scheme.  With the exception of the SCG, Scheme Creditors falling
into multiple classes will be able to vote in respect of their 8% Interest Claims and Specified
Interest Claims at the applicable meeting convened for the 8% Creditors and the Specified
Interest Creditors and in respect of their Higher Rate Claims at the meeting convened for the
Higher Rate Creditors.  Since the SCG is in a separate class, the SCG will vote at a single
meeting in respect of their 8% Interest Claims, Specified Interest Claims and Higher Rate
Claims.  To the extent Scheme Creditors hold multiple claims in a particular class, they must
vote all of those claims in the same class in the same manner.  To the extent Scheme Creditors
hold multiple claims in multiple classes, they may vote their claims held in each class
differently.  It is anticipated that the Scheme Meetings will be held at Linklaters' London office
on June 5, 2018 and that I will act as chairman of the Scheme Meetings.

### vii.    Implementation of the Scheme

52.    The proposed timetable for the implementation of the Scheme is as follows:

- May 14, 2018: All known Scheme Creditors will be provided with copies of relevant documentation, including the Debtor's determination of their voting rights in relation to the Scheme;

- June 5, 2018: Scheme Meetings will be held.

- June 8, 2018: The Debtor will file with the High Court a copy of the chairman's report of the Scheme Meetings.

- June 13, 2018: Subject to approval by the requisite majority of Scheme Creditors at the Scheme Meeting, a hearing will be held to determine whether the Scheme should be sanctioned.

- If the Scheme is sanctioned, it is anticipated that the Scheme will become effective shortly thereafter.

53.    The Administrators and I believe that the proposed timetable is reasonable and allows Scheme Creditors sufficient time to consider the terms of the Scheme, to vote on the Scheme and to carry out any other necessary steps in relation to the Scheme.

### viii.    Consequences of the Scheme

54.    If the Scheme is approved by the Scheme Creditors, in addition to making distributions in respect of Statutory Interest entitlements of 8% Creditors, Specified Interest Creditors and Higher Rate Creditors and a payment to the Subordinated Creditor, the Scheme may also make way for potential payments to LBHI2 in its capacity as the Debtor's shareholder (but those payments will only be made to the extent that all possible claims that rank in priority are either paid, or reserved for, in full).  To the extent that the Debtor goes into an insolvent liquidation however (contrary to the Administrators' current expectation and intention), it is intended that the provisions of the Scheme will prevail to the extent that the law allows and that

any amounts payable in respect of distributions under the Scheme will not be reduced or otherwise affected.

55.     I believe that the Scheme is in the best interests of the Scheme Creditors.  The Scheme represents a fair outcome for all Scheme Creditors because it will (i) facilitate earlier payments of Statutory Interest entitlements, (ii) avoid the risk of Scheme Creditors' entitlements becoming worthless if they are not paid prior to the Debtor going into liquidation, (iii) provide certainty that interest on all Provable Claims in the Administration will be calculated from the Administration Date, (iv) avoid the risk of Admitted Claims being challenged and (v) reduce the risk that there will be insufficient funds to make a full payment of Statutory Interest entitlements.

56.     If the Scheme is not approved, then the Scheme Creditors as a whole are likely to be disadvantaged because (i) uncertainty regarding the Scheme Creditors' entitlements to Statutory Interest would remain, (ii) the continuation of the Waterfall II Proceedings, Lacuna Application and Olivant Application would result in additional costs for the Administration and delay distributions from the Surplus, (iii) some Scheme Creditors' claims might be challenged or reduced, (iv) were the Debtor to enter into liquidation, the Scheme Creditors' rights to unpaid Statutory Interest would be lost and (v) due to the lack of a bar date, the Scheme Creditors would be exposed to the risk of new claims being received which, if of sufficient number, could decrease the amount payable to the Scheme Creditors with Admitted Claims.

**E.     Continuation of the Administration**

57.     Following the Effective Date of the Scheme, the Debtor will remain in administration, and the Administrators will make the distributions to Scheme Creditors under the Scheme.  On November 4, 2016, the Administration was extended by the High Court to

November 30, 2022.  The Scheme will not resolve all remaining issues in the Administration.
For example, the Scheme will not impact any trust entitlement of a Scheme Creditor.[15]

## V.     The Debtor's Headquarters and Connections to the United States

58.    Prior to the Administration, the Debtor was the main European broker-dealer in
the Lehman Group based out of the Lehman Group's regional headquarters in London, England,
where the Debtor continues to maintain its registered office.  Since the commencement of the
Administration, the Debtor has been, and continues to be, managed and controlled by the
Administrators, each of whom is located in London, England and supervised by the High Court.
Over the past ten years, the Administrators have been responsible for marshalling and
liquidating the Debtor's assets, reconciling and admitting claims asserted against the Debtor
and determining distributions to be made to those creditors.  The Administrators are also
responsible for all strategic and other decisions on behalf of the Debtor.  To perform these
functions, the Debtor maintains headquarters in London, England where employees of the
Debtor and the Administrators' firm assist the Administrators in fulfilling these responsibilities.
All key activities relating to the Debtor, including meetings of the Administrators, typically
occur either at the Debtor's headquarters in London, PwC's office in Leeds, England or at
PwC's London offices, where the Administrators maintain offices.  The periodic progress
reports that update the Debtor's creditors with respect to matters affecting the Debtor are
prepared by the Administrators in England and state that the Debtor's registered office is
located in London, England.  Other public filings made by, and correspondence from, the

---

[15] Prior to the Administration, the Debtor held, in the course of its prime brokerage, custody and other businesses, securities and cash (the "Trust Property") in trust for its clients and other affiliates (the "Trust Property Creditors").  While such trust entitlements will not be released by the Scheme, the Scheme will release any unsecured claim of a Trust Property Creditor if such a claim is not proved before the Bar Date.

Debtor, typically note that the Debtor is an English company and has a registered office in England. All of the Debtor's employees are located in England.

59.     While the Debtor's headquarters are located in England, the Debtor also has substantial connections to the United States. The Debtor is a party to over 300 ISDA Master Agreements and other contracts that are governed by New York law and contain New York forum selection clauses. The Debtor has the following assets located in the United States: (i) securities evidenced by physical certificates issued by a U.S. entity that are held by a custodian in New York; (ii) a judgment issued by a New York state court against a non-U.S. entity in the amount of approximately $230 million; (iii) allowed claims in the aggregate amount of approximately $2 billion in the chapter 11 cases of Lehman Brothers Holdings Inc. and its affiliates; (iv) a residual $1 million claim in the LBI SIPA proceeding; and (v) a $50,000 evergreen retainer with the New York office of Linklaters LLP being held in a client trust account located in New York. The Debtor is also the plaintiff in a lawsuit against AG Financial Products, Inc. that is pending before the Supreme Court of the State of New York pursuant to which the Debtor seeks a judgment against the defendant in connection with the early termination of 28 credit derivative transactions on the grounds of the Debtor's Administration (the "AG Financial Products Litigation").[16]

## VI.     Need for Chapter 15 Relief

60.     The English Proceeding, the Scheme and the Sanction Order comport with English law and, I am advised by U.S. counsel, satisfy the requirements for recognition and enforcement under chapter 15 of the Bankruptcy Code. Recognition of the English Proceeding,

---

[16] The case is *Lehman Brothers International Europe (in administration) vs. AG Financial Products, Inc.*, Index No. 653284/2011, pending in the Supreme Court of the State of New York, County of New York.

18-13477-scc    Doc 4836    Filed 05/14/18    Entered 05/14/18 01:49    Main Document
Pg 30 of 31

enforcement of the Scheme and the Sanction Order within the territorial jurisdiction of the

United States and approval of the Injunction are critical components in a series of steps required

to implement the Scheme without disruption or the threat of adverse actions by dissenting

creditors against the Debtor or its assets in the United States. Without assistance from this

Court, the Scheme and the Sanction Order could be fundamentally undermined to the detriment

of all parties in interest. I believe that the interests of all Scheme Creditors are aligned with the

Debtor in obtaining recognition of the English Proceeding, enforcement of the Scheme and the

Sanction Order within the territorial jurisdiction of the United States and approval of the

Injunction to ensure that the Scheme is implemented successfully.

61.    I have also requested that the Court cause the Proposed Order to become effective

immediately upon entry notwithstanding the 14-day stay of effectiveness of that order. I believe

that a waiver of the 14-day stay of effectiveness period is appropriate in these circumstances to

allow the Debtor to proceed immediately with the implementation of the Scheme in accordance

with the timetable set forth in the Lock-Up Agreement.

**VII.    Conclusion**

62.    In conclusion, for the reasons stated herein and in the Petition, I respectfully

request that the Petition for recognition of the English Proceeding as a foreign main proceeding

and for related relief be granted in its entirety, together with such other and further relief as this

Court deems just and proper.

*[Signature Page Follows]*

18-13947-scc Doc 483 Filed 05/14/18 Entered 05/14/18 01:49:27 Main Document Pg 31 of 31

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: May 14, 2018

/s/ Russell Downs
Russell Downs
Joint Administrator

## **Exhibit B**

Order Recognizing LBIE Scheme

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

*In re*

Lehman Brothers International (Europe) (in
administration),[1]

       Debtor in a Foreign Proceeding.

---------------------------------------------------------------

Chapter 15

Case No. 18-11470 (SCC)


**ORDER RECOGNIZING**
**FOREIGN PROCEEDING AND GRANTING RELATED RELIEF**

Upon the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main
Proceeding and Related Relief* [Dkt. No. 2] (together with the Form of Voluntary Petition [Dkt.
No. 1], the "**Petition**")[2] of Russell Downs, in his capacity as the duly authorized foreign
representative (the "**Foreign Representative**") of Lehman Brothers International (Europe) (in
administration) (the "**Debtor**"), which is the subject of proceedings under English law (the
"**English Proceeding**") currently pending before the Chancery Division (Companies Court) of the
High Court of Justice of England and Wales (the "**High Court**"), in support of entry of an order:

    a.    finding that (i) the Debtor is eligible to be a "debtor" under chapter 15 of title
11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*
(the "**Bankruptcy Code**"), (ii) the English Proceeding is a "foreign main
proceeding" within the meaning of section 1502 of the Bankruptcy Code, (iii)
the Foreign Representative satisfies the requirements of a "foreign
representative" under section 101(24) of the Bankruptcy Code, and (iv) the
Petition was properly filed and meets the requirements of section 1515 of the
Bankruptcy Code;

    b.    granting recognition of the English Proceeding as a "foreign main
proceeding" under sections 1517 and 1520 of the Bankruptcy Code;

---

[1]    The last four digits of the Debtor's England and Wales company registration number are 8254. The location of
the Debtor's registered office is Level 23, 25 Canada Square, London, United Kingdom E14 5LQ.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Petition.

c.      granting all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code;

d.      recognizing, granting comity to, and giving full force and effect within the territorial jurisdiction of the United States to the English Proceeding, the Scheme and the Sanction Order, including giving effect to the releases set forth in the Scheme (the "**Releases**");

e.      permanently enjoining all parties from commencing or continuing any action or proceeding in the United States against the Debtor or its assets located within the territorial jurisdiction of the United States that is inconsistent with the Scheme (the "**Injunction**");

f.      waiving the 14-day stay of effectiveness of the order; and

g.      granting related relief;

and upon the hearing held on June 19, 2018 (the "**Hearing**") on the Petition and this Court's review and consideration of the Petition, the Downs Declaration, the Hodgson Declaration and the *Supplemental Declaration of Richard David Hodgson in Support of Verified Chapter 15 Petition and Related Relief* [Dkt. No. 13]; and the Court having found and determined that the relief sought in the Petition is consistent with the purposes of chapter 15 of the Bankruptcy Code and is in the best interests of the Debtor; and after due deliberation and sufficient cause appearing therefor; and for the reasons stated on the record at the Hearing;

## IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.      This Court has jurisdiction to consider the Petition and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York dated as of January 31, 2012,

---

[3]   The findings and conclusions set forth herein and on the record of the Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 1, 2012) (Preska, C.J.).

B.      The consideration of the Petition and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b) and this Court may enter a final order consistent with Article III of the United States Constitution.

C.      Venue is proper before this Court pursuant to 28 U.S.C. § 1410(1) because the Debtor (i) has U.S. assets that are located within this District, (ii) is a party to litigation that is pending within this District and (iii) is a party to over 300 ISDA Master Agreements and other contracts that are governed by New York law and contain New York forum selection clauses.

D.      Good, sufficient, appropriate, and timely notice of the filing of the Petition and the Hearing has been given by the Foreign Representative, pursuant to Bankruptcy Rules 1011(b) and 2002(q) and the *Order Scheduling a Hearing on Chapter 15 Petition for Recognition and Related Relief and Specifying the Form and Manner of Service of Notice* [Dkt. No. 6] to (i) the United States Trustee for the Southern District of New York, (ii) the Scheme Creditors (as defined in the Petition), (iii) counsel to the SCG, (iv) counsel to the Wentworth Group, (v) the Debtor, (vi) all parties authorized to administer the Debtor as set forth in the Petition, (vii) the party listed in the Petition as a defendant in litigation with the Debtor in the U.S. and (viii) all parties that have filed a notice of appearance in this chapter 15 case.  In light of the nature of the relief requested and prior orders of this Court, no other or further notice is required.

E.      No objections or responses were filed to the relief requested in the Petition.

F.      The Debtor has tangible and intangible property within this District and therefore, the Debtor is "eligible" to be a debtor in this Chapter 15 Case pursuant to sections 109 and 1501 of the Bankruptcy Code.

G.      The English Proceeding is a "foreign proceeding" as such term is defined in section 101(23) of the Bankruptcy Code.

H.      The English Proceeding is pending in England, which is where the Debtor has its "center of main interests" as referred to in section 1517(b)(1) of the Bankruptcy Code.  As such, the English Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code, is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code and is entitled to all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code.

I.      The Foreign Representative is a "person" as such term is defined in section 101(41) of the Bankruptcy Code and has been duly appointed, made responsible for administering the Debtor and designated as the "foreign representative" of the Debtor as such term is defined in section 101(24) of the Bankruptcy Code.

J.      This Chapter 15 Case was properly commenced pursuant to sections 1504 and 1509 of the Bankruptcy Code, and the Petition satisfies the requirements of section 1515 of the Bankruptcy Code.

K.      The Foreign Representative and the Debtor, as applicable, are entitled to the additional assistance and discretionary relief requested in the Petition (including recognition and enforcement of the Scheme and the Sanction Order and the Releases contained therein) under sections 1507 and 1521 of the Bankruptcy Code.

L.      The relief granted herein is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 1504, 1507, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code and will not cause hardship to any party in interest.  To the extent that any hardship or

inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Foreign Representative, the Debtor, its creditors and other parties in interest.

M.      The relief granted herein is necessary to effectuate the purposes and objectives of chapter 15 of the Bankruptcy Code and to protect the Debtor and the interests of its creditors and all parties in interest.

N.      Absent the relief granted herein, the Scheme, the English Proceeding and the Debtor's efforts to consummate the settlement embodied in the Scheme may be thwarted by the actions of certain creditors, which would be at odds with the purpose of chapter 15 of the Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code.  Such results could threaten, frustrate, delay, and ultimately jeopardize the implementation of the settlement embodied in the Scheme.  Absent the Injunction, the Debtor and its assets may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative or regulatory actions or proceedings in connection with claims under the English Proceeding against the Debtor and its assets, thereby interfering with and causing irreparable harm to the Debtor, its creditors and other parties in interest.

O.      The Injunction contained herein (i) is within the Court's jurisdiction to grant, (ii) is essential to the success and objectives of the Scheme and the English Proceeding and (iii) confers material benefits on, and is in the best interests of, the Debtor, its creditors and all other parties in interest.

P.      The relief granted herein will, in accordance with section 1507(b) of the Bankruptcy Code, reasonably assure: (i) the just treatment of all holders of claims against or interests in the Debtor's property; (ii) the protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the English Proceeding; (iii) the prevention of

5

preferential or fraudulent dispositions of property of the Debtor; and (iv) the distribution of proceeds of the Debtor's property substantially in accordance with the order prescribed in the Bankruptcy Code.

Q.      All creditors and other parties in interest, including the Debtor, are sufficiently protected in the grant of the relief ordered hereby in compliance with section 1522(a) of the Bankruptcy Code.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

1.      The Petition and the relief requested therein are granted.

2.      The English Proceeding is recognized as a "foreign main proceeding" under sections 1517(a) and 1517(b)(1) of the Bankruptcy Code.

3.      The Foreign Representative is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the English Proceeding.

4.      All relief and protections afforded foreign main proceedings under section 1520 of the Bankruptcy Code are hereby granted to the English Proceeding, the Debtor and the Debtor's assets located in the United States, as applicable, including, without limitation, the application of the automatic stay under section 362 of the Bankruptcy Code to the Debtor and its property within the territorial jurisdiction of the United States.

5.      The Scheme and the Sanction Order (including the Releases) granted in the English Proceeding are hereby recognized, granted comity and given full force and effect in the United States and are binding and fully enforceable in accordance with their terms pursuant to sections 105(a), 1507, 1521 and 1525 of the Bankruptcy Code on all entities (as that term is defined in section 101(15) of the Bankruptcy Code) whose claims or interests are affected by the Scheme and each of their respective heirs, successors, assigns, trustees, subsidiaries, affiliates, officers,

directors, agents, employees, representatives, attorneys, beneficiaries, guardians and similar

officers, or any persons claiming through or in the right of any such persons or entities

(collectively, other than the Debtor and its expressly authorized representatives and agents, the

"**Affected Entities**"), whether or not the Affected Entity consented to be bound by or participated

in the Scheme.

6.      As of the Effective Date, all Affected Entities are hereby permanently enjoined

from asserting any debt, claim or interest affected by the Sanction Order and the Scheme, except

as expressly permitted by the Scheme, including without limitation:

    a.    executing against any of the Debtor's assets;

    b.    commencing or continuing, including issuing or employing process, of

a judicial, quasi-judicial, administrative, regulatory, arbitral, or other

action or proceeding, or to recover a claim, including, without

limitation, any and all unpaid judgments, settlements or otherwise

against the Debtor, its property, or any direct or indirect transferee of or

successor to any property of the Debtor, or any property of such

transferee or successor, or the seeking of any discovery related to any

of the foregoing, which in each case is in any way inconsistent with,

relates to, or would interfere with, the administration of the Debtor's

estate in the English Proceeding, English law or the implementation or

consummation of the Sanction Order or the Scheme (including the

Releases);

    c.    taking or continuing any act to create, perfect or enforce a lien or other

security interest, setoff or other claim against the Debtor or any of its

7

property or proceeds thereof, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the English Proceeding, English law or the implementation or consummation of the Sanction Order or the Scheme (including the Releases);

d.  transferring, relinquishing or disposing of any property of the Debtor to any entity other than the Foreign Representative and his authorized representatives and agents or taking or continuing any act to obtain possession of, commingle, or exercise control over, such property, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the English Proceeding, English law or the implementation or consummation of the Sanction Order or the Scheme (including the Releases);

e.  commencing or continuing in any manner, directly or indirectly, an individual action or proceeding concerning the Debtor's assets, rights, obligations or liabilities, or to resolve any dispute arising out of any provision of the Scheme, including the Releases, or English law relating to the Scheme, in each case, to the extent they have not been stayed pursuant to section 1520(a) and 362 of the Bankruptcy Code; and

f.  declaring or considering the filing of the English Proceeding, the Scheme, the Sanction Order or this Chapter 15 Case a default or event of default under any agreement, contract or arrangement;

8

*provided*, in each case, that such injunctions shall be effective solely within the territorial jurisdiction of the United States; *provided*, *further*, that nothing contained herein shall enjoin or otherwise stay the AG Financial Products Litigation that is pending in the Supreme Court of the State of New York, County of New York.

7.      As of the Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the liability of the Debtor or any other person released under the Scheme pursuant to the Releases, with respect to any debt cancelled, discharged or restructured under the Scheme, or as a result of English law relating to the Scheme, is unenforceable in the United States, in each case, to the extent inconsistent with the Scheme, the Sanction Order or such law.

8.      The Foreign Representative and the Debtor are authorized and empowered to, and may in their discretion and without further delay, execute and deliver documents to effectuate the Scheme (including the Releases) and take any action and perform any act necessary to implement and effectuate the terms of this Order, the Sanction Order and the Scheme.  The Debtor and the Foreign Representative are authorized and empowered to exercise all consent and approval rights provided for in the Scheme in the manner set forth in the Scheme, whether prior to or after the Effective Date.

9.      No action taken by the Foreign Representative, the Debtor or their respective agents, representatives, advisors, or counsel, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the English Proceeding, the documents contemplated thereunder, this Order, the Chapter 15 Case, any further order for additional relief in the Chapter 15 Case, or any adversary proceedings in connection therewith, will be deemed to

constitute a waiver of the immunity afforded such persons under sections 306 or 1510 of the Bankruptcy Code.

10.     No party shall incur any liability for following the terms of this Order (whether by acting or refraining from acting), except in the case of the party's own gross negligence or willful misconduct.

11.     Nothing herein shall enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding.

12.     The Foreign Representative, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

13.     Notwithstanding any provision in the Bankruptcy Code or the Bankruptcy Rules to the contrary, including, but not limited to Bankruptcy Rules 1018, 3020(e), 6004(h), 7062 and 9014, (a) this Order shall be effective immediately and enforceable upon its entry; (b) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and (c) this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

14.     This Court shall retain jurisdiction with respect to the implementation, enforcement, amendment or modification of this Order.

