WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone:   (212) 382-3300
Facsimile:   (212) 382-0050
William A. Maher
Paul R. DeFilippo
James N. Lawlor
Adam M. Bialek
Mara R. Lieber

FOX ROTHSCHILD LLP
101 Park Avenue, 17th Floor
New York, New York 10178
Telephone:   (212) 878-7900
Facsimile:   (212) 692-0940
Michael A. Rollin
Maritza Dominguez Braswell

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13555(SCC) |
| LEHMAN BROTHERS HOLDINGS INC.,<br><br>Plaintiff,<br><br>-against-<br><br>1AM, L.L.C. f/k/a 1ST ADVANTAGE MORTGAGE, L.L.C., and DRAPER AND KRAMER MORTGAGE CORPORATION d/b/a 1st Advantage Mortgage,<br><br>Defendants. | Adv. Pro. No. 16-01377 (SCC) |

**SUPPLEMENTAL SECOND AMENDED ADVERSARY COMPLAINT**

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), the Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), for its Supplemental Second Amended Complaint against Defendants 1AM, L.L.C f/k/a 1st Advantage Mortgage, LLC ("Defendant-Seller") and Draper and Kramer Mortgage Corporation d/b/a 1st Advantage Mortgage ("Defendant-Successor," and together with Defendant-Seller, "Defendants") alleges upon knowledge as to itself and its own conduct, and upon information and belief as to all other matters, as follows:

**NATURE OF ACTION**

1. LBHI seeks to enforce its right to contractual indemnification for liabilities, losses, damages, claims, judgments and any other costs, fees and expenses LBHI incurred as a result of Defendant-Seller's sale of defective mortgage loans in breach of Defendant-Seller's representations, warranties, obligations, and/or covenants for which LBHI incurred liability due to Defendant-Seller's acts, failures to act and/or omissions (the "Defective Loans").

2. LBHI sold the Defective Loans to the Federal National Mortgage Association ("Fannie Mae") and/or the Federal Home Loan Mortgage Corporation ("Freddie Mac") under agreements that included representations and warranties about the Defective Loans that were coextensive with those made by Defendant-Seller. LBHI retained the right to seek indemnification from Defendant-Seller and its successors in the event it became liable for certain indemnification events. After Fannie Mae and Freddie Mac discovered that the mortgage loans breached certain of those representations and warranties, Fannie Mae and Freddie Mac made claims upon LBHI for losses suffered on the Defective Loans. In January and February 2014, respectively, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") approved settlements between (i) LBHI and Fannie Mae (ECF No. 42153)

2

(together, the "Fannie Mae and Freddie Mac Settlements"), and (ii) LBHI and Freddie Mac (ECF No. 42754), giving rise to LBHI's indemnification claims under the Agreements, as defined below, with Defendants.

3.  In reliance on Defendant's promises, covenants, and representations and warranties, LBHI securitized certain loans. In connection with the securitizations, which were marketed and sold to third party investors, LBHI made certain representations and warranties regarding the quality and characteristics of certain of the loans that were coextensive with those made by Defendant. LBHI retained the right to seek indemnification from Defendant in the event it became liable for certain indemnification events. After the trustees for hundreds of trusts (the "RMBS Trustees") allegedly discovered that the mortgage loans breached certain of those representations and warranties, the RMBS Trustees filed claims in LBHI's bankruptcy case for losses suffered on certain loans. On March 15, 2018, this Court entered the Order Estimating Allowed Claim Pursuant to RMBS Settlement, dated March 15, 2018 (ECF No. 57785) (the "RMBS Order") resolving the majority of the claims. LBHI also settled several other RMBS Trustee claims as permitted by the Plan.[1]

4.  By this action, LBHI seeks to recover money damages from Defendants for the indemnification claims. As more fully explained below, Defendant-Successor acquired Defendant-Seller in a *de facto* merger and is continuing Defendant-Seller's operations with its former management, officers, and/or members as a mere continuation of Defendant-Seller's business. Defendant-Successor gave inadequate cash consideration for the acquisition leaving Defendant-Seller unable to satisfy its obligations to creditors, such as LBHI. Having transferred

---

[1] *See* RMBS Trust Settlement Agreement, entered into as of June 25, 2018, between LBHI and Wilmington Trust National Association; Allowed Proof of Claim numbers: 720000, 720001, 720002, 720003, 720004, 720005, 720006, 720007, 720008, 720009, 720010, 720011, 720012, 720013, 720014, 720015, 720016, 720017, 22773.04, 24792, 24810, 720020, 720025, 720021, 720024, 720022, 720023, 720018, 720019.

