WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
William A. Maher
Paul R. DeFilippo
James N. Lawlor
Adam M. Bialek
Mara R. Lieber

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | **Chapter 11** |
| Debtors. | **Case No. 08-13555 (SCC)** |
| LEHMAN BROTHERS HOLDINGS INC., | **Adv. Proc. No. _____** |
| Plaintiff, | |
| -against- | |
| ARLINGTON CAPITAL MORTGAGE CORPORATION and GATEWAY FUNDING DIVERSIFIED MORTGAGE SERVICES, L.P., | |
| Defendants. | |

### ADVERSARY COMPLAINT

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), the Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), for its Complaint against Arlington Capital Mortgage Corporation ("Arlington") and Gateway Funding Diversified Mortgage Services, L.P. ("Gateway" and together with Arlington, "Defendants") alleges upon knowledge as to itself and its own conduct, and upon information and belief as to all other matters, as follows:

### NATURE OF ACTION

1.      LBHI seeks to enforce its right to contractual indemnification for liabilities, losses, damages, claims, judgments and any other costs, fees and expenses LBHI incurred as a result of Defendants' sale and/or submission of defective mortgage loans in breach of Defendants' representations, warranties, obligations, and/or covenants and/or for which LBHI incurred liability due to Defendants' acts, failures to act and/or omissions (the "Defective Loans").

2.      In reliance on Defendants' promises, covenants, and representations and warranties, LBHI securitized certain loans.  In connection with the securitizations, which were marketed and sold to third party investors, LBHI made certain representations and warranties regarding the quality and characteristics of certain of the loans that were coextensive with those made by Defendants.  LBHI retained the right to seek indemnification from Defendants in the event it became liable for certain indemnification events.  After the trustees for hundreds of trusts (the "RMBS Trustees") allegedly discovered that the mortgage loans breached certain of those representations and warranties, the RMBS Trustees filed claims in LBHI's bankruptcy case for losses suffered on certain loans.  On March 15, 2018, this Court entered the Order Estimating Allowed Claim Pursuant to RMBS Settlement, dated March 15, 2018 (ECF No. 57785) (the

2

"RMBS Order") resolving the majority of the claims. LBHI also settled several other RMBS

Trustee claims as permitted by the Plan.[1]

      3.      By this action, LBHI seeks to recover money damages from Defendants for the

indemnification claims. Some Defective Loans were sold or submitted directly by Gateway to

LBHI's assignor, LBB, and some were sold or submitted directly by Arlington to LBHI's

assignor, LBB. However, as the U.S. District Court of the Eastern District of Pennsylvania and

U.S. Court of Appeals for the Third Circuit concluded, the alleged asset sale transaction between

Gateway and Arlington in 2008 amounted to a *de facto* merger between the two companies,

rendering Gateway jointly and severally liable for Arlington's indemnification obligations to

LBHI. *See Lehman Bros. Holdings v. Gateway Funding Diversified Mortg. Servs., L.P.*, 989 F.

Supp. 2d 411, 418 (E.D. Pa. 2013), *aff'd*, 785 F.3d 96 (3d Cir. 2015). Both Courts found that the

four factor *de facto* merger test was satisfied:

- <u>Continuity of enterprise</u>. Arlington's former officers continued to operate as the Arlington Branch of Gateway. The same personnel continued to carry out the same business operations, in the same markets, using the same assets, and at the same physical locations as Arlington had prior to the transaction. The transition to Gateway occurred with minimal interruption to Arlington's ongoing business.

- <u>Continuity of ownership</u>. Although Arlington shareholders had not acquired Gateway stock in the transition, they retained an ownership interest in Arlington and continued to share in its profits after the transaction by contractual profit sharing entitlements.

- <u>Cessation of business by the seller company</u>. Arlington, as a separate entity, maintained only a minimal level of activity after the asset purchase.

- <u>Assumption of ordinary business liabilities by the purchaser</u>. Gateway assumed substantially all of Arlington's debt and liabilities related to its ongoing loan origination business.

---

[1] *See* RMBS Trust Settlement Agreement, entered into as of June 25, 2018, between LBHI and Wilmington Trust National Association; Allowed Proof of Claim numbers: 720000, 720001, 720002, 720003, 720004, 720005, 720006, 720007, 720008, 720009, 720010, 720011, 720012, 720013, 720014, 720015, 720016, 720017, 22773.04, 24792, 24810, 720020, 720025, 720021, 720024, 720022, 720023, 720018, 720019.

