WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
William A. Maher
Paul R. DeFilippo
James N. Lawlor
Adam M. Bialek
Mara R. Lieber

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.,*<br><br>Debtors. | **Chapter 11**<br><br>**Case No. 08-13555 (SCC)** |
| LEHMAN BROTHERS HOLDINGS INC.,<br><br>Plaintiff,<br><br>-against-<br><br>PMAC LENDING SERVICES, INC., individually and as successor by merger to PMC Bancorp, f/k/a Professional Mortgage Corp., and as successor by merger to Reliant Mortgage Company, LLC, and PMC BANCORP, f/k/a Professional Mortgage Corp., individually, and RELIANT MORTGAGE COMPANY, LLC, individually,<br><br>Defendants. | **Adv. Proc. No. _____** |

## ADVERSARY COMPLAINT

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), the Plan Administrator under the
Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its
Affiliated Debtors (the "Plan"), for its Complaint Defendants PMC Bancorp, f/k/a Professional
Mortgage Corp. ("PMC Bancorp"), individually, Reliant Mortgage Company, LLC ("Reliant"),
individually, and PMAC Lending Services, Inc. ("PMAC Lending"), individually and as
successor to PMC Bancorp and Reliant (PMC Bancorp, Reliant, and PMAC Lending, and
Reliant are collectively referred to herein as the "Defendants"), alleges upon knowledge as to
itself and its own conduct, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.      LBHI seeks to enforce its right to contractual indemnification for liabilities,
losses, damages, claims, judgments and any other costs, fees and expenses LBHI incurred as a
result of Defendants' sale and/or submission of defective mortgage loans in breach of
Defendants' representations, warranties, obligations, and/or covenants and/or for which LBHI
incurred liability due to Defendant's acts, failures to act and/or omissions (the "Defective
Loans").

2.      In reliance on Defendants' promises, covenants, and representations and
warranties, LBHI securitized certain loans.  In connection with the securitizations, which were
marketed and sold to third party investors, LBHI made certain representations and warranties
regarding the quality and characteristics of certain of the loans that were coextensive with those
made by Defendants.  LBHI retained the right to seek indemnification from Defendants in the
event it became liable for certain indemnification events.  After the trustees for hundreds of trusts
(the "RMBS Trustees") allegedly discovered that the mortgage loans breached certain of those
representations and warranties, the RMBS Trustees filed claims in LBHI's bankruptcy case for

2

losses suffered on certain loans.  On March 15, 2018, this Court entered the Order Estimating

Allowed Claim Pursuant to RMBS Settlement, dated March 15, 2018 (ECF No. 57785) (the

"RMBS Order") resolving the majority of the claims.  LBHI also settled several other RMBS

Trustee claims as permitted by the Plan.[1]

3.      By this action, LBHI seeks to recover money damages from Defendants for the

indemnification claims.

4.      In addition to each Defendant's separate liability for the Defective Loans it sold,

LBHI also seeks to recover damages from PMAC Lending for LBHI's claims against PMC

Bancorp and Reliant because PMAC Lending is liable, as successor, for PMC Bancorp's and

Reliant's obligations, debts, and liabilities.  Specifically, PMAC Lending expressly or impliedly

agreed to assume PMC Bancorp's debts, obligations, and liabilities; engaged in a de-facto

consolidation or merger with PMC Bancorp; and/or is a mere continuation of PMC Bancorp.

PMAC Lending and PMC Bancorp also engaged in a fraudulent transfer of PMC Bancorp's

assets with actual intent to hinder, delay, or defraud PMC Bancorp's creditors, thereby giving

rise to PMAC Lending's liability as successor for PMC Bancorp's obligations, debts, and

liabilities.  PMAC Lending also expressly or impliedly agreed to assume Reliant's debts,

obligations, and liabilities.  As a result, PMAC is jointly and severally liable for PMC Bancorp

and Reliant's indemnification obligations to LBHI.

