| | |
|---|---|
| David R. Seligman, P.C. | Mark McKane, P.C. (admitted *pro hac vice*) |
| Joseph M. Graham (admitted *pro hac vice*) | Kevin Chang (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS LLP** | **KIRKLAND & ELLIS LLP** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 300 North LaSalle | 555 California Street |
| Chicago, Illinois 60654 | San Francisco, California 94104 |
| Telephone:   (312) 862-2000 | Telephone:   (415) 439-1400 |
| Facsimile:   (312) 862-2200 | Facsimile:   (415) 439-1500 |

*Counsel to the Joint Liquidators*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., et al. | ) |
| | ) Case No. 08-13555 (SCC) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

**REPLY IN SUPPORT OF THE JOINT LIQUIDATORS' MOTION FOR AN ORDER ENFORCING THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS FOR PURPOSES OF DISTRIBUTIONS**

Bruce Alexander Mackay and Matthew Robert Haw of RSM Restructuring Advisory LLP (the "***Joint Liquidators***") hereby file this reply in support of the *Joint Liquidators' Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors for Purposes of Distributions* [Dkt. No. 59409] (the "***Motion***") and in response to the *Plan Administrator's Objection to Motion to Allow Late Claim* [Dkt. No. 59549] (the "***Objection***").[1]  This reply is accompanied by a declaration of Lexa Hilliard (the "***Hilliard Decl.***") and a declaration of Joseph Graham (the "***Graham Decl.***"), each filed herewith.  In further support of the Motion and this reply, the Joint Liquidators respectfully state as follows.

---

[1]  Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Objection.

## Reply

1.    By the Motion, the Joint Liquidators seek to enforce the provisions of the Plan, the Confirmation Order, and the Bar Date Order, which collectively work together to allow, disallow, or preserve various claims in the Debtors' chapter 11 cases. The Joint Liquidators, who are court-supervised fiduciaries for their own estates, are looking for clarity regarding certain Swap Claims and liabilities listed in LBSF's Schedules that the Joint Liquidators respectfully submit remain extant, did not require the filing of proofs of claim, and have not been disallowed by any court order. The Joint Liquidators were the ones who brought the relevant scheduled Swap Claims to the Plan Administrator's attention, including the fact that one of the Swap Claims may result in monies owing to LBSF. The Joint Liquidators have asked the Plan Administrator for the most basic information about the Swap Claims, but have received nothing. This is perplexing, especially if a simple exchange of information may result in additional assets for the LBSF estate, or may have rendered this Motion unnecessary.[2]

2.    As set forth in the Motion, the Joint Liquidators argue that the scheduled Swap Claims are preserved because the relevant creditors (or possibly debtors) LP IV and LP V were (a) Exempt Entities that were excused from having to file proofs of claim by the Bar Date and (b) Non-Controlled Affiliates under the Plan whose claims were not eliminated by the terms of the Plan. Therefore, the Joint Liquidators have argued that the Plan Administrator must comply with the Plan's and Confirmation Order's allowance, reserve, and distribution procedures with

---

[2] Indeed, as this Court has previously noted, in October 2017, the Plan Administrator expressly "reserved its rights to obtain the [Joint] Liquidators' agreement not to distribute [certain money market funds held by the Partnerships] until all competing claims to such proceeds have been resolved." *In re Lehman Bros. Holdings Inc*, 591 B.R. 153, 158 (Bankr. S.D.N.Y. 2018). Given this concern about potential competing claims, the Joint Liquidators had expected the Plan Administrator to work cooperatively with the Joint Liquidators to determine the Swap Claims and whether amounts were owed to LBSF.

2

respect to the Swap Claims, just like the Plan Administrator has done with respect to other claims held by LP IV and LP V against LBHI. By the Objection, the Plan Administrator makes three primary arguments: (a) that the Swap Claims are late claims, (b) the Swap Claims were eliminated in the Plan because they were claims of Debtor-Controlled Entities, and (c) the Swap Claims *might* have been rejected by the Plan and, *if so*, LP IV and LP V had to file rejection damages claims by 45 days after the Effective Date, or April 20, 2012. As set forth below, each of the Plan Administrator's arguments fails.

