Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9         Debtors.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                U.S. Bankruptcy Court

12                One Bowling Green

13                New York, New York 10004

14

15                December 17, 2018

16                3:02 PM

17

18   B E F O R E :

19   HON SHELLEY C. CHAPMAN

20   U.S. BANKRUPTCY JUDGE

21

22

23

24

25

Page 2

1    Hearing re:  Conference re:  Objection to Claim Number 29606

2    Filed by SRM Global Master Fund Limited Partnership [ECF No.

3    53215]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Nicole Yawn

Page 3

1    A P P E A R A N C E S :

2    WHITE & CASE, LLP

3         Attorney for SRM

4         1221 Avenue of the Americas

5         New York, NY  10020-1095

6

7    BY:  GREGORY M. STARNER, ESQ.

8

9    WEIL, GOTSHAL & MANGES, LLP

10         Attorneys for Lehman

11         767 Fifth Avenue

12         New York, NY   10153-0119

13

14    BY:  RICHARD L. LEVINE, ESQ.

15         GARRETT FAIL, ESQ.

16         AGUSTINA BERRO, ESQ.

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Please, have a seat.
 3              MR. LEVINE:  Thank you, Your Honor.
 4              THE COURT:  So thanks for coming in.  I thought it
 5    was time that we get back together again.  You tried to
 6    settle this, and you failed.
 7              MR. LEVINE:  That's correct, Your Honor.
 8              THE COURT:  And since we were last together,
 9    Judge Abrams, in the District Court, issued a decision in
10    the Maverick case.
11              MR. LEVINE:  That's correct.
12              THE COURT:  And I wanted to, among other things,
13    ask for your impressions with that regard to whether or not
14    that decision is ultimately upheld on appeal, what your view
15    was of the impact of certain of the statements that
16    Judge Abrams.  There are, of course, distinctions between
17    the two cases.  Maverick involved what I call the spoke
18    guarantee, not a proper resolution, and -- well, won't give
19    you the rest of my thoughts.
20              But why don't I start with asking each of you to
21    tell me how you think Judge Abrams' decision in Maverick
22    bears on what I have before me, with respect to the SRM
23    claims?
24              MR. LEVINE:  Very good, Your Honor.  Rick Levine
25    and Garrett Fail, and Agustina Berro, for Lehman, from Weil,
```

Page 5

1    Gotshal.  We think that the 562 ruling, though we don't

2    agree with the Court's -- Judge Abrams' construction of 562,

3    --

4            THE COURT:  Insofar as its inapplicability to an

5    agreed termination?

6            MR. LEVINE:  Correct, Your Honor.

7            THE COURT:  Okay.

8            MR. LEVINE:  Obviously, following her ruling,

9    which she said 562 did not apply to Maverick, for that very

10   reason, because there was no unilateral contractual

11   termination.  The termination that took place was years in

12   advance, and it was mutual, under the settlement agreement.

13   She said that 562 applies when there's a unilateral

14   contractual right to terminate and it's exercised.  That's

15   what we have here.

16           SRM, unlike Maverick, because SRM was under the

17   English LBIE version of the Prime Brokerage Agreement.

18           THE COURT:  Right.

19           MR. LEVINE:  Unlike Maverick, which was under a

20   U.S. law, LBI version.  Maverick -- I'm sorry -- SRM did

21   have a unilateral contractual right to terminate, in the

22   event of an event of default, and the filing for

23   administration by LBIE was an act of insolvency, under the

24   PBA.  SRM sent a notice of event of default and then same

25   day, sent a termination letter, which was an exhibit to our

Page 6

1    objection.  It was Tab F of the binder.

2            So applying Judge Abrams' ruling, clearly, 562

3    applies here, because there was unilateral contractual right

4    to terminate.  They did terminate.  It was early in the

5    case.  It was in November of 2008.

6            It gave them certainty that Judge Abrams said was

7    central of 562.  So on that basis, we think it helps us, if

8    anything, because it reinforces when 562(a) applies, and it

9    applies here.  Now, that said, as Your Honor will remember,

10   we don't think it matters whether you value these guarantee

11   claims at issue under --

12           THE COURT:  Under -- right.

13           MR. LEVINE:  -- 502.

14           THE COURT:  Because it's all less than what the

15   claim would have been, right?

16           MR. LEVINE:  Well, it's a lot less than they

17   ultimately got paid by LBIE.

18           THE COURT:  Right.

19           MR. LEVINE:  On the termination date, the claim

20   was worth -- the segregated assets claim was worth 34

21   million.  On the petition date, it was worth 52 million, and

22   they got 220 million ultimately from LBIE.

23           The second part of Judge Abrams' decision --

24           THE COURT:  Yes.

25           MR. LEVINE:  -- had to do with the exculpation

1    clauses.

2              THE COURT:  Yes, and the exculpation clause in

3    this case in SRM, I believe -- at least it's your position

4    -- that it's broader than the exculpation clause in the

5    Maverick agreement.

6              MR. LEVINE:  Yes, Your Honor, I even put slides

7    together, if you're interested.

8              THE COURT:  Sure.

9              MR. LEVINE:  Thank you.  Approach the bench.  But,

10   yes, that is exactly our position, that it's much broader

11   language.

12             THE COURT:  Thank you.

13             MR. LEVINE:  So in Maverick, there were two

14   provisions.  The first one is the indented part of the first

15   --

16             THE COURT:  Right.

17             MR. LEVINE:  -- page of the slides.  And it was,

18   "You agree that Lehman Brothers would not be liable for any

19   lost caused directly, indirectly by government restrictions,

20   exchange, or market ruling, suspension of trading, and other

21   things beyond Lehman Brothers' control?"  And what she said

22   is that, "The filing for administration was not something

23   beyond Lehman Brothers' control."  Now, we disagree with

24   that, but we don't think that has any applicability, right

25   or wrong, to the exculpation provisions under the SRM PBA.

1               Similarly, on the second page of the slides, we

2      have the second of the Maverick exculpation provisions, and

3      Judge Abrams said that the language, "Lehman Brothers shall

4      not be liable in connection with the execution, clearing,

5      handling, purchasing, or selling of securities or other

6      actions, except for gross negligence or willful misconduct

7      on Lehman Brothers' part."  Just dealing with that part of

