**Objection Date and Time: May 8, 2019 at 4:00 p.m. (Prevailing Eastern Time)**
**Hearing Date and Time: To be scheduled if an objection is filed**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x
    :
**In re**     :     **Chapter 11 Case No.**
    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,     :     **08-13555 (SCC)**
    :
    **Debtors.**     :     **(Jointly Administered)**
    :
------------------------------------------------------------------------x

## NOTICE OF MOTION PURSUANT TO RULE 9019
## OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND
## SECTION 105(a) OF THE BANKRUPTCY CODE FOR APPROVAL OF
## OF A SETTLEMENT AGREEMENT RELATING TO THE STONY HILL
## CDO SPC INDENTURE AND CREDIT DEFAULT SWAP AGREEMENT

PLEASE TAKE NOTICE that on April 8, 2019, Lehman Brothers Holdings Inc.

("LBHI" and solely in its capacity as Plan Administrator, the "Plan Administrator") as Plan

Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers*

*Holdings Inc. and Its Affiliated Debtors* for certain entities in the above-referenced chapter 11

cases, filed a motion (the "Motion") pursuant to section 105(a) of title 11 of the United States

Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure approval of a Settlement

Agreement among (i) LBHI, (ii) U.S. Bank National Association, solely in its capacity as trustee

under the indenture dated as of July 14, 2005 and the trust thereunder; (iii) Stony Hill CDO SPC

for the account of the Series 2005-1 Segregated Portfolio, a segregated portfolio company

incorporated in the Cayman Islands with limited liability; and (iv) Stony Hill CDO Series 2005-1

LLC, as more fully described in the Motion, and that a hearing to consider the Motion will be

held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United

States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 623, One Bowling

Green, New York, New York 10004 (the "Bankruptcy Court"), on a date to be scheduled if an

objection is filed (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the

objecting party, the basis for the objection and the specific grounds thereof, and shall be filed

with the Bankruptcy Court electronically in accordance with General Order M-242 (which can

be found at *www.nysb.uscourts.gov*) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document

Format (PDF), WordPerfect, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the

Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom

623; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153,

Attn: Jacqueline Marcus, Esq., attorneys for the Plan Administrator; (iii) the Office of the United

States Trustee for Region 2, U.S. Federal Office Building 201 Varick Street, Suite 1006, New

York, New York 10014, Attn: William K. Harrington, Esq. and Andrea B. Schwartz, Esq.; and

(iv) Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603, Attn: Franklin H.

Top III, Esq., attorneys for U.S. Bank National Association, so as to be so filed and received no

later than **May 8, 2019 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

2

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: April 8, 2019
New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc. and Certain of Its Affiliates*

Objection Date and Time: May 8, 2019 at 4:00 p.m. (Prevailing Eastern Time)
Hearing Date and Time: To be scheduled if an objection is filed

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x
                                              :
In re                                         :    **Chapter 11 Case No.**
                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :    **08-13555 (SCC)**
                                              :
                      **Debtors.**            :    **(Jointly Administered)**
                                              :
-------------------------------------------------------------------------x

## MOTION PURSUANT TO RULE 9019
## OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND
## SECTION 105(a) OF THE BANKRUPTCY CODE FOR APPROVAL
## OF A SETTLEMENT AGREEMENT RELATING TO THE STONY HILL
## CDO SPC INDENTURE AND CREDIT DEFAULT SWAP AGREEMENT

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan

Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers*

*Holdings Inc. and Its Affiliated Debtors* (the "Plan") for certain entities in the above-referenced

chapter 11 cases, submits this motion (the "Motion") and respectfully represents:

### Relief Requested

1.    By this Motion, pursuant to Rule 9019(a) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and section 105(a) of title 11 of the United

States Code (the "Bankruptcy Code"), the Plan Administrator seeks approval of a settlement

agreement, dated as of April 3, 2019 (the "Settlement Agreement"), among (i) LBHI, (ii) U.S. Bank National Association (the "Trustee"), solely in its capacity as trustee under the indenture dated as of July 14, 2005 (the "Indenture" and the trust created thereunder, the "Trust")[1]; (iii) Stony Hill CDO SPC for the account of the Series 2005-1 Segregated Portfolio, a segregated portfolio company incorporated in the Cayman Islands with limited liability (the "Issuer"); and (iv) Stony Hill CDO Series 2005-1 LLC (the "Co-Issuer") (LBHI, the Issuer, the Co-Issuer, and the Trustee are collectively referred to herein as the "Parties").   The Settlement Agreement resolves certain remaining disputes and issues relating to a credit swap transaction described more fully below (the "Transaction"), and provides for the distribution of funds attributable to LBHI.

## Background

2.      Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases (together, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.

3.      On December 6, 2011, the Court approved and entered an order confirming the Plan [ECF No. 23023].  The Plan became effective on March 6, 2012.

## Jurisdiction

4.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[1]   A copy of the Indenture (without exhibits) is annexed hereto as Exhibit A.

2

## The Credit Default Swap Agreement and the Indenture

5.      Lehman Brothers International (Europe) ("LBIE") and the Issuer entered into the Transaction pursuant to a 1992 form ISDA Master Agreement, dated as of July 14, 2005 (as amended and restated, the "ISDA Master Agreement"), as amended and supplemented by a certain schedule to the ISDA Master Agreement (the "Schedule") and a confirmation, dated as of July 14, 2005 (the "Confirmation").[2]  LBHI guaranteed LBIE's obligations under the ISDA Master Agreement, the Schedule, and the Confirmation (the "Guarantee" and, together with the ISDA Master Agreement, the Schedule, and the Confirmation, the "Credit Default Swap Agreement").[3]

6.      Under the Credit Default Swap Agreement, LBIE agreed to make periodic payments to the Issuer in exchange for the Issuer's promise to make payments to LBIE in respect of losses incurred in respect of certain specified reference obligations.  In effect, LBIE, as the "Swap Counterparty," purchased protection from the Issuer, which sold protection on the creditworthiness of the obligations referenced in the Credit Default Swap Agreement.

## The Claims Determination Deed and the Letters of Direction

7.      On August 29, 2014, LBIE, the Issuer, the Co-Issuer, and the Trustee entered into a certain claims determination deed (the "Claims Determination Deed").[4]  The Claims Determination Deed provided that the Issuer shall have an unsecured claim against LBIE (the "Admitted Claim") in a certain amount (the "Agreed Claim Amount"), and that the Admitted Claim in the Agreed Claim Amount (plus interest thereon as set forth in the scheme of

---

[2]  A copy of the ISDA Master Agreement, Schedule, and Confirmation is annexed hereto as Exhibit B.

[3]  Capitalized terms used herein but not otherwise defined have the meaning ascribed to them in the Credit Swap Agreement or the Indenture, as applicable.

[4]  A copy of the Claims Determination Deed is annexed hereto as Exhibit C.

3

arrangement between LBIE and its creditors, dated May 14, 2018 (the "Scheme of Arrangement"), shall constitute the Issuer's sole claim against LBIE.

8.      LBHI is the holder of all of the notes issued by the Issuer, with the exception of a note in the original principal amount of $500,000 (the "Remaining Note" and the holder thereof, the "Remaining Noteholder").   On August 28, 2014, LBHI issued a letter of direction (the "Letter of Direction") to the Trustee.[5]   Pursuant to the Letter of Direction, LBHI, as the holder of 99% of the issued and outstanding Notes (the "Directing Holder"), instructed and directed the Trustee to undertake the following actions: (i) to execute the Claims Determination Deed; (ii) to pay certain fees, costs and expenses of the Trustee; and (iii) to withdraw and expunge any proof of claim filed against Lehman Brothers Special Financing Inc. and LBHI in these chapter 11 cases.   Additionally, the Letter of Direction provided that any remaining proceeds of the Admitted Claim would be the subject of a subsequent letter of direction.

9.      On March 5, 2015, LBHI issued a second letter of direction (the "Supplemental Letter of Direction"), in which it instructed and directed the Trustee to undertake the following actions: (i) to pay certain fees, costs and expenses of the Trustee; (ii) to establish a reserve from the proceeds of the Admitted Claim in the amount of $500,000 (the "Remaining Note Reserve") for the payment of the full principal amount of the Remaining Note (with the explicit caveat that LBHI, as the Directing Holder, believed that such holder of the Remaining Note is entitled to a much smaller amount); (iii) to establish a reserve in the amount of $150,000 to cover the cost of further administering, unwinding and terminating the Trust; and (iv) to distribute the remaining proceeds of the Admitted Claim held by the Trustee to LBHI.

---

[5]   A copy of the Letter of Direction is annexed hereto as Exhibit D.

10.    The Supplemental Letter of Direction also includes the following language:

> In the Event the Holder(s) of the Remaining Note is not identified on or prior to February 1, 2016, LBHI and the Trustee shall file a Motion with the Court seeking the approval of a settlement with respect to such Holder's position identical to the settlement reached between LBHI and LBIE; the form and substance of such Motion shall be acceptable to each of LBHI and the Trustee.

11.    On May 29, 2018, LBHI, as the Directing Beneficial Owner, issued a third letter of direction, in which it directed and instructed the Trustee to vote on the Scheme of Arrangement.

12.    On August 20, 2018, LBHI, as the Directing Beneficial Owner, issued a fourth letter of direction, in which it instructed the Trustee to (a) pay certain fees and expenses of the Trustee in the amount of $108,014.18 from the reserve for fees and expenses held by the Trustee, (b) pay $5,271,445.06 representing 99% of the proceeds from the distribution from LBIE to LBHI, and (c) add $53,246.92 to the Remaining Note Reserve maintained for the holder of the Remaining Note.

### The Settlement Agreement[6]

13.    Consistent with the Supplemental Letter of Direction, and given that the holder of the Remaining Note has not been identified and has not responded to multiple notices from the Trustee seeking the identity of such holder, the Parties have entered into the Settlement Agreement that, among other things, provides the holder of the Remaining Note with a recovery consistent with the settlement reached between LBHI and LBIE.

---

[6] In keeping with the confidentiality provisions of the Settlement Agreement, and due to the Parties' desire to keep the terms of the Settlement Agreement confidential, the Settlement Agreement has not been annexed hereto. The Plan Administrator will provide a copy of the Settlement Agreement to the Court and the Office of the United States Trustee prior to the hearing to consider the relief requested herein.

WEIL:\96563195\12\58399.0011

14.     The salient terms of the Settlement Agreement are as follows:

a.  Upon the Effective Date (as defined in the Settlement Agreement), the Trustee will transfer 99% of the Admitted Claim against LBIE to LBHI in consideration of LBHI's interests in the notes issued by the Issuer;

b.  Upon the Effective Date (as defined in the Settlement Agreement), the Trustee will sell the remainder of the Admitted Claim against LBIE to LBHI, and LBHI will pay the Trustee $1,000 in consideration therefor representing a market rate for the claims of this type against LBHI (as determined by LBHI and reported to the Trustee);

c.  On or shortly after the Effective Date, the Trustee will transfer $217,415.04 of the Remaining Note Reserve to the Depository Trust Company ("DTC") for the benefit of the Remaining Noteholder;

d.  Upon the Effective Date, any outstanding fees and expenses of the Trustee, the Issuer and the Co-Issuer related to administering the Trust shall be paid in full;

e.  Upon the Effective Date, the Trustee will reserve an amount of $30,000 (the "Termination Reserve") of the funds currently in the Trust for the cost, if any, of further administering, unwinding, and terminating the Trust, the Issuer and the Co-Issuer, and the balance of the Termination Reserve shall be transferred to LBHI, within 120 days of the Effective Date;

f.  The Trustee shall pay the remaining proceeds of the Admitted Claim held in the Trust to LBHI within 20 business days after the Effective Date;

g.  On the Effective Date, any outstanding indemnities granted by LBHI in favor of the Trustee, the Issuer, and/or the Co-Issuer shall be deemed terminated and any Claims thereunder shall be deemed released; and

h.  On the Effective Date, the Trust shall terminate and the Trustee shall be authorized to take all necessary steps to terminate the Trust.

15.     The effectiveness of the Settlement Agreement is conditioned on the

Court's approval of the terms of the Settlement Agreement pursuant to the terms of Bankruptcy

WEIL:\96563195\12\58399.0011

Rule 9019. Entry of an order by this Court, in the form annexed hereto, is, therefore, a condition precedent to the effectiveness of the Settlement Agreement.

16.     The Plan Administrator has determined in its informed business judgment that the terms of the Settlement Agreement are in the best interests of LBHI. Approval of the Settlement Agreement will enable LBHI to resolve all remaining issues in connection with the Transaction and to avoid expending further resources on these issues. It will also eliminate the outstanding indemnities which may be substantial long term obligations of the Debtors and free up additional cash that may be used to fund ongoing distributions to creditors, without adversely affecting the rights of the Remaining Noteholder.

**The Settlement Agreement Is in
The Debtors' Best Interests and Should Be Approved**

17.     The Plan Administrator submits that the Settlement Agreement is in the Debtors' best interests and should be approved under Rule 9019 of the Bankruptcy Rules. Bankruptcy Rule 9019(a) provides "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. R. 9019(a). This rule empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate." *In re Drexel Burnham Lambert Group*, *Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness." *Id.*; *see also Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

18.     Compromises are "a normal part of the process of reorganization." *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

7

Compromises may be effected separately during the reorganization proceedings or in the body of the plan itself. *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. at 758. The decision to approve a particular compromise lies within the sound discretion of the Court. *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). The Court's discretion may be exercised "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998). A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and in the best interest of the [debtor's] estate." *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted). The court must apprise itself "of all relevant facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424.

19.     Courts typically consider the following factors in determining whether a settlement should be approved: (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the difficulties of collecting any litigated judgment; (iii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; (iv) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; (v) the competence and experience of counsel who support the settlement; (vi) the relative benefits to be received by members of any affected class; (vii) the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion; and (viii) the debtor's informed judgment that the settlement is fair and reasonable. *See Id.*; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); *In re Best Prods. Co.*, 168 B.R. at 50.

8

20.    While a court must "evaluate . . . all . . . factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), or conduct a full independent investigation. *Drexel Burnham Lambert Group*, 134 B.R. at 496.    Moreover, in reviewing a global compromise, a court need not be aware of or decide the particulars of each individual claim resolved by the settlement or "assess the minutia of each and every claim"; rather, a court "need only canvass the issues and see whether the settlement falls 'below the lowest point in the range of reasonableness.'"    *Shugrue*, 165 B.R. at 123.    As one court explained in assessing a global settlement of claims, "[t]he appropriate inquiry is whether the Settlement Agreement *in its entirety* is appropriate for the . . . estate."    *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir. 1993) (emphasis added).

21.    Here, the Settlement Agreement will benefit LBHI, and its creditors. First, the Settlement Agreement will provide for the transfer of any excess funds from the Remaining Note Reserve and the Termination Reserve to LBHI's estate.    Second, entry into the Settlement Agreement will avoid future disputes and expenses in relation with the transaction. Finally, by terminating the Indemnities and other contingent obligations and unwinding and terminating the Trust and the Issuer, the Settlement Agreement will assist LBHI and the Plan Administrator in effectuating a wind down of the Debtors' estates.

22.    While the amount of the Remaining Note Reserve will be reduced, the Settlement Agreement provides, on information and belief, the holder of the Remaining Note with a recovery that is equivalent on a pro rata basis with the recovery that the Issuer realized on

9

its Admitted Claim against LBIE.  Thus, the Settlement Agreement reflects an adjustment of the Remaining Note Reserve that is fair to the Remaining Noteholder.

23.     For the reasons stated above, and in the Plan Administrator's informed business judgment, the compromises set forth in the Settlement Agreement are a "fair and equitable" resolution of the parties' dispute, well within the "range of reasonableness," and are in the best interests of the Debtors and their respective estates and creditors.  Accordingly, the Plan Administrator requests that the Settlement Agreement be approved, effective immediately upon entry of an Order granting the relief requested herein.

**The Bankruptcy Court Has Authority Pursuant to
Section 105(a) of the Bankruptcy Code to Approve the Settlement Agreement**

24.     The Plan Administrator also seeks approval of the Settlement Agreement pursuant to section 105(a) of the Bankruptcy Code.  This Court has authority under the broad equitable powers of the Bankruptcy Code, as set forth in section 105(a), to approve the Settlement Agreement.  Courts have used their equitable powers to permit deviations in trust agreements in order to preserve and protect a trust or where circumstances exist that would defeat or substantially impair the accomplishment of the purposes of the trust.  *See, e.g., In re A.H. Robbins*, 880 F.2d 769, 776 (4th Cir. 1989) (noting that section 105(a) authorizes the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code and finding that matters relating to the control and supervision of trusts are within the equity jurisdiction of the court); *In re Joint Eastern and Southern Districts Asbestos Litigation*, 878 F. Supp 473 (E.D.N.Y. & S.D.N.Y. 1995) and 129 B.R. 710 (E.D.N.Y. & S.D.N.Y. 1991) (holding that section 105(a) authorizes the federal courts in bankruptcy cases to approve a settlement modifying distributions, obligations, and payment procedures under a trust).

10

## Waiver of Bankruptcy Rule 6004(h)

25.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  The Debtors seek a waiver of the 14-day stay extant in Bankruptcy Rule 6004(h) to avoid any delays in the Trustee's ability to effectuate the terms of the Settlement Agreement which, among other things, inure to the benefit of the Debtors.

## Notice

26.    No trustee has been appointed in these chapter 11 cases.  The Plan Administrator has served notice of this Motion in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [ECF No. 9635] on (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603, Attn: Franklin H. Top III, Esq., attorneys for U.S. Bank National Association, as Trustee; and (vi) all parties who have requested notice in the Chapter 11 Cases. The Plan Administrator submits that no other or further notice need be provided.

WEIL:\96563195\12\58399.0011

WHEREFORE the Plan Administrator respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: April 8, 2019
New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

WEIL:\96563195\12\58399.0011

**Exhibit A**

SERIES INDENTURE, dated as of July 14, 2005 (this "Series Indenture"), among STONY HILL CDO SPC (the "Company") for the account of the Series 2005-1 Segregated Portfolio (the "Issuer"), a segregated portfolio company incorporated in the Cayman Islands with limited liability, STONY HILL CDO SERIES 2005-1 LLC, a special purpose limited liability company formed under the laws of the State of Delaware (the "Co-Issuer"; the Issuer and the Co-Issuer are collectively referred to hereinafter as the "Co-Issuers"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as Trustee.

W I T N E S S E T H :

WHEREAS, the Issuer desires to pledge the assets of the Issuer in favor of the Trustee on the Closing Date pursuant to this Series Indenture, which is supplemented by and incorporates by reference the Standard Terms for Indentures, dated as of July 14, 2005 (the "Standard Terms" and, together with this Series Indenture, the "Indenture"), and provide for the issuance of the Notes, which will be secured by the assets of the Issuer;

WHEREAS, the Issuer is entering into the Indenture and the Trustee is accepting the trusts created hereby, for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants expressed herein and for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit of the Secured Parties, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all accounts, general intangibles, payment intangibles, securities accounts, chattel paper, instruments, investment property, money (as such terms are defined in the UCC), and any and all other property of any type or nature owned by it, including but not limited to:

(a)      the Permitted Short-Term Investments including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, which the Issuer causes to be delivered to the Trustee (directly or through a Securities Intermediary or bailee) on the Closing Date, all payments made or to be made thereon or with respect thereto, and Permitted Short-Term Investments including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, which are delivered to the Trustee (directly or through a Securities Intermediary or bailee) on any date after the Closing Date pursuant to the terms hereof and all payments made or to be made thereon or with respect thereto;

(b)      the Credit Swap and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto and any collateral granted to the Issuer thereunder;

(c)      the Interest Collections Payment Account and the Principal Collections Payment Account or any other account of the Issuer, Permitted Short-Term Investments purchased with funds on deposit in said accounts, and all funds deposited therein and financial assets and investment property credited thereto and income from the investment of funds therein, including any part thereof which consists of general intangibles or investment property (each as defined in the UCC) relating thereto;

(d)      all Cash and Money delivered to the Trustee for the benefit of the Secured Parties (directly or through a Securities Intermediary or bailee);

(e)      all securities, loans, investments and agreements of any nature in which the Issuer has an interest, including any part thereof which consists of general intangibles or investment property (each as defined in the UCC) relating thereto; and

(f)      all Proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses;

but excluding, in each case, any asset situated in the Cayman Islands including, without limitation, (i) the Excepted Property, (ii) the Administration Agreement and the Issuer's rights thereunder) (clauses (a) through (f) above, with the exclusion of (i) and (ii) above, the "Collateral").

Such Grants are made in trust, to secure the Notes equally and ratably without prejudice, priority or distinction among the Notes by reason of difference in time of issuance or otherwise, except as expressly provided in this Indenture, and to secure (i) the payment of all amounts due on the Notes in accordance with their terms, (ii) the payment of all other sums payable under this Indenture, (iii) compliance with the provisions of this Indenture, and each related document, all as provided herein and therein and (iv) all other Secured Obligations.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein, for the benefit of the Secured Parties.  Upon the occurrence and during the continuation of any Event of Default hereunder, and in addition to any other rights available under this Indenture or any other instruments included in the Collateral held for the benefit and security of the Secured Parties or otherwise available at law or in equity but subject to the terms hereof, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law and the terms of this Indenture, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public and private sale.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof.

Section 1.  <u>Incorporation of Standard Terms</u>.

All of the provisions of the Standard Terms including, but not limited to, terms defined therein, a copy of which is attached hereto as <u>Appendix A</u>, are herein incorporated by reference in their entirety, such that this Series Indenture and the Standard Terms form a single agreement between the parties.  In the event of any inconsistency between the provisions of this Series Indenture and the provisions of the Standard Terms, this Series Indenture will prevail for purposes of the Notes.  All capitalized terms used and not defined herein shall have the meaning ascribed thereto in the Standard Terms.

Section 2.  <u>Definitions</u>.

The following terms shall have the meanings provided below:

"<u>Account</u>":  Any of the Interest Collections Payment Account and the Principal Collections Payment Account or any other Account.

"<u>Accrual Period</u>":  Shall mean (i) with respect to the Initial Payment Date, the period from and including the Closing Date to but excluding the Initial Payment Date, (ii) with respect to each Payment Date thereafter (other than the Scheduled Final Payment Date), the period from and including the immediately preceding Payment Date to but excluding such Payment Date, (iii) with respect to the Scheduled Final Payment Date, the period from and including the immediately preceding Payment Date to but excluding the Scheduled Final Payment Date, and (iv) with respect to the Early Termination Payment Date (if any), the period from and including the immediately preceding Payment Date to but excluding the Early Termination Payment Date.

"<u>Additional Event of Default</u>":  Not Applicable.

"<u>Additional Issuance</u>":  The meaning specified in Section 4(l).

"<u>Adjustment Amount</u>":  The meaning specified in Section 3(c)(ii).

"<u>Adjustment Reference Entity</u>":  The meaning specified in Section 3(c)(ii).

"<u>Affected Party</u>":  The meaning specified in the Credit Swap.

"<u>Aggregate Outstanding Amount</u>":  When used with respect to the Notes, (i) the outstanding principal amount of such Notes on the Closing Date, *plus* (ii) the principal amount of any Notes added in connection with an Additional Issuance of the Notes, *minus* (iii)(A) the aggregate amount of principal payments paid in respect of such Notes pursuant to the Priority of Payments, (B) the aggregate amount of principal reductions in respect of the Notes pursuant to <u>Section 4(b)</u>, and (C) the outstanding principal amount of the Notes redeemed in connection with an Optional Reduction.

"<u>Applicable U.S. Treasury Yield</u>":  Shall mean the yield on the on-the-run Treasury with a maturity closest to the Scheduled Final Payment Date.

"Bank":  U.S. Bank National Association, a national banking association, in its individual capacity and not as Trustee, until a successor Person shall have become Trustee pursuant to the provisions of this Indenture, and then "Bank" shall mean such successor Person in its individual capacity and not as Trustee.

"Business Day":  A day on which commercial banks and foreign exchange markets settle payments in each of London, New York and any other city in which the Corporate Trust Office is located and, in the case of the final payment of principal of any Note, in the place of presentation of such Note.

"Cash Settlement Amount":  The meaning specified in the Credit Swap.

"Closing Date":  July 14, 2005.

"Closing Date Deposit Account"  The trust account designated the "Closing Date Deposit Account" and established by the Trustee pursuant to Section 8(b).

"Co-Issuer":  Stony Hill CDO Series 2005-1 LLC, a limited liability company formed under the laws of the State of Delaware until a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Co-Issuer" shall mean such successor Person.

"Co-Issuers":  The Issuer and the Co-Issuer.

"Collateral":  The meaning specified in the Granting Clauses hereto.

"Collections":  With respect to any Payment Date, an amount equal to the sum of (i) Interest Collections and (ii) Principal Collections, if any, for such Payment Date.

"Company":  Stony Hill CDO SPC, a segregated portfolio company incorporated in the Cayman Islands with limited liability.

"Company Charter":  The Amended and Restated Memorandum and Articles of Association of the Company, dated June 28, 2005, as the same may be further amended, supplemented or otherwise modified and in effect.

"Contingency Amount":  An amount equal to the sum of (i) the Contingency Cash Settlement Amount with respect to the Notes, and (ii) the aggregate of all Outstanding Adjustment Amounts with respect to the Adjustment Reference Entities.

"Contingency Cash Settlement Amount":  An amount determined by the Credit Swap Calculation Agent in its sole discretion as being equal to the greater of (i) the Cash Settlement Amounts that would have been determined under the Credit Swap with respect to two (2) additional Reference Entities if a Credit Event had occurred with respect to each such Reference Entity and the Conditions to Settlement had been satisfied on or prior to the Scheduled Final Payment Date (assuming for purposes of such determinations that all Outstanding Adjustment Amounts with respect to all Adjustment Reference Entities were instead treated as

Cash Settlement Amounts under the Credit Swap and assuming in each case that each relevant Potential Failure to Pay was an actual Failure to Pay), and (ii) zero.

"Corporate Trust Office":  The corporate trust office of the Trustee, currently located at 1 Federal Street, 3rd Floor Mail Station EX-MA-FED Boston, Massachusetts 02110, Attention: Jon C. Warn and Amy Byrnes  Corporate Trust Services/CDO Administration, telephone number (617) 603-6479/6480, or such other address and telephone number as the Trustee may designate from time to time by notice to the Noteholders and the Issuer or the principal corporate trust office of any successor Trustee.

"Credit Event":  The meaning specified in the Credit Swap.

"Credit Swap":  The 1992 ISDA Master Agreement (Multicurrency-Cross Border), dated the Closing Date, between the Issuer and the Credit Swap Counterparty, as supplemented by the schedule attached thereto and a confirmation.

"Credit Swap Calculation Agent":  Lehman Brothers Special Financing Inc., as calculation agent under the Credit Swap.

"Credit Swap Counterparty":  Lehman Brothers International (Europe).

"Credit Swap Posted Amount":  Not Applicable.

"Custodian":  U.S. Bank National Association, or in the event U.S. Bank National Association is no longer acting as Trustee hereunder, such other entity that at the time is acting as successor Custodian hereunder or such other entity as is appointed by such successor Trustee to act as Custodian.

"Defaulting Party"  The meaning specified in the Credit Swap.

"Deferred Amount":  The meaning specified in Section 4(a)(iii).

"Deferred Interest Amount":  In respect of an Adjustment Reference Entity, an amount determined by the Calculation Agent in its sole discretion on the relevant Deferred Interest Cut-off Date as being equal to the excess (if any) of:

(i)     the amount of interest that would otherwise have been payable in respect of the on the relevant Payment Date or the Scheduled Final Payment Date (without duplication) if:

(A) in the circumstance where the relevant Potential Failure to Pay develops into an actual Failure to Pay, the Cash Settlement Amount in respect of such Adjustment Reference Entity had actually been determined under the Credit Swap on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred; or

(B) in the circumstance where the relevant Potential Failure to Pay is subsequently cured, the Adjustment Amount in respect of such Adjustment

Reference Entity had actually been zero on the date on which such Potential Failure to Pay was determined by the Calculation Agent to have occurred.;

*minus*:

(ii)    the Interest Distribution Amount (if any) paid on such payment date.

"Deferred Interest Cut-off Date":  In respect of an Adjustment Reference Entity, (a) the date on which the Cash Settlement Amount is determined under the Credit Swap; or (b) the date that the Credit Swap Calculation Agent determines in its sole discretion that the relevant Potential Failure to Pay has been cured, whichever is applicable.

"Deferred Interest Payment Date":   In respect of the relevant Adjustment Reference Entity, the third Business Day following the relevant Deferred Interest Cut-off Date.

"Deferred Redemption Amount":   Shall mean, (A) in respect of each related Adjustment Reference Entity for which a Cash Settlement Amount is determined, an amount (rounded up to the nearest cent and subject to a minimum of zero) determined by the Credit Swap Calculation Agent on the relevant Deferred Redemption Cut-off Date as being equal to the Adjustment Amount in respect of such Adjustment Reference Entity, *minus* such Cash Settlement Amount, (B) in respect of each related Adjustment Reference Entity for which no Cash Settlement Amount is determined because the relevant Potential Failure to Pay is cured, an amount (rounded up to the nearest cent) determined by the Credit Swap Calculation Agent on the relevant Deferred Redemption Cut-off Date as being equal to the Adjustment Amount in respect of such Adjustment Reference Entity, (C) if the Contingency Cash Settlement Amount is greater than zero on the Scheduled Final Payment Date and the Conditions to Settlement are satisfied during the Notice Delivery Period with respect to a maximum of two (2) additional Reference Entities (other than Adjustment Reference Entities), such Contingency Cash Settlement Amount *minus* the sum of the actual Cash Settlement Amount determined in respect of each such Reference Entity, and (D) if the Contingency Cash Settlement Amount is greater than zero on the Scheduled Final Payment Date and the Conditions to Settlement are not satisfied during the Notice Delivery Period with respect to any such additional Reference Entity (other than an Adjustment Reference Entity), such Contingency Cash Settlement Amount.

"Deferred Redemption Cut-off Date:  Shall mean, (i) in respect of an Adjustment Reference Entity, (a) the date on which the Cash Settlement Amount with respect to such Adjustment Reference Entity is determined under the Credit Swap, or (b) the date that the Credit Swap Calculation Agent determines in its sole discretion that the relevant Potential Failure to Pay has been cured, whichever is applicable, (ii) if the Contingency Cash Settlement Amount is greater than zero on the Scheduled Final Payment Date and the Conditions to Settlement are satisfied during the Notice Delivery Period with respect to a related Reference Entity (other than an Adjustment Reference Entity), the Event Determination Date with respect to such Reference Entity, and (iii) if the Contingency Cash Settlement Amount is greater than zero on the Scheduled Final Payment Date and the Conditions to Settlement are not satisfied during the Notice Delivery Period with respect to any related Reference Entity (other than an Adjustment Reference Entity), the end of the Notice Delivery Period.

"Deferred Redemption Date":  Shall mean, (i) in respect of an Adjustment Reference Entity, the third New York Business Day following the relevant Deferred Redemption Cut-off Date, and (ii) if the Contingency Cash Settlement Amount is greater than zero on the Scheduled Final Payment Date, the third New York Business Day following the relevant Deferred Redemption Cut-off Date.

"Distribution Date":  The Scheduled Final Payment Date or the Early Termination Payment Date, as and to the extent applicable.

"Early Termination Date":  The meaning specified in the Credit Swap.

"Early Termination Payment Date":  The fifth Business Day following the date of delivery (or deemed delivery) of an Enforcement Notice declaring the Notes to be immediately due and payable after the occurrence of an Event of Default.

"Final Amount":  The meaning specified in the Credit Swap.

"Final Price":  The meaning specified in the Credit Swap.

"Fixed Amount":  The meaning specified in the Credit Swap.

"Interest Collections":  With respect to any Payment Date or Distribution Date (as and to the extent applicable and without duplication), the amount equal to the sum of:  (i) the Fixed Amount received by the Issuer during the applicable Accrual Period pursuant to the terms of the Credit Swap; and (ii) the net investment earnings with respect to Permitted Short-Term Investments received by the Issuer during the applicable Accrual Period.

"Interest Collections Payment Account":  The payment account for Interest Collections established by the Trustee pursuant to Section 8(a).

"Interest Determination Date":  Shall mean (i) the Business Day immediately preceding each Payment Date (other than the Scheduled Final Payment Date), and (ii) the Scheduled Final Payment Date.

"Interest Distribution Amount":  The meaning specified in Section 3(c)(i).

"Initial Payment Date":  The Payment Date in September 2005.

"Issuer":  Stony Hill CDO Limited SPC for the account of the Series 2005-1 Segregated Portfolio, until a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"New York Business Day":  The meaning specified in the Credit Swap.

"Note":  Any fixed rate note due on the Scheduled Final Payment Date of the Stony Hill CDO SPC, Series 2005-1 Segregated Portfolio notes, each secured by the assets of the Issuer pursuant to the Indenture and executed by the Issuer and authenticated by the Trustee in

substantially the form of Exhibit A annexed hereto.  "Notes", as used herein, shall mean all Notes of the Stony Hill CDO SPC, Series 2005-1 Segregated Portfolio notes.

"Note Interest Rate":  The meaning specified in Section 3(b).

"Offering Memorandum":  The final Offering Memorandum, dated July 12, 2005, relating to the Notes.

"Option Agreement":  Not Applicable.

"Option Counterparty":  Not Applicable.

"Optional Reduction":  The meaning specified in Section 4(m).

"Outstanding Adjustment Amount":  If the Cash Settlement Amount in respect of an Adjustment Reference Entity has not been determined on or prior to the Scheduled Final Payment Date or the Potential Failure to Pay has not been cured on or prior to the Scheduled Final Payment Date, an amount equal to the Adjustment Amount of such Adjustment Reference Entity.

"Payment Date":  The 20th day of March, June, September and December of each year (or if any such day is not a Business Day, the next following Business Day), commencing on the Initial Payment Date and ending on the Scheduled Final Payment Date (unless the Notes are redeemed or repaid prior thereto).

"Permitted Long-Term Investment":  Not Applicable.

"Permitted Long-Term Investment Issuer":  Not Applicable.

"Principal Collections":  With respect to any Distribution Date, an amount equal to the sum of:  (i) the Final Amount received by the Issuer during the applicable Accrual Period pursuant to the terms of the Credit Swap; (ii) the balance of the Principal Collections Payment Account (excluding the net investment earnings with respect to Permitted Short-Term Investments held in the Principal Collections Payment Account), and (iii) the termination fee (if any) paid by the Credit Swap Counterparty upon an early termination of the Credit Swap.

"Principal Collections Payment Account":  The payment account for Principal Collections established by the Trustee pursuant to Section 8(a).

"Priority of Payments":  The meaning specified in Section 5.

"Rating Agencies":  Shall mean Moody's and S&P.

"Reference Entity":  The meaning specified in the Credit Swap.

"Reference Entity Calculation Amount":  The meaning specified in the Credit Swap.

"<u>Reference Entity Loss Amount</u>":  The meaning specified in the Credit Swap.

"<u>Reference Portfolio</u>":  The meaning specified in the Credit Swap.

"<u>Reference Registry</u>":  The registry maintained by the Credit Swap Counterparty pursuant to the relevant Credit Swap.

"<u>Scheduled Final Payment Date</u>":  The meaning specified in Section 3(b).

"<u>Swap Guarantee</u>":  The meaning set forth in the Credit Swap.

"<u>Transaction Documents</u>":  The Credit Swap, the Indenture and the Note Purchase Agreement.

"<u>Trustee</u>":  U.S. Bank National Association, a national banking association, in its capacity as trustee for the Noteholders, unless a successor Person shall have become the Trustee pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean such successor Person.

"<u>Weighted Average Outstanding Principal Amount</u>":  In respect of the Notes, the sum of the Aggregate Outstanding Amount of the Notes for each calendar day during each period for which such amount is calculated, divided by the actual number of calendar days in such period.

For purposes of calculating the Weighted Average Outstanding Principal Amount, if there is an Additional Issuance of the Notes, the Aggregate Outstanding Amount of the Notes shall be deemed to be increased by the principal amount of the new Notes on the first day of the Accrual Period in which such Additional Issuance occurred solely for purposes of determining the amount of interest payable on the next Payment Date or the first Distribution Date to occur (as and to the extent applicable and without duplication).

Section 3.  <u>The Authorized Amount; Note Interest Rate; Scheduled Final Payment Date of the Notes</u>.

(a) The Aggregate Outstanding Amount of Notes which may be issued under this Series Indenture may not exceed $50,000,000 excluding (i) Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Notes pursuant to <u>Section 2.3</u>, <u>2.4</u> or <u>8.5</u> of the Standard Terms, or (ii) additional issuances of Notes pursuant to Section 4(l).

(b) The Notes shall have an original Aggregate Outstanding Amount, original Note Interest Rate and Scheduled Final Payment Date as follows:

| Designation | Aggregate Outstanding Amount as of the Closing Date | Note Interest Rate as of the Closing Date | Scheduled Final Payment Date* |
|---|---|---|---|

| Notes | $50,000,000 | 9.25% | June 20, 2012 |

\* If such day is not a Business Day, the Scheduled Final Payment Date shall be the next following Business Day.

If the Contingency Amount with respect to the Notes is greater than zero on the Scheduled Final Payment Date, the legal final maturity date of the Notes shall be the earlier of (i) December 20, 2012 (or if such day is not a Business Day, the next following Business Day), and (ii) the final Deferred Redemption Date with respect to the Notes.

The Global Notes shall be issuable in minimum denominations of $500,000 and integral multiples of $1,000 in excess thereof.  The Certificated Notes shall be issuable in minimum denominations of $250,000 and integral multiples of $1,000 in excess thereof.  After issuance, any Note may fail to be in such required minimum denominations due to the reduction of principal thereof in accordance with Section 4(b).

(c) (i) Interest shall accrue during each Accrual Period on the Weighted Average Outstanding Principal Amount of the Notes at the Note Interest Rate.

The amount of interest payable on the Notes in respect of any Payment Date shall be calculated by the Trustee on the relevant Interest Determination Date by calculating the product of (a) the Note Interest Rate; (b) the Weighted Average Outstanding Principal Amount of the Notes for the relevant Accrual Period; and (c) the number of days elapsed in such Accrual Period (computed on the basis of a 360-day year consisting of twelve 30 day months) *divided* by 360 (the "Interest Distribution Amount").

(ii)    With respect to any Payment Date and the Scheduled Final Payment Date (without duplication), in the event that, in respect of the related Accrual Period and the related Interest Determination Date, a Potential Failure to Pay has occurred with respect to a Reference Entity included in the Reference Portfolio for the Credit Swap on or prior to such Interest Determination Date and such Potential Failure to Pay has not been cured on or prior to such Interest Determination Date (each such Reference Entity, an "Adjustment Reference Entity"); and (b) the Adjustment Amount is greater than zero, then:

(A) the Aggregate Outstanding Amount of the Notes will be reduced as of the date upon which the Potential Failure to Pay is determined by the Credit Swap Calculation Agent to have occurred by an amount equal to such Adjustment Amount solely for purposes of determining the Interest Distribution Amount that is "due and payable" with respect to the Notes on such payment date; and

(B) the relevant Deferred Interest Amount (if any) in respect of the Notes and the related Adjustment Reference Entity shall be paid by the Issuer to the Holders of the Notes on the related Deferred Interest Payment Date.

The Issuer shall use amounts received from the Credit Swap Counterparty under the Credit Swap on such Deferred Interest Payment Date to pay such Deferred Interest Amount.

If a Potential Failure to Pay occurs with respect to an Adjustment Reference Entity, an Adjustment Amount shall be determined by the Credit Swap Calculation Agent as of the date upon which the Potential Failure to Pay is determined to have occurred by calculating in accordance with the terms of the Credit Swap (i) a hypothetical Reference Entity Loss Amount for the relevant Adjustment Reference Entity, and (ii) a hypothetical Cash Settlement Amount for such Adjustment Reference Entity (assuming in each case that the Potential Failure to Pay was an actual Failure to Pay). The "Adjustment Amount" on the date upon which the Potential Failure to Pay is determined to have occurred shall mean an amount equal to the greater of (i) such hypothetical Cash Settlement Amount, and (ii) zero.

Section 4. Payment of Principal, Reduction of Principal and Payment of Interest; Rights Preserved.

(a) <u>Payment of Principal</u>.

(i) No principal payments shall be made on the Notes until the first Distribution Date to occur unless the outstanding principal amount of the Notes is reduced in connection with an Optional Reduction.

(ii) On the Scheduled Final Payment Date, the Issuer shall pay to the holders of the Notes an amount (the "Scheduled Final Payment Date Redemption Amount") equal to the Aggregate Outstanding Amount of the Notes on the Scheduled Final Payment Date *minus* the Contingency Amount with respect to the Notes on the Scheduled Final Payment Date.

(iii) If the Contingency Amount is greater than zero on the Scheduled Final Payment Date, the Issuer shall pay to the Holders of the Notes on each Deferred Redemption Date an amount equal to the sum of (A) the relevant Deferred Redemption Amount, *plus* (B) an amount equal to the product of (i) one-month LIBOR (determined on the LIBOR Determination Date immediately preceding the Scheduled Final Payment Date); (ii) such Deferred Redemption Amount, and (iii) the actual number of days between the Scheduled Final Payment Date and the related Deferred Redemption Cut-off Date *divided* by 360 (each a "Deferred Amount"). The Issuer shall pay a Deferred Amount from amounts paid by the Credit Swap Counterparty to the Issuer on such Deferred Redemption Date under the Credit Swap.

(b) <u>Reduction of Principal of the Notes</u>. On the date on which a Cash Settlement Amount is determined under the Credit Swap, the Aggregate Outstanding Amount of the Notes shall be reduced by an amount equal to such Cash Settlement Amount until the Aggregate Outstanding Amount of the Notes is reduced to zero.

No amounts shall be payable in respect of the Notes as a result of any such reduction.

(c) <u>Payment of Interest</u>. Interest on the Notes shall be due and payable on each Payment Date and the first Distribution Date to occur (without duplication), if and to the extent funds are available for such purpose in accordance with the applicable Priority of Payments.

(d) Notwithstanding anything in the Standard Terms or this Series Indenture to the contrary, all payments of principal and interest to the Noteholders shall be paid in accordance with the applicable Priority of Payments, shall be based on the Aggregate Outstanding Amount of the Notes and are subject to Section 12.16 of the Standard Terms.

(e) Interest shall cease to accrue on each Note, or in the case of a partial repayment or reduction, on such part, from the date of repayment or reduction, unless payment of principal is improperly withheld or unless Default is otherwise made with respect to such payments. To the extent lawful and enforceable, interest shall accrue on any Defaulted Interest on the Notes at the Note Interest Rate until paid.

(f) As a condition to the payment of principal of and interest on any Note without, or at a reduced rate of, U.S. withholding or backup withholding tax, the Trustee shall require certification reasonably acceptable to it to enable the Issuer to determine its duties and liabilities with respect to any taxes or other charges that the Issuer may be required to pay, deduct or withhold from payments in respect of such Note or the holder of such Note under any present or future law or regulation of the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). The Trustee may also require certification reasonably acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each holder of a Note agrees to provide any certification requested pursuant to this paragraph within a reasonable time period after such request is initially made and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

(g) Payments in respect of principal of and interest on Notes shall be payable by wire transfer in immediately available funds to a Dollar account maintained by the Holder thereof in accordance with wire transfer instructions received by any Paying Agent on or before the Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the U.S.

(h) The principal of and interest on any Note which is payable in accordance with the applicable Priority of Payments on a Payment Date or Distribution Date (as applicable) and is punctually paid or duly provided for on a Payment Date or Distribution Date (as applicable) shall be paid to the Person in whose name that Note (or one or more predecessor Notes) is registered in the Note Registrar at the close of business on the Record Date for such payment. All such payments that are mailed or wired and returned to the Paying Agent shall be held for payment as herein provided at the office or agency of the Co-Issuers to be maintained as provided in Section 7.4 of the Standard Terms.

Payments to Holders of the Notes shall be made in the proportion that the Aggregate Outstanding Amount of the Notes registered in the name of each such Holder on such Record Date bears to the Aggregate Outstanding Amount of all the Notes on such Record Date.

(i)   All reductions in the Aggregate Outstanding Amount of a Note (or one or more predecessor Notes) effected by (A) payments of installments of principal made on any Payment Date, or (B) reductions in the Aggregate Outstanding Amount of a Note pursuant to Section 4(b) shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment or reduction is noted on such Note.

(j)   Notwithstanding any other provision of this Indenture, or the Notes, the obligations of the Co-Issuers hereunder and thereunder are limited-recourse or non-recourse obligations of the Issuer or the Co-Issuer, as the case may be, payable solely from the Collateral, and following realization of the Collateral, any claims of the Noteholders, the Trustee and the Credit Swap Counterparty shall be extinguished and neither the Trustee nor any Noteholder or any other Secured Party shall be obliged or entitled to take any further steps against either of the Co-Issuers or their other assets to recover any sums due but still unpaid in respect of this Indenture, the Notes, the Credit Swap or otherwise.  In particular, neither the Trustee or any Noteholder or any other Secured Party shall be entitled to petition or take any other steps for the winding-up of the Issuer or the Co-Issuer in relation to any such sums or otherwise for a period of one year and one day (or, if longer, the then applicable preference period under the Bankruptcy Code) after payment in full of the Notes nor shall any of them have any claim in respect of any such sums in respect of any assets of the Issuer or the Co-Issuer other than the Collateral.  No recourse shall be had for the payment of any amount owing in respect of the Notes, this Indenture, the Credit Swap or otherwise against any officer or Authorized Officer, member, director, employee, security holder or incorporator of the Co-Issuers or their respective successors or assigns for any amounts payable under the Notes or this Indenture, the Credit Swap or otherwise.  It is understood that the foregoing provisions of this Section 4(j) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral, or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished.  It is further understood that the foregoing provisions of this Section 4(j) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

(k)   Subject to the foregoing provisions of this Section 4 and the provisions of Sections 2.3 and 2.4 of the Standard Terms, each Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest and principal that were carried by such other Note.

(l)  <u>Additional Issuances of Notes</u>.

(i)    The Co-Issuers may issue and sell additional Notes (each an "Additional Issuance") on any Business Day prior to the Scheduled Final Payment Date at the direction of the Managers.

(ii)    Any Additional Issuance of the Notes must satisfy the following conditions:  (A) the Aggregate Outstanding Amount of the Notes on the date of such Additional Issuance (after giving effect to the interest adjustment provisions, but prior to giving effect to such Additional Issuance) must be equal to the Aggregate Outstanding Amount of the Notes on the later of (1) the Closing Date, and (2) the date of the most recent Additional Issuance with respect to the Notes; (B) the terms of the new Notes must be substantially identical to the terms of previously issued Notes; (C)  the Co-Issuers must receive Rating Agency Confirmation with respect to such Additional Issuance; (D) such Additional Issuance must be approved by the Credit Swap Counterparty, and (E) an Opinion of Counsel must be delivered to the Trustee to the effect that (1) such Additional Issuance will not cause the Issuer to be engaged in a United States trade or business or otherwise subject to U.S. federal income taxation on a net income basis, and (2) such additional issuance will not have a material adverse affect on the tax characterization of the Issuer or of any Outstanding Notes at the time of issuance.  Each Note issued pursuant to an Additional Issuance shall accrue interest from the first day of the Accrual Period in which it was issued.

(iii)    Any additional Notes issued pursuant to this <u>Section 4(l)</u> shall be subject to the terms of this Indenture as if such Notes had been issued on the date hereof and shall be subject to the requirements of <u>Section 3.4 </u>of the Standard Terms.

(iv)    Any Additional Issuance of Notes will not be conditioned upon a vote of the existing Holders or Beneficial Owners of Notes or the execution of a supplemental indenture.

(v)    Upon receipt of the proceeds of any additional issuance of Notes, the Trustee shall (i) pay such proceeds to the Credit Swap Counterparty, (ii) direct the Credit Swap Counterparty to (A) increase the Loss Cap Amount by an amount equal to the outstanding principal amount of the relevant new Notes, and (B) make any other necessary amendments to the Credit Swap to reflect such increase.

(vi)    For all purposes of this Indenture, an Additional Issuance of Notes shall be deemed to not materially and adversely affect the interests of any Holder or Beneficial Owner of Notes.

(m) Reduction of the Notes.

(i)    If at any time the Managers or any of their affiliates are the Holders or the Beneficial Owners of all or a portion of the Notes (the "Lehman Notes"), the Managers or such affiliates may direct the Co-Issuers to redeem the Lehman Notes on any Payment Date upon 10 days notice to the Issuer, the Trustee and the Credit Swap Counterparty (each, an "Optional Reduction").

(ii)    Any Optional Reduction of the Notes must be approved by the Credit Swap Counterparty.

(iii)    The amount payable in connection with an Optional Reduction of the Notes will be (A) equal to the outstanding principal amount of the Lehman Notes being redeemed, (B) paid by the Credit Swap Counterparty on the relevant Payment Date, and (C) distributed by the Issuer to such holders on such Payment Date without regard to the Priority of Payments.

(iv)    On the date of each Optional Reduction, the Trustee shall direct the Credit Swap Counterparty to make any necessary amendments to the Credit Swap to reflect such decrease.

(v)    Any Optional Reduction shall not be conditioned upon a vote of the existing Holders or Beneficial Owners of Notes or the execution of a supplemental indenture.

(vi)    For all purposes of this Indenture, an Optional Reduction of Notes shall be deemed to not materially and adversely affect the interests of any Holder or Beneficial Owner of Notes.

(vii)    Notwithstanding anything in this Indenture to the contrary, the provisions of Section 3(c)(ii) shall not apply to any Lehman Notes being redeemed in connection with an Optional Reduction.

Section 5.    Disbursements of Monies from Payment Account. (a)  Notwithstanding anything to the contrary in this Indenture and subject to this Section 5, the Trustee shall disburse amounts from the Interest Collections Payment Account and the Principal Collections Payment Account in accordance with the following priorities (the "Priority of Payments"):

(i)    On each Payment Date or the Scheduled Final Payment Date (without duplication), Interest Collections received for such payment date will be allocated and applied to pay to the Holders of the Outstanding Notes (*pro rata*) the Interest Distribution Amount due and payable on the Notes on such payment date.

(ii)    On the Scheduled Final Payment Date, Principal Collections received for the Scheduled Final Payment Date will be allocated and applied to pay to the Holders of the Outstanding Notes the Scheduled Final Payment Date Redemption Amount for the Notes.

(iii)     On the Early Termination Payment Date (if any), Collections received for the Early Termination Payment Date will be allocated and applied in the following order of priority:

(A) if the Credit Swap Counterparty is not the Defaulting Party or the sole Affected Party under the Credit Swap, to pay to the Credit Swap Counterparty all termination payments owed to the Credit Swap Counterparty under the Credit Swap;

(B) to pay to the holders of the Notes (*pro rata*) (i) the Interest Distribution Amount due and payable on the Notes on the Early Termination Payment Date, and (ii) any Defaulted Interest and any accrued and unpaid interest on Defaulted Interest on the Notes;

(C) to pay to the Holders of the Outstanding Notes (*pro rata*) an amount equal to the Aggregate Outstanding Amount of the Notes;

(D) if the Credit Swap Counterparty is the Defaulting Party or the sole Affected Party under the Credit Swap, to pay to the Credit Swap Counterparty all termination payments owed to the Credit Swap Counterparty under the Credit Swap; and

(E) to pay to the Credit Swap Counterparty any remaining Collections.

(b) Except as otherwise expressly provided in this Section 5, if on any Payment Date or Distribution Date the amount available in the Interest Collections Payment Account and the Principal Collections Payment Account (as applicable) from amounts received in the related Accrual Period are insufficient to make the full amount of the disbursements required by a particular lettered subclause of Section 5(a)(i), Section 5(a)(ii) or Section 5(a)(iii), the Trustee shall make the disbursements called for by such subclause from the amount available in the Interest Collections Payment Account or the Principal Collections Payment Account at such time (after payment of the full amount of disbursements required by more senior subclauses) ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

Section 6.   Trustee's Duties.

For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in Section 5.1 of the Standard Terms unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof, unless, consistent with the standard of care required hereunder prior to the occurrence of such Event of Default or Default, the Trustee should have known of such an Event of Default or Default or unless written notice of any event which is in fact such an Event of Default or Default is received by the Trustee at the Corporate Trust Office, and such notice references the Notes generally, the Issuer, the Co-Issuer, the Collateral or this Indenture.  For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or a Default, such reference shall be

construed to refer only to such an Event of Default or Default of which the Trustee is deemed to have notice as set forth in this <u>Section 6</u>.

Section 7.  <u>Tax Representations and Allocations</u>.

     (a) <u>Certain Tax Forms and Treatment</u>.

     (i)    Each holder of a Note shall timely furnish the Issuer or its agents any U.S. federal income tax form or certification (such as IRS Form W-8BEN (Certification of Foreign Status as Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms) that the Issuer or its agents may reasonably request and shall update or replace such form or certification in accordance with its terms or its subsequent amendments.  The purchaser understands that the Issuer may require certification acceptable to it (a) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding or (b) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.  The purchaser agrees to provide any such certification that is requested by the Issuer.

     (ii)    Notwithstanding anything to the contrary contained in this Indenture, all persons may disclose to any and all persons, without limitation of any kind, the U.S. federal, state and local tax treatment of the Notes and the Issuer, any fact that may be relevant to understanding the U.S. federal, state and local tax treatment of the Notes and the Issuer, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal, state and local tax treatment and that may be relevant to understanding such U.S. federal, state and local tax treatment, other than the name of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, and any pricing terms or other nonpublic business or financial information that is unrelated to the U.S. federal, state and local tax treatment of the Notes and the Issuer to the taxpayer and is not relevant to understanding the U.S. federal, state and local tax treatment of the Notes and the Issuer to the taxpayer.

     (iii)    The Issuer will initially be treated as a foreign corporation for U.S. federal income tax purposes.  However, solely at the direction of the Managers, for U.S. federal income tax purposes, the Issuer may elect to be treated as a disregarded entity (if all of the equity interests in the Issuer are held by a single person, for U.S. federal income tax purposes) or as a partnership (if the equity interests in the Issuer are held by more than a single person, for U.S. federal income tax purposes).

Section 8.  <u>Accounts</u>.

     (a) <u>Payment Account</u>.  The Trustee shall, on or prior to the Closing Date, establish at the Accounts Securities Intermediary two segregated non-interest bearing trust accounts in the name of Stony Hill CDO SPC, Series 2005-1 Segregated Portfolio, subject to the

lien of U.S. Bank National Association as Trustee", which shall be designated as the Interest Collections Payment Account and the Principal Collections Payment Account, which shall be held by the Accounts Securities Intermediary in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal. The Trustee shall cause the Account Securities Intermediary to credit (i) all Principal Collections and/or amounts received by the Issuer under the Guarantee (if any) into the Principal Collections Payment Account and (ii) all Interest Collections and the liquidation proceeds of the Credit Swap Posted Amount and/or payments received by the Issuer from the Credit Swap Guarantor into the Interest Collections Payment Account. All Monies deposited from time to time in the Principal Collections Payment Account and the Interest Collections Payment Account pursuant to this Indenture shall be held in trust by the Trustee as part of the Collateral and shall be applied to the purposes provided herein.

The Trustee shall, at the direction of the Credit Swap Counterparty, invest amounts on deposit in the Principal Collections Payment Account and the Interest Collections Payment Account in Permitted Short-Term Investments that mature before the next Payment Date. The only permitted withdrawals from, or application of funds on deposit in, or otherwise to the credit of, the Principal Collections Payment Account and the Interest Collections Payment Account shall be to make the payments specified herein in accordance with the Priority of Payments. The Accounts Securities Intermediary, acting on behalf of the Trustee agrees to give the Issuer prompt notice if a responsible officer thereof becomes aware that the Principal Collections Payment Account or the Interest Collections Payment Account or any funds on deposit in such Accounts, or otherwise to the credit of such Accounts, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Principal Collections Payment Account or the Interest Collections Payment Account other than in accordance with the Priority of Payments.

(b) <u>Closing Date Deposit Account</u>. The Trustee shall, prior to the Closing Date, establish a single, segregated non-interest bearing trust account which may be maintained at the Corporate Trust Office, and which shall be designated as the Closing Date Deposit Account, for the benefit of the Noteholders and over which the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date the proceeds of the offering of the Notes will be paid to the Trustee for deposit into the Closing Date Deposit Account and shall be used by the Trustee to make an upfront payment under the Credit Swap. The Closing Date Deposit Account shall be closed promptly following the acquisition of the Permitted Long-Term Investment and the wire transfer of such proceeds to the Credit Swap Counterparty.

Section 9. <u>Rating Letter</u>. Notwithstanding anything to the contrary in section 3.2(c) of the Standard Terms and subject to this Section 9, the Notes may be executed by the Co-Issuers and delivered to the Trustee for authentication, and thereupon the same shall be authenticated and delivered to the Issuer by the Trustee upon Issuer Order and upon delivery by the Issuer to the Trustee, and receipt by the Trustee of letters signed by Moody's and S&P, respectively, confirming that the Notes have been rated at least "Ba1" by Moody's and at least "BB" by S&P.

Section 10. <u>Legal Holidays</u>.  In the event that the date of any payment date shall not be a Business Day, then notwithstanding any other provision of the Notes or this Indenture, payment need not be made on such date, but may be made on the next succeeding Business Day.

Section 11. <u>Governing Law</u>.

THIS SERIES INDENTURE AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED WITHIN THE STATE OF NEW YORK AND WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PROVISIONS THEREOF.

Section 12. <u>Counterparts</u>.

This Series Indenture may be executed in any number of counterparts, each of which shall be deemed an original, and all of which taken together shall constitute but one and the same instrument.

Section 13. <u>Non-Confidential</u>.

Notwithstanding anything to the contrary contained in this Indenture, all persons may disclose to any and all persons, without limitation of any kind, the U.S. federal, state and local tax treatment of the Notes and the Issuer, any fact that may be relevant to understanding the U.S. federal, state and local tax treatment of the Notes and the Issuer, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal, state and local tax treatment and that may be relevant to understanding such U.S. federal, state and local tax treatment, other than the name of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, and any pricing terms or other nonpublic business or financial information that is unrelated to the U.S. federal, state and local tax treatment of the Notes and the Issuer to the taxpayer and is not relevant to understanding the U.S. federal, state and local tax treatment of the Notes and the Issuer to the taxpayer.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Series Indenture to be duly executed by their respective authorized officers as of the date first written above.

STONY HILL CDO SPC,
    for the account of the Series 2005-1
    Segregated Portfolio,
    as Issuer

By: _____
    Name:  **Carlos Farjallah**
    Title:  Director

STONY HILL CDO SERIES 2005-1 LLC,
    as Co-Issuer

By: _____
    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION,
    as Trustee

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Series Indenture to be duly executed by their respective authorized officers as of the date first written above.

STONY HILL CDO SPC,
    for the account of the Series 2005-1
    Segregated Portfolio,
    as Issuer


By: _____
    Name:
    Title:


STONY HILL CDO SERIES 2005-1 LLC,
    as Co-Issuer


By: _____
    Name:   Donald D. Englisi
    Title:   Manager


U.S. BANK NATIONAL ASSOCIATION,
    as Trustee


By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Series Indenture to be duly executed by their respective authorized officers as of the date first written above.

STONY HILL CDO SPC,
    for the account of the Series 2005-1
    Segregated Portfolio,
    as Issuer


By: _____
    Name:
    Title:


STONY HILL CDO SERIES 2005-1 LLC,
    as Co-Issuer


By: _____
    Name:
    Title:


U.S. BANK NATIONAL ASSOCIATION,
    as Trustee


By _____
    Name:
    Title:

**Appendix A**

## STANDARD TERMS FOR INDENTURES

See Tab 1.03

STANDARD TERMS FOR INDENTURES

Dated as of July 14, 2005

## TABLE OF CONTENTS

Page

### ARTICLE I

### DEFINITIONS

| | | |
|---|---|---|
| Section 1.1 | Definitions. | 1 |
| Section 1.2 | Other Definitional Provisions; Rating Specifications. | 12 |
| Section 1.3 | Integration of Standard Terms and Series Indenture. | 12 |

### ARTICLE II

### THE NOTES

| | | |
|---|---|---|
| Section 2.1 | Forms Generally. | 12 |
| Section 2.2 | Execution, Authentication, Delivery and Dating. | 14 |
| Section 2.3 | Registration, Transfer and Exchange of Notes. | 15 |
| Section 2.4 | Mutilated, Defaced, Destroyed, Lost or Stolen Notes. | 28 |
| Section 2.5 | Persons Deemed Owners. | 29 |
| Section 2.6 | Cancellation. | 29 |
| Section 2.7 | No Gross Up. | 29 |
| Section 2.8 | Global Notes; Temporary Notes. | 30 |
| Section 2.9 | Required Sale of a Note by the Holder Upon the Occurrence of Certain Circumstances. | 31 |

### ARTICLE III

### CONDITIONS PRECEDENT; CERTAIN PROVISIONS RELATING TO COLLATERAL

| | | |
|---|---|---|
| Section 3.1 | General Provisions. | 32 |
| Section 3.2 | Security for Notes. | 33 |
| Section 3.3 | Investment at Direction of the Credit Swap Counterparty; Custodianship of Permitted Short-Term Investments. | 35 |
| Section 3.4 | Additional Notes – General Provisions. | 36 |

### ARTICLE IV

### SATISFACTION AND DISCHARGE

| | | |
|---|---|---|
| Section 4.1 | Satisfaction and Discharge of Indenture. | 38 |
| Section 4.2 | Application of Trust Money. | 39 |
| Section 4.3 | Repayment of Monies Held by Paying Agent | 39 |

# ARTICLE V

## REMEDIES

Section 5.1    Events of Default. ............................................................................39
Section 5.2    Acceleration of Maturity; Recission and Annulment .........................40
Section 5.3    Collection of Indebtedness and Suits for Enforcement by Trustee......42
Section 5.4    Remedies. .........................................................................................43
Section 5.5    [Reserved.] ........................................................................................45
Section 5.6    Trustee May Enforce Claims Without Possession of Notes. ..............45
Section 5.7    Application of Money Collected. ........................................................45
Section 5.8    Limitation on Suits............................................................................45
Section 5.9    Unconditional Rights of Noteholders to Receive Principal and Interest ...........46
Section 5.10   Restoration of Rights and Remedies. ..................................................46
Section 5.11   Rights and Remedies Cumulative. .....................................................47
Section 5.12   Delay or Omission Not Waiver ..........................................................47
Section 5.13   Control by the Noteholders. ...............................................................47
Section 5.14   Waiver of Past Defaults. ....................................................................47
Section 5.15   Undertaking for Costs. .......................................................................48
Section 5.16   Waiver of Stay or Extension Laws. ....................................................48
Section 5.17   Sale of Collateral. ..............................................................................49
Section 5.18   Action on the Notes. ..........................................................................49
Section 5.19   Senior Lien.........................................................................................49

# ARTICLE VI

## THE TRUSTEE

Section 6.1    Certain Duties and Responsibilities. ..................................................50
Section 6.2    Notice of Default................................................................................51
Section 6.3    Certain Rights of Trustee. ..................................................................52
Section 6.4    Not Responsible for Recitals or Issuance of Notes.............................53
Section 6.5    May Hold Notes .................................................................................53
Section 6.6    Money Held in Trust ..........................................................................53
Section 6.7    Corporate Trustee Required; Eligibility..............................................53
Section 6.8    Resignation and Removal; Appointment of Successor.........................54
Section 6.9    Acceptance of Appointment by Successor ..........................................55
Section 6.10   Merger, Conversion, Consolidation or Succession to Business of Trustee ........55
Section 6.11   Co-Trustees and Separate Trustee ......................................................56
Section 6.12   Representations and Warranties of the Trustee ...................................57
Section 6.13   Authenticating Agent .........................................................................57
Section 6.14   Duties and Responsibilities of Trustee Following Payment in Full of the
               Notes ..................................................................................................58
Section 6.15   Limitation on Duty of Trustee in Respect of Collateral. ....................58
Section 6.16   No Special Damages ..........................................................................59
Section 6.17   Trustee's Instruction to Account Securities Intermediary ..................59

# ARTICLE VII

## COVENANTS

Section 7.1    Payment of Principal and Interest ...................................................................59
Section 7.2    Compliance with Laws ...................................................................................59
Section 7.3    Maintenance of Books and Records ...............................................................59
Section 7.4    Maintenance of Office or Agency ...................................................................59
Section 7.5    Money for Note Payments to Be Held in Trust ...............................................60
Section 7.6    Existence of Co-Issuers .................................................................................62
Section 7.7    Protection of Collateral. .................................................................................62
Section 7.8    Issuance of Securities of a Separate Segregated Portfolio ..............................63
Section 7.9    Performance of Obligations. ...........................................................................64
Section 7.10   Negative Covenants. .......................................................................................64
Section 7.11   Statement as to Compliance ...........................................................................67
Section 7.12   Co-Issuers May Consolidate, Etc., Only on Certain Terms..............................67
Section 7.13   Successor Substituted .....................................................................................71
Section 7.14   No Other Business ..........................................................................................71
Section 7.15   Reporting .......................................................................................................71

# ARTICLE VIII

## SUPPLEMENTAL INDENTURES

Section 8.1    Supplemental Indentures without Consent of Noteholders ...............................72
Section 8.2    Supplemental Indentures with Consent of Noteholders....................................74
Section 8.3    Execution of Supplemental Indentures; Delivery of Supplemental
               Indentures..............................................................................................76
Section 8.4    Effect of Supplemental Indentures...................................................................77
Section 8.5    Reference in Notes to Supplemental Indentures ...............................................77
Section 8.6    Certain Further Limitations on Supplemental Indentures..................................77

# ARTICLE IX

## ACCOUNTS AND REPORTS

Section 9.1    Collection of Money. ......................................................................................78
Section 9.2    Reports by Trustee. ........................................................................................79
Section 9.3    Reports; Performance Registry. .......................................................................79
Section 9.4    Procedures Relating to the Establishment of Accounts Controlled by the
               Trustee; Criteria Applicable to Custodian and Account Securities
               Intermediary..........................................................................................80

## ARTICLE X

### CREDIT SWAP

Section 10.1    Credit Swaps. ...................................................................................81

## ARTICLE XI

### NOTEHOLDERS' RELATIONS

Section 11.1    Standard of Conduct ........................................................................82
Section 11.2    Right to List of Holders ...................................................................82

## ARTICLE XII

### MISCELLANEOUS

Section 12.1    Form of Documents Delivered to Trustee ..........................................82
Section 12.2    Acts of Noteholders. ........................................................................84
Section 12.3    Notices ............................................................................................84
Section 12.4    Notices to Noteholders; Waiver........................................................85
Section 12.5    Effect of Headings and Table of Contents ........................................86
Section 12.6    Successors and Assigns......................................................................86
Section 12.7    Separability ......................................................................................86
Section 12.8    Benefits of Indenture........................................................................86
Section 12.9    Governing Law .................................................................................86
Section 12.10   Submission to Jurisdiction ...............................................................86
Section 12.11   Counterparts......................................................................................86
Section 12.12   Judgment Currency ..........................................................................86
Section 12.13   Waiver of Jury Trial.........................................................................87
Section 12.14   Liability of Co-Issuers .....................................................................87
Section 12.15   Security Interest Representations and Warranties of the Issuer.........................88
Section 12.16   Limited Recourse .............................................................................89

Exhibit A-1(a)    –    Form of Certificated Note
Exhibit A-1(b)    –    Form of Regulation S Global Note
Exhibit A-1(c)    –    Form of Rule 144A Global Note
Exhibit B-1    –    Form of Transfer Certificate for Transfers From Certificated Note to
                      Certificated Note
Exhibit B-2    –    Form of Transfer Certificate for Transfers from Global Note to Global
                      Note
Exhibit C    –    Form of Opinion of Cadwalader, Wickersham & Taft LLP
Exhibit D    –    Form of Opinion of Maples and Calder
Schedule A            LIBOR

DCLIB1 83398.12

## STANDARD TERMS FOR INDENTURES

STANDARD TERMS FOR INDENTURES, dated as of July 14, 2005 by and among the Issuer, the Co-Issuer and the Trustee.

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes issuable as provided in this Indenture. All covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Noteholders and the Trustee. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with its terms have been done.

## ARTICLE I

## DEFINITIONS

Section 1.1    <u>Definitions</u>.  Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms.  Terms used herein but not defined herein shall have the meaning ascribed thereto in the Series Indenture.

"<u>Accounts Securities Intermediary</u>":  The financial institution maintaining the Accounts which, initially, shall be the Custodian.

"<u>Accredited Investor</u>":    The meaning set forth therefor in Rule 501(a) promulgated under the Securities Act.

"<u>Act</u>" and "<u>Acts of Noteholders</u>":  The meanings specified in <u>Section 13.2</u>.

"<u>Administration Agreement</u>":  An agreement dated as of the Closing Date, by and between the Issuer and the Administrator, relating to the administration of the Issuer, as the same may be amended, supplemented or otherwise modified and in effect from time to time in accordance with the terms thereof.

"<u>Administrator</u>":  Maples Finance Limited, a licensed trust company incorporated in the Cayman Islands, or any substitute Administrator duly appointed by the Board of Directors of the Issuer.

"<u>Affiliate</u>" or "<u>Affiliated</u>":  With respect to a Person, (i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such

Person or (ii) any other Person who is a director, officer or employee (a) of such Person, (b) of any subsidiary or parent company of such Person or (c) of any Person described in <u>clause (i)</u> above.  For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise; *provided, however, that* for the avoidance of doubt, the Affiliates of the Issuer shall not include the Administrator or any companies, other than the Issuer, controlled by the Administrator solely by virtue of such control.

"<u>Agent Members</u>":  Members of, or participants in, the Depositary.

"<u>Authenticating Agent</u>":  The Person designated by the Trustee to authenticate the Notes on behalf of the Trustee pursuant to <u>Section 6.15</u>.

"<u>Authorized Officer</u>":  With respect to the Issuer or the Co-Issuer, any officer who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding upon, the Issuer or the Co-Issuer.  With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer.  Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"<u>Bankruptcy Code</u>":  The federal Bankruptcy Code, Title 11 of the United States Code, as amended and any successor statute and/or any bankruptcy, insolvency, reorganization or similar law enacted under the laws of the Cayman Islands.

"<u>Beneficial Owner</u>":  Any Person owning a beneficial interest in a Global Note as reflected on the books of the Depositary or on the books of a Depositary Participant or on the books of an indirect participant for which a Depositary Participant of the Depositary acts as agent.

"<u>Benefit Plan Investor</u>":  The meaning specified in <u>Section 2.3(h)</u>.

"<u>Board of Directors</u>":  With respect to the Issuer, the duly appointed directors of the Issuer appointed by Board Resolution or by resolution of the stockholders of the Issuer; and with respect to the Co-Issuer, the Issuer, as sole member of the Co-Issuer, or the manager of the Co-Issuer duly appointed by the Issuer as sole member of the Co-Issuer.

"<u>Board Resolution</u>":  With respect to the Issuer, a resolution of the Board of Directors of the Issuer; and with respect to the Co-Issuer, an authorization executed by the Issuer, as sole member of the Co-Issuer, or the manager of the Co-Issuer.

"<u>Cash</u>":  Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"<u>Certificate of Authentication</u>":  The meaning specified in <u>Section 2.2(f)</u>.

"<u>Certificated Note</u>":  The meaning specified in <u>Section 2.1(c)</u>.

"<u>Certificated Security</u>":   A security, as defined in Section 8-102(a)(15) of the UCC, that is represented by a certificate.

"<u>Clearing Agency</u>":   An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"<u>Clearing Corporation</u>":   The meaning specified in Section 8-102(a)(5) of the UCC.

"<u>Clearstream</u>":   Clearstream Banking, société anonyme, a corporation organized under the laws of the Grand Duchy of Luxembourg.

"<u>Code</u>":  The United States Internal Revenue Code of 1986, as amended.

"<u>Controlling Class</u>":   Unless otherwise specified in the Series Indenture, the Holders of a Majority of the Notes, voting together as a single Class.

"<u>Controlling Person</u>":   A Person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of an entity or that provides investment advice to the entity for a fee (direct or indirect) with respect to such assets, or any Affiliate of such a Person.

"<u>Credit Swaps Guarantor</u>":  Lehman Brothers Holdings Inc.

"<u>Default</u>":   Any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"<u>Defaulted Interest</u>":   Any interest on any Note that is due and payable but is not punctually paid or duly provided for on or prior to the due date therefor and which remains unpaid and, to the extent not duplicative in any context in which this term "Defaulted Interest" is used, any interest on such amounts at the applicable rate.

"<u>Depositary</u>":   With respect to the Global Notes, DTC, its nominees, and their respective successors.

"<u>Depositary Participant</u>":   A broker, dealer, bank or other financial institution or other Person for whom from time to time the Depositary effects book-entry transfers and pledges of Notes deposited with the Depositary.

"<u>Distribution</u>":   Any payment of principal or interest or any dividend, premium or fee payment made on, or any other distribution in respect of, a security or obligation.

"<u>Dollar</u>" or "<u>$</u>":  A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"<u>DTC</u>":  The Depository Trust Company, a New York corporation.

"<u>Determination Date</u>"  The last day of the month.

DCLIB1 83398.12

"Enforcement Notice":  The meaning specified in Section 5.2.

"Entitlement Holder":  The meaning specified in Section 8-102(a)(7) of the UCC.

"Entitlement Order":  The meaning specified in Section 8-102(a)(8) of the UCC.

"ERISA":  The Employee Retirement Income Security Act of 1974, as amended.

"Euroclear":  Euroclear Bank, S.A./N.V.

"Excepted Property":  With respect to (i) the Issuer, the $250 capital contributed to the Company by Maples Finance Limited as payment for the Shares in accordance with the Issuer Charter, the $250 fee paid to the Issuer for agreeing to issue the Notes and the account established and maintained by the Issuer in the Cayman Islands into which such amounts are deposited and (ii) the Co-Issuer, the $100 capital contributed to the Co-Issuer by the Issuer as sole member of the Co-Issuer in accordance with the Co-Issuer's Limited Liability Company Agreement.

"Exchange Act":  The United States Securities Exchange Act of 1934, as amended.

"Financial Asset":  Except as otherwise provided in Section 8-103 of the UCC: (a) a Security; (b) an obligation of a Person or a share, participation or other interest in a Person or in property or an enterprise of a Person, which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area in which it is issued or dealt in as a medium for investment; or (c) any property that is held by a Securities Intermediary for another Person in a Securities Account if the Securities Intermediary has expressly agreed with the other Person that the property is to be treated as a financial asset under Article 8 of the UCC.

"Global Notes":  The meaning specified in Section 2.1(b).

"Grant":  To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge and create a security interest in and right of set-off against, deposit, set over and confirm.  A Grant of the Collateral, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including without limitation the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of the Collateral, and all other Monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Holder" or "Noteholder":  With respect to any Note, each Person in whose name such Note is registered in the Note Register.

"Indenture":  Means, collectively, the Series Indenture and this Standard Terms, as originally executed and, if from time to time supplemented or amended by one or more

-4-

indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"Independent":  As to any Person, any other Person (including, in the case of an accountant, or lawyer, a firm of accountants or lawyers and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, and (ii) is not connected with such Person as an officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions.  "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants. Whenever any Independent Person's opinion or certificate is to be furnished to the Trustee, such opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning hereof.

"Indorsement":  The meaning specified in Section 8-102(a)(11) of the UCC.

"Insolvency Proceeding":  The meaning specified in Section 5.3(g).

"Instruments":  The meaning specified in Section 9-102(a)(47) of the UCC.

"Investment Company Act":  The United States Investment Company Act of 1940, as amended.

"IRS":  The United States Internal Revenue Service.

"Issuer Order" and "Issuer Request":  A written order or request (which may be in the form of a standing order of request) dated and signed in the name of the Issuer (and of the Co-Issuer, if applicable) by an Authorized Officer of the Issuer (and of the Co-Issuer, if applicable), as the context may require or permit.

"Long-Term Credit Rating":  With respect to an issuer or obligor (i) the long-term credit rating for the senior unsecured debt of such issuer or obligor or (ii) the long-term issuer credit rating of such issuer or obligor.

"Majority":  With respect to the Notes or any Class thereof, the holders of more than 50% of the outstanding principal amount of the Notes or the Notes of such Class, as the case may be.

"Managers":  Lehman Brothers Inc. and Lehman Brothers International (Europe).

"Moody's":  Moody's Investors Service, Inc. and any successor or successors thereto and, if such corporation shall for any reason no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized rating agency designated in writing by the Issuer (with a copy to the Trustee), with the written consent of the Controlling Class.

"<u>Money</u>":  The meaning specified in Section 1-201(24) of the UCC.

"<u>Monthly Report</u>":  The meaning specified in <u>Section 9.3</u>.

"<u>Monthly Report Period</u>":  The period beginning on the first calendar day of each month and ending on the last calendar day of each month.

"<u>Note Purchase Agreement</u>":  The Note Purchase Agreement, dated as of the Closing Date, among the Issuer and the Managers.

"<u>Note Register</u>" and "<u>Note Registrar</u>":  The respective meanings specified in <u>Section 2.3</u> of this Indenture.

"<u>Officer's Certificate</u>":  With respect to any Person, a certificate signed by an Authorized Officer of such Person.  Any Officer's Certificate delivered with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(i)    a statement that each individual signing the certificate has read the covenant or condition and any definitions relating thereto;

(ii)    a brief statement of the nature and scope of the examination or investigation undertaken by each officer in rendering the certificate;

(iii)    a statement that each such officer has made such examination or investigation as, in such officer's opinion, is necessary to enable such officer to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv)    a statement as to whether, in the opinion of each such officer, such condition or covenant has been complied with.

"<u>Opinion of Counsel</u>":  A written opinion addressed to the Trustee and the Rating Agencies, in form and substance reasonably satisfactory to the Trustee and the Rating Agencies, of an attorney at law admitted to practice in any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer or the Co-Issuer and which attorney shall be reasonably satisfactory to the Trustee and the Rating Agencies.  Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to the Trustee and the Rating Agencies or shall state that the Trustee and the Rating Agencies shall be entitled to rely thereon.

"<u>Ordinary Shares</u>" or "<u>Shares</u>":  The 250 ordinary shares, par value $1.00 per share, of the Issuer.

"Outstanding":  As of any date of determination, all of the Notes theretofore authenticated and delivered under this Indenture except:

(i)    Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

(ii)    Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes; *provided, however, that,* if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)    Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such original Notes are held by a holder in due course; and

(iv)    Notes alleged to have been mutilated, defaced, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.4 of this Indenture;

*provided, that* in determining whether the Holders of the requisite Aggregate Outstanding Amount of the Notes have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes beneficially owned by the Issuer or the Co-Issuer or any Affiliate of either of them shall be disregarded and deemed not to be Outstanding.

"Paying Agent":  Any Person authorized by the Co-Issuers to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.4 of this Indenture.

"Permitted Short-Term Investments":  Any U.S. Dollar-denominated investment that is one or more of the following including, without limitation, Permitted Short-Term Investments for which the Trustee or an Affiliate of the Trustee provides services:

(i)    cash;

(ii)    direct Registered obligations of, and Registered obligations the timely payment of principal of and interest on which is fully and expressly guaranteed by, the United States of America or any full faith and credit agency, instrumentality or government sponsored entity;

(iii)    demand and time deposits in, certificates of deposit of, bankers' acceptances payable within 183 days of issuance issued by, or federal funds sold by any United States federal or state depository institution or trust company (including U.S. Bank National Association, in its individual capacity and not as Trustee), the commercial paper and/or debt obligations of which (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment has a Long-Term Credit Rating of not less than "Aa2" by Moody's and not less than "A+" by S&P, or a Short-Term Credit Rating of not less than

"P-1" by Moody's and not less than "A-1+" by S&P; *provided, that* in the case of commercial paper and short-term debt obligations with a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a Long-Term Credit Rating of not less than "A+" by S&P;

(iv)    Registered corporate debt securities (other than mortgage-backed securities) which are interest bearing and issued by any corporation incorporated under the laws of the United States of America or any state thereof and which has a Long-Term Credit Rating of at least "Aaa" by Moody's and "AAA" by S&P at the time of such investment or contractual commitment providing for such investment;

(v)    commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance having at the time of such investment a Short-Term Credit Rating of not less than "P-1" by Moody's and not less than "A-1+" by S&P; *provided, that* if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a Long-Term Credit Rating of not less than "Aa2" by Moody's and not less than "A+" by S&P;

(vi)    reinvestment agreements (so long as payments under any such reinvestment agreement are not subject to withholding taxes) issued by any bank (if treated as a deposit by such bank) or reinvestment agreements issued in Registered form by any insurance company or other corporation or entity organized under the laws of the United States of America or any state thereof with a maturity of not more than 364 days from the date of issuance that has a Short-Term Credit Rating of not less than "P-1" by Moody's and not less than "A-1+" by S&P; *provided, that* if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a Long-Term Credit Rating of not less than "Aa2" by Moody's and not less than "A+" by S&P; and

(vii)    any offshore money market fund or similar investment vehicle (including those for which U.S. Bank National Association or its Affiliates may act as manager or advisor, whether or not for a fee) with a maturity of not more than 364 days from the date of issuance having at the time of investment therein a Short-Term Credit Rating of not less than "P-1" by Moody's and "A-1+" by S&P; *provided, that* (x) if such investment has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a Long-Term Credit Rating of not less than "Aa2" by Moody's and not less than "A+" by S&P;

*provided, that* Permitted Short-Term Investments (a) shall not include obligations bearing interest at inverse floating rates or any investment the interest on which is variable (unless established by reference to a single index plus a fixed spread, if any, which interest rate moves proportionately with that index), any interest only security, any mortgage backed security, any security purchased at a price in excess of 100% of the par value thereof or any security whose repayment is subject to substantial non-credit related risk as determined in the sole judgment of the Credit Swap Counterparty, (b) shall be treated as indebtedness for U.S. federal income tax purposes, or the Issuer has received advice from Cadwalader, Wickersham & Taft LLP or an opinion of another nationally recognized U.S. tax counsel experienced in such matters

that the purchase of such investment shall not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes, (c) shall not cause the Issuer to be subject to U.S. federal, state or local income or franchise tax on a net income tax basis, (d) shall not cause holders of Notes to be subject to U.S. federal income tax on a net income basis, (e) shall not be subject to deduction or withholding for or on account of any withholding or similar tax, unless the payor is required to make "gross-up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required, and (f) shall not include obligations whose rating assigned by S&P includes the subscript "r" or "t"

"Person": An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), bank, unincorporated association or government or any agency or political subdivision thereof.

"Plan Asset Regulation": U.S. Department of Labor's regulation 29 C.F.R. Section 2510.03-101(f).

"Preference Claim": The meaning specified in Section 5.3(g) of this Indenture.

"Proceeding": Any suit in equity, action at law or other judicial or administrative proceeding.

"Proceeds": (i) Any property (including but not limited to Cash and securities) received as a Distribution on the Collateral or any portion thereof, (ii) any property (including but not limited to Cash and securities) received in connection with the sale, liquidation, exchange or other disposition of the Collateral or any portion thereof, and (iii) all proceeds (as such term is defined in Section 9-102(a)(64) of the UCC) of the Collateral or any portion thereof.

"Qualified Institutional Buyer": A "qualified institutional buyer" as defined in Rule 144A promulgated under the Securities Act.

"Qualified Purchaser": A "qualified purchaser" within the meaning of Section 3(c)(7) of the Investment Company Act.

"Rating Agency Confirmation": When required pursuant to this Indenture in connection with any particular action, shall mean a written confirmation from each Rating Agency that such action in and of itself will not result in the reduction or withdrawal of its then-current rating, if any, of the Notes Outstanding.

"Record Date": Unless otherwise specified in the Series Indenture, the date on which the Holders of the Notes entitled to receive a payment of principal and/or interest on the next succeeding Payment Date or Distribution Date are determined, such date as to any Payment Date or Distribution Date being the 15th calendar day (whether or not a Business Day) preceding the relevant Payment Date or Distribution Date (as and to the extent applicable); *provided, that* that the Record Date for purposes of determining the Holders of the Notes entitled to vote on any

matters shall, in each case be the date on which notice of the relevant event is sent to the Holders of the Notes by the Issuer or the Trustee.

"Registered":  With respect to any debt obligation, a debt obligation that is issued after July 18, 1984, and that is in registered form within the meaning of Section 881(c)(7) of the Code.

"Regulation D":  Regulation D under the Securities Act.

"Regulation S":  Regulation S under the Securities Act.

"Regulation S Global Note":  The meaning specified in Section 2.1(a) of this Indenture.

"Relevant Persons":  The meaning specified in Section 2.5 of this Indenture.

"Rule 144A":  Rule 144A under the Securities Act.

"Rule 144A Global Note":  The meaning specified in Section 2.1(b) of this Indenture.

"Rule 144A Information":  The meaning specified in Section 7.15.

"Sale":  The meaning specified in Section 5.17(a).

"S&P":  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, and any successor or successors thereto and, if such corporation shall for any reason no longer perform the functions of a securities rating agency, "S&P" shall be deemed to refer to any other nationally recognized rating agency designated in writing by the Issuer (with a copy to the Trustee), with the written consent of the Controlling Class.

"SEC":  The United States Securities and Exchange Commission.

"Secured Obligations":  Collectively, all of the indebtedness, liabilities and obligations owed from time to time by the Issuer to the Secured Parties, whether for principal, interest, fees, costs, expenses, premium or otherwise (including all amounts which would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code and the operation of Sections 502(b) and 506(b) thereof or any analogous provisions of any similar laws).

"Secured Parties":  Unless otherwise specified in the Series Indenture, the Noteholders, the Credit Swap Counterparty and the Trustee, collectively.

"Securities Account":  An account to which a Financial Asset is or may be credited in accordance with an agreement under which the Person maintaining the account undertakes to treat the Person for whom the account is maintained as entitled to exercise the rights that comprise the Financial Asset.

DCLIB1 83398.12

"Securities Act":  The United States Securities Act of 1933, as amended.

"Securities Intermediary":  (a)  A Clearing Corporation; or (b) a Person, including a bank or broker, that in the ordinary course of its business maintains Securities Accounts for others and is acting in that capacity.

"Security Entitlement":   The meaning specified in Section 8-102(a)(17) of the UCC.

"Series Indenture":  The Series Indenture, dated as of the Closing Date, among the Co-Issuers and Trustee, as amended from time to time.

"Shares":  The 250 ordinary shares, par value $1.00 per share, of the Company.

"Short-Term Credit Rating":  With respect to an issuer or obligor (i) the short-term issuer credit rating of such issuer or obligor or (ii) the short-term credit rating for the senior unsecured debt of such issuer or obligor.

"Specified Currency":  The meaning specified in Section 12.12.

"Specified Person":  The meaning specified in Section 2.4.

"Specified Place":  The meaning specified in Section 12.12.

"Standard Terms":  This Standard Terms for Indentures, dated as of July 14, 2005 by and among the Co-Issuers and the Trustee, as amended from time to time.

"Treasury Regulations":  The U.S. Treasury Regulations promulgated under the Code.

"Transfer Agent":  The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"Trust Officer":  When used with respect to the Trustee, any officer within the Corporate Trust Office (or any successor group of the Trustee) authorized to act for or on behalf of the Trustee and having direct responsibility for the administration of this Indenture, including any vice president, assistant vice president, or other officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred at the Corporate Trust Office because of his or her knowledge of and familiarity with the particular subject.

"UCC":  The Uniform Commercial Code as in effect from time to time in the State of New York.

"Uncertificated Security":  The meaning specified in Section 8-102(a)(18) of the UCC.

"Unregistered Securities":  The meaning specified in Section 5.17(c).

"U.S. Person":  The meaning specified under Regulation S under the Securities Act.

"U.S. Resident":  A "U.S. resident" within the meaning of the Investment Company Act.

Section 1.2    Other Definitional Provisions; Rating Specifications.

(a) All references in this Standard Terms to designated "Articles," "Sections," "Subsections" and other subdivisions are to the designated Articles, Sections, Subsections and other subdivisions of this instrument as originally executed.

(b) The words "herein," "hereof," "hereunder," "hereto" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section, Subsection or other subdivision.

(c) Notwithstanding anything herein to the contrary, if a Moody's rating or an S&P rating is specified herein, such rating shall only be applicable if Moody's or S&P is specified as a Rating Agency in the Series Indenture.

Section 1.3    Integration of Standard Terms and Series Indenture.

This Standard Terms shall not be effective with respect to the Notes or otherwise unless the Issuer and the Trustee shall have each executed and delivered the Series Indenture related to such Notes, it being the intent of the parties that the execution and delivery of this Standard Terms shall be solely for the purpose of establishing the provisions that may be incorporated from time to time with respect to a series of Notes, as such provisions may be modified by the Series Indenture executed and delivered in respect of such series of Notes.

## ARTICLE II

## THE NOTES

Section 2.1    Forms Generally.  The form of the Notes, including the Certificate of Authentication, shall be as set forth respectively as Exhibits A-1(a) and A-1(b) attached hereto.

(a) Regulation S Notes.  Except as provided below, the Notes sold to Persons that are neither U.S. Persons nor U.S. Residents in transactions outside of the United States in reliance on Regulation S shall be issued initially in the form of one or more permanent global notes in definitive, fully registered form without interest coupons in the form of, and with the applicable legends set forth in, Exhibit A-1(b) attached hereto (a "Regulation S Global Note"), which shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for the Depositary and registered in the name of a nominee of the Depositary for the respective accounts of Clearstream and Euroclear, duly

executed by the Co-Issuers and authenticated by the Trustee as hereinafter provided.  The Co-Issuers expect that Clearstream and Euroclear shall hold beneficial interests on behalf of their participants through their respective depositories, and such depositories shall hold such beneficial interests in the Regulation S Global Notes in participants' securities accounts in the depositories' names on the books of the Depositary.  The Aggregate Outstanding Amount of the Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary, or their respective nominees, as the case may be, as hereinafter provided.

(b) Rule 144A Notes.  The Notes offered and sold in the United States to Persons that are both Qualified Institutional Buyers and Qualified Purchasers in reliance on the exemption from registration under Rule 144A and qualified for resale to Persons that are both Qualified Institutional Buyers and Qualified Purchasers under Rule 144A, in a transaction exempt from registration under the Securities Act shall be issued initially in the form of one or more permanent global notes in definitive, fully registered form without interest coupons in the form of, and with the applicable legends set forth in, Exhibit A-1(c) attached hereto (a "Rule 144A Global Note" and, together with the Regulation S Global Notes, the "Global Notes"), which shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for the Depositary and registered in the name of a nominee of the Depositary duly executed by the Co-Issuers and authenticated by the Trustee as hereinafter provided.  The Aggregate Outstanding Amount of the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary, or their respective nominees, as the case may be, as hereinafter provided.

(c) Certificated Notes.  The Notes offered and sold in the United States to Persons that are both Accredited Investors and Qualified Purchasers, in a transaction exempt from registration under the Securities Act shall be issued in definitive, fully registered, certificated form, and with the applicable legends set forth in Exhibit A-1(a) attached hereto (the "Certificated Notes"), which shall be registered in the name of the Holder thereof, duly executed by the Co-Issuers and authenticated by the Trustee as hereinafter provided.

(d) Book-Entry Provisions.  This Section 2.1(d) shall apply only to Rule 144A Global Notes and Regulation S Global Notes (collectively, the "Global Notes") deposited with or on behalf of the Depositary.

The Co-Issuers shall execute and the Trustee shall, in accordance with this Section 2.1(d), authenticate and deliver initially one or more Global Notes that (i) shall be registered in the name of the nominee of the Depositary for such Global Note or Global Notes and (ii) shall be delivered by the Trustee to the Depositary pursuant to the instructions of the Depositary or held by the Trustee, as custodian for the Depositary.

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Trustee, as custodian for the Depositary, or under the Global Note, and the Depositary may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers, or the Trustee as the absolute owner of such Global Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its respective Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Global Note.

DCLIB1 83398.12

(e) <u>Beneficial Interests in Global Notes</u>.  Except as provided in <u>Section 2.09</u> hereof, owners of beneficial interests in Global Notes shall not be entitled to receive physical delivery of certificated Notes.

(f) <u>CUSIP, Common Code, ISIN and "Private Placement" Numbers</u>.  The Co-Issuers in issuing the Notes may use "CUSIP", "Common Code", "ISIN" or "private placement" numbers (if then generally in use), and, if so, the Trustee will indicate the "CUSIP", "Common Code", "ISIN" or "private placement" numbers of the Notes in notices of redemption and related materials as a convenience to Holders; *provided, however, that* with respect to any such notice the Trustee shall not be deemed to make any representation as to the correctness of such numbers either as printed on the Notes or as contained in any such notice.

(g) The Depositary for the Global Notes shall initially be DTC.

(h) The Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers executing such Notes as evidenced by their execution of such Notes.

Section 2.2    <u>Execution, Authentication, Delivery and Dating</u>.

(a) The Notes shall be executed on behalf of the Co-Issuers by an Authorized Officer of each of the Co-Issuers.  The signatures of such Authorized Officer on the Notes may be manual or facsimile (including in counterparts).

(b) Notes bearing the manual or facsimile signatures of an individual who was at any time the Authorized Officer of the Issuer shall bind such Person, notwithstanding the fact that such individual has ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such office at the date of issuance of such Notes.

(c) At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver the Notes to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

(d) Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date.  All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(e) Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Aggregate Outstanding Amount of

DCLIB1 83398.12

the Notes so transferred, exchanged or replaced.  In the event that any Note is divided into more than one Note in accordance with this Article II, the original Aggregate Outstanding Amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original Aggregate Outstanding Amount of such subsequently issued Notes.

(f)  No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication (the "Certificate of Authentication"), substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.3    Registration, Transfer and Exchange of Notes.

(a) (i)   The Trustee is hereby appointed as the registrar hereunder (the "Note Registrar") and as Transfer Agent with respect to the Notes.  The Note Registrar shall keep a register (the "Note Register") at the Corporate Trust Office in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of Notes and the registration of transfers of Notes.  Upon any resignation or removal of the Note Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of Note Registrar.

(ii)    If a Person other than the Trustee is appointed by the Issuer as Note Registrar, the Issuer will give the Trustee prompt written notice of the appointment of a Note Registrar and of the location, and any change in the location, of the Note Registrar, and the Trustee shall have the right to inspect the Note Register at all reasonable times and to obtain copies thereof, and the Trustee shall have the right to rely upon a certificate executed on behalf of the Note Registrar by an Authorized Officer thereof as to the names and addresses of the Holders of the Notes and the Aggregate Outstanding Amount and numbers of such Notes.

(iii)    Subject to this Section 2.3, upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers to be maintained as provided in Section 7.4, the Co-Issuers or the Issuer, as applicable, shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like Aggregate Outstanding Amount.

(iv)    At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like Aggregate Outstanding Amount, upon surrender of the Notes to be exchanged at such office or agency.  Whenever a Note is surrendered for exchange, the Co-Issuers shall execute and the Trustee shall authenticate and deliver the Notes that the Noteholder making the exchange is entitled to receive.

(v)    All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Co-Issuers, evidencing the same debt and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

(vi)    Every Note presented or surrendered for registration of transfer or exchange shall be duly indorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Co-Issuers and the Note Registrar duly executed, by the Holder thereof or his attorney duly authorized in writing.

(vii)    No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover (a) any tax or other governmental charge payable in connection therewith and (b) any expenses of delivery (if any) not made by regular mail.

(viii)    The Co-Issuers hereby appoint the Note Registrar as a Transfer Agent for the exchange or registration of the transfer of the Notes.

(ix)    The Co-Issuers shall not be required (i) to issue, register the transfer of or exchange any Note during (a) the period between the Record Date and Payment Date and (b) a period beginning at the opening of business 15 days before any selection of Notes to be redeemed and ending at the close of business on the day of the mailing of the relevant notice of redemption, or (ii) to register the transfer of or exchange any Note so selected for redemption.

(x)    All payments made by the Co-Issuers under the Notes will be made without any deduction or withholding for or on account of any tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect.  If the Co-Issuers are so required to deduct or withhold, then the Co-Issuers or the Issuer, as applicable, will not be obligated to pay any additional amounts in respect of such withholding or deduction.

(b) No Note may be sold or transferred by a Holder (including, without limitation, by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act and is exempt under applicable state securities laws.

No Note may be offered, sold or delivered within the United States or to, or for the benefit of, U.S. Persons or U.S. Residents except (i) (A)  in accordance with Rule 144A, to Persons that are both Qualified Institutional Buyers and Qualified Purchasers, purchasing for their own account or for the accounts of one or more Qualified Institutional Buyers that are Qualified Purchasers for which the purchaser is acting as fiduciary or agent and exercises sole investment discretion or (B) in reliance on an exemption from registration under the Securities Act, to Persons that are both Accredited Investors and Qualified Purchasers or (ii) in accordance with the provisions of this Article II, and any resale of a Note within the United States or to, or for the benefit of, U.S. Persons or U.S. Residents may only be made (i) in accordance with Rule 144A, to Persons that are both Qualified Institutional Buyers and Qualified Purchasers

purchasing for their own account or for the accounts of one or more Qualified Institutional Buyers that are Qualified Purchasers for which the purchaser is acting as fiduciary or agent and exercises sole investment discretion, or (ii) in reliance on an exemption from registration under the Securities Act, to Persons that are both Accredited Investors and Qualified Purchasers.  The Notes may also be sold or resold, as the case may be, in offshore transactions to Persons that are neither U.S. Persons nor U.S. Residents in reliance on Regulation S.  None of the Co-Issuers, the Trustee or any other Person may register the Notes under the Securities Act or any state securities laws.

  (c)  For so long as any of the Notes are Outstanding, the Issuer shall not transfer any stock of the Issuer to U.S. Persons or U.S. Residents and the Co-Issuer shall not transfer any equity interest in the Co-Issuer to U.S. Persons or U.S. Residents.

  (d)  Upon final payment of unpaid principal due on a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office of the Trustee or at the office of any Paying Agent (outside the United States if then required by applicable law in the case of a definitive Note issued in exchange for a beneficial interest in the Regulation S Global Note pursuant to Section 2.09); *provided, however, that* if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Issuer, the Co-Issuer or the Trustee that the applicable Note has been acquired by a bona fide purchaser, such final payment shall be made without presentation or surrender.

  (e)  So long as a Global Note remains outstanding and is held by or on behalf of the Depositary, transfers of a Global Note, in whole or in part, shall only be made in accordance with this Section 2.3(e).

  (i)  Subject to clauses (ii) through (vi) of this Section 2.3(e), transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.  Furthermore, interest in a Global Note may not be transferred to a person taking delivery in the form of an interest in a Certificated Note or exchanged for an interest in a Certificated Note.

  (ii)  Rule 144A Global Note to Regulation S Global Note.  If a Beneficial Owner of an interest in a Rule 144A Global Note deposited with the Depositary wishes at any time to exchange all or a portion of its interest in such Rule 144A Global Note for an interest in a Regulation S Global Note, or to transfer all or a portion of its interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of an interest in a Regulation S Global Note, such Beneficial Owner, provided such Beneficial Owner or, in the case of a transfer, the transferee, is not a U.S. Person or a U.S. Resident, may, subject to the rules and procedures of the Depositary, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the Regulation S Global Note; *provided, however,* that the remaining original stated principal

amount of such Beneficial Owner's beneficial interest in the Rule 144A Global Note shall either equal zero or meet the required minimum denomination of $500,000 and integral multiples of $1,000 in excess thereof.  Upon receipt by the Note Registrar of (A) instructions given in accordance with the Depositary's procedures from an Agent Member directing the Note Registrar to cause to be credited a beneficial interest in a Regulation S Global Note in an amount equal to the beneficial interest in such Rule 144A Global Note, but not less than the required minimum denomination of $500,000 and integral multiples of $1,000 in excess thereof, to be exchanged or transferred, (B) a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary and, in the case of an exchange or transfer pursuant to and in accordance with Regulation S, the Euroclear or Clearstream account to be credited with such increase and (C) a certificate substantially in the form of <u>Exhibit B-1</u> attached hereto given by the Beneficial Owner of such beneficial interest (in the case of an exchange) or the transferee of such beneficial interest (in the case of a transfer) stating, among other things, that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Securities, including that the transfer or exchange is being made to a Person that is neither a U.S. Person nor a U.S. Resident, the Note Registrar shall instruct the Depositary to reduce the principal amount of the Rule 144A Global Note and to increase the principal amount of the Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, and to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the Regulation S Global Note equal to the reduction in the principal amount of the Rule 144A Global Note.  A U.S. Person or a U.S. Resident may not hold an interest in a Regulation S Global Note at any time.  In addition, an interest in a Regulation S Global Note may only be held through Euroclear or Clearstream.

(iii)    <u>Rule 144A Global Note to Rule 144A Global Note</u>.  If a Beneficial Owner of an interest in a Rule 144A Global Note deposited with the Depositary wishes at any time to transfer all or a portion of its interest in such Rule 144A Global Note to a transferee who wishes to take delivery thereof in the form of an interest in a Rule 144A Global Note, such Beneficial Owner may, subject to the applicable rules and procedures of the Depositary, transfer, or cause the transfer of, such interest in the Rule 144A Global Note; *provided, however,* that the remaining original stated principal amount of such Beneficial Owner's beneficial interest in the Rule 144A Global Note shall either equal zero or meet the required minimum denomination of $500,000 and integral multiples of $1,000 in excess thereof.

(iv)    <u>Regulation S Global Note to Rule 144A Global Note</u>.  If a Beneficial Owner of an interest in a Regulation S Global Note deposited with the Depositary wishes at any time to exchange all or a portion of its interest in a Regulation S Global Note for an interest in a Rule 144A Global Note, or to transfer all or a portion of its interest in such Regulation S Global Note to a Person who wishes to take delivery thereof in the form of an interest in a Rule 144A Global Note, such Beneficial Owner or, in the case of a transfer, the transferee may, subject to the rules and procedures of Euroclear, Clearstream or the Depositary, as the case may be, exchange or transfer or cause the

-19-

exchange or transfer of, such interest for an equivalent beneficial interest in a Rule 144A Global Note; *provided, however,* that the remaining original stated principal amount of such Beneficial Owner's beneficial interest in the Regulation S Global Note shall either equal zero or meet the required minimum denomination of $500,000 and integral multiples of $1,000 in excess thereof.   Upon receipt by the Note Registrar of (A) instructions from Euroclear, Clearstream or the Depositary, as the case may be, directing the Note Registrar to cause to be credited a beneficial interest in a Rule 144A Global Note in an amount equal to the beneficial interest in such Regulation S Global Note, but not less than the required minimum denomination of $500,000 and integral multiples of $1,000 in excess thereof, to be exchanged or transferred, such instructions to contain information regarding the participant account with the Depositary to be credited with such increase, and (B) a certificate substantially in the form of Exhibit B-2 attached hereto given by the Beneficial Owner of such beneficial interest (in the case of an exchange) or the transferee of such beneficial interest (in the case of the transfer) stating, among other things, that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to Global Securities, including that the transfer or exchange is being made in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any State of the United States or any other jurisdiction and that the Beneficial Owner (in the case of an exchange) or the transferee of such beneficial interest (in case of a transfer) is a Qualified Institutional Buyer and a Qualified Purchaser and, then Euroclear or Clearstream or the Note Registrar, as the case may be, shall instruct the Depositary to reduce the Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Note to be transferred or exchanged and the Note Registrar shall instruct the Depositary, concurrently with such reduction, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Note.

(v)     Other Exchanges.  In the event that a Global Note is exchanged for Notes in definitive registered form without interest coupons pursuant to Section 2.09 hereof, such Notes may be exchanged for one another only in accordance with such procedures as are substantially consistent with the provisions above (including certification requirements intended to ensure that such transfers comply with Regulation S and Rule 144A), and as may be from time to time adopted by the Co-Issuers and the Trustee.

(vi)     Restrictions on U.S. Transfers.  Interests in any Regulation S Global Note may not be transferred to a U.S. Person or a U.S. Resident at any time.

Notwithstanding anything herein or in the Indenture to the contrary, a beneficial interest in a Global Note may be transferred (directly or indirectly) only if (i) such transfer is approved by the Issuer, (ii) the transferor of such beneficial interest notifies the Administrator in writing of its intention to transfer such beneficial interest, and (iii) such notice (A) identifies the transferee, (B) contains a transfer certificate executed by the transferee which includes each of the representations, warranties and agreements set forth below under in Section 2.3(i) or 2.3(j) as applicable, and (C) contains any other information reasonably requested by the Trustee or the Administrator. **Any purported sales or transfers of any beneficial interest in a Global Note**

**to a transferee which does not comply with the requirements of this paragraph shall be null and void *ab initio*.**

(f) So long as the Certificated Notes remain Outstanding, transfers and exchanges of a Certificated Note, in whole or in part, shall only be made in accordance with this Section 2.3(f).

(i)  Transfer of Certificated Notes to Certificated Notes.  If a Holder of a Certificated Note wishes at any time to transfer such Certificated Note to a transferee, such Holder may transfer or cause the transfer of such Certificated Note for an equivalent interest in one or more Certificated Notes as provided below; provided, that the Aggregate Outstanding Amount of such Holder's interest in the Certificated Note transferred to the transferee must meet the required minimum denomination of $250,000 and integral multiples of $1,000 in excess thereof and the remaining original Aggregate Outstanding Amount of such Holder's interest in the Certificated Note shall either equal zero or meet such required minimum denominations.  Upon receipt by the Issuer and the Note Registrar of (A) such Holder's Certificated Note properly indorsed for assignment in whole or in part to the transferee, (B) a certificate in substantially the form of Exhibit B-2 attached hereto given by the transferee of such interest.  No portion of a Certificated Note may be transferred to a person taking delivery in the form of an interest in a Global Note or exchanged for an interest in a Global Note

(ii)  Exchange of Certificated Notes.  If a Holder of an interest in one or more Certificated Notes wishes at any time to exchange such Certificated Notes for one or more such Certificated Notes of different original Aggregate Outstanding Amount, such Holder may exchange or cause the exchange of such interest for an equivalent interest in the applicable Certificated Notes bearing the same designation as the Certificated Notes indorsed for exchange as provided below.  Upon receipt by the Note Registrar of (A) such Holder's Certificated Notes properly indorsed for such exchange and (B) written instructions from such Holder designating the number and original Aggregate Outstanding Amounts of the applicable Certificated Notes to be issued (the aggregate of such original Aggregate Outstanding Amounts being equal to the original Aggregate Outstanding Amount of the Certificated Notes surrendered for exchange), then the Trustee shall cancel such Certificated Notes in accordance with Section 2.6 and instruct the Note Registrar to record the exchange in the Note Register and the Issuer shall execute and, upon receipt of an Issuer Order, the Trustee shall authenticate and deliver one or more applicable Certificated Notes bearing the same designation as the Certificated Notes indorsed for exchange, registered in the same names as the Certificated Notes surrendered by such Holder, in different original Aggregate Outstanding Amounts designated by such Holder (the aggregate of such amounts being equal to the interest in the Certificated Notes surrendered by such Holder), and in the required minimum denominations.

(g) If Notes are issued upon the transfer, exchange or replacement of Notes bearing the applicable legends set forth in Exhibits A-1(a), A-1(b), or A-1(C), as applicable, and if a request is made to remove such applicable legend on such Notes, the Notes so issued shall bear such applicable legend, or such

applicable legend shall not be removed, as the case may be, unless there is delivered to the Co-Issuers such satisfactory evidence, which may include an opinion of counsel licensed to practice law in the State of New York, as may be reasonably required by the Co-Issuers to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A, Regulation D or Regulation S, as applicable, and that the Issuer is not required to register under the Investment Company Act.  Upon provision of such satisfactory evidence, the Co-Issuers shall execute and the Trustee, at the direction of the Co-Issuers shall authenticate and deliver Notes that do not bear such applicable legend.

(h) Each transferee of a Certificated Note shall be required to make the following representations, warranties and agreements in a transfer certificate substantially in the form of Exhibit B-1 attached hereto:

(i)    *Investor Status*.  The transferee represents and warrants that it is purchasing the Note for its own account, in the minimum denominations of $250,000 and integral multiples of $1,000 in excess thereof, and is (i) both a Qualified Institutional Buyer and a Qualified Purchaser, (ii) both an Accredited Investor and a Qualified Purchaser, or (iii) neither a U.S. Person nor a U.S. Resident.

(ii)    *Securities Law Limitations on Resale*.  The transferee agrees on its own behalf and on behalf of any account for which it is purchasing the Certificated Note to offer, sell or otherwise transfer such Certificated Note only (i) in the required minimum denominations, and (ii)(A) in the United States, only in the form of a Certificated Note (1) to a Qualified Purchaser that the transferor reasonably believes is a Qualified Institutional Buyer, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is a Qualified Purchaser that the transferor reasonably believes is a Qualified Institutional Buyer, to whom notice is given that the resale, pledge or other transfer is being made in reliance on the exemption from Securities Act registration provided by Rule 144A thereof, and none of which are (x) a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than $25,000,000 in securities of issuers that are not affiliated to it, or (y) formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial owner of the transferee is a Qualified Purchaser), or (2) to a person that is both an Accredited Investor and a Qualified Purchaser, in a transaction exempt from registration under the Securities Act (*provided*, that in the case of any transfer pursuant to this clause (2), the transferee or the transferee has provided an opinion of counsel to each of the Trustee and the Co-Issuers that such transfer may be made pursuant to an exemption from registration under the Securities Act), or (B) outside the United States in the form of a Certificated Note to a person that is neither a U.S. Person nor a U.S. Resident in an offshore transaction in accordance with Regulation S under the Securities Act.  The transferee agrees to provide notice of such transfer restrictions to any subsequent transferee.

DCLIB1 83398.12

(iii)    *Minimum Denominations*.  The transferee agrees that no Note (or any interest therein) may be sold, pledged or otherwise transferred in a denomination of less than $250,000 and integral multiples of $1,000 in excess thereof.

(iv)    *No Governmental Approval*.  The transferee understands that the Notes have not been approved or disapproved by the SEC or any other governmental authority or agency of any jurisdiction, nor has the SEC or any other governmental authority or agency passed upon the accuracy or adequacy of the Offering Memorandum.  Any representation to the contrary is a criminal offense.

(v)    *Transferee Sophistication; Non-Reliance; Suitability; Access to Information*.  The transferee (i) has such knowledge and experience in financial and business matters that the transferee is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Notes, (ii) is financially able to bear such risk, (iii) in making such investment is not relying on the advice or recommendations of the Managers, the Co-Issuers or any of their respective affiliates (or any representative of any of the foregoing) and (iv) has determined that an investment in the Notes is suitable and appropriate for it.  The transferee has received, and has had an adequate opportunity to review the contents of, the Offering Memorandum.  The transferee has had access to such financial and other information concerning the Co-Issuers and the Notes as it has deemed necessary to make its own independent decision to purchase such Notes, including the opportunity, at a reasonable time prior to its purchase of such Notes, to ask questions and receive answers concerning the Co-Issuers and the terms and conditions of the offering of the Notes.

(vi)    *Limited Liquidity*.  The transferee understands that there is no market for the Notes and that no assurance can be given as to the liquidity of any trading market for the Notes and that it is unlikely that a trading market for the Notes will develop.  It further understands that, although the Managers may from time to time make a market in the Notes, the Managers are under no obligation to do so and, following the commencement of any market-making, may discontinue the same at any time. Accordingly, the transferee must be prepared to hold the Notes until the legal final maturity date of the Notes.

(vii)    *Investment Company Act*.  The transferee agrees that no sale, pledge or other transfer of a Note (or any interest therein) may be made if such transfer would have the effect of requiring either of the Co-Issuers or the Collateral to register as an investment company under the Investment Company Act.

(viii)    *ERISA*.  The transferee (i) is not using funds to effect the purchase of the Notes that constitute assets of a "Benefit Plan Investor" (as defined in the Plan Asset Regulation of the United States Department of Labor, 29 C.F.R. Section 2510.3-101(f) (the "Plan Asset Regulation")), including but not limited to any insurance company acting on behalf of its general account, any insurance company separate account and any collective investment fund and (ii) is not a person exercising discretionary authority or control over the Issuer's assets or who provides investment advice to the Issuer for a

direct or indirect fee or any affiliate of any such person (any such person, a "Controlling Person"). The transferee understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of the Notes as determined under the Plan Asset Regulation after disregarding Notes held by Controlling Persons both upon the original issuance of the Notes and upon any subsequent transfer of Notes for any reason. The transferee agrees to provide prompt written notice to each of the Issuer and the Trustee of any change in the information supplied above and further information regarding its status upon written request by the Issuer or the Trustee to such transferee. The transferee further acknowledges and agrees that the Indenture will entitle the Issuer to require such holder to dispose of its Notes as soon as practicable following such notification by such holder.

The representations to be made pursuant to this subsection (viii) shall be deemed made on each day from the date the transferee makes such representations through and including the date on which such transferee disposes of its interests in the Notes.

(ix)     *Certain Transfers Void*. The transferee agrees that (i) any sale, pledge or other transfer of a Note (or any interest therein) made in violation of the transfer restrictions contained in this <u>Section 2.3(h)</u>, or made based upon any false or inaccurate representation made by the transferee or a subsequent transferee to the Co-Issuers, will be void and of no force or effect and (ii) none of the Co-Issuers, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(x)     *Cayman Islands*.   The transferee is not a member of the public in the Cayman Islands.

(xi)     *Credit Swap Counterparty*.   The transferee acknowledges that the Credit Swap Counterparty will enter into the Credit Swaps and exercise its rights and perform its obligations thereunder solely on its own behalf and not as agent, fiduciary or in any other capacity on behalf of the Issuer, the holders of the Notes or any other Person. The transferee understands and acknowledges that (i) the interests of the Credit Swap Counterparty under the Credit Swaps may be adverse to the interests of the Issuer and the Noteholders, (ii) in selecting Reference Entities and Benchmark Obligations, declaring Credit Events and taking other actions permitted or required to be taken by the Credit Swap Counterparty under the Credit Swaps, the Credit Swap Counterparty will act within the parameters established under the Credit Swaps, however, any actions taken by the Credit Swap Counterparty will be in the Credit Swap Counterparty's own best interests, as determined by the Credit Swap Counterparty in its sole judgment, and any such action may not be in the interest of, and may be directly adverse to, the Issuer and the Noteholders, and (iii) the Credit Swap Counterparty is not obligated to consider the interests of the Issuer or the Noteholders in selecting Reference Entities or Benchmark Obligations, declaring Credit Events or taking other actions permitted or required to be taken by the Credit Swap Counterparty under the Credit Swaps.

DCLIB1 83398.12

(xii)    *Due Authorization; Capability*.  If the transferee is not a natural person, the transferee has the power and authority to enter into each agreement required to be executed and delivered by or on behalf of the transferee in connection with its purchase of Notes and to perform its obligations thereunder and consummate the transactions contemplated thereby, and the person signing any such documents on behalf of the transferee has been duly authorized to execute and deliver such documents and each other document required to be executed and delivered by the transferee in connection with its purchase of Notes.  If the transferee is an individual, the transferee has all requisite legal capacity to acquire and hold the Notes and to execute, deliver and comply with the terms of each of the documents required to be executed and delivered by the transferee in connection with the subscription for the Notes.  Such execution, delivery and compliance by the transferee does not conflict with, or constitute a default under, any instruments governing the transferee, any applicable law, regulation or order, or any material agreement to which the transferee is a party or by which the transferee is bound.

(xiii)    *Permanent Address*.  If the transferee's permanent address is located in the United States, the transferee was offered the Notes in the state of such transferee's permanent address and intends that the securities law of that state govern the transferee's subscription for the Notes.

(xiv)    *Certain Tax Matters*.  The transferee understands that any Co-Issuer, Trustee or Paying Agent shall require certification acceptable to it (i) as a condition to the payment of principal of and interest on any Notes without, or at a reduced rate of, U.S. withholding or backup withholding tax, and (ii) to enable each Co-Issuer, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Notes or the Holder of such Notes under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.  Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms).  In addition, any Co-Issuer, Trustee or Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.  Each transferee agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

(xv)    *Reliance on Representations, etc.*  The transferee acknowledges that the Co-Issuers, the Managers and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements and agrees that, if any of the acknowledgements, representations or warranties made or deemed to have been made

-25-

by it in connection with its purchase of the Notes are no longer accurate, the transferee will promptly notify the Co-Issuers and the Managers.

(i) Each transferee of a Note taking delivery in the form of an interest in a Rule 144A Global Note will be deemed to make the representations, warranties and agreements made by the transferees of a Certificated Note set forth in clauses (iv) through (xv) above under Section 2.3(h). Each transferee of a Note taking delivery in the form of an interest in a Rule 144A Global Note will also be deemed to make the following additional representations, warranties and agreements:

(i) *Qualified Institutional Buyer*. The transferee represents and warrants that it is purchasing an interest in a Rule 144A Global Note for its own account or one or more accounts with respect to which it exercises sole investment discretion, in each case in minimum denominations of $500,000 and integral multiples of $1,000 in excess thereof, and both it and each such account (if any) (i) is both a Qualified Institutional Buyer and a Qualified Purchaser, (ii) is not a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than $25,000,000 in securities of issuers that are not affiliated to it, (iii) was not formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial owner of the transferee is a Qualified Purchaser) and (iv) shall provide written notice to any transferee that any transferee taking delivery of the Note or interest therein in accordance with Rule 144A must satisfy the foregoing qualifications.

(ii) *Securities Law Limitations on Resale*. The transferee or subsequent transferee agrees on its own behalf and on behalf of any account for which it is purchasing an interest in a Rule 144A Global Note to offer, sell or otherwise transfer such interest only (i) in the required minimum denominations, and (ii)(A) in the United States, only in the form of an interest in a Rule 144A Global Note to a Qualified Purchaser that the transferor reasonably believes is a Qualified Institutional Buyer, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is a Qualified Purchaser that the transferor reasonably believes is a Qualified Institutional Buyer, to whom notice is given that the resale, pledge or other transfer is being made in reliance on the exemption from Securities Act registration provided by Rule 144A thereof, and none of which are (x) a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than $25,000,000 in securities of issuers that are not affiliated to it, or (y) formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial owner of the transferee is a Qualified Purchaser), or (B) outside the United States in the form of an interest in a Regulation S Global Note, to a person that is neither a U.S. Person nor a U.S. Resident in an offshore transaction in accordance with Regulation S under the Securities Act. The transferee or subsequent transferee agrees to provide notice of such transfer restrictions to any subsequent transferee.

(iii) *Minimum Denominations*. The transferee agrees that no interest in a Rule 144A Global Note may be sold, pledged or otherwise transferred in a denomination of less than $500,000 and integral multiples of $1,000 in excess thereof.

-26-

(iv)    *Additional Legend*.  Each transferee of a Note taking delivery in the form of an interest in a Rule 144A Global Note in reliance on the exemption from Securities Act registration provided by Rule 144A thereof understands and agrees that an additional legend in substantially form set forth in Exhibit 1-1(c) will be placed on each Note representing an interest in a Rule 144A Global Note.

(v)    *Limitation on Resale of Interests in Rule 144A Global Notes*.  The transferee understands and agrees that before a Note in the form of an interest in a Rule 144A Global Note may be offered, sold, pledged or otherwise transferred to a transferee that takes delivery in the form of an interest in a Regulation S Global Note, the transferee shall be required to provide the Trustee with a transfer certificate in the form provided herein and in the Indenture and such other certificates and other information as the Issuer, any Manager or the Trustee may reasonably require to confirm that the proposed transfer complies with the transfer restrictions contained in this Section 2.3(i);

(vi)    Notwithstanding anything herein to the contrary, a beneficial interest in a Rule 144A Global Note may be transferred only if (i) the transferor of such beneficial interest notifies the Administrator in writing of its intention to transfer such beneficial interest, and (ii) such notice (A) identifies the transferee, (B) contains a representation and warranty from the transferee that the transferee makes each of the representations, warranties and agreements set forth in this <u>Section 2.3(i)</u>, and (C) contains any other information reasonably requested by the Trustee or the Administrator.  Any purported sales or transfers of any beneficial interest in a Rule 144A Global Note to a transferee which does not comply with the requirements of this paragraph shall be null and void *ab initio*.

(vii)    No interest in a Rule 144A Global Note may be transferred to a person taking delivery in the form of an interest in a Certificated Note or exchanged for an interest in a Certificated Note; *provided, however,* that the Managers, as initial purchaser of the Rule 144A Global Note, holding through DTC, may transfer its interest in a Rule 144A Global Note, in whole or in part, to a person taking delivery in the form of an interest in a Certificated Note, in accordance with DTC procedures.

(j)  Each transferee of a Note taking delivery in the form of an interest in a Regulation S Global Note will be deemed to make the representations, warranties and agreements made by the transferees of a Note set forth in clauses (iv) through (xv) above under Section 2.3(h).  Each transferee of a Note taking delivery in the form of an interest in a Regulation S Global Note will also be deemed to make the following additional representations, warranties and agreements:

(i)    *Non-U.S. Person and Non-U.S. Resident Status*.  The transferee or transferee is neither a U.S. Person nor a U.S. Resident purchasing for its own account or one or more accounts, each of which is neither a U.S. Person nor a U.S. Resident, and as to each of which the transferee or subsequent transferee exercises sole investment discretion, in an offshore transaction in accordance with Regulation S, and is aware that

DCLIB1 83398.12

the sale of the Notes to it is being made in reliance on the exemption from registration provided by Regulation S.

(ii)    *Securities Law Limitations on Resale.*   The transferee or subsequent transferee agrees on its own behalf and on behalf of any account for which it is purchasing an interest in a Regulation S Global Note to offer, sell or otherwise transfer such interest only (i) in the required minimum denominations, and (ii)(A) outside the United States in the form of an interest in a Regulation S Global Note, to a person that is neither a U.S. Person nor a U.S. Resident in an offshore transaction in accordance with Regulation S under the Securities Act, or (B) in the United States, only in the form of an interest in a Rule 144A Global Note to a Qualified Purchaser that the transferor reasonably believes is a Qualified Institutional Buyer, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is a Qualified Purchaser that the transferor reasonably believes is a Qualified Institutional Buyer, to whom notice is given that the resale, pledge or other transfer is being made in reliance on the exemption from Securities Act registration provided by Rule 144A thereof, and none of which are (x) a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than $25,000,000 in securities of issuers that are not affiliated to it, or (y) formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial owner of the transferee is a Qualified Purchaser).  The transferee agrees to provide notice of such transfer restrictions to any subsequent transferee

(iii)   *Minimum Denominations.*   The transferee agrees that no interest in a Regulation S Global Note may be sold, pledged or otherwise transferred in a denomination of less than $500,000 and integral multiples of $1,000 in excess thereof.

(iv)   *Additional Legend for Notes under Regulation S.*  Each transferee of a Note taking delivery in the form of an interest in a Regulation S Global Note in accordance with Regulation S understands and agrees that an additional legend in substantially the form set forth in Exhibit 1-1(b) will be placed on each Note representing an interest in a Regulation S Global Note.

(v)    *Limitation on Resale of Interests in Regulation S Global Notes under Regulation S.*  The transferee or subsequent transferee understands and agrees that before a Note in the form of an interest in a Regulation S Global Note may be offered, sold, pledged or otherwise transferred to a transferee that takes delivery in the form of an interest in a Rule 144A Global Note, the transferee shall be required to provide the Trustee with a transfer certificate in the form provided herein and in the Indenture and such other certificates and other information as the Issuer, any Manager or the Trustee may reasonably require to confirm that the proposed transfer complies with the transfer restrictions contained in this Offering Memorandum, in the legend placed on the Notes and in the Indenture.

(vi)   Notwithstanding anything herein to the contrary, a beneficial interest in a Regulation S Global Note may be transferred only if (i) the transferor of such beneficial interest notifies the Administrator in writing of its intention to transfer such beneficial

-28-

interest, and (ii) such notice (A) identifies the transferee, (B) contains a representation and warranty from the transferee that the transferee makes each of the representations, warranties and agreements set forth in this <u>Section 2.3(j)</u>, and (C) contains any other information reasonably requested by the Trustee or the Administrator.  Any purported sales or transfers of any beneficial interest in a Regulation S Global Note to a transferee which does not comply with the requirements of this paragraph shall be null and void *ab initio*.

(vii)    No interest in a Regulation S Global Note may be transferred to a person taking delivery in the form of an interest in a Certificated Note or exchanged for an interest in a Certificated Note; *provided, however,* that the Managers, as initial purchaser of the Regulation S Global Note, holding through DTC, may transfer its interest in a Regulation S Global Note, in whole or in part, to a person taking delivery in the form of an interest in a Certificated Note, in accordance with DTC procedures.

(k) Each initial purchaser of a Note represented by a Certificated Note shall be required to execute and deliver an investor representation letter setting forth the acknowledgments, representations and warranties set forth in the transfer certificate attached hereto as <u>Exhibit B-2.</u>

(l) Each transferee of a Note represented by a Certificated Note shall be required to execute and deliver a transfer certificate in substantially the form attached hereto as <u>Exhibit B-2</u> to the Trustee in connection with its purchase of the Note.

(m)Notwithstanding anything contained in this Indenture to the contrary, neither the Trustee nor the Note Registrar (nor any other Transfer Agent) shall be responsible or liable for compliance with applicable federal or state securities laws (including, without limitation, the Securities Act or Rule 144A or Regulation S promulgated thereunder), the Investment Company Act, ERISA or the Code (or any applicable regulations thereunder); *provided, however, that* if a specified transfer certificate or Opinion of Counsel is required by the express terms of this <u>Section 2.3</u> to be delivered to the Trustee or Note Registrar prior to registration of transfer of a Note, the Trustee and/or Note Registrar, as applicable, shall be under a duty to receive such certificate or Opinion of Counsel and to examine the same to determine whether it conforms on its face to the requirements hereof (and the Trustee or Note Registrar, as the case may be, shall promptly notify the party delivering the same if it determines that such certificate or Opinion of Counsel does not so conform).

Section 2.4    <u>Mutilated, Defaced, Destroyed, Lost or Stolen Notes</u>.  If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Co-Issuers, the Trustee and the Transfer Agent (each, a "<u>Specified Person</u>") evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (b) there is delivered to the Specified Persons such security or indemnity as may reasonably be required by them to save each of them harmless (it being understood that if the Holder of such Note is a Qualified Institutional Buyer, such Holder's own unsecured agreement of indemnity shall be deemed to be

satisfactory), then in the absence of notice to the Specified Persons that such Note has been acquired by a bona fide purchaser, the Co-Issuers shall execute and, upon Issuer Request, the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note of like tenor (including the same date of issuance) and equal original Aggregate Outstanding Amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding.

If, after delivery of such new Note, a bona fide purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Specified Persons shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Specified Persons in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Co-Issuers in their discretion may, instead of issuing a new Note, pay such Note without requiring surrender thereof except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.4, the Co-Issuers, the Trustee or any Transfer Agent may require the payment by the registered holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this Section 2.4 in lieu of any mutilated, defaced, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Co-Issuers and such new Note shall be entitled, subject to the second paragraph of this Section 2.4, to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section 2.4 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.5    Persons Deemed Owners.  The Issuer, the Co-Issuer, the Trustee and any agent of any of them (collectively, the "Relevant Persons") may treat the Person in whose name any Note is registered as the owner of such Note on the Note Register on the applicable Record Date and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and no Relevant Person shall be affected by notice to the contrary; *provided, however, that* the Depositary shall be deemed the owner of the Global Notes, and Beneficial Owners shall not be considered the owners of any Notes for the purpose of receiving notices.

Section 2.6    Cancellation.  All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, shall promptly be canceled by the Trustee and

DCLIB1 83398.12

may not be reissued or resold.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this <u>Section 2.6</u>, except as expressly permitted by this Indenture. All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuer shall direct by an Issuer Order that they be returned to it.  Any Notes purchased by the Co-Issuers shall be immediately delivered to the Trustee for cancellation.

Section 2.7    <u>No Gross Up</u>.    The Issuer shall not be obligated to pay any additional amounts to the Holders or Beneficial Owners as a result of any withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges.

DCLIB1 83398.12

Section 2.8      Global Notes; Temporary Notes.

(a) A Global Note deposited with the Depositary pursuant to Section 2.1 shall be transferred to the Beneficial Owners thereof only if such transfer complies with Section 2.3 and the Depositary notifies the Co-Issuers that it is unwilling or unable to continue as Depositary for such Global Note or if at any time the Depositary ceases to be a "Clearing Agency" registered under the Exchange Act and a successor depository is not appointed by the Co-Issuers within 90 days after such notice.

(b) Any Global Note that is transferable to the Beneficial Owners thereof pursuant to this Section 2.08 shall be surrendered by the Depositary to the Trustee to be so transferred, in whole or from time to time in part, without charge, and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal original Aggregate Outstanding Amount of Notes of authorized denominations. Any portion of a Global Note transferred or exchanged pursuant to this Section 2.08 shall be executed, authenticated and delivered only in the required minimum denomination of $500,000 and integral multiples of $1,000 in excess thereof. Any Note delivered in exchange for an interest in a Global Note shall, except as otherwise provided by Section 2.3(g), bear the legend set forth in Exhibits A-1(b) and shall be subject to the transfer restrictions referred to in such legend. The Holder of such a registered individual Note may transfer such Note by surrendering it at the office of the Trustee.

(c) Subject to the provisions of Section 2.08(b), the registered Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

(d) In the event of the occurrence of either of the events specified in Section 2.08(a), the Co-Issuers shall promptly make available to the Trustee a reasonable supply of certificated Notes in definitive, fully registered form without interest coupons.

Pending the preparation of definitive Notes pursuant to this Section 2.08, the Co-Issuers may execute, and upon Issuer Order the Trustee shall authenticate and deliver, temporary Notes that are printed, lithographed, typewritten, mimeographed or otherwise reproduced, in any authorized denomination, substantially of the tenor of the definitive Notes in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the Authorized Officers executing such Notes may determine, as conclusively evidenced by their execution of such Notes.

If temporary Notes are issued, the Co-Issuers shall cause definitive Notes to be prepared without unreasonable delay. The definitive Notes shall be printed, lithographed or engraved, or provided by any combination thereof, or in any other manner permitted by the rules and regulations of any applicable securities exchange, all as determined by the Authorized

Officers executing such definitive Notes. After the preparation of definitive Notes, the temporary Notes shall be exchangeable for definitive Notes upon surrender of the temporary Notes at the office of the Trustee, without charge to the Holder. Upon surrender for cancellation of any one or more temporary Notes, the Co-Issuers shall execute, and, upon receipt of an Issuer Order, the Trustee shall authenticate and deliver, in exchange therefor the same Aggregate Outstanding Amount of definitive Notes of authorized denominations. Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits under this Indenture as definitive Notes.

Section 2.9    Required Sale of a Note by the Holder Upon the Occurrence of Certain Circumstances. The Co-Issuers shall be entitled to require any Holder of a Certificated Note who is a U.S. Person or a U.S. Resident that is determined not to have been both a Qualified Purchaser and an Accredited Investor at the time of acquisition of the Certificated Note to sell such interest within 30 days after notice of the sale requirement is given to (i) a person who is both an Accredited Investor and a Qualified Purchaser (*provided*, that in the case of any transfer pursuant to this clause (i) the purchaser or the transferee has provided an opinion of counsel to each of the Trustee and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act), (ii) both a Qualified Institutional Buyer and a Qualified Purchaser, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is both a Qualified Institutional Buyer and a Qualified Purchaser, pursuant to and in accordance with Rule 144A, or (iii) a Person taking delivery in the form of an interest in a definitive Regulation S Note that is neither a U.S. Person nor a U.S. Resident in an offshore transaction meeting the requirements of Regulation S. If such Holder fails to effect the sale within such 30-day period, upon direction from the Issuer, the Trustee, on behalf of and at the expense of the Issuer, shall cause such Holder's interest in the Note to be transferred in a commercially reasonable sale (conducted by the Trustee in accordance with Section 9-610 of the UCC as applied to securities that are sold on a recognized market or that may decline speedily in value) to a Person that certifies to the Trustee, the Co-Issuers and the Managers (x) if such Person is taking delivery of the Note in the form of an interest in a Certificated Note, that such Person is both a Qualified Purchaser and an Accredited Investor, together with the other acknowledgments, representations and agreements made in the related transfer certificate by a transferee of an interest in a Note taking delivery in the form of an interest in a Certificated Note pursuant to Section 2.3, or (y) if such Person is taking delivery of the Note in the form of an interest in a Regulation S Note, that such Person is neither a U.S. Person nor a U.S. Resident, together with the other acknowledgments, representations and agreements made by a transferee of an interest in a Note taking delivery in the form of an interest in a Regulation S Note pursuant to Section 2.3. No payments shall be made on the interest on such Note from the date notice of the sale requirement is sent to the date on which the interest is sold. The Co-Issuers shall also be entitled not to honor a transfer of an interest in a Note taking delivery in the form of an interest in a Certificated Note to a transferee that the Co-Issuers believe is not both a Qualified Purchaser and an Accredited Investor. In connection therewith, the Issuer shall also be entitled to require any Holder of a Note in the form of an interest in a Certificated Note to certify, upon request by the Issuer, whether such Holder is a U.S. Person or a U.S. Resident and whether such Holder was both a Qualified Purchaser and an Accredited Investor at the time of acquisition thereof. The Issuer shall be entitled to assume that any Holder of a Note in the form of an interest in a Certificated Note that does not respond to such request is

a U.S. Person or a U.S. Resident and was not both a Qualified Purchaser and an Accredited Investor at the time of acquisition thereof.

## ARTICLE III

## CONDITIONS PRECEDENT; CERTAIN PROVISIONS
## RELATING TO COLLATERAL

Section 3.1    <u>General Provisions</u>.  The Notes shall be executed by the Issuer and the Co-Issuer and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Request, upon compliance with <u>Section 3.2</u> and upon receipt by the Trustee of the following:

(a) (i)    an Officer's Certificate of the Issuer evidencing (A) the Issuer's authorization by Board Resolution of the execution, delivery and performance of each Transaction Document, the Administration Agreement and the Securities Account Control Agreement, and the execution, authentication and delivery of the Notes and specifying the Scheduled Final Payment Date the Aggregate Outstanding Amount and Note Interest Rate of the Notes to be authenticated and delivered; and (B) the Issuer's certification that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon; and

(ii)    an Officer's Certificate of the Co-Issuer evidencing (A) the authorization by Board Resolution of the execution and delivery of this Indenture and the execution, authentication and delivery of the Notes and specifying the Scheduled Final Payment Date, the Aggregate Outstanding Amount and the Note Interest Rate of the Notes to be authenticated and delivered; and (B) the Co-Issuer's certification that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

DCLIB1 83398.12

(b) (i) either (A) a certificate of the Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies at the time having jurisdiction in the premises, together with an Opinion of Counsel satisfactory in form and substance to the Trustee, to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes, or (B) an Opinion of Counsel of the Issuer satisfactory in form and substance to the Trustee, to the effect that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Notes except as may have been given for the purposes of the foregoing; *provided, however, that* the opinions of Cadwalader, Wickersham & Taft LLP and Maples and Calder, substantially in the forms of <u>Exhibits C</u> hereto, respectively, shall satisfy clause (B); and

(ii) either (A) a certificate of the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies at the time having jurisdiction in the premises, together with an Opinion of Counsel satisfactory in form and substance to the Trustee, to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes, or (B) an Opinion of Counsel of the Co-Issuer satisfactory in form and substance to the Trustee, to the effect that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Notes except as may have been given for the purposes of the foregoing; *provided, however, that* the opinions of Cadwalader, Wickersham & Taft LLP and Maples and Calder, substantially in the forms of <u>Exhibits C</u>, respectively, shall satisfy clause (B);

(c) an opinion of Cadwalader, Wickersham & Taft LLP, United States special counsel to the Co-Issuers, satisfactory in form and substance to the Issuer, dated the Closing Date, substantially in the form of <u>Exhibit C</u> hereto;

(d) an opinion of Maples and Calder, Cayman Islands counsel to the Issuer, satisfactory in form and substance to the Issuer, dated the Closing Date, substantially in the form of <u>Exhibit D</u> hereto;

(e) an Officer's Certificate of the Issuer stating that (to the best of the knowledge and belief of the Issuer) no Default has occurred under this Indenture and that the issuance of the Notes will not result in a breach of any of the terms, conditions or provisions of, or constitute a Default under the Issuer Charter, any indenture or other agreement or instrument to which the Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or by which it may be bound or to which it may be subject; and that all conditions precedent provided in this Indenture relating to the execution, authentication and delivery of the Notes, have been complied with;

(f) an Officer's Certificate of the Co-Issuer stating that (to the best of the knowledge and belief of the Co-Issuer) no Default has occurred under this Indenture and that the issuance of the Notes will not result in a breach of any of the

-35-

terms, conditions or provisions of, or constitute a Default under, the Certificate of Formation or Limited Liability Company Agreement of the Co-Issuer, any indenture or other agreement or instrument to which the Co-Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Co-Issuer is a party or by which it may be bound or to which it may be subject; and that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes applied for have been complied with;

(g) an executed copy of the Administration Agreement;

(h) an executed copy of each Transaction Document; and

(i) such other documents as the Trustee may reasonably require.

Section 3.2    Security for Notes.  Notes may be executed by the Co-Issuers and delivered to the Trustee for authentication, and thereupon the same shall be authenticated and delivered to the Issuer by the Trustee upon Issuer Order and upon delivery by the Issuer to the Trustee, and receipt by the Trustee, of the following:

(a) Grant.  Fully executed copies of this Indenture, and copies of each other instrument or document, fully executed (as applicable), necessary to consummate and perfect the Grant set forth in the Granting Clauses of this Indenture.

(b) Certificate of the Issuer.  The delivery to the Trustee of a certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, with respect to the assets pledged to the Trustee for inclusion in the Collateral on the Closing Date and immediately prior to the delivery thereof on the Closing Date:

(i)    the Issuer is the owner of such asset free and clear of any liens, claims or encumbrances of any nature whatsoever except for those which are being released on the Closing Date and except for those Granted pursuant to this Indenture and encumbrances arising from due bills, if any, with respect to interest, or a portion thereof, accrued on such asset prior to the Closing Date and owed by the Issuer to the seller of such asset;

(ii)    the Issuer has acquired its ownership in such asset in good faith without notice of any adverse claim (as such term is defined in UCC Section 8-102(a)(1)), except as set forth in clause (i) above;

(iii)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such asset (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(iv)    the Issuer has full right to Grant a security interest in and assign and pledge all of its right, title and interest in such asset to the Trustee and has taken all actions, if any required of it (including under Section 3.3) for perfection of that interest); and

(v)    upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral (assuming that any Clearing Corporation, Securities Intermediary or other entity not within the control of the Issuer involved in the Grant of Collateral takes the actions required of it (including under <u>Section 3.3</u>) for perfection of that interest).

In addition, on and as of the Closing Date, the Issuer hereby represents and warrants as set forth above in <u>clauses (i)</u> through <u>(v)</u>.

(c) <u>Rating Letters</u>.  The receipt of a letter by the Trustee signed by each Rating Agency assigning the ratings at least as high as those designated in the Series Indenture.

(d) <u>Accounts</u>.    Evidence of the establishment of the Accounts specified in the Series Indenture.

(e) <u>Financing Statement</u>.    The delivery by the Issuer of a UCC financing statement describing the Collateral and naming itself as debtor and the Trustee as secured party on behalf of itself, the Noteholders, and the Credit Swap Counterparty, to be filed by or on behalf of the Issuer with the Records of Deeds of the District of Columbia within ten (10) Business Days of the Closing Date.

Section 3.3    <u>Investment at Direction of the Credit Swap Counterparty; Custodianship of Permitted Short-Term Investments</u>.

(a) The Custodian shall be appointed to act as a securities intermediary with respect to the Accounts.  The Custodian, and any successor Custodian, shall satisfy the criteria set forth in <u>Section 9.4</u>.

(b) The Trustee shall in accordance with the instructions given to the Trustee by the Credit Swap Counterparty cause amounts on deposit in the Accounts to be invested in Permitted Short-Term Investments.  Each time that the Trustee shall cause the acquisition of any Permitted Short-Term Investment, the Trustee shall cause the transfer of such Permitted Short-Term Investment to the Custodian in the manner described in paragraph (c) hereof to be held in the Accounts for the benefit of the Trustee in accordance with the terms of this Indenture.  Notwithstanding the foregoing, the Trustee may cause any Permitted Short-Term Investment to be transferred to the Custodian for the benefit of the Trustee or to the Trustee by such other method for which an Opinion of Counsel specifies will result in a valid, perfected, first-priority security interest in favor of the Trustee in each Permitted Short-Term Investment.  The security interest of the Trustee in the funds or other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, be released.    The security interest of the Trustee shall nevertheless come into existence and continue in the Permitted Short-Term Investment so acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Permitted Short-Term Investment.  The Issuer shall also take any and all

-37-

other actions necessary to create in favor of the Trustee a valid, perfected, first-priority security interest in each Permitted Short-Term Investment Granted to the Trustee under laws and regulations (including <u>Articles 8</u> and 9 of the UCC) in effect from time to time.

(c) In the case of any Permitted Short-Term Investment to be transferred to the Custodian for the benefit of the Trustee, Permitted Short-Term Investment shall be delivered as follows:

(i)    in the case of a Certificated Security, by (A) delivering such Certificated Security to the Custodian in the State of New York indorsed to the Custodian or in blank by an effective Indorsement, or registered in the name of the Custodian, (B) causing the Custodian to maintain continuous possession of such Certificated Security in the State of New York, and (C) causing the Custodian to credit such asset to the applicable Account; and

(ii)    in the case of an Instrument, by (A) delivering such Instrument to the Custodian in the State of New York indorsed to the Custodian or indorsed in blank, by an effective Indorsement, (B) causing the Custodian to maintain continuous possession of such Instrument in the State of New York, (C) causing the Custodian to authenticate a record in which it acknowledges that it is holding such Instrument for the benefit of the Trustee, and (D) causing the Custodian to credit such asset to the applicable Account; and

(iii)    in the case of an Uncertificated Security, by (A) causing the Custodian to become the registered owner of such Uncertificated Security, (B) causing such registration to remain effective and (C) causing the Custodian to credit such asset to the applicable Account; and

(iv)    in the case of any Security Entitlement, by (A) causing the Custodian to become the Entitlement Holder of such Security Entitlement and (B) causing the Custodian to credit such Security Entitlement to the applicable Account.

(d) In addition to those steps specified in paragraph (c) above, the Issuer shall, following consultation with qualified counsel, take all steps necessary or advisable under the laws of the Cayman Islands to protect the security interest of the Trustee such as causing the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's registered office in the Cayman Islands.

Section 3.4    <u>Additional Notes – General Provisions</u>.  Additional Notes of any Class which are issued after the Closing Date pursuant to Section 4 of the Series Indenture may be executed by the Co-Issuers and delivered to the Trustee for authentication and thereupon authenticated and delivered by the Trustee upon Issuer Request, upon compliance with Section 3.2 and upon receipt by the Trustee of the following:

(a) (i)    an Officer's Certificate of the Issuer (A) evidencing the authorization by Board Resolution of the execution, authentication and delivery of the additional Notes specifying the Scheduled Final Payment Date, the principal amount and Note Interest Rate of each such Note to be authenticated and

delivered; and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the date of issuance and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon; and

(ii)    an Officer's Certificate of the Co-Issuer (A) evidencing the authorization by Board Resolution of the execution, authentication and delivery of the additional Notes and specifying the Scheduled Final Payment Date, the principal amount and Note Interest Rate of each such Note to be authenticated and delivered; and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the date of issuance and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b)  either

(i)    an Officer's Certificate of the Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel that the Trustee is entitled to rely thereon and that no other authorization, approval or consent of any governmental body is required for the valid issuance of the additional Notes, or (B) an Opinion of Counsel of the Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of such additional Notes except as may have been given for the purposes of the foregoing; *provided*, that opinions of Cadwalader, Wickersham & Taft LLP and Maples and Calder in respect of such matters, which opinions are substantially in the form of Exhibits C and D hereto, respectively, shall satisfy this clause (i)(B); and

(ii)    either (A) an Officer's Certificate of the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel that the Trustee is entitled to rely thereon and that no other authorization, approval or consent of any governmental body is required for the valid issuance of the additional Notes which are the same Class as the Notes, or (B) an Opinion of Counsel of the Co-Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of the additional Notes which are the same Class as the Notes except as may have been given for the purposes of the foregoing; *provided*, that an opinion of Cadwalader, Wickersham & Taft LLP substantially in the form of Exhibit L hereto in respect of such matters shall satisfy this clause (ii)(B);

(c)  an Officer's Certificate stating that no Default has occurred under this Indenture, that the issuance of the additional Notes will not result in a breach of any of the terms, conditions or provisions of, or constitute a Default under, the Issuer Charter, any indenture or other agreement or instrument to which the Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or

by which it may be bound or to which it may be subject; and that all conditions precedent provided in this Indenture, the Issuer Charter relating to the authentication and delivery of the Notes applied for have been complied with;

(d) an Officer's Certificate stating that no Default has occurred under this Indenture and that the issuance of the additional Notes will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the Certificate of Formation or Limited Liability Company Agreement of the Co-Issuer, any indenture or other agreement or instrument to which the Co-Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Co-Issuer is a party or by which it may be bound or to which it may be subject; and that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes applied for have been complied with; and

(e) receipt of Rating Agency Confirmation with respect to the ratings of the previously issued Notes of the relevant Class and receipt by the Trustee of letters signed by the Rating Agencies confirming that the new Notes of such Class have been assigned the same ratings as the previously issued Notes.

## ARTICLE IV

## SATISFACTION AND DISCHARGE

Section 4.1   Satisfaction and Discharge of Indenture.  This Indenture shall be discharged and shall cease to be of further effect with respect to the Collateral securing the Notes (except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon as provided herein (including, without limitation, as provided in the Priority of Payments and Article XIII), (iv) the rights, indemnities and immunities of the Trustee hereunder, (v) the rights of Noteholders as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them, and (vi) the agreement by the Trustee pursuant to Section 6.14), and the Trustee, on written demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(a) either:

(i)   all Notes theretofore authenticated and delivered (other than (A) Notes which have been mutilated, defaced, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.4 and (B) Notes for whose payment money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.5) have been delivered to the Trustee for cancellation; or

(ii)   all Notes not theretofore delivered to the Trustee for cancellation have become due and payable.

(b) the Co-Issuers have paid or caused to be paid all other sums payable by the Co-Issuers hereunder and payable by the Issuer under the Transaction Documents and the Administration Agreement; and

(c) the Co-Issuers have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent relating to the satisfaction and discharge of this Indenture have been complied with; *provided, however, that* in the case of clause (a)(ii) above, the Issuer has delivered to the Trustee an Opinion of Counsel of Independent U.S. tax counsel to the effect that the Holders of the Notes would recognize no income gain or loss for U.S. federal income tax purposes as a result of such deposit.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee and, if applicable, the Noteholders, as the case may be, under Sections 2.4, 2.5, 2.6, 4.2, 5.4, 5.8, 5.16, 6.1, 6.3, 6.4, 6.6, 6.7, 7.1, 7.2, 7.4 and 7.5, and Article XI and Article XII shall survive.

Section 4.2    Application of Trust Money.    All Monies deposited with the Trustee pursuant to Section 4.1 shall be held in trust and applied by it in accordance with the provisions of the Notes and this Indenture, including, without limitation, the Priority of Payments, for the payment of principal and interest either directly or through any Paying Agent, as the Trustee may determine, and of other sums due and payable hereunder for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required herein or required by law.

Section 4.3    Repayment of Monies Held by Paying Agent.    In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all Monies then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.5 and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such Monies.

## ARTICLE V

## REMEDIES

Section 5.1    Events of Default.    "Events of Default", wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a) either of the Co-Issuers fails to perform or observe any of its other obligations under the Notes or any Transaction Document which failure materially and adversely affects the rights of Holders of the Notes, and such failure continues unremedied for a period of thirty (30) days (or such longer period as the

-41-

Trustee may permit at the direction of the Controlling Class) following the delivery by the Trustee of written notice thereof to the Co-Issuers;

(b) the Trustee does not have a valid and enforceable security interest with respect to more than 5% of the Collateral and such failure if capable of remedy continues unremedied for a period of 30 days following the delivery by the Trustee of written notice thereof to the Co-Issuers;

(c) either (i) the entry of a decree or order by a court having competent jurisdiction adjudging either of the Co-Issuers as bankrupt or insolvent or granting an order for relief or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of, (ii) either of the Co-Issuers under the Bankruptcy Code, the bankruptcy or insolvency laws of the Cayman Islands or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its property, or ordering the winding up or liquidation of its affairs; or an involuntary case or proceeding shall be commenced against either of the Co-Issuers seeking any of the foregoing and such case or proceeding shall continue in effect for a period of 60 consecutive days; or (iii) the institution by either of the Co-Issuers of proceedings to be adjudicated as bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against, or the filing by it of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code, the bankruptcy or insolvency laws of the Cayman Islands or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due;

(d) it is or will become unlawful for either of the Co-Issuers to comply with its obligations in respect of the Notes or any Transaction Document;

(e) either of the Co-Issuers or the Collateral is required to register as an "investment company" under the United States Investment Company Act of 1940, as amended;

(f) an event of default occurs and is continuing under the Credit Swap or an Early Termination Date is designated under the Credit Swap;

(g) the occurrence of an Additional Event of Default.

Section 5.2    Acceleration of Maturity; Recission and Annulment.

(a) If an Event of Default described in Section 5(a) hereto occurs and is continuing, the Trustee (at the direction of the Controlling Class) may declare the principal of and accrued and unpaid interest on all the Notes to be immediately due and payable by written notice ("Enforcement Notice") to the Co-Issuers with a copy to the holders of the Notes and each Rating Agency. If an

Event of Default described in clause <u>Section 5(b)</u>, <u>Section 5(c)</u>, <u>Section 5(d)</u>, <u>Section 5(e)</u>, <u>Section 5(f)</u> or <u>Section 5(g)</u> hereto occurs, such an acceleration shall occur automatically and without any action by the holders of the Notes (and an Enforcement Notice will be deemed delivered to the Co-Issuers).

If the Notes are accelerated, the Aggregate Outstanding Amount of the Notes and all accrued and unpaid interest thereon shall be payable on the Early Termination Date from Collections, if and to the extent funds are available for such purpose in accordance with <u>Section 5</u> of the Series Indenture.

(b) At any time after such a declaration of acceleration of maturity has been made by the Trustee (at the direction of the Controlling Class) or the Controlling Class and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this <u>Article V</u>, the Controlling Class by written notice to the Issuer, the Trustee, the Holders of Notes and each Rating Agency, may rescind and annul such declaration and its consequences if:

(i)    the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay in accordance with the applicable Priority of Payments, and shall pay:

(A) all overdue installments of interest and principal of the Notes (other than amounts payable solely as a result of an acceleration of the Notes) and any interest thereon; and

(B) to the extent that payment of such interest is lawful, interest on Defaulted Interest at the Note Interest Rates; and

(ii)    the Trustee has determined that all Events of Default, other than the non-payment of the interest on or principal of Notes that have become due solely by such acceleration, have been cured and the Controlling Class by written notice to the Trustee have agreed with such determination (which agreement shall not be unreasonably withheld) or waived such Events of Default as provided in <u>Section 5.14</u> hereto.

(c)    No such rescission shall affect any subsequent Default or impair any right consequent thereon.

Section 5.3    Collection of Indebtedness and Suits for Enforcement by Trustee.

(a) The Co-Issuers covenant that if a Default shall occur in respect of the payment of any interest on or principal of any Note, the Co-Issuers shall, upon demand of the Trustee, or any affected Noteholder, pay to the Trustee, for the benefit of the Holder of such Note, the whole amount then due and payable on such Note for principal and interest, with interest upon the overdue principal of the Notes and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest on the Notes at the Note Interest Rate and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and such Noteholder and their respective agents and counsel.

(b) If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, the Trustee (at the direction of the Holders of at least a Majority of the Notes), in its own name and as Trustee of an express trust, shall institute a Proceeding for the collection of the sums so due and unpaid, and shall prosecute such Proceeding to judgment or final decree and shall enforce the same against the Co-Issuers and collect the Monies adjudged or decreed to be payable in the manner provided by law out of the Collateral.

(c) If an Event of Default occurs and is continuing, the Trustee may, in its discretion, and upon written direction of the Holders of at least a Majority of the Notes shall, proceed to protect and enforce its rights and the rights of the Noteholders by such appropriate Proceedings as the Trustee shall deem most effectual (if no direction by the Holders of at least a Majority of the Notes is received by the Trustee) or as the Trustee may be directed by the Holders of at least a Majority of the Notes to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

(d) In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property, or in case of any other comparable Proceedings relative to the Issuer or the Co-Issuer, or the creditors or property of the Issuer or the Co-Issuer, the Trustee, regardless of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

DCLIB1 83398.12

(i)     to file and prove a claim or claims for the whole amount of principal, interest owing and unpaid in respect of the Notes and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee) and of each of the Noteholders allowed in any Proceedings relative to the Issuer or the Co-Issuer or to the creditors or property of the Issuer or the Co-Issuer;

(ii)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Notes, upon the direction of such Holders, in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or Person performing similar functions in comparable Proceedings; and

(iii)     to collect and receive any Monies or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Noteholders and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Noteholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Noteholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of negligence or bad faith.

(e) Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting any Notes or the rights of any Holder of Notes or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

(f) All rights of action and of asserting claims under this Indenture, or under the Notes, may be enforced by the Trustee without the possession of any Notes or the production thereof in any trial or other Proceedings relative thereto, and any action or other Proceedings instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the reasonable expenses, disbursements and compensation of the Trustee, each predecessor trustee and their respective agents and attorneys and counsel, shall be for the ratable benefit of the Holders of the Notes payable to such Holders in accordance with the Priority of Payments.

(g) The Trustee shall promptly notify the Noteholders of either of the following as to which it has actual knowledge:  (i) the commencement of any proceeding by or against the Issuer commenced under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law (an "Insolvency

Proceeding") and (ii) the making of any claim in connection with any Insolvency Proceeding seeking the avoidance as a preferential transfer (a "Preference Claim") of any payment of principal of, or interest on, the Notes.

Section 5.4    Remedies.

(a) If an Event of Default shall have occurred and be continuing, and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may (after notice to the Noteholders, and shall, upon direction by the Controlling Class), to the extent permitted by applicable law, exercise (or refrain from exercising, at the direction of the Controlling Class) one or more of the following rights, privileges and remedies:

(i)    institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral Monies adjudged due;

(ii)    sell all or a portion of the Collateral or rights of interest therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.15;

(iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Trustee and the Holders of such Notes hereunder; and

(v)    exercise any other rights and remedies that may be available at law or in equity.

(b) If an Event of Default as set forth in Section 5(a) hereto shall have occurred and be continuing the Trustee may, and at the direction of a Majority of the Notes shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to such Event of Default, and enforce any equitable decree or order arising from such Proceeding.

(c) Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, any Holder of Notes may bid for and purchase the Collateral or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability.

Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, the receipt of the Trustee, or of the Authorized Officer making a sale under judicial proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for

-46-

its or their purchase money, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of judicial proceedings, shall bind the Co-Issuers, the Trustee, and the Noteholders, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d) Notwithstanding any other provision of this Indenture, the Trustee, in its own capacity, and each Noteholder, may not, prior to the date which is one year and one day (or, if longer, the then applicable preference period as provided for in the Bankruptcy Code) after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under federal or state bankruptcy or similar laws. Nothing in this Section 5.4 hereto shall preclude, or be deemed to stop, the Trustee or any Noteholder, (i) from taking any action in (A) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Trustee or such Noteholder, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

Section 5.5    [Reserved.]

Section 5.6    Trustee May Enforce Claims Without Possession of Notes.  All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the reasonable expenses and disbursements of the Trustee, each predecessor trustee and their respective agents and attorneys in counsel, shall be applied as set forth in Section 5.7.

Section 5.7    Application of Money Collected.  The application of any money collected by the Trustee with respect to the Notes pursuant to this Article V and any money that may then be held or thereafter received by the Trustee with respect to the Notes hereunder, at the date or dates fixed by the Trustee, shall be applied subject to, and in accordance with, Section 5 of the Series Indenture.

Section 5.8    Limitation on Suits.  No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

-47-

(a) such Holder has previously given written notice to the Trustee of a continuing Event of Default;

(b) except as otherwise provided in <u>Section 5.9</u>, the Holders of at least 25% of the then Aggregate Outstanding Amount of the Notes shall have made a written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(c) such Holder or Holders have offered to the Trustee indemnity reasonably satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request;

(d) the Trustee for 30 or more days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(e) no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Holders of at least 25% of the Aggregate Outstanding Amount of the Notes;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders of Notes of or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes, subject to and in accordance with <u>Section 5</u> of the Series Indenture.

In the event the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Notes, each representing less than a Majority of the Notes, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

Section 5.9    <u>Unconditional Rights of Noteholders to Receive Principal and Interest</u>.  Notwithstanding any other provision in this Indenture, but subject to <u>Section 4(h)</u> of the Series Indenture, the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Note as such principal and interest becomes due and payable, in accordance with <u>Section 5</u> of the Series Indenture and, subject to the provisions of <u>Section 5.8</u> hereto, to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

Section 5.10    <u>Restoration of Rights and Remedies</u>.    If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Noteholder, then and in every such case the Co-Issuers, the Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.11    <u>Rights and Remedies Cumulative</u>.    No right or remedy herein conferred upon or reserved to the Trustee or to the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise.    The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.12    <u>Delay or Omission Not Waiver</u>.    No delay or omission of the Trustee or of any Noteholder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.    Every right and remedy given by this <u>Article V</u> or by law to the Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Noteholders, as the case may be.

Section 5.13    <u>Control by the Noteholders</u>.    The Controlling Class shall have the right to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee or exercising any trust, right, remedy or power conferred on the Trustee; *provided, that*:

(a)    such direction shall not be in conflict with any rule of law or with this Indenture;

(b)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction;

(c)    the Trustee shall have been provided with indemnity satisfactory to it (and the Trustee need not take any action that it determines might involve it in liability unless it has received such indemnity against such liability); and

(d)    any direction to the Trustee to undertake a Sale of the Collateral shall be in accordance with <u>Section 5.4</u> hereto.

Section 5.14    <u>Waiver of Past Defaults</u>.    Prior to the time a judgment or decree for payment of the money due has been obtained by the Trustee, as provided in this <u>Article V</u>, the Holders of at least a Majority of the Notes may on behalf of the Holders of all Notes, with prior notice to each Rating Agency, waive any past Default and its consequences, except a Default:

-49-

(a) in respect of a covenant or provision hereof that under Section 8.2 hereto cannot be modified or amended without the consent of the Holders of the Outstanding Notes affected; or

(b) constituting an Event of Default as specified in Section 5.1(b), Section 5.1(c), Section 5.1(d), Section 5.1(e), Section 5.1(f) or Section 5.1(g) hereto.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture and the Co-Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Section 5.15   Undertaking for Costs.   All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.15 shall not apply to any suit instituted by the Trustee, to any suit instituted by any Noteholder, or group of Noteholders, holding in the aggregate more than 25% in Aggregate Outstanding Amount of the Notes, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note on or after the legal final maturity of the Notes.

Section 5.16   Waiver of Stay or Extension Laws.   The Co-Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted including, but not limited to, filing a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code, now or at any time hereafter in force, which may affect the covenants, the performance of or any remedies under this Indenture; and the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.17    <u>Sale of Collateral</u>.

(a) The power to effect any sale (a "<u>Sale</u>") of any portion of the Collateral pursuant to <u>Section 5.4</u> of the Series Indenture shall not be exhausted by any one or more Sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired until the entire Collateral shall have been sold or all amounts secured by the Collateral shall have been paid. The Trustee may, upon notice to the Noteholders (for so long as any Notes are Outstanding), and shall, upon direction of the Holders of at least a Majority of the Notes from time to time, postpone any Sale by public announcement made at the time and place of such Sale. The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale; *provided, that* the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof.

(b) The Bank, in its individual capacity, or any Noteholder may bid for and acquire any portion of the Collateral in connection with a public Sale thereof. The Bank may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c) If any portion of the Collateral consists of securities or debt obligations issued without registration under the Securities Act ("<u>Unregistered Securities</u>"), the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the consent of the Holders of at least a Majority of the Notes seek a no-action position from the Securities and Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities.

(d) The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Collateral in connection with a sale thereof, and to take all action necessary to effect such sale. No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any Monies.

Section 5.18    <u>Action on the Notes</u>. The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer or the Co-Issuer.

Section 5.19    <u>Senior Lien</u>.  The Trustee shall have a lien ranking senior to that of the Noteholders and any Secured Party, upon all property and funds held or collected as part of the Collateral to secure payment of amounts incurred by the Trustee in conjunction with the enforcement of the rights of Noteholders in the manner set forth in <u>Section 5.4</u> of the Series Indenture; *provided*, *that* the Trustee shall not institute any proceeding for enforcement of such lien unless the Credit Swap Counterparty and the Holders of 100% of the Outstanding Notes consent to such action by the Trustee.

## ARTICLE VI

## THE TRUSTEE

Section 6.1    <u>Certain Duties and Responsibilities</u>.

(a) Except during the continuance of an Event of Default:

(i)    the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, orders or opinions furnished to the Trustee and conforming to the requirements of this Indenture; *provided, that* in the case of any such certificates, orders or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform to the requirements of this Indenture and shall promptly notify the party delivering the same if such certificate, order or opinion does not conform. If a corrected form shall not have been delivered to the Trustee within fifteen (15) days after such notice from the Trustee, the Trustee shall so notify the Noteholders.

(b) In case an Event of Default known by a Trust Officer of the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from the Controlling Class (or such other percentage as may be required by the terms hereof) in Aggregate Outstanding Amount of the Notes, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c) No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this subsection (c) shall not be construed to limit the effect of subsection (a) of this <u>Section 6.1</u>;

DCLIB1 83398.12

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer in accordance with this Indenture, the Controlling Class (or such other percentage as may be required by the terms hereof) of the Notes relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it; and

(v)     the Trustee shall not be liable to the Noteholders for any action taken or omitted by it at the direction of each or both of the Co-Issuers, and/or a specified percentage of the Holders of Notes under circumstances in which such direction is required or permitted by the terms of this Indenture.

(d) Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 6.1.

(e) The Trustee shall, upon reasonable (but not less than one (1) Business Day) prior written notice to the Trustee, permit a Holder of a Note, during the Trustee's normal business hours, to examine all non-proprietary, privileged books of account, records, reports and other papers of the Trustee relating to the Notes, to make copies and extracts therefrom (the reasonable out-of-pocket expenses incurred in making any such copies or extracts to be reimbursed to the Trustee by such Holder, as applicable) and to discuss the Trustee's actions, as such actions relate to the Trustee's duties with respect to the Notes, with the Trustee's officers and employees responsible for carrying out the Trustee's duties with respect to the Notes.

Section 6.2    Notice of Default.  Promptly (and in no event later than two (2) Business Days) after the occurrence of any Event of Default known by a Trust Officer of the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall transmit by mail to the Issuer, each Rating Agency, the Credit Swap Counterparty and to all Holders of Notes, as their names and addresses appear on the Note Register, notice of all Events of Default hereunder known to the Trustee in a Notice of Default, unless such Event of Default shall have been cured or waived.

DCLIB1 83398.12

Section 6.3    Certain Rights of Trustee.    Except as otherwise provided in Section 6.1:

(a) the Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b) any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c) whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, conclusively rely upon an Officer's Certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other Persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d) as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel of its choice and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e) the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Trustee reasonable security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper documents, but the Trustee, in its discretion, may and, upon the written direction of the Controlling Class shall make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and, the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers, to examine the books and records relating to the Notes and the Collateral and the premises of the Co-Issuers, personally or by agent or attorney during the Co-Issuers' normal business hours;

*provided, that* the Trustee shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law by any regulatory authority and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g) the Trustee may employ or retain such Counsel, accountants, appraisers or other experts or advisers as it may reasonably require for the purpose of determining and discharging its rights and duties hereunder and shall not be responsible for any misconduct on the part of any of them;

(h) the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably and, after the occurrence and during the continuance of an Event of Default, prudently believes to be authorized or within its rights or powers hereunder;

(i) the rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder; and

(j) the Trustee may request that the Issuer deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

Section 6.4   <u>Not Responsible for Recitals or Issuance of Notes</u>.   The recitals contained herein and in the Notes, other than the Certificate of Authentication thereon, shall be taken as the statements of the Issuer and the Co-Issuer, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), of the Collateral or of the Notes.  The Trustee shall not be accountable for the use or application by the Co-Issuers of the Notes or the proceeds thereof or any money paid to the Co-Issuers pursuant to the provisions hereof.

Section 6.5   <u>May Hold Notes</u>.   The Trustee, any Paying Agent, the Note Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates, with the same rights it would have if it were not Trustee, Paying Agent, Note Registrar or such other agent.

Section 6.6   <u>Money Held in Trust</u>.   Money held by the Trustee hereunder shall be held in trust to the extent required herein.  The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed upon with the Issuer and

except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity.

Section 6.7    Corporate Trustee Required; Eligibility.  There shall at all times be a Trustee hereunder which shall be a corporation, national banking association or trust company organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by federal or state authority, having a Long-Term Rating of at least "Baa1" by Moody's and at least "BBB+" by S&P and having an office within the United States.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.7, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.7, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VI.

Section 6.8    Resignation and Removal; Appointment of Successor.

(a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article VI shall become effective until the acceptance of appointment by the successor Trustee under Section 6.9.

(b) The Trustee may resign at any time by giving written notice thereof to the Co-Issuers, the Noteholders, the Credit Swap Counterparty and each Rating Agency.  Upon receiving such notice of resignation, the Co-Issuers shall promptly, in accordance with Section 6.8(e) below, appoint a successor trustee or trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor trustee or trustees, together with a copy to each Noteholder; *provided, that* at any time when an Event of Default shall have occurred and be continuing, such successor Trustee shall be appointed only upon the written consent of the Controlling Class.  If no successor trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee or any Holder may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c) The Trustee may be removed at any time (including when an Event of Default shall have occurred and be continuing) by Act of the Controlling Class delivered to the Trustee and to the Co-Issuers.

(d) If at any time:

(i)    the Trustee shall cease to be eligible under Section 6.7 and shall fail to resign after written request therefor by the Co-Issuers or by any Holder or

(ii)    the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case (subject to <u>Section 6.8(a)</u>), (A) the Co-Issuers, by Issuer Order, may remove the Trustee, or (B) subject to <u>Section 5.13</u>, any Holder may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e) If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason, the Co-Issuers, by Issuer Order, shall promptly appoint a successor Trustee. If the Co-Issuers shall fail to appoint a successor Trustee within 60 days after such resignation, removal or incapability or the occurrence of such vacancy, a successor Trustee may be appointed by Act of the Controlling Class delivered to the Co-Issuers and the retiring Trustee. The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers. If no successor Trustee shall have been so appointed by the Co-Issuers or such Holders and shall have accepted appointment in the manner hereinafter; *provided, however, that* subject to <u>Section 5.15</u>, any Holder may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f) The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first-class mail, postage prepaid, to each Rating Agency, the Credit Swap Counterparty and the Holders as their names and addresses appear in the Note Register. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office. If the Co-Issuers fail to mail such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

Section 6.9    <u>Acceptance of Appointment by Successor</u>.    Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee an instrument accepting such appointment. Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee, but on request of the Co-Issuers or by Act of the Controlling Class delivered to the retiring Trustee or the successor Trustee, such retiring Trustee shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder. Upon request of any such successor Trustee,

the Co-Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

No successor Trustee shall accept its appointment unless at the time of such acceptance such successor shall (a) satisfy the criteria under Section 6.7 and (b) be qualified and eligible under this Article VI. No appointment of a successor Trustee shall become effective if the Controlling Class objects to such appointment; and no appointment of a successor shall become effective until the date ten days after notice of such appointment has been given to each Noteholder.

Section 6.10    Merger, Conversion, Consolidation or Succession to Business of Trustee. Any entity into which the Trustee may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such entity shall be otherwise qualified and eligible under this Article VI, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.11    Co-Trustees and Separate Trustee. At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee shall have power to appoint one or more Persons to act as co-trustee, jointly with the Trustee, of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to Section 5.4 and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.11. Any such Co-Trustee shall satisfy the criteria applicable to Successor Trustees pursuant to Section 6.7

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee. If the Co-Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have power to make such appointment.

Should any written instrument from the Co-Issuers be required by any co-trustee so appointed for more fully confirming to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers.

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(i)    the Notes shall be authenticated and delivered by, and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other

-58-

personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised and performed solely by, the Trustee;

(ii)    the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly in the case of the appointment of a co-trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by a co-trustee;

(iii)    the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.11, and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Co-Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.11;

(iv)    no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee hereunder;

(v)    the Trustee shall not be liable by reason of any act or omission of a co-trustee; and

(vi)    any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

DCLIB1 83398.12

Section 6.12    <u>Representations and Warranties of the Trustee</u>.    The Trustee represents and warrants that:

(a) the Trustee is a national banking association, with corporate power and authority to execute, deliver and perform its obligations under this Indenture, and is duly eligible and qualified to act as trustee under this Indenture;

(b) this Indenture has been duly authorized, executed and delivered by the Trustee and constitutes the valid and binding obligation of the Trustee, enforceable against it in accordance with its terms except (i) as limited by bankruptcy, fraudulent conveyance, fraudulent transfer, insolvency, reorganization, liquidation, receivership, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general equitable principles, regardless of whether considered in a proceeding in equity or at law, and (ii) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought; and

(c) neither the execution or delivery by the Trustee of this Indenture nor performance by the Trustee of its obligations under this Indenture requires the consent or approval of, the giving of notice to or the registration or filing with, any governmental authority or agency under any existing law of the United States of America governing the banking or trust powers of the Trustee.

Section 6.13    <u>Authenticating Agent</u>.    Upon the request of the Issuer and the Co-Issuer, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with issuances, transfers and exchanges under <u>Sections 2.4</u>, <u>2.5</u>, <u>2.6</u> and <u>8.5</u>, as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by those Sections to authenticate such Notes.  For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this <u>Section 6.13</u> shall be deemed to be the authentication of Notes "by the Trustee."

Any entity into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any entity succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any paper or any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Co-Issuers.  The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers.  Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written

notice of such appointment to the Co-Issuers if the resigning or terminated Authenticating Agent was originally appointed at the request of the Issuer or Co-Issuer.

The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto and the Trustee shall be entitled to be reimbursed for such payments. The provisions of Sections 2.9, 6.4 and 6.5 shall be applicable to any Authenticating Agent.

Section 6.14    Duties and Responsibilities of Trustee Following Payment in Full of the Notes. Following the payment in full of the Notes, the Trustee shall retain the remaining Collateral intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral in accordance with the Priority of Payments and the provisions of this Indenture and in return therefor will continue to have all its rights provided for hereunder until the following occurs: the liquidation of the remaining Collateral and the final distribution of the proceeds of such liquidation in accordance with the Priority of Payments.

Section 6.15    Limitation on Duty of Trustee in Respect of Collateral.

(a) Beyond the exercise of reasonable care in the custody thereof, the Trustee shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Trustee shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Trustee shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Trustee in good faith.

(b) The Trustee shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes negligence, bad faith or willful misconduct on the part of the Trustee, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Issuer to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.

Section 6.16    No Special Damages. Anything in this Indenture to the contrary notwithstanding, in no event shall the Trustee, be liable under or in connection with this

Indenture for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits, whether or not foreseeable, even if the Trustee has been advised of the possibility thereof and regardless of the form of action in which such damages are sought.

Section 6.17    <u>Trustee's Instruction to Account Securities Intermediary</u>.    The Trustee shall instruct the Account Securities Intermediary to transfer funds from the Accounts as required by the terms hereof and to make payments due to the Noteholders hereunder in accordance with the Priority of Payments.

## ARTICLE VII

## COVENANTS

Section 7.1    <u>Payment of Principal and Interest</u>.    The Co-Issuers will duly and punctually pay all principal of and interest on (including Defaulted Interest) the Notes in accordance with the terms of the Notes and this Indenture.  Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Noteholder of principal and/or interest shall be considered as having been paid by the Co-Issuers to such Noteholder for all purposes of this Indenture.

Section 7.2    <u>Compliance with Laws</u>.    The Co-Issuers will comply in all material respects with applicable laws, rules, regulations, writs, judgments, injunctions, decrees, awards and orders with respect to them, their business and their properties.

Section 7.3    <u>Maintenance of Books and Records</u>.    The Co-Issuers shall maintain and implement administrative and operating procedures reasonably necessary in the performance of their obligations hereunder and the Issuer shall keep and maintain at all times, or cause to be kept and maintained at all times in its Cayman Islands office, all documents, books, records, accounts and other information reasonably necessary or advisable for the performance of its obligations hereunder.

Section 7.4    <u>Maintenance of Office or Agency</u>.    The Co-Issuers hereby appoint the Trustee, as the Co-Issuers' agent where notices and demands to or upon the Co-Issuers in respect of the Notes or this Indenture may be served and where such Notes may be surrendered for registration of transfer or exchange.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; *provided, however, that* no Paying Agent shall be appointed in a jurisdiction which subjects payments on the Notes to withholding tax.  The Co-Issuers shall at all times maintain a Note Registrar with respect to the Notes in the Cayman Islands.  The Co-Issuers shall give prompt written notice to the Trustee, each Rating Agency and the Noteholders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

Section 7.5   <u>Money for Note Payments to Be Held in Trust</u>.  All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Interest Collections Payment Account and the Principal Collections Payment Account shall be made on behalf of the Co-Issuers by the Trustee or a Paying Agent with respect to payments on the Notes.

When the Co-Issuers shall have a Paying Agent that is not also the Note Registrar, they shall furnish, or cause the Note Registrar to furnish, no later than the fifth calendar day after each Record Date, a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

On or before the Business Day next preceding each Payment Date, the Co-Issuers shall direct the Trustee to instruct the Account Securities Intermediary to deposit on such Payment Date with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Interest Collections Payment Account), such sum to be held in trust for the benefit of the Persons entitled thereto and the Co-Issuers shall promptly notify the Trustee of its action or failure so to act.  Any moneys deposited with a Paying Agent in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Account Securities Intermediary for application in accordance with <u>Article X</u>.

The initial Paying Agent shall be as set forth in <u>Section 7.4</u>.  Any additional or successor Paying Agents shall be appointed by Issuer Order with written notice thereof to the Trustee; *provided, that* so long as the Notes are rated, (i) such Paying Agent must either (A) have a Long-Term Credit Rating of at least "Baa1" by Moody's and "A+" by S&P and Short-Term Credit Rating "P-1" by Moody's and "A-1" by S&P, or (B) agree not to hold any funds pursuant to this Indenture overnight or (ii) Rating Agency Confirmation must be received prior to utilizing a Paying Agent that does not satisfy the requirements of subclause (A) or (B) of clause (i).  The Co-Issuers shall not appoint any Paying Agent (other than an initial Paying Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities.  The Co-Issuers shall cause each Paying Agent other than the initial Paying Agent to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this <u>Section 7.5</u>, that such Paying Agent will:

(A) allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date among such Holders in the proportion specified in the applicable report or statement in accordance herewith, in each case to the extent permitted by applicable law;

(B) hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(C) if such Paying Agent is not the Trustee, immediately resign as a Paying Agent and forthwith pay to the Account Securities Intermediary all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment;

(D) if such Paying Agent is not the Trustee, immediately give the Trustee notice of any Default by the Issuer or the Co-Issuer in the making of any payment required to be made; and

(E) if such Paying Agent is not the Trustee, at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Account Securities Intermediary all sums so held in trust by such Paying Agent.

The Co-Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Account Securities Intermediary all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Account Securities Intermediary upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Account Securities Intermediary, such Paying Agent shall be released from all further liability with respect to such money.

Any money deposited with a Paying Agent that remains unclaimed for twenty Business Days shall be returned to the Account Securities Intermediary with a notice to the Trustee. Except as otherwise required by applicable law, any money deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest on any Note and remaining unclaimed for two years after such principal or interest has become due and payable shall be paid to the Co-Issuers on Issuer Request; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer or the Co-Issuer for payment of such amounts, and all liability of the Trustee or such Paying Agent with respect to such trust money (but only to the extent of the amounts so paid to the Co-Issuers) shall thereupon cease. The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Co-Issuers, any reasonable means of notification of such release of payment, including, but not limited to, mailing notice of such release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in Monies due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

Section 7.6    Existence of Co-Issuers. Each of the Issuer and the Co-Issuer shall take all reasonable steps to maintain its identity as a separate legal entity from that of its shareholder or member, as applicable. Each of the Issuer and the Co-Issuer shall keep its principal place of business and chief executive office at the address specified in Section 12.3. The Issuer and the Co-Issuer shall keep in full force and effect their rights and franchises as a segregated portfolio company with limited liability organized under the laws of the Cayman Islands and a limited liability company in the State of Delaware, respectively, shall comply with

-64-

the provisions of their respective organizational documents, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes and any of the Collateral; *provided, however, that* the Issuer shall be entitled to change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer so long as (a) such change is not disadvantageous in any material respect to the Holders (including by reason of a change in such Holders' tax treatment or the tax treatment of the Issuer), (b) written notice of such change shall have been given by the Co-Issuers to the Trustee, the Holders, the Credit Swap Counterparty and each Rating Agency and (c) on or prior to the 15th Business Day following such notice, the Trustee shall not have received written notice from the Controlling Class objecting to such change.  Without limiting the foregoing, (i) neither the Issuer nor the Co-Issuer shall have any subsidiaries (other than, with respect to the Issuer, the Co-Issuer) and (ii) neither the Issuer nor the Co-Issuer shall have any employees other than their respective directors in their additional capacities as officers of the Issuer and Co-Issuer, respectively.

Section 7.7    <u>Protection of Collateral</u>.

(a) The Issuer shall from time to time, execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to:

(i)    grant more effectively all or any portion of the Collateral;

(ii)    maintain or preserve the lien (and the priority thereof) of this Indenture or to carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture;

(iv)    enforce any of the Permitted Short-Term Investments or other instruments or property included in the Collateral;

(v)    preserve and defend title to the Collateral and the rights therein of the Secured Parties in the Collateral against the claims of all Persons and parties; or

(vi)    (x) pay or cause to be paid any and all taxes levied or assessed upon the Issuer or in respect of all or any part of the Collateral and timely file all tax returns and information statements as required and (y) if required to prevent the withholding or imposition of United States income tax, deliver or cause to be delivered a United States Internal Revenue Service Form W-8BEN or successor applicable form, to each issuer, counterparty or paying agent with respect to (as applicable) an item included in the Collateral at the time such item included in the Collateral is purchased or entered into and thereafter prior to the expiration or obsolescence of such form.

The Issuer hereby irrevocably and by way of security designates the Trustee, its agent and attorney-in-fact to execute any financing statement, continuation statement or other instrument required pursuant to this Section 7.7.

(b) The Trustee shall not (i) remove any portion of the Collateral that consists of Money or is evidenced by an Instrument, certificate or other writing (A) from the jurisdiction in which it was held as set forth in the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1(c), or (B) from the possession of the Person who held it on such date, (ii) cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (A) whose Securities Intermediary's jurisdiction differs from that governing such ownership or pledge was recorded at such date or (B) other than the Person on whose books such ownership or pledge was recorded at such date, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions or (iii) cause or permit (to its knowledge) any change in the notice, delivery and/or registration made pursuant to Section 3.3 with respect to any general intangible or participation, as applicable, unless the Trustee shall have received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(c) The Issuer shall enforce all of its material rights and remedies under the Credit Swaps. The Issuer will not enter into any agreement amending, modifying or terminating such agreement, without (A) ten (10) days prior notice thereof to the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder) and (B) receipt of a Rating Agency Confirmation.

Section 7.8    Issuance of Securities of a Separate Segregated Portfolio.

If at any time (i) the Company creates another segregated portfolio, and (ii)(A) S&P is not specified as a Rating Agency for the relevant transaction, the Issuer agrees that it shall obtain Rating Agency Confirmation from S&P prior to the issuance of such securities and (B) Moody's is not specified as a Rating Agency for the relevant transaction, the Issuer agrees that it shall notify Moody's of the new segregated portfolio.

Section 7.9    Performance of Obligations.

(a) The Co-Issuers shall not take any action, and will use their best efforts not to permit any action to be taken by others, that would release any Person from any of such Person's covenants or obligations under any instrument included in the Collateral.

(b) The Co-Issuers may, with the prior written consent of the Controlling Class (except that no such consent is needed with respect to actions

permitted pursuant to the Administration Agreement in effect at such time), and with notice to each Rating Agency contract with other Persons, including the Administrator for the performance of actions and obligations to be performed by the Co-Issuers hereunder by such Persons and the performance of the actions and other obligations of the nature set forth in the Administration Agreement by the Administrator. Notwithstanding any such arrangement, the Co-Issuers shall remain primarily liable with respect thereto. In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Co-Issuers; and the Issuer will punctually perform, and use its best efforts to cause the Administrator or such other Persons to perform, all of their obligations and agreements contained in the Administration Agreement or such other agreement.

(c) The Co-Issuers agree to comply in all material respects with all requirements applicable to them set forth in any Opinion of Counsel obtained pursuant to any provision of this Indenture including satisfaction of any event identified in any Opinion of Counsel as a prerequisite for the obtaining or maintaining by the Trustee of a valid, first-priority perfected security interest in the Collateral.

Section 7.10    Negative Covenants.

(a) The Issuer will not:

(i)    sell, transfer, assign, participate, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (by security interest, lien (statutory or otherwise), preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise) (or permit such to occur or suffer such to exist), any part of the Collateral, except as expressly permitted by this Indenture;

(ii)    claim any credit on, or make any deduction from, the principal or interest payable in respect of the Notes (other than amounts withheld in accordance with the Code or any other applicable laws) or assert any claim against any present or future Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(iii)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted hereby, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (including, without limitation, any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise (other than the lien of this Indenture)) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the proceeds thereof, or (C) take any action that would permit the lien of this Indenture not to constitute a valid, first-priority perfected security interest in the Collateral;

(iv)    make or incur any capital expenditures, except as reasonably required to perform its functions in accordance with the terms of this Indenture;

(v)    become liable in any way, whether directly or by assignment or as a guarantor or other surety, for the obligations of the lessee under any lease, hire any employees or pay any dividends to its shareholders;

(vi)    enter into any transaction with any Affiliate other than (A) the transactions contemplated by the Administration Agreement, (B) the transactions relating to the offering and sale of the Notes or (C) transactions on terms no less favorable than those obtainable in an arms'-length transaction with a wholly unaffiliated Person;

(vii)    maintain any bank accounts other than the Accounts, and the bank account to be established in the Cayman Islands to hold the Excepted Property;

(viii)    change its name without first delivering to the Trustee notice thereof and an Opinion of Counsel that such name change will not adversely affect the lien or the interest hereunder of the Noteholders;

(ix)    have any subsidiaries other than (x) the Co-Issuer, and (y) any subsidiaries necessitated by a change of jurisdiction pursuant to Section 7.6;

(x)    dissolve or liquidate in whole or in part, except as permitted hereunder;

(xi)    (A) incur, assume or guarantee or become directly or indirectly liable with respect to any indebtedness or any contingent obligations (including swap agreements, cap agreements, reimbursement obligations, repurchase obligations or the like), other than pursuant to the Notes, this Indenture, the Transaction Documents and the other agreements and transactions expressly contemplated hereby, or (B) issue any additional securities;

(xii)    the Issuer will not solicit, advertise or publish the Issuer's ability to enter into credit derivatives;

(xiii)    the Issuer will not register as or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as a bank, insurance company or finance company;

(xiv)    the Issuer will not be treated as a bank, insurance company or finance company for purposes of (i) any tax, securities law or other filing or submission made to any governmental authority, (ii) any application made to a rating agency or (iii) qualification for any exemption from tax, securities law or any other legal requirements; and

(xv)    the Issuer will not hold itself out to the public as a bank, insurance company or finance company.

(b)  The Co-Issuer will not:

(i)  claim any credit on, or make any deduction from, the principal or interest payable in respect of the Notes (other than amounts withheld in accordance with the Code or any other applicable laws) or assert any claim against any present or future Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(ii)  (A) incur, assume or guarantee or become directly or indirectly liable with respect to any indebtedness or any contingent obligations (including swap agreements, cap agreements, reimbursement obligations, repurchase obligations or the like), other than pursuant to the Notes, this Indenture, the Transaction Documents and the other agreements and transactions expressly contemplated hereby, or (B) issue any additional securities;

(iii)  (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted hereby, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (including, without limitation, any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise (other than the lien of this Indenture)) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the proceeds thereof, or (C) take any action that would cause the lien of this Indenture not to constitute a valid, first-priority perfected security interest in the Collateral, except as may be expressly permitted hereby (or in connection with a disposition of Collateral required hereby);

(iv)  make or incur any capital expenditures;

(v)  become liable in any way, whether directly or by assignment or as a guarantor or other surety, for the obligations of the lessee under any lease, hire any employees or pay any dividends to its shareholders;

(vi)  enter into any transaction with any Affiliate;

(vii)  maintain any bank accounts;

(viii)  change its name without first delivering to the Trustee notice thereof and an Opinion of Counsel that such name change will not adversely affect the lien or the interests hereunder of the Noteholders; and

(ix)  have any subsidiaries.

DCLIB1 83398.12

(c) Neither the Issuer nor the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral, or enter into or engage in any business with respect to any part of the Collateral except as expressly permitted or required by this Indenture.

(d) The Issuer will not agree to any amendments, modifications or waivers to or of (i) the Administration Agreement, (ii) any of the Transaction Documents, (iii) the Swap Guarantee, or (iv) enter into any material new agreements or arrangements without Rating Agency Confirmation and will provide notice of all new material agreements or arrangements to the Holders of the Notes and to each Rating Agency in writing (other than as aforesaid).  The foregoing notwithstanding, the Issuer may agree to any amendment, modification, or waiver without the consent of the Controlling Class; *provided, that* (i) the Issuer determines that such amendment, modification or waiver would not, upon or after becoming effective, adversely affect the rights or interests of the Holders of the Notes, (ii) the Issuer gives ten (10) days prior written notice to the Noteholders of such amendment, modification or waiver, (iii) Rating Agency Confirmation is obtained and (iii) the Controlling Class does not provide written notice to the Issuer that, notwithstanding the determination of the Issuer, the Persons provided notice have reasonably determined that such amendment, modification or waiver would, upon or after becoming effective, adversely affect the Noteholders (the failure of the Controlling Class to provide such notice to the Issuer within ten (10) days of receipt of notice of such amendment, modification or waiver from the Issuer being conclusively deemed to constitute hereunder consent to and approval of such amendment, modification or waiver).

Section 7.11   Statement as to Compliance.  On or before five (5) Business Days after each Payment Date or immediately if there has been a Default in the fulfillment of an obligation under this Indenture, the Issuer shall deliver to the Trustee and each Rating Agency an Officer's Certificate stating, as to each signer thereof, that:

-70-

(a) a review of the activities of the Issuer and of the Issuer's performance under this Indenture during the prior calendar year (or from the Closing Date until the Initial Payment Date designated in the Series Indenture, in the case of the first Officer's Certificate) has been made under his supervision; and

(b) to the best of his knowledge, based on such review, the Issuer has fulfilled all of its obligations under this Indenture throughout such year, or, if there has been a Default in the fulfillment of any such obligation, specifying each such Default known to him and the nature and status thereof.

Section 7.12   Co-Issuers May Consolidate, Etc., Only on Certain Terms.

(a) The Issuer shall not consolidate or merge with or into any other Person or convey or transfer all or substantially all of its properties and assets to any Person, unless permitted by Cayman Islands law and unless:

(i)   the Issuer shall be the surviving entity, or the Person (if other than the Issuer) formed by such consolidation or into which the Issuer is merged or to which all or substantially all property and assets of the Issuer are transferred shall be a limited purpose company incorporated and existing under the laws of the Cayman Islands or such other jurisdiction approved by the Controlling Class and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, each Holder of Notes, the due and punctual payment of the principal of and interest on all Notes and the performance of every covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein;

(ii)   each Rating Agency shall have been notified of such consolidation, merger, conveyance or transfer and the Co-Issuers and the Trustee shall have received Rating Agency Confirmation;

(iii)   such consolidation, merger, conveyance or transfer would not adversely affect the tax treatment of the Issuer or a Noteholder to any material extent or otherwise cause any of the statements described in the Offering Memorandum under the heading, "Certain U.S. Federal Income Tax Considerations" to be inaccurate or incorrect to any material extent, or the Noteholders agree by unanimous consent;

(iv)   if the Issuer is not the surviving entity, the Person formed by such consolidation or into which the Issuer is merged or to which all or substantially all property and assets of the Issuer are transferred shall have agreed with the Trustee (A) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Issuer with respect to its Affiliates and (B) not to consolidate or merge with or into any other Person or convey or transfer the Collateral or all or substantially all of its properties and assets to any other Person except in accordance with the provisions of this Section 7.12;

(v)   if the Issuer is not the surviving entity, the Person formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the

property and assets of the Issuer are transferred shall have delivered to the Trustee and each Rating Agency an Officer's Certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and (if applicable) in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in <u>clause (i)</u> above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law); that, immediately following the event which causes such Person to become the successor to the Issuer, (A) such Person has good and marketable title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Collateral securing, in the case of a consolidation or merger of the Issuer, all of the Secured Obligations or, in the case of any conveyance or transfer of the Collateral securing any of the Secured Obligations, such Secured Obligations, (B) the Trustee continues to have a valid perfected security interest in the Collateral securing, in the case of a consolidation or merger of the Issuer, all of the Secured Obligations, or, in the case of any conveyance or transfer of the Collateral securing any of the Secured Obligations, such Secured Obligations, and (C) such other matters as the Trustee or any Noteholder may reasonably require;

(vi)   immediately after giving effect to such transaction, the Issuer delivers to the Trustee an Officer's Certificate stating that no Default or Event of Default shall have occurred and be continuing;

(vii)   the Issuer shall have notified each Rating Agency in writing of such consolidation, merger, conveyance or transfer and shall have delivered to the Trustee, the Credit Swap Counterparty and each Noteholder an Officer's Certificate and an Opinion of Counsel each stating that such consolidation, merger, conveyance or transfer and such supplemental indenture comply with this <u>Article VII</u> and that all conditions precedent in this <u>Article VII</u> provided for relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to any Holder of the Notes or the Credit Swap Counterparty;

(viii)   after giving effect to such transaction, neither the Issuer nor the Co-Issuer will be required to register as an investment company under the Investment Company Act;

(ix)   after giving effect to such transaction, the outstanding shares of stock of the Issuer or the Co-Issuer will not be beneficially owned within the meaning of the Investment Company Act by any U.S. Person or U.S. Residents; and

(x)   the Issuer has received advice from Cadwalader, Wickersham & Taft LLP or an opinion of another nationally recognized U.S. tax counsel experienced in such

matters that the Issuer or the Person referred to in clause (a) will not be treated as engaged in a U.S. trade or business or otherwise subject to U.S. federal income tax on a net income tax basis.

(b) The Co-Issuer shall not consolidate or merge with or into any other Person or convey or transfer all or substantially all of its properties and assets to any Person unless:

(i)    the Co-Issuer shall be the surviving entity, or the Person (if other than the Co-Issuer) formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the properties and assets of the Co-Issuer are transferred shall be a limited purpose limited liability company organized and existing under the laws of the State of Delaware or such other jurisdiction approved by the Controlling Class and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, the due and punctual payment of the principal of and interest on all of the Notes and the performance of every covenant of this Indenture on the part of the Co-Issuer to be performed or observed, all as provided herein;

(ii)    each Rating Agency shall have been notified of such consolidation, merger, conveyance or transfer and the Co-Issuers and the Trustee shall have received a Rating Agency Confirmation;

(iii)    such consolidation, merger, conveyance or transfer would not affect the tax treatment of the Issuer or a Noteholder to any material extent or otherwise cause any of the statements described in the Offering Memorandum under the heading, "Certain U.S. Federal Income Tax Considerations" to be inaccurate or incorrect to any material extent, or the Noteholders agree by unanimous consent;

(iv)    if the Co-Issuer is not the surviving entity, the Person formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the properties and assets of the Co-Issuer are transferred shall have agreed with the Trustee (A) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Co-Issuer with respect to its Affiliates and (B) not to consolidate or merge with or into any other Person or convey or transfer its properties and assets substantially as an entirety to any other Person except in accordance with the provisions of this Section 7.12;

(v)    if the Co-Issuer is not the surviving entity, the Person formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the properties and assets of the Co-Issuer are transferred shall have delivered to the Trustee and each Rating Agency an Officer's Certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and (if applicable) in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in clause (i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance

of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law); that, immediately following the event which causes such Person to become the successor to the Co-Issuer, (A) such Person has good and marketable title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Collateral securing, in the case of a consolidation or merger of the Co-Issuer, all of the Secured Obligations or, in the case of any conveyance or transfer of the Collateral securing any of the Secured Obligations, such Secured Obligations, (B) the Trustee continues to have a valid perfected security interest in the Collateral securing, in the case of a consolidation or merger of the Co-Issuer, all of the Secured Obligations, or, in the case of any conveyance or transfer of the Collateral securing any of the Secured Obligations, such Secured Obligations; and (C) such other matters as the Trustee or any Noteholder may reasonably require;

(vi)     immediately after giving effect to such transaction, the Issuer delivers to the Trustee an Officer's Certificate stating that no Default or Event of Default shall have occurred and be continuing;

(vii)     the Co-Issuer shall have notified each Rating Agency in writing of such consolidation, merger, conveyance or transfer and shall have delivered to the Trustee, the Credit Swap Counterparty and each Noteholder an Officer's Certificate and an Opinion of Counsel each stating that such consolidation, merger, conveyance or transfer and such supplemental indenture comply with this Article VII and that all conditions precedent in this Article VII provided for relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to any Holder of the Notes or the Credit Swap Counterparty;

(viii)     after giving effect to such transaction, neither the Issuer nor the Co-Issuer will be required to register as an investment company under the Investment Company Act; and

(ix)     after giving effect to such transaction, the outstanding shares of common stock of the Issuer and the Co-Issuer will not be beneficially owned within the meaning of the Investment Company Act by any U.S. Person or U.S. Resident.

Section 7.13   Successor Substituted.   Upon any consolidation or merger, or conveyance or transfer of all or substantially all the properties and assets of the Issuer or the Co-Issuer, in accordance with Section 7.12, the Person formed by or surviving such consolidation or merger (if other than the Issuer or the Co-Issuer), or, the Person to which such consolidation, merger, conveyance or transfer is made, shall succeed to, and be substituted for, and may exercise every right and power of, and shall be bound by each such obligation and covenant of, the Issuer or the Co-Issuer, as the case may be, under this Indenture with the same effect as if such Person had been named as the Issuer or the Co-Issuer, as the case may be,

-74-

herein. In the event of any such consolidation, merger, conveyance or transfer, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this <u>Article VII</u> may be dissolved, wound-up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

Section 7.14    <u>No Other Business</u>. The Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture, entering into the Credit Swaps and acquiring, owning, disposing, holding and pledging and otherwise dealing with the Reference Portfolio and the Collateral in connection therewith, and the Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes, pursuant to this Indenture and, with respect to the Issuer and the Co-Issuer, such other activities which are necessary, including, without limitation, entering into the agreements contemplated hereby, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith. The Issuer and the Co-Issuer shall not amend their Memorandum of Association or Articles of Association and Certificate of Formation or Limited Liability Company Agreement, respectively, unless prior to making such amendment the Issuer or the Co-Issuer, as the case may be, receives Rating Agency Confirmation.

Section 7.15    <u>Reporting</u>. At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder of a Certificated Note or the Beneficial Owner of a Regulation S Global Note, the Co-Issuers, as appropriate, shall promptly furnish or cause to be furnished "Rule 144A Information" (as defined below) to such Holder or Beneficial Owner, to a prospective purchaser of such Note designated by such Holder or Beneficial Owner or to the Trustee for delivery to such Holder or Beneficial Owner or a prospective purchaser designated by such Holder or Beneficial Owner, as the case may be, in order to permit compliance by such Holder or Beneficial Owner with Rule 144A under the Securities Act in connection with the resale of such Note by such Holder or Beneficial Owner. "<u>Rule 144A Information</u>" shall be such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

# ARTICLE VIII

## SUPPLEMENTAL INDENTURES

Section 8.1    <u>Supplemental Indentures without Consent of Noteholders</u>. Without the consent of the Holders of any Notes, the Co-Issuers, when authorized by Board Resolutions, and the Trustee, at any time and from time to time subject to the requirement provided below in this <u>Section 8.1</u> with respect to the ratings of the Notes may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(a)  to evidence the succession of another Person to the Issuer or the Co-Issuer pursuant to Section 7.12 hereof, and the assumption by any such successor Person of the covenants of the Issuer or the Co-Issuer contained herein and in the Notes;

(b)  to add to the covenants of the Issuer, the Co-Issuer or the Trustee, for the benefit of the Holders of all of the Notes, or to surrender any right or power herein conferred upon the Issuer or the Co-Issuer;

(c)  to convey, transfer, assign, mortgage or pledge any property to or with the Trustee for the benefit of the Secured Parties, or add to the conditions, limitations or restrictions on the authorized amount, terms and purposes of the issue, authentication and delivery of the Notes;

(d)  to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Section 6.8, 6.09 or 6.11;

(e)  to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject to or required to be subject to the lien of this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations), or to cause any additional property to be subject to the lien of this Indenture;

(f)  to modify the restrictions on and procedures for resale and other transfer of the Notes in accordance with any change in any applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(g)  to correct any inconsistency, cure any defect or ambiguity or add any provision to this Indenture not inconsistent with the existing provisions hereof;

(h)  to accommodate the settlement of Notes in book-entry form through the facilities of DTC or otherwise;

(i)  to conform this Indenture to the Offering Memorandum in any non-material respect;

(j)  to prevent the Issuer, the holders of Notes or the Trustee from being subject to withholding or other taxes, fees or assessments, to prevent the Issuer from being treated as engaged in a U.S. trade or business or otherwise

subject to U.S. federal, state or local income or franchise tax on a net income tax basis, or

(k) to affect any action specified in Section 4(l) or Section 4(m) of the Series Indenture.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

The Trustee shall provide the Rating Agencies at least ten (10) Business Days prior written notice of any such supplemental indenture, as evidenced by a written acknowledgement in respect thereof. The Co-Issuers and the Trustee shall not enter into any such supplemental indenture unless it shall have received Rating Agency Confirmation with respect to such proposed supplemental indenture.

The Co-Issuers and the Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the interests of any holder of Notes would be materially and adversely affected thereby. Notwithstanding anything herein to the contrary, if the supplemental indenture is executed for the purposes specified in amended pursuant to clause (i) or clause (k) above the interests of any holder of the Notes shall be deemed to not be materially and adversely affected. The Co-Issuers and the Trustee shall not enter into any such supplemental indenture unless the Trustee has received advice from Cadwalader, Wickersham & Taft LLP or an opinion of another nationally recognized U.S. tax counsel experienced in such matters that the proposed supplemental indenture (i) will not cause the Issuer to be treated as being engaged in a U.S. trade or business or otherwise subject the Issuer to U.S. federal, state or local income or franchise tax on a net income tax basis and (ii) will not have a material adverse affect on the tax characterization of the Issuer or any Outstanding Notes. The Co-Issuers and the Trustee shall not enter into any such supplemental indenture without the prior written consent of the Credit Swap Counterparty if such supplemental indenture could reasonably be expected to have an adverse effect on the Credit Swap Counterparty under the Credit Swaps or hereunder. The Co-Issuers and the Trustee shall not enter into any such supplemental indenture without the prior written consent of any Option Counterparty specified in the Series Indenture if such supplemental indenture could reasonably be expected to have an adverse effect on such Option Counterparty under the Option Agreements (if any) specified in the Series Indenture or hereunder. The Trustee may, consistent with the written advice of counsel, determine whether or not any Class of Notes would be materially and adversely affected by any such proposed supplemental indenture; *provided that* such change will be deemed not to adversely affect any Class of Notes upon receipt by the Trustee of an Rating Agency Confirmation with respect to such proposed supplemental indenture. Such determination shall be conclusive and binding on all present and future holders of the Notes.

Section 8.2   <u>Supplemental Indentures with Consent of Noteholders</u>. With the written consent of the Holders of not less than a Majority of each Class of Notes materially and adversely affected thereby (except as set forth in <u>clauses (a)</u> through <u>(i)</u> below), by Act of said

-77-

Holders, delivered to the Co-Issuers and the Trustee and with the prior written consent of (i) the Credit Swap Counterparty (if such indenture supplement could reasonably be expected to have an adverse effect on the Credit Swap Counterparty under the Credit Swaps or hereunder) and (ii) any Option Counterparty specified in the Series Indenture (if such indenture supplement could reasonably be expected to have an adverse effect on such Option Counterparty under the Option Agreement (if any) specified in the Series Indenture or hereunder) the Co-Issuers and the Trustee may enter into one or more indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture *provided, however, that* notwithstanding anything in this Indenture to the contrary, no such supplemental indenture shall, without the consent of the Credit Swap Counterparty, any Option Counterparty specified in the Series Indenture and each Holder of each Outstanding Note materially and adversely affected thereby:

DCLIB1 83398.12

(a) change the Scheduled Final Payment Date or the legal final maturity date of any Note, or the date on which any installment of principal or interest on any Note is payable, reduces the principal amount of any Note or Note Interest Rate thereon or the rate at which interest accrues or the manner in which interest accrues or the amount due upon redemption thereof, change the earliest date on which any Note may be redeemed, change the provisions of this Indenture relating to the application of proceeds of the Collateral to the payment of principal of or interest on the Notes or change any place where, or the coin or currency in which, any Note or the principal thereof or interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the legal final maturity date;

(b) reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes whose consent is required for the authorization of any such supplemental indenture, or for any waiver of compliance with certain provisions of this Indenture or certain Defaults hereunder and their consequences provided for in this Indenture;

(c) impair or adversely affect the Collateral except as otherwise permitted in this Indenture;

(d) affect the tax treatment of the Issuer or a Noteholder to any material extent;

(e) permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or terminate the lien of this Indenture on any property at any time subject hereto (other than in connection with the sale thereof in accordance with this Indenture) or deprive any Secured Party of the security afforded by the lien of this Indenture;

(f) reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes whose consent is required to request that the Trustee to sell or liquidate the Collateral pursuant to Section 5.4;

(g) modify any of the provisions of this Section 8.2, except to increase any percentage of Outstanding Notes whose Holders' consent is required for any such action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby;

(h) modify the definition of the term "Outstanding" or the Priority of Payments set forth in the Series Indenture;

(i) modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of principal or interest due on any Note on any Payment Date or to affect the rights of the Secured Parties to the benefit of any provisions for the redemption of such Notes or otherwise

adversely affect the Holders of Notes, the provisions of which are not being altered.

Notwithstanding anything herein to the contrary, no consent of any other action of any holder of the Notes shall be required in connection with a supplemental indenture executed for the purposes specified in Section 8.1(i) and Section 8.1(k).

Not later than 15 Business Days prior to the execution of any such proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Noteholders and to the Credit Swap Counterparty, a copy of such supplemental indenture. Not less than ten (10) Business Days prior to the time specified for such mailing, for so long as the Notes are Outstanding and rated by each Rating Agency, the Trustee shall provide a copy of such supplemental indenture to each Rating Agency and request Rating Agency Confirmation, as applicable. The Trustee shall include in the mailing to the Noteholders the response of each Rating Agency to such request; *provided, however,* that if Moody's determines that the execution of such proposed supplemental indenture shall not result in the reduction of or withdrawal of its then current rating of the Notes, it shall not issue its written confirmation until at least a Majority of the Notes have consented (or deemed to have consented) to such proposed supplemental indenture. Unless within 15 Business Days after such mailing, the Trustee shall have received written notice from Holders representing at least a Majority of Notes that such Holders of Notes reasonably consider the Notes to be affected by the proposed supplemental indenture or the Holders of at least a Majority of the Notes shall have consented to or objected to such proposed supplemental indenture in writing, the Trustee may in its discretion determine whether or not the Holders of any Notes would be affected by any supplemental indenture and any such determination shall be conclusive and binding upon all present and future Holders of Notes. The Trustee shall not be liable for any such determination made in good faith and in reliance upon an Opinion of Counsel delivered to the Trustee as set forth in Section 8.3. If any Notes are Outstanding, the Trustee shall not without the written consent of 100% of the Notes enter into any such supplemental indenture if Rating Agency Confirmation is not received prior to the effective date of such supplemental indenture.

It shall not be necessary for any Act of Noteholders under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

Section 8.3    Execution of Supplemental Indentures; Delivery of Supplemental Indentures.  In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article VIII or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive and (subject to Sections 6.1 and 6.3) shall be fully protected in relying upon an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been complied with. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or indemnities under this Indenture or otherwise.

-80-

Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture, the Trustee, at the expense of the Co-Issuers, shall mail a copy of such supplemental indenture to the Holders of the Notes, the Credit Swap Counterparty, any Option Counterparty specified in the Series Indenture and each Rating Agency (so long as the Notes are outstanding and rated by each Rating Agency).  Any failure of the Trustee to publish or mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 8.4    <u>Effect of Supplemental Indentures</u>.  Upon the execution of any supplemental indenture under this <u>Article VIII</u>, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of the Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

Section 8.5    <u>Reference in Notes to Supplemental Indentures</u>.    Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this <u>Article VIII</u> may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Co-Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Issuer and the Co-Issuer and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

Section 8.6    <u>Certain Further Limitations on Supplemental Indentures</u>. Notwithstanding anything to the contrary herein, each of the Issuer and the Co-Issuer agree that they will not consent to or enter into any indenture supplemental hereto or any amendment to any other document related hereto:

(a) that amends any provision of this Indenture or such other document relating to the institution of proceedings for the Issuer or the Co-Issuer to be adjudicated as bankrupt or insolvent, or the consent by the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency proceeding against it, or the filing with respect to the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively; or

(b) that amends any provision of this Indenture or such other document that provides that the obligations of the Co-Issuers under the Notes are limited-recourse senior debt obligations of the Issuer and non-recourse debt obligations of the Co-Issuer, in each case payable solely from the Collateral and that following realization of the Collateral shall be extinguished; or

(c) unless the Issuer has received advice of Cadwalader, Wickersham & Taft LLP or an opinion of another nationally recognized U.S. tax counsel experienced in such matters that the proposed supplemental indenture or

-81-

amendment (i) will not cause the Issuer to be treated as engaged in a U.S. trade or business or otherwise subject the Issuer to U.S. federal income tax on a net income tax basis and (ii) the interest of the Issuer or the Noteholders will not be materially and adversely affected for U.S. federal income tax purposes as a result of the proposed supplemental indenture or amendment.

## ARTICLE IX

## ACCOUNTS AND REPORTS

Section 9.1    Collection of Money.

(a) Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Permitted Short-Term Investments in accordance with the terms and conditions of such Permitted Short-Term Investments. The Trustee shall segregate and hold all such Money and property received by it in trust pursuant to the Granting Clauses, for the Secured Parties. The accounts established by the Trustee pursuant to this Article X may include any number of subaccounts as determined by the Trustee for convenience in administering the Collateral.

(b) Each of the parties hereto hereby agrees that each Account shall be deemed to be a "Securities Account". Each of the parties hereto hereby agrees to cause the Custodian or any other Securities Intermediary that holds any Money or other property for the Issuer or the Co-Issuer in an Account to agree with the parties hereto that (x) the Money and other property is to be treated as a Financial Asset under Article 8 of the UCC and (y) the "securities intermediary's jurisdiction" (within the meaning of Section 8-110 of the UCC) for that purpose will be the State of New York. In no event may any Financial Asset held in any Account be registered in the name of, payable to the order of, or specially Indorsed to, the Issuer unless such Financial Asset has also been Indorsed in blank or to the Custodian or other Securities Intermediary that holds such Financial Asset in such Account.

Section 9.2    Reports by Trustee.

The Trustee shall as promptly as practicable supply in a timely fashion to the Issuer any information regularly maintained by the Trustee that the Issuer may from time to time request with respect to the Interest Collections Payment Account and Principal Collections Payment Account reasonably needed to complete the Monthly Report or to provide any other information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 9.3.

Section 9.3     Reports; Performance Registry.

(a) Monthly Report.  As of each Determination Date (or if such day is not a Business Day, on the next succeeding Business Day) the Credit Swap Counterparty shall compile a monthly report (the "Monthly Report").  The Monthly Report will be (i) mailed each month, by first-class mail, postage prepaid, to each Rating Agency, the Issuer, the Credit Swap Counterparty and the registered Holders of the Notes at their respective addresses appearing in the Note Register or (ii) sent electronically with the approval of the relevant recipient no later than the fifteenth day of each month.  The Monthly Report will contain the following information relating to the prior Monthly Report Period:

(1) A list of the Reference Entities, Reference Entity Calculation Amounts and the ratings of the Reference Entities;

(2) Whether or not a Credit Event has occurred or is continuing and, if so:

(i)     The Reference Entity with respect to which such Credit Event has occurred;

(ii)    The Final Price;

(iii)   The Reference Entity Loss Amount; and

(iv)    The Aggregate Loss Amount of each Class of Notes, if such amount has been determined.

(3) The Aggregate Outstanding Amount of the Notes on the preceding Payment Date or the Scheduled Final Payment Date (as and to the extent applicable) and the interest and principal payments with respect thereto that were paid on such payment date; and

(4) The interest payable on the Notes on the next payment date and the amount of principal payments (if any) to be made on the Notes on the next payment date.

(b) A copy of the current Reference Registry shall be provided by the Trustee to any Holder or Beneficial Owner of Notes promptly following the Trustee's receipt of a request therefor from such Holder or Beneficial Owner.

Capitalized terms used in this Section 9.3 but not otherwise defined in this Indenture shall have the meanings assigned to such terms in the Credit Swaps.

Section 9.4     Procedures Relating to the Establishment of Accounts Controlled by the Trustee; Criteria Applicable to Custodian and Account Securities Intermediary.

(a) Notwithstanding anything else contained herein, the Trustee agrees that with respect to each of the Accounts, it will cause each Accounts Securities Intermediary establishing such Accounts to enter into an agreement

DCLIB1 83398.12

whereby each such Accounts Securities Intermediary agrees that it will (i) comply with Entitlement Orders relating to such Account issued by the Trustee without further consent by the Issuer; (ii) credit all Permitted Short-Term Investments to the applicable Account; (iii) treat each item of property credited to such Account as a Financial Asset; (iv) not enter into any agreement with any other person relating to any Account pursuant to which agreement it has agreed to comply with Entitlement Orders made by such person; (v) not accept for credit to any Account any Permitted Short-Term Investment which is registered in the name of, or payable to the order of, specially indorsed to, any person other than the Accounts Securities Intermediary unless it subsequently has been indorsed to such Accounts Securities Intermediary or is indorsed in blank; and (vi) waive any right of set-off unrelated to its fees for such Account.

The Account Securities Intermediary shall provide to the Trustee (i) a statement, with respect to each Payment Date, of all deposits to and payments from the Accounts during the preceding Accrual Period and (ii) such additional information as the Trustee shall reasonably request.

DCLIB1 83398.12

(b) The Accounts shall remain at all times with the Accounts Securities Intermediary.  Any financial institution acting as Custodian or Account Securities Intermediary shall have a combined capital and surplus of at least U.S.$200,000,000, and shall have a (i) a Short-Term Credit Rating of not less than "P-1" by Moody's and not less than "A-1+" by S&P and a Long-Term Credit Rating of not less than "Aa2" by Moody's and not less than "AA-" by S&P (as applicable), provided such financial institution has executed an agreement as identified in <u>Section 9.4(a)</u>.  The Trustee shall not permit the Accounts (or any funds required by this Indenture to be credited to such Accounts upon receipt by the Trustee) to be held by the Trustee or any other person or financial institution other than the Custodian or Account Securities Intermediary.  The Trustee represents, warrants and agrees for the benefit of the holders of the Notes that it shall issue Entitlement Orders solely to comply with the express duties of the Trustee hereunder.

## ARTICLE X

## CREDIT SWAP

Section 10.1   <u>Credit Swaps</u>.

(a) The Issuer shall enter into the Credit Swaps on or prior to the Closing Date and shall Grant its interest therein to the Trustee pursuant to the Granting Clauses hereof.   The Credit Swaps shall contain appropriate limited-recourse and non-petition provisions equivalent (*mutatis mutandis*) to those contained in <u>Sections 2.6(h)</u> and <u>5.4(d)</u>.

(b) The Trustee shall, on behalf of the Issuer, pay amounts due to the Credit Swap Counterparty under the Credit Swaps and this Indenture.

(c) In the event the Trustee becomes aware that the Credit Swap Counterparty has defaulted in the payment when due of its obligations to the Issuer under the Credit Swaps, the Trustee shall make a demand on such party, or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on such date (or by such time on the next succeeding Business Day if such knowledge is obtained after 11:30 a.m., New York time).  The Trustee shall give notice to the Noteholders upon the continuing failure by such party to perform its obligations during the three (3) New York Business Days following a demand made by the Trustee on the Credit Swap Counterparty.

(d) If at any time the Credit Swaps become subject to early termination due to the occurrence of an Event of Default or a Termination Event (each as defined in the Credit Swaps), the Issuer and the Trustee shall take such actions (following the expiration of any applicable grace period and after the expiration of three (3) New York Business Day period referred to in <u>Section 10.1(c)</u>) to enforce the rights of the Issuer and the Trustee thereunder as

DCLIB1 83398.12

may be permitted by the terms of such agreement and consistent with the terms hereof, and shall apply the proceeds of any such actions to Principal Collections.

## ARTICLE XI

## NOTEHOLDERS' RELATIONS

Section 11.1  <u>Standard of Conduct</u>.  In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, <u>Section 5.8</u>, a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Noteholder, the Issuer, or any other Person, except for any liability to which such Noteholder may be subject to the extent the same results from such Noteholder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

Section 11.2  <u>Right to List of Holders</u>.  Any Noteholder shall have the right, upon five (5) Business Days prior notice to the Trustee to obtain a complete list of Noteholders.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1  <u>Form of Documents Delivered to Trustee</u>.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate of an Authorized Officer of the Issuer, the Co-Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Authorized Officer of the Issuer or the Co-Issuer or any Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate of, or representations by, the Issuer or the Co-Issuer or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer or the Co-Issuer or such other Person, unless such Authorized Officer of the Issuer or the Co-Issuer or such counsel knows that the certificate or representations with respect to such matters are erroneous.  Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate of, or representations by, an Authorized Officer of the Issuer or the

DCLIB1 83398.12

Co-Issuer, stating that the information with respect to such matters is in the possession of the Issuer or the Co-Issuer unless such counsel knows that the certificate or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of the Issuer or the Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to the Issuer's or the Co-Issuer's rights to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default or Event of Default as provided in <u>Section 6.1(d)</u>.

DCLIB1 83398.12

Section 12.2    Acts of Noteholders.

(a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this Section 12.2.

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c) The Aggregate Outstanding Amount and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Note Register.

(d) Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of such Note and of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note.

Section 12.3    Notices. Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(a) the Trustee by any Noteholder or by the Issuer or the Co-Issuer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Trustee addressed to it at the address designated in the Series Indenture;

(b) the Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Issuer addressed to it at the address designated in the Series Indenture;

-88-

(c) the Co-Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to the Issuer, as sole member, addressed to it at the address designated in the Series Indenture;

(d) each Rating Agency by the Co-Issuers or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to it at the address designated in the Series Indenture;

(e) the Managers by the Co-Issuers, any Noteholder or the Trustee shall be sufficient for every purpose hereunder if in writing and mailed first-class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to it at the address designated in the Series Indenture.

Delivery of any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents made as provided above will be deemed effective: (i) if in writing and delivered in person or by overnight courier service, on the date it is delivered; (ii) if sent by facsimile or electronic transmission, on the date that transmission is received by the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine); and (iii) if sent by registered mail, postage prepaid, seven (7) Business Days following the date sent.

Section 12.4    <u>Notices to Noteholders; Waiver</u>.    Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of Notes of any event:

(a) such notice shall be sufficiently given to Holders of Notes if in writing and mailed, first-class postage prepaid, to each Holder of a Note affected by such event, at the address of such Holder as it appears in the Note Register, not earlier than the earliest date and not later than the latest date, prescribed for the giving of such notice; and

(b) such notice shall be in the English language.

Such notices will be deemed to have been given on the date of such mailing.

The Trustee will deliver to the Holders of the Notes any readily available information or notice requested to be so delivered at the expense of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Note shall affect the sufficiency of such notice with respect to other Holders of Notes. In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification to Holders of Notes as shall be made with the approval of the Trustee shall constitute a sufficient notification to such Holders for every purpose hereunder.

-89-

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

Section 12.5    <u>Effect of Headings and Table of Contents</u>.  The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 12.6    <u>Successors and Assigns</u>.  All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 12.7    <u>Separability</u>.  In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 12.8    <u>Benefits of Indenture</u>.  Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Secured Parties, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 12.9    <u>Governing Law</u>.    THIS INDENTURE AND EACH NOTE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE (INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW BUT EXCLUDING ALL OTHER CHOICE-OF-LAW AND CONFLICTS-OF-LAW RULES).

Section 12.10    <u>Submission to Jurisdiction</u>.    THE CO-ISSUERS AND THE TRUSTEE HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE NOTES OR THIS INDENTURE, AND THE CO-ISSUERS AND THE TRUSTEE HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR FEDERAL COURT.  THE CO-ISSUERS AND THE TRUSTEE HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THAT THEY MAY LEGALLY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING.  THE CO-ISSUERS AND THE TRUSTEE AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

Section 12.11 <u>Counterparts</u>.  This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

Section 12.12 <u>Judgment Currency</u>.  This is an international financing transaction in which the specification of Dollars (the "<u>Specified Currency</u>"), and the specification of the place of payment, as the case may be (the "<u>Specified Place</u>"), is of the essence, and the Specified Currency shall be the currency of account in all events relating to payments of or on the Notes. The payment obligations of the Co-Issuers under this Indenture and the Notes shall not be discharged by an amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on conversion to the Specified Currency and transfer to the Specified Place under normal banking procedures does not yield the amount of the Specified Currency at the Specified Place.  If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder in the Specified Currency into another currency (the "<u>Second Currency</u>"), the rate of exchange which shall be applied shall be that at which in accordance with normal banking procedures the Trustee could purchase the Specified Currency with the Second Currency on the Business Day next preceding that on which such judgment is rendered.  The obligation of the Co-Issuers in respect of any such sum due from the Co-Issuers hereunder shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by the Trustee of any sum adjudged to be due hereunder or under the Notes in the Second Currency the Trustee may in accordance with normal banking procedures purchase and transfer to the Specified Place the Specified Currency with the amount of the Second Currency so adjudged to be due; and the Co-Issuers hereby, as a separate obligation and notwithstanding any such judgment (but subject to the Priority of Payments with respect to indemnities), agree to indemnify the Trustee and each Noteholder against, and to pay the Trustee or such Noteholder, as the case may be, on demand in the Specified Currency, any difference between the sum originally due to the Trustee or such Noteholder, as the case may be, in the Specified Currency and the amount of the Specified Currency so purchased and transferred.

Section 12.13 <u>Waiver of Jury Trial</u>.  THE TRUSTEE, THE NOTEHOLDERS AND EACH CO-ISSUER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS INDENTURE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE PARTIES HERETO.  EACH OF THE CO-ISSUERS, THE TRUSTEE AND THE NOTEHOLDERS ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR SUCH PARTIES ENTERING INTO THIS INDENTURE.

Section 12.14 <u>Liability of Co-Issuers</u>.  Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between (inter alia) the Co-Issuers or otherwise, neither the Issuer nor the Co-Issuer shall have any liability whatsoever to the other under this Indenture, the Notes, any such agreements or otherwise and, without prejudice to the generality of the foregoing, neither the Issuer nor the Co-Issuer shall be entitled to take any steps

-91-

to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreements or otherwise against the other.  In particular, neither the Issuer nor the Co-Issuer shall be entitled to petition or take any other steps for the winding up or bankruptcy of the other or shall have any claim in respect of any assets of the other.

DCLIB1 83398.12

Section 12.15  <u>Security Interest Representations and Warranties of the Issuer</u>.

(a) This Indenture creates a valid and continuing security interest (as defined in the applicable UCC) in the Collateral in favor of the Trustee, which security interest is prior to all other liens, and is enforceable as such as against creditors of and purchasers from the Issuer.

(b) The Issuer owns and has good and marketable title to the Collateral free and clear of any lien, claim or encumbrance of any Person.

(c) The Issuer has caused or will have caused, within ten days of the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Collateral granted to the Trustee hereunder.

(d) Other than the security interest granted to the Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Collateral.  The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Collateral other than any financing statement relating to the security interest granted to the Trustee hereunder or that has been terminated.  The Issuer is not aware of any judgment, pension benefit guaranty or tax lien filings against the Issuer.

(e) All original executed copies of each mortgage note, promissory note or other writing constituting an "instrument" (as defined in the applicable UCC) that constitute or evidence the Collateral have been delivered to the Custodian.

(f) None of the "instruments" (as defined in the applicable UCC) that constitute or evidence the Collateral has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee.

(g) The Issuer has received all consents and approvals required by the terms of the Collateral to the transfer to the Trustee of its interest and rights in the Collateral hereunder.

(h) No Account is in the name of any Person other than the Issuer. The Issuer has not consented to the securities intermediary of any Account to comply with entitlement orders or other instructions of any Person other than the Trustee.

(i) All of the Collateral consisting of "security entitlements" (within the meaning of the applicable UCC) has been credited to the Interest Collections Payment Account or the Principal Collections Payment Account.  The securities intermediary for each of the Interest Collections Payment Account or the Principal Collections Payment Account has agreed to treat all assets credited to the

Interest Collections Payment Account or the Principal Collections Payment Account as "financial assets" (within the meaning of the applicable UCC).

(j) The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the securities intermediary has agreed to comply with all entitlement orders and other instructions originated by the Trustee relating to the Interest Collections Payment Account or the Principal Collections Payment Account without further consent by the Issuer.

(k) Each of the Interest Collections Payment Account or the Principal Collections Payment Account is a "securities account" (within the meaning of the applicable UCC).

(l) Other than the Interest Collections Payment Account and the Principal Collections Payment Account the Collateral consists of (i) promissory notes or other writings constituting "instruments" (within the meaning of the applicable UCC), (ii) "accounts" within the meaning of the applicable UCC) or (iii) "general intangibles" (within the meaning of the applicable UCC).

(m) Each of the foregoing representations shall, as applicable, be deemed repeated each time new assets become part of the Collateral.

(n) The security interest of the Trustee in the Collateral shall, until payment in full of the indebtedness secured hereunder and termination of this Indenture, be a first-priority perfected security interest.

(o) The foregoing representations shall survive termination of this Indenture.

Section 12.16 <u>Limited Recourse</u>.  Notwithstanding anything in this Indenture or the Notes to the contrary, all amounts, payable or expressed to be payable by the Co-Issuers on, under or in respect of their obligations and liabilities under this Indenture or the Notes shall be recoverable only from and to the extent of sums in respect of, or calculated by reference to, the Collateral that are received by the Issuer pursuant to the terms and conditions thereof and the proceeds of any realization of enforcement of any Collateral, subject in any case to the Priority of Payments set out herein.  Upon final realization of such sums and proceeds, neither the Trustee nor the Noteholders, nor any person acting on their behalf, shall be entitled to take any further steps against the Co-Issuers to recover any sums due but still unpaid and all claims in respect of such sums due but still unpaid shall be extinguished.

Each holder of a Note by its acquisition thereof shall be deemed to agree as follows:  (i) the segregated portfolio assets of any other segregated portfolio shall not be available or used to make any payments in respect of the Notes or satisfy any other obligations of the Issuer in respect of the Notes, (ii) it shall have no recourse to the segregated portfolio assets of any other segregated portfolio of the Company, and (iii) if under any circumstance it were to have recourse to the segregated portfolio assets of any other segregated portfolio of the Company, its recourse to such assets shall be subordinate for all purposes to the creditors of the Company who are creditors of that segregated portfolio.

DCLIB1 83398.12

**EXHIBIT A-1(a)**

**FORM OF CERTIFICATED NOTE**

On File at CWT

**EXHIBIT A-1(b)**

**FORM OF RULE 144A GLOBAL NOTE**

See Tab 2.01(a)

**EXHIBIT A-1(c)**

**FORM OF REGULATION S GLOBAL NOTE**

See Tab 2.01(b)

**EXHIBIT B-1**

**FORM OF TRANSFER CERTIFICATE FOR TRANSFERS FROM CERTIFICATED
NOTE TO CERTIFICATED NOTE**

On File at CWT

**EXHIBIT B-2**

**FORM OF TRANSFER CERTIFICATE FOR TRANSFERS FROM GLOBAL NOTE TO GLOBAL NOTE**

On File at CWT

**EXHIBIT C**

**FORM OF OPINION OF CADWALADER, WICKERSHAM & TAFT LLP**

See Tab 7.01

**EXHIBIT D**

**FORM OF OPINION OF MAPLES AND CALDER**

See Tab 7.05

## SCHEDULE A

With respect to each Accrual Period or Semi-Annual Accrual Period (other than the initial Accrual Period or Semi-Annual Accrual Period), "LIBOR" will be determined by the Calculation Agent in accordance with the following provisions for purposes of calculating the Rate of Earnings (as defined in the Investment Agreement):

LIBOR for any Accrual Period or Semi-Annual Accrual Period shall equal the offered rate, as obtained by the Calculation Agent, for U.S. Dollar deposits of the applicable Designated Maturity which appears on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates) as of 11:00 a.m. (London time) on the applicable LIBOR Determination Date as reported by Bloomberg Financial Markets Commodities News. "LIBOR Determination Date" means, with respect to any Accrual Period or Semi-Annual Accrual Period, the second London Banking Day prior to the first day of such Accrual Period or such Semi-Annual Accrual Period.

If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for U.S. Dollar deposits of the Designated Maturity (except that in the case where such Accrual Period or Semi-Annual Accrual Period shall commence on a day that is not a Business Day, for the relevant term commencing on the next following Business Day), by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such LIBOR Determination Date made by the Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean. If, on any LIBOR Determination Date, fewer than two Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Issuer) are quoting on the relevant LIBOR Determination Date for U.S. Dollar deposits for the term of such Accrual Period or Semi-Annual Accrual Period (except that in the case where such Accrual Period or Semi-Annual Accrual Period shall commence on a day that is not a Business Day, for the relevant term commencing on the next following Business Day), to the principal London offices of leading banks in the London interbank market.

If the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR with respect to such Accrual Period or Semi-Annual Accrual Period shall be the arithmetic mean of the Base Rate for each day during such Accrual Period or Semi-Annual Accrual Period.

For purposes of clause (i) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point. For the purposes of clauses (ii) and (iii) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one thirty-second of a percentage point.

DCLIB1 82549.8

As used herein:

"Base Rate" means a fluctuating rate of interest determined by the Calculation Agent as being the rate of interest most recently announced by the Base Rate Reference Bank at its New York office as its base rate, prime rate, reference rate or similar rate for U.S. Dollar loans.   Changes in the Base Rate will take effect simultaneously with each change in the underlying rate.

"Base Rate Reference Bank" means Morgan Guaranty Trust Company of New York, or if such bank ceases to exist or is not quoting a base rate, prime rate, reference rate or similar rate for U.S. Dollar loans, such other major money center commercial bank in New York City as is selected by the Calculation Agent.

"Designated Maturity" has the meaning specified in Section 2 of the Series Indenture.

"London Banking Day" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

"Reference Banks" means four major banks in the London interbank market selected by the Calculation Agent.

The determination of LIBOR for each Accrual Period or Semi-Annual Accrual Period by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

DCLIB1 82549.8

**Exhibit B**

(Multicurrency—Cross Border)



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of July 14, 2005

**LEHMAN BROTHERS INTERNATIONAL**    and    **STONY HILL CDO SPC, for the account of**
**(EUROPE) ("Party A")**            **the Series 2005-1 Segregated Portfolio**
                           **("Party B")**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      **Definitions.**    The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      **Inconsistency.**    In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.   In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      **Single Agreement.**    All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      **General Conditions.**

     (i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

     (ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.   Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

     (iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    ***Change of Account***. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    ***Netting***. If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    ***Deduction or Withholding for Tax.***

(i)    ***Gross-Up***. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii)    *Liability*. If: —

    (1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

    (2)    X does not so deduct or withhold; and

    (3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations*.

    (i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)    *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)    *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)    any other documents specified in the Schedule or any Confirmation; and

    (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.       Events of Default and Termination Events**

(a)       *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)       *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)      *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)     *Credit Support Default.*

(1)       Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)       the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)       the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)      *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)       *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)      *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                                                                          ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**ISDA® 1992**

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate*. If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

**ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

**7.** **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.** **Contractual Currency**

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

**9.      Miscellaneous**

(a)      *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)      *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)      *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)      *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)      *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)      *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)      *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.     Offices; Multibranch Parties**

(a)      If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)      Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)      If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.     Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.   Notices**

(a)   *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)   if in writing and delivered in person or by courier, on the date it is delivered;

> (ii)   if sent by telex, on the date the recipient's answerback is received;

> (iii)   if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

> (iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

> (v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)   *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.   Governing Law and Jurisdiction**

(a)   *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)   *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

> (i)   submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)   *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)   *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.   Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)   in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)   in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)   in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)   in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

**ISDA® 1992**

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

**ISDA® 1992**

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

<table>
<tr><td>LEHMAN BROTHERS<br>INTERNATIONAL (EUROPE)<br>(Name of Party)</td><td>STONY HILL CDO SPC, for the account of the<br>Series 2005-1 Segregated Portfolio<br>(Name of Party)</td></tr>
</table>

By: .....................................................

   Name:

   Title:

   Date:

**ANDREW MACLEAN**

**Authorised Signatory**

By: .....................................................

   Name:

   Title:

   Date:

[ISDA MASTER AGREEMENT]

18

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| LEHMAN BROTHERS INTERNATIONAL (EUROPE) | STONY HILL CDO SPC, for the account of the Series 2005-1 Segregated Portfolio |
|:---:|:---:|
| (Name of Party) | (Name of Party) |

By:............................................................

    Name:

    Title:

    Date:

By:............................................................

    Name:

    Title:    **Carlos Farjallah**

    Date:    **Director**

[ISDA MASTER AGREEMENT]

**SCHEDULE**
to the Master Agreement
dated as of July 14, 2005

between

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** ("Party A"),
a company incorporated with unlimited liability under
the laws of England and Wales
and

**STONY HILL CDO SPC, for the account of the Series 2005-1 Segregated Portfolio**
("Party B"),
a segregated portfolio company with limited liability incorporated under
the laws of the Cayman Islands

*All terms used and not otherwise defined are given the meaning ascribed to them in the Indenture, dated as of July 14, 2005, among Party B, as Issuer, Stony Hill CDO Series 2005-1 LLC, as Co-Issuer and U.S. Bank National Association, as Trustee.*

Part 1. Termination Provisions

In this Agreement:-

(a)     **"Specified Entity"** means in relation to Party A for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

and in relation to Party B for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

(b)     **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)     **Payments on Early Termination.**

(i)     If an Early Termination Date is designated hereunder, Loss and Second Method shall be used to calculate any termination payment owing by either party in respect of such Early Termination Date.

80504

(ii)    Notwithstanding anything in the Agreement or this Schedule to the contrary, the aggregate of the termination payments owing by Party A hereunder in respect of an Early Termination Date shall not exceed the lesser of (i) the termination amount calculated hereunder with respect to Party A, and (ii) the amount by which unpaid interest and principal on the outstanding Notes on the Early Termination Payment Date exceeds Collections for the Early Termination Payment Date (excluding any termination amount paid by Party A upon an early termination hereunder).

(d)    The following shall be specified as an "Additional Termination Event" pursuant to <u>Section 5(b)(v)</u>:

An Event of Default under the Indenture has occurred and is continuing and has resulted in an acceleration of the Notes, in which case (i) the Affected Party shall be Party B, (ii) all Transactions shall be Affected Transactions, (iii) the Early Termination Date shall be the Early Termination Payment Date, and (iv) any amount payable by Party A in respect of such event shall be payable on the Business Day immediately preceding the Early Termination Payment Date.

(e)    The provisions of <u>Section 5(a)</u> (as modified by (c) above) and <u>Section 5(b)</u> (as modified by (d) above) will apply to Party A and to Party B as follows:-

| **Section 5(a)** | **Party A** | **Party B** |
|---|---|---|
| (i)    "Failure to Pay or Deliver" | Applicable. | Applicable. |
| (ii)    "Breach of Agreement" | Not Applicable. | Not Applicable. |
| (iii)    "Credit Support Default" | Applicable. | Not Applicable. |
| (iv)    "Misrepresentation" | Not Applicable. | Not Applicable. |
| (v)    "Default under Specified Transaction" | Not Applicable. | Not Applicable. |
| (vi)    "Cross Default" | Not Applicable. | Not Applicable. |
| (vii)    "Bankruptcy" | Applicable. | Applicable. |
| (viii)  "Merger Without Assumption" | Not Applicable. | Not Applicable. |

| **Section 5(b)** | **Party A** | **Party B** |
|---|---|---|
| (i)    "Illegality" | Applicable. | Applicable. |
| (ii)    "Credit Event Upon Merger" | Not Applicable. | Not Applicable. |
| (iii)    "Additional Termination Event" | Not Applicable. | Applicable. |

(f)    **Bankruptcy.**  With respect to Party B, Section 5(a)(vii) is hereby modified by deleting the words "becomes insolvent" from (2), deleting the words "seeks or" and "trustee, custodian" from (6), deleting (7) in its entirety and deleting (9) in its entirety.

(g)    **"Termination Currency"** means United States Dollars ("<u>USD</u>").

(h)    **Failure to Pay or Deliver**.  Section 5(a)(i) is hereby amended by deleting the words "third Local Business Day" and substituting therefor "fifth Local Business Day".

Part 2. Tax Representations.

(A)    **Payer Tax Representations**.  For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B each make the following representations:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Section 2(e)</u>, 6(d)(ii), or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction of the agreement of the other party contained in <u>Section 4(a)(i)</u> or 4(a)(iii) of this Agreement, and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or 4(a)(iii) of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, <u>provided</u> that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> of this Agreement by reason of material prejudice to its legal or commercial position.

(B)    **Payee Tax Representations**.  For the purpose of <u>Section 3(f)</u> of this Agreement, Party A and Party B make the following representations:

(i)    The following representation applies to Party A:-

Party A is a company incorporated with unlimited liability under the laws of England and Wales.

(ii)    The following representations apply to Party B:-

(A)    Party B is a "non-U.S. branch of a foreign person" for purposes of sections 1.1441-4(a)(3)(ii) and is a foreign person for purposes of section 1.6041-4(a)(4) of the U.S. Treasury Regulations.

(B)    Party B and each beneficial owner of Party B is not (i) a bank that has entered into this Agreement in the ordinary course of its trade or business of making loans, as described in section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (ii) a 10% shareholder of Party A within the meaning of Code section 871(h)(3)(B), or (iii) a controlled foreign corporation with respect to Party A within the meaning of Code section 881(c)(3)(C).

(C)    **Tax Representations in Confirmations**.  For purposes of <u>Sections 2(d)(i)(4)</u> and <u>3(f)</u>, any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

Part 3. Agreement to Deliver Documents.

For the purpose of <u>Section 4(a)(i)</u> and Section <u>4(a)(ii)</u> of this Agreement, Party A and Party B each agrees to deliver the following documents, as applicable:-

(a)    Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered |
| --- | --- | --- |
| Party B | A correct, complete and executed U.S. Internal Revenue Service Form W-8IMY (or any successor thereto), including appropriate attachments, that eliminates U.S. federal withholding and backup withholding tax on payments under this Agreement. | (i) Before the first Payment Date under this Agreement, (ii) before December 31 of each third succeeding calendar year, (iii) promptly upon reasonable demand by Party A, and (iv) promptly upon learning that any such Form previously provided by Party B has become obsolete or incorrect. |

(b)    Other documents to be delivered are:

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
| --- | --- | --- | --- |
| Party A | An opinion of counsel to Party A substantially in the form of <u>Exhibit B</u> to this Schedule. | Promptly after execution of this Agreement. | No |
| Party A | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party A | A guarantee of Lehman Brothers Holdings Inc. ("Holdings") substantially in the form of <u>Exhibit D</u> to this Schedule. | Upon execution of this Agreement. | No |
| Party B | An opinion of counsel to Party B substantially in the form of <u>Exhibit C</u> to this Schedule. | Promptly after execution of this Agreement. | No |
| Party B | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | A certified copy of the resolution or resolutions (the "Authorizing Resolution") of the Board of Directors or loan committee of Party B, certified by a secretary, or an assistant secretary of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction entered into under this Agreement. | Upon execution of this Agreement (unless an Authorizing Resolution has previously been furnished by Party B to Party A) and, with respect to each Transaction not covered by a previously furnished Authorizing Resolution, within five Business Days of the Trade Date. | Yes |
| Party B | A copy of all reports provided by Party B to the Noteholders, Moody's and S&P under the Indenture. | On the date that any such report is required to be provided to either the Noteholders or Moody's and S&P under the Indenture. | Yes |
| Party B | A certified copy of the Indenture and each amendment thereof. | Upon execution of this Agreement and on the date of each amendment thereof. | Yes |

Part 4. Miscellaneous.

(a)   **Addresses for Notices.**  For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to Party A:-

Address:        Lehman Brothers International (Europe)
                25 Bank Street.
                London E14 5LE
                England

Attention:      Documentation Manager

Telephone:      (44) 20 7102 1209

Facsimile No: (44) 20 7102 2044

For all purposes.

With copies to:

Address:        Lehman Brothers Inc.
                745 Seventh Avenue
                New York, New York 10019

Attention:      Structured Credit Trading

Telephone:      (212) 526-5410


Address for notices or communications to Party B:

Address:        Stony Hill CDO SPC, for the account of the Series 2005-1 Segregated
                Portfolio
                c/o Maples Finance Limited
                P.O. Box 1093GT
                Queensgate House
                South Church Street
                Grand Cayman, Cayman Islands
                British West Indies

Attention:      The Directors

Facsimile No: (345) 945-7100

For all purposes.


Address for notices or communications to Maples and Calder:

Address:      Maples and Calder
P.O. Box 309 GT
Ugland House
South Church Street
Grand Cayman, Cayman Islands
British West Indies

Attention:     Dale Crowley

Telephone:    (345) 949-8066

Facsimile No: (345) 949-8080

Address for notices or communications to Standard & Poor's Investments Services:

Address:      Standard & Poor's Investments Services
55 Water Street, New York, New York 10041

Attention:     Chui Ng and Surveillance Monitoring

Facsimile No: (212) 438-2000

Address for notices or communications to Moody's Investors Service, Inc.:

Address:      Moody's Investors Service, Inc.
99 Church Street
New York, New York 10007

Attention:     Asset-Backed Commercial Paper Group

Facsimile No: (212) 553-4170

(b)    **Process Agent.**  For the purpose of <u>Section 13(c)</u> of this Agreement:-

Party A appoints as its Process Agent:     Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019

Party B appoints as its Process Agent:     CT Corporation
111 8th Avenue
New York, NY  10011
Ref:  Stony Hill CDO SPC, for the

-7-

account of the Series 2005-1 Segregated Portfolio

(c)    **Offices.**  The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)    **Multibranch Party.**  For the purpose of <u>Section 10(c)</u> of this Agreement:-

Party A is a Multibranch Party and may act through its head office in London and the following Offices: Amsterdam, Frankfurt, Madrid, Milan, Paris, Stockholm, and Zurich.

Party B is not a Multibranch Party.

(e)    **Calculation Agent.**  The Calculation Agent is Party A.

(f)    **Credit Support Document.**  Details of any Credit Support Document:-

In the case of Party A, a guarantee (the "Swap Guarantee") of Party A's obligations hereunder substantially in the form of <u>Exhibit D</u> attached to this Schedule.  Any amendment, modification or waiver shall require, prior to its effectiveness, an S&P Rating Confirmation with respect to such amendment, modification or waiver.

In the case of Party B, not applicable.

(g)    **Credit Support Provider.**

Credit Support Provider means in relation to Party A:  Holdings.

Credit Support Provider means in relation to Party B:  Not Applicable.

(h)    **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York including all matters of construction, validity and performance (including Sections 5-1401 and 5-1402 of the New York General Obligations Law but excluding all other choice-of-law and conflicts-of-law rules).

(i)    **Netting of Payments.**  Section 2(c)(ii) will apply to all Transactions.

(j)    **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement, <u>provided, however,</u> that (i) with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc. and (ii) with respect to Party B such definition shall mean any person or entity controlled directly or indirectly by Party B.

(k)    **Jurisdiction.**  Section 13(b) is hereby amended by:  (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and deleting the final paragraph thereof.

(l)    **Set-Off.**  Set-Off does not apply to either Party A or Party B

Part 5. Other Provisions.

(a)    **Confirmation.**  Each Confirmation supplements, forms part of, and will be read and construed as one with the Agreement.  A form of Confirmation is set forth as <u>Exhibit A</u> hereto.

(b)    **Representations**.  Section 3 is hereby amended by adding the following additional subsections:

    (i)    **No Agency.**  It is entering into this Agreement, each Transaction, and any other documentation relating to this Agreement or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

    (ii)    **Eligible Contract Participant.**  It is an "eligible contract participant" as that term is defined in the Commodity Exchange Act, as amended.

    (iii)    **No Reliance.**  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communications (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

    (iv)    **Assessment and Understanding.**  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

    (v)    **Status of Parties**.  The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(c)    **No Bankruptcy Petition.**  Party A irrevocably and unconditionally agrees that it will not, prior to the date following the payment in full of all the Notes issued pursuant to the Indenture, as applicable, and the expiration of all applicable preference periods under the laws of the United States, the Cayman Islands or any other jurisdiction relating to any such payment, acquiesce, petition or otherwise invoke or cause Party B to invoke the process of any governmental authority for the purpose of commencing or sustaining a case (whether voluntary or involuntary) against Party B under any bankruptcy, reorganization arrangement, insolvency, moratorium, liquidation or similar law or proceeding or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Party B or any substantial part of its property or ordering the winding-up or liquidation of the affairs of Party B; <u>provided</u> that this provision shall not restrict or prohibit Party A from joining any other person, including, without limitation, the Trustee, in any bankruptcy, reorganization, arrangement,

insolvency, moratorium or liquidation proceedings already commenced or other analogous proceedings already commenced under applicable laws.

(d)     **Transfer.** <u>Section 7</u> is hereby amended by:  (i) adding the words "(which consent may not be unreasonably withheld)" after the words "consent" on the second line thereof, (ii) adding the words "(and notice of the transferee to)" after the word "of" on the third line thereof, and (iii) adding the words "(subject to providing written notice of the transferee to the other party)" after the word "transfer" on the fourth and seventh line thereof.  No transfer or assignment by Party A or Party B of its rights and obligations hereunder may be made unless an S&P Rating Confirmation is received with respect to such transfer.  Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate such guarantee to be substantially the same as the guarantee of the obligations of the transferor then in effect.

(e)     **Amendments to Section 9 of this Agreement.**  Section 9(b) of this Agreement is hereby amended by adding the following after the word "system" in the last line thereof:

"; <u>provided</u>, <u>however</u>, notwithstanding anything to the contrary in Section 9(b) of this Agreement, that no amendment, modification or waiver in respect of this Agreement will be effective unless S&P shall receive prior written notice of all such amendments, modifications or waivers; <u>provided</u>, <u>further</u>, that each such amendment, modification or waiver shall require, prior to its effectiveness, an S&P Rating Confirmation with respect to such amendments, modifications or waivers.

(f)     **Definitions**. Reference is made to the 2000 ISDA Definitions (the "ISDA Definitions") published by the International Swaps and Derivatives Association, Inc., which are hereby incorporated by reference.  For these purposes, all references in the ISDA Definitions to a "Business Day" shall be deemed references to a Local Business Day under this Agreement.  In the event of any inconsistency between the provisions of this Agreement and the ISDA Definitions the provisions of this Agreement shall prevail.  Any definitions included or incorporated by reference in a Confirmation shall prevail over the provisions of this Agreement, and the ISDA Definitions, for the purpose of the relevant Transaction.

(g)     **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(h)     **Indenture**.  Party B will not enter into a supplemental indenture or other modification to the Indenture that could reasonably be expected to have a material adverse effect on Party A without at least ten (10) Business Days' prior notice to Party A and the prior written consent of Party A (which consent shall not be unreasonably withheld) pursuant

-10-

to Section 8.1 or 8.2 of the Standard Terms of the Indenture, as applicable, provided, that such material adverse effect shall be limited to material adverse effects relating the timing, amount or priority of payments applicable thereto. Party B will furnish to Party A a copy of each proposed and each executed supplemental indenture to the Indenture and copies of any related Moody's Rating Confirmation and S&P Rating Confirmation in accordance with the terms of the Indenture.

(i)     **Limited Recourse.**  Notwithstanding anything in this Agreement or any Confirmation hereunder to the contrary, all amounts, payable or expressed to be payable by Party B on, under or in respect of its obligations and liabilities under this Agreement and any Confirmation hereunder shall be recoverable only from and to the extent of sums in respect of, or calculated by reference to, the Collateral that are received by Party B pursuant to the terms and conditions thereof and the proceeds of any realisation of enforcement of any Collateral, subject in any case to the Priority of Payments set out in the Indenture.  Upon final realisation of such sums and proceeds, neither Party A nor any person acting on its behalf shall be entitled to take any further steps against Party B to recover any sums due but still unpaid and all claims in respect of such sums due but still unpaid shall be extinguished.  No recourse shall be had for the payment of any amounts owing in respect of this Agreement against any officer, director, employee, stockholder, preference shareholder or incorporator of Party B.

(j)     **No Gross Up.**  Notwithstanding anything to the contrary in the Agreement, including Section 2(d) of the Master Agreement, no Tax shall be an Indemnifiable Tax with respect to payments made by Party A and therefore Party A shall have no obligation to pay an additional amount otherwise required under Section 2(d)(i)(4) of the Master Agreement

(k)     **Excise Tax Resulting From Change in Law**.  (i) All references in Section 2(d) to deduction or withholding for or on account of any Tax shall include the payment of any excise tax, including any excise tax imposed on Party A as a result of a Change in Tax Law, in respect of payments under this Agreement.  For avoidance of doubt, in the event that any excise tax is imposed on Party A as a result of a Change in Tax Law, any payment to which Party B is otherwise entitled under this Agreement shall be reduced by the amount of the excise tax and the excise tax shall not be an Indemnifiable Tax.

(ii)     With respect to Party B, a Tax Event shall not constitute a Termination Event.

"***Change in Tax Law***" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law, treaty, rule or regulation (or in the application or interpretation of any law, treaty, rule or regulation whether by official or informal means) that occurs on or after the date on which this Transaction is entered into."

(l)     **Notices.**  For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(m)   **Service of Process.**  The penultimate sentence of <u>Section 13(c)</u> shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(n)   **Accuracy of Specified Information.**  Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person.

(o)   **Non-Confidential.**  Notwithstanding anything to the contrary contained in this Agreement, all persons may disclose to any and all persons, without limitations of any kind, the U.S. federal, state or local tax treatment of any Transaction, any fact that may be relevant to understanding the U.S. federal, state or local tax treatment of any Transaction, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal, state or local tax treatment and that may be relevant to understanding such U.S. federal, state or local tax treatment, other than the name of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, and any pricing terms or other nonpublic business or financial information that is unrelated to the U.S. federal, state or local tax treatment of the Transaction to the taxpayer and is not relevant to understanding the U.S. federal, state or local tax treatment of the Transaction to the taxpayer.

(p)   **Additional Representations of Party B.**  Party B represents to Party A in accordance with <u>Section 3</u> of the Agreement (which representations will be deemed to be repeated by Party B at all times until termination of this Agreement) that:

   (i)   **Approved Credit Swap Counterparty.**  Party A is an approved Credit Swap Counterparty under the Indenture.

   (ii)   **Secured Party.**  Party A is a Secured Party under the Indenture.

   (iii)   **Constitutional Documents.**  Party B is in compliance, in all material respects, with its constitutional documents (including, but not limited to, the Indenture, as amended from time-to-time, and any and all resolutions, investment policies, guidelines, procedures or restrictions), and each Transaction contemplated hereunder is and will be an authorized and permitted transaction thereunder.

   (iv)   **Third-Party Beneficiary.**  Party A shall be an express third-party beneficiary of the Indenture.

(q)   **General Conditions**.  <u>Section 2(a)(iii)</u> is hereby amended by (X) inserting in the third line thereof after the words "and is continuing, (2)" and before the words "the condition precedent" the following phrase "the condition precedent that no Additional Termination Event has occurred and is continuing with respect to which the other party is an Affected Party and with respect to which all outstanding Transactions are Affected Transactions, (3)" and (Y) delete the symbol "(3)" before the words "each other applicable condition" and substitute the symbol "(4)" in lieu thereof.

(r)    **No Violation or Conflict Representation.**  <u>Section 3(a)(iii)</u> is hereby amended by inserting in the second line thereof after the words "constitutional documents" and before the words ", any order or judgment" the phrase "(including, but not limited to, the Indenture, as amended, and any and all resolutions, investment policies, guidelines, procedures or restrictions).";  <u>provided</u>, such amendment shall be applicable only with respect to the Representations of Party B.

(s)    **Severability.**  If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement;  <u>provided</u>, <u>however</u>, that this severability provision shall not be applicable if any provision of <u>Section 2</u>, <u>5</u>, <u>6</u> or <u>13</u> (or any definition or provision in <u>Section 14</u> to the extent it relates to, or is used in or connection with any such Section) shall be held to be invalid or unenforceable.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____

     Name:

     Title:

STONY HILL CDO SPC, for the account of the Series 2005-1 Segregated Portfolio

By: _____

     Name:

     Title:

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By:_____
    Name:
    Title:

STONY HILL CDO SPC, for the account of the Series 2005-1 Segregated Portfolio

By:_____
    Name:
    Title:    **Carlos Farjallah**
            **Director**

EXHIBIT A to Schedule

FORM OF CONFIRMATION

<u>EXHIBIT B to Schedule</u>

<u>FORM OF OPINION OF COUNSEL FOR PARTY A</u>

EXHIBIT C to Schedule

FORM OF OPINION OF COUNSEL FOR PARTY B

<u>EXHIBIT D to Schedule</u>

<u>GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.</u>

**Confirmation**

**DATE:**          July 14, 2005

**TO:**            Stony Hill CDO SPC, for the account of the Series 2005-1 Segregated Portfolio

**FROM:**          Lehman Brothers International (Europe)

**RE:**            Credit Derivative Transaction

The purpose of this letter (this "Confirmation") is to confirm the terms and conditions of the Credit Derivative Transaction entered into between Lehman Brothers International (Europe) ("Party A") and Stony Hill CDO SPC, for the account of the Series 2005-1 Segregated Portfolio ("Party B") on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1          The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions and the Additional Provisions for Physically Settled Default Swaps -- Monoline Insurer as Reference Entity (published on January 21, 2005) (collectively, the "Credit Derivatives Definitions"), each as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern. Capitalized terms used herein but not otherwise defined herein or in the Credit Derivatives Definitions shall have the meanings ascribed to such terms in the Indenture.

2          This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement (Multicurrency – Cross Border) dated as of July 14, 2005, as amended and supplemented from time to time (the "Agreement"), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

3          Party A will enter into the Transaction and exercise its rights and perform its obligations hereunder solely on its own behalf and not as agent, fiduciary or in any other capacity on behalf of Party B, the holders of the Notes or any other person.

           Lehman Brothers Inc. ("LBI") is acting as agent on behalf of Party A and Party B for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by Party A.

4          Party A may or may not have a credit exposure to any Reference Entity and may or may not have exposure to any Benchmark Obligation designated by Party A in respect of any Reference Entity.

5          The parties agree and acknowledge that the Transaction to which this Confirmation relates contemplates more than one Reference Entity and multiple Credit Event Notices, and that, accordingly, there may be more than one Credit Event and more than one Cash Settlement Amount, and that the Credit Derivatives Definitions should, for the purposes of this Confirmation, be interpreted accordingly.

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
REGULATED BY THE FINANCIAL SERVICES AUTHORITY
25 BANK STREET LONDON E14 5LE
TELEPHONE 020 7601 0011  TELEX 888881 LEHMAN G
REGISTERED IN ENGLAND (No. 2538254) AT THE ABOVE ADDRESS

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

DCLIB1 83480.8

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | July 14, 2005 |
| Effective Date: | July 14, 2005 |
| Cut-Off Date: | July 11, 2005 |
| Execution Time: | Execution time will be furnished upon Party B's written request. |
| Scheduled Termination Date: | June 20, 2012 (adjusted in accordance with the Business Day Convention). |
| Termination Date: | (A) the Scheduled Termination Date; or (B) if the Contingency Amount with respect to the Notes is greater than zero on the Scheduled Termination Date, the last Deferred Redemption Date with respect to the Notes. |
| | Section 1.7 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| Floating Rate Payer: | Party B (the "Seller") |
| Fixed Rate Payer: | Party A (the "Buyer") |
| Calculation Agent: | Lehman Brothers Special Financing Inc. |
| Business Day: | London and New York. |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Each entity specified in the reference registry attached hereto as Annex A (the "Reference Registry"); provided, however, that any Successor to a Reference Entity shall be identified pursuant to Section 2.2. of the Credit Derivatives Definitions, as modified herein. |

Party A shall be responsible for maintaining the Reference Registry. The Reference Registry shall contain, as to each Reference Entity, the following information:

(i)     the name of such Reference Entity;

(ii)    whether the monoline provisions apply to such Reference Entity;

(iii)   whether Restructuring applies with respect to such Reference Entity;

(iv)    its jurisdiction;

(v)     its Benchmark Obligation (if any) applicable to the Reference Entity;

-2-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

(vi)   the coupon of its Benchmark Obligation (if any) applicable to the Reference Entity; and

(vii)  the maturity date of its Benchmark Obligation (if any) applicable to the Reference Entity.

The information contained in the Reference Registry has been obtained by Party A from the following third party sources: Bloomberg, the website maintained by the Securities and Exchange Commission, the website maintained by Moody's and the website maintained by S&P. While the information obtained from such sources is believed to be accurate, neither Party A nor any of its affiliates makes any representation or warranty, expressed or implied, regarding the adequacy, correctness or completeness of the information obtained from such sources. If any of the information received from such sources is incorrect, (i) the corresponding information in the Reference Registry will likewise be incorrect, and (ii) the Reference Registry shall be amended (or deemed amended) to reflect the correct information. Under no such circumstance shall Party A be required to remove (i) the relevant Reference Entity from the Reference Portfolio, or (ii) the relevant Benchmark Obligation from the Reference Registry. Neither Party A nor any of its affiliates shall be liable to Party B, any holder of Notes or any other Person for any losses, costs, expenses or potential lost profits resulting from or related to any such incorrect information obtained from such sources.

Reference Entity
  Calculation Amount:                  With respect to each Reference Entity, the amount, expressed in U.S. dollars, specified as such in the Reference Registry on the relevant date of determination.

Reference Portfolio:              All of the Reference Entities included in the Reference Registry on the relevant date of determination.

Notwithstanding anything herein to the contrary, if an Additional Issuance of the Notes occurs, the Reference Entity Calculation Amount, the Loss Threshold Amount and the Loss Cap Amount with respect to the Notes shall be amended as follows: (i) the Reference Entity Calculation Amount of each Reference Entity shall be an amount equal to the product of (x) such Reference Entity Calculation Amount, and (y) a fraction, the numerator of which is the Aggregate Outstanding Amount of the Notes immediately after giving effect to such Additional Issuance, and the denominator of which is the Aggregate Outstanding Amount of the Notes immediately prior to giving effect to such Additional Issuance (such fraction, the "**Increase Adjustment Variable**"), (ii) the Loss Threshold Amount shall be an amount equal to the product of (x) such Loss Threshold Amount, and (y) the Increase Adjustment Variable, and (iii) the Loss Cap Amount shall be an amount equal to the product of (x) such Loss Cap Amount, and (y) the Increase Adjustment Variable.

Notwithstanding anything herein to the contrary, if an Optional Reduction of Notes occurs, the Reference Entity Calculation Amount, the Loss Threshold Amount and the Loss Cap Amount with respect to

-3-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

the Notes shall be amended as follows: (i) the Reference Entity Calculation Amount of each Reference Entity shall be an amount equal to the product of (x) such Reference Entity Calculation Amount, and (y) a fraction, the numerator of which is the Aggregate Outstanding Amount of the Notes immediately after giving effect to such Optional Reduction, and the denominator of which is the Aggregate Outstanding Amount of the Notes immediately prior to giving effect to such Optional Reduction (such fraction, the "**Reduction Adjustment Variable**"), (ii) the Loss Threshold Amount shall be an amount equal to the product of (x) such Loss Threshold Amount, and (y) the Reduction Adjustment Variable, and (iii) the Loss Cap Amount shall be an amount equal to the product of (x) such Loss Cap Amount, and (y) the Reduction Adjustment Variable.

| | |
|---|---|
| Benchmark Obligation: | In respect of a Reference Entity, the obligation (if any) specified in the Reference Registry opposite such Reference Entity. For purposes of this Confirmation, Benchmark Obligations may include obligations issued by an affiliate of a Reference Entity included in the Reference Portfolio. |

The provisions of Section 2.20 of the Credit Derivatives Definitions shall apply to each Benchmark Obligation as if it were a Deliverable Obligation.

The provisions of Section 2.2(d) and 2.30 of the Credit Derivatives Definitions shall apply to each Benchmark Obligation as if it were a Reference Obligation.

**Fixed Payments:**

| | |
|---|---|
| Fixed Amount: | An amount equal to the Interest Distribution Amount due and payable on the Notes on the immediately succeeding Payment Date or the first Distribution Date to occur (as and to the extent applicable and without duplication) (the "Fixed Amount"). |
| Additional Fixed Amount: | On the Business Day immediately preceding the first Distribution Date to occur, Party A shall pay to Party B an amount equal to the Loss Cap Amount *minus* the sum of (i) the aggregate of the Cash Settlement Amounts (if any) that have been determined on or prior to such Distribution Date, and (ii) if (A) such Distribution Date is the Scheduled Final Payment Date, and (B) the Contingency Amount with respect to the Notes is greater than zero on the Scheduled Final Payment Date, an amount equal to the Contingency Amount with respect to the Notes (the "Final Amount"). |
| Fixed Rate Payer Payment Dates: | The Business Day immediately preceding (as and to the extent applicable and without duplication) (i) each Payment Date and (ii) the first Distribution Date to occur. |
| Fixed Rate Payer Period End Date: | Each date on which distributions are required to be made to holders of the Notes under Section 5 of the Series Indenture. |

Fixed Rate Payer Calculation

-4-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

| | |
|---|---|
| Period: | The meaning specified in Section 2.9 of the Credit Derivatives Definitions; *provided that* notwithstanding anything to the contrary in Section 2.9 or Section 5.4 of the Credit Derivatives Definitions, the final Fixed Rate Payer Calculation Period shall end on, but exclude, the first Distribution Date to occur.

Section 2.10 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| Fixed Rate Payer Deferred Payments: | On each Deferred Interest Payment Date, Party A shall pay to Party B an amount equal to the related Deferred Interest Amount (if any) with respect to the Notes.

On each Deferred Redemption Date, Party A shall pay to Party B an amount equal to the related Deferred Amount (if any) with respect to the Notes. |
| Fixed Rate Payer Payment Following an Optional Reduction: | On each Payment Date on which an Optional Reduction of Notes occurs, Party A shall pay to Party B an amount equal to the outstanding principal amount of the Lehman Notes being redeemed. |

**Floating Payments:**

| | |
|---|---|
| Floating Rate Payer Payment Amount: | On the Effective Date, Party B shall pay to Party A $50,000,000. On the date on which an Additional Issuance of Notes occurs, Party B shall pay to Party A an amount equal to the principal amount of the relevant new Notes. |
| Floating Rate Payer Payment Date: | (i) The Effective Date and (ii) the date on which an Additional Issuance of Notes occurs. |

**Terms relating to Settlement:**

| | |
|---|---|
| Conditions to Settlement: | In respect of each Reference Entity:

Credit Event Notice

Notifying Party: Buyer

Notice of Publicly Available Information: Applicable

The Conditions to Settlement with respect to a Reference Entity may be satisfied on any day during the period from (and including) the Closing Date through (and including) the end of the Notice Delivery Period. |
| Credit Event Matrix: | The matrix attached hereto as Annex D. |
| Credit Events: | In respect of each Reference Entity, the applicable Credit Events shall be each event listed in the Credit Event Matrix applicable to the jurisdiction specified opposite the relevant Reference Entity in the Reference Registry. The Credit Events will include one or more of the following: (i) Bankruptcy, (ii) Failure to Pay, (iii) Obligation Acceleration, (iv) Restructuring (if specified as applicable in the Reference Registry) and (v) Repudiation/Moratorium. |

-5-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

Obligation(s):

Obligation Category:

In respect of each Reference Entity, the Obligation Category shall mean each category listed in the Credit Event Matrix applicable to the jurisdiction specified opposite the relevant Reference Entity in the Reference Registry. Each Benchmark Obligation will be deemed to satisfy the Obligation Category.

Obligation Characteristics:

In respect of each Reference Entity, the Obligation Characteristics shall mean each characteristic listed in the Credit Event Matrix applicable to the jurisdiction specified opposite the relevant Reference Entity in the Reference Registry. Each Benchmark Obligation will be deemed to satisfy the Obligation Characteristics.

Valuation Date:

In respect of each Reference Entity for which the Conditions to Settlement have been satisfied, the Event Determination Date.

Final Price:

Forty- percent (40%)

Reference Entity
  Loss Amount:

An amount equal to the product of (A) the Reference Price *minus* the Final Price and (B) the Reference Entity Calculation Amount with respect to such Reference Entity.

Notwithstanding anything to the contrary, on the date of each Additional Issuance of Notes, each Reference Entity Loss Amount determined prior to such date shall thereinafter be deemed to be an amount equal to the product of such Reference Entity Loss Amount (prior to adjustment) and the relevant Increase Adjustment Variable.

Notwithstanding anything to the contrary, on the Payment Date relating to an Optional Reduction of the Notes (if applicable), each Reference Entity Loss Amount determined prior to such date shall thereinafter be deemed to be an amount equal to the product of such Reference Entity Loss Amount (prior to adjustment) and the relevant Reduction Adjustment Variable.

Final Valuation Notice:

The Calculation Agent shall provide written notification to Party B and the Trustee of the Reference Entity Loss Amount with respect to a Reference Entity no later than the earlier of (i) the third (3rd) New York Business Days following the related Valuation Date, and (ii) the first Distribution Date to occur, in each case, as evidenced by the Trustee's prompt written acknowledgment of receipt thereof.

Aggregate Loss Amount:

At any time on any day, the aggregate of all Reference Entity Loss Amounts calculated hereunder with respect to all Reference Entities.

Loss Threshold Amount:

$86,666,667

Loss Cap Amount:

$50,000,000

Cash Settlement Amount:

The Cash Settlement Amount with respect to a Reference Entity shall be determined on the relevant Valuation Date. The "Cash Settlement Amount" on such Valuation Date shall mean an amount equal to:

-6-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

(i)    if the Aggregate Loss Amount on such date is less than or equal to the Loss Threshold Amount, zero;

(ii)    if the Aggregate Loss Amount on such date is greater than the Loss Threshold Amount but less than the sum of the Loss Threshold Amount and the Loss Cap Amount, (A) the Aggregate Loss Amount *minus* (B) the sum of (x) the Loss Threshold Amount and (y) the aggregate of any Cash Settlement Amounts determined prior to such date of delivery; and

(iii)    if the Aggregate Loss Amount on such date is greater than or equal to the sum of the Loss Threshold Amount and the Loss Cap Amount, (A) the Loss Cap Amount *minus* (B) the aggregate of any Cash Settlement Amounts determined prior to such date of delivery.

Notwithstanding anything to the contrary, on the date of each Additional Issuance of Notes, each Cash Settlement Amount determined prior to such date shall thereinafter be deemed to be an amount equal to the product of such Cash Settlement Amount (prior to adjustment) and the relevant Increase Adjustment Variable.

Notwithstanding anything to the contrary, on the Payment Date relating to an Optional Reduction of the Notes (if applicable), each Cash Settlement Amount determined prior to such date shall thereinafter be deemed to be an amount equal to the product of such Cash Settlement Amount (prior to adjustment) and the relevant Reduction Adjustment Variable.

Actions With Respect to
Cash Settlement Amounts:

On each Valuation Date, the Aggregate Outstanding Amount of the Notes shall be reduced by an amount equal to the relevant Cash Settlement Amount.

Notwithstanding anything to the contrary in the Credit Derivatives Definitions, Party B shall have no obligation to pay Party A any Cash Settlement Amounts determined hereunder.

**Additional Terms:**

Modifications to Certain
Defined Terms
and Provisions Related
to Determinations of
a Successor:

In respect of this Transaction:

(i)    Sections 2.2(a)(i) and (ii) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for the entire Credit Derivative Transaction" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(ii)    Sections 2.2(a)(iii) and (iv) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for a New Credit

-7-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

Derivative Transaction determined in accordance with the provisions of Section 2.2(e)" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(iii) Section 2.2(d) of the Credit Derivatives Definitions shall be amended by:

    (a) the deletion from sub-section (i) of the words "Credit Derivative Transaction" and their replacement with the words "Reference Entity";

    (b) the insertion in sub-section (iii) of the words "specified in relation to the relevant Reference Entity" after the words "the Reference Obligation" ; and

    (c) the deletion following sub-section (iii) of the words "Credit Derivative Transaction" and their replacement with the word "Successor";

(iv) Section 2.2(e) of the Credit Derivatives Definitions shall be replaced in its entirety by the following:  "Where, pursuant to Section 2.2 (a) above, one or more Successors have been identified in relation to a particular Reference Entity:"

    (a) each such Successor will be a Reference Entity (a "Successor Reference Entity") for the purposes of this Credit Derivative Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

    (b) the Reference Entity Calculation Amount in respect of each such Successor Reference Entity shall be the Reference Entity Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities."

| | |
|---|---|
| **Merger of Reference Entity and Seller:** | Section 2.31 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| **Modifications to Definition of Not Subordinated:** | In respect of this Transaction, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be amended by the insertion of (a) the words "of the relevant Reference Entity" immediately after the words "most senior Reference Obligation" in the second line thereof; (b) the words "with respect to such Reference Entity" immediately after the words "Reference Obligation is specified" in the third line thereof; and (c) the word "relevant" immediately before the words "Reference Entity" in the fifth line thereof. |

If (A) a Benchmark Obligation is specified in the Reference Registry, (B) a Credit Event occurs with respect to a Reference Entity, and (C) the Reference Obligation(s) identified by Party A in the applicable Reference Obligation Identification Notice is not the Benchmark

-8-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

Obligation of such Reference Entity, Section 2.19(b)(i)(A) of the Credit Derivatives Definitions shall be further amended by deleting the words "the most senior Reference Obligation" in the second line thereof and replacing such words with "the Benchmark Obligation of the relevant Reference Entity".

**Amendment to Section 9.1 of the Credit Derivatives Definitions:**

Additional Representations:

Section 9.1 of the Credit Derivatives Definitions is hereby amended by adding the following additional representations to such Section:

"(c)   Buyer and Seller shall each be deemed to represent to the other party on the Trade Date that:

(i)   it is duly authorized to enter into this Transaction.

(ii)   it understands the risks of this Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom.

(iii)   it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into this Transaction is appropriate for such party in light of its financial capabilities and objectives.

(iv)   it is acting for its own account and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction, it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction.  It has not received from the other party any assurance or guarantee as to the expected results of the Transaction.

(v)   it is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction.

(vi)   it is capable of assuming, and assumes, the financial and other risks of the Transaction.

(vii)   the other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

-9-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

(viii) it is acting as principal in respect of this Confirmation and the Transaction and not as agent or in any other capacity, fiduciary or otherwise.

(ix) that upon due execution and delivery of this Confirmation, such Confirmation shall constitute its legal, valid and binding obligation, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or in law)."

-10-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

DCLIB1 83480.8

**Interpretation;**
**No Need to Suffer a Loss:**

Interpretation:                         Each reference to the singular shall include the plural and vice versa.

No Need to Suffer a Loss:               Neither Party A nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by Party B with respect to this Transaction are not conditional on Party A (or any of its affiliates) sustaining or being exposed to a risk of loss.  The payments to be made by Party B with respect to this Transaction are due from Party B whether or not Party A (or any of its affiliates) actually suffers a loss.

Additional Provisions:                  See Annex C attached hereto for additional provisions that apply to this Transaction.

**Certain Additional Defined Terms:**

Notes:                                  Fixed Rate Notes issued by Party B and the Co-Issuer under the Indenture.

Co-Issuer:                              Stony Hill CDO Series 2005-1 LLC.

Indenture:                              The Series Indenture and the Standard Terms, collectively.

New York Business Day:                  A day on which commercial banks and foreign exchange markets settle payments in The City of New York.

Person:                                 An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), bank, unincorporated association or government or any agency or political subdivision thereof.

Series Indenture:                       The Series Indenture, dated as of July 14, 2005, among Party B, the Co-Issuer and the Trustee, which supplements and incorporates the Standard Terms.

Standard Terms:                         The Standard Terms for Indentures, dated as of July 14, 2005.

**Notice and Account Details:**

Telephone and
Facsimile Numbers and
Contact Details for
Notices:

Party A:                                Lehman Brothers International (Europe)
                                        Telephone Number:  (44) 20 7102 120
                                        Facsimile Number:  (44) 20 7102 2044
                                        Attn:  Documentation Manager

-11-

Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.

With a copy of all notices to:

Transaction Management
Telephone Number:  (212) 526-0806
Facsimile Number:  (212) 652-0556
Attn:  Jonathan Lai

Party B:

Stony Hill CDO SPC, for the Account of the Series 2005-1 Segregated Portfolio
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
Grand Cayman, Cayman Islands
Facsimile Number:  (345) 945-7100
Attn:  The Directors

With a copy of all notices to:

U.S. Bank National Association, as Trustee
1 Federal Street, 3rd Floor
Mail Station EX-MA-FED
Boston, Massachusetts 02110
Telephone Number: (617) 603-6479/6480
Facsimile Number
Attn:  Corporate Trust Services/CDO Administration

**Account Details:**

Payments to Party A

Account for payments:

Lehman Brothers International (Europe)
Fed ABA No: 021000021
Bank of America, New York
A/C Lehman Brothers International (Europe)
A/C # 6550-1-61536

Payments to Party B

Account for payments:

U.S. Bank National Association
Minneapolis, MN
ABA # 091-000-022
DDA Account # 173103321464
Account # 790227-200
Name: Stony Hill 2005-1 Interest Collections Payment Account

-12-

**Counterparties are advised to make an independent review and reach their own conclusions regarding the economic risks and benefits of a proposed transaction and the legal, credit, tax, accounting and other aspects of such transaction in relation to their particular circumstances  Lehman Brothers enters into over-the-counter derivatives transactions with counterparties on an arm's-length basis and does not act as an advisor or fiduciary to its counterparties except where a law, rule or written agreement expressly provides otherwise.**

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By:

Name:

Title:

**ANDREW MACLEAN**

**Authorised Signatory**

Confirmed as of the date first written:

STONY HILL CDO SPC, for the account of the
SERIES 2005-1 SEGREGATED PORTFOLIO

By:

Name:

Title:

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By:_____
      Name:
      Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.,
solely in its capacity as Calculation Agent

By:_____
      Name:
      Title:

Confirmed as of the date first written:

STONY HILL CDO SPC, for the account of the
SERIES 2005-1 SEGREGATED PORTFOLIO

By:_____
      Name:
      Title:

[Confirmation: Stony Hill 2005-1]

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS INTERNATIONAL (EUROPE)


By:_____
       Name:
       Title:


Confirmed as of the date first written:

STONY HILL CDO SPC, for the account of the
SERIES 2005-1 SEGREGATED PORTFOLIO

By:_____
   Name:
   Title:    **Carlos Farjallah**
           **Director**

## LEHMAN BROTHERS

### ANNEX A

See Appendix B of the Offering Memorandum

DCLIB1 83480.8

**LEHMAN BROTHERS**

**ANNEX B**

| Size of the Reference Portfolio | Loss Threshold Amount | | Loss Cap Amount | | Reference Entity Calculation Amount | |
|---|---|---|---|---|---|---|
| $3,333,333,333 | $86,666,667 | 2.60% | $50,000,000.00 | 1.50% | $33,333,333 | 1.00% |

**LEHMAN BROTHERS**

**ANNEX C**

**Additional Terms**

(a) **Additional Agreements.** Each party agrees as set out below for so long as either party has or may have any obligation under this Transaction:

(i) The Buyer shall be under no obligation to account to the Seller or to any of its affiliates for any payment or sums, if any, recovered from a Reference Entity or any third party.

(ii) Each party, the Calculation Agent and their respective affiliates may, whether by virtue of the types of relationships described herein or otherwise, at the date hereof or at any time hereafter, be in possession of information in relation to any Reference Entity that is or may be material in the context of this Transaction and that may or may not be publicly available or known to the aforementioned persons. Apart from the obligations of the Calculation Agent set out in this Confirmation, this Transaction does not create any obligation on the part of any such person or its affiliates to disclose to the other party any such relationship or information (whether or not confidential).

(iii) The parties agree that, in entering into this Transaction, neither the Buyer nor the Seller intends to enter into a contract of surety, guarantee, insurance, assurance or indemnity, and the parties' obligations hereunder are not conditional or dependent upon or subject to the Buyer having any title, ownership or interest (whether legal, equitable or economic) in any Reference Entity.

(iv) The parties shall be obliged to perform this Transaction without regard to whether the Buyer or any affiliate of the Buyer has any credit exposure in respect of a Reference Entity. Neither the Buyer nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by the Seller under this Transaction are not conditional on the Buyer (or any of its affiliates) sustaining or being exposed to a risk of loss.

(v) The Seller acquires no rights, either direct or indirect or by way of subrogation, against any Reference Entity or in respect of any Benchmark Obligation thereof as a result of entering into or performing its obligations under this Transaction.

(b) **The Calculation Agent.**

(1) The Calculation Agent shall be responsible for:

(i) Determining a successor as Calculation Agent (if necessary) after agreement with the Seller;

(ii) Determining a Successor to any Reference Entity in accordance with the Credit Derivatives Definitions;

(iii) Determining Reference Entity Loss Amounts and Cash Settlement Amounts;

(iv) Determining any Adjustment Amount, any Adjustment Reference Entity, any Deferred Interest Amount, the Contingency Amount with respect to the Notes, the Contingency Cash Settlement Amount with respect to the Notes, any relevant Deferred Interest Cut-off Date, any relevant Deferred

Redemption Cut-off Date, any relevant Deferred Redemption Date, any Deferred Redemption Amount with respect to the Notes and the Outstanding Adjustment Amount with respect to each Adjustment Reference Entity; and

(v)     To the extent not provided for by sub-paragraphs (i) to (iv) above, making the calculations and determinations and giving the notices as set out and contemplated hereunder.

(2)  Whenever the Calculation Agent is required to act or to exercise judgment, it shall do so in good faith and in a commercially reasonable manner.  Its calculations and determinations shall be binding in the absence of bad faith or manifest error.

(3)  Each party agrees that the Calculation Agent is not acting as a fiduciary for or as an advisor to either party in respect of its duties as Calculation Agent in connection with this Transaction.

# LEHMAN BROTHERS

# ANNEX D

# Credit Event Matrix

| Jurisdiction | NORTH AMERICA | EUROPE | JAPAN | LATIN AMERICA | LATIN AMERICA SOVEREIGN |
|---|---|---|---|---|---|
| All Guarantees: | Not Applicable | Applicable | Applicable | Applicable | Applicable |
| Credit Events: | Bankruptcy<br>Failure to Pay<br>Grace Period Extension:  Applicable<br>Restructuring, if specified as applicable in the Reference Registry<br>Restructuring Maturity Limitation and Fully Transferable<br>Obligation:  Applicable | Bankruptcy<br>Failure to Pay<br>Grace Period Extension:  Applicable<br>Restructuring, if specified as applicable in the Reference Registry<br>Modified Restructuring<br>Maturity Limitation and Conditionally Transferable<br>Obligation:  Applicable | Bankruptcy<br>Failure to Pay<br>Grace Period Extension:  Applicable<br>  Payment Requirement:  If the Floating Rate Payer Calculation Amount is in JPY, JPY 100,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay. In all other cases, USD 1,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the Failure to Pay.<br>Restructuring<br>  Multiple Holder Obligation: Not Applicable<br>  Default Requirement:  If the Floating Rate payer Calculation Amount is in JPY, JPY 1,000,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event.  In all other cases, USD 10,000,000 or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event. | Bankruptcy<br>Failure to Pay<br>Grace Period Extension:  Applicable<br>Obligation Acceleration<br>Restructuring<br>Multiple Holder<br>Obligation:  Not Applicable<br>Repudiation/Moratorium | Failure to Pay<br>Grace Period Extension:  Applicable<br>Obligation Acceleration<br>Restructuring<br>Multiple Holder<br>Obligation:  Not Applicable<br>Repudiation/Moratorium |
| Obligation Category[1]: | Borrowed Money | Borrowed Money | Borrowed Money | Bond | Bond |
| Obligation Characteristics*: | None | None | None | Not Subordinated<br>Not Domestic Currency<br>Not Domestic Law<br>Not Domestic Issuance | Not Subordinated<br>Not Domestic Currency<br>Not Domestic Law<br>Not Domestic Issuance |

---

[1]    A Benchmark Obligation specified in the Reference Registry will be deemed to satisfy the relevant criteria with respect to each jurisdiction.

**Exhibit C**

Dated                    2014


LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)

and

STONY HILL CDO SPC FOR THE ACCOUNT OF THE SERIES 2005-1
SEGREGATED PORTFOLIO

and

STONY HILL CDO SERIES 2005-1 LLC

and

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE


CLAIMS DETERMINATION DEED

This Claims Determination Deed (this "**Deed**") is made on                    2014 between:

(1)    **LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)**, a company incorporated in England and Wales with registered number 2538254, whose registered address is Level 23, 25 Canada Square, Canary Wharf, London E14 5LQ, United Kingdom, acting by its joint administrators, Anthony Victor Lomas, Steven Anthony Pearson, Julian Guy Parr, Paul David Copley and Russell Downs, each a partner of PwC, 7 More London Riverside, London SE1 2RT, United Kingdom (the "**Company**"); and

(2)    **STONY HILL CDO SPC for the account of the Series 2005-1 Segregated Portfolio**, an exempted company registered as a segregated portfolio company under the laws of the Cayman Islands, having its registered office at c/o Maples FS Limited, PO Box 1093, Queensgate House, South Church Street, Grand Cayman, KY1-1102, Cayman Islands, with 151034 as its company registration number (referred to herein, in respect of the Series 2005-1 Segregated Portfolio only, as the "**Creditor**");

(3)    **STONY HILL CDO SERIES 2005-1 LLC**, a limited liability corporation formed under the laws of the State of Delaware having its registered office at 850 Library Avenue, Suite 204, Newark, DE 19711 with 3996423 as its file number (the "**Co-Issuer**") and

(4)    **U.S. BANK NATIONAL ASSOCIATION**, a national banking association formed under the laws of the United States of America, not individually but as Trustee for the purposes of accepting and acknowledging the agreements set forth herein (the "**Trustee**").

**Background:**

(A)    Anthony Victor Lomas and Steven Anthony Pearson, each a partner of PwC, were appointed to act as joint administrators of the Company on the Administration Date pursuant to the Administration Order. On 2 November 2011, Paul David Copley and Russell Downs and on 22 March 2013 Julian Guy Parr, each a partner of PwC, were also appointed to act as joint administrators of the Company.

(B)    Pursuant to certain of the Granting Clauses of the Series Indenture (defined below) the Trustee holds as trustee the Creditor's rights, title and interest arising under the Creditor Agreement (as defined below).

(C)    In consideration of the Company, the Trustee and the Creditor agreeing that the Creditor has an Admitted Claim against the Company in an amount equal to the Agreed Claim Amount, (i) the Creditor, the Co-Issuer and the Trustee wish to release and discharge the Company and (ii) the Company wishes to release and discharge the Creditor, the Co-Issuer and the Trustee in respect of any and all other Claims, losses, costs, charges, expenses, demands, actions, causes of action, liabilities, rights and obligations to or against each other and howsoever arising other than certain continuing obligations of the Trustee to make payments under the Indenture.

**It is agreed** as follows:

**1      Definitions and Interpretation**

**1.1    Definitions**

In this Deed, unless inconsistent with the subject or context, the following expressions bear the following meanings:

"**Administration**"                    the administration of the Company under the

|  | Administration Order; |
|---|---|
| **"Administration Date"** | 15 September 2008; |
| **"Administration Order"** | the order of the Court dated 15 September 2008 made under paragraph 12 of Schedule B1 of the Insolvency Act under which Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis and Dan Yoram Schwarzmann were appointed as joint administrators of the Company; |
| **"Administrators"** | the persons from time to time serving as administrators of the Company who, as at the date of this Deed, are Anthony Victor Lomas, Steven Anthony Pearson, Julian Guy Parr, Paul David Copley and Russell Downs, each a partner of PwC, 7 More London Riverside, London SE1 2RT, United Kingdom; |
| **"Admitted Claim"** | an unsecured Claim of a creditor of the Company which qualifies for dividends from the estate of the Company available to its unsecured creditors pursuant to the Insolvency Rules and the Insolvency Act (or, if applicable, as amended or replaced pursuant to the terms of, *inter alia*, a scheme of arrangement or a company voluntary arrangement); |
| **"Affiliate"** | in relation to the Company, any Subsidiary, a Holding Company or any other Subsidiary of that Holding Company; |
| **"Agreed Claim Amount"** | £10,035,123.00; |
| **"CAPCO"** | Customer Asset Protection Company, an insurance company licensed by the state of Vermont, United States of America; |
| **"Change of Address"** | has the meaning given to it in Clause 22.2; |
| **"Claim"** | a claim in law, in equity or otherwise and of whatsoever nature: |

   (i)     including any and all claims, actions, liabilities, rights and obligations for breach of contract, tort, statute, restitutionary claims and breach of trust;

   (ii)    whether arising by reason of, amongst other things, insolvency or the termination, whether voluntary or for cause, of any contractual obligation or for any failure of a person to perform any contractual, legal or regulatory obligation or otherwise;

   (iii)   for, amongst other things, the enforcement of any right to, or any Liability in respect of a right to:

   (a)    seek or enforce judgment;

(b) exercise any remedy (for damages or otherwise), indemnity and contribution, whether for losses (including consequential loss, economic loss, loss of bargain, loss of value, or other losses computed by reference to value which may have been available had an obligation been duly performed in a timely manner, or otherwise), costs and expenses of any nature; or

(c) apply any set-off, netting, withholding, combination of accounts or retention or similar rights in respect of any claim or liability whatsoever, and/or

(iv) including a Proprietary Claim,

and "**to Claim**" and "**Claimed**" shall be construed accordingly;

"**Contractual Currency**"     any currency apart from pounds sterling;

"**Court**"     the High Court of Justice in England and Wales;

"**Creditor Agreement**"     ISDA Master Agreement entered into between the Company and the Creditor dated as of 14 July 2005 as supplemented by the certain Schedule to the ISDA Master Agreement dated 14 July 2005 and that certain Confirmation dated 14 July 2005 from the Company to the Creditor;

"**Currency Conversion Claim**"     a non-provable claim, if any, that may be asserted by the Creditor where:

(i) the Admitted Claim is paid in full by the Company by way of distributions in the Administration or following a Liquidation Event; and

(ii) the Creditor has a contractual right to be paid part or all of the Admitted Claim which is agreed in accordance with this Deed in a Contractual Currency (the sum arising from such right, the "**Original Foreign Currency Amount**"); and

(iii) the total amount received by the Creditor in distributions of principal in respect of such part (or all) of the Admitted Claim relating to the Original Foreign Currency Amount, when converted into the relevant Contractual Currency upon the dates of distribution, is less than the Original Foreign Currency Amount,

when calculating its claim under (ii) and (iii) above, the Creditor may take in to account the difference between any interest accrued on the Original Foreign Currency Amount, and any interest received in relation to such part (or all) of the Admitted Claim relating to the Original Foreign Currency Amount pursuant to Rule 2.88 of the

|  | Insolvency Rules, when converted into the relevant Contractual Currency upon the dates of distribution; |
|---|---|
| **"Current Process Agent"** | has the meaning given to it in Clause 22.3; |
| **"FSA"** | the Financial Services Authority of the United Kingdom (or any successor body as relevant); |
| **"FSA Rules"** | the rules and guidance of the FSA; |
| **"Holding Company"** | in relation to the Company, any other company, corporation or legal entity in respect of which it is a Subsidiary; |
| **"Indenture"** | the Series Indenture as supplemented by that certain Standard Terms for Indentures dated July 14, 2005; |
| **"Insolvency Act"** | Insolvency Act 1986; |
| **"Insolvency Rules"** | Insolvency Rules 1986; |
| **"LBHI"** | Lehman Brothers Holdings Inc.; |
| **"Liabilities"** | all liabilities, duties and obligations of every description, whether deriving from contract, common law, case law, legal provisions, statute or otherwise, whether present or future, actual or contingent, ascertained or unascertained or disputed or otherwise and whether owed or incurred severally or jointly or as principal or surety, and **"Liability"** means any one of them; |
| **"Liquidation Event"** | either an order by the Court to compulsorily wind up the Company or the commencement of a creditors' voluntary winding-up in respect of the Company (both pursuant to the Insolvency Act and the Insolvency Rules and including, but not limited to, under paragraph 83 of Schedule B1 to the Insolvency Act); |
| **"New Process Agent"** | has the meaning given to it in Clause 22.3; |
| **"Note Purchase Agreement"** | the Note Purchase Agreement dated July 14, 2005 entered into between the Creditor, Co-Issuer, Lehman Brothers Inc., and the Company |
| **"Notes"** | the Stony Hill CDO SPC, Series 2005-1 Segregated Portfolio notes issued by the Creditor and Co-Issuer pursuant to the Indenture and **"Noteholder"** means a holder of some or all of the Notes; |
| **"Party"** | the Company, the Creditor, the Co-Issuer or the Trustee or all of them (as applicable); |
| **"Plan"** | the Third Amended Joint Chapter 11 Plan of LBHI and its Affiliated Debtors approved by the United States Bankruptcy Court for the Southern District of New York on December 6, 2011; |

| | |
|---|---|
| **"Proceeding"** | any process, demand, action, legal or other proceeding or suit, including any administrative, judicial or quasi-judicial proceeding, any regulatory process, arbitration, alternative dispute resolution, mediation, expert determination, judicial review, adjudication, forfeiture, re-entry, seizure, distraint, execution, enforcement of judgment or award or otherwise howsoever and/or any other step taken for the purpose of creating or enforcing a lien; |
| **"Proprietary Claim"** | a claim, whether actual, prospective or contingent and whether arising by statute, at common law, in equity or otherwise, against the Company and/or the Administrators: |
| | (i) that the Creditor is the legal and/or beneficial owner of an asset (whether alone or jointly with others and whether or not it is subject to any prior ranking security interest or encumbrance of any kind whatsoever (including whether legal, equitable and/or possessory)); and/or |
| | (ii) for delivery and/or transfer of such asset to (or to the order of) the Creditor, and |
| | a reference to "asset" within this definition includes present and future properties, revenues and rights of every description; |
| **"PwC"** | PricewaterhouseCoopers LLP, a limited liability partnership registered in England (number OC 303525), with its registered office at 1 Embankment Place, London, England, WC2N 6RH; |
| **"Relevant Persons"** | the Company, the Administrators and their firm, members, partners, directors, officers, employees, agents, advisers and representatives; |
| **"Series Indenture"** | that certain Series Indenture dated as of July 14, 2005 entered into between, *inter alia*, the Creditor, the Trustee and the Co-Issuer; |
| **"Subsidiary"** | in relation to the Company or its Holding Company, any company, corporation or other legal entity: |
| | (i) which is controlled, directly or indirectly, by the Company or its Holding Company; |
| | (ii) more than half the issued share capital of which is beneficially owned, directly or indirectly, by the Company or its Holding Company; or |
| | (iii) which is a subsidiary of another Subsidiary of the Company or its Holding Company, |
| | and, for this purpose, a company or corporation shall be treated as being controlled by another if that other |

|  | company or corporation is able to determine the composition of the majority of its board of directors or equivalent body; |
|---|---|
| **"Transfer"** | in relation to any Claim, asset or liability, the assignment, novation, sale or any other form of transfer (including by way of any succession in title arising by operation of insolvency or any other law), whether directly or indirectly, legally or beneficially, which is effective to transfer the title to, rights of and obligations under such Claim, asset or liability, as the case may be, from one person to another and **"Transferred"** shall be construed accordingly; |
| **"Transfer Notice"** | has the meaning given to it in Clause 3.3; |
| **"Transferee"** | has the meaning given to it in Clause 3.2; and |
| **"Transferor"** | has the meaning given to it in Clause 3.2. |

## 1.2    Interpretation

In this Deed, unless the context otherwise requires or unless otherwise expressly provided:

1.2.1   references to any specified provision of this Deed shall be construed as references to that provision subject to any modification, addition or condition approved or imposed pursuant to Clause 13 (*Modification*);

1.2.2   references to a "**person**" include any company, unincorporated association or partnership, whether or not having separate legal personality, and references to a company include any company, corporation or body corporate, wherever incorporated;

1.2.3   references to any person shall be construed so as to include its successors in title, permitted assignees and permitted transferees;

1.2.4   a reference to the Administrators shall be construed as being to the Administrators both jointly and severally and to any person who from time to time is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Administrators;

1.2.5   references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

1.2.6   references to any document, agreement or instrument is a reference to that document, agreement or instrument as amended, novated, supplemented, extended, restated or replaced from time to time;

1.2.7   words importing the plural shall include the singular and vice versa and words importing one gender shall include all genders;

1.2.8   headings are for ease of reference only and shall not affect the interpretation of this Deed;

1.2.9   references to Clauses, sub-clauses and Appendices are to Clauses and sub-clauses of, and Appendices to, this Deed;

1.2.10    references to time are to London time;

1.2.11    in the event of a conflict or inconsistency between the provisions of this Deed, the Insolvency Act, the Insolvency Rules, the rules and guidance of the Prudential Regulation Authority of the United Kingdom (or any successor body as relevant) and/or the FSA Rules, for the purposes of this Deed, and to the extent such acts and/or rules permit, the provisions of this Deed shall prevail;

1.2.12    the language which governs the interpretation of this Deed is the English language. All notices to be given by any parties and all other communications and documentation which are in any way relevant to this Deed or the performance of this Deed shall be in the English language;

1.2.13    references to "**£**" and "**pounds sterling**" are to the lawful currency for the time being of the United Kingdom of Great Britain and Northern Ireland;

1.2.14    the words "**include**" and "**including**" mean include and including without limitation;

1.2.15    a reference to a "**judgment**" includes any order, injunction, determination, award or other judicial or arbitral measure in any jurisdiction;

1.2.16    a reference to a "**law**" includes common or customary law and any constitution, decree, judgment, legislation, order, ordinance, regulation, statute, treaty or other legislative measure, in each case of any jurisdiction whatever (and "**lawful**" shall be construed accordingly); and

1.2.17    references to "**FSA**", "**FSA Rules**" and "**FSA's Client Asset Sourcebook**" shall, where applicable, be construed as being or including a reference to the Financial Conduct Authority of the United Kingdom (the "**FCA**"), the successor to the FSA, and to the rules and guidance of the FCA and the FCA's Client Asset Sourcebook respectively.

## 2    Claims Agreement

2.1    The Company and the Creditor irrevocably and unconditionally agree that notwithstanding the terms of any contract (including the Creditor Agreement):

2.1.1    the Creditor shall have an Admitted Claim in an amount equal to the Agreed Claim Amount;

2.1.2    the Admitted Claim, in an amount equal to the Agreed Claim Amount, shall constitute the Creditor's entire Claim against the Company;

2.1.3    save solely for the Admitted Claim, and subject to Clause 2.3, (i) the Creditor, the Trustee and the Co-Issuer are hereby each irrevocably and unconditionally released and forever discharged by the Company and the Administrators and (ii) the Company and the Administrators are hereby each irrevocably and unconditionally released and forever discharged by the Creditor, the Trustee and the Co-Issuer, in each case from any and all losses, costs, charges, expenses, Claims (including all Claims for interest, costs and orders for costs), demands, actions, causes of action, liabilities, rights and obligations (including those which arise hereafter upon a change in the relevant law) to or against each other and howsoever arising, whether known or unknown, whether arising in equity or under common law or statute or by reason of breach of contract or in respect of any tortious or negligent act or omission (whether or not loss or damage caused

thereby has yet been suffered) or otherwise, whether arising under or related to the Creditor Agreement and the transactions contemplated thereby or not, whether in existence now or coming into existence at some time in the future, and whether or not in the contemplation of the Creditor, the Trustee, the Co-Issuer, the Company and/or the Administrators on the date hereof; and

2.1.4    the Creditor will not take any steps to prove for, or to Claim for, any debt in the Administration (or other insolvency process) of the Company, or otherwise bring any Claim, action, demand or issue (or continue) any Proceedings against the Company and/or the Administrators (or any of them) in any jurisdiction in respect of any and all Claims and matters as are referred to in Clause 2.1.3 above.

2.2    For the avoidance of doubt, this Deed shall not prejudice, affect or restrict (and entry into this Deed is not intended to be, and shall not be construed as, an election of remedy or a waiver or limitation of) any rights or claims that the Creditor may have for or in respect of interest under rules 2.88(7) to 2.88(9) (inclusive) of the Insolvency Rules or section 189 of the Insolvency Act.

2.3    Nothing in this Deed shall (i) prevent the Creditor from asserting a Currency Conversion Claim; (ii) operate as a discharge or release of a Currency Conversion Claim if any such claim exists; or (iii) constitute an acknowledgement by the Company of the existence (as a matter of law or fact) of any Currency Conversion Claim.

## 3    Transfer

3.1    Save as set out in Clause 3.2, the Trustee and the Creditor may not Transfer its legal and/or beneficial interest in, or otherwise the whole or any part of:

3.1.1    the Admitted Claim; and/or

3.1.2    its right to receive any dividend in respect of, or in connection with, the Admitted Claim.

3.2    Notwithstanding any provision to the contrary in the Creditor Agreement, and subject always to Clauses 3.3 and 3.4, the Trustee and the Creditor (together, the "**Transferor**") may assign all of the items set out in Clause 3.2.1 to 3.2.2 inclusive below (all together and in whole (but not part)):

3.2.1    its entire legal and beneficial interest in the Admitted Claim; and

3.2.2    its entire right to receive, and its entire legal and beneficial interest in, any and all dividends in respect of, or in connection with, the Admitted Claim,

to another person (the "**Transferee**").

3.3    Any assignment in accordance with Clause 3.2 shall not be valid and the Administrators and the Company shall not be bound to recognise, nor to deal with, the Transferee (in respect of such assignment) in substitution for, and in place of, the Transferor unless and until the Transferor and Transferee sign and deliver to the Company (in accordance with Clause 18 (*Notices*)) the letter agreement substantially in the form set out in the Appendix (*Form of Transfer Notice*) (a "**Transfer Notice**") and the Company countersigns such Transfer Notice and serves the same on the Transferor (in accordance with Clause 18 (*Notices*)) and the Transferee (such service being deemed effective by sending the same to the Transferee's postal or email address specified in the Transfer Notice), provided that such countersignature and service shall not be unreasonably withheld or delayed.

**3.4**   In respect of any assignment in accordance with Clause 3.2:

**3.4.1**   if the Company serves any notices on, or the Company or the Administrators make any payment to, or to the order of, the Transferor before the Company has served a countersigned Transfer Notice on the Transferor and Transferee (in accordance with Clause 3.3), this shall constitute a valid discharge of the Company's and the Administrators' obligations notwithstanding any assignment; and

**3.4.2**   where the countersigned Transfer Notice is served after any notice of declaration of a dividend to creditors with Admitted Claims, but before the actual payment of that dividend, payment to, or to the order of, the Transferor shall constitute a valid discharge of the Company's and the Administrators' obligation to pay the declared dividend.

**3.5**   Each of the Trustee and the Creditor represents and warrants to the Company and the Administrators, on the date that it executes the Transfer Notice, and immediately before the Effective Date (as defined therein), that it has not Transferred or purported to Transfer its legal and/or beneficial interest in, or otherwise the whole or any part of, the Admitted Claim and/or its right to receive, or legal or beneficial interest in, any dividend in respect of, or in connection with, the Admitted Claim, to any person.

## 4   Representations and Warranties

**4.1**   The Creditor makes the representations and warranties set out in this Clause 4.1 to the Company and the Administrators on the date of this Deed.

**4.1.1   Basic representations**

(i)   It is duly organised and validly existing under the laws of its jurisdiction of incorporation or organisation and, if relevant under such laws, in good standing.

(ii)   It has the power to execute, deliver and perform its obligations under this Deed (and any Transfer Notice to which it is party) and has taken all necessary action to authorise such execution, delivery and performance and the signatory or signatories (as applicable) are properly authorised to execute this Deed (and any such Transfer Notice) on its behalf.

(iii)   The execution, delivery and performance of its obligations under this Deed (and any Transfer Notice to which it is party) do not and will not conflict with any law or regulation applicable to it, and provision of the Indenture, its constitutional documents, any agreement or instrument binding on or affecting it or any of its assets.

(iv)   Its obligations under this Deed (and any Transfer Notice to which it is party) constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms.

**4.1.2   No insolvency proceedings**

(i)   No petition for insolvency proceedings in respect of it or its assets has been filed or is threatened to be filed.

(ii)    It is not unable to honour its obligations as they fall due and the value of its assets is not less than its liabilities (taking into account contingent and prospective liabilities).

### 4.1.3    No agency

It is acting as principal and not as agent in entering this Deed and in respect of the Admitted Claim, the Creditor Agreement and all transactions and trades thereunder.

### 4.1.4    Claims

(i)    Immediately prior to this Deed becoming effective, the Trustee was the legal owner of any and all Claims arising under or in connection with the Creditor Agreement and it held the benefit of such Claims for the holders of the notes issued in accordance with and under the Indenture.

(ii)    To the best of its knowledge and belief, and having made reasonable enquiries, (A) save for any payments (including any dividend or distribution) made directly by the Company and/or Administrators to the Creditor and/or (B) other than in respect of any Claims of the Creditor against LBHI under any guarantee it may have given to the Creditor in respect of the Liabilities of the Company, it has not received any amount or benefit in relation to any Claims against the Company arising under or in connection with the Creditor Agreement.

### 4.1.5    No previous Transfer

Save as set out in Clause 2.1.3 and in the Indenture, it has not Transferred, or purported to Transfer,  the benefit of, waived, compromised or otherwise disposed of any direct or indirect right, Claim, title, interest, action or cause of action (if any) against the Company whether arising in equity, at common law or under statute, contract (including any right, title or interest (if any) which it may have, or had, or purport to have (or to have had) under the Creditor Agreement or any other contract (if any) to which the Company and the Creditor are parties) or otherwise.

### 4.1.6    Accuracy of information

To the best of its knowledge and belief, and having made reasonable enquiries, any proof of debt and any substantiating documents submitted by, or on behalf of, the Creditor (as referenced in rule 2.72 of the Insolvency Rules) are, as at the date of this Deed, true, accurate and complete in every material respect.

### 4.1.7    No Claims against Affiliates

Other than in respect of any Claims of the Creditor against LBHI under any guarantee it may have given to the Creditor in respect of the liabilities of the Company, it has not Claimed or submitted a proof of debt (or equivalent in any foreign jurisdiction) in respect of the whole or any part of its Claim(s) arising under, or in connection with, the Creditor Agreement against any Affiliate of the Company.

### 4.1.8    No other agreements

Other than the Creditor Agreement, the Indenture, the Note Purchase Agreement relating to the Notes and this Deed, there are no other contracts entered into between the Creditor and the Company.

4.2     The Trustee makes the representations and warranties set out in this Clause 4.2 to the Company and the Administrators on the date of this Deed.

    4.2.1    It is duly organised and validly existing under the laws of its jurisdiction of incorporation or organisation and, if relevant under such laws, in good standing.

    4.2.2    Upon receipt of an executed letter of direction from the majority Noteholder directing the Trustee to enter into this Deed, it has the power to execute, deliver and perform its obligations under this Deed (and any Transfer Notice to which it is party) and has taken all necessary action to authorise such execution, delivery and performance and the signatory or signatories (as applicable) are properly authorised to execute this Deed (and any such Transfer Notice) on its behalf.

    4.2.3    The execution, delivery and performance of its obligations under this Deed (and any Transfer Notice to which it is party) do not and will not conflict with any law or regulation applicable to it, and provision of the Indenture, its constitutional documents, any agreement or instrument binding on or affecting it or any of its assets.

    4.2.4    Its obligations under this Deed (and any Transfer Notice to which it is party) constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

    4.2.5    It is the current trustee under the terms of the Indenture, it has the capacity to act as trustee under its governing documents and/or under applicable general law and its appointment is valid and effective both under the terms of the Indenture and the governing law of the Indenture.

4.3     The Company makes the representations and warranties set out in this Clause 4.3 on the date of this Deed.

    4.3.1    It is a company in administration, duly incorporated and validly existing under the laws of England and Wales.

    4.3.2    The Administrators were appointed to act as joint administrators of the Company pursuant to orders of the High Court of Justice, Chancery Division which provides that the affairs, business and property of the Company shall be managed by the Administrators in accordance with the Insolvency Act (the "**Orders**") and the Company accordingly warrants and represents that the Administrators have capacity to execute and deliver this Deed on behalf of the Company pursuant to such Orders.

    4.3.3    The obligations expressed to be assumed by it under this Deed are legal, valid, binding and enforceable obligations in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

    4.3.4    The entry into and performance by it of this Deed does not and will not conflict with any law or regulation applicable to it, or its constitutional documents.

**5    Undertakings**

The Trustee and the Creditor undertake to do all such acts and things as will be reasonably necessary and execute and deliver any further documents and give any further assurances as may be reasonably requested by the Company in order to give full effect to this Deed (and the terms of any further documents shall exclude any personal liability of the Administrators such exclusion to be substantially in the form contained in Clause 10 (*Exclusion of Administrators' Liability*)).

**6    Confidentiality**

**6.1    Confidentiality of this Deed**

6.1.1    No announcement or circular in connection with the existence or the subject matter of this Deed shall be made or issued by or on behalf of either Party save as provided below in this Clause 6.

6.1.2    The Parties shall treat as strictly confidential and not disclose (whether in writing, verbally or in electronic form or by any other means) to any party the negotiations relating to this Deed (and/or any part thereof) save as provided below.

6.1.3    The Parties may disclose this Deed (or any part thereof) to:

(i)    their respective directors, officers, partners, consultants, employees and regulators; and/or

(ii)    their respective advisers and auditors (on terms that such professional advisers undertake to comply with the provisions of Clauses 6.1.1 and 6.1.2 in respect of such information as if they were a party to this Deed).

6.1.4    The Creditor and the Trustee may disclose this Deed (or any part thereof) to:

(i)    any investors in the notes issued under the Indenture;

(ii)    LBHI, solely for the purpose of the Creditor proving a Claim against LBHI in respect of the obligations of the Company owed to the Creditor which were guaranteed by LBHI (on terms that LBHI undertake to comply with the provisions of Clauses 6.1.1 and 6.1.2 in respect of such information as if they were party to this Deed); and/or

(iii)    any Transferee and/or any person whom the Trustee and the Creditor consider, acting in good faith, to be a potential Transferee (in each case, on terms that such Transferee and/or potential Transferee undertakes to comply with the provisions of Clauses 6.1.1 and 6.1.2 in respect of such information as if they were a party to this Deed (where they are not otherwise bound by Clauses 6.1.1 and 6.1.2)).

**6.2    Waiver of confidentiality**

Each Party hereby waives, to the maximum extent permitted by law, any breach of confidentiality arising from the operation of this Deed and authorises the other Party and/or the Administrators to disclose to any other person any information which is required to be disclosed or considered to be necessary or desirable to disclose to enable this Deed to be administered effectively and/or for the purposes of disclosure as set out in Clause 6.3 (*Disclosure of information by the Parties*).

**6.3    Disclosure of information by the Parties**

Each of the Parties consents to the disclosure or use of information in the following circumstances:

6.3.1    any disclosure or use required by law or by any court of competent jurisdiction, the rules and regulations of any regulatory body or stock exchange;

6.3.2    disclosure or use for the purpose of any enquiry or investigation by any governmental, official or regulatory body which is lawfully entitled to require such disclosure or use;

6.3.3    any disclosure to CAPCO of any information received or generated by the Company and/or the Administrators pursuant to the submission of a proof of debt, information related thereto and this Deed to the extent that such information is requested or required by CAPCO;

6.3.4    any disclosure by the Administrators to any subsequent supervisor, liquidator or other officeholder of the Company;

6.3.5    any disclosure or use for the purpose of any Proceedings arising out of this Deed or any agreement entered into under or pursuant to this Deed or disclosure to a taxation authority in connection with the taxation affairs of a Party or in respect of any matters which are the subject of, or arise as a result of, the implementation and operation of this Deed;

6.3.6    any disclosure or use required in the exercise of the statutory duties of the Administrators or to the extent required by current insolvency practice or to enable the Administrators to properly carry out the duties of their office;

6.3.7    the information is or becomes publicly available (other than by breach of this Deed);

6.3.8    the relevant Party has given prior written approval to the disclosure or use;

6.3.9    any disclosure or use required by the Plan;

6.3.10    any disclosure by the Creditor permitted under Clause 6.1.4; and/or

6.3.11    the disclosure is made to a third party storage provider that provides disaster recovery or data back-up services to the Parties or the Administrators,

provided that, prior to disclosure or use of any information pursuant to sub-Clause 6.3.1 above, notice is given (to the extent legally possible) by the Party disclosing the information (the "**Disclosing Party**") to the other Party of the disclosure and the nature and extent of the disclosure and that, so far as is lawful and practicable to do so prior to such disclosure, the Disclosing Party shall promptly notify the other Party of such requirement or event for the purpose of which such disclosure would be made, with a view to providing the opportunity for the other Party to contest such disclosure or otherwise to agree the timing and content of such disclosure.

**7    Survival of Deed upon a Liquidation Event**

7.1    If the Company shall become subject to a Liquidation Event, this Deed shall not terminate and shall continue in full force and effect, and, unless the context otherwise requires, all

references to the Administrators shall be construed as references to the liquidators of the Company from time to time.

7.2     In the event of any inconsistency between the provisions of this Deed and the Insolvency Act or the Insolvency Rules as they apply to the Company following a Liquidation Event in accordance with this Clause 7, for the purposes of this Deed, the provisions of this Deed shall prevail to the maximum extent that the law allows.

## 8       Non-reliance on Information Ancillary to this Deed

8.1     So far as permitted by law and except in the case of fraud, the Relevant Persons shall not be liable in respect of anything done or suffered by the Trustee or the Creditor in reliance on any information provided or communications or announcements made to the Trustee or the Creditor in connection with this Deed.

8.2     The Trustee  has been directed and instructed by the majority holder of the Notes to enter into this Deed. The Creditor has made its own independent decision to enter into this Deed and as to whether this Deed is appropriate or proper for it based upon its own judgement and upon advice from its own independent advisers, as it has deemed necessary. Neither of the Trustee or the Creditor is relying on any communication and/or announcement (written or oral) of or from any Relevant Person as a recommendation or an inducement to enter into this Deed, it being understood that information and explanations relating to this Deed in any communication and/or announcement will not be relied upon or treated as a recommendation or an inducement to enter into this Deed.

8.3     No person has been authorised in connection with transactions contemplated by this Deed to give any information or make any representations other than those contained in this Deed and any such information or representation shall not be relied upon as having been authorised by the Company and/or the Administrators.

## 9       No Expense Claim

For the avoidance of doubt, no amount, liability or obligation in relation to this Deed shall be payable out of or charged on the property of the Company under paragraph 99(3) or 99(4) of Schedule B1 to the Insolvency Act and, if the Company becomes subject to a Liquidation Event, any and all such amounts, liabilities and obligations shall not rank as an expense of the Company's liquidation under Rule 4.218 of the Insolvency Rules.

## 10      Exclusion of Administrators' Liability

The Administrators have entered into and signed this Deed as agents for and on behalf of the Company and neither they, their firm, members, partners, directors, officers, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by the Company; or in respect of any failure on the part of the Company to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this Deed. The exclusion of liability set out in this Clause 10 shall arise and continue notwithstanding the termination of the agency of the Administrators and shall operate as a waiver of any Claims in tort as well as under the laws of contract.

**11      Contracts (Rights of Third Parties) Act 1999**

11.1    A person who is not a Party has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of, or enjoy any benefit under, this Deed, except to the extent set out in this Clause 11.

11.2    A subsequent supervisor, liquidator or other officeholder of the Company may enforce and rely on any Clause of this Deed to the same extent as if it were a Party.

11.3    The Administrators, their firm, members, partners, directors, officers, employees, agents, advisers and representatives may enforce and rely on Clause 2 (*Claims Agreement*), Clause 3 (*Transfer*), Clause 4 (*Representations and Warranties*), Clause 5 (*Undertakings*), Clause 6 (*Confidentiality*), Clause 8 (*Non-reliance on Information Ancillary to this Deed*), Clause 10 (*Exclusion of Administrators' Liability*), this Clause 11, Clause 21 (*Governing Law and Jurisdiction*) and Clause 22 (*Appointment of Process Agent*) to the same extent as if they were a Party.

11.4    Any term of this Deed may be amended or waived without the consent of any person named or described in Clauses 11.2 and, other than in respect of the Administrators, 11.3.

**12      Whole Agreement**

12.1    This Deed contains the whole agreement between the Company the Trustee and the Creditor relating to the subject matter of this Deed at the date of this Deed to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement between the Company and the Creditor in relation to the matters dealt with in this Deed.

12.2    Each of the Trustee and the Creditor acknowledges that the Trustee has been directed and instructed to enter into this Deed by the majority holder of the Notes and that neither of them has been induced to enter this Deed by any representation, warranty or undertaking not expressly incorporated into it.

**13      Modification**

No amendment, modification or waiver in respect of this Deed (or any agreement supplemental to it) shall be effective unless in writing and previously approved in writing by each of the Company, the Creditor (to the extent that it remains in existence) and the Trustee.

**14      Costs**

14.1    Except as expressly provided in this Deed and subject always to Clause 14.2, the Parties shall bear their own costs in connection with the preparation, negotiation, entry into and performance of this Deed. The Creditor and the Co-Issuer acknowledge that the fees and expenses of the Trustee may be paid by the Trustee from the proceeds received by it with respect to the Admitted Claim.

14.2    The Creditor shall bear the cost of all stamp duty, stamp duty reserve tax or stamp duty land tax, any notarial fees and all other taxes and duties or their equivalents in all jurisdictions where such fees, taxes and duties are payable as a result of the transactions contemplated by this Deed. The Creditor shall be responsible for arranging the payment of such stamp duty, stamp duty reserve tax or stamp duty land tax and all other such fees,

taxes and duties, including fulfilling any administrative or reporting obligation imposed by the jurisdiction in question in connection with the payment of such taxes and duties.

## 15    Invalidity

**15.1**    If, at any time, any provision of this Deed is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of that provision under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision of this Deed under the law of that jurisdiction shall in any way be affected or impaired thereby.

**15.2**    Subject to Clause 15.1, if any provision in this Deed shall be held to be illegal, invalid or unenforceable, in whole or in part, the provision shall apply with whatever deletion or modification is necessary so that the provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties.

**15.3**    Subject to Clause 15.1, to the extent it is not possible to delete or modify the provision, in whole or in part, under Clause 15.2, then such provision or part of it shall, to the extent that it is illegal, invalid or unenforceable, be deemed not to form part of this Deed and the legality, validity and enforceability of the remainder of this Deed shall, subject to any deletion or modification made under Clause 13 (*Modification*), not be affected.

## 16    Modification of Foreign Law Contracts

Where this Deed purports to modify any contract which is governed by a law other than English law, the modification will be effective to the maximum extent permitted under the proper law of the contract. Each of the Trustee and the Creditor undertakes to the Company to take all actions that the Company requests (including executing such instruments or entering into such agreements, in each case governed by the relevant proper law) to perfect any modifications to such contracts in order to ensure that such modifications are effective to the fullest extent possible under such governing law.

## 17    Waivers

No waiver by or on behalf of the Company of any requirement of or any rights under this Deed shall release the Creditor from the full performance of its remaining obligations under this Deed. No single or partial exercise or failure or delay in exercising, on the part of the Company, any right, power or remedy under this Deed or the granting of time by the Company shall prejudice, affect or restrict the rights, powers and remedies of the Parties under this Deed, nor shall any waiver by the Company of any breach of this Deed operate as a waiver of or in relation to any subsequent or any continuing breach of this Deed.

## 18    Notices

**18.1**    General

Any notice, information, or other communication to be given, or document to be sent pursuant to or in connection with this Deed:

**18.1.1**    by the Creditor, the Trustee or the Co-Issuer to the Company and/or the Administrators shall be in writing in English and shall be delivered by both:

(i)    prepaid post or airmail to, or by courier using an internationally recognised courier company only to Lehman Brothers International (Europe) (in administration), Level 23, 25 Canada Square, London, E14 5LQ, United Kingdom (for the attention of "Russell Downs / In House Legal Team"), (or to such other postal address as may be notified (in accordance with this Clause 18) to the Creditor from time to time) in accordance with Clause 18.2 (*Notices by post*); and

(ii)   electronic mail to claimsdeed@lbia-eu.com (or to such other electronic mail address as may be notified (in accordance with this Clause 18) to the Creditor from time to time) in accordance with Clause 18.3 (*Notices by electronic mail*); and

18.1.2   by the Company and/or the Administrators to the Creditor, the Co-Issuer or the Trustee either by:

(i)    prepaid post or airmail to, or by courier to, Stony Hill CDO SPC for the account of Series 2005-1 Segregated Portfolio, MaplesFS Limited Financial Services, PO Box 1093, Boundary Hall, Cricket Square KY1-1102, Cayman Islands and US Bank National Association, as Trustee, Global Corporate Trust Services, One Federal Street, 10th Floor, Boston, Massachusetts 02110 (Attn: Dawn M Zanotti (or to such other postal address as may be notified (in accordance with this Clause 18) to the Company and/or the Administrators from time to time) in accordance with Clause 18.2 (*Notices by post*); or

(ii)   electronic mail to cayman@maplesfs.com ; dpuglisi@puglisiassoc.com and dawn.zanotti@usbank.com (or to such other electronic mail address as may be notified (in accordance with this Clause 18) by the Creditor to the Company and/or the Administrators from time to time)) in accordance with Clause 18.3 (*Notices by electronic mail*).

## 18.2    Notices by post

18.2.1   Any notice, information or communication given or document sent by the Creditor by registered post or courier shall be effectively served on and received by the Company and/or the Administrators upon receipt by the Company and/or the Administrators (if sent in accordance with Clause 18.1.1(i)) and shall be deemed to have been received by the Company at the time of delivery to the relevant address specified in Clause 18.1.1(i).

18.2.2   Any notice, information or communication given or document sent by registered post or courier by the Company and/or the Administrators shall be sufficiently served by sending the same to the relevant address set out in Clause 18.1.2(i).

## 18.3    Notices by electronic mail

18.3.1   Any notice, information or communication given or document sent by electronic mail shall be sufficiently served by sending the same by electronic mail to the address specified in Clause 18.1.1(ii) or 18.1.2(ii) (as appropriate).

18.3.2   Any notice, information or communication given or document sent by electronic mail shall be deemed to have been received, at the time recorded on the computer of the person to whom the electronic mail is addressed.

18.4    **Accidental omission**

The accidental omission by the Company and/or the Administrators to send any notice, communication or document in accordance with this Clause 18, or the non-receipt of any such notice, communication or document by the Creditor, shall not affect the provisions of this Deed.

19    **Authority to Sign Notices and Documents**

In the case of this Deed and any notice, communication or other document in connection with this Deed, which is signed on behalf of the Trustee or the Creditor, neither the Company nor the Administrators shall be required to make enquiry as to the authority of the signatory of that Deed, notice, communication or document to sign such Deed, notice, communication or document on behalf of such Creditor.

20    **Counterparts**

20.1    This Deed may be entered into in any number of counterparts, all of which taken together shall constitute one and the same instrument. Any party may enter into this Deed by executing any such counterpart.

20.2    The Trustee is executing this Deed solely in its capacity as trustee and not in its individual capacity. Neither the Trustee nor any of its officers, directors, shareholders or agents shall be personally liable for any Claim, liability or obligation arising out of this Deed.

21    **Governing Law and Jurisdiction**

21.1    This Deed and any non-contractual obligations arising out of or in connection with it shall be governed by, and construed in accordance with, English law.

21.2    Each of the Trustee and the Creditor hereby agrees that the courts of England shall (save as otherwise provided in Clause 21.4) have exclusive jurisdiction to hear and determine any dispute or Proceedings arising out of or in connection with this Deed or the operation of this Deed, and that accordingly any Proceedings arising out of or in connection with this Deed (save as otherwise provided in Clause 21.4) shall be brought in such courts.

21.3    Each of the Trustee and the Creditor hereby submits to the exclusive jurisdiction of the courts of England for the purposes of Clause 21.2. Each of the Trustee and the Creditor also waives any objections to Proceedings in the courts of England that may arise that are based on the grounds of the venue or that the Proceedings have been brought in an inconvenient forum.

21.4    Notwithstanding Clauses 21.2 and 21.3, which are for the benefit of the Company and the Administrators, the Administrators and the Company retain the right to bring Proceedings, in the name of the Company or otherwise, in the courts of any other country having jurisdiction under its own laws to hear such Proceedings.

22    **Appointment of Process Agent**

22.1    Each of the Creditor and the Co-Issuer hereby irrevocably appoints as its agent to accept service of process in England in any legal action or Proceedings arising out of this Deed, service upon whom shall be deemed completed whether or not forwarded to or received by the Creditor or the Co-Issuer as the case may be, Maples and Calder, 11th Floor, 200

Aldersgate Street, London EC1A 4HD, United Kingdom, Attn: Process Agnecy. Fax: +44 (0)20 7466 1700, Email: processagency@maplesandcalder.com .

22.2    The Trustee hereby irrevocably appoints as its agent to accept service of process in England in any legal action or Proceedings arising out of this Deed, service upon whom shall be deemed completed whether or not forwarded to or received by the Trustee, US Bank Global Corporate Trust Services (Legal Department (ref: 12-01)), Level 5, 125 Old Broad Street, London EC2N 1AE, United Kingdom.

22.3    Each of the Trustee, the Creditor and the Co-Issuer agrees to inform the Company in writing of any change of address of such process agent (a "**Change of Address**") within 14 days of such change (in accordance with the provisions of Clause 18 (*Notices*)).

22.4    If such process agent (the "**Current Process Agent**") ceases to be able to act as such or to have an address in England, each of the Trustee, the Creditor and the Co-Issuer irrevocably agrees to appoint a new process agent acceptable to the Company (a "**New Process Agent**") and to deliver to the Company within 14 days a copy of a written acceptance of appointment by the New Process Agent together with the address of the New Process Agent (in accordance with the provisions of Clause 18 (*Notices*)).

22.5    In the event of a Change of Address or the appointment of a New Process Agent, each of the Trustee, the Creditor and the Co-Issuer agrees that any service of process in England in any legal action or Proceedings arising out of this Deed shall be deemed valid service upon the Trustee and/or the Creditor if service is effected:

(a)    to the address specified in Clauses 22.1 or 22.2, as applicable, (or to any subsequent address notified to the Company in accordance with Clause 22.3); or

(b)    to the Current Process Agent,

prior to notification by the Trustee, the Creditor and/or the Co-Issuer to the Company of such Change of Address or of the written acceptance of appointment by the New Process Agent and the address of the New Process Agent (in accordance with Clauses 22.3 and 22.4, respectively) (as appropriate) and notwithstanding any such Change of Address or appointment of a New Process Agent (as appropriate).

22.6    Nothing in this Deed shall affect the right to serve process in any other manner permitted by law.

**This Deed has been delivered on the date stated at the beginning of this Deed.**

**SIGNED** as a **DEED** for and on behalf of **LEHMAN BROTHERS INTERNATIONAL (EUROPE) (in administration)** by one of the Administrators acting as its agent and without personal liability

.................................................................

In the presence of:

Witness's signature:                                  .................................................................

Name:

Address:

Occupation:

**EXECUTED** as a **DEED** by                         ...................:.............................................

      ,      as      duly          **Authorised Signatory**
authorised signatory for and on behalf of **STONY HILL CDO SPC for the account of Series 2005-1 Segregated Portfolio**

and                                                   .................................................................

                                                      **Authorised Signatory**

**EXECUTED** as a **DEED** by
**Donald J. Puglisi, Manager**, as
duly authorised signatory for and
on behalf of **STONY HILL CDO
Series 2005-1 LLC**

..................................................

**Authorised Signatory**

**SIGNED** as a **DEED** by **US
BANK        NATIONAL
ASSOCIATION**, not in its
individual capacity but soley in its
capacity as Trustee, by

..................................................

**Authorised Signatory**

James H. Byrnes
Vice President

APPENDIX
FORM OF TRANSFER NOTICE

To:   Lehman Brothers International (Europe) (in administration) (the "**Company**")
Level 23
25 Canada Square
London
E14 5LQ
United Kingdom

**And by email: *[insert email address]***

Att:   Russell Downs / In House Legal Team

From:  *[Name of Transferor]* (the "**Transferor**")

      *[Address of Transferor]*

From:  *[Name of Transferee]* (the "**Transferee**")

      *[Address of Transferee]*

      *[Email Address of Transferee]*

      *[Telephone number of Transferee]*

      *[GAC Code of Transferee if Transferee has a GAC Code]*

                                                    ***[insert date]***

Dear Sirs

**Transfer Notice in respect of Transfer of Admitted Claim**

1      [Subject to paragraph 2 of this letter deed,] the terms of this letter deed shall be effective on the date upon which the Company serves a countersigned copy of this letter deed on the Transferor or Transferee (whichever is later) in accordance with paragraph 9 of this letter deed (the "**Effective Date**"), provided that paragraphs 2, 3, 4.1 and paragraphs 8 to 13 inclusive of this letter deed shall become effective on the date of this letter deed.

2      [If the Effective Date does not occur on or before ***[Transferor & Transferee to insert date]*** (or such later date as may be agreed in writing between the Company, the Transferor and the Transferee), this letter deed shall lapse and the terms of this letter deed shall cease to have any effect other than this paragraph 2 and paragraphs 3, 10, 11 and 13 which shall remain in full force and effect[1].]

3      Unless otherwise defined herein, terms defined in the Claims Determination Deed between the Company and ***[the Transferor / state name of original party to the deed if different to the Transferor]*** dated [●] (the "**Deed**"), shall have the same meaning in this letter deed.

4      The Transferor and Transferee agree that:

---

[1]   *[Transferor and Transferee to note that if this paragraph 2 is not included, consequential amendments in respect of cross-referencing will need to be made.]*

4.1    subject to paragraph 2 of this letter deed, the terms of this letter deed may not be revoked or amended without the prior written consent of the Company;

4.2    the whole of the Admitted Claim and the whole of the Transferor's right to receive any and all dividends in respect of, or in connection with, the Admitted Claim shall be unconditionally and immediately assigned to the Transferee;

4.3    the proof of debt and accompanying information lodged by or on behalf of the Transferor shall stand as the Transferee's proof of debt;

4.4    dividends paid, and/or any other benefit given in lieu thereof, by the Company and/or Administrators to (or at the direction of) the Transferee shall constitute a good discharge by the Company and the Administrators of their obligations in respect of the Admitted Claim;

4.5    subject to the provisions of the Deed, the Transferor confirms that the Transferee may agree, compromise, settle, waive, release, discharge, Transfer (by way of assignment, novation, sale or otherwise) or otherwise dispose of the whole or any part of the Admitted Claim (and/or any direct or indirect benefit, right, title, interest, action or cause of action deriving from the Admitted Claim, including any right to receive dividends in respect of, or in connection with, the Admitted Claim) and to the extent that the Transferor's consent is required for the Transferee to take such action, the Transferor hereby consents to the Transferee taking any such action;

4.6    the Company and/or the Administrators may communicate solely with the Transferee in relation to the Admitted Claim; and

4.7    the terms of this letter deed shall not prevent the Company and/or the Administrators from making further requests for information from the Transferor and/or the Transferee in due course.

5    The Transferor agrees that:

5.1    the Company and/or the Administrators shall be permitted to disclose to the Transferee and the Transferee's partners, directors, employees, officers, agents, advisers and representatives (together the "**Transferee's Representatives**") any and all documentation and/or information submitted by the Transferor, or on its behalf, to the Company and/or the Administrators in connection with the Admitted Claim and/or Creditor Agreement[s] (including but not limited to any proof of debt and any substantiating documents (as referenced in rule 2.72 of the Insolvency Rules 1986)); and

5.2    the Transferee and the Transferee's Representatives shall be permitted to rely on and utilise all such information.

6    The Transferee:

6.1    agrees that, subject to paragraph 7 of this letter deed, the rights and obligations of the Transferor under or in connection with the Deed constitute legal, valid and binding rights and obligations of the Transferee and that for the purpose of Clause 18.1.2 of the Deed, the postal address and the email address of the Transferee set out in this letter deed shall replace the postal address and the email address set out at Clause 18.1.2(i) and 18.1.2(ii) (respectively) of the Deed; and

6.2    makes the representations set out in Clause 4.1 of the Deed to the Company and the Administrators on the Effective Date provided that the Transferee shall not be required to

make the representations set out in Clause 4.1.4(i), Clause 4.1.5 and Clause 4.1.8 of the Deed.

7    For the avoidance of doubt, following an assignment (pursuant to Clause 3 of the Deed), the mutual discharge and release set out in Clause 2.1.3 of the Deed shall not apply to any Claims or other matters or causes of action (whether contractual, proprietary or otherwise arising) other than those Claims and other matters and causes of action released and discharged as between the Company, the Administrators and the Transferor by operation of Clause 2.1.3 immediately before the assignment (pursuant to Clause 3 of the Deed).

8    Each person signing this letter deed on behalf of the Transferor and Transferee (as appropriate) represents that they are an authorised signatory executing this letter deed for and on behalf of, and with authority to bind, the Transferor or the Transferee (as applicable) to this letter deed and each such person acknowledges that the Company and/or the Administrators reserve the right to require evidence of power and authority and/or any supporting documentation or supplementary information from any person who purports to execute this letter deed on behalf of each of the Transferor and Transferee (as appropriate).

9    The acknowledgement of receipt shall be sent by the Company to the Transferor in accordance with Clause 18 (*Notices*) of the Deed (and Clause 18.2.2 of the Deed shall govern the effective service thereof) and to the Transferee by sending such communication to the postal address or the email address of the Transferee as set forth in this letter deed and such acknowledgement shall be deemed to be sufficiently served on the Transferee by sending the same to the Transferee's  postal or email address.

10    The Transferor and Transferee agree that the Administrators have countersigned this letter deed and agree to be bound by the terms of this letter deed as agents for and on behalf of the Company and neither they, their firm, members, partners, directors, officers, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by the Company; or in respect of any failure on the part of the Company to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this letter deed. The exclusion of liability hereunder shall arise and continue notwithstanding the termination of the agency of the Administrators and shall operate as a waiver of any and all claims (including, but not limited to, claims in tort, equity and common law as well as under the laws of contract).

11    Any person who is not a party to this letter deed shall have no right (whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise) to enforce or enjoy the benefit of any term of this letter deed provided that the Administrators shall be entitled to rely on paragraph 4, paragraph 5, paragraph 7, paragraph 8, paragraph 10 and this paragraph 11 of this letter deed and the Administrators' firm, members, partners, directors, officers, employees, agents, advisers and representatives shall be entitled to rely on paragraph 10 and this paragraph 11 of this letter deed, as if they were a party to it.

12    This letter deed may be entered into in any number of counterparts, all of which taken together shall constitute one and the same instrument. Any party may enter into this letter deed by executing any such counterpart.

13    This letter deed and any non-contractual obligation arising out of or in connection with it shall be governed by, and construed in accordance with, English law.

This letter deed is executed by both the Transferor and the Transferee as a deed and is delivered on the date stated at the beginning of this letter deed.

[*Transferor/Transferee to delete/amend execution blocks as appropriate*]

[*If the Transferor is a company incorporated in England and Wales, use the following execution block.*]

**SIGNED** as a **DEED** by [*insert name of Transferor*] by [*insert name of director*]

........................................................

**Director**

In the presence of:

Witness's signature:

........................................................

Name:

Address:

Occupation:

[*If the Transferor is a company not incorporated in England and Wales, the following execution block may suffice. [N.B. Liaise with foreign counsel to ensure that this broad execution block satisfies local law requirements.]*

**SIGNED** as a **DEED** by [*insert name of Transferor*], a company incorporated in [*territory*], by [*insert name of authorised signatory*]

........................................................

**[Authorised Signatory]**

and [*name of authorised signatory*]

........................................................

**[Authorised Signatory]**

*[If the Transferee is a company incorporated in England and Wales, use the following execution block.]*

SIGNED as a DEED by *[insert name of Transferee]* by *[insert name of director]*

.................................................

**Director**

In the presence of:

Witness's signature:

.................................................

Name:

Address:

Occupation:

*[If the Transferor/Transferee is a company not incorporated in England and Wales, use the following execution block]*

SIGNED as a DEED by *[insert name of Transferee]*, a company incorporated in *[territory]*, by *[insert name of authorised signatory]*

.................................................

**[Authorised Signatory]**

and *[name of authorised signatory]*

.................................................

**[Authorised Signatory]**

*[N.B. Liaise with foreign counsel to ensure that this broad execution block satisfies local law requirements.]*

**Acknowledged and agreed by**

Administrator

for and on behalf of **Lehman Brothers International (Europe) (in administration)** acting as its agent and without personal liability

Date:

**<u>Exhibit D</u>**

August 28, 2014

U.S. Bank National Association
Corporate Trust Services Division
One Federal Street, 10th Floor
Boston, Massachusetts 02110
Attn: Dawn Zanotti

Re:    Series Indenture dated as of July 14, 2005 (the *"Series Indenture"*), among Stony
Hill CDO SPC for the account of the Series 2005-1 Segregated Portfolio (the
*"Issuer"*), Stony Hill CDO Series 2005-1 LLC (the *"Co-Issuer"*) and U.S. Bank
National Association, as Trustee as supplemented by those certain Standard Terms
for Indentures dated as of July 14, 2005 (the *"Standard Terms"* and collectively
with the Series Indenture, the *"Indenture"*), (ii) that certain ISDA Master
Agreement dated as of July 14, 2005 as amended from time to time (the *"Master
Agreement"*) by and between Lehman Brothers International (Europe) (*"LBIE"*)
and the Issuer, (iii) the Schedule to the Master Agreement dated as of July 14,
2005 (the *"Schedule"*) and (iv) the Confirmation in respect of a Credit Derivative
Transaction dated as of July 14, 2005 (the *"Confirmation"* and collectively with
the Master Agreement and Schedule, the *"Swap Agreements"*).

### Letter of Direction - Execution of Settlement Deed, Settlement of Swap Agreement and Distribution of Admitted Claim

Ladies and Gentlemen:

Reference is made to the Indenture referenced above.  All capitalized terms not defined
herein shall have the meanings set forth in the Indenture.

As the holder of the issued and outstanding Notes (the *"Directing Holder"*) in the original
principal amounts set forth on the attached *Exhibit A*, we hereby direct and instruct the Trustee,
to undertake the following actions thereafter as soon as practicable:

(1)    Execute that certain Claims Determination Deed by and among Lehman Brothers
International (Europe) (in Administration), Stony Hill CDO SPC for the account of the Series
2005-1 Segregated Portfolio, Stony Hill CDO 2005-1 and U.S. Bank National Association as
Trustee in form and substance similar to that attached hereto as *Exhibit B*;

(2)    Pay the fees, costs and expenses of the Trustee in the current amount of
$90,037.14, the fees and expenses of Puglisi & Associates in the amount of $23,050.00, and the
fees and expenses of Maples in the amount of $21,018.90 using proceeds from distributions
made on the Admitted Claim (as defined in the Claims Determination Deed); and

STONY HILL CDO
August 28, 2014

    (3)    Withdraw and expunge any proof of claim filed against LBSF and Lehman Brothers Holdings, Inc. in *In re Lehman Brothers Holdings, Inc., et al.*, Case No. 08-13555 (Bankr. S.D.N.Y.).

    The Distribution of any remaining proceeds of the Admitted Claim will be the subject of a subsequent letter of direction.

    The Directing Holder acknowledges the right of the Trustee to be indemnified under the terms of the Indenture and hereby indemnifies and holds harmless the Trustee from and against any and all losses, costs, damages, expenses, fees (including reasonable attorneys' fees and expenses), court costs, judgments, penalties, fines, obligations, suits, disbursements and liabilities of any kind or character whatsoever (*"Claims"*) that may be imposed upon, incurred by or asserted against the Trustee in connection with accepting this direction or taking any action in furtherance of this letter of direction.

    The undersigned represents and warrants that it is the beneficial holder of the Notes set forth on Exhibit A issued by the Issuer and the Co-Issuer and that the Trustee is relying upon this representation in accepting this letter of direction and taking the actions enumerated herein. The undersigned further represents and warrants that this letter and the acknowledgment contained herein have been duly authorized, executed and delivered on its behalf and constitutes its legal, valid and binding obligation enforceable in accordance with its terms.

    The Directing Holder generally releases, discharges and acquits the Issuer, Co-Issuer and Trustee and their respective current and former agents, servants, officers, directors, shareholders, employees, subsidiaries, divisions, branches, units, affiliates, parents, attorneys, successors, predecessors, heirs, personal representatives, and assigns (each of the foregoing, a *"Released Party"*), from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (including, without limitation, intentional torts, fraud, misrepresentation, defamation, breaches of alleged fiduciary duty, recklessness, gross negligence, or negligence) or otherwise, accrued or unaccrued, known or unknown, matured, unmatured, liquidated or unliquidated, certain or contingent, that LBSF or the Noteholder ever had or claimed to have, or now has or claims to have presently or at any future date, against any Released Party arising under or related to the Notes issued by the Issuer. Such release shall not however extend to the obligation of the Trustee, Issuer or Co-Issuer to act in accordance with the terms of this Letter of Direction. Nothing contained herein shall be deemed a release of LBSF's rights as a Noteholder to receive payments, net of fees and expenses and subject to the rights of the remaining noteholder(s), from proceeds of the Admitted Claim.

    All rights under Section 1542 of the California Civil Code, or any analogous state or federal law, are hereby expressly WAIVED, if applicable, with respect to any of the claims,

STONY HILL CDO
August 28, 2014

injuries, or damages described above but solely to the extent of the release of claims provided therein. Section 1542 of the California Civil Code reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

This Letter of Direction may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. The parties intend to be bound by signatures transmitted by any regular method of communication, including by telecopier and electronic mail.

U.S. Bank National Association is acknowledging this Letter of Direction solely in its capacity as Trustee and not in its individual capacity. None of U.S. Bank National Association or its respective officers, directors, shareholders or agents shall be liable for any claim, liability, or obligation arising out of this Letter of Direction or the Claims Determination Deed. U.S. Bank shall have no obligations under the terms of Claims Determination Deed including any obligations to enforce the terms thereof.

LEHMAN BROTHERS HOLDINGS, INC.

By: _____

Name: _____

Title: CEO

STONY HILL CDO
August 28, 2014

Exhibit A

| Notes | Cusip | Original Principal Amount Held |
|---|---|---|
| Stony Hill CDO SPC, Series 2005-1 Segregated Portfolio Notes | US81751HAA14 | USD49,500,000 |

STONY HILL CDO
August 28, 2014

<u>Exhibit B</u>

*[Attach Form of Claims Determination Deed]*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------------x
                                        :
In re                                   :        Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :        08-13555 (SCC)
                                        :
               Debtors.                 :        (Jointly Administered)
                                        :
-------------------------------------------------------------------------x
```

**ORDER PURSUANT TO RULE 9019 OF THE**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE AND**
**SECTION 105(a) OF THE BANKRUPTCY CODE APPROVING**
**A SETTLEMENT AGREEMENT RELATING TO THE STONY HILL**
**CDO SPC INDENTURE AND CREDIT DEFAULT SWAP AGREEMENT**

Upon the motion, dated April 8, 2019 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI" or the "Plan Administrator") as Plan Administrator under the *Modified*

*Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated*

*Debtors*, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") for

approval of the settlement agreement (the "Settlement Agreement") among (i) LBHI, (ii) U.S.

Bank National Association (the "Trustee"), solely in its capacity as trustee under the indenture

dated as of July 14, 2005 (the "Indenture" and the trust thereunder, the "Trust"), (iii) Stony Hill

CDO SPC for the account of the Series 2005-1 Segregated Portfolio, a segregated portfolio

company incorporated in the Cayman Islands with limited liability (the "Issuer"); and (iv) Stony

Hill CDO Series 2005-1 LLC (the "Co-Issuer"), all as more fully described in the Motion; and

the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion.

431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with the procedures set forth in the amended

order entered on June 17, 2010, governing case management and administrative procedures for

these cases [ECF No. 9635] on (i) the U.S. Trustee; (ii) the Securities and Exchange

Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern

District of New York; (v) the attorneys for the Trustee; and (vi) all parties who have requested

notice in the Chapter 11 Cases, and it appearing that no other or further notice need be provided;

and the Court having considered the notice provided to the Remaining Noteholder; and a hearing

having been held to consider the relief requested in the Motion; and the Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors, their

estates, their creditors, and all parties in interest and that the legal and factual bases set forth in

the Motion establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Settlement Agreement is

approved; and it is further

ORDERED that the Plan Administrator is authorized to execute, deliver,

implement and fully perform any and all obligations, instruments, documents and papers and to

take any and all actions reasonably necessary or appropriate to consummate the Settlement

Agreement and perform any and all obligations contemplated therein; and it is further

WEIL:\96563195\12\58399.0011

ORDERED that, pursuant to section 105(a) of the Bankruptcy Code, the Trustee is authorized and directed to take such actions as it reasonably deems necessary or appropriate to consummate the Settlement Agreement and to perform any and all obligations contemplated therein, and, upon completion of all such actions, the Trustee is authorized to terminate the Trust; and it is further

ORDERED that this Order is binding and effective on the Plan Administrator, LBHI and its subsidiaries that commenced the Chapter 11 Cases (collectively, the "Chapter 11 Entities"), and the Trustee, as well as any successor trustees under the Indenture. The Plan Administrator, the Chapter 11 Entities, the Trust, the Trustee, and all of their respective current and former officers, directors, shareholders, employees, agents, attorneys, successors and assigns, shall be and hereby are, fully exculpated and shall not have liability to each other or the Chapter 11 Entities or the Remaining Noteholder, arising out of, relating to, or in connection with the Motion, the Settlement Agreement or this Order, except to the extent of any obligations set forth in the Settlement Agreement that have not been performed; and it is further

ORDERED that notwithstanding the possible applicability of Bankruptcy Rule 6004(h), the terms of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of thereof; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2019
      New York, New York

                                          _____
                                          UNITED STATES BANKRUPTCY JUDGE