WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail
Peter D. Isakoff

*Attorneys for Lehman Brothers Holdings Inc.*
*And Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                                         :

| | |
|---|---|
| In re | Chapter 11 |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | (Jointly Administered) |

-----------------------------------------------------------------x

| | |
|---|---|
| **LEHMAN BROTHERS HOLDINGS INC.,** | |
| Plaintiffs, | |
| v. | <u>ADVERSARY COMPLAINT</u> |
| **LEHMAN BROTHERS LIMITED (in administration), MBAM INVESTOR LIMITED, ELDON STREET HOLDINGS LIMITED (in administration), LB HOLDINGS INTERMEDIATE 2 LIMITED (in administration),** | Adv. Proc. No. 19-_____ |
| Defendants. | |

-----------------------------------------------------------------x

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan"), brings this adversary proceeding against Defendants Lehman Brothers Limited (in administration) ("LBL"), MBAM Investor Limited ("MBAM"), Eldon Street Holdings Limited (in administration) ("ESH"), and LB Holdings Intermediate 2 Limited (in administration) ("LBHI2") and alleges the following on knowledge, as to LBHI's own acts, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1.      LBHI brings this action to recover $260,095,121.86 owed to LBHI from Defendants pursuant to the terms of the Settlement Agreement (as defined below)[1] entered into by LBHI and Defendants.  Specifically, LBHI is owed $128,044,775.80 from LBL, $16,280,324.87 from MBAM, $10,160,114.94 from ESH, and $105,609,906.25 from LBHI2.  LBHI distributed these amounts on account of LBHI Class 4B Senior Affiliate Guarantee Claims that were allowed pursuant to the Settlement Agreement (the "Guarantee Claims").  Each Defendant is in breach of the Settlement Agreement for its failure to remit such amount to LBHI.

2.      Pursuant to the Settlement Agreement, the Defendants agreed to remit to LBHI distributions that exceeded the amount of the Primary Claim.[2]  The relevant Primary Obligors have made distributions to the holder of each Primary Claim that equal the amount of the Primary Claim.  Thus, according to the express terms of the Settlement Agreement, all amounts distributed by

---

[1] Capitalized terms used herein but not otherwise defined shall have the same meaning as in the Settlement Agreement.

[2] Many of the LBHI Class 4B Senior Affiliate Guarantee Claims that were allowed pursuant to the Settlement Agreement were allowed against LBHI in amounts substantially lower than the amount of the corresponding Primary Claims.  Accordingly, the allowed Primary Claim, and not the allowed Guarantee Claim, was used to measure satisfaction of the Guarantee Claim.

2

LBHI on account of the Guarantee Claims were required to be remitted to LBHI. By failing to do so, each Defendant is in breach of the Settlement Agreement.

## THE PARTIES

### I.  Plaintiff LBHI

3.    Plaintiff LBHI is a corporation organized and incorporated under the laws of the State of Delaware, with its current principal business address at 277 Park Avenue, 46th floor, New York, New York 10172. On September 15, 2008, LBHI and certain of its affiliates commenced in this Court voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On December 6, 2011, the Court approved and entered an order confirming the Plan (ECF No. 23023) (the "Confirmation Order"). The Plan became effective on March 6, 2012.

### II.  Defendants

4.    Defendant LBL is a limited company organized under the laws of England and Wales (registered number 00846922) whose registered office is at PricewaterhouseCoopers LLP, 7 More London Riverside, London SE1 2RT. On September 15, 2008, LBL entered administration under the English Insolvency Act 1986, as amended (the "Insolvency Act"). LBL acts by Michael John Andrew Jervis, Zelf Hussain, Gillian Eleanor Bruce, Russell Downs, and Edward John Macnamara (collectively, the "LBL Administrators"), each in their respective capacities as joint administrators of LBL. LBL remains in administration pursuant to the Insolvency Act.

5.    Defendant MBAM is a limited company organized under the laws of England and Wales (registered number 05349993) whose registered office is at Hays Galleria, 1 Hays Lane, London SE1 2RD.

6.      Defendant ESH is a limited company organized under the laws of England and Wales (registered number 04108165) whose registered office is at PricewaterhouseCoopers LLP, 7 More London, Riverside, London SE1 2RT.  On December 9, 2008, ESH entered administration under the Insolvency Act.  ESH acts by Derek Anthony Howell, Gillian Eleanor Bruce, Russell Downs, and Edward John Macnamara, each in their respective capacities as joint administrators of ESH.  ESH remains in administration pursuant to the Insolvency Act.

7.      Defendant LBHI2 is a limited company organized under the laws of England and Wales (registered number 05957878) whose registered office is at PricewaterhouseCoopers LLP, 7 More London, Riverside, London SE1 2RT.  On January 14, 2009, LBHI2 entered administration under the Insolvency Act.  LBHI2 acts by Derek Anthony Howell, Gillian Eleanor Bruce, Ian David Green, Russell Downs, and Edward John Macnamara, each in their respective capacities as joint administrators of LBHI2 (collectively, the "LBHI2 Administrators").  LBHI2 remains in administration pursuant to the Insolvency Act.

## JURISDICTION AND VENUE

8.      LBHI and Defendants are parties to that certain settlement agreement, dated October 24, 2011, and included in the Plan Supplement (ECF No. 21254 at Ex. 5, the "Settlement Agreement"), which was approved by this Court and incorporated into the Plan pursuant to the Confirmation Order.[3]  Confirmation Order ¶15; Plan §6.5(b)(vii) ("[a]ny settlement agreement entered into among any of the Debtors and any Non-Controlled Affiliate that is contained in the Plan Supplement is incorporated into the Plan and shall become effective in accordance with its terms"); Plan Supplement (Exhibit 5 – Part D).

---

[3] A copy of the Settlement Agreement is attached hereto as **Exhibit A**.

4

9.      This Court has jurisdiction because the Settlement Agreement, the contract at issue in this adversary proceeding, contains an exclusive jurisdiction provision.  Section 12.01 of the Settlement Agreement provides in pertinent part that "[t]o the maximum extent permissible by law, the Parties expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement, and any Party bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court."  Settlement Agreement § 12.01.

10.     Additionally, this Court has jurisdiction because LBHI was a chapter 11 debtor, subject to the Bankruptcy Code and the Bankruptcy Rules, and this Court "may issue any order, process, or judgment that is necessary to or appropriate to carry out the provisions of the [Bankruptcy Code] . . . . or to prevent an abuse of process."  11 U.S.C. § 105(a); 11 U.S.C. § 1142(b) ("The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary for the consummation of the plan.").

11.     The Court retained jurisdiction, pursuant to the Confirmation Order and Article XIV Plan, to, among other things, "hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any agreements or documents incorporated in or contemplated by the Plan, including, without limitation, Sections . . . 6.5".  Plan § 14.1(h); *Confirmation Order* ¶ 77 ("This Court may properly and, upon the Effective Date shall, consistent with Article XIV of the Plan, retain exclusive jurisdiction over all matters arising under or related to, the chapter 11 cases, including, without limitation, the matters set forth in Article XIV of the Plan.").  *See also* Plan § 14.1 (b), (e), (i), (k), (o).

5

12.     Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, LBHI states that it consents to the entry of a final judgment by this Court.

13.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because the Chapter 11 Cases are pending in this district.

14.     Further, venue is proper because the exclusive jurisdiction provision in Section 12.01 of the Settlement Agreement also contains an exclusive venue clause, which provides that "any Party bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court . . . ."  Settlement Agreement § 12.01.

## FACTUAL ALLEGATIONS

15.     The Settlement Agreement provided for the allowance of certain claims against LBHI's estate that were held by Defendants.  Section 2.04 of the Settlement Agreement states: "On the Effective Date, each applicable UK Affiliate[4] shall have allowed claims against the applicable Debtor in the Applicable Classes and in the aggregate amounts set forth opposite such UK Affiliate's name in the relevant column in Schedule 9."

16.     As set forth in Schedule 9 of the Settlement Agreement, each Defendant received an allowed Class 4B Senior Affiliate Guarantee Claim in a specified amount against LBHI.   *See* Confirmation Order ¶ 15 ("Pursuant to Section 502 of the Bankruptcy Code, [each Defendant] shall have Allowed Claims against the Debtors in the amounts set forth in the [Settlement Agreement]").

17.     Lehman Brothers Holdings PLC ("LBH PLC") is the Primary Obligor for the Primary Claims held by LBL, ESH, and MBAM.  LBH PLC is a non-controlled, indirect subsidiary of LBHI.  LBH PLC is not a debtor in these Chapter 11 Cases.  On September 15, 2008, LBH PLC

---

[4] The Settlement Agreement defines UK Affiliate to include Defendants.

entered administration under the Insolvency Act. LBH PLC's estate is currently being administered by certain joint administrators (the "LBH PLC Administrators") not controlled by the Plan Administrator.

18.    Lehman Brothers International (Europe) ("LBIE") is the Primary Obligor for the Primary Claims that were held by LBHI2. LBIE is a subsidiary of LBHI2 and an indirect subsidiary of LBHI. LBIE is not a debtor in these Chapter 11 Cases. On September 15, 2008, LBIE entered administration under the Insolvency Act. LBIE's estate is currently being administered by certain joint administrators.

## I.    The Settlement Agreement Requires Defendants To Return Excess Distributions

19.    Section 2.04 of the Settlement Agreement requires Defendants to remit to LBHI distributions that exceed the amount of their respective Primary Claim (hereafter, the "Clawback Provision"). Specifically, section 2.04 provides in pertinent part:

> Notwithstanding anything to the contrary in the Plan or this Agreement, with respect to each UK Affiliate Claim for which the Applicable Class is set forth in Schedule 9 as "4B", each applicable UK Affiliate agrees that if at any time such UK Affiliate receives distributions on account of such UK Affiliate Claim, that, combined with any distributions received by such UK Affiliate on account of the relevant Primary Claim (as defined in the Current Plan), exceed the amount of such Primary Claim, such UK Affiliate shall remit from time to time any such excess distributions to LBHI within seven Business Days of receipt thereof, and such remitted excess distributions shall not be subject to reduction, avoidance, recharacterization, reconsideration, recovery, subordination, merger, consolidation, attack, offset, claim, defense, recoupment, deduction, counterclaim or objection, of any kind or nature.

Settlement Agreement §2.04.

20.    On February 7, 2018, the LBHI2 Administrators publicly acknowledged LBHI's right to the return of all distributions made by LBHI with respect to LBHI2's 4B Guarantee Claims. *See* LBHI2 progress report dated 7 February 2018 at 4, https://www.pwc.co.uk/business-

recovery/administrations/assets/lbhi2-18th-progress-report-and-am10.pdf ("Under the terms of the guarantee from LBHI, the guarantee payments will be clawed back by LBHI in the eventuality that the principal debt is fully repaid."). The LBL Administrators have similarly acknowledged LBL's obligation to remit excess distributions under the Clawback Provision. *See* LBL progress report dated April 10, 2018 at 3, https://www.pwc.co.uk/business- recovery/administrations/ assets/lbl_nineteenthprogressreport_20180411.pdf ("[t]he allowed claim is subject to a "clawback" arrangement, such that LBL would not recover in aggregate more than the value of its claims in the guaranteed entities").

21.     Consistent with this express contractual obligation, three other UK Affiliates (as defined in the Settlement Agreement) similarly situated to Defendants, remitted excess distributions to LBHI pursuant to section 2.04 of the Settlement Agreement after LBIE satisfied the Primary Claims: Lehman Brothers (Indonesia) Ltd., Preferred Mortgages Ltd., and Southern Pacific Mortgages Ltd.

## II.    LBH PLC Made Distributions That Exceed the Amount of the Applicable Primary Claims

22.     <u>LBL</u>.  Under the Settlement Agreement, LBHI gave Defendant LBL an Allowed Class 4B Senior Affiliate Guarantee Claim (No. 200020) in the amount of $360,000,000.00.  To date, LBHI has made distributions of $128,044,775.80 on account of such claim.  The corresponding Primary Claim against LBH PLC equals GBP 709,013,200.00.  To date, LBH PLC distributed GBP 726,861,189.28 on account of the Primary Claim (GBP 709,013,200.00 as 100% principal and GBP 17,847,989.28 as statutory interest).

23.     <u>MBAM</u>.  Under the Settlement Agreement, LBHI gave Defendant MBAM an Allowed Class 4B Senior Affiliate Guarantee Claim (No. 200031) in the amount of $46,568,411.00.  To date, LBHI has made distributions of $16,280,324.87 on account of such

claim.  The corresponding Primary Claim against LBH PLC equals GBP 51,924,415.00.  To date,

LBH PLC distributed GBP 53,231,508.30 on account of the Primary Claim (GBP 51,924,415.00

as 100% principal and GBP 1,307,093.30 as statutory interest).

24.    ESH.  Under the Settlement Agreement, LBHI gave Defendant ESH an Allowed

Class 4B Senior Affiliate Guarantee Claim (No. 200023) in the amount of $28,565,323.00.  To

date, LBHI has made distributions of $10,160,114.94 on account of such claim.  The corresponding

Primary Claim against LBH PLC equals GBP 31,358,468.41.  To date, LBH PLC distributed GBP

32,147,855.14 on account of the Primary Claim (GBP 31,358,468.41 as 100% principal and GBP

789,386.73 as statutory interest).

## III.    LBIE Made Distributions That Exceed the Amount of the Applicable Primary Claims

25.    Under the Settlement Agreement, LBHI gave Defendant LBHI2 an Allowed Class

4B Senior Affiliate Guarantee Claim (No. 200016) in the amount of $302,087,667.00.[5]  To date,

LBHI has made distributions of $105,609,906.25 on account of such claim.  The corresponding

Primary Claims against LBIE total GBP 1,278,542,606.85.    To date, LBIE distributed

GBP 1,996,348,851.41 on account of the Primary Claims (GBP 1,278,542,606.85 as 100%

principal and GBP 717,806,244.56 as statutory interest).

## IV.    LBHI's Efforts to Avoid Litigation

26.    Defendants have failed to make any portion of their required payments to date under

the Clawback Provision.

27.    LBHI engaged in discussions with Defendants for over six months to recover the

amounts to which LBHI became entitled.  While LBHI hoped that the discussions would lead to a

---

[5] LBHI2 subsequently assigned its rights to receive distributions from LBIE on the corresponding
Primary Claims.

9

satisfactory resolution, as of the filing of this adversary complaint, those discussions have not

resulted in a consensual resolution.    Accordingly, LBHI hereby brings these claims against

Defendants.

## CLAIMS FOR RELIEF

### COUNT I
### (Breach of Contract against LBL)

28.    LBHI hereby incorporates by reference the allegations set forth above as though

fully set forth herein.

29.    The Settlement Agreement is a valid, binding, and enforceable agreement between

LBHI and LBL, the terms of which are governed by, construed and enforced in accordance with

the laws of the state of New York and the Bankruptcy Code.  Settlement Agreement § 12.02.

30.    Because distributions by LBH PLC alone equal (and exceed) the amount of the

relevant Primary Claim, all distributions by LBHI on account of the Guarantee Claim are in excess

of the amount of the Primary Claim.  An amount equal to the sum of LBHI's distributions should

have been remitted to LBHI in accordance with the Clawback Provision, but was not.

31.    As a result of this breach, LBHI has been damaged and is entitled to

$128,044,775.80, plus prejudgment interest.

### COUNT II
### (Breach of Contract against MBAM)

32.    LBHI hereby incorporates by reference the allegations set forth above as though

fully set forth herein.

33.    The Settlement Agreement is a valid, binding, and enforceable agreement between

LBHI and MBAM, the terms of which are governed by, construed and enforced in accordance

with the laws of the state of New York and the Bankruptcy Code.  Settlement Agreement § 12.02.

34.     Because distributions by LBH PLC alone equal (and exceed) the amount of the relevant Primary Claim, all distributions by LBHI on account of the Guarantee Claim are in excess of the amount of the Primary Claim.  An amount equal to the sum of LBHI's distributions should have been remitted to LBHI in accordance with the Clawback Provision, but was not.

35.     As a result of this breach, LBHI has been damaged and is entitled to $16,280,324.87, plus prejudgment interest.

## COUNT III
### (Breach of Contract against ESH)

36.     LBHI hereby incorporates by reference the allegations set forth above as though fully set forth herein.

37.     The Settlement Agreement is a valid, binding, and enforceable agreement between LBHI and ESH, the terms of which are governed by, construed and enforced in accordance with the laws of the state of New York and the Bankruptcy Code.  Settlement Agreement § 12.02.

38.     Because distributions by LBH PLC alone equal (and exceed) the amount of the relevant Primary Claim, all distributions by LBHI on account of the Guarantee Claim are in excess of the amount of the Primary Claim.  An amount equal to the sum of LBHI's distributions should have been remitted to LBHI in accordance with the Clawback Provision, but was not.

39.     As a result of this breach, LBHI has been damaged and is entitled to $10,160,114.94, plus prejudgment interest.

## COUNT IV
### (Breach of Contract against LBHI2)

40.     LBHI hereby incorporates by reference the allegations set forth above as though fully set forth herein.

11

41.     The Settlement Agreement is a valid, binding, and enforceable agreement between LBHI and LBHI2, the terms of which are governed by, construed and enforced in accordance with the laws of the state of New York and the Bankruptcy Code.  Settlement Agreement § 12.02.

42.     Because distributions by LBIE alone equal (and exceed) the amount of the relevant Primary Claims, all distributions by LBHI on account of the Guarantee Claim are in excess of the amount of the Primary Claims.  An amount equal to the sum of LBHI's distributions should have been remitted to LBHI in accordance with the Clawback Provision, but was not.

43.     As a result of this breach, LBHI has been damaged and is entitled to $105,609,906.25, plus prejudgment interest.

## PRAYER FOR RELIEF

WHEREFORE, LBHI respectfully requests that judgment be entered against Defendants as follows:

a) awarding damages in favor of LBHI and against LBL in the amount of $128,044,775.80;

b) awarding damages in favor of LBHI and against MBAM in the amount of $16,280,324.87;

c) awarding damages in favor of LBHI and against ESH in the amount of $10,160,114.94;

d) awarding damages in favor of LBHI and against LBHI2 in the amount of $105,609,906.25;

e) awarding LBHI prejudgment interest; and

f) providing for such other and further relief as this Court deems just and proper.

Dated: April 30, 2019
New York, New York

By:   /s/ Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail
Peter D. Isakoff

*Attorney for Lehman Brothers Holdings Inc.
And Certain of Its Affiliates*

## Exhibit A

**Settlement Agreement**

**Execution Version**

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "**Agreement**") is made and entered into as of October 24, 2011, by and among the Debtors,[1] the LBLIS Group Entities,[2] the UK Administration Companies[3] (acting by their joint administrators, Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis, Dan Yoram Schwarzmann and Derek Anthony Howell, collectively, the "**Joint Administrators**"),[4] the UK Liquidation Companies[5] (acting by their joint liquidators Derek Anthony Howell and Ian Oakley-Smith, collectively, the "**Joint Liquidators**")[6] and the Other UK Affiliates[7] (the UK Administration Companies,

---

[1] As used herein, "**Debtors**" means Lehman Brothers Holdings Inc. ("**LBHI**"); Lehman Brothers Special Financing Inc. ("**LBSF**"); Lehman Commercial Paper Inc. ("**LCPI**"); Lehman Brothers Commercial Corporation; Lehman Brothers Financial Products Inc.; Lehman Brothers OTC Derivatives Inc. ("**LOTC**"); Lehman Brothers Derivative Products Inc.; Lehman Brothers Commodity Services Inc. ("**LBCS**"); Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES Aviation IX LLC; East Dover Limited ("**East Dover**"); Luxembourg Residential Properties Loan Finance S.a.r.l.; BNC Mortgage LLC; Structured Asset Securities Corporation; LB Rose Ranch LLC; LB 2080 Kalakaua Owners LLC; LB Somerset LLC; LB Preferred Somerset LLC; LB 745 LLC ("**LB 745**"); PAMI Statler Arms LLC.

[2] As used herein, "**LBLIS Group Entities**" means Lehman Brothers Luxembourg Investments Sarl ("**LBLIS**"), Lehman Brothers Holdings Scottish LP ("**LB Scottish**"), and Lehman Brothers UK Holdings (Delaware) Inc. ("**LB UK Delaware**").

[3] As used herein, "**UK Administration Companies**" means Lehman Brothers International (Europe) ("**LBIE**"); Lehman Brothers Limited ("**LBL**"); Lehman Brothers Holdings PLC; LB UK Re Holdings Limited ("**UK Re**"); Storm Funding Limited; Mable Commercial Funding Limited; Lehman Brothers Europe Limited; Lehman Brothers UK Holdings Limited ("**LB UK Holdings**"); LB UK Financing Ltd; LB SF No. 1; Cherry Tree Mortgages Limited; Lehman Brothers Lease & Finance No. 1 Limited; Zestdew Limited; Monaco NPL (No. 1) Limited; Lehman Commercial Mortgage Conduit Limited; LB RE Financing No. 3 Limited; Lehman Brothers (PTG) Limited; Eldon Street Holdings Limited; LB Holdings Intermediate 2 Limited; and Thayer Properties Limited (each in administration).

[4] A reference to the Joint Administrators shall be construed as being to the Joint Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Joint Administrators.

[5] As used herein, "**UK Liquidation Companies**" means Eldon Street (Cube) Limited; Eldon Street (Raven) Limited; Lehman Brothers Equity (Nominees Number 7) Limited; Platform Home Mortgage Securities No. 4 Limited; Platform Commercial Mortgage Limited; Lehman Brothers (Indonesia) Limited; Grace Hotels Limited; LBO Investments Limited; LBQ Funding (UK); and LB Lomond Investments (each in liquidation).

[6] A reference to the Joint Liquidators shall be construed as being to the Joint Liquidators both jointly and severally and to any other person who is appointed as a liquidator in substitution for any liquidator or as an additional liquidator in conjunction with the Joint Liquidators.

acting by their Joint Administrators, the UK Liquidation Companies, acting by their Joint Liquidators, and the Other UK Affiliates, collectively, the "**UK Affiliates**").    The Debtors, the LBLIS Group Entities and the UK Affiliates shall each be referred to individually as a "**Party**" and collectively as the "**Parties**"; *provided* that the terms "Party" and "Parties" refer to any of the LBLIS Group Entities solely to the extent set forth in Section 2.13(m) hereof.

## RECITALS

WHEREAS, on September 15, 2008 and on various dates thereafter, each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are being jointly administered under Case Number 08-13555 (JMP) (the "**Chapter 11 Cases**" and each a "**Chapter 11 Case**");

WHEREAS, on September 15, 2008 and on various dates thereafter, the UK Administration Companies entered English administration proceedings pursuant to the English Insolvency Act 1986 and the UK Liquidation Companies entered liquidation in the UK (collectively, the "**UK Proceedings**");

WHEREAS, the Joint Administrators were appointed as the joint administrators of the Administration Companies and the Joint Liquidators were appointed as the joint liquidators of the Liquidation Companies;

WHEREAS, on August 25, 2011, Thayer Group and Thayer Properties (collectively, the "**Thayer Liquidation Companies**") entered liquidation proceedings in Jersey, United Kingdom and the Thayer Liquidators were appointed as the liquidators of the Thayer Liquidation Companies; and

---

(continued…)

[7] As used herein, "**Other UK Affiliates**" means Acenden Limited (f/k/a Capstone Mortgage Services Limited); Blue I Real Estate Limited; Eldon Street (Birchin) Limited; Eldon Street (Colbert Orco) Limited; Eldon Street (Fidenza) Limited; Eldon Street (Harley) Limited; Eldon Street (Jefferson) Limited; Harley Property Ventures Limited; LB Holdings Intermediate 1 Limited; LB SF Warehouse Limited; LB Yellow (No. 1) Limited; MBAM Investor Limited; Myra Sarl; Parkmetro Limited; Preferred Group Limited; Preferred Holdings Limited; Preferred Mortgages Limited; Resetfan Limited; SM Funding No. 1 Limited; Southern Pacific Funding 3 Ltd.; Southern Pacific Mortgage Ltd.; Southern Pacific Personal Loans Limited; Southern Pacific Residuals 4 Limited; Stepstone Mortgage Funding Limited; Thayer Group Limited (in liquidation) ("**Thayer Group**") (acting by its joint liquidators, Nick Vermeulen and Mark James, collectively, the "**Thayer Group Liquidators**"); Thayer Properties (Jersey) Limited (in liquidation) ("**Thayer Properties**") (acting by its joint liquidators, Nick Vermeulen and Mark James, the "**Thayer Properties Liquidators**" and together with the Thayer Group Liquidators, the "**Thayer Liquidators**"); and Yellow Real Estate Limited.

WHEREAS, the UK Affiliates filed the proofs of claim listed on Schedule 1 attached hereto (collectively, the "**Proofs of Claim**") against certain Debtors on behalf of themselves and/or to preserve the rights of certain other entities with beneficial interests held through certain of the UK Affiliates;

WHEREAS, certain of the Debtors have asserted that they have claims against certain of the UK Affiliates, including claims asserted by LBHI against LBIE and certain other UK Affiliates in respect of intercompany funding (the "**Funding Claims**");

WHEREAS, the Debtors, the UK Administration Companies and the UK Liquidation Companies have entered into that certain tolling and forbearance agreement dated as of September 3, 2010, and the Debtors have entered into certain other tolling agreements with certain of the Other UK Affiliates (collectively, the "**Tolling Agreements**");

WHEREAS, on September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 19627] (the "**Current Plan**" and as amended, modified or supplemented by the Debtors from time to time, the "**Plan**");

WHEREAS, on September 1, 2011 by amended order of the Bankruptcy Court [Docket No. 19631] (the "**Disclosure Statement Approval Order**"), the Bankruptcy Court approved the Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (such disclosure statement as modified on September 15, 2011 by order of the Bankruptcy Court [Docket No. 20016], the "**Disclosure Statement**");

WHEREAS, on September 13, 2011 certain of the Parties entered into that certain Stipulation and Agreement for Provisional Allowance of Claims Solely for Purposes of Voting [Docket No. 19913] (the "**Voting Stipulation**") setting forth the amounts, if any, in which the UK Affiliates are entitled to vote upon the Plan;

WHEREAS, substantially contemporaneously hereof, certain of the Parties have entered into that certain Claim Reserve Agreement (the "**Claim Reserve Agreement**") attached hereto as Exhibit A; and

WHEREAS, the Debtors and the UK Affiliates desire to resolve all disputes and all other outstanding issues among them (except as expressly excluded herein) and to avoid extensive and expensive litigation thereon.

