Hearing Date and Time: To Be Scheduled
Objection Date and Time: May 17, 2019 at 4:00 p.m. (Prevailing Eastern Time)

Gary Gwilliam (Bar No. 33430)
Randall E. Strauss (Bar No. 168363)
**GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER**
1999 Harrison Street, Suite 1600
Oakland, California 94612-3528
Telephone: (510) 832-5411
Fax: (925) 820-0335
Email: GGwilliam@giccb.com, rstrauss@giccb.com

Mark S. Bostick (Bar No. 111241)
**WENDEL, ROSEN, BLACK & DEAN LLP**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone: (510) 834-6600
Fax: (510) 834-1928
Email: mbostick@wendel.com

Attorneys for Claimants, Sylvia Vega-Sutfin, Michelle Seymour,
Cheryl McNeil, Linda Howard-James, Isabel Guajardo and
Denise Colombo

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS,<br>INC., *et al.*,<br><br>                  Debtors. | Chapter 11<br><br>Case No. 08-13555 (SCC)<br><br>(Jointly Administered) |

**CLAIMANTS SYLVIA VEGA-SUFTIN, MICHELLE SEYMOUR, CHERYL MCNEIL, LINDA HOWARD-JAMES, ISABEL GUAJARDO AND COLEEN COLOMBO'S OPPOSITION TO PLAN ADMINISTRATOR'S OBJECTION TO CERTAIN AMENDED CLAIMS (REDUCE AND DISALLOW CLAIMS IN BNC MORTGAGE CASE)**

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................. 4

II.  STANDARD OF REVIEW .................................................................................... 5

III.  ARGUMENT ........................................................................................................ 6

   A. Debtor Has Not Challenged Claimant Vega-Sutfin's Defamation Claim ...................... 6

   B. The Other Claimants Have Stated a Claim for Defamation ........................................... 6

      1. The Alleged Defamation Statements Are Not Statements of Opinion ......................... 8

      2. BNC Is Not Protected By the Common Interest Privilege ......................................... 10

IV.  CONCLUSION ..................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*Baker v. Los Angeles Herald Examiner, supra*, 42 Cal.3d at pp. 263-264, 228 Cal.Rptr. 206, 721
   P.2d 87 ................................................................................................................. 10

*Burnette v. Carothers* (2d Cir. 1999) 192 F.3d 52, 56, *cert denied*, 531 U.S. 1052, 121 S. Ct. 657,
   148 L.Ed.2d 560 (2000) ......................................................................................... 6

*Correia v. Santos* (1961) 191 Cal.App.2d 844, 854 ................................................ 7

*D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 99 ............................................... 6

*DeJesus v. Sears, Roebuck & Co.* (2d Cir 1996) F.3d 65, 68, *cert denied*, 519 U.S. 1007, 117
   S.Ct. 509, 136 L.Ed.2d 388 (1996) ...................................................................... 6

*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394 ................................................... 9

*Frommoetheldydo v. Fire Ins. Exchange* (1986) 42 Cal.3d 208, 217 ....................... 12

*Gould v. Maryland Sound Indus., Inc.* (1995) 31 Cal.App.4th 1137 ........................ 10

*Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596 ................................... 9

*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1538 ..... 11

*Mercado v. Hoefler* (1961) 190 Cal.App. 23 12, 22 ................................................ 7

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695 (1990).............. 8, 9, 10

*Oberkotter v. Woolman* (1921) 187 Ca. 500, 503 .................................................... 7

*Robomatic, Inc. v. Vetco Offshore* (1990) 225 Cal.App.3d 270, 276 ...................... 12

*Sanborn v. Chronicle Publishing Co.* (1976) 18 Cal.3d 406, 413 ........................... 12

*Swan v. Thompson* (1899) 124 Cal. 193, 199 .......................................................... 7

*Washer v. Bank of America* (1948) 87 Cal.App.2d 501, 509....................................... 8

*Williams v. Seiglitz* (1921) 186 Cal. 767, 772........................................................... 7

**Statutes**

California Civil Code § 46(3) ...................................................................................... 6

California Civil Code § 47(c) ...................................................................................... 11

**Rules**

Fed. R. Civ. P. 12(b)(6).............................................................................................. 5

## I. PRELIMINARY STATEMENT

1.      Claimants are former employees of BNC Mortgage Inc. ("BNC"), a debtor herein whose Claims are based on causes of action set forth in their amended proofs of claim (claim numbers 68258, 68259, 68260, 68261, 68262 and 68263, collectively, the "Amended Claims"). The Amended Claims essentially allege that each of the Claimants was an employee of BNC who was asked to engage in fraudulent loan activity.  Each of them refused to do so and complained to upper management of illegal and fraudulent lending practices.  Subsequently, each was retaliated against and sexually harassed in the workplace.  They complained to management about this sexual harassment.  Their complaints were laughed off.  As a result, they were forced to leave their jobs.  Under California law, this constitutes constructive termination.  BNC has to date not identified any witnesses who dispute these facts.

2.      Each Claimant has claims for employment discrimination, harassment, failure to prevent discrimination, retaliation, intentional infliction of emotional distress, defamation, wrongful termination in violation of public policy, breach of implied and/or express contract of continued employment and breach of implied covenant of good faith and fair dealing.

3.      The categories of damages available to each Claimant under California Law, as modified by this Court's ruling of May 8, 2017, are economic damages from September 5, 2005 through October 22, 2007, prejudgment interest on the economic damages at 7%, emotional distress damages, attorney's fees and costs, and damages related to loss of earning capacity.

4.      BNC seeks an order disallowing Claimants' defamation claims, and an order implementing Claim Reduction Procedures requiring each Claimant to serve a Claim Reduction Notice stating a new claimed amount without any damages for the disallowed defamation claims.

