**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

In re                                                    Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*,                 Case No. 08-13555 (SCC)

                              Debtors.                    (Jointly Administered)

--------------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER SUSTAINING PLAN ADMINISTRATOR'S OBJECTION TO CLAIM NUMBER 29606 FILED BY SRM GLOBAL MASTER FUND LIMITED PARTNERSHIP

A P P E A R A N C E S :

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
By:    Richard L. Levine, Esq.
       Garrett A. Fail, Esq.

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of its Affiliates*

WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
By:    Gregory M. Starner, Esq.
       David G. Hille, Esq.

*Attorneys for SRM Global Master Fund Limited Partnership*

# TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 3

    A.  SRM's Relationship with LBIE ........................................................................ 3

    B.  Commencement of LBHI's Chapter 11 Proceeding and LBIE's Administration
        Proceeding ........................................................................................................ 4

    C.  SRM Terminates its Contracts with LBIE ...................................................... 4

    D.  The SRM Proof of Claim ................................................................................. 5

    E.  The LBIE Settlement ....................................................................................... 6

    F.  LBHI's Objection to the SRM Proof of Claim ............................................... 7

LEGAL STANDARD .................................................................................................. 9

DISCUSSION ............................................................................................................ 10

    A.  SRM Has Failed to Establish the Existence of a Valid and Binding Guarantee ............. 10

        1.  Applicable Law ................................................................................... 11

        2.  SRM Waived Reliance on the Corporate Resolution in the PBA ............................. 12

        3.  The Terms of the PBA are Enforceable by LBHI as a Third-Party Beneficiary ........ 16

    B.  The Value of the Segregated Assets Should be Determined as of the PBA Termination
        Date or, Alternatively, as of the Petition Date .................................................. 19

        1.  The Segregated Assets Claim ................................................................ 19

        2.  The Segregated Assets Claim Has Been Satisfied in Full ......................................... 21

            a.  Applicable Law ...................................................................... 21

            b.  Pursuant to Section 562 of the Bankruptcy Code, the Segregated Assets Claim
               Should be Valued as of the PBA Termination Date ............................................... 23

            c.  If Section 562 Does Not Apply, Section 502 of the Bankruptcy Code Requires
               That the Segregated Assets Claim be Valued as of the Petition Date ................. 26

            d.  The Segregated Assets Claim Should Not be Valued as of the LBIE Settlement
               Date Pursuant to English Law ................................................................ 29

    C.  Any Claim by SRM for Damages is Precluded by Clause 14.4 of the PBA ................... 31

        1.  Applicable Law ................................................................................... 33

        2.  SRM Has Failed to Plead Facts Sufficient to State a Claim for Gross Negligence or
            Fraud or to State a Claim that LBIE Was in Willful Default or Breach of its Duties  35

i

3.   Even Assuming SRM Could Assert a Claim for Damages Under Clause 14.4 of the
PBA, SRM's Damages Would be Limited to the Value of the Segregated Assets as of
the PBA Termination Date, Which Amount SRM has Already Recovered from LBIE
........................................................................................................................ 37

4.   SRM's Asserted Breach of Trust Claim Does Not Require Valuation of the
Segregated Assets as of the LBIE Settlement Date ..................................................... 40

D.  The Lost Opportunities Claim Fails to State a Claim Upon Which Relief Can be Granted
............................................................................................................................................... 43

1.   Clause 14.4 of the PBA Applies to Claims Under the CMNA ................................... 43

2.   The Lost Opportunities Claim Should be Dismissed .................................................. 47

CONCLUSION ............................................................................................................................ 51

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Objection to Claim Number 29606 [ECF No. 53215] (the

"Objection")[1] filed by Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as

Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman

Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan").  By the Objection, LBHI seeks to

disallow and expunge, pursuant to section 502(b), or alternatively, section 562, of title 11 of the

United States Code (the "Bankruptcy Code") and Rule 3007(d) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), the Contested Claims (as defined below) filed

by SRM Global Master Fund Limited Partnership ("SRM").

**INTRODUCTION**

Before diving into the complex legal issues presented by the Objection, the Court

believes it would be useful to describe in simple terms what is at stake.

Prior to the Lehman bankruptcy filings in September 2008, and pursuant to certain

documentation between the parties, Lehman Brothers International (Europe) ("LBIE") held

certain assets of SRM comprised, among other things, of shares of common stock of Virgin

Media, Inc. and Charter Communications, Inc.  Less than two weeks after the bankruptcy filings,

SRM requested the return of its assets and of certain margin cash that had been provided to LBIE

by SRM.  LBIE did not return the shares or the margin cash in response to SRM's requests.

Thereafter, on November 6, 2008, SRM terminated the Prime Brokerage Agreement between the

parties (the "PBA"), pursuant to which the foregoing assets and margin cash had been given to

---

[1]    Portions of the Objection, the responsive papers, and the declarations have been filed under seal pursuant to this Court's Order Pursuant to Section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 Authorizing (I) the Filing of Documents Under Seal and (II) the Redaction of Confidential Commercial Information [Dkt. No. 53512].  Certain portions of this Decision and Order also have been redacted in accordance with such order.

1

LBIE.  On the date on which LBHI filed for chapter 11 protection, the shares of Virgin Media, Inc. held by LBIE were worth approximately $51.9 million; on the date the PBA was terminated, the shares were worth approximately $34.08 million; and, on the date years later on which LBIE and SRM eventually settled their dispute, the shares were worth approximately $264 million, according to SRM.  Pursuant to the settlement between SRM and LBIE, SRM received cash in the amount of ████████ on account of all of its claims against LBIE, including LBIE's failure to return the shares.  Not satisfied with its recovery from LBIE, SRM now seeks more from LBHI.  Whether it is entitled to more is the issue before the Court.

In rendering this decision, in addition to having reviewed and considered the Objection, the Court has reviewed the following: (i) the Objection of SRM to LBHI's Motion to Estimate Claims for Reserve and Distribution Purposes [ECF No. 50319] (the "Estimation Objection"); (ii) the Declaration of Sir John Chadwick [ECF No. 53216] (the "Chadwick Declaration") in support of the Objection; (iii) the Response of SRM to the Objection [ECF No. 53250] (the "SRM Response"); (iv) the Declaration of Philip Ian Price [ECF No. 53251] in support of the SRM Response; (v) the Declaration of Jonathan Wood [ECF No. 53252] (the "Wood Declaration") in support of the SRM Response; (vi) the Declaration of Lord Collins of Mapesbury [ECF No. 53253] (the "Collins Declaration") in support of the SRM Response; (vii) the Reply in Support of the Plan Administrator's Objection [ECF No. 53515] (the "Reply"); (viii) the Supplemental Declaration of Sir John Chadwick [ECF No. 53516] (the "Supplemental Chadwick Declaration")[2] in support of the Reply; and (ix) the SRM Proof of Claim (as defined below).

---

[2]    Both parties agree that English law governs the Brokerage Agreements (as defined below) and have submitted declarations from experts on English law in support of their respective positions, pursuant to Federal Rule of Civil Procedure 44.1 ("Rule 44.1").  SRM argues that the Chadwick Declaration submitted by LBHI impermissibly exceeds the scope of Rule 44.1, makes no reference to English law authorities, and offers nothing

For the reasons discussed in this Memorandum Decision and Order, the Court sustains the Objection. Accepting as true all assertions set forth in the SRM Proof of Claim (as defined below) and drawing all reasonable inferences in SRM's favor, the Court concludes that SRM has failed to state a claim upon which relief can be granted for any of the Contested Claims (as defined below). The Court's decision follows.

## BACKGROUND

### A. SRM's Relationship with LBIE

SRM is a limited partnership hedge fund that was formed in 2006. On or around May 9, 2008, SRM entered into a prime brokerage arrangement with LBIE, a subsidiary of LBHI. To document their prime brokerage relationship, SRM and LBIE entered into the following agreements (collectively, the "Brokerage Agreements"): (i) the PBA between LBIE, as prime broker, and SRM, as counterparty, dated May 9, 2008;[3] (ii) the Master Institutional Futures Customer Agreement, dated on or about May 9, 2008 (the "MIFCA"); and (iii) the Cross Margining and Netting Agreement, dated May 9, 2008 (the "CMNA").[4] The Brokerage Agreements and the transactions with respect thereto are governed by English law. (*See* Estimation Obj. ¶¶ 3-4; Obj. ¶ 15.)

---

more than Sir Chadwick's interpretation of the contracts at issue. (*See* SRM Response ¶¶ 32-34.) SRM urges this Court to disregard the Chadwick Declaration in its entirety "because it seeks to usurp the Court's exclusive authority to apply law to facts and to make ultimate determinations in the case." (*Id.* ¶ 35.) In its Reply, LBHI cites to several cases in support of its argument that courts in this Circuit (i) may consider a foreign law expert's ultimate legal conclusions under Rule 44.1 and (ii) routinely reject requests to strike or disregard foreign law declarations on the basis that they include conclusory legal statements. (*See* Reply ¶¶ 8-10.)

The Court declines to strike the Chadwick Declaration and the Supplemental Chadwick Declaration in their entirety. The Court will give the Chadwick Declaration and Supplemental Chadwick Declaration appropriate weight. *See Winn v. Schafer*, 499 F. Supp. 2d 390, 396 n.28 (S.D.N.Y. 2007) (stating that a court may consider a foreign law expert's opinion even on ultimate legal conclusions, but noting that a court need not consider or follow that opinion, and may conduct its own research into the foreign law); *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 700 (S.D.N.Y. 2003), *aff'd sub nom.*, *Base Metal Trading Ltd. v. Russian Aluminum*, 98 F. App'x 47 (2d Cir. 2004) ("The Court must decide what weight, if any, to give to these [foreign law] declarations and to all of the evidence the Court uses in determining Russian law, but the Court will make such a determination rather than to merely strike informative testimony.").

[3]     A copy of the PBA is attached as Exhibit D to the Objection.
[4]     A copy of the CMNA is attached as Exhibit E to the Objection.

Additionally, SRM (by and through its general partner) and LBIE entered into an ISDA

Master Agreement, dated May 12, 2008 (the "ISDA Master" and, together with the appurtenant

Schedule, Credit Support Annex, and related documentation, the "ISDA Documentation");

LBIE's obligations under the ISDA Documentation were guaranteed by LBHI pursuant to that

certain Guarantee of Lehman Brothers Holdings Inc. (London Branch) dated May 18, 2008 (the

"ISDA Guarantee").  (*See* Estimation Obj. ¶ 5.)

## B.  Commencement of LBHI's Chapter 11 Proceeding and LBIE's Administration Proceeding

Commencing on September 15, 2008 (the "Petition Date"), LBHI and certain of its

subsidiaries commenced the above-captioned cases under chapter 11 of the Bankruptcy Code.

On December 6, 2011, the Court entered an order confirming the Plan and authorized LBHI to

interpose and prosecute objections to claims filed against LBHI and its affiliated debtors.  The

Plan became effective on March 6, 2012.

On September 15, 2008, LBIE was placed into English administration proceedings

pursuant to the United Kingdom Insolvency Act of 1986 (the "LBIE Administration"); the LBIE

Administration is a separate proceeding from these chapter 11 cases which is not controlled by

LBHI.[5]

## C.  SRM Terminates its Contracts with LBIE

On September 18, 2008, pursuant to the terms of the ISDA Master, SRM delivered a

notice to LBIE designating September 18, 2008 as the Early Termination Date (as defined in the

---

[5]     On May 14, 2018, Russell Downs, one of the joint administrators of LBIE, filed the Verified Petition Under Chapter 15 for Recognition of the LBIE Administration as a Foreign Main Proceeding, together with the Declaration of Russell Downs in support thereof [Case No. 18-11470, ECF No. 4] (the "Downs Declaration").  On June 19, 2018, this Court entered the Order Recognizing Foreign Proceeding and Granting Related Relief [Case No. 18-11470, ECF No. 15], which order, among other things, recognizes, grants comity to, and gives full force and effect to the LBIE foreign proceedings in the United Kingdom and the Scheme (as defined therein).

ISDA Documentation) and, on the following day, SRM delivered to LBIE a calculation statement with respect thereto.  On September 26, 2008, SRM amended its calculation statement to increase the stated total amount due under the ISDA Documentation to be $49,389,923.  (*See* Estimation Obj. ¶¶ 8-9.)

On September 26, 2008, SRM also sent a statement to LBIE notifying LBIE that it had applied certain setoffs and requesting the return of (i) certain assets of SRM which were held by LBIE (the "Segregated Assets"), including 5,094,060 shares of common stock of Virgin Media, Inc. (the "Virgin Media Shares") and 3,000,000 shares of common stock of Charter Communications, Inc.; and (ii) margin cash provided by SRM pursuant to the MIFCA in the amount of $8,893,650 including applicable interest (the "Margin Cash").  (*See id.* ¶ 10.)  SRM had previously requested from LBIE the return of the Segregated Assets by letters dated September 15, 2008, and September 19, 2008.  (*See* Wood Decl. ¶¶ 12-23, Exs. JW1-JW3.) LBIE did not return the Segregated Assets or the Margin Cash contemporaneously with SRM's requests.  (*See* Estimation Obj. ¶ 10.)

