Response Deadline: July 25, 2019 at 12:00 p.m. (Prevailing Eastern Time)
Hearing Date and Time: TBD

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re                                                  :    **Chapter 11 Case No.**
                                                       :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,   :    **08-13555 (SCC)**
                                                       :
                          **Debtors.**                 :    **(Jointly Administered)**
------------------------------------------------------------------x

## BRIEF ON REMAND IN FURTHER SUPPORT OF PLAN ADMINISTRATOR'S FIVE HUNDRED NINETEENTH OMNIBUS OBJECTION TO CLAIMS

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan"), files this brief in further support of, and to renew, the *Plan Administrator's Five Hundred Nineteenth Omnibus Objection to Claims (No Liability Claims)* [ECF No. 53107] (the "Objection") and respectfully represents:

## PRELIMINARY STATEMENT

1.      The procedural history of the instant litigation is long, but the applicable law on remand is clear, and the claimants' own allegations, which are accepted as true by LBHI for purposes of this renewed motion (solely), mandate the relief sought now by LBHI.

2.      Under the District Court's ruling, this Court must measure the guarantee claims filed by Maverick (defined below) against LBHI as of LBHI's chapter 11 petition date, September 15, 2008 (the "Petition Date").[1]  Accordingly, this Court should expunge Maverick's guarantee claims to the extent they seek more than the $4.3 million Maverick alleges its primary obligor owed on the Petition Date.

3.      As the Court is aware, each of Maverick's six fund claimants entered into prime brokerage and related agreements prior to the Petition Date with the primary obligor, Lehman Brothers International (Europe) ("LBIE"), a non-chapter 11 debtor affiliate of LBHI.  It is undisputed that Maverick posted collateral with LBIE as security for Maverick's liabilities to LBIE in accordance with those agreements.  Pursuant to the terms of the applicable contracts, and consistent with the entire purpose and function of collateral, LBIE's obligation to Maverick at any moment in time was only for any *excess* collateral – the positive difference, if any, between the value of the posted collateral and the amount of Maverick's liabilities to LBIE.

4.      The plain language of the relevant guarantee (the "LBHI Guarantee") covered LBIE's obligations to Maverick and not, as Maverick asserts, the gross value of the collateral.  Indeed, in no circumstances could Maverick have established a claim against LBIE for the *gross* amount of the collateral.  LBHI, accordingly, seeks by this renewed motion to reduce Maverick's guarantee claims to the amount Maverick itself asserts was the amount of the *excess* collateral on the Petition Date.

5.      Maverick claims that, on the Petition Date, the value of the collateral it posted was $118.1 million.  Maverick admits that on the Petition Date, Maverick owed liabilities

---

[1] *See Maverick Long Enhanced Fund, LTD., et al. v. Lehman Brothers Holdings, Inc.*, No. 17-CV-4203 (RA) (ECF No. 16)  (the "District Court Order").

WEIL:\97023262\18\58399.0011

to LBIE for which the collateral served as security.  Specifically, Maverick admits that to the extent

that, as it alleges, the collateral was posted on a fund-specific basis, and the collateral for one fund

did not secure the liability of the other funds, on the Petition Date, LBIE owed five of the six

Maverick funds an aggregate amount of $4.3 million (because those five funds owed LBIE

approximately $114 million).  Maverick admits that its sixth fund owed LBIE well more than $4.3

million and thus had no claim against LBIE (and thus no claim against LBHI) on the Petition Date.

6.    While the record has not been developed to establish whether each

Maverick fund posted its own collateral or whether Maverick directed (or permitted) LBIE to allow

collateral from one fund to be used to secure the liabilities of another fund, as a practical matter, it

would not be cost effective to develop the record as to such issues, and LBHI is willing to accept

Maverick's allegation as true and stipulate that collateral was posted on a fund-by-fund basis.[2]

7.    Accordingly, at this time, LBHI seeks an order disallowing Maverick's

claims on behalf of five of the funds to the extent they exceed LBHI's maximum potential exposure

– Guarantee Claims in the aggregate allowed amount of $4.3 million.  LBHI seeks the complete

disallowance of the claim of the sixth fund, which Maverick admits had no claim against LBIE as

of the Petition Date.

8.    In contrast, and contrary to the terms of the parties' agreements and

commercial reality, Maverick argues for the *allowance* of claims for the *gross* value of its posted

collateral as of the Petition Date – $118.1 million.  Maverick argues it was entitled to the return of

all of its collateral without regard to the formula prescribed by the Prime Brokerage Documents

---

[2] No Maverick fund would be entitled an Allowed claim if the alternative were true because, as of the Petition Date, the Maverick funds collectively owed LBIE more than LBIE owed them.  The Maverick's sixth fund was so under collateralized that its liabilities  would offset the aggregate $4.3 million that LBIE owed the other five Maverick funds combined.

WEIL:\97023262\18\58399.0011

for determining what collateral, if any, LBIE had an obligation to return.  *See* Appellants' Brief at 15.[3]  Maverick then argues that application of its liabilities to LBIE should count toward satisfaction of Maverick's allowed gross claims, rather than as a necessary component of the calculation of the allowable amounts of its claims themselves as of the Petition Date.  Maverick then goes even further in this false construct.  Using the Petition Date value of the collateral to satisfy a gross claim would permit Maverick to recover $4.3 million from claims of $118.1 million.  But, here, Maverick seeks to use a years-later date, when the collateral value was lower, for satisfaction purposes.  Doing so, Maverick argues it should be entitled to collect up to $16.2 million on gross claims of $118.1 million.  As set forth below, Maverick's arguments fail.

## RELEVANT BACKGROUND

9.    LBHI incorporates by reference the prior record on the Objection[4] but restates certain facts below relevant to the immediate issues before the Court.

### The Maverick Claims and the Prime Brokerage Documents

10.    On September 22, 2019, six Maverick funds ("Maverick") filed proofs of claim against LBHI that are substantively identical in all relevant respects (collectively, the "Maverick Claims").[5]  The Maverick Claims assert guarantee liability against LBHI based on alleged primary obligations of LBIE, all purportedly arising under certain "Prime Brokerage

---

[3] *Maverick Long Enhanced Fund, LTD., et al. v. Lehman Brothers Holdings, Inc.*, No. 17-CV-4203 (RA) (ECF No. 11) ("Appellants' Brief").

[4] A listing of the relevant pleadings, documents, and transcripts is attached hereto as Exhibit A and a copy of each will be provided to the Court for its convenience.

[5] The six Maverick Claims sought different amounts and cited different guarantees but the parties now agree that there is only one operative guarantee.

4

Documents." *See, e.g.,* Maverick Claim No. 27701 at ¶ 3.[6]  The Maverick Claims state each

"constitutes a demand for payment under the Guarantee." *Id.*

        11.     The Maverick Claims allege that, as of the Petition Date, "Lehman Entities

had custody of Maverick's assets or property pursuant to the Prime Brokerage Documents." (*See,*

*id.* ¶ 3.)  Maverick alleges that the value of these assets as of the Petition Date, in the aggregate,

was approximately $118.1 million.  (*See* ECF No. 50761 at fn. 5, the "Estimation Objection.")

        12.     The Maverick Claims expressly admit that LBIE held Maverick's assets as

collateral for Maverick's obligations to LBIE and LBIE's affiliates.  (*See, e.g.,* Maverick Claim

No. 27701 ¶ 3.)  Specifically, Maverick alleged:

> Under the terms of [certain] Prime Brokerage Documents, LBIE has a lien and first
> priority security interest in certain assets held or controlled by LBIE. Such assets
> are held as collateral by LBIE as agent and bailee for itself and *all other affiliates*
> *of LBIE* in connection with Maverick's obligations under the Prime Brokerage
> Documents.

(*See id.* (emphasis added).)

        13.     This is consistent with the Prime Brokerage Documents themselves:

- PB Agreement ¶ 3: "*As security for the payment and performance of all of your obligations*
  *and liabilities from time to time outstanding to any Lehman Brothers Entity* [defined to
  include LBHI and LBIE], whether under this Agreement or otherwise, *each Lehman*
  *Brothers Entity shall have a continuing lien and first priority security interest in all your*
  *Assets,* defined as (i) all property in which you now have or hereafter acquire an interest
  which is now or hereafter held by or through any Lehman Brothers Entity, including, but
  not limited to, any and all securities, accounts, instruments, documents, contract rights,
  contracts (including, but not limited to, open transactions, securities purchase or sale
  contracts, agreements to lend cash or securities, commodity contracts, futures contracts,
  forward contracts, repurchase agreements, swap agreements, contracts for differences or
  any other agreement, without regard to the form of such agreement which may include oral
  agreements or agreements confirmed or signed by only one party to the agreement and
  agreements entered into or signed by a Lehman Brothers Entity on your behalf) (hereinafter
  "Contracts"), commercial paper and other securities, monies, deposit accounts and general

---

[6] The Prime Brokerage Documents with each Maverick fund are: a Customer Account Agreement Prime Brokerage
(the "PB Agreement"); a Global Master Securities Lending Agreement (the "GMSLA"); and a Margin Lending
Agreement (the "MLA").

intangibles (including any security entitlements in respect thereof, all income and profits thereon, all dividends, interest and other payments and distributions with respect thereto and a proceeds from any of the foregoing), and (ii) any and all rights, claims or causes of action you may now or hereafter have against any Lehman Brothers Entity." (Emphasis added.)

- MLA ¶ 5: "*As security for Borrower's [Maverick's] payment and performance of all of its obligations and liabilities* (whether or not mature or contingent) from time to time ("Liabilities") to Lender [LBIE] under this Agreement, the GMSLA or in connection with any Loan and for all obligations owing to Lender (the "Obligations"), *Lender shall have a lien on and a continuing first priority security interest in* all of Borrower's cash, securities, financial assets and other property from time to time delivered under this Agreement or otherwise held by, or under the control of, Lender (the "Collateral''), irrespective of whether or not Lender has made advances to Borrower in connection with such securities or other property." (Emphasis added.)[7]

14.     As dictated by the foregoing (and commercial reality), LBIE's liability to Maverick as of any given point in time was for *excess* collateral *only* – the positive difference, if any, between the value of the collateral and the amount of Maverick's liabilities.  The MLA makes any obligation on the part of LBIE to return collateral expressly conditioned on the prior satisfaction by Maverick of any liabilities to LBIE: "*Upon satisfaction by Borrower [Maverick] of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender [LBIE]), Lender [LBIE] shall return to Borrower the Collateral.*"  (MLA 5(d).)

15.     Other provisions of the Prime Brokerage Documents are consistent with this clear and unambiguous intent:

- PB Agreement at ¶ 3: "In addition, in order to satisfy all of [Maverick's] outstanding liabilities or obligations to any Lehman Brothers Entity, each Lehman Brothers Entity may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to you, *use, apply* or transfer *any and all securities or other property or Assets* (including, without limitation, fully-paid securities and cash)." (Emphasis added.)

- PB Agreement at ¶ 4 (last sentence): "You and Lehman Brothers intend this Agreement to be a *master netting agreement*." (Emphasis added.)

---

[7] Under the MLA, "Borrower" is defined as the applicable Maverick fund and the "Lender" is defined as LBIE. (*See* Recitals, MLA ¶ 1.)

6

- <u>MLA ¶ 5(b)</u>: "In order to satisfy any of Borrower's Obligations, Lender may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to Borrower, *use, apply* or transfer *any and all Collateral*." (Emphasis added.)

- <u>GMLSA ¶ 15</u>: "In the event of either Party failing to remit sums in accordance with this Agreement such Party hereby undertakes to pay to the other Party upon demand interest (before as well as after judgment) on the *net balance due and outstanding*, for the period commencing on and inclusive of the original due date for payment to (but excluding) the date of actual payment, in the same currency as the principal sum and at the rate referred to in paragraph 10.7." (Emphasis added.)

16.    The commercial context is further evidenced by Maverick's obligations under the Prime Brokerage Documents to post collateral as Lehman should demand and to meet margin calls, as the parties monitored and tracked their respective obligations under the Prime Brokerage Documents on a net basis:

- <u>PB Agreement ¶ 17</u>: "You [Maverick] hereby agree to deposit and maintain such cash or collateral as margin in your margin accounts, if any, as Lehman Brothers may in its sole discretion require, and you agree to pay forthwith on demand any amount owing with respect to any of your margin accounts to satisfy Lehman Brothers' demand for such payment (a "Margin Call").   In addition, you further agree to deposit promptly and maintain such other collateral with Lehman Brothers as is required by any Contract you may have with any Lehman Brothers Entity.  Upon your failure to make any such payment or deposit, or if at any time Lehman Brothers, in its sole discretion, deems it necessary for its protection, whether with or without prior demand, call or notice, Lehman Brothers shall be entitled to exercise all rights and remedies provided herein."

- <u>PB Agreement ¶ 21(e)</u>: "You [Maverick] shall maintain in your account with LBI such *minimum net equity* in cash or securities as LBI, in its sole discretion, may require from time to time (the "Lehman Brothers Net Equity Requirements"), which shall in no event be less than the minimum net equity required by the SEC Letter (the "SEC Net Equity Requirements")."

17.    The Prime Brokerage Documents also are clear that in no event would LBIE have an obligation to return Maverick's *specific* asset posted as collateral:

- <u>PB Agreement at ¶ 19</u>: "[Maverick] hereby authorize[s] Lehman Brothers to lend either to itself or to others any securities held by Lehman Brothers in any of your accounts, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such property as collateral for its general loans.  *Any such property, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated* either separately or in common with other property for any amounts due to Lehman Brothers thereon or for a greater sum, *and Lehman*

7

> *Brothers shall have no obligation to retain a like amount of similar property in its possession and control.*" (Emphasis added.)

- <u>MLA at ¶ 7</u>:  "[LBIE] and [Maverick] acknowledge and agree that cash delivered by Borrower hereunder will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts. The parties further agree that Lender will use such cash in the course of its business and *[Maverick] will, therefore, rank as a general creditor of [LBIE] in respect of such cash.*" (Emphasis added.)

- <u>GLMSA at ¶ 24</u>:  "Notwithstanding the use of expressions such as "borrow", "lend", "Collateral", "Margin", "redeliver" etc. which are used to reflect terminology used in the market for transactions of the kind provided for in this Agreement, title to Securities "borrowed" or "lent" and "Collateral" provided in accordance with this Agreement shall pass from one Party to another as provided for in this Agreement, the Party obtaining such title being obliged to redeliver Equivalent Securities or Equivalent Collateral as the case may be."

Thus, the parties expressly agreed that in the event of a LBIE default, Maverick only would be entitled to an unsecured claim against LBIE for the amount of LBIE's obligations under the Prime Brokerage Documents.

