# **Exhibit C**

Capital Trust IV Allowed Claim

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000022122

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held **Lehman Brothers Holdings Inc.** | Case No. of Debtor **08-13555** |

NOTE: This form should not be used to make a claim for an administrative expense arising _after_ the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (see definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

The Bank of New York Mellon, as Indenture Trustee, Attn: John Guiliano
101 Barclay Street, 8 West
New York, NY 10286

with a copy to: Russell R. Reid, Jr., Sheppard Mullin, 30 Rockefeller Plaza, 24th Floor, New York, NY 10112

Telephone number: 212.815.5441    Email Address: john.guiliano@bnymellon

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
    (If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:    Email Address:

**1.  Amount of Claim as of Date Case Filed:** $ 311,742,937.05

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.  Basis for Claim:** Debt obligations (See addendum)
    (See instruction #2 on reverse side.)

**3.  Last four digits of any number by which creditor identifies debtor:** _____
    **3a. Debtor may have scheduled account as:** _____
        (See instruction #3a on reverse side.)

**4.  Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe: _____

Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____

**Amount of Secured Claim:** $_____    **Amount Unsecured:** $311,742,937.05 ⊞

**5.  Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

**6.  Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
    (See instruction #6 on reverse side.)

**7.  Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.  Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. _(See definition of "redacted" on reverse side.)_ If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

| Date: 9/21/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. JOHN GUILIANO VICE PRESIDENT |
|---|---|

_Penalty for presenting fraudulent claim:_ Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**FOR COURT USE ONLY**

FILED / RECEIVED
SEP 21 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS, INC., *et al.*,<br><br>Debtors. | Case No. 08-13555 (JMP)<br><br>Chapter 11<br><br>(Jointly Administered) |

**ADDENDUM TO PROOF OF CLAIM OF THE BANK OF NEW YORK MELLON, AS TRUSTEE FOR THE LEHMAN BROTHERS HOLDINGS INC. 6.375% SUBORDINATED DEFERRABLE INTEREST DEBENTURES DUE 10/31/2052, LINKED TO THE LEHMAN BROTHERS CAPITAL TRUST IV 6.375% PREFERRED SECURITIES, SERIES L**
**CUSIP 52520B206[1]**

## A. CREDITOR INFORMATION

THE BANK OF NEW YORK MELLON, a banking corporation duly organized and existing under the laws of the State of New York having a corporate trust office at 101 Barclay Street, New York, New York 10286, as successor trustee (the "Trustee") under that certain Indenture dated as of February 1, 1996 by and between Lehman Brothers Holdings Inc. ("LBHI" or, the "Debtor") and Chemical Bank, as original trustee, as supplemented from time to time (the "Indenture"), makes and files this proof of claim on behalf of the Holders (as defined in the Indenture) ("Claim Holder"). All Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture.

All communications regarding this Proof of Claim should be addressed to John Guiliano, The Bank of New York Mellon, Global Corporate Trust Department, 101 Barclay Street, 8 West, New York, NY 10286, with a copy to Russell R. Reid, Jr., Sheppard Mullin

[1] *The CUSIP number appearing herein has been included solely for convenience. The Bank of New York Mellon assumes no responsibility for the selection or use of such number and makes no representation as to the correctness of the CUSIP number listed herein.*

Richter & Hampton LLP, 30 Rockefeller Plaza, 24th Floor, New York, New York 10112, Telephone (212) 653-8700.

**B. CLAIM INFORMATION**

1. Basis for Claim.

(a) *Principal and Interest Due on the Securities.* The LBHI 6.375% Subordinated Deferrable Interest Debentures due 10/31/2052 were issued pursuant to the Indenture, attached hereto as Exhibit A, and the Prospectus Supplement to the Prospectus dated June 5, 2001, attached hereto as Exhibit B (the "Transaction Documents"). Pursuant to the Transaction Documents, the Debtor is obligated to pay to the Trustee, for the benefit of the Holders, among other things, principal and interest in the amounts set forth therein. As of September 15, 2008 (the "Petition Date"), the Debtor was and remains justly and truly indebted to the Trustee, for the benefit of the Holders, and the Trustee hereby claims the aggregate amount of not less than $311,742,937.05, for principal in the amount of $309,278,375.00 and interest due as of the Petition Date of not less than $2,464,562.05.[2] A calculation of interest owed as of the Petition Date is attached hereto as Exhibit C.

(b) *Fees, Expenses and Indemnification.* In addition to the claim for principal and interest described above, the Trustee makes a claim for fees and costs (including attorneys' fees) incurred or to be incurred by the Trustee in performing its duties under the Indenture, as well as for any indemnities owing or to become owing to the Trustee, pursuant to the provisions of the Indenture, as more particularly described below.

[2] In addition, the Trustee claims, to the extent allowed by the Bankruptcy Code and applicable law, any post-petition interest owed to the Trustee on behalf of the Holders.

Pursuant to Section 607 of the Standard Multiple-Series Indenture Provisions, which are incorporated by reference into the Indenture, the Debtor agreed to pay the Trustee for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of the Indenture (including the reasonable compensation and expenses of its agents and counsel) and to indemnify the Trustee and hold it harmless against any loss, liability or expense incurred arising out of or in connection with the administration of the trust. As of the date of this Proof of Claim, the amount of Trustee fees, expenses and indemnity obligations owed to the Trustee pursuant to the Indenture are not less than $73,957.62.

*    *    *    *    *

Without limiting any of the foregoing, Claim Holder reserves all of its rights to assert claims for interest (including, without limitation, at the default rate), fees, costs, charges, expenses, disbursements, liabilities, losses, damages, indemnification, reimbursement and/or contribution, and other amounts, including, without limitation, legal fees and expenses (including, without limitation, in connection with the preparation, filing and prosecution of the Proof of Claim), that exist or arise as of or after the date of the filing of the Proof of Claim, whether prior to, on or subsequent to the Petition Date, in each case to the extent or as may be permitted, provided and/or contemplated in the Indenture, Prospectus or any supporting documentation and under applicable law.

2.    Setoff. This claim is not subject to any known right of setoff held by the Debtor. The Claim Holder hereby asserts any and all rights of setoff it may have in respect of its Claim, including, without limitation, the right to setoff its Claim against any claims that the Debtor (or any successor, assignee or personal claiming through the Debtor) may assert against the Claim Holder.

3. Reservation of Rights. Claim Holder expressly reserves all rights and causes of action, including, without limitation contingent or unliquidated rights that it may have against the Debtor. The description and classification of claims by Claim Holder is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of Claim Holder. Claim Holder expressly reserves its right to further amend or further supplement this Amended Proof of Claim in all respects, including but not limited to, fixing or liquidating any contingent or unliquidated amounts, asserting a claim or claims for additional amounts due and/or claims based on alternative theories or liabilities, and any claims for damages arising from events or conduct by the Debtor. Claim Holder further reserves the right to assert all or part of its claim as administrative claims or other priority claims, and to file additional claim(s), including, without limitation, claims for interest, fees and related expenses (including, without limitation, attorneys' fees) that are not ascertainable at this time and for administrative claims or other priority claims. Claim Holder does not, by this Proof of Claim or by any amendment or other action, waive any rights with respect to any scheduled claim.

Filing of this Proof of Claim is not (a) a waiver or release of Claim Holder's rights against any person, entity or property, including any officers, directors or other principals of the Debtor; (b) a consent by Claim Holder to the jurisdiction of this Court with respect to proceedings, if any, commenced in the case against or otherwise involving Claim Holder; (c) a waiver or release of Claim Holder's right to trial by jury in any proceeding as to any and all matters so triable herein, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. Sec. 157(b)(2); (d) a waiver or release of Claim Holder's right to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Court Judge; (e) a waiver or release of Claim

Holder to have the reference withdrawn by the United States District Court for the Southern District of New York in any matter subject to mandatory or discretionary withdrawal; (f) a waiver or release of the right of Claim Holder to have any unliquidated portions of their claims determined by applicable state courts; (g) a waiver or release of any other rights, claims, actions, defenses, setoffs or recoupments to which Claim Holder may be entitled under agreements, documents or instruments, in law or equity, all of which rights, claims, actions, defenses, setoffs and recoupments are expressly reserved; or (h) an election of remedy.

By filing this Proof of Claim, Claim Holder does not waive any rights under chapter 5 of the Bankruptcy Code. By filing this Proof of Claim, Claim Holder does not waive or release: (a) any obligation owed to it, or any right to any security that may be determined to be held by any one of them or for its or their benefit; (b) any past, present or future defaults (or events of default) by the Debtor or others; (c) any right to the subordination, in favor of Claim Holder, of any indebtedness or liens held by other creditors of the Debtor.

**Dated: New York, New York**
**September 18, 2009**

**THE BANK OF NEW YORK MELLON, as Trustee**

By: ______________________

Name: JOHN GUILIANO

Title: VICE PRESIDENT

**Exhibit A**

Indenture and Indenture Supplements

THIS INDENTURE, dated as of February 1, 1996, is between LEHMAN BROTHERS HOLDINGS INC., a corporation duly organized and existing under the laws of the State of Delaware (the "Company"), and CHEMICAL BANK, a banking corporation duly organized and existing under the laws of the State of New York, as Trustee (the "Trustee").

W I T N E S S E T H:

WHEREAS, the Company has duly authorized the execution and delivery of this Indenture to provide for the issuance from time to time of its unsecured notes or other evidences of indebtedness to be issued in one or more series (the "Securities"), as in this Indenture provided, up to such principal amount or amounts as may from time to time be authorized in or pursuant to one or more resolutions of the Board of Directors; and

WHEREAS, all acts and things necessary to make this Indenture a valid agreement of the Company according to its terms have been done and performed, and the execution and delivery of this Indenture have in all respects been duly authorized,

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Securities and any related coupons are, and are to be, authenticated, issued and delivered, and in consideration of the premises, of the purchase and acceptance of the Securities by the Holders thereof and of the sum of one dollar duly paid to it by the Trustee at the execution and delivery of these presents, the receipt whereof is hereby acknowledged, the Company covenants and agrees with the Trustee for the equal and proportionate benefit of the respective Holders from time to time of the Securities or of any series thereof and any related coupons, as follows:

PARAGRAPH A.  Incorporation by Reference.

Articles One through Thirteen of the Shearson Lehman Brothers Holdings Inc. Standard Multiple-Series Indenture Provisions dated and filed with the Securities and Exchange Commission (the "Commission") on July 30, 1987 and as amended and refiled with the Commission on November 16, 1987 (the "Standard Provisions") are hereby incorporated herein by reference with the same force and effect as though fully set out herein.

PARAGRAPH B.  Additional Provisions.

The following Article Fourteen and each of the following provisions, which constitute part of this Indenture, are numbered to conform with the format of the Standard Provisions:

SECTION 101.

"Senior Debt" has the meaning specified in Section 1401.

SECTION 116.  Benefits of Indenture.

Nothing in this Indenture or in the Securities or coupons, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Holders and the holders of Senior Debt, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 401.

(c) The Company may make the deposit provided for in Section 401(a)(1)(B) hereof only if permitted by Article Fourteen.

SECTION 402.

(d) Funds and obligations held in trust pursuant to this Section 402 are not subject to the provisions of Sections 1401, 1402, 1404 and 1407.

SECTION 615.   Other Matters Concerning Trustee.

The Corporate Trust Office of the Trustee at the date of this Indenture is located at 450 West 33rd Street, New York, New York 10041 except that, with respect to the presentation of notices and other filings under this Indenture, the Corporate Trust Office shall mean the Corporate Trustee Administration Department of the Trustee located at 55 Water Street, Room 1820, New York, New York 10041.

A Responsible Officer means any officer of the Trustee with direct responsibility for the administration of this Indenture and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

SECTION 705.   Delivery of Reports by Trustee.

The reports to be transmitted by the Trustee pursuant to the provisions of Section 703 hereof shall be required to be transmitted on or before May 15, 1996 and on or before May 15 in every year thereafter, so long as any Securities are outstanding hereunder.

ARTICLE FOURTEEN

SUBORDINATION

SECTION 1401.   Securities Subordinated to Senior Debt.

The Company agrees, and each Holder of the Securities and related coupons by his acceptance thereof likewise agrees, that the payment of the principal of (and premium, if any) and interest, if any, on the Securities and related coupons is subordinated, to the extent and in the manner provided in this Article, to the prior payment in full when due of the principal of (and premium, if any) and interest, if any, on all Senior Debt.

For purposes of this Article, "Senior Debt" means all obligations (whether now outstanding or hereafter created, assumed or incurred) for the payment of which the Company is responsible or liable as obligor, guarantor or otherwise in respect of all principal of (and premium, if any) and interest if any (including any interest, if any, accruing subsequent to the commencement of a proceeding in bankruptcy by or against the Company) on (i) any indebtedness for money borrowed or evidenced by bonds, notes, debentures or similar instruments, (ii) indebtedness under capitalized leases, (iii) any indebtedness representing the deferred and unpaid purchase price of any property or business, and (iv) all deferrals, renewals, extensions and refundings of any such indebtedness or obligation; provided, that the following shall not constitute Senior Debt: (a) indebtedness evidenced by the Securities and related coupons, (b) indebtedness which is expressly made equal in right of payment with the Securities or subordinate and subject in right of payment to the Securities, (c) indebtedness for goods or materials purchased in the ordinary course of business or for services obtained in the ordinary course of business or indebtedness consisting of trade payables, or (d) indebtedness which is subordinated to any obligation of the type specified in clauses (i) through (iv) above.

This Article shall constitute a continuing offer to all persons who, in reliance upon such provisions, become holders of, or continue to hold, Senior Debt, and such provisions are made for the benefit of the holders of Senior Debt and such holders and/or each of them may enforce such provisions.

SECTION 1402.      Company Not to Make Payments with Respect to Securities in Certain Circumstances.

(a) Upon the failure to pay the principal of (and premium, if any) and interest, if any, on Senior Debt when due or upon the maturity of any Senior Debt by lapse of time, acceleration or otherwise, all principal of (and premium, if any) and interest, if any, and other amounts due in connection therewith

shall first be paid in full, or such payment duly provided for in cash or in a manner satisfactory to the holders of such Senior Debt, before any payment is made on account of the principal of (and premium, if any) and interest, if any, on the Securities or to acquire any of the Securities or on account of the redemption, sinking fund or analogous provisions in this Indenture.

(b) In the event that, notwithstanding the foregoing provisions of this Section 1402, any payment on account of principal of (and premium, if any) and interest, if any, on the Securities, or on account of the redemption provisions, shall be made by or on behalf of the Company and received by the Trustee, by any Holder or by any Paying Agent (or, if the Company is acting as its own Paying Agent, money for such payment shall be segregated and held in trust) at a time when such payment was prohibited by the provisions of this Section 1402, then, unless and until such payment is no longer prohibited by this Section 1402, such payment (subject to the provisions of Sections 1406 and 1407) shall be held by the Trustee, by any Holder or by any Paying Agent in trust for the benefit of, and shall be paid over and delivered to, the holders of Senior Debt (pro rata as to each of such holders on the basis of the respective amounts of Senior Debt held by them) or their representative or the trustee under the indenture or other agreement (if any) pursuant to which Senior Debt may have been issued, as their respective interests may appear, for application to the payment of all Senior Debt remaining unpaid to the extent necessary to pay all Senior Debt in full in accordance with its terms, after giving effect to any concurrent payment or distribution or provision therefor to the holders of Senior Debt. The Company shall give prompt written notice to the Trustee of any default under any Senior Debt or under any agreement pursuant to which Senior Debt may have been issued. Failure to give such notice shall not affect the subordination of the Securities to Senior Debt as provided in this Article.

SECTION 1403.    Securities Subordinated to Prior Payment of All Senior Debt on Dissolution, Liquidation or Reorganization of Company.

Upon any distribution of assets of the Company pursuant to any dissolution, winding up, liquidation or reorganization of the Company (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise):

(a) the holders of all Senior Debt shall first be entitled to receive payment in full of the Senior Debt before the Holders of the Securities and any related coupons are entitled to receive any payment on account of the principal of (and premium, if any) and interest, if any, on the Securities;

(b) any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to which the Holders of the Securities and any related coupons or the Trustee on behalf of the Holders of the Securities and any related coupons would be entitled except for the provisions of this Article, shall be paid by the liquidating trustee or agent or other person making such payment or distribution directly to the holders of Senior Debt or their representative, or to the trustee under any indenture under which Senior Debt may have been issued, to the extent necessary to make payment in full of all Senior Debt remaining unpaid, after giving effect to any concurrent payment or distribution or provision therefor to the holders of such Senior Debt; and

(c) in the event that, notwithstanding the foregoing provisions of the Section 1403, any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, shall be received by the Trustee or the Holders of the Securities and any related coupons or any Paying Agent (or, if the Company is acting as its own Paying Agent, money for any such payment or distribution shall be segregated or held in trust) on account of principal of (and premium, if any) and interest, if any, on the Securities before all Senior Debt is paid in full, or effective provision made for its payment, such payment or distribution (subject to the provisions of Sections 1406 and 1407) shall be received and held in trust for and shall be paid over to the holders of Senior Debt remaining unpaid or unprovided for or their representative, or to the

trustee under any indenture under which Senior Debt may have been issued, for application to the payment of such Senior Debt until all such Senior Debt shall have been paid in full, after giving effect to any concurrent payment or distribution or provision therefor to the holders of such Senior Debt.

The consolidation of the Company with, or the merger of the Company into, any other corporation or the liquidation or dissolution of the Company following the conveyance, transfer or lease of its properties and assets substantially as an entirety to any Person upon the terms and conditions provided in Article Eight shall not be deemed a dissolution, winding up, liquidation or reorganization for the purposes of this Section 1403 if such other corporation or Person, as the case may be, shall, as a part of such consolidation, merger, conveyance, transfer or lease, comply with the conditions stated in Article Eight. Nothing in this Section 1403 shall apply to claims of, or payments to, the Trustee under or pursuant to Section 607.

The Company shall give prompt written notice to the Trustee of any dissolution, winding up, liquidation or reorganization of the Company. Upon any payment or distribution of assets of the Company referred to in this Section 1403, the Trustee and the Holders of the Securities and any related coupons shall be entitled to rely upon a certificate of the receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution, delivered to the Trustee or to the Holders of the Securities and any related coupons, for the purpose of ascertaining the persons entitled to participate in such distribution, the holders of the Senior Debt and other indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article.

SECTION 1404.    Securityholders to be subrogated to Rights of Holders of Senior Debt.

Subject to the payment in full of all Senior Debt, the Holders of the Securities and any related coupons shall be subrogated to the rights of the holders of Senior Debt to receive payments or distributions of assets of the Company applicable to the Senior Debt until all amounts owing on the Securities shall be paid in full, and for the purpose of such subrogation no payments or distributions to the holders of the Senior Debt by or on behalf of the Company or by or on behalf of the Holders of the Securities and any related coupons by virtue of this Article which otherwise would have been made to the Holders of the Securities and any related coupons shall, as between the Company and the Holders of the Securities and any related coupons, be deemed to be payment by the Company to or on account of the Senior Debt, it being understood that the provisions of this Article are and are intended solely for the purpose of defining the relative rights of the Holders of the Securities and any related coupons, on the one hand, and the holders of the Senior Debt, on the other hand.

SECTION 1405.  Obligation of Company Unconditional.

Nothing contained in this Article or elsewhere in this Indenture or in any Security is intended to or shall impair, as between the Company and the Holders of the Securities and any related coupons, the obligation of the Company, which is absolute and unconditional, to pay to the Holders of the Securities and any related coupons the principal of (and premium, if any) and interest, if any, on the Securities as and when the same shall become due and payable in accordance with their terms, or is intended to or shall affect (except to the extent specifically provided above in Section 1404) the relative rights of the Holders of the Securities and any related coupons and creditors of the Company other than the holders of the Senior Debt, nor shall anything herein or therein prevent the Trustee or the Holder of any Security or any related coupon from exercising all remedies otherwise permitted by applicable law upon the occurrence of an Event of Default under this Indenture, subject to the rights, if any, under this Article of the holders of Senior Debt in respect of cash, property or securities of the Company received upon the exercise of any such remedy. Upon any distribution of assets of the Company referred to in this Article, the Trustee and the Holders of the Securities and any related coupons shall be entitled to rely upon any order or decree made by any court of competent jurisdiction in which such dissolution, winding up, liquidation or

reorganization proceedings are pending, or a certificate of the liquidating trustee or agent or other person making any distribution to the Trustee or to the Holders of the Securities and any related coupons, for the purpose of ascertaining the persons entitled to participate in such distribution, the holders of the Senior Debt and other indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article.

SECTION 1406.    Trustee Entitled to Assume Payments Not Prohibited in Absence of Notice.

The Trustee shall not at any time be charged with knowledge of the existence of any facts which would prohibit the making of any payment to or by the Trustee, unless and until a Responsible Officer shall have received written notice thereof from the Company or from one or more holders of Senior Debt or from any trustee therefor; and, prior to the receipt of any such written notice, the Trustee, subject to the provisions of Article Six, shall be entitled to assume conclusively that no such facts exist. The Trustee shall be entitled to rely on the delivery to it of a written notice by a person representing himself to be a holder of Senior Debt (or a trustee on behalf of such holder) to establish that such notice has been given by a holder of Senior Debt or a trustee on behalf of any such holder or holders.

SECTION 1407.    Application by Trustee of Monies Deposited with It.

Any deposit of monies by the Company with the Trustee or any Paying Agent (whether or not in trust) for the payment of the principal of (and premium, if any) and interest, if any, on any Securities other than pursuant to Article Four shall be subject to the provisions of this Article except that, if prior to the third Business Day prior to the date on which by the terms of this Indenture any such monies may become payable for any purpose (including, without limitation, the payment of the principal of (and premium, if any) and interest, if any, on any Security) the Trustee or, in the case of any such deposit of monies with a Paying Agent, the Paying Agent shall not have received with respect to such monies the notice provided for in Section 1406, then the Trustee or such Paying Agent, as the case may be, shall have full power and authority to receive such monies and to apply the same to the purpose for which they were received, and shall not be affected by any notice to the contrary which may be received by it on or after such date. In the event that the Trustee determines in good faith that further evidence is required with respect to the right of any person as a holder of Senior Debt to participate in any payment or distribution pursuant to this Article, the Trustee may request such person to furnish evidence to the reasonable satisfaction of the Trustee as to the amount of Senior Debt held by such person, the extent to which such person is entitled to participate in such payment or distribution and any other facts pertinent to the rights of such person under this Article, and if such evidence is not furnished the Trustee may defer any payment to such person pending judicial determination as to the right of such person to receive such payment.

The Trustee, however, shall not be deemed to owe any fiduciary duty to the holders of Senior Debt but shall have only such obligations to such holders as are expressly set forth in this Article.

SECTION 1408.    Subordination Rights Not Impaired by Acts or Omissions of Company or Holders of Senior Debt.

No right of any present or future holders of any Senior Debt and coupons to enforce subordination as provided herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by the Company with the terms of this Indenture, regardless of any knowledge thereof which any such holder may have or be otherwise charged with.

SECTION 1409.    Securityholders Authorize Trustee to Effectuate Subordination of Securities.

Each Holder of the Securities and related coupons by his acceptance thereof authorizes and expressly directs the Trustee on his behalf to take such

action as may be necessary or appropriate to effectuate the subordination provided in this Article and appoints the Trustee his attorney-in-fact for such purpose, including, in the event of any dissolution, winding up, liquidation or reorganization of the Company (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise), the immediate filing of a claim for the unpaid balance of its or his Securities in the form required in said proceedings and the causing of said claim to be approved. If the Trustee does not file a proper claim or proof of debt in the form required in such proceeding prior to 30 days before the expiration of time to file such claims, then the holders of Senior Debt are hereby authorized to have the right to file and are hereby authorized to file an appropriate claim for and on behalf of the Holders of said Securities and coupons.

SECTION 1410. Trustee as Holder of Senior Debt.

The Trustee shall be entitled to all of the rights set forth in this Article in respect of any Senior Debt at any time held by it to the same extent as any other holder of Senior Debt, and nothing in this Indenture shall be construed to deprive the Trustee of any of its rights as such holder.

SECTION 1411. Article Fourteen Not to Prevent Events of Default.

The failure to make a payment on account of principal of (and premium, if any) and interest, if any, by reason of any provision in this Article shall not be construed as preventing the occurrence of an Event of Default under Section 501.

Chemical Bank hereby accepts the trusts in this Indenture declared and provided, upon the terms and conditions hereinabove set forth.

IN WITNESS WHEREOF, Lehman Brothers Holdings Inc. has caused this Indenture to be signed and acknowledged by its President, its Chairman of the Board, one of its Vice Presidents, its Chief Financial Officer or its Treasurer, and its corporate seal to be affixed hereunto, and the same to be attested by its Secretary, its Assistant Secretary or one of its Attesting Secretaries, and Chemical Bank has caused this Indenture to be signed and acknowledged by one of its Vice Presidents, and its corporate seal to be affixed hereunto, and the same to be attested by one of its Assistant Secretaries, as of the day and year first written above.

[CORPORATE SEAL] LEHMAN BROTHERS HOLDINGS INC.

Attest: By________________________

________________________
Assistant Secretary

[CORPORATE SEAL] CHEMICAL BANK

Attest: By________________________

________________________
Assistant Secretary

STATE OF )
) ss.:
COUNTY OF )

On the ________ day of _______, 198_, before me personally came ___________, to me known, who, being by me duly sworn, did depose and say that he is ____________ of LEHMAN BROTHERS HOLDINGS INC., one of the corporations described in and which executed the foregoing instrument; that he knows the corporate seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by authority of the Board of Directors of said corporation, and that he signed his name thereto by like authority.

______________________________

[Notarial Seal]

STATE OF )
) ss.:
COUNTY OF )

On the ________ day of _______, 198_, before me personally came ___________, to me known, who, being by me duly sworn, did depose and say that he is ____________ of CHEMICAL BANK, one of the corporations described in and which executed the foregoing instrument; that he knows the corporate seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by authority of the Board of Directors of said corporation, and that he signed his name thereto by like authority.

______________________________

[Notarial Seal]

LEHMAN BROTHERS HOLDINGS INC.

AND

CHEMICAL BANK

Trustee

INDENTURE
Dated as of
February 1, 1996

THIS FIRST SUPPLEMENTAL INDENTURE, dated as of February 1, 1996, is between LEHMAN BROTHERS HOLDINGS INC., a corporation duly organized and existing under the laws of the State of Delaware (the "Company"), and CHEMICAL BANK, a banking corporation duly organized and existing under the laws of the State of New York, acting as Trustee under the Indenture referred to below (the "Trustee").

W I T N E S S E T H :

WHEREAS, the Company has duly authorized the execution and delivery of an Indenture dated as of February 1, 1996 (the "Indenture") to provide for the issuance from time to time of its unsecured notes or other evidences of indebtedness to be issued in one or more series (the "Securities"), as in the Indenture provided, up to such principal amount or amounts as may from time to time be authorized in or pursuant to one or more resolutions of the Board of Directors;

WHEREAS, the Company has duly authorized the execution and delivery of this First Supplemental Indenture in order to (i) provide for the issuance of global Securities in either registered or bearer form or in either temporary or global form and for the defeasance of certain obligations, (ii) provide for the conformity of Indenture to the Trust Indenture Act of 1939, as amended, (iii) provide for the issuance of, and clarify the treatment of Indexed Securities and Dual Currency Securities (as each of such terms is defined herein) and (iv) provide for the Euroclear and Cedel rules with respect to the exchange of Bearer Securities in global form (as each of such terms is defined herein);

WHEREAS, no Securities of any series have heretofore been issued under the Indenture; and

WHEREAS, all acts and things necessary to make this First Supplemental Indenture a valid agreement of the Company according to its terms have been done and performed, and the execution and delivery of this First Supplemental Indenture have in all respects been duly authorized;

NOW, THEREFORE, in consideration of the premises, of the purchase and acceptance of the Securities by the Holders thereof and of the sum of one dollar duly paid to it by the Trustee at the execution and delivery of these presents, the receipt whereof is hereby acknowledged, the Company covenants and agrees with the Trustee for the equal and proportionate benefit of the respective Holders from time to time of the Securities or of any series thereof and any related coupons, as follows:

SECTION I. AMENDMENTS TO THE INDENTURE

1.1 Amendment to Section 101 of the Indenture.  Section 101 of the Indenture is hereby amended by (a) adding the following new definitions thereto, in the appropriate alphabetical sequence:

'"Depositary" means, with respect to the Securities of any series issuable or issued in the form of a global Security, the Person designated as Depositary by the Company pursuant to Section 301 until a successor Depositary shall have become such pursuant to the applicable provisions of the Indenture, and thereafter "Depositary" shall mean or include each Person who is then a Depositary hereunder, and if at any time there is more than one such Person, "Depositary" as used with respect to the Securities of any such series shall mean the Depositary with respect to the Securities of that series.

"Global Exchange Agent" has the meaning specified in Section 304.

"Restricted Period" has the meaning set forth in United States Treasury Regulation Section 1.163-5(c)(2)(i)(D)(7) (generally, the first 40 days after the closing date and, with respect to unsold allotments, until sold).

, (b) deleting in their entirety the definitions of "Business Day", "CEDEL, S.A.", "Code", "Common Depositary", "Company Request", "Company Order", "Component Currency", "Conversion Date", "Conversion Event", "Currency Determination Agent", "Dollar Equivalent of the Currency Unit", "Dollar Equivalent of the Foreign Currency", "Election Date", "Euro-clear", "Exchange Rate Officer's Certificate", "Foreign Currency", "Officers' Certificate", "Specified Amount", "United States" and "Valuation Date", (c) inserting in proper alphabetical order the following definitions:

'"Business Day" means with respect to any Security, unless otherwise specified in accordance with Section 301, any day, other than a Saturday or Sunday, that meets each of the following applicable requirements: such day is (a) not a day on which banking institutions in the Borough of Manhattan, The City of New York are authorized or required by law, regulation or executive order to close; (b) if the Security is denominated in a Foreign Currency other than the ECU, (x) not a day on which banking institutions are authorized or required by law or regulation to close in the principal financial center of the country issuing the Foreign Currency and (y) a day on which banking institutions in such principal financial center are carrying out transactions in such Foreign Currency; (c) if the Security is denominated in ECU, (x) not a day on which banking institutions are authorized or required by law or regulation to close in Luxembourg and (y) an ECU clearing day, as determined by the ECU Banking Association in Paris; and (d) if such Security is a LIBOR Security, a London Banking Day.

"Cedel" means Cedel Bank, societe anonyme. All references in the Indenture to "CEDEL, S.A." shall mean "Cedel".

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Request" or "Company Order" means, respectively, a written request or order signed in the name of the Company by its Chairman of the Board, its Chief Executive Officer, its President or a Vice President, and by its Treasurer, an Assistant Treasurer, its Secretary or an Assistant Secretary, and delivered to the Trustee.

"Component Currency" has the meaning specified in Section 311(e).

"Conversion Event" means, with respect to any Foreign Currency, (i) the unavailability to the Company of such Foreign

Currency for making payments thereof due to the imposition of exchange controls or other circumstances beyond the Company's control, (ii) the cessation of use of such Foreign Currency as a unit of domestic exchange by the government or governments of the country or countries which so used such currency or (iii) the cessation of use of such Foreign Currency for the settlement of transactions by public institutions of or within the international banking community.

"Currency Determination Agent", with respect to Securities of any series, means a Person (other than the Trustee) designated pursuant to Section 301 or Section 312.

"Dual Currency Security" means any Security as to which the Company has a one time option of making all payments of principal (premium, if any) and interest scheduled after the exercise of such option in a specified currency other than the currency in which such Security is denominated, all as specified in accordance with Section 301.

"Election Date" has the meaning specified in Section 311(e).

"Euroclear" means Morgan Guaranty Trust Company of New York, Brussels office, or its successor, as operator of the Euroclear System. All references in the Indenture to "Euro-clear" shall mean "Euroclear".

"Foreign Currency" means any currency or composite currency actively maintained as a recognized unit of domestic exchange by the government or governments of any country or countries other than the United States.

"Indexed Security" means any Security as to which the amount of payments of principal, premium, if any, and/or interest due thereon is determined with reference to the rate of exchange between the currency or currency unit in which the Security is denominated and any other specified currency or currency unit, to the relationship between two or more currencies or currency units, to the price of one or more specified securities or commodities, to one or more securities or commodities exchange indices or other indices or by other similar methods or formulas, all as specified in accordance with Section 301.

"LIBOR" means, with respect to any series of Securities, the rate specified as LIBOR for such Securities in accordance with Section 301.

"LIBOR Security" means any Security which bears interest at a floating rate calculated with reference to LIBOR.

"London Banking Day" means, with respect to any LIBOR Security, any day on which dealings in deposits in the currency in which such LIBOR Security is denominated are transacted in the London interbank market.

"Market Exchange Rate" with respect to any Foreign Currency on any date means, unless otherwise specified in accordance with Section 301, the noon buying rate in The City of New York for cable transfers in such Foreign Currency as certified for customs purposes by the Federal Reserve Bank of New York for such Foreign Currency on the second Business Day prior to such date (or, in the event such buying rate is not then available, the most recently available buying rate for such Foreign Currency).

"Officers' Certificate" means a certificate signed by the Chairman of the Board, the Chief Executive Officer, any Vice Chairman of the Board, the President or a Vice President, and by the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Company, and delivered to the Trustee.

"United States" means the United States of America (including the States and District of Columbia) and its possessions (including

Puerto Rico and the U.S. Virgin Islands, Guam, American Samoa, Wake Island and Northern Mariana Islands).'

, (d) deleting the parenthetical in the definition "Holder", (e) inserting immediately before the period at the end of the definition of "Original Issue Discount Security" the following:

"and which is designated as an Original Issue Discount Security pursuant to Section 301"

, (f) deleting clause (ii) of the proviso appearing in the definition of "Outstanding" and inserting in lieu thereof the following:

"(ii) the principal amount of any Indexed Security that shall be deemed to be Outstanding for such purposes shall be deemed to be the face amount thereof unless the specified terms of any such Indexed Security provide otherwise and the principal amount of any Dual Currency Security shall be the amount that would be due and payable with respect to such Dual Currency Security as of the date of such determination upon a declaration of acceleration pursuant to Section 502."

and (g) adding to the definition "Trust Indenture Act" ", as amended by the Trust Indenture Reform Act of 1990," after the date "1939".

1.2 Amendment to Section 102 of the Indenture. Section 102 of the Indenture is hereby amended by adding in the first line of the second paragraph, after the word "certificate", the following:

"(other than certificates provided pursuant to Section 1006)".

1.3 Amendment to Section 108 of the Indenture. Section 108 of the Indenture is hereby amended by deleting Section 108 in its entirety and inserting in lieu thereof the following:

"If any provision hereof limits, qualifies or conflicts with the duties imposed by any of Sections 310 through 317, inclusive, of the Trust Indenture Act through the operation of Section 318(c) thereof, such imposed duties shall control."

1.4 Amendment to Article 1 of the Indenture. Article 1 of the Indenture is hereby amended by adding the following new Section 117 and new Section 118:

"SECTION 117.   Certain Matters Relating to Currencies.

Each reference to any currency or currency unit in any Security, or in the Board Resolution or supplemental indenture relating thereto, shall mean only the referenced currency or currency unit and no other currency or currency unit.

The Trustee shall segregate moneys, funds and accounts held by the Trustee in one currency or currency unit from any moneys, funds or accounts held in any other currencies or currency units, notwithstanding any provision herein which would otherwise permit the Trustee to commingle such amounts.

SECTION 118.   Calculation of Principal Amount.

For the purposes of calculating the principal amount of any Security denominated in a Foreign Currency for any purpose under this Indenture, the principal amount of such Security at any time outstanding shall be deemed to be that amount of Dollars that could be obtained for such principal amount on the basis of a spot rate of exchange specified to the Trustee for such Security in an Officers' Certificate for such Foreign Currency into Dollars as of the date of any such calculation."

1.5 Amendment to Section 203 of the Indenture. Section 203 of the Indenture is amended by adding a new paragraph at the end thereof,

as follows:

"Global Securities may be issued in either registered or bearer form and in either temporary or permanent form."

1.6 Amendment to Section 301 of the Indenture. Section 301 of the Indenture is hereby amended by (a) deleting the word "temporary" from the second line of paragraph (11), (b) deleting paragraph (16) in its entirety, (c) adding the phrase "and 1009" immediately following the phrase "Section 1008" in paragraph (21), (d) deleting paragraph (22) in its entirety, (e) redesignating paragraph (23) as paragraph (27) and (f) inserting the following paragraphs in proper numerical order:

"(16) if the Securities of such series are issuable as Indexed Securities, the manner in which the amount of payments of principal (premium, if any) and/or interest due thereon shall be determined;

(22) whether the Securities of the series shall be issued in whole or in part in the form of a global Security or Securities and, in such case, the Depositary and Global Exchange Agent, if any, for such global Security or Securities, whether such global form shall be permanent or temporary and, if applicable, the Exchange Date;

(23) if Securities of the series are to be issuable initially in the form of a temporary global Security, the circumstances under which the temporary global Security may be exchanged for permanent Securities and whether the permanent Securities will be Registered Securities and/or Bearer Securities and will be in certificated and/or global form and whether interest in respect of any portion of such global Security payable in respect of an Interest Payment Date prior to the Exchange Date shall be paid to any clearing organization with respect to a portion of such global Security held for its account and, in such event, the terms and conditions (including any certification requirements) upon which any such interest payment received by a clearing organization will be credited to the Persons entitled to interest payable on such Interest Payment Date if other than as provided in this Article Three;

(24) if the Securities of such series are issuable as Dual Currency Securities, the specified currency other than the denominated currency in which all payments of principal (premium, if any) and interest may be made at the option of the Company, and any other special terms with respect to such Securities (which terms shall not be inconsistent with the provisions of this Indenture);

(25) if the Securities of such series may be converted into or exchanged for other securities of the Company or any other Persons, the terms and conditions pursuant to which the Securities of such series may be converted or exchanged;

(26) if the principal of (or premium, if any) or interest, if any, on the Securities of such series are to be payable, at the election of the Company or a Holder thereof, in securities or other property, the type and amount of such securities or other property, or the method by which such amount shall be determined, and the periods within which, and the terms and conditions upon which, any such election may be made; and".

1.7 Amendment to Section 303 of the Indenture. Section 303 of the Indenture is hereby amended by (a) deleting the first two sentences of the third paragraph and inserting in lieu thereof the following:

"At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Securities of any series, together with any coupons appertaining thereto, executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Securities, and the Trustee in accordance with the Company Order shall authenticate and deliver such Securities; provided, however, that in connection with the

sale of a Security during the Restricted Period, no Bearer Security in definitive form shall be mailed or otherwise delivered to any location in the United States; and provided, further that a Bearer Security in definitive form may be delivered only if the Person entitled to receive such Bearer Security shall have furnished a certificate substantially in the form set forth in Exhibit A to this Indenture, dated no earlier than 15 days prior to the date on which such Bearer Security is delivered, unless a certificate substantially in the form set forth in Exhibit A to this Indenture has previously been furnished pursuant to Section 304. If any Security shall be represented by a permanent global Security, then, for purposes of this Section and Section 304, the notation of a beneficial owner's interest therein upon original issuance of such Security or upon exchange of a portion of a temporary global Security shall be deemed to be delivery in definitive form by the Company of such beneficial owner's interest in such permanent global Security."

, (b) replacing the word "definitive" on the third line of the sixth full paragraph with the word "permanent" and (c) inserting as the last two paragraphs of such Section the following:

"Any temporary global Security and any permanent global Security shall, unless otherwise provided therein, be delivered to a Depositary designated pursuant to Section 301, for the benefit, in the case of a global Security in bearer form, of Euroclear and Cedel, and for credit to the respective accounts of the beneficial owners of such Securities (or to such other accounts as they may direct). With respect to temporary global Securities in bearer form, on or prior to the last day of the Restricted Period, the Company shall deliver to the Trustee or the Global Exchange Agent as applicable definitive Bearer Securities and definitive Registered Securities executed by the Company.

Each Depositary designated pursuant to Section 301 for a global Security in registered form must, at the time of its designation and at all times while it serves as Depositary, be a clearing agency registered under the Securities Exchange Act of 1934 and any other applicable statute or regulation."

1.8 Amendment to Section 304 of the Indenture. Section 304 of the Indenture is hereby amended by deleting Section 304 in its entirety and inserting in lieu thereof the following:

"SECTION 304.    Temporary Securities; Exchange of Temporary Global Securities and Permanent Global Securities in Bearer Form.

Pending the preparation of permanent Securities of any series, the Company may execute, and upon Company Order the Trustee shall authenticate and deliver, temporary Securities which are printed, lithographed, typewritten, mimeographed or otherwise produced, in any authorized denomination, substantially of the tenor of the permanent Securities in lieu of which they are issued, in registered form or, if authorized, in bearer form with one or more coupons or without coupons, and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such Securities may determine, as evidenced by their execution of such Securities. Any such temporary Securities may be in global form, representing such of the Outstanding Securities of such series as shall be specified therein.

Except in the case of temporary global Securities in bearer form (which shall be exchanged in accordance with the provisions of the following paragraphs), if temporary Securities of any series are issued, the Company will cause permanent Securities of that series to be prepared within a reasonable period of time after the issue date of such temporary Securities. After the preparation of permanent Securities of such series, the temporary Securities of such series shall be exchangeable for permanent Securities of such series and of a like Stated Maturity and with like terms and provisions upon surrender of the temporary Securities of such series at the office or agency of the Company in a Place of Payment for that series, without charge to

the Holder. Upon surrender for cancellation of any one or more temporary Securities of any series the Company shall execute and (in accordance with a Company Order delivered at or prior to the authentication of the first permanent Security of such series) the Trustee shall authenticate and deliver in exchange therefor a like principal amount of permanent Securities of the same series of authorized denominations and of a like Stated Maturity and with like terms and provisions; provided, however, unless otherwise specified pursuant Section 301, no permanent Bearer Securities shall be delivered in exchange for a temporary Registered Security; and provided, further, that permanent Bearer Securities shall be delivered in exchange for a temporary global Security in bearer form only in compliance with the conditions set forth in Section 303 and this Section 304. Until exchanged as hereinabove provided, the temporary Securities of any series shall in all respects be entitled to the same benefits under this Indenture as permanent Securities of the same series and tenor authenticated and delivered hereunder.

Within a reasonable period of time after the Restricted Period but in any event not later than the date specified in or determined pursuant to the terms of any temporary global Security in bearer form, the Securities represented by any such temporary global Security in bearer form may be exchanged for (i) in whole, definitive Bearer Securities or (ii) in whole, Securities to be represented thereafter by one or more permanent global Securities in bearer form, without interest coupons, and/or (iii) in whole or in part, definitive Registered Securities (the date of such exchange, the "Exchange Date"); provided, however, that if definitive Bearer Securities have previously been issued in exchange for an interest in a permanent global Security in bearer form representing Securities of the same series, then (unless the Securities which would continue to be represented by any such permanent global Security in bearer form would be regarded by Euroclear and Cedel as fungible with any such definitive Bearer Securities issued in partial exchanges for interests in any such permanent global Security) interests in such temporary global Security in bearer form shall only thereafter be exchangeable, in whole, for definitive Bearer Securities, definitive Registered Securities or any combination thereof; provided, further, however, that if definitive Bearer Securities have previously been issued in exchange for interests in a temporary global Security in bearer form representing Securities of the same series, then interests in any such temporary global Security shall not be exchangeable for interests in a permanent global Security in bearer form of the series (unless the Securities to be represented by any such permanent global Security in bearer form would be regarded by Euroclear and Cedel as fungible with such previously issued definitive Bearer Securities). On the Exchange Date, any such temporary global Security shall be surrendered by the Depositary to the Trustee as the Company's agent for such purpose, or the agent appointed by the Company pursuant to Section 301 to effect the exchange of any such temporary global Security for permanent Securities (the "Global Exchange Agent"), and following such surrender, the Trustee or the Global Exchange Agent (as authorized by the Trustee as an Authenticating Agent pursuant to Section 614) shall (1) endorse any such temporary global Security to reflect the reduction of its principal amount by an equal aggregate principal amount of such permanent Securities being registered, (2) endorse the applicable permanent global Security in bearer form, if any, to reflect the initial amount, or an increase in the amount of Securities represented thereby, (3) manually authenticate such definitive Bearer Securities, definitive Registered Securities or permanent global Security, as the case may be, (4) deliver such definitive Bearer Securities or definitive Registered Securities, as the case may be, to the Holder thereof or, as the case may be, deliver such permanent global Security in bearer form to the Depositary to be held outside the United States for the accounts of Euroclear and Cedel, for credit to the respective accounts at Euroclear and Cedel, designated by or on behalf of the beneficial owners of such Securities (or to such other accounts as they may direct) and (5) redeliver such temporary global Security to the Depositary, unless such temporary global Security shall have been cancelled in accordance with Section

309 hereof; provided, however, that, unless otherwise specified in such temporary global Security or unless a certificate substantially in the form set forth in Exhibit B to this Indenture has previously been provided pursuant to this Section 304, upon such presentation by the Depositary, such temporary global Security shall be accompanied by a certificate dated the Exchange Date, or a subsequent date and signed by Euroclear as to the portion of such temporary global Security held for its account then to be exchanged for definitive Bearer Securities, definitive Registered Securities or Securities represented by one or more permanent global Securities in bearer form, as the case may be, and a certificate dated the Exchange Date or a subsequent date and signed by Cedel, as to the portion of such temporary global Security held for its account then to be exchanged for definitive Bearer Securities, definitive Registered Securities or Securities represented by one or more permanent global Securities in bearer form, as the case may be, each substantially in the form set forth in Exhibit B to this Indenture. Each certificate substantially in the form of Exhibit B hereto of Euroclear or Cedel, as the case may be, shall be based on certificates of the account holders listed in the records of Euroclear or Cedel, as the case may be, as being entitled to all or any portion of the applicable temporary global Security. An account holder of Euroclear or Cedel, as the case may be, desiring to effect the exchange of an interest in a temporary global Security in bearer form for definitive Bearer Securities, definitive Registered Securities or Securities represented by one or more permanent global Securities in bearer form, as the case may be, shall instruct Euroclear or Cedel, as the case may be, to request such exchange on its behalf and shall deliver to Euroclear or Cedel, as the case may be, a certificate substantially in the form of Exhibit A hereto and dated no earlier than 15 days prior to the Exchange Date.

The delivery to the Trustee or the Global Exchange Agent by Euroclear or Cedel of any certificate substantially in the form of Exhibit B hereto may be relied upon by the Company and the Trustee or the Global Exchange Agent as conclusive evidence that a corresponding certificate or certificates has or have been delivered to Euroclear or to Cedel, as the case may be, pursuant to the terms of this Indenture.

At any time after the last day of the Restricted Period, upon 30 days' notice to the Trustee or the Global Exchange Agent by Euroclear or Cedel, as the case may be, acting at the request of or on behalf of the beneficial owner, Securities represented by a permanent global Security in bearer form may be exchanged in whole for definitive Bearer Securities or in whole or in part for definitive Registered Securities and the Trustee or the Global Exchange Agent shall authenticate and deliver, in exchange for each portion of such permanent global Security, an equal aggregate principal amount of definitive Securities of the same series of authorized denominations and of like tenor as the portion of such permanent global Security to be exchanged, which, unless the Securities of the series are not issuable both as Bearer Securities and as Registered Securities, as contemplated by Section 301, shall be in the form of Bearer Securities or Registered Securities, or any combination thereof, as shall be specified by the beneficial owner thereof; provided, however, that if definitive Bearer Securities are issued in partial exchange for Securities represented by such a permanent global Security or by a temporary global Security in bearer form of the same series, such issuance shall (unless the Securities which would continue to be represented by such permanent global Security would be regarded by Euroclear and Cedel as fungible with any such definitive Bearer Securities issued in partial exchange for Securities represented by any such permanent global Security or any such temporary global Security of the same series) give rise to the exchange of such permanent global Security in whole for, at the option of the Holders entitled thereto, definitive Bearer Securities, definitive Registered Securities or any combination thereof. On or prior to the thirtieth day following receipt by the Trustee or the Global Exchange Agent of such notice with respect to the exchange of such Securities or, if such day is not a Business Day, the next succeeding Business Day, the permanent global Security

shall be surrendered by the Depositary to the Trustee or the Global Exchange Agent, as the Company's agent for such purpose, to be so exchanged for definitive Securities following such surrender, upon the request of Euroclear or Cedel, as the case may be, and the Trustee or the Global Exchange Agent shall (1) endorse the applicable permanent global Security to reflect the reduction of its principal amount by the aggregate principal amount of such definitive Securities being requested, (2) cause the terms of such Securities and coupons, if any, to be entered on one or more definitive Bearer Securities and/or definitive Registered Securities, as the case may be, (3) manually authenticate such definitive Securities and (4) with respect to definitive Bearer Securities, deliver such definitive Securities outside the United States to Euroclear or Cedel, as the case may be, for or on behalf of the beneficial owner thereof, in exchange for a portion of such permanent global Security.

Unless otherwise specified in any such temporary global Security or permanent global Security in bearer form, any such exchange shall be made free of charge to the beneficial owners of such temporary global Security or permanent global Security, except that a Person receiving definitive Securities must bear the cost of insurance, postage, transportation and the like in the event that such Person does not take delivery of such definitive Securities in person at the offices of Euroclear or Cedel or at the Corporate Trust Office of the Trustee or at the office or agency in a Place of Payment for Securities of such series, as the case may be. Definitive Securities in bearer form to be delivered in exchange for any portion of a temporary global Security or a permanent global Security in bearer form shall be delivered only outside the United States.

Until exchanged in full as herein above provided, any temporary global Security or permanent global Security in bearer form shall in all respects be entitled to the same benefits under this Indenture as definitive Bearer Securities of the same series and tenor authenticated and delivered hereunder, except that, unless otherwise specified as contemplated by Section 301, interest payable on any such temporary global Security on an Interest Payment Date for Securities of such series occurring prior to the applicable Exchange Date shall be payable to Euroclear and Cedel on such Interest Payment Date only upon delivery by Euroclear and Cedel to the Trustee or the Global Exchange Agent of a certificate or certificates substantially in the form set forth in Exhibit B to this Indenture, for credit without further interest on or after such Interest Payment Date to the respective accounts of the Persons who are the beneficial owners of such temporary global Security on such Interest Payment Date and who have each delivered to Euroclear or Cedel, as the case may be, a certificate substantially in the form set forth in Exhibit A to this Indenture.

Any definitive Bearer Security authenticated and delivered by the Trustee in exchange for a portion of a temporary global Security in bearer form or a permanent global Security in bearer form shall not bear a coupon for any interest which shall theretofore have been duly paid by the Trustee to Cedel or Euroclear or by the Company to the Trustee in accordance with the provisions of this Section 304."

1.9 Amendment to Section 305 of the Indenture. Section 305 of the Indenture is hereby amended by deleting Section 305 in its entirety and inserting in lieu thereof the following:

"SECTION 305.        Registration, Registration of Transfer and Exchange.

The Company shall cause to be kept at the Corporate Trust Office of the Trustee a register (the register maintained in such office and in any other office or agency of the Company in a Place of Payment being herein sometimes collectively referred to as the "Security Register") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Registered Securities and of transfers of Registered Securities. The Trustee is hereby appointed Security Registrar for the purpose of

registering Registered Securities and transfers of Registered Securities as herein provided.

Upon surrender for registration of transfer of any Registered Security of any series at the office or agency in a Place of Payment for that series, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Registered Securities of the same series, of any authorized denominations and in a like aggregate principal amount and of a like Stated Maturity and with like terms and conditions.

Except as set forth below, at the option of the Holder, Registered Securities of any series may be exchanged for other Registered Securities of the same series, of any authorized denominations and in a like aggregate principal amount and of a like Stated Maturity and with like terms and conditions, upon surrender of the Securities to be exchanged at such office or agency. Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Securities which the Holder making the exchange is entitled to receive. Except as otherwise specified pursuant to Section 301, Registered Securities may not be exchanged for Bearer Securities.

Notwithstanding any other provision of this Section or Section 304, unless and until it is exchanged in whole or in part for Registered Securities in definitive form, a global Security representing all or a portion of the Registered Securities of a series may not be transferred except as a whole by the Depositary for such series to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor Depositary for such series or a nominee of such successor Depositary.

At the option of the Holder, definitive Bearer Securities of any series may be exchanged for definitive Registered Securities of the same series of any authorized denominations and of a like aggregate principal amount and tenor, upon surrender of the definitive Bearer Securities to be exchanged at any such office or agency, with all unmatured coupons and all matured coupons in default thereto appertaining. If the Holder of a definitive Bearer Security is unable to produce any such unmatured coupon or coupons or matured coupon or coupons in default, such exchange may be effected if the definitive Bearer Securities are accompanied by payment in funds acceptable to the Company in an amount equal to the face amount of such missing coupon or coupons, or the surrender of such missing coupon or coupons may be waived by the Company and the Trustee if there is furnished to them such security or indemnity as they may require to save each of them and any Paying Agent harmless. If thereafter the Holder of such Security shall surrender to any Paying Agent any such missing coupon in respect of which such a payment shall have been made, such Holder shall be entitled to receive the amount of such payment; provided, however, that, except as otherwise provided in Section 1002, interest represented by coupons shall be payable only upon presentation and surrender of those coupons at an office or agency located outside the United States. Notwithstanding the foregoing, in case a definitive Bearer Security of any series is surrendered at any such office or agency in exchange for a definitive Registered Security of the same series and like tenor after the close of business at such office or agency on (i) any Regular Record Date and before the opening of business at such office or agency on the relevant Interest Payment Date, or (ii) any Special Record Date and before the opening of business at such office or agency on the related proposed date for payment of Defaulted Interest, such definitive Bearer Security shall be surrendered without the coupon relating to such Interest Payment Date or proposed date for payment, as the case may be (or, if such coupon is so surrendered with such definitive Bearer Security, such coupon shall be returned to the Person so surrendering the definitive Bearer Security), and interest or Defaulted Interest, as the case may be, will

not be payable on such Interest Payment Date or proposed date for payment, as the case may be, in respect of the definitive Registered Security issued in exchange for such Bearer Security, but will be payable only to the Holder of such coupon when due in accordance with the provisions of this Indenture.

Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Securities which the Holder making the exchange is entitled to receive.

If at any time the Depositary for Securities of a series in registered form notifies the Company that it is unwilling or unable to continue as Depositary for the Securities of such series or if at any time the Depositary for the Securities for such series shall no longer be eligible under Section 303, the Company shall appoint a successor Depositary with respect to the Securities for such series. If a successor Depositary for the Securities of such series is not appointed by the Company within 90 days after the Company receives such notice or becomes aware of such ineligibility, the Company's election pursuant to Section 301 shall no longer be effective with respect to the Securities for such series and the Company will issue, and the Trustee, upon receipt of a Company Order for the authentication and delivery of definitive Registered Securities of such series, will authenticate and deliver Registered Securities in definitive form in exchange for an aggregate principal amount equal to the principal amount of the global Security or Securities representing such Securities.

The Company may at any time and in its sole discretion determine that the Registered Securities of any series issued in the form of one or more global Securities shall no longer be represented by such global Security or Securities. In such event, the Company will issue, and the Trustee, upon receipt of a Company Order for the authentication and delivery of definitive Registered Securities of such series, will authenticate and deliver, Registered Securities of such series in definitive form and in an aggregate principal amount equal to the principal amount in exchange for the global Security or Securities representing such Registered Securities.

If specified by the Company pursuant to Section 301 with respect to a series of Securities in registered form, the Depositary for such series of Securities may surrender a global Security for such series of Securities in exchange in whole or in part for Registered Securities of such series of like tenor and terms and in definitive form on such terms as are acceptable to the Company and such Depositary. Thereupon the Company shall execute, and the Trustee shall authenticate and deliver, without service charge, (i) to each Person specified by such Depositary a new Registered Security or Securities of the same series, of like tenor and terms and of any authorized denomination as requested by such Person in aggregate principal amount equal to and in exchange for such Person's beneficial interest in the global Security; and (ii) to such Depositary a new global Security of like tenor and terms and in a denomination equal to the difference, if any, between the principal amount of the surrendered global Security and the aggregate principal amount of Registered Securities delivered to Holders thereof.

Upon the exchange in full of a global Security for Securities in definitive form, such global Security shall be cancelled by the Trustee. Registered Securities issued in exchange for a global Security pursuant to this Section shall be registered in such names and in such authorized denominations as the Depositary for such global Security, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Trustee. The Trustee shall deliver such Registered Securities to the Persons in whose names such Securities are so registered.

All Securities issued upon any registration of

transfer or exchange of Securities shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Securities surrendered upon such registration of transfer or exchange.

Every Registered Security presented or surrendered for registration of transfer or exchange shall (if so required by the Company or the Trustee) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Company and the Security Registrar duly executed, by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made for any registration of transfer or exchange of Securities, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Securities, other than exchanges pursuant to Section 304, 906 or 1108 not involving any transfer.

The Company shall not be required (i) to issue, register the transfer of or exchange Securities of any series during a period beginning at the opening of business 15 days before the day of the mailing of a notice of redemption of Securities of that series selected for redemption under Section 1104 and ending at the close of business on (A) if Securities of the series are issuable only as Registered Securities, the day of the mailing of the relevant notice of redemption and (B) if Securities of the series are issuable as Bearer Securities, the day of the first publication of the relevant notice of redemption or, if Securities of the series are also issuable as Registered Securities and there is no publication, the mailing of the relevant notice of redemption, or (ii) to register the transfer of or exchange any Registered Security so selected for redemption as a whole or in part, except the unredeemed portion of any Security being redeemed in part, or (iii) to exchange any Bearer Security so selected for redemption except that such a Bearer Security may be exchanged for a Registered Security of that series and like tenor, provided that such Registered Security shall be simultaneously surrendered for redemption."

1.10   Amendment to Section 307 of the Indenture.  Section 307 of the Indenture is hereby amended by adding, as the third paragraph thereof, a new paragraph, as follows:

"Unless otherwise provided or contemplated by Section 301, every permanent global Security in bearer form will provide that interest, if any, payable on any Interest Payment Date will be paid to each of Euroclear and Cedel with respect to that portion of such permanent global Security held for its account by the Depositary. Each of Euroclear and Cedel will in such circumstances credit the interest received by it in respect of such permanent global Security to the accounts of the beneficial owners thereof."

1.11   Amendment to Section 308 of the Indenture.  Section 308 of the Indenture is hereby amended by adding, as the last paragraph thereof, a new paragraph, as follows:

"None of the Company, the Trustee, any Paying Agent or the Security Registrar will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a global Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests."

1.12 Amendment to Section 311 of the Indenture. Section 311 of the Indenture is hereby amended by deleting Section 311 in its entirety and inserting in lieu thereof the following:

"SECTION 311.   Currency and Manner of Payments in Respect of Registered Securities.

Unless otherwise specified in accordance with Section 301 with respect to any series of Registered Securities, the following provisions shall apply:

(a) Except as provided in paragraphs (b) and (d) below, the principal of, premium, if any, and interest on Registered Securities of any series denominated in a Foreign Currency will be payable by the Company in Dollars based on the equivalent of that Foreign Currency converted into Dollars in the manner described in paragraph (c) below.

(b) It may be provided pursuant to Section 301 with respect to Registered Securities of any series denominated in a Foreign Currency that Holders shall have the option, subject to paragraph (d) below, to receive payments of principal of, premium, if any, and interest on such Registered Securities in such Foreign Currency by delivering to the Trustee (or to any such Paying Agent), a written election, to be in form and substance satisfactory to the Trustee (or to any such Paying Agent) not later than the close of business on the Election Date immediately preceding the applicable payment date. If a Holder so elects to receive such payments in such Foreign Currency, such election will remain in effect for such Holder until changed by such Holder by written notice to the Trustee (or to any such Paying Agent); provided, however, that any such change must be made not later than the close of business on the Election Date immediately preceding the next payment date to be effective for the payment to be made on such payment date; and provided, further, that no such change or election may be made with respect to payments to be made on any Registered Security of such series with respect to which an Event of Default has occurred, the Company has exercised any satisfaction or discharge options pursuant to Article Four or Section 1009 or notice of redemption has been given by the Company pursuant to Article Eleven. In the event any Holder makes any such election, such election will not be effective as to any transferee of such Holder and such transferee shall be paid in Dollars unless such transferee makes an election as specified above; provided, however, that such election, if in effect while funds are on deposit with respect to the Registered Securities as described in Section 401(a)(1)(B) or Section 1009, will be effective on any transferee of such Holder unless otherwise specified pursuant to Section 301 for such Registered Securities. Any Holder of any such Registered Security who shall not have delivered any such election to the Trustee (or to any duly appointed Paying Agent) not later than the close of business on the applicable Election Date will be paid in the amount due on the applicable payment date in Dollars.

(c) With respect to any Registered Security denominated in a Foreign Currency and payable in Dollars, the amount of Dollars so payable will be determined by the Currency Determination Agent based on the indicative quotation in The City of New York selected by the Currency Determination Agent at approximately 11:00 A.M., New York City time, on the second Business Day preceding the applicable payment date that yields the least number of Dollars upon conversion of the Foreign Currency. Such selection shall be made from among the quotations appearing on the bank composite or multi-contributor pages of the Reuters Monitor Foreign Exchange Service or, if not available, the Telerate Monitor Foreign Exchange Service. If such quotations are unavailable from either such foreign exchange service, such selection shall be made from the quotations received by the Currency Determination Agent from no more than three nor less than two recognized foreign exchange dealers in The City of New York selected by the Currency Determination Agent and approved by the Company (one of which may be the Currency Determination Agent) for the purchase by the quoting dealer, for settlement on such payment date, of the aggregate amount of the Foreign Currency payable on such payment date in respect of all Securities denominated in such Foreign Currency and for which the applicable dealer commits to execute a contract. If no such bid quotations are available, payments shall be made in the Foreign Currency.

(d) If a Conversion Event occurs with respect to a Foreign Currency in which any of the Registered Securities are payable, then with respect to each date for the payment of principal of, premium, if any, and interest on such Registered Securities occurring after the last date on which such Foreign Currency was used, the Company may make such payment in Dollars. The Dollar amount to be paid by the Company to the Trustee and by the Trustee or any Paying Agent to the Holders of such Registered Securities with respect to such payment date shall be determined by the Currency Determination Agent on the basis of the Market Exchange Rate. Any payment in respect of such Security made under such circumstances in Dollars will not constitute an Event of Default hereunder.

(e)      For purposes of this Indenture the following terms shall have the following meanings:

A "Component Currency" shall mean any currency which is a component currency of any composite currency, including, without limitation, the ECU.

"Election Date" shall mean, for any Registered Security, the date specified pursuant to Section 301(7).

(f) Notwithstanding any other provisions of this Section 311, the following shall apply: (i) if the official unit of any Component Currency is altered by way of combination or subdivision, the number of units of that currency as a component shall be divided or multiplied in the same proportion, (ii) if two or more Component Currencies are consolidated into a single currency, the amounts of those currencies as components shall be replaced by an amount in such single currency equal to the sum of the amounts of the consolidated Component Currencies expressed in such single currency, (iii) if any Component Currency is divided into two or more currencies, the amount of that original Component Currency as a component shall be replaced by the amounts of such two or more currencies having an aggregate value on the date of division equal to the amount of the former Component Currency immediately before such division and (iv) in the event of an official redenomination of any currency (including without limitation, a composite currency), the obligations of the Company to make payments in or with reference to such currency on any Registered Securities shall, in all cases, be deemed immediately following such redenomination to be obligations to make payments in or with reference to that amount of redenominated currency representing the amount of such currency immediately before such redenomination.

(g) All determinations referred to in this Section 311 made by the Currency Determination Agent shall be in its sole discretion and shall, in the absence of manifest error, be conclusive for all purposes and irrevocably binding upon the Holders of the applicable Registered Securities. The Currency Determination Agent shall promptly give written notice to the Trustee of any such decision or determination. The Currency Determination Agent shall have no liability for any determinations referred to in this Section 311 made by it.

(h) The Trustee shall be fully justified and protected in relying and acting upon information received by it from the Company or the Currency Determination Agent with respect to any of the matters addressed in or contemplated by this Section 311 and shall not otherwise have any duty or obligation to determine such information independently."

1.13 Amendment to Section 401 of the Indenture. Section 401 of the Indenture is amended by (a) deleting the lead-in clause and subparagraph (i) of paragraph (a)(1)(B) thereof in their entirety and inserting in lieu thereof the following:

"(B) except as otherwise specified pursuant to Section 301 for the Securities of such series, with respect to all Outstanding Securities of such series described in (A) above (and, in

the case of (i), (ii) or (iii) below, any coupons appertaining thereto)
not theretofore delivered to the Trustee for cancellation:

(i) the Company has deposited or caused to be
deposited with the Trustee as trust funds in trust an amount
in the currency or currency unit in which the Securities of
such series are payable (except as otherwise specified
pursuant to Section 301 for the Securities of such series and
except as provided in Sections 311(b) and 311(d), in which
case the deposit to be made with respect to Securities for
which an election has occurred pursuant to Section 311(b) or a
Conversion Event has occurred as provided in Section 311(d),
shall be made in the currency or currency unit in which such
Securities are payable as a result of such election or
Conversion Event), sufficient to pay and discharge the entire
indebtedness on all such Outstanding Securities of such series
and any related coupons for principal (and premium, if any)
and interest, if any, to the Stated Maturity, or any
Redemption Date as contemplated by Section 402, as the case
may be; or"

, (b) adding a new paragraph (iii) of Section 401(a)(1)(B), as follows:

"or (iii) the Company has deposited or caused to be deposited
with the Trustee such combination of trust funds or obligations in
trust pursuant to (i) and (ii) above, respectively, as will, in a
written opinion of independent public accountants delivered to the
Trustee, together with the predetermined and certain income to accrue
on such obligations in trust, be sufficient to pay and discharge when
due the entire indebtedness on all such Outstanding Securities of such
series and any related coupons for unpaid principal (and premium, if
any) and interest, if any, to the Stated Maturity or any Redemption
Date as contemplated by Section 402, as the case may be;"

and (c) deleting paragraph (b) thereof in its entirety and inserting in lieu
thereof the following:

"(b) Upon the satisfaction of the conditions set forth in this
Section 401 with respect to all the Securities of any series, the terms
and conditions of such series, including the terms and conditions with
respect thereto set forth in this Indenture, shall no longer be binding
upon, or applicable to, the Company, and the Holders of the Securities
of such series and any related coupons shall look for payment only to
the funds or obligations deposited with the Trustee pursuant to Section
401(a)(1)(B); provided, however, that in no event shall the Company be
discharged from (a) any payment obligations in respect of Securities of
such series and any related coupons which are deemed not to be
Outstanding under clause (c) of the definition thereof if such
obligations continue to be valid obligations of the Company under
applicable law, (b) from any obligations under Sections 402(b), 607,
610 and 1008 and (c) from any obligations under Sections 304, 305 and
306 (except that Securities of such series issued upon registration of
transfer or exchange or in lieu of mutilated, lost, destroyed or stolen
Securities and any related coupons shall not be obligations of the
Company) and Section 311, 701 and 1002; and provided, further, that in
the event a petition for relief under Title 11 of the United States
Code or a successor statute is filed and not discharged with respect to
the Company within 91 days after the deposit, the entire indebtedness
on all Securities of such series and any related coupons shall not be
discharged, and in such event the Trustee shall return such deposited
funds or obligations as it is then holding to the Company upon Company
Request. Notwithstanding the satisfaction of the conditions set forth
in this Section 401 with respect to all the Securities of any series
not payable in Dollars, upon the happening of any Conversion Event the
Company shall be obligated to make the payments in Dollars required by
Section 311(d) to the extent that the Trustee is unable to convert any
Foreign Currency or currency unit in its possession pursuant to Section
401(a)(1)(B) into the Dollar equivalent of such Foreign Currency or
currency unit, as the case may be. If, after the deposit referred to in

Section 401 has been made, (x) the Holder of a Security is entitled to, and does, elect pursuant to Section 311(b) to receive payment in a currency or currency unit other than that in which the deposit pursuant to Section 401 was made, or (y) a Conversion Event occurs as contemplated in Section 311(d), then the indebtedness represented by such Security shall be fully discharged to the extent that the deposit made with respect to such Security shall be converted into the currency or currency unit in which such Security is payable. The Trustee shall return to the Company any non-converted funds or securities in its possession after such payments have been made."

1.14 Amendment to Section 402 of the Indenture. Section 402 of the Indenture is hereby amended by adding the phrase "or Section 1009" immediately after the phrase "Section 401" in each place it appears therein.

1.15 Amendment to Section 502 of the Indenture. Section 502 of the Indenture is hereby amended by (a) deleting the first paragraph therein in its entirety and inserting in lieu thereof the following:

"If an Event of Default with respect to Securities of any series and any related coupons at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Securities of such series shall have already become due and payable, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Securities of that series may declare the principal amount (or if any Securities of that series are (i) Original Issue Discount Securities, such portion of the principal amount as may be specified in the terms of those Securities, or (ii) Indexed Securities or Dual Currency Securities, the amount determined in accordance with the specified terms of those Securities) of all of the Securities of that series to be due and payable immediately, by a notice in writing to the Company (and to the Trustee if given by the Holders), and upon any such declaration such principal amount (or specified amount) shall become immediately due and payable."

and (b) deleting the phrase "311(b), 311(d) and 311(e)" appearing therein and inserting the phrase "311(b) and 311(d)" in lieu thereof.

1.16 Amendment to Section 504 of the Indenture. Section 504 of the Indenture is hereby amended by deleting paragraph (i) therein in its entirety and inserting in lieu thereof the following:

"(i) to file and prove a claim for the whole amount of principal (or, if the Securities of such series are Original Issue Discount Securities, Indexed Securities or Dual Currency Securities, such amount as may be due and payable with respect to such Securities pursuant to a declaration in accordance with Section 502) (and premium, if any) and interest, if any, owing and unpaid in respect of the Securities of such series and any related coupons and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and of the Holders of the Securities of such series and any related coupons allowed in such judicial proceeding, and"

1.17 Amendment to Section 516 of the Indenture. Section 516 of the Indenture is hereby amended by deleting such Section in its entirety and inserting in lieu thereof the following:

"SECTION 516.  Judgment Currency.

If for the purpose of obtaining a judgment in any court with respect to any obligation of the Company hereunder or under any Security or any related coupon it shall become necessary to convert into any other currency or currency unit any amount in the currency or currency unit due hereunder or under such Security or coupon, then such conversion shall be made at the spot rate of exchange prevailing on the date the Company shall make payment to any Person in satisfaction of such judgment. If pursuant to any such judgment, conversion shall be

made on a date other than the date payment is made and there shall occur a change between such spot rate of exchange and the spot rate of exchange prevailing on the date of payment, the Company agrees to pay such additional amounts (if any) as may be necessary to ensure that the amount paid is equal to the amount in such other currency or currency unit which, when converted at the spot rate of exchange prevailing on the date of payment or distribution, is the amount then due hereunder or under such Security or coupon. Any amount due from the Company under this Section 516 shall be due as a separate debt and is not to be affected by or merged into any judgment being obtained for any other sums due hereunder or in respect of any Security or coupon. In no event, however, shall the Company be required to pay more in the currency or currency unit due hereunder or under such Security or coupon at the spot rate of exchange prevailing when payment is made than the amount of currency or currency unit stated to be due hereunder or under such Security or coupon so that in any event the Company's obligations hereunder or under such Security or coupon will be effectively maintained as obligations in such currency or currency unit, and the Company shall be entitled to withhold (or be reimbursed for, as the case may be) any excess of the amount actually realized upon any such conversion over the amount due and payable on the date of payment or distribution."

1.18 Amendment to Section 602 of the Indenture. Section 602 of the Indenture is amended by deleting in its entirety the last sentence of Section 602.

1.19 Amendment to Section 607 of the Indenture. Section 607 of the Indenture is amended by adding the following paragraphs:

"When the Trustee incurs expenses or renders services in connection with an Event of Default specified in Section 501(5) or (6), the expenses and the compensation for the services are intended to constitute expenses of administration under any bankruptcy law.

The Company's obligations under this Section 607 and any lien arising hereunder shall survive the resignation or removal of the Trustee, the discharge of the Company's obligations pursuant to Article Four of this Indenture and/or the termination of this Indenture."

1.20 Amendment to Section 608 of the Indenture. Section 608 is amended by deleting Section 608 in its entirety and inserting in lieu thereof the following:

"The Trustee for the Securities shall be subject to the provisions of Section 310(b) of the Trust Indenture Act during the period of time required thereby. Nothing herein shall prevent the Trustee from filing with the Commission the application referred to in the penultimate paragraph of Section 310(b) of the Trust Indenture Act. In determining whether the Trustee has a conflicting interest as defined in Section 310(b) of the Trust Indenture Act with respect to the Securities of any series, there shall be excluded Securities of any particular series of Securities other than that series."

1.21 Amendment to Section 609 of the Indenture. Section 609 is amended by deleting Section 609 in its entirety and inserting in lieu thereof the following:

"There shall at all times be a Trustee hereunder which shall be

(i) a corporation organized and doing business under the laws of the United States of America, any state thereof, or the District of Columbia, authorized under such laws to exercise corporate trust powers, and subject to supervision or examination by Federal or State authority, or

(ii) a corporation or other Person organized and doing

business under the laws of a foreign government that is permitted to act as Trustee pursuant to a rule, regulation, or other order of the Commission, authorized under such laws to exercise corporate trust powers, and subject to supervision or examination by authority of such foreign government or a political subdivision thereof substantially equivalent to supervision or examination applicable to United States institutional trustee,

having a combined capital and surplus of at least $50,000,000 and having its Corporate Trust Office in the Borough of Manhattan, The City of New York, or in such other city as contemplated by Section 301 with respect to any series of Securities. If such corporation or other Person publishes reports of condition at least annually, pursuant to law or to requirements of the aforesaid supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation or other Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. Neither the Company nor any Person directly or indirectly controlling, controlled by, or under the common control with the Company shall serve as Trustee for the Securities of any series. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereunder specified in this Article."

1.22 Amendment to Section 610 of the Indenture. Section 610(d)(1) of the Indenture is hereby amended by: (a) deleting the phrase "608(a)" after the word "Section" in the first line thereof and adding the phrase in lieu thereof the phrase "310(b) of the Trust Indenture Act pursuant to Section 608 hereof" and (b) adding immediately after the word "months" in the fourth line thereof the phrase ", unless the Trustee's duty to resign is stayed in accordance with the provisions of Section 310(b) of the Trust Indenture Act."

1.23 Amendment to Section 613 of the Indenture. Section 613 of the Indenture is hereby amended by deleting Section 613 in its entirety and inserting in lieu thereof the following:

"SECTION 613. Preferential Collection of Claims Against Company.

The Trustee shall comply with Section 311(a) of the Trust Indenture Act, excluding any creditor relationship listed in Section 311(b) of the Trust Indenture Act. A Trustee who has resigned or been removed shall be subject to Section 311(a) of the Trust Indenture Act to the extent indicated."

1.24 Amendment to Section 703 of the Indenture. Section 703 of the Indenture is hereby amended by deleting Section 703 in its entirety and inserting in lieu thereof the following:

"SECTION 703. Reports by Trustee.

On or about May 15 of each year, beginning with May 15, 1996, the Trustee shall, if required by law, mail to each Holder of a Security a brief report dated as of such date that complies with Section 313(a) of the Trust Indenture Act ss.313(a). The Trustee also shall comply with Sections 313(b) and 313(c) of the Trust Indenture Act."

1.25 Amendment of Section 705 of the Indenture. Section 705 of the Indenture is hereby deleted in its entirety.

1.26 Amendment of Section 902 of the Indenture. Section 902 of the Indenture is amended by deleting the "." at the end of paragraph (4) and adding the following thereafter:

", or

(5) amend this Indenture to modify its provisions relating to the subordination of any Security in a manner

adverse to the Holder thereof."

1.27 Amendment to Section 1006 of the Indenture.  Section 1006 of the Indenture is amended by deleting Section 1006 in its entirety and inserting in lieu thereof the following:

"The Company will deliver to the Trustee, within 120 days after the end of each fiscal year, a written statement signed by the principal executive officer, principal finance officer or principal accounting office of the Company stating whether or not to the best of his knowledge, the Company is in compliance with all conditions and covenants under this Indenture.

For purposes of this Section, such compliance shall be determined without regard to any period of grace or requirement of notice provided under this Indenture."

1.28 Amendment to Sections 1001, 1003, 1106, 1107 and 1203 of the Indenture.  Sections 1001, 1003, 1106, 1107 and 1203 of the Indenture are hereby amended by deleting the phrase "311(b), 311(d) and 311(e)" appearing in each such Section and inserting the phrase "311(b) and 311(d)" in lieu thereof.

1.29 Amendment to Section 1008 of the Indenture.  Section 1008 of the Indenture is hereby amended by is deleting the second full paragraph in its entirety and inserting in lieu thereof the following:

"The Company will pay to a Holder who is a United States Alien (as defined below) such additional amounts (the "Additional Amounts") as may be necessary so that every net payment of principal of and interest on any Security or of any coupon appertaining thereto, after deduction or withholding for or on account of any present or future tax, assessment or other governmental charge imposed upon such Holder, or by reason of the making of such payment, by the United States or any taxing authority thereof or therein, will not be less than the amount provided for in such Security or in such coupon to be then due and payable.  The Company shall not be required, however, to make any payment of any Additional Amounts for or on account of:

(a)   any tax, assessment or other governmental charge which would not have been imposed but for (i) the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary of, member or shareholder of, or possessor of a power over, such Holder, if such Holder is an estate, trust, partnership or corporation) and the United States, including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member, shareholder or possessor) being or having been a citizen or resident or treated as a resident thereof or being or having been engaged in trade or business or present therein, or having or having had a permanent establishment therein, or (ii) the presentation of a Security or any coupon appertaining thereto for payment on a date more than 10 days after the date on which such payment becomes due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(b)   any estate, inheritance, gift, sales, transfer, excise, personal property or similar tax, assessment or other governmental charge;

(c)   any tax, assessment or other governmental charge imposed by reason of such Holder's past or present status as a passive foreign investment company, a controlled foreign corporation, a personal holding company or foreign personal holding company with respect to the United States, or as a corporation which accumulates earnings to avoid United States federal income tax;

(d)   any tax, assessment or other governmental charge which is payable otherwise than by withholding from payment of principal of, or interest on, such Security or coupon;

(e)   any tax, assessment or other governmental charge required to be withheld by any paying agent from any payment of principal of, or interest on, any Security or coupon if such payment can be made without withholding by any

other paying agent;

(f) any tax, assessment or other governmental charge which would not have been imposed but for the failure to comply with certification, information, documentation or other reporting requirements concerning the nationality, residence, identity or connections with the United States of the Holder or beneficial owner of such Security or coupon, if such compliance is required by statute or by regulation of the United States Treasury Department as a precondition to relief or exemption from such tax, assessment or other governmental charge;

(g) any tax, assessment or other governmental charge imposed on interest received by (i) a 10% shareholder (as defined in Section 871(h)(3)(B) of the United States Internal Revenue Code of 1986, as amended (the "Code") and the regulations that may be promulgated thereunder) of the Company or (ii) a controlled foreign corporation with respect to the Company within the meaning of the Code; or

(h) any combination of items (a), (b), (c), (d), (e), (f) and (g), nor shall any Additional Amounts be paid to any Holder who is a fiduciary or partnership or other than the sole beneficial owner of such Security or a coupon appertaining thereto to the extent that a beneficiary or settlor with respect to such fiduciary, or a member of such partnership or a beneficial owner thereof would not have been entitled to the payment of such Additional Amounts had such beneficiary, settlor, member or beneficial owner been the Holder of the Securities or any coupon appertaining thereto."

1.30  Amendment to Section 1009 of the Indenture.  A new Section 1009 is added as follows:

"SECTION 1009.  Defeasance of Certain Obligations.

(a) If specified pursuant to Section 301 to be applicable to the Securities of any series, the Company may omit to comply with any term, provision or condition set forth in Section 801, Section 1005 and any other covenant not set forth herein and specified pursuant to Section 301 to be applicable to the Securities of such series and subject to this Section 1009, and any such omission with respect to such Sections shall not be an Event of Default, in each case with respect to the Securities of such series, provided, however, that the following conditions have been satisfied:

(1) with respect to all Outstanding Securities of such series and any coupons appertaining thereto not theretofore delivered to the Trustee for cancellation,

(i) the Company has deposited or caused to be deposited with the Trustee as trust funds in trust an amount in the currency or currency unit in which the Securities of such series are payable (except as otherwise specified pursuant to Section 301 for the Securities of such series and except as provided in Sections 311(b) and 311(d), in which case the deposit to be made with respect to Securities for which an election has occurred pursuant to Section 311(b) or a Conversion Event has occurred as provided in Section 311(d), shall be made in the currency or currency unit in which such Securities are payable as a result of such election or Conversion Event), sufficient to pay and discharge the entire indebtedness on all such Outstanding Securities of such series and any related coupons for principal (and premium, if any) and interest to the Stated Maturity or any Redemption Date as contemplated by Section 402, as the case may be; or

(ii) the Company has deposited or caused to

be deposited with the Trustee as obligations in trust such amount of Government Obligations as will, in a written opinion of independent public accountants delivered to the Trustee, together with the predetermined and certain income to accrue thereon (without consideration of any reinvestment thereof), be sufficient to pay and discharge when due the entire indebtedness on all such Outstanding Securities of such series and any related coupons for unpaid principal (and premium, if any) and interest, if any, to the Stated Maturity or any Redemption Date as contemplated by Section 402, as the case may be; or

(iii) the Company has deposited or caused to be deposited with the Trustee such combination of trust funds or obligations in trust pursuant to (i) and (ii) above, respectively, as will, in a written opinion of independent public accountants delivered to the Trustee, together with the predetermined and certain income to accrue on such obligations in trust, be sufficient to pay and discharge when due the entire indebtedness on all such Outstanding Securities of such series any related coupons for principal (and premium if any) and interest to the Stated Maturity or any Redemption Date as contemplated by Section 402, as the case may be;

(2) such deposit will not result in a breach or violation of, or constitute a default under, this Indenture or any other agreement or instrument to which the Company is a party or by which it is bound;

(3) no Event of Default or event which with the giving of notice or lapse of time, or both, would become an Event of Default with respect to the Securities of that series shall have occurred and be continuing on the date of such deposit and no Event of Default under Section 501(6) or Section 501(7) or event which with the giving of notice or lapse of time, or both, would become an Event of Default under Section 501(6) or Section 501(7) shall have occurred and be continuing on the 91st day after such date; and

(4) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the defeasance contemplated in the Section have been complied with.

(b) Notwithstanding the satisfaction of the conditions set forth in this Section 1009 with respect to all the Securities of any series not payable in Dollars, upon the happening of any Conversion Event the Company shall be obligated to make the payments in Dollars required by Section 311(d) to the extent that the Trustee is unable to convert any Foreign Currency or currency unit in its possession under Section 1009(a) into the Dollar equivalent of such Foreign Currency or currency unit, as the case may be. If, after the deposit referred to in Section 1009(a) has been made, (x) the Holder of a Security is entitled to, and does, elect pursuant to Section 311(b) to receive payment in a currency or currency unit other than that in which the deposit under Section 1009(a) was made, or (y) a Conversion Event occurs as contemplated in Section 311(d), then the indebtedness represented by such Security shall be fully discharged to the extent that the deposit made with respect to such Security shall be converted into the currency or currency unit in which such Security is payable. The Trustee shall return to the Company any non-converted funds or securities in its possession after such payments have been made.

All the obligations of the Company under this Indenture with

respect to the Securities of such series, other than with respect to Section 801, Section 1005, and any other covenant not set forth herein and specified pursuant to Section 301 to be applicable to the Securities of such series and subject to this Section 1009, shall remain in full force and effect. Anything in this Section 1009 to the contrary notwithstanding, the Trustee for any series of Securities shall deliver or pay to the Company, from time to time upon Company Request, any money or Government Obligations held by it as provided in this Section 1009 which, as expressed in a written opinion of independent public accountants delivered to such Trustee, are in excess of the amount thereof which would have been required to be deposited for the purpose for which such money or Government Obligations were deposited or received, provided such delivery can be made without liquidating any Government Obligations."

1.31 Amendment to Section 1402 of the Indenture. Section 1402 of the Indenture is hereby amended by deleting Section 1402 in its entirety and inserting in lieu thereof the following:

"In the event (a) of any insolvency or bankruptcy proceedings or any receivership, liquidation, reorganization or other similar proceedings in respect of the Company or a substantial part of its property, or of any proceedings for liquidation, dissolution or other winding up of the Company, whether or not involving insolvency or bankruptcy, or (b) subject to the provisions of Section 1403, that (i) a default shall have occurred with respect to the payment of principal of or interest on or other monetary amounts due and payable on any Senior Debt, or (ii) there shall have occurred an event of default (other than a default in the payment of principal or interest or other monetary amounts due and payable) in respect of any Senior Debt, as defined therein or in the instrument under which the same is outstanding, permitting the holder or holders thereof to accelerate the maturity thereof (with notice or lapse of time, or both), and such event of default shall have continued beyond the period of grace, if any, in respect thereof, and, in the cases of subclauses (i) and (ii) of this clause (b), such default or event of default shall not have been cured or waived or shall not have ceased to exist, or (c) that the principal of and accrued interest, if any, on the Securities of any series shall have been declared due and payable pursuant to Section 502 and such declaration shall not have been rescinded and annulled as provided in Section 502, then:

(1) the holders of all Senior Debt shall first be paid the full amount of the Senior Debt in cash, before the Holders of any of the Securities or related coupons are entitled to receive any payment on account of the principal of (and premium, if any) and interest on the Securities including, without limitation, any payments made pursuant to Article Eleven;

(2) any payment by, or distribution of assets of, the Company of any kind or character, whether in cash, property or securities, to which the Holders of any of the Securities or coupons or the Trustee would be entitled except for the provisions of this Article shall be paid or delivered by the person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of such Senior Debt or their representative or representatives or to the trustee or trustees under any indenture under which any instruments evidencing any of such Senior Debt may have been issued, ratably according to the aggregate amounts remaining unpaid on account of such Senior Debt held or represented by each, to the extent necessary to make payment in full of all Senior Debt remaining unpaid after giving effect to any concurrent payment or distribution to the holders of such Senior Debt, before any payment or distribution is made to the Holders of the Securities or related coupons or to the Trustee under this Indenture; and

(3) in the event that, notwithstanding the foregoing, any payment by, or distribution of assets of, the Company of any kind or character, whether in cash, property or securities, in respect of principal of or interest on the Securities or in connection with any repurchase by the Company of the Securities, shall be received by the Trustee or the Holders of any of the Securities of related coupons before all Senior Debt is paid in full in cash, such payment or distribution in respect of principal of or interest on the Securities or in connection with any repurchase by the Company of the Securities shall be paid over to the holders of such Senior Debt or their representative or representatives or to the trustee or trustees under any indenture under which any instruments evidencing any such Senior Debt may have been issued, ratably as aforesaid, for application to the payment of all Senior Debt remaining unpaid until all such Senior Debt shall have been paid in full, after giving effect to any concurrent payment or distribution (or provision therefor) to the holders of such Senior Debt.

Notwithstanding the foregoing, at any time after the 91st day following the date of deposit of cash or, in the case of Securities payable only in Dollars, Government Obligations of the United States of America pursuant to Section 401(a)(1)(B) (provided all other conditions set out in such Section shall have been satisfied) the funds so deposited and any interest thereon will not be subject to any rights of holders of Senior Debt including, without limitation, those arising under this Article.

The consolidation of the Company with, or the merger of the Company into, any other corporation or the liquidation or dissolution of the Company following the conveyance, transfer or lease of its properties and assets substantially as an entirety to any Person upon the terms and conditions provided in Article Eight shall not be deemed a dissolution, winding up, liquidation or reorganization for the purposes of this Section 1402 if such Person shall, as a part of such consolidation, merger, conveyance, transfer or lease, comply with the conditions stated in Article Eight. Nothing in this Section 1402 shall apply to claims of, or payments to, the Trustee under or pursuant to Section 607.

The Company shall give prompt written notice to the Trustee of any insolvency or bankruptcy proceedings or any receivership, liquidation, reorganization or similar proceedings in respect of the Company or a substantial part of its property or of any proceedings for liquidation, dissolution or winding up of the Company. Upon any payment or distribution of assets of the Company in connection with any such proceeding, the Trustee and the Holders of the Securities and any related coupons shall be entitled to rely upon a certificate of the trustee in bankruptcy, receiver, liquidating trustee, agent or other person making such payment or distribution, delivered to the Trustee or to the Holders of the Securities and any related coupons, for the purpose of ascertaining the persons entitled to participate in such distribution, the holders of the Senior Debt and other indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article."

1.32 Amendment to Section 1403 of the Indenture. Section 1403 of the Indenture is hereby amended by deleting Section 1403 in its entirety and inserting in lieu thereof the following:

"SECTION 1403.    Disputes with Holders of Certain Senior Debt.

Any failure by the Company to make any payment on or perform any other obligation under Senior Debt, other than any indebtedness incurred by the Company or assumed or guaranteed, directly or

indirectly, by the Company for money borrowed (or any deferral, renewal, extension or refunding thereof) or any indebtedness or obligation as to which the provisions of this Section 1403 shall have been waived by the Company in the instrument or instruments by which the Company incurred, assumed, guaranteed or otherwise created such indebtedness or obligation, shall not be deemed a default or event of default under clause (b) of the first paragraph of Section 1402 if (i) the Company shall be disputing its obligation to make such payment or perform such obligation and (ii) either (A) no final judgment relating to such dispute shall have been issued against the Company which is in full force and effect and is not subject to further review, including a judgment that has become final by reason of the expiration of the time within which a party may seek further appeal or review, and (B) in the event a judgment that is subject to further review or appeal has been issued, the Company shall in good faith be prosecuting an appeal or other proceeding for review and a stay of execution shall have been obtained pending such appeal or review."

1.33 Amendment to Section 1404 of the Indenture. Section 1404 of the Indenture is hereby amended by (a) capitalizing the letter "s" of the word "subrogated" in the heading and (b) adding immediately after the word "subrogated" in the second line the following:

"(equally and ratably with the holders of all obligations of the Company which by their express terms are subordinated to Senior Debt of the Company to the same extent as the Securities and related coupons are subordinated and which are entitled to like rights of subrogation)".

1.34 Amendment to Section 1405 of the Indenture. Section 1405 of the Indenture is hereby amended by (a) adding the phrase "or related coupon" after the word "Security" in the second line, (b) deleting the phrase "such dissolution, winding up, liquidation or reorganization" in the eighth line from the end of the paragraph and (c) adding the word "therefor" after the word "proceedings" in the seventh and eighth lines from the end of the paragraph.

1.35 Amendment to the Section 1406 of the Indenture. Section 1406 of the Indenture is hereby amended by (a) adding after the word "facts" in the second line the following:

"(other than the fact that the principal of (and premium, if any) or interest, if any, on the Securities of any series shall have been declared due and payable pursuant to Section 502)"

, (b) deleting the phrase "from one or more holders of Senior Debt or from any trustee therefor" and inserting in lieu thereof the following:

", any Holder of any Security or related coupon or any paying agent or holder or representative of any class of Senior Debt"

, (c) deleting the last sentence in its entirety and inserting in lieu thereof the following:

"The Trustee shall be entitled to rely on the delivery to it of a written notice by a Person representing such Person to be a holder of Senior Debt (or a trustee or representative on behalf of such Holder) to establish that such notice has been given by a holder of Senior Debt or a trustee or representative on behalf of any such holder or holders. In the event that the Trustee determines in good faith that further evidence is required with respect to the right of any Person as a holder of Senior Debt to participate in any payment or distribution pursuant to this Article, the Trustee may request such Person to furnish evidence to the reasonable satisfaction of the Trustee as to the amount of Senior Debt held by such Person, the extent to which such Person is entitled to participate in such payment or distribution and any other facts pertinent to the rights of such Person under this Article, and, if such evidence is not furnished, the Trustee may defer payment to such Person pending judicial determination as to the right of such Person to receive such payment."

and (d) adding a new paragraph at the end thereof, as follows:

> "If any holder of Senior Debt shall have notified the Trustee in writing of such holder's desire to receive notice of any of the following events and shall have provided the Trustee with an address for receipt of such notices, the Trustee shall send notice of the following events to such holder immediately upon the Trustee's acquisition of knowledge of any such events: (i) the occurrence of an Event of Default hereunder, (ii) the acceleration of the entire principal amount of any series of Securities, (iii) the execution of any amendment or supplement to the Indenture, or (iv) the resignation or removal of the Trustee or any change in the notice address of the Trustee."

1.36 Amendment to Exhibits. Exhibits A, B, C and D of the Indenture are hereby amended by deleting such exhibits in their entirety and inserting in lieu thereof Exhibits A and B attached hereto.

1.37 Amendment to Table of Contents. The table of contents to the Indenture is amended to reflect the additions and deletions described in this First Supplemental Indenture.

SECTION 2. MISCELLANEOUS

2.1 Separability. In case any provision in this First Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

II.2 No Third Party Benefits. Nothing in this First Supplemental Indenture, express or implied, shall give to any Person, other than the parties hereto and their successors under the Indenture, and the Holders of the Securities, any benefit or any legal or equitable right, remedy or claim under the Indenture.

II.3 Continuance of Indenture. This First Supplemental Indenture supplements the Indenture and shall be a part of and subject to all the terms thereof. The Indenture, as supplemented by this First Supplemental Indenture, shall continue in full force and effect.

II.4 The Trustee. The Trustee shall not be responsible in any manner for or in respect of the validity or sufficiency of this First Supplemental Indenture, or for or in respect of the recitals contained herein, all of which recitals are made by the Company solely.

II.5 Governing Law. This First Supplemental Indenture shall be governed by and construed in accordance with the laws of the State of New York.

II.6 Defined Terms. All capitalized terms used in this First Supplemental Indenture which are defined in the Indenture but not otherwise defined herein shall have the same meanings assigned to them in the Indenture.

II.7 Counterparts. This First Supplemental Indenture amy be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Chemical Bank hereby accepts the trusts in this First Supplemental Indenture declared and provided, upon the terms and conditions hereinabove set forth.

IN WITNESS WHEREOF, Lehman Brothers Holdings Inc. has caused this First Supplemental Indenture to be signed, and acknowledged by its President, its Chairman of the Board, one of its Vice Presidents, its Chief Financial Officer or its Treasurer, and its corporate seal to be affixed hereunto, and the same to be attested by its Secretary, its Assistant Secretary or one of its Attesting Secretaries, and Chemical Bank, as Trustee, has caused this First Supplemental Indenture to be signed and acknowledged by one of its authorized officers, and its corporate seal to be affixed hereunto, and the same to be attested by one of its authorized officers, as of the day and year first above written.

LEHMAN BROTHERS HOLDINGS INC.

By: ____________________________

[Corporate Seal]

Attest:

--------------------------

CHEMICAL BANK, as Trustee

By: ____________________________

[Corporate Seal]

Attest:

---------------------------

Exhibit A

CERTIFICATE

FORM OF CERTIFICATE TO BE GIVEN BY PERSON ENTITLED TO RECEIVE BEARER SECURITY

[Insert Title or Sufficient Description of Securities to be Delivered]

(the "Securities")

This is to certify that as of the date hereof, and except as set forth below, the above-captioned Securities held by you for our account (i) are owned by persons that are not citizens or residents of the United States, domestic partnerships, domestic corporations or any estate or trust the income of which is subject to United States Federal income taxation regardless of its source ("United States persons"), (ii) are owned by United States person(s) that (a) are foreign branches of a United States financial institution (as defined in U.S. Treasury Regulations Section 1.165-12(c)(1)(v) ("financial institutions") purchasing for their own account or for resale, or (b) acquired the Securities through foreign branches of United States financial institutions and who hold the Securities through such United States financial institutions on the date hereof (and in either case (a) or (b), each such United States financial institution hereby agrees, on its own behalf or through its agent, that you may advise the issuer or the issuer's agent that it will comply with the requirements of Section 165(j)(3)(A), (B) or (C) of the Internal Revenue Code of 1986, as amended, and the regulations thereunder), or (iii) are owned by United States or foreign financial institution(s) for purposes of resale during the restricted period (as defined in U.S. Treasury Regulations Section 1.163-5(c)(2)(i)(D)(7)), and in addition if the owner of the Securities is a United States or foreign financial institution described in clause (iii) above (whether or not also described in clause (i) or (ii)) this is to further certify that such financial institution has not acquired the Securities for purposes of resale directly or indirectly to a United States person or to a person within the United States or its possessions.

As used herein, "United States" means the United States of America (including the States and the District of Columbia); and its "possessions" include Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, Wake Island and the Northern Mariana Islands.

We undertake to advise you promptly by tested telex on or prior to the date on which you intend to submit your certification relating to the Securities held by you for our account in accordance with your operating procedures if any applicable statement herein is not correct on such date, and in the absence of any such notification it may be assumed that this certification applies as of such date.

This certification excepts and does not relate to $_________ of such interest in the above Securities in respect of which we are not able to certify and as to which we understand exchange and delivery of definitive Securities (or, if relevant, exercise of any rights or collection of any interest) cannot be made until we do so certify.

We understand that this certification is required in connection with certain tax laws of the United States. In connection therewith, if administrative or legal proceedings are commenced or threatened in connection with which this certification is or would be relevant, we irrevocably authorize you to produce this certification to any interested party in such proceedings.

Date: _____________, 19__ 1/

By: ______________________________
As, or as agent for
the beneficial owner(s)
of the Securities to
which this certificate relates

1/ Not earlier than 15 days prior to the Exchange Date or Interest Payment Date to which the certification relates

EXHIBIT B

FORM OF CERTIFICATION TO BE GIVEN
BY THE EUROCLEAR OPERATOR OR CEDEL

CERTIFICATE

[Insert title or sufficient description
of Securities to be delivered]

This is to certify that, based solely on certifications we have received in writing, by tested telex or by electronic transmission from member organizations appearing in our records as persons being entitled to a portion of the principal amount of the above-captioned Securities as of the date hereof, [_______________] principal amount of these Securities (i) is owned by persons that are not citizens or residents of the United States, domestic partnerships, domestic corporations or any estate or trust the income of which is subject to United States Federal income taxation regardless of its source ("United States persons"), (ii) is owned by United States persons that (a) are foreign branches of United States financial institutions (as defined in U.S. Treasury Regulations Section 1.165-12(c)(1)(v) ("financial institutions")) purchasing for their own account or for resale, or (b) acquired the Securities through foreign branches of United States financial institutions on the date hereof (and in either case (a) or (b), each such United States financial institution has agreed, on its own behalf or through its agent, that we may advise the Issuer or the Issuer's agent that it will comply with the requirements of Section 165(j)(3)(A), (B) or (C) of the Internal Revenue Code of 1986, as amended, and the regulations thereunder), or (iii) is owned by United States or foreign financial institutions for purposes of resale during the restricted period (as defined in U.S. Treasury Regulations Section 1.163-5(c)(2)(i)(D)(7)), and to the further effect that United States or foreign financial institutions described in clause (iii) above (whether or not also described in clause (i) or (ii)) have certified that they have not acquired the Securities for purposes of resale directly or indirectly to a United States person or to a person within the United States or its possessions.

We further certify (i) that we are not making available herewith for exchange (or, if relevant, exercise of any rights or collection of any interest) any portion of the temporary global security excepted in such certifications and (ii) that as of the date hereof we have not received any notification from any of our member organizations to the effect that the statements made by such member organizations with respect to any such portion of the part submitted herewith for exchange (or, if relevant, exercise of any rights or collection of any interest) are no longer true and cannot be relied upon as the date hereof.

As used herein, "United States" means the United States of America (including the States and the District of Columbia); and its "possessions" include Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, Wake Island and the Northern Mariana Islands.

We understand that this certification is required in connection with certain tax laws of the United States. In connection therewith, if administrative or legal proceedings are commenced or threatened in connection with which this certification is or would be relevant, we irrevocably authorize you to produce this certification to any interested party in such proceedings.

Date: _________________, 19__ 2/

[CEDEL S.A.]

By:______________________

2/ Not earlier than the relevant Exchange Date or Interest Payment Date to which the certification relates.

LEHMAN BROTHERS HOLDINGS INC.

AND

CHEMICAL BANK,
as Trustee

FIRST SUPPLEMENTAL INDENTURE

Dated as of February 1, 1996

**SHEARSON LEHMAN BROTHERS HOLDINGS INC.**

# STANDARD MULTIPLE-SERIES INDENTURE PROVISIONS

**Dated, and Filed with the Securities and Exchange Commission on, July 30, 1987 and as Amended and Refiled with the Securities and Exchange Commission on November 16, 1987**

## CROSS REFERENCE SHEET*

**between**

the provisions of Sections 310 through 318(a) of the Trust Indenture Act of 1939, as amended, and the Shearson Lehman Brothers Holdings Inc. Standard Multiple-Series Indenture Provisions:

| Section of Act | Section of Standard Multiple-Series Indenture Provisions |
|---|---|
| §310(a)(1) | 609 |
| (a)(2) | 609 |
| (a)(3) | Not Applicable |
| (a)(4) | Not Applicable |
| (b) | 608 |
| §311(a) | 613(a) |
| (b) | 613(b) |
| (b)(2) | 703(a)(2)<br>703(b) |
| §312(a) | 701<br>702(a) |
| (b) | 702(b) |
| (c) | 702(c) |
| §313(a) | 703(a) |
| (b) | 703(b) |
| (c) | 703(c) |
| (d) | 703(d) |
| §314(a) | 704 |
| (b) | Not Applicable |
| (c)(1) | 102 |
| (c)(2) | 102 |
| (c)(3) | Not Applicable |
| (d) | Not Applicable |
| (e) | 102 |
| §315(a) | 601(a) |
| (b) | 602<br>703(a)(6) |
| (c) | 601(b) |
| (d) | 601(c) |
| (d)(1) | 601(a)(1) |
| (d)(2) | 601(c)(2) |
| (d)(3) | 601(c)(3) |
| (e) | 514 |
| §316(a) | 101<br>502 |
| (a)(1)(A) | 512 |
| (a)(1)(B) | 513 |
| (a)(2) | Not Applicable |
| (b) | 508 |
| §317(a)(1) | 503 |
| (a)(2) | 504 |
| (b) | 1003 |
| §318(a) | 107 |

* This cross reference sheet is not part of the Standard Multiple-Series Indenture Provisions.

## TABLE OF CONTENTS*

### ARTICLE ONE
### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

| | | Page |
|---|---|---|
| SECTION 101. | Definitions: | |
| | Act | 1 |
| | Affiliate; control | 1 |
| | Authenticating Agent | 1 |
| | Authorized Newspaper | 2 |
| | Bearer Security | 2 |
| | Board of Directors | 2 |
| | Board Resolution | 2 |
| | Business Day | 2 |
| | CEDEL, S.A. | 2 |
| | Code | 2 |
| | Commission | 2 |
| | Common Depositary | 2 |
| | Company | 3 |
| | Company Request; Company Order | 3 |
| | Component Currency | 3 |
| | Consolidated Net Worth | 3 |
| | Conversion Date | 3 |
| | Conversion Event | 3 |
| | Corporate Trust Office | 3 |
| | Corporation | 3 |
| | coupon | 3 |
| | Currency Determination Agent | 3 |
| | Defaulted Interest | 3 |
| | Designated Subsidiary | 3 |
| | Dollar Equivalent of the Currency Unit | 4 |
| | Dollar Equivalent of the Foreign Currency | 4 |
| | Dollars; $ | 4 |
| | ECU | 4 |
| | Election Date | 4 |
| | Euro-clear | 4 |
| | European Communities | 4 |

* This table of contents shall not, for any purpose, be deemed to be a part of the Standard Multiple-Series Indenture Provisions.

| | Page |
| --- | --- |
| European Monetary System | 4 |
| Event of Default | 4 |
| Exchange Date | 4 |
| Exchange Rate Officer's Certificate | 4 |
| Floating Rate Security | 4 |
| Foreign Currency | 5 |
| Government Obligations | 5 |
| Holder | 5 |
| Indenture | 5 |
| Interest | 5 |
| Interest Payment Date | 5 |
| Market Exchange Rate | 5 |
| Maturity | 6 |
| Officers' Certificate | 6 |
| Opinion of Counsel | 6 |
| Original Issue Discount Security | 6 |
| Outstanding | 7 |
| Overdue Rate | 8 |
| Paying Agent | 8 |
| Person | 8 |
| Place of Payment | 8 |
| Predecessor Security | 8 |
| Redemption Date | 8 |
| Redemption Price | 8 |
| Registered Security | [illegible] |
| Regular Record Date | 9 |
| Responsible Officer | 9 |
| Securities | 9 |
| Security Register; Security Registrar | 9 |
| Special Record Date | 9 |
| Specified Amount | 9 |
| Stated Maturity | 9 |
| Stock Exchange | 9 |
| Subsidiary; voting stock | 9 |
| Trustee | 9 |
| Trust Indenture Act | 10 |
| United States | 10 |
| United States Alien | 10 |
| Valuation Date | 10 |
| Vice President | 10 |

| | | | Page |
|---|---|---|---|
| SECTION | 102. | Compliance Certificates and Opinions | 10 |
| SECTION | 103. | Form of Documents Delivered to Trustee | 11 |
| SECTION | 104. | Acts of Holders | 11 |
| SECTION | 105. | Notices, Etc., to Trustee and Company | 13 |
| SECTION | 106. | Notice to Holders; Waiver | 14 |
| SECTION | 107. | Language of Notices, Etc. | 15 |
| SECTION | 108. | Conflict with Trust Indenture Act | 15 |
| SECTION | 109. | Effect of Headings and Table of Contents | 15 |
| SECTION | 110. | Successors and Assigns | 15 |
| SECTION | 111. | Separability Clause | 15 |
| SECTION | 112. | Governing Law | 15 |
| SECTION | 113. | Legal Holidays | 15 |
| SECTION | 114. | Execution in Counterparts | 16 |
| SECTION | 115. | Immunity of Incorporators, Stockholders, Officers and Directors | 16 |
| SECTION | 116. | Certain Matters Relating to Currencies | 17 |

ARTICLE TWO
SECURITY FORMS

| | | | |
|---|---|---|---|
| SECTION | 201. | Forms Generally | 17 |
| SECTION | 202. | Form of Trustee's Certificate of Authentication | 18 |
| SECTION | 203. | Securities in Global Form | 19 |

ARTICLE THREE
THE SECURITIES

| | | | |
|---|---|---|---|
| SECTION | 301. | Amount Unlimited; Issuable in Series | 19 |
| SECTION | 302. | Denominations | 23 |
| SECTION | 303. | Execution, Authentication, Delivery and Dating | 23 |
| SECTION | 304. | Temporary Securities and Exchange of Securities | 25 |
| SECTION | 305. | Registration, Registration of Transfer and Exchange | 30 |
| SECTION | 306. | Mutilated, Destroyed, Lost and Stolen Securities and Coupons | 32 |
| SECTION | 307. | Payment of Interest; Interest Rights Preserved | 34 |
| SECTION | 308. | Persons Deemed Owners | 36 |

| | | Page |
|---|---|---|
| SECTION 309. | Cancellation | 36 |
| SECTION 310. | Computation of Interest | 37 |
| SECTION 311. | Currency and Manner of Payments in Respect of Registered Securities | 37 |
| SECTION 312. | Appointment and Resignation of Successor Currency Determination Agent | 42 |

## ARTICLE FOUR
### SATISFACTION AND DISCHARGE

| | | |
|---|---|---|
| SECTION 401. | Satisfaction and Discharge of Securities of any Series | 43 |
| SECTION 402. | Application of Trust Money | 46 |
| SECTION 403. | Satisfaction and Discharge of Indenture | 47 |

## ARTICLE FIVE
### REMEDIES

| | | |
|---|---|---|
| SECTION 501. | Events of Default | 47 |
| SECTION 502. | Acceleration of Maturity; Rescission and Annulment | 49 |
| SECTION 503. | Collection of Indebtedness and Suits for Enforcement by Trustee | 50 |
| SECTION 504. | Trustee May File Proofs of Claim | 51 |
| SECTION 505. | Trustee May Enforce Claims Without Possession of Securities or Coupons | 52 |
| SECTION 506. | Application of Money Collected | 53 |
| SECTION 507. | Limitation on Suits | 53 |
| SECTION 508. | Unconditional Right of Holders to Receive Principal, Premium and Interest | 54 |
| SECTION 509. | Restoration of Rights and Remedies | 55 |
| SECTION 510. | Rights and Remedies Cumulative | 55 |
| SECTION 511. | Delay or Omission Not Waiver | 55 |
| SECTION 512. | Control by Holders | 55 |
| SECTION 513. | Waiver of Past Defaults | 56 |
| SECTION 514. | Undertaking for Costs | 56 |
| SECTION 515. | Waiver of Stay or Extension Laws | 57 |
| SECTION 516. | Judgment Currency | 57 |

## ARTICLE SIX
### THE TRUSTEE

| | | Page |
|---|---|---|
| SECTION 601. | Certain Duties and Responsibilities | 58 |
| SECTION 602. | Notice of Defaults | 60 |
| SECTION 603. | Certain Rights of Trustee | 60 |
| SECTION 604. | Not Responsible for Recitals or Issuance of Securities | 62 |
| SECTION 605. | May Hold Securities | 62 |
| SECTION 606. | Money Held in Trust | 62 |
| SECTION 607. | Compensation and Reimbursement | 62 |
| SECTION 608. | Disqualification; Conflicting Interests | 63 |
| | (a) Elimination of Conflicting Interest or Resignation | 63 |
| | (b) Notice of Failure to Eliminate Conflicting Interest or Resign | 63 |
| | (c) "Conflicting Interest" Defined | 63 |
| | (d) Definitions of Certain Terms Used in This Section | 67 |
| | (e) Calculation of Percentages of Securities | 68 |
| SECTION 609. | Corporate Trustee Required; Eligibility | 69 |
| SECTION 610. | Resignation and Removal; Appointment of Successor | 70 |
| SECTION 611. | Acceptance of Appointment by Successor | 72 |
| SECTION 612. | Merger, Conversion, Consolidation or Succession to Business | 73 |
| SECTION 613. | Preferential Collection of Claims Against Company | 74 |
| | (a) Segregation and Apportionment of Certain Collections by Trustee, Certain Exceptions | 74 |
| | (b) Certain Creditor Relationships Excluded from Segregation and Apportionment | 77 |
| | (c) Definitions of Certain Terms Used in This Section | 78 |
| SECTION 614. | Appointment of Authenticating Agent | 78 |

## ARTICLE SEVEN
### HOLDERS' LISTS AND REPORTS BY TRUSTEE AND COMPANY

| | | |
|---|---|---|
| SECTION 701 | Company to Furnish Trustee Names and Addresses of Holders | 81 |
| SECTION 702. | Preservation of Information; Communications to Holders | 81 |
| SECTION 703. | Reports by Trustee | 83 |
| SECTION 704. | Reports by Company | 85 |

## ARTICLE EIGHT
### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

| | | Page |
|---|---|---|
| SECTION 801. | Company May Consolidate, Etc., Only on Certain Terms | 86 |
| SECTION 802. | Successor Corporation Substituted | 87 |
| SECTION 803. | Opinion of Counsel to be Given Trustee | 87 |

## ARTICLE NINE
### SUPPLEMENTAL INDENTURES

| | | |
|---|---|---|
| SECTION 901. | Supplemental Indentures Without Consent of Holders | 88 |
| SECTION 902. | Supplemental Indentures With Consent of Holders | 89 |
| SECTION 903. | Execution of Supplemental Indentures | 91 |
| SECTION 904. | Effect of Supplemental Indentures | 92 |
| SECTION 905. | Conformity with Trust Indenture Act | 92 |
| SECTION 906. | Reference in Securities to Supplemental Indentures | 92 |
| SECTION 907. | Notice of Supplemental Indenture | 92 |

## ARTICLE TEN
### COVENANTS

| | | |
|---|---|---|
| SECTION 1001. | Payment of Principal, Premium and Interest | 93 |
| SECTION 1002. | Maintenance of Office or Agency | 93 |
| SECTION 1003. | Money for Securities Payments to be Held in Trust | 95 |
| SECTION 1004. | Corporate Existence | 97 |
| SECTION 1005. | Limitation on Liens on Common Stock of Designated Subsidiaries | 97 |
| SECTION 1006. | Statement by Officers as to Default | 98 |
| SECTION 1007. | Waiver of Certain Covenants | 98 |
| SECTION 1008. | Payment of Additional Amounts | 98 |

## ARTICLE ELEVEN
### REDEMPTION OF SECURITIES

| | | |
|---|---|---|
| SECTION 1101. | Applicability of Article | 101 |
| SECTION 1102. | Tax Redemption; Special Tax Redemption | 101 |
| SECTION 1103. | Election to Redeem; Notice to Trustee | 105 |
| SECTION 1104. | Selection by Trustee of Securities to be Redeemed | 105 |
| SECTION 1105. | Notice of Redemption | 106 |
| SECTION 1106. | Deposit of Redemption Price | 107 |
| SECTION 1107. | Securities Payable on Redemption Date | 107 |
| SECTION 1108. | Securities Redeemed in Part | 108 |

ARTICLE TWELVE
SINKING FUNDS

| | | Page |
|---|---|---|
| SECTION 1201. | Applicability of Article | 109 |
| SECTION 1202. | Satisfaction of Mandatory Sinking Fund Payments with Securities | 109 |
| SECTION 1203. | Redemption of Securities for Sinking Fund | 110 |

ARTICLE THIRTEEN
MEETINGS OF HOLDERS OF SECURITIES

| | | |
|---|---|---|
| SECTION 1301. | Purposes for Which Meetings May Be Called | 110 |
| SECTION 1302. | Call, Notice and Place of Meetings | 110 |
| SECTION 1303. | Persons Entitled to Vote at Meetings | 111 |
| SECTION 1304. | Quorum; Action | 111 |
| SECTION 1305. | Determination of Voting Rights; Conduct and Adjournment of Meetings | 113 |
| SECTION 1306. | Counting Votes and Recording Action of Meetings | 114 |
| Exhibit A. | Form of Certificate to be given by Person Entitled to Receive Bearer Security or to Exchange an Interest in a Temporary Global Security for an Interest in a Permanent Global Security | |
| Exhibit B. | Form of Certificate to be given by Euro-clear and CEDEL, S.A. in connection with the Exchange of a Temporary Global Security for a Definitive Securities or for a Portion of a Permanent Global Security | |
| Exhibit C. | Form of Certificate to be given by Euro-clear and CEDEL, S.A. to Obtain Interest Prior to an Exchange Date | |
| Exhibit D. | Form of Certificate to be given by Beneficial Owners to Obtain Interest Prior to an Exchange Date | |

## ARTICLE ONE

### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 101. *Definitions.*

For all purposes of this Indenture and all Securities issued hereunder, except as otherwise expressly provided or unless the context otherwise requires:

(1) the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(2) all other terms used herein which are defined in the Trust Indenture Act, either directly or by reference therein, have the meanings assigned to them therein;

(3) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles in the United States of America, and, except as otherwise herein expressly provided, the term "generally accepted accounting principles" with respect to any computation required or permitted hereunder shall mean such accounting principles as are generally accepted in the United States of America at the date of such computation; and

(4) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision.

Certain terms, used principally in Article Six, are defined in that Article.

"*Act*", when used with respect to any Holder, has the meaning specified in Section 104.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Authenticating Agent*" means any Person authorized by the Trustee to act on behalf of the Trustee to authenticate Securities.

"*Authorized Newspaper*" means a leading newspaper customarily published at least once a day for at least five days in each calendar week and of general circulation in New York City and in London and, so long as the Securities are listed on the Stock Exchange and the Stock Exchange shall so require, in Luxembourg or, if it shall be impracticable in the opinion of the Trustee to make such publication, in another principal city in Western Europe. Such publication is expected to be made in *The Wall Street Journal* (Eastern edition), the *Financial Times* (London edition) and the *Luxemburger Wort*.

"*Bearer Security*" means any Security established pursuant to Section 201 which is payable to bearer.

"*Board of Directors*" means either the board of directors of the Company or any committee of that board duly authorized to act hereunder or any directors and/or officers of the Company to whom that board or committee shall have delegated its authority.

"*Board Resolution*" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"*Business Day*", when used with respect to any Place of Payment, means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in that Place of Payment are authorized or obligated by law to close, and shall otherwise mean each day of the week which is not a day on which banking institutions at the place where any specified act pursuant to this Indenture is to occur are authorized or required by law to close.

"*CEDEL, S.A.*" means Centrale de Livraison de Valeurs Mobilieres, S.A.

"*Code*" means the Internal Revenue Code of 1986, as it may be amended from time to time.

"*Commission*" means the Securities and Exchange Commission, as from time to time constituted, created under the Securities Exchange Act of 1934, or, if at any time after the execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties at such time.

"*Common Depositary*" has the meaning specified in Section 304.

"*Company*" means Shearson Lehman Brothers Holdings Inc., a Delaware corporation, until a successor corporation shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Company" shall mean each such successor corporation.

"*Company Request*" or "*Company Order*" means, respectively, a written request or order signed in the name of the Company by its Chairman of the Board, its President or a Vice President, and by its Treasurer, an Assistant Treasurer, its Secretary or an Assistant Secretary, and delivered to the Trustee.

"*Component Currency*" has the meaning specified in Section 311(h).

"*Consolidated Net Worth*" means consolidated assets minu consolidated liabilities as calculated in accordance with generally accepted accounting principles.

"*Conversion Date*" has the meaning specified in Section 311(d).

"*Conversion Event*" means the cessation of use of (i) a currency both as a Foreign Currency by the government of the country which issued such currency and for the settlement of transactions by public institutions of or within the international banking community, (ii) the ECU both within the European Monetary System and for the settlement of transactions by public institutions of or within the European Communities or (iii) any currency unit other than the ECU for the purposes for which it was established.

"*Corporate Trust Office*" of the Trustee means the principal office of the Trustee at which at any particular time its corporate trust business shall be administered. Such office is set forth in Section 615 of the Indenture.

"*Corporation*" includes corporations, associations, companies and business trusts.

"*coupon*" means any interest coupon appertaining to a Bearer Security.

"*Currency Determination Agent*", with respect to Securities of any series, means a New York Clearing House bank (other than the Trustee) designated pursuant to Section 301 or Section 312.

"*Defaulted Interest*" has the meaning specified in Section 307.

"*Designated Subsidiary*" means any present or future consolidated subsidiary the Consolidated Net Worth of which constitutes at least 5 percent of the Consolidated Net Worth of the Company.

"*Dollar Equivalent of the Currency Unit*" has the meaning specified in Section 311(g).

"*Dollar Equivalent of the Foreign Currency*" has the meaning specified in Section 311(f).

"*Dollars*" and the sign "$" mean the coin or currency of the United States of America as at the time of payment is legal tender for the payment of public and private debts.

"*ECU*" means the European Currency Unit as defined and revised from time to time by the Council of the European Communities.

"*Election Date*" has the meaning specified in Section 311(h).

"*Euro-clear*" means Morgan Guaranty Trust Company of New York, Brussels office, or its successor, as operator of the Euro-clear System.

"*European Communities*" means the European Economic Community, the European Coal and Steel Community and the European Atomic Energy Community.

"*European Monetary System*" means the European Monetary System established by the Resolution of December 5, 1978 of the Council of the European Communities.

"*Event of Default*" has the meaning specified in Section 501.

"*Exchange Date*" has the meaning specified in Section 304.

"*Exchange Rate Officer's Certificate*" means a tested telex or a certificate setting forth (i) the applicable Market Exchange Rate and (ii) the Dollar, Foreign Currency or currency unit amounts of principal, premium, if any, and interest, if any, respectively (on an aggregate basis and on the basis of a Security having the lowest denomination principal amount pursuant to Section 302 in the relevant currency or currency unit), payable with respect to a Security of any series on the basis of such Market Exchange Rate, sent (in the case of a telex) or signed (in the case of a certificate) by the Treasurer or any Assistant Treasurer of the Company.

"*Floating Rate Security*" means a Security which provides for the payment of interest at a variable rate determined periodically by reference to an interest rate index or any other index specified pursuant to Section 301.

"*Foreign Currency*" means a currency issued and actively maintained as the country's or countries' recognized unit of domestic exchange by the government of any country other than the United States.

"*Government Obligations*" means securities which are (i) direct obligations of the government which issued the currency in which the Securities of such series are payable or (ii) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the government which issued the currency in which the Securities of such series are payable, the payment of which is unconditionally guaranteed by such government, which, in either case, are full faith and credit obligations of such government and are not callable or redeemable at the option of the issuer thereof.

"*Holder*", when used with respect to any Security, means in the case of a Registered Security the Person in whose name the Security is registered in the Security Register and in the case of a Bearer Security (or any temporary global Security) the bearer thereof and, when used with respect to any coupon, means the bearer thereof.

"*Indenture*" means this instrument as originally executed or as it may from time to time be supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof and shall include the terms of particular series of Securities established as contemplated by Section 301.

"*interest*", when used with respect to an Original Issue Discount Security which by its terms bears interest only at Maturity, means interest payable at Maturity.

"*Interest Payment Date*", when used with respect to any Security, means the Stated Maturity of an instalment of interest on such Security.

"*Market Exchange Rate*" means (i) for any conversion involving a currency unit on the one hand and Dollars or any Foreign Currency on the other, the exchange rate between the relevant currency unit and Dollars or such Foreign Currency calculated by the method specified pursuant to Section 301 for the Securities of the relevant series, (ii) for any conversion of Dollars into any Foreign Currency the noon (New York City time) buying rate for such Foreign Currency for cable transfers quoted in New York City as certified for customs purposes by the Federal Reserve Bank of New York and (iii) for any conversion of one Foreign Currency into Dollars or another

Foreign Currency, the spot rate at noon local time in the relevant market at which, in accordance with normal banking procedures, the Dollars or Foreign Currency into which conversion is being made could be purchased with the Foreign Currency from which conversion is being made from major banks located in either New York City, London or any other principal market for Dollars or such purchased Foreign Currency in each case determined by the Currency Determination Agent. In the event of the unavailability of any of the exchange rates provided for in the foregoing clauses (i), (ii) and (iii) the Currency Determination Agent shall use, in its sole discretion and without liability on its part, such quotation of the Federal Reserve Bank of New York as of the most recent available date, or quotations from one or more major banks in New York City, London or other principal market for such currency or currency unit in question, or such other quotations as the Currency Determination Agent shall deem appropriate. Unless otherwise specified by the Currency Determination Agent, if there is more than one market for dealing in any currency or currency unit by reason of foreign exchange regulations or otherwise, the market to be used in respect of such currency or currency unit shall be that upon which a nonresident issuer of securities designated in such currency or currency unit would purchase such currency or currency unit in order to make payments in respect of such securities.

"*Maturity*", when used with respect to any Security, means the date on which the principal of such Security or an instalment of principal becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"*Officers' Certificate*" means a certificate signed by the Chairman of the Board, any Vice Chairman of the Board, the President or a Vice President, and by the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary, of the Company, and delivered to the Trustee.

"*Opinion of Counsel*" means a written opinion of counsel, who may be counsel for (including an employee of) the Company, and who shall be acceptable to the Trustee.

"*Original Issue Discount Security*" means any Security which provides for an amount less than the principal amount thereof to be due and payable upon a declaration of acceleration of the Maturity thereof pursuant to Section 502.

"*Outstanding*" when used with respect to Securities means, as of the date of determination, all Securities theretofore authenticated and delivered under this Indenture, except:

(a) Securities theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(b) Securities or portions thereof for whose payment or redemption money in the necessary amount and in the required currency or currency unit has been theretofore deposited with the Trustee or any Paying Agent (other than the Company or any other obligor on the Securities) in trust for the Holders of such Securities and any related coupons or shall have been set aside and segregated in trust by the Company or any other obligor on the Securities (if the Company or any other obligor on the Securities shall act as its own Paying Agent); *provided, however,* that, if such Securities or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made; and

(c) Securities which have been paid pursuant to Section 306 or in exchange for or in lieu of which other Securities have been authenticated and delivered pursuant to this Indenture other than any such Securities in respect of which there shall have been presented to the Trustee proof satisfactory to it that such Securities are held by a bona fide purchaser in whose hands such Securities are valid obligations of the Company;

*provided, however,* that in determining whether the Holders of the requisite principal amount of Securities Outstanding have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (i) Securities owned by the Company or any other obligor upon the Securities or any Affiliate of the Company or such other obligor shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Securities which the Trustee knows to be so owned shall be so disregarded (Securities so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Securities and that the pledgee is not the

Company or any other obligor upon the Securities or any Affiliate of the Company or such other obligor), and (ii) the principal amount of an Original Issue Discount Security that shall be deemed to be Outstanding for such purposes shall be the amount of the principal thereof that would be due and payable as of the date of such determination upon a declaration of acceleration pursuant to Section 502.

"*Overdue Rate*", when used with respect to any series of the Securities, means the rate designated as such in or pursuant to the Board Resolution or the supplemental indenture, as the case may be, relating to such series as contemplated by Section 301.

"*Paying Agent*" means any Person authorized by the Company to pay the principal of (and premium, if any) or interest, if any, on any Securities on behalf of the Company.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"*Place of Payment*", when used with respect to the Securities of any series, means the place or places where the principal of (and premium, if any) and interest, if any, on the Securities of that series are payable as specified as contemplated by Section 301 or, if not so specified, as specified in Section 1002.

"*Predecessor Security*" of any particular Security means every previous Security evidencing all or a portion of the same debt as that evidenced by such particular Security, and, for the purposes of this definition, any Security authenticated and delivered under Section 306 in exchange for or in lieu of a mutilated, destroyed, lost or stolen Security or a Security to which a mutilated, destroyed, lost or stolen coupon appertains shall be deemed to evidence the same debt as the mutilated, destroyed, lost or stolen Security or the Security to which the mutilated, destroyed, lost or stolen coupon appertains, as the case may be.

"*Redemption Date*", when used with respect to any Security to be redeemed, means the date fixed for such redemption by or pursuant to this Indenture.

"*Redemption Price*", when used with respect to any Security to be redeemed, means the price, in the currency or currency unit in which such

Security is denominated or which is otherwise provided for pursuant to this Indenture, at which it is to be redeemed pursuant to the resolution of the Board of Directors or the supplemental indenture, as the case may be, with respect to the Securities of such series as contemplated by Section 301, exclusive of interest accrued and unpaid to the Redemption Date.

"*Registered Security*" means any Security established pursuant to Section 201 which is registered in the Security Register.

"*Regular Record Date*" for the interest payable on any Interest Payment Date on the Registered Securities of any series means the date specified for that purpose as contemplated by Section 301.

"*Responsible Officer*", when used with respect to the Trustee, means the person or persons set forth in Section 615 of the Indenture.

"*Securities*" means any Securities authenticated and delivered under this Indenture.

"*Security Register*" and "*Security Registrar*" have the respective meanings specified in Section 305.

"*Special Record Date*" for the payment of any Defaulted Interest on the Registered Securities of any series means a date fixed by the Trustee pursuant to Section 307.

"*Specified Amount*" has the meaning specified in Section 311(h).

"*Stated Maturity*", when used with respect to any Security or any instalment of principal thereof or interest thereon, means the date specified in such Security or a coupon representing such instalment of interest as the fixed date on which the principal of such Security or such instalment of principal or interest is due and payable.

"*Stock Exchange*" means the Luxembourg Stock Exchange.

"*Subsidiary*" means a corporation more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Company or by one or more other Subsidiaries, or by the Company and one or more other Subsidiaries. For the purposes of this definition, "voting stock" means stock which ordinarily has voting power for the election of directors, whether at all times or only as long as no senior class of stock has such voting power by reason of any contingency.

"*Trustee*" shall mean the Person named as trustee in the first paragraph of this Indenture as originally executed until a successor Trustee shall have

become such pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean or include each Person who is then a Trustee hereunder, and "Trustee" as used with respect to the Securities of any series in any Article of this Indenture shall mean the Trustee with respect to Securities of that series.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939 as in force at the date as of which this instrument was executed, except as provided in Section 905.

"*United States*" means the United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"*United States Alien*" has the meaning specified in Section 1008.

"*Valuation Date*" has the meaning specified in Section 311(c).

"*Vice President*", when used with respect to the Company or the Trustee, means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president".

SECTION 102. *Compliance Certificates and Opinions.*

Upon any application or request by the Company to the Trustee to take any action under any provision of this Indenture, the Company shall furnish to the Trustee an Officers' Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with, except that in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture relating to such particular application or request, no additional certificate or opinion need be furnished.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(1) a statement that each individual signing such certificate or opinion has read such covenant or condition and the definitions herein relating thereto;

(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3) a statement that, in the opinion of each such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4) a statement as to whether, in the opinion of each such individual, such condition or covenant has been complied with.

SECTION 103. *Form of Documents Delivered to Trustee.*

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an officer of the Company may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Company stating that the information with respect to such factual matters is in the possession of the Company, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

SECTION 104. *Acts of Holders.*

(a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of

substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing. If Securities of a series are issuable as Bearer Securities, any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders of such series may, alternatively, be embodied in and evidenced by the record of Holders of Securities of such series voting in favor thereof, either in person or by proxies duly appointed in writing, at any meeting of Holders of Securities of such series duly called and held in accordance with the provisions of Article Thirteen, or a combination of such instruments and any such record. Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments or record or both are delivered to the Trustee and, where it is hereby expressly required, to the Company. Such instrument or instruments and any such record (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments or so voting at any such meeting. Proof of execution of any such instrument or of a writing appointing any such agent, or of the holding by any Person of a Security, shall be sufficient for any purpose of this Indenture and (subject to Section 601) conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section. The record of any meeting of Holders of Securities shall be proved in the manner provided in Section 1306.

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner which the Trustee deems sufficient.

(c) The principal amount and serial numbers of Registered Securities held by any Person, and the date of holding the same, shall be proved by the Security Register.

(d) The principal amount and serial numbers of Bearer Securities held by any Person, and the date of holding the same, may be proved by the

production of such Bearer Securities or by a certificate executed, as depositary, by any trust company, bank, banker or other depositary, wherever situated, if such certificate shall be deemed by the Trustee to be satisfactory, showing that at the date therein mentioned such Person had on deposit with such depositary, or exhibited to it, the Bearer Securities therein described; or such facts may be proved by the certificate or affidavit of the Person holding such Bearer Securities, if such certificate or affidavit is deemed by the Trustee to be satisfactory. The Trustee and the Company may assume that such ownership of any Bearer Security continues until (1) another certificate or affidavit bearing a later date issued in respect of the same Bearer Security is produced, (2) such Bearer Security is produced to the Trustee by some other Person, (3) such Bearer Security is surrendered in exchange for a Registered Security, or (4) such Bearer Security is no longer Outstanding. The principal amount and serial numbers of Bearer Securities held by any Person, and the date of holding the same, may also be proved in any other manner which the Company and the Trustee deem sufficient.

(e) Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Security shall bind every future Holder of the same Security and the Holder of every Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Security.

SECTION 105. *Notices, Etc., to Trustee and Company.*

Any request, demand, authorization, direction, notice, consent, waiver or Act of Holders or other document provided or permitted by this Indenture to be made upon, given or furnished to, or filed with,

(1) the Trustee by any Holder or by the Company shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to or with the Trustee at its Corporate Trust Office, or

(2) the Company by the Trustee or by any Holder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to the Company addressed to it at the address of its principal office specified in the first paragraph of this instrument or at any other address previously furnished in writing to the Trustee by the Company.

SECTION 106. *Notice to Holders; Waiver.*

Where this Indenture provides for notice to Holders of any event, (1) such notice shall be sufficiently given (unless otherwise herein expressly provided) to Holders of Registered Securities if in writing and mailed, first-class postage prepaid, to each such Holder affected by such event, at his address as it appears in the Security Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice; and (2) such notice shall be sufficiently given (unless otherwise herein expressly provided) to Holders of Bearer Securities if published in an Authorized Newspaper on a Business Day at least twice, the first such publication to be not earlier than the earliest date, and not later than the latest date, prescribed for the giving of such notice.

In any case where notice to Registered Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder of a Registered Security shall affect the sufficiency of such notice with respect to other Holders of Registered Securities or the sufficiency of any notice to Holders of Bearer Securities given as provided herein. In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice to Holders of Registered Securities by mail, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

In case by reason of the suspension of publication of any Authorized Newspaper or Authorized Newspapers or by reason of any other cause it shall be impracticable to publish any notice to Holders of Bearer Securities as provided above, then such notification to Holders of Bearer Securities as shall be made with the approval of the Trustee shall constitute sufficient notice to such Holders for every purpose hereunder. Neither the failure to give notice by publication to Holders of Bearer Securities as provided above, nor any defect in any notice so published, shall affect the sufficiency of any notice to Holders of Registered Securities given as provided herein.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

SECTION 107. *Language of Notices, Etc.*

Any request, demand, authorization, direction, notice, consent or waiver required or permitted under this Indenture shall be in the English language, and any published notice may also be in an official language of the country of publication.

SECTION 108. *Conflict with Trust Indenture Act.*

If any provision hereof limits, qualifies or conflicts with another provision hereof which is required to be included in this Indenture by any of the provisions of the Trust Indenture Act, such required provision shall control.

SECTION 109. *Effect of Headings and Table of Contents.*

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

SECTION 110. *Successors and Assigns.*

All covenants and agreements in this Indenture by the Company shall bind its successors and assigns, whether so expressed or not.

SECTION 111. *Separability Clause.*

In case any provision in this Indenture or in the Securities or coupons shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 112. *Governing Law.*

This Indenture and the Securities and coupons shall be governed by and construed in accordance with the laws of the State of New York.

SECTION 113. *Legal Holidays.*

In any case where any Interest Payment Date, Redemption Date or Stated Maturity of a Security of any series shall not be a Business Day at the relevant Place of Payment, then (notwithstanding any other provision of this Indenture or of the Securities or coupons) payment of interest, if any, or

principal (and premium, if any) with respect to such Security need not be made at such Place of Payment on such date, but may be made on the next succeeding Business Day at such Place of Payment with the same force and effect as if made on the Interest Payment Date or Redemption Date, or at the Stated Maturity, provided that no interest shall accrue for the period from and after such Interest Payment Date, Redemption Date or Stated Maturity, as the case may be.

SECTION 114. *Execution In Counterparts.*

This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

SECTION 115. *Immunity of Incorporators, Stockholders, Officers and Directors.*

No recourse shall be had for the payment of the principal of (and premium, if any) or the interest, if any, on any Security or coupon of any series, or for any claim based thereon, or upon any obligation, covenant or agreement of this Indenture, against any incorporator, stockholder, officer or director, as such, past, present or future, of the Company or of any successor corporation, either directly or indirectly through the Company or any successor corporation, whether by virtue of any constitution, statute or rule of law or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that this Indenture and all the Securities and coupons of each series are solely corporate obligations, and that no personal liability whatever shall attach to, or is incurred by, any incorporator, stockholder, officer or director, past, present or future, of the Company or of any successor corporation, either directly or indirectly through the Company or any successor corporation, because of the incurring of the indebtedness hereby authorized or under or by reason of any of the obligations, covenants or agreements contained in this Indenture or in any of the Securities or coupons of any series, or to be implied herefrom or therefrom; and that all such personal liability is hereby expressly released and waived as a condition of, and as part of the consideration for, the execution of this Indenture and the issue of the Securities and coupons of each series.

SECTION 116. *Certain Matters Relating to Currencies.*

Each reference to any currency or currency unit in any Security, or in the Board Resolution or supplemental indenture relating thereto, shall mean only the referenced currency or currency unit and no other currency or currency unit.

The Trustee shall segregate moneys, funds and accounts held by the Trustee in one currency or currency unit from any moneys, funds or accounts held in any other currencies or currency units, notwithstanding any provision herein which would otherwise permit the Trustee to commingle such amounts.

For the purposes of calculating the principal amount of Securities of any series payable in a Foreign Currency or currency unit for any purpose under this Indenture, the principal amount of such Securities at any time outstanding shall be deemed to be that amount of Dollars that could be obtained for such principal amount on the basis of a spot rate of exchange specified to the Trustee for such series in an Officer's Certificate for such Foreign Currency or currency unit into Dollars as of the date of any such calculation.

## ARTICLE TWO

### SECURITY FORMS

SECTION 201. *Forms Generally.*

The Registered Securities, if any, of each series and the Bearer Securities, if any, of each series and related coupons shall be in substantially the form (including global form) as shall be established by or pursuant to a Board Resolution or in one or more indentures supplemental hereto, in each case with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rules of any securities exchange or to conform to usage or as may, consistently herewith, be determined by the officers executing such Securities or coupons, as evidenced by their execution of the Securities or coupons. If temporary Securities of any series are issued in global form as permitted by Section

304, the form thereof shall be established as provided in the preceding sentence. If the forms of Securities or coupons of any series (or any such temporary global Security) are established by action taken pursuant to a Board Resolution, a copy of an appropriate record of such action shall be certified by the Secretary or an Assistant Secretary of the Company and delivered to the Trustee at or prior to the delivery of the Company Order contemplated by Section 303 for the authentication and delivery of such Securities (or any such temporary global Security) or coupons.

Unless otherwise specified as contemplated by Section 301, Securities in bearer form shall have interest coupons attached.

The definitive Securities and coupons, if any, shall be printed, lithographed or engraved on steel engraved borders or may be produced in any other manner, all as determined by the officers executing such Securities or coupons, as evidenced by their execution thereof.

SECTION 202. *Form of Trustee's Certificate of Authentication.*

The Certificate of Authentication on all Securities shall be in substantially the following form:

"This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

____________________________
as Trustee

By__________________________
Authorized Signature"

SECTION 203. *Securities in Global Form.*

If Securities of a series are issuable in global form, any such Security may provide that it shall represent the aggregate amount of Outstanding Securities from time to time endorsed thereon and may also provide that the aggregate amount of Outstanding Securities represented thereby may from time to time be reduced to reflect exchanges. Any endorsement of a Security in global form to reflect the amount, or any increase or decrease in the amount, of Outstanding Securities represented thereby shall be made in such

manner and by such Person or Persons as shall be specified therein. Any instructions by the Company with respect to a Security in global form, after its initial issuance, shall be in writing but need not comply with Section 102.

## ARTICLE THREE

### THE SECURITIES

SECTION 301. *Amount Unlimited; Issuable in Series.*

The aggregate principal amount of Securities which may be authenticated and delivered under this Indenture is unlimited.

The Securities may be issued in one or more series. There shall be established in or pursuant to a Board Resolution, or established in one or more indentures supplemental hereto, prior to the issuance of Securities of any series,

(1) the title of the Securities of the series (which shall distinguish the Securities of the series from all other series of Securities);

(2) any limit upon the aggregate principal amount of the Securities of the series which may be authenticated and delivered under this Indenture (except for Securities authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Securities of the series pursuant to Section 304, 305, 306, 906 or 1108);

(3) whether Securities of the series are to be issuable as Registered Securities [illegible]arer Securities or both;

(4) the [illegible] or dates (or manner of determining the same) on which the p[illegible]cip[illegible] of the Securities of the series is payable (which, if so provided in such Board Resolution or supplemental indenture, may be determined by the Company from time to time and set forth in the Securities of the series issued from time to time);

(5) the rate or rates (or manner of determining the same) at which the Securities of the series shall bear interest, if any, and the date or dates from which such interest shall accrue (which, in either case or both, if so provided in such Board Resolution or supplemental indenture, may be determined by the Company from time to time and set forth in the Securities of the series issued from time to time), the Interest Payment Dates on which such interest shall be payable (or the

manner of determining the same) and the Regular Record Date for the interest payable on any Registered Securities on any Interest Payment Date and the extent to which, or the manner in which, any interest payable on a temporary global Security on an Interest Payment Date will be paid if other than in the manner provided in Section 307;

(6) the place or places where, subject to the provisions of Section 1002, the principal of and any premium and any interest on Securities of the series shall be payable, any Registered Securities of that series may be surrendered for registration of transfer, any Securities of the series may be surrendered for exchange and notices and demands to or upon the Company in respect of the Securities of the series and this Indenture may be served;

(7) if Section 311(b) applies, the Election Date (which shall not be less than 15 days before the payment date);

(8) the price or prices at which, and the currency or currency unit in which, the Securities of the series are payable, and the period or periods within which and the terms and conditions upon which Securities of the series may be redeemed, as a whole or in part, at the option of the Company, pursuant to any sinking fund or otherwise;

(9) the obligation, if any, of the Company to redeem, purchase or repay Securities of the series pursuant to any sinking fund or analogous provisions or at the option of a Holder thereof and the price or prices at which, and the currency or currency unit in which, the Securities of the series are payable, and the period or periods within which and the terms and conditions upon which Securities of the series shall be redeemed, purchased or repaid, as a whole or in part, pursuant to such obligation;

(10) if the coin or currency in which the Securities shall be issuable is Dollars, the denominations in which any Registered Securities of the series shall be issuable, if other than denominations of $1,000 and any integral multiple thereof and the denominations in which any Bearer Securities of the series shall be issuable if other than the denomination of $5,000;

(11) the date as of which any Bearer Securities of the series and any temporary global Security representing Outstanding Securities of

the series shall be dated if other than the date of original issuance of the first Security of the series to be issued;

(12) if other than the principal amount thereof, the portion of the principal amount of Securities of the series which shall be payable upon declaration of acceleration of the Maturity thereof pursuant to Section 502;

(13) if other than Dollars, the coin or currency or currency unit in which payment of the principal of (and premium, if any) and interest, if any, on the Securities of the series shall be made or in which the Securities of the series shall be denominated and the particular provisions applicable thereto in accordance with, in addition to or in lieu of the provisions of Section 311;

(14) if the principal of (and premium, if any) or interest, if any, on the Securities of the series are to be payable, at the election of the Company or a Holder thereof, in a coin or currency or currency unit other than that in which the Securities are denominated or stated to be payable, in accordance with, in addition to or in lieu of the provisions of Section 311, the period or periods within which, and the terms and conditions upon which, such election may be made, and the time and manner of determining the exchange rate between the currency or currency unit in which the Securities are denominated and the currency or currency unit in which the Securities are stated to be payable;

(15) the designation of the original Currency Determination Agent, if any;

(16) if the amount of payments of principal of (and premium, if any) or interest, if any, on the Securities of the series may be determined with reference to an index based on a coin or currency or currencies other than that in which the Securities are denominated or stated to be payable or any other index, the manner in which such amounts shall be determined;

(17) the applicable Overdue Rate, if any;

(18) any addition to, or modification or deletion of, any Event of Default or any covenant of the Company specified herein with respect to the Securities of the series;

(19) if the Securities of such series do not bear interest, the applicable dates for purposes of Section 701;

(20) if other than as set forth in Section 401, provisions for the satisfaction and discharge of this Indenture;

(21) the application, if any, of Section 1008 to the Securities of the series;

(22) if the Securities of such series are issuable as Bearer Securities, whether such Securities will be issued in temporary or global form and whether the Exchange Date or any other terms of such Bearer Securities shall vary from the terms provided for in this Indenture; and

(23) any other terms of the series (which terms shall not be inconsistent with the provisions of this Indenture).

All Securities of any one series and the coupons appertaining to any Bearer Securities of such series shall be substantially identical except as to denomination, rate of interest, Stated Maturity and the date from which interest, if any, shall accrue, which terms, as set forth above, may be determined by the Company from time to time as to Securities of a series if so provided in or established pursuant to the authority granted in a Board Resolution or in any such indenture supplemental hereto, and except as may otherwise be provided in or pursuant to such Board Resolution and set forth in such Officers' Certificate (subject to Section 303) or in any such indenture supplemental hereto. All Securities of any one series need not be issued at the same time, and unless otherwise provided, a series may be reopened for issuance of additional Securities of such series.

If any of the terms of the series are established by action taken pursuant to a Board Resolution, a copy of an appropriate record of such action shall be certified by the Secretary or an Assistant Secretary of the Company and delivered to the Trustee at or prior to the delivery of the Officers' Certificate setting forth the terms of the series.

SECTION 302. *Denominations.*

Unless otherwise provided with respect to any series of Securities as contemplated by Section 301, any Registered Securities of a series shall be issuable in denominations of $1,000 and any integral multiple thereof, any Bearer Securities of a series shall be issuable in the denomination of $5,000, and Registered and Bearer Securities shall be payable in Dollars.

SECTION 303. *Execution, Authentication, Delivery and Dating.*

The Securities and any related coupons shall be executed on behalf of the Company by its Chairman of the Board, any Vice Chairman of the Board, its President, one of its Vice Presidents, its Chief Financial Officer or its Treasurer, under its corporate seal reproduced thereon attested by its Secretary or one of its Assistant Secretaries. The signature of any of these officers on the Securities may be manual or facsimile.

Securities and coupons bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Company shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Securities or did not hold such office at the date of such Securities.

At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Securities of any series, together with any coupons appertaining thereto, executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Securities, and the Trustee in accordance with the Company Order shall authenticate and deliver such Securities; *provided, however,* that, in connection with its original issuance, no Bearer Security shall be mailed or otherwise delivered to any location in the United States; and *provided, further,* that a Bearer Security may be delivered in connection with its original issuance only if the Person entitled to receive such Bearer Security shall have furnished a certificate substantially in the form set forth in Exhibit A to this Indenture, dated no earlier than 15 days prior to the earlier of the date on which such Bearer Security is delivered and the date on which any temporary Security or permanent global Security first becomes exchangeable for such Bearer Security in accordance with the terms of such temporary Security or permanent global Security and this Indenture. If any Security shall be represented by a permanent global Security, then, for purposes of this Section and Section 304, the notation of a beneficial owner's interest therein upon original issuance of such Security or upon exchange of a portion of a temporary global Security shall be deemed to be delivery in connection with the original issuance of such beneficial owner's interest in such permanent global Security. Except as permitted by Section 306 or 307, the Trustee shall not authenticate and deliver any Bearer Security unless all appurtenant coupons for interest then matured have been detached and cancelled. If all the Securities of any one series are not to be issued at one

time and if a Board Resolution or supplemental indenture relating to such series shall so permit, such Company Order may set forth procedures acceptable to the Trustee for the issuance of such Securities, including procedures with respect to interest rate, Stated Maturity, date of issuance and date from which interest, if any, shall accrue. In authenticating such Securities, and accepting the additional responsibilities under this Indenture in relation to such Securities, the Trustee shall be entitled to receive, and shall be fully protected in relying upon (i) a Board Resolution or an executed supplemental Indenture, if any, and (ii) an Opinion of Counsel stating,

(a) if the form of such Securities and any coupons have been established by or pursuant to Board Resolution or supplemental indenture as permitted by Section 201, that such forms have been established in conformity with the provisions of this Indenture;

(b) if the terms of such Securities and any coupons have been established by or pursuant to Board Resolution or supplemental indenture as permitted by Section 301, that such terms have been established in conformity with the provisions of this Indenture;

(c) that such Securities, together with any coupons appertaining thereto, when authenticated and delivered by the Trustee and issued by the Company in the manner and subject to any conditions specified in such Opinion of Counsel, will constitute valid and legally binding obligations of the Company, enforceable in accordance with their terms, subject to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting the enforcement of creditors' rights and to general equity principles; and

(d) that the issuance of such Securities and any related coupons will not conflict with or result in a breach of the terms or provisions of the charter or by-laws of the Company, or any indenture, mortgage or other agreement known to such counsel by which the Company is bound.

If such form or terms have been so established, the Trustee shall not be required to authenticate such Securities if the issue of such Securities pursuant to this Indenture will affect the Trustee's own rights, duties or immunities under the Securities and this Indenture or otherwise in a manner which is not reasonably acceptable to the Trustee.

Notwithstanding the provisions of Section 301 and of the preceding paragraph, if all Securities of a series are not to be originally issued at one time, it shall not be necessary to deliver the Officers' Certificate otherwise required pursuant to Section 301 or the Company Order and Opinion of Counsel otherwise required pursuant to such preceding paragraph at or prior to the time of authentication of each Security of such series if such documents are delivered at or prior to the authentication upon original issuance of the first Security of such series to be issued.

Each Registered Security shall be dated the date of its authentication, and unless otherwise specified as contemplated by Section 301, each Bearer Security (including any temporary or definitive Bearer Security in global form) shall be dated as of the date of original issuance of the first Security of such series to be issued.

No Security or coupon shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Security a certificate of authentication substantially in the form provided for herein executed by the Trustee by manual signature, and such certificate upon any Security shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder and is entitled to the benefits of this Indenture.

SECTION 304. *Temporary Securities and Exchange of Securities.*

Pending the preparation of definitive Securities of any series, the Company may execute, and upon Company Order the Trustee shall authenticate and deliver, temporary Securities which are printed, lithographed, typewritten, mimeographed or otherwise produced, in any authorized denomination, substantially of the tenor of the definitive Securities in lieu of which they are issued, in registered form or, if authorized, in bearer form with one or more coupons or without coupons, and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such Securities may determine, as evidenced by their execution of such Securities. In the case of any series issuable as Bearer Securities, such temporary Securities may be in global form, representing such of the Outstanding Securities of such series as shall be specified therein.

Except in the case of temporary Securities in global form (which shall be exchanged in accordance with the provisions of the following para-

graphs) if temporary Securities of any series are issued, the Company will cause definitive Securities of that series to be prepared without unreasonable delay. After the preparation of definitive Securities of such series, the temporary Securities of such series shall be exchangeable for definitive Securities of such series and of a like Stated Maturity and with like terms and provisions upon surrender of the temporary Securities of such series at the office or agency of the Company in a Place of Payment for that series, without charge to the Holder. Upon surrender for cancellation of any one or more temporary Securities of any series the Company shall execute and (in accordance with a Company Order delivered at or prior to the authentication of the first definitive Security of such series) the Trustee shall authenticate and deliver in exchange therefor a like principal amount of definitive Securities of the same series of authorized denominations and of a like Stated Maturity and with like terms and provisions; *provided, however,* unless otherwise specified pursuant Section 301, no definitive Bearer Security shall be delivered in exchange for a temporary Registered Security; and *provided, further,* that a definitive Bearer Security shall be delivered in exchange for a temporary Bearer Security only in compliance with the conditions set forth in Section 303. Until exchanged as herein above provided, the temporary Securities of any series shall in all respects be entitled to the same benefits under this Indenture as definitive Securities of the same series and tenor authenticated and delivered hereunder.

Any temporary global Security and any permanent global Security (as described below), shall, unless otherwise provided therein, be delivered to the London office of a depositary or common depositary (the "Common Depositary"), for the benefit of Euro-clear and CEDEL, S.A., for credit to the respective accounts of the beneficial owners of such Securities (or to such other accounts as they may direct).

On or after the date which is 90 days after the issue date of a temporary global Security (the "Exchange Date"), the Securities represented by such temporary global Security may be exchanged for definitive Securities (subject to the second succeeding paragraph) or Securities to be represented thereafter by one or more permanent global Securities, without interest coupons. On or after the Exchange Date such temporary global Security shall be surrendered by the Common Depositary to the Trustee, as the Company's agent for such purpose, and following such surrender, the Trustee shall (1) endorse the temporary global Security to reflect the

reduction of its principal amount by an equal aggregate principal amount of such Security, (2) endorse the applicable permanent global Security, if any, to reflect the initial amount, or an increase in the amount of Securities represented thereby, (3) manually authenticate such definitive Securities or such permanent global Security, as the case may be, (4) deliver such definitive Securities to the Holder thereof or, as the case may be, deliver such permanent global Security to the Common Depositary to be held outside the United States for the accounts of Euro-clear and CEDEL, S.A., for credit to the respective accounts at Euro-clear and CEDEL, S.A., designated by or on behalf of the beneficial owners of such Securities (or to such other accounts as they may direct) and (5) redeliver such temporary global Security to the Common Depositary, unless such temporary global Security shall have been cancelled in accordance with Section 309 hereof; *provided, however,* that, unless otherwise specified in such temporary global Security, upon such presentation by the Common Depositary, such temporary global Security shall be accompanied by a certificate dated the Exchange Date, or a subsequent date and signed by Euro-clear as to the portion of such temporary global Security held for its account then to be exchanged for definitive Securities or one or more permanent global Securities, as the case may be, and a certificate dated the Exchange Date or a subsequent date and signed by CEDEL, S.A., as to the portion of such temporary global Security held for its account then to be exchanged for definitive Securities or one or more permanent global Securities, as the case may be, each substantially in the form set forth in Exhibit B to this Indenture. Each certificate substantially in the form of Exhibit B hereto of Euro-clear or CEDEL, S.A., as the case may be, shall be based on certificates of the account holders listed in the records of Euro-clear or CEDEL, S.A., as the case may be, as being entitled to all or any portion of the applicable temporary global Security. An account holder of Euro-clear or CEDEL, S.A., as the case may be, desiring to effect the exchange of interest in a temporary global Security for an interest in definitive Securities or one or more permanent global Securities shall instruct Euro-clear or CEDEL, S.A., as the case may be, to request such exchange on its behalf and shall deliver to Euro-clear or CEDEL, S.A., as the case may be, a certificate substantially in the form of Exhibit A hereto and dated no earlier than 15 days prior to the Exchange Date. Until so exchanged, temporary global Securities shall in all respects be entitled to the same benefits under this Indenture as definitive Securities

and permanent global Securities of the same series authenticated and delivered hereunder, except as to payment of interest, if any.

The delivery to the Trustee by Euro-clear or CEDEL, S.A., of any certificate substantially in the form of Exhibit B hereto may be relied upon by the Company and the Trustee as conclusive evidence that a corresponding certificate or certificates has or have been delivered to Euro-clear or to CEDEL, S.A., as the case may be, pursuant to the terms of this Indenture.

On or prior to the Exchange Date, the Company shall deliver to the Trustee definitive Securities in aggregate principal amount equal to the principal amount of such temporary global Security, executed by the Company. At any time, on or after the Exchange Date, upon 30 days' notice to the Trustee by Euro-clear or CEDEL, S.A., as the case may be, acting at the request of or on behalf of the beneficial owner, a Security represented by a temporary global Security or a permanent global Security, as the case may be, may be exchanged, in whole or from time to time in part, for definitive Securities without charge and the Trustee shall authenticate and deliver, in exchange for each portion of such temporary global Security or such permanent global Security, an equal aggregate principal amount of definitive Securities of the same series of authorized denominations and of like tenor as the portion of such temporary global Security or such permanent global Security to be exchanged, which, unless the Securities of the series are not issuable both as Bearer Securities and as Registered Securities, as contemplated by Section 301, shall be in the form of Bearer Securities or Registered Securities, or any combination thereof, as shall be specified by the beneficial owner thereof; *provided, however,* that definitive Bearer Securities shall be delivered in exchange for a portion of the temporary global Sec. . / or the permanent global Security only in compliance with the requirements of the second preceding paragraph. On or prior to the thirtieth day following receipt by the Trustee of such notice with respect to a Security, or, if such day is not a Business Day, the next succeeding Business Day, the temporary global Security or the permanent global Security, as the case may be, shall be surrendered by the Common Depositary to the Trustee, as the Company's agent for such purpose, to be exchanged, in whole or from time to time in part, for definitive Securities without charge following such surrender, upon the request of Euro-clear or CEDEL, S.A., as the case may be, and the Trustee shall (1) endorse the applicable temporary global Security or the permanent global Security to reflect the reduction of its

principal amount by the aggregate principal amount of such Security, (2) cause the terms of such Security and coupons, if any, to be entered on a definitive Security, (3) manually authenticate such definitive Security and (4) deliver such definitive Security outside the United States to Euro-clear or CEDEL, S.A., as the case may be, for or on behalf of the beneficial owner thereof, in exchange for a portion of such permanent global Security.

Unless otherwise specified in such temporary global Security or permanent global Security, any such exchange shall be made free of charge to the beneficial owners of such temporary global Security or permanent global Security, except that a Person receiving definitive Securities must bear the cost of insurance, postage, transportation and the like in the event that such Person does not take delivery of such definitive Securities in person at the offices of Euro-clear or CEDEL, S.A. Definitive Securities in bearer form to be delivered in exchange for any portion of a temporary global Security or a permanent global Security shall be delivered only outside the United States.

Until exchanged in full as herein above provided, any temporary global Security or permanent global Security shall in all respects be entitled to the same benefits under this Indenture as definitive Securities of the same series and tenor authenticated and delivered hereunder, except that, unless otherwise specified as contemplated by Section 301, interest payable on such temporary global Security on an Interest Payment Date for Securities of such series occurring prior to the applicable Exchange Date shall be payable to Euro-clear and CEDEL, S.A. on such Interest Payment Date upon delivery by Euro-clear and CEDEL, S.A. to the Trustee of a certificate or certificates substantially in the form set forth in Exhibit C to this Indenture, for credit without further interest on or after such Interest Payment Date to the respective accounts of the Persons who are the beneficial owners of such temporary global Security on such Interest Payment Date and who have each delivered to Euro-clear or CEDEL, S.A., as the case may be, a certificate substantially in the form set forth in Exhibit D to this Indenture.

Any definitive Bearer Security authenticated and delivered by the Trustee in exchange for a portion of a temporary global Security or a permanent global Security shall not bear a coupon for any interest which shall theretofore have been duly paid by the Trustee to CEDEL, S.A. or Euro-clear or by the Company to the Trustee in accordance with the provisions of this Section 304.

SECTION 305. *Registration, Registration of Transfer and Exchange.*

The Company shall cause to be kept at the Corporate Trust Office of the Trustee a register (the register maintained in such office and in any other office or agency of the Company in a Place of Payment being herein sometimes collectively referred to as the "Security Register") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Registered Securities and of transfers of Registered Securities. The Trustee is hereby appointed Security Registrar for the purpose of registering Registered Securities and transfers of Registered Securities as herein provided.

Upon surrender for registration of transfer of any Registered Security of any series at the office or agency in a Place of Payment for that series, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Registered Securities of the same series, of any authorized denominations and in a like aggregate principal amount and of a like Stated Maturity and with like terms and conditions.

At the option of the Holder, Registered Securities of any series may be exchanged for other Registered Securities of the same series, of any authorized denominations and in a like aggregate principal amount and of a like Stated Maturity and with like terms and conditions, upon surrender of the Securities to be exchanged at such office or agency. Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Securities which the Holder making the exchange is entitled to receive. Except as otherwise specified pursuant to Section 301, Registered Securities may not be exchanged for Bearer Securities.

At the option of the Holder, Bearer Securities of any series may be exchanged for Registered Securities of the same series of any authorized denominations and of a like aggregate principal amount and tenor, upon surrender of the Bearer Securities to be exchanged at any such office or agency, with all unmatured coupons and all matured coupons in default thereto appertaining. If the Holder of a Bearer Security is unable to produce any such unmatured coupon or coupons or matured coupon or coupons in default, such exchange may be effected if the Bearer Securities are accompanied by payment in funds acceptable to the Company in an amount equal

to the face amount of such missing coupon or coupons, or the surrender of such missing coupon or coupons may be waived by the Company and the Trustee if there is furnished to them such security or indemnity as they may require to save each of them and any Paying Agent harmless. If thereafter the Holder of such Security shall surrender to any Paying Agent any such missing coupon in respect of which such a payment shall have been made, such Holder shall be entitled to receive the amount of such payment; *provided, however,* that, except as otherwise pr ided in Section 1002, interest represented by coupons shall be payable c upon presentation and surrender of those coupons at an office or agency located outside the United States. Notwithstanding the foregoing, in case a Bearer Security of any series is surrendered at any such office or agency in exchange for a Registered Security of the same series and like tenor after the close of business at such office or agency on (i) any Regular Record Date and before the opening of business at such office or agency on the relevant Interest Payment Date, or (ii) any Special Record Date and before the opening of business at such office or agency on the related proposed date for payment of Defaulted Interest, such Bearer Security shall be surrendered without the coupon relating to such Interest Payment Date or proposed date for payment, as the case may be (or, if such coupon is so surrendered with such Bearer Security, such coupon shall be returned to the person so surrendering the Bearer Security), and interest or Defaulted Interest, as the case may be, will not be payable on such Interest Payment Date or proposed date for payment, as the case may be, in respect of the Registered Security issued in exchange for such Bearer Security, but will be payable only to the Holder of such coupon when due in accordance with the provisions of this Indenture.

Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Securities which the Holder making the exchange is entitled to receive.

All Securities issued upon any registration of transfer or exchange of Securities shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Securities surrendered upon such registration of transfer or exchange.

Every Registered Security presented or surrendered for registration of transfer or for exchange shall (if so required by the Company or the Trustee) be duly endorsed, or be accompanied by a written instrument of

transfer in form satisfactory to the Company and the Security Registrar duly executed, by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made for any registration of transfer or exchange of Securities, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Securities, other than exchanges pursuant to Section 3( , 906 or 1108 not involving any transfer.

The Company shall not be required (i) to issue, register the transfer of or exchange Securities of any series during a period beginning at the opening of business 15 days before the day of the mailing of a notice of redemption of Securities of that series selected for redemption under Section 1104 and ending at the close of business on (A) if Securities of the series are issuable only as Registered Securities, the day of the mailing of the relevant notice of redemption and (B) if Securities of the series are issuable as Bearer Securities, the day of the first publication of the relevant notice of redemption or, if Securities of the series are also issuable as Registered Securities and there is no publication, the mailing of the relevant notice of redemption, or (ii) to register the transfer of or exchange any Registered Security so selected for redemption as a whole or in part, except the unredeemed portion of any Security being redeemed in part, or (iii) to exchange any Bearer Security so selected for redemption except tha n a Bearer Security may be exchanged for a Registered Security of the eries and like tenor, *provided* that such Registered Security shall be simultaneously surrendered for redemption.

SECTION 306. *Mutilated, Destroyed, Lost and Stolen Securities.*

If any mutilated Security or a Security with a mutilated coupon appertaining thereto is surrendered to the Trustee, the Company shall execute and the Trustee shall authenticate and deliver in exchange therefor a new Security of the same series and in a like aggregate principal amount and of a like Stated Maturity and with like terms and conditions and bearing a number not contemporaneously outstanding with coupons corresponding to the coupons, if any, appertaining to the surrendered Security.

If there shall be delivered to the Company and the Trustee (i) evidence to their satisfaction of the destruction, lo-- or theft of any Security or coupon

and (ii) such security or indemnity as may be required by them to save each of them and any agent of either of them harmless, then; in the absence of notice to the Company or the Trustee that such Security or coupon has been acquired by a bona fide purchaser, the Company shall execute and upon its request the Trustee shall authenticate and deliver, in lieu of any such destroyed, lost or stolen Security, or in exchange for the Security to which a destroyed, lost or stolen coupon appertains (with all appurtenant coupons not destroyed, lost or stolen), a new Security of the same series and in a like aggregate principal amount and of a like Stated Maturity and with like terms and conditions and bearing a number not contemporaneously outstanding with coupons corresponding to the coupons, if any, appertaining to such destroyed, lost or stolen Security or to the Security to which such destroyed, lost or stolen coupon appertains.

In case any such mutilated, destroyed, lost or stolen Security or coupon has become or is about to become due and payable, the Company in its discretion may, instead of issuing a new Security, pay such Security or coupon; *provided, however,* that principal of (and premium, if any) and any interest on Bearer Securities shall, except as otherwise provided in Section 1002, be payable only at an office or agency located outside the United States and, unless otherwise specified as contemplated by Section 301, any interest on Bearer Securities shall be payable only upon presentation and surrender of the coupons appertaining thereto.

Upon the issuance of any new Security under this Section, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Security of any series, with its coupons, if any, issued pursuant to this Section in lieu of any destroyed, lost or stolen Security or in exchange for a Security to which a destroyed, lost or stolen coupon appertains, shall constitute an original additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Security and its coupons, if any, or the destroyed, lost or stolen coupon shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Securities of that series and their coupons, if any, duly issued hereunder.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities or coupons.

SECTION 307. *Payment of Interest; Interest Rights Preserved.*

Interest on any Registered Security which is payable, and is punctually paid or duly provided for, on any Interest Payment Date shall be paid to the Person in whose name that Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest.

Unless otherwise provided with respect to the Securities of any series, at the option of the Company payment of interest may be made (i) by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register, or (ii) at the option of the Company, (1) in the case of a Bearer Security, by transfer to an account maintained by the payee with a bank located outside the United States, or (2) in the case of a Registered Security, by transfer to an account maintained by the payee with a bank located inside the United States.

Any interest on any Registered Security of any series which is payable, but is not punctually paid or duly provided for, on any Interest Payment Date (herein called "Defaulted Interest") shall forthwith cease to be payable to the Holder on the relevant Regular Record Date by virtue of having been such Holder, and such Defaulted Interest may be paid by the Company, at its election in each case, as provided in clause (1) or (2) below:

(1) The Company may elect to make payment of any Defaulted Interest to the Persons in whose names the Registered Securities of such series (or their respective Predecessor Securities) are registered at the close of business on a Special Record Date for the payment of such Defaulted Interest, which shall be fixed in the following manner. The Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each Registered Security of such series and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money in the currency or currency unit in which the Securities of such series are payable (except as otherwise specified pursuant to Section 301 for the

Securities of such series and except as provided in Sections 311(b), 311(d) and 311(e)), equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Interest as in this clause provided. Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than 15 days and not less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment. The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, to each Holder of Registered Securities of such series at his address as it appears in the Security Register, not less than 10 days prior to such Special Record Date. Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been so mailed, Defaulted Interest shall be paid to the Persons in whose names the Registered Securities of such series (or their respective Predecessor Securities) are registered at the close of business on such Special Record Date and shall no longer be payable pursuant to the following clause (2).

(2) The Company may make payment of any Defaulted Interest on the Registered Securities of any series in any other lawful manner not inconsistent with the requirements of any securities exchange on which such Securities may be listed, and upon such notice as may be required by such exchange, if, after notice given by the Company to the Trustee of the proposed manner of payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

Subject to the foregoing provisions of this Section and Section 305, each Security delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Security shall carry the rights to interest accrued and unpaid, and to accrue, which were carried by such other Security.

SECTION 308. *Persons Deemed Owners.*

Prior to due presentment of a Registered Security for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name such Registered Security is registered as the owner of such Registered Security for the purpose of receiving payment of principal of (and premium, if any) and (subject to Section 307) interest, if any, on such Security and for all other purposes whatsoever, whether or not such Security be overdue, and neither the Company, the Trustee nor any agent of the Company or the Trustee shall be affected by notice to the contrary.

Title to any Bearer Security and any coupons appertaining thereto shall pass by delivery. The Company, the Trustee and any agent of the Company or the Trustee may treat the bearer of any Bearer Security and the bearer of any coupon as the absolute owner of such Security or coupon for the purpose of receiving payment thereof or on account thereof and for all other purposes whatsoever, whether or not such Security or coupon be overdue, and neither the Company, the Trustee nor any agent of the Company or the Trustee shall be affected by notice to the contrary.

SECTION 309. *Cancellation.*

All Securities and coupons surrendered for payment, redemption, registration of transfer or exchange or for credit against any sinking fund payment shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and, in the case of Registered Securities and matured coupons, shall be promptly cancelled by it. All Bearer Securities and unmatured coupons so delivered to the Trustee shall be cancelled by the Trustee. The Company may at any time deliver to the Trustee for cancellation any Securities previously authenticated and delivered hereunder which the Company may have acquired in any manner whatsoever, and all Securities so delivered shall be promptly cancelled by the Trustee. Notwithstanding any other provision of this Indenture to the contrary, in the case of a series all the Securities of which are not to be originally issued at one time, a Security of such series shall not be deemed to have been Outstanding at any time hereunder if and to the extent that, subsequent to the authentication and delivery thereof, such Security is delivered to the Trustee for

cancellation by the Company or any agent thereof upon the failure of the original purchaser thereof to make payment therefor against delivery thereof, and any Security so delivered to the Trustee shall be promptly cancelled by it. No Securities shall be authenticated in lieu of or in exchange for any Securities cancelled as provided in this Section, except as expressly permitted by this Indenture. All cancelled Securities and coupons held by the Trustee shall be destroyed by the Trustee and a certificate of destruction evidencing such destruction of Securities and coupons shall be provided to the Company by the Trustee. In the case of any temporary global Security, which shall be destroyed if the entire aggregate principal amount of the Securities represented thereby has been exchanged, the certificate of destruction shall state that all certificates required pursuant to Section 304 hereof and substantially in the form of Exhibit B hereto, to be given by Euro-clear or CEDEL, S.A., have been duly presented to the Trustee by Euro-clear or CEDEL, S.A., as the case may be. Permanent global Securities shall not be destroyed until exchanged in full for definitive Securities or until payment thereon is made in full.

SECTION 310. *Computation of Interest.*

Except as otherwise specified pursuant to Section 301 for Securities of any series, interest on the Securities of each series shall be computed on the basis of a 360-day year of twelve 30-day months.

SECTION 311. *Currency and Manner of Payments in Respect of Registered Securities.*

(a) With respect to Registered Securities of any series not permitting the election provided for in paragraph (b) below or the Holders of which have not made the election provided for in paragraph (b) below, except as provided in paragraph (d) below, payment of the principal of (and premium, if any) and interest, if any, on any Registered Security of such series will be made in the currency or currency unit in which such Registered Security is payable.

(b) It may be provided pursuant to Section 301 with respect to Registered Securities of any series that Holders shall have the option, subject to paragraphs (d) and (e) below, to receive payments of principal of (and

premium, if any) and interest, if any, on such Registered Securities in any of the currencies or currency units which may be designated for such election by delivering to the Trustee a written election, to be in form and substance satisfactory to the Trustee, not later than the close of business on the Election Date immediately preceding the applicable payment date. If a Holder so elects to receive such payments in any such currency or currency unit, such election will remain in effect for such Holder or any transferee of such Holder until changed by such Holder or such transferee by written notice to the Trustee (but any such change must be made not later than the close of business on the Election Date immediately preceding the next payment date to be effective for the payment to be made on such payment date and no such change or election may be made with respect to payments to be made on any Registered Security of such series with respect to which an Event of Default has occurred or notice of redemption has been given by the Company pursuant to Article Eleven). Any Holder of any such Registered Security who shall not have delivered any such election to the Trustee not later than the close of business on the applicable Election Date will be paid the amount due on the applicable payment date in the relevant currency or currency unit as provided in paragraph (a) of this Section 311.

(c) If the election referred to in paragraph (b) above has been provided for pursuant to Section 301, then not later than the fourth Business Day after the Election Date for each payment date, the Currency Determination Agent will deliver to the Company a written notice specifying, in the currency or currency unit in which each series of the Registered Securities are payable, the respective aggregate amounts of principal of (and premium, if any) and interest, if any, on the Registered Securities to be made on such payment date, specifying the amounts in such currency or currency unit so payable in respect of the Registered Securities as to which the Holders of Registered Securities denominated in any currency or currency unit shall have elected to be paid in another currency or currency unit as provided in paragraph (b) above. If the election referred to in paragraph (b) above has been provided for pursuant to Section 301 and if at least one Holder has made such election, then, on the second Business Day preceding each payment date the Company will deliver to the Trustee an Exchange Rate Officer's Certificate in respect of the Dollar, Foreign Currency, ECU or currency unit payments to be made on such payment date. The Dollar,

Foreign Currency, ECU or currency unit amount receivable by Holders of Registered Securities who have elected payment in a currency or currency unit as provided in paragraph (b) above shall be determined by the Company on the basis of the applicable Market Exchange Rate in effect on the third Business Day (the "Valuation Date") immediately preceding each payment date. The Trustee shall notify the Currency Determination Agent as soon as practicable after the Election Date of the aggregate principal amount of Registered Securities for which Holders have made such written election.

(d) If a Conversion Event occurs with respect to a Foreign Currency, the ECU or any other currency unit in which any of the Registered Securities are denominated or payable other than pursuant to an election provided for pursuant to paragraph (b) above, then with respect to each date for the payment of principal of (and premium, if any) and interest, if any, on the applicable Registered Securities denominated or payable in such Foreign Currency, the ECU or such other currency unit occurring after the last date on which such Foreign Currency, the ECU or such other currency unit was used (the "Conversion Date"), the Dollar shall be the currency of payment for use on each such payment date. The Dollar amount to be paid by the Company to the Trustee and by the Trustee or any Paying Agent to the Holders of such Registered Securities with respect to such payment date shall be the Dollar Equivalent of the Foreign Currency or, in the case of a currency unit, the Dollar Equivalent of the Currency Unit, in each case as determined by the Currency Determination Agent in the manner provided in paragraph (f) or (g) below.

(e) If the Holder of a Registered Security denominated in any currency or currency unit shall have elected to be paid in another currency or currency unit as provided in paragraph (b) above, and a Conversion Event occurs with respect to such elected currency or currency unit, such Holder shall receive payment in the currency or currency unit in which payment would have been made in the absence of such election. If a Conversion Event occurs with respect to the currency or currency unit in which payment would have been made in the absence of such election, such Holder shall receive payment in Dollars as provided in paragraph (d) of this Section 311.

(f) The "Dollar Equivalent of the Foreign Currency" shall be determined by the Currency Determination Agent and shall be obtained for each

subsequent payment date by converting the specified Foreign Currency into Dollars at the Market Exchange Rate on the Conversion Date.

(g) The "Dollar Equivalent of the Currency Unit" shall be determined by the Currency Determination Agent and subject to the provisions of paragraph (h) below shall be the sum of each amount obtained by converting the Specified Amount of each Component Currency into Dollars at the Market Exchange Rate for such Component Currency on the Valuation Date with respect to each payment.

(h) For purposes of this Section 311 the following terms shall have the following meanings:

A "Component Currency" shall mean any currency which, on the Conversion Date, was a component currency of the relevant currency unit, including, but not limited to, the ECU.

A "Specified Amount" of a Component Currency shall mean the number of units of such Component Currency or fractions thereof which were represented in the relevant currency unit, including, but not limited to, the ECU, on the Conversion Date. If after the Conversion Date the official unit of any Component Currency is altered by way of combination or subdivision, the Specified Amount of such Component Currency shall be divided or multiplied in the same proportion. If after the Conversion Date two or more Component Currencies are consolidated into a single currency, the respective Specified Amounts of such Component Currencies shall be replaced by an amount in such single currency equal to the sum of the respective Specified Amounts of such consolidated Component Currencies expressed in such single currency, and such amount shall thereafter be a Specified Amount and such single currency shall thereafter be a Component Currency. If after the Conversion Date any Component Currency shall be divided into two or more currencies, the Specified Amount of such Component Currency shall be replaced by amounts of such two or more currencies, each of whose Dollar Equivalent at the Market Exchange Rate on the date of such replacement shall be equal to the Dollar Equivalent of the Specified Amount of such former Component Currency at the Market Exchange Rate on such date divided by the number of currencies into which such Component Currency was divided, and such amounts shall thereafter be Specified Amounts and such currencies shall thereafter be Component Currencies. If, after the Conversion Date of the relevant currency unit,

including, but not limited to, the ECU, a Conversion Event (other than any event referred to above in this definition of "Specified Amount") occurs with respect to any Component Currency of such currency unit, the Specified Amount of such Component Currency shall, for purposes of calculating the Dollar Equivalent of the Currency Unit, be converted into Dollars at the Market Exchange Rate in effect on the Conversion Date of such Component Currency.

"Election Date" shall mean the date for any series of Registered Securities as specified pursuant to Section 301(7).

All decisions and determinations of the Currency Determination Agent regarding the Dollar Equivalent of the Foreign Currency, the Dollar Equivalent of the Currency Unit and the Market Exchange Rate shall be in its sole discretion and shall, in the absence of manifest error, be conclusive for all purposes and irrevocably binding upon the Company and all Holders of the Registered Securities denominated or payable in the relevant currency or currency units. The Currency Determination Agent shall promptly give written notice to the Trustee of any such decision or determination.

In the event of a Conversion Event with respect to a Foreign Currency, the Company, after learning thereof, will immediately give written notice thereof to the Trustee and Currency Determination Agent (and the Trustee will promptly thereafter give notice in the manner provided in Section 106 to the Holders) specifying the Conversion Date. In the event of a Conversion Event with respect to the ECU or any other currency unit in which Registered Securities are denominated or payable, the Company, after learning thereof, will immediately give written notice thereof to the Trustee and Currency Determination Agent (and the Trustee will promptly thereafter give notice in the manner provided in Section 106 to the Holders) specifying the Conversion Date and the Specified Amount of each Component Currency on the Conversion Date. In the event of any subsequent change in any Component Currency as set forth in the definition of Specified Amount above, the Company, after learning thereof, will similarly give written notice to the Trustee and Currency Determination Agent.

The Trustee shall be fully justified and protected in relying and acting upon information received by it from the Company and the Currency Determination Agent and shall not otherwise have any duty or obligation to determine such information independently.

SECTION 312. *Appointment and Resignation of Successor Currency Determination Agent.*

(a) If and so long as the Securities of any series (i) are denominated in a currency other than Dollars or (ii) may be payable in a currency other than Dollars, or so long as it is required under any other provision of this Indenture, then the Company will maintain with respect to each such series of Securities, or as so required, a Currency Determination Agent. The Company will cause the Currency Determination Agent to make the necessary foreign exchange determinations at the time and in the manner specified pursuant to Section 301 for the purpose of determining the applicable rate of exchange and for the purpose of converting the issued currency into the applicable payment currency for the payment of principal and interest, if any, pursuant to Section 311.

(b) No resignation of the Currency Determination Agent and no appointment of a successor Currency Determination Agent pursuant to this Section shall become effective until the acceptance of appointment by the successor Currency Determination Agent as evidenced by a written instrument delivered to the Company and the Trustee accepting such appointment executed by the successor Currency Determination Agent.

(c) If the Currency Determination Agent shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Currency Determination Agent for any cause, with respect to the Securities of one or more series, the Company, by a Board Resolution, shall promptly appoint a successor Currency Determination Agent or Currency Determination Agents with respect to the Securities of that or those series (it being understood that any such successor Currency Determination Agent may be appointed with respect to the Securities of one or more or all of such series and that at any time there shall only be one Currency Determination Agent with respect to the Securities of any particular series).

## ARTICLE FOUR

### SATISFACTION AND DISCHARGE

SECTION 401. *Satisfaction and Discharge of Securities of any Series.*

(a) The Company shall be deemed to have satisfied and discharged the entire indebtedness on all the Securities of any particular series and, so long as no Event of Default shall be continuing, the Trustee, upon Company Request and at the expense of the Company, shall execute proper instruments acknowledging satisfaction and discharge of such indebtedness, when:

(1) either

(A) all Securities of such series theretofore authenticated and delivered and all coupons, if any, appertaining thereto (other than (i) coupons appertaining to Bearer Securities surrendered for exchange for Registered Securities and maturing after such exchange, whose surrender is not required or has been waived as provided in Section 305, (ii) any Securities and coupons of such series which have been destroyed, lost or stolen and which have been replaced or paid as provided in Section 306 (iii) coupons appertaining to Securities called for redemption and maturing after the relevant Redemption Date, whose surrender has been waived as provided in Section 1107 and (iv) Securities and coupons of such series for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Company and thereafter repaid to the Company or discharged from such trust, as provided in the last paragraph of Section 1003) have been delivered to the Trustee for cancellation; or

(B) with respect to all Outstanding Securities of such series described in (A) above (and, in the case of (i) or (ii) below, any coupons appertaining thereto) not theretofore delivered to the Trustee for cancellation:

(i) the Company has deposited or caused to be deposited with the Trustee as trust funds in trust an amount in the currency or currency unit in which the Securities of such series are payable (except as otherwise specified pursuant to Section 301 for the Securities of such series and except as provided in Sections 311(b),

311(d) and 311(e), in which case the deposit to be made with respect to Securities for which an election has occurred pursuant to Section 311(b) or a Conversion Event has occurred as provided in Sections 311(d) and 311(e), shall be made in the currency or currency unit in which such Securities are payable as a result of such election or Conversion Event), sufficient to pay and discharge the entire indebtedness on all such Outstanding Securities of such series and any related coupons for principal (and premium, if any) and interest to the Stated Maturity or any Redemption Date as contemplated by Section 402, as the case may be; or

(ii) the Company has deposited or caused to be deposited with the Trustee as obligations in trust such amount of Government Obligations as will, in a written opinion of independent public accountants delivered to the Trustee, together with the predetermined and certain income to accrue thereon (without consideration of any reinvestment thereof), be sufficient to pay and discharge when due the entire indebtedness on all such Outstanding Securities of such series and any related coupons for unpaid principal (and premium, if any) and interest, if any, to the Stated Maturity or any Redemption Date as contemplated by Section 402, as the case may be;

(2) the Company has paid or caused to be paid all other sums payable with respect to the Securities of such series and any related coupons;

(3) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of the entire indebtedness on all Securities of such series and any related coupons have been complied with; and

(4) if the Securities of such series and any related coupons are not to become due and payable at their Stated Maturity within one year of the date of such deposit or are not to be called for redemption within one year of the date of such deposit under arrangements satisfactory to the Trustee as of the date of such deposit, then the Company shall have given, not later than the date of such deposit, notice of such deposit to the Holders of the Securities of such series.

(b) Upon the satisfaction of the conditions set forth in this Section 401 with respect to all the Securities of any series, the terms and conditions of such series, including the terms and conditions with respect thereto set forth in this Indenture, shall no longer be binding upon, or applicable to, the Company, and the Holders of the Securities of such series and any related coupons shall look for payment only to the funds or obligations deposited with the Trustee pursuant to Section 401(1)(B): *provided, however,* that in no event shall the Company be discharged from (a) any payment obligations in respect of Securities of such series and any related coupons which are deemed not to be Outstanding under clause (c) of the definition thereof if such obligations continue to be valid obligations of the Company under applicable law, (b) from any obligations under Sections 402(b), 607, 610 and 1008 and (c) from any obligations under Sections 305 and 306 (except that Securities of such series issued upon registration of transfer or exchange or in lieu of mutilated, lost, destroyed or stolen Securities and any related coupons shall not be obligations of the Company) and Sections 311, 701 and 1002; and *provided, further,* that in the event a petition for relief under the Bankruptcy Act of 1978 or Title 11 of the United States Code or a successor statute is filed and not discharged with respect to the Company within 91 days after the deposit, the entire indebtedness on all Securities of such series and any related coupons shall not be discharged, and in such event the Trustee shall return such deposited funds or obligations as it is then holding to the Company upon Company Request. Notwithstanding the satisfaction of the conditions set forth in this Section 401 with respect to all the Securities of any series not denominated in Dollars, upon the happening of any Conversion Event the Company shall be obligated to make the payments in Dollars required by Section 311(d) to the extent that the Trustee is unable to convert any Foreign Currency or currency unit in its possession pursuant to Section 401(1)(B) into the Dollar Equivalent of the Foreign Currency or the Dollar Equivalent of the Currency Unit, as the case may be. If, after the deposit referred to in Section 401 has been made, (x) the Holder of a Security is entitled to, and does, elect pursuant to Section 311(b) to receive payment in a currency or currency unit other than that in which the deposit pursuant to Section 401 was made, or (y) a Conversion Event occurs as contemplated in Section 311(d) or 311(e), then the indebtedness represented by such Security shall be fully discharged to the extent that the deposit made with respect to such Security shall be converted

into the currency or currency unit in which such Security is payable. The Trustee shall return to the Company any non-converted funds or securities in its possession after such payments have been made.

SECTION 402. *Application of Trust Money.*

(a) All money and obligations deposited with the Trustee pursuant to Section 401 shall be held irrevocably in trust and shall be made under the terms of an escrow trust agreement in form and substance satisfactory to the Trustee. Such money and obligations shall be applied by the Trustee, in accordance with the provisions of the Securities, any coupons, this Indenture and such escrow trust agreement, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal of (and premium, if any) and interest, if any, on the Securities for the payment of which such money and obligations have been deposited with the Trustee. If Securities of any series are to be redeemed prior to their Stated Maturity, whether pursuant to any optional redemption provisions or in accordance with any mandatory sinking fund requirement, the Company shall make such arrangements as are satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company.

(b) The Company shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against Government Obligations deposited pursuant to Section 401 or the interest and principal received in respect of such Government Obligations other than any such tax, fee or other charge which by law is payable by or on behalf of Holders. The obligation of the Company under this Section 402(b) shall be deemed to be an obligation of the Company under Section 607(2).

(c) Anything in this Article Four to the contrary notwithstanding, the Trustee shall deliver or pay to the Company from time to time upon Company Request any money or Government Obligations held by it as provided in Section 401 which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, are in excess of the amount thereof which would then have been required to be deposited for the purpose for which such money or Government Obligations were deposited or received.

SECTION 403. *Satisfaction and Discharge of Indenture.*

Upon compliance by the Company with the provisions of Section 401 as to the satisfaction and discharge of each series of Securities issued hereunder, and if the Company has paid or caused to be paid all other sums payable under this Indenture, this Indenture shall cease to be of any further effect (except as otherwise provided herein). Upon Company Request and receipt of an Opinion of Counsel and an Officers' Certificate, the Trustee (at the expense of the Company) shall execute proper instruments acknowledging satisfaction and discharge of this Indenture.

Notwithstanding the satisfaction and discharge of this Indenture, any obligations of the Company under Sections 304, 305, 306, 311, 402(b), 607, 610, 701, 1002 and 1008 and the obligations of the Trustee under Section 402 shall survive.

## ARTICLE FIVE

### REMEDIES

SECTION 501. *Events of Default.*

"Event of Default", wherever used herein with respect to Securities of any series, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(1) default in the payment of any interest upon any Security of that series and any related coupon when it becomes due and payable, and continuance of such default for a period of 30 days; or

(2) default in the payment of the principal of (or premium, if any, on) any Security of that series at its Maturity; or

(3) default in the making or satisfaction of any sinking fund payment or analogous obligation when the same becomes due and payable by the terms of any Security of that series and continuance of such default for a period of 30 days; or

(4) default in the performance, or breach, of any covenant or warranty of the Company in respect of the Securities of that series

contained in this Indenture (other than a covenant or warranty in respect of the Securities of such series, a default in the performance of which or the breach of which is elsewhere in this Section specifically dealt with or which has expressly been included in this Indenture solely for the benefit of series of Securities other than that series), or established in or pursuant to the authority granted in the Board Resolution or in the supplemental indenture under which such series of Securities is issued, as the case may be, as contemplated by Section 301, and continuance of such default or breach for a period of 90 days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the Holders of at least 25% in principal amount of the Outstanding Securities of that series a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; or

(5) the entry by a court having jurisdiction in the premises of (A) a decree or order for relief in respect of the Company in an involuntary case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or (B) a decree or order adjudging the Company a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Company under any applicable Federal or State law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of 60 consecutive days; or

(6) the commencement by the Company of a voluntary case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or the consent by it to the entry of a decree or order for relief in respect of it in an involuntary case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against it, or the filing by it of a petition or answer or consent seeking

reorganization or relief under any applicable Federal or State law, or the consent by it to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or similar official of the Company or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by the Company in furtherance of any such action; or

(7) any other Event of Default provided in the applicable Board Resolution or in the supplemental indenture under which such series of Securities is issued, as the case may be, as contemplated by Section 301.

SECTION 502. *Acceleration of Maturity; Rescission and Annulment.*

If an Event of Default with respect to Securities of any series and any related coupons at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Securities of such series shall have already become due and payable, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Securities of that series may declare the principal amount (or, if the Securities of that series are Original Issue Discount Securities, such portion of the principal amount as may be specified in the terms of that series) of all of the Securities of that series to be due and payable immediately, by a notice in writing to the Company (and to the Trustee if given by the Holders), and upon any such declaration such principal amount (or specified amount) shall become immediately due and payable.

At any time after such a declaration of acceleration with respect to Securities of any series has been made and before a judgment or decree for payment of the money due has been obtained and entered by the Trustee as hereinafter in this Article provided, the Holders of a majority in principal amount of the Outstanding Securities of that series, by written notice to the Company and the Trustee, may rescind and annul such declaration and its consequences if,

(1) the Company has paid or deposited with the Trustee a sum sufficient to pay in the currency or currency unit in which the Securities of such series are payable (except as otherwise specified pursuant to Section 301 for the Securities of such series and except as provided in Sections 311(b), 311(d) and 311(e)),

(A) all overdue interest, if any, on all Securities of that series and any related coupons,

(B) the principal of (and premium, if any, on) any Securities of that series which have become due otherwise than by such declaration of acceleration and interest thereon at the Overdue Rate applicable to that series,

(C) to the extent that payment of such interest is lawful, interest upon overdue interest at the Overdue Rate applicable to that series, and

(D) all sums paid or advanced by the Trustee hereunder and the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel;

and

(2) all Events of Default with respect to Securities of that series, other than the non-payment of the principal of Securities of that series, which have become due solely by such declaration of acceleration, have been cured or waived as provided in Section 513.

No such rescission shall affect any subsequent default or impair any right consequent thereon.

SECTION 503. *Collection of Indebtedness and Suits for Enforcement by Trustee.*

The Company covenants that if,

(1) default is made in the payment of any interest on any Security of any series and any related coupons when such interest becomes due and payable and such default continues for a period of 30 days,

(2) default is made in the payment of the principal of (or premium, if any, on) any Security of any series at the Maturity thereof, or

(3) default is made in the making or satisfaction of any sinking fund payment or analogous obligation when the same becomes due pursuant to the terms of the Securities of any series and such default continues for a period of 30 days,

then the Company will, upon demand of the Trustee, pay to it, for the benefit of the Holder of such Securities and coupons, the whole amount then due and payable on such Securities and coupons for principal (and premium, if any) and interest, if any, with interest upon the overdue principal (and premium, if any) and, to the extent that payment of such interest shall be legally enforceable, upon any overdue instalment of interest, at the Overdue Rate of any such Securities; and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

If the Company fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, may prosecute such proceeding to judgment or final decree and may enforce the same against the Company or any other obligor upon such Securities and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon such Securities, wherever situated.

If an Event of Default with respect to Securities of any series occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders of Securities of such series and any related coupons by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

SECTION 504. *Trustee May File Proofs of Claim.*

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Company or any other obligor upon the Securities of any series or the property of the Company or of such other obligor or their creditors, the Trustee (irrespective of whether the principal of the Securities of such series shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand on the Company for the payment of

overdue principal or interest) shall be entitled and empowered, by intervention in such proceeding or otherwise,

(i) to file and prove a claim for the whole amount of principal (or, if the Securities of such series are Original Issue Discount Securities, such portion of the principal amount as may be due and payable with respect to such series pursuant to a declaration in accordance with Section 502) (and premium, if any) and interest, if any, owing and unpaid in respect of the Securities of such series and any related coupons and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and of the Holders of the Securities of such series and any related coupons allowed in such judicial proceeding, and

(ii) to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder of Securities and coupons to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders of Securities and coupons, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 607.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder of a Security or coupon any plan of reorganization, arrangement, adjustment or composition affecting the Securities or coupons of any series or the rights of any Holder thereof or to authorize the Trustee to vote in respect of the claim of any Holder of any Security or coupon in any such proceeding.

SECTION 505. *Trustee May Enforce Claims Without Possession of Securities or Coupons.*

All rights of action and claims under this Indenture or the Securities or coupons of any series may be prosecuted and enforced by the Trustee

without the possession of any of the Securities or coupons of such series or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Securities and coupons in respect of which such judgment has been recovered.

SECTION 506. *Application of Money Collected.*

Any money collected by the Trustee pursuant to this Article shall be applied in the following order, at the date or dates fixed by the Trustee and, in case of the distribution of such money on account of principal (or premium, if any) or interest, if any, upon presentation of the several Securities or coupons, or both, as the case may be, with respect to which such moneys were collected, and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid:

FIRST: To the payment of all amounts due the Trustee under Section 607;

SECOND: To the payment of the amounts then due and unpaid upon such Securities and coupons for principal of (and premium, if any) and interest, if any, in respect of which or for the benefit of which such money has been collected, ratably, without preference or priority of any kind, according to the amounts due and payable on such Securities and coupons for principal (and premium, if any) and interest, respectively; and

THIRD: The balance, if any, to the Person or Persons entitled thereto.

SECTION 507. *Limitation on Suits.*

No Holder of any Security of any series or any related coupons shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless,

(1) an Event of Default shall have occurred and be continuing and such Holder has previously given written notice to the Trustee of



such continuing Event of Default with respect to the Securities of that series;

(2) the Holders of not less than 25% in principal amount of the Outstanding Securities of that series shall have made written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(3) such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(4) the Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(5) no direction inconsistent with such written request has been given to the Trustee during such 60-day period by the Holders of a majority in principal amount of the Outstanding Securities of that series;

it being understood and intended that no one or more of such Holders shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all of such Holders.

SECTION 508. *Unconditional Right of Holders to Receive Principal, Premium and Interest.*

Notwithstanding any other provision in this Indenture, the Holder of any Security or coupon shall have the right, which is absolute and unconditional, to receive payment, in the currency or currency unit herein prescribed, of the principal of (and premium, if any) and (subject to Section 307) interest, if any, on such Security on the Stated Maturities expressed in such Security or coupon (or, in the case of redemption, on the Redemption Date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

SECTION 509. *Restoration of Rights and Remedies.*

If the Trustee or any Holder of a Security or coupon has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, the Trustee and the Holders of Securities and coupons shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

SECTION 510. *Rights and Remedies Cumulative.*

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities or coupons in the last paragraph of Section 306, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders of Securities or coupons is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 511. *Delay or Omission Not Waiver.*

No delay or omission of the Trustee or of any Holder of Securities of any series and any related coupons to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Trustee or to such Holders of Securities or coupons may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by such Holders, as the case may be.

SECTION 512. *Control by Holders.*

The Holders of a majority in principal amount of the Outstanding Securities of any series shall have the right to direct the time, method and

place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee, with respect to the Securities of such series, *provided,* that

(1) such direction shall not be in conflict with any rule of law or with this Indenture,

(2) such direction would not involve the Trustee in any personal liability (unless the Trustee is indemnified to its reasonable satisfaction), and

(3) the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction.

SECTION 513. *Waiver of Past Defaults.*

The Holders of not less than a majority in principal amount of the Outstanding Securities of any series and any related coupons may on behalf of the Holders of all the Securities of such series waive any past default hereunder with respect to such series and its consequences, except a default

(1) in the payment of the principal of (or premium, if any) or interest, if any, on any Security of such series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Securities of such series, or

(2) in respect of a covenant or provision hereof which under Article Nine cannot be modified or amended without the consent of the Holder of each Outstanding Security of such series affected.

Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

SECTION 514. *Undertaking for Costs.*

All parties to this Indenture agree, and each Holder of any Security or coupon by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, suffered or omitted by it as Trustee, the filing by any party

litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section shall not apply to any suit instituted by the Company, to any suit instituted by the Trustee, to any suit instituted by any Holder, or group of Holders, holding in the aggregate more than 10% in principal amount of the Outstanding Securities of any series, or to any suit instituted by any Holder of any Security or coupon for the enforcement of the payment of the principal of (or premium, if any) or interest, if any, on any Security or the payment of any coupon on or after the Stated Maturities expressed in such Security or coupon (or, in the case of redemption, on or after the Redemption Date).

SECTION 515. *Waiver of Stay or Extension Laws.*

The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 516. *Judgment Currency.*

If for the purpose of obtaining a judgment in any court with respect to any obligation of the Company hereunder or under any Security or any related coupon it shall become necessary to convert into any other currency or currency unit any amount in the currency or currency unit due hereunder or under such Security or coupon, then such conversion shall be made at the Market Exchange Rate as in effect on the date the Company shall make payment to any Person in satisfaction of such judgment. If pursuant to any such judgment, conversion shall be made on a date other than the date payment is made and there shall occur a change between such Market Exchange Rate and the Market Exchange Rate as in effect on the date of

payment, the Company agrees to pay such additional amounts (if any) as may be necessary to ensure that the amount paid is equal to the amount in such other currency or currency unit which, when converted at the Market Exchange Rate as in effect on the date of payment or distribution, is the amount then due hereunder or under such Security or coupon. Any amount due from the Company under this Section 516 shall be due as a separate debt and is not to be affected by or merged into any judgment being obtained for any other sums due hereunder or in respect of any Security or coupon. In no event, however, shall the Company be required to pay more in the currency or currency unit due hereunder or under such Security or coupon at the Market Exchange Rate as in effect when payment is made than the amount of currency or currency unit stated to be due hereunder or under such Security or coupon so that in any event the Company's obligations hereunder or under such Security or coupon will be effectively maintained as obligations in such currency or currency unit, and the Company shall be entitled to withhold (or be reimbursed for, as the case may be) any excess of the amount actually realized upon any such conversion over the amount due and payable on the date of payment or distribution.

## ARTICLE SIX

### THE TRUSTEE

SECTION 601. *Certain Duties and Responsibilities.*

(a) Except during the continuance of an Event of Default with respect to any series of Securities,

(1) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any

provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture.

(b) In case an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture with respect to each series of Securities for which it acts as Trustee and with respect to which an Event of Default is continuing, and with respect to such series of Securities use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

(c) No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own wilful misconduct, *except* that

(1) this Subsection shall not be construed to limit the effect of Subsection (a) of this Section;

(2) the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(3) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in principal amount of the Outstanding Securities of any series, relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture with respect to the Securities of such series; and

(4) no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers.

(d) Whether or not therein expressly so provided, every provision of this Indenture (except Section 603(b) hereof) relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section.

SECTION 602. *Notice of Defaults.*

Within 90 days after the occurrence of any default hereunder with respect to the Securities of any series, the Trustee shall transmit in the manner and to the extent provided in Section 703(c) and shall publish in the manner and to the extent provided in Section 106, notice of such default hereunder known to the Trustee, unless such default shall have been cured or waived; *provided, however,* that, except in the case of a default in the payment of the principal of (or premium, if any) or interest, if any, on any Security of such series or in the payment of any sinking fund instalment or analogous obligation with respect to Securities of such series, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee or a trust committee of directors or Responsible Officers of the Trustee in good faith determine that the withholding of such notice is in the interest of the Holders of Securities of such series and any related coupons; and *provided, further,* that in the case of any default of the character specified in Section 501(4) with respect to Securities of such series, no such notice to Holders shall be given until at least 30 days after the occurrence thereof. For the purpose of this Section, the term "default" means any event which is, or after notice or lapse of time or both would become, an Event of Default with respect to Securities of such series.

SECTION 603. *Certain Rights of Trustee.*

(a) Subject to the provisions of Section 601:

(i) the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, coupon, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii) any request or direction of the Company mentioned herein shall be sufficiently evidenced by a Company Request or Company Order and any resolution of the Board of Directors may be sufficiently evidenced by a Board Resolution;

(iii) whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to

taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officers' Certificate;

(iv) the Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon;

(v) the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders of any series or any related coupons pursuant to this Indenture, unless such Holders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction;

(vi) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, coupon, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney; and

(vii) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(b) The Trustee shall not be charged with knowledge of any Event of Default with respect to the Securities of any series for which it is acting as Trustee unless either (1) a Responsible Officer of the Trustee assigned to the department of the Trustee specified for such purpose in Section 615 shall have actual knowledge of the Event of Default or (2) written notice of such Event of Default shall have been given to the Trustee at the place so specified in Section 615 by the Company and any other obligor on such Securities or by any Holder of such Securities.

SECTION 604. *Not Responsible for Recitals or Issuance of Securities.*

The recitals contained herein and in the Securities, except the Trustee's certificates of authentication, and in any coupons shall be taken as the statements of the Company, and the Trustee or any Authenticating Agent assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Securities of any series or coupons. The Trustee or any Authenticating Agent shall not be accountable for the use or application by the Company of Securities of any series or the proceeds thereof.

SECTION 605. *May Hold Securities.*

The Trustee, any Authenticating Agent, any Paying Agent, any Security Registrar or any other agent of the Company, in its individual or any other capacity, may become the owner or pledgee of Securities and, subject to Sections 608 and 613, may otherwise deal with the Company with the same rights it would have it if were not Trustee, Authenticating Agent, Paying Agent, Security Registrar or such other agent.

SECTION 606. *Money Held in Trust.*

Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law. The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed with the Company.

SECTION 607. *Compensation and Reimbursement.*

The Company agrees:

(1) to pay to the Trustee from time to time such compensation in Dollars for all services rendered by it hereunder as may be mutually agreed in writing between the Company and the Trustee (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(2) except as otherwise expressly provided herein, to reimburse the Trustee in Dollars for the Securities of any series upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture

(including the reasonable compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its negligence or bad faith; and

(3) to indemnify the Trustee and each predecessor Trustee in Dollars for the Securities of any series for, and to hold it harmless against, any loss, liability or expense incurred without negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

As security for the performance of the obligations of the Company under this Section 607, the Trustee shall have a lien prior to the Securities upon all property and funds held or collected by the Trustee as such, except funds held in trust for the benefit of the Holders of particular Securities.

SECTION 608. *Disqualification; Conflicting Interests.*

(a) If the Trustee has or shall acquire any conflicting interest, as defined in this Section, with respect to the Securities of any series, it shall, within 90 days after ascertaining that it has such conflicting interest, either eliminate such conflicting interest or resign with respect to the Securities of that series in the manner and with the effect hereinafter specified in this Article.

(b) In the event that the Trustee shall fail to comply with the provisions of Subsection (a) of this Section with respect to the Securities of any series, the Trustee shall, within 10 days after the expiration of such 90-day period, transmit to all Holders of Securities of that series notice of such failure in the manner and to the extent provided in Section 106.

(c) For the purposes of this Section, the Trustee shall be deemed to have a conflicting interest with respect to the Securities of any series if,

(1) the Trustee is trustee under this Indenture with respect to the Outstanding Securities of any series other than that series or is trustee under another indenture under which any other securities, or certificates of interest or participation in any other securities, of the Company are

outstanding, unless such other indenture is a collateral trust indenture under which the only collateral consists of Securities of that series; *provided,* that there shall be excluded from the operation of this paragraph (x) this Indenture with respect to the Securities of any other series and (y) any indenture or indentures under which other securities, or certificates of interest or participation in other securities of the Company are outstanding, if

(i) this Indenture and such other indenture or indentures are wholly unsecured and such other indenture or indentures are hereafter qualified under the Trust Indenture Act, unless the Commission shall have found and declared by order pursuant to Section 305(b) or Section 307(c) of the Trust Indenture Act that differences exist between the provisions of this Indenture with respect to Securities of that series and the provisions of this Indenture with respect to one or more other series or the provisions of such other indenture or indentures which are so likely to involve a material conflict of interest as to make it necessary in the public interest or for the protection of investors to disqualify the Trustee from acting as such under this Indenture with respect to the Securities of that series and such other series or under such other indenture or indentures, or

(ii) the Company shall have sustained the burden of proving, on application to the Commission and after opportunity for hearing thereon, that trusteeship under this Indenture with respect to the Securities of that series and such other series or such other indenture or indentures is not so likely to involve a material conflict of interest as to make it necessary in the public interest or for the protection of investors to disqualify the Trustee from acting as such under this Indenture with respect to the Securities of that series and such other series or under such other indenture or indentures;

(2) the Trustee or any of its directors or executive officers is an obligor upon the Securities of that series or an underwriter for the Company;

(3) the Trustee directly or indirectly controls or is directly or indirectly controlled by or is under direct or indirect common control with the Company or an underwriter for the Company;

(4) the Trustee or any of its directors or executive officers is a director, officer, partner, employee, appointee or representative of the Company, or of an underwriter (other than the Trustee itself) for the Company who is currently engaged in the business of underwriting, except that (i) one individual may be a director or an executive officer, or both, of the Trustee and a director or an executive officer, or both, of the Company but may not be at the same time an executive officer of both the Trustee and the Company; (ii) if and so long as the number of directors of the Trustee in office is more than nine, one additional individual may be a director or an executive officer, or both, of the Trustee and a director of the Company; and (iii) the Trustee may be designated by the Company or by any underwriter for the Company to act in the capacity of transfer agent, registrar, custodian, paying agent, fiscal agent, escrow agent or depositary, or in any other similar capacity, or, subject to the provisions of paragraph (1) of this Subsection, to act as trustee, whether under an indenture or otherwise;

(5) 10% or more of the voting securities of the Trustee is beneficially owned either by the Company or by any director, partner or executive officer thereof, or 20% or more of such voting securities is beneficially owned, collectively, by any two or more of such persons; or 10% or more of the voting securities of the Trustee is beneficially owned either by an underwriter for the Company or by any director, partner or executive officer thereof, or is beneficially owned, collectively, by any two or more such persons;

(6) the Trustee is the beneficial owner of, or holds as collateral security for an obligation which is in default (as hereinafter in this Subsection defined), (i) 5% or more of the voting securities, or 10% or more of any other class of security, of the Company not including the Securities issued under this Indenture and securities issued under any other indenture under which the Trustee is also trustee, or (ii) 10% or more of any class of security of an underwriter for the Company;

(7) the Trustee is the beneficial owner of, or holds as collateral security for an obligation which is in default (as hereinafter in this Subsection defined), 5% or more of the voting securities of any person who, to the knowledge of the Trustee, owns 10% or more of the voting securities of, or controls directly or indirectly or is under direct or indirect common control with, the Company;

(8) the Trustee is the beneficial owner of, or holds as collateral security for, an obligation which is in default (as hereinafter in this Subsection defined), 10% or more of any class of security of any person who, to the knowledge of the Trustee, owns 50% or more of the voting securities of the Company; or

(9) the Trustee owns, on May 15 in any calendar year, in the capacity of executor, administrator, testamentary or inter vivos trustee, guardian, committee or conservator, or in any other similar capacity, an aggregate of 25% or more of the voting securities, or of any class of security, of any person, the beneficial ownership of a specified percentage of which would have constituted a conflicting interest under paragraph (6), (7) or (8) of this Subsection. As to any such securities of which the Trustee acquired ownership through becoming executor, administrator or testamentary trustee of an estate which included them, the provisions of the preceding sentence shall not apply, for a period of two years from the date of such acquisition, to the extent that such securities included in such estate do not exceed 25% of such voting securities or 25% of any such class of security. Promptly after May 15 in each calendar year, the Trustee shall make a check of its holdings of such securities in any of the above-mentioned capacities as of such May 15. If the Company fails to make payment in full of the principal (or premium, if any) or interest, if any, on any of the Securities when and as the same becomes due and payable, and such failure continues for 30 days thereafter, the Trustee shall make a prompt check of its holdings of such securities in any of the above-mentioned capacities as of the date of the expiration of such 30-day period, and after such date, notwithstanding the foregoing provisions of this paragraph, all such securities so held by the Trustee with sole or joint control over such securities vested in it, shall, but only so long as such failure shall continue, be considered as though beneficially owned by the Trustee for the purposes of paragraphs (6), (7) and (8) of this Subsection.

The specification of percentages in paragraphs (5) to (9) inclusive of this Subsection shall not be construed as indicating that the ownership of such percentages of the securities of a person is or is not necessary or sufficient to constitute direct or indirect control for the purposes of paragraph (3) or (7) of this Subsection.

For the purposes of paragraphs (6), (7), (8) and (9) of this Subsection only, (i) the terms "security" and "securities" shall include only such securities as are generally known as corporate securities but shall not include any note or other evidence of indebtedness issued to evidence an obligation to repay moneys lent to a person by one or more banks, trust companies or banking firms, or any certificate of interest or participation in any such note or evidence of indebtedness; (ii) an obligation shall be deemed to be "in default" when a default in payment of principal shall have continued for 30 days or more and shall not have been cured; and (iii) the Trustee shall not be deemed to be the owner or holder of (A) any security which it holds as collateral security, as trustee or otherwise, for an obligation which is not in default as defined in clause (ii) above, or (B) any security which it holds as collateral security under this Indenture, irrespective of any default hereunder, or (C) an, curity which it holds as agent for collection or as custodian, escrow agent or depositary, or in any similar representative capacity.

(d) For the purposes of this Section:

(1) The term "underwriter" when used with reference to the Company, means every person, who within three years prior to the time as of which the determination is made, has purchased from the Company with a view to, or has offered or sold for the Company in connection with, the distribution of any security of the Company outstanding at such time, or has participated or has had a direct or indirect participation in any such undertaking, or has participated or has had a participation in the direct or indirect underwriting of any such undertaking, but such term shall not include a person whose interest was limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.

(2) The term "director" means any director of a corporation or any individual performing similar functions with respect to any organization, whether incorporated or unincorporated.

(3) The term "person" means an individual, a corporation, a partnership, an association, a joint-stock company, a trust, an unincorporated organization or a government or political subdivision thereof. As used in this paragraph, the term "trust" shall

include only a trust where the interest or interests of the beneficiary or beneficiaries are evidenced by a security.

(4) The term "voting security" means any security presently entitling the owner or holder thereof to vote in the direction or management of the affairs of a person, or any security issued under or pursuant to any trust, agreement or arrangement whereby a trustee or trustees or agent or agents for the owner or holder of such security are presently entitled to vote in the direction or management of the affairs of a person.

(5) The term "Company" means any obligor upon the Securities of any series.

(6) The term "executive officer" means the president, every vice president, every trust officer, the cashier, the secretary and the treasurer of a corporation, and any individual customarily performing similar functions with respect to any organization whether incorporated or unincorporated, but shall not include the chairman of the board of directors.

(e) The percentages of voting securities and other securities specified in this Section shall be calculated in accordance with the following provisions:

(1) A specified percentage of the voting securities of the Trustee, the Company or any other person referred to in this Section (each of whom is referred to as a "person" in this paragraph) means such amount of the outstanding voting securities of such person as entitles the holder or holders thereof to cast such specified percentage of the aggregate votes which the holders of all the outstanding voting securities of such person are entitled to cast in the direction or management of the affairs of such person.

(2) A specified percentage of a class of securities of a person means such percentage of the aggregate amount of securities of the class outstanding.

(3) The term "amount", when used in regard to securities, means the principal amount if relating to evidences of indebtedness, the number of shares if relating to capital shares and the number of units if relating to any other kind of security.

(4) The term "outstanding" means issued and not held by or for the account of the issuer. The following securities shall not be deemed outstanding within the meaning of this definition:

(i) securities of an issuer held in a sinking fund relating to securities of the issuer of the same class;

(ii) securities of an issuer held in a sinking fund relating to another class of securities of the issuer, if the obligation evidenced by such other class of securities is not in default as to principal or interest or otherwise;

(iii) securities pledged by the issuer thereof as security for an obligation of the issuer not in default as to principal or interest or otherwise; and

(iv) securities held in escrow if placed in escrow by the issuer thereof;

*provided, however,* that any voting securities of an issuer shall be deemed outstanding if any person other than the issuer is entitled to exercise the voting rights thereof.

(5) A security shall be deemed to be of the same class as another security if both securities confer upon the holder or holders thereof substantially the same rights and privileges; *provided, however,* that, in the case of secured evidences of indebtedness, all of which are issued under a single indenture, differences in the interest rates or maturity dates of various series thereof shall not be deemed sufficient to constitute such series different classes and *provided, further,* that, in the case of unsecured evidences of indebtedness, differences in the interest rates or maturity dates thereof shall not be deemed sufficient to constitute them securities of different classes, whether or not they are issued under a single indenture.

SECTION 609. *Corporate Trustee Required; Eligibility.*

There shall at all times be a Trustee hereunder which shall be a corporation organized and doing business under the laws of the United States of America, any State thereof or the District of Columbia, authorized

under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000, subject to supervision or examination by Federal or State authority and having its Corporate Trust Office in the Borough of Manhattan, The City of New York, or in such other city as shall be specified as contemplated by Section 301 with respect to any series of Securities. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of said supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

SECTION 610. *Resignation and Removal; Appointment of Successor.*

(a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Trustee in accordance with the applicable requirements of Section 611.

(b) The Trustee may resign at any time with respect to the Securities of one or more series by giving written notice thereof to the Company. If the instrument of acceptance by a successor Trustee required by Section 611 shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee with respect to the Securities of such series.

(c) The Trustee may be removed at any time with respect to the Securities of any series by Act of the Holders of a majority in principal amount of the Outstanding Securities of such series delivered to the Trustee and to the Company.

(d) If at any time:

(1) the Trustee shall fail to comply with Section 608(a) with respect to Securities of any series after written request therefor by the Company or by any Holder of Securities of such series who has been a bona fide Holder of a Security of such series for at least six months, or

(2) the Trustee shall cease to be eligible under Section 609 and shall fail to resign after written request therefor by the Company or by any such Holder, or

(3) the Trustee shall become incapable of acting with respect to Securities of any series or shall be adjudged a bankrupt or insolvent or a receiver of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, (i) the Company by a Board Resolution may remove the Trustee with respect to Securities of such series, or (ii) subject to Section 514, any Holder of a Security of such series who has been a bona fide Holder of such Security for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee with respect to Securities of such series and the appointment of a successor Trustee or Trustees.

(e) If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any cause, with respect to the Securities of one or more series, the Company, by a Board Resolution, shall promptly appoint a successor Trustee or Trustees with respect to the Securities of that or those series (it being understood that any such successor Trustee may be appointed with respect to the Securities of one or more or all of such series and that at any time there shall be only one Trustee with respect to the Securities of any particular series) and shall comply with the applicable requirements of Section 611. If, within one year after such resignation, removal or incapability, or the occurrence of such vacancy, a successor Trustee with respect to the Securities of any series shall be appointed by Act of the Holders of a majority in principal amount of the Outstanding Securities of such series delivered to the Company and the retiring Trustee, the successor Trustee so appointed shall, forthwith upon its acceptance of such appointment in accordance with the applicable requirements of Section 611, become the successor Trustee with respect to the Securities of such series and to that extent supersede the successor Trustee appointed by the Company. If no successor Trustee with respect to the Securities of any series shall have been so appointed by the Company or the Holders and accepted appointment in the manner required by Section 611,

any Holder who has been a bona fide Holder of a Security of such series for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee with respect to the Securities of such series.

(f) The Company shall give notice of each resignation and each removal of the Trustee with respect to the Securities of any series and each appointment of a successor Trustee with respect to the Securities of any series in the manner and to the extent provided in Section 106. Each notice shall include the name of the successor Trustee with respect to the Securities of such series and the address of its Corporate Trust Office.

SECTION 611. *Acceptance of Appointment by Successor.*

(a) In case of the appointment hereunder of a successor Trustee with respect to all Securities, every such successor Trustee so appointed shall execute, acknowledge and deliver to the Company and to the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee; but, on the request of the Company or the successor Trustee, such retiring Trustee shall, upon payment of its charges, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee and, subject to Section 607, shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder.

(b) In case of the appointment hereunder of a successor Trustee with respect to the Securities of one or more (but not all) series, the Company, the retiring Trustee and each successor Trustee with respect to the Securities of one or more series shall execute and deliver an indenture supplemental hereto wherein each successor Trustee shall accept such appointment and which (1) shall contain such provisions as shall be necessary or desirable to transfer and confirm to, and to vest in, each successor Trustee all the rights, powers, trusts and duties of the retiring Trustee with respect to the Securities of that or those series to which the appointment of such successor Trustee relates, (2) if the retiring Trustee is not retiring with respect to all Securities, shall contain such provisions as shall be deemed necessary or desirable to

confirm that all the rights, powers, trusts and duties of the retiring Trustee with respect to the Securities of that or those series as to which the retiring Trustee is not retiring shall continue to be vested in the retiring Trustee, and (3) shall add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one Trustee, it being understood that nothing herein or in such supplemental indenture shall constitute such Trustees co-trustees of the same trust and each such Trustee shall be trustee of a trust or trusts hereunder separate and apart from any trust or trusts hereunder administered by any other such Trustee; and upon the execution and delivery of such supplemental indenture the resignation or removal of the retiring Trustee shall become effective to the extent provided therein and each such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee with respect to the Securities of that or those series to which the appointment of such successor Trustee relates; but, on request of the Company or any successor Trustee, such retiring Trustee shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder with respect to the Securities of that or those series to which the appointment of such successor Trustee relates.

(c) Upon request of any such successor Trustee, the Company shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts referred to in paragraph (a) or (b) of this Section, as the case may be.

(d) No successor Trustee shall accept its appointment unless at the time of such acceptance such successor Trustee shall be qualified and eligible under this Article.

SECTION 612. *Merger, Conversion, Consolidation or Succession to Business.*

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such corporation shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on

the part of any of the parties hereto. In case any Securities shall have been authenticated, but not delivered, by the Trustee or Authenticating Agent then in office, any successor by merger, conversion or consolidation to such authenticating Trustee or Authenticating Agent may adopt such authentication and deliver the Securities so authenticated with the same effect as if such successor Trustee or successor Authenticating Agent had itself authenticated such Securities.

SECTION 613. *Preferential Collection of Claims Against Company.*

(a) Subject to Subsection (b) of this Section, if the Trustee shall be or shall become a creditor, directly or indirectly, secured or unsecured, of the Company within four months prior to a default, as defined in Subsection (c) of this Section, or subsequent to such a default, then, unless and until such default shall be cured, the Trustee shall set apart and hold in a special account for the benefit of the Trustee individually, the Holders of the Securities and coupons and the holders of other indenture securities, as defined in Subsection (c) of this Section:

(1) an amount equal to any and all reductions in the amount due and owing upon any claim as such creditor in respect of principal or interest, effected after the beginning of such four months' period and valid as against the Company and its other creditors, except any such reduction resulting from the receipt or disposition of any property described in paragraph (2) of this Subsection, or from the exercise of any right of set-off which the Trustee could have exercised if a petition in bankruptcy had been filed by or against the Company upon the date of such default; and

(2) all property received by the Trustee in respect of any claim as such creditor, either as security therefor, or in satisfaction or composition thereof, or otherwise, after the beginning of such four months' period, or an amount equal to the proceeds of any such property, if disposed of, *subject, however,* to the rights, if any, of the Company and its other creditors in such property or such proceeds.

Nothing herein contained, however, shall affect the right of the Trustee:

(A) to retain for its own account (i) payments made on account of any such claim by any Person (other than the Company) who is

liable thereon, and (ii) the proceeds of the bona fide sale of any such claim by the Trustee to a third Person, and (iii) distributions made in cash, securities or other property in respect of claims filed against the Company in bankruptcy or receivership or in proceedings for reorganization pursuant to the Federal Bankruptcy Act, as defined in Subsection (c) of this Section, or applicable State law;

(B) to realize, for its own account, upon any property held by it as security for any such claim, if such property was so held prior to the beginning of such four months' period;

(C) to realize, for its own account, but only to the extent of the claim hereinafter mentioned, upon any property held by it as security for any such claim, if such claim was created after the beginning of such four months' period and such property was received as security therefor simultaneously with the creation thereof, and if the Trustee shall sustain the burden of proving that at the time such property was so received the Trustee had no reasonable cause to believe that a default, as defined in Subsection (c) of this Section, would occur within four months; or

(D) to receive payment on any claim referred to in paragraph (B) or (C), against the release of any property held as security for such claim as provided in paragraph (B) or (C), as the case may be, to the extent of the fair value of such property.

For the purposes of paragraphs (B), (C) and (D), property substituted after the beginning of such four months' period for property held as security at the time of such substitution shall, to the extent of the fair value of the property released, have the same status as the property released, and, to the extent that any claim referred to in any of such paragraphs is created in renewal of or in substitution for or for the purpose of repaying or refunding any pre-existing claim of the Trustee as such creditor, such claim shall have the same status as such pre-existing claim.

If the Trustee shall be required to account, the funds and property held in such special account and the proceeds thereof shall be apportioned among the Trustee, the Holders and the holders of other indenture securities in such manner that the Trustee, the Holders and the holders of other indenture securities realize, as a result of payments from such special account and payments of dividends on claims filed against the Company in bankruptcy

or receivership or in proceedings for reorganization pursuant to the Federal Bankruptcy Act or applicable State law, the same percentage of their respective claims, figured before crediting to the claim of the Trustee anything on account of the receipt by it from the Company of the funds and property in such special account and before crediting to the respective claims of the Trustee and the Holders and the holders of other indenture securities dividends on claims filed against the Company in bankruptcy or receivership or in proceedings for reorganization pursuant to the Federal Bankruptcy Act or applicable State law, but after crediting thereon receipts on account of the indebtedness represented by their respective claims from all sources other than from such dividends and from the funds and property so held in such special account. As used in this paragraph, with respect to any claim, the term "dividends" shall include any distribution with respect to such claim, in bankruptcy or receivership or proceedings for reorganization pursuant to the Federal Bankruptcy Act or applicable State law, whether such distribution is made in cash, securities or other property, but shall not include any such distribution with respect to the secured portion, if any, of such claim. The court in which such bankruptcy, receivership or proceedings for reorganization is pending shall have jurisdiction (i) to apportion among the Trustee, the Holders and the holders of other indenture securities, in accordance with the provisions of this paragraph, the funds and property held in such special account and proceeds thereof, or (ii) in lieu of such apportionment, in whole or in part, to give to the provisions of this paragraph due consideration in determining the fairness of the distributions to be made to the Trustee and the Holders and the holders of other indenture securities with respect to their respective claims, in which event it shall not be necessary to liquidate or to appraise the value of any securities or other property held in such special account or as security for any such claim, or to make a specific allocation of such distributions as between the secured and unsecured portions of such claims, or otherwise to apply the provisions of this paragraph as a mathematical formula.

Any Trustee which has resigned or been removed after the beginning of such four months' period shall be subject to the provisions of this Subsection as though such resignation or removal had not occurred. If any Trustee has resigned or been removed prior to the beginning of such four months' period, it shall be subject to the provisions of this Subsection if and only if the following conditions exist:

(i) the receipt of property or reduction of claim, which would have given rise to the obligation to account, if such Trustee had continued as Trustee, occurred after the beginning of such four months' period; and

(ii) such receipt of property or reduction of claim occurred within four months after such resignation or removal.

(b) There shall be excluded from the operation of Subsection (a) of this Section a creditor relationship arising from:

(1) the ownership or acquisition of securities issued under any indenture, or any security or securities having a maturity of one year or more at the time of acquisition by the Trustee;

(2) advances authorized by a receivership or bankruptcy court of competent jurisdiction or by this Indenture, for the purpose of preserving any property which shall at any time be subject to the lien of this Indenture or of discharging tax liens or other prior liens or encumbrances thereon, if notice of such advances and of the circumstances surrounding the making thereof is given to the Holders at the time and in the manner provided in this Indenture;

(3) disbursements made in the ordinary course of business in the capacity of trustee under an indenture, transfer agent, registrar, custodian, paying agent, fiscal agent or depositary, or other similar capacity;

(4) an indebtedness created as a result of services rendered or premises rented; or an indebtedness created as a result of goods or securities sold in a cash transaction, as defined in Subsection (c) of this Section;

(5) the ownership of stock or of other securities of a corporation organized under the provisions of Section 25(a) of the Federal Reserve Act, as amended, which is directly or indirectly a creditor of the Company; and

(6) the acquisition, ownership, acceptance or negotiation of any drafts, bills of exchange, acceptances or obligations which fall within the classification of self-liquidating paper, as defined in Subsection (c) of this Section.

(c) For the purposes of this Section only:

(1) the term "default" means any failure to make payment in full of the principal of or interest on any of the Securities or upon the other indenture securities when and as such principal or interest becomes due and payable;

(2) the term "other indenture securities" means any securities upon which the Company is an obligor outstanding under any other indenture (i) under which the Trustee is also trustee, (ii) which contains provisions substantially similar to the provisions of this Section, and (iii) under which a default exists at the time of the apportionment of the funds and property held in such special account;

(3) the term "cash transaction" means any transaction in which full payment for goods or securities sold is made within seven days after delivery of the goods or securities in currency or in checks or other orders drawn upon banks or bankers and payable upon demand;

(4) the term "self-liquidating paper" means any draft, bill of exchange, acceptance or obligation which is made, drawn, negotiated or incurred by the Company for the purpose of financing the purchase, processing, manufacturing, shipment, storage or sale of goods, wares or merchandise and which is secured by documents evidencing title to, possession of, or a lien upon, the goods, wares or merchandise or the receivables or proceeds arising from the sale of the goods, wares or merchandise previously constituting the security, provided the security is received by the Trustee simultaneously with the creation of the creditor relationship with the Company arising from the making, drawing, negotiating or incurring of the draft, bill of exchange, acceptance or obligation;

(5) the term "Company" means any obligor upon the Securities of any series; and

(6) the term "Federal Bankruptcy Act" means the Bankruptcy Act of 1978 or Title 11 of the United States Code or any successor statute thereto.

SECTION 614. *Appointment of Authenticating Agent.*

At any time when any of the Securities remain Outstanding the Trustee may appoint an Authenticating Agent or Agents with respect to one or more

series of Securities which shall be authorized to act on behalf of the Trustee to authenticate Securities of such series issued upon exchange, registration of transfer or partial redemption thereof or pursuant to Section 306, and Securities so authenticated shall be entitled to the benefits of this Indenture and shall be valid and obligatory for all purposes as if authenticated by the Trustee hereunder. Wherever reference is made in this Indenture to the authentication and delivery of Securities by the Trustee or the Trustee's certificate of authentication, such reference shall be deemed to include authentication and delivery on behalf of the Trustee by an Authenticating Agent and a certificate of authentication executed on behalf of the Trustee by an Authenticating Agent. Each Authenticating Agent shall be acceptable to the Company and, in the case of any series of Securities denominated and payable solely in Dollars, such Authenticating Agent shall be a corporation organized and doing business under the laws of the United States of America, any State thereof or the District of Columbia, authorized under such laws to act as Authenticating Agent, having a combined capital and surplus of not less than $50,000,000 and subject to supervision or examination by Federal or State authority. If such Authenticating Agent publishes reports of condition at least annually, pursuant to law or to the requirements of said supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such Authenticating Agent shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time an Authenticating Agent shall cease to be eligible in accordance with the provisions of this Section, such Authenticating Agent shall resign immediately in the manner and with the effect specified in this Section.

Any corporation into which an Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which such Authenticating Agent shall be a party, or any corporation succeeding to the corporate agency or corporate trust business of an Authenticating Agent, shall continue to be an Authenticating Agent, provided such corporation shall be otherwise eligible under this Section, without the execution or filing of any paper or any further act on the part of the Trustee or the Authenticating Agent.

An Authenticating Agent may resign at any time by giving written notice thereof to the Trustee and to the Company. The Trustee may at any time terminate the agency of an Authenticating Agent by giving written

notice thereof to such Authenticating Agent and to the Company. Upon receiving such a notice of resignation or upon such a termination, or in case at any time such Authenticating Agent shall cease to be eligible in accordance with the provisions of this Section, the Trustee may appoint a successor Authenticating Agent which shall be acceptable to the Company and shall provide notice of such appointment to all Holders of Securities of the series with respect to which such Authenticating Agent will serve in the manner and to the extent provided in Section 106. Any successor Authenticating Agent upon acceptance of its appointment hereunder shall become vested with all the rights, powers and duties of its predecessor hereunder, with like effect as if originally named as an Authenticating Agent. No successor Authenticating Agent shall be appointed unless eligible under the provisions of this Section.

The Company agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services under this Section.

If an appointment with respect to one or more series is made pursuant to this Section, the Securities of such series may have endorsed thereon, in addition to the Trustee's certificate of authentication, an alternate certificate of authentication in the following form:

This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

______________________________
As Trustee

By ___________________________
As Authenticating Agent

By ___________________________
Authorized Officer

## ARTICLE SEVEN

### HOLDERS' LISTS AND REPORTS BY TRUSTEE AND COMPANY

SECTION 701. *Company to Furnish Trustee Names and Addresses of Holders.*

The Company will furnish or cause to be furnished to the Trustee with respect to the Securities of any ser... (a) semi-annually, on a date not more than 5 days after each Regular Record Date with respect to an Interest Payment Date, if any, for the Securities of such series, (b) on semi-annual dates in each year to be determined pursuant to Section 301 if the Securities of such series do not bear interest and (c) at such other times as such Trustee may request in writing, within 30 days after receipt by the Company of any such request, a list in such form as such Trustee may reasonably require containing all the information in the possession or control of the Company, or any of its Paying Agents other than such Trustee, as to the names and addresses of the Holders of the Securities of such series, obtained since the date as of which the next previous list, if any, was furnished. Any such list may be dated as of a date not more than 15 days prior to the time such information is furnished or caused to be furnished and need not include information received after such date; *provided, however,* that as long as such Trustee is the Securities Registrar for such series, no such list shall be required to be furnished.

SECTION 702. *Preservation of Information; Communications to Holders.*

(a) The Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of Holders of Securities of each series contained in the most recent list furnished to the Trustee as provided in Section 701 and the names and addresses of Holders of Securities of such series received by the Trustee in its capacity as Security Registrar. The Trustee may destroy any list furnished to it as provided in Section 701 upon receipt of a new list so furnished.

(b) If three or more Holders (herein referred to as "applicants") of Securities of any series apply in writing to the Trustee, and furnish to the Trustee reasonable proof that each such applicant has owned a Security of such series for a period of at least six months preceding the date of such application, and such application states that the applicants desire to

communicate with other Holders of such series with respect to their rights under this Indenture or under the Securities of such series and is accompanied by a copy of the form of proxy or other communication which such applicants propose to transmit, then the Trustee shall, within five business days after the receipt of such application, at its election, either

(i) afford such applicants access to the information preserved at the time by the Trustee in accordance with Section 702(a), or

(ii) inform such applicants as to the approximate number of Holders of such series whose names and addresses appear in the information preserved at the time by the Trustee in accordance with Section 702(a), and as to the approximate cost of mailing to such Holders of such series the form of proxy or other communication, if any, specified in such application.

If the Trustee shall elect not to afford such applicants access to such information, the Trustee shall, upon the written request of such applicants, mail to each Holder of Securities of such series whose name and address appear in the information preserved at the time by the Trustee in accordance with Section 702(a) a copy of the form of proxy or other communication which is specified in such request, with reasonable promptness after a tender to the Trustee of the material to be mailed and of payment, or provision for the payment, of the reasonable expenses of mailing, unless within five days after such tender the Trustee shall mail to such applicants and file with the Commission, together with a copy of the material to be mailed, a written statement to the effect that, in the opinion of the Trustee, such mailing would be contrary to the best interest of such Holders or would be in violation of applicable law. Such written statement shall specify the basis of such opinion. If the Commission, after opportunity for a hearing upon the objections specified in the written statement so filed, shall enter an order refusing to sustain any of such objections or if, after the entry of an order sustaining one or more of such objections, the Commission shall find, after notice and opportunity for hearing, that all the objections so sustained have been met and shall enter an order so declaring, the Trustee shall mail copies of such material to all such Holders with reasonable promptness after the entry of such order and the renewal of such tender; otherwise the Trustee shall be relieved of any obligation or duty to such applicants respecting their application.

(c) Every Holder of Securities or coupons, by receiving and holding the same, agrees with the Company and the Trustee that neither the Company nor the Trustee nor any agent of either of them shall be held accountable by reason of the disclosure of any such information as to the names and addresses of the Holders in accordance with Section 702(b), regardless of the source from which such information was derived, and that the Trustee shall not be held accountable by reason of mailing any material pursuant to a request made under Section 702(b).

SECTION 703. *Reports by Trustee.*

(a) On or before the date provided therefor in Section 705 of this Indenture with respect to Securities of any series, so long as Securities of such series are outstanding hereunder, the Trustee for such series shall transmit by mail to all Holders of Securities of such series, as provided in Subsection (c) of this Section, a brief report dated as of a date 60 days preceding such date with respect to:

(1) its eligibility under Section 609 and its qualification under Section 608, or in lieu thereof, if to the best of its knowledge it has continued to be eligible and qualified under said Sections, a written statement to such effect;

(2) the character and amount of any advances (and if the Trustee elects so to state, the circumstances surrounding the making thereof) made by the Trustee (as such) which remain unpaid on the date of such report, and for the reimbursement of which it claims or may claim a lien or charge, prior to that of the Securities of any series, on any property or funds held or collected by it as Trustee, except that the Trustee shall not be required (but may elect) to report such advances if such advances so remaining unpaid aggregate not more than ½ of 1% of the principal amount of the Securities Outstanding on the date of such report;

(3) the amount, interest rate and maturity date of all other indebtedness owing by the Company (or by any other obligor on the Securities of any series) to the Trustee in its individual capacity, on the date of such report, with a brief description of any property held as collateral security therefor, except an indebtedness based upon a creditor relationship arising in any manner described in Section 613(b)(2), (3), (4) or (6);

(4) the property and funds, if any, physically in the possession of the Trustee, as such, on the date of such report;

(5) any additional issue of Securities of such series which the Trustee has not previously reported; and

(6) any action taken by the Trustee in the performance of its duties hereunder which it has not previously reported and which in its opinion materially affects the Securities of any series, except action in respect of a default, notice of which has been or is to be withheld by the Trustee in accordance with Section 602.

(b) The Trustee shall transmit by mail to all Holders of the Securities of any series, as provided in Subsection (c) of this Section, a brief report with respect to the character and amount of any advances (and if the Trustee elects so to state, the circumstances surrounding the making thereof) made by the Trustee (as such) since the date of the last report transmitted pursuant to Subsection (a) of this Section (or, if no such report has yet been so transmitted, since the date of execution of this instrument) for the reimbursement of which it claims or may claim a lien or charge, prior to that of the Securities of such series, on property or funds held or collected by it as Trustee and which it has not previously reported pursuant to this Subsection, except that the Trustee shall not be required (but may elect) to report such advances if such advances remaining unpaid at any time aggregate 10% or less of the principal amount of the Securities of such series Outstanding at such time, such report to be transmitted within 90 days after such time.

(c) Reports pursuant to this Section shall be transmitted by mail:

(1) to all Holders of Registered Securities, as the names and addresses of such Holders appear in the Security Register;

(2) to such Holders of the Securities as have, within the two years preceding such transmission, filed their names and addresses with the Trustee for that purpose; and

(3) except in the case of reports pursuant to Subsection (b) of this Section, to each Holder of a Security whose name and address is preserved at the time by the Trustee, as provided in Section 702(a).

(d) A copy of each such report shall, at the time of such transmission to Holders, be filed by the Trustee with each stock exchange upon which any

Securities are listed, with the Commission and with the Company. The Company will notify the Trustee when and as any Securities become listed on any stock exchange.

SECTION 704. *Reports by Company.*

The Company shall:

(1) file with the Trustee, within 15 days after the Company is required to file the same with the Commission, copies of the annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the Commission may from time to time by rules and regulations prescribe), which the Company may be required to file with the Commission pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934; or, if the Company is not required to file information, documents or reports pursuant to either of said Sections, then it shall file with the Trustee and the Commission, in accordance with rules and regulations prescribed from time to time by the Commission, such of the supplementary and periodic information, documents and reports which may be required pursuant to Section 13 of the Securities Exchange Act of 1934 in respect of a security listed and registered on a national securities exchange as may be prescribed from time to time in such rules and regulations;

(2) file with the Trustee and the Commission, in accordance with rules and regulations prescribed from time to time by the Commission, such additional information, documents and reports with respect to compliance by the Company with the conditions and covenants of this Indenture as may be required from time to time by such rules and regulations; and

(3) transmit, within 30 days after the filing thereof with the Trustee, to the Holders of Securities, in the manner and to the extent provided in Section 703(c) with respect to reports pursuant to Section 703(a), such summaries of any information, documents and reports required to be filed by the Company pursuant to paragraphs (1) and (2) of this Section as may be required by rules and regulations prescribed from time to time by the Commission.

## ARTICLE EIGHT

### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 801. *Company May Consolidate, Etc., Only on Certain Terms.*

The Company shall not consolidate with or merge into any other corporation or convey, transfer or lease its properties and assets substantially as an entirety to any Person, and the Company shall not permit any Person to consolidate with or merge into the Company or convey, transfer or lease its properties and assets substantially as an entirety to the Company, unless:

(1) in case the Company shall consolidate with or merge into another corporation or convey, transfer or lease its properties and assets substantially as an entirety to any Person, the corporation formed by such consolidation or into which the Company is merged or the Person which acquires by conveyance or transfer, or which leases, the properties and assets of the Company substantially as an entirety shall be a corporation organized and existing under the laws of the United States of America, any State thereof or the District of Columbia and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form satisfactory to the Trustee, the due and punctual payment of the principal of (and premium, if any) and interest, if any, (including all additional amounts, if any, payable pursuant to Section 1008) on all the Securities and any related coupons and the performance of every covenant of this Indenture on the part of the Company to be performed or observed;

(2) immediately after giving effect to such transaction and treating any indebtedness which becomes an obligation of the Company or a Subsidiary as a result of such transaction as having been incurred by the Company or such Subsidiary at the time of such transaction, no Event of Default, and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing;

(3) if, as a result of any such consolidation or merger or such conveyance, transfer or lease, properties or assets of the Company would become subject to a mortgage, pledge, lien, security interest or other encumbrance which would not be permitted by this Indenture, the

Company or such successor corporation or Person, as the case may be, shall take such steps as shall be necessary effectively to secure the Securities equally and ratably with (or prior to) all indebtedness secured thereby;

(4) the successor corporation assuming the Securities and coupons shall have agreed, by supplemental indenture, to indemnify the individuals liable therefor for the amount of United States Federal estate tax paid solely as a result of such assumption in respect of Securities and coupons held by individuals who are not citizens or residents of the United States at the time of their death; and

(5) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger, conveyance, transfer or lease and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture, complies with this Article and that all conditions precedent herein provided for relating to such transaction have been complied with.

SECTION 802. *Successor Corporation Substituted.*

Upon any consolidation by the Company with or merger by the Company into any other corporation or any conveyance, transfer or lease of the properties and assets of the Company substantially as an entirety in accordance with Section 801, the successor corporation formed by such consolidation or into which the Company is merged or to which such conveyance, transfer or lease is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture with the same effect as if such successor corporation had been named as the Company herein, and thereafter, except in the case of a lease, the predecessor corporation shall be relieved of all obligations and covenants under this Indenture, the Securities and any related coupons.

SECTION 803. *Opinion of Counsel to be Given Trustee.*

The Trustee shall be entitled to receive and, subject to Sections 601 and 603, shall be fully protected in relying upon an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale, conveyance or lease and any such assumption complies with the provisions of this Article Eight.

## ARTICLE NINE

### SUPPLEMENTAL INDENTURES

SECTION 901. *Supplemental Indentures Without Consent of Holders.*

Without the consent of any Holders of Securities or coupons, the Company, when authorized by a Board Resolution, and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(1) to evidence the succession of another corporation to the Company and the assumption by any such successor of the covenants of the Company herein and in the Securities; or

(2) to add to the covenants of the Company for the benefit of the Holders of all or any series of Securities and any related coupons (and if such covenants are to be for the benefit of less than all series of Securities, stating that such covenants are expressly being included solely for the benefit of such series) or to surrender any right or power herein conferred upon the Company; or

(3) to add any additional Events of Default; or

(4) to add to or to change any of the provisions of this Indenture to provide that Bearer Securities may be registrable as to principal, to change or eliminate any restrictions on the payment of principal of or any premium or interest on Bearer Securities, to permit Bearer Securities to be issued in exchange for Registered Securities, to permit Bearer Securities to be issued in exchange for Bearer Securities of other authorized denominations, to provide for the issuance of uncertificated Securities of any series in addition to or in place of any certificated Securities and to make all appropriate changes for such purposes; *provided* that any such action shall not adversely affect the interests of the Holders of Securities of any series or any related coupons in any material respect or

(5) to change or eliminate any of the provisions of this Indenture, *provided* that any such change or elimination shall become effective only when there is no Security Outstanding of any series created prior to the

execution of such supplemental indenture which is entitled to the benefit of such provision; or

(6) to secure the Securities pursuant to the requirements of Section 1005 or otherwise; or

(7) to establish the form or terms of Securities of any series and any related coupons as permitted by Sections 201 and 301; or

(8) to evidence and provide for the acceptance of appointment hereunder by a successor trustee with respect to the Securities of one or more series or to add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Section 611(b); or

(9) to supplement any of the provisions of this Indenture to such extent as shall be necessary to permit or facilitate the defeasance and discharge of any series of Securities pursuant to Section 401, *provided* that any such action shall not adversely affect the interests of the Holders of Securities of such series and any related coupons or any other series of Securities in any material respect; or

(10) to add to or change or eliminate any provisions of this Indenture as shall be necessary or desirable in accordance with any amendments to the Trust Indenture Act, *provided* such action shall not adversely affect the interests of the Holders of Securities of any series and any related coupons in any material respect; or

(11) to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Indenture, *provided* such action shall not adversely affect the interests of the Holders of Securities of any series and any related coupons in any material respect.

SECTION 902. *Supplemental Indentures with Consent of Holders.*

With the consent of the Holders of not less than 66⅔% in principal amount of the Outstanding Securities of each series affected by such supplemental indenture, by Act of said Holders delivered to the Company

and the Trustee, the Company, when authorized by a Board Resolution, and the Trustee may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of modifying in any manner the rights of the Holders of Securities of such series and any related coupons under this Indenture; *provided, however*, that no such supplemental indenture shall, without the consent of the Holder of each Outstanding Security affected thereby,

(1) change the Stated Maturity the principal of, or any instalment of principal of or interest on, any Security, or reduce the principal amount thereof or the rate of interest thereon or any premium payable upon the redemption thereof, or change any obligation of the Company to pay additional amounts pursuant to Section 1008 (except as contemplated by Section 801(1) and permitted by Section 901(1)), or reduce the amount of the principal of an Original Issue Discount Security that would be due and payable upon a declaration of acceleration of the Maturity thereof pursuant to Section 502, or adversely affect the right of repayment or repurchase, if any, at the option of the Holder, or reduce the amount of, or postpone the date fixed for, any payment under any sinking fund or analogous provisions for any Security, or change any Place of Payment where, or the coin or currency or currency unit in which, any Security or any premium or the interest, if any, thereon is payable, or change or eliminate the rights of a Holder under Section 311(b), or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the Redemption Date), or

(2) reduce the percentage in principal amount of the Outstanding Securities of any series, the consent of whose Holders is required for any such supplemental indenture, or the consent of whose Holders is required for any waiver (of compliance with certain provisions of this Indenture or certain defaults hereunder and their consequences) provided for in this Indenture, or reduce the requirements of Section 1304 for quorum or voting, or

(3) change any obligation of the Company to maintain an office or agency in the places and for the purposes specified in Section 1002, or

(4) modify any of the provisions of this Section, Section 513 or Section 1007, except to increase any such percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Security affected thereby, *provided, however*, that this clause shall not be deemed to require the consent of any Holder of a Security or coupon with respect to changes in the references to "the Trustee" and concomitant changes in this Section and Section 1007 in accordance with the requirements of Sections 611(b) and 901(8) or with respect to the deletion of this proviso.

A supplemental indenture which changes or eliminates any covenant or other provision of this Indenture which has expressly been included solely for the benefit of one or more particular series of Securities, or which modifies the rights of the Holders of Securities of one or more such series with respect to such covenant or other provision, shall be deemed not to affect the rights under this Indenture of the Holders of Securities of any other series.

It shall not be necessary for any Act of Holders under this Section to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

SECTION 903. *Execution of Supplemental Indentures.*

In executing, or accepting the additional trusts created by, any supplemental indenture permitted by this Article or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Section 601) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that such supplemental indenture, when executed and delivered by the Company, will constitute a valid and binding obligation of the Company in accordance with its terms. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

SECTION 904. *Effect of Supplemental Indentures.*

Upon the execution of any supplemental indenture under this Article, this Indenture shall be modified in accordance therewith, but only with respect to the Securities of each series and any related coupons affected by such supplemental indenture, and such supplemental indenture shall form a part of this Indenture for all purposes with respect to such series; and every Holder of Securities theretofore or thereafter authenticated and delivered hereunder and of any coupons appertaining thereto shall be bound thereby.

SECTION 905. *Conformity with Trust Indenture Act.*

Every supplemental indenture executed pursuant to this Article shall conform to the requirements of the Trust Indenture Act as then in effect.

SECTION 906. *Reference in Securities to Supplemental Indentures.*

Securities of any series authenticated and delivered after the execution of any supplemental indenture pursuant to this Article may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Company shall so determine, new Securities of any series and any related coupons so modified as to conform, in the opinion of the Trustee and the Company, to any such supplemental indenture may be prepared and executed by the Company and authenticated and delivered by the Trustee in exchange for Outstanding Securities of such series and any related coupons.

SECTION 907. *Notice of Supplemental Indenture.*

Promptly after the execution by the Company and the appropriate Trustee of any supplemental indenture pursuant to Section 902, the Company shall transmit to all Holders of any series of the Securities affected thereby, in the manner and to the extent provided in Section 106, a notice setting forth in general terms the substance of such supplemental indenture.

## ARTICLE TEN

### COVENANTS

SECTION 1001. *Payment of Principal, Premium and Interest.*

The Company covenants and agrees for the benefit of each series of Securities that it will duly and punctually pay in the currency or currency unit in which the Securities of such series are payable (except as otherwise specified pursuant to Section 301 for the Securities of such series and except as provided in Sections 311(b), 311(d) and 311(e)) the principal of (and premium, if any) and interest, if any, on the Securities of that series in accordance with the terms of such Securities, any coupons appertaining thereto and this Indenture. Unless otherwise specified as contemplated by Section 301 with respect to any series of Securities, any interest due on Bearer Securities on or before Maturity shall be payable only upon presentation and surrender of the several coupons for such interest instalments as are evidenced thereby as they severally mature. The interest, if any, due in respect of any temporary or permanent global Security, together with any additional amounts payable in respect thereof, as provided in the terms and conditions of such Security, shall be payable, subject to the conditions set forth in Section 1008, only upon presentation of such Security to the Trustee for notation thereon of the payment of such interest.

SECTION 1002. *Maintenance of Office or Agency.*

If Securities of a series are issuable only as Registered Securities, the Company will maintain in each Place of Payment for such series an office or agency where Securities of that series may be presented or surrendered for payment, where Securities of that series may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Company in respect of the Securities of that series and this Indenture may be served. If Securities of a series are issuable as Bearer Securities, the Company will maintain (A) in the Borough of Manhattan, The City of New York, an office or agency where any Registered Securities of that series may be presented or surrendered for payment, where any Registered Securities of that series may be surrendered for registration of transfer, where Securities of that series may be surrendered for exchange, where notices and demands to or upon the Company in respect of the Securities of that series and this

Indenture may be served and where Bearer Securities of that series and related coupons may be presented or surrendered for payment in the circumstances described in the following paragraph (and not otherwise), (B) subject to any laws or regulations applicable thereto, in a Place of Payment for that series which is located outside the United States, an office or agency where Securities of that series and related coupons may be presented and surrendered for payment: *provided, however,* that if the Securities of that series are listed on the Stock Exchange or any other stock exchange located outside the United States and such stock exchange shall so require, the Company will maintain a Paying Agent for the Securities of that series in Luxembourg or any other required city located outside the United States, as the case may be, so long as the Securities of that series are listed on such exchange, and (C) subject to any laws or regulations applicable thereto, in a Place of Payment for that series located outside the United States an office or agency where any Registered Securities of that series may be surrendered for registration of transfer, where Securities of that series may be surrendered for exchange and where notices and demands to or upon the Company in respect of the Securities of that series and this Indenture may be served. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of any such office or agency. If at any time the Company shall fail to maintain any such required office or agency in respect of any series of Securities or shall fail to furnish the Trustee with the address thereof, such presentations, and surrenders of Securities of that series may be made and notices and demands may be made or served at the Corporate Trust Office of the Trustee, except that Bearer Securities of that series and the related coupons may be presented and surrendered for payment at the offices specified in the Security, and the Company hereby appoints the same as its agent to receive such respective presentations, surrenders, notices and demands.

No payment of principal, premium or interest on Bearer Securities shall be made at any office or agency of the Company in the United States or by check mailed to any address in the United States or by transfer to an account maintained with a bank located in the United States; *provided, however,* that, if the Securities of a series are denominated and payable in Dollars, payment of principal of and any premium and interest on any Bearer Security shall be made at the office of the Company's Paying Agent in the

Borough of Manhattan. The City of New York. if, and only if, payment in Dollars of the full amount of such principal, premium or interest, as the case may be, at all offices or agencies outside the United States maintained for the purpose by the Company in accordance with this Indenture is illegal or effectively precluded by exchange controls or other similar restrictions.

The Company may also from time to time designate one or more other offices or agencies where the Securities of one or more series may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided, however,* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in accordance with the requirements set forth above for Securities of any series for such purposes. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

If and so long as the Securities of any series (i) are denominated in a currency other than Dollars or (ii) may be payable in a currency other than Dollars, or so long as it is required under any other provision of this Indenture, then the Company will maintain with respect to each such series of Securities, or as so required, a Currency Determination Agent.

SECTION 1003. *Money for Securities Payments to Be Held in Trust.*

If the Company shall at any time act as its own Paying Agent with respect to any series of Securities and any related coupons, it will, on or before each due date of the principal of (and premium, if any) or interest, if any, on any of the Securities of that series, segregate and hold in trust for the benefit of the Persons entitled thereto a sum in the currency or currency unit in which the Securities of such series are payable (except as otherwise specified pursuant to Section 301 for the Securities of such series and except as provided in Sections 311(b), 311(d) and 311(e)) sufficient to pay the principal (and premium, if any) or interest, if any, so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided and will promptly notify the Trustee of its action or failure so to act.

Whenever the Company shall have one or more Paying Agents for any series of Securities and any related coupons, it will, prior to each due date of the principal of (and premium, if any) or interest, if any, on any Securities

of that series, deposit with a Paying Agent for Securities of that series, a sum (in the currency or currency unit described in the preceding paragraph) sufficient to pay the principal (and premium, if any) or interest, if any, so becoming due, such sum to be held in trust for the benefit of the Persons entitled to such principal, premium or interest, if any, and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee of its action or failure so to act.

The Company will cause each Paying Agent for any series of Securities other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this Section, that such Paying Agent will:

(1) hold all sums held by it for the payment of the principal of (and premium, if any) or interest, if any, on Securities of that series in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided;

(2) give the Trustee notice of any default by the Company (or any other obligor upon the Securities of that series) in the making of any payment of principal (and premium, if any) or interest, if any, on the Securities of that series; and

(3) at any time during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Company may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Company Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Company or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Company or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of (and premium, if any) or interest, if any, on any Security of any series and remaining unclaimed for two years after such principal (and premium, if any) or interest, if any, has become due and payable shall, unless otherwise

required by mandatory provisions of applicable escheat or abandoned or unclaimed property law as determined by the Company, be paid to the Company on Company Request, or (if then held by the Company) shall be discharged from such trust; and the Holder of such Security or any coupon appertaining thereto shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease; *provided, however,* that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Company cause to be transmitted once, in the manner and to the extent provided in Section 106, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Company.

SECTION 1004. *Corporate Existence.*

Subject to Article Eight, the Company will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence, rights (charter and statutory) and franchises; *provided, however,* that the Company shall not be required to preserve any such right or franchise if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and that the loss thereof is not disadvantageous in any material respect to the Holders.

SECTION 1005. *Limitation on Liens on Common Stock of Designated Subsidiaries.*

Except as otherwise specified as contemplated by Section 301 for Securities of any series, so long as any Securities of any series shall remain Outstanding, the Company will not, and will not permit any Designated Subsidiary to, directly or indirectly, create, issue, assume, incur or guarantee any indebtedness for money borrowed which is secured by a mortgage, pledge, lien, security interest or other encumbrance of any nature on any of the present or future common stock of a Designated Subsidiary unless the Securities and, if the Company so elects, any other indebtedness of the Company ranking at least *pari passu* with the Securities, shall be secured

equally and ratably with (or prior to) such other secured indebtedness for money borrowed so long as it is outstanding.

SECTION 1006. *Statement by Officers as to Default.*

The Company will deliver to the Trustee, within 120 days after the end of each fiscal year of the Company ending after the date hereof, an Officers' Certificate, stating whether or not to the best knowledge of the signers thereof the Company is in default in the performance and observance of any of the terms, provisions and conditions of this Indenture and, if the Company shall be in default, specifying all such defaults and the nature and status thereof of which they may have knowledge.

SECTION 1007. *Waiver of Certain Covenants.*

The Company may omit in any particular instance to comply with any term, provision or condition set forth in Section 1005 or 1008 with respect to the Securities of any series if before the time for such compliance the Holders of at least a majority in principal amount of the Outstanding Securities of such series shall, by Act of such Holders, either waive such compliance in such instance or generally waive compliance with such term, provision or condition, but no such waiver shall extend to or affect such term, provision or condition except to the extent so expressly waived, and, until such waiver shall become effective, the obligations of the Company and the duties of the Trustee in respect of any such term, provision or condition shall remain in full force and effect.

SECTION 1008. *Payment of Additional Amounts.*

If specified pursuant to Section 301, the provisions of this Section 1008 shall be applicable to Securities of any series.

The Company will, subject to the exceptions and limitations set forth below, pay to the Holder of any Security or coupon who is a United States Alien such additional amounts as may be necessary so that every net payment on such Security or coupon, after deduction or withholding by the Company for or on account of any present or future tax, assessment or other governmental charge imposed upon or as a result of such payment by the United States (or any political subdivision or taxing authority thereof or therein), will not be less than the amount provided in such Security or

coupon to be then due and payable. However, the Company will not be required to make any payment of additional amounts for or on account of:

(a) any tax, assessment or other governmental charge that would not have been so imposed but for (i) the existence of any present or former connection between such Holder (or between a fiduciary, settlor, beneficiary, member or shareholder of, or a possessor of power over, such Holder, if such Holder is an estate, trust, partnership or corporation) and the United States including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member, shareholder or possessor) being or having been a citizen or resident thereof or being or having been engaged in trade or business or present therein or having or having had a permanent establishment therein, or (ii) the failure of such Holder to provide such certification or other documentation at or prior to the time of payment, including certification or documentation required under United States income tax laws and regulations, to establish entitlement to exemption from withholding (including backup withholding) as a United States Alien or (iii) the presentation of a Security or any coupon appertaining thereto for payment on a date more than 10 days after the date on which such payment becomes due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(b) any estate, inheritance, gift, sales, transfer, personal property or similar tax, assessment or other governmental charge;

(c) any tax, assessment or other governmental charge imposed by reason of such holder's past or present status as a personal holding company, foreign personal holding company, a controlled foreign corporation, passive foreign investment company, a private foundation or other tax-exempt organization, with respect to the United States, or as a corporation which accumulates earnings to avoid United States federal income tax;

(d) any tax, assessment or other governmental charge required to be withheld by any Paying Agent from a payment of principal of or interest on or in respect of the purchase price for, any Security or coupon, if such payment can be made without such withholding by any other Paying Agent;

(e) any tax, assessment or other governmental charge which is payable otherwise than by withholding from payments of principal of or interest on, or in respect of the purchase price for, such Security or coupon;

(f) any tax, assessment or other governmental charge imposed by reason of such holder's past or present status as the actual or constructive owner of 10% or more of the total combined voting power of all classes of stock entitled to vote of the Company; or

(g) any combination of items (a), (b), (c), (d), (e) and (f);

or to any Holder that is a fiduciary or partnership or other than the sole beneficial owner of such Security or coupon appertaining thereto to the extent that the beneficial owner thereof would not have been entitled to the payment of such additional amounts had such beneficial owner been the Holder of the Securities or any coupon appertaining thereto.

The term "United States Alien" means any corporation, partnership, individual or fiduciary that is, as to the United States, a foreign corporation, a nonresident alien individual, a nonresident fiduciary of a foreign estate or trust, or a foreign partnership one or more of the members of which is, as to the United States, a foreign corporation, a nonresident alien individual or a nonresident fiduciary of a foreign estate or trust.

Whenever in this Indenture there is mentioned, in any context, the payment of the principal of (or premium, if any) or interest on any Security or payment with respect to any coupon of any series, such mention shall be deemed to include mention of the payment of additional amounts provided for in the terms of such Securities and this Section to the extent that, in such context, additional amounts are, were or would be payable in respect thereof pursuant to the provisions of this Section and express mention of the payment of additional amounts (if applicable) in any provisions hereof shall not be construed as excluding additional amounts in those provisions hereof where such express mention is not made.

## ARTICLE ELEVEN

### REDEMPTION OF SECURITIES

SECTION 1101. *Applicability of Article.*

Securities of any series which are redeemable before their Stated Maturity shall be redeemable in accordance with their terms and (except as otherwise specified as contemplated by Section 301 for Securities of any series) in accordance with this Article.

SECTION 1102. *Tax Redemption; Special Tax Redemption.*

(a) Unless otherwise specified pursuant to Section 301, Securities of any series may be redeemed at the option of the Company in whole, but not in part, on not more than 60 days' and not less than 30 days' notice, on any Redemption Date at the Redemption Price specified pursuant to Section 301, if the Company determines that as a result of any change in or amendment to the laws or treaties, or any regulations or rulings promulgated thereunder, of the United States or of any political subdivision or taxing authority thereof or therein affecting taxation, or any proposed change in such laws, treaties or regulations or rulings, or any change in the official application, enforcement or interpretation of such laws, treaties or regulations or filings (including a holding by a court of competent jurisdiction in the United States) or any other action (other than an action predicated on law generally known on or before the date specified in such Security except for proposals before the Congress before such date) taken by any taxing authority or a court of competent jurisdiction in the United States, or the official proposal of any such action, whether or not such action or proposal was taken or made with respect to the Company, (A) the Security has or will become obligated to pay such additional amounts pursuant to Section 1008 on any Security or coupon or (B) there is a substantial possibility that the Company will be required to pay such additional amounts. Prior to the publication of any notice of redemption pursuant to this Section 1102(a), the Company shall deliver to the Trustee (i) an Officers' Certificate stating that the Company is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Company so to redeem have occurred, and (ii) an Opinion of Counsel to such effect based on such statement of facts. Notice may not be given prior

to 60 days before the date on which the Company will or, if applicable, there is a substantial possibility that the Company will, become obligated to pay such additional amounts if a payment of interest were to be made on such date.

(b) Unless otherwise specified pursuant to Section 301, if the Company shall determine that any payment made outside the United States by the Company or any of its Paying Agents in respect of any Bearer Security which is not a Floating Rate Security (an "Affected Security") would, under any present or future laws or regulations of the United States, be subject to any certification, documentation, information or other reporting requirement of any kind, the effect of which requirement is the disclosure to the Company, any Paying Agent or any governmental authority of the nationality, residence or identity of a beneficial owner of such Affected Security that is a United States Alien (other than such a requirement (i) that would not be applicable to a payment made by the Company or any one of its Paying Agents (A) directly to the beneficial owner or (B) to a custodian, nominee or other agent of the beneficial owner, or (ii) that can be satisfied by such custodian, nominee or other agent certifying to the effect that the beneficial owner is a United States Alien; *provided that,* in any case referred to in clause (i) (B) or (ii), payment by the custodian, nominee or agent to the beneficial owner is not otherwise subject to any such requirement), the Company shall elect either (x) (A) in the case of Affected Securities that are Original Issue Discount Securities, to permit the Holders of such Affected Securities to elect, but only if done within 90 days after publication of the Determination Notice as hereunder provided, to surrender the same for redemption in whole but not in part at the Redemption Price, and (B) in the case of any other Affected Securities, to redeem such Affected Securities as a whole but not in part, at the Redemption Price, or (y) if the conditions of the next succeeding paragraph are satisfied, to pay the additional amounts specified in such paragraph. The Company shall make such determination as soon as practicable and publish prompt notice thereof (the "Determination Notice"), stating the effective date of such certification, documentation, information or reporting requirement, whether the Company elects to redeem (or, in the case of Original Issue Discount Securities, permit the Holders to elect to surrender for redemption) the Affected Securities or to pay the additional amounts specified in the next succeeding paragraph, and (if applicable) the last date by which the redemption of the Affected Securities must take place. If the Affected Securities are to be redeemed

pursuant to this paragraph, the redemption shall take place on such date, no later than one year after the publication of the Determination Notice, as the Company shall specify by notice to the Trustee at least 60 days before the Redemption Date. Notice of such redemption of the Affected Securities shall be given to the Holders of Affected Securities not more than 60 days nor less than 30 days prior to the Redemption Date. Notwithstanding the foregoing, the Company shall not so redeem (or, in the case of Original Issue Discount Securities, permit the Holders to elect to surrender for redemption) the Affected Securities if the Company shall subsequently determine, not less than 30 days prior to the Redemption Date, that subsequent payments on the Affected Securities would not be subject to any such certification, documentation, information or other reporting requirement, in which case the Company shall publish prompt notice of such subsequent determination and any earlier redemption notice shall be revoked and be of no further effect.

If and so long as the certification, documentation, information or other reporting requirement referred to in the preceding paragraph would be fully satisfied by payment of a backup withholding tax or similar charge, the Company may elect to pay such additional amounts as may be necessary so that every net payment made outside the United States following the effective date of such requirement by the Company or any of its Paying Agents in respect of any Affected Security of which the beneficial owner is a United States Alien (but without any requirement that the nationality, residence or identity of such beneficial owner be disclosed to the Company, any Paying Agent or any governmental authority), after deduction or withholding for or on account of such backup withholding tax or similar charge (other than a backup withholding tax or similar charge which (i) would not be applicable in the circumstances referred to in the parenthetical clause of the first sentence of the preceding paragraph, or (ii) is imposed as a result of presentation of any such Affected Security for payment more than 15 days after the date on which such payment became due and payable or on which payment thereof was duly provided for, whichever occurs later), will not be less than the amount provided in any such Affected Security to be then due and payable. If the Company elects to pay additional amounts pursuant to this paragraph, the Company shall have the right to redeem (or, in the case of Original Issue Discount Securities, permit the Holders to elect, but only for the period of 30 days after the publication of notice of the redemption as hereinafter provided, to surrender for redemption) the

Affected Securities as a whole, but not in part, at any time at the Redemption Price, subject to the provisions of the last two sentences of the immediately preceding paragraph. If the Company has made the determination described in the preceding paragraph with respect to certification, documentation, information or other reporting requirements applicable only to interest and subsequently makes a determination in the manner and of the nature referred to in such preceding paragraph with respect to such requirements applicable to principal, the Company will redeem the Affected Securities in the manner and on the terms described in the preceding paragraph unless the Company elects to have the provisions of this paragraph apply rather than the provisions of the immediately preceding paragraph. If in such circumstances the Affected Securities are to be redeemed, the Company shall have no obligation to pay additional amounts pursuant to this paragraph with respect to principal, but will be obligated to pay such additional amounts with respect to interest accrued and unpaid to the date of such redemption. If the Company elects to pay additional amounts pursuant to this paragraph and the condition specified in the first sentence of this paragraph should no longer be satisfied, then the Company shall redeem (or, in the case of Original Issue Discount Securities, permit the Holders to elect, but only for the period of 30 days after publication of the notice of redemption as hereinafter provided, to surrender for redemption) the Affected Securities in whole, but not in part, at the Redemption Price subject to the provisions of the last two sentences of the immediately preceding paragraph. If the Company elects to, or is required to, redeem (or, in the case of Original Issue Discount Securities, is required to permit Holders to elect or surrender for redemption) the Affected Securities pursuant to the two immediately preceding sentences, it shall publish in the manner and to the extent provided in Section 106 prompt notice thereof. If the Affected Securities are to be redeemed pursuant to this paragraph, the redemption shall take place on such date, not later than one year after publication of the notice of redemption, as the Company shall specify by notice to the Trustee at least 60 days prior to the Redemption Date. Any redemption payments made by the Company pursuant to this paragraph shall be subject to the continuing obligation of the Company to pay additional amounts pursuant to this paragraph.

SECTION 1103. *Election to Redeem; Notice to Trustee.*

The election of the Company to redeem any Securities shall be evidenced by a Board Resolution. In case of any redemption at the election of the Company of less than all the Securities of any series, the Company shall, at least 60 days prior to the Redemption Date fixed by the Company (unless a shorter notice shall be satisfactory to the Trustee), notify the Trustee of such Redemption Date and of the principal amount of Securities of such series to be redeemed. In the case of any redemption of Securities prior to the expiration of any restriction on such redemption provided in the terms of such Securities or elsewhere in this Indenture, the Company shall furnish the Trustee with an Officers' Certificate evidencing compliance with such restriction.

SECTION 1104. *Selection by Trustee of Securities to Be Redeemed.*

If less than all the Securities of any series are to be redeemed, the particular Securities to be redeemed shall be selected not more than 60 days prior to the Redemption Date by the Trustee, from the Outstanding Securities of such series not previously called for redemption, by lot or such other method as the Trustee shall deem fair and appropriate and which may provide for the selection for redemption of portions (equal to the minimum authorized denomination for Securities of that series or any integral multiple thereof) of the principal amount of Securities of such series of a denomination larger than the minimum authorized denomination for Securities of that series pursuant to Section 302 in the currency or currency unit in which the Securities of such series are denominated. The portions of the principal amount of Securities so selected for partial redemption shall be equal to the minimum authorized denominations for Securities of such series pursuant to Section 302 in the currency or currency unit in which the Securities of such series are denominated or any integral multiple thereof, except as otherwise set forth in the applicable form of Securities.

The Trustee shall promptly notify the Company in writing of the Securities selected for redemption and, in the case of any Securities selected for partial redemption, the principal amount thereof to be redeemed.

For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to the redemption of Securities shall relate, in the case of any Securities redeemed or to be redeemed only in part, to the portion of the principal amount of such Securities which has been or is to be redeemed.

SECTION 1105. *Notice of Redemption.*

Except as otherwise provided herein, notice of redemption shall be given in the manner provided in Section 106 not less than 30 nor more than 60 days prior to the Redemption Date, to each Holder of Securities to be redeemed.

All notices of redemption shall state:

(1) the Redemption Date,

(2) the Redemption Price,

(3) if less than all the Outstanding Securities of any series are to be redeemed, the identification (and, in the case of partial redemption, the principal amounts) of the particular Securities or portions thereof to be redeemed,

(4) that on the Redemption Date the Redemption Price will become due and payable upon each such Security to be redeemed and, if applicable, that interest thereon will cease to accrue on and after said date,

(5) the place or places where such Securities, together in the case of Bearer Securities with all coupons appertaining thereto, if any, maturing after the Redemption Date, are to be surrendered for payment of the Redemption Price,

(6) that the redemption is for a sinking fund, if such is the case,

(7) that, unless otherwise specified in such notice, Bearer Securities of any series, if any, surrendered for redemption must be accompanied by all coupons maturing subsequent to the date fixed for redemption or the amount of any such missing coupon or coupons will be deducted from the Redemption Price, and

(8) if Bearer Securities of any series are to be redeemed and any Registered Securities of such series are not to be redeemed, and if such Bearer Securities may be exchanged for Registered Securities not subject to redemption on this Redemption Date pursuant to Section 305 or otherwise, the last date on which such exchanges may be made.

Notice of redemption of Securities to be redeemed at the election of the Company shall be given by the Company or, at the Company's request, by the Trustee in the name and at the expense of the Company.

SECTION 1106. *Deposit of Redemption Price.*

Prior to any Redemption Date, the Company shall deposit with the Trustee or with a Paying Agent (or, if the Company is acting as its own Paying Agent, segregate and hold in trust as provided in Section 1003) an amount of money in the currency or currency unit in which the Securities of such series are payable (except as otherwise specified pursuant to Section 301 for the Securities of such series and except as provided in Sections 311(b), 311(d) and 311(e)) sufficient to pay the Redemption Price of, and accrued interest, if any, on all the Securities or portions thereof which are to be redeemed on that date.

SECTION 1107. *Securities Payable on Redemption Date.*

Notice of redemption having been given as aforesaid, the Securities or portions thereof so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, together with accrued interest, if any, to the Redemption Date in the currency or currency unit in which the Securities of such series are payable (except as otherwise specified pursuant to Section 301 for the Securities of such series and except as provided in Sections 311(b), 311(d) and 311(e)), and from and after such date (unle. the Company shall default in the payment of the Redemption Price and accrued interest, if any) such Securities or portions thereof shall cease to bear interest and the coupons for such interest appertaining to any Bearer Securities so to be redeemed, except to the extent provided below, shall be void. Upon surrender of any such Security for redemption in accordance with said notice, together with all coupons, if any, appertaining thereto maturing after the Redemption Date, such Security or specified portions thereof shall be paid by the Company at the Redemption Price, together with accrued interest, if any, to the Redemption Date; *provided, however,* that instalments of interest on Bearer Securities whose Stated Maturity is on or prior to the Redemption Date shall be payable only at an office or agency located outside the United States (except as otherwise provided in Section 1002) and, unless otherwise specified as contemplated by Section 301, only upon presentation and surrender of coupons for such interest, and *provided, further,* that unless otherwise specified as contemplated by Section 301, instalments of interest on Registered Securities whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Securities, or one or more Predecessor

Securities, registered as such at the close of business on the relevant Record Dates according to their terms and the provisions of Section 307.

If any Bearer Security surrendered for redemption shall not be accompanied by all coupons appertaining thereto maturing after the Redemption Date, such Security may be paid after deducting from the Redemption Price an amount equal to the face amount of all such missing coupons, or the surrender of such missing coupon or coupons may be waived by the Company if there is furnished to it such security or indemnity as it may require to save the Company and any Paying Agent harmless. If thereafter the Holder of such Security shall surrender to the Trustee or any Paying Agent any such missing coupon in respect of which a deduction shall have been made from the Redemption Price, such Holder shall be entitled to receive the amount so deducted; *provided, however,* that interest represented by coupons shall be payable only at an office or agency located outside the United States (except as otherwise provided in Section 1002) and, unless otherwise specified as contemplated by Section 301, only upon presentation and surrender of those coupons.

If funds for the payment of any Security called for redemption shall not be so provided for, the principal (and premium, if any) shall, until paid, bear interest from the Redemption Date at the rate prescribed therefor in the Security.

SECTION 1108. *Securities Redeemed in Part.*

Any Registered Security which is to be redeemed only in part shall be surrendered at a Place of Payment therefor (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or his attorney duly authorized in writing), and the Company shall execute, and the Trustee shall authenticate and deliver to the Holder of such Security without service charge, a new Registered Security or Securities of the same series, of any authorized denomination as requested by such Holder, in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Security so surrendered.

# ARTICLE TWELVE

## SINKING FUNDS

SECTION 1201. *Applicability of Article.*

The provisions of this Article shall be applicable to any sinking fund for the retirement of Securities of a series except as otherwise specified as contemplated by Section 301 for Securities of such series.

The minimum amount of any sinking fund payment provided for by the terms of Securities of any series is herein referred to as a "mandatory sinking fund payment", and any payment in excess of such minimum amount provided for by the terms of Securities of any series is herein referred to as an "optional sinking fund payment". If provided for by the terms of Securities of any series, the cash amount of any sinking fund payment may be subject to reduction as provided in Section 1202. Each sinking fund payment shall be applied to the redemption of Securities of any series as provided for by the terms of Securities of such series.

SECTION 1202. *Satisfaction of Mandatory Sinking Fund Payments with Securities.*

The Company (1) may deliver Outstanding Securities of a series (other than any previously called for redemption), together in the case of any Bearer Securities of such series with all unmatured coupons appertaining thereto, and (2) may apply as a credit Securities of a series which have been redeemed either at the election of the Company pursuant to the terms of such Securities or through the application of permitted optional sinking fund payments pursuant to the terms of such Securities, in each case in satisfaction of all or any part of any mandatory sinking fund payment with respect to the Securities of such series required to be made pursuant to the terms of such Securities as provided for by the terms of such series; *provided* that such Securities have not been previously so credited. Such Securities shall be received and credited for such purpose by the Trustee at the Redemption Price specified in such Securities for redemption through operation of the sinking fund and the amount of such mandatory sinking fund payment shall be reduced accordingly.

SECTION 1203. *Redemption of Securities for Sinking Fund.*

Not less than 60 days prior to each sinking fund payment date for any series of Securities, the Company will deliver to the Trustee an Officers' Certificate specifying the amount of the next ensuing mandatory sinking fund payment for that series pursuant to the terms of that series, the portion thereof, if any, which is to be satisfied by payment of cash in the currency or currency unit in which the Securities of such series are payable (except as otherwise specified pursuant to Section 301 for the Securities of such series and except as provided in Sections 311(b), 311(d) and 311(e)) and the portion thereof, if any, which is to be satisfied by delivering and crediting Securities of that series pursuant to Section 1202 and will also deliver to the Trustee any Securities to be so delivered. Not less than 45 days before each such mandatory sinking fund payment date the Trustee shall select the Securities to be redeemed upon such mandatory sinking fund payment date in the manner specified in Section 1104 and cause notice of the redemption thereof to be given in the name of and at the expense of the Company in the manner provided in Section 1105. Such notice having been duly given, the redemption of such Securities shall be made upon the terms and in the manner stated in Sections 1107 and 1108.

## ARTICLE THIRTEEN

### MEETINGS OF HOLDERS OF SECURITIES

SECTION 1301. *Purposes for Which Meetings May Be Called.*

If Securities of a series are issuable as Bearer Securities, a meeting of Holders of Securities of such series may be called at any time and from time to time pursuant to this Article to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be made, given or taken by Holders of Securities of such series.

SECTION 1302. *Call, Notice and Place of Meetings.*

(a) The Trustee may at any time call a meeting of Holders of Securities of any series for any purpose specified in Section 1301, to be held at such time and at such place in the Borough of Manhattan, The City of New York,

or in London, as the Trustee shall determine. Notice of every meeting of Holders of Securities of any series, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given, in the manner provided in Section 106, not less than 20 nor more then 180 days prior to the date fixed for the meeting.

(b) In case at any time the Company, pursuant to a Board Resolution, or the Holders of at least 10% in principal amount of the Outstanding Securities of any series shall have requested the Trustee to call a meeting of the Holders of Securities of such series for any purpose specified in Section 1301, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have made the first publication of the notice of such meeting within 30 days after receipt of such request or shall not thereafter proceed to cause the meeting to be held as provided herein, then the Company or the Holders of Securities of such series in the amount above specified, as the case may be, may determine the time and the place in the Borough of Manhattan, The City of New York, or in London, for such meeting and may call such meeting for such purposes by giving notice thereof as provided in subsection (a) of this Section.

SECTION 1303. *Persons Entitled to Vote at Meetings.*

To be entitled to vote at any meeting of Holders of Securities of any series, a Person shall be (1) a Holder of one or more Outstanding Securities of such series, or (2) a Person appointed by an instrument in writing as proxy for a Holder or Holders of one or more Outstanding Securities of such series by such Holder or Holders. The only Persons who shall be entitled to be present or to speak at any meeting of Holders of Securities of any series shall be the Persons entitled to vote at such meeting and their counsel, any representatives of the Trustee and its counsel and any representatives of the Company and its counsel.

SECTION 1304. *Quorum; Action.*

The Persons entitled to vote a majority in principal amount of the Outstanding Securities of a series shall constitute a quorum for a meeting of Holders of Securities of such series; *provided, however,* that if any action is to be taken at such meeting with respect to a consent or waiver which this

Indenture expressly provides may be given by the Holders of not less than 66⅔% in principal amount of the Outstanding Securities of a series, then the Persons entitled to vote 66⅔% in principal amount of the Outstanding Securities of such series shall constitute a quorum. In the absence of a quorum within 30 minutes of the time appointed for any such meeting, the meeting shall, if convened at the request of Holders of Securities of such series, be dissolved. In any other case the meeting may be adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment of such meeting. In the absence of a quorum at any such adjourned meeting, such adjourned meeting may be further adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment of such adjourned meeting. Notice of the reconvening of any adjourned meeting shall be given as provided in Section 1302(a), except that such notice need be given only once not less than five days prior to the date on which the meeting is scheduled to be reconvened. Notice of the reconvening of an adjourned meeting shall state expressly the percentage, as provided above, of the principal amount of the Outstanding Securities of such series which shall constitute a quorum.

Except as limited by the proviso to Section 902, any resolution presented to a meeting or adjourned meeting duly reconvened at which a quorum is present as aforesaid may be adopted by the affirmative vote of the Holders of a majority in principal amount of the Outstanding Securities of that series; *provided, however,* that, except as limited by the proviso to Section 902, any resolution with respect to any consent or waiver which this Indenture expressly provides may be given by the Holders of not less than 66⅔% in principal amount of the Outstanding Securities of a series may be adopted at a meeting or an adjourned meeting duly convened and at which a quorum is present as aforesaid only by the affirmative vote of the Holders of 66⅔% in principal amount of the Outstanding Securities of that series; and *provided, further,* that, except as limited by the proviso to Section 902, any resolution with respect to any request, demand, authorization, direction, notice, consent, waiver or other action which this Indenture expressly provides may be made, given or taken by the Holders of a specified percentage, which is less than a majority, in principal amount of the Outstanding Securities of a series may be adopted at a meeting or an adjourned meeting duly reconvened and at which a quorum is present as

aforesaid by the affirmative vote of the Holders of such specified percentage in principal amount of the Outstanding Securities of that series.

Any resolution passed or decision taken at any meeting of Holders of Securities of any series duly held in accordance with this Section shall be binding on all the Holders of Securities of such series and the related coupons, whether or not present or represented at the meeting.

SECTION 1305. *Determination of Voting Rights; Conduct and Adjournment of Meetings.*

(a) Notwithstanding any other provision of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Holders of Securities of a series in regard to proof of the holding of Securities of such series and of the appointment of proxies and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate. Except as otherwise permitted or required by any such regulations, the holding of Securities shall be proved in the manner specified in Section 104 and the appointment of any proxy shall be proved in the manner specified in Section 104 or by having the signature of the person executing the proxy witnessed or guaranteed by any trust company, bank or banker authorized by Section 104 to certify to the holding of Bearer Securities. Such regulations may provide that written instruments appointing proxies, regular on their face, may be presumed valid and genuine without the proof specified in Section 104 or other proof.

(b) The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Company or by Holders of Securities as provided in Section 1302(b), in which case the Company or the Holders of Securities of the series calling the meeting, as the case may be, shall in like manner appoint a temporary chairman. A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the Persons entitled to vote a majority in principal amount of the Outstanding Securities of such series represented at the meeting.

(c) At any meeting each Holder of a Security of such series or proxy shall be entitled to one vote for each $1,000 principal amount (or such other

amount as shall be specified as contemplated by Section 301) of Securities of such series held or represented by him; *provided, however,* that no vote shall be cast or counted at any meeting in respect of any Security challenged as not Outstanding and ruled by the chairman of the meeting to be not Outstanding. The chairman of the meeting shall have no right to vote, except as a Holder of a Security of such series or proxy.

(d) Any meeting of Holders of Securities of any series duly called pursuant to Section 1302 at which a quorum is present may be adjourned from time to time by Persons entitled to vote a majority in principal amount of the Outstanding Securities of such series represented at the meeting; and the meeting may be held as so adjourned without further notice.

SECTION 1306. *Counting Votes and Recording Action of Meetings.*

The vote upon any resolution submitted to any meeting of Holders of Securities of any series shall be by written ballots on which shall be subscribed the signatures of the Holders of Securities of such series or of their representatives by proxy and the principal amounts and serial numbers of the Outstanding Securities of such series held or represented by them. The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the secretary of the meeting their verified written reports in triplicate of all votes cast at the meeting. A record, at least in duplicate, of the proceedings of each meeting of Holders of Securities of any series shall be prepared by the secretary of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was given as provided in Section 1302 and, if applicable, Section 1304. Each copy shall be signed and verified by the affidavits of the permanent chairman and secretary of the meeting and one such copy shall be delivered to the Company, and another to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the meeting. Any record so signed and verified shall be conclusive evidence of the matters therein stated.

[FORMS OF CERTIFICATION]

EXHIBIT A

[FORM OF CERTIFICATE TO BE GIVEN BY PERSON ENTITLED TO RECEIVE BEARER SECURITY OR TO EXCHANGE AN INTEREST IN A TEMPORARY GLOBAL SECURITY FOR AN INTEREST IN A PERMANENT GLOBAL SECURITY]

CERTIFICATE

**[Insert title or sufficient description of Securities to be delivered]**

This is to certify that the above-captioned Securities are not being acquired by or on behalf of a United States person or for offer to resell or for resale to a United States person or any person inside the United States or, if a beneficial interest in the Securities is being acquired by or on behalf of a United States person, that such United States person is either a financial institution within the meaning of Section 1.165-12(c)(1)(v) of the United States Treasury regulations or has acquired such above-captioned Securities through a financial institution and the above-captioned Securities are held by a financial institution which agrees to comply with the requirements of Section 165(j)(3)(A),(B) or (C) of the Internal Revenue Code of 1986 and the regulations thereunder and which is not purchasing for offer to resell or for resale inside the United States. If the undersigned is a dealer, the undersigned agrees to obtain a similar certificate from each person entitled to delivery of any of the above-captioned Securities in bearer form purchased from it; *provided, however,* that if the undersigned has actual knowledge that the information contained in such a certificate is false, the undersigned will not deliver a Security in temporary or definitive bearer form to the person who signed such certificate notwithstanding the delivery of such certificate to the undersigned.

As used herein, "United States person" means any citizen or resident of the United States, any corporation, partnership or other entity created or organized in or under the laws of the United States and any estate or trust the income of which is subject to United States federal income taxation regardless of its source, and "United States" means the United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

We undertake to advise you by telex if the above statement as to beneficial ownership is not correct on the date of delivery of the above-captioned Securities in bearer form as to all of such Securities.

We understand that this certificate may be required in connection with certain tax legislation in the United States. If administrative or legal proceedings are commenced or threatened in connection with which this certificate is or would be relevant, we irrevocably authorize you to produce this certificate or a copy thereof to any interested party in such proceedings.

Dated: , 19

[To be dated on or after , 19 (the date determined as provided in the Indenture)]

[Name of Person Entitled to Receive Bearer Security]

(Authorized Signatory)

Name:
Title:

## EXHIBIT B

**[FORM OF CERTIFICATE TO BE GIVEN BY EURO-CLEAR AND CEDEL S.A. IN CONNECTION WITH THE EXCHANGE OF A TEMPORARY GLOBAL SECURITY FOR DEFINITIVE SECURITIES OR FOR A PORTION OF A PERMANENT GLOBAL SECURITY]**

## CERTIFICATE

**[Insert title or sufficient description of Securities to be delivered]**

This is to certify with respect to $ principal amount of the above-captioned Securities (i) that we have received from each of the persons appearing in our records as persons entitled to a portion of such principal amount (our "Qualified Account Holders") a certificate with respect to such portion substantially in the form attached hereto, and (ii) that we are not submitting herewith for exchange any portion of the [temporary] [permanent] global Security representing the above-captioned Securities excepted in such certificates.

We further certify that as of the date hereof we have not received any notification from any of our Qualified Account Holders to the effect that the statements made by such Qualified Account Holders with respect to any portion of the part submitted herewith for exchange are no longer true and cannot be relied upon as of the date hereof.

Dated: , 19
[To be dated no earlier than the Exchange Date]

[Morgan Guaranty Trust Company of New York, Brussels Office, as Operator of the Euro-clear System]
[CEDEL, S.A.]

By ______________________________

# EXHIBIT C

**[FORM OF CERTIFICATE TO BE GIVEN BY EURO-CLEAR AND CEDEL S.A. TO OBTAIN INTEREST PRIOR TO AN EXCHANGE DATE]**

## CERTIFICATE

**[Insert title or sufficient description of Securities]**

This is to certify that, as of the Interest Payment Date on [Insert Date], the undersigned, which is a holder of an interest in the temporary global Security representing the above Securities, is not a United States person.

We confirm that the interest payable on such Interest Payment Date will be paid to each of the persons appearing in our records as being entitled to interest to be paid on the above date from whom we have received a written certification, dated not earlier than 15 days prior to such Interest Payment Date, to the effect that the beneficial owner of such portion with respect to which interest is to be paid on such date either is not a United States person or is a United States person which has either provided an Internal Revenue Service Form W-9 or certified that it is an exempt recipient as defined in United States Treasury Regulations §1.6049-4(c)(1)(ii). We undertake to retain certificates received from our member organizations in connection herewith for four years from the end of the calendar year in which such certificates are received.

As used herein, "United States person" means any citizen or resident of the United States, any corporation, partnership or other entity created or organized in or under the laws of the United States and any estate or trust the income of which is subject to United States federal income taxation regardless of its source, and "United States" means the United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

The foregoing reflects any advice received subsequent to the date of any certificate stating that the statements contained in such certificate are no longer correct.

Dated: , 19

[To be dated on or after the relevant Interest Payment Date]

[Morgan Guaranty Trust Company of New York, Brussels Office, as Operator of the Euro-clear System]
[CEDEL. S.A.]

By ______________________________

# EXHIBIT D

## [FORM OF CERTIFICATE TO BE GIVEN BY BENEFICIAL OWNERS TO OBTAIN INTEREST PRIOR TO AN EXCHANGE DATE]

## CERTIFICATE

**[Insert title or sufficient description of Securities]**

This is to certify that, as of the date hereof, no portion of the temporary global Security representing the above-captioned Securities and held by you for our account is beneficially owned by a United States person or, if any portion thereof held by you for our account is beneficially owned by a United States person, such United States person has either provided an Internal Revenue Service Form W-9 or certified that it is an exempt recipient as defined in Section 1.6049-4(c)(1)(ii) of the United States Treasury regulations.

We undertake to advise you by telex if the above statement as to beneficial ownership is not correct on the Interest Payment Date on [Insert Date] as to any such portion of such temporary global Security.

As used herein, "United States person" means any citizen or resident of the United States, any corporation, partnership or other entity created or organized in or under the laws of the United States and any state or trust the income of which is subject to United States federal income taxation regardless of its source, and "United States" means the United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

We understand that this certificate may be required in connection with certain tax legislation in the United States. If administrative or legal proceedings are commenced or threatened in connection with which this certificate is or would be relevant, we irrevocably authorize you to produce this certificate or a copy thereof to any interested party in such proceedings.

Dated: , 19

[To be dated on or after the 15th day before the relevant Interest Payment Date]

[Name of Account Holder]

______________________________
(Authorized Signatory)

Name:
Title:

**Exhibit B**

Prospectus Supplement

QuickLinks -- Click here to rapidly navigate through this document

Filed Pursuant to Rule 424(b)(2)
Registration Nos. 333-060474-03

PROSPECTUS SUPPLEMENT

(To prospectus dated June 5, 2001)

## 12,000,000 Preferred Securities

## LEHMAN BROTHERS HOLDINGS CAPITAL TRUST IV

## 6.375% Preferred Securities, Series L

(Liquidation amount $25 per preferred security)

fully and unconditionally guaranteed, to the extent set forth herein, by

# LEHMAN BROTHERS HOLDINGS INC.

**Maturity Date** — October 31, 2052

**Distributions Payable** — Quarterly, beginning January 31, 2004. May be postponed for up to five years, but not past the maturity date.

**Subordination** — The preferred securities are effectively subordinated to all senior indebtedness of Lehman Brothers Holdings and all existing and future liabilities of its subsidiaries.

**Listing** — An application will be filed with The New York Stock Exchange for listing of the preferred securities.

**Issuer** — The trust that is issuing the preferred securities will have no assets other than subordinated debentures issued by Lehman Brothers Holdings. These debentures will have essentially the same terms as the preferred securities. Therefore, the trust can only make payments on the preferred securities if Lehman Brothers Holdings first makes payments on the subordinated debentures.

*Investing in the preferred securities involves risks. Risk Factors begin on page 5 of the accompanying prospectus.*

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined that this prospectus supplement or the accompanying prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

| | Per Preferred Security | Total |
|---|---|---|
| Public offering price | $ 25.0000 | $ 300,000,000 |
| Underwriting commission | $ 0.7875 | $ 9,450,000 |
| Proceeds, before expenses, to Lehman Brothers Holdings | $ 24.2125 | $ 290,550,000 |

Lehman Brothers Holdings and the trust have granted the underwriters a 30-day option to purchase up to 1,800,000 additional preferred

securities on the same terms and conditions as set forth above solely to cover over-allotments, if any.

The preferred securities are expected to be ready for delivery in book-entry form only through The Depository Trust Company on or about October 31, 2003.

Lehman Brothers Inc., a wholly-owned subsidiary of Lehman Brothers Holdings, makes a market in Lehman Brothers Holdings' securities. It may act as principal or agent in, and this prospectus may be used in connection with, such transactions. Any such sales will be made at varying prices related to prevailing market prices at the time of sale.

LEHMAN BROTHERS

CITIGROUP
A.G. EDWARDS & SONS, INC.
MERRILL LYNCH & CO.
MORGAN STANLEY
UBS INVESTMENT BANK
WACHOVIA SECURITIES

BANC OF AMERICA SECURITIES LLC FIDELITY CAPITAL MARKETS JPMORGAN

October 9, 2003

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Prospectus Supplement | |
| Summary Information—Q&A | S-3 |
| Ratio of Earnings to Fixed Charges | S-5 |
| Use of Proceeds | S-5 |
| Lehman Brothers Holdings Capital Trust IV | S-5 |
| Description of Securities | S-6 |
| Certain Terms of the Preferred Securities | S-7 |
| Certain Terms of the Subordinated Debentures | S-11 |
| Relationship Among the Preferred Securities, the Subordinated Debentures and the Guarantee | S-14 |
| Certain United States Federal Income Tax Consequences | S-15 |
| ERISA Considerations | S-18 |
| Underwriting | S-21 |
| Experts | S-24 |
| Legal Matters | S-24 |
| Prospectus | |
| Summary Information—Q&A | 2 |
| Risk Factors | 5 |
| Where You Can Find More Infomation | 7 |
| Use of Proceeds | 8 |
| Ratio of Earnings to Fixed Charges | 8 |
| Accounting Treatment | 8 |
| Description of the Preferred Securities | 9 |
| Description of the Junior Subordinated Debt Securities | 17 |
| Description of the Guarantee | 21 |
| Effect of Obligations Under the Junior Subordinated Debt Securities and the Guarantee | 24 |

| | |
|---|---|
| United States Federal Income Tax Consequences | 25 |
| Plan of Distribution | 30 |
| ERISA Considerations | 33 |
| Legal Matters | 35 |
| Experts | 35 |

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. Lehman Brothers Holdings has not authorized any other person to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. Lehman Brothers Holdings is not making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted. You should assume that the information appearing in this prospectus supplement and the accompanying prospectus, as well as information Lehman Brothers Holdings previously filed with the Securities and Exchange Commission and incorporated by reference, is accurate as of the date of the applicable document. Lehman Brothers Holdings' business, financial condition, results of operations and prospects may have changed since that date.

You may request a copy of any document Lehman Brothers Holdings files with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, at no cost, by writing or telephoning Lehman Brothers Holdings at the following address, which replaces the address provided in the attached prospectus:

Office of the Corporate Secretary
399 Park Avenue
New York, New York 10022
(212) 526-0858

See "Where You Can Find More Information" in the attached prospectus.

## SUMMARY INFORMATION—Q&A

This summary, together with the summary beginning on page 2 of the accompanying prospectus, provides a brief overview of the key aspects of Lehman Brothers Holdings and the preferred securities. The term "Holdings" will refer to Lehman Brothers Holdings, and the term "trust" refers to Lehman Brothers Holdings Capital Trust IV, the issuer of the preferred securities. You should carefully read this prospectus supplement and the accompanying prospectus to understand fully the terms of the preferred securities as well as the tax and other considerations that are important to you in making a decision about whether to invest in the preferred securities. You should pay special attention to the "Risk Factors" section beginning on page 5 of the accompanying prospectus to determine whether an investment in the preferred securities is appropriate for you.

**What are the preferred securities?**

Each preferred security represents an undivided beneficial interest in the assets of the trust. Each preferred security will entitle the holder to receive cash distributions as described in this prospectus supplement and the accompanying prospectus.

**Who is the trust?**

The trust is a Delaware statutory trust. Its principal place of business is c/o Lehman Brothers Holdings Inc., 745 Seventh Avenue, New York, New York 10019, and its telephone number is (212) 526-7000.

All the common securities of the trust will be owned by Lehman Brothers Holdings. The trust will issue the preferred securities and the common securities to Lehman Brothers Holdings in exchange for a series of 6.375% Subordinated Deferrable Interest Debentures due 2052 from Lehman Brothers Holdings with the same financial terms as the preferred securities.

There are five trustees of the trust. Three of them, referred to as regular trustees, are officers of Lehman Brothers Holdings. JPMorgan Chase Bank will act as the property trustee of the trust, and Chase Manhattan Bank USA, National Association will act as the Delaware trustee.

**Who is Lehman Brothers Holdings Inc.?**

Lehman Brothers Holdings is one of the leading global investment banks, serving institutional, corporate, government and high-net-worth individual clients and customers. The company's worldwide headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in the United States, Europe, the Middle East, Latin America and the Asia Pacific region.

The company's business includes capital raising for clients through securities underwriting and direct placements, corporate finance and strategic advisory services, private equity investments, securities sales and trading, research, and the trading of foreign exchange, derivative products and certain commodities. The company acts as a market-maker in all major equity and fixed income products in both the domestic and international markets. The company is a member of all principal securities and commodities exchanges in the United States, as well as the National Association of Securities Dealers, Inc., and holds memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris and Milan stock exchanges.

Lehman Brothers Holdings' principal executive office is at 745 Seventh Avenue, New York, New York 10019, which replaces the address provided in the attached prospectus, and its telephone number is (212) 526-7000.

**When will you receive quarterly distributions and how much will you be paid?**

If you purchase the preferred securities, you will be entitled to receive cumulative cash distributions at an annual rate of 6.375%. Distributions will accumulate from the date the trust issues the preferred securities, and will be paid quarterly in arrears on January 31, April 30, July 31 and October 31 of each year, beginning January 31, 2004, unless they are deferred as described below.

**When can payment of your distributions be deferred?**

Holdings can, on one or more occasions, defer the quarterly interest payments on the subordinated debentures for up to 20 consecutive quarters unless the junior subordinated debentures are in default. In other words, Holdings may declare a five-year interest payment moratorium on the subordinated debentures. A deferral of interest payments cannot extend, however, beyond the maturity date of the

subordinated debentures. See "Certain Terms of the Subordinated Debentures—Option to Defer Interest Payments" for more details.

If Holdings defers interest payments on the subordinated debentures, the trust will also defer distributions on the preferred securities. Any deferred distributions will accumulate additional amounts due at an annual rate of 6.375% compounded quarterly. Once Holdings pays all deferred interest payments on the subordinated debentures, with accrued interest, it can again postpone interest payments on the subordinated debentures as described above.

If Holdings defers payments of interest on the subordinated debentures, the subordinated debentures will at that time be treated as being issued with original issue discount for United States federal income tax purposes. This means you would be required to accrue interest income with respect to distributions (even if they are deferred) and include such amounts in your gross income for United States federal income tax purposes before you receive any cash distributions relating to such interest payments. See "United States Federal Income Tax Consequences" in the accompanying prospectus for more details.

**When can the trust redeem the preferred securities?**

The trust will redeem all of the outstanding preferred securities when the subordinated debentures are paid at maturity on October 31, 2052. In addition, if Holdings redeems any subordinated debentures before their maturity, the trust will use the cash it receives on the redemption of the subordinated debentures to redeem, on a proportionate basis, the preferred securities and the common securities.

Holdings can redeem the subordinated debentures before their maturity at 100% of their principal amount plus accrued and unpaid interest:

• in whole or in part on one or more occasions any time on or after October 31, 2008; and

• in whole at any time, if certain changes in tax or investment company laws occur (which are more fully described under "Certain Terms of the Preferred Securities—Special Event Redemption"), provided Holdings chooses to redeem within 90 days of the occurrence of such event.

**How are the preferred securities guaranteed?**

Holdings will fully and unconditionally guarantee, to the extent set forth in the accompanying prospectus on page 21:

• amounts due on preferred securities to the extent the trust has funds available for payment of such distributions (the "guaran- tee"); and

• its obligations under the declaration of trust and the subordinated indenture (the document governing the subordinated debentures).

The guarantee does not cover payments when the trust does not have sufficient funds to make payments on the preferred securities. In other words, if Holdings does not make a payment on the subordinated debentures, the trust will not have sufficient funds to make payments on the preferred securities, and the guarantee will not obligate Holdings to make those payments on the trust's behalf. In addition, Holdings' obligations under the guarantee are subordinate to its obligations under all of its other liabilities.

**Will the preferred securities be listed on a stock exchange?**

An application will be filed with The New York Stock Exchange. If listed, trading is expected to commence on The New York Stock Exchange within 30 days after the preferred securities are first issued. You should be aware that the listing of the preferred securities will not necessarily ensure that a liquid trading market will be available for the preferred securities.

If the trust distributes the subordinated debentures, Holdings will use its best efforts to list them on The New York Stock Exchange or wherever the preferred securities are then listed.

**In what form will the preferred securities be issued?**

The preferred securities will be represented by one or more global securities that will be deposited with and registered in the name of The Depository Trust Company, New York, New York ("DTC") or its nominee. This means that you will not receive a certificate for your preferred securities. See "Description of the Preferred Securities—Book-Entry Only Issuance—The Depository Trust Company" beginning on page 14 of the accompanying prospectus for details.

---

**RATIO OF EARNINGS TO FIXED CHARGES**

| Year Ended November 30, | | | | | Six Months Ended |
|---|---|---|---|---|---|
| 1998 | 1999 | 2000 | 2001 | 2002 | May 31, 2003 |
| 1.07 | 1.12 | 1.14 | 1.11 | 1.13 | 1.23 |

## USE OF PROCEEDS

The trust will issue the preferred securities and common securities to Holdings in exchange for Holdings' subordinated debentures. Holdings will sell the preferred securities to the public. Holdings estimates that the net proceeds from the sale of the preferred securities will be approximately $290,250,000 after underwriting discounts and net of transaction expenses. Holdings will use the net proceeds from the sale of the subordinated debentures for working capital and general corporate purposes.

## LEHMAN BROTHERS HOLDINGS CAPITAL TRUST IV

Lehman Brothers Holdings Capital Trust IV is a statutory trust organized under Delaware law. Securities issued by the trust will be governed by Delaware law. Holdings established this trust by (1) filing a certificate of trust with the Secretary of State of Delaware on April 1, 1999, and (2) executing a declaration of trust on March 31, 1999, which was also signed by the property trustee and the Delaware trustee.

The trust's business and affairs are conducted by its trustees, which are JPMorgan Chase Bank (formerly known as The Chase Manhattan Bank), as property trustee, Chase Manhattan Bank USA, National Association, as Delaware trustee, and three regular trustees. The regular trustees are employees of Holdings. JPMorgan Chase Bank will also act as trustee under the guarantee.

Holdings has the right to appoint, remove and replace the trustees. If an event of default occurs under the subordinated indenture, the holders of a majority in liquidation amount of the preferred securities will have this right.

Holdings, as issuer of the subordinated debentures, will pay all fees and expenses related to the trust and the offering of the preferred securities. Holdings, as borrower, will also pay all ongoing costs, expenses and liabilities of the trust, except obligations to make distributions and other payments on the common and preferred securities.

The trust is being established for the following purposes only:

- to issue the preferred securities, which represent undivided beneficial ownership interests in the trust's assets, in exchange for Holdings' subordinated debentures;
- to issue the common securities to Holdings in a total liquidation amount equal to at least 3% of the trust's total capital in exchange for Holdings' subordinated debentures; and
- to engage in activities that are directly related to these activities, such as registering the transfer of the preferred securities.

Because the trust is being established only for the purposes listed above, the subordinated debentures will be the sole assets of the trust, and payments under the subordinated debentures will be the sole source of income to the trust.

All of the common securities of the trust will be owned by Holdings. The common securities will rank equally with the preferred securities, and payments on the common securities will be made on a proportionate basis with the preferred securities, unless Holdings fails to pay amounts that become due under the subordinated debentures or defaults under certain other circumstances described in "Description of the Junior Subordinated Debt Securities—Indenture Events of Default" beginning

---

on page 20 of the accompanying prospectus. If Holdings fails to pay these amounts, the trust will be unable to make payments under the common securities until it satisfies its obligations under the preferred securities. See "Certain Terms of the Preferred Securities—Subordination of Common Securities" for further details. Holdings will acquire common securities in total liquidation amount equal to at least 3% of the total capital of the trust.

The trust will initially issue $300,000,000 in liquidation amount of preferred securities (or $345,000,000 if the over-allotment option is exercised in full). The trust may, without the consent of the holders of the preferred securities, create and issue additional preferred securities ranking equally with the preferred securities and otherwise similar in all respects except for the issue date, issue price and the payment of distributions accumulating prior to the issue date of such additional preferred securities, provided that the issuance of the additional preferred

securities does not cause the trust to be other than a grantor trust. Such further preferred securities, if any, would be consolidated and form a single series with the preferred securities. No additional preferred securities can be issued if an event of default has occurred with respect to the subordinated debentures.

The preferred securities will always constitute approximately 97% of the liquidation amount of all issued securities and the common securities will constitute the balance. On October 31, 2003, the liquidation amount of preferred and common securities will be $309,278,375 ($300,000,000 of preferred securities and $9,278,375 of common securities). If the over-allotment option is exercised in full by the underwriters, the liquidation amount of preferred and issued securities will be $355,670,125 ($345,000,000 of preferred securities and $10,670,125 of common securities).

The property trustee will hold title to the subordinated debentures for the benefit of the holders of the preferred securities and, as the holder of subordinated debentures, the property trustee will have the power to exercise all rights, powers and privileges of a holder of subordinated debentures under the subordinated indenture. In addition, the property trustee will maintain exclusive control of a segregated non-interest bearing bank account to hold all payments made in respect of subordinated debentures for the benefit of the holders of the preferred securities.

For so long as the preferred securities remain outstanding, Holdings will covenant, among other things, to maintain 100% ownership of the common securities of the trust, to cause the trust to remain a statutory trust and to use its commercially reasonable efforts to ensure that the trust will not be an "investment company" for puposes of the Investment Company Act of 1940 (the "Investment Company Act").

The office of the Delaware trustee for the trust is Chase Manhattan Bank USA, National Association, Institutional Trust Services, 500 Stanton Christiana Road, Building 4, Third Floor, Newark, Delaware 19713.

The executive office of the trust is c/o Lehman Brothers Holdings Inc., 745 Seventh Avenue, New York, New York 10019, and its telephone number is (212) 526-7000.

The trust will not be required to make any filings with the Securities and Exchange Commission.

## DESCRIPTION OF SECURITIES

This prospectus supplement summarizes the specific terms and provisions of the preferred securities, the subordinated debentures and the guarantee, and supplements the general description of the terms and provisions of these securities in the accompanying prospectus. These summaries are not meant to be complete descriptions of each security. However, this prospectus supplement and the accompanying prospectus do contain the material terms and conditions for each security. For more information, please refer to the declaration of trust, the subordinated indenture and the guarantee. Forms of these documents are filed as exhibits to the registration statement of which this prospectus supplement and the accompanying prospectus are a part. All terms used but not defined in this prospectus supplement have the meanings given to them in those documents.

## CERTAIN TERMS OF THE PREFERRED SECURITIES

### Distributions

The preferred securities represent undivided beneficial ownership interests in the assets of the trust. The only assets of the trust will be the subordinated debentures. Distributions on the preferred securities are cumulative and will accumulate from October 31, 2003 at the annual rate of 6.375%. Distributions will be payable quarterly in arrears on January 31, April 30, July 31 and October 31 of each year, beginning January 31, 2004. Distributions not paid when due will accumulate additional distributions, at the annual rate of 6.375% on the amount of unpaid distributions, compounded quarterly. When we refer to any payment of distributions, the term "distributions" includes any such additional distributions. The amount of distributions payable for any period will be computed on the basis of a 360-day year comprised of twelve 30-day months. The amount of distributions payable for any period shorter than a full quarterly period will be computed on the basis of a 30-day month and, for periods of less than a month, the actual number of days elapsed per 30-day month.

If distributions are payable on a date that is not a business day (as defined at the end of this paragraph), payment will be made on the next business day (and without any interest or other payment in respect of such delay). However, if the next business day is in the next calendar year, payment of distributions will be made on the preceding business day. A "business day" means each day except Saturday, Sunday and any day on which banking institutions in The City of New York are authorized or required by law to close.

Distributions on the preferred securities will only be paid if the trust has sufficient funds available to make such payments. The income of the trust available for the payment of distributions will be limited to payments made by Holdings on the subordinated debentures.

**Deferral of Distributions**

If the subordinated debentures are not in default, Holdings can, on one or more occasions, defer interest payments on the subordinated debentures for up to 20 consecutive quarterly periods. A deferral of interest payments cannot extend, however, beyond the maturity date of the subordinated debentures. If Holdings defers interest payments on the subordinated debentures, the trust will also defer quarterly distributions on the preferred securities. During a deferral period, interest on the subordinated debentures would continue to accrue, and, accordingly, distributions otherwise due to you would continue to accumulate. See "Certain Terms of the Subordinated Debentures—Option to Defer Interest Payments" for a discussion of how you will be notified of a deferral of interest by Holdings.

Once Holdings makes all deferred interest payments on the subordinated debentures, it can again defer interest payments on the subordinated debentures as discussed above.

Holdings does not currently intend to defer interest payments on the subordinated debentures. However, if Holdings does defer such interest payments, it will be subject to certain restrictions relating to the payment of dividends on or purchases of its capital stock and payments on its debt securities that rank equal with or junior to the subordinated debentures. See "Certain Terms of the Subordinated Debentures—Option to Defer Interest Payments."

If Holdings chooses to defer payments of interest on the subordinated debentures, the subordinated debentures would at that time be treated as being issued with original issue discount for United States federal income tax purposes. This means you will be required to include interest income in gross income for United States federal income tax purposes before you receive cash distributions. This treatment will apply as long as you own preferred securities. See "United States Federal Income Tax Consequences—Interest Income and Original Issue Discount" in the accompanying prospectus.

**Payment of Distributions**

Distributions on the preferred securities will be payable to holders registered on the relevant record date. Payments on the preferred securities while they are represented by a global security will be made in immediately available funds to DTC, the depositary for the preferred securities.

As long as the preferred securities are only in book-entry form, the record date for the payment of distributions will be one business day before the

---

distribution date. If the preferred securities are ever issued in certificated form, the record date for the payment of distributions will be determined by the regular trustees and will be at least one business day before the relevant payment dates.

**Redemption**

Holdings may redeem the subordinated debentures before their maturity:

- in whole or in part on one or more occasions any time on or after October 31, 2008; and
- in whole at any time, if certain changes in tax or investment company law occur (each of which is a "Special Event" and is described more fully under "—Special Event Redemption" below).

When Holdings pays off the subordinated debentures, either at maturity on October 31, 2052 or upon early redemption (as discussed above), the trust will use the cash it receives from the redemption of the subordinated debentures to redeem a like amount of the preferred and common securities. The redemption price for the subordinated debentures is 100% of their principal amount plus accrued and unpaid interest.

If less than all the preferred and common securities are redeemed, the aggregate liquidation amount of preferred and common securities to be redeemed will be allocated proportionately among the preferred and common securities, subject to the exceptions described under "—Subordination of Common Securities." The preferred securities to be redeemed will be redeemed on a proportionate basis by DTC if they are in book-entry-only form.

**Special Event Redemption**

If a tax event or an investment company event (as defined below) has occurred and is continuing, and Holdings cannot cure the event by some reasonable action, Holdings may redeem the subordinated debentures, within 90 days following the occurrence of the Special Event.

"Tax event" as used herein means the receipt by the trust of an opinion of independent tax counsel experienced in such matters, to the effect that, as a result of

- any amendment to, change in or announced proposed change in the laws or regulations interpreting such laws of the United States or any political subdivision or taxing authority; or
- any official administrative pronouncement, action or judicial decision interpreting or applying such laws or regulations;

where such amendment or change becomes effective, or proposed change, pronouncement, action or decision is announced on or after the date of this prospectus supplement, there is more than an insubstantial risk currently or within the 90 days following such opinion that:

- the trust will be subject to United States federal income tax with respect to income received or accrued on the subordinated debentures;
- interest payable by Holdings on the subordinated debentures will not be deductible by Holdings, in whole or in part, for United States federal income tax purposes; or
- the trust will be subject to more than a de minimis amount of other taxes, duties or other governmental charges.

"Investment company event" means the receipt by the trust of an opinion of a nationally recognized independent counsel to the effect that, as a result of the occurrence of a change in law or regulation or a written change in interpretation or application of law or regulation by any legislative body, court, governmental agency or regulatory authority, there is more than an insubstantial risk that the trust will be considered an "investment company" under the Investment Company Act of 1940 that is required to be registered under this law.

If Holdings does not elect to redeem the subordinated debentures following a tax event or investment company event, the preferred securities will remain outstanding until the repayment of the subordinated debentures.

**Redemption Procedures**

The trust will give you at least 30 days' notice before any redemption of preferred securities. To the extent funds are available for payment, the trust will irrevocably deposit with DTC sufficient funds to pay the redemption amount for the preferred securities being redeemed. The trust will also give DTC irrevocable instructions, and authority to pay the redemption amount to the preferred securities holders. Any distribution to be paid on or before a redemption date for any preferred securities called for redemption will be payable to the registered holders on the record date for the distribution.

---

Once notice of redemption is given and the redemption amount is irrevocably deposited, additional distributions on the preferred securities will cease to accumulate. In addition, all rights of the holders of the preferred securities called for redemption will cease, except for the right to receive distributions payable prior to the redemption date and the redemption amount.

If any redemption date is not a business day, the redemption amount will be payable on the next business day, without any interest or other payment in respect of any such delay. However, if the next business day is in the next calendar year, the, redemption amount will be payable on the preceding business day.

Holdings or its affiliates may, at any time, purchase outstanding preferred securities by tender, in the open market or by private agreement.

Any preferred securities which are repurchased or redeemed will be cancelled.

**Withholding**

All payments of principal and interest will be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or on behalf of the jurisdiction of incorporation of Holdings or any political subdivision thereof or any authority therein or thereof having power to tax unless the withholding or deduction of such taxes, duties, assessments or governmental charges is required by law (based on the advice of counsel).

**Optional Liquidation of the Trust and Distribution of Subordinated Debentures**

Holdings may dissolve the trust at any time, and after paying the creditors of the trust may cause the subordinated debentures to be exchanged for the preferred securities. Holdings will give holders of the preferred securities at least 10 business days' prior notice of such dissolution.

Assuming that the trust is not taxable as a corporation, a distribution of subordinated debentures upon a liquidation of the trust would not be a taxable event to holders of the preferred securities. If, however, the trust were subject to United States federal income tax with respect to income accrued or received on the subordinated debentures, the distribution of subordinated debentures by the trust would be a taxable event to the trust and you.

If Holdings elects to dissolve the trust, thus causing the subordinated debentures to be distributed in exchange for the preferred securities, Holdings will continue to have the right to redeem the subordinated debentures in certain circumstances. See "Certain Terms of the Subordinated Debentures—Redemption" for more information.

**Subordination of Common Securities**

Payment of distributions or any redemption or liquidation amounts regarding the preferred and common securities will be made proportionately based on the aggregate liquidation amounts of the preferred and common securities. However, if the subordinated debentures are in default, no payments may be made on the common securities until all unpaid amounts on the preferred securities have been provided for or paid in full.

**Trust Enforcement Events**

An event of default under the subordinated indenture (an "indenture event of default") constitutes an event of default under the declaration of trust governing the trust securities (a "trust enforcement event"). See "Description of the Junior Subordinated Debt Securities—Indenture Events of Default" on page 20 of the accompanying prospectus. Upon the occurrence and continuance of a trust enforcement event, the property trustee, as the sole holder of the subordinated debentures, will have the right under the subordinated indenture to declare the principal amount of the subordinated debentures due and payable.

If the property trustee fails to enforce its rights under the subordinated debentures, any holder of preferred securities may institute a legal proceeding against Holdings to enforce the property trustee's rights under the subordinated debentures. If a trust enforcement event has occurred and is continuing and such event is attributable to the failure of Holdings to pay interest or principal on the subordinated debentures when due, the registered holder of preferred securities may institute a direct action for payment on or after the due date.

Pursuant to the declaration of trust, the holder of the common securities will be deemed to have waived any trust enforcement event with respect to

the common securities until all trust enforcement events with respect to the preferred securities have been cured, waived or otherwise eliminated. Until such trust enforcement events with respect to the preferred securities have been so cured, waived or otherwise eliminated, the property trustee will be deemed to be acting solely on behalf of the holders of the preferred securities and only the holders of the preferred securities will have the right to direct the property trustee in accordance with the terms of the preferred securities.

**Voting Rights; Amendment of the Declaration**

Except as provided below and under "Description of the Guarantee—Modification of Guarantee; Assignment" on page 23 in the accompanying prospectus and as otherwise required by law, the holders of the preferred securities will have no voting rights.

So long as any subordinated debentures are held by the property trustee, the holders of a majority of the preferred securities will have the right to direct the time, method and place of conducting any proceeding for any remedy available to the property trustee, or to direct the exercise of any trust or power conferred upon the property trustee under the declaration of trust, including the right to direct the property trustee, as holder of the subordinated debentures, to:

- exercise the remedies available to it under the subordinated indenture as a holder of the subordinated debentures;
- consent to any amendment or modification of the subordinated indenture or the subordinated debentures where such consent shall be required; or
- waive any past default and its consequences that is waivable under the indenture.

If an indenture event of default has occurred and is continuing, the holders of 25% of the aggregate liquidation amount of the preferred securities may direct the property trustee to declare the principal and interest on the subordinated debentures due and payable. However, where a consent or action under the subordinated indenture would require the consent or action of the holders of more than a majority of the aggregate principal amount of subordinated debentures affected thereby, only the holders of that greater percentage of the preferred securities may direct the property trustee to give such consent or to take such action.

The declaration of trust may be amended from time to time, without the consent of the holders of the preferred securities:

- to cure any ambiguity or correct or supplement any provisions that may be defective or inconsistent with any other provision;
- to add to the covenants, restrictions or obligations of Holdings in its capacity as sponsor of the trust;
- to conform to any change in Rule 3a-5 under the Investment Company Act of 1940 or written change in interpretation or application of Rule 3a-5 under the Investment Company Act of 1940 by any legislative body, court, government agency or regulatory authority; or
- to modify, eliminate or add to any provisions as necessary to ensure that the trust will be classified for United States federal income tax purposes as a grantor trust at all times or to ensure that the trust will not be required to register as an "investment company" under the Investment Company Act of 1940.

Amendments made without the consent of the preferred securities cannot adversely affect in any material respect the rights of the holders of preferred or common securities.

The declaration of trust may also be amended as to other matters with the consent of holders of at least $66^2/3$% of the outstanding preferred securities. However, without the consent of each affected holder of preferred or common securities, the declaration of trust may not be amended to:

- change the amount or timing of any distribution or otherwise adversely affect the amount of any distribution required to be made; or

- restrict the right of a holder to institute suit for the enforcement of any such payment.

The declaration of trust may not be amended if the amendment would cause the trust to be treated as other than a grantor trust for federal income tax purposes or to be deemed to be an "investment company" requiring registration under the Investment Company Act of 1940.

Any required approval or direction of holders of preferred securities may be given at a meeting convened for such purpose or pursuant to written consent.

**Information Concerning the Property Trustee**

The property trustee, other than during the occurrence and continuance of a trust enforcement event, undertakes to perform only the duties that are specifically set forth in the declaration of trust and, after a trust enforcement event (which has not been cured or waived), must exercise the same degree of care and skill as a prudent person would exercise or use in the conduct of his or her own affairs. Subject to this provision, the property trustee is under no obligation to exercise any of the powers vested in it by the declaration of trust at the request of any holder of preferred securities unless it is offered reasonable security and indemnity against the costs, expenses and liabilities that might be incurred thereby.

**Certificated Securities—Registration, Transfer and Payment**

If the trust issues certificated securities, each one will be registered in the name of the relevant securityholder. The preferred securities may be transferred or exchanged without the payment of any service charge (other than any tax or other governmental charge) by contacting the property trustee, JPMorgan Chase Bank, Institutional Trust Services, Financial Intermediary Trust Services, 4 New York Plaza, 15th Floor, New York, New York 10004.

Transfers of a certificated preferred security will only be made upon the surrender of the certificate at the office specified above, together with the form of transfer duly completed and executed and any other evidence that the agent may reasonably require. In the case of a transfer of part of a holding of preferred securities represented by one certificate, a new certificate shall be issued to the transferee in respect of the part transferred and a further new certificate in respect of the balance of the holding not transferred shall be issued to the transferor.

Distribution payments on certificated preferred securities will be made by check. Payment of the redemption price or liquidation amount will be made in immediately available funds when you surrender a preferred security.

## CERTAIN TERMS OF THE SUBORDINATED DEBENTURES

The subordinated debentures will be issued pursuant to the subordinated indenture, dated as of February 1, 1996, as amended and supplemented. Holdings may, without the consent of the holders of the subordinated debentures, create and issue additional subordinated debentures ranking equally with the subordinated debentures and otherwise similar in all respects except for the issue date, issue price and the payment of interest accruing prior to the issue date of such additional subordinated debentures. Such further subordinated debentures, if any, would be consolidated and form a single series with the subordinated debentures. No additional subordinated debentures can be issued if an event of default has occurred with respect to the subordinated debentures.

The preferred securities, the subordinated debentures and the guarantee do not limit the ability of Holdings and its subsidiaries to incur additional indebtedness, including indebtedness that ranks senior in priority of payment to the subordinated debentures and the guarantee.

In addition, the subordinated debentures will be effectively subordinated to all existing and future obligations of Holdings' subsidiaries. Since Holdings is a holding company, its cash flow and consequent ability to satisfy its obligations under the subordinated debentures is dependent upon the earnings of its subsidiaries and the distribution of those earnings or loans or other payments by those subsidiaries to Holdings. Holdings' subsidiaries will have no obligation to pay any amount in respect of the subordinated debentures or to make any funds available therefor.

---

Dividends, loans and other payments by certain of Holdings' subsidiaries are restricted by net capital and other rules of various regulatory bodies. Additionally, the ability of Holdings to participate as an equity holder in any distribution of assets of any subsidiary is subordinate to

the claims of creditors of the subsidiary, except to the extent that any claims Holdings may have as a creditor of the subsidiary are judicially recognized.

You should refer to the most recent report on Form 10-K or Form 10-Q of Holdings filed with the SEC and incorporated by reference in this prospectus supplement to obtain the most recent financial information about Holdings.

**Interest Rate and Maturity**

The subordinated debentures will mature on October 31, 2052 and will bear interest at the annual rate of 6.375%, payable quarterly in arrears on January 31, April 30, July 31 and October 31 of each year, beginning January 31, 2004. Interest payments not paid when due will themselves accrue additional interest at the annual rate of 6.375% on the amount of unpaid interest (to the extent permitted by law), compounded quarterly. The amount of interest payable for any period will be computed based on a 360-day year comprised of twelve 30-day months. The amount of interest payable for any period shorter than a full quarterly period will be computed on the basis of a 30-day month and, for periods of less than a month, the actual number of days elapsed per 30-day month. The interest payment provisions for the subordinated debentures correspond to the distribution provisions of the preferred securities. The subordinated debentures do not have a sinking fund. This means that Holdings is not required to make any principal payments prior to maturity.

**Redemption**

Holdings has the option to redeem some or all of the subordinated debentures before their maturity. See "Certain Terms of the Preferred Securities—Redemption" and "—Special Event Redemption" for further information.

**Distribution of Subordinated Debentures**

If the property trustee distributes the subordinated debentures to the preferred and common securities holders upon the dissolution and liquidation of the trust, the subordinated debentures will be issued in denominations of $25 principal amount and integral multiples thereof. Holdings anticipates that the subordinated debentures would be distributed in the form of one or more global securities and DTC, or any successor depositary for the preferred securities, would act as depositary for the subordinated debentures. The depositary arrangements for the subordinated debentures would be substantially similar to those in effect for the preferred securities.

For a description of DTC and the terms of the depositary arrangements relating to payments, transfers, voting rights, redemption and other notices and other matters, see "Description of the Preferred Securities—Book-Entry Only Issuance—The Depository Trust Company" on page 14 of the accompanying prospectus.

**Option to Defer Interest Payments**

Holdings can defer interest payments on the subordinated debentures for up to 20 consecutive quarterly periods if the subordinated debentures are not in default. A deferral of interest payments cannot extend, however, beyond the maturity date of the subordinated debentures. During the deferral period, interest will continue to accrue on the subordinated debentures, compounded quarterly and deferred interest payments will accrue additional interest. No interest will be due and payable on the subordinated debentures until the end of the deferral period except upon a redemption of the subordinated debentures during a deferral period.

Holdings may pay at any time all or any portion of the interest accrued to that point during a deferral period. At the end of the deferral period or on any redemption date, Holdings will be obligated to pay all accrued and unpaid interest.

Once Holdings makes all interest payments on the subordinated debentures, with accrued and unpaid interest, it can again defer interest payments on the subordinated debentures as described above.

During any deferral period, neither Holdings or any of its subsidiaries will be permitted to:

- pay a dividend or make any other payment or distribution on Holdings' capital stock;
- redeem, purchase or make a liquidation payment on any of Holdings' capital stock;
- make an interest, principal or premium payment, or repay, repurchase or redeem, any of Holdings'

debt securities that rank equal with or junior to the subordinated debentures; or

- make any guarantee payment with respect to any guarantee by Holdings of debt securities of any of its subsidiaries, if the guarantee ranks equal to or junior to the subordinated debentures.

During any deferral period, however, Holdings will be permitted to:

- pay dividends or distributions by way of issuance of its common stock;
- make payments under the guarantee in respect of the preferred and common securities;
- declare or pay a dividend in connection with the implementation of a shareholders' rights plan, or the issuing of stock under such a plan or repurchase such rights; and
- purchase common stock relating to the issuing of common stock or rights under any of Holdings' benefit plans.

If the property trustee is the sole holder of the subordinated debentures, Holdings will give the trust, the regular trustees and the property trustee notice if it decides to defer interest payments on the subordinated debentures. Holdings will give that notice one business day before the earlier of:

- the next date distributions on the preferred securities are payable; or
- the date the trust is required to give notice to The New York Stock Exchange (or any other applicable self-regulatory organization) or to holders of the preferred securities of the record date or the date any distribution is payable, but in any event at least one business day before the record date.

The regular trustees will give notice to the holders of preferred securities if Holdings decides to defer interest payments on the subordinated debentures.

If the property trustee is not the sole holder of the subordinated debentures, Holdings will give the holders notice of any deferral period ten business days prior to the earlier of:

- the next interest payment date; or
- the date Holdings is required to give notice to The New York Stock Exchange (or any other applicable self-regulatory organization) or to holders of the subordinated debentures of the record date or payment, date of any related interest payment, but in any event at least two business days prior to the record date.

**Miscellaneous**

The subordinated indenture provides that Holdings, as borrower, will pay all fees and expenses related to (i) the issuance and exchange of the trust securities and the subordinated debentures, (ii) the organization, maintenance and dissolution of the trust, (iii) the retention of the trustees and (iv) the enforcement by the property trustee of the rights of the holders of the preferred securities. The subordinated indenture and the subordinated debentures are governed by New York law.

## RELATIONSHIP AMONG THE PREFERRED SECURITIES, THE SUBORDINATED DEBENTURES AND THE GUARANTEE

**Full and Unconditional Guarantee**

Payments of distributions and other amounts due on the preferred securities are irrevocably guaranteed by Holdings (to the extent the trust has funds available for the payment of such distributions) as set forth under "Description of the Guarantee" on page 21 of the accompanying prospectus. If Holdings does not make payments under the subordinated debentures, the trust will not have sufficient funds to pay distributions or other amounts due on the preferred securities.

The guarantee does not cover payment of distributions when the trust does not have sufficient funds to pay such distributions. In that event, a holder of preferred securities may institute a legal proceeding directly against Holdings to enforce payment of the subordinated debentures to such holder in accordance with their terms including Holdings' right to defer interest payments.

Taken together, Holdings' obligations under the declaration of trust, the subordinated debentures, the subordinated indenture and the guarantee provide a full and unconditional guarantee of payments of distributions and other amounts due on the preferred securities.

**Sufficiency of Payments**

As long as payments of interest, principal and other payments are made when due on the subordinated debentures, those payments will be sufficient to cover distributions and other payments due on the preferred securities because of the following factors:

- the aggregate principal amount of the subordinated debentures will be equal to the sum of the aggregate stated liquidation amount of the preferred and common securities;
- the interest rate and payment dates on the subordinated debentures will match the distribution rate and payment dates for the preferred securities;
- Holdings, as borrower, will pay, and the trust will not be obligated to pay, all costs, expenses and liabilities of the trust except the trust's obligations under the preferred and common securities; and
- the declaration of trust further provides that the trust will not engage in any activity that is not consistent with the limited purposes of the trust.

Holdings has the right to set-off any payment it is otherwise required to make under the subordinated indenture with and to the extent Holdings makes a related payment under the guarantee.

**Enforcement Rights of Holders of Preferred Securities**

If a trust enforcement event occurs, the holders of preferred securities would rely on the enforcement by the property trustee of its rights as registered holder of the subordinated debentures against Holdings. In addition, the holders of a majority in liquidation amount of the preferred securities will have the right to direct the time, method, and place of conducting any proceeding for any remedy available to the property trustee or to direct the exercise of any trust or power conferred upon the property trustee under the declaration of trust, including the right to direct the property trustee to exercise the remedies available to it as the holder of the subordinated debentures. The subordinated indenture provides that the indenture trustee shall give holders of subordinated debentures notice of all events of default within 30 days after occurrence.

If the property trustee fails to enforce its rights under the subordinated debentures in respect of an indenture event of default after a holder of preferred securities has made a written request, such holder may, to the extent permitted by applicable law, institute a legal proceeding against Holdings to enforce the property trustee's rights under the subordinated debentures. In addition, if Holdings fails to pay interest or principal on the subordinated debentures, a holder of preferred securities may directly institute a proceeding for enforcement of payment to such holder of the principal of or interest on the subordinated debentures having a principal amount equal to the aggregate stated liquidation amount of the preferred securities of such holder (a "direct action"). In connection with such a direct action, Holdings will

have the right under the indenture to set off any payment made to such holder by Holdings. The holders of preferred securities will not be able to exercise directly any other remedy available to the holders of the subordinated debentures.

**Limited Purpose of Trust**

The preferred securities evidence beneficial ownership interests in the trust, and the trust exists for the sole purpose of issuing the common and preferred securities and investing the proceeds thereof in subordinated debentures. A principal difference between the rights of a holder of preferred securities and a holder of subordinated debentures is that a holder of subordinated debentures is entitled to receive from Holdings the principal of and interest accrued on subordinated debentures held, while a holder of preferred securities is entitled to receive distributions to the extent the trust has funds available for the payment of such distributions.

**Rights Upon Termination**

Upon any dissolution, winding-up or liquidation of the trust involving the liquidation of the subordinated debentures, the holders of the preferred securities will be entitled to receive, out of assets held by the trust, subject to the rights of any creditors of the trust, the liquidation distribution in cash. Upon any voluntary or involuntary liquidation or bankruptcy of Holdings, the property trustee, as holder of the subordinated debentures, would be a subordinated creditor of Holdings, subordinated in right of payment to all senior debt as set forth in the subordinated indenture, but entitled to receive payment in full of principal and interest before any stockholders of Holdings receive payments or distributions. Because Holdings is the guarantor under the guarantee and, under the subordinated indenture, has agreed to pay for all costs, expenses and liabilities of the trust (other than the trust's obligations to the holders of the preferred securities), the positions of a holder of preferred securities and a holder of the subordinated debentures relative to other creditors and to stockholders of Holdings in the event of liquidation or bankruptcy of Holdings would be substantially the same.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain United States federal income tax consequences of the purchase, ownership and disposition of the preferred securities as of the date hereof. Except where noted, this summary deals only with preferred securities that are held as capital assets by a non-United States holder who purchases those preferred securities upon original issuance at their original issue price. For a summary of certain United States federal tax consequences that will apply to you if you are a United States holder of preferred securities, please refer to the information under "United States Federal Income Tax Consequences" in the attached prospectus. If you are a United States holder of preferred securities, also please note that the backup withholding tax rate of 31% referenced in the attached prospectus under "United States Federal Income Tax Consequences—Information Reporting and Backup Withholding—United States Holders" has been reduced to 30% for payments made during 2003, 29% for payments made during 2004 and 2005 and 28% for payments made during 2006 through 2010, after which time the rate will revert back to 31% absent Congressional action. To the extent this summary is inconsistent with the summary under "United States Federal Income Tax Consequences—Consequences to Non-United States Holders" in the attached prospectus, it replaces that summary.

For purposes of this summary, you are a "United States holder" if you are:

- a citizen or resident of the United States;
- a corporation or partnership created or organized in or under the laws of the United States or any political subdivision of the United States;
- an estate the income of which is subject to United States federal income taxation regardless of its source; or
- a trust if (x) it is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all of its substantial decisions or (y) it has a valid election in effect under applicable United States Treasury

regulations to be treated as a United States person.

A "non-United States holder" is a holder other than a "United States holder."

**Consequences to Non-United States Holders**

This summary is based upon provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and regulations, rulings and judicial decisions as of the date of this prospectus supplement. Those authorities may be changed, perhaps retroactively, so as to result in United States federal income tax consequences different from those summarized below. This summary does not represent a detailed description of the federal income tax consequences to you in light of your particular circumstances. In addition, it does not represent a detailed description of the United States federal income tax consequences applicable to you if you are subject to special treatment under the United States federal income tax laws (including if you are a "controlled foreign corporation," "passive foreign investment company," "foreign personal holding company," corporation that accumulates earnings to avoid United States federal income tax or, in certain circumstances, a United States expatriate). We cannot assure you that a change in law will not alter significantly the tax considerations that we describe in this summary.

If a partnership holds the preferred securities, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding the preferred securities, you should consult your tax advisors.

If you are considering the purchase of preferred securities, you should consult your own tax advisors concerning the particular United States federal income tax consequences to you of the ownership of the preferred securities, as well as the consequences to you arising under the laws of any other taxing jurisdiction.

**United States Federal Withholding Tax**

The 30% United States federal withholding tax will not apply to any payment of principal or interest (including OID) on the preferred securities (or the junior subordinated debt securities) provided that:

- you do not actually (or constructively) own 10% or more of the total combined voting power of all classes of the voting stock of Lehman Brothers Holdings within the meaning of the Code and applicable United States Treasury regulations;

- you are not a controlled foreign corporation that is related to Lehman Brothers Holdings through stock ownership;

- you are not a bank whose receipt of interest on the preferred securities (or the junior subordinated debt securities) is described in Section 881(c)(3)(A) of the Code; and

- either (a) you provide your name and address on an IRS Form W-8BEN (or other applicable form), and certify, under penalties of perjury, that you are not a United States person or (b) you hold your preferred securities (or junior subordinated debt securities) through certain foreign intermediaries and satisfy the certification requirements of applicable United States Treasury regulations.

Special certification rules apply to certain non-United States holders that are entities rather than individuals. If you cannot satisfy the requirements described above, payments of premium, if any, and interest including OID made to you will be subject to the 30% United States federal withholding tax, unless you provide us with a properly executed:

- IRS Form W-8BEN (or other applicable form) claiming an exemption from, or reduction in, withholding under the benefit of an applicable tax treaty; or

- IRS Form W-8ECI (or successor form) stating that interest paid on the preferred security (or the junior subordinated debt security) is not subject to withholding tax because it is effectively connected with your conduct of a trade or business in the United States (as discussed below under "—United States Federal Income Tax").

The 30% United States federal withholding tax generally will not apply to any gain that you realize on the sale, exchange, retirement or other disposition of preferred securities (or junior subordinated debt securities).

**United States Federal Income Tax**

If you are engaged in a trade or business in the United States and interest on the preferred securities (or the junior subordinated debt securities) is effectively

connected with the conduct of that trade or business, you will be subject to United States federal income tax on that interest on a net income basis (although exempt from the 30% withholding tax, provided certain certification and disclosure requirements discussed above under "—United States Federal Withholding Tax" are satisfied) in the same manner as if you were a United States person, as defined under the Code. In addition, if you are a foreign corporation, you may be subject to a branch profits tax equal to 30% (or lower applicable treaty rate) of your earnings and profits for the taxable year, subject to adjustments, that are effectively connected with the conduct by you of a trade or business in the United States.

You will generally not be subject to United States federal income tax on any gain realized on the disposition of a preferred security (or a junior subordinated debt security) unless:

- the gain is effectively connected with your conduct of a trade or business in the United States; or
- you are an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met.

**United States Federal Estate Tax**

Your estate will not be subject to United States federal estate tax on preferred securities beneficially owned by you at the time of your death provided that:

- any payment to you on the preferred securities would be eligible for exemption from the 30% United States federal withholding tax under the rules described in the bullet points under "—United States Federal Withholding Tax," without regard to the certification requirements of the fourth bullet point; and
- interest on those preferred securities (or junior subordinated debt securities) would not have been, if received at the time of your death, effectively connected with the conduct by you of a trade or business in the United States.

**Information Reporting and Backup Withholding**

If you are a non-United States holder of preferred securities (or junior subordinated debt securities), Lehman Brothers Holdings must report annually to the Internal Revenue Service and to you the amount of payments Lehman Brothers Holdings makes to you and the tax withheld with respect to such payments, regardless of whether withholding was required. Copies of the information returns reporting such payments and withholding may also be made available to the tax authorities in the country in which you reside under the provisions of an applicable income tax treaty. You will not be subject to backup withholding regarding payments Lehman Brothers Holdings makes to you provided that Lehman Brothers Holdings does not have actual knowledge or reason to know that you are a United States person and Lehman Brothers Holdings has received from you the statement described above in the fourth bullet point under "—United States Federal Withholding Tax."

In addition, you will be subject to information reporting and, depending on the circumstances, backup withholding regarding the proceeds of the sale of preferred securities (or junior subordinated debt securities) made within the United States or conducted through United States-related intermediaries, unless the payor receives the statement described above and does not have actual knowledge or reason to know that you are a United States person, or you otherwise establish an exemption.

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your United States federal income tax liability provided the required information is furnished to the Internal Revenue Service.

**Recent Tax Shelter Regulations**

Under recently issued regulations, taxpayers engaging in certain transactions, including certain loss transactions above a threshold, may be required to include tax shelter disclosure information with their annual United States federal income tax return. The IRS has provided an exception from this disclosure requirement for losses arising from cash investments, but this exception does not apply to investments in flow-through entities. Holders should consult their tax advisors about whether the limitation applicable to flow-through entities would apply to their investment in the trust.

## ERISA CONSIDERATIONS

Each fiduciary of an employee benefit plan subject to Title I of ERISA, a plan described in Section 4975 of the Code (including an individual retirement arrangement and a Keogh plan), a plan subject to provisions under applicable federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), and any entity whose underlying assets include "plan assets" by reason of any such employee benefit plan's or plan's investment in such entity (each, a "Plan") should consider the fiduciary responsibility and prohibited transaction provisions of ERISA and Section 4975 of the Code (and any applicable Similar Laws) in the context of the Plan's particular circumstances before authorizing an investment in the preferred securities. Accordingly, such a fiduciary should consider, among other factors, that each Plan investing in the preferred securities will be deemed to have represented that the Plans's purchase and holding of the preferred securities will not constitute a non-exempt prohibited transaction under ERISA or Section 4975 of the Code or a violation of any applicable Similar Laws. Plan fiduciaries should also consider whether the Plan's investment in the preferred securities would satisfy the prudence and diversification requirements of ERISA and any applicable Similar Laws and would be consistent with the documents and instruments governing their Plan.

ERISA and the Code prohibit Plans that are subject to Title I of ERISA or Section 4975 of the Code (an "ERISA Plan") from engaging in certain transactions involving "plan assets" with persons who are "parties in interest" under ERISA or "disqualified persons" under the Code ("Parties in Interest") with respect to such ERISA Plan. A violation of these "prohibited transaction" rules may result in an excise tax, penalty or other liabilities under ERISA and/or Section 4975 of the Code for such persons, or in the case of an individual retirement account the occurrence of a prohibited transaction involving the individual who established the individual retirement account, or his or her beneficiaries, would cause the individual retirement account to lose its tax-exempt status, unless exemptive relief is available under an applicable statutory or administrative exemption. Plans that are governmental plans (as defined in Section 3(32) of ERISA), certain church plans (as defined in Section 3(33) of ERISA or Section 4975(g)(2) of the Code) and foreign plans (as described in Section 4(b)(4) of ERISA) are not subject to the requirements of ERISA or Section 4975 of the Code but may be subject to Similar Laws.

Under a regulation (the "Plan Assets Regulation") issued by the United States Department of Labor (the "DOL"), the assets of the trust would be deemed to be "plan assets" of an ERISA Plan for purposes of ERISA and Section 4975 of the Code if assets of an ERISA Plan were used to acquire an equity interest in the trust and no exception were applicable under the Plan Assets Regulation. An "equity interest" is defined under the Plan Assets Regulation as any interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features. Under one such exception contained in the Plan Assets Regulation, the assets of the trust would not be deemed to be "plan assets" of investing ERISA Plans if, immediately after the most recent acquisition of any equity interest in the trust, less than 25% of the value of each class of equity interests in the trust were held by employee benefit plans, whether or not subject to ERISA or Section 4975 of the Code (including governmental, church and foreign plans), and entities whose underlying assets are deemed to include "plan assets" under the Plan Assets Regulation (collectively, "Benefit Plan Investors"). No assurance can be given that the value of the preferred securities held by Benefit Plan Investors will be less than 25% of the total value of such preferred securities at the completion of the initial offering of the preferred securities or thereafter, and no monitoring or other measures will be taken with respect to the satisfaction of the conditions to this exception. All of the common securities will be purchased and held by Holdings.

It is possible that the preferred securities may qualify as "publicly-offered securities" under the Plan Assets Regulation. "Publicly-offered securities" within the meaning of the Plan Assets Regulation are:

- widely held (i.e., owned by more than 100 investors independent of Holdings and of each other);

- freely transferable; and

- (i) sold as part of an offering pursuant to an effective registration statement under the Securities Act of 1933 and then timely registered under Section 12 of the Securities Exchange Act of 1934 or (ii) part of a class of securities that is registered under Section 12 of the Securities Exchange Act of 1934.

If the preferred securities are "publicly-offered securities," the underlying assets of the trust would not be deemed to be "plan assets" of investing Plans. The underwriters expect:

- that the preferred securities will be held by at least 100 independent investors at the conclusion of the offering of the preferred securities;

- that there will be no restrictions imposed on the transfer of the preferred securities; and
- that the preferred securities will be sold as part of an offering pursuant to an effective registration statement under the Securities Act of 1933 and then will be timely registered under the Securities Exchange Act of 1934.

There can be no assurance that this or any of the other exceptions set forth in the Plan Assets Regulation will apply to the preferred securities, and, as a result, under the terms of the Plan Assets Regulation, an investing ERISA Plan's assets could be considered to include an undivided interest in the assets held by the trust (including the subordinated debentures), and transactions by the trust could be subject to the fiduciary responsibility and prohibited transaction provisions of Title I of ERISA and Section 4975 of the Code.

Regardless of whether the assets of the trust are deemed to be "plan assets" of ERISA Plans investing in the trust, as discussed above, the acquisition and holding of the preferred securities with assets of an ERISA Plan could itself result in a prohibited transaction. The DOL has issued five prohibited transaction class exemptions ("PTCEs") that may provide exemptive relief for direct or indirect prohibited transactions resulting from the purchase and/or holding of the preferred securities by an ERISA Plan. These class exemptions are:

- PTCE 96-23 (for certain transactions determined by "in-house asset managers");
- PTCE 95-60 (for certain transactions involving insurance company general accounts);
- PTCE 91-38 (for certain transactions involving bank collective investment funds);
- PTCE 90-1 (for certain transactions involving insurance company pooled separate accounts); and
- PTCE 84-14 (for certain transactions determined by independent "qualified professional asset managers").

Such class exemptions may not, however, apply to all of the transactions that could be deemed prohibited transactions in connection with an ERISA Plan's investment in the preferred securities.

Because of ERISA's prohibitions and those of Section 4975 of the Code, discussed above, the preferred securities, or any interest therein, should not be purchased or held by any ERISA Plan or any person investing assets of any ERISA Plan, unless such purchase and holding is covered by the exemptive relief available under PTCE 96-23, 95-60, 91-38, 90-1 or 84-14 (or some other applicable class or individual exemption).

Each purchaser and holder of the preferred securities or any interest therein will be deemed to have represented by its purchase and holding thereof that either:

- it is not a Plan and no part of the assets to be used by it to purchase and/or hold such preferred securities or any interest therein constitutes assets of any Plan; or
- it is itself a Plan, or is purchasing or holding the preferred securites or an interest therein on behalf of or with the assets of one or more Plans, and each such purchase and holding of such securities either (i) satisfies the requirements of, and is entitled to full exemptive relief under, PTCE 96-23, 95-60, 91-38, 90-1 or 84-14 (or some other applicable class or individual exemption) or (ii) the purchase and holding of the preferred securities will not constitute a non-exempt prohibited transaction under ERISA or the Code or a violation under any applicable Similar Law.

---

Although, as noted above, governmental plans, certain church plans and non-U.S. plans are not subject to ERISA, including the prohibited transaction provisions thereof, or of Section 4975 of the Code, laws governing the investment and management of the assets of such plans may contain fiduciary and prohibited transaction provisions similar to those under ERISA and Section 4975 of the Code discussed above, as well as other legal restrictions under applicable laws. Accordingly, fiduciaries of Plans not subject to ERISA or Section 4975 of the Code, in consultation with their advisors, should consider the impact of their respective laws on their investment in preferred securities, and the considerations discussed above, to the extent applicable.

Due to the complexity of the fiduciary responsibility and prohibited transaction rules described above and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries or other persons considering purchasing the preferred securities on behalf of or with "plan assets" of any Plan consult with their counsel, prior to any such purchase, with respect to the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such investment and whether any exemption would be applicable and determine on their own whether all conditions of such exemption or exemptions have been satisfied such that the acquisition and holding of preferred securities by or on behalf of the Plan are entitled to full exemption relief thereunder.

## UNDERWRITING

### General

Subject to the terms and conditions of an underwriting agreement dated the date of this prospectus supplement, the trust has agreed to issue and sell to Holdings the total number of preferred securities set forth below. Holdings, in turn, has agreed to sell to each of the underwriters named below, and each of the underwriters, for whom Lehman Brothers Inc. is acting as the representative, has severally agreed to purchase from Holdings the number of preferred securities set forth opposite its name below:

| Underwriters | Number of Preferred Securities |
|---|---|
| Lehman Brothers Inc. | 1,300,000 |
| Citigroup Global Markets Inc. | 1,280,000 |
| A.G. Edwards & Sons, Inc. | 1,280,000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 1,280,000 |
| Morgan Stanley & Co. Incorporated | 1,280,000 |
| UBS Securities LLC | 1,280,000 |
| Wachovia Capital Markets, LLC | 1,280,000 |
| Banc of America Securities LLC | 300,000 |
| Fidelity Capital Markets, a division of National Financial Services LLC | 300,000 |
| J.P. Morgan Securities Inc. | 300,000 |
| ABN AMRO Incorporated | 80,000 |
| Bear, Stearns & Co. Inc. | 80,000 |
| RBC Dain Rauscher Inc. | 80,000 |
| Deutsche Bank Securities Inc. | 80,000 |
| Fahnestock & Co. Inc. | 80,000 |
| Goldman, Sachs & Co. | 80,000 |
| J.J.B. Hilliard, W.L. Lyons, Inc. | 80,000 |
| HSBC Securities (USA) Inc. | 80,000 |
| Raymond James | 80,000 |
| Janney Montgomery Scott LLC | 80,000 |
| Legg Mason Wood Walker Incorporated | 80,000 |
| BNP Paribas Securities Corp. | 80,000 |
| Charles Schwab & Co., Inc. | 80,000 |
| Stifel, Nicolaus & Company, Incorporated | 80,000 |
| SunTrust Capital Markets, Inc. | 80,000 |
| U.S. Bancorp Piper Jaffray Inc. | 80,000 |
| Wells Fargo Securities, LLC | 80,000 |
| Advest, Inc. | 40,000 |
| Robert W. Baird & Co. Incorporated | 40,000 |
| BB&T Capital Markets, a division of Scott & Stringfellow Inc. | 40,000 |
| William Blair & Company, L.L.C. | 40,000 |
| H&R Block Financial Advisors, Inc. | 40,000 |
| Davenport & Company LLC | 40,000 |
| Fleet Securities, Inc. | 40,000 |

| | |
|---|---|
| C.L. King & Associates, Inc. | 40,000 |
| Maxim Group LLC | 40,000 |
| McDonald Investments Inc. | 40,000 |
| McGinn, Smith & Co., Inc. | 40,000 |
| Mesirow Financial, Inc. | 40,000 |
| Morgan Keenan & Company, Inc. | 40,000 |
| NatCity Investments, Inc. | 40,000 |
| Pershing Trading Co. LP | 40,000 |
| Ryan, Beck & Co., LLC | 40,000 |
| Southwest Securities, Inc. | 40,000 |
| TD Securities (USA) Inc. | 40,000 |
| BC Ziegler & Co. | 40,000 |
| Total | 12,000,000 |

Holdings has granted the underwriters an option to purchase an aggregate of up to an additional 1,800,000 preferred securities solely to cover over-allotments, at the initial offering price to the public. Any or all of such options may be exercised at any time until 30 days after the date of the underwriting agreement. To the extent that the option is exercised, the underwriters will be committed, subject to certain conditions, to purchase a number of the additional preferred securities proportionate to such underwriter's initial commitment as indicated in the preceding table.

Under the terms and conditions of the underwriting agreement, the underwriters are committed to take and pay for all the preferred securities offered hereby, if any are taken.

The underwriting agreement provides that Holdings will pay an underwriting commission of $0.7875 per preferred security (a total of $9,450,000 or $10,867,500 if the over-allotment option is exercised in full) to the underwriters, as compensation.

Preferred securities sold by the underwriters to the public will initially be offered at the initial public offering price set forth on the cover of this prospectus supplement. Any preferred securities sold by the underwriters to securities dealers may be sold at a discount of up to $0.50 per capital security from the initial public offering price. Any such securities dealers may resell any preferred securities purchased from the underwriters to certain other brokers or dealers at a discount of up to $0.45 per preferred security from the initial public offering price. After the initial public offering, the underwriters may change the offering price and the other selling terms.

Prior to this offering, there has been no established public trading market for the preferred securities. An application has been filed with The New York Stock Exchange for listing of the purchased securities. If listed, trading of the preferred securities is expected to commence on the exchange within 30 days of the issuance of the preferred securities. In order to meet all of the requirements for listing the preferred securities on The New York Stock Exchange, the underwriters have agreed to sell the preferred securities to a minimum of 400 beneficial holders. The representative has advised Holdings that it intends to make a market in the preferred securities prior to the commencement of trading on The New York Stock Exchange. However, the representative is not obligated to do so and may discontinue market making at any time without notice. We cannot give any assurance about the liquidity of the trading market for the preferred securities.

Holdings and the trust have agreed that for 30 business days after the date of this prospectus supplement they will not directly or indirectly offer, sell, offer to sell, grant any option for the sale of or otherwise dispose of any preferred securities or subordinated debentures or any securities convertible or exchangeable into, or exercisable for preferred securities or subordinated debentures, or any debt securities substantially similar to subordinated debentures or any equity securities substantially similar to the preferred securities (except for the preferred securities and subordinated debentures described in this prospectus supplement) without the prior written consent of Lehman Brothers Inc.

In connection with this offering, the underwriters may engage in stabilizing transactions, over-allotment, syndicate short covering transactions, and penalty bids or purchases for the purpose of pegging, fixing or maintaining the price of the preferred securities in accordance with Regulation M under the Securities Exchange Act of 1934;

- Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specific

maximum.

- Over-allotment transactions involve sales by the underwriters of preferred securities in excess of the number of preferred securities the underwriters are obligated to purchase, which creates a syndicate short position. The short position may be either a covered short position or a naked short position. In a covered short position, the number of preferred securities over-allotted by the underwriters is not greater than the number of preferred securities that they may purchase in the over-allotment option. In a naked short position, the number of preferred securities involved is greater than the number of preferred securities in the over-allotment option. The underwriters may close out any short position by either exercising their over-allotment option, in whole or in part, and/or

purchasing preferred securities in the open market.

- Syndicate covering transactions involve purchases of preferred securities in the open market after the distribution has been completed in order to cover syndicate short positions. In determining the source of preferred securities to close out the short position, the underwriters will consider, among other things, the price of preferred securities available for purchase in the open market as compared to the price at which they may purchase preferred securities through the over-allotment option. If the underwriters sell more preferred securities than could be covered by the over-allotment option, a naked short position, the position can only be closed out by buying preferred securities in the open market. A naked short position is more likely to be created if the underwriters are concerned that there could be downward pressure on the price of preferred securities in the open market after pricing that could adversely affect investors who purchase in the offering.

- Penalty bids permit the underwriters to reclaim a selling concession from a syndicate member when the preferred securities originally sold by the syndicate member are purchased in a stabilizing or syndicate covering transaction to cover a syndicate short positions.

These stabilizing transactions, syndicate covering transactions and penalty bids may have the effect of raising or maintaining the market price of the preferred securities or preventing or retarding a decline in the market price of the preferred securities. As a result, the price of the preferred securities may be higher than the price that might otherwise exist in the open market. These transactions may be effected on the New York Stock Exchange or otherwise and, if commenced, may be discontinued at any time.

Neither we nor any of the underwriters makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the preferred securities. In addition, neither we nor any of the underwriters makes any representation that the underwriters will engage in these stabilizing transactions or that any transaction, once commenced, will not be discontinued without notice.

Holdings and the trust have agreed to indemnify the several underwriters against, or contribute to payments that the underwriters may be required to make in respect of, certain liabilities, including liabilities under the Securities Act of 1933.

Holdings estimates that its share of the total expenses of the offering of the preferred securities, excluding underwriting discounts and commissions, will be approximately $300,000.

The underwriters do not intend to make sales of the preferred securities to accounts over which they exercise discretionary authority without obtaining the prior written approval of the account holder.

Each underwriter has severally represented and agreed that:

- it and each of its affiliates have not offered or sold and will not offer or sell any Notes to persons in the United Kingdom prior to the expiry of the period of six months from the issue date of the Notes except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations of 1995;

- it and each of its affiliates have only communicated or caused to be communicated and will only communicate or cause to be

communicated any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 (the "FSMA")) received by it in connection with the issue or sale of any Notes in circumstances in which Section 21(1) of the FSMA does not apply to Lehman Brothers Holdings; and

- it and each of its affiliates have complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Notes in, from or otherwise involving the United Kingdom.

The underwriting arrangements for this offering comply with the requirements of Rule 2720 of the

NASD regarding an NASD member firm underwriting securities of its affiliate.

The underwriters have in the past and may in the future engage in transactions with, or perform services for, Holdings or its subsidiaries in the ordinary course of their business.

## EXPERTS

The consolidated financial statements and financial statement schedule of Lehman Brothers Holdings as of November 30, 2002 and 2001, and for each of the years in the three-year period ended November 30, 2002, have been audited by Ernst & Young LLP, independent certified public accountants, as set forth in their report on the consolidated financial statements. The consolidated financial statements and accountant's report are incorporated by reference in Lehman Brothers Holdings' annual report on Form 10-K for the year ended November 30, 2002, and incorporated by reference in this prospectus supplement. The consolidated financial statements of Lehman Brothers Holdings referred to above are incorporated by reference in this prospectus supplement in reliance upon such report given on the authority of Ernst & Young LLP as experts in accounting and auditing.

## LEGAL MATTERS

Barrett S. DiPaolo, Associate General Counsel of Lehman Brothers Holdings, will act as legal counsel to Lehman Brothers Holdings and the trust. Mr. DiPaolo beneficially owns, or has rights to acquire under Lehman Brothers Holdings' employee benefit plans, an aggregate of less than 1% of Lehman Brothers Holdings' common stock. Richards, Layton & Finger, P.A. will act as legal counsel to Lehman Brothers Holdings and the trust with respect to certain legal matters under Delaware law. Simpson Thacher & Bartlett LLP, New York, New York, will act as legal counsel to the underwriters. Simpson Thacher & Bartlett LLP from time to time acts as counsel for Lehman Brothers Holdings and its subsidiaries.

# $3,000,000,000

# LEHMAN BROTHERS HOLDINGS CAPITAL TRUST III

# LEHMAN BROTHERS HOLDINGS CAPITAL TRUST IV

# LEHMAN BROTHERS HOLDINGS CAPITAL TRUST V

# LEHMAN BROTHERS HOLDINGS CAPITAL TRUST VI

# PREFERRED SECURITIES

Guaranteed to the Extent Set Forth Herein By

# LEHMAN BROTHERS HOLDINGS INC.

---

Lehman Brothers Holdings will provide the specific terms of these securities in supplements to this prospectus. You should read this prospectus and the accompanying prospectus supplement carefully before you invest.

The securities offered pursuant to this prospectus are offered in an aggregate principal amount of up to $3,000,000,000 subject to reduction as a result of the sale under certain circumstances of other securities.

---

**You are urged to carefully read the "Risk Factors" section beginning on page 5, where specific risks associated with these preferred securities are described, along with the other information in this prospectus before you make your investment decision.**

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus or any accompanying prospectus supplement is truthful or complete. Any representation to the contrary is a criminal offense.

---

June 5, 2001

---

## SUMMARY INFORMATION-Q&A

This summary provides a brief overview of the key aspects of Lehman Brothers Holdings and the preferred securities. The terms "trust" and "Lehman Brothers Holdings Capital Trust" refer to the Lehman Brothers Holdings Capital Trust for the specific transaction. You should carefully read this prospectus to understand fully the terms of the preferred securities as well as the tax and other considerations that are important to you in making a decision about whether to invest in the preferred securities. You should pay special attention to the "Risk Factors" section beginning on page 5 of this prospectus to determine whether an investment in the preferred securities is appropriate for you.

### What are the preferred securities?

Each preferred security represents an undivided beneficial interest in the assets of a trust. Each preferred security will entitle the holder to receive cash distributions as described in this prospectus.

### Who is the trust?

The trust is a Delaware business trust. Its principal place of business is c/o Lehman Brothers Holdings Inc., Three World Financial Center, New York, New York 10285, and its telephone number is (212) 526-7000.

All the common securities of the trust will be owned by Lehman Brothers Holdings. The trust will issue the preferred securities and the common securities to Lehman Brothers Holdings in exchange for a series of junior subordinated deferrable interest debentures from Lehman Brothers Holdings with the same financial terms as the preferred securities.

There are five trustees of the trust. Three of them, referred to as regular trustees, are officers of Lehman Brothers Holdings. The Chase Manhattan Bank will act as the property trustee of the trust, and Chase Manhattan Bank Delaware will act as the Delaware trustee.

### Who is Lehman Brothers Holdings Inc.?

Lehman Brothers Holdings is one of the leading global investment banks, serving institutional, corporate, government and high-net-

worth individual clients and customers. The company's worldwide headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in the United States, Europe, the Middle East, Latin America and the Asia Pacific region.

The company's business includes capital raising for clients through securities underwriting and direct placements, corporate finance and strategic advisory services, private equity investments, securities sales and trading, research, and the trading of foreign exchange, derivative products and certain commodities. The company acts as a market-maker in all major equity and fixed income products in both the domestic and international markets. The company is a member of all principal securities and commodities exchanges in the United States, as well as the National Association of Securities Dealers, Inc., and holds memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris and Milan stock exchanges.

Lehman Brothers Holdings' principal executive office is at Three World Financial Center, New York, New York 10285, and its telephone number is (212) 526-7000.

**When will you receive distributions on the preferred securities?**

The trust's only source of cash to make payments on the preferred securities are payments on the junior subordinated debt securities it purchases from Lehman Brothers Holdings.

---

If you purchase the preferred securities, you are entitled to receive cumulative cash distributions at the rate specified in the applicable prospectus supplement. Distributions will accumulate from the date the preferred securities are issued and will be paid in arrears on the dates specified in such prospectus supplement, unless distributions are deferred as described below.

**When will payment of your distributions be deferred?**

If Lehman Brothers Holdings defers interest payments on the junior subordinated debt securities, the trust generally will defer distributions on the preferred securities for up to five years. A deferral of distributions cannot extend, however, beyond the maturity date of the junior subordinated debt securities.

During any deferral period, except as described beginning on page 18, Lehman Brothers Holdings will not be permitted to:

- pay a dividend or make any distributions on its capital stock;
- redeem, purchase or make a liquidation payment on any of its capital stock;
- make an interest, principal or premium payment on, or repay, repurchase or redeem, any of its debt securities that rank equal with or junior to the junior subordinated debt securities; or
- make any guarantee payment with respect to any guarantee of debt securities of any subsidiary, if that guarantee ranks equally with or junior to the junior subordinated debt securities.

**What is Lehman Brothers Holdings' guarantee of the preferred securities?**

Lehman Brothers Holdings' guarantee of the preferred securities consists of:

- its obligations to make payments on the junior subordinated debt securities;
- its obligations under the preferred securities guarantee; and
- its obligations under the amended and restated declaration of trust of the trust, which sets forth the terms of the trust.

Lehman Brothers Holdings will irrevocably guarantee that if a payment on the junior subordinated debt securities is made to the trust

but, for any reason, the trust does not make the corresponding distribution or redemption payment to the holders of the preferred securities, then Lehman Brothers Holdings will make the payments directly to the holders of the preferred securities. The guarantee will not cover payments when the trust does not have sufficient funds to make payments on the preferred securities.

Lehman Brothers Holdings' obligations under the guarantee are subordinated as described on page 21.

**When could the junior subordinated debt securities be distributed to you?**

Lehman Brothers Holdings has the right to dissolve the trust at any time. If Lehman Brothers Holdings terminates the trust, the trust will distribute junior subordinated debt securities on a proportionate basis.

**Will the preferred securities be listed on a stock exchange?**

If specified in an accompanying prospectus supplement, application will be made to list the preferred securities on the New York Stock Exchange. If approved for listing, the trust expects the preferred securities will begin trading within 30 days after they are first issued.

---

**Will holders of the preferred securities have any voting rights?**

Generally, the holders of the preferred securities will not have any voting rights. See "Description of the Preferred Securities—Voting Rights."

**In what form will the preferred securities be issued?**

The preferred securities will be represented by one or more global securities that will be deposited with and registered in the name of The Depository Trust Company or its nominee. This means that you will not receive a certificate for your preferred securities and that your broker will maintain your position in the preferred securities.

---

**You should rely only on the information provided in this prospectus and the prospectus supplement, as well as the information incorporated by reference. Lehman Brothers Holdings has not authorized anyone to provide you with different information. Lehman Brothers Holdings is not making an offer of these securities in any jurisdiction where the offer is not permitted. You should not assume that the information in this prospectus, the prospectus supplement or any documents incorporated by reference is accurate as of any date other than the date of the applicable document.**

---

## RISK FACTORS

Your investment in the preferred securities will involve several risks. You should carefully consider the following discussion of risks, and the other information in this prospectus, before deciding whether an investment in the preferred securities is suitable for you.

**Lehman Brothers Holdings is not required to pay you under the guarantee and the junior subordinated debt securities unless it first makes other required payments.**

Lehman Brothers Holdings' obligations under the junior subordinated debt securities will rank junior to all of Lehman Brothers Holdings' senior debt. This means that Lehman Brothers Holdings cannot make any payments on the junior subordinated debt securities if it defaults on a payment of senior debt and does not cure the default within the applicable grace period or if the senior debt becomes immediately due because of a default and has not yet been paid in full. In addition, Lehman Brothers Holdings' obligations under the junior subordinated debt securities will be effectively subordinated to all existing and future liabilities of Lehman Brothers Holdings' subsidiaries.

Lehman Brothers Holdings' obligations under the guarantee are subordinated to all of its other liabilities. This means that Lehman Brothers Holdings cannot make any payments on the guarantee if it defaults on a payment on any of its other liabilities. In addition, in the event of the bankruptcy, liquidation or dissolution of Lehman Brothers Holdings, its assets would be available to pay obligations under the guarantee only after Lehman Brothers Holdings made all payments on its other liabilities.

Neither the preferred securities, the junior subordinated debt securities nor the guarantee limit the ability of Lehman Brothers Holdings and its subsidiaries to incur additional indebtedness, including indebtedness that ranks senior in priority of payment to the junior subordinated debt securities and the guarantee.

**Lehman Brothers Holdings is not required to pay you under the guarantee if the trust does not have cash available.**

The ability of the trust to make payments on the preferred securities is solely dependent upon Lehman Brothers Holdings making the related payments on the junior subordinated debt securities when due.

If Lehman Brothers Holdings defaults on its obligations to make payments on the junior subordinated debt securities, the trust will not have sufficient funds to make payments on the preferred securities. In those circumstances, you will not be able to rely upon the guarantee for payment of these amounts.

**Deferral of distributions would have adverse tax consequences for you and may adversely affect the trading price of the preferred securities.**

If distributions on the preferred securities are deferred, you will be required to recognize interest income for United States federal income tax purposes in respect of your ratable share of the interest on the junior subordinated debt securities held by the trust before you receive any cash distributions relating to this interest. In addition, you will not receive this cash if you sold the preferred securities before the end of any deferral period or before the record date relating to distributions which are paid.

Lehman Brothers Holdings has no current intention of deferring interest payments on the junior subordinated debt securities and believes that such deferral is a remote possibility. However, if Lehman Brothers Holdings exercises its right in the future, the preferred securities may trade at a price that does not fully reflect the value of accrued but unpaid interest on the junior subordinated debt securities. If you sell the preferred securities during an interest deferral period, you may not receive the same return on investment as someone else who continues to hold the preferred securities. In addition,

the existence of Lehman Brothers Holdings' right to defer payments of interest on the junior subordinated debt securities may mean that the market price for the preferred securities, which represent an undivided beneficial interest in the junior subordinated debt securities, may be more volatile than other securities that do not have these rights.

**You should not rely on the distributions from the preferred securities through their maturity date—they may be redeemed at any time if certain changes in tax or investment company law occur.**

If specified changes, which are more fully described below, in tax or investment company law occur and certain other conditions which are more fully described below are satisfied, the preferred securities could be redeemed by the trust at a redemption price equal to their issue price plus any accrued and unpaid distributions.

**You should not rely on the distributions from the preferred securities through their maturity date—they may be redeemed at the option of the company.**

The preferred securities may be redeemed, in whole, at any time, or in part, from time to time, on or after a date to be specified in a prospectus supplement, at a redemption price equal to their issue price plus any accrued and unpaid distributions. You should assume that this redemption option will be exercised if Lehman Brothers Holdings is able to refinance at a lower interest rate or it is otherwise in the interest of Lehman Brothers Holdings to redeem the junior subordinated debt securities. If the junior subordinated debt securities are redeemed, the trust must redeem the preferred securities in an aggregate liquidation amount equal to the aggregate principal amount of junior subordinated debt securities to be redeemed.

**You may suffer a loss if junior subordinated debt securities are distributed to you in exchange for preferred securities because market prices for the preferred securities or the junior subordinated debt securities may not be equal.**

Lehman Brothers Holdings cannot give you any assurance as to the market prices for the preferred securities or the junior subordinated debt securities that may be distributed in exchange for preferred securities. Accordingly, the preferred securities that an investor may purchase, whether pursuant to the offer made by this prospectus or in the secondary market, or the junior subordinated debt securities that a holder of preferred securities may receive in exchange for preferred securities, may trade at a discount to the price that the investor paid to purchase the preferred securities.

**You could suffer adverse tax consequences if Lehman Brothers Holdings terminates the trust and distributes junior subordinated debt securities to holders.**

Lehman Brothers Holdings has the right to terminate the trust at any time. If Lehman Brothers Holdings decides to exercise this right, the trust will redeem the preferred securities by distributing junior subordinated debt securities to holders of the preferred securities on a proportionate basis.

Under current United States federal income tax law, a distribution of junior subordinated debt securities to you on the dissolution of the trust should not be a taxable event to you. However, if the trust is characterized for United States federal income tax purposes as an association taxable as a corporation at the time it is dissolved or if there is a change in law, the distribution of junior subordinated debt securities to you may be a taxable event to you.

**Since you have limited voting rights, you cannot prevent the the trust trustees from taking actions you may not agree with.**

You will have limited voting rights. In particular, except for the limited exceptions described below, only Lehman Brothers Holdings can elect or remove any of the trustees.

---

**WHERE YOU CAN FIND MORE INFORMATION**

As required by the Securities Act of 1933, Lehman Brothers Holdings filed a registration statement (No. 333-60474) relating to the securities offered by this prospectus with the Securities and Exchange Commission. This prospectus is a part of that registration statement, which includes additional information.

Lehman Brothers Holdings files annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any document Lehman Brothers Holdings files at the SEC's public reference rooms in Washington, D.C., New York, New York and Chicago, Illinois. You can also request copies of the documents, upon payment of a duplicating fee, by writing the Public Reference Section of the SEC. Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. These SEC filings are also available to the public from the SEC's web site at http://www.sec.gov.

The SEC allows Lehman Brothers Holdings to "incorporate by reference" the information it files with the SEC, which means that it can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of this prospectus. Information that Lehman Brothers Holdings files later with the SEC will automatically update information in this prospectus. In all cases, you should rely on the later information over different information included in this prospectus or the prospectus supplement. Lehman Brothers Holdings incorporates by reference the documents listed below and any future filings made with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934:

- Annual Report on Form 10-K for the year ended November 30, 2000, filed with the SEC on February 28, 2001;
- Amendment No. 1 to Annual Report on Form 10-K for the year ended November 30, 2000, filed with the SEC on March 9 2001;
- Quarterly Report on Form 10-Q for the quarter ended February 28, 2001, filed with the SEC on April 16, 2001;
- Current Reports on Form 8-K, filed with the SEC on January 4, January 5, February 27, March 13, March 21, April 26 (two

filings), May 2, May 22 and June 1, 2001; and

- Registration Statement on Form 8-A, filed on April 29, 1994.

All documents Lehman Brothers Holdings files pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and before the later of (1) the completion of the offering of the securities described in this prospectus and (2) the date affiliates of Lehman Brothers Holdings stop offering securities pursuant to this prospectus shall be incorporated by reference in this prospectus from the date of filing of such documents.

You may request a copy of these filings, at no cost, by writing or telephoning Lehman Brothers Holdings at the following address:

Controller's Office
Lehman Brothers Holdings Inc.
Three World Financial Center
New York, New York 10285
(212) 526-0660

## USE OF PROCEEDS

Each trust will issue the preferred securities and the common securities to Lehman Brothers Holdings in exchange for a series of junior subordinated debt securities of Lehman Brothers Holdings. Lehman Brothers Holdings will use the proceeds from the sale of the preferred securities for general corporate purposes, primarily to fund its operating units and subsidiaries. Lehman Brothers Holdings may use some of the proceeds to refinance or extend the maturity of existing debt obligations.

## RATIO OF EARNINGS TO FIXED CHARGES

| | Year Ended November 30, | | | | | Three Months Ended February 28, |
|---|---|---|---|---|---|---|
| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
| Ratio of Earnings to Fixed Charges | 1.06 | 1.07 | 1.07 | 1.12 | 1.14 | 1.12 |

## ACCOUNTING TREATMENT

The financial statements of the trust will be reflected in Lehman Brothers Holdings' consolidated financial statements, with the preferred securities reflected on Lehman Brothers Holdings' balance sheet as a separate line item after total liabilities and before stockholders' equity, similar to a minority interest.

## DESCRIPTION OF THE PREFERRED SECURITIES

The preferred securities will be issued pursuant to an amended and restated declaration of trust. The declaration will be qualified under the Trust Indenture Act of 1939. The Chase Manhattan Bank will act as trustee under the declaration for purposes of the Trust Indenture Act. The terms of the preferred securities will include those stated in the declaration and those made part of the declaration by the Trust Indenture Act. The following summary of the terms of the preferred securities is not intended to be complete and is qualified by the applicable prospectus supplement, the declaration, the Trust Indenture Act and other applicable law. The declaration will be filed as an exhibit to a Form 8-K or similar document incorporated by reference in the registration statement of which this prospectus forms a part. You can obtain a copy of this document by following the directions on page 7.

**General**

The declaration authorizes the regular trustees to issue both common and preferred securities representing undivided beneficial interests in the assets of the trust. All the common securities will be owned, directly or indirectly, by Lehman Brothers Holdings. The common securities rank equally, and payments will be made on the common securities on a ratable basis, with the preferred securities. If an event of default under the declaration occurs and continues, however, the rights of the holders of the common securities to receive payment of periodic distributions and payments upon liquidation, redemption and otherwise will be subordinated to the rights of the holders of the preferred securities. The declaration does not permit the issuance of any other securities or the incurrence of any indebtedness by the trust.

Pursuant to the declaration, the property trustee will hold title to the junior subordinated debt securities purchased by the trust for the benefit of the holders of the trust securities. The payment of distributions out of money held by the trust, and payments upon redemption of the trust securities or liquidation of the trust out of money held by the trust, are guaranteed by Lehman Brothers Holdings to the extent described under "Description of the Guarantee." The guarantee will be held by The Chase Manhattan Bank, the guarantee trustee, for the benefit of the holders of the preferred securities. The guarantee does not cover payment of distributions when the trust does not have sufficient available funds to pay such distributions. In that event, the remedy of a holder of preferred securities is to:

- vote to direct the property trustee to enforce the property trustee's rights under the junior subordinated debt securities; or
- if the failure of the trust to pay distributions is attributable to the failure of Lehman Brothers Holdings to pay interest or principal on the junior subordinated debt securities, sue Lehman Brothers Holdings for enforcement of payment to the holder of an amount equal to the aggregate liquidation amount of his or her preferred securities.

**Distributions**

Distributions on the preferred securities will accumulate at the rate specified in the applicable prospectus supplement. The amount of distributions payable for any period will be computed on the basis of a 360-day year of twelve 30-day months.

Distributions on the preferred securities will be cumulative, will accumulate from the date the trust issues the preferred securities and will be paid in arrears on the dates specified in the applicable prospectus supplement, unless they are deferred as described below.

*Deferral of Distributions.* Lehman Brothers Holdings has the right under the indenture to defer interest payments on the junior subordinated debt securities for a period not exceeding five years during which no interest will be due and payable. A deferral of interest payments cannot extend, however, beyond the maturity of the junior subordinated debt securities. As a consequence of any such

---

deferral, distributions on the preferred securities also would be deferred. During a deferral period, the amount of distributions due to you would continue to accumulate and such deferred distributions will themselves accumulate additional distributions. When this prospectus refers to any payment of distributions, distributions include any such additional distributions unless otherwise stated.

Upon the termination of any deferral period and the payment of all amounts then due, Lehman Brothers Holdings may commence a new deferral period as discussed above. Consequently, there could be several deferral periods of varying lengths throughout the term of the junior subordinated debt securities. The regular trustees will give the holders of the preferred securities notice of any deferral period upon their receipt of notice from Lehman Brothers Holdings. If distributions are deferred, the deferred distributions on such distributions will be paid to holders of record of the preferred securities as they appear on the securities register of the trust on the record date following the termination of the deferral period. See "Description of the Junior Subordinated Debt Securities—Interest" and "—Option to Extend Interest Payment Period."

*Payment of Distributions.* Distributions on the preferred securities will be payable to the holders named on the securities register of the trust at the close of business on the relevant record dates. As long as the preferred securities remain in book-entry only form, the record dates will be one business day before the distribution dates. Such distributions will be paid through the property trustee who will hold amounts received on the junior subordinated debt securities in a property account for the benefit of the holders of the trust securities. Unless any applicable laws and regulations and the provisions of the declaration state otherwise, each payment will be made as described under "—Book-Entry Only Issuance—The Depository Trust Company" below.

If the preferred securities do not continue to remain in book-entry only form, the relevant record dates will conform to the rules of any securities exchange on which the preferred securities are listed. If any date on which distributions are to be made on the preferred securities is not a business day, then payment of the distributions payable on such date will be made on the next day which is a business day, and without any interest or other payment in respect of any delay. However, if such business day is in the next calendar year, the payment will be made on the immediately preceding business day. A "business day" means any day other than Saturday, Sunday or any other day on which banking institutions in New York City are permitted or required by law to close.

**Redemption**

The preferred securities will be redeemed upon the maturity of the junior subordinated debt securities or to the extent the junior subordinated debt securities are redeemed. The junior subordinated debt securities will mature on the date specified in the applicable prospectus supplement, and may be redeemed, in whole or in part, at any time on or after the date specified in the applicable prospectus supplement. The junior subordinated debt securities can also be redeemed at any time, in whole or in part, in certain circumstances upon the occurrence of a tax event or an investment company event.

Upon the maturity of the junior subordinated debt securities, the proceeds of their repayment will simultaneously be applied to redeem all outstanding trust securities at the redemption price. Upon the redemption of the junior subordinated debt securities, whether in whole or in part, either at the option of Lehman Brothers Holdings or pursuant to a tax or investment company event, the trust will use the cash it receives upon the redemption to redeem trust securities having an aggregate liquidation amount equal to the aggregate principal amount of the junior subordinated debt securities so redeemed at the redemption price. Before such redemption, holders of trust securities will be given not less than 30 days' notice.

---

**Special Event Redemption**

"Tax event" means that the regular trustees will have received an opinion of an independent tax counsel experienced in such matters which states that, as a result of any:

- amendment to, or change in, or announced proposed change in, the laws or associated regulations of the United States or any political subdivision or taxing authority of the United States; or
- official administrative pronouncement, action or judicial decision interpreting or applying such laws or regulations, there is more than an insubstantial risk currently or within the 90 days following such opinion that:
  - the trust would be required to pay United States federal income tax relating to income accrued or received on the junior subordinated debt securities;
  - interest payable to the trust on the junior subordinated debt securities would not be deductible by Lehman Brothers Holdings for United States federal income tax purposes; or
  - the trust would be required to pay more than a de minimis amount of other taxes, duties or other governmental charges.

"Investment company event" means that the regular trustees will have received an opinion of a nationally recognized independent counsel which states that, as a result of the occurrence of a change in law or regulation or a written change in interpretation or application of law or regulation by any legislative body, court, governmental agency or regulatory authority, there is more than an insubstantial risk that the trust is or will be considered an "investment company" which is required to be registered under the Investment Company Act of 1940.

This prospectus refers to a tax event or an investment company event as a "special event." If a special event occurs and continues, Lehman Brothers Holdings may, upon not less than 30 days' notice, redeem the junior subordinated debt securities, in whole or in part, for cash within 90 days following the occurrence of such special event.

**Redemption Procedures**

The trust may not redeem fewer than all of the outstanding preferred securities unless all accumulated and unpaid distributions thereon

have been paid.

Once notice of redemption is given and funds are irrevocably deposited, distributions will cease to accrue and all rights of holders of preferred securities called for redemption will cease, except the right of the holders to receive the redemption price but without interest on such redemption price. If any redemption date is not a business day, then payment of the redemption price payable on such date will be made on the succeeding day that is a business day, without any interest or other payment in respect of any such delay. However, if such business day falls in the next calendar year, payment will be made on the preceding business day.

If payment of the redemption price for any preferred securities is not made because the payment of the redemption price on the debentures is not made, interest will continue to accrue on the debentures, and, as a result, distributions on such preferred securities will continue to accumulate at the then applicable rate from the original redemption date to the date of payment. In this case, the actual payment date will be the redemption date for purposes of calculating the redemption price. See "—Book-Entry Only Issuance—The Depository Trust Company."

In the event that fewer than all of the outstanding preferred securities are to be redeemed, the preferred securities will be redeemed in accordance with the depositary's standard procedures. See "—Book-Entry Only Issuance—The Depository Trust Company."

---

Lehman Brothers Holdings or its subsidiaries may, at any time, and from time to time, purchase outstanding preferred securities by tender, in the open market or by private agreement, provided that it complies with United States federal securities laws and any other applicable laws.

**Distribution of the Junior Subordinated Debt Securities**

Lehman Brothers Holdings will have the right at any time to dissolve the trust. After satisfying the liabilities to its creditors, the trust may distribute junior subordinated debt securities in exchange for the preferred securities.

There can be no assurance as to the market prices for either the preferred securities or the junior subordinated debt securities that may be distributed in exchange for the preferred securities if a dissolution and liquidation of the trust were to occur. This means that the preferred securities that an investor may purchase, whether pursuant to the offer made by this prospectus or in the secondary market, or the junior subordinated debt securities that an investor may receive if a dissolution and liquidation of the trust were to occur, may trade at a discount to the price that the investor paid to purchase the preferred securities offered by this prospectus.

**Trust Enforcement Events**

Upon the occurrence of an indenture event of default (as described below), the property trustee as the sole holder of the junior subordinated debt securities will have the right under the indenture to declare the principal of and interest on the junior subordinated debt securities to be immediately due and payable.

If the property trustee fails to enforce its rights under the junior subordinated debt securities, any holder of preferred securities may directly institute a legal proceeding against Lehman Brothers Holdings to enforce these rights without first suing the property trustee or any other person or entity. If a trust enforcement event has occurred and is continuing and such event is attributable to the failure of Lehman Brothers Holdings to pay interest or principal on the junior subordinated debt securities on the date such interest or principal is otherwise payable, then a holder of preferred securities may also bring a direct action.

An "indenture event of default" is an event of default under the indenture and also constitutes a "trust enforcement event," which is an event of default under the declaration relating to the trust securities. Pursuant to the declaration, however, the holder of the common securities will be deemed to have waived any trust enforcement event relating to the common securities until all trust enforcement events relating to the preferred securities have been cured, waived or otherwise eliminated. Until such trust enforcement events relating to the preferred securities have been so cured, waived, or otherwise eliminated, the property trustee will be deemed to be acting solely on behalf of the holders of the preferred securities. Only the holders of the preferred securities will have the right to direct the property trustee as to matters under the declaration, and therefore the indenture.

**Voting Rights**

Except as described in this prospectus under "Description of the Guarantee—Modification of Guarantee; Assignment," and except as required by law, the holders of the preferred securities will have no voting rights.

The holders of a majority in aggregate liquidation amount of the preferred securities have the right to direct any proceeding for any remedy available to the property trustee, including to:

- exercise the remedies available to it under the indenture;

- waive any past indenture event of default and its consequences that is waivable under the indenture; or
- consent to any amendment, modification or termination where such consent is required.

Any required approval or direction of holders of preferred securities may be given at a separate meeting of holders of preferred securities convened for such purpose, at a meeting of all of the holders of trust securities or by written consent.

If an indenture event of default has occurred and not been cured, the holders of 25% of the aggregate liquidation amount of the preferred securities may direct the property trustee to declare the principal and interest on the junior subordinated debt securities due and payable. However, where a consent or action under the indenture would require the consent of more than a majority of the aggregate principal amount of debt securities affected thereby, consent from the holders of that greater percentage would be required. See "Description of the Junior Subordinated Debt Securities—Modifications and Amendments."

Despite the fact that holders of preferred securities are entitled to vote or consent under the circumstances described above, any of the preferred securities that are owned at the time by Lehman Brothers Holdings or any entity directly or indirectly controlling or controlled by, or under direct or indirect common control with, Lehman Brothers Holdings, will not be entitled to vote or consent. Instead, these preferred securities will be treated as if they were not outstanding.

The procedures by which holders of preferred securities may exercise their voting rights are described below. See "—Book-Entry Only Issuance—The Depository Trust Company."

Holders of the preferred securities generally will have no rights to appoint or remove the regular trustees. Instead, the trustees may be appointed, removed or replaced solely by Lehman Brothers Holdings as the indirect or direct holder of all of the common securities.

**Modification Of The Declaration**

The declaration may be amended from time to time without the consent of the holders of the preferred securities:

- to cure any ambiguity or correct or supplement any provisions that may be defective or inconsistent with any other provision;
- to add to the covenants, restrictions or obligations of Lehman Brothers Holdings in its capacity as sponsor of the trust;
- to conform to any change in Rule 3a-5 under the Investment Company Act of 1940 or written change in interpretation or application of such rule by any legislative body, court, government agency or regulatory authority; or
- to modify, eliminate or add to any provisions as necessary to ensure that the trust will be classified for United States federal income tax purposes as a grantor trust at all times or to ensure that the trust will not be required to register as an investment company under the Investment Company Act of 1940.

Amendments made without the consent of the preferred securities cannot adversely affect in any material respect the rights of the holders of preferred or common securities.

The declaration of trust may also be amended as to other matters with the consent of holders of at least $66^{2}/_{3}$% of the outstanding preferred securities. However, without the consent of each affected holder of preferred or common securities, the declaration of trust may not be amended to:

- change the amount or timing of any distribution or otherwise adversely affect the amount of any distribution required to be made; or
- restrict the right of a holder to institute suit for the enforcement of any such payment.

Despite the foregoing, no amendment or modification may be made to the declaration if such amendment or modification would

- cause the trust to be classified for United States federal income tax purposes as other than a grantor trust, or
- cause the trust to be deemed an "investment company" which is required to be registered under the Investment Company Act of 1940.

**Book-Entry Only Issuance—The Depository Trust Company**

The preferred securities will be book-entry securities. Upon issuance, all book-entry securities will be represented by one or more fully registered global securities. Each global security will be deposited with, or on behalf of, The Depository Trust Company, a securities depository, and will be registered in the name of DTC or a nominee of DTC. DTC will thus be the only registered holder of these securities.

Purchasers of securities may only hold interests in the global notes through DTC if they are participants in the DTC system. Purchasers may also hold interests through a securities intermediary—banks, brokerage houses and other institutions that maintain securities accounts for customers—that has an account with DTC or its nominee. DTC will maintain accounts showing the security holdings of its participants, and these participants will in turn maintain accounts showing the security holdings of their customers. Some of these customers may themselves be securities intermediaries holding securities for their customers. Thus, each beneficial owner of a book-entry security will hold that security indirectly through a hierarchy of intermediaries, with DTC at the "top" and the beneficial owner's own securities intermediary at the "bottom."

The securities of each beneficial owner of a book-entry security will be evidenced solely by entries on the books of the beneficial owner's securities intermediary. The actual purchaser of the securities will generally not be entitled to have the securities represented by the global securities registered in its name and will not be considered the owner under the declaration. In most cases, a beneficial owner will also not be able to obtain a paper certificate evidencing the holder's ownership of securities. The book-entry system for holding securities eliminates the need for physical movement of certificates and is the system through which most publicly traded common stock is held in the United States. However, the laws of some jurisdictions require some purchasers of securities to take physical delivery of their securities in definitive form. These laws may impair the ability to transfer book-entry securities.

A beneficial owner of book-entry securities represented by a global security may exchange the securities for definitive (paper) securities only if:

- DTC is unwilling or unable to continue as depositary for such global security and Lehman Brothers Holdings does not appoint a qualified replacement for DTC within 90 days; or
- Lehman Brothers Holdings in its sole discretion decides to allow some or all book-entry securities to be exchangeable for definitive securities in registered form.

Unless we indicate otherwise, any global security that is exchangeable will be exchangeable in whole for definitive securities in registered form, with the same terms and of an equal aggregate

principal amount. Definitive securities will be registered in the name or names of the person or persons specified by DTC in a written instruction to the registrar of the securities. DTC may base its written instruction upon directions that it receives from its participants.

In this prospectus, for book-entry securities, references to actions taken by security holders will mean actions taken by DTC upon instructions from its participants, and references to payments and notices of redemption to security holders will mean payments and notices of redemption to DTC as the registered holder of the securities for distribution to participants in accordance with DTC's procedures.

DTC is a limited purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered under section 17A of the Securities Exchange Act of 1934. The rules applicable to DTC and its participants are on file with the SEC.

Lehman Brothers Holdings and the trustees will not have any responsibility or liability for any aspect of the records relating to, or payments made on account of, beneficial ownership interest in the book-entry securities or for maintaining, supervising or reviewing any records relating to the beneficial ownership interests.

*Clearstream and Euroclear.* Links have been established among DTC, Clearstream Banking, société anonyme, Luxembourg ("Clearstream Banking SA") and Euroclear (two international clearing systems that perform functions similar to those that DTC performs in the U.S.), to facilitate the initial issuance of book-entry securities and cross-market transfers of book-entry securities associated with secondary market trading.

Although DTC, Clearstream Banking SA and Euroclear have agreed to the procedures provided below in order to facilitate transfers, they are under no obligation to perform such procedures, and the procedures may be modified or discontinued at any time.

Clearstream Banking SA and Euroclear will record the ownership interests of their participants in much the same way as DTC, and DTC will record the aggregate ownership of each of the U.S. agents of Clearstream Banking SA and Euroclear, as participants in DTC.

When book-entry securities are to be transferred from the account of a DTC participant to the account of a Clearstream Banking SA participant or a Euroclear participant, the purchaser must send instructions to Clearstream Banking SA or Euroclear through a participant at least one business day prior to settlement. Clearstream Banking SA or Euroclear, as the case may be, will instruct its U.S. agent to receive book-entry securities against payment. After settlement, Clearstream Banking SA or Euroclear will credit its participant's account. Credit for the book-entry securities will appear on the next day (European time).

Because settlement is taking place during New York business hours, DTC participants can employ their usual procedures for sending book-entry securities to the relevant U.S. agent acting for the benefit of Clearstream Banking SA or Euroclear participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC participant, a cross-market transaction will settle no differently than a trade between two DTC participants.

When a Clearstream Banking SA or Euroclear participant wishes to transfer book-entry securities to a DTC participant, the seller must send instructions to Clearstream Banking SA or Euroclear through a participant at least one business day prior to settlement. In these cases, Clearstream Banking SA or Euroclear will instruct its U.S. agent to transfer the book-entry securities against payment. The payment will then be reflected in the account of the Clearstream Banking SA or Euroclear participant the following day, with the proceeds back-valued to the value date (which would be the preceding day, when settlement occurs in New York). If settlement is not completed on the intended value date (i.e.,

the trade fails), proceeds credited to the Clearstream Banking SA or Euroclear participant's account would instead be valued as of the actual settlement date.

**Information Concerning the Property Trustee**

Prior to the occurrence of a default relating to the trust securities, the property trustee undertakes to perform only such duties as are specifically set forth in the declaration. After such a default, the property trustee will exercise the same degree of care as a prudent individual would exercise in the conduct of his or her own affairs. The property trustee is under no obligation to exercise any of the powers vested in it by the declaration at the request of any holder of preferred securities unless offered reasonable indemnity by such holder against the costs,

.

expenses and liabilities which might be incurred thereby.

**Paying Agent**

If the preferred securities do not remain in book-entry only form, the following provisions will apply:

- the property trustee will act as paying agent; and
- registration of transfers of preferred securities will be effected without charge (other than in respect of any tax or other government charge).

## DESCRIPTION OF THE JUNIOR SUBORDINATED DEBT SECURITIES

The junior subordinated debt securities in exchange for which the trust will issue the trust securities to Lehman Brothers Holdings will be issued pursuant to the indenture between Lehman Brothers Holdings and The Chase Manhattan Bank (formerly known as Chemical Bank), as the indenture trustee. The indenture will be qualified under the Trust Indenture Act of 1939. The terms of the junior subordinated debt securities will include those stated in the indenture and those made a part of the indenture by the Trust Indenture Act. The following summary of the material terms of the junior subordinated debt securities is not intended to be complete and is qualified by the applicable prospectus supplement, the indenture, the Trust Indenture Act and other applicable law. The indenture (including all amendments and a separate related document containing standard multiple series indenture provisions) has been filed with the SEC as an exhibit to, and is incorporated by reference in, the registration statement of which this prospectus forms a part. You can obtain a copy of the indenture by following the directions on page 7, or by contacting the indenture trustee.

**General**

The junior subordinated debt securities will be issued as unsecured debt under the indenture. The junior subordinated debt securities will be limited in aggregate principal amount to the amount issued by Lehman Brothers Holdings to the trust in exchange for the common securities and preferred securities. Lehman Brothers Holdings will simultaneously sell the preferred securities to the public.

The entire principal amount of the junior subordinated debt securities will mature and become due and payable, together with any accrued and unpaid interest thereon, on the date specified in the applicable prospectus supplement.

If junior subordinated debt securities are distributed to holders of preferred securities in liquidation of such holders' interests in the trust, such junior subordinated debt securities will initially be issued in the form of one or more global securities under depositary arrangements similar to those in effect for the preferred securities. See "Description of the Preferred Securities—Book-Entry Only Issuance—The Depository Trust Company." In the event junior subordinated debt securities are issued in certificated form, principal and interest will be payable, the transfer of the junior subordinated debt securities will be registrable and junior subordinated debt securities will be exchangeable for securities of other denominations of a like aggregate principal amount at the corporate trust office of the indenture trustee in New York, New York.

**Subordination**

The indenture provides that the junior subordinated debt securities are subordinated and junior in right of payment to all senior debt (as defined below) of Lehman Brothers Holdings. This means that no payment of principal, including redemption payments, premium, if any, or interest on the junior subordinated debt securities may be made if Lehman Brothers Holdings defaults in the payment of any principal of, or premium, if any, or interest on any senior debt when it becomes due and payable after any applicable grace period.

"Senior debt" means:

(1) the principal, premium, if any, and interest in respect of (A) indebtedness of Lehman Brothers Holdings for money borrowed and (B) indebtedness evidenced by securities, notes, debentures, bonds or other similar instruments issued by Lehman Brothers Holdings, including the senior debt securities;

(2) all capitalized lease obligations of Lehman Brothers Holdings;

(3) all obligations of Lehman Brothers Holdings representing the deferred purchase price of property; and

(4) all deferrals, renewals, extensions and refundings of obligations of the type referred to in clauses (1) through (3);

but senior debt does not include:

(a) subordinated debt securities;

(b) any indebtedness that by its terms is subordinated to, or ranks on an equal basis with, subordinated debt securities;

(c) indebtedness for goods or materials purchased in the ordinary course of business or for services obtained in the ordinary course of business or indebtedness consisting of trade payables; and

(d) indebtedness which is subordinated to an obligation of Lehman Brothers Holdings of the type specified in clauses (1) through (4) above.

The indenture does not limit the aggregate amount of senior debt that may be issued by Lehman Brothers Holdings.

**Redemption**

Lehman Brothers Holdings shall have the right to redeem the junior subordinated debt securities as described above under "Description of the Preferred Securities—Special Event Redemption." The redemption price will be equal to 100% of the principal amount to be redeemed plus any accrued and unpaid interest.

**Interest**

The junior subordinated debt securities will bear interest at the rate specified in the applicable prospectus supplement, payable in arrears on the dates specified in the applicable prospectus supplement, unless interest is deferred as described below. Interest will be paid to the person in whose name such junior subordinated debt security is registered, with limited exceptions, at the close of business on the business day next preceding such interest payment date. In the event the junior subordinated debt securities shall not continue to remain in book-entry only form, Lehman Brothers Holdings will select appropriate record dates.

The amount of interest payable for any period will be computed on the basis of a 360-day year of twelve 30-day months. The amount of interest payable for any period shorter than a full period will be computed on the basis of the actual number of days elapsed per 30-day month. If any date on which interest is payable on the junior subordinated debt securities is not a business day, then payment of the interest payable on such date will be made on the succeeding day that is a business day, and without any interest or other payment in respect of any such delay. However, if such business day is in the succeeding calendar year, then such payment shall be made on the preceding business day, in each case with the same force and effect as if made on such date.

**Option to Defer Interest Payments**

Lehman Brothers Holdings can defer interest payments for up to five years. However, no deferral period may extend beyond the maturity of the junior subordinated debt securities. At the end of the deferral period, Lehman Brothers Holdings will pay all interest then accrued and unpaid.

During any deferral period, neither Lehman Brothers Holdings nor any of its subsidiaries will be permitted to:

- pay a dividend or make any other payment or distribution on Lehman Brothers Holdings' capital stock;
- redeem, purchase or make a liquidation payment on any of Lehman Brothers Holdings' capital stock;
- make an interest, principal or premium payment, or repay, repurchase or redeem, any of Lehman Brothers Holdings' debt securities that rank equal with or junior to the junior subordinated debt securities; or
- make any guarantee payment with respect to any guarantee by Lehman Brothers Holdings of debt securities of any of its subsidiaries, if the guarantee ranks equal to or junior to the junior subordinated debt securities.

During any deferral period, however, Lehman Brothers Holdings will be permitted to:

- pay dividends or distributions by way of issuance of its common stock;
- make payments under the guarantee in respect of the preferred and common securities;
- declare or pay a dividend in connection with the implementation of a shareholders' rights plan, or the issuing of stock under such a plan or repurchase such rights; and
- purchase common stock relating to the issuing of common stock or rights under any of Holdings' benefit plans.

Lehman Brothers Holdings has no present intention of exercising its right to defer payments of interest by extending the interest payment period on the junior subordinated debt securities.

If the property trustee is the sole holder of the junior subordinated debt securities, Lehman Brothers Holdings will give the regular trustees and the property trustee notice of its election to defer interest payments one business day prior to the earlier of:

- the date distributions on the preferred securities would be payable, if not for such deferral period, or
- the date the regular trustees are required to give notice to the NYSE or other applicable self-regulatory organization or to holders of the preferred securities of the record date or the date such distribution would be payable, if not for such deferral period,

but in any event one business day prior to such record date. The regular trustees will give notice of Lehman Brothers Holdings' selection of such deferral period to the holders of the preferred securities.

If the property trustee is not the sole holder of the junior subordinated debt securities, Lehman Brothers Holdings shall give the holders of the junior subordinated debt securities notice of its election to defer interest payments ten business days prior to the earlier of

- the next succeeding interest payment date or
- the date upon which Lehman Brothers Holdings is required to give notice to the NYSE or other applicable self-regulatory organization or to holders of the junior subordinated debt securities of the record or payment date of such related interest payment,

but in any event two business days prior to such record date.

**Indenture Events of Default**

The indenture provides that the following are events of default relating to the junior subordinated debt securities:

- failure to pay required interest on any debt security of such series for 30 days;
- failure to pay principal or premium, if any, on any debt security of such series when due;
- failure to make any required scheduled installment payment for 30 days on debt securities of such series;
- failure to perform for 90 days after notice any other covenant in the relevant indenture other than a covenant included in the relevant indenture solely for the benefit of a series of debt securities other than such series;
- certain events of bankruptcy or insolvency, whether voluntary or not; and
- certain dissolutions of the related trust.

If any indenture event of default shall occur and be continuing, the property trustee, as the holder of the junior subordinated debt securities, will have the right to declare the principal of and the interest on the junior subordinated debt securities and any other amounts payable under the indenture to be immediately due and payable. An indenture event of default also constitutes a trust enforcement event. The holders of preferred securities in limited circumstances have the right to direct the property trustee to exercise its rights as the holder of the junior subordinated debt securities. See "Description of the Preferred Securities—Trust Enforcement Events" and "—Voting Rights."

Despite the foregoing, if a trust enforcement event has occurred and is continuing and such event is attributable to the failure of Lehman Brothers Holdings to pay interest or principal on the junior subordinated debt securities when such interest or principal is payable, Lehman Brothers Holdings acknowledges that, in such event, a holder of preferred securities may sue for payment. Lehman Brothers Holdings may not amend the indenture to remove this right to bring a direct action without the prior written consent of all of the holders of preferred securities.

**Agreement by Purchasers of Certain Tax Treatment**

Each junior subordinated debenture will provide that, by acceptance of the junior subordinated debenture, or a beneficial interest therein, the holder of the junior subordinated debenture intends that such subordinated debenture constitutes debt and agrees to treat it as debt for United States federal, state and local tax purposes.

**Concerning the Indenture Trustee**

Lehman Brothers Holdings and certain of its subsidiaries maintain bank accounts, borrow money and have other customary commercial banking or investment banking relationships with the indenture trustee in the ordinary course of business.

**Miscellaneous**

The indenture provides that Lehman Brothers Holdings will pay all fees and expenses related to:

- the issuance and exchange of the trust securities and the junior subordinated debt securities;
- the organization, maintenance and dissolution of the trust (other than U.S. withholding taxes);
- the retention of the trustees; and
- the enforcement by the property trustee of the rights of the holders of the preferred securities.

---

**DESCRIPTION OF THE GUARANTEE**

The guarantee to be executed and delivered by Lehman Brothers Holdings for the benefit of the holders of preferred securities will be qualified as an indenture under the Trust Indenture Act of 1939. The Chase Manhattan Bank will act as guarantee trustee for purposes of the Trust Indenture Act. The terms of the guarantee will include those set forth in the guarantee and those made part of the guarantee by the Trust Indenture Act. The following summary of the material terms of the guarantee is not intended to be complete and is qualified in all respects by the applicable prospectus supplement, the guarantee, the Trust Indenture Act and other applicable law. The guarantee will be filed as an exhibit to a Form 8-K or similar document incorporated by reference in the registration statement of which this prospectus forms a part. You can obtain a copy of this document by following the directions on page 7.

**General**

Pursuant to and to the extent set forth in the guarantee, Lehman Brothers Holdings will irrevocably and unconditionally agree to pay in full to the holders of the preferred securities and common securities, on a pro rata basis, as and when due, regardless of any defense, right of set-off or counterclaim which the trust may have or assert, the following payments without duplication:

- any accumulated and unpaid distributions that are required to be paid on the preferred securities, to the extent the trust has funds available for such distributions;
- the redemption price per preferred security, to the extent the trust has funds available for such redemptions; and
- upon a voluntary or involuntary dissolution, winding-up or liquidation of the trust, other than in connection with the distribution of junior subordinated debt securities to the holders of preferred securities, the lesser of
    - the aggregate liquidation amount of the preferred securities and all accumulated and unpaid distributions thereon, or
    - the amount of assets of the trust remaining for distribution to holders of the preferred securities upon a liquidation of the trust.

**Status of the Guarantees**

The guarantee will constitute an unsecured obligation of Lehman Brothers Holdings and will rank:

- subordinate and junior in right of payment to all other liabilities of Lehman Brothers Holdings,
- on a parity with the most senior preferred or preference stock now or hereafter issued by Lehman Brothers Holdings and with any guarantee now or hereafter entered into by Lehman Brothers Holdings in respect of any preferred securities of any affiliate of Lehman Brothers Holdings, and
- senior to Lehman Brothers Holding's common stock.

The guarantee will not place a limitation on the amount of additional senior debt that may be incurred by Lehman Brothers Holdings.

The guarantee will constitute a guarantee of payment and not of collection (that is, the guaranteed party may institute a legal proceeding directly against Lehman Brothers Holdings to enforce its rights under the guarantee without first instituting a legal proceeding against any other person or entity). The guarantee will not be discharged except by payment of the guarantee payments in full to the extent not

---

paid by the trust or upon distribution of the junior subordinated debt securities to the holders of the preferred securities in exchange for all such preferred securities.

The guarantee, when taken together with Lehman Brothers Holdings' obligations under the junior subordinated debt securities, the indenture and the declaration, including its obligations to pay costs, expenses, debts and liabilities of the trust, other than those relating to trust securities, will provide a full and unconditional guarantee on a subordinated basis by Lehman Brothers Holdings of payments due on the preferred securities. See "Effect of Obligations Under the Junior Subordinated Debt Securities and the Guarantee."

**Important Covenants Of Lehman Brothers Holdings**

In the guarantee, Lehman Brothers Holdings will covenant that, so long as any trust securities remain outstanding, if:

- there shall have occurred any event of default under the indenture,
- Lehman Brothers Holdings shall be in default with respect to its payment of any obligations under the guarantee, or
- Lehman Brothers Holdings shall have given notice of its election to defer interest payments and shall not have rescinded such notice, and while such interest is deferred,

then Lehman Brothers Holdings will not, and will not permit any subsidiary to:

- declare or pay any dividends or distributions on, or redeem, purchase, acquire or make a liquidation payment with respect to, any of Lehman Brothers Holdings' capital stock, or
- make any payment of principal, interest or premium, if any, on or repay, repurchase or redeem any debt securities of Lehman Brothers Holdings that rank on a parity with or junior in interest to the junior subordinated debt securities or make any guarantee payments with respect to any guarantee by Lehman Brothers Holdings of the debt securities of any subsidiary of Lehman Brothers Holdings if such guarantee ranks on a parity with or junior in interest to such junior subordinated debt securities, other than
    - dividends or distributions in common stock of Lehman Brothers Holdings,
    - payments under the guarantee made by Lehman Brothers Holdings in respect of the trust securities of the trust,
    - any declaration of a dividend in connection with the implementation of a shareholders' rights plan, or the issuance of stock under any such plan in the future, or the redemption or repurchase of any such rights pursuant thereto, and
    - purchases of common stock related to the issuance of common stock or rights under any of Lehman Brothers Holdings' benefit plans.

**Events of Default**

An event of default under the guarantee will occur upon the failure of Lehman Brothers Holdings to perform any of its payment or other obligations required by the guarantee. The holders of a majority in aggregate liquidation amount of the preferred securities have the right to direct the time, method and place of conducting any proceeding for any remedy available to the guarantee trustee in respect of the guarantee or to direct the exercise of any trust or power conferred upon the guarantee trustee under the guarantee.

Within 90 days after a default under the guarantee actually known to the trustee, the trustee will notify the holders by first-class mail of the default unless the default has been cured prior to sending

notice. The trustee may withhold a notice of default under the guarantee if the trustee determines in good faith that withholding the notice is in the interests of the holders of the preferred securities.

If the guarantee trustee fails to enforce the guarantee trustee's rights under the guarantee, any holder of related preferred securities may directly sue Lehman Brothers Holdings to enforce the guarantee trustee's rights under the guarantee without first suing the trust, the guarantee trustee or any other person or entity.

Lehman Brothers Holdings, as guarantor, will be required to file annually with the guarantee trustee a certificate as to whether or not Lehman Brothers Holdings is in compliance with all the conditions and covenants applicable to it under the guarantee.

**Modification of Guarantee; Assignment**

The guarantee may be amended only with the prior approval of the holders of not less than 66²/3% in aggregate liquidation amount of the outstanding preferred and common securities. No vote will be required, however, for any changes that do not materially adversely affect the rights of holders of preferred securities. All guarantees and agreements contained in the guarantee shall bind the successors, assignees, receivers, trustees and representatives of Lehman Brothers Holdings and shall inure to the benefit of the holders of the preferred securities then outstanding.

**Information Concerning the Guarantee Trustee**

Prior to the occurrence of a default relating to the guarantee, the guarantee trustee undertakes to perform only such duties as are specifically set forth in the guarantee. After such default, the guarantee trustee will exercise the same degree of care as a prudent individual would exercise in the conduct of his or her own affairs. Provided that the foregoing requirements have been met, the guarantee trustee is under no obligation to exercise any of the powers vested in it by the guarantee at the request of any holder of preferred securities unless it is offered reasonable indemnity against the costs, expenses and liabilities that might be incurred thereby.

**Termination Of The Guarantee**

The guarantee will terminate as to the preferred securities upon full payment of the redemption price of all preferred securities, upon distribution of the junior subordinated debt securities to the holders of the preferred securities or upon full payment of the amounts payable upon liquidation of the trust. The guarantee will continue to be effective or will be reinstated, as the case may be, if at any time any holder of preferred securities must restore payment of any sums paid under the preferred securities or the guarantee.

**Governing Law**

The guarantee will be governed by and construed in accordance with the laws of New York.

---

**EFFECT OF OBLIGATIONS UNDER THE JUNIOR SUBORDINATED DEBT SECURITIES AND THE GUARANTEE**

As set forth in the declaration, the sole purpose of the trust is to issue the trust securities in exchange for the junior subordinated debt securities. As long as payments of interest and other payments are made when due on the junior subordinated debt securities, such payments will be sufficient to cover the distributions and payments due on the trust securities. This is due to the following factors:

- the aggregate principal amount of junior subordinated debt securities will be equal to the sum of the aggregate stated liquidation amount of the trust securities;
- the interest rate and the interest and other payment dates on the junior subordinated debt securities will match the distribution rate and distribution and other payment dates for the preferred securities;
- under the indenture, Lehman Brothers Holdings will pay, and the trust will not be obligated to pay, directly or indirectly, all costs, expenses and obligations of the trust other than those relating to the trust securities; and
- the declaration further provides that the Lehman Brothers Holdings trustees may not cause or permit the trust to engage in any activity that is not consistent with the purposes of the trust.

Payments of distributions, to the extent there are available funds, and other payments due on the preferred securities, to the extent there are available funds, are guaranteed by Lehman Brothers Holdings to the extent described in this prospectus. If Lehman Brothers Holdings does not make interest payments on the junior subordinated debt securities, the trust will not have sufficient funds to pay distributions on the preferred securities. The guarantee is a subordinated guarantee in relation to the preferred securities. The guarantee does not apply to any payment of distributions unless and until the trust has sufficient funds for the payment of such distributions. See "Description of the Guarantee."

The guarantee covers the payment of distributions and other payments on the preferred securities only if and to the extent that Lehman Brothers Holdings has made a payment of interest or principal or other payments on the junior subordinated debt securities. The guarantee, when taken together with Lehman Brothers Holdings' obligations under the junior subordinated debt securities and the indenture and its obligations under the declaration, will provide a full and unconditional guarantee of distributions and all other amounts due on the preferred securities.

Lehman Brothers Holdings acknowledges that the guarantee trustee shall enforce the guarantee on behalf of the holders of the preferred securities. If Lehman Brothers Holdings fails to make payments under the guarantee, the guarantee allows the holders of the preferred securities to direct the guarantee trustee to enforce its rights thereunder. If the guarantee trustee fails to enforce the guarantee, any holder of preferred securities may directly sue Lehman Brothers Holdings to enforce the guarantee trustee's rights under the guarantee. Such holder need not first sue the trust, the guarantee trustee, or any other person or entity. A holder of preferred securities may also directly sue Lehman Brothers Holdings to enforce such holder' right to receive payment under the guarantee. Such holder need not first (1) direct the guarantee trustee to enforce the terms of the guarantee or (2) sue the trust or any other person or entity.

---

## UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

In the opinion of Simpson Thacher & Bartlett, special United States tax counsel to Lehman Brothers Holdings, the following discussion is an accurate summary of the material United States federal income tax consequences of the purchase, ownership and disposition of the preferred securities as of the date of this prospectus.

Except where we state otherwise, this summary deals only with preferred securities held as capital assets by a holder who:

- is a United States person (as defined below), and
- purchases the preferred securities upon original issuance at their original issue price.

A "United States person" is a holder who is one of the following:

- a citizen or resident of the United States,
- a corporation, partnership or other entity created or organized in or under the laws of the United States or any political subdivision of the United States,
- an estate the income of which is subject to United States federal income taxation regardless of its source,
- any trust that (x) is subject to the primary supervision of a court within the United States and the control of one or more United States persons or (y) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

Your tax treatment may vary depending on your particular situation. This summary does not address all the tax consequences that may be relevant to holders that are subject to special tax treatment, such as:

- dealers in securities or currencies;
- financial institutions;
- tax-exempt investors;
- real estate investment trusts;
- regulated investment companies;

- insurance companies;
- traders in securities that elect to use a mark-to-market method of accounting for their securities holdings;
- certain expatriates;
- persons liable for alternative minimum tax;
- persons holding preferred securities as part of a hedging, integrated, conversion or constructive sale transaction or a straddle.

In addition, this summary does not include any description of the tax laws of any state, local or foreign government.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the Treasury regulations promulgated under the Code and administrative and judicial interpretations. These income tax laws, regulations and interpretations, however, may change at any time. Any change could be retroactive to the issuance date of the preferred securities.

---

If a partnership holds our preferred securities, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding our preferred securities, you should consult your tax advisors.

The authorities on which this summary is based are subject to various interpretations. Either the Internal Revenue Service ("IRS") or the courts could disagree with the explanations or conclusions contained in this summary.

**You should consult your own tax advisor with respect to the tax consequences to you of the purchase, ownership and disposition of the preferred securities, including the tax consequences under state, local, foreign, and other tax laws. For a discussion of the possible redemption of the preferred securities upon the occurrence of a tax event see "Certain Terms of the Preferred Securities—Special Event Redemption."**

**Classification of the Trust**

We intend to take the position that the trust will be classified as a grantor trust for United States federal income tax purposes and not as an association taxable as a corporation. As a condition to the issuance of the junior subordinated debt securities, Simpson Thacher & Bartlett will deliver an opinion that under current law and assuming full compliance with the terms of the trust's amended and restated declaration, and based upon certain facts and assumptions contained in such opinion, the trust will be classified as a grantor trust for United States federal income tax purposes. As a result, for United States federal income tax purposes, you generally will be treated as owning an undivided beneficial ownership interest in the junior subordinated debt securities. Thus, you will be required to include in your gross income your pro rata share of the interest income or original issue discount ("OID") that is paid or accrued on the junior subordinated debt securities. See "—Interest Income and Original Issue Discount."

**Classification of the Junior Subordinated Debt Securities**

Lehman Brothers Holdings, the trust and you (by your acceptance of a beneficial ownership interest in a preferred security) will agree to treat the junior subordinated debt securities as indebtedness for all United States tax purposes.

**Interest Income and Original Issue Discount**

We anticipate that the junior subordinated debt securities will not be issued with an issue price that is less than their stated redemption price at maturity. In this case, subject to the discussion below, the junior subordinated debt securities will not be subject to the special OID rules, at least upon initial issuance, so that you will generally be taxed on the stated interest on the junior subordinated debt securities as ordinary income at the time it is paid or accrued in accordance with your regular method of tax accounting.

If, however, Lehman Brothers Holdings exercises its right to defer payments of interest on the junior subordinated debt securities, the junior subordinated debt securities will become OID instruments at such time. In such case, you will be subject to the special OID rules

described below. Once the junior subordinated debt securities become OID instruments, they will be taxed as OID instruments for as long as they remain outstanding.

Under the OID economic accrual rules, the following occurs:

- regardless of your method of accounting, you would accrue an amount of interest income each year that approximates the stated interest payments called for under the terms of the junior subordinated debt securities using the constant-yield-to-maturity method of accrual described in section 1272 of the Code;

- the actual cash payments of interest you receive on the junior subordinated debt securities would not be reported separately as taxable income;

- any amount of OID included in your gross income (whether or not during a deferral period) with respect to the preferred securities will increase your tax basis in such preferred securities; and

- the amount of distributions that you receive in respect of such accrued OID will reduce your tax basis in such preferred securities.

The Treasury regulations dealing with OID have not yet been addressed in any rulings or other interpretations by the IRS. It is possible that the IRS could assert that the junior subordinated debt securities were issued initially with OID merely because of Lehman Brothers Holdings' right to defer interest payments. If the IRS were successful in this regard, you would be subject to the special OID rules described above, regardless of whether Lehman Brothers Holdings exercises its option to defer payments of interest on such junior subordinated debt securities.

If you are a corporate holder of preferred securities, you will not be entitled to a dividends-received deduction with respect to any income you recognize with respect to the preferred securities.

**Distribution of Junior Subordinated Debt Securities or Cash upon Liquidation of the Trust**

As described under the caption "Certain Terms of the Preferred Securities—Distribution of the Junior Subordinated Debt Securities," the junior subordinated debt securities held by the trust may be distributed to you in exchange for your preferred securities when the trust is liquidated. Under current law, except as described below, this type of distribution would not be taxable. Upon a distribution, you will receive your pro rata share of the junior subordinated debt securities previously held indirectly through the trust. Your holding period and aggregate tax basis in the junior subordinated debt securities will equal the holding period and aggregate tax basis that you had in your preferred securities before the distribution.

Lehman Brothers Holdings also has the option to redeem the junior subordinated debt securities and distribute the resulting cash in liquidation of the trust. This redemption would be taxable as described below in "—Sales of Preferred Securities." Further, in other circumstances described under "Certain Terms of the Preferred Securities—Special Event Redemption," Lehman Brothers Holdings may redeem the junior subordinated debt securities and distribute cash in liquidation of the trust. This redemption would also be taxable as described below in "—Sales of Preferred Securities."

If you receive junior subordinated debt securities in exchange for your preferred securities, you would accrue interest in respect of the junior subordinated debt securities received from the trust in the manner described above under "—Interest Income and Original Issue Discount."

If, contrary to our intended position that the trust will be classified as a grantor trust, the trust is treated instead as an association taxable as a corporation, a tax event will occur. If Lehman Brothers Holdings elects to distribute the junior subordinated debt securities to you at this time, or to redeem the securities and distribute the resulting cash, the distribution or the redemption and distribution, would likely constitute a taxable event to the trust and to you.

**Sales of Preferred Securities**

If you sell or redeem your preferred securities, you will recognize gain or loss equal to the difference between:

- your amount realized on the sale or redemption of the preferred securities (less an amount equal to any accrued but unpaid qualified stated interest that you did not previously include in income, which will be taxable as such); and

- your adjusted tax basis in your preferred securities sold or redeemed.

The gain or loss will generally be a long-term capital gain or loss if you have held your preferred securities for more than one year. Long-term capital gains of individuals derived with respect to capital assets held for more than one year are taxed at a maximum rate of 20%. The deductibility of capital losses is subject to limitations.

**Consequences to Non-United States Holders**

The following discussion only applies to you if you are not a United States holder. As discussed above, the preferred securities will be treated by the parties as evidence of indirect beneficial ownership interests in the junior subordinated debt securities. See above under "—Classification of the Trust" in this section.

Special rules may apply to some non-United States holders, such as "controlled foreign corporations," "passive foreign investment companies," "foreign personal holding companies" and corporations that accumulate earnings to avoid United States federal income tax, that are subject to special treatment under the Code. These entities should consult their own tax advisors to determine the United States federal, state, local and other tax consequences that may be relevant to them.

**United States Federal Withholding Tax**

The 30% United States federal withholding tax will not apply to any payment of principal or interest (including OID) on the preferred securities (or the junior subordinated debt securities) provided that:

- you do not actually (or constructively) own 10% or more of the total combined voting power of all classes of our voting stock within the meaning of the Code and the United States Treasury regulations;

- you are not a controlled foreign corporation that is related to us through stock ownership;

- you are not a bank whose receipt of interest on the preferred securities (or the junior subordinated debt securities) is described in section 881(c)(3)(A) of the Code; and

- (a) you provide your name and address on an IRS Form W-8BEN (or successor form), and certify, under penalty of perjury, that you are not a United States person, or (b) if you hold your preferred securities (or junior subordinated debt securities) through certain foreign intermediaries, you satisfy the certification requirements of applicable United States Treasury regulations.

Special certification rules apply to certain non-United States holders that are entities rather than individuals. If you cannot satisfy the requirements described above, payments of premium, if any, and interest including OID, made to you will be subject to the 30% United States federal withholding tax, unless you provide us with a properly executed

- IRS Form W-8BEN (or successor form) claiming an exemption from, or reduction in, withholding under the benefit of a tax treaty, or

- IRS Form W-8ECI (or successor form) stating that interest paid on the preferred security (or junior subordinated debt security) is not subject to withholding tax because it is effectively connected with your conduct of a trade or business in the United States.

Except as discussed below, the 30% United States federal withholding tax generally will not apply to any gain that you realize on the

sale, exchange, retirement or other disposition of the preferred securities (or junior subordinated debt securities).

---

**United States Federal Income Tax**

If you are engaged in a trade or business in the United States and interest on the preferred securities (or the junior subordinated debt securities) is effectively connected with the conduct of that trade or business (although exempt from the 30% withholding tax), you will be subject to United States federal income tax on that interest on a net income basis in the same manner as if you were a United States person as defined under the Code. In addition, if you are a foreign corporation, you may be subject to a branch profits tax equal to 30% (or lower applicable treaty rate) of your earnings and profits for the taxable year, subject to adjustments, that are effectively connected with the conduct by you of a trade or business in the United States. For this purpose, interest on preferred securities (or junior subordinated debt securities) will be included in earnings and profits.

You will generally not be subject to United States federal income tax on the disposition of a preferred security (or a junior subordinated debt security) unless:

- the gain is effectively connected with your conduct of a trade or business in the United States, or
- you are an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met.

**United States Federal Estate Tax**

Your estate will not be subject to United States federal estate tax on the preferred securities (or the junior subordinated debt securities) beneficially owned by you at the time of your death, provided that (1) you do not own 10% or more of the total combined voting power of all classes of our voting stock (within the meaning of the Code and the Treasury regulations), and (2) interest on that preferred security (or the junior subordinated debt security) would not have been, if received at the time of your death, effectively connected with the conduct by you of a trade or business in the United States.

**Information Reporting and Backup Withholding**

**United States Holders**

In general, information reporting requirements will apply to payments of income on the preferred securities and to the proceeds of sale of preferred securities made to you (unless you are an exempt recipient such as a corporation). A 31% backup withholding tax will apply to such payments if you fail to provide a taxpayer identification number, a certification of exempt status, or fail to report in full dividend and interest income.

**Non-United States Holders**

In general, no information reporting or backup withholding will be required regarding payments on the preferred securities that we make to you provided that we do not have actual knowledge that you are a United States person and we have received from you the statement described above under "United States Federal Withholding Tax."

In addition, no information reporting or backup withholding will be required regarding the proceeds of the sale of preferred securities made within the United States or conducted through certain United States related financial intermediaries, if the payor receives the statement described above and does not have actual knowledge that you are a United States person or you otherwise establish an exemption.

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your United States federal income tax liability provided the required information is furnished to the IRS.

## PLAN OF DISTRIBUTION

Lehman Brothers Holdings may offer the preferred securities in one or more of the following ways from time to time:

- to or through underwriters or dealers;
- by itself directly;
- through agents; or
- through a combination of any of these methods of sale.

Any such underwriters, dealers or agents may include Lehman Brothers Inc. or other affiliates of Lehman Brothers Holdings.

The prospectus supplement relating to a particular offering of preferred securities will set forth the terms of such offering, including:

- the name or names of any underwriters, dealers or agents;
- the purchase price of the preferred securities and the proceeds to Lehman Brothers Holdings from such sale;
- any underwriting discounts and commissions or agency fees and other items constituting underwriters' or agents' compensation, which in the aggregate will not exceed 8 percent of the gross proceeds of the offering;
- the initial public offering price;
- any discounts or concessions to be allowed or reallowed or paid to dealers; and
- any securities exchanges on which such preferred securities may be listed.

Any initial public offering prices, discounts or concessions allowed or reallowed or paid to dealers may be changed from time to time.

If underwriters are used in an offering of preferred securities, such preferred securities will be acquired by the underwriters for their own account and may be resold from time to time in one or more transactions, including negotiated transactions, at a fixed public offering price or at varying prices determined at the time of sale. The securities may be either offered to the public through underwriting syndicates represented by one or more managing underwriters or by one or more underwriters without a syndicate. Unless otherwise set forth in the prospectus supplement, the underwriters will not be obligated to purchase preferred securities unless specified conditions are satisfied, and if the underwriters do purchase any preferred securities, they will purchase all preferred securities.

In connection with underwritten offerings of the preferred securities and in accordance with applicable law and industry practice, underwriters may over-allot or effect transactions that stabilize, maintain or otherwise affect the market price of the preferred securities at levels above those that might otherwise prevail in the open market, including by entering stabilizing bids, effecting syndicate covering transactions or imposing penalty bids, each of which is described below.

- A stabilizing bid means the placing of any bid, or the effecting of any purchase, for the purpose of pegging, fixing or maintaining the price of a security.
- A syndicate covering transaction means the placing of any bid on behalf of the underwriting syndicate or the effecting of any purchase to reduce a short position created in connection with the offering.

- A penalty bid means an arrangement that permits the managing underwriter to reclaim a selling concession from a syndicate member in connection with the offering when offered securities originally sold by the syndicate member are purchased in syndicate covering transactions.

These transactions may be effected on the NYSE, in the over-the-counter market, or otherwise. Underwriters are not required to engage in any of these activities, or to continue such activities if commenced.

If dealers are utilized in the sale of preferred securities, Lehman Brothers Holdings will sell such preferred securities to the dealers as principals. The dealers may then resell such preferred securities to the public at varying prices to be determined by such dealers at the time of resale. The names of the dealers and the terms of the transaction will be set forth in the prospectus supplement relating to that transaction.

Preferred securities may be sold directly by Lehman Brothers Holdings to one or more institutional purchasers, or through agents designated by Lehman Brothers Holdings from time to time, at a fixed price or prices, which may be changed, or at varying prices determined at the time of sale. Any such agent may be deemed to be an underwriter as that term is defined in the Securities Act. Any agent involved in the offer or sale of the preferred securities in respect of which this prospectus is delivered will be named, and any commissions payable by Lehman Brothers Holdings to such agent will be set forth, in the prospectus supplement relating to that offering. Unless otherwise indicated in such prospectus supplement, any such agent will be acting on a best efforts basis for the period of its appointment.

If so indicated in the applicable prospectus supplement, Lehman Brothers Holdings will authorize agents, underwriters or dealers to solicit offers from certain types of institutions to purchase preferred securities from Lehman Brothers Holdings at the public offering price set forth in such prospectus supplement pursuant to delayed delivery contracts providing for payment and delivery on a specified date in the future. Such contracts will be subject only to those conditions set forth in the prospectus supplement and the prospectus supplement will set forth the commission payable for solicitation of such contracts.

Lehman Brothers Inc., the broker-dealer subsidiary of Lehman Brothers Holdings, is a member of the National Association of Securities Dealers, Inc. and may participate in distributions of the preferred securities. Accordingly, offerings of preferred securities in which Lehman Brothers Inc. participates will conform to the requirements set forth in Rule 2720 of the Conduct Rules of the NASD. Furthermore, any underwriters offering the preferred securities will not confirm sales to any accounts over which they exercise discretionary authority without the prior approval of the customer.

This prospectus together with any applicable prospectus supplement may also be used by Lehman Brothers Inc. and other affiliates of Lehman Brothers Holdings in connection with offers and sales of the preferred securities in market-making transactions at negotiated prices related to prevailing market prices at the time of sale. Such affiliates may act as principals or agents in such transactions. Such affiliates have no obligation to make a market in any of the preferred securities and may discontinue any market-making activities at any time without notice, in their sole discretion.

Underwriters, dealers and agents may be entitled, under agreements with Lehman Brothers Holdings, to indemnification by Lehman Brothers Holdings relating to material misstatements and omissions. Underwriters, dealers and agents may be customers of, engage in transactions with, or perform services for, Lehman Brothers Holdings and affiliates of Lehman Brothers Holdings in the ordinary course of business.

Each series of preferred securities will be a new issue of securities and will have no established trading market. Any underwriters to whom preferred securities are sold for public offering and sale may make a market in such preferred securities, but such underwriters will not be obligated to do so

and may discontinue any market making at any time without notice. The preferred securities may or may not be listed on a national securities exchange. No assurance can be given that there will be a market for the preferred securities.

**United Kingdom Selling Restrictions**

Each underwriter will represent and agree that:

- it has not offered or sold and prior to the date six months after the date of issue of the preferred securities will not offer or sell

preferred securities in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995;

- it has complied and will comply with all applicable provisions of the Financial Services Act 1986 with respect to anything done by it in relation to the preferred securities in, from or otherwise involving the United Kingdom; and
- it has only issued or passed on, and will only issue or pass on, in the United Kingdom any document received by it in connection with the issue of the preferred securities to a person who is of a kind described in Article 11(3) of the Financial Services Act 1986 (Investment Advertisement) (Exemptions) Order 1996 (as amended) or is a person to whom the document may otherwise lawfully be issued or passed on.

## ERISA CONSIDERATIONS

A fiduciary of a pension, profit-sharing or other employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), or a "benefit plan investor" as defined in certain plan asset regulations issued under ERISA by the U.S. Department of Labor (each, a "Plan") should consider the fiduciary standards of ERISA in the context of the Plan's particular circumstances before authorizing an investment in the preferred securities of the trust. Among other factors, the fiduciary should consider whether such an investment is in accordance with the documents governing the Plan, the applicable provisions of ERISA, the Code and similar laws and whether the investment is appropriate for the Plan in view of its overall investment policy and diversification of its portfolio.

ERISA and the Code prohibit Plans subject to ERISA and the Code from engaging in certain transactions involving "plan assets" with parties that are "parties in interest" under ERISA or "disqualified persons" under the Code relating to the Plan. The U.S. Department of Labor has issued a final regulation (29 C.F.R. §2510.3-101) with regard to whether the underlying assets of an entity in which Plans acquire equity interests are deemed to be plan assets.

Under such regulation, for purposes of ERISA and section 4975 of the Code, the assets of the trust would be deemed to be "plan assets" of a Plan whose assets were used to purchase preferred securities of the trust if the preferred securities of the trust were considered to be equity interests in the trust and no exception to plan asset status were applicable under such regulation.

If the assets of the trust were deemed to be plan assets of Plans that are holders of the preferred securities of the trust, a Plan's investment in the preferred securities of the trust might be deemed to constitute a delegation under ERISA of the duty to manage plan assets by a fiduciary investing in preferred securities of the trust. Also, Lehman Brothers Holdings might be considered a "party in interest" or "disqualified person" relating to plans whose assets were used to purchase preferred securities of the trust. If this were the case, an investment in preferred securities of the trust by a Plan might constitute, or in the course of the operation of the trust give rise to, a prohibited transaction under ERISA or the Code. In particular, it is likely that under such circumstances a prohibited extension of credit to Lehman Brothers Holdings would be considered to occur under ERISA and the Code.

In addition, Lehman Brothers Holdings might be considered a "party in interest" or "disqualified person" for certain plans for reasons unrelated to the operation of the trust, e.g., because of the provision of services by Lehman Brothers Holdings or an affiliate to the plan. A purchase of preferred securities of the trust by any such Plan would be likely to result in a prohibited extension of credit to Lehman Brothers Holdings, without regard to whether the assets of the trust constituted plan assets.

Because of the possibility that a prohibited extension of credit could occur as a result of the purchase or holding of the preferred securities of the trust by a Plan, the preferred securities of the trust may be not purchased or held by any Plan or any person investing "plan assets" of any Plan, unless such purchaser or holder is eligible for exemptive relief under a prohibited transaction class exemption ("PTCE"). These class exemptions include, without limitation:

- PTCE 96-23 for transactions determined by in-house asset managers,
- PTCE 95-60 for transactions involving insurance company general accounts,

- PTCE 91-38 for transactions involving bank collective investment funds,
- PTCE 90-1 for transactions involving insurance company separate accounts, or
- PTCE 84-14 for transactions determined by independent qualified asset managers.

---

Any purchaser of the preferred securities of the trust or any interest therein will be deemed to have represented to the trust that either

(a) it is not a Plan and is not purchasing such securities or interest therein on behalf of or with "plan assets" of any Plan or

(b) its purchase and holding of the preferred securities of the trust or interest therein is eligible for the exemptive relief available under a PTCE.

Due to the complexity of these rules and the penalties imposed upon persons involved in prohibited transactions, it is important that any person considering the purchase of preferred securities of the trust with plan assets consult with its counsel regarding the consequences under ERISA and the Code of the acquisition and ownership of preferred securities and the availability of exemptive relief under the class exemptions listed above. In *John Hancock Mutual Life Insurance Co. v. Harris Trust And Savings Bank*, 114 S.Ct. 517 (1993), the Supreme Court ruled that assets held in an insurance company's general account may be deemed to be "plan assets" for ERISA purposes under certain circumstances. The issues raised in *Harris Trust* have also been the subject of legislative action, and have been addressed in regulations issued by the U.S. Department of Labor.

---

**LEGAL MATTERS**

Oliver Budde, Vice President of Lehman Brothers Holdings, has rendered an opinion to Lehman Brothers Holdings regarding the validity of the securities to be offered by Lehman Brothers Holdings by the prospectus. Richards, Layton & Finger, P.A., Wilmington, Delaware, has rendered an opinion to Lehman Brothers Holdings and the trusts regarding the validity of the preferred securities to be offered by the trusts and related matters. Simpson Thacher & Bartlett, New York, New York, or counsel to be identified in the applicable prospectus supplement, will act as legal counsel to the underwriters. Simpson Thacher & Bartlett has from time to time acted as counsel for Lehman Brothers Holdings and its subsidiaries and may do so in the future.

**EXPERTS**

The consolidated financial statements and financial statement schedule of Lehman Brothers Holdings Inc. as of November 30, 2000 and 1999, and for each of the years in the three-year period ended November 30, 2000, have been audited by Ernst & Young LLP, independent certified public accountants, as set forth in their report on the consolidated financial statements. The consolidated financial statements and such report are incorporated by reference in Lehman Brothers Holdings' annual report on Form 10-K for the year ended November 30, 2000, and incorporated by reference in this prospectus. The consolidated financial statements of Lehman Brothers Holdings referred to above are incorporated by reference in this prospectus in reliance upon such report given on the authority of said firm as experts in accounting and auditing. To the extent that Ernst & Young LLP audits and reports on consolidated financial statements of Lehman Brothers Holdings issued at future dates, and consents to the use of their report thereon, such consolidated financial statements also will be incorporated by reference in the registration statement in reliance upon their report given on said authority.

---

## 12,000,000 PREFERRED SECURITIES

# LEHMAN BROTHERS HOLDINGS CAPITAL TRUST IV

**6.375% PREFERRED SECURITIES, SERIES L**
**(Liquidation amount $25 per preferred security)**
**fully and unconditionally guaranteed, to the extent**
**set forth herein, by**

# LEHMAN BROTHERS HOLDINGS INC.

---

PROSPECTUS SUPPLEMENT

OCTOBER 9, 2003

(INCLUDING PROSPECTUS DATED
JUNE 5, 2001)

---

## LEHMAN BROTHERS

**CITIGROUP**
**A.G. EDWARDS & SONS, INC.**
**MERRILL LYNCH & CO.**
**MORGAN STANLEY**
**UBS INVESTMENT BANK**
**WACHOVIA SECURITIES**
**BANC OF AMERICA SECURITIES LLC**
**FIDELITY CAPITAL MARKETS**
**JPMORGAN**

---

QuickLinks

Investing in the preferred securities involves risks. Risk Factors begin on page 5 of the accompanying prospectus.
SUMMARY INFORMATION—Q&A
RATIO OF EARNINGS TO FIXED CHARGES
USE OF PROCEEDS
LEHMAN BROTHERS HOLDINGS CAPITAL TRUST IV
DESCRIPTION OF SECURITIES
CERTAIN TERMS OF THE PREFERRED SECURITIES
CERTAIN TERMS OF THE SUBORDINATED DEBENTURES
RELATIONSHIP AMONG THE PREFERRED SECURITIES, THE SUBORDINATED DEBENTURES AND THE GUARANTEE
CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES
ERISA CONSIDERATIONS
UNDERWRITING
EXPERTS

LEGAL MATTERS

**Exhibit C**

Interest Calculation

| Trust Name | Frequency | Subordinate Debenture Current O/S | Interest Due End | Days | Day count | Interest Due on the Jr. Sub. Deb. | Total |
|---|---|---|---|---|---|---|---|
| Lehman Brothers Holding Inc. 6.375% subordinated Deferrable Interest Debentures due 2052 | Q:JAJO,31 | $ 309,278,375.00 | 9/15/2008 | 45 | 30/360 | $ 2,464,562.05 | $ 311,742,937.05 |