**<u>Exhibit A</u>**
**Settlement Agreement**

WEIL:\97165561\4\58399.0011

## SETTLEMENT AGREEMENT

This Settlement Agreement is made and entered into as of September 5, 2019 by and among BNC Mortgage Inc. ("BNC"), acting through its Plan Administrator, Lehman Brothers Holdings Inc. ("LBHI" and solely in its capacity as such, the "Plan Administrator"), Sylvia Vega-Sutfin, Michelle Seymour, Linda (Weeks) Howard-James, Isabel Guajardo, Coleen Denise Colombo, and Alan S. Fukushima, in his capacity as trustee for the Bankruptcy Estate of Cheryl McNeil (collectively, the "Claimants") (each of the foregoing a "Party" and collectively the "Parties").

## RECITALS

A.      On November 18, 2005, the Claimants commenced an action in the Superior Court of the State of California, County of Sacramento, against BNC and three former BNC employees (the "California Action"), asserting claims, inter alia, for employment discrimination, harassment, failure to prevent discrimination, retaliation, intentional infliction of emotional distress, and defamation.

B.      Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its affiliates, including BNC, each filed a voluntary petition commencing the Chapter 11 Cases (as defined herein).

C.      On January 9, 2009, the California Action was stayed by the commencement of BNC's Chapter 11 Case.

D.      On December 6, 2011 the Bankruptcy Court entered an order confirming the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors [ECF No. 22737] (the "Plan"), which became effective on March 6, 2012.

E.      Pursuant to the Plan, LBHI was appointed as Plan Administrator and is authorized on behalf of BNC to prosecute, elect not to pursue, compromise, settle, abandon, dismiss or otherwise dispose of all causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever belonging to or assertable by BNC free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

F.      On July 7, 2009, each Claimant filed a proof of claim (claim numbers 5222, 5223, 5224, 5225, 5226, and 5227 (collectively, the "Original Claims")) against BNC asserting both compensatory and punitive damages in the aggregate amount of $35 million.

G.      On August 20, 2013, the Plan Administrator filed the Four Hundred Thirty-First Omnibus Objection to Claims (Reduce and Allow Claims) [ECF No. 39569] (the "Omnibus Objection") seeking to reduce and allow, inter alia, the Original Claims.

H.      On October 31, 2013, the Plan Administrator filed the Notice of ADR Procedures and Scheduling of Claims Objection Hearing With Respect to Objection to Proof of Claim Nos. 5222, 5223, 5224, 5225, 5226 and 5227 [ECF No. 40923].

1

                                                                         **EXECUTION VERSION**

I.     On June 24, 2014, the Claimants filed the Motion for Relief from Stay and Injunction Provided Under Plan [ECF No. 4484] and, on August 28, 2014, filed the Supplemental Motion for Relief from Stay and Injunction Provided Under Plan [ECF No. 46189] (the "Stay Relief Motions").

J.     The Bankruptcy Court denied the relief requested in the Stay Relief Motions pursuant to an order entered on October 21, 2014 [ECF No. 46545].

K.     On June 22, 2015, the Plan Administrator filed the Plan Administrator's Supplemental Objection to the Four Hundred Thirty-First Omnibus Objection to Claims (Reduce and Allow Claims) [ECF No. 50054] (the "Supplemental Objection").

L.     On April 13, 2017, the Bankruptcy Court issued its ruling regarding the Plan Administrator's Omnibus Objection and the Supplemental Objection (the "Ruling"), in which the Bankruptcy Court held that (i) the Claimants' claims for punitive damages were denied, with prejudice; (ii) the Claimants were precluded from recovering lost wages from BNC for the period after BNC's closure on October 22, 2007, but were not precluded from seeking damages suffered on account of alleged loss of earning capacity; and (iii) the Claimants had failed to state a claim of defamation against BNC, but would be allowed to amend their Original Claims to plead the substance of any allegedly defamatory statements made.

M.     On May 30, 2017, the Claimants filed a motion seeking leave from the District Court to pursue an interlocutory appeal of the Ruling with respect to the Claimants' punitive damages claims [CV-04034 (RJS) Vega-Sutfin v. Lehman Brothers Holdings, Inc., ECF No. 3]. On January 10, 2018, the District Court denied the Claimants' motion for leave to appeal [CV-04034 (RJS) Vega-Sutfin v. Lehman Brothers Holdings, Inc., ECF No. 11].

