Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9           Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  September 10, 2019

17                  2:31 PM

18

19

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  MATTHEW

Page 2

1    HEARING re Doc #59903 Motion of the Plan Administrator for

2    Orders Authorizing a Claims Consolidation Auction

3

4    HEARING re Doc #59807 Plan Administrators Five Hundred

5    Nineteenth Omnibus Objection to Claims

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    WEIL, GOTSHAL & MANGES LLP

 4           Attorneys for the Debtor

 5           767 Fifth Avenue

 6           New York, NY 10153

 7

 8    BY:  GARRETT FAIL

 9           JASON HUFENDICK

10

11    SHEARMAN & STERLING LLP

12           Attorneys for Maverick Entities

13           599 Lexington Avenue

14           New York, NY 10022

15

16    BY:  RANDALL MARTIN

17           SOLOMON J. NOH

18

19

20

21

22

23

24

25
```

Page 4

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  How is everyone?  How

3     are you, Mr. Fail?

4              MR. FAIL:  Good afternoon, Your Honor.  Well,

5     thank you.  Hope the same for you.

6              THE COURT:  Yep, despite my awkward approach, yes.

7     Okay.

8              MR. FAIL:  For the record, Garrett Fail, Weil,

9     Gotshal & Manges.  I want to begin for thanking the Court

10    for taking time and making time on your busy calendar today.

11             THE COURT:  Sure.

12             MR. FAIL:  Looking at the calendar, it's worth

13    nothing that we are days away from the 11th anniversary of

14    the filing of LBHI's case.  The two items on today's agenda

15    reflect, in different ways, the passage of time.  With me

16    today at counsel's table is my colleague, Jason Hufendick,

17    and in the courtroom with us today are Anton Kolev and

18    William Olshan, with whom you're familiar.  Mr. Kolev is

19    LBHI's Treasurer and has been with the estate since 2013

20    overseeing the distributions.

21             THE COURT:  Okay.

22             MR. FAIL:  Your Honor, for the first item on the

23    agenda, I would propose to turn the podium over to my

24    colleague, Mr. Hufendick.

25             THE COURT:  Sure.

Page 5

1          MR. FAIL:  As one housekeeping note, he's not

2     admitted yet in the Southern District of New York, but is

3     admitted and in good standing to the State of New York and

4     has an appointment scheduled in the Southern District for

5     his swearing in in October.  His admission has been -- his

6     application has been accepted.  He just hasn't -- I haven't

7     let him out to get sworn in.

8          THE COURT:  Very good.

9          MR. FAIL:  Thanks very much, Your Honor.

10         THE COURT:  Thank you.  Good afternoon.

11         MR. HUFENDICK:  Thank you, Your Honor.  For the

12    record, Jason Hufendick, Weil, Gotshal & Manges, for the

13    plan administrator on behalf of Lehman Brothers Holding,

14    Inc.  The first item, as Mr. Fail said, on the agenda is the

15    plan administrator's motion for orders authorizing a claim

16    consolidation option.

17         THE COURT:  Yes.

18         MR. HUFENDICK:  We are proceeding with this motion

19    on an uncontested basis.

20         THE COURT:  Okay.

21         MR. HUFENDICK:  Mr. Kolev submitted a Declaration

22    in support of the motion, which was attached as Exhibit A.

23    At this time, I would like to offer into evidence the

24    Declaration filed with the Court to form the basis of the

25    evidentiary record and with factual record for support of

Page 6

1    the motion.

2                    THE COURT:  Okay.

3                    MR. HUFENDICK:  And he's available if the Court

4    has any questions.

5                    THE COURT:  I do not.  Any objection?  All right,

6    very good.

7                    MR. HUFENDICK:  Thank you, Your Honor.

8                    THE COURT:  I do have a question, though.  If you

9    can look at Mr. Kolev's Declaration and turn to Page 2, the

10   chart.

11                   MR. HUFENDICK:  Okay.

12                   THE COURT:  I could be wrong, but the chart --

13   well, the chart is -- the purpose of the chart is to

14   demonstrate that the vast number of claims represent the

15   over 93 percent of the distributions, correct?

16                   MR. HUFENDICK:  Yes.

17                   THE COURT:  Okay.  But you see in the left-hand

18   column --

19                   MR. FAIL:  Your Honor, no, I think that's the

20   opposite.  I think the vast number of claims --

21                   THE COURT:  I'm sorry, I misspoke.

22                   MR. FAIL:  Thank you, Your Honor.

23                   THE COURT:  Right, okay.  But in the left-hand

24   column, it says total greater than or equal to 10 million.

25   I think that should be less than or equal to 10 million,

Page 7

1   right?  In other words, the largest claims at the top are

2   not subject to -- are not eligible claims subject to the

3   consolidation motion, right?

4           MR. HUFENDICK:  That's correct.

5           THE COURT:  Okay.  So then the vast number of

6   claims, the 15,000, are claims that are less than or equal

7   to $10 million.

8           MR. HUFENDICK:  That's correct.

9           THE COURT:  Okay.

10          MR. HUFENDICK:  I believe I have my sign

11  backwards.

12          THE COURT:  The sign is backwards, okay.  This is

13  just -- I'm doing this merely to demonstrate that I've read

14  your papers.

15          MR. HUFENDICK:  Or at least Mr. Kolev's

16  Declaration.

17          THE COURT:  Okay.  So it is -- the sign is in the

18  wrong direction, right?

19          MR. FAIL:  Yes.

20          THE COURT:  Okay, very good.  So, in fact, what

21  this is doing is giving the smaller claimants the

22  opportunity to sell their claims with the benefit that the

23  claims are consolidated for the purposes of the estate

24  making subsequent distributions.

25          MR. HUFENDICK:  Yes, exactly.

Page 8

```
 1              THE COURT:  Okay.

 2              MR. HUFENDICK:  And that was essentially one of

 3    the primary --

 4              THE COURT:  Right.

 5              MR. HUFENDICK:  -- goals of this process.

 6              THE COURT:  Right.  I assume that you looked at

 7    what your sister or brother estate, LBI, did in this regard.

