**HEARING DATE AND TIME: November 14, 2019 at 2:00 p.m. (Eastern Time)**

MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
Fax: (212) 262-1910
Brian Trust
Joaquin M. C de Baca
Jason Kirschner

*Attorneys for Capital Partners Securities Co., Ltd.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (SCC) |
| Debtors. | : | (Jointly Administered) |

**RESPONSE OF CAPITAL PARTNERS SECURITIES CO., LTD. IN OPPOSITION TO PLAN ADMINISTRATOR'S MOTION FOR AN ORDER IN AID OF EXECUTION OF THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN <u>BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS</u>**

734679114

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ............................................................................................................................ 2

ARGUMENT .................................................................................................................................. 4

    A.    The Plan Does Not Authorize Disgorgement. ................................................... 4

    B.    The Plan Administrator Should Not Be Allowed to Retroactively Disallow Claims. ..... 7

    C.    Disgorgement is Inconsistent With the Principles of Unjust Enrichment. ........................ 7

    D.    The Plan Administrator is Equitably Estopped. ................................................ 9

    E.    Denial of the Motion Will Not Prejudice Creditors or the Estate. ................................ 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Granite Broad. Corp.*,
    369 B.R. 120 (Bankr. S.D.N.Y. 2007)........................................................................................12

*In re Ionosphere Clubs, Inc.*,
    85 F.3d 992 (2d Cir.1996)..........................................................................................................9

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
    274 F.3d 706 (2d Cir. 2001)..................................................................................................8, 11

*In re Lehman Bros. Holdings Inc.*,
    591 B.R. 153 (Bankr. S.D.N.Y. 2018)......................................................................................14

*In re R&W Enters.*,
    181 B.R. 624 (Bankr. N.D. Fla. 1994).....................................................................................14

*In re Robinson*,
    Adv. Proc. No. 99-01048, 2001 WL 36160438 (Bankr. D. Vt. May 22, 2001) ......................14

*In re Sims*,
    278 B.R. 457 (Bankr. E.D. Ten. 2002) ....................................................................................14

*In re South Side House, LLC*,
    474 B.R. 391 (Bankr. E.D.N.Y. 2012)......................................................................................12

*In re Stillwater Asset Backed Offshore Fund Ltd.*,
    559 B.R. 563 (Bankr. S.D.N.Y. 2016).......................................................................................7

*In re Talbot*,
    124 F.3d 1201 (10th Cir. 1997) ...............................................................................................14

*In re Vick*,
    75 B.R. 248 (Bankr. E.D. Va. 1987)........................................................................................12

**Statutes**

11 U.S.C. § 502(j)............................................................................................................................13

Japanese Financial Instruments and Exchange Act of 2006............................................................1

Capital Partners Securities Co., Ltd. ("**CPS**"), by and through its undersigned counsel, hereby submits this response (the "**Response**") in opposition to the Motion of the Plan Administrator for an Order in Aid of Execution of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors [ECF No. 59936], dated September 17, 2019 (the "**Motion**"). In support of its Response, CPS respectfully states as follows:

## PRELIMINARY STATEMENT

1. CPS is a securities brokerage firm located in Tokyo, Japan, which offers a wide range of securities and investment advisory services. As a Japanese brokerage, CPS is subject to the Japanese Financial Instruments and Exchange Act of 2006, which governs the regulation of securities companies in Japan. Decl[1]. ¶2.

2. CPS is the holder of Allowed Guarantee Claims[2] against Lehman Brothers Holdings, Inc. ("**LBHI**") in the aggregate amount of at least $22,386,897.56. Lehman Brothers Treasury Co. B.V. ("**LBT**") is the primary obligor in respect of the unpaid amounts underlying these Allowed Guarantee Claims.

3. The Plan Administrator's Motion seeks an order directing CPS to disgorge payments which it alleges were made in "excess" of the total amount of CPS' Allowed Guarantee Claims as a result of the combined value of distributions made by LBHI in respect of CPS' Allowed Guarantee Claims and by LBT on the associated Primary Claims. Specifically, the Plan Administrator claims that it is entitled to disgorge an amount equal to the *entire* aggregate amount of Distributions LBHI has made on Allowed Guarantee Claims, asserting that

---

[1] *Declaration of Kunihiko Shimoda in Support of Response of Capital Partners Securities Co.., Ltd. in Opposition to Plan Administrator's Motion for an Order in Aid of Execution of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* filed contemporaneously herewith (the "**Decl.**").

