**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NOV − 1 2019

------------------------------------------------------------------x

| | | |
|---|---|---|
| In Re: | : | |
| | : | **Chapter 11** |
| | : | |
| **BNC MORTGAGE, LLC,** | : | **Case No: 09-10137-scc** |
| | : | |
| **Debtor.** | : | **Hon. Shelley C. Chapman** |
| | : | **Bankruptcy Judge** |

------------------------------------------------------------------x

## <u>AFFIRMATION IN SUPPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY TO ALLOW CIVIL LITIGATION TO PROCEED</u>

TYRONE KEITH ARMSTRONG, Pro Se, the undersigned, affirms the following under penalty of perjury:

1.     That I am the Movant in this matter (hereinafter referred to as "Movant").

2.     That I am over 18 years of age and competent to testify to the facts herein.

3.     That I have read the above and foregoing *Affirmation in Support of Motion for Relief from Automatic Stay to Allow Civil Litigation to Proceed* and know the contents thereof; that the same is true of my own knowledge, except those matters stated therein upon information and belief, and as to those matters I believe them to be true.

4.     That I bring the foregoing Affirmation in good faith and not for any improper purpose.

5.     That the jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1334(c) and 157(b)(2)(G).

6.     I make this Affirmation in Support of Movant's Motion for an Order to annul the automatic stay imposed by virtue of 11 U.S.C. §362, retroactive as of Debtor's bankruptcy filing date of January 09, 2009, so that Movant's claims may proceed against Debtor in the Eighth Judicial District Court of Clark County, Nevada ("the state court")

for the claims of: (*i*) wrongful foreclosure; (*ii*) quiet title; (*iii*) declaratory relief; (*iv*)

slander of title, (*v*) intentional infliction of emotional distress; and (*vi*) fraud.[1]

7.      Movant has also filed a motion for leave to file a late proof of claim,

which should be heard simultaneously with this motion. If the motion for leave to file a

late proof of claim is not heard within 30 days of filing or contemporaneously with the

filing of the instant motion, Movant waives his rights under 11 U.S.C. §362(e) to have

the motion for relief from automatic stay deemed granted.

8.      That at all times hereinafter mentioned, Movant is the owner of the

property commonly referred to as 3713 Brentcove Drive, North Las Vegas, Nevada

89032 ("the real property"), secured with a deed of trust from [Bank of America][2] and

recorded on December 29, 2004 as document number 200412290002078 in the office of

the Recorder in Clark County, Nevada.[3] Movant owns the real property free of

encumbrance as a result of satisfying or settling the original amount of his mortgage in

the amount of $224,000 with [Bank of America] and the recording of a Reconveyance of

Deed in favor of Movant on January 19, 2017 as document number 201701190001205 in

the office of the Recorder in Clark County, Nevada.[4] A dispute has arisen regarding a

cloud on title to the real property in that Debtor purportedly originated a [second]

mortgage in the amount of $237,000 and recorded a deed of trust on January 25, 2007 as

document number 200701250003978 in the office of the Recorder in Clark County,

---

[1] Exhibit "1" – State court complaint.

[2] Bank of America is successor to New Century Mortgage Corporation and Countrywide
by way of acquisition.

[3] Exhibit "2" – BofA deed of trust.

[4] Exhibit "3" – BofA Reconveyance of deed of trust.

Nevada.[5] Said (second) mortgage constituted a lien upon the real property. Debtor then

sold or assigned the lien to other defendant-entities named in the state court complaint.[6]

9.    On June 19, 2019, Movant commenced state court action against Debtor

and co-defendants as a defense to the notice of trustee sale recorded on June 13, 2019.[7]

On or about July 05, 2019, an affidavit of service was filed in the state court as to Debtor.

Movant challenges the foreclosure sale under Nevada law and contends that the deed/note

originated by Debtor is *void ab initio*, not merely voidable.

10.    On September 04, 2019, Garrett A. Fail, Esq. from the New York law firm

of Weil Gotshal & Manges LLP mailed to Movant written correspondence regarding the

Bar Order, the automatic stay of section §362 and its applicability to Debtor in the state

court proceedings.[8]

11.    On or about September 19, 2019, Movant, ***for the first time*** received

notice of the Bar Date. Movant had no actual knowledge of the bankruptcy or automatic

stay prior to receipt of Mr. Fail's letter. Movant immediately responded to Mr. Fail by

way of certified mail/return receipt requested and also via email, in an attempt to reach

stipulation to lift/annul the automatic stay.[9] Movant requested in relevant part:

> (A) *Has the automatic stay of section §362(a) of the U.S. Bankruptcy Code been
> terminated since your client's filing of the Chapter 11 petition on January 09,
> 2009?*

---

[5] Exhibit "4" – BNC proposed note/deed of trust (objected to as hearsay).

[6] Exhibit "5" – BNC's proposed assignments of mortgage.

[7] Exhibit "6" – Notice of trustee sale.

[8] Attached as Exhibit "7" – Initial correspondence from Weil, Gotshal & Manges.

[9] Attached as Exhibit "8" – Movant's response to Weil, Gotshal & Manges.

(B)  Has BNC Mortgage Inc./BNC Mortgage LLC/Lehman Brothers Holdings, Inc.
had a case dismissed within the year prior to the current petition date?

(C)  Is the 3713 Brentcove Drive property declared as part of your client's pre- and
post- petition estate property?

(D)  Has BNC Mortgage Inc./BNC Mortgage LLC/Lehman Brothers Holdings, Inc.'s
plan of reorganization been confirmed?

(E)  Is the 3713 Brentcove Drive property necessary to an effective reorganization
under 11 U.S.C. §362(d)(2)(B)?

12.     On September 20, 2019, without first conferring in good faith with

Movant regarding the proposed stipulation for relief from the automatic stay, Debtor

made an appearance in the Nevada state court and filed a Notice of Bankruptcy.

13.     On October 01, 2019, the Nevada state court entered a minute order and

stayed the "commencement or continuation of a judicial, administrative, or other action

or proceeding against the debtor."[10] Currently pending on the state court docket are the

defendants' motion to dismiss; Movant's countermotion for summary judgment; and a

minute order directing defendants to produce specific discovery related to origination of

the BNC mortgage.[11]

14.     Movant will be prejudiced by delay because discovery in the possession of

Debtor related to the origination of the mortgage is necessary to determine state court

claims and, Debtor currently appears to be exempt from producing discovery. A delay in

state court proceedings may result in dismissal of claims, defendants, and/or

opportunities to obtain discovery. Movant, who is indigent, will incur unnecessary

expense to re-litigate the matter if he does not receive retroactive relief from the

automatic stay, particularly since he has a summary judgment motion pending in state

---

[10] Attached as Exhibit "9" – State court minute order of 10/01/2019.

[11] Attached as Exhibit "10" – State court minute order of 07/31/2019.

court. Other factors to consider in balancing the harm against Movant are that Movant is

57 years of age, has medical disabilities, a delay in obtaining judgment has prejudiced

Movant's ability to refinance the real property, as well as living in constant fear of

foreclosure and irreparable harm due to the number of foreclosure sales employed against

the real property by purported successors to the BNC note/deed.[12]

15.    On October 13, 2019, Movant filed a pleading in state court that conveyed

in relevant part that Movant did not wish to pursue claims at this time that disturbed the

proceedings of the Bankruptcy Court. An order granting retroactive relief from the

automatic stay would restore the status quo and promote judicial economy because the

claims arose under Nevada law, the state court is already familiar with the facts of the

case and Movant's partial motion for summary judgment has a likelihood of success on

the merits.

16.    Debtor admittedly sold or assigned the (second) mortgage to other co-

defendants named in the state court case. Therefore, no equity remains in the real

property for the benefit of Debtor's estate and, accordingly, the real property is not

necessary to an effective reorganization.

17.    Movant has detrimentally changed his position in seeking damages from

Debtor and instead now relies on Debtor's insurance policy to secure and satisfy any and

all damages for the claims of wrongful foreclosure, slander of title, intentional infliction

of emotional distress and fraud. Movant's quiet title and declaratory relief claims seek a

determination of title to a single asset real estate and do not request enforcement of

payment that would affect the Debtor's estate.

---

[12] Attached as Exhibit "11" - Clark County Recorder register of actions.

18.     Movant has made a prima facie showing of cause for retroactive relief from the automatic stay described hereinabove based on the criteria set forth in *Killmer*.

19.     Grounds for relief from the stay existed because Applicant has shown cause based on the criteria set forth in the *Sonnax* factors:[13]

20.     Retroactive relief from the automatic stay will restore the status quo and/or permit Movant's claims to be fully resolved in the Nevada state court.

21.     Movant's state court claims will not interfere with the bankruptcy case as Movant will collect any judgment against the Debtor solely from the applicable insurance proceeds and/or other non-debtor sources; and the bankruptcy estate will not be affected by a state court determination of title to a single asset real estate that Debtor alleges to have sold or assigned.

22.     The Nevada state court possesses the necessary expertise to determine claims governed by state law and is the more convenient forum as Plaintiff resides there, the subject property is located in Nevada, the claims arose in Nevada and Debtor's principle place of business in California is much closer to Nevada than New York for the production of witnesses and discovery.

23.     That Movant, as title-owner of the real property, desires to quiet title in the state court according to the laws of the State of Nevada (and the Ninth Circuit), and the related claims to be satisfied by Debtor's insurance policy. Movant will be prejudiced if his claims do not proceed under Nevada law because the same claims in the Second Circuit require different elements. For example, in Nevada, the claim of wrongful foreclosure is not limited to an actual foreclosure sale. The exercise of the power of sale (i.e. notice of trustee sale) where the homeowner is not in default is sufficient to state a

---

[13] *Sonnax* factors are further supplemented in the related memorandum of law.

claim for wrongful foreclosure under Nevada law.[14] The claim of quiet title under Nevada law provides "An action may be brought by any person against another who claims an estate or interest in real property, adverse to the person bringing the action, for the purpose of determining such adverse claim."[15]

24.    That by reason of the Debtor having filed a petition under Chapter 11 on January 09, 2009 Movant is stayed from proceeding with state court action against Debtor. Movant is familiar with the facts and circumstances of this case to the extent that judgment in state court proceedings cannot proceed against Debtor until relief is granted from the automatic stay of section §362 of the U.S. Bankruptcy Code.

25.    It is respectfully asserted that for the aforesaid reasons, Movant's interest in the property is not adequately protected. Consequently, Movant is entitled to relief from the stay in order to pursue his quiet title and declaratory relief claims; and seek damages solely from Debtor's insurance carrier to satisfy the remaining claims.

26.    That by virtue of the foregoing, the Debtor has caused Movant to suffer prejudicial delay; and, therefore, pursuant to 11 U.S.C. §362(d)(1), cause exists to vacate the automatic stay.

27.    Due to the nature of this petition, Movant respectfully requests waiver of Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure which states that an order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise.

---

[14] *Collins v. Union Fed. Sav. & Loan*, 99 Nev. 284, 304, 662 P.2d 610, 623 (Nev. 1983).

[15] Nevada Revised Statute 40.010.

WHEREFORE, your affirmant respectfully requests an Order of this Court annulling the automatic stay by virtue of 11 U.S.C. §362 as to Movant; granting Movant leave to proceed with his claims in the Eighth Judicial District Court of Clark County, Nevada; the annulment of the stay shall bind the Debtor in any future conversion of the case; and for such other, further and different relief as this Court may deem just, proper and equitable.

Dated: Clark County, Nevada
October 31, 2019

By: <u>TYRONE KEITH ARMSTRONG</u>
     TYRONE KEITH ARMSTRONG
     3713 Brentcove Drive
     North Las Vegas, Nevada 89032
     (725) 212-1041
     performanceoneautomotive@gmail.com
     *Movant Pro Se*

STATE OF NEVADA     )
                 ) ss.
COUNTY OF CLARK     )

Signed and affirmed to before me on this <u>31st</u> day of October, 2019, by Tyrone Keith Armstrong.



ROGER HENRIQUEZ-JACOBO
NOTARY PUBLIC•STATE OF NEVADA
Appointment Recorded in Clark County
No: 17-2792-1 Expires June 1, 2021

<u>Roger Henriquez Jacobo</u>
NOTARY PUBLIC


ROGER HENRIQUEZ-JACOBO
NOTARY PUBLIC•STATE OF NEVADA
Appointment Recorded in Clark County
No: 17-2782-1 Expires June 1, 2021

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of October, 2019, I served a true and

correct copy of the foregoing *Affirmation in Support of Motion for Relief from Automatic*

*Stay to Allow Civil Litigation to Proceed*; *Form 4001-1*; and *Exhibits 1-11* via U.S. Mail,

first class postage prepaid, addressed to the following:

Jacqueline Marcus, Esq.
Garrett A. Fail, Esq.
Weil Gotshal & Manges, LLP
767 5th Avenue
New York, NY 10153
USPS certified mail tracking: 7019 0160 0001 0602 9736

BNC Mortgage LLC
(f/k/a BNC Mortgage, Inc.)
1901 Main Street
Irvine, CA 92624
USPS certified mail tracking: 7019 0160 0001 0602 9743

United States Trustee
201 Varick Street, Room 1006
New York, NY 10014
USPS certified mail tracking: 7019 0160 0001 0602 9750

Epiq Corporate Restructuring, LLC
777 Third Avenue, 12th Floor
New York, NY 10017
USPS certified mail tracking: 7019 0160 0001 0602 9767

By: */s/ Tyrone Keith Armstrong*
TYRONE KEITH ARMSTRONG
3713 Brentcove Drive
North Las Vegas, Nevada 89032
Telephone: (725) 212-1041
Email:performanceoneautomotive@gmail.com
*Movant Pro Se*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- X

<CASE CAPTION>
In Re:                                                    CASE NO. 09  -10137  (scc  )

BNC MORTGAGE, LLC,

                    Debtor.


------------------------------------------------------------------- X

---

RELIEF FROM STAY – REAL ESTATE AND
COOPERATIVE APARTMENTS

---

I, Tyrone Keith Armstrong
<NAME AND TITLE>  OF
Movant Pro Se
<NAME OF ORGANIZATION/CORPORATION/MOVING PARTY> (HEREINAFTER, "MOVANT"),
HEREBY DECLARE (OR CERTIFY, VERIFY, OR STATE):

**BACKGROUND INFORMATION**

1.   REAL PROPERTY OR COOPERATIVE APARTMENT ADDRESS WHICH IS THE SUBJECT OF THIS

MOTION: 3713 Brentcove Drive, North Las Vegas. Nevada 89032

2.   LENDER NAME: BNC Mortgage, LLC (f/k/a BNC Mortgage, Inc.)

3.   DATE OF MORTGAGE <MM/DD/YYYY>: 01/25/2007

4.   POST-PETITION PAYMENT ADDRESS:

Unknown

**DEBT/VALUE REPRESENTATIONS**

5.   TOTAL PRE-PETITION AND POST-PETITION INDEBTEDNESS OF DEBTOR(S) TO MOVANT AT THE TIME OF

FILING THE MOTION: $ To be determined

(Note: this amount may not be relied on as a "payoff" quotation.)

6.   MOVANT'S ESTIMATED MARKET VALUE OF THE REAL PROPERTY OR COOPERATIVE APARTMENT:

$ 266,000

7.  SOURCE OF ESTIMATED VALUATION:

Broker's Price Opinion or Comparative Market Analysis (attached)

### STATUS OF DEBT AS OF
### THE PETITION DATE

8.  TOTAL PRE-PETITION INDEBTEDNESS OF DEBTOR(S) TO MOVANT AS OF PETITION FILING DATE:

$ To be determined

    A.    AMOUNT OF PRINCIPAL: $ To be determined

    B.    AMOUNT OF INTEREST: $ To be determined

    C.    AMOUNT OF ESCROW (TAXES AND INSURANCE): $ 0.00

    D.    AMOUNT OF FORCED PLACED INSURANCE EXPENDED BY MOVANT: $ 0.00

    E.    AMOUNT OF ATTORNEYS' FEES BILLED TO DEBTOR(S) PRE-PETITION: $ 0.00

    F.    AMOUNT OF PRE-PETITION LATE FEES, IF ANY, BILLED TO DEBTOR(S): $ 0.00

9.  CONTRACTUAL INTEREST RATE: N/A    (If interest rate is (or was) adjustable, please list the rate(s) and date(s) the rate(s) was/were in effect on a separate sheet and attach the sheet as an exhibit to this form; please list the exhibit number here: N/A .)

10.  PLEASE EXPLAIN ANY ADDITIONAL PRE-PETITION FEES, CHARGES OR AMOUNTS CHARGED TO DEBTOR'S/DEBTORS' ACCOUNT AND NOT LISTED ABOVE:

State court quiet title action and damages, if any, satisfied solely by Debtor's insurance coverage.

(If additional space is needed, please list the amounts on a separate sheet and attach the sheet as an exhibit to this form; please list the exhibit number here: N/A .)

### AMOUNT OF ALLEGED POST-PETITION DEFAULT
### (AS OF 10/28/2019 <MM/DD/YYYY>)

11.  DATE LAST PAYMENT WAS RECEIVED: Never received     <MM/DD/YYYY>

12.  ALLEGED TOTAL NUMBER OF PAYMENTS DUE POST-PETITION FROM FILING OF PETITION THROUGH PAYMENT DUE ON N/A < MM/DD/YYYY >: N/A .

13.  PLEASE LIST ALL POST-PETITION PAYMENTS ALLEGED TO BE IN DEFAULT:

| ALLEGED PAYMENT DUE DATE | ALLEGED AMOUNT DUE | AMOUNT RECEIVED | AMOUNT APPLIED TO PRINCIPAL | AMOUNT APPLIED TO INTEREST | AMOUNT APPLIED TO ESCROW | LATE FEE CHARGED (IF ANY) |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
| TOTALS: | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

14. AMOUNT OF MOVANT'S ATTORNEYS' FEES BILLED TO DEBTOR FOR THE PREPARATION, FILING AND PROSECUTION OF THIS MOTION: $ TBD

15. AMOUNT OF MOVANT'S FILING FEE FOR THIS MOTION: $ TBD

16. OTHER ATTORNEYS' FEES BILLED TO DEBTOR POST-PETITION: $ TBD

17. AMOUNT OF MOVANT'S POST-PETITION INSPECTION FEES: $ 0.00

18. AMOUNT OF MOVANT'S POST-PETITION APPRAISAL/BROKER'S PRICE OPINION: $ 150.00

19. AMOUNT OF FORCED PLACED INSURANCE OR INSURANCE PROVIDED BY THE MOVANT POST-PETITION: $ 0.00

20. SUM HELD IN SUSPENSE BY MOVANT IN CONNECTION WITH THIS CONTRACT, IF APPLICABLE: $ 0.00

21. AMOUNT OF OTHER POST-PETITION ADVANCES OR CHARGES, FOR EXAMPLE TAXES, INSURANCE INCURRED BY DEBTOR ETC.: $ 0.00

## REQUIRED ATTACHMENTS TO MOTION

Please attach the following documents to this motion and indicate the exhibit number associated with the documents.

