HEARING DATE AND TIME:  November 14, 2019 at 2:00 p.m.

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg
Scott Davidson

*Counsel for Lehman Brothers Holdings Inc.,*
*As Plan Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No.: 08-13555 (SCC) |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------------x

**REPLY BY PLAN ADMINISTRATOR TO RESPONSE BY CAPITAL
PARTNERS SECURITIES CO., LTD TO MOTION FOR AN ORDER IN AID OF
EXECUTION OF THE MODIFIED THIRD AMENDED JOINT CHAPTER 11
PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

REPLY .............................................................................................................................................. 4

    A.    The Plan Authorizes the Disgorgement Remedy ................................................. 4

    B.    The Plan Administrator is Not Seeking to Disallow or Reconsider Any Claims ................ 6

    C.    Capital Partners is Bound by the Exchange Rate Set Forth in the Plan .............................. 7

    D.    Equitable Estoppel Does Not Apply to the Facts of This Case ......................................... 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Bio Medica Corp. v. Bailey*,
    341 F.Supp.3d 142 (N.D.N.Y. 2018) ................................................................................... 3

*In re Boylan Int'l, Ltd.*,
    452 B.R. 43 (Bankr. S.D.N.Y. 2011) .................................................................................. 9

*Celli v. First Nat'l Bank of N. N.Y. (In re Layo)*,
    460 F.3d 289 (2d Cir. 2006) ............................................................................................... 9

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988) ........................................................................................................... 8

*In re Futter Lumber Corp.*,
    473 B.R. 20 (E.D.N.Y. 2012) ............................................................................................. 8

*In re Indesco Int'l, Inc.*,
    354 B.R. 660 (Bankr. S.D.N.Y. 2006) ................................................................................ 8

*Kosakow v. New Rochelle Radiology Assoc.*,
    274 F.3d 706 (2d Cir. 2001) ............................................................................................. 11

*In re Lehman Bros. Holdings Inc.*,
    591 B.R. 153 (Bankr. S.D.N.Y. 2018) ................................................................................ 7

*In re R&W Enters.*,
    181 B.R. 624 (Bankr. N.D. Fla. 1994) ............................................................................... 6

*In re Sims*,
    278 B.R. 457 (Bankr. E.D. Tenn. 2002) ............................................................................. 6

*Sure-Snap Corp. v. State St. Bank & Trust Co.*,
    948 F.2d 869 (2d Cir. 1991) ............................................................................................... 9

*U.S. v. Carr*,
    557 F.3d 93 (2d Cir. 2009) ................................................................................................. 8

*In re Vebeliunas*,
    332 F.3d 85 (2d Cir. 2003) ............................................................................................... 10

*In re Vick*,
    75 B.R. 248 (Bankr. E.D. Va. 1987) ................................................................................ 11

**Statutes**

11 U.S.C. § 502(j) ...................................................................................................................2, 6, 7

11 U.S.C. § 1127(b) ........................................................................................................................9

**Other Authorities**

BLACK'S LAW DICTIONARY (8th ed. 2004) ............................................................................4

DMSLIBRARY01\35553269.v1

Lehman Brothers Holdings Inc. ("**LBHI**" or the "**Plan Administrator**"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* ("**Plan**"), hereby submits this reply ("**Reply**") to the response ("**Response**") [ECF No. 59989] filed by Capital Partners Securities Co., Ltd. ("**Capital Partners**") to the Motion by the Plan Administrator[1] for an order in aid of LBHI's Plan. In support of this Reply, the Plan Administrator represents as follows:

### PRELIMINARY STATEMENT

1. Capital Partners admits that based on the provisions in Sections 8.13(a) and 8.13(d) of the Plan, it has been overpaid on its Allowed Guarantee Claim.[2] While many other similarly-situated LBT creditors with LBHI guarantees have returned their Excess Payments to the Plan Administrator,[3] Capital Partners has not. None of its litany of excuses have any merit.

