HEARING DATE AND TIME: January 14, 2020 at 11:00 a.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus
Garrett A. Fail

*Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re                                              :    **Chapter 11 Case No.**
                                                   :
**LEHMAN BROTHERS HOLDINGS INC., et al.**          :    **08-13555 (SCC)**
                                                   :
                   Debtors.                        :    **(Jointly Administered)**
------------------------------------------------------------x

**PLAN ADMINISTRATOR'S OBJECTION
TO MOTIONS OF TYRONE ARMSTRONG (I) TO TAKE LEAVE
TO FILE LATE PROOF OF CLAIM AND (II) FOR RELIEF FROM
AUTOMATIC STAY TO ALLOW CIVIL LITIGATION TO PROCEED**

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan")[1] for the entities in the above-referenced chapter 11 cases, files this objection (the "Objection") to the *Motion to Take Leave to File Late Proof of Claim* (ECF No. 60011) (the "Motion to File Late Claim") and *Motion for Relief from Automatic Stay to Allow Civil Litigation to Proceed* (ECF No. 60012) (the "Motion for Relief from Stay" and together with the Motion to File Late Claim, the "Motions") filed by Tyrone Armstrong ("Armstrong") and respectfully represents as follows:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**Preliminary Statement**

1.  On June 19, 2019, Armstrong filed a complaint (the "Verified Complaint") in the Eighth Judicial District Court of Clark County, Nevada (the "State Court Action") against various defendants, including BNC Mortgage LLC ("BNC").[2] Armstrong's complaint in the State Court Action alleges claims of wrongful foreclosure, quiet title, declaratory relief, slander of title, intentional infliction of emotional distress, and fraud.

2.  On September 20, 2019, BNC filed a notice of bankruptcy with the Nevada State Court. Subsequently, on October 1, 2019, the Nevada State Court stayed Armstrong's complaint with respect to BNC pursuant to section 362 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.  On October 24, 2019, Armstrong filed a proof of claim against BNC (the "Proof of Claim"), in which he asserted a claim for $0.00.

4.  Subsequently, Armstrong filed the Motion for Relief from Stay, in which he seeks relief from the automatic stay to proceed with the State Court Action against BNC. Armstrong asserts—without any basis whatsoever—that "upon [Armstrong's] information and belief, there is available insurance coverage by which to cover the claims of the Movant against the Debtor, and allowing the civil litigation to proceed will cause no harm to the Debtor or the bankruptcy estate." *See* Motion for Relief from Stay, ¶ 3.

5.  At the same time, and somewhat inconsistently, Armstrong filed the Motion to File Late Claim, in which he seeks permission to file a late proof of claim in BNC's Chapter 11 Case—approximately twelve years after BNC ceased operating, eleven years after the Commencement Date (as defined hereinafter), and more than ten years after the bar date

---

[2] Notably, BNC filed for bankruptcy on January 9, 2009—approximately eleven (11) years ago.

established in these chapter 11 cases. Armstrong asserts that he "seeks damages solely from the Debtor's insurance coverage. . . [and] [t]herefore, the bankruptcy estate will not be affected by Movant's state court claims." *See* Motion to File Late Claim, ¶ 9. Armstrong states that "he was a secured creditor and selected "zero" for amount of damages [in the proof of claim] because the amount of damages, if any, that will be awarded to the Movant against the Debtor in the state court action is uncertain and expected to be satisfied with Debtor's insurance coverage." *Id*. ¶ 10.

6.  As discussed in further detail below, and in the *Declaration of Claire Leonard In Support of Plan Administrator's Objection to Motions of Tyrone Armstrong (I) To Take Leave To File Late Proof of Claim and (II) For Relief From Automatic Stay to Allow Civil Litigation to Proceed*, filed contemporaneously herewith (the "Leonard Declaration"), Armstrong is incorrect in his belief that there is an insurance policy available to cover Armstrong's claims against BNC in the State Court Action. There is simply no available insurance that covers Armstrong's claims. The premise underlying the Motions—that any damages awarded to Armstrong in the State Court Action will be covered by insurance and will not affect BNC's bankruptcy estate—is, therefore, incorrect. On the contrary, if Armstrong is allowed to file an unliquidated proof of claim at this juncture and to proceed with the State Court Action against BNC, any damages that will be awarded to Armstrong against BNC in the State Court Action will have to be paid from the bankruptcy estate, which might prejudice BNC's other creditors.

