**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus
Garrett A. Fail

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                  :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

----------------------------------------------------------------x

**DECLARATION OF CLAIRE LEONARD**
**IN SUPPORT OF OBJECTION TO MOTIONS OF TYRONE ARMSTRONG (I) TO**
**TAKE LEAVE TO FILE LATE PROOF OF CLAIM AND (II) FOR RELIEF FROM**
**AUTOMATIC STAY TO ALLOW CIVIL LITIGATION TO PROCEED**

Pursuant to 28 U.S.C. § 1746, I, Claire Leonard, declare:

1.      I am over the age of 18 years and make these statements of my personal

knowledge based on my personal experience, my review of business records of Lehman Brothers

Holdings Inc. ("LBHI" or the "Plan Administrator"), BNC Mortgage LLC ("BNC"), and/or

certain of their affiliates (collectively, the "Chapter 11 Estates"), my consultation with other

employees of and advisors to the Chapter 11 Estates, and/or the exhibits attached hereto. If

called to testify, I could testify to the truth of the matters set forth herein.

2.     I submit this Declaration in support of the *Plan Administrator's Objection to Motions of Tyrone Armstrong (I) to Take Leave to File Late Proof of Claim and (II) for Relief From Automatic Stay to Allow Civil Litigation to Proceed* (the "Objection").[1]

3.     I am a Vice President and Assistant Secretary of both LBHI and BNC and have been employed at the Chapter 11 Estates for over ten years.

4.     I am thus fully familiar with the facts underlying the Objection, which I approved prior to its filing.  I adopt the representations contained in the Objection, as if set forth in full and at length in this Declaration.

**Procedural Background**

5.     On June 19, 2019, Armstrong filed a complaint (the "Verified Complaint") in the Eighth Judicial District Court of Clark County, Nevada (the "State Court Action") against various defendants, including BNC Mortgage LLC ("BNC").  A copy of the Verified Complaint (without exhibits) is attached hereto as Exhibit A.  Armstrong's complaint in the State Court Action alleges claims of wrongful foreclosure, quiet title, declaratory relief, slander of title, intentional infliction of emotional distress, and fraud.

6.     On September 20, 2019, BNC filed a notice of bankruptcy with the Nevada State Court.  Subsequently, on October 1, 2019, the Nevada State Court stayed Armstrong's complaint with respect to BNC pursuant to section 362 of the Bankruptcy Code.

7.     In response, Armstrong filed the Proof of Claim.  He also filed the Motion for Relief from Stay in order to allow the State Court Action to proceed against BNC.  At the same time, Armstrong filed the Motion to File Late Claim, in which he seeks permission to file the Proof of Claim in BNC's chapter 11 case.

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Objection.

WEIL:\97328136\8\58399.0011

8.      I have consulted with my colleagues at LBHI and BNC responsible for insurance matters and I have been advised that there is no insurance policy that would cover Armstrong's claims against BNC in the State Court Action.

### Armstrong's Alleged Claim

9.      It is my understanding that prior to the Commencement Date, on January 25, 2007, a deed of trust (the "Deed of Trust"), was recorded against a residential real property located in Clark County, Nevada that is commonly known as 3713 Brentcove Drive, North Las Vegas, Nevada 89032 (the "Property").  A copy of the Deed of Trust is attached hereto as Exhibit B.  The Deed of Trust identified BNC Mortgage, Inc. (the predecessor to BNC) as "Lender" and Armstrong as "Borrower."  The Deed of Trust further identified Mortgage Electronic Registration Systems, Inc. ("MERS") as the beneficiary "acting solely as a nominee for Lender and Lender's successors and assigns."  The Deed of Trust referenced a promissory note signed by the Borrower (Armstrong), dated January 18, 2007, which stated that the Borrower (Armstrong) owed the Lender (BNC) $237,000.00 plus interest (the "Loan"), to be paid in regular periodic payments and to be paid in full no later than February 1, 2037.  The Loan was originally serviced by JPMorgan Chase Bank, National Association ("JPM"), and then the servicing was transferred to Ocwen Loan Servicing LLC ("Ocwen") on or about April 30, 2012.

10.      I further understand that the Loan was sold by BNC to Lehman Brothers Bank, FSB ("LBB") shortly after origination, thereby ending BNC's ownership interest in the Loan.  LBB then sold the Loan to LBHI on or around March 30, 2007, which then sold it to the Structured Asset Securities Corporation ("SASCO") pursuant to a mortgage loan sale and assignment agreement dated May 1, 2007.  SASCO deposited the Loan into a trust known as

3

Structured Asset Securities Corporation Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2007-BC3 pursuant to the trust agreement dated May 1, 2007.

11.     It is also my understanding that, on April 26, 2010, the Deed of Trust was assigned by MERS (the "Notice of Assignment of Deed of Trust") to U.S. Bank National Association, as Trustee of the Structured Asset Securities Corporation Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2007-BC3 ("U.S. Bank") and recorded in Clark County, Nevada, on May 6, 2010.  A copy of the Notice of Assignment of Deed of Trust is attached hereto as Exhibit C.  Thus, as of May 2007, at the latest, BNC had no further interest in the Loan or the Deed of Trust.

12.     Although I am not a handwriting expert, the signatures on the Deed of Trust and on the related promissory note appear to be identical to Armstrong's signature on the Verified Complaint.

13.     Based upon my review of the Verified Complaint, Armstrong has known about the Deed of Trust since May 6, 2010, when defendants in the State Court Action (other than BNC) recorded a Notice of Default on Armstrong's property.  See Verified Complaint ¶ 36-38.  Further, on December 20, 2016, Armstrong received a Deed and Encumbrance Report, which "reflected the BNC mortgage as a second mortgage on the property."  See Verified Complaint ¶ 50 (emphasis in original).

14.     BNC completed its distributions to its creditors on October 3, 2019. Currently, the BNC estate has approximately $2.1 million in cash and cash equivalents, which is expected to be used to repay certain post-petition creditors and fund BNC's remaining expenses. Any remaining funds will be dividended to BNC's parent, Lehman Brothers Bancorp Inc. and, ultimately, to LBHI.

15.     Assuming the Motions are denied, the Plan Administrator anticipates filing a final decree with respect to BNC's chapter 11 case within the next month.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 7th day of January 2020.

