*United States Bankruptcy Court Southern District of New York*
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

Guaranty Claim 29235

# PROOF OF CLAIM

| | |
|---|---|
| In re:<br>Lehman Brothers Holdings Inc., et al | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| Name of Debtor Against Which Claim is Held<br>Lehman Brothers Holdings Inc. | Case No. of Debtor<br>08-13555 |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000029235

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Newport Global Credit Fund (Master) L.P.

c/o Brown Rudnick LLP
David J. Molton, Esq.

Seven Times Square

New York, NY 10036

Telephone number: 212.209.4800    Email Address: dmolton@brownrudnick.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:          Email Address:

1.  **Amount of Claim as of Date Case Filed:** $ See Exhibit A, Attached
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2.  **Basis for Claim:** See Exhibit A, Attached
(See instruction #2 on reverse side.)

3.  **Last four digits of any number by which creditor identifies debtor:** _____
    3a    **Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

4.  **Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe: _____
Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
Amount of Secured Claim: $_____ Amount Unsecured: $_____

5.  **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(5).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☑ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(2).

**Amount entitled to priority:**

$ See Exhibit A, Attached

6.  **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7.  **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8.  **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FILED / RECEIVED

SEP 22 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

Date:

9/18/09

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

By: *Roger May*

Roger May, Senior Managing Director

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

## EXHIBIT A

## ADDENDUM TO PROOF OF CLAIM OF
## NEWPORT GLOBAL CREDIT FUND (MASTER) L.P.

1.      Prior to the commencement of these chapter 11 proceedings on September 15, 2008 (the "Petition Date"), Newport Global Credit Fund (Master) L.P. ("NGCF") entered into a Customer Account Prime Brokerage Agreement (the "Prime Brokerage Agreement") with Lehman Brothers Inc. ("LBI") and other Lehman Brothers Entities (as defined in the Prime Brokerage Agreement) (all such Lehman Entities named as parties to said Prime Brokerage Agreement shall be referred to as "Lehman"), including, but not limited to, Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers International (Europe) ("LBIE").[1]  A copy of the Prime Brokerage Agreement is attached hereto as Exhibit 1.  Pursuant to the Prime Brokerage Agreement, a prime broker account (the "Account") was opened at LBI for NGCF.  The Prime Brokerage Agreement was in effect as of the Petition Date and remains in effect as of the date hereof.  Upon information and belief, the Account remains with and under the control of Lehman, and was not transferred to Barclays Capital, Inc. or other third party in connection with any asset sale.

2.      Also prior to the Petition Date, NGCF, as Borrower, entered into a Margin Lending Agreement (the "Margin Lending Agreement," and together with the Prime

---

[1]    The Prime Brokerage Agreement provides that the parties to the agreement "shall consist of [NGCF] and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns . . . all such entities being collectively referred to hereafter as 'Lehman Brothers'[]." Prime Brokerage Agreement ¶ 1(a) at 1.

1

Brokerage Agreement, the "Agreements") with LBIE as Lender, and LBI, as Agent, pursuant to which LBIE agreed to make loans to NGCF in connection with transactions entered into by NGCF under the Prime Brokerage Agreement. A copy of the Margin Lending Agreement is attached hereto as Exhibit 2. The Margin Lending Agreement was in effect as of the Petition Date and remains in effect as of the date hereof.

3.      Pursuant to that Unanimous Written Consent of the Executive Committee of the Board of Directors of LBHI, dated June 9, 2005 (the "2005 LBHI Guarantee"), and that Guarantee of LBHI, dated January 4, 2008 (the "2008 LBHI Guarantee," and together with the 2005 LBHI Guarantee, the "LBHI Guarantee"), LBHI has guaranteed LBIE's obligations under both the Prime Brokerage Agreement and the Margin Lending Agreement and any other agreement between NGCF and LBIE.[2] Copies of the 2005 LBHI Guarantee and the 2008 LBHI Guarantee are attached hereto as Exhibit 3.

4.      Additionally, LBI and LBIE maintain surety bonds issued by the Customer Asset Protection Company ("CAPCO"). The LBI surety bond provides coverage for any unsatisfied portion of a customer's net equity claim not otherwise provided by LBI's assets or the Securities Investor Protection Corporation, and the LBIE

---

[2]      See 2005 LBHI Guarantee at p. 2 ("RESOLVED, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto [naming LBIE], each of which shall be a Guaranteed Subsidiary for purposes of the Code. . ."); 2008 LBHI Guarantee at p. 1 ("We, Lehman Brothers Holdings Inc., do hereby absolutely and unconditionally guarantee the payment by Lehman Brothers International (Europe) ("Affiliate") of all of Affiliate's liabilities, obligations and commitments (the "Guaranteed Obligations") to any counterparty of Affiliate and such counterparty's successors, endorsees and assigns (collectively, the "Beneficiaries"), as the same shall respectively become due, together with accrued interest and charges, if any, and we agree to reimburse each Beneficiary for all expenses including reasonable attorneys' fees of enforcing or obtaining or endeavoring to enforce or obtain payment thereof.").

surety bond provides coverage for any unsatisfied portion of a customer's net equity claim not otherwise provided by LBIE's assets or the LBHI Guarantee (collectively, "CAPCO Claims"). Lehman's marketing materials relating to its prime brokerage services lists recourse to the CAPCO surety bonds as protection for Lehman's prime brokerage customers.

5.    NGCF asserts a direct claim against LBHI pursuant to LBHI's obligations under the Prime Brokerage Agreement for the value of NGCF's assets held pursuant to the Agreements in the Account and that have not been otherwise been returned to NGCF. NGCF also asserts a claim against LBHI pursuant to the LBHI Guarantee for LBIE's obligations under the Agreements for the value of NCGF's assets held pursuant to the Agreements in the Account and that have not otherwise been returned to NCGF. Attached hereto as Exhibit 4 is a detailed list of such assets.

6.    Moreover, NGCF asserts a direct claim against LBHI pursuant to LBHI's obligations under the Prime Brokerage Agreement for all damages and losses resulting from Lehman's failure to comply with NGCF's instruction on September 10, 2008 to transfer securities held under the Agreements to Credit Suisse, which would have assumed the duties as the prime broker for NGCF going forward. NGCF also asserts a claim against LBHI pursuant to the LBHI Guarantee for all damages and losses resulting from Lehman's failure to comply with NGCF's instruction on September 10, 2008 to transfer securities held under the Agreements to Credit Suisse, which would have assumed the duties as the prime broker for NGCF going forward. Notwithstanding the assertion of such claims, NCGF does not waive, and reserves all rights pertaining to, its "customer claim" against LBI or its "customer" status under the Securities Investor Protection Act of 1970, as amended. See 15 U.S.C. § 78lll(2).

3

7.    The Agreements expressly provide that NGCF is entitled to receive all distributions, including, *inter alia,* dividends and interest in respect of their securities held in the Account (collectively, the "Distributions"), notwithstanding any such securities status as loaned, pledged, repledged, hypothecated or rehypothecated. Therefore, NGCF asserts a direct priority claim against LBHI pursuant to LBHI's obligations under the Prime Brokerage Agreement for the value of all Distributions received postpetition, and any such future dividend and interest distributions received (including payment-in-kind distributions) on account of NGCF's assets held pursuant to the Agreements in the Account.[3]    NGCF also asserts a priority claim against LBHI pursuant to the LBHI Guarantee for LBIE's obligations under the Agreements for the value of all Distributions received postpetition and any such future dividend and interest distributions received (including payment-in-kind distributions) on account of NGCF's

---

[3]    The Prime Brokerage Agreement provides:  "Unless otherwise agreed by Lehman Brothers and you, you will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, hypothecated or rehypothecated securities which are not otherwise received by you, to the full extent you would be entitled if the securities had not been loaned, pledged, hypothecated or rehypothecated." Prime Brokerage Agreement, ¶ 19(b) at 5-6. Other than the Agreements, there are no agreements regarding Distributions between LBHI and NGCF, and certainly none that would waive NGCF's rights to receive any and all Distributions.

assets held pursuant to the Agreements in the Account.[4]  Attached hereto as Exhibit 5 is a

summary of projected postpetition interest receivable for the Account.[5]

8.      Pursuant to the Agreements, NGCF is afforded the right to direct the vote

of its securities in the Account, absent certain circumstances that are inapplicable here.[6]

9.      NGCF asserts a priority claim against LBHI in an amount presently

unknown for the loss of its ability to participate in certain rights offering(s), as a direct

result of Lehman's post-petition breach of the Agreements.  NGCF also asserts a priority

against LBHI pursuant to the LBHI Guarantee for an amount presently unknown for the

loss of its ability to participate in certain rights offering(s), as a direct result of LBIE's

---

[4]     The Margin Lending Agreement provides: "Unless otherwise agreed by Lender and Borrower, Borrower will be entitled to receive all distributions, including, but not limited to, cash, stock, dividends, and interest payments, made on or in respect to any loaned, pledged, repledged, hypothecated, or rehypothecated securities which are not otherwise received by Borrower, to the full extent Borrower would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated." Margin Lending Agreement ¶ 5(c) at 3.

[5]     For the period beginning on the Petition Date through March of 2009 approximately $2,311,358 and €120,675 in interest distributions has become due and payable to NGCF in respect of securities held in the Account.  For the period beginning in April of 2009 through the end of this calendar year approximately $2,444,281 and €181,013 in interest distributions will become due and payable to NGCF in respect of securities held in the Account.

[6]     The Prime Brokerage Agreement provides as follows:  Lehman Brothers shall inform you if Lehman Brothers becomes aware of the occurrence of any of the following with respect to any securities in your account(s):  conversions, subdivision or consolidation; redemption; a takeover offer; calls; including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities.  Subject to Section 19 herein, if Lehman Brothers receives notice from you that you wish to act on any of the events referenced in this section and such notice is received by Lehman Brothers within a reasonable time for Lehman Brothers to act on such event, Lehman Brothers will act in accordance with your wishes.  Prime Brokerage Agreement ¶ 10 at 4; see also identical provision in the Margin Lending Agreement ¶ 7(g) at 5.

post-petition breaches of the Agreements in connection with the loss of NGCF's ability to participate in certain rights offering(s) as described above.

10.    NGCF asserts a priority claim against LBHI for any losses and injuries resulting from Lehman's failure to comply with NGCF's instructions to timely vote their securities held in the Account in favor of certain proposed chapter 11 plans of reorganization. NGCF also asserts a priority claim against LBHI pursuant to the LBHI Guarantee for any losses and injuries resulting from LBIE's failure to comply with NGCF's instructions to timely vote their securities held in the Account in favor of certain proposed chapter 11 plans of reorganization.

11.    NGCF also asserts a claim against LBHI for its failure to properly capitalize CAPCO, to the extent CAPCO cannot satisfy NGCF's CAPCO Claims. NGCF also asserts a claim against LBHI pursuant to the LBHI Guarantee for its failure to properly capitalize CAPCO, to the extent CAPCO cannot satisfy NGCF's CAPCO Claims. NGCF also asserts a claim against LBHI for all losses and damages to NGCF on account of its reliance on Lehman's CAPCO representations as inducement for entering into the Agreements.

