# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 60

---------------------------------------------------------------X

WELLS FARGO BANK, NATIONAL ASSOCIATION, U.S.
BANK NATIONAL ASSOCIATION, THE BANK OF NEW
YORK MELLON, THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A., WILMINGTON TRUST,
NATIONAL ASSOCIATION, HSBC BANK USA, N.A.,
DEUTSCHE BANK NATIONAL TRUST COMPANY (as
Trustees, Indenture Trustees, Securities Administrators, Paying
Agents, and/or Calculation Agents of Certain Residential
Mortgage-Backed Securitization Trusts),

Petitioners,

For Judicial Instructions under CPLR Article 77 on the
Administration and Distribution of a Settlement Payment.

---------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 657387/2017 |
| MOTION DATE | |
| MOTION SEQ. NO. | 001 |

**DECISION AND ORDER**

HON. MARCY S. FRIEDMAN:

The following e-filed documents, listed by NYSCEF document number (Motion 001) 10, 30, 31, 32, 33, 44, 50, 51, 52, 53, 55, 66, 67, 68, 69, 70, 71, 72, 73, 74, 76, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 117, 118, 120, 121, 122, 123, 124, 125, 126, 128, 129, 130, 131, 132, 133, 135, 136, 137, 138, 139, 140, 141, 144, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 159, 160, 161, 162, 163, 165, 166, 167, 168, 169, 171, 176, 177, 178, 179, 180, 187, 188, 191, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 226, 399, 400, 413, 414, 415, 486, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536, 537, 538, 539, 540, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 576, 577, 578, 579, 580, 581, 582, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596, 597, 598, 599, 600, 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613, 614, 615, 616, 617, 618, 619, 620, 621, 622, 623, 624, 625, 626, 627, 628, 629, 630, 631, 632, 633, 634, 635, 636, 637, 638, 639, 640, 641, 644, 645, 646, 647, 648, 649, 650, 651, 652, 653, 654, 655, 656, 657, 658, 659, 660, 661, 662, 663, 664, 665, 666, 667, 675, 687, 688, 689, 690, 691, 692, 693, 694, 695, 696, 698, 699, 700, 701, 702, 703, 704, 705, 706, 707, 708, 709, 717, 718, 719, 720, 721, 722, 723, 724, 725, 726, 727, 728, 729, 730, 731, 732, 733, 734, 735, 736, 737, 738, 739, 740, 741, 742, 743, 744, 745, 746, 747, 748, 749, 750, 751, 752, 753, 754, 755, 756, 757, 758, 759, 762, 763, 764, 765, 766, 767, 769, 770, 771, 772, 792

were read on this petition to/for          JUDICIAL INSTRUCTIONS

Petitioners, the Trustees and payment administrators (the Trustees) of more than 250

residential mortgage-backed securities (RMBS) Trusts (the Settlement Trusts or Trusts),

commenced this special proceeding, pursuant to CPLR Article 77, for judicial instructions

regarding the distribution of a $4.5 billion Settlement Payment made by JPMorgan Chase & Co.

1

FILED: NEW YORK COUNTY CLERK 02/13/2020 03:23 PM
NYSCEF DOC. NO. 843
INDEX NO. 657387/2017
RECEIVED NYSCEF: 02/13/2020
08-13555-mg   Doc 60488-2   Filed 03/27/20   Entered 03/27/20 17:11:33   Exhibit B
Pg 3 of 47

(JPMorgan) to the Trustees. In a prior Article 77 proceeding this court approved the Trustees' acceptance of a Settlement Agreement, dated as of November 15, 2013 and modified as of July 29, 2014 (the Settlement Agreement or Settlement), which covered claims against JPMorgan Chase & Co. as securitizer and servicer of the Settlement Trusts. (See Matter of U.S. Bank N.A. [v Federal Home Loan Bank of Boston], 2015 NY Slip Op 32846 (U), 2016 WL 9110399 [Sup Ct, NY County, Aug. 12, 2016] [JPMorgan I].)[1] The Settlement Agreement provided for a portion of the $4.5 billion Settlement Payment (the Trust's Allocable Share or the Share) to be transferred to each Settlement Trust, and then distributed by petitioners to the holders of certificates or other securities issued by the Trusts (certificateholders). (Petition ¶ 1.)

The Settlement was negotiated by JPMorgan and a group of institutional investors that together hold a significant percentage of the certificates issued by the Trusts (the Institutional Investors). The Institutional Investors, other certificateholders in the Settlement Trusts, and Ambac Assurance Corporation (Ambac), the certificate insurer for certain Settlement Trusts, have appeared as respondents in this proceeding, seeking to be heard on the methodology to be used in distributing the Settlement Payment.[2]

---

[1] Although U.S. Bank was the first named petitioner in JPMorgan I and Wells Fargo is the first named petitioner in the instant proceeding, the trustees in the prior and current proceeding are the same, with the exception that Law Debenture Trust Company of New York was a petitioner only in the prior proceeding.

[2] Respondents that have appeared in this proceeding include: American General Life Insurance Company, American Home Assurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, Pa., The United States Life Insurance Company in the City of New York, The Variable Annuity Life Insurance Company (together, AIG); AEGON USA Investment Management, LLC, BlackRock Financial Management, Inc., Cascade Investment, LLC, the Federal Home Loan Bank of Atlanta, the Federal Home Loan Mortgage Corporation (Freddie Mac), the Federal National Mortgage Association (Fannie Mae), Goldman Sachs Asset Management L.P., Voya Investment Management LLC, Invesco Advisers, Inc., Kore Advisors, L.P., Metropolitan Life Insurance Company, Pacific Investment Management Company LLC, Teachers Insurance and Annuity Association of America, the TCW Group, Inc., Thrivent Financial for Lutherans, Western Asset Management Company (collectively, together with AIG, referred to as the Institutional Investors); Nover Ventures, LLC (Nover); Tilden Park Investment Master Fund LP, Tilden Park Management I LLC and Tilden Park Capital Management LP, on behalf of themselves and their advisory clients (together, Tilden Park); HBK Master Fund L.P. (HBK); Olifant Fund, Ltd., FYI Ltd., and FFI Fund Ltd. (together, Olifant); Poetic Holdings VI LLC, Poetic Holdings VII LLC, and Prophet Mortgage Opportunities LP (together, Poetic & Prophet); DW Partners LP (DW); Ellington Management Group L.L.C. (Ellington); D.E. Shaw Refraction Portfolios, L.L.C. (D.E. Shaw); Axonic Capital LLC (Axonic);

2

The Petition raises a series of issues concerning the administration and distribution of the Settlement Payment on which the Trustees seek judicial instruction. According to the Trustees, resolution of these issues will affect "which classes of certificates ultimately receive the Settlement Payment and the amount of the Settlement Payment and the amount that each class receives," as well as "which classes of certificates are written up as a result of the distribution of the Settlement Payment, the amount of such write-ups, and, ultimately, the resulting certificate principal balances of the affected classes." (Petition ¶ 8.)

As explained by the Trustees, "[e]ach certificate generally has, or is assigned, a certificate principal balance equal to the total distribution of 'principal amount' such certificate is entitled to receive. . . . Certificates cannot receive distributions of principal amount in excess of their aggregate or total certificate principal balance." (Petition ¶ 3.) The Governing Agreements contain "waterfall" provisions that dictate the amounts of principal and interest distributable to the different classes of certificates and the order of distribution among the classes. (Id.) The Governing Agreements also contain provisions governing "the allocation of losses realized on mortgage loans to specific classes of certificates," and provide that when a class of certificates is allocated a realized loss, the certificate principal balance for the class must be "written down by the corresponding amount of such realized loss." (Id. ¶ 5.) A Trust may receive a monetary

---

Strategos Capital Management, LLC (Strategos); Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Corporation (together, Ambac); FT SOF IV Holdings, LLC, Fir Tree Capital Opportunity Master Fund, L.P., and Fir Tree Capital Opportunity Master Fund III, L.P. (together, Fir Tree); and the GMO Opportunistic Income Fund and GMO Global Real Return (USITS) Fund (together, GMO). By stipulation of all parties, Assured Guaranty Corp. (Assured Guaranty), a certificate insurer, was permitted to file an amicus brief.

This court's standing decision permitted only investors with a direct interest in a Settlement Trust (i.e., certificateholders) to appear with respect to the Trust. (Matter of Wells Fargo Bank, N.A., 2018 NY Slip Op 31883 (U), 2018 WL 3743897 [Sup Ct, NY County, Aug. 7, 2018], affd sub nom Matter of Wells Fargo Bank, N.A. [v Nover Ventures, LLC], 173 AD3d 626 [1st Dept 2019].) The decision dismissed Poetic & Prophet, Nover, HBK, and Axonic as respondents with respect to Settlement Trusts in which they do not own certificates. Certain CDO and NIM trusts, in which the dismissed respondents have an ownership interest, own certificates in Settlement Trusts. The trustees for these trusts have been substituted for the dismissed respondents other than Axonic, and have advanced their interests.

3

recovery related to a realized loss previously allocated to the certificates. Most Trusts refer to such a recovery as a "subsequent recovery," and provide that "[w]hen a subsequent recovery is realized, certificate principal balances of previously written down certificates generally must be increased, or 'written up,' by the amount of the subsequent recovery." (Id. ¶ 7.)

A threshold issue in this proceeding is whether, in distributing the Settlement Payment, the Trustees should follow the "Write-Up First Method" or the "Pay First Method." Under the Write-Up First Method, the certificate principal balances of the affected classes are increased—— i.e., written up——before the Settlement Payment is distributed. Under the Pay First Method, the Settlement Payment is distributed before the balances are written up. A related issue is whether the Settlement Payment may cause the Trusts to be "temporarily overcollateralized" where the Pay First Method is applied. (Petition ¶ 28.) Other issues in distributing the Settlement Payment concern "the method for writing up certificate principal balances of previously written down certificates," and "the treatment of certain classes of certificates and loan groups with current aggregate certificate balances of zero." (Petition ¶ 8; Petition, Request for Relief ¶ 5.)[3] Resolution of these issues will require interpretation of the Settlement Agreement and the Governing Agreements for the Trusts.[4]

<u>Write-Up First or Pay First Method</u>

---

[3] Other disputed issues are discussed in the body of this decision. The Trustees annex, as Exhibits D through H to the Petition, lists of the Trusts affected by specifically identified issues. The parties' positions on the issues are briefly summarized in charts that have been provided for the court's convenience. (Charts of Parties' Positions [NYSCEF Doc. Nos. 770-773].) The specific arguments of the parties are addressed at length in their memoranda of law. Each appearing party has filed three memoranda——the first, dated September 14, 2018 (Initial Memo.); the second, dated September 28, 2018 (Response Memo.); the third, dated October 10, 2018 (Reply Memo.).

It is noted that where all respondents that have appeared in connection with certain Trusts have agreed to the methodology for distribution, they have submitted consent judgments applicable to those Trusts, which this court has approved and which have universally provided that they will have no precedential value.

[4] The Governing Agreements generally include either a pooling and servicing agreement (PSA) or an indenture and related sale and servicing agreement. (Petition ¶ 2 n 8.)

