WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                          :
**In re**                                  :          **Chapter 11 Case No.**
                                          :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :          **08-13555 (SCC)**
                                          :
                            **Debtors.**   :          **(Jointly Administered)**
                                          :
------------------------------------------------------------------x

## NOTICE REGARDING CERTAIN UK LITIGATION

> **PLEASE TAKE NOTICE** that, following a trial commencing November 11, 2019 and ending November 22, 2019, the High Court of England and Wales gave judgment on July 3, 2020 relating to the ranking of claims held by Lehman Brothers Holdings Inc. and one of its affiliates in the insolvency proceedings of Lehman Brothers Holdings PLC (in administration) and LB Holdings Intermediate 2 Limited (in administration).

> A copy of the judgment is attached to this notice as <u>Exhibit A</u>.

Dated:  July 3, 2020
        New York, New York

                            */s/ Garrett A. Fail*
                            Garrett A. Fail

                            WEIL, GOTSHAL & MANGES LLP
                            767 Fifth Avenue
                            New York, New York 10153
                            Telephone: (212) 310-8000
                            Facsimile: (212) 310-8007

                            *Attorneys for Lehman Brothers Holdings Inc.*
                            *and Certain of Its Affiliates*

# **EXHIBIT A**



Neutral Citation [2020] EWHC 1681 (Ch)

Claim Nos: CR-2009-000052
CR-2008-000026

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMPANIES COURT (ChD)**

Royal Courts of Justice
Rolls Building
7 Rolls Buildings
Fetter Lane
London EC4A 1NL

Date: 3 July 2020

Before:

**THE HONOURABLE MR JUSTICE MARCUS SMITH**

- - - - - - - - - - - - - - - - - - - -

**IN THE MATTER OF LB HOLDINGS INTERMEDIATE 2 LIMITED (IN ADMINISTRATION)**
**AND IN THE MATTER OF LEHMAN BROTHERS HOLDINGS plc (IN ADMINISTRATION)**
**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

**Claim No CR-2009-000052**

BETWEEN:

**THE JOINT ADMINISTRATORS OF LB**
**HOLDINGS INTERMEDIATE 2 LIMITED**
**(IN ADMINISTRATION)**

Applicants

**- and -**

**(1) LEHMAN BROTHERS HOLDINGS**
**SCOTTISH LP 3**
**(2) LEHMAN BROTHERS HOLDINGS plc (IN**
**ADMINISTRATION)**
**(3) DEUTSCHE BANK AG (LONDON**
**BRANCH)**

Respondents

**IN THE MATTER OF LEHMAN BROTHERS HOLDINGS plc (IN ADMINISTRATION)**
**AND IN THE MATTER OF LEHMAN BROTHERS HOLDINGS plc (IN ADMINISTRATION)**

## AND IN THE MATTER OF THE INSOLVENCY ACT 1986

<u>**Claim No CR-2008-000026**</u>

BETWEEN:

### THE JOINT ADMINISTRATORS OF
### LEHMAN BROTHERS HOLDINGS plc (IN
### ADMINISTRATION)

<u>Applicants</u>

**- and -**

### (1) LEHMAN BROTHERS HOLDINGS INC
### (2) THE JOINT LIQUIDATORS OF LB GP No 1
### LIMITED (IN LIQUIDATION)
### (3) DEUTSCHE BANK AG (LONDON
### BRANCH)

<u>Respondents</u>

- - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - -

**Mr Peter Arden, QC** and **Ms Rosanna Foskett** (instructed by **Dentons UK and Middle East LLP**) for the **Joint Administrations of LB Holdings Intermediate 2 Limited (in administration)**, the Applicants in Claim CR-2009-000052.

**Mr Adrian Beltrami, QC** and **Mr Adam Kramer** (instructed by **Hogan Lovells International LLP**) for the **Joint Administrators of Lehman Brothers Holdings plc (in administration)**, the Applicants in Claim CR-2008-000026 and the Second Respondents in Claim CR-2009-000052.

**Ms Lexa Hilliard, QC** and **Mr Tom Roscoe** (instructed by **Charles Russell Speechlys LLP**) for **LB GP No 1 Limited**, the Second Respondent in Claim CR-2008-000026.

**Ms Sonia Tolaney, QC**, **Mr Richard Fisher** and **Mr Tim Goldfarb** (instructed by **Sidley Austin LLP**) for **Deutsche Bank AG (London Branch)**, the Third Respondent in Claim CR-2008-000026 and in Claim CR-2009-000052.

**Mr Mark Phillips, QC**, **Mr William Willson** and **Mr Edoardo Lupi** (instructed by **Weil, Gotshal & Manges (London) LLP**) for **Lehman Brothers Holdings Scottish LP 3**, the First Respondent in Claim CR-2009-000052 and **Lehman Brothers Holdings Inc**, the First Respondent in Claim CR-2008-000026.

Hearing dates: 11, 12, 13, 14, 15, 19, 20, 21 and 22 November 2019 (with supplemental written submissions thereafter), 7 May 2020 (with supplemental written submissions thereafter).

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic. The judgment was handed down remotely, the deemed time of hand-down being 10:00am on 3 July 2020

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

| CONTENTS | | |
|---|---|---|
| **A.** | **INTRODUCTION** | §1 |
| **(1)** | **The Lehman Group** | §1 |
| **(2)** | **The administrations** | §4 |
| **(3)** | **The present position under the administrations** | §6 |
| **(4)** | **The claims of the subordinated creditors** | §9 |
| *(a)* | *Overview* | §9 |
| *(b)* | *Claim A (by PLC against LBHI2)* | §10 |
| *(c)* | *Claim B (by SLP3 against LBHI2)* | §12 |
| *(d)* | *Claim C (by LBHI against PLC)* | §15 |
| *(e)* | *Claim D (by GP1 against PLC)* | §18 |
| *(f)* | *Claim E (by ECAPS holders against PLC)* | §20 |
| **(5)** | **Flow of funds** | §22 |
| **(6)** | **The applications before the court and the issues arising** | §23 |
| *(a)* | *The applications* | §23 |
| *(b)* | *Issues arising* | §27 |
| *(i)* | *Approach* | §27 |
| *(ii)* | *The LBHI2 administration: issues arising out of the application by the LBHI2 Administrators* | §28 |
| *(iii)* | *Issues arising out of the application by the PLC Administrators* | §30 |
| **(7)** | **The structure of this Judgment** | §32 |
| **B.** | **THE EVIDENCE BEFORE THE COURT** | §33 |
| **(1)** | **Overview** | §33 |
| **(2)** | **The factual evidence** | §35 |
| *(a)* | *Ms Sophie Hutcherson* | §36 |
| *(b)* | *Mr Thomas Grant* | §38 |
| *(c)* | *Mr Stephen Miller* | §40 |
| *(d)* | *Mr Raymond O'Grady* | §42 |
| *(e)* | *Ms Jackie Dolby* | §44 |
| *(f)* | *Mr Benjamin Katz* | §46 |
| *(g)* | *Mr Ronald Geraghty* | §50 |

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

| (3) | The expert evidence | §52 |
|---|---|---|
| (a) | *The issue on which expert evidence was called* | §52 |
| (b) | *The expert witnesses* | §55 |
| C. | **APPROACH TO QUESTIONS OF CONSTRUCTION** | §60 |
| (1) | **General principles** | §60 |
| (2) | **The factual evidence in this case** | §62 |
| (3) | **The expert evidence in relation to the Settlement Agreement** | §63 |
| D. | **THE NATURE OF REGULATORY CAPITAL** | §65 |
| E. | **THE NATURE OF SUBORDINATION** | §71 |
| (1) | **Introduction** | §71 |
| (2) | **Legal subordination** | §74 |
| (a) | *The relevant provisions* | §74 |
| (b) | *"Debt"* | §75 |
| (c) | *"Provable debts"* | §77 |
| (d) | *Distribution and the "waterfall"* | §79 |
| (e) | *The order of distribution: the operation of the waterfall* | §86 |
| (3) | **Structural subordination** | §88 |
| (4) | **Consensual subordination** | §90 |
| (a) | *Introduction* | §90 |
| (b) | *Trust subordination* | §91 |
| (c) | *Contingent debt subordination* | §94 |
| (d) | *Simple contractual subordination* | §97 |
| (i) | Introduction | §97 |
| (ii) | History and operation of actual subordination | §99 |
| (e) | *Issues regarding construction* | §106 |
| (f) | *The operation of consensual subordination* | §108 |
| (i) | Trust subordination | §109 |
| (ii) | Contingent debt subordination | §111 |
| (iii) | Simple contractual subordination | §115 |
| (g) | *Subordination below other categories of obligation* | §123 |

Approved judgment
Mr Justice Marcus Smith                         Lehman Brothers Holdings plc (in administration) and others

| F. | **THE PRIORITY DISPUTE BETWEEN CLAIM A (THE LBHI2 SUB-DEBT AGREEMENTS) AND CLAIM B (THE LBHI2 SUB-NOTES)** | §125 |
|---|---|---|
| **(1)** | **Approach** | §125 |
| **(2)** | **Claim A: the LBHI2 Sub-Debt Agreements** | §126 |
| *(a)* | *The form and content of the agreements* | §126 |
| *(i)* | *Form* | §126 |
| *(ii)* | *Section A* | §129 |
| *(iii)* | *Section B* | §134 |
| *(iv)* | *Section C* | §135 |
| *(b)* | *Operation of the subordination provisions* | §138 |
| *(i)* | *The repayment provisions are subject to the subordination provisions* | §139 |
| *(ii)* | *Phrase [1] of paragraph 5(1)* | §140 |
| *(iii)* | *Phrase [3] of paragraph 5(1)* | §143 |
| *(iv)* | *Contingent debt subordination: the first contingency (phrase [4])* | §145 |
| *(v)* | *Contingent debt subordination: the second contingency (phrase [5])* | §146 |
| *(vi)* | *Phrase [2]: "and accordingly"* | §147 |
| *(c)* | *A gloss to the subordination provisions?* | §150 |
| *(i)* | *The need for additional analysis* | §150 |
| *(ii)* | *Approach* | §155 |
| **(3)** | **Claim B: the <u>Unamended</u> LBHI2 Sub-Notes** | §157 |
| *(a)* | *Introduction* | §157 |
| *(b)* | *The form and content of the Unamended LBHI2 Sub-Notes* | §159 |
| *(c)* | *The relevance of the factual evidence regarding the background to the LBHI2 Sub-Notes* | §161 |
| *(d)* | *Operation of the subordination provisions* | §162 |
| *(i)* | *Phrase [1] of condition 3* | §162 |
| *(ii)* | *Phrases [2], [3] and [4] of condition 3* | §163 |
| *(iii)* | *Phrase [2] of condition 3* | §164 |
| *(iv)* | *Phrases [3] and [4] of condition 3* | §168 |
| *(v)* | *"accordingly"* | §172 |

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

| **(4)** | **The priority dispute between Claim A (the LBHI2 Sub-Debt) and Claim B (the <u>Unamended</u> LBHI2 Sub-Notes)** | §173 |
|---|---|---|
| *(a)* | *Approach* | §173 |
| *(b)* | *The operation of the subordination provisions in Claim A as regards Claim B* | §177 |
| *(i)* | *The simple contractual subordination provision* | §179 |
| *(ii)* | *The contingent debt subordination provision* | §186 |
| *(c)* | *The operation of the subordination provisions in Claim B as regards Claim A* | §190 |
| *(i)* | *The simple contractual subordination provision* | §191 |
| *(ii)* | *The contingent debt subordination provision* | §192 |
| *(d)* | *Circuity* | §196 |
| **(5)** | **Claim B: the <u>Amended</u> LBHI2 Sub-Notes** | §199 |
| *(a)* | *Introduction* | §199 |
| *(b)* | *The modification process* | §201 |
| *(c)* | *The modifications* | §203 |
| *(d)* | *The factual history giving rise to the modifications* | §204 |
| *(e)* | *The operation of the new subordination provisions and other related matters of construction* | §216 |
| *(i)* | *Points in issue* | §216 |
| *(ii)* | *The significance of the "explanatory note"* | §218 |
| *(iii)* | *The contention that condition 3(a) does not apply* | §221 |
| *(iv)* | *The operation of the subordination provisions* | §226 |
| **(6)** | **The priority dispute between Claim A (the LBHI2 Sub-Debt) and Claim B (the <u>Amended</u> LBHI2 Sub-Notes)** | §232 |
| *(a)* | *Approach* | §232 |
| *(b)* | *The operation of the subordination provisions in Claim A as regards Claim B* | §233 |
| *(i)* | *Simple contractual subordination* | §235 |
| *(ii)* | *Contingent debt subordination* | §241 |
| *(c)* | *The operation of the subordination provisions in Claim B as regards Claim A* | §243 |
| *(d)* | *Circuity* | §244 |

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

| **(7)** | **Whether resolution of the ranking issue between Claims A(i), A(ii) and A(iii) makes a difference?** | §245 |
|---|---|---|
| *(a)* | *Approach* | §245 |
| *(b)* | *How is the loop to be broken?* | §248 |
| *(c)* | *Effect on the priorities between Claim A and Claim B* | §252 |
| *(d)* | *The solvency condition in Claim A* | §253 |
| **(8)** | **Rectification** | §254 |
| *(a)* | *Introduction* | §254 |
| *(b)* | *The test for rectification* | §257 |
| *(i)* | *Some initial distinctions* | §257 |
| *(ii)* | *The rules regarding "common mistake" rectification* | §258 |
| *(c)* | *Rectification in the present case* | §259 |
| *(i)* | *Overview* | §259 |
| *(ii)* | *No discernible intention on the part of the Issuer beyond the words contained in the instruments themselves* | §261 |
| *(iii)* | *No discernible intention on the part of the Noteholder beyond the words contained in the instruments themselves* | §264 |
| *(iv)* | *No subjective continuing common intention manifested by an outward expression of accord* | §268 |
| *(v)* | *Conclusion* | §269 |
| **G.** | **THE PRIORITY DISPUTE BETWEEN CLAIM C (THE PLC SUB-DEBT AGREEMENTS), CLAIM D (THE PLC SUB-NOTES) AND CLAIM E (THE ECAPS GUARANTEES)** | §270 |
| **(1)** | **Introduction** | §270 |
| **(2)** | **The Settlement Agreement release argument** | §273 |
| *(a)* | *Introduction* | §273 |
| *(b)* | *The relevant provisions of the Settlement Agreement* | §274 |
| *(c)* | *The scope of the release* | §277 |
| *(d)* | *Analysis and conclusion* | §283 |
| **(3)** | **The Claim C partial discharge argument** | §288 |

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

| *(a)* | *Introduction* | §288 |
|---|---|---|
| *(b)* | *Where creditor A has not received payment from his or her principal debtor B, but has received part payment from guarantor C, is A's claim against B released, discharged or diminished to the extent of the payment by C to A?* | §293 |
| *(c)* | *The rule against double proof* | §300 |
| *(d)* | *The effect of an assignment* | §303 |
| **(4)** | **The Claim D reduction argument** | §305 |
| *(a)* | *Introduction* | §305 |
| *(b)* | *Is the debt under the PLC Sub-Notes a provable debt?* | §312 |
| *(c)* | *Is the debt under the PLC Sub-Notes a future debt?* | §314 |
| *(d)* | *Interest* | §317 |
| *(e)* | *Conclusion* | §321 |
| **(5)** | **Claim C: the subordination provisions in the PLC Sub-Debt Agreements** | §322 |
| *(a)* | *Form and content of the agreements* | §322 |
| *(i)* | *Regulatory irregularity?* | §322 |
| *(ii)* | *The relevant provisions of the PLC Sub-Debt Agreements* | §328 |
| *(b)* | *Factual background* | §330 |
| *(c)* | *Operation of the subordination provisions* | §331 |
| *(i)* | *Phrase [1]: simple contractual subordination* | §331 |
| *(ii)* | *Phrase [3]: contingent debt subordination* | §333 |
| *(iii)* | *"accordingly"* | §335 |
| **(6)** | **Claim D: the PLC Sub-Notes** | §336 |
| *(a)* | *Form and content* | §336 |
| *(b)* | *Factual background* | §338 |
| *(c)* | *Operation of the subordination provisions* | §339 |
| *(i)* | *Phrases [1] and [2]* | §339 |
| *(ii)* | *Phrase [3]* | §340 |
| *(iii)* | *Phrase [5]* | §344 |
| **(7)** | **The priority dispute between Claim C and Claim D** | §349 |
| *(a)* | *Introduction* | §349 |

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

| (b) | *The operation of the subordination provisions in Claim C as regards Claim D* | §350 |
|---|---|---|
| (i) | *Simple contractual subordination* | §351 |
| (ii) | *Contingent debt subordination* | §359 |
| (c) | *The operation of the subordination provisions in Claim D as regards Claim C* | §361 |
| (i) | *Simple contractual subordination* | §361 |
| (ii) | *Contingent debt subordination* | §362 |
| (d) | *Circuity* | §346 |
| H. | **THE DIVIDEND STOPPER** | §347 |
| (1) | **Deutsche Bank's interest** | §347 |
| (2) | **The "Dividend Stopper" argument** | §348 |
| (3) | **Evidence relating to the Dividend Stopper argument** | §352 |
| (a) | *The evidence: an overview* | §352 |
| (b) | *The evidence of Mr Katz* | §353 |
| (c) | *The evidence of Mr O'Grady* | §357 |
| (4) | **Conclusion regarding the Dividend Stopper argument** | §358 |
| I. | **CONCLUSIONS AND DISPOSITION** | §362 |
| **TABLES** | | |
| Table 1 | **The "waterfall" – the order of distribution of assets in an English law distributing administration** | §87 |
| Table 2 | **Operation of the simple contractual subordination provision in Claim A** | §185 |
| Table 3 | **Calculation of Liabilities *L* for purpose of the solvency condition in Claim A** | §187 |
| Table 4 | **Hypothetical operation of the solvency condition (example 1)** | §188(3) |
| Table 5 | **Hypothetical operation of the solvency condition (example 2)** | §188(7) |
| Table 6 | **Operation of the simple contractual subordination provision in Claim B** | §191 |
| Table 7 | **Testing whether the solvency condition in Claim B is met** | §193 |
| Table 8 | **Operation of the simple contractual subordination provision in Claim A** | §240 |

| Table 9 | **Testing whether the solvency condition in Claim C is met** | §359 |
|---|---|---|
| | **ANNEXES** | |
| **Annex 1** | **Terms and abbreviations used in the judgment** | |
| **Annex 2** | **Diagrammatic representation of the three relevant corporate chains** | |
| **Annex 3** | **Diagrammatic representation of the flow of funds and the rival claims to those funds** | |

**Mr Justice Marcus Smith:**

## A.   INTRODUCTION

### (1)   The Lehman Group

1.   These proceedings are further proceedings arising out of the collapse of the Lehman Brothers group of companies (the **Lehman Group**[1]) in 2008.

2.   Lehman Brothers Holdings Inc (**LBHI**) is the ultimate parent company of the Lehman Group. In September 2008, it began Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court and emerged from those proceedings in March 2012.

3.   LBHI has many subsidiary companies, themselves having subsidiaries. For the purposes of these proceedings, there are three relevant corporate "chains", each with LBHI as the starting point (when viewing the chain from the top down):

   (1)   *The LBIE "chain".* One of LBHI's subsidiaries is Lehman Brothers International (Europe) (**LBIE**), which is an unlimited company. LBIE was the Lehman Group's main trading company in Europe. Its share capital consists of a number of ordinary shares, as well as a number of redeemable shares. All of these shares are held by LB Holdings Intermediate 2 Ltd (**LBHI2**), whose sole function was to act as LBIE's immediate holding company.[2] Above LBHI2 in this corporate "chain" are:

      (a)   LB Holdings Intermediate 1 Ltd (**LBHI1**); and

      (b)   Lehman Brothers Holdings plc (**PLC**).

   (2)   *The SLP3 "chain".* Another of LBHI's subsidiaries is Lehman Brothers Holdings Scottish LP3, owned indirectly by LBHI via Lehman Brothers UK Holdings (Delaware) Inc and Lehman Brothers Holdings Scottish LP2. I shall refer to Lehman Brothers Holdings Scottish LP3 as **SLP3**. It will be unnecessary to refer to the other companies in the chain.

   (3)   *The GP1 "chain".* LB GP No 1 Ltd (**GP1**) is the general partner of a number of **Partnerships**. Another company within the Lehman Group, a sister company of GP1, LB Investment Holdings Ltd (**LBI**), is the preferential limited partner in the Partnerships. The other limited partner in each of the Partnerships was Chase Nominees Limited (the **Initial Limited Partner**). Other persons having an "interest" in GP1 included Deutsche Bank AG (London Branch) (**Deutsche Bank**).[3] Deutsche Bank is not, I stress, a part of the Lehman Group, but a third party. Deutsche Bank – amongst others – is the holder (through its account with

---

[1] The first annex to this Judgment (**Annex 1**) contains a list of the **bolded** terms and abbreviations used in this Judgment, as well as the paragraph number in the Judgment where that term or abbreviation is first used.

[2] One ordinary share was previously held by Lehman Brothers Ltd, which was the service company for the Lehman Group's operations in the United Kingdom, Europe and the Middle East.

[3] The details do not matter for present purposes. Although it appears that it may have been intended that Deutsche Bank be a partner in GP1 (a point on which I make no findings), Deutsche Bank's actual interest is more indirect, in that Deutsche Bank's interest is held in dematerialised form as described.

Euroclear) of **ECAPS**, which are preferred securities issued by the Partnerships and which constitute limited interests in the Partnerships represented by the Initial Limited Partner. The Partnerships used the proceeds of the sale of the ECAPS to subscribe for notes issued by PLC, and which form part of PLC's subordinated debt. It is through the ECAPS it holds that Deutsche Bank derives its interest in these proceedings.

I should point out that all three of these "chains" have been presented in a simplified form in the foregoing sub-paragraphs. The reality is more complex, but it is unnecessary to go into this complexity for the purposes of this Judgment. A diagrammatic representation of these three (simplified) chains is at the second annex to this Judgment (**Annex 2**).

## (2)   The administrations

4.   PLC and LBHI2 are (amongst other companies in the Lehman Group) in administration. The purpose of these administrations has been (at least for the times material to these proceedings) the realisation of PLC's and LBHI2's assets to best advantage, rather than the preservation of the companies as going concerns. In other words, these administrations are "distributing administrations".[4]

5.   I shall refer to the joint administrators of PLC as the **PLC Administrators**; and to the joint administrators of LBHI2 as the **LBHI2 Administrators**.

## (3)   The present position under the administrations

6.   Perhaps contrary to many people's expectations when PLC and LBHI2 went into administration, these companies have been able to repay all of their unsecured unsubordinated creditors.[5] The 21st progress report of the LBHI2 Administrators states:

"**Unsubordinated creditors**

Creditors may recall that on 15 June 2017, the court granted the Administrators permission to make distributions to [LBHI2's] unsecured creditors. The [LBHI2] Administrators have declared and paid cumulative distributions of £1,181.5m to the unsubordinated creditors, and the claims and post-administration statutory interest entitlements of the unsubordinated, unsecured creditors have now been paid in full."[6]

7.   The same is essentially true of PLC. PLC's unsecured unsubordinated creditors have had the principal sums owing to them paid in full, although some statutory interest remains due.

8.   That leaves the claims of the subordinated creditors of PLC and LBHI2. There is some £300m to £900m to distribute to these subordinated creditors (the **Fund**). That is sufficient to satisfy some, but by no means all, of the claims of these subordinated creditors, and it is this fact that has given rise to the present applications. By these

---

[4] As to the power in an administration to make distributions, see van Zwieten, *Goode on Principles of Corporate Insolvency Law*, 5th ed (2019) (**Goode**) at [11-92].

[5] By definition, this means that secured creditors will have been repaid.

[6] In all quotations, footnotes have been omitted and non-material typographical errors corrected without indication. Where a substantive change or correction has been made, this is indicated by square brackets ("[…]").

applications, the PLC Administrators and the LBHI2 Administrators seek the directions of the court as to how the Fund may be distributed.

**(4)    The claims of the subordinated creditors**

*(a)    Overview*

9.    There are five sets of claims, which I shall refer to (as a convenient shorthand) as Claims A to E. Claims A and B are advanced against LBHI2; Claims C, D and E are advanced against PLC. I shall describe each of these claims, briefly, in the following paragraphs.

*(b)    Claim A (by PLC against LBHI2)*

10.    **Claim A** is advanced by PLC against LBHI2. Claim A arises under two long-term subordinated loan facility agreements and one short-term subordinated loan facility agreement made between PLC as lender and LBHI2 as borrower. I shall refer to these three loan agreements as the **LBHI2 Sub-Debt Agreements** and the obligations owed by LBHI2 to PLC as the **LBHI2 Sub-Debt**.

11.    More specifically:

(1)    The first LBHI2 Sub-Debt Agreement is dated 1 November 2006 and was effective on that date. By that agreement, PLC lent to LBHI2 up to US$4,500,000,000 under a revolving credit facility. The purpose of this agreement was to provide LBHI2 with what I shall term **regulatory capital**, by which I mean capital intended to enable an organisation to satisfy the requirements of the capital adequacy rules that applied to entities operating in the banking/financial services sector from time-to-time.

(2)    The second LBHI2 Sub-Debt Agreement is also dated 1 November 2006 and was effective on that date. By that agreement, PLC lent to LBHI2 up to €3,000,000,000 under a revolving credit facility. As with the first agreement, the purpose of this agreement was to provide LBHI2 with regulatory capital.

(3)    The third LBHI2 Sub-Debt Agreement, also dated and effective 1 November 2006, involved PLC lending LBHI2 up to US$8,000,000,000 on a short-term basis. Again, the purpose of this agreement was to provide LBHI2 with regulatory capital.

*(c)    Claim B (by SLP3 against LBHI2)*

12.    **Claim B** is advanced by SLP3 against LBHI2. SLP3 is the holder of some US$6,139,000,000 floating rate subordinated notes issued by LBHI2 pursuant to an offering circular dated 26 April 2007. I shall refer to the notes held by SLP3 as the **LBHI2 Sub-Notes**; and the offering circular setting out the terms and conditions on which the LBHI2 Sub-Notes were issued as the **LBHI2 Sub-Notes Circular**.

13.    As with the LBHI2 Sub-Debt Agreements, the underlying purpose for the issue of the LBHI2 Sub-Notes was to provide LBHI2 with regulatory capital. As will be described further in this Judgment, the rules anticipated that regulatory capital would be provided by way of <u>loans</u> rather than <u>notes</u>. The fact that notes were issued, rather than a loan negotiated, has more to do with perceived tax advantages within the Lehman Group than

13

anything else. Nevertheless, the distinction between loans and notes is a matter of some moment in these applications.

14.    By a resolution dated 3 September 2008, LBHI2 as issuer of the LBHI2 Sub-Notes resolved to amend the terms and conditions of the LBHI2 Sub-Notes (the **LBHI2 Sub-Notes Resolution**). Thus, in 2008, the terms on which the LBHI2 Sub-Notes were issued changed. I shall refer to the LBHI2 Sub-Notes <u>before</u> the LBHI2 Sub-Notes Resolution as the **Unamended LBHI2 Sub-Notes**; and to the notes in their <u>amended</u> form (reflecting the effect of the LBHI2 Sub-Notes Resolution) as the **Amended LBHI2 Sub-Notes**.

*(d)    Claim C (by LBHI against PLC)*

15.    **Claim C** is advanced by LBHI against PLC. Claim C arises under two long-term subordinated loan facility agreements and one short-term subordinated loan facility agreement made between Lehman Brothers UK Holdings Limited (**LB Holdings**) as lender and PLC as borrower. I shall refer to these three loan agreements as the **PLC Sub-Debt Agreements** and to the obligations owed by PLC to (originally) LB Holdings as the **PLC Sub-Debt**. As is the case with the LBHI2 Sub-Debt Agreements, the purpose of the PLC Sub-Debt Agreements was to provide regulatory capital to the Lehman Group.

16.    The PLC Sub-Debt Agreements comprise three loans: *(i)* one for up to US$4,500,000,000, dated and effective 30 July 2004; *(ii)* one for up to €3,000,000,000 dated and effective 30 July 2004; *(iii)* a third for up to US$8,000,000,000, dated and effective 31 October 2005.

17.    Claim C comes to be advanced by LBHI (rather than by the original lender and creditor, LB Holdings) because the "PLC Sub-Debt has now, by various assignments and other transactions, vested in LBHI".[7] I was not shown the chain of title between LB Holdings and LBHI and have proceeded on the basis that LBHI has an unimpeachable title, subject however to the question of the release of LBHI's rights, which is a question that is considered further below.

*(e)    Claim D (by GP1 against PLC)*

18.    **Claim D** is advanced by GP1 against PLC. GP1 is the holder of four sets of subordinated notes (the **PLC Sub-Notes**) issued by PLC pursuant to four offering circulars (the **PLC Sub-Notes Circulars**). More specifically:

    (1)    GP1 holds €225,000,000 fixed rate subordinated notes issued pursuant to an offering circular dated 29 March 2005. These notes have a maturity date of 30 March 2035.

    (2)    GP1 holds €200,000,000 fixed rate subordinated notes issued pursuant to an offering circular dated 19 September 2005. These notes have a maturity date of 21 September 2035.

    (3)    GP1 holds €50,000,000 fixed rate subordinated notes issued pursuant to an offering circular dated 26 October 2005. These notes also have a maturity date of 21 September 2035.

---

[7] Paragraph 20(a) of the written submissions of the LBHI2 Administrators.

**(4)**    GP1 holds €500,000,000 fixed/floating rate subordinated notes issued pursuant to an offering circular dated 20 February 2006. These notes have a maturity date of 22 February 2036.

The purpose of the PLC Sub-Notes was again to provide regulatory capital to the Lehman Group.

**19.**    GP1, as has been described,[8] is the general partner of a number of Partnerships. Deutsche Bank's interest in these proceedings arises indirectly as one of the holders of ECAPS. Should GP1's claims rank ahead of those of other unsecured subordinated creditors, then Deutsche Bank (as well as any other holder of ECAPS) will benefit accordingly.

### (f)    *Claim E (by ECAPS holders against PLC)*

**20.**    **Claim E** is advanced by the holders of ECAPS including, but not limited to, Deutsche Bank. As part of the ECAPS issue, PLC gave various guarantees (the **ECAPS Guarantees**) to holders of ECAPS.

**21.**    The question of the rights of ECAPS holders under the ECAPS Guarantees, which constitute Claim E, is now an academic one for the purposes of this Judgment. All of the interested parties before me, including Deutsche Bank, agreed that Claim E ranked <u>lower</u> than Claim C and Claim D. All of the interested parties, including Deutsche Bank, sought a declaration to this effect, which I am (in the circumstances) prepared to make. It follows that Claim E is not a matter that I need consider further in this Judgment.

### (5)    Flow of funds

**22.**    It was common ground that the Fund would be applied in the following way:

**(1)**    First, in satisfaction of the debts of LBHI2. This would entail determining the priority of the two rivals claims against LBHI2, that is to say, Claim A and Claim B. Were Claim A to prevail, this would entail payment to PLC, which would redound to the benefit of PLC's creditors. Conversely, were Claim B to prevail, this would entail a payment to SLP3.

**(2)**    It was common ground that LBHI2 could not (at least as matters presently stand) satisfy the claims of <u>all</u> of its subordinated creditors. It is for that reason that the question of priority as between Claim A and Claim B must be resolved. If there were sufficient assets to satisfy <u>both</u> Claim A and Claim B, self-evidently the question of priority would be a purely academic one that would not call for resolution. As it is, by their application, the LBHI2 Administrators seek to have this priority dispute resolved.

**(3)**    PLC's ability to distribute to its subordinated creditors is contingent upon the priority dispute between Claim A and Claim B favouring Claim A, where PLC is the creditor. Even in this case, PLC will not have enough assets to satisfy the claims of <u>all</u> its subordinated creditors. This is where the priority dispute between Claim C and Claim D arises, the priority of Claim E (for the reasons I have given) now

---

[8] See paragraph 3(3) above.

not requiring resolution by this court.[9] By their application, the PLC Administrators seek to have this priority dispute resolved.

I have sought to represent this flow of funds, and the rival claims to those funds, diagrammatically at **Annex 3**.

## (6)    The applications before the court and the issues arising

### (a)    *The applications*

23.    There are, therefore, two applications before the court:

    **(1)**    First, the application of the LBHI2 Administrators regarding the distribution of assets in their hands.

    **(2)**    Secondly, the application of the PLC Administrators regarding the distribution of assets that <u>may</u> come into their hands: this distribution is contingent upon the outcome of the application of the LBHI2 Administrators.

24.    To a very considerable degree, therefore, there is an interest in the PLC Administrators in the outcome of the application of the LBHI2 Administrators, which is reflected in the fact that PLC is named as the Second Respondent in the application of the LBHI2 Administrators.

25.    Although the LBHI2 Administrators have adopted a neutral position in their application, they have, quite properly, made clear their own interest in these applications. The written submissions of the LBHI2 Administrators state:

> "5.    The LBHI2 Administrators adopt a neutral position on the issues arising in their Application. Their interest is in ensuring that the substantial funds held by them are distributed on the correct basis, and in accordance with the agreements and other documents entered into by LBHI2, to the parties entitled to them. It is nevertheless right to point out that LBHI2 does have an economic interest in the outcome. It is a feature of the Lehman Brothers insolvency that much of the remaining debt comprises inter-company debt and that, because of the way in which that debt is held, there is a complex circuity relating to cash-flows between Lehman Brothers companies…
>
> 6.    The PLC Administrators adopt a neutral position on the issues arising in their Application but are advancing a positive case in relation to the issues arising in the LBHI2 Application. The LBHI2 Administrators do not advance any positive case on the issues arising in the PLC Application. Although LBHI2 has an economic interest in the PLC estate, that interest is at levels which have priority to the subordinated claims against PLC of LBHI and GP1 (and Deutsche Bank, which is at one stage removed) and is therefore unaffected by the disputes between the holders of subordinated unsecured debt. It is the case, however, that the dispute concerning the proper construction of the Settlement Agreement may well be of wider relevance to the administration of the estates of other Lehman Brothers companies…"

26.    The reference, in paragraph 6 of the written submissions of the LBHI2 Administrators, to a **Settlement Agreement** is a reference to a settlement made and entered into as of 24

---

[9] See paragraph 21 above.

October 2011. It will be necessary, in due course, to refer to the Settlement Agreement in greater detail: for the present, it is sufficient to note its existence.

***(b)    Issues arising***

*(i)    Approach*

27.    Given the flow of funds that I have described in paragraph 22 above, it is logical to consider the issues arising out of the administration of LBHI2 first, and the issues arising out of the administration of PLC thereafter.

*(ii)    The LBHI2 administration: issues arising out of the application by the LBHI2 Administrators*

28.    Fundamentally, the issue in the administration of LBHI2 is whether Claim A prevails over Claim B (or *vice versa*) or whether these Claims rank *pari passu*.[10] Both Claim A and Claim B involve forms of subordinated debt, and it will be necessary in order to resolve this issue:

   (1)    To understand in general terms how subordination operates as a device for causing an obligation that would ordinarily rank above, or *pari passu* with, another obligation, to rank below that obligation. (As will be described – but as is already obvious from the term "subordination" – subordination provisions can only <u>demote</u> an obligation in terms of its relative priority over other obligations of the same debtor.)

   (2)    To understand the nature of the subordination provisions in the LBHI2 Sub-Debt Agreements (Claim A) and in the LBHI2 Sub-Notes (Claim B).

   (3)    To determine how these (separately concluded) subordination provisions interrelate so as to determine the relative priority between Claim A and Claim B.

29.    It is important to appreciate that Claim B involves two different subordination provisions: the provision contained in the Unamended LBHI2 Sub-Notes; and the provision contained in the Amended LBHI2 Sub-Notes. Although it was accepted by all that it was the subordination provision in the Amended LBHI2 Sub-Notes that was determinative, SLP3/LBHI[11] contended:

   (1)    That the <u>later</u> subordination provision in the Amended LBHI2 Sub-Notes had to be read in the light of the <u>earlier</u> subordination provision in the Unamended LBHI2 Sub-Notes.

---

[10] Certain arguments as to priority were not made. Thus, no-one contended that Claim B had priority over Claim A. This Judgment obviously deals with the arguments that were presented by the parties, but I do not regard myself as constrained by those arguments. Most of the issues before me involved question of construction of documents, and I regard it as my duty to ascertain the correct construction of those documents, even if that construction was <u>not</u> one that was contended for by the parties.

[11] SLP3 and LBHI were represented by the same legal team and their interests are aligned. Although some points advanced were points that could only be made by SLP3 and some points advanced were points that could only be made by LBHI, for the sake of simplicity, I shall generally refer to points being made by SLP3 and/or LBHI as "SLP3/LBHI" points without differentiation between the two.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

(2)     That the <u>later</u> subordination provision in the Amended LBHI2 Sub-Notes, although substantially different to the <u>earlier</u> subordination provision in the Unamended LBHI2 Sub-Notes, was not intended, and on its true construction did not, alter the effect of the <u>earlier</u> subordination provision in the Unamended LBHI2 Sub-Notes.

(3)     That <u>if</u> (contrary to SLP3/LBHI's primary contentions) the <u>later</u> subordination provision in the Amended LBHI2 Sub-Notes <u>did</u> alter the subordination of the LBHI2 Sub-Notes, then that subordination provision should be rectified so as to bring it into line with the <u>earlier</u> subordination provision in the Unamended LBHI2 Sub-Notes.

*(iii)    Issues arising out of the application by the PLC Administrators*

30.     One of the issues arising out of the application by the PLC Administrators concerns the priority between Claim C and Claim D, Claim E having fallen away.[12] This involves similar questions regarding the operation of the subordination provisions contained in the PLC Sub-Debt Agreements and the PLC Sub-Notes Circulars. In contrast to the application by the LBHI2 Administrators, there is, in the case of Claim C and Claim D, only one material subordination provision in the case of each Claim; and no question of rectification arises.

31.     However, there are a number of other issues that <u>do</u> arise, which are unique to the PLC Administrators' application. These issues are as follows:

(1)     Deutsche Bank contended that the effect of the releases contained in the Settlement Agreement, in combination with the subsequent transfer of LB Holdings' claims under the PLC Sub-Debt Agreements to LBHI (described in paragraph 17 above), caused those claims to be released. Naturally, this contention was resisted by SLP3/LBHI. I shall refer to this contention as the **Settlement Agreement release argument**.

(2)     In the alternative to the Settlement Agreement release argument, Deutsche Bank contended that LBHI's claims under the PLC Sub-Debt Agreements fell to be reduced, discharged or diminished by virtue of the interaction of LBHI's claims under the PLC Sub-Debt Agreements with other instruments. It will be necessary to consider the provisions of the various instruments involved, and their legal effect, in due course. For the present, it is sufficient to note the existence of this issue, which I refer to as the **Claim C partial discharge argument**.

(3)     The long-stop maturity dates for the PLC Sub-Notes are (respectively) 30 March 2035, 21 September 2035 and 22 February 2036. It was a matter of controversy between Deutsche Bank and SLP3/LBHI as to whether the PLC Sub-Notes contained, according to the true construction of their terms, an "acceleration" provision, which would render the debts under these instruments not future debts at all, but present claims. If, contrary to Deutsche Bank's contentions in this regard, the claims under the PLC Sub-Notes were future claims, the question arose as to whether these claims fell to be discounted in accordance with the provisions of rule 14.44 of the Insolvency (England and Wales) Rules 2016[13] (the **Insolvency Rules**

---

[12] See paragraph 21 above.
[13] SI No 1024 of 2016.

2016). I shall refer to the issues arising out of this question (including the question of construction as to whether the claims are future claims at all) as the **Claim D reduction argument**.

## (7)    The structure of this Judgment

32.    This Judgment is structured as follows:

(1)    Section B describes the evidence before the court. That evidence was principally documentary, and it is fair to characterise the questions before the court as generally ones of construction and/or pure law. Nevertheless, a considerable amount of factual evidence going to these points was adduced by the parties, in particular by Deutsche Bank and SLP3/LBHI. Additionally, I had the benefit of expert evidence as to the construction of the Settlement Agreement (which is governed by the law "of the State of New York and the bankruptcy code") from two US lawyers, both former judges.

(2)    All of the parties accepted that, when it came to questions of construction, I would principally be assisted by consideration of the terms contained in the documents, and that the witness evidence (both factual and expert) described in Section B was secondary to this. Nevertheless, since substantial witness evidence was adduced before me, it is important that I explain in general terms my approach. This is done in Section C. I then consider – to the extent appropriate – the specific factual evidence arising in relation to specific instruments as I consider those instruments. The exception to this approach lies in relation to what I shall term the **Dividend Stopper argument**:

(a)    Essentially, this was an argument run by Deutsche Bank, principally in the context of the priority dispute between Claim C and Claim D. In Deutsche Bank's written submissions, the point was put in the following way. After making the point that it is the meaning of the words in the instruments that is of primary importance, Deutsche Bank submitted:

"29.    SLP3 and LBHI have, however, gone to some lengths in their position paper to introduce inadmissible and irrelevant factual material based upon the alleged subjective knowledge of various individuals. This material is broadly directed at the submission that there was no commercial rationale for the subordinated debts of LBHI2 and PLC to rank anything other than *pari passu* (albeit notably SLP3 and LBHI cannot advance a positive commercial rationale for the relevant debts to rank *pari passu*).

30.    The suggestion that there was no commercial rationale for the ranking advocated by Deutsche Bank (and also PLC and GP1 on the respective Applications) is incorrect. Deutsche Bank has therefore set out, in summary, what it submits the commercial rationale was (which is objectively apparent from the terms of the contracts before the court). This background context may be of particular assistance in relation to the PLC Application in demonstrating why the relevant parties would have intended the PLC Sub-Notes to rank senior to the PLC Sub-Debt, as Deutsche Bank and GP1 submit."

19

(b)   Because of the generality of this point, it cannot be dealt with during the course of my consideration of the various specific instruments that I must construe. Accordingly, I deal with the Dividend Stopper argument as a self-standing point in Section H below.

(3)   Section D considers briefly the nature of regulatory capital. As I have described, all of the instruments under consideration in this Judgment – the LBHI2 Sub-Debt Agreements, the LBHI2 Sub-Notes Circular, the PLC Sub-Debt Agreements and the PLC Sub-Notes Circulars[14] – were intended to provide regulatory capital to the Lehman Group and it is necessary to understand at least the broad outlines of the regulatory capital regime, as this forms an important part of the context.

(4)   Section E considers, in abstract terms, the nature of subordination. It is necessary to understand how subordination works as a matter of law in order to be able to understand and construe provisions intended to achieve a subordination effect. Again, this forms an important part of the context.

(5)   Section F considers the priority dispute between Claim A and Claim B. Section F deals with all of the issues as between Claim A and Claim B identified in paragraphs 28 and 29 above.

(6)   Section G considers the issues arising out of the application by the PLC Administrators, namely:[15]

(a)   The Settlement Agreement release argument.

(b)   The Claim C partial discharge argument.

(c)   The Claim D reduction argument.

(d)   The priority dispute between Claim C and Claim D.

(7)   Section H – as I have described[16] – deals with the Dividend Stopper argument.

(8)   Finally, Section I sets out my conclusions.

## B.   THE EVIDENCE BEFORE THE COURT

## (1)   Overview

33.   There was a considerable amount of documentary evidence before me. The material that was of primary importance was the agreements and instruments themselves. These materials were contained in a single lever arch file. In addition, there was a chronological run of "contemporaneous documents" running to some 10 lever arch files. Much of this material related to the drafting history of the agreements and instruments to be construed.

---

[14] See paragraphs 11, 13, 15 and 18 above.

[15] Described in paragraphs 30 and 31 above.

[16] See paragraph 32(2) above.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

34.    Additionally, I heard evidence from seven factual witnesses and two experts. I describe the factual witnesses in section B(2) below and the expert witnesses in Section B(3) below.

**(2)    The factual evidence**

35.    I consider the evidence of the various factual witnesses in the order in which the witnesses were called.

*(a)    Ms Sophie Hutcherson*

36.    Ms Sophie Hutcherson is a chartered accountant. She worked in a series of senior roles for the Lehman Group between 1999 and 2008. She had previously been employed by the Securities and Futures Authority, which later became part of the Financial Services Authority (**FSA**). She gave evidence on behalf of SLP3/LBHI. Her evidence was contained in a witness statement dated 18 April 2019 (**Hutcherson 1**), and she was called to give evidence on Day 2 (12 November 2019). Prior to her witness statement, she assisted the parties to both Applications by agreeing to be interviewed; a transcript of her interview – given on 25 March 2019 – was before me.

37.    Ms Hutcherson was a straightforward and honest witness. She was clearly highly capable on compliance matters and in dealing with such matters with organisations like the FSA. These were her key areas of competence, and in these areas she gave her evidence with great authority. When asked about matters outside her key areas of competence – for example, the operation of corporate structures or legal questions – she was (understandably) much less sure of herself and, to her credit, she was concerned to make this clear.

*(b)    Mr Thomas Grant*

38.    Mr Thomas Grant is, and at all material times was, a solicitor at Allen & Overy LLP (**A&O**). He was called to give evidence by SLP3/LBHI. He was involved in the amendment of the LBHI2 Sub-Notes and gave evidence to this effect. He gave one witness statement, dated 19 March 2019 (**Grant 1**). He was called to give evidence on Day 2 (12 November 2019).

39.    Mr Grant was a careful, even meticulous, and fair witness. He did his very best to recall events which involved matters of considerable detail and which cannot, by their nature, have been intrinsically particularly memorable. I consider that he did so to the very best of his ability and was at all times doing his best to assist the court. He often sought to structure his recollection by reference to the contemporaneous documents. Although I consider that Mr Grant was doing his very best to reconstruct events and his thinking at the time, and although I found him (as I have indicated) an impressive witness, I must bear in mind that the nature of the events Mr Grant was seeking to recall was intrinsically unmemorable, and that a good deal of his recollection will have been based upon what, in these circumstances, he would have done – that is, upon reconstruction rather than actual recollection.

*(c)* **Mr Stephen Miller**

40.    Mr Stephen Miller is, and at all material times was, a solicitor at A&O. He was called to give evidence by SLP3/LBHI. He was involved in the drafting of the PLC Sub-Notes in 2005 and 2006 and in the drafting of the LBHI2 Sub-Notes in 2007. He gave one witness statement, dated 19 March 2019 (**Miller 1**). He was called to give evidence on Day 2 (12 November 2019) and Day 3 (13 November 2019).

41.    Like Mr Grant, Mr Miller was a careful and fair witness, doing his best to assist the court. In one very real sense, Mr Miller's evidence was easier to give than that of Mr Grant. Whereas Mr Grant had to consider the detailed events that led up to and resulted in the amendment of the LBHI2 Sub-Notes, Mr Miller was concerned with the more general question of the drafting of notes that were intended to function in the same way as loans. Essentially, this involved arriving at terms that were compliant with the prevailing regulatory framework,[17] and in particular the requirement that the borrowing be appropriately subordinated.

*(d)* **Mr Raymond O'Grady**

42.    Mr Raymond O'Grady is a chartered accountant, who joined the Lehman Group in 2000, working within the financial control team of the Lehman Group's European finance function. He left the Lehman Group in 2008. He gave evidence on behalf of SLP3/LBHI. His evidence was contained in two witness statements, the first dated 18 April 2019 (**O'Grady 1**)[18] and the second dated 9 May 2019 (**O'Grady 2**). He was called to give evidence on Day 3 (13 November 2019).

43.    Mr O'Grady gave evidence on the Dividend Stopper argument. On the whole, Mr O'Grady gave evidence that was so far off the beaten track of material relevance that it is difficult to assess the quality of his evidence. This was not Mr O'Grady's fault. The fact that he appeared as an overly cautious witness is more to do with the points he had been asked to address in his witness statements than in his capacity as a witness.

*(e)* **Ms Jackie Dolby**

44.    Ms Jackie Dolby was, at the material times, Head of European Corporate Tax and Planning for the Lehman Group.[19] She was called as a witness by the PLC Administrators.[19] She was involved in the issuing of the LBHI2 Sub-Debt and the LBHI2 Sub-Notes, including the amendments to those notes. She gave evidence to this effect. Ms Dolby gave one witness statement, dated 16 April 2019 (**Dolby 1**). She was called to give evidence on Day 3 (13 November 2019).

45.    Ms Dolby was a straightforward and honest witness. It is important to note that Ms Dolby's expertise was essentially in tax, and that – like Ms Hutcherson – this operated as something of a straitjacket on her evidence: within her competence, Ms Dolby was a confident and very capable witness. She was at pains to avoid straying outside her

---

[17] Miller 1/§22.

[18] Which was corrected by an errata sheet dated 8 November 2019.

[19] Prior to her witness statement, she assisted the parties to both Applications by agreeing to be interviewed and a transcript of her interviews – given on 2 July 2013 and 10 April 2019 – was before me. SLP3/LBHI served a hearsay notice in respect of these interviews.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

competence, which reflected her responsibilities at the time. As with Ms Hutcherson, I consider that this does her credit.

### (f)    *Mr Benjamin Katz*

46.    Mr Benjamin Katz was, at the material times, a managing director in the Structured Capital Solutions Group (later the Capital Advisory Group) within the Lehman Group. In this role – obviously amongst other duties – he had oversight of the teams who structured the ECAPS note issues described above. He was the principal supporter – called by Deutsche Bank – of what I have termed the Dividend Stopper argument.

47.    Mr Katz's written evidence was contained in three witness statements:

(1)    His first statement, dated 18 April 2019 (**Katz 1**);

(2)    His second statement, dated 9 May 2019 (**Katz 2**); and

(3)    His third statement, dated 6 November 2019 (**Katz 3**).

Mr Katz gave evidence on Day 4 (14 November 2020).

48.    Mr Katz was a cagey witness, wanting to give nothing away, and his evidence generally lacked frankness. If pressed with an absolutely precise question, Mr Katz (with one exception, which I address below) would answer that question, but providing as minimal a response as possible. A good example of the nature of Mr Katz's evidence, albeit in relation to a relatively minor point, concerns the person to whom Mr Katz reported:

(1)    In Katz 1/§6, Mr Katz states:

"…I reported directly to the CFO of Lehman Brothers, Erin Callan…"

(2)    That (simple and, on the face of it, very clear) statement was corrected in Katz 3, which states (so far as material):

"5.    …At paragraph 6, I stated that in this role, I reported to Erin Callan, who I identified as being the CFO of Lehman Brothers. I stated this to identify who Erin Callan was, and did not intend to convey that I reported directly to her in her capacity as CFO. Erin Callan became the CFO of Lehman Brothers in December 2007, when she replaced Chris O'Meara in that role. Therefore, to be clear, I did not report directly to Erin Callan while she was CFO (and neither did I report directly to Chris O'Meara when he was CFO).

6.    At the time of the first ECAPS transaction in 2005, Erin Callan was head of Global Financial Solutions at Lehman Brothers and I reported directly to her in that capacity at that time."

(3)    It is entirely understandable for witnesses to make mistakes in their evidence. Generally speaking, a short corrective statement (or, indeed, a correction made in examination in-chief) is sufficient to remedy this. The oddity about Mr Katz's correction is that the apparently straightforward statement in Katz 1/§6 is (by the correction in Katz 3/§§5-6) converted into a statement where it is actually not possible to say with any clarity to whom Mr Katz reported or what he was correcting.

23

(4)    Unsurprisingly, clarification of the position was sought when Mr Katz came to be cross-examined. The fact that it took a number of pages of cross-examination, and an intervention by me, says a great deal about Mr Katz as a witness.[20] The fact is that Mr Katz "reported" in a manner of speaking to Ms Callan, but (in his first witness statement) he misdescribed her role and the nature of his relationship with her.

(5)    At first, it seemed to me that Mr Katz had simply mischaracterised Ms Callan's role, when he was reporting to her, and that was my understanding of his correction in the light of his oral evidence:[21]

| | |
|---|---|
| Q: Marcus Smith J | So the essence of the correction that you are making is simply regarding the office that Erin Callan was holding. Is that the extent of the correction that you are making to [Katz 1/§6]? |
| A: Mr Katz | Yes. She became the CFO thereafter. |
| Q: Marcus Smith J | Right. |
| A: Mr Katz | And I was sort of labelling her as a CFO of Lehman. |
| Q: Marcus Smith J | Right. So the error is simply her role. But you are not making any correction as to how you reported in terms of the individual when you had the role described in paragraph 5? |
| A: Mr Katz | Correct. |

(6)    In fact, my understanding was incorrect, as was shown by the next passage of cross-examination of Mr Katz:[22]

| | |
|---|---|
| Q: Mr Phillips, QC | …and one reason why you did not report to Mr O'Meara as CFO, and you did not report to Erin Callan as CFO, is that you were not in the finance division? That's the reason, isn't it? |
| A: Mr Katz | That was a complicated question. I did not report – I was not in the finance division, if that is what you are asking, yes. |
| Q: Mr Phillips, QC | Yes, and that is why you didn't report to them in the capacity as the CFO, because you were in the structured capital solutions group, weren't you? |
| A: Mr Katz | Correct. |
| Q: Mr Phillips, QC | And at the time of the ECAPS, the structured capital solutions group, their role was that they would sell products to external clients, so this is an outward-facing role, correct? |
| A: Mr Katz | It was an outward facing role. |
| Q: Mr Phillips, QC | Thank you. |
| A: Mr Katz | And – and if I could add, my Lord, one comment to that. In this capacity that we are here today, Lehman was a client, so as much as I worked for Lehman, Lehman was a client, like any other client. |

---

[20] Day 4/pp.6-11 (cross-examination of Mr Katz).

[21] Day 4/p.11 (cross-examination of Mr Katz).

[22] Day 4/pp.11-12 (cross-examination of Mr Katz).

Mr Katz was not, in fact "reporting" to Ms Callan in the conventional sense of a subordinate in an organisation reporting to a superior. He was – albeit employed by the Lehman Group – acting in a client-facing role as regards the Lehman Group. The reason, I infer, for the convoluted nature of Mr Katz's correction to Katz 1/§6 is because he wanted to correct an error (namely, the impression he gave as to the role he had) without explaining the purpose of that correction. As I say, this is a relatively minor point in the context of the issues before me. But I do consider that it casts clear light on the quality of Mr Katz's evidence.

49.    The exception (mentioned in paragraph 48 above) related to the (extremely important) question of subordination. On questions of subordination of debt, I am afraid that Mr Katz ceased to be cagey, and gave evidence that was evasive, unhelpful and wrong. It will be necessary to consider this evidence when dealing with the Dividend Stopper argument.

### (g)    Mr Ronald Geraghty

50.    Mr Geraghty is employed as the managing director of LBHI. He was called by SLP3/LBHI. For purposes of the trial, Mr Geraghty gave one witness statement, dated 18 April 2019, but it was his second in these proceedings (**Geraghty 2**). His first statement was immaterial for this trial.[23] He gave evidence on Day 4 (14 November 2019). His evidence related to the true meaning of the Settlement Agreement.

51.    Mr Geraghty was an engaging witness, but giving evidence in support of SLP3/LBHI's contentions regarding the Settlement Agreement meant that he was placed in the difficult position of providing evidence on what was truly a matter of construction. Like Mr O'Grady,[24] his issue in giving evidence had nothing to do with his capability as a witness, and turned on the nature of the evidence he had been asked to give.

### (3)    The expert evidence

### (a)    The issue on which expert evidence was called

52.    The experts were called to give evidence on the construction of contracts expressed to be governed by New York law and the US Bankruptcy Code. That is because section 12.02 of article 12 of the Settlement Agreement provides:

"This Agreement and all claims and disputes relating to the construction or application of the terms of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York and the Bankruptcy Code without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York or the Bankruptcy Code."

53.    The Settlement Agreement contains, in article 8, a series of releases. As I have described in paragraphs 15 to 17 above, Claim C arises under the PLC Sub-Debt Agreements. Claim C originally vested in LB Holdings,[25] but the claim was assigned to LBHI.[26] It was

---

[23] See Day 4/p.94 (examination in-chief of Mr Geraghty).
[24] See paragraph 43 above.
[25] See paragraph 15 above.
[26] See paragraph 17 above.

Deutsche Bank's contention that the effect of this assignment <u>to LBHI</u>, in conjunction with the operation of article 8, was to release the PLC Sub-Debt.

54.     Clearly, therefore, the construction of the Settlement Agreement – and in particular, article 8 – was a matter of some importance. By his order of 24 July 2018, Mann J gave permission to adduce expert evidence "in the field of US law to address issues relating to the construction of contracts which are expressed to be governed by New York law and the US Bankruptcy Code, insofar as they may be relevant to what is referred to as the "Release Issue"…".[27]

### (b)     The expert witnesses

55.     In consequence, I heard from two experts on US law. Judge Allan Gropper is a member of the bar of the State of New York and a retired Judge of the Bankruptcy Court of the Southern District of New York. He was called by SLP3/LBHI and gave evidence on Day 5 (15 November 2019). Judge Gropper provided an expert report dated 5 June 2019 (the **Gropper Report**).

56.     The second expert, who was called after Judge Gropper, but also on Day 5 (15 November 2019), was Judge Robert Smith, also a member of the New York bar and, like Judge Gropper, a retired judge. He was called by Deutsche Bank. Judge Smith was formerly an Associate Judge of the New York Court of Appeals. Judge Smith provided an expert report dated 6 June 2019 (the **Smith Report**).

57.     Both Judges collaborated in producing a joint report, dated 25 July 2019, in which they set out the points on which they agreed and the points where they differed (the **Joint Report**).

58.     Both Judges gave candid, helpful and clearly expert evidence. In the course of their cross-examination, both Judges were drawn into giving their views as to the construction of article 8 itself.[28] Both Judges acknowledged that the construction of article 8 was a matter for me, not them, and that their role was to inform me as to the relevant precepts of US law so that I could properly construe the Settlement. I certainly do not criticise either Judge for straying into the specifics of construction: it is extremely difficult to articulate the significance and effect of principles of construction as they relate to a specific contract in purely abstract terms, and I consider that it was inevitable that both Judges would be drawn into the true construction of the Settlement Agreement when seeking to articulate abstract propositions of foreign law.

59.     I found it helpful to have the terms of article 8 debated in court. In effect, both Judges served as a sounding board for the difficult questions of construction arising out of article 8. But I stress that I have reached my own view as to the meaning of the Settlement Agreement, and I have relied upon the evidence of Judge Gropper and Judge Smith <u>only</u>

---

[27] See paragraph 14 of the order of Mann J.

[28] It is clear that this is not a matter for them, but for me: see *BNP Paribas SA v. Trattamento Rifiuti Metropolitani SPA*, [2019] EWCA Civ 768 at [45]-[49].

to the extent that they articulated abstract questions of US law, which I have sought to apply when construing the Settlement Agreement.

## C.    APPROACH TO QUESTIONS OF CONSTRUCTION

### (1)    General principles

60.    It is not necessary to set out in enormous detail all the applicable principles to the construction or interpretation of commercial contracts or instruments. In *Lukoil Asia Pacific Pte Ltd v. Ocean Tankers (Pte) Ltd (The "Ocean Neptune")*,[29] Popplewell J summarised the relevant principles as follows:

> "There is an abundance of recent high authority on the principles applicable to the construction of commercial documents, including *Investors Compensation Scheme Ltd v. West Bromwich Building Society (No 1)*, [1998] 1 WLR 896; *Chartbrook Ltd v. Persimmon Homes Ltd*, [2009] 1 AC 1101; *Re Sigma Finance Corp*, [2010] 1 All ER 571; *Rainy Sky SA v. Kookmin Bank*, [2011] 1 WLR 2900; *Arnold v. Britton*, [2015] AC 1619; and *Wood v. Capita Insurance Services Ltd*, [2017] AC 1173. The court's task is to ascertain the objective meaning of the language which the parties have chosen in which to express their agreement. The court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. The court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching its view as to the objective meaning of the language used. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other. Interpretation is a unitary exercise; in striking a balance between the indications given by the language and the implications of the competing constructions, the court must consider the quality of drafting of the clause and it must also be alive to the possibility that one side may have agreed to something which with hindsight did not serve his interest; similarly, the court must not lose sight of the possibility that a provision may be a negotiated compromise or that the negotiators were not able to agree more precise terms. This unitary exercise involves an iterative process by which each suggested interpretation is checked against the provisions of the contract and its commercial consequences are investigated. It does not matter whether the more detailed analysis commences with the factual background and the implications of rival constructions or a close examination of the relevant language in the contract, so long as the court balances the indications given by each."

61.    There are, however, a number of aspects of this which warrant expansion in the circumstances of the present case:

(1)    Whilst I fully accept that construction of contracts must take account of the "factual matrix" – i.e. the material available to the parties in the situation in which they were at the time of the contract – this material does not include evidence of pre-contractual negotiations[30] nor does it include material that is only available to one, and not all, of the parties to the contract.

(2)    What comprises the relevant matrix of fact in any given case depends on the nature of the instrument being construed. As was noted by Lord Hoffmann in *Attorney-*

---

[29] [2018] EWHC 163 (Comm) at [8] (*per* Popplewell J).
[30] Beale (ed), *Chitty on Contracts*, 33rd ed (2018) (**Chitty**) at [13-052].

*General of Belize v. Belize Telecom Ltd*,[31] the law "permits reference to all the background knowledge which would reasonably be available to the audience to whom the instrument is addressed." As *Lewison*[32] points out "in the case of a standard form contract, a negotiable contract or a public document, evidence of background to an individual contract has a more limited part to play. The same principle applies to documents where the need for certainty is paramount."

(3)   In the present case, there are (as it seems to me) four reasons why reliance on a broad factual matrix arising out of the evidence of individual witnesses would be dangerous:

(a)   First, and this is a general point as regards such evidence, such material very often does not "cross the line" in that it is <u>not</u> available to all the parties.

(b)   Secondly, and as is further described below, the regulators unsurprisingly took a great deal of interest in the nature and terms of regulatory capital. In particular, the regulators wanted to be assured that the debt agreed by these instruments was appropriately subordinated so that it <u>could</u> properly act as regulatory capital. This level of interest was such that the terms of the subordination clauses in the instruments considered in this Judgment were variously: imposed by the FSA; or else derived from wording that stemmed from the FSA; or at the very least had an underlying regulatory function. In these circumstances, it is extremely difficult to see how – in cases where what was intended was regulatory capital – anything other than background generally known to participants in the banking/financial services sector could form part of the factual matrix.[33]

(c)   Thirdly, the regulators appear to have been concerned with the subordination of <u>sub</u>ordinated debt to <u>un</u>subordinated debt, the protection of general (<u>un</u>subordinated) creditors being one of the key purposes of regulatory capital. The regulators appear to have been <u>un</u>surprisingly indifferent to the relative priority between different <u>sub</u>ordinated debt instruments.[34] Moreover, those having the most interest in this question of relative priority (those involved in putting in place these subordinated debt instruments) appear (again, quite unsurprisingly) to have taken the view that the relative priority between subordinated debt instruments was, in practice, a question that was not going to arise. With one exception,[35] the evidence of the witnesses before me was that they simply did not contemplate the Lehman Group becoming insolvent. Thus:

---

[31] [2009] 2 All ER 1127 at [16].

[32] Lewison, *The Interpretation of Contracts*, 6th ed (2015) (***Lewison***) at Section 18

[33] *Chitty* at [13-051]; *Lewison* at fn 31 above.

[34] Best illustrated by their failure to notice or deal with various issues regarding "endless loops" preventing an orderly ranking of different subordinated obligations, all intended to provide regulatory capital. For an explanation of this issue, see paragraphs 150*ff* below.

[35] The exception was Mr Katz, whose evidence I consider in the context of the Dividend Stopper argument in Section H below.

 (i)  Ms Dolby said this in relation to the 2008 amendments to the LBHI2 Sub-Notes:[36]

   "…at no time as part of the 2008 Amendments process did I think about what would happen in the event of an insolvency of Lehman Brothers or LBHI2. I did not have any reason to think about that, or about the order in which the LBHI2 Sub-Notes and the LBHI2 Sub-Debt would be paid in any such insolvency as it simply was not a relevant consideration."

 (ii)  Ms Hutcherson agreed:[37]

   "As I said in the March interview, the question of ranking was not one I recall being discussed within the Lehman Group. Like Ms Dolby, I agree that the issue of insolvency (and priorities in insolvency) was not one that was ever addressed by my colleagues within the Lehman Group. It was simply not on our radar."

 **(d)** Fourthly, as is clear from Section E below, which considers the nature of subordination, debt subordination is a technical area, where it is necessary to have primary focus on the words used in the various instruments involved.

## (2) The factual evidence in this case

**62.** Although I heard a good deal of factual evidence over three days, and although the vast majority of that evidence was of a high quality, the evidence of these witnesses was – at the end of the day – of limited, if any, use to me. That is because most of the critical questions before me were questions of construction of various provisions in the various agreements that I have described, where the scope for the "factual matrix" to elucidate was limited.

## (3) The expert evidence in relation to the Settlement Agreement

**63.** The same was true of the expert evidence given in relation to the Settlement Agreement. I appreciate that the Settlement Agreement is not governed by English law and the expert evidence that I heard did not go to the "factual matrix". However, the US law, as expounded by Judges Gropper and Smith, like English law, attaches primacy to the contractual language, and – provided that language is unambiguous – there is little scope for reference to material extraneous to the language of the contract. The Joint Report identified the following as principles of New York law agreed by Judge Gropper and Judge Smith:

 "4. A contract will be construed to give effect to the intentions of the parties as set forth in the language of the contract itself and in light of the commercial purposes of the agreement…

 5. New York generally adheres to the so-called "plain meaning rule" of contract interpretation, by which, if a court finds contractual language to have an unambiguous,

---

[36] Dolby 1/§67.

[37] Hutcherson 1/§31.

plain meaning, the court will enforce that language in accordance with that meaning and will not refer to evidence outside the contract's text…

6.    A contract must be interpreted as a whole, giving effect where possible to all of its provisions…

7.    Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing…

8.    Contract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion. An unambiguous agreement is not reasonably susceptible of more than one interpretation…

9.    Ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably diligent person who has examined the content of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business…

10.   The test for ambiguity is an objective one – i.e., whether a reasonable person would find the agreement to be capable of more than one interpretation. Disagreement between the parties concerning the meaning of a contractual provision does not render the provision ambiguous. Whether an agreement is ambiguous is a question of law for the courts to be determined in examining the four corners of the writing, not outside sources…

11.   A contract should be interpreted, if possible, to avoid unfair or anomalous consequences. Parties to an agreement are presumed to act sensibly in regard to it, and an interpretation that produces an absurdly harsh result or a forfeiture is to be avoided…"

64.  Obviously, where the evidence assists, I review and consider it in this Judgment. However, as will be seen, because of the nature of the questions before me, the critical question was the meaning of the words in the contracts before me and only this.

## D.    THE NATURE OF REGULATORY CAPITAL

65.  It is unnecessary to set out the rules regarding regulatory capital in any great detail. But it is necessary to be aware of the importance for a bank or financial institution, like the Lehman Group, to be adequately and properly capitalised. There are, and at all material times have been, detailed rules regarding capital adequacy.

66.  The regulations determine, in essence, two things: how <u>much</u> capital a bank must have; and the <u>composition</u> of that capital. Obviously, capital can comprise many things. For example, it can comprise:

(1)   Cash and reserves, which are high-quality types of bank capital, since the bank has no payment obligations in respect of those assets, which can be used to absorb losses.

(2)   Ordinary shares, also high-quality capital, since the bank has no redemption obligation, dividends are discretionary and non-cumulative, and on a winding-up ordinary shareholders rank last in receiving payment out of the bank's assets.

67.  A loan to a bank or financial institution <u>can</u> constitute capital. However, a loan without provisions subordinating it to other loans is unsatisfactory as capital, because (on an insolvency) the creditor's claims will rank alongside all other unsecured creditors and that creditor will receive (in the event of a shortfall) a *pari passu* share. Hence, in order to qualify as regulatory capital, loans need to be subordinated to all other <u>un</u>subordinated creditors.

68.  This is why the loans and notes described above and considered more particularly below, all contain subordination provisions. As Ms Hutcherson explained, the FSA originally used standard form agreements for regulatory capital.[38] Thus, the LBHI2 Sub-Debt Agreements were in standard form, and the PLC Sub-Notes – because they involved notes and were not in standard form – required the specific sanction of the FSA.[39] In time, the use of standard form agreements was abandoned, thus providing greater flexibility to firms in designing their own documentation.[40] Of course, the purpose behind regulatory capital remained the same, and (to an extent) earlier precedents remained in use or were "grandfathered" in.[41]

69.  Of course, the questions before the court in these proceedings turn on the manner in which subordination clauses interact amongst themselves, i.e. where there are multiple subordinated debts arising out of different instruments. I refer to this question as one of "relative priority". For the reasons set out above,[42] this question of relative priority did not concern the regulators and appears not to have been considered by the Lehman Group.[43]

70.  One point that was not canvassed before me by the parties was the consequence if what was <u>intended</u> as regulatory capital failed to comply with the rules. I infer that the answer to this is that whilst such a compliance failure might very well cause a firm to be in breach of the regulations and to have <u>less</u> regulatory capital than it thought, it would not cause the instrument itself to be invalidated in any way.[44]

## E.    THE NATURE OF SUBORDINATION

### (1)    Introduction

71.  Subordination refers to the order in which rival claims are paid. Clearly, subordination only assumes real importance where the assets of a company are insufficient to pay its liabilities.

72.  English law has a series of default rules, which determines the ranking of claims. I shall refer to this as **legal subordination** because the ranking of claims is determined by operation of law and not by party consent. An important subsidiary question turns on the

---

[38] Hutcherson 1/§§16*ff*.

[39] Hutcherson 1/§§46*ff*.

[40] Hutcherson 1/§20.

[41] Hutcherson 1/§§21-22.

[42] See paragraph 61(3)(c).

[43] The possible exception to this is Mr Katz, whose evidence in this regard is considered in Section H below.

[44] There was one case, considered below, where it might be said that there was a failure to comply with the standard forms.

extent to which the rules of legal subordination can be varied by other arrangements. Such arrangements may be by way of:

**(1)** **Structural subordination**, where the assets of a group are owned not by the parent, but by subsidiaries. In this way, the rules of legal subordination may be side-stepped by causing the assets and liabilities within the group to subsist or arise in relation to a particular subsidiary company within that group.

**(2)** **Consensual subordination**, where unsecured creditors of the same debtor, whose claims would otherwise by law rank equally, may nevertheless devise structures to vary the ranking of those claims. Often – perhaps even usually – such subordination is contractual in nature, but that is not exclusively the case.[45]

**73.** Before turning to the subordination provisions in the present case it is necessary to have a clear understanding of how these three different forms of subordination operate and inter-relate.

## (2)    Legal subordination

### (a)    *The relevant provisions*

**74.** The relevant provisions are, generally, contained in the Insolvency Act 1986 and in the Insolvency Rules 2016. Part 14 of the Insolvency Rules deals with claims by and distributions to creditors in administration, winding up and bankruptcy. Obviously, this is a case of an administration.

### (b)    *"Debt"*

**75.** Rule 14.1(3) of the Insolvency Rules 2016 defines a debt in relation to winding up and administration as:

"(a)    any debt or liability to which the company is subject at the relevant date;

(b)    any debt or liability to which the company may become subject after the relevant date by reason of any obligation incurred before that date;[46]

(c)    any interest provable as mentioned in rule 14.23."

**76.** Rule 14.1(5) provides:

"For the purposes of references in any provision of the [Insolvency Act 1986] or these Rules about winding up or administration to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent, or whether its amount is fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in any such provision to owing a debt are to be read accordingly."

---

[45] Hence the reference to "consensual subordination" as opposed to "contractual subordination".

[46] "Relevant date" is a term defined in rule 14.1(3). It is unnecessary to set out that definition in this Judgment. Suffice it to say that, without prejudice to any other questions that will have to be considered, all of the obligations at issue in these applications either existed as at the relevant date or arose out of an obligation before the relevant date.

### (c)    "Provable debts"

**77.**    Rule 14.2(1) of the Insolvency Rules 2016 defines what is a provable debt as follows:[47]

> "All claims by creditors except as provided in this rule, are provable as debts against the company or bankrupt, whether they are present or future, certain or contingent, ascertained or sounding only in damages."

**78.**    Rules 14.2(2) and (3) identify certain debts that are not provable debts. For present purposes, these provisions are immaterial. Rules 14.2(4) and (5) then provide:

> "(4)    The following claims are not provable until after all other claims of creditors have been paid in full with interest under sections 189(2) (winding up), section 328(4) (bankruptcy) and rule 14.23 (payment of interest) –
>
> (a)    a claim arising by virtue of section 382(1)(a) of the Financial Services and Markets Act 2000 (restitution orders), unless it is also a claim arising by virtue of sub-paragraph (b) of that section (a person who has suffered loss, etc); or
>
> (b)    in administration and winding up, a claim which by virtue of the [Insolvency Act 1986] or any other enactment is a claim the payment of which in a bankruptcy, an administration or a winding up is to be postponed.
>
> (5)    Nothing in this rule prejudices any enactment or rule of law under which a particular kind of debt is not provable, whether on grounds of public policy or otherwise."

### (d)    Distribution and the "waterfall"

**79.**    There are detailed rules in the Insolvency Rules 2016 as to how provable debts are proved in an insolvency, and it is unnecessary to describe these. The Insolvency Rules 2016 provide that whenever the liquidator or distributing administrator[48] has sufficient funds in hand he or she must declare and distribute dividends among the creditors in respect of the debts which they have respectively proved (subject to any retention that may be necessary for the winding up or administration). There are rules regarding the giving of notice of an intended dividend or distribution, and there is nothing to stop the liquidator or distributing administrator from making multiple dividends or distributions.

**80.**    In terms of the order of priority of distribution, there is in fact no single provision in either the Insolvency Act 1986 or the Insolvency Rules 2016 setting this out. There are helpful statements of the law to be found in both the books and the case-law, but these statements have been derived from a piecing together of multiple different provisions. Thus, *Fletcher* says this:[49]

> "…the order of priority of distribution of the monies available from realisation of the assets is as follows:
>
> (1)    the costs and expenses of the liquidation, including the liquidator's own remuneration;

---

[47] Rule 14.1(3) states that the definition of "provable debt" is in rule 14.2.

[48] The rules are generally (but not always) the same whether one is talking about a winding up or a distributing administration. However, most of the books tend to focus on liquidations or windings up, because generally speaking the primary or first purpose of an administration is not distribution.

[49] Fletcher, *The Law of Insolvency*, 5th ed (2017) (**Fletcher**) at [24-016].

(2)     preferential debts;

(3)     (if there is a floating charge relating to property of the company) the prescribed part of the company's net property, to be available for the satisfaction of ordinary, unsecured debts;

(4)     debts secured by a floating charge (to be paid using the balance of the proceeds of realisation of the property comprised in the charge);

(5)     ordinary, unsecured debts;

(6)     post-insolvency interest on debts;

(7)     postponed debts;

(8)     the balance (if any), to be returned to the contributories."

81.    *Fuller* does not provide an order of priority, but rather states a series of propositions:[50]

"-     shares rank after debts;

-      share capital can be divided into various classes, the levels of ranking being determined by the articles of association (with preference shares normally ranking ahead of, and deferred shares normally ranking after, the ordinary shares);

-      unsecured debts rank after secured and preferential debts;

-      debts secured by floating charges rank after debts secured by fixed charges and preferential debts;

-      the ranking of floating charges amongst themselves is determined by law and/or by agreement between the chargees;

-      preferential debts rank after debts secured by fixed charges;

-      the ranking of fixed charges amongst themselves is determined by law and/or by agreement between the chargees; and

-      statutory provisions require payment of certain debts to be deferred until the company's other debts and liabilities have been paid in full."

82.    In *Re Lehman Brothers International (Europe) (in administration) (No 4),*[51] Lord Neuberger described the order thus:

---

[50] Fuller, *The Law and Practice of International Capital Markets*, 3rd ed (2012) (***Fuller***) at [11.01]. The parties were coy in citing *Fuller* to me. That is doubtless because Mr Fuller is a consultant at A&O, and was a partner in that firm. The documents show he was peripherally involved in relation to the documentation that I have considered in the course of this Judgment. The book is also eight years' old in its present (third) edition. I have elected to cite *Fuller* in this Judgment because it seems to me important to use, so far as possible, a common set of terms of reference for the concepts here in play. The citations of *Fuller* should be seen in this light: as providing useful labels for concepts that I would have deployed in any event, but using unhelpfully different language.

[51] [2017] UKSC 38 at [17]. I shall refer to this part of the Lehman litigation as "***Lehman 4***", and the decision of the Supreme Court as "***Lehman 4 (SC)***".

"I summarised the priorities in relation to such payments by a liquidator or a distributing administrator in the following terms in *In Re Nortel GmbH*, [2014] AC 209 at [39]:

"In a liquidation of a company and in an administration (where there is no question of trying to save the company or its business), the effect of insolvency legislation…as interpreted and extended by the courts, is that the order of priority for payment out of the company's assets is, in summary terms, as follows:

(1)     Fixed charge creditors;

(2)     Expenses of the insolvency proceedings;

(3)     Preferential creditors;

(4)     Floating charge creditors;

(5)     Unsecured provable debts;

(6)     Statutory interest;

(7)     Non-provable liabilities; and

(8)     Shareholders."

This description of what is known as the waterfall is a generalised summary of the distribution priorities in an insolvency. It was not intended to be treated as some sort of quasi-statutory statement of immutable legal principle, and it would have been better if I had said so at the time."

83.    It will be observed that there are some differences in the articulation of the "waterfall" – as I shall call it, adopting this helpful term – by Lord Neuberger, *Fletcher* and *Fuller*. Thus, Lord Neuberger puts fixed charge creditors at the top of his waterfall, whereas *Fletcher* does not mention fixed charge creditors at all. Conversely, *Fletcher* lists postponed debts at item (7) in his waterfall, which is not a category of obligation mentioned by Lord Neuberger. It is important for the purpose of resolving certain issues raised by the parties, notably the Claim D reduction argument, to have a clear understanding of the order of distribution in an insolvency situation. This is considered in Section E(2)*(e)* below.

84.    Furthermore, *Fletcher* notes that "[t]he fundamental principle of distribution in insolvency is that all liabilities belonging to a higher category of priority must be fully discharged, or provided for, before any payment may take place in respect of a liability belonging to a lower category of priority. Within each separate category, however, the process of distribution is individually prescribed by legislation."[52]

85.    As a general statement of the law, this is no doubt unexceptionable. But if this is the case without exception, then the implication for contractual subordination provisions is profound. Essentially, what this would mean is that whereas it might be possible for an unsecured debt to be subordinated to other unsecured debts, it would not be possible to subordinate a debt to a lower category. This is a point I consider in paragraphs 113 to

---

[52] *Fletcher* at [24-017].

Lehman Brothers Holdings plc (in administration) and others

114 and 117*ff* below. For the present, the passage in Fletcher again underlines the
necessity of a clear understanding of the order of distribution in an insolvency situation.

## *(e)    The order of distribution: the operation of the waterfall*

**86.**    The general powers of an administrator to make a payment or distribution to a company's
creditors are provided for by the Insolvency Act 1986 as follows:

**(1)**    Paragraph 65 of Schedule B1 provides that an administrator can make a distribution
to secured and preferential creditors, and of the prescribed part to unsecured
creditors, without the leave of the court.

**(2)**    Paragraph 66 of Schedule B1 provides that an administrator can make a payment
other than in accordance with paragraph 65, if he or she thinks it likely to assist the
achievement of the purpose of administration. This paragraph has been relied on to
enable administrators to make payments to creditors other than in accordance with
the statutory priority rules.[53]

**(3)**    The administrator also has the power under paragraph 13 of Schedule 1 to make
any payment which is necessary or incidental to the performance of his functions.

**87.**    The table below identifies various categories of obligation in column (1) in the order in
which they rank or have priority according to the rules of legal subordination in a
distributing administration.[54] Column (2) describes the provisions or rules determining
this ranking or priority. Column (3) describes the provisions or rules which determine
the ranking or priority of obligations <u>within</u> each particular category. The table sets out
the general position and makes no effort to deal with specific exceptions or carve outs to
this regime.

| (1)<br>Ranking of category of obligation (highest first) | (2)<br>Provision determining ranking <u>between</u> categories | (3)<br>Provisions regarding ranking of obligations <u>within</u> categories |
|---|---|---|
| (i)<br>**Fixed charge creditors** | The claim of a fixed charge creditor constitutes a separate proprietary claim, outside the insolvency waterfall. The assets of secured creditors do not fall within the pool of assets to be distributed to creditors by the administrator, as legally they belong to the charge holder and not to the company.[55] | Depending on the nature of the property, priority between fixed charge creditors is determined either by rules of registration or order of creation. |
| (ii)<br>**Expenses of the insolvency proceedings** | Section 175(1A) of the Insolvency Act 1986 provides that "[o]rdinary preferential debts rank equally among themselves <u>after the expenses of the winding up</u> and shall be paid in full, unless the assets are insufficient to meet | As to the expenses of the administration, and their order of priority, see rules 3.50 to 3.52 of the Insolvency Rules 2016. |

---

[53] *Re HPJ UK Ltd*, [2007] BCC 284; *Re Nortel Networks UK Ltd (No. 536 of 2009)*, [2017] 2 BCLC 555 at [38].

[54] Although the rules are generally the same in a winding up, that is not always the case.

[55] See, for instance, *Re Lynch, Inspiration Finance Ltd v. Cadwallader*, [2020] EWHC 15 (Ch). The same can be
said of suppliers of goods under agreements reserving title or anyone for whom the company holds assets on trust:
*Goode* at [8-04] and [8-17].

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

| (1)<br>Ranking of category of obligation<br>(highest first) | (2)<br>Provision determining ranking <u>between</u> categories | (3)<br>Provisions regarding ranking of obligations <u>within</u> categories |
|---|---|---|
| | them, in which case they abate in equal proportions." | |
| (iii)<br>**Preferential creditors** | Section 175 of the Insolvency Act 1986 differentiates between "ordinary preferential debts" and "secondary preferential debts". Secondary preferential debts rank <u>after</u> ordinary preferential debts.<br>Both ordinary and secondary preferential debts are "paid in priority to all other debts".[56] | Ordinary preferential debts rank equally among themselves after the expenses of the winding up and shall be paid in full, unless the assets are insufficient to meet them, in which case they abate in equal proportions.[57]<br>Secondary preferential debts rank equally among themselves after the ordinary preferential debts and shall be paid in full, unless the assets are insufficient to meet them, in which case they abate in equal proportions.[58] |
| (iv)<br>**Floating charge[59] creditors** | Section 175(2)(b)[60] of the Insolvency Act 1986 provides that claims secured by a floating charge are postponed to those of preferential creditors.[61]<br>Section 176A of the Insolvency Act 1986 provides that where assets are subject to a floating charge created on or after 15 September 2003, a "prescribed part" of the company property available to holders of floating charges must be set aside for the satisfaction of ordinary, unsecured debts. This section applies in administration as well as liquidation by virtue of section 176A(1) of the Insolvency Act 1986. | Priority between floating charge creditors is determined either by rules of registration or order of creation. |
| (v)<br>**Unsecured provable debts** | There is no express statutory provision ranking unsecured provable debts, but it can be inferred from the rules set out above and below that unsecured provable debts fall to be paid after secured and preferential creditors (including floating charge holders, subject always to the prescribed part), but before statutory interest.<br>With the exception of the prescribed part, an administrator requires the | In an administration, debts other than preferential debts rank equally between themselves and, after the preferential debts, must be paid in full unless the assets are insufficient for meeting them, in which case they abate in equal proportions between themselves.[63] |

---

[56] Section 175(1) of the Insolvency Act 1986.

[57] Section 175(1A) of the Insolvency Act 1986. Paragraph 65(2) of Schedule B1 to the Insolvency Act 1986 provides that section 175 shall apply to administrations as it applies in relation to a winding up.

[58] Section 175(1B) of the Insolvency Act 1986. Paragraph 65(2) of Schedule B1 to the Insolvency Act 1986 provides that section 175 shall apply to administrations as it applies in relation to a winding up.

[59] See the definition of "floating charge" in section 251 of the Insolvency Act 1986.

[60] Paragraph 65(2) of Schedule B1 to the Insolvency Act 1986 provides that section 175 will apply in relation to a distribution made by an administrator as well as in a winding up. See also, to similar effect, section 754 of the Companies Act 2006.

[61] Originating from section 2 of the Preferential Payments in Bankruptcy Amendment Act 1897.

[63] Rule 14.12 of the Insolvency Rules 2016.

| (1) Ranking of category of obligation (highest first) | (2) Provision determining ranking <u>between</u> categories | (3) Provisions regarding ranking of obligations <u>within</u> categories |
|---|---|---|
| | permission of the court to make a distribution to unsecured creditors.[62] | |
| (vi) **Statutory interest** | In an administration,[64] any surplus remaining after payment of the debts proved must, before being applied for any other purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the relevant date. | All statutory interest payable ranks equally, whether or not the debts on which it is payable rank equally.[65] |
| (vii) **Non-provable liabilities** | In *Lehman 4 (SC)* at [60]-[62], Lord Neuberger found that even though there was no provision in the Insolvency Act 1986 specifically addressing non-provable liabilities, a liquidator was in practice obliged to pay non-provable liabilities. At [62], he tentatively extended that conclusion to distributing administrations.[66] | The statutory provisions for rateable distribution apply to all <u>provable</u> debts, but it has been held that if a company has sufficient assets to discharge all provable debts (along with statutory interest), but insufficient assets to discharge all non-provable debts, the assets fall to be distributed on a *pro rata* basis.[67] |
| (viii) **Shareholders** | Section 74(2)(f) of the Insolvency Act 1986 provides that a sum due to any member of a company (in his character as a member) by way of dividends, profits or otherwise, is not deemed to be a debt of the company, payable to that member in a case of competition between himself and any other creditor of the company.<br><br>This is based on the long-standing legal principle that shareholders contract on the basis that a company's assets are to be applied in satisfaction of its debts.[68]<br><br>No express provision is made for distributions to members, and it has been held that the court cannot approve a proposed distribution to members by an administrator.[69] In the case of the Lehman Brothers Europe Ltd administration, distribution to members was instead achieved by way of a reduction of capital under the Companies Act 2006. | Share capital can be divided into classes, some of which rank above ordinary shares (preference shares) and others which rank below (deferred shares). The ranking of, and different rights attached to, the different categories of shares in case of insolvency are set out in a company's articles of association. |

---

[62] Paragraph 65 of Schedule B1 to the Insolvency Act 1986.

[64] Rule 14.23(7)(a) of the Insolvency Rules 2016.

[65] Rule 14.23(7)(b) of the Insolvency Rules 2016.

[66] Lord Neuberger left open the question of whether a person to whom a company in administration has a non-provable liability would be a "creditor" for the purposes of paragraph 65 of Schedule B1 to the Insolvency Act 1986.

[67] See the decision of the Court of Appeal in *Lehman 4* (***Lehman 4 (CA)***)) at [165] (*per* Briggs LJ). The decision of the Court of Appeal was overturned by the Supreme Court in *Lehman 4 (SC)*, but not on this particular point.

[68] See: *Re Addlestone Linoleum Co* (1887) 37 Ch. D. 191; *Houldsworth v Glasgow City Bank* (1880) 5 App. Cas. 317; *Webb Distributors (Aust) Pty Ltd v State of Victoria* (1993) 179 CLR 15.

[69] Unreported judgment of Briggs J in *Re Lehman Brothers Europe Ltd (in administration)*, 21 June 2012, extracted in full in *Re Lehman Brothers Europe Ltd (in administration) (No. 9)*, [2017] EWHC 2031 (Ch); also *Goode* at [11-92].

Table 1: The "waterfall" – the order of distribution of assets in an English law distributing administration

**(3)   Structural subordination**

88.   *Fuller* says this about structural subordination:[70]

"Where the main assets of a group are owned by subsidiaries, and the parent has no meaningful assets other than its shareholdings in the subsidiaries, creditors of the parent are said to be "structurally subordinated" to creditors of the subsidiaries. This is particularly seen in acquisition finance, where it is common for the "senior" bank lenders to lend either to the operating subsidiaries direct or to an intermediate holding company (with the benefit of guarantees from the operating subsidiaries), and to require that other debt (such as "mezzanine" bank loans or high yield bonds) be incurred only at a higher level in the group. The advantages to the senior lenders are that they have a greater likelihood of being repaid, and that they have greater flexibility (and control) in any insolvency or restructuring of the group."

89.   When the corporate structure of the Lehman Group as illustrated in Annex 2 is compared with the flow of funds within the Lehman Group as illustrated in Annex 3, it can be seen that there is a high level of structural subordination within the Group. This provides the background to the rival claims here being considered (Claim A versus Claim B; and Claim C versus Claim D), but it is only background and requires no further consideration in this Judgment.

**(4)   Consensual subordination**

*(a)   Introduction*

90.   There are three methods of achieving some form of subordination by consent:

(1)   Trust subordination (or a contractual variant to similar effect).

(2)   Contingent debt subordination.

(3)   Simple contractual subordination (to adopt *Fuller*'s term[71]).

*(b)   Trust subordination*

91.   In a trust subordination, the creditor whose interests are to be subordinated agrees that any payments received by him or her in respect of his or her debt in a winding up or distributing administration shall be held by him or her on trust for the creditor(s) to whose interests he or she is to be subordinated.[72]

92.   The attraction of trust subordination is that it operates outside the normal framework of legal subordination and does not affect the operation of that framework at all. The creditor whose interests are being subordinated proves for the debt in the usual way and is paid by the liquidator/administrator according to his or her legal entitlement, ahead of

---

[70] *Fuller* at [11.01].
[71] *Fuller* at [11.59].
[72] See *Fuller* at [11.49].

the creditor to whose interest he or she is to be subordinated. However, the payment that is received by the subordinated creditor is held on trust for the senior creditor.

93.   It is possible for trust subordination to operate purely at a contractual level, where the creditor whose interests are to be subordinated promises to prove for his or her debt and then to pay an amount equal to his or her recoveries to the creditor(s) to whose interests he or she is to be subordinated.[73] The disadvantage of this variant is that the intended senior creditor has no proprietary interest in any monies received by the creditor whose interests are to be subordinated. There is, therefore, a significant risk if the subordinated creditor is or becomes insolvent.

*(c)   Contingent debt subordination*

94.   There is no reason why an obligation owed by a debtor (here: the company that is in liquidation or administration) cannot be expressed to be a <u>contingent</u> debt or obligation. The right to payment then depends on the satisfaction of the contingency, whether the debtor is insolvent or solvent. It is, therefore, important that the contingency be appropriately defined.

95.   Typically, where subordination is the objective, the contingency will be expressed as a "solvency requirement", where regard must be had to defined criteria concerning the debtor's solvency, which must be satisfied as the (or a) pre-condition to payment. Alternatively, the contingency will identify the "senior debt" and stipulate that the creditor is not entitled to payment unless that senior debt is either satisfied or (at the time of payment) capable of being satisfied.

96.   There are many different ways in which the contingency can be framed. Contingent debt subordination provisions present no difficulty in the creditor proving for his or her debt in an insolvency, since contingent debts are provable.[74] *Fuller* spells out the implications of this:[75]

"The junior creditor may prove in the winding up of the debtor, since contingent debts are provable. However, the liquidator is required to estimate the value of the debt having regard to the likelihood of the contingency occurring, and the amount estimated is the amount provable in the winding up. The liquidator may revise the estimate during the course of the winding up as circumstances change or fresh information becomes available."

*(d)   Simple contractual subordination*

*(i)   Introduction*

97.   As I have described, *Fuller* refers to this as "simple" contractual subordination:[76]

---

[73] See *Fuller* at [11.54].

[74] See paragraphs 76 and 77 above.

[75] *Fuller* at [11.67].

[76] *Fuller* at [11.59].

"Simple contractual subordination is the most straightforward, but least used, method.[77] The subordination is achieved by a mere contractual statement in the junior debt, without involving contingencies or trusts. No set form of words is required. The junior debt could:

- Be described as "subordinated to", "postponed to", or "ranking after", the senior debt;
- As in *Maxwell*, provide that the senior debt is entitled to be paid before any payments shall be made on the junior debt; or
- As in *SSSL*, involve an undertaking by the junior creditor not to claim until the senior debt has been paid in full."

**98.**    Simple contractual subordination was not frequently used because there was, initially, debate as to whether it was indeed effective.[78]

*(ii)    History and operation of simple contractual subordination*

**99.**    Section 107 of the Insolvency Act 1986 provides:

"Subject to the provisions of this Act as to preferential payments, the company's property in a voluntary winding up shall on the winding up be applied in satisfaction of the company's liabilities *pari passu* and, subject to that application, shall (unless the articles otherwise provide) be distributed among the members according to their rights and interests in the company."

**100.**    Rule 14.12 of the Insolvency Rules 2016 provides:[79]

"(1)    This rule applies in an administration and a winding up by the court.

(2)    Debts other than preferential debts rank equally between themselves and, after the preferential debts, must be paid in full unless the assets are insufficient for meeting them, in which case they abate in equal proportions between themselves."

**101.**    Until the decision in *Re Maxwell Communications Corporation plc (No 2)*,[80] the prevailing wisdom was that the effect of section 107 and the predecessor to rule 14.12 (rule 4.181 of the Insolvency Rules 1986[81]) meant that all unsecured creditors <u>must</u> be paid equally, come what may. In this way, simple contractual subordination, whether <u>within</u> the category of unsecured debts or even <u>between</u> categories of obligation was simply not possible.[82]

---

[77] *Fuller* was writing in 2012.

[78] See, for example, *Fuller* at [11.60] to [11.61].

[79] This did not materially change the previous rules: see Rule 4.181 of the Insolvency Rules 1986, SI No 1925 of 1986.

[80] [1993] 1 WLR 1402.

[81] SI 1925 of 1986.

[82] See *National Westminster Bank Limited v. Halesowen Presswork & Assemblies Limited*, [1972] AC 785. This case concerned the similar provisions in section 31 of the Bankruptcy Act 1914. Albeit *obiter*, Viscount Dilhorne (at 805), Lord Simon (at 808-809) and Lord Kilbrandon (at 824) took the view that the word "shall" in section 31 meant that it was not possible to contract out of the statutory rule. Lord Cross took a different view (at 813 and 818). Also, *British Eagle International Air Lines Limited v. Compagnie Nationale Air France*, [1975] 1 WLR 758, where (again, *obiter*) the House of Lords considered that contracting out was not possible (Lord Simon at 771-772 and Lord Cross at 779-781).

Approved judgment                                                                    Lehman Brothers Holdings plc (in administration) and others
Mr Justice Marcus Smith

102.  In *Re Maxwell Communications Corporation plc (No 2)*,[83] the due and punctual payment
      of certain bonds and preference shares (with interest) was guaranteed by Maxwell
      Communications Corporation plc (**MCC**) as follows:[84]

      "The guarantee of payment of the nominal value (or in the case of an event of default only of the
      paid-up value) and interest with regard to the bonds and of the paid up value of the preference
      shares under this guarantee, constitutes an unsecured and subordinated obligation of the guarantor
      in that in any case of any distribution of assets by the guarantor, whether in cash or otherwise, in
      liquidation or bankruptcy of the guarantor, during a period in which a suspension of payment is
      granted to the guarantor or in case the guarantor negotiates with all its creditors with a view to a
      general settlement, creditors of unsubordinated indebtedness of the guarantor shall be entitled to
      be paid in full before any payment shall be made on account of payments under the bonds or the
      preference shares shall be made before any payment shall be made in such cases to the holder of
      any class of stock in the guarantor."

103.  Vinelott J was obliged to consider whether simple contractual subordination was possible
      because, in this case, trust subordination was not possible, as the Judge explained:[85]

      "That machinery, which is a very common means of ensuring that debt is effectively
      subordinated, was not available in the instant case because the guarantee is governed by Swiss
      law which does not recognise trusts. Under Swiss law, a provision for the subordination of debt
      is recognised and effective, but to the extent that English assets of MCC fall to be dealt with in
      an insolvent winding up, the distribution of the assets will be governed by English law. In these
      circumstances, I must now decide whether a contractual provision for the subordination of a debt
      unsupported by the trust mechanism used in the *British & Commonwealth Holdings* case is
      effective under English law."

104.  After reviewing the authorities, and specifically the decision in *Halesowen*, Vinelott J
      held:[86]

      "As I see it, the decision of the majority in the House of Lords did not rest solely on the mandatory
      language used in section 31 alone, but on the mandatory language used coupled with the
      proposition that the liquidator and the general body of creditors might have an interest in ensuring
      that debts due to and from a creditor arising from mutual dealings are set off. This is quite explicit
      in the speech of Lord Simon of Glaisdale who, at 808, considered and rejected the claim that the
      wording of the section could be construed "as introducing a right entirely in favour of anyone."

      That proposition, it seems to me, must rest upon the inconvenience and potential unfairness to
      the trustee or liquidator, and so to other creditors, that might arise if a creditor was entitled either
      to exercise or, at his option, not to exercise the right of set-off. For otherwise, the creditor might
      prove in the bankruptcy or winding up leaving it to the trustee or liquidator to recover the debt
      due to the estate in proceedings which might be protracted and expensive, and which might not
      result in the recovery of the full amount due. In the meantime the distribution of the insolvent
      estate might be held up and a question might arise whether a creditor who had waived his right
      of set-off would be entitled to a dividend while proceedings to recover the debt due from him
      were still on foot. An agreement between the debtor and the creditor excluding the creditor's right
      of set-off, or the waiver by the creditor of his right of set-off, even after the commencement of

---

[83] [1993] 1 WLR 1402.
[84] Quoted at 1405-1406.
[85] At 1405.
[86] At 1411-1412, 1416 and 1418-1419.

Lehman Brothers Holdings plc (in administration) and others

the bankruptcy or winding up, might thus equally hinder the rapid, efficient and economical process of bankruptcy.

The question is whether this underlying consideration of public policy should similarly invalidate an agreement between a debtor and a creditor postponing or subordinating the claim of the creditor to the claims of other unsecured creditors and preclude the waiver or subordination of the creditor's claim after the commencement of a bankruptcy or winding up. I do not think that it does. It seems to me plain that after the commencement of a bankruptcy or winding up a creditor must be entitled to waive his debt just as he is entitled to decline to submit a proof. There might, in any given case, be a question whether a waiver was binding on him but that is irrelevant for this purpose. If the creditor can waive his right altogether I can see no reason why he should not waive his right to prove, save to the extent of any assets remaining after the debts of other unsecured creditors have been paid in full; or if he is a preferential creditor, to agree that his debt will rank equally with unsecured non-preferential debts.

So also, if the earlier creditor can waive his right to prove, or agree the postponement of his debt after the commencement of the bankruptcy or winding up, I can see no reason why he should not agree with the debtor that his debt will not be payable or will be postponed or subordinated in the event of a bankruptcy or winding up. The reason for giving effect to an agreement in these terms seems to me to be, if anything, stronger than that for allowing the creditor to waive, or postpone, or subordinate his debt after the commencement of a bankruptcy or winding up; for other creditors might have given credit on the assumption that the agreement would be binding.

…

In my judgment I am not compelled by the decisions of the House of Lords in the *Halesowen* and *British Eagle* cases, or by the decisions of the Court of Appeal in those cases or in *Rolls Razor Limited v. Cox*, [1967] 1 QB 552, to conclude that a contract between a company and a creditor, providing for the debt due to the creditor to be subordinated in the insolvent winding up of the company to other unsecured debt, is rendered void by the insolvency legislation. A contrary decision would have wide-reaching repercussions. It is not infrequently the case that a company can only continue to trade and incur credit with the financial support of a parent or associated company, or a bank which is willing to subordinate its debt to the debts owed to the other unsecured creditor. Subordinated debt is in many contexts treated for accountancy purposes as if it were part of the company's capital…

…

I have some doubt whether in English law a subordinated debt is accurately described as a contingent liability and the analysis by Goldstone J.A. of the nature of subordinated debt indicates that there may be some differences between the law of England and the law of South Africa. In English law subordinated debt would not, I think, be accurately described as a "contingent liability" even if the debt is expressed to be payable only in the event of a winding up and is to be subordinated to other unsecured debts in a winding up. It may still be paid in full or in part. The position is *a fortiori* if, as is more usually the case, the debt may become payable while the company is a going concern but is subordinated to other unsecured debts in a winding up. A debt cannot be said to be a contingent debt merely because in a winding up it may rank behind other debts and because the assets of the company may not suffice to pay the other debts in full.

However, nothing turns on the question whether a subordinated debt is aptly described as a contingent claim. The essential feature pointed to by Goldstone J.A. is that it is a debt payable only to the extent that there is a surplus after meeting the claims of other unsubordinated creditors."

105.    A similar approach was taken by the Court of Appeal in *Re SSSL Realisations (2002) Limited (in liquidation)*.[87]

*(e)    Issues regarding construction*

106.    Although I have set out the different methods of consensual subordination discretely and distinctly for the purposes of analysis, it is possible to deploy different methods of consensual subordination in the same debt instrument. As will be seen, most of the debt instruments in the present case deploy a <u>combination</u> of contingent debt subordination and simple contractual subordination. Also, it is quite possible for it to be <u>unclear</u> what form of consensual subordination method the person drafting a debt instrument has used. In *Lehman 4*, the High Court,[88] Court of Appeal[89] and Supreme Court[90] were considering a provision similar to some of the provisions that I will be considering later on in this Judgment. It is appropriate to set out the provision as described by the Court of Appeal and Lewison LJ's analysis of the different types of subordination:[91]

"36    Paragraph 5 contains the subordination provisions and says:

"(1)    notwithstanding the provisions of paragraph 4, the rights of the lender in respect of the subordinated liabilities are subordinated to the senior liabilities and accordingly payment of any amount (whether principal, interest or otherwise) of the subordinated liabilities is conditional on – (a) (if an order has not been made or an effective resolution passed for the insolvency of the borrower and, being a partnership, the borrower has not been dissolved) the borrower being in compliance with not less than 120% of its financial resources requirement immediately after payment by the borrower and accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that (i) paragraph 4(3) has been complied with; and (ii) the borrower could make such payment and still be in compliance with such financial resources requirement; and (b) the borrower being 'solvent' at the time of, and immediately after, the payment by the borrower and accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that the borrower could make such payment and still be 'solvent'.

(2)    for the purposes of sub-paragraph (1)(b) above, the borrower shall be 'solvent' if it is able to pay its liabilities (other than the subordinated liabilities) in full disregarding (a) obligations which are not payable or capable of being established or determined in the insolvency of the borrower, and (b) the excluded liabilities.

(3)    interest will continue to accrue at the rate specified pursuant to paragraph 3 on any payment which does not become payable under this paragraph 5.

(4)    for the purposes of sub-paragraph (1)(b) above, a report given at any relevant time as to the solvency of the borrower by its insolvency officer, in form and substance acceptable to the FSA, shall in the absence of proven error be treated

---

[87] [2006] EWCA Civ 7.

[88] [2014] EWHC 704 (Ch). Hereafter, "***Lehman 4 (HC)***".

[89] In *Lehman 4 (CA)*.

[90] In *Lehman 4 (SC)*.

[91] I appreciate that *Lehman 4* went to the Supreme Court. Nevertheless, there are aspects of the judgments of David Richards J and the Court of Appeal that are extremely helpful and remain good law.

as accepted by the FSA, the lender and the borrower as correct and sufficient evidence of the borrower's solvency or insolvency.

(5)     subject to the provisions of sub-paragraphs (6), (7) and (8) below, if the lender shall receive from the borrower payment of any sum in respect of the subordinated liabilities (a) when any of the terms and conditions referred to in sub-paragraph (1) above is not satisfied, or (b) where such payment is prohibited under paragraph 4(3).

(6)     any sum referred to in sub-paragraph (5) above shall be received by the lender on trust to return it to the borrower.

(7)     any sum so returned shall then be treated for the purposes of the borrower's obligations hereunder as if it had not been paid by the borrower and its original payment shall be deemed not to have discharged any of the obligations of the borrower hereunder.

(8)     a request to the lender for return of any sum referred to in sub-paragraph (5) shall be in writing and shall be made by or on behalf of the borrower or, as the case may be, its insolvency officer."

37     Paragraph 7 contained undertakings by the lender not without the consent of the FSA to:

"(d)     attempt to obtain repayment of any of the subordinated liabilities otherwise than in accordance with the terms of this agreement;

(e)     take or omit to take any action whereby the subordination of the subordinated liabilities or any part of them to the senior liabilities might be terminated, impaired or adversely affected."

38     There are a number of different ways in which subordination agreements can be drawn. Three are relevant for present purposes. The first is an agreement that if the subordinated creditor receives any payment in part satisfaction of its subordinated debt it will hold the receipt on trust for the senior creditors. This form of agreement is reflected in clause 5(6) of the agreement in our case. The second is an agreement which expresses the subordinated creditor's right to repayment as being contingent on the satisfaction of a condition or conditions. In our case the right to repayment arises under clause 4, but that is subject to clause 5. Clause 5 imposes conditions on the right to repayment. If no insolvency process has begun then the condition in clause 5(1)(a) must be satisfied. Whether or not an insolvency process has begun, the condition in clause 5(1)(b) must also be satisfied. In my judgment clause 5(1) means that the right to repayment of the subordinated debt is a contingent right, contingent on the satisfaction of clause 5(1)(b) and, if appropriate, clause 5(1)(a) as well. The third method of subordinating loans, of which the clause in *Re SSSL Realisations (2002) Limited (in liquidation)*, [2006] Ch 610 is an example, contains a contractual provision precluding the subordinated creditor from proving in the insolvency of the debtor until all other creditors have been paid. This is described by Goode on Legal Problems of Credit and Security, 4th ed (2008), p 210 as the most controversial formulation of subordination agreement, although a clause of this kind has been held not to infringe the pari passu principle and hence is legally valid."

107.    It is clear from the passage at [38] above that Lewison LJ regarded the subordination provisions he had set out in [36] above as a form of contingent debt subordination. By contrast, David Richards J and the Supreme Court appear to have regarded the provisions as a form of simple contractual subordination, although it is fair to say that neither

45

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

decision states this unequivocally in these terms.[92] This question of classification is important, because the nature of the provision unsurprisingly affects the way it works.

### (f)    *The operation of consensual subordination*

**108.**    The legal operation of these various methods of consensual subordination is very different.

### (i)    *Trust subordination*

**109.**    Trust subordination does no violence to the order of ranking laid down by legal subordination. The creditor who has agreed to be subordinated by way of trust proves in the normal way, in the amount of his or her claim. It is simply that – on receipt of the dividend from the liquidator/administrator, the subordinated creditor holds the dividend on trust and must account for it consistently with that trust.[93] It follows that trust subordination as a subordination mechanism operates <u>independently</u> of the rules of legal subordination, as a kind of "overlay".[94] The statutory waterfall created by legal subordination is untouched: it is simply that the "output" of the operation of those rules – in the sense of the dividend that is produced by their operation – is subjected to the trust that trust subordination imposes.

**110.**    As I have described,[95] it is possible for trust subordination to operate on a purely contractual level, without a trust. In this case, the subordinated creditor – on receipt of the dividend produced by the rules of legal subordination – is only under a contractual obligation to account to the contractually superior creditor, who will be exposed in the event of the subordinated creditor's insolvency. Although inferior to trust subordination for this reason, this form of subordination otherwise operates in exactly the same way as trust subordination.

### (ii)    *Contingent debt subordination*

**111.**    Contingent debt subordination involves the creation of a debt that is payable only in the event of a given contingency being satisfied. By modifying the nature of the obligation owed by the debtor to the creditor, the <u>operation</u> of the rules of legal subordination changes. It is not that the rules <u>themselves</u> are changed, but they apply differently because of the contingent nature of the debt. Thus:

(1)    The subordinated creditor continues to be entitled to prove in the insolvency, because contingent debts are provable.[96] However, the liquidator/administrator must estimate the value of the debt, having regard to the probability of the contingency occurring. The amount estimated is the amount provable.[97] There is, however, nothing to stop the liquidator/administrator from revising the estimate

---

[92] *Lehman 4 (HC)* at [60]*ff*; *Lehman 4 (SC)* at [37] and [64].

[93] *Fuller* at [11.65].

[94] As trusts typically do operate. A trustee owes fiduciary duties to his or her *cestui qui trust*, but to the rest of the world acts as owner.

[95] See paragraph 93 above.

[96] See paragraph 96 above.

[97] *Fuller* at [11.67]; Insolvency Rules 2016, Rule 14.14.

during the course of the winding up/distribution as circumstances change or fresh information becomes available.[98]

**(2)**   This reveals a potential problem with contingent debt subordination, which was articulated by Lord Neuberger in *Lehman 4 (SC)* at [69]:

> "…If, at the time such a proof was lodged, there was a chance that the Senior Liabilities would be paid in full, then, as with any other debt which rests on a contingency that may occur, a valuation of that proof would not be nil: it would have to be a figure which discounted the sum due, in order to allow for the contingency not occurring. However, if the proof is ascribed a valuation greater than nil, it would have to be paid out on any distribution made prior to the satisfaction in full of other proved claims (unless there was one payment of 100%). As David Richards J said, that would appear to fall foul of clause 7. Further, any dividend would be paid out before any statutory interest or any non-provable liabilities had been paid off, which would be inconsistent with the conclusions I have just expressed."

In short, contingent debt subordination, by its nature, does not necessarily achieve the kind of <u>total</u> subordination of one obligation or category of obligation below another obligation or category of obligation that may be desired in some cases, notably in the case of regulatory capital.

112.   Contingent debt subordination operates through an agreement between the debtor and the creditor. The <u>beneficiary</u> of this agreement – the party who is created a senior creditor – is not involved. The obvious consequence of this non-involvement is that the rights of the senior creditor are not altered. It follows that the contingency can only serve to <u>demote</u> the rights of the (intended junior) creditor, that is to say, to vary the rights of that creditor such that his or her obligation is paid later and so subordinated. Of course, that has the practical consequence of improving the position of the senior creditor, but without affecting the legal rights as between debtor and senior creditor.

113.   There remains the question of whether contingent debt subordination can subordinate a debt not merely to below other debts, but also below other <u>categories</u> of obligation. The point is best articulated by reference to Table 1 in paragraph 87 above. A debt – even a contingent debt of the sort here being considered – would fall within Category (v) ("unsecured provable debts"). The question is whether a contingency can only cause the debt to be subordinated <u>within that Category</u> (so as to vary the *pari passu* rule that would apply according to the rules of legal subordination), or whether a contingency can be so crafted as to subordinate the debt to a level <u>below</u> Category (v) (e.g. to rank below Category (vi) ("statutory interest").

114.   If the passage in *Fletcher* set out and considered in paragraphs 84 and 85 above correctly states the position even in the case of consensual subordination, and the fundamental principle of distribution in insolvency is that all liabilities belonging to a higher category of priority must be fully discharged or provided for, before any payment may take place in respect of a liability belonging to a lower category of priority, then clearly there will be limits to what contingent debt subordination can achieve. It is not readily apparent <u>why</u> such a limit should exist, and certainly the judges at all instances in *Lehman 4* appear to have accepted that there was no such limit. As will be seen, in *Lehman 4 (SC)*, Lord Neuberger expressly found (in the case of simple contractual subordination) that it was

---

[98] *Fuller* at [11.67] and [11.68].

perfectly possible for simple contractual subordination not only to push a debt below other Category (v) ("unsecured provable debts") obligations, but also below other categories of obligation as well. Although – as will be described[99] – there are limits to the extent that this can be done, there seems no reason why the same should not be the case so far as contingent debt subordination is concerned.

*(iii)    Simple contractual subordination*

115.    Simple contractual subordination alters the order in which the legal waterfall operates. As Vinelott J made clear in his analysis in *Re Maxwell Communications Corporation (No 2)*, simple contractual subordination does not involve the use of a contingency, but an agreement on the part of the intended junior creditor that his or her rights rank lower in the legal waterfall than they otherwise would.[100]

116.    It is also clear that whereas contingent debt subordination can affect the creditor's rights whether the debtor is solvent or insolvent (it may be that, with careful drafting of the contingency, it can be limited to purely insolvent situations), simple contractual subordination only affects the waterfall that pertains in an insolvency (i.e. the ranking informed by legal subordination).

117.    Like contingent debt subordination, simple contractual subordination can <u>only</u> serve to demote the creditor's interests in relation to other creditors. But, whereas this is achieved through the articulation of a contingency in the case of contingent debt subordination, simple contractual subordination simply enables the creditor to select <u>at what point</u> in the waterfall his or her interests will be considered, provided:

(1)    That point is <u>lower</u> than the priority accorded to the creditor by the legal waterfall; and

(2)    All the creditor is doing is selecting a point in the legal waterfall, without re-writing that order. In other words, all a creditor is doing is <u>waiving</u> his or her right to be paid at a certain priority and electing to sit at a priority <u>lower</u> than would be the case according to the rules of legal subordination.

118.    The law in this regard was set out by Lord Neuberger in *Lehman 4 (SC)*:

"64    Looking at the issue from a broader, purposive, perspective, the conclusion that both statutory interest and non-provable liabilities have priority over the subordinated debt seems to me to accord both with the eponymous nature of the subordinated debt, and with what a reasonable reader would expect from the general thrust of the terms of the loan agreements. The purpose of the parties to those agreements was to ensure that all those with claims on LBIE would have priority over the holders of the subordinated debt. In summary terms, the perception of the reasonable reader would be that the holders of the subordinated debt were to be at the end of the queue and, in the event of an insolvency, at the bottom of the waterfall. As to the two categories over which LBHI2 claims priority, the only difference between non-provable liabilities and statutory interest in the present connection is that statutory interest is specifically provided for in the 1986 legislation, whereas non-provable liabilities are not. However, they are both categories of liabilities which have to be met after paying out proofs in full and before any balance

---

[99] See paragraphs 123 to 124 below.
[100] See the passage set out in paragraph 104 above.

can properly be used for another purpose (i.e. paid over to the members or rendered subject to a liquidation). It would therefore be surprising if they were treated differently for the purposes of a provision such as clause 5(2)(a).

65    Even if (contrary to my conclusion in [56] above) statutory interest were not "payable or owing by [LBIE]", then, because non-provable liabilities rank ahead of the subordinated debt, I would none the less have concluded that statutory interest should rank ahead of the subordinated debt. It would not, in my view, be legally possible for the subordinated debt to rank ahead of statutory interest but behind non-provable liabilities. The legislative provisions (as interpreted and, arguably, as extended, by judges) make it clear that statutory interest must be paid off before non-provable liabilities; and the terms of the loan agreements, as contractual documents, cannot vary the order in which statutory interest and non-provable liabilities are payable in accordance with the waterfall (unless all those who would thereby be prejudiced have agreed, and there is no public policy reason against giving effect to the variation).

66    Although it may at first sight appear to be equally arguable in terms of narrower logic that the subordinated debt should, in these circumstances, rank ahead of statutory interest and non-provable liabilities, I do not consider that that could possibly be right. Once it is accepted that the terms of the loan agreements mean that the subordinated debt ranks behind non-provable liabilities, it must necessarily follow that it ranks behind statutory interest. In agreement with all the parties on this appeal, I can see no objection to giving effect to a contractual agreement that, in the event of an insolvency, a contracting creditor's claim will rank lower than it would otherwise do in the "waterfall". James LJ's dictum in *Ex parte Mackay; Ex parte Brown; In re Jeavons* (1873) LR 8 Ch App 643, 647 that a person "is not allowed, by stipulation with a creditor, to provide for a different distribution of his effects in the event of bankruptcy from that which the law provides" is correct, albeit that it should be treated as subject to two qualifications. First, that it does not apply where the "different distribution" involves the creditor in question ranking lower in the waterfall than the law otherwise provides. Secondly, even if the "different distribution" involves him ranking higher than he otherwise would, the dictum would not apply if all those who are detrimentally affected by his promotion have agreed to it (unless there was some public policy reason not to accede to the "different distribution").

67    Finally, it is right to acknowledge that this conclusion involves giving little, if any, meaning to the expression "in the insolvency" in clause 5(2)(a); the argument that it was intended to exclude claims which were unenforceable as a matter of general law (e.g. statute-barred claims or foreign tax demands) is not very attractive. However, the fact that an expression in a sentence, especially in a very full document, does not, on analysis, have much, if any, effect if it is given its natural meaning is not, at least on its own, a very attractive or a very convincing reason for giving it an unnatural meaning…"

119.    For the reasons I have given, the creditor whose claims are subordinated by a contingency can and must prove in the ordinary way.[101] Section 189(2) of the Insolvency Act 1986 and Rule 14.23(7)(a) of the Insolvency Rules 2016 (formerly Rule 2.88(7) of the Insolvency Rules 1986) provide for what occurs after proved debts have been paid. The former provision applies in the case of a liquidation, and states:

"Any surplus remaining after the payment of the debts proved in a winding up shall, before being applied for any other purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the company went into liquidation."

---

[101] See paragraph 111(1) above.

The latter provision applies in the case of an administration, and similarly states:

"In an administration –

(a)    any surplus remaining after payment of the debts proved must, before being applied for
any other purpose, be applied in paying interest on those debts in respect of the periods
during which they have been outstanding since the relevant date…"

120.    Thus, it seems clear that where a creditor lodges a proof, and the liquidator/administrator
admits it, the liquidator/administrator will be obliged to distribute the available assets to
"the debts proved". In *Lehman 4 (HC)*, David Richards J considered that clause 7(d) and
(e) of the subordination clause before him (set out in [37] of Lewison LJ's judgment
quoted in paragraph 106 above) precluded the lodging of a proof by the subordinated
creditor:[102]

"…In my judgment, the lodging of a proof in respect of the subordinated loan debts coupled with
an attempt to require the administrator to admit the proof would be both an attempt to obtain
repayment of subordinated liabilities otherwise than in accordance with the terms of the
agreement, within the meaning of clause 7(d), and the taking of action whereby the subordination
of those liabilities to the Senior Liabilities might be impaired or adversely affected, within the
meaning of clause 7(e). In my view, an attempt to rely on provisions of the applicable insolvency
law to advance the subordinated liabilities above Senior Liabilities is well within the intended
scope of paragraphs (d) and (e) of clause 7."

121.    The Supreme Court agreed with David Richards J.[103] Thus, both David Richards J and
the Supreme Court concluded that the provisions of the subordination clause in this case
<u>precluded</u> the lodging of a proof – at least whilst the senior debts (and the statutory
interest on them) remained at large. Lord Neuberger was more hesitant about what the
position would be <u>if</u> these senior debts and the statutory interest were paid. Could the
subordinated creditor lodge a late proof or was the effect of the subordination to turn
what would otherwise be a <u>provable</u> debt into a <u>non-provable</u> liability? Lord Neuberger
said this:

"69.    In my judgment, David Richards J's view on this point is to be preferred. The Court of
Appeal's view appears to me to raise a logical problem. If, at the time such a proof was
lodged, there was a chance that the Senior Liabilities would be paid in full, then, as with
any other debt which rests on a contingency that may occur, a valuation of that proof
would not be nil: it would have to be a figure which discounted the sum due, in order to
allow for the contingency not occurring. However, if the proof is ascribed a valuation
greater than nil, it would have to be paid out on any distribution made prior to the
satisfaction in full of other proved claims (unless there was one payment of 100%). As
David Richards J said, that would appear to fall foul of clause 7. Further, any dividend
would be paid out before any statutory interest or any non-provable liabilities had been
paid off, which would be inconsistent with the conclusions I have just expressed.

70.    It therefore follows that, in my view, it would not be open to LBHI2 to lodge a proof in
respect of the subordinated debt until the non-provable liabilities have been paid in full,
or at least until it is clear that, after meeting that proof in full and paying any statutory

---

[102] At [69] of *Lehman 4 (HC)*.
[103] At [68] of *Lehman 4 (SC)*. The Supreme Court disagreed with the analysis of the Court of Appeal, but – if I
am right that the Court of Appeal viewed these provisions as amounting to contingent debt subordination – that
disagreement was less to do with the right to prove and more to do with the difference of view between the various
instances as to the nature of the clause before them.

interest due on it, the non-provable liabilities could be met in full. As soon as that has happened, there would, subject to what I say in the next paragraph, be nothing to stop LBHI2 lodging a late proof.

71.     On the face of it at any rate, it seems a little strange that a proof can be, or has to be, lodged for a debt which ranks after statutory interest (which can only be paid out of a "surplus") and non-provable liabilities. It may be that the proper analysis is that the subordinated debt is a non-provable debt which ranks after all other non-provable liabilities. It is unnecessary to decide that point, and, as it was not argued, I say no more about it."

122.    In the present case, the point <u>does</u> arise, because all obligations ranking in priority to the subordinated claims before me have been or will shortly be discharged and I must determine the priorities *inter se* of these subordinated claims. The parties before me adopted different views as to whether the subordinated claims needed to be proved for by way of late proof or whether the provisions by which the claims were subordinated had the incidental effect of changing the obligations from provable debts to non-provable debts. Because this question <u>may</u> affect the construction of the various subordination and other clauses before me, and certainly does go to points like the Claim D reduction argument, it is appropriate that I resolve this question:

(1)     Although Lord Neuberger expressly kept the point open in [71] of *Lehman 4 (SC)*,[104] some reliance was placed on [72] of the same judgment, where Lord Neuberger said:

"Accordingly, I would restore para (i) of the order made by David Richards J, because, although I agree with the Court of Appeal that he was right as to the ranking of the subordinated debt, I disagree with the Court of Appeal, and agree with the Judge, as to when the subordinated creditors can prove for the subordinated debt (assuming that they can prove)."

Paragraph (i) of the order of David Richards J stated:

"The claims of […LBHI2…] under its subordinated loan agreements with […LBIE…] are subordinated to provable debts, statutory interest and non-provable liabilities, all of which…must be paid in full before (a) LBHI2 is entitled to prove and require the LBIE Administrators to admit such proof in respect of its claims under its subordinated loan agreements with LBIE and (b) such claims are available for insolvency set-off resulting from the giving of notice by the LBIE Administrators, on 4 December 2009, that they proposed to make a distribution to LBIE's unsecured creditors."

It is certainly the case that this order anticipated the subordinated creditor <u>proving</u>. Lord Neuberger's reference to this paragraph <u>might</u> be read as endorsing this as a legal proposition, and was certainly relied upon to this end by SLP3/LBHI. However, that would be to disregard both [71] of *Lehman 4 (SC)* ("…it is unnecessary to decide that point, and, as it was not argued, I will say no more about it…") and the closing words of [72] ("…assuming that they can prove"). I do not consider that I can rely on Lord Neuberger's endorsement of the order of David Richards J as deciding a point that Lord Neuberger had expressly stated was being

---

[104] Quoted in paragraph 121 above.

left open. Accordingly, I proceed on the basis that the point is, as Lord Neuberger said, an open one.

(2)    As I have described, both David Richards J and the Supreme Court held that the reason that a proof could not be lodged by the subordinated creditor was because that would breach the terms of the agreement between the debtor and the subordinated creditor. Clause 7(d) and (e) of the agreement before the courts in *Lehman 4* is a provision that may or may not be replicated in other subordination agreements. However, as it seems to me, where there is a provision actually subordinating a debt (i.e., a case of simple contractual subordination), then such a provision must be stating that the subordinated debt itself ranks below other obligations that would ordinarily themselves be below it in the legal waterfall. It would render such a subordination provision entirely futile if, contrary to the subordination provision, the subordinated creditor nevertheless proved. It therefore seems to me that any <u>effective</u> clause of this kind subordinating one obligation to another must render the creditor unable to prove <u>at least until the obligations prior to that debt have been satisfied in full</u>.

(3)    Generally speaking, there are time limits within which creditors are to prove their debts or claims. Failure to abide by these time limits does not mean that a late proof cannot be made. It is simply that a creditor who fails to prove in time is excluded from distributions made before that creditor has proved. In short, a creditor who subsequently seeks to lodge proof <u>may do so</u> until the company's dissolution, but is not allowed to disturb any distribution made before his proof was admitted.[105]

(4)    In these circumstances, there is no need to cause a debt subordinated by way of simple contractual subordination to lose its status as a provable debt and become an unprovable obligation. If the effect of such a subordination provision is to prevent the lodging of a proof <u>until</u> all prior obligations have been satisfied, then simple subordination merely compels the creditor to lodge the proof late: but does nothing more than this. Since the creditor proving late cannot disturb any prior distribution, but can receive payment if there continues to be a surplus, it follows that treating the debt as provable late *(i)* does least violence to the statutory scheme whilst *(ii)* ensuring that the subordination provision operates as intended.

### (g)    Subordination below other categories of obligation

123.    I have concluded that it is possible for both contingent debt subordination and simple contractual subordination to subordinate not merely <u>within</u> a category of obligation but <u>between</u> categories of obligation.[106] As I have described, the difference between the two forms of subordination lies in the manner in which the subordinated creditor can prove.[107]

124.    The extent to which a creditor can subordinate his or her debt does have some limits:

(1)    As described, a creditor can only subordinate, and never promote.

---

[105] *Fletcher* at [23-013].

[106] See paragraph 114 above (contingent debt subordination) and paragraph 117*ff* above (simple contractual subordination).

[107] See paragraph 111(2) above (contingent debt subordination) and paragraph 117*ff* above (simple contractual subordination).

(2)     Moreover, there will be certain classes of obligation below which it will not be possible for a creditor to subordinate his or her debt. A clear example of this is – again, referring to Table 1 in paragraph 87 above – Category (viii) ("shareholders"). The fundamental distinction between debt and equity must mean that a creditor cannot subordinate below shareholders. That is because shareholders come last but – a concomitant arising out of the very nature of their legal position – take the residue. It is clear from the statutory scheme that shareholders form an altogether different class of obligation to that of creditors.

## F.    THE PRIORITY DISPUTE BETWEEN CLAIM A (THE LBHI2 SUB-DEBT AGREEMENTS) AND CLAIM B (THE LBHI2 SUB-NOTES)

### (1)    Approach

125.    I propose to consider the priority dispute between Claim A and Claim B in the following way:

(1)     First, in Section F(2) below, I consider the form and content of the LBHI2 Sub-Debt Agreements, which give rise to the claims advanced by PLC against LBHI2, which I call Claim A by way of shorthand. Section F(2), in particular, considers the terms and nature and operation of the subordination provisions contained in the LBHI2 Sub-Debt Agreements.

(2)     Secondly, in Section F(3) below, I consider the form and content of the Unamended LBHI2 Sub-Notes, which I call Claim B by way of shorthand. As in Section F(2), Section F(3) pays particular attention to the terms and nature and operation of the subordination provisions contained in the LBHI2 Sub-Notes Circular. I appreciate that the Unamended LBHI2 Sub-Notes were superseded by the Amended LBHI2 Sub-Notes. Nevertheless, for the reasons given in paragraph 29 above, it is necessary to consider the terms of the Unamended LBHI2 Sub-Notes.

(3)     Thirdly, in Section F(4) below, I consider and determine the outcome – in terms of ranking – between Claim A and Claim B (treating Claim B, for this purpose, as based upon the terms of the Unamended LBHI2 Sub-Notes). Section F(4) necessarily has to consider <u>how</u> a priority dispute is to be resolved as between instruments that <u>each</u> contain subordinating provisions.

(4)     Fourthly, in Section F(5) below, I consider the form and content of the terms of the Amended LBHI2 Sub-Notes, which give rise to the claims advanced by SLP3 against LBHI2 (also called Claim B by way of shorthand). The approach is as it was in Sections F(2) and F(3), save that I also consider the origins and purpose of the amendments introduced by the LBHI2 Sub-Notes Resolution. It is convenient to consider this history in the context of the amendments made, even though the history is of primary relevance to the question of rectification.[108]

(5)     Fifthly, in Section F(6) below, I consider the ranking between Claim A and Claim B, but this time considering the terms of the Amended LBHI2 Sub-Notes. Apart from this difference, the approach is as set out in Section F(4).

---

[108] See paragraph 29(3) above.

**(6)**    Sixthly, in Section F(7) below, I consider an issue arising out of the inter-relationship between the three agreements that together comprise Claim A.[109] The nature of that issue is articulated in paragraphs 150-154 below.

**(7)**    Seventhly and lastly, Section F(8) considers SLP3/LBHI's contention that, if the amendments to the LBHI2 Sub-Notes Circular caused their relative priority to change, then the terms of the Amended LBHI2 Sub-Notes should be rectified.

## (2)    Claim A: the LBHI2 Sub-Debt Agreements

### (a)    *The form and content of the agreements*

### (i)    *Form*

**126.**    As I have described,[110] there were three LBHI2 Sub-Debt Agreements. Although there are variations between the three agreements, these are not material for the purposes of subordination. The following description is based upon the first LBHI2 Sub-Debt Agreement described in paragraph 11(1) above. I confine myself to a consideration of the terms of this contract: there was no evidence on "factual matrix" that assisted.

**127.**    The agreement is entitled "Long-Term Subordinated Loan Agreement for the purposes of Consolidated Supervision".

**128.**    The agreement comprises three sections, respectively entitled Sections A, B and C:

**(1)**    "A. Front Page";

**(2)**    "B. Variable Terms"; and

**(3)**    "C. Standard Terms".

I shall go through these Sections in turn.

### (ii)    *Section A*

**129.**    Section A provides that:

"THIS AGREEMENT is made on the date set out in the Variable Terms (as set out in Schedule 1 to this Agreement) and is to be effective on that date unless a different effective date is set out in those terms"

**130.**    Section A then identifies the parties to the Agreement, which are referred to as "Lender" and "Borrower". These are both terms defined in paragraph 1(1) of Section C as follows:

**(1)**    The "Lender" is "the person identified as such in the Variable Terms and includes its permitted successors and assigns". Here, the Lender was PLC.

**(2)**    The "Borrower" is "the person identified as such in the Variable Terms and includes its permitted successors and assigns and, where the Borrower is a

---

[109] See paragraph 11 above.
[110] See paragraphs 10-11 above.

partnership, each Partner". Partner is a defined term, but nothing turns on this. Here, the Borrower was LBHI2.

131.    The first, and only, recital in Section A provides:

> "WHEREAS the Borrower wishes the Loan to qualify as Financial Resources contributing to its Financial Resources Requirement (as those expressions are defined in the Standard Terms) and has fully disclosed to the FSA the circumstances giving rise to the Loan or facility and the effective Subordination of the Loan"

This recital contains a number of defined terms, which are defined in paragraph 1(1) of Section C. So far as material, paragraph 1(1) provides:

> ""Advance" means, where this Agreement is for a loan facility, an amount drawn or to be drawn down by the Borrower or otherwise made available by the Lender under this Agreement as that amount may be reduced from time to time by any repayment or prepayment permitted under this Agreement

> "Financial Resources" means the financial resources which apply to the Borrower as calculated under rule 10-200(1) of the Financial Rules and are notifiable to the Borrower via its subsidiaries regulated by the FSA from time to time

> "Financial Resources Requirement" means the financial resources requirement which applies to the Borrower as calculated under rule 10-200(1) of the Financial Rules and are notifiable to the Borrower via its subsidiaries regulated by the FSA from time to time

> "Financial Rules" means the rules in IPRU(INV) 10 of the FSA handbook

> …

> "Loan" means the indebtedness of the Borrower to the Lender referred to in paragraph 2(1) as that indebtedness may be reduced from time to time by any repayment or prepayment permitted under this Agreement"

> …

> "the FSA" means The Financial Services Authority Limited whose registered office is at 25 The North Colonade, Canary Wharf, London, E14 5HS…"

132.    The definition of "Financial Rules" refers to **IPRU(INV) 10** of the FSA handbook, which is a reference to Chapter 10 of the "Interim Prudential sourcebook: Investment businesses". IPRU(INV) 10 contains many provisions. It is unnecessary to consider IPRU(INV)10 in detail, but the following should be noted:

(1)    By Rule 10-200(1), a regulated firm was obliged to ensure that its group maintained externally generated group financial resources in excess of its group financial resources requirement.

(2)    By Rule 10-63(1), a regulated firm was entitled to take into account subordinated loan capital in its financial resources, subject to the provisions contained in IPRU(INV) 10.

Lehman Brothers Holdings plc (in administration) and others

(3)    By Rule 10-63(2)(a), a subordinated loan had to be drawn up in accordance with the FSA's standard forms if it was to count as the regulated firm's financial resources.

133.    The standard forms are various. In this case, the first LBHI2 Sub-Debt Agreement followed **IPRU(INV) FORM 10.6**.

*(iii)    Section B*

134.    Given that the purpose of the Agreement is to enable the borrowing to be used to meet the Borrower's Financial Resources Requirement, the Variable Terms contained in Section B deal with mechanical matters like the identity of the Borrower and the Lender, the Effective Date of the Agreement, the amount borrowed and the repayment terms. The extent to which the Standard Terms in Section C can be departed from is, unsurprisingly given the regulated nature of the agreement, slight.

*(iv)    Section C*

135.    Section C contains, in paragraphs 11 to 16, provisions regarding:

(1)    *The relationship between the Variable Terms and the Standard Terms: paragraph 11.* The Standard Terms are to prevail.

(2)    *Entire Agreement: paragraph 12.* The Agreement constitutes "the entire agreement as to the Subordinated Liabilities". The term Subordinated Liabilities is one considered below.

(3)    *Amendments: paragraph 13.* Amendments without the consent of the FSA are void.

(4)    *Governing law (paragraph 15).* The Agreement is governed by English law.

(5)    *Jurisdiction (clause 16).* Both the Borrower and the Lender irrevocably submit to the jurisdiction of the English Courts, "[f]or the benefit of the FSA solely".

136.    Paragraph 4 of Section C deals with repayment:

(1)    Paragraph 4(1) states:

"The provisions of this paragraph are subject in all respects to the provisions of paragraph 5 (subordination)."

(2)    Paragraphs 4(4) to 4(7) constrain the ability of the Lender to recover from the Borrower where the Borrower is in breach of the Agreement. Essentially, the paragraphs prevent a Lender from recovering more from the Borrower than the Lender could obtain given the subordination provisions in paragraph 5.

137.    Paragraph 5 concerns subordination. Paragraphs 5(1) and 5(2) must be set out in full. I have numbered various "phrases" of the clause for ease of reference – these are the numbers in square brackets:

"(1)    **[1]** Notwithstanding the provisions of paragraph 4, the rights of the Lender in respect of the Subordinated Liabilities are subordinated to the Senior Liabilities **[2]** and accordingly

**[3]** payout of any amount (whether principal, interest or otherwise) of the Subordinated Liabilities is conditional upon –

(a)    **[4]** (if an order has not been made or an effective resolution passed for the Insolvency of the Borrower and, being a partnership, the Borrower has not been dissolved) the Borrower being in compliance with not less than 100% of its Financial Resources Requirement immediately after payment by the Borrower and accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that –

      i.    paragraph 4(3) has been complied with;[111] and

      ii.   the Borrower could make such payment and still be in compliance with such Financial Resources Requirement; and

(b)    **[5]** the Borrower being "solvent" at the time of, and immediately after, the payment by the Borrower and accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that the Borrower could make such payment and still be "solvent".

(2)    **[6]** For the purposes of sub-paragraph (1)(b) above, the Borrower shall be "solvent" if it is able to pay its Liabilities (other than the Subordinated Liabilities) in full disregarding–

(a)    obligations which are not payable or capable of being established or determined in the Insolvency of the Borrower, and

(b)    the Excluded Liabilities."

The remaining sub-paragraphs of the provision are not material.

### (b)    *Operation of the subordination provisions*

138.    In light of the description, in Section E above, of the nature of consensual subordination, I turn to consider the operation of the subordination provisions in the LBHI2 Sub-Debt Agreements. Agreements, of course, must be construed as a whole. However, given the technical nature of the subordination provisions, and their importance in the scheme of regulatory capital, primacy must be given to the provisions of paragraph 5 itself.

### (i)    *The repayment provisions are subject to the subordination provisions*

139.    The repayment provisions contained in paragraph 4 of Section C of the Agreements are expressly subject to the provisions of paragraph 5, which contains the subordination provisions.[112]

### (ii)    *Phrase [1] of paragraph 5(1)*

140.    The first part of paragraph 5(1) (phrase **[1]**) ("the rights of the Lender in respect of the Subordinated Liabilities are subordinated to the Senior Liabilities") is a form of simple contractual subordination. The Lender's (PLC's) rights in respect of the Subordinated

---

[111] Paragraph 4(3) sets out the circumstances in which repayments or prepayments of the Loan or any Advance may be made. It is not material for present purposes.

[112] See paragraph 4(1) of Section C, set out in paragraph 136(1) above.

Liabilities are pushed down within the class of provable debts so as to rank below Senior Liabilities.

141.    Phrase **[1]** contains various terms, which are defined in paragraph 1(1) of Section C:

   (1)    "Lender" is a term already come across and is a reference to PLC.[113]

   (2)    "Subordinated Liabilities" is defined to mean "all Liabilities to the Lender in respect of the Loan or each Advance made under this Agreement and all interest payable thereon".

   (3)    "Liabilities" means "all present and future sums, liabilities and obligations payable or owing by the Borrower (whether actual or contingent, jointly or severally or otherwise howsoever)".

   (4)    "Borrower" is a term again already come across, and refers to LBHI2.[114]

   (5)    "Senior Liabilities" means "all Liabilities except the Subordinated Liabilities and Excluded Liabilities"

   (6)    "Excluded Liabilities" means "Liabilities which are expressed to be and, in the opinion of the Insolvency Officer[115] of the Borrower, do, rank junior to Subordinated Liabilities in any Insolvency of the Borrower".

142.    In my judgment, and subject to the effect of the words "and accordingly" (phrase **[2]**, considered below), the effect of phrase **[1]** is to subordinate Subordinated Liabilities to Senior Liabilities in the waterfall and to prevent – at least in an English insolvency – the Lender from proving in that insolvency <u>until</u> the Senior Liabilities have been discharged.[116]

*(iii)    Phrase [3] of paragraph 5(1)*

143.    Phrase **[3]** is in the same sentence as phrase **[1]**. The two phrases are connected by the words "and accordingly" (phrase **[2]**), the significance of which is considered below.

144.    Viewed on its own, phrase **[3]** is a form of contingent debt subordination ("payment…is conditional upon…"), the conditions being set out in phrases **[4]** and **[5]**.

*(iv)    Contingent debt subordination: the first contingency (phrase [4])*

145.    The first of these two conditions, that contained in paragraph 5(1)(a) (phrase **[4]**), is not applicable in the present circumstances, because the condition only applies "if an order has <u>not</u> been made or an effective resolution passed for the Insolvency of the Borrower and, being a partnership, the Borrower has not been dissolved".[117] In this case, an order

---

[113] See paragraph 130(1) above.

[114] See paragraph 130(2) above.

[115] By paragraph 1(1) of Section C, Insolvency Officer means and includes "any person duly appointed to administer and distribute the assets of the Borrower in the course of the Borrower's Insolvency".

[116] See paragraph 122 above, where the effect of simple contractual subordination is explained.

[117] Emphasis added.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

for the "Insolvency"[118] of LBHI2 has been made, namely the order placing LBHI2 into administration.

*(v)    Contingent debt subordination: the second contingency (phrase [5])*

146.    Paragraph 5(1)(b) (phrase **[5]**) pertains even in an "Insolvency" situation. This is a "solvency" condition, giving the Lender an entitlement to be paid only if the definition of "solvency" is met. As to this:

(1)    "Solvency" is defined in paragraph 5(2) (phrase **[6]**). The Borrower will be "solvent" if it can pay its Liabilities in full excluding: *(i)* Subordinated Liabilities; *(ii)* obligations not payable or capable of being established or determined in the Insolvency of the Borrower; and *(iii)* Excluded Liabilities. These are all defined terms already come across.

(2)    Determining whether the condition has been satisfied entails a consideration of the overall financial position of the Borrower. Unless the Borrower can pay its Liabilities in full (albeit ignoring those Liabilities described in paragraph 146(1) above), the Lender cannot be paid.

(3)    It will readily be appreciated that this involves different considerations to those engaged by the simple contractual subordination provision in phrase **[1]** considered above. The provision in phrase **[1]** prevents the Lender from proving until the Senior Liabilities are discharged. The present provision prevents payment (whether in insolvency or otherwise) unless the Borrower's liabilities (as defined) can be paid in full. Although the two provisions have the same goal, they operate very differently and by reference to different factors.

*(vi)    Phrase [2]: "and accordingly"*

147.    On the face of it, paragraph 5(1) combines two forms of consensual subordination, simple contractual subordination (phrase **[1]**) and contingent debt subordination (phrase **[3]**). Although clearly having the same goal – the subordination of the Subordinated Liabilities – it is quite possible that a payment permissible under one provision will nevertheless be precluded by the other. I see nothing incongruous in this. The goal is the subordination of the Subordinated Liabilities and the drafter is covering all bases.

148.    The two subordination provisions – phrases **[1]** and **[3]** – appear in the same sentence, linked by the words "and accordingly" (phrase **[2]**). It might be contended that having two forms of consensual subordination in the same sentence is suggestive of one or other phrase not having contractual effect and being merely declaratory. Thus:

(1)    It might be said that phrase **[1]** has subordinating effect, and that phrase **[3]** is simply spelling out the consequences of phrase **[1]**, with no legal effect of its own; alternatively

---

[118] Insolvency is widely defined in paragraph 1(1) of Section C as meaning and including "liquidation, winding up, bankruptcy, sequestration, administration, rehabilitation and dissolution (whichever term may apply to the Borrower) or the equivalent in any other jurisdiction to which the Borrower may be subject".

(2)     It might be said that phrase **[1]** is simply declaratory of the intention of the provision, bearing no contractual meaning of its own, leaving it to phrase **[3]** (and, of course, phrases **[4]** and **[5]**) to do the actual subordinating.

Both these constructions could be said to be supported by the use of the word "accordingly", which suggests a link between the two phrases.

149.    Whilst these constructions are possible, it seems to me that I should not – without very clear language – deprive either phrase **[1]** or phrase **[3]** of all legal effect. In my judgment, what the draft seeks to achieve is subordination at all cost – hence the reliance on two different forms of consensual subordination. The word "accordingly", on this basis, makes clear that the simple contractual subordination of Subordinated Liabilities to Senior Liabilities is reinforced by the solvency condition that the Borrower must be able – at all times – to pay its liabilities (as defined) in full.

*(c)*     ***A gloss to the subordination provisions?***

*(i)*      *The need for additional analysis*

150.    As has been described, Claim A in fact comprises <u>three</u> claims, one claim arising out of each of the three LBHI2 Sub-Debt Agreements.[119] The three LBHI2 Sub-Debt Agreements are in materially the same terms, including as to the terms of their subordination provisions. It is precisely this similarity in the subordination provisions that gives rise to a circuity that prevents any form of orderly ranking. I shall, as a convenient shorthand to explain their interaction, refer to these three claims as **Claim A(i)**, **Claim A(ii)** and **Claim A(iii)**.

151.    The circuity arises out of the simple contractual subordination provision in phrase **[1]**. (As will be seen, it also has implications in relation to the contingent debt subordination contained within these provisions.) Starting with the wording in Claim A(i), it is clear that:

(1)     The payment obligations of the Borrower under <u>this</u> agreement – first LBHI2 Sub-Debt Agreement – but <u>not</u> the payment obligations of the Borrower under the two <u>other</u> agreements are Subordinated Liabilities.[120] As such, they rank below Senior Liabilities. The payment obligations of the Borrower under the two <u>other</u> Agreements are, in my judgment, Senior Liabilities. All Liabilities are Senior Liabilities unless they are Subordinated Liabilities or Excluded Liabilities:[121]

(a)     By definition, the payment obligations under Claims A(ii) and A(iii) cannot fall within the scope of Subordinated Liabilities. They are not Liabilities in respect of "this Agreement".

(b)     Neither can they be Excluded Liabilities. Claims A(ii) and A(iii) are – of course – themselves subordinated to Senior Liabilities, but – according to their own terms – they are <u>Subordinated</u> Liabilities <u>not</u> Excluded Liabilities. In short, the wording of Claims A(ii) and A(iii) makes clear their

---

[119] See paragraph 11 above.

[120] "Subordinated Liabilities" are very clearly confined to the Liabilities in respect of "this Agreement".

[121] "Senior Liabilities" is thus a "catch-all". Any Liability not a Subordinated Liability or an Excluded Liability is a Senior Liability.

subordination of what they term "Senior Liabilities" but does not bring them within the class of "Excluded Liabilities" as that term is defined in Claim A(i). In short, Claims A(ii) and A(iii) do <u>not</u> say that the liabilities arising out of these agreements are subordinated to the Subordinated Liabilities of Claim A(i).

So, Claims A(ii) and A(iii) <u>must</u> be Senior Liabilities for the purposes of Claim A(i).

(2)    The problem is that exactly the same goes for Claims A(ii) and A(iii). The payment obligations under the second LBHI2 Sub-Debt Agreement (but <u>not</u> the payment obligations of the Borrower under the first and third agreements) are Subordinated Liabilities. As such, they rank below Senior Liabilities, which term again must include the payment obligations of the Borrower under the two <u>other</u> Agreements.

(3)    The same is true, *mutatis mutandis*, in relation to the third LBHI2 Sub-Debt Agreement.[122]

152.    In short, there is an infinite (never-ending) race to the bottom, with each Claim asserting that (according to the express wording governing it) it ranks <u>below</u> the other two claims: a circle that cannot, at least on the express words of the agreements, be broken.

153.    All of the parties before me accepted that the agreements could not operate in this fashion. Some of the parties invited me to disregard this issue altogether. They considered that I should move to consider the relative priorities between Claim A and Claim B, without further ado. They said that there was no need to rank the three component elements of Claim A, as they all represented debts between the same debtor and the same creditor, at broadly the same level of subordination. In short, it was submitted, I could simply treat Claims A(i), A(ii) and A(iii) as a single debt and leave it at that.

154.    I am not persuaded that I can or should take this approach. In the first place, the question of how to resolve such circuity may arise in the case of other instruments, apart from Claims A(i), A(ii) and A(iii). Furthermore, the mechanism used to break the impasse between these claims <u>might</u> (and I say this without anticipating the outcome) so alter the subordination provisions of Claim A so as to affect the relative priority not merely between Claims A(i), A(ii) and A(iii), but also as between these claims and Claim B. In short, breaking the circuity so as to avoid the absurdity of an infinite race to the bottom might involve, for example, the implication of a term that would have a broader effect on priorities, going beyond simply the relative priorities of Claims A(i), A(ii) and A(iii). I must, I consider, be alive to that possibility.

*(ii)    Approach*

155.    It would be an altogether surprising – and undesirable – result were the relative ranking between Claim A and Claim B to be affected by the resolution of a problem arising only in relation to the relative ranking as between Claims A(i), A(ii) and A(iii). For example, if – and of course, that is a question I have yet to consider – the express wording of Claim A were to rank Claim A <u>below</u> Claim B, it would be odd for that outcome to change

---

[122] The conclusion is, in fact, exactly the same if Claims A(ii) and A(iii) were classified as "Excluded Liabilities" for the purposes of Claim A(i) and so on. A similar circuity would result.

because (for example) of words implied in order to resolve the ranking issue between Claims A(i), A(ii) and A(iii).

**156.** The following approach, therefore, commends itself:

**(1)** I should consider – before resolving the relative ranking issue between Claims A(i), A(ii) and A(iii) – how Claims A and B would rank according to their terms.

**(2)** I should then consider how the problem of ranking Claims A(i), A(ii) and A(iii) is to be resolved, and seek to adopt a solution that maintains the ranking between Claims A and B <u>unless</u> no other course is open to me.

## (3)  Claim B: the <u>Unamended</u> LBHI2 Sub-Notes

### (a)  Introduction

**157.** As I have described, Claim B is advanced by SLP3 against LBHI2.[123] SLP3 is the holder of some US$6,139,000,000 floating rate subordinated notes issued by LBHI2. The terms of the LBHI2 Sub-Notes were originally set out in the LBHI2 Sub-Notes Circular dated 26 April 2007.

**158.** As I have also described,[124] the terms on which the LBHI2 Sub-Notes were issued were changed in 2008 and – as will be seen – changed quite radically by the LBHI2 Sub-Notes Resolution. In these circumstances, it must be asked why it is necessary to construe the terms of the Unamended LBHI2 Sub-Notes at all. The answer to this question lies in the submissions that were advanced by SLP3/LBHI (and responded to by the other parties). As is clear from paragraph 360 of SLP3/LBHI's written opening submissions, SLP3/LBHI contended:

**(1)** That the 2008 amendments did not alter the priorities laid down in the Unamended LBHI2 Sub-Notes. SLP3/LBHI contended that, on the true construction of the Unamended LBHI2 Sub-Notes, the LBHI2 Sub-Debt (i.e., Claim A) and the LBHI2 Sub-Notes (i.e., Claim B) ranked *pari passu*. The 2008 amendments, *pace* SLP3/LBHI, left the relative subordination of these claims <u>unchanged</u>.[125] Whilst I can see a strong case for contending that the variations to the LBHI2 Sub-Notes Circular introduced by the LBHI2 Sub-Notes Resolution ought to be construed objectively according to their terms as amended, and without reference to the provisions those variations replaced, I am reluctant to shut out arguments based upon the construction of the unamended LBHI2 Sub-Notes Circular without actually considering them.

**(2)** That, if SLP3/LBHI was wrong on construction,[126] the 2008 amendments should be rectified. The short point was that *if* (contrary to SLP3/LBHI's primary case) the effect of the 2008 amendments was to alter the priorities laid down in the unamended LBHI2 Sub-Notes Circular, then the LBHI2 Sub-Notes Circular as

---

[123] See paragraphs 12 to 13 above.

[124] See paragraph 14 above.

[125] See paragraph 378 of SLP3/LBHI's written opening submissions.

[126] Including a point that I have not specifically identified here, but which I will consider in due course when I come to construe the relevant provisions, namely that the 2008 amendments are in any event, as a matter of their true construction, not engaged.

amended by the LBHI2 Sub-Notes Resolution should be rectified to give effect to the parties' common intention which, by mistake, had not been reflected in the 2008 amendments.[127] There are a number of complexities in this rectification argument, which will be considered later on in this Judgment: however, it is clear from this summary that it will be necessary, in order to resolve the point, to determine the true meaning of the <u>Unamended</u> LBHI2 Sub-Notes.

For these reasons, this Section considers the meaning and operation of the <u>unamended</u> LBHI2 Sub-Notes Circular.

### (b)    *The form and content of the Unamended LBHI2 Sub-Notes*

**159.**    The relevant provision (again, with specific "phrases" identified for ease of reference) is condition 3 of the LBHI2 Sub-Notes Circular, which provides as follows:

"**Status and subordination**

(a)    **[1]** The [LBHI2 Sub-Notes] constitute direct, unsecured and subordinated obligations of the Issuer and the rights and claims of the Noteholders against the Issuer rank *pari passu* without any preference among themselves. **[2]** The rights of the Noteholders against the Issuer in respect of the Notes are subordinated in right of payment to the Senior Creditors (as defined below) and **[3]** accordingly payment of principal in respect of the Notes is conditional upon the Issuer being solvent at the time of, and immediately after, such payment, and **[4]** accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that the Issuer could make such payment and still be solvent immediately thereafter.

(b)    **[5]** For the purposes of Condition 3(a) above, the Issuer shall be 'solvent' if **[6]** (i) it is able to pay its debts as they fall due and **[7]** (ii) its Assets exceed its Liabilities  **[8]** (each as defined below) **[9]** (other than its Liabilities to persons who are not Senior Creditors). **[10]** A report as to the solvency of the Issuer by two directors of the Issuer or, if the Issuer is dissolved or being would up, its liquidator, shall, in the absence of proven error, be treated and accepted by the Issuer and the Noteholders as correct and sufficient evidence thereof.

**[11]** For the purposes of the above provisions:

**[12]** "**Senior Creditors**" means creditors of the Issuer **[13]** (i) who are unsubordinated creditors of the Issuer or **[14]** (ii) who are subordinated creditors of the Issuer **[15]** other than **[16]** those with whose claims the claims of the Noteholders are expressed to rank *pari passu* **[17]** and those whose claims rank, or are expressed to rank, *pari passu* with, or junior to, the claims of the Noteholders;

**[18]** "**Assets**" means the unconsolidated gross assets of the Issuer and **[19]** "**Liabilities**" means the unconsolidated gross liabilities of the Issuer, **[20]** all as shown by the latest published audited balance sheet of the Issuer, but adjusted for contingencies and for subsequent events, all in such manner as two directors of the Issuer, its auditors or its liquidator (as the case may be) may determine.

(c)    **[21]** Subject to applicable law, no Noteholder may exercise, claim or plead any right of set-off, counter-claim or retention in respect of any amount owed to it by the Issuer

---

[127] See, for instance, paragraph 406 of SLP3/LBHI's written opening submissions.

arising under or in connection with the Notes and each Noteholder shall, by virtue of being the holder of any Note, be deemed to have waived all such rights of such set-off, counter-claim or retention."

160.   Most of the defined terms used in this provision are defined within it. To the extent they are not, and are material, they are described in the course of the discussion below.

*(c)*   *The relevance of the factual evidence regarding the background to the LBHI2 Sub-Notes*

161.   Mr Miller gave evidence regarding the background to the LBHI2 Sub-Notes.[128] Although I have great respect for the quality of the evidence he gave, which he gave clearly and well, I have little doubt that what he told is not legally relevant for the purposes of construing the terms of the LBHI2 Sub-Notes. For the reasons given in paragraphs 60 and 61 above, I consider that the subjective intentions of the persons behind a note issue – where it is very difficult for a common understanding to "cross the line" and form a part of the factual matrix – cannot affect the construction of the wording of the LBHI2 Sub-Notes as finally agreed. I entirely accept that the objective was to ensure subordination of the LBHI2 Sub-Notes in accordance with the prevailing regulatory regime, and that the regulatory regime did not cater for note issues. But the regulatory regime did not consider priorities <u>between</u> subordinated obligations, being mainly concerned with the fact that subordinated obligations were properly subordinated to unsubordinated obligations. No-one appears to have considered relative priority between instruments where those instruments <u>all</u> contained subordination provisions.

*(d)*   *Operation of the subordination provisions*

*(i)*   *Phrase [1] of condition 3*

162.   Phrase **[1]**, the first sentence of condition 3(a), makes clear that the Notes themselves rank *pari passu* as between themselves. As regards <u>other obligations</u> of the Issuer, phrase **[1]** makes clear that the Notes are subordinated. However, phrase **[1]** does not specify to which other obligations the Notes are subordinate. In other words, whilst it is clearly stated that the Notes are subordinated, the level to which the Notes are subordinated, as against other claims/obligations, is not stated in this phrase.

*(ii)*   *Phrases [2], [3] and [4] of condition 3*

163.   Phrases **[2]**, **[3]** and **[4]** are all part of the same sentence. They are linked by two "accordingly"s (the first word in phrases **[3]** and **[4]**). This is resonant of phrase **[2]** of the subordination provision in the LBHI2 Sub-Debt Agreements, which links by an "accordingly" phrases **[1]** and **[3]** of that clause.[129]

*(iii)*   *Phrase [2] of condition 3*

164.   Phrase **[2]** ("The rights of the Noteholders against the Issuer in respect of the Notes are subordinated in right of payment to the Senior Creditors…") is a form of simple

---

[128] See paragraphs 40 to 41 above.
[129] See paragraphs 147 to 149 above.

contractual subordination, capable of having its own meaning and effect. Quite simply, the rights of Noteholders are subordinated to the rights of the "Senior Creditors".

165.   "Senior Creditors" is a defined term: see phrase **[12]**. As can be seen from the definitions which follow phrase **[11]**, "Senior Creditors" is the first of three defined terms, the other terms being "Assets" (phrase **[18]**) and "Liabilities" (phrase **[19]**).

166.   The definition of Senior Creditors itself has two limbs, expressed in phrase **[13]** and phrase **[14]**:

(1)   Phrase **[13]** defines as a Senior Creditor any creditor of the Issuer who is <u>not</u> a subordinated creditor of the Issuer. In short, all <u>un</u>subordinated creditors rank as Senior Creditors. Since Claim A, on any view, is <u>subordinated</u> debt, this limb can be disregarded for present purposes.

(2)   The second limb (phrases **[14]** to **[17]**) concerns <u>subordinated</u> creditors of the Issuer. For present purposes, this is the significant part of the definition of Senior Creditors. As to this:

   (a)   It is clear from phrase **[14]** that the <u>starting point</u> is that the Noteholders are intended to rank <u>below</u> even <u>subordinated</u> creditors of the Issuer (""Senior Creditors" means creditors of the Issuer…who are subordinated creditors of the Issuer…").

   (b)   This, however, is only the starting point, for there are then "carve-outs" or derogations from this starting position (reflected by the words "other than" in phrase **[15]**).

   (c)   There are two "carve-outs", at phrases **[16]** and **[17]**.

   (d)   The first of these carve-outs (phrase **[16]**) relates back to phrase **[1]**. Phrase **[1]**, it will be recalled, provides that the Noteholders should rank *pari passu inter se*.[130] Phrase **[16]** is making clear that where the claims of the Noteholders are expressed to rank *pari passu* (i.e., as between Noteholders), it cannot be said that a Noteholder is a Senior Creditor. This provision seems to be for the avoidance of doubt, since that would appear to be the effect of phrase **[1]** in any event. The carve-out at phrase **[16]** is irrelevant to the questions before me.

   (e)   Turning, then, to the second carve-out, at phrase **[17]**, this explicitly refers to the ranking of claims <u>other than</u> those of Noteholders. Where those other claims either rank or are expressed to rank *pari passu* with or junior to the claims of the Noteholders, then those creditors are <u>not</u> Senior Creditors. More specifically:

      (i)   Phrase **[17]** draws a distinction between subordinated claims "ranking" relative to the claims of the Noteholders and those "expressed to rank" relative to the claims of the Noteholders. The distinction is an elusive one: it appears to seek to differentiate

---

[130] See paragraph 162 above.

between the order of <u>legal</u> subordination described in Section E(2) above (where claims rank in a default priority determined by law) and <u>consensual</u> subordination described in Section E(4) above (where the default position can be changed by party consent, which involves some form of wording or expression). The problem is that this provision applies only to "subordinated creditors of the Issuer", which by definition will exclude those creditors relying <u>solely</u> on their priority as determined by law. It is, therefore, very difficult to make anything of this distinction. However, it is clear that legal subordination can be altered by consensual subordination; and that the critical words of the provision – at least for present purposes – are therefore "claims…<u>expressed</u> to rank" *pari passu* or below the Noteholders' claims.

(ii)   The effect of phrase **[17]** is to cause those subordinated creditors whose claims against the Issuer <u>themselves</u> contain a form of subordination provision to fall outside the definition of "Senior Creditors". The significance of phrase **[17]** concerns only the <u>definition</u> of "Senior Creditor". The <u>only</u> effect of the second carve-out in phrase **[17]** is to remove certain, rival, claims from the meaning of "Senior Creditor". The term says nothing about ranking *per se*.

167.   Having ascertained the meaning of "Senior Creditor", it is necessary to go back to the subordination provision contained in phrase **[2]**. Phrase **[2]**, as as been described, simply says that the rights of the Noteholders are subordinated, in right of payment, to the Senior Creditors. In short, if a claim is that of a Senior Creditor, the rights of the Noteholders are subordinated to that claim. But phrase **[2]** says <u>nothing</u> about priority as between Noteholders and creditors who are <u>not</u> Senior Creditors. The point is simply not addressed and the inevitable inference is that the default rules of <u>legal</u> subordination will apply.

*(iv)   Phrases [3] and [4] of condition 3*

168.   It is appropriate to consider these phrases together.

169.   Phrase **[3]**, which begins with the first "accordingly", is a form of contingent debt subordination ("…is conditional upon…"). It requires the Issuer to be solvent – a term defined in clause 3(b) (phrase **[5]**) – before making any payment <u>of principal</u> in respect of the Notes. Phrase **[3]** makes clear that the Issuer must not only be solvent at the time of this payment, but also immediately thereafter.

170.   Phrase **[4]**, which begins with the second "accordingly", is less a self-standing contingency, and more a reinforcement of the condition at phrase **[3]**. Phrase **[4]** makes clear that a solvent Issuer <u>cannot</u> make payment of any principal if, as a result of that payment, it would <u>cease</u> to be solvent immediately thereafter.

171.   I turn, then, to the definition of solvency in phrases **[5]** to **[10]**. This definition, which explicitly refers back to condition 3(a) in phrase **[5]**, contains multiple elements in phrases **[6]** to **[10]**. As to these:

(1)    Phrase **[10]** deals with how solvency is to be evidenced and can be disregarded for present purposes.

(2)    As can be seen from phrases **[6]** and **[7]**, the definition of solvency itself comprises two limbs which are <u>cumulative</u> and <u>not</u> alternative (see the "and" before phrase **[7]**).

(3)    I begin with phrase **[6]**:

(a)    The first limb, in phrase **[6]**, contains words very familiar from sections 122(1)(f)[131] and 123(1)(e)[132] of the Insolvency Act 1986. These Insolvency Act provisions define (some of) the conditions whereby a company may be wound up: they are "triggers" for the winding up process. It is difficult, however, to read phrase **[6]** in this way. If phrase **[6]** were read as a "trigger", then – once triggered – the requirement would always be <u>not met</u>. In other words, LBHI2, having <u>once</u> been unable to pay its debts as they fall due, would <u>always</u> be insolvent.

(b)    If that were right, the provision would preclude <u>any</u> payment in respect of the principal of the Notes <u>after</u> this solvency condition had been breached. Having once been unable to pay its debts as they fell due, the Noteholders forever lose their right to claim the principal.

(c)    Whilst this is a possible reading of phrase **[6]**, it is an unlikely one. It would mean that once the condition was breached, the principal could never be paid, no matter how great LBHI2's surplus ultimately proved to be. In other words, in a case like the present, where (unexpectedly) LBHI2 has been able to pay its unsubordinated creditors (with interest) and has a surplus with which to pay its subordinated creditors, the Noteholders could not participate in that surplus by reason of LBHI2's <u>past</u> lack of solvency. I reject this reading of phrase **[6]**.

(d)    Rather, it seems to me that the question of solvency must be tested from time-to-time, as and when LBHI2 seeks to make a payment of principal. Phrase **[6]** makes clear that such a payment <u>cannot</u> be made if – either at the time of making the payment or immediately thereafter – LBHI2 cannot remain solvent in the manner defined by phrase **[6]**.

(4)    Turning, then, to the second limb of the solvency test in phrase **[7]**, the effect of this phrase is to prevent the payment of principal to the Noteholders unless LBHI2's Assets exceed its Liabilities. More specifically:

(a)    As is clear from phrase **[8]**, Assets and Liabilities are <u>both</u> defined terms, and they are defined in phrases **[18]**, **[19]** and **[20]**.

---

[131] "A company may be wound up by the court if…(f) the company is unable to pay its debts…".

[132] "A company is deemed unable to pay its debts…(e) if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due…".

(b)  Phrase **[20]**, which deals with the evidencing of these matters, can again be disregarded for present purposes.[133]

(c)  Phrase **[18]** defines Assets conventionally, as the unconsolidated gross assets of the Issuer; and phrase **[19]** defines Liabilities, also conventionally, as the unconsolidated gross liabilities of the Issuer.

(d)  Without more, it is clear that phrase **[7]** would prevent – even in the present circumstances – any form of payment of principal by LBHI2, for even now (after satisfaction of LBHI2's unsubordinated debts) LBHI2's Liabilities (<u>taking account</u> of the subordinated liabilities) exceed its Assets.

(e)  However, phrase **[9]** removes from the meaning of Liabilities any liabilities to persons who are <u>not</u> Senior Creditors. Thus, the claims of those creditors who are <u>not</u> Senior Creditors do not count towards the definition of Liabilities.

(5)  It is important to note that this solvency condition says <u>nothing</u> about the relative priorities of claims that are not claims of Senior Creditors. All the solvency pre-condition does is regulate whether the Issuer has sufficient assets to enable it to pay.

*(v)   "accordingly"*

172.  For reasons similar to those given in paragraphs 147 to 149 above, I do not consider that the use of the word "accordingly" should serve to deprive any words capable of having contractual effect of that effect. Whilst there does appear to be some duplication or reinforcement in phrases **[3]** and **[4]**, there is a clear difference in effect between the simple contractual subordination in phrase **[2]** and the contingency described in phrases **[3]** and **[4]**. Both need to be given effect to, and one or the other cannot, in my judgment, be left out of account.

**(4)   The priority dispute between Claim A (the LBHI2 Sub-Debt) and Claim B (the <u>Unamended</u> LBHI2 Sub-Notes)**

*(a)   Approach*

173.  As I have described, consensual subordination takes effect by way of agreement between the debtor and the <u>subordinated</u> creditor. The debtor's other creditors (who become more senior as a result of this arrangement) are not party to it.[134] It follows from the fact that consensual subordination is simply an arrangement between the debtor and the <u>subordinated</u> creditor that the rights of the debtor's <u>other</u> creditors cannot be affected. The rise in seniority of these creditors occurs not as a result of any variation in the rights of these creditors, but simply because the <u>subordinated</u> creditor has negotiated away a relative priority that he or she would otherwise have had.

174.  This has important implications when seeking to apply the subordination provisions in agreements that <u>each</u> have subordination provisions. Where the priority dispute is

---

[133] Like the provision considered in paragraph 171(1) above.
[134] See paragraphs 112 and 117 above.

between a <u>subordinated</u> creditor and an <u>un</u>subordinated creditor, obviously only one subordination provision needs to be considered, and the question is:

*How low does this provision push the claims of the <u>subordinated</u> creditor as against the <u>un</u>subordinated creditor?*

175. Where the rival creditors have <u>both</u> subordinated themselves, matters are more complex:

(1) An <u>impermissible</u> approach would be to read the subordination provisions in some way conjunctively. Unless there has been some "network" agreement involving several creditors, subordination provisions must be read according to their own terms and as only affecting the rights and obligations arising out of <u>that agreement</u>. It is not permissible to seek to apply or to construe two subordination provisions in conjunction with one another, even if this avoids the sort of circuity described in relation to Claims A(i), A(ii) and A(iii).[135]

(2) That said, a subordination provision may seek to rank itself by reference to other obligations of the debtor. Indeed, this is the way simple contractual subordination works.[136] Whilst contingent debt subordination may define the pre-conditions to payment by reference to other matters – like solvency – simple contractual subordination works by placing an obligation that would otherwise rank *pari passu* with or above another obligation <u>below</u> that obligation. Obviously, where a subordination provision places itself below other obligations of a certain defined type or kind, it is necessary to look at those other obligations to see whether they in fact do fall within that defined type or kind. To this extent, but to this extent only, it is permissible to refer to a second instrument when construing the first. The first instrument, the one being construed, creates a link or nexus with another, second, instrument. But that nexus is always defined by the subordination provision being construed.

(3) It follows that it is quite possible for two subordination provisions in different instruments, construed and applied in this way, to reach <u>inconsistent</u> outcomes, where each provision is (according to its own terms) forcing itself to rank below the other. A clear instance of this is the circuity between Claims A(i), A(ii) and A(iii), described in paragraphs 150 to 156 above.

176. So far as the relative priority of these specific claims are concerned (Claim A versus Claim B), the approach is as follows:

(1) I must consider how Claim A ranks as against Claim B, considering only the subordination provisions in Claim A. That, as I have described, does not mean that the terms of Claim B can be altogether disregarded. To the extent that the subordination provisions in Claim A rank Claim A relative to Claim B, the provisions of Claim B will (to this extent only) have to be looked to.

---

[135] See paragraphs 150 to 156 above.
[136] See paragraph 115 above.

(2)    I must do the exact converse as regards Claim B: I must consider how Claim B ranks as against Claim A, considering only the subordination provisions in Claim B.

(3)    If the separate operation of the two subordination provisions in Claim A and Claim B results in a common (but not agreed) order of priority (there are three possible outcomes: Claim A after Claim B; Claim B after Claim A; and *pari passu*), then that resolves the question of priority. If, on the other hand, the result is a form of circuity, that must be considered and resolved.

*(b)    The operation of the subordination provisions in Claim A as regards Claim B*

177.    I turn, therefore, to consider how the subordination provisions in Claim A rank the rights of PLC under the LBHI2 Sub-Debt Agreements (i.e. Claim A) as against the rights of SLP3 under the LBHI2 Sub-Notes (Claim B).

178.    I have concluded that the Claim A LBHI2 Sub-Debt Agreements contain <u>two</u> distinct subordination provisions: a simple contractual subordination provision;[137] and a form of contingent debt subordination.[138] These distinct[139] provisions are considered in turn below.

*(i)    The simple contractual subordination provision*

179.    PLC's rights, as Lender under the LBHI2 Sub-Debt Agreements, are "Subordinated Liabilities". As such, they are subordinated to the Senior Liabilities.[140]

180.    Senior Liabilities are all Liabilities except the Subordinated Liabilities themselves and Excluded Liabilities.[141] The liabilities of LBHI2 under Claim B <u>cannot</u> be Subordinated Liabilities, since they do not arise under any of the LBHI2 Sub-Debt Agreements.[142] The question is whether these liabilities amount to Excluded Liabilities.

181.    Excluded Liabilities are liabilities which are expressed to be and, in the opinion of the Insolvency Officer of LBHI2 do, rank junior to the Subordinated Liabilities in the Insolvency of LBHI2.[143] All of the parties accepted that the determination of this court would inform the opinion of the Insolvency Officer: so the question is whether the liabilities of LBHI2 under Claim B are expressed to be junior in rank to, and in my judgment are, junior to the liabilities of LBHI2 under the Sub-Debt Agreements.

182.    The subordination provisions in Claim A thus oblige me to consider the simple contractual subordination provisions in Claim B, but always from the standpoint of the simple contractual subordination provisions in <u>Claim A</u>. The contingent debt subordination provisions in Claim A do not rank Claim A by reference to other claims like Claim B, and so cannot assist in this case. Turning, then, to the provisions in Claim

---

[137] See paragraphs 140-142 above.

[138] See paragraphs 143*ff* above.

[139] Distinct for the reasons articulated in paragraphs 147 to 149 above.

[140] See paragraphs 140 and 141(2) above.

[141] See paragraph 141(5) above.

[142] See paragraph 141(2) above.

[143] See paragraph 141(6) above.

B, according to clause 3 of the unamended LBHI2 Sub-Notes Circular,[144] SLP3's rights are subordinated to the Senior Creditors, but <u>only</u> to the "Senior Creditors", which is itself a term that is defined by reference to the provisions in other instruments between LBHI2 and its creditors. In other words, I must consider whether PLC's rights under Claim A constitute the rights of Senior Creditors as that term is defined in Claim B. This depends on the application of the second limb of the definition of that term.[145]

**183.**   <u>Excluded</u> from the definition of Senior Creditors in Claim B are those whose claims rank or are expressed to rank *pari passu* or junior to those of the Noteholders. As to this:

   **(1)**   The subordination provisions in Claim A in themselves say <u>nothing</u> about the ranking of Claim A as against Claim B. The provisions of Claim A draw upon what Claim B says about itself, and Claim B (in this regard) says nothing, because it simply refers back to Claim A. To this extent, therefore, the provisions are circular. There is no meaningful expression of ranking at all.

   **(2)**   That being the case, PLC's claims under Claim A do not constitute PLC a Senior Creditor.

**184.**   Turning back, then, to the provisions in Claim A, the question is whether Claim B is expressed to be and, in the opinion of the Insolvency Officer of LBHI2 does, rank junior to the Subordinated Liabilities. The answer to that is clear: it does not, and so is <u>not</u> an Excluded Liability but <u>is</u> a Senior Liability.

**185.**   Thus, according to the simple contractual subordination provision in Claim A, Claim A is subordinated to Claim B. The claims of SLP3 under Claim B rank <u>ahead</u> of the claims of PLC under Claim A and must be satisfied first. Represented in diagrammatic form, the position is as follows:

| Stage | Provisions of the LBHI2 Sub-Debt Agreements (Claim A) | Provisions of the LBHI2 Sub-Notes (Claim B) (Relevant only when called into play by the provisions of Claim A) |
|---|---|---|
| 1 | Under Claim A, LBHI2's obligations to PLC under the LBHI2 Sub-Debt Agreements are Subordinated Liabilities. | |
| 2 | Subordinated Liabilities are subordinated to Senior Liabilities. | |
| 3 | Senior Liabilities are <u>all</u> Liabilities <u>except</u> Subordinated Liabilities and Excluded Liabilities. | |
| 4 | Is Claim B a Senior Liability? | |
| 4(a) | Claim B is <u>not</u> a Subordinated Liability, because it is not a liability under any of the LBHI2 Sub-Debt Agreements. | |
| 4(b) | An Excluded Liability is one expressed to rank junior to a Subordinated Liability. ***This requires reference to the provisions of Claim B, to see how it is expressed to rank.*** | |

---

[144] Whose operation is described in paragraphs 162*ff* above.

[145] See paragraphs 166(2) above.

| 4(c) | | According to its terms, are SLP3's rights (as defined under Claim B) expressed to rank junior to a Subordinated Liability (as defined in Claim A)? |
|---|---|---|
| 4(d) | | According to Claim B, SLP3's rights are subordinated to "Senior Creditors". |
| | | Senior Creditors are relevantly defined as subordinated creditors <u>other than</u> those whose claims rank or are expressed to rank *pari passu* with or junior to SLP3's rights. In other words, excluded from this definition of Senior Creditors are those whose claims rank or are expressed to rank *pari passu* with or junior to SLP3's rights. |
| | | This, in turn, requires reference back to the provisions in Claim A to see how PLC's claims rank and/or are expressed to rank. |
| | | PLC's claims do not fall within this definition. They are (on their own terms) subordinated and are <u>not</u> expressed to rank either *pari passu* or junior to SLP3's rights. |
| | | PLC is not, therefore, a Senior Creditor. SLP3's rights are not subordinated. |
| | SLP3's rights are <u>not</u> expressed to rank junior to a Subordinated Liability. | |
| 5 | Claim B is a Senior Liability, being neither a Subordinated Liability nor an Excluded Liability. | |

<u>Table 2</u>: Operation of the simple contractual subordination provision in Claim A

*(ii)    The contingent debt subordination provision*

**186.**    According to the solvency condition described in paragraphs 146*ff* above, payment to PLC in respect of Claim A is dependent upon the satisfaction of this solvency condition. Unsurprisingly, the actual satisfaction of the condition depends upon the exact figures, which were not before me. More to the point, given my conclusion regarding the priority accorded to Claim B by Claim A according to the simple contractual subordination provision in Claim A, the question may well be an academic one since the Fund is unlikely to be sufficient to satisfy both Claim B and Claim A. However, since the asset position of the Lehman Group is not fixed but developing, and since the operation of the solvency condition is much less straightforward than one might, on the face of it, expect, I consider the operation of the condition in the following paragraphs.[146]

**187.**    The solvency condition requires LBHI2 to be "solvent" at the time of and immediately after "the payment" by LBHI2. LBHI2 will be solvent if it is able to pay its Liabilities ("*L*") in full. *L* is calculated in the following way. Instead of figures, letter symbols are used:

| Description | Value/calculation |
|---|---|

---

[146] The parties – and in particular the PLC Administrators and the LBHI2 Administrators – very helpfully drew attention to these matters when the Judgment was circulated in draft. The issue – which was not addressed at the original hearing – was the subject of further written submissions by the parties, provided to me in the course of May/June 2020.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

| | |
|---|---|
| Total Liabilities of LBHI2[147] | *TL* |
| Deduct | |
| Subordinated Liabilities, which are the liabilities under (as the case may be) Claim A(i), Claim A(ii) or Claim A(iii). As has been described, liabilities under only <u>one</u> of these claims can be a Subordinated Liability[148] | *SL* |
| Obligations not capable of being established[149] | *UL* |
| Excluded Liabilities[150] | *EL* |
| | |
| **Liabilities *L* for the purpose of the solvency condition = *TL* − (*SL* + *UL* + *EL*)** | *L* |

<u>Table 3</u>: Calculation of Liabilities *L* for purpose of the solvency condition in Claim A

Provided LBHI2 can pay its Liabilities *L*, so calculated, in full, it will satisfy the solvency condition.

**188.** It is to this question that I now turn:

(1) The LBHI2 Administrators and the PLC Administrators made clear to me that the asset position of the Lehman Group was *(i)* even now developing and *(ii)* in some respects indeterminate. Thus, by way of example, the parties had sought to agree the precise sums due in respect of Claims A(i), A(ii) and A(iii). I have been informed that – despite best endeavours – it has not been possible to establish what was drawn down under each of the LBHI2 Sub-Debt Agreements. Nor, so I am informed, is it likely to be possible to obtain concluded figures after further investigation.[151]

(2) As I have noted, given the conclusion I have reached in paragraph 185 above that, according to the simple contractual subordination provision in Claim A, Claim B ranks in priority to Claim A, Excluded Liabilities *EL* would not include Claim B. On the conclusion I have reached, Claim B must be paid in priority to Claim A and that fact is reflected in the operation of the solvency condition. For this reason, if I am right in my conclusion as to priority, the operation of the solvency condition in this instance may be academic.[152] However, since *(i)* I may be wrong in my conclusion as to priority and *(ii)* the operation of the solvency condition is relevant in cases apart from this one, and raises difficult issues that need to be resolved for the purpose of the administrations, I propose to consider the operation of the solvency condition on the assumption that Claim A ranks (according to its own terms) ahead of Claim B.

---

[147] See the definition of Liabilities set out in paragraph 141(3) above.

[148] See paragraph 141(2) above.

[149] See phrase **[6]** at paragraph 137 above.

[150] See paragraph 141(6) above.

[151] As will be seen, it might be helpful to have a breakdown of Claim A, so as to know the sums due in respect of Claims A(i), A(ii) and A(iii). However, it is not my function to determine every controversy within the administrations. These are matters for the PLC Administrators and the LBHI2 Administrators. It is my function to determine the issues framed by the LBHI2 Administrators and the PLC Administrators for determination by the court. In order to fulfil that function, it is unnecessary for me to determine these details – although, to be clear, had they been agreed and available before me I would have drawn on them.

[152] See paragraph 186 above.

(3) On this assumption, any sums due under Claim B would fall to be treated as Excluded Liabilities *EL*.[153] Using indicative figures,[154] the solvency condition would operate as follows:

| Description | |
|---|---|
| Total assets *A* of LBHI2 | £1.6 billion |
| | |
| Liability under Claim A (not differentiating between Claims A(i), A(ii) and A(iii)) | £1.546 billion |
| | |
| Total Liabilities *TL* of LBHI2 | £5.824 billion |
|     Deduct | |
|     Subordinated Liabilities *SL*, treating the entirety of Claim A as a Subordinated Liability | £1.546 billion |
|     Obligations not capable of being established (unestablished liabilities *UL*) | £0 |
|     Excluded Liabilities *EL* (i.e., Claim B) | £4.278 billion |
| | |
| Liabilities *L* for the purpose of the solvency condition = *TL* – (*SL* + *UL* + *EL*) | £0 |

Table 4: Hypothetical operation of the solvency condition (example 1)

Treating the entirety of Claim A as a Subordinated Liability – which is, in my judgment, a misapplication of the solvency condition, and one to which I shall return – it is clear that the solvency condition is satisfied. Liabilities as calculated according to the solvency condition are £0; there are assets of £1.6 billion; and the liability under Claim A (£1.546 billion) can be met in full.

(4) The same would be true if assets *A* were <u>less</u> than Claim A. Suppose the assets were (a much more realistic figure in present circumstances) £500 million. Liabilities *L* could still be discharged in full, and £500 million could partially discharge Claim A.

(5) As I have noted, however, Claim A in fact comprises three entirely distinct claims, albeit in materially the same terms. Just as was the case with the simple contractual subordination provision, the solvency condition needs to be considered separately in relation to each claim. Thus, taking Claim A(i), for the purposes of the solvency condition, whilst Claim A(i) <u>does</u> qualify as a Subordinated Liability, Claims A(ii) and A(iii) do <u>not</u>. Nor are they Excluded Liabilities. This is, in a different context, exactly the same issue as was considered in paragraph 151 above.

(6) It is, therefore, on the face of it, necessary to differentiate between Claims A(i), A(ii) and A(iii). The first problem is that – according to the LBHI2 and PLC Administrators – it is not possible to do so. Whilst the overall quantum of Claim A is known, the split between the three claims comprising it is not; nor can the answer

---

[153] Because, on this hypothesis, Claim B ranks below Claim A.

[154] The figure for assets *A* I take, in the first instance, as an entirely hypothetical US$1.6 billion, selected because it is a little bit <u>more</u> than the presently indicated liability under Claim A.

be found with the exercise of reasonable diligence. The position of the LBHI2 and PLC Administrators was that substantial additional efforts would be required, and even then there could be no assurance that a reliable answer could be found.

(7) In addition to this practical problem, there is one of principle. Assuming assets *A* of £500 million and an even split between Claims A(i), A(ii) and A(iii), such that these claims each comprise £515 million, it is difficult to see how (on its strict terms) the solvency condition can work:

| Description | Scenario 1: Disaggregating Claims A(i), (ii) and (iii) | | Scenario 2: Aggregating Claims A(i), (ii) and (iii) | |
|---|---|---|---|---|
| Total assets *A* of LBHI2 | | £500m | | £500m |
| | | | | |
| Liability under Claim A(i) | | £515m | | £515m |
| | | | | |
| Total Liabilities *TL* of LBHI2 | | £5.824bn | | £5.824bn |
| Deduct | | | | |
| Subordinated Liabilities *SL* | Claim A(i) | £515m | Claims A(i), A(ii) and A(iii) | £1.546bn |
| Obligations not capable of being established (unestablished liabilities *UL*) | | £0 | | £0 |
| Excluded Liabilities *EL* (i.e., Claim B) | | £4.278bn | | £4.278bn |
| | | | | |
| Liabilities *L* for the purpose of the solvency condition = *TL* − (*SL* + *UL* + *EL*) | | £1,031m | | £0m |

Table 5: Hypothetical operation of the solvency condition (example 2)

Taking Scenario 1 – where Claims A(i), A(ii) and A(iii) are treated, as they should be, as distinct claims – since the assets *A* of LBHI2 cannot discharge Liabilities *L* in full, no distribution can be made in respect of Claim A(i), even though *(i)* LBHI2 has assets of £500 million and *(ii)* the component elements of Claim A (i.e., Claims A(i), A(ii) and A(iii)) all fall (on present assumptions) to be paid first. This is manifestly absurd, since the purpose of the administrations (at this stage, at least) is to distribute and there are no other claims ranking in priority to these claims.

The absurdity is shown by Scenario 2, where Claims A(i), A(ii) and A(iii) are treated as a single claim for the purposes of the solvency condition. The short point is that Claim A(i) would be paid if Claims A(i), A(ii) and A(iii) were to be treated as one claim for the purpose of the solvency condition.

189. As was the case in relation to the simple contractual subordination provision considered in paragraphs 150 to 156 above, all of the parties before me agreed that these provisions could not operate in this (commercially unacceptable) way. In my judgment, the solution is to treat Claims A(i), A(ii) and A(iii) as ranking *pari passu* and so falling to be treated – for purposes of the solvency condition – as the same claim. In short, despite the fact that Claims A(i), A(ii) and A(iii) are in law different claims, they fall to be treated in the manner set out in Scenario 2 in Table 5 above. My reasons for reaching this conclusion

are inextricably linked with the infinite (never-ending) priority race to the bottom that also exists between Claims A(i), A(ii) and A(iii). I consider the solution to both issues in Section F(7) below.[155]

### (c)    The operation of the subordination provisions in Claim B as regards Claim A

190.    It is next necessary to consider the converse question, which is how the subordination provisions in Claim B rank the rights of SLP3 under the LBHI2 Sub-Notes (i.e. Claim B) as against the rights of PLC under the LBHI2 Sub-Debt Agreements (i.e. Claim A). As in the case of the subordination provisions in Claim A, the LBHI2 Sub-Notes Circular contains both a simple contractual subordination provision,[156] and a form of contingent debt subordination.[157] Again, they are considered in turn below.

### (i)    The simple contractual subordination provision

191.    Phrase **[2]** of clause 3 of the unamended LBHI2 Sub-Notes Circular subordinates the rights of the Noteholders to those of the Senior Creditors.[158] As already noted in the context of Claim A, this renders it necessary to consider, through the prism of the provisions in Claim B, how Claim A ranks itself according to its own subordination provisions. The question is whether PLC, when advancing Claim A, is to be regarded as a Senior Creditor within the meaning of that term in Claim B. As to this:

(1)    Subject to two "carve-outs", Senior Creditor includes <u>any</u> subordinated creditor of the Issuer.[159] That would render PLC a Senior Creditor.

(2)    For reasons given in paragraph 166(2)(d), the first "carve out" is not material. The second carve out is material: it excludes certain subordinated claims from the definition of Senior Creditor, namely those cases where the rival claim ranks or is expressed to rank *pari passu* with or junior to the claims of the Noteholders under Claim B.[160]

(3)    This, of course, requires reference to the subordination provisions of Claim A, which have been considered above. The process articulated in Table 2 above applies, with the result there stated.

(4)    In consequence, Claim A does not fall within the definition of Senior Creditor in Claim B. As was noted in paragraph 167 above, the Claim B subordination provision simply ranks Claim B <u>below</u> Senior Creditors. It says <u>nothing</u> about priority as between Noteholders and creditors who are <u>not</u> Senior Creditors. The point is simply not addressed and the inevitable inference is that the default rules of <u>legal</u> subordination will apply.

---

[155] Beginning at paragraph 246 below.

[156] See paragraphs 164*ff* above.

[157] See paragraphs 168*ff* above.

[158] See paragraph 164 above.

[159] See paragraph 166(2)(a) above.

[160] See paragraph 166(2)(e) above.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

In short, Claim B does not subordinate itself in relation to Claim A and (according to the provisions of Claim B) the claims rank *pari passu*. Represented in diagrammatic form, the position is as follows:

| Stage | Provisions of the LBHI2 Sub-Notes (Claim B) | Provisions of the LBHI2 Sub-Debt Agreements (Claim A)<br><br>(Relevant only when called into play by the provisions of Claim B) |
|---|---|---|
| 1 | The rights of the Noteholders are subordinated to the rights of Senior Creditors. | |
| 2 | Do the rights of PLC under Claim A constitute the rights of Senior Creditors?<br><br>If the rights under Claim A rank or are expressed to rank *pari passu* with or junior to the claims of the Noteholders under Claim B, then they are not the rights of Senior Creditors.<br><br>***This requires reference to the provisions of Claim A*** | |
| 3 | | The analysis that must be followed is that set out in Table 2 above.<br><br>The rights under Claim A do not rank and are not expressed to rank *pari passu* with or junior to Claim B. |
| 4 | PLC is not a Senior Creditor within the meaning of Claim B. Accordingly, there is no applicable subordination provision at all, and the Claims rank *pari passu* according to the rules of legal subordination. | |

Table 6: Operation of the simple contractual subordination provision in Claim B

*(ii)    The contingent debt subordination provision*

192.    This provision was considered in paragraph 171(4) above. Unless satisfied, the condition prevents the payment of principal to the Noteholders (payments of interest <u>not</u> being caught by this provision). For the condition to be satisfied, Assets must exceed Liabilities both before and after the payment in question.

193.    The terms Assets and Liabilities are both defined terms. Again – because I do not have the figures before me – I can do no more than describe how the condition may be satisfied in the abstract:

| (1)<br>Description | (2)<br>Value/calculation |
|---|---|
| Assets of LBHI2[161] | *A* |
| Gross Liabilities of LBHI2[162] | *B* |
| Liabilities to persons who are <u>not</u> Senior Creditors | *C* |

[161] Paragraph 171(4)(c)above.

[162] Liabilities are defined as exclusive of liabilities to persons who are <u>not</u> Senior Creditors.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

| Liabilities for the purposes of the solvency condition = $B - C$ | $D$ |
|---|---|
| Extent to which Assets $A$ exceed Liabilities $D$ | $E$ |

Table 7: Testing whether the solvency condition in Claim B is met

194.   The solvency condition is met provided that Assets $A$ exceed Liabilities $D$. To the extent that $E$ – the difference between $A$ and $D$ – has a positive value, payment may, to the extent of that positive value, be made. The parties have not raised any issues or difficulties in relation to the operation of the Claim B solvency condition. I therefore say nothing more for the purposes of this Judgment.

195.   Subject to the solvency condition being satisfied, and viewed solely on its own terms, Claim B would indicate that it ranks *pari passu* with rival Claim A. That is because its simple contractual subordination provision (as I have described) actually says nothing about Claim B's relative ranking with Claim A. The simple contractual subordination provisions of Claim A and Claim B do not, therefore, indicate precisely the same outcome.

*(d)   Circuity*

196.   Issues of circuity tend to arise in the case of competing simple contractual subordination clauses rather than in the case of contingent debt subordination clauses. That is because simple contractual subordination works by demoting an obligation down the waterfall, which is done by defining the level in the waterfall to which the obligation drops. It follows that where there are competing simple contractual subordination clauses, there may well be the sort of cross-referencing between contracts and clauses as is seen here.

197.   That is not to say that the situation cannot arise in the case of a contingent debt subordination clause: that depends upon the nature of the condition.

198.   The subordination provisions contained in Claim A and Claim B do not result in the infinite race to the bottom that is the consequence of the operation of the subordination provisions contained in Claims A(i), A(ii) and A(iii). Nor, however, are they absolutely consistent in the relative ranking they dictate. As I have concluded:

(1)   Claim A subordinates itself to Claim B.[163]

(2)   However, Claim B says nothing about its relative priority to Claim A.[164]

This is in fact the case considered in paragraph 174 above. Paragraph 174 was considering the case where there is a priority dispute between a subordinated creditor and an unsubordinated creditor. That is precisely the case here. Although Claim B does, of course, contain a subordination provision, that is a provision that does not apply when considering the relative ranking of Claim A and Claim B. There is, in this case, only one operative subordination provision, namely that contained in Claim A. For purposes of relative priority between Claims A and B, the priority dispute is as between a subordinated creditor and an unsubordinated creditor. The subordination provisions in

---

[163] See paragraph 185 above.
[164] See paragraph 191 above.

78

Lehman Brothers Holdings plc (in administration) and others

Claim A must be given effect to. Accordingly, I conclude that Claim A ranks below Claim B, and that there is nothing in Claim B to require a different outcome.

**(5)    Claim B: the <u>Amended</u> LBHI2 Sub-Notes**

*(a)    Introduction*

199.    Although the primary purpose of this Section is to describe the amendments or modifications made to the LBHI2 Sub-Notes and the operation of these provisions, it is necessary also to describe the manner in which the modifications came about. This is partly because there may be something in the factual history that has a bearing on construction (as a part of the "factual matrix"), but also because such points are relevant to the question of rectification (considered later in Section F(8)). It is convenient to set out the modifications and their history in one place.

200.    Accordingly, this Section:

(1)    Describes the mechanics of the modification process in Section F(5)*(b)* below.

(2)    Describes the modifications themselves in Section F(5)*(c)* below.

(3)    Considers the factual history that gave rise to the modifications in Section F(5)*(d)* below.

(4)    Considers the operation of the new subordination provisions put in place by these modifications, plus two other related matters of construction in Section F(5)*(e)* below.

*(b)    The modification process*

201.    Condition 12 of the LBHI2 Sub-Notes Circular provides, amongst other things, for modifications to the terms of the LBHI2 Sub-Notes.  As to this:

(1)    Condition 12(b) makes provision for the Registrar to make modifications to the terms of the LBHI2 Sub-Notes without the consent of the Noteholders in certain circumstances:

"The Registrar may, without the consent of the Noteholders, agree to any modification of these Conditions (other than in respect of a Reserved Matter) which is proper to make if such modification will not be materially prejudicial to the interests of the Noteholders and to any modification of the Notes which is of a formal, minor or technical nature or is to correct a manifest error."

(2)    No-one suggested that the modification to the LBHI2 Sub-Notes could be justified by Condition 12(b). Indeed, it would appear that the modification to the terms of the LBHI2 Sub-Notes constituted a "Reserved Matter" within the meaning of Condition 12(a). Reserved Matters required sanction "by an Extraordinary Resolution passed at a meeting of Noteholders at which one or more persons holding or representing not less than two-thirds or, at any adjourned meeting, representing any (or, in certain circumstances specified in the Procedures Memorandum, not less than one third) of the aggregate principal amount of the

outstanding Notes form a quorum. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not."

(3)     The LBHI2 Sub-Notes Resolution,[165] dated 3 September 2008, provided:[166]

"[SLP3] confirms that it is the registered holder of 100 per cent of the Notes and as such has the sole power to assent to any amendment or modification of the Conditions and does hereby assent to the modification of the Conditions which shall henceforth be in the form attached as Annex A to this Written Resolution."

(4)     This was not an Extraordinary Resolution, but merely a written resolution. The written resolution stated:[167]

"Pursuant to Condition 12 of the Notes (Meetings of Noteholders; Modification and Waiver), this Written Resolution shall take effect as if it were an Extraordinary Resolution (as defined in the Conditions)."

The relevant part of Condition 12 provides:

"…a resolution in writing signed by or on behalf of all Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Procedures Memorandum will take effect as if it were an Extraordinary Resolution. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders."

202.    In my judgment, the LBHI2 Sub-Notes Resolution properly altered the terms of the LBHI2 Sub-Notes Circular. No-one contended otherwise. It is appropriate now to describe the modifications thereby effected.

*(c)    The modifications*

203.    The modifications to the terms of the LBHI2 Sub-Notes Circular are (so far as material) set out below. Although the modifications – which were appended to the LBHI2 Sub-Notes Resolution – do not "redline" the changes made, I have identified the changes by way of <u>underlining</u> and ~~strike-out~~:

"**Status and subordination**

(a)     **[1]** The [LBHI2 Sub-Notes] constitute direct, unsecured and subordinated obligations of the Issuer and the rights and claims of the Noteholders against the Issuer rank *pari passu* without any preference among themselves. **[2]** The rights of the Noteholders against the Issuer in respect of the Notes are subordinated in right of payment to the Senior Creditors (as defined below) and **[3]** accordingly payment of principal **[4]** <u>and interest (including Arrears of Interest as defined below)</u> in respect of the Notes is <u>(subject as provided below)</u> **[5]** conditional upon the Issuer being solvent at the time of, and immediately after, such payment, and **[6]** accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that the Issuer could make such payment and still be solvent immediately thereafter.

---

[165] See paragraph 14 above.
[166] At clause 2.
[167] At clause 3.

(b)   ~~For the purposes of Condition 3(a) above, the Issuer shall be 'solvent' if (i) it is able to pay its debts as they fall due and (ii) its Assets exceed its Liabilities (each as defined below) (other than its Liabilities to persons who are not Senior Creditors). A report as to the solvency of the Issuer by two directors of the Issuer or, if the Issuer is dissolved or being would up, its liquidator, shall, in the absence of proven error, be treated and accepted by the Issuer and the Noteholders as correct and sufficient evidence thereof.~~

~~For the purposes of the above provisions:~~

~~"**Senior Creditors**" means creditors of the Issuer (i) who are unsubordinated creditors of the Issuer or (ii) who are subordinated creditors of the Issuer other than those with whose claims the claims of the Noteholders are expressed to rank *pari passu* and those whose claims rank, or are expressed to rank, *pari passu* with, or junior to, the claims of the Noteholders;~~

~~"**Assets**" means the unconsolidated gross assets of the Issuer and "**Liabilities**" means the unconsolidated gross liabilities of the Issuer, all as shown by the latest published audited balance sheet of the Issuer, but adjusted for contingencies and for subsequent events, all in such manner as two directors of the Issuer, its auditors or its liquidator (as the case may be) may determine.~~

(c)   ~~Subject to applicable law, no Noteholder may exercise, claim or plead any right of set-off, counter-claim or retention in respect of any amount owed to it by the Issuer arising under or in connection with the Notes and each Noteholder shall, by virtue of being the holder of any Note, be deemed to have waived all such rights of such set-off, counter-claim or retention.~~

[7] The conditionality referred to above shall not apply where an order is made by a competent court, or a resolution passed, for the winding-up or dissolution of the Issuer (except for the purposes of a reconstruction, amalgamation, reorganisation, merger or consolidation on terms previously approved in writing by an Extraordinary Resolution of the Noteholders).

[8] If any time an order is made by a competent court, or a resolution passed, for the winding-up or dissolution of the Issuer (except for the purposes of a reconstruction, amalgamation, reorganisation, merger or consolidation on terms previously approved in writing by an Extraordinary Resolution of the Noteholders), [9] there shall be payable by the Issuer in respect of each Note (in lieu of any other payment by the Issuer) such amount, if any, as [10] would have been payable to the Noteholder, if, on the day prior to the commencement of the winding-up and thereafter, such Noteholder were the holder of one of a class of preference shares in the capital of the Issuer having a preferential right to a return of assets in the winding-up of the Issuer over:

(i)    [11] the holders of all other classes of issued shares in each case for the time being in the capital of the Issuer; and

(ii)   [12] the Notional Holders,

[13] on the assumption that such preference share was entitled to receive, on a return of assets in such winding-up, an amount equal to the principal amount of such Note together with Arrears of Interest (if any) and any accrued interest (other than Arrears of Interest).

[14] For the purposes of the above provisions:

[15] "**Notional Holder**" means any creditor of the Issuer whose claims against the Issuer on a winding-up are quantified as though they held a Notional Share.

[16] "**Notional Share**" means any notional and unissued shares in the capital of the Issuer which have a preferential right to a return of assets in the winding-up of the Issuer over the holders of all other classes of issued shares for the time being in the capital of the Issuer but not further or otherwise.

[17] *The Notes are intended to have a right to a return of assets in the winding-up or dissolution of the Issuer in priority to the rights of the holders of any securities of the Issuer which qualify (or, save where their non-qualification is due only to any applicable limitation on the amount of such capital, would qualify) as Upper Tier 2 Capital or Tier 1 Capital (within the respective meanings given to such terms in the General Prudential Sourcebook published by the Financial Services Authority, as amended, supplemented or replaced from time to time).*

(b)     [18] For the purposes of Condition 3(a) above, the Issuer shall be 'solvent' if [19] (i) it is able to pay its debts as they fall due and [20] (ii) its Assets exceed its Liabilities [21] (each as defined below) [22] (other than its Liabilities to persons who are not Senior Creditors). [23] A report as to the solvency of the Issuer by two directors of the Issuer or, if the Issuer is dissolved or being would up, its liquidator, shall, in the absence of proven error, be treated and accepted by the Issuer and the Noteholders as correct and sufficient evidence thereof.

[24] For the purposes of the above provisions:

[25] "**Senior Creditors**" means creditors of the Issuer [26] (i) who are unsubordinated creditors of the Issuer or [27] (ii) who are subordinated creditors of the Issuer [28] other than [29] those with whose claims the claims of the Noteholders are expressed to rank *pari passu* [30] and those whose claims rank, or are expressed to rank, *pari passu* with, or junior to, the claims of the Noteholders;

[31] "**Assets**" means the unconsolidated gross assets of the Issuer and [32] "**Liabilities**" means the unconsolidated gross liabilities of the Issuer, [33] all as shown by the latest published audited balance sheet of the Issuer, but adjusted for contingencies and for subsequent events, all in such manner as two directors of the Issuer, its auditors or its liquidator (as the case may be) may determine."

## (d)   *The factual history giving rise to the modifications*

204.   The genesis of the modifications lay not in a decision to alter the subordination of, or the subordination provisions in, the LBHI2 Sub-Notes.[168] The modification of the LBHI2 Sub-Notes Circular was broached in order to correct what was seen as an error or flaw in the provisions governing the notes, namely that interest was not deferred.[169] Thus, at 1 Grant/§15, Mr Grant said:

"The Lehman Group instruction was to amend the LBHI2 Sub-Notes in order to allow for interest to be deferred on any future interest payment dates. Interest deferral provisions were

---

[168] Grant 1/§§10(a) and 15.

[169] Grant 1/§§10(b) and 15*ff.*

commonplace for certain types of regulatory capital instruments. The Lehman Group instruction did not include a request to change the degree of subordination of the LBHI2 Sub-Notes."

205.    Due to the passage of time, it is not known precisely how A&O came to be instructed to consider this question. It has not been possible to identify any written instructions from the Lehman Group to A&O:[170] indeed, it is not known if there even were written instructions. It would appear that the decision to involve A&O originated with a Ms Sarah McMorrow, a lawyer within the Lehman Group, but it is unknown who exactly within A&O Ms McMorrow approached (if indeed it was Ms McMorrow who made the approach).[171] Certainly, Mr Grant was not himself approached <u>directly</u> by the Lehman Group, but he came to be involved through others in A&O.

206.    Whilst Mr Grant was considering the changes that needed to be made to the drafting to ensure that interest <u>was</u> deferred, he discussed the LBHI2 Sub-Notes – and, specifically, the proposed amendments to them – with a colleague, a Mr Amrit Dehal. Mr Dehal was then a senior associate in A&O's tax department. Mr Grant did not want the notes to "fall foul of the rules regarding the tax deductibility of interest".[172]

207.    During the course of these discussions, Mr Dehal raised an issue that had nothing to do with the deferral of interest, but which related to the solvency condition that had to be satisfied in order for payment under the LBHI2 Sub-Notes to be permitted. Mr Dehal's concern was that because the solvency condition applied in a winding-up as well as outside a winding-up, payments of interest on the LBHI2 Sub-Notes might not be tax deductible.[173]

208.    Whilst this concern was being bottomed out within A&O, Mr Grant naturally kept the Lehman Group up to date with progress. In particular, he liaised with Ms McMorrow.[174]

209.    It is important to appreciate that the issue identified by Mr Dehal – and which proved to be an issue of real concern – related <u>not</u> to the amendments that A&O had been asked to draft. The problem related to provisions in the notes that would not otherwise have been changed, specifically the subordination provisions set out and described above. Mr Grant put the point thus:[175]

    "Although Mr Dehal reviewed the first draft of the amended LBHI2 Sub-Notes after I had included the interest deferral, his concern about tax deductibility did not relate to the new provisions. The potential issue regarding the solvency condition operating in a winding-up would also have arisen on the unamended LBHI2 Sub-Notes, although the proposed interest deferral could potentially have exacerbated the problem if not properly drafted…"

210.    Mr Dehal suggested that "to optimise the drafting from a tax perspective, amendments should be made to the LBHI2 Sub-Notes at the same time as adding the interest deferral

---

[170] Day 2/pp.94*ff* (cross-examination of Mr Grant).

[171] Dolby 1/§61.

[172] Grant 1/§19.

[173] Grant 1/§§10(c) and 19*ff*.

[174] E.g. Grant 1/§20.

[175] Grant 1/§35.

feature requested by the Lehman Group. The amendments would minimise the potential argument that interest on the LBHI2 Sub-Notes was not tax deductible".[176]

211. As a result, the amended subordination provision, set out above, was drafted by Mr Grant.[177] The amendment was "a bespoke solution which I drafted to deal with the potential uncertainty regarding tax. It is not something which I had or had seen drafted with respect to Lower Tier 2 security before. Nor is it something which I have or have seen drafted since".[178] It should not be thought that Mr Grant operated entirely on his own: he consulted others within A&O, and no doubt there were also discussions within the Lehman Group. I simply do not consider it material to set out these communications and discussions, to the extent they were in evidence.

212. The amended draft, together with draft minutes for the meeting at which the amendments were to be adopted, were sent by Mr Grant to Ms Dolby on 12 June 2008. The draft minutes noted that the purpose of the changes "was to allow the Company to defer payments of interest on the Notes at its discretion".[179] The amendments to the subordination provisions were not referred to in these draft minutes.

213. Ms Dolby had been involved in the issue of the original LBHI2 Sub-Notes, which she saw as "a tax-motivated project".[180] Within the Lehman Group, she co-ordinated the process "with support from other relevant individuals from the regulatory and legal teams as appropriate".[181] She did not "think about, or seek advice on, the relative priority of LBHI2's different subordinated debts in the event of an insolvency".[182] She was also involved in the amendments to the LBHI2 Sub-Notes, but her perspective was similar – that is, she viewed matters from the tax angle.[183] However, "we were aware of the need to ensure that the amendments would not prevent the LBHI2 Sub-Notes from keeping their status as Lower Tier 2 capital, and that A&O were asked to confirm that as part of their work on the amendments. I believe that this was so that we could confirm the position to the FSA".

214. According to the terms of the notes,[184] it was also necessary to obtain FSA consent. However, because the FSA's policy in relation to formal consents or non-objections had changed (in that they were no longer needed or given), this provision in the notes was changed.

215. In due course, the amendments to the notes were – as I have described – made and the notes listed in their amended form on the Channel Islands Stock Exchange.

---

[176] Grant 1/§37.
[177] Grant 1/§§39ff.
[178] Grant 1/§49.
[179] Grant 1/§58.
[180] Dolby 1/§40.
[181] Dolby 1/§40.
[182] Dolby 1/§53.
[183] Dolby 1/§60.
[184] Grant 1/§§60ff. The relevant condition is Condition 12(b).

### (e)    The operation of the new subordination provisions and other related matters of construction

### (i)    Points in issue

216.    In addition to the operation of the new subordination provisions, it is necessary to consider two other matters:

    (1)    First, the significance of the "explanatory note" that is to be found at the end of the new parts of Condition 3(a) (phrase **[17]**) set out in paragraph 203 above.

    (2)    Secondly, SLP3/LBHI's contention that new subordination provisions did not, in fact, apply in the present circumstances.[185] The effect of the modifications to the LBHI2 Sub-Notes Circular was to insert a new subordination provision, whilst substantially retaining the old provision that has already been considered in this Judgment. The two provisions were not cumulative, but alternative. Thus, the "old" subordination provision (contained in phrases **[1]** to **[6]**) is disapplied in the circumstances specified in phrase **[7]**. Those circumstances arise when "an order is made by a competent court, or a resolution passed, for the winding-up or dissolution of the Issuer (except for the purposes of a reconstruction, amalgamation, reorganisation, merger or consolidation on terms previously approved by an Extraordinary Resolution of the Noteholders)". It was SLP3/LBHI's contention that this disapplying condition was <u>not</u> satisfied in the present case, because the present case was <u>not</u> a winding-up, but an administration. Accordingly, the "old" and not the "new" subordination provisions continued to apply, notwithstanding the modifications.

217.    I consider these two points first, before proceeding to an analysis of the operation of the new subordination provisions. (I appreciate that SLP3/LBHI's case regarding the non-operation of the new subordination provisions was in the alternative to its primary case that the modifications did not, in fact, alter the relative subordination between Claim A and Claim B. Logically, however, this point comes first, and that is how I propose to deal with it.)

### (ii)    The significance of the "explanatory note"

218.    I consider the explanatory note to be the equivalent of a recital normally to be found at the beginning of a contract or deed. The fact that it appears in the middle of the contractual wording does not, to my mind, make any difference.

219.    *Chitty* says this about the importance of recitals to the construction of contracts:[186]

"When the words in the operative part of an instrument are ambiguous, the recitals and other parts of the instrument may be used to fix the appropriate meaning of those words. But clear words in the operative part of an instrument cannot be controlled by recitals. However, modern methods of interpretation, in which, as we have noted, background plays a far larger part than used to be the case, may have "tempered" the traditional approach, such that recitals in a deed

---

[185] See paragraphs 377*ff* of SLP3/LBHI's written opening submissions.
[186] *Chitty* at [13-064].

Approved judgment
Mr Justice Marcus Smith
                                    Lehman Brothers Holdings plc (in administration) and others

can be looked at as part of the surrounding circumstances of the contract "without a need to find ambiguity in the operative provisions of the contract.""

220.   That is the approach I intend to take here. I will construe the provisions of condition 3(a), but in light of the explanatory note (and, of course, any other relevant background).

*(iii)   The contention that the "new" subordination provision does not apply*

221.   The amendments to the terms of the LBHI2 Sub-Notes Circular effected by the LBHI2 Sub-Notes Resolution are, clearly, significant. Speaking in the broadest of terms – I shall obviously seek to construe condition 3 more narrowly in due course – condition 3(a) contains, as a result of the modifications introduced – <u>two</u> regimes regarding the subordination of the LBHI2 Sub-Notes:

   (1)   One regime (that described from phrase **[8]** onwards) which applies where the following condition is satisfied, which is when:[187]

      "…an order is made by a competent court, or a resolution passed, for the winding-up or dissolution of the Issuer (except for the purposes of a reconstruction, amalgamation, reorganisation, merger or consolidation on terms previously approved in writing by an Extraordinary Resolution of Noteholders)."

   (2)   Another regime (that described from phrase **[2]** onwards) which applies where this condition is not satisfied.

222.   The second regime – applicable where the condition is <u>not</u> satisfied – is, in all essential respects, the same as that which applied in the case of the <u>Unamended</u> LBHI2 Sub-Notes, considered in Section F(3) above. The first regime – applicable where the condition <u>is</u> satisfied – is new. It will be necessary to consider the nature of this new subordination regime in due course: before doing so, however, it is necessary to consider whether it in fact applies. The answer to that question turns on whether the condition is satisfied.

223.   It is plain that the present state of LBHI2 did not arise for the purposes of reconstruction, amalgamation, reorganisation, merger or consolidation; indeed, even if there had been, there would have been no approval of that process in writing by an Extraordinary Resolution of Noteholders.

224.   So, the question is whether an order has been made for the winding-up or dissolution of LBHI2. There was no dispute that an order had been made for the administration of LBHI2, but it was suggested by SLP3/LBHI that – even in the case of a distributing administration – this was not necessarily sufficient to trigger the condition.

225.   I have no hesitation in rejecting this contention:

   (1)   The distinction that is being drawn by the condition is between a solvent LBHI2 and an insolvent LBHI2. Under English insolvency law – and I do bear in mind that English law might not necessarily be the applicable law in all cases – an inability to pay one's debts is a requirement both for a winding-up <u>and</u> a court-

---

[187] The condition is at phrase **[7]**, and its operation is seen at phrase **[5]**.

ordered administration.[188] It is simply that, in the latter case, one of the purposes of the administration[189] can be met and the court considers administration preferable to immediate liquidation/winding up. But to suggest that the course of making an administration order instead of a winding up order, taken <u>because</u> of an insolvency and only to protect creditors, should be regarded as a basis for holding that the condition is inapplicable would be a curious outcome indeed.

(2)    I cannot see how this <u>wider</u> reading of the condition could have any adverse effect. To the contrary, it seems to me to be highly undesirable for there to be a subordination regime in cases of administration that would be different to the regime applicable in cases of liquidations. That, as it seems to me, would be to create a distinction where none ought to exist.

(3)    I bear in mind that the condition is intended to apply to an insolvency of LBHI2 in a foreign jurisdiction ("made by a competent court"). In these circumstances, it would be altogether wrong to adopt a narrow, or parochial, construction of the terms of the condition.

*(iv)    The operation of the subordination provisions*

226.    It is unnecessary for me to consider the second, "old", subordination regime, applicable where the condition is <u>not</u> satisfied. That is because: *(i)* I have found that the condition <u>is</u> satisfied, and that the "old" regime does not, therefore, apply; and *(ii)* even if I am wrong, I have already considered the operation of this provision and the outcome (if that is the applicable subordination provision) in the priority dispute between Claim A and Claim B.

227.    Accordingly, this section considers only the <u>first</u> subordination regime, which begins at phrase **[8]**.

228.    The first part of the clause (phrase **[8]**) simply reiterates the condition that serves to trigger this part of the provision, which is also to be found in phrase **[7]**. The clause proper begins at phrase **[9]**. Where the condition pertains, as I find it does here, the Noteholder is entitled to payment determined by reference to what are, in effect, <u>new terms</u>. The Noteholder receives payment if he or she would have been paid if – hypothetically speaking – he or she were the holder of a class of preference share having certain characteristics. It must be stressed that these shares are purely notional. The Noteholders remain creditors and do not become members of LBHI2.

229.    The characteristics of this <u>hypothetical</u> preference share are that:

(1)    It ranks <u>above</u> "all other classes of issued shares" (phrase **[11]**). Although phrased in language alien to subordination ("above", rather than "below"), all this provision does is make clear that the rights of the Noteholders do not fall below those of any shareholder. In short, the provision <u>limits</u> the extent of the subordination. I doubt

---

[188] As regards administrations, see paragraph 11(a) of Schedule B1 to the Insolvency Act 1986: "The court may make an administration order in relation to a company only if satisfied…(a) that the company is or is likely to become unable to pay its debts…". Compare section 122(1)(f) of the Insolvency Act 1986: "A company may be wound up by the court if…(f) the company is unable to pay its debts…".

[189] As to these purposes, see paragraph 3 of Schedule B1 to the Insolvency Act 1986.

very much whether it would be legally possible to subordinate debt below shares,[190] but in any event this provision makes clear that the rights of Noteholders rank just above shares.

(2)     It ranks above the Notional Holders (phrase **[12]**). Notional Holders is a term defined in phrase **[15]** as "any creditor of the Issuer whose claims against the Issuer on a winding-up are quantified <u>as though they held a Notional Share</u>" (emphasis added). As to this:

(a)     A Notional Holder is any other creditor of the Issuer whose claims are subordinated by way of subordination provisions that operate in the same way as this – that is to say, by reference to the rights of shareholders and/or by deeming rights of creditors to be rights of shareholders for subordination purposes.

(b)     The effect of this provision is to ensure that the rights of the Noteholders are <u>not</u> subordinated to other deemed preference shares. Quite how the provision would operate would depend upon the nature of the provisions governing the rights of the Notional Holders. Since Claim A does not involve a subordination provision that operates in this way, it will be unnecessary (and, indeed, impossible) to consider how this provision might operate in a specific case.

230.    I have referred to the difficulties that can arise when seeking to categorise the nature of a subordination provision.[191] It seems to me that this provision is more naturally seen as a case of simple contractual subordination, albeit using the device of a deeming provision to determine and define the level to which the Noteholders' rights are subordinated. The provision is not a form of contingent debt subordination: there is, on examination, no contingency discernible.

231.    According to this provision, the rights of the Noteholders rank above all shareholdings, but below <u>all</u> debt – <u>including subordinated debt</u> – <u>except</u> for debt that has a subordination provision similar to the deeming provisions used by the Noteholders themselves for the purposes of subordination. The subordination provision thus altogether fails to qualify its relative priority in relation to claims that are subordinated by methods <u>other than</u> by reference to a "notional share" or the "holder of a notional share". It simply subordinates the rights of Noteholders, in such cases, to the position of a preference shareholder. With the benefit of hindsight, this might be regarded as surprising; it is a point that I consider in the context of SLP3/LBHI's case on rectification. I should say, however, that I regard these subordination provisions as unequivocal. It does not appear to me that this meaning is gainsaid by the "recital" set out at phrase **[17]** in paragraph 203 above: but, even if it were, I do not consider that I could abandon the very clear meaning that I have found in the subordination provisions of the Amended LBHI2 Sub-Notes themselves.

---

[190] See paragraph 124(2) above.

[191] See paragraph 106 above.

**(6)   The priority dispute between Claim A (the LBHI2 Sub-Debt) and Claim B (the <u>Amended</u> LBHI2 Sub-Notes)**

*(a)   Approach*

232.   My approach is as I described it in paragraphs 173 to 176 above. Thus, first I consider how Claim A ranks as against Claim B, considering only the subordination provisions in Claim A. I then do the exact converse as regards Claim B. If the separate operation of the two subordination provisions results in a common (not agreed) order of priority, then the question of priority is resolved. If, on the other hand, there is an issue with circuity, that must be considered and resolved.

*(b)   The operation of the subordination provisions in Claim A as regards Claim B*

233.   I considered the subordination provisions in Claim A in terms of their effect on Claim A in relation to Claim B in paragraphs 179*ff* above. I concluded that Claim A contained <u>two</u> subordination provisions, a simple contractual subordination provision[192] and a form of contingent debt subordination.[193] Although, I must construe the subordination provisions in Claim A consistently, as has been seen, the simple debt subordination provisions in Claim A are, to an extent, affected by the provisions in Claim B. The fact, therefore, that the subordination provisions in Claim B have changed is material to the operation of the subordination provisions in Claim A.

234.   It will, therefore, be necessary to re-consider the operation of the subordination provisions in Claim A, and I do so in the following paragraphs.

*(i)   Simple contractual subordination*

235.   PLC's rights, as Lender under the LBHI2 Sub-Debt Agreements, are "Subordinated Liabilities". As such, they are subordinated to the Senior Liabilities.[194] Senior Liabilities are all Liabilities except the Subordinated Liabilities themselves and Excluded Liabilities.[195] The liabilities of LBHI2 under Claim B <u>cannot</u> be Subordinated Liabilities, since they do not arise under any of the LBHI2 Sub-Debt Agreements.[196] The question, again, is whether these liabilities amount to Excluded Liabilities.

236.   Excluded Liabilities are liabilities which are expressed to be and, in the opinion of the Insolvency Officer of LBHI2 do, rank junior to the Subordinated Liabilities in the Insolvency of LBHI2.[197] The subordination provisions in Claim A thus oblige me to consider the simple contractual subordination provisions in Claim B.

237.   According to new provisions governing the Amended LBHI2 Sub-Notes, the ranking of the Noteholders is determined by reference to the hypothetical Notional Holder.[198] The subordination provisions in Claim B operate by deeming the rights of the Noteholders to

---

[192] See paragraphs 140-142 above.

[193] See paragraphs 143-147 above.

[194] See paragraphs 140 and 141(2) above.

[195] See paragraph 141(5) above.

[196] See paragraph 141(2) above.

[197] See paragraph 141(6) above.

[198] See paragraphs 228 to 229 above.

Lehman Brothers Holdings plc (in administration) and others

rank as if they were holders of hypothetical preference shares, thus ranking <u>above</u> all shares but <u>below</u> all debt, including subordinated debt.[199] The Noteholders rank above all shareholders and also above any creditor whose claims are quantified as though they held a Notional Share, but otherwise rank below <u>all</u> other forms of debt, including subordinated debt. That is the effect of the deeming provision stipulating that the Noteholders be paid <u>as if</u> a preference shareholder.[200]

238. In these circumstances, the liabilities of LBHI2 under Claim B are expressed to be, and in my judgment are, junior to the liabilities of LBHI2 under the Sub-Debt Agreements. In short, they are Excluded Liabilities because they rank <u>junior</u> to the Subordinated Liabilities in any Insolvency of the Borrower.

239. In my judgment, the effect of the simple contractual subordination in Claim A is <u>not</u> to subordinate Claim A to a level below or *pari passu* with Claim B. Claim A, according to these provisions, ranks <u>above</u> Claim B.

240. Thus, Claim B is – to revert to the wording in the subordination provisions in Claim A – one expressed to rank junior to a Subordinated Liability. The wording in Claim B is clear and Claim B is an Excluded Liability. Represented in diagrammatic form, the position is as follows:

| Stage | Provisions of the LBHI2 Sub-Debt Agreements (Claim A) | Provisions of the LBHI2 Sub-Notes (Claim B) (Relevant only when called into play by the provisions of Claim A) |
|---|---|---|
| 1 | Under Claim A, LBHI2's obligations to PLC under the LBHI2 Sub-Debt Agreements are Subordinated Liabilities. | |
| 2 | Subordinated Liabilities are subordinated to Senior Liabilities. | |
| 3 | Senior Liabilities are <u>all</u> Liabilities <u>except</u> Subordinated Liabilities and Excluded Liabilities. | |
| 4 | Is Claim B a Senior Liability? | |
| 4(a) | Claim B is <u>not</u> a Subordinated Liability, because it is not a liability under any of the LBHI2 Sub-Debt Agreements. | |
| 4(b) | An Excluded Liability is one expressed to rank junior to a Subordinated Liability. ***This requires reference to the provisions of Claim B, to see how it is expressed to rank.*** | |
| 4(c) | | The "deeming" provision, stating that the Noteholders receive payment <u>as if</u> holding a Notional Share has the effect of subordinating Claim B to <u>all debt, including subordinated debt</u>, unless that debt is subordinated by a similar deeming provision. |
| 4(d) | SLP3's rights are expressed to rank junior to a Subordinated Liability. | |
| 5 | Claim B is an Excluded Liability. | |

[199] See paragraphs 228 to 231 above.
[200] See paragraph 229 above.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

      Table 8: Operation of the simple contractual subordination provision in Claim A

*(ii)    Contingent debt subordination*

241.    Given my conclusion that according to its provisions Claim A ranks in priority to Claim B – and subject, of course, to the operation of the provisions in Claim B itself – the operation of the contingent debt subordination provisions in Claim A that were considered in paragraphs 186 to 189 above assume a greater importance. Claim B does fall to be treated as an Excluded Liability *EL* and the difficulty presented by the interaction between Claims A(i), A(ii) and A(iii) becomes a real one.

242.    The conclusions expressed in these paragraphs hold good for the present assessment. The justification for those conclusions – as stated in paragraph 189 above – appears in Section F(7) below.

*(c)    The operation of the subordination provisions in Claim B as against Claim A*

243.    My conclusion in relation to the subordination provisions in Claim B, insofar as those provisions determine Claim B's ranking as against Claim A, can be shortly stated. For the reasons that I have given,[201] the subordination provisions in Claim B push the rights of the Noteholders <u>below</u> the rights of all creditors of the Issuer, including holders of subordinated debt, <u>except</u> those subordinated creditors using a similar subordination mechanism to that used by the Noteholders themselves.[202] Since the creditors under Claim A adopt a different subordination mechanism, the rights of the creditors under Claim A rank ahead of the rights of the Noteholders under Claim B.

*(d)    Circuity*

244.    Given the conclusions I have reached, no issue of circuity arises. I do not propose to address the solution to a problem that I find not to exist: such a solution can only be found in light of the specific issues raised.

**(7)    Whether resolution of the ranking issue between Claims A(i), A(ii) and A(iii) makes a difference?**

*(a)    Approach*

245.    On the face of the subordination provisions in Claim A and both versions of Claim B, there is a general consistency of outcome in each case:

    **(1)**    According to the subordination provisions in Claim A as against unamended Claim B, Claim B ranks higher than Claim A. Claim B, as I have noted, says nothing about its relative priority with Claim A.

    **(2)**    According to the subordination provisions in Claim A as against amended Claim B, Claim A ranks higher than Claim B, this time according to the operation of <u>both</u> subordination provisions.

---

[201] See paragraphs 228*ff* and 235*ff* above.
[202] See paragraph 228*ff* above.

Approved judgment                                                      Lehman Brothers Holdings plc (in administration) and others
Mr Justice Marcus Smith

246.    There is no circuity between the subordination provisions of Claim A and Claim B,
        whereby these provisions compete to push each claim lower than the other. That is not
        the case with Claims A(i), A(ii) and A(iii) where – as I have described – the subordination
        provisions create an endless loop or race to the bottom.[203]

247.    For the reasons given in paragraph 154 above, I do not consider this to be an academic
        question. It is necessary to understand whether the manner in which the endless
        subordination of these Claims is broken affects the outcome between the ranking of
        Claims A and B. As I have noted,[204] my approach must be to avoid such a consequence,
        if that is possible. Accordingly, this section considers the following questions:

        (1)    First, how the "endless loop" between Claims A(i), A(ii) and A(iii) is to be broken?

        (2)    Secondly, what effect, if any, this resolution has on the relative priorities between
               Claim A and Claim B?

        (3)    Thirdly, how this resolution itself results in the resolution of the difficulties arising
               in relation to the solvency condition in Claim A, which I considered in paragraphs
               186 to 189 and 241 to 242 above.

*(b)    How is the loop to be broken?*

248.    So far as I am aware, there is no authority on this point. None of the parties pointed me
        to any. However, in my judgment, the answer is shortly stated and obvious: where
        different subordination provisions result in an infinite race to the bottom, the answer is
        that as between those provisions, as a matter of law, a *pari passu* approach should be
        adopted. That is because the instruments in question contain ineffective consensual
        subordination provisions. They are not ineffective because of the terms of the
        subordination provisions themselves (if so, then they would not be given effect to at all),
        but because – when considered in conjunction with other subordination provisions in
        other instruments – the interaction between the subordination provisions renders them all
        ineffective.

249.    On this basis, consensual subordination cannot be made to work through an interpretative
        approach. Because the nature of the problem is an ineffective interaction between two
        contracts, drafted on a stand-alone basis, it seems to me that it would be judicial overreach
        to seek to resolve the issue by construing the agreements in such a way as to resolve the
        situation. Such an approach is not defensible, since there is no way the judge can know
        what the intention of the parties to the instruments in question actually was.

250.    Rather, where the interaction between two subordination clauses results in a meaningless
        outcome, the provisions should be treated as just that: meaningless in that particular
        instance. If, operating independently as I have described, two subordination clauses serve
        to create an endless loop when they interact, then the obligations they seek to subordinate
        rank *pari passu* as between those obligations. That is simply because consensual
        subordination does not work and the default – the ranking that would pertain pursuant to
        the rules of legal subordination – pertains and is not displaced.

---

[203] See paragraphs 150 to 152 above.
[204] Paragraphs 155 to 156 above.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

251. That is my conclusion as regards Claims A(i), A(ii) and A(iii).

*(c)*   ***Effect on the priorities between Claim A and Claim B***

252. This approach is not only consistent with principle, but also (because it entails no alteration of the provisions of the instrument in question) does least violence to the parties' intentions, and manner in which the consensual subordination provisions were intended to operate. It follows that because the subordination provisions in Claim A and Claim B work – in the sense that they achieve a consistent and definite outcome – there is nothing to interrupt. My approach in resolving the endless loop in the case of Claims A(i), A(ii) and A(iii) has no effect on my conclusions as regards the ranking of Claims A and B.

*(d)*   ***The solvency condition in Claim A***

253. In paragraphs 186 to 189 and 241 to 242 above, I identified a potential issue concerning the operation of the solvency condition in Claims A(i), A(ii) and A(iii). Although the position was rendered more obscure by the fact that the LBHI2 Administrators and the PLC Administrators were not able to state the sums owed by LBHI2 in respect of each Claim, that was not in fact the real problem. The real problem was that if the solvency condition that appears identically in each instrument is applied literally, with the consequence that <u>only</u> one of Claims A(i), A(ii) or A(iii) (as the case may be: I shall assume Claim A(i)) is treated as a Subordinated Liability *SL*, Liabilities *L* are increased (by virtue of the inclusion of Claims A(ii) and A(iii)) such that a distribution is impossible.[205] The difficulty is shown in Scenario 1 in Table 5 at paragraph 188(7) above. The solution is shown in Scenario 2 in the same table. The solution involves treating Claims A(i), A(ii) and A(iii) as Subordinated Liabilities *SL* in the case of <u>each</u> of the specific instruments. That solution is necessary to avoid the obvious absurdity described in paragraph 188(7) above, and is legally justified as follows:

(1) The source of the problem is the definitional rigour contained in the terms "Liabilities", "Senior Liabilities", "Subordinated Liabilities" and "Excluded Liabilities": see paragraph 151 above.

(2) The problem is that whilst these provisions appear to operate satisfactorily when viewed in isolation, they <u>may</u> not work when considered in conjunction with provisions in other instruments; and they certainly do <u>not</u> work when those other instruments are framed in materially similar terms.

(3) The first manifestation of the problems this (lack of) interaction gives rise to is in the "endless loop" described and resolved above. Effectively, a non-functioning set of subordination provisions gives way to the default imposed by legal subordination, namely that the claims rank *pari passu*. The outcome, as I have described, operates as a matter of law, not construction or implication.

(4) This outcome, as it seems to me, must be consistently applied throughout the relevant instruments. In other words, if the legal position is that claims rank *pari*

---

[205] There may be numerical combinations as between the claims under Claims A(i), A(ii) and A(iii) which render a distribution possible (obviously, where A(ii) and A(iii) are zero, that would be the case), but that will be the exception and not the rule.

*passu*, that outcome cannot be thwarted by the manifestation of the <u>same</u> problem elsewhere in the relevant instruments. In other words, if (for purposes of simple contractual subordination) two claims are treated as ranking *pari passu* despite the strict wording of the instrument then, where the same issue arises in (here) the context of contingent debt subordination, the same treatment must pertain, and the claims must continue to be treated as ranking *pari passu*.

(5)   I should be clear that I do not regard this as a matter of implying a term into Claims A(i), A(ii) and A(iii), although no doubt that is an alternative potential solution. Rather, the solution seems to me to arise by operation of law. If two claims rank *pari passu* as a matter of legal subordination which subordination is not (as it ordinarily would be) displaced by consensual subordination (as is the case here) then payment to the creditors cannot be withheld by virtue of a provision that denies the creditors' legal rights by inconsistently treating (for purposes of a solvency condition) rights as not ranking *pari passu* when as a matter of law they do.

## (8)   Rectification

### (a)   Introduction

254.   SLP3/LBHI's contentions in this regard are summarised in paragraph 29 above. It is now necessary to set out these contentions in a little greater detail. Essentially, SLP3/LBHI contended:

(1)   That, as a matter of construction, Claim A and <u>un</u>amended Claim B ranked *pari passu*.[206]

(2)   That, as a matter of construction, the amendments to Claim B did not change this outcome.[207]

(3)   But that, <u>if</u> the amendments had this effect, then the amendments should be rectified so as to achieve this effect.[208]

255.   I have concluded that, contrary to SLP3/LBHI's contentions, Claim A and unamended Claim B do not rank *pari passu*, but that in fact SLP3's Claim B ranks in priority to Claim A.[209] However, I have also found – contrary to the submissions of SLP3/LBHI – that one effect of the modifications to the subordination provisions in Claim B is to reverse this ranking between the claims, and to cause Claim A to rank ahead of Claim B. It is in this context that SLP3/LBHI's contentions must be seen.

256.   Before I consider SLP3/LBHI's rectification claim, it is necessary that I set out the relevant law.

---

[206] See paragraph 262(1) and paragraphs 317*ff* of SLP3/LBHI's written submissions.

[207] See paragraph 262(2) and paragraphs 363*ff* (and in particular paragraphs 377*ff*) of SLP3/LBHI's written submissions.

[208] See paragraphs 406*ff* of SLP3/LBHI's written submissions.

[209] SLP3/LBHI did not, at the trial, contend for this outcome. I understand that it was once a contention advanced, but that it was not pursued.

#### (b)   The test for rectification

#### (i)   Some initial distinctions

257.   It is necessary to draw a distinction between:

(1)   *"Common mistake" rectification and "unilateral mistake" rectification.* Whilst neither label is particularly clear or helpful, and in any event appears not to have survived the decision of the Court of Appeal in *FSHC v. GLAS*,[210] the distinction nevertheless has an historical importance and is explained in *Chitty*:[211]

"It has become customary to divide rectification cases into two types. Most of the cases involve what has been agreed by the parties having been wrongly recorded in the document without either party being aware of the mistake. These cases involve what may be termed rectification to correct a common mistake; the document is rectified to bring it into line with the prior agreement. Rectification may also be available when…one party signed a written document which did not record his intentions correctly, and the other party knew of the first party's intentions."

Thus, "unilateral mistake" rectification tends to involve an element of taking advantage:[212] the written agreement will be rectified where one party knows of the other's mistake and does nothing to correct it, where it would be inequitable to allow the second party to insist on the contract in its written form.[213] SLP3/LBHI's case was not based on "unilateral mistake" rectification, but on "common mistake" rectification.

(2)   *The nature of the instrument being rectified.* One of the reasons "common mistake" rectification is unhelpful as a term, is because it suggests that the only instruments capable of being rectified are <u>contracts</u>. It is, however, perfectly possible for an instrument to be capable of rectification where only one person is involved. A distinction can be drawn between bilateral and multilateral instruments on the one hand and unilateral instruments on the other. The test for rectification ought to reflect the nature of the instrument that is being rectified. Thus, a unilateral instrument (like a voluntary settlement by a settlor) involves reference only to the settlor's state of mind for the purposes of rectification.[214] In the present case:

(a)   A note is to be differentiated from a loan. A loan is simply a contract between the lender and the borrower. A note is a security that is transferable (in accordance with the applicable securities laws) by one noteholder to another.

(b)   There is a fundamental difference between these two instruments: whereas a loan might very well involve some negotiation between lender and

---

[210] *FSHC Group Holdings Ltd v. GLAS Trust Corporation Ltd*, [2019] EWCA Civ 1361 ("*FSHC v. GLAS*").

[211] *Chitty* at [3-057].

[212] Although this is not necessarily a requirement, where one party is mistaken as to the translation of an oral agreement into documentary form, and the other party knows this, and does not draw it to the attention of the first party, some kind of sharp practice will generally be in play.

[213] *Chitty* at [3-069].

[214] See, e.g., *Re Butlin's Settlement Trusts*, [1976] 1 Ch 251 at 261 (*per* Brightman J); see, further, *FSHC v. GLAS* at [164]*ff* and the cases there cited.

borrower, so as to give rise to an anterior common intention which the contract then fails to reflect, it is extremely difficult to see how such an anterior common intention could arise in a note issue, where it is the issuer that states the terms, and a prospective purchaser of the note chooses whether or not to subscribe to it on the terms stated. In short, the issue of a note involves something of a "take it or leave it" approach that is alien to a negotiated contract. This is reflective of the fact that notes are intended to be freely transferable instruments.

I appreciate that SLP3/LBHI were not seeking to rectify the unamended notes at all. They were seeking to rectify the amendments to those notes. Nevertheless, it is important to appreciate the nature of the instrument SLP3/LBHI were seeking to rectify and the context in which the claim to rectification was being made.

(3)   *Provisions concerning amendment contained within the instrument.* Some instruments – the rules of employee pension schemes are an excellent example – contain specific provisions regarding their own amendment, as the terms of the notes do here.[215] Such provisions can affect the rules regarding rectification.

(ii)   *The rules regarding "common mistake" rectification*

258.   The leading authority on rectification is now *FSHC v. GLAS*, and the propositions below are derived from the judgment of Leggatt LJ, with whom Flaux and Rose LJJ agreed:

(1)   The general principle of rectification for "common mistake" may be stated as follows:[216]

"At a general level, the principle of rectification based on a common mistake is clear. It is necessary to show that at the time of executing the written contract the parties had a common intention (even if not amounting to a binding agreement) which, as a result of mistake on the part of both parties, the document failed accurately to record. This requires convincing proof to displace the natural presumption that the written contract is an accurate record of what the parties agreed."

(2)   The question is how this common intention is established. As is well-known from the construction of contracts, intention can be subjectively or objectively ascertained:

(a)   An objective common intention is ascertained by reference to what an objective observer of the communications passing between the parties would have thought their common intention to be.[217]

(b)   A subjective common intention is ascertained by reference to what the parties subjectively believed and intended.[218]

(3)   For a period of time, it was considered that, in order to rectify for a "common mistake", it was necessary to show an antecedent contract whose terms were

---

[215] See *FSHC v. GLAS* at [78] to [79] and the cases there described.

[216] *FSHC v. GLAS* at [46].

[217] *FSHC v. GLAS* at [47].

[218] *FSHC v. GLAS* at [49].

inaccurately recorded in the subsequent written instrument executed by the parties.[219] The question whether rectification could only be granted in order to bring a document into conformity with a prior concluded contract was resolved by the decision of the Court of Appeal in *Joscelyne v. Nissen*.[220] The Court of Appeal held that an antecedent contract was <u>not</u> required, provided:

(a)    As regards the provision or aspect of the instrument to be rectified, there was a common continuing intention in regard to that particular provision or aspect; and

(b)    There was some outward expression of accord.

As *FSHC v. GLAS* clarifies, although *Joscelyne v. Nissen* made clear that the existence of an antecedent contract was not a <u>necessary</u> condition for "common mistake" rectification, the distinction between such an antecedent contract and the existence of a "common continuing intention" regarding a particular provision or aspect of an agreement never concluded has become fundamental.

(4)    Where there is an antecedent contract, rectification for common mistake is, essentially, a manifestation of the doctrine of specific performance. If there is a prior contract, by mistake inaccurately transposed in a subsequent written instrument, the written instrument can be rectified to conform to the prior contract:[221]

"…if parties make a binding agreement to execute a document containing particular terms but instead execute a document containing different terms, the court may specifically enforce the agreement by rectifying the document;…in such a case, the terms of the contract to which the subsequent document is made to conform must be objectively determined in the same way as any other contract."

In short, where there is an antecedent or prior contract, it is the terms of that contract, objectively ascertained, which will determine the extent and manner to which the subsequent written instrument will be rectified.

(5)    Matters are very different where there is <u>no</u> antecedent contract, but only a common continuing intention in regard to a particular provision or aspect of the instrument intending to reflect that common continuing intention. In such a case – where there is no antecedent contract – it is necessary for the party seeking rectification to show:

(a)    The existence of a <u>subjective</u> continuing common intention;

(b)    That is manifested by an outward expression of accord.

This is because a continuing common intention is not the same thing as an antecedent contract. The latter case gives rise to rectification because the remedy

---

[219] *FSHC v. GLAS* at [56].

[220] [1970] 2 QB 86; *FSHC v. GLAS* at [72]*ff*.

[221] *FSHC v. GLAS* at [141].

of specific performance is used to ensure that the antecedent contract is given effect to.  The former case does not, for that very reason:[222]

"We do not, however, accept that the same reasoning can be applied to a situation in which parties have not made any prior contract but had a common continuing intention in respect of a particular matter in the document sought to be rectified. Where, as we see it, the analysis in the *Chartbrook* case went awry was in regarding rectification to reflect a common intention where there was no prior contract as also based on the principle that agreements must be kept. As we have seen, that was not historically the principle on which equity interfered with written contracts which mistakenly failed to reflect the common intention of the parties; nor, in our view, does it provide a proper basis for such interference. Rather, rectification to give effect to a "common continuing intention" not amounting to a legally enforceable contract is justified, and is only capable of being justified, as an instance of the second form of rectification, based on an equitable principle of good faith."

Where there is no antecedent contract, rectification is based upon the conscience of the parties to the negotiation: one party will not be permitted to enforce an agreement against another which that party knows to be contrary to that counterparty's subjective understanding. It is here that the doctrines of "common mistake" rectification and "unilateral mistake" rectification merge:[223]

"The justification for rectifying a contractual document to conform to a "continuing common intention" is therefore not to be found in the principle that agreements (as objectively determined) must be kept. It lies elsewhere. It rests on the equitable doctrine that a party will not be allowed to enforce the terms of a written contract, objectively ascertained, when to do so is against conscience because it is inconsistent with what both parties in fact intended (and mutually understood each other to intend) those terms to be when the document was executed. This basis for rectification is entirely concerned with the parties' subjective states of mind. The underlying moral principle can be characterised, to adopt Lord Hoffmann's analysis, as being that persons who make a contract have to observe certain standards of good faith."

(6)    Thus, the approach depends upon the nature of the pre-existing understanding between the parties. As Leggatt LJ stated:

"153    …there is in our view no anomaly in applying an objective test where rectification is based on a prior concluded contract and a subjective test where it is based on a common continuing intention. Different principles are in play.

…

176    For all these reasons, we are unable to accept that the objective test of rectification for common mistake articulated in Lord Hoffmann's *obiter* remarks in the *Chartbrook* case correctly states the law. We consider that we are bound by authority, which also accords with sound legal principle and policy, to hold that, before a written contract may be rectified on the basis of a common mistake, it is necessary to show either (1) that the document fails to give effect to a prior concluded contract or (2) that, when they executed the document, the parties had a common intention in respect of a particular matter which, by mistake, the document did not accurately record. In the latter case it is necessary to show not

---

[222] *FSHC v. GLAS* at [142].

[223] *FSHC v. GLAS* at [146].

Approved judgment                                                Lehman Brothers Holdings plc (in administration) and others
Mr Justice Marcus Smith

only that each party to the contract had the same actual intention with regard to the relevant matter, but also that there was an "outward expression of accord" – meaning that, as a result of communication between them, the parties understood each other to share that intention."

### (c)    *Rectification in the present case*

### (i)    *Overview*

**259.**    SLP3/LBHI's submissions placed a great deal of weight on the factual outcome at first instance in *FSHC v. GLAS*.[224] Thus, for example, SLP3/LBHI's written submissions stated:[225]

> "413.    In reaching these conclusions on the law, the Court of Appeal upheld the <u>factual findings</u> of Henry Carr J, where at first instance he had concluded that the absence of a positive intention suffices for the necessary common intention and that, <u>on the facts</u>, the absence of any relevant discussion about a fundamental change to the nature of the parties obligations constituted "convincing proof" of an intention not to incur such additional and onerous obligations…
>
> 414.    The Court of Appeal <u>agreed with the judge's findings</u> that the parties understood and intended the relevant documentation "to do no more than provide the missing security"… and concluded that:
>
>> "…the judge was undoubtedly correct to characterise this mistake as a mistake about the legal effect of the contractual documents and not just about their commercial consequences. This is not a case in which the parties had merely a general intention about how it was to be achieved. Rather, on the judge's factual findings, their common intention was the legally specific one of binding the Parent to particular contract terms…This is the classic case of rectification."
>
> 415    For the reasons set out below, this too is a classic case of rectification, where the parties' *actual* understanding and intention was "to do no more (or less)" than to permit the deferral of interest."

I consider the holdings of the Court of Appeal in *FSHC v. GLAS* on the law of rectification to be binding on me, and I propose to follow them. However, I do not consider that I am assisted by an analysis or consideration of the (very different) facts in *FSHC v. GLAS*. I consider it neither appropriate nor helpful to seek to determine, from the <u>facts</u> of another case, what the outcome should be in <u>this</u> case. It is my duty to consider the facts of <u>this</u> case and to apply to those facts the law as laid down by the Court of Appeal. I shall not refer any further to the facts in *FSHC v. GLAS*.

**260.**    In my judgment, SLP3/LBHI's rectification claim must fail for the following reasons:

> **(1)**    There is no discernible intention on the part of the Issuer regarding the drafting of the LBHI2 Sub-Notes going beyond the words contained in the notes themselves.
>
> **(2)**    There is no discernible intention on the part of the Noteholders beyond the words contained in the instruments themselves.

---

[224] [2018] EWHC 1558 (Ch), a decision of Henry Carr J.
[225] Emphasis added.

(3)    There is no subjective continuing common intention manifested by an outward expression of accord.

I expand upon these points in the following paragraphs.

*(ii)    No discernible intention on the part of the Issuer beyond the words contained in the instruments themselves*

261.    It was not part of SLP3/LBHI's case that the terms of the Unamended LBHI2 Sub-Notes required rectification. SLP3/LBHI were content to stand by the objective construction of the LBHI2 Sub-Notes Circular, whatever that might be. Of course, all of the parties made submissions as to what that objective construction was; but no evidence was led as to what the subjective understanding of either the Issuer (LBHI2) or the Noteholders (SLP3) actually was as regards the original subordination provision contained within the LBHI2 Sub-Notes Circular.

262.    It seems to me that the most that can be said is that LBHI2 (as Issuer) intended that the Sub-Notes should be regulatory capital, as indeed they were. I can see no evidence of any intention – going beyond the objective construction of the LBHI2 Sub-Notes Circular – as to how the Notes, as subordinated debt, should rank as against other subordinated debt issued by LBHI2. Indeed, such evidence as there was before me strongly pointed to this being a matter that simply was not considered by LBHI2 at all:

(1)    Both Ms Dolby and Ms Hutcherson stated – in relation to the 2008 amendments – that they gave no thought to the insolvency of the Lehman Group.[226] It follows, of course, from this, that no thought would have been given to subordination between different subordinated obligations.

(2)    The factual history behind the modifications – set out in paragraphs 204*ff* – also does not evidence any consideration of relative subordination. The consideration focussed on *(i)* ensuring that the instruments were tax efficient, *(ii)* dealing with the question of interest and *(iii)* ensuring that the instruments complied with the requirements of regulatory capital. Significantly, as I have described, these regulatory requirements focussed on the subordination of regulatory capital to unsubordinated debt, not on relative subordination between subordinated debts.

(3)    I should say that this is not in any way surprising, for the following reasons:

(a)    The parties do not appear to have contemplated the insolvency of the Lehman Group at all. Subordination was primarily important as a means of obtaining regulatory capital as effectively and efficiently as possible. That was what the parties – certainly the Issuer – were focussed on. I can see some scope, therefore, for the existence of an intention that the instruments comply with the requirements for regulatory capital. But, as I have described, such requirements were essentially indifferent to the relative rankings of different subordinated debt.

(b)    If – and I do not consider that it was – an insolvency of the Lehman Group was contemplated, then it seems to me that relative priorities between

---

[226] See the evidence set out in paragraph 61(3)(c) above.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

different subordinated debt instruments would not have been a matter of particular consideration by the parties. By definition, regulatory capital (such as the Notes) ranked behind <u>un</u>subordinated debt. Subordinated creditors would simply not expect to be paid in an insolvency situation.

(c)  The operation of subordination provisions is complex. Not only are these provisions complex <u>in themselves</u>, but their operation often depends, at least in cases of simple contractual subordination, on the interrelationship between the subordination provision in one instrument and the subordination provision in another instrument, whose terms will be unknown and unconsidered at the time of the drafting of the subordination provision in the instrument here under consideration. As has been seen, the ranking between Claim A and Claim B turns in part on the interplay between the subordination provisions in each instrument. It cannot possibly be said that, when drafting the terms of the subordination provision in Claim A, the drafter would have had in mind the terms of Claim B, or *vice versa*.

(4)  Indeed, it is not clear to me that <u>even if</u> LBHI2 had been told, in terms, that the priority between the Sub-Notes and the Sub-Debt would be inverted or reversed by the LBHI2 Sub-Notes Resolution – and I should be clear that nothing even approaching this was ever intimated or suggested by the evidence – that the drafting would have been changed. As to this:

(a)  In her witness statement, Ms Dolby said this:[227]

"Had Tom Grant or anyone else told me that the amendments did or might mean that the LBHI2 Sub-Debt would take priority over the LBHI2 Sub-Notes in the event of insolvency, it is difficult to say what I would have thought at the time, but I would likely have discussed the situation with my legal and regulatory colleagues if I had been made aware of the change. As I have said, a Lehman Brothers insolvency was unthinkable, and therefore any questions relating to how particular transactions would play out on an insolvency were never discussed or considered."

(b)  This evidence was probed by Mr Phillips, QC in cross-examination:[228]

| Q: Mr Phillips, QC | So, if Tom Grant had said to you: this means that the Sub-Debt is going to take priority over the Sub-Notes, or *vice versa*, what you are saying is that if that had been drawn to your attention, you would have discussed it with your legal and regulatory colleagues, is that right? |
|---|---|
| A: Ms Dolby | Yes. It wouldn't have created me a tax problem, but it might have created the other guys in the team, in the other departments, a problem, I don't know. |
| Q: Mr Phillips, QC | And if you had been made aware of that change, you would have discussed it with them, is that right? |
| A: Ms Dolby | I would have hoped to have discussed it with them. |

---

[227] Dolby 1/§68.
[228] Day 3/pp.91-93 (cross-examination of Ms Dolby).

Lehman Brothers Holdings plc (in administration) and others

| Q: Mr Phillips, QC | Yes. So it would have been sort of – a change like that would have warranted some discussions, wouldn't it? |
|---|---|
| A: Ms Dolby | Yes, but I can't recall any discussions happening. |
| Q: Mr Phillips, QC | No. What you wouldn't have done is you wouldn't have just signed off without there being any discussions, would you? |
| A: Ms Dolby | I think it is unlikely, but I can't, I can't recall. |
| Q: Mr Phillips, QC | And you wouldn't have just signed it off, if Mr Grant had said to you: I am changing all of this. You wouldn't have just signed off on it because Mr Grant had come up with it, would you? |
| A: Ms Dolby | As I say in my statement, I think I would have raised it with my colleagues, who were probably more interested in it than I was. |
| Q: Mr Phillips, QC | And I don't know if you were in court yesterday, but Mr Grant told us that if the amendments had meant that the Sub-Debt would take priority over the Sub-Notes, he would have told Ms McMorrow and taken instructions, and that is what he told us yesterday. So he would have – says he would have raised it, and you would have discussed it. That's right, isn't it? |
| A: Ms Dolby | I would hope so, yes. |

(c)   I accept this evidence as true. Obviously, the drafting of the terms of the LBHI2 Sub-Notes was a matter that LBHI2 and the Lehman Group generally took seriously. These were important documents, and I have no doubt that had the drafting raised problems regarding tax efficiency or the status of the Notes as regulatory capital, this would have been taken extremely seriously. Indeed, that is precisely what Mr Grant and Ms Dolby – amongst others – did.

(d)   But that is not the point. The point is that no-one focussed on the question of relative subordination: the point was <u>not</u> raised.[229] That fact provides significant insight into what would have happened, had the point been raised. In my judgment – and, of course, the question is a hypothetical one – had the question been raised, it would have been met with a resounding "So what?" from within the Lehman Group. I consider that it would have been a matter of indifference to the Lehman Group as a whole, and to LBHI2 in particular, which subordinated creditor ranked above or below which other subordinated creditor. In paragraph 231 above, I suggested that the operation of the subordination provisions in the Amended LBHI2 Sub-

---

[229] It is important to understand the evidence of Mr Grant in this light. For instance, in Grant 1/§38, Mr Grant said this:

"It was important when making the amendments that they did not prejudice the subordination of the LBHI2 Sub-Notes so I needed to be mindful of that when addressing the tax comments. Simply stating that the solvency condition did not operate on a winding-up would have solved the tax concern but potentially undermined the subordination."

I accept this evidence, but Mr Grant was referring to the importance of ensuring – for regulatory capital purposes – that the LBHI2 Sub-Notes remained subordinated to <u>unsubordinated</u> creditors.

> Notes might – with the benefit of hindsight – be regarded as surprising. I stress the reference to hindsight. It seems to me, looking at a case where the Lehman Group is insolvent, but not so insolvent as to prevent the payment of some subordinated debt, the subordination provisions in the instruments I am considering might well have been differently and better drafted. But that comes nowhere near meeting the requirements for rectification.

263.    So far as LBHI2's intentions in relation to the drafting of the modifications of the Sub-Notes are concerned, I conclude that LBHI2 had no intention regarding relative subordination beyond that evinced by the objective construction of the terms of the Sub-Notes, Unamended and Amended, <u>whatever</u> that construction may have been. In short, there was no continuing intention, of any sort, different to that obtaining on an objective construction of these instruments.

*(iii)    No discernible intention on the part of the Noteholder beyond the words contained in the instruments themselves*

264.    The Noteholder was SLP3. I do not consider that SLP3 can have had any intention regarding the terms of the Unamended LBHI2 Sub-Notes other than to subscribe to the Notes on the terms issued. It must be borne in mind that the terms of the Unamended LBHI2 Sub-Notes were not the subject of a negotiated contract: they were issued by LBHI2 on a "take-it or leave-it" basis, and SLP3 will have subscribed to the issue on the basis of the terms set out in the Notes, as objectively construed according to their terms.

265.    It follows that SLP3 will have had no appreciation – one way or the other – of how the Notes ranked in relation to other subordinated debt issued by LBHI2. This is not only because the terms of the LBHI2 Sub-Notes are complex and intrinsically difficult to construe, but also because the relative ranking of the LBHI2 Sub-Notes tends to depend on the interaction of two subordination provisions – that contained in the Sub-Notes and that contained in whatever rival obligation the LBHI2 Sub-Notes were in competition with. In this dispute, this was Claim A, the LBHI2 Sub-Debt, but there was no evidence before me that SLP3 considered any of these matters. In short, there was no evidence of any intention as to how the Sub-Notes should rank, when compared with other subordinated debt.

266.    In these circumstances, the suggestion that SLP3 only acceded to the modifications to the LBHI2 Sub-Notes Resolution on the basis that its relative subordination did not change is fanciful. SLP3 did not call any evidence as to its own state of mind as Noteholder. As I have described in paragraphs 188 to 189 above, SLP3 simply acceded to the modification of the conditions; and there is nothing to suggest that SLP3 had any intention other than to signing up to those modifications <u>whatever their objective construction was</u>.[230]

267.    So far as SLP3's intentions in relation to the drafting of the modifications of the LBHI2 Sub-Notes are concerned, I conclude that SLP3 had no intention regarding relative subordination beyond that evinced by the objective construction of the terms of the LBHI2 Sub-Notes, Unamended and Amended, whatever that construction may have

---

[230] That is my conclusion even if the draft minutes referred to in paragraph 212 can be said accurately to state the purpose of the modifications. I am quite prepared to proceed on the basis that this was the intention behind the modifications. But that does not mean to say that that is all the modifications achieved.

been. In short, there was no continuing intention, of any sort, different to that obtaining on an objective construction of these instruments.

*(iv)   No subjective continuing common intention manifested by an outward expression of accord*

**268.**   The only common intention in this case is that reflected in the instruments themselves. There was, I find, no subjective continuing common intention other than that; and no outward expression of accord different to that manifested in the instruments.

*(v)   Conclusion*

**269.**   Had I found a continuing common intention with an outward manifestation of accord on the part of <u>someone</u> within both LBHI2 and SLP3, potentially interesting questions of whether that intention could be attributed to LBHI2 or SLP3 would arise. As it is, these questions do not arise because I have found no relevant intention to exist <u>anywhere</u> in these organisations. I can see no basis whatsoever for rectification.

## G.   THE PRIORITY DISPUTE BETWEEN CLAIM C (THE PLC SUB-DEBT AGREEMENTS), CLAIM D (THE PLC SUB-NOTES) AND CLAIM E (THE ECAPS GUARANTEES)

### (1)   Introduction

**270.**   For the reason given in paragraph 21 above, it is unnecessary for me to consider the relative priority of Claim E. The parties were all agreed that I could proceed on the basis that Claim E ranked behind Claims C and D. The parties are also agreed that a declaration as to the priority of Claim E should be made. I am prepared to do so. But nothing is to be inferred from this regarding the other points in issue.

**271.**   So far as the priority dispute between Claim C and Claim D is concerned, my approach will be similar to that adopted in relation to the priority dispute between Claim A and Claim B, described in paragraphs 173*ff* above. However, the issue of the relative priority between Claim C and Claim D is not the only point that must be resolved. As I have described in paragraph 31 above, it is necessary to consider and determine the Settlement Agreement release argument, the Claim C partial discharge argument and the Claim D reduction argument.

**272.**   I consider these points in the following order:

**(1)**   Section G(2) considers the Settlement Agreement release argument.

**(2)**   Section G(3) considers the Claim C partial discharge argument.

**(3)**   Section G(4) considers the Claim D reduction argument.

Having then established the quantum of Claims C and D, Sections G(5) to G(7) consider the question of priority between Claims C and D. Specifically:

**(4)**   Section G(5) considers the form and content of the PLC Sub-Debt Agreements, which give rise to the claims advanced by LBHI against PLC, which I call Claim C by way of shorthand. Section G(5) in particular considers the terms and nature

and operation of the subordination provisions contained in the PLC Sub-Debt Agreements.

**(5)** Section G(6) similarly considers the form and content of the PLC Sub-Notes, which give rise to the claims advanced by GP1 against PLC, which I call Claim D by way of shorthand.

**(6)** Section G(7) considers and determines the outcome – in terms of ranking – between Claim C and Claim D.

## (2) The Settlement Agreement release argument

### (a) Introduction

273. Claim C arises under the three PLC Sub-Debt Agreements described in paragraph 15 above. The agreements were originally between PLC as borrower and LB Holdings as lender. Although Claim C originally vested in LB Holdings, by a series of assignments and other transactions Claim C now vests in LBHI.[231] It was contended by Deutsche Bank that it was this very vesting of LB Holdings' rights in LBHI that caused Claim C to be released. This release arose by operation of the Settlement Agreement.

### (b) The relevant provisions of the Settlement Agreement

274. According to its Preamble, the Settlement Agreement was "made and entered into as of October 24, 2011, by and among the Debtors". "Debtors" is a term defined in the Settlement Agreement:[232] footnote 1 in the Preamble lists the Debtors, one of which is LBHI. LB Holdings is <u>not</u> a Debtor in this list.

275. Section 8.02 provides for a "Debtors' Release", and provides as follows:

"Upon the occurrence of the Effective Date, except with respect to (1) the Allowed Claims and the Admitted Claims and any rights and distribution entitlements in respect thereof, (2) the agreements, promises, settlements, representations and warranties set forth in this Agreement, (3) the performance of the obligations set forth herein and (4) the Excluded Items, and in consideration of the foregoing and each Party's execution of this Agreement, each Debtor, on behalf of itself, its estates, its successors and assigns (including any chapter 7 trustees that may be appointed upon or after conversion of the Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code or any party that may succeed to any Causes of Action of any of the Debtors or their estates, or may seek to bring any Causes of Action on behalf of any of the Debtors' estates, derivatively or otherwise), hereby fully and forever releases, discharges and acquits each Debtor Released Party, from all Causes of Action (including in respect of any derivative claim by any third party or representative of any Debtors' estate, including the official committee of unsecured creditors appointed in the Chapter 11 Cases), whether at law or in equity, whether based on contract (including quasi-contract, guarantee, indemnity or estoppel), statute, regulation, tort or otherwise (excluding fraud in connection with the negotiation of (A) this Agreement or (B) the amounts of the Allowed Claims and the Admitted Claims), accrued or unaccrued, foreseen or unforeseen, foreseeable or unforeseeable, known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, certain or contingent, in each case, that arise from, are based on, connected with, alleged in or related to any facts or circumstances in existence prior to the date hereof, including (i) any Funding Claims, (ii) any Causes of Action

---

[231] See paragraph 17 above.
[232] See Article 1, Section 1.01, which refers (in the case of Debtors) back to the Preamble.

under chapter 5 of the Bankruptcy Code or similar actions under applicable state law, (iii) except as explicitly set forth in Section 2.04, any claims based upon asserted right of subrogation, indemnification (whether express or implied), contribution or reimbursement, including any such claims in connection with distributions to any of the UK Affiliates or any of their creditors based upon a guarantee or similar document by LBHI or any Lehman Entity and (iv) all Causes of Action against any Debtor Released Party, arising from, in connection with, or relating to any Causes of Action against any other entity (whether or not a Party) existing as at the date hereof. For the avoidance of doubt, this Section 8.02 is without prejudice to any of the Debtors' rights or Causes of Actions against any entity that is not a Debtor Released Party."

276.    Section 8.02 contains a great deal of verbiage, much of which is redundant for present purposes. Leaving what is left in **bold**, we get:

"**Upon the occurrence of the Effective Date,** except with respect to (1) the Allowed Claims and the Admitted Claims and any rights and distribution entitlements in respect thereof, (2) the agreements, promises, settlements, representations and warranties set forth in this Agreement, (3) the performance of the obligations set forth herein and (4) the Excluded Items, and in consideration of the foregoing and each Party's execution of this Agreement, **each Debtor**, on behalf of itself, its estates, its successors and assigns (including any chapter 7 trustees that may be appointed upon or after conversion of the Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code or any party that may succeed to any Causes of Action of any of the Debtors or their estates, or may seek to bring any Causes of Action on behalf of any of the Debtors' estates, derivatively or otherwise), **hereby fully and forever releases, discharges and acquits each Debtor Released Party, from all Causes of Action** (including in respect of any derivative claim by any third party or representative of any Debtors' estate, including the official committee of unsecured creditors appointed in the Chapter 11 Cases)**, whether at law or in equity, whether based on contract (including quasi-contract, guarantee, indemnity or estoppel), statute, regulation, tort or otherwise** (excluding fraud in connection with the negotiation of (A) this Agreement or (B) the amounts of the Allowed Claims and the Admitted Claims)**, accrued or unaccrued, foreseen or unforeseen, foreseeable or unforeseeable, known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, certain or uncertain, in each case, that arise from, are based on, connected with, alleged in or related to any facts or circumstances in existence prior to the date hereof**, including (i) any Funding Claims, (ii) any Causes of Action under chapter 5 of the Bankruptcy Code or similar actions under applicable state law, (iii) except as explicitly set forth in Section 2.04, any claims based upon asserted right of subrogation, indemnification (whether express or implied), contribution or reimbursement, including any such claims in connection with distributions to any of the UK Affiliates or any of their creditors based upon a guarantee or similar document by LBHI or any Lehman Entity and (iv) all Causes of Action against any Debtor Released Party, arising from, in connection with, or relating to any Causes of Action against any other entity (whether or not a Party) existing as at the date hereof. For the avoidance of doubt, this Section 8.02 is without prejudice to any of the Debtors' rights or Causes of Actions against any entity that is not a Debtor Released Party**."

*(c)*    *The scope of the release*

277.    The release is, further simplified, as follows:

*Upon the occurrence of the Effective Date, each Debtor releases each Debtor Released Party from all Causes of Action arising from facts or circumstances in existence prior to the date hereof*

There are a number of definitions that need to be understood:

(1)    The "Effective Date" is a defined term in the Settlement Agreement.[233] The definition is complex, requiring certain conditions to be fulfilled. These conditions are not material for present purposes. It is simply necessary to know that:

    (a)    The Effective Date, when these pre-conditions were met, was 6 March 2012.

    (b)    The Effective Date is not the same as the date the Settlement Agreement was made or concluded. This was earlier, on 24 October 2011.

(2)    "Debtor" has already been considered.

(3)    "Debtor Released Party" is defined as:[234]

"…each UK Affiliate, and each of its Joint Administrators, Joint Liquidators, directors, officers, employees, representatives, agents, financial advisors, accountants, attorneys and representatives, each of the foregoing solely in their respective capacity as such…"

UK Affiliates has the meaning ascribed in the Preamble. The term includes PLC. PLC is, thus, a Debtor Released Party.

(4)    "Cause of Action" is defined to mean "all manners of action, causes of action, judgments, executions, debts, liabilities, demands, rights, damages, costs, rights, expenses and claims of every kind, nature and character whatsoever."[235]

278.    Clearly, the claim that LB Holdings had against PLC was a Cause of Action within the meaning of article 8.02. Equally clearly, that Cause of Action arose from facts or circumstances in existence prior to the date of the Settlement Agreement: as noted, the Settlement Agreement is dated 24 October 2011, and the PLC Sub-Debt Agreements are dated 30 July 2004 (in the case of the first two) and 31 October 2005 (in the case of the third). Further, as I have already noted, PLC is a Debtor Released Party within the meaning of article 8.02.

279.    The only reason why the claims that LB Holdings had against PLC are not unequivocally released is because LB Holdings is not a "Debtor" within the meaning of the article. ("Debtor" is, in this context, an unhelpful term: LB Holdings was, of course, the creditor under the PLC Sub-Debt Agreements: all of the obligations released by article 8.01 will have been rights vesting in "Debtors".) Absent the transfer of LB Holdings' rights to LBHI, there could be no question of LB Holdings' claims being released. The question is whether the (indirect) transfer of LB Holdings' claims to LBHI after the Effective Date caused the release to bite. Put another way, does the release extend to Causes of Action acquired by LBHI after the Effective Date?

280.    Section 8.02 is – as can be seen – enormously specific: but this specificity does not especially help in this case. For example, it is clear that "Cause of Action" is intended to be read very widely. Not only is the term itself widely defined,[236] but the express wording of section 8.02 makes clear that the term is intended to embrace "unaccrued", "unforeseen", "unforeseeable", "unknown", "unmatured", "contingent", "unliquidated"

---

[233] See the definitions in article 1 of the Settlement Agreement.
[234] See the definitions in article 1 of the Settlement Agreement.
[235] See the definitions in article 1 of the Settlement Agreement.
[236] See paragraph 277(4) above.

and/or "uncertain" Causes of Action. The problem is that none of these terms addresses the state of affairs pertaining here, namely the transfer of a claim, after the Effective Date, to a Debtor. As I have noted, the <u>only</u> reason the claims under the PLC Sub-Debt Agreements are not unequivocally released is because LBHI only became vested <u>after</u> the Effective Date. Although Deutsche Bank placed a great deal of weight on the width of the Cause of Action definition, I do not consider that the question before me is resolved by that width of definition.

281.   Nor do I find that I am assisted by the distinction – which both Judge Gropper and Judge Smith drew – between "general" and "specific" releases. Judge Smith relied most heavily on the distinction. He described the nature of the distinction as follows:[237]

"A release may be specific or general. That is, it may only release identified claims, or it may release all of the releasor's claims against the releasee (often subject to identified exceptions). Whether an instrument is a general release that discharges any and all claims against the party released depends on the intention of the parties, on the controversy being settled, and on the purpose for which the release was given…"

Where a release is "general", the release will be most strongly construed against the releasor,[238] and a release may extend as follows:[239]

"Any claims arising at the time a general release is given, and claims that arise or mature after that time, may be extinguished by the release if they are expressly embraced within the instrument or, even if not specifically listed, fall within the fair import of its terms."

282.   I should say that I have no difficulty in accepting any of this evidence. It seems to me, if I may respectfully say so, an eminently sensible approach. Equally, I am quite prepared to read section 8.02 as a "general" and not a "specific" release, and so construe its terms broadly against LBHI. But, as Judge Smith accepted, even a general release derives its limits from the wording used and has to be <u>construed</u>.[240]  There is no magic in the label "general" release and the difference between a "general" release and a "specific" release is, as Judge Smith himself accepted, one of fact and degree and – above all – construction:[241]

| | |
|---|---|
| **Q: Marcus Smith J** | Judge Smith, "general release" is not a term you would want to give precise definition to, it is more a concept, where what is being released is a class of claim. Would that be a fair way of describing it? |
| **A: Judge Smith** | Well, that is fair. It's a descriptive term, but in normal speech there is a – almost every release we have seen and talked about, in this, in Judge Gropper's testimony and mine, was in form of a general release. A specific release is one limited on its face to a specific claim and the doesn't usually raise any problems. |
| | So, in many of these, we have releases that are general in form, and in some of them the court says: it may be in general form, but that is really not what the parties intended to do. |

---

[237] Smith Report/§35.

[238] Smith Report/§38.

[239] Smith Report/§39.

[240] Smith Report/§§31ff.

[241] Day 5/pp.133ff (cross-examination of Judge Smith). See also the evidence of Judge Gropper at Day 5/pp.40, 41 and 79.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

|  |  |
|---|---|
|  | This one is in a sense the most general release I have ever seen, because there is no… |
| **Q: Marcus Smith J** | Don't go to the wording on this one. I just want to understand more particularly your understanding of general release, because you are obviously attaching some significance, both in terms of burden of proof and waiver or release of unforeseen claims, when something is a general release as opposed to when it is a specific release. |
|  | But couldn't one have, for instance, instance where there are…well, let's say there is a dispute about intellectual property rights between two companies, and they effect a very broad form of release, which is on the face of it confined to IP rights. I quite understand that where one has got an intellectual property claim that neither party has thought of, chances are it will have been released? |
| **A: Judge Smith** | Yes. |
| **Q: Marcus Smith J** | But it wouldn't extend to, let us say, a tortious claim for personal injury or damage to property or anything like that? |
| **A: Judge Smith** | Yes, but if it says it is limited to intellectual property claims, then it is, yes. |
| **Q: Marcus Smith J** | Yes: but would you call that a general release or a specific release? |
| **A: Judge Smith** | I think I would call it a specific release, but yes – I see your Lordship's point. I mean there is no magic to these terms. |
|  | … |
| **Q: Mr Phillips, QC** | Judge, isn't what is comes down to, is you actually have to construe the clause, the release, in question? |
| **A: Judge Smith** | Yes. |
| **Q: Mr Phillips, QC** | You have to construe the language, you have to construe it in its context, yes? |
| **A: Judge Smith** | Yes. |
| **Q: Mr Phillips, QC** | And you have to look at what it was in the contemplation of the parties, in other words what they were trying to release, what they were trying to settle, yes? |
| **A: Judge Smith** | Yes. But in most cases, even in the release area, in most cases, the text, if clear, is conclusive. |
| **Q: Mr Phillips, QC** | But you are still engaged in that question of interpretation, yes, and putting labels on it really doesn't advance matters, does it? |
| **A: Judge Smith** | Well, putting labels on things as a normal rule does not advance matters. Sometimes a descriptive term helps to understand. |

## (d)    Analysis and conclusion

**283.**    So, I am thrown back to the construction of section 8.02. I proceed on the basis that the Settlement Agreement was intended to effect a clean break between different entities within the Lehman Group,[242] and that the terms of the Settlement Agreement therefore

---

[242] See in particular the following recital: "WHEREAS the Debtors and the UK Affiliates desire to resolve all disputes and all other outstanding issues among them (except as expressly excluded herein) and to avoid expensive and extensive litigation thereon."

fall to be construed broadly in this light so as to avoid expensive and extensive litigation. Approaching the question in this light, it is clear that the express wording of section 8.02 does <u>not</u> extend to release PLC from LBHI's after-acquired claim against it, arising under the PLC Sub-Debt Agreements. I have reached this conclusion for the following reasons:

(1) The key words in section 8.02 are that, as at the Effective Date, a Debtor <u>releases</u>, <u>discharges</u> and <u>acquits</u> Debtor Released Parties from all Causes of Action.

(2) It is clear that in order to effect a release, discharge or acquittal (I shall hereon generally refer to "releases", but the use of multiple words shows that the drafter did not intend the term to be narrowly construed), <u>there must be something for the Debtor to release</u>.

(3) Whilst it is clear that this "something" can be exiguous – a Cause of Action will still be released, even if it has not accrued or is unmatured, is unforeseen by the Debtor and was unforeseeable and/or unknown, and is contingent, unliquidated and uncertain. But there must be some legal relation between the Debtor and the Debtor Released Party that is capable of being released as at the Effective Date. A relation that arises altogether <u>after</u> the Effective Date cannot sensibly be the subject of a release, discharge or acquittal. The concepts of release, discharge and acquittal are backward looking in time: there must, to repeat myself, be something in existence at this time, in the hands of the person effecting the release, that is <u>capable</u> of release, discharge or acquittal.

(4) Thus, at the time of the release, there was (as regards the undoubted cause of action subsisting between LB Holdings and PLC[243]) no kind of relation whatsoever between LBHI and PLC. As regards these debts, owed by PLC to LB Holdings, there was <u>nothing</u> for LBHI to release.

284. Because the Settlement Agreement is so determined to ensure that any claim that a Debtor might have against a Debtor Released Party is released, the definition of what is released is extraordinarily wide. Nevertheless, the distinction between a right presently existing, but (potentially) enforceable only in the future and a right which does not exist at all (albeit that it may do in the future) is one that is well-understood. I appreciate that the Settlement Agreement is not governed by English law, but the distinction I am alluding to is one well-articulated in the English cases. In *Colonial Bank v. European Grain & Shipping Ltd*, Mustill LJ stated:[244]

"All contractual rights are vested from the moment when the contract is made, even though they may not presently be enforceable, either because the promisee must first perform his own part, or because some condition independent of the will of either party (such as the elapsing of time) has yet to be satisfied. Equally, all unperformed obligations to pay money are in one sense *debitum in praesenti solvendum in futuro*."

By contrast, an expectation or *spes* is not a right at all. In *Re Parsons*,[245] Kay J stated:

---

[243] I am assuming that all transfers of LBI's interest post-dated the Effective Date. That may not have been the case: but provided there was no transfer to LBHI or another Debtor <u>before</u> the Effective Date, this is immaterial.
[244] [1988] 3 WLR 60 at 67-68. The decision was reversed on appeal to the House of Lords ([1989] AC 1056), but not on this ground.
[245] (1890) 45 ChD 51 at 55.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

"It is indisputable law that no one can have any estate or interest, at law or in equity, contingent or other, in the property of a living person to which he hopes to succeed as heir at law or next of kin of such living person. During the life of such a person, no one can have more than a *spes successionis*, an expectation or hope of succeeding to his property."

285.    The reason the point is difficult in the present case is because there unquestionably was a cause of action in existence at the relevant date. It is simply that it was vested in LB Holdings and not in LBHI. This point was put to Judge Smith in cross-examination:[246]

| | |
|---|---|
| **Q: Mr Phillips, QC** | If you have no right – you, Judge Smith, have got no legal right, circumstances have not arisen that have given you a legal right to sue me – you cannot sue me? |
| **A: Judge Smith** | That seems right. |
| **Q: Mr Phillips, QC** | Yes. And, equally, you cannot release a claim against me, because it doesn't exist? |
| **A: Judge Smith** | I am not sure that follows. |
| **Q: Mr Phillips, QC** | Really? |
| **A: Judge Smith** | Really. |
| **Q: Mr Phillips, QC** | And even if you put the widest words possible into a contract – that is you, Judge Smith, put the widest words into a contract that say "I am releasing my claims against Mark Phillips that arise out of events that have happened before he cross-examined me, but after that all bets are off", if you said "I release all claims I have against Mark Phillips whatsoever, howsoever they may have arisen" and all the rest of it, how could you do that if you do not have a legal right – how would you get rid of a claim that does not exist? |
| **A: Judge Smith** | Well, it is not a claim that doesn't exist, it is a claim that doesn't exist in my hands. Assume this really happened. Assume we had some dispute which ended the day you cross-examined me and we decide we are going to exchange releases and we decide, even though we might have some particular controversies in mind, we are going to have the broadest release we can, we are going to negotiate for total peace and we sign the release and the next day I go over to your learned friend over here and I purchase from her a claim against you and sue on it. You would say: "That is not what I bargained for. That is not total peace." |

Judge Smith is absolutely right to say that the issue is not that the claim against PLC does not exist at all, but that it did not – at the relevant time – exist in the hands of LBHI. There was – on this basis – nothing for LBHI to release, discharge or acquit. The acquisition of a right to sue one party under a settlement <u>subsequent</u> to a settlement by the other party can, quite rightly, be regarded as something inconsistent with a desire to achieve "total peace". But "total peace" would, on this basis, be achieved by promises not to sue in the future (for example) and not by adopting a strained and clearly wrong definition of the words "release", "discharge" and "acquit".

286.    My reading of section 8.02 is consistent with other parts of the Settlement Agreement:

---

[246] Day 5/pp.151-152 (cross-examination of Judge Smith).

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

(1) Section 5.04(a) contains various warranties as to title to claims released given by the Debtors:

"Each Debtor…owns all claims it may have against any UK Affiliate, including all claims released hereunder…"

I do not see how – if the release extended to after acquired claims not held by LBHI at the time of the agreement – such a warranty could meaningfully be given.

(2) Equally, the Settlement Agreement contains a number of provisions restricting the parties in the transfer of claims.[247] Had the parties to the agreement wished, they could easily have made provision for the release of after-acquired property, by either requiring the Debtor to promise not to sue on such claims or else to release such claims on their acquisition. The fact is that the parties clearly considered the transfer of claims within the Lehman Group and – in an agreement of this sophistication – it must be inferred that they chose not to deal with property acquired by a Debtor after the agreement, even if that involved a claim against a Debtor Released Party.

I do not suggest that these points are in any way conclusive: they are persuasive only. It is my reading of the words "release", "discharge" and "acquit" that I consider to be determinative.

287. Since I regard the wording of the Settlement Agreement as clear and unambiguous, I do not, therefore, take into account the additional factual material that the parties adduced in order to assist me in construing the Settlement Agreement. I should say that I did not regard the evidence of Mr Geraghty nor the evidence regarding post-contractual performance of the Settlement Agreement as helpful in any event. I was taken to a considerable body of US authorities, but (as all before me recognised) at the end of the day this was principally (and, as I find, solely) a matter of construing the words of the Settlement Agreement. There was one case, however, which did appear to involve the release of after acquired property, and Deutsche Bank unsurprisingly placed considerable reliance on it. Although what is decisive is the construction of the wording of the Settlement Agreement, it is appropriate that I briefly explain why I do not consider that this case – *Re Professional Satellite and Communication LLC* – assists.[248] The facts of the case were as follow:

(1) Professional Satellite and Communication LLC – **Prosat** – was a Californian limited liability company, wholly owned and controlled by four individuals (the **Prosat Members**), one of these four being a Mr Jonathan Shiff.

(2) In 2006, Prosat was sued for breach of contract by Imagitas Inc. The claim was subsequently amended to add the Prosat Members, including Mr Shiff. The claims against the Prosat Members were for fraudulent transfer.[249]

---

[247] See sections 4.04 and 5.04.

[248] 2017 WL 4286995 (SD Cal, Sept 27, 2017).

[249] As I understand it, fraudulent transfer prevents a debtor, like Prosat, from improperly transferring assets away to another, thereby defrauding a creditor. One of the remedies permitted is against the recipient of the transferred assets.

(3)     Imagitas obtained judgment against both Prosat and the Prosat Members. Prosat and the Prosat Members were jointly and severally liable for this **Imagitas Judgment Debt**.

(4)     Prosat then filed for bankruptcy, and Imagitas filed a proof of claim in that bankruptcy for the amount of the Imagitas Judgment Debt.[250] Mr Shiff also filed for bankruptcy, and Imagitas filed a proof of claim in that bankruptcy also.

(5)     A settlement was negotiated and agreed between Mr Shiff (as debtor-in-possession of his estate)[251] and the trustee of the Prosat Estate. That settlement sought to govern the treatment of the claims Imagitas had made in <u>both</u> bankruptcies in the event of Mr Shiff's estate making a payment of the Imagitas Judgment Debt. In short, the settlement permitted Mr Shiff to make a claim in the bankruptcy of the Prosat Estate in that eventuality. The Settlement Agreement also contained a very broad form of release, whereby Mr Shiff released all claims he had against the Prosat estate. I will not set it out, but the release was as broadly drafted as any that I have seen.

(6)     Mr Shiff – by a separate agreement – then compromised the Imagitas Judgment Debt. As part of this settlement, Mr Shiff became entitled to Imagitas' claim in the Prosat bankruptcy. The trustee of the Prosat Estate objected to this claim (referred to as "Claim No 41") and contended that it had been released by the settlement agreement negotiated between the estate of Mr Shiff and the estate of Prosat.

(7)     At first instance, Judge Adler held that Mr Shiff's assertion of Claim No 41 was precluded by the settlement agreement. In the subsequent appeal to the United States District Court, District Judge Benitez described her decision in the following terms:

"Years later, on October 20, 2016, Wolf, as Trustee of the Prosat Estate, objected to Claim No 41 in the Prosat case. On January 9, 2017, Judge Adler entered her Order Disallowing Claim of Jonathan Shiff (Claim No 41). She held that the Release precluded the Shiff Estate from recovering on Claim No 41. Judge Adler found that the "spirit" of the Settlement Agreement and "its intended purpose was to resolve all claims of these parties against each other related to the [Imagitas Judgment Debt] unless actual payment was made by Shiff to Imagitas". To Judge Adler, "the Shiff Estate's attempt to back door a claim against ProSat by subsequently acquiring from Imagitas its proof of claim #41 against Prosat…is, in the Court's view, a violation of the spirit of the" Settlement Agreement. Her Order disallowed Claim No 41 in its entirety and reduced the value of Claim No 41 to $0. This appeal and cross-appeal followed."

(8)     On appeal:

(a)     District Judge Benitez accepted that an assignment of Imagitas' claim would generally be effective to transfer Imagitas' title to Claim No 41 to Mr Shiff.

(b)     However, he noted that the rules regarding assignment were subject to US Bankruptcy Code, which provided that where a claim was made against a debtor – here Prosat – a "party in interest" could object to the claim and, if

---

[250] Some of this debt had been paid – but nothing turns on this.

[251] It would appear that the bankrupt can effectively act as his own trustee in bankruptcy.

such objection was made, "the court…shall allow such claim in such amount, except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement…". He went on to say that "[t]he plain statutory text places no limit on which is asserting the claim, who negotiated the agreement, or the contents of the agreement. Rather, the text provides that "any agreement" can render the claim "unenforceable against the debtor and property of the debtor"."

(c)     The District Judge then proceeded to consider the settlement agreement, and he noted the extreme width of the release therein. He did not consider the point that I have found to be decisive in this context, namely that a "release" cannot be forward looking. He was, of course, aware that Mr Shiff had acquired Claim No 41 <u>after</u> the settlement agreement had been concluded. Nevertheless, he held that the release included Claim No 41.

(d)     The District Judge then went on to say:

"…when Shiff agreed to the Release, he was aware of Imagitas' Claim No 41. He later acquired that claim through an assignment, knowing that he had signed a comprehensive release barring him from asserting any and all claims against the Prosat estate except for a possible claim if the Shiff estate made a payment [in relation to the Imagitas Judgment Debt]. Neither the Shiff estate nor Shiff individually ever made a payment [in relation to the Imagitas Judgment Debt]…"

Undoubtedly, the District Judge read the release in this case as applying to an after-acquired claim. To that extent, Deutsche Bank's contentions regarding the construction of section 8.02 are supported. However, the District Judge, like Judge Adler, appeared to be influenced by the fact that Mr Shiff appeared to be abusing or circumventing the settlement he had negotiated,[252] and was prepared to use the wide discretion afforded to him by the Bankruptcy Code.[253] Moreover, the District Judge appears to have read the settlement as precluding the <u>bringing</u> of claims,[254] which is a very different mechanism from that of release, it being perfectly possible to promise not to bring a claim in the future.[255]

**(3)    The Claim C partial discharge argument**

*(a)    Introduction*

**288.**   If, contrary to its primary contention – that is, the Settlement Agreement release argument – LBHI's claims against PLC under Claim C were <u>not</u> released, Deutsche Bank contended that LBHI's claims under the PLC Sub-Debt were released, discharged or diminished <u>in part</u>.

---

[252] See paragraph 287(7) above.

[253] See paragraph 287(8)(b) above.

[254] See paragraph 287(8)(d) above.

[255] Only limited parts of the settlement agreement are quoted in the report of the decision, and it may be that the District Judge was thinking of other provisions. If he was, he certainly did not cite them, and I find these parts of the decision very hard to understand in light of the parts of the settlement quoted. Suffice it to say that I cannot regard section 8.02 as amounting to a promise by a Debtor not, in the future, to bring certain claims against a Debtor Released Party.

289.    The relevant facts necessary to understand the point are these:

(1)    Claim C arises out of the PLC Sub-Debt Agreements, which were originally (as I have described) between LB Holdings (as lender) and PLC (as borrower).[256]

(2)    PLC's obligations under the Sub-Debt Agreements were guaranteed by LBHI pursuant to a guarantee (the **LBHI Guarantee**).

(3)    LB Holdings thus had a claim against LBHI pursuant to the LBHI Guarantee, which it pursued, and in respect of which it has (in part) been paid. That part payment is said to be about 36% of the money that was owing to LB Holdings under the PLC Sub-Debt Agreements. That payment was made pursuant to the Settlement Agreement.

290.    LB Holdings has, of course, assigned its claims under the PLC Sub-Debt Agreements to LBHI. No party contended that <u>if</u> the payment under the LBHI Guarantee served to release, discharge or diminish LB Holdings' claim against PLC by the amount of the payment under the LBHI Guarantee, LBHI could (as the ultimate assignee of the claim) be in a better position than LB Holdings.

291.    Accordingly, the effect of the payment under the LBHI Guarantee ought to be considered – at least in the first instance – on the basis that there was <u>no</u> assignment of LB Holdings' rights. The question then becomes:

*Where creditor A has not received payment from his or her principal debtor B, but has received part payment from guarantor C, is A's claim against B released, discharged or diminished to the extent of the payment by C to A?*

292.    I consider this question, first, in Section F(3)*(b)* below.

**(b)    *Where creditor A has not received payment from his or her principal debtor B, but has received part payment from guarantor C, is A's claim against B released, discharged or diminished to the extent of the payment by C to A?***

293.    Deutsche Bank asserted that "[i]t is a fundamental principle of the law of guarantees that a part payment by a surety to a creditor diminishes the principal debt *pro tanto*", citing clear authority to this effect.[257] As a result, Deutsche Bank contended:[258]

"…when LBHI made a part payment of the PLC Sub-Debt to [LB Holdings], it had the effect of reducing the principal amount of the PLC Sub-Debt. When [LB Holdings] <u>later</u> assigned the [LB Holdings] Sub-Debt, it cannot have assigned more than it had, namely the PLC Sub-Debt as reduced by the prior part payment."

---

[256] See paragraphs 15 to 17 above.

[257] See paragraph 147 of Deutsche Bank's written submissions. These – and other – submissions regarding discharge were supplemented by post-hearing written submissions by both Deutsche Bank and SLP3/LBHI. These submissions were permitted because of pressures of time during the hearing, and only to supplement/elucidate points already being made. I have obviously considered them, but in this light. I am not aware of any new point arising out of these submissions and – obviously – such would have been drawn to my attention when the Judgment was circulated in draft.

[258] See paragraph 148 of Deutsche Bank's written submissions.

Approved judgment                                    Lehman Brothers Holdings plc (in administration) and others
Mr Justice Marcus Smith

294.    I shall leave for later consideration the effect of the assignment. For the present, the
question is whether the proposition asserted by Deutsche Bank is right. Deutsche Bank
cited a passage in *Andrews and Millett* in support:[259]

"The surety sometimes makes a part-payment of the guaranteed debt to the creditor in
consideration of his being granted an absolute release. Where this occurs, the part-payment
constitutes part-payment of the principal obligation and reduces it *pro tanto* as between the
principal and the creditor. In *Milverton Group Ltd v. Warner World Ltd*, [1995] 32 EG 70,
Hoffmann J said that unless this were the case, "a creditor could pick off his debtors one by one
and recover in total more than the whole debt". This would operate to the disadvantage of the
principal and the co-sureties."

295.    It is not clear to me that this is a case where LBHI was granted an absolute release as a
result of making the payments that I have described. But this was not a point taken by
LBHI in response to Deutsche Bank. Rather, LBHI took an altogether more fundamental
point, namely that this was a rule that had no application in an insolvency situation:[260]

"The starting point is the well-established principle that a creditor is entitled to prove for the full
amount of its debt in the insolvency of the debtor, notwithstanding that payments have been made
by a surety in respect of such a claim (unless and until the creditor has been paid in full)."

296.    Deutsche Bank's response[261] to this was somewhat equivocal. Deutsche Bank noted
SLP3/LBHI's point, but stated that it had:[262]

"…nothing to do with the present situation…It is true that there are cases involving guarantees
which suggest that a part-payment by a guarantor should not reduce the amount that the creditor
can claim in the administration or liquidation of the principal debtor…These cases are concerned
with how to treat in an insolvency a situation in which more than one person is entitled to claim
in respect of what is in substance the same debt (i.e., a surety that has now made a part payment,
and a creditor). In that case, the rule against double proof intervenes to ensure that only one
person can prove in respect of the same debt as a matter of policy…"

Thus:

(1)    Deutsche Bank did not defend the proposition it had advanced in its written
submissions a mere two paragraphs earlier.[263] Deutsche Bank simply did not, in
this document, engage with SLP3/LBHI's proposition that matters were different
in an insolvency, but merely suggested (without specificity) that SLP3/LBHI's
proposition was wrong.

(2)    Deutsche Bank then set another hare running, namely the rule against double proof.
It will, of course, be necessary to deal with this argument – as I do in Section F(3)*(c)*
below – but it is first necessary to determine whether SLP3/LBHI's proposition is

---

[259] Andrews and Millett, *Law of Guarantees*, 7th ed (2015) (**Andrews and Millett**) at [9-003].

[260] See paragraph 555 of SLP3/LBHI's written submissions.

[261] These arguments were rehearsed in various "position papers" exchanged by the parties. These were superseded
by the parties' (extensive) written submissions. Deutsche Bank's submissions simply tracked the sequence of the
arguments that had been made in the position papers, rather than providing a synthesized argument, which dropped
bad points and articulated the true nature of the dispute between the parties. Of course, there were also the post-
hearing supplemental submissions by Deutsche Bank, which added a further layer to the submissions.

[262] Quoting from paragraphs 149 to 151 of Deutsche Bank's written submissions.

[263] Described in paragraphs 293 to 294 above.

correct or not, for Deutsche Bank did not concede the point, whilst failing to argue it.

297.    SLP3/LBHI's point is that where the principal debtor *B* (here: PLC) is insolvent, creditor *A* (here: LB Holdings[264]) can prove for the full amount of the debt, notwithstanding that creditor *A* has received part payment from guarantor *C* (here LBHI).

298.    At first, this proposition seems counter-intuitive. The basis for the rule is, however, explained and justified in *Andrews and Millett*:[265]

"Where the principal is insolvent and the surety makes a part payment to the creditor before the creditor has been paid a dividend, the rule is that the surety has no right to prove, and the creditor does not have to give credit by reducing his proof by the amount received from the surety, so long as the creditor does not receive more than 100 pence in the pound. The creditor can prove for the full amount and the surety is barred from proving at all. It makes no difference that the payment was before or after the commencement of the insolvency. The basis for the rule is that the surety has undertaken to be responsible for the full sum guaranteed, including whatever may remain due to the creditor after receipt of dividends in the principal's insolvency, and cannot prove (or, more correctly, receive a dividend) in competition with the creditor for a right of indemnity. Since the creditor is himself entitled to prove for the whole amount without giving credit for sums received from the surety, the rule against double proof will, upon the creditor proving for the whole amount of the debt, preclude the surety from proving (or claiming a set-off against the principal's estate) in relation to the part paid."

As SLP3/LBHI made clear in their written submissions,[266] this principle is supported by considerable authority.

299.    Leaving on one side the assignment to LBHI – which I shall come to – it is clear that, given the insolvency of the principal debtor *B* (here: PLC), creditor *A* (here: LB Holdings) can prove for the full amount of the debt, notwithstanding that creditor *A* has received part payment from guarantor *C* (here: LBHI). The contrary proposition advanced by Deutsche Bank (see paragraph 293 above) does not apply in these circumstances.

*(c)    The rule against double proof*

300.    It is, of course, quite clear from the passage in *Andrews and Millett* cited in paragraph 298 above that the rule against double proof is part of the reason why the creditor *A* can prove for the debt in the insolvency of principal debtor *B*, whereas guarantor *C* cannot.

301.    Deutsche Bank did not in any way seek to gainsay the principles I have articulated – and, indeed, cited a number of further authorities in support of them.[267] Having itself raised the issue of the rule against double proof,[268] Deutsche Bank then submitted that the rule

---

[264] For present purposes, I disregard the assignment to LBHI: it will be necessary to consider the effect of the assignment in due course.

[265] At [13-007].

[266] Paragraphs 556 to 559 of SLP3/LBHI's written submissions and the authorities there cited.

[267] Paragraphs 151 to 153 of Deutsche Bank's written submissions.

[268] Paragraph 151 of Deutsche Bank's written submissions.

was, in fact, "completely irrelevant in the present context".[269] It is necessary to set out Deutsche Bank's argument in detail:

"154.    …the rule against double proof and its corollary are completely irrelevant in the present context, where there is only one person entitled to prove for the PLC Sub-Debt, namely LBHI. The rule against double proof operates only for so long as there is the possibility of a double proof. This is made clear in Lord Walker's description of the rule in [*Re Kaupthing Singer & Friedlander Ltd (No 2)*][270] at [11] – [12]:

> "11.    …The rule prevents a double proof of what is in substance the same debt being made against the same estate, leading to the payment of a double dividend out of one estate. It is for that reason sometimes called the rule against double dividend…
>
> 12.    The primary purpose of the rule has been described as the protection of other creditors of [the principal debtor] against unfair treatment by an arrangement under which there are multiple creditors in respect of the same debt…"

155.    Thus, even where a surety has made a part payment to a creditor after the insolvency of the principal debtor, the rule applies only for so long as the creditor and the surety might both be able to prove in the insolvency…

156.    Indeed, the very existence of the rule against double proof pre-supposes that, absent that special rule, the creditor would be able to prove only for the outstanding amount of its debt, as reduced by any part payment by the surety.

157.    The rule against double proof and its corollary, which are procedural rules of insolvency law, thus say nothing about the issue that arises in the present case, which concerns the quantum of the substantive claim that LBHI acquired by assignment.

158.    It follows that, even if LBHI's claims under the PLC Sub-Debt were not released in full, its claims were nevertheless diminished in part by the part-payments made to [LB Holdings]."

302.    It appears, from this, to be Deutsche Bank's position that:

(1)    In the three party situation that I have so far been considering, the law as stated by SLP3/LBHI and as set out above is correct: where the principal debtor *B* (here: PLC) is insolvent, creditor *A* (here: LB Holdings) can prove for the full amount of the debt, notwithstanding that creditor *A* has received part payment from guarantor *C* (here LBHI).

(2)    However, where there has been an assignment of creditor *A*'s claims against principal debtor *B* to guarantor *C*, such that *A* drops out of the picture, the effect of the assignment (*pace* Deutsche Bank) is to re-write the rule permitting the creditor to prove for the entire amount of the debt.

No authority was cited in support of this proposition. I consider its correctness in the next section, Section F(3)*(d)*.

---

[269] Paragraph 154 of Deutsche Bank's written submissions.
[270] [2011] UKSC 48.

*(d)*     ***The effect of an assignment***

303.    It is difficult to see why an assignment of a debt should cause the assignee's rights in an
insolvency to be any less than those of the assignor. As guarantor, LBHI was not entitled
to prove in PLC's insolvency; as creditor, through the assignment, LBHI came to be so
entitled. There is no logic or reason to Deutsche Bank's argument and – as I have noted
– no authority was cited in support of it.

304.    The Claim C partial discharge argument fails.

**(4)     The Claim D reduction argument**

*(a)     Introduction*

305.    It is now necessary to turn – at least for this point – away from Claim C to Claim D.
Claim D is advanced by GP1 against PLC for monies owed by PLC to LP I, LP II and
LP III under the PLC Sub-Notes.[271]

306.    The parties acknowledged that there was a potentially significant difference between the
PLC Sub-Debt and the PLC Sub-Notes. As Deutsche Bank said in its written
submissions[272] "[b]ecause the maturity date for the PLC Sub-Debt has passed, all parties
agree that (subject to the subordination dispute and the entitlements of the
unsubordinated, unsecured creditors being paid in full) the PLC Sub-Debt will be due
and payable by PLC at its full face value".

307.    There is no similar common ground in relation to the PLC Sub-Notes. LBHI's contention
in this regard was that because the long-stop maturity date for the PLC Sub-Notes is
(respectively) 30 March 2035, 21 September 2035 and 22 February 2036, any claim in
the administration must be treated as a future debt and so, for the purpose of dividend
payments, must be subject to discounting in accordance with the provisions of rule 14.44
of the Insolvency Rules 2016. Rule 14.44 provides:

"(1)    Where a creditor has proved for a debt of which payment is not due at the date of the
declaration of a dividend, the creditor is entitled to the dividend equally with other
creditors, but subject as follows.

(2)    For the purpose of dividend (and no other purpose) the amount of the creditor's admitted
proof must be discounted by applying the following formula –

$$X / 1.05^n$$

where –

(a)     "X" is the value of the admitted proof; and

---

[271] See paragraph 18 above.
[272] At paragraph 200.

     (b)     "n" is the period beginning with the relevant date[273] and ending with the date on which the payment of the creditor's debt would otherwise be due, expressed in years (part of a year being expressed as a decimal fraction of a year)."

**308.** If applicable, this would result in a substantial discount to the face value of the notes as future debts. Essentially, the face value of the claim would be discounted at a rate of 5% back to the relevant date (15 September 2008, being the commencement of the administration) for the purpose of any dividend payments, which would (approximately) mean discounting the PLC Sub-Notes to 27% of their face value.

**309.** A related question is whether, and if so to what extent, interest is payable on the PLC Sub-Notes:

    **(1)**    Apart from the insolvency, interest would be payable on the notes in accordance with their terms. However, by rule 14.23(1) of the Insolvency Rules 2016, interest that would otherwise be paid is not provable after the relevant date.

    **(2)**    It was common ground that statutory interest would be payable from the relevant date to the actual payment of a dividend.

**310.** There are a number of points that fall for consideration:

    **(1)**    First, whether, as a matter of construction, the liability in respect of the PLC Sub-Notes "should not be treated as a future debt at all, but rather as a debt capable of being claimed against PLC in the administration by reference to the full face amount of the PLC Sub-Notes".[274] It was contended that such an outcome – effectively an acceleration of the debt – could be achieved through the construction of the contract, the implication of a term, or by way of the rule in *Ex parte James*.

    **(2)**    Secondly, and alternatively, whether the liability in respect of the PLC Sub-Notes is a provable debt at all. As to this, Deutsche Bank contended:[275]

        "…the liability in respect of the PLC Sub-Notes is not in fact a provable future debt at all. The effect of the subordination provisions is that the PLC Sub-Notes debt is not a provable debt and, as such, none of the rules (including Rule 14.44) is applicable. The claim in respect of the PLC Sub-Notes therefore cannot be discounted, alternatively can only be discounted at a current commercial rate…"

        Thus, Deutsche Bank contended that because the debt was subordinated, it was not provable and that therefore the rules set out above regarding discounting and interest would simply not apply.[276]

---

[273] This is the commencement of the administration, being (in this case) 15 September 2008: see Rule 14.1(3) of the Insolvency Rules 2016.

[274] Paragraph 206(1) of Deutsche Bank's written submissions.

[275] Paragraph 206(2) of Deutsche Bank's written submissions.

[276] Paragraph 206(2) of Deutsche Bank's written submissions.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

(3)   Thirdly, Deutsche Bank contended that the contractual claim for future interest in respect of the PLC Sub-Notes was also capable of being admitted as a future liability for distribution purposes:[277]

"…to the extent that PLC's liability in respect of the PLC Sub-Notes is treated as a future debt, PLC's liability for future interest in respect of the PLC Sub-Notes until the date such liability falls due is also capable of being admitted as a future liability for distribution purposes. In particular, to the extent that any claim is respect of the PLC Sub-Notes is provable, that claim for future interest is not barred from proof on the proper construction of Rule 14.23(1)…"

311.   Although Deutsche Bank addressed these points in the order set out in paragraph 310 above, I propose to consider, first, whether the debt under the PLC Sub-Notes is provable or not; and the other questions after this, initial, question.

**(b)   Is the debt under the PLC Sub-Notes a provable debt?**

312.   It was Deutsche Bank's contention that the effect of the subordination provision in the PLC Sub-Notes Circular rendered the debt a non-provable debt.[278] I consider the detail of the subordination provisions in the PLC Sub-Notes Circular below, when considering the question of priority. The question of the general effect of subordination provisions was considered in Section E above. As regards both contingent debt subordination and simple contractual subordination, I have concluded that the subordinated debt continues to be a provable debt.[279] I therefore reject Deutsche Bank's contentions in this regard.

313.   It therefore follows that the rules that apply to provable debts apply in the case of the PLC Sub-Notes. In particular, if (contrary to Deutsche Bank's submissions, considered below) the debts under the PLC Sub-Notes are future debts, rule 14.44 of the Insolvency Rules 2016 applies.

**(c)   Is the debt under the PLC Sub-Notes a future debt?**

314.   The four sets of PLC Sub-Notes have maturity dates set well into the future.[280] As Deutsche Bank notes,[281] "[w]hat the PLC Sub-Notes lack as a matter of drafting is an express acceleration clause providing that the PLC Sub-Notes will become immediately due and repayable at their principal amount (along with any arrears of interest) in the event that the Issuer enters a form of distributing insolvency".

315.   Notwithstanding this omission, Deutsche Bank contends:[282]

"…if the terms of the PLC Sub-Notes are analysed in detail, the only coherent result that can be arrived at (whether as a matter of construction or implication of terms, or otherwise) is that, if any payment is to be made by the Issuer now, prior to the Maturity Date, in respect of the PLC Sub-Notes, it must be referable to a currently due claim in the full face amount of the PLC Sub-

---

[277] Paragraph 206(3) of Deutsche Bank's written submissions.

[278] See paragraphs 250*ff* of Deutsche Bank's written submissions.

[279] See paragraph 111(1) (contingent debt subordination) and paragraph 122 above (simple contractual subordination).

[280] See paragraph 18 above.

[281] Paragraph 208 of Deutsche Bank's written submissions.

[282] Paragraph 209 of Deutsche Bank's written submissions.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

Notes. Anything else (including treating the debt as being a future debt in the insolvency of PLC in respect of which dividends can be paid on a discounted basis) would contradict the express terms of the PLC Sub-Notes, in particular Condition 6(d), and be wholly uncommercial."

316.   I do not consider this contention to be seriously sustainable, for the following reasons:

(1)   The PLC Sub-Notes are carefully drafted documents which GP1 acquired on the "take-it or leave-it" basis that underlies note issues. In these circumstances, there are limits to the extent to which an acceleration clause, admittedly not present in the express wording, can be implied.

(2)   That is particularly so where an insolvency regime that must have been under consideration by the drafter makes express provision for the manner in which future debts are to be proved. It defies understanding that – by some oversight – the effect of rule 14.44 was overlooked. It seems to me that the more natural inference is that the drafter intended the natural consequences of the words used. In these circumstances, there can be no question of the implication of an acceleration clause (or equivalent).

(3)   Of course, if – according to the true construction of the words used in the PLC Sub-Notes Circular – the debt is accelerated and is not, therefore, a future debt, then effect must be given to this. But, in my judgment, nothing less than a clear intention derived from the wording, objectively construed, will do.

(4)   Turning, then, to the provisions of the PLC Sub-Notes Circular:

(a)   Clause 6(a) provides:

"*Scheduled redemption:* Unless previously redeemed, or purchased and cancelled, the Notes will be redeemed at their principal amount on 30 March 2035 (the "Maturity Date"), subject as provided in Condition 3 (*Status and Subordination*) and Condition 7 (*Payments*)."

(b)   Neither Condition 3 nor Condition 7 makes any provision for other forms of redemption. Condition 6(e) deals with the purchase of the Notes, and Condition 6(f) with their cancellation. Conditions 6(b), (c) and (d) then deal further with redemption.

(c)   Condition 6(b) provides for redemption for tax reasons, where certain pre-conditions have been met (notably that the Issuer has become obliged, through a change in the tax regime, to pay additional amounts by way of taxation).

(d)   Condition 6(c) provides:

"*Redemption at the option of the Issuer:* The Notes may be redeemed at the option of the Issuer in whole, but not in part, at any time on or after 30 March 2010 (the date of redemption being the "Call Settlement Date") at a redemption price equal to 100 per cent of their principal amount plus accrued interest (if any) up to but excluding the Call Settlement Date on the Issuer's giving not less than 15 nor more than 30 days' notice to the Noteholders (which notice shall be irrevocable and shall oblige the Issuer to redeem the Notes on the Call Settlement Date at such price plus accrued interest to such date)."

122

(e)    Condition 6(d) provides:

"*No other redemption:* The Issuer shall not be entitled to redeem the Notes otherwise than as provided in paragraphs (a) (*Scheduled redemption*) to (c) (*Redemption at the option of the Issuer*) above."

(5)    It is clear that condition 6 provides a complete code for the redemption, purchase or cancellation of the Notes. I can see no arguable basis for re-writing these provisions to turn what is clearly a future debt into a present one.

## (d)    *Interest*

317.    Rule 14.23 of the Insolvency Rules 2016 provides:

"(1)    Where a debt proved in insolvency proceedings bears interest, that interest is provable as part of the debt except in so far as it is payable in respect of any period after the relevant date.

(2)    In the circumstances set out below the creditor's claim may include interest on the debt for periods before the relevant date although not previously reserved or agreed.

(3)    If the debt is due by virtue of a written instrument and payable at a certain time, interest may be claimed for the period from that time to the relevant date.

(4)    If the debt is due otherwise, interest may only be claimed if demand for payment of the debt was made in writing by or on behalf of the creditor, and notice was delivered that interest would be payable from the date of the demand to the date of payment, before –

(a)    the relevant date, in respect of administration or winding up; or

(b)    the presentation of the bankruptcy petition or the bankruptcy application.

…"

318.    This provision makes clear that future interest that would otherwise be payable in the future is not provable <u>after</u> the relevant date. As described above, the relevant date is the commencement of the administration, being (in this case) 15 September 2008.[283] I do not see how this provision can be circumvented: its terms are clear. What is more, I can see no reason in justice why it should be circumvented in the manner suggested by Deutsche Bank, for to do so would be to undermine the intention behind the statutory scheme contained in the Insolvency Rules. As to this:

(1)    Rule 14.23(7) of the Insolvency Rules 2016 provides:

"In an administration –

(a)    any surplus remaining after payment of the debts proved must, before being applied for any other purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the relevant date;

---

[283] See footnote 269 above; and Rule 14.1(3) of the Insolvency Rules 2016.

(b)    all interest payable under sub-paragraph (a) ranks equally whether or not the debts on which it is payable rank equally; and

(c)    the rate of interest payable under sub-paragraph (a) is whichever is the greater of the rate specified under paragraph (6) and the rate applicable to the debt apart from the administration."

Rule 14.23(6) specifies the default rate of interest as that specified under section 17 of the Judgments Act 1838.

(2)    There is thus good reason for ensuring that interest is not paid on a provable debt from the relevant date, save in accordance with rule 14.23(7). In the first place, were the contrary to be the case, there would be double recovery of interest, because it is difficult to see how rule 14.23(7) could be disapplied were interest to be paid after the relevant date other than pursuant to rule 14.23(7). Secondly, the policy behind the rules is very clear: provable debts are, in an administration, treated equally in terms of the interest they recover, save as regards rate, where the default rate under the Judgments Act 1838 may be overtaken by a higher agreed rate.

319.    Finally, Deutsche Bank sought to invoke the rule in *Ex parte James*.[284] The effect of this decision has, most recently, been explained in the decision of the Court of Appeal in *Lehman Brothers Australia Ltd (in liquidation) v. MacNamara*.[285] David Richards LJ stated:[286]

"The principle established by the decision of the Court of Appeal in *Ex parte James* is that the court will not permit its officers to act in a way which, although lawful and in accordance with enforceable rights, does not accord with the standards which right-thinking people or, as it may be put, society would think should govern the conduct of the court or its officers. The principle applies to a failure to act, as much as to positive acts: see *Re Hall* [1907] 1 KB 875, a decision of this court. As a public authority and given its role in society, the court is expected to apply standards to its own conduct which may go beyond bare legal rights and duties."

320.    I am afraid I can see no basis for the invocation of the rule in *Ex parte James*. Essentially, what Deutsche Bank is asking me to do is to prefer its interests over those of other, rival, claimants to the Fund, in circumstances where Deutsche Bank – or, rather, the party through which it claims, GP1 – has no legal entitlement. That, as it seems to me, is entirely <u>in</u>consistent with the standards of right-thinking people.

*(e)    Conclusion*

321.    For all these reasons, the Claim D reduction argument fails.

---

[284] (1874) LR 9 Ch App 609.

[285] [2020] EWCA Civ 321.

[286] At [35].

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

## (5)   Claim C: the subordination provisions in the PLC Sub-Debt Agreements

### (a)   *Form and content of the agreements*

### (i)   *Regulatory irregularity?*

322.  In form, the PLC Sub-Debt Agreements are very similar to the LBHI2 Sub-Debt Agreements that comprise Claim A. They contain the same three Sections – Sections A, B and C – and broadly similar – although not identical – terms. I have considered the differences that do exist: I am satisfied that these differences, in themselves, are not material to the question of ranking that I am now considering.

323.  On the other hand, these differences <u>are</u> sufficient to render the PLC Sub-Debt Agreements non-standard when considered in relation to the form followed by the LBHI2 Sub-Debt Agreements. That form, it will be recalled, was laid down in IPRU(INV)10,[287] and the form followed by the LBHI2 Sub-Debt Agreements was IPRU(INV) FORM 10.6.

324.  The reason for the failure to follow in all respects the standard form was explored in cross-examination of Ms Hutcherson by Ms Hilliard, QC.[288] Ms Hutcherson, entirely unsurprisingly, could give no direct evidence as to why this might be the case. She did, however, seek to explain why this might be the case. Her first explanation was that an error had been made.[289] Her second was that this might have been a case where the standard forms did not have to be used.[290]

325.  Both explanations are possible. The fact is that someone in the Lehman Group took IPRU(INV) FORM 10.6, and then varied it or caused it to be varied in a manner beyond that permitted if *(i)* the regulatory capital regime applied; and *(ii)* this was intended to be regulatory capital. As I have noted, the standard form envisaged only that the Section B variable terms could and would be altered,[291] and these changes went beyond that.

326.  Whilst it is possible that a standard form for regulatory capital was used – albeit with some changes – in a case where the standard form was not in fact required, it seems to me more likely that changes were made in circumstances where the standard form should have been adhered to, but was not. If so, then this was regulatory capital that was not compliant with the rules.

327.  I raise this point so that I can dismiss it for the purposes of this Judgment. Even assuming the form of the PLC Sub-Debt Agreements was deficient, the most that this could have done was rendered what the Lehman Group <u>intended</u> as regulatory capital not regulatory capital. Obviously, that would or might be serious in the regulatory context, but any such deficiency would sound only in the regulatory context and would not otherwise affect the obligations arising under the PLC Sub-Debt Agreements.[292] In short, the rules regarding

---

[287] See paragraph 132 above.

[288] Day 2/pp.51*ff* (cross-examination of Ms Hutcherson).

[289] Day 2/p.55 and p.70 (cross-examination of Ms Hutcherson).

[290] Day 2/pp.71-72 (cross-examination of Ms Hutcherson).

[291] See paragraphs 126*ff* above.

[292] See paragraphs 16 above

regulatory capital, and their potential breach, have no bearing on the questions of subordination that I must address.

*(ii)   The relevant provisions of the PLC Sub-Debt Agreements*

328.   As I have described,[293] there were three PLC Sub-Debt Agreements. Although there are variations between the three agreements, these are not material for the purposes of subordination. The following description is based upon the first PLC Sub-Debt Agreement referenced in paragraph 16 above.

329.   Paragraph 5 of this agreement concerns subordination, and paragraphs 5(1) and 5(2) must be set out in full. As before, I have numbered the various "phrases" of the clause for ease of reference:

"(1)   **[1]** Notwithstanding the provisions of paragraph 4, the rights of the Lender in respect of the Subordinated Liabilities are subordinated to the Senior Liabilities **[2]** and accordingly **[3]** payout of any amount (whether principal, interest or otherwise) of the Subordinated Liabilities is conditional upon –

(a)   **[4]** (if an order has not been made or an effective resolution passed for the Insolvency of the Borrower and, being a partnership, the Borrower has not been dissolved) the Borrower being in compliance with not less than 120% of its Financial Resources Requirement immediately after payment by the Borrower and accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that –

i.   paragraph 4(3) has been complied with; and

ii.   the Borrower could make such payment and still be in compliance with such Financial Resources Requirement; and

(b)   **[5]** the Borrower being "solvent" at the time of, and immediately after, the payment by the Borrower and accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that the Borrower could make such payment and still be "solvent".

(2)   **[6]** For the purposes of sub-paragraph (1)(b) above, the Borrower shall be "solvent" if it is able to pay its Liabilities (other than the Subordinated Liabilities) in full disregarding–

(a)   obligations which are not payable or capable of being established or determined in the Insolvency of the Borrower, and

(b)   the Excluded Liabilities."

*(b)   Factual background*

330.   For the same reasons given in paragraph 161 above, I find that the evidence given in relation to the drafting of these notes does not assist in relation to the issues of construction that I must consider.

---

[293] See paragraphs 10-11 above.

**(c)**    ***Operation of the subordination provisions***

**(i)**    *Phrase [1]: simple contractual subordination*

331.    Phrase **[1]** contains a simple contractual form of subordination, whereby the rights of the Lender (LB Holdings) in respect of the Subordinated Liabilities are subordinated to the Senior Liabilities.

332.    Phrase **[1]** is in terms very similar to those in the LBHI2 Sub-Debt Agreements. The defined terms used are defined in Section C. Notwithstanding their similarity to the provisions of the LBHI2 Sub-Debt Agreements, I set out these defined terms below:

(1)    "Liabilities" is defined as "all present and future sums, liabilities and obligations payable or owing by the Borrower (whether actual or contingent, jointly or severally or otherwise howsoever)".

(2)    "Senior Liabilities" are "all Liabilities except the Subordinated Liabilities and Excluded Liabilities".

(3)    "Subordinated Liabilities" are "all Liabilities to the Lender in respect of each Advance made under the Agreement and all interest payable thereon".

(4)    "Excluded Liabilities" are "Liabilities which are expressed to be and, in the opinion of the Insolvency Officer, do, rank junior to the Subordinated Liabilities in any Insolvency[294] of the Borrower".

**(ii)**    *Phrase [3]: contingent debt subordination*

333.    The contingent debt subordination provision begins at phrase **[3]**. As with the LBHI2 Sub-Debt Agreements, there are in fact two contingencies, in paragraph 5(1)(a) (phrase **[4]**) and in paragraph 5(1)(b) (phrase **[5]**).

334.    The first contingency (phrase **[4]**) is not applicable because an order has been made for the Insolvency of the Borrower. The second contingency (phrase **[5]**), which is a solvency condition, does however apply. Payment of the Subordinated Liabilities can only be made if the Borrower is solvent according to the test laid down in phrase **[6]**.

**(iii)**    *"accordingly"*

335.    For the reasons given in paragraph 172, I consider that the subordination provisions are to be read cumulatively, and that the PLC Sub-Debt Agreements contain <u>both</u> a simple contractual subordination provision and a contingent debt subordination provision.

---

[294] "Insolvency" means and includes "liquidation, winding up, bankruptcy, sequestration, administration, rehabilitation and dissolution (whichever term may apply to the Borrower) or the equivalent in any other jurisdiction to which the Borrower may be subject."

**(6)**    **Claim D: the PLC Sub-Notes**

*(a)*    *Form and content*

336.    GP1 is the holder of the PLC Sub-Notes, which (by way of shorthand) I refer to as Claim D. The Notes were issued by PLC, and there were four issues of PLC Sub-Notes. Their terms are materially the same: for purposes of quotation, I use the first PLC Sub-Notes Circular, described in paragraph 18(1) above.

337.    The subordination provision is at condition 3 and provides as follows (again, marking out the distinct "phrases" in the provision):

"**Status and Subordination**

(a)    **[1]** The [PLC Sub-Notes] constitute direct, unsecured and subordinated obligations of the Issuer and **[2]** the rights and claims of the Noteholders against the Issuer rank *pari passu* without any preference among themselves. **[3]** The rights of the Noteholders in respect of the Notes are subordinated to the Senior Liabilities **[4]** and accordingly **[5]** payment of any amount (whether principal, interest or otherwise) in respect of the Notes is conditional upon:

   (i)    **[6]** (if an order has not been made or an effective resolution passed for the Insolvency of the Issuer) **[7]** the Issuer being in compliance with not less than 100 per cent of its Financial Resources Requirement immediately after such payment, **[8]** and accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that (a) Condition 3(d) or Condition 3(g), as the case may be, has been complied with; **[9]** and (b) the Issuer could make such payment and still be in compliance with such Financial Resources Requirements; **[10]** and

   (ii)    **[11]** the Issuer being solvent at the time of, and immediately after, such payment, **[12]** and accordingly no such amount which would otherwise fall due for payment shall be payable except to the extent that the Issuer could make such payment and still be solvent.

(b)    **[13]** For the purposes of Condition 3(a) above, **[14]** the Issuer shall be "solvent" if it is able to pay its Liabilities (other than the Subordinated Liabilities) in full disregarding (i) **[15]** obligations which are not payable or capable of being established or determined in the Insolvency of the Issuer, and (ii) **[16]** the Excluded Liabilities.

(c)    **[17]** For the purposes of Condition 3(b) above, **[18]** prior to the Insolvency of the Issuer, a report given at any relevant time as to the solvency of the Issuer by the Auditors, and **[19]** on or after the Insolvency of the Issuer a report given at any relevant time as to the solvency of the Issuer by its Insolvency Officer, **[20]** in each case in form and substance acceptable to the FSA, shall in the absence of manifest error be treated and accepted by the FSA, the Issuer and the Noteholders as correct and sufficient evidence of the Issuer's solvency or Insolvency."

*(b)*    *Factual background*

338.    For the same reasons given in paragraph 161 above, I find that the evidence given in relation to the drafting of these notes does not assist in relation to the issues of construction that I must consider.

128

### (c)  *Operation of the subordination provisions*

### (i)  *Phrases [1] and [2]*

**339.**  Phrases **[1]** and **[2]** deal only with the rights of the Noteholders *inter se*. This is similar to the approach taken in the case of the LBHI2 Sub-Notes, which were, however, concluded subsequent to the PLC Sub-Notes.[295]

### (ii)  *Phrase [3]*

**340.**  Phrase **[3]** is a form of simple contractual subordination, subordinating the rights of Noteholders in respect of the Notes to the Senior Liabilities.

**341.**  "Senior Liabilities" is a defined term in the PLC Sub-Note Circular,[296] defined as "all Liabilities except the Subordinated Liabilities and Excluded Liabilities". Senior Liabilities thus references a number of other defined terms, notably:

**(1)**  "Liabilities", being "all present and future sums, liabilities and obligations payable or owing by the Issuer (whether actual or contingent, jointly or severally or otherwise howsoever)".

**(2)**  "Subordinated Liabilities", being "all Liabilities to Noteholders in respect of the Notes and all other Liabilities of the Issuer which rank or are expressed to rank *pari passu* with the Notes".[297]

**(3)**  "Excluded Liabilities", being "Liabilities which are expressed to be and, in the opinion of the Insolvency Officer do, rank junior to the Subordinated Liabilities in any Insolvency of the Issuer".

**342.**  It will readily be noted that these terms are similar to those of the LBHI2 and PLC Sub-Debt Agreements described above.[298] There is, however, a significant difference in the drafting of the definition of "Subordinated Liabilities". In the LBHI2 and PLC Sub-Debt Agreements, "Subordinated Liabilities" are defined as "all Liabilities to the Lender in respect of each Advance made under the Agreement and all interest payable thereon". That definition is <u>not</u> followed in the case of the PLC Sub-Notes. That is because the debt created in the case of the PLC Sub-Notes does not arise out of an <u>agreement</u>, but out of individual and legally distinct notes. That fact has required an adjustment to the definition of "Subordinated Liabilities" in the case of the PLC Sub-Notes. However, the reference to "all other Liabilities of the Issuer" – which I have emphasised in the quotation in paragraph 341(2) above – appears to go beyond this, and were words to which Deutsche Bank attached particular significance.

---

[295] The offering circular in the case of the LBHI2 Sub-Notes is dated 26 April 2007, and the offering circulars in the case of the PLC Sub-Notes are variously dated 29 March 2005, 19 September 2005, 26 October 2005 and 20 February 2006. It may well be that the earlier circulars were used as a precedent or source for the later, but no party sought to make anything of this, and in my judgment, they were right not to do so.

[296] Defined terms are set out in Condition 1 of the Circular.

[297] Emphasis added.

[298] See paragraphs 141 and 332 above.

343.  The effect of this simple contractual subordination provision is that the rights of Noteholders in respect of the Notes rank <u>behind</u> all Liabilities <u>except</u>:

(1)  Liabilities that rank or are expressed to rank *pari passu* with the Notes (i.e. Subordinated Liabilities);

(2)  Liabilities that rank junior to the Notes (i.e. Excluded Liabilities).

*(iii)  Phrase [5]*

344.  Phrase [5] is a form of contingent debt subordination, linked to phrase [3] by the "accordingly" in phrase [4]. This sort of link is one that we have come across before, and I apply the same meaning to the word.

345.  The contingency in phrase [5] involves two, cumulative, conditions, set out in condition 3(a)(i) (beginning at phrase [6]) and condition 3(a)(ii) (beginning at phrase [11]).

346.  The first condition only applies where "an order has not been made or an effective resolution passed for the Insolvency of the Issuer" (phrase [6]). "Insolvency" is a defined term, and that definition is a broad one.[299] In this case, given the administration of PLC, this condition does not apply, and can be disregarded.

347.  The second condition, condition 3(a)(ii) is a solvency condition. The Issuer must be solvent at the time of the payment and the payment itself must not make the Issuer not solvent (see phrases [11] and [12]).

348.  What constitutes "solvency" is itself set out in condition 3(b), beginning at phrase [13]. The Issuer (PLC) will be solvent if it is able to pay its Liabilities, other than Subordinated Liabilities, in full, disregarding:

(1)  Obligations which are not payable or capable of being established or determined in the insolvency (phrase [15]); and

(2)  The Excluded Liabilities (phrase [16]).

**(7)    The priority dispute between Claim C and Claim D**

*(a)    Introduction*

349.  My approach is the same as that adopted in resolving earlier questions of relative priority. I consider first the operation of the subordination provisions in Claim C as regards Claim D (in Section G(7)*(b)* below); I then consider the converse question (in Section G(7)*(c)* below); finally, to the extent necessary (in Section G(7)*(d)* below), I consider questions of circuity.

---

[299] "Insolvency" is defined as meaning and including "liquidation, winding up, bankruptcy, sequestration, administration, rehabilitation and dissolution (whichever term may apply to the Issuer) or the equivalent in any other jurisdiction to which the Issuer may be subject)".

Approved judgment                                          Lehman Brothers Holdings plc (in administration) and others
Mr Justice Marcus Smith

**(b)    The operation of the subordination provisions in Claim C as regards Claim D**

350.    As I have described,[300] Claim C combines a simple contractual subordination provision
with a form of contingent debt subordination. I consider the two in turn below.

*(i)    Simple contractual subordination*

351.    The rights of the Lender (LB Holdings) are Subordinated Liabilities, and these liabilities
are subordinated to Senior Liabilities (phrase **[1]**). Senior Liabilities comprise all
liabilities except the Subordinated Liabilities and Excluded Liabilities.[301]

352.    The rights under Claim D <u>cannot</u> constitute Subordinated Liabilities as understood by
Claim C as they do not arise under any of the agreements comprising Claim C, i.e. they
cannot constitute an "Advance made under the Agreement". Unless the rights under
Claim D are Excluded Liabilities, they <u>must</u> be Senior Liabilities.

353.    Excluded Liabilities are "Liabilities which are expressed to be and, in the opinion of the
Insolvency Officer, do, rank junior to the Subordinated Liabilities in any Insolvency of
the Borrower". The parties were agreed that the view of the court would inform the
opinion of the Insolvency Officer, so the question is whether Claim D expresses itself to
be, and is, junior to the Subordinated Liabilities.

354.    This definition requires ("expressed to be") reference to the terms of Claim D. The
relevant part is the simple contractual subordination part, which serves to express where
Claim D ranks in terms of priority.

355.    According to Claim D, the Noteholders' rights are subordinated to the Senior Liabilities
(phrase **[3]**, paragraph 341 above), which bears exactly the same definition as in Claim
C. Senior Liabilities are all Liabilities <u>except</u> Subordinated Liabilities and Excluded
Liabilities.

356.    However, as I noted in paragraph 342, the definition of the term Subordinated Liability
in Claim D is not on all fours with the definition of that term in Claim C. The question is
whether this makes a difference. The question is this:

*Is Claim C a Liability of the Issuer ranking or expressed to rank pari passu with the
Notes?*

Given that Claim C is subordinated debt and is not expressed to rank *pari passu* with the
PLC Sub-Notes, this definitional difference makes no difference to the outcome.  Claim
C is <u>not</u> a Subordinated Liability as understood and defined by Claim D.

357.    The definition of an Excluded Liability presents more difficulty. This question is, in fact,
the one considered in the context of Claims A(i), A(ii) and A(iii) above.[302] For exactly
those reasons, Claim D is not an Excluded Liability for the purposes of Claim C and *vice
versa*. Each – viewed through the prism of the other's subordination provisions – ranks
as a Senior Liability.

---

[300] See paragraph 335 above.
[301] The definition is set out at paragraph 332 above.
[302] See paragraph 151 above.

358.    In short, because of the similarity in the simple contractual subordination provisions, the never-ending race to the bottom of the waterfall is created as between Claims C and D. According to its own provisions, Claim C ranks below Claim D: but, because that is precisely what Claim D says about Claim C, the conclusion is a meaningless one.[303]

*(ii)    Contingent debt subordination*

359.    The relevant contingency is the solvency condition described in paragraphs 344*ff* above. The satisfaction of the solvency condition depends upon the exact figures, which will be known to the PLC Administrators, but which are not known to me. The table below sets out <u>how</u> satisfaction of the solvency condition is to be determined. Instead of figures, letter symbols are used:

| Description | Value/calculation |
| --- | --- |
| Total Liabilities of PLC | *A* |
| <u>Deduct</u> | |
| Subordinated Liabilities, which are the liabilities under (as the case may be) one of the PLC Sub-Debt Agreements | *B* |
| Obligations not capable of being established | *C* |
| Excluded Liabilities | *D* |
| | |
| **Liabilities for the purpose of the solvency condition = *A − (B + C + D)*** | ***E*** |

<u>Table 7</u>: Testing whether the solvency condition in Claim C is met

360.    Excluded Liabilities do not, given the conclusion I have reached, include Claim D. But there may be other Liabilities that are Excluded Liabilities within the meaning of this provision. This reflects the fact that whereas simple contractual subordination relates to the relative ranking between two specific obligations, this solvency condition is focussed on the position of PLC as a whole.

***(c)    The operation of the subordination provisions in Claim D as regards Claim C***

*(i)    Simple contractual subordination*

361.    These provisions are materially the same as the subordination provisions in Claim C. According to its own provisions, Claim D ranks below Claim C: but, because that is precisely what Claim C says about Claim D, the conclusion is a meaningless one.

*(ii)    Contingent debt subordination*

362.    The relevant contingency is the solvency condition, which again is similar in operation to that already described in relation to Claim C.

---

[303] For these reasons, seeking to set out the operation of the provisions in diagrammatic form is not a helpful undertaking.

*(d)*    **Circuity**

**363.**    This is a case of circuity. According to Claim C, it ranks below Claim D. According to Claim D, it ranks below Claim C. There is precisely the same race to the bottom that arises in relation to Claims A(i), A(ii) and A(iii).

**364.**    As has been described in relation to these Claims, there are actually two issues that arise:

(1)    First, the question of the priority attributed to the competing claims by virtue of the operation of the simple contractual subordination provisions.

(2)    Secondly, and relatedly, the question of the operation of the solvency provisions.

These questions were considered – and resolved – in Section F(7) above,[304] and that resolution pertains equally here. The "race to the bottom" is broken in the manner described in paragraphs 248*ff* above and Claim C and Claim D rank *pari passu*. That characterisation of their priority is read into the operation of the solvency provisions in the manner described in paragraphs 253*ff*.

## H.    THE DIVIDEND STOPPER

### (1)    Deutsche Bank's interest

**365.**    Deutsche Bank – as I have described – derives its interest in Claim D prevailing over Claim C because it is a significant holder (through its account with Euroclear) of ECAPS.[305] ECAPS are preferred securities issued by the Partnerships. The Partnerships used the proceeds of issuing the ECAPS to the market to subscribe to the PLC Sub-Notes.[306]

### (2)    The "Dividend Stopper" argument

**366.**    Deutsche Bank's "dividend stopper" argument – which I shall presume, for the sake of explanation but without presently deciding the point, to be relevant as part of the "factual matrix"[307] – goes like this:

(1)    According to the ECAPS offering circulars[308] distributions to ECAPS holders like Deutsche Bank will be made "only if the Issuer has received sufficient funds under the [PLC Sub-Notes]".[309]

(2)    Moreover, Holders have no right to be paid if the General Partner (that is, GP1) published a "No Payment Notice".[310] GP1 had considerable discretion in issuing a No Payment Notice.

---

[304] Paragraphs 245*ff* above.

[305] Deutsche Bank written opening submissions at paragraph 34.

[306] Deutsche Bank written opening submissions at paragraph 35.

[307] I consider this point further below.

[308] As with the other instruments, there were several materially similar versions of the ECAPS offering circulars. I refer, for the purposes of this Judgment, to that dated 29 March 2005.

[309] See condition 2.3 and paragraph 36(1) of Deutsche Bank's written submissions.

[310] See condition 2.4 and paragraph 36(2) of Deutsche Bank's written submissions.

(3)     The discretionary nature of the obligation to pay Distributions enabled "beneficial treatment for LBHI's regulatory capital and ratings purposes".[311] As Mr Katz put it:[312]

> "It was a key feature of the structure that the PLC Note was treated as debt for tax purposes, in order that the coupon payments to LP I were deductible for UK tax purposes and that, on a consolidated basis, LBHI could treat the interest coupons for US tax purposes as a debt expense. It was equally key that the ECAPS securities had equity-like features in order that they could be treated as equity for ratings and regulatory capital purposes at LBHI. These features included a right (and full discretion) for LBHI, through its control of the general partner of LP I, to cause a "No Payment Notice" to be published at any time and for any reason, following which the holders were not entitled to receive distributions based upon the coupon payments received by the LP from LBH. Instead, the coupon payments would be paid to an entity controlled by LBH."

What is very clear is that both the PLC Sub-Notes and the ECAPS were very carefully crafted instruments designed to maximise the efficiency (in terms of cost) of these instruments to both the Lehman Group and the holders of ECAPS. The parties were prepared to sanction provisions that might otherwise be regarded as uncommercial – like the "No Payment Notice" – in furtherance of this end.

(4)     The Partnerships are constituted by **Limited Partnership Agreements** to which LBHI was a party. Clause 18(1) of these Agreements provided that:

> "18.1   **Dividend stopper**
>
>         LBHI undertakes that, in the event that any Distribution is not paid in full, it will not:
>
>         (a)     declare or pay any dividend on its shares of common stock; or
>
>         (b)     repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,
>
>         until such time as Distributions on the Preferred Securities have been paid in full for one year."

(5)     Unsurprisingly, I shall refer to this provision as the **Dividend Stopper**. As Mr Katz himself recognised, triggering the Dividend Stopper would have been extremely damaging to the Lehman Group:[313]

> "As a commercial matter, it would have been extremely damaging to the Lehman Group if a dividend stopper had been activated. The consequences to LBHI and the US group would have been especially damaging if the US group was otherwise financially healthy, and the dividend stopper had been triggered solely because of a liquidity issue at PLC."

Thus, the discretionary nature of the right to receive Distributions (which was used to obtain the advantages described in paragraph 366(3) above) was limited, not as a matter of law, but as a matter of commercial practicality, by the Dividend Stopper.

---

[311] To quote from paragraph 37 of Deutsche Bank's written submissions.

[312] Katz 1/§13.

[313] Katz 1/§16.

One can imagine the lengths that LBHI would go to to avoid triggering the Dividend Stopper, and this obviously would act as a kind of (commercial) assurance to ECAPS holders that Distributions would, in fact, be made.[314]

(6)     Of course, LBHI could only go to lengths to avoid triggering the Dividend Stopper in a <u>solvent</u> situation. At this point, Deutsche Bank draw a distinction between <u>LBHI's</u> solvency and <u>PLC's</u> solvency:[315]

"It is accepted that the incentive of the Dividend Stopper and avoiding a public default would apply only for so long as LBHI was solvent and otherwise intending to pay dividends or to repurchase its listed stock. <u>Importantly, however, the Dividend Stopper could be triggered even if LBHI was financially healthy. This is because, as set out above, payments under the ECAPS were conditional on PLC's ability to make payments under the PLC Sub-Notes, and not on LBHI's solvency.</u>"

I entirely accept the correctness of this paragraph. But it entirely ignores the point made by Mr Katz of deleterious consequences <u>to LBHI</u> of permitting this to occur. The whole point of the Dividend Stopper, as I see it, was to create a <u>commercial</u> incentive on LBHI to ensure that PLC <u>could pay</u>.[316]

367.    Of course, in the present case LBHI <u>is</u> insolvent, and cannot pay. Deutsche Bank contends that the subordination provisions in the PLC Sub-Notes and the PLC Sub-Debts, and the relative ranking of the obligations in those instruments, must be construed in light of the Dividend Stopper.[317] Deutsche Bank also contends that the Dividend Stopper informs the relative ranking of LBHI2's subordinated debts.[318]

368.    The arguments advanced by Deutsche Bank bear no reference to the terms of the instruments themselves, and simply make contentions regarding the commerciality of the operation of these provisions. Before considering how far such matters can be relevant at all to construction, it is necessary to summarise the evidence adduced in relation to this point.

## (3)     Evidence relating to the Dividend Stopper argument

### (a)     The evidence: an overview

369.    A considerable amount of evidence was adduced both in support of and in opposition to the Dividend Stopper argument. Specifically, the evidence going to this point was:

(1)     The evidence of Mr Katz.

(2)     The evidence of Mr O'Grady.

---

[314] A point accepted by Deutsche Bank: see Deutsche Bank's written submissions at paragraph 38.

[315] Quoting, here, from paragraph 39 of Deutsche Bank's written submissions, but with emphasis supplied.

[316] As noted above, quotations have footnotes omitted. Paragraph 39 of Deutsche Bank's submissions references Katz 1/§16, quoted above.

[317] Deutsche Bank's written submissions at paragraphs 40-43.

[318] Deutsche Bank's written submissions at paragraphs 44-50.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

*(b)*   ***The evidence of Mr Katz***

370.   In Katz 1, Mr Katz described the nature of the ECAPS issue, and concludes:[319]

"In the case of ECAPS, LBHI would have been strongly commercially incentivised to ensure that PLC was able to make its interest payments on the PLC Note. Unlike interest on purely internal subordinated debt, the failure to pay coupon to the ECAPS issuers would inevitably mean that the dividend stopper would be activated since the LP could only fund distributions from the ECAPS from coupon payments from PLC. For this reason, I recall that the PLC Note (being the subordinated notes that provided cash-flows to the ECAPS issuer partnerships and their only contractual source of funds) would have been prioritised over PLC's other subordinated debt payments to entities in the Lehman group. Furthermore, I do not recall there to have been any commercial reason for the PLC Notes to compete with purely internal subordinated debt."

371.   The commercial incentivisation on LBHI to ensure payments were made is one that I understand and accept. It is the emphasised portion of the foregoing paragraph – which hints at a discussion to prioritise the cash flows to ECAPS – that is harder to understand, and in relation to which Mr Katz's witness statement sheds little light. Unsurprisingly, he was cross-examined about this statement:[320]

| | |
|---|---|
| **Q: Mr Phillips, QC** | …do you mean that if you had considered priorities, you would have prioritised the PLC Sub-Notes over other subordinated liabilities; or are you telling his Lordship you actually recall considering that the Sub-Notes were senior to the Sub-Debt? Are you telling his Lordship you actually recall that? |
| **A: Mr Katz** | I am telling my Lordship – my Lord that – exactly what I am saying here, that I recall that the Sub-Notes were prioritised to the Sub-Debt. |
| **Q: Mr Phillips, QC** | Let's discuss this recollection. What exactly do you recall? Do you recall a conversation? |
| **A: Mr Katz** | It was part of the normal structuring for this variety of transaction, obviously this was a first time, though, it has never been done before this. ECAPS, it was taking a US product, bringing it into the UK, and the Lehman Group in the UK was the first group ever to have used this US structure. |
| | But, having said that, the overall, you know, this type of structure, these type of Tier 1 structures, were commonly used throughout the world at this point in time, and ranking and prioritisation was something that we always discussed and we always made sure that external capital market transactions would rank ahead of internal obligations. |
| **Q: Mr Phillips, QC** | So you recall actual discussions about this? |
| **A: Mr Katz** | Yes, I do. |
| **Q: Mr Phillips, QC** | You do, and do you recall whether those discussions were oral or where they by email? |

Pausing there, Mr Katz, quite understandably, was unable to identify with specificity particular conversations or particular emails. Given the passage of time, and the frailty

---

[319] Katz 1/§18 (emphasis added).

[320] Day 4/pp.39-40 (cross-examination of Mr Katz).

of memory, I would not expect a witness to have such a recollection, particularly when Mr Katz had made clear at the beginning of his cross-examination that he had not reviewed the documents in the case when signing his witness statements.[321]

372.    In these circumstances, it was important to gain a sense of the quality of Mr Katz's recollection:[322]

| | |
|---|---|
| **Q: Mr Phillips, QC** | Okay, so let's be crystal clear. When we look at the emails passing between members of your team, we will see discussion of the Sub-Notes ranking senior to the Sub-Debt, is that right? |
| **A: Mr Katz** | We haven't seen these emails that you are speaking of? |
| **Q: Mr Phillips, QC** | I am talking to you, I am asking you about what we should expect to see. If your evidence is correct, we should see a discussion of the Sub-Notes ranking senior to the Sub-Debt? |
| **A: Mr Katz** | I don't know what to expect and what you haven't shown me. |
| **Q: Marcus Smith J** | Mr Katz, I think it would assist: you have given evidence of actual discussions. We quite understand that time has passed and memory is a frail thing, but you are very clear that there were discussions? |
| **A: Mr Katz** | Yes, absolutely. |
| **Q: Marcus Smith J** | Right. Are you able to be clear as to the form of those discussions? You say there were conversations between you and your team regarding priority? |
| **A: Mr Katz** | Yes. |
| **Q: Marcus Smith J** | You have an actual recollection of such conversations? |
| **A: Mr Katz** | Yes, I do. |
| **Q: Marcus Smith J** | Okay, is there any reason why such conversations would only be conducted orally? |
| **A: Mr Katz** | No, there is no reason why they wouldn't – they probably were – if I had to guess, there probably were emails. Do I remember specific emails on the subject: I do not. But I will also tell you, you know, as you have seen in my witness statements, this transaction was unique. This transaction had a very heavy US tax component to it, and these subordinated notes needed to be respected as debt, and making sure that they were structured as strong as possible was – was a very key ingredient, and hence why I have a very good memory about those discussions. |
| **Q: Marcus Smith J** | Yes, thank you. I mean, obviously this is not a memory test, and no-one is expecting you to recall either the terms of a particular conversation or the terms of a particular email. It is just that, when counsel takes you through the email correspondence, I want to have established on the record that there is no reason for such discussions of priority not to be in the email traffic. |
| **A: Mr Katz** | Yes, there could be. |

---

[321] Day 4/p.3 (cross-examination of Mr Katz). Mr Katz was not specifically asked about his review of documents before giving evidence, but my impression was that the same was true in relation to his preparation to give evidence. That is not, to be clear, intended as a criticism.

[322] Day 4/pp.41-43.

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

| Q: Marcus Smith J | We will see – |
|---|---|
| A: Mr Katz | – I don't, I don't know. There could – |
| Q: Marcus Smith J | I understand. |
| A: Mr Katz | There could well be, there could well not be, emails. I haven't seen the emails yet. |
| Q: Marcus Smith J | But you will, I am sure, be taken to them – |
| A: Mr Katz | Yes. |
| Q: Marcus Smith J | – but there is no reason for this discussion to be confined purely to an oral conversation? |
| A: Mr Katz | Correct. |
| Q: Marcus Smith J | You might equally have had it – you may not – but you might equally have had it by way of email? |
| A: Mr Katz | Yes, absolutely agree. |

373.  I do not believe Mr Katz's evidence that there was any discussion – in whatever format – regarding Sub-Notes ranking senior to Sub-Debt. I disbelieve the evidence for the following reasons:

(1)    It was the evidence of other witnesses (but not Mr Katz) that there was no real sense that the Lehman Group was at risk of insolvency and that there might, therefore, be an issue – as we have here – regarding the ranking, amongst themselves, of different subordinated debt instruments.[323] I consider that the mind-set of persons involved in the creation of subordinated debt instruments for the Lehman Group was not to consider how the instruments would perform in an insolvency situation, but rather to consider how most cheaply and efficiently to deliver subordinated debt that could meet the regulatory capital requirements of the Lehman Group. In other words, my starting point – although, of course, Mr Katz may, exceptionally, have been different – is that the sort of conversations he claims to remember are pretty unlikely to have occurred.

(2)    As Mr Katz's evidence showed, he too focussed on structuring the instruments appropriately. I simply do not believe, without more in the shape of confirmatory documentary evidence, that he would have focussed on the relative priorities of the PLC Sub-Notes as against other forms of subordinated debt, as opposed to the overriding question of ensuring that the PLC Sub-Notes and the ECAPS were as tax efficient as it was possible to make them. It was for those reasons that the No Payment Notice provisions and the Dividend Stopper were framed.

(3)    Unsurprisingly, in these circumstances, there is no contemporaneous documentary evidence to support Mr Katz's recollection that the PLC Sub-Notes were to have relative priority. To the contrary, as Mr Katz's cross-examination shows,[324] this question was either not discussed at all, or else the view was taken in drafting that the PLC Sub-Notes should rank lower in the waterfall of subordinated debt. There is no evidence to support the suggestion that the PLC Sub-Notes should rank below unsubordinated debt, but above other forms of subordinated debt. Obviously, to

_____

[323] See, for example, the evidence of Ms Dolby in Dolby 1/§67. Also Hutcherson 1/§31.
[324] Day 4/pp.56ff (cross-examination of Mr Katz).

achieve this, careful thought would have had to have been given to the drafting. Equally obviously, it was not.

(4)     Mr Katz's insistence on his version of events resulted in his giving profoundly unsatisfactory evidence, that I do not accept. Mr Katz simply did not engage in seeking to explain the documents that demonstrated the contrary to what he was saying.[325] Instead, he persisted – in the face of contrary evidence – in contending that there had been discussions regarding the prioritisation of the PLC Sub-Notes over the PLC Sub-Debt, when there was, quite simply, nothing in the record that could support that view:[326]

| Q: Mr Phillips, QC | Mr Katz, I can help you to this extent. There are no contemporaneous emails that show that the Dividend Stopper was intended to ensure that the Sub-Notes were intended to rank above the PLC Sub-Debt? Do you follow? |
| --- | --- |
| A: Mr Katz | I hear what you are saying. |
| Q: Mr Phillips, QC | And what we have seen is that the opposite was discussed in the emails we have looked at? Yes? |
| A: Mr Katz | What we have seen is the emails that you have produced and that you have found, which we just went through. I don't know if there are others. I do not recollect others. |
| Q: Mr Phillips, QC | Let me help you. |
| A: Mr Katz | But, as I said, we did have a discussion about ranking. |
| Q: Mr Phillips, QC | Yes. Disclosure was given of many thousands of emails passing between your team, yes? I am helping you with this, and not a single email in that disclosure discussed the need for the PLC Sub-Notes to rank senior to the PLC Sub-Debt. Do you follow? |
| A: Mr Katz | Yes, if that is what you say, yes. I don't know if there is thousands of emails or two emails. |
| Q: Mr Phillips, QC | And the only documents that we have seen are the drafts that show that the Sub-Notes were intended to be junior to the rest of the Sub-Debt, do you follow? |
| A: Mr Katz | Yes. |
| Q: Mr Phillips, QC | And the reason for that is that your recollection is faulty. There never was an intention to prioritise the Sub-Notes over the Sub-Debt, and there never were any discussions about prioritising the Sub-Notes over the Sub-Debt, do you follow? |
| A: Mr Katz | That is what you are saying. That is not what I recollect, that is not what my witness statement says. |

374.   Mr Phillips, QC did not go so far as to put to Mr Katz that his evidence was dishonest, and in these circumstances it would not be appropriate for me to make such a finding. But Mr Katz was, at the very least, over-dogmatic and cavalier with the truth in persisting in advancing a thesis that *(i)* was never especially likely, in all the circumstances, *(ii)* was

---

[325] See, for example, the exchange at D4/pp.66-69 (cross-examination of Mr Katz).
[326] Day 4/pp.75-77 (cross-examination of Mr Katz).

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

not supported by contemporaneous evidence that ought, if Mr Katz was right, to have existed and *(iii)* that was in fact contradicted by such documentary evidence that did exist. For all these reasons, I disbelieve his evidence and attach no weight to it.

*(c)    The evidence of Mr O'Grady*

375.  Mr O'Grady's evidence was directed to the Lehman Group's approach to payments of interest and principal on the relevant subordinated debts.[327] I am at a loss to understand how the manner in which the Lehman Group performed its obligations is in any way relevant to the construction of the notes that are before me or indeed relevant to the Dividend Stopper point articulated by Mr Katz.[328]

**(4)    Conclusion regarding the Dividend Stopper argument**

376.  Because of the unsatisfactory nature of Mr Katz's evidence and because the documentary evidence gainsays it, the Dividend Stopper argument fails on the facts. In these circumstances, it is not appropriate for me to consider at any length whether – had my factual findings been different – the Dividend Stopper argument might have succeeded. I would only say that such an argument – even if supported by clear evidence – would have faced enormous difficulties. That is for three, related, reasons:

(1)  First, the evidence would go to contradicting or varying the meaning of the instruments that I have construed and attached a clear meaning to.

(2)  Of course – and this is the second reason – evidence going to the "factual matrix" is material to the construction of documents. However, for the reasons I have set out, in this case evidence of factual matrix needs to be treated with some caution.[329]

(3)  Thirdly, I am in some doubt that the evidence sought to be adduced by Deutsche Bank could even be regarded as material relevant to issues of construction. It seems to me that this material was, *par excellence*, material relating to the drafting history of documents that never crossed the line to be considered by other persons involved in the instruments being construed.

377.  For all these reasons – but principally on the facts – the Dividend Stopper argument fails.

**I.    CONCLUSIONS AND DISPOSITION**

378.  For the reasons given in this Judgment, my conclusions are as follows:

(1)  *The priority dispute between Claim A (the claims under the LBHI2 Sub-Debt Agreements) and Claim B (the claims under the Unamended LBHI2 Sub-Notes).* The terms of the Claim B Sub-Notes were amended, and the priority dispute between Claim A (the claims under the LBHI2 Sub-Debt Agreements) and Claim B (the claims under the Unamended LBHI2 Sub-Notes) is strictly speaking relevant only as background to other issues before me, in particular, the question of priority between Claim A (the claims under the LBHI2 Sub-Debt Agreements) and Claim

---

[327] O'Grady 1/§14.

[328] In addition to O'Grady 1, there was a statement in response from Mr Katz (Katz 2) and a reply statement from Mr O'Grady (O'Grady 2). It is unnecessary for me to consider these statements any further.

[329] See paragraphs 61*ff* above.

Lehman Brothers Holdings plc (in administration) and others

B (the claims under the Amended LBHI2 Sub-Notes). Nevertheless, I set out my conclusions, which are as follow:

(a)     According to the simple contractual subordination provision in Claim A, the claims of SLP3 under Claim B rank ahead of the claims of PLC under Claim A.[330] According to the simple contractual subordination provision in Claim B, Claim A and Claim B rank *pari passu*.[331] That is because, on its true construction, this subordination provision does not serve to rank itself in relation to Claim A. There is, therefore, no absolute consistency of outcome between the operation of the subordination provisions in Claim A and those in Claim B. This is a case where Claim B says nothing about its relative priority to Claim A, but where Claim A subordinates itself to Claim B. In these circumstances, Claim A is subordinated to Claim B.[332]

(b)     The contingent debt subordination provisions in Claims A and B, which take the form of solvency conditions, would have to be separately applied. In this case, <u>if</u> (contrary to what I have found) the provisions of the Unamended LBHI2 Sub-Notes were determinative, it would be the solvency condition in Claim B that would be of principal relevance, given LBHI2's asset position.[333]

(c)     I have considered the operation of the solvency condition in Claim A.[334] That is because that condition is of broader relevance than simply to this issue.

(2)   *The priority dispute between Claim A (the claims under the LBHI2 Sub-Debt Agreements) and Claim B (the claims under the Amended LBHI2 Sub-Notes).* As to this:

(a)     The applicable subordination provision in the Amended LBHI2 Sub-Notes is the "new" subordination provision inserted by the LBHI2 Sub-Notes Resolution into the amended LBHI2 Sub-Notes Circular. Accordingly, the question of priority as between Claim A and Claim B must be re-visited in light of the "new" subordination provision inserted by the LBHI2 Sub-Notes Resolution.[335] If I am wrong in this conclusion, and the question of priority is to be determined by reference to the "old" subordination provision, then my conclusion in paragraph 378(1) above holds good.

(b)     According to the simple contractual subordination provision in Claim A, the claims of PLC under Claim A rank ahead of the claims of SLP3 under Claim B.[336]

---

[330] See paragraphs 179 to 185 above.
[331] See paragraph 191 above.
[332] See paragraphs 196 to 198 above.
[333] That provision is considered in paragraphs 192 to 195 above.
[334] The issues that the solvency condition gives rise to are set out in paragraphs 186 to189 above; those issues are resolved in Section F(7) above.
[335] See paragraphs 221 to 225 above.
[336] See paragraphs 235 to 240 above.

(c)    According to the simple contractual subordination provision in the Amended LBHI2 Sub-Notes (Claim B), the rights of creditors under Claim A rank ahead of the rights of the Noteholders under Claim B.[337]

I conclude that the priority dispute between Claim A (the claims under the LBHI2 Sub-Debt Agreements) and Claim B (the claims under the Amended LBHI2 Sub-Notes) would be resolved in favour of Claim A.

(d)    Although I have concluded that the modifications to the LBHI2 Sub-Notes introduced by the LBHI2 Sub-Note Resolution have altered the ranking between Claim A and Claim B, I do not consider that the rectification argument advanced by SLP3/LBHI can succeed. For the reasons given in Section F(8),[338] the claim to rectification fails.

(e)    The operation of the solvency condition is as stated in paragraph 378(1).

(3)    *The priority dispute between Claim C (the claims under the PLC Sub-Debt Agreements) and Claim D (the claims under the PLC Sub-Notes).* As to this:

(a)    For the reasons given in paragraph 21, I have not considered the relative priority of Claim E as regards Claim C and Claim D. All of the parties before me accept that Claim E ranks <u>below</u> Claim C and Claim D and I am prepared to grant a declaration to this effect.

(b)    The Settlement Agreement release argument fails. Claim C is not released by section 8.02 of the Settlement Agreement.[339]

(c)    For the reasons given in paragraphs 288*ff* above, the Claim C partial discharge argument fails.

(d)    For the reasons given in paragraphs 305*ff* above, the Claim D reduction argument fails.

(e)    For the reasons given in paragraphs 349*ff* above, the simple contractual subordination provisions in Claims C and D result in circuity. A never-ending race to the bottom of the waterfall is created as between Claims C and D. According to its own provisions, Claim C ranks below Claim D: but, because that is precisely what Claim D says about Claim C, the conclusion is a meaningless one. The circuity is broken by ranking the Claims *pari passu* and the solvency condition operates in the manner set out in paragraph 378(1) above.

(4)    *The Dividend Stopper argument.* For the reasons given in this Judgment, this argument was considered separately in Section H above, and for the reasons there set out does not alter the conclusions previously stated.

---

[337] See paragraph 243 above.

[338] See paragraphs 254*ff* above.

[339] See paragraph 273*ff* above.

379. I will require further assistance from the parties in determining the precise formulation of the order setting out the consequences of, and consequential matters arising out of, this Judgment. A further hearing at which this order can be made will be arranged.

# ANNEX 1

(paragraph 1, footnote 1 of the Judgment)

## GLOSSARY OF NAMES AND TERMS USED IN THE JUDGMENT

| TERM | MEANING | FIRST USE IN THE JUDGMENT |
|---|---|---|
| **A&O** | Allen & Overy LLP, solicitors used by the Lehman Group. | §38 |
| **Amended LBHI2 Sub-Notes** | The LBHI2 Sub-Notes after the amendments made pursuant to the LBHI2 Sub-Notes Resolution. | §14 |
| ***Andrews and Millett*** | Andrews and Millett, *Law of Guarantees*, 7th ed (2015). | §294 fn 259 |
| **Annex 1** | Annex 1 to this Judgment, containing a glossary of names and terms. | §1 fn 1 |
| **Annex 2** | Annex 2 to this Judgment, containing a simplified diagrammatic representation of the three corporate chains described in paragraph 3 of the Judgment. | §3 |
| **Annex 3** | Annex 3 to this Judgment, containing a diagrammatic representation of the flow of funds and the rival claims to those funds. | §22 |
| ***Chitty*** | Beale (ed), *Chitty on Contracts*, 33rd ed (2018). | §61(1) fn 30 |
| **Claim A** | Claims advanced by PLC against LBHI2 for monies owed by LBHI2 to PLC under the LBHI2 Sub-Debt Agreements. | §10 |
| **Claim A(i)** | The claim arising out of the first LBHI2 Sub-Debt Agreement. | §150 |
| **Claim A(ii)** | The claim arising out of the second LBHI2 Sub-Debt Agreement. | §150 |
| **Claim A(iii)** | The claim arising out of the third LBHI2 Sub-Debt Agreement. | §150 |
| **Claim B** | Claims advanced by SLP3 against LBHI2 for monies owed by LBHI2 to SLP3 under the LBHI2 Sub-Notes. | §12 |
| **Claim C** | Claims advanced by LBHI (as the ultimate assignee of the rights of LB Holdings) against PLC for monies owed by PLC to LBHI under the PLC Sub-Debt Agreements. | §15 |
| **Claim C partial discharge argument** | Deutsche Bank's contention that LBHI's claims under the PLC Sub-Debt Agreements fell to be partially discharged or reduced. | §31(2) |
| **Claim D** | Claims advanced by GP1 against PLC for monies owed by PLC to GP1 under the PLC Sub-Notes. | §18 |

Approved judgment
Mr Justice Marcus Smith

Lehman Brothers Holdings plc (in administration) and others

| **Claim D reduction argument** | The question whether Claim D is a future claim, not a present claim, and – if so – whether it falls to be reduced pursuant to rule 14.44 of the Insolvency Rules 2016. | §31(3) |
|---|---|---|
| **Claim E** | Claims advanced by the holders of ECAPS against PLC under the ECAPS Guarantees. | §20 |
| **consensual subordination** | Consensual subordination arises where the ranking of claims, or their priority, normally determined by operation of law (legal subordination) is varied by consent. | §72(2) |
| **Deutsche Bank** | Deutsche Bank AG (London Branch). | §3(3) |
| **Dividend Stopper argument** | An argument advanced by Deutsche Bank going to the relative priorities of (principally) Claim C and Claim D. | §32(2) |
| **Dolby 1** | The first statement of Ms Jackie Dolby dated 16 April 2019. | §44 |
| **ECAPS** | Preferred securities issued by the Partnerships. Deutsche Bank is a purchaser and holder of ECAPS. | §3(3) |
| **ECAPS Guarantees** | Guarantees given by PLC to holders of ECAPS pursuant to the ECAPS issue. | §20 |
| *FSHC v. GLAS* | The decision of the Court of Appeal in *FSHC Group Holdings Ltd v. GLAS Trust Corporation Ltd*, [2019] EWCA Civ 1361. | §257(1) fn 210 |
| *Fletcher* | Fletcher, *The Law of Insolvency*, 5th ed (2017) | §80 fn 49 |
| **FSA** | The Financial Services Authority. | §36 |
| *Fuller* | Fuller, *The Law and Practice of International Capital Markets*, 3rd ed (2012). | §81 fn 50 |
| **Fund** | The money available for distribution to subordinated creditors. | §8 |
| *Goode* | Van Zwieten, *Goode on Principles of Corporate Insolvency Law*, 5th ed (2019). | §4 fn 4 |
| **GP1** | LB GP No 1, a company in the Lehman Group and the general partner in a number of Partnerships. | §3(3) |
| **Grant 1** | The first statement of Mr Thomas Grant dated 19 March 2019. | §38 |
| **Gropper Report** | The expert report by Judge Gropper dated 5 June 2019. | §55 |
| **Hutcherson 1** | The first statement of Ms Sophie Hutcherson dated 18 April 2019. | §36 |
| **Imagitas Judgment Debt** | A judgment debt obtained by Imagitas against Prosat and the Prosat Members. | §287(3) |
| **Initial Limited Partner** | Chase Nominees Limited | §3(3) |
| **Insolvency Rules 2016** | The Insolvency (England and Wales) Rules 2016, SI 1024 of 2016. | §31(3) |

| | | |
|---|---|---|
| **IPRU(INV) 10** | Chapter 10 of the Interim Prudential sourcebook: Investment businesses. | §132 |
| **IPRU(INV) FORM 10.6** | A standard form contained in IPRU(INV) 10. | §133 |
| **Joint Report** | A joint report produced by Judge Gropper and Judge Smith. | §57 |
| **Katz 1** | The first statement of Mr Benjamin Katz dated 18 April 2019. | §47(1) |
| **Katz 2** | The second statement of Mr Benjamin Katz dated 9 May 2019. | §47(2) |
| **Katz 3** | The third statement of Mr Benjamin Katz dated 6 November 2019. | §47(3) |
| **LB Holdings** | Lehman Brothers UK Holdings Limited, a company in the Group and the original creditor under the PLC Sub-Debt Agreements. | §15 |
| **LBHI** | Lehman Brothers Holdings Inc, the ultimate parent company of the Lehman Group. | §2 |
| **LBHI Guarantee** | A guarantee of PLC's obligations under the PLC Sub-Debt Agreements by LBHI. | §289(2) |
| **LBHI1** | Lehman Brothers Holdings Intermediate 1 Ltd, a company above LBHI2 in the corporate "chain". | §3(1)(a) |
| **LBHI2** | LB Holdings Intermediate 2, LBIE's immediate holding company. | §3(1) |
| **LBHI2 Administrators** | The joint administrators of LBHI2. | §5 |
| **LBHI2 Sub-Debt** | The obligations owed by LBHI2 to PLC under the LBHI2 Sub-Debt Agreements. Referred to as Claim A in the Judgment. | §10 |
| **LBHI2 Sub-Debt Agreements** | Three subordinated loan agreements between PLC and LBHI2, whereby PLC lent monies to LBHI2. | §10 |
| **LBHI2 Sub-Notes** | Subordinated notes issued by LBHI2 pursuant to the LBHI2 Sub-Notes Circular and held by SLP3. LBHI2's obligations under these notes are referred to as Claim B in the Judgment. | §12 |
| **LBHI2 Sub-Notes Circular** | The offering circular setting out the terms on which the LBHI2 Sub-Notes are held. | §12 |
| **LBHI2 Sub-Notes Resolution** | A resolution dated 3 September 2008, whereby the terms and conditions of the LBHI2 Sub-Notes were amended. | §14 |
| **LBI** | LB Investment Holdings Ltd, a company in the Lehman Group and the preferential limited partner in a number of Partnerships. | §3(3) |
| **LBIE** | Lehman Brothers International Europe, an unlimited company and the Lehman Group's main trading company in Europe. A subsidiary of LBHI. | §3(1) |

| **legal subordination** | Legal subordination arises where the ranking of claims, or their priority, is determined by operation of law. | §72 |
|---|---|---|
| **Lehman Group** | The Lehman Brothers group of companies. | §1 |
| ***Lehman 4*** | *Re Lehman Brothers International (Europe) (in administration) (No 4)*, heard in the High Court (Chancery Division), Court of Appeal and Supreme Court. | §82 fn 45 |
| ***Lehman 4 (CA)*** | The decision of the Court of Appeal in *Lehman 4*, reported at [2015] EWCA Civ 485. | Table 1 at §87 fn 62 |
| ***Lehman 4 (HC)*** | The decision of the High Court in *Lehman 4*, reported at [2014] EWHC 704 (Ch). | §106 fn 81 |
| ***Lehman 4 (SC)*** | The decision of the Supreme Court in *Lehman 4*, reported at [2017] UKSC 38. | §82 fn 51 |
| ***Lewison*** | Lewison, *The Interpretation of Contracts*, 6th ed (2015). | §61(2) fn 32 |
| **Limited Partnership Agreements** | The agreements constituting the Partnerships. | §366(4) |
| **MCC** | Maxwell Communications Corporation plc. | §102 |
| **Miller 1** | The first statement of Mr Stephen Miller dated 19 March 2019. | §40 |
| **O'Grady 1** | The first statement of Mr Raymond O'Grady dated 18 April 2019. | §42 |
| **O'Grady 2** | The second statement of Mr Raymond O'Grady dated 19 May 2019. | §42 |
| **Partnerships** | Partnerships comprising a general partner (GP1), a preferential limited partner (LBI) and a limited partner, such as Deutsche Bank. The Partnerships issue preferred securities known as ECAPS. | §3(3) |
| **PLC** | Lehman Brothers Holdings plc, a company above LBHI2 in the corporate "chain". | §3(1)(b) |
| **PLC Administrators** | The joint administrators of PLC. | §5 |
| **PLC Sub-Debt** | The obligations owed by PLC to LBHI under the PLC Sub-Debt Agreements. Referred to as Claim C in the Judgment. | §15 |
| **PLC Sub-Debt Agreements** | Three subordinated loan agreements between PLC and LB Holdings, whereby PLC lent monies to LB Holdings. LB Holdings' interests in the PLC Sub-Debt Agreements have been assigned to LBHI. | §15 |
| **PLC Sub-Notes** | Subordinated notes issued by PLC pursuant to the PLC Sub-Notes Circulars and held by GP1. PLC's obligations under these notes are referred to as Claim D in the Judgment. | §18 |
| **PLC Sub-Notes Circulars** | The offering circulars setting out the terms on which the PLC Sub-Notes are held. | §18 |

| **Prosat** | Professional Satellite and Communication LLC. | §287(1) |
|---|---|---|
| **Prosat Members** | Four individuals controlling Prosat. | §287(1) |
| **regulatory capital** | Capital intended to enable an organisation to satisfy the requirements of the capital adequacy rules that applied to entities operating in the banking/financial services sector from time-to-time. | §11(1) |
| **Settlement Agreement** | A settlement made as between various entities in the Group regarding claims *inter se* and the release of those claims. | §26 |
| **Settlement Agreement release argument** | Deutsche Bank's contention that LBHI's claims under the PLC Sub-Debt Agreements were released by operation of the Settlement Agreement. | §31(1) |
| **SLP3** | Lehman Brothers Holdings Scottish LP3, an indirect subsidiary of LBHI. | §3(2) |
| **Smith Report** | The expert report by Judge Smith dated 6 June 2019. | §56 |
| **structural subordination** | A form of subordination whereby the structure of a group of companies affects or determines which company receives assets and which company assumes obligations. | §72(1) |
| **Unamended LBHI2 Sub-Notes** | The LBHI2 Sub-Notes before the amendments made pursuant to the LBHI2 Sub-Notes Resolution. | §14 |

## ANNEX 2

(paragraph 3 of the Judgment)

### SIMPLIFIED CORPORATE STRUCTURE



Save where they are labelled "Partner", all relationships denoted by the arrows are corporate parent/subsidiary relationships. Deutsche Bank's interest is indirect and not strictly that of a partner, as is more specifically described in paragraph 3(3) of the Judgment. However, it is convenient to identify Deutsche Bank's indirect interest in this way.

It is to be stressed that this represents a simplified corporate structure, intended only to elucidate the Judgment.

# ANNEX 3

(paragraph 22 of the Judgment)

## FLOW OF FUNDS

