**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE

LEHMAN BROTHERS HOLDINGS
INC., et al,
       Debtor.

---

JOSPEH WASKE
       Appellant,

Bankr. No. 08-13555(SCC)
Adv. No. 1:20-cv-05083

       v.

LEHMAN BROTHERS HOLDINGS INC.
       Appellee.

---

**Statement of Issues to Be Presented**

JOSEPH WASKE, pursuant to Federal Rule of Bankruptcy
Procedure

8009(a), hereby states the issues to be presented on appeal:

1.   The Plan Administrator added the Motion to Reclassify as
     a motion to be heard during the hearing when the
     Honorable Judge asked him what was on the agenda. The
     Motion to Reclassify was not on the "Agenda" (Docket
     #60653), nor was it scheduled to be in the "Hearing"
     (Docket #60498).

1

2.   Joseph Waske and the Joinders were not served on the
     hearing agenda with the Motion to Reclassify on it.
     Additionally, Joseph Waske and the Joinders were not
     given the proper time and opportunity to argue the
     Motion to Reclassify.

3.   The Honorable Judge then proceeded to focus an
     overwhelming majority of the hearing on the Motion to
     Reclassify and based the "ORDER" (Docket #60337) mainly
     on the Motion to Reclassify.

4.   "Ex Parte" was facilitated before the hearing between
     the Honorable Judge and the Plan Administrator by the
     fact that the Honorable Judge added the Motion to
     Reserve for the Motion to Reclassify over the objection
     (Docket #60641 and Docket #60642) by Joseph Waske to aid
     the Plan Administrator by giving the Plan Administrator
     a legal avenue to defeat the Motion for Summary Judgment
     (Docket #60484). The additional motion added to the
     hearing gave the Plan Administrator the legal cover to
     file an objection late. During the hearing, the
     Honorable Judge refused to hear arguments on Neuberger
     Berman which would have further proved the
     enforceability of the Guarantee(Docket #60448, Exhibit
     D). The Neuberger Berman argument is the argument for
     the Motion to Reserve for the Motion to Reclassify.
     The Honorable Judge added the Motion to Reserve for the
     Motion to Reclassify to the hearing over the objection
     of Joseph Waske and then refused to hear the argument

that provides basis for relief in the Motion to Reserve for the Motion to Reclassify. The honorable judge did not allow the arguments for the motion, but added the Motion to Reserve for the Motion to Reclassify that allowed the Plan Administrator to defeat the Motion for Summary Judgment.

5.   The Plan Administrator stated during the hearing that he is not "aware" of the Important Covenants of Lehman Brothers Holdings when it is argued for on dockets 60448, 60337, 60542 and 60642. Those dockets were all scheduled to be heard on the June 3rd 2020 hearing. If the Plan Administrator was unaware of the Important Covenants of Lehman Brothers Holdings, then they were not prepared for the Motion for Summary Judgment or the Motion to Reserve for the Motion to Reclassify that were rightfully scheduled to be heard on June 3rd 2020, instead they were prepared to argue the Motion to Reclassify which the Plan Administrator stated it was on the Agenda to have it heard and ruled on to avoid the Motion for Summary Judgment and the Motion to Reserve for the Motion to Reclassify. The intent of such a statement provides cover in the transcripts and allows the Plan Administrator to continue to violate the "Covenants."

6.   The Plan Administrator continues to omit affiliate preferred security parity guarantee rights in court and earlier in the "Objections" (Docket #60542) filed in

response to Joseph Waske's motions and other motions relating to the enforcement of the guarantees of the Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and VI. The Plan Administrator misled by omission in both the bankruptcy courts and appellate court levels (Docket #60542, page 10).

7. Joseph Waske and the Joinders had their rights and due process violated and denied in the June 3rd,2020 hearing and in the order that was issued by the Honorable Judge based on the actions described in this Statement of Issues points 1, 2, 3 and 4.

8. Joseph Waske requests Honorable Judge Ronnie Abrams to not remand this case back to the Honorable Judge Chapman's court because of the bias and Ex Parte the Honorable Court has shown against Joseph Waske and the Joinders.

9. Joseph Waske and the Joinders have the standing and rights to file a lawsuit against LBHI to enforce the guarantee as if they are the Trustee upon the Trustee failing to enforce the Guarantee (Docket #60542, page 62).

10. The Bankruptcy Court erred by not ruling on the merits of the Motion for Summary Judgment.

11. The Bankruptcy Court erred by refusing to hear arguments for the Motion to Reserve for the Motion to Reclassify when the issue of Neuberger Berman was presented in court for argument. Then, the bankruptcy court ruled

4

against the motion. The Bankruptcy Court was the one who insisted on adding the Motion to Reserve for the Motion to Reclassify over the objection of Joseph Waske. The motion was added to the hearing and then the court refused to hear its arguments.

12.  The Bankruptcy Court erred by not ruling if the rights of the Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and VI were violated under the guarantee and if the LBHI Capital Trusts have parity status with the Preference Shares of Neuberger Berman that were redeemed at full value.

13.  The Bankruptcy Court erred by not ruling if the rights of the Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and VI were violated under the guarantee by the LBMB transaction or any other transaction of LBHI's affiliates or subsidiaries that involved preferred equity or subordinated debt transactions.

14.  The Bankruptcy Court erred by not ruling on the enforceability of the Important Covenants of Lehman Brothers Holdings and the Guarantee provided to Capital Trust III, IV, V, VI holders.

15.  The Bankruptcy Court erred by not ruling on recent distributions to affiliate and subsidiary preferred equity as basis for relief to reclassify the existing Capital Trust III-VI Claims in parity with the highest class of affiliate and subsidiary preferred equity to receive distributions.

16. In the hearing on June 3rd 2020, the Plan Administrator acknowledged that equity with value exists or has been created in spin-offs or affiliates. The bankruptcy court erred in not ruling that the Capital Trusts III, IV, V and VI covenants and guarantees have been breached and that the Capital Trusts III, IV, V and VI are in parity with the highest spin-off or affiliate preferred equity.

Respectfully Submitted,

Joseph Waske
22862 Via Genoa, Dana Point,
CA.  92629
949-517-8330
jwaske3@yahoo.com

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE

LEHMAN BROTHERS HOLDINGS
INC., et al,

      Debtor.

---

JOSEPH WASKE

      Appellant,

   v.

LEHMAN BROTHERS HOLDINGS INC.
      Appellee.

Bankr. No.08-13555(SCC)
Adv. No. 1:20-cv-05083

---

## Designation of Items to be Included in the Record on Appeal

JOSEPH WASKE, pursuant to Federal Rule of Bankruptcy Procedure

8009(a), hereby designates the following items to be included in the record on appeal:

1.   Transcripts of Hearing 06.03.2020

2.   Order Denying (I) Motion to Reclassify (Related Doc # [60337]); (II) Motion to Reserve for Motion to Reclassify (Related Doc # [60448]); and (III) Motion for Summary Judgment  (Docket#60337)

3.   Notice of Telephonic Hearing (Docket #60498)

4.   Motion for Summary Judgement (Docket #60484)

5.   Motion to Reserve for Motion to Reclassify (Docket # 60448)

6.   Objection to Motion / Plan Administrators Objection to Motion to Reserve (Docket #60482)

7.   Memorandum Endorsed Order Denying Request signed on 4/14/2020 (Docket #60508)

8.  Notice of Memorandum Endorsed Order Denying Request (Docket #60509)

9.  Response to Objection to Motion to Reserve (Docket #60542)

10.  Objection: Plan Administrators Objection to Motion for Summary Judgment (Docket #60641)

11.  Response to Plan Administrators Objection to Motion for Summary Judgment (Docket #60642)

12.  Notice of Agenda of Matters Scheduled for the Hearing on June 3rd, 2020 at 10am EST (Docket #60653)

13.  Joinder of Rex Wu (Docket #60348)

14.  Witness Statement of Russell Downs, 08.02.2013

15.  Joseph Waske's Motion to Reclassify (Docket # 60448)

16.  Lehman Brothers Holdings Inc Capital Trusts III Prospectus

17.  Lehman Brothers Holdings Inc Capital Trusts IV Prospectus

18.  Lehman Brothers Holdings Inc Capital Trusts V Prospectus

19.  Lehman Brothers Holdings Inc Capital Trusts VI Prospectus

20.  Lehman Brothers Holdings Executive Committee written consent to expand guarantees


Respectfully Submitted,


_____
Joseph Waske
22862 Via Genoa, Dana Point,
CA. 92629
949-517-8330
jwaske3@yahoo.com

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS, INC.,

8

9          Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                 United States Bankruptcy Court

