18-1079
*Lehman Brothers Special Financing Inc. v. Bank of America N.A.*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2018

(Argued: June 26, 2019    Decided: August 11, 2020)

Docket No. 18-1079

In Re: Lehman Brothers Holdings Inc.,

*Debtor*.

------------------------------------------------------------------

Lehman Brothers Special Financing Inc.,

*Plaintiff-Appellant,*

–v.–

Branch Banking and Trust Company, Successor in Interest to
Susquehanna Bank and SBSI, Inc., U.S. Bank National Association,
Continental Life Insurance Company of Brentwood Tennessee,
Country Life Insurance Company, Deutsche Bank Trust Company
Americas, as Trustee, Elliott International, L.P., First Northern
Bank and Trust Company, Garadex Inc., Gatex Properties Inc.,
General Security National Insurance, Genworth Life and Annuity
Insurance Co., Goldman Sachs International, Goldman Sachs & Co.
LLC, f/k/a, Goldman, Sachs & Co., LGT Bank in Liechtenstein Ltd., The
Liverpool Limited Partnership, Magnetar Constellation Fund II Ltd,
Magnetar Constellation Master Fund III Ltd, Magnetar
Constellation Master Fund Ltd, Mariner LDC, Marsh & McLennan
Companies, Inc. Stock Investment Plan, Marsh & McLennan Master
Retirement Trust, MBIA, Inc., Modern Woodmen of America, Inc.,
MoneyGram Securities, LLC and its Successors in Interest, Morgan

STANLEY & CO., INCORPORATED, MORGANS FINANCIAL LIMITED, MULBERRY
STREET CDO, LTD., NATIXIS FINANCIAL PRODUCTS LLC, PCA LIFE
ASSURANCE CO. LTD., PHL VARIABLE INSURANCE COMPANY, PHOENIX LIFE
INSURANCE COMPANY, PUTNAM DYNAMIC ASSET ALLOCATION FUNDS –
GROWTH PORTFOLIO, PUTNAM INTERMEDIATE DOMESTIC INVESTMENT GRADE
TRUST, PUTNAM STABLE VALUE FUND, RGA REINSURANCE CO., SBSI, INC.,
SCOR REINSURANCE COMPANY, SECURITY BENEFIT LIFE INSURANCE CO.,
SHENANDOAH LIFE INSURANCE COMPANY, STATE STREET BANK AND TRUST
COMPANY, AS TRUSTEE, STATE STREET GLOBAL ADVISORS, STATE STREET
INTERNATIONAL IRELAND LIMITED, STRUCTURED CREDIT OPPORTUNITIES
FUND II, L.P., SUSQUEHANNA BANK, TRICADIA CREDIT STRATEGIES MASTER
FUND, LTD., F/K/A, MARINER-TRICADIA CREDIT STRATEGIES MASTER FUND,
LTD., TRUSTEE U.S. BANK TRUST NATIONAL ASSOCIATION, UNICREDIT BANK
AG, LONDON BRANCH, ZAIS INVESTMENT GRADE LIMITED X,

*Defendants-Appellees,*

CITIBANK, N.A., PRINCIPAL LIFE INSURANCE COMPANY,

*Defendants.*[*]

––––––––––––––

B e f o r e :

JACOBS, CARNEY, and BIANCO, *Circuit Judges.*

––––––––––––––

Lehman Brothers Special Financing Inc. ("LBSF") appeals from the March 15,
2018 district court judgment affirming the Bankruptcy Court's grant of defendants'
motion to dismiss. This case grows out of the Chapter 11 bankruptcy of Lehman
Brothers Holdings Inc., considered to be the largest bankruptcy proceeding to date in
U.S. history. The Bankruptcy Court held that, in the context of synthetic collateralized
debt obligations, certain "Priority Provisions" that subordinated LBSF's payment
priority to claims of the Noteholder defendants are enforceable by virtue of section 560

––––––––––––––––––––––––

[*] The Clerk of Court is directed to amend the caption to conform to the above.

of the Bankruptcy Code ("the Code"). Section 560 exempts "swap agreements" from the Code's prohibition of "*ipso facto* clauses." The District Court affirmed, and LBSF appealed. For the reasons set forth below, we AFFIRM the judgment of the District Court.

AFFIRMED.

───────────────

PAUL R. DEFILIPPO (William F. Dahill, *on the brief*), Wollmuth Maher & Deutsch LLP, New York, NY, *for Plaintiff-Appellant Lehman Brothers Special Financing, Inc.*

CARMINE D. BOCCUZZI (Emily J. Balter, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, NY, *for Defendants-Appellees Goldman Sachs International and Goldman Sachs & Co. LLC., f/k/a, Goldman, Sachs & Co.*

Joshua Dorchak, Morgan, Lewis, & Bockius, LLP, New York, NY; John C. Goodchild, III, Rachel Jaffe Mauceri, Morgan, Lewis, & Bockius, LLP, Philadelphia, PA, *for Defendant-Appellee Branch Banking and Trust Company, Successor in Interest to Susquehanna Bank and SBSI, Inc.*

Franklin H. Top III, Chapman and Cutler LLP, Chicago, IL, *for Defendants-Appellees U.S. Bank National Association and Trustee U.S. Bank Trust National Association.*

Joshua Dorchak, Morgan, Lewis, & Bockius, LLP, New York, NY, *for Defendants-Appellees Continental Life Insurance Company of Brentwood Tennessee, Country Life Insurance Company, Marsh & McLennan Companies, Inc. Stock Investment Plan, Marsh & McLennan Master Retirement Trust, Modern Woodmen of America, Inc.,*

