Hearing Date and Time: October 6, 2020 at 10:00 a.m.

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006
Mark A. Speiser
Claude G. Szyfer
Sherry J. Millman
Patrick N. Petrocelli

*Attorneys for Mizuho Securities Co., Ltd.*

| | |
|---|---|
| In re:<br><br>**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13555 (SCC) |

### OBJECTION OF MIZUHO SECURITIES CO., LTD. TO MOTION FOR ALTERNATIVE DISPUTE RESOLUTION PROCEDURES ORDER IN CONNECTION WITH CLAIMS HELD BY LEHMAN BROTHERS HOLDINGS INC. REGARDING EXCESS PAYMENTS RECEIVED BY CLAIMANTS ON ACCOUNT OF GUARANTEE CLAIMS

Mizuho Securities Co., Ltd. ("**MHSC**"), for its objection to the *Motion for Alternative Dispute Resolution Procedures Order in Connection with Claims Held by Lehman Brothers Holdings Inc. Regarding Excess Payments Received by Claimants on Account of Guarantee Claims* [Docket No. 60863] (the "**Motion**"), filed by LBHI as Plan Administrator in the Chapter 11 Cases, respectfully states as follows:[1]

### INTRODUCTION

1. According to the Plan Administrator, it made roughly $32 million in Distributions under the Plan to over 50 recipients that it now claims it was not authorized to make. Through the Motion, the Plan Administrator seeks to subject the so-called Excess Payment Recipients,

---

[1] Undefined capitalized terms used herein have the same meanings given to them in the Motion.

including MHSC, to mandatory mediation over the Plan Administrator's unspecified claims to force disgorgement of the alleged overpayments. The Plan Administrator lacks a legal right to seek "disgorgement" of alleged overpayments, and whatever claims it purports to hold are baseless.

2.  Nevertheless, MHSC does not object to an order authorizing fair and appropriate ADR procedures. Several of the procedures the Plan Administrator asks the Court to approve, however, are contrary to the law and to a fair and orderly mediation process. First, under no circumstances should the Court require financial intermediaries (i.e., the so-called "conduits") to reveal the identities of their customers, nor has the Plan Administrator set forth any legal or equitable basis requiring adverse parties effectively to act as the Plan Administrator's process server. Second, as part of the ADR procedures, the Plan Administrator should be required to disclose certain critical information to allow so-called Excess Payment Recipients to understand the nature of the claims being asserted against them. Third, the so-called Excess Payment Recipients should have a role in selecting the mediator who will attempt to facilitate the settlement of their dispute with the Plan Administrator. And, finally, service of notice should be accomplished via hand delivery or overnight mail, with a copy also sent via email if possible, and, where appropriate, service should be made on counsel, not the adverse party directly.

3.  Accordingly, for the reasons set forth more fully herein, MHSC respectfully submits that the proposed ADR procedures order should be amended prior to its entry. For the avoidance of doubt, nothing contained in this Objection should be construed as an admission that the potential claims the Plan Administrator purports to hold against MHSC are valid or have any merit whatsoever. MHSC reserves all of its rights with respect to the Plan Administrator's alleged claims, including, but not limited to, its rights with respect to all jurisdictional defenses.

**BACKGROUND**

4. MHSC is a securities services provider serving individual retail investors and institutional clients located in Japan. It is registered with the Director of the Kanto Local Finance Bureau of the Ministry of Finance of Japan and subject to the Financial Instruments and Exchange Act (Act No. 25 of 1948, as amended; the "**FIEA**"), among other laws and regulations applicable to securities companies in Japan.

5. When the Chapter 11 Cases were commenced, MHSC was the holder of record in the relevant depository clearing system of certain notes issued by LBT and guaranteed by LBHI. It held those notes in the segregated custody accounts it established as a securities company on behalf of more than 1200 retail investors. Of those, the Motion appears potentially to be relevant to more than 100 retail investors, all of whom are domiciled in Japan and the large majority of whom are individuals. These retail customers had purchased notes of a Luxembourg entity, that were governed by English law and provided for resolution of disputes in English courts and included an agreement by LBHI not to contest the venue of English courts, the disclosure for which was, as least in part, in Japanese. MHSC filed Proofs of Claim in the Chapter 11 Cases based on those notes and held Allowed Guarantee Claims for which LBT is the Primary Obligor, as that phrase is used in Section 6.5(b)(iii) of the Plan. It also held Primary Claims under LBT's composition plan approved by the Amsterdam District Court (the "**LBT Composition Plan**"). None of MHSC's customers met the qualified institutional investor status prerequisite for election to receive substitute notes in the LBT partial wind-down with the result that the final payment under the LBT Composition Plan for all of MHSC's customers occurred in May 2019 and the Primary Claims at issue here have been extinguished.

