WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
William A. Maher
Adam M. Bialek
Brant D. Kuehn

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.,*<br><br>Debtors. | **Chapter 11**<br><br>**Case No. 08-13555 (SCC)** |
| LEHMAN BROTHERS HOLDINGS INC.,<br><br>Plaintiff,<br><br>-against-<br><br>CORAL MORTGAGE BANKERS CORP. and GREEN LIGHT ADVANCE CORP., as successor to Coral Mortgage Bankers Corp.,<br><br>Defendants. | Adv. Proc. No. _____ |

**ADVERSARY COMPLAINT**

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), the Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), for its Complaint against Defendants Coral Mortgage Bankers Corp. ("Coral Mortgage") and Green Light Advance Corp., as successor to Coral Mortgage Bankers Corp. ("Green Light" and together with Defendant Coral Mortgage, "Defendants") alleges upon knowledge as to itself and its own conduct, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1. LBHI seeks to enforce its right to contractual indemnification for liabilities, losses, damages, claims, judgments and any other costs, fees and expenses LBHI incurred as a result of Defendant Coral Mortgage's sale and/or submission of defective mortgage loans in breach of Defendant Coral Mortgage's representations, warranties, obligations, and/or covenants and/or for which LBHI incurred liability due to Defendant Coral Mortgage's acts, failures to act and/or omissions (the "Defective Loans").

2. In reliance on Defendant Coral Mortgage's promises, covenants, and representations and warranties, LBHI securitized certain loans. In connection with the securitizations, which were marketed and sold to third-party investors, LBHI made certain representations and warranties regarding the quality and characteristics of certain of the loans that were coextensive with those made by Defendant Coral Mortgage. LBHI retained the right to seek indemnification from Defendant Coral Mortgage in the event it became liable for certain indemnification events. After the trustees for hundreds of trusts (the "RMBS Trustees") allegedly discovered that the mortgage loans breached certain of those representations and warranties, the RMBS Trustees filed claims in LBHI's bankruptcy case for losses suffered on certain loans. On

March 15, 2018, this Court entered the Order Estimating Allowed Claim Pursuant to RMBS Settlement (ECF No. 57785) (the "RMBS Order") resolving the majority of the claims. LBHI also settled several other RMBS Trustee claims as permitted by the Plan.[1]

3. By this action, LBHI seeks to recover money damages from Defendants for the indemnification claims.

## PARTIES

4. On September 15, 2008, Plaintiff LBHI commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. LBHI is a Delaware corporation with its principal place of business in New York, New York.

5. Defendant Coral Mortgage is an entity that, at all times relevant, is organized in and does business within the United States.

6. Defendant Green Light is an entity that, at all times relevant, is organized in and does business within the United States.

## JURISDICTION AND VENUE

7. This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

8. This Court has subject-matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334 and as the matter has a close nexus with the Plan, which was confirmed by Order of the Bankruptcy Court, dated December 6, 2011 (the "Confirmation Order"), and became effective on March 6, 2012. The Court has retained post-confirmation jurisdiction over this matter pursuant to section 14.1 of the Plan and paragraph 77 of the

---

[1] *See* RMBS Trust Settlement Agreement, entered into as of June 25, 2018, between LBHI and Wilmington Trust National Association; Allowed Proof of Claim numbers: 720000, 720001, 720002, 720003, 720004, 720005, 720006, 720007, 720008, 720009, 720010, 720011, 720012, 720013, 720014, 720015, 720016, 720017, 22773.04, 24792, 24810, 720020, 720025, 720021, 720024, 720022, 720023, 720018, 720019.

2

Confirmation Order.

9.    Venue is proper under 28 U.S.C. §§ 157(a), 1391, 1408, and 1409 because the claims arise out of pre-petition contracts and are asserted as part of the administration of the estate as set forth in the Plan, and because a substantial part of the acts or omissions giving rise to the claims occurred within the district, including the underlying agreements and loan transactions, and because the loss was suffered within the district.

10.   This Court has personal jurisdiction over Defendants under Rule 7004(f) of the Bankruptcy Rules. In addition, this Court has personal jurisdiction over Defendants because Defendants are organized in and do business within the United States, and because the transactions giving rise to this controversy occurred in the United States.

