WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
William A. Maher
Adam M. Bialek
Brant D. Kuehn

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.,*<br><br>  Debtors. | Chapter 11<br><br>Case No. 08-13555 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC.,<br><br>  Plaintiff,<br><br>-against-<br><br>SECURITY PACIFIC HOME LOANS, SKYLINE FINANCIAL CORP., as successor to Security Pacific Home Loans, and FINANCE OF AMERICA MORTGAGE LLC, as successor to Security Pacific Home Loans,<br><br>  Defendants. | Adv. Proc. No. _____ |

**ADVERSARY COMPLAINT**

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), the Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), for its Complaint against Defendant Security Pacific Home Loans ("Defendant Security Pacific" or "Seller") and Skyline Financial Corp., as successor to Security Pacific Home Loans ("Defendant Skyline"), and Finance Of America Mortgage LLC, as successor to Security Pacific Home Loans ("Defendant FOA" and together with Defendant Security Pacific and Defendant Skyline, "Defendants") alleges upon knowledge as to itself and its own conduct, and upon information and belief as to all other matters, as follows:

**NATURE OF ACTION**

1.      LBHI seeks to enforce its right to contractual indemnification for liabilities, losses, damages, claims, judgments and any other costs, fees and expenses LBHI incurred as a result of Defendant Security Pacific's sale of defective mortgage loans in breach of Defendant Security Pacific's representations, warranties, obligations, and/or covenants and/or for which LBHI incurred liability due to Defendants' acts, failures to act and/or omissions (the "Defective Loans").

2.      In reliance on Defendant Security Pacific's promises, covenants, and representations and warranties, LBHI securitized certain loans. In connection with the securitizations, which were marketed and sold to third-party investors, LBHI made certain representations and warranties regarding the quality and characteristics of certain of the loans that were coextensive with those made by Defendant Security Pacific. LBHI retained the right to seek indemnification from Defendant Security Pacific in the event it became liable for certain indemnification events.  After the trustees for hundreds of trusts (the "RMBS Trustees") allegedly discovered that the mortgage loans breached certain of those representations and warranties, the RMBS Trustees filed claims in LBHI's bankruptcy case for losses suffered on certain loans. On

March 15, 2018, this Court entered the Order Estimating Allowed Claim Pursuant to RMBS Settlement (ECF No. 57785) (the "RMBS Order") resolving the majority of the claims. LBHI also settled several other RMBS Trustee claims as permitted by the Plan.[1]

3. By this action, LBHI seeks to recover money damages from Defendants for the indemnification claims.

## PARTIES

4. On September 15, 2008, Plaintiff LBHI commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. LBHI is a Delaware corporation with its principal place of business in New York, New York.

5. Defendant Security Pacific is an entity that, at all times relevant, is organized in and does business within the United States.

6. Defendant Skyline is an entity that, at all times relevant, is organized in and does business within the United States.

7. Defendant FOA is an entity that, at all times relevant, is organized in and does business within the United States.

## JURISDICTION AND VENUE

8. This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

9. This Court has subject-matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334 and as the matter has a close nexus with the Plan, which was confirmed by Order of the Bankruptcy Court, dated December 6, 2011 (the "Confirmation

---

[1] *See* RMBS Trust Settlement Agreement, entered into as of June 25, 2018, between LBHI and Wilmington Trust National Association; Allowed Proof of Claim numbers: 720000, 720001, 720002, 720003, 720004, 720005, 720006, 720007, 720008, 720009, 720010, 720011, 720012, 720013, 720014, 720015, 720016, 720017, 22773.04, 24792, 24810, 720020, 720025, 720021, 720024, 720022, 720023, 720018, 720019.

2

Order"), and became effective on March 6, 2012. The Court has retained post-confirmation jurisdiction over this matter pursuant to section 14.1 of the Plan and paragraph 77 of the Confirmation Order.