Dated:      June 19, 2018
            New York, New York

                        /S/ Shelley C. Chapman
                        THE HONORABLE SHELLEY C. CHAPMAN
                        UNITED STATES BANKRUPTCY JUDGE

## **Exhibit C**

LBIE Scheme

**IN THE HIGH COURT OF JUSTICE**                    **No. CR-2018-003713**

**BUSINESS AND PROPERTY COURTS**

**OF ENGLAND AND WALES**

**COMPANIES COURT (ChD)**


**IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE)**
**(in administration)**

**- and -**

**IN THE MATTER OF THE COMPANIES ACT 2006**

---

**SCHEME OF ARRANGEMENT**

(under Part 26 of the Companies Act 2006)

BETWEEN

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
(in administration)

AND

THE SCHEME CREDITORS
(as hereinafter defined)

---

# Table of Contents

**Contents**                                                                                    **Page**

PART I: RECITALS, DEFINITIONS AND INTERPRETATION ............................................. 5

Recitals ....................................................................................................................................... 5

1    Definitions and interpretation ..................................................................................... 5

PART II: EFFECTIVE DATE AND INITIAL SCHEME STEPS ............................................. 30

2    Scheme Effective Date............................................................................................... 30

3    Scheme Outcome Statements ................................................................................... 30

4    Adequate Reserves.................................................................................................... 31

5    Higher Rate Claims, 8% Interest Claims and Specified Interest Claims............................ 32

PART III: SCHEME DISTRIBUTIONS TO 8% CREDITORS, SETTLEMENT CREDITORS
AND SPECIFIED INTEREST CREDITORS.................................................................... 33

6    The 8% Payment........................................................................................................ 33

7    The Specified Interest Payment ................................................................................ 33

8    The Settlement Premium ........................................................................................... 34

9    Timing of the 8% Payment, the Specified Interest Payment and the Settlement Premium 34

PART IV: SCHEME DISTRIBUTIONS TO CERTIFYING CREDITORS ............................. 35

10    Applicable CI Payments ............................................................................................ 35

11    Determination of Applicable CI Payments.................................................................. 35

12    Consultation with the Subordinated Creditor ....................................................... 37

13    Failure to submit a Certification................................................................................. 37

14    Forfeit of entitlement to Settlement Premium........................................................ 37

15    Timing of payment of Applicable CI Payment .......................................................... 37

16    Undetermined Certification Claims ........................................................................... 38

PART V: GENERAL PROVISIONS APPLICABLE TO SCHEME DISTRIBUTIONS AND
SUBORDINATED DISTRIBUTIONS.............................................................................. 39

17      General.................................................................................................... 39

18      Tax......................................................................................................... 39

19      Conditions to payment of Scheme Distributions and Subordinated Distributions............... 42

20      UCC Challenges .................................................................................... 43

21      Unclaimed Scheme Distributions ............................................................ 44

22      Representations by Scheme Creditors .................................................... 44

        PART VI: DISPUTE RESOLUTION PROCEDURE .......................... 45

23      The Adjudicator .................................................................................... 45

24      The Appeal ............................................................................................ 47

25      Service of documents and other communications .................................. 50

26      Adjudication Costs ................................................................................ 51

27      Confidentiality........................................................................................ 52

        PART VII: SETTLEMENT OF PROCEEDINGS AND RELEASE OF CLAIMS .................. 54

28      Settlement of Proceedings and release of Claims.................................. 54

        PART VIII: ADMINISTRATORS' POWERS AND REMUNERATION AND SUBORDINATED
        DISTRIBUTIONS ................................................................................... 56

29      Powers of the Company and the Administrators...................................... 56

30      Retained Expense Claims...................................................................... 57

31      The Storm Payment ............................................................................... 58

32      The Subordinated Debt .......................................................................... 58

33      Equity Distributions ............................................................................... 59

34      Dissolution of the Creditors' Committee.................................................. 59

        PART IX: MISCELLANEOUS PROVISIONS .................................... 60

35      Third Party rights and enforcement........................................................ 60

36      Chapter 15.............................................................................................. 60

37    Governing law and jurisdiction ................................................................. 60

38    Duration of this Scheme ........................................................................... 61

39    Limit on Company's obligations ................................................................ 61

40    Partial invalidity ...................................................................................... 61

41    Notices .................................................................................................... 61

42    Modifications ........................................................................................... 63

43    Extension and calculation of deadlines .................................................... 63

44    Conflict .................................................................................................... 63

45    Modification of foreign law contracts ........................................................ 64

46    FCA Notices ............................................................................................ 64

Schedule 1 Appeal Form ................................................................................... 65

Schedule 2 Governance Protocol ...................................................................... 66

1    Operating Committee ................................................................................ 66

2    Meetings, voting etc. ................................................................................ 67

3    Amendment or waiver .............................................................................. 69

4    Disputes .................................................................................................. 69

Schedule 3 Shareholder Undertaking ................................................................ 70

Schedule 4 Storm Undertaking .......................................................................... 79

## PART I: RECITALS, DEFINITIONS AND INTERPRETATION

### Recitals

(A)    The Company was incorporated in England and Wales on 10 September 1990 under the Companies Act 1985 as a private limited company with registered number 02538254 under the name Lehman Brothers International Limited.

(B)    The Company was re-registered on 21 December 1992 under the Companies Act 1985 as a private unlimited company under the name Lehman Brothers International (Europe).

(C)    On 15 September 2008, on an application of the directors of the Company, the Company was placed into administration pursuant to Schedule B1 to the Insolvency Act.

(D)    On 15 September 2008, Anthony Victor Lomas and Steven Anthony Pearson, on 2 November 2011, Russell Downs and on 22 March 2013, Julian Guy Parr, each of PricewaterhouseCoopers LLP, were appointed as joint administrators of the Company pursuant to orders of the High Court.

## 1    Definitions and interpretation

### Definitions

1.1    In this Scheme, unless inconsistent with the subject or context, the following expressions bear the following meanings:

| | |
|---|---|
| "**1992 ISDA Master Agreement**" | means the 1992 version of the Master Agreement (Multicurrency Cross Border) as published by the International Swaps and Derivatives Association, Inc. |
| "**2002 ISDA Master Agreement**" | means the 2002 version of the Master Agreement as published by the International Swaps and Derivatives Association, Inc. |
| "**8% Creditor**" | means a Scheme Creditor who holds legal title to one or more 8% Interest Claims |
| "**8% Interest Claim**" | means a Provable Claim other than a Higher Rate Claim, a Specified Interest Claim or the Subordinated Debt |
| "**8% Interest Rate**" | means a simple rate of interest at 8% per annum |
| "**8% Payment**" | means a payment to: |
| | (i)   an 8% Creditor, of Statutory Interest in respect of its 8% Interest Claims; or |
| | (ii)  a Settlement Creditor, of Statutory Interest in respect of its Higher Rate Claims, |
| | in each case calculated in accordance with Clause 6.2 |
| "**Additional Information Request**" | has the meaning given to it in Clause 11.2.4 |
| "**Adequate Reserves**" | has the meaning given to it in Clause 4.1 |
| "**Adjudication Costs**" | means all fees, costs and expenses (inclusive of any VAT) of the Adjudicator and his Support Team which are payable by the Company in respect of an Appeal |

| | |
|---|---|
| "**Adjudicator**" | means a person appointed as an adjudicator (including any replacement adjudicator) by the Company to determine an Appeal in accordance with Clause 23 |
| "**Adjudicator's Address for Service**" | has the meaning given to it in Clause 25.1.1 |
| "**Administration**" | means the administration of the Company pursuant to an order of the High Court on the Administration Date |
| "**Administration Claim**" | means any Claim, pursuant to the Insolvency Act or otherwise, against the Administrators or the Released Third Parties where such Claim arises from actions taken (or failure to take action) by any such person on or after the Administration Date but prior to the Effective Date |
| "**Administration Date**" | means 15 September 2008 |
| "**Administration Expenses**" | means any expenses, disbursements, remuneration or other costs and liabilities incurred in the course of the Administration including those set out in paragraphs (a) to (j) at Rule 3.51(2) of the Insolvency Rules and including all debts and liabilities referred to in paragraphs 99(4) and 99(5) of Schedule B1 to the Insolvency Act |
| "**Administrators**" | means the persons from time to time serving as joint administrators in the Administration who, as at the date of this Scheme, are Anthony Victor Lomas, Steven Anthony Pearson, Russell Downs and Julian Guy Parr of PricewaterhouseCoopers LLP, 7 More London Riverside, London SE1 2RT, acting as agents only for and on behalf of the Company and without personal liability |
| "**Administrators' Address for Service**" | has the meaning given to it in Clause 25.1.2 |
| "**Admitted Certification Claim**" | means the amount of an Undetermined Certification Claim that is admitted for dividend by the Administrators pursuant to Rule 14.7 of the Insolvency Rules |
| "**Admitted Claim**" | means any ordinary unsecured claim against the Company (whether in respect of unpaid principal or unpaid interest accrued prior to the Administration Date) which is or has been admitted for dividend by the Administrators in accordance with either Rule 14.7 of the Insolvency Rules or Rule 2.77 of the Insolvency Rules 1986 |
| "**Advisers**" | means:<br>(i)    Linklaters LLP; and<br>(ii)    any other professional advisers to the Administrators |
| "**AFB Master Agreement**" | means the AFB Master Agreement for Foreign Exchange and Derivatives Transactions (1994) (AFB) |
| "**AFB/FBF Agreed Position**" | means the agreed position in respect of issues concerning the |

| | |
|---|---|
| | Euro-denominated claims arising under the AFB/FBF French Master Agreements, as published on the Website on 14 September 2015 |
| "**AFB/FBF French Master Agreements**" | means: |
| | (i)    the AFB Master Agreement; |
| | (ii)   the FBF Master Agreement; and |
| | (iii)  any long-form confirmation which incorporates the terms of the AFB Master Agreement or the FBF Master Agreement |
| "**Affiliates**" | means, with respect to any person, any other person (other than an individual) directly or indirectly controlling or controlled by or under direct or indirect common control with such person |
| "**AFTB/AFTI French Master Agreements**" | means the AFTB Master Agreement for Repurchase Transactions with Delivery of Securities (1994) (AFTB) and the AFTI Master Agreement for Loans of Securities (1997) (AFTI) |
| "**AGFP Proceedings**" | means ongoing litigation with AG Financial Products Inc. before the Supreme Court of the State of New York (with Court Reference 653284/2011) |
| "**Appeal**" | means an appeal against a Rejection Notice to be determined by an Adjudicator in accordance with Part VI |
| "**Appeal Form**" | means a document in the same, or substantially the same, form as appended at Schedule 1 |
| "**Appellant Certifying Creditor**" | has the meaning given to it in Clause 24.1.1 |
| "**Appellant Certifying Creditor's Case**" | has the meaning given to it in Clause 24.2.1 |
| "**Applicable CI Payment**" | means a payment made to a Certifying Creditor of Statutory Interest in respect of a Certification Claim determined in accordance with Clauses 11, 13 and 24 |
| "**Available Funds**" | means Cash and Cash Equivalents held in the House Estate together with such sum in respect of anticipated future realisations and receivables of the Company as the Administrators determine in their sole discretion |
| "**Bar Date**" | means the Effective Date |
| "**Benchmark Rate**" | means a variable reference rate of interest which is generally published on a daily basis (when banks are open for business) by Thomson Reuters or such other internationally recognised information service as the Administrators may in their sole discretion (acting reasonably) determine |
| "**Books and Records**" | means books, records or other information in any form including paper, electronically stored data, magnetic media, film and microfilm and, for the avoidance of doubt, shall include information received by the Company from Scheme Parties through the Portal or otherwise |

| | |
|---|---|
| "**Business Day**" | means a day (other than a Saturday or Sunday) on which banks are open for general business in London and New York |
| "**Cash and Cash Equivalents**" | means, at the relevant time, all cash held in any bank or other accounts, and all investments in any short-term money market deposits, UK government or quasi-government debt securities and supranational debt, in each case held by the Company, in accordance with the investment strategy set out in the Nineteenth Progress Report |
| "**CASS**" | means the Client Assets Sourcebook of the FCA Handbook as it applies to the Company |
| "**CASS7**" | means Chapter 7 of CASS and, if and to the extent relevant, Chapter 7A of CASS as they apply to the Company |
| "**Certification**" | means a statement submitted to the Company and identified by a Certifying Creditor as being a "Certification" stating the Higher Rate Claim to which it relates by reference to the relevant Claim Reference and: |

(i)     in respect of an ISDA Master Agreement:

     (a)     the asserted Cost of Funding applicable from time to time for the period during which the relevant Higher Rate Claim was, or has been, outstanding, in whole or in part;

     (b)     the asserted Certified Rate(s); and

     (c)     the asserted Certified Sum; and

(ii)     in respect of any Relevant Contract other than an ISDA Master Agreement, the asserted Certified Rate and the asserted Certified Sum,

together with an electronic mail address to which Notices and any communications regarding the Certification may be sent, and any information, documents and submissions in support of such statement that a Certifying Creditor wishes in its discretion to submit

| | |
|---|---|
| "**Certification Claim**" | means a Higher Rate Claim that is the subject of a Valid Certification Election |
| "**Certification Deadline**" | means the Effective Date |
| "**Certification Option**" | means the option available to Higher Rate Creditors to submit a Certification |
| "**Certified Rate**" | means: |

(i)     in respect of an ISDA Master Agreement, the rate(s) per annum equal to the asserted Cost of Funding plus 1% per annum; or

(ii)     in respect of any Relevant Contract other than an ISDA Master Agreement, the rate(s) of interest stated in the

|  | relevant Certification as the relevant interest rate(s), |
|---|---|
|  | in each case in respect of the relevant Certification Claim |
| "**Certified Sum**" | means the amount in GBP of interest that a Certifying Creditor states in a Certification as being payable to it in respect of the relevant Certification Claim calculated by applying the relevant Certified Rate(s) set out in the Certification to the balance outstanding from time to time of the relevant Certification Claim (calculated in accordance with the Relevant Principles) |
| "**Certifying Creditor**" | means a Higher Rate Creditor in relation to the Higher Rate Claims held by it that are Certification Claims |
| "**Chapter 15 Order**" | means an order of the US Bankruptcy Court which, among other things, recognises this Scheme as a foreign main proceeding under Chapter 15 of the US Bankruptcy Code, enforces the Court Order within the territorial jurisdiction of the United States and enjoins Scheme Parties from commencing or continuing any action or Proceeding in the United States against the Company or its assets located within the territorial jurisdiction of the United States that is inconsistent with this Scheme |
| "**Civil Procedure Rules**" | means the civil procedure rules used by the High Court of England and Wales that are in force as at the Effective Date |
| "**Claim Reference**" | means: |
|  | (i)   in respect of an Admitted Claim, the unique identifying number used by the Company to identify such Admitted Claim, as stated in the relevant UCC4; and |
|  | (ii)  in respect of an Undetermined Provable Claim, such reference number used by the Company to identify the relevant Undetermined Provable Claim as may be communicated by the Company to the relevant holder of such Undetermined Provable Claim prior to the Bar Date |
| "**Claims**" | means all claims, actions, Proceedings, demands, rights or causes of action, be they known or unknown, incurred solely or jointly or as principal or surety or in any other capacity, present, future or contingent, of any nature whatsoever and howsoever arising, whether arising in equity, common law or statute or by reason of breach of contract or trust, as a result of a restitutionary claim, or in respect of any tortious or negligent act or omission (whether or not loss or damage caused thereby has yet been suffered) or otherwise, whether in existence now or coming into existence at some time in the future, whether the amount is fixed or liquidated or is capable of being ascertained by fixed rules or as a matter of opinion, including those which arise hereafter upon a change in the relevant law, whether or not in the contemplation of the relevant person at the date |

hereof, and including:

(i)    any and all claims, actions, Proceedings, demands, rights or causes of action to, for or in respect of interest, late payment or a Shortfall;

(ii)    any and all claims, actions, Proceedings, demands, rights or causes of action arising by reason of, among other things, insolvency or the termination, whether voluntary or for cause, of any contractual obligation or for any failure of a person to perform any contractual, legal or regulatory obligation or otherwise;

(iii)    any and all claims, actions, Proceedings, demands, rights or causes of action for, among other things, the enforcement of any right to, or any Liability in respect of a right to:

    (a)    seek or enforce a judgment;

    (b)    exercise any remedy (for damages or otherwise), indemnity and/or contribution, whether for losses (including consequential loss, economic loss, loss of bargain, loss of value, or other losses computed by reference to value which may have been available had an obligation been duly performed in a timely manner, or otherwise), or for costs and expenses of any nature; or

    (c)    apply any set-off, netting, withholding, combination of accounts or retention or similar rights in respect of any claim or Liability whatsoever;

(iv)    any and all claims, actions, Proceedings, demands, rights or causes of action in respect of any Loss;

(v)    any "Debt" as defined in Rule 14.1(3) of the Insolvency Rules; and

(vi)    any "liability" as defined in Rule 14.1(6) of the Insolvency Rules

| | |
|---|---|
| "**Clearance**" | has the meaning given to it in Clause 18.2.1(ii) |
| "**Client Money**" | means "client money" as defined in the FCA Rules for the purposes of, *inter alia*, CASS7 |
| "**Client Money Entitlement**" | means a "client money entitlement" as such term is used in CASS, by reference to which the quantum of a beneficial interest in the Client Money Estate arising under the statutory trust created by CASS7, is calculated in accordance with CASS7 |
| "**Client Money Estate**" | means the notional pool of Client Money constituted at the date |

of the Company's primary pooling event (as defined in CASS7)

| | |
|---|---|
| "**Companies Act**" | means the Companies Act 2006 |
| "**Company**" | means Lehman Brothers International (Europe) (in administration), a private unlimited company incorporated in England and Wales with registered number 02538254 whose registered address is Level 23, 25 Canada Square, London E14 5LQ |
| "**Company's Case**" | has the meaning given to it in Clause 24.3.1 |

"**Compounding Principle**"    means, where:

(i)    Statutory Interest in respect of a Higher Rate Claim or Specified Interest Claim is calculated (subject to the terms of this Scheme) by reference to a contractual compounding rate(s) of interest; and

(ii)   prior to being paid in full, such Higher Rate Claim or Specified Interest Claim was discharged in part by the payment of one or more interim dividends,

the principle to be applied for the purpose of calculating the amount of Statutory Interest that accrues on the balance of the relevant claim outstanding from the date(s) of payment of the relevant interim dividend(s) to the date on which the relevant Claim was paid in full, being that any accrued Statutory Interest referable to the amount(s) by which the relevant claim was discharged by the relevant interim dividend(s) shall continue to compound in accordance with the terms of the relevant Specified Interest Contract or Relevant Contract (as applicable)

| | |
|---|---|
| "**Conflict of Interest**" | means any agreement, arrangement, affiliation, interest, understanding or activity which conflicts or has a significant risk of conflicting with the Adjudicator's or a member of his Support Team's ability to perform their respective roles |
| "**Consultation Period**" | has the meaning given to it in Clause 11.2 |
| "**Contributory Claim**" | means any call, claim, action, proceeding, demand, right or cause of action that may be made or brought by a future liquidator of the Company against any contributory (as defined in section 79 of the Insolvency Act) arising pursuant to section 74 or section 165 of the Insolvency Act |
| "**Control**" | means the right to determine Voting and Elections in respect of a Higher Rate Claim whether by way of a sub-participation agreement or otherwise, and "**Controlled**" shall be construed accordingly |
| "**Cost of Funding**" | means the cost to the relevant party (i) if it were to fund or (ii) of funding, the relevant Certification Claim, as certified by the Certifying Creditor |
| "**Counteroffer**" | means a counteroffer, setting out an amount in GBP of Statutory Interest that the Company states as being payable to |

|  | a Certifying Creditor in respect of its Certification Claim |
| "**Counteroffer Sum**" | the amount in GBP of Statutory Interest stated in a Counteroffer |
| "**Court of Appeal**" | means the Court of Appeal of England and Wales |
| "**Court Order**" | means an order of the High Court sanctioning this Scheme under Section 899 of the Companies Act |
| "**Courts**" | means the High Court, Court of Appeal and/or Supreme Court |
| "**Creditor Challenge Right**" | means a right, pursuant to the Insolvency Rules, Insolvency Act or otherwise, to challenge the quantum or validity of an Admitted Claim whether by bringing a Claim against the relevant Scheme Party, the Company, the Administrators and/or any future liquidator of the Company and/or issuing an application in the Administration and/or any future liquidation of the Company |
| "**Creditor Contributory Claim Right**" | means a right, pursuant to the Insolvency Rules, Insolvency Act or otherwise, to request or require a future liquidator of the Company to make a Contributory Claim |
| "**Creditors' Committee**" | means the committee of creditors of the Company constituted under paragraph 57 of Schedule B1 to the Insolvency Act |
| "**De Minimis Distribution**" | has the meaning given to it in Clause 21.1.1 |
| "**Decision Notice**" | has the meaning given to it in Clause 11.2 |
| "**Delegate**" | means any person appointed as a delegate pursuant to Clause 29.2.2 |
| "**Direction**" | has the meaning given to it in Clause 18.2.1(i) |
| "**Directions Application**" | means an application by the Administrators to the High Court pursuant to paragraph 63 of Schedule B1 to the Insolvency Act |
| "**Dispute Resolution Procedure**" | means the dispute resolution procedure described in Part VI for determining the Applicable CI Payment in respect of a Rejected Certification that is the subject of an Appeal |
| "**Disputed Claim**" | means a Retained Claim (other than Excluded Proceedings), where: |
|  | (i) the amount claimed by the holder of such Retained Claim is stated to be either (a) a certain sum equal to or greater than GBP 20,000,000; or (b) an uncertain sum that in the Company's opinion (acting reasonably) could give rise to a liability of the Company equal to or greater than GBP 20,000,000; and |
|  | (ii) such claim has not been agreed by the Administrators |
| "**DRP Election**" | has the meaning given to it in Clause 11.9 |
| "**Effective Date**" | means the date upon which a copy of the Court Order is delivered to the Registrar of Companies in England and Wales |
| "**Election**" | means the election by a Scheme Creditor, made at the time it |

submitted its Vote, for either the Settlement Payment Option or the Certification Option in respect of its Higher Rate Claims and "**Elect**" and "**Elected**" shall be construed accordingly

"**Election Deadline**"     means, where a Higher Rate Creditor is Voting by proxy submitted via the Portal, the Proxy Deadline or, in all other cases, the date and time of Voting at the relevant Scheme Meeting

"**Equity Distribution**"     means any distribution (including a distribution *in specie*) or dividends paid, or return of capital (whether ordinary or preferred) made by the Company or any office holder appointed in respect of it to the Shareholder, in accordance with the Insolvency Act, the Insolvency Rules, and, if applicable, the Companies Act

"**Excluded Claims**"     means (exclusively) any:

(i)     Undetermined Provable Claim (but excluding for the avoidance of doubt any entitlement, right to or interest in Statutory Interest in respect of such claim);

(ii)     proprietary claim or trust entitlement of a Scheme Creditor to Client Money held by the Company (but excluding, for the avoidance of doubt, any Provable Claim arising from or in connection with a Client Money Entitlement);

(iii)     Non-Provable Claim, the details of which have been notified to the Company by the holder of such claim prior to the Bar Date;

(iv)     Expense Claim, the details of which have been notified to the Company by the holder of such claim prior to the Bar Date;

(v)     UCC Challenge, the details of which have been notified to the Company prior to the Bar Date;

(vi)     Administration Claim, the details of which have been notified to the Company and the relevant person against whom such Claim is being asserted or brought, prior to the Bar Date; and

(vii)     Creditor Challenge Rights in respect of any Admitted Claim that is admitted by the Administrators on or after the Record Date

"**Excluded Proceedings**"     means any of the following:

(i)     the WHT Proceedings;