Defendant-Seller's assets and business operations to Defendant-Successor, business operations by the Defendant-Seller entity ultimately ceased and dissolution of that entity was sought. As a result, Defendant-Successor is jointly and severally liable for Defendant-Seller's indemnification obligations to LBHI.

## PARTIES

5.     On September 15, 2008, Plaintiff LBHI commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. LBHI is a Delaware corporation with its principal place of business in New York, New York.

6.     Defendant-Seller is an entity that, at all times relevant, was organized in and did business within the United States.

7.     Defendant-Successor is an entity that, at all times relevant, is organized in and does business within the United States.

## JURISDICTION AND VENUE

8.     This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

9.     This Court has subject-matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334 as the matter has a close nexus with the Plan, which was confirmed by Order of the Bankruptcy Court, dated December 6, 2011 (the "Confirmation Order"), and became effective on March 6, 2012. The Court has retained post-confirmation jurisdiction over this matter pursuant to section 14.1 of the Plan and paragraph 77 of the Confirmation Order.

10.    Venue is proper under 28 U.S.C. §§ 157(a), 1391, 1408, and 1409 because the claims arise out of pre-petition contracts and are asserted as part of the administration of the estate as set forth in the Plan, and because a substantial part of the acts or omissions giving rise

4

to the claims occurred within the district, including the underlying agreements and loan transactions, and because the loss was suffered within the district.

11. This Court has personal jurisdiction over Defendants under Rule 7004(f) of the Bankruptcy Rules. In addition, this Court has personal jurisdiction over Defendants because Defendants, at all times relevant, were organized in and did business within the United States, and because the transactions giving rise to this controversy occurred in the United States.

## FACTUAL BACKGROUND

12. Prior to commencement of these cases, LBHI engaged in the purchase and sale of mortgage loans directly or through affiliates, including Lehman Brothers Bank, FSB ("LBB"), then sold the loans to third parties, including Fannie Mae and Freddie Mac, or securitized the loans, which were then marketed and sold to third party investors.

13. At all relevant times, Defendant-Seller engaged in mortgage origination, as well as the sale of mortgage loans on the secondary market to entities such as LBB and LBHI.

**A.     The Governing Agreements**

14. This dispute arises out of Defendant-Seller's sale of residential mortgage loans to LBHI's assignor, LBB, under one or more Loan Purchase Agreements with LBB (each a "LPA").[2]

15. The dates of the relevant LPAs are listed in Exhibit A attached hereto.

16. The LPAs specifically incorporates the terms and conditions of the Seller's Guide of loan administrator, Aurora Loan Services LLC (the "Seller's Guide," together with the LPAs,

---

[2] Although the language of certain sections referenced throughout this Complaint may vary slightly from LPA to LPA, it is generally consistent in all material respects.

5

the "Agreements") which set forth additional duties and obligations of Defendant-Seller.[3]  The Seller's Guide in its entirety is valid and binding on Defendant-Seller.

17. The Agreements set forth the duties and obligations of the parties with respect to the purchase and sale of mortgage loans, including but not limited to purchase price, delivery, and conveyance of the mortgage loans and mortgage loan documents.

18. The Agreements also set forth Defendant-Seller's duties and obligations regarding underwriting; representations and warranties concerning the parties and individual mortgage loans purchased, or sold; and Defendant-Seller's indemnification obligations.

19. Pursuant to the Agreements, Defendant-Seller sold Defective Loans to LBB that resulted in LBHI being exposed to and incurring liability, as described further below.

20. Defendant-Seller agreed that its obligations would extend to any subsequent purchasers and/or assignees, such as, in this case, LBHI.  The Seller's Guide defines the "Purchaser" as LBB and, among others, its "successors and/or assigns."  *See* Seller's Guide § 8.

21. In conjunction with the sale by LBB to LBHI of the Loans, LBB assigned to LBHI all of its rights and remedies under the Agreements pertaining to the Loans.

22. Further, the Seller's Guide provides that LBHI, as a subsequent holder of any Mortgage Loan, "shall be a third party beneficiary" of the LPAs.  *See* Seller's Guide § 711.

### B. Defendant-Seller's Representations Under the LPAs

23. Accordingly, LBHI as the "assignee" and third-party beneficiary of the Agreements, and as "subsequent holder" of the Loans, is entitled to all the benefits of the Agreements, including the right to contractual indemnification for Defective Loans.