*See Lehman Brothers Holdings, Inc. v. Gateway Funding Diversified Mortgage Services, L.P.,*
758 F.3d 96, 102 (3d Cir. 2015).

## PARTIES

4.        On September 15, 2008, Plaintiff LBHI commenced with this Court a voluntary
case under chapter 11 of the Bankruptcy Code.  LBHI is a Delaware corporation with its
principal place of business in New York, New York.

5.        Arlington is an entity that, at all times relevant, was organized in and does
business within the United States.

6.        Gateway is an entity that, at all time relevant, is organized in and does business
within the United States.

## JURISDICTION AND VENUE

7.        This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the
Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

8.        This Court has subject-matter jurisdiction to consider and determine this matter
pursuant to 28 U.S.C. §§ 157 and 1334 and as the matter has a close nexus with the Plan, which
was confirmed by Order of the Bankruptcy Court, dated December 6, 2011 (the "Confirmation
Order"), and became effective on March 6, 2012.  The Court has retained post-confirmation
jurisdiction over this matter pursuant to section 14.1 of the Plan and paragraph 77 of the
Confirmation Order.

9.        Venue is proper under 28 U.S.C. §§ 157(a), 1391, 1408, and 1409 because the
claims arise out of pre-petition contracts and are asserted as part of the administration of the
estate as set forth in the Plan, and because a substantial part of the acts or omissions giving rise
to the claims occurred within the district, including the underlying agreements and loan
transactions, and because the loss was suffered within the district.

4

10.    This Court has personal jurisdiction over Defendants under Rule 7004(f) of the

Bankruptcy Rules.  In addition, this Court has personal jurisdiction over Defendants because

Defendants are organized in and does business within the United States, and because the

transactions giving rise to this controversy occurred in the United States.

### FACTUAL BACKGROUND

11.    Prior to commencement of these case, LBHI engaged in the purchase and sale of

mortgage loans directly or through affiliates, including Lehman Brothers Bank, FSB ("LBB"),

then securitized the loans, which were then marketed and sold to third party investors.

12.    At all relevant times, Defendants engaged in mortgage origination, as well as the

sale of mortgage loans on the secondary market to entities such as LBB and LBHI.

### A.  The Governing Agreements

13.    This dispute arises out of Defendants' sale of residential mortgage loans to

LBHI's assignor, LBB, under one or more Loan Purchase Agreements with LBB (each a

"LPA");[2] and Defendant's submission of residential mortgage loans to LBHI's assignor, LBB,

under a Broker Agreement with LBB (the "Broker Agreement").[3]

14.    Several of the residential mortgage loans were also sold under the terms and

conditions of the related Purchase Price and Term Letters by and between LBB and Gateway

(each a "Purchase Letter"), as contemplated in the related LPAs.

15.    The dates of the relevant LPAs, Broker Agreement, and Purchase Letters are

listed in Exhibit A hereto.

---

[2] Although the language of certain sections referenced throughout this Complaint may vary slightly from LPA to LPA, it is generally consistent in all material respects.

[3] The operative Broker Agreement for each of the Defective Loans is the version in effect at the time the Gateway sold the loan to LBB.  Although the language of certain sections referenced throughout this Complaint may vary slightly from Broker Agreement to Broker Agreement, it is generally consistent in all material respects.

16.     The LPAs specifically incorporate the terms and conditions of the Seller's Guide

of loan administrator, Aurora Loan Services LLC (the "Seller's Guide," together with the LPAs,

Broker Agreement, and Purchase Letters, the "Agreements") which sets forth additional duties

and obligations of Defendants.[4]  The Seller's Guide in its entirety is valid and binding on

Defendants.

17.     The Agreements set forth the duties and obligations of the parties with respect to

the purchase and sale of mortgage loans, including but not limited to purchase price, delivery,

and conveyance of the mortgage loans and mortgage loan documents.

18.     The Agreements also set forth Defendants' duties and obligations regarding

underwriting; representations and warranties concerning the parties and individual mortgage

loans purchased, sold or submitted; and Defendants' indemnification obligations.