## PARTIES

5.      On September 15, 2008, Plaintiff LBHI commenced with this Court a voluntary

case under chapter 11 of the Bankruptcy Code.  LBHI is a Delaware corporation with its

---

[1] *See* RMBS Trust Settlement Agreement, entered into as of June 25, 2018, between LBHI and Wilmington Trust
National Association; Allowed Proof of Claim numbers:  720000, 720001, 720002, 720003, 720004, 720005,
720006, 720007, 720008, 720009, 720010, 720011, 720012, 720013, 720014, 720015, 720016, 720017, 22773.04,
24792, 24810, 720020, 720025, 720021, 720024, 720022, 720023, 720018, 720019.

principal place of business in New York, New York.

6.    Upon information and belief, Defendants are organized in and do business within the United States.

7.    PMAC Lending is a successor to PMAC Bancorp and Reliant.  As a result, all debts, liabilities and obligations of PMAC Bancorp. and Reliant vested in PMAC Lending. PMAC Lending is named in this action both in its own capacity and as successor.

## JURISDICTION AND VENUE

8.    This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

9.    This Court has subject-matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334 and as the matter has a close nexus with the Plan, which was confirmed by Order of the Bankruptcy Court, dated December 6, 2011 (the "Confirmation Order"), and became effective on March 6, 2012.  The Court has retained post-confirmation jurisdiction over this matter pursuant to section 14.1 of the Plan and paragraph 77 of the Confirmation Order.

10.    Venue is proper under 28 U.S.C. §§ 157(a), 1391, 1408, and 1409 because the claims arise out of pre-petition contracts and are asserted as part of the administration of the estate as set forth in the Plan, and because a substantial part of the acts or omissions giving rise to the claims occurred within the district, including the underlying agreements and loan transactions, and because the loss was suffered within the district.

11.    This Court has personal jurisdiction over Defendants under Rule 7004(f) of the Bankruptcy Rules.  In addition, this Court has personal jurisdiction over Defendants because Defendants are organized in and do business within the United States, and because the transactions giving rise to this controversy occurred in the United States.

4

## FACTUAL BACKGROUND

12.     Prior to commencement of these case, LBHI engaged in the purchase and sale of mortgage loans directly or through affiliates, including Lehman Brothers Bank, FSB ("LBB"), then securitized the loans, which were then marketed and sold to third party investors.

13.     At all relevant times, Defendants engaged in mortgage origination, as well as the sale of mortgage loans on the secondary market to entities such as LBB and LBHI.

### A.     The Governing Agreements

14.     This dispute arises out of Defendants' sale of residential mortgage loans to LBHI's assignor, LBB, under one or more Loan Purchase Agreements with LBB (a "LPA").[2]

15.     Several of the residential mortgage loans were also sold under the terms and conditions of the related Purchase Price and Term Letters by and between LBB and Defendants (each a "Purchase Letter"), as contemplated in the related LPAs.

16.     The dates of the relevant LPAs and Purchase Letters are listed in Exhibit A hereto.

17.     The LPAs specifically incorporate the terms and conditions of the Seller's Guide of loan administrator, Aurora Loan Services LLC (the "Seller's Guide," together with the LPAs, the "Agreements") which sets forth additional duties and obligations of Defendants.[3]  The Seller's Guide in its entirety is valid and binding on Defendants.

18.     The Agreements set forth the duties and obligations of the parties with respect to

---

[2] Although PMC Bancorp, PMAC Lending, and Reliant entered into separate Loan Purchase Agreements, the relevant provisions are substantially similar in all material respects as between the Loan Purchase Agreements at issue in this action.

[3] The operative Seller's Guide for each of the Defective Loans is the version in effect at the time the Defendants sold the loan to LBB.  Although the language of certain sections referenced throughout this Complaint may vary slightly from Seller's Guide to Seller's Guide, it is generally consistent in all material respects.

the purchase and sale of mortgage loans, including but not limited to purchase price, delivery, and conveyance of the mortgage loans and mortgage loan documents.

19.    The Agreements also set forth Defendants' duties and obligations regarding underwriting; representations and warranties concerning the parties and individual mortgage loans purchased, sold or submitted; and Defendants' indemnification obligations.

20.    Pursuant to the Agreements, Defendants sold and/or submitted Defective Loans to LBB that resulted in LBHI being exposed to and incurring liability, as described further below.

21.    The parties agreed that Defendants' obligations would extend to any subsequent purchasers and/or assignees, such as, in this case, LBHI.  The Seller's Guide defines the "Purchaser" as LBB and, among others, its "successors and/or assigns."  *See* Seller's Guide § 8.