3.      ***First***, the Plan Administrator argues half-heartedly that the Motion is really a motion to file late claims. But that is not what the Motion seeks. The Motion seeks to enforce the terms of the Plan with respect to the Swap Claims. The Swap Claims are not "new" claims. Indeed, as the Plan Administrator concedes, the Swaps were included in LBSF's Schedules and were known potential liabilities or assets of the LBSF estate. Obj. ¶ 6(a) ("The information that the Joint Liquidators have now was known to all parties in interest in LBSF's cases since the filing by LBSF of its schedules of liabilities in June of 2009."). Unlike other "unliquidated" claims included in the Schedules, LP IV and LP V were not required to file proofs of claim because LP IV and LP V were listed as Exempt Entities under the Bar Date Order. The liquidated amount of those claims would be based on whether (and if so when) the Swaps were terminated. As noted in the Motion, it is possible that LBSF may have claims against the LP IV estate if the Swaps were terminated at the commencement of the LBSF chapter 11 case based on LBSF's Schedules. Yet the Plan Administrator has not been willing to provide the Joint Liquidators with the most basic information or documentation about the Swaps, and whether

3

(and as of what date) the Plan Administrator believes the Swaps were terminated.[3] Simply put, the Swap Claims are not "new" claims. Whether they are preserved depends on an analysis of the terms of the Plan and Confirmation Order.

4. *Second*, the Plan Administrator argues that LP IV and LP V are "Debtor-Controlled Entities," that under the Plan the claims of Debtor-Controlled Entities were disallowed unless specifically preserved in the Schedule of Claims of Debtor-Controlled Entities contained within the Plan Supplement, and that neither LP IV and LP V nor the Swap Claims were listed on that schedule. But the Plan Administrator wrongly presumes that LP IV and LP V are in fact Debtor-Controlled Entities. Under the terms of the Plan, for any of the Partnerships to be a Debtor-Controlled Entity, the General Partner (which was the general partner directing the activities of each Partnership) would need to be "***managed and controlled***" by a Debtor on the Plan's Effective Date of March 6, 2012. Plan, Art. 1.41 (emphasis added).

5. The question of whether LBHI "managed and controlled" the General Partner and the Partnerships as of the Effective Date is one of contract interpretation.[4] The Plan is governed by New York law (*see* Plan, Art. 15.14), and under New York Law, "words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (internal quotations omitted); *see also Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (when interpreting

---

[3] The Joint Liquidators, for their part, have reviewed the limited records that the General Partner and the Partnerships have with respect to assets and liabilities, and do not have the relevant ISDA or any additional information regarding the Swaps other than what was filed in the McKane Declaration.

[4] Neither "manage" nor "control" are defined in the Plan.

contracts, words should not be read to "distort the meaning" of those terms "and thereby make a new contract for the parties") (internal quotations omitted).

6.  The argument that LBHI "managed and controlled" the General Partner and the Partnerships on the Effective Date is contradicted by the plain meaning of those words. To "manage" another entity, a party would need "to direct or carry on business or affairs" of that entity. *Manage*, Merriam-Webster Dictionary (2019). But as of the Effective Date, no one was directing or carrying on the affairs of the General Partner, which is why it had been dissolved and stricken from the U.K. Register of Companies almost 21 months before. And certainly the dissolved and stricken General Partner was not—and indeed could not—direct or carry on the affairs of the Partnerships as of the Effective Date. Indeed, the General Partner's directors and corporate secretary had resigned more than two years before the Effective Date and have never been replaced, which illustrates that LBHI had effectively abandoned the General Partner and the Partnerships. It was for this reason that the "Registrar of Companies had reasonable cause to believe that that General Partner was no longer conducting business." *In re Lehman Bros. Holdings, Inc.*, 591 B.R. at 157.[5] In fact, each of the Partnerships had also been dissolved because their managing partner, the General Partner, had dissolved. *See id.*; Substitution Motion ¶ 12. Next, to "control" another entity, a party would need "to have power over" or "to exercise restraining or directing influence over" that entity. *Control*, Merriam-Webster Dictionary (2019). As previously stated, although LBHI was the sole shareholder of the General Partner, LBHI would not have any power or influence over the General Partner (and thus no power or