8      it, she said well, this was they didn't return assets, so

9      it's not covered.  Now, again, if I was in front of her and

10     arguing, I would say it's all about handling of assets,

11     other action.  Of course, it's covered, but again, it

12     doesn't matter, because that's not the language found in the

13     SRM then.

14               And finally, the last sentence of the Maverick

15     exculpation provision -- as far as I can tell, Judge Abrams

16     just didn't focus on, because it says, "In no event will

17     Lehman Brothers be liable for any special, indirect,

18     incidental, or consequential damages," and as far as I can

19     recall, she didn't mention that provision, and I don't

20     really understand why she felt that that sentence was

21     subject to the first sentence, when it said, "In no event."

22     But in any event, that was her ruling, but we don't think it

23     applies here.

24               In here in SRM, we have very different provisions.

25     Language just is not the same.  So 1404 expressly limits

Page 9

1    Lehman's liability, and it expressly says includes

2    affiliates.  So where it refers to the prime broker, 14.9

3    says that includes all affiliates of the prime broker.

4          It limits Lehman's liability to instances of gross

5    negligence, fraud, or willful default or breach and

6    precludes damages based on any special circumstances,

7    indirect or consequential losses, or subsequent variations

8    to the market values of the relevant cash or security.  Now,

9    you know our argument.  We believe that's directly

10   applicable here, but --

11         THE COURT:  Right.

12         MR. LEVINE:  -- putting aside how it relates to

13   SRM, that language to us is not parallel to the language

14   Judge Abrams ruled on in the Maverick deal.  Similarly,

15   Clause 14.4 goes on to say that, as a genuine pre-estimate

16   of loss, the prime broker's liability to the counterparty

17   shall be determined based only upon the market value of the

18   relevant cash or securities as at the date of the discovery

19   of loss.  And last, I made a whole argument of what it meant

20   to discover your loss, and there was a debate back and forth

21   whether that meant when you could actually quantify down to

22   the detail or simply knew that you were going to have a

23   loss.

24         THE COURT:  Well, I mean, your construction foots

25   more with the distinction between a claim being contingent

Page 10

1    versus not.  Your construction of the discovery of loss, as

2    opposed to the loss, coincides with the notion that it's a

3    moment in time when there are no impediments to enforcement.

4              MR. LEVINE:  I think it's parallel.

5              THE COURT:  Parallel?

6              MR. LEVINE:  I'm not sure I really agree that it's

7    the same thing.

8              THE COURT:  No, not the same thing.

9              MR. LEVINE:  Okay, okay.

10             THE COURT:  But a parallel.

11             MR. LEVINE:  I agree there's definitely a parallel

12   there, and obviously, we argued that that had to be before

13   they sent notice of default and the termination notice in

14   early November of 2008.  But again, for this point of this

15   piece of today's appearance, none of that language was

16   language before Judge Abrams.

17             THE COURT:  Yeah.

18             MR. LEVINE:  And then finally, we have Clause

19   14.3, which is a little bit closer, but broader than the

20   language in the Maverick PBA.  It precludes any recovery

21   around for damages arising directly or indirectly from the

22   general risks of investing or investing or holding assets in

23   a particular country, including, but not limited to, losses

24   arising from governmental actions and market conditions

25   affecting the orderly execution of securities transactions

Page 11

1    or fell (ph) in the value of the assets.  Now, again, we had

2    an argument in SRM as to whether that applies or not, but

3    for this moment, my point is simply that --

4              THE COURT:  Right.

5              MR. LEVINE:  -- that wasn't language that Judge

6    Abrams addressed.

7              THE COURT:  So just to try to distill what you're

8    saying, so there's kind of headline bases for Lehman's

9    position that these claims ought to be dismissed, and the

10   headline bases that would apply across the board are the

11   waiver of reliance, if you will, on the corporate

12   resolution/guarantee and then the application of these

13   exculpation provisions apply across the board.

14             MR. LEVINE:  Right, right.

15             THE COURT:  Right?

16             MR. LEVINE:  And then the value -- and they'd

17   issue for --

18             THE COURT:  Right.  And then separately, with

19   respect to the segregated assets claim, notwithstanding

20   Judge Abrams' ruling in Maverick, first choice 562 in no

21   event, anything other than 502 and certainly not settlement

22   date and therefore, no segregated assets claim.

23             MR. LEVINE:  Perfect, Your Honor.  Thank you.

24             THE COURT:  Right?  And then with respect to lost

25   opportunities claim, that's covered by the headline rulings,

1    as well as by the concept that either under British law or

2    under U.S. pleading law, Iqbal-Twombly, no claim has been

3    stated, nor could any claim be stated for lost

4    opportunities, because too speculative, you know, even

5    though there is arguably such a cause of action under U.K.

6    law, it doesn't cover the type of situation here, and also,

7    with respect to the forced sales claim, that the headline

8    grounds would be the basis for Lehman's position that, as a

9    matter of law, that claim can't stand.

10          MR. LEVINE:  Right, right.  On a forced sales

11   claim, you're right.  It's consequential damages are

12   excluded.

13          THE COURT:  Consequential, right.

14          MR. LEVINE:  And lack of causation.

15          THE COURT:  Okay.

16          MR. LEVINE:  And on lost opportunities, in

17   addition to stating a claim, as a matter of New York law, --

18          THE COURT:  Right.

19          MR. LEVINE:  -- you can't get speculative damages

20   for lost opportunities.  You have to tie it to a particular

21   investment that you were going to make like a bond.  Say

22   well, you were going to invest in the bond and that paid 5

23   percent, so you prove it.

24          THE COURT:  But --

25          MR. LEVINE:  Where you're not identifying a

Page 13

1    particular investment you would have made.  As a matter of

2    New York law, you can't get a claim for lost opportunities

3    damages.