NOW, THEREFORE, in consideration of the recitals stated above, the agreements, promises and warranties set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

3

ARTICLE 1

DEFINITIONS

SECTION 1.01.    Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement.

"**A&M**" means Alvarez and Marsal North America, LLC, in its capacity as agents of the Debtors.

"**Admitted Claims**" means, collectively, the LCPI/LBIE Claim, the LBCS/LBIE Claim, and the Other Debtor Claims.

"**Affiliate**" has the meaning ascribed to it in section 101(2) of the Bankruptcy Code.

"**Allowed Claims**" means, collectively, the LBIE Guarantee Claim, the LBIE/LBSF Claim, the LBIE/LOTC Claim and the UK Affiliates Claims.

"**Alternative Plan**" means any chapter 11 plan for the Debtors that is neither proposed nor supported (directly or indirectly) by the Debtors.

"**Applicable Class**" means, for any claim of any UK Affiliate against any Debtor, (i) with respect to the Current Plan, the "Class" (as defined in the Current Plan) set forth in Schedule 9 hereto for which such UK Affiliate is designated the "Applicable UK Affiliate" and such Debtor is designated the "Applicable Debtor" and (ii) with respect to any Plan (other than the Current Plan), the category of claims that each applicable UK Affiliate and the applicable Debtor mutually determine in good faith is most similarly situated to the "Class" (as defined in the Current Plan) set forth in Schedule 9 hereto for which such UK Affiliate is designated the "Applicable UK Affiliate" and such Debtor is designated the "Applicable Debtor".

"**Assigned Debtor Interest**" has the meaning ascribed to it in Section 5.04(b).

"**Assigned Debtor/LBIE Assets**" means all LBSF/LBIE Assets, all Assigned LBCS/LBIE Assets, and all LCPI/LBIE Assets, in each case, other than (i) Competing Claims that are waived and released pursuant to Section 2.05(c) and (ii) to the extent relevant, the securities to be transferred in accordance with the Unfunded Notes Settlement Agreement.

"**Assigned LBCS/LBIE Assets**" means all LBCS/LBIE Assets other than the Returned LBCS/LBIE Assets.

4

"**Assigned UK Affiliate Interest**" has the meaning ascribed to it in Section 4.04(b).

"**Bankruptcy Code**" has the meaning ascribed to it in the Recitals.

"**Bankruptcy Court**" has the meaning ascribed to it in the Recitals.

"**Bankhaus**" means Lehman Brothers Bankhaus A.G.

"**Bankhaus Claim**" means LBIE's claim against Bankhaus on account of Client Money deposited with Bankhaus to have recognized a right of separate satisfaction (*Aussonderungsrecht*, Sec. 47 German Insolvency Code) or, in the alternative, to have recognized a general unsecured claim for such Client Money.

"**Bankhaus Claim Litigation**" means the litigation in Germany between LBIE and Bankhaus in respect of the Bankhaus Claim.

"**Bankhaus Non-Trust Claim**" has the meaning ascribed to it in Section 2.01(b).

"**Bankhaus Resolution Date**" means the date on which the Bankhaus Claim Litigation is finally settled or adjudicated.

"**Bankhaus Trust Claim**" has the meaning ascribed to it in Section 2.01(b).

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York or the United Kingdom.

"**Causes of Action**" means all manners of action, causes of action, judgments, executions, debts, liabilities, demands, rights, damages, costs, rights, expenses, and claims of every kind, nature, and character whatsoever.

"**Chapter 11 Cases**" has the meaning ascribed to it in the Recitals.

"**Claim Reserve Agreement**" has the meaning ascribed to it in the Recitals.

"**Client Money**" means "Client Money" as defined in the UK Financial Services Authority's rules, and any proceeds thereof.

"**Client Money Tracing Application**" means any application in any court in which LBIE, or any beneficiary (other than any Debtor or any Debtor-Controlled Entity) of the Client Money Trust, or their respective successors in title or assignees, seeks direction from a court of competent jurisdiction with respect to Client Money tracing issues.

5

"**Client Money Tracing Claim**" means any claim by LBIE, or any beneficiary (other than any Debtor or any Debtor-Controlled Entity) of the Client Money Trust, or their respective successors in title or assignees, against any entity (including any of the Debtors) arising under, related to, or connected with any Proprietary Interest that LBIE, or any beneficiary (other than any Debtor or any Debtor-Controlled Entity) of the Client Money Trust, or their respective successors in title or assignees, has in any asset by reason of an interest as trustee under, or beneficiary of, the Client Money Trust (including any cash in any currency) or the proceeds thereof.

"**Client Money Trust**" means the trust on which LBIE held and holds Client Money pursuant to the UK Financial Services Authority's rules.

"**Competing Claim**" means a claim by a Debtor to a beneficial interest in, or to delivery of, or to the proceeds of, or any derived asset or income arising from, any securities or money in LBIE's custody or control, for which LBIE reasonably believes in good faith that its books and records indicate that any UK Affiliate (except LBIE) also has such a claim in relation to the same stockline or money, it being understood that a Security Interest is not such a claim.

"**Compromised Structured Securities**" means those Structured Securities set forth in Schedule 2.

"**Confirmation Order**" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to LBIE, (i) confirming the Plan pursuant to section 1129 of the Bankruptcy Code; (ii) approving, pursuant to Rule 9019 the Federal Rules of Bankruptcy Procedure and applicable provisions of the Bankruptcy Code, the terms of this Agreement; and (iii) authorizing the Debtors to take all necessary corporate actions to consummate the transactions contemplated by this Agreement.

"**Current LBLIS Managers**" has the meaning ascribed to it in Section 2.13(a).

"**Current Plan**" has the meaning ascribed to it in the Recitals.

"**Debtor Claim Transferee**" has the meaning ascribed to it in Section 5.04(b).

"**Debtor-Controlled Entity**" means the (i) LBLIS Group Entities and (ii) any Affiliate of the Debtors that is directly or indirectly managed or controlled by a Debtor, either immediately before or at any time after the Execution Date, but is not a Party.

"**Debtor Released Party**" means each UK Affiliate, and each of its Joint Administrators, Joint Liquidators, directors, officers, employees, representatives,

6

agents, financial advisors, accountants, attorneys and representatives, each of the foregoing solely in their respective capacity as such.

"**Debtors**" has the meaning ascribed to it in the Preamble.

"**Disclosure Statement**" has the meaning ascribed to it in the Recitals.

"**Disclosure Statement Approval Order**" has the meaning ascribed to it in the Recitals.

"**East Dover**" has the meaning ascribed to it in the Preamble.

"**Effective Date**" means the earliest date on which each of the following conditions are satisfied (or will be satisfied substantially simultaneously with the occurrence of the Effective Date) or waived by the Parties:

> (i)    the Plan (incorporating in full this Agreement) is effective in accordance with its terms; and

> (ii)    the LBJ Settlement Agreement is approved by the Bankruptcy Court and effective in accordance with its terms.

"**Existing NDA**" means that certain letter agreement in respect of the treatment of confidential information dated June 30, 2010 by and between LBHI, for itself, its subsidiaries and its controlled affiliates, and certain of the UK Administration Companies and UK Liquidation Companies.

"**Excluded Items**" means, collectively:

> (i)    subject to Section 2.12, each Party's rights, obligations, claims and causes of action against any entity (including any Lehman Entity or Extended Lien Claimant) other than the Parties, the Debtor Released Parties and the UK Affiliate Released Parties, and such entities' rights, obligations, claims, defenses and causes of action against any Party;

> (ii)    each Party's rights, obligations, claims, defenses and causes of action arising under, related to, or connected with:

> > (A)    any Surviving Contract;

> > (B)    subject to Section 2.22 and the proviso in Section 4.04(b), any Trust Claim other than the LBIE Guarantee Claim;

> > (C)    any funds received by any Debtor after such Debtor's Insolvency Filing Time (i) on behalf of any UK Affiliate

7

or (ii) by way of payment or transfer by any third party in respect of any debt or other obligation owed to any UK Affiliate;

> (D)    other than in respect of any RASCALS Assets or any Assigned Debtor/LBIE Assets, any funds received by any UK Affiliate after the earlier of such UK Affiliate's Insolvency Filing Time (where applicable) and the Execution Date (i) on behalf of any Debtor or (ii) by way of payment or transfer by any third party in respect of any debt or other obligation owed to any Debtor;

> (E)    subject to Section 2.01(d), Section 2.02(b), Section 2.02(c), Section 2.03(c), Section 2.03(e), Section 2.11(a), Section 2.19, Section 2.21 and Section 2.23, any Extended Lien Claim; or

> (F)    subject to Section 2.11 and the provisos in Section 5.04(b), the R3 Claim and the JPM Claim, and all rights in connection thereto, including any rights to any assets in LBIE's custody or control, whether direct or indirect, or held by a sub-custodian or any other party on behalf of LBIE; and

(iii)    subject to Section 2.20, LBIE's rights, obligations, claims and causes of action arising under, related to, or connected with any LBIE Structured Securities.

"**Execution Date**" means the earliest date on which each of the following conditions are satisfied:

> (i)    this Agreement is executed and delivered by the Parties; and

> (ii)    the Claim Reserve Agreement is executed and delivered by the parties thereto.

"**Extended Lien Application**" means the application dated June 6, 2011 brought by LBIE in respect of Extended Lien Claims and currently before the English High Court.

"**Extended Lien Asia Application**" means the application dated 29 July 2011 brought by Lehman Brothers Securities Asia Limited in respect of Extended Lien Claims and currently before the Hong Kong Courts.

"**Extended Lien Asset**" means any securities or money held on a segregated basis or otherwise by or on behalf of the Holding Affiliate (i) as to which (1) an

8

Ownership Claimant has asserted or could assert a beneficial interest or (2) the Holding Affiliate, based on the information available to it, has concluded that an Ownership Claimant may have a beneficial interest (in each case, either for itself or on behalf of an underlying client of that Ownership Claimant) and in either case an Extended Lien Claimant asserts or could assert an Extended Lien Claim; or (ii) that were so held at the Holding Affiliate's Insolvency Filing Time, and in any case any asset received or receivable by the Holding Affiliate after its Insolvency Filing Time arising out of or derived from any securities or money that was or were an Extended Lien Asset at or immediately before the time at which that other asset was received.

"**Extended Lien Claim**" means any claim that a term of an agreement between a Holding Affiliate and an Ownership Claimant confers a Security Interest in respect of an Extended Lien Asset in relation to debts owed not only by the Ownership Claimant to the Holding Affiliate but also to any other Lehman Entity, including any person claiming through or against such other Lehman Entity.

"**Extended Lien Claimant**" means any Lehman Entity that may assert, and/or have, a Security Interest in Extended Lien Assets held by or on behalf of a Holding Affiliate.

"**Final Order**" means an order of the Bankruptcy Court or any other court of competent jurisdiction (i) that is in full force and effect, (ii) is not reversed or vacated and (iii) as to which the time to appeal, petition for certiorari, and move for reargument or rehearing has expired and (1) as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or (2) in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been timely sought, such appeal, writ of certiorari, or reargument or rehearing shall have been withdrawn, denied or resolved by the highest court to which such order was appealed or from which certiorari, rehearing or reargument was sought; *provided* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or applicable law, may be filed with respect to such order shall not prevent such order from being a Final Order.

"**Funding Claim**" has the meaning ascribed to it in the Recitals.

"**Holding Affiliate**" means a Lehman Entity that holds or held Extended Lien Assets as to which one or more Ownership Claimants may assert, or have, beneficial ownership claims and as to which one or more Extended Lien Claimants may assert or have an Extended Lien Claim.

"**House Proofs of Claim**" means those claims asserted in the Proofs of Claim other than the Trust Claims.

9

"**Insolvency Filing Time**" means the time at which a Lehman Entity commenced an insolvency, bankruptcy, administration, liquidation, winding-up, receivership or similar proceeding in such Lehman Entity's relevant jurisdiction (or the time at which such a proceeding was commenced in relation to such Lehman Entity), whether by the filing of one or more petitions or papers (including a petition under chapter 11 of the Bankruptcy Code), by the entry of an order for relief, by obtaining an order of a court of competent jurisdiction, or otherwise; *provided* that, in the case of a Lehman Entity in liquidation in the United Kingdom where such liquidation was immediately preceded by an administration, the Insolvency Filing Time for such Lehman Entity shall be the time at which it entered administration where English law so provides in relation to the company in question.

"**ITS**" means the ITS trading system (also known as "International Trading System"), which various Lehman Entities used to record, clear, monitor and settle client and intercompany transactions, depot holdings and securities positions.

"**Joint Administrators**" has the meaning ascribed to it in the Preamble.

"**Joint Liquidators**" has the meaning ascribed to it in the Preamble.

"**JPM Claim**" means all claims for which LBHI is subrogated to a claim of any JPM Entity against LBIE, to the extent of the payments made by LBHI or applied from LBHI's property to such claim of such JPM Entity pursuant to that certain Collateral Disposition Agreement among JPMorgan Chase Bank, N.A. and the Debtors dated March 16, 2010.

"**JPM Claim Proposal**" has the meaning ascribed to it in Section 2.11(b).

"**JPM Entity**" means JPMorgan Chase Bank, N.A. or any of its affiliates.

"**LB 745**" has the meaning ascribed to it in the Preamble.

"**LBCS**" has the meaning ascribed to it in the Preamble.

"**LBCS/LBIE Claim**" has the meaning ascribed to it in Section 2.03(c).

"**LBCS/LBIE Assets**" means any right, title or interest that LBCS may have in securities (a) in LBIE's custody or control or (b) that are set forth on Schedule 3, in each case, together with all security entitlements (as such term is defined under Section 8-102 of the New York Uniform Commercial Code) with respect thereto and all proceeds thereof, including derived income and redemption proceeds.

"**LBHI**" has the meaning ascribed to it in the Preamble.

10

"**LBHI Client Money Payment**" has the meaning ascribed to it in Section 2.22(b).

"**LBHI-LB Lux Share**" has the meaning ascribed to it in Section 2.12(a).

"**LBHI/LBIE Assets**" means those assets set forth in Schedule 4.

"**LBIE**" has the meaning ascribed to it in the Preamble.

"**LBIE Extended Lien Asset**" means any Extended Lien Asset in respect of which LBIE is an Ownership Claimant.

"**LBIE Guarantee Claim**" has the meaning ascribed to it in Section 2.01(a).

"**LBIE/LBSF Claim**" has the meaning ascribed to it in Section 2.02(a).

"**LBIE-LB Lux Litigation**" means, collectively, the (i) judicial proceedings that are currently pending before the second chamber of the Luxembourg District Court (*tribunal d'arrondissement*), sitting in commercial matters, registered under the number 135.350, that have been introduced by LBIE by writ of summons served on the liquidators of LB Lux on 19 January 2011, following the rejection by the liquidators of LB Lux of the statement of claim submitted by LBIE in the LB Lux liquidation proceedings and (ii) any other proceedings or Causes of Action that arise from, are based on, connected with, alleged in or related to any of the facts or circumstances at issue in the judicial proceedings referred to in clause (i).

"**LBIE-LB Lux Payment Amount**" has the meaning ascribed to it in Section 2.12(c)(iv).

"**LBIE-LB Lux Share**" has the meaning ascribed to it in Section 2.12(a).

"**LBIE/LOTC Claim**" has the meaning ascribed to it in Section 2.03(a).

"**LBIE Non-Trust Guarantee Claim**" has the meaning ascribed to it in Section 2.01(b).

"**LBIE Structured Securities**" means any Structured Securities other than any Compromised Structured Securities.

"**LBIE Trust Guarantee Claim**" has the meaning ascribed to it in Section 2.01(b).

"**LBJ**" means Lehman Brothers Japan Inc.

11

"**LBJ Settlement Agreement**" means a settlement agreement among LBJ, LBSF, LBHI and LBIE in respect of their respective claims to the rights, title and interests in certain Japanese government bonds, in the form attached as Exhibit B, with such changes as may be agreed by LBSF, LBHI and LBIE.

"**LBL**" has the meaning ascribed to it in the Preamble.

"**LBL Indemnified Person**" has the meaning ascribed to it in Section 2.13(l).

"**LBL Nominated Managers**" has the meaning ascribed to it in Section 2.13(b).

"**LBLIS**" has the meaning ascribed to it in the Preamble.

"**LBLIS Group Entities**" has the meaning ascribed to it in the Preamble.

"**LB Lux**" means Lehman Brothers (Luxembourg) S.A. (in liquidation) or its estate, as applicable.

"**LB Lux/LBIE Assets**" means any assets (together with all security entitlements (as such term is defined under Section 8-102 of the New York Uniform Commercial Code) with respect thereto and all proceeds thereof, including derived income and redemption proceeds) in LBIE's custody or control for which it has been determined by LBIE, acting in good faith, or by a final, non-appealable order of a court of competent jurisdiction that (i) LB Lux is the beneficial owner and (ii) no Lehman Entity has a Security Interest in such assets by virtue of any Extended Lien Claim.

"**LB Scottish**" has the meaning ascribed to it in the Preamble.

"**LBSF**" has the meaning ascribed to it in the Preamble.

"**LBSF Creditor Debtors**" means, collectively, LBHI, LBCS, LCPI, LB 745, and East Dover.

"**LBSF/LBIE Assets**" means any right, title or interest that LBSF may have in securities (a) in LBIE's custody or control or (b) that are set forth on Schedule 5, in each case, together with all security entitlements (as such term is defined under Section 8-102 of the New York Uniform Commercial Code) with respect thereto and all proceeds thereof, including derived income and redemption proceeds.

"**LB UK Delaware**" has the meaning ascribed to it in the Preamble.

"**LB UK Holdings**" has the meaning ascribed to it in the Preamble.

"**LCPI**" has the meaning ascribed to it in the Preamble.

12

"**LCPI/LBIE Assets**" means any right, title or interest that LCPI may have in securities (a) in LBIE's custody or control or (b) that are set forth on Schedule 6, in each case, together with all security entitlements (as such term is defined under Section 8-102 of the New York Uniform Commercial Code) with respect thereto and all proceeds thereof, including derived income and redemption proceeds.

"**LCPI/LBIE Claim**" has the meaning ascribed to it in Section 2.03(b).

"**Lehman Entities**" means, collectively, LBHI and each of its Affiliates.

"**LOTC**" has the meaning ascribed to it in the Preamble.

"**LPS Trust Claims**" means (1) those claims in respect of Structured Securities asserted in Proof of Claim number 62783 and (2) those claims in respect of Structured Securities asserted in Proof of Claim numbers 62779, 62780, 62781, 62784, 62785, 62786, 62787, 62788 and 62789 to the extent that the securities to which such claims relate are not beneficially owned by LBIE as of the Execution Date.

"**Other Debtor Claims**" has the meaning ascribed to it in Section 2.05(a).

"**Other UK Affiliates**" has the meaning ascribed to it in the Preamble.

"**Ownership Claimant**" means a person which asserts and/or may have a beneficial interest (other than an interest which arises as a result of a Security Interest) in securities or the proceeds thereof or any asset or money derived therefrom held by or on behalf of any Holding Affiliate at such Holding Affiliate's Insolvency Filing Time.

"**Party**" has the meaning ascribed to it in the Preamble.

"**Plan**" has the meaning ascribed to it in the Recitals.

"**Proofs of Claim**" has the meaning ascribed to it in the Recitals.

"**Proprietary Interest**" means any proprietary interest whatsoever (whether at law or in equity, and whether as trustee, beneficiary, absolute owner or otherwise).

"**R3 Claim**" means all claims assigned to LBHI pursuant to that certain Assignment of Claim entered into as of October 17, 2008, between R3 and LBHI, and for which, prior to the Execution Date, LBHI is subrogated to a claim of R3 against LBIE.

"**R3 Claim Proposal**" has the meaning ascribed to it in Section 2.11(b).

"**R3**" means R3 Capital Partners Master, L.P.

13

"**RASCALS Assets**" means securities (other than, to the extent relevant, the securities to be transferred in accordance with the Unfunded Notes Settlement Agreement) acquired or otherwise received or held by LBIE for the account of any Debtor's trading book that were, at any time, subject to processes known as Regulation and Administration of Safe Custody And globaL (or Local) Settlement, being intra-group processes that purported to and/or served to address, among other things, certain regulatory capital adequacy concerns of LBIE via (i) inter-company secured financing transactions referred to in the RASCALS Decision as "automatic RASCALS" and (ii) the process referred to in the RASCALS Decision as "manual RASCALS" whereby securities settled by LBIE for the account of Lehman affiliates' trading books were subjected to inter-company financing transactions, in each case, including all proceeds thereof, all derived income in respect thereof and all redemption or sale proceeds in respect thereof.

"**RASCALS Decision**" means the judgment handed down by The Honourable Mr. Justice Briggs on November 19, 2010 in Case no. 7942 of 2008 in the English High Court, as reflected in the Order of November 19, 2010 that was sealed on December 23, 2010.

"**Returned LBCS/LBIE Assets**" means those assets set forth in Schedule 7.

"**Security Interest**" means any legal, equitable, contractual or possessory interest (or equivalent under any relevant legal system) of a person in an Extended Lien Asset that is in the nature of a lien, pledge, charge or other right that encumbers or restricts the entitlement of the owner or holder of that Extended Lien Asset until one or more obligations owed to that person are discharged in full.

"**Standstill Entity**" has the meaning ascribed to it in Section 2.09(a).

"**Standstill Termination Date**" has the meaning ascribed to it in Section 2.09(a).

"**Structured Securities**" means, collectively, the certain (i) structured notes issued by Lehman Brothers Treasury Co, B.V., (ii) certificates and warrants issued by Lehman Brothers Securities N.V., (iii) structured notes issued by LBHI, (iv) structured notes issued by Bankhaus, (v) structured securities issued by LB Lux, (vi) certificates issued by Lehman Brothers Finance S.A. (vii) any notes issued by any Lehman Entity under any notes program, including the European Medium Term Note Program and (viii) any securities issued by any Lehman Entity substantially similar to any of the foregoing.

"**Supporting Creditor PSA**" means each plan support agreement that the creditors listed on Exhibit 20 to the Disclosure Statement (as such exhibit may be amended or supplemented to include additional parties) entered into in connection with the Chapter 11 Cases.

14

"**Surviving Contracts**" means all agreements among any of the UK Affiliates and any of the Debtors (i) that were entered into on or after September 15, 2008 (other than any Tolling Agreement) or (ii) are set forth on Schedule 8.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature, including any related penalty or interest.

"**Third-Party Creditor**" has the meaning ascribed to it in Section 20.02.

"**Tax Deduction**" means any deduction or withholding for or on account of Tax.

"**Terminated UK Affiliate**" has the meaning ascribed to it in Section 11.02(b).

"**Thayer Group**" has the meaning ascribed to it in the Preamble.

"**Thayer Group Liquidators**" has the meaning ascribed to it in the Preamble.

"**Thayer Liquidation Companies**" has the meaning ascribed to it in the Recitals.

"**Thayer Liquidators**" has the meaning ascribed to it in the Preamble.

"**Thayer Properties**" has the meaning ascribed to it in the Preamble.

"**Thayer Properties Liquidators**" has the meaning ascribed to it in the Preamble.

"**Tolling Agreements**" has the meaning ascribed to it in the Recitals.

"**Transfer**" means any assignment, conveyance, recovery, payment, right, title, interest, sale, pledge, encumbrance, abandonment, disposition, participation or other transfer (or the proceeds of any of the foregoing) and may be used either as a verb or a noun.

"**Trust Claim**" means (i) the LBIE Guarantee Claim, (ii) any Client Money Tracing Claim and (iii) any LPS Trust Claim.

"**UK Administration Companies**" has the meaning ascribed to it in the Preamble.

"**UK Affiliates**" has the meaning ascribed to it in the Preamble.

"**UK Affiliate Claim Transferee**" has the meaning ascribed to it in Section 4.04(b).

"**UK Affiliates Claims**" has the meaning ascribed to it in Section 2.04.

"**UK Affiliate Released Party**" means A&M, each Debtor and each Debtor's directors, officers, employees, representatives, agents, financial advisors,

15

accountants, attorneys and representatives, each of the foregoing solely in their respective capacity as such.

"**UK Liquidation Companies**" has the meaning ascribed to it in the Preamble.

"**UK Proceedings**" has the meaning ascribed to it in the Recitals.

"**UK Re**" has the meaning ascribed to it in the Preamble.

"**UK Re/LBIE Assets**" means any assets (together with all security entitlements (as such term is defined under Section 8-102 of the New York Uniform Commercial Code) with respect thereto and all proceeds thereof, including derived income and redemption proceeds) in LBIE's custody or control for which it has been determined by LBIE, acting in good faith, or by a final, non-appealable order of a court of competent jurisdiction that (i) UK Re is the beneficial owner and (ii) no Lehman Entity has a Security Interest in such assets by virtue of an Extended Lien Claim.

"**Unfunded Notes Settlement Agreement**" means that certain agreement dated on or prior to the date hereof between LBIE and LBSF, pursuant to which LBIE is to procure the transfer of certain securities to LBSF's order.

"**Voting Stipulation**" has the meaning ascribed to it in the Recitals.

SECTION 1.02.    *Other Definitional and Interpretative Provisions.*    The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.    The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.    Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.    Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.    "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.    References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.    References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.    References

16

to "law", "laws" or to a particular statute or law shall be deemed also to include any and all applicable law.    References to "third parties" shall be deemed to refer to entities that are not Lehman Entities.