5.      For the reasons stated below, Claimants have set forth valid defamation claims.

4

6.      Assuming arguendo that Claimants' defamation claims are disallowed, Claimants'

claims will not be significantly reduced, if at all.  The damages suffered by Claimants under their

remaining theories more than support the Amended Claims amounts, even without taking into

consideration the defamation claims.  See Declaration of Eric Ivary, attached hereto as Exhibit

A. Mr. Ivary is an experienced attorney and mediator who has years of experience litigating and

mediating employment disputes involving issues of whistleblower retaliation and sexual

harassment. He offers expert opinion that the Amended Claims are more than supported by the

allegations and theories of recovery asserted therein, including emotional distress damages,

damages for loss of earning capacity and attorney's fees, even without considering the

defamation claims. This opinion is based upon Mr. Ivary's experiences as both a trial lawyer and

mediator.

7.      BNC attaches an "Exhibit A" to The Plan Administrator's Objection to Certain

Amended Claims (Reduce and Disallow Claims) which accurately sets forth each Claimants'

Asserted Claim Amount.  Exhibit A also sets for a "Proposed Claim Amount."  BNC makes no

argument or request for relief based on its Proposed Claim Amount, and it is unclear why this

information is set forth.  In any event, the Proposed Claim Amounts bear no rational relationship

to the actual claims of Claimants, the relief available as a remedy for those Claims, or the

evidence that will be presented at trial for these Claims.  Accordingly, Claimants request that the

Proposed Claim Amounts set forth in Exhibit A to the Objection not be considered by the Court

for any purpose.

## II. STANDARD OF REVIEW

Debtor asserts that the standard of review here is equivalent to a motion to dismiss under

Fed. R. Civ. P. 12(b)(6).  A motion to dismiss is "designed to test the legal sufficiency of the

5

complaint, and thus does not require the Court to examine the evidence at issue." *DeJesus v. Sears, Roebuck & Co.* (2d Cir 1996) F.3d 65, 68, *cert denied*, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 388 (1996). The complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitled him to relief." *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 99, citing *Burnette v. Carothers* (2d Cir. 1999) 192 F.3d 52, 56, *cert denied*, 531 U.S. 1052, 121 S. Ct. 657, 148 L.Ed.2d 560 (2000). Debtor has not and cannot meet this high burden in this Objection.

### III. ARGUMENT

#### A. Debtor Has Not Challenged Claimant Vega-Sutfin's Defamation Claim

BNC does not challenge the sufficiency of Claimant Vega-Sutfin's claims of defamation. (See paragraphs 38 and 39 of the Objection). Any Order resulting from this Objection must therefore necessarily not apply to Vega-Sutfin. BNC misleadingly includes Vega-Sutfin Amended Claim (68259) in its Objection and Proposed Procedure for Reduction of Amended Claims, perhaps hoping this Court will not notice that it has not raised any arguments relating to Vega-Sutfin's defamation claim. This cannot be permitted or condoned. Thus, Claimant Vega-Sutfin's defamation claims may not be disallowed.

#### B. The Other Claimants Have Stated a Claim for Defamation

Slander is a form of defamation, and consists of "a false and unprivileged publication, orally uttered," that "tends directly to injure [her] in respect to [her] office, profession, trade or business, either by imputing to [her] general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profits. California Civil Code § 46(3). Such statements are considered slander per se.

6

An attack on the honesty of an employee is slander per se. *Williams v. Seiglitz* (1921) 186 Cal. 767, 772. Statements imputing a "general disqualification" with respect to the requirements of a profession are slanderous per se. *Oberkotter v. Woolman* (1921) 187 Ca. 500, 503. Imputation of a want of integrity in one holding a private office of confidence or trust is slander per se. *Correia v. Santos* (1961) 191 Cal.App.2d 844, 854. Statements that an employee "was in the habit of getting drunk" are defamatory. *Swan v. Thompson* (1899) 124 Cal. 193, 199. Statements impugning a plaintiff's vocational capacity are defamatory. *Mercado v. Hoefler* (1961) 190 Cal.App. 23 12, 22.

These examples of slander per se echo the allegations of slanderous statements detailed in the Amended Claims. (Colombo "was out to destroy [account managers'] ability to make loans and would find reasons to decline their loans"; Colombo would "cuss [Defendant Linda Harris] out and throw violent fits in the office"; Stay away from Colombo because she was a "trouble maker" and was "being watched"; Statements degrading Colombo's underwriting abilities; Statement that "the problems in the office were the fault of the Claimants who were 'complainers'"; Stay away from Howard-James because she was a "trouble maker" and was "being watched"; Howard-James was "incompetent at her job and 'worthless' as an underwriter, did not know what she was doing and was a problem'; Guajardo "had all them kids' and got 'birthing hips' because she wanted to have a 'drink after work'"'; Guajardo was "stupid for helping out her brother by loaning her the car"; Seymour was incompetent and did not know what she was doing; McNeil "was an alcoholic'"; BNC gave McNeil's prospective employer a negative referenced about her "stating that she was a poor performer and an incompetent employee.)

7

Thus, Claimants have alleged slanderous statements that tend to injure them in respect to

their profession by imputing to them general disqualification, incompetence, lack of vocational

capacity and drunkenness.  These are all examples of slander per se.

### 1.    The Alleged Defamation Statements Are Not Statements of Opinion

Debtor BNC does not argue that the alleged defamatory statements are "true", which

would be a complete defense to a defamation claim.  See *Washer v. Bank of America* (1948) 87

Cal.App.2d 501, 509.

Instead, Debtor BNC attempts to overturn over a century of California jurisprudence by

breezily asserting that the alleged defamatory statements are unactionable "opinion."