On October 30, 2008, LBIE delivered a margin notice to SRM which SRM believed was erroneous and contrary to SRM's previous correspondence with LBHI and to the setoffs that SRM had effectuated on September 26, 2008.  (*See* SRM Response ¶ 23.)  On November 6, 2008 (the "PBA Termination Date"), SRM sent LBIE (i) a notice of default, declaring that an event of default had occurred under the PBA by virtue of the LBIE Administration and (ii) a notice of termination, terminating the PBA.  (*See* Wood Decl. ¶ 23.)

### D.  The SRM Proof of Claim

On September 22, 2009 (the "POC Filing Date"), SRM filed proof of claim number 29606 (the "SRM Proof of Claim") asserting claims against LBHI as guarantor on account of its alleged liability to SRM for obligations of LBIE under the ISDA Documentation and the

Brokerage Agreements. SRM asserts that LBHI is liable as guarantor based on (i) the ISDA

Guarantee and (ii) that certain Unanimous Written Consent of the Executive Committee of the

Board of Directors of Lehman Brothers Holdings Inc., dated June 9, 2005 (the "Corporate

Resolution").[6]

By the SRM Proof of Claim, SRM asserts the following claims: (i) a claim of

$49,389,923 relating to terminated transactions under the ISDA Documentation (the "ISDA

Claim");[7] (ii) an aggregate claim of $106.6 million relating to (a) losses resulting from LBIE's

purported failure to segregate and to return the Segregated Assets pursuant to the terms of the

PBA (the "Segregated Assets Claim")[8] and (b) LBIE's failure to return the Margin Cash

pursuant to the MIFCA (the "Margin Cash Claim"); (iii) a claim of $48.3 million relating to the

so-called "forced sales" of certain equity positions which SRM submits it was forced to liquidate

to meet margin calls with other brokers because it did not have access to the Segregated Assets

(the "Forced Sales Claim"); (iv) a claim of $100 million relating to investment opportunities that

SRM allegedly lost as a result of LBIE's purported failure to segregate assets and deliver

compliant margin notices under the PBA and CMNA (the "Lost Opportunities Claim"); and (v) a

claim for fees in the amount of $750,000 (the "Fees Claim"). (*See* SRM Proof of Claim ¶ 18.)

**E. The LBIE Settlement**

On ▮▮▮▮▮▮, SRM entered into a Deed of Settlement with LBIE; on ▮▮▮▮▮▮

▮▮▮ (the "LBIE Settlement Date"), such Deed of Settlement was supplemented by a

---

[6]     A copy of the Corporate Resolution is attached as Exhibit C to the Objection. The parties agree that the Corporate Resolution is governed by New York law. (*See* July 28, 2016 Hr'g Tr. 42:22-23; 132:9-12.)

[7]     SRM asserts that it has a right of setoff with respect to a portion of its ISDA Claim such that the net amount owed to SRM with respect to the ISDA Documentation is $26,462,531.23. (*See* SRM Proof of Claim ¶¶ 11, 18 n.2.)

[8]     The SRM Proof of Claim values the Segregated Assets at $65.4 million, which was the value of the Segregated Assets on the date the proof of claim was filed, September 22, 2009. (*See* SRM Proof of Claim ¶ 12.)

Supplemental Deed of Settlement.[9]  Pursuant to the Deed of Settlement and the Supplemental

Deed of Settlement (together, the "LBIE Settlement"), LBIE agreed to pay SRM (in U.S.

Dollars): (i) ▮▮▮▮▮▮▮ on account of LBIE's failure to return the Margin Cash; (ii) ▮▮▮

▮▮▮ on account of LBIE's failure to return the Segregated Assets; and (iii) ▮▮▮▮▮ on

account of SRM's remaining claims against LBIE.  Under the LBIE Settlement, SRM

specifically reserved its rights to pursue its unsatisfied claims against LBHI.  (*See* Estimation

Obj. ¶ 14.)

Beginning in November 2012, after an extensive claims reconciliation process, the

administrators of LBIE made four distributions to creditors which, in the aggregate, repaid the

principal amount of all admitted claims against LBIE in full.  (*See* Downs Decl. ¶ 11.)

Moreover, pursuant to the LBIE scheme of arrangement (the "Scheme") which was approved by

the Chancery Division (Companies Court) of the High Court of Justice of England and Wales

(the "High Court") and was recognized by this Court, creditors of LBIE holding admitted claims,

such as SRM, are entitled to receive statutory interest of eight percent (8%) per annum or more.

(*See id.* ¶¶ 37-38; Supplemental Decl. of Richard David Hodgson in Support of Verified Ch. 15

Petition and Related Relief ¶ 7 [Case No. 18-11470, ECF No. 13].)

### F.  LBHI's Objection to the SRM Proof of Claim

On June 10, 2015, LBHI filed a motion [ECF No. 49954] (the "Estimation Motion")

seeking to estimate at zero dollars each of 1,150 claims asserting guarantee liability against

LBHI based on primary obligations of LBIE.  The Estimation Motion stated that such obligations

were anticipated to be satisfied in full as a result of distributions from LBIE alone; accordingly,

holders of LBIE-based guarantee claims would not be entitled to any recovery from LBHI on

---

[9]        A copy of the Deed of Settlement is attached as Exhibit 4 to the SRM Response and a copy of the
Supplemental Deed of Settlement is attached as Exhibit 5 to the SRM Response.  Both deeds were filed under seal.

account of their alleged LBHI guarantee liability.  (*See* Obj. ¶ 13.)  In order for LBHI to avoid

the undue delay of awaiting the conclusion of the LBIE Administration and the full satisfaction

of such claims, the Estimation Motion sought to estimate each LBIE-based guarantee claim filed

against LBHI, including the SRM Proof of Claim, in the amount of zero dollars for reserve and

distribution purposes.

On July 10, 2015, SRM filed the Estimation Objection in opposition to the Estimation

Motion, pursuant to which SRM asserted that, except with respect to the Margin Cash Claim, the

LBIE Settlement did not satisfy any of SRM's Claims in full.  In the Estimation Objection, SRM

valued the Segregated Assets Claim at over $264 million, which was SRM's asserted value of

the Segregated Assets as of the LBIE Settlement Date.[10]  (*See* Estimation Obj. ¶ 17.)  LBHI

subsequently withdrew the Estimation Motion with respect to the SRM Proof of Claim and

sought discovery pursuant to Bankruptcy Rule 2004.  (*See id.* ¶14.)

On May 20, 2016, LBHI filed the Objection, objecting solely to the Segregated Assets

Claim, the Forced Sales Claim, and the Lost Opportunities Claim (collectively, the "Contested

Claims").[11]  On July 5, 2016, SRM filed the SRM Response to the Objection and, on July 26,

2016, LBHI filed the Reply.  On July 28, 2016, the Court held a Sufficiency Hearing[12] to address

the sufficiency of the Contested Claims, after which the Court took the matter under advisement.

While the Objection was *sub judice*, the parties engaged in mediation with the Honorable Joseph

J. Farnan as mediator, but the mediation was unsuccessful.  (*See* SRM letter to the Court, dated

---

[10]    As of the LBIE Settlement Date, Virgin Media, Inc. was no longer trading, as it had been acquired by Liberty Global plc earlier that year.

[11]    The ISDA Claim is not subject to the Objection.  (*See* Obj. ¶ 16, n.2.)

[12]    Pursuant to an Order of the Court, dated April 19, 2010 [ECF No. 8474] (the "Procedures Order") which established claims hearing procedures and alternative dispute resolution procedures for resolving claims, a "Sufficiency Hearing" is defined as a non-evidentiary hearing held to address (i) the legal sufficiency of a contested claim and (ii) whether such contested claim states a claim against the asserted debtor under Bankruptcy Rule 7012. (*See* Procedures Order, Ex. A, ¶ 4(a).)

February 2, 2017 [ECF No. 54691].)  Thereafter, the parties returned to the Court for further

status conferences on October 23, 2017 and on December 17, 2018.

## LEGAL STANDARD

For a proof of claim to be entitled to *prima facie* validity under Bankruptcy Rule 3001(f),

the claim must allege "facts sufficient to support a legal liability to the claimant."  *In re*

*Allegheny Int'l Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).  Pursuant to the Procedures Order, all

hearings "to address the legal sufficiency of [a] particular Contested Claim and whether the

Contested Claim states a claim against the asserted Debtor under Bankruptcy Rule 7012" shall be

"Sufficiency Hearings," unless LBHI serves the holder of a contested claim with a Notice of

ADR Procedure or Notice of Merits Hearing (each as defined in the Procedures Order).  (*See*

Procedures Order, Ex. A, ¶ 4.)  The standard of review for a Sufficiency Hearing is "equivalent

to the standard applied by the Court upon a motion to dismiss for failure to state a claim" under

Bankruptcy Rule 7012(b), which incorporates Federal Rule of Civil Procedure 12(b)(6) ("Rule

12(b)(6)").  (*See id.* ¶ 4(a)(i).)

A bankruptcy court may dismiss an adversary proceeding if a plaintiff's complaint fails

to state a claim upon which relief may be granted.  (*See* Fed. R. Bankr. P. 7012(b), applying Rule

12(b)(6).)  In reviewing a motion to dismiss under Rule 12(b)(6), the court accepts the factual

allegations of the complaint as true and draws all reasonable inferences in the plaintiff's favor.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-

56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).  To survive a

challenge to the adequacy of a complaint under Rule 12(b)(6), the factual allegations in a

complaint must be supported by more than mere conclusory statements.  *Twombly*, 550 U.S. at

555.  The allegations must be sufficient "to raise a right to relief above the speculative level" and

"a formulaic recitation of the elements of a cause of action will not do."  *Id.* (citations omitted).

9

A court may dismiss a complaint unless a plaintiff pleads "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). Therefore, the appropriate inquiry "is not whether a plaintiff is likely to prevail, but whether [he] is entitled to offer evidence to support [his] claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) (citations omitted).

Applying the standard for a motion to dismiss under Rule 12(b)(6) here, in the context of the Sufficiency Hearing, the Court construes the Objection as a motion to dismiss, SRM as the plaintiff, and the SRM Proof of Claim as the complaint. Accordingly, the Court may sustain LBHI's Objection if the Court finds that, after accepting all factual allegations in the SRM Proof of Claim as true and drawing all reasonable inferences in SRM's favor, the allegations in the SRM Proof of Claim fail to state a claim upon which relief may be granted.

**DISCUSSION**

### A. SRM Has Failed to Establish the Existence of a Valid and Binding Guarantee

As a threshold matter, the Court first must determine whether LBHI bears any guarantee liability for the Contested Claims. SRM asserts that LBHI guaranteed all of LBIE's obligations to SRM under the Brokerage Agreements pursuant to the Corporate Resolution and that such guarantee is enforceable by SRM against LBHI.[13] (*See* SRM Proof of Claim ¶ 7; SRM Response ¶ 38.) SRM argues that it has sufficiently put LBHI on notice of its guarantee claim, which, it submits, is all that is required at this stage of the proceedings. In contrast, LBHI argues that, to

---

[13]    The SRM Proof of Claim references the Corporate Resolution as its only support for the alleged existence of an LBHI guarantee here.

However, in the SRM Response, SRM states that LBHI also issued a Guarantee of Lehman Brothers Holdings Inc., dated January 4, 2008 (the "LBHI 2008 Guarantee"), which document is attached as Exhibit 3 to the SRM Response. (*See* SRM Response ¶ 10.) SRM has not expressly stated its reliance on the LBHI 2008 Guarantee, nor has SRM requested leave to amend the SRM Proof of Claim. As such, the Court will not address the validity or enforceability of the LBHI 2008 Guarantee.

the extent the Corporate Resolution is found to be a guarantee, it is, at best, a general guarantee

enforceable only if SRM establishes that it knew of and relied upon the Corporate Resolution

when transacting business with LBIE.  LBHI asserts that SRM has not established such

knowledge and reliance.  Even accepting as true SRM's factual assertions that it knew of and

relied upon the Corporate Resolution prior to signing the PBA, however, LBHI asserts that SRM

is nonetheless precluded from asserting reliance on the Corporate Resolution in order to establish

a guarantee claim against LBHI here because, in the PBA, SRM expressly disclaimed reliance on

prior statements not set forth in the PBA.  (*See* Obj. ¶¶ 32-33.)

### 1.  Applicable Law

A guarantee is a contractual promise by one party, the guarantor, to fulfill the debts or

obligations of another party, the primary obligor, in the event of a default by such primary

obligor.  *See Lakhaney v. Anzelone*, 788 F. Supp. 160, 163 (S.D.N.Y. 1992); 38 AM. JUR. 2D

*Guaranty* § 1 (2019).  Under New York law, guarantees are governed by contract law and, like

any other contract, a guarantee can only be made by mutual assent of the parties.  *See Cavendish*

*Traders, Ltd. v. Nice Skate Shoes, Ltd.*, 117 F. Supp. 2d 394, 400 (S.D.N.Y. 2000); *Davis*

*Sewing-Mach. Co. v. Richards*, 115 U.S. 524, 525 (1885).