18.    To enforce the foregoing, each party agreed that it would not seek specific performance of the other party's obligation to deliver or redeliver "Equivalent" collateral.  *See* GMLSA ¶ 20 ("Each Party agrees that in relation to legal proceedings it will not seek specific performance of the other Party's obligation to deliver or redeliver Securities, Equivalent Securities, Collateral or Equivalent Collateral . . .").

19.    Notwithstanding Maverick's current argument, each Maverick Claim sought the value of collateral "*less any amounts owed by Maverick in connection with the Prime Brokerage Documents.*"  *See*, *e.g.*, *id.* ¶ 4) (emphasis added.)[8]  Each Maverick Claim made clear that it was a claim for a net amount owed to Maverick by LBIE to "take into account any amounts

---

[8] The aggregate amount across the Maverick funds was $118.1 million.  *See* Estimation Objection ¶ 1.  The Maverick Claims had originally asserted the gross value was $187.3.

or obligations that Maverick may owe to the Lehman Entities under the terms of the Prime Brokerage Documentation (*id.* at n.3).

**The Objection**

20.    In the original Objection (ECF No. 53107), LBHI noted (among other things) that, although bankruptcy claims typically are valued as of "the date of the filing of the petition" pursuant to section 502(b) of the Bankruptcy Code, claims arising out of the termination of certain specified contracts, including "master netting agreements" and "securities contracts," like the Prime Brokerage Documents, are valued as of the date of contract termination. *See* 11 U.S.C. § 562(a); *see also* Objection ¶ 23. LBHI argued, therefore, that the Maverick Claims should be valued as of the section 562 date – the date the Prime Brokerage Documents were terminated by the Maverick/LBIE settlement agreement. On that date, LBIE did not owe Maverick anything, but, rather, Maverick owed and paid LBIE $30 million. *Id.* ¶ 26. LBHI argued that, therefore, there was no guarantee liability because Maverick had no primary claim against LBIE as of such date. *See Objection*.

21.    LBHI also argued, in the alternative, that, if the Petition Date was the appropriate measurement date, Maverick failed to meet its burden of establishing a *prima facie* guarantee claim for the gross amount of the collateral held by LBIE on the Petition Date. (*See* Objection ¶ 13; LBHI's Reply, ECF No. 55046 at ¶ 29-31.) Specifically, LBHI argued that LBIE's obligation under the PB Agreements was to return *excess* collateral; thus, Maverick could not establish a guarantee claim looking only at the gross amount of the collateral without regard for the amounts Maverick owed LBIE which such collateral secured. (Objection ¶ 27.) Maverick had alleged the gross value of its collateral on the Petition Date was approximately $118.1 million (*id.* ¶¶ 16-20), but Maverick conceded that, on the Petition Date, the value of its obligations to

9

LBIE was approximately $114 million (Estimation Obj. ¶ 13, n. 5).[9]  As a result, on the Petition

Date, Maverick was a creditor of LBIE for no more than approximately $4.3 million.  (*Id*.)

22.     LBHI also argued in the Objection that two exculpatory provisions in the

PB Agreements – paragraphs 28 and 29 – barred any claims based on the decline in value of the

collateral subsequent to the Petition Date as well as any other claims for consequential damages.

(*See* Objection ¶14; PB Agreement at ¶ 29 ("In no event will Lehman Brothers be liable for any

special, indirect, incidental or consequential damages arising out of this Agreement.").)

**The Bankruptcy Court and District Court Decisions**

23.     This Court ruled that the operative date for valuing the Maverick Claims

was the section 562 LBIE/Maverick settlement date because the Prime Brokerage Documents were

terminated by settlement on that date.  (ECF No. 55348, Hr'g Tr. at 73:6-8.)  The Court also found

that the Maverick Claims were precluded by aspects of the exculpation provisions in paragraphs

28 and 29 of the PB Agreements.  (*Id.* at 75:9-16.)  The Court thus disallowed the Maverick Claims.

(ECF No. 55348.)  The Court did not rule on LBHI's alternative arguments based on a Petition

Date valuation or the prohibition on consequential damages.

24.     Maverick appealed.  Maverick argued that its claims should be valued as of

the Petition Date, not the section 562 date.  *See* Appellants' Brief at 8 ("Maverick has always

asserted that both the Prime Brokerage Agreements and the LBHI Guarantee were breached on

[the Petition Date] and that damages must therefore be calculated as of such date, as mandated

both by applicable New York state law and by Section 502(b) of the Bankruptcy Code").  In

---

[9] It is settled law that a formal judicial admission takes the place of evidence and is conclusive of the facts admitted. *See Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter*, 32 F.2d 195, 198 (2d Cir. 1929) ("A pleading prepared by an attorney is an admission by one presumptively authorized to speak for his principal."); *GJF Const., Inc. v. Sirius Am. Ins. Co.*, 89 A.D.3d 622, 624, 934 N.Y.S.2d 697 (1st. Dep't 2011) ("The hallmark of a formal judicial admission is that it 'dispenses with the production of evidence by conceding, for the purposes of the litigation, the truth of a fact alleged by the adversary'").

addition, Maverick argued that neither the exculpation or limitation of liability provisions of the PB Agreement applied and that it was entitled to amend its claim to assert a claim for "lost profits." *Id.* at 49.

25.    On September 30, 2018, the Distict Court reversed this Court holding that section 562 did not apply, and ruling that the operative date for valuing the Maverick Claims was the Petition Date. (District Court Order at 17.) The District Court also held that the two exculpatory provisions did not limit LBHI's liability because (a) the bankruptcy proceedings "are not covered by the extraordinary events paragraph" [PB Agreement ¶ 28] and (b) any damages sustained by Maverick were not caused by activity on the part of Lehman that is within the reach of the limitation of liability clause [PB Agreement ¶ 29]. (*Id.* at 14.) The District Court did not specifically address paragraph 29 of the PB Agreement's separate prohibition on consequential damages. Finally, the District Court noted that Maverick withdrew the aspect of its appeal contending that this Court abused its discretion in denying Maverick leave to amend its proofs of claim to assert a loss profits claim. (*Id.* at 17.)

26.    The District Court remanded the case to this Court to address LBHI's arguments assuming that the Maverick Claims were to be valued as of the Petition Date. District Court Order at 17.

## RELIEF REQUESTED

27.    The Plan Administrator seeks an Order, pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), disallowing and expunging five of the six Maverick Claims [Claim Nos. 27701, 27702, 27704, 27695 and 27696] to the extent such claims are asserted for the gross value of the collateral posted to LBIE on the Petition Date without regard

for amounts owed by Maverick (*i.e.*, to the extent they seek more than $4.3 million) and disallowing and expunging the sixth Maverick Claim [Claim No. 27703] in its entirety.

## STANDARD OF REVIEW

28.     A claim should not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."   11 U.S.C. § 502(b)(1).

29.     To be entitled to *prima facie* validity under Bankruptcy Rule 3001(f), a proof of claim must allege "facts sufficient to support a legal liability to the claimant."  *In re Allegheny Int'l Inc.*, 954 F.2d 167, 173 (3d Cir. 1992); *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991).  An objection refuting – on either a factual or a legal basis – one of a claim's essential allegations shifts the burden of proof to the claimant.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729, 2007 WL 601452, at *5 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

30.     As set forth in an order of this Court, dated April 19, 2010 [ECF No. 8474], all hearings to address the legal sufficiency of a particular contested claim and whether the contested claim states a claim against the Lehman debtor under Bankruptcy Rule 7012 are considered "sufficiency hearings."  The standard of review at a "sufficiency hearing" is equivalent to the standard applied on a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6).  *Id.*; *see In re Lehman Bros. Holdings Inc.*, 515 B.R. 171, 174 (Bankr. S.D.N.Y. 2014) ("Federal Rule of Bankruptcy Procedure 7012(b), which incorporates Federal Rule of Civil Procedure 12(b)(6), permits a bankruptcy court to dismiss an adversary proceeding if a plaintiff's complaint fails to state a claim upon which relief may be granted.").

12

31.    In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must assume that well-pleaded factual allegations are true, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but a court need not accept legal conclusions, naked assertions, conclusory statements unsupported by facts, or implausible inferences. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 555). Thus, a creditor "must allege 'enough facts to state a claim for relief that is plausible on its face.'" *In re Residential Capital, LLC*, 2014 WL 3397779, at *3 (Bankr. S.D.N.Y. July 11, 2014) (citing *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). Thus, "[t]he pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

## ARGUMENT

## I.    There Can Be No Claim By Maverick For The Value Of Its Collateral Disconnected From The Obligations That Such Collateral Secured

32.    Claims that arise under state law must be valued in accordance with substantive state law. *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 123 (D. Del. 2006); *see also Raleigh v. Illinois Department of Revenue*, 530 U.S. 15, 20 (2000) (stating that the "'basic federal rule' in bankruptcy is that state law governs the substance of claims, ... Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.'"). A court, therefore, must look at how a claim would have been valued in the state court system had the debtor never entered bankruptcy. *In re Armstrong* at 123. In making this determination, the claim must be valued as of the Petition Date. *See, e.g.*, *id.*; 11 U.S.C. § 502

WEIL:\97023262\18\58399.0011

("the court . . . shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition.").

33.    As a matter of New York contract law, Maverick cannot state a guarantee claim except to the extent it can establish an unsatisfied debt owed by the primary obligor as of the relevant valuation date:  "A *prima facie* case for breach of a written guarantee in New York requires a plaintiff to establish (1) an absolute and unconditional guarantee, (2) the underlying debt, and (3) the guarantor's failure to satisfy the unpaid debt."  *Myers Indus., Inc. v. Schoeller Arca Sys., Inc.,* 171 F. Supp. 3d 107, 121 (S.D.N.Y. 2016).  Indeed, it is axiomatic that a guarantor is not liable absent some unsatisfied obligation owed by the primary obligor.  *See Granite Computer Leasing Corp. v. Travelers Indem. Co.*, 894 F.2d 547, 551 (2d Cir. 1990) ("Under basic suretyship law, a surety's obligations cannot be more burdensome than those of its principal, and where the principal is not liable on the obligation, neither is the guarantor") (citation omitted); *CN Funding LLC v. Ensig Grp. Ltd.*, 18 Misc. 3d 214, 220 (N.Y. Sup. Ct. N.Y. Cty. 2007) ("As plaintiff is unable as a matter of law to prove the underlying debt, its enforcement of the guarantee claim must also be dismissed").

34.    Here, Maverick asserts guarantee claims against LBHI on behalf of five of the six funds for an aggregate of $118.1 million based on the alleged gross value of the posted collateral as of the Petition Date – without regard to those funds' $114 million of liabilities to LBIE.  Yet Maverick conceded in the Maverick Claims that LBHI's liability is the value of the collateral "*less any amounts owed by Maverick in connection with the Prime Brokerage Agreements*."  (*See, e.g.*, Claim 27701 at ¶ 4.)  The Maverick Claims thus concede (consistent with the Prime Brokerage Documents as set forth in detail above) that LBIE's only obligations to Maverick were to return an amount equal to any excess after application of the collateral against

14

Maverick's liabilities to LBIE. In other words, any LBIE obligation to "return" collateral cannot be calculated without first subtracting the amount Maverick owed to LBIE. *See, e.g.*, MLA at ¶ 5(d) ("Upon satisfaction by Borrower [Maverick] of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender [LBIE]), Lender [LBIE] shall return to Borrower the Collateral"). If LBHI had not filed for chapter 11, Maverick could have only demanded from LBHI the amount LBIE owed Maverick – which was limited to any excess collateral. *See Armstrong* at 123 (explaining that a "court must . . . look at how a claim would have been valued in the state court system had the debtor never entered bankruptcy").

35.    Moreover, Maverick's theory that LBHI guaranteed the gross amount of the collateral held by LBIE is contrary to the express terms of both the Guarantee and the Prime Brokerage Documents. Under the LBHI Guarantee, what LBHI guaranteed was LBIE's "Obligations," which were defined as "all obligations under" the PB Agreement, the MLA, and the GMLSA. *See* LBHI Guarantee. Nowhere in the Prime Brokerage Documents did LBIE (or any affiliated Lehman entity) have an obligation to simply "return" the collateral until and unless there was value remaining after applying it to satisfy Maverick's debts to LBIE; rather, in all circumstances, LBIE's obligation to "return" collateral was contingent on whether or not Maverick's underlying obligations that the collateral secured had been satisfied. Since, as established above, a guarantor's liability cannot be greater than that of the primary obligor, the only way to value Maverick's Guaranty Claim against LBHI as of the Petition Date is to calculate the amount of LBIE's obligations as of the Petition Date. Maverick has admitted that such amount is, at most, $4.3 million. (*See* Estimation Objection at fn. 5.)

36.    While the plain meaning of the LBHI Guarantee and the applicable provisions of the Prime Brokerage Documents are clear, this Court has noted that the "meaning of

particular language ... should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." *Lehman Bros. Special Fin. Inc. v. Bank of Am., N.A. (In re Lehman Bros. Holdings Inc.)*, 553 B.R. 476, 498–99 (Bankr. S.D.N.Y. 2016), *aff'd*, No. 17 Civ. 1224 (LGS), 2018 WL 1322225 (S.D.N.Y. Mar. 14, 2018). Maverick's claim that LBHI's liability under the LBHI Guaranty was greater than LBIE's underlying obligation defies New York law, the plain meaning of the Prime Brokerage Documents and the LBHI Guarantee, and the commercial reality of the parties' arrangement. As this Court already has explained, "[i]t would be contrary to commercial practice and commercial reality for a brokerage customer to be able to recover more from its primary obligor and guarantor in bankruptcy than it would outside of bankruptcy where a customer's economic exposure is measured on a net basis with the value of its long positions offset against its short positions[.]" (ECF No. 55348, Hr'g Tr. at 75:1-8.)

## II.    LBHI's Guarantee Obligations Became Fixed as of the Petition Date

37.    As this Court has held, and courts in this Circuit have held, a claim against a guarantor becomes fixed at the time the primary obligor breaches its obligations. *In re Lehman Brothers Holdings Inc.*, 2019 WL 2323775, at *15 (Bankr. S.D.N.Y., 2019) (stating that "liability on a guarantee ceases to be contingent and is fixed after the primary obligor has defaulted on its obligation; such default is the predicate to enforcement of the guarantee"); *In re LightSquared Inc.*, 2014 WL 5488413, at *3-4 (Bankr. S.D.N.Y. Oct. 30, 2014) (same). *See also Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 384 (2d Cir. 2006) ("It is settled Second Circuit law that in a breach of contract case, damages are calculated at the time of the breach."); *In re O.P.M. Leasing Servs., Inc.*, 56 B.R. 678, 684 (Bankr. S.D.N.Y. 1986) ("[d]amages in a bankruptcy case must be measured in accordance with accepted contract law principles.").