N.     On June 7, 2017, each Claimant filed an amended proof of claim (claim numbers 68258, 68259, 68260, 68261, 68262, and 68263, collectively, the "Amended Claims") against BNC asserting damages in the aggregate amount of $27 million.

O.     On April 16, 2019, the Plan Administrator filed the Plan Administrator's Objection to Certain Amended Claims (Reduce and Disallow) [ECF No. 59622] (the "Objection").

P.     On May 14, 2019, the Claimants filed the Claimants' Opposition to the Plan Administrator's Objection to Certain Amended Claims (Reduce and Disallow) [ECF No. 59716] (the "Opposition").

Q.     On August 6, 2019, the Plan Administrator filed the Reply In Support of the Plan Administrator's Objection to Certain Amended Claims (Reduce and Disallow) [ECF No. 59860] (the "Reply").

R.     Pursuant to the Broad Form Employment Practices Liability Insurance Policy number BM00020483EP05A (the "Policy"), issued by XL Insurance (Bermuda) Ltd (the "Insurer"), to Lehman Brothers Holdings Inc. ("LBHI"), the Insurer is required to indemnify LBHI for certain Loss Amounts (as defined in the Policy) incurred by LBHI and certain Additional Insured Organizations (as defined in the Policy), including BNC, on account of any

2

**EXECUTION VERSION**

Claim first reported to the Insurer during the policy period of April 14, 2005 to April 14, 2006, which alleged Employment Practice Liability (as defined in the Policy), up to a Limit of Liability of $100,000,000 and subject to a self-insured per-Claim Retention of $5,000,000 (the "Retention Amount").

S.    The Insurer has agreed to indemnify BNC for Loss Amounts (as defined in the Policy) incurred by BNC in connection with the California Action, the Original Claims and the Amended Claims, including BNC's defense costs and the Settlement Payment (as defined below), to the extent they are in excess of the Retention Amount under reservation of rights, and subject to the Bankruptcy Court's approval.

WHEREAS, the Parties desire to resolve all disputes and issues between them so as to avoid extensive, uncertain, and expensive litigation.

NOW, THEREFORE, in consideration of the recitals stated above, the agreements, promises, and warranties set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

Section 1.    Defined Terms.  In this Settlement Agreement, the following terms shall have the following respective meanings.

"Affiliates" means, with respect to any entity, its (i) current and former parents, subsidiaries, related companies, partnerships or joint ventures and, with respect to each of them, their predecessors and successors;  and (ii) current and former directors, managers, officers, employees, agents, financial advisors, attorneys, accountants, consultants, representatives and other professionals.

"Approval Order" means a stipulation and order, signed by the Parties hereto and "so ordered" by the Bankruptcy Court, approving the terms of this Settlement Agreement.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York exercising jurisdiction over the Chapter 11 Cases.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are closed in, the State of New York.

"Causes of Action" means all causes of action, judgments, executions, setoff challenges, debts, demands, obligations, rights, suits, damages, actions, interests, remedies, costs, expenses, liabilities, and Claims of every kind, nature, and character whatsoever, whether

3

asserted or un-asserted, known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, accrued or un-accrued, matured or un-matured, liquidated or unliquidated, certain or contingent, state or federal, currently existing or hereafter arising, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute (including, without limitation, any federal, state, or local law prohibiting harassment, retaliation or discrimination on the basis of any protected characteristic; California's Fair Employment and Housing Act; the California Labor Code; Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act of 1990; the Americans with Disabilities Act, as amended; the Family and Medical Leave Act; the Lilly Ledbetter Fair Pay Act of 2009; the Genetic Information Nondiscrimination Act of 2008; the Equal Pay Act of 1963, as amended; the Employee Retirement Income Security Act of 1974, as amended; the Sarbanes-Oxley Act of 2002, as amended), regulation, tort (including, without limitation, intentional torts, fraud, misrepresentation, defamation, tortious interference, breaches of alleged fiduciary duty, recklessness, gross negligence, negligence, wrongful termination, or constructive discharge) or otherwise, including, without limitation, the California Action, and all claims for prepetition, post-petition, post-confirmation, prejudgment and post-judgment interest, and legal expenses and all appeal rights.

"Chapter 11 Cases" means the cases under chapter 11 of the Bankruptcy Code commenced by LBHI and certain of its affiliates, including BNC, by filing voluntary petitions for relief in the Bankruptcy Court and thereafter jointly administered pursuant to Bankruptcy Rule 1015(b) as Case No. 08-13555 (SCC).