 8              MR. HUFENDICK:  Exactly.  And we modeled the

 9    procedures off of their process, and I'm happy to explain

10    some of the differences if Your Honor would like.

11              THE COURT:  I'm good.  I'm good.  All right.  I

12    have no further questions, other just -- other than

13    clarifying my reading of that one particular aspect of the

14    chart.  So I did note that there were some folks on the

15    phone, so let me ask if anyone else wishes to be heard with

16    respect to the motion of the plan administrator for orders

17    authorizing a claims consolidation option for the claims

18    pending against the estate.

19              Okay, very good.  If you would submit an order in

20    Word format to chambers, we'll get this entered.

21              MR. HUFENDICK:  We will.

22              THE COURT:  All right?

23              MR. HUFENDICK:  Thank you.

24              THE COURT:  Thank you very much.  Okay, so this

25    gets us to Maverick.
```

Page 9

1          MR. FAIL:  Good morning, Your Honor.

2          THE COURT:  Afternoon.

3          MR. FAIL:  For the record again, Garrett Fail,

4    Weil, Gotshal & Manges.  The next item on the agenda is the

5    plan administrator's brief on remand in further support of

6    its 519th omnibus objection.  I'll open it up to questions.

7          THE COURT:  So I think you're hesitating to just

8    launch into an argument.

9          MR. FAIL:  I'm not going to.  I just -- I know

10   better.

11         THE COURT:  We've spent so much time on this

12   already.  So, you know, your briefs are fascinating because

13   they both -- it's an exercise if you both pointing out

14   everything that the other side, you know, admits and why,

15   therefore, you win.  So it was a completely fascinating set

16   of papers.

17         One thing is clear.  We are in a freezeframe as of

18   the petition date; that's what we're figuring out.  What is

19   the claim that Maverick was permitted to lodge as of the

20   petition date, right?

21         MR. FAIL:  Yes, Your Honor.

22         THE COURT:  Okay.  No dispute about that.

23         MR. FAIL:  Correct.

24         THE COURT:  So for the purposes of claims

25   allowance, it's as if the world ended the day after the

1    petition date, right?

2            MR. FAIL:  Correct, Your Honor.

3            THE COURT:  We're not going to look at when LBIE

4    filed or what LBI distributed or what the allowed claim was

5    for the purposes of determining what the claim is that they

6    are -- Maverick is permitted to lodge as of the petition

7    date, right?

8            MR. FAIL:  Correct, Your Honor.

9            THE COURT:  Okay.  Subsequent history becomes

10   relevant for the application of the one satisfaction rule.

11           MR. FAIL:  We believe so, Your Honor.

12           THE COURT:  Right?  Okay, that's great.  Then you

13   agree basically on nothing else.

14           MR. FAIL:  We agree --

15           THE COURT:  Well, let me --

16           MR. FAIL:  -- it varies the facts.  I don't think

17   there are facts in dispute.  The legal issues, we disagree

18   with.

19           THE COURT:  Right.

20           MR. FAIL:  But the facts are undisputed for

21   purposes today.

22           THE COURT:  But the fundamental disagreement or

23   dispute has to do with what it means that the collective

24   documents were reflected in netting arrangement, right?  And

25   I think that the kryptonite point is the provision of the

Page 11

1      applicable agreement that says that netting or setoff only

2      applies when Maverick is the party that's in default.

3      That's kind of it. If I agree with that, that's

4      dispositive. If I don't agree with that -- in other words,

5      if I agree -- if I focus on what you said in your reply, Mr.

6      Fail, which was basically aha, they admit, they admit, they

7      admit, they admit that the net claim, right, on the petition

8      date was 4.3 million.

9               MR. FAIL: Right.

10              THE COURT: If I agree with you -- that was one --

11     we go in one direction. If I don't agree with you, we go in

12     a different direction.

13              MR. FAIL: Sure.

14              THE COURT: Right?

15              MR. FAIL: I think that's true either way. Either

16     we win or they win, I suppose.

17              THE COURT: Right.

18              MR. FAIL: We are arguing that LBHI guaranteed the

19     LBIE's obligations, and that LBIE's obligations under the

20     relevant documents were to return excess collateral. Simply

21     put, there was no obligation to return collateral and then

22     to become a general unsecured creditor or an unsecured

23     creditor of Maverick; that's not how the documents work.

24              I think the point -- I would respectfully disagree

25     that they're pointing out that LBHI can only net -- or their

Page 12

1    argument that LBHI could only net if Maverick defaulted and

2    LBHI didn't.  I don't think it's kryptonite because I think

3    we pointed -- as we pointed out in our briefs and we've

4    previously argued, there's another provision in another

5    document that LBHI gets the benefit of; that it's clear from

6    the agreements that these are master netting agreements,

7    that they have the burden of proof to show -- and they have

8    not shown one case or one provision in the agreement that

9    says, LBIE was obligated on the petition date to return all

10   of the assets that were brokered.  And that doesn't -- they

11   can't provide that and that's their burden, to get to 118.

12            THE COURT:  But if we are in a freezeframe world

13   on the petition date and LBIE filed the same day?

14            MR. FAIL:  Half an hour to an hour and a half

15   later.

16            THE COURT:  Half an hour later, right?  But if

17   we're in a freezeframe world on the petition date, then how

18   is it that I can do the analysis that you want me to do?

19            MR. FAIL:  The way we did it --

20            THE COURT:  In other words, how do I avoid, other

21   than in the context of trying to figure out single

22   satisfaction rule distribution purposes, how do I -- how do

23   I navigate that?

24            MR. FAIL:  So we pointed to provisions.  So you

25   look at the claim.  The claim is a guaranty claim against HI

Page 13

1    saying that LBHI guaranteed LBIE's obligations.  You then

2    look to the relevant agreements and what are LBIE's

3    obligations: simply to return excess collateral.  The

4    function of a prime broker is -- would only be to return

5    excess.  LBIE, as a prime broker, did not undertake to take

6    the risk that it would owe significant amounts and,