[2.] Capitalized terms not defined herein shall have the meaning given them in the Motion.

it has a right to a dollar-for-dollar credit for all amounts paid by LBT after combined LBHI and LBT distributions have satisfied the $22,386,897.56 amount of the LBHI Allowed Guarantee Claims.

4. In support of this remedy, the Plan Administrator has set forth a distorted interpretation of the Plan which, if imposed, would result in violations of fundamental bankruptcy principles and settled orders of this Court. In particular, the Plan Administrator openly utilizes the fixed Yen to Dollar exchange rate codified in Section 8.13(d) of the Plan – which was an outlier rate following the Tōhoku earthquake, tsunami and resulting disaster at the Fukushima nuclear power plant – to inflate its LBT distribution calculation by approximately $5.876 million above and beyond the true economic value of what has been received by CPS from LBT. Moreover, the Plan Administrator ignores the salient fact that it has been in control of both the payments and the information underlying alleged "excess" payments, but nonetheless allowed CPS to receive Distributions from both LBHI and LBT, with the knowledge that CPS – as a broker holding claims on securities – is obligated to distribute such amounts to CPS' customers (as the ultimate beneficiaries of the underlying securities). As such, not only has CPS not been enriched in any way that would justify this extreme remedy, but the Plan Administrator is also equitably estopped from seeking disgorgement against CPS.

## BACKGROUND

5. From May 2007 through June 2008, Lehman Brothers Japan Inc. ("**Lehman Japan**") aggressively lobbied CPS to purchase structured securities issued by or in connection with LBT. Decl. ¶3. On or about June 4, 2008, following a downgrade of its long-term credit rating by Standard & Poor's, an affiliate of Lehman Japan (Lehman Brothers Securities Co., Ltd., ("**LBSC**")) sent a letter to CPS assuring CPS that this downgrade was not material. Decl.

¶4. As a result of this letter and Lehman Japan's continued aggressive marketing efforts, CPS placed certain LBT securities, including a portion of the securities comprising the basis of CPS' Allowed Guarantee Claim, with CPS' retail investors. Decl. ¶4. Then, in July 2008, CPS' contact at Lehman Japan suddenly left Lehman Japan and, without explanation, ceased communications. Decl. ¶5.

6. Less than three months later, beginning on September 15, 2008 and periodically thereafter, LBHI and certain of its affiliates (collectively, the "**Debtors**") commenced voluntary cases under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") before this Court.

7. On September 16, 2008, Lehman Japan filed for civil reorganization in Tokyo District Court and ceased its operations not long thereafter. Prior to stopping operations, Lehman Japan acted as the nominee responsible for the securities that it had previously sold to CPS. Decl. ¶7. As a result of Lehman Japan's closure, CPS was forced to take over as nominee in respect of these securities. *Id.*

8. CPS' Allowed Guarantee Claims arise under Claim No. 62783 and the Structured Securities Procedures Order, which established the methodology used in valuing and allowing the underlying Guarantee Claims. Motion, ¶19.

9. CPS has at all times held the securities underlying the Allowed Guarantee Claims as a nominee on behalf of its customers and has promptly paid the proceeds of Distributions from both LBHI and LBT to those customers as the ultimate beneficiaries of such securities. Decl. ¶8.

10. On September 17, 2019, the Plan Administrator filed the Motion. CPS received a copy of the Motion on September 19, 2019. Decl. ¶9.

3

**ARGUMENT**

A.  **The Plan Does Not Authorize Disgorgement.**

11. The Plan Administrator claims that Section 8.13 of the Plan "expressly" provides for disgorgement and frames its entire Motion as though it is a simple matter of obtaining the Court's administrative aid in connection therewith. But Section 8.13 of the Plan contains no such "express" remedy, and LBHI is barred from implying such a right in relation to CPS.

12. As an initial matter, CPS does not dispute that Section 8.13 of the Plan governs how and to what extent *LBHI is liable* for debts unpaid by its subsidiaries (such as LBT), as set forth in the *Attestor/LBHI Opinion* cited by the Plan Administrator. Accordingly, CPS has no reason to challenge the holdings of the *Attestor/LBHI Opinion*. But the Plan Administrator does not (and cannot) offer support for the proposition that Section 8.13 governs the *liability of holders of Allowed Guarantee Claims* in instances where LBHI is unable to collect against its subsidiaries, which is the inevitable result of the interpretation of Section 8.13 offered by the Plan Administrator.