(1) Copies of documents that indicate Movant's interest in the subject property. For purposes of example only, a complete and legible copy of the promissory note or other debt instrument together with a complete and legible copy of the mortgage and any assignments in the chain from the original mortgagee to the current moving party. (Exhibit 2 .)

(2) Copies of documents establishing proof of standing to bring this Motion. (Exhibit 2 .)

(3) Copies of documents establishing that Movant's interest in the real property or cooperative apartment was perfected. For the purposes of example only, a complete and legible copy of the Financing Statement (UCC-1) filed with either the Clerk's Office or the Register of the county the property or cooperative apartment is located in. (Exhibit 2 .)

## CERTIFICATION FOR BUSINESS RECORDS

I CERTIFY THAT THE INFORMATION PROVIDED IN THIS FORM AND/OR ANY EXHIBITS ATTACHED TO THIS FORM (OTHER THAN THE TRANSACTIONAL DOCUMENTS ATTACHED AS REQUIRED BY PARAGRAPHS 1, 2 AND 3, IMMEDIATELY ABOVE) IS DERIVED FROM RECORDS THAT WERE MADE AT OR NEAR THE TIME OF THE OCCURRENCE OF THE MATTERS SET FORTH BY, OR FROM INFORMATION TRANSMITTED BY, A PERSON WITH KNOWLEDGE OF THOSE MATTERS, WERE KEPT IN THE COURSE OF THE REGULARLY CONDUCTED ACTIVITY; AND WERE MADE BY THE REGULARLY CONDUCTED ACTIVITY AS A REGULAR PRACTICE.

I FURTHER CERTIFY THAT COPIES OF ANY TRANSACTIONAL DOCUMENTS ATTACHED TO THIS FORM AS REQUIRED BY PARAGRAPHS 1, 2 AND 3, IMMEDIATELY ABOVE, ARE TRUE AND ACCURATE COPIES OF THE ORIGINAL DOCUMENTS. I FURTHER CERTIFY THAT THE ORIGINAL DOCUMENTS ARE IN MOVANT'S POSSESSION, EXCEPT AS FOLLOWS:

_____.

### DECLARATION

I, TYRONE KEITH ARMSTRONG_____
<NAME AND TITLE> OF
__Movant Pro Se_____
<NAME OF MOVANT>, HEREBY DECLARE (OR CERTIFY, VERIFY, OR STATE) PURSUANT TO 28 U.S.C. SECTION 1746 UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON PERSONAL KNOWLEDGE OF THE MOVANT'S BOOKS AND BUSINESS RECORDS.

EXECUTED AT Clark County_____ <CITY/TOWN>, NV__ <STATE> ON THIS 28__ DAY OF October_____ <MONTH>, 20 19_ <YEAR>.


/s/ Tyrone Keith Armstrong_____

Movant Pro Se_____

3713 Brentcove Drive_____

North Las Vegas, Nevada 89032_____

_____

<PRINT NAME>
<TITLE>
<MOVANT>
<STREET ADDRESS>
<CITY, STATE AND ZIP CODE>



Enrique Moreno
Executive Realty Services
enrique@executiverealtyservices.com
Office Ph: 702-278-8871
Delivering Excellence Since 2000



**Researched and prepared by**

Enrique Moreno

**Prepared exclusively for**

Tyrone K. Armstrong

**Prepared on**
October 27, 2019

**Subject Property**

3713 Brentcove Drive

North Las Vegas, NV

89032-3157



**Enrique Moreno**
Executive Realty Services
3960 Howard Hughes Parkway Suite 500
Las Vegas, NV 89169
702-278-8871
enrique@executiverealtyservices.com

Copyright: 2019 All rights reserved.
This is a broker price opinion or comparative market analysis and should not be considered an appraisal or opinion of value. In making any decision that relies upon my work, you should know that I have *not* followed the guidelines for development of an appraisal or analysis contained in the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.

# Comparative Market Analysis



| | |
|---|---|
| **Researched and prepared by** | **Subject Property** |
| Enrique Moreno | 3713 Brentcove Drive |
| | North Las Vegas, NV |
| **Prepared exclusively for** | 89032-3157 |
| Tyrone K. Armstrong | |
| **Prepared on** | |
| October 27, 2019 | |



**Enrique Moreno**
Executive Realty Services
3960 Howard Hughes Parkway Suite 500
Las Vegas, NV 89169
702-278-8871
enrique@executiverealtyservices.com

Copyright: 2019 All rights reserved.
This is a broker price opinion or comparative market analysis and should not be considered an appraisal or opinion of value. In making any decision that relies upon my work, you should know that I have *not* followed the guidelines for development of an appraisal or analysis contained in the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation .

**Enrique Moreno**
Executive Realty Services
enrique@executiverealtyservices.com
Office Ph: 702-278-8871
Delivering Excellence Since 2000

| Subject Property: 3713 Brentcove Drive, North Las Vegas | October 27, 2019 |
|---|---|

## Summary of Comparable Listings

This page summarizes the comparable listings contained in this market analysis.

### Active Listings

| Address | Price | Beds | Bth F | Bth H | SqFt | $/SqFt | List Date |
|---|---|---|---|---|---|---|---|
| 3713 Brentcove Drive | | 3 | 2 | | 1852 | $0.00 | |
| 3318 VINA Court | $255,000 | 4 | 2 | 0 | 1,844 | $138.29 | 09/06/2019 |
| 3817 ROSE CANYON Drive | $259,900 | 4 | 2 | 1 | 1,878 | $138.39 | 08/09/2019 |
| 1712 MIZZENMAST Avenue | $266,000 | 4 | 2 | 1 | 1,866 | $142.55 | 08/07/2019 |
| 4028 CLOVE HITCH Street | $269,000 | 4 | 2 | 1 | 1,866 | $144.16 | 10/08/2019 |
| 3445 QUIET PUEBLO Street | $280,900 | 3 | 2 | 0 | 1,805 | $155.62 | 09/04/2019 |
| Averages: | $266,160 | 3.8 | 2.0 | 0.6 | 1,852 | $143.80 | |

### Sold Listings

| Address | Price | Beds | Bth F | Bth H | SqFt | $/SqFt | Sold Date |
|---|---|---|---|---|---|---|---|
| 3713 Brentcove Drive | | 3 | 2 | | 1852 | $0.00 | |
| 1616 TEASDALE Avenue | $253,000 | 3 | 2 | 1 | 1,826 | $138.55 | 10/24/2019 |
| 1948 QUARTET Drive | $265,000 | 3 | 2 | 1 | 1,824 | $145.29 | 06/28/2019 |
| 3617 NAIROBI Lane | $269,000 | 3 | 2 | 0 | 1,857 | $144.86 | 07/12/2019 |
| Averages: | $262,333 | 3.0 | 2.0 | 0.7 | 1,836 | $142.90 | |

### Under Contract - No Show Listings

| Address | Price | Beds | Bth F | Bth H | SqFt | $/SqFt | Contract Date |
|---|---|---|---|---|---|---|---|
| 3713 Brentcove Drive | | 3 | 2 | | 1852 | $0.00 | |
| 817 PEACH Avenue | $265,000 | 3 | 2 | 0 | 1,815 | $146.01 | 09/30/2019 |
| Averages: | $265,000 | 3.0 | 2.0 | 0.0 | 1,815 | $146.01 | |

### Under Contract - Show Listings

| Address | Price | Beds | Bth F | Bth H | SqFt | $/SqFt | Contract Date |
|---|---|---|---|---|---|---|---|
| 3713 Brentcove Drive | | 3 | 2 | | 1852 | $0.00 | |
| 821 PEACH Avenue | $249,990 | 3 | 2 | 0 | 1,815 | $137.74 | 10/02/2019 |
| Averages: | $249,990 | 3.0 | 2.0 | 0.0 | 1,815 | $137.74 | |

| | Low | Median | Average | High | Count |
|---|---|---|---|---|---|
| Comparable Price | $249,990 | $265,000 | $263,279 | $280,900 | 10 |
| Adjusted Comparable Price | $249,990 | $265,500 | $264,129 | $280,900 | 10 |

On Average, the 'Sold' status comparable listings sold in 77 days for $262,333

**Researched and prepared by Enrique Moreno**
**Executive Realty Services**



**Enrique Moreno**
Executive Realty Services
enrique@executiverealtyservices.com
Office Ph: 702-278-6871
Delivering Excellence Since 2000

| Subject Property: 3713 Brentcove Drive, North Las Vegas | October 27, 2019 |
|---|---|

# CMA Price Adjustments

This page outlines the subject property versus comparables properties.





| | Subject Property | Details | Adjust | Details | Adjust |
|---|---|---|---|---|---|
| | 3713 Brentcove Drive | 3318 VINA Court | | 3817 ROSE CANYON Drive | |
| MLS# | | 2133604 | | 2124284 | |
| List Price | | $255,000 | | $259,900 | |
| List Date | | 09/06/2019 | | 08/09/2019 | |
| Status | | Active | | Active | |
| Bldg Desc | | 1 Story | | 2 Stories | |
| Tot Liv Area | 1852 | 1,844 | | 1,878 | |
| Appx Liv Area | 1852 | 1,844 | | 1,878 | |
| Beds | 3 | 4 | | 4 | |
| Baths Total | 2/ | 2/0 | | 2/1 | |
| Flooring | | Carpet | | Carpet, Ceramic | |
| PV Pool | | No | | Yes | 8,500 |
| #Garage | 2 | 2 | | 2 | |
| #Fireplaces | | 0 | | 1 | |
| Lot SqFt | 6970 | 6,970 | | 6,534 | |
| Lot Desc | | Under 1/4 Acre | | Under 1/4 Acre | |
| Prop Desc | | | | | |
| Assoc/Comm | | CC&RS | | None | |
| Features | | | | | |
| House Views | | | | | |
| Year Built | 1994 | 2000 | | 1994 | |
| Sold Price | $129,950 | | | | |
| $LP/SqFt | | $138.29 | | $138.39 | |
| $SP/SqFt | | | | | |
| Sold Date | 12/8/1998 | | | | |

| | | | |
|---|---|---|---|
| | Beautiful single story 4-bedroom NLV home. Fresh paint and new carpeting throughout. Kitchen includes all appliances. Large backyard ready for your imagination. | | Great deal on this open floor plan w/4 beds, oversized lot w/RV-Boat parking on side, sparkling pool w/waterfall, & NO HOA. Tile thru-out bottom floor. Kitchen opens to cozy family room w fireplace. Large front entry w/ living/dining room. Large master, master bath has dual vanity, garden tub, & shower. All good sized bed rooms w/ ceiling fans. Den downstairs off family room. Huge yard, covered patio & did I mention the |

| | | | |
|---|---|---|---|
| Price | | $255,000 | $259,900 |
| Total Adjustments | | $0 | $8,500 |
| Adjusted Price | | $255,000 | $268,400 |

**Researched and prepared by Enrique Moreno**
**Executive Realty Services**

**Enrique Moreno**
Executive Realty Services
enrique@executiverealtyservices.com
Office Ph 702-278-8871
Delivering Excellence Since 2000

---

**Subject Property: 3713 Brentcove Drive, North Las Vegas**                    October 27, 2019

## CMA Price Adjustments

This page outlines the subject property versus comparables properties.



Subject Property





| | Subject Property | Details | Adjust | Details | Adjust |
|---|---|---|---|---|---|
| | 3713 Brentcove Drive | 1712 MIZZENMAST Avenue | | 4028 CLOVE HITCH Street | |
| MLS# | | 2124592 | | 2142669 | |
| List Price | | $266,000 | | $269,000 | |
| List Date | | 08/07/2019 | | 10/08/2019 | |
| Status | | Active | | Active | |
| Bldg Desc | | 2 Stories | | 2 Stories | |
| Tot Liv Area | 1852 | 1,866 | | 1,866 | |
| Appx Liv Area | 1852 | 1,866 | | 1,866 | |
| Beds | 3 | 4 | | 4 | |
| Baths Total | 2/ | 2/1 | | 2/1 | |
| Flooring | | Carpet, Ceramic | | Carpet, Tile | |
| PV Pool | | No | | No | |
| #Garage | 2 | 2 | | 2 | |
| #Fireplaces | | 0 | | 0 | |
| Lot SqFt | 6970 | 4,792 | | 4,356 | |
| Lot Desc | | Under 1/4 Acre | | Under 1/4 Acre | |
| Prop Desc | | | | | |
| Assoc/Comm | | CC&RS | | None | |
| Features | | | | | |
| House Views | | | | | |
| Year Built | 1994 | 2005 | | 2005 | |
| Sold Price | $129,950 | | | | |
| $LP/SqFt | | $142.55 | | $144.16 | |
| $SP/SqFt | | | | | |
| Sold Date | 12/8/1998 | | | | |

Spacious 4 bedroom, large master bedroom nice master bath, with mountain view, come to see! you will love it

Great floor plan with 4 bedrooms, living room and spacious back yard. Subdivision has playground / picnic area.
Great location!

| | | | |
|---|---|---|---|
| Price | | $266,000 | $269,000 |
| Total Adjustments | | $0 | $0 |
| Adjusted Price | | $266,000 | $269,000 |

Researched and prepared by Enrique Moreno
Executive Realty Services



**Enrique Moreno**
Executive Realty Services
enrique@executiverealtyservices.com
Office Ph: 702-278-8871
Delivering Excellence Since 2000

Subject Property: 3713 Brentcove Drive, North Las Vegas                                    October 27, 2019

# CMA Price Adjustments

This page outlines the subject property versus comparables properties.





| Subject Property | | Details | Adjust | Details | Adjust |
|---|---|---|---|---|---|
| 3713 Brentcove Drive | | 3445 QUIET PUEBLO Street | | 1616 TEASDALE Avenue | |
| MLS# | | 2131769 | | 2133803 | |
| List Price | | $280,900 | | $257,000 | |
| List Date | | 09/04/2019 | | 09/12/2019 | |
| Status | | Active | | Sold | |
| Bldg Desc | | 2 Stories | | 2 Stories | |
| Tot Liv Area | 1852 | 1,805 | | 1,826 | |
| Appx Liv Area | 1852 | 1,805 | | 1,826 | |
| Beds | 3 | 3 | | 3 | |
| Baths Total | 2/ | 2/0 | | 2/1 | |
| Flooring | | Carpet, Tile | | Carpet, Linoleum/Vinyl | |
| PV Pool | | No | | No | |
| #Garage | 2 | 2 | | 2 | |
| #Fireplaces | | 0 | | 0 | |
| Lot SqFt | 6970 | 4,356 | | 7,405 | |
| Lot Desc | | Under 1/4 Acre | | Under 1/4 Acre, Corner | |
| Prop Desc | | | | | |
| Assoc/Comm Features | | CC&RS | | BBQ Area, CC&RS, COMMUNITY Wall, Gated, Jogging, Not Age | |
| House Views | | | | | |
| Year Built | 1994 | 2005 | | 2012 | |
| Sold Price | $129,950 | | | $253,000 | |
| $LP/SqFt | | $155.62 | | $140.74 | |
| $SP/SqFt | | | | $138.55 | |
| Sold Date | 12/8/1998 | | | 10/24/2019 | |

Exceptional Floor plan with plenty of well used square footage, a bedroom and bathroom downstairs, separate living and family rooms, and a massive loft - Ready and awaiting new ownership! Plank style tiles and open inclusive floor plan make this home perfect for entertaining! Owner has upgraded cabinetry and quartz countertops! Owned solar *Low cost energy going forward-Welcome home!

**PRICED TO SELL FAST** Beautiful 3 Bedroom, 2.5 Bathroom Home on the Largest lot in the Community. Well Maintained Community w/ Walking Path & BBQ Areas. Home Features Granite Countertops, Open Floor-Plan, Ceiling Fans, Large Master Bdrm, Only 1 Neighboring Home, Huge Backyard, & Much More! This Home is Perfect! Near New Construction Increasing Value! Move-In Ready With All Appliances!! **Sellers

| | Price | $280,900 | $253,000 |
|---|---|---|---|
| | Total Adjustments | $0 | $0 |
| | Adjusted Price | $280,900 | $253,000 |

Researched and prepared by Enrique Moreno
Executive Realty Services



**Enrique Moreno**
Executive Realty Services
enrique@executiverealtyservices.com
Office Ph: 702-278-8871
Delivering Excellence Since 2000

---

**Subject Property: 3713 Brentcove Drive, North Las Vegas** | October 27, 2019

# CMA Price Adjustments

This page outlines the subject property versus comparables properties.