2. Capital Partners' argument that the disgorgement remedy is not set forth in the Plan is just wrong. Section 8.13(a) of the Plan, among other things, references LBHI's subrogation remedy against future Distributions made by the Primary Obligor, but the calculation of the subrogated amount is reduced by "any amounts received by LBHI by way of disgorgement thereof." Disgorgement is therefore a distinct and separate path for recovery of Excess Payments and is not dependent on the subrogation remedy against the Primary Obligor. In other words, after an Allowed Guarantee Claim has been deemed satisfied in full, the Plan Administrator can recover Excess Payments either (a) through subrogation from future

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan or in the *Motion of the Plan Administrator For An Order In Aid Of Execution Of The Modified Third Amended Joint Chapter 11 Plan Of Lehman Brothers Holdings Inc. And Its Affiliated Debtors*, filed by the Plan Administrator on September 17, 2019 ("**Motion**") [ECF No. 59936].

[2] *See* Response, ¶¶ 12, 17, 20.

[3] Some of these similarly-situated creditors included Japanese claimants who already had turned over Excess Payments to their customers.

1

DMSLIBRARY01\35553269.v1

Distributions by the Primary Obligor,[4] or (b) through disgorgement from the claimant. In a similar vein, Section 8.13(f) of the Plan clearly provides that the Plan Administrator can recover Distributions by subrogation, but it also provides for Excess Payment recoveries by the separate remedy of disgorgement. Accordingly, Capital Partners' argument that the Plan Administrator waived its right to recover overpayments from a claimant through disgorgement because it agreed not to seek the subrogation remedy against a Primary Obligor is illogical and wrong.

3. Capital Partners' attempt to distinguish the cases under Section 502(j) of the Bankruptcy Code similarly falls flat. The last sentence of Section 502(j) provides for the separate remedy of recovery of overpayments (*i.e.*, disgorgement) without regard to whether the claim is being reconsidered. Capital Partners' attempt to distinguish the cases cited in the Motion because here, the Excess Payment calculation is based on distributions from two debtor estates, is a distinction without a difference. The Plan formula calculation of the Excess Payments is what governs—not the number of debtor estates included in such calculation.

4. Capital Partners' attempt to label this dispute as a garden variety "unjust enrichment" case is a detour to nowhere. The Plan Administrator is seeking to enforce a contractual provision of the Plan which permits the disgorgement remedy from a claimant who has received Excess Payments after its Allowed Guarantee Claim has been satisfied in full. The term "unjust enrichment" was used in the Motion to describe the improper result that would occur if the Excess Payments were not returned. In that context, the entity that received the

---

[4] Because of the settlement agreement between LBHI and LBT ("**LBT Settlement Agreement**"), the subrogation remedy is not available where LBT is the Primary Obligor. Thus, the Plan Administrator relies on the disgorgement remedy available to it under the Plan to ensure that Excess Payments are turned over to the Plan Administrator.

2

Excess Payment will have been unjustly enriched[5] at the expense of other LBHI creditors, who are the intended beneficiaries of disgorged Excess Payments.

5. Capital Partners' focus on Section 8.13(b) is correct, but it cannot enhance its argument by adding words like "further" that are not in that provision. Section 8.13(b) is an express prohibition for holders of an Allowed Guarantee Claim (like Capital Partners) from receiving Distributions that exceed their Allowed Guarantee Claim amount (after accounting for Distributions made on the Primary Claim). Significantly, this prohibition is not limited to "further" Distributions made by the Primary Obligor as Capital Partners alleges, nor is it limited by when the Distributions on the Primary Claim occur.[6] Essentially, Capital Partners agreed that its recovery from the LBHI estate would be capped, and its distribution potentially adjusted (by the remedy of disgorgement) depending on whether its Allowed Guarantee Claim was satisfied in full.

6. Finally, Capital Partners' equitable estoppel argument does not withstand scrutiny. To be invoked, equitable estoppel requires, among other things, (a) a false representation or concealed facts, and (b) a mismatch of information between the parties. None of those factors are present here. The Plan Administrator did not make a false representation or conceal facts and certainly Capital Partners knew how much it was owed, how much it was paid, and the relevant formula for calculating whether its Allowed Guarantee Claim was deemed

---

[5] "The 'essence' of unjust enrichment [is] a situation where 'one party is in possession of money or property that rightly belongs to another.'" *Am. Bio Medica Corp. v. Bailey*, 341 F.Supp.3d 142, 162 (N.D.N.Y. 2018) (quoting *Clifford R. Gray, Inc. v. LeChase Constr. Servs., LLC*, 819 N.Y.S.2d 182, 187 (3d Dept. 2006).