7.  Further, Armstrong acknowledges that "[i]n the event Debtor's insurance policy will not cover the claims, the Movant seeks only judgment to be entered in the state court with enforcement left to the Bankruptcy Court." *See* Motion for Relief from Stay, ¶ 3. In other words, even if there is no insurance coverage, Armstrong seeks authority from this Court to lift the automatic stay to proceed with the State Court Action against BNC, to seek money damages from

BNC in State Court, and to enforce such judgment against BNC's bankruptcy estate. The Plan Administrator adamantly objects to such relief.

8.      Allowing Armstrong to pursue his alleged claim against BNC would require the Plan Administrator to defend the claim and to consume limited estate resources, all with respect to a claim that is likely time barred and is unlikely to succeed on the merits. Granting the relief requested would risk opening the floodgates to claims by thousands of BNC borrowers who, given the passage of nearly a decade since the Bar Date, have had time to concoct claims against BNC. Allowing such claims would delay closing the BNC case by months, if not years. Particularly given that BNC is on the verge of closing its chapter 11 case and dissolving, the Motions should be denied with prejudice.

## General Background

9.      Commencing on September 15, 2008 (the "Commencement Date"), and periodically thereafter, LBHI and certain of its affiliates, including BNC, each filed a voluntary petition commencing the chapter 11 cases. Although BNC's chapter 11 case commenced on January 9, 2009, it actually ceased operating its business in November, 2007.

10.     On July 2, 2009, the Court entered the *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form* (ECF No. 4271) (the "Bar Date Order") setting forth procedures for filing proofs of claim in these chapter 11 cases and establishing September 22, 2009 (the "Bar Date") as the general deadline for filing proofs of claim in the Chapter 11 Cases.

11.     The Notice of Bar Date attached as Exhibit A to the Bar Date Order prominently stated in bold-face type that "any creditor who fails to file a Proof of Claim in

4

accordance with the Bar Date Order on or before the Bar Date . . . specifying the applicable Debtor and other requirements set forth in the Bar Date Order, for any claim such creditor holds or wishes to assert against the Debtors, will be forever barred, estopped, and enjoined from asserting such claim (and from filing a Proof of Claim with respect to such claim)." *See* Notice of Bar Date, ¶ 6. In accordance with the Bar Date Order, the Notice of Bar Date was published on August 4, 2009 in the Wall Street Journal, the New York Times, the International Herald Tribune, and the Worldwide Editions of the Financial Times.[3]

12. On December 6, 2011, the Court entered the *Order Confirming Modified Third Amended Plan of Lehman Brothers Holdings Inc. And Its Affiliated Debtors* (ECF No. 23023) (the "Confirmation Order").

13. The Confirmation Order provided that, pursuant to section 13.7 of the Plan, all injunctions or stays arising under or entered during the chapter 11 cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Closing Date. *See* Confirmation Order ¶ 54.

14. The Confirmation Order also provided for the following injunction (the "Plan Injunction"):

> Pursuant to Section 13.5 of the Plan, except as expressly provided in the Plan, herein, or a separate order of the Court or as agreed to by a Creditor and the Plan Administrator (on behalf of a Debtor), all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors (whether proof of such Claims or Equity Interests has been filed or not) and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, are permanently enjoined, on and after the Effective Date, solely with respect to any Claims and Causes of Action that will be or are extinguished or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in

---

[3] See *Affidavit of Publication of Notice of Deadlines for Filing Proofs of Claims filed by Shai Waisman on behalf of Lehman Brothers Holdings Inc.* (ECF No. 9930).

>
> a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties; (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan.

*See* Confirmation Order ¶ 55.

15. Further, the Confirmation Order provided that "[a]fter the Effective Date, … a proof of Claim relating to a prepetition Claim may not be filed … without the authority of the Court." *See* Confirmation Order ¶ 86. The Plan became effective on March 6, 2012.