/s/ Claire Leonard_____
Claire Leonard

WEIL:\97328136\8\58399.0011

Electronically Filed
6/19/2019 12:01 PM
Steven D. Grierson
CLERK OF THE COURT

**MISC**

1   TYRONE KEITH ARMSTRONG
2   3713 Brentcove Drive
    North Las Vegas, Nevada 89032
3   Telephone: (702) 491-8426
    Email: performanceoneautomotive@gmail.com
4   *Plaintiff Pro Se*

5                           **DISTRICT COURT**

6
                         **CLARK COUNTY, NEVADA**
7

8   TYRONE KEITH ARMSTRONG,            )   Case No:
9                                      )   Dept No:
                  Plaintiff,           )
10                                     )
11                                     )   **VERIFIED COMPLAINT FOR:**
    vs.                                )
12                                     )   **1. WRONGFUL FORECLOSURE;**
13  U.S. BANK NATIONAL ASSOCIATION,    )
    as Trustee for Structured Asset Securities  )   **2. QUIET TITLE;**
14  Corporation Mortgage Pass-Through  )
    Certificates, Series 2007-BC3; OCWEN )   **3. DECLARATORY RELIEF;**
15  LOAN SERVICING, LLC; PHH           )
16  MORTGAGE CORPORATION;              )   **4. SLANDER OF TITLE;**
    WESTERN PROGRESSIVE-NEVADA,        )
17  INC. BNC MORTGAGE, INC. DOES 1     )   **5. INTENTIONAL INFLICTION OF**
    through 20; and ROE BUSINESS       )      **EMOTIONAL DISTRESS; AND**
18  ENTITIES 1 through 20;             )
19                                     )   **6. FRAUD**
                  Defendants.          )
20  _____  )

21                    **VERIFIED COMPLAINT**
22     **(ARBITRATION EXCEPTION CLAIMED: TITLE TO REAL PROPERTY)**

23          COMES NOW Plaintiff Pro Se TYRONE KEITH ARMSTRONG, and complains of

24  Defendants as follows:

25                          **I. PARTIES**

26  1.    Plaintiff TYRONE KEITH ARMSTRONG ("Plaintiff"), is, and was at all relevant times
27
28  herein, a resident and owner of certain real property located in Clark County, Nevada.

                               -1-

2.      Defendant U.S. BANK NATIONAL ASSOCIATION as Trustee for Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2007-BC3 ("U.S. Bank"), is, and was at all relevant times herein, a business entity of unknown form doing business in Clark County, Nevada.

3.      Defendant OCWEN LOAN SERVICING, LLC ("Ocwen"), is, and was at all relevant times herein, a foreign limited liability company incorporated in the State of Delaware, doing business in Clark County, Nevada, registered with our Secretary of State as Business ID: NV20021078677.

4.      Defendant PHH MORTGAGE SERVICES aka PHH MORTGAGE CORPORATION ("PHH"), is, and was at all relevant times herein, a foreign corporation incorporated in the State of New Jersey, doing business in Clark County, Nevada, registered with our Secretary of State as Business ID: NV19861005108.

5.      Defendant WESTERN PROGRESSIVE-NEVADA, INC. ("Western"), is, and was at all relevant times herein, a foreign corporation incorporated in the State of Delaware, doing business in Clark County, Nevada, registered with our Secretary of State as Business ID: NV20121471611.

6.      Upon information and belief Defendant BNC MORTGAGE, INC. ("BNC") is, and was at all relevant times herein, a defunct foreign corporation from the State of Delaware, doing business in Clark County, Nevada, registered with our Secretary of State as Business ID: NV19981309027.

7.      All other persons unknown claiming any right, title, estate, lien or interest in the real property described in the complaint adverse to Plaintiff's ownership, or any cloud upon Plaintiff's title thereto.

-2-

8.    Plaintiff does not know the true names and capacities of the defendants sued herein as DOES 1 through 20 and ROE BUSINESS ENTITIES 1 through 20 and, therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and therefore alleges that each of the Defendants designated as DOES or ROE BUSINESS ENTITIES is responsible in some manner for the events and occurrences referred to in this Complaint, claims some right, title or interest in the Property described below that is subject and subordinate to the rights, interests, and asserted ownership of Plaintiff described herein. Plaintiff will amend this Complaint to insert the true names and capacities of DOES 1 through 20 and/or ROE BUSINESS ENTITIES 1 through 20, when the same have been ascertained and to join Defendants in this action.

9.    Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, Defendants U.S. Bank, Ocwen, PHH, Western, BNC, DOES 1-20 and ROE BUSINESS ENTITIES 1-20 are the agents, employees and/or joint-venturers of each other, and in doing the things alleged herein below, were acting with the course and scope of such agency, employment and/or joint venture. Defendants U.S. Bank, Ocwen, PHH and Western are hereinafter collectively referred to as the "Foreclosing Defendants."

## II. JURISDICTION

10.    This action relates to the ownership and title to certain residential real property located in Clark County, Nevada that is commonly known as 3713 Brentcove Drive, North Las Vegas, Nevada 89032; APN: 139-09-217-099; and legally described as LOT 1, BLOCK 4 of CHEYENNE RIDGE-UNIT 2A, PLAT BOOK 54, PAGE 67, of the public records of Clark County, Nevada (hereinafter the "Property"). Accordingly, jurisdiction and venue are appropriate in Clark County, Nevada.

-3-

11.    Plaintiff's *Petition for Foreclosure Mediation Assistance*[1] filed in the Eighth Judicial District Court on July 18, 2018 is an in rem or quasi in rem proceeding[2] in which Defendants U.S. Bank and Western entered into a *Stipulation for a 90-Day Stay of Foreclosure With a Certificate to Issue in 90-Days.* No notice of entry of order has yet been entered following said *Stipulation and Order* and the register of actions currently reflects that the case remains open.

12.    Defendant U.S. Bank's unlawful detainer related to the Property filed in North Las Vegas Justice Court,[3] detailed herein below, was an in rem or quasi in rem proceeding and further subjects the instant action to the prior-exclusive-jurisdiction-doctrine.

13.    This Court has continuing, exclusive jurisdiction over this matter because: (*i*) the Foreclosure Mediation state court case remains open; (*ii*) the state court *90-day Stay* is tolled pending a notice of entry of order; (*iii*) the state court *Stay* will commence and continue to remain in effect 90 days after a notice of entry of order is filed; (*iv*) an unlawful detainer filed by Defendant U.S. Bank in North Las Vegas was posted on Plaintiff's Property; and (*v*) Plaintiff responded to Defendants' unlawful detainer action. This Court should deny Defendants' anticipated request to remove the instant case to federal court.

### III. INTRODUCTION

14.    This is an action brought by Plaintiff for declaratory judgment, injunctive and equitable relief, and for compensatory, special, general and punitive damages. Plaintiff, the homeowner, disputes the title and ownership of the real property in question, which is the subject of this action, in that a purported lender alleges to have ownership of Plaintiff's mortgage note and/or

---

[1] Dist. Ct. Case No: A-18-777819-FM.