12.    As certain of the damages described above are contingent, unliquidated and likely to continue, the exact amount of NGCF's total claim as set forth herein is unknown at this time. NGCF reserves the right to amend or supplement this claim from time to time hereafter as it may deem necessary and proper.

13.    NGCF reserves all of its rights and defenses, whether under title 11 of the United States Code or other applicable law, as to any claims that may be asserted against NGCF by LBHI, including, without limitation, any rights of setoff and/or recoupment not expressly observed above. NGCF reserves the right to amend and/or supplement this

Proof of Claim and any Exhibit attached hereto at any time and in any manner. NGCF reserves the right to file additional proofs of claim for additional claims which may be based on the same or additional documents. NGCF reserves the right to file additional proofs of claim for administrative expenses or other claims entitled to priority. NGCF reserves the right to file claims for the payment of interest (subject to applicable law) and for the reimbursement of all reasonable expenses (including attorneys' fees and collection fees) incurred by NGCF in connection with the claims described herein. NGCF further reserves all of its rights as against the other debtors in these Chapter 11 proceedings and against other Lehman entities, including LBI and LBIE, in any other Lehman proceeding in the United States or overseas.

14.    This Proof of Claim is filed under the compulsion of the bar date set in this case and is filed to protect NGCF from forfeiture of its claim by reason of said bar date. The filing of this Proof of Claim shall not constitute: (a) a waiver, release, or limitation of NGCF's rights against any person, entity or property (including, without limitation, LBHI or any other person or entity that is or may become a debtor in a case pending in this Court) in which NGCF has a security interest or lien, (b) a consent by NGCF to the jurisdiction or venue of this Court or any other court with respect to the proceedings, if any, commenced in any case against or otherwise involving NGCF with respect to the subject matter of the claims set forth in this Proof of Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving NGCF, (c) a waiver, release, or limitation of the right of NGCF to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding

7

the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the U.S. Constitution, (d) a consent by NGCF to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (e) a waiver, release, or limitation of NGCF's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a U.S. District Court Judge, (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving NGCF, (g) a consent to the termination of LBHI's liability to NGCF by any particular court, including, without limitation, this Court, (h) a consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c), or (i) an election of remedies.  No judgment has been rendered on this claim. This claim is not subject to any setoff or counterclaim rights by LBHI.

15.    All notices and distributions in respect of this claim should be forwarded to:  Newport Global Credit Fund (Master) L.P., c/o Brown Rudnick LLP, David J. Molton, Esq., and Andrew Dash, Esq., Seven Times Square, New York, NY 10036.

**EXHIBIT 1**

# Customer Account Agreement Prime Brokerage

**LEHMAN BROTHERS INC.**

Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019

(212) 526-7000

| Title: Newport Global Credit Fund (Master) LP | Account (and Group) No.: |
|---|---|
| | |

## Please Read Carefully, Sign and Return

This agreement ("Agreement") sets forth the terms and conditions under which Lehman Brothers (as defined below) will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer. Throughout this Agreement references to "you" and "your" refer to you as our customer.

In consideration of Lehman Brothers opening a prime brokerage account for you, you agree to the following:

**1. PARTIES.** (a) A prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc. ("LBI"). All transactions, agreements and contracts between you and Lehman Brothers have been entered into in consideration of each other. You hereby agree that the parties to this Agreement shall consist of you and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns (each such entity or person being referred to hereinafter as a Lehman Brothers or a "Lehman Brothers Entity," unless otherwise specified, and all such entities or persons being collectively referred to hereinafter as "Lehman Brothers"). Unless you advise Lehman Brothers in writing to the contrary, you represent that you are not an affiliate (as defined in Rule 144(a)(1) under the U.S. Securities Act of 1933 as may be amended, modified or supplemented) of the issuer of any security held in any account opened hereby.

(b) You represent and warrant to Lehman Brothers that you are either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and you covenant and agree that any successor Investment Advisor (or Investment Manager or General Partner, as the case may be) appointed by you will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and you will provide Lehman Brothers with a Investment Advisor Representation Letter .

**2. APPLICABLE LAWS, RULES AND REGULATIONS; SEVERABILITY.** All transactions under this Agreement shall be subject to the applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities, including, but not limited to, the rules and regulations of the Board of Governors of the Federal Reserve System of the United States and the constitution, rules and customs of the exchange or market (and clearing house) where such transactions are executed or settled. In the event of any conflict between any such present or future laws, regulations and rules and the terms of this Agreement, the provision(s) of this Agreement so affected shall be deemed modified or superseded to conform to such laws, regulations and rules, but the remaining provisions of this Agreement shall remain in full force and effect.

**3. SECURITY INTEREST AND LIEN; REGISTRATION OF SECURITIES.** As security for the payment and performance of all of your obligations and liabilities from time to time outstanding to any Lehman Brothers Entity, whether under this Agreement or otherwise, each Lehman Brothers Entity shall have a continuing lien and first priority security interest in all your Assets, defined as (i) all property in which you now have or hereafter acquire an interest which is now or hereafter held by or through any Lehman Brothers Entity, including, but not limited to, any and all securities, accounts, instruments, documents, contract rights, contracts (including, but not limited to, open transactions, securities purchase or sale contracts, agreements to lend cash or securities,

commodity contracts, futures contracts, forward contracts, repurchase agreements, swap agreements, contracts for differences or any other agreement, without regard to the form of such agreement which may include oral agreements or agreements confirmed or signed by only one party to the agreement and agreements entered into or signed by a Lehman Brothers Entity on your behalf) (hereinafter "Contracts"), commercial paper and other securities, monies, deposit accounts and general intangibles (including all security entitlements in respect thereof, all income and profits thereon, all dividends, interest and other payments and distributions with respect thereto and all proceeds from any of the foregoing), and (ii) any and all rights, claims or causes of action you may now or hereafter have against any Lehman Brothers Entity. The continuing lien and first priority security interest shall apply to all such Assets, which from time to time may be deposited or credited to any account you may have with a Lehman Brothers Entity, be held or carried by a Lehman Brothers Entity for you, be due from a Lehman Brothers Entity to you, or be delivered to or in a Lehman Brothers Entity's possession or control for any purpose, including safekeeping. Such continuing lien and first priority security interest shall apply irrespective of whether or not Lehman Brothers has made advances in connection with such Assets, the number of accounts you have with Lehman Brothers or which particular Lehman Brothers Entity holds such Assets. You hereby acknowledge and agree that all such Assets held by or through any Lehman Brothers Entity are held as collateral by such Lehman Brothers Entity as agent and bailee for itself and all other Lehman Brothers Entities and, as such, each Lehman Brothers Entity shall comply with any orders or instructions originated by any other Lehman Brothers Entity with respect to or in connection with such collateral without your further consent. You and Lehman Brothers agree that all such Assets held in or credited to any account will be treated as financial assets under Article 8 of the Uniform Commercial Code as in effect in the State of New York (the "UCC") and that any account maintained by you with any Lehman Brothers Entity shall be a securities account under Article 8 of the UCC. In the event of a breach or default by you, a Lehman Brothers Entity shall have, in addition to the rights and remedies provided in this Agreement, all rights and remedies available to a secured creditor under the UCC and any other applicable law. You represent that all of the above-described Assets shall at all times be free and clear of all liens, claims and encumbrances of any nature other than the security interest created hereby. Assets consisting of securities shall be delivered in good deliverable form (or Lehman Brothers shall have the unrestricted power to place such securities in good deliverable form) in accordance with the requirements of the primary market for these securities. In addition, in order to satisfy any of your outstanding liabilities or obligations to any Lehman Brothers Entity, each Lehman Brothers Entity may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to you, use, apply or transfer any and all securities or other property or Assets (including, without limitation, fully-paid securities and cash). You hereby agree that, except as otherwise specifically agreed in writing, each Lehman Brothers Entity may register and hold the securities and other property or Assets in your accounts in its name or the name of its designee. You shall execute such documents and take such other action as such Lehman Brothers Entity shall reasonably request in order to perfect its rights with respect to any of the Assets. In addition, you appoint Lehman Brothers as your attorney-in-fact to act on your behalf to sign, seal, execute and deliver all documents and do all such acts as may be required to realize upon any of Lehman Brothers' rights in the Assets.

**4.  BREACH, BANKRUPTCY OR DEFAULT.** If you shall:

(i) breach, repudiate or default under this Agreement or any Contract with any Lehman Brothers Entity, whether heretofore or hereafter entered into;

(ii) make or repeat any misrepresentations in connection with this Agreement or any Contract with any Lehman Brothers Entity;

(iii) state that you will not perform any obligation to any Lehman Brothers Entity;

(iv) apply for, consent to or be the subject of an application or petition for the appointment of or the taking of possession by a receiver, custodian, trustee, liquidator or similar persons of yourself or of all of or a substantial part of your property;

(v) admit in writing your inability, or become generally unable, to pay your debts as such debts become due or give Lehman Brothers other grounds for insecurity, as determined by Lehman Brothers in its sole and absolute discretion (including, without limitation, death; mental incompetence; dissolution; the appointment of a receiver by or against you, any guarantor, co-signer or other party liable on or providing security for your obligations to any Lehman Brothers Entity

2

or the attachment against your or such other party's account(s) with any Lehman Brothers Entity; or any indication of your refusal or inability to satisfy promptly any Margin Call (as defined below) or other obligation);

(vi) make a general assignment for the benefit of your creditors; or

(vii) file or be subject of the filing or entry of a petition or order for relief or be subject of the commencement of a proceeding regarding reorganization, bankruptcy, liquidation, dissolution or insolvency;

then, any such event shall constitute, at Lehman Brothers' election, a default by you under this Agreement and any or all Contracts you may then have with any Lehman Brothers Entity, whether heretofore or hereafter entered into. In the event of any such default, each Lehman Brothers Entity shall have all of the rights of a secured party upon default under the UCC and other applicable laws, rules and regulations, including, without limitation, the right, without prior notice to you, to sell any and all Assets in which you have an interest (including without limitation this Agreement and any Contract) held by or through any Lehman Brothers Entity (either individually or jointly with others), to buy any or all property which may have been sold short, to exercise any and all options and other rights, to accelerate, cancel, terminate, liquidate, close out and net the settlement payments and/or delivery obligations under any or all outstanding transactions and/or to purchase or sell any other securities or property to offset market risk, and to set off or offset any obligation owing by any Lehman Brothers Entity to you against any obligations owing by you to any Lehman Brothers Entity, after which you shall be liable to Lehman Brothers for any remaining deficiency, loss, costs or expenses incurred or sustained by Lehman Brothers in connection therewith. Such purchases and/or sales may be effected publicly or privately without notice or advertisement in such manner as Lehman Brothers may in its sole discretion determine. At any such sale or purchase, any Lehman Brothers Entity may purchase or sell the property to or from itself or third parties free of any right of redemption and you shall remain liable to Lehman Brothers for any deficiency; it being understood that a prior tender, demand or call of any kind from Lehman Brothers, or prior notice from Lehman Brothers, of the time and place of such sale or purchase shall not be considered a waiver of Lehman Brothers' right to buy or sell any securities, commodities or other property or Asset held by Lehman Brothers, or which you may owe to Lehman Brothers. In addition, each Lehman Brothers Entity shall have the right, at any time and from time to time, to set off and otherwise apply any and all amounts owing by such Lehman Brothers Entity to you or for your account against any and all amounts now or hereafter owing by you to any Lehman Brothers Entity (including, without limitation, any indebtedness in your accounts), whether matured or unmatured, fixed, contingent or otherwise and irrespective of whether any Lehman Brothers Entity shall have made any demand therefor. Lehman Brothers agrees to notify you of any such set-off and application, provided, however, that the failure to give such notice shall not affect the validity of any such set-off and application. You agree that any obligation of a Lehman Brothers Entity to you shall be subject to there being no breach, repudiation, misrepresentation or default (however characterized) by you which is continuing under any Contract with a Lehman Brothers Entity. You and Lehman Brothers intend this Agreement to be a master netting agreement.