4

The Trustees seek an instruction, for the Trusts listed in Exhibit D, as to whether the

Allocable Shares for the Trusts should be administered and distributed using the Pay First

Method, the Write-Up First Method, or a different method authorized by this court. (Petition,

Request for Relief ¶ 5 [a].)    The Trustees note that "[s]ection 3.06 of the Settlement Agreement

specifies two operations that must be performed in connection with the Settlement Payment: (i)

the distribution of the Settlement Payment to Certificateholders, and (ii) the writing up of

certificate principal balances in the amount of the Settlement Payment Write-Up." (Petition ¶

21.)  They take the position that the Settlement Agreement does not address the order of

operations—that is, whether the Settlement Agreement "requires the Petitioners to apply the

Settlement Payment Write-Up after distribution of the Settlement Payment to Certificateholders

or merely after the Petitioners receive the Settlement Payment but before distribution to

Certificateholders." (Id.)  The Trustees further represent that "[f]or Settlement Trusts with

Governing Agreements that clearly specify a particular order of operations, . . . [they] are

required and intend to follow the provisions of the Governing Agreements for such Settlement

Trusts." (Id. ¶ 23.)  The Trustees state, however, that the Governing Agreements for the Trusts

listed on Exhibit D, which exceed 200, "do not clearly specify whether the Petitioners should use

the Pay First Method or the Write-Up First Method in this circumstance." (Id.)

    Respondents, in contrast, claim that the order of operations is in fact addressed by the

Settlement Agreement and/or the Governing Agreements.  Notably, respondents do not claim

that the Settlement Agreement or any Governing Agreement is ambiguous, although their

interpretations of the Agreements markedly differ.  For example, Tilden Park argues that '[t]he

Settlement Agreement controls all distribution and write-up issues to the extent it purports to do

so," but that it "delegates" the issue of the order of operations to the Governing Agreements "by

5

employing the distribution provisions of those agreements applicable to 'subsequent recoveries.'" (Tilden Park Initial Memo. at 1, 2 [emphasis omitted].) Tilden Park further contends that some of the Tilden Park Trusts clearly require the Write-Up First Method, while some plainly require the Pay First Method. (Id. at 2.) HBK argues that the Governing Agreements for the HBK Trusts unambiguously require the Pay First Method. (HBK Response Memo. at 5, 7-9.) Olifant argues that the Governing Agreements for the Olifant Trusts unambiguously require the Write-Up First Method, that the Settlement Agreement is consistent with this method or, at a minimum, does not require Pay First, and that the Settlement Agreement could not in any event amend the Governing Agreements. (Olifant Initial Memo. at 2, 9-10; Response Memo. at 4.) The Institutional Investors contend that "the Governing Agreements are silent as to the order of operations," that the Settlement Agreement requires the Pay First Method, and that the Settlement Agreement accordingly controls. (Institutional Investors Initial Memo. at 2; Response Memo. at 5; GMO Initial Memo. at 4-5 [joining Institutional Investors' Memo.].)[5]

As an initial matter, the court rejects certain respondents' contention that no claim was made in the prior Article 77 proceeding, JPMorgan I, that the Settlement Agreement did not provide for the Pay First Method, and that the prior proceeding therefore bars any objection to the Pay First Method under the res judicata doctrine. (See Institutional Investors Initial Memo. at 6-9.) As discussed further below in connection with the Write-Up Methodology, JPMorgan I did not interpret the Settlement Agreement. The issue of whether the Settlement Agreement

---

[5] Given the extent of the briefing, this decision does not purport to summarize every argument made on every issue, and does not identify every respondent that advances or supports a particular position on an issue. Even if not discussed, all arguments have been considered.

provides for the Pay First or Write-Up First Method does, however, require interpretation of that Agreement, to which the court turns.

Section 3.06 (a) of the Settlement Agreement provides for each Trust's Allocable Share of the Settlement Payment to be distributed to investors "in accordance with the distribution provisions of the Governing Agreements . . . as though [it] was a 'subsequent recovery' relating to principal proceeds available for distribution on the immediately following distribution date." It is undisputed that sections 3.06 (a) and (b) of the Settlement Agreement are relevant to the determination of whether the Settlement Agreement provides for either the Pay First or Write-Up First Method.

Section 3.06 (a) provides in pertinent part:

> "Each Trust's Allocable Share shall be deposited into the related Trust's collection or distribution account pursuant to the terms of the Governing Agreements, for further distribution to Investors in accordance with the distribution provisions of the Governing Agreements (taking into account the Expert's determination under Section 3.05) as though such Allocable Share was a 'subsequent recovery' relating to principal proceeds available for distribution on the immediately following distribution date (provided that if the Governing Agreement for a particular Settlement Trust does not include the concept of "subsequent recovery," the Allocable Share of such Settlement Trust shall be distributed as though it was unscheduled principal available for distribution on such immediately following distribution date), subject to Section 3.04."

Section 3.06 (b) further provides in full:

> "After the distribution of the Allocable Share to a Settlement Trust pursuant to Subsection 3.06(a), the Accepting Trustee for such Settlement Trust will apply (or if another party is responsible for such function under the applicable Governing Agreement will use reasonable commercial best efforts to cause such party to apply) the amount of the Allocable Share for that Settlement Trust in the reverse order of previously allocated losses, to increase the balance of each class of securities (other than any class of REMIC residual interests) to which such losses have been previously allocated, but in each case by not more than the amount of such losses previously allocated to that class of securities pursuant to the Governing Agreements. Investors shall not be entitled to payment in respect of

7

FILED: NEW YORK COUNTY CLERK 02/13/2020 03:23 PM    INDEX NO. 657387/2017

NYSCEF DOC. NO. 843    08-13555-mg    Doc 60488-2    Filed 03/27/20    Entered 03/27/20 17:11:33    Exhibit B    RECEIVED NYSCEF: 02/13/2020

Pg 9 of 47

> interest on the amount of such increases for any interest accrual period
> relating to the distribution date on which such increase occurs or any prior
> distribution date. For the avoidance of doubt, this Subsection 3.06(b) is
> intended only to increase the balances of the related classes of securities,
> as provided for herein, and shall not affect the distribution of the
> Settlement Payment provided for in Subsection 3.06(a)."

A court presented with a contractual interpretation issue should "construe the [contract] so as to give full meaning and effect to the material provisions. A reading of the contract should not render any portion meaningless. Further, a contract should be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." (Beal Sav. Bank v Sommer, 8 NY3d 318, 324-25 [2007] [internal quotation marks and citations omitted]; W.W.W. Assocs., Inc. v Giancontieri, 77 NY2d 157, 162 [reading the contract "as a whole to determine its purpose and intent"]; National Conversion Corp. v Cedar Bldg. Corp., 23 NY2d 621, 625 [1969] [holding that "[a]ll parts of an agreement are to be reconciled, if possible, in order to avoid inconsistency"].) "Courts 'may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" (Matter of Banos [v Rhea, as Chairperson of the New York City Hous. Auth.], 25 NY3d 266, 287 [2015], quoting Vermont Teddy Bear v 538 Madison Realty Co., 1 NY3d 470, 475 [2004].) "Importantly, too, courts should 'aim [for] a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations.'" (Matter of Banos, 25 NY3d at 287 [quoting Sutton v East River Sav. Bank, 55 NY2d 550, 555 [1982].)

In addition, the determination of whether a contract is ambiguous is one of law to be resolved by the court. (Matter of Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995]; W.W.W. Assocs., Inc., 77 NY2d at 162.) The court should determine from contractual language, without regard to extrinsic evidence, whether there is any ambiguity. (Chimart Assocs. v Paul,

66 NY2d 570, 573 [1986].) "'Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent' or where its terms are subject to more than one reasonable interpretation." (Universal Am. Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa., 25 NY3d 675, 680 [2015] [internal quotation marks and citations omitted]; Chimart Assocs., 66 NY2d at 573 [ambiguity exists where "the agreement on its face is reasonably susceptible of more than one interpretation"].)

Applying these precepts, the court holds that the Settlement Agreement is not ambiguous as to the order of operations. As section 3.06 (a) expressly defers to the distribution provisions of the Governing Agreements, the Governing Agreements control where they specify the order of operations, and the Settlement Agreement controls only where the Governing Agreements do not specify such order. The court further holds that the only interpretation to which the Settlement Agreement is reasonably susceptible is that the Settlement Agreement requires application of the Pay First Method, under which the Settlement Payment must be distributed prior to the writing up of the certificate principal balance. Section 3.06 (a) provides not only for "deposit" of the Trust's Share into the Trust's collection or distribution account, but also for "further distribution to Investors in accordance with the distribution provisions of the Governing Agreements" as a "subsequent recovery." Section 3.06 (b) addresses the write-up of the balance of previously written down classes of certificates. Section 3.06 (b) thus provides that the Trustee will apply the amount of the Share for the Trust in order "to increase the balance of each class of securities . . . to which [] losses have been previously allocated. . . ." Section 3.06 (b) also expressly provides for the write-up to occur "after" the distribution pursuant to 3.06 (a).

Citing the first sentence of section 3.06 (b) that the Trustee will write-up the balance "[a]fter the distribution of the Allocable Share to a Settlement Trust pursuant to Subsection

9

FILED: NEW YORK COUNTY CLERK 02/13/2020 03:23 PM
INDEX NO. 657387/2017
NYSCEF DOC. NO. 843
08-13555-mg    Doc 60488-2    Filed 03/27/20    Entered 03/27/20 17:11:33    Exhibit B
RECEIVED NYSCEF: 02/13/2020
Pg 11 of 47

3.06(a)," certain respondents contend that the write-up is to occur after the deposit of the Share

into the Trust account, and not after distribution of the Settlement Payment to investors. (Nover

Initial Memo. at 18-20; Ambac Initial Memo. at 8-9.) This contention reads out the language of

section 3.06 (a) that the Share shall be deposited into the account "for further distribution to

Investors in accordance with the distribution provisions of the Governing Agreements. . . ."

Moreover, the last sentence of 3.06 (b) is inconsistent with the contention that the write-up is

intended to occur before the distribution to investors. This sentence unequivocally states that

"Subsection 3.06(b) is intended only to increase the [certificate] balances . . . , and shall not

affect the distribution of the Settlement Payment provided for in Subsection 3.06(a)." Write-up

of the balances before distribution of the Settlement Payment would materially affect the

distribution because it would increase the amounts of the Settlement Payment that certain classes

are entitled to receive and/or affect the classes that are entitled to receive a portion of the

Settlement Payment. (See Petition ¶¶ 36-37.)

Having held that the Settlement Agreement governs the order of operations only if the

Governing Agreements do not specify the order of operations, the court turns to interpretation of

the Governing Agreements. The Institutional Investors argue that the Governing Agreements are

silent as to the order of operations. Most other respondents argue that the order of operations is

in fact specified in the Governing Agreements for their Trusts, and that numerous Trusts require

application of the Write-Up First Method, while some provide for the Pay First Method. As

discussed further below, the latter respondents demonstrate that the Trusts generally contain

distribution provisions that specify the order of operations.

Write-Up First Trusts

As to the Write-Up First Trusts, the court holds that the distribution provisions of the Governing Agreements require distributions to various classes "until the Certificate Principal Balance thereof is reduced to zero"; that, in order to implement the distribution provisions, the Trustees must determine the Certificate Principal Balance for each class; and that this determination is in turn governed by the definition of Certificate Principal Balance for the Trusts, which provides for the certificate balances to be written up before distribution. (See e.g. Tilden Park Initial Memo. at 11.)