13                 One Bowling Green

14                 New York, NY  10004

15

16                 June 3, 2020

17                 10:01 AM

18

19

20

21  B E F O R E :

22  HON SHELLEY C. CHAPMAN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  UNKNOWN

1    HEARING re Doc #60448 Motion to Reserve for Motion to

2    Reclassify, filed by Joseph Waske.

3

4    HEARING re Doc #60448 Motion for Summary Judgment filed by

5    Joseph Waske.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

**Page 3**

```
 1   A P P E A R A N C E S :

 2

 3   WEIL GOTSHAL & MANGES LLP

 4        Attorneys for Debtors

 5        767 Fifth Avenue

 6        New York, NY 10153

 7

 8   BY:  GARRETT FAIL (TELEPHONICALLY)

 9

10   ALSO APPEARING TELEPHONICALLY:

11

12   REX WU, Pro Se (TELEPHONICALLY)

13   JOSEPH WASKE, Pro Se (TELEPHONICALLY)

14   ANA LUCIA HURTADO (TELEPHONICALLY)

15   CHRISTOPHER STAUBLE (TELEPHONICALLY)

16   ELIZABETH HARRISON (TELEPHONICALLY)

17   GLENN BRAZE (TELEPHONICALLY)

18   CHRISTOPHER WHELAN (TELEPHONICALLY)

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2            THE COURT:  Hello, good morning.  This is Judge

3    Chapman.  We're here this morning for an agenda of matters

4    in the Lehman Brothers Holdings, Inc. case.  This hearing is

5    being conducted entirely telephonically via the Court

6    Solutions application.  It is being recorded.  A transcript

7    of it will be created and made available to parties who

8    request it.  In order to create an accurate transcript, I'm

9    requesting that anyone who speaks identify himself or

10   herself, and the party on whose behalf they are appearing,

11   and that you do so every time that you speak so that the

12   record can be accurate.  I also would like to point out that

13   no private recordings of this hearing are permissible.  I

14   would also ask that you keep your phones on mute unless you

15   are speaking.

16            I have an agenda that I've received as a matter

17   scheduled for hearing today.  I also have a roster of those

18   who have dialed in to participate today.  Mr. Fail, shall I

19   start with you?

20            MR. FAIL:  Good morning, Your Honor, Garrett Fail,

21   Weil, Gotshal & Manges for Lehman Brothers Holdings, Inc. as

22   the Plan Administrator.  Thank you for the Court's time this

23   morning.  I'm on the line.

24            THE COURT:  Would you like to get us started?

25            MR. FAIL:  I can, thank you, Your Honor.  There

Page 5

1    are a number of items on the agenda, all related.  The first

2    filed was a Motion to Reclassify filed by Mr. Joseph Waske.

3    It's at ECF 60337.  The Debtor, or the Plan Administrator

4    filed an objection to this motion at ECF 60378.  The next

5    item on the agenda is a Motion for Reserve for the Motion to

6    Reclassify, filed by Mr. Waske at 60448.  The Plan

7    Administrator objected to this motion at ECF 60482.  Mr.

8    Waske also filed a Motion for Summary Judgment related to

9    the Motion for Reserve at 60484, and the plan administrator

10   objected to that motion at docket number 60641.

11            Your Honor, I'll be brief in opening because the

12   movant bears the burden.  The Plan Administrator's positions

13   are set forth in the objection.  And as set forth in the

14   objections, we believe each of the motions should be denied.

15   It fails to state a basis for relief.  Your Honor has

16   addressed very similar questions before and found, in the

17   way that the Plan Administrator asks that you find today, to

18   deny the motions, including, most recently by motions filed

19   by Mr. Rex Wu.  I'm happy to answer any questions the Court

20   may have now and if Your Honor permits, I'll reserve time to

21   rebut or respond to anything that Mr. Waske has to say

22   today.

23            THE COURT:  All right, that makes sense, Mr. Fail.

24   Thank you very much.  Mr. Waske, are you on the line, sir?

25            MR. WASKE:  Yes.  Good morning, Your Honor.  This

Page 6

1    is Joseph Waske.  I'm on the line.  I appreciate the

2    opportunity to be heard.

3            THE COURT:  Okay, go right ahead.

4            MR. WASKE:  Yes, good morning, Your Honor.  I

5    wanted to start off by addressing the reason I'm here today.

6    All of my motions, essentially, center around the prospectus

7    contract language under the status of the guarantee, and

8    under the prospectus' Important Covenant section.  Within

9    each of those specific sections, there are parent and senior

10   affiliate equity rights, and additionally, payment stoppage

11   rights across all subsidiaries that I argue -- I'm asking

12   for the relief that placed the Capital Trusts Three, Four

13   Five and Six, in parity with the parent, the affiliate and

14   the subsidiary preference shares or equity shares.  And,

15   having said that, I guess I'll give up some time and

16   possibly let the counsel for Lehman Brothers respond to

17   that.

18           As far as the earlier objections, they do not

19   address the affiliate parity guarantee, and there has been

20   no response I have seen as far as the important covenant

21   section granted within the prospectus, giving payment

22   stoppage rights across all subsidiaries.

23           THE COURT:  Mr. Waske, I have a question for you.

24   When did you acquire your securities?

25           MR. WASKE:  My first acquisition was prior to the

Page 7

1    Neuberger Berman spinoff, would have been in 2011,

2    approximately.

3              THE COURT:  No, I mean the -- what you seek to

4    have reclassified now.

5              MR. WASKE:  That was my first acquisition and I've

6    had subsequent purchases since then, Your Honor.

7              THE COURT:  Thank you.

8              MR. WASKE:  Thank you.

9              THE COURT:  Mr. Fail?

10             MR. FAIL:  Thank you, Your Honor.  For the record,

11   again, Garrett Fail, Weil Gotshal.

12             THE COURT:  Mr. Fail, having called on you, let me

13   just make the overarching observation, Mr. Waske, you of

14   course have entirely ignored the fact that this is 2020, and

15   that there was an entire 12 years of a bankruptcy proceeding

16   before this, which is and has been conducted according to

17   the bankruptcy code, the bankruptcy rules and a series of

18   court orders.  And what you have done, is arrived at this

19   late date with a theory that you suggest that you first

20   became aware of in the context of a ruling this Court made

21   in 2019, and that, therefore, you now get to assert these

22   rights and make these requests.  You also ignore the fact

23   that Mr. Wu made a similar series of arguments which were

24   rejected by the Court.  There are also, apparently, a number

25   of others who have filed joinders to the relief that you're

1   requesting.  There's a very important -- there are competing

2   concepts in the law that I'd like to remind you about.

3   There's the concept of due process, very important; very

4   important for folks to be able to be heard by a Court, to

5   have their day in Court, and today's day in Court, oddly

6   enough, is telephonically, but we go on.  But there's also

7   the concept of finality.  It is impossible for arguments to

8   continue to be permitted to be made over and over and over

9   again, and to have expense and time be incurred addressing

10  the same arguments over and over again.  So, we're going to

11  dispose of these arguments today, hopefully once and for

12  all.  But I'd like to point out to you that in moving

13  directly to address what you view as the merits of your

14  claim, which are incorrect on the merits, you have skipped

15  over the many procedural impediments to your assertion of

16  these arguments at this very, very late date.  Mr. Fail, do

17  you want to take it from here in terms of what the estate's

18  responses are?

19          MR. FAIL:  Thank you, Your Honor, I will.  There

20  were two points raise:  one, breaches of covenants in either

21  the prospectus or in the guarantee.  Assuming that there is

22  one and was one, it would give rise to a claim under the

23  guarantee.  But that guarantee was not a guarantee of

24  payment or return of the investment.  The guarantee was

25  limited to certain circumstances if the trusts had money and

1    didn't pay through the money.  So, that's one thing: it

2    would not give rise to a claim, but more importantly, the

3    status of subordination of the guarantee.  The provision

4    that Mr. Waske cites to and includes quotes of, provides

5    that the guarantee will rank subordinate and junior to all

6    other liabilities of Lehman Brothers Holdings.  That's key.

7              The second sentence would apply, perhaps, in a

8    bankruptcy.  Or outside of bankruptcy, on parity with other

9    preferred stock.  But there's no question that it's

10   subordinate to all other claims.  The guarantee will be on

11   parity with guarantees of other things, but there are none.

12   There is nothing.  Mr. Waske's pleadings is filled with

13   words that are real words and concepts that are real

14   concepts that have no applicability here.  The fact that

15   equity was created in the spinoff from the Neuberger Berman

16   investment banking division, has nothing to do with what

17   existed prior to the bankruptcy, and nothing to do with

18   this.  The fact that there's equity with value in the world

19   doesn't matter here.  The question is, if there was a

20   guarantee claim for this, where would it rank?  They're

21   seeing to reclassify guarantee claim that exists from a

22   subordinated status junior to all liabilities of Lehman

23   Brothers Holdings, Inc. as provided for in the guarantee and

24   in the plan, to a higher pari passu with creditors.  There's

25   absolutely no basis whatsoever to do that.

Page 10

1            THE COURT:  All right, thank you.  Mr. Waske, is

2     there anything you'd like to say?

3            MR. WASKE:  Yes, Your Honor.  I'd like to respond

4     to some of the points that counsel for the estate brought

5     up.  Let me back up even a little further than that.  I

6     understand that it's a late date to file these claims.  I

7     honestly, as a holder of these securities, it's not very

8     easy to find the information that other affiliate senior

9     preference shares or subsidiary shares had received

10    distributions, which would haver been a breach of the

11    affiliate rights and a breach of the covenants.

12    Additionally, I did reach out to the Trustee to try and work

13    through some of these issues and was provided kind of a

14    boilerplate, while the Plan Administrator will make that

15    determination and fund us if appropriate.

16            So, I did, I acknowledge that it's a late date.

17    But the fact that it's a long duration does not negate the

18    fact that the rights were written into the prospectus as far

19    as the affiliate parity rights, and the stoppage language on

20    any payments across the 177 subsidiaries that Lehman had.

21    Those rights were granted to the security holders, the

22    capital trust security holders, so long as the remained

23    outstanding.  And those --

24            THE COURT:  Mr. Waske, you do understand that the

25    indentured trustees of the capital trust filed global proofs

Page 11

1    of claim.  You do understand that, right?

2              MR. WASKE:  I do, Your Honor.  I do understand

3    that, but the difference -- the issue is that we are not

4    subordinate to any equity, any preference equity across the

5    parent, an affiliate or any subsidary.  I guess I'll close

6    -- can I say one more thing, Your Honor?

7              THE COURT:  Sure.  Of course.

8              MR. WASKE:  Those rights were written in there, in

9    the prospectus contract.  They were provided to the security

10   holder so long as they remain outstanding.  The rights are

11   there.  I understand it's the Plan Administrator now.  But

12   the Plan Administrator is bound by those rights, even though

13   that -- the fact that those -- the breach of those covenants

14   and those rights, have not been honored, doesn't -- for a

15   long duration, that long duration does not make it right.

16             THE COURT:  I will say to you again that Lehman

17   Brothers filed in 2008.  It was, perhaps the most publicly

18   known bankruptcy filing of all time.  One needed to be in a

19   cave to not know about this filing.  The bar date was in

20   2009.  This is 2020.  It appears that folks have taken pages

21   from various prospectuses and cobbled together these

22   arguments and have determined to continue to create

23   something where there is nothing.  And it has caused the

24   estate tremendous expense.  I would have thought that after

25   the disposition of Mr. Wu's claim, this wouldn't have

Page 12

1    happened again, but it has.  So, I'm prepared to give you a

2    decision on all of your claims and all of your motions and

3    all of your arguments, and the transcript of this decision

4    will be incorporated into a ruling.  We've had these

5    documents for some time and I've had a chance to review

6    them, and I've also seen the, what I would describe as

7    cookie cutter joinder letters filed by various other

8    persons.

9             So, I'm going to ask now if anybody else who has

10   registered for this hearing, wishes to be heard.  Mr. Wu, do

11   you wish to be heard?

12             MR. WU:  Yes, I do, Your Honor.

13             THE COURT:  Go ahead.

14             MR. WU:  Is today's hearing about the motions

15   reclassified?  I was under the impression it was only for

16   the Motion for Reserve and the Motion for Summary Judgment.

17             THE COURT:  Let me be perfectly clear.  There's

18   been a lot of back and forth with my chambers about what's

19   on for hearing.  You should all understand that even though

20   Mr. Waske did not ask for hearing on that motion, I am going

21   to dispose of all three motions.  We are incorporating a

22   ruling on that motion into the hearing today.  They are all

23   related.  They are all seeking, in essence, the same relief.

24   I am under no obligation to hold a hearing on any particular

25   motion.  It is within the Court's discretion to dispose of

Page 13

1     any filed motion on the papers without oral argument.

2     That's something that courts do all the time.  So, I will be

3     ruling today on all three motions.  Do you understand?

4              MR. WU:  Yes, Your Honor.  May I comment on the

5     Neuberger Berman transaction?

6              THE COURT:  I have no interest in your comments on

7     the Neuberger Berman transaction, Mr. Wu.

8              MR. WU:  Why is that, Your Honor?

9              THE COURT:  They have nothing whatsoever to do

10    with the matters that are before the Court today.

11             MR. WU:  Yes, it does, Your Honor.  It does.

12             THE COURT:  Did you hear me say that I don't wish

13    to hear your comments on the Neuberger Berman transaction?

14             MR. WU:  Yes, Your Honor.

15             THE COURT:  Okay.  And you have, other than being

16    an interested party, you're not a co-movant with Mr. Waske,

17    are you, Mr. Wu?

18             MR. WU:  I filed a joinder, Your Honor.

19             THE COURT:  You filed a joinder, but you're not a

20    co-movant, correct?

21             MR. WU:  Yes, Your Honor.

22             THE COURT:  And you already had your motions ruled

23    on by this Court.  Isn't that right?

24             MR. WU:  Yes, Your Honor.  I chose to file the

25    joinder.

Page 14

```
 1              THE COURT:  Right.  But you have no motion that's

 2     on for hearing today, correct?

 3              MR. WU:  No, Your Honor.  I filed a joinder.

 4              THE COURT:  And you have taken an appeal of this

 5     Court's previous ruling on your motions, correct?

 6              MR. WU:  The Danny Ianello motion appeals was

 7     dismissed by the Appellate Court based on his standing.  It

 8     has nothing to do with the ruling.  It did not rule on the

 9     ruling, Your Honor.

10              THE COURT:  So, you have nothing further pending

11     before this Court or any other court?

12              MR. WU:  Except for this joinder, no, Your Honor.

13              THE COURT:  All right, thank you.  Anything else

14     from Mr. Fail or anyone else?  Okay, I'm going to read a --

15     yes?

16              MR. FAIL:  I was going to say nothing from our

17     side.  Thank you.

18              THE COURT:  All right.  If you would bear with me,

19     this will take a few moments.  And as I said, at the

20     conclusion of this bench ruling, I'll ask that an order be

21     prepared and circulated that will incorporate the ruling.