*PHL Variable Insurance Company, Phoenix Life Insurance Company, Putnam Dynamic Asset Allocation Funds – Growth Portfolio, Putnam Intermediate Domestic Investment Grade Trust, Putnam Stable Value Fund, SBSI, Inc., and Susquehanna Bank.*

Christopher M. Desiderio, Nixon Peabody LLP, New York, NY, *for Defendants-Appellees Deutsche Bank Trust Company Americas, as Trustee, State Street Bank and Trust Company, as Trustee, State Street Global Advisors, State Street International Ireland Limited, and ZAIS Investment Grade Limited X.*

Matthew J. Gold, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York, NY, *for Defendant-Appellee Elliott International, L.P.*

William A. Slaughter, Ballard Spahr LLP, Philadelphia, PA; Leslie C. Heilman, Ballard Spahr LLP, Wilmington, DE, *for Defendant-Appellee First Northern Bank and Trust Company.*

John H. Thompson, McGuire Woods LLP, Washington, DC, *for Defendants-Appellees Garadex Inc., Gatex Properties Inc., and Morgan Stanley & Co., Incorporated.*

Scott Walter Reynolds, Chaffetz Lindsey LLP, New York, NY; Nicole E. Schiavo, Peter A. Ivanick, Hogan Lovells US LLP, New York, NY, *for Defendants-Appellees General Security National Insurance and SCOR Reinsurance Company.*

Nicholas P. Crowell, Alex R. Rovira, Andrew P. Propps, Sidley Austin LLP, New York, NY, *for Defendants-Appellees Genworth Life and Annuity Insurance Co., Magnetar Constellation Fund II Ltd,*

4

*Magnetar Constellation Master Fund III Ltd, Magnetar Constellation Master Fund Ltd., and UniCredit Bank AG, London Branch.*

Gregory F. Hauser, Wuersch & Gering LLP, New York, NY, *for Defendant-Appellee LGT Bank in Liechtenstein Ltd.*

Matthew J. Gold, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York, NY, *for Defendant-Appellee The Liverpool Limited Partnership.*

Thomas J. Fleming, Olshan Frome Wolosky LLP, New York, NY, *for Defendants-Appellees Mariner LDC, Structured Credit Opportunities Fund II, L.P., and Tricadia Credit Strategies Master Fund, Ltd., f/k/a Mariner-Tricadia Credit Strategies Master Fund, Ltd.*

Kevin J. Biron, Morgan, Lewis & Bockius LLP, New York, NY, *for Defendant-Appellee MBIA, Inc.*

Brian Dillon, Gray, Plant, Mooty, Mooty, & Bennett, P.A., Minneapolis, MN, *for Defendant-Appellee MoneyGram Securities, LLC and its Successors in Interest.*

Lewis J. Liman, Cleary Gottlieb Steen & Hamilton, New York, NY, *for Defendant-Appellee Morgans Financial Limited.*

Jack Yoskowitz, Seward & Kissel LLP, New York, NY, *for Defendant-Appellee Mulberry Street CDO, Ltd.*

Scott W. Reynolds, Chaffetz Lindsey LLP, New York, NY, *for Defendant-Appellee Natixis Financial Products LLC.*

Nicholas P. Crowell, Jon W. Muenz, Andrew P. Propps, Sidley Austin LLP, New York, NY, *for Defendant-Appellee PCA Life Assurance Co. Ltd.*

Emilio B. Nicolas, Jackson Walker LLP, Austin, TX, *for Defendant-Appellee RGA Reinsurance Co.*

David Adler, McCarter & English, LLP, New York, NY, *for Defendant-Appellee Security Benefit Life Insurance Co.*

Joseph J. Saltarelli, Hunton Andrews Kurth LLP, *for Defendant-Appellee Shenandoah Life Insurance Company.*

Madlyn Gleich Primoff, Timothy P. Harkness, David Y. Livshiz, Henry V. Hutten, Jill K. Serpa, *on the brief*, Freshfields Bruckhaus & Deringer US LLP, New York, NY, *for Amicus Curiae Structured Finance Industry Group.*

———————

PER CURIAM:

The Bankruptcy Code generally bars enforcement of "*ipso facto* clauses," which trigger or modify payment obligations when a party seeks relief in bankruptcy. Lehman Brothers Special Financing Inc. ("LBSF") seeks to recover payments made to defendant noteholders (the "Noteholders") in connection with certain synthetic collateralized debt obligations. LBSF argues that "Priority Provisions" that subordinated its interests to those of the Noteholders were unenforceable *ipso facto* clauses because they were triggered as a result of the Chapter 11 bankruptcy of Lehman Brothers Holdings Inc.

("LBHI").[1] The Bankruptcy Court held (and the District Court agreed) that section 560 of the Bankruptcy Code (the "Code"), which creates a safe harbor for the liquidation of swap agreements, allowed the distribution of proceeds according to the Priority Provisions whether or not those provisions are properly characterized as *ipso facto* clauses. For the reasons set forth below, we AFFIRM the judgment of the District Court.

## BACKGROUND[2]

On September 15, 2008, LBHI filed a voluntary petition for relief under Chapter 11. Two weeks later, on October 3, LBSF, an indirect subsidiary of LBHI, began its own Chapter 11 proceeding. About two years later, in September 2010, LBSF initiated an adversary proceeding against 250 defendant noteholders, note issuers, and indenture trustees in connection with 44 synthetic collateralized debt obligations ("CDOs") that Lehman affiliates structured, negotiated, and marketed (each, a "synthetic CDO transaction"). LBSF sought to recover roughly $1 billion that was distributed to the Noteholders after LBSF defaulted.