6. Following the effective dates of the Plan and the LBT Composition Plan, MHSC began receiving primary obligation payments in Japanese yen, Australian dollars, and U.S.

3

dollars, the currencies in which the notes were issued, from LBT and separate guarantee payments from LBHI in U.S. dollars. Although MHSC did not receive full payment in satisfaction of the Primary Claims under the LBT Composition Plan, the Plan Administrator claims that, when payments received from LBT are converted to U.S. dollars and aggregated with payments received from LBHI, MHSC has received payments in excess of its Allowed Guarantee Claims under the Plan.

7. The Plan Administrator filed the Motion to establish ADR procedures to govern mediation between LBHI and MHSC, among other holders of Allowed Guarantee Claims. Although the Plan Administrator points to certain provisions of the Plan, it has not identified the legal basis for the claims it believes it holds against MHSC, nor has it identified any source of authority allowing it to compel MHSC to turn over to the Plan Administrator alleged Excess Payments received from LBHI.

8. Instead, the Plan Administrator attempts to cobble together a claim for "disgorgement" by relying on three separate provisions of the Plan. *See* Motion ¶¶ 9-12 (citing Sections 8.13(a), 8.13(b), and 8.13(f) of the Plan). None of those provisions, however, entitle the Plan Administrator to seek any relief from holders of Allowed Guarantee Claims, like MHSC.

9. Sections 8.13(a) and 8.13(f) of the Plan, for example, leave open the possibility that LBHI might in some circumstances receive certain amounts through disgorgement, but neither section creates a cause of action for disgorgement or otherwise provides the Plan Administrator with any right to assert claims against holders of Allowed Guarantee Claims for alleged overpayments. Similarly, Section 8.13(b) provides that holders of Allowed Guarantee Claims shall not "receive Distributions . . . that combined with Distributions or other consideration provided on the corresponding Primary Claim . . . are in excess of the Allowed

4

amount of the Guarantee Claim." That section, however, does ***not*** provide the Plan Administrator with a right to claw back or disgorge overpayments in cases where, as claimed here, the Plan Administrator violated the restriction set forth therein by making payments to the holders of Allowed Guarantee Claims it later alleges were, in retrospect, excess payments under the Plan.

10.  The only section of the Plan that contemplates actual procedures to govern potential claims for disgorgement—Section 8.13(e)—is ***not applicable here*** and is not relied on by the Plan Administrator. Under Section 6.5(b)(iii) of the Plan, "holders of Allowed Guarantee Claims for which LBT is the Primary Obligor[, such as MHSC,] ***shall not be subject to Section 8.13(e) of the Plan***." (Emphasis added.) Accordingly, the Plan specifically excluded holders of Allowed Guarantee Claims corresponding to Primary Claims against LBT, like MHSC, from being subjected to these procedures. The Plan Administrator cannot look to the Plan itself to provide a cause of action to assert against MHSC.

11.  To the extent the Plan Administrator seeks to rely on a general equitable remedy of disgorgement, the Motion fails to suggest a plausible entitlement to equitable relief. Disgorgement is generally used "to prevent wrongdoers from unjustly enriching themselves through violations [of the law], which has the effect of deterring subsequent fraud." *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006). Here, MHSC has engaged in no wrongdoing whatsoever and has not been unjustly enriched by the alleged overpayments. Quite the opposite. MHSC was a passive recipient of payments from LBHI and LBT over a period of years, during the vast majority of which the U.S. dollar was worth in excess of 100 or more Japanese yen, resulting in materially lower values for the amount actually received from LBT than the approximately 77.5 exchange rate applicable on the Confirmation Date. Following the effective