## FACTUAL BACKGROUND

11.   Prior to commencement of these case, LBHI engaged in the purchase and sale of mortgage loans directly or through affiliates, including Lehman Brothers Bank, FSB ("LBB"), then securitized the loans, which were then marketed and sold to third-party investors.

12.   At all relevant times, Defendant Coral Mortgage engaged in mortgage origination, as well as the sale of mortgage loans on the secondary market to entities such as LBB and LBHI.

### A.    The Governing Agreements

13.   This dispute arises out of Defendant Coral Mortgage's sale of residential mortgage loans to LBHI's assignor, LBB, under one or more the Loan Purchase Agreements with LBB (each an "LPA");[2] and Defendant Coral Mortgage's submission of residential mortgage loans to LBHI's assignor, LBB, under one or more Broker Agreements with LBB (each a "Broker Agreement").[3]

---

[2] Although the language of certain sections referenced throughout this Complaint may vary slightly from LPA to LPA, it is generally consistent in all material respects.

[3] The operative Broker Agreement for each of the Defective Loans is the version in effect at the time Defendant Coral Mortgage sold the loan to LBB. Although the language of certain sections referenced throughout this Complaint may

3

14. The dates of the relevant LPAs and Broker Agreements are listed in Exhibit A hereto.

15. The LPAs specifically incorporate the terms and conditions of the Seller's Guide of loan administrator, Aurora Loan Services LLC (the "Seller's Guide," together with the LPAs and Broker Agreements, the "Agreements") which sets forth additional duties and obligations of Defendant Coral Mortgage.[4] The Seller's Guide in its entirety is valid and binding on Defendant Coral Mortgage.

16. The Agreements set forth the duties and obligations of the parties with respect to the purchase and sale of mortgage loans, including but not limited to purchase price, delivery, and conveyance of the mortgage loans and mortgage loan documents.

17. The Agreements also set forth Defendant Coral Mortgage's duties and obligations regarding underwriting; representations and warranties concerning the parties and individual mortgage loans purchased, sold; and Defendant Coral Mortgage's indemnification obligations.

18. Pursuant to the Agreements, Defendant Coral Mortgage sold and/or submitted Defective Loans to LBB that resulted in LBHI being exposed to and incurring liability, as described further below.

19. The parties agreed that Defendant Coral Mortgage's obligations would extend to any subsequent purchasers and/or assignees, such as, in this case, LBHI. The Seller's Guide defines the "Purchaser" as LBB and, among others, its "successors and/or assigns." *See* Seller's Guide § 8.

---

vary slightly from Broker Agreement to Broker Agreement, it is generally consistent in all material respects.

[4] The operative Seller's Guide for each of the Defective Loans is the version in effect at the time the Defendant Coral Mortgage sold the loan to LBB. Although the language of certain sections referenced throughout this Complaint may vary slightly from Seller's Guide to Seller's Guide, it is generally consistent in all material respects.

4

20. The Broker Agreement provides that LBB as the "Lender, in its sole discretion, may assign this Agreement from time to time." *See e.g.,* Broker Agreement § 19.

21. In conjunction with the sale by LBB to LBHI of the Defective Loans, LBB assigned to LBHI all of its rights and remedies under the Agreements pertaining to the loans.

22. Further, the Seller's Guide provides that LBHI, as a subsequent holder of any mortgage loan, "shall be a third-party beneficiary" of the LPAs. *See* Seller's Guide § 711.

### B. Defendant Coral Mortgage's Representations Under the LPAs

23. Accordingly, LBHI as the "assignee" and third-party beneficiary of the LPAs, and as "subsequent holder" of the loans, is entitled to all the benefits of the Agreements, including the right to contractual indemnification for Defective Loans.

24. With respect to each of the loans sold to LBHI (as, among other things, LBB's assignee) under the LPA, Seller made a number of representations, warranties, and covenants concerning the quality, characteristics, and underwriting of the mortgage loans; the property securing the mortgage loans; and the borrowers.

25. Specific examples of Defendant Coral Mortgage's representations, warranties and covenants include, but are not limited to, the following:

> No document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading. Seller's Guide § 703(1).