10. Venue is proper under 28 U.S.C. §§ 157(a), 1391, 1408, and 1409 because the claims arise out of pre-petition contracts and are asserted as part of the administration of the estate as set forth in the Plan, and because a substantial part of the acts or omissions giving rise to the claims occurred within the district, including the underlying agreements and loan transactions, and because the loss was suffered within the district.

11. This Court has personal jurisdiction over Defendants under Rule 7004(f) of the Bankruptcy Rules. In addition, this Court has personal jurisdiction over Defendants because Defendants are organized in and do business within the United States, and because the transactions giving rise to this controversy occurred in the United States.

## FACTUAL BACKGROUND

12. Prior to commencement of these case, LBHI engaged in the purchase and sale of mortgage loans directly or through affiliates, including Lehman Brothers Bank, FSB ("LBB"), then securitized the loans, which were then marketed and sold to third-party investors.

13. At all relevant times, Defendant Security Pacific engaged in mortgage origination, as well as the sale of mortgage loans on the secondary market to entities such as LBB and LBHI.

### A. The Governing Agreements

14. This dispute arises out of Defendant Security Pacific's sale of residential mortgage loans to LBHI's assignor, LBB, under one or more the Loan Purchase Agreements with LBB (each an "LPA").[2]

---

[2] Although the language of certain sections referenced throughout this Complaint may vary slightly from LPA to LPA, it is generally consistent in all material respects.

3

15. The dates of the relevant LPAs are listed in Exhibit A hereto.

16. The LPAs specifically incorporate the terms and conditions of the Seller's Guide of loan administrator, Aurora Loan Services LLC (the "<u>Seller's Guide</u>," together with the LPAs, the "<u>Agreements</u>") which sets forth additional duties and obligations of Defendant Security Pacific.[3] The Seller's Guide in its entirety is valid and binding on Defendant Security Pacific.

17. The Agreements set forth the duties and obligations of the parties with respect to the purchase and sale of mortgage loans, including but not limited to purchase price, delivery, and conveyance of the mortgage loans and mortgage loan documents.

18. The Agreements also set forth Defendant Security Pacific's duties and obligations regarding underwriting; representations and warranties concerning the parties and individual mortgage loans purchased, sold; and Defendant Security Pacific's indemnification obligations.

19. Pursuant to the Agreements, Defendant Security Pacific sold Defective Loans to LBB that resulted in LBHI being exposed to and incurring liability, as described further below.

20. The parties agreed that Defendant Security Pacific's obligations would extend to any subsequent purchasers and/or assignees, such as, in this case, LBHI. The Seller's Guide defines the "Purchaser" as LBB and, among others, its "successors and/or assigns." *See* Seller's Guide § 8.

21. In conjunction with the sale by LBB to LBHI of the Defective Loans, LBB assigned to LBHI all of its rights and remedies under the Agreements pertaining to the loans.

22. Further, the Seller's Guide provides that LBHI, as a subsequent holder of any mortgage loan, "shall be a third-party beneficiary" of the LPAs. *See* Seller's Guide § 711.

---

[3] The operative Seller's Guide for each of the Defective Loans is the version in effect at the time Defendant Security Pacific sold the loan to LBB. Although the language of certain sections referenced throughout this Complaint may vary slightly from Seller's Guide to Seller's Guide, it is generally consistent in all material respects.

4

23. Accordingly, LBHI as the "assignee" and third-party beneficiary of the LPAs, and as "subsequent holder" of the loans, is entitled to all the benefits of the Agreements, including the right to contractual indemnification for Defective Loans.

### B. Defendant Security Pacific's Representations Under the LPAs

24. With respect to each of the loans sold to LBHI (as, among other things, LBB's assignee) under the LPA, Defendant Security Pacific made a number of representations, warranties, and covenantsconcerning the quality, characteristics, and underwriting of the mortgage loans; the property securing the mortgage loans; and the borrowers.

25. Specific examples of Defendant Security Pacific's representations, warranties and covenants include, but are not limited to, the following:

> No document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading. Seller's Guide § 703(1).