(ii)     the LBA Proceedings; and

(iii)     the AGFP Proceedings,

but only to the extent that such Proceedings do not seek to

|  | determine the calculation of Statutory Interest in a manner that is inconsistent with the payment of Statutory Interest pursuant to this Scheme |
|---|---|
| "**Exclusion Application**" | means an application to the High Court pursuant to Rule 14.11(1)(a) of the Insolvency Rules to exclude a proof of debt or to reduce the amount claimed by a Scheme Party in respect of an Admitted Claim |
| "**Expense Claims**" | means Claims that rank as Administration Expenses |
| "**Explanatory Statement**" | means the statement dated 14 May 2018, as may be amended or supplemented (and the appendices thereto), explaining the effect of this Scheme in compliance with Section 897 of the Companies Act |
| "**FBF Master Agreement**" | means the FBF Master Agreement Relating to Transactions on Forward Financial Instruments (2001) (FBF) |
| "**FCA**" | means the Financial Conduct Authority of the United Kingdom |
| "**FCA Handbook**" | means the handbook containing rules, principles and guidance made by the FCA under powers given to it by FSMA as applicable to the Company from time to time |
| "**FCA Rules**" | means FSMA and the FCA Handbook |
| "**Final Certification**" | has the meaning given to it in Clause 16.1.2 |
| "**Final Certification Deadline**" | has the meaning given to it in Clause 16.1.2 |
| "**Fixed Rate**" | means a fixed rate of interest expressed as a percentage |
| "**Floating Rate**" | means a rate of interest expressed as a Benchmark Rate or as a Benchmark Rate plus X, where X is a number or a percentage |
| "**FSMA**" | means the Financial Services and Markets Act 2000 |
| "**Full SI Payment Statement**" | means a statement confirming that the Company's Net Available Funds are sufficient to allow for the payment in full of the High Case Scheme Distribution |
| "**Governance Protocol**" | means a protocol in respect of the formation, rights and obligations of the Operating Committee as set out in Schedule 2 |
| "**High Case Scheme Distribution**" | means a notional amount equal to the aggregate of all Scheme Distributions to be made under this Scheme, assuming (where relevant) for the purposes of such calculation that: |
|  | (i)  any Undetermined Provable Claims are admitted by the Administrators for the full amount proved for (or, if relevant, in the amount ordered by the Court to be reserved for in respect of such claim(s)) and the principal amount of such claim(s) is paid in full on 15 September 2021; and |
|  | (ii)  the Applicable CI Payment in respect of any |

|  | Certification that is, at the relevant time, yet to be determined will be the Certified Sum set out in such Certification |
|---|---|
| **"High Court"** | means the High Court of Justice in England and Wales |
| **"Higher Rate Claim"** | means a Provable Claim (or the component part thereof) derived from a Relevant Contract |
| **"Higher Rate Creditor"** | means a Scheme Creditor who holds the legal title to one or more Higher Rate Claims |
| **"HMRC"** | means HM Revenue & Customs and any other authority, body or official in the United Kingdom competent to assess, demand, impose, administer or collect Tax or amounts in respect of Tax or make any decision or ruling on any matter relating to Tax |
| **"House Estate"** | means all of the Company's cash, property and assets which do not form part of the Client Money Estate or which are not otherwise held on trust for another person |
| **"Income Tax Act"** | means the Income Tax Act 2007 |
| **"Increased Voting Rights Decision"** | means the decision of the chairman of the Scheme Meetings in respect of a request by a Higher Rate Creditor for Voting Rights in respect of its Higher Rate Claims in excess of those stated in its UCC4 (or as otherwise communicated to it by the Company prior to the Scheme Meetings) |
| **"Initial Certification"** | means a Certification in respect of an Undetermined Certification Claim prepared and submitted in accordance with Clause 16 |
| **"Insolvency Act"** | means the Insolvency Act 1986 |
| **"Insolvency Rules"** | means the Insolvency (England & Wales) Rules 2016 |
| **"Insufficient Funds Statement"** | means a statement confirming that the Company's Net Available Funds are insufficient to allow for either a part payment or the full payment of the High Case Scheme Distribution |
| **"ISDA Master Agreement"** | means:<br>(i)  the 1992 ISDA Master Agreement;<br>(ii)  the 2002 ISDA Master Agreement; and<br>(iii)  any long-form confirmation which incorporates the terms of the 1992 ISDA Master Agreement or the 2002 ISDA Master Agreement |
| **"Issued Scheme Outcome Statement"** | means a Scheme Outcome Statement that has been published on the Website and is not subject to a Retraction Notice in accordance with Clause 3.3 |
| **"KYC Information"** | means information requested by the Company to ensure compliance with any relevant regulatory and anti-money |

|  | laundering requirements |
|---|---|
| "**Lacuna Application**" | means the application issued on 28 November 2017 by the Administrators, with the Subordinated Creditor as respondent, seeking directions in relation to a request, made by the Subordinated Creditor, that the Administrators seek a decision of creditors, pursuant to paragraph 56(1) of Schedule B1 to the Insolvency Act, to bring about the termination of the Administration and the commencement of a liquidation of the Company |
| "**LBA Proceedings**" | means an application issued by Lehman Brothers Australia Limited – in liquidation on 20 December 2016 pursuant to paragraph 74 of Schedule B1 to the Insolvency Act seeking to vary the amount of its Provable Claim |
| "**LBEL**" | means Lehman Brothers Europe Limited (in administration), a company incorporated in England and Wales with registered number 03950078 whose registered address is 7 More London Riverside, London SE1 2RT |
| "**LBH PLC**" | means Lehman Brothers Holdings PLC (in administration), a company incorporated in England and Wales with registered number 01854685 whose registered address is 7 More London Riverside, London SE1 2RT |
| "**LBHI**" | means Lehman Brothers Holdings Inc., a corporation incorporated under the laws of the State of Delaware, United States of America with registered number 2024634 whose registered address is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808, United States of America, and whose principal place of business is at 277 Park Avenue, 46th Floor, New York, NY 10172, United States of America as Plan Administrator (as defined in the Chapter 11 Plan) under the Chapter 11 Plan, on behalf of itself |
| "**LBHI2**" | means LB Holdings Intermediate 2 Limited (in administration), a company incorporated in England and Wales with registered number 05957878 whose registered address is 7 More London Riverside, London SE1 2RT |
| "**LBL**" | means Lehman Brothers Limited (in administration), a company incorporated in England and Wales with registered number 00846922 whose registered address is 7 More London Riverside, London SE1 2RT |
| "**Leap Year**" | means a 12-month period (beginning on 15 September) that includes 29 February |

| | |
|---|---|
| "**Liabilities**" | means all liabilities, duties and obligations of every description, whether deriving from contract, common law, case law, legal provisions, statute or otherwise, whether present or future, actual or contingent, ascertained or unascertained or disputed and whether owed or incurred severally or jointly or as principal or surety and "**Liability**" means any one of them |
| "**Liquidation Event**" | means either an order by the High Court to compulsorily wind up the Company or the commencement of a voluntary winding-up in respect of the Company (both pursuant to the Insolvency Act and the Insolvency Rules) |
| "**Lock-Up Agreement**" | means a lock-up agreement dated 22 December 2017 made between (among others) the Company, the Administrators, Burlington Loan Management DAC, Wentworth Sons Senior Claims S.à r.l., LBHI and the Subordinated Creditor |
| "**Locked Up Parties**" | means: |
| | (i) each of the parties (other than the Company and the Administrators) to the Lock-Up Agreement and their respective professional advisers; and |
| | (ii) in respect of (i) above, their respective members, partners, investment managers, directors, officers, employees and any of their respective agents, professional advisers or their employees |
| "**Loss**" | means any loss (including loss of profit or loss of earnings), damage, cost, charge, penalty, expense or Liability of whatever nature |
| "**Lugano Convention**" | means the convention on jurisdiction and the enforcement of judgments in civil and commercial matters signed in Lugano on 30 October 2007 and published in the Official Journal of the European Union on 21 December 2007 |
| "**Minimum Sum**" | means an amount sufficient for a payment of at least GBP 0.01 to each Scheme Creditor (save for the Subordinated Creditor) and Storm in respect of the Scheme Distributions |
| "**Net Available Funds**" | means from time to time the sum in GBP calculated by deducting the aggregate amount of Adequate Reserves from the amount of Available Funds |
| "**Nineteenth Progress Report**" | means the nineteenth progress report dated 10 April 2018 prepared by the Administrators in accordance with Rule 18.3 of the Insolvency Rules |
| "**Non-Provable Claims**" | means Claims which are not Provable Claims or Expense Claims, but which are payable in the Administration of the Company from the Surplus after the payment of Statutory Interest and before payment of the Subordinated Debt |
| "**Notice**" | means any notice given in accordance with Clause 41 and |

|  | "**Notify**" and "**Notified**" shall be construed accordingly |
|---|---|
| "**Olivant Application**" | means the application pursuant to Rule 14.8(3) of the Insolvency Rules issued in the Administration by the Subordinated Creditor on 19 September 2017 challenging the decision of the Administrators to admit the proof of debt filed in the Administration by Olivant Investments Switzerland S.A. and the associated joinder application brought by Lehman Brothers Opportunity Holdings Inc. |
| "**Operating Committee**" | means a committee to be formed following the dissolution of the Creditors' Committee pursuant to Clause 34 whose rights and obligations against the Company and the Administrators are described in the Governance Protocol |
| "**Other Proceedings**" | means any and all Proceedings (other than Excluded Proceedings) of any nature, however arising, whether brought directly or indirectly, in any jurisdiction or forum, which have been formally commenced against the Company on or prior to the Bar Date |
| "**Part SI Payment Rate**" | means the rate of distribution set out in a Part SI Payment Statement or such updated rate of distribution as may be published on the Website from time to time in accordance with Clause 3.4 |
| "**Part SI Payment Statement**" | means a statement confirming (i) that the Company's Net Available Funds are sufficient to allow for a part payment of the High Case Scheme Distribution and (ii) the rate of Scheme Distributions to be paid by reference to the Net Available Funds as a percentage of the High Case Scheme Distribution |
| "**Payment**" | means a payment by the Company of a Scheme Distribution, Subordinated Distribution (other than the Subordinated Principal) or any other amount pursuant to this Scheme but excluding, for the avoidance of doubt, a WHT Repayment |
| "**Portal**" | means a secure online facility made available to Scheme Creditors with Admitted Claims on the website of PricewaterhouseCoopers LLP at https://dm.pwc.com/LBIE_CIP/login.aspx |
| "**Practice Statement Letter**" | means the letter sent to creditors of the Company on 18 April 2018 in accordance with the practice statement issued by the High Court on 15 April 2002 in relation to schemes of arrangement proposed under the Companies Act |
| "**Preferential Debts**" | has the meaning given to that term in Section 386 of the Insolvency Act |
| "**Proceedings**" | means any process, action, application, legal or other proceeding, including any administrative, judicial or quasi-judicial proceeding, any regulatory process, arbitration, alternative dispute resolution, mediation, judicial review, adjudication, forfeiture, re-entry, seizure, distraint, execution, |

|  | enforcement of judgment or any other step taken for the purpose of creating or enforcing a lien |
|---|---|
| "**Provable Claim**" | means a Claim provable in the Administration, in accordance with Rule 14.2 of the Insolvency Rules including, for the avoidance of doubt, any Shortfall Claim |
| "**Proxy Deadline**" | means 5.00 p.m. on the day falling one Business Day prior to the Scheme Meetings, being the deadline by which creditors wishing to submit a form of proxy via the Portal must do so in order to Vote and (where applicable) make an Election |
| "**Recast Jurisdiction and Judgments Regulation**" | means Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters |
| "**Record Date**" | means 5.00 pm London time on 24 May 2018 |
| "**Rejected Certification**" | has the meaning given to it in Clause 11.9 |
| "**Rejection Date**" | means the date of delivery of a Rejection Notice in accordance with Clause 11 |
| "**Rejection Notice**" | means a Decision Notice informing a Higher Rate Creditor of its Rejected Certification pursuant to Clause 11.2.2, 11.7.2, 11.8.1 or 11.8.2 |
| "**Released Administration Claims**" | has the meaning given to it in Clause 28.1.4 |
| "**Released Claims**" | means the Claims released and waived by the Scheme Parties pursuant to Clause 28 |
| "**Released Scheme Implementation Claims**" | means any Claims against the Company, the Administrators, the Released Third Parties or the Locked Up Parties where such Claims arise from or in connection with an action taken by any such person on or after 1 November 2017 with respect to: |

(i) the negotiation, preparation, implementation and/or consummation of this Scheme; or

(ii) the execution of any documents required in order to implement this Scheme and the carrying out of the actions, steps and transactions contemplated by such documents,

but excluding (a) Claims by the Locked Up Parties against each other or the Shareholder, or by the Shareholder against any Locked Up Party, under contracts in existence prior to the Bar Date, and (b) for the avoidance of doubt, any Scheme Breach Claims

| "**Released Third Parties**" | means: |
|---|---|

(i) the Administrators' firm;

(ii) the Advisers;

(iii) in respect of paragraphs (i) and (ii) above, their

|  | respective members, partners, directors, officers, employees and any of their respective agents, professional advisers or their employees; and |
|  | (iv) current and former employees of the Company |
| "**Released Third Party Claims**" | means the Released Administration Claims and the Released Scheme Implementation Claims |
| "**Relevant Contracts**" | means certain pre-administration contracts, the counterparties to which may be entitled to Statutory Interest calculated at a rate in excess of the 8% Interest Rate, being: |
|  | (i) ISDA Master Agreements; |
|  | (ii) AFB/FBF French Master Agreements; and |
|  | (iii) AFTB/AFTI French Master Agreements |
| "**Relevant Employees**" | means (in relation only to Claims relating to their individual contracts of employment) employees or former employees of the Company who are domiciled in a Relevant State and who have not submitted a proof of debt in the Administration or otherwise submitted to the jurisdiction of the English Courts in relation to the Administration prior to the Effective Date |
| "**Relevant Jurisdiction Clause Creditors**" | means (in relation only to Claims arising in connection with such contracts) any person domiciled in a Relevant State who holds a contractual claim against the Company under a contract which is in writing or evidenced in writing and which contains an agreement that the courts of a Relevant State are to have exclusive jurisdiction to settle any disputes which have arisen or which may arise in connection with that contractual relationship and who have not submitted a proof of debt in the Administration or otherwise submitted to the jurisdiction of the English Courts in relation to the Administration prior to the Effective Date |
| "**Relevant Principles**" | means: |
|  | (i) in respect of ISDA Master Agreements, the principles set out in the Tranche C Judgment as set out in the declarations contained in the Tranche C Order; |
|  | (ii) in respect of AFB/FBF French Master Agreements, the AFB/FBF Agreed Position; |
|  | (iii) in respect of all Statutory Interest Claims, the Courts' decisions in Tranche A; and |
|  | (iv) in respect of Certification Claims and Specified Interest Claims, the Compounding Principle (if applicable) |
| "**Relevant State**" | means a state other than the United Kingdom which is a party to the Recast Jurisdiction and Judgments Regulation or the Lugano Convention |
| "**Retained Claims**" | means Excluded Claims, Excluded Proceedings and Retained |

|  | Expense Claims |
|---|---|
| "**Retained Expense Claim**" | means any Expense Claim held by a Scheme Party, which: |

|  | (i) | was a contingent claim as at the Bar Date and which became payable on or after the Bar Date under a contract that was entered into by the Company between the Administration Date and the Bar Date; |
|---|---|---|
|  | (ii) | relates to the Company's payment obligations under a contract that was continuing to be performed as at the Bar Date; |
|  | (iii) | arises from an action or activity of the Company that takes place on or after the Bar Date (including a Scheme Breach Claim) or a contract entered into by the Company after the Bar Date; or |
|  | (iv) | arose within 10 days prior to the Bar Date in circumstances where (in the Administrators' sole discretion (acting reasonably)) the relevant Scheme Party could not reasonably have been expected to notify the Company or the Administrators of the Expense Claim prior to the Bar Date |

| "**Retained Unclaimed Scheme Distribution**" | means an Unclaimed Scheme Distribution that is not a De Minimis Distribution |
|---|---|
| "**Retraction Notice**" | has the meaning given to it in Clause 3.3.1 |
| "**Revised Scheme Outcome Statement**" | has the meaning given to it in Clause 3.3.2 |
| "**Scheme**" | means this scheme of arrangement in its present form or with or subject to any modification, addition or condition approved or imposed pursuant to Clause 42 |
| "**Scheme Breach Claims**" | means any Claims against the Company or the Administrators arising out of or in connection with a breach by the Company or the Administrators of the terms of this Scheme |
| "**Scheme Creditor**" | means any person who holds a Provable Claim against the Company (including, for the avoidance of doubt, (i) any Admitted Claim whether unpaid or paid in full or in part; and (ii) the Subordinated Debt), save for: |

|  | (i) | Storm; |
|---|---|---|
|  | (ii) | any Relevant Employees; and |
|  | (iii) | any Relevant Jurisdiction Clause Creditors |

| "**Scheme Distribution**" | means (as the context requires) a payment by the Company in respect of: |
|---|---|

|  | (i) | the 8% Payment; |
|---|---|---|
|  | (ii) | the Specified Interest Payment; |

|  | (iii) | the Storm Payment; |
|--|-------|--------------------|
|  | (iv)  | the Settlement Premium; and/or |
|  | (v)   | the Applicable CI Payment |

| "**Scheme Meetings**" | means the separate meetings of the relevant classes of Scheme Creditors convened by order of the High Court pursuant to Section 896 of the Companies Act for the purpose of considering and, if thought appropriate, approving this Scheme, including any adjournment thereof |
|--|--|

| "**Scheme Outcome Statement**" | means (as relevant): |
|--|--|
|  | (i)   a Full SI Payment Statement; |
|  | (ii)  a Part SI Payment Statement; |
|  | (iii) an Insufficient Funds Statement; or |
|  | (iv)  a Revised Scheme Outcome Statement |

| "**Scheme Party**" | means each Scheme Creditor and Storm |
|--|--|

| "**Settled Proceedings**" | means : |
|--|--|
|  | (i)   the Waterfall Proceedings; |
|  | (ii)  the Lacuna Application; |
|  | (iii) the Olivant Application; and |
|  | (iv)  any Other Proceedings |

| "**Settlement Creditor**" | means a Higher Rate Creditor in relation to any Higher Rate Claim(s) held by it that is not subject to a Valid Certification Election |
|--|--|

| "**Settlement Higher Rate Claim**" | means a Higher Rate Claim that is not subject to a Valid Certification Election |
|--|--|

| "**Settlement Instructions**" | means a Scheme Party's settlement instructions that meet the Company's minimum requirements in respect of settlement instructions as set out in the Portal (from time to time) |
|--|--|

| "**Settlement Payment**" | means, in respect of a Settlement Creditor, the 8% Payment and the Settlement Premium together |
|--|--|

| "**Settlement Payment Option**" | means the option available to Higher Rate Creditors to receive the Settlement Payment in respect of their Higher Rate Claims |
|--|--|

| "**Settlement Premium**" | means a settlement sum to be paid to a Settlement Creditor equal to 2.5% of the amount admitted for dividend by the Administrators in respect of its Settlement Higher Rate Claim(s) |
|--|--|

| "**Shareholder**" | means LBHI2 in its capacity as a shareholder of the Company |
|--|--|

| "**Shareholder Undertaking**" | means a deed of undertaking to be entered into prior to the Effective Date between the Company and the Shareholder in connection with this Scheme in the form set out in Schedule 3 |
|--|--|

| | |
|---|---|
| "**Shareholder Undertaking Claim**" | means any Claims against the Shareholder arising out of a breach by the Shareholder of the terms of the Shareholder Undertaking |
| "**Shortfall**" | means, where the total distributions received by a client of the Company from the Client Money Estate (X) are less than its Client Money Entitlement (Y), the difference between X and Y |
| "**Shortfall Claim**" | means any unsecured claim against the House Estate to recover any Shortfall |
| "**Specified Countries**" | means the Netherlands, France, Italy, Germany, Switzerland, the United Arab Emirates, Qatar, Spain, Sweden, Israel and South Korea |
| "**Specified Interest Claim**" | means a Provable Claim (or the component part thereof) that is derived from a Specified Interest Contract |
| "**Specified Interest Contract**" | means a contract other than a Relevant Contract or a Subordinated Debt Agreement which stipulates a Specified Interest Rate which, when applied to the balance outstanding from time to time under such contract (in accordance with Relevant Principles), would give rise to an amount of Statutory Interest that is greater than the amount of Statutory Interest that would be calculated if the 8% Interest Rate were to have applied in place of such Specified Interest Rate |
| "**Specified Interest Creditor**" | means a Scheme Creditor who holds legal title to one or more Specified Interest Claims |
| "**Specified Interest Payment**" | means a payment to a Specified Interest Creditor of Statutory Interest in respect of its Specified Interest Claims calculated in accordance with Clause 7.2 |
| "**Specified Interest Rate**" | means either: |
| | (i)     a Fixed Rate; or |
| | (ii)    a Floating Rate, |
| | whether such rate is applied on a simple or compound basis |
| "**SSI Deadline**" | means the later of: |
| | (i)     20 Business Days from the date on which all Scheme Distributions other than Unclaimed Scheme Distributions have been paid in full by the Company; and |
| | (ii)    12 months from the Effective Date |
| "**Statutory Interest**" | means any statutory interest payable by the Company pursuant to Rule 14.23 of the Insolvency Rules |
| "**Statutory Interest Claims**" | means Claims in respect of Statutory Interest |
| "**Storm**" | means Storm Funding Limited (in administration), a company incorporated in England and Wales with registered number |

|  |  |
|---|---|
|  | 02682306 whose registered address is 7 More London Riverside, London SE1 2RT |
| "**Storm Payment**" | means a payment in the amount of GBP 20,955,623.55 to Storm in full and final settlement of its rights to Statutory Interest in respect of its Admitted Claim |
| "**Storm Undertaking**" | means a deed of undertaking to be entered into prior to the Effective Date between the Company and Storm pursuant to which Storm agrees to be bound by and perform certain of the terms of this Scheme, in the form set out in Schedule 4 |
| "**Subordinated Creditor**" | means Wentworth Sons Sub-Debt S.à r.l., a private limited liability company (*société à responsabilité limitée*) incorporated and existing under the laws of the Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies' Register under number B 179. 340, whose registered office is 6 Rue Eugène Ruppert, L 2453 Luxembourg, Grand Duchy of Luxembourg |
| "**Subordinated Debt**" | means Claims in respect of the subordinated liabilities of the Company arising pursuant to the Subordinated Debt Agreements |
| "**Subordinated Debt Admittance Date**" | has the meaning given to it in Clause 32.2 |
| "**Subordinated Debt Agreements**" | means any of the three intercompany loan agreements entered into between the Company and LBHI2, each dated 1 November 2006 and which have been assigned by LBHI2 to the Subordinated Creditor pursuant to a deed of assignment dated 31 January 2014 |
| "**Subordinated Debt SI Payment**" | has the meaning given to it in Clause 32.5 |
| "**Subordinated Distributions**" | means any payment in respect of the Subordinated Debt (whether in respect of principal, interest accrued prior to the Administration Date, Statutory Interest or otherwise) made in accordance with the terms of this Scheme |
| "**Subordinated Interest**" | has the meaning given to it in Clause 32.3 |
| "**Subordinated Principal**" | means the part of the Subordinated Creditor's Provable Claim that relates to the principal amount of the Subordinated Debt, in the sum of GBP 1,240,452,696, and excluding any part that relates to interest on the Subordinated Debt accrued prior to the Administration Date |
| "**Support Team**" | means one or more appropriately qualified and trained, technically competent and independent professionals (with relevant market and/or financial experience) engaged by the Adjudicator to support and assist the Adjudicator with his understanding of the Appellant Certifying Creditor's Case and the Company's Case |
| "**Supreme Court**" | means the Supreme Court of the United Kingdom |