---

[3] The operative Seller's Guide for each of the Defective Loans is the version in effect at the time the Defendant-Seller sold the loan to LBB.  Although the language of certain sections referenced throughout this Complaint may vary slightly from Seller's Guide to Seller's Guide, it is generally consistent in all material respects.

6

24. With respect to each of the loans sold to LBHI (as, among other things, LBB's assignee) under the LPAs, Defendant-Seller made a number of representations, warranties, and covenants concerning the quality, characteristics, and underwriting of the mortgage loans; the property securing the mortgage loans; and the borrowers.

25. Specific examples of Defendant-Seller's representations, warranties and covenants include, but are not limited to, the following:

> No document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading. Seller's Guide § 703(1).

> Seller . . . has duly and faithfully complied with and will continue to comply with: (i) all applicable laws, rules, regulations, decrees, pronouncements, directives, orders and contractual requirements with respect to the origination, closing, underwriting, processing and servicing of each Mortgage Loan . . . . Seller's Guide § 703(8).

> The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud was committed in connection with the origination of the Mortgage Loan. The Seller has reviewed all of the documents constituting the Mortgage Loan File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein. Seller's Guide § 703(12).

> There is no default, breach, violation or event of acceleration existing under the Mortgage or the Note and, no event has occurred or condition exists that, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration and neither Seller nor its predecessors has waived any default, breach, violation or event of acceleration. Seller's Guide § 703(18).

> The Mortgage Loan has been originated and processed by Seller or Seller's correspondent in accordance with, and conforms with, the terms of this Seller's Guide and the Loan Purchase Agreement, and

7

> the Mortgage Loan has been underwritten in accordance with Underwriting Guidelines in effect as of the date of the Delivery Commitment applicable to the Mortgage Loan. The Mortgage Loan complies with all the requirements of the related Program Profile applicable to such Mortgage Loan . . . . Seller's Guide § 703(21).
>
> The Mortgaged Property is lawfully occupied under applicable law, unless properly disclosed to Purchaser. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property, or with respect to the use and occupancy of the same (including, without limitation, certificates of occupancy and fire underwriting certificates), have been made or obtained by Seller or Seller's correspondent from the appropriate authorities. The Mortgagor represented at the time of origination of the Mortgage Loan that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence, if applicable. Seller's Guide § 703(24).
>
> Notwithstanding anything contained elsewhere in this Seller's Guide or the Loan Purchase Agreement, Seller hereby represents and warrants that all appraisals and other forms of real estate valuation conducted in connection with each Mortgage Loan comply with applicable federal and state law, including without limitation, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 as applicable, and the requirements of Fannie Mae or Freddie Mac and the Seller's Guide and were conducted and delivered prior to approval of the Mortgage Loan application by either (i) in the case of an appraisal, by a qualified appraiser, duly appointed by the Seller, or (ii) a valuation method meeting the requirements of the Seller's Guide. The fair market value of the Mortgaged Property as indicated by the property appraisal or valuation is materially accurate. Any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property has no interest, direct or indirect, in the Mortgaged Property or in any security thereof. The compensation of any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property was not affected by the approval or disapproval of the Mortgage Loan. Seller's Guide § 703(36).

26.     To the extent Defendant-Seller was also the underwriter of certain loans as permitted under the Seller's Guide or other applicable agreements, Defendant-Seller additionally represented, warranted and covenanted in Section 717(1) of the Seller's Guide that with respect to such loans:

8

> All underwriting performed by Seller hereunder shall be in strict compliance with the underwriting guidelines and product descriptions contained in the Seller's Guide and such other guidelines and requirements as may be provided to Seller in writing from time to time.

27. Defendant-Seller represented and/or warranted that it had the ability to perform its obligations under, and satisfy all requirements of, the LPAs. *See* Seller's Guide § 702(5).

28. LBHI (as, among other things, LBB's assignee) relied upon the representations and warranties contained in the Agreements in purchasing the Loans. Specifically, Section 701 of the Seller's Guide provides that:

> Seller acknowledges that Mortgage Loans are purchased in reliance upon: (i) the truth and accuracy of Seller's representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide, each of which representations and warranties relates to a matter material to such purchase; and (ii) Seller's compliance with each of the agreements, requirements, terms, covenants and conditions set forth in the Loan Purchase Agreement and this Seller's Guide.