19.     Pursuant to the Agreements, Defendants sold and/or submitted Defective Loans to

LBB that resulted in LBHI being exposed to and incurring liability, as described further below.

20.     The parties agreed that Defendants' obligations would extend to any subsequent

purchasers and/or assignees, such as, in this case, LBHI.  The Seller's Guide defines the

"Purchaser" as LBB and, among others, its "successors and/or assigns."  *See* Seller's Guide § 8.

21.     The Broker Agreement provides that LBB as the "Lender, in its sole discretion,

may assign this Agreement from time to time."  *See e.g.,* Broker Agreement § 15.

22.     In conjunction with the sale by LBB to LBHI of the Defective Loans, LBB

assigned to LBHI all of its rights and remedies under the Agreements pertaining to the loans.

23.     Further, the Seller's Guide provides that LBHI, as a subsequent holder of any

---

[4] The operative Seller's Guide for each of the Defective Loans is the version in effect at the time the
Defendant sold the loan to LBB.  Although the language of certain sections referenced throughout this Complaint
may vary slightly from Seller's Guide to Seller's Guide, it is generally consistent in all material respects.

6

mortgage loan, "shall be a third party beneficiary" of the LPAs.  *See* Seller's Guide § 711.

**B. Defendants' Representations Under the LPAs**

24.     Accordingly, LBHI as the "assignee" and third-party beneficiary of the LPAs, and as "subsequent holder" of the loans, is entitled to all the benefits of the Agreements, including the right to contractual indemnification for Defective Loans.

25.     With respect to each of the loans sold to LBHI (as, among other things, LBB's assignee) under the LPAs, Defendants made a number of representations, warranties, and covenants concerning the quality, characteristics, and underwriting of the mortgage loans; the property securing the mortgage loans; and the borrowers.

26.     Specific examples of Defendants' representations, warranties and covenants include, but are not limited to, the following:

> No document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.  Seller's Guide § 703(1).

> Seller . . . has duly and faithfully complied with and will continue to comply with: (i) all applicable laws, rules, regulations, decrees, pronouncements, directives, orders and contractual requirements with respect to the origination, closing, underwriting, processing and servicing of each Mortgage Loan . . . .  Seller's Guide § 703(8).

> The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud was committed in connection with the origination of the Mortgage Loan. The Seller has reviewed all of the documents constituting the Mortgage Loan File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein.  Seller's Guide § 703(12).

There is no default, breach, violation or event of acceleration existing under the Mortgage or the Note and, no event has occurred or condition exists that, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration and neither Seller nor its predecessors has waived any default, breach, violation or event of acceleration. Seller's Guide § 703(18).

The Mortgage Loan has been originated and processed by Seller or Seller's correspondent in accordance with, and conforms with, the terms of this Seller's Guide and the Loan Purchase Agreement, and the Mortgage Loan has been underwritten in accordance with Underwriting Guidelines in effect as of the date of the Delivery Commitment applicable to the Mortgage Loan. The Mortgage Loan complies with all the requirements of the related Program Profile applicable to such Mortgage Loan . . . . Seller's Guide § 703(21).

The Mortgaged Property is lawfully occupied under applicable law, unless properly disclosed to Purchaser. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property, or with respect to the use and occupancy of the same (including, without limitation, certificates of occupancy and fire underwriting certificates), have been made or obtained by Seller or Seller's correspondent from the appropriate authorities. The Mortgagor represented at the time of origination of the Mortgage Loan that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence, if applicable. Seller's Guide § 703(24).

Notwithstanding anything contained elsewhere in this Seller's Guide or the Loan Purchase Agreement, Seller hereby represents and warrants that all appraisals and other forms of real estate valuation conducted in connection with each Mortgage Loan comply with applicable federal and state law, including without limitation, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 as applicable, and the requirements of Fannie Mae or Freddie Mac and the Seller's Guide and were conducted and delivered prior to approval of the Mortgage Loan application by either (i) in the case of an appraisal, by a qualified appraiser, duly appointed by the Seller, or (ii) a valuation method meeting the requirements of the Seller's Guide. The fair market value of the Mortgaged Property as indicated by the property appraisal or valuation is materially accurate. Any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property has no interest, direct or indirect, in the Mortgaged Property or in any security thereof. The compensation of any appraiser, inspector or other real estate professional engaged

8

> in the valuation of the Mortgaged Property was not affected by the
> approval or disapproval of the Mortgage Loan. Seller's Guide §
> 703(36).