22.    The Purchase Letters provide that "[t]he Purchaser has the right to assign all of its rights under the Purchase Price and Terms Letter, the Agreement, and/or any of the Mortgage Loans purchased under the Agreement or the Guide to any affiliate of the Purchaser or third party."[4]

23.    In conjunction with the sale by LBB to LBHI of the Defective Loans, LBB assigned to LBHI all of its rights and remedies under the Agreements pertaining to the loans.

24.    Further, the Seller's Guide provides that LBHI, as a subsequent holder of any mortgage loan, "shall be a third party beneficiary" of the LPAs.  *See* Seller's Guide § 711.

**B.    Defendants' Representations Under the LPAs**

25.    Accordingly, LBHI as the "assignee" and third-party beneficiary of the LPAs, and as "subsequent holder" of the loans, is entitled to all the benefits of the Agreements, including the right to contractual indemnification for Defective Loans.

---

[4] Although the language of certain provisions referenced in this Complaint may vary slightly from Purchase Letter to Purchase Letter, it is generally consistent in all material respects.

26.    With respect to each of the loans sold to LBHI (as, among other things, LBB's assignee) under the LPAs, Defendants made a number of representations, warranties, and covenants concerning the quality, characteristics, and underwriting of the mortgage loans; the property securing the mortgage loans; and the borrowers.

27.    Specific examples of Defendants' representations, warranties and covenants include, but are not limited to, the following:

> No document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.  Seller's Guide § 703(1).

> Seller . . . has duly and faithfully complied with and will continue to comply with: (i) all applicable laws, rules, regulations, decrees, pronouncements, directives, orders and contractual requirements with respect to the origination, closing, underwriting, processing and servicing of each Mortgage Loan . . . .  Seller's Guide § 703(8).

> The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud was committed in connection with the origination of the Mortgage Loan. The Seller has reviewed all of the documents constituting the Mortgage Loan File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein.  Seller's Guide § 703(12).

> There is no default, breach, violation or event of acceleration existing under the Mortgage or the Note and, no event has occurred or condition exists that, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration and neither Seller nor its predecessors has waived any default, breach, violation or event of acceleration.  Seller's Guide § 703(18).

> The Mortgage Loan has been originated and processed by Seller or Seller's correspondent in accordance with, and conforms with, the terms of this Seller's Guide and the Loan Purchase Agreement, and

7

the Mortgage Loan has been underwritten in accordance with Underwriting Guidelines in effect as of the date of the Delivery Commitment applicable to the Mortgage Loan. The Mortgage Loan complies with all the requirements of the related Program Profile applicable to such Mortgage Loan . . . . Seller's Guide § 703(21).

The Mortgaged Property is lawfully occupied under applicable law, unless properly disclosed to Purchaser. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property, or with respect to the use and occupancy of the same (including, without limitation, certificates of occupancy and fire underwriting certificates), have been made or obtained by Seller or Seller's correspondent from the appropriate authorities. The Mortgagor represented at the time of origination of the Mortgage Loan that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence, if applicable. Seller's Guide § 703(24).

Notwithstanding anything contained elsewhere in this Seller's Guide or the Loan Purchase Agreement, Seller hereby represents and warrants that all appraisals and other forms of real estate valuation conducted in connection with each Mortgage Loan comply with applicable federal and state law, including without limitation, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 as applicable, and the requirements of Fannie Mae or Freddie Mac and the Seller's Guide and were conducted and delivered prior to approval of the Mortgage Loan application by either (i) in the case of an appraisal, by a qualified appraiser, duly appointed by the Seller, or (ii) a valuation method meeting the requirements of the Seller's Guide. The fair market value of the Mortgaged Property as indicated by the property appraisal or valuation is materially accurate. Any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property has no interest, direct or indirect, in the Mortgaged Property or in any security thereof. The compensation of any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property was not affected by the approval or disapproval of the Mortgage Loan. Seller's Guide § 703(36).