---

[5] The Joint Liquidators are aware of no evidence of any management or board meetings or any other corporate activity illustrating active management of the General Partner from June 10, 2010, through and past the Effective Date. Indeed, there could have been no activity under U.K. law until the General Partner was restored to the U.K. Register of Companies on February 3, 2017. *See* Hilliard Decl.

influence over the Partnerships) as of the Effective Date because the General Partner had been dissolved and stricken from the U.K. Register of Companies, and the General Partner's directors and corporate secretary had resigned, years earlier.

7. The Plan Administrator's position is also expressly contradicted by the Plan's treatment of LP IV's and LP V's other claims. The Plan Administrator treats LP IV and LP V as having allowed, direct claims against LBHI on account of subordinated debt issued by LBHI. *See* Graham Decl., Exs. A & B (including Schedule No. 555367300, which is treated as an "Allowed" scheduled claim in the amount of $280,716,769.51 on account LP IV's subordinated note claim against LBHI and Schedule No. 555367310, which is treated as an "Allowed" scheduled claim in the amount of $500,575,105.00 on account of LP V's subordinated note claim against LBHI). The Plan Administrator similarly conceded that the General Partner had standing regarding the Substitution Motion, presumably because of LP IV's and LP V's allowed, direct claims against LBHI that it referenced in its Substitution Motion. *See* June 7, 2018, Hr'g Tr. 7:6–16. But these subordinated note claims are not listed on the Schedule of Claims of Debtor-Controlled Entities because none of the Partnerships are listed on that schedule. If this schedule somehow controls each of the Partnership's claims, it would seem that even these subordinated notes claims should not exist even though they are "Allowed" claims on the claims register and under the Plan. Therefore, the Plan Administrator should be estopped from arguing that the General Partner and the Partnerships are Debtor-Controlled Entities that were "managed and controlled" by LBHI on the Effective Date, because that argument is inconsistent with the other provisions of the Plan and the Plan Administrator's own interpretations of those provisions.

8. In reality, the General Partner and the Partnerships were dissolved and the General Partner stricken from the U.K. Register of Companies precisely because LBHI ***failed*** to

6

ensure that it "managed and controlled" the General Partner. All of the directors had resigned by February 27, 2009, and LBHI did nothing to appoint new directors. The corporate secretary then resigned on January 21, 2010, and LBHI did nothing to appoint a new corporate secretary. After all of the General Partner's directors and officers had resigned, the Registrar of Companies filed at Companies House a notice of its intent to strike the General Partner off the U.K. Register of Companies on March 9, 2010, and LBHI did nothing. Then, after months of inaction and lack of management and control by LBHI, the General Partner was stricken from the U.K. Register of Companies and dissolved. The Plan Administrator is simply wrong now to say that on the March 6, 2012, Effective Date (after the passing of two more years of LBHI inaction), the Plan Administrator did in fact manage and control the General Partner and the Partnerships.

9.   That LBHI did not "manage and control" the General Partner and the Partnerships on the Effective Date makes common sense and is the proper interpretation of these provisions under the Plan. The General Partner and the Partnerships were clearly each a "Non-Controlled Affiliate" because none was "currently managed and controlled by a Debtor as of the Effective Date."[6] The Schedule of Claims of Debtor-Controlled Entities therefore does not eliminate LP IV's or LP V's Swap Claims.[7]