4              THE COURT:  But to the extent that the SRM's

5    position is that that's a U.K. law, cause of action, your

6    position it still doesn't matter?

7              MR. LEVINE:  It still doesn't matter.

8              THE COURT:  Okay, all right.  Thank you.

9              MR. LEVINE:  Thank you, Your Honor.

10             THE COURT:  Okay?

11             MR. STARNER:  Thank you, Your Honor.  Thank you

12   for the opportunity to come in and speak a little bit about

13   that appeal.  Maybe I'll take it in cite in reverse order

14   dealing with the limitation liability provisions and then

15   talk about Section 562.

16             THE COURT:  Sure.

17             MR. STARNER:  Because I actually think the

18   limitation liability provisions are a little bit easier.  If

19   you recall, we were here last year, and it was the debtor's

20   position that the language in both PBAs, SRM's and Maverick,

21   were effectively the same.  Now, they've obviously taken a

22   slightly different position.  They argued, at that time --

23   and I have a chart, where they obviously said look, yes, the

24   language is different, but basically, it's about the same.

25   So if you dismiss the Maverick claim on the basis of the

1    exculpation provisions, then you should also dismiss SRM's.

2         Now, given the District Court's decision, --

3         THE COURT:  But the District --

4         MR. STARNER:  Yes.

5         THE COURT:  I agreed with that.  Well, in

6    Maverick, I said the exculpation applies.  Judge Abrams

7    disagreed, but what they're saying now is it kind of doesn't

8    matter, because the exculpation version here is even

9    broader/more like M.F. Global than that.  So it kind of --

10   what they're saying is that there's nothing in Judge Abrams'

11   decision, were I to apply it, that strengthens your argument

12   here.

13        MR. STARNER:  Okay.  I'll just point out the fact

14   in that point in time, they were saying look, it's very

15   similar.  Now, they're saying now that we have a decision

16   from the District Court saying that these limitation

17   liability provisions do not apply, now the language is a

18   little bit different.  That's all I'm saying.

19        THE COURT:  Okay.  But I mean, --

20        MR. STARNER:  And then let's talk about the

21   decisions.

22        THE COURT:  But I can read it, right?

23        MR. STARNER:  Yeah, absolutely, absolutely, Your

24   Honor.

25        THE COURT:  I mean, I can determine for myself if

Page 15

1    it's broader or not.

2           MR. STARNER:  And from my reading of the District

3    Court's ruling, Your Honor, --

4           THE COURT:  Yes.

5           MR. STARNER:  -- I think the headlines are pretty

6    clear.  It's that, if these limitation liabilities

7    provisions don't specifically reference filing for

8    bankruptcy, then the plan reading these provisions should

9    not be read to exclude damages premised on the filing for

10   bankruptcy.  So in other words, the Court ruled that, in

11   effect, there was no reference to, you know, filing for

12   involuntary -- sorry -- a voluntary proceeding, either

13   Chapter 11 or U.K. Administration, then the plain reading of

14   that provision should not preclude damages premised on that.

15          THE COURT:  Well, I think the District Court went

16   a little bit further and expressed the view that the purpose

17   of the guarantee was to protect against the filing of

18   bankruptcy.

19          MR. STARNER:  I think that was a gloss on the

20   language of the provision, but, yes, Your Honor, the

21   guarantee was also there as a backstop to protect against

22   that precise occurrence.  All I say is in this instance

23   here, with the language of the provisions in SRM's PBA,

24   there's also no reference specifically to the filing of

25   bankruptcy.

1          THE COURT:  If I were to agree with you, though,

2     that still doesn't get you out of a problem with respect to

3     the limitation on consequential damages, which is a general

4     limitation.

5          MR. STARNER:  And I'll get to that in a moment,

6     but let's start with the 14.4.

7          THE COURT:  Uh-huh.

8          MR. STARNER:  And this is where it talks about

9     basically that the -- well, back up for a moment.  Sorry,

10    Your Honor.  Let's start with 14.3, because there that's a

11    more general reference to a limitation on liability where --

12         THE COURT:  Right.

13         MR. STARNER:  -- general risk is investing.  And

14    then they talk about the risks of investing or holding

15    assets in a particular country, and I think, just based on

16    the plain reading of those terms, particularly given

17    Judge Abrams' decision, that that can't be read to preclude

18    the claim premised on the bankruptcy filing here of LBIE.

19         THE COURT:  Why?

20         MR. STARNER:  Because there's no reference there

21    to the filing for bankruptcy.  All it says is the general

22    risks of investing, and the general risks of investing, too,

23    does not --

24         THE COURT:  Or.  It says the general risks of

25    investing --

1            MR. STARNER:  Or.  And then B is investing or

2    holding assets in a particular country.  So there's nothing

3    particularly unique about a voluntary proceeding in whatever

4    country you may be in.  So I think a plain reading of that

5    would refer to something unique to a particular country and

6    investing in a particular country.

7            THE COURT:  Okay.  I think you're making that up,

8    but be that as it may, but then you get to 14.4.

9            MR. STARNER:  Okay.

10            THE COURT:  Supposing I could agree with you on

11    14.3, hypothetically, --

12            MR. STARNER:  So getting to 14.4, Your Honor, --

13            THE COURT:  Right.

14            MR. STARNER:  So starting with the first provision

15    there, that they're only liable for gross negligence,

16    fraudulent, or willful default or breach.  That is what SRM

17    has alleged here.  So they have alleged a grossly negligent,

18    fraudulent, or willful default or breach of this agreement,

19    and that's our allegation, Your Honor.

20            THE COURT:  Okay.  But then you have to --

21            MR. STARNER:  It's backed up by the fact that --

22            THE COURT:  -- word and.

23            MR. STARNER:  And then and.  And then it gets to

24    the part while, the parties agree that as a genuine pre-

25    estimate of loss -- and that talks about --

Page 18

1          THE COURT:  No, no, no, no, no, no, the second

2     part of Clause 14.4 says, "And precludes damages, based on

3     special circumstances, indirect or consequential losses, or