ARTICLE 2
SETTLEMENT OF CLAIMS

SECTION 2.01.    *LBIE's Claims Against LBHI.*

(a)    On the Effective Date, LBIE shall have an allowed, non-priority, unsecured, senior affiliate guarantee claim against LBHI ("LBHI Class 4B" as described in the Current Plan) in the aggregate amount of $1,008,000,000 (the "**LBIE Guarantee Claim**").

(b)    Solely for determining whether the LBIE Guarantee Claim has been deemed satisfied in full in accordance with Section 8.13 of the Current Plan (or any provision of similar effect in the Plan), (i) Bankhaus shall be deemed the "Primary Obligor" (as defined in the Current Plan) and (ii) the Bankhaus Claim shall be deemed to be the "Primary Claim" (as defined in the Current Plan); *provided* that if a portion and only a portion of the Bankhaus Claim is recognized as a right of separate satisfaction (*Aussonderungsrecht*, Sec. 47 German Insolvency Code) in the Bankhaus insolvency proceedings (any portion recognized as a right of separate satisfaction, the "**Bankhaus Trust Claim**" and any portion not recognized as a right of separate satisfaction, the "**Bankhaus Non-Trust Claim**"), then (x) the LBIE Guarantee Claim shall be deemed to be two allowed claims against LBHI, one of which shall be in an amount equal to the Bankhaus Trust Claim (such allowed claim against LBHI, the "**LBIE Trust Guarantee Claim**") and the other of which shall be in an amount equal to $1,008,000,000 *minus* the amount of the LBIE Trust Guarantee Claim (such allowed claim against LBHI, the "**LBIE Non-Trust Guarantee Claim**") and (y) the Bankhaus Trust Claim shall be deemed the "Primary Claim" (as defined in the Current Plan) for the LBIE Trust Guarantee Claim, and the Bankhaus Non-Trust Claim shall be deemed the "Primary Claim" (as defined in the Current Plan) for the LBIE Non-Trust Guarantee Claim.    It is expressly agreed and understood that LBIE may negotiate, litigate or settle the Bankhaus Claim in its sole discretion.

(c)    LBIE and LBHI agree that prior to the Bankhaus Resolution Date, pursuant to Section 8.13(e) of the Plan, all amounts distributed on account of the LBIE Guarantee Claim under the Plan shall be posted as security with LBHI, and LBHI shall hold such posted amounts in cash for the benefit of LBIE.    Within three Business Days of the Bankhaus Resolution Date, the Debtors shall release such posted amounts and remit to LBIE any distributions to which the LBIE Guarantee Claim is entitled under the Plan from the effective date of such Plan

17

through and including the Bankhaus Resolution Date (for the avoidance of doubt, after giving effect to any adjustment in accordance with Section 2.01(b)), together with any interest that has accrued in respect of such posted amounts.

(d)    The UK Affiliates shall not assert any lien, security interest or Extended Lien Claim over the LBHI/LBIE Assets in respect of any indebtedness owed by LBHI to such UK Affiliate; *provided* that any Extended Lien Claims of any Lehman Entity (other than any UK Affiliate) in respect of the LBHI/LBIE Assets shall be unaffected by this Section 2.01(d).    LBIE agrees to remit, return, transfer, convey, assign or otherwise deliver any remaining LBHI/LBIE Assets to LBHI within ten Business Days after the final resolution of any Competing Claims by UK Re and any Extended Lien Claims with respect to such assets, such ten-Business-Day period subject to LBHI supplying LBIE in a timely manner with adequate settlement information for delivery of such LBHI/LBIE Assets.

SECTION 2.02.    *LBIE's Claims Against LBSF.*

(a)    On the Effective Date, LBIE shall have an allowed, non-priority, unsecured affiliate claim against LBSF ("LBSF Class 5C" as described in the Current Plan) in the aggregate amount of $900,000,000 (the "**LBIE/LBSF Claim**").

(b)    If and to the extent that Extended Lien Claimants have enforceable rights in respect of Extended Lien Assets, or a Holding Affiliate has enforceable obligations towards Extended Lien Claimants in respect of Extended Lien Claims, and so as to ensure, as best the parties are able, that the value of the LBSF/LBIE Assets falls to LBIE as agreed in this Agreement, then each LBSF Creditor Debtor, within three Business Days of receipt thereof, shall remit to LBIE (in the form and amount received or, in the case of an obligation reduction, in cash for the value of such reduction) any Transfer received on account of any Extended Lien Claims against any LBSF/LBIE Assets (or any claims in respect thereof) in connection with claims that such LBSF Creditor Debtor may have against LBSF or obligations that LBSF may owe to such LBSF Creditor Debtor; *provided* that LBIE, in its reasonable discretion, may instruct, and no LBSF Creditor Debtor shall object to any such instruction, any relevant Holding Affiliate to remit any such Transfer directly to LBIE (or if the Holding Affiliate is LBIE to retain the same for itself).    Each LBSF Creditor Debtor agrees (i) not to waive, release or assign any such Extended Lien Claims without LBIE's prior written consent and (ii) upon LBIE's reasonable request, diligently to prosecute any such Extended Lien Claims and reasonably to cooperate with LBIE regarding the same.    For the avoidance of doubt, any remittances to LBIE in accordance with this Section 2.02(b) shall in no way reduce the amount of any of the Allowed Claims.

18

(c)    LBSF agrees with each LBSF Creditor Debtor that any Transfer received by such LBSF Creditor Debtor that is remitted to LBIE in accordance with Section 2.02(b) shall in no way reduce the amount of any claims such LBSF Creditor Debtor may have against LBSF.

(d)    The Debtors represent and warrant to LBIE that no Debtor (other than the LBSF Creditor Debtors) has any claims against LBSF.

SECTION 2.03.    *Claims Between LBIE and Certain Other Debtors.*

(a)    On the Effective Date, LBIE shall have an allowed, non-priority, unsecured affiliate claim against LOTC ("LOTC Class 5C" as described in the Current Plan) in the aggregate amount of $68,000,000 (the "**LBIE/LOTC Claim**").

(b)    On the Effective Date, LCPI shall have a claim against LBIE admitted to rank for dividend purposes as an unsecured claim in the aggregate amount of $28,800,000 (the "**LCPI/LBIE Claim**").

(c)    On the Effective Date, LBCS shall have a claim against LBIE admitted to rank for dividend purposes as an unsecured claim in the aggregate amount of $71,000,000 (the "**LBCS/LBIE Claim**").   LBIE agrees to remit, return, transfer, convey, assign or otherwise deliver the Returned LBCS/LBIE Assets to LBCS, under the simplified regime applicable to what are known as "No Agreement Affiliates" under the control of persons subject to the supervision of a relevant court under the terms of the Extended Lien Application, and LBIE accepts that LBCS is under the control of persons subject to the supervision of a relevant court for such purpose.   For the avoidance of doubt, any recoveries by LBCS in respect of the Returned LBCS/LBIE Assets shall in no way reduce the amount of the LBCS/LBIE Claim.

(d)    Each of LCPI and LBCS acknowledges that it will be required to file a proof of debt that complies with the Insolvency Rules 1986 in LBIE's UK Proceedings in respect of the LCPI/LBIE Claim and the LBCS/LBIE Claim, respectively.   LBIE will not object to any such proof of debt that complies in all material respects with the Insolvency Rules 1986 and references this Agreement as evidence to support such proof of debt.   For the avoidance of doubt, no further evidence, information and/or documents other than this Agreement are required in order to satisfy the requirements for a proof of debt as set out in the Insolvency Rules 1986.   Once such proof of debt has been duly filed, it shall qualify for dividends on the same basis as other admitted claims of unsecured creditors of LBIE under the applicable distribution regimes.

(e)    If and to the extent that Extended Lien Claimants have enforceable rights in respect of Extended Lien Assets, or a Holding Affiliate has enforceable

19

obligations towards Extended Lien Claimants in respect of Extended Lien Claims, then each of LCPI and LBCS, within three Business Days of receipt thereof, shall remit to LBIE (in the form and amount received or, in the case of an obligation reduction, in cash for the value of such reduction) any Transfer received on account of any Extended Lien Claims against any LBIE Extended Lien Assets (or any claims in respect thereof) in connection with claims that LCPI or LBCS, as applicable, may have against LBIE or obligations that LBIE may owe to LCPI or LBCS, as applicable; *provided* that LBIE, in its reasonable discretion, may instruct, and neither LCPI nor LBCS shall object to any such instruction, any relevant Holding Affiliate to remit any such Transfer directly to LBIE.   Each of LCPI and LBCS agrees (i) not to waive, release or assign any such Extended Lien Claims without LBIE's prior written consent and (ii) upon LBIE's reasonable request, diligently to prosecute any such Extended Lien Claims and reasonably to cooperate with LBIE regarding the same; *provided, further*, that any obligations of LCPI and LBCS under this section Section 2.03(e) shall automatically terminate as soon as the total Transfers received by LCPI or LBCS, individually or in the aggregate, that are remitted to LBIE in accordance with this Section 2.03(e) have a value equal to $33,000,000.   LBIE agrees with each of LCPI and LBCS that any Transfer received by LCPI or LBCS that is remitted to LBIE in accordance with this Section 2.03(e) shall in no way reduce the amount of the LCPI/LBIE Claim or the LBCS/LBIE Claim.

SECTION 2.04.    *The UK Affiliates' (Other Than LBIE's) Claims Against the Debtors.*    On the Effective Date, each applicable UK Affiliate shall have allowed claims against the applicable Debtor in the Applicable Classes and in the aggregate amounts set forth opposite such UK Affiliate's name in the relevant column in Schedule 9 (collectively, the "**UK Affiliates Claims**"). Notwithstanding anything to the contrary in the Plan or this Agreement, with respect to each UK Affiliate Claim for which the Applicable Class is set forth in Schedule 9 as "4B", each applicable UK Affiliate agrees that if at any time such UK Affiliate receives distributions on account of such UK Affiliate Claim, that, combined with any distributions received by such UK Affiliate on account of the relevant Primary Claim (as defined in the Current Plan), exceed the amount of such Primary Claim, such UK Affiliate shall remit from time to time any such excess distributions to LBHI within seven Business Days of receipt thereof, and such remitted excess distributions shall not be subject to reduction, avoidance, recharacterization, reconsideration, recovery, subordination, merger, consolidation, attack, offset, claim, defense, recoupment, deduction, counterclaim or objection, of any kind or nature.

SECTION 2.05.    *The Debtors' Claims Against the UK Affiliates (Other Than LBIE).*

(a)    On the Effective Date, (i) each applicable Debtor shall have an agreed claim against the applicable UK Administration Companies and UK Liquidation Companies in the aggregate amounts set forth opposite such Debtor's name in the relevant column in Schedule 10 and (ii) each applicable Other UK Affiliate hereby acknowledges its indebtedness to the applicable Debtors in the aggregate amount set forth opposite such Debtor's name in the relevant column in Schedule 10, in each case, without defense, counterclaim, offset or reduction ((i) and (ii) collectively, the "**Other Debtor Claims**").

(b)    Each applicable Debtor acknowledges that it will be required to file a proof of debt that complies with the Insolvency Rules 1986 in the applicable UK Administration Company's or UK Liquidation Company's UK Proceedings in respect of the applicable Other Debtor Claims.    Each applicable UK Administration Company and each applicable UK Liquidation Company acknowledges that it will not object to any such proof of debt that complies with the Insolvency Rules 1986 and references this Agreement as evidence to support such proof of debt.    For the avoidance of doubt, no further evidence, information and/or documents other than this Agreement are required in order to satisfy the requirements for a proof of debt as set out in the Insolvency Rules 1986.    Once such proof of debt has been duly filed with the applicable UK Administration Company or UK Liquidation Company, it shall, in relation to LBIE and the UK Liquidation Companies, qualify for dividends on the same basis as other admitted claims of unsecured creditors of those companies under their applicable distribution regime, and, in relation to any other company, shall, upon a notice of intention to distribute to unsecured creditors being filed by the applicable administrators, qualify for dividends on the same basis as other admitted claims of unsecured creditors.

(c)    Each Debtor hereby irrevocably waives and releases and shall be deemed to have hereby irrevocably waived and released, effective as of the Effective Date, automatically and without further action, any Competing Claims other than any Competing Claims that LBHI may have in respect of the LBHI/LBIE Assets.

SECTION 2.06.    *Assigned Debtor/LBIE Assets.*    Each of LBSF, LBCS and LCPI, as applicable, hereby irrevocably assigns to LBIE, and shall be deemed to have irrevocably assigned to LBIE, in each case, effective as of the Effective Date, automatically and without further action, all Assigned Debtor/LBIE Assets and all claims in respect thereof.    If any Debtor obtains any Transfer in respect of any Assigned Debtor/LBIE Assets (or in connection with any claims in respect thereof), including by way of reduction of any obligation whether through setoff

21

or otherwise, such Debtor shall, within three Business Days of receipt thereof, remit such Transfer to LBIE (in the form and amount received or, in the case of an obligation reduction, in cash for the value of such reduction).   For the avoidance of doubt, (i) any recoveries by LBIE in respect of the Assigned Debtor/LBIE Assets shall in no way reduce the amount of any of the Allowed Claims and (ii) this Agreement is without prejudice to any argument, claim or assertion by LBIE that it had, prior to the Effective Date, right, title and/or interest to any Assigned Debtor/LBIE Assets.

SECTION 2.07.   *RASCALS.*   The Parties agree that, as among LBIE and the Debtors: (i) LBIE is the sole legal and beneficial owner of the RASCALS Assets, (ii) none of the Debtors has any claim or cause of action of any kind whatsoever (including in relation to any legal, beneficial or equitable title) to any RASCALS Assets or any assets derived therefrom, whether by way of legal title, beneficial title or otherwise, (iii) if (contrary to the foregoing clauses (i) and (ii) of this Section 2.07) any of the Debtors does have any residual right, title or interest in or to any of the RASCALS Assets or any assets derived therefrom, each of the Debtors hereby irrevocably assigns to LBIE, and shall be deemed to have irrevocably assigned to LBIE, in each case, effective as of the Effective Date, automatically and without further action, all such residual right, title or interest, and all claims in respect thereof, and (iv) the Debtors shall be bound by the RASCALS Decision and none of the Debtors will challenge or assist any third party in challenging the basis or validity of the RASCALS Decision regardless of any judgment that may be given by the English Court of Appeal in any proceeding related to the RASCALS Assets or any other judgment of a court of competent jurisdiction.

SECTION 2.08.   *Reconciliation.*   (a) Each applicable UK Affiliate agrees and (b) each Debtor agrees to use reasonable efforts to cause each applicable Debtor-Controlled Entity, in each case, to in good faith expeditiously reconcile any claims between the Debtor-Controlled Entities, on the one hand, and the UK Affiliates, on the other hand.

SECTION 2.09.   *Standstill.*

(a)      Each Party agrees that, if any UK Affiliate has asserted or, in the future, asserts a claim against a Debtor-Controlled Entity, or any Debtor or Debtor-Controlled Entity has asserted or, in the future, asserts a claim against an Other UK Affiliate or LBLIS, and even if such claim is acknowledged pursuant to Section 2.05 of this Agreement, the applicable Party shall forbear or, if applicable, shall use reasonable efforts to cause its Debtor-Controlled Entity to forbear, from taking any action to enforce any rights or remedies under applicable law in respect of such claim against the relevant Debtor-Controlled Entity or Other UK Affiliate (in either case, the "**Standstill Entity**"), including by demanding

22

payment on account thereof or taking any action (whether pursuant to legal proceedings or self-help) to collect such claim, until the earliest of (i) the date that is 90 days after the delivery of a written notice in accordance with Article 13 by the applicable Party to the Standstill Entity, if the Standstill Entity is an Other UK Affiliate, to LBHI, if the Standstill Entity is a Debtor-Controlled Entity (other than LBLIS), or to LBLIS with a copy (that shall not constitute notice) to LBHI, if the Standstill Entity is LBLIS, (ii) the date that is 90 days after the delivery of a written notice in accordance with Article 13 by the Standstill Entity to the applicable Party, if such Party is an Other UK Affiliate, to LBHI, if the applicable entity is a Debtor-Controlled Entity (other than LBLIS) and to LBLIS with a copy (that shall not constitute notice) to LBHI, if the applicable entity is LBLIS, (iii) the date on which the applicable Standstill Entity commences a case under the Bankruptcy Code, an English administration or liquidation proceeding pursuant to the English Insolvency Act 1986, or any other form of reorganization or liquidation under any bankruptcy, insolvency, or similar law of any jurisdiction, or (iv) the date of any payment or distribution by the applicable Standstill Entity in respect of any equity interests or claims existing prior to September 15, 2008 (with respect to (x) the applicable Party asserting a claim and (y) the applicable Standstill Entity, such earliest date, the "**Standstill Termination Date**").

(b)     So long as the applicable Standstill Termination Date has not occurred, if any Debtor or Debtor-Controlled Entity has asserted a claim against any Other UK Affiliate, then such Other UK Affiliate agrees to provide written notice to LBHI in accordance with Article 13 at least ten Business Days prior to making any payment of the type referred to in clause (iv) of this Section 2.09. So long as the applicable Standstill Termination Date has not occurred, if any UK Affiliate has asserted any claim against any Debtor-Controlled Entity (other than LBLIS), then the Debtors agree to use reasonable efforts to cause such Debtor-Controlled Entity (other than LBLIS) to provide written notice to any such UK Affiliate in accordance with Article 13 at least ten Business Days prior to such Debtor-Controlled Entity (other than LBLIS) making any payment of the type referred to in clause (iv) of this Section 2.09.

(c)     So long as the applicable Party or Debtor-Controlled Entity forbears from enforcing any applicable rights or remedies in accordance with Section 2.09(a), each Standstill Entity hereby agrees that any statute or period of limitations, statutes of repose, or other time-based limitations or defenses, whether at law, in equity, under statute, contract, or otherwise (including the doctrine of laches or waiver) that might be asserted as a time bar and/or limitation to any claims that is or may be asserted by any applicable Party or any applicable Debtor-Controlled Entity pursuant to Section 2.09(a) is tolled from the Effective Date to the applicable Standstill Termination Date.

23

SECTION 2.10.   [Reserved]

SECTION 2.11.   *R3 Claim and JPM Claim.*

(a)   As between LBHI and LBIE, (i) the R3 Claim and the JPM Claim shall be treated as if LBHI were a third party asserting such claims against LBIE, (ii) the R3 Claim and the JPM Claim shall not give rise to any rights of setoff or recoupment against any claims that LBIE may have against LBHI, including the LBIE Guarantee Claim and (iii) LBHI shall not have any Extended Lien Claims in respect of the R3 Claim and the JPM Claim.

(b)   Within 30 days of the Effective Date, LBHI shall deliver to LBIE statements in respect of the R3 Claim and the JPM Claim, which statements shall include all reasonable detail in LBHI's possession that LBHI determines in good faith is relevant to LBIE's undertaking pursuant to Section 2.11(d) to deliver the R3 Claim Proposal and the JPM Claim Proposal, respectively.

(c)   Within 120 days of the Effective Date, LBHI shall file proofs of debt that comply with the Insolvency Rules 1986 in LBIE's UK Proceedings in respect of the R3 Claim and the JPM Claim, respectively.

(d)   So long as LBHI complies with the provisions of Section 2.11(b) and Section 2.11(c), and subject to the proviso in this Section 2.11(d), LBIE shall deliver written proposals to LBHI within 180 days of the Effective Date with respect to the amounts of the R3 Claim and the JPM Claim, and the validity of any claims in respect thereof to any right, title or interest in assets in LBIE's custody and control, or held by a sub-custodian on behalf of LBIE consistent with the methodologies that LBIE employs with third-party claims of a similar type (such proposal in respect of the R3 Claim, the "**R3 Claim Proposal**", and in respect of the JPM Claim, the "**JPM Claim Proposal**"); *provided* that the Debtors and LBIE acknowledge that the timely cooperation of (i) the applicable JPM Entities is required in order for LBIE to deliver the JPM Claim Proposal within such timeframe and (ii) R3 is required in order for LBIE to deliver the R3 Claim Proposal within such timeframe.

(e)   If LBHI does not respond to the R3 Claim Proposal within 30 days of receipt thereof, the R3 Claim Proposal shall be binding on LBHI and LBIE. If LBHI responds to the R3 Claim Proposal within 30 days of receipt thereof, LBHI and LBIE agree to use reasonable efforts to conduct negotiations regarding the same with a view toward concluding such negotiations 60 days after the commencement thereof.   At the end of such 60-day period (or such later date as may be agreed by LBHI and LBIE), LBIE shall either accept the R3 Claim, reject the R3 Claim or accept the R3 Claim in part and reject the R3 Claim in part; *provided* that it is expressly agreed by LBHI that LBIE's obligations in respect of

24

such acceptance or rejection in whole or in part shall not extend to any portion of the R3 Claim that in any way involves any issues related to (i) any assets or securities underlying the R3 Claim that are not then in LBIE's custody or control or (ii) whether LBHI is a beneficiary of the Client Money Trust in respect of the R3 Claim.

(f)    If LBHI does not respond to the JPM Claim Proposal within 30 days of receipt thereof, the JPM Claim Proposal shall be binding on LBHI and LBIE. If LBHI responds to the JPM Claim Proposal within thirty 30 days of receipt thereof, LBHI and LBIE agree to use reasonable efforts to conduct negotiations regarding the same with a view toward concluding such negotiations within 60 days after the commencement thereof.    At the end of such 60-day period (or such later date as may be agreed by LBHI and LBIE), LBIE shall either accept the JPM Claim, reject the JPM Claim or accept the JPM Claim in part and reject the JPM Claim in part; *provided* that it is expressly agreed by LBHI that LBIE's obligations in respect of such acceptance or rejection in whole or in part shall not extend to any portion of the JPM Claim that in any way involves any issues related to (i) any assets or securities underlying the JPM Claim that are not then in LBIE's custody or control or (ii) whether LBHI is a beneficiary of the Client Money Trust in respect of the JPM Claim.

(g)    This Section 2.11 is without prejudice to all rights and defenses of LBIE and LBHI in respect of the JPM Claim and the R3 Claim.

SECTION 2.12.    *LB Lux.*

(a)    Subject to the proviso in Section 2.12(c)(iv), LBHI and LBIE agree to share any distributions made to either of them in respect of LB Lux 45% to LBHI (the "**LBHI-LB Lux Share**") and 55% to LBIE (the "**LBIE-LB Lux Share**").    As part of such arrangement (i) LBHI and LBIE agree to use reasonable efforts to secure acceptance and implementation by LB Lux of distributions to LBHI and LBIE in accordance with the LBHI-LB Lux Share and LBIE-LB Lux Share, respectively and (ii) LBIE shall return any LB Lux/LBIE Assets to LB Lux within ten Business Days of any such assets becoming LB Lux/LBIE Assets, such ten-Business-Day period subject to LB Lux supplying LBIE in a timely manner with adequate settlement information for delivery of such LB Lux/LBIE Assets (it being understood that LBIE and LBHI intend that the value of any such returned LB Lux/LBIE Assets be distributed by LB Lux to LBHI and LBIE in accordance with the LBHI-LB Lux Share and LBIE-LB Lux Share, respectively).

(b)    LBIE (i) agrees that, within 180 days of the Effective Date, LBIE either shall (x) determine whether, subject to any Extended Lien Claims, any assets are LB Lux/LBIE Assets (and, subject to applicable data privacy

25

restrictions and confidentiality obligations owed to counterparties, shall keep LBHI informed of the status of such determination from time to time, upon reasonable request by LBHI, and promptly inform LBHI of any such determination made by LBIE) or (y) file an application with the English court seeking such a determination, (ii) consents and shall not object to LBHI's filing, upon ten-Business-Days' written notice to LBIE, an application with the English court disputing any determination made by LBIE pursuant to clause (i)(x) of this Section 2.12(b), and (iii) consents and shall not object to LBHI's participation in any application to the English court described in clause (i)(y) of this Section 2.12(b).

(c)    Irrespective of whether LB Lux distributes amounts to LBHI and LBIE in accordance with Section 2.12(a) in whole or in part, as between themselves and subject to the proviso in Section 2.12(c)(iv), LBHI and LBIE agree to share all distributions remitted to them in respect of LB Lux, with the LBHI-LB Lux Share for LBHI and the LBIE-LB Lux Share for LBIE.    In furtherance of the foregoing and subject to the proviso in Section 2.12(c)(iv):

(i)    if on any date the distributions received by LBHI in respect of LB Lux through and including such date *divided by* the aggregate distributions received by LBHI and LBIE in respect of LB Lux through and including such date exceed the LBHI-LB Lux Share (including, if applicable, after giving effect to any deemed change in the LBHI-LB Lux Share pursuant to the proviso in Section 2.12(c)(iv)), then LBHI shall, within five Business Days of such date, remit cash to LBIE in an amount necessary to cause the distributions received by LBHI in respect of LB Lux through and including such date (after giving effect to the cash remittance to LBIE in accordance with this Section 2.12(c)(i)) *divided by* the aggregate distributions received by LBHI and LBIE in respect of LB Lux through and including such date to equal the LBHI-LB Lux Share;

(ii)    if on any date the distributions received by LBIE in respect of LB Lux through and including such date *divided by* the aggregate distributions received by LBHI and LBIE in respect of LB Lux through and including such date exceed the LBIE-LB Lux Share, then LBIE shall, within five Business Days of such date, remit cash to LBHI in an amount necessary to cause the distributions received by LBIE in respect of LB Lux through and including such date (after giving effect to the cash remittance to LBHI in accordance with this Section 2.12(c)(ii)) *divided by* the aggregate distributions received by LBHI and LBIE in respect of LB Lux through and including such date to equal the LBIE-LB Lux Share;

26

(iii)     each of LBHI and LBIE agree to notify the other, promptly upon receipt thereof, of the amount any distributions remitted to it in respect of LB Lux; and

(iv)     LBHI and LBIE agree to use reasonable efforts to secure (x) the stay of the LBIE-LB Lux Litigation and (y) upon the occurrence of the Effective Date, the resolution of the LBIE-LB Lux Litigation in a manner acceptable to LBIE, in its sole discretion; *provided* that notwithstanding any such reasonable efforts by LBHI and LBIE, in the event that LBIE makes any payments or distributions to LB Lux pursuant to any order of a court of competent jurisdiction in respect of the LBIE-LB Lux Litigation or in connection with any other resolution of the LBIE-LB Lux Litigation (the aggregate amount of any such payments or distributions, the "**LBIE-LB Lux Payment Amount**"), then (1) the LBHI-LB Lux Share shall be deemed to be 0% and the LBIE-LB Lux Share shall be deemed to be 100% for purposes of this Section 2.12(b) unless and until the aggregate distributions received by LBIE in respect of LB Lux subsequent to the date that LBIE remits any LBIE-LB Lux Payment Amount equals such LBIE-LB Lux Payment Amount and (2) any distributions received by LBIE as a result of clause (1) of this proviso shall be disregarded for purposes of Section 2.12(c)(i) and Section 2.12(c)(ii).