BNC argues that statements of opinion are only actionable if they can reasonably be

understood as declaring or implying actual facts capable of being proven false. See *Milkovich v.*

*Lorain Journal Co.*, 497 U.S. 1, 20 (1990). The statements alleged here clearly can be reasonably

understood to be declaring or implying facts capable of being proven false:

| Defamatory Statement Alleged | Fact Capable of Being Proven False |
|---|---|
| Colombo "was out to destroy [account managers'] ability to make loans and would find reasons to decline their loans. | *Either Colombo would find reasons to decline loans or she would not.* |
| Colombo would "cuss [Defendant Linda Harris] out and throw violent fits in the office." | *Either Colombo acted this way or she did not.* |
| Stay away from Colombo because she was a "trouble maker" and was "being watched". | *Either Colombo was being watched because she was a trouble maker, or she was not.* |
| Statements degrading Colombo's underwriting abilities. | *Either Colombo was a good underwriter or she was not.* |
| Statements that "the problems in the office were the fault of the Claimants who were "complainers". | *Either the Claimants made complaints that were the cause of problems or they did not.* |
| Stay away from Howard-James because she was a "trouble maker" and was "being watched". | *Either Howard-James was being watched because she was a trouble maker, or she was not.* |
| Howard-James was "incompetent at her job and 'worthless' as an underwriter, did not know what she was doing and was a problem". | *Either Howard-James was incompetent and did not know what she was doing, or she was not.* |
| Guajardo "'had all them kids' and got 'birthing | *Either Guajardo had a problem with alcohol* |

8

| | |
|---|---|
| hips' because she wanted to have a 'drink after work'". | *or she did not.* |
| Guajardo "was 'stupid' for helping out her brother by loaning her (sic) the car". | *Either Guajardo was stupid or she was not.* |
| Seymour was incompetent and did not know what she was doing. | *Either Seymour was incompetent and did not know what she was doing, or she did not.* |
| McNeil "was an alcoholic". | *Either McNeil was an alcoholic or she was not.* |
| Gave prospective employer a negative reference about McNeil "stating that she was a poor performer and an incompetent employee". | *Either McNeil was an alcoholic or she was not.* |

Thus, each of the alleged defamatory statements fail the *Milkovich, supra* test because they assert

statements of actual facts that are capable of being proven true or false. [1]

    *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, cited by BNC, does not

support its position. There the Court distinguished statements made in the heat of public debate

from actionable defamation:

> Thus, where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion. Id. at 601.

    Claimants defamation allegations contain no such statements made during a labor dispute

or other public forum designed to persuade others to adopt a particular political position.

Instead, they allege statements made by BNC managers that impugn their competence and

integrity in performing their chosen profession. In short, classic slander per se.

    Similarly, BNC cites *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394 for the proposition

that Claimants allegations of defamatory statements should be brushed aside because the

constitute "lusty and imaginative expressions of contempt and words used in a loose, figurative

sense", and are thus mere opinion. Id., at 1401. In *Ferlauto*, the alleged defamatory statements

---

[1] Although this motion is not directed at Vega-Suftin's defamation allegations, they are susceptible to the same analysis, and are clearly not opinion under *Milkovich, supra*.

were made in a "book [that] is laden with flip, earthy and colorful language, and written in an

exaggerated, irreverent and attention-grabbing style." Id at 1398. This context was critical in

determining the allegedly defamatory statements were opinion, as no reasonable reader would

consider them to be anything other than hyperbole on the part of the author. The court noted:

> Caricature, imaginative expression, and rhetorical hyperbole, as used here,
> are often subject to the threat of a defamation action, but generally constitute a
> legitimate exercise of literary style. (*Milkovich v. Lorain Journal Co., supra*, 497
> U.S. at p. 20, 110 S.Ct. 2695; *Baker v. Los Angeles Herald Examiner, supra*, 42
> Cal.3d at pp. 263-264, 228 Cal.Rptr. 206, 721 P.2d 87.) For example, the
> statements in the book that the judge in the Vossler litigation "laughed at their
> motion" and "thought their motion was a joke" are merely colorful descriptions of
> the incontestable fact that the court indeed denied Vossler's motion. Although
> the judge may not have literally laughed, authors are not limited to a sterile
> narrative of facts. Id at 1403.

Claimants have not alleged any facts to suggest they were subject to caricature,

imaginative expression or rhetorical hyperbole.

In *Gould v. Maryland Sound Indus., Inc.* (1995) 31 Cal.App.4th 1137, relied on by BNC,

the court found that a poor performance review constituted unactionable opinion because the

performance review itself did not contain any slander. Citing an earlier decision, the court held

"unless an employer's performance evaluation accuses an employee of criminal conduct, lack of

integrity, dishonesty, incompetence or reprehensible personal characteristics or behavior ... it

cannot support a cause of action for libel.: Id. at 1153. Claimants' defamation claims are

distinguishable in that they do not allege the statement were made in the context of a

performance evaluation, and they do impugn their integrity, honesty and competence – again,

classic slander per se.

### 2.    BNC Is Not Protected By the Common Interest Privilege

BNC further argues that it is entitled to qualified impunity under the "common interest

privilege." It argues that statements made by an employer to employees may be privileged if the

statements serve the common interest of preserving morale and job efficiency. To qualify for this qualified privilege, the statement must be made "*by management and coworkers to other coworkers explaining why an employer disciplined an employee*". *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1538. (emphasis added). None of the alleged defamatory statements were made for this purpose. There are no allegations that the defamatory statements were made by BNC management or co-workers to explain why Claimants were disciplined. To the contrary, they were made for the purpose of retaliating against Claimants for being whistleblowers.

Clearly, the defamatory statements alleged by Claimant McNeil that were made to her prospective employer are not covered by the privilege, despite the unsupported assertion by BNC. In *McGrory v. Applied Signal Technology, Inc, supra*, the court applied the privilege to statements by management and coworkers *to other coworkers* explaining why an employer disciplined an employee. To the contrary, these alleged defamatory statements were made to outsiders, i.e., prospective employers.