"Guaranties are distinguished in the law as being either general or special."  *Evansville*

*Nat. Bank v. Kaufmann*, 93 N.Y. 273, 276 (1883).  A "special" or "specific" guarantee identifies

the benefiting creditor or underlying agreement being guaranteed, whereas a "general" guarantee

is addressed to persons generally and may be enforced by anyone to whom it is presented.  *See*

*id*.; 38 AM. JUR. 2D *Guaranty* § 14.  To enforce a general guarantee, a creditor must demonstrate

that it had definite knowledge of the existence of the guarantee and that it acted in reliance on it

when entering into the transaction with the primary obligor.  *See Fed. Deposit Ins. Corp. v.*

*Schuhmacher*, 660 F. Supp. 6, 8 (E.D.N.Y. 1984) ("It is, of course, elementary that a creditor's

right to enforce a contract of guaranty must be based upon knowledge of the existence of the

guaranty and that the credit must be extended in reliance thereof.") (citation omitted); 38 AM.

JUR. 2D *Guaranty* § 14.

### 2.  SRM Waived Reliance on the Corporate Resolution in the PBA

The Corporate Resolution states, in pertinent part, that

> The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions . . .
>
> RESOLVED, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto . . . .

(Corporate Resolution at 1-2.)  LBIE is one of the named subsidiaries listed on Schedule A of the

Corporate Resolution.[14]

The parties do not dispute that the Corporate Resolution, which does not identify any

particular benefiting party or transaction, is at best a general guarantee.  Instead, the parties

disagree on SRM's ability to enforce the Corporate Resolution in connection with LBIE's

obligations to SRM under the Brokerage Agreements.

LBHI asserts that (i) SRM must establish as a *prima facie* element of its claim that SRM

knew of, and relied upon, the Corporate Resolution in transacting business with LBIE and (ii)

SRM has failed to allege such knowledge and reliance here.  (*See* Obj. ¶¶ 32-33.)  SRM

maintains that it sufficiently put LBHI on notice of its guarantee claim in the SRM Proof of

Claim and in the related Guarantee Questionnaire that SRM submitted and that SRM has alleged

facts from which it reasonably can be inferred that SRM knew of and relied upon the Corporate

Resolution at the time it entered into the Brokerage Agreements.  (*See* SRM Response ¶¶ 39-44.)

---

[14]     A copy of the Corporate Resolution is attached as Exhibit C to the Objection.

Additionally, SRM asserts that, ultimately, the question of reliance is a factual issue and the evidence will show that SRM in fact knew of and relied upon the Corporate Resolution prior to entering into the Brokerage Agreements with LBIE. (*See id.* ¶ 44). SRM also disputes that the terms of the PBA preclude SRM's enforcement of the Corporate Resolution. LBHI concedes that the question of whether SRM knew of, and relied upon, the Corporate Resolution may be an issue of fact; however, LBHI submits that, even if this Court accepts all of SRM's factual allegations as true, SRM is nonetheless precluded from relying upon the Corporate Resolution as a matter of law because SRM waived such reliance pursuant to Clauses 2.2 and 16.3 of the PBA. (*See* Reply ¶¶ 11-12.)

### Clause 2.2 of the PBA

Clause 2.2 of the PBA provides, in pertinent part, that

> Except to the extent that any other document or notice is expressly referred to in this Agreement (including, without limitation, the Customer Agreements) the terms of this Agreement constitute the entire agreement between the parties as to its subject matter and, to the extent of any such other document or notice, the terms of this Agreement will prevail.

(PBA § 2.2.)

SRM submits that the merger language in Clause 2.2 – which specifically refers to "the entire agreement between the parties as to its subject matter" – does not encompass the Corporate Resolution because LBHI is not a party to the PBA and LBHI's obligation as a guarantor of LBIE is not the subject matter of the PBA. (*See* SRM Response ¶ 48.) SRM further states that, under English law, any intention to limit or exclude liability must be clearly stated on the face of the instrument, and any ambiguity must be resolved against the party seeking to avoid liability. Here, SRM asserts that, because Clause 2.2 fails to clearly provide that SRM specifically agreed to waive its right to enforce the Corporate Resolution against LBHI, Clause

13

2.2 cannot operate to absolve LBHI of its obligations as guarantor as a matter of English law.

(*Id.* ¶¶ 46-47.)

### **Clause 16.3 of the PBA**

Clause 16.3 of the PBA provides, in pertinent part, that

> Each party acknowledges and agrees that
>
> > (a) they have not relied on any representation, warranty or other statement of another party in entering into this Agreement other than those expressly set out in this Clause 16; and
> >
> > (b) in the case of [SRM], [SRM] further represents and warrants to [LBIE] that –
> >
> > > (i) it has not relied on any oral or written representation made by Prime Broker [LBIE] or any person on behalf of Prime Broker [LBIE], and acknowledges that this Agreement sets out to the fullest extent the duties of [LBIE] . . . .

(PBA § 16.3.)

SRM contends that it did not waive reliance on the Corporate Resolution under Clause 16.3 of the PBA because the words "of another party" in Clause 16.3(a) should be construed to refer only to the parties to the PBA (SRM and LBIE) and not to LBHI. SRM further argues that the words "any oral or written representation made by Prime Broker [LBIE] or any person on behalf of Prime Broker [LBIE]" in Clause 16.3(b)(i) do not encompass the Corporate Resolution, which (i) LBIE did not issue and (ii) LBHI issued on behalf of itself, not on behalf of LBIE. (*See* SRM Response ¶¶ 49-50.)

LBHI argues that the language of Clauses 2.2 and 16.3 is clear and unambiguous and that either (i) Clause 2.2 (SRM's agreement that only documents expressly referenced in the PBA will prevail) or (ii) Clause 16.3(a) (SRM's representation that it had not relied upon any other representation, warranty, or other statement in entering into the PBA) negates any pre-execution

14

discussions with respect to a purported guarantee by LBHI which allegedly occurred between the parties prior to their entry into the PBA.  (*See* Obj. ¶ 3.)

The PBA is governed by, and must be construed in accordance with, English law.  (*See* PBA § 28.1.)  As under New York law, contractual interpretation under English law seeks to give effect to the intention of the parties, and a court's determination of such intention should be based on commercial common sense.  (*See* Collins Decl. ¶¶ 24-25 (citing *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619, at paras [15]-[22]).)  English courts have warned, however, that reliance on common sense should not be invoked to undervalue the contractual language which is to be construed because parties have control over the language that they use and have presumably chosen such words deliberately.  (Collins Decl. ¶ 24(2)-(4).)

While the Court finds LBHI's argument regarding the meaning and effect of Clause 2.2 unavailing, the Court nonetheless agrees with its interpretation of Clause 16.3.  In Clause 16.3(a) of the PBA, SRM and LBIE represent that each of them has not "relied on any representation, warranty or other statement of another party in entering into [the PBA] other than those expressly set out in this Clause 16."  (PBA § 16.3(a).)  In construing a contractual provision, English courts look to the natural, ordinary meaning of the language, even if the natural meaning appears imprudent for one of the parties.  (*See* Collins Decl. ¶¶ 25(7), 27-28.)

The Court concludes that the natural, ordinary meaning of the words "another party" means any party other than SRM and LBIE, which broadly encompasses LBHI.  This interpretation of Clause 16.3(a) is supported by other provisions of the PBA which reflect that, when SRM and LBIE intended to refer only to each other, they refer to each other as the "other" party and eschew usage of the phrase "another party," as used in Clause 16.3(a).  (*See*, *e.g.*, PBA § 16.1 ("Each party represents and warrants to the other that . . . ."); § 16.5 ("A party shall notify

15

the other immediately in writing if . . . .").)  LBHI also correctly observes that, if the drafters of

the PBA had intended to limit Clause 16.3(a) to only SRM and LBIE, they would have used

defined terms, as they did in the immediately succeeding Clause 16.3(b), which provides that the

"Counterparty" disclaims reliance on statements made by the "Prime Broker" and "any person

on behalf of the Prime Broker."  As between two sophisticated parties such as LBIE and SRM,

the Court must presume that use of the words "another party" (rather than "the other party" or

"the parties") was deliberate, and that LBIE relied upon SRM's representation in Clause 16.3(a)

when LBIE entered into the PBA.  (*See* Collins Decl. ¶ 25(4) ("[P]arties have control over the

language that they use in a contract [and] . . . the parties must have been specifically focusing on

the issue covered by the provision when agreeing [to] the wording of that provision.") (citation

omitted).)

Further, the Court finds that the ordinary meaning of the words "any . . . other statement"

is also broad enough to encompass any statements made by LBHI in the Corporate Resolution.

The Court declines to accept SRM's argument that, as a matter of English law, SRM did not

waive its right to rely on LBHI's guarantee simply because the Corporate Resolution is not

specifically referenced in Clause 16.3(a).  (*See* SRM Response ¶¶ 46, 49.)  If correct, SRM's

theory would render Clause 16.3(a) as drafted entirely meaningless, as Clause 16.3(a) fails to

specify any documents at all.

Based on the clear and unambiguous language of Clause 16.3(a) of the PBA, the Court

finds that SRM waived reliance on the Corporate Resolution and is therefore precluded as a

matter of law from relying on the LBHI guarantee set forth in the Corporate Resolution.

### 3.   The Terms of the PBA are Enforceable by LBHI as a Third-Party Beneficiary

Even assuming that, pursuant to Clause 16.3(a) of the PBA, SRM did waive its right to

rely on the Corporate Resolution to hold LBHI liable as guarantor, SRM contends that LBHI

cannot enforce the terms of the PBA because LBHI is neither a party to the PBA nor a third party

beneficiary thereunder.  (*See* SRM Response ¶ 51.)  LBHI counters that (i) applicable English

law, the Contract (Rights of Third Parties) Act of 1999, and (ii) Clause 31.1 of the PBA permit

affiliates of LBIE, such as LBHI, to enforce the terms of the PBA.  (*See* Reply ¶¶ 17-20.)  The

Court agrees.

**<u>Clause 31.1 of the PBA</u>**

Clause 31.1 of the PBA provides, in pertinent part, that

[o]ther than Affiliates of the Primer Broker [LBIE] and the directors, officers, employees and agents of the Prime Broker or its Affiliates, a person who is not a party to this Agreement shall have no right under the Contract (Rights of Third Parties) Act 1999 to enforce any of its terms.

(PBA § 31.1.)  Schedule 3 of the PBA defines an "Affiliate" to include a "holding company" of

the Prime Broker as such term is defined in section 736 of the Companies Act 1985 (or any

statutory modification or re-enactment thereof).  (PBA Schedule 3.)  Section 736 of the

Companies Act 1985 has most recently been re-enacted as section 1159 of the Companies Act

2006 (Companies Act 2006, schedule 16).  Both the 1985 and 2006 enactments of the

Companies Act include indirect holding companies within the meaning of "holding company."

Specifically, section 1159 of the Companies Act 2006 provides that:

(1) A company is a "subsidiary" of another company, its "holding company", if that other company—
    (a) holds a majority of the voting rights in it, or
    (b) is a member of it and has the right to appoint or remove a majority of its board of directors, or
    (c) is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it, or if it is a subsidiary of a company that is itself a subsidiary of that other company.

Applying this definition, LBIE is a "subsidiary" of LBHI, and, as LBIE's ultimate parent, LBHI

is LBIE's "holding company" within the meaning of the Companies Act.  LBHI is thus an

"Affiliate" of LBIE as such term is used in Clause 31.1 of the PBA.

As a matter of English law, the Contract (Rights of Third Parties) Act 1999 permits a

third party to rely on a contractual right in two situations.  Section 1(1) of the Act provides that

> (1) Subject to the provisions of this Act a person who is not a party to a contract (a
>     "third party") may in his own right enforce a term of the contract if –
>     (a)  the contract expressly provides that he may, or
>     (b)  subject to subsection (2),[15] the term purports to confer a benefit on him.

(Reply ¶ 17.)

Inasmuch as the PBA does not specify the parties which may affirmatively enforce its

terms, Section 1(1)(a) of the Act is inapplicable here.  With respect to Section 1(1)(b) of the Act,

the Court must examine whether the terms of the PBA purport to confer a benefit on LBHI such

that LBHI can enforce such agreement.

"[T]he ultimate aim of interpreting a provision in a contract, especially a commercial

contract, is to determine what the parties meant by the language used, which involves

ascertaining what a reasonable person would have understood the parties to have meant."

(Collins Decl. ¶ 34 (citing *Rainy Sky SA v. Kookmin Bank* [2001] UKSC 50, [2001] 1 WLR

2900, at paras [14] and [21]).)  By expressly carving out "Affiliates" of LBIE from Clause 31.1

of the PBA, a reasonable person would conclude that SRM and LBIE conferred a right on such

Affiliates to enforce the terms of the PBA.  The Court has determined that LBHI is an Affiliate

of LBIE under the PBA.  Thus, LBHI is a third-party beneficiary of the PBA and has the right to

enforce its terms.