38.     By Maverick's own admission, the contractual obligations that LBHI guaranteed "were breached when LBIE entered U.K. administration proceedings[.]" (Estimation Objection ¶ 16 ("LBIE's failure to comply with such obligations was compensable by an award of money damages, calculated as of the date of breach."); *id.* at 18 ("LBHI's resulting liability under the [LBHI Guarantee] must be calculated based on . . . the date of breach (*i.e.,* September 15, 2008).")

39.     In light of the foregoing admission that LBHI's breach occurred on the Petition Date, and that, as detailed above, all relevant facts to calculating damages on the Petition Date are either known, stipulated to by LBHI, or admitted to by Maverick in pleadings before this Court, Maverick's guarantee claims should be reduced to $4.3 million.

## III.    *Ivanhoe* Does Not Support Maverick's Theory of Recovery

40.     Maverick contends it is entitled to a dollar-for-dollar recovery of $16.2 million for the difference between its $118.1 million valuation of the collateral as of the Petition Date and the $102 million it received credit for under its 2015 settlement with LBIE pursuant to the Supreme Court's decision in *Ivanhoe Bldg. & Loan Ass'n of Newark, N.J. v. Orr*, 295 U.S. 243, 244 (1935). *Ivanhoe*, however, stands only for the proposition that a creditor may assert the full amount of its claim (to receive distributions based on the full principal amount) against a bankrupt debtor co-obligor notwithstanding the creditor's recovery of some but not all of the amount owed from a third-party co-obligor until the creditor is made whole. *See Ivanhoe,* 295 U.S. at 246-47. Critically, *Ivanhoe* and its progeny do not allow the creditor to obtain more than the value of its claim. *See Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 295 (3d Cir. 2012) (finding that the "rarely cited" *Ivanhoe* "does not hold that the actual amount the creditor collects from the estate evades reduction by recovery from third parties. Rather, it states the exact opposite: a creditor cannot collect more,

17

in total, than the amount it is owed"); Bankruptcy Court Order, ECF No. 55346, Tr. at 74:16-74:20

("Maverick cites *Ivanhoe*, but *Ivanhoe* and its progeny merely stand for the proposition that a

creditor cannot recover more than the value of its claims or damages, and *Ivanhoe* does not enable

Maverick to assert additional guarantee claim rights against LBHI").  Here, based on Maverick's

admissions, the five Maverick funds were owed, at most $4.3 million by the primary obligor

(LBIE) as of the Petition Date.  *Ivanhoe* in no way supports Maverick's theory that it can assert a

claim for more than $4.3 Million against LBHI.

## **RESERVATION OF RIGHTS**

41.    The Plan Administrator reserves all rights to object on any other bases to

the Maverick Claims.  The Plan Administrator reserves the right to conduct further discovery as

to the Maverick Claims and any matters raised by Maverick and to supplement this and other

filings as a result thereof.

## **NOTICE**

42.    No trustee has been appointed in these chapter 11 cases.  Notice of this

objection has been provided to (i) the United States Trustee for Region 2; (ii) the Securities and

Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the

Southern District of New York; (v) Maverick; and (vi) all other parties entitled to notice in

accordance with the procedures set forth in the second amended order entered on June 17, 2010

governing case management and administrative procedures for these cases [ECF No. 9635].  The

Plan Administrator submits that no other or further notice need be provided.

18

WHEREFORE the Plan Administrator respectfully requests entry of an Order granting the relief requested herein and such other and further relief as is just.

Dated: July 3, 2019
New York, New York

/s/ *Garrett A. Fail*

Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

19

Response Deadline: July 25, 2019 at 12:00 p.m. (Prevailing Eastern Time)
Hearing Date and Time: TBD

## Exhibit A

| Maverick Claims | Claim No. |
|---|---|
| Maverick Neutral Fund, Ltd. | 27701 |
| Maverick Fund USA, Ltd. | 27702 |
| Maverick Fund II, Ltd. | 27703 |
| Maverick Fund, L.D.C. | 27704 |
| Maverick Long Enhanced Fund, Ltd. | 27695 |
| Maverick Neutral Levered Fund, Ltd. | 27696 |
| **Documents** | **ECF No.** |
| Prime Brokerage Agreements | 50761, Exhibit B |
| Sample Margin Lending Agreement (MLA) | Exhibit A-1 hereto |
| Sample Global Securities Lending Agreement (GMLA) | Exhibit A-2 hereto |
| LBHI Guarantee | 50761, Exhibit C |
| Maverick-LBIE Settlement Agreement | 50761, Exhibit E |
| **Bankruptcy Court Pleadings** | **ECF No.** |
| Plan Administrator's Motion to Estimate Claims | 49954 |
| Maverick's Objection to the Estimation Motion | 50761 |
| Plan Administrator's Motion to Dismiss Maverick Claims | 53107 |
| Maverick's Opposition to the Motion to Dismiss | 53435 |
| Plan Administrator's Reply in Support of Motion to Dismiss | 55046 |
| Order Granting Motion to Dismiss | 55346 |
| **Bankruptcy Court Transcripts** | **ECF No.** |
| Hearing Transcript, March 24, 2017 (Motion to Dismiss) | 55115 |
| Hearing Transcript, January 14, 2019 (Status Conference) | 59467 |
| **District Court Pleadings[10]** | **D.Ct. ECF No.** |
| Maverick's Appellant Brief | 11 |
| Plan Administrator's Appellee Brief | 13 |
| Maverick's Reply Brief | 14 |
| District Court Opinion | 16 |

---

[10] *See Maverick Long Enhanced Fund, LTD., et al. v. Lehman Brothers Holdings, Inc.*, No. 17-CV-4203 (RA).

## Exhibit A-1

**Global Master Securities Lending Agreement**

RSION: MAY 2000



LBIE

M Neutral

Levered

Fund Lt

**GLOBAL MASTER SECURITIES LENDING AGREEMENT**

## CLIFFORD CHANCE

## CONTENTS

1.  Applicability ............................................................................................................... 1

2.  Interpretation .............................................................................................................. 1

3.  Loans Of Securities ................................................................................................... 5

4.  Delivery ...................................................................................................................... 5

5.  Collateral .................................................................................................................... 6

6.  Distributions And Corporate Actions ........................................................................ 9

7.  Rates Applicable To Loaned Securities And Cash Collateral .................................. 10

8.  Redelivery Of Equivalent Securities ....................................................................... 11

9.  Failure To Redeliver ................................................................................................ 12

10. Set-Off Etc ............................................................................................................... 14

11. Transfer Taxes ......................................................................................................... 17

12. Lender's Warranties ................................................................................................. 17

13. Borrower's Warranties ............................................................................................. 17

14. Events Of Default ..................................................................................................... 18

15. Interest On Outstanding Payments .......................................................................... 19

16. Transactions Entered Into As Agent ....................................................................... 19

17. Termination Of This Agreement .............................................................................. 20

18. Single Agreement ..................................................................................................... 21

19. Severance .................................................................................................................. 21

20. Specific Performance ............................................................................................... 21

21. Notices ...................................................................................................................... 21

22. Assignment ............................................................................................................... 22

23. Non-Waiver .............................................................................................................. 22

24. Governing Law And Jurisdiction ............................................................................. 22

25. Time .......................................................................................................................... 22

26. Recording .................................................................................................................. 22

27. Waiver Of Immunity ................................................................................................ 23

28. Miscellaneous ........................................................................................................... 23

SCHEDULE .................................................................................................................... 25

AGREEMENT

BETWEEN:

**Lehman Brothers International (Europe) ("Party A")** a company incorporated under the laws of England and Wales of 25 Bank Street, London E14 5LE acting through a Designated Office; and **Maverick Neutral Levered Fund, Ltd. ("Party B")** a company incorporated under the laws of Cayman Islands of c/o M&C Corporate Services Limited , PO Box 309GT, Ugland House, South Church Street, George Town , Grand Cayman, Cayman Islands  acting through a Designated Office.

1. **APPLICABILITY**

1.1 From time to time the parties may enter into transactions in which one party (**"Lender"**) will transfer to the other (**"Borrower"**) securities and financial instruments (**"Securities"**) against the transfer of Collateral (as defined in paragraph 2) with a simultaneous agreement by Borrower to transfer to Lender Securities equivalent to such Securities on a fixed date or on demand against the transfer to Borrower by Lender of assets equivalent to such Collateral.

1.2 Each such transaction shall be referred to in this Agreement as a **"Loan"** and shall be governed by the terms of this Agreement, including the supplemental terms and conditions contained in the Schedule and any Addenda or Annexures attached hereto, unless otherwise agreed in writing.

1.3 Either party may perform its obligations under this Agreement either directly or through a Nominee.

2. **INTERPRETATION**

2.1 In this Agreement:-

**"Act of Insolvency"** means in relation to either Party

(i) its making a general assignment for the benefit of, or entering into a reorganisation, arrangement, or composition with creditors; or

(ii) its stating in writing that it is unable to pay its debts as they become due; or

(iii) its seeking, consenting to or acquiescing in the appointment of any trustee, administrator, receiver or liquidator or analogous officer of it or any material part of its property; or

(iv) the presentation or filing of a petition in respect of it (other than by the other Party to this Agreement in respect of any obligation under this Agreement) in any court or before any agency alleging or for the bankruptcy, winding-up or insolvency of such Party (or any analogous proceeding) or seeking any reorganisation, arrangement, composition, re-adjustment, administration, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such petition not having been stayed or dismissed within 30 days of its filing (except in the case

such 30 day period shall apply); or

(v)    the appointment of a receiver, administrator, liquidator or trustee or analogous officer of such Party over all or any material part of such Party's property; or

(vi)   the convening of any meeting of its creditors for the purpose of considering a voluntary arrangement as referred to in Section 3 of the Insolvency Act 1986 (or any analogous proceeding);

**"Alternative Collateral"** means Collateral having a Market Value equal to the Collateral delivered pursuant to paragraph 5 and provided by way of substitution in accordance with the provisions of paragraph 5.3;

**"Base Currency"** means the currency indicated in paragraph 2 of the Schedule;

**"Business Day"** means a day other than a Saturday or a Sunday on which banks and securities markets are open for business generally in each place stated in paragraph 3 of the Schedule and, in relation to the delivery or redelivery of any of the following in relation to any Loan, in the place(s) where the relevant Securities, Equivalent Securities, Collateral or Equivalent Collateral are to be delivered;

**"Cash Collateral"** means Collateral that takes the form of a transfer of currency;

**"Close of Business"** means the time at which the relevant banks, securities exchanges or depositaries close in the business centre in which payment is to be made or Securities or Collateral is to be delivered;

**"Collateral"** means such securities or financial instruments or transfers of currency as are referred to in the table set out under paragraph 1 of the Schedule as being acceptable or any combination thereof as agreed between the Parties in relation to any particular Loan and which are delivered by Borrower to Lender in accordance with this Agreement and shall include Alternative Collateral;

**"Defaulting Party"** shall have the meaning given in paragraph 14;

**"Designated Office"** means the branch or office of a Party which is specified as such in paragraph 4 of the Schedule or such other branch or office as may be agreed to in writing by the Parties;

**"Equivalent "** or **"equivalent to"** in relation to any Securities or Collateral provided under this Agreement means securities, together with cash or other property(in the case of Collateral) as the case may be, of an identical type, nominal value, description and amount to particular Securities or Collateral, as the case may be, so provided. If and to the extent that such Securities or Collateral, as the case may be, consists of securities that are partly paid or have been converted, subdivided, consolidated, made the subject of a takeover, rights of pre-emption, rights to receive securities or a certificate which may at a future date be exchanged for securities, the expression shall include such securities or other assets to which Lender or Borrower as the case may be, is entitled following the occurrence of the relevant event, and, if appropriate, the giving of the relevant notice in accordance with paragraph 6.4 and provided that Lender or Borrower, as the case may be, has paid to the other Party all and any sums due in respect thereof. In the event that

are the subject of a capitalisation issue or are subject to an event similar to any of the foregoing events described in this paragraph, the expression shall have the following meanings:-

(a)  in the case of redemption, a sum of money equivalent to the proceeds of the redemption;

(b)  in the case of a call on partly paid securities, securities equivalent to the relevant Loaned Securities or Collateral, as the case may be, provided that Lender shall have paid Borrower, in respect of Loaned Securities, and Borrower shall have paid to Lender, in respect of Collateral, an amount of money equal to the sum due in respect of the call;

(c)  in the case of a capitalisation issue, securities equivalent to the relevant Loaned Securities or Collateral, as the case may be, together with the securities allotted by way of bonus thereon;

(d)  in the case of any event similar to any of the foregoing events described in this paragraph, securities equivalent to the Loaned Securities or the relevant Collateral, as the case may be, together with or replaced by a sum of money or securities or other property equivalent to that received in respect of such Loaned Securities or Collateral, as the case may be, resulting from such event;

"**Income**" means any interest, dividends or other distributions of any kind whatsoever with respect to any Securities or Collateral;

"**Income Payment Date**", with respect to any Securities or Collateral means the date on which Income is paid in respect of such Securities or Collateral, or, in the case of registered Securities or Collateral, the date by reference to which particular registered holders are identified as being entitled to payment of Income;

"**Letter of Credit**" means an irrevocable, non-negotiable letter of credit in a form, and from a bank, acceptable to Lender;

"**Loaned Securities**" means Securities which are the subject of an outstanding Loan;

"**Margin**" shall have the meaning specified in paragraph 1 of the Schedule with reference to the table set out therein;

"**Market Value**" means:

(a)  in relation to the valuation of Securities, Equivalent Securities, Collateral or Equivalent Collateral (other than Cash Collateral or a Letter of Credit):

(i)   such price as is equal to the market quotation for the bid price of such Securities, Equivalent Securities, Collateral and/or Equivalent Collateral as derived from a reputable pricing information service reasonably chosen in good faith by Lender; or

(ii)  if unavailable the market value thereof as derived from the prices or rates bid by a reputable dealer for the relevant instrument reasonably chosen in good faith by Lender,

of either Party where in its reasonable opinion there has been an exceptional movement in the price of the asset in question since such time, the latest available price; plus (in each case)

(iii)   the aggregate amount of Income which has accrued but not yet been paid in respect of the Securities, Equivalent Securities, Collateral or Equivalent Collateral concerned to the extent not included in such price,

(provided that the price of Securities, Equivalent Securities, Collateral or Equivalent Collateral that are suspended shall (for the purposes of paragraph 5) be nil unless the Parties otherwise agree and (for all other purposes) shall be the price of such Securities, Equivalent Securities, Collateral or Equivalent Collateral, as the case may be, as of Close of Business on the dealing day in the relevant market last preceding the date of suspension or a commercially reasonable price agreed between the Parties;

(b)   in relation to a Letter of Credit the face or stated amount of such Letter of Credit; and

(c)   in relation to Cash Collateral the amount of the currency concerned;

"**Nominee**" means an agent or a nominee appointed by either Party to accept delivery of, hold or deliver Securities, Equivalent Securities, Collateral and/or Equivalent Collateral or to receive or make payments on its behalf;

"**Non-Defaulting Party**" shall have the meaning given in paragraph 14;

"**Parties**" means Lender and Borrower and "Party" shall be construed accordingly;

"**Posted Collateral**" has the meaning given in paragraph 5.4;

"**Required Collateral Value**" shall have the meaning given in paragraph 5.4;

"**Settlement Date**" means the date upon which Securities are transferred to Borrower in accordance with this Agreement.