"Claim" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"Claims and Noticing Agent" means Epiq Corporate Restructuring, LLC.

"Claimants' Representative" means Gwilliam, Ivary, Chiosso, Cavalli & Brewer, attorneys for the Claimants; provided, that solely with respect to Claimant Cheryl McNeil, "Claimants' Representative" shall mean Alan S. Fukushima, in his capacity as Trustee for the bankruptcy estate of Cheryl McNeil.

"Effective Date" means the first business day after entry of the Approval Order.

"Execution Date" means the date set forth in the preamble to this Settlement Agreement on which it is has been executed and delivered by the Parties.

"Released Parties" means BNC, the Plan Administrator, the Insurer, and/or all of their respective Affiliates.

"Settlement Agreement" means, this Settlement Agreement made and entered into as of the Execution Date by and among the parties.

Section 2.  Settlement of Claims.

4

**EXECUTION VERSION**

a. In consideration of the Claimants' execution of this Settlement Agreement, BNC shall pay the Claimants the aggregate amount of $5,000,000 in full and final satisfaction of the Claimants' Causes of Action against the Released Parties (the "Settlement Payment"). The Settlement Payment shall not be subject to objections, challenges or defenses, whether by way of setoff, recoupment, counterclaim, netting or otherwise.

b. The Settlement Payment shall be allocated to the Claimants by the Claimants' Representatives in accordance with Exhibit A annexed hereto. BNC shall deliver the Settlement Payment to the Claimants' Representatives, in accordance with the payment instructions annexed hereto as Exhibit B within five (5) Business Days of the Effective Date.

c. On or prior to the Effective Date, each Claimant shall provide BNC and the Plan Administrator with (1) its tax identification number (TIN) on a duly completed IRS Form W-9, and a signed certification regarding its status under the Office of Foreign Asset Control (OFAC) sanctions and (2) a completed IRS Form W-4. If any Claimant has failed to provide such information, the Settlement Payment made by BNC pursuant to Section 2(c) of this Settlement Agreement shall be reduced by the portion of the Settlement Payment allocable to such Claimant.

d. Except for the Settlement Payment provided for in this Section, the Claimants acknowledge and agree that they are entitled to no other compensation, incentive compensation, wages, payments, bonuses, overtime pay, commissions, severance, and/or benefits from the Released Parties of any kind or nature whatsoever and that the Claimants will not make any claims for any additional compensation, payments, severance or benefits. The Claimants also acknowledge and agree that they are receiving compensation beyond that to which the Claimants were already entitled before entering into this Settlement Agreement.

e. The Claimants agree that they have not relied on any advice from the Released Parties concerning the tax consequences of the Settlement Payment pursuant to this Settlement Agreement, but are relying on their own judgment and advice of personal counsel. The Claimants, on behalf of themselves, their spouses if any, heirs, executors, administrators, conservators and assigns shall defend, indemnify and hold the Released Parties harmless from any and all claims, suits, or disputes between the Claimants, and each of them, and any governmental taxing authority from any of their respective failures to pay any taxes which are determined to be owed by them by any taxing authority on the payments referred to above. The Claimants, and each of them, shall be responsible for any and all taxes owed by them on the Settlement Payment now, in the past and in the future, including but not limited to Medicare and FICA. Notwithstanding the above, (1) the Claimants acknowledge and agree that the portion of the Settlement Payment designated as "Portion Attributable to Back Pay/Lost Earning Capacity" on Exhibit A shall be reduced by applicable withholding and payroll taxes, including Medicare and FICA and (2) BNC is and shall remain responsible for paying BNC's share of any payroll taxes and any other taxes determined to be owed by BNC by any taxing authority on the Settlement Payment.