7    therefore, HI wouldn't have guaranteed those.  It's not

8    commercial reality.  The document is replete with references

9    to LBIE holding it as collateral and references to master

10   netting agreements.

11            THE COURT:  But how do I deal with figuring out

12   the extent of the excess collateral --

13            MR. FAIL:  Maverick is -- Maverick is --

14            THE COURT:  -- as of the petition date?  That's

15   what I'm struggling with.  If we all agree that --

16            MR. FAIL:  We agree on what that is; it's 4.3.

17   There's no dispute that when you look at the -- what they

18   would like to believe as offsetting claims, there was $118

19   roughly million dollars of collateral, there was $114

20   million of short positions, 4.3 is undisputed.

21            The only question is, were they ever entitled to

22   118, such that when they got to set off their corresponding

23   claims, that's relevant.  They want to look subsequent for

24   an application, and we're saying there was never an

25   obligation to give back 118; that's a fiction, that's false,

Page 14

1    that's not commercial reality.  You can't separate, in this

2    instance, the collateral from the obligation.

3           This isn't like a mortgage, you know, a house, you

4    know, a mortgage.  This was a series of transactions, some

5    in the red/some in the green.  But as the prime broker,

6    LBIE's obligations was to return excess at any time from

7    time to time.  It moved.  But there's no debate that on

8    September 15th, it was $4 million roughly, 4.3, owing to

9    LBIE on five funds.

10          And just the same way for the sixth fund, Your

11   Honor, they didn't file a claim and say LBIE owed me X and I

12   owed LBIE 2X.  They just said, you know, net/net, I'm not

13   owed anything.  So we think when you look at the obligations

14   that LBIE had, that's what guaranteed.  Netting doesn't --

15   setoff doesn't come in.

16          There's just -- there's no -- they haven't proven

17   a prima facie case.  They haven't pointed you to a provision

18   to affirmatively build up a claim for a gross number.  And

19   it's not our job to kind of -- to defeat anything that's not

20   there.  There's nothing there; that's our argument.  They

21   have the burden of proof to build a prima facie case for

22   118, and they haven't pointed to a provision that says

23   they're entitled.

24          THE COURT:  But now we get into the difficulty of

25   the procedural posture because, technically, sold this as a

Page 15

1    sufficiency hearing and it's kind of an odd duck of a

2    sufficiency hearing.

3            MR. FAIL:  Based on the papers, which was their

4    claim, and based on their pointing to the agreement, and new

5    facts wouldn't come in.  Like, there's nothing more

6    relevant, there's no parol evidence that's going to change

7    what the agreements say or the dollar amounts.  We're

8    accepting as true for these purposes their valuation of 118

9    and their valuation of 114.  The documents are what they

10   are, and no one is saying that there's anything more for

11   these purposes.

12           THE COURT:  So the bookends -- so what -- is the

13   estate's position that Maverick should have an allowed claim

14   for 4.3 million or have, at most, an allowed claim for 12.3

15   million?

16           MR. FAIL:  We are conceding, at this point, that

17   they can have a claim for 4.3.  There was previously

18   discussions to clarify -- this is a long procedural history.

19           THE COURT:  Right.

20           MR. FAIL:  At different points in the case, prior

21   to this round of briefing on remand, LBHI reserved the right

22   and have argued that across funds --

23           THE COURT:  Right.

24           MR. FAIL:  -- the five or six funds --

25           THE COURT:  Right.

1          MR. FAIL:  -- the collateral was pooled.  And the

2    fact that Maverick owed LBIE generally even more than the

3    4.3 would wipe it out to zero; and, therefore, LBIE's

4    obligations were zero.

5          THE COURT:  Right, right.

6          MR. FAIL:  There was a discussion before we came

7    back for this round of briefing, like maybe that was a fact

8    that we needed to do discovery on.  LBHI said and then made

9    a decision, it isn't worth the discovery, it isn't worth the

10   delay for a claim of $4.3 million.  Each claim stands alone,

11   there's no facts in dispute, there's no need for discovery.

12         THE COURT:  Okay.  And then the bookend is -- and

13   I can speak to Maverick's counsel about this -- but the

14   bookend is that Maverick seeks to collect 16.2 million.

15         MR. FAIL:  Right, Your Honor.

16         THE COURT:  Right?  Seeks to lodge a claim for 118

17   million and then present that claim until it gets enough

18   distributions to fill up 16.2 million.  So those are -- so

19   those are the buckets, right?  So we're at an allowed claim

20   of 4.3 at whatever the -- I mean, going rate is, like, 40-

21   cent distributions.

22         MR. FAIL:  Say, like, 20 cents per use, 29 cents.

23         THE COURT:  29 cents.

24         MR. FAIL:  30 cents.

25         THE COURT:  Okay.  So those are the goalposts --

Page 17

1          MR. FAIL:   Correct, Your Honor.

2          THE COURT:  -- that we're at.  And if you could

3     show me what provisions of the applicable agreements

4     override the argument; that, you know, we can talk about

5     setoff all we want, but, in fact, there was no setoff.  Show

6     me which provisions of which agreements of fact within E,

7     the automatic netting that overcomes the limitation that

8     only applies when Maverick is in default.  Show me that, if

9     you can, please.

10         MR. FAIL:  Give me just a moment, Your Honor.

11         THE COURT:  Mm hmm.  I'll help you a little bit.

12         MR. FAIL:  I was going to -- I'm just asking for

13    an extra copy to present.

14         THE COURT:  Okay.

15         MR. FAIL:  But if you have it, Your Honor.

16         THE COURT:  No, I don't.  I'm just keying off of

17    Page 10 of Maverick's brief, which recites, and I think in

18    the GMSLA, that the parties expressly agreed that an LBIE

19    bankruptcy would not result in an automatic setoff of all

20    mutual debts.

21         MR. FAIL:  Your Honor, the Paragraph 4 isn't

22    required, so that's coming -- they're quoting Paragraph 4 of

23    the prime brokerage agreement, right, Your Honor?

24         THE COURT:  I can't tell.  The reference is to

25    Section 9 of V of an addendum to the GMSLA.  And then that -

```
 1    - the citation before that is to Paragraph 4 of the prime

 2    brokerage agreement.