13. The portion of Section 8.13(a) quoted by the Plan Administrator references disgorgement as a limiting factor in connection with LBHI's subrogation rights, not as a stand-alone or "express" remedy.[3] The focus of that provision is the detailed delineation of circumstances under which LBHI may receive consideration on account of Primary Claims as a subrogee under Section 8.14(a) of the Plan. No such detailed delineation of circumstances is offered in connection with the disgorgement limiter cited by the Plan Administrator. As such, it

---

[3] Section 8.13(a) provides, in relevant part: "An . . . Allowed Guarantee Claim that receives Distributions . . . that combined with Distributions or other consideration provided on the corresponding Primary Claim . . . equal the Allowed amount of such Guarantee Claim . . . shall . . . be deemed satisfied in full as to such . . . Allowed Guarantee Claim against the applicable Debtor. To the extent that an Allowed Guarantee Claim is deemed satisfied in full, LBHI shall be entitled to receive future Distributions or consideration on account of the corresponding Primary Claim as subrogee pursuant to Section 8.14(a) of the Plan to the extent of LBHI's Distribution on account of such Guarantee Claim less any amounts received by LBHI by way of disgorgement thereof."

4

734679114

fails to set out the circumstances in which disgorgement is appropriate other than as part of the formula to be applied in connection with consideration sought by the Plan Administrator in its capacity as a subrogee.

14. The Plan Administrator claims that LBHI's subrogation rights – the obvious source of recovery for any debtor in respect of distributions made to claimants such as CPS on Guarantee claims – are not implicated by the Motion. But the Plan Administrator acknowledges that LBHI has, in fact, *waived* its subrogation rights against LBT pursuant to the LBT Settlement Agreement and in Section 6.5(b)(iii) of the Plan.[4] As such, the Plan Administrator cannot utilize the subrogation-based right to receive Primary Claim payments set forth in Section 8.13(a) or the associated disgorgement limitation included therein because no corresponding subrogation is available against LBT.

15. LBHI's waiver of subrogation rights against LBT also brings into focus what the Plan Administrator is really trying to accomplish in the motion: the substitution of recipients of Distributions on Allowed Guarantee Claims (such as CPS) in place of LBT as sources of recovery for LBHI's payment on those very claims. But LBHI has waived those subrogation recovery rights against LBT, so it is instead attempting to contort the Plan to synthesize a recovery right against claim holders like CPS. This leads to the absurdity of a secondary obligor

---

[4] Section 6.5(b)(iii) of the Plan provides: "The LBT Settlement Agreement is incorporated in the Plan. The LBT Settlement Agreement provides for the allowance of certain claims of LBT, including, without limitation, an Allowed Senior Affiliate Claim of LBT against LBHI in LBHI Class 4A in the amount of $34,548,000,000, the allowance of certain Claims asserted by certain Debtors against LBT, the exchange of mutual releases between the Debtors and LBT and other material terms and conditions, all as more fully set forth in the LBT Settlement Agreement. Additionally, pursuant to the LBT Settlement Agreement, *Sections* 8.10, *8.14*, 8.15 and 13.8 *of the Plan shall not apply to LBT* or the Allowed Senior Affiliate Claim of LBT *and holders of Allowed Guarantee Claims for which LBT is the Primary Obligor shall not be subject to Section 8.13(e) of the Plan*. (Emphasis added).

5

734679114

(LBHI) seeking to enforce its subrogation recovery rights against the very entity (CPS) that the secondary obligor was obligated to pay in respect of the relevant Guarantee in the first place.[5]

16. The Plan Administrator's interpretation of Section 8.13(b) is similarly flawed. That Section provides in relevant part that "[i]n no event shall . . . an Allowed Guarantee Claim *receive Distributions* . . . that combined with Distributions or other consideration provided on the corresponding Primary Claim . . . are in excess of the Allowed amount of the Guarantee Claim . . . ." (emphasis added). This section delineates the circumstances under which holders of Allowed Guarantee Claims *should not receive further Distributions from LBHI*. It does not provide LBHI, expressly or otherwise, with a mandate to disgorge funds from holders of Allowed claims. The difference between the use of phrase "Allowed Guarantee *Claim*," rather than "Allowed Guarantee *Claimant*" is critical in this respect and makes clear that this section operates as a shield against overpayment on Allowed Guarantee Claims rather than as a sword to uproot already settled Distributions.