 

| | Subject Property | Details | Adjust | Details | Adjust |
|---|---|---|---|---|---|
| | 3713 Brentcove Drive | 1948 QUARTET Drive | | 3617 NAIROBI Lane | |
| MLS# | | 2048329 | | 2090797 | |
| List Price | | $265,000 | | $269,000 | |
| List Date | | 11/13/2018 | | 04/26/2019 | |
| Status | | Sold | | Sold | |
| Bldg Desc | | 2 Stories | | 1 Story | |
| Tot Liv Area | 1852 | 1,824 | | 1,857 | |
| Appx Liv Area | 1852 | 1,824 | | 1,857 | |
| Beds | 3 | 3 | | 3 | |
| Baths Total | 2/ | 2/1 | | 2/0 | |
| Flooring | | Carpet, Ceramic, Manmade wood or Laminate | | Ceramic | |
| PV Pool | | No | | No | |
| #Garage | 2 | 2 | | 2 | |
| #Fireplaces | | 1 | | 0 | |
| Lot SqFt | 6970 | 5,663 | | 6,970 | |
| Lot Desc | | Under 1/4 Acre | | Under 1/4 Acre | |
| Prop Desc | | | | | |
| Assoc/Comm | | CC&RS | | CC&RS, Gated | |
| Features | | | | | |
| House Views | | | | | |
| Year Built | 1994 | 1994 | | 1999 | |
| Sold Price | $129,950 | $265,000 | | $269,000 | |
| $LP/SqFt | | $145.29 | | $144.86 | |
| $SP/SqFt | | $145.29 | | $144.86 | |
| Sold Date | 12/8/1998 | 06/28/2019 | | 07/12/2019 | |

| | | | |
|---|---|---|---|
| | | Curb Appeal! Front porch entry! Formal Living & Dining Room w/ Fireplace. Separate tiled Family Room! Gas Fireplace. Tiled counter-tops in kitchen w/ EAT in nook area. LARGE Park like BACKYARD w/COVERED PATIO! Separate Master suite w/ mirrored doors w/ large walk in closet. Large tub & walk in shower! Front porch entry. All appliances included! Sep laundry room. Tile & laminate wood like flooring. Newer AC & Water heater! | ****MOVE IN READY ON HUGE CORNER LOT!!*** Ceramic tile flooring, neutral décor, huge backyard! Kitchen features stainless steel appliances, island, pantry! Separate tub & shower, dual sinks in Master Bedroom! Located in a beautiful GATED COMMUNITY!! |

| | Price | $265,000 | | $269,000 | |
|---|---|---|---|---|---|
| | Total Adjustments | $0 | | $0 | |
| | Adjusted Price | $265,000 | | $269,000 | |

**Researched and prepared by Enrique Moreno**
**Executive Realty Services**

**Enrique Moreno**
Executive Realty Services
enrique@executiverealtyservices.com
Office Ph: 702-278-8871
Delivering Excellence Since 2000

| Subject Property: 3713 Brentcove Drive, North Las Vegas | October 27, 2019 |
| --- | --- |

# CMA Price Adjustments

This page outlines the subject property versus comparables properties.





| **Subject Property** | | **Details** | **Adjust** | **Details** | **Adjust** |
| --- | --- | --- | --- | --- | --- |
| 3713 Brentcove Drive | | 817 PEACH Avenue | | 821 PEACH Avenue | |
| MLS# | | 2121191 | | 2101506 | |
| List Price | | $265,000 | | $249,990 | |
| List Date | | 07/31/2019 | | 06/02/2019 | |
| Status | | Under Contract - No Show | | Under Contract - Show | |
| Bldg Desc | | 1 Story | | 1 Story | |
| Tot Liv Area | 1852 | 1,815 | | 1,815 | |
| Appx Liv Area | 1852 | 1,815 | | 1,815 | |
| Beds | 3 | 3 | | 3 | |
| Baths Total | 2/ | 2/0 | | 2/0 | |
| Flooring | | Carpet, Manmade wood or Laminate, Tile | | Manmade wood or Laminate, Mexican Tile, Tile | |
| PV Pool | | No | | No | |
| #Garage | 2 | 2 | | 2 | |
| #Fireplaces | | 0 | | 0 | |
| Lot SqFt | 6970 | 6,098 | | 6,098 | |
| Lot Desc | | Under 1/4 Acre | | Under 1/4 Acre | |
| Prop Desc | | | | | |
| Assoc/Comm Features | | None | | CC&RS | |
| House Views | | None | | | |
| Year Built | 1994 | 2005 | | 2005 | |
| Sold Price | $129,950 | | | | |
| $LP/SqFt | | $146.01 | | $137.74 | |
| $SP/SqFt | | | | | |
| Sold Date | 12/8/1998 | | | | |

This 3bed, 2bath home has many upgrades including solar panels (lease), new AC, new Anderson windows in the great room! The kitchen has granite counters, S/S appliances and eat-in area. The great room opens through a new French door to the fully redesigned backyard complete with a built-in BBQ area w/chiller and grill, patio, grass area. The master bath has decorative tile surround shower, dual sinks, a water closet and a

Hate carpet? You're going to love this home...With tile and wood like flooring occupying all of the living areas this is the perfect home for you. Single story house with lots of potential, in a great location, just minutes from shopping and freeways. Save money on your electricity bills with installed solar panels on this 3 bed 2 bath property. Back yard to be cleaned up before close of escrow.

| | Price | $265,000 | $249,990 |
| --- | --- | --- | --- |
| | Total Adjustments | $0 | $0 |
| | Adjusted Price | $265,000 | $249,990 |

**Researched and prepared by Enrique Moreno**
**Executive Realty Services**

**Enrique Moreno**
Executive Realty Services
enrique@executiverealtyservices.com
Office Ph: 702-278-8871
Delivering Excellence Since 2000

**Subject Property: 3713 Brentcove Drive, North Las Vegas**                    October 27, 2019

## CMA Map Layout

This page displays the Map for the CMA Subject and your comparables.



| | |
|---|---|
| 1 | 3713 Brentcove Drive |
| 2 | 3318 VINA CT |
| 3 | 3817 ROSE CANYON DR |
| 4 | 1712 MIZZENMAST AV |
| 5 | 4028 CLOVE HITCH ST |
| 6 | 3445 QUIET PUEBLO ST |
| 7 | 821 PEACH AV |
| 8 | 817 PEACH AV |
| 9 | 1616 TEASDALE AV |
| 10 | 1948 QUARTET DR |
| 11 | 3617 NAIROBI LN |

Researched and prepared by Enrique Moreno
Executive Realty Services

Enrique Moreno
Executive Realty Services
enrique@executiverealtyservices.com
Office Ph: 702-278-8871
Delivering Excellence Since 2000

| Subject Property: 3713 Brentcove Drive, North Las Vegas | October 27, 2019 |
| --- | --- |

# Pricing Recommendation

## General Facts About Pricing...

There are certain factors that are within our control and some factors beyond our control when it comes to setting the price. Those factors within our control are: the appearance of the property, how aggressively we market the property and the price. Factors outside our control are: location of property, size and local amenities. It's important to accept those factors that are beyond our control and focus on the pricing and preparation.

A property priced at market value will attract more buyers than a home priced above market value. Consider that a competitively priced property will also attract a greater number of potential buyers and increase your opportunity for a quick sale.

**Market Statistics...**

| Sell Price Statistics | | Sell Price Per Sq. Ft. Statistics | |
| --- | --- | --- | --- |
| Average Price: | $264,100 | Average Price/Sq Ft: | $144 |
| High Price: | $280,900 | High Price/Sq Ft: | $156 |
| Median Price: | $265,500 | Median Price/Sq Ft: | $144 |
| Low Price: | $250,000 | Low Price/Sq Ft: | $138 |

Figures are based on selling price after adjustments, and rounded to the nearest $100

**Summary...**

$266,000.00

## Recommended Price: $266,000.00

---

**Researched and prepared by Enrique Moreno**
**Executive Realty Services**

# EXHIBIT "1"

**Electronically Filed**
**6/19/2019 12:01 PM**
**Steven D. Grierson**
**CLERK OF THE COURT**

**MISC**

1  TYRONE KEITH ARMSTRONG
2  3713 Brentcove Drive
   North Las Vegas, Nevada 89032
3  Telephone: (702) 491-8426
   Email: performanceoneautomotive@gmail.com
4  *Plaintiff Pro Se*

5                          **DISTRICT COURT**

6                      **CLARK COUNTY, NEVADA**
7

8  TYRONE KEITH ARMSTRONG,              )    Case No:
9                                        )    Dept No:
               Plaintiff,                )
10                                       )
11                                       )    **VERIFIED COMPLAINT FOR:**
   vs.                                   )
12                                       )    **1. WRONGFUL FORECLOSURE;**
13 U.S. BANK NATIONAL ASSOCIATION,      )
   as Trustee for Structured Asset Securities )    **2. QUIET TITLE;**
14 Corporation Mortgage Pass-Through    )
   Certificates, Series 2007-BC3; OCWEN )    **3. DECLARATORY RELIEF;**
15 LOAN SERVICING, LLC; PHH             )
16 MORTGAGE CORPORATION:                )    **4. SLANDER OF TITLE;**
   WESTERN PROGRESSIVE-NEVADA,          )
17 INC.; BNC MORTGAGE, INC.; DOES 1     )    **5. INTENTIONAL INFLICTION OF**
   through 20; and ROE BUSINESS         )       **EMOTIONAL DISTRESS; AND**
18 ENTITIES 1 through 20;               )
19                                       )    **6. FRAUD**
               Defendants.              )
20 _____)

21            <u>**VERIFIED COMPLAINT**</u>
22    **(ARBITRATION EXCEPTION CLAIMED: TITLE TO REAL PROPERTY)**

23       COMES NOW Plaintiff Pro Se TYRONE KEITH ARMSTRONG, and complains of

24 Defendants as follows:

25                       **I. <u>PARTIES</u>**

26
27 1.    Plaintiff TYRONE KEITH ARMSTRONG ("Plaintiff"), is, and was at all relevant times

28 herein, a resident and owner of certain real property located in Clark County, Nevada.

                                -1-

2.       Defendant U.S. BANK NATIONAL ASSOCIATION as Trustee for Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2007-BC3 ("U.S. Bank"), is, and was at all relevant times herein, a business entity of unknown form doing business in Clark County, Nevada.

3.       Defendant OCWEN LOAN SERVICING, LLC ("Ocwen"), is, and was at all relevant times herein, a foreign limited liability company incorporated in the State of Delaware, doing business in Clark County, Nevada, registered with our Secretary of State as Business ID: NV20021078677.

4.       Defendant PHH MORTGAGE SERVICES aka PHH MORTGAGE CORPORATION ("PHH"), is, and was at all relevant times herein, a foreign corporation incorporated in the State of New Jersey, doing business in Clark County, Nevada, registered with our Secretary of State as Business ID: NV19861005108.

5.       Defendant WESTERN PROGRESSIVE-NEVADA, INC. ("Western"), is, and was at all relevant times herein, a foreign corporation incorporated in the State of Delaware, doing business in Clark County, Nevada, registered with our Secretary of State as Business ID: NV20121471611.

6.       Upon information and belief Defendant BNC MORTGAGE, INC. ("BNC") is, and was at all relevant times herein, a defunct foreign corporation from the State of Delaware, doing business in Clark County, Nevada, registered with our Secretary of State as Business ID: NV19981309027.

7.       All other persons unknown claiming any right, title, estate, lien or interest in the real property described in the complaint adverse to Plaintiff's ownership, or any cloud upon Plaintiff's title thereto.

8.      Plaintiff does not know the true names and capacities of the defendants sued herein as DOES 1 through 20 and ROE BUSINESS ENTITIES 1 through 20 and, therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and therefore alleges that each of the Defendants designated as DOES or ROE BUSINESS ENTITIES is responsible in some manner for the events and occurrences referred to in this Complaint, claims some right, title or interest in the Property described below that is subject and subordinate to the rights, interests, and asserted ownership of Plaintiff described herein.   Plaintiff will amend this Complaint to insert the true names and capacities of DOES 1 through 20 and/or ROE BUSINESS ENTITIES 1 through 20, when the same have been ascertained and to join Defendants in this action.

9.      Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, Defendants U.S. Bank, Ocwen, PHH, Western, BNC, DOES 1-20 and ROE BUSINESS ENTITIES 1-20 are the agents, employees and/or joint-venturers of each other, and in doing the things alleged herein below, were acting with the course and scope of such agency, employment and/or joint venture.   Defendants U.S. Bank, Ocwen, PHH and Western are hereinafter collectively referred to as the "Foreclosing Defendants."

## II. JURISDICTION

10.      This action relates to the ownership and title to certain residential real property located in Clark County, Nevada that is commonly known as 3713 Brentcove Drive, North Las Vegas, Nevada 89032; APN: 139-09-217-099; and legally described as LOT 1, BLOCK 4 of CHEYENNE RIDGE-UNIT 2A, PLAT BOOK 54, PAGE 67, of the public records of Clark County, Nevada (hereinafter the "Property").   Accordingly, jurisdiction and venue are appropriate in Clark County, Nevada.

-3-

11.    Plaintiff's *Petition for Foreclosure Mediation Assistance*[1] filed in the Eighth Judicial

District Court on July 18, 2018 is an in rem or quasi in rem proceeding[2] in which Defendants

U.S. Bank and Western entered into a *Stipulation for a 90-Day Stay of Foreclosure With a*

*Certificate to Issue in 90-Days*.  No notice of entry of order has yet been entered following said

*Stipulation and Order* and the register of actions currently reflects that the case remains open.

12.    Defendant U.S. Bank's unlawful detainer related to the Property filed in North Las

Vegas Justice Court,[3] detailed herein below, was an in rem or quasi in rem proceeding and

further subjects the instant action to the prior-exclusive-jurisdiction-doctrine.

13.    This Court has continuing, exclusive jurisdiction over this matter because: (*i*) the

Foreclosure Mediation state court case remains open; (*ii*) the state court *90-day Stay* is tolled

pending a notice of entry of order; (*iii*) the state court *Stay* will commence and continue to

remain in effect 90 days after a notice of entry of order is filed; (*iv*) an unlawful detainer filed by

Defendant U.S. Bank in North Las Vegas was posted on Plaintiff's Property; and (*v*) Plaintiff

responded to Defendants' unlawful detainer action.  This Court should deny Defendants'

anticipated request to remove the instant case to federal court.

## III. **INTRODUCTION**

14.    This is an action brought by Plaintiff for declaratory judgment, injunctive and equitable

relief, and for compensatory, special, general and punitive damages.  Plaintiff, the homeowner,

disputes the title and ownership of the real property in question, which is the subject of this

action, in that a purported lender alleges to have ownership of Plaintiff's mortgage note and/or

---

[1] Dist. Ct. Case No: A-18-777819-FM.

[2] *Chapman v. Deutsche Bank Nat'l Trust Co.*, 302 P.3d 1103 (Nev. May 30, 2013).

[3] North Las Vegas Justice Court Case No: 15CN000006.

-4-

1  Deed of Trust and, that the claim, although facially valid, is invalid and unenforceable because it

2  is supported by false or fraudulent documents and licensing.  Defendants are attempting to

3  unlawfully sell, assign and/or transfer its purported ownership/security interest in a promissory

4  note and deed of trust related to the Property, and, thus, do not have lawful ownership or a

5  security interest in Plaintiff's home which is described in detail herein.  For these reasons, the

6
7  Court should issue a preliminary and permanent injunction against the Notice of Trustee Sale

8  scheduled on **July 19, 2019** at **9:00am** against Plaintiff's home and quiet title to the Property in

9  Plaintiff's name.

10  ### IV. **ALLEGATIONS REGARDING BNC MORTGAGE, INC.**

11
12  15.      On May 02, 1995, BNC originally incorporated in the State of California as reflected by

13  the official records of the California Secretary of State.

14  16.      On October 15, 1997, BNC registered in the State of Delaware as a foreign corporation

15  from California, as reflected by the official records of the Delaware Secretary of State.

16
17  17.      On March 11, 1998, the official records of the California Secretary of State reflect a

18  merger between BNC, a California corporation, and BNC, a Delaware corporation, with BNC, a

19  Delaware corporation, as the surviving entity.

20  18.      On March 11, 1998, BNC registered in the State of California as a foreign corporation

21  from Delaware, as reflected by the official records of the California Secretary of State.

22
23  19.      On March 20, 1998, BNC, a Delaware corporation, withdrew its domestic corporation

24  and was no longer active in the State of Delaware, as reflected by the official records of the

25  Delaware Secretary of State.

26  20.      On August 17, 1998, BNC registered in the State of Nevada as a foreign corporation from

27  Delaware as reflected by the official records of the Nevada Secretary of State.

28

-5-

21.     On August 17, 1998, BNC filed a Foreign Qualification with the Nevada Secretary of State, under penalty of perjury, and declared that BNC is in good standing in the State of Delaware.

22.     In accordance with the Foreign Qualification filed by BNC, the State of Nevada Division of Mortgage Lending approved BNC with an exempt company registration and permitted BNC to originate loans in Nevada.

23.     BNC renewed its annual foreign registration in Nevada and continued to transact business in this State until 2007, as reflected by the official records of the Nevada Secretary of State.

24.     At all times relevant herein, BNC was not properly licensed to originate mortgage loans in Nevada due to BNC's status as a defunct corporation in its home state of Delaware.

### V. <u>GENERAL ALLEGATIONS</u>

25.     On December 23, 1998, Plaintiff obtained fee simple title to the Property, against the whole world. The Deed of Trust identified Norwest Mortgage, Inc. as the lender and was recorded as document number 199812230001631 in the official records of Clark County, Nevada.

26.     On December 23, 2003, Plaintiff refinanced his home, the Deed of Trust identified Finance America, LLC as the lender and was recorded as document number: 200312230003212 in the official records of Clark County, Nevada.

27.     On December 29, 2004, Plaintiff refinanced his home and the Deed of Trust identified New Century Mortgage Corporation as the lender and was recorded as document number: 200412290002078 in the official records of Clark County, Nevada. The note reflects that the amount of the mortgage was $224,000.00 at a 6.5% interest rate. The trustee of record was Southwest Title.

-6-

28.    As a result of the real estate crisis of 2007, New Century Mortgage Corporation was acquired by Countrywide Financial Corporation, and then acquired by Bank of America (hereinafter collectively referred to as "Bank of America").

29.    On January 25, 2007, a Deed of Trust was recorded against the Property, identified the lender as BNC, and recorded as document number: 200701250003978 in the official records of Clark County, Nevada. The purported BNC note was in the amount of $237,000.00 with a 6.4% interest rate. The trustee of record is reflected as T.D. Service Company. The escrow company was identified as National Alliance Title Company.

30.    Defendant U.S. Bank alleges to be the beneficiary of the BNC note/deed, Defendant Ocwen services the purported loan. Defendant PHH is partners with or possesses a joint interest with Ocwen, and Defendant Western records notices of default and trustee sales on behalf of the Foreclosing Defendants.

31.    Plaintiff categorically denies that he applied for a mortgage with BNC and challenges the authenticity of said note/deed of trust.

32.    Neither Bank of America nor Plaintiff received the $237,000.00 benefit from the purported BNC (second) mortgage. The Foreclosing Defendants have failed to produce proof of payment and have further failed to produce the original BNC note/deed of trust for inspection.

33.    At no time has Plaintiff made a payment to BNC, ever.

34.    According to the Nevada Secretary of State, the escrow company where the BNC mortgage was purportedly executed, National Alliance Title Company, was permanently revoked on or about May 31, 2008.

-7-

35.     On February 24, 2009, Plaintiff's mortgage was subject to a consent judgment[4] entered between Countrywide Financial Corporation (aka New Century/Bank of America) and the State of Nevada related to mortgages that originated with Countrywide or its subsidiaries.

36.     On May 06, 2010, the Foreclosing Defendants, through the Cooper Castle Law Firm, interfered with Plaintiff's use of the Property and recorded a Notice of Default and Election to Sell as document number: 201005060002260 in the official records of Clark County, Nevada. The notice of default was premised on a promise to pay BNC. Said notice of default identified U.S. Bank as the beneficiary, Ocwen as the loan servicer and Western as the trustee.

37.     As a result of the initial non-judicial foreclosure proceedings against Plaintiff's home, he suffered from a lack of sleep, anxiety, depression, lack of appetite and loss of productivity related to his employment.

38.     Notwithstanding numerous requests made by Plaintiff pursuant to NRS 106.295, the Foreclosing Defendants either concealed or failed to produce the original or a certified copy of the BNC note, mortgage and any endorsements, either blank or to a specific party.

39.     On October 11, 2012, the Foreclosing Defendants, through the Cooper Castle Law Firm, rescinded said Notice of Default and Election to Sell as document number: 201210110001889 in the official records of Clark County, Nevada.

40.     On January 07, 2015, Defendant U.S. Bank filed an unlawful detainer as part of North Las Vegas Justice Court case number 15CN000006, naming only Anthony Morris, an alleged tenant. On or about said date, a copy of said unlawful detainer was posted on Plaintiff's Property, yet failed to name Plaintiff.

---

[4] District Court Case No: A583442.

-8-

41.    On April 23, 2015, Plaintiff filed a pleading with the North Las Vegas Justice Court that indicates in relevant part, that Plaintiff is the owner and Anthony Morris has no interest in the Property.

42.    On May 14, 2015, Plaintiff appeared at a hearing related to the unlawful detainer in North Las Vegas Justice Court. The register of actions reflects that Plaintiff was "present but is not party to this case. Off calendar."