[6] Section 8.13(a) uses the phrase "future distributions" when describing the subrogation remedy. Section 8.13(e) uses the phrase "no Distributions shall thereafter be made" when describing what happens after an Allowed Guarantee Claim is satisfied in full. Section 8.13(b) does not use a "future" Distributions phrase when expressly barring overpayments to holders of Allowed Guarantee Claims.

3

satisfied in full. In other words, it had all the relevant information to know that it received an Excess Payment and was not entitled to retain it.[7]

## REPLY

A.   **The Plan Authorizes the Disgorgement Remedy**

7.   As set forth in the Motion, Section 8.13(a) of the Plan provides, in relevant part: "To the extent that an Allowed Guarantee Claim is deemed satisfied in full, LBHI shall be entitled to receive future Distributions or consideration on account of the corresponding Primary Claim as subrogee pursuant to Section 8.14(a) of the Plan to the extent of LBHI's Distribution on account of such Guarantee Claim *less any amounts received by LBHI by way of disgorgement thereof*." Plan, § 8.13(a) (emphasis added). This provision *limits LBHI's subrogation rights* in the event Excess Payments *had already been disgorged*[8] from a holder of an Allowed Guarantee Claim. Thus, the Plan explicitly confirms that there are at least two express remedies for an overpayment, and one of them—subrogation—should be reduced to the extent the other remedy, disgorgement, has already occurred. The fact that disgorgement functions as an offset to the subrogation amount can only mean that it is an independent remedy available to the Plan Administrator—*in addition to* subrogation. Another critical difference between these distinct remedies is that the subrogation remedy is brought against a different party (*i.e.*, the Primary Obligor) than disgorgement, which is brought against the holder of an Allowed Guarantee Claim.

---

[7] The maximum disgorgement claim against Capital Partners would be approximately $6.127 million ("**Maximum Amount**"), which is the amount paid by the Plan Administrator with respect to Capital Partners' Allowed Guarantee Claim. The most recent payment made by LBT to Capital Partners on account of the Plan Administrator's 19th distribution (made to LBT after the Motion was filed) should be added to the amount Capital Partners needs to disgorge (subject to the Maximum Amount).

[8] The Black's Law Dictionary definition of "disgorgement" is the "act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." Disgorgement, BLACK'S LAW DICTIONARY (8th ed. 2004). The term connotes a remedy imposed by one party as against another for the return of that wrongfully-held property.

4

8.     Capital Partners is correct that LBHI waived its subrogation rights as against LBT as an express condition of the LBT Settlement Agreement. But that waiver (a) was done solely with respect to LBT (not Capital Partners), and (b) was incorporated into the Plan (*see* Plan, § 6.5(b)(iii)) which also preserved the separate disgorgement remedy for the Plan Administrator. Bottom line: the subrogation waiver did not alter the Plan Administrator's right to recover Excess Payments received by a claimant.

9.     In negotiating the LBT Settlement Agreement, LBT made it clear that it did not want to be saddled with the administrative burden of addressing issues arising from the relationship between LBHI and holders of Allowed Guarantee Claims.[9] When LBHI agreed to accommodate LBT on its "administrative burden" concern and waive its subrogation remedy against LBT as part of the LBT Settlement Agreement, it did so while preserving the ability to recover Excess Payments by including in the Plan the disgorgement remedy against the Allowed Guarantee claimant. Thus, while the LBT Settlement Agreement eliminated one path to recovery of Excess Payments (*i.e.*, subrogation), it did not foreclose the Plan Administrator's other path of recovery—seeking disgorgement from holders of Allowed Guarantee Claims.

10.    Capital Partners has no answer as to why Section 8.13(f) of the Plan is not directly applicable. As set forth in the Motion (¶¶ 28, 30), Section 8.13(f) also explicitly contemplates a "disgorgement" remedy in the event of Excess Payments on an Allowed Guarantee Claim: "Any portion of any Distribution made by LBHI to the holder of an Allowed Guarantee Claim that is recovered pursuant to Section 8.13 or 8.14 of the Plan, whether by way of subrogation, ***disgorgement or*** otherwise, shall be treated as Available Cash of LBHI and distributed accordingly." (emphasis added). Thus, "subrogation" and "disgorgement" are two separate and

---

[9] There are thousands of bonds at issue in the LBT estate, which are in numerous different currencies. Some of the bondholders have Allowed Guarantee Claims in the LBHI case.

distinct remedies explicitly contemplated as available to the Plan Administrator to recover Excess Payments, along with any other remedy that may be applicable.