**Armstrong's Alleged Claim**

16. Prior to the Commencement Date, on January 25, 2007, a deed of trust (the "Deed of Trust") was recorded against a residential real property located in Clark County, Nevada that is commonly known as 3713 Brentcove Drive, North Las Vegas, Nevada 89032 (the "Property"). The Deed of Trust identified BNC Mortgage, Inc. (predecessor entity to BNC) as "Lender" and Armstrong as "Borrower." The Deed of Trust further identified Mortgage Electronic Registration Systems, Inc. ("MERS") as the beneficiary "acting solely as a nominee for Lender and Lender's successors and assigns." The Deed of Trust referenced a promissory note signed by the Borrower (Armstrong), dated January 18, 2007, which stated that the Borrower (Armstrong) owed the Lender (BNC) $237,000.00 plus interest (the "Loan"), to be paid in regular periodic

6

payments and to be paid in full no later than February 1, 2037.[4] The Loan was originally serviced by JPMorgan Chase Bank, National Association ("JPM"), and then the servicing transferred to Ocwen Loan Servicing LLC ("Ocwen") on or about April 30, 2012.

17. The Loan was sold by BNC to Lehman Brothers Bank, FSB ("LBB") shortly after origination, thereby ending BNC's ownership interest in the Loan. LBB sold the Loan to LBHI on or around March 30, 2007, which then sold it to the Structured Asset Securities Corporation ("SASCO") pursuant to a mortgage loan sale and assignment agreement dated May 1, 2007. SASCO deposited the Loan into a trust known as Structured Asset Securities Corporation Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2007-BC3 pursuant to the trust agreement dated May 1, 2007.

18. On April 26, 2010, the Deed of Trust was assigned by MERS (the "Notice of Assignment of Deed of Trust") to U.S. Bank National Association, as Trustee of the Structured Asset Securities Corporation Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2007-BC3 ("U.S. Bank") and recorded in Clark County, Nevada, on May 6, 2010. Thus, as of May 2007, at the latest, BNC had no further interest in the Loan or the Deed of Trust.[5]

19. Pursuant to the Verified Complaint, Armstrong denies that he applied for a mortgage with BNC and challenges the authenticity of the Deed of Trust. Verified Complaint ¶ 31.[6] Armstrong argues that he never received the Loan and that he never made any payments to BNC. Verified Complaint ¶ 33.[7] Further, Armstrong argues that the Deed of Trust is invalid and unenforceable because it is supported by false or fraudulent documents. Verified Complaint ¶ 14.

---

[4] A copy of the Deed of Trust is attached as Exhibit B to the Leonard Declaration.
[5] A copy of the Notice of Assignment of Deed of Trust is attached as Exhibit C to the Leonard Declaration.
[6] Notably, Armstrong's signatures on the Deed of Trust and the related promissory note appear to be identical to Armstrong's signature on the Verified Complaint.
[7] Given that BNC was not the servicer of the Loan, a borrower such as Armstrong would not have paid BNC directly. Instead, payments would have been made to JPM and then to Ocwen.

7

20. Even if, as Armstrong alleges, he did not apply for the Loan, nor know of the Deed of Trust's existence in 2007, it is incontrovertible that he knew about the Loan and the Deed of Trust years before he commenced the State Court Action. On May 6, 2010, nearly a decade before Armstrong commenced the State Court Action, defendants in the State Court Action (other than BNC) recorded a Notice of Default on the Property "premised on a promise to pay BNC," following which, Armstrong made multiple requests to obtain a certified copy of the Deed of Trust. *See* Verified Complaint ¶ 36-38.[8] Similarly, on December 20, 2016, Armstrong received a Deed and Encumbrance Report, which "reflected the BNC mortgage as a *second mortgage* on the property." *See* Verified Complaint ¶ 50 (emphasis in original). In fact, Armstrong alleges that he was denied a loan because of the existence of the BNC Deed of Trust. *See* Verified Complaint ¶ 50. Armstrong has known about the Deed of Trust since at least 2010, nearly ten years prior to filing the Motions.

## Argument

### A. The Court Should Not Permit Armstrong to File Late Proof of Claim

21. Armstrong requests permission to file a late claim against BNC—approximately eleven years after BNC filed for bankruptcy, more than ten years after the Bar Date established in these chapter 11 cases, and more than seven years after the effective date of the Plan. Armstrong, however, has failed to establish cause to allow him to file a late claim at this very late stage of these chapter 11 cases.[9]

---

[8] The Notice of Default was rescinded on October 11, 2012 and was recorded again on June 12, 2015.
[9] Armstrong's situation is not that different from that of claimant Rex Wu, whose request to file a late claim was denied by this Court (ECF No. 59801). Like Mr. Wu, Armstrong contends that he learned of the facts giving rise to his asserted claim after the Bar Date. And so, like Mr. Wu, Armstrong's request to file a late claim should be denied.