[2] *Chapman v. Deutsche Bank Nat'l Trust Co.,* 302 P.3d 1103 (Nev. May 30, 2013).

[3] North Las Vegas Justice Court Case No: 15CN000006.

-4-

1   Deed of Trust and, that the claim, although facially valid, is invalid and unenforceable because it

2   is supported by false or fraudulent documents and licensing.  Defendants are attempting to

3   unlawfully sell, assign and/or transfer its purported ownership/security interest in a promissory

4   note and deed of trust related to the Property, and, thus, do not have lawful ownership or a

5   security interest in Plaintiff's home which is described in detail herein.  For these reasons, the

6
7   Court should issue a preliminary and permanent injunction against the Notice of Trustee Sale

8   scheduled on **July 19, 2019** at **9:00am** against Plaintiff's home and quiet title to the Property in

9   Plaintiff's name.

10              IV.  **ALLEGATIONS REGARDING BNC MORTGAGE, INC.**

11  15.     On May 02, 1995, BNC originally incorporated in the State of California as reflected by
12
13  the official records of the California Secretary of State.

14  16.     On October 15, 1997, BNC registered in the State of Delaware as a foreign corporation

15  from California, as reflected by the official records of the Delaware Secretary of State.

16  17.     On March 11, 1998, the official records of the California Secretary of State reflect a
17
18  merger between BNC, a California corporation, and BNC, a Delaware corporation, with BNC, a

19  Delaware corporation, as the surviving entity.

20  18.     On March 11, 1998, BNC registered in the State of California as a foreign corporation

21  from Delaware, as reflected by the official records of the California Secretary of State.

22  19.     On March 20, 1998, BNC, a Delaware corporation, withdrew its domestic corporation
23
24  and was no longer active in the State of Delaware, as reflected by the official records of the

25  Delaware Secretary of State.

26  20.     On August 17, 1998, BNC registered in the State of Nevada as a foreign corporation from

27  Delaware as reflected by the official records of the Nevada Secretary of State.

28

-5-

21.     On August 17, 1998, BNC filed a Foreign Qualification with the Nevada Secretary of State, under penalty of perjury, and declared that BNC is in good standing in the State of Delaware.

22.     In accordance with the Foreign Qualification filed by BNC, the State of Nevada Division of Mortgage Lending approved BNC with an exempt company registration and permitted BNC to originate loans in Nevada.

23.     BNC renewed its annual foreign registration in Nevada and continued to transact business in this State until 2007, as reflected by the official records of the Nevada Secretary of State.

24.     At all times relevant herein, BNC was not properly licensed to originate mortgage loans in Nevada due to BNC's status as a defunct corporation in its home state of Delaware.

## V. **GENERAL ALLEGATIONS**

25.     On December 23, 1998, Plaintiff obtained fee simple title to the Property, against the whole world. The Deed of Trust identified Norwest Mortgage, Inc. as the lender and was recorded as document number 199812230001631 in the official records of Clark County, Nevada.

26.     On December 23, 2003, Plaintiff refinanced his home, the Deed of Trust identified Finance America, LLC as the lender and was recorded as document number: 200312230003212 in the official records of Clark County, Nevada.

27.     On December 29, 2004, Plaintiff refinanced his home and the Deed of Trust identified New Century Mortgage Corporation as the lender and was recorded as document number: 200412290002078 in the official records of Clark County, Nevada. The note reflects that the amount of the mortgage was $224,000.00 at a 6.5% interest rate. The trustee of record was Southwest Title.

-6-

28.    As a result of the real estate crisis of 2007, New Century Mortgage Corporation was acquired by Countrywide Financial Corporation, and then acquired by Bank of America (hereinafter collectively referred to as "Bank of America").

29.    On January 25, 2007, a Deed of Trust was recorded against the Property, identified the lender as BNC, and recorded as document number: 200701250003978 in the official records of Clark County, Nevada. The purported BNC note was in the amount of $237,000.00 with a 6.4% interest rate. The trustee of record is reflected as T.D. Service Company. The escrow company was identified as National Alliance Title Company.

30.    Defendant U.S. Bank alleges to be the beneficiary of the BNC note/deed, Defendant Ocwen services the purported loan, Defendant PHH is partners with or possesses a joint interest with Ocwen, and Defendant Western records notices of default and trustee sales on behalf of the Foreclosing Defendants.

31.    Plaintiff categorically denies that he applied for a mortgage with BNC and challenges the authenticity of said note/deed of trust.

32.    Neither Bank of America nor Plaintiff received the $237,000.00 benefit from the purported BNC (second) mortgage. The Foreclosing Defendants have failed to produce proof of payment and have further failed to produce the original BNC note/deed of trust for inspection.

33.    At no time has Plaintiff made a payment to BNC, ever.

34.    According to the Nevada Secretary of State, the escrow company where the BNC mortgage was purportedly executed, National Alliance Title Company, was permanently revoked on or about May 31, 2008.

-7-

35.      On February 24, 2009, Plaintiff's mortgage was subject to a consent judgment[4] entered between Countrywide Financial Corporation (aka New Century/Bank of America) and the State of Nevada related to mortgages that originated with Countrywide or its subsidiaries.

36.      On May 06, 2010, the Foreclosing Defendants, through the Cooper Castle Law Firm, interfered with Plaintiff's use of the Property and recorded a Notice of Default and Election to Sell as document number: 201005060002260 in the official records of Clark County, Nevada. The notice of default was premised on a promise to pay BNC.  Said notice of default identified U.S. Bank as the beneficiary, Ocwen as the loan servicer and Western as the trustee.

37.      As a result of the initial non-judicial foreclosure proceedings against Plaintiff's home, he suffered from a lack of sleep, anxiety, depression, lack of appetite and loss of productivity related to his employment.

38.      Notwithstanding numerous requests made by Plaintiff pursuant to NRS 106.295, the Foreclosing Defendants either concealed or failed to produce the original or a certified copy of the BNC note, mortgage and any endorsements, either blank or to a specific party.

39.      On October 11, 2012, the Foreclosing Defendants, through the Cooper Castle Law Firm, rescinded said Notice of Default and Election to Sell as document number: 201210110001889 in the official records of Clark County, Nevada.

40.      On January 07, 2015, Defendant U.S. Bank filed an unlawful detainer as part of North Las Vegas Justice Court case number 15CN000006, naming only Anthony Morris, an alleged tenant. On or about said date, a copy of said unlawful detainer was posted on Plaintiff's Property. yet failed to name Plaintiff.

---

[4] District Court Case No: A583442.