**5. ADEQUATE ASSURANCES.** Subject to, and not as a limitation of, the rights of Lehman Brothers under this Agreement, if at any time Lehman Brothers has reasonable grounds for insecurity with respect to your performance of any of your obligations, Lehman Brothers may demand, and you shall give, adequate assurance of due performance within 24 hours, or within any shorter period of time Lehman Brothers demands that is reasonable under the circumstances. The adequate assurance of performance that may be demanded by Lehman Brothers may include, but shall not be limited to, the delivery by you of additional property as collateral.

**6. EXECUTION FEES AND SERVICE CHARGES.** You understand that your account(s) will be charged brokerage commissions or mark-ups/mark-downs in connection with the execution of transactions ("Execution Fees") and may be charged certain other fees for custody and other services furnished to you ("Service Fees"). You further understand that Execution Fees may be changed from time to time upon prior written notice to you and that Service Fees may be changed from time to time upon prior written notice to you and, in each case, you agree to be bound thereby.

**7. AMOUNTS OWED; TRUTH-IN-LENDING.** You hereby acknowledge receipt of Lehman Brothers' Truth-in-Lending disclosure statement. You understand that interest will be charged on any amount you owe in your account(s) in accordance with the methods described in such statement or in any amendment or revision thereto which may be provided to you. Any amount due which is not paid at the close of an interest period will be added to the opening balance for the next interest period.

3

**8. COLLECTION AND OTHER ACCOUNT-RELATED COSTS.** You hereby agree to pay, on demand, all reasonable costs, liabilities and damages incurred by Lehman Brothers (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with (i) enforcing its rights hereunder, (ii) any investigation, litigation or proceeding involving your account or any property therein (including, without limitation, claims to such property by third parties), (iii) your use of or access to any Lehman Brothers or third-party system or (iv) Lehman Brothers' acting in reliance upon instructions, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail, from you or your authorized agents (including investment managers or advisers). In each case and whether or not demand has been made therefor, you hereby authorize Lehman Brothers to charge your account(s) for any and all such costs, liabilities and damages, including, without limitation, those incurred in connection with the liquidation of any of your Assets.

**9. IMPARTIAL LOTTERY ALLOCATION.** You agree that, in the event Lehman Brothers holds on your behalf securities in its name, in the name of its designee or in bearer form which are called in part, you will participate in the impartial lottery allocation system for such called securities in accordance with the rules of The New York Stock Exchange, Inc. or any other appropriate self-regulatory organization. When any such call is favorable, no allocation will be made to any account in which, to the knowledge of Lehman Brothers, any officer, director or employee of Lehman Brothers has any financial interest until all other customers have been satisfied on an impartial lottery basis.

**10. SECURITIES EVENTS.** Lehman Brothers shall inform you if Lehman Brothers becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities in your account(s): conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to Section 19 herein, if Lehman Brothers receives notice from you that you wish to act on any of the events referenced in this section and such notice is received by Lehman Brothers within a reasonable time for Lehman Brothers to act on such event, Lehman Brothers will act in accordance with your wishes. You represent that you review all prospectuses and offering statements that you may receive and understand the risks inherent with your securities transactions, including any risks associated with the above-described securities events.

**11. VOTING RIGHTS.** If any right to vote arises with respect to securities in your account, you may inform Lehman Brothers that you wish to exercise such right as you specify. Subject to Section 19 hereof, if Lehman Brothers receives this notice within a reasonable time to act, it will act in accordance with your wishes. If Lehman Brothers does not receive such timely notice from you, it will use its discretion to decide whether and how to vote such securities.

**12. WAIVER, ASSIGNMENT AND NOTICES.** Neither Lehman Brothers' failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lehman Brothers of any of its rights or privileges hereunder. Any purported assignment of your rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lehman Brothers shall be null and void. Each Lehman Brothers Entity reserves the right to assign any of its rights or obligations hereunder or under any Contract to any other Lehman Brothers Entity without prior notice to you. Notices and other communications to you (including, without limitation, Margin Calls) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by you, shall, until the respective Lehman Brothers Entity has received notice in writing of a different address or number, be deemed to have been personally delivered to you. Margin Calls may also be communicated orally, without subsequent written confirmation.

**13. FREE CREDIT BALANCES.** You hereby authorize Lehman Brothers to use any free credit balance awaiting investment or reinvestment in your account(s) in accordance with all applicable rules and regulations and to pay interest thereon at such rate or rates and under such conditions as are established from time to time by Lehman Brothers for such account(s) and for the amounts of cash so used.

**14. RESTRICTIONS ON ACCOUNT.** You understand that Lehman Brothers, in its sole and absolute discretion, may restrict or prohibit trading of securities or other property in your account(s) and may terminate your account(s), and you shall nevertheless remain liable for all of your obligations to the Lehman Brothers Entities under

4

this Agreement or any Contract. In the event that Lehman Brothers, in its sole and absolute discretion, determines to impose such restrictions on your account(s) due to credit, margin, legal, regulatory, money laundering or other concerns, Lehman Brothers shall be under no obligation to provide you with prior notice of such restriction.

**15. CREDIT INFORMATION AND INVESTIGATION.** You authorize Lehman Brothers, in its discretion, at any time and from time to time, to make or obtain reports concerning your credit standing and business conduct (including, but not limited to, obtaining audited account statements, if such are available). You may make a written request for a description of the nature and scope of the reports made or obtained by Lehman Brothers and the same will be provided to you within a reasonable period of time.

**16. SHORT AND LONG SALES.** In placing any sell order for a short sale, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "short". You are required to and will comply with all applicable rules and regulations relating to short sale transactions. In placing any sell order for a long order, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "long". The designation of a sell order as being long shall constitute a representation by you that you own the security with respect to which the order has been placed, that such security is not restricted under Rules 144 and/or 145 under the U.S. Securities Act of 1933 (as may be amended, modified or supplemented) or any other applicable law, rule or regulation and, as such, may be sold without restriction in the open market and that, if Lehman Brothers does not have the security in its possession at the time you place the order, you shall deliver the security by settlement date in good deliverable form or pay to Lehman Brothers any losses and expenses it may incur or sustain as a result of your failure to make delivery on a timely basis.

**17. MARGIN ACCOUNTS.** All Loans made hereunder are demand loans. You hereby agree to deposit and maintain such cash or collateral as margin in your margin accounts, if any, as Lehman Brothers may in its sole discretion require, and you agree to pay forthwith on demand any amount owing with respect to any of your margin accounts to satisfy Lehman Brothers' demand for such payment (a "Margin Call"). In addition, you further agree to deposit promptly and maintain such other collateral with Lehman Brothers as is required by any Contract you may have with any Lehman Brothers Entity. Upon your failure to make any such payment or deposit, or if at any time Lehman Brothers, in its sole discretion, deems it necessary for its protection, whether with or without prior demand, call or notice, Lehman Brothers shall be entitled to exercise all rights and remedies provided herein. No demands, calls, tenders or notices that Lehman Brothers may have made or given in the past in any one or more instances shall invalidate your waiver of the requirement to make or give the same in the future.

**18. SECURITIES CONTRACTS.** You acknowledge and agree that any positions in your account(s) shall be deemed "securities contracts" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code.

**19. CONSENT TO LOAN OR PLEDGE OF SECURITIES IN MARGIN ACCOUNTS.**

(a) Except as noted in subparagraph (b) below, within the limits of applicable law and regulations, you hereby authorize Lehman Brothers to lend either to itself or to others any securities held by Lehman Brothers in any of your accounts, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such property as collateral for its general loans. Any such property, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lehman Brothers thereon or for a greater sum, and Lehman Brothers shall have no obligation to retain a like amount of similar property in its possession and control. You hereby acknowledge that, as a result of such activities, Lehman Brothers may receive and retain certain benefits to which you will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations or rehypothecations may limit, in whole or in part, your ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. You agree to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation.

(b) Unless otherwise agreed by Lehman Brothers and you, you will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned,

5

pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by you, to the full extent you would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

**20. OPTIONS.** You are aware of and agree to be bound by the Rules of the applicable Options Exchange or Association as well as The Options Clearing Corporation (OCC). You represent and warrant not to enter into any purchase or sale of equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions and risks as set out in the Characteristics and Risks of Standardized Options booklet and applicable supplements. You understand that short options positions are assigned on an automated random basis and may be assigned on the day written. You understand that the official closing price may be determined some time after the close of trading for purposes of this section. You understand that listed equity options may be automatically exercised by the OCC at expiration if the options are in-the-money by an amount equal to or in excess of a minimum amount determined by the OCC by reference to the composite closing price. You will notify Lehman Brothers of your intention to exercise listed options that are out-of-the-money by any amount, at-the-money, or in-the-money but are not subject to automatic exercise, no later than 1 hour past the close of trading for that option on that day. You will notify Lehman Brothers of your intention not to exercise an option that is in-the-money, and subject to automatic exercise, no later than 1 hour past the close of trading for that option on that day. You understand that listed options on an underlying index are automatically exercised by the OCC at expiration if the options are in-the-money by an amount equal to or in excess of a minimum amount determined by the OCC by reference to the composite closing price. You will notify Lehman Brothers of your intention to exercise any option early or not to exercise an option on an underlying index which is in-the-money no later than 15 minutes prior to the close of trading for that option on that day. If notification is not given to Lehman Brothers within the times noted, Lehman Brothers is under no obligation to take action but will endeavor to comply with your instructions. Except as required by the OCC Rules, Lehman Brothers has no obligation to exercise any option absent specific instructions from you to that effect. You agree to not violate, whether acting alone or in concert with others, the position or exercise limits of the applicable listed options exchange.