The Pooling and Servicing Agreement for Bear Stearns Asset Backed Securities I Trust 2005-AQ2 (BSABS 2005-AQ2) contains terms typical of those in PSAs that require application of the Write-Up First Method.[6] This PSA contains a distribution provision, section 5.04 (a), which provides that principal shall be distributed "[o]n each Distribution Date," to the classes in the order of priority specified in that section, "until the Certificate Principal Balance [of each such class] is reduced to zero."[7] Section 5.04 (a) is, however, silent, as to whether the write-up

---

[6] Tilden Park holds certificates in this Trust and analyzes the provisions of the Trust's PSA in support of its claim that the provisions require application of the Write-Up First Method. Tilden Park claims that the majority of its Trusts are governed by PSAs with similar provisions. (Tilden Park Initial Memo at 14-16, 14 n 7 [identifying Tilden Park Write-Up First Trusts].) Trusts with PSA provisions similar to BSABS 2005-AQ2 are identified by respondents Olifant (Initial Memo. at 1, 4 [stating that all Olifant Trusts on Exhibit D to the Petition are Write-Up First Trusts]); D.E. Shaw (Initial Memo. at 2 [stating that two of its Trusts are Write-Up First Trusts for the reasons set forth by Tilden Park]); Poetic & Prophet (Initial Memo. at 2-5 [identifying the Trusts on Ex. B to the Initial Memo. as Write-Up First Trusts]); Nover (Initial Memo. at 14-18 [contending that the Write-Up First Method is the only appropriate method and applies to its Trusts on Exhibit D]); Ellington (Initial Memo. at 21-24 [identifying Ellington Trust GPMF 2006-AR1 as a Write-Up First Trust]); Ambac (Response Memo. at 2-3 [identifying GPMF 2005-AR5 as a Write-Up First Trust].)

[7] Section 5.04 (a) provides:
    "On each Distribution Date, an amount equal to the Interest Funds and Principal Funds for such Distribution Date shall be withdrawn by the Trustee from the Distribution Account and distributed in the following order of priority." Subsection (a) (2) goes on to provide, with respect to principal, that for each Distribution Date, at specified times and on specified conditions, Principal Funds shall be distributed in the specified Principal Distribution Amount and in the specified order of priority, to specified classes of certificates, which are limited to Class A and Class M Certificates and sub-classes thereof, "until the Certificate Principal Balance thereof is reduced to zero."

of the Certificate Principal Balance must occur before or after the distribution. Section 5.04 (b) provides that, "with respect to any Subsequent Recoveries," "[i]f, after taking into account such Subsequent Recoveries, the amount of a Realized Loss is reduced, the amount of such Subsequent Recoveries will be applied to increase the Certificate Principal Balance of the Class of Certificates with the highest payment priority to which Realized Losses have been allocated . . . ."[8] Section 5.04 (b) is the write-up provision, as it is the provision that directs the increase of the Certificate Principal Balance. This section too, however, is silent as to whether the write-up must occur before or after the distribution.

The order of operations is left to the definition in the PSA of Certificate Principal Balance. As stated in this definition, Certificate Principal Balance is the balance "as of any Distribution Date" of the Initial Certificate Principal Balance, plus, in the case of specified certificates, "any Subsequent Recoveries added to the Certificate Principal Balance of such Certificate[s] pursuant to Section 5.04 (b)," less (i) all amounts distributed "in reduction of the Certificate Principal Balance thereof on previous Distribution Dates . . . and (ii) any Applied

---

[8] Section 5.04 (b) provides in full:

"In addition to the foregoing distributions, with respect to any Subsequent Recoveries, the Master Servicer shall deposit such funds into the Protected Account pursuant to Section 4.01(b)(iii). If, after taking into account such Subsequent Recoveries, the amount of a Realized Loss is reduced, the amount of such Subsequent Recoveries will be applied to increase the Certificate Principal Balance of the Class of Certificates with the highest payment priority to which Realized Losses have been allocated, but not by more than the amount of Realized Losses previously allocated to that Class of Certificates pursuant to Section 5.05; provided, however, to the extent that no reductions to a Certificate Principal Balance of any Class of Certificates currently exists as the result of a prior allocation of a Realized Loss, such Subsequent Recoveries will be applied as Excess Spread. The amount of any remaining Subsequent Recoveries will be applied to increase the Certificate Principal Balance of the Class of Certificates with the next highest payment priority, up to the amount of such Realized Losses previously allocated to that Class of Certificates pursuant to Section 5.05, and so on. Holders of such Certificates will not be entitled to any payment in respect of Current Interest on the amount of such increases for any Interest Accrual Period preceding the Distribution Date on which such increase occurs. Any such increases shall be applied to the Certificate Principal Balance of each Certificate of such Class in accordance with its respective Percentage Interest."

12

Realized Loss Amounts allocated to such Certificate[s] on previous Distribution Dates."[9]  The definition of Certificate Principal Balance thus provides for deduction of payments of principal that were made "on previous Distribution Dates" and for deduction of losses that were allocated "on previous Distribution Dates."  In contrast, this definition provides for addition not only of previously distributed Subsequent Recoveries but of "any" Subsequent Recoveries "as of any Distribution Date."  Had the drafters intended to include only previous subsequent recoveries in the calculation of Certificate Principal Balance and thereby to delay the write-up of such subsequent recoveries, they could have done so, as they did for other principal distributions and losses.  (Tilden Park Initial Memo. at 14-16; Olifant Initial Memo. at 2-6; D.E. Shaw Initial Memo. at 2 [adopting Tilden Park's arguments]; Poetic & Prophet Initial Memo. at 2-5; Nover Initial Memo. at 14-18; DW/Ellington Initial Memo. at 21-24 [for Ellington Trust only]; Ambac Response Memo. at 2-3].)

The court further holds that the provisions of the BSABS 2005-AQ2 PSA and similar PSAs are not reasonably susceptible to a contrary interpretation.  The Institutional Investors assert that the Governing Agreements for the Exhibit D Trusts are "silent" as to, or do not specify, the order of operations.  (Institutional Investors Response Memo. at 1, 10.)  They contrast certain "JPALT" Trusts, which the Trustees have excluded from Exhibit D.  It is undisputed by the Trustees and respondents that the Certificate Principal Balance definition for

---

[9] The BSABS 2005-AQ2 PSA's definition of Certificate Principal Balance states in full:
"Certificate Principal Balance: As to any Certificate (other than the Class CE Certificates or any Class R Certificate) and as of any Distribution Date, the Initial Certificate Principal Balance of such Certificate plus, in the case of a Class A Certificate and Class M Certificate, any Subsequent Recoveries added to the Certificate Principal Balance of such Certificate pursuant to Section 5.04(b), less the sum of (i) all amounts distributed with respect to such Certificate in reduction of the Certificate Principal Balance thereof on previous Distribution Dates pursuant to Section 5.04, and (ii) any Applied Realized Loss Amounts allocated to such Certificate on previous Distribution Dates.  As to the Class CE Certificates and as of any Distribution Date, an amount equal to the Uncertificated Principal Balance of the Class CE Interest."

13

these Trusts provides for the Pay First Method by stating that the certificate balances shall be

measured "as of the close of business of the immediately preceding Distribution Date. . . ." (Id.

at 11 [emphasis in original]; Sheeren Supp. Aff., Ex. 22 [NYSCEF Doc. No. 665] [excerpts from

PSAs for JPALT Trusts excluded from Trustees' Ex. D].) The Certificate Principal Balance

definition for these Trusts thus does not include Subsequent Recoveries to be distributed on the

current Distribution Date. The Institutional Investors also point out that the Trustees have

excluded from Exhibit D certain Trusts which provide for the Write-Up First Method by using a

definition of "Class Principal Amount" that is materially similar to the Certificate Principal

Balance definition in the BSABS 2005-AQ2 PSA, except that it also refers to a provision that

specifically states that the write-up of the Class Principal Amount will occur "prior to giving

effect to distributions" on the Distribution Date. (Institutional Investors Reply Memo. at 7;

Second Supplemental Sheeren Aff., Ex. 25 [NYSCEF Doc. No. 741] [excerpts from PSAs for

Write-Up First Trusts excluded from Trustees' Ex. D].)

The provisions of the BSABS 2005-AQ2 PSA and similar PSAs do not address the order

of operations as explicitly as the PSAs for the JPALT Trusts or the excluded Write-Up First

Trusts. Determination of the timing of the write-up for the Trusts with PSAs similar to BSABS

2005-AQ2 thus requires analysis of the operative provisions of the PSAs, including the full

definition of Certificate Principal Balance and the distribution and write-up provisions. Contrary

to the Institutional Investors' apparent contention, however, the need for interpretation of these

provisions does not mean that they are silent as to the order of operations. The definition of

Certificate Principal Balance in these PSAs expressly provides that "any" Subsequent Recoveries

are to be added to the balance. The Institutional Investors thus do not persuasively contend that

the definition of Certificate Principal Balance is silent as to "which subsequent recoveries are

FILED: NEW YORK COUNTY CLERK 02/13/2020 03:23 PM    INDEX NO. 657387/2017
NYSCEF DOC. NO. 843    08-13555-mg    Doc 60488-2    Filed 03/27/20    Entered 03/27/20 17:11:33    Exhibit B    RECEIVED NYSCEF: 02/13/2020

Pg 16 of 47

used to increase" the balance. (Response Memo. at 12 [emphasis in original].) Nor is the court

persuaded by the further contention that the word "any" does not include both current and

previously distributed Subsequent Recoveries, or that the word "all" (as opposed to "any") is

required to convey such meaning. (See Institutional Investors Reply Memo. at 7; Oral Argument

Transcript at 5-6.)

The court is also unpersuaded by the arguments advanced in support of the claim, made

by HBK alone, that the BSABS 2005-AQ2 and similar PSAs require the Pay First Method.

(HBK Initial Memo. at 7-9.) HBK appears to assert that the "structure" of the PSA requires the

Pay First Method because the distribution provision, section 5.04 (a), appears in the PSA before

the write-up provision, section 5.04 (b), and the latter provision refers to "the foregoing

distributions." (Id. at 7; Response Memo. at 9-11.) The mere sequence of these provisions

cannot serve to impose an order of operations and, as held above, neither section imposes an

order of operations. Contrary to HBK's further contention, section 5.04 (b) does not specify an

order of operations by stating that the Certificate Principal Balance will not be written up unless

or until, "after taking into account such Subsequent Recoveries, the amount of a Realized Loss is

reduced. . . ." Characterizing the reduction of a Realized Loss as a "condition precedent" to the

write-up, HBK asserts, without support, that the Trustee cannot determine if this condition

precedent has been met—that is, the Trustee cannot determine if the amount of a Realized Loss

has been reduced—until after the distribution actually occurs. (See HBK Initial Memo. at 8.) To

the extent that HBK relies on section 5.05 in support of this contention (see HBK Response

Memo. at 17), such reliance is misplaced, as section 5.05 applies to allocation, not reduction, of

realized losses.

Nor does HBK offer convincing support for its assertion that the Write-Up First Method is not provided for by the definition of Certificate Principal Balance or that this definition does not reflect a material distinction between Subsequent Recoveries, on the one hand, and prior distributions of principal and allocation of losses on the other. As discussed above, the definition of Certificate Principal Balance instructs that "any Subsequent Recoveries" be added to the balance, without limitation as to when the recoveries are received, while providing for deduction from the balance only of principal distributions, and of Applied Realized Loss Amounts allocated, "on previous Distribution Dates." HBK posits, without explanation, that it is unnecessary to clarify that the definition of Certificate Principal Balance refers to Subsequent Recoveries from previous distribution dates because Subsequent Recoveries are "a component of Applied Realized Losses." (HBK Response Memo. at 16.)

In sum, the court holds that respondents Tilden Park, Olifant, D.E. Shaw, Poetic & Prophet, Nover, Ellington, and Ambac demonstrate that specified Trusts in which they have interests contain provisions substantially similar to the provisions of the BSABS 2005-AQ2 Trust discussed above, and therefore provide for the application of the Write-Up First Method in distributing the Settlement Payment. It is noted that although these respondents do not quote each Trust's PSA provisions, respondents that oppose the Write-Up First Method do not point to any material differences in the provisions of the PSAs for the specified Trusts.