22              Before the Court are three motions filed by Mr.

23     Joseph Waske.  One, Motion to Reclassify, which appears at

24     docket number 60337, and two related motions: a Motion for

25     Reserve, docket number 60448, and a Motion for Summary
```

Page 15

1    Judgment, docket number 60484.

2             Lehman Brothers Holdings Inc., or LBHI, as plan

3    administrator, has timely objected to each of the motions.

4    See docket numbers 63078, 60482 and 60641.  Various

5    individuals have filed letters supporting or joining in Mr.

6    Waske's Motion to Reclassify.  They are Mr. Rex Wu, docket

7    numbers 60348, 60400; Alex Olivo, docket number 60354;

8    Elizabeth Harrison, docket number 60379; Glen Braze, docket

9    number 60381; Jeffrey Wood, docket number 60478; Brian

10   Lindsay, docket number 60479, and Alvin Wilson, docket

11   number 60645.  Mr. Waske has submitted replies to the Plan

12   Administrator's objection.  See docket number 60403, 60542,

13   60642.

14             The reasons that follow, and as previously

15   discussed on the record of this hearing, Mr. Waske's motions

16   must be denied.

17             The crux of Mr. Waske's arguments are as follows:

18   Mr. Waske supports to own shares in LBHI Capital Trust

19   three, four, five and six; the Trusts.  He asserts that the

20   trustee for these trusts has not properly asserted the

21   rights of the trust; namely, by enforcing a certain

22   guarantee against LBHI.  Mr. Waske argues that events that

23   occurred after confirmation of the LBHI plan make the

24   guarantee now, quote, unquote, enforceable.  He seems to

25   believe that the omnibus claims filed by the trustee for

Page 16

1    each of these trusts, should be reclassified because of this

2    now allegedly enforceable guarantee.  He believes that this

3    reclassification would result in a distribution to holders

4    of shares in these capital trusts.  Mr. Waske also asserts

5    that he relies upon the existence of the guarantee and, in

6    part, upon this Court's ruling on June 19, 2019, when

7    subsequently purchasing his shares in the trust.  The Motion

8    to Reclassify seeks to reclassify the trust's global claims

9    into class four of the plan of reorganization: the Motion to

10   Reclassify at page four.  The Motion for Reserve seeks an

11   order from this Court requiring that the plan administrator

12   reserve approximately $71 million to satisfy the potential

13   claims of Mr. Waske and those parties who have filed

14   joinders to his Motion to Reclassify; the Motion for Reserve

15   at page ten and Exhibit D.  The Motion for Summary Judgment

16   seeks immediate entry of an order granting the Motion for

17   Reserve because, according to Mr. Waske, the Plan

18   Administrator failed to object to the motion within the

19   deadline provided in the Federal Rules of Civil Procedure,

20   see Motion for Summary Judgment, page two.

21           The joinders were filed by individuals who appear

22   to be similarly situated to Mr. Waske.  They largely repeat

23   Mr. Waske's argument.

24           The Plan Administrator objects to Mr. Waske's

25   motions and ask that they be denied with prejudice.

1              With respect to the Motion to Reclassify, the Plan

2      Administrator notes correctly that the time for seeking this

3      relief has long been past.  The bar date for filing claims

4      in the Lehman Chapter 11 cases was September 22, 2009,

5      docket number 4271.  Indeed, the indentured trustees of

6      Capital Trust Three, Four, Five and Six, timely filed global

7      proofs of claim on behalf of the trust.  See claim numbers

8      21805, 22122, 22123 and 67753.  These claims were classified

9      in LBHI class 10B under the Lehman plan, docket number 22973

10     at section 4.14.  As described in the relevant prospectuses,

11     the only assets of these trusts was subordinated debt.  This

12     class of claim, like other classes of subordinated debt

13     against LBHI was not expected to receive any recovery under

14     the Lehman Plan and, indeed, it has not.  See disclosure

15     statement, docket number 19629 at page 85.  This Court

16     entered an order confirming the Lehman Plan on December 6,

17     2011, docket number 23023.

18              The Plan Administrator further argues that even if

19     the time to file claims or object to the plan

20     classification, has not long since passed, there is simply

21     no basis for reclassifying the claims of the trust.  The

22     Plan Administrator is correct:  The holders of shares in the

23     capital trust have no right to file proofs of claim.  That

24     right is held by the indentured trustees who properly filed

25     such claims in a timely fashion.  The trusts hold only

Page 18

1    subordinated claims.  The guarantee identified by Mr. Waske

2    is likewise subordinated and is not entitled to any

3    distribution.

4              As I noted during the hearing earlier today, this

5    Court previously denied a similar motion filed by Mr. Rex

6    Wu, one of the individuals who has filed a joinder to the

7    motion here.  While it is clear that Mr. Waske's motions

8    likewise failed on the merits, it is unnecessary for the

9    Court to reiterate what it has already said about those

10   arguments today and in previous rulings.  The time for Mr.

11   Waske to file a proof of claim has long since passed.  The

12   time for Waske to object to the reclassification of claims

13   under the plan have long since passed.  It is time for these

14   arguments to cease being made and for the resources of this

15   estate to not have to be deployed in order to address what

16   this Court considers to be these frivolous arguments.

17             With respect to the timing, Bankruptcy Rule

18   3030(c)(3) requires that the Bankruptcy Court establish a

19   deadline for filing poofs of claim in a chapter 11 case.

20   Claims filed after the bar date shall be disallowed.  A bar

21   date is, quote, critically important to the administration

22   of a chapter 11 case as it is intended to be a mechanism

23   providing the debtor and its creditors with finality.  See

24   Enron Creditors Recovery Corporation, 3070 Bankruptcy 90 at

25   94, Bankruptcy SDNY 2007.  A bar date allows the parties in

1   a bankruptcy case to identify the universe of claims and

2   claimants in a reasonably prompt fashion, which is a

3   necessary step of achieving the goals of a successful

4   reorganization.  See First Fidelity Bank NA versus Hooker

5   Investments, In re Hooker, 937 F.2d 833, 840, Second Circuit

6   1991.  The bar date is not merely a procedural gauntlet;

7   It's an integral part of the reorganization process designed

8   to serve the efficient and fair administration of bankruptcy

9   cases.  See, In re Lehman Brothers Holdings, 433, Bankruptcy

10  113, Bankruptcy SDNY 2010, affirmed 445 Bankruptcy 137, SDNY

11  2011.

12          Bankruptcy courts do have discretion to enlarge

13  the time to file claims where the failure to file was the

14  result of excusable neglect.  See Bankruptcy Rule 906(b)(1).

15  This is, at its core, an equitable determination.  Four

16  factors determine are considered when analyzing excusable

17  neglect.  They are: one, the danger of prejudice to the

18  debtor; two, the length of the delay and its potential

19  impact on judicial proceedings; three, the reason for the

20  delay, including whether it was in the reasonable control of

21  the movant, and four, whether the movant acted in good

22  faith.  See Pioneer Investment Services Company versus

23  Brunswick Associates LP, 507 US 380 at 395, 1993.

24          The parties seeking an extension of time bears the

25  burden of proving excusable neglect.  In re Enron

1    Corporation. 419, F3d, 115, 121, Second Circuit 2005.

2            In these cases in particular, enforcing the bar

3    date is of extreme importance.  In 2010, ten years ago, in

4    denying several motions to allow late file claims in these

5    cases, then presiding Judge Peck reasoned that allowing the

6    filing of late claims would expose the debtors to the risk

7    of a virtually never-ending claims resolution process.

8    Particularly in the context of these enormously complex

9    cases, the bar date order needs to be uniformly enforced

10   except in truly unusual and compelling circumstances.  In Re

11   Lehman Brothers Holdings, 433 Bankruptcy at 127.

12           Mr. Waske does not provide any reason for seeking

13   to lodge a claim against the Lehman Estate, more than a

14   decade after the claim's bar date, let alone a reason that

15   might constitute excusable neglect.  He implies that certain

16   recent events have provided another reason why he thinks he

17   ought to be able to file a claim.  This does not, in any

18   way, change the analysis, nor does the subsequent purchase

19   of claims in a bankruptcy proceeding.  As held by the Court

20   in Enron Corporation, the purchase of claims in a bankruptcy

21   proceeding should not grant a transferee any greater rights

22   than the transferor had.  See In re Enron Corporation 2005,

23   Westlaw 383, 2053 at star 14, Bankruptcy, Southern District

24   of New York, November 28, 2005.

25           The lateness of this request, as I've said, is all

Page 21

1   the more inexcusable as it comes years after the

2   confirmation of the Lehman Chapter 11 plan.  The claims of

3   the trust were treated under the Lehman plan as class 10(b)

4   claims.  Mr. Waske now seeks to reclassify these claims as

5   class four claims.  It bears noting that Mr. Waske is not a

6   plan proponent and, indeed, has no standing to seek to

7   modify the Lehman Plan at all, let alone at this late date.

8   See 11 USC, Section 1127(b), In re Boylan International

9   Limited, 452 Bankruptcy 43 at 48, Bankruptcy SDNY 2011.

10          While a plan proponent may seek to modify the plan

11   if, for example, unforeseen circumstances render the

12   confirmed plan unworkable, modifications that accept the

13   expectation of creditors should be prohibited.  See Boylan

14   International, 452 Bankruptcy at 50.  Confirmation of a plan

15   is the equivalent of a final judgment in the civil

16   litigation.  Section 1127, it reinforces the principal of

17   finality by preserving the rights bought and paid for under

18   the plan.  In re Rickel & Associates, 260 Bankruptcy, 673,

19   at 677, Bankruptcy SDNY 2001.

20          Simply put, Mr. Waske has not standing to seek to

21   modify the Lehman plan to change the classification of the

22   trust claims from class 10(b) to class four.  Indeed, even

23   if he did have standing, such a modification would severely

24   upset the expectation of creditors and would not be

25   warranted.  For these reasons, and the reasons discussed in

Page 22

1    the oppositions filed by the Plan Administrator and as

2    previously described by the Court on this record, the three

3    motions filed by Mr. Waske are all denied.

4            All right, Mr. Fail, I would ask that you

5    circulate an appropriate order and circulate it to Mr. Waske

6    and send it to chambers for us to enter.

7            MR. FAIL:  Thank you, Your Honor, we will.  And

8    thank you and your chambers for the time this morning and

9    leading up to it.

10           THE COURT:  Thank you.  This concludes the

11   hearing.  Thank you all for participating.  Everybody please

12   stay safe.

13           MR. WASKE:  Thank you, Your Honor.  Thank you, Mr.

14   Fail.

15           MR. WU:  Thank you.

16           MR. FAIL:  Thank you.

17

18           (Whereupon these proceedings were concluded at

19   10:37 AM)

20

21

22

23

24

25

Page 23

1                          I N D E X

2

3                          RULINGS

4                                              Page      Line

5

6    Three motions all denied                  22        3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  June 23, 2020

[& - application]                                                                    Page 1

| & | | | |
|---|---|---|---|

**&**   3:3 4:21 21:18

**0**

**08-13555**   1:3

**1**

**1**   19:14
**10**   21:3,22
**10004**   1:14
**10153**   3:6
**10:01**   1:17
**10:37**   22:19
**10b**   17:9
**11**   17:4 18:19,22
   21:2,8
**1127**   21:8,16
**113**   19:10
**115**   20:1
**11501**   24:23
**12**   7:15
**121**   20:1
**127**   20:11
**137**   19:10
**14**   20:23
**177**   10:20
**19**   16:6
**19629**   17:15
**1991**   19:6
**1993**   19:23

**2**

**2001**   21:19
**2005**   20:1,22,24
**2007**   18:25
**2008**   11:17
**2009**   11:20 17:4
**2010**   19:10 20:3
**2011**   7:1 17:17
   19:11 21:9
**2019**   7:21 16:6
**2020**   1:16 7:14
   11:20 24:25
**2053**   20:23

**21805**   17:8
**22**   17:4 23:6
**22122**   17:8
**22123**   17:8
**22973**   17:9
**23**   24:25
**23023**   17:17
**260**   21:18
**28**   20:24

**3**

**3**   1:16 18:18 23:6
**300**   24:22
**3030**   18:18
**3070**   18:24
**330**   24:21
**380**   19:23
**383**   20:23
**395**   19:23

**4**

**4.14.**   17:10
**419**   20:1
**4271**   17:5
**43**   21:9
**433**   19:9 20:11
**445**   19:10
**452**   21:9,14
**48**   21:9

**5**

**50**   21:14
**507**   19:23

**6**

**6**   17:16
**60337**   5:3 14:24
**60348**   15:7
**60354**   15:7
**60378**   5:4
**60379**   15:8
**60381**   15:9
**60400**   15:7
**60403**   15:12
**60448**   2:1,4 5:6
   14:25

**60478**   15:9
**60479**   15:10
**60482**   5:7 15:4
**60484**   5:9 15:1
**60542**   15:12
**60641**   5:10 15:4
**60642**   15:13
**60645**   15:11
**63078**   15:4
**673**   21:18
**677**   21:19
**67753**   17:8

**7**

**71**   16:12
**767**   3:5

**8**

**833**   19:5
**840**   19:5
**85**   17:15

**9**

**90**   18:24
**906**   19:14
**937**   19:5
**94**   18:25

**a**

**able**   8:4 20:17
**absolutely**   9:25
**accept**   21:12
**accurate**   4:8,12
   24:4
**achieving**   19:3
**acknowledge**
   10:16
**acquire**   6:24
**acquisition**   6:25
   7:5
**acted**   19:21
**additionally**   6:10
   10:12
**address**   6:19 8:13
   18:15

**addressed**   5:16
**addressing**   6:5
   8:9
**administration**
   18:21 19:8
**administrator**
   4:22 5:3,7,9,17
   10:14 11:11,12
   15:3 16:11,18,24
   17:2,18,22 22:1
**administrator's**
   5:12 15:12