## I.    The Transactions

In each of the synthetic CDO transactions, LBSF and its affiliates (collectively, "Lehman") established a special purpose vehicle (the "Issuer") through which it marketed and sold notes (the "Notes") to the Noteholders pursuant to an Indenture

---

[1] The LBHI bankruptcy is considered to be the largest bankruptcy proceeding in U.S. history: When it filed for bankruptcy, LBHI held consolidated assets of $639 billion and liabilities of $613 billion.

[2] This factual statement is taken from the complaint and the documents incorporated therein. We accept it as true for purposes of reviewing the grant of a motion to dismiss. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016).

Agreement. The Issuer then used the proceeds from sale of the Notes to acquire highly rated securities; those valuable securities, in turn, would serve as collateral (the "Collateral"). The Issuer used income generated by the Collateral to make scheduled interest payments to the Noteholders.

The Issuer then entered into a "swap agreement" with LBSF, pursuant to an ISDA Master Agreement and other related contracts, including the Schedule and Confirmation.[3] Under the swap agreement, the Issuer contracted to sell LBSF a credit default swap—credit protection against the potential default of certain "reference entities" or "reference obligations." In exchange, LBSF made regular payments to the Issuer. (LBHI guaranteed LBSF's obligations under the swap.) The Issuer used the flow of payments it received from LBSF to supplement the interest payments it made to the Noteholders.

The swap agreement provided that if the reference entities experienced certain "Credit Events," the Issuer could owe LBSF payment from the Collateral. If, by contrast, the transaction reached its scheduled maturity *without* a Credit Event occurring, then the Noteholders would be repaid the principal amount of their investment from the Collateral. The Trustees—a third party entity—held the Collateral in trust for the benefit of the secured parties—primarily LBSF and the Noteholders.

As described above, the two components of the synthetic CDO transaction—the CDO and the swap—were documented separately, but the swap and indenture agreements (the "Transaction Documents") referenced each other. The Indenture

---

[3] An ISDA Master Agreement is a standard form, published by the International Swaps and Derivatives Association, regularly used to govern over-the-counter derivatives transactions.

Agreement specified that, upon the occurrence of an "Event of Default," the Trustees were empowered to issue a "Termination Notice," which would accelerate payment due on the Notes and trigger early termination of the swaps. After issuing a Termination Notice, the Trustee could—but was not required to—liquidate the Collateral, and distribute the proceeds according to the stated priority of payments ("Priority Provisions"). Under the Priority Provisions, LBSF enjoyed payment priority over the Noteholders in certain circumstances. But in other circumstances—including in the case of LBSF's default—LBSF's payment was subordinated to that of the Noteholders.

LBHI's bankruptcy filing in 2008 constituted an Event of Default under the ISDA Master Agreement, with LBSF as the defaulting party. LBSF's default triggered the early terminations of the credit default swaps. Those terminations, in turn, led to the liquidation of the Collateral and to subsequent distributions. Because LBSF defaulted, it dropped in priority and was entitled to receive its portion of the disbursement only after the Noteholders received their portion.

When the early terminations occurred, LBSF was "in the money"—that is, its swap position had value—but because it was also the defaulting party, the Noteholders received payment priority over LBSF. The proceeds from the Collateral were insufficient to make any payment to LBSF after they were drawn from to pay the Noteholders. This precipitous drop in LBSF's priority underlies the dispute between LBSF and defendants in this case. Specifically, at issue is the enforceability in bankruptcy of those contractual provisions—the Priority Provisions—that subordinated LBSF's payment priority upon its default.

II.    **Procedural History**

In September 2010, LBSF commenced an adversary proceeding in Bankruptcy

Court as a putative defendant class action against certain of the Noteholders, the

Trustees, and the Issuers. It alleged first that the Priority Provisions are unenforceable

*ipso facto* clauses—that is, clauses that modify a debtor's contractual right solely because

it petitioned for bankruptcy. *See* 11 U.S.C. § 365(e); *Lehman Bros. Holdings Inc. v. BNY*

*Corp. Tr. Servs. Ltd.*, 422 B.R. 407, 415 (Bankr. S.D.N.Y. 2010) ("*BNY*") ("It is now

axiomatic that *ipso facto* clauses are, as a general matter, unenforceable."). It next

claimed that the distributions to the Noteholders violated the automatic stay provision

in the Bankruptcy Code.[4] Finally, LBSF sought a claw-back of the distributions under

various other provisions of the Code and asserted several common-law causes of action.

Five years later, defendants filed an omnibus motion to dismiss, which the Bankruptcy

Court (Chapman, J.) granted. *See Lehman Bros. Special Fin. Inc. v. Bank of Am. Nat'l Ass'n*

*(In re Lehman Bros. Holdings Inc.)*, 553 B.R. 476 (Bankr. S.D.N.Y. 2016) ("*Lehman I*").

In *Lehman I*, the Bankruptcy Court made three independent rulings on LBSF's

bankruptcy-law claims. First, Judge Chapman classified each of the 44 transactions as

either a "Type 1" or "Type 2" Transaction, based on the specific contractual language in

each of the Transaction's Priority Provisions. The court determined that the Priority

Provisions for the five Type 1 Transactions were unenforceable *ipso facto* clauses because

they modified LBSF's rights based on its filing for bankruptcy. By contrast, under the

---

[4] Section 362(a) of the Code provides, in relevant part, that the filing of a petition under Chapter
11 "operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of
the estate or of property from the estate or to exercise control over property of the estate."
11 U.S.C. § 362(a).

remaining 39 transactions—the "Type 2" Transactions—LBSF never held a default priority right to payment, the Bankruptcy Court reasoned, and therefore LBSF's bankruptcy did not modify its rights. *Id.* at 494-95. The Bankruptcy Court thus concluded that Type 2 Transactions did not contain *ipso facto* clauses and were therefore enforceable.