5

dates of the Plan and the LBT Composition Plan, MHSC never sought to compel either LBHI or LBT to make payments to it. And, even when combined with the Distributions and converted at the rates on the Confirmation Date, MHSC has not received more than the amount it is entitled to receive under the LBT Composition Plan. Disgorgement is neither just nor appropriate under these circumstances. *See In re Vecchio*, 20 F.3d 555, 560 (2d Cir. 1994) (recognizing that bankruptcy courts have "discretion over the entry of disgorgement orders" and that they "could weigh the benefits and burdens of [issuing a disgorgement order where other creditors would have to return funds] and reach a just result").

12. Further, upon information and belief, following the effective date of the LBT Composition Plan, LBT had no assets of its own and was, therefore, only able to make payments to holders of Primary Claims, such as MHSC, when LBHI itself made payments to LBT. And, under Section 6.1(b)(ii) of the Plan, the Plan Administrator is empowered to "make Distributions to holders of Allowed Claims in accordance with the Plan." Thus, the Plan Administrator knew at all relevant times (a) how much money LBT had available to it to make payments in partial satisfaction of Primary Claims; and (b) that, under the LBT Composition Plan, certain Primary Claims were allowed by LBT in higher amounts than the corresponding Allowed Guarantee Claims were allowed by LBHI under the Plan. Moreover, unlike MHSC, the Plan Administrator was in a position to assess the level of potential future Distributions to LBT that would result in LBT making future payments to Allowed Guarantee Claim holders, and the Plan Administrator would have been aware of the prevailing exchange rates when it made Distributions. As the entity with sole authority to cause an alleged overpayment to occur, and with full knowledge of the facts giving rise to potential overpayments, the Plan Administrator, not MHSC, should bear any financial hardship resulting from its own errors.

13. This is especially true here because, at all relevant times, LBHI knew that a significant portion of the notes issued by LBT and guaranteed by LBHI were beneficially owned by small retail investors outside of the United States. Although not directly applicable to whatever post-Plan cause of action the Plan Administrator contemplates bringing against MHSC and other financial intermediaries, the safe harbor provision in section 546(e) of the Bankruptcy Code should be instructive in considering the Plan Administrator's apparent claims for equitable relief. Absent a clear entitlement to the relief sought, either in the Plan itself or otherwise, the Court should be mindful of Congress's desire "to 'promot[e] finality . . . and certainty' for investors, by limiting the circumstances, e.g., to cases of intentional fraud, under which securities transactions could be unwound." *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 92 (2d Cir. 2019). Congress's concerns as to finality and the proper functioning of the securities market are no less prevalent here, where the Plan Administrator seeks retroactively to unwind post-Plan securities transactions it was solely responsible for making.

## SPECIFIC OBJECTIONS TO THE PROPOSED ADR ORDER

14. Despite the factual and legal flaws in the Plan Administrator's alleged claims, MHSC is mindful of the efficiency benefits to the Court of ADR procedures and does not wholesale oppose entry of an Order establishing ADR procedures to govern mediation between holders of Allowed Guarantee Claims, such as MHSC, and the Plan Administrator. Nevertheless, four provisions of the Plan Administrator's proposed ADR order are legally deficient or otherwise contrary to a fair and efficient ADR process. They should not be adopted.

15. **First**, recognizing that at least some of the so-called Excess Payment Recipients served as intermediaries (or "conduits") between LBHI and LBT, on the one hand, and third-party investors, on the other, the Plan Administrator built in a provision in the proposed ADR order deeming these unnamed third-parties "Excess Payment Recipients for purposes of the

7

Excess Payment ADR Procedures" under certain circumstances and, where applicable, requiring them "to cooperate fully in the Excess Payment ADR Procedures." Proposed Form of Order ¶ 2. Further, the Plan Administrator's proposed ADR order requires any "Excess Payment Recipient that asserts that it was a conduit . . . to forward [the] Order to those third parties that it asserts are the recipients of the Excess Payments, and [provides that] such forwarding shall constitute judicial notice to such recipients." *Id.* These provisions should be stricken from any ADR procedures order entered by the Court.