> Seller . . . has duly and faithfully complied with and will continue to comply with: (i) all applicable laws, rules, regulations, decrees, pronouncements, directives, orders and contractual requirements with respect to the origination, closing, underwriting, processing and servicing of each Mortgage Loan  Seller's Guide § 703(8).

> The documents, instruments and agreements submitted for loan

5

underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud was committed in connection with the origination of the Mortgage Loan. The Seller has reviewed all of the documents constituting the Mortgage Loan File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein. Seller's Guide § 703(12).

There is no default, breach, violation or event of acceleration existing under the Mortgage or the Note and, no event has occurred or condition exists that, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration and neither Seller nor its predecessors has waived any default, breach, violation or event of acceleration. Seller's Guide § 703(18).

The Mortgage Loan has been originated and processed by Seller or Seller's correspondent in accordance with, and conforms with, the terms of this Seller's Guide and the Loan Purchase Agreement, and the Mortgage Loan has been underwritten in accordance with Underwriting Guidelines in effect as of the date of the Delivery Commitment applicable to the Mortgage Loan. The Mortgage Loan complies with all the requirements of the related Program Profile applicable to such Mortgage Loan  Seller's Guide § 703(21).

The Mortgaged Property is lawfully occupied under applicable law, unless properly disclosed to Purchaser.  All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property, or with respect to the use and occupancy of the same (including, without limitation, certificates of occupancy and fire underwriting certificates), have been made or obtained by Seller or Seller's correspondent from the appropriate authorities. The Mortgagor represented at the time of origination of the Mortgage Loan that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence, if applicable. Seller's Guide § 703(24).

Notwithstanding anything contained elsewhere in this Seller's Guide or the Loan Purchase Agreement, Seller hereby represents and warrants that all appraisals and other forms of real estate valuation conducted in connection with each Mortgage Loan comply with applicable federal and state law, including without limitation, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 as applicable, and the requirements of Fannie Mae or Freddie Mac and the Seller's Guide and were

6

conducted and delivered prior to approval of the Mortgage Loan application by either (i) in the case of an appraisal, by a qualified appraiser, duly appointed by the Seller, or (ii) a valuation method meeting the requirements of the Seller's Guide. The fair market value of the Mortgaged Property as indicated by the property appraisal or valuation is materially accurate. Any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property has no interest, direct or indirect, in the Mortgaged Property or in any security thereof. The compensation of any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property was not affected by the approval or disapproval of the Mortgage Loan. Seller's Guide § 703(36).

26. To the extent Defendant Coral Mortgage was also the underwriter of certain loans as permitted under the Seller's Guide or other applicable agreements, Defendant Coral Mortgage additionally represented, warranted and covenanted in Section 717(1) of the Seller's Guide that with respect to such loans:

> All underwriting performed by Seller hereunder shall be in strict compliance with the underwriting guidelines and product descriptions contained in the Seller's Guide and such other guidelines and requirements as may be provided to Seller in writing from time to time.

27. Defendant Coral Mortgage represented and/or warranted that they had the ability to perform their obligations under, and satisfy all requirements of, the LPA. *See* Seller's Guide § 702(5).

28. LBHI (as, among other things, LBB's assignee) relied upon the representations and warranties contained in the Agreements in purchasing the loans. Specifically, Section 701 of the Seller's Guide provides that:

> Seller acknowledges that Mortgage Loans are purchased in reliance upon: (i) the truth and accuracy of Seller's representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide, each of which representations and warranties relates to a matter material to such purchase; and (ii) Seller's compliance with each of the agreements, requirements, terms, covenants and conditions set forth in the Loan Purchase Agreement and this

7

Seller's Guide.

### C. Defendant Coral Mortgage's Indemnification Obligation Under the LPAs

29. Defendant Coral Mortgage agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses and expenses it might sustain as a result of the Defective Loans, including attorneys' fees. Section 711 of the Seller's Guide, entitled "Indemnification and Third Party Claims," provides, in pertinent part, as follows:

> In addition to any repurchase and cure obligations of Seller, . . . Seller shall indemnify Purchaser and Purchaser's designee (including, without limitation, any subsequent holder of any Note) from and hold them harmless against all claims, losses, damages, penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Purchaser may sustain in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement by any agent, employee, representative or officer of Seller or Seller's correspondent. In addition to any and all other obligations of Seller hereunder, Seller agrees that it shall pay the reasonable attorney's fees of Purchaser incurred in enforcing Seller's obligations hereunder . . . .