> Seller . . . has duly and faithfully complied with and will continue to comply with: (i) all applicable laws, rules, regulations, decrees, pronouncements, directives, orders and contractual requirements with respect to the origination, closing, underwriting, processing and servicing of each Mortgage Loan  Seller's Guide § 703(8).

> The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud was committed in connection with the origination of the Mortgage Loan. The Seller has reviewed all of the documents constituting the Mortgage Loan File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein. Seller's Guide § 703(12).

> There is no default, breach, violation or event of acceleration existing under the Mortgage or the Note and, no event has occurred or condition exists that, with the passage of time or with notice and

5

the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration and neither Seller nor its predecessors has waived any default, breach, violation or event of acceleration.  Seller's Guide § 703(18).

The Mortgage Loan has been originated and processed by Seller or Seller's correspondent in accordance with, and conforms with, the terms of this Seller's Guide and the Loan Purchase Agreement, and the Mortgage Loan has been underwritten in accordance with Underwriting Guidelines in effect as of the date of the Delivery Commitment applicable to the Mortgage Loan. The Mortgage Loan complies with all the requirements of the related Program Profile applicable to such Mortgage Loan  Seller's Guide § 703(21).

The Mortgaged Property is lawfully occupied under applicable law, unless properly disclosed to Purchaser.  All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property, or with respect to the use and occupancy of the same (including, without limitation, certificates of occupancy and fire underwriting certificates), have been made or obtained by Seller or Seller's correspondent from the appropriate authorities. The Mortgagor represented at the time of origination of the Mortgage Loan that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence, if applicable. Seller's Guide § 703(24).

Notwithstanding anything contained elsewhere in this Seller's Guide or the Loan Purchase Agreement, Seller hereby represents and warrants that all appraisals and other forms of real estate valuation conducted in connection with each Mortgage Loan comply with applicable federal and state law, including without limitation, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 as applicable, and the requirements of Fannie Mae or Freddie Mac and the Seller's Guide and were conducted and delivered prior to approval of the Mortgage Loan application by either (i) in the case of an appraisal, by a qualified appraiser, duly appointed by the Seller, or (ii) a valuation method meeting the requirements of the Seller's Guide. The fair market value of the Mortgaged Property as indicated by the property appraisal or valuation is materially accurate. Any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property has no interest, direct or indirect, in the Mortgaged Property or in any security thereof. The compensation of any appraiser, inspector or other real estate professional engagedin the valuation of the Mortgaged Property was not affected by the approval or disapproval of the Mortgage Loan. Seller's Guide §

6

703(36).

26. To the extent Defendant Security Pacific was also the underwriter of certain loans as permitted under the Seller's Guide or other applicable agreements, Defendant Security Pacific additionally represented, warranted and covenanted in Section 717(1) of the Seller's Guide that with respect to such loans:

> All underwriting performed by Seller hereunder shall be in strict compliance with the underwriting guidelines and product descriptions contained in the Seller's Guide and such other guidelines and requirements as may be provided to Seller in writing from time to time.

27. Defendant Security Pacific represented and/or warranted that it had the ability to perform its obligations under, and satisfy all requirements of, the LPA. *See* Seller's Guide § 702(5).

28. LBHI (as, among other things, LBB's assignee) relied upon the representations and warranties contained in the Agreements in purchasing the loans. Specifically, Section 701 of the Seller's Guide provides that:

> Seller acknowledges that Mortgage Loans are purchased in reliance upon: (i) the truth and accuracy of Seller's representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide, each of which representations and warranties relates to a matter material to such purchase; and (ii) Seller's compliance with each of the agreements, requirements, terms, covenants and conditions set forth in the Loan Purchase Agreement and this Seller's Guide.