| | |
|---|---|
| "**Surplus**" | means the Company's assets remaining after the provision for or payment in full of Expense Claims, Preferential Debts and Admitted Claims and before the payment of Statutory Interest, Non-Provable Claims, the Subordinated Debt and Equity Distributions, but excluding any Contributory Claim |
| "**Tax**" | means all forms of taxation, whether levied by reference to income, profits, gains, net wealth, asset values, turnover, added value or otherwise and shall further include payments in respect of or on account of such forms of taxation (including any interest and/or penalties in relation to such taxation), in each case whether of the United Kingdom or elsewhere in the world whenever imposed and whether chargeable directly or primarily against or attributable directly or primarily to the Company, a Scheme Party or any other person |
| "**Tax Authority**" | means any taxing or other authority, whether of the United Kingdom or elsewhere in the world, competent to impose any liability in respect of Tax, or responsible for the administration and/or collection of Tax or enforcement of any law in relation to Tax |
| "**Third Party**" | means a person that is not the Company, a Scheme Party, an Administrator, a Released Third Party or a Locked Up Party |
| "**Tranche A**" | means "Tranche A" of Waterfall II as described in the definition of Waterfall II |
| "**Tranches A and B Costs Principle**" | means, in relation to any costs payable by the Company pursuant to Clause 28.3, the limitation imposed by the High Court in paragraph 2 under the heading "Costs" in the order of David Richards J dated 17 October 2016 in relation to Tranche A and Tranche B |
| "**Tranche B**" | means "Tranche B" of Waterfall II as described in the definition of Waterfall II |
| "**Tranche C**" | means "Tranche C" of Waterfall II as described in the definition of Waterfall II |
| "**Tranche C Judgment**" | means Lomas & Ors v Burlington Loan Management Limited & Ors [2016] EWHC 2417 (Ch) |
| "**Tranche C Order**" | means the declarations made by Hildyard J in the order of the High Court dated 12 December 2016 in respect of the Tranche C Judgment |
| "**UCC Challenge**" | means a challenge in writing to the Company by a Scheme Creditor of the allocation or composition of its Admitted Claim(s) between any combination of 8% Interest Claim(s), Specified Interest Claim(s) and/or Higher Rate Claim(s) set out in its UCC4 (or as otherwise communicated to it in writing by the Company), where such challenge includes a statement as to the allocation or composition of 8% Interest Claim(s), Specified Interest Claim(s) and/or Higher Rate Claim(s) (as relevant) |

|  | claimed by that Scheme Creditor as constituting its Admitted Claim(s) |
|---|---|
| **"UCC4"** | means the certificate provided by the Company to a Scheme Creditor on or around the date of the Explanatory Statement setting out, among other things, the disaggregation of such Scheme Creditor's Admitted Claim(s) between 8% Interest Claim(s), Specified Interest Claim(s) and/or Higher Rate Claim(s) (as relevant) |
| **"Unclaimed Scheme Distribution"** | means any Scheme Distribution which (i) would be payable by the Company to a Scheme Party but for that Scheme Party's failure to provide the Company with Settlement Instructions and/or KYC Information (or confirm such information) in accordance with Clause 19.4 or (ii) was paid by way of a cheque that is cancelled by the Company pursuant to Clause 19.6.3 |
| **"Unclaimed Scheme Distribution Application"** | has the meaning given to it in Clause 21.2 |
| **"Undetermined Certification Claim"** | means a Certification Claim that is an Undetermined Provable Claim |
| **"Undetermined Provable Claim"** | means, as at any given date, a Provable Claim in respect of which a proof of debt has been submitted in accordance with Rules 14.3 and 14.4 of the Insolvency Rules prior to the Bar Date, where such proof of debt is still to be finally adjudicated upon by the Administrators or is the subject of determination by the Court or in respect of which the 21-day period in Rule 14.8(2) of the Insolvency Rules has not expired |
| **"US Bankruptcy Code"** | means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. |
| **"US Bankruptcy Court"** | means the United States Bankruptcy Court for the Southern District of New York or other court of competent jurisdiction presiding over any case filed under Chapter 15 of the US Bankruptcy Code seeking, among other things, recognition of this Scheme as a foreign main proceeding and enforcement of the Court Order in the United States |
| **"Valid Certification Election"** | means an Election by a Higher Rate Creditor that is: |
|  | (i)    for the Certification Option in relation to one or more Higher Rate Claims; |
|  | (ii)   made prior to the Election Deadline; and |
|  | (iii)  made contemporaneously with a representation by that Scheme Creditor to the Company (such representation being true and accurate as at the date it is made) that: |
|  | (a)    it has made the same Election in respect of all Higher Rate Claims which it legally owns and Controls; and |

(b)    where it has Elected for the Certification Option in respect of Higher Rate Claim(s) which are Controlled by a third party, it has made the same Election in respect of all Higher Rate Claim(s) that are Controlled by such party

"**VAT**"    means, within the European Union, such tax as may be levied in accordance with (but subject to derogations from) the Directive 2006/112/EC and, outside the European Union, any tax of a similar nature levied by reference to added value or sales

"**Voting**"    means the exercise of a Scheme Creditor's vote to approve or reject this Scheme at a meeting of Scheme Creditors convened for that purpose and "**Vote**" shall be construed accordingly

"**Voting Rights**"    means the value attributed to 8% Interest Claims, Specified Interest Claims and Higher Rate Claims for the purpose of Voting at the relevant Scheme Meeting(s)

"**Waterfall I**"    means a joint application issued on 14 February 2013 by the respective administrators of the Company, LBL and LBHI2, with LBHI as a respondent, seeking a determination as to, among other things, the existence and priority ranking of certain claims in respect of the Surplus, and the rights and obligations of the Company as against its contributories, heard by the High Court, the Court of Appeal and the Supreme Court, the Supreme Court judgment being given on 17 May 2017

"**Waterfall II**"    means the application issued on 12 June 2014 (as amended pursuant to the orders of David Richards J dated 9 March 2015 and Hildyard J dated 9 October 2015) by the Administrators, with Burlington Loan Management Limited, CVI GVF (Lux) S.à r.l., Hutchinson Investors, LLC, the Subordinated Creditor and York Global Finance BDH, LLC as respondents, seeking determination of issues that impact the potential entitlements of the Company's creditors to payments from the Surplus, split into Tranche A and Tranche B (with case citation, in respect of the Court of Appeal decision, [2017] EWCA Civ 1462), and Tranche C (with case citation, in respect of the first instance decision, [2016] EWHC 2417 (Ch))

"**Waterfall III**"    means the application issued on 25 April 2016 by the Administrators with the respective joint administrators of LBHI2, LBL and LBEL as respondents, seeking determination of issues relating to the rights and obligations of the Company, LBHI2, LBL, LBEL and LBH PLC arising out of (i) the Company's status as an unlimited liability company and (ii) certain recharge arrangements among those entities, and the associated cross-application issued on 17 October 2016 by the administrators of LBL

"**Waterfall Proceedings**"    means Waterfall I, Waterfall II and Waterfall III as the context

|  | requires |
|---|---|
| "**Website**" | means the website which can be accessed at https://www.pwc.co.uk/services/business-recovery/administrations/lehman.html |

| "**Wentworth Parties**" | means: |
|---|---|
| | (i)     LBHI; |
| | (ii)    Wentworth Sons Senior Claims S.à. r.l.; |
| | (iii)   the Subordinated Creditor; |
| | (iv)   the Shareholder; |
| | (v)    King Street Capital Management, L.P.; |
| | (vi)   Elliott Management Corporation; and |
| | (vii)  in respect of (v) and (vi) above, their respective Affiliates that are parties to the Lock Up Agreement |

| "**WHT Deduction**" | has the meaning given to it in Clause 18.1.1 |
|---|---|
| "**WHT Deduction Certificate**" | has the meaning given to it in Clause 18.1.3(ii) |
| "**WHT Determination Event**" | has the meaning given to it in Clause 18.3 |
| "**WHT Proceedings**" | means the application issued by the Administrators on 22 December 2015, with HMRC as respondent, seeking directions of the High Court in relation to the application of section 874 of the Income Tax Act to payments of Statutory Interest (with case citations, in respect of the first instance decision, [2016] EWHC 2492 (Ch), and in respect of the Court of Appeal decision, [2017] EWCA Civ 2124) |
| "**WHT Repayment**" | has the meaning given to it in Clause 18.3.1 |
| "**WHT Repayment Event**" | has the meaning given to it in Clause 18.3.2 |

### Interpretation

1.2    In this Scheme, unless the context otherwise requires or unless otherwise expressly provided:

1.2.1    references to any specified provision of this Scheme shall be construed as references to that provision subject to any modification, addition or condition approved or imposed pursuant to Clause 42;

1.2.2    references to a person include any company, unincorporated association or partnership whether or not having separate legal personality, and references to a company include any company, corporation or body corporate, wherever incorporated;

1.2.3    references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

**1.2.4**    all monetary amounts stated in this Scheme are in GBP unless expressly stated otherwise;

**1.2.5**    a reference to "**GBP**" is to the lawful currency for the time being of the United Kingdom of Great Britain and Northern Ireland;

**1.2.6**    references to specific Insolvency Rules shall include references to the equivalent provisions of the Insolvency Rules 1986 (if the context so allows);

**1.2.7**    a reference to a "**judgment**" includes any order, injunction, determination, award or other judicial or arbitral measure in any jurisdiction;

**1.2.8**    a reference to a "**law**" includes common or customary law and any constitution, decree, judgment, order, ordinance, regulation, statute, treaty or other legislative measure, in each case of any jurisdiction whatever;

**1.2.9**    words importing the plural shall include the singular and vice versa and words importing one gender shall include all genders;

**1.2.10**   headings are for ease of reference only and shall not affect the interpretation of this Scheme;

**1.2.11**   the words "**include**" and "**including**" mean include and including without limitation (and "**includes**" shall be construed accordingly);

**1.2.12**   the words "**prior to**" before a stated date shall be construed to mean "prior to and not including" the stated date; and

**1.2.13**   references to Clauses, Parts and Schedules are to Clauses and Parts of and Schedules to this Scheme, and references to time are to London time.

**1.3**    In determining whether any action is "**reasonably practicable**" for the Company and/or the Administrators for the purposes of this Scheme, regard shall be had to:

**1.3.1**    the fact that the Company is in administration;

**1.3.2**    the limitations on access to Books and Records of the Company and other resources; and

**1.3.3**    the materiality of the likely impact of such action on the Company's aim to manage costs appropriately and to deal with matters arising under this Scheme expeditiously.

## PART II: EFFECTIVE DATE AND INITIAL SCHEME STEPS

**2    Scheme Effective Date**

**2.1**    This Scheme shall become effective on and from the Effective Date and shall be binding on the Company, the Administrators and the Scheme Creditors and their respective successors and assigns on and from the Effective Date.

**2.2**    Storm has consented to, and agreed to be bound by, the terms of this Scheme, on and from the Effective Date, pursuant to the terms of the Storm Undertaking.

**2.3**    The Shareholder has consented to this Scheme and, on and from the Effective Date, undertaken certain obligations in connection with this Scheme pursuant to the Shareholder Undertaking in consideration for being entitled to enforce each of the rights conferred on it pursuant to this Scheme.

**2.4**    The Company shall notify the Scheme Parties and the Shareholder of the occurrence of the Effective Date by:

**2.4.1**    immediately publishing a Notice on the Website confirming the occurrence of the Effective Date;

**2.4.2**    promptly arranging for the publication of a notice in the following publications in relation to the same:

(i)    the Financial Times (United Kingdom and International editions);

(ii)    the London Gazette;

(iii)    The Times Newspaper; and

(iv)    the Wall Street Journal (US National Edition); and

**2.4.3**    promptly arranging for the publication of the notice specified at Clause 2.4.2 to be published in such other publications (if any) as the Company may in its sole discretion consider appropriate in each of the countries in which Company branches operated, including the Specified Countries.

**2.5**    A Scheme Party's entitlement to Statutory Interest (if any) shall be quantified, provided for, paid and fully satisfied in accordance with the provisions of this Scheme only, such that Scheme Parties shall have no entitlement to Statutory Interest save as set out in this Scheme.

**3    Scheme Outcome Statements**

**3.1**    As soon as is reasonably practicable, the Company shall:

**3.1.1**    determine the High Case Scheme Distribution;

**3.1.2**    determine the Adequate Reserves in accordance with Clause 4;

**3.1.3**    determine the Net Available Funds; and

**3.1.4**    publish a Scheme Outcome Statement on the Website in accordance with Clause 3.2.

**3.2** Where:

**3.2.1** the Net Available Funds are the same as or greater than the High Case Scheme Distribution, the Company shall publish a Full SI Payment Statement on the Website;

**3.2.2** the Net Available Funds are the same as or greater than the amount required in order to distribute the Minimum Sum but less than the High Case Scheme Distribution, the Company shall publish a Part SI Payment Statement on the Website; and

**3.2.3** the Net Available Funds are insufficient to distribute the Minimum Sum, the Company shall publish an Insufficient Funds Statement on the Website.

**3.3** Subject to Clause 3.4, if at any time there is a change in the Net Available Funds, such that the Company determines (in its sole discretion) that an Issued Scheme Outcome Statement does not accurately reflect whether Scheme Distributions can be paid in full, in part or at all, in accordance with Clause 3.2, the Company shall:

**3.3.1** promptly upon becoming aware of the relevant change, publish on the Website a notice confirming (i) that the Company has determined that the Issued Scheme Outcome Statement is no longer valid and (ii) the reason for such conclusion (a "**Retraction Notice**"); and

**3.3.2** within five Business Days of the Company publishing a Retraction Notice, publish on the Website an updated Scheme Outcome Statement that reflects the relevant change in the Net Available Funds (a "**Revised Scheme Outcome Statement**").

**3.4** If an Issued Scheme Outcome Statement is a Part SI Payment Statement, the Company shall:

**3.4.1** make further Scheme Distributions as soon as is reasonably practicable following an increase in the Part SI Payment Rate, on account of a change in the Net Available Funds; and

**3.4.2** Notify the Scheme Parties of any changes to the Part SI Payment Rate on or before the payment of any further Scheme Distribution.

**4    Adequate Reserves**

**4.1** Subject to Clause 4.2, the Administrators shall as soon as is reasonably practicable and from time to time, in their sole discretion, set aside from the Available Funds such amounts as they consider necessary in order to adequately reserve for:

**4.1.1** the Retained Claims (other than Non-Provable Claims); and

**4.1.2** any other matters that the Administrators consider it necessary to reserve for in accordance with their statutory duties,

(each an "**Adequate Reserve**" and, together, the "**Adequate Reserves**").

**4.2** Subject to Clause 4.4, in respect of any Retained Claim that is a Disputed Claim as at 30 September 2018, the Administrators shall promptly take one of the actions specified in Clause 4.3.

**4.3**    In respect of a Disputed Claim referred to in Clause 4.2 that is:

**4.3.1**    an Undetermined Provable Claim, the Administrators shall:

(i)    either admit or reject such Undetermined Provable Claim (in whole or in part); and/or

(ii)    issue a Directions Application (on an expedited basis if in the Administrators' opinion (acting reasonably) it is reasonable to do so), which seeks determination of the Undetermined Provable Claim and/or the appropriate amount to be set aside by way of an Adequate Reserve in respect of such Undetermined Provable Claim;

**4.3.2**    an Expense Claim or a Non-Provable Claim, the Administrators shall issue a Directions Application (on an expedited basis if in the Administrators' opinion (acting reasonably) it is reasonable to do so), which seeks determination of:

(i)    the validity and quantum of such Claim;

(ii)    in respect of an Expense Claim, the appropriate amount to be set aside by way of an Adequate Reserve in respect of such Expense Claim; and

(iii)    in respect of a Non-Provable Claim, the appropriate amount to be reserved for in respect of such Non-Provable Claim for the purposes of making any Subordinated Distribution.

**4.4**    The Company will not be required to take any of the actions referred to in Clause 4.3 in respect of a Disputed Claim that is, as at 30 September 2018, subject to extant proceedings before the Courts that seeks to determine the amount to be held by way of a reserve (including an Adequate Reserve) in respect of such Retained Claim.

**4.5**    Nothing in Clauses 4.2 or 4.3 shall delay the determination of Adequate Reserves under Clause 4.1 and/or the publication of a Scheme Outcome Statement unless a Disputed Claim would, if allowed in full, prevent the Company from publishing a Full SI Payment Statement or a Part SI Payment Statement.

**5**    **Higher Rate Claims, 8% Interest Claims and Specified Interest Claims**

**5.1**    The amount of each Scheme Creditor's Higher Rate Claim(s), 8% Interest Claim(s) and/or Specified Interest Claim(s) (as relevant) for the purposes of this Scheme shall be:

**5.1.1**    if the Scheme Creditor has not notified the Company of a UCC Challenge prior to the Bar Date, the amounts stated in its UCC4 or, if it did not receive a UCC4, such amounts as have been communicated in writing to it by the Company prior to the Bar Date;

**5.1.2**    if the Scheme Creditor has notified the Company of a UCC Challenge prior to the Bar Date, such amounts as may be agreed between it and the Company in accordance with Clause 20.1 or as are determined by the High Court in accordance with Clause 20.2; and

**5.1.3**    in respect of any Retained Claim that is an Undetermined Provable Claim that is admitted by the Administrators after the Bar Date, such amount as may be communicated in writing to the holder of such Claim by the Company at the time of the relevant admittance by the Administrators.

## PART III: SCHEME DISTRIBUTIONS TO 8% CREDITORS, SETTLEMENT CREDITORS AND SPECIFIED INTEREST CREDITORS

**6      The 8% Payment**

**6.1**    Subject to Clause 9 and the provisions of Part V, the Company shall pay the 8% Payment to:

**6.1.1**    each 8% Creditor in full and final satisfaction of its rights to Statutory Interest in respect of its 8% Interest Claims; and

**6.1.2**    each Settlement Creditor in full and final satisfaction of its rights to Statutory Interest in respect of its Settlement Higher Rate Claims.

**6.2**    In respect of the Admitted Claim to which it relates, the Company shall calculate the relevant 8% Payment applying the Relevant Principles and accordingly:

**6.2.1**    any and all dividends paid in respect of the relevant Admitted Claim from time to time in the Administration shall be treated as having discharged the amount of the relevant Admitted Claim(s) before discharging any Statutory Interest in respect thereof;

**6.2.2**    the 8% Interest Rate shall be applied to such portion of the relevant Admitted Claim as remained outstanding from time to time (having regard to Clause 6.2.1) from the Administration Date until the date on which the amount of such Admitted Claim was paid in full by the Company; and

**6.2.3**    where any amount of the relevant Admitted Claim remained outstanding for a period falling partly or wholly within a Leap Year, the daily rate for the relevant period shall be calculated by dividing the 8% Interest Rate by 366.

**7      The Specified Interest Payment**

**7.1**    Subject to Clause 9 and the provisions of Part V, the Company shall pay the Specified Interest Payment to each Specified Interest Creditor in full and final satisfaction of its rights to Statutory Interest in respect of its Specified Interest Claims.

**7.2**    In respect of an Admitted Claim to which it relates, the Company shall calculate the Specified Interest Payment applying the Relevant Principles and accordingly:

**7.2.1**    any and all dividends paid in respect of the relevant Admitted Claim from time to time in the Administration shall be treated as having discharged the amount of the relevant Admitted Claim(s) before discharging any Statutory Interest in respect thereof;

**7.2.2**    the relevant Specified Interest Rate shall be applied to such portion of the relevant Admitted Claim as remained outstanding from time to time (having regard to Clause 7.2.1 and, if relevant, the Compounding Principle) from the Administration Date (or, if later, the date on which the entitlement to interest arises under the relevant Specified Interest Contract) until the date(s) on which the amount of such Admitted Claim was paid in full by the Company; and

**7.2.3**    where any amount of the relevant Admitted Claim remained outstanding for a period falling partly or wholly within a Leap Year, the daily rate for the relevant period shall be calculated by dividing the Specified Interest Rate by 366.

**8**      **The Settlement Premium**

Subject to Clause 9 and the provisions of Part V, and in consideration of each Settlement Creditor not having exercised its right to Elect for the Certification Option, the Company shall pay the Settlement Premium to each Settlement Creditor.

**9**      **Timing of the 8% Payment, the Specified Interest Payment and the Settlement Premium**

**9.1**    Subject to the provisions of Part V, the Company shall pay:

**9.1.1**   the 8% Payment in accordance with Clause 6;

**9.1.2**   the Specified Interest Payment in accordance with Clause 7; and

**9.1.3**   the Settlement Premium in accordance with Clause 8,

within 20 Business Days of the publication of an Issued Scheme Outcome Statement (other than an Insufficient Funds Statement).

## PART IV: SCHEME DISTRIBUTIONS TO CERTIFYING CREDITORS

**10    Applicable CI Payments**

Subject to Clause 15 and the provisions of Part V, the Company shall pay the Applicable CI Payment to each Certifying Creditor in full and final satisfaction of its rights to Statutory Interest in respect of each of its Certification Claims.

**11    Determination of Applicable CI Payments**

**11.1**    Subject to Clause 16, each Certifying Creditor shall provide the Company with a Certification prior to the Certification Deadline.

**11.2**    Subject to Clauses 11.4 and 15.3, where a Certifying Creditor has duly provided the Company with a Certification prior to the Certification Deadline, within 20 Business Days of the Effective Date (the "**Consultation Period**"), the Company shall Notify the Certifying Creditor that it has decided to take one of the following actions in respect of the relevant Certification:

**11.2.1**    accept the Certification;

**11.2.2**    reject the Certification;

**11.2.3**    propose a Counteroffer that contains a Counteroffer Sum that is lower than the Certified Sum; or

**11.2.4**    request that the Certifying Creditor provides additional information in support of its Certification (an "**Additional Information Request**"),

(each a "**Decision Notice**").

**11.3**    During the Consultation Period, the Company may engage in confidential, without prejudice, settlement discussions with a Certifying Creditor, with the intention of reaching agreement as regards the action to be taken by the Company pursuant to Clause 11.2. Subject to Clause 27, any communication or request for information between the Company and a Certifying Creditor during the Consultation Period, that is expressed as being made pursuant to this Clause 11.3, shall remain private and confidential, shall not constitute an Additional Information Request or Counteroffer for the purposes of Clauses 11.7 and 11.8, and shall not be disclosable to any other Scheme Party or the Adjudicator save that it will be disclosable by the Company to the Subordinated Creditor in accordance with Clause 12.

**11.4**    The Company and a Certifying Creditor may agree in writing to an extension to the Consultation Period of up to 15 Business Days.