### C.  **Defendant-Seller's Indemnification Obligation Under the Agreements**

29. Defendant-Seller agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses and expenses it might sustain as a result of the Defective Loans, including attorneys' fees. Section 711 of the Seller's Guide, entitled "Indemnification and Third Party Claims," provides, in pertinent part, as follows:

> In addition to any repurchase and cure obligations of Seller, . . . Seller shall indemnify Purchaser and Purchaser's designee (including, without limitation, any subsequent holder of any Note) from and hold them harmless against all claims, losses, damages, penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Purchaser may sustain in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement by any agent, employee, representative or officer of Seller or Seller's correspondent. In addition to any and all other obligations of Seller

9

>       hereunder, Seller agrees that it shall pay the reasonable attorney's
>       fees of Purchaser incurred in enforcing Seller's obligations
>       hereunder . . . .

### D.     LBHI's Settlements With Fannie Mae and Freddie Mac

30.     When LBB acquired loans from Defendant-Seller and others, it typically did not hold those loans on its books.  The loans it acquired from Defendant-Seller and other entities, including certain Defective Loans, were sold to LBHI, and then sold to other industry participants, including Fannie Mae and Freddie Mac.

31.     When LBHI sold the Defective Loans to Fannie Mae and/or Freddie Mac, it relied on information provided to LBB by Defendant-Seller, and it made representations and warranties to Fannie Mae and/or Freddie Mac based, in part, on the representations Defendant-Seller made to LBB.

32.     Eventually, Fannie Mae and/or Freddie Mac discovered breaches of representations, warranties and/or covenants in the Defective Loans.

33.     Fannie Mae and Freddie Mac filed proofs of claim in LBHI's bankruptcy proceeding to recover for losses on the Defective Loans and other loans sold to LBB.

34.     Many of the loans at issue in the Fannie Mae and Freddie Mac proofs of claims, and all of the Defective Loans, contained defects which caused LBHI to incur losses, judgments, costs, expenses, attorneys' fees, and liability to Fannie Mae and Freddie Mac.

35.     LBHI was forced to defend against and eventually settle with Fannie Mae and Freddie Mac.

36.     The Bankruptcy Court approved LBHI's settlements with Fannie Mae and Freddie Mac, including loan-level damages amounts for each Defective Loan (as shown in Exhibit A of each settlement agreement), finding the settlements to be "reasonable and appropriate."

37. The types of defects which caused LBHI to incur expenses, costs, losses, judgments, attorneys' fees, and liability to Fannie Mae and Freddie Mac, include but are not limited to defects concerning the quality and characteristics of the loans, the creditworthiness of the borrowers, and the value and characteristics of the collateral, such as with respect to the income, employment, assets, and debt obligations of the borrowers, the intended and actual occupancy status of the properties, the appraised value of the properties and compliance with appraisal standards, among other things; defects concerning underwriting and the collection and review of the loan application and supporting documentation; and defects concerning origination practices generally, including compliance with applicable laws, rules, regulations, decrees, pronouncements, directives, orders and guidelines.

38. As it concerns Defendants specifically, Exhibit B attached hereto identifies each of the Defective Loans in connection with the Fannie Mae and Freddie Mac Settlements, and provides a non-exclusive list of the defects causing LBHI to incur liability, expenses, losses, judgments, attorneys' fees, and other costs for each Defective Loan.  A general description of the defects identified in Exhibit B is included in Exhibit C attached hereto.

39. The liability incurred by LBHI to Fannie Mae and/or Freddie Mac was the result of Defendant-Seller's acts, failures, omissions, and breaches of its representations, warranties, obligations, and/or covenants, which representations, warranties, obligations, and/or covenants are co-extensive with the representations and warranties LBHI made to Fannie Mae and Freddie Mac.

### E.    LBHI's Settlement with RMBS Trustees

40. When LBB acquired loans from Defendant-Seller and others, it typically did not permanently hold those loans on its books.  Some of the loans it acquired from Defendant-Seller and other entities, including Defective Loans, were sold to LBHI, and then packaged for

11

securitization.

41. In connection with such securitizations, LBHI relied on information that Defendant-Seller provided to LBB, and it made representations and warranties to the securitization trusts, based, in part, on the representations Defendant-Seller made to LBB.

42. The agreements governing the securitizations provide that the applicable RMBS Trustee may seek contractually defined repurchases of loans in the event certain breaches of representations and warranties occurred.