27.     To the extent Defendants were also the underwriter of certain loans as permitted

under the Seller's Guide or other applicable agreements, Defendants additionally represented,

warranted and covenanted in Section 717(1) of the Seller's Guide that with respect to such loans:

> All underwriting performed by Seller hereunder shall be in strict
> compliance with the underwriting guidelines and product
> descriptions contained in the Seller's Guide and such other
> guidelines and requirements as may be provided to Seller in writing
> from time to time.

28.     Defendants represented and/or warranted that it had the ability to perform its

obligations under, and satisfy all requirements of, the LPAs. *See* Seller's Guide § 702(5).

29.     LBHI (as, among other things, LBB's assignee) relied upon the representations

and warranties contained in the Agreements in purchasing the loans. Specifically, Section 701 of

the Seller's Guide provides that:

> Seller acknowledges that Mortgage Loans are purchased in reliance
> upon: (i) the truth and accuracy of Seller's representations and
> warranties set forth in the Loan Purchase Agreement and this
> Seller's Guide, each of which representations and warranties relates
> to a matter material to such purchase; and (ii) Seller's compliance
> with each of the agreements, requirements, terms, covenants and
> conditions set forth in the Loan Purchase Agreement and this
> Seller's Guide.

**C. Defendants' Indemnification Obligation Under the LPAs**

30.     Defendants agreed to indemnify LBHI (as, among other things, LBB's assignee)

from liabilities, claims, judgments, losses and expenses it might sustain as a result of the

Defective Loans, including attorneys' fees. Section 711 of the Seller's Guide, entitled

"Indemnification and Third Party Claims," provides, in pertinent part, as follows:

> In addition to any repurchase and cure obligations of Seller, . . .
> Seller shall indemnify Purchaser and Purchaser's designee

9

(including, without limitation, any subsequent holder of any Note)
from and hold them harmless against all claims, losses, damages,
penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable
attorney's fees, judgments and any other costs, fees and expenses
that the Purchaser may sustain in any way related to or resulting
from any act or failure to act or any breach of any warranty,
obligation, representation or covenant contained in or made
pursuant to this Seller's Guide or the Loan Purchase Agreement by
any agent, employee, representative or officer of Seller or Seller's
correspondent.  In addition to any and all other obligations of Seller
hereunder, Seller agrees that it shall pay the reasonable attorney's
fees of Purchaser incurred in enforcing Seller's obligations
hereunder . . . .

### D.  Gateway's Representations Under the Broker Agreement

31.    With respect to each of the loans submitted under the Broker Agreement,

Gateway made a number of representations, warranties, and covenants concerning the quality,

characteristics, and underwriting of the mortgage loans; the property securing the mortgage

loans; and the borrowers of the mortgage loans.

32.    Specific examples of Gateway's representations, warranties and covenants

include, but are not limited to, the following:

To Broker's knowledge, after review of the entire loan application
package (including, without limitation, the loan application, earnest
money or purchase contract, property appraisal, verification of
income, deposits and credit sources, and closing affidavits or
certifications and other representations by borrowers), no fraudulent
information or documentation is present in the loan application
package or in the origination process used to generate the loan
application package. Broker has used its best efforts to ensure that
nothing contained in any loan application package, whether
obtained, derived or requested by the borrower, Broker or otherwise,
is untrue, erroneous or misleading.  Broker Agreement § 5(d).

Broker has no knowledge nor any reason to know of any . . .
circumstance or condition which might indicate that the appraisal is
incomplete or inaccurate or that the value of the Property might not
be at least the amount reported therein; or . . . circumstances or
conditions with respect to the Property, the borrower or the
borrower's credit that could reasonably be expected to cause private
institutional investors to regard the loan as an unacceptable

> investment or cause the loan to become delinquent, or adversely
> affect the value or marketability of the loan.  Broker Agreement §
> 5(e).

> Broker has complied with all terms, conditions, and requirements of
> Lender's Guidelines and this Agreement, and with all applicable
> federal, state and local laws relating to the loan application process
> . . . Broker Agreement § 5(g).