28.    To the extent Defendants were also the underwriters of certain loans as permitted under the Seller's Guide or other applicable agreements, Defendants additionally represented, warranted and covenanted in Section 717(1) of the Seller's Guide that with respect to such loans:

> All underwriting performed by Seller hereunder shall be in strict compliance with the underwriting guidelines and product descriptions contained in the Seller's Guide and such other guidelines and requirements as may be provided to Seller in writing from time to time.

29.     Defendants represented and/or warranted that they had the ability to perform their obligations under, and satisfy all requirements of, the LPAs. *See* Seller's Guide § 702(5).

30.     LBHI (as, among other things, LBB's assignee) relied upon the representations and warranties contained in the Agreements in purchasing the loans. Specifically, Section 701 of the Seller's Guide provides that:

> Seller acknowledges that Mortgage Loans are purchased in reliance upon: (i) the truth and accuracy of Seller's representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide, each of which representations and warranties relates to a matter material to such purchase; and (ii) Seller's compliance with each of the agreements, requirements, terms, covenants and conditions set forth in the Loan Purchase Agreement and this Seller's Guide.

**C.    Defendants' Indemnification Obligation Under the LPAs**

31.     Defendants agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses and expenses it might sustain as a result of the Defective Loans, including attorneys' fees. Section 711 of the Seller's Guide, entitled "Indemnification and Third Party Claims," provides, in pertinent part, as follows:

> In addition to any repurchase and cure obligations of Seller, . . . Seller shall indemnify Purchaser and Purchaser's designee (including, without limitation, any subsequent holder of any Note) from and hold them harmless against all claims, losses, damages, penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Purchaser may sustain in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement by any agent, employee, representative or officer of Seller or Seller's correspondent. In addition to any and all other obligations of Seller

hereunder, Seller agrees that it shall pay the reasonable attorney's fees of Purchaser incurred in enforcing Seller's obligations hereunder . . . .

**D.      LBHI's Settlement with RMBS Trustees**

32.     When LBB acquired loans from Defendants and others, it typically did not permanently hold those loans on its books.  The loans it acquired from Defendants and other entities, including Defective Loans, were sold to LBHI, and then packaged for securitization.

33.     In connection with such securitizations, LBHI relied on information that Defendants provided to LBB, and it made representations and warranties to the securitization trusts, based, in part, on the representations Defendants made to LBB.

34.     The agreements governing the securitizations provide that the applicable RMBS Trustee may seek contractually defined repurchases of loans in the event certain breaches of representations and warranties occurred.

35.     Eventually, the RMBS Trustees discovered breaches of representations, warranties and/or covenants in the Defective Loans.

36.     The RMBS Trustees filed claim to recover for losses on the Defective Loans and other loans sold to LBB.

37.     Many of the loans at issue in the claims, including the loans in Exhibit B, were alleged to contain defects which caused LBHI to incur losses, judgments, costs, expenses, attorneys' fees, and liability to the RMBS Trustees.

38.     LBHI was forced to defend against such allegations and eventually settle with the RMBS Trustees.

39.     LBHI entered into a settlement agreement with the RMBS Trustees, under which it agreed to seek estimation of the liability underlying the claims in a proceeding before the Bankruptcy Court (the "Estimation Proceeding").  In that Estimation Proceeding, the RMBS

Trustees sought damages of over $11.4 billion in damages based upon losses flowing from the at issue loans.  After the conclusion of the lengthy and highly contested Estimation Proceeding, for which LBHI provided notice of that proceeding to the Defendants, the Court entered the RMBS Order allowing a claim in favor of the RMBS Trustees.  LBHI also settled several other RMBS Trustee claims in the course of business its bankruptcy case as permitted by the Plan.[5]

40.     LBHI incurred liability, expenses, costs, losses, judgments, and attorneys' fees to the RMBS Trustees as a result of defects, including but not limited to, defects concerning the quality and characteristics of the loans, the creditworthiness of the borrowers, the characteristics of the collateral, the intended and actual occupancy status of the properties, compliance with appraisal standards and lending regulations, application of underwriting guidelines and the collection and review of the loan application and supporting documentation, and documentation deficiencies.

41.     As it concerns Defendants specifically, Exhibit B attached hereto identifies each of the at issue loans in connection with the RMBS Order, and provides a non-exclusive list of the defects alleged by the RMBS Trustees on those loans.  LBHI incurred liability, expenses, losses, judgments, attorneys' fees, and other costs as a result of the Defective Loans.  A general description of the defects identified in Exhibit B is included in Exhibit C attached hereto.