---

[6]   Indeed, the Plan Administrator conceded as much when seeking relief pursuant to the Substitution Motion. Substitution Motion ¶ 21 ("[T]he administration of the Chapter 11 Estates continues long after the Effective Date of the Plan and depends on the Plan Administrator's continued operations including collecting on claims and interests in **Non-Controlled Affiliates**, the current value of which could not have been imagined on the Effective Date.") (emphasis added). Notwithstanding the Plan Administrator's incorrect assertions in its Objection, (*see* Obj. ¶ 2), the Joint Liquidators have not conceded that LBHI managed and controlled the General Partner as of the Effective Date. Rather, the Joint Liquidators argued that LBHI could have had that role, but instead allowed the General Partner to dissolve and be stricken from the U.K. Register of Companies. *See* Motion ¶ 23 ("[T]he General Partner was dissolved and the Partnerships had no manager to oversee their affairs due to LBHI's own inaction.").

[7]   The Plan Administrator's argument that LBHI "managed and controlled" the General Partner

7

10. ***Third***, the Plan Administrator argues that even if the Partnerships are Non-Controlled Affiliates, the Swap Claims were barred by the Confirmation Order, which bars new or amended claims without authority of the Court (paragraph 86), and sets a deadline for filing proofs of claim for rejection damages claims for contracts rejected by the Plan (paragraph 37). The Plan Administrator's positions are wrong on both points.

11. As an initial matter, paragraph 86 of the Confirmation Order pre-supposes that there is an underlying obligation to file a proof of claim in the first place, and only then establishes a procedure for the filing of "new" or "amended" proofs of claim. But LP IV and LP V are seeking to enforce their previously scheduled Swap Claims, which remain extant, not file new proofs of claim. Paragraph 86 simply does not apply to scheduled claimants who were exempt from the Bar Date Order and whose claims were not otherwise eliminated by the Plan. Indeed, it would be manifestly unfair for a debtor to excuse a non-debtor subsidiary from filing a proof of claim under a bar date order, and then, after that bar date, preclude that subsidiary—who the debtor allowed to be dissolved by refusing to ensure proper management of that subsidiary—from filing a proof of claim under its plan with such vague and non-applicable language.[8]

---

merely because it was an equity-owner also sits in stark contrast to the Plan's treatment of the many foreign Lehman subsidiaries who commenced their own foreign insolvency proceedings. These foreign subsidiaries were expressly included in the Non-Controlled Affiliate definition. *See* Plan, Art. 1.108 (defining "Non-Controlled Affiliate" to include "all affiliates that are subject to a Foreign Proceeding"). Surely the estate representatives for each of these entities would have vigorously objected if the Debtors took the position that these entities were Debtor-Controlled Entities solely due to the Debtors' direct or indirect equity ownership. Although the General Partner and the Partnerships were not in formal insolvency proceedings, they were dissolved and were under no one's control or management as of the Plan's Effective Date as a matter of English law. *See* Hilliard Decl.

[8] Paragraph 25 of the Confirmation Order separately does not allow an Exempt Entity to file a proof of claim if its claim is not on the Schedule of Claims of Debtor-Controlled Entities. Regardless, paragraph 25 is not relevant here, where the Partnerships were Exempt Entities that were Non-Controlled Affiliates before and as of the Effective Date.

8

12. The Plan and Confirmation Order only require new claims to be filed where a contract or lease is automatically rejected pursuant to the terms of the Plan. Confirmation Order, ¶ 37. The Joint Liquidators conceded in the Motion that if the Swaps were never terminated during the Debtors' cases, then they would have been automatically rejected under the Plan on the Effective Date. But it is not clear what happened to the Swaps because the Joint Liquidators have been unable to obtain any information about the treatment of the Swaps in the Debtors' cases. The Plan Administrator also has refused to tell the Joint Liquidators what happened to the Swaps, and the Plan Administrator does not answer that question in the Objection.