4     subsequent variances to market values."  So even if you hue

5     to Judge Abrams' construction of the exculpation clause, you

6     have an expressed limitation on claims against, under the

7     PBA, for consequential damages, which surely, the lost

8     opportunity and the forced sales are.

9          MR. STARNER:  Let me just make sure I'm following

10    Your Honor.  So 14.4 of the agreement --

11         THE COURT:  Yeah.

12         MR. STARNER:  The first sentence of 14.4 refers to

13    the fact that the prime broker shall only be liable to the

14    counterparty to the extent that the prime broker has been

15    grossly negligent, fraudulent, or in willful default or in

16    breach of its duties, as set out in this agreement.  Save

17    that nothing in this agreement shall restrict any liability

18    owed by the prime broker to the counterparty under the

19    Financial Services Markets Act of 2000 or the rules and

20    disclaimers."  And so, that's the sentence there, and, Your

21    Honor, you were reading from the second sentence, "The

22    parties agree that, as a genuine pre-estimate of loss, the

23    prime broker's liability to the counterparties shall be

24    determined based upon, only upon the market value of the

25    relevant cash or securities as of the date of the discovery

Page 19

1    of loss and without reference to any special circumstances,

2    indirect or consequential."  So I'd just take that in two

3    pieces, Your Honor.

4          So the first piece, as I stated, the first

5    sentence there we have alleged that they have willfully and

6    fraudulently and negligently breached --

7          THE COURT:  But it's up to me to determine whether

8    your allegations are legally sufficient.

9          MR. STARNER:  It is, Your Honor.  It is.

10          THE COURT:  Okay?

11          MR. STARNER:  And we're happy to talk to that.

12    But then the second piece I think we're focused on here is,

13    while the parties also agree that, as a genuine pre-estimate

14    of loss, they are generally going to be looking at the

15    market value of the relevant cash or securities as of the

16    date of discovery of loss, and that kind of gets back to

17    what that means.  What is the discovery of loss?

18          THE COURT:  Okay.  I'm asking a much more simple

19    question.

20          MR. STARNER:  Yeah.

21          THE COURT:  Okay?  Let me go back to Mr. Levine.

22          What the provision that cuts off consequential

23    damages?

24          MR. LEVINE:  Well, both 14.3 and 14.4 specifically

25    disallow consequential damages.  So in 14.3, it says, below

1    the A&B, "And such exclusion of liability shall extend

2    without limitation to obligations in tort any indirect,

3    punitive, special, or consequential loss or damage, even if

4    the prime broker was previously informed of the possibility

5    of such loss or damage," and then there's an exclusion for

6    personal injury, but I don't see how it can be broader than

7    that.

8            THE COURT:  Okay.

9            MR. LEVINE:  14.4 says, in the language that

10   Mr. Starner was just reading, the second sentence, it talks

11   about, "The parties agree that, as a genuine pre-estimate of

12   loss, the prime broker's liability to the counterparty shall

13   be determined based only upon the market value of the

14   relevant cash or securities as of the date of discovery of

15   loss and without reference to any special circumstances," --

16           THE COURT:  Right.  So whether or not we agree on

17   the determining date for loss, whether it's the date of the

18   settlement or before, you still don't get to include

19   consequential damages.  That's your point, right,

20   Mr. Levine?

21           MR. LEVINE:  That  is my point, Your Honor.

22           MR. STARNER:  And I think my response to that

23   direct -- that specific issue is --

24           THE COURT:  Yeah.

25           MR. STARNER:  -- keep in mind that we're talking

Page 21

1    about segregated assets.  It's specific property.  It's

2    collateral in the form of shares.

3              THE COURT:  Yeah, well, I'm not talking about

4    that.  I'm talking about the lost opportunities claim and

5    the forced assets claim.  Those are claims for consequential

6    damages.

7              MR. STARNER:  And I think there, Your Honor, the

8    argument is under English law, when you have kind of a

9    relationship of trust that we had with our prime broker,

10   that there is an argument that that type of provision would

11   not be enforceable, and that's our argument on the lost

12   opportunities and the forced sales.

13             THE COURT:  So notwithstanding the language that

14   precludes the assertion of consequential damages, you say

15   that, under English law, there's a trust relationship and

16   that that would somehow be out of the realm of a

17   consequential damage?

18             MR. STARNER:  I may  have misspoke there.  I think

19   there's a slight distinction to be made between the lost

20   opportunities claims and the forced sale claims.  Lost

21   opportunities we've talked about fairly at length.  The

22   forced sale claim is this idea that, because we were forced

23   to close out our positions, we were forced to sell specific

24   positions we had in order to cover our margin goals.  So

25   those are specific sales that we can identify at that time

Page 22

1    that -- this is we took -- we sold certain positions at a

2    loss.  We were forced to, and so, those are --

3               THE COURT:  But that's a --

4               MR. STARNER:  Yeah.

5               THE COURT:  -- damage that's consequential.  The

6    world is divided into two things, damages that are related

7    to the market value of the securities that were not returned

8    and everything else.  You divide the world into those two

9    buckets.  What you're just describing belongs to everything

10   else.

11              MR. STARNER:  I would argue that's not necessarily

12   consequential.  That's a direct result of the breach of the

13   agreement.

14              THE COURT:  Okay.  All right.  So I think we've

15   covered that point.

16              So what about the 562 point?

17              MR. STARNER:  Yes, Your Honor, so the 562 -- I

18   think the 2 --

19              THE COURT:  Your argument --

20              MR. STARNER:  Yeah.

21              THE COURT:  -- there is based on some notion that

22   this is not a securities contract, which clearly, it is.

23              MR. STARNER:  Well, I think, Your Honor, the

24   District Court ruled that it's not necessarily as clean as

25   that.  You need to look at the context for --

Page 23