(d)     LBHI and LBIE agree to use reasonable efforts to work together and with the liquidators of LB Lux to achieve the best recoveries reasonably obtainable by LB Lux in its estate and to secure an expeditious distribution of assets by LB Lux to its creditors.

(e)     If any Debtor (other than LBHI) or any UK Affiliate (other than LBIE) obtains any Transfer in respect of LB Lux (or in connection with any claims in respect thereof), including by way of reduction of any obligation whether through setoff or otherwise, such Debtor or UK Affiliate shall, within five Business Days of receipt thereof, remit such Transfer to LBIE (in the form and amount received or, in the case of an obligation reduction, in cash for the value of such reduction).    LBIE shall treat any remittances received in accordance with this Section 2.12(e) as a remittance in respect of LB Lux and subject to the provisions of Section 2.12(b).

SECTION 2.13.    *LBLIS.*

(a)     LBLIS acknowledges that, on the Effective Date, each of its then-current managers (the "**Current LBLIS Managers**") is to resign without any claim for compensation.    LB Scottish, in its capacity as sole shareholder of LBLIS, (i) shall procure such resignation on such terms by the Current LBLIS

27

Managers on the Effective Date and (ii) in the event that the Current LBLIS Managers have not so resigned on the Effective Date, LB Scottish shall pass a shareholder resolution in the form attached hereto as Exhibit C revoking the Current LBLIS Managers, but giving them discharge for their mandate.

(b)    Not later than 14 days prior to the Effective Date, LBL shall provide to LB Scottish a list of three nominees for managers of LBLIS.    On the Effective Date, LB Scottish shall cause such nominees to be elected as managers of LBLIS in replacement of the Current LBLIS Managers who will at the same time obtain a discharge for their mandate, and will thereafter (i) support such managers' re-election and not seek their removal or revocation, (ii) support the election of such supplemental or replacement managers as may be proposed by LBL from time to time (the managers from time to time of LBLIS that are nominated by LBL, collectively, the "**LBL Nominated Managers**") and (iii) not elect or support the election of any persons not nominated by LBL.

(c)    Unless requested to do so by the LBL Nominated Managers, none of any Debtor, LB UK Delaware nor LB Scottish shall take any steps towards putting LBLIS in any insolvency, bankruptcy, winding-up, liquidation or similar proceeding, whether through the exercise of any contractual or legal rights or in such entity's capacity as shareholder or creditor of LBLIS.

(d)    Prior to the initial election of the LBL Nominated Managers, LBLIS shall not take any steps towards putting LBLIS in any insolvency, bankruptcy, winding-up, liquidation or similar proceeding, unless required to do so by Luxembourg law.

(e)    To the largest extent permitted by applicable law, none of any Debtor, LB UK Delaware nor LB Scottish shall object to or take any action to prevent any decision by the LBL Nominated Managers to place LBLIS in any insolvency, bankruptcy, winding-up, liquidation or similar proceeding.

(f)    Pending the Effective Date, LBLIS shall, and LB Scottish shall procure that LBLIS shall, operate in the ordinary course of business and shall only make payments or enter into transactions that are within the ordinary course of its business; *provided, however*, that LBLIS shall not, and LB Scottish shall procure that LBLIS shall not, make any payment or distribution to any Debtor or Debtor-Controlled Entity in respect of any equity interests or claims existing prior to September 15, 2008.

(g)    LB Scottish hereby acknowledges the obligations undertaken by LBLIS in this Section 2.13 and shall take no actions or inactions that are inconsistent with such obligations or prevent LBLIS from fulfilling such obligations.

28

(h)     LB UK Delaware hereby irrevocably agrees and shall be deemed to have hereby irrevocably agreed, effective on the Effective Date, that any and all of its claims against LBLIS are subordinated in right of payment to all other creditors of LBLIS, including LBL.

(i)     Unless and until LBL shall have been indefeasibly paid $225,000,000 in respect of its claims against LBLIS, plus any interest accrued thereon in accordance with applicable contract and law, if LB UK Delaware obtains any Transfer in respect of any of its claims against LBLIS, including by way of reduction of any obligation whether through setoff or otherwise, LB UK Delaware shall, within three Business Days of receipt thereof, remit such Transfer to LBL (in the form and amount received or, in the case of an obligation reduction, in cash for the value of such reduction).

(j)     LB UK Delaware and LBHI hereby acknowledge the obligations undertaken by LB Scottish in this Section 2.13 and shall take no actions or inactions that are inconsistent with such obligations or prevent LB Scottish from fulfilling such obligations.

(k)     On or after the Effective Date, to the extent that LBHI (i) is holding any cash for or on behalf of LBLIS, or in which LBLIS has a Proprietary Interest or (ii) is authorized to direct the withdrawal of any cash held in accounts in the name of LBLIS or in which LBLIS has a Proprietary Interest, in each case, LBHI will return such cash to LBLIS within two Business Days after LBLIS's written request to LBHI.

(l)     LBL agrees to indemnify each of LBHI, LB UK Delaware, LB Scottish and each of their and LBLIS' members, partners, directors, officers, employees, agents, advisers or representatives, present and future, (each an "**LBL Indemnified Person**") against any damages or losses actually suffered in connection with any Causes of Action asserted against them (other than any Causes of Action asserted against them by or on behalf of any Debtor or Debtor-Controlled Entity (other than any Causes of Action asserted by LBLIS after the Effective Date)) asserted against such LBL Indemnified Person in relation to the provision of, or otherwise connected with, the performance of the obligations set forth in this Section 2.13; *provided* that this indemnity shall not apply, to the extent it would otherwise apply, in respect of (i) any Causes of Action arising by reason of the Current LBLIS Managers being given a discharge for their mandate except solely to the extent relating directly to their acting or causing LBLIS to act so as to comply with an obligation of LBLIS under this Section 2.13; (ii) any Causes of Action arising from any actions or inactions of the Current LBLIS Managers while in office as managers of LBLIS except solely to the extent that they arise directly as a result of the Current LBLIS Managers (x) acting or failing to act so as to cause LBLIS to comply with its obligations under Section 2.13(f) or

29

(y) resigning in accordance with Section 2.13(a); or (iii) any losses or damages resulting from the willful misconduct, bad faith, fraud or gross negligence of such LBL Indemnified Person.

(m)    Each LBLIS Group Entity is party to this Agreement solely to the extent of the provisions set forth in Section 2.09, Section 2.13, Article 4 (but solely to the extent of any representations or warranties made by LBL thereunder), Article 6, Article 9 through Article 19 and Article 23 through Article 27, and, except in such provisions, each reference to the term "Party" or "Parties" throughout this Agreement shall be deemed to refer to a Party other than any of the LBLIS Group Entities or the Parties other than LBLIS Group Entities, respectively.

SECTION 2.14.    *Claim Allowance Final.*    The Allowed Claims and the Admitted Claims shall not be subject to (a) reduction, avoidance, recharacterization, reconsideration, recovery, subordination, merger, consolidation, attack, offset, claim, defense, recoupment, deduction, counterclaim or objection, of any kind or nature, whether under the Bankruptcy Code or any provision of the Plan or otherwise or (b) disallowance or holdback (other than any posting of security in accordance with Section 2.01(c) in respect of the LBIE Guarantee Claim) under any provision of the Plan or Bankruptcy Code, including section 502(d) thereof, or otherwise.

SECTION 2.15.    *Allowed Claims' Treatment Under the Plan.*

(a)    Except as set forth in Section 2.01(c), the Allowed Claims shall be treated at least as favorably as the most favorably treated guarantee claim or direct claim, as applicable, of any Lehman Entity against the applicable Debtor, including with respect to the timing of distributions thereunder, except to the extent that any UK Affiliate agrees hereunder that its claims will be treated less favorably than other claims in the same class; *provided* that this Section 2.15(a) shall not prohibit the Debtors from (i) treating the Allowed Claims, or any other claims, in any manner that the Debtors determine, in the reasonable exercise of their fiduciary duties, is required by applicable law or required to render the Plan confirmable pursuant to section 1129 of the Bankruptcy Code or (ii) treating any guarantee claim or direct claim of any Lehman Entity more favorably than any Allowed Claims that are in a different class than the applicable Lehman Entity's claim under the Plan, so long as (x) such treatment is not materially more favorable and (y) such classification and treatment comply with applicable law. For the purposes of this Section 2.15(a), each UK Affiliate agrees that it shall not assert that the Current Plan treats the Allowed Claims less favorably than the most favorably treated guarantee claim or direct claim, as applicable, of any Lehman Entity against the applicable Debtor.

(b)    Except as set forth in Section 2.01(b), the Allowed Claims under any Plan shall be unaffected by any allowance or disallowance of any UK Affiliate's claims against any Lehman Entity (other than the Debtors) or the amounts thereof.

(c)    Notwithstanding anything to the contrary in Section 8.13 of the Current Plan (or any provisions of similar effect in any Plan), the Debtors agree that any Allowed Claim shall be deemed (i) satisfied in full or (ii) not entitled to any further distributions from the Debtors, in each case, only if the holder of such Allowed Claim receives distributions from the Debtors on account of such Allowed Claim that combined with any other distributions provided to such holder in respect of the corresponding "Primary Claim" (as defined in the Current Plan) equal the allowed amount of the corresponding "Primary Claim" (as defined in the Current Plan).

(d)    Subject to Section 2.15(c) hereof, Sections 8.10, 8.13(e) (except as explicitly set forth in Section 2.01(c) hereof), 8.14, 8.15 and 13.8 (to the extent Section 13.8 seeks to preserve the Debtors' rights to Causes of Action (as defined in the Current Plan) that are released or waived under this Agreement) of the Current Plan (and any provisions of similar effect in the Plan) shall not apply to the UK Affiliates or the Allowed Claims.   This Section 2.15(d) is without prejudice to any rights of the Debtors under the Plan or otherwise against any entities that are not Parties.

SECTION 2.16.    *Tolling Agreements.*    Each Tolling Agreement shall be deemed terminated as of the Effective Date and be of no further force and effect as between the Debtors and the applicable UK Affiliates.

SECTION 2.17.    *LBJ Settlement Agreement.*    LBSF, LBHI and LBIE shall take all steps reasonably necessary expeditiously to negotiate and execute the LBJ Settlement Agreement and seek approval thereof from the Bankruptcy Court under the Plan.   Each of LBSF, LBHI and LBIE agree that solely vis-à-vis one another, the releases set forth in Article 8 supersede and replace any releases set forth in the LBJ Settlement Agreement.

SECTION 2.18.    *Claim Reserve Agreement.*    The Parties acknowledge that this Agreement is the Settlement Agreement (as defined in the Claim Reserve Agreement).

SECTION 2.19.    *Unfunded Notes Settlement Agreement.*    The Debtors hereby irrevocably waive and release and shall be deemed to have hereby irrevocably waived and released, automatically and without further action, any claims or causes of action they may have against LBIE (including in the Debtors' respective capacities as Extended Lien Claimants) in respect of the transactions contemplated by the Unfunded Notes Settlement Agreement; *provided* that any of

31

LBSF's rights, obligations, claims or causes of action under the Unfunded Notes Settlement Agreement are neither waived nor released pursuant to this Section 2.19.

SECTION 2.20.    *LBIE Structured Securities.*

(a)    LBIE agrees to acquire beneficial ownership of LBIE Structured Securities after the Execution Date only (i) through the exercise of rights or remedies, under contract or applicable law, of any liens or security interests LBIE may have in any LBIE Structured Securities or (ii) in connection with a settlement or other resolution of any contracts or transactions entered into by LBIE with a counterparty (including any Lehman Entity) prior to LBIE's Insolvency Filing Time.

(b)    LBIE and LBHI hereby agree that any claims by LBIE (or any of its permitted transferees, assignees or participants in accordance with Section 2.20(c)) against LBHI arising under LBIE Structured Securities (i) shall be allowed claims (solely for purposes of distributions under the Plan) against LBHI in an amount equal to the amount determined in accordance with the methodology and principles used by the Debtors to value Structured Securities beneficially owned by third parties; *provided* that the Debtors reserve the right to object to the LBIE Structured Securities on the grounds that such claims do not include a blocking number or include an invalid blocking number, are duplicative of other claims, have been amended and superseded, or otherwise do not comply with the provisions of the Bar Date Order (as defined in the Current Plan); (ii) in the case of LBIE Structured Securities that were issued by any Lehman Entity (other than LBHI), shall be classified under the Plan as unsecured, non-priority, senior affiliate guarantee claims against LBHI ("LBHI Class 4B" as described in the Current Plan); *provided* that such claims shall be treated as if they were unsecured, non-priority, senior third-party guarantee claims against LBHI ("LBHI Class 5" as described in the Current Plan); and (iii) in the case of LBIE Structured Securities that were issued by LBHI, shall be classified under the Plan in the same classes, and receive the same treatment under the Plan, as if such Structured Securities had not been acquired by LBIE.

(c)    LBIE agrees to convey, transfer, assign, or participate any of the LBIE Structured Securities after the Execution Date only to any entity that agrees to be bound by LBIE's obligations under Section 2.20(b) and this Section 2.20(c).

SECTION 2.21.    *Extended Lien Applications.*    LBIE shall not object to LBHI's (or any other Debtor's) participation in the Extended Lien Application and/or Extended Lien Asia Application.

32

SECTION 2.22.   *Client Money Tracing Claims.*

(a)   LBIE shall commence a Client Money Tracing Claim against LBHI only if expressly directed to do so by either (i) a court of competent jurisdiction (it being understood that such direction may be in connection with an application commenced by LBIE in such court, including the Client Money Tracing Application) or (ii) the UK Financial Services Authority.

(b)   In the event that a court of competent jurisdiction renders, by a final, unappealable order, a judgment against LBHI in respect of a Client Money Tracing Claim and, as a result thereof, LBHI actually remits to LBIE or any beneficiary of the Client Money Trust, or their respective successors in title or assignees, cash or other property in or towards settlement of such Client Money Tracing Claim (such payment, an "**LBHI Client Money Payment**,") then LBIE shall pay to LBHI an amount equal to the aggregate amount of such dividend or dividends as LBIE would have paid on that portion of any admitted unsecured claim against LBIE that is indefeasibly reduced by the LBHI Client Money Payment at the same time or times as such dividend payments would have been made (and, in the case of any dividends already paid by LBIE to the relevant claimant or claimants, LBIE hereby expressly agrees to use reasonable efforts (i) to recover and (ii) to assist LBHI, to the extent LBHI is seeking to recover, such dividends from the relevant creditor or creditors and, solely to the extent such dividends are recovered by LBIE, agrees to pay such dividends to LBHI within seven Business Days of receipt thereof).

(c)   LBIE hereby expressly agrees (i) to LBHI's participation in any Client Money Tracing Application, and (ii) not to seek any costs from LBHI in respect of participation in such an application.

(d)   Subject to applicable confidentiality and data privacy laws and restrictions, LBIE shall use reasonable efforts, from time to time at LBHI's request, to provide LBHI with information regarding entitlements to protection as Client Money under the Client Money Trust, including (i) creditors who may have such entitlements and (ii) the amounts and natures of such creditors' claims that may give rise to such entitlements; *provided* that, without prejudice to the general applicability of the Existing NDA, LBHI acknowledges that any information provided to it pursuant to this Section 2.22(d) shall be treated as "Confidential Information" (as defined in the Existing NDA).

(e)   Nothing in this Section 2.22 waives or releases any rights or defenses any Party may have in respect of any Client Money Tracing Claim, all of which are expressly reserved.

33

SECTION 2.23.    *UK Re/LBIE Assets.*    LBIE (i) agrees that, within 180 days of the Effective Date, LBIE either shall (x) determine whether, subject to any Extended Lien Claims, any assets are UK Re/LBIE Assets (and, subject to applicable data privacy restrictions and confidentiality obligations owed to counterparties, shall keep LBHI informed of the status of such determination from time to time, upon reasonable request by LBHI, and promptly inform LBHI of any such determination made by LBIE) or (y) file an application with the English court seeking such a determination, (ii) consents and shall not object to LBHI's filing, upon ten-Business-Days' written notice to LBIE, an application with the English court disputing any determination made by LBIE pursuant to clause (i)(x) of this Section 2.23, (iii) consents and shall not object to LBHI's participation in any application to the English court described in clause (i)(y) of this Section 2.23, (iv) confirms (it being understood that such confirmation shall be treated as a statement made in good faith but not constitute a warranty or representation having legal effect) that, on the basis of its books and records as currently reviewed and on the basis of the proprietary claims made against LBIE to date by UK Re, there are no competing ownership claims in respect of assets in LBIE's custody or control that are claimed by UK Re other than Competing Claims by LBHI, (v) agrees that LBIE will not assert any lien over the UK Re/LBIE Assets in respect of any indebtedness owed by UK Re to LBIE and (vi) agrees that, within ten Business Days after the date upon which it has been finally determined that any assets are UK Re/LBIE Assets, LBIE shall remit, return, transfer, convey, assign or otherwise deliver such assets to UK Re, such ten-Business-Day period subject to UK Re supplying LBIE in a timely manner with adequate settlement information for delivery of such UK Re/LBIE Assets.

ARTICLE 3
PLAN SUPPORT

SECTION 3.01.    *Plan Supplement.*    The Debtors shall file this Agreement (but not Schedule 2, Schedule 3 or Schedule 5) in the Plan Supplement (as defined in the Plan) on or prior to the deadline set forth in the Disclosure Statement Approval Order for filing the Plan Supplement; *provided* that so long as the Debtors take all steps reasonably necessary to ensure that the contents thereof are not publicly disclosed, Schedule 2, Schedule 3 and Schedule 5 may be (i) filed by the Debtors with the Bankruptcy Court under seal and/or (ii) disclosed on a confidential basis to the Bankruptcy Court, the United States Trustee for the Southern District of New York and the advisors to the official committee of unsecured creditors in the Chapter 11 Cases on a "professionals'-eyes only" basis.

SECTION 3.02.    *PSA Creditor.*    Contemporaneously with filing this Agreement with the Bankruptcy Court in accordance with Section 3.01, the Debtors shall file with the Bankruptcy Court an amendment to Schedule 4 of the

34

Plan, which amendment shall add each UK Affiliate as a PSA Creditor (as defined in the Current Plan).

SECTION 3.03.    *Plan.*    The Debtors shall (a) prosecute the Plan (incorporating this Agreement in full) and seek entry of an order confirming the Plan (incorporating this Agreement in full), (b) provide LBIE with any contemplated amendment, modification or supplement to the Plan or Disclosure Statement as soon as practicable and in any event prior to the filing of such document with the Bankruptcy Court, (c) not amend, modify or supplement the Plan in a manner the effect of which is that this Agreement is not (or is no longer) incorporated in full in the Plan and (d) not propose or support any other chapter 11 plan for the Debtors unless such plan incorporates this Agreement in full; *provided* that clauses (a), (c) and (d) of this Section 3.03 shall not prohibit the Debtors from acting in any manner that the Debtors' determine, in the reasonable exercise of their fiduciary duties, is required by applicable law or required to render the Plan confirmable pursuant to section 1129 of the Bankruptcy Code.

SECTION 3.04.    *Plan Support Obligations.*    So long as (a) the Debtors are not in breach of their obligations hereunder, including in this Article 3, (b) this Agreement has not terminated in accordance with Article 11 and (c) the Plan incorporates this Agreement in full, then, with respect to the Allowed Claims, the Excluded Items, and any other claims that the UK Affiliates have asserted or may assert against any Debtor, (i) provided that the applicable UK Affiliate has been properly solicited in accordance with section 1125 of the Bankruptcy Code, each UK Affiliate shall timely vote to accept the Plan and not thereafter withdraw or change such vote, and LBIE shall file a statement in support of approval and confirmation of the Plan; *provided* that LBIE, acting as "nominee" (as used in paragraph 27 of the Disclosure Statement Approval Order) or as "Voting Nominee" (as used in paragraph 24 of the Disclosure Statement Approval Order), shall be entitled to vote any LPS Trust Claims either to accept or to reject the Plan (or to abstain from voting on the Plan), in each case, as directed by the applicable beneficial holders, (ii) no UK Affiliate shall oppose or object to (or support any objection to) confirmation of the Plan, (iii) subject to Section 3.06, no UK Affiliate shall (x) participate in the formation of, file or prosecute any Alternative Plan, (y) join in or support any Alternative Plan, including, without limitation, express support in writing of, or enter into any form of plan support agreement with respect to any Alternative Plan, or (z) take any action to alter, delay or impede the confirmation and consummation of the Plan.

SECTION 3.05.    *Solicitation Required in Connection with the Plan.* Notwithstanding anything contained in Section 3.04 or elsewhere in this Agreement, this Agreement is not, and shall not be deemed to be, a solicitation of a vote for the acceptance of the Plan pursuant to section 1125 of the Bankruptcy Code, or rejection of any Alternative Plan.    Acceptance of the Plan will not be

solicited until the Disclosure Statement and ballots have been transmitted to parties entitled to receive the same in accordance with the Disclosure Statement Approval Order.

SECTION 3.06.    *Alternative Plans.*    So long as (a) the Debtors are not in breach of their obligations hereunder, including in this Article 3, (b) this Agreement has not terminated in accordance with Article 11 and (c) the Plan incorporates this Agreement in full, then, if the Bankruptcy Court allows other parties to solicit acceptances of any Alternative Plans at the same time as the Plan, any UK Affiliate may vote to accept such Alternative Plans only if such Alternative Plan or Alternative Plans provide the applicable UK Affiliate with an equal or greater economic recovery than the Plan; *provided, however*, that such UK Affiliate shall also (i) timely vote to accept the Plan and not thereafter withdraw or change such vote, (ii) comply with the provisions of Section 3.04, and (iii) support approval and confirmation of the Plan, and indicate a preference for the Plan on its voting ballot, if the Plan provides such UK Affiliate with an equal or greater economic recovery compared with any Alternative Plan that such UK Affiliate votes to accept.    So long as (x) the Debtors are not in breach of their obligations hereunder, including in this Article 3, (y) this Agreement has not terminated in accordance with Article 11 and (z) the Plan incorporates this Agreement in full, then, notwithstanding anything contained in this Article 3, the UK Affiliates shall not indicate a preference on their voting ballots for any Alternative Plans; *provided, further*, that if the Bankruptcy Court orders or directs creditors of the Debtors to indicate a preference on their ballots, then the UK Affiliates may indicate a preference on their voting ballots for any Alternative Plans that provide greater economic recovery than the Plan.

SECTION 3.07.    *Other PSA.*

(a)    The Parties intend for this Agreement to be an "Other PSA" as referred to and described in each applicable Supporting Creditor PSA.

(b)    The UK Affiliates shall not file, support or participate in any objections to the claims of any creditor that enters into an Other PSA (as defined in each applicable Supporting Creditor PSA) with the Debtors substantially similar to this Agreement, except with respect to any creditor that files, supports or participates in any objections to the approval of this Agreement by the Bankruptcy Court.

ARTICLE 4
THE UK AFFILIATES' REPRESENTATIONS AND WARRANTIES

In order to induce the Debtors to enter into and perform their obligations under this Agreement, each UK Affiliate hereby represents, warrants and acknowledges as follows:

SECTION 4.01.    *Authority.*    The UK Affiliates have the power and authority to execute, deliver and perform their obligations under this Agreement, and to consummate the transactions contemplated herein, and the execution, delivery and performance by the UK Affiliates of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of the UK Affiliates, and no other proceedings on the part of the UK Affiliates are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

SECTION 4.02.    *Validity.*    This Agreement has been duly executed and delivered by the UK Affiliates and, subject to general bankruptcy rules, constitutes the legal, valid and binding agreement of the UK Affiliates, enforceable against the UK Affiliates in accordance with its terms.

SECTION 4.03.    *Authorization of Governmental Authorities and Creditors.*    No action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by the UK Affiliates of their obligations hereunder.

SECTION 4.04.    *Title; No Prior Transfer of Claims.*

(a)    The UK Affiliates (i) own the House Proofs of Claim free and clear of any and all liens, claims, setoff rights, security interests, participations, or encumbrances created or incurred by the UK Affiliates, (ii) are not aware of any third-party rights with respect to the House Proofs of Claim as of the Execution Date, and (iii) have not transferred or assigned to any other person any of the House Proofs of Claim, in whole or in part.