None of the other defamatory statements were made for a legitimate purpose, as discussed in *McGrory, supra*. BNC cannot show an absence of malice necessary to support the privilege. In fact, Claimants have properly alleged malice that defeats the privilege. See California Civil Code § 47(c), (privilege inapplicable to statements made with malice).

BNC argues that Claimants have made only general allegations that the statements were made with malice with no reason to believe they were true, and thus malice is not properly alleged. This appears to be a willful misreading of the claims.

11

As authority cited by BNC makes clear, malice may be properly alleged where there are detailed facts showing defendant's ill will towards [her]. See *Robomatic, Inc. v. Vetco Offshore* (1990) 225 Cal.App.3d 270, 276. Claimants have all alleged such facts.

First, Claimants have all alleged the statements were false and were made with the intent to injure them. The privilege is lost if the defendant knows the statement is false or has no reasonable ground for belief in the truth of the statement. *Sanborn v. Chronicle Publishing Co.* (1976) 18 Cal.3d 406, 413.

Second, Claimants have alleged facts showing that BNC employees made the statements bearing actual malice, hatred or ill will. See *Frommoetheldydo v. Fire Ins. Exchange* (1986) 42 Cal.3d 208, 217. ("The malice necessary to defeat a qualified privilege is 'actual malice' which is established by showing that the publication was motivated by hatred or ill will toward the plaintiff..." Id. Claimants' Amended Claims each contain a Sixth Cause of Action (Defamation) that re-incorporates and repeats the allegations that precede it in the attached Complaint for Damages originally filed in the Sacramento County Superior Court on November 8, 2005. Each succeeding cause of action incorporates all the preceding paragraphs, such that the entire Complaint for Damages is included in the defamation claim.

The Complaint for damages describes the reasons why BNC bore Claimants ill will, and thus provides detailed facts describing malice. For example, Claimant Colombo complained of fraudulent loan practices in April or May of 2005, and immediately thereafter began to experience retaliation. (Complaint for Damages, ¶27). Her managers told her co-workers not to associate with her. (Complaint for Damages, ¶31). Claimant Howard-James made similar complaints, and experienced immediate retaliation. (Complaint for Damages, ¶30). Claimant Guajardo experienced retaliation after she refused an order to not associate with her co-

Claimants for making complaints of loan fraud. (Complaint for Damages, ¶41). Claimant McNeil reported loan fraud in April 2005 and immediately experienced retaliation. (Complaint for Damages, ¶64). Claimant Seymour reported loan fraud on or about May 20, 2005. After Claimant Vega-Sutfin made various complaints of unlawful activity, her supervisor began referring to her as "that bitch" and said he "hate[s] that bitch." (Complaint for Damages, ¶85). All of the Claimants made various complaints of sexual harassment which were unlawfully ignored by BNC management in retaliation for making complaints of fraudulent loan practices. In short, Claimants' defamation claim contains ample examples that BNC bore them ill will, and the trier of fact could easily so conclude. This is sufficient to plead malice under the authorities cited by BNC.

## IV. CONCLUSION

For the foregoing reasons, the Plan Administrator's Objection should be overruled, and the motion should be denied.

### Relief Requested

Claimants respectfully request that the Court order the stay lifted and allow the litigation to move forward in Sacramento County Superior Court. Claimants renew this request, previously denied without prejudice by the Court on October 7, 2014, based on the fact that there have now been three failed mediations and absolutely no progress in completing discovery necessary to move this case towards trial.

///

///

///

13

In the alternative, Claimants request that the Court issue an order directing a discovery plan, so the parties can move towards preparing the case for trial.

DATED:                                GWILLIAM IVARY CHIOSSO CAVALLI & BREWER

/s/ J. Gary Gwilliam
J. Gary Gwilliam
Randall E. Strauss
Attorneys for Claimants, Sylvia Vega-Suftin,
Michelle Seymour, Cheryl McNeil, Linda
Howard-James, Isabel Guajardo and Coleen
Denise Colombo

# EXHIBIT A

Hearing Date and Time: To be Scheduled
Objection Date and Time: May 17, 2019 at 4:00 p.m. (Prevailing Eastern Time)

Gary Gwilliam (Bar No. 33430)
Randall E. Strauss (Bar No. 168363)
**GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER**
1999 Harrison Street, Suite 1600
Oakland, California 94612-3528
Telephone: (510) 832-5411
Fax: (510) 832-1918
Email: GGwilliam@giccb.com, rstrauss@giccb.com

Mark S. Bostick (Bar No. 111241)
**WENDEL, ROSEN, BLACK & DEAN LLP**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone: (510) 834-6600
Fax: (510) 834-1928
Email: mbostick@wendel.com

Attorneys for Claimants, Sylvia Vega-Sutfin, Michelle Seymour,
Cheryl McNeil, Linda Howard-James, Isabel Guajardo and
Denise Colombo

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF ERIC H. IVARY IN OPPOSITION TO THE PLAN
ADMINISTRATORS' OBJECTION TO CERTAIN AMENDED CLAIMS (REDUCE
AND DISALLOW CLAIMS IN BNC MORTGAGE CASE)**

I, Eric H. Ivary, declare as follows:

1.     I am over the age of eighteen, and if called, could testify competently as to the contents of this Declaration. I have been an attorney for 47 years. As a practicing attorney, I represented many plaintiffs in employment cases, including plaintiffs bringing claims of wrongful termination, sexual harassment, whistleblower discrimination and constructive termination. I have tried 6 employment cases to verdict. I am a member of the American Board of Trial Advocates. A true and correct copy of my current CV is attached to this Declaration as Exhibit 1.