In sum, the Court finds that (i) pursuant to the terms of the PBA, SRM waived its right to

rely on the Corporate Resolution and the guarantee by LBHI contained therein and (ii) LBHI, as

---

[15]    Subsection (2) provides that "Subsection (1)(b) does not apply if on a proper construction of the contract it appears that the parties did not intend the term to be enforceable by the third party."  Subsection 2 is not relevant here.  (*See* Reply ¶ 18.)

a third party beneficiary of the PBA, has a right to enforce such waiver.[16]  Because the Contested

Claims against LBHI are based solely upon the guarantee set forth in the Corporate Resolution,

the Contested Claims must be disallowed in their entirety.  While, in light of this determination,

the Objection can be sustained on this basis alone and the Court need not address the parties'

additional arguments, the Court nevertheless will consider the Objection based upon the

assumption, *arguendo*, that SRM is able to enforce a guarantee claim against LBHI based on the

Corporate Resolution.  This discussion follows.

### B. The Value of the Segregated Assets Should be Determined as of the PBA Termination Date or, Alternatively, as of the Petition Date

Even assuming, *arguendo*, SRM has the right to enforce LBHI's guarantee of LBIE's

obligations and that SRM could assert a claim for damages on account of the Segregated Assets

that LBIE failed to return to SRM, the Court finds that SRM's proposed valuation date for the

Segregated Assets – the LBIE Settlement Date – has no basis in law.  The value of the

Segregated Assets for purposes of the Segregated Assets Claim should be determined as of the

PBA Termination Date pursuant to section 562 of the Bankruptcy Code or, alternatively, as of

the Petition Date pursuant to section 502 of the Code.

#### 1. The Segregated Assets Claim

The Segregated Assets Claim is based on SRM's assertion that LBIE breached the PBA

and its duties as trustee of SRM's assets when LBIE failed to (i) segregate the Segregated Assets

which SRM posted as collateral to LBIE as its prime broker and (ii) return the Segregated Assets

that LBIE had not rehypothecated.  (*See* SRM Proof of Claim ¶¶ 13-15; SRM Response ¶ 28.)  In

---

[16]    The Court recognizes that the Lost Opportunities Claim is based upon LBIE's purported breaches of not only the PBA but also the CMNA.  For reasons discussed *infra*, the Court concludes that the PBA and the CMNA should be read together as one agreement, and therefore, the waiver in Clause 16.3(a) of the PBA is applicable to the Lost Opportunities Claim and to any other claims arising out of the CMNA.

the SRM Proof of Claim, SRM estimates that the value of the Segregated Assets on the POC

Filing Date was approximately $65.4 million, and SRM asserts that the total value of the

Segregated Assets Claim was $97.7 million.[17]  (*See* SRM Proof of Claim ¶¶ 12, 15.)

Under the LBIE Settlement, LBIE agreed to pay SRM ████████ in respect of the

Segregated Assets.  (*See* Estimation Obj. ¶ 15.)  Notwithstanding the $97.7 million value

asserted in the SRM Proof of Claim on account of the Segregated Assets Claim, by the

Estimation Objection, SRM subsequently asserted a value of $264,268,340.60 for the Segregated

Assets Claim, although SRM has never amended its proof of claim.  SRM has based such

assertion on its alleged entitlement to recover the purported value of the Virgin Media Shares[18]

on the LBIE Settlement Date, which value SRM claims was $264,268,340.60.[19]  SRM therefore

argues that the LBIE Settlement did not satisfy the Segregated Assets Claim in full and,

consequently, asserts its entitlement to a claim against LBHI as guarantor.  (*See* Estimation Obj.

¶ 17.)

LBHI argues that the value of the Segregated Assets Claim is the value of the Segregated

Assets,[20] measured not as of the LBIE Settlement Date but rather as of (i) the PBA Termination

---

[17]    Although SRM states that the value of its collateral was approximately $65.4 million, it submits that the
larger portfolio of assets held by LBIE on behalf of SRM under the PBA was worth $97.7 million because "if LBIE
had properly segregated those long positions, SRM would have sold its European long positions and then applied the
proceeds to discharge SRM's short positions under the PBA and the overdraft, leaving the North American long
positions wholly unencumbered and therefore free to be delivered up immediately to SRM."  (*See* SRM Proof of
Claim ¶¶ 12, 15.)

[18]    SRM does not provide a valuation for the Charter Communications Inc. common stock even though it
acknowledges that such stock was never returned.  (*See* Estimation Obj. ¶ 17, n.5 ("SRM also held 3,000,000 shares
of Charter Communications common stock which LBIE did not return.").)  It does not appear that SRM is asserting
a claim with respect to the Charter Communications common stock.

[19]    SRM's calculation of the Segregated Assets Claim is based upon (i) Liberty Group plc's acquisition of
Virgin Media, Inc. on or about June 7, 2013, pursuant to which the Virgin Media Shares were exchanged for cash
and shares of Liberty Group plc and (ii) the assumption that, had LBIE returned Virgin Media Shares to SRM, SRM
would have held those shares for approximately five years until they were converted, and SRM would have sold the
converted Virgin Media Shares for a profit.  (*See* Estimation Obj. ¶17.)

[20]    LBHI's arguments that SRM is not entitled to additional damages (*e.g.*, consequential damages) on account
of the Segregated Assets Claim beyond the value of the Segregated Assets are discussed below.

Date pursuant to section 562(a) of the Bankruptcy Code, or, alternatively, (ii) the Petition Date

pursuant to section 502(b) of the Bankruptcy Code.  (*See* Obj. ¶¶ 43-51.)  Since SRM received

███████████  from LBIE on account of the Segregated Assets, LBHI contends that, whether the

Segregated Assets are valued as of the PBA Termination Date or as of the Petition Date, SRM

has been paid in full and the Segregated Assets Claim should be dismissed as a matter of law.

(*See* Obj. ¶ 50.)  This is so, argues LBHI, because each such valuation is substantially lower than

such amount.[21]

SRM responds that it is premature to consider the question of how damages should be

calculated at a Sufficiency Hearing and that SRM should be entitled to submit evidence in

support of its damages theories.  (*See* SRM Response ¶ 73.)  Even so, SRM argues that LBHI's

proposed approach to calculating damages is incorrect because (i) section 562 of the Bankruptcy

Code does not apply to its claims, as the Corporate Resolution is not a "securities contract" and

(ii) the Segregated Assets Claim was contingent and unliquidated as of the Petition Date and,

therefore, it could not be valued as of the Petition Date pursuant to section 502 of the Bankruptcy

Code.  (*See* SRM Response ¶¶ 75-78.)  Instead, SRM submits that the Segregated Assets Claim

is properly valued as of the LBIE Settlement Date and should not be limited by section 562 or

502 of the Bankruptcy Code.

### 2. The Segregated Assets Claim Has Been Satisfied in Full

#### a. Applicable Law

Under the Bankruptcy Code, claims are generally valued "as of the date of the filing of

the petition."  11 U.S.C. § 502(b).  In 2005, Congress enacted certain so-called "safe harbors" as

part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 in an effort to

---

[21]    SRM does not dispute LBHI's assertion that, on the PBA Termination Date, the value of the Segregated Assets was $34,079,261, and on the Petition Date, the value of the Segregated Assets was $51,908,471.

limit the systemic impact of the collapse of a major financial institution. *See Maverick Long Enhanced Fund, Ltd. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, 2018 WL 4735712, at *2, 6 (S.D.N.Y. Sept. 30, 2018) (hereinafter, "*Maverick*"). Such safe harbors were designed to provide certainty to the financial counterparties of insolvent firms by enabling them to exercise any termination rights such counterparties may have in a contract. *Id.* at *6. The safe harbor under section 562 of the Bankruptcy Code, which mandates that damages related to certain financial contracts be assessed as they stand at the moment of termination, serves as a statutory exception to section 502(b). *See id.* at *3, 6.

Specifically, section 562(a) of the Bankruptcy Code provides, in relevant part, that

[i]f the trustee rejects a swap agreement, [or] securities contract (as defined in section 741) . . . or if a . . . financial institution, securities clearing agency, repo participant, financial participant, master netting agreement participant, or swap participant liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of—

(1) the date of such rejection; or

(2) the date or dates of such liquidation, termination, or acceleration.

11 U.S.C. § 562(a).

Subparagraphs (A)(i) and (A)(x) of section 741 of the Bankruptcy Code define a "securities contract" to include, among other things, "a contract for the purchase, sale, or loan of a security" and "a master agreement that provides for an agreement or transaction referred to in clause (i)." 11 U.S.C. § 741(7)(A)(i), (x). Section 741(7)(A)(xi) also defines a "securities contract" to include

any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph [(A)], including any guarantee or reimbursement obligation by or to a stockbroker, securities clearing agency, financial institution, or financial participant in connection with any agreement or transaction referred to in this subparagraph [(A)] . . ."

11 U.S.C. § 741(7)(A)(xi).

      **b. Pursuant to Section 562 of the Bankruptcy Code, the Segregated Assets Claim Should be Valued as of the PBA Termination Date**

The PBA, an agreement that "applies to all acquisitions and disposals of securities, and the provision of any advances of cash and securities in respect thereof" between SRM and LBIE, falls squarely within the definition of a securities contract set forth in section 741(7)(A)(xi) of the Bankruptcy Code. (PBA ¶ 2.1.) The parties do not dispute this; instead, they disagree as to whether the Corporate Resolution is a securities contract under the Code.

LBHI argues that because SRM claims that the Corporate Resolution is a guarantee by LBHI of LBIE's obligations under the PBA (itself, a securities contract), the Corporate Resolution is thus a guarantee which is "related to" a securities contract, as defined in subparagraph (A)(xi) of section 741(7) of the Bankruptcy Code. Notably, LBHI points out that section 741(7)(A)(xi) defines a "securities contract" to include

> any security agreement or arrangement or other credit enhancement ***related to*** any agreement or transaction referred to in this subparagraph [(A)], ***including any guarantee*** or reimbursement obligation by or to a stockbroker, securities clearing agency, financial institution, or financial participant ***in connection with any agreement or transaction referred to in this subparagraph*** [(A)] . . ."

11 U.S.C. § 741(7)(A)(xi) (emphasis added). LBHI submits that, because the PBA is a securities contract, then the Corporate Resolution – a guarantee "related to" or "in connection with" the PBA – is also a securities contract. Section 562 requires claims arising from the termination of a securities contract to be measured as of the contract termination date; applying section 562 here, LBHI argues that the appropriate valuation date for the Segregated Assets is the PBA Termination Date.

SRM responds that the Corporate Resolution is not a "securities contract" because it "does not reference or specifically concern any securities transaction." (SRM Response ¶ 75.) In support of its contention, SRM cites to a single case, *In re Qimonda Richmond, LLC*, 467 B.R.

318, 323 (Bankr. D. Del. 2012) in which the court determined that certain bonds and their indenture were not "securities contracts" under the Bankruptcy Code.

SRM cannot have it both ways – it cannot seek to rely on the Corporate Resolution as a guarantee of LBIE's liability under the PBA and, at the same time, deny that the Corporate Resolution is related to the PBA. The Court finds that the Corporate Resolution is a securities contract under section 741 of the Bankruptcy Code because, as alleged by SRM, it is related to a securities contract, the PBA. This Court has previously determined that no specific language is required to connect multiple agreements in order for them to be deemed "related to" securities contracts under section 741(7)(A)(xi) of the Code; all that is required is that agreements be related to one another. *See Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 439 (Bankr. S.D.N.Y. 2012). As such, the absence of language connecting the PBA and the Corporate Resolution does not preclude the Court from determining that the Corporate Resolution constitutes a securities contract within the meaning of section 741. The sole case cited by SRM in support of its argument that guarantees are not securities contracts, *Qimonda Richmond*, does not discuss this narrow issue, and SRM's reliance on such case is misplaced. Because the Corporate Resolution is a securities contract, section 562(a) of the Bankruptcy Code applies.

Section 562(a) requires that SRM's damage claim must be measured as of the date of its termination of the PBA. Clause 13.1 of the PBA specifically provides that, upon the occurrence of an event of default thereunder, the non-defaulting party may terminate the agreement. (*See* PBA § 13.1.) Pursuant thereto, SRM unilaterally terminated the PBA on the PBA Termination Date. Accordingly, the Court concludes that, for the purposes of fixing the amount of LBHI's

alleged guarantee liability, the Segregated Assets should be valued as of the PBA Termination

Date, November 6, 2008, in accordance with section 562(a).

The Court's conclusion in this regard is also consistent with the stated intent of Congress

in enacting the safe harbor provisions of the Bankruptcy Code, which include section 562. The

safe harbor provisions were enacted to protect financial markets from the volatility and

catastrophic ripple effects which may be caused by delaying the final and prompt resolution of

securities and derivatives contracts. (*See*, *e.g.*, H.R. Rep. No. 101-484, at 2 (1990), U.S. Code

Cong. & Admin. News 1990 pp. 223-24.) The District Court has observed that "in an effort to

limit the systemic impact of the collapse of a major institution," the Bankruptcy Code provides

"immediate certainty, of which Section 562 is an integral component," by permitting

counterparties to elect to exercise their termination rights with respect to contracts with insolvent

firms. However, the Code also mandates that, upon termination, damages be assessed as they

stand at that precise moment. (*See Maverick*, 2018 WL 4735712, at *6.) This requirement

prevents a counterparty from attempting to collect from a debtor any post-termination increase in

the value of assets covered by the applicable securities contract. Were SRM's argument to

prevail – that the Segregated Assets should be valued as of the LBIE Settlement Date, ███████

███████, and not as of the date that SRM elected to terminate the PBA, November 6, 2008 – this

Court would in essence be permitting SRM to collect from LBHI the post-termination increase in

the value of the Segregated Assets.[22] Such a result cannot be countenanced.