## 2.2    Headings

All headings appear for convenience only and shall not affect the interpretation of this Agreement.

## 2.3    Market terminology

Notwithstanding the use of expressions such as "borrow", "lend", "Collateral", "Margin", "redeliver" etc. which are used to reflect terminology used in the market for transactions of the kind provided for in this Agreement, title to Securities "borrowed" or "lent" and "Collateral" provided in accordance with this Agreement shall pass from one Party to another as provided for in this Agreement, the Party obtaining such title being obliged to redeliver Equivalent Securities or Equivalent Collateral as the case may be.

## 2.4    Currency conversions

Required Collateral Value, Relevant Value, Bid Value and Offer Value for the purposes of paragraphs 5 and of this Agreement) prices, sums or value stated in currencies other than the Base Currency shall be converted into the Base Currency at the latest available spot rate of exchange quoted by a bank selected by Lender (or if an Event of Default has occurred in relation to Lender, by Borrower) in the London interbank market for the purchase of the Base Currency with the currency concerned on the day on which the calculation is to be made or, if that day is not a Business Day the spot rate of exchange quoted at Close of Business on the immediately preceding Business Day.

2.5    The parties confirm that introduction of and/or substitution (in place of an existing currency) of a new currency as the lawful currency of a country shall not have the effect of altering, or discharging, or excusing performance under, any term of the Agreement or any Loan thereunder, nor give a party the right unilaterally to alter or terminate the Agreement or any Loan thereunder. Securities will for the purposes of this Agreement be regarded as equivalent to other securities notwithstanding that as a result of such introduction and/or substitution those securities have been redenominated into the new currency or the nominal value of the securities has changed in connection with such redenomination.

2.6    **Modifications etc to legislation**

Any reference in this Agreement to an act, regulation or other legislation shall include a reference to any statutory modification or re-enactment thereof for the time being in force.

3.    **LOANS OF SECURITIES**

Lender will lend Securities to Borrower, and Borrower will borrow Securities from Lender in accordance with the terms and conditions of this Agreement. The terms of each Loan shall be agreed prior to the commencement of the relevant Loan either orally or in writing (including any agreed form of electronic communication) and confirmed in such form and on such basis as shall be agreed between the Parties. Any confirmation produced by a Party shall not supersede or prevail over the prior oral, written or electronic communication (as the case may be).

4.    **DELIVERY**

4.1    **Delivery of Securities on commencement of Loan**

Lender shall procure the delivery of Securities to Borrower or deliver such Securities in accordance with this Agreement and the terms of the relevant Loan. Such Securities shall be deemed to have been delivered by Lender to Borrower on delivery to Borrower or as it shall direct of the relevant instruments of transfer, or in the case of Securities held by an agent or within a clearing or settlement system on the effective instructions to such agent or the operator of such system which result in such Securities being held by the operator of the clearing system for the account of the Borrower or as it shall direct, or by such other means as may be agreed.

4.2    **Requirements to effect delivery**

instructions to procure that all right, title and interest in:

(a)     any Securities borrowed pursuant to paragraph 3;

(b)     any Equivalent Securities redelivered pursuant to paragraph 8;

(c)     any Collateral delivered pursuant to paragraph 5;

(d)     any Equivalent Collateral redelivered pursuant to paragraphs 5 or 8;

shall pass from one Party to the other subject to the terms and conditions set out in this Agreement, on delivery or redelivery of the same in accordance with this Agreement with full title guarantee, free from all liens, charges and encumbrances. In the case of Securities, Collateral, Equivalent Securities or Equivalent Collateral title to which is registered in a computer based system which provides for the recording and transfer of title to the same by way of book entries, delivery and transfer of title shall take place in accordance with the rules and procedures of such system as in force from time to time. The Party acquiring such right, title and interest shall have no obligation to return or redeliver any of the assets so acquired but, in so far as any Securities are borrowed or any Collateral is delivered to such Party, such Party shall be obliged, subject to the terms of this Agreement, to redeliver Equivalent Securities or Equivalent Collateral as appropriate.

**4.3     Deliveries to be simultaneous unless otherwise agreed**

Where under the terms of this Agreement a Party is not obliged to make a delivery unless simultaneously a delivery is made to it, subject to and without prejudice to its rights under paragraph 8.6 such Party may from time to time in accordance with market practice and in recognition of the practical difficulties in arranging simultaneous delivery of Securities, Collateral and cash transfers waive its right under this Agreement in respect of simultaneous delivery and/or payment provided that no such waiver (whether by course of conduct or otherwise) in respect of one transaction shall bind it in respect of any other transaction.

**4.4     Deliveries of Income**

In respect of Income being paid in relation to any Loaned Securities or Collateral, Borrower in the case of Income being paid in respect of Loaned Securities and Lender in the case of Income being paid in respect of Collateral shall provide to the other Party, as the case may be, any endorsements or assignments as shall be customary and appropriate to effect the delivery of money or property equivalent to the type and amount of such Income to Lender, irrespective of whether Borrower received the same in respect of any Loaned Securities or to Borrower, irrespective of whether Lender received the same in respect of any Collateral.

**5.     COLLATERAL**

**5.1     Delivery of Collateral on commencement of Loan**

Subject to the other provisions of this paragraph 5, Borrower undertakes to deliver to or deposit with Lender (or in accordance with Lender's instructions) Collateral

no later than Close of Business on the Settlement Date. In respect of Collateral comprising securities such Collateral shall be deemed to have been delivered by Borrower to Lender on delivery to Lender or as it shall direct of the relevant instruments of transfer, or in the case of such securities being held by an agent or within a clearing or settlement system, on the effective instructions to such agent or the operator of such system, which result in such securities being held by the operator of the clearing system for the account of the Lender or as it shall direct, or by such other means as may be agreed.

5.2     **Deliveries through payment systems generating automatic payments**

Unless otherwise agreed between the Parties, where any Securities, Equivalent Securities, Collateral or Equivalent Collateral (in the form of securities) are transferred through a book entry transfer or settlement system which automatically generates a payment or delivery, or obligation to pay or deliver, against the transfer of such securities, then:-

(i)     such automatically generated payment, delivery or obligation shall be treated as a payment or delivery by the transferee to the transferor, and except to the extent that it is applied to discharge an obligation of the transferee to effect payment or delivery, such payment or delivery, or obligation to pay or deliver, shall be deemed to be a transfer of Collateral or redelivery of Equivalent Collateral, as the case may be, made by the transferee until such time as the Collateral or Equivalent Collateral is substituted with other Collateral or Equivalent Collateral if an obligation to deliver other Collateral or redeliver Equivalent Collateral existed immediately prior to the transfer of Securities, Equivalent Securities, Collateral or Equivalent Collateral; and

(ii)    the party receiving such substituted Collateral or Equivalent Collateral, or if no obligation to deliver other Collateral or redeliver Equivalent Collateral existed immediately prior to the transfer of Securities, Equivalent Securities, Collateral or Equivalent Collateral, the party receiving the deemed transfer of Collateral or redelivery of Equivalent Collateral, as the case may be, shall cause to be made to the other party for value the same day either, where such transfer is a payment, an irrevocable payment in the amount of such transfer or, where such transfer is a delivery, an irrevocable delivery of securities (or other property, as the case may be) equivalent to such property.

5.3     **Substitutions of Collateral**

Borrower may from time to time call for the repayment of Cash Collateral or the redelivery of Collateral equivalent to any Collateral delivered to Lender prior to the date on which the same would otherwise have been repayable or redeliverable provided that at the time of such repayment or redelivery Borrower shall have delivered or delivers Alternative Collateral acceptable to Lender and Borrower is in compliance with paragraph 5.4 or paragraph 5.5, as applicable.

Unless paragraph 1.3 ⸍⸍⸍he Schedule indicates that paragraph 5.5 ⸍ll apply in lieu of this paragraph 5.4, or unless otherwise agreed between the Parties:-

(i) the aggregate Market Value of the Collateral delivered to or deposited with Lender (excluding any Equivalent Collateral repaid or redelivered under Paragraphs 5.4(ii) or 5.5(ii) (as the case may be)) ("**Posted Collateral**") in respect of all Loans outstanding under this Agreement shall equal the aggregate of the Market Value of the Loaned Securities and the applicable Margin (the "**Required Collateral Value**") in respect of such Loans;

(ii) if at any time on any Business Day the aggregate Market Value of the Posted Collateral in respect of all Loans outstanding under this Agreement exceeds the aggregate of the Required Collateral Values in respect of such Loans, Lender shall (on demand) repay and/or redeliver, as the case may be, to Borrower such Equivalent Collateral as will eliminate the excess;

(iii) if at any time on any Business Day the aggregate Market Value of the Posted Collateral in respect of all Loans outstanding under this Agreement falls below the aggregate of Required Collateral Values in respect of all such Loans, Borrower shall (on demand) provide such further Collateral to Lender as will eliminate the deficiency.

5.5 **Marking to Market of Collateral during the currency of a Loan on a Loan by Loan basis**

If paragraph 1.3 of the Schedule indicates this paragraph 5.5 shall apply in lieu of paragraph 5.4, the Posted Collateral in respect of any Loan shall bear from day to day and at any time the same proportion to the Market Value of the Loaned Securities as the Posted Collateral bore at the commencement of such Loan. Accordingly:

(i) the Market Value of the Posted Collateral to be delivered or deposited while the Loan continues shall be equal to the Required Collateral Value;

(ii) if at any time on any Business Day the Market Value of the Posted Collateral in respect of any Loan exceeds the Required Collateral Value in respect of such Loan, Lender shall (on demand) repay and/or redeliver, as the case may be, to Borrower such Equivalent Collateral as will eliminate the excess; and

(iii) if at any time on any Business Day the Market Value of the Posted Collateral falls below the Required Collateral Value, Borrower shall (on demand) provide such further Collateral to Lender as will eliminate the deficiency.

5.6 **Requirements to redeliver excess Collateral**

Where paragraph 5.4 applies, unless paragraph 1.4 of the Schedule indicates that this paragraph 5.6 does not apply, if a Party (the "**first Party**") would, but for this paragraph 5.6, be required under paragraph 5.4 to provide further Collateral or redeliver Equivalent Collateral in circumstances where the other Party (the "**second Party**") would, but for this paragraph 5.6, also be required to or provide Collateral or redeliver Equivalent Collateral under paragraph 5.4, then the Market Value of the Collateral or

Market Value of the Collateral or Equivalent Collateral deliverable by the second Party ("Y") and the only obligation of the Parties under paragraph 5 shall be, where X exceeds Y, an obligation of the first Party, or where Y exceeds X, an obligation of the second Party to repay and/or (as the case may be) redeliver Equivalent Collateral or to deliver further Collateral having a Market Value equal to the difference between X and Y.

5.7    Where Equivalent Collateral is repaid or redelivered (as the case may be) or further Collateral is provided by a Party under paragraph 5.6, the Parties shall agree to which Loan or Loans such repayment, redelivery or further provision is to be attributed and failing agreement it shall be attributed, as determined by the Party making such repayment, redelivery or further provision to the earliest outstanding Loan and, in the case of a repayment or redelivery up to the point at which the Market Value of Collateral in respect of such Loan equals the Required Collateral Value in respect of such Loan, and then to the next earliest outstanding Loan up to the similar point and so on.

5.8    **Timing of repayments of excess Collateral or deliveries of further Collateral**

Where any Equivalent Collateral falls to be repaid or redelivered (as the case may be) or further Collateral is to be provided under this paragraph 5, unless otherwise agreed between the Parties, it shall be delivered on the same Business Day as the relevant demand. Equivalent Collateral comprising securities shall be deemed to have been delivered by Lender to Borrower on delivery to Borrower or as it shall direct of the relevant instruments of transfer, or in the case of such securities being held by an agent or within a clearing or settlement system on the effective instructions to such agent or the operator of such system which result in such securities being held by the operator of the clearing system for the account of the Borrower or as it shall direct or by such other means as may be agreed.

5.9    **Substitutions and extensions of Letters of Credit**

Where Collateral is a Letter of Credit, Lender may by notice to Borrower require that Borrower, on the Business Day following the date of delivery of such notice, substitute Collateral consisting of cash or other Collateral acceptable to Lender for the Letter of Credit. Prior to the expiration of any Letter of Credit supporting Borrower's obligations hereunder, Borrower shall, no later than 10.30a.m. UK time on the second Business Day prior to the date such Letter of Credit expires, obtain an extension of the expiration of such Letter of Credit or replace such Letter of Credit by providing Lender with a substitute Letter of Credit in an amount at least equal to the amount of the Letter of Credit for which it is substituted.

6.    **DISTRIBUTIONS AND CORPORATE ACTIONS**

6.1    **Manufactured Payments**

Where Income is paid in relation to any Loaned Securities or Collateral (other than Cash Collateral) on or by reference to an Income Payment Date Borrower, in the case of Loaned Securities, and Lender, in the case of Collateral, shall, on the date of the payment of such Income, or on such other date as the Parties may from time to time agree, (the **"Relevant Payment Date"**) pay and deliver a sum of money or property

Lender would have been entitled to receive had such Securities not been loaned to Borrower and had been retained by Lender on the Income Payment Date, and, in the case of Collateral, Borrower would have been entitled to receive had such Collateral not been provided to Lender and had been retained by Borrower on the Income Payment Date unless a different sum is agreed between the Parties.

6.2    **Income in the form of Securities**

Where Income, in the form of securities, is paid in relation to any Loaned Securities or Collateral, such securities shall be added to such Loaned Securities or Collateral (and shall constitute Loaned Securities or Collateral, as the case may be, and be part of the relevant Loan) and will not be delivered to Lender, in the case of Loaned Securities, or to Borrower, in the case of Collateral, until the end of the relevant Loan, provided that the Lender or Borrower (as the case may be) fulfils their obligations under paragraph 5.4 or 5.5 (as applicable) with respect to the additional Loaned Securities or Collateral, as the case may be.

6.3    **Exercise of voting rights**

Where any voting rights fall to be exercised in relation to any Loaned Securities or Collateral, neither Borrower, in the case of Equivalent Securities, nor Lender, in the case of Equivalent Collateral, shall have any obligation to arrange for voting rights of that kind to be exercised in accordance with the instructions of the other Party in relation to the Securities borrowed by it or transferred to it by way of Collateral, as the case may be, unless otherwise agreed between the Parties.