Section 3.    Release of Claims.

a. On the Effective Date, in consideration of the execution of this Settlement Agreement by the Plan Administrator and the payments to be made pursuant to

5

**EXECUTION VERSION**

Section 2 hereof, each of the Claimants, on behalf of herself and any other party, person or entity claiming under or through her, shall be deemed to generally release, discharge and acquit the Released Parties from all Causes of Actions asserted or that can or could be asserted, whether known or unknown, by the Claimants against the Released Parties.

        b.      On the Effective Date, all Causes of Action asserted by the Claimants against any Released Party, other than the obligations arising under Section 2 of this Settlement Agreement, shall be forever expunged, disallowed, and released in accordance with Section 3(a) of this Settlement Agreement.

        c.      On the Effective Date, all proofs of claim filed by the Claimants against BNC, the Plan Administrator and/or any of their Affiliates, including the Original Claims and the Amended Claims, shall be forever expunged, disallowed, released in their entirety, and deemed withdrawn in accordance with Section 3(a) of the Settlement Agreement. On the Effective Date, the Claims and Noticing Agent shall be authorized to expunge the Original and Amended Claims from the Chapter 11 Cases' claims register.

        d.      Nothing in this Settlement Agreement shall be deemed a restriction on the Claimants' ability to file a claim with a government or administrative agency, including, but not limited to, the Equal Employment Opportunity Commission; provided, however, that the Claimants understand and agree that, by reason of the release set forth in this Settlement Agreement, they will not receive any monetary benefit as a result of their filing such an administrative claim. The release set forth in this Settlement Agreement is not intended to apply to any rights that as a matter of law are not waivable.

      Section 4.    <u>Further Assurances and Mutual Co-operation</u>. Each Party hereby agrees, at its own expense, to duly execute and deliver all such other and further agreements and instruments of conveyance, transfer, release and assignment and to take such other action, as any Party may reasonably deem necessary to effectuate the transactions and releases contemplated in this Settlement Agreement.

      Section 5.    <u>Representations</u>. Except to the extent set forth in this paragraph with respect to BNC and Alan S. Fukushima, in his capacity as Trustee for the bankruptcy estate of Cheryl McNeil, each Party represents and warrants to each other Party that (i) the execution, delivery, and performance by such Party of this Settlement Agreement are within the powers of such Party and have been duly authorized by all necessary action on the part of such Party, (ii) this Settlement Agreement has been duly executed and delivered by such Party and on the Effective Date will constitute a valid and binding obligation of such Party, enforceable against such Party in accordance with the terms hereof, (iii) it is not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this Settlement Agreement, (iv) it has had the opportunity to be represented and advised by legal counsel in connection with this Settlement Agreement, which it enters voluntarily and of its own choice and not under coercion or duress, (v) it has made its own investigation of the facts and is relying upon its own knowledge and the advice of its counsel and service providers, and (vi) it knowingly waives any and all claims, other than those related to or arising from representations made by the Parties in this Settlement Agreement, that this Settlement Agreement was induced by any misrepresentation or non-disclosure and knowingly waives any

6

and all rights to rescind or avoid this Settlement Agreement based upon presently existing facts, known or unknown (other than to the extent any representation made in this Settlement Agreement proves to be false). BNC and the Plan Administrator represent and warrant to the Claimants that this Settlement Agreement is being entered into in accordance with and pursuant to the authority granted to BNC and the Plan Administrator by the Plan and the Approval Order. Alan S. Fukushima, in his capacity as Trustee for the bankruptcy estate of Cheryl McNeil, represents and warrants that, promptly after the date hereof, he will seek authorization from the United States Bankruptcy Court in which the Chapter 7 bankruptcy case of Claimant Cheryl McNeil is pending for authorization to enter into this Settlement Agreement and to release, discharge and acquit the Released Parties from all Causes of Actions asserted or that could be asserted by Claimant Cheryl McNeil against the Released Parties. The Parties agree and stipulate that each Party is relying upon the representations and warranties in this Section in entering into the Settlement Agreement. Furthermore, the Parties agree that these representations and warranties are a material inducement for entering into this Settlement Agreement. These representations and warranties shall survive the execution of this Settlement Agreement indefinitely without regard to statutes of limitations.

Section 6.    Approval.  The obligations of BNC and the Plan Administrator pursuant to this Settlement Agreement are subject to occurrence of the Effective Date, except the obligations under this Section 6, which are effective on the Execution Date. The Plan Administrator shall promptly file a notice of presentment of a stipulation and order with the Bankruptcy Court providing for approval of this Settlement Agreement and shall reasonably endeavor to obtain the entry of the Approval Order. The Plan Administrator shall consult in good faith with the Claimants as to the Approval Order and any related pleadings and any proposed or actual modifications to the Approval Order. The Claimants shall cooperate in good faith with the Plan Administrator's efforts to obtain the entry of the Approval Order. In the event that the Bankruptcy Court declines to enter the Approval Order, this Settlement Agreement shall terminate and be of no further force or effect. If this Settlement Agreement terminates in accordance with the preceding sentence, each provision contained in this Settlement Agreement shall be of no further force and effect from and after such date of termination.