 3              MR. FAIL:  So Paragraph 32 of the prime brokerage

 4    agreement is --

 5              THE COURT:  Hold on.  Let me try to -- I have your

 6    binder here.  Let me see if I can find it.  It's Exhibit 7.

 7    So I'm in the prime brokerage agreement.

 8              MR. FAIL:  And we'll go to Paragraph 32.

 9              THE COURT:  We're in the master prime brokerage

10    agreement.

11              MR. FAIL:  That's it, Your Honor.  Customer prime

12    brokerage agreement.

13              THE COURT:  Paragraph 32?  It's the wrong one.

14              MR. FAIL:  Yeah.

15              THE COURT:  Tab 4.  Tab 4?

16              MR. FAIL:  Your Honor, there's a customer prime

17    brokerage agreement.

18              THE COURT:  Yeah, I got it.

19              MR. FAIL:  So Paragraph 32 says, cumulative rights

20    entire agreement.  And skip down past the first sentence,

21    quote, "To the extent that provisions of any contracts you

22    have --

23              THE COURT:  Hold on, Mr. Fail.  I lost you.

24              MR. FAIL:  Okay.  Page 9.

25              THE COURT:  Okay, I got it.  So Paragraph 32?
```

Page 19

1          MR. FAIL:  Mm hmm, that's right, Your Honor.  To

2    the extent that any -- and we reference it in Paragraph 11

3    of our reply brief.  To the extent that the rights, remedy -

4    - to the extent that any provisions of any contracts you

5    have with any Lehman Brothers entity, whether heretofore or

6    hereafter entered into or inconsistent, whether

7    inconsistency between the contracts or within a single

8    contract, conflict shall be resolved in favor of the

9    provision which afford Lehman Brothers with the maximum

10   rights, remedies, benefits, or protections.

11          And so, we argue that consistent with the

12   commercial context of a prime broker getting collateral and

13   not taking -- not being exposed to the credit risk for the

14   short provisions of $104 million in this instance, for

15   example, of its counterparty, there is no -- there is no

16   rhyme or reason that -- and they literally point to no

17   provision in the agreement which affirmatively says that

18   LBIE had to return, upon a LBIE default, all of the assets,

19   all of its collateral and stay naked for the shorts

20   position.

21          It just doesn't make sense and it's because it

22   doesn't -- it doesn't exist.  There's no provision here that

23   says return the collateral.  All of the provisions talk

24   about returning excess and talk about LBIE, the prime

25   broker, protecting itself for the counterparty default.  Of

1    course, this was a world where no one predicted a Lehman

2    Brothers default and the prime brokerage agreement this

3    Court is familiar with, you know, and all the other -- many

4    of the other agreements regarding Lehman-friendly, as

5    opposed to individual customer-friendly.  There's simply no

6    provision.  And so this cumulative rights provision, though,

7    does take us to the other document, which gives netting upon

8    either parties' default.

9              THE COURT:  And where is that?

10             MR. FAIL:  So --

11             THE COURT:  So what they go -- what Maverick goes

12   on to say is that you admitted that you had gotten that

13   wrong, right?  So Paragraph 22 of their brief, they say,

14   although it has now changed its tune, LBHI previously

15   admitted to this Court that Maverick's reading of the

16   contract is correct.  Quote, "Now we made a mistake in our

17   opening brief presented to Your Honor the netting provision

18   in the prime brokerage agreement, which provides for

19   netting, and Maverick correctly pointed out in their

20   opposition that that only applied if Maverick was in

21   default."

22             MR. FAIL:  With respect to that one section that

23   we cited for that agreement, the record speaks for itself.

24   We did say that that only applied in Maverick default

25   situation, which wasn't the current situation.  At that

Page 21

1    hearing, the transcript reflects that we, at the same time

2    we did that in our opening, pointed the parties and the

3    Court to the cumulative rights section and the other

4    agreement.  And we said, then we say again that that isn't

5    fatal, it isn't kryptonite, there's no their there.

6            We would also, you know, harken back -- and I'll

7    try to make it the last time that I say it -- it's not

8    LBHI's burden to prove a negative.  They have to -- and

9    that's all Maverick is trying to say, look, this provision

10   doesn't -- doesn't say what they say, but we don't have a

11   burden right now.

12           They have a burden to show a place in these

13   documents that says, LBIE should have returned all of the

14   collateral, all of its protection and become an unsecured

15   creditor of Maverick for $104 million.  And I just -- I

16   don't think they can do that.  We said they didn't do that

17   and don't think they can do that, doesn't make any sense.

18           THE COURT:  All right.  Thank you, Mr. Fail.

19           MR. FAIL:  Thank you, Your Honor.

20           MR. MARTIN:  Good afternoon, Your Honor.  Randy

21   Martin from Shearman & Sterling for the Maverick entities.

22   Solomon Noh is also here from Sherman & Sterling, as is Mr.

23   John McCafferty, who's come from Texas today to be here.  We

24   thank you for your time also.

25           THE COURT:  Okay.  All right, so --

```
1             MR. MARTIN:  I feel like maybe I shouldn't launch

2    into an argument either, if it's your preference.

3             THE COURT:  All you have to do is tell me why Mr.

4    Fail is wrong.

5             MR. MARTIN:  I'd start with the kryptonite then,

6    Your Honor.

7             THE COURT:  Okay.

8             MR. MARTIN:  That provision is the only provision

9    --

10            THE COURT:  When you say that provision, which

11   provision do you mean?

12            MR. MARTIN:  I'm talking about the global master

13   securities agreement.

14            THE COURT:  Yeah.

15            MR. MARTIN:  And in particular, the Section 10.

16   This is at Tab 6 of your binder, Your Honor.  That is the

17   one and only provision in these contracts, and that is

18   titled setoff.  And that goes through a detailed series of

19   mechanics that would allow for --

20            THE COURT:  But let me stop you.  So there's, in

21   my mind and experience of these things, there's setoff.