17. CPS does not contest that its Allowed Guarantee Claims have been deemed satisfied in full under Section 8.13(b) of the Plan as a result of the combined distributions it has received from LBHI and LBT. This deemed satisfaction illustrates the correct application of Section 8.13(b) of the Plan, and CPS concedes that the Plan Administrator is authorized to cease all Distributions in respect of the CPS' Allowed Guarantee Claims, despite the fact that the combined amount of LBHI and LBT Distributions on these claims still falls well short of the

---

[5] The exemption of Allowed Guaranty Claims in Section 6.5(b)(iii) of the Plan from the requirements of Section 8.13(e) Plan is also telling. Section 8.13(e) sets forth certification and disclosure requirements for Allowed Guaranty Claim holders to aid LBHI in determining and enforcing its subrogation rights against its subsidiaries under Section 8.14(a), and, in turn, Section 8.13(a). The carve-out in Section 6.5(b)(iii) of Allowed Guarantee Claims for which LBT is the Primary Obligor (which includes Allowed Guaranty Claims held by CPS) can only be understood as evidence that the incorporation of the LBT Settlement into the Plan was intended to waive all direct or indirect subrogation attempts against LBT, including potential attempts through holders of Allowed Guarantee Claims for which LBT is the Primary Obligor.

6

734679114

combined amounts of such claims. As a result, LBHI has been relieved of any further obligation to make Distributions on these claims and LBHI will end up only having paid out a fraction of the full allowed amount of such claims.[6]

**B.     The Plan Administrator Should Not Be Allowed to Retroactively Disallow Claims.**

18.    If the Plan Administrator is successful in its attempt to impose its distorted interpretation of Section 8.13, CPS will end up being required to disgorge the full amount of Allowed Guaranty Claim Distributions, which would result in CPS ultimately being paid *nothing* by LBHI on its Allowed Guarantee Claims. This would constitute the *de facto* reconsideration and complete disallowance of such Allowed Guarantee Claims with none of the justifications or procedural safeguards typically required in connection therewith. Moreover, such an order would be facially inconsistent with fundamental provisions of the Bankruptcy Code regarding the base-line treatment of these claims that operated as a predicate for the Plan to have been eligible for confirmation in the first place (including with regard to payment, the absolute priority rule and all other provisions requiring the fair and equal treatment of creditors). And it would result in the violation of this Court's Structured Securities Procedures Order as a result of nullification of the ISIN-by-ISIN values that Order allowed for these Guarantee Claims.

**C.     Disgorgement is Inconsistent With the Principles of Unjust Enrichment.**

19.    Additionally, allowing disgorgement would completely invert the equitable principles of unjust enrichment the Plan Administrator cites as the foundation for the applicability of disgorgement in this context. To establish a claim for unjust enrichment, a plaintiff must show "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be

---

[6] The Plan Administrator is seeking $5,718,351.21 on the $22,386,897.56 amount of Allowed Guarantee Claims.

7

734679114

recovered." *In re Stillwater Asset Backed Offshore Fund Ltd.*, 559 B.R. 563, 623 (Bankr. S.D.N.Y. 2016) (citations omitted).

20.     The Plan Administrator immediately fails to meet the first of these elements because the *true* economic value of LBT's distributions to CPS is approximately $5.876 million *less* than as calculated by the Plan Administrator. Decl. ¶11. The Plan Administrator achieves this inflation of claimed "excess" LBT distributions by inequitably relying on Section 8.13(d) of the Plan to utilize a fixed and demonstrably abnormal Yen to Dollar exchange rate in calculating the value of distributions made from LBT to CPS. While this calculation technically applies the exchange rate set out in the Plan, the real-world result is LBHI's arbitrary enrichment at another party's expense (here, CPS).