43.    On June 12, 2015, the Foreclosing Defendants once again interfered with Plaintiff's use of the Property and recorded a Notice of Default and Election to Sell as document number: 201506120001252 in the official records of Clark County, Nevada.

44.    As a result of the second non-judicial foreclosure proceedings against Plaintiff's home, he suffered from a lack of sleep, anxiety, depression, lack of appetite and loss of productivity related to his employment.

45.    Plaintiff once again requested the Foreclosing Defendants to produce the original or certified copy of the note, mortgage and/or assignments. Defendants either concealed or failed to produce the same.

46.    On November 24, 2015, a Notice of Trustee Sale was recorded by Defendant Western on behalf of the Foreclosing Defendants as document number: 201511240001981 in the official records of Clark County, Nevada.

47.    On or about July 04, 2016, the Internal Revenue Service responded to a complaint filed by Plaintiff regarding the theft of his identity and confirmed "We verified your documents to support your identity theft report."

48.    On or about October 26, 2016, Plaintiff satisfied or settled his mortgage with the true holder of the note and deed of trust, Bank of America.

-9-

49.    Plaintiff received written correspondence from Bank of America that reflects "*We received a full payoff for this loan*" (attached as exhibit "1"). Along with said written correspondence, Bank of America enclosed the "original" note[5] and deed of trust originating from New Century Mortgage Corporation stamped "paid in full" (attached as exhibit "2").

50.    On December 20, 2016, Plaintiff received a Deed and Encumbrance Report in connection with an attempt to refinance his Property. Said report reflected the BNC mortgage as a *second mortgage* on the property. Plaintiff was denied for the loan due to the BNC encumbrance.

51.    The BNC mortgage was not used to extinguish the Bank of America mortgage.

52.    Upon information and belief, a title report and appraisal of the Property were required prior to issuance of the alleged BNC mortgage.

53.    BNC purportedly issued a second mortgage in the amount of $237,000.00 on a Property that was encumbered by a $224,000.00 first lien by Bank of America; creating a total indebtedness of $461,000.00 secured by a Property that, according to BNC, last appraised for $237,000.00.

54.    On January 19, 2017, Bank of America as the current beneficiary recorded a Substitution of Trustee and Full Reconveyance in favor of Plaintiff as document number: 201701190001205 in the official records of Clark County, Nevada (attached as exhibit "3").

55.    On February 15, 2017, Plaintiff filed a police report with the North Las Vegas Police Department claiming that his identity had been stolen to obtain the BNC mortgage.

56.    On January 18, 2018, the Defendants' second Notice of Default and Election to Sell was rescinded by Defendant Western and recorded as document number: 201801180000153 in the official records of Clark County, Nevada.

---

[5] Original note available for inspection upon request.

57.     On May 31, 2018, the Foreclosing Defendants, through Defendant Western, recorded a
third Notice of Default and Election to Sell as document number: 201805310000866 in the
official records of Clark County, Nevada.

58.     As a result of the third foreclosure proceedings against Plaintiff's home, he suffered from
a lack of sleep, anxiety, depression, lack of appetite and loss of productivity related to his
employment.

59.     On July 18, 2018, Plaintiff filed his *Petition for Foreclosure Mediation* in district court.

60.     On September 18, 2018, a stipulation and order was entered for a 90-day stay of
foreclosure with a certificate to issue in 90-days. No ***notice of entry*** of the stipulation and order
appears in the case file.

61.     On November 04, 2018, Plaintiff submitted a complaint to the Nevada Secretary of State
Notary Division and alleged that he did not execute his signature on the BNC note that was
purportedly witnessed by Roseanne Ehring, a Nevada notary. Plaintiff requested to inspect the
notary's journal to determine whether Plaintiff's signature was present. Plaintiff's complaint to
the Notary Division details the due diligence he conducted to locate the notary, but to no avail.

62.     On November 29, 2018, the Notary Division responded to Plaintiff's complaint, found
that the notary's appointment expired in 2008 and that the former notary is not required to
produce her journal more than seven years after expiration of her appointment.

63.     On December 10, 2018, Plaintiff conducted due diligence in an attempt to inspect
documents in connection with the purported BNC loan application and to identify the individuals
that participated at closing. Plaintiff made attempts to locate the escrow company that is
reflected on the BNC deed of trust, National Alliance Title Company. All locations in Clark
County were out of business.

-11-

64.     According to the Nevada Secretary of State, National Alliance Title Company was a foreign corporation from California that was permanently revoked on or about May 31, 2008.

65.     In a further attempt to locate the purported BNC mortgage records, a business entity search with California Secretary of State revealed no record for National Alliance Title Company.

66.     To date, Defendants have failed to produce adequate evidence of the original or certified copy of the Note, Mortgage and/or Assignments.

67.     Plaintiff has openly and continuously been in exclusive possession and control of the Property since December 23, 1998; maintained and paid all utilities including, but not limited to water, sewer, trash, electric, gas, HOA fees, property taxes, homeowner's insurance, and made numerous improvements to the Property.

68.     On June 13, 2019, the Foreclosing Defendants recorded a Notice of Trustee Sale as document number: 201906130001519 in the official records of Clark County, Nevada.

69.     Unless and until enjoined and restrained by order of this court, Defendants will cause grave and irreparable injury to Plaintiff in that he will be deprived of his home.

70.     Plaintiff has no adequate remedy at law for the continuing conduct in that it would be impossible for Plaintiff to determine the precise amount of damage he will suffer if Defendants' conduct is not restrained, and that Plaintiff will be deprived of the Property, his home of 20 years, which deprivation cannot be compensated in damages.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (WRONGFUL FORECLOSURE)

71.     Plaintiff hereby incorporates each and every paragraph above as though fully set forth herein.

-12-

72.    Plaintiff was not in default when the Foreclosing Defendants exercised the power of sale because Plaintiff tendered the amount of the secured indebtedness to Bank of America or was excused from tendering and Plaintiff received a satisfaction of mortgage from Bank of America (see exhibits "1-3," inclusive).

73.    Plaintiff was not in default when the Foreclosing Defendants exercised the power of sale because *at no time* did Plaintiff enter into a residential mortgage agreement with BNC for the power of sale to be conferred upon or exercised by the Foreclosing Defendants.

74.    Plaintiff has repeatedly challenged the authenticity of the BNC note and, notwithstanding Plaintiff's numerous requests via certified mail, the Foreclosing Defendants have either concealed or failed to produce the original or certified copy of the note, mortgage and/or assignments required pursuant to NRS 106.295.

75.    Assuming *arguendo*, even if Defendants did have the ability to produce an original note/mortgage (and they do not), BNC *was not properly licensed* to originate loans in Nevada, or elsewhere, because at all relevant times herein BNC was a defunct corporation in its home state of Delaware.

76.    The note by which the foreclosing bank purportedly took a beneficial interest in the deed of trust is not merely voidable, but *void ab initio*; and the Foreclosing Defendants have no legal right to foreclose on the Property. The void note is the proximate cause of actual injury and Plaintiff has been harmed or prejudiced as a result.

77.    Plaintiff has no other plain, speedy or adequate remedy and the injunctive relief prayed for below is necessary and appropriate at this time to prevent irreparable loss to Plaintiff. Plaintiff has suffered and will continue to suffer in the future unless Defendants' wrongful

-13-

1  conduct is restrained and enjoined because real property is inherently unique and it will be

2  impossible for Plaintiff to determine the precise amount of damage he will suffer.

3  **SECOND CLAIM FOR RELIEF**
   **(QUIET TITLE)**

4

5  78.    Plaintiff hereby incorporates each and every paragraph above as though fully set forth

6  herein.

7  79.    Plaintiff is the equitable owner of the Property and entitled to a determination from this

8  Court pursuant to NRS 30.010 *et seq.* and/or 40.010.

9

10  80.    An actual controversy has arisen and exists between Plaintiff and Defendants specified

11  hereinabove, regarding Plaintiff's respective rights, in that Plaintiff contends that Defendants,

12  and each of them, are unlawfully asserting an adverse claim to title to real property duly owned

13  by Plaintiff; that title to the Property is affected by a claim by the Defendants (i.e. Notice of

14  Trustee Sale); and that the claim, although facially valid, is invalid and unenforceable because it

15  is supported by false or fraudulent documents and licensing.  Defendants do not have the right to

16

17  foreclose on the Property because Defendants, and each of them, have failed to perfect any

18  security interest in the Property, cannot prove to the court that they have a valid interest, properly

19  licensed, or are otherwise barred by the statute of limitations.

20  **THIRD CLAIM FOR RELIEF**
   **(DECLARATORY RELIEF)**

21

22  81.    Plaintiff hereby incorporates each and every paragraph above as though fully set forth

23  herein.

24

25  82.    Plaintiff seeks a declaration from this Court, pursuant to NRS 30.010 *et seq.* and/or

26  40.010, that title in the Property be vested in Plaintiff free and clear of all liens and

27

28

-14-

encumbrances, that the Defendants herein have no estate, title, right, interest, or claim to the subject Property adverse to the Plaintiff.

### FOURTH CLAIM FOR RELIEF
### (SLANDER OF TITLE)

83.     Plaintiff hereby incorporates each and every paragraph above as though fully set forth herein.

84.     Only the beneficiary of a Deed of Trust or the beneficiary's assignee or the agent of a beneficiary or its assignee may cause to be recorded against real property either a Notice of Default or Notice of a Trustee's Sale.

85.     Defendants, and each of them, disparaged Plaintiff's exclusive valid title by and through the preparation, posting, publishing and recordings related to the BNC mortgage including, but not limited to numerous Notices of Default and Notice of Trustee Sales.

86.     Defendants knew or should have known that such documents were improper in that at the time of execution and delivery of said documents, Defendants had no right, title or interest in the Property.  These documents were naturally and commonly to be interpreted as denying, disparaging, and casting doubt upon Plaintiff's legal title to the Property.  Due to the posting, publishing and recording of said documents, Defendants' disparagement of Plaintiff's legal title was made to the world at large.

87.     At the time that the false and disparaging documents were created and published, Defendants knew the documents were false and created and published them with the malicious intent to injure Plaintiff and deprive him of his exclusive right, title, and interest in the Property, and to obtain the Property for their own use by unlawful means.

88.     As a direct and proximate result of Defendants' fraudulent, oppressive and malicious conduct in publishing these documents, Plaintiff's title to the Property has been disparaged and

slandered, there is a cloud on Plaintiff's title, Plaintiff has suffered, and continues to suffer, damages in an amount that exceeds $15,000.00.

## FIFTH CLAIM FOR RELIEF
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

89.    Plaintiff hereby incorporates each and every paragraph above as though fully set forth herein.

90.    The actions of Defendants, as set forth herein, have resulted in the Plaintiff being threatened with the loss of Property.

91.    This outcome has been created without any right or privilege on the part of the Defendants, and, as such, their actions constitute outrageous or reckless conduct.

92.    Defendants, intentionally, knowingly and recklessly misrepresented to the Plaintiff those Defendants were entitled to exercise the power of sale provision contained in a fraudulent deed of trust.  Defendants were not entitled to do so and have no legal, equitable, or actual beneficial interest whatsoever in the Property.

93.    Defendants' conduct, fraudulently attempting to foreclose or claiming the right to foreclose on the Property in which they have no right, title, or interest is so outrageous and extreme that it exceeds all bounds usually tolerated in a civilized community.

94.    Such conduct was taken with the specific intent of inflicting emotional distress and debilitated that Plaintiff would be unable to exercise legal rights in the Property; the right to title of the Property; the right to verify the alleged debt that Defendants are attempting to collect, and right to clear title to the Property such that said title will regain its marketability and value.

95.    At the time Defendants began their fraudulent foreclosure proceedings, Defendants were not acting in good faith while attempting to collect on the subject debt.  Defendants, and each of

them, committed the acts set forth above with complete, utter and reckless disregard of the probability of causing Plaintiff to suffer severe emotional distress.

96.    As an actual and proximate cause of Defendants' attempt to fraudulently foreclose on Plaintiff's home or claim of the right to foreclose on Plaintiff's home, the Plaintiff has suffered severe emotional distress, including but not limited to lack of sleep, anxiety and depression.

97.    Plaintiff did not default in the manner expressed in the notices of default, yet due to Defendants' outrageous conduct, Plaintiff has been living under the constant emotional nightmare of losing his Property.

98.    As a proximate cause of Defendants' conduct, Plaintiff has experienced many sleepless nights, severe depression, lack of appetite, and loss of productivity related to his employment.

99.    As a result of Defendants' conduct, Plaintiff has been damaged in an amount in excess of $15,000.00.

### SIXTH CLAIM FOR RELIEF
### (FRAUD)

100.    Plaintiff hereby incorporates each and every paragraph above as though fully set forth herein.

101.    Defendant BNC knowingly or recklessly filed a Foreign Qualification with the Nevada Secretary of State, under penalty of perjury, that it knew to be false or fraudulent.

102.    Defendant BNC knowingly or recklessly induced the Nevada Mortgage Lending Division to issue BNC a license to transact business in Nevada.

103.    The State of Nevada Mortgage Lending Division relied on the material representation that BNC was a foreign corporation in good standing when issuing BNC a license to transact business in Nevada.

-17-

104.    Upon information and belief, Defendants BNC manufactured false or fraudulent notes during the real estate crisis of 2007 in an effort to foreclose on homes in which it had no interest and, as a calculated business practice, incurred no liability due to its status as a defunct foreign corporation.

105.    On or about February 18, 2015, Defendant U.S. Bank attempted to circumvent notice requirements to Plaintiff by posting an unlawful detainer on his Property, yet failing to name Plaintiff in said unlawful detainer, as a fraudulent and calculated business practice to remove Plaintiff from the Property without affording Plaintiff due process of law.

106.    Defendants, at all relevant times herein, omitted documents required to be produced pursuant to NRS 106.295.

107.    Plaintiff further contends that the above-specified Defendants, and each of them, falsely or fraudulently prepared documents required for Defendants, and each of them, to foreclose on Plaintiff's home as a calculated and fraudulent business practice.

108.    Plaintiff requests that this Court find that Defendants are vexatious litigants and that the purported power of sale contained in the purported Note and Deed of Trust has no force and effect because Defendants' actions in the processing, handling and attempted foreclosure of this loan involved numerous fraudulent, false, deceptive and misleading practices, including, but not limited to violations of State laws designed to protect borrowers, which has directly caused Plaintiff to be at an equitable disadvantage to Defendants, and each of them.

109.    Defendants, and each of them, through the allegations alleged above, have or claim the right to illegally commence foreclosure under the Note on the Property via a foreclosure action supported by false or fraudulent documents. Said unlawful foreclosure action has caused and continues to cause Plaintiff great and irreparable injury in that real property is unique.

-18-

110.   As a proximate result of Defendants' conduct, Plaintiff has suffered harm.

111.   As a result of Defendants' conduct, Plaintiff has been damaged in an amount in excess of $15,000.00.

**WHEREFORE,** Defendant prays for judgment as follows:

1.   For the foreclosure sale to be enjoined by a preliminary and/or permanent injunction.

2.   A judicial declaration that the title to the subject Property is vested in Plaintiff alone and that Defendants, and all other persons unknown, and each of them be declared to have no right, title, estate, lien or interest in the real property described in the complaint adverse to Plaintiff's ownership, or any cloud upon Plaintiff's title thereto.

3.   That Defendants, and all other persons unknown, their agents or assigns, be forever enjoined from asserting any right, title, estate, lien or interest in the real property described in the complaint adverse to Plaintiff's ownership, or any cloud upon Plaintiff's title thereto.

4.   Compensatory, special, general and punitive damages.

5.   For such other and further relief as the Court deems just and proper.

**DATED** this 18th day of June, 2019.

By: _____
TYRONE KEITH ARMSTRONG
3713 Brentcove Drive
North Las Vegas, Nevada 89032
(702) 491-8426
performanceoneautomotive@gmail.com
*Plaintiff Pro Se*

-19-

## <u>VERIFICATION</u>

STATE OF NEVADA          )
                                        ) ss.
COUNTY OF CLARK       )

I, TYRONE KEITH ARMSTRONG, under penalty of perjury, state:

1.     That I am the Plaintiff in this matter.

2.     That I am over 18 years of age and competent to testify to the facts herein.

3.     That I have read the above and foregoing *Verified Complaint* and know the contents
thereof; that the same is true of my own knowledge, except those matters stated therein upon
information and belief, and as to those matters I believe them to be true.

4.     That I bring this Complaint in good faith and not for any improper purpose.

Per NRS 53.045 "I declare under penalty of perjury that the foregoing is true and correct."

**DATED** this <u>18</u>th day of June, 2019.

_____
TYRONE KEITH ARMSTRONG

-20-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "1"

**Bank of America** 

Bank of America
4500 Amon Carter Blvd
TX2-979-01-19
Fort Worth, TX 76155

October 26, 2016

TYRONE K ARMSTRONG
3713 BRENTCOVE DR APT A
North Las Vegas, NV  89032

Loan #9786998021208001

Property Address:        3713 BRENTCOVE DR
NORTH LAS VEGAS NV 89032

TYRONE K ARMSTRONG,

## We received a full payoff for this loan.

Our records show that Bank of America has received a full payoff of your promissory note, home equity
agreement, or other instrument of indebtedness (referred to as "Note" in this letter) for the loan listed
above.

## What you should know

 X    Enclosed is the original Note marked "paid".

⠄    Enclosed is a copy of the Note marked "paid". Based on our records, the original Note has been lost
or destroyed.

⠄    We are unable to locate the original Note or a copy. Based on our records, the original Note has been
lost or destroyed.

X    Enclosed is the original security instrument marked "paid" .

⠄    Enclosed is a copy of the security instrument marked "paid". Based on our records, the original
security instrument has been lost or destroyed.

⠄    We are unable to locate the original security instrument or a copy. Based on our records, the original
security instrument instrument has been lost or destroyed.

We are providing you this letter for your records.