11.  Likewise, Capital Partners has no answer to the actual wording of Section 8.13(b) which is an express bar from it receiving Excess Payments on its Allowed Guarantee Claim after taking into account Distributions made by the Primary Obligor (LBT), whenever made.  In such circumstances, the Plan and, as described in the next section, the Bankruptcy Code, provide for the disgorgement remedy.

**B.    The Plan Administrator is Not Seeking to Disallow or Reconsider Any Claims**

12.  Capital Partners' argument that Section 502(j) of the Bankruptcy Code does not apply because the Plan Administrator is not seeking to have its claim reconsidered is a red herring.  The last sentence in Section 502(j), by its express language, stands independent from the "reconsideration of claim" provisions in Section 502(j):  "This subsection [502(j)] does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor."

13.  *In re R&W Enters.*, 181 B.R. 624 (Bankr. N.D. Fla. 1994), is directly on point. There, the Court ruled that this "***unrelated final sentence of Section 502(j)***" provides a disgorgement avenue for the trustee "as it preserves the Trustee's Bankruptcy Act powers to 'recover from a creditor any excess payment or transfer made to such creditor.'"  *Id.* at 636-37 (emphasis added).  *In re Sims*, 278 B.R. 457 (Bankr. E.D. Tenn. 2002) is in accord:  "It is clear from this statement [the last sentence in Section 502(j)] that a trustee's authority to recover overpayments from a creditor is implied or contemplated by the Bankruptcy Code notwithstanding the absence of a specific Bankruptcy Code provision expressly granting such authority."  *Id.* at 477.

6

14. Capital Partners attempts to distinguish these cases because the excess payment made in those cases were from a single estate. But it does not explain why that fact is relevant, and it is not. An excess distribution calculated by the formula in the Plan from whatever source the Plan deems relevant is the relevant criteria for determining whether disgorgement is appropriate.[10]

C. **Capital Partners is Bound by the Exchange Rate Set Forth in the Plan**

15. Capital Partners admits that "its Allowed Guarantee Claims have been deemed satisfied in full under Section 8.13(b) of the Plan as a result of the combined distributions it has received from LBHI and LBT." Response, ¶ 17. Having made that determinative concession, Capital Partners' arguments that there was something improper or unfair (in hindsight) about Section 8.13(d) of the Plan fixing the exchange rate to measure distributions as of the Confirmation Date are entirely irrelevant.

16. Capital Partners seems to imply that LBHI sought to take advantage of a natural disaster to disadvantage Capital Partners. Nonsense. *First*, Section 8.13(d) of the Plan was a provision negotiated with LBHI's creditors, and it was approved by the Court years ago when the Court confirmed the Plan. Creditors, including Capital Partners, could have objected to the language in Section 8.13(d) or appealed the Confirmation Order; they did not. The Plan provision is thus binding on all creditors, including Capital Partners. *Second*, Section 8.13(d) did not single out the Yen currency; it applies to over 20 other currencies and concerns thousands of securities. *Third*, the exchange rate for the Yen, or any other currency involved, could have

---

[10] Capital Partners' citation to this Court's decision in *In re Lehman Bros. Holdings Inc.*, 591 B.R. 153 (Bankr. S.D.N.Y. 2018) (*see* Response, ¶ 29), does not support its position. In that case, the Plan Administrator sought an order authorizing it to issue stock under LBHI's pre-Effective Date charter. But the Plan prohibited LBHI from issuing new, non-voting stock to any party other than the Plan Trust, and the Plan Administrator could not point to a provision under the Bankruptcy Code that provided for such stock issuance. In contrast, here, the Plan and the Bankruptcy Code specifically contemplate the disgorgement remedy sought in the Motion. *See* Plan, §§ 8.13(a), 8.13(f); 11 U.S.C. § 502(j).

7

moved the other way and been in the creditors' favor. This Court previously recognized that possibility. *See* February 19, 2015 Hr'g Tr. [ECF No. 48880], at 74:2-4 ("If the exchange rate had gone the other way, right, and you looked at it on the distribution date, you could have a windfall.").[11] No party could predict in advance which way (and the degree) the rates for each currency would move after the Confirmation Date. To create certainty for all parties, the Plan fixed the valuation of all Plan distributions on the Confirmation Date. This Court held that was proper pursuant to the Confirmation Order;[12] it is the law of the case. *See, e.g.*, *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) ("when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case" (citation omitted)); *U.S. v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009) ("when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case").