8

22. In exercising its discretion during the course of these chapter 11 cases to disallow hundreds of late-filed claims and to deny numerous requests for permission to file late claims, this Court has properly focused on (a) whether any delay in filing was in the creditor's control, (b) the impact on the administration of these mega cases, and (c) the impact on other creditors, notwithstanding the potential validity of the late or new claims. *See e.g., In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 120 (Bankr. S.D.N.Y. 2010), aff'd sub nom. *CVI GVF (Lux) Master S.a.r.l. v. Lehman Bros. Holdings Inc.*, 445 B.R. 137 (S.D.N.Y. 2011). Here, application of each of these factors militates in favor of denial of the Motion to File Late Claim.

23. <u>Control</u>: As indicated above, the Deed of Trust was recorded against the Property on January 25, 2007. The Deed of Trust was assigned to U.S. Bank on April 26, 2010, and recorded on May 6, 2010. Armstrong filed his complaint in the State Court Action on June 19, 2019—approximately twelve years after the Deed of Trust was recorded and approximately nine years after it was assigned to U.S. Bank. Most importantly, Armstrong did not file his claim against BNC and the related Motion to Allow Late Claim until nearly ten years after he learned about the existence of the Loan and the Deed of Trust. Under these circumstances, any delay was clearly within Armstrong's control. Armstrong cannot seriously argue otherwise.

24. <u>Impact on administration</u>: The Court has repeatedly recognized the deleterious impact of new claims on the administration of these mega cases. The Plan Administrator need not repeat all of the arguments it has made in the past in detail here. "The prejudice to the Debtors is not traceable to the filing of any single additional claim but to the impact of permitting exceptions that will encourage others to seek similar leniency." *In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 126 (Bankr. S.D.N.Y. 2010), aff'd sub nom. *CVI GVF (Lux) Master*

9

*S.a.r.l. v. Lehman Bros. Holdings Inc.*, 445 B.R. 137 (S.D.N.Y. 2011).[10] Granting the Motion to File Late Claim will open the floodgates for numerous similarly-situated, individual holders of potential mortgage-related claims against BNC to file motions to allow late-filed claims. Armstrong ignores the incremental administrative expense required for analysis and any objection to each newly-asserted claim. As remaining amounts available for distribution continue to decrease over time, the proportion of expense to creditor recovery continues to increase exponentially. Armstrong's assertion that filing a late proof of claim "will not unduly prejudice Debtor and . . . will not substantially impact the judicial proceedings" in these chapter 11 cases is pure *ipse dixit*.

25. Further, Armstrong's statement that "he did not wish to disturb the proceedings of the Bankruptcy Court . . . [and] has shifted his position in state court and now seeks damages solely from Debtor's insurance coverage," *see* Motion to File Late Claim, ¶ 9, is inconsistent with the relief he seeks in the Motion to File Late Claim— Armstrong is seeking authorization to file a late claim.[11]

26. In addition to the passage of more than a decade since the Bar Date, denial of the Motion to File Late Claim is warranted here, given the status of BNC's chapter 11 case. The last disputed claims against BNC were resolved just two months ago, when the Court approved a compromise and settlement between BNC and certain creditors (ECF No. 59955). Subsequent to that date, holders of general unsecured claims were paid 100% of their claims plus postpetition interest.

---

[10] "Creditors act at their peril where they fail to adequately investigate and pursue their rights." *Id.* Cf. *In re Hooker Invs., Inc.*, 937 F.2d 833, 840 (2d Cir. 1991) (stating a deadline for asserting claims is more than a "procedural gauntlet" and functions as "an integral part of the reorganization process."); *In re Keene Corp.*, 188 B.R. 903, 907 (Bankr. S.D.N.Y. 1995) (same).

[11] The Plan Administrator notes, however, that the Proof of Claim is for $0, which is puzzling, to say the least.