-8-

41.    On April 23, 2015, Plaintiff filed a pleading with the North Las Vegas Justice Court that indicates in relevant part, that Plaintiff is the owner and Anthony Morris has no interest in the Property.

42.    On May 14, 2015, Plaintiff appeared at a hearing related to the unlawful detainer in North Las Vegas Justice Court. The register of actions reflects that Plaintiff was "present but is not party to this case. Off calendar."

43.    On June 12, 2015, the Foreclosing Defendants once again interfered with Plaintiff's use of the Property and recorded a Notice of Default and Election to Sell as document number: 201506120001252 in the official records of Clark County, Nevada.

44.    As a result of the second non-judicial foreclosure proceedings against Plaintiff's home, he suffered from a lack of sleep, anxiety, depression, lack of appetite and loss of productivity related to his employment.

45.    Plaintiff once again requested the Foreclosing Defendants to produce the original or certified copy of the note, mortgage and/or assignments. Defendants either concealed or failed to produce the same.

46.    On November 24, 2015, a Notice of Trustee Sale was recorded by Defendant Western on behalf of the Foreclosing Defendants as document number: 201511240001981 in the official records of Clark County, Nevada.

47.    On or about July 04, 2016, the Internal Revenue Service responded to a complaint filed by Plaintiff regarding the theft of his identity and confirmed "We verified your documents to support your identity theft report."

48.    On or about October 26, 2016, Plaintiff satisfied or settled his mortgage with the true holder of the note and deed of trust, Bank of America.

-9-

49.    Plaintiff received written correspondence from Bank of America that reflects "*We received a full payoff for this loan*" (attached as exhibit "1"). Along with said written correspondence, Bank of America enclosed the "original" note[5] and deed of trust originating from New Century Mortgage Corporation stamped "paid in full" (attached as exhibit "2").

50.    On December 20, 2016, Plaintiff received a Deed and Encumbrance Report in connection with an attempt to refinance his Property. Said report reflected the BNC mortgage as a *second mortgage* on the property. Plaintiff was denied for the loan due to the BNC encumbrance.

51.    The BNC mortgage was not used to extinguish the Bank of America mortgage.

52.    Upon information and belief, a title report and appraisal of the Property were required prior to issuance of the alleged BNC mortgage.

53.    BNC purportedly issued a second mortgage in the amount of $237,000.00 on a Property that was encumbered by a $224,000.00 first lien by Bank of America; creating a total indebtedness of $461,000.00 secured by a Property that, according to BNC, last appraised for $237,000.00.

54.    On January 19, 2017, Bank of America as the current beneficiary recorded a Substitution of Trustee and Full Reconveyance in favor of Plaintiff as document number: 201701190001205 in the official records of Clark County, Nevada (attached as exhibit "3").

55.    On February 15, 2017, Plaintiff filed a police report with the North Las Vegas Police Department claiming that his identity had been stolen to obtain the BNC mortgage.

56.    On January 18, 2018, the Defendants' second Notice of Default and Election to Sell was rescinded by Defendant Western and recorded as document number: 201801180000153 in the official records of Clark County, Nevada.

---

[5] Original note available for inspection upon request.

-10-

57.     On May 31, 2018, the Foreclosing Defendants, through Defendant Western, recorded a third Notice of Default and Election to Sell as document number: 201805310000866 in the official records of Clark County, Nevada.

58.     As a result of the third foreclosure proceedings against Plaintiff's home, he suffered from a lack of sleep, anxiety, depression, lack of appetite and loss of productivity related to his employment.

59.     On July 18, 2018, Plaintiff filed his *Petition for Foreclosure Mediation* in district court.

60.     On September 18, 2018, a stipulation and order was entered for a 90-day stay of foreclosure with a certificate to issue in 90-days. No **notice of entry** of the stipulation and order appears in the case file.

61.     On November 04, 2018, Plaintiff submitted a complaint to the Nevada Secretary of State Notary Division and alleged that he did not execute his signature on the BNC note that was purportedly witnessed by Roseanne Ehring, a Nevada notary. Plaintiff requested to inspect the notary's journal to determine whether Plaintiff's signature was present. Plaintiff's complaint to the Notary Division details the due diligence he conducted to locate the notary, but to no avail.

62.     On November 29, 2018, the Notary Division responded to Plaintiff's complaint, found that the notary's appointment expired in 2008 and that the former notary is not required to produce her journal more than seven years after expiration of her appointment.

63.     On December 10, 2018, Plaintiff conducted due diligence in an attempt to inspect documents in connection with the purported BNC loan application and to identify the individuals that participated at closing. Plaintiff made attempts to locate the escrow company that is reflected on the BNC deed of trust, National Alliance Title Company. All locations in Clark County were out of business.

-11-

64. According to the Nevada Secretary of State, National Alliance Title Company was a foreign corporation from California that was permanently revoked on or about May 31, 2008.

65. In a further attempt to locate the purported BNC mortgage records, a business entity search with California Secretary of State revealed no record for National Alliance Title Company.

66. To date, Defendants have failed to produce adequate evidence of the original or certified copy of the Note, Mortgage and/or Assignments.

67. Plaintiff has openly and continuously been in exclusive possession and control of the Property since December 23, 1998; maintained and paid all utilities including, but not limited to water, sewer, trash, electric, gas, HOA fees, property taxes, homeowner's insurance, and made numerous improvements to the Property.

68. On June 13, 2019, the Foreclosing Defendants recorded a Notice of Trustee Sale as document number: 201906130001519 in the official records of Clark County, Nevada.

69. Unless and until enjoined and restrained by order of this court, Defendants will cause grave and irreparable injury to Plaintiff in that he will be deprived of his home.

70. Plaintiff has no adequate remedy at law for the continuing conduct in that it would be impossible for Plaintiff to determine the precise amount of damage he will suffer if Defendants' conduct is not restrained, and that Plaintiff will be deprived of the Property, his home of 20 years, which deprivation cannot be compensated in damages.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (WRONGFUL FORECLOSURE)

71. Plaintiff hereby incorporates each and every paragraph above as though fully set forth herein.

-12-

72.    Plaintiff was not in default when the Foreclosing Defendants exercised the power of sale because Plaintiff tendered the amount of the secured indebtedness to Bank of America or was excused from tendering and Plaintiff received a satisfaction of mortgage from Bank of America (see exhibits "1-3," inclusive).

73.    Plaintiff was not in default when the Foreclosing Defendants exercised the power of sale because *at no time* did Plaintiff enter into a residential mortgage agreement with BNC for the power of sale to be conferred upon or exercised by the Foreclosing Defendants.