**21. PRIME BROKERAGE SERVICES.** Under the terms and conditions of this Agreement, LBI will act as a prime broker for you in accordance with the no-action letter of the Securities and Exchange Commission dated January 25, 1994, as such letter may be amended, modified or supplemented from time to time (the "SEC Letter") and the provisions set forth below:

(a) LBI will, subject to the terms and conditions of this Agreement, accept for clearance and settlement trades executed on your behalf by such executing brokers as you may designate from time to time and who have received LBI's prior approval and who have previously executed an agreement with LBI setting forth the terms and conditions under which such executing brokers will be authorized to accept orders from you for settlement by LBI (the "Executing Brokerage Agreement").

(b) LBI shall be responsible for settling trades executed on your behalf by your executing broker(s) and reported to LBI by you and your executing broker(s) provided that you have reported to LBI on trade date, by the time designated to you by LBI, all the details of such trades including, but not limited to, the contract amount, the security involved, the number of shares or the number of units and whether the transaction was a long or short sale or a purchase, and further provided that LBI has either affirmed or not "DK'd" ("indicated it does not know") and has not subsequently disaffirmed such trades. In the event that LBI determines not to settle a trade, LBI shall not have settlement responsibility on such trade and shall, instead, send you a cancellation notification to offset the notification sent to you under sub-paragraph (c) of this paragraph. You shall be solely responsible and liable to your executing broker(s) for settling such trade. In addition, LBI may be required to cease providing prime brokerage services to you in accordance with the Executing Brokerage Agreement.

(c) On the day following each transaction, LBI shall send you a confirmation of each trade placed with an executing broker in accordance within the SEC Letter based upon the information you provided to LBI. Any confirmations issued by LBI as prime broker shall identify the executing broker and provide you with the information required by the SEC Letter. Confirmations of the execution of orders and other activity in your account(s) which have been provided or made available to you by 10:00 a.m. (New York time) on the business day immediately following the trade date shall be conclusive if not objected to by 2:00 p.m. (New York time) on such business day or, if such reports are provided or made available to you after 10:00 a.m. (New York time) on such business day, then such confirmations shall be conclusive if not objected to within four (4) hours after such

confirmations have been provided or made available to you. Monthly statements shall be sent to you in accordance with the SEC Letter. Information contained in monthly statements of account, to the extent not included in an activity report, shall be conclusive if not objected to within ten (10) days after such statements have been provided or made available to you. LBI may send communications to your address of record or another address provided to LBI in writing. All communications sent to such address, whether by mail, facsimile, telegraph, messenger, electronic means or otherwise, shall be deemed to have been given to you personally as of the date and time sent, whether actually received or not.

(d) In the event of: (i) the filing of a petition or other proceeding in bankruptcy, insolvency or for the appointment of a receiver by or against your executing broker, (ii) the termination of your executing broker's registration and the cessation of business by it as a broker-dealer, or (iii) your executing broker's failure, inability or refusal, for any reason whatsoever or for no reason at all, to settle a trade, and if LBI agrees to settle any trades executed on your behalf by such executing broker, regardless of whether LBI either affirmed or did not DK and did not disaffirm such trades, you shall be solely responsible, and liable to LBI, for any losses arising out of or incurred in connection with LBI's agreement to settle such trades.

(e) You shall maintain in your account with LBI such minimum net equity in cash or securities as LBI, in its sole discretion, may require from time to time (the "Lehman Brothers Net Equity Requirements"), which shall in no event be less than the minimum net equity required by the SEC Letter (the "SEC Net Equity Requirements"). In the event your account falls below the SEC Net Equity Requirements, you hereby authorize LBI to notify promptly all executing brokers with whom it has an Executing Brokerage Agreement on your behalf of such event. Moreover, if you fail to restore your account to compliance with the SEC Net Equity Requirements within the time specified in the SEC Letter, LBI shall, without notice to you: (i) notify all such executing brokers that LBI is no longer acting as your prime broker and (ii) either not affirm or "DK" ("indicate that it does not know") all prime brokerage transactions on your behalf with a trade date after the business day on which such notification was sent. In the event : (i) your account falls below the Lehman Brothers Net Equity Requirements, (ii) LBI determines in its sole discretion that there would not be enough cash in your account to settle such transactions or that a maintenance Margin Call may be required as a result of settling such transactions, or (iii) LBI determines in its sole discretion that the continuation of prime brokerage services to you presents an unacceptable risk to Lehman Brothers taking into consideration all the facts and circumstances, then LBI may disaffirm all your prime brokerage transactions and/or cease to act as your prime broker. In any such case, LBI shall send a cancellation notification to you, and you understand that you must settle outstanding trades directly with the relevant executing broker and that you authorize LBI to provide the executing broker with any information useful to settle such trades. You further agree that LBI will not be bound to make any investigation into the facts surrounding any transaction to which you are a party and that immediately upon notice to you and, if required, to the executing brokers, LBI may cease acting as your prime broker.

(f) If you have instructed your executing broker(s) to send confirmations to you in care of LBI, as your prime broker, the confirmation sent by such executing broker is available to you promptly from LBI (once received), at no additional charge.

(g) If your account is managed on a discretionary basis, you hereby acknowledge that your prime brokerage transactions may be aggregated with those of other accounts of your adviser, according to your adviser's instructions, for execution by your executing broker(s) in a single bulk trade and for settlement in bulk by LBI. You understand that no part of any transaction may be allocated to any other account where such other account's net equity is below the minimum levels established in the SEC Letter and that, should such a net equity deficiency occur in any such other account, LBI must disaffirm the entire transaction. In the event any trade is disaffirmed, as soon as practicable thereafter, LBI shall supply your executing broker(s) with the allocation of the bulk trade, based upon information provided by your adviser.

(h) You hereby authorize LBI to disclose your name, address and tax I.D. number to your executing broker(s) to enable such executing broker to establish on its books an account for you to be used in the event transactions are disaffirmed by LBI.

(i) Lehman Brothers will not be responsible or liable for any acts or omissions of any executing broker or its employees. You understand that Lehman Brothers does not act as investment adviser or solicit orders, that Lehman

7

Brothers does not advise prime brokerage customers, perform any analysis, or make any judgment on any matters pertaining to the suitability of any order, or offer any opinion, judgment or other type of information pertaining to the nature, value, potential or suitability of any particular investment.

(j) You agree to indemnify and hold Lehman Brothers harmless from any loss, claim or expense, including attorneys' fees, incurred by Lehman Brothers in connection with Lehman Brothers acting or declining to act as prime broker for you and to fully reimburse Lehman Brothers for any legal or other expenses (including the cost of any investigation and preparation) which Lehman Brothers may incur in connection with any claim, action, proceeding or investigation arising out of or in connection with this Agreement or any transactions hereunder.

(k) You represent and warrant that you are currently in compliance, and during the term of this Agreement will remain in compliance, with all applicable requirements of the SEC Letter, including, but not limited to, the requirement that you execute an agreement with each executing broker.

(l)    The prime brokerage services hereunder shall be provided in a manner consistent with the SEC Letter.

**22.  LEGALLY BINDING.** You hereby agree that this Agreement and all of the terms hereof shall be binding upon you and your estate, heirs, executors, administrators, personal representatives, successors and assigns. You further agree that all purchases and sales shall be for your account(s) in accordance with your oral or written instructions. You hereby waive any and all defenses that any oral instruction was not in writing as may be required by any applicable law, rule or regulation. With respect to any of your accounts maintained in connection with this Agreement, you hereby authorize Lehman Brothers to act and rely on any instructions (including, without limitation, instructions to transfer cash or securities, purchase or sell securities, enter into derivative or other transactions or borrow money or securities) received by Lehman Brothers from any of the persons listed on Exhibit A, as such list may be amended by you from time to time. In addition, you hereby authorize Lehman Brothers to act and rely on any instructions received by Lehman Brothers from any of your employees or agents (including any investment manager or adviser) that Lehman Brothers reasonably believes is authorized to so act on your behalf.

**23.  AMENDMENT.** You agree that Lehman Brothers may modify the terms of this Agreement at any time upon prior written notice to you. By continuing to accept services from Lehman Brothers thereafter, you will have indicated your acceptance of any such modification. If you do not accept such modification, you must notify Lehman Brothers in writing; your account may then be terminated by Lehman Brothers, after which you will remain liable to Lehman Brothers for all outstanding liabilities and obligations. Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lehman Brothers.

**24.  GOVERNING LAW.** THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF.

**25.  JURISDICTION; WAIVER OF JURY TRIAL.** The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

**26.  WAIVER OF IMMUNITIES.** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or

8

after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

**27. TRANSFERS.** Lehman Brothers shall have the right to transfer Assets between any account in order to satisfy any of your obligations to Lehman Brothers. When giving instructions to transfer Assets from your accounts to any bank or other entity, you agree that all such requests will have been approved by an authorized signatory and you agree to provide Lehman Brothers with an accurate account number designating the account to receive such Assets. You agree to indemnify and hold Lehman Brothers harmless from and against all liabilities arising from the provision of an inaccurate account number or any other liabilities arising as a result of the transfer at your request.

**28. PROVISION OF DATA.** With respect to any market data or other information that Lehman Brothers or any third party service provider provide to you, (i) Lehman Brothers and any such provider are not responsible or liable if any such data or information is inaccurate or incomplete in any respect; (ii) Lehman Brothers and any such provider are not responsible or liable for any actions that you take or do not take based on such data or information; (iii) you will use such data or information solely for the purposes set forth in this Agreement and any other agreement between us; (iv) such data or information is proprietary to Lehman Brothers and any such provider and you will not retransmit or disclose such data or information to third parties except as required by applicable law or regulation; and (v) you will use such data or information solely in compliance with applicable laws, rules and regulations.

**29. EXTRAORDINARY EVENTS.** You agree that Lehman Brothers will not be liable for any loss caused, directly or indirectly, by government restrictions, exchange or market rulings, suspension of trading, war (whether declared or undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of utility services, accidents, adverse weather or other events of nature, including but not limited to earthquakes, hurricanes and tornadoes, or other conditions beyond Lehman Brothers' control. In the event that any communications network, data processing system, or computer system Lehman Brothers uses is rendered inoperable, Lehman Brothers will not be liable to you for any loss, liability, claim, damage or expense resulting, either directly or indirectly, therefrom.

**30. LIMITATION OF LIABILITY.** Lehman Brothers shall not be liable in connection with the execution, clearing, handling, purchasing or selling of securities, commodities or other property, or other action, except for gross negligence or willful misconduct on Lehman Brothers' part. You understand that certain securities may be held outside the United States by unaffiliated, foreign agent banks and depositories. Lehman Brothers will not be liable to you for any loss, liability or expense incurred by you in connection with these arrangements except to the extent that any such loss, liability or expense results from Lehman Brothers' gross negligence or willful misconduct. In no event will Lehman Brothers be liable for any special, indirect, incidental or consequential damages arising out of this Agreement.