Pay First Method

Two respondents further contend that the Governing Agreements for certain of their Exhibit D Trusts provide for application of the Pay First Method in distributing the Settlement Payment. Tilden Park claims that 24 of the Trusts in which it has an interest are Pay First Trusts, while D.E. Shaw claims that two of its Trusts are Pay First Trusts. (Tilden Park Initial Memo. at

16

17, n 9, 10; 18, n 11, 12; D.E. Shaw Initial Memo. at 1-2.)  Tilden Park claims that the Pay First

Trusts fall into four groups.  (Tilden Park Initial Memo. at 16-18.)  The first, which includes

BSABS 2005-SD2, is governed by a PSA in which the definition of Certificate Principal Balance

limits the Subsequent Recoveries to be added to the balance (i.e., written up) to "any Subsequent

Recoveries allocated to such Class on previous Distribution Dates. . . ."[10]  It is now undisputed

that the Pay First Method should be applied to this Trust.  (See Chart of Parties' Positions

[NYSCEF Doc. No. 772 at 4].)  The court holds that group 1 PSAs with substantially similar

definitions of Certificate Principal Balance also provide for the Pay First Method.  The second

group consists of the JPALT Trusts, discussed above, which were excluded by the Trustees from

Exhibit D, as their Governing Agreements indisputably provide for the Pay First Method.  The

third group, which includes JPALT 2006-A5, is governed by a PSA in which the definition of

Certificate Principal Amount provides for the amount (or balance) to be increased "by the

amount of Subsequent Recoveries distributed as principal. . . ."[11]  Tilden contends, and the court

---

[10] The definition of Certificate Principal Balance in the PSA for BSABS 2005-SD2 states in full:
> "Certificate Principal Balance: As to any Certificate (other than any Class B-IO
> Certificate or Residual Certificate) and as of any Distribution Date, the Initial Certificate Principal
> Balance of such Certificate, reduced by the sum of (i) all amounts distributed with respect to such
> Certificate in reduction of the Certificate Principal Balance thereof on previous Distribution Dates
> pursuant to Section 5.04, and (ii) in the case of any Subordinated Certificate, any Applied Realized
> Loss Amounts allocated to such Certificate on previous Distribution Dates, and increased by (iii)
> in the case of each such Class of Subordinated Certificates, any Subsequent Recoveries allocated
> to such Class on previous Distribution Dates pursuant to Section 5.04A. References herein to the
> Certificate Principal Balance of a Class of Certificates shall mean the Certificate Principal
> Balances of all Certificates in such Class."
(emphasis in original.)

[11] The definition of Certificate Principal Amount in the PSA for JPALT 2006-A5 states in full:
> "Certificate Principal Amount: With respect to any Certificate, the Certificate Principal Amount as
> of the Closing Date as reduced by all amounts previously distributed on that Certificate in respect
> of principal and the principal portion of any Realized Losses previously allocated to that
> Certificate; provided, however, that the aggregate Certificate Principal Amount of each class of
> Certificates to which Realized Losses have been allocated shall be increased, sequentially in the
> priority in which Realized Losses have been allocated, by the amount of Subsequent Recoveries
> distributed as principal to any related class of Certificates, but not by more than the amount of
> Realized Losses previously allocated to reduce the Certificate Principal Amount of such class of
> Certificates."

holds that, the Pay First Method is imposed by the requirement that the Subsequent Recoveries have been distributed before the increase.

The fourth group involves Trusts with Governing Agreements which, according to Tilden Park, "require a Pay First Method by omitting any explicit method for writing up certificate balances for subsequent recoveries." (Tilden Park Initial Memo. at 18.) This group also includes the two D.E. Shaw Trusts. (D.E. Shaw Initial Memo. at 1-2.) Tilden Park cites, as an example of such a Trust, SAMI 2006-AR8. The PSA for this Trust has a definition of Certificate Principal Balance which is substantially similar to that for the BSABS 2005-AQ2 Trust in that it requires "any Subsequent Recoveries" to be added to the balance pursuant to a specified provision in the PSA, section 6.02, and requires that the balance be reduced by previously distributed principal and Applied Realized Loss Amounts. The heading of section 6.02 is "Allocation of Losses and Subsequent Recoveries on Certificates." The body of the provision does not, however, mention Subsequent Recoveries or otherwise address increases in the certificate balance. Tilden Park does not persuasively argue that the Governing Agreements for these Trusts, which are affected by an apparent drafting error, should be regarded as imposing the Pay First Method. They also cannot be viewed as imposing the Write-Up First Method, given their silence as to the write-up mechanics. The court holds, in the absence of a controlling provision in the Governing Agreements, that the group four Trusts are governed by the Settlement Agreement, which requires application of the Pay First Method.

Overcollateralization of Pay First Trusts

A further sharply disputed issue is whether the Settlement Payment may create overcollateralization if the Pay First Method is applied. The Trustees do not explicitly request instruction on this issue, but highlight the potential for the Pay First Method to cause the trusts

18

FILED: NEW YORK COUNTY CLERK 02/13/2020 03:23 PM
NYSCEF DOC. NO. 843

08-13555-mg    Doc 60488-2    Filed 03/27/20    Entered 03/27/20 17:11:33    Exhibit B
Pg 20 of 47

INDEX NO. 657387/2017

RECEIVED NYSCEF: 02/13/2020

with an overcollateralization structure (OC Trusts) "to appear to be temporarily
overcollateralized." (Petition ¶ 28.) Tilden Park and HBK assert that, under the terms of the
Governing Agreements for the OC Trusts, overcollateralization may occur if the Pay First
Method is applied, thus requiring distribution of a portion of the Settlement Payment (the
Overcollateralization Release Amount) through a different waterfall than the waterfall for
distribution of principal. (Tilden Park Response Memo. at 13-15; HBK Response Memo. at 3-4,
21-25.) The Institutional Investors dispute this interpretation of the Governing Agreements and
contend that, under their terms, distribution of the Settlement Payment will not create
overcollateralization. (Institutional Investors Initial Memo. at 14-18; GMO Initial Memo. at 4-5
[adopting the arguments of the Institutional Investors].) The Institutional Investors also claim
that if the Settlement Payment were found to cause overcollateralization, the result would be
absurd, commercially unreasonable, or contrary to the reasonable expectations of the investors.
(Institutional Investors Initial Memo. at 18-20.) Other respondents take the position that the Pay
First Method should not be applied because it would cause the OC Trusts to appear to be
temporarily overcollateralized although they are not, and would result in distribution of the
Settlement Payment in an absurd or commercially unreasonable manner. (Nover Initial Memo.
at 20-22; Olifant Initial Memo. at 10-11.)

　　　　As the Trustees explain, in Trusts with an overcollateralization structure, the "initial
aggregate mortgage loan balances . . . are greater than the initial aggregate certificate principal
balances of the Class A, Class M, and Class B certificates. . . ." (Petition ¶ 25.) The excess of
aggregate mortgage loan balances over aggregate certificate principal balances is often referred
to as the "overcollateralization amount." (Id.) Where the overcollateralization amount exceeds a
specified "overcollateralization target," the amount in excess of the target "constitutes

'overcollateralization release amount,' which is typically distributed as excess cashflow instead of as principal amount in any given month." (Id. ¶ 26.)  The distribution of excess cashflow is made under a waterfall that differs from the waterfall for principal distributions and can have significant impacts on the distribution of the settlement payment, including distribution of some portion of the settlement payment to junior certificates and, in some OC Trusts, to a certificate insurer.  (Id. ¶¶ 30, 33.)

According to the Trustees, "the Pay First Method may cause the OC Trusts to appear to be temporarily overcollateralized" for the following reasons:

> "[T]he overcollateralization amount for a given distribution date is calculated as the excess of the aggregate mortgage loan balances over the pertinent aggregate certificate principal balances. The applicable Governing Agreements provide that in determining the amount of the aggregate certificate principal balances for this calculation, it should be assumed that all principal funds are being applied as principal amount to reduce such balances. The Settlement Payment is treated as though it was a subsequent recovery included in principal funds and, as a result, the aggregate certificate principal balances are reduced by the amount of the Settlement Payment. Applying the Pay First Method to the OC Trusts would make it appear that the overcollateralization amount includes the entire amount of the Settlement Payment, because the unchanged aggregate mortgage loan balances would exceed the adjusted aggregate certificate principal balances as reduced by amount of the Settlement Payment."

(Petition ¶ 28.)

The Trustees' explanation assumes that if the Pay First Method is used, the Overcollateralization Amount——a defined term in the PSAs for the OC Trusts——will be calculated based on the reduction of the aggregate certificate principal balances by the amount of the Settlement Payment, but without consideration of the corresponding write-up of such balances.  Under this scenario, the difference between the aggregate mortgage loan balances and the aggregate certificate principal balances will increase and could potentially reach a threshold for release of the Settlement Payment as excess cashflow rather than as principal.  (Id. ¶¶ 26, 28.)

Respondents take differing positions on whether the definition of Overcollateralization Amount

in fact requires both the reduction and the write-up of the aggregate certificate principal balances

to be taken into account.

It is undisputed that the most common variant of the definition of Overcollateralization

Amount provides that this amount is calculated as the aggregate principal balance of the Trust's

mortgage loans minus the aggregate certificate principal balance "after taking into account the

payment of principal. . . ." (See Institutional Investors Initial Memo. at 16-17.)[12]

The Institutional Investors contend that the definition of Overcollateralization Amount

requires the Trustee to "'take into account' or 'give effect to' not only the reduction of certificate

balances associated with the receipt of subsequent recoveries, but also an equal and offsetting

increase in certificate balances required upon the receipt of subsequent recoveries." (Initial

Memo. at 15 [emphasis in original].) They further contend that, "[a]s a matter of accounting,"

the Governing Agreements "state that when subsequent recoveries are distributed, certificate

balances are written down and up by equal and offsetting amounts——keeping the trusts' assets

and liabilities in balance." (Reply Memo. at 8 [emphasis in original].) According to this

analysis, "[t]he level of overcollateralization in the trusts would remain unchanged by the

---

[12] The PSA for BSABS 2005-SD2, a Trust in which both Tilden Park and the Institutional Investors hold
certificates, sets forth the following definition:
 "Overcollateralization Amount: With respect to a Group and any Distribution Date, the excess, if
 any, of (i) the aggregate Stated Principal Balance of the Mortgage Loans of a Group as of the last
 day of the related Due Period, over (ii) the sum of the Certificate Principal Balances of the
 Certificates of a related Group (after taking into account the payment of principal other than any
 related Extra Principal Distribution Amount on such Certificates) on such Distribution Date."

Other variants of the definition of Overcollateralization Amount are summarized by the Institutional Investors
(Sheeren Aff., Ex. 14 [NYSCEF Doc. No. 591], and include that the calculation be made "after taking into account
the distributions of principal . . ." or "after giving effect to distributions of the Principal Distribution Amount to be
made . . . ." Respondents do not claim that other variants of the definition have a material effect on the meaning of
Overcollateralization Amount.

Settlement Payment, because overcollateralization cannot be assessed at some fleeting moment during the distribution itself." (Initial Memo. at 15 [emphasis in original].)