**affiliate**   6:10,13
   6:19 10:8,11,19
   11:5
**affirmed**   19:10
**agenda**   4:3,16 5:1
   5:5
**ago**   20:3
**ahead**   6:3 12:13
**alex**   15:7
**allegedly**   16:2
**allow**   20:4
**allowing**   20:5
**allows**   18:25
**alvin**   15:10
**ana**   3:14
**analysis**   20:18
**analyzing**   19:16
**answer**   5:19
**anybody**   12:9
**apparently**   7:24
**appeal**   14:4
**appeals**   14:6
**appear**   16:21
**appearing**   3:10
   4:10
**appears**   11:20
   14:23
**appellate**   14:7
**applicability**   9:14
**application**   4:6

apply   9:7
appreciate   6:1
appropriate
   10:15 22:5
approximately
   7:2 16:12
argue   6:11
argues   15:22
   17:18
argument   13:1
   16:23
arguments   7:23
   8:7,10,11,16
   11:22 12:3 15:17
   18:10,14,16
arrived   7:18
asking   6:11
asks   5:17
assert   7:21
asserted   15:20
assertion   8:15
asserts   15:19 16:4
assets   17:11
associates   19:23
   21:18
assuming   8:21
attorneys   3:4
available   4:7
avenue   5:1
aware   7:20

**b**

b   1:21 19:14 21:3
   21:8,22
back   10:5 12:18
bank   19:4
banking   9:16
bankruptcy   1:1
   1:12,23 7:15,17
   7:17 9:8,8,17
   11:18 18:17,18,24
   18:25 19:1,8,9,10
   19:10,12,14 20:11
   20:19,20,23 21:9

21:9,14,18,19
bar   11:19 17:3
   18:20,20,25 19:6
   20:2,9,14
based   14:7
basis   5:15 9:25
   17:21
bear   14:18
bears   5:12 19:24
   21:5
behalf   4:10 17:7
believe   5:14 15:25
believes   16:2
bench   14:20
berman   7:1 9:15
   13:5,7,13
boilerplate   10:14
bought   21:17
bound   11:12
bowling   1:13
boylan   21:8,13
braze   3:17 15:8
breach   10:10,11
   11:13
breaches   8:20
brian   15:9
brief   5:11
brothers   1:7 4:4
   4:21 6:16 9:6,23
   11:17 15:2 19:9
   20:11
brought   10:4
brunswick   19:23
burden   5:12
   19:25

**c**

c   1:22 3:1 4:1
   18:18 24:1,1
called   7:12
capital   6:12 10:22
   10:25 15:18 16:4
   17:6,23

case   1:3 4:4 18:19
   18:22 19:1
cases   17:4 19:9
   20:2,5,9
caused   11:23
cave   11:19
cease   18:14
center   6:6
certain   8:25 15:21
   20:15
certified   24:3
chambers   12:18
   22:6,8
chance   12:5
change   20:18
   21:21
chapman   1:22 4:3
chapter   17:4
   18:19,22 21:2
chose   13:24
christopher   3:15
   3:18
circuit   19:5 20:1
circulate   22:5,5
circulated   14:21
circumstances
   8:25 20:10 21:11
cites   9:4
civil   16:19 21:15
claim   8:14,22 9:2
   9:20,21 11:1,25
   17:7,7,12,23
   18:11,19 20:13,17
claim's   20:14
claimants   19:2
claims   9:10 10:6
   12:2 15:25 16:8
   16:13 17:3,8,19
   17:21,25 18:1,12
   18:20 19:1,13
   20:4,6,7,19,20
   21:2,4,4,5,22

class   16:9 17:9,12
   21:3,5,22,22
classes   17:12
classification
   17:20 21:21
classified   17:8
clear   12:17 18:7
close   11:5
cobbled   11:21
code   7:17
comes   21:1
comment   13:4
comments   13:6,13
company   19:22
compelling   20:10
competing   8:1
complex   20:8
concept   8:3,7
concepts   8:2 9:13
   9:14
concluded   22:18
concludes   22:10
conclusion   14:20
conducted   4:5
   7:16
confirmation
   15:23 21:2,14
confirmed   21:12
confirming   17:16
considered   19:16
considers   18:16
constitute   20:15
context   7:20 20:8
continue   8:8
   11:22
contract   6:7 11:9
control   19:20
cookie   12:7
core   19:15
corporation   18:24
   20:1,20,22
correct   13:20 14:2
   14:5 17:22

correctly  17:2
counsel  6:16 10:4
country  24:21
course  7:14 11:7
court  1:1,12 4:2,5
  4:24 5:19,23 6:3
  6:23 7:3,7,9,12,18
  7:20,24 8:4,5,5
  10:1,24 11:7,16
  12:13,17 13:6,9
  13:10,12,15,19,22
  13:23 14:1,4,7,10
  14:11,11,13,18,22
  16:11 17:15 18:5
  18:9,16,18 20:19
  22:2,10
court's  4:22 12:25
  14:5 16:6
courts  13:2 19:12
covenant  6:8,20
covenants  8:20
  10:11 11:13
create  4:8 11:22
created  4:7 9:15
creditors  9:24
  18:23,24 21:13,24
critically  18:21
crux  15:17
cutter  12:7

**d**

d  4:1 16:15 23:1
danger  19:17
danny  14:6
date  7:19 8:16
  10:6,16 11:19
  17:3 18:20,21,25
  19:6 20:3,9,14
  21:7 24:25
day  8:5,5
deadline  16:19
  18:19
debt  17:11,12

debtor  5:3 18:23
  19:18
debtors  1:9 3:4
  20:6
decade  20:14
december  17:16
decision  12:2,3
delay  19:18,20
denied  5:14 15:16
  16:25 18:5 22:3
  23:6
deny  5:18
denying  20:4
deployed  18:15
describe  12:6
described  17:10
  22:2
designed  19:7
determination
  10:15 19:15
determine  19:16
determined  11:22
dialed  4:18
difference  11:3
directly  8:13
disallowed  18:20
disclosure  17:14
discretion  12:25
  19:12
discussed  15:15
  21:25
dismissed  14:7
dispose  8:11
  12:21,25
disposition  11:25
distribution  16:3
  18:3
distributions
  10:10
district  1:2 20:23
division  9:16
doc  2:1,4

docket  5:10 14:24
  14:25 15:1,4,6,7,8
  15:8,9,10,10,12
  17:5,9,15,17
documents  12:5
due  8:3
duration  10:17
  11:15,15

**e**

e  1:21,21 3:1,1 4:1
  4:1 23:1 24:1
earlier  6:18 18:4
easy  10:8
ecf  5:3,4,7
ecro  1:25
efficient  19:8
either  8:20
elizabeth  3:16
  15:8
enforceable  15:24
  16:2
enforced  20:9
enforcing  15:21
  20:2
enlarge  19:12
enormously  20:8
enron  18:24 19:25
  20:20,22
enter  22:6
entered  17:16
entire  7:15
entirely  4:5 7:14
entitled  18:2
entry  16:16
equitable  19:15
equity  6:10,14
  9:15,18 11:4,4
equivalent  21:15
essence  12:23
essentially  6:6
establish  18:18
estate  10:4 11:24
  18:15 20:13

estate's  8:17
events  15:22
  20:16
everybody  22:11
example  21:11
excusable  19:14
  19:16,25 20:15
exhibit  16:15
existed  9:17
existence  16:5
exists  9:21
expectation  21:13
  21:24
expected  17:13
expense  8:9 11:24
expose  20:6
extension  19:24
extreme  20:3

**f**

f  1:21 24:1
f.2d  19:5
f3d  20:1
fact  7:14,22 9:14
  9:18 10:17,18
  11:13
factors  19:16
fail  3:8 4:18,20,20
  4:25 5:23 7:9,10
  7:11,12 8:16,19
  14:14,16 22:4,7
  22:14,16
failed  16:18 18:8
fails  5:15
failure  19:13
fair  19:8
faith  19:22
far  6:18,20 10:18
fashion  17:25
  19:2
federal  16:19
fidelity  19:4
fifth  3:5

Page 4

file   10:6 13:24
   17:19,23 18:11
   19:13,13 20:4,17
filed   2:2,4 5:2,2,4
   5:6,8,18 7:25
   10:25 11:17 12:7
   13:1,18,19 14:3
   14:22 15:5,25
   16:13,21 17:6,24
   18:5,6,20 22:1,3
filing   11:18,19
   17:3 18:19 20:6
filled   9:12
final   21:15
finality   8:7 18:23
   21:17
find   5:17 10:8
first   5:1 6:25 7:5
   7:19 19:4
five   6:13 15:19
   17:6
folks   8:4 11:20
follow   15:14
follows   15:17
foregoing   24:3
forth   5:13,13
   12:18
found   5:16
four   6:12 15:19
   16:9,10 17:6
   19:15,21 21:5,22
frivolous   18:16
fund   10:15
further   10:5
   14:10 17:18

g

g   4:1
garrett   3:8 4:20
   7:11
gauntlet   19:6
give   6:15 8:22 9:2
   12:1

giving   6:21
glen   15:8
glenn   3:17
global   10:25 16:8
   17:6
go   6:3 8:6 12:13
goals   19:3
going   8:10 12:9
   12:20 14:14,16
good   4:2,20 5:25
   6:4 19:21
gotshal   3:3 4:21
   7:11
grant   20:21
granted   6:21
   10:21
granting   16:16
greater   20:21
green   1:13
guarantee   6:7,19
   8:21,23,23,23,24
   9:3,5,10,20,21,23
   15:22,24 16:2,5
   18:1
guarantees   9:11
guess   6:15 11:5

h

happened   12:1
happy   5:19
harrison   3:16
   15:8
haver   10:10
hear   13:12,13
heard   6:2 8:4
   12:10,11
hearing   2:1,4 4:4
   4:13,17 12:10,14
   12:19,20,22,24
   14:2 15:15 18:4
   22:11
held   17:24 20:19
hello   4:2

higher   9:24
hold   12:24 17:25
holder   10:7 11:10
holders   10:21,22
   16:3 17:22
holdings   1:7 4:4
   4:21 9:6,23 15:2
   19:9 20:11
hon   1:22
honestly   10:7
honor   4:20,25
   5:11,15,20,25 6:4
   7:6,10 8:19 10:3
   11:2,6 12:12 13:4
   13:8,11,14,18,21
   13:24 14:3,9,12
   22:7,13
honored   11:14
hooker   19:4,5
hopefully   8:11
hurtado   3:5
hyde   2:25 24:3,8

i

ianello   14:6
identified   18:1
identify   4:9 19:1
ignore   7:22
ignored   7:14
immediate   16:16
impact   19:19
impediments   8:15
implies   20:15
importance   20:3
important   6:8,20
   8:1,3,4 18:21
importantly   9:2
impossible   8:7
impression   12:15
includes   9:4
including   5:18
   19:20
incorporate   14:21

incorporated   12:4
incorporating
   12:21
incorrect   8:14
incurred   8:9
indentured   10:25
   17:5,24
individuals   15:5
   16:21 18:6
inexcusable   21:1
information   10:8
integral   19:7
intended   18:22
interest   13:6
interested   13:16
international   21:8
   21:14
investment   8:24
   9:16 19:22
investments   19:5
issue   11:3
issues   10:13
item   5:5
items   5:1

j

jeffrey   15:9
joinder   12:7
   13:18,19,25 14:3
   14:12 18:6
joinders   7:25
   16:14,21
joining   15:5
joseph   2:2,5 3:13
   5:2 6:1 14:23
judge   1:23 4:2
   20:5
judgment   2:4 5:8
   12:16 15:1 16:15
   16:20 21:15
judicial   19:19
june   1:16 16:6
   24:25

junior  9:5,22

**k**

keep  4:14
key  9:6
kind  10:13
know  11:19
known  11:18

**l**

language  6:7
  10:19
largely  16:22
late  7:19 8:16
  10:6,16 20:4,6
  21:7
lateness  20:25
law  8:2
lbhi  15:2,18,22,23
  17:9,13
leading  22:9
ledanski  2:25 24:3
  24:8
legal  24:20
lehman  1:7 4:4,21
  6:16 9:6,22 10:20
  11:16 15:2 17:4,9
  17:14,16 19:9
  20:11,13 21:2,3,7
  21:21
length  19:18
letters  12:7 15:5
liabilities  9:6,22
likewise  18:2,8
limited  8:25 21:9
lindsay  15:10
line  4:23 5:24 6:1
  23:4
litigation  21:16
little  10:5
llp  3:3
lodge  20:13
long  10:17,22
  11:10,15,15 17:3
  17:20 18:11,13

lot  12:18
lp  19:23
lucia  3:14

**m**

manges  3:3 4:21
matter  1:5 4:16
  9:19
matters  4:3 13:10
mean  7:3
mechanism  18:22
merely  19:6
merits  8:13,14
  18:8
million  16:12
mineola  24:23
modification
  21:23
modifications
  21:12
modify  21:7,10,21
moments  14:19
money  8:25 9:1
morning  4:2,3,20
  4:23 5:25 6:4 22:8
motion  2:1,1,4 5:2
  5:4,5,5,7,8,9,10
  12:16,16,20,22,25
  13:1 14:1,6,23,24
  14:25 15:6 16:7,9
  16:10,14,14,15,16
  16:18,20 17:1
  18:5,7
motions  5:14,18
  5:18 6:6 12:2,14
  12:21 13:3,22
  14:5,22,24 15:3
  15:15 16:25 18:7
  20:4 22:3 23:6
movant  5:12
  13:16,20 19:21,21
moving  8:12
mute  4:14

**n**

n  3:1 4:1 23:1
  24:1
necessary  19:3
needed  11:18
needs  20:9
negate  10:17
neglect  19:14,17
  19:25 20:15
neuberger  7:1
  9:15 13:5,7,13
never  20:7
new  1:2,14 3:6
  20:24
noted  18:4
notes  17:2
noting  21:5
november  20:24
number  5:1,10
  7:24 14:24,25
  15:1,7,8,9,9,10,11
  15:12 17:5,9,15
  17:17
numbers  15:4,7
  17:7
ny  1:14 3:6 24:23

**o**

o  1:21 4:1 24:1
object  16:18
  17:19 18:12
objected  5:7,10
  15:3
objection  5:4,13
  15:12
objections  5:14
  6:18
objects  16:24
obligation  12:24
observation  7:13
occurred  15:23
oddly  8:5
okay  6:3 13:15
  14:14

old  24:21
olivo  15:7
omnibus  15:25
once  8:11
opening  5:11
opportunity  6:2
oppositions  22:1
oral  13:1
order  4:8 14:20
  16:11,16 17:16
  18:15 20:9 22:5
orders  7:18
ought  20:17
outside  9:8
outstanding  10:23
  11:10
overarching  7:13

**p**

p  3:1,1 4:1
page  16:10,15,20
  17:15 23:4
pages  11:20
paid  21:17
papers  13:1
parent  6:9,13
  11:5
pari  9:24
parity  6:13,19 9:8
  9:11 10:19
part  16:6 19:7
participate  4:18
participating
  22:11
particular  12:24
  20:2
particularly  20:8
parties  4:7 16:13
  18:25 19:24
party  4:10 13:16
passed  17:20
  18:11,13
passu  9:24

**[pay - rights]**

pay 9:1
payment 6:10,21
  8:24
payments 10:20
peck 20:5
pending 14:10
perfectly 12:17
permissible 4:13
permits 5:20
permitted 8:8
persons 12:8
phones 4:14
pioneer 19:22
placed 6:12
plan 4:22 5:3,6,9
  5:12,17 9:24
  10:14 11:11,12
  15:2,11,23 16:9
  16:11,17,24 17:1
  17:9,14,16,18,19
  17:22 18:13 21:2
  21:3,6,7,10,10,12
  21:14,18,21 22:1
pleadings 9:12
please 22:11
point 4:12 8:12
points 8:20 10:4
poofs 18:19
positions 5:12
possibly 6:16
potential 16:12
  19:18
preference 6:14
  10:9 11:4
preferred 9:9
prejudice 16:25
  19:17
prepared 12:1
  14:21
preserving 21:17
presiding 20:5
previous 14:5
  18:10

previously 15:14
  18:5 22:2
principal 21:16
prior 6:25 9:17
private 4:13
pro 3:12,13
procedural 8:15
  19:6
procedure 16:19
proceeding 7:15
  20:19,21
proceedings
  19:19 22:18 24:4
process 8:3 19:7
  20:7
prohibited 21:13
prompt 19:2
proof 18:11
proofs 10:25 17:7
  17:23
properly 15:20
  17:24
proponent 21:6
  21:10
prospectus 6:6,8
  6:21 8:21 10:18
  11:9
prospectuses
  11:21 17:10
provide 20:12
provided 9:23
  10:13 11:9 16:19
  20:16
provides 9:4
providing 18:23
proving 19:25
provision 9:3
publicly 11:17
purchase 20:18
  20:20
purchases 7:6
purchasing 16:7

put 21:20

**q**

question 6:23 9:9
  9:19
questions 5:16,19
quote 15:24 18:21
quotes 9:4

**r**

r 1:21 3:1 4:1 24:1
raise 8:20
rank 9:5,20
reach 10:12
read 14:14
real 9:13,13
reason 6:5 19:19
  20:12,14,16
reasonable 19:20
reasonably 19:2
reasoned 20:5
reasons 15:14
  21:25,25
rebut 5:21
receive 17:13
received 4:16 10:9
reclassification
  16:3 18:12
reclassified 7:4
  12:15 16:1
reclassify 2:2 5:2
  5:6 9:21 14:23
  15:6 16:8,8,10,14
  17:1 21:4
reclassifying
  17:21
record 4:12 7:10
  15:15 22:2 24:4
recorded 4:6
recordings 4:13
recovery 17:13
  18:24
registered 12:10
reinforces 21:16

reiterate 18:9
rejected 7:24
related 5:1,8
  12:23 14:24
relevant 17:10
relief 5:15 6:12
  7:25 12:23 17:3
relies 16:5
remain 11:10
remained 10:22
remind 8:2
render 21:11
reorganization
  16:9 19:4,7
repeat 16:22
replies 15:11
request 4:8 20:25
requesting 4:9 8:1
requests 7:22
requires 18:18
requiring 16:11
reserve 2:1 5:5,9
  5:20 12:16 14:25
  16:10,12,14,17
resolution 20:7
resources 18:14
respect 17:1 18:17
respond 5:21 6:16
  10:3
response 6:20
responses 8:18
result 16:3 19:14
return 8:24
review 12:5
rex 3:12 5:19 15:6
  18:5
rickel 21:18
right 5:23 6:3
  10:1 11:1,15
  13:23 14:1,13,18
  17:23,24 22:4
rights 6:10,11,22
  7:22 10:11,18,19

[rights - trust]                                                                                     Page 7

10:21 11:8,10,12
11:14 15:21 20:21
21:17
**rise**  8:22 9:2
**risk**  20:6
**road**  24:21
**roster**  4:17
**rule**  14:8 18:17
19:14
**ruled**  13:22
**rules**  7:17 16:19
**ruling**  7:20 12:4
12:22 13:3 14:5,8
14:9,20,21 16:6
**rulings**  18:10 23:3

**s**

**s**  3:1 4:1
**safe**  22:12
**satisfy**  16:12
**scc**  1:3
**scheduled**  4:17
**sdny**  18:25 19:10
19:10 21:9,19
**se**  3:12,13
**second**  9:7 19:5
20:1
**section**  6:8,21
17:10 21:8,16
**sections**  6:9
**securities**  6:24
10:7
**security**  10:21,22
11:9
**see**  15:4,12 16:20
17:7,14 18:23
19:4,9,14,22
20:22 21:8,13
**seeing**  9:21
**seek**  7:3 21:6,10
21:20
**seeking**  12:23
17:2 19:24 20:12

**seeks**  16:8,10,16
21:4
**seen**  6:20 12:6
**send**  22:6
**senior**  6:9 10:8
**sense**  5:23
**sentence**  9:7
**september**  17:4
**series**  7:17,23
**serve**  19:8
**services**  19:22
**set**  5:13,13
**severely**  21:23
**shares**  6:14,14
10:9,9 15:18 16:4
16:7 17:22
**shelley**  1:22
**side**  14:17
**similar**  5:16 7:23
18:5
**similarly**  16:22
**simply**  17:20
21:20
**sir**  5:24
**situated**  16:22
**six**  6:13 15:19
17:6
**skipped**  8:14
**solutions**  4:6
24:20
**sonya**  2:25 24:3,8
**southern**  1:2
20:23