Second, ruling in the alternative, the Bankruptcy Court concluded that even if the Priority Provisions in the Type 2 Transactions modified LBSF's rights, any "modification" of LBSF's rights was effective upon early termination resulting from LBSF's default, which, for all but two transactions, *preceded* LBSF's bankruptcy. *Id.* at 495-96. Because the prohibition on *ipso facto* clauses invalidates only those modifications of rights that occur *after* the filing of a bankruptcy petition, the transactions that were terminated *before* LBSF filed for bankruptcy did not involve *ipso facto* clauses.

Third, the Bankruptcy Court concluded that even if the Priority Provisions governing each of the transactions were *ipso facto* clauses, they nevertheless are enforceable under the "safe harbor" codified at section 560 of the Bankruptcy Code. *Id.* at 500-01. That section creates a safe harbor for the termination and liquidation of swap agreements, exempting them from the Bankruptcy Code's prohibition on the enforcement of *ipso facto* clauses.[5]

---

[5] Because we ultimately agree with the Bankruptcy Court that the Priority Provisions were enforceable under the section 560 safe harbor, we assume without deciding that the Priority Provisions are *ipso facto* clauses. We therefore have no occasion to parse the Bankruptcy Court's distinction between "Type 1" and "Type 2" Transactions, or to review the Bankruptcy Court's conclusion that the Priority Provisions in "Type 2" Transactions are not *ipso facto* clauses.

Finally, the Bankruptcy Court dismissed LBSF's state-law claims, reasoning that because the distributions were not improper, LBSF had not been deprived of any state-law property or contractual rights.

LBSF appealed to the District Court (Schofield, *J.*), which affirmed. *Lehman Bros. Special Fin. Inc. v. Bank of Am. Nat'l Ass'n (In re Lehman Bros. Holdings Inc.)*, 17 Civ. 1224 (LGS), 2018 WL 1322225 (S.D.N.Y. Mar. 14, 2018) ("*Lehman II*"). Resolving LBSF's bankruptcy-law claims, the court rested its decision entirely on the Bankruptcy Court's third ground—that the Code's safe harbor provision in section 560 permits the enforcement of the Priority Provisions. The District Court also affirmed the dismissal of all of LBSF's state-law claims. LBSF again appeals.

## DISCUSSION

LBSF contends that the Priority Provisions that subordinated its claims and eliminated its priority upon its default are unenforceable *ipso facto* clauses. We disagree. LBSF has failed to identify any error in the District Court's opinion, and, in affirming, we largely adopt the cogent reasoning of the District Court.

### I.     Standard of Review

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure incorporates Federal Rule of Civil Procedure 12(b)(6) and permits a bankruptcy court to dismiss an adversary proceeding when a complaint fails to state a claim. A district court's judgment "in a bankruptcy case is subject to plenary review, meaning that this Court undertakes an independent examination of the factual findings and legal conclusions of the bankruptcy court." *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 333 (2d Cir. 2011) (internal quotation marks omitted). Here, we review de novo the District Court's statutory interpretation of section 560. *See id.* at 334.

12

II.     **The Section 560 Safe Harbor**

A.     *Ipso facto* clauses and the section 560 safe harbor

The Bankruptcy Code generally prohibits enforcement of *ipso facto* clauses—

contract clauses that modify or terminate an executory contract due to a debtor's filing

of a bankruptcy petition. A number of provisions in the Code effect this prohibition.

Section 365(e)(1) of the Code provides:

> [A]n executory contract . . . may not be terminated or modified, and any
> right or obligation under such contract . . . may not be terminated or
> modified, at any time after the commencement of the case solely because
> of a provision in such contract . . . that is conditioned on— (A) the
> insolvency or financial condition of the debtor at any time before the
> closing of the case; (B) the commencement of a case under this title; or
> (C) the appointment of or taking possession by a trustee in a case under
> this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1). In other words, section 365(e) curtails creditors' ability to modify

contracts with a bankrupt party. This general ban helps "deter the race of diligence of

creditors to dismember the debtor before bankruptcy and promote equality of

distribution." *Merit Mgmt. Grp. v. FTI Consulting, Inc.*, 138 S. Ct. 883, 888 (2018) ("*Merit

Management*") (internal quotation marks omitted) (discussing an analogous safe harbor

provision).

Section 541 of the Code also effects the prohibition of *ipso facto* clauses by

providing that a debtor's interest in property

> becomes property of the estate . . . notwithstanding any provision in an
> agreement, transfer instrument, or applicable nonbankruptcy law . . .
> that is conditioned on . . . the commencement of a case under this title . . .

13

and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1).

Section 363(*l*) further implements the Code's ban on *ipso facto* clauses by preserving the right of the bankruptcy trustee to take certain actions using the property belonging to the bankruptcy estate[6]:

> [T]he trustee may use, sell, or lease property . . . notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on . . . the commencement of a case under this title concerning the debtor . . . and that effects . . . a forfeiture, modification, or termination of the debtor's interest in such property.

11 U.S.C. § 363(*l*). These anti-*ipso facto* provisions strip non-bankrupt counterparties of certain contractual rights they otherwise have and prevent them from collecting debts due from the bankrupt party.