16. As an initial matter, it is not clear what the Plan Administrator means by its reference to "judicial notice" in this context. Courts may take judicial notice of facts that are (1) "generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." *Flaxer v. Gifford (In re Lehr Constr. Corp.)*, 528 B.R. 598, 606 (Bankr. S.D.N.Y. 2015) (quoting Fed. R. Evid. 201(b)). The Plan Administrator's use of the phrase "judicial notice" makes no sense in the context of the Motion and is not the type of judicial notice contemplated by the Federal Rules of Evidence.

17. To the extent the Plan Administrator is attempting to use "judicial notice" as a proxy for jurisdiction or service of process, the Plan Administrator has made no showing that service in this manner is appropriate or that these unnamed third parties are subject to the jurisdiction of this Court. Given the likelihood that a vast majority of the unnamed third parties, if not all of them, are domiciled outside the United States, the Plan Administrator will be unable to obtain personal jurisdiction over them should it decide to commence an adversary proceeding, contested matter, or other litigation against them in this Court. *See, e.g.*, *Lehman Bros. Special Financing Inc. v. Bank of Am. Nat'l Assoc. (In re Lehman Bros. Holdings, Inc.)*, 535 B.R. 608,

8

620 (Bankr. S.D.N.Y. 2015) (personal jurisdiction requires "minimum contacts" with the United States, "[t]he defendant's connection to the forum state must arise out of contacts the 'defendant *himself* creates,' and those contacts must be between the defendant and 'the forum state itself, not . . . persons who reside there'") (emphasis in original). The Court should not adopt any procedures that would make unnamed third parties subject to ADR procedures in the United States without a proper showing by the Plan Administrator that those unnamed third parties are, in fact, subject to the jurisdiction of United States courts.

18. Worse still, assuming MHSC's understanding of the Plan Administrator's use of the phrase "judicial notice" is correct, the Plan Administrator's proposed ADR procedures order conscripts adverse parties, such as MHSC, to act as its process server by requiring them to send process to their retail customers merely for mentioning certain facts in opposition to the Plan Administrator's unspecified claims, such as, in the case of MHSC, the undisputed fact that its Proofs of Claim were filed as the holder of record in the depository clearing system of the LBT notes on behalf of a great number of beneficial owners. *See* Proposed Form of Order ¶ 2. The process the Plan Administrator would have MHSC send to its retail customers, under penalty of Court sanction, is not a mere ministerial function. Under the Plan Administrator's proposed ADR procedures order, the process will force foreign nationals to "cooperate fully in the Excess Payment ADR Procedures" and "shall constitute judicial notice to such recipients." *Id.* Presumably, these unnamed third parties' failure to comply with the Excess Payment ADR Procedures would, likewise, subject them to possible Court sanction. There is no legal basis for forcing MHSC or any other so-called Excess Payment Recipient to act on behalf of the Plan Administrator in this manner. Nor has the Plan Administrator even attempted to show that use of

9

this "judicial notice" procedure is an appropriate means of serving hundreds, if not thousands, of retail investors across the globe.

19. Additionally, there are international comity concerns that counsel against adopting paragraph 2 of the Plan Administrator's proposed ADR procedures order. Upon information and belief, the Attorney Act of Japan (Act No. 205 of 1949, as amended) prevents MHSC from acting as a legal or debt collection intermediary between the Plan Administrator and its investors, which MHSC would likely be forced to do if it (a) decides to assert the "conduit" defense referenced in paragraph 2; and (b) is required by the ADR procedures order to forward the order to its Japanese-speaking retail customers.

20. Further, it is also a violation of the Act on the Protection of Personal Information of Japan (Act No. 57 of 2003, as amended), the FIEA and the rules of Japan Securities Dealers Association, for MHSC to reveal the identities or other personal information of its customers without first obtaining their consent. Requiring MHSC to forward information to its customers and thereby requiring them to participate in the ADR procedures runs the risk of forcing MHSC to violate Japanese law to the extent such acts would reveal the identities of its retail customers. Moreover, if MHSC were to be forced to contact its retail customers to try to obtain their consent, it would, again, potentially violate the Attorney Act of Japan because it would, at a minimum, need to explain the ADR process to its customers, inform them of the nature of the claims asserted, advise them on the ramifications of providing their consent to being disclosed to the Plan Administrator, and answer any of the customers' questions about securities transactions that were processed more than two years ago.