### D. Defendant Coral Mortgage's Representations Under the Broker Agreements

30. With respect to each of the loans submitted under the Broker Agreements, Defendant Coral Mortgage made a number of representations, warranties, and covenants concerning the quality, characteristics, and underwriting of the mortgage loans; the property securing the mortgage loans; and the borrowers of the mortgage loans.

31. Specific examples of Defendant Coral Mortgage's representations, warranties and covenants include, but are not limited to, the following:

> Broker has made diligent inquiry into all facts and circumstances in making the loan, including all material representations and warranties of the borrower, and to Broker's knowledge, none of the statements, information, or documentation included in the loan application, underwriting and closing packages contain any false or

8

> misleading statements or omit material facts necessary to make such statements accurate and not misleading. After review of the entire loan application package and closing documents . . . Broker has no knowledge of nor any reason to know of any fraudulent information or documentation present in the loan application package, closing documents or in the origination process used to generate the loan application package or closing documents. Broker Agreement § 8(g).

> Broker has no knowledge nor any reason to know of any circumstance or condition which might indicate that the appraisal is incomplete or inaccurate or that the value of the Property might not be at least the amount reported therein, or any circumstances or conditions with respect to the Property, the borrower or the borrower's credit that could reasonably be expected to cause private institutional investors to regard the loan as an unacceptable investment or cause the loan to become delinquent, or adversely affect the value or marketability of the loan. Broker Agreement § 8(h).

> Broker has complied with all terms, conditions, and requirements of Lender's Guidelines and this Agreement, and with Applicable Law relating to the loan application process. . . . Broker Agreement § 8(k).

32.     Defendant Coral Mortgage represented and/or warranted that it had the ability to perform its obligations under, and satisfy all requirements of, the Broker Agreement.

33.     Defendant Coral Mortgage agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses and expenses it might sustain as a result of the Defective Loans, including attorneys' fees. Section 9 of the Broker Agreement, entitled "Indemnification," provides, in pertinent part, as follows:

> In addition to Lender's rights and remedies under Applicable Law (whether arising at law or in equity), Broker shall indemnify and hold Lender, its successors and assigns, and their respective officers, directors, employees. shareholders, members, agents, contractors, affiliates and subsidiaries (collectively, the "Lender Indemnitees") harmless from and against, and shall reimburse Lender Indemnitees with respect to, any and all claims, demands, losses, damages, interest, penalties, fines, forfeitures, judgments and expenses (including, without limitation, reasonable fees and disbursements of counsel, and court costs) (any of the foregoing hereinafter referred

9

> to as a "Claim"), resulting from, relating to or arising out of, whether the result of negligent or intentional conduct or otherwise: (i) any breach of any representation or warranty made by Broker pursuant to this Agreement or Lender's Guidelines: (ii) any breach or failure to perform any covenant or obligation of Broker in this Agreement or Lender's Guidelines. . . .

34. The Broker Agreement also provides for the "prevailing party" to recover attorneys' fees incurred to enforce the Broker Agreement. Section 18 of the Broker Agreement, entitled "Attorneys' Fees," provides as follows:

> If any action or proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

### E. LBHI's Settlement with RMBS Trustees

35. When LBB acquired loans from Defendant Coral Mortgage and others, it typically did not permanently hold those loans on its books. The loans it acquired from Defendant Coral Mortgage and other entities, including Defective Loans, were sold to LBHI, and then packaged for securitization.

36. In connection with such securitizations, LBHI relied on information that Defendant Coral Mortgage provided to LBB, and it made representations and warranties to the securitization trusts, based in part, on the representations Defendant Coral Mortgage made to LBB.

37. The agreements governing the securitizations provide that the applicable RMBS Trustee may seek contractually defined repurchases of loans in the event certain breaches of representations and warranties occurred.

38. Eventually, the RMBS Trustees discovered breaches of representations, warranties and/or covenants in the Defective Loans.