**C.    Defendant Security Pacific's Indemnification Obligation Under the LPAs**

29. Defendant Security Pacific agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses and expenses they might sustain as a result of the Defective Loans, including attorneys' fees. Section 711 of the Seller's Guide, entitled "Indemnification and Third Party Claims," provides, in pertinent part, as follows:

7

> In addition to any repurchase and cure obligations of Seller, . . . Seller shall indemnify Purchaser and Purchaser's designee (including, without limitation, any subsequent holder of any Note) from and hold them harmless against all claims, losses, damages, penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Purchaser may sustain in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement by any agent, employee, representative or officer of Seller or Seller's correspondent. In addition to any and all other obligations of Seller hereunder, Seller agrees that it shall pay the reasonable attorney's fees of Purchaser incurred in enforcing Seller's obligations hereunder . . . .

### D.     LBHI's Settlement with RMBS Trustees

30. When LBB acquired loans from Defendant Security Pacific and others, it typically did not permanently hold those loans on its books. The loans it acquired from Defendant Security Pacific and other entities, including Defective Loans, were sold to LBHI, and then packaged for securitization.

31. In connection with such securitizations, LBHI relied on information that Defendant Security Pacific provided to LBB, and it made representations and warranties to the securitization trusts, based in part, on the representations Defendant Security Pacific made to LBB.

32. The agreements governing the securitizations provide that the applicable RMBS Trustee may seek contractually defined repurchases of loans in the event certain breaches of representations and warranties occurred.

33. Eventually, the RMBS Trustees discovered breaches of representations, warranties and/or covenants in the Defective Loans.

34. The RMBS Trustees filed claims to recover for losses on the Defective Loans and other loans sold to LBB.

35. Many of the loans at issue in the claims, including the loans in Exhibit B, were

8

alleged to contain defects which caused LBHI to incur losses, judgments, costs, expenses, attorneys' fees, and liability to the RMBS Trustees.

36. LBHI was forced to defend against such allegations and eventually settle with the RMBS Trustees.

37. LBHI entered into a settlement agreement with the RMBS Trustees, under which it agreed to seek an estimation of the liability underlying the claims in a proceeding before the Bankruptcy Court (the "Estimation Proceeding"). In that Estimation Proceeding, the RMBS Trustees sought damages of over $11.4 billion in damages based upon losses flowing from the at-issue loans. After the conclusion of the lengthy and highly-contested Estimation Proceeding, for which LBHI provided notice of that proceeding to Defendants, the Court entered the RMBS Order allowing a claim in favor of the RMBS Trustees. LBHI also settled several other RMBS Trustee claims in the course of business of its bankruptcy case as permitted by the Plan.[4]

38. LBHI incurred liability, expenses, costs, losses, judgments, and attorneys' fees to the RMBS Trustees as a result of defects, including, but not limited to, defects concerning the quality and characteristics of the loans, the creditworthiness of the borrowers, the characteristics of the collateral, the intended and actual occupancy status of the properties, compliance with appraisal standards and lending regulations, application of underwriting guidelines and the collection and review of the loan application and supporting documentation, and documentation deficiencies.

39. LBHI made representations, warranties, obligations and/or covenants to the RMBS Trustees that were coextensive with those made by Defendant Security Pacific, and LBHI incurred liability to the RMBS Trustees as a result of Defendant Security Pacific's acts, failures, omissions,

---

[4] *See* RMBS Trust Settlement Agreement, entered into as of June 25, 2018, between LBHI and Wilmington Trust National Association; Allowed Proof of Claim numbers: 720000, 720001, 720002, 720003, 720004, 720005, 720006, 720007, 720008, 720009, 720010, 720011, 720012, 720013, 720014, 720015, 720016, 720017, 22773.04, 24792, 24810, 720020, 720025, 720021, 720024, 720022, 720023, 720018, 720019.

9

and breaches of its representations, warranties, obligations, and/or covenants.

### E. Defendant Security Pacific's Obligation to Indemnify LBHI

40. Defendant Security Pacific agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses, attorneys' fees and expenses it might sustain as a result of the Defective Loans. *See* Seller's Guide § 711.