**11.5**    In taking any of the actions set out in Clause 11.2, the Company shall have regard to, where applicable, the Relevant Principles.

**11.6**    If the Company accepts a Certifying Creditor's Certification in respect of a Certification Claim pursuant to Clause 11.2.1 or following an Additional Information Request pursuant to Clause 11.2.4, the Applicable CI Payment in respect of that Certification Claim shall be the Certified Sum.

**11.7**    If the Company proposes a Counteroffer pursuant to Clause 11.2.3, the relevant Certifying Creditor shall Notify the Company of its acceptance or rejection of such Counteroffer within

10 Business Days of the date on which it receives the Decision Notice containing the Counteroffer, and:

**11.7.1**   where the relevant Certifying Creditor accepts the Counteroffer or fails to respond within the 10 Business Day period specified in this Clause 11.7, the Applicable CI Payment shall be the Counteroffer Sum; or

**11.7.2**   where the relevant Certifying Creditor rejects the Counteroffer within the 10 Business Day period specified in this Clause 11.7, the Company shall automatically reject the Certification to which the Counteroffer relates and shall promptly Notify the relevant Certifying Creditor of such decision by way of a Decision Notice (which shall include details of the rejected Counteroffer) in accordance with Clause 11.2.2.

**11.8**   If the Company makes an Additional Information Request pursuant to Clause 11.2.4, the Certifying Creditor to whom the Additional Information Request is made shall provide the relevant information to the Company within 10 Business Days of receipt of the Decision Notice containing the Additional Information Request and:

**11.8.1**   where the Certifying Creditor does not provide the information set out in the Additional Information Request within the 10 Business Day period specified in this Clause 11.8, the Company shall automatically reject the Certification to which the Additional Information Request relates and shall promptly Notify the relevant Certifying Creditor of such decision by way of a Decision Notice in accordance with Clause 11.2.2; or

**11.8.2**   where the Certifying Creditor provides the requested additional information within the 10 Business Day period specified in this Clause 11.8, the Company shall, having considered such additional information, take one of the actions described in Clauses 11.2.1 to 11.2.3 within 10 Business Days of receiving the relevant additional information and shall promptly Notify the relevant Certifying Creditor of such decision by way of a Decision Notice in accordance with Clause 11.2.1, 11.2.2 or 11.2.3 as applicable.

**11.9**   If the Company rejects a Certification pursuant to Clause 11.2.2, 11.7.2 or 11.8 (a "**Rejected Certification**"), the relevant Certifying Creditor may elect to have the Rejected Certification determined by an Adjudicator pursuant to the provisions of Part VI (a "**DRP Election**").

**11.10**   If a Certifying Creditor does not make a DRP Election in accordance with Clause 24.1.1, the Applicable CI Payment in respect of the Certification Claim to which the Rejected Certification relates shall be an amount equal to the 8% Payment that would be payable under this Scheme if the relevant Certification Claim were an 8% Interest Claim.

**11.11**   For the avoidance of doubt, in no circumstances shall the Applicable CI Payment in respect of a Certification Claim:

**11.11.1**   exceed the Certified Sum; or

**11.11.2**   be less than the 8% Payment that would be payable under this Scheme if the relevant Certification Claim were an 8% Interest Claim (subject to any deductions made pursuant to Clause 26.4 (if applicable)).

**12      Consultation with the Subordinated Creditor**

**12.1**   Notwithstanding any provision to the contrary, the Company shall consult with the Subordinated Creditor prior to issuing any Decision Notice pursuant to Clause 11.2; however, the final decision regarding which Decision Notice to issue pursuant to Clause 11.2 shall be made by the Company in its sole discretion.

**12.2**   Without prejudice to the generality of Clause 12.1, in the event that the Company determines to make a Counteroffer pursuant to Clause 11.2.3, it shall first agree the terms of the Counteroffer with the Subordinated Creditor and, in the absence of such agreement, shall issue a Decision Notice containing such Counteroffer as the Subordinated Creditor recommends to the Company to propose to the relevant Certifying Creditor.

**13      Failure to submit a Certification**

Where a Certifying Creditor fails to submit a Certification in respect of a Certification Claim that it holds by the Certification Deadline, the Applicable CI Payment in respect of the relevant Certification Claim shall be an amount equal to the 8% Payment that would be payable under this Scheme if the relevant Certification Claim were an 8% Interest Claim.

**14      Forfeit of entitlement to Settlement Premium**

No Settlement Premium shall be payable in respect of any Certification Claim, including any Certification Claim in respect of which the relevant Certifying Creditor fails to submit a Certification by the Certification Deadline.

**15      Timing of payment of Applicable CI Payment**

**15.1**   Subject to the provisions of Part V and Part VI the Company shall pay the Applicable CI Payment to the relevant Certifying Creditor in respect of the Certification Claim to which it relates within 20 Business Days of the later of:

**15.1.1**   the Applicable CI Payment in respect of such Certification Claim being determined in accordance with Clause 11 or 13; and

**15.1.2**   publication of an Issued Scheme Outcome Statement (other than an Insufficient Funds Statement).

**15.2**   For the avoidance of doubt, the Company shall pay the Applicable CI Payment in respect of a Certification Claim in accordance with Clause 15.1, notwithstanding that, at the time of such payment, an Applicable CI Payment may not have been determined in respect of all of such Certifying Creditor's Certification Claims.

**15.3**   Where a Certifying Creditor has notified the Company of a UCC Challenge prior to the Bar Date, the determination of its Certification(s) pursuant to this Part IV shall be stayed, and any time periods set out in this Part IV shall be suspended, until such time as the UCC Challenge has been either agreed in accordance with Clause 20.1 or finally determined by the Courts in accordance with Clause 20.2 (as applicable).

## 16    Undetermined Certification Claims

**16.1**    Where a Certifying Creditor holds an Undetermined Certification Claim:

    **16.1.1**    it shall provide an Initial Certification to the Company in respect of that Undetermined Certification Claim prior to the Certification Deadline; and

    **16.1.2**    to the extent the Undetermined Certification Claim is admitted for dividend (in whole or in part) by the Administrators, it shall update its Initial Certification to include all Certified Rates applicable to the Admitted Certification Claim up to the date of payment in full of the principal amount of the Admitted Certification Claim and a revised Certified Sum (a "**Final Certification**") to the Company in respect of the relevant Admitted Certification Claim within 10 Business Days of the Admitted Certification Claim having been paid in full by the Company (the "**Final Certification Deadline**").

**16.2**    The provisions of this Part IV and Part VI shall apply to any Initial Certification or Final Certification submitted in accordance with Clause 16.1, subject to the following modifications:

    **16.2.1**    subject to Clause 16.2.3, references to a Certification shall be construed to mean both the Initial Certification and the Final Certification;

    **16.2.2**    references to a Certification Claim shall be construed to mean the relevant Admitted Certification Claim;

    **16.2.3**    references in Clause 13 to a Certification shall be construed to mean an Initial Certification;

    **16.2.4**    an Initial Certification shall be prepared on the assumption that the relevant Undetermined Certification Claim is an Admitted Claim and was paid in full by the Company on the date of such Initial Certification; and

    **16.2.5**    determination of the Initial Certification pursuant to Clause 11.2.2 shall be stayed until such time as the company receives the Final Certification and all time periods specified in this Part IV will commence from that date.

**16.3**    Where a Certifying Creditor fails to submit a Final Certification by the Final Certification Deadline in accordance with Clause 16.1.2, its Initial Certification shall be deemed to be its Final Certification for the purposes of this Clause 16.

## PART V: GENERAL PROVISIONS APPLICABLE TO SCHEME DISTRIBUTIONS AND SUBORDINATED DISTRIBUTIONS

**17      General**

**17.1**   Any Scheme Distribution or Subordinated Distribution payable by the Company pursuant to this Scheme shall be paid in GBP.

**17.2**   The Company shall not be required to pay any Scheme Distribution or Subordinated Distribution at any time when an Issued Scheme Outcome Statement is an Insufficient Funds Statement.

**17.3**   In calculating the amount of any Scheme Distribution pursuant to this Scheme, the Company shall treat any and all dividends paid in respect of Admitted Claims from time to time in the Administration as having discharged the component parts of such Admitted Claim (whether 8% Interest Claims, Higher Rate Claims and/or Specified Interest Claims) pro rata.

**17.4**   If at the time the Company makes a Scheme Distribution in accordance with this Scheme, the Issued Scheme Outcome Statement is:

**17.4.1**   a Full SI Payment Statement, the Scheme Distribution shall be paid in full; and

**17.4.2**   a Part SI Payment Statement, the Scheme Distribution shall be paid in part and rateably at the Part SI Payment Rate set out in the relevant Part SI Payment Statement.

**17.5**   The Company shall, from time to time following the publication of a Part SI Payment Statement, make such further payments of Scheme Distributions, subject to the terms of this Scheme, as it considers necessary to ensure that all Scheme Creditors receive Scheme Distributions rateably at the prevailing Part SI Payment Rate.

**17.6**   Where a Full SI Payment Statement or a Part SI Payment Statement is subject to a Retraction Notice, no Scheme Party shall have a Claim against the Company (or any other Scheme Party) in relation to or arising from any Scheme Distribution that was effected prior to the issuance of the Retraction Notice and will not be entitled to disturb or otherwise challenge the payment of such Scheme Distribution(s).

**17.7**   Notwithstanding any other term of this Scheme, the Company shall not be required to pay any Scheme Distributions or Subordinated Distributions or Equity Distribution at any time when a Retraction Notice has been published and a Revised Scheme Outcome Statement has not been published in accordance with Clause 3.3.2.

**17.8**   Scheme Distributions shall rank equally between themselves and shall be paid rateably if not otherwise paid in full.

**17.9**   The Company shall be entitled to effect the payment of any Scheme Distribution to a Scheme Party in accordance with such Scheme Party's Settlement Instructions.

**18      Tax**

**18.1    Payments and Withholding Tax**

**18.1.1**   Subject to Clause 18.2 below, on making a Payment to any Scheme Party, the Company shall deduct from the Payment a sum representing United Kingdom

income tax at the basic rate in force for the year in which the Payment is made as if the Payment were a payment of yearly interest arising in the United Kingdom for the purposes of Section 874 of the Income Tax Act and Section 874(2) of the Income Tax Act required such deduction (a "**WHT Deduction**").

18.1.2    For the purposes of this Clause 18, a Payment shall be treated as made where a Payment which would otherwise be due from the Company is set off against a liability which is owed to the Company and Clause 18.1.1 shall apply accordingly.

18.1.3    Where the Company makes a WHT Deduction, the Company shall:

(i)      pay to HMRC the amount of the WHT Deduction in accordance with Chapter 15 of Part 15 of the Income Tax Act; and

(ii)     issue to the relevant Scheme Party, within 10 Business Days of the date of the payment in paragraph (i) above, a statement showing the gross amount of the Payment, the amount of the WHT Deduction and the actual amount paid to the Scheme Party (a "**WHT Deduction Certificate**").

## 18.2    Exceptions from WHT Deduction

18.2.1    Notwithstanding Clause 18.1:

(i)      if not less than seven Business Days prior to making a Payment to a Scheme Party, the Company has received a written direction from HMRC to the Company's satisfaction (a "**Direction**") that the Company may make that Payment (or any part thereof) to that Scheme Party without a WHT Deduction pursuant to an applicable double tax treaty or with a WHT Deduction at a reduced rate of deduction under an applicable double tax treaty, the Company shall make that Payment (or the relevant part thereof) to that Scheme Party without a WHT Deduction or with a WHT Deduction at a reduced rate of deduction, as the case may be, and in compliance with the Direction (and for the avoidance of doubt the Company shall be under no obligation (other than as provided in Clause 18.3) to pay or repay to any Scheme Party any amounts in respect of any WHT Deduction in respect of any Payment paid to a Scheme Party prior to the receipt of such Direction with respect to that Scheme Party); or

(ii)     if not less than seven Business Days prior to making a payment of a Settlement Premium, the Company has received written confirmation from HMRC to the Company's satisfaction that the Settlement Premium does not constitute yearly interest for the purposes of Section 874 of the Income Tax Act and that it may be paid without withholding or deduction in respect of United Kingdom income tax (the "**Clearance**"), the Company shall pay that Settlement Premium without any deduction for or on account of United Kingdom income tax (and for the avoidance of doubt the Company shall be under no obligation (other than as provided in Clause 18.3 below) to pay or repay to any Scheme Party any amounts in respect of any WHT Deduction in respect of any Settlement Premium paid to a Scheme Party prior to the receipt of the Clearance).

18.2.2    The Company shall, at a Scheme Party's written request and expense, provide that Scheme Party with such information and assistance as is reasonably requested by that Scheme Party to enable it (or any person deriving beneficial ownership of the

relevant Payment through it) to obtain a Direction or to obtain any available refund with respect to a WHT Deduction, provided that such request is made prior to the SSI Deadline and further provided that such provision of information or assistance is not materially disadvantageous to the Company, the Administrators or any other creditor (including a former creditor) of the Company, and would not require the disclosure of identifying information regarding other creditors (or former creditors) of the Company, in each case as determined by the Company.

**18.3     WHT Repayments**

In the event that the Company makes a WHT Deduction as provided for under Clause 18.1 and either (i) it is finally determined as a consequence of the WHT Proceedings that the Payment in respect of which the WHT Deduction was made was not a payment of yearly interest for the purposes of Section 874 of the Income Tax Act; or (ii) the Company receives the Clearance to its satisfaction (each a "**WHT Determination Event**"):

**18.3.1**   if and to the extent that the Company is entitled to claim from HMRC a repayment of the whole or any part of the WHT Deduction (and any interest or repayment supplement thereon) attributable to a Payment (a "**WHT Repayment**") in circumstances where (i) the Scheme Party in question is not entitled to claim such WHT Repayment directly from HMRC; and (ii) that Scheme Party has not already received a refund or credit in respect of that WHT Deduction, the Company shall, at the Scheme Party's written request and expense, use reasonable efforts to claim such WHT Repayment;

**18.3.2**   if and to the extent that HMRC makes a WHT Repayment to the Company following the WHT Determination Event (a "**WHT Repayment Event**"), the Company shall pay to the Scheme Party to whom the Company paid the Payment from which the relevant WHT Deduction was made, within 20 Business Days of the relevant WHT Repayment Event, an amount equal to the WHT Repayment received from HMRC, provided that if HMRC subsequently seeks to recover all or any part of the WHT Repayment from the Company, the Scheme Party to whom the Company paid the WHT Repayment shall promptly reimburse the Company in respect of all or any part of the WHT Repayment recovered by HMRC from the Company upon receipt of a copy of HMRC's notice seeking recovery;

**18.3.3**   if HMRC does not make a WHT Repayment to the Company following the WHT Determination Event, there shall be no obligation on the Company to (i) pay or repay any amounts in respect of the WHT Deduction to any Scheme Party; or (ii) other than as provided in Clause 18.3.1 above, to recover any amount in respect of any WHT Deduction from HMRC; and

**18.3.4**   following a WHT Determination Event, each Scheme Party shall provide the Company and/or HMRC with such information as the Company and/or HMRC may require in order to determine whether, or to what extent, HMRC shall make a WHT Repayment to the Company or to that Scheme Party.

**18.4     Other Withholding Taxes**

**18.4.1**   The Company shall withhold, deduct or retain any amount for or on account of Tax which is required by any applicable law (other than Section 874(2) of the Income Tax Act) to be withheld, deducted, retained or otherwise accounted for in respect of, or in connection with, any Payment made or treated as made as a result of the

implementation and operation of this Scheme and the Company shall account for the amount of such withholding, deduction or retention to the appropriate Tax Authority as may be required by applicable law, provide evidence reasonably requested by a Scheme Party that the relevant Tax has been withheld, deducted or retained and accounted for to the appropriate Tax Authority, and take such other steps as may be required by applicable law.

18.4.2   For the purposes of Clause 18.4.1, a Payment shall be treated as made where a Payment which would otherwise be due from the Company is set off against a liability which is owed to the Company and Clause 18.4.1 shall apply accordingly.

18.4.3   Except as permitted by this Clause 18 or required by any applicable law, the Company shall not withhold, deduct or retain any amount for or on account of Tax from any Payment.

### 18.5   No Compensation

Except as provided in Clause 18.3 and without prejudice to any remedies available to Scheme Parties for Scheme Breach Claims, the Company shall be under no obligation to pay, repay or compensate any Scheme Party in respect of any WHT Deduction, or other deduction or withholding permitted under this Scheme, from any Payment.

### 18.6   Reporting

The Company and the Administrators (acting in accordance with the Administrators' statutory duties) may make any disclosures or reports to any Tax Authority as such Tax Authority reasonably requests in respect of any matters which are the subject of, or arise as a result of the implementation and operation of, this Scheme.

### 18.7   Other Taxes

Any stamp duty, stamp duty reserve tax or other transfer taxes, VAT or other Tax liabilities or costs (including any penalties and interest thereon) arising out of or in connection with any Payment shall be borne by the Scheme Party to whom such Payment is made, whether chargeable directly or primarily against or attributable directly or primarily to the Scheme Party or any other person.

## 19   Conditions to payment of Scheme Distributions and Subordinated Distributions

19.1   The Scheme Distributions are payable in respect of Admitted Claims that have been paid in full only.

19.2   Notwithstanding any other term of this Scheme, no Scheme Distribution (or part of a Scheme Distribution, if relevant) shall be payable by the Company until 10 Business Days following the date on which the Provable Claim(s) to which such Scheme Distribution relates has/have been admitted by the Administrators.

19.3   Notwithstanding any other term of this Scheme, the Company shall not be required to pay any Scheme Distribution or Subordinated Distribution (as applicable) to a Scheme Party that has taken any action that is inconsistent with the releases, waivers and undertakings set out in this Scheme until such time that such action has been remedied by such Scheme Party to the Company's sole satisfaction.

**19.4**    Subject to Clause 19.5 and notwithstanding any other term of this Scheme, the Company shall not be required to pay any Scheme Distribution or Subordinated Distribution to a Scheme Party until 15 Business Days following the date on which the Company receives to its sole satisfaction from such Scheme Party (i) Settlement Instructions and KYC Information or (ii) confirmation that the Settlement Instructions and KYC Information previously provided by it to the Company are still valid.

**19.5**    Any Settlement Instructions and KYC Information to be provided or confirmed to the Company by a Scheme Party pursuant to Clause 19.4, shall be provided to the Company as follows:

**19.5.1**    Settlement Instructions shall be provided through the Portal; and

**19.5.2**    KYC Information shall be provided by electronic mail to compliancequeries@lbia-eu.com.

**19.6**    To the extent that a Scheme Party's Settlement Instructions specify that it is to receive payment of any Scheme Distribution or Subordinated Distribution by cheque:

**19.6.1**    the Company shall effect payment of the relevant Scheme Distribution or Subordinated Distribution (or any part thereof) by posting a cheque for the relevant amount by first class post to the address provided by such Scheme Party in its Settlement Instructions;

**19.6.2**    the date of payment of the relevant Scheme Distribution or Subordinated Distribution (or any part thereof) for the purposes of the Company satisfying its payment obligations within a specified time period pursuant to this Scheme shall be the date of posting, or leaving with, delivering to or collection by, the relevant postal service provider;

**19.6.3**    any such cheques that are not cashed by the SSI Deadline will be cancelled; and

**19.6.4**    without prejudice to Clause 19.6.2, and subject to Clause 19.6.3, the Company shall, within 20 Business Days of a request to do so by such Scheme Party (provided that such request is made prior to the SSI Deadline), cancel and reissue any uncashed cheque and effect payment of the relevant Scheme Distribution or Subordinated Distribution in accordance with Clause 19.6.1.

## 20    UCC Challenges

**20.1**    Where a Scheme Creditor has notified the Company of a UCC Challenge prior to the Bar Date, the Scheme Creditor and the Company shall negotiate in good faith in order to resolve the UCC Challenge by agreement.

**20.2**    If a UCC Challenge has not been resolved by agreement within 20 Business Days of the Effective Date, either the Company or the relevant Scheme Creditor shall be at liberty to commence Proceedings seeking the determination of the UCC Challenge by the High Court.

**20.3**    Notwithstanding any other term of this Scheme, the Company shall not be required to pay any Scheme Distribution to any Scheme Creditor that has notified the Company of a UCC Challenge prior to the Bar Date, until such UCC Challenge has been finally resolved by agreement in accordance with Clause 20.1 or finally determined by the Courts (as applicable).

**21      Unclaimed Scheme Distributions**

**21.1**   Upon the SSI Deadline:

    **21.1.1**   each Scheme Creditor shall be deemed to have irrevocably waived any right to receive an Unclaimed Scheme Distribution the amount of which is less than GBP 1,000,000 (a "**De Minimis Distribution**");

    **21.1.2**   the Company shall be deemed to have satisfied its obligation to pay such De Minimis Distribution to the relevant Scheme Creditor; and

    **21.1.3**   all De Minimis Distributions shall automatically form part of the Available Funds.

**21.2**   To the extent that any Retained Unclaimed Scheme Distribution remains unpaid after the SSI Deadline, the Administrators shall, within 30 Business Days of the SSI Deadline, issue a Directions Application which seeks determination as to how the Company shall deal with such Retained Unclaimed Scheme Distribution (an "**Unclaimed Scheme Distribution Application**") and the Scheme Creditors hereby acknowledge that such determination may result in the rights of the relevant Scheme Creditor to a Retained Unclaimed Scheme Distribution being extinguished.

**21.3**   Subject to Clause 21.4, the Company's and/or the Administrators' costs in respect of an Unclaimed Scheme Distribution Application (including in respect of legal fees) shall, unless ordered otherwise by the Courts, be borne in equal shares by the Scheme Creditors to whom the Retained Unclaimed Scheme Distribution(s) are payable as at the SSI Deadline, and shall be payable from such Retained Unclaimed Scheme Distributions, and to the extent such Retained Unclaimed Scheme Distribution are insufficient to meet the relevant costs, the relevant costs shall be paid as an Administration Expense.

**21.4**   If, prior to receiving directions of the High Court in relation to an Unclaimed Scheme Distribution Application, the Company receives to its sole satisfaction, (i) KYC Information and/or (ii) Settlement Instructions (or confirmation of such information) that specify a method of payment other than cheque, from a Scheme Creditor to whom a Retained Unclaimed Scheme Distribution is payable (as relevant), the Company shall pay such Retained Unclaimed Scheme Distribution to such Scheme Creditor in accordance with Clause 19.4 less such proportional amount in respect of the Company's and/or the Administrators' costs (including legal fees) in respect of the Unclaimed Scheme Distribution Application as the Administrators may determine in their sole discretion (acting reasonably).

**21.5**   Each Scheme Party undertakes and agrees to be bound by the directions of the High Court in relation to any Unclaimed Scheme Distribution Application.

**22      Representations by Scheme Creditors**

In paying Scheme Distributions to Scheme Creditors, the Company and the Administrators shall be entitled to rely on the representations made by Scheme Creditors at the time of Voting or making their Election(s).