43. Eventually, the RMBS Trustees discovered breaches of representations, warranties and/or covenants in the Defective Loans.

44. The RMBS Trustees filed claims to recover for losses on the Defective Loans and other loans sold to LBB.

45. Many of the loans at issue in the claims, including the loans in Exhibit D, were alleged to contain defects which caused LBHI to incur losses, judgments, costs, expenses, attorneys' fees, and liability to the RMBS Trustees.

46. LBHI was forced to defend against such allegations and eventually settle with the RMBS Trustees.

47. LBHI entered into a settlement agreement with the RMBS Trustees, under which it agreed to seek estimation of the liability underlying the claims in a proceeding before the Bankruptcy Court (the "<u>Estimation Proceeding</u>").  In that Estimation Proceeding, the RMBS Trustees sought damages of over $11.4 billion in damages based upon losses flowing from the at issue loans.  After the conclusion of the lengthy and highly contested Estimation Proceeding, for which LBHI provided notice of that proceeding to the Defendants, the Court entered the RMBS Order allowing a claim in favor of the RMBS Trustees.  LBHI also settled several other RMBS

Trustee claims in the course of its bankruptcy case as permitted by the Plan.[4]

48.     LBHI incurred liability, expenses, costs, losses, judgments, and attorneys' fees, to the RMBS Trustees as a result of defects, including but not limited to, defects concerning the quality and characteristics of the loans, the creditworthiness of the borrowers, the characteristics of the collateral, the intended and actual occupancy status of the properties, compliance with appraisal standards and lending regulations, application of underwriting guidelines and the collection and review of the loan application and supporting documentation, and documentation deficiencies.

49.     As it concerns Defendant-Seller specifically, Exhibit D attached hereto identifies each of the at issue loans in connection with the RMBS Order, and provides a non-exclusive list of the defects alleged by the RMBS Trustees on those loans. LBHI incurred liability, expenses, losses, judgments, attorneys' fees, and other costs as a result of the Defective Loans. A general description of the defects identified in Exhibit D is included in Exhibit C attached hereto.

50.     LBHI made representations, warranties, obligations, and/or covenants to the RMBS Trustees that were coextensive with those made by Defendant-Seller, and LBHI incurred liability to the RMBS Trustees as a result of Defendant-Seller's acts, failures, omissions, and breaches of its representations, warranties, obligations, and/or covenants.

F.     **Defendant-Seller's Obligation to Indemnify LBHI**

51.     Defendant-Seller agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses, attorneys' fees, and expenses it might sustain as a result of the Defective Loans. *See* Seller's Guide § 711.

---

[4] *See* RMBS Trust Settlement Agreement, entered into as of June 25, 2018, between LBHI and Wilmington Trust National Association; Allowed Proof of Claim numbers: 720000, 720001, 720002, 720003, 720004, 720005, 720006, 720007, 720008, 720009, 720010, 720011, 720012, 720013, 720014, 720015, 720016, 720017, 22773.04, 24792, 24810, 720020, 720025, 720021, 720024, 720022, 720023, 720018, 720019.

52. Pursuant to the Agreements, the laws of the State of New York govern this action.

53. All conditions precedent to bringing this action have been met, occurred or have been waived.

### G. Defendant-Successor's Liability for Defendant-Seller's Obligations

54. Defendant-Successor acquired Defendant-Seller's business, including nearly all of its assets and business relationships used in or necessary for the operation of Defendant-Seller's business (the "Acquisition"). The Acquisition amounted to a *de facto* merger of the two companies and Defendant-Successor is continuing Defendant-Seller's enterprise as a mere continuation of Defendant-Seller.

55. In connection with the Acquisition, Defendant-Seller's members received what amounts to an ownership interest in Defendant-Successor, including but not limited to: (i) cash payments over time from Defendant-Successor over time contingent upon certain minimum profits; (ii) profit-sharing "bonuses" from Defendant-Successor proportionate to each member's former ownership interest in Defendant-Seller; (iii) a right to a percentage of net proceeds in the event of a sale or liquidation of Defendant-Successor, and (iv) voting rights for one or more of Defendant-Seller's members.

56. Defendant-Seller no longer had any of the assets, employees, offices, phone lines, websites, business relationships, and/or credit facilities required to do business, and its business operations promptly ceased following the Acquisition.

57. After Defendants transferred Defendant-Seller's assets and business operations to Defendant-Successor, dissolution of that entity was sought.