33.     Gateway represented and/or warranted that it had the ability to perform its

obligations under, and satisfy all requirements of, the Broker Agreement.

34.     Gateway agreed to indemnify LBHI (as, among other things, LBB's assignee)

from liabilities, claims, judgments, losses and expenses it might sustain as a result of the

Defective Loans, including attorneys' fees.  Section 8 of the Broker Agreement, entitled

"Indemnification," provides, in pertinent part, as follows:

> In addition to Lender's rights and remedies under applicable law
> (whether arising at law or in equity), Broker shall indemnify and
> hold Lender, its successors and assigns, and their respective officers,
> directors, employees. shareholders, members, agents, contractors,
> affiliates and subsidiaries (collectively, the "Lender Indemnitees")
> harmless from and against, and shall reimburse Lender Indemnitees
> with respect to, any and all claims, demands, losses, damages,
> interest, penalties, fines, forfeitures, judgments and expenses
> (including, without limitation, reasonable fees and disbursements of
> counsel, and court costs) (any of the foregoing hereinafter referred
> to as a "Claim"), resulting from, relating to or arising out of, whether
> the result of negligent or intentional conduct or otherwise: (i) any
> breach of any representation or warranty made by Broker pursuant
> to this Agreement or Lender's Guidelines: (ii) any breach or failure
> to perform any covenant or obligation of Broker in this Agreement
> or Lender's Guidelines. . . .

35.     The Broker Agreement also provides for the "prevailing party" to recover

attorneys' fees incurred to enforce the Broker Agreement.  Section 14 of the Broker Agreement,

entitled "Attorneys' Fees," provides as follows:

> If any action or proceeding is brought for the enforcement of this
> Agreement, or because of an alleged dispute, breach, default, or
> misrepresentation in connection with any of the provisions of this

Agreement, the successful or prevailing party or parties shall be entitled to reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

### E. LBHI's Settlement with RMBS Trustees

36.      When LBB acquired loans from Defendants and others, it typically did not permanently hold those loans on its books.  The loans it acquired from Defendants and other entities, including Defective Loans, were sold to LBHI, and then packaged for securitization.

37.      In connection with such securitizations, LBHI relied on information that Defendants provided to LBB, and it made representations and warranties to the securitization trusts, based, in part, on the representations Defendants made to LBB.

38.      The agreements governing the securitizations provide that the applicable RMBS Trustee may seek contractually defined repurchases of loans in the event certain breaches of representations and warranties occurred.

39.      Eventually, the RMBS Trustees discovered breaches of representations, warranties and/or covenants in the Defective Loans.

40.      The RMBS Trustees filed claim to recover for losses on the Defective Loans and other loans sold to LBB.

41.      Many of the loans at issue in the claims, including the loans in Exhibit B, were alleged to contain defects which caused LBHI to incur losses, judgments, costs, expenses, attorneys' fees, and liability to the RMBS Trustees.

42.      LBHI was forced to defend against such allegations and eventually settle with the RMBS Trustees.

43.      LBHI entered into a settlement agreement with the RMBS Trustees, under which it agreed to seek estimation of the liability underlying the claims in a proceeding before the

12

Bankruptcy Court (the "Estimation Proceeding").  In that Estimation Proceeding, the RMBS

Trustees sought damages of over $11.4 billion in damages based upon losses flowing from the at

issue loans.  After the conclusion of the lengthy and highly contested Estimation Proceeding, for

which LBHI provided notice of that proceeding to the Defendants, the Court entered the RMBS

Order allowing a claim in favor of the RMBS Trustees.  LBHI also settled several other RMBS

Trustee claims in the course of business its bankruptcy case as permitted by the Plan.[5]

44.    LBHI incurred liability, expenses, costs, losses, judgments, and attorneys' fees to

the RMBS Trustees as a result of defects, including but not limited to, defects concerning the

quality and characteristics of the loans, the creditworthiness of the borrowers, the characteristics

of the collateral, the intended and actual occupancy status of the properties, compliance with

appraisal standards and lending regulations, application of underwriting guidelines and the

collection and review of the loan application and supporting documentation, and documentation

deficiencies.