42.     LBHI made representations, warranties, obligations and/or covenants to the RMBS Trustees that were coextensive with those made by Defendants, and LBHI incurred liability to the RMBS Trustees as a result of Defendants' acts, failures, omissions, and breaches of its representations, warranties, obligations, and/or covenants.

---

[5] *See* RMBS Trust Settlement Agreement, entered into as of June 25, 2018, between LBHI and Wilmington Trust National Association; Allowed Proof of Claim numbers:  720000, 720001, 720002, 720003, 720004, 720005, 720006, 720007, 720008, 720009, 720010, 720011, 720012, 720013, 720014, 720015, 720016, 720017, 22773.04, 24792, 24810, 720020, 720025, 720021, 720024, 720022, 720023, 720018, 720019.

### E.    Defendants' Obligation to Indemnify LBHI

43.    Defendants agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses, attorneys' fees, and expenses it might sustain as a result of the Defective Loans.  *See* Seller's Guide § 711.

44.    Pursuant to the Agreements, the laws of the State of New York govern this action.

45.    All conditions precedent to bringing this action have been met, occurred or have been waived.

### F.    PMAC Lending's Liability for PMC Bancorp's Obligations and Liabilities

46.    Under their respective Agreements, PMC Bancorp and PMAC Lending must indemnify LBHI for all liabilities, claims, losses, damages, judgments, and expenses that LBHI might sustain because of the Defective Loans.

47.    PMAC Lending, however, is not only liable for the Defective Loans it sold to LBHI or LBHI's assignor, but is also liable, as successor, for PMC Bancorp's obligations.

48.    As detailed below, in 2010 PMC Bancorp and its principals deliberately schemed to shift PMC Bancorp's assets, employees, and interests to PMAC Lending to hinder, delay, or defraud PMC Bancorp's various creditors, including LBHI.

49.    PMC Bancorp's scheme resulted in (i) a *de facto* merger with PMAC Lending and/or (ii) otherwise rendering PMAC Lending a mere continuation of PMC Bancorp.

50.    Since that time, PMAC Lending has also impliedly agreed to assume, and has assumed, PMC Bancorp's liabilities.

### (i)    PMC Bancorp Seeks to Escape Massive Contractual Exposure

51.    PMC Bancorp is and/or was, at all relevant times, wholly owned by William Park and his wife, Soo Mi Kim.

52.    PMC Bancorp is and/or was, at all relevant times, operated by William Park and

Soo Mi Kim, with Soo Mi Kim's family, including her brothers Ryan Kim and James Kim who

worked for PMC Bancorp respectively as Executive Vice President and Manager of Sales.

53.      William Park incorporated PMC Bancorp in 1998 and operated PMC Bancorp as

a wholesale mortgage lender, in which capacity PMC Bancorp procured thousands of loans from

mortgage brokers, underwrote and funded those loans, and then sold those loans into the

secondary mortgage market to purchasers such as LBHI (or LBHI's assignor LBB), Bank of

America, JP Morgan Chase, and Citibank, among others.

54.      As the financial crisis of 2008 intensified, buyers of PMC Bancorp's mortgage

loans increasingly asserted repurchase and indemnity demands to PMC Bancorp related to PMC

Bancorp's sale of defective loans into the secondary market.

55.      According to PMC Bancorp's former in-house counsel Daniel Kim, these

demands exceeded $150 million.

56.      Facing significant and increasing repurchase/indemnity exposure, PMC Bancorp

and its principals searched for a mortgage loan originator that PMC Bancorp and/or its principals

could purchase so the principals could then transfer PMC Bancorp's assets, employees, and

operations to that mortgage loan originator, leaving PMC Bancorp and its massive debts behind.

57.      In or about May 2010, Daniel Binowitz—who worked in PMC Bancorp's

secondary markets division—contacted Jon Magill, the founder and owner of PMAC Lending.

58.      Binowitz contacted Magill on behalf of PMC Bancorp's owner William Park to

inquire whether Magill was interested in selling PMAC Lending.