13. The issue of whether the Swaps were terminated is the key open question in determining whether LP IV and LP V were required to file proofs of claim on account of rejection of the Swaps. If the Swaps were terminated before the Effective Date, the Swaps would not have been rejected by the Plan because after termination, the Debtors would be unable to reject an already terminated contract. *See, e.g.*, *Vanderpark Props., Inc. v. Buchbinder (In re Windmill Farms, Inc.)*, 841 F. 2d 1467, 1469 (9th Cir. 1988) (holding that if a lease has been terminated, there is nothing left to assume); *In re Masterworks, Inc.*, 94 B.R. 262, 265 (Bankr. D. Conn. 1988) (same). Thus, if the Swaps were terminated, neither the Plan nor the Confirmation Order could require a new proof of claim be filed on account of rejection of the Swaps because there would be no contract to reject. On the other hand, if the Swaps were not terminated, they would have been rejected on the Effective Date and proofs of claim would be necessary pursuant to the terms of the Plan. Despite this, the Plan Administrator has never asserted that the Swaps were terminated or not terminated, nor has the Plan Administrator provided any relevant documentation to the Joint Liquidators. This refusal to assist the Joint

Liquidators in their role as fiduciaries for the Partnerships is what has led to the filing of the Motion in the first instance.

14.     *Finally*, the Plan Administrator suggests that granting this Motion may prejudice other creditors or settlements encompassed in the Plan.  But the Motion seeks to enforce the Plan's claims allowance, dispute, and distribution provisions, not alter the Plan.  By the Motion, the Joint Liquidators are not seeking to file a late claim, which the Joint Liquidators recognize is a high bar.  As the Joint Liquidators stated, they have been appointed by the English Court in their capacity as insolvency practitioners pursuant to section 6(3) of the Limited Partnership Act of 1907 to wind up the Partnerships, and are fiduciaries that have duties to determine who each Partnership's creditors are—regardless of the identities of those creditors—and determine each Partnership's assets and liabilities.  The Joint Liquidators' duty to determine each Partnership's assets is not driven by any creditor, but rather is part and parcel of the Joint Liquidators' duties under English law.  And if the LP IV Swap results in a claim by LBSF against LP IV, for example, the Joint Liquidators acknowledge that such a claim must be addressed in the U.K. LP IV liquidation proceedings in accordance with all applicable rights and priorities.[9]  Given the lack of information available to the Joint Liquidators, and the Plan Administrator's refusal to assist, the Joint Liquidators had no alternative but to file the Motion to comply with their duties under English law and obtain the clarity they need to move forward with their administration of the LP IV and LP V estates.[10]

---

[9]  For the avoidance of doubt, any claims against LP IV by LBSF are subject to allowance and quantification in the U.K. liquidation proceedings, whether through agreement with the Joint Liquidators or adjudication in the appropriate forum, in either case subject to appropriate supporting documentation.

[10] The Plan Administrator tries to make much of the approximately two years that have passed since the appointment of the Joint Liquidators, as if that has some ramification—which it does not—on whether the Swap Claims were preserved under the Plan and Confirmation

10

|  |  |
|---|---|
|  | Respectfully, |
| Dated: March 4, 2019<br>New York, New York | /s/ David R. Seligman, P.C.<br>David R. Seligman, P.C.<br>Joseph M. Graham (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:    (312) 862-2200<br>Email: david.seligman@kirkland.com<br>             joe.graham@kirkland.com<br><br>-and-<br><br>Mark McKane, P.C. (admitted *pro hac vice*)<br>Kevin Chang (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>555 California Street<br>San Francisco, California 94104<br>Telephone:    (415) 439-1400<br>Facsimile:    (415) 439-1500<br>Email:  mark.mckane@kirkland.com<br>             kevin.chang@kirkland.com<br><br>*Counsel to the Joint Liquidators* |

---

Order.  As discussed in the Motion, part of that delay resulted from the time it took for the Joint Liquidators to obtain funds held by the Plan Administrator, as well as the ruling on the Substitution Motion, given that one outcome of that Motion was that LBHI could ultimately have been the primary creditor of the Partnerships, leaving little for the Joint Liquidators to do with respect to winding up the Partnerships' affairs.  The Joint Liquidators also hoped that they would be able to resolve the questions raised by the Motion through their dialogue with the Plan Administrator.