```
 1              THE COURT:  No, she said she --

 2              MR. STARNER:  Right.

 3              THE COURT:  -- you had to look at the context when

 4    you were talking about the termination, and if you read from

 5    the District Court's decision -- and I'm happy to do that.

 6    Let's see.

 7         (Pause)

 8              MR. STARNER:  The language I was looking at, Your

 9    Honor, I think it starts on page 6, at the bottom there.

10              THE COURT:  Yeah.

11              MR. STARNER:  And beginning of the top of page 7.

12    And she discusses that the purported damages that Maverick

13    asserted fall outside of the reach of the statute, because

14    the termination that occurred was not of the sort

15    contemplated.

16              THE COURT:  Yes, so what she's talking about there

17    --

18              MR. STARNER:  Yeah.

19              THE COURT:  -- is that it was not a termination by

20    a party.  It was a termination pursuant to a consensus, if

21    you keep reading.  The settlement agreement represented a

22    consensus.

23              MR. STARNER:  But she also notes that the

24    termination did not cause harm, and she noted that and made

25    that kind of as a relevant consideration of -- or what's the
```

1    purpose of the termination.  Was it to, in effect, cause

2    harm, I guess, to the estate, thus the Bankruptcy Code

3    should come into play, or not?  And I guess, in the context

4    of the mutual agreement determined it as part of a

5    settlement.  The conclusion was it wasn't intended to cause

6    harm.

7              THE COURT:  If you look down at the bottom of page

8    7, --

9              MR. STARNER:  Yes.

10             THE COURT:  She says, "The language is clear that

11   the statute applies when one of the specified participants

12   elects to take one of the unilateral numerated actions in a

13   unilateral fashion." So that's what SRM did.  They elected

14   -- you didn't have to, but you did.  You elected to

15   terminate the PBA, and the only case that you've cited from

16   the beginning on this is the Moto (ph) case, which is

17   clearly not relevant.

18             MR. STARNER:  But I'd cut this a few different

19   ways, Your Honor.  Number one, the guarantee was never

20   terminated.  The guarantee was expressly carved out of the

21   settlement.  So, one, the guarantee, which is kind of at

22   issue here, was never terminated, number one.

23             Number two, this is also an issue where --

24   frankly, it is a question that we have raised with this

25   Court that we don't think Section 562 was intended to apply

Page 25

1    extra-territorially, and that's not a question that the

2    District Court addressed.  I know it was raised on appeal by

3    Maverick, but it's not something the Court addressed, and

4    obviously more relevant here, when we have the PBA governed

5    by English law and all relevant kind of acts of the parties

6    were happening in the U.K.

7               THE COURT:  But so let's move on 562, and let's go

8    to 502.  Your view is that, because your underlying claim

9    against LBIE is governed by U.K. law, the Bankruptcy Code --

10   all bets are off.  Bankruptcy Code doesn't get to have

11   anything to say about when the claim gets calculated.

12              MR. STARNER:  Well, I think when it comes down to

13   -- well, there's a few arguments there, Your Honor.  One,

14   that, yes, under U.K. law, we believe that the quantum of

15   our claims should be -- came into play or it was confirmed

16   that the date we settled.  Because before that, keep in mind

17   we were seeking recovery of specific property, all the way

18   up until that date of the settlement, and indeed, we

19   understand that there was actually shares to be turned over.

20              THE COURT:  So I've asked you this before, and

21   I'll ask you it again.

22              MR. STARNER:  Okay.

23              THE COURT:  Lehman Brothers wasn't required to

24   hang around the hoop waiting for you to settle your claim.

25   Indeed, you sat around while the value of the securities

Page 26

1     continued to increase.

2             MR. STARNER:  Well, I think that's not a fair

3     characterization of what we did, Your Honor.

4             THE COURT:  Well, time went by --

5             MR. STARNER:  Sat around.  We submitted (ph) our

6     claim.

7             THE COURT:  And during that time, the value of the

8     securities greatly increased, right?

9             MR. STARNER:  But they could have gone down, Your

10    Honor.

11            THE COURT:  They could have gone down.  But if

12    Lehman, if hypothetically, this were not the huge case that

13    it were and Lehman confirmed the plan two months after you

14    terminated the PBA, they would have been entitled to

15    determine the amount of your claim, period.  At that point,

16    when you terminated the PBA, the guarantee was not a

17    contingent liability any more.  There was no impediment to

18    the enforcement of your claim.

19            MR. STARNER:  Well, I think, from the perspective

20    of seeking turnover of specific property, I agree with you.

21    We were seeking the specific property to be returned to us.

22    And to the extent that he Lehman estate here had the ability

23    to return that property to us, absolutely, we could have

24    sought and received it at that time.

25            THE COURT:  You could have received a claim at

Page 27

1    that time for that amount, and you could have then gone out

2    into the market and bought the securities.

3             MR. STARNER:  Well, again, that amount -- it's

4    basically we want that property.  I guess there is a world

5    where --

6             THE COURT:  Yes, but if they say we're in

7    administration, we're not allowed to or we can't return the

8    property to you, oh, look, here's the market value of these

9    shares today, here is this amount of money, go out and buy

10   the securities, you would have been completely whole.

11            MR. STARNER:  I don't know the answer to that

12   question, Your Honor, but I do know that that would put us

13   in a very different position than we were in in negotiating

14   our claim against LBIE, or, you know, the primary obligor

15   here.

16            THE COURT:  So your answer is that, for your

17   purposes, Section 502 and/or 562 are irrelevant and that you

18   -- it was perfectly fine for you to proceed along for years

19   and years and years and then, in disregard of 502 or 562,

20   allege a please give me more claim against Lehman?

21            MR. STARNER:  I don't --

22            THE COURT:  I just don't understand --

23            MR. STARNER:  Yes.

24            THE COURT:  I just don't understand how you get to

25   the other meaninglessness of 502 and 562 when you're seeking

Page 28

```
 1    to enforce a "guarantee," quote, unquote, that's governed by

 2    U.S. law.

 3            MR. STARNER:  But it was a guarantee that was

 4    guaranteeing our ability to recover specific property in the

 5    form of our collateral, and so, --

 6            THE COURT:  When you terminated, they told you

 7    that you're not getting it back, and your view in your

 8    papers is that, well, they could have changed their mind at

 9    any time.  You haven't answered my question.  If two months

10    after you terminated the PBA and Lehman made a motion to

11    dismiss or estimate your claim, what would your answer have

12    been?  Lehman just has to sit in bankruptcy until some day,

13    you settle and your claim is liquidated?  That's just not

14    the law.

15            MR. STARNER:  Well, we would have had that fight

16    as to what would be the appropriate valuation of that claim

17    at that time, and we would have had that fight, and we would

18    have looked at that time what --

19            THE COURT:  But you can look at that --

20            MR. STARNER:  -- what would have been --

21            THE COURT:  You can do that now, because we know

22    what the date is.

23            MR. STARNER:  But the property is still and was

24    still available for years afterwards, and we actually still

25    wanted to receive it.  So it's kind of an artificial
```

Page 29

```
 1    exercise, because it isn't as if there was a requirement for

 2    us to liquidate our claim at that time as we were pursuing

 3    our rights against LBIE and reserving our right to proceed

 4    against the guarantor at the same time, which was within our

 5    rights and they were on notice of, and keep in mind, too,

 6    this is a situation where you have relationships governed by

 7    English law.  You had a relationship of trust, which I think

 8    plays an important part in all of this.

 9              THE COURT:  You're --

10              MR. STARNER:  I'm circling back to English law.

11    Why?  Because it's a very relevant aspect of our claim, Your

12    Honor, and so, I know that you want to look at the 502 or

13    562, but at the end of the day, English law kind of governs.

14              THE COURT:  At the end of the day, what you're

15    saying is that, because the PBA is governed by English law,

16    you get to render irrelevant what the Bankruptcy Code says

17    about the measuring dates for claims asserted in a U.S.

18    bankruptcy.

19              MR. STARNER:  I would frame it a little bit

20    differently, Your Honor.  What I would say is the U.S.

21    Bankruptcy Code respects the law the parties agreed would

22    govern their relationship.