(b)    Other than as expressly set forth in this Agreement, no UK Affiliate may convey, transfer, assign, or participate any of the claims or receivables that are allowed, compromised, settled, waived or released hereunder, or any rights or interests arising under any of the foregoing, in whole or in part; *provided* that after the Effective Date the UK Affiliates may convey, transfer, assign or participate any of the Allowed Claims (in each case, an **Assigned UK Affiliate Interest**"), to any party or parties (in each case, a "**UK Affiliate Claim Transferee**"); *provided, further*, that any such conveyance, transfer, assignment, or participation is consummated pursuant to a written agreement that provides that

37

the terms and provisions of this Agreement shall be binding in all respects upon UK Affiliate Claim Transferees, and any successor transferees, and shall govern their acts.    No such conveyance, transfer, assignment, or participation shall be valid unless (1) the Debtor against which such Assigned UK Affiliate Interest is asserted receives a copy of said written agreement executed by the transferor and the transferee and (2) such Debtor does not object in writing within five Business Days of receipt of said written agreement to the proposed conveyance, transfer, assignment, or participation, based on the failure of said written agreement to contain the foregoing provisions; *provided*, *further*, that the foregoing restriction on objections shall not apply with respect to any objections premised on any orders entered in the Chapter 11 Cases relating to the trading of claims.    Any such conveyance, transfer, assignment, or participation shall not relieve the UK Affiliates of any of their obligations under this Agreement.    Notwithstanding the foregoing, the conveyance, transfer, assignment, or participation of any claims, receivables, rights or interest in respect of Excluded Items is not prohibited or restricted by this Section 4.04(b); *provided, however,* that LBIE shall not transfer any Client Money Tracing Claims it holds in its capacity as a fiduciary without the prior written consent of LBHI.

SECTION 4.05.    *No Reliance.*    The UK Affiliates (i) are sophisticated parties with respect to the subject matter of this Agreement, (ii) have been represented and advised by legal counsel in connection with this Agreement, (iii) have adequate information concerning the matters that are the subject of this Agreement, and (iv) have independently and without reliance upon any Debtor or any officer, employee, agent or representative thereof, and based on such information as the UK Affiliates have deemed appropriate, made their own analysis and decision to enter into this Agreement, except that the UK Affiliates have relied upon each Debtor's express representations, warranties and covenants in this Agreement.    The UK Affiliates acknowledge that they have entered into this Agreement voluntarily and of their own choice and not under coercion or duress.

## ARTICLE 5
### DEBTORS' REPRESENTATIONS AND WARRANTIES

In order to induce the UK Affiliates to enter into and perform their obligations under this Agreement, each Debtor hereby represents, warrants and acknowledges as follows:

SECTION 5.01.    *Authority.*

(a)    Subject to the occurrence of the Effective Date, each signatory Debtor has the power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions contemplated herein,

and the execution, delivery and performance by such Debtor of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of such Debtor, and no other proceedings on the part of such Debtor are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

SECTION 5.02.    *Validity*.    Subject to the occurrence of the Effective Date, this Agreement has been duly executed and delivered by each Debtor and, subject to general bankruptcy rules, constitutes the legal, valid and binding agreement of each Debtor, enforceable against each Debtor in accordance with its terms.

SECTION 5.03.    *Authorization of Governmental Authorities*.    Subject to the occurrence of the Effective Date, no action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by each Debtor of its obligations hereunder.

SECTION 5.04.    *Title; No Transfer of Claims*.

(a)    Each Debtor (i) owns all claims it may have against any UK Affiliate, including all claims released hereunder, free and clear of any and all liens, claims, setoff rights, security interests, participations, or encumbrances created or incurred by such Debtor, (ii) is not aware of any third-party rights with respect to any such claims as of the Execution Date, and (iii) has not transferred or assigned to any other person any of such claims, in whole or in part.

(b)    Other than as expressly set forth in this Agreement, no Debtor may convey, transfer, assign, or participate any of the claims or receivables that are allowed, compromised, settled, waived or released hereunder, or any rights or interests arising under any of the foregoing, in whole or in part; *provided* that after the Effective Date the Debtors may convey, transfer, assign or participate any of the Admitted Claims (in each case, an "**Assigned Debtor Interest**"), to any party or parties (in each case, a "**Debtor Claim Transferee**"); *provided* that any such conveyance, transfer, assignment, or participation is consummated pursuant to a written agreement that provides that the terms and provisions of this Agreement shall be binding in all respects upon Debtor Claim Transferees, and any successor transferees, and shall govern their acts.    No such conveyance, transfer, assignment, or participation shall be valid unless (1) the UK Affiliate against which such Assigned Debtor Interest is asserted receives a copy of said written agreement executed by the transferor and the transferee and (2) such UK Affiliate does not object in writing within five Business Days of receipt of said written agreement to the proposed conveyance, transfer, assignment, or participation, based on the failure of said written agreement to contain the

39

foregoing provisions.    Any such conveyance, transfer, assignment, or participation shall not relieve the Debtors of any of their obligations under this Agreement.    Notwithstanding the foregoing, the conveyance, transfer, assignment, or participation of any claims, receivables, rights or interest in respect of Excluded Items is not prohibited or restricted by this Section 5.04(b); *provided, however*, that if LBHI transfers or assigns all or any portion of the JPM Claim or the R3 Claim, the Parties' obligations with respect to the JPM Claim or the R3 Claim, as applicable, shall automatically terminate; *provided, further*, that LBHI shall only transfer or assign all or any portion of the JPM Claim or the R3 Claim to a third party, and only so long as such third party agrees to be bound by LBHI's obligations under this proviso of Section 5.04(b).

SECTION 5.05.    *No Reliance*.    Each Debtor (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon any UK Affiliate or any officer, employee, agent or representative thereof, and based on such information as each Debtor has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that each Debtor has relied upon each UK Affiliate's express representations, warranties and covenants in this Agreement.    Each Debtor acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

## ARTICLE 6
### LBLIS GROUP ENTITIES' REPRESENTATIONS AND WARRANTIES

In order to induce the UK Affiliates to enter into and perform their obligations under this Agreement, each LBLIS Group Entity hereby represents, warrants and acknowledges as follows:

SECTION 6.01.    *Authority*.

(a)    Subject to the occurrence of the Effective Date, each signatory LBLIS Group Entity has the power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions contemplated herein, and the execution, delivery and performance by such LBLIS Group Entity of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of such LBLIS Group Entity, and no other proceedings on the part of such LBLIS Group Entity are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

40

SECTION 6.02.    *Validity*.    Subject to the occurrence of the Effective Date, this Agreement has been duly executed and delivered by each LBLIS Group Entity and, subject to general bankruptcy rules, constitutes the legal, valid and binding agreement of each LBLIS Group Entity, enforceable against LBLIS Group Entity in accordance with its terms.

SECTION 6.03.    *Authorization of Governmental Authorities*.    Subject to the occurrence of the Effective Date, no action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by each LBLIS Group Entity of its obligations hereunder.

SECTION 6.04.    *No Reliance*.    Each LBLIS Group Entity (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon any UK Affiliate or any officer, employee, agent or representative thereof, and based on such information as each LBLIS Group Entity has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that each LBLIS Group Entity has relied upon LBL's express representations, warranties and covenants in this Agreement.    Each LBLIS Group Entity acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

## ARTICLE 7
### SURVIVING CONTRACTS

The Surviving Contracts shall survive the execution, consummation or termination of this Agreement, and the Debtors shall not reject any Surviving Contracts pursuant to sections 365 or 1123(b)(2) of the Bankruptcy Code.    All pre-petition contracts between any of the Debtors and any UK Affiliate that are not Surviving Contracts shall be rejected under the Plan pursuant to section 365 of the Bankruptcy Code as of the Effective Date.    Any claims that arise from the rejection of such contracts will be deemed to be satisfied in full by the treatment of the Allowed Claims under any Plan as set forth herein or the distributions to be made in respect of the Admitted Claims, as applicable.

## ARTICLE 8
### RELEASES

SECTION 8.01.    *UK Affiliates' Release.*    Upon the occurrence of the Effective Date, except with respect to (1) the Allowed Claims and the Admitted

41

Claims and any rights and distribution entitlements in respect thereof, (2) the agreements, promises, settlements, representations and warranties set forth in this Agreement, (3) the performance of the obligations set forth herein, and (4) the Excluded Items, and in consideration of the foregoing and each Party's execution of this Agreement, each UK Affiliate, on behalf of itself, its estate, its successors and assigns (including any liquidators that may be appointed upon or after conversion of any administration of any UK Administration Company into liquidations, and any parties that may succeed to any Causes of Action of any of the UK Affiliates or their estates, or that may seek to bring any Causes of Action on behalf of any of the UK Affiliate's estates, derivatively or otherwise), hereby fully and forever releases, discharges and acquits each UK Affiliate Released Party from all Causes of Action (including in respect of any derivative claim by any third party or representative of any UK Affiliate's estate), whether at law or in equity, whether based on contract (including quasi-contract, guarantee, indemnity or estoppel), statute, regulation, tort or otherwise (excluding fraud in connection with the negotiation of (A) this Agreement or (B) the amounts of the Allowed Claims and the Admitted Claims) accrued or unaccrued, foreseen or unforeseen, foreseeable or unforeseeable, known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, certain or contingent, in each case, that arise from, are based on, connected with, alleged in or related to any facts or circumstances in existence prior to the date hereof, including (i) any claims based upon an asserted right of subrogation, indemnification (whether express or implied), contribution or reimbursement, and (ii) all Causes of Action against any UK Affiliate Released Party, arising from, in connection with, or relating to any Causes of Action against any other entity (whether or not a Party) existing as of the date hereof.

SECTION 8.02.    *Debtors' Release.*    Upon the occurrence of the Effective Date, except with respect to (1) the Allowed Claims and the Admitted Claims and any rights and distribution entitlements in respect thereof, (2) the agreements, promises, settlements, representations and warranties set forth in this Agreement, (3) the performance of the obligations set forth herein and (4) the Excluded Items, and in consideration of the foregoing and each Party's execution of this Agreement, each Debtor, on behalf of itself, its estates, its successors and assigns (including any chapter 7 trustees that may be appointed upon or after conversion of any of the Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code or any party that may succeed to any Causes of Action of any of the Debtors or their estates, or may seek to bring any Causes of Action on behalf of any of the Debtors' estates, derivatively or otherwise), hereby fully and forever releases, discharges and acquits each Debtor Released Party, from all Causes of Action (including in respect of any derivative claim by any third party or representative of any Debtors' estate, including the official committee of unsecured creditors appointed in the Chapter 11 Cases), whether at law or in equity, whether based on contract (including quasi-contract, guarantee, indemnity

42

or estoppel), statute, regulation, tort or otherwise (excluding fraud in connection
with the negotiation of (A) this Agreement or (B) the amounts of the Allowed
Claims and the Admitted Claims), accrued or unaccrued, foreseen or unforeseen,
foreseeable or unforeseeable, known or unknown, matured or unmatured, fixed or
contingent, liquidated or unliquidated, certain or contingent, in each case, that
arise from, are based on, connected with, alleged in or related to any facts or
circumstances in existence prior to the date hereof, including (i) any Funding
Claims, (ii) any Causes of Action under chapter 5 of the Bankruptcy Code or
similar actions under applicable state law, (iii) except as explicitly set forth in
Section 2.04, any claims based upon an asserted right of subrogation,
indemnification (whether express or implied), contribution or reimbursement,
including any such claims in connection with distributions to any of the UK
Affiliates or any of their creditors based upon a guarantee or similar document by
LBHI or any Lehman Entity and (iv) all Causes of Action against any Debtor
Released Party, arising from, in connection with, or relating to any Causes of
Action against any other entity (whether or not a Party) existing as of the date
hereof.   For the avoidance of doubt, this Section 8.02 is without prejudice to any
of the Debtors' rights or Causes of Actions against any entity that is not a Debtor
Released Party.

SECTION 8.03.    *Joint Administrators' Confirmation.*    The Joint
Administrators confirm that, upon the occurrence of the Effective Date, and in
consideration of the foregoing and each Party's execution of this Agreement, they
shall not be entitled to commence against any UK Affiliate Released Party any
action under the English Insolvency Act 1986 including, any action against any
UK Affiliate Released Party in relation to transactions at an undervalue,
preferences or transactions to defraud creditors.

ARTICLE 9
FEES AND EXPENSES

The fees and expenses incurred by each Party (including the fees of any
attorneys, accountants, investment bankers, financial advisors or any other
professionals engaged by such Party) in connection with this Agreement and the
transactions contemplated hereby, whether or not the transactions contemplated
hereby are consummated, will be paid by such Party.

ARTICLE 10
EFFECTIVENESS OF AGREEMENT

Article 1, Section 2.02(d), clause (x) of Section 2.12(c)(iv), Section 2.13(a)
through Section 2.13(d), Section 2.13(f), Section 2.13(g), Section 2.13(j), Section
2.13(l), Section 2.13(m), Section 2.15(a), Section 2.17, Section 2.18, Section 2.19,

43

Section 2.20(a), Section 2.20(c), Section 2.21, Section 2.22(c) through Section 2.22(e), Article 3, Article 4, Article 5, Article 6, Article 10 through Article 20 (other than clause (iii) of Section 20.01) and Article 23 through Article 27 shall be effective upon the Execution Date.   The other provisions of this Agreement shall be effective upon the Effective Date; *provided* that this Agreement has not been terminated in accordance with accordance with Section 11.01, Section 11.02(a) or Section 11.03 prior to the Effective Date.

ARTICLE 11
TERMINATION

SECTION 11.01.    *Automatic Termination.*    This Agreement shall automatically terminate on any date on which the Bankruptcy Court (i) denies the motion seeking the Confirmation Order with prejudice, or (ii) enters an order confirming an Alternative Plan pursuant to section 1129 of the Bankruptcy Code.

SECTION 11.02    *The Debtors' Right to Terminate.*

(a)    Solely prior to the Effective Date, each Debtor, in its sole discretion, shall have the right, at its election, to terminate this Agreement by written notice to LBIE if (a) there is a breach in any material respect, taken as a whole, of the representations, warranties and/or covenants of any of the UK Administration Companies and UK Liquidation Companies hereunder, and the relevant UK Administration Company or UK Liquidation Company, as applicable, shall fail to cure such breach within ten days following receipt of written notice of such breach from the Debtors or (b) any of the Admitted Claims against any UK Administration Company or UK Liquidation Company receive materially different treatment than the claims held by other creditors of the applicable UK Administration Company or UK Liquidation Company that are legally and factually similar to such Admitted Claim and that results in such other creditors having a recovery entitlement in respect of such claims that is materially higher than the recovery entitlement in respect of such Admitted Claim.

(b)    Solely prior to the Effective Date, each Debtor, in its sole discretion, shall have the right, at its election, to terminate this Agreement as between the Debtors and any Other UK Affiliate (such Other UK Affiliate, a "**Terminated UK Affiliate**") by written notice to such Terminated UK Affiliate if (a) there is a breach in any material respect, taken as a whole, of the representations, warranties and/or covenants of such Terminated UK Affiliate hereunder, and such Terminated UK Affiliate shall fail to cure such breach within ten days following receipt of written notice of such breach from the Debtors or (b) any of the Admitted Claims against such Terminated UK Affiliate receive materially different treatment than the claims held by other creditors of such Terminated UK Affiliate that are legally and factually similar to such Admitted Claim and that

44

results in such other creditors having a recovery entitlement in respect of such claims that is materially higher than the recovery entitlement in respect of such Admitted Claim; *provided* that notwithstanding anything to the contrary in Section 11.04, this Agreement shall remain in full force and effect among, and such termination pursuant to this Section 11.02(b) shall have no effect on the rights and obligations of, the Debtors, the LBLIS Group Entities and the UK Affiliates (other than any Terminated UK Affiliate) vis-à-vis one another.

SECTION 11.03.    *LBIE's Right to Terminate.*    Solely prior to the Effective Date, LBIE, in its sole discretion, (and no other UK Affiliate) shall have the right, at its election, to terminate this Agreement by written notice to the Debtors if (a) there is a breach in any material respect, taken as a whole, of the representations, warranties and/or covenants of any of the Debtors hereunder, and such Debtor shall fail to cure such breach within ten days following receipt of written notice of such breach from LBIE, (b) the Debtors withdraw the Current Plan or the Plan, (c) the Confirmation Order is not entered by the Bankruptcy Court on or before February 29, 2012, (d) the Plan (incorporating in full this Agreement) is not effective in accordance with its terms on or before July 1, 2012, (e) the Debtors propose or support any chapter 11 plan for the Debtors that provides for the substantive consolidation of any of the Debtors with any of the other Debtors or with any other Lehman Entity, (f) any chapter 11 plan for the Debtors that does not incorporate in full this Agreement is confirmed or such order confirming such plan does not approve this Agreement in full, (g) the Debtors amend or otherwise modify the Current Plan, the Plan or the Disclosure Statement, in each case, in a manner that, individually or, in the aggregate together with all other such amendments or modifications, would, if and when the Plan were to be consummated, adversely affect (other than in a *de minimis* manner) the treatment of, estimated recoveries by, or distributions to, or proportionate share of the Debtors' assets that are distributed pursuant to the Plan to, the Allowed Claims, (h) the Debtors or any Debtor-Controlled Entity takes any other action or makes any other agreement (including with respect to claims or with respect to asset transfers or allocations) in each case, that, individually or, in the aggregate together with all other such actions and agreements, would, if and when the Plan were to be consummated, materially and adversely affect the treatment of, estimated recoveries by, or distributions to, or proportionate share of the Debtors' assets that are distributed pursuant to the Plan to, the Allowed Claims or (i) the Plan provides for different treatment (other than in a *de minimis* manner) of claims held by other creditors that are legally and factually similar to the Allowed Claims that results in such other creditors having a recovery entitlement in respect of such claims that is higher (other than in a *de minimis* amount) than the recovery entitlement provided for in the Plan; *provided* that, with respect to clauses (g), (h) and (i) of this Section 11.03, (x) the Debtors do not guarantee, represent, warrant or otherwise commit that any UK Affiliate will receive any specific recovery amount or proportion under the Plan, (y) variations

45

from or modifications to the projected recovery amounts or percentages set forth in the Disclosure Statement due to, or based upon, revised projections of asset values or the amount, enforceability, classification and/or priority of any claims as determined pursuant to an order of the Bankruptcy Court following litigation on the merits of such claim(s) (and not based on a settlement, agreement or stipulation with the Debtors) shall not be taken into account or constitute an adverse effect for the purposes of clauses (g), (h) and (i) of this Section 11.03 and (z) the refusal of the Bankruptcy Court to include in the order confirming the Plan a release and exculpation of any Plan Support Creditor (as defined in the Current Plan) shall not constitute an adverse effect for the purposes of clauses (g), (h) and (i) of this Section 11.03.

SECTION 11.04.    *Effect of Termination.*    In the event that this Agreement is terminated in accordance with Section 11.01, Section 11.02(a) or Section 11.03 by any Party, then neither this Agreement, nor any motion or other pleading filed in the Bankruptcy Court with respect to the approval of this Agreement, shall have any *res judicata* or collateral estoppel effect or be of any force or effect, each of the Parties' respective interests, rights, remedies and defenses shall be restored without prejudice as if this Agreement had never been executed and the Parties hereto shall be automatically relieved of any further obligations hereunder; *provided* that Article 1, Section 2.18, Section 2.19, Article 10 through Article 18 and Article 23 through Article 27 shall survive any termination of this Agreement.    In the event that this Agreement is terminated as between the Debtors and any Terminated UK Affiliate in accordance with Section 11.02(b) by any Debtor, then neither this Agreement, nor any motion or other pleading filed in the Bankruptcy Court with respect to the approval of this Agreement, shall have any *res judicata* or collateral estoppel effect or be of any force or effect as between the Debtors and such Terminated UK Affiliate, each of the Debtors; and such Terminated UK Affiliates' respective interests, rights, remedies and defenses vis-à-vis one another shall be restored without prejudice as if this Agreement had never been executed and the Debtors and such Terminated UK Affiliate shall be automatically relieved of any further obligations hereunder vis-à-vis one another; *provided* that Article 1, Section 2.18, Section 2.19, Article 10 through Article 18 and Article 23 through Article 27 shall survive any termination of this Agreement as between the Debtors and any Terminated UK Affiliate.    Except as expressly provided herein, this Agreement and all communications and negotiations among the Parties with respect hereto or any of the transactions contemplated hereunder are without waiver of or prejudice to the Parties' rights and remedies, and the Parties hereby reserve all claims, defenses and positions that they may have with respect to each other.

46

## ARTICLE 12
### VENUE AND CHOICE OF LAW

SECTION 12.01.    *Venue.*    To the maximum extent permissible by law, the Parties expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement, and any Party bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court; *provided* that any actions or proceedings arising out of or relating to (i) disputes regarding the amount or validity of Admitted Claims or any other claims against UK Administration Companies or UK Liquidation Companies, (ii) issues that are the subject of any litigation currently pending in the English High Court (including, the Extended Lien Application, the currently pending Client Money Tracing Application and the application in respect of RASCALS Assets) or any applications in the English Courts that arise out of or relate to such currently pending litigation, (iii) Client Money or the Client Money Trust, in each case, other than any Client Money Tracing Claims against any Debtor (*provided, however*, that nothing in this Section 12.01 shall affect the rights of any beneficiary of the Client Money Trust who is not a Party to commence an action or proceeding to pursue a Client Money Tracing Claim in any jurisdiction or affect the rights of the Debtors to object thereto) and (iv) ownership or security interest claims (and asset shortfall claims and claims for short positions) in respect of assets held or settling into depots in LBIE's name or under LBIE's custody or control wherever situated, in each case, shall be within the exclusive jurisdiction of the English High Court, and, in each case, any Party bringing such action or proceeding shall bring such action or proceeding in the English High Court, and the Parties expressly consent and submit to the exclusive jurisdiction of such court in relation to the matters referred to in clauses (i) to (iv) of this proviso; *provided, further*, that any actions or proceedings arising out of disputes regarding the amount or validity of Admitted Claims or any other claims against Other UK Affiliates shall be within the non-exclusive jurisdiction of any court of competent jurisdiction.    Each of the Parties agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.    If the Bankruptcy Court refuses or abstains from exercising jurisdiction over any action or proceeding that would have otherwise been within the exclusive jurisdiction of the Bankruptcy Court, such action or proceeding shall be in any court in the State of New York having proper jurisdiction.    Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so,  (1)  any objection that it may now or hereafter have to the laying of venue of any such action or proceeding with the Bankruptcy Court or with any other federal court located within the Southern District of New York, or with the English High Court or other court of competent jurisdiction as described above, and  (2)  the defense

47

of an inconvenient forum to the maintenance of such action or proceeding in any such court.    Each Party irrevocably consents to service of process in the manner provided for notices in Article 13 hereof.    Nothing in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by applicable law.    Notwithstanding the foregoing, this Agreement may be put before the English High Court as evidence of the terms and provisions contained herein.

SECTION 12.02.    *Choice of Law.*    This Agreement and all claims and disputes relating to the construction or application of the terms of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York and the Bankruptcy Code, without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York or the Bankruptcy Code.

ARTICLE 13
NOTICES

All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day or (c) when sent by an internationally recognized courier, specifying next day delivery, upon written confirmation of delivery by such courier.    All communications shall be sent:

If to any Debtor or any LBLIS Group Entity at:

1271 Avenue of the Americas, 39th Floor
New York, New York 10020
U.S.A.
Attn: Daniel J. Ehrmann
Facsimile: (646) 834-0874
Email: dehrmann@alvarezandmarsal.com

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
U.S.A.
Attn: Lori R. Fife and Robert J. Lemons
Facsimile: (212) 310-8007
Email: lori.fife@weil.com and robert.lemons@weil.com

48

<u>If to any UK Affiliate at</u>:

The address(es) set forth in the applicable UK Affiliate's signature page hereto, with a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
U.S.A.
Attn: Marshall S. Huebner and Brian M. Resnick
Facsimile: (212) 701-5800
Email: marshall.huebner@davispolk.com and
        brian.resnick@davispolk.com

and

Linklaters LLP
One Silk Street
London
EC2Y 8HQ
United Kingdom
Attn: Richard Holden and Titia Holtz
Facsimile: +44 20 7456 2222
Email: richard.holden@linklaters.com and
        titia.holtz@linklaters.com

or to such other address(es) as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

ARTICLE 14
NO ADMISSION OF LIABILITY

Each Party acknowledges that this Agreement effects a settlement of potential claims, counterclaims and factual allegations that are in whole or in part denied and contested, and that nothing contained herein shall be construed as an admission of liability or wrongdoing or with respect to any disputed fact.

ARTICLE 15
ENTIRE AGREEMENT

This Agreement constitutes the entire and only agreement of the Parties concerning the subject matter hereof.    This Agreement supersedes and replaces any and all prior or contemporaneous oral or written agreements between the Parties concerning the subject matter hereof, and, to the extent of any conflicts or

49

inconsistencies between any confirmed Plan and the terms of this Agreement, the terms of this Agreement shall control.   The Parties acknowledge that this Agreement is not being executed in reliance on any oral or written agreement, promise or representation not contained herein.   For the avoidance of doubt, nothing in this Agreement is intended to or shall supersede the Voting Stipulation or, except as set forth in Section 2.18, the Claim Reserve Agreement.

## ARTICLE 16
### NO ORAL MODIFICATIONS

This Agreement may not be modified or amended orally.   This Agreement may be modified or amended only by a writing signed by a duly authorized representative of each affected Party hereto; provided that this Agreement may be modified or amended without a writing signed by a duly authorized representative of any particular Other UK Affiliate to the extent such amendment or modification does not directly adversely affect such Other UK Affiliate.   Any waiver of compliance with any term or provision of this Agreement on the part of any of the Debtors must be provided in a writing signed by each affected UK Affiliate.   Any waiver of compliance with any term or provision of this Agreement on the part of any of the UK Affiliates must be provided in a writing signed by each affected Debtor.   No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach.   No failure or delay by any party in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or be construed as a waiver or variation of it or preclude its exercise at any subsequent time, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

## ARTICLE 17
### CONSTRUCTION

This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

## ARTICLE 18
### BINDING EFFECT; SUCCESSOR AND ASSIGNS

Any declaration or statement of any Joint Administrator, Joint Liquidator or Thayer Liquidator shall be made only in his capacity and function as a Joint Administrator, Joint Liquidator or Thayer Liquidator of the applicable UK

50

Affiliate, and shall in no circumstance be construed as being a declaration or statement of such Joint Administrator, Joint Liquidator or Thayer Liquidator on his own and personal behalf.   This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors (including any chapter 7 trustees that may be appointed upon or after conversion of any of the Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code or any party that may succeed to the rights or claims of any of the Debtors or their estates, derivatively or otherwise, and including any liquidators that may be appointed upon or after conversion of any administration of any UK Administration Company into liquidations) and permitted assigns; *provided*, *however*, that no Party may assign its rights or obligations under this Agreement without the written consent of each affected Party, and any assignment not in accordance with the terms hereof shall be null and void *ab initio*.