2.     For the past 17 years, I have served both privately and as a Court-appointed Mediator, Arbitrator and Neutral Case evaluator for civil cases, and as a provider of Mediation and Arbitration services in cases pending in both State and Federal Courts in Northern California. I have also mediated many cases pre-litigation. I have mediated approximately 1200 cases at various Northern California venues, including San Francisco, Alameda, Sacramento, San Mateo and Santa Clara Counties. Nearly all these mediations took place in Northern California at our offices in San Francisco, Oakland and San Jose. Of the 1200 or so cases I have mediated, approximately 400 of them have been employment cases. I have mediated at least 15 employment cases in the past 6 months with an approximate 90% success rate. I participated actively in the parties' negotiations and am aware of the range of settlement values achieved in the cases I have mediated, and keep generally familiar with settlements reached by other mediators in employment cases. ADR Services has at least 20 co-panelists who also mediate Employment cases in our Northern California offices. At ADR we routinely share our ideas and thoughts through education seminars conducted internally, at least 3 or 4 per year. We also informally discuss employment case values which one could describe as "comparing notes". We

are routinely updated by our research department of any new development in all areas of

employment law and, in addition, I keep apprised of reported jury verdicts in employment cases,

particularly in Northern California, including the Sacramento County Superior Court. Finally, I

attend Educational Seminars focusing on employment law as part of my MCLE requirements

mandated by the State Bar. I am 100% in compliance with all requirements.

    3.    I have no financial interest in the outcome of this matter. I am not personally

involved in the litigation, and do not know the Claimants. I do not have any financial interest in

Claimants' counsels' law firm. I was formerly a partner at Gwilliam, Ivary, Chiosso, Cavalli &

Brewer, but left the firm in 2001. I have been asked by Claimants' counsel to review certain

materials in the litigation and to opine on the settlement value of the claims asserted. I have

reviewed the following documents to aid me in this task:

- (6) Form 410 Proofs of Claim filed May 7, 2017 in the Southern District of NY for each
  Claimant
- A 15 page letter dated August 3, 2013 to Lawrence Baer and Candace from J. Gary
  Gwilliam, which has formed the basis of Claimants' Mediation Statements
- Reports on all 6 Claimants authored by Dr. Paul Berg, enclosed with the above letter
- An order from Judge Chapman dated May 8, 2017
- A transcript of the hearing held April 13, 2017
- Debtor's Current Motion re Amended Claims and supporting documents 2019

    4.    I understand in this matter that Claimants have brought claims against BNC

Mortgage Inc. and Lehman Brothers for employment discrimination, harassment, failure to

prevent discrimination, retaliation, intentional infliction of emotional distress, defamation,

3

wrongful termination in violation of public policy, breach of implied and/or express contract of continued employment and breach of implied covenant of good faith and fair dealing.

5.    In my experience, defamation claims are pleaded as one theory of recovery in employment cases involving wrongful termination, retaliation and workplace harassment. Defamation is generally an alternate theory of recovery applicable for a special category of damages where the employer goes out of its way to sabotage the employee's career prospects. Usually this is done in retaliation for perceived "whistleblower activity". Defamation is in no way an essential component of a cause of action for wrongful termination in violation of public policy. I have carefully reviewed the defamation allegations made by Claimants. Although there is no doubt that if these allegations are proven, Claimants will have proved a compensable injury, the defamation damages per se are only a small component of the total damages alleged. In my opinion and experience, defamation claims, by themselves, only comprise a fraction of the damages to be paid either through a mediated settlement or jury verdict. The rest of the case remains unaffected. Simply put, a loss of earning capacity claim is in no way dependent on defamation as a theory of recovery. It is merely an enhancement.

6.    I have reviewed psychological reports prepared by Dr. Paul Berg with respect to each Claimant, wherein he describes in great detail the emotional distress suffered by each Claimant as a result of the alleged conduct by BNC and Lehman Brothers. This injury is severe and ongoing according to Dr. Berg. In my opinion and experience the value of these non-economic damage claims range from a low of 1.8 million to a high of 3.5 million dollars. The emotional distress suffered by these ladies are, per Dr. Berg, a function of how they grew up and their sad and sometimes tragic life experiences. None was equipped to have to deal with having their lives disrupted by harassment and retaliation. Claimant's counsel's assertion that the non

4

economic damages could easily exceed $2,000,000 per Claimant in a mediated settlement or jury verdict is a reasonable estimate for settlement. And it is a likely outcome for a jury verdict, if Claimants' claims are proven at trial.

7.       Attorneys' fees are also a significant component of these cases. Because of the extreme delay in the resolution of these cases it's understandable that the amount of attorneys' fees is likely to be quite large. From my review of this litigation, it is obvious that Claimants' counsel must have expended many, many hours of work on this litigation. I point this out since attorneys' fees are considered in the negotiations of FEHA based employment cases. The reason for this is that plaintiffs' attorneys' fees are awarded by the court. If they are successful at trial on their claims brought under California's Fair employment and Housing Act (FEHA). Claimants would be entitled to the full value of their attorneys' fees, adding hundreds of thousands or even millions of dollars to the value of these claims either through mediated settlement or jury verdict. More importantly, courts typically add a multiplier to the Lodestar rate, which can have the effect of doubling the attorneys' fees award. This occurs when an important public interest or civil right is vindicated. In my opinion, that is a distinct possibility in this case given these facts.

8.       If Claimants are successful, they would be entitled to recover future loss of earning capacity. Such loss would be included in any jury instruction on the subject and would be awardable by the jury just the same as past damages. The work-life expectancy is different for each claimant so I make no comment on the amount of such damages.