---

[22]    This assumes that LBHI would be liable as a guarantor, notwithstanding this Court's finding to the
contrary, *supra*.

c. **If Section 562 Does Not Apply, Section 502 of the Bankruptcy Code Requires That the Segregated Assets Claim be Valued as of the Petition Date**

Section 502(b) of the Bankruptcy Code provides that a "court shall determine the amount of [a] claim in lawful currency of the United States as of the date of the filing of the petition," subject to limited exceptions, including the exception set forth in section 562.  11 U.S.C. § 502(b).  A contingent claim is properly calculated when it ceases to be contingent and becomes fixed and liquidated.  *See*, *e.g.*, *Stebbins v. Artificial Horizon, Ltd.*, 2016 U.S. Dist. LEXIS 34680, at *13-19 (E.D.N.Y. Mar. 17, 2016).  Although the Bankruptcy Code does not define "contingent," it is generally agreed that "a contingent debt is 'one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger . . . liability.'"  *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 303 (2d Cir. 1997) (citing *Brockenbrough v. Commissioner*, 61 B.R. 685, 686 (W.D. Va. 1986)); *see also United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1004 (2d Cir. 1991).  A claim is not contingent merely because the debtor disputes the claim or because such claim has not been fully and finally adjudicated; instead, the concept of contingency relates to the time or circumstance under which the liability arises.  *See In re Mazzeo*, 131 F.3d at 303.

A guarantee is a classic example of a contingent obligation.  *See In re S. Cinemas, Inc.*, 256 B.R. 520, 533 (Bankr. M.D. Fla. 2000) (citing *In re Barnett*, 42 B.R. 254, 256 (Bankr. S.D.N.Y. 1984)).  However, liability on a guarantee ceases to be contingent and is fixed after the primary obligor has defaulted on its obligation; such default is the predicate to enforcement of the guarantee.  *In re LightSquared Inc.*, 2014 WL 5488413, at *3 (Bankr. S.D.N.Y. Oct. 30, 2014) (citations omitted).

LBHI submits that, if the Court were to hold that section 562 of the Bankruptcy Code is not applicable here, then the Court should value the Segregated Assets as of the Petition Date, in

accordance with section 502 of the Bankruptcy Code. SRM disagrees, asserting that, as of the

Petition Date, the Segregated Assets Claim was a contingent, unliquidated claim which "[was]

premised on enforcing the guarantee against LBHI if the primary obligor, LBIE, failed to satisfy

fully SRM's claims;" and such claim only ceased to be contingent on the LBIE Settlement Date,

when SRM settled with LBIE for less than the full value of its claim. (SRM Response ¶ 78.)

SRM asserts that "all predicates to enforcement" of its claim did not occur until SRM settled

with LBIE because only then did SRM know for certain that LBIE would not return the Virgin

Media Shares to SRM. Specifically, at the Sufficiency Hearing, counsel for SRM argued that the

Segregated Assets Claim is a claim to recoup the Virgin Media Shares, and that LBIE did not

breach the PBA until the LBIE Settlement Date, the date on which LBIE affirmatively failed to

return such shares. (*See generally* July 28, 2016 Hr'g Tr. 94:13-96:15.)

LBHI contends that SRM's position is inconsistent with (i) SRM's prior statements in the

SRM Proof of Claim and in the Estimation Objection and (ii) long-standing bankruptcy

precedent concerning guarantee claims. (*See* Reply ¶¶ 29-32.) First, LBHI points specifically to

SRM's allegations that LBIE breached the PBA before or within weeks of the Petition Date by

(a) failing to segregate the Segregated Assets before and shortly after the Petition Date; (b)

refusing to return the Segregated Assets in response to SRM's request on September 26, 2008;

and (c) failing to recognize the setoff of ISDA and prime brokerage obligations on September 26,

2008. (*See* Reply ¶ 31 (citing SRM Proof of Claim ¶ 14; Estimation Obj ¶¶ 10, 27).) All of the

alleged breaches described in the SRM Proof of Claim, which were the predicate on which

SRM's guarantee claim against LBHI became fixed, occurred approximately five years before

the LBIE Settlement Date of ████████████. Tellingly, argues LBHI, the SRM Proof of

Claim does not describe SRM's claims as being contingent.

LBHI also asserts that SRM's contention that the Segregated Assets Claim was contingent until SRM settled with LBIE runs contrary to precedent concerning guarantee claims. (*See* Reply ¶ 29.)  Courts in this Circuit have long held that a claimant enforcing a guarantee claim is entitled to assert the full value of its underlying claim against the guarantor, and such claimant need not wait until it receives payment from the principal obligor.  *See e.g.*, *Bankers' Trust Co. v. Irving Trust Co. (In re United Cigar Stores Co. of Am.)*, 73 F.2d 296, 297 (2d Cir. 1934) ("Although the claim against the bankrupt is secondary, it should be allowed in full, and dividends should be paid, regardless of the security furnished by the principal obligor, until full satisfaction is had by the appellant [creditor].").  As such, LBHI argues that SRM did not need to wait until after the LBIE Settlement Date to pursue a guarantee claim against LBHI.

The Court finds that SRM's claims against LBHI as guarantor became fixed at the time LBIE, the primary obligor, breached its obligations under the PBA.  By SRM's own admission, these alleged breaches occurred around the time of the Petition Date, approximately five years prior to the LBIE Settlement Date.[23]  At that time, when LBIE defaulted on its obligations, SRM acquired the right to enforce the guarantee.  *See In re LightSquared Inc.*, 2014 WL 5488413, at *3-4 (Bankr. S.D.N.Y. Oct. 30, 2014) (holding that liability on a guarantee ceases to be contingent and is fixed after the primary obligor has defaulted on its obligation; such default is the predicate to enforcement of the guarantee).  Accordingly, if section 562 does not apply here, the Segregated Assets must be valued on or about the Petition Date pursuant to section 502, assuming, contrary to the Court's prior determination, that LBHI is liable as guarantor.

---

[23]     *See* SRM Proof of Claim ¶ 14 ("Shortly following the appointment of administrators to LBIE on 15 September 2008, LBIE disclosed to SRM that LBIE had not been complying with [its] commitment [under the PBA]"); ¶ 15 ("SRM suffered damages in respect of the losses which it has suffered as a consequence of LBIE having failed to segregate its long positions, contrary to its commitment described in paragraph 13 above and in breach of contract and/or trust . . . ."); ¶ 17 (asserting damages for "continued and repeated breaches" related to delivery of "grossly erroneous" margin notices on or around October 30, 2008).)

SRM has not disputed that (i) it received ███████ from LBIE on account of the

Segregated Assets[24] as part of the LBIE Settlement and (ii) the value of the Segregated Assets as

of the Petition Date and as of the PBA Termination Date was substantially lower than such

amount.[25]  Under either scenario – applying a valuation date of (a) the Petition Date pursuant to

section 502 or (b) the PBA Termination Date pursuant to section 562, SRM indisputably has

received the full value of the Segregated Assets by virtue of the LBIE Settlement.  While SRM

asserts that the ultimate question of how much the LBIE Settlement may apply to offset any

judgment against LBHI is "a question for another day" (SRM Response n.39), the Court

observes that, even if LBHI were liable as guarantor, SRM has indisputably been paid in full by

the primary obligor, such that SRM would not be entitled to further recovery from LBHI on

account of the Segregated Assets.

### d.  The Segregated Assets Claim Should Not be Valued as of the LBIE Settlement Date Pursuant to English Law

SRM asserts that a trust relationship between LBIE and SRM existed in respect of the

Segregated Assets, pursuant to which SRM held a proprietary beneficial interest in the Virgin

Media Shares.  Such interest was not extinguished on the PBA Termination Date, argues SRM,

because, under English law, "it is unlikely that the termination of the PBA for any reason, let

alone because of the trustee's default, could have the effect of extinguishing a beneficial interest

in the trust assets."  (SRM Response ¶ 80.)  Instead, SRM maintains that its proprietary

---

[24]    The Supplemental Deed of Settlement provides, in pertinent part, that "In respect of and in full and final satisfaction of its rights in respect of the SRM Formerly Claimed Shares, the Counterparty shall receive (in accordance with the terms of this Deed) a cash payment out of the LBI Distribution in the amount of ████████████████████ . . . ."  Supplemental Deed of Settlement § 4.1.  The Supplemental Deed of Settlement defines "SRM Formerly Claimed Shares" as "the 5,094,060 Virgin Media common stock (CUSIP: 92769L101) and the 701,033 Charter Communication common stock (CUSIP: 16117M107) . . . claimed by the Company in respect of the Counterparty as part of the LBI Omnibus Claim."

[25]    The asserted value of the Segregated Assets as of the Petition Date was approximately $52 million; the asserted value of the Segregated Assets as of the PBA Termination Date was approximately $34 million.

beneficial interest was only compromised on the LBIE Settlement Date, when such interest was substituted for a contractual right to a settlement payment. For this reason, SRM asserts that the Segregated Assets are properly valued as of the LBIE Settlement Date pursuant to English law.

LBHI submits that when the Bankruptcy Code specifically addresses an issue – here, the valuation of a claim in a chapter 11 case – the Bankruptcy Code controls, citing to a decision in this District where the court held that "state law is only controlling where the Bankruptcy Code itself does not establish the rule to be applied." (*See* Obj. ¶ 47 (citing *In re Enron*, 354 B.R. 652, 659 (S.D.N.Y. 2006).) Similarly, LBHI argues that this Court need not look to English law to determine the value of the Segregated Assets where the Bankruptcy Code contains specific provisions that govern the valuation of the claim here. Moreover, LBHI submits that, even if SRM had a proprietary (or customer) claim to the Segregated Assets, such proprietary claim would have ceased to be exercisable on the PBA Termination Date, leaving SRM with only a contractual claim for the return of the Segregated Assets or for the net amounts due to SRM (if any) on or about such date. (Obj. ¶ 54).

Because the Bankruptcy Code specifically establishes a date on which a claim asserted against a debtor is to be valued, the Court agrees with LBHI that the Bankruptcy Code must be applied to determine the value of the Segregated Assets Claim. Consideration of English law principles is not required to value a claim in this case, particularly where the instrument pursuant to which the guarantee claim is asserted – the Corporate Resolution – is governed not by English law but by New York law. Accordingly, the Court declines to determine whether English law and the terms of the PBA would dictate a different result.

The circumstances here provide a quintessential example of the rationale behind the Bankruptcy Code's requirement that, upon termination of a securities contract, damages be

assessed as they stand at that precise moment.  LBHI was not required to wait until SRM settled

its claims with LBIE in order to fix LBHI's guarantee liability, if any; conversely, it defies

common sense that SRM would now be permitted to collect from LBHI several years of post-

termination increase in the value of the Segregated Assets.  From a practical perspective, had

LBHI's bankruptcy case concluded several years ago, LBHI would have been entitled to fix the

amount of SRM's claim, if any, at that time.  The Bankruptcy Code does not permit a claimant to

delay a determination of its debtor counterparty's liability from the time of the claimant's

termination of the parties' securities contract until the value of its claim becomes more beneficial

to the claimant.  Once the claimant terminates, damages become fixed; here, SRM voluntary

elected to terminate the PBA on November 6, 2008.  Because there was no legal impediment to

the enforcement of the Segregated Assets Claim as of November 6, 2008, the PBA Termination

Date, the Segregated Assets must be valued, at the latest, as of such date.

### C. Any Claim by SRM for Damages is Precluded by Clause 14.4 of the PBA

In addition to the Segregated Assets Claim, the SRM Proof of Claim asserts (i) the

Forced Sales Claim in the amount of $48.3 million and (ii) the Lost Opportunities Claim in the

amount of $100 million.  The Forced Sales Claim is based on SRM's assertion that, because

LBIE failed to return the Segregated Assets, SRM was forced to "prematurely liquidate positions

at highly disadvantageous prices to cover margin requirements at its other brokerages as a result

of the unavailability of its wholly unencumbered Segregated Assets."  (SRM Response ¶ 28; *see

also* SRM Proof of Claim ¶ 16.)  By the Lost Opportunities Claim, SRM submits that LBIE

repeatedly breached its obligations to segregate assets and serve compliant margin notices under

the PBA and the CMNA, and, as a consequence, SRM lost significant investment opportunities

resulting from "the unprecedented and inordinate diversion of SRM's senior management's

time" spent addressing LBIE's purported breaches.  (SRM Response ¶ 28; *see also* SRM Proof of Claim ¶ 17.)[26]

LBHI argues that any claim by SRM for damages is precluded by the broad exculpatory provision in Clause 14.4 of the PBA, which limits LBIE's liability to (i) damages related to LBIE's gross negligence, fraud, or willful default or breach of its duties under the PBA and (ii) the market value of the applicable securities "as of the date of discovery of loss."  Clause 14.4 provides, in pertinent part, that

> [w]here the Prime Broker has been found to be liable, the Prime Broker shall only be liable to the Counterparty to the extent that the Prime Broker has been grossly negligent, fraudulent or is in willful default or breach of its duties as set out in this Agreement, save that nothing in this Agreement shall restrict any liability owed by the Prime Broker to the Counterparty under the Financial Services and Markets Act 2000 or the Rules or disclaim any liability to an extent not permitted by such Act or the Rules.  The parties agree that, as a genuine pre-estimate of loss, the Prime Broker's liability to the Counterparty shall be determined based only upon the Market Value of the relevant cash or securities as [sic] at the date of the discovery of loss and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities.