6.4    **Corporate actions**

Where, in respect of any Loaned Securities or any Collateral, any rights relating to conversion, sub-division, consolidation, pre-emption, rights arising under a takeover offer, rights to receive securities or a certificate which may at a future date be exchanged for securities or other rights, including those requiring election by the holder for the time being of such Securities or Collateral, become exercisable prior to the redelivery of Equivalent Securities or Equivalent Collateral, then Lender or Borrower, as the case may be, may, within a reasonable time before the latest time for the exercise of the right or option give written notice to the other Party that on redelivery of Equivalent Securities or Equivalent Collateral, as the case may be, it wishes to receive Equivalent Securities or Equivalent Collateral in such form as will arise if the right is exercised or, in the case of a right which may be exercised in more than one manner, is exercised as is specified in such written notice.

7.    **RATES APPLICABLE TO LOANED SECURITIES AND CASH COLLATERAL**

7.1    **Rates in respect of Loaned Securities**

In respect of each Loan, Borrower shall pay to Lender, in the manner prescribed in sub-paragraph 7.3, sums calculated by applying such rate as shall be agreed between the Parties from time to time to the daily Market Value of the Loaned Securities.

7.2    **Rates in respect of Cash Collateral**

to Borrower, in the manner prescribed in paragraph 7.3, sums calculated by applying such rates as shall b᷈     ᷈eed between the Parties from time to tim᷈    ᷈ the amount of such Cash Collateral. Any such payment due to Borrower may be set-off against any payment due to Lender pursuant to paragraph 7.1.

7.3    **Payment of rates**

In respect of each Loan, the payments referred to in paragraph 7.1 and 7.2 shall accrue daily in respect of the period commencing on and inclusive of the Settlement Date and terminating on and exclusive of the Business Day upon which Equivalent Securities are redelivered or Cash Collateral is repaid. Unless otherwise agreed, the sums so accruing in respect of each calendar month shall be paid in arrear by the relevant Party not later than the Business Day which is one week after the last Business Day of the calendar month to which such payments relate or such other date as the Parties shall from time to time agree.

8.    **REDELIVERY OF EQUIVALENT SECURITIES**

8.1    **Delivery of Equivalent Securities on termination of a Loan**

Borrower shall procure the redelivery of Equivalent Securities to Lender or redeliver Equivalent Securities in accordance with this Agreement and the terms of the relevant Loan on termination of the Loan. Such Equivalent Securities shall be deemed to have been delivered by Borrower to Lender on delivery to Lender or as it shall direct of the relevant instruments of transfer, or in the case of Equivalent Securities held by an agent or within a clearing or settlement system on the effective instructions to such agent or the operator of such system which result in such Equivalent Securities being held by the operator of the clearing system for the account of the Lender or as it shall direct, or by such other means as may be agreed. For the avoidance of doubt any reference in this Agreement or in any other agreement or communication between the Parties (howsoever expressed) to an obligation to redeliver or account for or act in relation to Loaned Securities shall accordingly be construed as a reference to an obligation to redeliver or account for or act in relation to Equivalent Securities.

Subject to paragraph    and the terms of the relevant Loan, Ler.    shall be entitled to terminate a Loan and to call for the redelivery of all or any Equivalent Securities at any time by giving notice on any Business Day of not less than the standard settlement time for such Equivalent Securities on the exchange or in the clearing organisation through which the Loaned Securities were originally delivered. Borrower shall redeliver such Equivalent Securities not later than the expiry of such notice in accordance with Lender's instructions.

### 8.3    Borrower's right to terminate a Loan

Subject to the terms of the relevant Loan, Borrower shall be entitled at any time to terminate a Loan and to redeliver all and any Equivalent Securities due and outstanding to Lender in accordance with Lender's instructions and Lender shall accept such redelivery.

### 8.4    Redelivery of Equivalent Collateral on termination of a Loan

On the date and time that Equivalent Securities are required to be redelivered by Borrower on the termination of a Loan, Lender shall simultaneously (subject to paragraph 5.4 if applicable) repay to Borrower any Cash Collateral or, as the case may be, redeliver Collateral equivalent to the Collateral provided by Borrower pursuant to paragraph 5 in respect of such Loan. For the avoidance of doubt any reference in this Agreement or in any other agreement or communication between the Parties (however expressed) to an obligation to redeliver or account for or act in relation to Collateral shall accordingly be construed as a reference to an obligation to redeliver or account for or act in relation to Equivalent Collateral.

### 8.5 /    Redelivery of Letters of Credit

Where a Letter of Credit is provided by way of Collateral, the obligation to redeliver Equivalent Collateral is satisfied by Lender redelivering for cancellation the Letter of Credit so provided, or where the Letter of Credit is provided in respect of more than one Loan, by Lender consenting to a reduction in the value of the Letter of Credit.

### 8.6    Redelivery obligations to be reciprocal

Neither Party shall be obliged to make delivery (or make a payment as the case may be) to the other unless it is satisfied that the other Party will make such delivery (or make an appropriate payment as the case may be) to it. If it is not so satisfied (whether because an Event of Default has occurred in respect of the other Party or otherwise) it shall notify the other party and unless that other Party has made arrangements which are sufficient to assure full delivery (or the appropriate payment as the case may be) to the notifying Party, the notifying Party shall (provided it is itself in a position, and willing, to perform its own obligations) be entitled to withhold delivery (or payment, as the case may be) to the other Party.

### 9.    FAILURE TO REDELIVER

### 9.1    Borrower's failure to redeliver Equivalent Securities

paragraph 8.1 or 8.2, Lender may elect to continue the loan (which Loan, for the avoidance of doubt, shall continue to be taken into account for the purposes of paragraph 5.4 or 5.5 as applicable) provided that if Lender does not elect to continue the Loan, Lender may either by written notice to Borrower terminate the Loan forthwith and the Parties' delivery and payment obligations in respect thereof (in which case sub-paragraph (ii) below shall apply) or serve a notice of an Event of Default in accordance with paragraph 14.

(ii)     Upon service of a notice to terminate the relevant Loan pursuant to paragraph 9.1(i):-

(a)     there shall be set-off against the Market Value of the Equivalent Securities concerned such amount of Posted Collateral chosen by Lender (calculated at its Market Value) as is equal thereto;

(b)     the Parties delivery and payment obligations in relation to such assets which are set-off shall terminate;

(c)     in the event that the Market Value of the Posted Collateral set-off is less than the Market Value of the Equivalent Securities concerned Borrower shall account to Lender for the shortfall; and

(d)     Borrower shall account to Lender for the total costs and expenses incurred by Lender as a result thereof as set out in paragraphs 9.3 and 9.4 from the time the notice is effective.

### 9.2    Lender's failure to Redeliver Equivalent Collateral

(i)      If Lender does not redeliver Equivalent Collateral in accordance with paragraph 8.4 or 8.5, Borrower may either by written notice to Lender terminate the Loan forthwith and the Parties' delivery and payment obligations in respect thereof (in which case sub-paragraph (ii) below shall apply) or serve a notice of an Event of Default in accordance with paragraph 14.

(ii)     Upon service of a notice to terminate the relevant Loan pursuant to paragraph 9.2(i):-

(a)     there shall be set-off against the Market Value of the Equivalent Collateral concerned the Market Value of the Loaned Securities;

(b)     the Parties delivery and payment obligations in relation to such assets which are set-off shall terminate;

(c)     in the event that the Market Value of the Loaned Securities held by Borrower is less than the Market Value of the Equivalent Collateral concerned Lender shall account to Borrower for the shortfall; and

(d)     Lender shall account to Borrower for the total costs and expenses incurred by Borrower as a result thereof as set out in paragraphs 9.3 and 9.4 from the time the notice is effective.

### 9.3    Failure by either Party to redeliver

redelivery obligation within the standard settlement time for the asset concerned on the exchange or in the clearing organisation through which the asset equivalent to the asset concerned was originally delivered or within such other period as may be agreed between the Parties. In such situation, in addition to the Parties' rights under the general law and this Agreement where the other Party (the **"Transferee"**) incurs interest, overdraft or similar costs and expenses the Transferor agrees to pay on demand and hold harmless the Transferee with respect to all such costs and expenses which arise directly from such failure excluding (i) such costs and expenses which arise from the negligence or wilful default of the Transferee and (ii) any indirect or consequential losses. It is agreed by the Parties that any costs reasonably and properly incurred by a Party arising in respect of the failure of a Party to meet its obligations under a transaction to sell or deliver securities resulting from the failure of the Transferor to fulfil its redelivery obligations is to be treated as a direct cost or expense for the purposes of this paragraph.

9.4    **Exercise of buy-in on failure to redeliver**

In the event that as a result of the failure of the Transferor to fulfil its redelivery obligations a "buy-in" is exercised against the Transferee, then the Transferor shall account to the Transferee for the total costs and expenses reasonably incurred by the Transferee as a result of such "buy-in".

10.    **SET-OFF ETC**

10.1    **Definitions for paragraph 10**

In this paragraph 10:

**"Bid Price"** in relation to Equivalent Securities or Equivalent Collateral means the best available bid price on the most appropriate market in a standard size;

**"Bid Value"** subject to paragraph 10.5 means:-

(a)    in relation to Collateral equivalent to Collateral in the form of a Letter of Credit zero and in relation to Cash Collateral the amount of the currency concerned; and

(b)    in relation to Equivalent Securities or Collateral equivalent to all other types of Collateral the amount which would be received on a sale of such Equivalent Securities or Equivalent Collateral at the Bid Price at Close of Business on the relevant Business Day less all costs, fees and expenses that would be incurred in connection therewith, calculated on the assumption that the aggregate thereof is the least that could reasonably be expected to be paid in order to carry out such sale or realisation and adding thereto the amount of any interest, dividends, distributions or other amounts, in the case of Equivalent Securities, paid to Borrower and in respect of which equivalent amounts have not been paid to Lender and in the case of Equivalent Collateral, paid to Lender and in respect of which equivalent amounts have not been paid to Borrower, in accordance with paragraph 6.1 prior to such time in respect of such Equivalent Securities, Equivalent Collateral or the original Securities or Collateral held, gross of all and any tax deducted or paid in respect thereof;

best available offer price on the most appropriate market in a standard size;

"**Offer Value**" subject to paragraph 10.5 means:-

(a)    in relation to Collateral equivalent to Collateral in the form of a Letter of Credit zero and in relation to Cash Collateral the amount of the currency concerned; and

(b)    in relation to Equivalent Securities or Collateral equivalent to all other types of Collateral the amount it would cost to buy such Equivalent Securities or Equivalent Collateral at the Offer Price at Close of Business on the relevant Business Day together with all costs, fees and expenses that would be incurred in connection therewith, calculated on the assumption that the aggregate thereof is the least that could reasonably be expected to be paid in order to carry out the transaction and adding thereto the amount of any interest, dividends, distributions or other amounts, in the case of Equivalent Securities, paid to Borrower and in respect of which equivalent amounts have not been paid to Lender and in the case of Equivalent Collateral, paid to Lender and in respect of which equivalent amounts have not been paid to Borrower, in accordance with paragraph 6.1 prior to such time in respect of such Equivalent Securities, Equivalent Collateral or the original Securities or Collateral held, gross of all and any tax deducted or paid in respect thereof;

10.2    **Termination of delivery obligations upon Event of Default**

Subject to paragraph 9, if an Event of Default occurs in relation to either Party, the Parties' delivery and payment obligations (and any other obligations they have under this Agreement) shall be accelerated so as to require performance thereof at the time such Event of Default occurs (the date of which shall be the "**Termination Date**" for the purposes of this clause) so that performance of such delivery and payment obligations shall be effected only in accordance with the following provisions:

(i)    the Relevant Value of the securities which would have been required to be delivered but for such termination (or payment to be made, as the case may be) by each Party shall be established in accordance with paragraph 10.3; and

(ii)    on the basis of the Relevant Values so established, an account shall be taken (as at the Termination Date) of what is due from each Party to the other and (on the basis that each Party's claim against the other in respect of delivery of Equivalent Securities or Equivalent Collateral or any cash payment equals the Relevant Value thereof) the sums due from one Party shall be set-off against the sums due from the other and only the balance of the account shall be payable (by the Party having the claim valued at the lower amount pursuant to the foregoing) and such balance shall be payable on the Termination Date.

If the Bid Value is greater than the Offer Value, and the Non-Defaulting Party had delivered to the Defaulting Party a Letter of Credit, the Defaulting Party shall draw on the Letter of Credit to the extent of the balance due and shall subsequently redeliver for cancellation the Letter of Credit so provided.

to the Non-Defaulting Party a Letter of Credit, the Non-Defaulting Party shall draw on the Letter of Credit the extent of the balance due and shall subsequently redeliver for cancellation the Letter of Credit so provided.

In all other circumstances, where a Letter of Credit has been provided to a Party, such Party shall redeliver for cancellation the Letter of Credit so provided.

10.3    **Determination of delivery values upon Event of Default**

For the purposes of paragraph 10.2 the "**Relevant Value**":-

(i)    of any securities to be delivered by the Defaulting Party shall, subject to paragraph 10.5 below, equal the Offer Value of such securities; and

(ii)    of any securities to be delivered to the Defaulting Party shall, subject to paragraph 10.5 below, equal the Bid Value of such securities.

10.4    For the purposes of paragraph 10.3, but subject to paragraph 10.5, the Bid Value and Offer Value of any securities shall be calculated for securities of the relevant description (as determined by the Non-Defaulting Party) as of the first Business Day following the Termination Date, or if the relevant Event of Default occurs outside the normal business hours of such market, on the second Business Day following the Termination Date (the "**Default Valuation Time**");

10.5    Where the Non-Defaulting Party has following the occurrence of an Event of Default but prior to the close of business on the fifth Business Day following the Termination Date purchased securities forming part of the same issue and being of an identical type and description to those to be delivered by the Defaulting Party or sold securities forming part of the same issue and being of an identical type and description to those to be delivered by him to the Defaulting Party, the cost of such purchase or the proceeds of such sale, as the case may be, (taking into account all reasonable costs, fees and expenses that would be incurred in connection therewith) shall (together with any amounts owing pursuant to paragraph 6.1) be treated as the Offer Value or Bid Value, as the case may be, of the amount of securities to be delivered which is equivalent to the amount of the securities so bought or sold, as the case may be, for the purposes of this paragraph 10, so that where the amount of securities to be delivered is more than the amount so bought or sold as the case may be, the Offer Value or Bid Value as the case may be, of the balance shall be valued in accordance with paragraph 10.4.

10.6    Any reference in this paragraph 10 to securities shall include any asset other than cash provided by way of Collateral.