Section 7.    Execution in Counterparts.  This Settlement Agreement may be executed in any number of counterparts and by different Parties in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page by facsimile or PDF transmission shall be as effective as delivery of a manually executed counterpart.

Section 8.    Effectiveness.  This Settlement Agreement shall become effective on the Effective Date.

Section 9.    Governing Law.  This Settlement Agreement and all claims and disputes arising out of or in connection with this Settlement Agreement will be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the Bankruptcy Code and the laws of the State of New York (including Section 5-1401 of the New York General Obligations Law), without regard to conflicts of laws principles that would require the application of the law of another jurisdiction. The Bankruptcy Court shall have exclusive jurisdiction over any action

7

or proceeding with respect to the enforcement or interpretation of this Settlement Agreement and each Party agrees to submit to such jurisdiction and to waive any defense based on the location or jurisdiction of such court.

Section 10.   Special Provision for Unknown Claims.   All rights under Section 1542 of the California Civil Code, or any analogous state or federal law, are hereby expressly WAIVED, if applicable, with respect to any of the claims, injuries, or damages described in this Settlement Agreement.   The Claimants understand and acknowledge that they are releasing potentially unknown claims, and that they may have limited knowledge with respect to some of the claims being released.   The Claimants acknowledge that there is a risk that, after signing this Settlement Agreement, they may learn information that might have affected their decision to enter into this Settlement Agreement.   The Claimants assume this risk and all other risks of any mistake in entering into this Agreement.   The Claimants agree that this Settlement Agreement is fairly and knowingly made.   In addition, the Claimants expressly waive and release any and all rights and benefits under Section 1542 of the Civil Code of the State of California and any other similar statute, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Any Claims or facts in addition to or different from those which are now known or believed by the Claimants to exist may be discovered after they sign this Settlement Agreement, but it is the Claimants' intention to release all Claims that they have or may have against the Released Parties, whether known or unknown, suspected or unsuspected.

Section 11.   Successors and Assigns.   The provisions of this Settlement Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

Section 12.   Amendment.   This Settlement Agreement may only be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

Section 13.   Entire Agreement; Severability.   This Settlement Agreement constitutes the entire agreement and understanding of the Parties relating to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof.   If any provision of this Settlement Agreement or the application thereof is held invalid, such invalidation shall not affect other provisions or applications of this Settlement Agreement and to this end, the provisions of this Settlement Agreement are declared to be severable. Notwithstanding the foregoing, upon any finding by a court of competent jurisdiction that the release and obligations provided for in the above sections of this Settlement Agreement are illegal, void or unenforceable, the Claimants agree, at the Released Parties' option, to execute a release, waiver and/or covenant that is legal and enforceable to effectuate the terms of this

8

**EXECUTION VERSION**

Settlement Agreement.

Section 14.    <u>Capacity</u>.    Each of the Parties acknowledges and agrees that LBHI is executing this Settlement Agreement in its capacity as Plan Administrator of BNC and shall not be subject to any liability or responsible to take any action on its own behalf by virtue of signing this Settlement Agreement in such capacity.

Section 15.    <u>Construction</u>.    This Settlement Agreement has been negotiated by the Parties and their respective attorneys, and legal or equitable principles that might require the construction of this Settlement Agreement or any of its provisions against the Party responsible for drafting this Settlement Agreement will not apply in any construction or interpretation of this Settlement Agreement.

Section 16.    <u>ADEA Waiver; Knowing and Voluntary</u>.    The Claimants expressly recognize and agree that, by entering into this Settlement Agreement, they are waiving any and all rights or claims that they may have against the Released Parties arising under the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act of 1990 ("<u>ADEA</u>"), which have arisen on or before the date of execution of this Settlement Agreement.    By their signature below, the Claimants warrant and represent that (a) in return for this Settlement Agreement, they will receive compensation beyond that to which they were already entitled before entering into this Settlement Agreement; (b) they were advised (by this Settlement Agreement) to consult with an attorney before signing this Settlement Agreement; (c) they have been given twenty-one days to review this ADEA release and waiver and seven days to revoke it; and (d) they have voluntarily elected to execute this Settlement Agreement on the date set forth herein.    In the event that any of the Claimants wish to revoke this Settlement Agreement pursuant to the ADEA, they must provide written notice of revocation to attorneys for BNC and the Plan Administrator, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Jacqueline Marcus), by no later than the seventh day after the Claimants sign this Settlement Agreement.