22            MR. MARTIN:  Sure.

23            THE COURT:  Which everyone seems to agree is an

24   act.

25            MR. MARTIN:  Correct.
```

Page 23

1          THE COURT:  Okay.  But in the ordinary world of

2    these master netting agreements, there is a concept of

3    continuous netting.  You're all going to be doing a bunch of

4    transactions and there's all going to be posting of

5    collateral and values are going to move up and down and

6    there's going to be netting.

7          So I don't use -- I don't see netting and setoff

8    as being the same thing.  So, therefore, I find all of the

9    argument that you made about, well, look, nobody setoff and

10   the Supreme Court says that somebody has to actually setoff,

11   I don't find that persuasive or dispositive.  Because if, in

12   fact, there's a master netting agreement, then, as Mr. Fail

13   makes a big deal out of, you know, your admission that on

14   the petition date that the net amount was, you know, $4.3

15   million.  So, to me, that's the big -- that's the big thing

16   that I have to figure out.

17          MR. MARTIN:  And I think that's a great

18   distinction, Your Honor.  And I think you're drawing a very

19   thought there in an important distinction, because I do

20   think you're probably right that when the Supreme Court said

21   in Citizens Bank of Maryland that there has to be an act of

22   setoff, I don't think they were probably precluding

23   automatic setoff provisions, if those occur in a contract.

24          So there's two types of provisions, I think, and I

25   think you articulated them well.  On the one hand, there are

Page 24

1    these automatic netting provision, and on the other hand,

2    there are these discretionary setoff provisions.  Everything

3    the pointed to, Your Honor, they pointed to about a dozen

4    provisions, those are discretionary setoff provisions, and

5    those do require under Supreme Court precedent an

6    affirmative act.  Our allegation is that act was not taken

7    here.

8            You are right, of course, Your Honor, that there

9    is a distinction between an automatic and self-effectuating

10   type provision, but there is one and only one such

11   provisions in these contracts, Your Honor.  It's in Section

12   10 of the global master securities lending agreement, and it

13   sounds like you've looked at it, so I was going to go

14   through in some detail, but I won't.  It's about two pages

15   long.  I think it's a customary provision.  You've seen

16   provisions like this in the Pyxis CDO case, for instance.

17           But, Your Honor, I wish I had called it the

18   kryptonite.  When you turn to Page 27 of the addendum, it

19   could not be more clear.  Section 9 on Page 27 of the global

20   master securities lending agreement says Paragraph 10; that

21   is the only setoff, automatic setoff provision in the

22   contract will only apply if Party B is the defaulting party.

23   Maverick is Party B.  Maverick did not default.

24           The one and only provision that would save them

25   that would allow for this automatic setoff. that is exempted

Page 25

1    under Supreme Court's requirement they actually take

2    affirmative action, was expressly agreed by the parties not

3    to apply.  In other words, Your Honor, the parties sat down,

4    looked at a master netting provision, looked at a provision

5    that would do exactly what they want you to say happened

6    here, and said no, we won't have this automatic setoff.  It

7    couldn't have been more clear.

8            It's not just, Your Honor, that it's missing from

9    the contract; it's that in the contract.  The parties looked

10   at it, and then said Paragraph 10 of this agreement will

11   only apply if Maverick defaults.  We didn't default, Your

12   Honor.

13           They make an argument, Mr. Fail -- I don't want to

14   go on if you're looking at the language, Your Honor.

15           THE COURT:  No, just give me a second.  So what

16   you're saying is that, just as an economic model, what Mr.

17   Fail posits as being a commercially unreasonable set of

18   circumstances, was, in fact, the case.  That if on the LBHI

19   and LBIE filed, because Maverick hadn't terminated yet,

20   right, and Maverick was not in default, at that moment,

21   Maverick had the right to demand all of their collateral

22   back without regard to the fact that that would turn into an

23   unsecured position.  Because that's just a weird thing,

24   right?

25           MR. MARTIN:  You're right.  You're right, Your

Page 26

1    Honor.

2              THE COURT:  Okay.

3              MR. MARTIN:  This is a bit of a misdirection play.

4    It's a clever -- it's a clever argument, but it misconstrues

5    what really would have happened.

6              THE COURT:  Okay.  So tell me what would have

7    really happened.

8              MR. MARTIN:  We should have gotten $4.3 million of

9    cash, yes, for our $118 million.  That leaves the question,

10   Your Honor, what happens to the other $114 million?  They

11   obviously had to give us that money as well.  And the way

12   they had to give it to us, Your Honor, was through the

13   reduction of the debt that we owed them.  We obviously would

14   have accepted that.  We weren't going to say send us a wire

15   for $118 million and we're going to send you a wire back for

16   144.

17             THE COURT:  Right.

18             MR. MARTIN:  That's what the Supreme Court says is

19   absurd --

20             THE COURT:  Right.

21             MR. MARTIN:  -- by the absurd setoff, A owes B, B

22   owes A.  What we sure would have accepted, Your Honor, if it

23   had happened -- and it didn't happen -- was a reduction of

24   the short positions, the loans that were outstanding.

25             THE COURT:  Right.

1          MR. MARTIN:  Four years after LBIE goes bankrupt,

2    they pop their head out of the surface and say, guess what?

3    All of your short loans are still outstanding.  So

4    critically, Your Honor, we were not only owed $4.3 million;

5    we were also owed the closing of our short positions.  If

6    they had done that -- and that, by the way, wouldn't have

7    been the commercially thing, as you've intuited from the

8    very beginning, Your Honor.  This is what Mr. McCafferty

9    went to London in 2012 to argue about.

10          The commercially reasonable thing would have been

11    for them to have agreed, because they breached the contract,

12    that all of the positions could have been closed out.

13          THE COURT:  But if you agree that at that moment

14    all that Maverick was entitled to was excess collateral,

15    right?

16          MR. MARTIN:  We don't agree.

17          THE COURT:  Well, you just said the 4.3.  And

18    because then, what that -- so that's a moment in time where

19    there was 4.3 of excess collateral.  What you're then saying

20    is that, but afterwards, LBIE messed up and that caused us

21    additional damages.  No?

22          MR. MARTIN:  Let me be more clear than Your Honor

23    just did.

24          THE COURT:  Okay.

25          MR. MARTIN:  This is an absolutely critical point.