21.     The Plan Administrator's use of the exchange rate in Section 8.13(d) further compounds the inequities of this situation because that rate was set nine months after the Tōhoku earthquake, tsunami and Fukushima nuclear power plant disaster (which took place on March 11, 2011), at the exact point in time at which the relative value of Japanese Yen reached its most extreme point in reaction to that series of events. Decl. ¶13. A glance at any publically available record of the history of the Yen to Dollar exchange rate over the last twenty years clearly shows a huge (and unrepeated) spike in the value of the Yen around the Plan confirmation date that materially deviates from typical Yen strength variations. *Id.* As such, any argument that CPS (or any other Japanese holder of Allowed Guaranty Claims) 'made its bet' on the rate set forth in the Plan like all other Guarantee claimants is patronizing, at best, or a blatant use of a humanitarian disaster as a means to strip payment rights from an entire subset of claimholders, at worst. The disgorgement of $5.876 million based solely on this arbitrarily chosen exchange

8

rate—which has no connection to the actual value received by CPS—would be neither equitable nor in good conscience.

**D.    The Plan Administrator is Equitably Estopped.**

22.    The doctrine of equitable estoppel is properly invoked where "the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001) (citing *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir.1996)). The Plan Administrator's position under the Plan, in combination with its informational and logistical advantages, impose an affirmative obligation on the Plan Administrator to avoid making potential "overpayment" Distributions, the receipt of which was justifiably relied on by CPS as the source of funds for payments to its customers who are the ultimate beneficiaries of the underlying securities.[7] As such, the Plan Administrator is equitably estopped from disgorging any related Distributions from CPS.

23.    As set forth above, Section 8.13(b) acts as a shield to prevent situations where LBHI might make "excess" Distributions on Allowed Guarantee Claims after such claims have been deemed satisfied, and LBHI has authority thereunder to refuse to make Distributions which might result in such "excess." And as conceded by the Plan Administrator, "the Plan Administrator's mandate is to enforce the confirmed Plan (which is the functional equivalent of a contract between LBHI and its creditors)," (Motion, ¶3), including the responsibilities contemplated in Section 8.13(b) to prevent overpayment and to correctly calculate the amounts of Allowed Guarantee Claim Distributions that might be affected by potential overpayments. As such, as a matter of the contractual nature of the Plan, CPS justifiably relied on the Plan

---

[7] Because CPS acted as a 'pass through' in connection with these Distributions, CPS notes that any liability in connection with any disgorgement (which CPS contends is not proper) may not ultimately rest with CPS.

9

734679114

Administrator in respect of the amount of each Distribution installment on Allowed Guarantee Claims.

24. The Plan Administrator cannot feign ignorance to these duties. In fact, the Plan Administrator filed the Guarantee Claims Procedures Motion (the "**GCP Motion**")[8] to address exactly these potential problems. The LBT Procedures (as defined in the GCP Motion) requested by the Plan Administrator in that GCP Motion, and as contained in the order that followed (the "**GCP Order**"),[9] were meant to confirm LBHI's authority to refrain from making further distributions for satisfied allowed claims. In support of that relief, the Plan Administrator argued that "[w]ithout [the LBT Procedures], it is certain that ISIN Guarantee Claims will be overpaid," (GCP Motion, ¶17), and that "[t]he alternative to the LBT Procedures—forcing the Plan Administrator to make Distributions that would certainly result in overpayments on account of certain ISIN Guarantee Claims—is unreasonable and inefficient. The Plan Administrator should not be required to make Distributions that result in overpayments to a creditor and then seek to recover overpaid amounts. Doing so would require a costly and lengthy process with uncertain results." GCP Motion, ¶27. The Plan Administrator has, through its inaction following entry of the GCP Order, manifested exactly such an unreasonable and inefficient process and has, with the service of the Motion, unfairly passed the related costs along to CPS.

25. The Plan Administrator also acknowledges in the GCP Motion that claimholders should be notified by the Plan Administrator in *advance* of their Allowed Guarantee Claims being satisfied in full. To that effect, the Plan Administrator stated that "[t]he LBT Procedures will provide adequate notice and opportunity to object to holders of ISIN Guarantee Claims before their ISIN Guarantee Claims are deemed satisfied . . . ." (GCP Motion, ¶2) and that "[t]he

---

[8] A copy of the GCP Motion is attached hereto as Exhibit A.

[9] A copy of the GCP Order is attached hereto as Exhibit B.

10

734679114

LBT Procedures are designed to eliminate the risk that holders of ISIN Guarantee Claims find their Guarantee Claims satisfied by "surprise."" GCP Motion, ¶23.