## Questions?

We appreciate the opportunity to serve your home loan needs. If you have any questions, please call us
at 800.669.4807 Monday through Friday 7 a.m. to 10 p.m. Eastern.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "2"

20041229-0002078

Assessor's Parcel Number:
139-09-217-099
Return To: New Century Mortgage
Corporation
18400 Von Karman, Suite 1000
Irvine, CA 92612

Prepared By: New Century Mortgage
Corporation
18400 Von Karman, Suite 1000
Irvine, CA 92612
Recording Requested By: New Century
Mortgage Corporation
18400 Von Karman, Suite 1000
Irvine, CA 92612

Fee. $36.00
N/C Fee:  $25.00

12/29/2004            10:32:25
T20040160085
Requestor:
    SOUTHWEST TITLE

Frances Deane              KGP
Clark County Recorder    Pgs: 23

04-12-0012 TR ——[Space Above This Line For Recording Data]————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   December 23, 2004
together with all Riders to this document.
**(B) "Borrower"** is TYRONE K ARMSTRONG, A Single Man



610  069980212 D2  001  003

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is New Century Mortgage Corporation

Lender is a Corporation
organized and existing under the laws of California

1000584013

**NEVADA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**     Form 3029  1/01
-6(NV) (0307).01
Page 1 of 15         Initials: _TKA_
VMP Mortgage Solutions (800)521-7291

# ADJUSTABLE RATE NOTE

### (LIBOR Six Month Index (as Published in *The Wall Street Journal*) -  Rate Caps)
### 2 YEAR RATE LOCK

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT.**

| | | |
|---|---|---|
| December 29, 2004 | North Las Vegas | Nevada |
| (Date) | (City) | (State) |

**3713 BRENTCOVE DRIVE, North Las Vegas, NV  89032**

(Property Address)

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 224,000.00 (this amount is called "principal"), plus interest, to the order of the Lender.  The Lender is **New Century Mortgage Corporation**

, a California Corporation.  I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid.  I will pay interest at a yearly rate of **6.500** %.  The interest rate I will pay may change.  The interest rate required by this Section 2 and Section 4 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

The interest rate I will pay may change on the first day of **January, 2007**, and on that day every 6th month thereafter.  Each date on which my interest rate could change is called an "Interest Rate Change Date."  The new rate of interest will become effective on each Interest Rate Change Date in accordance with Section 4 of this Note.

## 3.  PAYMENTS

### (A) Time and Place of Payments

Beginning on the first day of **February 1, 2005** and on the first day of every month thereafter until the first day of **January, 2007**, I will pay only interest on the unpaid principal balance of the Note.  Thereafter, I will pay principal and interest by making payments every month until the Maturity Date, as provided below.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.

My monthly payments will be applied to interest before principal.  If on January 1, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

610   069980212   N   001   001

I will make my monthly payments at **18400 Von Karman, Suite 1000 Irvine, CA 92612** or at a different place if required by the Note Holder.

### (B) Amount of My Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **1,213.34** . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### (D) Withholding

If I am a non-resident alien, I understand that all payments due hereunder shall be paid without reduction for any taxes, deductions or withholding of any nature. If such tax, deduction or withholding is required by any law to be made from any payment to the Note Holder, I shall continue to pay this Note in accordance with the terms hereof, such that the Note Holder will receive such amount as it would have received had no such tax, deduction or withholding been required.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of **January, 2007** and on the same day of every 6th month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date."

### (B) The Index

Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a margin. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London market ("LIBOR"), as published in *The Wall Street Journal* "Money Rates" Table. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

At each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Five And Eight Tenth(s)** percentage points (**5.800%**) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

> **(i) Interest-Only Period.** The "Interest-only Period" is the period from the date of this Note through **January 1, 2007** . For the Interest-only Period, the Note Holder will calculate the amount of the monthly payment to be one-twelfth (1/12th) of one (1) year's interest **6.500 %**. The result of this calculation will be the amount of my monthly payment until the next Interest Rate Change Date.

**(ii) Amortization Period.** The "Amortization Period" is the period after the Interest-only Period and continuing until the Maturity Date. During the Amortization Period, after calculating my new interest rate as provided in Section 4(C) above, the Note Holder will then calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly payments by the Maturity Date, assuming, for purposes of each calculation, that the interest rate remained unchanged during that period. The result of this calculation will be the new amount of my monthly payment.

### (D) Limit on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **8.000** % or less than **6.500** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one and one half percentage points (1.5%) from the rate of interest I have been paying for the preceding month. My interest rate will never be greater than **13.500** % nor less than **6.500%**.

### (E) Effective Date of Changes

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment at least 25 days before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note and to pay the interest then accruing at the Note rate as of the date my prepayments are applied. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** or **$5.00**, whichever is greater of my overdue monthly payment. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

### (D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amount owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor, and further waive all relief under any valuation and appraisement laws. "Presentment" means the right to

require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. GOVERNING LAW - SECURED NOTE

This Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the Security Instrument (as defined below) is located. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

<div align="center">

**CAUTION**
**IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS NOTE BEFORE YOU SIGN IT.**

</div>

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____      _____
TYRONE K ARMSTRONG      - Borrower          - Borrower

_____      _____
- Borrower          - Borrower

_____      _____
- Borrower          - Borrower

_____      _____
- Borrower          - Borrower

(Sign Original Only)

NCMC
2/28 Six Month LIBOR Note
RE-410 (111803)

1000584013

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "3"

Inst #: 20170119-0001205
Fees: $21.00
N/C Fee: $0.00
01/19/2017 10:28:53 AM
Receipt #: 2985352
Requestor:
RECONTRUST COMPANY NA
Recorded By: CDE Pgs: 2
DEBBIE CONWAY
CLARK COUNTY RECORDER



Tax ID: 139-09-217-099

THE UNDERSIGNED HEREBY AFFIRMS THAT THIS DOCUMENT CONTAINS NO INDIVIDUAL'S FEDERAL SOCIAL SECURITY NUMBER
Trisha Baca, Assistant Vice President



UID:652744e8-7f84-435f-b2f5-84b6cd9a8af1
DOCID_2006998021220100

## SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

WHEREAS,   TYRONE K ARMSTRONG
Is the trustor, NEW CENTURY MORTGAGE CORPORATION, BY COUNTRYWIDE HOME LOANS, INC., ITS ATTORNEY-IN-FACT is the current beneficiary ("Beneficiary") and SOUTHWEST TITLE was the original trustee under that certain Deed of Trust dated 12/23/2004 and recorded 12/29/2004, as Instrument or Document No.20041229-0002078, in Book N/A, Page N/A, of Official Records of the County of CLARK, State of Nevada.
NOW THEREFORE, the undersigned Beneficiary hereby substitutes a new trustee, ReconTrust Company, N.A. ("Trustee"), under the Deed of Trust, and Trustee does hereby reconvey, without warranty, to the person or persons legally entitled thereto, the estate now held by Trustee under the Deed of Trust.

Dated: 01/09/2017

**Beneficiary:**
NEW CENTURY MORTGAGE CORPORATION, BY
COUNTRYWIDE HOME LOANS, INC., ITS
ATTORNEY-IN-FACT

By: _____

Jesse Lester
Assistant Vice President

**Trustee:**
ReconTrust Company, N.A.

By: _____

Trisha Baca
Assistant Vice President

---

TYRONE K ARMSTRONG
3713 BRENTCOVE DR APT A
North Las Vegas, NV 89032

Document Prepared By And
When Recorded Return To:
ReconTrust Company, N.A./Lien Release
TX2-979-01-19 REL
P.O. BOX 619040
Dallas, TX 75261-9943
(800) 540-2684

This Substitution of Trustee and Full Reconvenyance is made without recourse to or against the New Century Liquidating Trust and New Century Mortgage Corporation, and without representation of warranty, express or implied, by the New Century Liquidating Trust and New Century Mortgage Corporation.

**Notarial Acknowledgment**

DOCID_2006998021220100

Attached to <u>Substitution of Trustee and Full Reconveyance</u> dated: 01/09/2017
2 pages including this page

STATE OF ARIZONA,
COUNTY OF MARICOPA
On 01/09/17, before me, Amanda Rodriguez, Notary Public, personally appeared Jesse Lester, Assistant Vice President of NEW CENTURY MORTGAGE CORPORATION, BY COUNTRYWIDE HOME LOANS, INC., ITS ATTORNEY-IN-FACT  and Trisha Baca, Assistant Vice President of ReconTrust Company, N.A., whose identities were proven to me on the basis of satisfactory evidence to be the persons they claim to be and whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument the persons, or entity upon behalf of which the persons acted, executed the instrument.
IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year last written.

AMANDA RODRIGUEZ
NOTARY PUBLIC - ARIZONA
Maricopa County
My Commission Expires
September 26, 2018

Amanda Rodriguez
Notary Public for said State and County

TYRONE K ARMSTRONG
3713 BRENTCOVE DR APT A
North Las Vegas, NV 89032

Document Prepared By And
When Recorded Return To:
ReconTrust Company, N.A./Lien Release
TX2-979-01-19 REL
P.O. BOX 619040
Dallas, TX 75261-9943
(800) 540-2684

# EXHIBIT "2"

# ADJUSTABLE RATE NOTE

**(LIBOR Six Month Index (as Published in *The Wall Street Journal*) - Rate Caps)**
**2 YEAR RATE LOCK**

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT.**

December 29, 2004                 North Las Vegas                          Nevada
(Date)                                    (City)                                     (State)

**3713 BRENTCOVE DRIVE, North Las Vegas, NV  89032**

(Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 224,000.00 (this amount is called "principal"), plus interest, to the order of the Lender.  The Lender is **New Century Mortgage Corporation**

, a California Corporation.  I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid.  I will pay interest at a yearly rate of **6.500 %**.  The interest rate I will pay may change.  The interest rate required by this Section 2 and Section 4 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

The interest rate I will pay may change on the first day of **January, 2007**, and on that day every 6th month thereafter.  Each date on which my interest rate could change is called an "Interest Rate Change Date."  The new rate of interest will become effective on each Interest Rate Change Date in accordance with Section 4 of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

Beginning on the first day of **February 1, 2005** and on the first day of every month thereafter until the first day of **January, 2007**, I will pay only interest on the unpaid principal balance of the Note.  Thereafter, I will pay principal and interest by making payments every month until the Maturity Date, as provided below.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.

My monthly payments will be applied to interest before principal.  If on **January 1, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

610    069980212    N    001    001

I will make my monthly payments at **18400 Von Karman, Suite 1000 Irvine, CA 92612** or at a different place if required by the Note Holder.

### (B) Amount of My Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **1,213.34** . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### (D) Withholding

If I am a non-resident alien, I understand that all payments due hereunder shall be paid without reduction for any taxes, deductions or withholding of any nature. If such tax, deduction or withholding is required by any law to be made from any payment to the Note Holder, I shall continue to pay this Note in accordance with the terms hereof, such that the Note Holder will receive such amount as it would have received had no such tax, deduction or withholding been required.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of **January, 2007** and on the same day of every 6th month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date."

### (B) The Index

Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a margin. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London market ("LIBOR"), as published in *The Wall Street Journal* "Money Rates" Table. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

At each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Five And Eight Tenth(s)** percentage points (**5.800%**) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

> **(i) Interest-Only Period.** The "Interest-only Period" is the period from the date of this Note through **January 1, 2007** . For the Interest-only Period, the Note Holder will calculate the amount of the monthly payment to be one-twelfth (1/12th) of one (1) year's interest **6.500 %**. The result of this calculation will be the amount of my monthly payment until the next Interest Rate Change Date.

**(ii) Amortization Period.** The "Amortization Period" is the period after the Interest-only Period and continuing until the Maturity Date. During the Amortization Period, after calculating my new interest rate as provided in Section 4(C) above, the Note Holder will then calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly payments by the Maturity Date, assuming, for purposes of each calculation, that the interest rate remained unchanged during that period. The result of this calculation will be the new amount of my monthly payment.

### (D) Limit on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **8.000** % or less than **6.500** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one and one half percentage points (1.5%) from the rate of interest I have been paying for the preceding month. My interest rate will never be greater than **13.500** % nor less than **6.500%**.

### (E) Effective Date of Changes

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment at least 25 days before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note and to pay the interest then accruing at the Note rate as of the date my prepayments are applied. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** or $5.00, whichever is greater of my overdue monthly payment. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

### (D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amount owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor, and further waive all relief under any valuation and appraisement laws. "Presentment" means the right to

require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. GOVERNING LAW - SECURED NOTE

This Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the Security Instrument (as defined below) is located. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## CAUTION
## IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS NOTE BEFORE YOU SIGN IT.


WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED


**TYRONE K ARMSTRONG**            - Borrower                              - Borrower

_____          - Borrower          _____  - Borrower

_____          - Borrower          _____  - Borrower

_____          - Borrower          _____  - Borrower

(Sign Original Only)

**Description of Attached Document**

Title of Type of Document **DEED OF TRUST**

Document Date **12/2004**     Number of Pages **15**

### Copy Certification

State of **NEVADA**

§

County of **CLARK**

On this **27** day of **AUGUST**, in the year 20**19**, I certify that the

preceding or attached document, is a true, exact, complete and unaltered photocopy

made by me of **DEED OF TRUST** presented to me by the

document's custodian **TYRONE K ARMSTRONG**, and that, to the best of my

knowledge, the photocopied document is neither a public record nor a publicly recorded document, certified copies of which are available from an official source other than a notary.

Witness my hand and official seal.

_____
**Notary Signature**

M. HARRIS
NOTARY PUBLIC STATE OF NEVADA
Appointment Recorded in Clark County
No: 11-3958-1
Expires November 1, 2022

(seal)

20041229-0002078

Assessor's Parcel Number:
139-09-217-099
Return To: New Century Mortgage
Corporation
18400 Von Karman, Suite 1000
Irvine, CA 92612

Prepared By: New Century Mortgage
Corporation
18400 Von Karman, Suite 1000
Irvine, CA 92612
Recording Requested By: New Century
Mortgage Corporation
18400 Von Karman, Suite 1000
Irvine, CA 92612

Fee $36.00
N/C Fee $25.00

12/29/2004       10:32.25
T2004016C085
Requestor:
SOUTHWEST TITLE

Frances Deane          KGP
Clark County Recorder  Pgs 23

CN-12-0012 TR [Space Above This Line For Recording Data]

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated December 23, 2004 together with all Riders to this document.
**(B) "Borrower"** is TYRONE K ARMSTRONG, A Single Man



610  069980212  D2  001  003

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is New Century Mortgage Corporation

Lender is a Corporation
organized and existing under the laws of California

1000584013

**NEVADA**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**          Form 3029  1/01

-6(NV) (0307).01
Page 1 of 15          Initials: _____
VMP Mortgage Solutions (800)521-7291

Lender's address is 18400 Von Karman, Suite 1000, Irvine, CA 92612

Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is SOUTHWEST TITLE

**(E) "Note"** means the promissory note signed by Borrower and dated December 23, 2004
The Note states that Borrower owes Lender TWO HUNDRED TWENTY-FOUR THOUSAND AND 00/100
Dollars
(U.S. $224,000.00         ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than January 1, 2035
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | Prepayment Rider |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

County                                of                            Clark                          :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
See Legal Description Attached Hereto and Made a Part Hereof

Parcel ID Number: 139-09-217-099                        which currently has the address of
3713 BRENTCOVE DRIVE                                                          [Street]
North Las Vegas                              [City], Nevada 89032        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

1000584013

Initials: _Th ft_

-6(NV) (0307).01                        Page 3 of 15                        Form 3029  1/01

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials: _T K H_

1000584013

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _7KH_

1000584013

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

Initials: _TKH_

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $2,500.00.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____

_____ (Seal)
TYRONE K ARMSTRONG                 -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                                   -Borrower

1000584013

-6(NV) (0307).01            Page 14 of 15            Form 3029  1/01

**STATE OF NEVADA**
**COUNTY OF** *Clark*

This instrument was acknowledged before me on *Dec. 23, 04*                by

*Tyrone K Armstrong*

Mail Tax Statements To:
New Century Mortgage Corporation
18400 Von Karman, Suite 1000
Irvine, CA 92612



Notary Public - State of Nevada
COUNTY OF CLARK
TIMEKA CLARK
No. 02-76724-1  My Appointment Expires June 7, 2005

*Timeka Clark*

1000584013

# EXHIBIT "3"



October 26, 2016

TYRONE K ARMSTRONG
3713 BRENTCOVE DR APT A
North Las Vegas, NV  89032

Bank of America
4500 Amon Carter Blvd
TX2-979-01-19
Fort Worth, TX 76155

Loan #9786998021208001

Property Address:       3713 BRENTCOVE DR
NORTH LAS VEGAS NV 89032

TYRONE K ARMSTRONG,

## We received a full payoff for this loan.

Our records show that Bank of America has received a full payoff of your promissory note, home equity
agreement, or other instrument of indebtedness (referred to as "Note" in this letter) for the loan listed
above.

## What you should know

    Enclosed is the original Note marked "paid".

Enclosed is a copy of the Note marked "paid". Based on our records, the original Note has been lost
or destroyed.

We are unable to locate the original Note or a copy. Based on our records, the original Note has been
lost or destroyed.

    Enclosed is the original security instrument marked "paid" .

Enclosed is a copy of the security instrument marked "paid". Based on our records, the original
security instrument has been lost or destroyed.

We are unable to locate the original security instrument or a copy. Based on our records, the original
security instrument instrument has been lost or destroyed.

We are providing you this letter for your records.

## Questions?

We appreciate the opportunity to serve your home loan needs. If you have any questions, please call us
at 800.669.4807 Monday through Friday 7 a.m. to 10 p.m. Eastern.

Inst #: 20170119-0001205
Fees: $21.00
N/C Fee: $0.00
01/19/2017 10:28:53 AM
Receipt #: 2985352
Requestor:
RECONTRUST COMPANY NA
Recorded By: CDE   Pgs: 2
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

Tax ID: 139-09-217-099

THE UNDERSIGNED HEREBY AFFIRMS THAT THIS DOCUMENT CONTAINS NO INDIVIDUAL'S FEDERAL SOCIAL SECURITY NUMBER
Trisha Baca, Assistant Vice President

UID:652744e8-7f84-435f-b2f5-84b6cd9a8af1
DOCID_2006998021220100

## SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

WHEREAS,   TYRONE K ARMSTRONG
Is the trustor, NEW CENTURY MORTGAGE CORPORATION, BY COUNTRYWIDE HOME LOANS, INC., ITS ATTORNEY-IN-FACT is the current beneficiary ("Beneficiary") and SOUTHWEST TITLE was the original trustee under that certain Deed of Trust dated 12/23/2004 and recorded 12/29/2004, as Instrument or Document No.20041229-0002078, in Book N/A, Page N/A, of Official Records of the County of CLARK, State of Nevada.

NOW THEREFORE, the undersigned Beneficiary hereby substitutes a new trustee, ReconTrust Company, N.A. ("Trustee"), under the Deed of Trust, and Trustee does hereby reconvey, without warranty, to the person or persons legally entitled thereto, the estate now held by Trustee under the Deed of Trust.

Dated: 01/09/2017

Beneficiary:
NEW CENTURY MORTGAGE CORPORATION, BY
COUNTRYWIDE HOME LOANS, INC., ITS
ATTORNEY-IN-FACT

By:  _____

Jesse Lester
Assistant Vice President

Trustee:
ReconTrust Company, N.A.

By: _____

Trisha Baca
Assistant Vice President

---

TYRONE K ARMSTRONG
3713 BRENTCOVE DR APT A
North Las Vegas, NV 89032

Document Prepared By And
When Recorded Return To:
ReconTrust Company, N.A./Lien Release
TX2-979-01-19 REL
P.O. BOX 619040
Dallas, TX 75261-9943
(800) 540-2684

This Substitution of Trustee and Full Reconveyance is made without recourse to or against the New
Century Liquidating Trust and New Century Mortgage Corporation, and without representation of
warranty, express or implied, by the New Century Liquidating Trust and New Century Mortgage
Corporation.