17. While Capital Partners acknowledges the import of Section 8.13(d) of the Plan,[13] it argues that it would not be appropriate to apply that Plan provision in this case. However, the Confirmation Order is a final, non-appealable Order. To the extent that Capital Partners seeks to bar the application of Section 8.13(d) of the Plan, such an objection is barred by the doctrine of *res judicata*. *See, e.g.*, *In re Indesco Int'l, Inc.*, 354 B.R. 660, 664 (Bankr. S.D.N.Y. 2006) (a confirmation order is "treated as a final judgment with *res judicata* effect"); *In re Futter Lumber Corp.*, 473 B.R. 20, 29 (E.D.N.Y. 2012) ("it is beyond contention, that a confirmed plan of

---

[11] The February 19, 2015 hearing concerned a claims objection by the Plan Administrator, wherein it argued that the creditor had been paid in full on its Allowed Guarantee Claim. There, the creditor argued that it had only received 74% of its Allowed Guarantee Claim, and not 100%. Relying on Section 8.13(d) of the Plan, the Court disagreed, overruled the objection and granted the Plan Administrator's claim objection. *See* February 19, 2015 Hr'g Tr., at 68:19-80:7.

[12] The Court also found it proper when granting the Plan Administrator's claims objection at the February 19 2015 hearing. *See id.*

[13] *See* Response, ¶ 20 ("While the calculation [of the Excess Payment] **technically applies the exchange rate set out in the Plan** . . . ." (emphasis added)).

8

reorganization constitutes a final judgment on the merits that is entitled to preclusive effect under the doctrine of *res judicata*"); *see also Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991) (a confirmed plan "bind[s] its debtors and creditors as to *all* the plan's provisions, and all related, property or non-property based claims which could have been litigated in the same cause of action").[14]

18.  In essence, Capital Partners is seeking a modification to a provision of a substantially consummated Plan. There is no justification for it to be exempt from the application of Section 8.13(d). Nor does the Court have the authority to modify a substantially consummated Plan. *See* 11 U.S.C. § 1127(b) ("The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan ***and before substantial consummation of such plan*** . . . ." (emphasis added)); *see also In re Boylan Int'l, Ltd.*, 452 B.R. 43, 48 (Bankr. S.D.N.Y. 2011) ("After a plan has been substantially consummated, modification is no longer an option except to the extent permitted by section 1127(e), which only applies to individual debtors."). Accordingly, Capital Partners is bound by Section 8.13(d) of the Plan.

---

[14] To determine whether the doctrine of *res judicata* bars a subsequent action, courts in the Second Circuit consider whether (i) the prior decision was final judgment on the merits; (ii) the litigants were the same parties; (iii) the prior court was of competent jurisdiction; and (iv) the causes of action were the same. *Celli v. First Nat'l Bank of N.Y. (In re Layo)*, 460 F.3d 289, 292 (2d Cir. 2006) (citations omitted). "In the bankruptcy context, [courts] ask as well whether an independent judgment in a separate proceeding would impair, destroy, challenge, or invalidate the enforceability or effectiveness of the reorganization plan." *Id.* Here, the four elements necessary for the doctrine of *res judicata* to apply are present: (1) the Confirmation Order is a final order. It expressly provides that "[a]ll parties have had a full and fair opportunity to litigate all issues raised in the objections . . ., or which might have been raised, and the objections . . . have been fully and fairly litigated." (Confirmation Order ¶ QQ); (2) The identity of the parties is the same. Capital Partners was a party to the Plan confirmation process. It was on notice that it would be bound by the Confirmation Order and the Plan as the Confirmation Order expressly provides that the "Plan and its provisions shall be binding on . . . any entity acquiring or receiving property or a Distribution under the Plan, and any holder of a Claim against or Equity Interest in the Debtors. . . ." *Id.* at ¶ 8; (3) It cannot be disputed that the Court had jurisdiction to enter the Confirmation Order and (4) It cannot be disputed that the causes of action at issue during the Plan confirmation process and those raised in the Response are the same. For the purpose of a *res judicata* analysis, causes of action are the same if the second action involves the same claim or nucleus of operative fact as the first. *See In re Layo*, 460 F.3d at 292, 293 (holding that confirmation proceedings and a subsequent adversary proceeding to challenge certain aspects of the confirmed plan were identical for res judicata purposes where the creditor had the "motive and opportunity" to raise its objection "at or before the time that the plan was confirmed.").