27. <u>Impact on creditors</u>: Armstrong asserts that "other creditors cannot be prejudiced if no previous proof of claim has been filed." *See* Motion to File Late Claim, ¶ 10. Clearly, this statement is wrong and reflects a fundamental misunderstanding of the facts. As reflected on the BNC claims docket, there are other holders of allowed claims against BNC. "Creditors must be able to learn what they will receive under a Plan . . . [f]ailure to [identify the creditor body] prejudices the entire community of interest . . ." *See In re Waterman S.S. Corp.*, 59 B.R. 724, 728 (Bankr. S.D.N.Y. 1986). Moreover, it is appropriate for the Court to take into account not only the interests of BNC creditors, but also the interests of the creditors of the Debtors.

28. Armstrong's failure to take any action to pursue his alleged claim against BNC for nearly ten years, in addition to rendering the claim time barred under applicable Nevada law, also warrants barring his claims under the equitable doctrine of laches.[12] In *In re Drexel Burnham Lambert Group, Inc.*, 151 B.R. 674, 684 (Bankr. S.D.N.Y. 1993), the district court affirmed the application of laches, finding that unreasonable delay was established by the two years that elapsed between the date the claimant became aware of its claim and the date it sought to enforce its rights against the debtor. The *Drexel* court found prejudice to the debtor because the claim "would consume a significant portion of the remaining reserves" and "by a substantial factor materially dilute other disputed claims which had been properly asserted and were awaiting liquidation out of the remaining undistributed assets." *In re Drexel Burnham Lambert Group, Inc.*, 157 B.R. 532, 539 (S.D.N.Y. 1993). Likewise, Armstrong's delay of nearly ten years and the fact

---

[12] Under Nevada law, there is a two year statute of limitations for actions for slander of title as well as for any action for intentional infliction of emotional distress. NRS 11.190(4)(c), (e). A five-year statute of limitations exists for actions founded upon the title to real property, though there must be a seizure or dispossession of the property for such a claim to exist, which is not the case here. NRS 11.070. Given the passage of twelve years since the Deed of Trust was executed, most if not all of Armstrong's claims are time-barred under Nevada law.

11

that the BNC estate has completed its distributions to creditors support the application of laches here.

29. Accordingly, the Plan Administrator respectfully submits that the Court should deny the Motion to File Late Claim.

### B. The Court Should Not Grant Relief from Automatic Stay

30. Following the consummation of a confirmed chapter 11 plan, courts consider a motion to lift the automatic stay as a motion to modify the plan injunction. *See, e.g.*, *In re Worldcom, Inc.*, 2006 WL 2270379, at *2, n.3 (S.D.N.Y. Aug. 4, 2006). Parties seeking relief from the plan injunction must satisfy the same standard applicable to a motion to lift the automatic stay pursuant to section 362 of the Bankruptcy Code. *See, e.g.*, *In re Worldcom, Inc.*, No. 02-13533, 2007 WL 841948, at *5 (Bankr. S.D.N.Y. 2007) ("Although the factors set forth in *Sonnax* pertain to determining 'cause' with respect to a request for relief from the automatic stay rather than relief from or modification of the Plan Injunction, the Court finds that the same principles of 'cause' would also apply in the context of the Plan Injunction."); *In re Fucilo*, No. 00-36261 (CGM) (Bankr. S.D.N.Y. Jan. 24, 2002) ("Determining whether relief from the permanent injunction is warranted under appropriate circumstances should be analyzed pursuant to a cause standard. Such a cause standard is found in *In re Sonnax Industries, Inc.*, 907 F.2d 1280 (2d Cir. 1990).") (internal citations omitted).

31. The automatic stay affords "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Protection*, 474 U.S. 494, 503 (1986); *see also In re Drexel Burnham Lambert Group Inc.*, 113 B.R. 830, 836-37 (Bankr. S.D.N.Y. 1990). The automatic stay maintains the status quo to protect a debtor's ability to control the sale or other disposition of property of the estate. 3 Collier on Bankruptcy ¶

362.03 (Richard Levin & Henry J. Sommer eds. 16th ed.).  The automatic stay "is necessary to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the process of reorganization." *Fidelity Mortgage Inv. v. Camelia Builders, Inc.*, 550 F.2d 47, 53 (2d Cir. 1976).  Additionally, the automatic stay prevents the state-law "race to the courthouse" and is intended to "allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000) (internal quotation omitted).  Indeed, "[t]he automatic stay prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding." *In re AP Indus.*, 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990).  In this regard, the automatic stay "promot[es] equal creditor treatment and giv[es] the debtor a breathing spell." *In re Pioneer Commercial Funding Corp.*, 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990).