74.    Plaintiff has repeatedly challenged the authenticity of the BNC note and, notwithstanding Plaintiff's numerous requests via certified mail, the Foreclosing Defendants have either concealed or failed to produce the original or certified copy of the note, mortgage and/or assignments required pursuant to NRS 106.295.

75.    Assuming *arguendo*, even if Defendants did have the ability to produce an original note/mortgage (and they do not), BNC *was not properly licensed* to originate loans in Nevada, or elsewhere, because at all relevant times herein BNC was a defunct corporation in its home state of Delaware.

76.    The note by which the foreclosing bank purportedly took a beneficial interest in the deed of trust is not merely voidable, but *void ab initio*; and the Foreclosing Defendants have no legal right to foreclose on the Property. The void note is the proximate cause of actual injury and Plaintiff has been harmed or prejudiced as a result.

77.    Plaintiff has no other plain, speedy or adequate remedy and the injunctive relief prayed for below is necessary and appropriate at this time to prevent irreparable loss to Plaintiff. Plaintiff has suffered and will continue to suffer in the future unless Defendants' wrongful

-13-

conduct is restrained and enjoined because real property is inherently unique and it will be

impossible for Plaintiff to determine the precise amount of damage he will suffer.

## SECOND CLAIM FOR RELIEF
### (QUIET TITLE)

78.     Plaintiff hereby incorporates each and every paragraph above as though fully set forth

herein.

79.     Plaintiff is the equitable owner of the Property and entitled to a determination from this

Court pursuant to NRS 30.010 *et seq.* and/or 40.010.

80.     An actual controversy has arisen and exists between Plaintiff and Defendants specified

hereinabove, regarding Plaintiff's respective rights, in that Plaintiff contends that Defendants,

and each of them, are unlawfully asserting an adverse claim to title to real property duly owned

by Plaintiff; that title to the Property is affected by a claim by the Defendants (i.e. Notice of

Trustee Sale); and that the claim, although facially valid, is invalid and unenforceable because it

is supported by false or fraudulent documents and licensing.  Defendants do not have the right to

foreclose on the Property because Defendants, and each of them, have failed to perfect any

security interest in the Property, cannot prove to the court that they have a valid interest, properly

licensed, or are otherwise barred by the statute of limitations.

## THIRD CLAIM FOR RELIEF
### (DECLARATORY RELIEF)

81.     Plaintiff hereby incorporates each and every paragraph above as though fully set forth

herein.

82.     Plaintiff seeks a declaration from this Court, pursuant to NRS 30.010 *et seq.* and/or

40.010, that title in the Property be vested in Plaintiff free and clear of all liens and

-14-

1  encumbrances, that the Defendants herein have no estate, title, right, interest, or claim to the

2  subject Property adverse to the Plaintiff.

3                          **FOURTH CLAIM FOR RELIEF**
                             **(SLANDER OF TITLE)**
4

5  83.    Plaintiff hereby incorporates each and every paragraph above as though fully set forth

6  herein.

7  84.    Only the beneficiary of a Deed of Trust or the beneficiary's assignee or the agent of a

8  beneficiary or its assignee may cause to be recorded against real property either a Notice of

9
   Default or Notice of a Trustee's Sale.
10

11 85.    Defendants, and each of them, disparaged Plaintiff's exclusive valid title by and through

12 the preparation, posting, publishing and recordings related to the BNC mortgage including, but

13 not limited to numerous Notices of Default and Notice of Trustee Sales.

14
   86.    Defendants knew or should have known that such documents were improper in that at the
15
   time of execution and delivery of said documents, Defendants had no right, title or interest in the
16

17 Property.  These documents were naturally and commonly to be interpreted as denying,

18 disparaging, and casting doubt upon Plaintiff's legal title to the Property.  Due to the posting,

19 publishing and recording of said documents, Defendants' disparagement of Plaintiff's legal title

20
   was made to the world at large.
21

22 87.    At the time that the false and disparaging documents were created and published,

23 Defendants knew the documents were false and created and published them with the malicious

24 intent to injure Plaintiff and deprive him of his exclusive right, title, and interest in the Property,

25 and to obtain the Property for their own use by unlawful means.
26
   88.    As a direct and proximate result of Defendants' fraudulent, oppressive and malicious
27
28 conduct in publishing these documents, Plaintiff's title to the Property has been disparaged and

                                          -15-

1  slandered, there is a cloud on Plaintiff's title, Plaintiff has suffered, and continues to suffer,

2  damages in an amount that exceeds $15,000.00.

3  ### FIFTH CLAIM FOR RELIEF
   ### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)
4

5  89.    Plaintiff hereby incorporates each and every paragraph above as though fully set forth

6  herein.

7  90.    The actions of Defendants, as set forth herein, have resulted in the Plaintiff being

8  threatened with the loss of Property.

9

10  91.    This outcome has been created without any right or privilege on the part of the

11  Defendants, and, as such, their actions constitute outrageous or reckless conduct.

12  92.    Defendants, intentionally, knowingly and recklessly misrepresented to the Plaintiff those

13  Defendants were entitled to exercise the power of sale provision contained in a fraudulent deed

14  of trust. Defendants were not entitled to do so and have no legal, equitable, or actual beneficial
15

16  interest whatsoever in the Property.

17  93.    Defendants' conduct, fraudulently attempting to foreclose or claiming the right to

18  foreclose on the Property in which they have no right, title, or interest is so outrageous and

19  extreme that it exceeds all bounds usually tolerated in a civilized community.

20
   94.    Such conduct was taken with the specific intent of inflicting emotional distress and
21

22  debilitated that Plaintiff would be unable to exercise legal rights in the Property; the right to title

23  of the Property; the right to verify the alleged debt that Defendants are attempting to collect, and

24  right to clear title to the Property such that said title will regain its marketability and value.

25  95.    At the time Defendants began their fraudulent foreclosure proceedings, Defendants were
26

27  not acting in good faith while attempting to collect on the subject debt. Defendants, and each of

28

-16-

them, committed the acts set forth above with complete, utter and reckless disregard of the probability of causing Plaintiff to suffer severe emotional distress.

96.    As an actual and proximate cause of Defendants' attempt to fraudulently foreclose on Plaintiff's home or claim of the right to foreclose on Plaintiff's home, the Plaintiff has suffered severe emotional distress, including but not limited to lack of sleep, anxiety and depression.

97.    Plaintiff did not default in the manner expressed in the notices of default, yet due to Defendants' outrageous conduct, Plaintiff has been living under the constant emotional nightmare of losing his Property.

98.    As a proximate cause of Defendants' conduct, Plaintiff has experienced many sleepless nights, severe depression, lack of appetite, and loss of productivity related to his employment.