**31. HEADINGS; COUNTERPARTS.** The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder. This Agreement may be executed in counterparts, each of which shall be deemed an original.

**32. TELEPHONE CONVERSATIONS.** For the protection of both you and Lehman Brothers, and as a tool to correct misunderstandings, you hereby authorize Lehman Brothers, at Lehman Brothers' discretion and without prior notice to you, to monitor and/or record any or all telephone conversations or electronic communications between you and Lehman Brothers or any of Lehman Brothers' employees or agents. You acknowledge that Lehman Brothers may determine not to make or keep any of such recordings and that such determination shall not in any way affect any party's rights.

**33. CUMULATIVE RIGHTS; ENTIRE AGREEMENT.** The rights, remedies, benefits and protections afforded to each Lehman Brothers Entity under this Agreement and under any Contract you may have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that any Lehman Brothers Entity may have. To the extent that the provisions of any Contracts you have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the Contracts or within a single Contract), the conflict shall be resolved in favor of the provision which affords Lehman Brothers with the maximum rights, remedies, benefits or

9

protections. You hereby appoint Lehman Brothers as your agent and attorney-in-fact to take any action (including, but not limited to, the filing of financing statements) necessary or desirable to perfect and protect the security interest granted herein or to otherwise accomplish the purposes of this Agreement. Except as set forth above, this Agreement represents the entire agreement and understanding between you and Lehman Brothers concerning the subject matter hereof.

**34. CAPACITY TO CONTRACT; ANTI-MONEY LAUNDERING; AFFILIATIONS.** You represent that you have the capacity and authority to enter into this Agreement. You represent to the best of your knowledge that you do not maintain or transact business for or with nor will you introduce individuals or entities to Lehman Brothers that the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") has listed as "Specially Designated Nationals and Blocked Persons" nor with any client in an embargoed country as determined by OFAC. Furthermore, you represent that you have conducted thorough due diligence with respect to all of your clients, and you do not know or have any reason to suspect that the monies used to fund the account have been or will be derived from or related to any illegal activities, including but not limited to, money laundering activities. You agree to provide Lehman Brothers with any information that it may require in relation to compliance with any applicable money laundering regulations. Each representation or warranty made by you in this Agreement will be deemed to be repeated by you on each date on which a transaction occurs hereunder.

You represent that you are of legal age and that, unless you have notified Lehman Brothers to the contrary, neither you nor any member of your immediate family is: (i) an employee or member of any exchange, (ii) an employee or member of the National Association of Securities Dealers, Inc. or any of its affiliates, (iii) an individual or an employee of any corporation or firm engaged in the business of dealing, as broker or principal, in securities, options or futures or (iv) an employee of any bank, trust company or insurance company. If you are signing on behalf of others, you hereby represent that the persons(s) or entity(ies) on whose behalf you are signing is/are authorized to enter into this Agreement and that you are duly authorized to sign this Agreement and make the representations contained herein in the name and on behalf of such other person(s) or entity(ies) and you agree to indemnify and hold Lehman Brothers harmless from any claim or claims arising from your unauthorized execution of this Agreement on the behalf of such other person(s) or entity(ies). You hereby authorize Lehman Brothers to accept faxed copies of this or any other document or instruction as if it were the original and further to accept signatures on said faxes as if they were original.

**35. ERISA.** The investment manager or advisor for Customer represents that Customer is not benefit plan an ERISA Plan as defined in Section 3(3) of ERISA, or subject to ERISA or Section 4975 of the Code, or Similar Law. The investment manager further represents and warrants that Customer is not a person acting on behalf of an ERISA Plan and that the Customer's assets do not constitute assets of an ERISA Plan.

PLEASE COMPLETE THIS INFORMATION *AND* SIGN THE APPROPRIATE SPACE BELOW:

THIS AGREEMENT IS DATED AS OF _____, 200_

Newport Global Credit Fund (Master) LP
_____
*Name of Customer*

21 Weterway Ave, Suite 150    USA
_____
*Address*                        *Country*

The Woodlands, TX    77380
_____
*City, State*                    *Zip Code + 4*

BY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE THAT:

YOU HAVE RECEIVED A COPY OF THIS AGREEMENT AND AGREE TO ITS TERMS AND CONDITIONS.

CUSTOMER NAME:    Newport Global Credit Fund (Master) LP
_____
*Individual or Printed Name of Company*

SIGNATURE:    _____
*Signature of Authorized Person*

PRINT NAME:    Timothy T. Janszen, Authorized Officer of Ultimate General Partner
_____
*Printed Name and Title of Signatory* or *Name of General Partner if Signer is a Partnership*

BY:    _____
*Authorized Signatory and Title of General Partner if Above Signer is a Partnership* Otherwise Blank

ACKNOWLEDGED AND AGREED

BY: Newport Global Advisors LP solely for the purposes of the representation in Section 35

By: _____

Name: Timothy T. Janszen

Title: CEO

ACCEPTED AND AGREED TO:

_____
Lehman Brothers Inc., as signatory for itself and as agent for the affiliates named herein

11

## EXHIBIT A
### AUTHORIZED PERSONS

| <u>Name</u> | <u>Specimen Signature</u> |
|---|---|
| Roger A. May | *Roger A. May* |
| Thomas Reeg | |
| Ryan Langdon | |

**EXHIBIT 2**

## Margin Lending Agreement

**LEHMAN BROTHERS
INTERNATIONAL (EUROPE)**

Lehman Brothers International (Europe)
25 Bank Street,
London E14 5LE
United Kingdom

| Borrower: Newport Global Credit Fund (Master) LP | Reference No.: |
|---|---|

This Margin Lending Agreement (this "Agreement") by and among Lehman Brothers International (Europe) ("Lender") and the above-listed borrower ("Borrower") is arranged by Lehman Brothers Inc. ("Agent"), a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") under the U.S. Securities and Exchange Act of 1934, as amended, and governs all loans (the "Loans") of money or securities that Lender may, from time to time in its sole and absolute discretion, agree to make to Borrower in connection with transactions entered into by Borrower in the Lehman Brothers Inc. Customer Account Agreement – Prime Brokerage dated _____, as amended from time to time (the "LBI Account Agreement").

1.  **AGENT AS AGENT OF LENDER AND BORROWER.**

(a) Lender and Borrower (the "Principals") each appoints Agent to act as agent with regard to any and all actions necessary to effect Loans as described in this Agreement and Agent acknowledges and accepts such appointment.

(b) As agent of each of the Principals and in compliance with all applicable regulations, Agent will arrange all Loans.

(c) In connection with each Loan, Agent acts solely in its capacity as agent for the Principals pursuant to instructions from the Principals. Agent shall have no responsibility or personal liability to either Principal arising from any failure by a Principal to pay or perform any obligation hereunder. Notwithstanding anything herein to the contrary, Agent shall not have any responsibility for or any obligation or liability to either Principal with respect to the monitoring of margin maintenance hereunder. Each Principal agrees to proceed solely against the other to collect or recover any amount owing to it or to enforce any of its other rights in connection with, or as a result of, any Loan. The Principals acknowledge that Agent is acting solely as an agent hereunder, and the Principals agree to hold Agent harmless from all liability except for losses or damages caused by Agent's gross negligence or wilful misconduct.

(d) Each Principal and Agent hereby agree that any and all notices, demands, communications, payments or deliveries of any kind relating to any Loan may be delivered or made solely through Agent.

2.  **PURPOSE OF THE LOANS.** Unless notice is provided to Lender in advance of a Loan, the proceeds of each Loan shall be utilized by Borrower solely to satisfy its payment or delivery obligations under the LBI Account Agreement from time to time in effect between Borrower and Agent.

3.  **LOAN TERMS.**

(a) Subject to all other applicable provisions of this Agreement, all Loans that are loans of securities shall be governed by the terms of a standard-form Global Master Securities Lending Agreement (May 2000 version), as modified and supplemented by the Schedule to GMSLA and 2000 UK Tax Addendum attached thereto (collectively, the "GMSLA"), which terms are hereby incorporated into this Agreement as if set forth fully herein. In the event of any conflict between the terms of the GMSLA incorporated herein and the terms expressly set forth herein, the terms expressly set forth herein shall control. In furtherance of the foregoing (and not by way of limitation), Lender,

**LEHMAN BROTHERS**

Borrower and Agent agree that: (i) the fees payable by Borrower with respect to Loans of securities will be governed by this Agreement (including the TCR (as defined in Section 4 hereof)), not by Paragraph 7 of the GMSLA; (ii) the collateralization and margin requirements and procedures relating to Loans of securities will be governed by this Agreement (including the TCR), not by Paragraph 5 of the GMSLA; (iii) the obligations of Borrower to Lender and Agent will be secured by a first priority security interest in certain property of Borrower (as set forth herein and in the LBI Account Agreement), not by Borrower transferring title in certain property pursuant to the GMSLA, including Paragraphs 2.3 and 4.2 of the GMSLA; and (iv) the term Posted Collateral (as used in Paragraph 9.1 of the GMSLA) will be deemed to be a reference to the collateral held by Lender and Agent pursuant to this Agreement and the LBI Account Agreement.

(b) All Loans are demand loans. Immediately upon Lender's demand from time to time, Borrower shall repay outstanding amounts under any or all Loans of money (together with all accrued interest) and/or redeliver Equivalent Securities (as defined in the GMSLA) under any or all Loans of securities. The inclusion of Section 6 hereof and of provisions in the GMSLA relating to Events of Default (as defined therein) shall not affect the status of the Loans as demand loans or Borrower's obligations set forth in the preceding sentence.

4. **INTEREST AND LOAN FEES.** Borrower agrees that interest and fees will accrue on all outstanding Loans of money and securities in accordance with the methods described in a terms and conditions rider that has been separately provided to it or in any amendment or revision thereto which may be provided to it (the "TCR"). Borrower agrees that all such accrued interest and/or fees not paid at the close of an applicable period shall constitute an additional Loan of money hereunder.

5. **COLLATERAL.**

(a) Lender may from time to time, in its sole and absolute discretion, demand that Borrower deliver for credit to a securities account maintained by Lender (any such account, "Lender's Account") collateral in the form of cash or securities, in such amounts and/or currencies as are determined by Lender in its sole discretion. Borrower shall immediately comply with any such demand and any failure to immediately comply shall constitute a default under this Agreement. Borrower shall ensure that at all times the Market Value (as defined below) of the cash and securities collateral delivered to Lender's Account exceeds the sum of (i) the aggregate Market Value (as defined below) of the cash and securities lent under outstanding Loans and (ii) the margin requirement determined by Lender from time to time in its sole and absolute discretion and notified to Borrower (the "Margin Requirement").