Tilden Park contends, in contrast, that the requirement in the definition of Overcollateralization Amount that the payment of principal on the certificates must be taken into account means that, "within the calculation of the overcollateralization amount for the distribution date that includes the Settlement Payment distribution, the aggregate certificate balance will be decreased by the amount of the Settlement Payment." (Tilden Park Response Memo. at 14-15 [emphasis in original].) According to Tilden Park, "the overcollateralization amount -- the difference between the aggregate (unchanged) mortgage loan balances and the aggregate (lowered) certificate balances -- will be raised and may exceed the overcollateralization target . . . ," in which event a distribution through the excess cashflow waterfall will be required. (Tilden Park Response Memo. at 15.) Both Tilden Park and HBK contend that the Overcollateralization Amount definition requires the reduction of aggregate certificate balances to account for the payment of principal but does not state that the balances should also take into account a write-up. (Tilden Park Response Memo. at 16; HBK Response Memo. at 23.) They assert that the Institutional Investors' interpretation of the definition to require accounting for the write-up "has no basis in the text" of the definition (Tilden Park Response Memo. at 16) or "the terms of the [] PSAs." (HBK Response Memo. at 23.)

As discussed above, BSABS 2005-SD2 is a Pay First Trust in which the Institutional Investors and Tilden Park claim an interest. Its waterfall provisions for distribution of interest and principal, including subsequent recoveries, are set forth in PSA section 5.04. Section 5.04 provides that principal shall be distributed to the classes in the order of priority specified in that

section "until the Certificate Principal Balance [of each class] is reduced to zero."[13]  Application of this waterfall provision requires the calculation of the Certificate Principal Balance of each class of certificates prior to the distribution of principal to the various classes, as distribution of principal is only permissible to the extent the remaining Certificate Principal Balance for the class exceeds zero.

The BSABS 2005-SD2 definition of Certificate Principal Balance (quoted in full *supra*) further requires that such balance be "*increased by* . . . any Subsequent Recoveries allocated [to the specified classes—there, classes of subordinated certificates] on previous Distribution Dates pursuant to Section 5.04A." (emphasis in original.)  The definition by its terms limits any write-up, for the purpose of calculating the Certificate Principal Balance, to subsequent recoveries that were distributed on prior dates.  Under the definition, the Certificate Principal Balance will not be increased by the amount of the Settlement Payment.

Section 5.04A, the write-up provision in the BSABS 2005-SD2 PSA, does not include such limiting language.  Rather, this section provides in pertinent part:

> "If a Servicer or the Master Servicer receives a Subsequent Recovery in a Prepayment Period, it will be distributed on the following Distribution Date in accordance with the priorities described under Section 5.04(a). Additionally, the Certificate Principal Balance of each Class of Subordinated Certificates that had been reduced by the allocation of a Realized Loss will be increased, in order of seniority, by the amount of such Subsequent Recovery, but not in excess of the Unpaid Applied Realized Loss Amount for such Class immediately prior to that Distribution Date."

---

[13] Section 5.04 (a) provides: "On each Distribution Date, an amount equal to the Interest Funds and Principal Funds with respect to each Group for such Distribution Date shall be withdrawn by the Paying Agent from the Distribution Account and distributed as directed in accordance with the Remittance Report for such Distribution Date, in the manner set forth in clauses (i), (ii), and (iii) below." Clause (ii) goes on to provide that the Paying Agent shall apply the Principal Distribution Amount at specified times, on specified conditions, and in the specified order of priority, with respect to specified Groups, containing classes of A, M, and B certificates, "until the Certificate Principal Balance of each such Class is reduced to zero." The definition of Principal Funds includes Subsequent Recoveries.

Section 5.04A thus provides that if a Subsequent Recovery is received, it will be distributed pursuant to 5.04 (a), and the Certificate Principal Balance will be written up in the amount of the Subsequent Recovery.

No respondent disputes that, under the terms of the Pay First Trust PSAs, where a Subsequent Recovery is received and distributed so as to reduce the Certificate Principal Balance of a specified class, the Certificate Principal Balance must be written up in the same amount as the amount distributed, although the write-up may be applied to the balance of a different class. Rather, as discussed above, those respondents that argue for a distribution based on overcollateralization focus solely on the requirement in the definition of Overcollateralization Amount that the amount be calculated "after taking into account the payment of principal," and contend that payment of principal is taken into account merely by reducing the certificate balance. Their interpretation fails to apply the settled precept that a contract must be read as a whole so as to give meaning to all of its terms. (See Beal Sav. Bank, 8 NY3d at 324-25.) The interpretation ignores or reads out the write-up provision of the PSAs, which requires Subsequent Recoveries to be accounted for not just by payment of the amount of the Subsequent Recoveries, but also by write-up of certificate balances in the corresponding amount. Both accounting operations are required to take place upon distribution of Subsequent Recoveries. The court accordingly holds that "taking into account payment of principal" or "giving effect to the distributions" to be made, encompasses both a reduction of the balance in the amount of principal to be paid out, and an increase of the balance in the amount of the Subsequent Recovery to be distributed.[14] As Overcollateralization Amount must be calculated based on

---

[14] In a prior Article 77 proceeding involving distribution of a settlement payment to Pay First OC Trusts, this Court (Scarpulla, J.) held that a PSA provision that provided for an overcollateralization release was enforceable. (Matter of Bank of New York Mellon, 56 Misc 3d 210 [Sup Ct, New York County 2017].) There, the definition of the term Principal Distribution Amount was determinative of whether there would be an overcollateralization release. As

24

Certificate Principal Balances that have not only been reduced by the Settlement Payment but have also been written up, overcollateralization will not occur.

In view of this holding, the court need not and does not reach the contention of respondents, other than Tilden Park and HBK, that a contrary reading would be commercially unreasonable or would be inconsistent with the reasonable expectations of investors.[15] It bears noting, however, that, as explained by the Trustees, overcollateralization essentially functions as a first-loss position intended to insulate senior classes from realized losses and operates as a credit enhancement for such classes—i.e., a cushion against loss. (See Petition ¶ 25.) In OC Trusts, amounts are required to be released to certificateholders under an excess cashflow waterfall, rather than as principal, when a specified overcollateralization target has been met. (Id. ¶¶ 25-28.) In view of the losses realized by the Trusts over the years, "[f]or many of the OC Trusts, the overcollateralization target has not been met or exceeded for many years and, as a result, there have been no recent overcollateralization release amounts and no excess cashflow distributions." (Id. ¶ 27.) Treatment of the Settlement Payment in a manner that would cause the overcollateralization target to be reached, with a resulting distribution of the Payment as excess cashflow rather than as principal, could result in diversion of distributions to junior

Tilden Park acknowledges, that term is not at issue here. That decision is therefore not relevant to the contractual analysis of the different PSA provisions concerning overcollateralization that are at issue in this proceeding. (See Tilden Park Response Memo. at 16, n 17 [acknowledging that the term analyzed in Bank of New York Mellon is not at issue in this proceeding].)

[15] Some respondents base this contention on the potential for overcollateralization to result in distribution to junior certificateholders. (Nover Initial Memo. at 20-22; Olifant Initial Memo. at 11; Olifant Response Memo. at 16-17.) The Institutional Investors claim that because the OC Trusts have sustained massive losses, their initial overcollateralization has been "substantially or completely exhausted" (Initial Memo. at 14); that the Settlement Payment will not "come close to reimbursing the trusts for the full amount of their prior and future losses" (id. at 19); and that overcollateralization would therefore be a commercially unreasonable fiction. (Reply Memo. at 8; see also Olifant Initial Memo. at 11.)

certificateholders as opposed to payment to senior certificateholders.  (See id. ¶¶ 4-5 [discussing

the senior-subordinate payment priority structure typical of the Trusts].)

### Write-Up Methodology

The Trustees also seek instruction as to whether the Settlement Payment write-up should

be made using the Settlement Agreement write-up instruction, the subsequent recovery write-up

instructions in the applicable Governing Agreements, or a different method authorized by the

court. (Petition, Request for Relief ¶ 5 [b].)  The Trustees note that the method to be used in

writing up the balances will have an impact on the classes of certificates that are written up and

the order in which the write-up is applied to the various classes for the Trusts listed in Exhibit F.

(Id. ¶¶ 41-52.)  In particular, the Trustees point out that while the Settlement Agreement provides

for the write-up in the reverse order of previously allocated losses, some of the Governing

Agreements for the Exhibit F Trusts provide for the write-up to be applied by "payment

priority," which may differ from the reverse order of previously allocated losses.  (Id. ¶ 50.)[16]  In

addition, according to the Trustees, the Governing Agreements for some of the Exhibit F Trusts

do not contain clear write-up instructions.  (Id.)

The Institutional Investors, among other respondents, contend that the Governing

Agreements generally contain unambiguous provisions that specify the order in which to apply

subsequent recovery write-ups, and that, where these write-up provisions conflict with the

Settlement Agreement write-up provision, the Governing Agreements must control.  They

further contend that the Settlement Agreement write-up provision governs only where the

Governing Agreements are silent.  (Institutional Investors Initial Memo. at 23-24; GMO Initial

---

[16] For example, according to the Trustees, for some Trusts the losses may be allocated sequentially, while the
Governing Agreements may require subsequent recovery write-ups to be applied on a pro rata basis among classes
of Class A certificates.  (Petition ¶ 50.)

FILED: NEW YORK COUNTY CLERK 02/13/2020 03:23 PM    INDEX NO. 657387/2017

NYSCEF DOC. NO. 833    08-13555-mg    Doc 60488-2    Filed 03/27/20    Entered 03/27/20 17:11:33    Exhibit B    RECEIVED NYSCEF: 02/13/2020

Pg 28 of 47

Memo. at 3-4; Nover Initial Memo. at 2.) Tilden Park, among other respondents, argues that the

Settlement Agreement write-up provision controls where it conflicts with the Governing

Agreements. (Tilden Park Initial Memo. at 2, 5-10; D.E. Shaw Initial Memo. at 1 [joining in

Tilden Park's Memo.]; Strategos Initial Memo. at 2 [joining in Tilden Park's Memo.];

DW/Ellington Initial Memo. at 4.)

In support of their claim that the Settlement Agreement write-up provision controls, the

latter respondents contend that any challenge to this provision is barred by the doctrine of res

judicata, based on this court's prior decision in JPMorgan I approving the Settlement Agreement.

They assert that interested parties had a full and fair opportunity to object to the terms of the

Settlement Agreement, and that the court overruled an objection that section 3.06

(a), the provision directing distribution of the Settlement Payment as if it were a subsequent

recovery, was inconsistent with certain Governing Agreements. According to these respondents,

as no objection was raised to section 3.06 (b), the Settlement Agreement write-up provision, the

assertion here that the section is unenforceable is barred by res judicata. (E.g. Tilden Park Initial

Memo. at 4-7.) They reason that the section is therefore enforceable even if it conflicts with the

Governing Agreements. (Tilden Park Reply Memo. at 1.)

The court holds that the res judicata doctrine is not determinative of whether the

Settlement Agreement write-up provision controls where it is inconsistent with the write-up

provisions in the Governing Agreements. In JPMorgan I, this court held that the objection to

section 3.06 (a) was without merit and that the Trustees exercised their discretion reasonably and

in good faith in approving the Settlement Agreement. (2016 WL 9110399, at * 16.)[17] While

---

[17] In overruling the objection to section 3.06 (a), the decision reasoned that the Trustees' reading of the PSAs "supports their contention that treatment of the settlement payment as a Subsequent Recovery comports with the PSAs and with certificateholders' expectations." (2016 WL 9110399, at * 14.)

JPMorgan I bars any claim that the provisions of the Settlement Agreement are unenforceable, the decision did not interpret the Settlement Agreement. (See Tilden Park Reply Memo. at 1 [acknowledging that res judicata "does not extend to disputes over interpretation of the Settlement Agreement"].)