**speak**  4:11
**speaking**  4:15
**speaks**  4:9
**specific**  6:9
**spinoff**  7:1 9:15
**standing**  14:7
21:6,20,23
**star**  20:23
**start**  4:19 6:5

**started**  4:24
**state**  5:15
**statement**  17:15
**states**  1:1,12
**status**  6:7 9:3,22
**stauble**  3:15
**stay**  22:12
**step**  19:3
**stock**  9:9
**stoppage**  6:10,22
10:19
**submitted**  15:11
**subordinate**  9:5
9:10 11:4
**subordinated**
9:22 17:11,12
18:1,2
**subordination**  9:3
**subsequent**  7:6
20:18
**subsequently**  16:7
**subsidiaries**  6:11
6:22 10:20
**subsidiary**  6:14
10:9 11:5
**successful**  19:3
**suggest**  7:19
**suite**  24:22
**summary**  2:4 5:8
12:16 14:25 16:15
16:20
**supporting**  15:5
**supports**  15:18
**sure**  11:7

**t**

**t**  24:1,1
**take**  8:17 14:19
**taken**  11:20 14:4
**telephonically**  3:8
3:10,12,13,14,15
3:16,17,18 4:5 8:6
**ten**  16:15 20:3

**terms**  8:17
**thank**  4:22,25
5:24 7:7,8,10 8:19
10:1 14:13,17
22:7,8,10,11,13
22:13,15,16
**theory**  7:19
**thing**  9:1 11:6
**things**  9:11
**thinks**  20:16
**thought**  11:24
**three**  6:12 12:21
13:3 14:22 15:19
17:6 19:19 22:2
23:6
**time**  4:11,22 5:20
6:15 8:9 11:18
12:5 13:2 17:2,19
18:10,12,13 19:13
19:24 22:8
**timely**  15:3 17:6
17:25
**timing**  18:17
**today**  4:17,18
5:17,22 6:5 8:11
12:22 13:3,10
14:2 18:4,10
**today's**  8:5 12:14
**transaction**  13:5,7
13:13
**transcribed**  2:25
**transcript**  4:6,8
12:3 24:4
**transferee**  20:21
**transferor**  20:22
**treated**  21:3
**tremendous**  11:24
**true**  24:4
**truly**  20:10
**trust**  10:22,25
15:18,21 16:7
17:6,7,21,23 21:3
21:22

| | |
|---|---|
| **trust's** 16:8 | 6:1,4,23,25 7:5,8 |
| **trustee** 10:12 | 7:13 9:4 10:1,3,24 |
| 15:20,25 | 11:2,8 12:20 |
| **trustees** 10:25 | 13:16 14:23 15:11 |
| 17:5,24 | 15:18,22 16:4,13 |
| **trusts** 6:12 8:25 | 16:17,22 18:1,11 |
| 15:19,20 16:1,4 | 18:12 20:12 21:4 |
| 17:11,25 | 21:5,20 22:3,5,13 |
| **try** 10:12 | **waske's** 9:12 15:6 |
| **two** 8:20 14:24 | 15:15,17 16:23,24 |
| 16:20 19:18 | 18:7 |
| **u** | **way** 5:17 20:18 |
| | **we've** 12:4 |
| **u.s.** 1:23 | **weil** 3:3 4:21 7:11 |
| **understand** 10:6 | **westlaw** 20:23 |
| 10:24 11:1,2,11 | **whatsoever** 9:25 |
| 12:19 13:3 | 13:9 |
| **unforeseen** 21:11 | **whelan** 3:18 |
| **uniformly** 20:9 | **wilson** 15:10 |
| **united** 1:1,12 | **wish** 12:11 13:12 |
| **universe** 19:1 | **wishes** 12:10 |
| **unknown** 1:25 | **wood** 15:9 |
| **unnecessary** 18:8 | **words** 9:13,13 |
| **unquote** 15:24 | **work** 10:12 |
| **unusual** 20:10 | **world** 9:18 |
| **unworkable** | **written** 10:18 |
| 21:12 | 11:8 |
| **upset** 21:24 | **wu** 3:12 5:19 7:23 |
| **usc** 21:8 | 12:10,12,14 13:4 |
| **v** | 13:7,8,11,14,17 |
| | 13:18,21,24 14:3 |
| **value** 9:18 | 14:6,12 15:6 18:6 |
| **various** 11:21 | 22:15 |
| 12:7 15:4 | **wu's** 11:25 |
| **veritext** 24:20 | **x** |
| **versus** 19:4,22 | |
| **view** 8:13 | **x** 1:4,10 23:1 |
| **virtually** 20:7 | **y** |
| **w** | |
| | **years** 7:15 20:3 |
| **want** 8:17 | 21:1 |
| **wanted** 6:5 | **york** 1:2,14 3:6 |
| **warranted** 21:25 | 20:24 |
| **waske** 2:2,5 3:13 | |
| 5:2,6,8,21,24,25 | |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                     :

In re                              :          Chapter 11 Case No.
                                       :

LEHMAN BROTHERS HOLDINGS INC., *et al.*    :          08-13555 (SCC)
                                       :

     Debtors.                     :          (Jointly Administered)
                                       :

------------------------------------------------------------------x

### ORDER DENYING (I) MOTION TO RECLASSIFY  (ECF NO. 60337); (II) MOTION TO RESERVE FOR MOTION TO RECLASSIFY (ECF NO. 60448); AND (III) MOTION FOR SUMMARY JUDGEMENT (ECF NO. 60484)

The Court having considered the following motions filed by Joseph Waske ("**Waske**"):

(i) *Motion to Reclassify* [ECF No. 60337] (the "**Motion to Reclassify**"), (ii) *Motion to Reserve*

*for Motion to Reclassify* [ECF No. 60448] (the "**Motion to Reserve**"), (iii) *Motion for Summary*

*Judgement* [ECF No. 60484] (the "**Motion for Summary Judgement**" and collectively with the

Motion to Reclassify and the Motion to Reserve, the "**Motions**); and the Court having

considered the timely objections by the Plan Administrator to the Motion to Reclassify [ECF No.

60378], to the Motion to Reserve [ECF No. 60482], and to the Motion for Summary Judgement

[ECF No.60641]; and the Court having considered each of Waske's replies thereto [ECF Nos.

60403, 60542, and 60642]; and the Court having considered all of the joinders and statements

filed in connection with the Motions (collectively, the "**Joinders**") [ECF Nos. 60348, 60354,

60379, 60381, 60400, 60478, 60479, 60507, 60645, and 60654]; and the Court having

jurisdiction to decide the Motions and the relief requested therein in accordance with 28 U.S.C.

§§ 157(a)-(b) and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31,

2012 (Preska, C.J.); and consideration of the Motions and the relief requested therein being a

core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having conducted a hearing on the

Motions on June 3, 2020 (the "**Hearing**"); and after due deliberation and for the reasons stated

by the Court in its bench ruling at the Hearing, which are incorporated as if set forth herein and

made part hereof, the Court having determined that no party established sufficient factual or

legal basis for the requested relief in the Motions, it is hereby

      1.    ORDERED that each of the Motions is denied with prejudice; and it is

further

      2.    ORDERED that any relief sought by the Motions or the Joinders is denied

with prejudice.

      3.    ORDERED that this Court shall retain jurisdiction with respect to all

matters arising from or related to the implementation of this Order.

Dated: June 11, 2020
     New York, New York

                      /S/ Shelley C. Chapman
                      THE HONORABLE SHELLEY C. CHAPMAN
                      UNITED STATES BANKRUPTCY JUDGE

Party: First Applicant
Witness: Russell Downs
Statement No: 4
Exhibit: "RD1"
Date: 2 August 2013

**Nos. 7942 and 7945 of 2008 and No. 429 of 2009**

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>CHANCERY DIVISION</u>
<u>COMPANIES COURT</u>

IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

BETWEEN:

(1) THE JOINT ADMINISTRATORS OF LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)
(2) THE JOINT ADMINISTRATORS OF LEHMAN BROTHERS LIMITED (IN ADMINISTRATION)
(3) THE JOINT ADMINISTRATORS OF LB HOLDINGS INTERMEDIATE 2 LIMITED (IN ADMINISTRATION)

<u>Applicants</u>

- and -

(1) LEHMAN BROTHERS HOLDINGS, INC
(2) LYDIAN OVERSEAS PARTNERS MASTER FUND LIMITED

<u>Respondents</u>

---

FOURTH WITNESS STATEMENT OF

RUSSELL DOWNS

---

I, **RUSSELL DOWNS** of PricewaterhouseCoopers LLP ("**PwC**") of 7 More London Riverside, London, SE1 2RT say as follows:

1    I am a Partner in the firm of PwC of the above address and am one of the joint administrators of Lehman Brothers International (Europe) (in administration) ("**LBIE**").

2    I make this statement in relation to the Application for directions issued on behalf of the Administrators of LBIE (the "**LBIE Administrators**"), the administrators of Lehman Brothers Limited ("**LBL**") and the administrators of LB Holdings Intermediate 2 Limited ("**LBHI2**") on 14 February 2013 pursuant to paragraph 63 of Schedule B1 to the Insolvency Act 1986 (the "**Act**") and as amended on 2 May 2013 (the "**Joint Application**").

3    There is now produced and shown to me a paginated bundle of documents marked "**RD1**" and a paginated bundle of documents and correspondence marked "**AVL1**" (previously exhibited to the witness statement of Anthony Victor Lomas dated 14 February 2013 in support of the Joint Application (the "**Lomas Witness Statement**")), to which I shall refer. Save where otherwise stated, page references in this statement are to the contents of these exhibits.

4    Save where otherwise stated this witness statement is made from facts and matters that are within my own knowledge.

5    Certain background to the Joint Application is set out in the Lomas Witness Statement. I do not repeat in this witness statement the matters already set out in the Lomas Witness Statement.

6    As part of the process of preparing LBIE's case in the Joint Application, the LBIE Administrators have:

6.1    conducted a disclosure exercise in which LBIE searched, on behalf of the Applicants, certain sources of documents (agreed among the Applicants and the Respondents (the "**Parties**")) for certain search terms (agreed among the Parties) and, having reviewed the search results for documents relevant to the factual topics identified in the Court's order of 2 May 2013, disclosed the resulting documents to the Parties (the "**Disclosure Exercise**"); and

6.2    participated (by their solicitors, Linklaters LLP ("**Linklaters**")) in a number of interviews, attended also by representatives of LBL, LBHI2 and Lehman Brothers Holdings, Inc. ("**LBHI**"), with the following individuals identified by the Parties as having been involved in the events to which the Application relates and/or potentially having knowledge relevant to the issues in the Application:

(i)    Marcus Jackson (who was, prior to leaving Lehman Brothers in May 2008, European Financial Controller and a director of LBIE and LBHI2);

(ii)     Jackie Dolby (who was, prior to LBIE's entry into administration, head of European Corporate Tax);

(iii)    Antony Rush (who was, prior to LBIE's entry into administration, International Tax Director and a director of LBIE and LBHI2);

(iv)    Peter Sherratt (who was, prior to LBIE's entry into administration, Chief Legal Officer);

(v)     Dave Rushton (who was, prior to LBIE's entry into administration, employed in the Treasury function);

(vi)    Dominic Gibb (who was, prior to LBIE's entry into administration, European Financial Controller); and

(vii)   Margaret Smith (who was, prior to LBIE's entry into administration, in-house counsel and LBIE Company Secretary),

(the "**Joint Interviews**" and each a "**Joint Interview**").

7    I refer in this witness statement to information obtained during those interviews; in each case I identify the name of the individual who provided that information.

## (A)   LBIE CORPORATE BACKGROUND AND STRUCTURE

8    LBIE was the principal trading company within the European Lehman Brothers group of companies (the "**European Lehman Group**") and is (and was, at the time of its entry into administration) an English unlimited company. LBL and LBHI2 (the second and third Applicants to the Joint Application) are the only shareholders of LBIE. LBL holds one ordinary share of $1. LBHI2 holds:

8.1    6,273,113,999 ordinary shares of $1 each;

8.2    2 million 5% redeemable preference shares of $1,000 each; and

8.3    5.1 million 5% redeemable Class B preference shares of $1,000 each.

A copy of LBIE's most recent Articles and Memorandum of Association appears at **pages 1 to 24 of AVL1**. Copies of previous versions of LBIE's Articles and Memorandum of Association insofar as there were material differences in those versions at the time of the events relevant to the Joint Application are at **pages 1-77 of RD1**. A copy of LBIE's most recent Annual Return, dated 23 April 2008, is at **pages 78-92 of RD1**.

9    LBIE was incorporated on 10 September 1990, as a limited company named "Lehman Brothers International Limited" ("**LBIL**") and with the registered company number 02538254. A copy of LBIE's original Certificate of Incorporation is at **page 116 of RD1**.

*LBIE's re-registration as an unlimited company*

10   On 21 December 1992, LBIE was re-registered as an unlimited liability company and renamed as "Lehman Brothers International (Europe)". A copy of the relevant Certificate of Incorporation on Change of Name and Re-Registration of a Limited Company as Unlimited is at **page 117 of RD1**.

11   In the course of the Disclosure Exercise and the Joint Interviews, one of the factual topics on which the Parties sought information was the rationale behind the decision to re-register LBIE as an unlimited company in December 1992. I understand that those processes have revealed little information that sheds light on that decision. However, I am informed that during the Joint Interview with Ms Dolby (who was employed in various roles within the Lehman Brothers European Tax department from August 1996 until LBIE's entry into administration on 15 September 2008), Ms Dolby explained that it was her understanding that the re-registration of LBIE as an unlimited company was undertaken for US tax reasons. In particular, Ms Dolby was of the understanding that at the relevant time US tax law allowed a company, provided certain conditions were met, to be treated as a "branch" of another company for tax purposes. One benefit of such treatment was the potential for a taxable profit in the "parent" to be set off against a loss in the "branch" (or vice versa) for US tax purposes (a concept similar to "group relief" under UK corporate tax law).

12   It is Ms Dolby's understanding that re-registration as an unlimited company was considered to be one of the means by which a company could be deemed a branch of another under the relevant US tax law. I understand that Ms Dolby is of the view that LBIE was re-registered as an unlimited liability company so that LBIE could be treated as a branch of its then parent, Lehman Brothers Holdings Plc ("**LBHPLC**"), for US tax purposes. At **pages 118-119 of RD1** is a copy of a file note written by Ms Dolby on 27 December 2000 in which she recorded her understanding of the reasons for LBIE's re-registration as an unlimited company in December 1992. I understand that Ms Dolby does not recall the circumstances in which she wrote the file note.

*LBIE's minority shareholder*

13   I am informed by Linklaters that, from the date of its incorporation and throughout
     most (but not all) of its corporate history, LBIE had a shareholder holding one
     ordinary $1 share (a "**Single Dollar Share**") or one ordinary £1 share (a "**Single
     Sterling Share**" and, together with a Single Dollar Share, a "**Single Share**")) in
     LBIE. In particular, LBIE's corporate records show that:

   13.1   LBIE was incorporated with an issued share capital of $2. The original
          subscribers were Alistair Francis Bird and Colleen Ann Harney (each