Section 560 carves out an exception, however, and exempts swap agreements from the prohibition of *ipso facto* clauses by protecting a swap participant's contractual right to terminate, liquidate, or accelerate a transaction upon a counterparty's bankruptcy:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind in section 365(e)(1) of this title [the prohibition on *ipso facto* clauses] or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or

---

[6] Section 541 of the Code defines the bankruptcy estate to include, *inter alia*, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

14

> more swap agreements shall not be stayed, avoided, or otherwise limited
> by operation of any provision of this title or by order of a court or
> administrative agency in any proceeding under this title.

11 U.S.C. § 560. In other words, this safe harbor permits swap participants to modify or

terminate an executory contract solely because of the commencement of a bankruptcy

case. Originally added to the Code in 1990, section 560 was meant to protect the stability

of swap markets and to ensure that swap markets are "not destabilized by uncertainties

regarding the treatment of their financial instruments under the Bankruptcy Code." *See*

H.R. Rep. No. 101-484, at 1 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 223, 223; *see also* 136

Cong. Rec. S7534-01 (daily ed. June 6, 1990) (statement of Sen. DeConcini) (asserting

that the "potential for disruption in the financial markets justified the creation of an

exclusion for these contracts from the usual powers of a bankruptcy trustee").

Congress amended section 560 in the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) (codified in 11

U.S.C.) (the "2005 Act"). Relevant here, the 2005 Act broadened the definition of "swap

agreement" to include virtually all derivatives. *See* 11 U.S.C. § 101(53B). The revised

section 560 also clarifies that a swap participant's contractual right to liquidate and

accelerate a swap agreement—in addition to its right to terminate the swap—are

protected under the safe harbor provision. *See* 11 U.S.C. § 560.

B.     Application of the section 560 safe harbor

LBSF maintains that the Priority Provisions—which define the payment order for

distributions of proceeds from the Collateral—are unenforceable *ipso facto* clauses

because they modify and downgrade LBSF's right to receive proceeds. Defendants urge

that the section 560 safe harbor authorizes enforcement of the Priority Provisions, even

if they contain *ipso facto* clauses. The applicability of the safe harbor turns on whether,

15

under section 560, the following conditions apply: (1) the Priority Provisions are "swap agreements"; (2) the distribution of the Collateral constitutes "liquidation"; and (3) the Trustees, in liquidating the Collateral and distributing its proceeds, exercised a "contractual right of a[] swap participant."

Like the District Court, we hold that, even if the Priority Provisions were *ipso facto* clauses, their enforcement was nevertheless permissible under the section 560 safe harbor.

### 1. Definition of "Swap Agreements"

Section 101(53B) of the Bankruptcy Code defines a "swap agreement" to include "any agreement, *including the terms and conditions incorporated by reference in such agreement*, which is" a swap. 11 U.S.C. § 101(53B)(A)(i) (emphasis added). A swap agreement also includes "a master agreement that provides for an agreement or transaction referred to in clause (i)[] [or] (ii), . . . together with all supplements to any such master agreement" and "any security agreement or arrangement or other credit enhancement related to any agreements or transactions referred to in [the above] clause[s] . . . , including any guarantee or reimbursement obligation by or to a swap participant . . . in connection with any agreement or transaction referred to in any such clause." *Id.* § 101(53B)(v), (vi).

Neither party disputes that the Code's sweeping definition of "swap agreement" includes the ISDA Master Agreement, along with the related schedule and confirmation documents. LBSF contends, however, that the Priority Provisions—laid out in the Indenture Agreement—are not part of the swap agreement, and, therefore, are not protected under the section 560 safe harbor. We disagree: The ISDA Master Agreement

16

incorporates by reference the Priority Provisions, and, therefore, the Priority Provisions, too, are swap agreements under section 560.

The Schedule to the ISDA Master Agreement states: "all amounts, payable or expressed to be payable by [the Issuer] . . . shall be recoverable only from . . . the Collateral . . . , *subject in any case to the Priority of Payments set out in the Indenture*." App'x 1335, Schedule Part 5(i). The clause specifically identifies the referenced document—the Indenture and the relevant clause therein. *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) ("[A] paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it." (internal quotation marks omitted)). This evinces the parties' assent to receive payment in accordance with the Priority Provisions. What is more, the only way to settle the Issuers' obligations to LBSF and the Noteholders under the Swap and CDO was the liquidation of the Collateral and distribution of the proceeds. The reference to the Priority Provisions in the Schedule to the ISDA Master Agreement clarifies in what order the Trustees were to distribute the proceeds from the liquidated Collateral.

Seeking to avoid this straightforward conclusion, LBSF asserts that the phrase "subject to" is ambiguous and that its meaning cannot be clarified on a motion to dismiss. We discern no ambiguity; and, indeed, LBSF does not provide any alternative interpretation of "subject to." Accordingly, the Priority Provisions are incorporated by reference into the Swap Agreement, and thus, under the Code, are themselves part of a "swap agreement."

17

2.  *Definition of the right to "cause the liquidation . . . of one or more swap
agreements"*

Section 560 affords safe harbor from the prohibition on *ipso facto* clauses when a
swap participant exercises its contractual right "to cause *the liquidation, termination, or
acceleration* of one or more swap agreements." 11 U.S.C. § 560 (emphasis added). The
question here is whether application of the Priority Provisions—and distribution of the
Collateral according to those Priority Provisions—constitutes the "liquidation" of a
swap agreement under section 560.