21. Without a firm legal basis supporting the Plan Administrator's attempts to force MHSC and the other so-called Excess Payment Recipients to reveal the identities of their

10

customers and then take the additional step of serving them with process on behalf of the Plan Administrator, the Court should not require them to potentially violate foreign laws just for asserting a potential defense or raising otherwise undisputed facts as part of non-binding mediation.

22.    Requiring so-called Excess Payment Recipients that acted as financial intermediaries to reveal the identities and other information about their retail customers is also contrary to the reasonable expectations of the parties based on the *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form* [Docket No. 4271]. That Order provided: "[A] Filing Entity that files a claim on behalf of multiple account holders or holders of any Lehman Program Security shall not be required to provide identifying information for such account holders or holders of any Lehman Program Security." *Id.* at 14, ¶ (k). Now, over ten years later, there is no justification to reverse course by requiring so-called Excess Payment Recipients to disclose this information as part of a mediation.

23.    **Second**, any ADR procedures order entered by the Court should provide clear guidelines as to the information the Plan Administrator must include in the Excess Payment ADR Notice. The Plan Administrator's proposed ADR procedures order falls well short of doing so. Instead, it requires the Plan Administrator to only set forth "sufficient information regarding the Excess Payment ADR Dispute to make the Excess Payment Recipient aware of the nature of LBHI's affirmative claim and of its demand for settlement, including an amount of monetary recovery LBHI would accept in full settlement and compromise." Proposed Form of Order ¶ 7(a). At a minimum, the Plan Administrator should be required to disclose in the Excess

11

Payment ADR Notice the following information, all of which is necessary to allow alleged Excess Payment Recipients a full and fair opportunity to understand the nature of the Plan Administrator's claims and prepare their defenses:

(a) The dates and amounts of each Distribution to the alleged Excess Payment Recipients made by LBHI by ISIN and blocking number;

(b) The dates and amounts (including currencies used and the applicable exchange rate between such currency and the U.S. dollar on the date of the payment and, if different, the rate relied on by the Plan Administrator) of each payment of other consideration to the alleged Excess Payment Recipients made by LBT or any other third-party by ISIN and blocking number;

(c) On the date of each Distribution made by LBHI and payment of other consideration made by LBT or any other third-party, the cumulative amount of Distributions and the cumulative amount of other consideration the Plan Administrator claims had been received as of that date by the alleged Excess Payment Recipients by ISIN and blocking number (with payments in currencies other than U.S. dollars converted to U.S. dollars at the exchange rate on the date of payment); and

(d) The legal basis the Plan Administrator intends to rely on to support its claim(s) against the alleged Excess Payment Recipients.

24. **Third**, the Plan Administrator's proposed ADR procedures order gives LBHI unilateral authority to select a mediator from the Court's Register of Mediators and, even if LBHI's initial selection is unavailable, LBHI has unilateral authority to select an alternate mediator. *See* Proposed Form of Order ¶ 9(c). Granting LBHI this amount of discretion to select a mediator is antithetical to the consensual nature of mediation and contrary to at least one prior ADR procedures order entered in these cases. *See, e.g.*, Exhibit A to Order, Claims Hearing Procedures and ADR Procedures ¶ 5(a), *In re Lehman Bros. Holdings Inc., et al.*, Case No 08-13555 (Bankr. S.D.N.Y. April 19, 2020) [Docket No. 8474] (providing that the Debtors select four mediators from a List of Mediators and authorizing claimants to "strike not more than three" of them). The Court should provide alleged Excess Payment Recipients with a voice in the

12

selection of mediators by allowing the Plan Administrator to select a slate of four mediators and authorizing the alleged Excess Payment Recipients the right to strike up to three of them. Further, in addition to using the Court's Register of Mediators, the list of potential mediators should also include JAMS mediators with a background in bankruptcy to ensure that there are sufficient mediators for the Plan Administrator and the alleged Excess Payment Recipients to choose from.