10

39. The RMBS Trustees filed claims to recover for losses on the Defective Loans and other loans sold to LBB.

40. Many of the loans at issue in the claims, including the loans in Exhibit B, were alleged to contain defects which caused LBHI to incur losses, judgments, costs, expenses, attorneys' fees, and liability to the RMBS Trustees.

41. LBHI was forced to defend against such allegations and eventually settle with the RMBS Trustees.

42. LBHI entered into a settlement agreement with the RMBS Trustees, under which it agreed to seek an estimation of the liability underlying the claims in a proceeding before the Bankruptcy Court (the "Estimation Proceeding"). In that Estimation Proceeding, the RMBS Trustees sought damages of over $11.4 billion in damages based upon losses flowing from the at-issue loans. After the conclusion of the lengthy and highly-contested Estimation Proceeding, for which LBHI provided notice of that proceeding to Defendants, the Court entered the RMBS Order allowing a claim in favor of the RMBS Trustees. LBHI also settled several other RMBS Trustee claims in the course of business of its bankruptcy case as permitted by the Plan.[5]

43. LBHI incurred liability, expenses, costs, losses, judgments, and attorneys' fees to the RMBS Trustees as a result of defects, including, but not limited to, defects concerning the quality and characteristics of the loans, the creditworthiness of the borrowers, the characteristics of the collateral, the intended and actual occupancy status of the properties, compliance with appraisal standards and lending regulations, application of underwriting guidelines and the collection and review of the loan application and supporting documentation, and documentation deficiencies.

---

[5] *See* RMBS Trust Settlement Agreement, entered into as of June 25, 2018, between LBHI and Wilmington Trust National Association; Allowed Proof of Claim numbers: 720000, 720001, 720002, 720003, 720004, 720005, 720006, 720007, 720008, 720009, 720010, 720011, 720012, 720013, 720014, 720015, 720016, 720017, 22773.04, 24792, 24810, 720020, 720025, 720021, 720024, 720022, 720023, 720018, 720019.

11

44. LBHI made representations, warranties, obligations and/or covenants to the RMBS Trustees that were coextensive with those made by Defendant Coral Mortgage, and LBHI incurred liability to the RMBS Trustees as a result of Defendant Coral Mortgage's acts, failures, omissions, and breaches of its representations, warranties, obligations, and/or covenants.

### F.  Defendant Coral Mortgage's Obligation to Indemnify LBHI

45. Defendant Coral Mortgage agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses, attorneys' fees and expenses it might sustain as a result of the Defective Loans.  *See* Seller's Guide § 711; Broker Agreement § 9.

46. Pursuant to the Agreements, the laws of the State of New York govern this action.

47. All conditions precedent to bringing this action have been met, occurred or have been waived.

### G.  Defendant Green Light's Liability for Seller's Obligations

48. Defendant Green Light acquired Seller's business, including substantially all of its assets used in or necessary for the operation of the Seller's business (the "Acquisition").

49. Following the Acquisition, Seller's employees, offices, phone lines, websites and other requirements for doing business, along with its business operations, were transferred to Defendant Green Light.

50. As part of the Acquisition, Defendant Green Light assumed liabilities that were ordinarily necessary for the continuation of Seller's business operations.

51. Defendant Green Light continued Seller's enterprise, management, personnel, assets, branch locations, equipment, and general business operations.

52. Defendant Green Light required continued employment of many of Seller's employees and management as a condition of the Acquisition in order to continue the business operations of Seller immediately after the Acquisition.

53. The Acquisition was structured to disadvantage creditors such as LBHI, including inadequate cash consideration given for Seller's business, leaving Seller unable to satisfy its obligations to creditors, such as LBHI.

54. Under one or more theories of successor liability, Defendant Green Light is responsible for Seller's indemnification obligations to LBHI.

55. Prior to the Acquisition, Mark Lichtschein ("Lichtschein") was Seller's Chief Executive Officer.

56. After the Acquisition, Lichtschein became the president of Defendant Green Light.

### H. Allocation of Damages to Defendants

57. Defendants are responsible for their allocated share of the liability, expenses, costs, losses, judgments, and attorneys' fees incurred by LBHI to the RMBS Trustees as a result of loan defects including, but not limited to, defects concerning the quality and characteristics of the loans, the creditworthiness of the borrowers, the characteristics of the collateral, the intended and actual occupancy status of the properties, compliance with appraisal standards and lending regulations, application of underwriting guidelines and the collection and review of the loan application and supporting documentation, and documentation deficiencies.