41. Pursuant to the Agreements, the laws of the State of New York govern this action.

42. All conditions precedent to bringing this action have been met, occurred or have been waived.

### F. Defendant Skyline and Defendant FOA's Liability for Seller's Obligations

43. Defendant Skyline acquired Seller's business, including substantially all of its assets used in or necessary for the operation of the Seller's business (the "Security Pacific Acquisition").

44. Following the Security Pacific Acquisition, Seller's employees, offices, phone lines, websites and other requirements for doing business, along with its business operations, were transferred to Defendant Skyline.

45. As part of the Security Pacific Acquisition, Defendant Skyline assumed liabilities that were ordinarily necessary for the continuation of Seller's business operations.

46. Defendant Skyline continued Seller's enterprise, management, personnel, assets, branch locations, equipment, and general business operations.

47. Defendant Skyline required continued employment of many of Seller's employees and management as a condition of the Security Pacific Acquisition in order to continue the business operations of Seller immediately after the Security Pacific Acquisition.

48. The Security Pacific Acquisition was structured to disadvantage creditors such as LBHI, including inadequate cash consideration given for Seller's business, leaving Seller unable to satisfy its obligations to creditors, such as LBHI.

49. Under one or more theories of successor liability, Defendant Skyline is responsible for Seller's indemnification obligations to LBHI.

50. In 2018, Defendant Skyline was acquired by, or merged with, Defendant FOA (the "Skyline Acquisition"), by which Defendant FOA acquired Defendant's Skyline's business, including substantially all of its assets used in or necessary for the operation of the Defendant Skyline's business.

51. Following the Skyline Acquisition, Defendant Skyline's employees, offices, phone lines, websites and other requirements for doing business, along with its business operations, were transferred to Defendant FOA.

52. As part of the FOA Acquisition, Defendant FOA assumed liabilities that were ordinarily necessary for the continuation of Defendant Skyline's business operations.

53. Defendant FOA continued Defendant Skyline's enterprise, management, personnel, assets, branch locations, equipment, and general business operations.

54. Defendant FOA required continued employment of many of Defendant Skyline's employees and management as a condition of the Skyline Acquisition in order to continue the business operations of Defendant Skyline immediately after the Skyline Acquisition.

55. The Skyline Acquisition was structured to disadvantage creditors such as LBHI, including inadequate cash consideration given for Defendant Skyline's business, leaving Defendant Skyline unable to satisfy its obligations to creditors, such as LBHI.

11

56. Under one or more theories of successor liability, Defendant FOA is responsible for Defendant Skyline's indemnification obligations to LBHI.

57. Prior to the Security Pacific Acquisition, Nectar Kalajian ("Kalajian"), Seller's founder, served as the company's President and Chief Operating Officer.

58. Following the Security Pacific Acquisition, Kalajian served as the Chief Operating Officer at Defendant Skyline.

59. Following the Skyline Acquisition, Kalajian now serves as the Senior Vice President of Defendant FOA since April of 2020.

60. Bill Dallas ("Dallas") filed Seller's Articles of Incorporation with the California Secretary of State on June 27, 2006.

61. In May 2009, Dallas' equity firm, Dallas Capital, invested $1.5 million for control of Defendant Skyline.

62. Prior to FOA's acquisition of Skyline, Dallas served as Chief Executive Officer of Skyline.

63. Following the Skyline Acquisition, Dallas became President of Defendant FOA.

64. According to the Nationwide Multistate Licensing System and Registry ("NMLS") database, Skyline's prior trade names include: Security Pacific Home Loans; Skyline Funding; and Skyline Home Loans.

### G. Allocation of Damages to Defendants

65. Defendants are responsible for their allocated share of the liability, expenses, costs, losses, judgments, and attorneys' fees incurred by LBHI to the RMBS Trustees as a result of loan defects including, but not limited to, defects concerning the quality and characteristics of the loans, the creditworthiness of the borrowers, the characteristics of the collateral, the intended and actual occupancy status of the properties, compliance with appraisal standards and lending regulations,

application of underwriting guidelines and the collection and review of the loan application and supporting documentation, and documentation deficiencies.