## PART VI: DISPUTE RESOLUTION PROCEDURE

### 23   The Adjudicator

#### 23.1   Engagement

23.1.1   In respect of each Appeal, the Company shall use reasonable endeavours to appoint one of (in the following order of priority):

(i)   Sir Bernard Rix;

(ii)   Michael Brindle QC; or

(iii)   Tim Howe QC

as the Adjudicator, to act in the capacity of an expert and not as an arbitrator.

23.1.2   In the event that none of the persons named in Clause 23.1.1 is able to accept an appointment as Adjudicator in respect of an Appeal, the Company and the Subordinated Creditor shall negotiate with each other in good faith to agree the name of an alternative suitably qualified, independent Adjudicator and the Company shall use reasonable endeavours to appoint such person as Adjudicator in respect of the relevant Appeal. Where agreement on the same cannot be reached as between the Company and the Subordinated Creditor, the Company shall appoint in its sole discretion an alternative former member of the England & Wales judiciary and/or English law qualified Queen's Counsel as Adjudicator.

23.1.3   Any person appointed as an Adjudicator shall be engaged by the Company on such reasonable terms as may be agreed by the Company, which terms shall be consistent with the provisions of this Part VI.

#### 23.2   Support Team

23.2.1   The Adjudicator may engage the services of a Support Team if he deems that this is necessary to enable him to understand fully the type of funding asserted in the Appellant Certifying Creditor's Case and/or the Company's Case and/or any accompanying calculations.

23.2.2   The Support Team shall be engaged by the Adjudicator on such reasonable terms as may be agreed by the Adjudicator, in consultation with the Company.

23.2.3   The Support Team shall not be permitted to conduct their own factual investigations.

#### 23.3   Independence and conflicts of interest

23.3.1   The Adjudicator must be independent and must not have any Conflict of Interest as regards the Company, the Administrators, PricewaterhouseCoopers LLP, the Appellant Certifying Creditor or the Wentworth Parties.

23.3.2   In the event the Adjudicator becomes aware that he has a Conflict of Interest in respect of an Appeal, the Adjudicator must as soon as reasonably practicable serve upon the Company a notice of resignation from the role of Adjudicator for the Appeal in respect of which the Conflict of Interest has been identified and ensure that all documentation relating to the relevant Appeal in his possession is destroyed or returned to the Company or, as applicable, the relevant serving Appellant Certifying Creditor.

**23.3.3** All members of the Support Team must be independent and must not have any Conflict of Interest as regards the Company, the Administrators, PricewaterhouseCoopers LLP, the Appellant Certifying Creditor or the Wentworth Parties.

**23.3.4** In the event the Adjudicator becomes aware that a member of the Support Team has a Conflict of Interest in respect of any Appeal, the Adjudicator must as soon as reasonably practicable inform the Company and the relevant Appellant Certifying Creditor of the Conflict of Interest, terminate the retainer of the relevant member of the Support Team in respect of the relevant Appeal only, and ensure that all documentation relating to the relevant Appeal in the possession of that member of the Support Team is destroyed or returned to the Adjudicator.

## 23.4 Liability

**23.4.1** Save in circumstances of fraud or bad faith, the Adjudicator shall not be liable to any Scheme Creditor for any act or omission arising from any Appeal, and Scheme Creditors shall not bring any claims against the Adjudicator in respect of any Appeal.

**23.4.2** The Adjudicator shall not provide details or copies of any documents or information arising from an Appeal to any person other than members of the Support Team, the Company, the Administrators and the relevant Appellant Certifying Creditor, unless he is under a legal obligation to provide oral or written evidence, documents or other details, including where he has been ordered to do so by a court of competent jurisdiction.

## 23.5 Incapacity, resignation or death

**23.5.1** If the Adjudicator is unable to make a determination in an ongoing Appeal due to incapacity, resignation or death:

(i) the Adjudicator (if possible) and the Company shall use reasonable endeavours to arrange for documents provided to the Adjudicator to be destroyed, or returned to the Appellant Certifying Creditor or the Company, as the case may be;

(ii) a replacement Adjudicator shall be appointed in accordance with Clause 23.1; and

(iii) as soon as reasonably practicable following the appointment of the replacement Adjudicator:

(a) the Company shall provide the replacement Adjudicator with copies of any documentation served on the previous Adjudicator, the Company and/or the Appellant Certifying Creditor in accordance with Clause 24; and

(b) the replacement Adjudicator shall use reasonable endeavours to engage the same Support Team as retained by the previous Adjudicator, on substantially the same terms.

## 24   The Appeal

### 24.1   Initiating an Appeal

**24.1.1**   A Certifying Creditor who wishes to appeal against a Rejection Notice (an "**Appellant Certifying Creditor**") must serve a completed Appeal Form on the Company within 10 Business Days of the Rejection Date to initiate an Appeal.

**24.1.2**   The Company shall use reasonable endeavours to appoint an Adjudicator in respect of the Appeal in accordance with Clause 23.1 as soon as reasonably practicable following service of the Appeal Form.

**24.1.3**   As soon as reasonably practicable following the appointment of the Adjudicator, the Company shall notify the Appellant Certifying Creditor of that appointment.

### 24.2   Appellant Certifying Creditor's Case

**24.2.1**   Within 10 Business Days of receiving notice of the Adjudicator's appointment, the Appellant Certifying Creditor shall serve upon the Adjudicator and the Company copies of the following documents:

(i)      its Certification as lodged with the Company prior to the Certification Deadline;

(ii)     any information provided to the Company pursuant to an Additional Information Request;

(iii)    the Appeal Form; and

(iv)    any further information or documents, and/or written submissions upon which the Appellant Certifying Creditor wishes to rely to support the Certified Rate and Certified Sum as set out in the Certification,

(together, the "**Appellant Certifying Creditor's Case**").

**24.2.2**   If for any reason the Adjudicator appointed in relation to the Appeal is no longer engaged at the point at which the Appellant Certifying Creditor's Case should be served, the Appellant Certifying Creditor shall serve the Appellant Certifying Creditor's Case on the Company alone.

### 24.3   The Company's Case

**24.3.1**   Within 20 Business Days of the service of the Appellant Certifying Creditor's Case in accordance with Clause 24.2, the Company shall, following consultation with the Subordinated Creditor but in its sole discretion, serve upon the Adjudicator and the Appellant Certifying Creditor:

(i)      the Rejection Notice (and, where relevant, the Counteroffer) issued by the Administrators in respect of the Certification relevant to the Appeal;

(ii)     any further information, documents and/or written submissions upon which the Company wishes to rely to support:

(a)      where the Company made a Counteroffer in accordance with Clause 11.2.3, the Counteroffer Sum proposed by the Company in its Counteroffer; or

(b)  where the Company made no Counteroffer in accordance with Clause 11.2.3, the Company's decision to reject the Appellant Certifying Creditor's Certification; and/or

(iii)  any further information, documents and/or written submissions upon which the Company wishes to rely in response to the Appellant Certifying Creditor's Case,

(together, the "**Company's Case**").

24.3.2  If for any reason the Adjudicator appointed in relation to the Appeal is no longer engaged at the point at which the Company's Case should be served, the Company shall serve the Company's Case on the Appellant Certifying Creditor alone.

## 24.4  Increased Voting Rights Decisions

Neither the Appellant Certifying Creditor's Case nor the Company's Case may include any reference to any Increased Voting Rights Decision.

## 24.5  Oral hearing

There shall be no oral hearing in respect of the Appeal.

## 24.6  The Adjudicator's procedural discretion

The Adjudicator may, having regard to the Relevant Principles where relevant:

24.6.1  vary the timetable provided for in this Clause 24 including, for the avoidance of doubt, the time period specified for service of the Adjudicator's determination in Clause 24.7.9, in respect of any Appeal;

24.6.2  require the Appellant Certifying Creditor to serve further information, documents and/or written submissions in order to clarify his understanding of the Appellant Certifying Creditor's Case; and/or

24.6.3  require the Company to serve further information, documents and/or written submissions in order to clarify his understanding of the Company's Case,

should the Adjudicator think it necessary to do so in order to determine the Appeal.

## 24.7  Determination of the Appeal

24.7.1  The Adjudicator shall determine each Appeal by:

(i)  considering the Appellant Certifying Creditor's Case, the Company's Case, any information provided by the Support Team to assist the Adjudicator's understanding of the Appellant Certifying Creditor's Case and/or the Company's Case (as relevant) and any further information provided pursuant to a request under Clause 24.6.2 and/or 24.6.3; and

(ii)  having regard to, where applicable, the Relevant Principles.

24.7.2  In making a determination in an Appeal, the Adjudicator shall not be permitted to have regard to any Increased Voting Rights Decision.

24.7.3  In making a determination in an Appeal, the Adjudicator shall not be permitted to conduct his own factual investigations.

**24.7.4** Save as provided in Clauses 24.7.6 and 24.7.7, upon making a determination in accordance with Clause 24.7.5, the Adjudicator shall either:

(i) uphold the Appellant Certifying Creditor's Case in its entirety; or

(ii) uphold the Company's Case in its entirety.

**24.7.5** The Adjudicator shall uphold the Company's Case if he is satisfied on the balance of probabilities (with the burden of proof resting on the Company) that the Certification of the Appellant Certifying Creditor has been made in bad faith, irrationally or other than in accordance with the Relevant Principles. If he is not so satisfied, the Adjudicator must uphold the Appellant Certifying Creditor's Case (save as provided in Clause 24.7.6).

**24.7.6** Where the Adjudicator (including through his Support Team) identifies a mathematical or numerical error in either the Appellant Certifying Creditor's Case or the Company's Case, he shall consult with the Appellant Certifying Creditor and the Company and following such consultation he shall be permitted to correct such error and replace an erroneous number or rate in a calculation or document.

**24.7.7** Where the Adjudicator (including through his Support Team) identifies that a Certified Sum stated in a Certification has been calculated in a manner that is inconsistent with Clause 5, the Adjudicator shall be permitted to correct such error and replace the Certified Sum with a figure calculated by applying the Certified Rate(s) stated in the Certification to the relevant Certification Claim (in accordance with Clause 5).

**24.7.8** Where the Adjudicator:

(i) upholds the Appellant Certifying Creditor's Case in its entirety, the Applicable CI Payment shall be the Certified Sum (corrected as necessary in accordance with Clause 24.7.6 or 24.7.7);

(ii) upholds the Company's Case in its entirety where the Company made a Counteroffer, the Applicable CI Payment shall be the Counteroffer Sum (corrected as necessary in accordance with Clause 24.7.6); or

(iii) upholds the Company's Case in its entirety where the Company did not make a Counteroffer, the Applicable CI Payment shall be an amount equal to the 8% Payment that would be payable under this Scheme if the relevant Certification Claim were an 8% Interest Claim.

**24.7.9** The Adjudicator shall use reasonable endeavours to serve his determination in writing on the Appellant Certifying Creditor and the Company as soon as practicable after service of the Company's Case on the Adjudicator (or the provision of further information pursuant to a request in accordance with Clause 24.6.2 and/or 24.6.3) and in any event within 20 Business Days of service of the Company's Case on the Adjudicator (or the provision of further information, if applicable).

**24.7.10** The Adjudicator shall not provide the reasons behind his determination and the Appellant Certifying Creditor and the Company shall not request the Adjudicator to provide such reasons following his determination.

**24.7.11** Where the Adjudicator's determination contains a clerical mistake, an accidental error or omission, a miscalculation or a mistake in the description of any item or matter, the Adjudicator may correct the determination within 20 Business Days of service of that determination. The Company and the Appellant Certifying Creditor shall notify the Adjudicator of any such errors, mistakes, omissions or miscalculations within 10 Business Days of service of the determination.

**24.8    Exclusivity and finality**

**24.8.1** The process described in this Part VI of this Scheme shall be the exclusive method for the determination of the subject matter of any Appeal, and the Adjudicator shall have exclusive jurisdiction to make a determination on the subject matter of any Appeal.

**24.8.2** Insofar as the law allows, the Adjudicator's determination is final and binding on the Company, the Administrators, the Appellant Certifying Creditor and all other Scheme Parties.

**24.8.3** For the avoidance of doubt, insofar as the law allows, the Adjudicator's determination is final and binding regardless of whether it was served within 20 Business Days of service of the Company's Case.

## 25    Service of documents and other communications

**25.1    Service of documents**

**25.1.1** As soon as practicable following the Adjudicator's appointment under Clause 23.1, the Adjudicator shall provide to the Company an email address for service of documents on, and any other communications with, the Adjudicator in relation to any Appeal (the "**Adjudicator's Address for Service**").

**25.1.2** Upon receipt of the Adjudicator's Address for Service, the Company shall communicate:

(i)        the Adjudicator's Address for Service; and

(ii)       an email address for service of documents on, and any other communications with, the Company in relation to any Appeal (the "**Administrators' Address for Service**"),

to the Appellant Certifying Creditor.

**25.1.3** Any document to be served upon each of the following in relation to any Appeal must be delivered in electronic format by email to:

(i)        in respect of the Adjudicator, the Adjudicator's Address for Service;

(ii)       in respect of the Company, the Administrators' Address for Service; and

(iii)      in respect of the Appellant Certifying Creditor, the address specified by the Appellant Certifying Creditor in its Certification.

**25.2    Other communications**

**25.2.1** The Adjudicator, the Company and the Appellant Certifying Creditor shall ensure that any communications (including notices) in respect of an Appeal shall be copied to:

(i)     in the case of communications sent by the Appellant Certifying Creditor to the Adjudicator, the Administrators' Address for Service;

(ii)    in the case of communications sent by the Company to the Adjudicator, save for communications in relation to the Adjudicator's retainer and/or the engagement of the Support Team, the address specified by the Appellant Certifying Creditor in its Certification;

(iii)   in the case of communications sent by the Adjudicator to the Company, save for communications in relation to the Adjudicator's retainer and/or the engagement of the Support Team, the address specified by the Appellant Certifying Creditor in its Certification; and

(iv)    in the case of communications sent by the Adjudicator to the Appellant Certifying Creditor, the Administrators' Address for Service.

## 26    Adjudication Costs

26.1    If the Adjudicator upholds the Appellant Certifying Creditor's Case:

26.1.1    the reasonable legal costs of the Appellant Certifying Creditor in relation to the Appeal; and

26.1.2    the Company's and the Administrators' costs (including the Adjudication Costs) in relation to the Appeal,

shall be borne on an indemnity basis (in accordance with the principles in Part 44.3 of the Civil Procedure Rules) by the Company as an expense of the Administration.

26.2    If the Adjudicator upholds the Company's Case, the Appellant Certifying Creditor shall bear on an indemnity basis (in accordance with the principles in Part 44.3 of the Civil Procedure Rules):

26.2.1    its own legal and professional costs in relation to the Appeal; and

26.2.2    the Company's and the Administrators' reasonable legal costs (including the Adjudication Costs, which would otherwise be payable by the Company) in relation to the Appeal.

26.3    If the Adjudicator upholds the Appellant Certifying Creditor's Case:

26.3.1    the Appellant Certifying Creditor must serve upon the Company a statement of costs; and

26.3.2    in the event that there is disagreement between the Company and the Appellant Certifying Creditor as to the amount of costs to be paid, the matter shall be referred to the Adjudicator that heard the Appeal to determine an appropriate amount of costs payable in respect of the Appeal (which determination shall be in his sole discretion, final and binding).

26.4    If the Adjudicator upholds the Company's Case:

26.4.1    the Company must serve upon the Appellant Certifying Creditor a statement of its costs;

26.4.2    in the event that there is disagreement between the Company and the Appellant Certifying Creditor as to the amount of the costs to be paid, the matter shall be

referred to the Adjudicator that heard the Appeal to determine an appropriate amount of costs payable (which determination shall be in his sole discretion, final and binding);

26.4.3 the Company shall deduct the amount payable in respect of its costs and the Administrators' costs in relation to the Appeal from the Appellant Certifying Creditor's Scheme Distribution; and

26.4.4 in the event that the amount payable in costs exceeds the Appellant Certifying Creditor's Scheme Distribution entitlement, the Appellant Certifying Creditor shall pay the balance to the Administrators within 15 Business Days of written demand by the Company.

## 27   Confidentiality

27.1   Each Appellant Certifying Creditor, the Company, the Adjudicator and the Support Team shall maintain the confidentiality of any Appeal and any documentation or information provided to it pursuant to Clause 11.3 and shall not disclose to any person save for the Subordinated Creditor and/or the Operating Committee the Adjudicator's determination or any information concerning or documentation provided exclusively in the course of the Appeal or pursuant to Clause 11.3, save where:

27.1.1 the Appellant Certifying Creditor and the Company have agreed otherwise in writing;

27.1.2 the information is already in the public domain;

27.1.3 the disclosure is necessary in connection with legal proceedings or is otherwise required by law or any regulatory body;

27.1.4 the disclosure is required by current insolvency practice or to enable the Administrators properly to carry out the duties of their office;

27.1.5 the disclosure is made by the Administrators to any subsequent supervisor, liquidator or other officeholder of the Company;

27.1.6 the Administrators consider it desirable in the course of carrying out the duties of their office to disclose the Adjudicator's determination in respect of an Appeal; or

27.1.7 the disclosure is made to a professional adviser that is bound by professional duties of confidentiality.

27.2   Each of the Subordinated Creditor and each member of the Operating Committee shall maintain the confidentiality of any Appeal disclosed to it and any documentation or information provided to it pursuant to Clause 11.3 and shall not disclose to any person the Adjudicator's determination or any information concerning or documentation provided exclusively in the course of the Appeal or pursuant to Clause 11.3, save where:

27.2.1 the Appellant Certifying Creditor and the Company have agreed otherwise in writing;

27.2.2 the information is already in the public domain;

27.2.3 the disclosure is necessary in connection with legal proceedings (including any Chapter 11 case, if relevant) or is otherwise required by law or any regulatory body;

**27.2.4**   the disclosure is made to a professional adviser that is bound by professional duties of confidentiality; or

**27.2.5**   the disclosure is made to an Affiliate that has, prior to any such disclosure, entered into a confidentiality undertaking in favour, and to the satisfaction, of the relevant Appellant Certifying Creditor and/or the Company (as applicable).

## PART VII: SETTLEMENT OF PROCEEDINGS AND RELEASE OF CLAIMS

**28    Settlement of Proceedings and release of Claims**

**28.1**    Without prejudice to a Scheme Party's right to receive Scheme Distributions and/or Subordinated Distributions (as applicable), and save in respect of any Retained Claim, with effect from the Effective Date, each Scheme Party hereby irrevocably and unconditionally:

**28.1.1**    agrees to the Settled Proceedings being brought to an end;

**28.1.2**    releases and waives in favour of the Company and each other Scheme Party (and, in respect of Clause 28.1.2(v) only, the Shareholder) all its rights, entitlements and interest in any Claims against the Company including:

(i)    subject to Clause 38, any Claims arising from, or in connection with, the subject matter of any of the Settled Proceedings;

(ii)    any Provable Claims;

(iii)    any Non-Provable Claims;

(iv)    any Expense Claims;

(v)    any Creditor Contributory Claim Rights;

(vi)    subject to Clause 18.3, any Claims arising from, or in connection with, any WHT Deduction; and

(vii)    any Shortfall Claims;

**28.1.3**    releases and waives in favour of the Company, the Administrators and each other Scheme Party all its rights, entitlements and interest in any Creditor Challenge Rights in respect of any Admitted Claim that was admitted by the Administrators prior to the Record Date;

**28.1.4**    releases and waives in favour of the Administrators and the Released Third Parties all its rights, entitlements and interest in any Administration Claims to the extent that the Administrators or the Released Third Parties would have an indemnity or other similar claim against the Company arising in respect of such Administration Claim(s) (the "**Released Administration Claims**");

**28.1.5**    releases and waives in favour of the Administrators, the Released Third Parties and the Locked Up Parties all its rights, entitlements and interest in any Released Scheme Implementation Claims; and

**28.1.6**    undertakes and agrees not to commence, voluntarily aid, or in any way prosecute against the Company, the Administrators, the Released Third Parties, the Locked Up Parties or the Scheme Parties (as applicable) in any jurisdiction whatsoever, any Claim which seeks recovery or a determination in respect of or arising out of any Released Claim.

**28.2**    The Company and the Administrators shall be authorised by the Scheme Parties to take such steps as they consider necessary or expedient to bring an end to the Settled Proceedings. The costs of any such actions taken by the Company or the Administrators in respect of the Settled Proceedings (excluding Other Proceedings) shall be payable as an Administration Expense.

**28.3**    The terms of any costs orders made by the Courts in respect of the Settled Proceedings prior to the Effective Date shall remain in full force and effect and remain binding on the parties to the Settled Proceedings. The costs of the parties to any Settled Proceedings (excluding Other Proceedings) in respect of which no costs order has been made by the Courts prior to the Effective Date shall be paid by the Company as Administration Expenses in such amounts as may be agreed between the Administrators and the relevant parties to such Settled Proceedings (subject to assessment on the standard basis (pursuant to the Civil Procedure Rules) if not otherwise agreed).

**28.4**    Provided that the Settled Proceedings (excluding Other Proceedings) are brought to an end in accordance with Clause 28.2 and the costs of the parties to the Settled Proceedings (excluding Other Proceedings) are paid by the Company in accordance with Clause 28.3, each Scheme Party hereby undertakes and agrees not to seek any further order for its costs in respect of the Settled Proceedings.

**28.5**    Save in respect of any Excluded Proceedings and any Scheme Breach Claims, each of the Scheme Parties, the Company and the Administrators hereby (i) irrevocably and unconditionally releases and waives, insofar as the law allows, all its rights of appeal in respect of any first instance decision of any court of competent jurisdiction in any jurisdiction whatsoever (save in the event of fraud or bias by the relevant court) which relates to a function or power exercisable or exercised by the Administrators and which is made after the Effective Date (including in respect of any Directions Application issued by the Administrators or any appeal of the Administrators' adjudication of a proof of debt) and each of the Scheme Parties, the Company and the Administrators hereby undertakes and agrees to be bound by any such first instance decision; and (ii) undertakes not to pursue any such rights of appeal.

**28.6**    No Scheme Party shall take any action that is inconsistent with the releases, waivers and undertakings set out in this Clause 28.

**28.7**    Each Scheme Party shall hold on trust for the benefit of the Company, the Administrators any Released Third Party and/or any Locked Up Party (as applicable) any recovery made against such person after the Effective Date, pursuant to any Released Claim in breach of this Clause 28, and the Scheme Party shall turn over any such recovery to the Company, the Administrators, the Released Third Party and/or the Locked Up Party (as applicable) without set-off, counterclaim or deduction. To the extent that the asset comprising the recovery cannot be held on trust by the Scheme Party, the Scheme Party shall pay to the Company, the Administrators, the Released Third Party and/or the Locked Up Party (as applicable) an amount equal to that recovery immediately upon demand being made by the Company, the Administrators, the Released Third Party and/or the Locked Up Party (as applicable) without set-off, counterclaim or deduction and, to the extent such amount is paid to the Company, such amount shall form part of the Available Funds.