58. Defendant-Successor assumed nearly all of Defendant-Seller's obligations and liabilities, including for certain agreements and contracts that were ordinarily necessary for the uninterrupted continuation of Defendant-Seller's business operations.

59. Defendant-Successor continued Defendant-Seller's enterprise under the "dba" of "1st Advantage Mortgage," including continuation of management, personnel, physical location, and general business operations.

60. Following the Acquisition, nearly all of Defendant-Seller's employees continued with Defendant-Successor to process mortgage loan applications and solicited new mortgage loans of the same type in the same manner as they had when they were employees of Defendant-Seller.

61. Defendant-Seller's Managing Member, Paul Luekens, became the president of Defendant-Successor in connection with the Acquisition.

62. Defendant-Seller's member, Mark Grego, became Chief Operating Officer of Defendant-Successor in connection with the Acquisition.

63. Keith Hoffman, Gilbert Antokal, and Steven Gross were also members of Defendant-Seller. Courtney Gross also had an ownership interest as a result of her relationship to Steven Gross or succeeded such interest by assignment or other means. In connection with the Acquisition, all members of Defendant-Seller or their surrogates continued their involvement in in the combined company as officers, managers, and/or employees of Defendant-Successor.

64. Following the Acquisition, Defendant-Seller's former office became Defendant-Successor's headquarters, and Defendant-Successor uses one or more of Defendant-Seller's phone numbers and maintains Defendant-Seller's former web address.

65. Following the Acquisition, Defendants sent announcements to third-parties informing them that Defendant-Successor acquired Defendant-Seller and would conduct business under the "1st Advantage" name.

66. Paul Luekens, the former Managing Member of Defendant-Seller and subsequent

15

President and Director of Defendant-Successor, represented to the Department of Housing that the Acquisition was conducted to take advantage of the economics provided by combining the two companies into one.

67. The Acquisition was structured to disadvantage creditors such as LBHI, including, inadequate cash consideration given for the Defendant-Seller's business, leaving Defendant-Seller unable to satisfy obligations to its creditors, such as LBHI.

68. Defendant-Successor is a mere continuation of Defendant-Seller, and the Acquisition amounted to a *de facto* merger of the two companies.

69. Defendant-Successor is liable for the predecessor's indemnification obligations to LBHI as Defendant-Seller's successor.

## FIRST CLAIM FOR RELIEF

**(Contractual Indemnification)**
**(Against Defendant-Seller and Defendant-Successor)**

70. LBHI hereby incorporates by reference the allegations set forth above as though fully set forth herein.

71. The Agreements are valid and enforceable contracts that are binding upon Defendants.

72. LBHI and/or LBB have substantially performed all of their obligations under the Agreements.

73. Defendants owe LBHI indemnity for its liabilities, losses, claims, attorneys' fees, judgments and any other costs, fees and expenses as to the Defective Loans.

74. Defendant-Seller's breaches of the Agreements and other acts and/or omissions as to the Defective Loans resulted in LBHI incurring liability and/or losses in an amount to be

determined at trial, plus prejudgment interest pursuant to New York law, attorney's fees, litigation costs, and all other fees and costs provided by the Agreements.

75. Defendant-Successor is jointly and severally liable for LBHI's contractual indemnification claim, as alleged herein, because it is a mere continuation of Defendant-Seller and engaged in a *de facto* merger with Defendant-Seller.

## **PRAYER FOR RELIEF**

WHEREFORE, LBHI respectfully requests that this Court enter judgment in its favor and against Defendants jointly and severally:

    a) For all damages arising from or relating to Defendant-Seller's obligations under the indemnification provisions of the Agreements, in an amount to be determined at trial;

    b) For recoverable interest;

    c) For the costs and expenses incurred by LBHI in enforcing Defendant-Seller's obligations under the Agreements, including attorneys' fees and costs and any expert witness fees incurred in litigation; and

    d) Providing for such other relief as the Court deems just and proper.

Dated: New York, New York
December 5, 2018

*/s/* William A. Maher
William A. Maher
Paul R. DeFilippo
James N. Lawlor
Adam M. Bialek
Mara R. Lieber

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone:  (212) 382-3300
Facsimile:   (212) 382-0050

Michael A. Rollin
Maritza Dominguez Braswell

FOX ROTHSCHILD LLP
101 Park Avenue, 17th Floor
New York, New York 10178
Telephone: (212) 878-7900
Facsimile: (212) 692-0940

*Counsel for Lehman Brothers Holdings Inc.*