45.    As it concerns Defendants specifically, Exhibit B attached hereto identifies each

of the at issue loans in connection with the RMBS Order, and provides a non-exclusive list of the

defects alleged by the RMBS Trustees on those loans.  LBHI incurred liability, expenses, losses,

judgments, attorneys' fees, and other costs as a result of the Defective Loans.  A general

description of the defects identified in Exhibit B is included in Exhibit C attached hereto.

46.    LBHI made representations, warranties, obligations and/or covenants to the

RMBS Trustees that were coextensive with those made by Defendants, and LBHI incurred

liability to the RMBS Trustees as a result of Defendants' acts, failures, omissions, and breaches

---

[5] *See* RMBS Trust Settlement Agreement, entered into as of June 25, 2018, between LBHI and Wilmington Trust
National Association; Allowed Proof of Claim numbers:  720000, 720001, 720002, 720003, 720004, 720005,
720006, 720007, 720008, 720009, 720010, 720011, 720012, 720013, 720014, 720015, 720016, 720017, 22773.04,
24792, 24810, 720020, 720025, 720021, 720024, 720022, 720023, 720018, 720019.

of its representations, warranties, obligations, and/or covenants.

**F.  Defendants' Obligations to Indemnify LBHI**

47.     Defendants agreed to indemnify LBHI (as, among other things, LBB's assignee)

from liabilities, claims, judgments, losses, attorneys' fees, and expenses it might sustain as a

result of the Defective Loans.  *See* Seller's Guide § 711; Broker Agreement § 8.

48.     Gateway is also liable for Arlington's obligations to LBHI because it is

Arlington's successor as a matter of law.  *See Gateway Funding Diversified Mortgage Services,*

*L.P.*, 758 F.3d at 96 (affirming decision that a *de facto* merger had occurred between Gateway

and Arlington).

49.     Pursuant to the Agreements, the laws of the State of New York govern this action.

50.     All conditions precedent to bringing this action have been met, occurred or have

been waived.

**G.  Gateway's Liability for Arlington's Obligations**

51.     On February 8, 2008, Arlington and Gateway entered into what was named an

Asset Purchase Agreement ("APA").  Under the APA, Arlington sold to Gateway "all of

[Arlington]'s right, title and interest in and to the personal, tangible, intangible and other

properties, rights and assets used in the operation of or held for use or useable in the Business."

*See Gateway Funding*, 989 F. Supp. 2d at 418 (concluding that the transaction between Gateway

and Arlington amounted to a de facto merger between the two companies), *aff'd*, 785 F.3d 96.

52.     Gateway obtained "all of the following assets of [Arlington]" including:

equipment, fixtures, and furniture; intellectual property; computer software; telephone numbers,

domain names, and email address; credits, advance payments and deposits; all loans on both

warehouse facilities; "[a]ll accounts receivable as of the Closing Date;" "[r]ights to all prepaid

expenses as of the Closing Date;" "[r]ights in and to any restrictive covenants and other

14

obligations of present and former employees, independent contractors, consultants, suppliers and customers to [Arlington];" "[a]ll cash in all accounts, including excess cash in both Warehouse Facilities;" and "[c]laims and rights against third parties" related to the purchased assets. *Id.* at 418. Gateway also obtained "[a]ll Pipeline Loans that have not gone to settlement by the Closing Date." *Id.* The APA defined "Pipeline Loans" as "any residential mortgage loan for which an application has been taken by [Arlington]'s employees on or before the Closing Date, and that has not been closed and for which a check has not been issued or wire has not been sent as of the Closing Date." *Id.*

53.     Gateway's CEO publicly admitted that he sought to maintain the "ongoing business" of Arlington, that he sought to continue the mortgage operations, even after the pipeline closed, and that he not only bought the residential mortgage loans in process, but "the ability to get that . . . business in the future." *Id.*

**1. Gateway's Assumption of Liabilities Ordinarily Necessary for the Uninterrupted Continuation of Normal Business Operations**

54.     Besides purchasing substantially all of Arlington's assets, Gateway also assumed many of its liabilities.

55.     Under the APA, Gateway assumed certain liabilities of Arlington, including all of Arlington's warehouse debt, all accounts payable, all accrued payroll, lock fees, escrows, almost all accrued expenses, and a loan and a line of credit from Wilmington Trust. *Id.* at 419. Arlington and Gateway also signed an "Assignment, Delegation and Assumption Agreement." This agreement states that Gateway "is to assume, substantially all of the contracts, liabilities and obligations of [Arlington] relating to [Arlington]'s business and operations except for Excluded Liabilities (as defined in the Purchase Agreement)." *Id.*