59.      William Park then requested information from Magill regarding whether PMAC

Lending faced any repurchase/indemnity exposure related to the sale of defective loans and, if

so, how much.

60.     After learning that PMAC Lending's repurchase/indemnity was minimal, William Park communicated to Magill his intention to purchase PMAC Lending through his intermediary company known as Alamo Heights Financials, Inc. ("Alamo"), a company that otherwise had no legitimate business purpose.

61.     At the direction of William Park, Alamo was incorporated by PMC Bancorp's Manager of Sales and William Park's brother-in-law, James Kim.  From inception, Alamo was primarily owned by William Park, who also owned PMC Bancorp.

62.     As a result of Alamo's unity of ownership with PMC Bancorp, the lines between Alamo and PMC Bancorp were often blurred.  For example, Alamo shared PMC Bancorp's address, shared many of PMC Bancorp's banking relationships, and relied on PMC Bancorp to pay certain of Alamo's expenses.

63.     On September 10, 2010, William Park and PMC Bancorp, through Alamo, purchased all of PMAC Lending's outstanding shares.

64.     PMC Bancorp provided Alamo with at least part of the funds to purchase PMAC Lending.

***(ii)     PMC Bancorp-PMAC Lending Agreements Rendering PMAC Lending a Mere Continuation of PMC Bancorp and/or Giving Rise to a De Facto Merger Between the Two Entities***

65.     Following Alamo's purchase of PMAC Lending, William Park immediately controlled and operated PMAC Lending.

66.     While simultaneously operating (and winding down) PMC Bancorp, William Park also appointed himself and his brother-in-law, Ryan Kim, to PMAC Lending's board of directors.

67.     In October 2010, one month after Alamo's purchase, PMC Bancorp and PMAC

14

Lending entered an agreement whereby PMC Bancorp would broker mortgage loans for PMAC Lending.

68.     Under the October 2010 agreement, PMC Bancorp accessed PMAC Lending's credit and warehouse lines to fund loans procured by PMC Bancorp, alleviating PMC Bancorp's need to access its own warehouse lines of credit, which had been increasingly limited as a result of PMC Bancorp's massive repurchase exposure.

69.     The October 2010 agreement also allowed PMC Bancorp to retain loans already in PMC Bancorp's pipeline and divert the funding of those loans to PMAC Lending, after which PMC Bancorp could sell its loans into the secondary market through PMAC Lending, disguising that PMC Bancorp procured and originated these loans.

70.     It was necessary for PMC Bancorp to funnel its loans into the secondary market via PMAC Lending because, by that time, many primary market participants had suspended PMC Bancorp from selling into the secondary market because of the increasing and unsatisfied repurchase demands.

71.     The October 2010 agreement was also designed to insulate PMC Bancorp's ongoing loan origination business and the resulting assets (the loans and the servicing rights) from PMC Bancorp's growing list of creditors.

72.     In December 2010, PMC Bancorp contracted with PMAC Lending whereby PMC Bancorp transferred thousands of PMC Bancorp servicing rights to PMAC Lending, although by December 2010 PMAC Lending lacked the infrastructure or ability to service mortgage loans.

73.     PMC Bancorp did not receive reasonably equivalent value for transferring these servicing rights.

74.     The December 2010 servicing rights agreement was not intended to obtain fair

15

value for PMC Bancorp's assets but, instead, sought to transfer one of PMC Bancorp's most valuable assets—mortgage servicing rights—beyond the reach of PMC Bancorp's creditors.

75.    Because PMAC Lending lacked the ability to service mortgage loans, PMC Bancorp and PMAC Lending—after the December 2010 agreement—immediately entered a second agreement whereby PMC Bancorp, as a subcontractor or "sub-servicer," serviced the loans for which PMAC Lending now held the servicing rights.