23              THE COURT:  And you're saying that, as applied in

24    this case, that would have meant that Lehman would have had

25    to sit around and not be able to liquidate your claim,
```

Page 30

1    because you didn't know, and I don't understand how that

2    could possibly be the law.

3              MR. STARNER:  Well, I think the law does very

4    clearly say that, under the Bankruptcy Code, they should

5    respect the law that governs a contract relationship.  So

6    the fact that we had a U.K.-governed contract with LBIE, I

7    think that is something the Code would recognize and

8    enforce.  And then if that then gave us the right to proceed

9    against LBIE in the way we did to recover that specific

10   property, under various theories, including the theory of

11   trust, the trust relationship that was formed, then whenever

12   we ultimately got that property, --

13             THE COURT:  You didn't get the property.

14             MR. STARNER:  But we may have, but ultimately, we

15   didn't.  You're absolutely right.  And so, at that point in

16   time when we did not, that's when our contingent claim

17   became basically limited.

18             THE COURT:  No, your contingent claim became non-

19   contingent when LBIE told you we're not giving you back the

20   property.  At that point, it was not contingent any more.

21   There was no impediment to enforcement.  At that moment, if

22   you had sued LBIE, which you couldn't, but if you had sued

23   LBIE, the answer wouldn't have been it's not right, we still

24   -- they told you, "We're not giving you the shares back."

25             MR. STARNER:  Well, actually, that's not entirely

Page 31

1   accurate, Your Honor.  The record shows they did not say

2   that until basically the date we settled.  It's my

3   understanding that, in fact, there was a lot of back and

4   forth where they were saying we don't know where your

5   property is.

6           Let's find that property.  Give us more time and

7   maybe with a different entity.  We're not sure where it

8   went.  And ultimately, at the end of the day, you know,

9   you're right.  We don't have it.  We've got to pay you cash,

10  and that was around the settlement time, not before then.

11          THE COURT:  Thank you.

12          Mr. Levine, you want to respond?

13          MR. LEVINE:  Yes, Your Honor.  I mean, dealing

14  with that last point, they did send a letter in September of

15  2015 demanding return of the assets.  When they didn't get

16  it back, they sent a notice of default.  Sent the letter,

17  and then they called that a termination event, an event of

18  default and terminated, and in the English case that they

19  cited -- it's actually -- I'm reading a quote from page 16

20  of our reply brief, but it's from the in re:  Lehman

21  Brothers International Europe case, paragraph 36 of our

22  reply brief.

23          "The obvious risks to Clause 13.2," which is the

24  clause in this PBA, -- "would convert a proprietary claim to

25  a breach of contract claim has to date been enough to deter

Page 32

1    the parties before that Court from serving termination

2    notices or, for that matter, default notices on LBIE."  So

3    according to the English Court, its understanding was the

4    decision they made, which most LBIE counterparties didn't

5    do, to serve a termination notice, in fact, gave them only a

6    contract claim, and that's in November of 2008, the

7    termination date on which their segregated assets were worth

8    $34 million.  So I think it's clear that, as a matter of

9    English law, they did not have -- Your Honor's entirely

10   correct.  They didn't have this continuing expectation or

11   right to return of the assets.  They had a contract claim,

12   even under English law, putting aside the fact that this is

13   a guarantee claim, under the Bankruptcy Code.

14          And as Your Honor observed the first time we were

15   here, under Ivanhoe and as you were just kind of getting to

16   it before, a guarantee claim was ripe at the moment they

17   alleged a breach by the primary obligor, and they alleged

18   that when they served -- they declared an event of default.

19   And if, as you said, we had had an incredibly fast case

20   where LBHI was paying out in the months after its bankruptcy

21   filings, the guarantee claim would have been 100 percent of

22   what was owed by LBIE, but it would have measured either as

23   of the 562 date or the petition date.  They wouldn't have

24   had to wait to settle with LBIE to collect from us.

25          THE COURT:  Right.  Well, if 562 applies, then

```
 1    it's an exception to 502.

 2              MR. LEVINE:  Exactly.

 3              THE COURT:  The default is that 502 applies.

 4              MR. LEVINE:  Right, but either one --

 5              THE COURT:  Right.

 6              MR. LEVINE:  Obviously, you know, -- does Your

 7    Honor have the chart we handed the first time?

 8              THE COURT:  Yeah, I do.

 9              MR. LEVINE:  If you look at the very bottom line

10    of that, --

11              THE COURT:  The summary of key provisions?

12              MR. LEVINE:  No.

13              THE COURT:  Or the --

14              MR. LEVINE:  No, the dollar chart, the one-pager.

15              THE COURT:  Yeah, okay.  Right.

16              MR. LEVINE:  The top half is a different claim.

17              THE COURT:  Yes.

18              MR. LEVINE:  If you look at the very bottom, --

19              THE COURT:  Right.

20              MR. LEVINE:  -- it's the segregated assets, which

21    they allege in their response, in paragraph 26, are these

22    Virgin Media shares, which are where the 264 million comes

23    from, because the Virgin Media shares, because of the

24    takeover, were allegedly worth that on the settlement date.

25    If you look at the bottom line, while they were worth the
```

Page 34

1    264 on the settlement date, --

2              THE COURT:  Yep.

3              MR. LEVINE:  -- on the petition date, they're only

4    worth 51.9 million and 34 million, and they ultimately

5    recovered, and god bless them.  They got $220 million on

6    that claim from LBIE, but this is a guarantee claim.  They

7    were entitled, under that guarantee claim, if it had been

8    processed in this bankruptcy, very quickly, either 52

9    million or 34 million.  And when they ultimately recovered,

10   $220 million from LBIE,  we would have been subrogated, and

11   they would have had to pay us back.

12             THE COURT:  Right.

13             MR. LEVINE:  But that's how it would have worked.

14             THE COURT:  Right.

15             MR. LEVINE:  There was no contingency here.

16   There's a few other points, Your Honor.  As Your Honor also

17   kind of hinted at while Mr. Starner was arguing that they

18   alleged gross negligence, willful default or fraud, they

19   don't.  I mean, willful default they've kind of argued, but

20   they haven't alleged the elements of that.  I don't think

21   they've ever really alleged fraud.

22             That they claim is that there were certain

23   breaches.  One is a breach of some oral side agreement after

24   the PBA was signed that LBIE would not rehypothecate their

25   securities without giving them notice.  So at most, they

1    have a breach of what may be or may not be an enforceable

2    oral agreement that wasn't part of the PBA.  The PBA hadn't

3    gave them the right to send a notice saying don't

4    rehypothecate.

5            It didn't do that.  They claim that they had a

6    side agreement that LBIE would not rehypothecate without

7    giving them notice.  I don't know whether that exists, but

8    that's, at most, a breach of contract claim, and plain and

9    clear there was a contract there.

10           They also allege gross negligence and

11   rehypothecating.  But again, no elements of the negligence

12   claim are ever alleged.

13           And willful default -- their main breach of

14   contract claim is the failure to return the assets, but as

15   we know, administrators were appointed.  They obviously had

16   an obligation, under the governing regulations in U.K. and

17   Wales to marshal assets and determine claims.  Moreover, in

18   the PBA itself, it expressly provides that, in the event of

19   an event of default -- so I'm looking at Clause 7.2 of the

20   contract, which says, "The prime broker acting in good faith

21   and in commercially reasonable discretion shall not be

22   required to make a payment or delivery, under Clause 7.1, a,

23   an event of default or potential event of default has

24   occurred and is continuing."

25           In their termination notice, they alleged a

Page 36

1    potential event of default, and indeed, filing for

2    administration is defined as an act of insolvency, in the

3    PBA, which is an event of default.  So any obligation to

4    return the assets, as the judge in that LBIE case I was just

5    referring to recognized, terminate any obligation to return

6    assets.  At that point, they just had a contract claim.

7              THE COURT:  Okay.

8              MR. LEVINE:  Okay?

9              THE COURT:  All right.

10             MR. LEVINE:  And obviously, the last point I

11   wanted to make is we're not arguing 562 applies extra-

12   territorially.  We're arguing it applies to the Lehman

13   Holdings Chapter 11 case in this court in New York City.

14             THE COURT:  All right.

15             MR. STARNER:  If I may, just two or three points

16   there?

17             THE COURT:  Yep.

18             MR. STARNER:  The last first.  I mean, their

19   argument applies to a contract governed by U.K. law that was

20   executed by parties in the U.K., which the damages and all

21   the injury we're alleging all happened in the U.K.

22             THE COURT:  You're seeking to recover, in this

23   court, a claim on what you say is a U.S.-based guarantee.

24             MR. STARNER:  Yeah, but they're arguing that 562

25   applies to our PBA.

Page 37

```
 1                THE COURT:  Okay.