## ARTICLE 19
### FURTHER ASSURANCES

The Parties agree to execute any and all further documents, agreements and instruments, and take all further action that may be required under applicable law, or that the Parties may reasonably request, in order to effectuate the terms of this Agreement and, as necessary, to promptly seek Bankruptcy Court approval of any such documents, agreements and instruments.   Without limiting the generality of the foregoing, (i) each Party, in its capacity as a creditor of any UK Affiliate, agrees to not object to the settlements contemplated herein and (ii) each Debtor agrees to use reasonable efforts to cause any Debtor-Controlled Entity (as defined in the Current Plan), in such Debtor-Controlled Entity's capacity as a creditor or entity otherwise economically interested (directly or indirectly) in the assets of any UK Affiliate, to not object to the settlements contemplated herein.

## ARTICLE 20.
### COOPERATION.

SECTION 20.01.   *LBSF's and LBCS's Cooperation.*   Subject to applicable data privacy restrictions and to confidentiality obligations owed to counterparties and to applicable restrictions on LBSF's or LBCS's respective ability to provide market or pricing data supplied to it by third parties, LBSF and LBCS agree (i) to use reasonable efforts to provide LBIE with any information relating to any Assigned Debtor/LBIE Assets (or any claims in respect thereof) that LBIE may reasonably request, (ii) to not object to, or directly or indirectly support any objection to, LBIE's prosecution of any claims in respect of any Assigned Debtor/LBIE Assets and (iii) to execute any release in respect of any Assigned Debtor/LBIE Assets that LBIE in good faith deems necessary in connection with any claims in respect thereof; *provided* that (x) any information

51

supplied on such basis shall be supplied on terms that LBSF and LBCS, as applicable, incur no obligation or liability to LBIE in connection therewith, and (y) such obligation shall not require either LBSF or LBCS, as applicable, to expend any funds which it considers unreasonable or unduly burdensome.    Nothing in this Section 20.01 shall require LBSF or LBCS, as applicable, to act in any manner that it considers, in its sole discretion, to be adverse to its interests or inconsistent with the fiduciary duties of LBSF or LBCS, as applicable.

SECTION 20.02.    *UK Administration Companies' and UK Liquidation Companies' Cooperation.*    Subject to applicable data privacy restrictions, to confidentiality obligations owed to counterparties and to applicable restrictions on each UK Administration Company's and each UK Liquidation Company's ability to provide market or pricing data supplied to it by third parties, each UK Administration Company and each UK Liquidation Company agrees that, upon LBHI's written request and representation that a creditor (other than any Lehman Entity) of such UK Administration Company or UK Liquidation Company, as applicable, has asserted a corresponding guarantee claim against LBHI (each such third-party creditor, a "**Third-Party Creditor**"), such UK Administration Company or UK Liquidation Company, as applicable, shall use reasonable efforts to provide LBHI with:

(a)    information regarding whether such UK Administration Company or UK Liquidation Company, as applicable, and such Third-Party Creditor have resolved any of such Third-Party Creditor's claims against such UK Administration Company or UK Liquidation Company, as applicable;

(b)    to the extent any such claims have been resolved, information regarding the number and amount of such claims that have been admitted or disallowed, and any distributions that have been made on account of any such admitted claims; and

(c)    to the extent any such claims are disputed or otherwise unresolved, any information as the relevant UK Administration Company or UK Liquidation Company, in its sole discretion, may agree

; *provided*, in each case, that (i) without prejudice to the general applicability of the Existing NDA, LBHI acknowledges that any information provided to it pursuant to this Section 20.02 shall be treated as "Confidential Information" (as defined in the Existing NDA); (ii) such UK Administration Company or UK Liquidation Company, as applicable, shall incur no obligation or liability to LBHI in connection with any information supplied in accordance with this Section 20.02, (iii) such obligation shall not involve such UK Administration Company or UK Liquidation Company, as applicable, incurring any cost or suffering any delay that it considers, in its sole discretion, unreasonable or unduly burdensome,

(iv) nothing in this Section 20.02 shall give LBHI any right of veto over the terms of any settlement between such UK Administration Company or UK Liquidation Company, as applicable, and any such counterparty and (v) nothing in this Section 20.02 shall require such UK Administration Company or UK Liquidation Company, as applicable, to act in any manner that it considers, in its sole discretion, to be adverse to its interests, inconsistent with the duties of the Joint Administrators or Joint Liquidators, as applicable, or contrary to best insolvency practice in the United Kingdom.

## ARTICLE 21
### FOREIGN EXCHANGE

Notwithstanding the use for convenience of US Dollar amounts throughout this Agreement, any amount agreed to be due under the terms of Section 2.03 or Section 2.05 of this Agreement by a UK Administration Company, a UK Liquidation Company or a Thayer Liquidation Company shall be admitted to rank for dividend or other distribution in Sterling at the exchange rate applicable to such UK Administration Company, UK Liquidation Company or Thayer Liquidation Company in accordance with applicable law or in accordance with such UK scheme of arrangement or company voluntary arrangement as is applicable in the case of the relevant company, applied to each relevant US Dollar amount stated in this Agreement.   Any amount due by LBIE pursuant to Section 2.22(b) shall be payable in Sterling or, if LBIE and LBHI so agree, in US Dollars and in the latter case at such spot rate of exchange as LBIE is able to obtain on or about the day of payment in accordance with normal practice in the foreign exchange market.

## ARTICLE 22
### TAX

SECTION 22.01.   All payments or distributions on account of the Allowed Claims or the Admitted Claims shall be made without any Tax Deduction, unless a Tax Deduction is required by law.

SECTION 22.02.   Each Party shall, upon becoming aware that it must make a Tax Deduction from a payment or distribution to another Party on account of the Allowed Claims or the Admitted Claims (or that there is any change in the rate or the basis of a Tax Deduction) notify such other Party accordingly.

SECTION 22.03.   The Parties shall co-operate in completing any procedural formalities necessary to obtain authorization to make payments or distributions on account of the Allowed Claims or the Admitted Claims without a Tax Deduction.   To the extent that any payments or distributions made on

account of the Allowed Claims or the Admitted Claims may be subject to any Tax
Deduction by the Debtors or the UK Affiliates, the relevant Debtors and the
relevant UK Affiliates shall take all reasonable steps to ensure that:

(a)    such withholding is mitigated as far as permissible; and

(b)    the recipient of such payments is able reclaim any Tax Deduction
from a tax authority,

in each case, whether under the terms of an applicable double taxation agreement,
local Tax law or practice, or any other applicable law.

SECTION 22.04.    The Parties agree that any payments made on account
of the claims and receivables that are the subject of this Agreement shall be
allocated for all purposes, including but not limited to US federal income tax and
UK tax purposes, first to the principal portion of such claims and receivables, and,
only after the principal portion of such respective claims and receivables is
satisfied in full, to any portion of such claims and receivables comprising interest
(but solely to the extent that interest is an allowable portion of such claims and
receivables).

SECTION 22.05.    The Parties shall cooperate with respect to all
reasonable information requests from a Party relating to the Party's preparation
and filing of tax returns or other tax filings and withholding determinations, and
any tax proceedings.

SECTION 22.06.    Nothing in this Article 22 shall require any Party to
take any step that in its reasonable opinion would have material adverse
consequences for it.

ARTICLE 23
COUNTERPARTS

This Agreement may be executed in counterparts, each of which
constitutes an original, and all of which, collectively, constitute only one
agreement.    The signatures of all of the Parties need not appear on the same
counterpart.

ARTICLE 24
NO PERSONAL LIABILITY

The Joint Administrators, the Joint Liquidators, the Thayer Liquidators,
and A&M act as agents for and on behalf of the UK Administration Companies,
the UK Liquidation Companies, the Thayer Liquidation Companies, and the

54

Debtors, respectively, and neither they, their firm, members, partners, directors, officers, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by any of the UK Administration Companies, UK Liquidation Companies, Thayer Liquidation Companies, or Debtors, or in respect of any failure on the part of any of the UK Administration Companies, UK Liquidation Companies, Thayer Liquidation Companies, or Debtors to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant hereto.   The exclusion of liability set out in this paragraph shall arise and continue notwithstanding the termination of the agency of any of the Joint Administrators, Joint Liquidators, Thayer Liquidators or A&M and shall operate as a waiver of any claims in tort as well as under the laws of contract and any claims otherwise at law or in equity.   The Joint Administrators', the Joint Liquidators', and the Thayer Liquidators' firm, and A&M, and each of their respective members, partners, directors, officers, employees, agents, advisers and representatives are express third-party beneficiaries hereunder and may enforce and rely on this paragraph, to the same extent as if they or it were a party.   Each Party accepts and agrees that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of any of the officers, directors, employees, members, consultants, agents, asset managers, representatives or professional advisors of any other Party and, to the extent any such personal liability existed, each Party explicitly waives any and all potential rights and claims against all of the aforementioned persons.   Any claim by a Party against any of the Joint Administrators, Joint Liquidators, Thayer Liquidators, UK Administration Companies, UK Liquidation Companies, or Thayer Liquidation Companies, arising under, related to, or connected with this Agreement shall be satisfied only out of the assets of the estate of the applicable UK Administration Company, UK Liquidation Company or Thayer Liquidation Company, and any claim by a Party against A&M as agent for a Debtor, or against such Debtor, arising under, related to, or connected with this Agreement shall only be satisfied out of the assets of such Debtor.

## ARTICLE 25
### THIRD-PARTY BENEFICIARIES

Other than (i) the Joint Administrators, Joint Liquidators and Thayer Liquidators (each of whom is an intended beneficiary of all limitations, exclusions, undertakings, covenants, releases and indemnities in their favor contained herein) and (ii) the beneficiaries of the forbearances set forth in Section 2.09 and releases set forth in Article 8 (each of whom is an intended beneficiary of such forbearances and releases), no provision of this Agreement shall create any third-party beneficiary or other rights to any entity other than the Parties.   No LBLIS Group Entity shall have any third-party beneficiary or other rights except in

respect of the provisions to which such LBLIS Group Entity is party pursuant to Section 2.13(m).

## ARTICLE 26
### NON-SEVERABILITY

Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement.

## ARTICLE 27
### WAIVER OF JURY TRIAL

EACH OF THE PARTIES HERETO HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.   EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS ARTICLE 27 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.   THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.,
LEHMAN COMMERCIAL PAPER INC.,
LEHMAN BROTHERS COMMODITY
SERVICES INC., LEHMAN BROTHERS
SPECIAL FINANCING INC., LEHMAN
BROTHERS OTC DERIVATIVES INC.,
LEHMAN BROTHERS COMMERCIAL
CORPORATION, LB 745 LLC, PAMI
STATLER ARMS LLC, CES AVIATION
LLC, CES AVIATION V LLC, CES
AVIATION IX LLC, LEHMAN SCOTTISH
FINANCE L.P., BNC MORTGAGE LLC, LB
ROSE RANCH LLC, STRUCTURED
ASSET SECURITIES CORPORATION, LB
2080 KALAKAUA OWNERS LLC, LB
PREFERRED SOMERSET LLC, LB
SOMERSET LLC, as Debtors and Debtors in
Possession

By: _____

Name:    John Suckow

Title:    Authorized Signatory


LEHMAN BROTHERS DERIVATIVES
PRODUCTS INC., LEHMAN BROTHERS
FINANCIAL PRODUCTS INC., EAST
DOVER LIMITED, LUXEMBOURG
RESIDENTIAL PROPERTIES LOAN
FINANCE S.A.R.L., as Debtors and Debtors
in Possession

By: _____

Name:    Daniel Ehrmann

Title:    Authorized Signatory


*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Lehman Brothers Luxembourg Investments
S.À.R.L.

By:

Name:    Daniel Ehrmann

Title:    Manager of category A


By:

Name:    John Keen

Title:    Manager of category B

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Lehman Brothers Luxembourg Investments
S.À.R.L.

By: _____

Name: Daniel Ehrmann

Title: Manager of category A


By: _____

Name: John Keen

Title: Manager of category B

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Lehman Brothers Holdings Scottish LP

By: _____

Name: William J. Fox

Title: Authorized Signatory

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Lehman Brothers UK Holdings (Delaware) Inc.

By: _____

Name:    William J. Fox

Title:    Executive Vice President
and Chief Financial Officer

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

**IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:**

**Lehman Brothers International (Europe)**
**(in administration)**

By: _____

      **Anthony V. Lomas, Joint**
      **Administrator of Lehman Brothers**
      **Europe Limited (in administration),**
      **acting as its agent and without**
      **personal liability**
      **Level 23**
      **25 Canada Square**
      **London, E14 5LQ**
      **United Kingdom**
      **Email: tony.lomas@uk.pwc.com**

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Mable Commercial Funding Limited
(in administration)

By: _____
Dan Y. Schwarzmann, Joint
Administrator of Mable Commercial
Funding Limited (in administration),
acting as its agent and without personal
liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

Storm Funding Limited
(in administration)

By: _____
Dan Y. Schwarzmann, Joint
Administrator of Storm Funding
Limited (in administration), acting as
its agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

LB UK Re Holdings Limited
(in administration)

By: _____
Dan Y. Schwarzmann, Joint
Administrator of LB UK Re Holdings
Limited (in administration), acting as its
agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

Lehman Brothers Europe Limited
(in administration)

By: _____
Dan Y. Schwarzmann, Joint
Administrator of Lehman Brothers
Europe Limited (in administration),
acting as its agent and without personal
liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Lehman Brothers Limited
(in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
Limited (in administration), acting as
its agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: mike.jervis@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Cherry Tree Mortgages Limited
(in administration)

By: _____
      Michael J. A. Jervis, Joint
      Administrator of Cherry Tree
      Mortgages Limited (in administration),
      acting as its agent and without personal
      liability
      With notice to:
      Derek A. Howell
      Level 23
      25 Canada Square
      London, E14 5LQ
      United Kingdom
      Email: derek.a.howell@uk.pwc.com

Eldon Street Holdings Limited
(in administration)

By: _____
      Michael J. A. Jervis, Joint
      Administrator of Eldon Street Holdings
      Limited (in administration), acting as
      its agent and without personal liability
      With notice to:
      Derek A. Howell
      Level 23
      25 Canada Square
      London, E14 5LQ
      United Kingdom
      Email: derek.a.howell@uk.pwc.com

LB Holdings Intermediate 2 Limited
(in administration)

By: _____
      Michael J. A. Jervis, Joint
      Administrator of LB Holdings
      Intermediate 2 Limited
      (in administration), acting as its agent
      and without personal liability
      With notice to:
      Derek A. Howell
      Level 23
      25 Canada Square
      London, E14 5LQ
      United Kingdom
      Email: derek.a.howell@uk.pwc.com

LB RE Financing No. 3 Limited
(in administration)

By: _____
      Michael J. A. Jervis, Joint
      Administrator of LB RE Financing
      No. 3 Limited (in administration),
      acting as its agent and without personal
      liability
      With notice to:
      Derek A. Howell
      Level 23
      25 Canada Square
      London, E14 5LQ
      United Kingdom
      Email: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

LB SF No. 1 (in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of LB SF No. 1
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

LB UK Financing Ltd
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of LB UK Financing Ltd
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Lehman Brothers Holdings PLC
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
Holdings PLC (in administration),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Lehman Brothers Lease & Finance No. 1
Limited (in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
Lease & Finance No. 1 Limited (in
administration), acting as its agent and
without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Lehman Brothers (PTG) Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
(PTG) Limited (in administration),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Lehman Brothers UK Holdings Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Brothers UK
Holdings Limited (in administration),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Lehman Commercial Mortgage Conduit
Limited (in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Commercial
Mortgage Conduit Limited
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Monaco NPL (No. 1) Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Monaco NPL (No. 1)
Limited (in administration), acting as
its agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Thayer Properties Limited
(in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Thayer Properties
Limited (in administration), acting as its
agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Zestdew Limited (in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Zestdew Limited
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Eldon Street (Cube) Limited
(in liquidation)

By: _____
Ian Oakley-Smith, Joint Liquidator of
Eldon Street (Cube) Limited
(in liquidation), acting as its agent and
without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

Eldon Street (Raven) Limited
(in liquidation)

By: _____
Ian Oakley-Smith, Joint Liquidator of
Eldon Street (Raven) Limited
(in liquidation), acting as its agent and
without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

Grace Hotels Limited (in liquidation)

By: _____
Ian Oakley-Smith, Joint Liquidator of
Grace Hotels Limited (in liquidation),
acting as its agent and without personal
liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

LB Lomond Investments (in liquidation)

By: _____
Ian Oakley-Smith, Joint Liquidator of
LB Lomond Investments
(in liquidation), acting as its agent and
without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Platform Commercial Mortgage Limited
(in liquidation)

By: _____
Ian Oakley-Smith, Joint Liquidator of
Platform Commercial Mortgage
Limited (in liquidation), acting as its
agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Platform Home Mortgage Securities No. 4
Limited (in liquidation)

By: _____
Ian Oakley-Smith, Joint Liquidator of
Platform Home Mortgage Securities
No. 4 Limited (in liquidation), acting as
its agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

LBO Investments Limited (in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
LBO Investments Limited
(in liquidation), acting as its agent and
without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com


LBQ Funding (UK) (in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
LBQ Funding (UK) (in liquidation),
acting as its agent and without personal
liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com


Lehman Brothers Equity (Nominees
Number 7) Limited (in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Lehman Brothers Equity (Nominees
Number 7) Limited (in liquidation),
acting as its agent and without personal
liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com


Lehman Brothers (Indonesia) Limited
(in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Lehman Brothers (Indonesia) Limited
(in liquidation), acting as its agent and
without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com


*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Acenden Limited (f/k/a Capstone Mortgage
Services Limited)

By: _____

     Amany Attia, as Director of Acenden
     Limited (f/k/a Capstone Mortgage
     Services Limited)
     Acenden Limited
     4th Floor
     22-25 Finsbury Square
     London EC2A 1DX
     United Kingdom
     Email: Amany.Attia@acenden.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Acenden Limited (f/k/a Capstone Mortgage
Services Limited)

By: _____
Jeff Lundgren, as Director of Acenden
Limited (f/k/a Capstone Mortgage
Services Limited)
Acenden Limited
4th Floor
22-25 Finsbury Square
London EC2A 1DX
United Kingdom
Email: Jeff.Lundgren@acenden.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Eldon Street (Birchin) Limited

By: _____

A J P Brereton, as Director of Eldon
Street (Birchin) Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Eldon Street (Colbert Orco) Limited

By: _____

A J P Brereton, as Director of Eldon
Street (Colbert Orco) Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Eldon Street (Fidenza) Limited

By: _____

A J P Brereton, as Director of Eldon
Street (Fidenza) Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Eldon Street (Jefferson) Limited

By: _____

A J P Brereton, as Director of Eldon
Street (Jefferson) Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Eldon Street (Harley) Limited

By: _____
    A J P Brereton, as Director of Eldon
    Street (Harley) Limited
    <u>With notice to:</u>
    Reed Smith LLP
    The Broadgate Tower
    20 Primrose Street
    London
    EC2A 2RS
    <u>Attn</u>: Jeff Drew and Monika Kuzelova
    <u>Email</u>: jdrew@reedsmith.com and
    mkuzelova@reedsmith.com

LB Yellow (No. 1) Limited

By: _____
    A J P Brereton, as Director of LB
    Yellow (No. 1) Limited
    <u>With notice to:</u>
    Reed Smith LLP
    The Broadgate Tower
    20 Primrose Street
    London
    EC2A 2RS
    <u>Attn</u>: Jeff Drew and Monika Kuzelova
    <u>Email</u>: jdrew@reedsmith.com and
    mkuzelova@reedsmith.com

LB Holdings Intermediate 1 Limited

By: _____
    A J P Brereton, as Director of LB
    Holdings Intermediate 1 Limited
    <u>With notice to:</u>
    Reed Smith LLP
    The Broadgate Tower
    20 Primrose Street
    London
    EC2A 2RS
    <u>Attn</u>: Jeff Drew and Monika Kuzelova
    <u>Email</u>: jdrew@reedsmith.com and
    mkuzelova@reedsmith.com

LB SF Warehouse Limited

By: _____
    A J P Brereton, as Director of LB SF
    Warehouse Limited
    <u>With notice to:</u>
    Reed Smith LLP
    The Broadgate Tower
    20 Primrose Street
    London
    EC2A 2RS
    <u>Attn</u>: Jeff Drew and Monika Kuzelova
    <u>Email</u>: jdrew@reedsmith.com and
    mkuzelova@reedsmith.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

MBAM Investor Limited

By: _____
    A J P Brereton, as Director of MBAM
    Investor Limited
    <u>With notice to:</u>
    Reed Smith LLP
    The Broadgate Tower
    20 Primrose Street
    London
    EC2A 2RS
    <u>Attn</u>: Jeff Drew and Monika Kuzelova
    <u>Email</u>: jdrew@reedsmith.com and
    mkuzelova@reedsmith.com

Parkmetro Limited

By: _____
    A J P Brereton, as Director of
    Parkmetro Limited
    <u>With notice to:</u>
    Reed Smith LLP
    The Broadgate Tower
    20 Primrose Street
    London
    EC2A 2RS
    <u>Attn</u>: Jeff Drew and Monika Kuzelova
    <u>Email</u>: jdrew@reedsmith.com and
    mkuzelova@reedsmith.com

Preferred Holdings Limited

By: _____
    A J P Brereton, as Director of Preferred
    Holdings Limited
    <u>With notice to:</u>
    Reed Smith LLP
    The Broadgate Tower
    20 Primrose Street
    London
    EC2A 2RS
    <u>Attn</u>: Jeff Drew and Monika Kuzelova
    <u>Email</u>: jdrew@reedsmith.com and
    mkuzelova@reedsmith.com

Preferred Group Limited

By: _____
    A J P Brereton, as Director of Preferred
    Group Limited
    <u>With notice to:</u>
    Reed Smith LLP
    The Broadgate Tower
    20 Primrose Street
    London
    EC2A 2RS
    <u>Attn</u>: Jeff Drew and Monika Kuzelova
    <u>Email</u>: jdrew@reedsmith.com and
    mkuzelova@reedsmith.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Resetfan Limited

By: _____
A J P Brereton, as Director of Resetfan
Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

SM Funding No. 1 Limited

By: _____
A J P Brereton, as Director of SM
Funding No. 1 Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Southern Pacific Residuals 4 Limited

By: _____
A J P Brereton, as Director of Southern
Pacific Residuals 4 Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Southern Pacific Personal Loans Limited

By: _____
A J P Brereton, as Director of Southern
Pacific Personal Loans Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Stepstone Mortgage Funding Limited

By: _____

A J P Brereton, as Director of Stepstone
Mortgage Funding Limited
<u>With notice to</u>:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Yellow Real Estate Limited

By: _____

A J P Brereton, as Director of Yellow
Real Estate Limited
<u>With notice to</u>:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Preferred Mortgages Limited

By: _____

    Lee Brandon, as Director of Preferred
    Mortgages Limited
    St. Johns Place
    Easton Street
    High Wycombe, HP11 1NL
    England
    Email: brandons@talktalk.net

Southern Pacific Funding 3 Ltd.

By: _____

    Lee Brandon, as Director of Southern
    Pacific Funding 3 Ltd.
    Level 23
    25 Canada Square
    London, E14 5LQ
    United Kingdom
    Email: brandons@talktalk.net

Southern Pacific Mortgage Ltd.