9.       Finally there are intangibles in these cases not often seen in employment cases. First is the passage of time. I have not seen such a long passage of time between the claimed employer misconduct to the present. The sheer passage of time with no compensation makes

each claimant less able to cope with the passage of all those years economically, medically and emotionally. Fourteen years is a very long time. As the saying goes "Justice delayed…" Another intangible affecting value is the magnitude of the wrongdoing which precipitated the "mortgage loan crisis". Any potential juror is aware of what happened. As if we needed a reminder, we have all recently witnessed two individuals going to prison for loan application fraud. While punitive damages are not part of this case, years of experience tells me that regardless, the magnitude of the wrongful conduct and the total scope of harm always increases the value of the general damages whether by settlement or verdict. An example I often use in my mediations is "What is the difference between the case of someone injured in a car accident and the same person injured in an airplane crash?" Obviously wrongful conduct by the defendant results in higher jury verdicts as comparted to simple negligence.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed on this _9th_ day of _May_, 2019, at _Oakland_, California.

Eric H. Ivary

EXHIBIT 1





# ERIC IVARY, ESQ.

100 First Street
27th Floor
San Francisco, CA 94105
(415) 772-0900 Tel.
(415) 772-0960 Fax

www.adrservices.com

## EXPERIENCE

- Associate Attorney, Law Office of Alred R. Naphan 1972-1978
- Co-Founding Partner, Gwilliam, Ivary, Chiosso, Cavalli & Brewer (1978-2000), Oakland, California, Managing Partner 1988-2000
  Tried all types of personal injury cases, employment cases, medical and hospital negligence as well as insurance bad faith.

## ALTERNATIVE DISPUTE RESOLUTION (ADR) EXPERIENCE

In the past 15+ years, Mr. Ivary has mediated over 1,000 cases involving:

- Personal Injury / Products Liability
- Employment (wrongful termination, retaliation, age & gender discrimination)
- Public Entity Liability, including school districts
- Civil rights, discrimination of all types, police misconduct
- Insurance, including arbitration of UM/UIM cases
- ERISA, both disability claims and employer contribution liability
- Served 12 years' on the Northern District panel for ADA cases involving disability access, architectural barriers for all types of commercial establishments, including nationwide corporate policy for institutions such as hospitals, and also cases involving service animal access and related issues.

- Served as Judge Pro Tem for the Superior Courts for three Bay Area Counties since 1989.
- Mediator for the United States District Court ADR Program in the fields of Employment, Federal civil rights, Medical Malpractice, ERISA, ADA, Maritime and Federal Tort claims.
- Panelist for all the Alameda County Settlement Programs (since 1985).
- Panelist for the Contra Costa County Courts programs (since 1991).
- Panelist for San Mateo County Courts MAP Program (since 2008).
- Panelist for Santa Clara County Court

## EDUCATION

- B.A., Saint Mary's College of California, 1968
- J.D., University of Santa Clara, 1971
- Admitted to State and Federal Courts, 1972

*Eric Ivary, Esq. – Professional Resume*
*Page 2 of 6*

- Continuing Education requirements met in all fields, including Advanced Mediation Training for both State and Federal courts

## MEDIATION TRAINING

- Initial training through San Mateo, Contra Costa and Alameda County court sponsored ADR Programs (MAP, EASE, SMART and TOT programs)
- 40 Hour Intensive Mediation Training course taught by Nancy Yeend (2001)
- 20 Hour US District Court training program
- Multiple CLE programs on a variety of topics, as well as regular updates on specific mediation issues on interest (including confidentiality, changes in the law, etc.)

## PAST & PRESENT PROFESSIONAL ASSOCIATIONS

- American Board of Trial Advocates, inducted 1989
- American Inns of Court, Wiley Manuel Chapter, Senior Mentor, 1999-2000
- Association of Trial Lawyers of America, (Advocate, National College of Advocacy)
- Alameda-Contra Costa Trial Lawyers Association
  - o Board of Governors, 1975-1990
  - o Editor of *The Verdict*, 1986
  - o President, 1990
- Alameda County Lawyer's Club

## AWARDS & HONORS

- Lawyer of the Year, Alameda County Lawyer's Club, 1995.
- Selected as Evaluator by the CEB Trial Advocacy Program.
- State Bar Commendation for Outstanding Contributions to Pro Bono and Voluntary Legal Services.

## PUBLICATIONS

- *Mediating with the Difficult Plaintiff*
- *Medical Malpractice Jury Instructions*
- *Punitive Damages in Employment Cases*
- Invited Panelist and Speaker to Employer Groups and Panelist for Employment Law Seminars.

*Eric Ivary, Esq. – Professional Resume*
*Page 3 of 6*

## MEDIATION APPROACH

Experience has taught me to do what works and not get too caught up in theory or the academic side of mediation. My goal is to get the case in a position where the parties can see a clear path to settlement.

My approach varies because no two cases are alike. For example, an employment case can be very sensitive to the parties involved as can a police misconduct case or a medical malpractice case. Probably the best way to describe my approach to mediation is **to be sure that the parties are dealing with their REAL case, not the one they wish they had**. This often involves asking both sides questions, sometimes uncomfortable ones. (The tough questions are asked in separate sessions).

**When parties request I will become very active in their negotiations**. For a full explanation of my mediation style and philosophy, please download an article I wrote for the SFTLA magazine. It can be found at the ADR website (www.adrservices.com). Although originally written as a practical guide for the plaintiff's bar, it also tells the defense how I approach mediation.

My assumption in mediation is that the parties are there to get their case settled, not just have a discussion or use the process as a discovery vehicle. **I view the process as a "time out" from the litigation** and an opportunity to identify the REAL case.

**I work with little formality**. As long as the attorneys agree, anyone can speak, not just the lawyers. I insist on civility but I am very sensitive to what the parties themselves want the process to be.

**I discourage "opening statements" and oral arguments**. My theory is that the briefs should adequately cover the parties' legal positions and opening statements and arguments only reinforce entrenched positions and don't help settle cases.

In my opinion, mediation should not resemble what we experience in court. Trial is always an option if you don't settle your case. I don't try to tell the defense about the "cost of defense" or tell the plaintiffs that they "might lose their case".