(PBA § 14.4.)  LBHI submits that, here, SRM has not adequately pled LBIE's liability for gross negligence, fraud, or willful default or breach of duties to SRM.  Moreover, even if SRM's allegations were sufficient to state a claim, LBHI argues that Clause 14.4 of the PBA precludes any recovery beyond the market value of the Segregated Assets as of the "date of discovery of loss," which date, LBHI submits, occurred shortly after the Petition Date.  Since SRM has already recovered such value from LBIE, LBHI asserts that SRM has not alleged any facts that

---

[26]    Under the LBIE Settlement, SRM received an aggregate amount of ███████ on account of the Forced Sales Claim, the Lost Opportunities Claim, the ISDA Claim, and the Fees Claim, the allocation of which is not specified.  (*See* Estimation Obj. ¶ 18.)

would bring its claims outside the limitations of Clause 14.4 of the PBA; as such, all of the Contested Claims should be disallowed.  (*See* Objection ¶¶ 5, 6, 34-35.)

SRM disagrees, for several reasons.  First, SRM asserts the question of whether LBIE's conduct supports a finding that LBIE was grossly negligent, fraudulent, or in willful default of breach of its duties under the PBA cannot be resolved at a pleading stage, but even if it were an appropriate question at this stage, "there is at least a plausible basis" that SRM has adequately pled liability under such causes of action based on the facts it has alleged.  (*See* SRM Response ¶¶ 55-57.)  Further, SRM submits that the "date of discovery of loss" in Clause 14.4 of the PBA refers to the LBIE Settlement Date, and therefore, LBIE's liability is not limited to the value of the relevant securities as of the Petition Date or the PBA Termination Date, as LBHI contends. (*See id.* ¶¶ 82-84.)  Finally, SRM argues that the facts it has alleged give rise to a breach of trust claim under English law, and that Clause 14.4 does not apply to a breach of trust claim because "an exemption clause such as Clause 14.4 cannot excuse a trustee such as LBIE who knows that its act or omission is contrary to the interests of the beneficiary (here, SRM) or is recklessly indifferent to the beneficiary's interests."  (*Id.* ¶¶ 58-59 (citing *Armitage v Nurse and others* [1997] EWCA Civ 1279).)

### 1. Applicable Law

Pursuant to Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to give the defendant fair notice of the nature of the claim and the grounds on which it rests.  Fed. R. Civ. P. 8(a)(2); *Twombly*, 550 U.S. at 555 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "[T]he sufficiency of a complaint to state a claim on which relief may be granted is a question of law." *Berrios v. N.Y.C. Housing Auth*., 564 F.3d 130, 134 (2d Cir. 2009); *LJL 33rd St. Assocs., LLC v. Pitcairn Properties Inc*., 725 F.3d 184, 191 (2d Cir. 2013).

33

In order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff's "factual

allegations must be enough to raise a right of relief above the speculative level;" a plaintiff must

demonstrate more than a conceivable possibility that a defendant has acted unlawfully. *In re

LIBOR-Based Fin. Instruments Antitrust Litig*., 27 F. Supp. 3d 447, 458 (S.D.N.Y. 2014) (citing

*Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678). If a plaintiff has "not nudged [its] claims

across the line from conceivable to plausible, [the] complaint must be dismissed." *In re LIBOR-

Based Fin. Instruments Antitrust Litig*., 27 F. Supp. 3d at 458 (citing *Twombly*, 550 U.S. at 570).

Although a complaint can survive a motion to dismiss without detailed factual allegations, the

plaintiff must provide grounds for his entitlement to relief beyond mere labels, conclusions, or a

formulaic recitation of the elements of the cause of action. *Twombly*, 550 U.S. at 555 (citations

omitted). "[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to

threadbare recitals of a cause of action's elements, supported by mere conclusory statements.

Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Under English law, "gross negligence" in the contractual commercial context is more

than a fundamental failure to exercise proper skill or care; gross negligence arises from conduct

"undertaken with actual appreciation of the risk involved [and] also serious disregard of or

indifference to an obvious risk." (Collins Decl. ¶ 52 (citing *Red Sea Tankers Ltd v

Papachristidis (The Ardent)* [1997] 2 Lloyd's Rep 547, at 586).) "Willful" in the contractual

context similarly requires knowledge or consciousness of a wrongful action or omission, or some

act or omission that was done with reckless carelessness – that is, not caring what the results of

that carelessness might be. (*Id.* ¶¶ 55-56 (citing Lewin on Trusts, 19th ed Tucker et al, 2015,

para 39-143; *Springwell Navigation Corp v JPMorgan Chase Bank* [2010] EWCA Civ 1221,

[2010] 2 CLC 705, at [193]).)

### 2. SRM Has Failed to Plead Facts Sufficient to State a Claim for Gross Negligence or Fraud or to State a Claim that LBIE Was in Willful Default or Breach of its Duties

LBHI submits that Clause 14.4 of the PBA limits LBIE's liability to instances in which

LBIE has been grossly negligent, fraudulent, or in willful default or breach of its duties to SRM,

and that SRM has not plausibly pled any of such causes of action or otherwise alleged facts

which would bring its claims outside the limitations of Clause 14.4. (*See* Obj. ¶ 35.) Because

the standard of review at a Sufficiency Hearing is equivalent to that under Rule 12(b)(6), LBHI

asserts that the Contested Claims should be dismissed as a matter of law for failure to state a

claim upon which relief can be granted.

SRM argues that the questions of whether LBIE's alleged breaches constitute gross

negligence or fraud or whether LBIE was in willful default or breach of its duties under the PBA

are questions of fact that cannot be resolved at the pleading stage. Even if the Contested Claims

could be dismissed as a matter of law at this stage, SRM submits that, under a Rule 12(b)(6)

standard, the Court must draw all reasonable inferences in SRM's favor and that, under English

law, there is at least a plausible basis that LBIE was grossly negligent based on the facts that

SRM has alleged. (*See* SRM Response ¶¶ 55-57.) In support of its contention, SRM points to

allegations it made in the SRM Proof of Claim that (i) prepetition, LBIE repeatedly agreed that it

would not rehypothecate any of SRM's asserts without obtaining SRM's permission or, at a

minimum, providing SRM with sufficient notice; (ii) SRM relied upon LBIE's commitments and

assurances when it posted substantial collateral with LBIE; and (iii) LBIE failed to segregate and

return SRM's assets in breach of its duties under the PBA and under the rules of the Financial

Services Authority (FSA). (*See id.* ¶ 57 (citing SRM Proof of Claim ¶ 13).)

In response, LBHI asserts that the question of whether SRM has adequately pled gross negligence, fraud, or willful default is not a matter of fact, as SRM argues, but a matter of law which can be, and often is, decided at the pleading stage.  (*See* Reply ¶¶ 42, 43 n.8.)  LBHI contends that SRM has not pled facts to support its argument that LBIE's actions were grossly negligent, fraudulent, or in willful default or breach of its duties because (i) SRM has not alleged any facts suggesting a culpable state of mind consistent with disregard or indifference, and (ii) SRM has only made conclusory allegations which, at most, amount to a simple breach of contract claim.  (*See* Reply ¶¶ 42-45.)

The United States Court of Appeals for the Second Circuit has held that "the sufficiency of a complaint to state a claim on which relief may be granted is a question of law."  *Berrios v. N.Y.C. Housing Auth.*, 564 F.3d 130, 134 (2d Cir. 2009).  Here, the Court must determine as a matter of law (i) whether SRM has sufficiently alleged that LBIE was grossly negligent, fraudulent, or in willful default or breach of its duties under the PBA or (ii) accepting all of SRM's allegations as true, whether SRM could plausibly plead any of such causes of action such that they would survive a motion to dismiss under Rule 12(b)(6).  *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").  The Court concludes that SRM has failed to state a claim upon which relief may be granted under any of the causes of action set forth in the exculpation clause in Clause 14.4.

The parties agree that, under English law, "willful default" generally entails intentional or reckless breach of duty and "gross negligence" arises from a serious disregard of, or indifference

to, an obvious risk.  (*See* SRM Response ¶ 56; Reply ¶ 45.)  However, SRM has not alleged any facts which suggest a culpable state of mind consistent with intentional or reckless disregard of duties on the part of LBIE.  None of the facts alleged by SRM plausibly suggests that LBIE purposefully or recklessly disregarded its obligations to segregate or return to SRM the assets which LBIE held in trust.  Instead, the allegations propounded by SRM would appear, at most, to support a claim for breach of contract, and they do not contain the degree of willfulness or intent required to demonstrate gross negligence, fraud, or a willful breach of LBIE's duties under the PBA.

For the foregoing reasons, the Court concludes that SRM has failed to state a claim for damages for gross negligence, fraud, willful default, or breach of duties under Clause 14.4 of the PBA; the Contested Claims must be disallowed and expunged in their entirety.[27]

### 3. Even Assuming SRM Could Assert a Claim for Damages Under Clause 14.4 of the PBA, SRM's Damages Would be Limited to the Value of the Segregated Assets as of the PBA Termination Date, Which Amount SRM has Already Recovered from LBIE

LBHI submits that, even assuming, *arguendo*, that (i) the Corporate Resolution binds LBHI as guarantor here and (ii) LBIE had committed gross negligence, fraud, or a willful default or breach of its duties under the PBA, the plain language of Clause 14.4 limits the amount of SRM's damages to the market value of the Segregated Assets "at the date of the discovery of loss."  (*See* PBA § 14.4;[28] Reply ¶ 41.)  LBHI argues that the date SRM discovered "loss" was

---

[27]    Because the Court finds that SRM has failed to state a claim upon which relief can be granted with respect to the exculpation clause contained in Clause 14.4, the Court declines to reach LBHI's alternative argument that Clause 7.2(a) of the PBA permitted LBIE to decide not to return the Segregated Assets after it entered into the LBIE Administration.

[28]    Clause 14.4 of the PBA provides, in pertinent part, that
. . . The parties agree that, as a genuine pre-estimate of loss, the Prime Broker's liability to the Counterparty shall be determined based only upon the Market Value of the relevant cash or securities as [sic] at the date of the discovery of loss and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities.

on or about September 19, 2008.  On or about such date, SRM's attorneys sent multiple written demands to LBIE for the return of SRM's securities, but such securities were never returned to SRM.  (Reply ¶ 39.)  LBHI thus submits that any recovery on the Contested Claims should be limited to the "market value" of the Segregated Assets on or about such date, and any claims for additional damages, consequential or otherwise, are precluded by Clause 14.4.  Because the amount received by SRM in respect of the Segregated Assets, ███████, is indisputably greater than the market value of the Segregated Assets on or around either the Petition Date or the PBA Termination Date, LBHI argues that SRM cannot allege any cognizable damages relating to the Contested Claims, and such claims should be disallowed and expunged.

SRM asserts that Clause 14.4 of the PBA does not operate to limit LBHI's liability as of the date of the *breach*, but rather as of the date of discovery of the *amount of its loss*, because, on the date of breach, a party's loss may still be incapable of being discovered.  (*See* SRM Response ¶¶ 83-84.)  Here, SRM maintains that its loss in respect of the Segregated Assets was only "discovered" on the LBIE Settlement Date – the point at which SRM "knew" it would not receive the Segregated Assets.  (*See* SRM Response ¶¶ 82-84.)

Because the PBA and the transactions with respect thereto are governed by English law, the Court must look to English law to interpret the provisions of Clause 14.4 of the PBA.  When interpreting an exclusion or exculpatory provision under English law, English courts have held that a party seeking to exclude or limit liability "must do so in clear words; unclear words do not suffice; [and] any ambiguity or lack of clarity must be resolved against that party."  (Collins Decl. ¶ 47 (citing *Dairy Containers Ltd v Tasman Orient Line CV* [2004] UKPC 22, [2015] 1 WLF 215, at 12).)  English law, in this regard, is similar to New York law.  (*See Digizip.com, Inc. v. Verizon Servs. Corp.*, 139 F. Supp. 3d 670, 681 (S.D.N.Y. 2015) (citing *Bank of Am. Nat'l*

*Trust & Sav. Ass'n v. Gillaizeau,* 766 F.2d 709, 713 (2d Cir. 1985) ("To be valid, a release must 'contain an explicit, unequivocal statement of a present promise to release [a] defendant from liability.' . . . The scope of a release is determined by the parties' intent.").)  As discussed *supra,* when interpreting contractual provisions under English law, "the starting point is . . . the natural meaning of the language used by the parties" and "[i]n the vast majority of cases . . . the enquiry will start, and usually finish, by asking what is the ordinary meaning of the words used." (Collins Decl. ¶¶ 27-28 (citing *Prenn v Simmonds* [1971] 1 WLR 1381, at 1385; *Charter Reinsurance Co Ltd. v Fagan* [1997] AC 313, 384).)