10.7    **Other costs, expenses and interest payable in consequence of an Event of Default**

The Defaulting Party shall be liable to the Non-Defaulting Party for the amount of all reasonable legal and other professional expenses incurred by the Non-Defaulting Party in connection with or as a consequence of an Event of Default, together with interest thereon at the one-month London Inter Bank Offered Rate as quoted on a reputable financial information service ("**LIBOR**") as of 11.00 am, London Time, on the date on which it is to be determined or, in the case of an expense attributable to a particular transaction and where the parties have previously agreed a rate of interest for the

applicable to each month or part thereof that any sum payable pursuant to this paragraph 10.7 remains outstanding is the rate of LIBOR determined on the first Business Day of any such period of one month or any part thereof. Interest will accrue daily on a compound basis and will be calculated according to the actual number of days elapsed.

11.  **TRANSFER TAXES**

Borrower hereby undertakes promptly to pay and account for any transfer or similar duties or taxes chargeable in connection with any transaction effected pursuant to or contemplated by this Agreement, and shall indemnify and keep indemnified Lender against any liability arising as a result of Borrower's failure to do so.

12.  **LENDER'S WARRANTIES**

Each Party hereby warrants and undertakes to the other on a continuing basis to the intent that such warranties shall survive the completion of any transaction contemplated herein that, where acting as a Lender:

(a)  it is duly authorised and empowered to perform its duties and obligations under this Agreement;

(b)  it is not restricted under the terms of its constitution or in any other manner from lending Securities in accordance with this Agreement or from otherwise performing its obligations hereunder;

(c)  it is absolutely entitled to pass full legal and beneficial ownership of all Securities provided by it hereunder to Borrower free from all liens, charges and encumbrances; and

(d)  it is acting as principal in respect of this Agreement or, subject to paragraph 16, as agent and the conditions referred to in paragraph 16.2 will be fulfilled in respect of any Loan which it makes as agent.

13.  **BORROWER'S WARRANTIES**

Each Party hereby warrants and undertakes to the other on a continuing basis to the intent that such warranties shall survive the completion of any transaction contemplated herein that, where acting as a Borrower:

(a)  it has all necessary licenses and approvals, and is duly authorised and empowered, to perform its duties and obligations under this Agreement and will do nothing prejudicial to the continuation of such authorisation, licences or approvals;

(b)  it is not restricted under the terms of its constitution or in any other manner from borrowing Securities in accordance with this Agreement or from otherwise performing its obligations hereunder;

(c)  it is absolutely entitled to pass full legal and beneficial ownership of all Collateral provided by it hereunder to Lender free from all liens, charges and encumbrances; and

(d)  it is acting as principal in respect of this Agreement.

14.1 Each of the following events occurring in relation to either Party (the **"Defaulting Party"**, the other Party being the **"Non-Defaulting Party"**) shall be an Event of Default for the purpose of paragraph 10 but only (subject to sub-paragraph (v) below) where the Non-Defaulting Party serves written notice on the Defaulting Party:-

   (i) Borrower or Lender failing to pay or repay Cash Collateral or deliver Collateral or redeliver Equivalent Collateral or Lender failing to deliver Securities upon the due date;

   (ii) Lender or Borrower failing to comply with its obligations under paragraph 5;

   (iii) Lender or Borrower failing to comply with its obligations under paragraph 6.1;

   (iv) Borrower failing to comply with its obligations to deliver Equivalent Securities in accordance with paragraph 8;

   (v) an Act of Insolvency occurring with respect to Lender or Borrower, an Act of Insolvency which is the presentation of a petition for winding up or any analogous proceeding or the appointment of a liquidator or analogous officer of the Defaulting Party not requiring the Non-Defaulting Party to serve written notice on the Defaulting Party;

   (vi) any representation or warranty made by Lender or Borrower being incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated;

   (vii) Lender or Borrower admitting to the other that it is unable to, or it intends not to, perform any of its obligations under this Agreement and/or in respect of any Loan;

   (viii) Lender (if applicable) or Borrower being declared in default or being suspended or expelled from membership of or participation in, any securities exchange or association or suspended or prohibited from dealing in securities by any regulatory authority;

   (ix) any of the assets of Lender or Borrower or the assets of investors held by or to the order of Lender or Borrower being transferred or ordered to be transferred to a trustee (or a person exercising similar functions) by a regulatory authority pursuant to any securities regulating legislation, or

   (x) Lender or Borrower failing to perform any other of its obligations under this Agreement and not remedying such failure within 30 days after the Non-Defaulting Party serves written notice requiring it to remedy such failure.

14.2 Each Party shall notify the other (in writing) if an Event of Default or an event which, with the passage of time and/or upon the serving of a written notice as referred to above, would be an Event of Default, occurs in relation to it.

14.3 The provisions of this Agreement constitute a complete statement of the remedies available to each Party in respect of any Event of Default.

consequential loss or damage in the event of failure by the other party to perform any of its obligations under this Agreement.

15.    **INTEREST ON OUTSTANDING PAYMENTS**

In the event of either Party failing to remit sums in accordance with this Agreement such Party hereby undertakes to pay to the other Party upon demand interest (before as well as after judgment) on the net balance due and outstanding, for the period commencing on and inclusive of the original due date for payment to (but excluding) the date of actual payment, in the same currency as the principal sum and at the rate referred to in paragraph 10.7. Interest will accrue daily on a compound basis and will be calculated according to the actual number of days elapsed.

16.    **TRANSACTIONS ENTERED INTO AS AGENT**

16.1    **Power for Lender to enter into Loans as agent**

Subject to the following provisions of this paragraph, Lender may (if so indicated in paragraph 6 of the Schedule) enter into Loans as agent (in such capacity, the **"Agent"**) for a third person (a **"Principal"**), whether as custodian or investment manager or otherwise (a Loan so entered into being referred to in this paragraph as an **"Agency Transaction"**).

16.2    **Conditions for agency loan**

A Lender may enter into an Agency Transaction if, but only if:-

(i)    it specifies that Loan as an Agency Transaction at the time when it enters into it;

(ii)    it enters into that Loan on behalf of a single Principal whose identity is disclosed to Borrower (whether by name or by reference to a code or identifier which the Parties have agreed will be used to refer to a specified Principal) at the time when it enters into the Loan or as otherwise agreed between the Parties; and

(iii)    it has at the time when the Loan is entered into actual authority to enter into the Loan and to perform on behalf of that Principal all of that Principal's obligations under the agreement referred to in paragraph 16.4(ii).

16.3    **Notification by Lender of certain events affecting the principal**

Lender undertakes that, if it enters as agent into an Agency Transaction, forthwith upon becoming aware:-

(i)    of any event which constitutes an Act of Insolvency with respect to the relevant Principal; or

(ii)    of any breach of any of the warranties given in paragraph 16.5 or of any event or circumstance which has the result that any such warranty would be untrue if repeated by reference to the then current facts;

it will inform Borrower of that fact and will, if so required by Borrower, furnish it with such additional information as it may reasonably request.

(i)       Each Agency Transaction shall be a transaction between the relevant Principal and Borrower and no person other than the relevant Principal and Borrower shall be a party to or have any rights or obligations under an Agency Transaction. Without limiting the foregoing, Lender shall not be liable as principal for the performance of an Agency Transaction, but this is without prejudice to any liability of Lender under any other provision of this clause; and

(ii)      all the provisions of the Agreement shall apply separately as between Borrower and each Principal for whom the Agent has entered into an Agency transaction or Agency Transactions as if each such Principal were a party to a separate agreement with Borrower in all respects identical with this Agreement other than this paragraph and as if the Principal were Lender in respect of that agreement;

**PROVIDED THAT**

if there occurs in relation to the Agent an Event of Default or an event which would constitute an Event of Default if Borrower served written notice under any sub-clause of paragraph 14, Borrower shall be entitled by giving written notice to the Principal (which notice shall be validly given if given to Lender in accordance with paragraph 21) to declare that by reason of that event an Event of Default is to be treated as occurring in relation to the Principal. If Borrower gives such a notice then an Event of Default shall be treated as occurring in relation to the Principal at the time when the notice is deemed to be given; and

if the Principal is neither incorporated in nor has established a place of business in Great Britain, the Principal shall for the purposes of the agreement referred to in paragraph 16.4(ii) be deemed to have appointed as its agent to receive on its behalf service of process in the courts of England the Agent, or if the Agent is neither incorporated nor has established a place of business in Great Britain, the person appointed by the Agent for the purposes of this Agreement, or such other person as the Principal may from time to time specify in a written notice given to the other Party.

The foregoing provisions of this paragraph do not affect the operation of the Agreement as between Borrower and Lender in respect of any transactions into which Lender may enter on its own account as principal.

16.5    **Warranty of authority by Lender acting as agent**

Lender warrants to Borrower that it will, on every occasion on which it enters or purports to enter into a transaction as an Agency Transaction, have been duly authorised to enter into that Loan and perform the obligations arising under such transaction on behalf of the person whom it specifies as the Principal in respect of that transaction and to perform on behalf of that person all the obligations of that person under the agreement referred to in paragraph 16.4(ii).

17.    **TERMINATION OF THIS AGREEMENT**

Each Party shall have the right to terminate this Agreement by giving not less than 15 Business Days' notice in writing to the other Party (which notice shall specify the date of

into but not discharged at the time such notice is given are duly discharged in accordance with this Agreement.

18. **SINGLE AGREEMENT**

Each Party acknowledges that, and has entered into this Agreement and will enter into each Loan in consideration of and in reliance upon the fact that, all Loans constitute a single business and contractual relationship and are made in consideration of each other. Accordingly, each Party agrees:

(i)     to perform all of its obligations in respect of each Loan, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Loans; and

(ii)    that payments, deliveries and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Loan.

19. **SEVERANCE**

If any provision of this Agreement is declared by any judicial or other competent authority to be void or otherwise unenforceable, that provision shall be severed from the Agreement and the remaining provisions of this Agreement shall remain in full force and effect. The Agreement shall, however, thereafter be amended by the Parties in such reasonable manner so as to achieve as far as possible, without illegality, the intention of the Parties with respect to that severed provision.

20. **SPECIFIC PERFORMANCE**

Each Party agrees that in relation to legal proceedings it will not seek specific performance of the other Party's obligation to deliver or redeliver Securities, Equivalent Securities, Collateral or Equivalent Collateral but without prejudice to any other rights it may have.

21. **NOTICES**

21.1    Any notice or other communication in respect of this Agreement may be given in any manner set forth below to the address or number or in accordance with the electronic messaging system details set out in paragraph 4 of the Schedule and will be deemed effective as indicated:

(i)     if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)   if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or the receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the Close of Business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

21.2    Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

22.    **ASSIGNMENT**

Neither Party may charge assign or transfer all or any of its rights or obligations hereunder without the prior consent of the other Party.

23.    **NON-WAIVER**

No failure or delay by either Party (whether by course of conduct or otherwise) to exercise any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege as herein provided.

24.    **GOVERNING LAW AND JURISDICTION**

24.1    This Agreement is governed by, and shall be construed in accordance with, English law.

24.2    The courts of England have exclusive jurisdiction to hear and decide any suit, action or proceedings, and to settle any disputes, which may arise out of or in connection with this Agreement (respectively, "**Proceedings**" and "**Disputes**") and, for these purposes, each party irrevocably submits to the jurisdiction of the courts of England.

24.3    Each party irrevocably waives any objection which it might at any time have to the courts of England being nominated as the forum to hear and decide any Proceedings and to settle any Disputes and agrees not to claim that the courts of England are not a convenient or appropriate forum.

24.4    Each of Party A and Party B hereby respectively appoints the person identified in paragraph 5 of the Schedule pertaining to the relevant Party as its agent to receive on its behalf service of process in the courts of England. If such an agent ceases to be an agent of Party A or party B, as the case may be, the relevant Party shall promptly appoint, and notify the other Party of the identity of its new agent in England.

25.    **TIME**

Time shall be of the essence of the Agreement.

26.    **RECORDING**

The Parties agree that each may record all telephone conversations between them.

Each Party hereb waives all immunity (whether on the is of sovereignty or otherwise) from jurisdiction, attachment (both before and after judgement) and execution to which it might otherwise be entitled in any action or proceeding in the courts of England or of any other country or jurisdiction relating in any way to this Agreement and agrees that it will not raise, claim or cause to be pleaded any such immunity at or in respect of any such action or proceeding.

28.    **MISCELLANEOUS**

28.1    This Agreement constitutes the entire agreement and understanding of the Parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

28.2    The Party (the "**Relevant Party**") who has prepared the text of this Agreement for execution (as indicated in paragraph 7 of the Schedule) warrants and undertakes to the other Party that such text conforms exactly to the text of the standard form Global Master Securities Lending Agreement posted by the International Securities Lenders Association on its website on 7 May 2000 except as notified by the Relevant Party to the other Party in writing prior to the execution of this Agreement.

28.3    No amendment in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the Parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

28.4    The obligations of the Parties under this Agreement will survive the termination of any Loan.

28.5    The warranties contained in paragraphs 12, 13, 16 and 28.2 will survive termination of this Agreement for so long as any obligations of either of the Parties pursuant to this Agreement remain outstanding.

28.6    Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

28.7    This Agreement (and each amendment in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

28.8    A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any terms of this Agreement, but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

EXECUTED by the PARTIES

SIGNED BY                              )

                                       )

DULY AUTHORISED FOR AND                ) LEHMAN BROTHERS INTERNATIONAL
ON BEHALF OF                           ) (EUROPE)

                                       )


SIGNED BY                              )

                                       )

DULY AUTHORISED FOR AND                ) MAVERICK NEUTRAL LEVERED FUND, LTD.
ON BEHALF OF                           )

                              By:    Maverick Capital, Ltd.
                                     its Investment Manager

                              By:    Sharyl Robertson
                                     Chief Financial Officer

                              DATE: DECEMBER 28, 2004

1. **Collateral**

1.1 The collateralization and margin requirements and procedures relating to Loans of Loaned Securities will be governed by the Margin Lending Agreement (the "Margin Lending Agreement"), among Party A, Party B and Lehman Brothers Inc., including the terms and conditions rider (the "TCR") referred to therein, in each case as amended or supplemented from time to time by the parties thereto.

1.2 [Intentionally Deleted]

1.3 Paragraph 5.4 (aggregation) shall apply when determining the amount of outstanding Loans of Loaned Securities to be subject to the collateralization and margin requirements and procedures of the Margin Lending Agreement, including the TCR.

1.4 Paragraph 5.6 (netting of obligations to deliver Collateral and redeliver Equivalent Collateral) shall not apply. The collateralization and margin requirements and procedures relating to Loans of Loaned Securities will be governed by the Margin Lending Agreement, including the TCR.

2. **Base Currency**

The Base Currency applicable to this Agreement is US Dollars.

3. **Places of Business**

London

(See definition of Business Day.)