Section 17.    <u>Automatic Termination</u>.    In the event that any of the Claimants provides written notice of revocation in accordance with Section 16 of this Settlement Agreement, or that Alan S. Fukushima, in his capacity as Trustee for the bankruptcy estate of Cheryl McNeil, does not obtain the bankruptcy court authorization contemplated by section 6 hereof, this Settlement Agreement shall automatically terminate as to all Claimants and be of no further force or effect.

Section 18.    <u>No Admissions</u>.    Neither this Settlement Agreement, nor anything contained in it, shall constitute or shall be used as an admission or as evidence of any liability or wrongdoing whatsoever.    Neither party shall be deemed a prevailing party.    This Settlement Agreement is of no precedential effect.    Neither this Settlement Agreement, nor anything contained in it, shall be introduced in any proceeding except to enforce this Settlement Agreement or to defend against any claim relating to the subject matter of the releases contained herein or as required by court order, subpoena or other legal process.

Section 19.    <u>No Other Claims Filed or Assigned</u>.    The Claimants represent and warrant that they will not file any Claims, complaints, charges, lawsuits, or other legal actions at any time hereafter derived from the Causes of Action released above.    The Claimants agree that if they initiate any Claim, complaint, charge, lawsuit or other legal action against any of the Released

WEIL:\97156510\8\58399.0011

**EXECUTION VERSION**

Agreement concerning the Causes of Action released above, the Claimants, and each of them, shall defend, indemnify, and hold the Released Parties harmless from and against any such Claim, lawsuit or other legal action, including payment of reasonable attorneys' fees and costs actually incurred.    The Claimants further represent and warrant that they have not heretofore assigned or transferred to any person not a party to this Settlement Agreement any Cause of Action released or any part or portion thereof.    The Claimants agree that if any court, agency or self-regulatory organization assumes jurisdiction over any Claim, complaint, charge, lawsuit, or other legal action that is the subject of the Causes of Action released in this Settlement Agreement, the Claimants waive all relief available to them, including without limitation, monetary damages and reinstatement, unless waiver of such relief is precluded by applicable law.

*[Remainder of Page Intentionally Left Blank]*

WEIL:\97156510\8\58399.0001

By their authorized signatures below, each Claimant certifies she has carefully read and fully considered the terms of this Settlement Agreement, that she has had an opportunity to discuss these terms with attorneys or advisors of her own choosing, that she agrees to all of the terms of this Settlement Agreement, that she intends to be bound by them and to fulfill the promises set forth herein, and that she voluntarily and knowingly enters into this Settlement Agreement with full understanding of its binding legal consequences.

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Settlement Agreement as of the date first written above.

**Sylvia Vega-Sutfin**
By:
Name: Gary Gwilliam
Title: Attorney for Claimants

**Michelle Seymour,**
By:
Name: Gary Gwilliam
Title: Attorney for Claimants

**Linda (Weeks) Howard-James**
By:
Name: Gary Gwilliam
Title: Attorney for Claimants

**Isabel Guajardo**
By:
Name: Gary Gwilliam
Title: Attorney for Claimants

**Coleen Denise Colombo**
By:
Name: Gary Gwilliam
Title: Attorney for Claimants

**Bankruptcy Estate of Cheryl McNeil**
By:
Name: Alan S. Fukushima
Title: Trustee for the Bankruptcy
Estate of Cheryl McNeil

**EXECUTION VERSION**

By their authorized signatures below, each Claimant certifies she has carefully read and fully considered the terms of this Settlement Agreement, that she has had an opportunity to discuss these terms with attorneys or advisors of her own choosing, that she agrees to all of the terms of this Settlement Agreement, that she intends to be bound by them and to fulfill the promises set forth herein, and that she voluntarily and knowingly enters into this Settlement Agreement with full understanding of its binding legal consequences.

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Settlement Agreement as of the date first written above.