```
 1              THE COURT:  Okay.

 2              MR. MARTIN:  We had $118 million of our property

 3    with LBIE.

 4              THE COURT:  Yes.

 5              MR. MARTIN:  We owned it.  We pledged it as

 6    security, but we owned it.

 7              THE COURT:  Right.

 8              MR. MARTIN:  It was our property.  They say we

 9    don't understand how collateral works.  This is kind of

10    crazy that I'm going to tell a Bankruptcy Judge how

11    collateral works.

12              THE COURT:  No, that's fine.

13              MR. MARTIN:  But here's how collateral works.

14    They don't get to come in and seize our collateral because

15    they defaulted.  Moreover, when they do seize your

16    collateral, they don't just get to keep it.  Yes, we had a

17    net balance of 4.3 million that they owed us in cash.  But

18    if they had taken the $114 million of other Maverick

19    property, they didn't get to put it in their pocket.  They

20    had to use the proceeds to pay down the debt.  That's real

21    value, Your Honor.  It's value we didn't get.

22              And it is critically important what happened in

23    2012.  You have to look at the petition date only to value

24    our claim.  But in 2012, they popped their head up and say,

25    by the way, we never reduced any of that debt.
```

1          THE COURT:  That they being LBIE, not LBHI.  LBHI

2    is hanging out over here waiting --

3          MR. MARTIN:  You're right.

4          THE COURT:  -- to see what happens, right?

5          MR. MARTIN:  Correct.

6          THE COURT:  Okay.

7          MR. MARTIN:  Okay.  That's real value, Your Honor.

8    The $114 million of application of collateral to repay debt,

9    that's the 114 million we didn't get.

10         THE COURT:  But what Mr. -- what LBHI continues to

11   say is, I hear you, but too bad, so sad, to use technical

12   legal argument because the only thing that LBHI guaranteed

13   was LBIE's obligation, and LBIE's obligation was only to

14   return excess collateral.  And you just told me that on the

15   petition date, which is the date that we all agree the as-of

16   date when I have to value it, that as of the petition date,

17   the obligation was to return the excess collateral; that

18   there's no an independent obligation to return the 118 of

19   collateral.

20         MR. MARTIN:  There was not an obligation to send

21   us a wire in cash and to become an unsecured creditor.  But

22   there was absolutely, Your Honor, an obligation if they are

23   going to seize $114 million of our property to immediately

24   use it to cancel indebtedness.

25         THE COURT:  So there's -- so what you're saying --

1          MR. MARTIN:  That's what they didn't do.

2          THE COURT:  -- that was a breach.

3          MR. MARTIN:  Of course, it was a breach.  The only

4    other thing you could believe, Your Honor, is their

5    position, which is that they could just keep the $114

6    million and not use it and not apply it to pay down the

7    debt.  That's obviously not what the contract provides.

8          I have it in my outline about nine times; I'm not

9    going to say it nine times.  That's a breach, Your Honor.

10   If you seize on someone's collateral, take it, keep it, and

11   don't use it to pay the indebtedness and then sue them on

12   the indebtedness?  Of course, that's a breach.

13         THE COURT:  So let me ask you -- let me switch

14   before I ask Mr. Fail to come back.  So procedurally, there

15   still is sufficiency hearing.

16         MR. MARTIN:  On the 11th anniversary.

17         THE COURT:  Happy anniversary to me.  So what you

18   would have me do is -- so sufficiency hearing means there's

19   a hearing on the plan administrator's objection to the

20   claims.  You would have me deny that.

21         MR. MARTIN:  Yes, Your Honor.

22         THE COURT:  Okay.  And then what?

23         MR. MARTIN:  I would hope that they would spare

24   you, at this point, an evidentiary hearing because the facts

25   are not in dispute.  You just heard Mr. Fail say that.

1          THE COURT:  But then what do I -- what would I

2    have before -- so then I have filed claims that haven't been

3    stricken, right?

4          MR. MARTIN:  What I would hope they would do, Your

5    Honor, and we could discuss --

6          THE COURT:  And the claims, you know, so I looked

7    at this.  There are -- and we -- and you've all agreed also

8    that it's kind of one aggregate number, even though there's

9    multiple claims.

10         MR. MARTIN:  I'm using that for a convenience.

11         THE COURT:  Yeah, yeah, yeah.

12         MR. MARTIN:  It's very important that these are

13   separate legal funds.

14         THE COURT:  I absolutely agree.  Yeah, absolutely

15   agree, just for the purpose of claim disposition.  I'm just

16   trying to figure out if I agree with you, what do I -- what

17   are we going to do next?

18         MR. MARTIN:  We can do one of two things.  If

19   years after having received very comprehensive discovery

20   from us, they have an argument on the facts, which he just

21   said were I think uncontested, and they are going to be

22   uncontested.  This happened, they've told us before, they

23   have no contrary evidence or independent evidence.

24         But we can do one of two things.  They'll either

25   tell you they want an evidentiary hearing, at which point,

Page 32

1    we'll come in and we'll show you emails that show definitely

2    that there was no setoff fund in 2008.  Then we'll show you

3    basically that we received $102 million, rather than $118

4    million.  We'll go through this.  It'll probably be a half

5    day or a day at most; that'll be up to them.  Or they can

6    stipulate that the facts that we've asserted are true.  They

7    have those facts before them in documents we produced many

8    years ago.

9            At that juncture, Your Honor, I think they would

10   still have their right to appeal to the Second Circuit,

11   should they choose to do so.  And the Second Circuit will

12   decide, you know, whether they agree with your

13   interpretation of Section 562 or Judge Abrams and Judge

14   Peck's interpretation of Section 562, and they could strike

15   our claim down to zero.  I think that's what they should do.

16           But we have to do one of those two things, I

17   think, Your Honor, move on to an evidentiary hearing, if

18   they insist on one and they want to torture you, or we can

19   move on to the appeal before the Second Circuit.

20           MR. FAIL:  For the record again, Garrett Fail.

21   Thank you for your patience.

22           THE COURT:  Sure.

23           MR. FAIL:  A couple of points, maybe the easiest