26.  Additionally, with regard to timing, LBHI learned that "certain Primary Claims were allowed by LBT in substantially higher amounts than the corresponding Allowed Guarantee Claims were allowed by LBHI" on April 12, 2013 (the date that LBT published final valuations for Primary Claims against LBT on an ISIN-by-ISIN basis). *See* Motion, ¶17. As such, LBHI was the party with access to information on the amounts of Distributions from both itself *and* from LBT, and was clearly best positioned to act to prevent any perceived overpayments on Allowed Guarantee Claims. But despite this information advantage, and despite being authorized under Section 8.13(b) to prevent overpayment, LBHI did nothing for *years*. The Plan Administrator gave no warnings about potential Claim "overpayment" in connection with any of the numerous Allowed Guarantee Claim Distributions or the LBT Primary Claim Distributions and took *no* other action to prevent perceived "excess" Distributions until August 11, 2017, when it filed its Satisfied Guarantee Claims Objection and the GCP Motion. But even then, *after* obtaining certainty as to the deemed satisfaction of Allowed Guarantee Claims and its authority and notice responsibilities under the GCP Motion, the Plan Administrator served *no notice* warning of possible "overpayment" in respect of LBT Primary Claim Distributions until nearly a year later, when it transmitted the Plan Administrator June 2018 Letter.[10] Motion, ¶20.

27.  As noted above, CPS holds its Allowed Guarantee Claims as nominee for its customers, who are the ultimate beneficiaries of all payments made in connection with the

---

[10] CPS has no record of receiving either the Plan Administrator June 2018 Letter or the Plan Administrator November 2018 Letter. Decl. ¶10. CPS has records of receiving the Plan Administrator July 2018 E-mail and the Plan Administrator January 2019 E-Mail, but in the absence of certified mail copies of the Letters referenced therein, and in light of CPS' records reflecting the true economic value of aggregate LBT Distributions (nearly $5.9 million less than alleged in the Letters), CPS reasonably reacted to the emails with skepticism and suspicion, offering no response until receipt of the Motion. Decl. ¶11.

underlying securities. At the time that CPS received each Distribution from each of LBHI and LBT, CPS relied on the above described duties and obligations of the Plan Administrator, including, without limitation, in connection with CPS' obligation to distribute the proceeds of such Distributions to the beneficial owners of such claims. Accordingly, any disgorgement of such Distributions would be inequitable in light of CPS' justifiable reliance upon the Plan Administrator's conduct and should therefore be equitably estopped. *See In re Vick*, 75 B.R. 248, 249 (Bankr. E.D. Va. 1987) (holding that a trustee was equitably estopped from recovering excess claim distributions from creditor who had accepted an overpayment in good faith and in reliance on the trustee's actions in connection therewith, noting in support that "as a result of the trustee's action, the creditors changed their relationships with the debtor to their detriment" and that "[t]he Doctrine of Equitable Estoppel rests on the principle that when one of two innocent parties must suffer a loss, it must be borne by the party whose action or conduct rendered the injury possible."); *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d at 725.

28. The Plan Administrator claims that the disgorgement is fair under "provisions of the Bankruptcy Code which concern the fair and equal treatment of all creditors." Motion, ¶25. In support of this assertion, the Plan Administrator cites to *In re Granite Broad. Corp.,* 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) and *In re South Side House, LLC,* 474 B.R. 391, 420 (Bankr. E.D.N.Y. 2012) for the uncontroversial proposition that a creditor of an insolvent debtor cannot receive more than the allowed amount of its claim. But neither of those cases dealt with the question of "deemed" satisfaction of an allowed claim as a result of the combined value of guaranty payments (made from the debtor's estate) and primary claim payments (made from outside the debtor's estate) that still fall well short of the aggregate claim value. If we were to compare these cases "apples to apples," focusing only on the debtor's estate as the source of the

12

overpayment of an allowed claim amount (i.e., the circumstances under which other creditors would be prejudiced), then CPS would be in no danger of having received any overpayment from the estate of the debtor. The Plan Administrator is seeking to reclaim $5,718,351.21 that LBHI has paid out in respect of the $22,386,897.56 of CPS' Allowed Guarantee Claims (approximately 25% of such claims) and will make no further payments in respect of such claims. As such, this is not a situation like *In re Granite Broad. Corp.* or *In re South Side House, LLC*, where the estate had inadvertently directed payments in excess of the full amount of the relevant allowed claim. If anything, the truncated liability in respect of CPS' Allowed Guarantee Claims (resulting from the deemed satisfaction of such claims) has inured to the benefit of other creditors and the LBHI estate, meaning that any further recovery would act as a windfall to such creditors and the estate.