### Notarial Acknowledgment

DOCID_2006998021220100

Attached to <u>Substitution of Trustee and Full Reconveyance</u> dated: 01/09/2017
2 pages including this page

STATE OF ARIZONA,
COUNTY OF MARICOPA
On 01/09/17, before me, Amanda Rodriguez, Notary Public, personally appeared Jesse Lester,
Assistant Vice President of NEW CENTURY MORTGAGE CORPORATION, BY COUNTRYWIDE
HOME LOANS, INC., ITS ATTORNEY-IN-FACT and Trisha Baca, Assistant Vice President of
ReconTrust Company, N.A., whose identities were proven to me on the basis of satisfactory evidence
to be the persons they claim to be and whose names are subscribed to the within instrument and
acknowledged to me that they executed the same in their authorized capacities, and that by their
signatures on the instrument the persons, or entity upon behalf of which the persons acted, executed
the instrument.
IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year
last written.

AMANDA RODRIGUEZ
NOTARY PUBLIC - ARIZONA
Maricopa County
My Commission Expires
September 26, 2018

Amanda Rodriguez
Notary Public for said State and County

---

TYRONE K ARMSTRONG
3713 BRENTCOVE DR APT A
North Las Vegas, NV 89032

Document Prepared By And
When Recorded Return To:
ReconTrust Company, N.A./Lien Release
TX2-979-01-19 REL
P.O. BOX 619040
Dallas, TX 75261-9943
(800) 540-2684

# EXHIBIT "4"

Loan No: LAS011562

# ADJUSTABLE RATE NOTE



(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| January 18, 2007 | Irvine | California |
|---|---|---|
| [Date] | [City] | [State] |

3713 BRENTCOVE DR, NORTH LAS VEGAS, NV  89032
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 237,000.00        (this amount is called "Principal"), plus interest, to the order of Lender. Lender is BNC MORTGAGE, INC., A DELAWARE CORPORATION

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        6.400 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on March 1, 2007        .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on February 1, 2037        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at Chase Home Finance LLC, Attn: Financial Processing, Dept. 360, P.O. Box 501580, San Diego, CA 92150-1580
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,482.45        . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

LAS011562

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) -
Single Family - Fannie Mae UNIFORM INSTRUMENT

-838N (0210)        Form 3520 1/01

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 4        Initials:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of February, 2009 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Four And 950/1000 percentage points ( 4.950 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 9.400 % or less than 6.400 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.400 %, or less than 6.400 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

LAS011562



## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

LAS011562



**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
TYRONE K. ARMSTRONG                -Borrower                                                          -Borrower

_____ (Seal)      _____ (Seal)
                                                   -Borrower                                                          -Borrower

_____ (Seal)      _____ (Seal)
                                                   -Borrower                                                          -Borrower

_____ (Seal)      _____ (Seal)
                                                   -Borrower                                                          -Borrower

*[Sign Original Only]*

LAS011562

-838N (0210)                                    Page 4 of 4                                    Form 3620 1/01

Assessor's Parcel Number:
139-09-217-099
Return To: BNC MORTGAGE, INC.

P.O. BOX 19656
IRVINE, CA 92623-9656

Prepared By:

Recording Requested By:
National Alliance Title

2007O125-0003978

Fee: $36 00
N/C Fee: $25 00

01/25/2007                    14-08-21
T20070014405
Requestor:
NATIONAL ALLIANCE TITLE

Debbie Conway                    KXC
Clark County Recorder     Pst  23

Loan No.: LAS011562

——————————— [Space Above This Line For Recording Data] ———————————

## DEED OF TRUST

MIN 100122200003018717

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.
(A) "Security Instrument" means this document, which is dated January 18, 2007
together with all Riders to this document.
(B) "Borrower" is TYRONE K. ARMSTRONG, A SINGLE MAN.

Borrower is the trustor under this Security Instrument.
(C) "Lender" is BNC MORTGAGE, INC., A DELAWARE CORPORATION

Lender is a corporation
organized and existing under the laws of Delaware

LAS011562

NEVADA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
WITH MERS
Form 3029  1/01
   -6A(NV) (0307)
Page 1 of 15          Initials: TA
VMP Mortgage Solutions (800)521-7291

Lender's address is **P.O. BOX 19656, IRVINE, CA 92623-9656**

(D) "Trustee" is **T.D. SERVICE COMPANY**

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated **January 18, 2007**
The Note states that Borrower owes Lender **two hundred thirty-seven thousand and 00/100** Dollars
(U.S. $ **237,000.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **February 1, 2037** .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [x] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |
| | | **Prepayment Penalty Rider** |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

Initials: _TA_    LAS011562

-6A(NV) (0307)    Page 2 of 15    Form 3029  1/01

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                    [Type of Recording Jurisdiction] of CLARK, NEVADA                    [Name of Recording Jurisdiction]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HERETO AS EXHIBIT A.

Parcel ID Number:                                        which currently has the address of
3713 BRENTCOVE DR                                                              [Street]
NORTH LAS VEGAS                               [City], Nevada 89032          [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

Initials: _TA_                    LAS011562

-6A(NV) (0307)                    Page 3 of 15                    Form 3029   1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives

Initials: _TA_

LAS011562

Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials: TA    LAS011562

-6A(NV) (0307)    Page 5 of 15    Form 3029  1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: _TA_                                   LAS011562

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials: _TA_    LAS011562

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

Initials: _TA_  **LAS011562**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials: _7A_                                         LAS011562

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _TH_

LAS011562

⑥ -6A(NV) (0307)    Page 10 of 15    Form 3029  1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

Initials: _T H_

LAS011562

-6A(NV) (0307)                    Page 11 of 15                    Form 3029  1/01

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: _TH_                                    LAS011562

🕷-6A(NV) (0307)                    Page 12 of 15                    Form 3029   1/01

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $                    .

Initials: _TH_

LAS011562

**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____    *Tyrone K. Armstrong* (Seal)
TYRONE K. ARMSTRONG    -Borrower

_____

_____    _____ (Seal)
                                                        -Borrower

_____ (Seal)    _____ (Seal)
-Borrower                                           -Borrower

_____ (Seal)    _____ (Seal)
-Borrower                                           -Borrower

_____ (Seal)    _____ (Seal)
-Borrower                                           -Borrower

LAS011562

-6A(NV) (0307)    Page 14 of 15    Form 3029  1/01

STATE OF NEVADA
COUNTY OF Clark

This instrument was acknowledged before me on January 18, 2007    by
TYRONE K. ARMSTRONG



Mail Tax Statements To:
TYRONE K. ARMSTRONG
3713 BRENTCOVE DR, NORTH LAS VEGAS, NV 89032

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ROSEANNE EHRING
Appt. No. 04-93269-1
My Appt. Expires Nov. 10, 2023

Initials: T A    LAS011562

-6A(NV) (0307)    Page 15 of 15    Form 3029  1/01

EXHIBIT "A"

The land referred to in this Commitment is situated in the County of Clark, State of Nevada and is
described as follows:

LOT ONE (1) IN BLOCK FOUR (4) OF CHEYENNE RIDGE UNIT 2A, AS SHOWN BY MAP
THEREOF ON FILE IN BOOK 54 OF PLATS, PAGE 67, IN THE OFFICE OF THE COUNTY
RECORDER OF CLARK COUNTY, NEVADA, AND AMENDED BY CERTIFICATE OF
AMENDMENT RECORDED JANUARY 8, 1993, AS DOCUMENT NO. 00777 IN BOOK 930108
OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

# EXHIBIT "5"

Inst #: 201005060002258
Fees: $14.00
N/C Fee: $0.00
05/06/2010 11:20:06 AM
Receipt #: 340526
Requestor:
FIRST AMERICAN TITLE NDTS
Recorded By: OSA  Pgs: 1
DEBBIE CONWAY
CLARK COUNTY RECORDER

Requested and Prepared by:
The Cooper Castle Law Firm
        First American Title
When Recorded Mail To:
Chase Home Finance LLC
10790 Rnacho Bernardo Road
San Diego CA 92127
139-09-217-099

A.P.N.:   139-09-217-099
Loan No.:   24165052
TS NO:   10-04-4630-NV
4430221-AS  ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:  U.S. Bank National Association, as Trustee of the Structured Asset Securities Corporation Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2007-BC3 all beneficial interest under that certain Deed of Trust dated: January 18, 2007 executed by Tyrone Armstrong, as Trustor(s), Service Company as Trustee, and recorded as Instrument No. 20070125 Book No. 0003978 on January 25, 2007 of Official Records, in the office of the County Recorder of Clark County, Nevada together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

DATE:  April 26, 2010

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS) BY THE COOPER CASTLE LAW FIRM LLP AS ITS ATTORNEY IN FACT

Michael W. Chen, Esq., Managing Partner

Acknowledgement:
State of Nevada
County of Clark

On April 26, 2010 before me, Andrea Buelow, personally appeared Michael W. Chen, who provided to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of Nevada that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature

Tyrone Armstrong / 10-04-4630-NV

ANDREA BUELOW
Notary Public-State of Nevada
APPT NO  09 11859 1
My App. Expires November 20, 2013

Inst #: 20150406-0000759
Fees: $19.00
N/C Fee: $0.00
04/06/2015 08:05:57 AM
Receipt #: 2374405
Requestor:
SECURITY CONNECTIONS INC
Recorded By: ECM   Pge: 3
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

Assessor's/Tax ID No. 13909217099

Recording Requested By:
OCWEN LOAN SERVICING, LLC

When Recorded Return To:
OCWEN LOAN SERVICING, LLC
240 TECHNOLOGY DRIVE
IDAHO FALLS, ID 83401

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Clark, Nevada
SELLER'S SERVICING #:7100758254 "ARMSTRONG"
SELLER'S LENDER ID#: DCR SCI
OLD SERVICING #: 24165052

MIN #: 100122200003018717 SIS #: 1-888-679-6377

THE UNDERSIGNED DOES HEREBY AFFIRM THAT THIS DOCUMENT SUBMITTED
FOR RECORDING DOES NOT CONTAIN PERSONAL INFORMATION ABOUT ANY
PERSON.

Date of Assignment: March 24th, 2015
Assignor: Mortgage Electronic Registration Systems, Inc. ("MERS"), solely as nominee for BNC
Mortgage, Inc., a Delaware Corporation, its successors and/or assigns at PO BOX 2026 FLINT MI
48501, 1901 E VOORHEES ST, STE C, DANVILLE, IL 61834
Assignee: U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED
ASSET SECURITIES CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2007-BC3 at C/O OCWEN LOAN SERVICING, LLC., 1661 WORTHINGTON ROAD,
STE 100, WEST PALM BEACH     , FL 33409

Executed By: TYRONE K. ARMSTRONG, A SINGLE MAN.  To: MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE FOR
BNC MORTGAGE, INC., ITS SUCCESSORS AND/OR ASSIGNS
Date of Deed of Trust: 01/18/2007 Recorded: 01/25/2007 in Book: 20070125 Page: NA as
Instrument No.: 0003978 In the County of Clark, State of Nevada.

Assessor's/Tax ID No. 13909217099

Property Address: 3713 BRENTCOVE DR, NORTH LAS VEGAS, NV 89032

Legal: NA
THE PURPOSE OF THIS CORRECTIVE ASSIGNMENT OF DEED OF TRUST IS TO
CORRECT THE ASSIGNOR, ASSIGNEE & BORROWER NAME ON THE ASSIGNMENT
*UT*UTGMAC*03/24/2015 12:36 15 PM* GMAC40GMACA00000000000000004484568*
NVCLARK* NVCLARK_TRUST_ASSIGN_ASSN * KS*KS1GMAC*

CORPORATE ASSIGNMENT OF DEED OF TRUST Page 2 of 3

RECORDED ON MAY 06, 2010 IN INSTRUMENT NUMBER 201005060002258

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Deed of Trust having an original principal sum of $237,000.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under the Deed of Trust.

TO HAVE AND TO HOLD the said Deed of Trust, and the said property unto the said Assignee forever, subject to the terms contained in said Deed of Trust. IN WITNESS WHEREOF, the assignor has executed these presents the day and year first above written:

Mortgage Electronic Registration Systems, Inc. ("MERS"), solely as nominee for BNC Mortgage, Inc., a Delaware Corporation, its successors and/or assigns
On __MAR 2 5 2015__

By_____ , Assistant
    MARY KAMMEYER
Secretary

*UT*UTGMAC*03/24/2015 12:36:15 PM* GMAC40GMACA00000000000000004484568*
NVCLARK* NVCLARK_TRUST_ASSIGN_ASSN * KS*KS1GMAC*

CORPORATE ASSIGNMENT OF DEED OF TRUST Page 3 of 3

STATE OF ___Iowa_____

COUNTY OF ___Black Hawk_____

On __MAR 25 2015__, before me, _____Karen Smith_____, a Notary Public in and for
___Black Hawk___ in the State of _____Iowa_____, personally appeared
___MARY KAMMEYER_____, Assistant Secretary, personally known to me (or proved to me on
the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity, and that by his/her/their signature on the instrument the person(s), or the
entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_Karen Smith_ (signature)
___Karen Smith___
Notary Expires: 6/10/17

KAREN SMITH
COMMISSION NO.784540
MY COMMISSION EXPIRES
JUNE 10, 2017

(This area for notarial seal)

Mail Tax Statements To: TYRONE ARMSTRONG, 3713 BRENTCOVE DR, NORTH LAS
VEGAS, NV  89032

*UT*UTGMAC*03/24/2015 12:36:15 PM* GMAC40GMACA00000000000004484568*
NVCLARK* NVCLARK_TRUST_ASSIGN_ASSN * KS*KS1GMAC*

## NOTICE OF ASSIGNMENT, SALE OR TRANSFER
## OF SERVICING RIGHTS

Loan Number LAS011562

You are hereby notified* that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from BNC Mortgage, Inc.

to CHASE HOME FINANCE LLC

_____ effective March 1, 2007

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing. In this case, the present servicer and the new servicer have combined all necessary information in this one notice.

**Your present servicer is BNC MORTGAGE, INC., A DELAWARE CORPORATION**

If you have any questions relating to the transfer of servicing from your present servicer call our servicing department at (800) 587-0371 - between 8:30 a. m. and 5:30 p.m. Pacific Standard Time on the following days, Monday through Friday, is a toll-free number.

**Your new servicer will be CHASE HOME FINANCE LLC**

The business address for your new servicer is: 10790 Rancho Bernardo Road, San Diego, CA 92109

The toll-free or collect call telephone number of your new servicer is: 1(800)548-7912

FINANCE LLC, ATTN: CUSTOMER CARE DEPARTMENT 310 at 1(800)548-7912 between 8:00 a.m. and  8:00  p.m. Eastern Standard Time on the following days, Monday through Friday.

The date that your present servicer will stop accepting payments from you is March 1, 2007
The date that your new servicer will start accepting payments from you is March 1, 2007.

You should also be aware of the following information, which is set out in more detail in Section 6 of RESPA (12 U.S.C. §2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. §2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day, excluding public holidays (State or Federal), Saturday and Sunday.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

## BORROWER ACKNOWLEDGEMENT

I/We have read this disclosure form, and understand its contents, as evidenced by my/our loan signature(s) below.

Borrower TYRONE K. ARMSTRONG

_____          _____
Borrower                         Borrower

_____          _____
Borrower                         Borrower

* This notification is a requirement of Section 6 of the Real Estate Settlement Procedures Act (RESPA).
(12 U.S.C. §2605).



OCWEN

www.ocwen.com

April 10, 2012

Tyrone Armstrong
3713 BRENTCOVE DR
NORTH LAS VEGAS, NV 89032

## NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS

OCWEN LOAN #:      7100758254
PROPERTY ADDRESS:    3713 BRENTCOVE DR
                     NORTH LAS V, NV 89032

Dear Borrower(s):

Ocwen Loan Servicing, LLC ("Ocwen") would like to welcome you as a new customer.  In accordance with Section 6 of the Real Estate Settlement Procedures Act ("RESPA") (12 U.S.C. Section 2605), we are informing you that effective April 1, 2012, the servicing of your mortgage loan, that is the right to collect payments from you, will be assigned, sold and/or transferred from JPMorgan Chase Bank, N.A. to Ocwen. Except in limited circumstances, the law requires that your new Servicer must send you notice no later than 15 days after this effective date.  The assignment, sale, or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Your present Servicer is JPMorgan Chase Bank, N.A..  If you have questions relating to the transfer of servicing from your present Servicer please call JPMorgan Chase Bank, N.A. Customer Care Center, Monday through Friday, between 8:00 am and 5:00 pm EST at 1-800-848-9136. This is a toll-free telephone number.

Your new Servicer will be Ocwen.  The business address for your new Servicer is set forth in the paragraph below.  The toll-free telephone number for your new Servicer is (800)746-2936.  If you have any questions, please contact Ocwen's Customer Care Center, Monday through Friday between 8:00 am ET to 9:00 pm ET, Saturday 8:00 am ET to 5:00 pm ET or Sunday Noon ET till 9:00 pm ET.  Information concerning Ocwen and your mortgage loan may also be found online at www.ocwen.com.

Effective April 1, 2012 please direct your monthly mortgage payments to your new Servicer, Ocwen.  JPMorgan Chase Bank, N.A. will stop accepting payments from you on March 31, 2012.  Please send all payments due on or after that date to Ocwen at the payment address indicated below:  If you use a Bill Pay Service, you will also need to inform them of this new payment address.

For Western Union Quick Collect users, you can find the location nearest to you by calling 1-800-238-5772 or visiting www.westernunion.com and clicking on "Find a Location".  At the location, please pay to name "OCWEN" and provide the loan number.

| PAYMENTS | CORRESPONDENCE |
|---|---|
| Ocwen Loan Servicing, LLC | Ocwen Loan servicing, LLC |
| P.O. Box 6440 | Attn: Customer Care Center |
| Carol Stream, IL 60197-6440 | P.O. Box 24738 |
|  | West Palm Beach, FL 33416-4738 |

Please note that payments sent to any other location will cause a delay in posting.  Payments and correspondence sent to Ocwen should include your new Ocwen Loan Number, as shown above.  For your convenience, we have included a temporary payment coupon on the other side of this letter.

Additionally, it is important to contact your insurance agency to ensure that (i) Ocwen receives proof of hazard insurance (with flood and/or windstorm coverage, as applicable) on your property and (ii) Ocwen is named as the beneficiary in the Mortgagee Clause of your policy.  If your mortgage payment includes escrow for taxes or insurance, please take the necessary steps to have all future bills forwarded to:

| INSURANCE | PROPERTY TAXES |
|---|---|
| Ocwen  Loan Servicing, LLC | Ocwen Loan Servicing, LLC |
| ISAOA | Attn: Tax Department |
| P. O. Box 6723 | P.O. Box 24665 |
| Springfield, OH 45501-6723 | West Palm Beach, FL 33416-4665 |
|  | Phone: (800)746-2936 |

You may also forward evidence of insurance or insurance bills via fax or e-mail to Ocwen

Toll Free Fax: (888)882-1816                           E-mail: updateinsuranceinfo@ocwen.com

Should you have questions about your insurance, please feel free to call our Insurance Center toll-free at (866) 825-9265.