9

**D.    Equitable Estoppel Does Not Apply to the Facts of This Case**

19.    Capital Partners' equitable estoppel argument is meritless. The factors to establish an equitable estoppel claim in this Circuit are:

> Under New York law, the elements of equitable estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The parties asserting estoppel must show with respect to themselves: (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions.

*In re Vebeliunas*, 332 F.3d 85, 93-94 (2d Cir. 2003).[15]

20.    Capital Partners fails to satisfy the first element of the equitable estoppel test as it cannot show conduct that amounts to a false representation or the concealment of a material fact. It points to the Guarantee Claims Procedure Motion and Order, and argues that the Plan Administrator knew all along that there could be Excess Payments. If anything, these pleadings ***highlighted*** that there could be Excess Payments, and the Plan Administrator was seeking procedures to protect against such a situation. The Plan Administrator never said that there could never be an Excess Payment. In fact, while Capital Partners relies on the Guarantee Claims Procedure Motion and Order, it fails to acknowledge that the Satisfied Guarantee Claims Objection filed on the exact same date as these other pleadings expressly reserved the Plan Administrator's "rights to recover amounts paid on account of Satisfied ISIN Claims in excess of amounts permitted by the Plan." Satisfied Guarantee Claims Objection, ¶ 14. There simply was no false representation or concealment of material facts that would warrant a finding of equitable estoppel.

---

[15] Section 15.14 of the Plan provides that, "[e]xcept to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflicts of law thereof."

21.     Moreover, as to Capital Partners, it cannot show that it lacked knowledge of, or the means to understand, the true facts here.  The relevant facts are: (i) the amount of Capital Partners' Allowed Guarantee Claim and the amount of its Primary Claim—facts clearly known to Capital Partners; (ii) knowledge of the applicable Plan provisions—as creditors of LBHI who are bound by the Plan, Capital Partners knew of the applicable Plan provisions that are binding on them; and (iii) the exchange rate for the relevant Lehman structured securities as of the Confirmation Date—this was known by Capital Partners.  Capital Partners thus had, or had access to, all of the relevant knowledge concerning the issues raised by the Motion, which defeats any claim of equitable estoppel.[16]

22.     The cases cited by Capital Partners in support of its equitable estoppel argument are easily distinguishable.  In *In re Vick*, 75 B.R. 248 (Bankr. E.D. Va. 1987), the equitable estoppel test was based on the law in the Fourth Circuit, and it relied on different factors than the New York test.  Among other things, Capital Partners had the same information as the Plan Administrator and knew or should have known it had received Excess Payments.

23.     *Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d 706 (2d Cir. 2001), the other case cited by Capital Partners, is also inapposite.  That case concerned a claim under the Family Medical Leave Act ("**FMLA**").  The issue was whether the plaintiff had worked enough hours to qualify under the FMLA.  However, the defendant-employer was under a legal duty to inform its employees (including the plaintiff) of the protection of the FMLA by posting required notices or including required information in a handbook.  *Id.* at 726.  The court found there was a

---

[16] While Capital Partners asserts that it has no record of receiving the Plan Administrator June 2018 Letter or the Plan Administrator November 2018 Letter, it acknowledges receiving the Plan Administrator July 2018 E-mail and the Plan Administrator January 2019 E-mail (*see* Response, at p. 11 n. 10).  Both e-mails attached the applicable demand letters sent to Capital Partners.  Capital Partners contention that it was dubious of the authenticity of this correspondence is itself dubious.  It certainly could have sought to verify the authenticity of the correspondence as it had communicated with the LBHI estate on other matters, but instead it simply ignored them.

question of fact whether the required information was provided; if it was not, the defendant could be equitably estopped from arguing the plaintiff was ineligible under the FMLA. *Id.* at 727. *Kosakow* is based on the defendant withholding information known only to it. Here, as noted, Capital Partners had all the information it needed to calculate the overpayment on its Allowed Guarantee Claim.

WHEREFORE, the Plan Administrator respectfully requests that the Court enter the proposed order attached to the Motion as **Exhibit "K** and grant it such other and further relief as it deems just and proper.

Dated: November 8, 2019
       New York, New York

    /s/ Arthur Steinberg
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Counsel for Lehman Brothers Holdings Inc.,
As Plan Administrator*

12