32.　　Section 362(d)(1) of the Bankruptcy Code provides that a court may grant relief from the automatic stay "for cause."  11 U.S.C. § 362(d)(1).

33.　　The Second Circuit has established a set of twelve factors in *Sonnax* (the "<u>Sonnax Factors</u>") that have become the standard by which courts in the Second Circuit consider whether to modify the automatic stay.[13]  *See In re Lehman Bros. Holdings Inc.*, 435 B.R. 122, 138

---

[13] The *Sonnax* Factors are:
(1) whether relief would result in a partial or complete resolution of the issues;
(2) lack of any connection with or interference with the bankruptcy case;
(3) whether the other proceeding involves the debtor as a fiduciary;
(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
(5) whether the debtor's insurer has assumed full responsibility for defending it;
(6) whether the action primarily involves third parties;
(7) whether litigation in another forum would prejudice the interests of other creditors;
(8) whether the judgment claim arising from the other action is subject to equitable subordination;
(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;
(10) the interests of judicial economy and the expeditious and economical resolution of litigation;

WEIL:\97322629\12\58399.0011

(S.D.N.Y. 2010) ("*Sonnax* . . . is routinely referenced as the leading relief from stay precedent in this Circuit."), *aff'd sub nom. Suncal Cmtys. I LLC v. Lehman Commercial Paper, Inc.*, 402 F. App'x 634 (2d Cir. 2010).

34. Although the *Sonnax* Court outlined twelve (12) factors, courts need not consider each factor, but may consider only the factors that are relevant to the particular case. *See In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 526 (Bankr. S.D.N.Y. 1996) ("A court should . . . use only the factors that are deemed relevant . . . ."). In fact, the *Sonnax* Court itself considered only four of the twelve factors as relevant in that case. *Sonnax*, 907 F.2d at 1286. Additionally, courts need not assign equal weight to each factor, and have discretion in weighing the factors against one another. *RCM Global*, 200 B.R. at 526 ("A court should apply these factors on a case-by-case basis . . . assigning to each factor whatever weight the court feels is appropriate.").

35. The Second Circuit has held that the party seeking to lift or modify the automatic stay bears the initial burden to show cause as to why the stay should be modified or lifted and "[i]f the movant fails to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *Sonnax*, 907 F.2d at 1285. Once the movant has shown cause, the party opposing the motion must show that it is entitled to the continuing protections of the automatic stay. *See, e.g., Enron*, 306 B.R. at 476 (citing *In re M.J. & K. Co.*, 161 B.R. 586, 590 (Bankr. S.D.N.Y. 1993)).

36. Armstrong asserts that five of the twelve *Sonnax* factors are relevant in this case and weigh in favor of lifting the automatic stay to allow Armstrong to proceed with the State

---

(11) whether the parties are ready for trial in the other proceeding; and
(12) impact of the stay on the parties and the balance of harms.
*Sonnax*, 907 F.2d at 1286.

14

Court Action. The Plan Administrator disagrees with Armstrong's analysis of the *Sonnax* factors.[14]

37. <u>Factor 1 – Partial or Complete Resolution of the Issues</u>. This factor weighs against lifting the automatic stay under the circumstances, as the relief requested would result in only partial resolution of the issues. Specifically, even if Armstrong were to prevail in the State Court Action, he would still have to return to this Court to enforce a claim arising from any judgment rendered in his favor.

38. <u>Factor 2 – Interference With the Bankruptcy Case</u>. Armstrong asserts that he only seeks to liquidate his claims in the State Court Action to recover under the applicable insurance policy and from other non-debtor sources. As noted above, the Motions are inconsistent on this issue. *Cf.* Motion to File Late Claim, ¶ 9 *with* Motion for Relief from Stay, ¶ 3. In other words, it seems Armstrong seeks authority to enforce any judgment in the State Court Action against BNC's bankruptcy estate. Given the substantial consummation of the Plan as to BNC, granting stay relief will interfere with the conclusion of BNC's chapter 11 case.

39. <u>Factor 4 – Specialized Tribunal</u>. Armstrong commenced the State Court Action against BNC in Nevada state court. As that court is not a specialized tribunal, factor 4 weighs against modifying the automatic stay.