99.    As a result of Defendants' conduct, Plaintiff has been damaged in an amount in excess of $15,000.00.

**SIXTH CLAIM FOR RELIEF**
**(FRAUD)**

100.    Plaintiff hereby incorporates each and every paragraph above as though fully set forth herein.

101.    Defendant BNC knowingly or recklessly filed a Foreign Qualification with the Nevada Secretary of State, under penalty of perjury, that it knew to be false or fraudulent.

102.    Defendant BNC knowingly or recklessly induced the Nevada Mortgage Lending Division to issue BNC a license to transact business in Nevada.

103.    The State of Nevada Mortgage Lending Division relied on the material representation that BNC was a foreign corporation in good standing when issuing BNC a license to transact business in Nevada.

-17-

104.    Upon information and belief, Defendants BNC manufactured false or fraudulent notes during the real estate crisis of 2007 in an effort to foreclose on homes in which it had no interest and, as a calculated business practice, incurred no liability due to its status as a defunct foreign corporation.

105.    On or about February 18, 2015, Defendant U.S. Bank attempted to circumvent notice requirements to Plaintiff by posting an unlawful detainer on his Property, yet failing to name Plaintiff in said unlawful detainer, as a fraudulent and calculated business practice to remove Plaintiff from the Property without affording Plaintiff due process of law.

106.    Defendants, at all relevant times herein, omitted documents required to be produced pursuant to NRS 106.295.

107.    Plaintiff further contends that the above-specified Defendants, and each of them, falsely or fraudulently prepared documents required for Defendants, and each of them, to foreclose on Plaintiff's home as a calculated and fraudulent business practice.

108.    Plaintiff requests that this Court find that Defendants are vexatious litigants and that the purported power of sale contained in the purported Note and Deed of Trust has no force and effect because Defendants' actions in the processing, handling and attempted foreclosure of this loan involved numerous fraudulent, false, deceptive and misleading practices, including, but not limited to violations of State laws designed to protect borrowers, which has directly caused Plaintiff to be at an equitable disadvantage to Defendants, and each of them.

109.    Defendants, and each of them, through the allegations alleged above, have or claim the right to illegally commence foreclosure under the Note on the Property via a foreclosure action supported by false or fraudulent documents.  Said unlawful foreclosure action has caused and continues to cause Plaintiff great and irreparable injury in that real property is unique.

-18-

110.    As a proximate result of Defendants' conduct, Plaintiff has suffered harm.

111.    As a result of Defendants' conduct, Plaintiff has been damaged in an amount in excess of $15,000.00.

**WHEREFORE,** Defendant prays for judgment as follows:

1.    For the foreclosure sale to be enjoined by a preliminary and/or permanent injunction.

2.    A judicial declaration that the title to the subject Property is vested in Plaintiff alone and that Defendants, and all other persons unknown, and each of them be declared to have no right, title, estate, lien or interest in the real property described in the complaint adverse to Plaintiff's ownership, or any cloud upon Plaintiff's title thereto.

3.    That Defendants, and all other persons unknown, their agents or assigns, be forever enjoined from asserting any right, title, estate, lien or interest in the real property described in the complaint adverse to Plaintiff's ownership, or any cloud upon Plaintiff's title thereto.

4.    Compensatory, special, general and punitive damages.

5.    For such other and further relief as the Court deems just and proper.

    **DATED** this 18th day of June, 2019.

By: _____
    TYRONE KEITH ARMSTRONG
    3713 Brentcove Drive
    North Las Vegas, Nevada 89032
    (702) 491-8426
    performanceoneautomotive@gmail.com
    *Plaintiff Pro Se*

-19-

## VERIFICATION

STATE OF NEVADA    )
                    ) ss.
COUNTY OF CLARK    )

      I, TYRONE KEITH ARMSTRONG, under penalty of perjury, state:

1.     That I am the Plaintiff in this matter.

2.     That I am over 18 years of age and competent to testify to the facts herein.

3.     That I have read the above and foregoing *Verified Complaint* and know the contents thereof; that the same is true of my own knowledge, except those matters stated therein upon information and belief, and as to those matters I believe them to be true.

4.     That I bring this Complaint in good faith and not for any improper purpose.

Per NRS 53.045 "I declare under penalty of perjury that the foregoing is true and correct."

**DATED** this 18th day of June, 2019.

TYRONE KEITH ARMSTRONG

-20-

Assessor's Parcel Number:
**139-09-217-099**
Return To: BNC MORTGAGE, INC.

**P.O. BOX 19656
IRVINE, CA 92623-9656**

Prepared By:

Recording Requested By:
**National Alliance Title**

20070125-0003978

Fee: $36.00
N/C Fee:  $25.00

01/25/2007          14:08:21
T20070014405
**Requestor:**
  NATIONAL ALLIANCE TITLE

**Debbie Conway**          KXC
**Clark County Recorder**    Pgs: 23

Loan No.: LAS011562

21008CA13-915TR

—————— [Space Above This Line For Recording Data] ——————

# DEED OF TRUST

MIN 100122200003018717

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **January 18, 2007**
together with all Riders to this document.

**(B) "Borrower"** is **TYRONE K. ARMSTRONG,  A SINGLE MAN.**

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **BNC MORTGAGE, INC., A DELAWARE CORPORATION**

Lender is a **corporation**
organized and existing under the laws of **Delaware**

LAS011562

**NEVADA**-Single Family-**Fannie Mae/Freddie Mac** UNIFORM INSTRUMENT
WITH MERS

Form 3029  1/01

**-6A(NV)** (0307)
Page 1 of 15          Initials: TH
VMP Mortgage Solutions (800)521-7291

Lender's address is **P.O. BOX 19656, IRVINE, CA 92623-9656**

**(D) "Trustee"** is **T.D. SERVICE COMPANY**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated **January 18, 2007**
The Note states that Borrower owes Lender **two hundred thirty-seven thousand and 00/100**                                                                                                      Dollars
(U.S. $ **237,000.00**          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **February 1, 2037**          .