"Market Value" means:

(i) with respect to cash, the amount of such cash (converted, if necessary, into U.S. dollars at a spot rate obtained from a source selected by Lender in its sole and absolute discretion); and

(ii) with respect to securities, the price for such securities obtained from a source selected by Lender in its sole and absolute discretion; provided that, (A) if prices for such securities are available on an exchange, the price shall be the closing price on such exchange and (B) the price of securities that are suspended, or in respect of which there is no source or a discontinuous source, shall be determined by Lender in its sole and absolute discretion. Market Value is determined by Lender solely for the purposes of determining Margin Requirements and should not be relied on by Borrower for any other purposes.

(b) As security for Borrower's payment and performance of all of its obligations and liabilities (whether or not mature or contingent) from time to time ("Liabilities") to Lender under this Agreement, the GMSLA or in connection with any Loan and for all obligations owing to Lender (the "Obligations"), Lender shall have a lien on and a continuing first priority security interest in all of Borrower's cash, securities, financial assets and other property from time to time delivered under this Agreement or otherwise held by, or under the control of, Lender (the "Collateral"), irrespective of whether or not Lender has made advances to Borrower in connection with such securities or other property. All Collateral shall be free and clear of all prior liens, claims and encumbrances (other than the lien in favor of Lender and its affiliates), and Borrower will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, claims or encumbrances of any nature other than the security interest created in Lender's favor and in favor of its affiliates. Borrower agrees that any Collateral may be registered and held in the name of Agent or its designee. Borrower shall execute such documents and take such other action as

**LEHMAN BROTHERS**                                    2

Lender shall reasonably request in order to perfect Lender's rights with respect to any Collateral. In addition, Borrower hereby appoints Agent and each of its affiliates as Borrower's agent and attorney-in-fact to take any action, including without limitation to sign, seal, execute and deliver all documents, as may be required to perfect Lender's interest in and to realize upon all of Lender's rights in the Collateral or to otherwise accomplish the purposes of this Agreement. In order to satisfy any of Borrower's Obligations, Lender may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to Borrower, use, apply or transfer any and all Collateral.

(c)  Except as noted in the last sentence of this subsection, within the limits of applicable law and regulations, Borrower hereby authorizes Lender to lend either to itself or to others any or all Collateral, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such Collateral as collateral for its general loans. Any Collateral, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lender thereon or for a greater sum, and Lender shall have no obligation to retain a like amount of similar property in its possession and control. Borrower hereby acknowledges that, as a result of such activities, Lender may receive and retain certain benefits to which Borrower will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations and rehypothecations may limit, in whole or in part, Borrower's ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. Borrower agrees to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation. Unless otherwise agreed by Lender and Borrower, Borrower will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by Borrower, to the full extent Borrower would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

(d)  Upon satisfaction by Borrower of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender), Lender shall return to Borrower the Collateral.

(e)  Borrower authorizes and requests Agent, as agent for Borrower, to transfer cash or securities from the account(s) of Borrower opened and maintained pursuant to the LBI Account Agreement (the "LBI Customer Account(s)") to Lender's Account as Collateral under this Agreement. In addition, if, at any time, Borrower has provided excess collateral under this Agreement and also (i) is required to deliver margin, collateral or other credit support (including title transfer credit support) to Lender under any other agreement or (ii) is required to deliver day trading margin to LBI for the benefit of any of its LBI Customer Account(s), then Borrower authorizes and requests Lender to transfer such excess collateral to itself (or to LBI, as the case may be) on Borrower's behalf in order to satisfy (to the extent possible) Borrower's obligation to deliver margin or credit support under such other agreement (or, in the case of the LBI Customer Account(s), to deliver day trading margin in compliance with New York Stock Exchange regulations). If Lender or Agent makes a delivery on Borrower's behalf pursuant to this Section 5(e), such delivery shall have the same effect as if Borrower itself had made such delivery under the applicable agreement.

6.  EVENTS OF DEFAULT.  The occurrence of each of the following is an "Event of Default" hereunder:

(i) any "Event of Default" (as defined in the GMSLA);

(ii) any event of the type described in Section 4 of the LBI Account Agreement;

(iii) Borrower's failure to maintain collateral as required by Section 5 hereof;

(iv) Borrower's failure to make any payment or delivery when required hereunder;

(v) Borrower's failure to comply with or perform any other agreement or obligation hereunder;

(vi) the occurrence of an Act of Insolvency (as defined in the GMSLA) with respect to Borrower or with respect to any general partner, managing member or analogous representative entity of Borrower;

**LEHMAN BROTHERS**                    3

(vii) any representation made or deemed to have been made by Borrower shall be incorrect or untrue in any respect when made or deemed made;

(viii) Borrower is suspended or expelled from or surrenders its membership or participation in any securities exchange or association or other self-regulatory organization or is suspended from dealing in securities by any governmental agency, or any of the assets of Borrower or the assets of an investor held by, or to the order of, Borrower are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation;

(ix) Borrower states that it is unable to, or intends not to, perform any of its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent;

(x) there is a material adverse change in the business affairs of Borrower;

(xi) any event of default or equivalent event occurs under any other agreement between Borrower and Lender or Agent or any of their affiliates; or

(xii) any material document or constitutive document of Borrower is modified in a manner which, in the sole and absolute discretion of Lender, may have a material adverse effect on any Loan or Borrower's ability to perform its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent.

Upon the occurrence of an Event of Default, all Loans shall become immediately due and payable and Lender shall have all of the rights of a secured party upon default under the Uniform Commercial Code in effect from time to time in the State of New York and other applicable laws, rules and regulations, all rights set forth in the GMSLA arising upon an "Event of Default" thereunder and all rights arising under the LBI Account Agreement after a default thereunder or under a Contract (as defined therein) including, without limitation, the right, without prior notice to Borrower, to cancel any outstanding commitments for or relative to any Loans and/or apply any Collateral to, or sell any or all of the Collateral and apply the proceeds to, any Loan (or to the purchase of securities that are the subject of any Loan); after which Borrower shall be liable to Lender and Agent for any remaining deficiency, loss, costs or expenses incurred or sustained by Lender or Agent in connection therewith. Such purchases and/or sales may be effected by Lender (or Agent, as its agent) publicly or privately without notice or advertisement in such manner as Lender may in its sole discretion determine. At any such sale or purchase, Lender, Agent or any of Lender or Agent's affiliates may purchase or sell the property to or from itself or third parties free of any right of redemption. Lender shall have the right to convert currencies in connection with the exercise of its rights hereunder in such manner as it may determine, in its sole discretion, to be commercially reasonable.

## 7. MISCELLANEOUS.

(a) Capacity to Contract. Borrower represents and warrants to Lender and Agent that it has the capacity and authority to enter this Agreement and each Loan and make each pledge of Collateral. Each representation or warranty made by Borrower in this Agreement will be deemed to be repeated on each date on which (i) a Loan is made, (ii) Collateral is delivered or released or (iii) any other transaction occurs hereunder.

(b) ERISA. (i) Borrower represents and warrants to Lender and Agent that it is either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and it covenants and agrees that any successor Investment Manager or General Partner appointed by it will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and it will provide Lender and Agent with a Investment Advisor Representation Letter.

LEHMAN BROTHERS                    4

(ii) The investment manager or advisor for Borrower represents that Borrower is not an ERISA Plan as defined in Section 3(3) ERISA, or subject to ERISA or Section 4975 of the Code, or Similar Law. The investment manager further represents and warrants that Borrower is not a person acting on behalf of an ERISA Plan and that the Borrower's assets do not constitute assets of an ERISA Plan.

(c) Compliance with Regulations. All Loans are subject to the laws, rules and regulations of the United States, England and any other applicable jurisdiction and applicable regulatory and self-regulatory authorities, including but not limited to the SEC, The Financial Services Authority of England and Wales (the "FSA"), all relevant securities and commodities exchanges and the Board of Governors of the Federal Reserve System.

(d) FSA Customer Protections. Lender is authorised by the FSA and is regulated by its rules (the "Rules"). Affiliates (such as Agent) of Lender may not be authorised by the FSA and certain services provided outside of England and Wales pursuant to this Agreement may not be regulated by the Rules. Lender and Borrower acknowledge and agree that cash held for Borrower hereunder is received as collateral with full ownership under a collateral arrangement and is subject to the security interest contained herein. Accordingly, such cash will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts. The parties further agree that Lender will use such cash in the course of its business and Borrower will, therefore, rank as a general creditor of Lender in respect of such cash. Notwithstanding the choice of law provision as set forth in Clause (m) in this Section 7 below, this Clause (d) of Section 7 shall be construed in accordance with the laws of England.

(e) Adequate Assurances. Subject to, and not as limitation of, the rights of Lender under this Agreement, if at any time Lender has reasonable grounds for insecurity with respect to Borrower's performance of any Obligation, Lender may demand, and Borrower shall give, adequate assurance of due performance within 24 hours, or within any shorter period of time Lender demands that is reasonable under the circumstances. The adequate assurance of performance that may be demanded by Lender may include, but shall not be limited to, the delivery by Borrower of additional property as Collateral.

(f) Costs and Expenses. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender or Agent (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with enforcing their rights hereunder or incurred or charged for custody of the Collateral. In each case and whether or not demand has been made therefor, Borrower hereby authorizes Lender to increase the amount of any outstanding Loan by any and all such costs, liabilities and damages, including without limitation, those incurred in connection with the liquidation of any of the Collateral.

(g) Securities Events. Lender shall inform Borrower if Lender becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities pledged to Lender: conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to 5(c), above, if Lender receives notice from Borrower that Borrower wishes to act on any of the events referenced in this paragraph and such notice is received by Lender within a reasonable time for Lender to act on such event, Lender will act in accordance with Borrower's wishes. Borrower represents that it will review all prospectuses and offering statements that it may receive and understands the risks inherent with the Loans, including any risks associated with the above-described securities events.

(h) Voting Rights. If any right to vote arises with respect to securities pledged to Lender, Borrower may inform Lender that Borrower wishes to exercise such right as Borrower specifies. Subject to 5(c), above, if Lender receives this notice within a reasonable time to act, it will act in accordance with Borrower's wishes. If Lender does not receive such timely notice from Borrower, it will use its discretion to decide whether and how to vote such securities.

(i) Waiver, Assignment and Notices. Neither Lender's failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lender of any of its rights or privileges hereunder. Any purported assignment of your

LEHMAN BROTHERS                                        5

rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lender and Agent shall be null and void. Lender and Agent each reserves the right to assign any of its rights or obligations hereunder or under any other agreement with Borrower to any of their affiliates without prior notice to Borrower. Notices and other communications to you (including without limitation demands for collateral) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by Borrower, shall, until Agent has received notice in writing of a different address or number, be deemed to have been personally delivered to Borrower. Demands for additional Collateral may also be communicated orally, without subsequent written confirmation.

(j) Securities Contract; Margin Payment; Settlement Payment. Borrower acknowledges and agrees that each Loan shall be deemed to be a "securities contract" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code and each payment or delivery hereunder, including each payment or delivery of collateral, shall be deemed to be a "margin payment" or "settlement payment" (each as defined in Section 101 and 741 of the U.S. Bankruptcy Code) made to and held by a "stockbroker" within the meaning of Sections 362 and 546 of the U.S. Bankruptcy Code.