Here, it is undisputed that some Governing Agreements contain write-up provisions that differ from the Settlement Agreement write-up provision. Interpretation of the Settlement Agreement is therefore required to determine whether the write-up provision of the Settlement Agreement, section 3.06 (b), applies where it conflicts with a write-up provision of a Governing Agreement. For the reasons discussed below, the court holds that section 3.06 (b) does not apply in the case of such conflict but, rather, is a "gap filler," which applies only where the Governing Agreement is silent as to the write-up mechanics.

By its terms, the Settlement Agreement does not supersede or override the Governing Agreements. Section 7.05 of the Settlement Agreement unequivocally provides: "The Parties agree that this Settlement Agreement reflects a compromise of disputed claims and is not intended to, and shall not be argued or deemed to constitute, an amendment of any term of any Governing Agreement." This provision would be rendered meaningless by a holding that the Settlement Agreement controls the write-up of the Settlement Payment or modifies the write-up provisions of the Governing Agreements if they conflict with the write-up provision of the Settlement Agreement. (See e.g. Institutional Investors Initial Memo. at 24 [relying on section 7.05]; Nover Initial Memo. at 4-5; Olifant Initial Memo. at 3.) [18]

---

[18] Tilden Park acknowledges that the Settlement Agreement write-up provision differs from the write-up provisions of certain Governing Agreements, but contends that the provisions do not conflict because the Governing Agreement provisions do not apply by their terms. In particular, Tilden Park argues that the Governing Agreement write-up provisions "apply only to Subsequent Recoveries that are received by the Master Servicer and reduce the Realized Loss for a specific loan." (Tilden Park Initial Memo. at 20 [emphasis omitted].) It is correct that the Settlement Payment is not like a typical subsequent recovery to the extent that it is not a recovery of an amount "in respect of a Liquidated Loan after a Realized Loss has been allocated with respect thereto. . . ." (See BSABS 2005-

Moreover, the write-up provisions of the Governing Agreements are integral to the distribution of a subsequent recovery pursuant to those Agreements. As discussed above in connection with the order of operations, section 3.06 (a) of the Settlement Agreement directs the distribution of the Settlement Payment as though it were a subsequent recovery relating to principal proceeds, and expressly directs such distribution "in accordance with the distribution provisions of the Governing Agreements. . . ." The distribution provisions of the Governing Agreements in turn refer to the write-up provisions in those Agreements and require their application. For example, as also discussed above, distribution of principal pursuant to the waterfall provision of the Governing Agreements for both Pay First and Write-Up First Trusts requires prior calculation of the Certificate Principal Balance. As set forth in the definition of Certificate Principal Balance (quoted supra), the calculation includes increases for subsequent recoveries that are generally required to be made pursuant to specifically referenced write-up provisions in the Governing Agreements.

Section 3.06 (a) expressly defers to the Governing Agreements whereas section 3.06 (b) does not. Significantly, however, section 3.06 (b) does not state that it is an exception to the section 7.05 mandate that the Settlement Agreement shall not be deemed to amend any term of the Governing Agreements. If the intention of the drafters was to create such an exception they could and should have included an express term to that effect.

In so holding, the court rejects Tilden Park's contention that where the Settlement Agreement varies the PSAs' terms, it does not thereby amend the PSAs. Tilden Park reasons that because the Settlement Agreement created distribution and write-up rules for a "one-time event," it "did not change PSA procedures for ordinary course distributions and write-ups going

---

SD2 PSA, Definition of Subsequent Recovery.) However, Tilden Park's contention ignores that the Settlement Agreement provides that the Settlement Payment is to be treated as if it were a subsequent recovery.

29

FILED: NEW YORK COUNTY CLERK 02/13/2020 03:23 PM
NYSCEF DOC. NO. 843
08-13555-mg    Doc 60488-2    Filed 03/27/20    Entered 03/27/20 17:11:33    Exhibit B
Pg 31 of 47
INDEX NO. 657387/2017
RECEIVED NYSCEF: 02/13/2020

forward." (Tilden Park Initial Memo. at 9 n 5.) While the settlement is unquestionably an exceptional event that differs from ordinary course distributions and was unanticipated by the Governing Agreements, the Settlement Agreement expressly elects to apply the existing distribution provisions in the Governing Agreements for distribution of the Settlement Payment. Even assuming, without deciding, that the Trustees had the discretion to enter a settlement agreement that was inconsistent with the Governing Agreements, the Settlement Agreement here does not contain a term which provides that it is to be followed in the event of a conflict with the Governing Agreements. Nor does it otherwise evidence an intent to vary the terms of the Governing Agreements regarding the order of operations or the write-up method.[19]

Finally, this holding that section 3.06 (b) will not control the write-up in the event of a conflict with a Governing Agreement is in fact consistent with the terms of section 3.06 (b). The last sentence of section 3.06 (b) states that the write-up instruction "is intended only to increase the balances of the related classes of securities, as provided for herein, and shall not affect the distribution of the Settlement Payment provided for in Subsection 3.06(a)." As the Trustees explain, if section 3.06 (b) superseded the write-up instructions in the Write-Up First Trust Governing Agreements, it could affect the classes entitled to the distribution of the Settlement Payment and the amounts of the distribution to those classes. (See Petition ¶¶ 41, 43.)

Although the Settlement Agreement write-up provision will not apply if it is in conflict with a Governing Agreement write-up provision, the Settlement Agreement write-up provision is not superfluous. As discussed above in connection with the Pay First Trusts, the Governing

---

[19] Given that the Settlement Agreement was drafted to implement an exceptional distribution, it is unfortunate that the Agreement did not provide more explicit instructions for the distribution and write-up. It is to be hoped that, in the event of future settlements, the Trustees and investors involved in the negotiation of the settlement will endeavor, to the extent possible, to avoid the need for interpretation of so many issues affecting the different classes of investors.

Agreements for a number of such Trusts lack a write-up provision due to an apparent drafting error. For those Trusts, and any others that lack a write-up provision, the write-up will be applied pursuant to Settlement Agreement section 3.06 (b).

<u>Write-Up Eligibility of Senior Certificates</u>

The Trustees note a further conflict between the Settlement Agreement write-up provision and the Governing Agreements for the Exhibit E Trusts with respect to the eligibility of senior certificates for write-ups, and seek an instruction on whether the Settlement Agreement or Governing Agreements will control on this issue. (Petition ¶¶ 45-48; Request for Relief, ¶ 5 [b].)

Tilden Park, among other respondents, argues that the Settlement Agreement write-up provision controls and directs that all certificates in the Exhibit E Trusts are eligible to be written up. (Tilden Park Initial Memo. at 19-20; DW/Ellington Initial Memo. at 6-7.) The Institutional Investors, among others, contend that the Governing Agreements control and permit the write-up of senior certificates in these Trusts. (Institutional Investors Initial Memo. at 21-23; Response Memo. at 16-17; DW/Ellington Initial Memo. at 8-12.) Nover alone contends that certain Governing Agreements, by their terms, do not permit such write-up. (Nover Initial Memo. at 6-10.)

The above holding that the write-up provisions of the Governing Agreements control in the event of a conflict with the Settlement Agreement write-up provision is applicable to the issue of whether senior certificates are eligible for write-up. Section 3.06 (b) of the Settlement Agreement provides for the write-up of "the balance of <u>each class</u> of securities . . . to which such losses have been previously allocated" (emphasis supplied), and therefore clearly provides for

the write-up of senior certificates. The Governing Agreements for certain Exhibit E Trusts limit the write-up to subordinate certificates, while others do not.

In seeking the instruction regarding the write-up of senior certificates, the Trustees cite the PSA for BSARM 2005-11, which contains a provision, section 6.02 (h), that directs the write-up of subordinate certificates. (Petition ¶ 45; BSARM 2005-11 PSA [NYSCEF Doc. No. 700].) In the briefing, the parties addressed the effect of this and other provisions of the PSA on the write-up. Even prior to the briefing, however, the parties with interests in BSARM 2005-11—the Institutional Investors, Ellington, and AIG— consented to a judgment, dated March 28, 2018, resolving the issues for which judicial instruction had been sought concerning the administration and distribution of the Settlement Payment to BSARM 2005-11 and numerous other Trusts. The consent judgment, like the other consent judgments among investors that have resolved their disputes in this proceeding, expressly provides that it shall have no precedential effect on any remaining disputes. While BSARM 2005-11 is no longer at issue, the parties' arguments as to that Trust are equally applicable to BALTA 2006-3, a Trust in which Nover holds an interest. (See NYSCEF Doc. No. 602 [list of Nover Settlement Trusts].)

The PSA for BALTA 2006-3 (NYSCEF Doc. No. 639) contains a provision, similar to BSARM 2005-11 PSA section 6.02 (h), which directs the write-up of specified classes of subordinate certificates. Section 6.04 (h) of the BALTA 2006-3 PSA provides in pertinent part:

> ". . . If, after taking into account such Subsequent Recoveries, the amount of a Realized Loss is reduced, the amount of such Subsequent Recoveries will be applied to increase the Certificate Principal Balance of the related Class of Group II Subordinate Certificates or Group III Subordinate Certificates with the highest payment priority to which Realized Losses have been allocated, but not by more than the amount of Realized Losses previously allocated to that Class of Group II Subordinate Certificates or Group III Subordinate Certificates, as applicable, pursuant to Section 6.04. The amount of any remaining Subsequent Recoveries will be applied to sequentially increase the Certificate Principal Balance of the Group II Subordinate Certificates or Group III Subordinate Certificates, as

applicable, beginning with the related Class of Subordinate Certificates with the next highest payment priority, up to the amount of such Realized Losses previously allocated to such Class or Classes of Certificates pursuant to this Section 6.04."[20]

This section, by its terms, provides only for the write-up of the balances of the specified subordinate certificates to the extent of previously allocated Realized Losses.

The Institutional Investors, among other respondents, contend that this, and similar write-up provisions, must be read in light of the definition of Realized Losses in the same PSAs. More particularly, they contend that the definition of Realized Losses provides for the allocation of realized losses to senior classes of certificates (see Sheeren Aff. Ex. 19 [NYSCEF Doc. 596] [summarizing the Definitions of Realized Loss in PSAs for Disputed Exhibit E Trusts]), and that the definition not only does not limit the classes of certificates eligible for subsequent recovery write-ups, but "necessarily includes senior certificates." (Institutional Investors Initial Memo. at 21-22; Ambac Response Memo. at 4-5.)

Contrary to this contention, while the Realized Loss definition provides for the allocation of losses to reduce certificate balances of certificates including senior certificates, the definition does not address the write-up of balances of certificates to account for subsequent recoveries. Moreover, respondents do not point to any provision in the BALTA 2006-3 PSA or similar PSAs which permits write-ups of senior certificates in the face of a provision, like section 6.04 (h),

---

[20] The BSARM 2005-11 write-up provision, section 6.02 (h) similarly provides in pertinent part: ". . . If, after taking into account such Subsequent Recoveries, the amount of a Realized Loss is reduced, the amount of such Subsequent Recoveries will be applied to increase the Current Principal Amount of the Class of Subordinate Certificates with the highest payment priority to which Realized Losses have been allocated, but not by more than the amount of Realized Losses previously allocated to that Class of Subordinate Certificates pursuant to this Section 6.02. The amount of any remaining Subsequent Recoveries will be applied to sequentially increase the Current Principal Amount of the Subordinate Certificates, beginning with the Class of Subordinate Certificates with the next highest payment priority, up to the amount of such Realized Losses previously allocated to such Class of Certificates pursuant to this Section 6.02." (NYSCEF Doc. No. 700.)

which expressly limits the write-up to specified subordinate certificates.