          holding a Single Dollar Share) (LBIE's memorandum and articles of
          association showing the original subscribers is at **pages 1-19 of RD1**).

   13.2   On 5 October 1990, the original subscribers transferred their shareholdings
          as follows (a copy of board minutes of LBIE (then LBIL) dated 5 October
          1990 approving the transfers is at **pages 120-123 of RD1**):

        (i)    Mr Bird transferred his Single Dollar Share to LBHPLC (which was,
               at that time, named Shearson Lehman Brothers Holdings PLC);
               and

        (ii)   Ms Harney transferred her Single Dollar Share to Martin William
               Cornish (a solicitor then employed within the Lehman Brothers
               group who was Chief Legal Officer and the LBIE Company
               Secretary until 2 October 1991);

   13.3   On 30 November 1990, 59,999,998 ordinary shares of $1 were allotted to
          LBHPLC, making LBHPLC the majority shareholder (a copy of a board
          minute of LBIE (then LBIL) dated 29 November 1990 approving the
          allotment is at **pages 124-127 of RD1**). From that point until the 2006
          Restructuring (see Section C below), LBHPLC was LBIE's majority
          shareholder;

   13.4   Mr Cornish held a Single Dollar Share until 2 October 1991, when it was
          transferred to Mr Sherratt (who was also a solicitor employed within the
          Lehman Brothers group and who succeeded Mr Cornish as Chief Legal
          Officer and LBIE's Company Secretary on 2 October 1991) (a copy of board
          minutes of LBIE (then LBIL) approving the transfer is at **page 128 of RD1**);

   13.5   Mr Sherratt held the Single Share until 22 September 1992, when it was
          transferred to LBHPLC (a copy of the stock transfer form dated 22

September 1992 is at **page 129 of RD1** and a copy of board minutes of LBIE (then LBIL) dated 1 October 1992 approving the transfer is at **pages 131-140 of RD1**). It appears that, although the stock transfer form purports to transfer a Single Sterling Share, this is an error and the stock transfer form ought to refer to a Single Dollar Share because:

    (i)    the LBIE share register (the "**Share Register**") reflects a transfer of a Single Dollar Share (a copy of the Share Register is at **pages 149-158 of RD1**);

    (ii)    LBIE has found no evidence of a Single Sterling Share ever having been transferred or allotted to Mr Sherratt; and

    (iii)    LBIE's memorandum and articles of association at that time did not allow for LBIE's share capital to be denominated in sterling;

13.6    between 22 September 1992 and 23 November 1994 LBIE had only one shareholder, being LBHPLC;

13.7    on 10 December 1992, LBIE's memorandum and articles of association were amended and its authorised share capital increased by the creation of 50,000,000 shares of £1 each;

13.8    on 18 December 1992, LBIE (by its sole shareholder, LBHPLC) adopted a written shareholder resolution amending its articles of association to, amongst other things, limit its number of shareholders to one unless otherwise determined by special resolution (a copy of the written resolution is at **pages 356-360 of RD1** and a copy of LBIE's new memorandum and articles of association adopted on 18 December 1992 is at **pages 23-43 of RD1**);

13.9    on 23 November 1994, LBIE (by its sole shareholder, LBHPLC) adopted a written shareholder resolution amending its articles of association to, amongst other things, remove the restriction on LBIE having more than one shareholder which had been entered into its articles on 18 December 1992. A copy of the written resolution is at **pages 361-362 of RD1** and LBIE's new memorandum and articles of association adopted on 23 November 1994 is at **pages 44-60 of RD1**;

13.10    on 23 November 1994, LBL acquired from LBHPLC a Single Sterling Share to be held as nominee on behalf of LBHPLC. A copy of the stock transfer

form dated 23 November 1994 effecting that transfer is at **pages 141-142 of RD1**. A copy of board minutes of LBL resolving to hold the Single Sterling Share as nominee for LBHPLC is at **page 143 of RD1**. A copy of board minutes of LBIE approving the transfer is at **page 144 of RD1**;

13.11    on 1 May 1997, LBIE resolved to cancel and extinguish all sterling shares, including the Single Sterling Share held by LBL, and the LBIE board resolved to allot to LBL a Single Dollar Share. I understand that, unlike LBL's earlier holding of a Single Sterling Share as nominee for LBHPLC, there is nothing in the documents effecting the allotment of the Single Dollar Share to indicate that LBL would be holding the Single Dollar Share as a nominee. A copy of the minutes of the meeting of shareholders cancelling and extinguishing the Single Sterling Share is at **page 145 of RD1**. A copy of LBL board minutes approving an application for the allotment to LBL of a Single Dollar Share is at **page 146 of RD1**, a copy of a letter from LBL to LBIE making that application is at **page 147 of RD1** and a copy of the LBIE board minutes approving the allotment of the Single Dollar Share is at **page 148 of RD1**. A copy of the Share Register is at **pages 149-158 of RD1**.

14    In the course of the Disclosure Exercise and the Joint Interviews, the LBIE Administrators (together with the other Parties) have sought information as to:

14.1    why LBIE had a shareholder holding a Single Share from its incorporation until 22 September 1992 and from 23 November 1994 until the present; and

14.2    why LBL was LBIE's minority shareholder from 23 November 1994.

15    I understand from Linklaters that the Disclosure Exercise and the Joint Interviews have revealed little information that sheds light on those questions. Furthermore, I am advised by Linklaters that there is no obvious correlation between the corporate law applicable to LBIE at the relevant times and LBIE's shifts between:

15.1    having two shareholders until 22 September 1992;

15.2    having a single shareholder between 22 September 1992 and 23 November 1994; and

15.3    having two shareholders from 23 November 1994.

16    However, Mr Sherratt (who was LBIE's Company Secretary and the holder of a Single Share between 2 October 1991 and 22 September 1992, and Chief Legal Officer from 2 October 1991 until LBIE's entry into administration), suggested in his

Joint Interview that one possible reason for LBL (as opposed to another entity) holding a Single Share in LBIE from 23 November 1994 was that LBL was an unregulated entity and the Lehman Brothers group would have preferred the Single Share to be held in an unregulated entity so as not to attract the adverse regulatory consequences that would potentially result from a regulated entity holding the Single Share and the unlimited liability that attached to it.

(B)    **CAPITAL ADEQUACY REQUIREMENTS**

17    In Section C (The 2006 Restructuring) below, I refer at various points to the capital adequacy requirements to which LBIE was subject at relevant times. In this Section I set out my broad understanding of those capital adequacy requirements.

18    I understand that capital adequacy denotes the amount of capital that a bank or other financial institution is required to hold under the rules set down by its financial regulator. The purpose of capital adequacy rules is to ensure that firms provide financial resources to protect the firm, its customers and other stakeholders against premature failure and enable it to withstand some level of loss.

19    In LBIE's case the relevant financial regulator was the Financial Services Authority ("**FSA**") (which has since been replaced, for the purposes of capital adequacy regulation, by the Prudential Regulation Authority). The FSA, like many regulators worldwide, devised capital adequacy rules based on the Basel Accords, which are published from time to time by the Basel Committee on Banking Supervision at the Bank for International Settlements.

20    I am advised by Linklaters that on 31 December 2006, the FSA introduced the General Prudential Sourcebook ("**GENPRU**") which set out the capital adequacy requirements applicable to LBIE from that date until its entry into administration. GENPRU set out rules to ensure that a regulated firm would "*at all times maintain overall financial resources, including capital resources and liquidity resources, which are adequate, both as to amount and quality, to ensure that there is no significant risk that its liabilities cannot be met as they fall due*" (GENPRU 1.2.26). In order to categorise the "quality" of a firm's capital resources, GENPRU set out three "tiers" of capital (based on the Second Basel Accord (known as "Basel II") then in effect) which a firm was required to identify separately in its regulatory capital reporting to the FSA (GENPRU 1.2.36).

21    However I am advised by Linklaters that the tier ranking of a particular capital instrument was not necessarily decided solely based on its characteristics. In particular, FSA rules limited the amount of capital that a regulated firm could designate as tier 2 capital to a value no greater than 50% of the value of tier 1 capital held, with any excess capital being designated as tier 3 capital. As a result, capital instruments which, on their terms, were capable of constituting tier two capital might in fact be classified as tier 3 capital if a firm had already reached its tier 2 capital capacity.

22    I am advised by Linklaters that the three tiers of capital set out by GENPRU are as described below:

22.1    Tier 1 capital

GENPRU described tier 1 capital as typically having the following characteristics:

(i)    it is able to absorb losses;

(ii)    it is permanent;

(iii)    it ranks for repayment upon winding up, administration or similar procedures after all other debts and liabilities; and

(iv)    it has no fixed costs (i.e. no inescapable obligation to pay dividends or interest).

I am advised that the most obvious example of tier 1 capital is ordinary share capital.

22.2    Upper and lower tier 2 capital

GENPRU described tier 2 capital as capital which does not meet the requirements of permanency and lack of fixed servicing costs which are required for tier 1 capital. In particular, there are two types of tier 2 capital:

(i)    upper tier 2 capital is capital which is perpetual (i.e. which has no fixed repayment term) but which carries servicing costs which cannot be waived at the firm's option (but may be deferred). Upper tier 2 capital specifically includes cumulative preference shares; and

(ii)    lower tier 2 capital is capital which is either not perpetual (i.e. which has a fixed repayment term) or has fixed servicing costs that cannot generally be either waived or deferred. Lower tier 2 capital should

normally have an original maturity of at least five years. Lower tier 2 capital specifically includes medium to long-term subordinated debt (with an original maturity of at least five years)

**22.3** Tier 3 capital

GENPRU describes tier 3 capital as forms of capital conforming least well to the characteristics of tier 1 capital. Tier 3 capital specifically includes "*subordinated debt of short maturity*".

23    Regulated firms such as LBIE were required to hold certain levels of regulatory capital based upon ratios reflecting the level of risk they faced from time to time. Given the lower "quality" of tier 2 and tier 3 capital, LBIE was limited in the amount of its capital base that could be constituted of tier 2 and tier 3 capital instruments.

**(C)    THE 2006 RESTRUCTURING**

24    In late 2006, the Lehman Brothers group conducted a restructuring of its European business aimed at reducing the global effective tax rate of the Lehman Brothers group as a whole (the "**2006 Restructuring**"). This restructuring saw LBHI2 become LBIE's majority shareholder, holding all but one of the ordinary shares in LBIE.

25    LBIE was the UK broker dealer of the Lehman Brothers group, providing a wide range of financial services including trading and broking fixed income and equity instruments, participation in the syndication and underwriting of new security issues and stock broking in relation to securities issued in many major and emerging markets around the world. I am informed by Ms Dolby and Mr Jackson (who was, prior to leaving Lehman Brothers in May 2008, European Financial Controller) that during the 2000s, there was a significant expansion of Lehman Brothers' activities in Europe, resulting in an increase in business booked to LBIE.

26    I am informed by Ms Dolby that this increase in LBIE's trading activity gave rise to a need for the Lehman Brothers group to ensure:

**26.1**    that its tax planning was always up-to-date to allow this increased activity to be conducted as efficiently as possible from a global tax perspective; and

**26.2**    that LBIE would continue to meet its regulatory capital requirements as an FSA-regulated entity.

27    Ms Dolby and Mr Jackson have explained that, as a result of the Lehman Brothers group's growing European trading activities, by 2006 LBIE was accumulating a significant volume of foreign tax credits (that is, in respect of amounts paid in taxation in relation to its trades) (the "**LBIE FTCs**"), and that the global Lehman Brothers group wanted to be able to utilise these LBIE FTCs in the United States, to avoid double taxation and thereby reduce the Group's global effective tax rate.

28    Ms Dolby has also explained that in order for the LBIE FTCs to be available to the Lehman Brothers group for the purposes of its financial reporting in the US, LBIE needed to be profitable. Ms Dolby's recollection is that, at that time, LBIE was not profitable, for two main reasons:

    28.1    much of LBIE's profitable business had previously been transferred to Lehman Brothers Europe Limited (for other tax reasons that are not relevant for the purposes of the Joint Application); and

    28.2    LBIE was paying interest on the amounts outstanding under certain subordinated debt agreements it had in place at that time with its parent LBHPLC (the "**LBHPLC Sub-Debt Agreements**", and the debt issued under those agreements the "**LBHPLC Sub-Debt**") which formed part of its regulatory capital base.

29    Therefore one way to increase LBIE's profitability was to restructure LBIE's regulatory capital base in such a way that it would no longer need to pay interest on the funding it received under the LBHPLC Sub-Debt Agreements.

*The LBHPLC Sub-Debt Agreements*