The parties dispute the meaning of the term "liquidation" as used in section 560.
Because the Bankruptcy Code does not define the term "liquidation," we interpret the
term according to its "ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel
Corp.*, 571 U.S. 220, 227 (2014) (internal quotation marks omitted). Considered in the
abstract, to "liquidate" might plausibly mean "[t]o settle (an obligation) by payment or
other adjustment" or "[t]o ascertain the precise amount of (debt, damages, etc.)."
*Liquidate*, BLACK'S LAW DICTIONARY (10th ed. 2014). The term thus might refer to the act
of ascertaining the precise amount of debt, as LBSF maintains. Alternatively, it could
refer to the process of winding down a transaction, as defendants urge. Bearing in mind
"the specific context in which that language is used," *Merit Management*, 138 S. Ct. at
892-93, we conclude that the term "liquidation," as used in section 560, must include the
disbursement of proceeds from the liquidated Collateral.

Section 560 operates as an exception to the Code's prohibition of *ipso facto*
clauses. To understand the scope of the exception, we start with a brief overview of the
ban on the enforcement of such clauses. The prohibition on *ipso facto* clauses prevents a
non-bankrupt counterparty from modifying a contract simply because the counterparty
declared bankruptcy. *See* 11 U.S.C. § 365(e). Similarly, the Code's automatic stay

18

provision prohibits the non-bankrupt party from terminating any executory contracts where the debtor has a property interest in that executory contract. *Id.* § 362(a)(3).

While the non-bankrupt party is typically limited in its capacity to terminate an executory contract with a bankrupt counterparty, the debtor or bankruptcy trustee, by contrast, may "assume or reject any executory contract . . . of the debtor." *Id.* § 365(a). If "the contract is a good deal for the [bankruptcy] estate," then the debtor will "assume the contract, fulfilling its obligations while benefitting from the counterparty's performance." *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) ("*Mission Product Holdings*"). If the contract is a bad deal for the debtor, the Code also enables the debtor to reject a losing contract, "repudiating any further performance of its duties." *Id.* The Code explains that "the rejection of an executory contract . . . constitutes a breach of such contract," 11 U.S.C. § 365(g), and thus the non-bankrupt counterparty "has a claim against the estate for damages resulting from the debtor's nonperformance," *Mission Product Holdings*, 139 S. Ct. at 1658. But the counterparty is likely to "receive only cents on the dollar" for such a claim.[7] *Id.* Because the prohibition on *ipso facto* clauses bars a non-bankrupt counterparty from modifying or terminating an executory contract, a party's bankruptcy exposes the counterparty to significant risk.

The upshot of all this is that the section 560 safe harbor *exempts* the non-bankrupt swap participant from this regime. It specifically permits the non-bankrupt party to terminate, liquidate, and accelerate a swap agreement because of the counterparty's

---

[7] That is so because the Code treats the debtor's breach as occurring "immediately before the date of the filing of the bankruptcy petition," and, therefore, the counterparty is treated like any other unsecured creditor. *Mission Product Holdings*, 139 S. Ct. at 1658 (brackets and internal quotation marks omitted) (quoting 11 U.S.C. § 365(g)(1)).

petition for bankruptcy. Without the safe harbor provision, swap participants would be vulnerable to, *inter alia*, the automatic stay and the bankrupt counterparty's assumption or rejection of the swap agreement. *See* 5 Collier on Bankruptcy § 560.01. By affording swap agreements special treatment, section 560 shields swap participants from some of the risks associated with a counterparty's bankruptcy and enables them to unwind the transactions. This is what the statute means when it authorizes the exercise of a "contractual right . . . to cause the liquidation . . . of one or more swap agreements." 11 U.S.C. § 560.

Because the statutory language in section 560 is "unambiguous," we need not "consider legislative history." *United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 171 (2d Cir. 2018). Nevertheless, we note that the congressional reports accord with this interpretation, which reads section 560 to protect a swap participant's ability to unwind the swap transaction. *See, e.g.*, 136 Cong. Rec. H2281-06, H2284 (daily ed. May 15, 1990) (statement of Rep. Schumer) (noting that section 560 will "bring a degree of certainty and finality to the resolution of troubled market participants"); 136 Cong. Rec. S7535 (statement of Sen. DeConcini) ("[T]he swap provisions will . . . provide certainty for swap transactions and thereby stabilize domestic markets by allowing the terms of the swap agreement to apply notwithstanding the bankruptcy filing."); *see also Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1050 (9th Cir. 2003) ("The legislative history of the Swap Amendments plainly reveals that Congress recognized the growing importance of interest rate swaps and sought to immunize the swap market from the legal risks of bankruptcy.").

Reading section 560's reference to "liquidation" of a swap agreement to include distribution of the Collateral furthers the statutory purpose of protecting swap

20

participants from the risks of a counterparty's bankruptcy filing by permitting parties to quickly unwind the swap. On LBSF's reading of "liquidation," by contrast, the non-defaulting counterparty's rights under the safe harbor are hollow: simply *calculating* amounts due "provides no security to swap participants if they will not be able to collect," as the District Court aptly concluded. *Lehman II*, 2018 WL 1322225, at *6. The right to liquidate, in other words, would hardly protect swap counterparties if it merely sheltered their ability to determine amounts owed, but not to distribute the proceeds from the sold Collateral.[8] The District Court's reading of "liquidation" is thus grounded in the statutory text and purpose of the section 560 safe harbor.

LBSF, by contrast, appears to take its understanding of "liquidation" from the particular context of "unliquidated"—that is, uncalculated—claims. *See* Appellant's Br. 33 (citing *In re Dow Corning Corp.*, 215 B.R. 346, 355 (Bankr. E.D. Mich. 1997)). That is a far cry from liquidating swap agreements: section 560 does not focus on "unascertained amounts and the need to ascertain them." *Lehman II*, 2018 WL 1322225 at *6. It is, instead, concerned with unwinding swap agreements.