25. **Finally**, the Plan Administrator's proposed ADR procedures order authorizes LBHI to serve alleged Excess Payment Recipients, their counsel, their legal guardian, their estate representative, or any other representatives via hand delivery, first class mail, or overnight mail. *See* Proposed Form of Order ¶ 3(b). Given the fact that many businesses have instituted work from home protocols because of the COVID-19 pandemic and the fact that COVID-19 has caused delays in USPS mail delivery times, LBHI should be required to serve alleged Excess Payment Recipients with an Excess Payment ADR Package either via hand delivery or via overnight mail only. And, where the Plan Administrator has email addresses associated with an alleged Excess Payment Recipient, e.g., if email addresses are listed on an alleged Excess Payment Recipient's proof of claim, the Plan Administrator should be required to simultaneously email the Excess Payment ADR Package to the alleged Excess Payment Recipient. These steps will ensure that the alleged Excess Payment Recipients receive timely notice of an Excess Payment ADR Dispute.

26. Further, where the Plan Administrator is aware that an alleged Excess Payment Recipient is represented by counsel, e.g., because counsel is identified on a Proof of Claim or because counsel has filed a notice of appearance or otherwise communicated with the Plan Administrator, LBHI should be required to serve the Excess Payment ADR Package on counsel,

13

not on the alleged Excess Payment Recipient or any other representative. *See* Fed. R. Bankr. Proc. 7005 (Rule 5 of the Federal Rules of Civil Procedure "applies in adversary proceedings"); Fed. R. Civ. P. 5(b)(1) ("If a party is represented by an attorney, service under this rule must be made on the attorney unless the court orders service on the party.").

27.   The foregoing changes to the proposed ADR procedures order will ensure fair and efficient mediations between the Plan Administrator and the so-called Excess Payment Recipients. They should be adopted in their entirety in any order entered by the Court.

## CONCLUSION

WHEREFORE, MHSC respectfully requests that the Court:

(a)   Strike paragraph 2 of the Proposed Form of Order submitted by the Plan Administrator;

(b)   Require the Plan Administrator to include in an Excess Payment ADR Notice: (i) the dates and amounts of each Distribution to the alleged Excess Payment Recipients made by LBHI by ISIN and blocking number; (ii) the dates and amounts (including currencies used and the applicable exchange rate between such currency and the U.S. dollar on the date of the payment and, if different, the rate relied on by the Plan Administrator) of each payment of other consideration to the alleged Excess Payment Recipients made by LBT or any other third-party by ISIN and blocking number; (iii) on the date of each Distribution made by LBHI and payment of other consideration made by LBT or any other third-party, the cumulative amount of Distributions and the cumulative amount of other consideration the Plan Administrator claims had been received as of that date by the alleged Excess Payment Recipients by ISIN and blocking number (with payments in currencies other than U.S. dollars converted to U.S. dollars at the exchange rate on the date of payment); and (iv) the legal basis the Plan Administrator intends to rely on to support its claim(s) against the alleged Excess Payment Recipients.

(c)   Require the Plan Administrator to select four potential mediators from the Court's Register of Mediators and/or from JAMS' list of neutrals with a bankruptcy background, and authorize the alleged Excess Payment Recipients to strike up to three of those potential mediators;

(d)   Require the Plan Administrator to serve the Excess Payment ADR Package (i) via hand delivery or overnight mail only; (ii) with a copy simultaneously delivered via email if LBHI has email addresses associated

with the alleged Excess Payment Recipients; and (iv) where LBHI is aware that an alleged Excess Payment Recipient is represented by counsel, service must be made on counsel; and

  (e)  Grant MHSC such further relief as the Court deems just and proper.

| | |
|---|---|
| Dated: New York, New York<br>    September 29, 2020 | /s/ Mark A. Speiser<br>Mark A. Speiser<br>Claude G. Szyfer<br>Sherry J. Millman<br>Patrick N. Petrocelli<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038<br>Telephone: (212) 806-5400<br>Facsimile: (212) 806-6006<br>Email:  mspeiser@stroock.com<br>     cszyfer@stroock.com<br>     smillman@stroock.com<br>     ppetrocelli@stroock.com<br><br>*Attorneys for Mizuho Securities Co., Ltd.* |