58. With respect to the liability itself (excluding costs and fees), Defendants are liable for a portion of the $2.38 billion liability the Court fixed in 2018, not gross loan-level losses, allocated based on those loans that drove the liability fixed by the Court.

59. For these loans, the allocation is based on the four principal types of misrepresentation breaches (income, employment, occupancy and debt) that underlie the Court's $2.38 billion RMBS judgment in the Estimation Proceeding. To ensure that its allocation ties to only the strongest breach claims, LBHI excludes from that group loans that (i) performed for over three years following origination, (ii) had breaches supported only by evidence that LBHI

13

considers less reliable, or supported by insufficient evidence, including insufficient servicing records, and therefore failed to meet the burden of proof necessary to establish a breach, and (iii) were included in LBHI's RMBS claims solely based on missing "Documentation," because the Court attributed no liability to those types of claims.

60. Applying the criteria described above to LBHI's entire population of RMBS loans, including loans originated and brokered by entities not at issue in any current or past litigation, yields an aggregate liability of roughly $4.0 billion. This represents a discount of approximately 65% from the aggregate gross loan-level losses asserted by the RMBS Trustees. A further discount factor of approximately 41% of $4.0 billion brings that amount into line with the Court's $2.38 billion award and ensures that LBHI cannot collect more from the defendants, in the aggregate, than their allocable share of that amount.

61. In allocating that amount, LBHI applies this discount with certain immaterial adjustments in two circumstances: (i) in the RMBS settlement process, the RMBS Trustees sought approval from certificate holders in covered private label RMBS securitizations, but investors in one trust (SASCO 2006-4) opted out of the settlement, negotiated their claims separately, and ultimately reached a settlement that gave them an allowed claim of $70 million, or roughly twice what the trust would have received under the estimation settlement; and (ii) during the period between the RMBS settlement and the estimation hearing, several RMBS trusts collapsed and were granted allowed claims based upon a pro rata share of the initial $2.44 billion settlement in principal with certain institutional investors.

62. As it concerns Defendants specifically, Exhibit B attached hereto identifies each of the at-issue loans in connection with the RMBS Order, provides a non-exclusive list of the defects alleged by the RMBS Trustees on those loans, and sets forth Defendants' allocated indemnification

14

liability (excluding costs and fees). A general description of the defects identified in Exhibit B is included in Exhibit C attached hereto.

## FIRST CLAIM FOR RELIEF

**(Contractual Indemnification)**

63. LBHI hereby incorporates by reference the allegations set forth above as though fully set forth herein.

64. The Agreements are valid and enforceable contracts that are binding upon Defendants.

65. LBHI and/or LBB has substantially performed all of their obligations under the Agreements.

66. Defendants owe LBHI indemnity for its liabilities, losses, claims, attorneys' fees, judgments and any other costs, fees and expenses as to the Defective Loans.

67. Seller's breaches of the Agreements and other acts and/or omissions as to the Defective Loans resulted in LBHI incurring liability and/or losses in an amount to be determined at trial, plus prejudgment interest pursuant to New York law, attorneys' fees, litigation costs, and all other fees and costs provided by the Agreements.

## PRAYER FOR RELIEF

WHEREFORE, LBHI respectfully requests that this Court enter judgment in its favor and against Defendants:

a)     For all damages arising from or relating to the obligations of Defendants under the indemnification provisions of the Agreements, in an amount to be determined at trial;

b)     For recoverable interest;

c)     For the costs and expenses incurred by LBHI in enforcing the obligations of Defendants under the Agreements, including attorneys' fees and costs and any expert witness fees incurred in litigation; and

d)     Providing for such other relief as the Court deems just and proper.

Dated: New York, New York
         March 5, 2021

*/s/ William A. Maher*

William A. Maher
Adam M. Bialek
Brant D. Kuehn

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050

*Counsel for Lehman Brothers Holdings Inc.*

16