66. With respect to the liability itself (excluding costs and fees), Defendants are liable for a portion of the $2.38 billion liability the Court fixed in 2018, not gross loan-level losses, allocated based on those loans that drove the liability fixed by the Court.

67. For these loans, the allocation is based on the four principal types of misrepresentation breaches (income, employment, occupancy and debt) that underlie the Court's $2.38 billion RMBS judgment in the Estimation Proceeding. To ensure that its allocation ties to only the strongest breach claims, LBHI excludes from that group loans that (i) performed for over three years following origination, (ii) had breaches supported only by evidence that LBHI considers less reliable, or supported by insufficient evidence, including insufficient servicing records, and therefore failed to meet the burden of proof necessary to establish a breach, and (iii) were included in LBHI's RMBS claims solely based on missing "Documentation," because the Court attributed no liability to those types of claims.

68. Applying the criteria described above to LBHI's entire population of RMBS loans, including loans originated and brokered by entities not at issue in any current or past litigation, yields an aggregate liability of roughly $4.0 billion. This represents a discount of approximately 65% from the aggregate gross loan-level losses asserted by the RMBS Trustees. A further discount factor of approximately 41% of $4.0 billion brings that amount into line with the Court's $2.38 billion award and ensures that LBHI cannot collect more from the defendants, in the aggregate, than their allocable share of that amount.

69. In allocating that amount, LBHI applies this discount with certain immaterial adjustments in two circumstances: (i) in the RMBS settlement process, the RMBS Trustees sought

13

approval from certificate holders in covered private label RMBS securitizations, but investors in one trust (SASCO 2006-4) opted out of the settlement, negotiated their claims separately, and ultimately reached a settlement that gave them an allowed claim of $70 million, or roughly twice what the trust would have received under the estimation settlement; and (ii) during the period between the RMBS settlement and the estimation hearing, several RMBS trusts collapsed and were granted allowed claims based upon a pro rata share of the initial $2.44 billion settlement in principal with certain institutional investors.

70. As it concerns Defendants specifically, Exhibit B attached hereto identifies each of the at-issue loans in connection with the RMBS Order, provides a non-exclusive list of the defects alleged by the RMBS Trustees on those loans, and sets forth Defendants' allocated indemnification liability (excluding costs and fees). A general description of the defects identified in Exhibit B is included in Exhibit C attached hereto.

### FIRST CLAIM FOR RELIEF
### (Contractual Indemnification)

71. LBHI hereby incorporates by reference the allegations set forth above as though fully set forth herein.

72. The Agreements are valid and enforceable contracts that are binding upon Defendants.

73. LBHI and/or LBB has substantially performed all of their obligations under the Agreements.

74. Defendants owe LBHI indemnity for its liabilities, losses, claims, attorneys' fees, judgments and any other costs, fees and expenses as to the Defective Loans.

75. Defendant Security Pacific's breaches of the Agreements and other acts and/or omissions as to the Defective Loans resulted in LBHI incurring liability and/or losses in an amount

14

to be determined at trial, plus prejudgment interest pursuant to New York law, attorneys' fees, litigation costs, and all other fees and costs provided by the Agreements.

**PRAYER FOR RELIEF**

WHEREFORE, LBHI respectfully requests that this Court enter judgment in its favor and against Defendants:

a) For all damages arising from or relating to the obligations of Defendants under the indemnification provisions of the Agreements, in an amount to be determined at trial;

b) For recoverable interest;

c) For the costs and expenses incurred by LBHI in enforcing the obligations of Defendants under the Agreements, including attorneys' fees and costs and any expert witness fees incurred in litigation; and

d) Providing for such other relief as the Court deems just and proper.

Dated: New York, New York
March 5, 2021

*/s/ William A. Maher*

William A. Maher
Adam M. Bialek
Brant D. Kuehn

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050

*Counsel for Lehman Brothers Holdings Inc.*

16