**28.8**    The Company and the Administrators undertake and agree not to make an Exclusion Application in respect of any Scheme Party's Admitted Claims which were admitted as at the Effective Date.

## PART VIII: ADMINISTRATORS' POWERS AND REMUNERATION AND SUBORDINATED DISTRIBUTIONS

## 29   Powers of the Company and the Administrators

**29.1**   The Company and the Administrators shall in their sole discretion (acting reasonably) deal with any Scheme Party or any group of them in such order as the Administrators see fit, provided that this does not conflict with the terms of this Scheme or the Administrators' statutory duties.

**29.2**   In carrying out its functions under this Scheme, the Company shall (without prejudice to the terms of this Scheme) be empowered, to the extent that such powers are necessary for or reasonably incidental to the implementation of this Scheme, to:

**29.2.1**   employ and remunerate its Advisers in connection with this Scheme; and

**29.2.2**   delegate in writing to any person all or any of the functions, rights, authorities, powers and discretions conferred upon the Company under this Scheme, and from time to time to revoke any such delegation, provided that the Company shall be responsible for any act or omission of any such Delegate to the same extent as if the Company had itself exercised the relevant functions, rights, authorities, powers and discretions.

**29.3**   The Administrators have undertaken and agreed to be bound by this Scheme as it applies to them and to execute or do, or to procure to be executed or done, all documents (including any deeds of release in favour of Third Parties), acts or things as may be necessary, or as the High Court may order necessary, to be executed or done by the Company or on its behalf to implement and to give effect to this Scheme (in all cases, without prejudice and in addition to the general powers afforded to the Administrators pursuant to Schedule 1 to the Insolvency Act).

**29.4**   Each Scheme Party hereby authorises the Administrators to carry out all acts and exercise all discretions, authorities, powers and duties conferred upon the Company by this Scheme in order to facilitate its implementation.

**29.5**   Each Scheme Party hereby irrevocably authorises the Company and the Administrators so that any of them, acting individually or jointly, may, as true and lawful agent and attorney of that Scheme Party, with express power of delegation and substitution sign, execute, seal and deliver any documents in such form as the Company or the Administrators may deem appropriate on behalf of such Scheme Party and generally do any other act, matter or thing, that is, in each case in the reasonable opinion of the Company or the Administrators, desirable, necessary, ancillary or expedient in order to:

**29.5.1**   bring an end to the Settled Proceedings;

**29.5.2**   give effect to the release of Released Third Party Claims pursuant to Clauses 28.1.4 and 28.1.5;

**29.5.3**   bring an end to any Proceedings brought in contravention of Clause 28.5; and

**29.5.4**   subject to Clause 29.6 and without prejudice to the foregoing, facilitate the implementation of this Scheme on its terms,

in the same manner and as fully and effectually as that Scheme Party could have done.

**29.6**   Not less than three Business Days prior to exercising its or their powers pursuant to Clause 29.5.4, the Company or the Administrators (as applicable) shall send a Notice to the relevant Scheme Party that includes: (i) a statement of its intention to exercise such powers; (ii) a description of the relevant act, matter or thing it intends to do in their name or on their behalf; and (iii) a request that the relevant Scheme Party does the relevant act, matter or thing prior to the Company or the Administrators exercising its or their powers pursuant to Clause 29.5.4.

**29.7**   Each Scheme Party hereby ratifies any act whatsoever that the Company or the Administrators may do in their name or on their behalf by exercising its or their powers pursuant to Clause 29.5 and the costs of any such actions taken by the Company or the Administrators shall be payable as an Administration Expense.

**29.8**   The authority granted in Clause 29.5 shall be treated, for all purposes whatsoever and without limitation, as having been granted by each Scheme Party to the Company and the Administrators by deed.

**29.9**   All actions and determinations by the Company or the Administrators under this Scheme shall be made in good faith.

**29.10**   Subject to any applicable provision of the Insolvency Act, no Scheme Party shall be entitled to challenge the validity of any act done or omitted to be done in good faith by the Company, the Administrators or any Delegate, in pursuance of its functions or duties under this Scheme, or the exercise or non-exercise by the Company, the Administrators or any Delegate, in good faith, of any power or discretion conferred upon it for the purposes of this Scheme, and neither the Company, the Administrators nor any Delegate shall be liable for any Loss whatsoever and howsoever arising out of any such act or omission, exercise or non-exercise of any power or discretion, unless such Loss is attributable to the wilful default, fraud or dishonesty of the Company or to the wilful default, fraud or dishonesty of the Administrators or Delegate (as applicable).

**29.11**   The Administrators shall be entitled to claim their remuneration as an Administration Expense in relation to actions taken by them in respect of this Scheme.

**29.12**   The Administrators have agreed to carry out their roles and functions and exercise their powers as provided for in this Scheme as agents for and on behalf of the Company and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by the Company; or in respect of any failure on the part of the Company to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this Scheme.

## 30   Retained Expense Claims

**30.1**   The Administrators shall establish an Adequate Reserve in respect of a Retained Expense Claim upon the Company being Notified of such Retained Expense Claim.

**30.2**   No Scheme Party that holds a Retained Expense Claim shall be entitled to disturb or in any way challenge any payments (in whole or part) of any Scheme Distribution or Subordinated Distribution made by the Company prior to the Company receiving Notice of such Retained Expense Claim from the relevant Scheme Party.

**31    The Storm Payment**

**31.1**  Subject to Clause 31.3 and the provisions of Part V, the Company shall pay the Storm Payment to Storm in full and final satisfaction of its rights to Statutory Interest in respect of its Admitted Claim.

**31.2**  The provisions of Part V shall be construed to apply to Storm as if it were a Scheme Creditor.

**31.3**  The Company shall pay the Storm Payment within the time period specified in relation to the payment of the 8% Payment, the Specified Interest Payment and the Settlement Premium pursuant to Clause 9.1.

**32    The Subordinated Debt**

**32.1**  The Company shall not make any Subordinated Distributions prior to the Subordinated Debt Admittance Date.

**32.2**  On the Business Day following the earlier of:

**32.2.1**  the date falling 20 Business Days from the date on which a Full SI Payment Statement has been published and not withdrawn in accordance with Clause 3.3.1; and

**32.2.2**  the day on which the Company makes the final payment which results in it having paid in full the 8% Payment, the Settlement Premium and the Specified Interest Payment to the Scheme Creditors in accordance with the provisions of Part III, and the Storm Payment to Storm in accordance with Clause 31,

(the "**Subordinated Debt Admittance Date**"), the Administrators shall admit the Subordinated Principal.

**32.3**  The Administrators shall not be required to admit, on the Subordinated Debt Admittance Date, the part of the Subordinated Creditor's Provable Claim that relates to interest on the Subordinated Debt accrued prior to the Administration Date ("**Subordinated Interest**"), and Subordinated Interest shall be determined at a future time by the Administrators without prejudice to the Subordinated Principal admitted pursuant to Clause 32.1.

**32.4**  On the date that is 10 Business Days after the Subordinated Debt Admittance Date, the Company shall make payments to the Subordinated Creditor in respect of the Subordinated Principal and, to the extent it has been admitted by the Administrators prior to such date, any Subordinated Interest from the Net Available Funds (and after setting aside reserves in respect of (i) the High Case Scheme Distribution (to the extent unpaid); and (ii) any Non-Provable Claims notified to the Company prior to the Bar Date).

**32.5**  Following the date on which the Company has paid in full the Subordinated Principal and Subordinated Interest the Company shall pay to the Subordinated Creditor Statutory Interest on the Subordinated Principal and the Subordinated Interest at a rate to be determined at a future date (the "**Subordinated Debt SI Payment**") from the Net Available Funds (and after setting aside reserves in respect of (i) the High Case Scheme Distribution (to the extent unpaid); and (ii) any Non-Provable Claims notified to the Company prior to the Bar Date).

**32.6**   Any Statutory Interest payable in respect of the Subordinated Debt (whether in respect of Subordinated Principal or Subordinated Interest) shall be calculated in accordance with the Relevant Principles.

## 33   Equity Distributions

**33.1**   The Company shall not make any Equity Distributions prior to the Subordinated Debt Admittance Date.

**33.2**   Subject to Clause 33.1 and the relevant provisions of the Companies Act and Insolvency Act, the Company may make Equity Distributions at the Company's discretion.

## 34   Dissolution of the Creditors' Committee

**34.1**   With effect from the Subordinated Debt Admittance Date:

**34.1.1**   the Company's existing Creditors' Committee shall be dissolved;

**34.1.2**   thereafter, the Operating Committee shall be constituted in accordance with the Governance Protocol; and

**34.1.3**   the Administrators' remuneration shall be approved by the Operating Committee in accordance with the Governance Protocol, without any recourse to the remaining creditors of the Company, except for Scheme Creditors that are members of the Operating Committee (if any).

# PART IX: MISCELLANEOUS PROVISIONS

## 35    Third Party rights and enforcement

**35.1**    Save as expressly provided for in this Scheme and as identified in this Clause 35, nothing in this Scheme or the Explanatory Statement is intended to confer any rights on, or to be enforceable by, any Third Party under the Contracts (Rights of Third Parties) Act 1999 or otherwise.

**35.2**    The Administrators and Storm shall be entitled to enforce each of the terms of this Scheme as if they were a party to it.

**35.3**    Each of the Released Third Parties, the Locked Up Parties and the Shareholder shall be entitled to enforce the releases and undertakings expressed to be granted in their favour in this Scheme.

**35.4**    Any Adjudicator shall be entitled to enforce Clause 23.4.1.

**35.5**    The Company hereby undertakes to and agrees with each Scheme Party to take such actions as it considers to be reasonable and appropriate to bring any Shareholder Undertaking Claim.

**35.6**    In the event that the Company fails to take actions to bring a Shareholder Undertaking Claim within a reasonable period of such claim arising, the Company shall, if requested to do so by a Scheme Party, bring the relevant Shareholder Undertaking Claim provided that it has received to its satisfaction an indemnity from such Scheme Party in respect of the associated legal costs (including fees and disbursements of legal advisers and all costs associated with attending Proceedings).

## 36    Chapter 15

To the extent it has not already done so prior to the Effective Date, the Company may file a petition for recognition of this Scheme under Chapter 15 of the US Bankruptcy Code.

## 37    Governing law and jurisdiction

**37.1**    This Scheme shall be governed by, and construed in accordance with, English law and the Scheme Parties hereby severally agree that the courts of England shall (save as otherwise provided in the Dispute Resolution Procedure set out at Part VI of this Scheme) have exclusive jurisdiction to hear and determine any dispute or Proceedings arising out of or in connection with the Explanatory Statement or this Scheme, or the operation of this Scheme, and the Scheme Parties hereby severally submit to the exclusive jurisdiction of the courts of England for such purposes. The Scheme Parties also waive any objections to Proceedings in the courts of England that are based on the grounds of venue or that the Proceedings have been brought in an inconvenient forum.

**37.2**    Notwithstanding the provisions of Clause 37.1, the Company and the Administrators retain the right to bring Proceedings, in the name of the Company or otherwise, in the courts of any other country having jurisdiction under its own laws to hear such Proceedings.

**37.3**    The US Bankruptcy Court shall have exclusive jurisdiction to hear and determine any dispute, suit, action or Proceeding (including any settlement thereof) which may arise out of or in connection with any Chapter 15 Order relating to the Company or its assets located within the territorial jurisdiction of the United States.

**38      Duration of this Scheme**

**38.1**    Subject to Clause 38.3, the Scheme Parties, the Company and the Administrators hereby undertake in favour of each other not to take any action or step to initiate a Liquidation Event until (i) all Scheme Distributions and (ii) any other payments in respect of Statutory Interest contemplated by this Scheme (including the Subordinated Debt SI Payment (unless the Subordinated Creditor agrees otherwise)) have been paid in full by the Company or some other arrangement has been made, which in the Company's opinion (acting by the Administrators), ensures that Scheme Distributions, the Subordinated Debt SI Payment and any other payments of Statutory Interest contemplated by this Scheme will be in no way adversely affected by a Liquidation Event.

**38.2**    If on the date falling 90 days prior to the expiry of the Administration, (i) all Scheme Distributions and (ii) any other payments in respect of Statutory Interest contemplated by this Scheme have not been paid in full, the Administrators shall apply to Court for an order extending the period of the Administration.

**38.3**    The Administrators may initiate a Liquidation Event one Business Day prior to the expiry of the Administration.

**38.4**    If the Company shall become subject to a Liquidation Event, this Scheme shall not terminate and shall continue in full force and effect.

**38.5**    In the event of any inconsistency between the provisions of this Scheme and the Companies Act, the Insolvency Act or the Insolvency Rules or the FCA Rules as they apply to the Company following a Liquidation Event in accordance with Clause 38.1, for the purposes of this Scheme the provisions of this Scheme shall prevail to the extent that the law allows.

**39      Limit on Company's obligations**

Notwithstanding any other provision of this Scheme, each Scheme Party hereby acknowledges and agrees that the Company's payment obligations in respect of the Scheme Distributions, Non-Provable Claims and the Subordinated Distributions shall be no greater than an amount equal to the value from time to time of the Surplus.

**40      Partial invalidity**

If at any time any provision of this Scheme is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of that provision under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision of this Scheme under the law of that jurisdiction shall in any way be affected or impaired thereby.

**41      Notices**

**41.1**    General provisions

**41.1.1**    Subject to Clause 41.1.3, any Notice, document or other communication to be given, delivered or served pursuant to or in connection with this Scheme, except where this Scheme otherwise provides, shall be in writing and in English and shall be delivered in accordance with this Clause 41.

**41.1.2**    The non-receipt by any Scheme Party of any Notice, communication or document delivered or sent in accordance with this Clause 41, shall not affect the provisions of this Scheme or the validity of such Notice.

**41.1.3**    In the event of a conflict between this Clause 41 and Clause 25, insofar as they relate to the provisions of Part VI of this Scheme, Clause 25 shall prevail.

## 41.2    Electronic mail addresses

**41.2.1**    Subject to Clause 19.5, any Notice, document or communication shall be given, delivered or served pursuant to or in connection with this Scheme to the Company by electronic mail to schemequeries@lbia-eu.com.

**41.2.2**    Subject to Clause 41.2.3, any Notice, document or communication shall be given, delivered or served pursuant to or in connection with this Scheme, by the Company to a Scheme Party by electronic mail to:

(i)    the electronic mail address from which any Notice, document or communication under or in connection with this Scheme has been sent by or on behalf of that Scheme Party to the Company and/or the Administrators; or

(ii)    such other electronic mail address as the Scheme Party may Notify to the Company from time to time.

**41.2.3**    The Scheme Parties shall provide details of an electronic mail address and maintain such electronic mail account at their own risk and shall be responsible for informing the Company of any changes to the electronic mail address and/or providing an alternative electronic mail address (as appropriate).

## 41.3    Notices by electronic mail

Any Notice, document or communication given, delivered or served by electronic mail shall be deemed to have been received:

**41.3.1**    if delivered to the Company, at the time recorded on the response email that will be automatically generated by the Company's electronic mail system; or

**41.3.2**    otherwise at the time recorded on the computer of the person to whom the electronic mail is addressed,

provided that if such receipt occurs on a day which is not a Business Day or after 5.00 p.m. on any Business Day, such Notice, communication or document shall be deemed to have been received at 9.30 a.m. on the next Business Day.

## 41.4    Notices by upload to the Website

**41.4.1**    Any Notice, document or communication shall be deemed to be given, delivered or served (as applicable) by the Company to all Scheme Parties by the Company publishing such Notice, document or communication on the Website.

**41.4.2**    Any Notice, document or communication uploaded to the Website in accordance with Clause 41.4.1 shall state on its face a date and time of upload.

**41.4.3**    Any Notice, document or communication given, delivered or served by upload to the Website shall be deemed to have been received at the time of upload stated in such Notice, document or communication provided that if the date of upload stated

in such Notice, document or communication is not a Business Day or the time of upload stated in such Notice, document or communication is, or is after, 5.00 p.m. on any Business Day, such Notice, document or communication shall be deemed to have been received by Scheme Parties at 9.30 a.m. on the next Business Day.

**41.5    Authority to sign notices and documents**

In the case of a Notice, document or communication which is signed on behalf of a Scheme Party, neither the Company, the Administrators nor the Adjudicator (as applicable) shall be required to make any enquiry as to the authority of the signatory of that Notice, document or communication to sign such Notice, document or communication on behalf of such Scheme Party.

## 42    Modifications

**42.1**    The Company may, at any hearing to sanction this Scheme, consent on behalf of the Scheme Parties to any modification of the Scheme or terms or conditions that the High Court may think fit to approve or impose. However, if such modifications could reasonably be expected directly or indirectly to have a material adverse effect on the interests of a Scheme Party or the Shareholder, then the Company shall not be entitled to provide such consent without the prior written consent of that Scheme Party or the Shareholder respectively.

**42.2**    The Company shall inform the Scheme Parties, by publishing a Notice on the Website in accordance with Clause 41, of any modification of, addition to or condition imposed by the Courts on this Scheme approved in accordance with this Clause 42.

**42.3**    Modifications, additions or conditions approved or imposed pursuant to this Clause 42 shall be binding on the Scheme Parties, the Company and the Administrators and this Scheme shall be amended accordingly.

**42.4**    The Company shall be entitled, in its sole discretion, to amend the form of any Notice to be provided to the Scheme Parties under this Scheme provided that such modifications shall not adversely affect the rights of any class of Scheme Creditors as a whole.

## 43    Extension and calculation of deadlines

Subject to Clause 42.1, all or any of the deadlines laid down by this Scheme for the taking of any step by the Administrators or the Company or by any Scheme Party, save in respect of: (i) the Dispute Resolution Procedure; (ii) Clauses 9.1 and 15.1; and (iii) the Bar Date, may be postponed or extended for such period or periods as may be determined by the Company and Notified to the Scheme Parties in accordance with Clause 41.

## 44    Conflict

In the event of a conflict or inconsistency between the provisions of this Scheme, the Companies Act, the Insolvency Act, the Insolvency Rules and/or the FCA Rules, for the purposes of this Scheme, and to the extent such acts and/or rules permit, the provisions of this Scheme shall prevail.

**45      Modification of foreign law contracts**

Where this Scheme purports to modify any contract which is governed by a law other than English law, the modification will be effective to the maximum extent permitted under the proper law of the contract and the Company and Scheme Parties will each take any necessary steps to ensure that such modifications are effective to the fullest extent possible under such governing law.

**46      FCA Notices**

Copies of the Practice Statement Letter, the Explanatory Statement and this Scheme have been sent to the FCA in accordance with Section 362 of FSMA.

**Schedule 1**
**Appeal Form[1]**


Appeal Form


Capitalised terms used in this document shall have the meaning given to them in the scheme of arrangement between Lehman Brothers International (Europe) (in administration) and the Scheme Creditors (as defined therein), as sanctioned by the High Court on _____ 2018 (the "**Scheme**").


Name of Certifying Creditor: _____

Claim Reference to which the Certification relates: _____

Date of Certification being appealed: _____

Date of Rejection Notice: _____


The above-named Certifying Creditor hereby:

(a)     acknowledges that it has received a Rejection Notice from the Company;

(b)     confirms that it wishes to make a DRP Election pursuant to Clause 11.9 of the Scheme;

(c)     confirms that this Appeal Form has been served within 10 Business Days of the Rejection Date in accordance with Clause 24.1.1 of the Scheme; and

(d)     accepts that the Applicable CI Payment in respect of its Certification Claim shall be determined by an Adjudicator in accordance with the provisions of Part VI of the Scheme.


Signed:


_____


Name:
Position:


Dated:


_____


---

[1]   This Appeal Form is to be served upon the Company in accordance with Clause 25.1.3(ii) of the Scheme.

## Schedule 2
## Governance Protocol

This Governance Protocol summarises the guidelines for the formation and governance of the Operating Committee with respect to the Scheme and assisting with the management of the Administration.

In this Schedule 2 only, the following words and expressions shall have the following meanings:

| | |
|---|---|
| "**Elliott Delegate**" | means any representative of Elliott Management Corporation appointed by the Subordinated Creditor as its delegate(s) from time to time |
| "**King Street Delegate**" | means any representative of King Street Capital Management, L.P. appointed by the Subordinated Creditor as its delegate(s) from time to time |
| "**LBHI Delegate**" | means any representative of LBHI appointed by the Subordinated Creditor as its delegate(s) from time to time; |
| "**LBHI2 Delegate**" | means the joint administrators of LBHI2 from time to time (or any one of them) and/or their representative, in each case appointed by the Subordinated Creditor as its delegate(s) from time to time |
| "**Subordinated Creditor Delegates**" | means the Elliott Delegate, the King Street Delegate, the LBHI Delegate and the LBHI2 Delegate as notified by the Subordinated Creditor to the Administrators from time to time |
| "**Unsecured Creditor Representative**" | means a Scheme Creditor whose Claim has not been paid or provided for by the Company, if any |

## 1    Operating Committee

1.1    With effect from the Subordinated Debt Admittance Date, a new, informal, oversight body called the Operating Committee shall be constituted in place of the Creditors' Committee. For the avoidance of any doubt, the Operating Committee is not a creditors' committee for the purposes of Rule 18 of the Insolvency Rules but it will have a similar purpose and function in the context of the Scheme.

1.2    The Administrators will manage the Administration in a manner consistent with the statutory objective. In performing their duties, the Administrators shall (among other things) take all reasonable steps in order to:

1.2.1    give effect to the Scheme;

1.2.2    expedite the realisation of the Company's residual assets;

1.2.3    finalise the Company's client money and trust estates;

1.2.4    accelerate (where possible) the run-off of indemnities provided by the Company after the commencement of the Administration;

1.2.5    adjudicate any unagreed creditor claims;

1.2.6    manage distributions to stakeholders;

1.2.7    wind-down operations of people, systems and data in an orderly manner; and

1.2.8    comply with statutory formalities and regulatory requirements (including document retention and destruction).

1.3    The Operating Committee will assist the Administrators in performing their functions and act in accordance with the relevant guidelines (as summarised in this Governance Protocol) and the Scheme. In particular, the Operating Committee shall be empowered to:

1.3.1    consider and approve actions and decisions taken by the Administrators, where such approval is sought; and

1.3.2    authorise the remuneration of the Administrators.

1.4    The Operating Committee will comprise a maximum of five members:

1.4.1    one Elliott Delegate;

1.4.2    one King Street Delegate;

1.4.3    one LBHI Delegate; and

1.4.4    one LBHI2 Delegate, (as the Subordinated Creditor Delegates); and

1.4.5    at the Administrators' election, one Unsecured Creditor Representative.

(each an "**OC Member**" and together the "**OC Members**").

1.5    The Subordinated Creditor Delegates will not be entitled to payment of their (or their representatives') fees or expenses in attending meetings or otherwise in respect of their membership of the Operating Committee.