2.  **Continuity of Ownership**

56.     As a condition of closing the asset purchase transaction, Arlington president

Kevin Kenyon and executive vice presidents Daniel Leinhauser and Joseph Granahan signed

"Branch Manager Employment Agreements."  *Id.* at 419-20.  Through these agreements

Gateway hired the three Arlington shareholders as branch managers of the former Arlington

offices that became the Arlington Branch of Gateway.  These branches used the Arlington

Capital Mortgage name as a d/b/a and used the Arlington name outside their front door.  In this

capacity, the three Arlington shareholders supervised many of the same employees they had

previously supervised at Arlington and did so at the former Arlington locations.  *Id.*

57.     Arlington CEO Russo, signed a different "Employment Agreement," providing

for special compensation terms and benefits.  *Id.*  Russo's employment agreement contractually

entitled him to five percent of Gateway's total profits.  It also entitled him to ten percent of the

profits of the Arlington Branch of Gateway, which included not only the former Arlington

offices, but "any offices to which any of . . . [Arlington's] business operations are transferred and

any new offices opened with respect to such business operations."  *Id.* at 435.

58.     Russo, however, was not the only shareholder to receive contractual profit-sharing

rights at Gateway.  Each of the three minority shareholders also signed Branch Manager

Employment Agreements that entitled them to share in the profits of the former Arlington

offices. Each of the three shareholders received the net profits from the branch they managed,

and both Granahan and Leinhauser admitted that their situation was similar to that of a small

business owner.  *Id*. at 435.  In this way, the three shareholders also maintained an ownership

interest in Arlington's former assets after the transaction.

59.     In addition to these profit sharing rights, Arlington's four shareholders received

significant lump sum payments and forgivable loans as part of their Agreement Not to Compete

16

with Gateway.  At least one former shareholder admitted that these payments compensated for the fact that the transaction rendered his shares worthless.

60.     In sum, four Arlington shareholders continued to have an ownership interest in their assets after the transaction with Gateway.  Before the transaction, the Arlington owners shared in Arlington's profits as shareholders.  After the transaction, they continued to share in the profits of the Arlington Branch of Gateway.  Continuity of ownership exists.

**3.  Continuity of Arlington's Enterprise**

61.     Gateway purchased the ability to continue Arlington's entire loan production business and did successfully continue that business.  *Id.* at 432.  Gateway's CEO admitted that he not only sought Arlington's pipeline of loans but the ability to continue to generate that business.  *Id.*

62.     In the transition from Arlington to Gateway, the former Arlington employees worked in the same office, worked under the same business name (using the Arlington name as a d/b/a), and continued to work in the same markets—including the jumbo loan market—as they had before the transaction.  *Id.* at 424-25; 432.

63.     Gateway offered employment to the vast majority of Arlington's employees, most of whom accepted the offers.  The APA states that "[i]t is the intention of [Gateway] that [Gateway] shall employ all of [Arlington]'s existing qualified loan production and production support employees that are employed in connection with the operation of the Business," as well as additional employees listed in a separate schedule.  *Id.* at 424.  The additional list of employees contains approximately 180 people, including branch managers, accountants, underwriters, compliance coordinators, financial analysts, IT staff, administrative assistants, and a Human Resources generalist, among others.  *Id.*  Gateway offered employment to the "large majority" of Arlington employees, and approximately 90% accepted Gateway's offer of

17

employment. *Id.*

64.    At least as late as 2011, Gateway's website listed two branches under the

Arlington name. *Id.* at 426. As late as July 2011, a branch called "Arlington Capital Mortgage–

PA" was still listed under Gateway's Pennsylvania locations. *Id.* As late as August 2011, a

branch called "Arlington Capital Mortgage–NJ" was still listed under Gateway's New Jersey

Locations. *Id.* In August 2011, Gateway's online profile for Arlington Capital Mortgage–NJ—

the former Arlington Princeton Branch—stated in the "About Us" section that: "As one of the

oldest mortgage banking firms . . . in Princeton, New Jersey, Arlington Capital Mortgage knows

how to make home financing solutions happen." *Id.* The APA provided that Arlington would

transfer its telephone numbers to Gateway, and the former Arlington branches of Gateway

continued to use the same phone numbers they had used prior to the asset purchase transaction.