*(iii)    The Re-making of PMAC Lending in PMC Bancorp's Image*

76.    When it shifted assets to PMAC Lending, PMC Bancorp also transferred over 40 key employees and executives to PMAC Lending *en masse* into the same or substantially similar positions that each such employee/executive had held at PMC Bancorp, including but not limited to these individuals:

a.    William Park, PMC Bancorp's owner, CEO, and controlling principal became, through his intermediary Alamo, PMAC Lending's owner and controlling principal by his position on PMAC Lending's board and, later, as its CEO;

b.    Daniel Kim, PMC Bancorp's in-house counsel, became in-house counsel for PMAC Lending;

c.    Soo Mi Kim's brother Ryan Kim, EVP at PMC Bancorp, became EVP at PMAC Lending;

d.    Sharon Kim, Director of Operations at PMC Bancorp, became Director of Operations at PMAC Lending;

e.    Brian Witham, Senior Vice President of Servicing at PMC Bancorp, became CEO of PMAC Lending after William Park abandoned that position;

f.    Carol Sim, Controller at PMC Bancorp, became Controller at PMAC Lending;

g.    Robert Ramirez, Manager of Loss Mitigation at PMC Bancorp, became Manager of Loss Mitigation at PMAC Lending;

h.    Constantine "Gus" Cafcalas, SVP of Capital Markets at PMC Bancorp, became a consultant, among various other ongoing ties, to PMAC Lending while simultaneously remaining behind at PMC Bancorp to serve as PMC Bancorp's litigation representative for Rule 30(b)(6) depositions, tasked with pleading that PMC Bancorp could not satisfy claims to resolve the

16

outstanding repurchase/indemnity claims. While performing these duties, Mr. Cafcalas also engaged in an aggressive scheme to fraudulently convey PMC Bancorp's remaining real property assets to Alamo insiders for no consideration.

77.     In conjunction with the transfer of employees and executives, William Park remade PMAC Lending in PMC Bancorp's image, including converting PMAC Lending from a retail mortgage lender to PMC Bancorp's model as a wholesale mortgage lender, and migrating PMC Bancorp's software and loan-origination computer systems to PMAC Lending. Park also caused PMAC Lending to use PMC Bancorp's broker networks, replaced PMAC Lending's pricing engine with PMC Bancorp's pricing engine, and caused PMAC Lending to adopt PMC Bancorp's underwriting philosophy.

78.     William Park also moved PMAC Lending's loan processing center from California to PMC Bancorp's loan processing company in the Philippines.

79.     From October 2014 through March 2016, via monthly wires of thousands of dollars, PMAC Lending continued to fund PMC Bancorp's remaining operations, which by that point comprised little else than litigation.

80.     After Alamo's purchase, PMAC Lending's financial relationships were abandoned for PMC Bancorp's relationships, including a move to one of PMC Bancorp's primary banks, known then as Center Bank (n/k/a BBCN Bank).

***(iv)     The Center Bank Loan***

81.     In August 2011, PMAC Lending applied for and received a $10 million line of credit from Center Bank.

82.     Although the loan was for PMAC Lending's benefit, the loan was securitized by PMC Bancorp's assets and collateral.

83.     PMC Bancorp also guaranteed the loan via a guaranty signed by William Park as

17

PMC Bancorp's President and Ryan Kim as PMC Bancorp's Secretary.

84.     William Park pledged various personal assets as collateral for PMAC Lending's Center Bank loan, including his stock in various banks, and Soo Mi Kim pledged various personal assets as collateral for PMAC Lending's Center Bank loan, including her real property.

85.     On December 31, 2015, during proceedings to enforce a judgment that LBHI obtained in March 2013 against PMC Bancorp (related to loans different than those at issue here), federal Magistrate Judge Patrick Walsh (C.D. Cal.) reviewed the Center Bank transaction and found that "Lehman Brothers has produced more than enough evidence to suggest that PMC and PMAC have at times operated as one, including with regard to this loan." Magistrate Judge Walsh also found "it appears that PMC and PMAC are intertwined and have been for a number of years." *Lehman Brothers Holdings Inc. v. PMC Bancorp*, 2:10-cv-07207-JAK-PJW, Doc. # 338 (C.D. Cal. Dec. 21, 2015).

*(v)     Unity of Ownership and Interests between PMC Bancorp and PMAC Lending Has Continued into the Present*

86.     In 2013, despite having moved to PMAC Lending and serving as an executive at PMAC Lending and on its board of directors, Ryan Kim continued to control PMC Bancorp's affairs, including signing of two grant deeds on behalf of PMC Bancorp as part of Gus Cafcalas' scheme to transfer PMC Bancorp's real properties to Alamo insiders, including James Kim's wife, Helen Choi.