 2                MR. STARNER:  The guarantee is a different

 3       contract, was never terminated, Your Honor and arguably, is

 4       not a securities agreement.  So if they want to -- they

 5       can't have it both ways.  You're either talking about the

 6       PBA or the guarantee.

 7                THE COURT:  Is it your view that the corporate

 8       resolution, under 562, is not a securities agreement or

 9       related to a securities agreement?

10                MR. STARNER:  My argument is that it was not

11       terminated.  We did not terminate the guarantee, Your Honor.

12       And so, if you apply the District Court's ruling about when

13       562 applies, it applies when there's a termination event.

14       The guarantee was not terminated here.  Okay.

15                THE COURT:  Okay, go ahead.

16                MR. STARNER:  And, number two, we're going to talk

17       about the allegations of willful breach negligence, and I

18       just refer the Court to our initial pleadings here when we

19       put in our -- I think it was the response to the objection

20       --

21                THE COURT:  Well, I'm not interested in your

22       response.

23                MR. STARNER:  Okay.

24                THE COURT:  You can read to me what you think the

25       allegations are.
```

```
 1            MR. STARNER:  Oh, certainly, Your Honor.  The

 2    allegations are, I guess, two parts I would highlight.  One,

 3    at the time the PBA was entered into, there was indeed

 4    representations made about the fact that collateral would

 5    not be rehypothecated.  I can't even say it.

 6            THE COURT:  Rehypothecated.

 7            MR. STARNER:  Rehypothecated.  Excuse me, Your

 8    Honor.  That it would be in the segregated and preserved for

 9    SRM's benefit, number one.

10            Number two, in the context of the bankruptcy

11    filing, there was further representations made that the

12    assets would be returned to SRM, which were also, you know,

13    alleged in our papers.

14            And then finally, just on the point about the

15    termination of the PBA, what we highlight -- and, you know,

16    it's paragraph 23 of our submission, but what we highlight

17    is that we received a notice from LBIE in October of 2008.

18    This was before the PBA was terminated.  That notice was, in

19    effect, totally erroneous, said that we were a debtor to the

20    tune of $108 million, and thus, prior to all our

21    understanding of what the parties' arrangement was, we're

22    now being accused by LBIE that we're exposed now to $110

23    million almost.  So basically, it was a reaction to that,

24    what was, in effect, a misrepresentation by LBIE that SRM

25    took steps to terminate the PBA.
```

```
 1              Now, under U.K. law -- now, we put in submissions
 2     from an expert, and I guess I'd refer -- I think we talk
 3     about this in paragraph 35 and 36 of our submission.  While,
 4     under the U.K. law, generally speaking, a counterparty to a
 5     contract generally cannot benefit from its own misconduct
 6     when it comes to something like this, where we terminated --
 7     our termination was premised on their own misconduct.
 8              THE COURT:  Okay.  Give me one minute, please.
 9              MR. LEVINE:  So, Your Honor, again, --
10              THE COURT:  Okay, just give me one second.
11              MR. LEVINE:  Sorry, sure.
12         (Pause)
13              MR. STARNER:  Sorry, it's actually page 35.
14     Excuse me.
15              THE COURT:  Okay.
16              MR. STARNER:  And it's paragraph 80 and 81.  We
17     just say it's a matter of English law that the idea of the
18     termination of the PBA --
19              THE COURT:  The contract (ph) thing about 562 -- I
20     thought your argument was that 562 doesn't apply, because
21     the corporate resolution is not a securities contract.  And
22     now, what you're saying is that 562 doesn't apply, because
23     the termination of the PBA did not terminate.
24              MR. STARNER:  Your Honor, we have both arguments.
25     We indeed believe the guarantee is not a securities
```

1    agreement.

2                THE COURT:  Okay.

3                MR. STARNER:  It's not specifically talking about

4    any securities agreement.  It's a general guarantee, Your

5    Honor.  It's a global guarantee.  They do not specifically

6    --

7                THE COURT:  Of the securities contract?

8                MR. STARNER:  But there's no reference there.

9    It's a general obligation for them to backstop the PBA.  It

10   does not refer to securities agreements, Your Honor, but in

11   the context of the Maverick appeal, the question is what

12   impact does that appeal have on our 562 position, and I

13   think the Court didn't necessarily address squarely the

14   question of whether or not the guarantee that we had -- that

15   was not before the Court, whether or not that was a

16   securities agreement, but the Court did rule that -- and

17   you, in fact, would look at a termination event.  And here,

18   with the global guarantee, there was no termination event.

19   We didn't terminate that.  Quite the opposite.  We expressly

20   carved that out of our settlement with LBIE.

21               THE COURT:  Well, Mr. Levine, can you address that

22   point?

23               MR. LEVINE:  Yes, on --

24               THE COURT:  It's new to me.  Maybe I've missed it,

25   because we've argued this so many times.

1          MR. LEVINE:  Yes, we have done that, Your Honor.

2     So first of all, under the definition of securities

3     contract, --

4          THE COURT:  Right.

5          MR. LEVINE:  -- a guarantee of a securities

6     contract is a securities contract.

7          THE COURT:  Right.

8          MR. LEVINE:  So either this guarantee has nothing

9     to do with this or --

10         THE COURT:  Okay.  So --

11         MR. LEVINE:  -- or it's a securities contract.

12         THE COURT:  -- I believe that that is correct and

13    that Judge Abrams didn't say anything inconsistent with

14    that.

15         MR. LEVINE:  Right.

16         THE COURT:  But now, there's a new argument --

17         MR. LEVINE:  Right.

18         THE COURT:  -- that the termination of the PBA

19    does not trigger 562.

20         MR. LEVINE:  Well, and let us look at the language

21    of 562.  The heading, which under your second

22    interpretation, can be looked at if a contract -- if a

23    statutory provision is ambiguous -- is timing of damage

24    measurement in connection with swap agreements, securities

25    contracts, forward contracts, commodity contracts, where you

Page 42

1    purchase agreements, and master netting agreements.  So it's

2    timing of damage measurement.  That's all 562 is about, and

3    going down to the halfway through, if a forward contract

4    merchant, dot, dot, dot, --

5                THE COURT:  Right.

6                MR. LEVINE:  -- financial participant, master

7    netting agreement participant, or swap agreement liquidates,

8    terminates, or accelerates such contract or agreement, --

9                THE COURT:  That's the PBA.

10               MR. LEVINE:  That's the PBA.  They terminated the

11   agreement.

12               THE COURT:  Right.

13               MR. LEVINE:  So it doesn't say that it has to be

14   -- if your claim is against the guarantor, it has to be the

15   guarantee that's terminated.  It's simply proposing an

16   alterative -- not proposing.  It's an exception, as Your

17   Honor pointed out, to 502, and it's simply saying that,

18   where you have one of these types of agreements that's

19   terminated, that's the measurement date.  And that had to do

20   with all kinds of policies about the derivatives world, but

21   none of that is relevant.

22               THE COURT:  Right, right.

23               MR. LEVINE:  Because it doesn't matter, in our

24   view, whether it's 502 or 562(a).

25               THE COURT:  Okay.

1          MR. LEVINE:  We think 562(a) clearly applies, but

2     either way, it's one or the other.  That's when you measure

3     the guarantee claim.

4          The other thing I wanted to quickly go through,

5     Your Honor, is their assertion that somehow, their

6     termination of the PBA was based on wrongdoing.  I mean,

7     wrongdoing to me suggests something that's immoral,

8     criminal.

9          THE COURT:  Something Madoffian?

10          MR. LEVINE:  Right.  This was --

11          THE COURT:  Right?  Not went into administration

12     and then the administrator said he's not going to -- can't

13     return your shares.

14          MR. LEVINE:  Right, here we have -- and this is

15     the thing, because they put it before the Court.  So they're

16     admitting exhibits to the declaration of Jonathan Wood (ph).

17     And Exhibit --

18          THE COURT:  I'm not smart enough to come up with

19     the specific examples, but this type of allegation has

20     arisen on the LBI side of the case from time to time.

21          MR. LEVINE:  Right.  So --

22          THE COURT:  So --

23          MR. LEVINE:  -- on Exhibit Jonathan Wood, JW-2, is

24     a letter from Clifford Chance (ph), as counsel for SRM.

25     They demand, on page 2, "Segregated assets are the property

Page 44