By: _____

    Lee Brandon, as Director of
    Southern Pacific Mortgage Ltd.
    St. Johns Place
    Easton Street
    High Wycombe, HP11 1NL
    England
    Email: brandons@talktalk.net

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Thayer Group Limited (in liquidation)

By: _____
    Nick Vermeulen, Joint Liquidator of
    Thayer Group Limited (in liquidation),
    acting as its agent and without personal
    liability
    PricewaterhouseCoopers CI LLP
    Twenty Two Colomberie
    St Helier
    Jersey, JE1 4XA
    United Kingdom
    Email: nick.vermeulen@gg.pwc.com

Thayer Properties (Jersey) Limited
(in liquidation)

By: _____
    Nick Vermeulen, Joint Liquidator of
    Thayer Properties (Jersey) Limited
    (in liquidation), acting as its agent and
    without personal liability
    PricewaterhouseCoopers CI LLP
    Twenty Two Colomberie
    St Helier
    Jersey, JE1 4XA
    United Kingdom
    Email: nick.vermeulen@gg.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Blue I Real Estate Limited

By: _____

Barry Porter, as Director of Blue I Real
Estate Limited
Lehman Brothers
Level 23
25 Canada Square
London E14 5LQ
Email: Barry.Porter@lbia-eu.com


Harley Property Ventures Limited

By: _____

Barry Porter, as Director of Harley
Property Ventures Limited
Lehman Brothers
Level 23
25 Canada Square
London E14 5LQ
Email: Barry.Porter@lbia-eu.com


Myra Sarl

By: _____

Barry Porter, as Manager of Myra Sarl
With notice to:
Alter Domus
5 rue Guillaume Kroll
L-1882
Luxembourg
Attn: Sandrine Klusa
Email:
Sandrine.Klusa@alterdomus.com


*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Schedule 1

**Proofs of Claim**

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 16524 | Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers OTC Derivatives Inc. |
| 16525 | Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers Holdings Inc. |
| 16527 | Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers Special Financing Inc. |
| 17067 | Blue I Real Estate Limited | Lehman Brothers Holdings Inc. |
| 14625 | Cherry Tree Mortgages Limited | Lehman Brothers Holdings Inc. |
| 23478 | Eldon Street (Cube) Limited | Lehman Commercial Paper Inc. |
| 42254 | Eldon Street (Cube) Limited | Lehman Brothers Holdings Inc. |
| 23481 | Eldon Street (Raven) Limited | Lehman Brothers Holdings Inc. |
| 14635 | Eldon Street Holdings Limited | Lehman Commercial Paper Inc. |
| 23484 | Eldon Street Holdings Limited | Lehman Brothers Holdings Inc. |
| 14621 | Grace Hotels Limited | Lehman Brothers Holdings Inc. |
| 23567 | Grace Hotels Limited | Lehman Commercial Paper Inc. |
| 17066 | Harley Property Ventures Limited | Lehman Brothers Holdings Inc. |
| 16522 | LB Holdings Intermediate 2 Limited | Lehman Brothers Holdings Inc. |
| 16519 | LB Lomond Investments | Lehman Brothers Holdings Inc. |
| 14618 | LB RE Financing No. 3 Limited | Lehman Brothers Holdings Inc. |
| 21520 | LB RE Financing No. 3 Limited | Lehman Brothers Special Financing Inc. |
| 14623 | LB SF No. 1 | Lehman Brothers Special Financing Inc. |

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 21525 | LB SF No. 1 | Lehman Brothers Holdings Inc. |
| 14616 | LB UK Financing Ltd | Lehman Brothers Holdings Inc. |
| 14617 | LB UK Re Holdings Limited | Lehman Brothers Commercial Corporation |
| 21524 | LB UK Re Holdings Limited | Lehman Brothers Holdings Inc. |
| 23566 | LB UK Re Holdings Limited | Lehman Brothers Special Financing Inc. |
| 23570 | LB UK Re Holdings Limited | Lehman Commercial Paper Inc. |
| 17071 | LB Yellow (No. 1) Limited | Lehman Brothers Holdings Inc. |
| 16518 | LBO Investments Limited | Lehman Brothers Holdings Inc. |
| 23483 | LBQ Funding (UK) | Lehman Brothers Holdings Inc. |
| 23563 | Lehman Brothers (Indonesia) Limited | Lehman Brothers Holdings Inc. |
| 14645 | Lehman Brothers (PTG) Limited | Lehman Commercial Paper Inc. |
| 23475 | Lehman Brothers (PTG) Limited | Lehman Brothers Holdings Inc. |
| 23482 | Lehman Brothers Equity (Nominees Number 7) Limited | Lehman Brothers Holdings Inc. |
| 14614 | Lehman Brothers Europe Limited | LB 745 LLC |
| 14620 | Lehman Brothers Europe Limited | Lehman Brothers OTC Derivatives Inc. |
| 14622 | Lehman Brothers Europe Limited | Lehman Brothers Special Financing Inc. |
| 14640 | Lehman Brothers Europe Limited | Lehman Commercial Paper Inc. |
| 14647 | Lehman Brothers Europe Limited | Lehman Brothers Commodity Services Inc. |
| 21519 | Lehman Brothers Europe Limited | Lehman Brothers Holdings Inc. |

Schedule 1-2

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 23474 | Lehman Brothers Europe Limited | Lehman Brothers Commercial Corporation |
| 14012 | Lehman Brothers Holdings PLC | Lehman Brothers Holdings Inc. |
| 14016 | Lehman Brothers Holdings PLC | Lehman Commercial Paper Inc. |
| 21522 | Lehman Brothers Holdings PLC | Lehman Brothers Special Financing Inc. |
| 21516 | Lehman Brothers International (Europe) | Lehman Brothers Derivative Products Inc. |
| 21518 | Lehman Brothers International (Europe) | LB 745 LLC |
| 21521 | Lehman Brothers International (Europe) | Lehman Brothers Commodity Services Inc. |
| 21526 | Lehman Brothers International (Europe) | Lehman Commercial Paper Inc. |
| 21527 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 21528 | Lehman Brothers International (Europe) | Lehman Brothers OTC Derivatives Inc. |
| 21529 | Lehman Brothers International (Europe) | Lehman Brothers Commercial Corporation |
| 21530 | Lehman Brothers International (Europe) | Lehman Brothers Special Financing Inc. |
| 21532 | Lehman Brothers International (Europe) | Lehman Brothers Financial Products Inc. |
| 62779 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62780 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62781 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |

Schedule 1-3

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 62783 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62784 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62785 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62786 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62787 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62788 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62789 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 66831 | Lehman Brothers International (Europe) | Merit LLC |
| 14637 | Lehman Brothers Lease & Finance No. 1 Limited | Lehman Brothers Holdings Inc. |
| 14011 | Lehman Brothers Limited | Lehman Brothers Commodity Services Inc. |
| 14014 | Lehman Brothers Limited | LB 745 LLC |
| 14015 | Lehman Brothers Limited | Structured Asset Securities Corporation |
| 14017 | Lehman Brothers Limited | Lehman Brothers Commercial Corporation |
| 14038 | Lehman Brothers Limited | Lehman Brothers Financial Products Inc. |
| 14040 | Lehman Brothers Limited | Lehman Commercial Paper Inc. |
| 14041 | Lehman Brothers Limited | Lehman Brothers Derivative Products Inc. |

Schedule 1-4

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 14388 | Lehman Brothers Limited | CES Aviation LLC |
| 16497 | Lehman Brothers Limited | BNC Mortgage LLC |
| 16498 | Lehman Brothers Limited | Lehman Brothers OTC Derivatives Inc. |
| 21523 | Lehman Brothers Limited | Lehman Brothers Holdings Inc. |
| 23477 | Lehman Brothers Limited | Lehman Brothers Special Financing Inc. |
| 14646 | Lehman Brothers UK Holdings Limited | Lehman Brothers Holdings Inc. |
| 14644 | Lehman Commercial Mortgage Conduit Limited | Lehman Brothers Holdings Inc. |
| 23480 | Lehman Commercial Mortgage Conduit Limited | Lehman Commercial Paper Inc. |
| 42255 | Lehman Commercial Mortgage Conduit Limited | Lehman Brothers Holdings Inc. |
| 14643 | Mable Commercial Funding Limited | Lehman Brothers Holdings Inc. |
| 14641 | Mable Commercial Funding Limited | Lehman Commercial Paper Inc. |
| 14624 | Mable Commercial Funding Limited | Lehman Brothers Special Financing Inc. |
| 16523 | MBAM Investor Limited | Lehman Brothers Holdings Inc. |
| 14636 | Monaco NPL (No. 1) Limited | Lehman Brothers Special Financing Inc. |
| 14619 | Monaco NPL (No. 1) Limited | Lehman Brothers Holdings Inc. |
| 14642 | Monaco NPL (No. 1) Limited | Lehman Commercial Paper Inc. |
| 23569 | Myra Sarl | Lehman Brothers Holdings Inc. |
| 16520 | Platform Commercial Mortgage | Lehman Brothers Holdings Inc. |

Schedule 1-5

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| | Limited | |
| 16521 | Platform Home Mortgage Securities No. 4 Limited | Lehman Brothers Holdings Inc. |
| 16494 | Preferred Mortgages Limited | Lehman Brothers Holdings Inc. |
| 17072 | Resetfan Limited | Lehman Brothers Holdings Inc. |
| 17068 | SM Funding No. 1 Limited | Lehman Brothers Holdings Inc. |
| 17062 | Southern Pacific Funding 3 Ltd. | Lehman Brothers Holdings Inc. |
| 17061 | Southern Pacific Mortgage Ltd. | Lehman Brothers Special Financing Inc. |
| 17073 | Southern Pacific Mortgage Ltd. | Lehman Brothers Holdings Inc. |
| 17069 | Stepstone Mortgage Funding Limited | Lehman Brothers Holdings Inc. |
| 62782 | Storm Funding Limited | Lehman Brothers Holdings Inc. |
| 14639 | Storm Funding Limited | Lehman Brothers Special Financing Inc. |
| 21517 | Storm Funding Limited | Lehman Brothers Holdings Inc. |
| 23473 | Storm Funding Limited | Lehman Commercial Paper Inc. |
| 23485 | Thayer Group Limited | Lehman Brothers Holdings Inc. |
| 23486 | Thayer Properties (Jersey) Limited | Lehman Commercial Paper Inc. |
| 23488 | Thayer Properties (Jersey) Limited | Lehman Brothers Holdings Inc. |
| 23476 | Thayer Properties Limited | Lehman Commercial Paper Inc. |
| 23487 | Thayer Properties Limited | Lehman Brothers Holdings Inc. |
| 17064 | Yellow Real Estate Limited | Lehman Brothers Holdings Inc. |
| 17070 | Yellow Real Estate Limited | Lehman Commercial Paper Inc. |
| 14615 | Zestdew Limited | Lehman Brothers Special Financing Inc. |

Schedule 1-6

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 14638 | Zestdew Limited | Lehman Brothers Holdings Inc. |

**Schedule 2**

**Compromised Structured Securities**

REDACTED

**Schedule 3**

**Certain LBCS Assets**

REDACTED

**Schedule 4**

**LBHI/LBIE Assets**

| LBIE's ISIN Record | Position | LBIE's Annotation on Current Competing Claims |
|---|---|---|
| CUSIP - 1US453947 | 990,875 | no |
| FR0010351866 | 10 | yes |
| FR0010368878 | 10 | yes |
| FR0010368894 | 10 | yes |
| FR0010368902 | 10 | yes |
| FR0010368910 | 10 | yes |
| FR0010377341 | 10 | yes |
| FR0010395905 | 10 | yes |
| IE00B0T0GQ85 | 10000 | no |

**Schedule 5**

**Certain LBSF/LBIE Assets**

REDACTED

**Schedule 6**

**Certain LCPI/LBIE Assets**

| LBIE's ISIN Record | Position |
|---|---|
| CUSIP - 0011221D2 | 24,792 |
| CUSIP - 1DE288825 | 5,350 |
| 1NL077863 | 3,500,000 |

Schedule 7

**Returned LBCS/LBIE Assets**

| LBIE's ISIN Record | Position |
|---|---|
| ANN5214T4335 | 75,000 |
| CH0036891189 | 965,000 |
| CH0036891197 | 630,000 |
| CH0036891247 | 556,000 |
| CH0039308678 | 280,000 |
| CH0043088670 | 505,000 |
| CH0043088704 | 815,000 |
| XS0246449440 | 3,390,000 |
| XS0259959962 | 340,000 |
| XS0267460359 | 215,000 |
| XS0272634535 | 100,000 |
| XS0276121307 | 9,330,000 |
| XS0276162327 | 157,000 |
| XS0278983191 | 70,000 |
| XS0280241851 | 50,000 |
| XS0291974664 | 2,300,000 |
| XS0292459327 | 289,000 |
| XS0293964002 | 40,000 |
| XS0295438369 | 1,422,000 |
| XS0296792582 | 2,450,000 |
| XS0299701655 | 450,000 |
| XS0303539273 | 431,000 |
| XS0306096628 | 2,000 |
| XS0308389807 | 183,000 |
| XS0309306651 | 200,000 |
| XS0310309785 | 20,000,000 |
| XS0311769219 | 279 |
| XS0312439556 | 43,000 |
| XS0314479337 | 1,570,000 |
| XS0314918276 | 2,969 |
| XS0320100323 | 400,000 |
| XS0320337685 | 160,000 |
| XS0321124801 | 1,370,000 |
| XS0322064840 | 200,000 |
| XS0323108265 | 949,000 |
| XS0323493584 | 1,391,000 |
| XS0323535418 | 974 |
| XS0323619600 | 10,145,000 |

| LBIE's ISIN Record | Position |
|---|---|
| XS0323619782 | 2,200,000 |
| XS0324841153 | 1,851,000 |
| XS0325477379 | 85,000 |
| XS0326046504 | 2,000,000 |
| XS0327723580 | 400,000 |
| XS0327774732 | 300,000 |
| XS0329715394 | 70,000 |
| XS0330889493 | 250,000 |
| XS0331533173 | 30 |
| XS0331533256 | 905,000 |
| XS0331533330 | 10,000 |
| XS0331566181 | 200,000 |
| XS0332526929 | 490,000 |
| XS0332675338 | 10,000 |
| XS0333420395 | 250,000 |
| XS0334205795 | 1,040,000 |
| XS0334494290 | 353 |
| XS0335137120 | 1,332 |
| XS0337407943 | 200,000 |
| XS0337763576 | 98,000 |
| XS0338071987 | 680,000 |
| XS0338072019 | 80,000 |
| XS0338078131 | 20,000 |
| XS0338483588 | 340,000 |
| XS0338685299 | 1,300,000 |
| XS0339532672 | 300,000 |
| XS0339537390 | 2,422,000 |
| XS0339537804 | 480,000 |
| XS0339538448 | 240,000 |
| XS0340076321 | 1,154 |
| XS0340756898 | 35,000 |
| XS0341730363 | 33,000 |
| XS0342097317 | 200,000 |
| XS0343610530 | 60,000 |
| XS0344537997 | 200,000 |
| XS0344556864 | 581,000 |
| XS0344557839 | 150,000 |
| XS0344583249 | 15,300,000 |
| XS0346007320 | 75,000 |
| XS0346438061 | 4,320,000 |
| XS0346461634 | 130,000 |
| XS0346707903 | 243,000 |

Schedule 7-2

| LBIE's ISIN Record | Position |
|---|---|
| XS0347683400 | 100,000 |
| XS0348299180 | 50,000 |
| XS0349166917 | 363 |
| XS0349282151 | 442,000 |
| XS0350390406 | 389,000 |
| XS0351506257 | 100,000 |
| XS0351979587 | 11,000 |
| XS0353289472 | 200,000 |
| XS0353676082 | 103,000 |
| XS0353821860 | 1,170,000 |
| XS0354002577 | 103,000 |
| XS0356499052 | 174,000 |
| XS0357658672 | 660,000 |
| XS0361886699 | 3,000,000 |
| XS0362447558 | 701,000 |
| XS0363582460 | 20,000 |
| XS0365671121 | 2,000,000 |
| XS0366131497 | 10,000 |
| XS0366802964 | 25,000 |
| XS0371015750 | 81,000 |
| XS0373858249 | 57,000 |

**Schedule 8**

**Certain Surviving Contracts**

None.

Schedule 9

UK Affiliate Claims[1]

| Applicable UK Affiliate | Applicable Debtor | Claim Amount | Applicable Class |
|---|---|---|---|
| LB SF No. 1 | LBHI | $ 353,187 | 4B |
| LB SF No. 1 | LBHI | 2,875,036,779 | 4A |
| LB Holdings Intermediate 2 Limited | LBHI | 302,087,677 | 4B |
| LB Holdings Intermediate 2 Limited | LBHI | 2,683,033 | 4A |
| Lehman Brothers UK Holdings Limited | LBHI | 608,943,967 | 4B |
| Lehman Brothers UK Holdings Limited | LBHI | 10,645 | 4A |
| Lehman Brothers Limited | LBHI | 360,000,000 | 4B |
| Storm Funding Limited | LBHI | 148,127,123 | 4B |
| Storm Funding Limited | LBHI | 795,799,394 | 4A |
| Eldon Street Holdings Limited | LBHI | 28,565,323 | 4B |
| Eldon Street Holdings Limited | LBHI | 611,350,282 | 4A |
| Lehman Brothers Europe Limited | LBHI | 18,898,410 | 4B |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | LBHI | 9,454 | 4B |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | LBHI | 80,568,540 | 4A |
| Preferred Mortgages Limited | LBHI | 22,896,254 | 4B |
| Preferred Mortgages Limited | LBHI | 42,632,876 | 4A |
| Lehman Commercial Mortgage Conduit Limited | LBHI | 8,314,737 | 4B |
| MBAM Investor Limited | LBHI | 46,568,411 | 4B |
| MBAM Investor Limited | LBHI | 1,214,694 | 4A |
| Southern Pacific Mortgage Ltd. | LBHI | 48,442,147 | 4B |
| Southern Pacific Funding 3 Ltd. | LBHI | 35,450,774 | 4A |

[1] To the extent any pairing of a particular UK Affiliate and a particular Debtor is not set forth on this Schedule 9, such pairing shall be deemed to be included in this Schedule 9 as if such UK Affiliate were listed as the "Applicable UK Affiliate", such Debtor were listed as the "Applicable Debtor" and the relevant "Claim Amount" were listed as $0.

| Applicable UK Affiliate | Applicable Debtor | Claim Amount | Applicable Class |
|---|---|---|---|
| Mable Commercial Funding Limited | LBHI | 19,727,757 | 4B |
| Lehman Brothers (Indonesia) Limited | LBHI | 13,011,749 | 4B |
| Lehman Brothers (Indonesia) Limited | LBHI | 613,749 | 4A |
| Thayer Group Limited | LBHI | 7,494,450 | 4A |
| Lehman Brothers Equity (Nominees Number 7) Limited | LBHI | 4,158,067 | 4A |
| Eldon Street (Raven) Limited | LBHI | 2,297,221 | 4A |
| Grace Hotels Limited | LBHI | 3,149 | 4B |
| Grace Hotels Limited | LBHI | 1,649,083 | 4A |
| Zestdew Limited | LBHI | 1,580,988 | 4B |
| LBQ Funding (UK) | LBHI | 819,882 | 4A |
| Resetfan Limited | LBHI | 531,281 | 4A |
| Eldon Street (Cube) Limited | LBHI | 200,925 | 4B |
| Lehman Brothers Limited | LBSF | 3,698,368 | 5C |
| Storm Funding Limited | LBSF | 5,041,731 | 5C |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | LBSF | 16,715 | 5C |
| Zestdew Limited | LBSF | 3,390,693 | 5C |
| Monaco NPL (No. 1) Limited | LBSF | 2,951,633 | 5C |
| Lehman Brothers Holdings PLC | LBSF | 19,366,981 | 5C |
| Lehman Brothers Limited | LOTC | 52,756 | 5C |
| Lehman Brothers Europe Limited | LOTC | 25,642 | 5C |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | LOTC | 2,193 | 5C |
| Lehman Brothers Limited | LCPI | 2,501,392 | 5C |
| Storm Funding Limited | LCPI | 182,554,645 | 5C |
| Lehman Brothers Europe Limited | LCPI | 4,974,264 | 5C |
| Lehman Commercial Mortgage Conduit Limited | LCPI | 101,984,667 | 5C |
| Eldon Street (Cube) Limited | LCPI | 803,699 | 5C |
| LB UK Re Holdings Limited | LCPI | 8,585,062 | 5C |
| Thayer Properties Limited | LCPI | 13,360 | 5C |
| Lehman Brothers Holdings PLC | LCPI | 2,221,859 | 5C |
| Lehman Brothers Limited | Lehman Brothers Commercial Corporation | 139,764 | 5C |
| Lehman Brothers Limited | LBCS | 659,343 | 5C |

| Applicable UK Affiliate | Applicable Debtor | Claim Amount | Applicable Class |
|---|---|---|---|
| Lehman Brothers Limited | Lehman Brothers Derivative Products Inc. | 44 | 4B |
| Lehman Brothers Limited | Lehman Brothers Financial Products Inc. | 623 | 4B |
| Lehman Brothers Limited | BNC Mortgage LLC | 26 | 4B |
| Lehman Brothers Limited | CES Aviation LLC | 1,556 | 4B |
| Lehman Brothers Limited | Structured Asset Securities Corporation | 61 | 4B |

**Schedule 10**

**Other Debtor Claims[1]**

| Applicable Debtor | Applicable UK Affiliate | Claim Amount |
|---|---|---|
| LBHI | LB UK Financing Ltd | $   3,768,465,238 |
| LBHI | LB UK Re Holdings Limited | 781,605,210 |
| LBHI | Thayer Properties Limited | 261,674,213 |
| LBHI | Lehman Brothers (PTG) Limited | 269,512,581 |
| LBHI | Lehman Brothers Lease & Finance No. 1 Limited | 192,469,432 |
| LBHI | Monaco NPL (No. 1) Limited | 100,992,542 |
| LBHI | Yellow Real Estate Limited | 88,993,258 |
| LBHI | Lehman Brothers Holdings PLC | 63,893,551 |
| LBHI | Thayer Properties (Jersey) Limited | 15,336,338 |
| LBHI | Platform Commercial Mortgage Limited | 4,781,487 |
| LBHI | SM Funding No. 1 Limited | 4,566,235 |
| LBHI | Cherry Tree Mortgages Limited | 1,192,799 |
| LBHI | Stepstone Mortgage Funding Limited | 987,745 |
| LBHI | Platform Home Mortgage Securities No. 4 Limited | 852,342 |
| LBHI | LBO Investments Limited | 561,348 |
| LBHI | LB Lomond Investments | 79,945 |
| LBSF | LB RE Financing No. 3 Limited | 574,772,981 |
| LBSF | LB SF No. 1 | 1,859,029 |
| LBSF | Lehman Brothers Europe Limited | 694,125 |
| LBSF | Southern Pacific Mortgage Ltd. | 121,133 |
| LBSF | Mable Commercial Funding Limited | 14,566 |
| LBSF | LB UK Re Holdings Limited | 23,991,719 |
| LCPI | Mable Commercial Funding Limited | 3,196,376 |
| LCPI | Thayer Properties (Jersey) Limited | 19,154 |
| LCPI | Grace Hotels Limited | 260,000 |
| LCPI | Lehman Brothers (PTG) Limited | 9,547 |
| LCPI | Monaco NPL (No. 1) Limited | 8,470 |
| Lehman Brothers Commercial Corporation | LB UK Re Holdings Limited | 11,579 |
| LBCS | Lehman Brothers Europe Limited | 5,285,576 |
| LB 745 | Lehman Brothers Limited | 429,883 |

[1] To the extent any pairing of a particular Debtor and a particular UK Affiliate is not set forth on this Schedule 10, such pairing shall be deemed to be included in this Schedule 10 as if such Debtor were listed as the "Applicable Debtor", such UK Affiliate were listed as the "Applicable UK Affiliate" and the relevant "Claim Amount" were listed as $0.

**Exhibit A**

**Claim Reserve Agreement**

**Execution Version**

# CLAIM RESERVE AGREEMENT

This Claim Reserve Agreement (this "**Agreement**") is made and entered into as of October 24, 2011 by and among the Debtors,[1]  the UK Administration Companies[2]  (acting by their joint administrators, Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis, Dan Yoram Schwarzmann and Derek Anthony Howell, collectively, the "**Joint Administrators**"),[3]  the UK Liquidation Companies[4]  (acting by their joint liquidators Derek Anthony Howell and Ian Oakley-Smith, collectively, the "**Joint Liquidators**")[5]  and the Other UK Affiliates[6]  (the UK Administration Companies, acting by their Joint

---

[1]  As used herein, "**Debtors**" means Lehman Brothers Holdings Inc.; Lehman Brothers Special Financing Inc.; Lehman Commercial Paper Inc.; Lehman Brothers Commercial Corporation; Lehman Brothers Financial Products Inc.; Lehman Brothers OTC Derivatives Inc.; Lehman Brothers Derivative Products Inc.; Lehman Brothers Commodity Services Inc.; Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES Aviation IX LLC; East Dover Limited; Luxembourg Residential Properties Loan Finance S.a.r.l.; BNC Mortgage LLC; Structured Asset Securities Corporation; LB Rose Ranch LLC; LB 2080 Kalakaua Owners LLC; Merit LLC; LB Somerset LLC; LB Preferred Somerset LLC; LB 745 LLC; PAMI Statler Arms LLC.

[2]  As used herein, "**UK Administration Companies**" means Lehman Brothers International (Europe); Lehman Brothers Limited; Lehman Brothers Holdings PLC; LB UK Re Holdings Limited; Storm Funding Limited; Mable Commercial Funding Limited; Lehman Brothers Europe Limited; Lehman Brothers UK Holdings Limited; LB SF No. 1; Zestdew Limited; Monaco NPL (No. 1) Limited; Lehman Commercial Mortgage Conduit Limited; Eldon Street Holdings Limited; LB Holdings Intermediate 2 Limited; and Thayer Properties Limited (each in administration).

[3]  A reference to the Joint Administrators shall be construed as being to the Joint Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Joint Administrators.

[4]  As used herein, "**UK Liquidation Companies**" means Eldon Street (Raven) Limited; Lehman Brothers Equity (Nominees Number 7) Limited; Lehman Brothers (Indonesia) Limited; Grace Hotels Limited; and LBQ Funding (UK) (each in liquidation).

[5]  A reference to the Joint Liquidators shall be construed as being to the Joint Liquidators both jointly and severally and to any other person who is appointed as a liquidator in substitution for any liquidator or as an additional liquidator in conjunction with the Joint Liquidators.

[6]  As used herein, "**Other UK Affiliates**" means Acenden Limited (f/k/a Capstone Mortgage Services Limited); MBAM Investor Limited; Preferred Mortgages Limited; Resetfan Limited; Southern Pacific Funding 3 Ltd.; Southern Pacific Mortgage Ltd.; Thayer Group Limited (in liquidation) ("**Thayer Group**") (acting by its joint liquidators, Nick Vermeulen and Mark James, collectively, the "**Thayer Group Liquidators**"); and Thayer Properties (Jersey) Limited (in liquidation) ("**Thayer Properties**") (acting by its joint liquidators, Nick Vermeulen and Mark James, the "**Thayer Properties Liquidators**" and together with the Thayer Group Liquidators, the "**Thayer Liquidators**").

Administrators, the UK Liquidation Companies, acting by their Joint Liquidators, and the Other UK Affiliates, collectively, the "**UK Affiliates**").    The Debtors and the UK Affiliates shall each be referred to individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

WHEREAS, on September 15, 2008 and on various dates thereafter, each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are being jointly administered under Case Number 08-13555 (JMP) (the "**Chapter 11 Cases**" and each a "**Chapter 11 Case**");

WHEREAS, on September 15, 2008 and on various dates thereafter, the UK Administration Companies entered English administration proceedings pursuant to the English Insolvency Act 1986 and the UK Liquidation Companies entered liquidation in the UK (collectively, the "**UK Proceedings**");

WHEREAS, the Joint Administrators were appointed as the joint administrators of the Administration Companies and the Joint Liquidators were appointed as the joint liquidators of the Liquidation Companies;

WHEREAS, on Thayer Group and Thayer Properties (collectively, the "**Thayer Liquidation Companies**") have entered liquidation proceedings in Jersey, United Kingdom and the Thayer Liquidators were appointed as the liquidators of the Thayer Liquidation Companies; and

WHEREAS, on September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 19627] (the "**Current Plan**" and as amended, modified or supplemented by the Debtors from time to time, the "**Plan**");

WHEREAS, pursuant to Section 8.4 of the Current Plan, the Debtors may establish reserves on account of any Disputed Claim (as defined in the Current Plan) based upon an amount as may be agreed upon by the holder of such Disputed Claim and the Plan Administrator (as defined in the Current Plan); and

WHEREAS, the Parties have reached an agreement in principle resolving claims between the Debtors and the UK Affiliates, and are currently negotiating a Settlement Agreement with respect thereto (the "**Settlement Agreement**");

NOW, THEREFORE, in consideration of the recitals stated above, the agreements, promises and warranties set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.   Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement.