*Eric Ivary, Esq. – Professional Resume*
*Page 4 of 6*

## REPRESENTATIVE CASES

### Employment

- Female clerical employee claimed her employers gave her unwanted massages including full body massages. She was employed for three months, took time off and finally left her employment. She claimed emotional distress, no wage loss claim.
- A 38-year-old veteran elementary school teacher with multiple sclerosis claimed the district failed to accommodate her disability, forcing her to retire.
- 28 construction workers joined as Plaintiffs discrimination case alleging various theories, including Failure to hire, wrongful termination / race discrimination. Case complicated by insolvency of principal employer leaving Project owners and general contractor as Defendants. Confidential Settlement.
- Low 6 figure settlement for an Elementary School teacher who claimed she was harassed and constructively terminated for reporting an incident of clergy abuse in her past.
- Low 6 figure settlement for a Female employee terminated when Employer perceived that she was pregnant. Employer denied that was the reason, suggesting there were performance issues.
- Confidential high 6 figure settlement for a Departing Corporate Officer who claimed he was owed an additional million dollars in compensation while the Board claimed he committed misconduct and was overpaid.
- 5 figure settlement for Female mid-level manager who claimed her employer failed to accommodate her digestive disability and retaliated against her when she complained. Employer claimed it did everything possible to accommodate her limitations.
- Mid 5 figure settlement for Night shift employee of a mass Transit Employer who claimed he was being intentionally harassed and endangered by day shift managers and claimed Constructive termination. Employer claimed the offensive acts were committed by peers and, if they occurred at all, were trivial in nature and that he simply left on his own.

### Personal Injury / Products Liability

- Intersection accident, in which defendant had $100k policy. The case settled for $200k with $100k contribution by the insured.
- 350K settlement for a High School student's mother who tripped and fell on outdoor makeshift steps while attending daughter's tennis match. The fall resulted in disfiguring facial injuries.
- Confidential low 6 figure settlement for a Plaintiff who accidentally cut off 2 fingertips while using a table saw for a home improvement project. Plaintiff claimed the saw was defective because, although it came with a safety guard, the guard was removable and he had removed it. Claimed safer available technology.

*Eric Ivary, Esq. – Professional Resume*
*Page 5 of 6*

- 5 figure settlement for Intersection accident where both vehicles had a stop sign. Case resolved by discussion of physical evidence. No witnesses. Multiple skeletal injuries.
- Low 7 figure settlement for a Seaman who suffered disabling back injuries after slipping and falling in a walk-in freezer aboard ship. Maritime law issues.
- Confidential 7 figure settlement for the family of a Dockworker crushed by container during unloading of vessel. Wrongful death claim. Longshoreman and Harbor Workers' Act.
- High 6 figure settlement for a Personal injury and 2 wage and hour cases brought on behalf of three Tree Service workers. Employer had failed to procure Workers' Comp coverage. Settlement included cash and medical coverage purchased by Employer.
- Severe dog bite to infant necessitating facial surgery. Dog ownership disputed. Both the purported dog owner and the kennel contributed equally to a 1.25 million dollar settlement.
- Plaintiff mechanic injured when a Gantry crane collapsed on her and rendered her a paraplegic. Employer settled workers' compensation claim and waived lien with manufacturer paying low eight-figures.
- $6 million settlement. Wrongful Death for spouse and children of decedent in his 50s making over $100k/year. Decedent was walking home from a party when he was struck and killed by a drunk driver. Plaintiffs claimed the City was on notice from neighborhood complaints about excessive vehicle speeds. Claimed improper road modifications, road design, lack of sidewalk, unsafe lighting and absent traffic controls. City claimed immunities.

**Medical / Hospital / Pharmaceutical/ Malpractice**

- 750K settlement for the Death of a 38 year old unemployed woman due to overmedication during outpatient plastic surgery. No anesthesiologist in attendance. Surgeon fled the jurisdiction. Case settled against physician group.
- Feeding tube placed in airway instead of stomach. Wrongful death of 63 year old woman. Confidential low 6 figure settlement.
- Ventilation tube placed in esophagus instead of airway. Wrongful death. Limited economic losses. Mid 6 figure settlement.
- Medication error by Compounding pharmacy not discovered by Retail Pharmacy. Damages disputed. Main issue was that the patient's claimed adverse reaction was inconsistent with published side effects. Confidential mid 5 figure settlement.

**Civil Rights / Law Enforcement / Public Entity / School District Liability**

- $2.5 million dollar settlement for a high school freshman who was sexually molested by her teacher for over a year. Claimed negligent supervision and failure of mandatory reporters to report incidents of questionable behavior. Damages alleged need for lifetime therapy.

- $50K settlement for an African American attorney whom Police stopped, detained and briefly handcuffed after shots had been "reported in the area" over the radio with no specific location.
- High 6 figure settlement for the family of an African American inmate suffocated by correctional officers when his seizures were mistaken for a threat during the booking processing.
- 800K settlement for an 80 year old woman who was attacked in her kitchen by a Police dog allowed off-leash. Severe tissue and nerve damage to arm.
- High 6 figure settlement for the spouse of a former gang member placed in a holding cell after exhibiting bizarre behavior at arrest. Over a 6 hour period, the Prisoner hanged himself with a makeshift rope fashioned from his shirt. Claimed he should have been put on a suicide watch. Wrongful death. Immunity issues.
- Plaintiffs, husband and wife, claimed that State and local Joint task force drug raid erroneously targeted their residence. Occupants claimed Warrants were defective and overbroad. Claimed damages for False arrest / wrongful detention. Emotional distress claimed. No physical injury. Low 6 figure settlement.
- Mass Transit Police shoot a suspect on a platform after he threatened them by throwing a Bottle. Suspect carrying a knife not visible to officers. Compromise 5 figure settlement.
- Mass Transit Police stop, pursue and arrest a passenger who ran away when ordered to stop playing loud music. Alleged excessive force. Minor injuries. Mid 5 figure settlement.
- Mass Transit Police Beat patron with a baton causing superficial bruising. Plaintiff claimed beating was for failing to follow instructions. Excessive force claimed. Mid 5 figure settlement.