The natural interpretation of the phrase "the date of discovery of loss" is the date on which SRM discovered that LBIE had breached its obligation under the PBA to deliver the Segregated Assets to SRM.  Notably, Clause 14.4 does not refer to the "date of discovery of *the amount of* loss" and therefore, it cannot reasonably be interpreted as a reference to the date on which the amount of loss can be quantified.  The Court's interpretation of the words "date of discovery of loss" is supported by a reading of such language in the context of Clause 14.4 as a whole.  In the same sentence in which the phrase "date of discovery of loss" appears, the parties express the purpose of the provision and "agree that, as a genuine *pre-estimate of loss,*" LBIE's liability shall be limited.  (PBA § 14.4.)  The sentence then ends by stating that such loss is "without reference to . . . subsequent variations to the Market Values of the relevant cash or securities."  (*Id.*)  These words are indicative of the intention of the contracting parties to estimate the amount of SRM's damages at an early stage, without waiting for an exact calculation of damages and without consideration of future market values of the securities.  SRM's interpretation of the language in Clause 14.4 does not withstand scrutiny.[29]  Accordingly,

---

[29]    SRM argues that the date of discovery of loss is a question of fact that should not be addressed at the Sufficiency Hearing Stage.  (*See* SRM Response ¶ 84.)  The Court declines to address this argument in light of the

the Court determines that that the "date of discovery of loss," as such term is used in Clause

14.4, was not the LBIE Settlement Date, as SRM asserts, but instead was on or about the date or

dates on which SRM did not receive the Segregated Assets from LBIE after making written

demand for their return.  The Court need not pinpoint an exact date in September or October

2008 as the "date of discovery of loss" because SRM has not asserted that the market value of

the Segregated Assets at any point during that period of time was greater than the amount SRM

received in the LBIE Settlement.

Accordingly, even assuming, *arguendo*, that LBIE had committed gross negligence or

fraud, or was in willful default or breach of its duties under the PBA, the Court finds that any

damages under the PBA are limited by Clause 14.4 to the market value of the Segregated Assets

"at the date of the discovery of loss," which was on or about September 19, 2008.  Because such

amount has been satisfied in full by the LBIE Settlement, the Court determines that SRM has

failed to state a claim upon which relief can be granted and the Contested Claims must be

disallowed and expunged.

### 4. SRM's Asserted Breach of Trust Claim Does Not Require Valuation of the Segregated Assets as of the LBIE Settlement Date

SRM further argues that it has alleged facts which give rise to a breach of trust claim

under English law and that an exemption clause such as Clause 14.4 of the PBA cannot excuse a

---

fact that SRM has acknowledged in the SRM Proof of Claim that SRM became aware that LBIE had not been complying with its obligations under the PBA "[s]hortly following the appointment of administrators to LBIE on 15 September 2008."  (SRM Proof of Claim ¶ 14.)  Furthermore, the Wood Declaration explains, in intricate detail, the many steps that SRM took to recoup the Segregated Assets prior to SRM's termination of the PBA.  Mr. Wood describes the numerous letters sent by SRM to LBIE requesting return of the Segregated Assets including (i) a letter dated September 15, 2008; (ii) a letter (sent through its counsel, Clifford Chance) dated September 19, 2008, in which "SRM confirms that the delay to date in the return of the Segregated Assets has resulted in loss and irreparable harm to SRM;" and (iii) a letter dated September 26, 2008.  (*See* Wood Decl. ¶¶ 12-23, Exs. JW1-JW3.) Accordingly, by its own admission, SRM discovered its loss no later than the PBA Termination Date and well before the LBIE Settlement Date, even if the exact date is a question of fact.

trustee such as LBIE who knows that its act or omission is contrary to the interests of the beneficiary (SRM) or is recklessly indifferent to such beneficiary's interests. (*See* SRM Response ¶¶ 58-59.) SRM further maintains that its beneficial interest in the Virgin Media Shares, which interest granted SRM a proprietary right to the return of the Segregated Assets from LBIE, continued to exist after the PBA Termination Date. This proprietary interest, asserts SRM, was substituted for a contractual right to a settlement payment only on the LBIE Settlement Date. As a matter of English law, SRM submits that it is "unlikely" that the proprietary beneficial interest in the Segregated Assets conferred by the PBA could be extinguished by the termination of the PBA for any reason, let alone because of the trustee's default. (*See id.* ¶ 80.) In support of its contentions, SRM cites to two English cases, *Armitage v Nurse and others* [1997] EWCA Civ 1279[30] and *Re Lehman Brothers International Europe* [2009] EWHC 2454 (Ch) ("*LBIE UK*").[31] (*See* SRM Response ¶ 58 (citing to *LBIE UK* at 72), ¶ 59 (citing *Armitage*), ¶ 80 (citing to *LBIE UK* at 66).)

LBHI responds that, once SRM terminated the PBA, any trust relationship between LBIE and SRM created by the PBA was extinguished. After the PBA Termination Date, LBHI asserts, SRM did not have a trust or customer claim to the Segregated Assets that granted it a proprietary right to a return of those assets. (*See* Reply ¶ 35.) Moreover, LBHI contends that *LBIE UK*, cited by SRM in support of its assertions, actually supports LBHI's conclusion that any trust relationship was extinguished by SRM's own termination of the PBA. (*See id.* ¶ 36.)

In *LBIE UK*, the High Court determined that securities held by LBIE as a prime broker remained held in trust following the commencement of the LBIE Administration. However, the High Court did not address (i) whether parties to a prime brokerage agreement can contractually

---

[30]    A copy of *Armitage* is attached as Exhibit 10 to the SRM Response.
[31]    A copy of *LBIE UK* is attached as Exhibit 9 to the SRM Response.

agree to limit liability of the trustee or (ii) whether a trust relationship can be extinguished by termination of a brokerage agreement.  Indeed, as LBHI points out, the High Court assumed, albeit in *dicta*, that when a counterparty terminates its prime brokerage agreement with LBIE, it has the "potentially disastrous consequence" of converting all proprietary interests in securities into unsecured receivables of equivalent value, (*see LBIE UK*, [2009] EWHC 2454 (Ch) at 65-67).

Similarly, the decision in *Armitage* cited by SRM does not support SRM's argument that the exemption in Clause 14.4 cannot bar liability of a trustee under English law or extinguish the trust relationship between SRM and LBIE.  In *Armitage*, the primary question before the Court of Appeal of the United Kingdom was whether a trustee exemption clause can validly exclude liability for gross negligence.  (*See Armitage v Nurse and others* [1997] EWCA Civ 1279 at 253.)  There, the petitioner argued that an exemption clause which excluded all liability of the trustee except in the instance of actual fraud was void either for repugnancy or as contrary to public policy.  (*See id.* at 251.)  Although the Court of Appeal expressed disapproval of exculpatory clauses which exclude liability for gross negligence, the Court of Appeal did not find the exculpation clause unenforceable or contrary to public policy; instead, it stated that if such clauses should be denied effect, it should be done through legislation.  (*See id.* at 256.)

Neither of the cases cited by SRM directly supports the conclusion that SRM seeks here – that it held a proprietary beneficial interest in the Virgin Media Shares which remained in existence until the LBIE Settlement Date, and, as such, the Segregated Assets Claim should be valued as of such date, notwithstanding Clause 14.4 or SRM's termination of the PBA on November 6, 2008.  SRM's arguments with respect to its asserted breach of trust claim do not

alter the Court's prior conclusion that the Contested Claims fail to state a claim upon which relief can be granted.

### D. The Lost Opportunities Claim Fails to State a Claim Upon Which Relief Can be Granted

#### 1. Clause 14.4 of the PBA Applies to Claims Under the CMNA

As discussed *supra*, LBHI asserts that Clause 14.4 of the PBA bars recovery on all of the Contested Claims unless SRM can demonstrate that LBIE was grossly negligent, fraudulent, or in willful default or breach of its duties to SRM. In an effort to limit the reach of the exculpatory provisions under Clause 14.4, SRM asserts that the Lost Opportunities Claim, which seeks damages for the purported diversion of SRM's senior management's time occasioned by LBIE's alleged breaches, is based not only on LBIE's alleged breaches of the PBA, but also of the CMNA. SRM alleges that (i) LBIE breached the CMNA by failing to serve SRM with compliant margin notices and (ii) the CMNA does not bar recovery of damages on account of this breach, even if such damages are considered indirect or consequential, as LBHI asserts.[32] (*See* SRM Response ¶ 62.)

In response, LBHI argues that the relevant language in the PBA and the CMNA indicates that SRM and LBIE intended that the two agreements be read as a single agreement; accordingly, Clause 14.4 of the PBA applies to claims arising under the CMNA as well. (*See* Reply ¶¶ 52-59.) First, LBHI points to Clause 2.2 of the PBA, which states that

> **[a]ll Transactions and *ancillary arrangements* contemplated by this Agreement are entered into by the parties to this Agreement** . . . in reliance on the fact that this Agreement and all settlement requests, acknowledgments, Instructions, term sheets, confirmations **and *all other documents* identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties**. Except to the extent that any other document or notice is expressly referred to in this Agreement (including, without limitation, the Customer

---

[32]    SRM states that it does not concede that the Lost Opportunities Claim seeks to recovery indirect or consequential damages. (*See* SRM Response ¶ 62.)

43

Agreements)[33] the terms of this Agreement constitute the entire agreement between the parties as to its subject matter and, to the extent of any inconsistency between the terms of Agreement and any such other document or notice, the terms of this Agreement will prevail.

(*Id.* ¶ 55 (citing PBA § 2.2. (emphasis added)).)  LBHI argues that the CMNA is an "ancillary agreement" to the PBA and is a document "related to a Transaction[34] contemplated by [the PBA];" the plain meaning of these terms supports the conclusion that the CMNA and the PBA "form a single agreement between the parties."  (Reply ¶ 55.)  Further, LBHI points out that the CMNA itself provides that the PBA is a "Base Contract" (per Schedule 1 of the CMNA) and its recitals specifically tie the CMNA to the "Base Contracts," one of which is the PBA.  (*Id.* ¶ 56.)

SRM asserts that the PBA and the CMNA are not intended to "form a single agreement" under Clause 2.2 because (i) there is no reference to the CMNA or any margin notices in Clause 2.2, or, for that matter, anywhere in the PBA; (ii) the documents contemplated by Clause 2.2 are documents generated in connection with "Transactions" which have nothing to do with a separate contractual arrangement such as the CMNA; and (iii) under English law, an intention to exclude or limit liability must be clearly set forth in the relevant agreement, and nowhere in the CMNA does it specifically state that Clause 14.4 of the PBA applies to limit LBIE's liability under the CMNA.  (*See* SRM Response ¶¶ 64-65.)

In analyzing the relationship between two agreements, English courts look at the agreement "in broad commercial terms and by reference to the language of the two agreements." (Collins Decl. ¶ 44 (citing *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487, [2008] 2 CLC 864 at 58).)  As LBHI observes, Clause 2.2 of the PBA is not limited to

---

[33]    A "Customer Agreement" includes "any contract for differences."  (PBA, Schedule 3 (Definitions).)
[34]    A "Transaction" under the PBA is defined as "all acquisitions and disposals of securities, and the provision of any advances of cash and securities in respect thereof . . . ."  (PBA § 2.1.)

"Transactions" as defined in the PBA; it also incorporates "ancillary arrangements"

contemplated by the PBA and documents that are "related to a Transaction."  (*See* Reply ¶ 55.)

The CMNA was an ancillary arrangement contemplated by the PBA which was entered

into by LBIE and SRM to address margin specifics related to Transactions under the PBA.  LBIE

had a right to collect margin from SRM under the PBA; in fact, the entirety of Clause 6 of the

PBA, entitled "Margin Requirement," focuses on the delivery and calculation of margin.  Clause

6.8 of the PBA further provides that "[LBIE] may from time to time specify general principals,

criteria and margin rates which it intends to adopt in connection with its calculation of the

Margin Requirement applicable to any Transactions and positions."  (PBA § 6.8.)  Such margin

specifics were laid out in the CMNA, which enabled LBIE and SRM to "reduce [] operational

expense in respect of the Base Contracts by Calculating the Margin Requirement[35] on a net basis

across all the Base Contracts."  (CMNA at 1.)

A plain reading of the CMNA leaves no doubt that the CMNA is related to the PBA,

notwithstanding the fact that the PBA does not specifically reference the CMNA.  The recitals of

the CMNA, which set forth the purpose of the agreement, make specific reference to the PBA.