4. **Designated Office and Address for Notices**

(A) **Designated office of Party A:**

Address for notices or communications to Party A:

Address: 25 Bank Street, London E14 5LE.

Attention: Equity Finance Department

Facsimile No: +44 (0) 20 7102 3192

Telephone No: +44 (0) 20 7102 2025

Electronic Messaging System Details: May be provided by Party A after execution of this Agreement

(B) **Designated office of Party B:**

Address for notices or communications to Party B:

Address: : c/o M&C Corporate Services Limited, PO Box 309GT,Ugland House, South Church Street, George Town, Grand Cayman Islands

Facsimile No:

Telephone No:

Electronic Messaging System Details:

(C)    In addition, any notice or other communication in respect of this Agreement may be given by Party A or Party B in any manner contemplated by and in accordance with the terms and provisions of the Margin Lending Agreement.

5.    **Agent for Service of Process**

    (A)    **Agent of Party A for Service of Process**

        None.

    (B)    **Agent of Party B for Service of Process**

        None.

6.    **Agency**

    Paragraph 16 will apply to Party A when (i) Party A is lending U.S. Securities and (ii) Party B is a U.S. resident or person for U.S. tax purposes.  If Paragraph 16 is applicable to Party A, then the Principal Lender will be Lehman Brothers Inc.

    Paragraph 16 will not apply to Party B.

7.    **Party Preparing this Agreement**

    Party A is the party preparing this Agreement.

8.    **Amendment to Paragraph 24**

Paragraph 24 of this Agreement shall be deleted in its entirety and replaced with the following:

"THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF.

Any controversy arising out of or relating to this Agreement or any Loan or Loans or the breach thereof or default thereunder, shall be resolved by arbitration conducted only at the NYSE, NASD, or AMEX or any other self-regulatory organization ("SRO") of which the Agent (as defined in the Margin Lending Agreement) is a member that is subject to the jurisdiction of the Securities and Exchange Commission and pursuant to the arbitration procedures then in effect at any such exchange or SRO as Party B may elect. If Party B does not make such election by registered mail addressed to the Corporate Secretary at Agent within 5 days after demand by Agent or Party A that Party B make this election, then Agent or Party A will have the right to elect the arbitration tribunal of its choice.  Judgment upon any award

award of the arbitrators shall be final. Nothing in this agreement shall be construed as consent by Agent or Party A to any punitive damages. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action, until:(i) the class certification is denied; (ii) the class action is decertified; or (iii) such person is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein. The foregoing agreement to arbitrate does not entitle Party B to obtain arbitration of claims that would be barred by the relevant statutes of limitations if such claims were brought in a court of competent jurisdiction. If, at the time that a demand for arbitration is made or an election or notice of intention to arbitrate is served, the claims sought to be arbitrated would have been barred by the relevant statute of limitations or other time bar, any party to this agreement may assert the limitations as a bar to the arbitration either before the arbitrators or by applying to any court of competent jurisdiction. Party B expressly agrees that any issues relating to the application of a statute of limitations or other time bar are referable to such court.

By entering into this Agreement, Party B represents that it understands that:

- Arbitration is final and binding on Party A, Agent and Party B.

- The parties waive their right to seek remedies in court, including the right to a jury trial.

- Pre-arbitration discovery is generally more limited than and different from court proceedings.

- The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.

- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry."

9.   **Additional Amendments**   This Agreement is further amended as follows: (i) the simultaneous delivery obligations set forth in this Agreement (including Paragraph 4.3 hereof) will not apply to Loans of Loaned Securities; (ii) Paragraph 6 of this Agreement will only apply to Loaned Securities; (iii) Paragraphs 9.2 and 14.3 of this Agreement will not apply to Loans of Loaned Securities; (iv) Paragraphs 9.3 and 9.4 of this Agreement will only apply to the redelivery obligations of Party B; (v) Paragraph 10 of this Agreement will only apply if Party B is the Defaulting Party; and (vi) Paragraph 28.8 of this Agreement is deleted.

10.   **Additional Warranty of Party B**   Party B hereby represents and warrants to Party A (on a continuing basis with the intent that such representation and warranty shall survive the completion of any transactions hereunder) that Party B is not (i) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (ii) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), or materially similar provisions of any other law ("Similar Law"). Party B further represents and warrants (on a continuing basis with the intent that such representation and warranty shall survive the completion of any transactions hereunder) that it is not a person acting on behalf of an ERISA Plan and that Party B's assets do not constitute assets of an ERISA Plan. Party B agrees that if Party B becomes subject to ERISA, the Code or Similar Law or otherwise becomes unable to make the representations and warranties set forth above, then

its sole and absolute discretion, deems necessary to comply with ERISA, the Code or Similar Law.

**<u>Exhibit A-2</u>**

**Margin Lending Agreement**

WEIL:\97023262\18\58399.0011

# Margin Lending Agreement

**LEHMAN BROTHERS
INTERNATIONAL (EUROPE)**

Lehman Brothers International (Europe)
25 Bank Street,
London E14 5LE
United Kingdom

| Borrower: MAVERICK NEUTRAL LEVERED FUND, LTD. | Reference No.: |
|---|---|

This Margin Lending Agreement (this "Agreement") by and among Lehman Brothers International (Europe) ("Lender") and the above-listed borrower ("Borrower") is arranged by Lehman Brothers Inc. ("Agent"), a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") under the U.S. Securities and Exchange Act of 1934, as amended, and governs all loans (the "Loans") of money or securities that Lender may, from time to time in its sole and absolute discretion, agree to make to Borrower in connection with transactions entered into by Borrower in the Lehman Brothers Inc. Customer Account Agreement – Prime Brokerage dated _DEC. 27, 2004_, as amended from time to time (the "LBI Account Agreement").

## 1.  AGENT AS AGENT OF LENDER AND BORROWER.

(a)  Lender and Borrower (the "Principals") each appoints Agent to act as agent with regard to any and all actions necessary to effect Loans as described in this Agreement and Agent acknowledges and accepts such appointment.

(b)  As agent of each of the Principals and in compliance with all applicable regulations, Agent will arrange all Loans.

(c)  In connection with each Loan, Agent acts solely in its capacity as agent for the Principals pursuant to instructions from the Principals. Agent shall have no responsibility or personal liability to either Principal arising from any failure by a Principal to pay or perform any obligation hereunder. Notwithstanding anything herein to the contrary, Agent shall not have any responsibility for or any obligation or liability to either Principal with respect to the monitoring of margin maintenance hereunder. Each Principal agrees to proceed solely against the other to collect or recover any amount owing to it or to enforce any of its other rights in connection with, or as a result of, any Loan. The Principals acknowledge that Agent is acting solely as an agent hereunder, and the Principals agree to hold Agent harmless from all liability except for losses or damages caused by Agent's gross negligence or wilful misconduct.

(d)  Each Principal and Agent hereby agree that any and all notices, demands, communications, payments or deliveries of any kind relating to any Loan may be delivered or made solely through Agent.

**2.  PURPOSE OF THE LOANS.**  Unless notice is provided to Lender in advance of a Loan, the proceeds of each Loan shall be utilized by Borrower solely to satisfy its payment or delivery obligations under the LBI Account Agreement from time to time in effect between Borrower and Agent.

## 3.  LOAN TERMS.

(a)  Subject to all other applicable provisions of this Agreement, all Loans that are loans of securities shall be governed by the terms of a standard-form Global Master Securities Lending Agreement (May 2000 version), as modified and supplemented by the Schedule to GMSLA and 2000 UK Tax Addendum attached thereto (collectively, the "GMSLA"), which terms are hereby incorporated into this Agreement as if set forth fully herein. In the event of any conflict between the terms of the GMSLA incorporated herein and the terms expressly set forth herein, the terms expressly set forth herein shall control. In furtherance of the foregoing (and not by way of limitation), Lender,

## LEHMAN BROTHERS

Borrower and Agent agree that: (i) the fees payable by Borrower with respect to Loans of securities will be governed by this Agreement (including the TCR (as defined in Section 4 hereof)), not by Paragraph 7 of the GMSLA; (ii) the collateralization and margin requirements and procedures relating to Loans of securities will be governed by this Agreement (including the TCR), not by Paragraph 5 of the GMSLA; (iii) the obligations of Borrower to Lender and Agent will be secured by a first priority security interest in certain property of Borrower (as set forth herein and in the LBI Account Agreement), not by Borrower transferring title in certain property pursuant to the GMSLA, including Paragraphs 2.3 and 4.2 of the GMSLA; and (iv) the term Posted Collateral (as used in Paragraph 9.1 of the GMSLA) will be deemed to be a reference to the collateral held by Lender and Agent pursuant to this Agreement and the LBI Account Agreement.

(b)  All Loans are demand loans.  Immediately upon Lender's demand from time to time, Borrower shall repay outstanding amounts under any or all Loans of money (together with all accrued interest) and/or redeliver Equivalent Securities (as defined in the GMSLA) under any or all Loans of securities.  The inclusion of Section 6 hereof and of provisions in the GMSLA relating to Events of Default (as defined  therein) shall not affect the status of the Loans as demand loans or Borrower's obligations set forth in the preceding sentence.

**4.  INTEREST AND LOAN FEES.**  Borrower agrees that interest and fees will accrue on all outstanding Loans of money and securities in accordance with the methods described in a terms and conditions rider and other letter agreement that has been separately provided to it or in any amendment or revision thereto which may be provided to it (the "TCR").  Borrower agrees that all such accrued interest and/or fees not paid at the close of an applicable period shall constitute an additional Loan of money hereunder.

**5.  COLLATERAL.**

(a)  Lender may from time to time, in its sole and absolute discretion, demand that Borrower deliver for credit to a securities account maintained by Lender (any such account, "Lender's Account") collateral in the form of cash or securities, in such amounts and/or currencies as are determined by Lender in its sole discretion.  Borrower shall immediately comply with any such demand and any failure to immediately comply shall constitute a default under this Agreement.  Borrower shall ensure that at all times the Market Value (as defined below) of the cash and securities collateral delivered to Lender's Account exceeds the sum of (i) the aggregate Market Value (as defined below) of the cash and securities lent under outstanding Loans and (ii) the margin requirement determined by Lender from time to time in its sole and absolute discretion and notified to Borrower (the "Margin Requirement").

"Market Value" means:

(i)  with respect to cash, the amount of such cash (converted, if necessary, into U.S. dollars at a spot rate obtained from a source selected by Lender in its sole and absolute discretion); and

(ii)  with respect to securities, the price for such securities obtained from a source selected by Lender in its sole and absolute discretion; provided that, (A) if Lender determines that both bid and offer prices for the relevant securities are available then the bid price will be used in respect of Loans of securities and the offer price will be used in respect of collateral in the form of securities, (B) if Lender determines in its  discretion that only mid-market prices are available, that price will be used, and (C) the price of securities that are suspended, or in respect of which there is no source or a discontinuous source, shall be determined by Lender in its sole and absolute discretion.

(b)  As security for Borrower's payment and performance of all of its obligations and liabilities (whether or not mature or contingent) from time to time ("Liabilities") to Lender under this Agreement, the GMSLA or in connection with any Loan and for all obligations owing to Lender (the "Obligations"), Lender shall have a lien on and a continuing first priority security interest in all of Borrower's cash, securities, financial assets and other property from time to time delivered under this Agreement or otherwise held by, or under the control of, Lender (the "Collateral"), irrespective of whether or not Lender has made advances to Borrower in connection with such securities or other property.  All Collateral  shall be free and clear of all prior liens, claims and encumbrances (other than the lien in favor of Lender and its affiliates), and Borrower will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, claims or encumbrances of any nature other than the security interest created in Lender's favor and in favor of its affiliates.  Borrower agrees that any Collateral may be registered

LEHMAN BROTHERS                    2

and held in the name of Agent or its designee. Borrower shall execute such documents and take such other action as Lender shall reasonably request in order to perfect Lender's rights with respect to any Collateral. In addition, Borrower hereby appoints Agent and each of its affiliates as Borrower's agent and attorney-in-fact to take any action, including without limitation to sign, seal, execute and deliver all documents, as may be required to perfect Lender's interest in and to realize upon all of Lender's rights in the Collateral or to otherwise accomplish the purposes of this Agreement. In order to satisfy any of Borrower's Obligations, Lender may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to Borrower, use, apply or transfer any and all Collateral.

(c) Except as noted in the last sentence of this subsection, within the limits of applicable law and regulations, Borrower hereby authorizes Lender to lend either to itself or to others any or all Collateral, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such Collateral as collateral for its general loans. Any Collateral, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lender thereon or for a greater sum, and Lender shall have no obligation to retain a like amount of similar property in its possession and control. Borrower hereby acknowledges that, as a result of such activities, Lender may receive and retain certain benefits to which Borrower will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations and rehypothecations may limit, in whole or in part, Borrower's ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. Borrower agrees to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation. Unless otherwise agreed by Lender and Borrower, Borrower will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by Borrower, to the full extent Borrower would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

(d) Upon satisfaction by Borrower of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender), Lender shall return to Borrower the Collateral.

(e) Borrower authorizes and requests Agent, as agent for Borrower, to transfer cash or securities from the account(s) of Borrower opened and maintained pursuant to the LBI Account Agreement (the "LBI Customer Account(s)") to Lender's Account as Collateral under this Agreement. In addition, if, at any time, Borrower has provided excess collateral under this Agreement and also (i) is required to deliver margin, collateral or other credit support (including title transfer credit support) to Lender under any other agreement or (ii) is required to deliver day trading margin to LBI for the benefit of any of its LBI Customer Account(s), then Borrower authorizes and requests Lender to transfer such excess collateral to itself (or to LBI, as the case may be) on Borrower's behalf in order to satisfy (to the extent possible) Borrower's obligation to deliver margin or credit support under such other agreement (or, in the case of the LBI Customer Account(s), to deliver day trading margin in compliance with New York Stock Exchange regulations). If Lender or Agent makes a delivery on Borrower's behalf pursuant to this Section 5(e), such delivery shall have the same effect as if Borrower itself had made such delivery under the applicable agreement.