**Sylvia Vega-Sutfin**
By:_____
Name: Gary Gwilliam
Title: Attorney for Claimants

**Michelle Seymour**
By:_____
Name: Gary Gwilliam
Title: Attorney for Claimants

**Linda (Weeks) Howard-James**
By:_____
Name: Gary Gwilliam
Title: Attorney for Claimants

**Isabel Guajardo**
By:_____
Name: Gary Gwilliam
Title: Attorney for Claimants

**Coleen Denise Colombo**
By:_____
Name: Gary Gwilliam
Title: Attorney for Claimants

**Bankruptcy Estate of Cheryl McNeil**
By:_____
Name: Alan S. Fukushima
Title: Trustee for the Bankruptcy Estate of Cheryl McNeil

**EXECUTION VERSION**

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Settlement Agreement as of the date first written above.

**BNC MORTGAGE INC.** acting through its Plan Administrator, Lehman Brothers Holdings Inc.

By: _____
Name:  Kristine Dickson
Title:    EVP and Chief Financial Officer

**EXECUTION VERSION**

## **EXHIBIT A**

| Claimant | Total Settlement Payment | Portion Attributable to Back Pay/Lost Earning Capacity (subject to W-2 withholding) | Portion Attributable to Emotional Distress/Defamation |
|---|---|---|---|
| Sylvia Vega-Sutfin | $1,200,000 | $60,000 | $1,140,000 |
| Linda Howard-James | $1,100,000 | $55,000 | $1,045,000 |
| Coleen Colombo | $1,000,000 | $50,000 | $ 950,000 |
| Michelle Seymour | $650,000 | $32,500 | $ 617,500 |
| Cheryl McNeil | $600,000 | $30,000 | $ 570,000 |
| Isabel Guajardo | $450,000 | $22,500 | $ 427,500 |
| **Total** | $5,000,000 | $250,000 | $4,750,000 |

**EXECUTION VERSION**

## <u>EXHIBIT B</u>
### Payment Instructions

### <u>For all Claimants other than Claimant Cheryl McNeil:</u>
Wire transfer instructions:

Name of Bank:  FREMONT BANK

Address of Bank:  39005 Fremont Hob, Fremont, CA 94538

Account Name:  Gwilliam, Ivary, Chiosso, Cavalli & Brewer Trust Account

Bank Routing Number:  121107882

Account Number:  02952041


### <u>For Claimant Cheryl McNeil:</u>
Send check to:

Chapter 7 Estate of McNeil
c/o Alan Fukushima, Trustee
770 L Street, Suite 950
Sacramento, CA 95814

**Exhibit B**
**Funding Agreement**

## FUNDING AGREEMENT

This Reimbursement and Funding Agreement (the "Funding Agreement") is entered into as of September 11, 2019 among BNC Mortgage Inc. ("BNC"), acting through its Plan Administrator, Lehman Brothers Holdings Inc. ("LBHI" and solely in its capacity as such, the "Plan Administrator"), and XL Insurance (Bermuda) Ltd (the "Insurer") with respect to the following:

## RECITALS

A.    On November 18, 2005, the Claimants ("Claimants") commenced an action in the Superior Court of the State of California, County of Sacramento, against BNC and three former BNC employees (the "California Action"), asserting claims, inter alia, for employment discrimination, harassment, failure to prevent discrimination, retaliation, intentional infliction of emotional distress, and defamation.

B.    On July 7, 2009, each Claimant filed a proof of claim in the United States Bankruptcy Court for the Southern District of New York in Chapter 11 Case No. 08-13555, *In re Lehman Brothers Holdings Inc., et al.* (claim numbers 5222, 5223, 5224, 5225, 5226, and 5227 (collectively, the "Original Claims") against BNC asserting both compensatory and punitive damages in the aggregate amount of $35 million. On June 7, 2017, each Claimant filed an amended proof of claim (claim numbers 68258, 68259, 68260, 68261, 68262, and 68263, collectively, the "Amended Claims") against BNC asserting damages in the aggregate amount of $27 million.

C.    The Insurer issued Broad Form Employment Practices Liability Insurance Policy number BM00020483EP05A (the "Policy") to LBHI, for Loss Amounts (as defined in the Policy) incurred by LBHI and certain Additional Insured Organizations (as defined in the

Policy), including BNC, on account of any Claim first reported to the Insurer during the policy period of April 14, 2005 to April 14, 2006, which alleged Employment Practice Liability (as defined in the Policy), up to a Limit of Liability of $100,000,000 and subject to a self-insured per-Claim Retention of $5,000,000 (the "Retention Amount").