24   first.  What would happen if you decide they're right on the

25   interpretation?  I'm not sure what the evidentiary hearing

Page 33

1    would be about.  If they win, they win and then we'd have

2    our appeal rights.  Mr. Martin is correct, we could appeal

3    this or we could take up the District Court's overturning

4    your decision that if you want to look, if as Maverick does

5    today, at a valuation and what happened between September

6    15th '08 and 2012 when they finally settled and terminated

7    and liquidated their securities contract, the master netting

8    agreement under 562 or otherwise.

9           If you want to look at all that history, like,

10   we're happy to because, as we said and as you ruled,

11   Maverick owed money on that date, there's no claim, and then

12   we're done.  There's no need for evidence here, Your Honor.

13   You're very busy and I don't know what we would fight about.

14           A couple of other points, though.  I mean, maybe I

15   didn't connect it well enough.  But I really don't -- we

16   really don't think that there's kryptonite in the paragraph

17   that Mr. Martin cites to, because what he's saying happened

18   is that --

19           THE COURT:  But he's saying --

20           MR. FAIL:  If you look at --

21           THE COURT:  So you have the standard -- you have

22   the standard GMSLA, right?

23           MR. FAIL:  Yeah, but then you go to the exhibits.

24           THE COURT:  Right.

25           MR. FAIL:  But let's read the exhibit; let's not

Page 34

1    just -- well then let me read it.  And it says, "The

2    collateralization and margin requirements and procedures

3    relating to this will be governed by the margin lending

4    agreement."  Okay?  So let's look at that.  That's at Tab 5

5    in Your Honor's binder.  And on Page 3 of that margin

6    lending agreement in subsection (d), it also talks about

7    only excess.  It says, quote, "Upon satisfaction by borrower

8    of all obligations (and all other obligations owed by

9    borrower to each affiliate of lender), lender shall return

10   to borrower the collateral."  So, again, upon satisfaction,

11   lender shall return.

12           So there's nothing -- there's no they're there

13   yet, right?  If you want to look at the margin lending

14   agreement, you look at the margin lending agreement, and it

15   has the same excess type language.  You don't give it all

16   back.  You give it all that's net; you only get back net.

17   That's the one thing.

18           And then Tab 7 is the, to close the loop on what

19   happens when you look back at the old most favored nations

20   document.

21           THE COURT:  Back in the prime brokerage agreement.

22           MR. FAIL:  Back at the old -- right, and that's

23   the old master prime brokerage agreement.  That provision in

24   Section 13 makes it clear that it's only the net.  So,

25   again, they tried to debunk and tried to say that it doesn't

1   apply, and obviously what's been -- you know, what was

2   articulated prior in previous oral argument.  I mean, the

3   document is here; you can look at it.  It's before you.

4   It's not controversial; it's not controverted.  This doesn't

5   say scrap it and return gross.  Otherwise, you would have

6   read it in the papers.  We would have read it in the papers,

7   and we would have said, wow, you pointed to something.

8           Instead, we're saying you haven't pointed to

9   anything, and what you did point to isn't that.  It's the

10  same language, only the net.  So I think that's very

11  important.

12          We also think that their reference to what

13  happened between 2008 and 2012, you know, and the valuation

14  dropping and changing is irrelevant.  If we wanted to look

15  at what happened, you know, we were happy to.  We did, Your

16  Honor did, and we looked at what happened on 2012 when they

17  did it.

18          Everything else, you know, is, at best, collateral

19  damages, which is barred by the prime brokerage agreement.

20  I think Your Honor found that in other cases before the

21  Court on prime brokerage agreements.  You know, at best, if

22  there was a swing, there was -- that's collateral damage and

23  what happened.

24          Your Honor has also ruled, and now the District

25  Court has instructed you to look, at valuing the claim on

Page 36

1     the petition date only.  We weren't asked to wait.  We can't

2     be asked to wait as a guarantor in bankruptcy until all of

3     the obligations of all of the many primary obligors were

4     settled and satisfied.  That's not what we did, it's not

5     what you're supposed to do, it's not what the law dictates.

6               So when you look on the petition date, we don't

7     have to guess, you know, what would happen later.  We didn't

8     have to be right when you look at what should have happened

9     on the petition date.  It may be wrong, but that's what the

10    claim that you get on the petition date.

11              THE COURT:  Well, hypothetically -- and we've had

12    this in another matter that I won't charge Mr. Martin with

13    knowledge of that -- where if you posit that instead of

14    still being here after 11 years doing this, that in three

15    years, somehow the LBHI estate will wind down before LBIE

16    had a chance to do anything.  Right?

17              MR. FAIL:  Within the first day, within the first

18    week --

19              THE COURT:  Right.

20              MR. FAIL:  -- we could have.  They demanded money

21    from LBHI.  What was LBHI to do on that day?  LBHI was to

22    give $4.3 million.  You know, we've said it, they've

23    admitted it.  Turn to that purpose, they were owed a net of

24    4.3.

25              THE COURT:  So, Mr. Martin, if the world had ended

Page 37

1    before LBIE, as you said, lifted its head up, I mean, that

2    would have been it.  I mean, I'm getting up, I'm turning out

3    the lights, you know, what are you entitled to.  You

4    couldn't have said please wait, right?  You would have just

5    had to take the $4.3 million.  No?

6              MR. MARTIN:  No, Your Honor.

7              THE COURT:  Why not?

8              MR. MARTIN:  Because this is a guaranty of

9    payment, not a guaranty of collection.

10             THE COURT:  So your idea is that everybody who

11   shows up with a guaranty of payment, I would have to keep

12   this estate open until all this other stuff happens?

13             MR. MARTIN:  Let me explain just very briefly what

14   the distinction between a guaranty of payment and a guaranty

15   of collection.

16             THE COURT:  Okay.  You can do that, but in a non-

17   condescending way.

18             MR. MARTIN:  I'm sorry.  I didn't mean to be