E.    **Denial of the Motion Will Not Prejudice Creditors or the Estate.**

29.    The Plan Administrator attempts to buttress its perceived disgorgement right by citing to select language in Section 502(j) of the Bankruptcy Code. The last sentence of that subsection provides that it "*does not alter or modify the trustee's right* to recover from a creditor any excess payment or transfer made to such creditor." 11 U.S.C. § 502(j) (emphasis added). The Plan Administrator claims that this language creates a stand-alone code-based disgorgement mechanism. But the Plan Administrator has conveniently failed to note that Section 502(j) deals with claims reconsideration, *not* disgorgement. That subsection sets forth the detailed standards that apply in the context of claims reconsideration.[11] The disgorgement reference at the end of

---

[11] In its entirety, Section 502(j) of the Bankruptcy Code provides:

A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case. Reconsideration of a claim under this subsection does not affect the validity of any payment or transfer from the estate made to a holder of an allowed claim on account of such allowed claim that is not reconsidered, but if a reconsidered claim is allowed and is of the same class as such holder's claim, such holder may not receive any additional payment or transfer from the estate on account of such

13

734679114

Section 502(j), as is clear from a plain reading of that language, simply makes clear that the claims reconsideration rules set forth in Section 502(j) do not alter or modify *any otherwise existing* disgorgement rights, which rights are in turn predicated on preventing prejudice to the estate (a concern not present here).  But the Plan Administrator has no existing disgorgement "right" and thus cannot rely on Section 502(j).  Thus, as with its interpretation of the Plan, Section 502(j) falls well short of providing any "express" disgorgement remedy in this context. *See, e.g., In re Lehman Bros. Holdings Inc.*, 591 B.R. 153, 162-63 (Bankr. S.D.N.Y. 2018) (denying a motion by the Plan Administrator for an order in aid of execution of the Plan because the Bankruptcy Code sections relined on by the Plan Administrator in such motion (Sections 105(a) and 1142(b)) did not operate on a stand-alone basis and did not confer any substantive right not otherwise available under applicable law or beyond what was provided for in the Plan). Moreover, as discussed above, the Plan Administrator's motion seeks *de facto* claims reconsideration, so it is ironic that it cites to Section 502(j) without soaking in the full requirements of that section, including the need to show cause in connection with any reconsideration action.

30.  The cases the Plan Administrator cites in its attempt to establish precedent for disgorgement fare no better.  The Plan Administrator cites to four cases, all from outside the Second Circuit and the Southern District of New York, for the proposition that a trustee might be able to disgorge claim distributions following mistaken payments by the debtor. *See In re R&W Enters.,* 181 B.R. 624, 636-37 (Bankr. N.D. Fla. 1994); *In re Sims,* 278 B.R. 457, 477 (Bankr. E.D. Ten. 2002); *In re Talbot,* 124 F.3d 1201 (10th Cir. 1997); and *In re Robinson,* Adv. Proc. No. 99-01048, 2001 WL 36160438, at *4 (Bankr. D. Vt. May 22, 2001).  But like the cases cited

---

holder's allowed claim until the holder of such reconsidered and allowed claim receives payment on account of such claim proportionate in value to that already received by such other holder.  This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.

14

in connection with unjust enrichment, these cases all examined excess payments made from a *single* estate where it was clear that such estate had paid in excess of the allowed claim value. That is not the case here. LBHI's estate is not responsible for paying up to and above the full value of the CPS Allowed Guarantee Claims, and has, in fact, paid far less. As such, these cases are inapposite.

WHEREFORE, CPS respectfully requests that the Court (i) deny all relief requested in the Motion and (ii) grant CPS such further relief as the Court deems just.

Dated: New York, New York
October 28, 2019

/s/ Joaquin M. C de Baca
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
Fax: (212) 262-1910
Brian Trust
Jason Kirschner
Joaquin M. C de Baca

*Attorneys for Capital Partners Securities Co., Ltd.*

\* \* \*