Ocwen Loan Servicing, LLC is a debt collector attempting to collect a debt: any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.



OCWEN

www.ocwen.com

The transfer of servicing rights may affect the terms of, or the continued availability of mortgage life, disability insurance, or any other type of optional Insurance. Not everyone has this type of insurance, but if you do, please be advised that it may not transfer to Ocwen Loan Servicing, LLC. However, to verify if Ocwen is able to offer any of these services, please call our Customer Care Center at (800)746-2936, during the business hours indicated above or contact an independent insurance agent for alternative coverage options.

Mortgage escrow accounts ensure that homeowners' property taxes, fire and hazard insurance premiums; mortgage insurance premiums and other escrow items are paid in a timely fashion. They are a guarantee that there is always enough money to pay these bills when they are due so that the homeowner avoids the risk of lapsed insurance coverage or delinquent taxes. If you would like to establish an escrow account with Ocwen, please call our office at (800)746-2936.

You should also be aware of the following information which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act ("RESPA") (12 U.S.C. Section 2605). During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old Servicer before its due date may not be treated by the new loan Servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA also gives you certain consumer rights. If you send a "qualified written request" to Ocwen concerning the servicing of your loan, Ocwen must provide you with a written acknowledgement within 20 business days of receipt of your request. A "qualified written request" is defined as a written correspondence, other than notice on a payment coupon or other payment medium supplied by the Servicer which includes your name and account number and your reasons for the request. A "business day" is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions. Not later than 60 business days after receiving your request, Ocwen must make the appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60-business-day period, Ocwen may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent Ocwen from initiating foreclosure if proper grounds exist under the mortgage documents. In addition, except as otherwise provided herein, we may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Section 6 of RESPA also provides for damages and costs for individuals in circumstances where servicers are shown to have violated this section. You should seek legal advice if you believe your rights have been violated.

Upon receipt of this letter, please call our office at (800)746-2936 between Monday through Friday between 8:00 am to 9:00 pm ET, Saturday, 8:00 am ET to 5:00 pm ET or Sunday Noon ET till 9:00 pm ET or visit our website at www.ocwen.com, which is available 24 hours a day, so that we may verify the information we received. We look forward to servicing your loan.

Sincerely,

Ocwen Loan Servicing. LLC
NMLS # 1852

---

*Please Detach below and include with your monthly payment.*

00001250406  4444444881  000007100758254  50  001250406

Tyrone Armstrong

Account Number: 7100758254

**Payment Coupon**

Check box if your contact information has changed, update on the back

OCWEN

| AMOUNT DUE | $ |
|---|---|
| Additional Principal | $ |
| Additional Escrow | $ |
| Other (Please Specify) | $ |
| | |
| Total Enclosed | $ |

OCWEN
PO BOX 6440
CAROL STREAM IL 60197-6440

Note: If your loan is current, any excess funds will first be applied to outstanding amounts due and then additional principal. If this payment is made via automatic drafting, this statement is for informational purposes only.

# EXHIBIT "6"

Inst #: 20190613-0001519
Fees: $40.00
06/13/2019 01:10:03 PM
Receipt #: 3737580
Requestor:
PREMIUM TITLE TSG
Recorded By: COJ  Pgs: 4
DEBBIE CONWAY
CLARK COUNTY RECORDER
Src: ERECORD
Ofc: ERECORD

TS No.: 2013-00385-NV

APN: 139-09-217-099

**Western Progressive - Nevada, Inc.**
**Northpark Town Center**
**1000 Abernathy Rd NE; Bldg 400, Suite 200**
**Atlanta, GA 30328**

T.S. No.: 2013-00385-NV

The undersigned hereby affirms that there is no Social Security number contained in this document.

# NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 01/18/2007. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

**Western Progressive - Nevada, Inc.,** as duly appointed trustee under and pursuant to the Deed of Trust recorded **01/25/2007**, as Inst. No. **20070125-0003978**, in book ---, page ---, of Official Records in the office of the County Recorder of **Clark** County, Nevada executed by: **TYRONE K. ARMSTRONG, A SINGLE MAN**

WILL SELL AT PUBLIC AUCTION TO HIGHEST BIDDER FOR CASH, CASHIER'S CHECK DRAWN ON A STATE OR NATIONAL BANK, A CHECK DRAWN BY A STATE OR FEDERAL CREDIT UNION, OR A CHECK DRAWN BY A STATE OR FEDERAL SAVINGS AND LOAN ASSOCIATION, A SAVINGS ASSOCIATION OR SAVINGS BANK:

Place of Sale: At the Front Entrance of Nevada Legal News, Nevada Legal News, 930 S. Fourth St, Las Vegas, NV 89101

All right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to a Deed of Trust described as:

THE REFERRED TO IN THIS COMMITMENT IS SITUATED IN THE COUNTY OF CLARK, STATE OF NEVADA AND IS DESCRIBED AS FOLLOWS:

LOT ONE (1) IN BLOCK FOUR (4) OF CHEYENNE RIDGE UNIT 2A, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 54 OF PLATS, PAGE 67, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA, AND AMENDED BY CERTIFICATE OF AMENDMENT RECORDED JANUARY 8, 1993, AS DOCUMENT NO. 00777 IN BOOK 930108 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA.



TS No.: 2013-00385-NV

# NOTICE OF TRUSTEE'S SALE

The street address and other common designation, if any, of the real property described above is purported to be:
3713 Brentcove Dr, North Las Vegas, NV 89032

The undersigned Trustee disclaims any liability for any incorrectness of the street address or other common designation, if any, shown above.

Date of Sale: **07/19/2019 at 09:00 AM**

The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale. This property is sold as-is, the beneficiary and undersigned Trustee are unable to validate the condition, defects or disclosure issues of said property and Buyer waives the disclosure requirements under NRS 113.130 by purchasing at this sale and signing a receipt in connection therewith. The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is: **$423,686.43.**

TS No.: 2013-00385-NV

## NOTICE OF TRUSTEE'S SALE

If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse. If the sale is set aside for any reason, the Purchaser at the sale shall be entitled only to a return of the deposit paid. The Purchaser shall have no further recourse against the Mortgagor, the Mortgagee, or the Mortgagee's Attorney.

**Note:** Because the Beneficiary reserves the right to bid less than the total debt owed, it is possible that at the time of the sale the opening bid may be less than the total debt.



TS No.: 2013-00385-NV

# NOTICE OF TRUSTEE'S SALE

The beneficiary of the Deed of Trust has executed and delivered to the undersigned a written request to commence foreclosure and due to the continuing default on the loan obligation, the beneficiary under said Deed of Trust has authorized the undersigned Trustee to proceed with a trustee's sale.

Date: **June 13, 2019**                     Western Progressive - Nevada, Inc., as Trustee for
                                            beneficiary
                                            Northpark Town Center
                                            1000 Abernathy Rd NE; Bldg 400, Suite 200
                                            Atlanta, GA 30328
                                            Sale Information Line: (866) 960-8299
                                            http://www.altisource.com/MortgageServices/DefaultMan
                                            agement/TrusteeServices.aspx

                                            _____
                                            C.Scott          Trustee Sale Assistant

**State of GA} ss**
**County of Fulton}**

On June 13, 2019 before me Iman Walcott  Personally appeared C. Scott who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. authorized capacity(ies), and that by his/her/their signature(s) on the instrument.

WITNESS my hand and official seal.

Signature _____ (Seal)
          Iman Walcott

Version 1.1 NV NOS 0417                                             Page 4 of 4

# EXHIBIT "7"

**Weil, Gotshal & Manges LLP**

BY FIRST CLASS MAIL

<div align="right">
767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Garrett A. Fail**
+1 (212) 310-8451
Garrett.Fail@weil.com
</div>

September 4, 2019

Tyrone Keith Armstrong
3713 Brentcove Drive
North Las Vegas, Nevada 89032

**Re: In re Lehman Brothers Holdings Inc. (Case No. 08-13555)**

Dear Mr. Armstrong:

We are the attorneys for Lehman Brothers Holdings Inc., BNC Mortgage LLC ("BNC")[1] and certain of their affiliates in the above-referenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). BNC's Chapter 11 Case, which was commenced on January 9, 2009 (the "Commencement Date"), is pending before the Honorable Shelley C. Chapman in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

It has been brought to our attention that, without seeking leave from the Bankruptcy Court, you filed a complaint for wrongful disclosure, quiet title, injunctive and declaratory relief against BNC in the District Court in Clark County, Nevada [Case Number: A-19-796941-C] (the "Complaint") on or about June 19, 2019.

Pursuant to section 362(a) of the Bankruptcy Code, an automatic stay (the "Automatic Stay") went into effect with regard to BNC on the Commencement Date. The Automatic Stay "is effective immediately upon the filing of the petition, and any proceedings or actions described in section 362(a)(1) are void and without vitality if they occur after the automatic stay takes effect." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994); *see also, Dalton v. New Commodore Cruise Lines Ltd.*, 2004 WL 344035 *3 (S.D.N.Y. 2002).

---

[1] BNC Mortgage LLC and BNC Mortgage, Inc. are the same entity. BNC was originally organized under the laws of Delaware as a corporation under the name "BNC Mortgage, Inc." On or about January 13, 1998, BNC changed its corporate form from a corporation to a limited liability company under the name "BNC Mortgage LLC." BNC is still referred to as "BNC Mortgage Inc." in those states in which it is registered to conduct business under its former name.

September 4, 2019                                                    **Weil, Gotshal & Manges LLP**
Page 2

The Automatic Stay expressly prohibits:

> the commencement or continuation, including the issuance or employment
> of process, of a judicial, administrative, or other action or proceeding
> against the debtor that was or could have been commenced before the
> commencement of the case under this title, or to recover a claim against
> the debtor that arose before the commencement of a case under this title.
>
> &ast;&ast;&ast;
>
> any act to obtain possession of property of the estate or of property from
> the estate or to exercise control over property of the estate.
>
> &ast;&ast;&ast;
>
> any act to collect, assess, or recover a claim against the debtor that arose
> before the commencement of the case under this title.

11 U.S.C. §§ 362(a)(1), 362(a)(3), 362(a)(6). Further, "since the bankruptcy stay is automatic, '[t]he action is void even where the acting party had no actual notice of the stay.'" *Hearst Magazines v. Stephen L. Geller, Inc.*, 2009 WL 812039 *1 (S.D.N.Y. 2009) (quoting *Dalton*, 2004 WL 344035 *3).

On December 6, 2011, the Bankruptcy Court entered an order confirming the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Confirmation Order"). Pursuant to paragraph 54 of the Confirmation Order, the Automatic Stay extant in the Chapter 11 Cases remains in full force and effect.

Accordingly, the commencement of the Complaint, which is a violation of the Automatic Stay, is void *ab initio* with respect to BNC. Pursuant to established case law, parties may be held in contempt of court for violating the Automatic Stay. *See Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976); *Colon v. Hart* (*In re Colon*), 114 B.R. 890, 896 (Bankr. E.D. Pa. 1990) ("Many courts have held . . . that a willful violation of the statutory stay provision constitutes civil contempt and may be addressed as such.").

Further, on July 2, 2009, the Bankruptcy Court entered an order (the "Bar Date Order") pursuant to section 502(b)(9) of the Bankruptcy Code and Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure establishing, among other things, September 22, 2009 (the "Bar Date") as the deadline for parties in interest to file proofs of claim in the Chapter 11 Cases. Since you failed to file a claim against BNC prior to the Bar Date, you are barred from asserting prepetition claims (as defined in the Bankruptcy Code) against BNC.

In the event that BNC determines that it no longer retains an interest in the disputed property, it may be willing to stipulate to appropriate relief in the Chapter 11 Cases to allow you to proceed with the Complaint. Until such relief is granted in the Chapter 11 Cases, however, the Complaint is stayed and

September 4, 2019                                              **Weil, Gotshal & Manges LLP**
Page 3

you are directed to so inform the District Court in Clark County, Nevada and provide us with
confirmation of same immediately upon receipt of this letter.

Please respond to this letter within five (5) business days so that we can determine whether any further
actions are required in order to protect our client's interests.

If you have any questions regarding the foregoing, please do not hesitate to contact me.

Very truly yours,

*/s/ Garrett A. Fail*
    Garrett A. Fail

# EXHIBIT "8"

 Gmail                    Tyrone Armstrong <performanceoneautomotive@gmail.com>

---

## S.D.N.Y. Case No: (08-13555-scc)
1 message

**Tyrone Armstrong** <performanceoneautomotive@gmail.com>                    Thu, Sep 19, 2019 at 5:41 PM
To: Garrett.Fail@weil.com

Mr. Garrett A. Fail:

My name is Tyrone K. Armstrong and I am the homeowner of the real property commonly referred to as 3713 Brentcove Drive, North Las Vegas, Nevada. I am in receipt of your letter dated September 04, 2019 (attached as Exhibit "1").

On January 25, 2007, a deed of trust was recorded against my property, without my knowledge, consent or receipt of consideration. The deed of trust reflected that it secured a second mortgage originated by BNC Mortgage, Inc.

On June 13, 2019, a notice of foreclosure sale was recorded against my residence by U.S. Bank, National Association; Ocwen Loan Servicing, LLC; PHH Mortgage Corporation; and Western-Progressive Nevada, Inc. based on non-payment of the purported mortgage issued by BNC Mortgage, Inc.

On June 18, 2019, I filed a complaint in the Eighth Judicial District Court of Clark County, Nevada (case number: A-19-796941-C) for: (*i*) wrongful foreclosure; (*ii*) quiet title; (*iii*) declaratory relief; (*iv*) slander of title; (*v*) intentional infliction of emotional distress; and (*vi*) fraud. A prove-up hearing for default against BNC Mortgage, Inc. is currently scheduled in the state court for October 23, 2019, as well as a motion for summary judgment against all other defendants.

The crux of the state court complaint requests a determination of rights and title to a single asset real estate in which I am the title-owner, occupant and have maintained exclusive possession of since December 24, 1998.

In your letter, you represent to be attorney of record for Lehman Brothers Holdings, Inc., BNC Mortgage, LLC, and *certain affiliates* as part of bankruptcy proceedings commenced in the Southern District of New York (case no: 08-13555-scc).

Your letter appears to allege that the BNC Mortgage, Inc. (Delaware entity file #2810062) that I commenced state court action against converted to BNC Mortgage, LLC (Delaware entity file #2845659) and that they are one in the same entity. If true, your letter conveys that the state court claim triggered the automatic stay provisions of section §362(a) of the U.S. Bankruptcy Code, rendering the Nevada state court proceedings *void ab initio*.

It appears that BNC Mortgage, Inc. may be two separate entities that possess the same name based on the following facts and circumstances:

Footnote #1 of your letter indicates that BNC Mortgage, Inc. was a corporation *originally* organized under the laws of the State of Delaware.

The BNC Mortgage, Inc. named as a defendant in Nevada state court proceedings was *originally* organized under the laws of the State of California on May 02, 1995 under the name of North American Acceptance Corporation (attached as Exhibit "2").

On July 21, 1995, the official records of the California Secretary of State reflect that North American Acceptance Corporation amended its name to BNC Mortgage, Inc. (attached as Exhibit "3").

On October 15, 1997, BNC Mortgage, *Inc.* registered in Delaware as a foreign corporation from California (attached as Exhibit "4").

On January 13, 1998, BNC Mortgage, *LLC* originally organized under the laws of the State of Delaware (attached as Exhibit "5").

On March 11, 1998, the official records of the California Secretary of State reflect that BNC Mortgage, *Inc.*, a California corporation, merged with BNC Mortgage, *Inc.*, a Delaware corporation, with BNC Mortgage, *Inc.*, a Delaware corporation as the surviving entity (attached as Exhibit "6").

On March 20, 1998, BNC Mortgage, *Inc.* (entity file #2810062) dissolved in the State of Delaware (attached as Exhibit "7"). On said date, the name: *BNC Mortgage, Inc.* became available in Delaware. No subsequent entry appears in the history of Delaware entity file (#2810062) (see Exhibit "4").

On February 27, 2007, the entity filing history of BNC Mortgage, LLC reflects: (*i*) **the formation of BNC Mortgage, Inc.**; and on the same date, (*ii*) that BNC Mortgage **Inc.** converted into BNC Mortgage, **LLC** (see Exhibit "5").

After the dissolution date of March 20, 1998, the Delaware entity file of BNC Mortgage, Inc. (#2810062) reflects no further entries of reinstatement or revival, payment of franchise tax fees, letter of good standing, nor that it converted to another entity (see Exhibit "4"). However, said entity's name became available after the date of dissolution and explains how BNC Mortgage, Inc. (#2845659) appears in the entity file of BNC Mortgage, LLC.

The BNC Mortgage, Inc. that was formed on February 27, 2007 under Delaware entity file (#2845659) did not have the ability to: (*i*) register as a foreign entity in Nevada on *August 18, 1998*; nor (*ii*) record a deed of trust in Nevada on *January 25, 2007*. Therefore the identities of the BNC entities are not one in the same and accordingly, the automatic stay of section §362 is not applicable to a separate entity with the same name.

Assuming *arguendo* that your client is eligible to invoke protection under the automatic stay of section §362, I will be in danger of losing my home and would suffer irreparable harm. Moreover, I did not receive adequate notice of any of the BK proceedings, including but not limited to "The Bar Date" and may take leave to file a late proof of claim. *In re CHATEAUGAY CORP.*, 104 B.R. 617, 620, 1989 Bankr. LEXIS 1365, *7 (Bankr. S.D.N.Y. August 16, 1989). The state court is in the best position to determine whether a counterclaim is properly asserted as a defense to the

foreclosure claim under applicable state law. *In re Residential Capital, LLC,* 2012 Bankr. LEXIS 3726, *1, 2012 WL 3423285 (Bankr. S.D.N.Y. August 14, 2012). I will have an opportunity to address the 12-factors in support of lifting the stay after I am able to confirm additional facts. *Id.*

In an effort to expedite this matter with respect to the S.D.N.Y. BK court, and to make accurate representations to the Nevada state court, please provide a response to each of the requests below so that I may determine: (*i*) whether the BNC entity I commenced state court action against in Nevada is one in the same as the BNC entity that commenced chapter 11 bankruptcy proceedings in the S.D.N.Y.; and if they are, (*ii*) whether good cause exists to lift or annul the automatic stay as to BNC Mortgage, Inc. so that I may proceed with state court proceedings in Nevada.