40. <u>Factor 5 – Insurance</u>. There is no insurance policy that covers Armstrong's claims against BNC in the State Court Action. Armstrong's underlying assumption that any damages awarded to Armstrong in the State Court Action will be covered by insurance and will not affect BNC's bankruptcy estate, therefore, is incorrect. Consequently, factor 5 does not support modifying the automatic stay.

---

[14] *Sonnax* factors 3, 8, and 9 are inapplicable and will not be addressed.

15

41.     <u>Factor 6 – Action Primarily Involves Third Parties</u>.  The State Court Action asserts claims against six defendants other than BNC.  However, the only substantive claim related to BNC's involvement in the Loan relates to the origination in 2007, *at least twelve years ago*, which does not primarily involve claims against third parties.  Accordingly, factor 6 does not support modifying the automatic stay.

42.     <u>Factor 7 – Impact on Other Creditors</u>.  Armstrong asserts that lifting the stay will not prejudice other creditors.  This is clearly wrong.  If Armstrong is allowed to proceed with the State Court Action against BNC (and subsequently to file a proof of claim against BNC), defending against the claims will necessarily deplete the estate's limited resources and any damages that will be awarded to Armstrong against BNC in the State Court Action will be paid from the bankruptcy estate to the detriment of BNC's other stakeholders.  Any new claims against BNC at this late stage of the chapter 11 cases will potentially impact and prejudice the existing creditors that filed timely proofs of claim and have already received distributions from BNC under the Plan.  Factor 7, therefore, supports denial of the Motion for Relief from Stay.

43.     <u>Factor 10 – Judicial Economy and Expeditious Resolution</u>.  Armstrong has neither alleged nor proven that the State Court Action would be resolved expeditiously.  Moreover, if Armstrong were to prevail in the State Court Action and were to seek distribution on a claim against BNC under the Plan, this Court would become embroiled in a lengthy and time consuming process of managing the disgorgement of distributions by BNC creditors and reapportionment of BNC's assets to its creditors.  Accordingly, factor 10 weighs against modifying the automatic stay.

44.     <u>Factor 11 – Readiness for Trial</u>.  The State Court Action was filed approximately six months ago, and has not yet reached the discovery stage.  As a result, the parties are not ready for trial.  Factor 11, therefore, weighs against modifying the automatic stay.

45. <u>Factor 12 – Balance of Harms</u>. Finally, Armstrong asserts that denying his request to lift the automatic stay will deny him the opportunity to prosecute his claims against BNC and will impose substantial hardship on him. Regardless of the purported merits of Armstrong's claim, it is quite clear that Armstrong did not act expeditiously in seeking to enforce his alleged claims. The holders of allowed claims against BNC, who timely filed claims before the Bar Date and otherwise complied with their obligations under the Plan and other orders of this Court, should not be penalized at this late date. Nor should the creditors of LBHI who stand to benefit from the modest dividend paid by BNC to LBHI. Moreover, even if Armstrong's Motion for Relief from Stay is denied, he will nonetheless have the ability to prosecute his claims against the other defendants, which are the parties with current interests in the Loan and related foreclosure proceedings.

46. Accordingly, the Plan Administrator respectfully submits that Armstrong has not satisfied his burden under *Sonnax* and that the Court should deny the Motion for Relief from Stay.

**Conclusion**

47. Prior to filing this objection, the Plan Administrator attempted to reach a consensual resolution with Armstrong. The Plan Administrator informed Armstrong that there is no insurance policy that covers his claims. The Plan Administrator also made it clear to Armstrong that it will object to the Motions to the extent that Armstrong seeks to recover any money damages from BNC and to any late-filed claim that Armstrong wishes to file against BNC. The Plan Administrator indicated that it would agree to limited relief from the automatic stay to allow Armstrong to proceed against the other defendants in the State Court Action and to withdraw the Proof of Claim. Unfortunately, Armstrong continues to believe—without any factual basis—that

17

insurance coverage must be available and that he should be allowed to liquidate his claims against BNC in the State Court Action and later to file such claims against BNC.

48.   For the reasons set forth above, the Plan Administrator respectfully requests entry of an order denying the Motions in their entirety with prejudice and granting the Plan Administrator such other or further relief as may be just.

Dated:  January 7, 2020
        New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus
Garrett A. Fail

*Attorneys for Lehman Brothers Holdings Inc. and Certain of Its Affiliates*