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [x] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |
| | | **Prepayment Penalty Rider** |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

Initials: _TA_                          LAS011562

-6A(NV) (0307)                    Page 2 of 15                          Form 3029  1/01

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY**                    [Type of Recording Jurisdiction]
of **CLARK, NEVADA**                    [Name of Recording Jurisdiction]:
**LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HERETO AS EXHIBIT A.**

| | |
|---|---|
| Parcel ID Number: | which currently has the address of |
| **3713 BRENTCOVE DR** | [Street] |
| **NORTH LAS VEGAS** | [City], Nevada **89032**      [Zip Code] |
| ("Property Address"): | |

        TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

        BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

Initials: _TH_

LAS011562

-6A(NV) (0307)              Page 3 of 15              Form 3029  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives

Initials: _TA_

 -6A(NV) (0307)                    Page 4 of 15                    LAS011562

                                                                                Form 3029  1/01

Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: _T H_                                    LAS011562

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials: _TH_

LAS011562

VMP -6A(NV) (0307)                    Page 7 of 15                    Form 3029  1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Initials: _TA_                                                LAS011562

(vmp) -6A(NV) (0307)                    Page 8 of 15                    Form 3029  1/01

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials:     LAS011562

VMP®  -6A(NV) (0307)                    Page 9 of 15                    Form 3029   1/01

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _TH_    LAS011562

 **-6A(NV)** (0307)    Page 10 of 15    Form 3029  1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

Initials: _TH_

LAS011562

-6A(NV) (0307)    Page 11 of 15    Form 3029  1/01

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: _TH_                      LAS011562

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $

Initials: _TA_

LAS011562

 -6A(NV) (0307)

Page 13 of 15

Form 3029  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                 TYRONE K. ARMSTRONG        -Borrower

_____          _____ (Seal)
                                                           -Borrower

_____ (Seal)   _____ (Seal)
            -Borrower                                      -Borrower

_____ (Seal)   _____ (Seal)
            -Borrower                                      -Borrower

_____ (Seal)   _____ (Seal)
            -Borrower                                      -Borrower

LAS011562

-6A(NV) (0307)          Page 14 of 15          Form 3029   1/01

STATE OF NEVADA
COUNTY OF Clark

This instrument was acknowledged before me on ~~January 18, 2007~~ by
TYRONE K. ARMSTRONG



Mail Tax Statements To:
TYRONE K. ARMSTRONG
3713 BRENTCOVE DR, NORTH LAS VEGAS, NV 89032

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ROSEANNE EHRING
Appt. No. 04-93289-1
My Appt. Expires Nov. 18, 2008

Initials: T A

LAS011562

-6A(NV) (0307)

Page 15 of 15

Form 3029   1/01

EXHIBIT "A"

The land referred to in this Commitment is situated in the County of Clark, State of Nevada and is described as follows:

LOT ONE (1) IN BLOCK FOUR (4) OF CHEYENNE RIDGE UNIT 2A, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 54 OF PLATS, PAGE 67, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA, AND AMENDED BY CERTIFICATE OF AMENDMENT RECORDED JANUARY 8, 1993, AS DOCUMENT NO. 00777 IN BOOK 930108 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

# PLANNED UNIT DEVELOPMENT RIDER

Loan Number **LAS011562**

THIS PLANNED UNIT DEVELOPMENT RIDER is made this    **18th day of January, 2007**
, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned ("Borrower") to secure Borrower's Note to **BNC MORTGAGE, INC., A DELAWARE CORPORATION**

("Lender") of the same date and covering the Property described in the Security Instrument and located at:

**3713 BRENTCOVE DR, NORTH LAS VEGAS, NV  89032**
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

COVENANTS, CONDITIONS, AND RESTRICTIONS

(the "Declaration"). The Property is a part of a planned unit development known as

**"  CHEYENNE RIDGE**                                                "

[Name of Planned Unit Development]
(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B.    Hazard Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," then:

(i)  Lender waives the provision in Covenant 3 of the Security Instrument for the monthly payment to Lender of one-twelfth of the yearly premium installments for hazard insurance on the Property; and

(ii)  Borrower's obligation under Covenant 5 of the Security Instrument to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or blanket policy.

---

**PLANNED UNIT DEVELOPMENT RIDER**      Page 1 of 2

**LAS011562**

R-PUD1
08/23/2006-SH

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, with any excess paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Covenant 11 of the Security Instrument.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:

(i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender;

(iii) termination of professional management and assumption of self-management of the Owners Association; or

(iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.


BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.


_____ (Seal)                   _____ (Seal)
TYRONE K. ARMSTRONG       Borrower                                            Borrower


_____ (Seal)                   _____ (Seal)
                          Borrower                                            Borrower


_____ (Seal)                   _____ (Seal)
                          Borrower                                            Borrower


**PLANNED UNIT DEVELOPMENT RIDER**     Page 2 of 2

LAS011562

B-PUD2
04/21/2006 DH

**RECORDING REQUESTED BY, AND
WHEN RECORDED MAIL TO:**

**BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CALIFORNIA 92623-9656**

(Space above this line for Recorder's use)

## PREPAYMENT CHARGE RIDER

Loan No.:    **LAS011562**
Application No.:  **LAS011562**

THIS PREPAYMENT CHARGE RIDER (the "Prepayment Rider") is made this **18th day of January, 2007 ,**  , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **BNC MORTGAGE, INC., A DELAWARE CORPORATION**

("Lender") of the same date and covering the property described in the Security Instrument and located at: **3713 BRENTCOVE DR, NORTH LAS VEGAS, NV 89032**

To the extent that the provisions of this Prepayment Rider (the "Rider") are inconsistent with the provisions of the Security Instrument and/or the Note, the provisions of this Prepayment Rider shall prevail over and shall supersede any such inconsistent provisions of the Security Instrument and/or the Note.

For value received, the receipt and sufficiency of which are hereby acknowledged, Section 5    of the Note is amended to read in its entirety as follows:

**"5. BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If within twenty-four  ( 24  ) months from the date of execution of the Security Instrument, I make a full Prepayment or partial Prepayment(s), I will at the same time pay to the Note Holder a Prepayment charge equal to six (6) months' advance interest on the amount of the Prepayment that, when added to all other amounts prepaid during the 12-month period immediately preceding the date of the Prepayment, exceeds twenty percent (20%) of the original Principal amount of this Note."

Page 1 of 2

PPRCH01
08/20/05

LAS011562

By signing below, I (We) accept and agree to the terms and covenants contained in this Prepayment Charge Rider.