(k) Legally Binding. Borrower hereby agrees that this Agreement and all of the terms hereof shall be binding upon it and its successors and assigns. Borrower hereby waives any and all defences that any oral instruction was not in writing as may be required by any applicable law, rule or regulation. Borrower hereby authorizes Lender and Agent to accept and act on any instructions received by Lender and/or Agent from any investment manager or advisor that Lender and/or Agent believe is authorized to act on Borrower's behalf. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender and/or Agent (including, without limitation, attorneys' fees, court costs and other expenses) in connection with Lender and/or Agent acting in reliance upon instructions from any such investment manager or advisor, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail.

(l) Amendment. Borrower agrees that Lender may modify the terms of this Agreement at any time upon prior written notice to Borrower. By failing to immediately discharge all of its Obligations upon delivery of any such notice, Borrower will have indicated its acceptance of any such modification. If Borrower does not accept such modification, Borrower must notify Lender in writing; Lender may then demand immediate discharge of all of Borrower's Obligations. Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lender.

(m) GOVERNING LAW. THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF, SAVE FOR CLAUSE (D) IN THIS SECTION 7 WHICH SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF ENGLAND.

(n) JURISDICTION; WAIVER OF JURY TRIAL. The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

(o) NO CONSEQUENTIAL DAMAGES. IN NO EVENT WILL LENDER OR AGENT BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT.

LEHMAN BROTHERS                    6

(p) Waiver of Immunities. Lender and Borrower each irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

(q) Headings. The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder.

(r) Cumulative Rights; Entire Agreement. The rights, remedies, benefits and protections afforded to Lender and Agent under this Agreement and under any other agreement Borrower may have with Lender or Agent or any affiliate of Lender or Agent, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that Lender or Agent may have. To the extent that the provisions of any agreements Borrower has with Lender or Agent, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the agreements or within a single agreement), the conflict shall be resolved in favor of the provision which affords Lender or Agent (as applicable) with the maximum rights, remedies, benefits or protections. Except as set forth above, this Agreement represents the entire agreement and understanding between Borrower, Agent and Lender concerning the subject matter hereof.

LEHMAN BROTHERS                    7

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the ____ day of _____.

Lender:

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____

Name: David Swenson

Title: Managing Director

Borrower:

NEWPORT GLOBAL CREDIT FUND (MASTER) LP

By: _____

Name: Timothy T. Janszen

Title: Authorized officer of Ultimate General Partner

Investment Advisor (for the sole purpose of agreeing to and acknowledging the representation contained in Section 7 (b) (ii))

By: _____

Name: Timothy T. Janszen

Title: CEO

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

LEHMAN BROTHERS INC.

By: _____

Name:

Title:

**LEHMAN BROTHERS**                           8

**EXHIBIT 3**

# UNANIMOUS WRITTEN CONSENT OF THE

# EXECUTIVE COMMITTEE OF THE

# BOARD OF DIRECTORS OF

# LEHMAN BROTHERS HOLDINGS INC.

The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware:

WHEREAS, the Corporation has previously authorized by specific resolution, which authority has not been revoked (the "Outstanding Guarantee Resolutions"), the guarantee of all or specified obligations and liabilities of certain direct and indirect subsidiaries of the Corporation, each of which is a "Guaranteed Subsidiary" as such term is used in the Corporation's Code of Authorities as currently in effect (the "Code"),

WHEREAS, certain of the Guaranteed Subsidiaries presently enjoy full guarantees while others have only partial guarantees, and the Corporation now wishes to expand such partial guarantees to full guarantees,

WHEREAS, due to the passage of time the names of certain of the Guaranteed Subsidiaries have changed, rendering the Outstanding Guarantee Resolutions out of date to that extent,

WHEREAS, the Corporation wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,

WHEREAS, Management wishes to establish additional Guaranteed Subsidiaries,

WHEREAS, Management wishes to specify that to the extent lawful and allowable, guarantees issued by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, so as to secure certain tax and accounting benefits, and

WHEREAS, Management believes that it would facilitate the conduct of the business of the Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their entirety with this single document,

NOW THEREFORE BE IT,

06-09-05   11:31   JDM INVESTMENTS                    ID=2023386294                              P.02
ID=2023386294

26.06.2005    29:11    2-FAX + 9120221280294                                    NO.290    004
26/06/2005    16:41    LEHMAN + 9164675296                                      NO.584    082

**RESOLVED,** that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the Code;

**RESOLVED,** that the Outstanding Guarantee Resolutions are hereby superseded and replaced in their entirety with this single document, **provided** that any guarantees provided pursuant to the Outstanding Guarantee Resolutions and outstanding on the date hereof, whether in the form of a separately executed individual guarantee or otherwise, shall remain issued, outstanding and valid for all purposes;

**RESOLVED,** that guarantees provided by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, to the extent lawful and allowable, as specified on Schedule A hereto;

**RESOLVED,** that each of the persons listed in the Code (as it may be amended from time to time) as being authorized to approve individual guarantees issued by the Corporation with respect to Guaranteed Subsidiaries, or any proper delegee thereof (collectively, "Authorized Persons"), are hereby authorized, in the name and on behalf of the Corporation, to execute such guarantees in such form as is approved by an attorney of the Corporation and such Authorized Person, subject to any limitations specified herein, his or her execution of each such guarantee to be conclusive evidence of approval thereof, and to do such other acts and things as may be advisable or necessary in order to effect the purposes and intent of these resolutions; and

**FURTHER RESOLVED,** that any and all actions contemplated by the foregoing resolutions and taken by such Authorized Persons prior to the date hereof are hereby ratified, confirmed and approved in all respects.

Dated: June 9, 2005

Richard S. Fuld, Jr.

John D. Macomber

2

06/08/2005    16:41    LEHMAN # 51648758265S                                    NO.504    P03

**Schedule A**
**to LBHI Unanimous Written Consent**
**dated June 9 , 2005**

| | Name of Subsidiary | Issue Corporation guarantee from branch located in London, England, to the extent lawful and allowable? |
|---|---|---|
| 1. | Lehman Brothers Asia Holdings Limited | No |
| 2. | Lehman Brothers Bankhaus A.G. | Yes (London branch of such subsidiary only) |
| 3. | Lehman Brothers Commercial Bank | No |
| 4. | Lehman Brothers Commercial Corporation | No |
| 5. | Lehman Brothers Commercial Corporation Asia Limited | No |
| 6. | Lehman Brothers Equity Finance (Cayman) Limited | No |
| 7. | Lehman Brothers Finance S.A. | No |
| 8. | Lehman Brothers Holdings Plc | Yes |
| 9. | Lehman Brothers International (Europe) | Yes |
| 10. | Lehman Brothers Japan Inc. | No |
| 11. | Lehman Brothers (Luxembourg) Equity Finance S.A. | No |
| 12. | Lehman Brothers (Luxembourg) S.A. | No |
| 13. | Lehman Brothers OTC Derivatives Inc. | No |
| 14. | Lehman Brothers Securities Asia Limited | No |
| 15. | Lehman Brothers Securities N.V. | No |
| 16. | Lehman Brothers Special Financing Inc. | No |
| 17. | Lehman Brothers Treasury Co. B.V. | No |
| 18. | Lehman Re Limited | No |

3

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

To:    **Standard & Poor's Rating Services**
**55 Water Street**
**New York, NY 10041**

We, Lehman Brothers Holdings Inc., do hereby absolutely and unconditionally guarantee the payment by Lehman Brothers International (Europe) ("Affiliate") of all of Affiliate's liabilities, obligations and commitments (the "Guaranteed Obligations") to any counterparty of Affiliate and such counterparty's successors, endorsees and assigns (collectively, the "Beneficiaries"), as the same shall respectively become due, together with accrued interest and charges, if any, and we agree to reimburse each Beneficiary for all expenses including reasonable attorneys' fees of enforcing or obtaining or endeavoring to enforce or obtain payment thereof.

This Guarantee is absolute and unconditional without limitation as to monetary amount or duration, irrespective of the validity, regularity or enforceability of any agreement or document setting forth a Guaranteed Obligation (each a "Borrower Agreement") against Affiliate (other than as a result of the unenforceability of the applicable Borrower Agreement against the Beneficiary), any waiver or consent by any Beneficiary with respect to any provisions thereof or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defenses of payment and statute of limitations, neither of which is waived); provided, however, that we shall be entitled to exercise any right that Affiliate could have exercised under the applicable Borrower Agreement to cure any default in respect of its obligations under the Borrower Agreement or to setoff, counterclaim or withhold payment in respect of any event of default or similar event in respect of a Beneficiary, but only to the extent such right is provided to Affiliate under the Borrower Agreement. We shall have no right of subrogation with respect to any payments we make under this Guarantee in connection with a Borrower Agreement until all Guaranteed Obligations of Affiliate under that Borrower Agreement are paid in full.

This Guarantee is a guarantee of payment, and not of collection, and each Beneficiary may exercise its rights hereunder against us without first having to take any action against Affiliate, or any other guarantor. We hereby waive diligence, presentment, protest, demand of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee.

This Guarantee shall be binding upon us, our successors and assigns.

We further agree that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation or interest thereon is rescinded or must otherwise be restored by or is recovered from a Beneficiary as a preference or fraudulent transfer under the federal Bankruptcy Code or any similar applicable state or foreign law.

hereunder to us shall be to Lehman Brothers Holdings Inc., Attention: Treasurer, at 745 Seventh Avenue, New York, New York (Facsimile No. 646-758-3334).

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the conflicts of laws principles thereof.

**IN WITNESS WHEREOF**, I have hereunto set my hand on January 4, 2008.

LEHMAN BROTHERS HOLDINGS INC.