In so holding, the court finds that the Institutional Investors have not shown that application of Governing Agreement provisions such as section 6.04 (h) to preclude the write-up of senior certificates would lead to an "absurd result." (Institutional Investors Initial Memo. at 23.) Although the Governing Agreements for the Trusts generally provide for structures in which distributions are made and losses are allocated based on seniority (see Petition ¶¶ 4-5), the Institutional Investors fail to show that it is absurd for a Governing Agreement to give priority in limited respects, such as allocation of write-ups, to junior classes. DW/Ellington also fails to show that Governing Agreement write-up provisions limiting write-ups to subordinate classes reflect a "scrivener's error." (DW/Ellington Initial Memo. at 16-17.) Its suggestion that such write-up provisions were imported from PSAs in which losses were not allocated to senior certificates is based on speculation. (See DW/Ellington Response Memo. at 9.)

The court further holds that not all of the Governing Agreements for Exhibit E Trusts provide for subsequent recovery write-ups only of subordinate certificates. DW/Ellington makes a persuasive showing that certain of the Governing Agreements for these Trusts contain provisions that do not limit subsequent recovery write-ups to subordinate certificates and expressly provide for write-up of senior certificates, at least in limited circumstances. In fact, the BALTA 2006-3 PSA is such a Governing Agreement. While section 6.04 (h) limits the write-up to subordinate certificates in Groups II and III, section 6.03 (b) provides for the write-up of senior certificates in Group I. Section 6.03 (b) thus provides in pertinent part:

> ". . . If, after taking into account such Subsequent Recoveries, the amount of a Realized Loss is reduced, the amount of such Subsequent Recoveries will be applied to increase the Certificate Principal Balance of the Class of Group I Subordinate Certificates with the highest payment priority to which Applied Realized Loss Amounts have been allocated, but not by more than the amount of Applied Realized Loss Amounts previously allocated to that Class of Group I

Subordinate Certificates. The amount of any remaining Subsequent Recoveries will be applied to sequentially increase the Certificate Principal Balance of the Group I Certificates, beginning with the Class of Group I Certificates with the next highest payment priority, up to the amount of such Applied Realized Loss Amounts previously allocated to such Class or Classes of Group I Certificates. Notwithstanding the forgoing [sic], any Subsequent Recoveries will be allocated to the Group I Senior Certificates to the extent of any Applied Realized Loss Amounts before being applied to the Group I Subordinate Certificates. . . . Any such increases shall be applied to the Certificate Principal Balance of each Group I Certificate of such Class in accordance with its respective Fractional Undivided Interest."

(emphasis supplied.)[21]

In sum, Exhibit E Trusts with PSA provisions similar to BALTA 2006-3 section 6.04 (h), which expressly provide for the subsequent recovery write-up of specified subordinate certificate balances, must be applied to permit write-up only of those subordinate certificates pursuant to the terms of the provisions.

Write-Up of Zero Balance Certificates

The Governing Agreements for some Settlement Trusts, the Exhibit G Trusts, contain a "Retired Class" provision, which appears at the end of the distribution section of the Agreements and states in full:

"In addition, notwithstanding the foregoing, on any Distribution Date after the Distribution Date on which the Certificate Principal Balance of a Class of Class A Certificates or Class M Certificates has been reduced to zero, that Class of Certificates will be retired and will no longer be entitled to distributions, including distributions in respect of Prepayment Interest Shortfalls or Basis Risk Shortfall Carry Forward Amounts."

---

[21] Nover asserts in its Preliminary Statement that "regarding those Settlement Trusts with Governing Agreements that specify which certificates are eligible to be written up (the Exhibit E Settlement Trusts), the Court should direct Petitioners to write up only the eligible, subordinate certificates." (Nover Initial Memo. at 2.) Despite this broad language, Nover does not advance the blanket position that the Governing Agreements for all of the Exhibit E Trusts permit only subordinate certificates to be written up. Rather, Nover acknowledges that the Governing Agreements treat write-ups of subsequent recoveries differently in different groups or classes of certificates, and contends that "[w]hen a Governing Agreement expresses that only certain classes of certificates should be written up, the Court should give meaning and effect to the omission of other classes. . ." and direct the write-up only of the classes as to which the Governing Agreement expressly provides for write-up. (Id. at 8.) As held above, the court agrees.

(BSABS 2005-EC 1 PSA, § 5.04 [a].)[22]

The Trustees seek an instruction as to whether and how to apply the Retired Class

provision, including whether or not to apply the provision 1) "to prevent distribution of the

applicable Allocable Shares to any applicable classes of certificates with aggregate certificate

principal balances of zero at the time of the distribution"; and 2) "to prevent any portion of the

Settlement Payment Write-Up from being applied to any such classes of certificates." (Petition,

Request for Relief ¶ 5 [c].)

The Trustees assert that the Retired Class provision appears to preclude distributions to

any Class A, B, or M Certificates if the aggregate principal balance of such class has been

reduced to zero, regardless of whether the balance has been reduced to zero as a result of realized

losses or because the initial certificate principal balance has been paid in full. (Petition ¶ 55.)

The Trustees further note that the provision does not appear to expressly preclude zero balance

classes from being written up in connection with subsequent recoveries. (Id. ¶ 57.) As explained

by the Trustees, the significance of whether zero balance classes may be written up is that, if

written up, such classes "would then no longer have balances of zero and could receive the

Settlement Payment (if the Write-Up First Method is used) or, at the very least, future principal

and interest distributions (if the Pay First Method is used or the Write-Up First Method is used

but other classes of certificates receive the Settlement Payment)." (Id.)

---

[22] This provision is substantially similar to the provision quoted by the Trustees in seeking the instruction.
That provision, which appears at the end of section 6.04 (a), the distribution section of the BSABS 2006-
AC4 PSA, states in full:
  "In addition, notwithstanding the foregoing, on any Distribution Date after the
  Distribution Date on which the Certificate Principal Balance of a Class of Class A, Class B or
  Class M Certificates has been reduced to zero, that Class of Certificates will be retired and will no
  longer be entitled to distributions, including distributions in respect of Prepayment Interest
  Shortfalls or Basis Risk Shortfall Carry Forward Amounts."
(Trustees' emphasis.) The BSABS 2006-AC4 Trust was also the subject of the March 28, 2018 judgment consented
to by Institutional Investors, Ellington, and AIG.

Tilden Park, among others, takes the position that the Settlement Agreement write-up provision controls to require certificates with zero balances to be written up. Alternatively, it contends that the Retired Class provisions of the Governing Agreements, even if not "overridden" by the Settlement Agreement, do not preclude write-ups of zero balance certificates or distributions after such write-ups. (Tilden Park Initial Memo. at 22-24; DW/Ellington Initial Memo. at 17-21 [asserting, on behalf of DW only, that zero balance certificates should be written up].) Nover does not agree that the Settlement Agreement applies but, like Tilden Park and DW/Ellington, contends that the Governing Agreements do not preclude write-ups of zero balance certificates or post-write-up distributions. (Nover Initial Memo. at 10-14; Olifant Initial Memo. at 15.) The Institutional Investors contend that the Settlement Agreement is silent as to the treatment of Retired Classes, and that the Retired Class provisions of the Governing Agreements should be enforced with one exception. They appear to assume that the Retired Class provisions bar the write-up of zero balance classes, but take the apparently inconsistent position that "based on a structural limitation in the trusts . . . if the Settlement Payment exceeds the realized losses of the then-outstanding certificates, the Trustees may be required to write-up a written off certificate in order to keep the Trust's assets and liabilities in balance." (Institutional Investors Initial Memo. at 25, 25 n 58.) Poetic & Prophet and HBK contend that the Retired Class and other provisions of the Governing Agreements categorically prohibit any future distributions to, or write-ups of, any class that has been written down to a zero balance. (Poetic & Prophet/HBK Joint Initial Memo. [in its entirety addressing retired class issue]; Joint Response Memo. [same].)

The Settlement Agreement write-up provision, section 3.06 (b), authorizes the write-up of "each class of securities" to which losses have previously been allocated. The provision

therefore authorizes the write-up of zero balance classes. For the reasons stated above, the court

holds that the Settlement Agreement write-up provision controls regarding the write-up of zero

balance certificates only where a Governing Agreement lacks a write-up provision applicable to

subsequent recoveries.

The court further holds that the Retired Class provisions of the Governing Agreements

for the Exhibit G Trusts expressly prohibit distributions to zero balance classes but do not

address write-ups of certificate balances in connection with subsequent recoveries. In contrast,

the write-up provisions do not limit the classes that may be written up on account of subsequent

recoveries. Rather, they provide for the balances of all classes of certificates to be written up by

subsequent recoveries, although only to the extent of realized losses previously allocated to a

class. Thus, for example, as discussed above, BSABS 2005-EC 1 PSA section 5.04 (a) precludes

distributions to zero balance certificates. Section 5.04 (b) of this PSA provides, however, for the

write-up of subsequent recoveries, stating in pertinent part:

> ". . . If, after taking into account such Subsequent Recoveries, the amount of a
> Realized Loss is reduced, the amount of such Subsequent Recoveries will be
> applied to increase the Certificate Principal Balance of the Class of Certificates
> with the highest payment priority to which Realized Losses have been allocated,
> but not by more than the amount of Realized Losses previously allocated to that
> Class of Certificates pursuant to Section 5.05; provided, however, to the extent
> that no reductions to a Certificate Principal Balance of any Class of Certificates
> currently exists as a result of a prior allocation of a Realized Loss, such
> Subsequent Recoveries will be applied as Excess Spread. The amount of any
> remaining Subsequent Recoveries will be applied to increase the Certificate
> Principal Balance of the Class of Certificates with the next highest payment
> priority, up to the amount of such Realized Losses previously allocated to that
> Class of Certificates pursuant to Section 5.05, and so on."

The court accordingly holds that zero balance certificates in the Exhibit G Trusts may be

written up in the amounts authorized by the Governing Agreements for the Trusts. If the Write-

Up First Method is required by the Governing Agreement, the zero balance certificates will be

entitled to receive the Settlement Payment to the extent of the amounts authorized by the
Governing Agreements. If the Pay First Method is required, or if the Write-Up First Method is
required but other classes of certificates receive the Settlement Payment, the zero balance
certificates may be entitled to receive future principal and interest distributions. (See Petition ¶
57.)

In so holding, the court notes that the Settlement Agreement compensates investors for
losses in connection with the mortgage loans, as it settles all claims regarding the sale of
mortgage loans to the Trusts and the servicing of those loans, including claims for breaches of
representations and warranties and for failure to notify the Trustees of such breaches.
(Settlement Agreement § 3.02.) The write-up provisions of the Trusts are consistent with the
purpose of the Settlement Agreement, as they permit write-ups of the zero balance certificates to
the extent of previously allocated realized losses.

Redirection Provisions

As further explained by the Trustees, some of the Governing Agreements for the Exhibit
G Trusts that contain a Retired Class provision also contain a "Class A Redirection Provision."
According to the Trustees, the latter provision "appears to require principal amounts that would
have otherwise been distributed to Class A certificates in one loan group, but for being 'no
longer outstanding,' to be distributed to the Class A certificates in a different loan group."
(Petition ¶¶ 58-60.) The Trustees request an instruction as to whether or not to apply this
provision. (Id. ¶ 5 [c].) The Institutional Investors, AIG, and Tilden Park are the only
respondents with an interest in the application of the Class A Redirection Provision, and agree
that it is enforceable. (See Chart of Parties' Positions [NYSCEF Doc. No. 770].) The court
holds that the Redirection provision should be enforced.