30    The LBHPLC Sub-Debt Agreements were three subordinated debt agreements entered into between LBHPLC (as lender) and LBIE (as borrower):

    30.1    a €3,000,000,000 Long Term Subordinated Loan Facility dated 19 July 2004, a copy of which is at **pages 159-176 of RD1** (the "**Long Term Euro LBHPLC Facility**");

    30.2    a $4,500,000,000 Long Term Subordinated Loan Facility dated 19 July 2004, a copy of which is at **pages 177-194 of RD1** (the "**Long Term Dollar LBHPLC Facility**" and, together with the Long Term Euro LBHPLC Facility, the "**Long Term LBHPLC Facilities**"); and

A16825003

30.3    a $8,000,000,000 Short Term Subordinated Loan Facility dated 31 October 2005, a copy of which is at **pages 195-213 of RD1** (the "**Short Term LBHPLC Facility**").

31    I am informed by Dominic Gibb that the Short Term LBHPLC Facility was entered into later than the Long Term LBHPLC Facilities because it became clear that some of the LBHPLC Sub-Debt under the Long Term LBHPLC Facilities would, notwithstanding the fact that it was designated "long-term" subordinated debt, be treated as tier 3 (rather than lower tier 2) regulatory capital for FSA reporting purposes (due to FSA rules limiting the amount of capital that a regulated firm could designate as tier 2 capital to a value no greater than 50% of the value of tier 1 capital held, with any excess capital being designated as tier 3 capital). In the circumstances, it was advantageous for LBIE to repay such amounts outstanding under the Long Term LBHPLC Facilities, enter into the Short Term LBHPLC Facility and draw down replacement LBHPLC Sub-Debt under that agreement. Specifically, the regulatory treatment of the LBHPLC Sub-Debt would be unchanged, but LBIE would benefit from the greater flexibility offered by the Short Term LBHPLC Facility.

32    I am informed by staff working on the LBIE administration that the LBHPLC Sub-Debt Agreements were the final link in a chain of subordinated debt arrangements that allowed for the flow of subordinated debt through the corporate chain between LBIE (the primary regulated trading entity in the European Lehman Group) and its ultimate US parent, LBHI, which is one of the Respondents to the Joint Application. A diagram showing the entities through which this subordinated debt funding flowed prior to the 2006 Restructuring is at **page 214 of RD1**.

*The 2006 Restructuring*

33    Ms Dolby has explained that planning and effecting the 2006 Restructuring was a joint process among, principally, three functions in the European Lehman Group:

33.1    the Tax function, whose concern was to ensure that the restructuring achieved the aim of releasing the LBIE FTCs for use in the US without other adverse tax implications;

33.2    the Regulatory function, whose concern was to ensure that the restructuring was achieved without jeopardising LBIE's ability to meet its regulatory capital requirements as an FSA-regulated entity; and

33.3    the Treasury function, whose concern was to ensure that the restructuring did not jeopardise LBIE's (and, more broadly, the Lehman Brothers group's) general funding requirements.

34    Ms Dolby also explained that, following discussions among those three functions, LBIE took the steps described below.

34.1    LBIE replaced $2 billion of its LBHPLC Sub-Debt with $2 billion non-cumulative preference shares ("**Preference Shares**"). The Preference Shares, unlike the LBHPLC Sub-Debt, carried no interest obligation and, unlike cumulative preference shares, carried no obligation to pay dividends. Replacement of the LBHPLC Sub-Debt with such instruments freed LBIE from the burden of paying funding costs on this part of its regulatory capital and thereby improved LBIE's profitability. I am advised by Linklaters and by LBIE staff working on the LBIE administration (specifically, Ms Dolby and Mr Jackson) that the Preference Shares constituted lower tier 2 capital for the purposes of the FSA's regulatory capital requirements (a legal opinion dated 23 October 2006 advising on the regulatory treatment of the Preference Shares is at **pages 215-220 of RD1**).

34.2    Rather than directly replace the LBHPLC Sub-Debt with Preference Shares issued to LBHPLC, a new intermediary holding company was inserted between LBHPLC and LBIE to hold the Preference Shares. The purpose of doing so was, again, to realise a tax benefit. Ms Dolby has explained that the purchase of the Preference Shares by the intermediary company would be funded by the subordinated debt funding that flowed down through the corporate chain from LBHI (see paragraph 32 above and the diagram at **page 214 of RD1**). The intermediary company would pay interest on that subordinated debt funding. Since the intermediary company would be paying interest on that subordinated debt, but receiving no interest or dividends on the Preference Shares, it would make a significant loss in respect of its holding of the Preference Shares. This simple (or "clean") loss was desirable for tax planning purposes (that is, it could potentially be offset against taxable profits generated elsewhere in the Lehman Brothers group). The intermediary company that was inserted into the group structure to hold the Preference Shares was LBHI2. A copy of the LBIE board minutes dated 1 November 2006 approving the allotment of 2,000,000 Preference Shares to LBHI2 of $1,000 each is at **pages 221-222 of RD1**.

34.3 Finally, again (according to Ms Dolby) for US tax purposes, it was necessary to insert into the group structure a further intermediary company between LBHPLC and LBHI2. This company was required simply to hold the share capital in LBHI2, and was otherwise dormant. This company was LB Holdings Intermediate 1 Limited.

35 In addition, I understand that, at the same time as replacing the LBHPLC Sub-Debt with the Preference Shares, it was decided that LBIE should enter into new subordinated loan agreements with its new direct parent company, LBHI2. Ms Dolby and Mr Rushton (who, prior to LBIE's entry into administration, was employed in the Treasury function) recall that this was done because the Treasury function wanted to retain the flexibility that having some subordinated debt as part of LBIE's regulatory capital base allowed. In particular, I am informed by LBIE staff working on the LBIE administration (specifically, Ms Dolby and Mr Jackson) that the drawdown and repayment of subordinated debt under a subordinated debt facility could be conducted more quickly than preference shares can be issued and redeemed.

36 Accordingly, on 1 November 2006 LBIE entered into the following three subordinated loan agreements with LBHI2:

36.1 a €3,000,000,000 Long Term Subordinated Loan Facility, a copy of which is at **pages 210 to 224 of AVL1** (the "**Long Term Euro Facility**");

36.2 a $4,500,000,000 Long Term Subordinated Loan Facility, a copy of which is at **pages 225 to 240 of AVL1** (the "**Long Term Dollar Facility**" and, together with the Long Term Euro Facility, the "**Long Term Facilities**"); and

36.3 a $8,000,000,000 Short Term Subordinated Loan Facility, a copy of which is at **pages 241 to 260 of AVL1** (the "**Short Term Facility**"),

(together, the "**LBHI2 Sub-Debt Agreements**"). It can be seen from the LBHI2 Sub-Debt Agreements that, in respect of currency, amount and term, the LBHI2 Sub-Debt Agreements were direct replacements for the LBHPLC Sub-Debt Agreements.

37 I am informed by staff working on the LBIE administration that the relevant accounts of the Lehman Brothers group show that, in terms of LBIE funding, the overall effect of the 2006 Restructuring was that:

37.1 LBIE repaid $6.275 billion of LBHPLC Sub-Debt;

**37.2**    LBIE repaid EUR 200 million of LBHPLC Sub-Debt; and

**37.3**    replaced the LBHPLC Sub-Debt with new funding in the form of:

(i)    the $2 billion of Preference Shares issued to LBHI2 on 1 November 2006; and

(ii)    $5.7 billion of LBHI2 Sub-Debt drawn down under the Short Term Facility in November 2006.

A diagram illustrating these movements as part of the 2006 Restructuring and showing the new flow of subordinated debt funding through the corporate chain from LBHI to LBIE following the 2006 Restructuring is at **page 223 of RD1**. The data contained in these diagrams is extracted from a Lehman Brothers finance system called Dun & Bradstreet Software ("**DBS**"). I am informed by staff working on the LBIE administration that DBS is the system that provides the most complete picture of the LBHI2 Sub-Debt transactions between the execution of the LBHI2 Sub-Debt Agreements on 1 November 2006 and LBIE's entry into administration on 15 September 2008. DBS was used within the Lehman Brothers group as the general ledger and is the principal source for the financial statements. The information concerning the split between preference shares and subordinated debt is extracted from the finance system Treasury Workstation ("**TWS**") which was used to book and manage trades.

(D)    **THE TERMS OF THE LBHI2 SUB-DEBT AGREEMENTS**

**38**    I am informed by Linklaters that the LBHI2 Sub-Debt Agreements all contain essentially the same subordination provision. Specifically, the LBHI2 Sub-Debt Agreements subordinate all present and future sums, liabilities and obligations, and all interest payable thereon, payable or owing by LBIE to the Lender under the agreements to all other sums, liabilities and obligations payable or owing by LBIE (apart from sums owed by LBIE which are expressed to be and, in the opinion of the administrators of LBIE do, rank junior to the subordinated liabilities).

**39**    Clause 5(1) of Schedule 2 of each LBHI2 Sub-Debt Agreement provides:

*"Notwithstanding the provisions of paragraph 4, the rights of the Lender in respect of the Subordinated Liabilities are subordinated to the Senior Liabilities…".*

**40**    The relevant definitions are as follows:

""*Excluded Liabilities*" *means Liabilities which are expressed to be and, in the opinion of the Insolvency Officer of the Borrower, do, rank junior to the Subordinated Liabilities in any Insolvency of the Borrower.*

"*Insolvency*" *means and includes liquidation, winding up, bankruptcy, sequestration, administration, rehabilitation and dissolution (whichever term may apply to the Borrower) or the equivalent in any other jurisdiction to which the Borrower may be subject.*

"*Insolvency Officer*" *means and includes any person duly appointed to administer and distribute assets of the Borrower in the course of the Borrower's insolvency.*

"*Liabilities*" *means all present and future sums, liabilities and obligations payable or owing by the Borrower (whether actual or contingent, jointly or severally or otherwise howsoever).*

"*Senior Liabilities*" *means all Liabilities except the Subordinated Liabilities and the Excluded Liabilities.*

"*Subordinated Liabilities*" *means all Liabilities to the Lender in respect of each Advance made under this Agreement and all interest payable thereon.*"

**41**    In the course of the Disclosure Exercise and the Joint Interviews, the LBIE Administrators sought information as to the process by which the LBHI2 Sub-Debt Agreements were entered into and the process by which the subordination wording in the agreements was agreed. Based on the Disclosure Exercise and the Joint Interviews, it appears that relevant Lehman Brothers personnel (including directors of the relevant companies), in putting in place the LBHI2 Sub-Debt Agreements:

**41.1**    were focused on the objective of ensuring LBIE's capital adequacy requirements would be met; and

**41.2**    did not give consideration to the possibility of a LBIE insolvency.

**42**    Mr Rushton recalls that the LBHI2 Sub-Debt Agreements were based heavily on templates provided by the FSA. Ms Dolby also explained that it was her understanding that the LBHPLC Sub-Debt Agreements would have been based on FSA templates, and the LBHI2 Sub-Debt Agreements would likely simply have been based on the LBHPLC Sub-Debt Agreements which they replaced.

43    The approach recalled by Mr Rushton and Ms Dolby is reflected in the LBHI2 Sub-Debt Agreements themselves. In particular:

43.1    there are only minimal, insignificant differences between the LBHI2 Sub-Debt Agreements and the LBHPLC Sub-Debt Agreements they replaced (comparison documents showing the LBHI2 Sub-Debt Agreements as compared against the LBHPLC Sub-Debt Agreements are at **pages 363-420 of RD1**); and

43.2    there are only minimal differences between the terms of the subordination provision in the LBHI2 Sub-Debt Agreements and the subordination provision in the FSA standard form subordinated debt agreement (copies of the FSA standard form agreements are at **pages 214-254 of RD1**).

44    Finally, it appears that no consideration was given, prior to LBIE's administration, to the effect of the subordination wording in the LBHI2 Sub-Debt Agreements upon the priority ranking of the LBHI2 Sub-Debt relative to LBIE's other obligations in the event of a LBIE insolvency (including the payment of statutory interest to ordinary unsecured creditors in the event that there were to be a surplus remaining after those creditors had been paid in full). In the course of the Disclosure Exercise and the Joint Interviews, the LBIE Administrators sought documents and information that might reveal any such consideration. Those exercises have resulted in no evidence at all that any such consideration was given to this point. Indeed, the recollections of several witnesses in the Joint Interviews was that it is highly unlikely that anyone within the Lehman Brothers group would have considered this issue prior to LBIE's entry into administration.

(E)    **TREATMENT OF THE LBHI2 SUB-DEBT BETWEEN LBIE AND LBHI2**

45    The LBIE Administrators have (including during the course of the Disclosure Exercise and Joint Interviews) sought information as to how the LBHI2 Sub-Debt was treated between LBIE and LBHI2. In this section I set out the LBIE Administrators' understanding based on the work they have conducted.

*Role of LBHI2 Sub-Debt*

46    I am informed by LBIE staff working on the LBIE administration (specifically, Ms Dolby and Mr Jackson) that the role of the LBHI2 Sub-Debt was essentially two-fold (albeit those roles are inter-related):