LBSF urges on appeal that (1) Chapter 7 of the Bankruptcy Code, which governs liquidation, undermines the Bankruptcy and District Courts' reasoning; and (2) the Supreme Court's recent decision in *Merit Management* undercuts those courts' analysis of section 560. We disagree on both counts. First, Chapter 7, if anything, supports

---

[8] That the Trustees in several instances retained the Collateral, but did not distribute the proceeds until they received indemnification from the Noteholders does not upset our analysis. The scope of the term "liquidation" does not turn on whether immediate distribution is required (contractually or legally). The issue instead is whether distribution of proceeds is a "contractual right" to "liquidate" under the section 560 safe harbor. Here, distribution of the proceeds was the sole means by which the parties could obtain the economic benefit of the synthetic CDO upon termination.

defendants' more capacious reading of "liquidation." LBSF contends that Chapter 7 refers to "liquidation" and "distribution" as distinct concepts and specifically uses the word "distribution" to describe an estate's payment of proceeds to creditors. *See* 11 U.S.C. § 726 ("Distribution of property of the estate"). Chapter 7, however, lends some support to the notion that "liquidation" is a process by which the bankruptcy trustee first "collect[s] and reduce[s] to money the property of the estate," 11 U.S.C. § 704(a)(1), and next, ensures that the "property of the estate . . . [is] distributed," *id.* § 726(a); *see also* 6 Collier on Bankruptcy § 700.01 ("Liquidation is a form of relief afforded by the bankruptcy laws that involves the collection, liquidation, and distribution of the nonexempt property of the debtor . . . ."). The fact that Chapter 7 is entitled "Liquidation" and discusses distribution of the estate's property "suppl[ies] cues as to what Congress intended."[9] *Merit Management*, 138 S. Ct. at 893 (internal quotation marks omitted).

Second, we reject LBSF's suggestion that *Merit Management*, a Supreme Court decision rendered after the Bankruptcy Court issued its ruling, invalidates the reasoning of either the Bankruptcy Court or the District Court. *Merit Management* analyzed a different safe harbor provision, 11 U.S.C. § 546(e), which prevents

---

[9] In addition, Amicus Curiae the Structured Finance Industry Group cites to a number of industry-specific dictionaries, which use the term "liquidation" to refer to distribution of assets. *See* Amicus Br. 16-18 (citing Dictionary of Business and Economic Terms (5th ed. 2012) ("To liquidate often means to pay"); Dictionary of Finance and Investment Terms (9th ed. 2014) ("Dismantling of a business, paying off debts in order of priority"); Dictionary of Banking Terms (6th ed. 2012) ("When an obligation is paid off it is said to be liquidated.")). Although we rely primarily on the plain meaning of section 560, we may also look to the way the term is used "in the context of the securities industry." *Enron Creditors Recovery Corp.*, 651 F.3d at 333 (internal quotation marks omitted).

bankruptcy trustees from "avoiding"—or clawing back—certain transactions.[10] 138 S. Ct. at 893. The Court ruled that the safe harbor did not apply where the transfer is between *non*-protected parties and the funds simply move through a protected institution (a financial institution), as a conduit, without benefitting it. The Court reasoned that to determine whether a transaction falls within the safe harbor, it must identify the relevant transfer—that is, the transfer that the trustee seeks to claw back. *See id.* at 893-94.

LBSF contends that the Bankruptcy and District Courts ran afoul of *Merit Management* because they concluded that, as LBSF puts it, the safe harbor protected the "entire transaction[] merely because one component of such a transaction is safe harbored." Appellant's Br. 24. We reject that unfair characterization of the lower courts' opinions. Both the Bankruptcy and District Courts focused on the challenged action— transfers enforcing the Priority Provisions—and determined that the distribution according to the Priority Provisions constituted the exercise of a contractual right to effect liquidation. They undertook a careful analysis of the statute's text, and concluded,

---

[10] Section 546(e) provides:

> [T]he trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract . . . commodity contract, . . . or forward contract, that is made before the commencement of the case . . . .

11 U.S.C. § 546(e).

23

correctly, that the challenged action was safe harbored *as part of the "liquidation" process*, not bootstrapped in by the sale of the Collateral.[11]

### 3.  Definition of "Swap Participant"

In a last attempt to avoid the consequences of the section 560 safe harbor, LBSF contends that the Trustees who terminated the swaps and distributed the proceeds of the Collateral were not "swap participants." As a result, LBSF continues, the Trustees' actions fall outside the ambit of section 560's safe harbor, which expressly protects certain contractual rights of "swap participant[s]" only. 11 U.S.C. § 560.

Section 101(53C) defines "swap participant" as "an entity that, any time before the filing of the petition, has an outstanding swap agreement with the debtor." Neither party disputes that the Issuers, as parties to the swaps, were "swap participants" under the Bankruptcy Code. The Transaction Documents grant the Issuers the right to terminate the Swaps and liquidate the Collateral, and expressly permit the Trustees to exercise those rights. Section 7.7(c) of the Indenture, for instance, instructs that the "Issuer shall enforce all of its material rights and remedies under the Credit Swaps." App'x 1601. And section 10.1 of the Indenture expressly grants to the Trustee all of the

---

[11] We acknowledge that this reading of section 560 conflicts with that adopted by Bankruptcy Judge Peck, who originally presided over the Lehman bankruptcy. In two earlier cases arising out of Lehman's bankruptcy, Judge Peck ruled that the priority provisions were unenforceable *ipso facto* clauses that fell outside the section 560 safe harbor. *See BNY*, 422 B.R. 407; *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd.*, 452 B.R. 31 (Bankr. S.D.N.Y. 2011) ("*Ballyrock*"). The court wrote that "a mandated elimination of a substantive right to receive funds that existed prior to the bankruptcy of LBHI should not be entitled to any protection under safe harbor provisions that, by their express terms, are limited exclusively to preserving the right to liquidate, terminate and accelerate a qualifying financial contract." *Ballyrock*, 452 B.R. at 40. As set forth in this Opinion, we disagree with that statement: the term "liquidation," as used in section 560, is in our view broad enough to include the subordination of LBSF's payment priority and distribution according to the amended waterfall of payment priorities.