1.6    The Unsecured Creditor Representative shall be entitled to be reimbursed for reasonable travel expenses directly incurred by the Unsecured Creditor Representative or its representative in attending meetings of the Operating Committee (but not, for the avoidance of doubt, the fees or expenses of the Unsecured Creditor Representative's advisers).

1.7    The Operating Committee shall remain in effect until the Company exits administration.

## 2    Meetings, voting etc.

2.1    Subject to appropriate confidentiality arrangements being put in place, meetings of the Operating Committee shall be called for the participation of the Subordinated Creditor Delegates on a monthly basis to discuss (as applicable) the following:

2.1.1    a report of receipts and payments;

**2.1.2**   an update on the position of unsecured claims, including:

    (i)      any new Claims notified,

    (ii)     Certifications;

    (iii)    the resolution of disputes through the adjudication process provided by the Scheme; and

    (iv)    reserving for Claims;

**2.1.3**   an update on the realisation of assets;

**2.1.4**   an update on the run-off of priority claims and indemnities;

**2.1.5**   an update on ongoing litigation and settlement;

**2.1.6**   a report on progress of matters relating to the Scheme;

**2.1.7**   an update on anticipated future distributions to the Subordinated Creditor;

**2.1.8**   a qualitative update in respect of other matters e.g. budgeting and staffing; and

**2.1.9**   the strategy for ending the Administration.

**2.2**   The following will be permitted to attend meetings of the Operating Committee:

**2.2.1**   the Administrators, one of whom (or a person appointed by them) will act as chairperson;

**2.2.2**   each OC Member;

**2.2.3**   each OC Member's legal advisors;

**2.2.4**   the FCA where relevant and for so long as the Company remains FCA regulated and where the FCA wishes to attend as an observer at a meeting; and

**2.2.5**   a fee advisor, to be appointed by the Administrators, with the agreement of the Operating Committee.

**2.3**   In respect of all meetings of the Operating Committee:

**2.3.1**   if voting is necessary:

    (i)      each OC Member has one vote; and

    (ii)     a resolution is passed when a majority of the OC Members attending, or represented at, the meeting have voted in favour of it;

**2.3.2**   meetings may take place in person or by phone. In respect of meetings held by phone, the Administrators shall make appropriate arrangements to:

    (i)      verify the identity of those attending the meeting; and

    (ii)     (enable those attending the meeting to exercise their rights to speak or vote;

**2.3.3**   physical meetings shall take place every six months (unless agreed otherwise between the Administrators and the Subordinated Creditor Delegates) at a venue to be chosen by the Administrators.  In respect of all physical meetings, notice of the date and venue shall be provided to each OC Member at least 5 Business Days in advance of the relevant meeting;

**2.3.4** meetings may be called on 5 Business Days' notice if so requested by at least two OC Members; and

**2.3.5** a quorum of at least two Subordinated Creditor Delegates must be present at each meeting, one of whom must be an Elliott Delegate or a King Street Delegate and one of whom must be an LBHI Delegate or an LBHI2 Delegate.

**2.4** In the event that an Unsecured Creditor Representative is appointed, the Administrators and the Subordinated Creditor Delegates will agree the information to be provided to the Unsecured Creditor Representative in order to enable it to meaningfully participate in the meeting (or part thereof).

## 3    Amendment or waiver

Any term of this Governance Protocol may be amended or waived only with the written consent of the Subordinated Creditor and the Company.

## 4    Disputes

**4.1** The Administrators and the Operating Committee shall negotiate in good faith in order to resolve any disputes between them in relation to the matters referred to above.

**4.2** If it is not possible for the Administrators to reach agreement with the Subordinated Creditor Delegates as regards actions proposed by the Administrators, save where expressly agreed otherwise (including under the terms of the Scheme), the Administrators shall not be bound to follow a course of action directed by the Subordinated Creditor Delegates, where they consider such a direction to be contrary to their statutory duties.

**4.3** In the event that the Operating Committee refuses to authorise the Administrators' remuneration, the Administrators shall be entitled to have recourse to the courts as provided for by Rule 18 of the Insolvency Rules or pursuant to paragraph 63 of Schedule B1 to the Insolvency Act.

**Schedule 3**
**Shareholder Undertaking**

Dated [●] 2018

# LB HOLDINGS INTERMEDIATE 2 LIMITED (IN ADMINISTRATION)

and

# LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)

## DEED OF UNDERTAKING

# Linklaters

Ref: L-245528

Linklaters LLP

**THIS DEED OF UNDERTAKING** is made on [●] 2018

**By:**

(1)    **LB HOLDINGS INTERMEDIATE 2 LIMITED (IN ADMINISTRATION)** a company incorporated in England and Wales with registered number 05957878 whose registered address is 7 More London Riverside, London SE1 2RT (the "**Shareholder**") acting by its joint administrators Gillian Eleanor Bruce, Anthony Victor Lomas, Steven Anthony Pearson, Derek Anthony Howell and Julian Guy Parr, each of PricewaterhouseCoopers LLP, 7 More London Riverside, London SE1 2RT, acting as agents only for and on behalf of the Company and without personal liability (the "**LBHI2 Administrators**");

**In favour of:**

(2)    **LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)** a company incorporated in England and Wales with registered number 02538254 whose registered address is Level 23, 25 Canada Square, London E14 5LQ (the "**Company**") acting by its joint administrators Anthony Victor Lomas, Steven Anthony Pearson, Julian Guy Parr and Russell Downs, each a partner of PricewaterhouseCoopers LLP, 7 More London Riverside, London SE1 2RT, acting as agents only for and on behalf of the Company and without personal liability (the "**LBIE Administrators**"); and

(3)    **THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES** (the "**High Court**").

**Whereas**

(A)    The Company proposes to enter into a scheme of arrangement under Part 26 of the Companies Act 2006  with certain of its creditors (the "**Scheme Creditors**") in the terms set out in Appendix 1 to this Deed.

(B)    The Scheme Creditors are creditors with Provable Claims against the Company. The primary purpose of the Scheme is to facilitate payments to Scheme Creditors in full and final settlement of their rights to Statutory Interest which has accrued on their Admitted Claims during the Administration. The Scheme also provides the basis on which the Subordinated Creditor is to be paid Subordinated Distributions.

(C)    The Shareholder is the sole shareholder of the Company.

## Definitions

Unless otherwise defined in this Deed or the context otherwise requires, words and expressions used in this Deed shall have the meanings given to them in the Scheme Document.

References in this Deed to the "**Scheme**" or the "**Scheme Document**" are to a scheme of arrangement in the terms set out in Appendix 1 to this Deed with or subject to any modification approved or imposed pursuant to clause 42.1 of the terms set out in Appendix 1 to this Deed.

**This Deed witnesses** and it is hereby declared as follows:

**1**    From and with effect from the Effective Date, the Shareholder hereby irrevocably:

**1.1**    consents to the Scheme;

**1.2**    acknowledges that the Company may make Equity Distributions at the Company's discretion, however, no Equity Distribution will be made prior to the Subordinated Debt

Admittance Date or otherwise than in accordance with the relevant provisions of the Companies Act and Insolvency Act;

1.3   in consideration of the Scheme being implemented in accordance with its terms, agrees and undertakes that it shall not:

    1.3.1   take any action or step to initiate a Liquidation Event until (i) all Scheme Distributions; and (ii) any other payments in respect of Statutory Interest contemplated by the Scheme (including the Subordinated Debt SI Payment (unless the Subordinated Creditor agrees otherwise)), have been paid in full by the Company or some other arrangement has been made, which in the Company's opinion, ensures that Scheme Distributions, the Subordinated Debt SI Payment and any other payments of Statutory Interest contemplated by the Scheme will be in no way adversely affected by a Liquidation Event;

    1.3.2   seek to disturb or otherwise challenge:

        (i)   any Decision Notice, the Company's Case or any decision made by the Adjudicator in respect of a Certification;

        (ii)   any Scheme Outcome Statement;

        (iii)   any petition for recognition of the Scheme under Chapter 15 of the US Bankruptcy Code;

        (iv)   the Company's determination of the Available Funds, the Net Available Funds, the High Case Scheme Distribution or the Adequate Reserves;

        (v)   the Settled Proceedings being brought to an end;

        (vi)   the payment of costs in relation to the Settled Proceedings, pursuant to the terms of the Scheme;

        (vii)   the payment (in whole or in part) of any Scheme Distribution;

        (viii)   the payment (in whole or in part) of any Subordinated Distribution;

        (ix)   any payment of Tax in relation to a Scheme Distribution or a Subordinated Distribution;

        (x)   the release and waiver of the Released Claims,

        in each case, made or given in accordance with the terms of the Scheme;

        (xi)   insofar as the law allows, any first instance decision of any court of competent jurisdiction in any jurisdiction whatsoever (save in the event of fraud or bias by the relevant court) which relates to a function or power exercisable by the Administrators and which is made after the Effective Date (including in respect of any Directions Application issued by the Administrators or any appeal of the Administrators' adjudication of a proof of debt but excluding any Claim arising out of a breach of this Deed); or

        (xii)   without prejudice to the foregoing, the validity of any act done or omitted to be done in good faith by the Company, the LBIE Administrators or any Delegate in pursuance of its or their powers, functions or duties under the Scheme; and

1.4   unconditionally releases and waives:

**1.4.1**   all its rights, entitlements and interest in any Creditor Challenge Rights in respect of any Admitted Claim that was admitted by the Administrators for dividend prior to the Record Date; and

**1.4.2**   any Released Third Party Claims.

**2**   From and with effect from the Effective Date, the Company undertakes to the Shareholder to implement the Scheme in accordance with its terms (as amended from time to time).

**3**   The LBHI2 Administrators have signed this Deed as agents for and on behalf of the Shareholder, and neither they, their firm, its members, partners, directors, officers or employees nor any of their respective agents, advisers or representatives shall incur any personal liability whatever in respect of this Deed, any of the obligations undertaken by the Shareholder in respect of any failure by the Shareholder to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this Deed or in connection with it or in relation to any related matter or claims, whether in contract, tort or restitution or by reference to any other remedy or right, in any jurisdiction or forum.

**4**   The LBIE Administrators have signed this Deed as agents for and on behalf of the Company, and neither they, their firm, its members, partners, directors, officers or employees nor any of their respective agents, advisers or representatives shall incur any personal liability whatever in respect of this Deed, any of the obligations undertaken by the Company in respect of any failure by the Company to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this Deed or in connection with it or in relation to any related matter or claims, whether in contract, tort or restitution or by reference to any other remedy or right, in any jurisdiction or forum.

**5**   The exclusions of liability set out in Clauses 3 and 4 above shall arise and continue notwithstanding the termination of the agency of the LBHI2 Administrators and the LBIE Administrators respectively and shall operate as a waiver of any and all claims including, but not limited to, claims in tort, equity and common law as well as under the laws of contract.

**6**   If requested by the Company in writing before the earlier of: (a) the conclusion of the administration of the Shareholder; (b) the Shareholder being placed into liquidation; and (c) the expiry of twelve months from the Effective Date, the Shareholder (acting by the LBHI2 Administrators) shall (at the expense of the Company) enter into documents or agreements necessary to give effect to the terms of this Deed, provided that any such documents or agreements: (i) shall be prepared by the Company or its advisers at the Company's expense and all reasonable legal and other external costs of the Shareholder and the LBHI2 Administrators shall be payable as an Administration Expense; (ii) do not impose any liabilities on the Shareholder or the LBHI2 Administrators; (iii) do not require the Shareholder or the LBHI2 Administrators to commence or continue or be joined as any party to any Proceedings; (iv) do not require the LBHI2 Administrators to be made a separate party thereto; and (v) contain an exclusion of the LBHI2 Administrators' liability on terms substantially similar to the exclusion terms set out in Clauses 3 and 4 above.

**7**   No party may assign, grant any security over, hold on trust or otherwise transfer the benefit of the whole or any part of this Deed.

**8**   The consent and undertakings set out in this Deed are given strictly on the basis of the terms of this Deed and without prejudice to the rights of the parties otherwise.

**9**      No variation of this Deed or any waiver of any term of this Deed shall be effective unless in writing and signed by or on behalf of the Shareholder and the Company.

**10**     The terms of this Deed shall remain in full force and effect if the Company makes minor or procedural modifications to the operation of the Scheme after the Effective Date, for the purposes of the implementation of the Scheme, provided that such modifications do not adversely affect the rights of the Shareholder.

**11**     This Deed together with any documents or agreements expressly referred to in this Deed or entered into by the Shareholder in connection with it after the Effective Date in accordance with Clause 6 represents the entire understanding and constitutes the whole agreement in relation to its subject matter and supersedes any previous agreement or understanding, whether oral or in writing, between the parties with respect to such subject matter and, without prejudice to the generality of the foregoing, excludes any express or implied representation, warranty, condition or other undertaking or assurance implied at law or by custom, usage or course of dealing.

**12**     Clauses 1.2 (*Definitions and interpretation*), 41 (*Notices*) and 44 (*Conflict*) of the Scheme Document are incorporated *mutatis mutandis* in this Deed, with references to "this Scheme" being understood to refer to this Deed.

**13**     A person who is not a party to this Deed shall not have any right by virtue of the Contracts (Rights of Third Parties) Act 1999 or otherwise to enforce or enjoy the benefit of any term (express or implied) of this Deed, except that: (i) the LBHI2 Administrators, their firm, its members, partners, directors, officers, employees and any of their respective agents, advisers and representatives and (ii) the LBIE Administrators, their firm, its members, partners, directors, officers, employees and any of their respective agents, advisers and representatives shall each be entitled to rely on this Deed as if they were a party to this Deed.

**14**     This Deed may be executed in any number of separate counterparts, each of which is an original but all of which taken together shall constitute one and the same instrument.

**15**     Nothing in this Deed is intended or shall be deemed to waive or release any right and/or entitlement of the Shareholder:

**15.1**   subject to Clause 1.2 above, to receive any Equity Distribution;

**15.2**   to exercise set-off, defend or make a counterclaim in respect of any Contributory Claim;

**15.3**   in respect of any Claim arising out of a breach of this Deed; and

**15.4**   to claim for costs arising out of future litigation in respect of the matters referred to in Clauses 15.1 to 15.3 above.

**16**     Nothing in this Deed is intended to or shall be deemed to constitute any submission by the Shareholder to the jurisdiction of the US Bankruptcy Court.

**17**     This Deed and any non-contractual obligations arising out of or in connection with this Deed shall be governed by, and construed in accordance with, the laws of England and Wales and the courts of England and Wales shall have exclusive jurisdiction to hear and/or decide any claim, action or proceedings and to settle any disputes arising out of or in connection with this Deed.

**In witness whereof** this Deed has been delivered on the date first stated above.

**Appendix 1**

**Scheme Document**

**The Shareholder**

SIGNED as a DEED by
**LB HOLDINGS INTERMEDIATE 2 LIMITED
(IN ADMINISTRATION)**
acting by:


[_____]
Joint administrator acting as agent for and on behalf
of LB Holdings Intermediate 2 Limited (in
administration) without personal liability

in the presence of

Name:

Address:

Occupation:




**The Company**

SIGNED as a DEED by
**LEHMAN BROTHERS INTERNATIONAL
(EUROPE) (IN ADMINISTRATION)**
acting by:


[_____]
Joint administrator acting as agent for and on behalf
of Lehman Brothers International (Europe) (in
administration) without personal liability

in the presence of

Name:

Address:

Occupation:

**Schedule 4**
**Storm Undertaking**

Dated [●] 2018

STORM FUNDING LIMITED (IN ADMINISTRATION)

and

LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)

# DEED OF UNDERTAKING

# Linklaters

Ref: L-245528

Linklaters LLP

**THIS DEED OF UNDERTAKING** is made on [●] 2018

**By:**

(1)  **STORM FUNDING LIMITED (IN ADMINISTRATION)** a company incorporated in England and Wales with registered number 02682306 whose registered address is 7 More London Riverside, London SE1 2RT (the "**Grantor**") acting by its joint administrators Dan Schwarzmann, Anthony Victor Lomas, Steven Anthony Pearson, and Julian Guy Parr, each a partner of PricewaterhouseCoopers LLP, 7 More London Riverside, London SE1 2RT, acting as agents only for and on behalf of the Company and without personal liability (the "**Storm Administrators**");

**In favour of:**

(2)  **LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)** a company incorporated in England and Wales with registered number 02538254 whose registered address is Level 23, 25 Canada Square, London E14 5LQ (the "**Company**") acting by its joint administrators Anthony Victor Lomas, Steven Anthony Pearson, Julian Guy Parr and Russell Downs, each a partner of PricewaterhouseCoopers LLP, 7 More London Riverside, London SE1 2RT, acting as agents only for and on behalf of the Company and without personal liability (the "**Administrators**");

(3)  **THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES** (the "**High Court**"); and

(4)  **THE SCHEME PARTIES** as defined in the Scheme Document.

**Whereas**

(A)  The Company proposes to enter into a scheme of arrangement under Part 26 of the Companies Act 2006 (the "**Scheme**") with certain of its creditors (the "**Scheme Creditors**") substantially in the terms set out in Appendix 1 of this Deed (the "**Scheme Document**").

(B)  The Scheme Creditors are persons with Provable Claims against the Company. The primary purpose of the Scheme is to facilitate Scheme Distributions in full and final settlement of the relevant recipients' rights to Statutory Interest which has accrued on their Admitted Claims during the Administration.

(C)  The Grantor is Storm, as such term is defined in the Scheme Document.

## Definitions

Unless otherwise defined in this Deed or the context otherwise requires, words and expressions used in this Deed shall have the meanings given to them in the Scheme Document.

**This Deed witnesses** and it is hereby declared as follows:

**1**  From and with effect from the Effective Date, the Grantor hereby irrevocably:

**1.1**  consents to the Scheme;

**1.2**  agrees and undertakes that it shall be bound by the Scheme and each of the waivers, releases and restrictions expressed to apply to Storm under the Scheme, and shall perform each of the obligations expressed to apply to Storm under the Scheme;

**1.3** authorises the Company and the Administrators so that any of them, acting individually or jointly, may, as true and lawful agent and attorney of the Grantor, with express power of delegation and substitution, sign, execute, seal and deliver any documents on behalf of the Grantor that are in the reasonable opinion of the Company or the Administrators desirable or necessary in order to facilitate the implementation of the Scheme and generally to do any other act, matter or thing which the Company or the Administrators shall consider ancillary or expedient for such purposes or any of the acts authorised by this power of attorney in the same manner and as fully and effectually as the Grantor could have done;

**1.4** ratifies any act whatsoever that the Company or the Administrators may do in the name or on behalf of the Grantor by exercising its powers pursuant to paragraph 1.3 above; and

**1.5** agrees that the costs of any actions taken by the Company or the Administrators pursuant to paragraph 1.3 above shall be payable as an Administration Expense.

**2** The Storm Administrators have signed this Deed as agents for and on behalf of the Grantor, and neither they, their firm, its members, partners, directors, officers or employees nor any of their respective agents, advisers or representatives shall incur any personal liability whatever in respect of this Deed, any of the obligations undertaken (including representations given) by the Grantor or in respect of any failure by the Grantor to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this Deed or in connection with it or in relation to any related matter or claims, whether in contract, tort or restitution or by reference to any other remedy or right, in any jurisdiction or forum.

**3** The exclusions of liability set out in paragraph 2 above shall arise and continue notwithstanding the termination of the agency of the Storm Administrators and shall operate as a waiver of any and all claims including, but not limited to, claims in tort, equity and common law as well as under the laws of contract.

**4** A person who is not a party to this Deed shall not have any right by virtue of the Contracts (Rights of Third Parties) Act 1999 or otherwise to enforce or enjoy the benefit of any term (express or implied) of this Deed, except that: (i) the Storm Administrators, their firm, its members, partners, directors, officers, employees and any of their respective agents, advisers and representatives; (ii) the Administrators; and (iii) the Released Parties shall each be entitled to rely on this Deed as if they were a party to this Deed.

**5** This Deed and any non-contractual obligations arising out of or in connection with this Deed shall be governed by, and construed in accordance with, the laws of England and Wales and the courts of England and Wales shall have exclusive jurisdiction to hear and/or decide any claim, action or proceedings and to settle any disputes arising out of or in connection with this Deed.

**6** This Deed may be executed in any number of separate counterparts, each of which is an original but all of which taken together shall constitute one and the same instrument.

**In witness whereof** this Deed has been delivered on the date first stated above.

# Appendix 1

**Scheme Document**

**The Grantor**

SIGNED as a DEED by **STORM FUNDING LIMITED
(IN ADMINISTRATION)**
acting by:


[_____]
Joint administrator acting as agent for and on behalf
of Storm Funding Limited (in administration) without
personal liability

in the presence of

Name:

Address:

Occupation:

**<u>Exhibit D</u>**

Notification of Effective Date (LBIE Scheme)



**pwc** | UK

# *Update – Announcement of the proposed scheme of arrangement, pursuant to Part 26 of the Companies Act 2006, for a full and final settlement in respect of surplus entitlements and the payment of statutory interest – notification of effective date – 20 June 2018*

Further to the announcement made on 18 June 2018 (a copy of which can be accessed here), the Joint Administrators are pleased to announce that, following the receipt on 19 June 2018 of the Order from the US Bankruptcy Court granting Chapter 15 recognition of LBIE's scheme of arrangement (a copy of which can be accessed here), the Joint Administrators have today filed the Order of the High Court of England and Wales sanctioning the scheme at the Registrar of Companies (a copy of which can be accessed here), and the scheme has now become effective.

As explained in previous communications, the scheme is binding on all "Scheme Creditors", being persons with ordinary unsecured claims against LBIE, and provides a framework for the consensual determination of Scheme Creditors' entitlements to LBIE's surplus, so as to facilitate an expedited payment to Scheme Creditors in respect of their statutory interest entitlements.

As soon as reasonably practicable, LBIE will now determine the funds available for distribution to Scheme Creditors in respect of their statutory interest entitlements (including the 2.5% settlement premium which certain Higher Rate Creditors elected for). On the basis that the bar date has now occurred and the deadline for the submission of Certifications passed, the Joint Administrators expect to be able to publish in the near future a Scheme Outcome Statement on LBIE's website confirming that LBIE can pay all statutory interest entitlements in full and, subject to certain conditions having been met (including the provision of settlement instructions and KYC information), are targeting making distributions to all Scheme Creditors (other than those who have submitted Certifications in respect of their Higher Rate Claims) around the end of July 2018.

Further information on the process by which distributions will be made to Scheme Creditors, and the steps to be taken by Scheme Creditors prior to the receipt of such distributions, will be posted to LBIE's website and communicated to Scheme Creditors in due course.

If you have any questions in relation to the scheme, please contact the Joint Administrators by email to schemequeries@lbia-eu.com.

© 2015-2018 PwC. All rights reserved. PwC refers to the PwC network and/or one or more of its member firms, each of which is a separate legal entity. Please see www.pwc.com/structure for further details.