*Id.* The APA provided that Arlington would transfer the right to use its domain names and email

addresses to Gateway, including arlingtoncapital.com, acmc-web.com, Thinkarlington.com, and

Windsorfinancial.com, and after the transaction, Arlington's website redirected to Gateway's

website, while Thinkarlington.com redirected to Gateway's website until at least August 2010.

*Id.*

65.    Virtually all of Arlington's assets transferred to Gateway. The APA provides that

Gateway purchased all of the "Assets Used in the Business," which represent all of the assets

used by [Arlington] to conduct its mortgage origination business as it is now being conducted."

The APA even designated that "all cash in all accounts be transferred to Gateway as part of the

transaction."

66.    Additionally, Arlington's operations continued uninterrupted during the transition

to Gateway. The APA required Arlington to ensure the continuity of its general business

operations and

> use all commercially reasonable efforts to (i) preserve the business organization of [Arlington], (ii) keep available the services of the current officers and employees of [Arlington] that are engaged in the Business . . ., and (iii) maintain the existing relations with Customers, creditors, business partners and others having business dealings with [Arlington] in connection with the Business.

*Id.* at 425.

### 4. Cessation of Ordinary Business Operations

67.     Although Arlington did not formally dissolve, Arlington retained no employees, offices, or assets of substance after the transaction.  Arlington also ceased its ordinary business operations:  Arlington discontinued its residential mortgage origination business—its primary enterprise—as required by the Arlington shareholders' Agreements Not to Compete.  *Id.* at 437.

68.     Furthermore, by the end of 2009, Arlington had devolved into an asset-less shell. Its cash was virtually depleted, and only $11,000 remained in the bank.  Since 2009, Arlington's cash assets have not fluctuated greatly and it and is still an asset-less entity.  *Id.*

69.     Arlington has not made disbursements to shareholders since shortly after the transaction, and two of Arlington's shareholders testified that their ownership interest was worthless.  *Id.*

70.     Arlington did not carry on an independent business after the merger.

### FIRST CLAIM FOR RELIEF

### (Contractual Indemnification)

71.     LBHI hereby incorporates by reference the allegations set forth above as though fully set forth herein.

72.     The Agreements are valid and enforceable contracts that are binding upon Defendants.

73.     LBHI and/or LBB has substantially performed all of their obligations under the Agreements.

74.     Defendants owe LBHI indemnity for its liabilities, losses, claims, attorneys' fees, judgments and any other costs, fees and expenses as to the Defective Loans.

75.     Defendants' breaches of the Agreements and other acts and/or omissions as to the Defective Loans resulted in LBHI incurring liability and/or losses in an amount to be determined at trial, plus prejudgment interest pursuant to New York law, attorneys' fees, litigation costs, and all other fees and costs provided by the Agreements.

76.     Gateway is jointly and severally liable for any and all judgments, losses, liability and/or damages resulting from the wrongful actions of Arlington, as alleged herein, because it is Arlington's successor.

## PRAYER FOR RELIEF

WHEREFORE, LBHI respectfully requests that this Court enter judgment in its favor and against Defendants jointly and severally

a)      For all damages arising from or relating to Defendants' obligations under the indemnification provisions of the Agreements, in an amount to be determined at trial;

b)      For recoverable interest;

c)      For the costs and expenses incurred by LBHI in enforcing Defendants' obligations under the Agreement, including attorneys' fees and costs and any expert witness fees incurred in litigation; and

d)      Providing for such other relief as the Court deems just and proper.

Dated:  New York, New York
        December 12, 2018

                                        /s/ William A. Maher
                                        William A. Maher
                                        Paul R. DeFilippo
                                        James N. Lawlor
                                        Adam M. Bialek
                                        Mara R. Lieber

                                        WOLLMUTH MAHER & DEUTSCH LLP
                                        500 Fifth Avenue
                                        New York, New York 10110
                                        Telephone:  (212) 382-3300
                                        Facsimile:   (212) 382-0050

                                        *Counsel for Lehman Brothers Holdings Inc.*