87.     During the proceeding to enforce the March 2013 judgment referenced above, LBHI pursued PMAC Lending as successor. During those proceedings, PMC Bancorp and PMAC Lending often spoke with one voice, culminating in PMAC Lending's agreement on August 19, 2016, through counsel, to pay more than $3 million owed to LBHI by PMC Bancorp.

*(vi)     Status of PMC Bancorp and PMAC Lending*

88.     PMC Bancorp is no longer solvent and claims to have one remaining shareholder, a Mexican company named Sal Si Puedes De Esta, SA de CV, which translates to "get out if you can."

89.     In March 2015, William Park sold many of PMAC Lending's assets to Finance of America except for PMAC Lending's servicing rights which, upon information and belief, had been obtained from PMC Bancorp.

90.     In July 2016, William Park purportedly sold all of PMAC Lending's shares to new shareholders, after which PMAC Lending was renamed AmWest Funding Corp.

**G.     PMAC Lending's Liability for Reliant's Obligations and Liabilities**

91.     PMAC Lending is also liable as successor for Reliant's obligations and debts. Upon information and belief, on August 16, 2013, PMAC Lending agreed to merge with Reliant and expressly and/or impliedly assumed Reliant's obligations, debts, and liabilities, including Reliant's contractual obligations under the Agreement between Reliant and LBHI or LBHI's assignor.

**FIRST CLAIM FOR RELIEF**

**(Contractual Indemnification)**

92.     LBHI hereby incorporates by reference the allegations set forth above as though fully set forth herein.

93.     The Agreements are valid and enforceable contracts that are binding upon Defendants.

94.     LBHI and/or LBB has substantially performed all of their obligations under the Agreements.

95.     Pursuant to their respective Agreements, Defendants owe LBHI indemnity for its

19

liabilities, losses, claims, attorneys' fees, judgments and any other costs, fees and expenses as to the Defective Loans.

96.    Defendants failed to indemnify LBHI for its liabilities, losses, claims, attorneys' fees, judgments and any other costs, fees and expenses as to the Defective Loans.

97.    Defendants' breaches of the Agreements and other acts and/or omissions as to the Defective Loans resulted in LBHI incurring liability and/or losses in an amount to be determined at trial, comprised of the settlement amount for each Defective Loan as identified in the court-approved Fannie Mae and/or Freddie Mac settlement agreement, plus prejudgment interest pursuant to New York law, attorneys' fees, litigation costs, and all other fees and costs provided by the Agreements.

98.    PMAC is jointly and severally liable for LBHI's contractual indemnification claim, as alleged herein, because it is PMC Bancorp's and Reliant's successor.

## PRAYER FOR RELIEF

WHEREFORE, LBHI respectfully requests relief in this matter, including as follows:

a)    A judgment against PMC Bancorp for all damages arising from or relating to its contractual obligations, in an amount to be determined at trial;

b)    A judgment against PMAC Lending for all damages against arising from or relating to its contractual obligations, in an amount to be determined at trial;

c)    A judgment against Reliant for all damages against arising from or relating to its contractual obligations, in an amount to be determined at trial;

d)    A judgment against PMAC Lending for all damages against arising from or relating to PMC Bancorp's contractual obligations, in an amount to be determined at trial;

e)    A judgment against PMAC Lending for all damages against arising from or

relating to Reliant's contractual obligations, in an amount to be determined at

trial;

f)      An award of all recoverable interest from all Defendants;

g)      An award of all costs and expenses incurred by LBHI in enforcing the

Defendants' obligations under the Agreement, including attorneys' fees and costs

and any expert witness fees incurred in litigation; and

h)      Any other relief as the Court deems just and proper.

Dated: New York, New York
       December 17, 2018

                                        */s/* William A. Maher
                                        William A. Maher
                                        Paul R. DeFilippo
                                        James N. Lawlor
                                        Adam M. Bialek
                                        Mara R. Lieber

                                        WOLLMUTH MAHER & DEUTSCH LLP
                                        500 Fifth Avenue
                                        New York, New York 10110
                                        Telephone:  (212) 382-3300
                                        Facsimile:   (212) 382-0050
                                        *Counsel for Lehman Brothers Holdings Inc.*