```
 1    of SRM.  We hereby request Lehman immediately to return or
 2    procure the return of the segregated assets to the following
 3    account of SRM."  So on September 19th, 2008, they sent a
 4    demand to LBIE for return of what they say are the
 5    segregated assets.
 6            Then if we turn to Exhibit JW-5, this is another
 7    letter from SRM's counsel.  This is actually from SRM.  I
 8    apologize.  Dated 6 November, 2008, and it says, "Dear Sirs,
 9    default notice under International Prime Brokerage
10    Agreement."
11            And it says, "This letter constitutes a default
12    notice under the P.B. Agreement by virtue of the appointment
13    of administrators to Lehman on 15 September, 2008, an act of
14    insolvency, as specified in Clause 12.1(d) of the P.B.
15    Agreement has occurred and is continuing in relation to
16    Lehman.  We hereby notify you that we are treating that
17    event as an event of default for purposes of the P.B.
18    Agreement."  So they are sending a default notice based on
19    LBIE filing for administration.
20            Then the next exhibit, Exhibit JW-6 -- this is
21    also from SRM dated November 6th, same date, and it's headed
22    Termination Notice Under International Prime Brokerage
23    Agreement.  "We write in connection with the International
24    Prime Brokerage Agreement dated 9 May, 2008 between LBIE and
25    SRM."  I'm summarizing there.
```

1              "We refer to Clause 13.1 of the P.B. Agreement and

2     our first letter and default notice of today, and we hereby

3     give notice to terminate the P.B. Agreement with effect from

4     6 November, 2008."  So clearly, the record shows these are

5     the documents they put in the paper.  They made a demand for

6     return of the assets, and they allege elsewhere they didn't

7     get them.  They sent a default notice, and they sent a

8     termination notice.  That's the record.

9              THE COURT:  Okay.  All right.  Well, this has been

10    helpful clarification and also as a refresher.  I'm going to

11    be dismissing the entirety of the proof claim on --

12    depending upon which particular bucket of claims, segregated

13    assets, lost opportunity, forced sales, there are going to

14    be multiple bases on which I'm going to dismiss each of

15    those claims.  We will, in a written opinion, work through

16    it all.

17             I think that LBHI has convinced me on the non-

18    reliance point.  I'm convinced on the applicability of the

19    various aspects of the exculpation clause, including the

20    limitation on consequential damages.  I think that the

21    segregated assets claim cannot be sustained.  I think 562

22    applies.

23             And in any event, it almost doesn't matter,

24    because 502 applies provisions of the Code, notwithstanding

25    the fact that the underlying obligation is U.K. denominated.

Page 46

1    It simply doesn't matter.  This is the way it works in the

2    U.S. Bankruptcy.  Despite the efforts throughout, which I

3    understand, to create issues of fact where I believe there

4    are none, I don't believe there are any issues of fact that

5    are inconsistent with my ruling, as a matter of law, with

6    respect to the sufficiency of the pleadings and with respect

7    to the viability of the claims.  So the entirety of the

8    claim is going to be dismissed.

9            It's going to take a while to write this.  We have

10    a lot of other things going on.  So I thought I owed it to

11    you to give you a decision.  That's the decision.  Details

12    to follow in due course.  You know, optimistically shoot for

13    some time in January, but we have a very major trial coming

14    up, and I just don't know that we're going to get to it in

15    that time frame.

16            If, by any chance, the parties want to start

17    talking to each other and you're approaching a settlement,

18    please send us a missive, and we'll put pencils down and,

19    you know, be delighted to hear that you settled.  But look,

20    this has been before me now for longer than I care to think

21    about it.  We had a number of rounds.  We took a time out

22    for you to have settlement discussions.  It's too bad those

23    didn't result in a settlement.

24            And then we had the additional Maverick decision.

25    So now, this was, I believe, entirely right for me to tell

Page 47

1   you what my thinking is.  That's what my thinking is, and

2   we'll publish a decision when we publish a decision, and

3   we'll trust that you'll let us know if you come to an

4   amicable resolution.  All right?

5              MR. LEVINE:  Thank you very much, Your Honor.

6              MR. STARNER:  Thank you, Your Honor.

7              THE COURT:  Okay.  Thank you.  Happy Holidays.

8              MR. LEVINE:  We appreciate it.

9              MR. STARNER:  Happy Holidays to you.

10              THE COURT:  Thank you again for coming in today.

11   I appreciate it.

12         (Whereupon, these proceedings were concluded at 3:57

13   PM)

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3                            R U L I N G

4                                                    PAGE

5    SRM's Objection to Claim Number 296060        46

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 49

1                   C E R T I F I C A T I O N

2

3    I, Nicole Yawn, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7    Sonya                  Digitally signed by Sonya Ledanski
                            Hyde
                            DN: cn=Sonya Ledanski Hyde, o, ou,
     Ledanski Hyde          email=digital1@veritext.com, c=US
8    _____
                            Date: 2019.03.25 15:11:44 -04'00'

9    Nicole R. Yawn

10

11

12

13

14   Date:  January 10, 2019

15

16

17

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501