(a)    "**Alternative Plan**" means any chapter 11 plan filed in the Chapter 11 Cases that is neither proposed nor supported (directly or indirectly) by any of the Debtors.

(b)    "**Applicable Class**" means, for any claim of any UK Affiliate against any Debtor, (i) with respect to the Current Plan, the "Class" (as defined in the Current Plan) set forth in Schedule 1 hereto for which such UK Affiliate is designated the "Applicable UK Affiliate" and such Debtor is designated the "Applicable Debtor" and (ii) with respect to any Confirmed Plan (other than the Current Plan), the category of claims that each applicable UK Affiliate and the applicable Debtor determine in good faith is most similarly situated to the "Class" (as defined in the Current Plan) set forth in Schedule 1 hereto for which such UK Affiliate is designated the "Applicable UK Affiliate" and such Debtor is designated the "Applicable Debtor".

(c)    "**Bankruptcy Code**" has the meaning ascribed to it in the Recitals.

(d)    "**Bankruptcy Court**" has the meaning ascribed to it in the Recitals.

(e)    "**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York or the United Kingdom.

(f)    "**Chapter 11 Cases**" has the meaning ascribed to it in the Recitals.

(g)    "**Confirmed Plan**" means the Plan or any other chapter 11 plan for the Debtors (other than an Alternative Plan) that is confirmed by the Bankruptcy Court.

(h)    "**Current Plan**" has the meaning ascribed to it in the Recitals.

(i)    "**Debtors**" has the meaning ascribed to it in the Preamble.

(j)    "**Final Order**" means an order of the Bankruptcy Court or any other court of competent jurisdiction (i) that is in full force and effect, (ii) is not reversed or vacated and (iii) as to which the time to appeal, petition for certiorari, and move for reargument or rehearing has expired and (1) as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or (2) in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been timely sought, such appeal, writ of certiorari, or

3

reargument or rehearing shall have been withdrawn, denied or resolved by the highest court to which such order was appealed or from which certiorari, rehearing or reargument was sought; *provided* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or applicable law, may be filed with respect to such order shall not prevent such order from being a Final Order.

(k)    "**Joint Administrators**" has the meaning ascribed to it in the Preamble.

(l)    "**Joint Liquidators**" has the meaning ascribed to it in the Preamble.

(m)    "**Other UK Affiliates**" has the meaning ascribed to it in the Preamble.

(n)    "**Party**" has the meaning ascribed to it in the Preamble.

(o)    "**Plan**" has the meaning ascribed to it in the Preamble.

(p)    "**Reserve Amount**" means, for any claim of any UK Affiliate against any Debtor, the amount, if any, set forth in Schedule 1 hereto for which such UK Affiliate is designated the "Applicable UK Affiliate" and such Debtor is designated the "Applicable Debtor".

(q)    "**Thayer Group**" has the meaning ascribed to it in the Preamble.

(r)    "**Thayer Group Liquidators**" has the meaning ascribed to it in the Preamble.

(s)    "**Thayer Liquidation Companies**" has the meaning ascribed to it in the Recitals.

(t)    "**Thayer Liquidators**" has the meaning ascribed to it in the Preamble.

(u)    "**Thayer Properties**" has the meaning ascribed to it in the Preamble.

(v)    "**Thayer Properties Liquidators**" has the meaning ascribed to it in the Preamble.

(w)    "**UK Administration Companies**" has the meaning ascribed to it in the Preamble.

(x)    "**UK Affiliates**" has the meaning ascribed to it in the Preamble.

(y)    "**UK Liquidation Companies**" has the meaning ascribed to it in the Preamble.

4

(z)    "**UK Proceedings**" has the meaning ascribed to it in the Recitals.

## ARTICLE 2
### RESERVES

Section 2.01.    Notwithstanding any provision of any Confirmed Plan or any confirmation order with respect thereto, the Debtors shall hold in reserve, under any Confirmed Plan and at all times, an amount not less than the cumulative amount that would have been distributed to each applicable UK Affiliate were each such UK Affiliate to have held allowed claims against each applicable Debtor as of the effective date of such Confirmed Plan (i) in the Applicable Class and (ii) in an amount equal to the applicable Reserve Amount, which reserve shall be available solely for the benefit of the applicable UK Affiliate unless and until (and only to the extent that) it is subsequently determined by Final Order of a court of competent jurisdiction that such UK Affiliate's allowed claims against the applicable Debtor are less than the applicable Reserve Amount.

## ARTICLE 3
### EFFECTIVENESS OF AGREEMENT; TERMINATION

Section 3.01.    This Agreement shall be effective as of the date first written above.

Section 3.02.    This Agreement shall automatically terminate on the earlier of (i) the date that the Settlement Agreement becomes effective in accordance with its terms or (ii) any date on which the Bankruptcy Court enters an order confirming an Alternative Plan pursuant to section 1129 of the Bankruptcy Code.

## ARTICLE 4
### VENUE AND CHOICE OF LAW

Section 4.01.    *Venue.*    To the maximum extent permissible by law, the Parties expressly consent and submit to the jurisdiction of the Bankruptcy Court solely over any actions or proceedings relating to the enforcement or interpretation of this Agreement.    Each of the Parties agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.    Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection that it may now or hereafter have to the laying of venue of any such suit, action or proceeding with the Bankruptcy Court or with any other federal court located within the Southern District of New York, and (ii) the defense of an inconvenient forum to the maintenance of such action or

proceeding in any such court.    Each Party irrevocably consents to service of process in the manner provided for notices in Article 5 hereof.    Nothing in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by applicable law.

Section 4.02.    *Choice of Law.*    This Agreement and all claims and disputes relating to the construction or application of the terms of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York and the Bankruptcy Code, without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York or the Bankruptcy Code.

ARTICLE 5
NOTICES

All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day or (c) when sent by an internationally recognized courier, specifying next day delivery, upon written confirmation of delivery by such courier.    All communications shall be sent:

If to any Debtor at:

1271 Avenue of the Americas, 39th Floor
New York, New York 10020
U.S.A.
Attn: Daniel J. Ehrmann
Facsimile: (646) 834-0874
Email: dehrmann@alvarezandmarsal.com

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
U.S.A.
Attn: Lori R. Fife and Robert J. Lemons
Facsimile: (212) 310-8007
Email: lori.fife@weil.com and robert.lemons@weil.com

6

<u>If to any UK Affiliate at</u>:

The address(es) set forth in the applicable UK Affiliate's signature page hereto, with a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
U.S.A.
Attn: Marshall S. Huebner and Brian M. Resnick
Facsimile: (212) 701-5800
Email: marshall.huebner@davispolk.com and
        brian.resnick@davispolk.com

and

Linklaters LLP
One Silk Street
London
EC2Y 8HQ
United Kingdom
Attn: Richard Holden and Titia Holtz
Facsimile: +44 20 7456 2222
Email: richard.holden@linklaters.com and
        titia.holtz@linklaters.com

or to such other address(es) as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

ARTICLE 6
No Admission of Liability

Each Party acknowledges that this Agreement in part addresses potential claims, counterclaims and factual allegations that are in whole or in part denied and contested, and that nothing contained herein shall be construed as an admission of liability or wrongdoing or with respect to any disputed fact. Without limiting the generality of the foregoing, the amount of any Reserve Amount or the failure of any Reserve Amount to be set forth in Schedule 1 hereto for any particular UK Affiliate shall not (i) impair or prejudice the rights, positions, claims or obligations of any Party or (ii) be used as evidence by or against any Party, in each case, in any litigation in connection with the merits of the claims (or the amounts thereof) that the Parties may have against one another.

7

ARTICLE 7
ENTIRE AGREEMENT

This Agreement constitutes the entire and only agreement of the Parties concerning the subject matter hereof.    This Agreement supersedes and replaces any and all prior or contemporaneous oral or written agreements between the Parties concerning the subject matter hereof, and to the extent of any conflicts or inconsistencies between any Confirmed Plan and the terms of this Agreement, the terms of this Agreement shall control.    The Parties acknowledge that this Agreement is not being executed in reliance on any oral or written agreement, promise or representation not contained herein.

ARTICLE 8
NO ORAL MODIFICATIONS

This Agreement may not be modified or amended orally.    This Agreement may be modified or amended only by a writing signed by a duly authorized representative of each affected Party hereto.    Any waiver of compliance with any term or provision of this Agreement on the part of any of the Debtors must be provided in a writing signed by each affected UK Affiliate. Any waiver of compliance with any term or provision of this Agreement on the part of any of the UK Affiliates must be provided in a writing signed by each affected Debtor.    No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach.    No failure or delay by any party in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or be construed as a waiver or variation of it or preclude its exercise at any subsequent time, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

ARTICLE 9
CONSTRUCTION

This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

ARTICLE 10
BINDING EFFECT; SUCCESSOR AND ASSIGNS

Any declaration or statement of any Joint Administrator, Joint Liquidator or Thayer Liquidator shall be made only in his capacity and function as a Joint Administrator, Joint Liquidator or Thayer Liquidator, as applicable, of the relevant UK Affiliate, and shall in no circumstance be construed as being a

8

declaration or statement of such Joint Administrator, Joint Liquidator or Thayer
Liquidator on his own and personal behalf.    This Agreement shall inure to the
benefit of and be binding upon the Parties and their respective successors
(including any chapter 7 trustees that may be appointed upon or after conversion
of any of the Chapter 11 Cases to a case or cases under chapter 7 of the
Bankruptcy Code or any party that may succeed to the rights or claims of any of
the Debtors or their estates, derivatively or otherwise, and including any
liquidators that may be appointed upon or after conversion of any administration
of any UK Administration Company into liquidations) and permitted assigns;
*provided*, *however*, that no Party may assign its rights or obligations under this
Agreement without the written consent of each other affected Party, and any
assignment not in accordance with the terms hereof shall be null and void *ab
initio*.

## ARTICLE 11
### COUNTERPARTS

This Agreement may be executed in counterparts, each of which
constitutes an original, and all of which, collectively, constitute only one
agreement.    The signatures of all of the Parties need not appear on the same
counterpart.

## ARTICLE 12
### NO PERSONAL LIABILITY

The Joint Administrators, the Joint Liquidators and the Thayer Liquidators
act as agents for and on behalf of the UK Administration Companies the UK
Liquidation Companies and the Thayer Liquidation Companies, respectively, and
neither they, their firm, members, partners, directors, officers, employees, agents,
advisers or representatives shall incur any personal liability whatsoever in respect
of any of the obligations undertaken by any of the UK Administration Companies,
UK Liquidation Companies or Thayer Liquidation Companies or in respect of any
failure on the part of any of the UK Administration Companies, UK Liquidation
Companies or Thayer Liquidation Companies to observe, perform or comply with
any such obligations; or under or in relation to any associated arrangements or
negotiations; or under any document or assurance made pursuant hereto.    The
exclusion of liability set out in this paragraph shall arise and continue
notwithstanding the termination of the agency of any of the Joint Administrators,
Joint Liquidators or Thayer Liquidators and shall operate as a waiver of any
claims in tort as well as under the laws of contract and any claims otherwise at
law or in equity.    The Joint Administrators', the Joint Liquidators' and the
Thayer Liquidators' firm, members, partners, directors, officers, employees,
agents, advisers and representatives are express third-party beneficiaries
hereunder and may enforce and rely on this paragraph, to the same extent as if
they or it were a party.    Each Party accepts and agrees that this Agreement and

9

all transactions and measures contained herein do not give rise to any personal liability on the part of any of the officers, directors, employees, members, consultants, agents, asset managers, representatives or professional advisors of any other Party and, to the extent any such personal liability existed, each Party explicitly waives any and all potential rights and claims against all of the aforementioned persons.    Any claim by a Party against any of the Joint Administrators, Joint Liquidators, Thayer Liquidators, UK Administration Companies, UK Liquidation Companies or Thayer Liquidation Companies arising under, related to, or connected with this Agreement shall be satisfied only out of the assets of the estate of the applicable UK Administration Company, UK Liquidation Company or Thayer Liquidation Company, and any claim by a Party against a Debtor arising under, related to, or connected with this Agreement shall only be satisfied out of the assets of such Debtor.

## ARTICLE 13
### NON-SEVERABILITY

Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement.    If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to the Parties.    Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, each Party hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of this Agreement as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

## ARTICLE 14
### WAIVER OF JURY TRIAL

EACH OF THE PARTIES HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO

10

THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.   EACH OF THE PARTIES IS HEREBY AUTHORIZED TO FILE A COPY OF THIS ARTICLE 14 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.   THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT.

IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.,
LEHMAN COMMERCIAL PAPER INC.,
LEHMAN BROTHERS COMMODITY
SERVICES INC., LEHMAN BROTHERS
SPECIAL FINANCING INC., LEHMAN
BROTHERS OTC DERIVATIVES INC.,
LEHMAN BROTHERS COMMERCIAL
CORPORATION, LB 745 LLC, PAMI
STATLER ARMS LLC, CES AVIATION
LLC, CES AVIATION V LLC, CES
AVIATION IX LLC, LEHMAN SCOTTISH
FINANCE L.P., BNC MORTGAGE LLC, LB
ROSE RANCH LLC, STRUCTURED
ASSET SECURITIES CORPORATION, LB
2080 KALAKAUA OWNERS LLC, MERIT
LLC, LB PREFERRED SOMERSET LLC,
LB SOMERSET LLC, as Debtors and
Debtors in Possession

By: _____

Name:    John Suckow

Title:    Authorized Signatory

LEHMAN BROTHERS DERIVATIVES
PRODUCTS INC., LEHMAN BROTHERS
FINANCIAL PRODUCTS INC., EAST
DOVER LIMITED, LUXEMBOURG
RESIDENTIAL PROPERTIES LOAN
FINANCE S.A.R.L., as Debtors and Debtors
in Possession

By: _____

Name:    Daniel Ehrmann

Title:    Authorized Signatory

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:

Lehman Brothers International (Europe)
(in administration)

By: _____

Anthony V. Lomas, Joint
Administrator of Lehman Brothers
Europe Limited (in administration),
acting as its agent and without
personal liability
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: tony.lomas@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Mable Commercial Funding Limited
(in administration)

By: _____

Dan Y. Schwarzmann, Joint
Administrator of Mable Commercial
Funding Limited (in administration),
acting as its agent and without personal
liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

Storm Funding Limited
(in administration)

By: _____

Dan Y. Schwarzmann, Joint
Administrator of Storm Funding
Limited (in administration), acting as
its agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

LB UK Re Holdings Limited
(in administration)

By: _____

Dan Y. Schwarzmann, Joint
Administrator of LB UK Re Holdings
Limited (in administration), acting as its
agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

Lehman Brothers Europe Limited
(in administration)

By: _____

Dan Y. Schwarzmann, Joint
Administrator of Lehman Brothers
Europe Limited (in administration),
acting as its agent and without personal
liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Lehman Brothers Limited
(in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
Limited (in administration), acting as
its agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: mike.jervis@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Lehman Brothers UK Holdings Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Brothers UK
Holdings Limited (in administration),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Monaco NPL (No. 1) Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Monaco NPL (No. 1)
Limited (in administration), acting as
its agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Lehman Commercial Mortgage Conduit
Limited (in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Commercial
Mortgage Conduit Limited
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Thayer Properties Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Thayer Properties
Limited (in administration), acting as
its agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Zestdew Limited (in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Zestdew Limited
(in administration), acting as its agent
and without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Eldon Street Holdings Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Eldon Street Holdings
Limited (in administration), acting as its
agent and without personal liability
With notice to:
~~Derek A. Howell~~
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

LB SF No. 1 (in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of LB SF No. 1
(in administration), acting as its agent
and without personal liability
With notice to:
~~Derek A. Howell~~
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

LB Holdings Intermediate 2 Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of LB Holdings
Intermediate 2 Limited
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Lehman Brothers Holdings PLC
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
Holdings PLC (in administration),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Eldon Street (Raven) Limited
(in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Eldon Street (Raven) Limited
(in liquidation), acting as its agent and
without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

LBQ Funding (UK) (in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
LBQ Funding (UK) (in liquidation),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Grace Hotels Limited (in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Grace Hotels Limited (in liquidation),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Lehman Brothers Equity (Nominees
Number 7) Limited (in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Lehman Brothers Equity (Nominees
Number 7) Limited (in liquidation),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Lehman Brothers (Indonesia) Limited
(in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Lehman Brothers (Indonesia) Limited
(in liquidation), acting as its agent and
without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Acenden Limited (f/k/a Capstone Mortgage
Services Limited)

By: _____

    Amany Attia, as Director of Acenden
    Limited (f/k/a Capstone Mortgage
    Services Limited)
    Acenden Limited
    4th Floor
    22-25 Finsbury Square
    London EC2A 1DX
    United Kingdom
    Email: Amany.Attia@acenden.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Acenden Limited (f/k/a Capstone Mortgage
Services Limited)

By: _____

Jeff Lundgren, as Director of Acenden
Limited (f/k/a Capstone Mortgage
Services Limited)
Acenden Limited
4th Floor
22-25 Finsbury Square
London EC2A 1DX
United Kingdom
Email: Jeff.Lundgren@acenden.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Preferred Mortgages Limited

By: _____
    Lee Brandon, as Director of Preferred
    Mortgages Limited
    St. Johns Place
    Easton Street
    High Wycombe, HP11 1NL
    England
    Email: brandons@talktalk.net

Southern Pacific Funding 3 Ltd.

By: _____
    Lee Brandon, as Director of Southern
    Pacific Funding 3 Ltd.
    Level 23
    25 Canada Square
    London, E14 5LQ
    United Kingdom
    Email: brandons@talktalk.net

Southern Pacific Mortgage Ltd.

By: _____
    Lee Brandon, as Director of
    Southern Pacific Mortgage Ltd.
    St. Johns Place
    Easton Street
    High Wycombe, HP11 1NL
    England
    Email: brandons@talktalk.net

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Thayer Group Limited (in liquidation)

By: _____

Nick Vermeulen, Joint Liquidator of
Thayer Group Limited (in liquidation),
acting as its agent and without personal
liability
PricewaterhouseCoopers CI LLP
Twenty Two Colomberie
St Helier
Jersey, JE1 4XA
United Kingdom
Email: nick.vermeulen@gg.pwc.com

Thayer Properties (Jersey) Limited
(in liquidation)

By: _____

Nick Vermeulen, Joint Liquidator of
Thayer Properties (Jersey) Limited
(in liquidation), acting as its agent and
without personal liability
PricewaterhouseCoopers CI LLP
Twenty Two Colomberie
St Helier
Jersey, JE1 4XA
United Kingdom
Email: nick.vermeulen@gg.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

MBAM Investor Limited

By: _____

A J P Brereton, as Director of MBAM
Investor Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com


Resetfan Limited

By: _____

A J P Brereton, as Director of Resetfan
Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

## Schedule 1

### Reserve Amounts

| Applicable UK Affiliate | Applicable Debtor | Amount | Applicable Class |
|---|---|---|---|
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers Holdings Inc. | $84,007,466 | 4A |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers Holdings Inc. | $19,300 | 4B |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers OTC Derivatives Inc. | $2,292 | 5C |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers Special Financing Inc. | $17,047 | 5C |
| Eldon Street (Raven) Limited | Lehman Brothers Holdings Inc. | $2,300,000 | 4A |
| Eldon Street Holdings Limited | Lehman Brothers Holdings Inc. | $57,130,000 | 4B |
| Eldon Street Holdings Limited | Lehman Brothers Holdings Inc. | $611,400,000 | 4A |
| Grace Hotels Limited | Lehman Brothers Holdings Inc. | $1,650,000 | 4A |
| Grace Hotels Limited | Lehman Brothers Holdings Inc. | $4,500 | 4B |
| Lehman Brothers Equity (Nominees Number 7) Limited | Lehman Brothers Holdings Inc. | $4,200,000 | 4A |
| LB Holdings Intermediate 2 Limited | Lehman Brothers Holdings Inc. | $2,309,300,000 | 4B |
| LB Holdings Intermediate 2 Limited | Lehman Brothers Holdings Inc. | $2,700,000 | 4A |
| LB SF No. 1 | Lehman Brothers Holdings Inc. | $505,000 | 4B |
| LB SF No. 1 | Lehman Brothers Holdings Inc. | $2,875,036,779 | 4A |
| LB UK Re Holdings Limited | Lehman Commercial Paper Inc. | $46,940,663 | 5C |
| LBQ Funding (UK) | Lehman Brothers Holdings Inc. | $820,000 | 4A |
| Lehman Brothers (Indonesia) Limited | Lehman Brothers Holdings Inc. | $18,600,000 | 4B |
| Lehman Brothers (Indonesia) Limited | Lehman Brothers Holdings Inc. | $614,000 | 4A |
| Lehman Brothers Europe Limited | Lehman Brothers Holdings Inc. | $224,162,000 | 4B |
| Lehman Brothers Europe Limited | Lehman Commercial Paper Inc. | $5,000,000 | 5C |
| Lehman Brothers Europe Limited | Lehman Brothers OTC Derivatives Inc. | $26,000 | 5C |
| Lehman Brothers Europe Limited | Lehman Brothers Commercial Corporation | $260 | 5C |

| Applicable UK Affiliate | Applicable Debtor | Amount | Applicable Class |
|---|---|---|---|
| Lehman Brothers Holdings PLC | Lehman Brothers Holdings Inc. | $2,200,000 | 4B |
| Lehman Brothers Holdings PLC | Lehman Commercial Paper Inc. | $2,222,000 | 5C |
| Lehman Brothers International (Europe) | Lehman Brothers Commercial Corporation | $300,000,000 | 5C |
| Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. | $6,090,000,000 | 4B |
| Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc.[7] | $1,008,000,000 | 4B |
| Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc.[8] | $1,500,000,000 | 4B |
| Lehman Brothers International (Europe) | Lehman Brothers OTC Derivatives Inc. | $75,000,000 | 5C |
| Lehman Brothers International (Europe) | Lehman Brothers Special Financing Inc. | $5,000,000,000 | 5C |
| Lehman Brothers Limited | Lehman Brothers Commercial Corporation | $139,764 | 5C |
| Lehman Brothers Limited | Lehman Brothers Commodity Services Inc. | $888,000 | 5C |
| Lehman Brothers Limited | Lehman Brothers Holdings Inc. | $1,450,100,000 | 4B |
| Lehman Brothers Limited | Lehman Brothers Holdings Inc. | $400,000 | 4A |
| Lehman Brothers Limited | Lehman Brothers OTC Derivatives Inc. | $52,756 | 5C |
| Lehman Brothers Limited | Lehman Brothers Special Financing Inc. | $3,700,000 | 5C |
| Lehman Brothers Limited | Lehman Commercial Paper Inc. | $2,501,392 | 5C |
| Lehman Brothers UK Holdings Limited | Lehman Brothers Holdings Inc. | $1,937,900,000 | 4B |
| Lehman Brothers UK Holdings Limited | Lehman Brothers Holdings Inc. | $10,645 | 4A |
| Lehman Commercial Mortgage Conduit Limited | Lehman Commercial Paper Inc. | $101,985,000 | 5C |
| Lehman Commercial Mortgage Conduit Limited | Lehman Brothers Holdings Inc. | $92,100,000 | 4B |
| Mable Commercial Funding Limited | Lehman Brothers Holdings Inc. | $42,190,000 | 4B |
| MBAM Investor Limited | Lehman Brothers Holdings Inc. | $93,137,000 | 4B |
| MBAM Investor Limited | Lehman Brothers Holdings Inc. | $1,214,000 | 4A |
| Monaco NPL (No. 1) Limited | Lehman Brothers Special Financing Inc. | $3,000,000 | 5C |
| Preferred Mortgages Limited | Lehman Brothers Holdings Inc. | $32,709,000 | 4B |
| Preferred Mortgages Limited | Lehman Brothers Holdings Inc. | $42,633,000 | 4A |

---

[7] On account of the guarantee of LBIE's Bankhaus Claim.

[8] On account of LPS Trust Claims.

2

| Applicable UK Affiliate | Applicable Debtor | Amount | Applicable Class |
|---|---|---|---|
| Resetfan Limited | Lehman Brothers Holdings Inc. | $531,281 | 4A |
| Southern Pacific Funding 3 Ltd. | Lehman Brothers Holdings Inc. | $35,500,000 | 4A |
| Southern Pacific Mortgage Ltd. | Lehman Brothers Holdings Inc. | $69,200,000 | 4B |
| Storm Funding Limited | Lehman Brothers Holdings Inc. | $896,339,000 | 4B |
| Storm Funding Limited | Lehman Brothers Holdings Inc. | $810,903,934 | 4A |
| Storm Funding Limited | Lehman Commercial Paper Inc. | $182,820,000 | 5C |
| Thayer Group Limited | Lehman Brothers Holdings Inc. | $7,500,000 | 4A |
| Thayer Properties (Jersey) Limited | Lehman Brothers Holdings Inc. | $22,663,000 | 4B |
| Thayer Properties Limited | Lehman Commercial Paper Inc. | $13,400 | 5C |
| Zestdew Limited | Lehman Brothers Holdings Inc. | $3,253,000 | 4B |
| Zestdew Limited | Lehman Brothers Special Financing Inc. | $3,391,000 | 5C |