**Business / ERISA / Other cases**

- Settled numerous cases involving retail establishments sued over alleged architectural barriers. Handicap Access compliance, Readily Achievable standard, attorneys' fees.
- Negotiated numerous settlements involving ERISA issues including Claims by Plan Members for denial of medical/disability benefits. Issues typically included the standard of Review, Delegation of Discretion, the Role of Trustees in determining plan benefits and the determination of offsets for Social Security and Workers Compensation. Other ERISA cases involved Actions by Trustees alleging Underfunded Contributions by Employer, Audits.
- Real Estate Broker sued Commercial property owner for Commission after backing out of sale at the 11th hour.
- Commercial Tenant sued for violation of non-compete clause contained in Shopping Center master lease.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Stephanie Wickizer, declare:

I am a citizen of the United States and am employed in the County of Alameda.  I am over the age of 18 years and not a party to the within-entitled action.  My business address is: Gwilliam Ivary Chiosso Cavalli & Brewer, 1999 Harrison Street, Suite 1600, Oakland, CA 94612.

On the date set out below, I caused to be served the following document(s):

CLAIMANTS SYLVIA VEGA-SUFTIN, MICHELLE SEYMOUR, CHERLY MCNEIL, LINDA HOWARD-JAMES, ISABEL GUAJARDO AND COLEEN COLOMBO'S OPPOSITION TO PLAN ADMINISTRATOR'S OBJECTION TO CERTAIN AMENDED CLAIMS (REDUCE AND DISALLOW CLAIMS IN BNC MORTGAGE CASE)

by placing a true and correct copy thereof enclosed in a sealed envelopes and consigning them to an express mail service for guaranteed delivery on the next business day following the date of consignment to the addresses set forth below. A copy of the consignment slip is attached to this proof of service.

| | |
|---|---|
| Honorable Shelley C. Chapman<br>Courtroom 623<br>One Bowling Green<br>New York, New York 10004 | United States Bankruptcy Court<br>Southern District of New York |
| Attn: Jacqueline Marcus, Esq.<br>Weil, Gotshal & Manges, LLP<br>767 Fifth Avenue<br>New York, New York 10153 | Attorneys for Plan Administrator |
| Attn: William K. Harrington, Esq.<br>Susan Golden, Esq.<br>Andrea B. Schwartz, Esq.<br>The Office of the United States Trustee for<br>Region 2<br>U.S. Federal Office Building<br>201 Varick Street, Suite 1006<br>New York, New York 10014 | The Office of the United States Trustee for<br>Region 2 |

016733.0004\4004488.1

CERTIFICATE OF SERVICE

1    I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct.

3       Executed on May 14, 2019, at Oakland, California.

4                                          /s/ Stephanie Wickizer
5                                     Stephanie Wickizer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

016733.0004\4004488.1

CERTIFICATE OF SERVICE                          2

FedEx Ship Manager - Print Your Label(s)

ORIGIN ID:JEMA    (510) 832-5411
STEPHANIE WICKIZER

1999 HARRISON ST.
SUITE 1600
OAKLAND, CA 94612
UNITED STATES US

SHIP DATE: 14MAY19
ACTWGT: 0.10 LB
CAD: 107962900/INET4100

BILL SENDER

TO  JACQUELINE MARCUS
    WEIL, GOTSHAL & MANGES LLP
    767 FIFTH AVE.

NEW YORK CITY NY 10153
(510) 832-5411        REF: 738
INV:
PO:                        DEPT:

565.1/C6EC/23AD



FedEx
Express

WED - 15 MAY 8:00A

FIRST OVERNIGHT

TRK#
0201    7752 1941 2223

N1 JRBA

10153
NY-US    EWR



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

5/14/2019

https://www.fedex.com/shipping/shipAction.handle?method=doContinue

1/1

FedEx Ship Manager - Print Your Label(s)

5/14/2019

ORIGIN ID:JEMA  (510) 832-5411
STEPHANIE WICKIZER

1999 HARRISON ST.
SUITE 1600
OAKLAND, CA 94612
UNITED STATES US

SHIP DATE: 14MAY19
ACTWGT: 0.10 LB
CAD: 107962900/INET4100

BILL SENDER

TO  WILLIAM K. HARRINGTON, SUSAN GOLDEN
UNITED STATES TRUSTEE, REGION 2
201 VARICK STREET
SUITE 1006
NEW YORK NY 10014
(510) 832-5411        REF 738
INV:
PO:                    DEPT:



**FedEx** Express

WED - 15 MAY 8:00A
FIRST OVERNIGHT

TRK#
0201  7752 1944 3759

N1 UTOA

10014
NY-US  EWR

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

https://www.fedex.com/shipping/shipAction.handle?method=doContinue

1/1

FedEx Ship Manager - Print Your Label(s)

5/14/2019



ORIGIN ID:JEMA    (510) 832-5411
STEPHANIE WICKIZER

1999 HARRISON ST.
SUITE 1600
OAKLAND, CA 94612
UNITED STATES US

SHIP DATE: 14MAY19
ACTWGT: 0.10 LB
CAD: 107962900/INET4100

BILL SENDER

TO  HON. SHELLEY C. CHAPMAN
    UNITED STATES BANKRUPTCY COURT
    ONE BOWLING GREEN
    COURTROOM 623
    NEW YORK NY 10004
(510) 832-5411          REF: 739
INV:
PO:                          DEPT.

FedEx.
Express

WED - 15 MAY 8:00A
FIRST OVERNIGHT

TRK#
0201   7752 1937 8213



N1 SXYA                 10004
                    NY-US  EWR

After printing this label:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

https://www.fedex.com/shipping/shipAction.handle?method=doContinue    1/1