The recitals state as follows:

> LBIE and the Counterparty have entered into two or more Base Contracts pursuant
> to which LBIE and the Counterparty may from time to time have exposures,
> contingent liabilities or debts to each other.  LBIE will require the Counterparty to
> provide Margin in relation to such exposures, contingent liabilities or debts
> pursuant to the terms of the relevant Base Contract.

(CMNA at 1.)  A "Base Contract" is defined as "any agreement or transaction between [SRM]

and LBIE and identified in Schedule 1" and Schedule 1 of the CMNA specifically lists the PBA

---

[35]    "Margin Requirement" under the CMNA is defined as "the amount of Margin payable and deliverable by
[SRM] to LBIE in respect of Transactions" and "Transactions" is defined as "any individual transaction made
subject to the terms of a Base Contract."  (CMNA § 1.4.)

as a Base Contract.[36]  (*See* CMNA § 1.4; Schedule 1.)  That the two agreements were intended to be read as a single agreement is evident from these provisions.

That the parties entered into the CMNA and the PBA on the same day, May 9, 2008, lends further support to the conclusions that the two agreements were intended to be read together.  Indeed, as SRM admits, all of the Brokerage Agreements, including the CMNA and the PBA, were executed by SRM and LBIE as part of "a series of agreements" "[t]o memorialize their relationship."  (SRM Response ¶ 12.)  Under English law, contracts that are entered into contemporaneously are generally construed as a single document.  (*See* Collins Decl. ¶ 42 (citing *Smith v Chadwick* (1882) 20 Ch D 27, 62-63 ("[W]hen documents are actually contemporaneous, that is, two deeds executed at the same moment . . . or within so short an interval that . . . the Court comes to the conclusion that the series of deeds represents a single transaction between the same parties, it is then that they are all treated as one deed")).)

When looking at a complex series of agreements, English courts have emphasized the need "to construe an agreement which was part of a series of agreements by taking into account the overall scheme of the agreements and reading sentences and phrases in the context of that overall scheme."  (Collins Decl. ¶ 45 (citing *Sebastian Holdings Inc v Deutsche Bank AG* [2010] EWCA Civ 998, [2010] 1 Lloyd's Rep 106).)  Based on a reading of both the CMNA and the PBA, there is little doubt that the parties intended that the two agreements were to be read together in accordance with Clause 2.2 of the PBA.  Accordingly, whether the Lost Opportunities Claim asserts claims pursuant to the PBA or the CMNA, the Lost Opportunities Claim remains subject to the limitations of liability set forth in Clause 14.4 of the PBA.

---

[36]     The ISDA Master and the MIFCA are also listed as "Base Contracts" under Schedule 1 of the CMNA.

### 2. The Lost Opportunities Claim Should be Dismissed

By the Lost Opportunities Claim, SRM submits that LBIE repeatedly breached its

obligations to segregate assets and serve compliant margin notices under the PBA and the

CMNA.  Specifically, SRM asserts that its management was "compelled to devote significant

time and effort to dealing with the consequences of [LBIE's] breaches" and, as a consequence,

SRM lost significant investment opportunities resulting from the "unprecedented and inordinate

diversion of SRM's senior management's time" spent addressing LBIE's purported breaches.

(SRM Response ¶ 28; *see also* SRM Proof of Claim ¶ 17.)  If management's time had not been

diverted, SRM argues that it could have "devoted substantially more time to finding even more

mispriced investments and the fund returns would have been better."  (SRM Proof of Claim

¶ 17.)  The Lost Opportunities Claim claims losses of approximately $100 million, based on

SRM's estimate that its return would have improved by 50 percent between January and

September 2009 had management's time and energy not been so substantially diverted.  (*See id.*)

LBHI argues that the damages SRM seeks by the Lost Opportunities Claim –

hypothetical profits SRM did not earn due to its "loss of investment opportunities" – are

consequential damages that are barred under Clause 14.4 of the PBA.  As discussed *supra*,

Clause 14.4 of the PBA provides, in pertinent part, that

> The parties agree that, as a genuine pre-estimate of loss, the Prime Broker's liability
> to the Counterparty shall be determined based only upon the Market Value of the
> relevant cash or securities as [sic] at the date of the discovery of loss **and without
> reference to any special circumstances, indirect or consequential losses,** or
> subsequent variations to the Market Values of the relevant cash or securities.

(PBA § 14.4 (emphasis added).)  The Court agrees.  SRM has not demonstrated any causal

linkage between the many hypothetical steps necessary to get to the damages sought by the Lost

Opportunities Claim – instead, the claim merely asserts that the *alleged* breach *allegedly* caused

a diversion of SRM's management's time and energy which *allegedly* resulted in SRM's

inability to find more profitable investments which *allegedly* caused SRM not to have earned $100 million in profits. SRM has established no connection between LBIE's alleged breaches and SRM's alleged losses. Such damages are precisely the type of "indirect or consequential losses" which the Parties agreed SRM could not seek under Clause 14.4 of the PBA.

Even assuming, *arguendo*, that the exculpatory language of Clause 14.4 of the PBA did not bar the Lost Opportunities Claim, LBHI asserts that the Court should nonetheless dismiss such claim because the damages sought are entirely speculative and are not adequately pled. (*See* Reply ¶ 63.) Because pleading requirements are governed by New York law, LBHI asserts that this Court should follow the well-established law set by New York courts that, where there is a claim for lost profits, the alleged loss must be capable of proof with reasonable certainty." (*See id.* ¶¶ 63-68 (citing *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261 (1986).) Noting that SRM asserted the Lost Opportunities Claim in the amount of $100 million, an amount LBHI characterizes as "obviously plucked-from-thin-air," LBHI submits that the Lost Opportunities Claim should be dismissed because SRM has not alleged any facts either directly (i) tracing the claimed damages to the purported breach or (ii) supporting its claim that the damages actually were incurred. As such, LBHI argues that the Lost Opportunities Claim is too remote and speculative to sustain a cause of action. (*See* Reply ¶¶ 63, 68.)

SRM argues that, as a matter of English law, (i) parties to a contract are permitted to seek recovery of losses arising from a breach of contract based on lost investment opportunities and diversion of employees' time and (ii) it is reasonable for the Court to infer that, had SRM's management's time not been diverted, their time would have been applied to activities which would have generated income for SRM. Moreover, SRM submits that, under English law, the Lost Opportunities Claim cannot be dismissed at the pleading stage for failure to establish a

48

sufficient causal link between the alleged breaches and the losses and that SRM will, when the time is proper, present evidence supporting its claim.  (*See* SRM Response ¶¶ 85-88.)

As observed by LBHI and as conceded by SRM's expert Lord Collins, "[t]he extent to which details of the losses must be pleaded is, in accordance with elementary principles, a matter of procedure governed by the law of the forum, i.e. [sic] New York law."  (Collins Decl. ¶ 74.)[37] However, because the Brokerage Agreements are governed by English law, the question of whether or not SRM can seek damages for the Lost Opportunities Claim turns on this Court's interpretation of English law.  According to Lord Collins, under English law, losses caused by disruption of management time are recoverable as damages for breach of contract if such damages are caused by the breach and are reasonably foreseeable.  (SRM Response ¶ 86; Collins Decl. ¶ 72 (citing to *Aerospace Publishing Ltd v Thames Water Utilities Ltd*, [2007] EWCA Civ 3, [2007] Bus LR 726.))[38]

Even accepting that English law governs SRM's entitlement to a recovery under the Lost Opportunities Claim, the Court finds that SRM has failed to allege any cognizable damages.  As discussed *supra*, in the context of a Sufficiency Hearing, a proof of claim must satisfy the pleading standard established by Rule 12(b)(6) and contain sufficient factual matter "to state a claim to relief that is plausible on its face" which "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Ashcroft v. Iqbal*, 556 U.S. at 678 (citations and quotation marks omitted).  To survive a challenge to the adequacy of a

---

[37]    Under applicable New York law, "[a] court may properly dismiss a claim for consequential damages at the pleading stage where the allegations are insufficient on their face to state a claim."  *ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 46 Misc. 3d 1210(A) (N.Y. Sup. Ct. 2015), *aff'd*, 18 N.Y.S.3d 853 (N.Y. App. Div. 2015) (rejecting plaintiff's contention that dismissal was inappropriate at pleading stage because it would require court to make findings of fact).

[38]    A copy of *Aerospace Publishing Ltd v Thames Water Utilities Ltd* is attached as LC/31 of the Collins Declaration.

complaint under Rule 12(b)(6), the factual allegations in a complaint must be supported by more than mere conclusory statements. *Twombly*, 550 U.S. at 555.

Here, SRM makes conclusory allegations of hypothetical losses based on hypothetical investments that the Court finds would be incapable of proof even if SRM were given the opportunity to present evidence. SRM has not alleged any specific facts in support of the Lost Opportunities Claim; it does not (i) allege how much of management's time was diverted because of LBIE's breach, (ii) specify which investments it would have made had management had the opportunity; or (iii) demonstrate that such investments would have yielded a profit at all, let alone a profit of $100 million, as claimed. SRM has provided no detail with respect to its quantification of its alleged damages; instead, its damages are speculative, remote, and not directly traceable to LBIE's alleged breaches.

The damages sought by SRM are markedly different from those awarded in *Aerospace*, which were easily quantifiable. In *Aerospace*, the claimant asserted damages related to a flood which occurred on its premises after a water pipe burst. The defendant did not dispute its liability, and the lower court awarded damages equal to the claimants' cost of employing its staff for the period of time that the staff spent cleaning up the flood. *See generally*, *Aerospace Publishing,* [2007] EWCA Civ 3, [2007] Bus LR 726 at 1-5, 73-78. In affirming the lower court's decision to award such damages, the Court of Appeal stated that "it is reasonable for the court to infer from the disruption that, had their time not been thus diverted, staff would have applied it to activities which would, directly or indirectly, have generated revenue for the claimant in an amount at least equal to the costs of employing them during that time." *Id.* at 86. The *Aerospace* court also noted that the claimants had set out in detail, and adequately established, that a significant number of its senior employees had diverted time to address the

50

flood. *Id.* at 87. In contrast, even if SRM had alleged specific facts in, or was permitted to make such allegations through an amendment or supplement to,[39] its proof of claim, any hypothetical damages based on hypothetical losses caused by the alleged breaches are incapable of proof with any level of reasonable certainty. Accordingly, pursuant to the Procedures Order, which mandates application of the Rule 12(b)(6) standard of review to claims at a Sufficiency Hearing, the Court finds that the Lost Opportunities Claim must be disallowed and expunged in its entirety.

**CONCLUSION**

Based on the foregoing, the Court finds that SRM has failed to establish the existence of a valid and enforceable guarantee pursuant to which LBHI is liable for the Contested Claims asserted by the SRM Proof of Claim.

Assuming, *arguendo*, that SRM had the right to enforce LBHI's guarantee of LBIE's obligations under the Corporate Resolution and that SRM could assert a claim for damages on account of the Segregated Assets that LBIE failed to return to SRM, the Court finds that SRM's proposed valuation date for the Segregated Assets – the LBIE Settlement Date – has no basis in law. The value of the Segregated Assets for purposes of the Segregated Assets Claim should be determined as of the PBA Termination Date pursuant to section 562 of the Bankruptcy Code or, alternatively, as of the Petition Date pursuant to section 502 of the Code.

Additionally, Clause 14.4 of the PBA limits liability to instances in which LBIE has been grossly negligent, fraudulent, or in willful default or breach of its duties to SRM, and SRM has failed to state a claim for cognizable damages under Clause 14.4 of the PBA such that SRM

---

[39]    SRM has made the argument that it should be permitted to supplement or amend its proof of claim "to the extent the Court concludes additional detail is necessary or would be helpful." (SRM Response ¶ 89.) However, SRM has not sought affirmative relief to amend or supplement the SRM Proof of Claim; as such, the issue is not properly before the Court.

would be entitled to recovery on any of the Contested Claims.  Moreover, even if SRM's

allegations were sufficient to state such a claim, Clause 14.4 of the PBA precludes any recovery

beyond the market value of the Segregated Assets as of the "date of discovery of loss," which is

not the LBIE Settlement Date, as SRM asserts, but instead was on or about the date or dates on

which SRM did not receive the Segregated Assets after making written demand for their return,

shortly after the Petition Date.

      Because the amount received by SRM in respect of the Segregated Assets, ███████,

is indisputably greater than the market value of the Segregated Assets on or around either the

Petition Date or the PBA Termination Date, the Court finds that, under any scenario, SRM

cannot allege any cognizable damages relating to the Contested Claims.  Finally, the Lost

Opportunities Claim fails as a matter of law under the pleading standards of applicable New

York law and under substantive English law.

      For all of the foregoing reasons, the Objection is sustained and the Contested Claims are

disallowed and expunged in their entirety.  Any other arguments made and not specifically

addressed in this Decision and Order are hereby overruled

IT IS SO ORDERED.

Dated:  May 30, 2019
New York, New York

          /s/ Shelley C. Chapman_____
          UNITED STATES BANKRUPTCY JUDGE