6. **EVENTS OF DEFAULT.** The occurrence of each of the following is an "Event of Default" hereunder:

(i) any "Event of Default" (as defined in the GMSLA);

(ii) any event of the type described in Section 4 of the LBI Account Agreement;

(iii) Borrower's failure to maintain collateral as required by Section 5 hereof;

(iv) Borrower's failure to make any payment or delivery when required hereunder;

(v) Borrower's failure to comply with or perform any other agreement or obligation hereunder;

LEHMAN BROTHERS                    3

    (vi)  the occurrence of an Act of Insolvency (as defined in the GMSLA) with respect to Borrower or with respect to any general partner, managing member or analogous representative entity of Borrower;

    (vii)  any representation made or deemed to have been made by Borrower shall be incorrect or untrue in any respect when made or deemed made;

    (viii)  Borrower is suspended or expelled from or surrenders its membership or participation in any securities exchange or association or other self-regulatory organization or is suspended from dealing in securities by any governmental agency, or any of the assets of Borrower or the assets of any investor held by, or to the order of, Borrower are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation;

    (ix)  Borrower states that it is unable to, or intends not to, perform any of its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent;

    (x)  there is a material adverse change in the business affairs of Borrower;

    (xi)  any event of default or equivalent event occurs under any other agreement between Borrower and Lender or Agent or any of their affiliates; or

    (xii)  any material document or constitutive document of Borrower is modified in a manner which, in the sole and absolute discretion of Lender, may have a material adverse effect on any Loan or Borrower's ability to perform its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent.

Upon the occurrence of an Event of Default, all Loans shall become immediately due and payable and Lender shall have all of the rights of a secured party upon default under the Uniform Commercial Code in effect from time to time in the State of New York and other applicable laws, rules and regulations, all rights set forth in the GMSLA arising upon an "Event of Default" thereunder and all rights arising under the LBI Account Agreement after a default thereunder or under a Contract (as defined therein) including, without limitation, the right, without prior notice to Borrower, to cancel any outstanding commitments for or relative to any Loan and/or apply any Collateral to, or sell any or all of the Collateral and apply the proceeds to, any Loan (or to the purchase of securities that are the subject of any Loan); after which Borrower shall be liable to Lender and Agent for any remaining deficiency, loss, costs or expenses incurred or sustained by Lender or Agent in connection therewith. Such purchases and/or sales may be effected by Lender (or Agent, as its agent) publicly or privately without notice or advertisement in such manner as Lender may in its sole discretion determine. At any such sale or purchase, Lender, Agent or any of Lender or Agent's affiliates may purchase or sell the property to or from itself or third parties free of any right of redemption. Lender shall have the right to convert currencies in connection with the exercise of its rights hereunder in such manner as it may determine, in its sole discretion, to be commercially reasonable.

## 7.  MISCELLANEOUS.

    (a) <u>Capacity to Contract</u>.  Borrower represents and warrants to Lender and Agent that it has the capacity and authority to enter this Agreement and each Loan and make each pledge of Collateral.  Each representation or warranty made by Borrower in this Agreement will be deemed to be repeated on each date on which (i) a Loan is made, (ii) Collateral is delivered or released or (iii) any other transaction occurs hereunder.

    (b) <u>ERISA</u>.  Borrower represents and warrants to Lender and Agent that Borrower is not (i) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (ii) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), or materially similar provisions of any other law ("Similar Law"). The Borrower further represents and warrants that it is not a person acting on behalf of an ERISA Plan and that the Borrower's assets do not constitute assets of an ERISA Plan.  Borrower agrees that if Borrower becomes subject to ERISA, the Code or Similar Law or otherwise becomes unable to make the representations and warranties set forth above, then Borrower

LEHMAN BROTHERS        4

shall promptly notify Lender and Agent in writing and Borrower shall take such action as Lender and Agent, in their sole and absolute discretion, deem necessary to comply with ERISA, the Code or Similar Law.

(c) Compliance with Regulations. All Loans are subject to the laws, rules and regulations of the United States, England and any other applicable jurisdiction and applicable regulatory and self-regulatory authorities, including but not limited to the SEC, The Financial Services Authority of England and Wales (the "FSA"), all relevant securities and commodities exchanges and the Board of Governors of the Federal Reserve System.

(d) FSA Customer Protections. Lender is authorised by the FSA and is regulated by its rules (the "Rules"). Affiliates (such as Agent) of Lender may not be authorised by the FSA and certain services provided outside of England and Wales pursuant to this Agreement may not be regulated by the Rules. Lender and Borrower acknowledge and agree that cash delivered by Borrower hereunder will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts. The parties further agree that Lender will use such cash in the course of its business and Borrower will, therefore, rank as a general creditor of Lender in respect of such cash.

(e) Adequate Assurances. Subject to, and not as limitation of, the rights of Lender under this Agreement, if at any time Lender has reasonable grounds for insecurity with respect to Borrower's performance of any Obligation, Lender may demand, and Borrower shall give, adequate assurance of due performance within 24 hours, or within any shorter period of time Lender demands that is reasonable under the circumstances. The adequate assurance of performance that may be demanded by Lender may include, but shall not be limited to, the delivery by Borrower of additional property as Collateral.

(f) Costs and Expenses. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender or Agent (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with enforcing their rights hereunder or incurred or charged for custody of the Collateral. In each case and whether or not demand has been made therefor, Borrower hereby authorizes Lender to increase the amount of any outstanding Loan by any and all such costs, liabilities and damages, including without limitation, those incurred in connection with the liquidation of any of the Collateral.

(g) Securities Events. Lender shall inform Borrower if Lender becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities pledged to Lender: conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to 5(c), above, if Lender receives notice from Borrower that Borrower wishes to act on any of the events referenced in this paragraph and such notice is received by Lender within a reasonable time for Lender to act on such event, Lender will act in accordance with Borrower's wishes. Borrower represents that it will review all prospectuses and offering statements that it may receive and understands the risks inherent with the Loans, including any risks associated with the above-described securities events.

(h) Voting Rights. If any right to vote arises with respect to securities pledged to Lender, Borrower may inform Lender that Borrower wishes to exercise such right as Borrower specifies. Subject to 5(c), above, if Lender receives this notice within a reasonable time to act, it will act in accordance with Borrower's wishes. If Lender does not receive such timely notice from Borrower, it will use its discretion to decide whether and how to vote such securities.

(i) Waiver, Assignment and Notices. Neither Lender's failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lender of any of its rights or privileges hereunder. Any purported assignment of your rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lender and Agent shall be null and void. Lender and Agent each reserves the right to assign any of its rights or obligations hereunder or under any other agreement with Borrower to any of their affiliates without prior notice to Borrower. Notices and other communications to you (including without limitation demands for collateral) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each

LEHMAN BROTHERS                    5

case to the address or number provided by Borrower, shall, until Agent has received notice in writing of a different address or number, be deemed to have been personally delivered to Borrower. Demands for additional Collateral may also be communicated orally, without subsequent written confirmation.

(j) <u>Securities Contract; Margin Payment; Settlement Payment</u>.  Borrower acknowledges and agrees that each Loan shall be deemed to be a "securities contract" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code and each payment or delivery hereunder, including each payment or delivery of collateral, shall be deemed to be a "margin payment" or "settlement payment" (each as defined in Section 101 and 741 of the U.S. Bankruptcy Code) made to and held by a "stockbroker" within the meaning of Sections 362 and 546 of the U.S. Bankruptcy Code.

(k) <u>Legally Binding</u>.  Borrower hereby agrees that this Agreement and all of the terms hereof shall be binding upon it and its successors and assigns.  Borrower hereby waives any and all defences that any oral instruction was not in writing as may be required by any applicable law, rule or regulation.  Borrower hereby authorizes Lender and Agent to accept and act on any instructions received by Lender and/or Agent from any investment manager or advisor that Lender and/or Agent believe is authorized to act on Borrower's behalf.  Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender and/or Agent (including, without limitation, attorneys' fees, court costs and other expenses) in connection with Lender and/or Agent acting in reliance upon instructions from any such investment manager or advisor, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail.

(l) <u>Amendment</u>.  Borrower agrees that Lender may modify the terms of this Agreement at any time upon prior written notice to Borrower.  By failing to immediately discharge all of its Obligations upon delivery of any such notice, Borrower will have indicated its acceptance of any such modification.  If Borrower does not accept such modification, Borrower must notify Lender in writing; Lender may then demand immediate discharge of all of Borrower's Obligations.  Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lender.

(m) **GOVERNING LAW.**  THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF.

LEHMAN BROTHERS                    6

(n) **ARBITRATION ; WAIVER OF JURY TRIAL.** Any controversy arising out of or relating to this Agreement or any Loan or Loans or the breach thereof or default thereunder, shall be resolved by arbitration conducted only at the NYSE, NASD, or AMEX or any other self-regulatory organization ("SRO") of which the Agent is a member that is subject to the jurisdiction of the Securities and Exchange Commission and pursuant to the arbitration procedures then in effect at any such exchange or SRO as Borrower may elect. If Borrower does not make such election by registered mail addressed to the Corporate Secretary at Agent within 5 days after demand by Agent or Lender that Borrower make this election, then Agent or Lender will have the right to elect the arbitration tribunal of its choice. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Any such award of the arbitrators shall be final. Nothing in this agreement shall be construed as consent by Agent or Lender to any punitive damages. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action, until:(i) the class certification is denied; (ii) the class action is decertified; or (iii) such person is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein. The foregoing agreement to arbitrate does not entitle Borrower to obtain arbitration of claims that would be barred by the relevant statutes of limitations if such claims were brought in a court of competent jurisdiction. If, at the time that a demand for arbitration is made or an election or notice of intention to arbitrate is served, the claims sought to be arbitrated would have been barred by the relevant statute of limitations or other time bar, any party to this agreement may assert the limitations as a bar to the arbitration either before the arbitrators or by applying to any court of competent jurisdiction. Borrower expressly agrees that any issues relating to the application of a statute of limitations or other time bar are referable to such court.

By entering into this Agreement, Borrower represents that it understands that:

- Arbitration is final and binding on Lender, Agent and Borrower.

- The parties waive their right to seek remedies in court, including the right to a jury trial.

- Pre-arbitration discovery is generally more limited than and different from court proceedings.

- The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.

- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

(o) **NO CONSEQUENTIAL DAMAGES.** IN NO EVENT WILL LENDER OR AGENT BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT.

(p) Waiver of Immunities. Lender and Borrower each irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

(q) Headings. The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder.

(r) Cumulative Rights; Entire Agreement. The rights, remedies, benefits and protections afforded to Lender and Agent under this Agreement and under any other agreement Borrower may have with Lender or Agent or any affiliate of Lender or Agent, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that Lender or Agent may have. To the extent that the provisions of any

**LEHMAN BROTHERS**                    7

agreements Borrower has with Lender or Agent, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the agreements or within a single agreement), the conflict shall be resolved in favor of the provision which affords Lender or Agent (as applicable) with the maximum rights, remedies, benefits or protections. Except as set forth above, this Agreement represents the entire agreement and understanding between Borrower, Agent and Lender concerning the subject matter hereof.

(s) Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original.

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the 27TH day of DECEMBER , 2004

Lender:

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____
Name: NAT RAY
Title: AUTHORISED SIGNATORY

Borrower:

MAVERICK NEUTRAL LEVERED FUND, LTD.
BY: MAVERICK CAPITAL, LTD. AS INVESTMENT MANAGER

By: _____
Name: SHARYL ROBERTSON
Title: CHIEF FINANCIAL OFFICER

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS                    8

**Financing Product Annex**
**Lehman Brothers International Europe**
**Margin Lending Agreement**

The Borrower in determining whether to enter into any transactions confirms that it is not relying upon and will not rely upon the advice of the Lender in so doing but instead has made and will make its own independent judgement from time to time as to the suitability to it of trading strategies using Lehman Brothers PrimePLUS and PrimeVEST ("PrimePLUS" and "PrimeVEST", respectively) based on careful consultation by the Borrower with its own independent legal and tax advisors. The Borrower further acknowledges that the Lender does not act as tax advisor to the Borrower nor does it assume any fiduciary responsibilities in relation to the Borrower with respect to the use of PrimePLUS and PrimeVEST and therefore cannot and does not opine on the suitability of either of these products to the Borrower's investment circumstances, criteria, strategies, or risk profile.

The Borrower represents that it has received all required consents from the underlying beneficial owners of assets under its control in relation to the use of PrimePLUS and PrimeVEST. The Borrower understands and accepts that the Lender is under no obligation to monitor and will not monitor the Borrower's trading strategies or positions and the Lender accepts no responsibility or liability in relation to the conduct or performance thereof. In particular, the Borrower represents that it understands the meaning and effect of "acquisition indebtedness" under applicable law and accepts that the Lender shall not be liable for any losses, expenses, charges or costs whatsoever (including without limitation any tax liability) which may arise in the event that the Borrower's trading strategy results in the generation of acquisition indebtedness.

**IN WITNESS WHEREOF** this Annex to the Margin Lending Agreement dated _DECEMBER 27, 2004_ has been executed on behalf of the Parties hereto:

**Lehman Brothers International (Europe)**

By: _____

Title: _AUTHORISED SIGNATORY_

Date: _____

**Maverick Neutral Levered Fund, Ltd.**
_BY: MAVERICK CAPITAL, LTD. AS INVESTMENT MANAGER_
By: _CHARYL ROBERTSON_

Title: _CHIEF FINANCIAL OFFICER_

Date: _DECEMBER 27, 2004_

**Financing Product Annex**
**Lehman Brothers International Europe**
**Margin Lending Agreement**

The Borrower in determining whether to enter into any transactions confirms that it is not relying upon and will not rely upon the advice of the Lender in so doing but instead has made and will make its own independent judgement from time to time as to the suitability to it of trading strategies using Lehman Brothers PrimePLUS and PrimeVEST ("PrimePLUS" and "PrimeVEST", respectively) based on careful consultation by the Borrower with its own independent legal and tax advisors. The Borrower further acknowledges that the Lender does not act as tax advisor to the Borrower nor does it assume any fiduciary responsibilities in relation to the Borrower with respect to the use of PrimePLUS and PrimeVEST and therefore cannot and does not opine on the suitability of either of these products to the Borrower's investment circumstances, criteria, strategies, or risk profile.

The Borrower represents that it has received all required consents from the underlying beneficial owners of assets under its control in relation to the use of PrimePLUS and PrimeVEST. The Borrower understands and accepts that the Lender is under no obligation to monitor and will not monitor the Borrower's trading strategies or positions and the Lender accepts no responsibility or liability in relation to the conduct or performance thereof. In particular, the Borrower represents that it understands the meaning and effect of "acquisition indebtedness" under applicable law and accepts that the Lender shall not be liable for any losses, expenses, charges or costs whatsoever (including without limitation any tax liability) which may arise in the event that the Borrower's trading strategy results in the generation of acquisition indebtedness.

**IN WITNESS WHEREOF** this Annex to the Margin Lending Agreement dated _DECEMBER 28, 2004_ has been executed on behalf of the Parties hereto:

**Lehman Brothers International (Europe)**

By: _____

Title: _____

Date: _____

**Maverick Neutral Levered Fund, Ltd.**
BY: _MAVERICK CAPITAL, LTD, AS INVESTMENT MANAGER_
By: _Sharyl Robertson_
      _SHARYL ROBERTSON_
Title: _CHIEF FINANCIAL OFFICER_

Date: _DECEMBER 27, 2004_