     D.     LBHI submitted the California Action to the Insurer for coverage under the Policy and the Insurer reserved its rights in connection with the extent of coverage under the Policy for the California Action.

     E.     BNC and the Claimants have agreed to settle The California Action, the Original Claims, and the Amended Claims (cumulatively, the "Claims") for $5,000,000 (the "Settlement Payment") pursuant to a settlement agreement between them dated September 11, 2019 (the "Settlement").

     F.     BNC's Defense Costs (as defined by the Policy and agreed by the Insurer) in defending the Claims have eroded the Retention by approximately $1,500,000.

     **NOW THEREFORE, IT IS HEREBY AGREED** by the Plan Administrator, BNC, and the Insurer, through their undersigned counsel, as follows:

     1.     BNC will fund $3,500,000 of the Settlement Payment as part of its Retention Amount.

     2.     The Insurer will indemnify BNC for the balance of the Settlement Payment, $1,500,000, as a Loss Amount (as defined in the Policy) in excess of the remaining Retention Amount (the "Insurer's Share of the Settlement Payment"), subject to the Bankruptcy Court's approval.

     3.     The Insurer will also reimburse BNC for BNC's remaining Defense Costs (as defined by the Policy and agreed by the Insurer), both above the $1,500,000 estimated in Recital

paragraph "F", and future Defense Costs (as defined by the Policy and agreed by the Insurer) incurred in concluding the Settlement, subject to the Bankruptcy Court's approval.

4.    This Funding Agreement shall have no force or effect unless and until the Insurer's payments from the Policy proceeds pursuant to paragraphs "2" and "3" are approved by the Bankruptcy Court (the "Effective Date").

5.    Within three Business Days of the Effective Date, the Insurer shall deliver the Insurer's share of the Settlement Payment ($1,500,000) to BNC by wire instructions furnished by BNC to the Insurer.

6.    BNC agrees that upon payment of the Insurer's Share of the Settlement Payment, any and all rights under the Policy to Loss Amounts (as defined by the Policy) incurred in connection with the Claims, other than Defense Costs, will be released.

7.    Each person who executes this Funding Agreement on behalf of a party hereto represents that he or she is duly authorized to execute this Funding Agreement on behalf of such party.

8.    This Funding Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

9.    No amendment or waiver of any provision of this Funding Agreement shall be effective unless the same shall be in writing and signed by the parties, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

10.    BNC and the Insurer agree and acknowledge that the negotiation, execution, and performance of this Funding Agreement shall not: (1) be deemed to be and shall not constitute any admission of or any evidence that the Insurer in any way does business in the United States,

or any state, territory, or possession of the United States, or that the Insurer is subject to the jurisdiction of any United States federal court, or of any court of any state, territory or possession of the United States; (b) alter the terms of the Policy, including the alternative dispute resolution provisions therein; or (c) be deemed to be precedent in any other matter or evidence of coverage or lack of coverage under any other insurance policy.

11.    This Funding Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Agreed to:

Dated: September 11, 2019
       New York, New York

By:
   *[signature]*
   WEIL, GOTSHAL & MANGES LLP
   767 Fifth Avenue
   New York, New York 10153
   Telephone: (212) 310-8000
   Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.
and BNC Mortgage Inc.*

*-and-*

By:

   _____
   KAUFMAN BORGEEST & RYAN LLP
   120 Broadway
   New York, New York 10271
   Telephone: (914) 449-1001
   Julianna Ryan

*Attorneys for XL Insurance (Bermuda) Ltd*

States, or any state, territory, or possession of the United States, or that the Insurer is subject to

the jurisdiction of any United States federal court, or of any court of any state, territory or

possession of the United States; (b) alter the terms of the Policy, including the alternative

dispute resolution provisions therein; or (c) be deemed to be precedent in any other matter or

evidence of coverage or lack of coverage under any other insurance policy.

11.    This Funding Agreement may be executed in counterparts, each of which shall

be deemed an original but all of which together shall constitute one and the same instrument.

Agreed to:

Dated: September 11, 2019
       New York, New York

By: _____

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.
and BNC Mortgage Inc.*

-and-

By: *Julianna Ryan*
    *Kaufman Borgeest & Ryan LLP*
KAUFMAN BORGEEST & RYAN LLP
120 Broadway
New York, New York 10271
Telephone: (914) 449-1001
Julianna Ryan

*Attorneys for XL Insurance (Bermuda) Ltd*