19   condescending at all.  I'm trying to articulate what the law

20   is.  The distinction is, if you have a guaranty of payment,

21   Your Honor, you can go to the guarantor without taking any

22   enforcement action against -- you're aware of the concept.

23             THE COURT:  I am aware of the concept, yes.

24             MR. MARTIN:  So, yes, our position, Your Honor, is

25   that we could have taken $118 million from LBHI.  Now, they

1    say that's commercially unreasonable; in fact, it's not.

2    There are many protections that would have been available to

3    LBHI.  Most importantly, Your Honor, they should have had,

4    and should have negotiated if they did not, rights of

5    subrogation.  Those are there to protect the issuer of a

6    guaranty of payment in a circumstance precisely like this,

7    where the guarantor is asked to make good on the liability

8    in the first instance.  So, yes, we would have had a claim

9    for $118 million.  They could have done various things.

10   This is all very hypothetical.

11              THE COURT:  Yes.

12              MR. MARTIN:  We should probably go with what

13   actually happened, we would argue.  One of the things they

14   could have asked LBIE to do is to say, look, why don't you

15   please agree that the $114 million of debt that you are

16   claiming Maverick owes you is extinguished, and we'll give

17   them 4.3.  That would have been the more rationale way to

18   resolve it.

19              THE COURT:  For LBHI, on the one hand, and LBIE,

20   on the other hand to have had that conversation?

21              MR. MARTIN:  Yes, exactly.  But, yet, if something

22   got caught in the weeds, Your Honor, and they couldn't cause

23   LBIE to perform their obligations, they had issued a

24   guaranty of payment.

25              THE COURT:  Well, I'm quite sure at that point in

Page 39

1    time, they didn't have ability to direct LBIE to do

2    anything.

3             MR. MARTIN:  I think probably right.

4             THE COURT:  That's just one of the many lessons of

5    Lehman was that LBIE did its own thing, right?

6             MR. MARTIN:  Understood, Your Honor.

7             THE COURT:  Okay.

8             MR. MARTIN:  And, yes, if you take on that risk by

9    issuing an absolute and unconditional guaranty of payments

10   and you say you're guaranteeing all obligations, I do think

11   they would had to have given us $118 million.  I think they

12   would have had a claim back against LBIE for the full amount

13   and they would have been protected in that manner, but they

14   took on that risk.  That's what we believe a guaranty of

15   payment gets you.

16            THE COURT:  Okay, all right.  Thank you very much.

17   Let me give Mr. Fail last looks, all right?

18            MR. MARTIN:  Thank you very much.

19            THE COURT:  Thank you very much.

20            MR. FAIL:  Thank you, Your Honor.

21            THE COURT:  This is as good as Nadal Medvedev, I

22   think.

23            MR. FAIL:  Let's see how it works and who's who,

24   but I'm glad others are having fun watching and I hope they

25   are.  You know, I haven't heard an argument that overcomes

Page 40

1    the provisions that I pointed to, both in the margin lending

2    agreement itself with the Section D that I read and in Tab 7

3    of your agreement, the 99 master prime brokerage agreement,

4    in Section 13, which deals with closeout, which, you know, I

5    could read into the record or Your Honor has in her Tab 7,

6    which says, "On the occurrence of an event of default, the

7    following shall immediately occur."

8         Now I note Mr. Martin talked about if this was an

9    immediate, then, you know, LBHI wins.  So here it is, "It

10   shall immediately occur."  It's automatic.  Any obligation

11   of the prime broker to use reasonable endeavors, dah, dah,

12   dah.  All other outstanding obligations of each party to

13   deliver shall fall due for performance.  The non-defaulting

14   party shall establish this.

15        But then D, on the basis of sums established, an

16   account shall be taken as the termination date of what's due

17   from each party to the other under the agreement, and on the

18   basis that each party's claim against the other in respect

19   of their securities, dah, dah, dah, dah, and the sums due

20   shall be set off against the sums due only -- and only the

21   balance of the account shall be payable by the party having

22   a claim valued at the lower amount, and such balance shall

23   be due and payable on the next following business day.

24        We have the automatic language, we have clear net

25   language, and we have the trail of dots and breadcrumbs

Page 41

1   leading you to it.  If there's any ambiguity, which we don't

2   believe there is, we believe it has to be resolved in favor

3   of LBHI's argument.  There is nothing to support that the

4   burden of proof that Maverick has to support its claim in

5   the documents or otherwise.  And we really honestly have --

6   we only have an obligation to look at the proofs of claim.

7   That was their opportunity to present their prima facie

8   case; there's no trial needed.

9           Thank you, Your Honor.

10          THE COURT:  All right, thank you.  All right.  Not

11  going to give you your decision today.  Too much to think

12  about, so give me some time.  I'll reach back out to you and

13  let you know what I intend to do next and what makes the

14  most sense in terms of giving a decision, having you come

15  back in to plan next steps or the like.  But I find this

16  fascinating, with a high degree of difficulty.  And happy

17  11th anniversary.

18          MR. FAIL:  We saved the best for last, Your Honor.

19  Thank you very much for your time.

20          THE COURT:  Okay.

21          MR. FAIL:  Happy anniversary, Your Honor.

22          THE COURT:  Yeah, thank you.  Thank you.  Have a

23  good afternoon.

24          MR. FAIL:  Thank you.

25          MR. MARTIN:  Thank you.

Page 42

1           (Whereupon these proceedings were concluded at

2    3:20 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 43

1                              I N D E X

2

3                               RULINGS

4                                                    Page      Line

5

6    #59903 Motion Approved                          8         22

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 44

1                     C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6        Sonya

7        Landanski Hyde

Digitally signed by Sonya Landanski
Hyde
DN: cn=Sonya Landanski Hyde, o, ou,
email=digital1@veritext.com, c=US
Date: 2019.09.12 15:37:22 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 12, 2019