1.      I have reviewed S.D.N.Y. case number (08-13555-scc) and there are roughly **59,930** entries in the bankruptcy case docket. In order to streamline the process, **can you please identify the docket entry numbers of ALL filings related to BNC Mortgage, Inc.?**

2.      **What is the entity file number of the BNC Mortgage, *Inc.* you allege *originally* organized under the laws of the State of Delaware?**

3.      **Is BNC Mortgage, Inc. (Delaware entity file #2810062) one in the same as the BNC Mortgage, Inc. reflected in (Delaware entity file #2845659)?**

4.      **Did BNC Mortgage, Inc. (Delaware entity file #2845659) assume the same name that formerly belonged to BNC Mortgage, Inc. (Delaware entity file #2810062) but are in fact separate entities?**

5.      **Please provide evidence to support the representation that BNC Mortgage, Inc. (Delaware entity #2810062) converted into BNC Mortgage, LLC (Delaware entity #2845659).**

6.      **Please provide evidence that BNC Mortgage, LLC (Delaware entity #2845659) is a subsidiary of Lehman Brothers Holdings, Inc.**

7.      **Please provide evidence that the BNC Mortgage, Inc. that registered as a foreign entity with the Nevada Secretary of State on August 17, 1998 is affiliated with BNC Mortgage, LLC/Lehman Brothers Holdings, Inc. (Nevada SOS filings attached as Exhibit "8").**

8.      **Has the automatic stay of section §362(a) of the U.S. Bankruptcy code been terminated since your client's filing of the chapter 11 petition on January 09, 2009?**

9.      **Has BNC Mortgage, Inc./BNC Mortgage, LLC/Lehman Brothers Holdings, Inc. had a case dismissed within the year prior to the current petition date?**

10.      **Is the 3713 Brentcove Drive property declared as part of your client's pre- and post-petition estate property?**

11.      **Has BNC Mortgage, Inc./BNC Mortgage, LLC/Lehman Brothers Holdings Inc.'s plan of reorganization been confirmed?**

**12.    Is the 3713 Brentcove Drive property necessary to an effective reorganization under 11 U.S.C.S. §362(d)(2)(B)?**

Please allow me 30 days from the date you respond to confirm any information you provide and prepare necessary documents to request relief under section §362 of the U.S. Bankruptcy Code, if need be.

**DATED** this 19th day of September, 2019.


By: _/s/ Tyrone K. Armstrong_
    TYRONE K. ARMSTRONG
    3713 Brentcove Drive
    North Las Vegas, Nevada 89032
    Tel: (702) 491-8426
    Email: performanceoneautomotive@gmail.com
    *Pro Se*

---

**Exhibits.pdf**
5683K

# USPS Tracking®

FAQs >

## Track Another Package  +

**Tracking Number:** 70190160000106029484

Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 4:22 pm on September 30, 2019 in NEW YORK, NY 10153.

## ⊘ Delivered

September 30, 2019 at 4:22 pm
Delivered, Front Desk/Reception/Mail Room
NEW YORK, NY 10153

**Get Updates** ⌄

Feedback

---

### Text & Email Updates                                  ⌄

---

### Tracking History                                       ⌃

**September 30, 2019, 4:22 pm**
Delivered, Front Desk/Reception/Mail Room
NEW YORK, NY 10153
Your item was delivered to the front desk, reception area, or mail room at 4:22 pm on September 30, 2019 in NEW YORK, NY 10153.

**September 30, 2019, 4:32 am**
Departed USPS Regional Destination Facility
NEW YORK NY DISTRIBUTION CENTER

**September 29, 2019**
In Transit to Next Facility

**September 28, 2019, 2:14 pm**
Arrived at USPS Regional Destination Facility
NEW YORK NY DISTRIBUTION CENTER

**September 25, 2019, 8:45 am**
Departed USPS Facility
SOMERSET, PA 15501

**September 25, 2019, 8:44 am**
Arrived at USPS Facility
SOMERSET, PA 15501

**September 25, 2019, 5:45 am**
Arrived at Unit
SOMERSET, PA 15501

**September 24, 2019, 5:15 pm**
Departed USPS Regional Facility
JOHNSTOWN PA DISTRIBUTION CENTER

**September 22, 2019, 11:56 am**
Arrived at USPS Regional Facility
JOHNSTOWN PA DISTRIBUTION CENTER

**September 20, 2019, 5:54 pm**
Departed USPS Regional Facility
LAS VEGAS NV DISTRIBUTION CENTER

**September 19, 2019, 10:32 pm**
Arrived at USPS Regional Origin Facility
LAS VEGAS NV DISTRIBUTION CENTER

Feedback

**September 19, 2019, 4:38 pm**
USPS in possession of item
HENDERSON, NV 89052

---

**Product Information**                                               ⌄

---

See Less ⌃

# Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.



**FAQs**

Feedback

# EXHIBIT "9"

# REGISTER OF ACTIONS
## CASE NO. A-19-796941-C

| | |
|---|---|
| Tyrone Armstrong, Plaintiff(s) vs. US Bank National Association, Defendant(s) | § § § § § § § |

| | |
|---|---|
| Case Type: | **Other Title to Property** |
| Date Filed: | **06/18/2019** |
| Location: | **Department 18** |
| Cross-Reference Case Number: | **A796941** |

---

### PARTY INFORMATION

| | | |
|---|---|---|
| | | **Lead Attorneys** |
| **Defendant** | **BNC Mortgage Inc** | **Colt B. Dodrill**<br>*Retained*<br>702-476-0100(W) |
| **Defendant** | **Ocwen Loan Servicing LLC** | **Jeffrey S. Allison**<br>*Retained*<br>949-679-1111(W) |
| **Defendant** | **PHH Mortgage Corporation** | **Jeffrey S. Allison**<br>*Retained*<br>949-679-1111(W) |
| **Defendant** | **US Bank National Association** | **Mark J Connot**<br>*Retained*<br>702-262-6899(W) |
| **Defendant** | **Western Progressive-Nevada Inc** | **Jeffrey S. Allison**<br>*Retained*<br>949-679-1111(W) |
| **Plaintiff** | **Armstrong, Tyrone Keith** | **Pro Se** |

---

### EVENTS & ORDERS OF THE COURT

| | |
|---|---|
| 10/01/2019 | **Minute Order** (4:20 PM) (Judicial Officer Holthus, Mary Kay) |

**Minutes**

10/01/2019 4:20 PM
- This COURT FINDS, Defendant BNC Mortgage, Inc., filed a Notice of Bankruptcy on September 20, 2019. Therefore, pursuant to 11 U.S.C. 362(a)(1) and (362)(a)(3) of the Bankruptcy Code, the filing of the Notice of Bankruptcy operates as a Stay of the commencement or continuation of a judicial, administrative, or other action or proceeding against the debtor. Therefore, COURT ORDERS, any action against Defendant BNC Mortgage, Inc. is stayed and Plaintiff s Motion Prove-Up Hearing against Defendant BNC Mortgage, Inc., having been scheduled before this Court on October 23, 2019, is hereby vacated. CLERK'S NOTE: The above minute order has been distributed to: Colt B. Dodrill, Esq. - cbdodrill@wolfewyman.com and Keith Armstrong, Proper Person- performanceoneautomotive@gmail.com //10-1-19/ dy

Return to Register of Actions

# EXHIBIT "10"

# REGISTER OF ACTIONS
## CASE NO. A-19-796941-C

| | |
|---|---|
| Tyrone Armstrong, Plaintiff(s) vs. US Bank National Association, § Defendant(s) | Case Type: **Other Title to Property** |
| | Date Filed: **06/18/2019** |
| | Location: **Department 18** |
| | Cross-Reference Case Number: **A796941** |

---

### PARTY INFORMATION

| | | Lead Attorneys |
|---|---|---|
| **Defendant** | BNC Mortgage Inc | **Colt B. Dodrill** *Retained* 702-476-0100(W) |
| **Defendant** | Ocwen Loan Servicing LLC | **Jeffrey S. Allison** *Retained* 949-679-1111(W) |
| **Defendant** | PHH Mortgage Corporation | **Jeffrey S. Allison** *Retained* 949-679-1111(W) |
| **Defendant** | US Bank National Association | **Mark J Connot** *Retained* 702-262-6899(W) |
| **Defendant** | Western Progressive-Nevada Inc | **Jeffrey S. Allison** *Retained* 949-679-1111(W) |
| **Plaintiff** | Armstrong, Tyrone Keith | Pro Se |

---

### EVENTS & ORDERS OF THE COURT

07/10/2019 | **Motion for Temporary Restraining Order**  (9:00 AM) (Judicial Officer Holthus, Mary Kay)
07/10/2019, 07/31/2019, 07/31/2019
*MOTION FOR TPO*

**Minutes**
07/10/2019 9:00 AM
- Ramin Zaeeti present on behalf of Tyrone Armstrong. Court noted it was concerned that no one from the bank would show up; further indicating the affidavit of service was filed on July 2, 2019 and the Bank filed a Motion last night, July 9, 2019. Mr. Zaeeti noted they had filed a document and served. Court inquired if Mr. Armstrong has spoke with the Bank, because the Court believed someone with the same name received a second mortgage on Mr. Armstrong's house and the Court didn't know how that could be fixed. Court noted it would keep Temporary Restraining Order (TRO) in effect; further noted, the bank filed the Motion last night, July 9, 2019 and they canceled the scheduled foreclosure sale. COURT ORDERED, matter CONTINUED for 30 days. Court noted it seemed as though there was a typo and it would try to get someone from the bank to be present. Mr. Armstrong requested an order to serve someone. Court noted it appears service had been effective; therefore, the bank had until July 23, 2019 to answer Complaint as long as they stop the sale. 7/31/19 9:00 AM CONTINUED: MOTION FOR TEMPORARY RESTRAINING ORDER

07/31/2019 9:00 AM
- Edward Vargas, Esq. present on for Plaintiff. Court noted there
  was no need for the Temporary Restraining Order (TPO)
  because there was no foreclosure sale. Statements by Mr.
  Vargas regarding foreclosure sale. Court indicated it couldn't
  do anything about it; however, if they tried anything again
  parties would have to come back and the Court would proceed
  accordingly. Colloquy between parties regarding case facts.
  Following colloquy, Ramin Zabeti spoke on behalf of Mr.
  Armstrong stating it appears the bank had something that
  resembles Mr. Armstrong's signature and driver's license which
  was used on loan documents. Statements by Mr. Vargas
  indicating fraud. Court noted MATTER TRAILED to look into
  getting the bank on the phone. MATTER RECALLED. Same
  parties present. Law Clerk advised parties the District
  Attorney's Office had been contacted, and noted the bank was
  located in California; however, they would be able to appear by
  phone that afternoon at 2:30 pm. COURT ORDERED, matter
  CONTINUED until the afternoon. 7/31/19 2:30 PM
  CONTINUED: MOTION FOR TPO

07/31/2019 2:30 PM
- Jeffery Allison, Esq. present for Deft. via Conference Call.
  Edward Vargas, Esq. present on behalf of Deft. Court advised
  Mr. Allison it placed the instant matter on calendar to figure out
  what was going on. Mr. Allison indicated they did not receive
  notice of the instant hearings. Court inquired if Mr. Allison had
  looked into the instant case at all. Mr. Allison advised there
  wasn't a foreclosure sale going forward and sale was on hold;
  therefore, as long as there was a hold nothing would take
  place. Colloquy between parties regarding facts of case. Court
  noted Mr. Armstrong stated the loan was paid in full a couple of
  years ago. Statements by Mr. Allison. Mr. Vargas advised Mr.
  Allison to follow the money and see who was making
  payments. Upon Court's inquiry, Mr. Allison indicated there was
  a Motion to Dismiss on for September 4, 2019; however, he
  had a conflict with date and would be requesting that Motion
  continued to the following week. COURT SO ORDERED. Court
  advised Mr. Allison to get any documents for Plaintiff to pursue
  information ahead of time. Mr. Allison requested that Plaintiff
  provide any documentation to show this might be fraud or
  identity theft, and include any conclusions that had been
  reached. Mr. Vargas indicated Deft. had police report, IRS
  identity theft claim and a claim with North Las Vegas Police
  Report. Mr. Vargas indicated he would send documents over.
  COURT DIRECTED Mr. Allison to take a look a the original
  note, where funds were released and who was making
  payments. COURT FURTHER ORDERED, Exparte Motion for
  a Temporary Restraining Order was hereby VACATED and
  Motion to Dismiss was continued. Partied agreed that order
  would be sufficient as opposes to an Order. 9/25/19 9:00 AM
  MOTION TO DISMISS

Parties Present
Return to Register of Actions

# EXHIBIT "11"

## Search Results  <u>Print</u>

You searched under: **Parcel Number** for: **139-09-217-099** with the document types of: **ALL DOCUMENTS** between: **1/1/1900** and **10/30/2019**

**Records found: 26**

Refresh |

| First Party Name | First Cross Party Name | Instrument # | Document Type | Modifier | Record Date | Parcel # | Remarks | Total Value |
|---|---|---|---|---|---|---|---|---|
| <u>INNOVATIONS AT HIDDEN CANYON INC</u> | SCHWARTZ, MITCHELL B | 199311190000001 | DEED | | 11/19/1993 8:00:00 AM | 139-09-217-099 | | 120575.0000 |
| <u>NATIONAL DEFAULT SERVICING CORPORAT</u> | NORWEST MORTGAGE CORPORATION | 199806300000961 | TRUSTEE DEED | | 6/30/1998 8:40:28 AM | 139-09-217-099 | | 129950.0000 |
| <u>HOUSING AND URBAN DEVELOPMENT</u> | ARMSTRONG, TYRONE K | 199812230001630 | DEED | | 12/23/1998 3:25:00 PM | 139-09-217-099 | | 120750.0000 |
| <u>ARMSTRONG, TYRONE</u> | TO WHOM IT MAY CONCERN | 200312230003211 | HOMESTEAD | Abandon | 12/23/2003 2:58:10 PM | 139-09-217-099 | | |
| <u>ARMSTRONG, TYRONE K</u> | FINANCE AMERICA LLC | 200312230003212 | DEED OF TRUST | | 12/23/2003 2:58:10 PM | 139-09-217-099 | | |
| <u>WELLS FARGO HOME MORTGAGE INC</u> | ARMSTONG, TYRONE K | 200401120003689 | SUBSTITUTION/RECONVEYANCE | | 1/12/2004 4:55:41 PM | 139-09-217-099 | | |
| <u>ARMSTRONG, TYRONE K</u> | NEW CENTURY MORTGAGE CORPORATION | 200412290002078 | DEED OF TRUST | | 12/29/2004 10:32:25 AM | 139-09-217-099 | | |
| <u>FINANCE AMERICA LLC</u> | ARMSTRONG, TYRONE K | 200501190005135 | SUBSTITUTION/RECONVEYANCE | | 1/19/2005 3:48:25 PM | 139-09-217-099 | | |
| <u>ARMSTRONG, TYRONE K</u> | BNC MORTGAGE INC | 200701250003978 | DEED OF TRUST | | 1/25/2007 2:08:21 PM | 139-09-217-099 | | |
| <u>RECONTRUST COMPANY NA</u> | ARMSTRONG, TYRONE K | 200702090000298 | SUBSTITUTION/RECONVEYANCE | | 2/9/2007 8:01:12 AM | 139-09-217-099 | | |
| <u>MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC</u> | US BANK NATIONAL ASSOCIATION EE | 201005060002258 | ASSIGNMENT | | 5/6/2010 11:20:06 AM | 139-09-217-099 | | 0.0000 |
| <u>US BANK NATIONAL ASSOCIATION EE</u> | COOPER CASTLE LAW FIRM LLP | 201005060002259 | SUBSTITUTION | TRUSTEE | 5/6/2010 11:20:06 AM | 139-09-217-099 | PG 1 BOTTOM MARGIN | 0.0000 |
| <u>ARMSTRONG, TYRONE</u> | COOPER CASTLE LAW FIRM LLP THE | 201005060002260 | BREACH & ELECTION TO SELL | | 5/6/2010 11:20:06 AM | 139-09-217-099 | | 0.0000 |
| | ARMSTRONG TYRONE K | 201210110001889 | DEFAULT | RESCISSION | | 139-09- | | 0.0000 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Refresh | |

| First Party Name | First Cross Party Name | Instrument # | Document Type | Modifier | Record Date | Parcel # | Remarks | Total Value |
|---|---|---|---|---|---|---|---|---|
| COOPER CASTLE LAW FIRM LLP | | | | | 10/11/2012 12:06:20 PM | 217-099 | | |
| US BANK NATIONAL ASSOCIATION EE | WESTERN PROGRESSIVE NEVADA INC | 201401210000722 | SUBSTITUTION | TRUSTEE | 1/21/2014 8:08:39 AM | 139-09-217-099 | TEXT IN THE RIGHT MARGIN PG 2 | 0.0000 |
| MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC | US BANK NATIONAL ASSOCIATION EE | 201504060000759 | ASSIGNMENT | | 4/6/2015 8:05:57 AM | 139-09-217-099 | | 0.0000 |
| ARMSTRONG, TYRONE K | WESTERN PROGRESSIVE-NEVADA INC | 201506120001252 | DEFAULT & ELECTION TO SELL | | 6/12/2015 9:06:33 AM | 139-09-217-099 | TEXT IN MARGIN | 0.0000 |
| ARMSTRONG, TYRONE K | | 201507290002758 | HOMESTEAD | | 7/29/2015 12:38:12 PM | 139-09-217-099 | | 0.0000 |
| ARMSTRONG, TYRONE | WESTERN PROGRESSIVE-NEVADA INC | 201509140000173 | CERTIFICATE FORECLOSURE MEDIATION NEVADA | | 9/14/2015 8:01:55 AM | 139-09-217-099 | | 0.0000 |
| ARMSTRONG, TYRONE K | WESTERN PROGRESSIVE-NEVADA INC | 201511240001981 | NOTICE OF TRUSTEE SALE | | 11/24/2015 1:06:50 PM | 139-09-217-099 | | 0.0000 |
| NEW CENTURY MORTGAGE CORPORATION | ARMSTRONG, TYRONE K | 201701190001205 | SUBSTITUTION/RECONVEYANCE | | 1/19/2017 10:28:53 AM | 139-09-217-099 | | 0.0000 |
| WESTERN PROGRESSIVE-NEVADA INC | ARMSTRONG, TYRONE K | 201801180000153 | DEFAULT | RESCISSION | 1/18/2018 8:02:18 AM | 139-09-217-099 | | 0.0000 |
| ARMSTRONG, TYRONE K | WESTERN PROGRESSIVE-NEVADA INC | 201805310000866 | DEFAULT & ELECTION TO SELL | | 5/31/2018 9:45:37 AM | 139-09-217-099 | | 0.0000 |
| ARMSTRONG, TYRONE K | WESTERN PROGRESSIVE-NEVADA INC | 201901300000205 | CERTIFICATE FORECLOSURE MEDIATION NEVADA | | 1/30/2019 8:02:27 AM | 139-09-217-099 | | 0.0000 |
| ARMSTRONG, TYRONE K | PROGRESSIVE, WESTERN | 201906130001519 | NOTICE OF TRUSTEE SALE | | 6/13/2019 1:10:03 PM | 139-09-217-099 | | 0.0000 |
| US BANK NATIONAL ASSOCIATION | ARMSTRONG, TYRONE KEITH | 201906270001426 | LIS PENDENS | | 6/27/2019 12:01:40 PM | 139-09-217-099 | | 0.0000 |