_____          _____
Borrower                                                              Borrower
**TYRONE K. ARMSTRONG**


_____          _____
Borrower                                                              Borrower


_____          _____
Borrower                                                              Borrower


_____ (Space below this line for Acknowledgment) _____

LAS011562

Page 2 of 2

PPRCHO2
09/26/05

Loan No.: LAS011562

### ADJUSTABLE RATE RIDER
### WITH INTEREST ONLY PAYMENT PERIOD

**This   Adjustable   Rate   Rider   with   Interest   Only   Payment   Period** is made this
**18th day of January, 2007 ,**
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument"), of the same date given by the undersigned (the "Borrower") to secure Adjustable
Rate Note ("Note") to
**BNC MORTGAGE, INC., A DELAWARE CORPORATION**
, (the "Lender") of the same date and covering the property described in the Security Instrument and located at:
**3713 BRENTCOVE DR, NORTH LAS VEGAS, NV  89032**
[Property Address]
**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND
THE MONTHLY PAYMENT.  THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST
RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST
PAY.**

**THE NOTE AND ITS ADDENDA CONTAIN PROVISIONS ALLOWING FOR AN INITIAL PERIOD OF
MONTHLY PAYMENTS OF INTEREST ONLY AND FOR SUBSEQUENT MONTHLY PAYMENTS OF
BOTH PRINCIPAL AND INTEREST.**

**INTEREST ONLY PERIOD.**

The Note and its Addenda provide for an initial period of monthly payments of interest only, in the amount
of $ **1,264.00** , as follows:

**INTEREST RATE AND MONTHLY PAYMENT CHANGES.**

**ADDITIONAL COVENANTS:**  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**I.**  Sections 3 and 4 of the Note as modified by its Addenda provide for sixty  (60) payments of interest only
("Interest Only Period") at the interest rates determined in accordance with Sections 2 and 4 of the Note.

**1. PAYMENTS**

**(A) Time and Place of Payments.**

I will pay interest during the interest Only Period, and principal and interest thereafter, by making a
payment every month.
I will make my monthly payments on the first day of each month beginning on **March 1, 2007**
. I will make these payments every month until I have paid all of the principal and interest and any other charges
described below that I may own under this Note. Each monthly payment will be applied as of its scheduled due
date and will be applied to interest before principal.  If on        **February 1, 2037**        , I still owe amounts
under this Note, I will pay those amounts in full on that date, which is called the "maturity date."
I will make my monthly payments at **Chase Home Finance LLC, Attn: Financial Processing, Dept.
360, P.O. Box 501580, San Diego, CA 92150-1580**        , or at a different place if required by the Note Holder.

---

Interest Only Adj. Rate Note Rider                                                    Rev.  102703

Page 1  of 3

READ01                                           Borrower Initials

LAS011562

**(B) Amount of My Interest Only Payments.**

The first **twenty-four   ( 24 )** monthly payments will be in the amount of U.S. $ **1,264.00** , which equals one twelfth 1/12) of the amount of yearly interest due on the principal at the initial rate.   These payments are called "Interest Only Payments."

No payments of principal are due during the Interest Only Period. The Interest Only Payments will not reduce the principal amount of this Note. **Additional payments of principal may be made in accordance with Section 5 of the Note.**

**(C) Monthly Payment Changes.**

After the Interest Only Period, changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**2.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates.**

The interest rate I will pay may change on the first day of    **February, 2009**               , and on that day every  **6th**  month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index.**

Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

**(C) Calculation of Changes.**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Four And 950/1000**                                    percentage points ( **4.950**      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes.**

The Interest rate I am required to pay at the first Change Date will not be greater than  **9.400**        % or less than    **6.400**       %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than  ONE AND 00/100   percentage point(s) ( 1.00  %) from the rate of interest I have been paying for the preceding 6 months.  My interest rate will never be greater than  **13.400** % or less than  **6.400** % .

**(E) Effective Date of Changes.**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

---

Interest  Only  Adj.  Rate  Note  Rider                                                                    Rev.  102703

Page 2 of 3

Borrower Initials  _TA_  ____  ____  ____  ____  ____

BHADJR2

**LAS011562**

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

All other provisions of the Note and any Addenda are unchanged by this Addendum to Note for Interest Only Payments and remain in full force and effect.

**II.**    By signing below, Borrower accepts and agrees to the terms and conditions contained in the Interest Only Payment Period Addendum.

_____ (Seal)          _____ (Seal)
TYRONE K. ARMSTRONG

_____ (Seal)          _____ (Seal)

_____ (Seal)          _____ (Seal)

_____ (Seal)          _____ (Seal)


**I understand that for the interest only period I will not be reducing the principal balance (unless I make additional payments of principal, which may be made in accordance with Section 5 of this Note).**

**After sixty (60) payments if I only made my minimum payment, my principal balance will not be reduced.**

_____ (Seal)          _____ (Seal)
TYRONE K. ARMSTRONG

_____ (Seal)          _____ (Seal)

_____ (Seal)          _____ (Seal)

_____ (Seal)          _____ (Seal)


Interest  Only  Adj.  Rate  Note  Rider                                        Rev.  102703

Page 3 of 3

Borrower Initials  _TA_   ____  ____  ____  ____  ____

LAS011562

Inst #: 201005060002258
Fees: $14.00
N/C Fee: $0.00
05/06/2010 11:20:06 AM
Receipt #: 340526
Requestor:
FIRST AMERICAN TITLE NDTS
Recorded By: OSA    Pgs: 1
DEBBIE CONWAY
CLARK COUNTY RECORDER

Requested and Prepared by:
**The Cooper Castle Law Firm**
          First American Title
When Recorded Mail To:
Chase Home Finance LLC
10790 Rnacho Bernardo Road
San DiegoCA92127
   139-09-217-099

A.P.N.:      139-09-217-099
Loan No.:    24165052
TS NO:       10-04-4630-NV
          4430221-AS    **ASSIGNMENT OF DEED OF TRUST**

For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:  U.S. Bank
National Association, as Trustee of the Structured Asset Securities Corporation Mortgage Loan Trust,
Mortgage Pass-Through Certificates, Series 2007-BC3 all beneficial interest under that certain Deed of
Trust dated:  January 18, 2007 executed by Tyrone Armstrong, as Trustor(s), Service Company  as
Trustee, and recorded as Instrument No. 20070125 Book No. 0003978 on January 25, 2007 of Official
Records, in the office of the County Recorder of Clark County, Nevada together with the Promissory
Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

**DATE:  April 26, 2010**

                              MORTGAGE ELECTRONIC REGISTRATION
                              SYSTEMS, INC. (MERS) BY THE COOPER
                              CASTLE LAW FIRM LLP AS ITS ATTORNEY IN
                              FACT


                              Michael W. Chen, Esq., Managing Partner

Acknowledgement:
State of  Nevada
County of Clark

On April 26, 2010 before me, Andrea Buelow, personally appeared Michael W. Chen, who provided to me on
the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that
by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s)
acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of Nevada that the foregoing paragraph is
true and correct.
WITNESS my hand and official seal.

Signature

ANDREA BUELOW
Notary Public-State of Nevada
APPT. NO. 09-11659-1
My App. Expires November 20, 2013

Tyrone Armstrong / 10-04-4630-NV