By:

Name: James J. Killerlane III
Title:  Vice President

2

**EXHIBIT 4**

| Trade Date of Transaction | Name of Security | CUSIP | LBI Owes Me (Long) | I Owe LBI (Short) |
|---|---|---|---|---|
| 1/9/2008 | Ames True Temper FRN '12 | 031042AC8 | 1,000,000.00 | |
| 1/10/2008 | Ames True Temper FRN '12 | 031042AC8 | 2,000,000.00 | |
| 1/3/2008 | BONTEN 9 06/15 | 09852TAA4 | 2,500,000.00 | |
| 1/17/2008 | BONTEN 9 06/15 | 09852TAA4 | 500,000.00 | |
| 2/28/2008 | BONTEN 9 06/15 | 09852TAA4 | 2,000,000.00 | |
| 12/1/2008 | BONTEN 9 06/15 | 09852TAA4 | 243,750.00 | |
| 6/1/2009 | BONTEN 9 06/15 | 09852TAA4 | 255,633.00 | |
| 1/2/2008 | CHTR 11 10/15 | 12502BAC7 | 1,000,000.00 | |
| 1/4/2008 | CHTR 11 10/15 | 12502BAC7 | 1,000,000.00 | |
| 5/15/2008 | DRD FRN 12/10 | 263578AG1 | 3,000,000.00 | |
| 3/25/2008 | EDMC 10 1/4 6/16 | 28140JAD2 | 2,000,000.00 | |
| 8/20/2008 | EDMC 10 1/4 6/17 | 28140JAD2 | 1,000,000.00 | |
| 8/5/3008 | FRP 13 1/8 04/18 | 305560AF1 | | 1,000,000.00 |
| 8/11/2008 | FRP 13 1/8 04/18 | 305560AF1 | | 1,000,000.00 |
| 5/19/2008 | HELLAS II FLT 01/15 | 88706QAA2 | 1,650,000.00 | |
| 6/3/2008 | HELLAS II FLT 01/15 | 88706QAA2 | 1,500,000.00 | |
| 8/19/2008 | HELLAS V FLT 12 | EF1190836 | 1,000,000.00 | |
| 7/31/2008 | INMARS FRN 11/12 | 45763UAC9 | 830,000.00 | |
| 5/14/2008 | IPCS FLT 05/13 | 44980YAK3 | 1,000,000.00 | |
| 5/20/2008 | IPCS FLT 05/13 | 44980YAK3 | 1,000,000.00 | |
| 4/18/2008 | LAUR 10 1/4 08/15 | 518613AB0 | 2,000,000.00 | |
| 6/2/2008 | LAUR 10 1/4 08/15 | 518613AB0 | 1,000,000.00 | |
| 8/15/2008 | LAUR 10 1/4 08/15 | 518613AB0 | 84,333.00 | |
| 2/15/2009 | LAUR 10 1/4 08/15 | 518613AB0 | 169,638.32 | |
| 8/15/2009 | LAUR 10 1/4 08/15 | 518613AB0 | 178,968.42 | |
| 1/10/2008 | MAJEST 9 1/2 10/10 | 56075RAF9 | 1,500,000.00 | |
| 1/22/2008 | MAJEST 9 1/2 10/10 | 56075RAF9 | 1,000,000.00 | |
| 5/5/2008 | NTVF 13 03/17 | 652366AA3 | 3,000,000.00 | |
| 3/15/2009 | NTVF 13 03/17 | 652366AA3 | 206,250.00 | |
| 1/4/2008 | NATRC 10 03/12 | 657337AF8 | 3,235,000.00 | |
| 6/2/2008 | PLIANT 11 1/8 9/1/09 | 729136AF8 | 390,000.00 | |
| 6/3/2008 | PLIANT 11 1/8 9/1/09 | 729136AF8 | 2,500,000.00 | |
| 4/3/2008 | ROIA 8 7/8 07/11 | 75040PAF5 | 1,000,000.00 | |
| 4/10/2008 | ROIA 8 7/8 07/11 | 75040PAF5 | 1,250,000.00 | |
| 5/29/2008 | ROIA 8 7/8 07/11 | 75040PAF5 | 1,000,000.00 | |
| 5/23/2008 | IESYRP Flt '13 | EF346678 | 2,000,000.00 | |
| 1/2/2008 | UNO 10 02/11 | 91528XAA7 | 1,500,000.00 | |
| 1/3/2008 | UNO 10 02/11 | 91528XAA7 | 1,500,000.00 | |
| 1/14/2008 | VIRGIN 9 01/12 | 92769PAC6 | 1,670,000.00 | |
| 1/14/2008 | VIRGIN 9 01/12 | 92769PAC6 | 690,000.00 | |
| 6/3/2008 | VIRGIN 9 01/12 | 92769PAC6 | 1,000,000.00 | |

**EXHIBIT 5**

| | Name |
|---|---|
| 031042AC8 | AMES TRUE TEMPER FLTR 12 |
| 09852TAA4 | BONTEN MEDIA GROUP INC SR SUB TOGGLE NT 144A R/MD 9.00 06/01/2015 |
| 12502BAC7 | CHARTER COMMUNICATIONS 11 10/15 |
| 263578AG1 | DRD Flt 12/10 |
| 28140JAD2 | EDUCATION MANAGEMENT 10 1/4 6/16 |
| 305560AF1 | FRP 13 1/8 04/18 |
| 88706QAA2 | HELLAS II FLT 01/15 |
| EF1190596 | HELLAS V FRN '12 |
| 45763UAC9 | INMARS 0 / 10 3/8 11/12 |
| 44980YAK3 | IPCS Flt 05/13 |
| 518613AB0 | LAUREATE ED INC SR TOGGLE NT 144A R/MD 10.25 08/15/2015 |
| 56075RAF9 | MAJEST STAR 9 1/2 10/10 |
| 652366AA3 | NEWPORT TELEVISION LLC / NTV FIN CORP SR NT 144A R/MD 13.00 03/15/2017 |
| 657337AF8 | NORTH ATLANTIC TRADNG 10 3/12 |
| 729136AF8 | PLIANT CORP 11 1/8 09 |
| 75040PAF5 | ROIA 8 7/8 07/11 |
| EF346678 Corp | UNITYMEDIA HESSEN Flt 4/13 |
| 91528XAA7 | UNO RESTARANT MERGER SUB INC SENIOR SECD NOTE 144A R/MD 10.00 02/15/2011 |
| 92769PAC6 | VIRGIN GAMING 9 01/12 |

|  |  |  |  | starting 9/15/2008 |  |
| Owner | Quantity | Coupon | Coupon Frequency | September-08 | October-08 |
|---|---|---|---|---|---|
| NGC | 3,000,000 | 6.71 | Quarterly |  | $52,062.00 |
| NGC | 5,000,000 | 9.75 | Semi-annual |  |  |
| NGC | 2,000,000 | 11.00 | Semi-annual |  | $110,000.00 |
| NGC | 3,000,000 | 7.32 | Quarterly | $55,017.00 |  |
| NGC | 3,000,000 | 10.25 | Semi-annual |  |  |
| NGC | 2,000,000 | 13.13 | Semi-annual |  | $131,285.00 |
| NGC | 3,150,000 | 8.54 | Quarterly |  | $67,257.46 |
| NGC | 1,000,000 | 8.46 | Quarterly |  | € 21,157.50 |
| NGC | 830,000 | 10.38 | Semi-annual |  |  |
| NGC | 2,000,000 | 4.93 | Quarterly |  |  |
| NGC | 3,084,333 | 11.00 | Semi-annual |  |  |
| NGC | 2,500,000 | 9.50 | Semi-annual |  |  |
| NGC | 3,000,000 | 13.75 | Semi-annual | $206,250.00 |  |
| NGC | 3,235,000 | 10.00 | Semi-annual |  |  |
| NGC | 2,890,000 | 11.13 | Semi-annual |  |  |
| NGC | 3,250,000 | 8.88 | Semi-annual |  |  |
| NGC | 2,000,000 | 7.84 | Quarterly |  | € 39,615.00 |
| NGC | 3,000,000 | 10.00 | Semi-annual |  | $151,125.00 |
| NGC | 3,360,000 | 9.00 | Semi-annual |  |  |

| November-08 | December-08 | January-09 | February-09 | March-09 | April-09 | May-09 |
|---|---|---|---|---|---|---|
| | | $67,103.00 | | | $38,208.00 | |
| | $243,750.00 | | | | | |
| | | | | | | |
| | $54,740.00 | | | $48,054.00 | | |
| | $153,750.00 | | | | | |
| | | | | | $131,285.00 | |
| | | $84,545.00 | | | $53,900.00 | |
| | | € 22,535.00 | | | € 15,280.00 | |
| | | | | | | $43,056.00 |
| $24,628.15 | | | $26,588.00 | | | $16,009.00 |
| | | | $169,638.32 | | | |
| | | | | | | |
| | | | | $196,083.00 | | |
| | | | | $161,750.00 | | |
| | | | | | | |
| | | $144,218.75 | | | | |
| | | € 38,938.00 | | | € 24,051.00 | |
| | | | $150,000.00 | | | |
| | | $151,200.00 | | | | |

| June-09 | July-09 | August-09 | September-09 | October-09 | November-09 | December-09 |
|---|---|---|---|---|---|---|
| | $38,912.00 | | | $50,325.00 | | |
| $255,632.81 | | | | | | $268,094.91 |
| | | | | | | |
| $44,009.00 | | | $3,050,630.00 | | | |
| $153,750.00 | | | | | | $153,750.00 |
| | | | | $131,250.00 | | |
| | $54,792.00 | | | $67,257.46 | | |
| | € 12,475.00 | | | € 21,157.50 | | |
| | | | | | $21,528.13 | |
| | | $15,938.00 | | | $24,628.15 | |
| | | $178,968.42 | | | | |
| | | | | | | |
| | | | $233,910.39 | | | |
| | | | $161,750.00 | | | |
| | | | | | | |
| | $144,218.75 | | | | | |
| | € 21,768.00 | | | € 39,180.00 | | |
| | | $150,000.00 | | | | |
| | | | | | | |

| January-10 | February-10 | March-10 | April-10 | May-10 | June-10 | July-10 | August-10 |
|---|---|---|---|---|---|---|---|
| $50,325.00 | | | $50,325.00 | | | $50,325.00 | |
| | | | | | $281,164.54 | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | $153,750.00 | | |
| | | | $131,250.00 | | | | |
| $67,257.46 | | | $67,257.46 | | | $67,257.46 | |
| € 21,157.50 | | | € 21,157.50 | | | € 21,157.50 | |
| | | | | $21,528.13 | | | |
| | $24,628.15 | | | $24,628.15 | | | $24,628.15 |
| | $188,811.69 | | | | | | $199,196.33 |
| | | | | | | | |
| | | $249,991.73 | | | | | |
| | | $161,750.00 | | | | | |
| | | | | | | | |
| $144,218.75 | | | | | | $144,218.75 | |
| € 39,180.00 | | | € 39,180.00 | | | € 39,180.00 | |
| | $150,000.00 | | | | | | $150,000.00 |
| | | | | | | | |

| September-10 | October-10 | November-10 | December-10 |
|---|---|---|---|
|  | $50,325.00 |  |  |
|  |  |  | $294,871.31 |
|  |  |  |  |
|  |  |  |  |
|  |  |  | $153,750.00 |
|  | $131,250.00 |  |  |
|  | $67,257.46 |  |  |
|  | € 21,157.50 |  |  |
|  |  | $21,528.13 |  |
|  |  | $24,628.15 |  |
|  |  |  |  |
|  |  |  |  |
| $267,178.66 |  |  |  |
| $161,750.00 |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  | € 39,180.00 |  |  |
|  |  |  |  |
|  |  |  |  |



**ADMIT ONE**

STAPLES

**H
A
N
D**

**D
E
L
I
V
E
R
Y**

FILED / RECEIVED

SEP 2 2 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

TP.

_____
**RECEIVED BY:**

_____
**DATE**

3:30
_____
**TIME**