Distribution of Allocable Shares as Interest or Principal

The Trustees seek an instruction with respect to the Exhibit H Trusts as to whether to distribute the Allocable Shares by treating them as interest collections or principal collections. (Petition ¶ 5 [d].)  No respondent argues that the Shares should be treated other than as principal. The court holds that the Allocable Shares should be treated as principal.

Ambac

Ambac is the certificate insurer for the Class I-A-2 and II-A-2 certificates in GPMF 2006-AR2, and for the Class II-A-2 certificates in GPMF 2006-AR3 (together, the 2006 Trusts). Ambac is the certificate insurer for the Class II-A-2 and III-A-2 certificates in GPMF 2005-AR5 (the 2005 Trust).  (Ambac Initial Memo. at 2.)

Ambac claims that, under the terms of the Governing Agreements for the 2006 Trusts, it is entitled, before payments are made to any certificateholders, to receive "an amount from Subsequent Recoveries that equals the component of its Reimbursement Amounts representing any claim payments Ambac made for Realized Losses that were allocated to the Insured Certificates."  (Id. at 6.)  Ambac further claims that because that amount "far exceeds" the Allocable Shares for the related loan groups, it is entitled to receive the entire Allocable Shares for such loan groups.  (Id.)

As to the 2005 Trust, Ambac does not claim that the Governing Agreement gives it priority rights to Subsequent Recoveries.  Rather, it seeks reimbursement of amounts paid to insured certificateholders based on its subrogation rights, and contends that all classes of certificates, not only subordinate certificates, are eligible for write-up. (Ambac Initial Memo. at 7-9; Response Memo. at 4-5.)

The Institutional Investors and Nover dispute Ambac's claims as to the 2006 Trusts,

while Nover disputes Ambac's claims as to the 2005 Trust. As an initial matter, the Institutional

Investors assert that instructions should not be given to the Trustees regarding Ambac's

reimbursement issues, as the Trustees did not raise these issues in the Petition. (Institutional

Investors Response Memo. at 18-19.) The Institutional Investors and Nover have, however, both

fully addressed Ambac's claims. Absent any prejudice, the court holds that the interests of

judicial economy will best be served by considering the issues raised by Ambac.

As to the merits, the Institutional Investors contend that the principal distribution

waterfall of the Governing Agreements for the 2006 Trusts requires distribution of Subsequent

Recoveries to senior certificates on a pro rata basis until their certificate balances are reduced to

zero. The Institutional Investors further contend that Ambac is not entitled to payment before the

A1 certificates receive their pro rata share, although it is entitled to payment of the pro rata share

of the A2 certificates to reimburse it for claim payments made to those certificates. (Institutional

Investors Response Memo. at 19-22; see Nover Reply Memo. at 10 [stating that Ambac is not

entitled to the full Allocable shares for insured loan groups in the 2006 Trusts, and that Nover

adopts the Institutional Investors' position].)

In claiming that it is entitled to reimbursement for the insurance payments made to the

A2 certificates, Ambac contends that sections 6.02 (b) and (c) of the Governing Agreements for

the 2006 Trusts provide that Subsequent Recoveries will "first" be paid to the Certificate Insurer

for unreimbursed claims payments. Section 6.02 (b) of the PSA for GPMF 2006-AR2 provides in

pertinent part:

> ". . . [I]n the event that the Servicer receives any Subsequent Recoveries, the
> Servicer shall deposit such funds into the Custodial Account. . . . Subsequent
> Recovers [sic] will first [be] used to pay any amounts owed to the Certificate
> Insurer as set for [sic] in Section 6.02 (c)."

41

Section 6.02 (c), in turn, provides in pertinent part:

> "Subsequent Recoveries will be allocated first to the Certificate Insurer for payment on any Reimbursement Amounts for such Distribution Date in respect of any Deficiency Amount . . . but only to the extent of the portion of Subsequent Recoveries that were paid by the Certificate Insurer for Realized Losses that were allocated to Class I-A-2 Certificates or Class II-A-2 Certificates, as applicable."

As the Institutional Investors correctly argue, the principal distribution provision of the PSA, section 6.01, is also relevant. This section provides that principal will be distributed first to the Class I-A and Class II-A Certificates, on a pro rata basis until the Current Principal Amount of each class is reduced to zero, and "second" to the Certificate Insurer. Section 6.01, Third, states in pertinent part that principal will be paid to the "Class A, Class M and Class B Certificates, in the following order of priority":

> "(A)  For each Distribution Date (i) prior to the Stepdown Date or (ii) on which a Trigger Event is in effect, from the Principal Funds and the Extra Principal Distribution Amount for such Distribution Date:
> 1.  (a)  An amount equal to the Group I Principal Distribution Amount will be distributed <u>first</u> to each class of Class I-A Certificates on a <u>pro rata</u> basis until the Current Principal Amount of each such Class is reduced to zero and <u>second</u>, to the Certificate Insurer, any accrued and unpaid Reimbursement Amounts payable to the Certificate Insurer for that Distribution Date in respect of any Deficiency Amount described in clauses (a)(2) or (b)(y) of such definition, but only to the extent of the portion of Subsequent Recoveries with respect to the Mortgage Loans with respect to which Realized Losses were paid by the Certificate Insurer would otherwise by payable to the Class I-A-2 Certificates."[23]

(emphasis in original.)

Reading the Governing Agreements as a whole, as the court must do, the court holds that sections 6.01 and 6.02 are reconcilable with respect to the priority of distribution of Subsequent

---

[23] Section 6.01, Third (A) (1) (b), regarding distribution of principal to Class II-A certificates, is substantially similar to the above-quoted provision regarding distribution to Class I-A certificates.

The GPMF 2006-AR3 PSA distribution provision and its Subsequent Recovery provisions, sections 6.02 (b) and (c), are substantially similar to those of the GPMF 2006-AR2 PSA.

42

Recoveries as between Ambac and certificateholders. As the Institutional Investors persuasively contend, section 6.02 (c) provides that if Ambac has previously paid claims to A2 certificates for realized losses that were allocated to the A2 certificates, Ambac must be reimbursed for the payments from Subsequent Recoveries associated with such realized losses. The section does not modify or contradict section 6.01 to the extent that it provides that A1 certificates are entitled to payment of Subsequent Recoveries through the principal distribution waterfall on a pro rata basis until the certificate principal balances are zero. Ambac will, however, receive the pro rata payment designated for the A2 certificates, as reimbursement for the claim payments Ambac made to the A2 certificateholders. Thus, the A2 certificateholders will not receive a double recovery. (See Institutional Investors Response Memo. at 22.)

As to the 2005 Trust, the court holds that section 6.02 (h), the write-up provision of the GPMF 2005-AR5 PSA, is substantially similar to section 6.04 (h) of the BALTA 2006-3 PSA, which the court considered in the section of this decision on the write-up eligibility of senior certificates. For the reasons stated there, the court rejects Ambac's claim that the PSA authorizes the write-up of senior certificates.

Assured Guaranty

Assured Guaranty submitted an amicus brief, on consent of all parties, with respect to the distribution of the Settlement Payment allocated to a single trust, SACO 2005-GP1. Assured Guaranty is the note insurer for the Class A-1 and Class M-1 Notes issued by this Trust, and claims rights under the Indenture for the Trust and as subrogee of the noteholders. (Assured Guaranty Memo. at 1.) It contends that no distribution of the Settlement Payment should be made to notes subordinate to the Class M-1 insured notes, and that there should not be any write-

up of such subordinate classes of notes under any circumstances as a result of the Settlement
Payment. (Id. at 2.)

Assured Guaranty makes a prima facie showing that, even if the Pay First Method of
distribution is applied, the Trust will not be overcollateralized, and that the Settlement Payment
will therefore be distributed to Class A-1 and Class M-1 notes before any distribution is made to
subordinated classes pursuant to Indenture section 3.03 (e) (1). (Assured Guaranty Memo. at 3-
6.) As this showing is not challenged by any respondent, Assured Guaranty's position as to
distribution should be accepted by the Trustee.

Remaining Issues

The Trustees seek instruction as to "issues related to [Exhibit D] Settlement Trusts in
which aggregate certificate principal balances of the outstanding classes are currently less than
the applicable Allocable Shares." (Petition, Request for Relief ¶ 5 [a].) The Trustees have not
identified the Trusts, if any, which have balances less than the Allocable Shares. If such
balances will continue to exist, after application of the distribution instructions given by this
decision, the Trustees may request further instruction in the event the interested respondents are
unable to reach agreement on the issue.

The Trustees also seek instruction, with respect to the Exhibit E and F Trusts, as to
adjustments "to prevent undercollateralization of certificates" as a result of the write-up
mechanics. (Petition, Request for Relief ¶ 5 [b].) If undercollateralization will occur, after
application of the instructions given by this decision, the Trustees may request further instruction
in the event the interested respondents are unable to reach agreement on the issue.

Finally, the court has received a letter (NYSCEF Doc. No. 819) requesting, on consent of
all interested parties, that parties that have been or are able to resolve issues on which instruction

44

is sought be permitted to do so, in consultation with the Trustees, independent of the court's

ultimate determination as to how such issues should be resolved among parties that continue to

dispute the issues. The letter also requests that, upon the ultimate determination of this

proceeding, respondents and the Trustees be afforded the opportunity to reduce the final order to

"individualized judgments" for each of the remaining Settlement Trusts. These requests are

granted.

ORDER

It is hereby ORDERED that, as to any Settlement Trust in which a dispute exists between

or among respondents as to any issue that is the subject of this proceeding, the Trustees are

directed to administer and distribute the Settlement Payment in accordance with the instructions

set forth in this decision with respect to the disputed issue(s); and it is further

ORDERED that, as to any Settlement Trust in which all interested respondents are able,

after the issuance of this decision and in consultation with the Trustees, to resolve a dispute as to

any issue that is the subject of this proceeding, they may do so independent of the court's

ultimate determination as to how such issue should be resolved among parties that continue to

dispute the issue; and it is further

ORDERED that respondents and the Trustees shall meet and confer with a view to

developing a written procedure for: 1) filing individualized consent judgments for any remaining

Settlement Trusts, which shall (a) identify any issue(s) that are resolved by all interested parties

in consultation with the Trustees and (b) apply the instructions set forth in this decision to any

remaining disputed issue(s). To the extent possible, the written procedure shall provide for

coordinated submission and consolidation of the judgments. The written procedure shall also

address procedures for settlement of judgments in the event the parties are unable to reach

45

FILED: NEW YORK COUNTY CLERK 02/13/2020 03:23 PM
INDEX NO. 657387/2017

NYSCEF DOC. NO. 843
08-13555-mg    Doc 60488-2    Filed 03/27/20    Entered 03/27/20 17:11:33    Exhibit B
RECEIVED NYSCEF: 02/13/2020
Pg 47 of 47

agreement as to the form of the judgments. The procedure shall be subject to the approval of the

court. If the parties are unable to agree to such a procedure, in whole or in part, they shall

telephone the court to schedule a conference.

Dated: New York, New York

---

**2/13/2020**
**DATE**

MARCY S. FRIEDMAN, J.S.C.

CHECK ONE:  [X] CASE DISPOSED    [ ] NON-FINAL DISPOSITION
            [X] GRANTED  [ ] DENIED    [ ] GRANTED IN PART    [ ] OTHER

APPLICATION:  [ ] SETTLE ORDER    [ ] SUBMIT ORDER

CHECK IF APPROPRIATE:  [ ] INCLUDES TRANSFER/REASSIGN    [ ] FIDUCIARY APPOINTMENT    [ ] REFERENCE