**46.1** The LBHI2 Sub-Debt formed part of LBIE's regulatory capital for the purposes of the FSA's capital adequacy requirements. This is evident from relevant accounting records, internal correspondence and LBIE's dealings with the FSA.

**46.2** The LBHI2 Sub-Debt was a particularly flexible form of regulatory capital funding. The terms of the LBHI2 Sub-Debt Agreements (see Section D above) allowed for rapid drawdown and repayment of LBHI2 Sub-Debt, which allowed the European Lehman Group:

(i) rapidly to put LBIE in funds to the extent required in order to meet LBIE's capital adequacy requirements as they varied from time to time; and

(ii) rapidly to release from LBIE excess funding that was no longer required to meet LBIE's capital adequacy requirements as they varied from time to time, so that it could be put to more efficient use elsewhere in the global Lehman Brothers group.

**47** Accordingly, drawdowns and repayments of LBHI2 Sub-Debt generally shared the characteristics set out below:

**47.1** Movements of LBHI2 Sub-Debt occurred quickly, often over a matter of days.

**47.2** Movements of LBHI2 Sub-Debt involved an assessment on the part of the Lehman Brothers group of LBIE's capital adequacy requirements to determine whether LBIE required a drawdown or had spare LBHI2 Sub-Debt funding in excess of its capital adequacy requirements.

*Accounting treatment of the LBHI2 Sub-Debt*

**48** I am informed by staff working on the LBIE administration that, in the general ledger accounts in DBS, the LBHI2 Sub-Debt was accounted for together with the Preference Shares into which any LBHI2 Sub-Debt (or, formerly, LBHPLC Sub-Debt) had been converted. As at the date of LBIE's entry into administration, for example, the DBS balance between LBIE and LBHI2 was $9,325,000,000, consisting of $7,100,000,000 of Preference Shares and $2,225,000,000 of LBHI2 Sub-Debt. A chart prepared by my staff based on the data extracted from the DBS system, showing the DBS balance as at 15 September 2008, is at **page 255 of RD1**.

---

A16825003

**49**   In addition to DBS accounting for the LBHI2 Sub-Debt and the Preference Shares together, I am informed by PwC staff working on the LBIE administration that the relevant Lehman Brothers finance systems did not link trades in LBHI2 Sub-Debt to specific LBHI2 Sub-Debt Agreements. I am informed that the process of determining whether, at any given date, the outstanding amount of LBHI2 Sub-Debt was long term or short term LBHI2 Sub-Debt is, therefore, a forensic process involving analysis of the relevant finance systems alongside other relevant documents and information.

**50**   In LBIE's statutory accounts, which had been prepared in accordance with UK GAAP, it appears that all LBHI2 Sub-Debt (whether drawn down under the Short Term Facility or one of the Long Term Facilities) was treated in the same way. Specifically, all LBHI2 Sub-Debt was accounted for as "*Creditors: amounts falling due within one year*". The notes to the accounts state that amounts owing under the LBHI2 Sub-Debt Agreements are "repayable at any time at the Company's option" (see notes 13 and 14 respectively to LBIE's 2006 and 2007 audited accounts, copies of which are at **pages 256-275 and 276-300 of RD1**).

**51**   I understand from staff working on the LBIE administration that this accounting treatment was a result of the fact that both the Short Term Facility and the Long Term Facilities had, essentially, the same repayment terms, which provided for LBIE, at its option, to repay LBHI2 Sub-Debt drawn thereunder in whole or in part at any time on giving only two business days' notice to LBHI2.

**52**   The Preference Shares were accounted for in LBIE's audited accounts as "*Creditors: amounts falling due over one year*" (see note 15 to LBIE's 2006 and 2007 audited accounts, copies of which are at **pages 256-275 and 276-300 of RD1**).

*2007 Restructuring*

**53**   As part of a further restructuring which took effect on 1 May 2007, the majority of the then-outstanding LBHI2 Sub-Debt was converted into Preference Shares (the "**May 2007 Restructuring**"). Specifically:

**53.1**   LBIE was discharged from the obligation to repay $5.1 billion of LBHI2 Sub-Debt (being the majority of the balance of LBHI2 Sub-Debt outstanding as at 1 May 2007); and

**53.2**   LBIE allotted to LBHI2, as consideration for the discharge of the LBHI2 Sub-Debt, $5.1 billion of Preference Shares.

A copy of the LBIE board minutes approving the allotment to LBHI2 of the $5.1 billion Preference Shares is at **pages 301-303 of RD1**. A copy of the LBHI2 board minutes approving the its subscription of the $5.1 billion Preference Shares is at **pages 304-305 of RD1**.

54    Ms Dolby has explained that the May 2007 Restructuring was essentially a "refinancing" of the LBHI2 Sub-Debt. Converting the majority of the LBHI2 Sub-Debt into Preference Shares (as with the 2006 Restructuring) freed LBIE from the burden of paying interest on the LBHI2 Sub-Debt, and crystallised further losses in LBHI2 (which, as explained above at paragraph 34.2, was beneficial to the Lehman Brothers group for US tax purposes).

55    The sums outstanding at the date of Administration in respect of the LBHI2 Sub-Debt held by LBIE are $2.225 billion (see diagram at **page 255 of RD1**.)

(F)    **LBIE CREDITOR OUTLOOK**

56    The LBIE Administrators' ninth progress report to creditors covering the six month period to 14 March 2013 was issued on 12 April 2013 (a copy of the report is at **pages 306-352 of RD1**). The estimated outcome (that is, dividend payment) for unsecured creditors set out in that report ranged from 61 pence in the pound to 116 pence in the pound (subject to important assumptions and caveats). These figures do not reflect:

56.1    any provision for the payment of statutory interest to unsecured creditors in the event that their claims are paid in full;

56.2    any provision for claims from LBIE's members, LBHI2 and LBL; or

56.3    the rights of contribution claims which LBIE has against LBHI2 and LBL in the event that LBIE has insufficient assets to meet unsecured creditors' claims in full.

57    The prices quoted anecdotally for ordinary unsecured LBIE debt in the secondary debt market are currently in excess of 100p in the pound, suggesting that the market anticipates that there will be a payment of statutory interest to unsecured creditors. LBIE has paid dividends to date amounting to 68.5 pence.

(G)   **ESTIMATED IMPACT ON CREDITORS OF JOINT APPLICATION**

58   If it is held in the Application that, in the event of there being a surplus available after LBIE has paid ordinary unsecured creditors in full, statutory interest ranks ahead of the subordinated claim from LBHI2 (in the sum of £1.3 billion), there will be no monies available to meet LBHI2's subordinated claim based on the estimated outcome in paragraph 56 above.

59   If it is decided that LBHI2's subordinated claim should rank ahead of the payment of statutory interest on the claims of the unsecured creditors in the event of a surplus, then LBHI2's subordinated debt claim would, in the high estimated outcome, be paid in full and the amount of funds available to pay statutory interest to ordinary unsecured creditors would be reduced by a corresponding amount.

(H)   **LBL CREDITOR STATUS**

60   LBL has lodged an unsecured claim in the LBIE administration in the sum of £363 million. A copy of LBL's proof of debt is at **pages 177 to 194 of AVL1**.

61   Discussions have begun between LBIE and LBL as to the quantum of LBL's claim. At the present time it is LBIE's view that LBL's claim is overstated and could be reduced to a sum not exceeding £100 million.

(I)   **LBHI2 CREDITOR STATUS**

62   LBHI2 has lodged an unsecured claim in the LBIE administration in the sum of £38 million. A copy of LBHI2's s proof of debt is at **pages 196 to 209 of AVL1**.

63   The quantum of the claim accords with the value stated in both estates' statement of affairs. The transactions comprising the balance are to be the subject of a more detailed review over the coming weeks but the LBIE Administrators' current view is that this amount will not be subject to change.

(J)   **LBIE FUTURE**

64   I understand that, depending upon the outcome of certain issues in the Joint Application, it may, at some stage, be in the interests of LBIE's creditors for LBIE to enter into liquidation.

65   The LBIE Administrators consider that all options are available with regard to whether LBIE might in due course go into liquidation. The LBIE Administrators will consider whether, and if so when, to place LBIE into liquidation, including in light of the Court's determination of the issues in the Joint Application. The LBIE Administrators' Proposals (as approved by creditors) expressly contemplate the possibility of a liquidation (a copy of the Proposals is at **pages 353-355 of RD1**). Further, if it is in the interests of creditors to do so, the costs of moving into liquidation are (relative to the potential sums at stake) de minimis.

(K)   **CONCLUSION**

66   For the reasons set out above, the Court is respectfully requested to provide directions for the determination of the issues identified in the Application.

67   I believe that the facts stated in this witness statement are true.

**Dated 2 August 2013**

.................................................

**Russell Downs**

Party: First Applicant
Witness: Russell Downs
Statement No: 4
Exhibit: "RD1"
Date: 2 August 2013

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

**IN THE MATTER OF LEHMAN BROTHERS**
**INTERNATIONAL (EUROPE)**
**(IN ADMINISTRATION)**

**AND IN THE MATTER OF THE INSOLVENCY ACT**
**1986**

**BETWEEN:**

**(1) THE JOINT ADMINISTRATORS OF LEHMAN**
**BROTHERS INTERNATIONAL (EUROPE) (IN**
**ADMINISTRATION)**
**(2) THE JOINT ADMINISTRATORS OF LEHMAN**
**BROTHERS LIMITED**
**(IN ADMINISTRATION)**
**(3) THE JOINT ADMINISTRATORS OF LB**
**HOLDINGS INTERMEDIATE 2 LIMITED**
**(IN ADMINISTRATION)**

**Applicants**

**- and -**

**(1) LEHMAN BROTHERS HOLDINGS, INC**
**(2) LYDIAN OVERSEAS PARTNERS MASTER**
**FUND LIMITED**

**Respondents**

---

**FOURTH WITNESS STATEMENT OF**

**RUSSELL DOWNS**

Linklaters LLP
One Silk Street
London EC2Y 8HQ

Tel:  (+44) 20 7456 2000
Fax: (+44) 20 7456 2222
Solicitors for the Applicants
Ref: Tony Bugg/Euan Clarke/Jared Oyston

# UNANIMOUS WRITTEN CONSENT OF THE

# EXECUTIVE COMMITTEE OF THE

# BOARD OF DIRECTORS OF

# LEHMAN BROTHERS HOLDINGS INC.

The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware:

WHEREAS, the Corporation has previously authorized by specific resolution, which authority has not been revoked (the "Outstanding Guarantee Resolutions"), the guarantee of all or specified obligations and liabilities of certain direct and indirect subsidiaries of the Corporation, each of which is a "Guaranteed Subsidiary" as such term is used in the Corporation's Code of Authorities as currently in effect (the "Code"),

WHEREAS, certain of the Guaranteed Subsidiaries presently enjoy full guarantees while others have only partial guarantees, and the Corporation now wishes to expand such partial guarantees to full guarantees,

WHEREAS, due to the passage of time the names of certain of the Guaranteed Subsidiaries have changed, rendering the Outstanding Guarantee Resolutions out of date to that extent,

WHEREAS, the Corporation wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,

WHEREAS, Management wishes to establish additional Guaranteed Subsidiaries,

WHEREAS, Management wishes to specify that to the extent lawful and allowable, guarantees issued by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, so as to secure certain tax and accounting benefits, and

WHEREAS, Management believes that it would facilitate the conduct of the business of the Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their entirety with this single document,

NOW THEREFORE BE IT,

**RESOLVED**, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the Code;

**RESOLVED**, that the Outstanding Guarantee Resolutions are hereby superseded and replaced in their entirety with this single document, *provided* that any guarantees provided pursuant to the Outstanding Guarantee Resolutions and outstanding on the date hereof, whether in the form of a separately executed individual guarantee or otherwise, shall remain issued, outstanding and valid for all purposes;

**RESOLVED**, that guarantees provided by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, to the extent lawful and allowable, as specified on Schedule A hereto;

**RESOLVED**, that each of the persons listed in the Code (as it may be amended from time to time) as being authorized to approve individual guarantees issued by the Corporation with respect to Guaranteed Subsidiaries, or any proper delegee thereof (collectively, "Authorized Persons"), are hereby authorized, in the name and on behalf of the Corporation, to execute such guarantees in such form as is approved by an attorney of the Corporation and such Authorized Person, subject to any limitations specified herein, his or her execution of each such guarantee to be conclusive evidence of approval thereof; and to do such other acts and things as may be advisable or necessary in order to effect the purposes and intent of these resolutions; and

**FURTHER RESOLVED**, that any and all actions contemplated by the foregoing resolutions and taken by such Authorized Persons prior to the date hereof are hereby ratified, confirmed and approved in all respects.

Dated: June 9, 2005

_____
Richard S. Fuld, Jr.

_____
John D. Macomber

2

**Schedule A**
**to LBHI Unanimous Written Consent**
**dated June 9 , 2005**

|     | Name of Subsidiary | Issue Corporation guarantee from branch located in London, England, to the extent lawful and allowable? |
| --- | --- | --- |
| 1. | Lehman Brothers Asia Holdings Limited | No |
| 2. | Lehman Brothers Bankhaus A.G. | Yes<br>(London branch of such subsidiary only) |
| 3. | Lehman Brothers Commercial Bank | No |
| 4. | Lehman Brothers Commercial Corporation | No |
| 5. | Lehman Brothers Commercial Corporation Asia Limited | No |
| 6. | Lehman Brothers Equity Finance (Cayman) Limited | No |
| 7. | Lehman Brothers Finance S.A. | No |
| 8. | Lehman Brothers Holdings Plc | Yes |
| 9. | Lehman Brothers International (Europe) | Yes |
| 10. | Lehman Brothers Japan Inc. | No |
| 11. | Lehman Brothers (Luxembourg) Equity Finance S.A. | No |
| 12. | Lehman Brothers (Luxembourg) S.A. | No |
| 13. | Lehman Brothers OTC Derivatives Inc. | No |
| 14. | Lehman Brothers Securities Asia Limited | No |
| 15. | Lehman Brothers Securities N.V. | No |
| 16. | Lehman Brothers Special Financing Inc. | No |
| 17. | Lehman Brothers Treasury Co. B.V. | No |
| 18. | Lehman Re Limited | No |