Issuer's rights, title, and interest in the Swap. Specifically, it provides that "[t]he Issuer shall enter into the Credit Swaps . . . and shall Grant its interest therein to the Trustee." *Id.* at 1618.

The District Court correctly pointed out that section 560 requires the exercise of a contractual right "*of*" any swap participant, not *by* one. Special App'x 85 (emphasis added). Thus, the mere fact that the Trustees (rather than the Issuers) liquidated the swap does not place the transaction outside the safe harbor. Here, the Transaction Documents enabled the Issuers to grant their right to terminate and liquidate to the Trustees. The Trustees therefore exercised the contractual rights of a swap participant.

Neither party disputes that the Issuers incurred obligations to LBSF and the Noteholders, both of which had recourse for satisfaction of the Issuers' obligations against only the Collateral. App'x 1335, Schedule Part 5(i). As a result, the obligation to pay LBSF and the Noteholders from the proceeds of the Collateral was the Issuers' obligation. Once the swap was terminated, the Issuers had to satisfy their obligations in accordance with the terms of the Transaction Documents. Because of LBSF's default, the Priority Provisions required them to distribute the proceeds of the Collateral pursuant to Noteholder priority.

In short: The Priority Provisions are incorporated by reference into the swap agreements and thus, for the purposes of section 560, are considered to be part of a swap agreement. The contractual right to liquidate included distributions made pursuant to Noteholder priority. The Trustees exercised a contractual right to effect liquidation when they distributed the proceeds of the sold Collateral. And, in doing so, the Trustees exercised the rights of a swap participant.

25

III.    State Law Claims and Declaratory Judgment

LBSF brought a number of state-law claims as well, alleging, for instance, that defendants were unjustly enriched, breached their contracts with LBSF, and effected fraudulent transfers by distributing the proceeds to defendants. *See* App'x 272-83, Fourth Amended Complaint, Counts XIII-XVIII. All of LBSF's state-law causes of action require LBSF to allege plausibly that it was entitled to the payments. They therefore rise and fall with the disposition of the bankruptcy-law claims. Because we have already concluded that the Priority of Payments clauses are enforceable under the Code, LBSF's state-law claims also fail.

In Count XIX, LBSF seeks a declaratory judgment that the Priority Provisions constitute unenforceable penalties under New York law by depriving it of payments it was allegedly owed. The penalty doctrine applies to liquidated damages clauses where the "damages [are] grossly disproportionate to the amount of actual damages." *172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n*, 25 N.E.3d 952, 957 (N.Y. 2014) (internal quotation marks omitted). As both the Bankruptcy Court and District Court remarked, however, the Priority Provisions do not fix damages, but rather subordinate LBSF's payment priority. The District and Bankruptcy Courts thus correctly concluded that LBSF is not entitled to declaratory relief.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is AFFIRMED.

26

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**ROBERT A. KATZMANN**
CHIEF JUDGE

Date: August 11, 2020
Docket #: 18-1079bk
Short Title: In Re: Lehman Brothers Holding

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

DC Docket #: 17-cv-1224
DC Court: SDNY (NEW YORK CITY)
DC Judge: Schofield

## BILL OF COSTS INSTRUCTIONS

The requirements for filing a bill of costs are set forth in FRAP 39. A form for filing a bill of costs is on the Court's website.

The bill of costs must:
*  be filed within 14 days after the entry of judgment;
*  be verified;
*  be served on all adversaries;
*  not include charges for postage, delivery, service, overtime and the filers edits;
*  identify the number of copies which comprise the printer's unit;
*  include the printer's bills, which must state the minimum charge per printer's unit for a page, a cover, foot lines by the line, and an index and table of cases by the page;
*  state only the number of necessary copies inserted in enclosed form;
*  state actual costs at rates not higher than those generally charged for printing services in New York, New York; excessive charges are subject to reduction;
* be filed via CM/ECF or if counsel is exempted with the original and two copies.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**ROBERT A. KATZMANN**                          **CATHERINE O'HAGAN WOLFE**
CHIEF JUDGE                                      CLERK OF COURT

Date: August 11, 2020                            DC Docket #: 17-cv-1224
Docket #: 18-1079bk                              DC Court: SDNY (NEW YORK
Short Title: In Re: Lehman Brothers Holding      CITY)
                                                 DC Judge: Schofield

**VERIFIED ITEMIZED BILL OF COSTS**

Counsel for
_____

respectfully submits, pursuant to FRAP 39 (c) the within bill of costs and requests the Clerk to
prepare an itemized statement of costs taxed against the
_____

and in favor of
_____

for insertion in the mandate.

Docketing Fee         _____

Costs of printing appendix (necessary copies _____ )  _____

Costs of printing brief (necessary copies _____ ____)  _____

Costs of printing reply brief (necessary copies _____ )  _____

**(VERIFICATION HERE)**

                                                 _____
                                                 Signature